IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00-697C |
| v. | ) | (Senior Judge Merow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Phone: (202) 305-9640
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

June 4, 2004

Attorneys for Defendant

TABLE OF CONTENTS

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE COURT CANNOT DETERMINE THE APPROPRIATE BASIS FOR ASSESSING LIABILITY ABSENT REFERENCE TO THE GOVERNMENT'S PENDING RATE MOTION . . . . . . . . . . . . . . . . . . . . . . . 2

A. DOE's January 31, 1998 Partial Breach As To All Contract Holders Does Not Provide An Adequate Legal Basis For A Liability Determination As To Any Particular Contract Holder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Because Plaintiff Obtained An Approved Delivery Commitment Schedule Requiring Acceptance Of Specific Spent Nuclear Fuel Amounts During The Period From January 31, 1998 Through January 30, 1999, DOE's Failure To Accept That Spent Nuclear Fuel From Plaintiff By January 30, 1999 Establishes The Proper Basis For Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C. With All Due Respect, Decisions From This Court Questioning The Effect Of The DCS Process Have Rendered The Schedule Terms Of The Standard Contract Irrelevant, In Violation Of Contract Interpretation Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. IF THE COURT ADOPTS THE PLAINTIFF'S ARGUMENT THAT THE DCS PROVISIONS OF THE STANDARD CONTRACT ARE RENDERED MEANINGLESS, THE STANDARD CONTRACT IS SIMPLY TOO INDEFINITE TO ENFORCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . 18

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) . . . . . . . . . . 16

City of Tacoma, Department of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . 18

Commonwealth Edison Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . 12

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . 13, 14

Cosmo Construction Co. v. United States,
196 Ct. C 451 F.2d 602 (1971) . . . . . . . . . . 5

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . 18

David Nassif Associates v. United States,
214 Ct. C 557 F.2d 249 (1977) . . . . . . . . . . 15, 17

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . 13

Hometown Financial, Inc. v. United States,
53 Fed. Cl. 326 (2002) . . . . . . . . . . 4

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 2

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . 18

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . 16

Modern System Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Northern States Power Co. v. United States,
224 F.3d 1361 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Puritan Assocs. v. United States,
215 Ct. Cl. 976, 978 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. Apr. 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tennessee Valley Authority v. United States,
No. 01-249C (Fed. Cl. June 2, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Transamerica Equipment Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Winstar Corp. v. United States,
21 Cl. Ct. 112 (1990), aff'd, 64 F.3d 1531
(Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 4

Wisconsin Knife Works v. National Metal Crafters,
781 F.2d 1280 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl. June 26, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FEDERAL STATUTES AND REGULATIONS

10 C.F.R. § 961.11, Art. V.B . . . . . . . . . . 6

10 C.F.R. § 961.11, Art. VI.B.1 . . . . . . . . . . 7

10 C.F.R. § 961.11, Art. IV.B.5.b . . . . . . . . . . 7, 8

10 C.F.R. § 961.11, Art. IV.B.5.a . . . . . . . . . . 8

10 C.F.R. § 961.11, Art. V.B.1 . . . . . . . . . . 8, 9, 10

10 C.F.R. § 961.11, Art. V.B.2 . . . . . . . . . . 8, 9

10 C.F.R. § 961.11, Appendix C . . . . . . . . . . 9

10 C.F.R. § 961.11, Art. II . . . . . . . . . . 9, 10

10 C.F.R. § 961.11, Art. XVI.A . . . . . . . . . . 10, 11

Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270 . . . . . . . . . . 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00-697C |
| v. | ) | (Senior Judge Merow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

Pursuant to RCFC 56, defendant, the United States, respectfully opposes the motion for summary judgment on liability ("liability motion") filed by plaintiff, Wisconsin Electric Power Company, upon the grounds that plaintiff is not entitled to judgment as a matter of law. In support of our response, we refer the Court to "Defendant's Motion For Partial Summary Judgment Regarding The Rate Of Spent Nuclear Fuel Acceptance," filed November 28, 2001 ("rate motion"). To determine whether the Department of Energy ("DOE") is liable to any particular utility for contract damages, and to determine the scope of that liability, the Court must first resolve the issues presented in our rate motion regarding the rate of spent nuclear fuel acceptance.

STATEMENT OF THE ISSUE

Whether the Court can determine the Government's liability to plaintiff without identifying the appropriate basis upon which to impose liability.

# ARGUMENT

## I. THE COURT CANNOT DETERMINE THE APPROPRIATE BASIS FOR ASSESSING LIABILITY ABSENT REFERENCE TO THE GOVERNMENT'S PENDING RATE MOTION

### A. DOE's January 31, 1998 Partial Breach As To All Contract Holders Does Not Provide An Adequate Legal Basis For A Liability Determination As To Any Particular Contract Holder

In its liability motion, plaintiff contends that the United States Court of Appeals for the Federal Circuit's holdings in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), and Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000), mandate a liability finding against the Government. See liability motion at 4. As the Court is well aware, in our August 15, 2001 filing, we acknowledged that, in light of those two decisions and others, "DOE's inability to begin the services to be provided by the Standard Contract by January 31, 1998 constituted a partial breach of the Standard Contract." Defendant's Response to the Court's July 24, 2001 Order (August 15, 2001) at 2-3 (emphasis added). However, the Government is not willing to concede that the January 31, 1998 partial breach constitutes the breach of a duty or obligation to any one particular contract holder necessary to impose liability in a particular case. In fact, the January 31, 1998 partial breach, in and of itself, does not create liability to any particular contract holder because there is no direct causal connection between that breach and the damages alleged to have been incurred by any particular contract holder.

The January 31, 1998 deadline for beginning acceptance of spent nuclear fuel and/or high-level radioactive waste (collectively, "SNF") under the Standard Contract was not a deadline that required DOE to begin accepting some SNF from each and every contract holder by

January 31, 1998. Instead, that January 31, 1998 deadline was a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole. A particular contract holder could not have suffered any injury simply as a result of DOE's failure to begin acceptance of SNF from the commercial nuclear utility contract holders in the aggregate by January 31, 1998, under the program created pursuant to the Nuclear Waste Policy Act. This is the reason that the finding in Maine Yankee of a partial breach as to "the entire nuclear industry" does not mandate a finding of liability to any particular contract holder. Instead, any injury that a particular contract holder incurred would need to result from DOE's actual failure to accept its specific SNF according to commitments to accept specific SNF upon specific dates made under the contract mechanism for creating such commitments.

The dispute between the parties as to the nature of the schedule upon which the parties agreed is the central "schedule issue" that has been the focus of discovery and the subject of the Government's rate motion in this case. Essentially, that dispute is a recognition that neither of the parties has conceded the central issue of liability – the nature of the breach of duty or obligation upon which plaintiff bases its alleged damages. By urging the Court to accept the January 31, 1998 partial breach as the basis for a liability ruling, plaintiff is asking the Court to sidestep the very question upon which it has been called to answer through the Government's rate motion.

In its rate motion, the Government does not attempt to establish a method of assessing damages. Instead, we identified a method of determining, according to the terms of the Standard Contract, whether DOE made "binding commitments" to particular contract holders regarding "the rate and order of SNF and/or HLW acceptance," and the nature of those commitments in

terms of the amount of fuel that DOE had committed to accept from a particular contract holder and by what date. See rate motion at 10-14. Only when that determination is made will the Court be able to determine the scope and extent of DOE's liability in any particular case, and only then will the Court be able to determine whether there will be a causal connection between the damages plaintiff alleges to have incurred and any breaches of acceptance commitments.

Plaintiff's argument that it is entitled to a liability ruling based simplistically upon the Government's acknowledgment of the January 31, 1998 partial breach date also ignores the traditional requirement that a plaintiff must show some resulting injury from the identified breach before obtaining a ruling on liability. Plaintiff relies upon Judge Firestone's opinion in Hometown Financial, Inc. v. United States, 53 Fed. Cl. 326, 338 (2002), as support for its contention that the issue of causation of an injury in fact is not necessary to the granting of a partial summary judgment on liability, and, instead, may be reserved to the damages phase of the proceedings. Liability motion at 5. However, there is ample authority to the contrary.

It is well-settled that a judgment on the issue of liability should not be based upon a finding of breach alone. See Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280, 1289 (7th Cir. 1986)(in which Judge Posner stated that "causation is an essential element of liability"); see also The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)" (italics in original)); Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d

1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). The Court of Claims has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . .

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469 n.3, 451 F.2d 602, 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). In an action bifurcated as to entitlement and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the entitlement phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Id. at 469-70, 451 F.2d at 605-06 (emphasis in original). Plaintiff has not provided the Court with any explanation of how DOE's failure to begin acceptance of SNF from any one of a number of contract holders in the nuclear power industry as a whole on January 31, 1998 has resulted in damages to plaintiff or a breach of a performance obligation running directly to plaintiff under its specific contract.

B. Because Plaintiff Obtained An Approved Delivery Commitment Schedule Requiring Acceptance Of Specific Spent Nuclear Fuel Amounts During The Period From January 31, 1998 Through January 30, 1999, DOE's Failure To Accept That Spent Nuclear Fuel From Plaintiff By January 30, 1999 Establishes The Proper Basis For Liability

Notwithstanding the foregoing discussion, we acknowledge that plaintiff obtained an approved delivery commitment schedule ("DCS") through which DOE agreed to accept specific amount of SNF from plaintiff at some point between January 31, 1998 and January 30, 1999. It is that approved DCS that forms the basis of any initial liability finding against DOE.

As explained in our rate motion, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. As this Court has recently recognized, the Standard Contract "establishes a definite and detailed procedure that the parties agreed to employ to determine the applicable rate of [SNF] acceptance." Tennessee Valley Auth. v. United States, No. 01-249C, slip op. at 8 (Fed. Cl. June 2, 2004) (Lettow, J.). That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, timely to submit a DCS to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

Although plaintiff claims that it is clear that DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that breach, in and of itself, does not render DOE liable to plaintiff. Nor does it establish that plaintiff has incurred any

damages as a result of DOE's breach of contract. Instead, as explained below, DOE's contractual liability arises from its inability to accept SNF identified in an approved DCS and final delivery schedule.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See

id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; Appendix to Defendant's Rate Motion, at 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If

the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF

"specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[1] Id.

---

[1] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of

Here, as discussed in our rate motion, plaintiff submitted DCSs for DOE's approval, which DOE granted. Accordingly, it is those approved DCSs that form the basis of any liability. Plaintiff could not have suffered a direct injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Instead, any injury that plaintiff incurred would result from DOE's failure to accept plaintiff's SNF as identified in plaintiff's first approved delivery commitment schedules. The first "breach" that would have caused an injury to plaintiff would not have occurred until January 30, 1999, the end of the 12-month period during which DOE was entitled, and obligated, to accept the first of plaintiff's SNF through its 1998 approved delivery commitment schedule. Any liability ruling should be based upon DOE's failure to satisfy its obligation to comply with that DCS by January 30, 1999.

### C. With All Due Respect, Decisions From This Court Questioning The Effect Of The DCS Process Have Rendered The Schedule Terms Of The Standard Contract Irrelevant, In Violation Of Contract Interpretation Principles

As the Court is most likely aware, since the Government filed its motion for summary judgment regarding the rate of SNF acceptance, this Court has issued two published decisions and two unpublished decisions resolving our motions in the cases in which those decisions were issued. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

---

fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

The Court's decision in Commonwealth Edison Co. v. United States, 57 Fed. Cl. 88 (2003) (Hewitt, J.), the rationale of which the Court adopted through unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. Apr. 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court in Commonwealth Edison did not explain – from a practical standpoint – the manner in which SNF acceptance would, or will, work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Commonwealth Edison, 57 Fed. Cl. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance require (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if

interpreted as it has been in the ComEd case. Further, the ComEd Court fails to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, as discussed in our motion for summary judgment, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. As we establish in our motion, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in this case.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98,

is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation.[2] In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a summary judgment proceeding. Not only does it ignore the DCS process and the agreements that

---

[2] In fact, the plaintiff in this case has identified no basis to support the idea that it held any belief, at the time of contract award, that DOE was obligated to satisfy any such requirement. In addition to the materials discussed in our motion for summary judgment motion, plaintiff has no contemporaneous evidence of its beliefs regarding schedule at the time of contract formation. In response to a request for production of documents that was served in the coordinated discovery proceedings, plaintiff was required to produce all documents relating to, among other things, contract formation issues involving the schedule of SNF acceptance. Plaintiff did not produce any documents that indicated any personal understanding on plaintiff's part, at the time of contract formation, that DOE was obligated to accept SNF at a rate sufficient to meet the objectives that plaintiff now espouses.

DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

## II. IF THE COURT ADOPTS THE PLAINTIFF'S ARGUMENT THAT THE DCS PROVISIONS OF THE STANDARD CONTRACT ARE RENDERED MEANINGLESS, THE STANDARD CONTRACT IS SIMPLY TOO INDEFINITE TO ENFORCE

With all due respect, the trial court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd and Indiana cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding

schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir.

1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term that the plaintiff seeks to have the Court insert into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court inserts into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what

a reasonable schedule term should be. A rejection of the Government's schedule would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[3]

As we have established in our motion for summary judgment regarding the rate of SNF acceptance, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, the Department of Energy published its Acceptance Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten

[3] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to supply essential missing terms if the parties fail to reach an agreement following good faith negotiations or to supply them when the contract provides no means by which the Court can ascertain the parties' intentions. In any event, it does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to insert its own schedule into plaintiff's contract. As such, it would be improper for the Court to impose liability upon the basis of undefined obligations to begin SNF acceptance from any particular contract holder at any particular time.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court enter any liability ruling only in accordance with the DCS provisions of the Standard Contract.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Kevin B. Crawford
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Phone: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

June 4, 2004

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 4th day of June, 2004, a copy of this "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kevin B. Crawford