IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**WE'S REPLY TO DEFENDANT'S RESPONSE TO WE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**


Of Counsel:

Martin P. Willard
Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1635

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY


Dated: June 21, 2004

**TABLE OF CONTENTS**


I. ARGUMENT .......... 1

A. WE Is Entitled To Judgment on Liability as a Matter of Law .......... 1

B. The Standard Contract's Acceptance Rate Must Be Resolved Through Further Proceedings .......... 4

1. The Government's DCS Argument Is Devoid of Merit .......... 5

2. The Government Mischaracterizes the Court's Denials of the Government's Acceptance Rate Motion .......... 8

C. The Government's Contention That the Court's Rejection of Its DCS Argument Renders the Standard Contract Unenforceable Strains Credulity .......... 10

II. CONCLUSION .......... 13

## TABLE OF AUTHORITIES

**Cases**

Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495 (1991) .............................. 11

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003)............................ passim

Cosmo Constr. Co. v. United States, 451 F.2d 602 (Ct. Cl. 1977) .......................................... 3

Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302 (Fed. Cir. 1998) .................................. 11

Duke v. Whatley, 580 So.2d 1267 (Miss. 1991) ..................................................................... 12

Hometown Financial, Inc. v. United States, 53 Fed. Cl. 326 (2002) ....................................... 3

Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003)................................. 5, 9

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ........................................................................................................... 1, 2, 11

Massengill v. Guardian Management Co., 19 F.3d 196 (5th Cir. 1994)................................. 12

Modern Systems Tech. Corp. v. United States, 979 F.2d 200 (Fed. Cir. 1992) ..................... 11

Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000).......................... 1

Puritan Assocs. v. United States, 215 Ct. Cl. 976 (1977) ........................................................ 3

Ridge Runner Forestry v. Veneman, 287 F.3d 1058 (Fed. Cir. 2002).................................... 11

Southern Nuclear Operating Co., No. 98-614C (Fed. Cl. Apr. 7, 2004) (Merow, S.J.)............................................................................................................ 2,5

Tennessee Valley Auth. v. United States, No. 01-249C, 2004 WL 1211893 (Fed. Cl. June 2, 2004) (Letow, J.)................................................................................ 5

The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F.Supp. 1164 (S.D. Ind. 1992)...................... 3

Winstar Corp. v. United States, 21 Cl. Ct. 112 (1990)............................................................ 3

Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir. 1986) .................................................................................................................. 4

Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.)................................................................................................. 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**WE'S REPLY TO DEFENDANT'S RESPONSE TO WE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

The Government does not meaningfully contest the facts material to Wisconsin Electric's ("WE") entitlement to partial summary judgment on liability based upon the Department of Energy's ("DOE") breach of WE's Standard Contract. Instead, the Government resurrects arguments that this Court has already uniformly rejected in other Spent Nuclear Fuel ("SNF") cases. For example, the Government reargues points from its ill-founded Acceptance Rate motion, including its Delivery Commitment Schedule ("DCS") argument. Nothing argued by the Government provides a basis for denying WE's liability motion. Accordingly, WE's motion for partial summary judgment for liability should be granted and its damages case should proceed to trial.

## I. ARGUMENT

### A. WE Is Entitled To Judgment on Liability as a Matter of Law

In Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000) and Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000), the Federal Circuit held that the Government was liable for breach of the Standard Contract when it failed to begin disposal of nuclear waste by January 1, 1998. WE entered into the Standard Contract with DOE on June 16, 1983. See WE's Proposed Findings of

Uncontroverted Fact in Support of WE's Motion for Partial Summary Judgment on Liability ("WE's Proposed Findings of Fact"), ¶ 1. DOE promised to begin removal of SNF under the Standard Contract no later than January 31, 1998. Id., ¶ 2. Pursuant to the terms of the Standard Contract, WE has paid substantial fees to the DOE for this service. Id., ¶ 5. DOE did not begin disposal of any SNF, including WE's SNF, in 1998 and has indicated that it will not be accepting SNF until 2010 at the earliest. Id., ¶ 10.[1] Therefore, the Government is liable for breach of WE's Standard Contract.

The Government's response ignores that the Federal Circuit has already concluded that WE has an action for contract breach, stating that: "[t]he breach involved all the utilities that had signed the contract – the entire nuclear electric industry." Maine Yankee, 225 F.3d at 1342. As this Court recently noted, the Government's argument to the contrary has "been essentially moot since the Circuit Court's rulings affirming defendant's partial breach." Order in Southern Nuclear Operating Co., No. 98-614C (Fed. Cl. Apr. 7, 2004) (Merow, S.J.). Indeed, none of the Government's arguments have precluded the entry of liability orders in nine SNF cases.[2] Thus, there can be no question that the Court should affirm the Government's breach of contract and schedule pretrial proceedings to determine WE's damages.

Certainly nothing argued by the Government commends a contrary conclusion. The Government argues that WE is not entitled to summary judgment on liability because WE

---

[1] In its response to WE's Proposed Findings of Fact, the Government does not controvert the substance of WE's proposed findings at ¶¶ 1, 2, 5 and 10.

[2] Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Florida Power & Light Co. v. United States, No. 98-483C (Sypolt, J.); Commonwealth Edison Co. v. United States, No. 98-621C (Hewitt, J.); Yankee Atomic Elec. Co. v. United States, No. 98-126C (Merow, S.J.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Merow, S.J.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Merow, S.J.); Indiana Michigan Power Co. v. United States, No. 98-486C (Hodges, J.); Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.); and Tennessee Valley Auth. v. United States, No. 01-249C (Letow, J.).

has not provided a sufficient "explanation" of its damages. See Defendant's Response to Plaintiff's Motion for Partial Summary Judgment on Liability ("Def.'s Response") at 5. The Government, however, does not and cannot challenge the Court of Federal Claims authority, holding that summary judgment on contract liability may properly be entered while reserving causation issues until a case's damages phase. Hometown Financial, Inc. v. United States, 53 Fed. Cl. 326, 338 (2002).

Further, the Government's assertion that WE's motion on liability should be denied because WE has not "explained its damages" is incorrect for two additional reasons. Def.'s Response at 5. First, DOE will be at least twelve years late in beginning to dispose of SNF. The Government cannot seriously allege that this twelve-year delay will not impact WE financially. Second, Standard Contract Article VI B.1. establishes that fuel acceptance priority is based upon the age of SNF calculated from the date of discharge, organized in priority by oldest fuel first (subject to certain exceptions). WE's Rate Opposition Appendix ("WEA") at 14-15. WE has some of the oldest SNF in the industry. See 1991 APR, WEA 1583-1615.

In addition, WE would be delighted to explain its damages to the Court and to the Government. However, in our opinion, that exercise should occur after the Court enters partial summary judgment on liability in favor of WE and schedules this matter for a determination of WE's damages.

The cases cited by the Government on pages 4-5 of its response merely establish that liability for breach of contract requires proof of several elements and that proof of causation or actual damages cannot be speculative. See, e.g., The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F.Supp. 1164, 1166 (S.D. Ind. 1992); Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977); Cosmo Constr. Co. v. United States, 451 F.2d 602, 605 (Ct. Cl. 1977). To the extent that a court determines it necessary, it is permitted to require further briefing on those elements. Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990). Here, however,

WE has established the required elements of a breach of contract to the degree necessary for entry of judgment on liability.

The remaining decision cited by the Government, Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280, 1289 (7th Cir. 1986), stands for the proposition that a party *opposing* a breach claim may present evidence showing "either that [the party asserting breach] sustained no damage from the alleged breach of contract, or, what amounts to the same thing, that the alleged breach was not causally related to that damage." Id. at 1289. The Wisconsin Knife Works decision did not address whether the party defending against the breach claim has a right to present such evidence at the liability stage of the proceedings. Here, the Government was not precluded from presenting evidence in an attempt to contest the facts material to WE's motion for summary judgment on liability. It chose not to do so (presumably because the facts material to WE's motion cannot be controverted.) Instead, the Government prematurely devotes most of its response to extensive argument regarding its position as to how WE's damages eventually should (in its view) be determined. Such Government arguments may be considered after the Court enters an order on liability and this case proceeds to the damages phase.

**B. The Standard Contract's Acceptance Rate Must Be Resolved Through Further Proceedings**

The Government contends that, before the Court can grant WE's motion for partial summary judgment on liability, it must first consider the Government's "standard" Motion for Partial Summary Judgment on the Acceptance Rate ("Government's Rate Motion"). WE agrees that the Court will need to rule upon the Government's Rate Motion. WE, however, believes that the Court must first grant WE's motion for partial summary judgment on liability. Thereafter, the Court should deny the Government's Rate Motion on the grounds that there are material facts in dispute with regard to the Government's Rate Motion and resolve the Standard Contract's acceptance rate through further proceedings.

Thus, we believe that the Government's discussion of the merits of its Rate Motion is irrelevant to WE's instant motion, but briefly respond in this reply. This Court has denied the Government's Rate Motion in every decision rendered to date. Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003); Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003); Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.); Southern Nuclear Operating Co., No. 98-614C (Fed. Cl. Apr. 7, 2004) (Merow, S.J.); Tennessee Valley Auth. v. United States, No. 01-249C, 2004 WL 1211893 (Fed. Cl. June 2, 2004) (Letow, J.).

As demonstrated in WE's Rate Opposition, the Government is not entitled to summary judgment on the rate issue because the Government interprets the Standard Contract incorrectly and there exist material facts in dispute regarding the proper interpretation of the Standard Contract. In addition, material issues of disputed fact exist with regard to whether the Government has fulfilled its obligations to perform its agreement in good faith and to engage in fair dealing regarding its misuse of the Standard Contract's planning provisions. Thus, as in Yankee Atomic and Southern Nuclear Operation Co., this Court should deny the Government's Rate Motion, enter partial summary judgment on liability in favor of WE, and schedule this matter for a determination of WE's damages.

**1. The Government's DCS Argument Is Devoid of Merit**

The Standard Contract does not contain a SNF acceptance rate on its face. Commonwealth Edison, 56 Fed. Cl. at 662. The Government argues that the Contract provides a "framework" that "defines" a specific rate of SNF acceptance through DOE's promulgation of Annual Capacity Reports ("ACRs") and the utilities' subsequent submission of DCSs. Def.'s Response at 6-11. This Government DCS argument, however, is devoid of merit. As the Court has previously noted, the Standard Contract's ACR and DCS processes did "not contain or create a SNF acceptance rate." Commonwealth Edison, 56 Fed. Cl. at 663.

Properly understood, the ACR issuance and the DCS submission reflect "a two-step process which the Standard Contract develops for the exchange of information between the parties." Id. (emphasis added). There is "no evidence that the exchange of DCSs was intended to create a contract between the parties." Id. A utility's submission and the DOE's acceptance of a "proposed DCS did not create a contractually binding obligation for either party." Commonwealth Edison, 56 Fed. Cl. at 666. As a consequence, this Court has rejected the Government's DCS argument in every instance where the Standard Contract's SNF acceptance rate is at issue.

The Government relies on the ACRs as essentially establishing the rate set out in the Contract. Def's Response at 7-8. Neither the Contract nor ACRs, however, support that position. The Contract states that the ACRs are only for "planning purposes." Standard Contract Art. IV.B.5.b, WEA at 291, 300. Moreover, the ACR documents themselves, such as the 1991 ACR, explicitly state that they are not binding: "as specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." WEA at 1568, 1571-72.

In addition, the utilities' submission of DCSs did not establish a rate under the Standard Contract. DOE attempts to link the DCS provisions with the provision governing the ACRs, implying that the DCS process was supposed to somehow make binding the projected rates in the ACR. Def's Response at 8. To the contrary, the Standard Contract contains no such connection. The ACR provision does not refer to the DCS provision. Standard Contract Art. IV.B.5.b, WEA at 291, 300. Nor does the DCS provision refer to the ACRs or the ACR provisions. Id., Art. V.B., WEA at 301. In fact, the Contract provided that the utilities could submit a DCS for "all SNF and/or HLW the [utility] wishes to deliver to" DOE. Id., Art. V.B.1, WEA at 301. Moreover, the Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility [or facilities] can accommodate." Standard

Contract Art. VI.B.1, WEA at 300. Further, it provided that each Standard Contract holder every year could increase or decrease the amount of SNF in any DCS by twenty percent. Id., Art. V.B.2., WEA at 301.

In the Instructions to Standard Contact Holders to Complete the DCSs ("DCS Instructions"), DOE made it clear that the DCSs did not establish an acceptance rate. The DCS Instructions -- contrary to the terms of the Standard Contract itself -- informed the utilities that they had to fill out the DCSs using whatever particular allocation the most recent ACR showed that the utility had for a particular year. See Commonwealth Edison, 56 Fed. Cl. at 665. Yet, as stated, the ACRs explicitly provided that they were not binding on either party and, under the Contract, the ACRs were to be reissued every year. See, e.g., Standard Contract Art. IV.B.5.b, WEA at 291, 300.

Moreover, the Government's claim that the DCSs are binding is contradicted by the testimony of DOE officials. The DOE official in charge of DCS submissions, Nancy Slater-Thompson, testified that she did not consider the DCSs binding on either DOE or the utilities. WEA at 755, 757. Ms. Slater-Thompson's supervisor, Alan Brownstein (head of DOE's SNF waste acceptance and scheduling office), also testified that the DCSs were only for planning purposes. WEA at 506, 516, 527, 532-33.

Finally, the Government's current DCS argument is less than credible given its abandonment of the ACR and DCS processes. DOE subverted the ACR process by issuing the 1995 ACR without reference to specific acceptance years, by failing to issue any ACRs after 1995, and by not publishing ACR data for the full period of DOE's breach. See WE's Rate Opposition at 48-51. Further, DOE no longer processes or approves DCSs or Final Delivery Schedules. See Commonwealth Edison, 56 Fed. Cl. at 665; WEA at 806B. DOE officials have even testified that utilities will need to re-submit DCSs that DOE has already approved. WEA 820, 822, 635, 647-48.

In sum, neither the ACRs nor the DCS submissions establish the applicable acceptance rate under the Contract. See Commonwealth Edison, 56 Fed. Cl. at 652. Indeed, the Government's attempt to use these processes to unilaterally impose an acceptance rate raises an issue of fact as to whether it is in breach of its duty of good faith and fair dealing. Id. at 665.

### 2. The Government Mischaracterizes the Court's Denials of the Government's Acceptance Rate Motion

As part of its reargument in support of its fatally-flawed Rate Motion, the Government attempts to misportray the import of several of the Court decisions that rejected the Government's Rate Motion. Again, WE believes that the Government's discussion of this issue is immaterial to resolution of WE's instant motion, but briefly responds as follows:

The Government's analysis of the Court's rejection of the Government's Rate Motion in the Commonwealth Edison decision misses the mark. Def.'s Response at 11-13. The Government asserts that the Court did "not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process." Id. at 12. To the contrary, in Commonwealth Edison, the Court did not ignore the DCS process in its decision. The Court examined the DCS and ACR provisions in detail and found that the Government's "use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions" created a fact issue as to whether the Government had breached its duty of good faith and fair dealing. Commonwealth Edison, 56 Fed. Cl. at 665. Further, the Government's Response in no way demonstrates that the Commonwealth Edison decision renders the DCS provisions "meaningless." Defendant's Response at 13. To the contrary, the decision invests these Standard Contract planning provisions with the meaning intended by the parties. Id. at 666-67

In Commonwealth Edison, the Court was not questioning that the Standard Contract contains ACR and DCS provisions and that these provisions reflect a general process for

planning for SNF removal. Instead, the Court reasonably questioned the specific acceptance rate (or acceptance schedule) that the Government sought to impose on the Standard Contract through the Government's attempted distortion of the ACR and DCS planning processes. The Court properly did so because it was presented with substantial evidence that the parties intended that DOE would utilize an acceptance rate that was significantly higher than that proposed in the Government's Rate Motion. Commonwealth Edison, 56 Fed. Cl. at 666-67.

As in Commonwealth Edison, the Court in Indiana Michigan did not reject the Standard Contract's provisions, but rather the Government's implementation of them, stating that the "Government used an artificially small quantity of waste [in the ACRs, and therefore, DCSs] to limit its liability." Indiana Michigan, 57 Fed. Cl. at 98. Moreover, the Court in Indiana Michigan did not determine the SNF acceptance rate at which DOE "might have voluntarily elected to perform." Def.'s Response at 13. Instead, the Court supplied a missing essential contract term, pursuant to Restatement (Second) of Contracts, § 204 cmt. d (1981). Indiana Michigan, 57 Fed. Cl. at 100. The Court in Indiana Michigan found the Government's Rate Motion arguments inconsistent with the Standard Contract. Id. at 97. Moreover, the Court found substantial support in the record for a Standard Contract SNF acceptance rate "sufficient to eliminate the need for additional storage on site and to reduce the backlog of already stored materials." Id. at 99-100.

In its Rate Motion Opposition, WE submitted overwhelming evidence (including declarations of current and former WE employees) establishing a disputed issue of material fact regarding the issues raised in the Government's Rate Motion and as well as substantial existence of an acceptance rate higher than that now proposed by the Government. See WEA Rate Appendix. Presentation of WE's complete damages evidence, however, is neither appropriate nor required at this stage in the proceedings.

**C. The Government's Contention That the Court's Rejection of Its DCS Argument Renders the Standard Contract Unenforceable Strains Credulity**

The only issue presented by WE's instant motion is whether the Government is liable for breach of WE's Standard Contract. In the last portion of its response, however, the Government embarks on an extended discussion on the ramifications of the Court's denial of the Government's DCS argument. The Government's argument is irrelevant. It also is ill-founded.

The Government makes two supporting arguments. First, it contends that, by rejecting the Government's DCS argument, the Court somehow "intends to substitute a schedule term" in place of that schedule allegedly mandated by the Standard Contract's DCS and ACR provisions. Def's Response at 15. Second, the Government asserts that "a rejection of the Government's schedule [by the Court] would effectively render the Standard Contract too indefinite to enforce." Id. at 18.

The Government's arguments are meritless. As discussed, a determination of the Standard Contract's acceptance rate does not displace the ACR and DCS provisions. Instead, as the Commonwealth Edison decision articulates, the ACR and DCS provisions provide a general planning process for the removal of SNF. The ACR and DCS processes, however, did "not contain or create a SNF acceptance rate." Commonwealth Edison, 56 Fed. Cl. at 663. That rate then must be determined based upon consideration of all of the relevant circumstances including the substantial evidence that the parties intended to utilize a higher acceptance rate than proposed by the Government's DCS argument.

The Government's second argument is unsound because it both relies on its flawed first argument and because it is speculative. Contrary to the Government's protestations, the Court, in its decisions rejecting the Government's Rate Motion, is not creating a contract that the parties did not create. To the contrary, the Court's repeated denials of the Government's

Rate Motion and its determination in Commonwealth Edison, Yankee Atomic and Southern Nuclear that a damages trial is appropriate properly provides those utilities with the opportunity to prove a reasonable acceptance rate under the contractual circumstances. Having a trial on damages issues, including a determination of an acceptance rate, does not increase the risk of an unenforceable contract.

The Government's argument that the Court cannot supply an essential term to the Standard Contract does not withstand scrutiny. Its argument is premised upon its allegation that, if the Court does not adopt the "Approved DCS" theory, the Standard Contract becomes an insufficiently definite "agreement to agree." It cites case law analyzing unenforceable agreements that are plainly distinguishable from the Standard Contract. See, e.g., Ridge Runner Forestry v. Veneman, 287 F.3d 1058 (Fed. Cir. 2002) ("tender agreements" did not constitute contracts in absence of definite promise to perform); Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302 (Fed. Cir. 1998) (agreement unenforceable for lack of a minimum quantity term or exclusivity provision); Modern Systems Tech. Corp. v. United States, 979 F.2d 200 (Fed. Cir. 1992) (Basic Pricing Agreement not a contract where there was no minimum or exclusive purchase requirement); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495 (1991) ("entirely open-ended" agreement unenforceable in absence of quantity term).

In contrast, the Standard Contract is an enforceable contract. Maine Yankee, 225 F.3d at 1342-3. It contains many definite provisions with a term that is missing. WE agreed to pay a determinable fee. Standard Contract Art. VIII, WEA at 307-313. The Government agreed to accept "all" of WE's SNF. Id., Art. III, WEA 296. The Government agreed that the services that it would provide under the Standard Contract would begin not later than January 31, 1998. Id., Art. II, WEA 296. The Government's response fails to negate these definite contract terms. The Standard Contract is not subject to the Government's proposed legal

standard because it is not an "agreement to make a future contract," or an "agreement to agree" lacking any definite terms.

Finally, the Government's discussion of Mississippi contract law in Massengill v. Guardian Management Co., 19 F.3d 196, 202 (5th Cir. 1994) is unhelpful. The Government cites a portion of the Massengill decision that concerns the interpretation of "agreements to agree" to future contracts. Under Mississippi law, an "agreement to make a *future contract* [must be] definite and certain upon all the subjects to be embraced, [or] it is nugatory." Duke v. Whatley, 580 So.2d 1267, 1274 (Miss. 1991) (citations omitted) (emphasis added). The Standard Contract is not an agreement to make a future contract. Therefore, the Government's discussion of Massengill is irrelevant.[3]

In sum, the Government's assertions fail to establish that DOE's contract with WE is unenforceable under the specific facts of WE's case and are irrelevant to WE's instant motion. As the Court noted in evaluating the Defendant's Rate Motion in another SNF case, "[t]he determination of the rate of acceptance, to the extent that this will impact on the amount of damages claimed, is thus in dispute and must be resolved by evidentiary proceedings." June 26, 2003 Order in Yankee Atomic at 2. The acceptance rate applicable to WE's damages case must similarly be determined at trial on damages after the Court has affirmed the Government's liability for breach of the Standard Contract.

[3] It is further noted that the court's decision in Massengill relied upon the contract's fundamental ambiguities, rather than the absence of a single essential term, to determine that it was unenforceable. The case involved a suit for specific performance of a contract for the sale of general partnership interests. The Fifth Circuit declined to enforce the agreement at issue because the "three executed documents [that comprised the agreement were] too contradictory, confusing, and vague to constitute an enforceable contract," and contained "substantial ambiguities on vital contract provisions, rather than merely failing to state the time of performance." Massengill, 19 F.3d at 202. None of these circumstances are present here.

## II. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court enter an order granting WE's motion for partial summary judgment on liability.

Dated: June 21, 2004

Respectfully submitted,

s/Richard W. Oehler by s/Donald J. Carney
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Martin P. Willard
Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1635

**Certificate of Filing**

I hereby certify that on this 21st day of June, 2004, a copy of the foregoing "WE's Reply To Defendant's Response To WE's Motion For Partial Summary Judgment On Liability" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney