IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | No. 00-697C |
| v. | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES

Defendant, the United States, respectfully responds to the motion for an order regarding subsequent damages actions and request for expedited consideration filed by plaintiff, Wisconsin Electric Power Company ("WEPCO"). Plaintiff's motion also raises the issue of whether it is entitled to recover pre-breach and future damages in the present action. Although this Court has twice held that plaintiffs in these spent nuclear fuel ("SNF") cases shall be allowed to present evidence of damages incurred prior to the January 31, 1998 date that the Department of Energy ("DOE") failed to begin acceptance of SNF in accordance with the requirements of the Standard Contract, 10 C.F. R. § 961.11 (1983) ("pre-breach damages"), and evidence of costs that may be incurred after the date of the complaint or the date of trial arising from post-complaint and future breaches of the Standard Contract ("future damages"), the Government believes, with all due respect, that neither pre-breach nor future damages are recoverable on a claim of partial breach. Instead, the scope of damages to be properly litigated at the trial scheduled to commence on July 14, 2006 are those that WEPCO can establish it has incurred between January 31, 1998 and the date of the filing of its complaint. Therefore, defendant also respectfully requests that the Court

grant the Government summary judgment regarding WEPCO's ability to recover pre-breach and future damages in the present action.

## SUMMARY OF THE ARGUMENT

In its motion on damages, WEPCO requests an order from the Court that establishes the following: one, that, during the trial scheduled to commence on July 14, 2006, the parties are to litigate damages that WEPCO may have incurred since 1988, and might in the future incur through 2015, all allegedly arising from a partial breach that it alleges will extend through through December 31, 2009; and, two, that reserves WEPCO's right to file a subsequent lawsuit seeking recovery of damages that may be incurred both before and after 2015. WEPCO, however, has chosen to plead a partial breach of contract, a choice which necessarily limits its damages to those costs incurred between the date of breach and the date of upon which it filed its complaint or, potentially, an amended complaint. WEPCO also misapprehends the continuing nature of the Government's partial breach. The Government's breach is not a single breach that extends from 1998 to whatever date that DOE currently anticipates that it will be able to begin performance (assumed to be 2010 in WEPCO's motion). Instead, a partial breach of the contract results every time that it does not perform in accordance with the Government's agreements with individual utilities to accept a specific amount of their SNF.

Based upon the nature of the breach to be litigated and damages assessed, the Court should limit the consideration of damages to those incurred from January 31, 1998, the date of the breach of contract, through the date upon which WEPCO filed its complaint. If WEPCO decides to file a new or amended complaint encompassing all partial breaches that have occurred to the date of the filing of that new or amended complaint, which could then be consolidated with

this case, WEPCO's damages recovery could include those damages incurred through the date of that new or amended complaint. Such an order would preclude the need for an order from the Court to allow WEPCO to split its claims or, as WEPCO requests, for the Court to retain jurisdiction over claims that may be litigated more than 10 years from now. Instead, WEPCO can seek to recover future damages arising from future partial breaches when they are incurred in future claims brought to this Court within the applicable statute of limitations.

## ARGUMENT

### I. WEPCO SEEKS TO RECOVER DAMAGES FOR A PARTIAL, RATHER THAN TOTAL, BREACH OF CONTRACT

WEPCO has made a careful decision in identifying the type of contractual breach upon which it relies in this litigation. In its complaint, WEPCO alleges that DOE's failure to begin acceptance of the nuclear utilities' SNF by January 31, 1998, constitutes a partial breach of the Standard Contract at issue in this litigation. Complaint, dated November 16, 2000, Count One. Moreover, this Court already found that “the issue of defendant’s liability for partial breach of its contracts with utilities . . . is not in doubt.” Order, dated October 8, 2004, at 2. WEPCO's reliance upon a partial breach of contract theory, as opposed to a total breach of contract theory, affects the scope of damages that WEPCO may recover in this case and the parties' continuing obligations under the Standard Contract.

The distinction between a total and a partial breach of contract is extremely important here. If WEPCO wanted to pursue a claim for a total breach of contract, it certainly could have attempted to have done so. However, as explained below, had WEPCO pursued and prevailed upon such a theory, DOE would have had no further obligation to perform under the Standard

Contract or to accept WEPCO's SNF. Instead, DOE only would have been liable to WEPCO for damages resulting from the total breach. We presume that, because WEPCO wants DOE to continue to perform the Standard Contract and wants to ensure that DOE will accept its SNF to preclude it from having to find an alternative means of long-term storage for that waste, WEPCO consciously elected not to pursue claims for total breach and limited its claims to partial breach claims. Having elected to pursue a claim for partial breach, WEPCO's damages must be confined to those properly allowed for a partial breach.

## II. WEPCO CAN RECOVER ONLY FOR PARTIAL BREACHES THAT HAVE OCCURRED AS OF THE FILING OF ITS COMPLAINT

### A. DOE's Continuing Breaches Are Tied To The Failure To Accept SNF In Accordance With The Approved DCSs With Individual Utilities

WEPCO seeks an order from the Court that, in part, mandates that the damages to be litigated at trial are those it has incurred to date and may incur through 2015 arising from DOE's assumed failure to perform until 2010. This request is based upon DOE's past announcements that it expects that it will not commence acceptance from the nuclear utility industry until at least 2010. However, WEPCO incorrectly views DOE's failure to perform to date as a single partial breach that extends from 1998 to 2010. Instead, DOE's failure to perform is properly viewed as a series of partial breaches tied to DOE's failure to perform in accordance with the delivery commitment schedules that DOE approved relating to individual utilities and specific amounts of SNF. Given the uncertainty that exists with regard to future events, the Court cannot decide with certainty that breaches will occur in the future. Further, the Court only possesses jurisdiction to entertain suits based upon breaches that had occurred as of the date upon which the complaint was filed.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and/or high-level waste ("HLW")] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear

power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 3 ("Instructions For Completing The Appendix C Delivery Commitment Schedule, General Instructions, Item 3, When To Submit").[1]

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

---

[1] "A. __" refers to the appendix attached to this brief.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF "specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific

delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[2] Id. It is DOE's failure to perform in accordance with these

[2] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in

approved DCSs that gives rise to the partial breach of contract for which WEPCO and the other nuclear utilities seek damages.[3]

B. Performance In 2010 Has Not Been Established As An Independent Contractual Commitment Pursuant To The Standard Contract

WEPCO incorrectly views one of this Court's earlier holdings that DOE "will not commence performance until at least 2010" as one defining the nature and the scope of the breach at issue. Pl. Mtn. at 2. However, the Standard Contract has not been modified to create a new performance obligation that runs from 2010. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 n.19 (2004), appeal pending, No. 04-5122 (Fed. Cir. docketed July 24, 2004). DOE's obligation to perform continues to run from 1998. Moreover, uncertainty as to the future actions that Congress, DOE, or the Nuclear Regulatory Commission may take which could affect DOE's ability to commence operations at Yucca Mountain by 2010 or at another

---

writing to the Department of Energy Board of Contract Appeals. Id. The board would review the contracting officer's decision for abuse of discretion. Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983); see United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982); Fraas Surgical Mfg. Co. v. United States, 215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978).

[3] Pursuant to the Court's October 8, 2004 order, the Court has determined that the issue regarding the rate of acceptance and the role of the approved DCSs in the determination of that rate would be resolved in further proceedings. Order at 2-3 ("[I]t is concluded that the extent of defendant's liability for breach of [the Standard Contract] . . . can not be resolved or limited by means of the motions at issue. Rather, liability for damages can only be resolved after trial proceedings and in the context of the specific amounts to be claimed by WEPCO. . . . At this stage in the proceedings it is not clear that a determination of any specific overall rate of acceptance . . . will be required in order to resolve the question of defendant's liability for specific damage items claimed by plaintiff. Obtaining disclosure of these specific damage items and calculations is an initial step in the resolution process."). Accordingly, the actual extent of the Government's breach in any given year since 1998 will be developed in future proceedings, presumably at trial.

facility prior to that time preclude the Court from knowing that the time period 1998 to 2010 defines the specific extent of DOE's partial breaches.

While DOE has clearly stated that it currently anticipates that it will begin performance at a repository at Yucca Mountain in 2010, it is also not at all certain that no action will be taken with regard to utility SNF prior to 2010, given national security and other cost considerations. The Court, during the trial in Yankee Atomic, heard evidence regarding this uncertainty. As Mr. Kouts, director of the office responsible for the waste acceptance function within the Office of Civilian Radioactive Waste Management, testified, circumstances could change that would allow or require DOE to perform prior to 2010. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain. Congress has considered legislation that provided for these actions in the past. A. 12; A. 17. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for utilities to store all of their spent fuel for national security reasons. A. 13. Either of these actions, among other possible scenarios, could alleviate the burden imposed upon contract holders by DOE's continuing breach. Congress clearly continues to monitor issues related to the storage of SNF at nuclear utilities for reasons of national security, urging DOE to "move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date." A. 19.

If Congress took action that permitted DOE to begin performing prior to 2010, utility plaintiffs that have recovered damages based upon DOE's non-performance until 2010 may receive a windfall in the form of payment for costs that will not be incurred because of delays in DOE's performance. The Court should find that DOE's failure to perform to date pursuant to the

approved DCSs has given rise to a series of partial breaches. If the Court only adjudicates possible damages tied to these partial breaches that have been definitively incurred, the Court preserves WEPCO's ability to return to court to seek damages arising from any future failure by DOE to perform pursuant to the Standard Contract. Further, awarding damages beyond those that have already been incurred would require speculation regarding those costs that WEPCO will definitely incur in the future, despite uncertainties about the length of time that WEPCO's reactor will operate[4] or the specific activities that will be necessary for storage. Given that WEPCO can return to court to seek damages for costs incurred in the future, this speculation is unnecessary.

## III. BECAUSE WEPCO SEEKS CONTINUED PERFORMANCE OF THE STANDARD CONTRACT, WEPCO CANNOT RECOVER DAMAGES FOR COSTS THAT WERE INCURRED PRIOR TO DOE'S PARTIAL BREACHES OF CONTRACT OR AFTER THE DATE THAT ITS COMPLAINT WAS FILED

### A. The Measure Of Damages For A Partial Breach Of Contract Differs From That For A Total Breach Of Contract

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. That is, a claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance," while a claim for damages for total breach is "one for damages based on all of the injured party's

---

[4] For example, each of the nuclear reactors at issue in the three Yankee Atomic cases prematurely and unexpectedly were shut down. Clearly, it is possible that, in the future, WEPCO could make a similar decision.

remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996) (concluding that the jury's determination that damages for partial breach of contract exceeded those for total breach was "obviously irrational"). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). The distinction between partial and total breach "is particularly important in executory contracts." Id. at 586.

"The terms total breach and partial breach are frequently used by the courts in determining the remedies available to the injured party." 9 A. Corbin, Corbin on Contracts § 946, at 717-18 (interim ed. 1979). "A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." 9 A. Corbin, supra, § 946, at 718; see Restatement (Second) of Contracts § 236(1), at 214 (1981) ("[a] claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance").[5] "[I]t is clear that, wherever the court will hold that

---

[5] The United States Court of Appeals for the Federal Circuit recently held that "[t]he Restatement of Contracts is recognized as an appropriate source of authority in contract cases." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 n.9 (Fed. Cir. 2004) (citing Mobil Oil Exploration v. United States, 530 U.S. 604, 608 (2000)). Similarly, the Federal Circuit has repeatedly relied upon the Restatement (Second) of Judgments (to which we will cite in this motion) as authority. See, e.g., Christopher Village, L.P. v. United States, 360 F.3d 1319 (Fed. Cir. 2004) (citing repeatedly to Restatement (Second) of Judgments); Ammex, Inc. v. United States, 334 F.3d 1052, 1056 (Fed. Cir. 2003) (recognizing that court is broadly guided by the Restatement (Second) of Judgments); Young Engineers, Inc. v. United States Int'l Trade

A's breach is a total breach, B can regard A's performance as at an end and at once maintain action for damages for all of his injury, past, present, and future." 9 A. Corbin, supra, § 946, at 718.

"While in the case of a total breach the injured party can at once get judgment for his entire injury, it is not always necessary for him to elect this remedy." 9 A. Corbin, supra, § 946, at 720. "In some cases he may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id., quoted in Indiana Michigan, 60 Fed. Cl. at 664; see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract").[6] "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981).

The concept of "partial" breach is particularly applicable to contracts that involve a requirement for a series of performances, or installments, over an extended period of time. Professor Corbin has described the election that the non-breaching party to an installment

---

Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983) ("[i]n our analysis we will be guided by the Restatement (Second) of Judgments (1982) . . . .").

[6] "A partial breach of contract is a breach where remedial rights provided by law can be substituted by the injured party for only part of the existing contractual rights." Restatement (First) of Contracts § 313(2) (1932).

contract can make when the other party fails to satisfy the requirements of an installment of the contract:

> If the seller of goods delivers an instalment of nonconforming goods, in breach of some warranty, even though the breach may be such as to operate as a total breach the buyer is not required to treat it so. He may keep the defective instalment, retaining his right to damages or recoupment, and demand delivery of the remaining instalments required by the contract. When sued for the price of the instalments received by him, he may recoup for breach of warranty and claim damages for the seller's failure to deliver the subsequent instalments. The seller has committed one breach, treated by the buyer as partial, and a second breach that is total.

9 A. Corbin, supra, § 946, at 720. Professor Corbin considers a contract that requires continuing performance similar to an installment contract and potentially capable of a series of partial breaches:

> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "instalment" contract: and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

Id. § 956, at 746.[7]

Aside from the different measure of damages applicable to a partial and total breach, these claims can also be distinguished based upon the remedies they provide to an injured party.

---

[7] Professor Corbin concluded that there is "no essential difference between a 'continuing' contract and an 'instalment' contract." 9 A. Corbin, Corbin on Contracts § 956, at 748.

Indeed, a plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). This is because a "total breach justifies termination of the contract and damages for complete failure of performance," whereas a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). As the Court held in Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976), a contractor must make an election in response to an anticipatory repudiation either (1) to view the anticipatory repudiation as a total breach and view the contract as concluded or (2) to waive the anticipatory repudiation and continue contract performance:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1382 (Fed. Cir. 2004) (finding that the Government waived plaintiff's prior material breach by continuing to make contract assistance payments).

Here, WEPCO's decision to continue the contract after the Government's breach and insist upon the Government's performance of its obligations has at least two consequences. First, because the Government's contractual obligations were not discharged as a result of WEPCO's suit for partial breach, it did not discharge the Government's obligation to accept and dispose of WEPCO's SNF. Second, it limited WEPCO's recovery of damages to those for partial breach. The significance of the second consequence of WEPCO's election to pursue a partial rather than total breach theory is material here because, although a plaintiff could establish a total breach prior to the performance due date by demonstrating an anticipatory repudiation, a plaintiff cannot establish a partial breach through an anticipatory repudiation.

### B. Because WEPCO Has Elected To Pursue Damages For A Partial Breach Of Contract, Rather Than A Total Breach, It Cannot Recover Damages That Pre-Date The Actual Partial Breach

#### 1. Under A Partial Breach Claim, A Plaintiff Cannot Rely Upon An Anticipatory Partial Repudiation Theory To Recover Damages That Precede The Actual Partial Breach

Although damages for breach of contract are generally measured from the date of the actual breach, see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958), WEPCO seeks damages that precede the actual partial breach of contract in this case. Although not set forth in its complaint, WEPCO claims in its damages motion that it has been incurring costs in an effort to mitigate damages as a result of DOE's breach "[s]ince 1988," at least ten years before the date upon which the Court found DOE to have partially breached the Standard

Contract. Pl. Mtn. at 2.[8] WEPCO claims that these mitigation efforts were undertaken based upon the assertion that, "[b]eginning in the late 1980s, it became apparent that DOE likely would not be able to begin SNF disposal by the January 31, 1998, deadline." Id. With these allegations, WEPCO apparently intends to establish that there was some type of "anticipatory" breach by DOE. Id.

An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id.; see Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) ("[a]t common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract"); Tretchick v. Department of Transportation, 109 F.3d 749, 752 (Fed. Cir. 1997) (anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made").

An anticipatory repudiation of a contract is, in and of itself, a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir.1997) ("[t]he disclaimer of a contractual duty is a breach of contract even if the time specified in the

---

[8] Although unnecessary to the Government's motion, it is clear that damages predating WEPCO's complaint, filed in 2000, by up to 12 years would be barred by the statute of limitations. See 28 U.S.C. § 2501.

contract for performing the duty has not yet arrived"). However, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia Assocs., 536 U.S. at 143 (emphasis added) (citing Roehm v. Horst, 178 U.S. 13 (1900)). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm, 178 U.S. at 13. Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see United States v. Dekonty Corp., 109 F.3d 749, 752 (Fed. Cir. 1991) (injured party who elects to sue for anticipatory breach of contract must "treat th[e] refusal [to perform] as a breach and commence an action at once therefor").

This Court recognizes two forms of anticipatory repudiation. First, at common law, an anticipatory repudiation occurs "when one party to [a] . . . contract absolutely refuses to perform his contract, and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party . . . ." DeKonty, 922 F.2d at 828 (quoting Dingley v. Oler, 117 U.S. at 499-500). Under that form of repudiation, the "mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient; it must be distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made . . . ." DeKonty, 922 F.2d at 828 (quoting Dingley, 117 U.S. at 503); see Tretchick, 109 F.3d at 752.

More recently, the United States Court of Appeals for the Federal Circuit adopted a second and more modern form of repudiation, "in which reasonable grounds support the obligee's

belief that the obligor will breach the contract." Danzig, 224 F.3d at 1337. Under these circumstances, "the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." Id. at 1337-38 (quoting Restatement (Second) of Contracts § 251 (1981)). At that time, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see Cities Serv. Helex, 211 Ct. Cl. at 234, 543 F.2d at 1313 (contractor must make election in response to anticipatory breach either: (1) to view the contract as concluded; or (2) to continue contract performance and retain "only a claim for damages for partial breach").

Unfortunately for WEPCO, "a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253 cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations.

The Court of Appeals for the Second Circuit's decision in Lucente v. IBM Corp., 310 F.3d 243 (2d Cir. 2002), is instructive on the effect of a partial breach theory on damages. In Lucente, a former executive of IBM had entered into a "letter agreement" with IBM that prohibited him from working for a competitor and provided for cancellation of his stock options in the event of his violation of the agreement. Id. at 249. Two years later, in 1993, Lucente became an executive of Digital Equipment Corporation ("Digital"), a competitor of IBM, and IBM sent a cancellation letter to Lucente informing him that his restricted stock and stock options at IBM were now cancelled as a result of his employment with Digital. Id. at 250. From 1993 to 1999, the value of IBM stock significantly rose. In 1999, Lucente filed a suit against IBM, arguing that IBM's 1993 cancellation letter was an anticipatory repudiation that he elected to ignore while awaiting IBM's future performance. Id. at 251. In 2001, Lucente attempted to exercise his options by tendering $1.89 million to IBM. IBM rejected Lucente's purported exercise of his options and returned Lucente's check. Subsequently, the district court granted Lucente leave to amend his complaint to treat IBM's cancellation letter as an anticipatory repudiation with respect to his stock options. Id. at 252. Lucente's amended complaint also alleged that IBM's cancellation letter was a breach for the purposes of Lucente's restricted stock. Id. The district court awarded Lucente $4.8 million, concluding that Lucente had properly exercised his stock options.

The Court of Appeals for the Second Circuit reversed, finding that Lucente could not treat IBM's 1993 cancellation letter as both a breach and an anticipatory repudiation that he chose to ignore. The court stated that, "[a]part from allowing Lucente to have his cake and eat it too, such a result is antithetical to the common law percepts of anticipatory repudiation and the election of

remedies doctrine." Id. at 258. The court explained that, when confronted with a anticipatory repudiation, the non-breaching party must make a choice:

> When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.

Id. (citations omitted). "The non-repudiating party must, however, make an affirmative election" and "'cannot at the same time treat the contract as broken and subsisting,' for '[o]ne course of action excludes the other.'" Id. (citations omitted). Indeed, "[t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." Id. (quoting Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969)). "Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed." Id. at 258-59.

The court further recognized that, under an anticipatory repudiation theory, a contract holder who elects to treat a repudiated contract as binding and valid waives any action against the repudiating party until an actual breach occurs and can recover damages only for the actual breach:

> Under an anticipatory repudiation theory, a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. Since it is undisputed that Lucente failed to take action to exercise any of his stock options before filing this suit, Lucente had no claim for breach against IBM under the theory of anticipatory repudiation. Therefore, the only claim that Lucente could possibly have asserted in 1999 was that IBM breached its contractual obligations by cancelling his restricted stock and stock options in April 1993.

Id. at 259. The court further held that "damages for breach of contract are to be measured *from the date of the breach*." Id. at 262 (emphasis added).

Here, WEPCO's decision to proceed under a partial breach theory following DOE's breach on January 31, 1998, and not to declare the Standard Contract at an end following some earlier alleged anticipatory repudiation clearly indicates that WEPCO elected to waive any anticipatory repudiation theory. Had WEPCO elected to proceed based upon anticipatory repudiation prior to January 31, 1998, and sought to recover damages accruing from the date of the repudiation, WEPCO would have had to file its suit at that time and, further, would have to have elected to consider the Standard Contract at an end, eliminating both parties' further performance obligations. However, WEPCO waited until the time for DOE's performance under the Standard Contract had passed and then sued for partial breach because it did not want to discharge DOE's obligation to accept WEPCO's SNF. Having made this election, WEPCO cannot now attempt to claim damages both for a partial breach of contract on January 31, 1998, and for an anticipatory total breach of contract at some point earlier than January 31, 1998, while at the same time seeking to enforce DOE's continuing performance obligations under the Standard Contract.

Because WEPCO elected to pursue a partial breach theory in its 2000 suit, WEPCO cannot recover damages for costs it incurred prior to DOE's breach on January 31, 1998. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"); Cities Service Helex, 211 Ct. Cl. 222, 543 F.2d at 1313 & n.16 (once party elects to continue repudiated

contract, he retains "only a claim for damages for partial breach"); Dunkin Donuts of Am., Inc. v. Minerva, Inc., 956 F.2d 1566, 1571 (11th Cir. 1992) (franchisee who continued performance after learning of material breach could not seek damages for total breach, and his damages were limited to those for partial breach); Pinewood Realty Ltd. P'ship, 223 Ct. Cl. at 104, 617 F.2d at 215 ("[i]f the injured party ignores the breach, and continues to perform, it has . . . only retained its claim for damages for partial breach").

2. WEPCO Cannot Circumvent The Legal Bar To Recovery Of Its Pre-Breach Damages By Formulating Them As Costs Incurred In The Exercise Of Its Duty Of Mitigation

WEPCO, in its motion, asserts that it undertook efforts to mitigate the possible damages arising from the Government's breach and incurred costs arising from this mitigation effort beginning in 1988. Pl. Mtn. at 2. Despite WEPCO's attempt to cast these efforts as mitigation, WEPCO's election to pursue a partial breach claim limits its possible damages to those incurred after the date of the actual breach.

"As a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis original, citation omitted). The duty of mitigation reflects the policy of encouraging an injured party to attempt to avoid loss when it can do so without undue risk or burden. In this way, the amount of damages that the injured party could have avoided by taking reasonable steps to reduce its damages are subtracted from the amount that would otherwise have been recoverable as damages. See Restatement (Second) of Contracts § 350 cmt. b (1981); Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 679 (Ct. Cl. 1968).

Nevertheless, although costs incurred in the exercise of the duty of mitigation may possibly be recoverable in a breach of contract action, costs preceding the date of a breach are not recoverable. Indeed, WEPCO cannot circumvent the bar to recovery of its pre-breach damages by formulating them as costs reasonably incurred in the exercise of its duty of mitigation. Costs incurred prior to an actual breach are not incurred solely as a consequence of the breach. At best, such "mitigation" costs might be incurred in anticipation of the possibility that the other party might breach the contract. Given that WEPCO cannot rely upon an anticipatory repudiation as a basis for supporting any pre-breach damages for a partial breach, it cannot circumvent that rule by arguing that it is entitled to rely on pre-breach "repudiations" to incur pre-breach costs.

In Middleton v. United States, 175 Ct. Cl. 786 (1966), the Court of Claims rejected the argument that a non-breaching party can recover the costs of "mitigation" efforts that occurred prior to the breach:

> [N]either of the parties here may insist upon an expansion of this concept so as to encompass items which relate to a period *antedating* defendant's breach. Both the defendant's right to a setoff and the plaintiff's duty to mitigate are defined in terms of the same fixed time period; like opposites of the same coin, they are inextricably bound together. Thus, plaintiff could no more seek to reduce defendant's setoff by alleging expenses incurred prior to his discharge, than defendant could enlarge his setoff by seeking the inclusion of income which plaintiff earned prior to his erroneous dismissal. . . . It follows, therefore, that all expenses which arose prior to plaintiff's discharge that he seeks to include, may not be considered within the framework of the setoff question.

Id. at 792 (italics in original; underlining added). To the extent that WEPCO claims that costs incurred prior to DOE's partial breach are recoverable under principles of mitigation, WEPCO's arguments are meritless and cannot resurrect its claims for pre-breach damages. Accordingly, the

Court should bar limit the possible damages to be pursued through discovery and considered at trial to those costs that WEPCO incurred or committed itself to incur after January 31, 1998.

In response to the Government's motion in limine regarding the presentation of evidence at trial concerning pre-breach damages filed in Yankee Atomic Electric Company v. United States, No. 98-126C (Fed. Cl.), the Court held that plaintiffs would not be precluded from the presentation of evidence regarding costs incurred prior to the date of DOE's breach of the Standard Contract. Yankee Atomic Electric Co. v. United States, No. 98-126C, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004). In reaching the decision regarding the scope of evidence that could be presented, the Court questioned whether the plaintiffs in these cases were required to wait for DOE's actual breach prior to deciding how to address the harm arising from that breach. Id. However, with all due respect, the consideration of this evidence of costs incurred before the actual breach eliminates the plaintiff's obligation to make an election to declare the contract in total breach in response to an anticipatory repudiation or to waive the anticipatory repudiation and pursue damages for only a partial rather than a total breach of contract. We have found no case support for such a proposition.[9] Further, we understood the Court's order in Yankee as deciding whether the plaintiffs there would be permitted to present

---

[9] The Court cited to its decision in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), as support for the concept that pre-breach damages potentially could be recoverable. See Yankee Atomic, 2004 WL 1535688, at *6. However, in response to the Government's motion for reconsideration, in which the Government demonstrated that pre-breach damages were not recoverable in a partial breach case, and should not be permitted as a matter of law, the TVA court indicated that its decision should not be interpreted as permitting TVA to recover damages prior to the date that the TVA court defined as the first partial breach. **A. 20** (Order in Tennessee Valley Authority v. United States, No. 01-249C (Fed. Cl. Aug. 12, 2004)).

evidence regarding pre-breach damages, rather than finally deciding that pre-breach damages would be recoverable.

Further, in deciding the motion in limine in Yankee Atomic, the Court also found that the Court's reasoning in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), regarding the availability of pre-breach damages was "dicta." Instead, the Court determined that the Court's decision in Indiana Michigan was predicated upon a finding that Indiana Michigan had failed to establish a causal link between DOE's breach and the incurred costs. Yankee Atomic, 2004 WL 1535688, at *7. Again, with all due respect, the Court's reading of the decision in Indiana Michigan is incorrect. The Court in Indiana Michigan explicitly found that Indiana Michigan's "claim of partial breach of contract does not permit the recovery of damages incurred before January 1998 and after March 2004 (the date of trial)." 60 Fed. Cl. at 641. The Court also made factual findings, in the alternative, regarding the failure of plaintiff to establish the causal link or the speculative nature of all of Indiana Michigan's future costs, but these findings were not predicated upon a determination that Indiana Michigan could possibly recover these costs. Id.

C. WEPCO Also Cannot Recover As Damages Costs Incurred After The Date That Its Complaint Was Filed

As explained above, the damages that a plaintiff can seek in a suit for a partial breach differ substantially from those that are recoverable in a suit for a total breach. Generally, "[i]f the initial breach is accompanied or followed by a 'repudiation' (see Restatement (Second) Contracts § 250)" – that is, if the breach is total – "and the plaintiff thereafter commences an action for damages, he is obliged in order to avoid 'splitting,' to claim all his damages with respect to the

contract, prospective as well as past, and judgment in the action precludes any further action by the plaintiff for damages arising from the contract." Restatement (Second) of Judgments § 26 cmt. g, at 240 (1982) (emphasis added). "In the event of a 'material' breach (see Restatement, Second, Contracts § 241) that is not accompanied or followed by a repudiation, the plaintiff is entitled to treat the contract as at an end and to recover damages for performances not yet due as well as those already due on the theory that there has been a total breach of contract." Restatement (Second) of Judgments § 26 cmt. g, at 240-41 (1982). "If a plaintiff does this, a judgment extinguishing the claim under the rules of merger or bar precludes another action by him for further recovery on the contract." Id. at 241. Accordingly, if a plaintiff seeks damages for a total breach of contract, he must seek to recover all damages that he has or will incur as a result of the total breach, given that the parties' obligations to continue contract performance are terminated and a judgment for the non-breaching party will conclude all obligations under the breached contract.

"On the other hand, although the breach is material, the plaintiff may elect to treat it as being merely a partial breach." Id. "A claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance." Restatement (Second) of Contracts § 236(2), at 214 (1981) (emphasis added). As previously discussed, a partial breach of contract does not conclude the parties' continuing contract obligations, but instead requires continued contract performance. When a plaintiff elects to treat a breach of contract only as a partial breach, "[i]t has been thought that where there has been no repudiation, the plaintiff can recover damages for his injury only to the date of the writ – that he must treat the breach as only 'partial.'" 9 A. Corbin, supra, § 956, at 747 (emphasis added). Specifically, if the non-breaching

party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (suggesting that, under Texas state law, plaintiffs seeking damages for partial breach may recover damages incurred through date of filing the pleading).

The fact that WEPCO cannot seek future damages for future partial breaches of the Standard Contract is supported by the absence of a legal remedy for an anticipatory partial breach discussed above. Indeed, "an anticipatory breach cannot be predicated on a partial breach of the contract." City of Fairfax, Va., 582 F.2d at 1331 (emphasis added); see 9 A. Corbin, supra, § 972, at 798 ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations. See Restatement (Second) of Contracts § 253 cmt. b, at 287 (1981) ("a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties). This Court has recently recognized that "[a]nticipatory repudiation does not apply in a partial breach situation." Indiana Michigan Power, 60 Fed. Cl. at 648. Accordingly, WEPCO, having elected not to seek damages for a total breach of contract and to continue to seek performance under the Standard Contract, cannot anticipate partial breaches of the Standard Contract that may occur in the future or seek damages at this time for partial breaches of the Standard Contract that may occur in the future.

As a result, this Court need not investigate and make decisions about the speculative events that may, or may not, occur in the future.

______Support for the premise that WEPCO may only recover for breaches that have occurred as of the filing of its complaint is found in cases analyzing the Court's jurisdiction to consider partial breach claims. In San Carlos Irrigation & Drainage District. v. United States, 23 Cl. Ct. 276 (1991), this Court considered a contract that it concluded was a "continuing contract" subject to a series of partial breaches. In that case, the United States was required to operate and maintain the "Project Works" (Coolidge Dam, San Carlos Reservoir, including spillways and an electrical generating system) for the irrigation district in the best possible manner, pursuant to a "Repayment Contract" entered in 1931. Apparently, the spillways became inoperable no later than 1966, and possibly as early as the 1940s, and the irrigation district stopped receiving its share of water or power in 1980. However, in 1983, a storm caused the dam to be shut down and evacuated, leaving the district no way to generate electrical power or store water. In response to the Government's argument that the irrigation district's claims had accrued for statute of limitations purposes no later than 1980, and possibly in 1966 or the early 1940s, the Court held that the Repayment Contract was a "continuing contract" potentially subject to a series of partial breaches, that the alleged 1983 breach was not time-barred by the applicable six-year limitations period because each "partial" breach created a new claim, and that the "fact that other partial breach claims, not raised in this litigation, are now time-barred is of no consequence." Id. at

279-80;[10] see Tennessee Valley Authority, 60 Fed. Cl. at 678 ("TVA's future claims for its future damages should, therefore, be considered to accrue for purposes of the statute of limitations at the time such damages are incurred.");[11] see Keefe Co. v. Americable Int'l, Inc., 755 A.2d 469, 472-75 (D.C. Ct. App. 2000) (discussing installment contracts); Kaiser, 587 S.W.2d at 457-58 (discussing continuing contracts); Restatement (First) of Contracts § 313 cmt. c (1932) (for partial breach, "the promisor may perform the remainder of the contract and be subject merely to a remedial duty to give compensation in damages" for the partial breach, but not for future anticipated partial breaches). Given that this Court's jurisdiction is determined by the circumstances existing upon the date that the complaint is filed, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n.4 (1992) (post-filing conduct cannot create jurisdiction that did not exist at outset of litigation); Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"), and given the problems that will always arise in identifying and verifying claimed damages incurred between the conclusion of fact discovery and the commencement of

---

[10] The Court distinguished the situation before it from the "continuing claim" doctrine, in which "a continuing course of action by the United States constitutes a continuing breach of a duty." San Carlos Irrig., 23 Cl. Ct. at 280. It recognized that, as with WEPCO's claims, "[t]he District is not claiming a continuing breach of the Repayment Contract, but rather that there were partial breaches of a continuing contract." Id.

[11] The Court's ruling in Yankee Atomic did not disagree with this legal reasoning regarding the scope of damages that could be considered for future breaches. Yankee Atomic, 2004 WL 1535688 at *2-3. Instead, the Court reached a different result based upon the finding of a single partial breach that extended from 1998 to 2010. Id. ("Damages caused by any failure to commence pick-up after 2010 (as well as any related issued concerning the adequacy of that future performance) would be future damages for future breaches.") As explained above, DOE's failure to perform is more properly viewed as a continuing series of partial breaches, the extent of which can only be measured with certainty as of the date of the filing of WEPCO's complaint or the date of trial, at the latest, rather than a single partial breach that runs from 1998 to 2010.

trial, the rules identified in the Restatement (Second) of Contracts and Restatement (Second) of Judgments, establishing an end date for damages for a partial breach at the filing of a complaint, appear correct.

Alternatively, other courts, including this one, have found that damages may be recovered under a partial breach to the extent that they were incurred by the time of trial. In Coughlin v. Blair, 41 Cal. 2d 587, 262 P.2d 305 (1953), the California court held that, "[i]f the breach is partial only, the injured party may recover damages for non-performance only to the time of trial and may not recover damages for anticipated future non-performance." Id. at 598, 262 P.2d at 311, quoted in May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1367 n.2 (9th Cir. 1980); see Quick v. American Steel & Pump Corp., 397 F.2d 561, 564 (2d Cir. 1968) ("we see no reason not to apply the usual rule that contracts to pay money in instalments are breached one instalment at a time"). This Court recently adopted the holding in the Coughlin decision in Indiana Michigan, finding that "[d]amages for partial breach of contract are measured by costs incurred between the breach and the date of trial." 60 Fed. Cl. at 648 (citing Coughlin, 41 Cal. 2d at 598, 262 P.2d at 311). If WEPCO were allowed to seek damages incurred up to the date of trial, the Government's ability to conduct discovery into those damages may be hampered by the need to prepare for trial while at the same time seeking to audit and verify WEPCO's incurred costs. Accordingly, the better result would be to require WEPCO to identify its costs incurred to a date certain in advance of trial, through a new complaint in a new case that could be consolidated with this case (to eliminate any jurisdictional issues), and to allow WEPCO to bring a future claim for any additional costs incurred after that date. See Tennessee Valley Authority, 60 Fed. Cl. at 678 n.16 (directing that the damages to be considered at trial encompass those incurred through the

end of plaintiff's most recent fiscal year to "make the presentation and analysis of evidence more convenient and efficient for the parties and the Court without inflicting prejudice on either party.")

Here, WEPCO has elected to treat DOE's failure to meet the January 31, 1998 date for beginning SNF acceptance as a partial, rather than total, breach. Accordingly, its damages are limited to those for the partial breach, or partial breaches, that occurred by the time that WEPCO filed its complaint or, at the outside, that have occurred to date. See 9 A. Corbin, supra, § 950, at 728 ("[o]ne judgment bars any further action for breaches that existed at the time suit was brought and that might then have been included in a single action"). To the extent that additional partial breaches occur in the future, WEPCO may attempt to seek appropriate relief at that time. See Indiana Michigan, 60 Fed. Cl. at 664 ("[w]hen [plaintiff] can show that it has incurred costs related to defendant's breach, plaintiff may have causes of action that are not speculative" and may elect to "maintain a second suit in case a further breach occurs" (quoting 9 A. Corbin, supra, § 946, at 720)); Tennessee Valley, 60 Fed. Cl. at 678; Yankee Atomic, 2004 WL 1535688, at *3. Currently, WEPCO's damages should be limited to damages, if any, specifically caused by the delay in beginning SNF and/or HLW acceptance upon which its complaint is based, and should not be extended to other possible future delays in continuing SNF and/or HLW acceptance or future damages that have not yet occurred. In any event, the existence of future delays in continuing SNF and/or HLW acceptance is speculative in light of the possible effects of future events, precluding an award of future damages.

## IV. BY REQUESTING THE ABILITY TO RETURN TO THE COURT WITH FUTURE CLAIMS, WEPCO RECOGNIZES THE LIMITATIONS UPON ITS ABILITY TO RECOVER FUTURE OR PROSPECTIVE DAMAGES

### A. WEPCO, In Seeking To "Split" Its Claims, Recognizes That It Cannot Now Litigate The Damages Arising From Future Partial Breaches

In addition to requesting that the Court adjudicate all possible damages incurred or to be incurred between 1988 and 2015 arising from DOE's failure to perform prior to 2010, WEPCO further requests that it be allowed to preserve claims for future damages that it may incur after 2015 arising from DOE's failure to perform during this same period of January 31, 1998 through December 31, 2009, and claims for future damages that it may incur arising "as a result of any additional partial breaches of contract resulting from DOE's failure to commence SNF acceptance by 2010 or thereafter." Pl. Mtn. at 1, 5, 7-8. To allow these actions, WEPCO proposes that it be allowed to split its claims and that the Court retain jurisdiction over its claims. Both actions are unnecessary. Because of the nature of the breach – DOE's failure to perform constituting a series of partial breaches – WEPCO has the ability to bring future claims for any future breaches for which it can establish damages.

Challenges to claim splitting are properly invoked when different claims are based upon different legal theories. Alyeska Pipeline Service Co. v. United States, 688 F.2d 765, 769 (1982). "A single nondivisible contract . . . normally gives rise to only one claim." Id. (citing Nager Electric Co. v. United States, 177 Ct. Cl. 234, 254, 368 F.2d 847, 861 (1966)). "A separate action founded upon a single nondivisible contract may be maintained if the later claim is severable from the earlier one, and, if at the time of commencement of the earlier suit, the later claim was not then capable of being asserted." Everett Plywood Corp. v. United States, 206 Ct.

Cl. 244, 251, 512 F.2d 1082, 1087 (1975) (citations omitted). "However, if the claimant, before filing its first suit is in possession of all the facts on which its second suit is based, the splitting of claims into multiple suits is fatal to maintenance of the later-filed action." Id. (citing Container Transportation Int'l, Inc. v. United States, 468 F.2d 926, 199 Ct. Cl. 713 (1972)).

When a plaintiff makes a partial breach claim, the rules regarding "claim splitting" apply differently. As the Restatement (Second) of Judgments explains, if the plaintiff elects to treat a contract breach as partial, "he is entitled to maintain an action for breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date. Id. § 26 cmt. g. In that instance, the plaintiff may "sue from time to time for damages incurred to the date of suit." Id. § 26(1)(e).

In its motion, WEPCO asks to be allowed to split breach of contract claims arising from the Standard Contract with DOE, referring to the guidelines set forth in section 26 of the Restatement (Second) of Judgments. Pl. Mtn. at 5-6. WEPCO wants to limit current consideration of its damages to those allegedly accruing by 2015, but seeks to preserve its rights, under a partial breach theory, to petition this Court at some point after 2010 for damages arising for possible breaches of the Standard Contract after that date in addition to preserving its rights to bring claims for damages that it cannot now determine. Pl. Mtn. at 1, 5, 7-8. In making this request, WEPCO recognizes that it does not now know all of the circumstances that will give rise to its future partial breach claim. However, the Court should not distinguish between "near" future damages and "far" future damages. The rules applicable to bringing and maintaining claims based upon partial breach are well-established in the Restatement. Based upon WEPCO's

partial breach claims, all future or prospective damages – whether accruing in 2006, 2007, or 2011 – should be brought at later dates, after they have been incurred.

### B. The Court Need Not Retain Jurisdiction Or Toll The Statute Of Limitations

WEPCO asks, in a footnote, that the Court retain jurisdiction over and toll the statute of limitations on any claims that WEPCO may be allowed to reserve for the future or that WEPCO may bring if DOE fails to begin performance in 2010. Pl. Mtn. at 7, n. 2. WEPCO fails to provide any support for the proposition that the Court can or should undertake these actions.

The only authority of which we are aware that would allow the Court to adjudicate WEPCO's current claims and issue a final judgment on those claims, yet retain jurisdiction, would be RCFC 54(b). Pursuant to RCFC 54(b), the Court "may direct the entry of a final judgment as to one or more but fewer than all the claims or parties only upon an express determination that there is no just reason for delay." RCFC 54(b) is intended to "avoid the possible injustice of a delay in judgment of a distinctly separate claim to await adjudication of the entire case." Brown v. United States, 3 Cl. Ct. 409, 412 (1983) (quoting Fed. R. Civ. P. 54(b) note (1946)). "[T]he court may not invoke Rule 54(b) liberally, but must find 'some danger of hardship or injustice through delay which would be alleviated by immediate appeal.'" Cherokee Nation of Oklahoma v. United States, 23 Cl. Ct. 735, 738 (1991) (quoting, in part, Brunswick Corp. v. Sheridan, 582 F.2d 175, 183 (2d Cir. 1978) (denying request for invocation of RCFC 54(b) because plaintiff had not shown that "hardship or injustice" would result from delay)).

WEPCO is not asking the Court to adjudicate claims now to avoid the possible hardship of delay. Instead, WEPCO is asking the Court to retain jurisdiction over claims that have not

accrued and, apparently, cannot yet be defined because they will be, at least in part, based upon partial breaches that have not yet occurred. The rule does not appear to contemplate partial adjudication by the Court to allow for the presentation of new claims at a future date. Further, this Court does not possess jurisdiction to entertain claims in this case based upon partial breaches that have not yet occurred or that occurred after WEPCO's complaint was filed. As explained above, WEPCO may pursue damages for future partial breaches in separate proceedings before this Court. See Tennessee Valley Authority, 60 Fed. Cl. at 678. WEPCO's claims do not fit within the narrow confines in which RCFC 54(b) was intended to be invoked. Moreover, to the extent that WEPCO is requesting that the Court enter a partial judgment and simply retain the case on its docket, that effort seems unnecessary and a waste of the Court's resources. Given WEPCO's inability to know precisely the scope of its future claims, it is better that WEPCO start with a fresh claim before the Court. See Indiana Michigan, 60 Fed. Cl. at 664.

Similarly, WEPCO's request that the Court "toll the statute of limitations" is without explanation or the benefit of citation to authority. Any plaintiff that alleges that the United States has breached a contract must bring any claim for the alleged breach within the Tucker Act’s six-year statute of limitations. 28 U.S.C. § 2501. Although no court has ever held that 28 U.S.C. § 2501 can be equitably tolled, see Frazer v. United States, 288 F.3d 1347,1352-53 (Fed. Cir. 2002), the Court need not decide that issue here. Even when equitable tolling is potentially available, it is clear that equitable tolling is available against the Government only if "the Government tricked [the plaintiff] into missing the deadline" and if the plaintiff was "diligen[t]" in pursuing its claims. Juice Farms Inc. v. United States, 68 F.3d 1344, 1346 (Fed. Cir. 1995);

see Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable [tolling] relief only sparingly.").

Further, given that WEPCO is seeking to bring future claims for costs that have not yet accrued, it is unclear why it is necessary for the Court to toll the six-year statute of limitations that applies to all claims brought before the Court. WEPCO retains the ability to bring claims within this time period in the future. The six-year statute of limitations for a partial breach begins to run from the date of each individual partial breach. Tennessee Valley Auth., 60 Fed. Cl. at 678. With regard to future partial breaches that have not yet occurred, the statute of limitations has obviously not begun to run. Without an explanation as to exactly how or why the tolling of this statute of limitations is necessary or appropriate, the Government is unable to respond further to WEPCO's request that the Court toll the statute of limitations for such future claims.

Finally, WEPCO seeks expedited review of its motion, arguing that denying the motion will effect the scope of discovery required in the case. Pl. Mtn. at 7 & n. 3. In the claim documents that WEPCO provided to the Government along with its Supplemental Disclosures and Damages Schedules (“Disclosures”) on February 14, 2005, pursuant to the Court's November 8, 2002, October 8, 2004 and November 24, 2004 orders, WEPCO has only provided cost information for costs incurred through September 4, 2004. Pl. Mtn. at 2; A. 22-23. In its Disclosures, WEPCO states that it does not intend to produce information on the amount and calculation of the claimed costs it has incurred or expects to incur after September 4, 2004 until it serves its expert disclosures. A. 30. The Court’s November 24, 2004 order provides that this could occur as late as November 14, 2005. WEPCO implies that the Court’s denial of its motion

will cause the need for additional discovery by forcing it "to support its entitlement to all of its future damages flowing from the Government's partial breach of contract in the present proceeding." Pl. Mtn. at 7 & n. 3. It is unknown whether the "partial breach" referred to in that event consists of partial breaches related to DOE's announced delay of its performance until at least 2010 or some other undefined set of partial breaches. In any event, the "future damages" claim support referred to undoubtedly is meant to include damages WEPCO expects to incur after December 31, 2015. As such, it would seem any support that WEPCO would provide for these damage claims would be in the form of the expert opinions provided by the same experts upon which it will rely to support the claimed costs it has incurred or expects to incur after September 4, 2004. While the Government would be interested to learn how these experts will deal with the issue of identifying upon which set of partial breaches they intend to rely, WEPCO has not described how their providing this additional support would increase the time necessary for discovery. Without the present benefit of the support for WEPCO's future damages claim,[12] the Government is presently unable to estimate if this seemingly speculative endeavor will require any more time devoted to the expert discovery period than would its investigation of what would seem to be an equally speculative future cost damages claim through 2015 that WEPCO already intends to assert. However, by granting the Government's motion to limit the scope of potential damages to the costs incurred between 1998 and the date of WEPCO's complaint, the Court will properly limit the scope of discovery by foreclosing the need to conduct discovery into

[12] The Government does not raise here the issue of the insufficiency of the damage schedules provided by WEPCO based upon its failure to provide information on the amount of the future damages it expects to incur through 2015 that it presently intends to assert in the present action, but will do so, if necessary, by separate motion.

the actions that DOE, the NRC, or WEPCO may take as many as ten years into the future. Discovery will be properly focused upon the decisions that WEPCO has already made and the costs that it has allegedly already incurred as a result of DOE's continuing breaches and its storage decisions. Discovery into what "may" happen in the future will be unnecessary.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny WEPCO's motion in its entirety and grant the Government's cross-motion limiting the consideration of damages to those incurred between January 31, 1998 and the date that WEPCO filed its complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Kevin B. Crawford
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

March 11, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on March 11, 2005, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kevin B. Crawford

No. 00-697C
(Senior Judge Merow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WISCONSIN ELECTRIC POWER COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION
FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS
AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR
SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

March 11, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . iii

INDEX TO THE APPENDIX . . . . . . . . . . viii

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTION AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 3

I. WEPCO SEEKS TO RECOVER DAMAGES FOR A PARTIAL, RATHER THAN TOTAL, BREACH OF CONTRACT . . . . . . . . . . 3

II. WEPCO CAN RECOVER ONLY FOR PARTIAL BREACHES THAT HAVE OCCURRED AS OF THE FILING OF ITS COMPLAINT . . . . . . . . . . 4

A. DOE's Continuing Breaches Are Tied To The Failure To Accept SNF In Accordance With The Approved DCSs With Individual Utilities . . . . . . . 4

B. Performance In 2010 Has Not Been Established As An Independent Contractual Commitment Pursuant To The Standard Contract . . . . . . . . . 9

III. BECAUSE WEPCO SEEKS CONTINUED PERFORMANCE OF THE STANDARD CONTRACT, WEPCO CANNOT RECOVER DAMAGES FOR COSTS THAT WERE INCURRED PRIOR TO DOE'S PARTIAL BREACHES OF CONTRACT OR AFTER THE DATE THAT ITS COMPLAINT WAS FILED . . . . . . . . . . 11

A. The Measure Of Damages For A Partial Breach Of Contract Differs From That For A Total Breach Of Contract . . . . . . . . . . 11

B. Because WEPCO Has Elected To Pursue Damages For A Partial Breach Of Contract, Rather Than A Total Breach, It Cannot Recover Damages That Pre-Date The Actual Breach . . . . . . . . . . 16

1. Under A Partial Breach Claim, A Plaintiff Cannot Rely Upon An Anticipatory Partial Repudiation Theory To Recover Damages That Precede The Actual Partial Breach . . . . . . . . . . 16

2. WEPCO Cannot Circumvent The Legal Bar To Recovery Of Its Pre-Breach Damages By Formulating Them As Costs Incurred In The Exercise Of Its Duty Of Mitigation . . . . . . . . . . . . . . . . . . . 23

C. WEPCO Also Cannot Recover As Damages Costs Incurred After The Date That Its Complaint Was Filed . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV. BY REQUESTING THE ABILITY TO RETURN TO THE COURT WITH FUTURE CLAIMS, WEPCO RECOGNIZES THE LIMITATIONS UPON ITS ABILITY TO RECOVER FUTURE OR PROSPECTIVE DAMAGES . . . . . . . 33

A. WEPCO, In Seeking To "Split" Its Claims, Recognizes That It Cannot Now Litigate The Damages Arising From Future Partial Breaches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. The Court Need Not Retain Jurisdiction Or Toll The Statute Of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alyeska Pipeline Service Co. v. United States,
688 F.2d 765 (1982) . . . . . 33

Ammex, Inc. v. United States,
334 F.3d 1052 (Fed. Cir. 2003) . . . . . 12

Apex Pool Equipment Corp. v. Lee,
419 F.2d 556 (2d Cir. 1969) . . . . . 21

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . 16

Brown v. United States,
3 Cl. Ct. 409 (1983) . . . . . 35

Brunswick Corp. v. Sheridan,
582 F.2d 175, 183 (2d Cir. 1978) . . . . . 35

Cherokee Nation of Oklahoma v. United States,
23 Cl. Ct. 735 (1991) . . . . . 35

Christopher Village, L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) . . . . . 12

Cities Service Helex, Inc. v. United States,
211 Ct. C 543 F.2d 1306 (1976) . . . . . 15, 16, 19, 22

City of Fairfax, Va. v. Washington Metropolitan Area Transit Authority,
582 F.2d 1321 (4th Cir. 1978), cert. denied, 440 U.S. 914 (1979) . . . . . 19, 28

Container Transportation International, Inc. v. United States,
468 F.2d 926, 199 Ct. 713 (1972) . . . . . 34

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) . . . . . 17, 19

Dittmore-Freimuth Corp. v. United States,
390 F.2d 664 (Ct. Cl. 1968) . . . . . 23

Dunkin Donuts of America, Inc. v. Minerva, Inc.,
956 F.2d 1566 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Everett Plywood Corp. v. United States,
206 Ct. Cl. 244, 512 F.2d 1082 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fraas Surgical Mfg. Co. v. United States,
215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Franconia Associates v. United States,
536 U.S. 129 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 22

Frazer v. United States,
288 F.3d 1347 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002), vacated and remanded on other grounds,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), appeal pending,
No. 04-5122 (Fed. Cir. docketed July 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Irwin v. Department of Veterans Affairs,
498 U.S. 89 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Juice Farms Inc. v. United States,
68 F.3d 1344 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lovink v. Guilford Mills, Inc.,
878 F.2d 584 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

Lucente v. IBM Corp.,
310 F.3d 243 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Middleton v. United States,
175 Ct. Cl. 786 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mobil Oil Exploration v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nager Electric Co. v. United States,
177 Ct. Cl. 234, 368 F.2d 847 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Newman-Green, Inc. v. Alfonzo-Larrain,
490 U.S. 826 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PVI, Inc. v. Ratiopharm,
253 F.3d 320 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pinewood Realty Ltd. P'ship v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

Quick v. American Steel & Pump Corp.,
397 F.2d 561 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Rapid City Indian Health Advisory Bd. of Directors,
ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983) . . . . . . . . . . . . . . . . . . . . . . 9

Reynolds v. United States,
141 Ct. Cl. 211, 158 F. Supp. 719 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Roboserve, Inc. v. Kato Kagaku Co.,
78 F.3d 266 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Roehm v. Horst,
178 U.S. 1 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

S&R Corp. v. Jiffy Lube International, Inc.,
968 F.2d 371 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

San Carlos Irrigation & Drainage District v. United States,
23 Cl. Ct. 276 (1991), aff'd, 111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . 12, 29, 30

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Tretchick v. Department of Transportation,
109 F.3d 749 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

United States v. Dekonty Corp.,
109 F.3d 749 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States Fidelity & Guaranty Co. v. United States,
230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wisconsin Power & Light Co. v. Century Indemnity Co.,
130 F.3d 787 (7th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Yankee Atomic Electric Co. v. United States,
No. 98-126C, 2004 WL 1535688 (Fed. Cl. June 28, 2004) . . . . . . . . . . . . . . 25, 26, 30, 32

Young Engineers, Inc. v. United States International Trade Commission,
721 F.2d 1305 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATE CASES**

Coughlin v. Blair,
41 Cal. 2d 587, 262 P.2d 305 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 31

Kaiser v. Northwest Shopping Ctr., Inc.,
587 S.W.2d 454 (Tex. Civ. Ct. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Keefe Co. v. Americable International, Inc.,
755 A.2d 469 (D.C. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

May v. Morganelli-Heumann &Associates,
618 F.2d 1363 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**FEDERAL STATUTES AND REGULATIONS**

28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 36

10 C.F.R. § 961.11 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**MISCELLANEOUS**

4 A. Corbin, Corbin on Contracts § 972 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28

9 A. Corbin, Corbin on Contracts § 946 (interim ed. 1979) . . . . . . . . . . . . . . . . . . . 12, 13, 14, 32

9 A. Corbin, Corbin on Contracts § 950 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

9 A. Corbin, Corbin on Contracts § 956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

Restatement (First) of Contracts § 313 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 30

Restatement (Second) of Contracts § 236 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 19, 27

Restatement (Second) of Contracts § 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 28

Restatement (Second) of Contracts § 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Restatement (Second) of Judgments § 26 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 34

**INDEX TO THE APPENDIX**

Document Pages

Letter from M. Detmer, Contracting Officer, to Ronald G. Cocherell, Southern Nuclear Operating Company, dated March 4, 1992, attaching Instructions for Completing the Appendix C Delivery Commitment Schedule . . . . . . . . . . . . . . . 1

Excerpt of Trial Testimony of Christopher Kouts in Yankee Atomic Electric Co. v. United States, No. 98-126C, August 2, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Excerpt of Civilian Radioactive Waste Management System Requirements Document, Rev. 05, January 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Excerpt of H.R. Rep. No. 108-212, "Energy and Water Development Appropriations Bill, 2004," July 16, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Order, Tennessee Valley Authority v. United States, No. 01-249C, August 12, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Plaintiff's Supplemental Disclosures and Damages Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# APPENDIX

# INDEX TO THE APPENDIX


| Document | Pages |
|---|---|
| Letter from M. Detmer, Contracting Officer, to Ronald G. Cocherell, Southern Nuclear Operating Company, dated March 4, 1992, attaching Instructions for Completing the Appendix C Delivery Commitment Schedule | 1 |
| Excerpt of Trial Testimony of Christopher Kouts in Yankee Atomic Electric Co. v. United States, No. 98-126C, August 2, 2004 | 10 |
| Excerpt of Civilian Radioactive Waste Management System Requirements Document, Rev. 05, January 1999 | 15 |
| Excerpt of H.R. Rep. No. 108-212, "Energy and Water Development Appropriations Bill, 2004," July 16, 2003 | 18 |
| Order, Tennessee Valley Authority v. United States, No. 01-249C, August 12, 2004 | 20 |
| Plaintiff's Supplemental Disclosures and Damages Schedules | 21 |

**Department of Energy**
Washington, DC 20585

MAR 04 1992

Mr. Ronald G. Cocherell
Southern Nuclear Operating Company
P.O. Box 1295
Birmingham, AL 35201

Dear Mr. Cocherell:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible.

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

## U. S. DEPARTMENT OF ENERGY

## INSTRUCTIONS FOR COMPLETING THE APPENDIX C DELIVERY COMMITMENT SCHEDULE

### GENERAL INSTRUCTIONS

1. **PURPOSE AND USE OF DATA**
   The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) states that, beginning January 1, 1992, Purchasers may begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter. The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

2. **WHO SHOULD SUBMIT**
   The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

3. **WHEN TO SUBMIT**
   Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited. For each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992).

4. **WHERE TO SUBMIT**
   Purchasers shall forward the completed DCS and one copy to:

   U.S. Department of Energy
   DOE Contracting Officer
   Office of Placement and Administration
   PR-322.1
   1000 Independence Avenue, S.W.
   Washington, DC 20585

cc: U.S. Department of Energy
   Chief, Logistics and Utility Interface Branch
   Office of Civilian Radioactive Waste Management
   RW-432
   1000 Independence Avenue, S.W.
   Washington, DC 20585

5. **AUTHORITY**
Data on the DCS are collected under the authority of the Nuclear Waste Policy Act of 1982, as amended, (42 U.S.C. 10101 et seq.) and Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.

6. **PROVISIONS REGARDING CONFIDENTIALITY OF INFORMATION**
Data being collected on the DCS are not considered to be confidential.

7. **BACKGROUND INFORMATION**
   (a) The 1991 Acceptance Priority Ranking (APR) established the order in which FWMS acceptance capacity is allocated in the 1991 ACR. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual Purchaser allocations. The Purchasers' allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval. Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval (e.g., in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.)

   (b) Once a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation (see also Item 7.(h)).

   (c) The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

   (d) Over the 10 year period for which the 1991 ACR allocated FWMS acceptance capacity, Purchasers may qualify for a specific number of allocations (from 0 through 10). Beginning in January 1992, Purchasers may submit DCSs for any or all of their allocations, up through year 10. Early submission of DCSs will facilitate the exchange of approved DCSs between Purchasers, as allowed by Article V.E. of the Standard Contract.

   (e) The actual number of DCSs submitted by a Purchaser will vary according to the number of allocations they have in the ACR and the number of DCSs they choose to submit for each allocation. A DCS should be submitted for only one designated delivery site, only one fuel type (BWR, PWR, or Other) and only one delivery

year. Therefore, if a Purchaser splits an allocation between two or more delivery sites or between fuel types, more than one DCS will be required. There is no limit to the number of DCSs that can be submitted for each allocation, as long as the total metric tons of uranium (MTU) requested does not exceed the Purchaser's total MTU allocation for that year.

(f) Unless specifically requested otherwise, DOE will evaluate all DCSs submitted against a single allocation period independently. If a Purchaser prefers all DCSs submitted against a single allocation year to be considered as one package, this should be communicated to DOE at the time of submission. When evaluating the DCSs as a package, if one DCS is disapproved then all DCSs for that period will be disapproved and returned to the Purchaser for resubmittal.

(g) Waste acceptance capacity allocated to Purchasers is expressed in terms of MTU. The MTU allocation does not necessarily limit the number of assemblies that can be delivered. The DCS is designed to cover a given quantity of SNF as measured in MTU, not assemblies. DOE realizes that the number of assemblies associated with an allocation will vary according to the actual SNF designated for delivery. The appropriate entry for the blank on the DCS labeled "Number of Assemblies" is discussed in more detail below in the Specific Instructions For Completion of DCS.

(h) Since the DCS does not require the identification of the specific fuel to be delivered, each DCS is assumed to be for Standard Fuel, Class S1 or Class S2, as defined in Appendix E of the Standard Contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The Contract makes specific provisions for delivery of other than standard fuel. If a Purchaser intends to deliver other than standard fuel, the Purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the Purchaser has the option to deliver standard fuel on the schedule in the approved DCS or exchange the approved DCS with another Purchaser, provided contractual time limitations can be met.

## 8. DCS PROCESS

Upon receipt by DOE, each DCS will be date stamped. DOE shall approve or disapprove the DCS within 3 months of receipt. Such approval will be confirmed by signatures of the DOE Contracting Officer and DOE Technical Representative on the DCS returned to the Purchaser. If the DCS is incomplete or if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the

Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. **QUESTIONS ON THE DCS**

If you have any questions or require more information for completing the DCS, please contact **Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634.** Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

## SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 **DCS IDENTIFICATION NUMBER:** A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

YY = the last two digits of the Proposed Delivery Year
RRID = RW-859 reactor identification number of the designated delivery site
NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 **CONTACT PERSON:** Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 **CONTRACT NUMBER:** Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 **REACTOR/FACILITY INFORMATION:** Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 **TYPE OF CASK REQUIRED:** Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 **SHIPPING LOT NUMBER:** ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 **PROPOSED SHIPPING MODE:** Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 **PROPOSED DELIVERY DATE:** Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 **DOE ASSIGNED DELIVERY COMMITMENT DATE:** This entry will be completed by DOE.

2.6 **RANGE OF DISCHARGE DATES (Earliest to Latest):** Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 **METRIC TONS OF URANIUM (Initial):** Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

(Discharged) "Not Required" has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.

2.8 **NUMBER OF ASSEMBLIES--BWR/PWR/Other:** Enter the number of SNF assemblies corresponding to the Metric Tons Uranium indicated in Item 2.6 in the appropriate blank for BWR, PWR or Other (e.g., HTGR, TRIGA). If the SNF in the designated range of discharge dates encompasses assemblies with a wide range of MTU/assembly, state the maximum number of assemblies that may be delivered. Since the actual number of assemblies to be delivered may vary according to the specific SNF selected for delivery, adjustments to the number of assemblies will be made during the FDS process.

3.0 **CERTIFICATIONS:** An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE. Insert the appropriate signatory's title and date.

4.0 **NOTIFICATION OF DOE APPROVAL:** The signatures of DOE's Technical Representative and the Contracting Officer will indicate that the DCS has been approved.

Page 3378

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3379

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

Page 3380

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 3381

P R O C E E D I N G S

MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

10

Page 3450

A Yes, they do.
Q And what do those reports represent?
A They represent the views and positions of the M&O contractor on those issues.
Q Are these reports deliverables under their contract?
A Yes, they are.
Q Does DOE accept these reports as deliverables?
A Yes, we accept them as deliverables if they -- if we believe that they appropriately addressed the statement of work and the intention of the report, yes.
Q Are those reports the statements of DOE?
A No, they are not.
Q By accepting the report, does DOE accept the conclusions stated in the report?
A No.
Q When would these reports become the reports or statements of DOE?
A When DOE either issued a document under its own letterhead, it would have an RW number, radioactive waste number on it. Or if there was some policy statement made by the Department in some mechanism either through correspondence or other

Page 3451

areas.
Q Thank you. Mr. Kouts, are you familiar with the term receipt rate?
A Yes, I am.
Q What is the receipt rate?
A The receipt rate, as we use it in the program, is the technical capability of our facilities to receive materials and process them through the system.
Q Are you familiar with the term acceptance rate?
A Yes, I am.
Q What is the acceptance rate?
A The acceptance rate is the contractual rate at which the Department has committed to receive materials from the contract holders.
Q Where is the acceptance rate set forth?
A The acceptance rate is set forth in the acceptance priority ranking and the Annual Capacity Report.
Q Could the receipt rate and the acceptance rate be different?
A Yes, they could.
Q Why?
A Essentially, the Department can determine

Page 3452

from a business standpoint as a business judgment that it does not want to commit to accept materials at the amount of the maximum capability, if you will, of our ability to receive those materials.
So, depending on how the Department views how it wants to operate the program from a business perspective, if you will, it could be different than what the total receipt rate and the total capability of the receipt rate would be of our facilities.
Q Could there be other constraints on the acceptance rate?
A Potentially there could be issues associated with how we want to deploy facilities and how we want to essentially process the fuel.
Q Are you familiar with the term ramp-up rate?
A Yes, I am.
Q What is ramp-up rate?
A It's standard practice, when you're going to start up any kind of facility, including nuclear facility, and I would say especially a nuclear facility, that you don't want to start out at a maximum rate. You don't want to tax your facilities to their maximum rate until you had a learning curve, if you will.
So the ramp-up rate that we typically had in

Page 3453

our technical baseline documents is a step-by-step approach to try to work us up to our maximum rate that would allow us the ability to learn as we go and to bring on capability -- additional capability in a measured fashion as opposed to trying to do a maximum amount on day one.
Q Thank you. Mr. Kouts, are you familiar with the MRS that DOE was designing to be able to accept waste in 1998?
A I'm familiar with the various designs that were being considered for that, yes.
Q What type of facility did DOE plan to build?
A That was a bare fuel handling storage only facility that could receive materials from transportation casks, if you will, from utilities and from utility sites, and store it on site by removing materials out of those casks, out of those transportation casks and putting them into various storage devices.
Q And do you know what the estimated cost for that facility was?
A Depending on the type of storage technology to be used, the life cycle cost we looked at somewhere between 1.7 and $2.7 billion.
Q Thank you. Can we have Plaintiffs' Exhibit

Page 3454

254?

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Sure. Yes.

MS. SULLIVAN: Your Honor, would you like a copy?

THE COURT: I can use this.

MS. SULLIVAN: Okay.

BY MS. SULLIVAN:

Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?

A Yes, I do.

Q Would you explain to the Court what this document is.

A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.

Q And does this document contain information with regard to the design requirements of the repository?

A Yes, it does.

Q Okay. How is this document used by your

Page 3455

office in its waste acceptance function?

A Essentially, it gives us guidance to – in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.

Q Is your office responsible for the preparation of this document?

A I – yes. I manage changes to this. And I basically do that for the director of the program.

Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?

A Yes, I am.

Q How are you familiar with that facility?

A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.

Q What type of facility did DOE plan to build as the centralized interim storage facility?

A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in – in table 3 here.

Q Okay. And the rates in table 3, do you have

Page 3456

an understanding as to what the source of those rates was?

A Yes.

MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste. So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.

MS. SULLIVAN: Would you like me to address that, Your Honor?

THE COURT: If you wish.

MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case. And also, further questions will make clear it's tied in part to the 2010 date.

Page 3457

THE COURT: Okay. Go forward.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q Mr. Kouts, what was – do you have an understanding what the source of the rates were for the facilities that were set forth in this document?

A Yes.

Q And what was your understanding?

A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes. These ramp-up rates were basically rates that were contained in those bills.

Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?

A Bills pending in Congress.

Q And did you have an understanding as to what the legislation called for, generally?

A The – the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a – an interim storage facility or centralized interim

12

Page 3458

storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.

Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s – in the 1980s and early '90s?

A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done.

It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.

Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?

A No, it was not.

Q Why not?

A The legislation was never passed and the

Page 3459

Department never received any authorizations to proceed on it.

Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?

A If Congress passed that legislation, then the Department would be authorized to implement it, yes.

Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?

A Yes, I am.

Q And what was the initiative discussed in that budget submission?

A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the – the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.

Q Do you have an understanding as to what initiatives could result from this study?

Page 3460

A There have been various considerations on Capitol Hill as to initiatives that would use Homeland Security funds to essentially fund the reactors to put their – the pool – the materials that they're now managing in the pools, the high-level waste materials, the spent fuel into dry storage casks, and undertake that initiative.

Q Mr. Kouts, are you familiar with the material known as Greater Than Class C radioactive waste?

A Yes.

Q Do you understand that GTCC radioactive waste is generated by commercial nuclear utilities?

A Yes.

Q Is GTCC radioactive waste one of the waste materials that DOE will accept pursuant to the standard contract?

A No.

Q Is DOE designing the repository to accept GTCC radioactive waste generated by commercial nuclear facilities?

A No, it is not.

Q Could DOE accept GTCC radioactive waste at the repository?

A Theoretically it could. It would require, I

Page 3461

believe, a change in legislation to allow less than high-level waste materials to go into the repository.

In addition to that, we would have to perform a variety of technical analyses and supplement our analyses that we are currently planning for the Nuclear Regulatory Commission as to how we would dispose of those materials within Yucca Mountain.

In addition to that, we would have to develop some kind of fee structure to pay for the additional costs associated with those materials.

Q Are there space limitation issues that DOE would have to analyze if GTCC were to go to the repository?

A Yes. Potentially there are.

Q And are there issues concerning the current design of the surface facilities at Yucca Mountain that would have to be analyzed?

A Yes. Right now, our facilities are designed to deal with high-level waste materials, spent fuel, bare spent fuel, if you will. If we were going to handle Greater Than Class C waste, we would have to figure out how it would be packaged, where it would be packaged, and probably require separate service facilities over and above what we have now, since our current facilities are designed only to handle the

13

Page 3462

materials, the high-level waste materials.
And as such, we would not want to reduce the capacities of those facilities in order to deal with other waste materials.
Q Could DOE place GTCC in the backfill spaces of the repository?
MR. STOUCK: Can we watch the leading questions here on this, Your Honor? There have been a series of leading questions about this GTCC issue, and *I object on that basis.*
THE COURT: Well, you could rephrase.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, when I use the term backfill spaces, do you know what I'm talking about?
A Yes.
Q Could those backfill spaces --
MS. SULLIVAN: I don't understand quite how this is leading. This is a direct question, whether or not they could place GTCC in the backfill spaces. Would you like me to try to rephrase, Your Honor?
MR. STOUCK: I can explain why it's leading, Your Honor. She asked if they could put GTCC in the repository. And he said no. That would have been the place to mention why not, rather than have counsel

Page 3463

lead him to the explanation.
MS. SULLIVAN: He's provided some reasons. I think there are some other reasons, and I'm helping him --
THE COURT: The record reflects that -- you may answer the question. I'll overrule the objection.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Okay. As simplistically -- my sense is, from my understanding of what's in Greater Than Class C low-level waste, I don't think we could just simply put these materials in backfill or in various spaces in the drifts, if you will, the underground tunnels, if you will, in the repository, *without some kind of packaging and assurance that* these materials would not get out so that it would affect our ability to meet the very stringent EPA standards.
So what I alluded to earlier was the fact that we do have to do a variety of analytical work to determine how best these materials would have to -- would be placed in the repository, what they would be placed in, what kind of canisters, what type of waste packages they would be in. And without that *additional detail work, it's difficult at this time to* say whether or not they could go in backfill, if you

Page 3464

will, of the repository.
Let me also add we're in the planning on backfilling the repository. Essentially what we're doing is placing the waste packages. We're not filling up the repository with any kind of materials.
It's been theorized in the past we would take pulverized tuff or volcanic materials and backfill it.
We're not planning on doing that. That's not part of the current plan to demonstrate to the Nuclear *Regulatory Commission that this site can isolate* material.
So there isn't a lot of space in the drifts to add additional materials. So my sense is what would have to happen is there would be additional drifts or tunnels that would have to be drilled out where these materials would be placed.
THE COURT: What if you would package the GTCC in exactly the same type of container that the fuel assemblies are put in?
THE WITNESS: We could do that. I would also indicate that each of the waste packages costs roughly about half a million dollars. That's a very expensive package for low-level waste materials.
There might be more efficient, more effective ways to do that. But I think when we analyze this in our

Page 3465

environmental impact statements, as we had to look at reasonably foreseeable alternatives, what we did analyze and essentially take these materials and put them in these packages and evaluate them as part of the EIS process.
That was the option we took because it was expedient, and we didn't want to expend any additional analytical work. It was kind of an outer bound of what we might do.
THE COURT: Would that solve the fee problem too, because you could charge the same fee as SNF?
THE WITNESS: That might help with the fee.
We would have to look at, you know, what amount of new *drifts, if you will, new tunnels would be caused by* this. There were -- in the EIS, as I remember, there were roughly 2,000 cubic meters of these materials that were identified in the EIS. You translate that to cubic yards. That's roughly about 2600 cubic yards. So that's going to be quite a few waste packages and quite a few drifts that you would have to develop, if you will, in order to put these materials in there.
THE COURT: Okay. Ms. Sullivan.
MS. SULLIVAN: *Thank you, Your Honor.*

14

HQO.19990112.0001 QA:L

DOE/RW-0406

*Office of Civilian Radioactive Waste Management*

# *Civilian Radioactive Waste Management System Requirements Document*

***Revision 05***
***(A00000000-00811-1708-00003)***

***January 1999***

***U. S. Department of Energy***
***Office of Civilian Radioactive Waste Management***





PLAINTIFF'S EXHIBIT
P0254
Yankee Atomic Elec. Co. et al

I. Waste Acceptance and Transportation Element shall accomplish planning and scheduling according to the provisions of the Standard Contract (10 CFR Part 961) and the EM/RW and NNPP/RW MOAs.

J. Integrated plans for CRWMS activities shall be developed and updated as needed to respond to changed data and operating conditions. Planning involves allocating system capacity, evaluating schedule requests, and establishing the CRWMS operations schedule.

K. Records validation shall be initiated upon receipt of Purchaser/Producer/Custodian forms describing the SNF/HLW to be delivered.

L. Waste Acceptance and Transportation shall validate title and/or transfer of responsibility and custody documentation from the Purchasers/Producers/Custodians.

## 3.4 MGR ELEMENT REQUIREMENTS

This section contains the requirements allocated to the MGR Element.

A. The MGR shall be designed to be capable of accommodating the total inventory of SNF and HLW (as documented in Planning Consideration 2.4.C) consistent with current disposal concepts (e.g., HLW/DOE SNF co-disposal). However, until the second repository is approved the MGR operational capacity shall be limited to 70,000 MTHM or equivalent of SNF and HLW.

B. The waste packages shall be designed such that substantially complete containment of the waste can be demonstrated for at least 1,000 years.

C. The monitored geologic repository concept shall allow the repository to be closed as early as 10 years after emplacement of the last waste package or to be kept open for at least 100 years from initiation of waste emplacement. The design shall not preclude the ability to keep the repository open, with appropriate maintenance and monitoring, for 300 years after initiation of waste emplacement. Future generations will make the ultimate decision on whether it is appropriate to continue to maintain the repository in an open, monitored condition or to close the repository, based on development of their own criteria and level of certainty regarding ultimate repository performance.

## 3.5 CISF ELEMENT REQUIREMENTS

If a CISF is approved, the following allocated requirements shall be met.

A. The CISF shall be designed to expedite operations by using a phased approach with Phase 1 having the capability to receive and store licensed dual purpose and multi-purpose systems only and Phase 2 having the capability to receive and store SNF in licensed dual purpose and multi-purpose systems and as individual assemblies at the rates indicated in Table 3.

Table 3. CISF Receipt Rates[7] (In MTHM or Equivalent/Year)

| Phase | Year of Operation | Commercial SNF[8] | Government Managed Nuclear Materials |
|---|---|---|---|
| I | 1 | 1200 | TBD 3 |
| I | 2 | 1200 | TBD 3 |
| II | 3 and 4 | 2000 | TBD 4 |
| II | 5 | 2700 | TBD 4 |
| II | 6 and subsequent | 3000 | TBD 4 |
| II | TBD 2 | 3000 | TBD 4 |

B. The CISF shall have a minimum storage capacity of 10,000 MTHM of SNF.

C. The CISF shall have a HLW storage capacity of **(TBD 6)**.

D. The CISF shall be capable of preparing SNF and HLW for off-site transport.

## 3.6 INTERFACE REQUIREMENTS

This section identifies the interface requirements between CRWMS system elements. Acceptance criteria for nuclear materials are documented in the Waste Acceptance System Requirements Document (WA-SRD) (DOE/RW-0351P).

### 3.6.1 Waste Acceptance and Transportation - Government Agency Interface Requirements

Waste Acceptance and Transportation shall interface with appropriate federal, state, tribal, and local government agencies to meet legal, regulatory and operational requirements for acceptance and transportation of SNF and HLW, such as route selection, approval, scheduling and notification, emergency planning and response, and security.

7 Receipt rates in this table are only applicable if a CISF is approved.

8 This could include MOX SNF in Phase II.

108TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT 108-212

# ENERGY AND WATER DEVELOPMENT APPROPRIATIONS BILL, 2004

JULY 16, 2003.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HOBSON, from the Committee on Appropriations, submitted the following

## REPORT

[To accompany H.R. 2754]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for energy and water development for the fiscal year ending September 30, 2004, and for other purposes.

INDEX TO BILL AND REPORT


| | Page Number Bill | Page Number Report |
|---|---|---|
| Introduction | ........ | 4 |
| I. Department of Defense—Civil: | | |
| Corps of Engineers—Civil: | | |
| Introduction | ........ | 7 |
| General investigations | 2 | 9 |
| Construction, general | 3 | 36 |
| Flood control, Mississippi River and Tributaries | 4 | 55 |
| Operation and maintenance, general | 5 | 59 |
| Regulatory program | 6 | 80 |
| Formerly Utilized Sites Remedial Action Program | 6 | 81 |
| Flood control and coastal emergencies | 6 | 81 |
| General expenses | 6 | 82 |
| Administrative provisions | 7 | .......... |
| General provisions | 7 | 82 |
| II. Department of the Interior: | | |
| Central Utah Project completion account | 9 | 85 |
| Bureau of Reclamation: | | |
| Water and related resources | 9 | 87 |
| Bureau of Reclamation loan program account | 11 | 104 |
| California Bay-Delta ecosystem restoration | ........ | 105 |
| Central Valley Project restoration fund | 11 | 105 |


85-160

PLAINTIFF'S EXHIBIT
P1889
Yankee Atomic Elec. Co. et al. v. US, 98-126C, 98-154C, 98-474C

DOE headquarters, $7,774,000 for Technical Information Management; and $1,020,000 for Energy Research Analyses. The request for program direction for field offices was reduced by $3,720,000 and the amount transferred to the Safeguards and Security line. The control level for fiscal year 2004 is at the program account level of Science Program Direction.

FUNDING ADJUSTMENTS

The Committee recommendation includes an offset of $4,383,000 for the safeguards and security charge for reimbursable work, as proposed in the budget request. A general reduction of $1,000,000 has been applied to the Science account.

NUCLEAR WASTE DISPOSAL

| | |
|---|---|
| Appropriation, 2003 | $144,058,000 |
| Budget Estimate, 2004 | 161,000,000 |
| Recommended, 2004 | 335,000,000 |
| Comparison: | |
| Appropriation, 2003 | +190,942,000 |
| Budget Estimate, 2004 | +174,000,000 |

The Federal government has a clear statutory responsibility, assigned by Congress in the Nuclear Waste Policy Act of 1982, as amended, to provide for the permanent disposal of spent nuclear fuel and high-level radioactive waste. The Department of Energy was required by statute to accept commercial spent nuclear fuel for disposal beginning on January 31, 1998, and entered into legally enforceable contracts with utilities to execute that obligation. Unfortunately, the Department has been unable to meet that deadline, resulting in a number of lawsuits over the Department's failure to meet its statutory and contractual obligation and a growing financial liability over that failure. The Court of Federal Claims has found the Department to be in breach of its contractual obligations and is proceeding to determine the extent of damages.

The primary consequence of the Department's failure to begin accepting spent nuclear fuel is not, however, the existence of lawsuits and damage claims; it is that vast quantities of commercial spent nuclear fuel remain in temporary storage at reactor sites scattered around the country, many located near major population centers. The Committee is not questioning the current safety and security of spent nuclear fuel stored at commercial sites in accordance with Nuclear Regulatory Commission criteria. The Committee does, however, believe that the safety and security of these materials will be enhanced the sooner they are placed in the underground repository at Yucca Mountain. After the events of September 11, 2001, the Committee believes it is more essential than ever to move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date.

Chronic funding shortfalls, however, have starved the program of the resources necessary to keep the repository program on schedule. The Department's latest schedule calls for opening the repository and beginning to accept spent fuel in 2010 at the earliest, over 12 years behind schedule. Most recently, the Department requested a total of $591,000,000 for the nuclear waste disposal program in fiscal year 2003, yet received only $457,000,000, a funding shortfall

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 01-249-C

(Filed: August 12, 2004)

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

ORDER

The government's motion for reconsideration, filed on August 10, 2004, respecting this Court's decision reported at 60 Fed. Cl. 665 (2004), proceeds on erroneous premises. First, contrary to the government's motion, the Court made *no* "finding that TVA could receive damages beginning in 1995." Def.'s Mot. at 12. Rather, the Court explicitly found that "DOE breached its obligation to act on TVA's DCSs in good faith," 60 Fed. Cl. at 674, and that initially occurred in 1997. Second, causation is an element of proof regarding damages, and the Court specifically denied TVA's motion for summary judgment respecting damages. *See* 60 Fed. Cl. at 675-76. Defendant's motion for reconsideration is denied.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 00-697C<br>(Senior Judge Merow) |

**PLAINTIFF'S SUPPLEMENTAL DISCLOSURES AND DAMAGES SCHEDULES**

Pursuant to Rule 26(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and this Court's Orders of November 8, 2002 and November 24, 2004, Plaintiff Wisconsin Electric Power Company ("WE") hereby produces to the Defendant its supplemental disclosures and damages schedules.[1] In accordance with the direction provided by the Court's above-referenced orders, WE further presents the basis for the "items and figures" (cost schedules) documentation provided in the damages schedules discussed in this pleading and in the documents being produced to the Government this same day.

## I. Introduction

In 1983, WE entered into Contract No. DE-CR01-83NE44425 ("Standard Contract") with the Department of Energy ("DOE") for disposal of spent nuclear fuel ("SNF") generated at Point Beach Nuclear Plant, Units 1 and 2 ("PBNP"). Article II of the Standard Contract between WE and DOE required DOE to begin accepting SNF by January 31, 1998. However, DOE has not accepted any of WE's SNF and has repeatedly represented instead,

[1] WE's responses to the Government's interrogatories and requests for production of documents filed during the coordinated discovery proceedings satisfied its initial disclosure obligations under RCFC 26 and the Court's above-referenced orders.

that performance of its SNF disposal obligation will commence in 2010. See Order in Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl., Dec. 20, 2004). On October 8, 2004, the Court of Federal Claims entered a ruling establishing DOE's liability for partial breach of WE's Standard Contract and the case is now in the damages phase.

DOE's failure to perform under WE's Standard Contract has caused, and will continue to cause, WE to incur significant costs. Through September 30, 2004, WE has currently identified approximately $42,369,000 in costs incurred arising from DOE's contract breach.[2] WE expects to continue to incur costs and damages for SNF storage until such time as no SNF exists at Point Beach except for what would have remained on site had DOE not breached its contract. Future damages, as well as would-have-been costs, and the time-value of money costs, will be the subject of WE's expert damages report disclosed in accordance with the Court's pretrial schedule. WE currently intends to use personnel from The Kenrich Group LLC as its damages experts.

The information that is contained in WE's incurred cost schedules was compiled with the assistance of personnel from the Kenrich Group LLC. In addition, WE employees David Weaver and Paul Farron, and former WE employee Ione Straub, provided source support for damages items. Source support was also provided by Jim Becka and Linda Fencil of the Nuclear Management Corporation ("NMC"). NMC operates PBNP pursuant to a contract with WE.

WE's incurred cost schedules and support are in the form of hardcopy documents grouped according to the 19 categories of WE's past cost elements discussed below. Each of the categories of documents are subdivided by four tabs – summary, detailed accounting

---

[2] In this submission, amounts are based on nominal dollars for costs already incurred. Nominal dollars are actual dollars spent or expected to be spent in each of the relevant years. The dollars will be present-valued in expert report submissions and for trial.

data, invoices, and purchase orders – and cover costs incurred by WE through September 2004. This summary provides below additional detail regarding the documents' contents and the past cost elements covered by the schedules.

## II. WE's Increased Costs Resulting from DOE's Breach of Contract

The following are the costs that WE has incurred due to the DOE's breach of the Contract.

### A. Organization Of Supporting Documents

Each category is organized in the following manner.

#### 1. Summary

The first tab for each group states the title of the cost category at issue and contains a summary spreadsheet of the costs that WE has incurred in this cost category by year and month. The summaries are based on the data included in the other sections of the category and total all costs incurred for the particular cost category.

#### 2. Detailed Accounting Data

The WE Accounting Report contains schedules that provide more detail regarding the types of costs and the months in which they were entered into the accounting records. The WE Accounting Report extracts entries from WE's Consolidated General Ledger. The Consolidated General Ledger contains general ledger entries relating to SNF storage and planning costs arising from the operation of PBNP. The general ledger has been subject to financial statement audit by WE's independent auditors. Further, financial statements prepared based on these general ledger entries have been submitted to the Securities and Exchange Commission and the Federal Energy Regulatory Commission. WE is subject to regulation by the Public Service Commission of Wisconsin ("PSCW") as well as the Michigan Public Service Commission.

The "Invoice Provided" and "Check Provided" columns in these reports indicate which line entries are accompanied by supporting documentation. These columns were added for this submission for the purpose of ease of review.

**3. Invoices**

This section contains copies of invoices paid to outside vendors for expenses related to the management and storage of SNF for entries greater than $5,000. When an invoice could not be located, a note was included. The supporting invoices are organized chronologically. Some entries on the accounting report are accruals. Given the nature of accrual accounting, no support is provided for these individual line entries.

This section also contains copies of canceled checks which correspond to the invoices. Checks are not generally provided prior to 1997 because such checks are not available due to WE's document retention policy. The supporting checks are located behind the corresponding invoice.

**4. Purchase Orders**

This section contains copies and printouts of sections of purchase orders issued to outside vendors for work related to SNF storage and management. In some instances, contracts and specifications are included with the respective purchase orders.

**B. Summary Of Past Cost Elements**

WE established several project accounts to collect costs associated with the storage and management of SNF. The following are the categories in which WE has currently identified past costs that it would not have incurred but for DOE's breach. The account description was established on a contemporaneous basis by WE. A review of the costs and supporting documentation indicates that certain costs captured in a particular account (i.e., NRC fees included in the NRC Inspection And Application Fees (1200033)) do not necessarily include all costs associated with that particular subject. (NRC fees are also

included in the Additional Spent Fuel Storage Account.) The accounting reports have not been adjusted to group costs in any manner different than WE did on a contemporaneous basis. The total past costs are approximately $42,369,000.

**1. Additional Spent Fuel Storage (N9500203/33664)[3]**

Account N9500203/33664 was established by WE to capture the costs incurred in analyzing alternative spent fuel storage options, including dry storage. WE began incurring costs against this account in 1988. This cost account includes the cost to analyze alternative storage options, the PSCW Independent Spent Fuel Storage Installation ("ISFSI") application and related party costs incurred in accordance with Wisconsin state law, certain NRC fees, as well as costs associated with the design, licensing and the construction of the ISFSI and related plant modifications. Costs were incurred under this account until 1997 and totaled approximately $12,638,000.

**2. General Spent Fuel Attorney Fees (31644/1300545/1300946)[4]**

Account 31644 was established by WE to capture certain legal costs incurred by WE in the four-year PSCW application proceedings and related litigation as well as the development of WE's Request For Equitable Adjustment that was submitted to the DOE dated August 21, 1998. The total amount incurred by WE through 1998 is approximately $664,000.

**3. Dry Cask Storage – O&M Activities (1203430)**

Account 1203430 was established by WE to capture certain operation and maintenance costs of the ISFSI beginning in 1996 when the ISFSI became operational.

---

[3] This account was opened under WE's prior accounting system as No. 33664. Under an updated accounting system, a new account number, N9500203, was assigned.

[4] This account also includes charges to two successor accounts, 1300545 and 1300946.

These costs include the expenses for maintaining the ISFSI and related equipment, the labor associated with the operation of the ISFSI, equipment purchases, contractor services, and any minor modifications to either the ISFSI or the dry storage system. Costs were captured in this category until 2001 when, pursuant to a contract with WE, NMC became the operator of the PBNP. Costs were charged to this account totaling approximately $3,855,000.

**4. NRC Inspection and Application Fees (1200033)**

Account 1200033 was established by WE to capture certain Nuclear Regulatory Commission ("NRC") costs incurred by WE for NRC licensing and other regulatory reviews of the ISFSI. The total amount incurred by WE from 1996 through 2004 captured in this specific account is approximately $150,000.

**5. Loading Of Casks (1203402)**

Account 1203402 was established in 1996 to track certain costs associated with the loading of SNF into dry storage casks and the transporting of those casks to the ISFSI. These costs include operational, maintenance, system engineering, security, and health physics personnel costs as well as contractor expenses. Costs were tracked in this account until 2001 when the NMC became the plant operator. The costs incurred in this account total approximately $1,320,000.

**6. Casks 1 – 8 (N9600018)**

Account N9600018 was established in 1996 to capture the costs of the first eight dry storage casks, which are VSC-24 casks. This account includes costs related to the purchase of the first eight VSC-24 casks as well as WE support to the manufacturer, Sierra Nuclear, for development of these casks as well as the issuance of a Certificate of Compliance by NRC. Costs were incurred to this account until 1999 in the amount of approximately $2,055,000.

**7. Casks 9 – 12 (N9600009)**

Account N9600018 was established in 1996 by to capture the costs of VSC-24 casks nine through twelve. This account includes costs related to the purchase of the VSC-24 casks as well as WE's support to the manufacturer, Sierra Nuclear, for development of these casks as well as the issuance of a Certificate of Compliance by the NRC. Costs were incurred under this account until 2001 in the amount of approximately $1,133,000.

**8. Casks 13 - 16 (3.0009)**

Account 3.0009 was established in 2001 to capture the costs of VSC-24 casks 13 through 16. This account includes costs related to the purchase of these VSC-24 casks, WE's support to the manufacturer for cask development and with regard to issuance of Certificate of Compliance by the NRC. It also includes certain ISFSI operations and maintenance costs charged by NMC. Costs were incurred to this account until 2002 in the amount of approximately $1,365,000.

**9. Modifications For Metal Dry Fuel Storage (1205835, 1205836, 1205837)**

Accounts 1205835, 1205836, 1205837 were established in 1998 to capture the costs related to the development of the TN-32 casks. This account includes costs related to WE's support of the manufacturer, Transnuclear, in cask development and in obtaining issuance of a Certificate of Compliance by the NRC. Costs were incurred through 2001 in the amount of approximately $3,607,000.

**10. Metal Dry Cask Storage (3.0019)**

Account 3.0019 was established in 2001 by WE to capture the costs related to the development of the TN-32 casks after NMC became the plant operator. These costs include all expenses related to WE's support of the manufacturer, Transnuclear, in cask development and in obtaining issuance of the Certificate of Compliance by the NRC as well as other TN-

32 cask-related costs. Costs continue to be charged to this account and, through September 30, 2004, total approximately $1,439,000.

**11. Casks 17 – 30 (3.0182)**

Account 3.0182 was established in 2001 to capture the costs of casks 17 through 30, which are TN-32 PT casks. This account includes costs related to the purchase of these TN-32 PT casks, WE's support of the manufacturer, Transnuclear, for cask development and in obtaining issuance of Certificate of Compliance by the NRC, and various operations and maintenance ISFSI costs charged by NMC. Costs in this account are ongoing and, through September 30, 2004, total approximately $9,174,000.

**12. NUHOMS Modification Design Work (3.5051)**

Account 3.5051 was established in 2003 to capture the additional costs related to the development of the TN-32 PT casks. These costs include professional engineering services to provide field support for modifications at PBNP related to the implementation of the TN-32 PT casks. Costs in this account are ongoing and, through September 30, 2004, total approximately $772,000.

**13. Transportation License For VSC-24 (3.5055)**

Account 3.5055 was established in 2004 to capture the costs related to transportation licensing of the VSC-24 casks. Costs in this account are ongoing and, through September 30, 2004, total approximately $85,000.

**14. Tri-Lifter Truck (3.5027)**

Account 3.5027 was established in 2002 to track the costs associated with the modification of the VSC-24 spent fuel cask transfer equipment to enable this equipment to transfer the TN-32 PT dry storage casks. These costs include operational, maintenance, system engineering, personnel and contractor costs. The costs in this account total approximately $278,000.

**15. Dry Cask Storage Recovery (N9600004/46752)**

Account N9600004/46752 was established in 1996 to track certain costs associated with the resolution of regulatory and technical issues raised by the NRC with regard to the VSC-24 spent fuel casks. This account includes engineering costs, contractor costs, testing and inspection costs, and manufacturer support costs. The costs in this account total approximately $1,703,000.

**16. High Level Waste Solutions (N46082/1200036)**

Account N46082/1200036 was established in 1995 by WE to capture certain costs related to investigation of alternative storage options for SNF. These costs include consulting service costs and funding of participation in alternative storage options. Costs were charged to this account until 1998 in the amount of approximately $981,000.

**17. Strategic Issues Administration (1200039)**

Account 1200039 was established in 1996 to capture certain costs related to investigation of alternative storage options for SNF. These costs include consulting costs and PSCW fees paid for approval to store SNF at the ISFSI. Costs were incurred to this account until 2001 and total approximately $460,000.

**18. Nuclear Waste Program (1200038)**

Account 1200038 was established in 1996 to capture certain costs related to investigation of alternative storage options for SNF. These costs include the cost of consulting services to conduct a viability study for an interim dry fuel storage facility. Costs were incurred to this account until 2000 and total approximately $104,000.

**19. Manage High Level Waste (3.0001-67-0055)**

Account 3.0001-67-0055 was established in 2001 to capture certain costs related to investigation of alternative SNF storage options. These costs include consulting services,

training activities, inspection services and work on fuel specification amendment issues. Costs were incurred to this account until 2004 and total approximately $586,000.

### C. Summary Of Future Cost Elements

With the assistance of the Kenrich Group LLC, WE will develop estimates of the projected costs for future SNF storage and management events and activities. In some instances, these future costs will be estimated based on the analysis of historical costs incurred by WE for similar activities. These future costs will be the subject of WE's expert damages report that will be filed in accordance with the Court's November 24, 2004 Order.

### D. Summary Of Would-Have-Been Cost Elements

With the assistance of the Kenrich Group LLC, WE will develop the costs of activities that would have been incurred by WE if DOE had honored its obligation under the Standard Contract to begin SNF acceptance by January 31, 1998. In some instances, these future costs will be estimated based on analysis of historical costs incurred by WE for similar activities.

Once determined, these cost elements will be an offset in calculation of WE's damages. These would-have-been cost elements will be the subject of WE's expert damages report that will be filed in accordance with the Court's November 24, 2004 Order.

Dated: February 14, 2005

Respectfully submitted,

Richard W. Oehler BY DONALD J. CARNEY

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Martin P. Willard
Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1635

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on February 14, 2005, the foregoing "Plaintiff's Supplemental Disclosures and Damages Schedules" was served on counsel for the defendant by hand delivery to:

Kevin B. Crawford, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Room 12128
1100 L Street, N.W.
Washington, DC 20530

Donald J. Carney