# APPENDIX

# INDEX TO THE APPENDIX


| Document | Pages |
| --- | --- |
| Letter from M. Detmer, Contracting Officer, to Ronald G. Cocherell, Southern Nuclear Operating Company, dated March 4, 1992, attaching Instructions for Completing the Appendix C Delivery Commitment Schedule | 1 |
| Excerpt of Trial Testimony of Christopher Kouts in Yankee Atomic Electric Co. v. United States, No. 98-126C, August 2, 2004 | 10 |
| Excerpt of Civilian Radioactive Waste Management System Requirements Document, Rev. 05, January 1999 | 15 |
| Excerpt of H.R. Rep. No. 108-212, "Energy and Water Development Appropriations Bill, 2004," July 16, 2003 | 18 |
| Order, Tennessee Valley Authority v. United States, No. 01-249C, August 12, 2004 | 20 |
| Plaintiff's Supplemental Disclosures and Damages Schedules | 21 |

**Department of Energy**
Washington, DC 20585

MAR 04 1992

Mr. Ronald G. Cocherell
Southern Nuclear Operating Company
P.O. Box 1295
Birmingham, AL 35201

Dear Mr. Cocherell:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible.

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

U. S. DEPARTMENT OF ENERGY

INSTRUCTIONS FOR COMPLETING THE APPENDIX C DELIVERY COMMITMENT SCHEDULE

GENERAL INSTRUCTIONS

1. **PURPOSE AND USE OF DATA**
The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) states that, beginning January 1, 1992, Purchasers may begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter. The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

2. **WHO SHOULD SUBMIT**
The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

3. **WHEN TO SUBMIT**
Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited. For each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992).

4. **WHERE TO SUBMIT**
Purchasers shall forward the completed DCS and one copy to:

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

cc: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

5. **AUTHORITY**
Data on the DCS are collected under the authority of the Nuclear Waste Policy Act of 1982, as amended, (42 U.S.C. 10101 et seq.) and Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.

6. **PROVISIONS REGARDING CONFIDENTIALITY OF INFORMATION**
Data being collected on the DCS are not considered to be confidential.

7. **BACKGROUND INFORMATION**

(a) The 1991 Acceptance Priority Ranking (APR) established the order in which FWMS acceptance capacity is allocated in the 1991 ACR. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual Purchaser allocations. The Purchasers' allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval. Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval (e.g., in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.)

(b) Once a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation (see also Item 7.(h)).

(c) The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

(d) Over the 10 year period for which the 1991 ACR allocated FWMS acceptance capacity, Purchasers may qualify for a specific number of allocations (from 0 through 10). Beginning in January 1992, Purchasers may submit DCSs for any or all of their allocations, up through year 10. Early submission of DCSs will facilitate the exchange of approved DCSs between Purchasers, as allowed by Article V.E. of the Standard Contract.

(e) The actual number of DCSs submitted by a Purchaser will vary according to the number of allocations they have in the ACR and the number of DCSs they choose to submit for each allocation. A DCS should be submitted for only one designated delivery site, only one fuel type (BWR, PWR, or Other) and only one delivery

year. Therefore, if a Purchaser splits an allocation between two or more delivery sites or between fuel types, more than one DCS will be required. There is no limit to the number of DCSs that can be submitted for each allocation, as long as the total metric tons of uranium (MTU) requested does not exceed the Purchaser's total MTU allocation for that year.

(f) Unless specifically requested otherwise, DOE will evaluate all DCSs submitted against a single allocation period independently. If a Purchaser prefers all DCSs submitted against a single allocation year to be considered as one package, this should be communicated to DOE at the time of submission. When evaluating the DCSs as a package, if one DCS is disapproved then all DCSs for that period will be disapproved and returned to the Purchaser for resubmittal.

(g) Waste acceptance capacity allocated to Purchasers is expressed in terms of MTU. The MTU allocation does not necessarily limit the number of assemblies that can be delivered. The DCS is designed to cover a given quantity of SNF as measured in MTU, not assemblies. DOE realizes that the number of assemblies associated with an allocation will vary according to the actual SNF designated for delivery. The appropriate entry for the blank on the DCS labeled "Number of Assemblies" is discussed in more detail below in the Specific Instructions For Completion of DCS.

(h) Since the DCS does not require the identification of the specific fuel to be delivered, each DCS is assumed to be for Standard Fuel, Class S1 or Class S2, as defined in Appendix E of the Standard Contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The Contract makes specific provisions for delivery of other than standard fuel. If a Purchaser intends to deliver other than standard fuel, the Purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the Purchaser has the option to deliver standard fuel on the schedule in the approved DCS or exchange the approved DCS with another Purchaser, provided contractual time limitations can be met.

8. **DCS PROCESS**

Upon receipt by DOE, each DCS will be date stamped. DOE shall approve or disapprove the DCS within 3 months of receipt. Such approval will be confirmed by signatures of the DOE Contracting Officer and DOE Technical Representative on the DCS returned to the Purchaser. If the DCS is incomplete or if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the

Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. **QUESTIONS ON THE DCS**

If you have any questions or require more information for completing the DCS, please contact **Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634.** Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

## SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 **DCS IDENTIFICATION NUMBER:** A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

YY = the last two digits of the Proposed Delivery Year
RRID = RW-859 reactor identification number of the designated delivery site
NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 **CONTACT PERSON:** Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 **CONTRACT NUMBER:** Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 **REACTOR/FACILITY INFORMATION:** Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 **TYPE OF CASK REQUIRED:** Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 **SHIPPING LOT NUMBER:** ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 **PROPOSED SHIPPING MODE:** Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 **PROPOSED DELIVERY DATE:** Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 **DOE ASSIGNED DELIVERY COMMITMENT DATE:** This entry will be completed by DOE.

2.6 **RANGE OF DISCHARGE DATES (Earliest to Latest):** Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 **METRIC TONS OF URANIUM (Initial):** Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

(Discharged) "Not Required" has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.

2.8 **NUMBER OF ASSEMBLIES--BWR/PWR/Other:** Enter the number of SNF assemblies corresponding to the Metric Tons Uranium indicated in Item 2.6 in the appropriate blank for BWR, PWR or Other (e.g., HTGR, TRIGA). If the SNF in the designated range of discharge dates encompasses assemblies with a wide range of MTU/assembly, state the maximum number of assemblies that may be delivered. Since the actual number of assemblies to be delivered may vary according to the specific SNF selected for delivery, adjustments to the number of assemblies will be made during the FDS process.

3.0 **CERTIFICATIONS:** An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE. Insert the appropriate signatory's title and date.

4.0 **NOTIFICATION OF DOE APPROVAL:** The signatures of DOE's Technical Representative and the Contracting Officer will indicate that the DCS has been approved.

Page 3378

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3379

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

Page 3380

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 3381

P R O C E E D I N G S
MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

10

Page 3450

A Yes, they do.
Q And what do those reports represent?
A They represent the views and positions of the M&O contractor on those issues.
Q Are these reports deliverables under their contract?
A Yes, they are.
Q Does DOE accept these reports as deliverables?
A Yes, we accept them as deliverables if they -- if we believe that they appropriately addressed the statement of work and the intention of the report, yes.
Q Are those reports the statements of DOE?
A No, they are not.
Q By accepting the report, does DOE accept the conclusions stated in the report?
A No.
Q When would these reports become the reports or statements of DOE?
A When DOE either issued a document under its own letterhead, it would have an RW number, radioactive waste number on it. Or if there was some policy statement made by the Department in some mechanism either through correspondence or other

Page 3451

areas.
Q Thank you. Mr. Kouts, are you familiar with the term receipt rate?
A Yes, I am.
Q What is the receipt rate?
A The receipt rate, as we use it in the program, is the technical capability of our facilities to receive materials and process them through the system.
Q Are you familiar with the term acceptance rate?
A Yes, I am.
Q What is the acceptance rate?
A The acceptance rate is the contractual rate at which the Department has committed to receive materials from the contract holders.
Q Where is the acceptance rate set forth?
A The acceptance rate is set forth in the acceptance priority ranking and the Annual Capacity Report.
Q Could the receipt rate and the acceptance rate be different?
A Yes, they could.
Q Why?
A Essentially, the Department can determine

Page 3452

from a business standpoint as a business judgment that it does not want to commit to accept materials at the amount of the maximum capability, if you will, of our ability to receive those materials.
So, depending on how the Department views how it wants to operate the program from a business perspective, if you will, it could be different than what the total receipt rate and the total capability of the receipt rate would be of our facilities.
Q Could there be other constraints on the acceptance rate?
A Potentially there could be issues associated with how we want to deploy facilities and how we want to essentially process the fuel.
Q Are you familiar with the term ramp-up rate?
A Yes, I am.
Q What is ramp-up rate?
A It's standard practice, when you're going to start up any kind of facility, including nuclear facility, and I would say especially a nuclear facility, that you don't want to start out at a maximum rate. You don't want to tax your facilities to their maximum rate until you had a learning curve, if you will.
So the ramp-up rate that we typically had in

Page 3453

our technical baseline documents is a step-by-step approach to try to work us up to our maximum rate that would allow us the ability to learn as we go and to bring on capability -- additional capability in a measured fashion as opposed to trying to do a maximum amount on day one.
Q Thank you. Mr. Kouts, are you familiar with the MRS that DOE was designing to be able to accept waste in 1998?
A I'm familiar with the various designs that were being considered for that, yes.
Q What type of facility did DOE plan to build?
A That was a bare fuel handling storage only facility that could receive materials from transportation casks, if you will, from utilities and from utility sites, and store it on site by removing materials out of those casks, out of those transportation casks and putting them into various storage devices.
Q And do you know what the estimated cost for that facility was?
A Depending on the type of storage technology to be used, the life cycle cost we looked at somewhere between 1.7 and $2.7 billion.
Q Thank you. Can we have Plaintiffs' Exhibit

11

Page 3454

254?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Sure. Yes.
MS. SULLIVAN: Your Honor, would you like a copy?
THE COURT: I can use this.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?
A Yes, I do.
Q Would you explain to the Court what this document is.
A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.
Q And does this document contain information with regard to the design requirements of the repository?
A Yes, it does.
Q Okay. How is this document used by your

Page 3455

office in its waste acceptance function?
A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.
Q Is your office responsible for the preparation of this document?
A I -- yes. I manage changes to this. And I basically do that for the director of the program.
Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?
A Yes, I am.
Q How are you familiar with that facility?
A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.
Q What type of facility did DOE plan to build as the centralized interim storage facility?
A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.
Q Okay. And the rates in table 3, do you have

Page 3456

an understanding as to what the source of those rates was?
A Yes.
MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste. So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.
MS. SULLIVAN: Would you like me to address that, Your Honor?
THE COURT: If you wish.
MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case. And also, further questions will make clear it's tied in part to the 2010 date.

Page 3457

THE COURT: Okay. Go forward.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?
A Yes.
Q And what was your understanding?
A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes. These ramp-up rates were basically rates that were contained in those bills.
Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?
A Bills pending in Congress.
Q And did you have an understanding as to what the legislation called for, generally?
A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

12

Page 3458

storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.

Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s – in the 1980s and early '90s?

A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done. It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.

Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?

A No, it was not.

Q Why not?

A The legislation was never passed and the

Page 3459

Department never received any authorizations to proceed on it.

Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?

A If Congress passed that legislation, then the Department would be authorized to implement it, yes.

Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?

A Yes, I am.

Q And what was the initiative discussed in that budget submission?

A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the – the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.

Q Do you have an understanding as to what initiatives could result from this study?

Page 3460

A There have been various considerations on Capitol Hill as to initiatives that would use Homeland Security funds to essentially fund the reactors to put their – the pool – the materials that they're now managing in the pools, the high-level waste materials, the spent fuel into dry storage casks, and undertake that initiative.

Q Mr. Kouts, are you familiar with the material known as Greater Than Class C radioactive waste?

A Yes.

Q Do you understand that GTCC radioactive waste is generated by commercial nuclear utilities?

A Yes.

Q Is GTCC radioactive waste one of the waste materials that DOE will accept pursuant to the standard contract?

A No.

Q Is DOE designing the repository to accept GTCC radioactive waste generated by commercial nuclear facilities?

A No, it is not.

Q Could DOE accept GTCC radioactive waste at the repository?

A Theoretically it could. It would require, I

Page 3461

believe, a change in legislation to allow less than high-level waste materials to go into the repository. In addition to that, we would have to perform a variety of technical analyses and supplement our analyses that we are currently planning for the Nuclear Regulatory Commission as to how we would dispose of those materials within Yucca Mountain. In addition to that, we would have to develop some kind of fee structure to pay for the additional costs associated with those materials.

Q Are there space limitation issues that DOE would have to analyze if GTCC were to go to the repository?

A Yes. Potentially there are.

Q And are there issues concerning the current design of the surface facilities at Yucca Mountain that would have to be analyzed?

A Yes. Right now, our facilities are designed to deal with high-level waste materials, spent fuel, bare spent fuel, if you will. If we were going to handle Greater Than Class C waste, we would have to figure out how it would be packaged, where it would be packaged, and probably require separate service facilities over and above what we have now, since our current facilities are designed only to handle the

13

Page 3462

materials, the high-level waste materials.
And as such, we would not want to reduce the capacities of those facilities in order to deal with other waste materials.
Q Could DOE place GTCC in the backfill spaces of the repository?
MR. STOUCK: Can we watch the leading questions here on this, Your Honor? There have been a series of leading questions about this GTCC issue, and *I object on that basis.*
THE COURT: Well, you could rephrase.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, when I use the term backfill spaces, do you know what I'm talking about?
A Yes.
Q Could those backfill spaces --
MS. SULLIVAN: I don't understand quite how this is leading. This is a direct question, whether or not they could place GTCC in the backfill spaces. Would you like me to try to rephrase, Your Honor?
MR. STOUCK: I can explain why it's leading, Your Honor. She asked if they could put GTCC in the repository. And he said no. That would have been the place to mention why not, rather than have counsel

Page 3463

lead him to the explanation.
MS. SULLIVAN: He's provided some reasons. I think there are some other reasons, and I'm helping him --
THE COURT: The record reflects that -- you may answer the question. I'll overrule the objection.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Okay. As simplistically -- my sense is, from my understanding of what's in Greater Than Class C low-level waste, I don't think we could just simply put these materials in backfill or in various spaces in the drifts, if you will, the underground tunnels, if you will, in the repository, *without some kind of packaging and assurance that* these materials would not get out so that it would affect our ability to meet the very stringent EPA standards.
So what I alluded to earlier was the fact that we do have to do a variety of analytical work to determine how best these materials would have to -- would be placed in the repository, what they would be placed in, what kind of canisters, what type of waste packages they would be in. And without that *additional detail work, it's difficult at this time to* say whether or not they could go in backfill, if you

Page 3464

will, of the repository.
Let me also add we're in the planning on backfilling the repository. Essentially what we're doing is placing the waste packages. We're not filling up the repository with any kind of materials. It's been theorized in the past we would take pulverized tuff or volcanic materials and backfill it. We're not planning on doing that. That's not part of the current plan to demonstrate to the Nuclear *Regulatory Commission that this site can isolate* material.
So there isn't a lot of space in the drifts to add additional materials. So my sense is what would have to happen is there would be additional drifts or tunnels that would have to be drilled out where these materials would be placed.
THE COURT: What if you would package the GTCC in exactly the same type of container that the fuel assemblies are put in?
THE WITNESS: We could do that. I would also indicate that each of the waste packages costs roughly about half a million dollars. That's a very expensive package for low-level waste materials. There might be more efficient, more effective ways to do that. But I think when we analyze this in our

Page 3465

environmental impact statements, as we had to look at reasonably foreseeable alternatives, what we did analyze and essentially take these materials and put them in these packages and evaluate them as part of the EIS process.
That was the option we took because it was expedient, and we didn't want to expend any additional analytical work. It was kind of an outer bound of what we might do.
THE COURT: Would that solve the fee problem too, because you could charge the same fee as SNF?
THE WITNESS: That might help with the fee. We would have to look at, you know, what amount of new *drifts, if you will, new tunnels would be caused by* this. There were -- in the EIS, as I remember, there were roughly 2,000 cubic meters of these materials that were identified in the EIS. You translate that to cubic yards. That's roughly about 2600 cubic yards. So that's going to be quite a few waste packages and quite a few drifts that you would have to develop, if you will, in order to put these materials in there.
THE COURT: Okay. Ms. Sullivan.
MS. SULLIVAN: *Thank you, Your Honor.*

14

HQO.19990112.0001 QA: L

DOE/RW-0406

Office of Civilian Radioactive Waste Management

# Civilian Radioactive Waste Management System Requirements Document

Revision 05
(A00000000-00811-1708-00003)

January 1999

U. S. Department of Energy
Office of Civilian Radioactive Waste Management



HQO.19990112.0001.0001

PLAINTIFF'S EXHIBIT
P0254
Yankee Atomic Elec. Co. et al

I. Waste Acceptance and Transportation Element shall accomplish planning and scheduling according to the provisions of the Standard Contract (10 CFR Part 961) and the EM/RW and NNPP/RW MOAs.

J. Integrated plans for CRWMS activities shall be developed and updated as needed to respond to changed data and operating conditions. Planning involves allocating system capacity, evaluating schedule requests, and establishing the CRWMS operations schedule.

K. Records validation shall be initiated upon receipt of Purchaser/Producer/Custodian forms describing the SNF/HLW to be delivered.

L. Waste Acceptance and Transportation shall validate title and/or transfer of responsibility and custody documentation from the Purchasers/Producers/Custodians.

## 3.4 MGR ELEMENT REQUIREMENTS

This section contains the requirements allocated to the MGR Element.

A. The MGR shall be designed to be capable of accommodating the total inventory of SNF and HLW (as documented in Planning Consideration 2.4.C) consistent with current disposal concepts (e.g., HLW/DOE SNF co-disposal). However, until the second repository is approved the MGR operational capacity shall be limited to 70,000 MTHM or equivalent of SNF and HLW.

B. The waste packages shall be designed such that substantially complete containment of the waste can be demonstrated for at least 1,000 years.

C. The monitored geologic repository concept shall allow the repository to be closed as early as 10 years after emplacement of the last waste package or to be kept open for at least 100 years from initiation of waste emplacement. The design shall not preclude the ability to keep the repository open, with appropriate maintenance and monitoring, for 300 years after initiation of waste emplacement. Future generations will make the ultimate decision on whether it is appropriate to continue to maintain the repository in an open, monitored condition or to close the repository, based on development of their own criteria and level of certainty regarding ultimate repository performance.

## 3.5 CISF ELEMENT REQUIREMENTS

If a CISF is approved, the following allocated requirements shall be met.

A. The CISF shall be designed to expedite operations by using a phased approach with Phase 1 having the capability to receive and store licensed dual purpose and multi-purpose systems only and Phase 2 having the capability to receive and store SNF in licensed dual purpose and multi-purpose systems and as individual assemblies at the rates indicated in Table 3.

Table 3. CISF Receipt Rates[7] (In MTHM or Equivalent/Year)

| Phase | Year of Operation | Commercial SNF[8] | Government Managed Nuclear Materials |
|---|---|---|---|
| I | 1 | 1200 | TBD 3 |
| I | 2 | 1200 | TBD 3 |
| II | 3 and 4 | 2000 | TBD 4 |
| II | 5 | 2700 | TBD 4 |
| II | 6 and subsequent | 3000 | TBD 4 |
| II | TBD 2 | 3000 | TBD 4 |

B. The CISF shall have a minimum storage capacity of 10,000 MTHM of SNF.

C. The CISF shall have a HLW storage capacity of (**TBD 6**).

D. The CISF shall be capable of preparing SNF and HLW for off-site transport.

## 3.6 INTERFACE REQUIREMENTS

This section identifies the interface requirements between CRWMS system elements. Acceptance criteria for nuclear materials are documented in the Waste Acceptance System Requirements Document (WA-SRD) (DOE/RW-0351P).

### 3.6.1 Waste Acceptance and Transportation - Government Agency Interface Requirements

Waste Acceptance and Transportation shall interface with appropriate federal, state, tribal, and local government agencies to meet legal, regulatory and operational requirements for acceptance and transportation of SNF and HLW, such as route selection, approval, scheduling and notification, emergency planning and response, and security.

[7] Receipt rates in this table are only applicable if a CISF is approved.

[8] This could include MOX SNF in Phase II.

108TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT 108-212

# ENERGY AND WATER DEVELOPMENT APPROPRIATIONS BILL, 2004

JULY 16, 2003.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HOBSON, from the Committee on Appropriations, submitted the following

# REPORT

[To accompany H.R. 2754]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for energy and water development for the fiscal year ending September 30, 2004, and for other purposes.

INDEX TO BILL AND REPORT


| | Page Number Bill | Page Number Report |
|---|---|---|
| Introduction | ........ | 4 |
| I. Department of Defense—Civil: | | |
| Corps of Engineers—Civil: | | |
| Introduction | ........ | 7 |
| General investigations | 2 | 9 |
| Construction, general | 3 | 36 |
| Flood control, Mississippi River and Tributaries | 4 | 55 |
| Operation and maintenance, general | 5 | 59 |
| Regulatory program | 6 | 80 |
| Formerly Utilized Sites Remedial Action Program | 6 | 81 |
| Flood control and coastal emergencies | 6 | 81 |
| General expenses | 6 | 82 |
| Administrative provisions | 7 | .......... |
| General provisions | 7 | 82 |
| II. Department of the Interior: | | |
| Central Utah Project completion account | 9 | 85 |
| Bureau of Reclamation: | | |
| Water and related resources | 9 | 87 |
| Bureau of Reclamation loan program account | 11 | 104 |
| California Bay-Delta ecosystem restoration | ........ | 105 |
| Central Valley Project restoration fund | 11 | 105 |


85-360

PLAINTIFF'S EXHIBIT
P1889
Yankee Atomic Elec. Co. et al.
v. US, 98-126C, 98-154C, 98-474C

DOE headquarters, $7,774,000 for Technical Information Management; and $1,020,000 for Energy Research Analyses. The request for program direction for field offices was reduced by $3,720,000 and the amount transferred to the Safeguards and Security line. The control level for fiscal year 2004 is at the program account level of Science Program Direction.

FUNDING ADJUSTMENTS

The Committee recommendation includes an offset of $4,383,000 for the safeguards and security charge for reimbursable work, as proposed in the budget request. A general reduction of $1,000,000 has been applied to the Science account.

NUCLEAR WASTE DISPOSAL

| | |
|---|---|
| Appropriation, 2003 | $144,058,000 |
| Budget Estimate, 2004 | 161,000,000 |
| Recommended, 2004 | 335,000,000 |
| Comparison: | |
| Appropriation, 2003 | +190,942,000 |
| Budget Estimate, 2004 | +174,000,000 |

The Federal government has a clear statutory responsibility, assigned by Congress in the Nuclear Waste Policy Act of 1982, as amended, to provide for the permanent disposal of spent nuclear fuel and high-level radioactive waste. The Department of Energy was required by statute to accept commercial spent nuclear fuel for disposal beginning on January 31, 1998, and entered into legally enforceable contracts with utilities to execute that obligation. Unfortunately, the Department has been unable to meet that deadline, resulting in a number of lawsuits over the Department's failure to meet its statutory and contractual obligation and a growing financial liability over that failure. The Court of Federal Claims has found the Department to be in breach of its contractual obligations and is proceeding to determine the extent of damages.

The primary consequence of the Department's failure to begin accepting spent nuclear fuel is not, however, the existence of lawsuits and damage claims; it is that vast quantities of commercial spent nuclear fuel remain in temporary storage at reactor sites scattered around the country, many located near major population centers. The Committee is not questioning the current safety and security of spent nuclear fuel stored at commercial sites in accordance with Nuclear Regulatory Commission criteria. The Committee does, however, believe that the safety and security of these materials will be enhanced the sooner they are placed in the underground repository at Yucca Mountain. After the events of September 11, 2001, the Committee believes it is more essential than ever to move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date.

Chronic funding shortfalls, however, have starved the program of the resources necessary to keep the repository program on schedule. The Department's latest schedule calls for opening the repository and beginning to accept spent fuel in 2010 at the earliest, over 12 years behind schedule. Most recently, the Department requested a total of $591,000,000 for the nuclear waste disposal program in fiscal year 2003, yet received only $457,000,000, a funding shortfall

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 01-249-C

(Filed: August 12, 2004)

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

ORDER

The government's motion for reconsideration, filed on August 10, 2004, respecting this Court's decision reported at 60 Fed. Cl. 665 (2004), proceeds on erroneous premises. First, contrary to the government's motion, the Court made *no* "finding that TVA could receive damages beginning in 1995." Def.'s Mot. at 12. Rather, the Court explicitly found that "DOE breached its obligation to act on TVA's DCSs in good faith," 60 Fed. Cl. at 674, and that initially occurred in 1997. Second, causation is an element of proof regarding damages, and the Court specifically denied TVA's motion for summary judgment respecting damages. *See* 60 Fed. Cl. at 675-76. Defendant's motion for reconsideration is denied.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**PLAINTIFF'S SUPPLEMENTAL DISCLOSURES AND DAMAGES SCHEDULES**

Pursuant to Rule 26(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and this Court's Orders of November 8, 2002 and November 24, 2004, Plaintiff Wisconsin Electric Power Company ("WE") hereby produces to the Defendant its supplemental disclosures and damages schedules.[1] In accordance with the direction provided by the Court's above-referenced orders, WE further presents the basis for the "items and figures" (cost schedules) documentation provided in the damages schedules discussed in this pleading and in the documents being produced to the Government this same day.

## I. Introduction

In 1983, WE entered into Contract No. DE-CR01-83NE44425 ("Standard Contract") with the Department of Energy ("DOE") for disposal of spent nuclear fuel ("SNF") generated at Point Beach Nuclear Plant, Units 1 and 2 ("PBNP"). Article II of the Standard Contract between WE and DOE required DOE to begin accepting SNF by January 31, 1998. However, DOE has not accepted any of WE's SNF and has repeatedly represented instead,

[1] WE's responses to the Government's interrogatories and requests for production of documents filed during the coordinated discovery proceedings satisfied its initial disclosure obligations under RCFC 26 and the Court's above-referenced orders.

that performance of its SNF disposal obligation will commence in 2010. See Order in Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl., Dec. 20, 2004). On October 8, 2004, the Court of Federal Claims entered a ruling establishing DOE's liability for partial breach of WE's Standard Contract and the case is now in the damages phase.

DOE's failure to perform under WE's Standard Contract has caused, and will continue to cause, WE to incur significant costs. Through September 30, 2004, WE has currently identified approximately $42,369,000 in costs incurred arising from DOE's contract breach.[2] WE expects to continue to incur costs and damages for SNF storage until such time as no SNF exists at Point Beach except for what would have remained on site had DOE not breached its contract. Future damages, as well as would-have-been costs, and the time-value of money costs, will be the subject of WE's expert damages report disclosed in accordance with the Court's pretrial schedule. WE currently intends to use personnel from The Kenrich Group LLC as its damages experts.

The information that is contained in WE's incurred cost schedules was compiled with the assistance of personnel from the Kenrich Group LLC. In addition, WE employees David Weaver and Paul Farron, and former WE employee Ione Straub, provided source support for damages items. Source support was also provided by Jim Becka and Linda Fencil of the Nuclear Management Corporation ("NMC"). NMC operates PBNP pursuant to a contract with WE.

WE's incurred cost schedules and support are in the form of hardcopy documents grouped according to the 19 categories of WE's past cost elements discussed below. Each of the categories of documents are subdivided by four tabs – summary, detailed accounting

---

[2] In this submission, amounts are based on nominal dollars for costs already incurred. Nominal dollars are actual dollars spent or expected to be spent in each of the relevant years. The dollars will be present-valued in expert report submissions and for trial.

data, invoices, and purchase orders – and cover costs incurred by WE through September 2004. This summary provides below additional detail regarding the documents' contents and the past cost elements covered by the schedules.

## II. WE's Increased Costs Resulting from DOE's Breach of Contract

The following are the costs that WE has incurred due to the DOE's breach of the Contract.

### A. Organization Of Supporting Documents

Each category is organized in the following manner.

#### 1. Summary

The first tab for each group states the title of the cost category at issue and contains a summary spreadsheet of the costs that WE has incurred in this cost category by year and month. The summaries are based on the data included in the other sections of the category and total all costs incurred for the particular cost category.

#### 2. Detailed Accounting Data

The WE Accounting Report contains schedules that provide more detail regarding the types of costs and the months in which they were entered into the accounting records. The WE Accounting Report extracts entries from WE's Consolidated General Ledger. The Consolidated General Ledger contains general ledger entries relating to SNF storage and planning costs arising from the operation of PBNP. The general ledger has been subject to financial statement audit by WE's independent auditors. Further, financial statements prepared based on these general ledger entries have been submitted to the Securities and Exchange Commission and the Federal Energy Regulatory Commission. WE is subject to regulation by the Public Service Commission of Wisconsin ("PSCW") as well as the Michigan Public Service Commission.

The "Invoice Provided" and "Check Provided" columns in these reports indicate which line entries are accompanied by supporting documentation. These columns were added for this submission for the purpose of ease of review.

**3. Invoices**

This section contains copies of invoices paid to outside vendors for expenses related to the management and storage of SNF for entries greater than $5,000. When an invoice could not be located, a note was included. The supporting invoices are organized chronologically. Some entries on the accounting report are accruals. Given the nature of accrual accounting, no support is provided for these individual line entries.

This section also contains copies of canceled checks which correspond to the invoices. Checks are not generally provided prior to 1997 because such checks are not available due to WE's document retention policy. The supporting checks are located behind the corresponding invoice.

**4. Purchase Orders**

This section contains copies and printouts of sections of purchase orders issued to outside vendors for work related to SNF storage and management. In some instances, contracts and specifications are included with the respective purchase orders.

**B. Summary Of Past Cost Elements**

WE established several project accounts to collect costs associated with the storage and management of SNF. The following are the categories in which WE has currently identified past costs that it would not have incurred but for DOE's breach. The account description was established on a contemporaneous basis by WE. A review of the costs and supporting documentation indicates that certain costs captured in a particular account (i.e., NRC fees included in the NRC Inspection And Application Fees (1200033)) do not necessarily include all costs associated with that particular subject. (NRC fees are also

included in the Additional Spent Fuel Storage Account.) The accounting reports have not been adjusted to group costs in any manner different than WE did on a contemporaneous basis. The total past costs are approximately $42,369,000.

### 1. Additional Spent Fuel Storage (N9500203/33664)[3]

Account N9500203/33664 was established by WE to capture the costs incurred in analyzing alternative spent fuel storage options, including dry storage. WE began incurring costs against this account in 1988. This cost account includes the cost to analyze alternative storage options, the PSCW Independent Spent Fuel Storage Installation ("ISFSI") application and related party costs incurred in accordance with Wisconsin state law, certain NRC fees, as well as costs associated with the design, licensing and the construction of the ISFSI and related plant modifications. Costs were incurred under this account until 1997 and totaled approximately $12,638,000.

### 2. General Spent Fuel Attorney Fees (31644/1300545/1300946)[4]

Account 31644 was established by WE to capture certain legal costs incurred by WE in the four-year PSCW application proceedings and related litigation as well as the development of WE's Request For Equitable Adjustment that was submitted to the DOE dated August 21, 1998. The total amount incurred by WE through 1998 is approximately $664,000.

### 3. Dry Cask Storage – O&M Activities (1203430)

Account 1203430 was established by WE to capture certain operation and maintenance costs of the ISFSI beginning in 1996 when the ISFSI became operational.

---

[3] This account was opened under WE's prior accounting system as No. 33664. Under an updated accounting system, a new account number, N9500203, was assigned.

[4] This account also includes charges to two successor accounts, 1300545 and 1300946.

These costs include the expenses for maintaining the ISFSI and related equipment, the labor associated with the operation of the ISFSI, equipment purchases, contractor services, and any minor modifications to either the ISFSI or the dry storage system. Costs were captured in this category until 2001 when, pursuant to a contract with WE, NMC became the operator of the PBNP. Costs were charged to this account totaling approximately $3,855,000.

**4. NRC Inspection and Application Fees (1200033)**

Account 1200033 was established by WE to capture certain Nuclear Regulatory Commission ("NRC") costs incurred by WE for NRC licensing and other regulatory reviews of the ISFSI. The total amount incurred by WE from 1996 through 2004 captured in this specific account is approximately $150,000.

**5. Loading Of Casks (1203402)**

Account 1203402 was established in 1996 to track certain costs associated with the loading of SNF into dry storage casks and the transporting of those casks to the ISFSI. These costs include operational, maintenance, system engineering, security, and health physics personnel costs as well as contractor expenses. Costs were tracked in this account until 2001 when the NMC became the plant operator. The costs incurred in this account total approximately $1,320,000.

**6. Casks 1 – 8 (N9600018)**

Account N9600018 was established in 1996 to capture the costs of the first eight dry storage casks, which are VSC-24 casks. This account includes costs related to the purchase of the first eight VSC-24 casks as well as WE support to the manufacturer, Sierra Nuclear, for development of these casks as well as the issuance of a Certificate of Compliance by NRC. Costs were incurred to this account until 1999 in the amount of approximately $2,055,000.

7. **Casks 9 – 12 (N9600009)**

Account N9600018 was established in 1996 by to capture the costs of VSC-24 casks nine through twelve. This account includes costs related to the purchase of the VSC-24 casks as well as WE's support to the manufacturer, Sierra Nuclear, for development of these casks as well as the issuance of a Certificate of Compliance by the NRC. Costs were incurred under this account until 2001 in the amount of approximately $1,133,000.

8. **Casks 13 - 16 (3.0009)**

Account 3.0009 was established in 2001 to capture the costs of VSC-24 casks 13 through 16. This account includes costs related to the purchase of these VSC-24 casks, WE's support to the manufacturer for cask development and with regard to issuance of Certificate of Compliance by the NRC. It also includes certain ISFSI operations and maintenance costs charged by NMC. Costs were incurred to this account until 2002 in the amount of approximately $1,365,000.

9. **Modifications For Metal Dry Fuel Storage (1205835, 1205836, 1205837)**

Accounts 1205835, 1205836, 1205837 were established in 1998 to capture the costs related to the development of the TN-32 casks. This account includes costs related to WE's support of the manufacturer, Transnuclear, in cask development and in obtaining issuance of a Certificate of Compliance by the NRC. Costs were incurred through 2001 in the amount of approximately $3,607,000.

10. **Metal Dry Cask Storage (3.0019)**

Account 3.0019 was established in 2001 by WE to capture the costs related to the development of the TN-32 casks after NMC became the plant operator. These costs include all expenses related to WE's support of the manufacturer, Transnuclear, in cask development and in obtaining issuance of the Certificate of Compliance by the NRC as well as other TN-

32 cask-related costs. Costs continue to be charged to this account and, through September 30, 2004, total approximately $1,439,000.

**11. Casks 17 – 30 (3.0182)**

Account 3.0182 was established in 2001 to capture the costs of casks 17 through 30, which are TN-32 PT casks. This account includes costs related to the purchase of these TN-32 PT casks, WE's support of the manufacturer, Transnuclear, for cask development and in obtaining issuance of Certificate of Compliance by the NRC, and various operations and maintenance ISFSI costs charged by NMC. Costs in this account are ongoing and, through September 30, 2004, total approximately $9,174,000.

**12. NUHOMS Modification Design Work (3.5051)**

Account 3.5051 was established in 2003 to capture the additional costs related to the development of the TN-32 PT casks. These costs include professional engineering services to provide field support for modifications at PBNP related to the implementation of the TN-32 PT casks. Costs in this account are ongoing and, through September 30, 2004, total approximately $772,000.

**13. Transportation License For VSC-24 (3.5055)**

Account 3.5055 was established in 2004 to capture the costs related to transportation licensing of the VSC-24 casks. Costs in this account are ongoing and, through September 30, 2004, total approximately $85,000.

**14. Tri-Lifter Truck (3.5027)**

Account 3.5027 was established in 2002 to track the costs associated with the modification of the VSC-24 spent fuel cask transfer equipment to enable this equipment to transfer the TN-32 PT dry storage casks. These costs include operational, maintenance, system engineering, personnel and contractor costs. The costs in this account total approximately $278,000.

**15. Dry Cask Storage Recovery (N9600004/46752)**

Account N9600004/46752 was established in 1996 to track certain costs associated with the resolution of regulatory and technical issues raised by the NRC with regard to the VSC-24 spent fuel casks. This account includes engineering costs, contractor costs, testing and inspection costs, and manufacturer support costs. The costs in this account total approximately $1,703,000.

**16. High Level Waste Solutions (N46082/1200036)**

Account N46082/1200036 was established in 1995 by WE to capture certain costs related to investigation of alternative storage options for SNF. These costs include consulting service costs and funding of participation in alternative storage options. Costs were charged to this account until 1998 in the amount of approximately $981,000.

**17. Strategic Issues Administration (1200039)**

Account 1200039 was established in 1996 to capture certain costs related to investigation of alternative storage options for SNF. These costs include consulting costs and PSCW fees paid for approval to store SNF at the ISFSI. Costs were incurred to this account until 2001 and total approximately $460,000.

**18. Nuclear Waste Program (1200038)**

Account 1200038 was established in 1996 to capture certain costs related to investigation of alternative storage options for SNF. These costs include the cost of consulting services to conduct a viability study for an interim dry fuel storage facility. Costs were incurred to this account until 2000 and total approximately $104,000.

**19. Manage High Level Waste (3.0001-67-0055)**

Account 3.0001-67-0055 was established in 2001 to capture certain costs related to investigation of alternative SNF storage options. These costs include consulting services,

training activities, inspection services and work on fuel specification amendment issues. Costs were incurred to this account until 2004 and total approximately $586,000.

**C. Summary Of Future Cost Elements**

With the assistance of the Kenrich Group LLC, WE will develop estimates of the projected costs for future SNF storage and management events and activities. In some instances, these future costs will be estimated based on the analysis of historical costs incurred by WE for similar activities. These future costs will be the subject of WE's expert damages report that will be filed in accordance with the Court's November 24, 2004 Order.

**D. Summary Of Would-Have-Been Cost Elements**

With the assistance of the Kenrich Group LLC, WE will develop the costs of activities that would have been incurred by WE if DOE had honored its obligation under the Standard Contract to begin SNF acceptance by January 31, 1998. In some instances, these future costs will be estimated based on analysis of historical costs incurred by WE for similar activities.

Once determined, these cost elements will be an offset in calculation of WE's damages. These would-have-been cost elements will be the subject of WE's expert damages report that will be filed in accordance with the Court's November 24, 2004 Order.

Dated: February 14, 2005

Respectfully submitted,

Richard W. Oehler By Donald J. Carney

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Martin P. Willard
Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1635

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on February 14, 2005, the foregoing "Plaintiff's Supplemental Disclosures and Damages Schedules" was served on counsel for the defendant by hand delivery to:

Kevin B. Crawford, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Room 12128
1100 L Street, N.W.
Washington, DC 20530

Donald J. Carney