**No. 00-697C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**WISCONSIN ELECTRIC POWER COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**WISCONSIN ELECTRIC POWER COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND ITS OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES**

---

**Richard W. Oehler**
**Perkins Coie LLP**
**1201 Third Avenue, Suite 4800**
**Seattle, Washington 98101-3099**
**Telephone: (206) 359-8419**
**Facsimile: (206) 359-9419**

**Attorneys for Plaintiff**
**WISCONSIN ELECTRIC POWER COMPANY**

**Of Counsel:**
**Donald J. Carney**
**Perkins Coie LLP**
**607 Fourteenth Street N.W.**
**Washington, D.C. 20005**
**Telephone: (202) 434-1675**
**Facsimile: (202) 654-9113**

**April 11, 2005**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

WISCONSIN ELECTRIC POWER COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND ITS OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES .......... 1

I. SUMMARY OF ARGUMENT .......... 2

II. ARGUMENT .......... 3

A. The Government's Partial Breach Damages Theory Is An Artificial Restriction That Should Not Be Adopted In This Spent Nuclear Fuel Case. .......... 4

B. Contrary To The Government's Assertion, Contract Law Allows The Recovery Of Mitigation Damages Incurred Prior To January 31, 1998. .......... 6

C. Contrary To The Government's Assertion, Contract Law Allows The Recovery Of Future Damages That Will Be Incurred To Mitigate Losses. .......... 11

D. The Government's Claim-Splitting Charge Against WE's Proposed Approach To Future Damages Ignores This Court's Clear Authority To Reserve WE's Right To Bring A Subsequent Action. .......... 14

III. CONCLUSION .......... 16

# TABLE OF AUTHORITIES

## Cases

Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed. Cir. 2001)....................4, 11

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953)....................passim

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003)....................10

Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002)....................12

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001)....................3

Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004)....................8, 10, 11

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000)....................passim

Middleton v. United States, 175 Ct. Cl. 786 (1966)....................10, 11

N. Helex Co. v. United States, 455 F.2d 546 (Ct. Cl. 1972)....................12

Robinson v. United States, 305 F.3d 1330 (Fed. Cir. 2002)....................6, 9

Roedler v. Dep't of Energy, 255 F.3d 1347 (Fed. Cir. 2001)....................5, 14

Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002)....................11

Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. Dec. 20, 2004)....................passim

Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004)....................7, 15

Tennessee Valley Authority v. United States, No. 01-249-C (Fed. Cl. Aug. 12, 2004)....................8

Trainor Co. v. Aetna Cas. & Sur. Co., 290 U.S. 47 (1933)....................2, 4

Yankee Atomic Electric Co. v. United States, No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004)....................passim

## Statutes

42 U.S.C. § 10131(b)(2) .......... 14

42 U.S.C. § 10222(b)(1)(A) .......... 5

**Other Authorities**

59 Fed. Reg. 27,007 (1994) .......... 9, 13

60 Fed. Reg. 21,793 (1995) .......... 9

9 CORBIN ON CONTRACTS § 956 (2004 Fall Cum. Supp.) .......... 3, 12, 14, 16

RESTATEMENT (SECOND) OF CONTRACTS (1981) .......... 4, 6, 9, 10

RESTATEMENT (SECOND) OF JUDGMENTS (1982) .......... 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow)<br><br>Filed electronically: April 11, 2005 |

**WISCONSIN ELECTRIC POWER COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND ITS OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES**

In its Motion for an Order Regarding Subsequent Damages Actions, Wisconsin Electric Power Company ("WE") explained that it intends to seek damages arising from the Government's partial beach of the Standard Contract from January 31, 1998, to December 31, 2009, to the extent such damages are incurred through December 31, 2015. See WE's Mot. at 1. Accordingly, WE asked this Court to reserve for a later filed action WE's right: (a) to recover future damages that WE incurs subsequent to December 31, 2015, as a result of the partial breach of contract caused by the failure of the Department of Energy ("DOE") to commence spent nuclear fuel ("SNF") acceptance prior to 2010; and (b) to bring additional breach of contract actions in the event DOE fails to commence SNF acceptance by 2010.

The Government's Response and Cross-Motion, on the other hand, maintains that WE's recovery of damages should be limited to those incurred between January 31, 1998, when DOE failed to commence acceptance of SNF, and November 16, 2000, when WE filed its Complaint. See Gov.'s Resp. at 39. Restated, the Government insists that WE's recovery

be limited to damages incurred during a two-year window — notwithstanding the two decades that will have lapsed between the time the Government first announced it would not timely meet its contractual obligation and the earliest possible time the Government has suggested it might begin meeting that obligation.

This Court has previously rejected the Government's contentions on multiple occasions in SNF litigation. It should do so again in this case.

## I. SUMMARY OF ARGUMENT

The Government argues that WE made an "election" to sue DOE for partial, rather than total, breach of the Standard Contract and that certain limitations upon WE's damages inevitably flow from that election. This Court should reject the Government's argument because, in reality, there was no such election to be made. Under the applicable regulatory scheme and because of the Standard Contract's unique subject matter — highly radioactive SNF — WE was effectively obligated to preserve the Standard Contract. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337 (Fed. Cir. 2000). Under these circumstances, the purported dichotomy between total and partial breach of contract on which the Government relies is illusory and does not restrict evidence of WE's damages. See Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. Dec. 20, 2004) (order regarding subsequent damages actions; attached at A-1 – A-4).

Moreover, there is nothing in contract law that precludes the recovery of pre-January 31, 1998, or future damages in a partial breach action. The Government's argument for eliminating such damages conflicts with the central premise of contract damages law — that damages should place the non-breaching party "in as good position as if the contract had been kept." Trainor Co. v. Aetna Cas. & Sur. Co., 290 U.S. 47, 54 (1933). For this reason alone, it should be summarily rejected.

Under standard contract law, WE may recover reasonable costs incurred prior to January 31, 1998, to mitigate the damages that were reasonably certain to arise from a breach

that the Government announced well in advance of that date. See Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953). As this Court so tellingly asked in Yankee Atomic Electric Co. v. United States, No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004):

> Should the [utilities] have waited until December 31, 1998 and then decided what to do with their nuclear waste? The court thinks not, and accordingly, will not preclude evidence and argument in this regard.

Id. at *6.

Moreover, because future damages attributable to the Government's failure to perform between January 31, 1998, and December 31, 2009, can be ascertained with reasonable certainty, there is no reason to delay trying such damages until a later-filed action. Where an existing partial breach is reasonably certain to continue for a definite period and the costs can be reasonably estimated, textbook contract law provides that future damages for such partial breach are recoverable. See 9 CORBIN ON CONTRACTS § 956 (2004 Fall Cum. Supp.).

In this light, this Court should accord WE the opportunity to prove damages attributable to DOE's failure to perform between January 31, 1998, and December 31, 2009 — including damages incurred before January 31, 1998, and future damages to be incurred through December 31, 2015. At the same time, the Court should reserve for a later filed action WE's right: (a) to recover future damages that WE may incur subsequent to December 31, 2015, as a result of DOE's failure to commence SNF acceptance prior to 2010; and (b) to bring additional breach of contract actions in the event DOE fails to commence SNF acceptance by 2010.

## II. ARGUMENT

"The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001) (internal quotation marks and citation omitted);

Trainor, 290 U.S. at 54 ("In fixing compensation for damage resulting from breach of a contract the general rule is that the injured party should be placed in the same position as if there had been no breach." (internal quotation marks and citation omitted)). The rule seeks to satisfy the non-breaching party's expectation interest — "the 'interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)). "Expectation damages are recoverable provided they [1] are actually foreseen or reasonably foreseeable, [2] are caused by the breach of the promisor, and [3] are proved with reasonable certainty." Id.

WE is fully prepared to satisfy these criteria, which ensure that damages from the Government's breach of the Standard Contract are appropriately limited. The Government's attempt to impose additional restrictions — precluding damages incurred before January 31, 1998, as well as future damages — enjoys no support in the law and should be rejected outright.

**A. The Government's Partial Breach Damages Theory Is An Artificial Restriction That Should Not Be Adopted In This Spent Nuclear Fuel Case.**

The Government's rationale for severely limiting both pre-January 31, 1998, and future damages is based upon a "theoretical damage concept[]" that the Government attributes to partial breach of contract actions. Southern Nuclear, No. 98-614C (Fed. Cl. Dec. 20, 2004). This concept has no import, however, for resolving the scope of damages for which the Government may be responsible for its breach of WE's Standard Contract:

> In the circumstances of this complex litigation, involving performance and lack of performance of long-term contracts, it is not contemplated that the introduction of evidence relevant to the monetary impact of DOE's current performance delay until 2010 will be artificially restricted by theoretical damage concepts involving what

> may, in the regulatory climate which exists for storage or transfer of highly radioactive materials, be an illusionary dichotomy between total and partial breach of contract. The ultimate question to resolve is the extent of the financial obligation which the United States must reasonably bear for the continued failure by DOE to begin to dispose of plaintiffs' HLW or SNF commencing no later than January 31, 1998 and extending to 2010.

Id. (emphasis added). Like the plaintiffs in Southern Nuclear, WE is a utility operating in the "regulatory climate" that has precluded it from exercising a genuine "election" between total and partial breach of contract theories. Similarly, its damages evidence should not be restricted by artificial damages concepts purportedly arising from those theories.

The Government nevertheless has made these artificial damages concepts the main contention in its pleading. See Gov.'s Resp. at 3. It insists that "[WE] consciously elected not to pursue claims for total breach" and that, "[h]aving elected to pursue a claim for partial breach, [WE's] damages must be confined to those properly allowed for a partial breach." Id. at 4; see also id. at 3 ("WEPCO has made a careful decision in identifying the type of contractual breach upon which it relies in this litigation.").

As the Government concedes, in order to have pursued remedies for total breach, WE "would have to have elected to consider the Standard Contract at an end." Gov.'s Resp. at 39. But the Nuclear Waste Policy Act "effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing [or renewing] licenses to any operator who has not 'entered into a contract with the Secretary' or who 'is [not] actively and in good faith negotiating with the Secretary for a contract.'" Maine Yankee, 225 F.3d at 1337 (emphasis added; second alteration in original; quoting 42 U.S.C. § 10222(b)(1)(A)); see also Roedler v. Dep't of Energy, 255 F.3d 1347, 1350 (Fed. Cir. 2001) ("The Act requires the producers of nuclear-generated power to enter into contractual arrangements with the Department of Energy in accordance with the terms of a Standard Contract . . . ."). Therefore, WE's hands were tied with respect to DOE's failure to perform

under the Standard Contract: WE had to preserve the Standard Contract and, accordingly, treat the Government's failure as a partial breach.

This was hardly an election — it was a Hobson's choice created by the Government itself. The Court should not countenance the Government's attempt to avoid responsibility with an "election" theory that is, at best, artificial. As discussed below, the Government's theory is also contrary to the legal authorities.

**B. Contrary To The Government's Assertion, Contract Law Allows The Recovery Of Mitigation Damages Incurred Prior To January 31, 1998.**

WE is entitled to recover for costs that it incurred prior to January 31, 1998, in attempting to mitigate damages attributable to DOE's previously-announced failure to commence SNF acceptance as of that date. The Government erroneously contends that WE cannot recover damages incurred prior to January 31, 1998, because WE has elected to pursue a claim for partial breach. See Gov.'s Resp. at 16-23. The Government's contention has been soundly rejected by this Court on multiple occasions and should be rejected again.

The general rule of damages provides that an injured party may recover reasonable costs incurred to mitigate damages from a forthcoming breach of contract — including a forthcoming partial breach. See Chain Belt, 115 F. Supp. at 713-14. This rule, in turn, derives from the fact that "[o]nce a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected to . . . take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b (1981). Indeed, "[r]easonable efforts in the form of affirmative steps are required to mitigate damages." Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir. 2002) (emphasis added).

This Court has accordingly held that a non-breaching party may recover for reasonable steps it takes to mitigate the damages of the other party's non-performance once it becomes clear that performance will not be forthcoming. As the Court explained in Yankee

Atomic, under facts similar, if not identical, to those in this case: "[T]he utility was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance." 2004 WL 1535688, at *6 (internal quotation marks and citation omitted). Noting that "[c]ontract damages are to place the injured party in as good a position as he or she would have been had the breaching party fully performed," the Court held that "[p]laintiffs shall not be precluded from presenting evidence of damages incurred prior [to] DOE's failure to commence acceptance in 1998." Id. at *7 (internal quotation marks and citations omitted).

This Court has similarly rejected the Government's position on multiple other occasions in SNF litigation. For example, in Southern Nuclear, the Court held that "evidence as to claimed damage items occurring prior to January 31, 1998, will not be excluded solely because the cost or obligation was incurred prior to the final statutory and contractual deadline for DOE to begin to dispose of high-level radioactive waste ('HLW') or SNF." No. 98-614C (Dec. 20, 2004). Likewise, in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004) ("TVA"), the Court explained:

> When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. . . . TVA's construction of dry storage facilities for spent nuclear fuel . . . must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach. Accordingly, to the extent that TVA is able to show at trial that it has incurred damages as a result of DOE's failure to act upon the proposed DCSs and its failure to collect SNF, TVA may recover those damages.

Id. at 674-75 (footnote omitted).[1]

---

[1] The Government asserts that, subsequent to issuance of the above-quoted summary judgment order in TVA, the Court somehow tempered its holding in resolving the Government's motion for reconsideration. See Gov.'s Resp. at 25 n.9. In denying the motion for reconsideration — which, the Court explained, "proceed[ed] on erroneous premises" — the Court issued a one-paragraph order simply: (1) clarifying that it had "made no finding

The correctness of the result in each of these SNF cases is confirmed by precedent in other contexts. For example, in Chain Belt, the Government contracted to sell a building to a private company, agreeing to remove its machinery from the building by December 10, 1946. "By November 1946, it was apparent that under no circumstances could [the Government] move out all its machinery by December 10, as provided in the contract." 115 F. Supp. at 713. Accordingly, the private company began moving the machinery out prior to December 10 and incurred moving costs both before and after that date. Id. The Court allowed recovery of the mitigation costs incurred prior to December 10, explaining:

> We think that plaintiff is entitled to recover the amount proved to have been spent as expenses incurred in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract. . . . . [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm which the defendant had reason to foresee would be the probable result of its breach when the contract was made. It makes no difference whether the breach has already occurred, or where (as was the case of the work done prior to December 10) it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

Id. at 714 (emphasis added).[2]

---

that TVA could receive damages beginning in 1995"; and (2) explaining that "causation is an element of proof regarding damages." Tennessee Valley Authority v. United States, No. 01-249-C (Fed. Cl. Aug. 12, 2004) (order denying reconsideration of summary judgment order; attached at A-5) (internal quotation marks and emphasis omitted). In other words, pre-breach damages will be awarded in the case if proven at trial.

[2] Relying on the interpretation proffered in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649-50 (2004), the Government may argue that Chain Belt was a total breach case. It was not. The contract at issue was for the sale of real property. The building was, in fact, transferred to the plaintiff and the Government received $1,422,000 in return. Chain Belt, 115 F. Supp. at 705. The dispute involved the Government's breach of the relatively minor provision concerning removal of machinery from the building. The Government did not repudiate its entire remaining contractual obligation to remove the machinery — it simply waited until after an "on-site sale of December 4" to commence

In this light, WE should be permitted to recover the pre-January 31, 1998, damages it sustained in mitigating the Government's forthcoming failure to perform. Indeed, DOE "made statements in 1987 and 1989 suggesting that [it] might not meet the 1998 deadline." Yankee Atomic, 2004 WL 1535688, at *6 n.8 (internal quotation marks and citations omitted). In its 1991 Annual Capacity Report, DOE estimated that it would not commence SNF pick up before "at least 2007." (Attached at A-6 – A-7.) "[I]n 1994 DOE announced that it could not begin disposal of SNF by January 31, 1998 as required under the Standard Contract because the storage repository it planned to build would not be ready until at least 2010." Yankee Atomic, 2004 WL 1535688, at *6 (citing 59 Fed. Reg. 27,007, 27,007-08 (1994)). And, in 1995 DOE went so far as to suggest that it had neither a statutory nor a contractual obligation to accept nuclear waste from utilities in the absence of a repository or an interim storage facility. Maine Yankee, 225 F.3d at 1338 (Fed. Cir. 2000) (citing 60 Fed. Reg. 21,793 (1995)).

In short, WE was well justified in concluding, as far back as 1987, that the Government would not perform by January 31, 1998, and WE was therefore "expected to take such affirmative steps as [we]re appropriate in the circumstances to avoid loss by making substitute arrangements." RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b (1981). Indeed, WE was obligated to make appropriate alternative arrangements for the storage of SNF. See Robinson, 305 F.3d at 1334 ("[R]easonable efforts in the form of affirmative steps are required to mitigate damages . . . ."). This obligation attached as soon as WE "ha[d] reason to know that performance by [DOE] w[ould] not be forthcoming" —

---

performance and therefore did not complete removal until after the December 10 deadline. Id. at 706-07.

In truth, the distinction between "total" and "partial" breaches is irrelevant to the availability of damages incurred to mitigate, as confirmed by the facts in Chain Belt and by its failure to address — even mention — the distinction.

not after January 31, 1998, had come and gone. RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b (1981). WE's reasonable pre-January 31, 1998, mitigation expenditures for substitute SNF storage accommodations are therefore recoverable. See Chain Belt, 115 F. Supp. at 714.

Nevertheless, the Government insists that, because its breach is partial, damages incurred prior to January 31, 1998, are not recoverable.[3] To this end, the Government relies on Indiana Michigan, which states that a claim for partial, rather than total, breach "precludes damages incurred before [the] breach." 60 Fed. Cl. at 642. This Court, however, has properly recognized that statement as dicta, explaining that, during the trial in Indiana Michigan, "the utility failed to establish that defendant's breach was the reason any costs, either pre- or postbreach were incurred. Accordingly, the court's discussion and rejection of any damages incurred before December of 1998 were dicta." Yankee Atomic, 2004 WL 1535688, at *7 (footnote omitted).

In addition, Indiana Michigan itself relied on dicta from another case, Middleton v. United States, 175 Ct. Cl. 786 (1966). Middleton was not even a contract matter; it concerned the appropriate setoff to a claim for back pay by an improperly discharged sailor — a dispute founded in administrative law rather than contract law. See Schism v.

---

[3] Although the Government correctly refers to its breach as partial, it misapprehends the nature of the breach. The Government asserts that its contractual obligations are set not by the NWPA and the concomitant Standard Contract that required it to commence SNF acceptance by January 31, 1998, but rather by its own Delivery Commitment Schedules. The Government thus insists that a series of partial breaches tied to its failure to perform in accordance with its DCSs is really at issue. See Gov.'s Resp. at 4-9. This position has been squarely and correctly rejected. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 666 (2003).

To be clear, WE claims a single partial breach of the Standard Contract from January 31, 1998, to December 31, 2009 (or, as the Court put it in Southern Nuclear, "the breach of contract represented by DOE's performance delay until 2010," No. 98-614C (Dec. 20, 2004)).

United States, 316 F.3d 1259, 1271-74 (Fed. Cir. 2002) (en banc) ("The Supreme Court has recognized the irrelevance of contract law for members of the military many times, stating, for example, that common-law rules governing private contracts have no place in the area of military pay." (internal quotation marks and citation omitted)). In any event, the case was decided on causation grounds — not on the timing of the "mitigation" expenses at issue. Those expenses were attorneys' fees the sailor had incurred in civilian criminal proceedings prior to his discharge from the Navy. While the Court, in disallowing the fees, emphasized that they "relate[d] to a period antedating defendant's breach," i.e., the discharge, 175 Ct. Cl. at 792, under no view of the facts were the fees caused by the Government or its "breach." The sailor incurred them to stay out of jail — not to thwart some potential future discharge. In fact, in relying on Middleton to disallow "pre-breach" damages, Indiana Michigan conceded that the "antedating" language might be dicta and that, in any event, it "did not necessarily establish 'an inflexible rule.'" Indiana Michigan, 60 Fed. Cl. at 651.

Accordingly, this Court should reject the contention that pre-January 31, 1998, damages are not recoverable. So long as WE can prove that such damages were "actually foreseen or reasonably foreseeable, . . . caused by the breach of the promisor, and . . . proved with reasonable certainty," it should be permitted to recover them. Bluebonnet Sav. Bank, 266 F.3d at 1355.

**C. Contrary To The Government's Assertion, Contract Law Allows The Recovery Of Future Damages That Will Be Incurred To Mitigate Losses.**

Like damages incurred prior to January 31, 1998, the future damages WE seeks for the Government's breach are entirely appropriate so long as they are foreseeable, caused by the breach, and established with reasonable certainty. In fact, courts routinely award future lost profit damages, which involve far more uncertainty than the damages WE seeks for the Government's breach of the Standard Contract. See, e.g., Energy Capital Corp. v. United

States, 302 F.3d 1314, 1324-25, 1334 (Fed. Cir. 2002); N. Helex Co. v. United States, 455 F.2d 546, 564 (Ct. Cl. 1972).

It is again of no moment that the Government's breach is partial, and this Court should therefore reject the Government's recycled contention that for "a partial breach, plaintiff may only recover for expenditures incurred prior to the filing of the Complaint." Yankee Atomic, 2004 WL 1535688, at *1 "A breach can cause future damages and still be only 'partial.' It is not true that future damages are inconsistent with a partial breach." 9 CORBIN ON CONTRACTS § 956, at 576 (2004 Fall Cum. Supp.).[4]

In this light, the Court should follow the approach that it adopted in Yankee Atomic:

> Given the nature of the breach here, as well as the suggested magnitude of measures taken to store the waste that defendant was required by contract and statute to accept, to limit any recovery in this action to expenditures either to the date of the filing of the Complaint or the date of trial may well not adequately compensate plaintiffs and restore them to the position they would have been in but for the breach.

2004 WL 1535688, at *3. Given that "at the earliest, DOE will not be prepared to commence performance until 2010," the Court held that "evidence of damages established with reasonable certainty based on the failure to perform until that time whether they are incurred or projected, so long as they are reasonably certain and caused by prior breaches will not be precluded." Id. at *2. The Court reaffirmed this approach in Southern Nuclear, when it held: "given DOE's repeated past representations that performance of its SNF disposal obligation

---

[4] In its response, the Government persists in citing — indeed, quoting — a previous version of Section 956 of the Corbin treatise for the proposition that "where there is no repudiation, the plaintiff can recover damages for his injury only to the date of the writ — . . . he must treat the breach as only 'partial.'" Gov.'s Resp. at 27. In Yankee Atomic, this Court corrected the Government for relying on the treatise in this regard, explaining that "the supplement to that section challenges and dispels that thought." 2004 WL 1535688, at *1. Amazingly, the Government again relies on the superseded section — without even acknowledging the supplement.

will commence in 2010," plaintiffs would be permitted to pursue "damages asserted to be incurred as a result of the breach of contract represented by DOE's performance delay until 2010." No. 98-614C (Dec. 20, 2004).

The results reached in these cases are correct legally as well as sound as a matter of policy. Indeed, the policy reason sometimes advanced for barring future damages simply is not present in this case:

> Future damages are generally not awarded due to the possibility of windfall to the non-breaching party should the expenses not materialize if the breaching party does perform. Here, given defendant's admission that performance will not commence at the earliest until 2010, there is no risk of windfall; there is no possibility that future government performance will ameliorate or eliminate expenditures caused by defendant's failure to take actions necessary to commence performance in 1998 and perform through 2010.

Yankee Atomic, 2004 WL 1535688, at *2.

Confronted with this earlier holding, the Government attempts to resurrect the specter of double recovery by now insisting that DOE may yet perform before 2010. E.g., Gov.'s Resp. at 9 ("[U]ncertainty as to the future actions that Congress, DOE, or the Nuclear Regulatory Commission may take which could affect DOE's ability to commence operations at Yucca Mountain by 2010 or at another facility prior to that time preclude the Court from knowing that the time period 1998 to 2010 defines the specific extent of DOE's partial breaches."). The Government's conjecture can only be described as a convenient, post-hoc position adopted specifically for purposes of litigation and not grounded in reality. See 59 Fed. Reg. 27,007, 27,007-08 (1994) ("Should Yucca Mountain prove scientifically suitable, and be licensed by the Nuclear Regulatory Commission and approved by the Congress, the Department currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010." (emphasis added)). As discussed above, the Government has repeatedly represented that it will not perform before 2010. There is, in short, no danger of double recovery.

Moreover, it is sound policy to allow future damages in this case. A contrary blanket rule would force WE to resort to repetitious, periodic lawsuits as damages are incurred going forward. Efficiency, conservation of judicial resources, and common sense militate against such a result.

Finally, permitting future damages is the only reasonable result in a situation like the present one, where federal law both creates a monopoly in spent fuel disposal and requires utilities to contract with the monopolist. See 42 U.S.C. § 10131(b)(2) ("The purpose[] of this part [is] . . . to establish the Federal responsibility . . . for the disposal of such waste and spent fuel . . . ."); Roedler, 255 F.3d at 1350 ("The Act requires the producers of nuclear-generated power to enter into contractual arrangements with the Department of Energy in accordance with the terms of a Standard Contract . . . ."); Maine Yankee, 225 F.3d at 1337 (noting that the NWPA "effectively made entry into such contracts [with DOE] mandatory for the utilities"). Because of the monopoly DOE possesses in SNF disposal, WE simply cannot "cover." As a matter of law and practicality, it cannot send its SNF elsewhere for disposal. Instead, WE must await DOE's performance, certain to incur damages into the future. That fact alone renders this action "a proper case" for awarding future damages. 9 CORBIN ON CONTRACTS § 956, at 576 (2004 Fall Cum. Supp.) ("A partial breach should be subject to . . . future damage remedies in a proper case . . . .")

**D. The Government's Claim-Splitting Charge Against WE's Proposed Approach To Future Damages Ignores This Court's Clear Authority To Reserve WE's Right To Bring A Subsequent Action.**

As noted, WE seeks to prove in this case all damages incurred through December 31, 2015, arising from the delay in performance that the Government has acknowledged will occur, i.e., the delay in performance through December 31, 2009. Accordingly, WE asks this Court to reserve its right to bring subsequent actions for future damages that it incurs subsequent to December 31, 2015, as a result of the Government's failure to commence SNF

acceptance prior to 2010. WE likewise seeks to reserve its right to bring subsequent actions for future damages it may incur as a result of any additional partial breaches of contract that would result from the Government's failure to commence SNF acceptance in 2010 or thereafter. See WE's Mot. at 7-8.

WE's Motion does not, as the Government contends, request impermissible "claim splitting." Although a final judgment generally extinguishes subsequent claims related to the transaction that was the subject of the original action, there are a number of exceptions. One such exception applies where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action." RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(b) (1982).

This Court has made such reservations in SNF litigation on several occasions. In TVA, the Court invoked § 26(1)(b) in holding that "TVA shall retain the right to bring subsequent actions for damages it sustains after the period encompassed by [the instant] trial." 60 Fed. Cl. at 678; see also id. at 679 ("TVA shall retain the right to bring subsequent actions on claims for damages incurred after the period encompassed . . . above, regardless of any final judgment entered by the Court following trial on the merits in this case."). In Southern Nuclear, the Court ordered that "any DOE delay in its obligation to dispose of plaintiffs' HLW or SNF occurring after 2010 shall comprise a separate cause of action accruing then, and not comprising a part of the current litigation." No. 98-614C (Dec. 20, 2004). And, in Yankee Atomic, the Court held that "[d]amages caused by any failure to commence pick-up after 2010 (as well as any related issues concerning the adequacy of that future performance) would be future damages for future breaches." 2004 WL 1535688, at *3. In short, such reservations are standard fare, the Government's objections notwithstanding.

In fact, reservation in this case would advance the policy behind the general rule against claim splitting — to prevent "unnecessary and vexatious and unjust" actions.

9 CORBIN ON CONTRACTS § 955. Allowing WE to reserve future actions as requested would result in fewer lawsuits than the Government's suggested approach, which presumably entails one action for the recovery of damages incurred between January 31, 1998, and November 16, 2000, followed by successive lawsuits every six years.

Accordingly, WE respectfully asks that this Court reserve its right to bring subsequent actions for future damages that it may incur if the Government fails to commence SNF acceptance in 2010 or thereafter and for future damages that it may incur subsequent to 2015 as a result of the partial breach of contract caused by the Government's failure to commence SNF acceptance prior to 2010.

## III. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court grant its Motion for an Order Regarding Subsequent Damages Actions and deny the Government's Cross-Motion to limit the consideration of damages to those incurred between January 31, 1998, and November 16, 2000, the date WE filed its Complaint.

Respectfully submitted this 11th
day of April, 2005.

s/Richard W. Oehler by s/Donald J. Carney

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Telephone: (206) 359-8419
Facsimile: (206) 359-9419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:
Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street N.W.
Washington, D.C. 20005
Telephone: (202) 434-1675
Facsimile: (202) 654-9113

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on April 11, 2005, I caused a copy of the foregoing WISCONSIN ELECTRIC POWER COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND ITS OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney

# APPENDIX

**WISCONSIN ELECTRIC POWER COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND ITS OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES**

# INDEX TO THE APPENDIX

Southern Nuclear Operating Co. v. United States, No. 98-614C
(Fed. Cl. Dec. 20, 2004)....................................................................................A-1

Tennessee Valley Authority v. United States, No. 01-249-C
(Fed. Cl. Aug. 12, 2004)....................................................................................A-5

1991 Annual Capacity Report, DOE (selected pages)..........................................................A-6

Gov.'s Resp. to Utility Pls.' Joint First Set of Interrogs. (selected pages)............................A-8

# In the United States Court of Federal Claims

No. 98-614C
(Filed December 20, 2004)

******************************
SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, GEORGIA POWER COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.
******************************

## ORDER

This matter comes before the court on plaintiffs' Motion for an Order Regarding Subsequent Damages Actions, filed September 1, 2004, defendant's Response and Cross-Motion for Summary Judgment Regarding Pre-Breach and Future Damages, filed October 1, 2004, and the subsequent responses to these submissions filed by the parties.

The issue raised by the cited submissions is the scope of the trial ordered in this case with respect to damages stemming from the failure of the Department of Energy ("DOE") to commence removal of Spent Nuclear Fuel ("SNF") by no later than January 31, 1998.

Plaintiffs seek an order recognizing that the scope of this case involves damages for DOE's failure to remove SNF through December 31, 2009, which failure can engender damage items incurred through December 31, 2020. For any breach by DOE in its SNF removal obligation occurring on or after January 1, 2010, plaintiffs seek an

order recognizing their right to file a subsequent complaint, and also seek an order removing any statute of limitation concerns such a subsequent suit(s) might generate.

Defendant, consistent with its litigation position that DOE's SNF removal obligation arises only upon DOE's approval of a delivery commitment schedule ("DCS") for a specific quantity of SNF, opposes plaintiffs' Motion. Instead, defendant seeks recognition that the trial in this case will encompass damages only for, and subsequent to, a series of partial breaches of contract stemming from DOE's failure to remove SNF in quantities on approved DCSs. Accordingly, defendant seeks an order limiting the scope of trial to damages incurred after January 31, 1998, until July 29, 1998, the date the Complaint was filed – a 179-day period. Alternatively, defendant suggests the trial date as a damages terminus. Defendant has no objection to successive suits for any future failures by DOE timely to remove plaintiffs' SNF included on an approved DCS.

At this pretrial stage in the proceedings we are concerned with the extent of the evidence to be submitted at trial by the parties, not whether any particular damage items will or will not be included in the final judgment to be entered following trial proceedings and post-trial briefing.

For the reasons expressed in the undersigned's Order in *Yankee Atomic Electric Co. v. United States*, No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004), evidence as to claimed damage items occurring prior to January 31, 1998, will not be excluded solely because the cost or obligation was incurred prior to the final statutory and contractual deadline for DOE to begin to dispose of high-level radioactive waste ("HLW") or SNF. *See* 42 U.S.C. § 10222(a)(5)(B). Similarly, given DOE's repeated past representations that performance of its SNF disposal obligation will commence in 2010, the current litigation involves damages asserted to be incurred as a result of the breach of contract represented by DOE's performance delay until 2010. Further delay, if any, in DOE's performance of its SNF disposal obligation beyond 2010, would comprise a separate breach of contract, not part of the instant case.

Accordingly, each party is free to propose the evidence supporting its theory of this case. Defendant will undoubtedly propose evidence supporting its DCS-related theory of damages and the limitations resulting therefrom. Plaintiffs will propose the evidence supporting their theory for the damages claimed, tied to DOE's performance delay encompassing a period preceding January 31, 1998 until 2010,

albeit with some cost implications for this delay period extending until 2020. For pretrial discovery each party's proposed evidence must be disclosed and is subject to evaluation and verification.

In the circumstances of this complex litigation, involving performance and lack of performance of long-term contracts, it is not contemplated that the introduction of evidence relevant to the monetary impact of DOE's current performance delay until 2010 will be artificially restricted by theoretical damage concepts involving what may, in the regulatory climate which exists for storage or transfer of highly radioactive materials, be an illusionary dichotomy between total and partial breach of contract. The ultimate question to resolve is the extent of the financial obligation which the United States must reasonably bear for the continued failure by DOE to begin to dispose of plaintiffs' HLW or SNF commencing no later than January 31, 1998 and extending to 2010.

Accordingly, it is **ORDERED**:

(1) Plaintiffs' motion, filed September 1, 2004, shall be **GRANTED** to the extent that:

> (a) evidence shall be received in this litigation addressed to the monetary damages plaintiffs claim to be appropriately tied to the period of DOE's current performance delay until 2010, including cost or monetary ramifications thereof extending to 2020; and
>
> (b) any DOE delay in its obligation to dispose of plaintiffs' HLW or SNF occurring after 2010 shall comprise a separate cause of action accruing then, and not comprising a part of the current litigation;

(2) Defendant's cross-motion, filed October 1, 2004, shall be **DENIED**, without prejudice to the appropriate reassertion of the arguments presented in post-trial briefing;

(3) Except as so granted above, the parties' cited motions shall be, otherwise, **DENIED**.

s/ James F. Merow
James F. Merow
Senior Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 01-249-C

(Filed: August 12, 2004)

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

ORDER

The government's motion for reconsideration, filed on August 10, 2004, respecting this Court's decision reported at 60 Fed. Cl. 665 (2004), proceeds on erroneous premises. First, contrary to the government's motion, the Court made *no* "finding that TVA could receive damages beginning in 1995." Def.'s Mot. at 12. Rather, the Court explicitly found that "DOE breached its obligation to act on TVA's DCSs in good faith," 60 Fed. Cl. at 674, and that initially occurred in 1997. Second, causation is an element of proof regarding damages, and the Court specifically denied TVA's motion for summary judgment respecting damages. *See* 60 Fed. Cl. at 675-76. Defendant's motion for reconsideration is denied.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

DOE RW 0331P

Office of Civilian Radioactive
Waste Management

# Annual Capacity Report

December 1991

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility' schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | ) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | ) |
| MAINE YANKEE ATOMIC POWER COMPANY | ) |
| FLORIDA POWER & LIGHT COMPANY | ) |
| NORTHERN STATES POWER COMPANY | ) Case Nos. 98-126C, |
| DUKE POWER, A Division of DUKE ENERGY CORP. | ) 98-154C, 98-474C, |
| INDIANA MICHIGAN POWER COMPANY | ) 98-483C, 98-484C, |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | ) 98-485C, 98-486C, |
| SOUTHERN NUCLEAR OPERATING COMPANY, et al. | ) 98-488C, 98-614C, |
| COMMONWEALTH EDISON COMPANY | ) 98-621C, 99-447C, |
| BOSTON EDISON COMPANY | ) 00-440C, 00-697C, |
| GPU NUCLEAR, INCORPORATED | ) 00-703C, 01-115C, |
| WISCONSIN ELECTRIC POWER COMPANY | ) 01-116C, 01-249C |
| POWER AUTHORITY OF THE STATE OF NEW YORK | ) |
| OMAHA PUBLIC POWER DISTRICT | ) Judge Weinstein |
| NEBRASKA PUBLIC POWER DISTRICT | ) (Discovery Judge) |
| TENNESSEE VALLEY AUTHORITY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

RECEIVED LLP
OCT 10 2001
PERKINS COIE

**DEFENDANT'S RESPONSES TO UTILITY**
**PLAINTIFFS' JOINT FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's order for coordinated discovery, filed on September 26, 2001, defendant, the United States, provides the following responses to the plaintiffs' joint first set of interrogatories.

GENERAL OBJECTIONS

1. Defendant objects to each and every interrogatory to the extent that it calls for the disclosure of material or information that is subject to any claim of privilege or protection, including without limitation, the attorney-client privilege, the work-product doctrine, or any Government privilege. Defendant will not produce privileged or protected documents, materials or information in response to the document requests. The inadvertent production by defendant

**INTERROGATORY NO. 56:**

Identify the earliest date on which DOE reasonably believes it will begin to accept SNF from Purchasers pursuant to the Standard Contract. Describe the basis for DOE's response to this Interrogatory.

**RESPONSE:**

The Department of Energy has previously represented that it anticipates that no Federal facility constructed under the Nuclear Waste Policy Act will be available until at least 2010. Under the current statutory requirements of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, the Department of Energy cannot begin SNF acceptance until that facility is operational. Absent congressional action that would allow the Department of Energy to make alternative arrangements regarding SNF disposal and/or storage, DOE does not anticipate that it can begin SNF acceptance until at least 2010.