IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-697C |
| | ) | (Senior Judge Merow) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME

Pursuant to Rule 6(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests an enlargement of time of 63 days, to and including Friday, May 5, 2006, within which to complete fact discovery. The date requested is one week prior to the currently scheduled deadline for submission of defendant's expert reports and audit response. Fact discovery is currently scheduled to close on Friday, March 3, 2006. This is defendant's first request for an enlargement of time for this purpose, the Court having granted the parties' joint motion to amend the scheduling order in this matter on December 20, 2005. This request will not affect any other dates set forth in the Court's most recent scheduling order. The undersigned has spoken and written to counsel for plaintiff, Wisconsin Electric Power Company ("WEPCO"), regarding the substance of this motion, but is not yet able to represent WEPCO's stance on the motion.

BACKGROUND

The Court granted defendant's motion to conduct more than ten depositions in this matter on October 11, 2005. Subsequently, after conducting a telephone conference with the parties, this Court granted the parties' joint motion to revise the pending scheduling order. Order dated

December 20, 2005. That order enlarged the then-pending discovery deadline to Friday, March 3, 2006. By that time, defendant had conducted depositions of 13 of the persons that had been disclosed by WEPCO in its discovery responses and other disclosures as having knowledge of issues in the case. Since that time, the parties have each propounded additional written discovery requests and have engaged in audit activity. Additionally, defendant has conducted depositions of 13 more of the persons that had been disclosed by WEPCO as having knowledge.[1]

The Court recently granted an unopposed motion allowing WEPCO an enlargement until March 20, 2006 to respond to certain recent sets of Government discovery requests. Still pending is WEPCO's motion for leave to amend its pleadings to assert an claim of over $2 million in additional damages.

## ARGUMENT

Defendant needs this enlargement of time for the following reasons:

1. Continuation of unfinished depositions: At this point, three of the depositions conducted by the Government are incomplete. Those are the depositions of Jim Becka, Eric Meils, and Ione Straub. The requested enlargement will allow for the scheduling of the continuation of these depositions at times that are mutually convenient to the witnesses and the parties' counsel.[2]

---

[1] The deposition of one of those persons – Mr. Glenn Adams – is scheduled to be conducted today.

[2] The deposition of Eric Meils was scheduled to be completed on March 3, 2006, the last day of the fact discovery period. Based upon an unforeseen scheduling problem, the parties were not able to accomplish this, and have agreed that the deposition may be completed after the present fact discovery deadline.

2. Reopening of certain depositions for further inquiry into specific areas: Early in the deposition process several of the deponents were asked about their involvement or communications with Richard J. Sieracki and Kenneth P. Metcalfe of the Kenrich Group, LLC, the expert witnesses that have submitted reports supporting WEPCO's damages claim. At that time those witnesses were instructed not to answer the questions posed to them based upon claims that the information sought was protected from disclosure under the attorney work product doctrine or the attorney-client privilege. For example:

Michael Baumann: Mr. Baumann was identified in WEPCO's disclosure as a witness with knowledge of the rate or schedule upon which WEPCO anticipated that DOE would accept its spent nuclear fuel or to which WEPCO contends that the Court should refer for the purpose of assessing damages in this case, and as a person who provided answers to some of the discovery responses in this case. The following exchange took place in the deposition of Mr. Baumann:

Q: [Mr. Crawford, defendant's counsel] Mr. Baumann, have you had any involvement with or communication with Eileen M. Supko of Energy Resources International, Inc.?

A: Over the course of my career, yes.

*****

Q: Any communications or meetings with her with respect to this litigation you are providing deposition testimony on here today?

A: No.

Q: All right. Same question with respect to two individuals for the -- who are employed by the Kenrich Group, LLC, and their names are Richard J. Sieracki or Kenneth P. Metcalfe. Have you had any involvement or discussion with those two gentlemen?

A: I have met the two gentlemen.

Q: And under what circumstances have you met the two gentlemen?

A: Two meetings at the WEPCO offices.

Q: When were those?

A: I'd have to go back and look at records of when I met with him -- or met with the project team.

Q: What do you mean by "the project team"?

A: The group that I was asked to participate in a couple meetings with.

Mr. Carney [WEPCO's counsel]: And Mr. –

Q: With respect to what? With respect to what?

A: Dry storage.

Q: In what regard?

Mr. Carney: I'm going to direct you not to answer to the extent it involves communications -- privileged communications on the attorney work product doctrine or attorney-client privilege. It's my understanding that Mr. Oehler and myself were at both of those meetings, and so communications or direction on those grounds are privileged.

Q: Well, let me deal with it this way. You said those meetings dealt with dry storage. Did they deal with this litigation?

A: Yes.

Q: And what was the -- what was your purpose for attending those meetings?

A: Just historical perspective of the project.

Q: During the meeting, did you communicate with Mr. Sieracki and Mr. Metcalfe?

A: Not directly.

Q: How did you communicate with them in any other fashion other than directly?

Mr. Carney: I'm going to direct you not to answer any specific communications at that meeting that are under the privileges I just described.

Q: And I was just asking how did you do that in any means other than directly?

A: There were just some general discussions that I was participating in.

Q: So you may not have been -- your involvement in those discussions may not have been to directly communicate with Mr. Sieracki and Mr. Metcalfe, it was just that you were participating in the discussion; is that correct?

A: That is correct.

Q: Am I correct also that the purpose of your being at that meeting was so that you could -- you could gain an understanding of historical perspective on things; is that correct?

Mr. Carney: I'm going to direct you not to answer to the extent it deals with specific communications at that meeting.

Q: Yeah. I'm just asking you what the purpose was.

A: I was asked to attend the meetings for my historical perspective of our dry storage project.

Q: For your historical perspective or for you to get an understanding of the historical perspective?

A: I was there, so I was part of the history.

Q: Oh, I see. All right. What particular information did you provide to the group at that time?

Mr. Carney: I'm going to direct you not to answer that question as it relates -- I'm going to direct you not to answer that question if it relates to any communications during that meeting.

Mr. Crawford: It would be pretty hard to answer that question then, wouldn't it?

Q: Are you going to refuse to answer the question?

Mr. Carney: You're going to follow my advice; is that correct?

A: [Mr. Baumann] I'm going to follow your advice.

Q: [Mr. Crawford] And you're going to refuse to answer the question?

A: I would refuse to answer the question.

October 31, 2005 deposition of Michael F. Baumann, at p. 211, ll. 6-9 and p. 211, l. 15 - p. 215, l. 9.

David Weaver: Mr. Weaver was identified in WEPCO's disclosures as a person who provided source support to the Kenrich Group for various items in the damages claim. The following exchange took place in the deposition of Mr. Weaver:

Q: [Mr. Shultis, defendant's counsel] Okay. Mr. Weaver, you were identified as a person who provided data to the Kenrich Group for preparation of WEPCO's damages claim. What did you provide?

Mr. Carney [WEPCO's counsel]: I'm going to direct you not to answer on the basis of attorney-client privilege and attorney-product doctrine.

A: [Mr. Weaver] I will not answer.

Q: How was it determined what cost information you would provide?

Mr. Carney: I instruct you not to answer again.

Q: I'm not asking for the information. I'm asking for the process. I don't want to know, you know – you just said he – you wouldn't tell us what he did provide, but I want to know how it was determined what you would provide?

Mr. Carney: I'm instructing you that that relates to attorney processes and inputs that you can't testify about.

Q: Okay. My question really gets to, what did you provide in this effort?

Mr. Carney: I'm directing you not to answer.

A: [Mr. Weaver] I won't answer based on counsel's advice.

Q: Okay, but how did you go about, you know, without the aid of counsel or anything, how did you go about deciding what to provide?

Mr. Carney: I'm directing you not to answer.

Mr. Shultis: Okay, and the basis?

Mr. Carney: Attorney-client privilege and attorney-work product doctrine.

Q: And are you going to refuse to answer?

A: I will not answer the question based on counsel's advice.

Q: Let me ask you this. Are you familiar with WEPCO's damages claim in this case?

A: I know we had a damages case pending with the government.

Q: What do you understand that claim to be?

Mr. Carney: I'm just going to caution you not to discuss things that are attorney-client privileged or attorney-work product doctrine, covered by those doctrines. If you can say, generally, you know the claim was discussed, that would be a sufficient answer.

A: [Mr. Weaver] That would be my answer.

Q: Mr. Weaver, do you have any knowledge about the damages claim?

A: Yes, I do have knowledge.

Q: What is that knowledge?

Mr. Carney: My prior instructions stand.

A: [Mr. Weaver] I can't answer that question based on counsel's advice.

Q: So you're not going to tell me what you know about the damages claim, is that correct?

A: What I know is based on privileged information.

Mr. Shultis: Okay. We object to that as non-responsive because we're not asking for privileged information.

Q: What can you -- so you're not going to tell me what you know about the damages claim?

Mr. Carney: My prior advice stands, so I'm directing you not to answer what you know about the damages claim.

A: [Mr. Weaver] And I won't answer based on counsel's advice.

November 3, 2005 deposition of David Weaver, at p. 149, l. 24 - p. 153, l. 1.

This Court has recently held that the withholding of similar testimony in these spent nuclear fuel cases under these same claims of privilege is improper. Pacific Gas & Electric Co. v. United States, No. 04-75C (Fed. Cl. January 25, 2006).

Additionally, in the earlier rounds of depositions, witnesses that had been identified as having knowledge of certain broader issues such as the rate or schedule of spent nuclear fuel acceptance, or that were identified as persons who provided answers to some of the discovery responses in this case or who provided source support to the Kenrich Group for various items in the damages claim, claimed not to have any knowledge with elements of the claim in their depositions. For example:

Paul Farron: Mr. Farron was specifically identified as having provided source support to the Kenrich Group for various items in the damages claim, yet, when he was shown the damages claim schedule prepared by the Kenrich Group, the following exchange took place:

Q: Mr. Farron, I'm giving you a copy of what has previously been marked as Exhibit 29 for this deposition. And I was wondering if you could page to

the page that's -- says summary of cost-by-cost element, strategic issues administration. It's the -- oh, okay. It is Bates numbered 2995. Are you there?

A: Uh-huh.

Q: Now, this is a part of the expert report we received from WEPCO in this litigation. It's from Kenrich Group. My question is, do you see where it has, for instance, the cost elements? Have you seen this before, by the way?

Mr. Carney: Objection, compound.

Mr. Shultis: I'll withdraw the last question.

Q: I'll ask you very simply, have you seen this document before?

A: I don't remember seeing this before.

Q: And you're on page 2995 with me?

A: Yeah.

Q: Across the top, under the cost element, it says, "Contract costs, labor." And it says under the column 1996, 24,948; 1997, 121,193; 1998, 70,219. Do you see where I'm reading?

A: Uh-huh.

Q: Do you know where those numbers come from?

A: I couldn't tell ya. I don't know.

*****

Q: So how was it determined which of these costs were to be included in the damages claim?

A: I don't know.

Q: And you said you don't know whose time would be reflected in these costs?

A: If I did at one time, I don't remember. But I don't recall at all really. I just don't.

*****

Q: During the period from '96 to '98, which of the strategic issues would you have been working on?
A: On here?

Q: Yes.

A: I don't know.

Q: And when you refer to the account -- I think the single order account, what account is that?

A: I don't -- I know there was a number. I don't remember what that number was.

Q: Were there -- in this '96-'98 time frame, which issues were related to DOE's delay?

A: In here?

Q: Right. I mean, which issues did the -- that the strategic issues group was working on were related to the Department of Energy's delay?

A: Can you ask another question? Because I'm not sure what you mean by "DOE's delay."

Q: I'm talking about the delay in accepting WEPCO's spent nuclear fuel pursuant to the standard contract.

A: I don't know that we did anything specific to the standard contract. I don't know of anything that we did specific to the standard contract.

Q: Well, do you know of anything generally related to that?

A: To the standard contract? No.

Q: Just so that I'm clear on it, what issues that the strategic issues group was dealing in in this '96-'98 time frame dealt with the delay -- DOE's delay in accepting WEPCO's spent nuclear fuel?

A: I don't know. Maybe you should repeat the question. I'm sorry. Maybe you can read it back?

Q: What issues that the strategic issues group was dealing with in the '96-'98 time frame dealt with DOE's delay in accepting WEPCO's spent nuclear fuel?

A: I don't know.

Q: Can I take you to the bottom line there where it says "miscellaneous off other," and then under the year 2000, there's -- it says 87,907, and 2001, 60,718, okay?

A: Uh-huh.

Q: Where did those costs come from?

A: We're on the same page, right?

Q: Yes.

A: And under 2000-2001?

Q: Yeah. I'm referring to those two columns. Under 2000 --

A: Okay. Is that fees to Public Service Commission, PSCW?

Q: Yes, yes, it is.

A: I don't know at that time. I'm -- I don't know.

Q: Do you know whose time they would reflect?

A: I don't -- I think those reflect -- no, no.

Q: Who would know?

A: I don't know. I couldn't tell you.

Q: Do you know who would know the basis of these – of the other costs in '96, '97, '98 costs?

A: The basis? Possibly Gary Krieser.

Q: Anybody else?

A: For the basis -- for the basis, I don't know.

Q: And by "basis" do you mean -- I'm referring to what activities they represented.

A: Possibly -- possibly Ione Straub, possibly.

Q: Anyone else?

A: I don't know of anyone else.

October 12, 2005 deposition of Paul Farron, at p. 57, l. 6 - p. 58, l. 9; p. 58, l. 21 - p. 59, l. 2; and p. 59, l. 16 - p. 62, l. 9.

Gary Krieser: Mr. Krieser was identified by WEPCO as one of the persons having knowledge of the rate or schedule of spent nuclear fuel acceptance, and as one of the persons who provided answers to some of the discovery responses. He was a person who testified during the hearings before the Public Service Commission of Wisconsin in support of WEPCO's application for approval to construct its ISFSI. He was involved with certain of the projects upon which WEPCO's damages claim is based. And, as can be seen from the citation above, Mr. Farron points to him as a person with knowledge of certain of the claimed damages costs allegedly incurred in the 1996 - 1998 time frame. Yet, when shown the same Kenrich schedule of claimed damages costs, the following exchange occurred:

Q: Mr. Krieser, I've placed before you a document which has been previously marked as Government Deposition Exhibit No. 29. It's a document prepared by an expert witness retained by Wisconsin Electric in this case, and it summarizes some of the costs that have been incurred or that are being claimed as having been incurred relating to the dry cask storage project, and I want to ask you about some of these.

You'll see that these costs are located in this table on the first page of Exhibit 29, and the costs are organized in the table with a column. The second column has the accounting code relating to the types of costs, and then under that column, damage category contains a description of the costs.

Let me ask you, with respect to the first line item, which is in that -- I'll identify it by the tab numbers contained in that first column. Tab 1, dealing with the two accounting codes that you see there, and the damage category, additional spent fuel storage, do you have any knowledge relating to what those costs represent?

A: I certainly couldn't get into details.

*****

Q: Why don't I let you do a little independent review here, okay? Do what we've been doing. Go down each line item, take a look at the breakout page, see if there are any of these costs that you can tell me anything about, and if you get to one that you think you can tell me something about, let me know.

Otherwise, just at the end, just tell me that there's none of them that you can tell me about.

A: They're all high-level project cost element categories. To tell you specifically what they are, I can't do that.

November 1, 2005 deposition of Gary Krieser, at p. 401, l. 22 - p. 402, l. 20 and p. 410, l. 18 - p. 411, l. 5.

Notwithstanding the denials of knowledge by Mr. Krieser and Mr. Farron, they were later identified by Ione Straub, the budget coordinator of WEPCO's Nuclear Business Unit, as persons that were heavily involved in putting together WEPCO's damages claim. In fact, Mr. Krieser was the lead WEPCO employee on a project to prepare an earlier version of WEPCO's claim when it was first presented to the Department of Energy in August 1998. February 24, 2006 deposition of Ione Straub ("Straub deposition"), at p. 99, l. 14 - p. 110, l. 25. From the time she

left employment with WEPCO in January 2002, Ms. Straub has worked as a contractor on three assignments with Paul Farron of WEPCO. Straub deposition at p. 9, l. 15 - p. 11, l. 14. Those assignments each related to updating the earlier claim to create the damages claim in this case. Id.; Straub deposition at p. 111, ll. 10-12. Her deposition testimony indicates that both Mr. Krieser and Mr. Farron have more knowledge about the claim than we were led to believe by their initial testimony. For instance, Ms. Straub has testified to the following:

– She was provided guidance in the preparation of the earlier claim by Gary Krieser and WEPCO's counsel. Straub deposition at p. 103, ll. 5-11; p. 165, ll.2-6.

– Mr. Krieser instructed her as to which dry storage-related projects from which to pull costs together in preparing the earlier claim. Straub deposition at p. 104, ll. 2-18.

– Mr. Krieser provided her guidance as to which other costs to include in the earlier claim. Straub deposition at p. 104, l. 19 - 105, l. 1.

– Mr. Farron provided her guidance in determining whether costs relating to a project to pursue other off-site dry spent fuel storage projects should be included in the damages claim. Straub deposition at p. 91, l. 4 - p. 92, l. 4.

The instances of failure to provide testimony and the conflicting facts cited to above give rise to the need, at the very least, to reopen the depositions of Paul Farron, Gary Krieser, Michael Baumann, and David Weaver, if only for the limited purpose of re-examining them regarding their knowledge of the facts relating to their involvement in the preparation of the damages claim and the information that they provided to the experts relating to that issue.

3. RCFC 30(b)(6) depositions. To the extent that reopening the depositions of the witnesses mentioned above is determined not to be the best method of obtaining the facts

surrounding the preparation of the damages claim and the information that was provided to the experts relating to that issue, defendant will use the requested enlargement to conduct a Rule 30(b)(6) deposition on that topic. One of the goals of the initial pretrial order issued by this Court was to provide defendant with an opportunity to examine persons who could, in turn, provide defendant with information and explanations that would allow defendant to verify the items or figures in WEPCO's damages claim. Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl. November 8, 2005) at 2, ¶ (b). At present, the Government is uncertain whether we have been provided that opportunity.

Additionally, Bill Hennessy, an engineer in WEPCO's Reactor Engineering department, testified that WEPCO might have used certain fuel management strategies, including change of fuel cycle length, fuel enrichment, or core design, in order to increase the amount of space available for storage in the spent fuel pool if DOE had begun acceptance in 1998 by reducing the amount of spent fuel discharged prior to DOE's first scheduled acceptance. February 3, 2006 deposition of William Hennessy ("Hennessy deposition"), at p. 203, l. 18 - p. 205, l. 12. However, he also testified that he did not have adequate knowledge to testify as to the amount of costs that WEPCO would have incurred to pursue these strategies, but that someone in WEPCO's Nuclear Fuel Services department would be able to provide this type of economic analysis. Hennessy deposition at p. 205, ll. 13-17; p. 278, l. 25 - p. 281, l. 7. Mr. Hennessy singled out John Hughes, as a person in that department who might be able to provide the Government with this type of information. Id. The requested enlargement will allow for the scheduling of a deposition of either Mr. Hughes or another Rule 30(b)(6) witness to provide testimony on this issue.

During discovery, counsel for the Government advised WEPCO's counsel that they needed testimony of a person with knowledge about the claimed damages costs relating to a High Level Waste group belonging to Nuclear Management Company, LLC, the company that currently operates WEPCO's Point Beach Nuclear Plant. Based upon that discussion, it was decided to see what testimony Jim Becka could provide upon this topic before making a request for any additional testimony. Because Mr. Becka's deposition has not been completed, the Government does not yet know if additional testimony is necessary. The requested enlargement will provide the Government adequate opportunity for that determination, and, if necessary, the scheduling of a deposition of a Rule 30(b)(6) witness to provide testimony on this issue.

WEPCO has included a claim for approximately $38 million as a claim for interest expense as damages based upon a weighted cost of capital calculation performed by David Ackerman of WEPCO's Finance department. It was initially expected that Mr. Ackerman would be able to provide testimony on all aspects of this calculation. However, neither he nor Ms. Straub have sufficient knowledge to provide testimony as to the component of the calculation relating to the financing of WEPCO's fuel expense through the financing entity know as the Wisconsin Electric Fuel Trust or "WEFT." The requested enlargement will provide the Government adequate opportunity for the scheduling of a deposition of a Rule 30(b)(6) witness to provide testimony on this issue.

4. Provide adequate time for review of discovery. Having just completed many depositions involving a great deal of travel while still awaiting additional written discovery responses that will not be produced until March 20, 2006, defendant needs additional time to review the results of this discovery and determine if we need to resolve any disputes over the

responsiveness of WEPCO's responses. During the recent depositions, it was determined that several of WEPCO's earlier responses to discovery were not completely responsive. The requested enlargement will provide the Government adequate opportunity for this review and determination.

CONCLUSION

Therefore, we respectfully request that the Court grant this motion for an enlargement of time.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Kevin B. Crawford
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

RUSSELL A. SHULTIS
SONIA M. ORFIELD
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

October 3, 2005

CERTIFICATE OF FILING

I hereby certify that, on March 3, 2006, a copy of the foregoing "DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kevin B. Crawford