# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 00-697C<br>Senior Judge Merow |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME

Having already received a four month discovery extension in this action, the Government now seeks another two month discovery extension until May 5, 2006. The Government has already conducted thirty-four days of depositions and now seeks to conduct eleven more deposition sessions. Wisconsin Electric Power Company ("WE"), respectfully submits that, at most, the Government should be afforded a limited discovery extension in order to permit additional deposition sessions of one day each for Eric Meils, Jim Becka and Ione Straub and the Court should otherwise deny the Government's motion. As explained below, the Government has already obtained extensive discovery in this action and has failed to offer sufficient justification for the substantial, additional depositions that it now seeks.

## I. BACKGROUND

After concluding that the U.S. Department of Energy ("DOE") breached its Standard Contract with WE, the Court, in a November 24, 2004 Order, established a pretrial schedule for resolution of damages resulting from that breach, including a determination of the rate at which DOE would accept spent nuclear fuel/high level waste ("SNF") under the Standard

Contract. Pursuant to that Order, fact discovery ended November 4, 2005 and the trial was scheduled for July 14, 2006. Thereafter, on February 14, 2005, WE served on the Government Plaintiff's Supplemental Disclosures and Damages Schedules ("WE's Supplemental Disclosures"). WE's Supplemental Disclosures identified approximately $42 million in past costs through September 30, 2004. Further, these disclosures provided the past cost elements, including the account number, the account name and a description of the costs contained in that account, and hardcopy supporting documentation. WE's past damages derive from its single nuclear plant which has two reactors and one wet pool.

Then, on July 14, 2005, WE served an expert damages report prepared by Messrs. Richard Sieracki and Kenneth Metcalfe of the Kenrich Group ("WE's Damages Expert Report," or "Report"). That report identified $42.4 million (nominal dollars) in past costs through December 31, 2004. This sum became $80.4 million in present value dollars as of July 14, 2006 (the original date of trial).[1] This sum included the following types of costs:

- Engineering, design, licensing, and construction of a dry storage Independent Spent Fuel Storage Installation ("ISFSI") including NRC fees: $21.5 million;
- Dry cask costs: $23.4 million;
- Private Fuel Storage: $0.9 million;
- Other SNF management and oversight activities: $1.3 million; and
- Cost of capital: $40.6 million.

[1] This amount also includes an offset of $4.7 million nominal (or $7.2 million in present value as of July 14, 2006) damages for loading DOE containers in the non-breach world. Given that the current case is now limited to past costs, an offset is no longer appropriate.

WE's Expert Damages Report also identified several individuals as the source for various items included in the claim: Ione Straub, Eric Meils, David Ackerman, Linda Fencil, Jim Becka, and Yelena Veisman. Further, the Report identified the information considered by the experts in developing the Report. Finally, the Report was extensively annotated and cross-referenced to identify the information supporting each claimed cost. WE also provided substantial, supporting documentation.

The Government waited until June 2005 to serve interrogatories and document production requests. It also conducted audit verification activities in July 2005. The Government waited until mid-September 2005 to indicate its interest in conducting depositions. Then, in an October 1, 2005 Order, the Court granted the Government's motion for leave to conduct twenty depositions and indicated that "some relaxation in the November 4, 2005 [discovery cut-off] date may be needed." Order at p. 2. To accommodate this discovery, WE had no choice but to agree to a new pretrial schedule that extended discovery by four months to March 4, 2006 and extended the trial date to March 27, 2007.

During this period, WE has responded to extensive Government discovery requests:

- WE has defended 26 depositions, including 7 multi-day depositions;
- WE has responded to 112 document requests;
- WE has responded to 157 interrogatories (including subparts); and
- WE will have produced more than 97,000 pages of documents by March 20, 2006, plus WE has produced over 3,200 pages of damages expert submissions and supporting work papers.

Further, on March 20, 2006, WE is scheduled to respond to additional Government discovery, including thirty-two requests for production of documents, nine requests for admission and three interrogatories. The Government and WE also have engaged in extensive audit verification activities. The first such activities occurred in July 2005 and were followed by numerous Government requests for information. Wisconsin Electric also hosted a three-day Government audit session at WE's offices in November 2005. To date, the costs incurred by WE in responding to the Government's discovery requests have been substantial. WE has incurred more than $1.3 million in attorney fees and disbursements since June 2005.

Another aspect of the discovery has been the length of the depositions. RCFC 30(d)(2) provides that a deposition shall consist of a single day of seven hours unless the parties otherwise agree. In this case, the Government has deposed six witnesses for two days and one witness for 2.5 days. Further, although the depositions typically commenced at 9:00 a.m., eleven of the deposition sessions went past 6:00 p.m.

On February 6, 2006, WE moved for leave to amend its Complaint to assert past damages from the filing of its initial complaint in November 2000 through December 31, 2005. As noted, past costs through December 31, 2004 were already addressed in WE's July 2005 Expert Damages Report. Thus, the motion for leave added only $2.7 million in 2005 costs, inclusive of approximately $0.4 million in cost of capital. It also added $980,000 in additional cask loading costs for the period 2001-2005. These costs did not add any new issues to this case. They are simply more cask purchase costs and more cask loading costs.

These are the same type of costs addressed in WE's Expert Damages Report and have been the subject of extensive Government discovery.

## II. ARGUMENT

### A. A Limited Discovery Extension for the Purpose of Completing the Meils, Becka, and Straub Depositions Is More Than Sufficient in this Case

In addition to indicating that some relaxation in the original discovery cutoff date of November 4, 2005 may be needed, the Court added: "In a case of this magnitude, the parties must have adequate discovery." Order at p. 4. WE respectfully submits that the discovery in this case has been more than adequate and that, at most, the Government's additional discovery should be limited to completion of the depositions of Eric Meils, Jim Becka, and Ione Straub.

In addition, the discovery sought by the Government does even not go to the central issues in this case. In order to recover its damages, WE must show that its damages were reasonably foreseeable, caused by the breach, and proven with reasonable certainty. Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citations omitted). "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." Id. In order to prove damages, it "is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 572 (Ct. Cl. 1966) (citation omitted). There is "usually little difficulty in proving the amount that the injured party has actually spent" in determining the reasonable certainty of damages. Restatement (Second) Contracts, § 352, cmt. a

Nearly all the additional discovery proposed by the Government, however, does not concern the types of damages incurred by WE and the supporting documentation and rationale. The Government has already obtained such discovery. Instead, it concerns the "process" by which the costs at issue were compiled for the damages experts. These are issues that the Government can and should address during expert discovery.

The Government is not prejudiced by waiting to ask these questions during expert discovery. Indeed, in most cases, the other party does not receive expert reports until after fact discovery is completed. It is only because WE provided an expert damages report during fact discovery that the issue of asking fact witnesses questions regarding expert reports has even arisen.

None of the Government's proposed discovery (except possibly the depositions of Messrs. Meils and Becka and Ms. Straub) goes to the relevant fact issues in this past damages case. In addition to being unnecessary, as discussed below, the Government's proposed discovery is burdensome and will materially jeopardize the current pretrial and trial schedule.

**1. The Meils, Becka, and Straub Depositions**

In order to meet any Government contention that it has not had sufficient deposition discovery, WE does not object to completion of the depositions of Messrs. Meils and Becka and Ms. Straub. WE, however, submits that each of these deposition sessions should be limited to one additional day of seven hours. Mr. Becka has already been deposed for 2.5 days. Mr. Meils has been deposed for eight hours and the DOJ counsel indicated that she may not need an entire day to complete his deposition. Meils Tr. 163, line 22 – 164, line 8.

With regard to Ms. Straub, she has already participated in all of the Government audit verification activities including answering the Government's questions for three days in mid-November 2005. Government counsel represented to us that, based on her participation in the audit verification activities, the Government would only need to depose Ms. Straub for one-half day. The Government, however, has now deposed Ms. Straub for one full day and seeks to continue her deposition without limit. In such circumstances, the Government should be required to finish her deposition in one seven hour day.

**2. There Is No Basis for Reopening Depositions**

A party must obtain leave of court to depose a witness who has already been deposed in the case. RCFC 30(a)(2)(B). The Government has failed to provide a compelling reason to reopen four depositions (Baumann, Weaver, Krieser and Farron) that were already completed in this case.

With regard to Mr. Baumann, the Government seeks to reopen his deposition to inquire into a meeting with outside counsel to discuss this litigation because an individual who may testify as an expert at trial, Mr. Richard Sieracki, was in attendance. As the Government's motion reflects, Mr. Baumann testified that he had no direct communications with Mr. Sieracki. Thus, there is no basis for the Government to invade communications protected by the attorney-client privilege which protects "the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000) (citations omitted).

The privilege for communications between the attorneys and their clients is not lost because Mr. Sieracki may have been in attendance. Here, the appropriate manner for the Government to learn whether Mr. Baumann (or any other individual) provided factual information considered by Mr. Sieracki (or any other testifying expert) is to ask the expert in his deposition. In that manner, the Government can obtain any information considered by Mr. Sieracki while the attorney-client privilege is preserved.

Similarly, there is no basis for reopening the deposition of Mr. Weaver. The Government asked this witness about the "process" by which "it was determined" whether Mr. Weaver would provide information to WE's damages experts. Weaver Tr. 150, line 13-17. The Government then asked what the witness knew about WE's damages claim and the witness stated that his knowledge of the claim was "based on privileged information." Weaver Tr. 152, line 13-15. To the extent that Mr. Weaver's knowledge derived from attorney-client communications, it is legally privileged, and he was correctly instructed not to answer.

With regard to Mr. Farron, the Government misstates his testimony. The Government asserts that, in his deposition, Mr. Farron "claimed not to have any knowledge with elements of the claim." Govt. Mot. at 8. To the contrary, the Government examined Mr. Farron regarding a damages claim schedule prepared by Messrs. Sieracki and Metcalfe. That schedule (Deposition Exhibit 29) contained accounting codes and account names. After testifying that he had not seen the schedule previously, Mr. Farron not surprisingly could not testify regarding the specific actions undertaken by the damages experts to prepare these damage schedules.

That hardly means that Mr. Farron does not know the type of costs that WE is seeking to recover in this lawsuit. The Government ignores that Mr. Farron testified extensively regarding many issues relevant to WE's damages claim including the activities of WE's Strategic Issues Group, timekeeping issues, WE's meetings with the DOE related to the Standard Contract and DOE acceptance rates, the need for TN-32 casks, and Private Fuel Storage. See, respectively, Farron Tr. 29, line 17 – 34, line 14; 62, line 10 – 65, line 16; 66, line 5 – 78, line 13; 136, line 23 – 153, line 9; and 159, line 12 - 164, line 18.

In addition, we believe that the questioning by Government counsel of Mr. Farron regarding these expert damage schedules was confusing and Mr. Farron had difficulty understanding the questions posed. Moreover, to the extent that the Government wanted to ask about Mr. Farron's role in preparing either the Proposed Bilateral Modification and Request for Equitable Adjustment that WE submitted to DOE during 1998 settlement discussions ("the 1998 REA") or WE's current claim, our review of the record indicates that these questions were not asked. In every deposition, "choices have to be made about the subject matter to be covered. The 7-hour rule necessitates, especially in complex cases, that almost all depositions will be under-inclusive." In re Sulfuric Acid Antitrust Litigation, 230 F.R.D. 527, 532 (N.D. Ill. 2005). To the extent the Government did not pursue this line of questioning, it should not be allowed to have yet another chance to furrow this ground.

With regard to Mr. Krieser, the Government has no basis for stating that he denied knowledge of WE's claim. To the contrary, Mr. Krieser testified that he could not identify the specific activities reflected in expert damage schedule summaries. Further, Mr. Krieser stated that he could not get into the details regarding certain columns in the expert damages

summaries. That is much different from not knowing anything regarding WE's damages in this case. Indeed, when Mr. Krieser did recall specific account numbers, he provided the best of his recollection regarding the manner in which these costs were recorded and tracked:

> Q Let's just focus our attention on the costs in the other three years. And can you tell me, please, are you familiar with that accounting code at the top of the page, the 1200039 [accounting code]?
>
> A I remember it.
>
> Q And what involvement did you have with that accounting code or what caused you to be able to remember it?
>
> A It's just a number that --
>
> Q Let me --
>
> A -- the name of the -- sorry.
>
> Q No, you go ahead.
>
> A The name of it is -- strategic issues administration is familiar to me. And the 39, it's just a series of numbers that define various charge accounts. And that clearly is one that I recall that either I or people reporting to me would have charged.
>
> Q Time, too?
>
> A Time, expense.
>
> Q And with respect to that, I note that cost – most of the -- let me change that. A lot of the costs in this area for these three years are billed to what is called a certain series of cost elements over on the -- that are described on the left-hand column. And are you familiar with any of those cost element numbers there?
>
> A I'm familiar to the extent that I know our accounting system requires one to define the cost element.
>
> Q So when people in your group, in the strategic issues group would bill either their time or expenses, they would use both the accounting number at the top of the page and the cost element number; is that correct?

A Anytime anyone within Wisconsin Electric charges expense or labor, you not only have to define a project number, in this case strategic issues administration, you also define a cost element. The cost element just puts the dollars into a specific bucket of -- it just puts it into a specific category of expense.

Q In a typical work week, would employees such as yourself with Wisconsin Electric be expected to bill their time during the week to a particular project code and cost element group?

A When we charge expenses, like on an expense bill, we have to define the project and the cost element. The labor -- the cost element associated with labor is -- I don't know who assigns that. But it gets assigned within an accounting system somehow. In other words, when we charge our time, we don't necessarily define the cost element.

Krieser Tr. 109, line 6 – 111, line 8.

Additionally, the Government's claim that Mr. Krieser's testimony conflicts with Ms. Straub's testimony regarding his involvement in WE's 1998 REA is incorrect. Gov't Mot. at 14. Mr. Krieser testified regarding his involvement in developing WE's original 1998 REA:

Q Were you involved in any way in work or the activities surrounding Wisconsin Electric's proposed bilateral modification and request for equitable adjustment to the standard contract?

A Yes.

Q How were you involved in that?

MR. OEHLER: Let me caution you not to reveal any privileged communications, Mr. Krieser. Other than that, you can answer the question.

THE WITNESS: I participated in the development of that agreement and discussions with the department with respect to that agreement.

* * *

Q And I think in my question I had the work that I'm talking about there is the work on that bilateral modification, but that's what I meant to say, if I did not say it.

A My participation in that was somewhat of a general level. I reviewed the information. For example, I didn't actually create the information.

* * *

Q Who actually led the work done on that activity, from Wisconsin Electric's standpoint?

A At a very high level, I guess I probably would be the person who was essentially coordinating that activity, although Paul Farron and the other people I mentioned were essentially the people that were providing the information.

Krieser Tr. 265, line 1 – 268, line 25. Mr. Krieser's work eight years ago on WE's 1998 REA does not mean that that he worked on the 2005 claim, or that he should be able to recognize and explain expert damages summaries relating to the 2005 claim.

**3. There is No Justification for Additional Testimony regarding the Government's Requested 30(b)(6) Deposition Topics**

In addition to the foregoing seven deposition sessions, the Government also seeks to conduct Rule 30(b)(6) depositions regarding the following topics: (1) the information provided to WE's damages experts; (2) the costs that WE <u>might</u> have incurred in the areas of fuel cycle length, fuel design and core design if DOE has performed as required under the Standard Contract; (3) the use of the Wisconsin Electric Fuel Trust in the financing of WE's fuel costs; and (4) the services performed by the operating company's High Level Waste group.

The Government wants 30(b)(6) testimony relating to the process by which WE created its damages claim. Gov't Mot. at 15. As noted, in July 2005, WE provided the

Government an extensive expert damages report that addressed past costs through December 31, 2004 and thousands of pages of supporting documents. The Government already has examined numerous witnesses regarding the principal costs claimed, such as the ISFSI costs, cask acquisition costs, financing and other costs. Further, to the extent that the Government has any questions regarding the expert damages report, it can and will depose the damages expert.

WE also questions the relevance of the Government's inquiry. The Government cites no authority, and WE is aware of none, that the process followed to prepare a damages claim is somehow relevant to assessing the validity of a party's claimed damages. Instead, the elements of WE's damages must stand or fall on the evidence that they are fair and reasonable and were caused by the breach. Bluebonnet, 266 F.3d at 1355. Thus, the Government has failed to sufficiently justify the burden of yet further deposition testimony on the subject of the "process" of claim preparation. See RCFC 26(b)(2)(iii). Again, to the extent that the Government is interested in finding out the information witnesses provided to WE's damages experts, the Government can depose WE's damages experts.

The Government states that it wants deposition testimony that will provide an economic analysis of the cost of the nuclear fuel management strategies that a WE witness, Bill Hennessy, testified that WE might have pursued if DOE had assured WE that it would perform under the Standard Contract and actually did so (the "would have been world"). Thus, under Rule 30(b)(6), the Government is asking WE to prepare economic analyses of hypotheticals identified by Mr. Hennessy. In his question, Government counsel asked the witness to assume that DOE performance would not begin until 1999:

Q All right. Then in the spring discharge of 1998, you would have 28 more assemblies discharged, and at that point in time -- well, what would you do with those because now you're at -- you're going to go over the -- I mean, you only had 12 spaces left in your pool, and you need to discharge 28 in the spring of 1998. DOE is not coming [until 1999], so what would WEPCO have been able to do in order to -- what would be the consequence of that, of not having enough space in the pool to discharge, to do the discharge during the spring outage?

MR. CARNEY: Objection, calls for speculation. Objection, vague in regards to DOEs not coming.

BY MR. CRAWFORD:
Q Yeah, I'm not really worried about that. What I'm worried about is what would be the consequence of this situation where you'd have 1490 spaces used, you'd be sitting there ready to do a discharge, an outage where you needed to discharge 28 assemblies from one of the reactors. What would happen at that point?

A Purely speculating, I mean, purely talking about a hypothetical situation?

Q Yeah.

A You would either have to design a core cycle that did not -- well, what you would have to do, I should say, is you would have to design a core cycle that did not discharge 28 fuel assemblies.

Q But what if you were in a 12-month cycle where you needed to discharge?

A The need to discharge, the number of fuel assemblies chosen for a given cycle is dependent on a great number of factors.

Q Okay, and maybe I misunderstood your statement. You're saying that back in 1991, if they knew that this would happen in 1998, they could project that, which I assume they could because they've got these assumptions built into this Environmental Screening Report. You're saying that they would have to change their cycle in order to avoid that problem?

A No. What I'm saying is, they would have to investigate alternate core design strategies which may involve changing the cycle length or may involve changing the enrichment of the fuel assemblies or even the design of the fuel assemblies to get more fuel into fewer fuel assemblies, for example, so that

> they would not discharge as many. That could be done anytime -- at any time during the period of time that we were talking about.

Hennessy Tr. 203, line 2 – 205, line 4. We are unaware of any authority that requires a party to prepare such analyses as part of Rule 30(b)(6) deposition testimony. If the Government is interested in this issue, it can pursue these economic analyses with its own experts.

The Government also seeks Rule 30(b)(6) testimony regarding the financing of WE's nuclear fuel expenses through the Wisconsin Electric Fuel Trust ("WEFT"). At the outset, we note that the WE claim does not raise the WEFT issue. Moreover, this topic has already been the subject of extensive Government discovery. The Government raised the issue of nuclear fuel financing during the three day audit in Milwaukee during November 2005. In response to the Government's request, WE produced a 13-page document setting forth the company's policy regarding Nuclear Fuel Procurement and Lease. See Wisconsin Energy Corp., Sub Process Narrative, "Nuclear Fuel Procurement and Lease" (Nov. 1, 2004) (Deposition Exhibit 268). The document explains the WEFT, and identifies the entity issuing the commercial paper and financing WE's investment in the nuclear fuel. The Government has already questioned Ms. Straub extensively regarding this document and issues relating to the WEFT. Straub Tr. 30, line 4 – 38, line 7. The Government also examined Mr. Ackerman regarding nuclear fuel capital leases, their relation to the ratemaking process, and the WEFT. Ackerman Tr. 41, line 22 – 51, line 18; 125, line 24 – 131, line 17. Having already conducted discovery on this issue, the Government has failed to provide sufficient justification to reopen discovery to conduct further inquiries.

With regard to the fourth topic, the activities of NMC's High Level Waste group, the Government has already examined Jim Becka on this issue and obtained a substantial amount

of information regarding its activities. The following is an excerpt of Mr. Becka's responses to the Government's questions regarding the High Level Waste Group:

> Q And this high-level waste group, we talked about that a little bit at your prior deposition, but am I correct that the labor figures stated at the top of page 800 are labor relating to the three individuals named in that parenthetical at the top?
>
> A That's what it appears to be, yes.
>
> Q Okay. And what is it that those people do at Point Beach?
>
> A In 2005, those three individuals made up the NMC high-level waste group. The high-level waste group's a centralized function of NMC. It supports not only Point Beach but also Palisades Nuclear Plant, Duane Arnold Energy Center, Prairie Island and Monticello nuclear plants.
>
> Q And what type of centralized function do they perform?
>
> A Ms. Leblang is the high-level waste manager. She is in the center of that group. She coordinates and is the primary spokesperson and negotiator with Transnuclear, which is a big contract with NMC.
>
> She also is cognizant of industry issues relating to high-level waste. So, for instance, she would attend owner's group meetings, national meetings. She would follow issues being discussed between the Nuclear Energy Institute and the Nuclear Regulatory Commission. And so she provides those types of high-level function.
>
> Mr. Morse is the fabrication engineer. He's in charge of fabrication efforts for casks and cask components being fabricated for all the NMC sites. Mr. Smith, at this time, was in charge of tracking of rental equipment, Transnuclear rental equipment as well as providing services during loading campaigns.

Becka Tr. 374, line 18 – 376, line 3. To the extent that the Government has questions regarding the specific High Level Waste group costs that the experts included in the July 2005 expert damages report, those questions should be directed to the damages experts in their depositions.

**B. A Substantial Extension Will Require Revision of the Pretrial Schedule and Will Materially Prejudice WE**

The Government ignores that its requested discovery will require that the current pretrial schedule be revised and the trial delayed. The Government apparently assumes that WE should be able to defend eleven additional depositions from now through May 5 while also preparing for submission of WE's additional expert reports on April 7, 2006. Any such schedule would be grossly unfair to WE. WE should not be required to submit its expert reports until after fact discovery has closed. That means that, under the Government schedule, WE's expert reports will not be due until sometime after May 5, probably in late May or June 2006. That, in turn, likely will require revision of the pretrial schedule and the trial date.

The Government's motion also assumes that the parties can schedule and complete the eleven depositions sought by the Government by May 5, 2006. Based on past experience in this case, we believe that it will take considerably past May 5 to conduct eleven additional depositions given the need to prepare the deponents and to implement a deposition schedule that accommodates the schedules of all concerned.

Even continuation of the three depositions identified above (Meils, Becka and Straub) may well require an extension of the April 7, 2006 date for submission of WE's expert reports. However, our hope is that the current pretrial schedule can accommodate a small extension in this date. If the Court permits the Government to conduct eleven more deposition sessions and unspecified other discovery, we see no way that the current pretrial and trial schedule can be maintained.

**C. The Government's Request to Review Discovery Further Is Insufficient Justification for a Discovery Extension**

Unwilling to limit itself to even the eleven depositions discussed above, the Government also seeks an extension of the discovery period to review WE's prior discovery requests. This is nothing more than an open-ended request by the Government to conduct whatever additional discovery it should later find appropriate. For the same reasons as previously discussed, this is clearly insufficient justification for another discovery extension.

## III. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court permit the Government to complete the depositions of Eric Meils, Jim Becka, and Ione Straub, each in one seven hour day, and otherwise deny the Government's motion to for an extension of the discovery period.

Dated: March 17, 2006

Respectfully submitted,

s/Richard W. Oehler by s/Donald J. Carney
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on March 17, 2006, I caused a copy of the foregoing "Plaintiff's Opposition to Defendant's Motion for an Enlargement of Time" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney