# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>Senior Judge Merow |

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE ITS AMENDED AND SUPPLEMENTAL COMPLAINT

In its Response to Plaintiff's Motion for Leave to File Its Amended and Supplemental Complaint ("Response"), the Government requests extended and extensive fact discovery. Nothing in Wisconsin Electric Power Company's ("WE's") Amended and Supplemental Complaint ("Amended Complaint") justifies such fact discovery. WE's purpose in filing its Amended Complaint is to conform its pleadings to the damages evidence that WE previously submitted to the Government for audit and discovery. The Government's Response nevertheless incongruously seeks to condition WE's ability to amend and supplement its Complaint upon a significant enlargement of discovery.

As discussed below, the Government has already audited and taken discovery regarding the cost categories that WE seeks to update through 2005. The Government's Response is a transparent attempt to buttress its recently filed, meritless Motion for Enlargement of Time to conduct extensive, additional discovery through May 5, 2006.[1]

[1] The Government's Motion for an Enlargement of Time requested an extension of fact discovery through May 5 while the Government's Response requested an extension through May 7.

Therefore, the Court should deny the enlarged discovery that the Government requested in its Response and instead grant WE's Motion for Leave to Amend and Supplement its Complaint ("WE's Motion for Leave") without imposing any conditions.[2]

## I. ARGUMENT

This Reply focuses primarily on the only new Government assertion in its Response – that the Government has purportedly not had adequate time to conduct a "proper investigation" of WE's 2005 damages claim and that, therefore, continuing audit activity and discovery is required. Response at 6. As explained below, the Government has had more than adequate opportunity to audit and to take discovery regarding WE's claimed costs. Moreover, WE has already agreed to allow the Government to complete (within one seven hour day each) the three depositions that the Government alleges were not complete. In Plaintiff's Opposition to Defendant's Motion for an Enlargement of Time to extend discovery until May 5, 2006 ("WE's Opposition"), WE has already explained why the Government has not justified the remainder of its request for substantial additional discovery. Consequently, WE will not restate in this Reply the arguments from WE's Opposition other than to provide necessary context.

### A. The Government Has Had More Than Adequate Discovery to Investigate WE's Claimed Costs Through 2004

The Government has had WE's damages expert report, including documentation of WE's incurred costs from November 2000 through December 2004, since July 2005. The additional costs incurred from November 2000 forward are straightforward. They primarily

Since May 7 is a Sunday, WE presumes that the Government intended to request an extension through May 5 as referenced in its original Motion for an Enlargement of Time.

[2] In Plaintiff's Opposition to Defendant's Motion for an Enlargement of Time, WE agreed to afford the Government a limited discovery extension in order to permit additional deposition sessions of one day each for Eric Meils, Jim Becka, and Ione Straub. The Government asks for the ability to "complete" the depositions of these three witnesses in its Response. Response at 5. WE agrees that the Meils deposition was not completed, but not the Straub and Becka depositions.

consist of cask purchase and cask loading costs and a few other costs regarding managing spent nuclear fuel because of DOE's continuing breach of performance under WE's Standard Contract.

The Government states that WE's Amended Complaint failed "to present in any great detail the specific nature of the new damages claims that [WE] wishes to present." Response at 4. To the contrary, WE's Amended Complaint describes in appropriate depth for such a pleading the nature of the damages requiring supplementation of its pleading for the period November 2000 through December 2005.

The amount of damages suffered by WE during this period exceeds $26 million (present dollars as of March 27, 2007), the exact amount to be determined at trial. These costs are fully described in the Amended Complaint: "fabrication oversight, purchase and delivery of dry storage containers; loading and handling of dry storage containers; operation and maintenance of WE's ISFSI; and spent fuel management activities to address the long-term disposal of spent fuel." Amended Comp. ¶ 36 (emphasis added).

More importantly, the Government is very familiar with these costs because it conducted extensive audit verification and discovery activities with regard to these costs for approximately eight months, all before fact discovery closed on March 3, 2006. Indeed, the Government frankly admits that it has had "much of the support" for WE's damages that are the subject of its Amended Complaint since July 2005. Response at 5. Thus, the Government had several months (through November 2005) to conduct audit and discovery activities regarding those costs under the Court's original scheduling order. The Government then obtained an additional four months through early March 2006 to conduct even more audit activity and discovery regarding those costs. Therefore, the Government has had ample time to "investigate" WE's claimed damages.

The Government's Response provides no basis for its contention that it did not have adequate time to complete discovery regarding those costs through the already enlarged

discovery schedule. Indeed, its Motion for an Enlargement of Time did not request additional time to "complete its continuing audit of damages claim materials" that it mentions for the first time in its Response. Response at 6. The Government's demand that the filing of WE's Amended Complaint be conditioned on additional discovery is an unavailing attempt to buttress Defendant's Motion for an Enlargement of Time that is unrelated to the merits of WE's instant motion. Accordingly, the Government's request to condition approval of WE's Motion for Leave upon additional discovery for costs incurred through 2004 should be denied.

**B. The Government Has Already Taken, and Can Complete, Discovery Regarding WE's Cost Update**

In addition to the costs identified above, WE claimed in its Amended Complaint two additional groups of costs: (1) additional cask acquisition and cask loading costs for 2005; and (2) additional cask loading costs located under a different project number for the period 2001-2005. WE provided the Government with substantial documentation regarding these costs on February 10, 2006.

**1. 2005 Cost Update**

There is no reason for the Government to conduct additional discovery regarding the initial category of 2005 costs beyond completing the three depositions to which WE has already agreed. First, the Government has already taken substantial discovery regarding these costs. The Government admits that "it is true that the Government was able to ask certain of the fact witnesses it had not yet deposed about these damages" but that it was "unable to complete some of those depositions." Response at 5. WE has agreed to allow the Government to depose Messrs. Meils and Becka and Ms. Straub for one final day each. That discovery is more than adequate to conduct any reasonable discovery regarding WE's 2005 costs.

Second, the 2005 update relates to only three cost accounts, all of which are very well-known to the Government. All three were identified to the Government in WE's February 2005 submissions and July 2005 expert report. The Government is fully familiar with the reasons that WE has incurred these costs and the types of expenditures to which they relate. These three categories include:

1. TN-32PT Casks 17-30 (Cost Code 3.0182);
2. Transportation License for VSC-24 Casks (Cost Code 3.5055); and
3. Management of High Level Waste (3.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).

The vast majority of WE's 2005 incurred costs relate only to the first category, cost code 3.0182 relating to the TN-32PT casks. WE incurred $1,875,000 in costs in that category in 2005. The other two categories amounted to only $79,000 and $23,000, respectively, in 2005.

The Government extensively addressed all three cost accounts during its two and a half days of deposition questioning of Jim Becka, the Point Beach Nuclear Plant ("Point Beach" or "PBNP") dry fuel storage supervisor. With regard to the most important cost category, 3.1082, Mr. Becka testified that "I[ a]m responsible for charges to project 3.0182." Becka Tr. 414, line 14. In response to Government questioning, he also provided a detailed explanation of how TN-32PT casks are loaded. Becka Tr. 90, line 21 – 103, line 19. The Government also has discussed cask acquisition and loading costs in other depositions such as the depositions of Dave Weaver, Mike Holzmann, Ione Straub, and Mike Baumann. See Weaver Tr. 218, line 14 – 221, line 2; Holzmann Tr. 286, line 15 – 287, line 12; Straub Tr. 112, line 12 – 114, line 10; and Baumann Tr. 177, line 23 – 179, line 16. To the extent that the Government has additional questions regarding this cost category, it should surely be able to complete that questioning in an additional day of testimony.

Mr. Becka also testified that he was the source for information used in preparing WE's damages report regarding the TN-32PT casks and the Transportation License for VSC-24 casks. This occurred in the following exchange:

> Q Exhibit No. 29 was prepared by a company by the name of the Kenrich Group, LLC. Did you do any work with anybody from that particular company?
>
> A I did provide them some information.
>
> Q What information did you provide them?
>
> A I provided them some information on costs associated with dry cask systems, the ones I was familiar with. I provided them some technical information on the two cask designs that are in use at Point Beach.
>
> Q With respect to the costs associated with dry cask systems, what particular costs did you provide them?
>
> A I believe I provided them information for some of these line items listed on page 1 of Exhibit 29.
>
> Q Which ones?
>
> A The ones for accounting code <u>3.0182</u> [TN-32PT Casks 17-30], 3.5051, <u>3.5055</u> [Transportation License for VSC-24 Casks], 3.5027. Those are the ones I recall providing information on.

Becka Tr. 299, line 25 – 300, line 2 (emphasis added). Again, to the extent that the Government has additional questions regarding these costs, they would be appropriately directed to Mr. Becka or to WE's damages experts.

Mr. Becka also provided to the Government testimony regarding the nature of the costs regarding code 3.5055.

> Q What about line item 3.5055 on the first page of Exhibit 29, what I take it as described as the category related to transportation license for VSC-24 storage casks? What work was involved in that?
>
> A This is analytical work being performed by the certificate holder for the VSC-24 system, BNFL nuclear group, BNG. The work involves doing

analysis and finishing with a submittal to the NRC for a part 71 -- excuse me, 10 CFR part 71 license for the VSC-24 storage casks that would allow them to be transported. Right now they only have a part 72 license.

Q What is the status of that project?

A It's ongoing. We're getting toward the end of it.

Q When you say you're "getting toward the end of it," what do you mean by that?

A We are expecting to submit to the NRC this year a request for a part 71 license for the VSC-24 system.

Becka Tr. 358, line 4 – 358, line 23.

Mr. Becka also testified regarding the third category of 2005 updated costs – the Management of High Level Waste (3.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). The following is an excerpt of Mr. Becka's deposition testimony:

Q So is it the case that costs relating to project code 3.0001, functional area 67 and activity 0055 are not costs that you would have some knowledge of as the manager of the dry cask storage project?

A No, I would have knowledge of these.

* * *

Q But these that are found in this document which was put together in February of 2005, or at least dealt with in 2005, and this document was actually produced to us in July of 2005, to the extent it's showing costs recorded to this functional area 67 for years 2001 through 2004, what would those costs represent?

A What do all these costs represent?

Q Well, yeah, generally speaking.

A Oh, generally speaking.

Q Yeah.

A Well, they appear to be the NMC costs for a variety of things including labor and travel and some administrative costs that were charged to base dry fuel storage operations during these years, 2001, 2004.

Q And those were the years that you were in charge of the project, right?

A Yes.

Q So what were these costs for? What did they—why were they being charged to the project?

A I—I don't know how to answer the question beyond, you know, what's in the cost element name here. Those are the categories of the costs. Unless I looked specifically at what—where these charges came from, I can't give you a decent answer as to what they are.

Q Okay.

A I can partially answer. I see the travel costs in 2001, 2002.

Q What were those related to?

A Well, we alluded to this earlier, that after the decision to go to the NUHOMS system, we did go on some benchmarking trips to other plants that had been using the NUHOMS system. So my guess would be that's what those charges are relating to.

Becka Tr. 376, line 4 – 379, line 22.

Thus, the Government has taken discovery regarding all of the cost categories that WE seeks to update through 2005. It will be able to take more discovery during the three additional days of fact deposition to which WE has agreed and during expert discovery.

**2. Additional Loading Costs**

WE's February 2006 submission included additional loading costs from 2001 through 2005 totaling less than $1 million that WE had not previously included in its damages claim. These costs principally concern workers in the supporting plant disciplines such as maintenance, chemistry, radiation protection and other ancillary service departments. The costs end with the code "0055" (Manage High Level Waste). Mr. Becka has testified extensively regarding cask loading costs, including these "0055" loading costs:

A Okay. I'm fairly certain that if there is a charge that chemistry -- the chemistry group charged to this particular object number 3.0001-01-0055 in months close to or associated with one of my loads, I'm pretty sure those are real costs that were attributed to the support of my project.

Q And what would tell you that? Just the time?

A The timing and the fact that the chemistry group is not going to erroneously charge me things or -- attribute high-level waste type labor costs -- which is what 0055 is telling me -- they're not going to do that frivolously.

Q And what about 0055 tells you that that was something that was attributed to your dry cask loading project?

A Because most of the activities that take place at Point Beach that would be captured under 0055 activity would, to my knowledge, be very likely dry storage costs.

* * *

Q But am I also correct that just because a cost is accumulated or placed within that 0055 category at the time when other costs -- other similar costs were recorded to that category, it still does not mean that that cost related to the dry cask storage project; am I correct in that?

A It's likely that it does relate to the dry cask storage project. But can I say with 100 percent certainty? No, I can't.

Q Would there be any way to confirm that with more certainty than just looking at this information?

A Well, yes. You could go back to the source record which is somebody's timesheet.

Q What would that tell you?

A Well, that would tell you that a particular person charged a certain amount of time to this WBS at this particular point in history. And the supervisor agreed with that and approved his timesheet. So you could –

Q But again, that would only take you to, though, charging that time to a WBS, which would take it only as specific on activity level as 0055. The

> question is, how would you determine whether that person's time was time that was related to the dry cask storage project?
>
> A If you went back and talked to the person, talked to their supervisor, looked at when it appeared in history, you could probably get a pretty good idea of that if you wanted to go to that amount of detail. But, I mean, that's why we have supervisors is to ensure that the time being charged is appropriate. So, again, what I was trying to tell you earlier was, can I tell you for certain that everything that is charged to 0055 is dry storage? No, I can't. Because I know there's a few other things that we do at the plant such as radiation protect activities. But for the most part are they? Yeah, I think they are.

Becka Tr. 328, line 22 – 338, line 17.

In sum, the Government has already conducted extensive discovery regarding the costs identified in February 2006. Accordingly, it will not be prejudiced by the filing of WE's Amended Complaint and does not need the extensive, additional discovery sought in its Response.

### C. Most of the Additional Discovery Proposed by the Government Relates to Expert Discovery and Is Unrelated to WE's Amended and Supplemental Complaint

The Government proposes to conduct numerous additional depositions regarding the preparation of WE's damages claim and information provided to WE's damages experts, the Nuclear Management Company's High-Level Waste Group, any WE hypothetical fuel management strategies, and WE's cost of capital calculations. Response at 5-6. The vast majority of this discovery has no relation to the limited issues raised by WE's Amended Complaint. Moreover, as discussed in WE's Opposition, the Government has already conducted substantial discovery regarding these issues. To the extent that the Government still has questions, its questions should be directed to WE's damages experts in their depositions.

**D. The Government's Criticisms of WE's Damages Presentations Is Ill-Founded and Provides No Basis for Additional Discovery**

The Government attempts to support its contention that additional discovery is necessary by listing some alleged deficiencies in the manner in which WE has plead and presented its damages. Response at 4. It compares the damages amount that WE plead in its original November 2000 complaint ("an amount in excess of $35 million") with a subsequent WE damage disclosure that indicates a damage amount as of November 2000 of $69 million and complains that this $34 million increase has not been fully explained. After making this argument, the Government then incongruously *explains* the increase in damages, stating that almost all of this increase is due to the application of a weighted cost of capital to the underlying sum. It also notes that cost of capital is a significant component ("approximately $26 million") of the post-Complaint damages. Response at 4. The Government's final point is that there has been an increase to the Amended Complaint that increases the damages from approximately $35 million to $95 million and that the support of this claim has only been the subject of discovery for eight months. Id.

The Government's assertions hardly merit more discovery. Eight months should be more than enough time for the Government to conduct discovery with regard to a cost of capital claim. Further, its criticisms of WE's original Complaint or its Amended Complaint are unavailing. WE is not obligated to provide a final and certain damage amount in its Complaint. RCFC 8(a) ("Claims for Relief. A pleading which sets forth a claim for relief . . . shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief."); Knights of Columbus Council #7604 v. United States, 42 Fed. Cl. 661, 663 (1999) (noting that RCFC 8(a)'s requirement of a claim for relief is "not a strict test," and "[o]nce fair notice is provided, discovery and other pretrial procedures are used to more precisely define the basis of a claim."). WE also appropriately qualified its Complaint by

saying that the amount proven at trial would ultimately be in excess of the amount then stated.

To the extent that the Government criticizes WE for not providing an updated expert damages report with its Amended Complaint, that criticism is also unavailing. In addition to providing an expert damages report in July 2005, WE has spent months in discovery and in audit verification activities, providing the Government and its auditors with additional information regarding every conceivable aspect of WE's claim, including cost of capital issues. Moreover, a party usually is not provided an expert report until after fact discovery concludes and the Government has had the benefit of WE's expert damages report during eight months of intense discovery.

In sum, the Government has had more than sufficient source support and documentation to complete its damages fact discovery and should not be given yet more opportunities for such discovery.

## II. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court grant its Motion for Leave to File an Amended and Supplemental Complaint. In view of WE's agreement to permit the Government to complete the depositions of Eric Meils, Jim Becka, and Ione Straub, each in one seven hour day, WE requests that the Court deny the condition of additional discovery sought by the Government in its Response.

Dated: March 21, 2006

Respectfully submitted,

s/Richard W. Oehler by s/Donald J. Carney
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, on March 21, 2006, I caused a copy of the foregoing "Plaintiff's Opposition to Defendant's Motion for an Enlargement of Time" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney