IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**WISCONSIN ELECTRIC POWER COMPANY'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2001
(202) 434-1675

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Dated: October 27, 2006

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 5

A. The Contract Required the United States to Fulfill Its Long-Standing Obligation to Accept Commercial Spent Nuclear Fuel ..... 5

1. Background ..... 5

2. The Enactment of the NWPA and Promulgation of the Standard Contract ..... 7

B. Both Parties Expected DOE to Dispose of SNF at a Rate Sufficient for Utilities to Avoid Building Additional Storage Capacity After 1998 and to Work Off the Backlog of SNF ..... 8

1. DOE's Intent at Contract Execution ..... 9

2. WE's Intent at Contract Execution ..... 10

C. The Point Beach Nuclear Plant and Its SNF Storage Capacity ..... 11

D. By the Late 1980s, Both Parties Recognized that DOE's Performance Under the Standard Contract was Subject to Extended Delay ..... 12

E. WE's Plan to Mitigate DOE's Anticipated Inability to Perform Under the Standard Contract Until 2003 and Beyond ..... 14

1. In 1989, WE Selected a Dry Storage System as a Flexible Long-Term Solution to DOE's Failure to Perform ..... 15

2. WE Applied for Authority to Implement Dry Storage Based on the Strong Likelihood that DOE Would Fail to Perform Under the Standard Contract ..... 18

3. DOE's Formal Notice that it Would Not Timely Perform in 1998 ..... 20

4. PSCW Approval of Dry Storage at Point Beach ..... 21

5. Spent Fuel Management and Alternate Storage Option Costs ..... 21

F. WE Would Not Have Incurred Costs for Dry Storage and Alternative Storage Options if DOE Had Timely Performed ... 22

G. WE Would Not Have Incurred NRC Fees Related to Dry Storage if DOE Had Performed ... 25

H. WE's Implementation of Dry Storage at Point Beach ... 27

1. WE's Construction of an ISFSI and Initial Loading of VSC-24 Casks ... 27

2. WE's Acquisition of TN-32 Backup Casks ... 28

3. WE Loads Additional VSC-24 Casks ... 30

4. Implementation of the NUHOMS Dual-Purpose Dry Storage System at Point Beach ... 31

I. DOE's Current "Best Achievable" SNF Acceptance Schedule Begins in 2017 ... 34

III. ISSUES OF FACT AND LAW ... 34

A. Issues of Law ... 34

B. Issues of Fact ... 35

IV. LEGAL AUTHORITY ... 35

A. WE's Damages Were Foreseeable, Caused by DOE's Breach, and Will Be Proven with Reasonable Certainty ... 35

1. The Government Caused and Should Have Foreseen that WE Would Incur Dry Storage Costs ... 37

a. WE Reasonably Built an ISFSI and Loaded VSC-24 Casks to Mitigate DOE's Partial Breach of Contract ... 37

b. WE's Acquisition of Three TN-32 Casks Was Commercially Reasonable Given the Risks Associated with the VSC-24 Cask ... 38

c. Acquisition of the Dual-Purpose NUHOMS TN-32PT Cask Was Commercially Reasonable ... 39

d. DOE's Partial Breach of the Standard Contract Has Caused WE to Incur Foreseeable NRC Licensing Fees .......... 39

2. The Government Caused and Should Have Foreseen that WE Would Incur Costs Managing SNF and Investigating Alternate Storage Facilities Because of DOE's Breach ...................................... 40

3. Reasonable Certainty ........................................................................... 41

B. The Government Cannot Meet its Burden of Showing that WE's Mitigation Efforts Were Unreasonable ......................................................... 42

1. WE Should Recover Its Internal Labor Costs .................................... 42

2. No Offset Should Be Taken for Would Have Been World Loading Costs ........................................................................................ 43

3. WE's Financing of Its Mitigation Costs Is Recoverable ..................... 44

V. CONCLUSION ........................................................................................................ 46

# TABLE OF AUTHORITIES

**Cases**

*Bluebonnet Sav. Bank, F.S.B. v. Unites States,*, 266 F.3d 1348 (Fed. Cir. 2001) ............ 35, 42

*Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) (en banc) ............ 40

*CUB v. PSCW*, 565 N.W.2d 554 (Wis. Ct. App. 1997) ............ 28

*CUB v. PSCW*, No. 95 CV 676 (Dane Cty. Cir. Ct. Dec. 22, 1995) ............ 28

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ............ 35

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239 (4th Cir. 1987) ............ 5, 6

*Home Savings of Am., FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005) ............ 42

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ............ 36

*In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) ............ 42

*Indiana Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ............ passim

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990) ............ 38

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ............ 42

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ............ 36

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ............ 2, 26

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ............ 2, 8

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) ............ 2, 36, 42

*Pacific Gas & Electric Company v. United States*, No. 04-74C (Oct. 13, 2006) ............ 24

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) ............ 36

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319 (Fed. Cir. 2005) .......... 41

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) .......... 43, 44

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) .......... passim

*Wickham Constr. Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) .......... 44, 45

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Sept. 30, 2006) .......... passim

**Statutes**

28 U.S.C. § 2516(a) .......... 45

42 U.S.C. § 10131(a)(2)(A) .......... 8

42 U.S.C. § 10131(b)(1) .......... 8

42 U.S.C. § 10131(b)(2) .......... 7

42 U.S.C. § 10168(d)(1) .......... 14

42 U.S.C. § 10222(a)(1) (1982) .......... 8

42 U.S.C. §§ 10131-10270 .......... 1

42 U.S.C. §§ 10132-10133 .......... 40

42 U.S.C. §§ 10132-35 .......... 8

42 U.S.C. §§ 10162-10169 .......... 40

42 U.S.C. §§ 2011 .......... 5

42 U.S.C. 10222(a)(5)(B)(2000) .......... 1

Wis. Admin Code PSC § 112.05(1)(b) (1982) .......... 16, 23

Wis. Admin. Code PSC § 112.05(2)(a) (1982) .......... 23

**Other Authorities**

1980 U.S. Code Cong. & Admin. News .......... 5

1982 U.S. Code Cong. & Admin. News, 3794 .......... 6

Restatement (Second) of Contracts § 347 (1981) .................................................................36

Restatement (Second) of Contracts § 350 (1981) .................................................................36

**Regulations**

59 Fed. Reg. 27,007 (May 25, 1994) .........................................................................20

60 Fed. Reg. 21,793 (May 3, 1995) ...........................................................................21

64 Fed. Reg. 31448 (June 10, 1999) ..........................................................................26

71 Fed. Reg. 60490 (Oct. 13, 2006)...........................................................................33

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>Senior Judge Merow |

## WISCONSIN ELECTRIC POWER COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to RCFC, Appendix A, ¶ 14(a) and the Court's Order of December 20, 2005, Plaintiff Wisconsin Electric Power Company ("WE" or the "Company") files this Memorandum of Contentions of Fact and Law.

## I. INTRODUCTION

The purpose of trial in this matter is to resolve WE's straightforward damages claim arising from the partial breach by the U.S. Department of Energy ("DOE") of Contract No. DE-CR01-83NE44425 (the "Standard Contract" or "Contract"). As required by the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10131-10270), DOE entered into contracts with all nuclear utilities. In return for very substantial fees, DOE assumed responsibility for storage and disposal of commercial spent nuclear fuel ("SNF") and high-level radioactive waste "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B)(2000). WE has paid over $215 million in Contract fees to the Nuclear Waste Fund to date, but has received no performance from DOE in return.

On October 8, 2004, this Court granted WE's Motion for Partial Summary Judgment on Liability, finding that DOE's failure to timely begin disposal activity with respect to WE's SNF constituted a partial breach of contract. *See* October 8, 2004 Order; *see also Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry.").

On February 6, 2006, WE moved the Court for leave to file an Amended and Supplemental Complaint to update its damages. On April 6, 2006, the Court granted WE's motion for leave and allowed the Government to conduct additional discovery that it had requested by separate motion. *See* April 6, 2006 Order. The Court also ordered that trial proceedings be confined to damages incurred by WE through December 2005. *Id.* at 3.[1] Trial is scheduled to begin on March 27, 2007.

In *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), the U.S. Court of Appeals for the Federal Circuit set forth the legal standard applicable for determining damages in partial breach cases, including DOE's partial breach of the Standard Contract. That DOE's impending delay required utilities to take measures mitigating the cost of DOE's failure to perform is "beyond debate." *Id.* at 1375. In order to recover its incurred mitigation expenditures, WE must establish foreseeability, causation, and reasonableness. *Id.* at 1373. As the breaching party, the Government bears the burden of showing that WE's mitigation efforts were unreasonable. *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) (Government did not meet its burden to establish that actual expenditures were not reasonable).

---

[1] The Court further ordered that any damages incurred after December 2005 be addressed in a subsequent action(s) to be filed after such damages have been incurred. *Id.*

The damages incurred by WE to mitigate the Government's failure to timely perform under the Contract satisfy the aforementioned standards and fall into four general categories. First, WE seeks to recover the costs of constructing an Independent Spent Fuel Storage Installation ("ISFSI") at the Point Beach Nuclear Plant ("Point Beach") located north of Milwaukee in Manitowoc County. This category of costs includes significant expenditures that WE made to obtain the approval of the Public Service Commission of Wisconsin ("PSCW" or the "Commission") for the storage facility, as well as SNF-related fees imposed by the Nuclear Regulatory Commission ("NRC"). Second, WE seeks to recover the costs for the dry storage casks that it acquired to store SNF at Point Beach and related plant modifications to accommodate these casks. Third, WE seeks to recover costs relating to investigation of Private Fuel Storage as an alternate SNF storage facility. Finally, WE seeks its costs for managing SNF issues and investigating other potential SNF storage sites. WE's damages calculation also includes an offset to the Government for costs that WE may have incurred in the "Would Have Been" world, *i.e.*, the world where DOE performs its obligations under the Standard Contract. The offset concerns the acquisition of a temporary rack for potential use in the cask laydown area in the Point Beach wet pool.

As will be discussed at trial by WE personnel and WE's damages experts – Kenneth Metcalfe and Richard Sieracki – a summary of WE's damages is as follows:

**SUMMARY OF DAMAGES (in millions of Dollars)**[2]

| CATEGORY | NOMINAL DOLLARS | VALUE AT TRIAL "2007" DOLLARS |
|---|---|---|
| *Engineering, design, licensing, and construction of an ISFSI, including NRC fees* | $21.7 | $49.9 |
| *Dry Cask Costs* | $26.5 | $42.4 |
| *Private Fuel Storage* | $0.9 | $2.2 |
| *Other SNF Management and Oversight Activities* | $1.3 | $2.2 |
| *Temporary Cask Pit Rack* | ($2.0) | ($5.7) |
| TOTAL | $48.4 | $91.0 |

The Court's October 8, 2004 Order establishing the Government's liability identified six specific factual issues that the Court would need to resolve assuming that WE was claiming the cost of constructing and operating an ISFSI. October 8, 2004 Order at 2. Given that such costs (ISFSI and casks) make up the overwhelming majority of WE's damages, this Memorandum addresses these issues below. The Court identified these six issues as follows:

1. the capacity of WE's Spent Fuel Pool (addressed on pp. 11-12, 20, below);
2. the rate of discharge into the pool (addressed on pp. 24-25, below);
3. the quantity of SNF that would have been required to be removed from the pool to obviate any need for ISFSI construction (addressed on pp. 24-25, below);
4. the time period(s) within which it would be necessary for DOE to dispose of some quantity of WE's nuclear waste to obviate any need for an ISFSI (addressed on pp. 24-25, below);
5. the relationship or lack of relationship of ISFSI construction to DOE's failure to commence disposal activity (addressed on pp. 14-20, 22-25, below);

---

[2] As noted, the cut-off date for damages in this case is December 31, 2005. In this case, WE seeks to recover damages incurred through that date. Damages incurred by WE after that date will be the subject of a future action.

*6.* the amount, or range of amounts, of SNF and/or HLW for DOE disposal the parties to Contract DE-CR01-83NE44425 reasonably contemplated or relied upon for relevant planning during any specific time period(s) (addressed on pp. 8-10, below).

*Id.*

## II. STATEMENT OF FACTS

### A. The Contract Required the United States to Fulfill Its Long-Standing Obligation to Accept Commercial Spent Nuclear Fuel

#### 1. Background

The federal Government has always assumed responsibility for the disposal of commercial spent fuel. Congress declared that "[t]he stated policy of the Federal Government has always been that the safe disposal of high-level radioactive waste is to be accomplished under Federal management." 1980 U.S.C.C.A.N., p. 6934. An important purpose of the Congress in enacting the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011 *et seq.*, was to provide for the commercial use of atomic energy while assuring the public health and safety. *See Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 243 (4th Cir. 1987). This purpose had to include "a safe, effective method of disposing of the irradiated fuel." *Id.* at 244.

From the beginning of the Government's nuclear program until 1977, the Government regarded reprocessing as the only proper and acceptable method for disposal of SNF from nuclear power reactors. *Id.* at 245. The Government promoted the development of a commercial reprocessing industry and, furthermore, established a policy that the Government would reprocess SNF in the event that commercial reprocessing services were unavailable when irradiated power reactor fuels were discharged from reactors. *Id.* at 246. A commercial reprocessing industry subsequently developed, with full-scale reprocessing occurring at the Nuclear Fuel Services facility in West Valley, New York, and operations planned for a General Electric ("GE") facility in Morris, Illinois. *Id.* at 248.

Point Beach Units 1 and 2 are pressurized water reactors and received their 40-year operating licenses in 1970 and 1973, respectively. WE undertook the significant expense of constructing these units in reliance on the availability of reprocessing for the "back end" of the nuclear fuel cycle, *i.e.*, the disposal of spent fuel. Accordingly, Point Beach's spent fuel pool was originally licensed to accommodate only slightly more than 200 assemblies because it was anticipated that Point Beach's SNF would be reprocessed. As options for reprocessing were reduced, Point Beach shipped 120 spent fuel assemblies between 1972 and 1975 to Nuclear Fuel Services for reprocessing and interim storage, but none were reprocessed.

In 1976, President Carter issued a policy statement urging temporary deferral of reprocessing. 1982 U.S.C.C.A.N., p. 3794. In 1977, President Carter effectively ended SNF reprocessing when he announced that "spent fuel reprocessing . . . would be indefinitely deferred," but "the Federal government would provide interim storage for utilities' spent fuel." *Id.* In October 1977, DOE announced its "New Spent Fuel Policy" to implement the indefinite suspension of civilian reprocessing in favor of permanent disposal of SNF by the Government backed up by private interim storage. *See Florida Power & Light Co.*, 826 F.2d at 251. DOE described this action as "a logical extension . . . of the long-established Federal responsibility for permanent disposal of high-level wastes." *Id.*

Despite the elimination of reprocessing as an alternative for its SNF, WE took several steps to continue supplying electricity from Point Beach to its customers. In order to make space in the spent fuel pool, Point Beach shipped 108 fuel assemblies to GE's Morris facility between 1975 and 1978 for temporary storage.[3] Additionally, Point Beach operated with less

---

[3] All of the spent fuel assemblies at Nuclear Fuel Services and Morris were returned to Point Beach by 1984 except for six spent fuel assemblies provided to DOE Pacific Northwest National Laboratory ("PNNL") in 1978 for research. WE transferred three additional assemblies to PNNL for research purposes in 1985. The nine assemblies transferred to PNNL are the property of the Government.

than one full core reserve ("FCR") of space in the spent fuel pool for several months in each of the years 1974, 1975, and 1979.[4] WE also applied for and received permission from the NRC to re-rack[5] the spent fuel pool twice. WE applied for the first re-rack in the mid-1970s to accommodate a total of 351 assemblies. WE's second application in 1979 was for an additional re-racking to accommodate a total of 1502 assemblies.

Additionally, WE was extensively involved in nuclear energy industry groups, including those dedicated to dealing with the problem of SNF disposal. These activities included monitoring the Government's implementation of a federal disposal solution that ultimately resulted in the enactment of the NWPA. In the late 1970s and early 1980s, WE worked with, among other organizations, the American Committee on Radioactive Waste Disposal, American Nuclear Energy Council, Atomic Industrial Forum, Edison Electric Institute Nuclear Fuels Committee, Electric Utility Companies' Nuclear Transportation Group, and the Utility Nuclear Waste Management Group. Through these groups, WE participated in the industry's comments to DOE regarding the development and implementation of the Standard Contract.

**2. The Enactment of the NWPA and Promulgation of the Standard Contract**

Enacted on January 7, 1983, the NWPA reaffirmed the Government's long-standing responsibility to provide for the timely disposal of commercial SNF and high level radioactive waste. *See* 42 U.S.C. § 10131(b)(2) (one purpose of NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel"). The NWPA stated that "[a] national problem has been created by the accumulation of

---

[4] FCR at Point Beach requires storage of 121 spent fuel assemblies.

[5] "Re-rack" as used here refers to the replacement of existing storage racks in the spent fuel pool with new racks capable of holding more spent fuel assemblies.

. . . spent nuclear fuel from nuclear reactors" 42 U.S.C. § 10131(a)(2)(A). The NWPA set a definite schedule by which the Government would assume responsibility for the disposal of commercially generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW). It required the Secretary of Energy to select an appropriate site and, following presidential and congressional approval of that selection, to proceed with construction authorization through the NRC. *Id.* §§ 10132-35.

Congress directed DOE to enter into contracts with nuclear utilities for the disposal of each utility's SNF and HLW. NWPA, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257 (1983) (codified at 42 U.S.C. § 10222(a)(1) (1982)); *see also Northern States*, 224 F.3d at 1364. The utilities would pay fees into the Nuclear Waste Fund, and in return, the Government would begin SNF and HLW disposal services no later than January 31, 1998. *See Ind. Mich.* 422 F.3d at 1372. Pursuant to Section 302, DOE created the Standard Contract. *Northern States*, 224 F.3d at 1364.

WE executed the Standard Contract on June 16, 1983. Contract, Plaintiff's Trial Exhibit ("PX") 41. WE continues to pay approximately $8 million per year into the Nuclear Waste Fund.

**B. Both Parties Expected DOE to Dispose of SNF at a Rate Sufficient for Utilities to Avoid Building Additional Storage Capacity After 1998 and to Work Off the Backlog of SNF**

When WE executed the Standard Contract, it expected that DOE would perform at a rate sufficient to eliminate the need for WE to construct additional storage at Point Beach after January 31, 1998 and to reduce the amount of SNF that had built up at Point Beach. DOE likewise intended that no utility would have to add SNF storage capacity after that date and that it was the federal Government's responsibility to take fuel at a rate sufficient to work off the backlog of SNF.

**1. DOE's Intent at Contract Execution**

DOE's planning documents and other evidence establish that DOE's intent was to perform at a rate sufficient to avoid the enormous SNF storage costs that would otherwise be incurred by the utilities after January 31, 1998. DOE personnel responsible for implementing the Standard Contract have testified that DOE anticipated performing at a rate that would preclude the need to build storage after 1998 and to work off the backlog of accumulated SNF. For example, former DOE official Lake Barrett stated: "One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation." *See Tennessee Valley Authority v. United States,* 69 Fed. Cl. 515, 519 (2006). Current DOE official Thomas E. Pollog stated: "Another goal of the waste disposal program was to preclude utilities' need to provide for storage of spent fuel outside the pools attendant to their reactors." *Id.*

DOE incorporated these goals in its own planning documents such as its draft Mission Plan, which stated that "[t]he waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998." Civilian Radioactive Waste Management Program Mission Plan, at 2-1 (Dec. 20, 1983 Draft), PX52. Robert Morgan, Acting-Director of DOE's program, further explained DOE's plan as follows:

> The basic strategy which we've only outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

*Program Overview,* Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Feb. 1984), PX57.

Consistent with this understanding, DOE has charged WE and other utilities fees assuming that DOE would pick up SNF at a robust rate sufficient to meet the objective of avoiding additional at-reactor storage after 1998 and to work off the backlog of SNF. DOE has determined the fee by planning for a 3,000 metric ton uranium ("MTU") industrywide acceptance rate. Indeed, from 1983 to the present, DOE has used the 3,000 MTU rate to establish the fee charged to utilities for waste disposal services that DOE will render under the Standard Contract. *See* U.S. DOE, *Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste,* DOE/S-0020/1, July 1983, PX45, p. 9; U.S. DOE, Office of Civilian Radioactive Waste Management ("OCRWM"), *Nuclear Waste Fund Fee Adequacy: An Assessment*, DOE/RW-0534, May 2001, PX599; U.S. DOE, OCRWM, *Analysis of the Total Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0533, May 2001, PX600.

Additionally, DOE witnesses have testified on more than one occasion that a phased-in 3,000 MTU acceptance rate is a reasonable rate. *See, e.g.,* Deposition Testimony of Lake Barrett, 1370-71 (May 10, 2002).

**2. WE's Intent at Contract Execution**

WE's witnesses will testify as to the Company's understanding of the parties' respective obligations under the Standard Contract, including WE's expectations regarding DOE's performance obligation. They will testify that WE understood that DOE's rate of acceptance would eliminate the need for WE to construct additional storage at Point Beach after January 31, 1998 and would reduce at a reasonable rate the amount of SNF that had built up at Point Beach prior to January 31, 1998.

WE also placed critical importance on the Standard Contract's requirement that DOE accept SNF on an Oldest Fuel First ("OFF") basis. WE witnesses will testify that the Company possessed some of the oldest SNF and, therefore, anticipated having significant quantities of SNF accepted by DOE early in the acceptance queue.

**C. The Point Beach Nuclear Plant and Its SNF Storage Capacity**

Point Beach's two units have a total capacity of approximately 1,000 megawatts and produce electricity for WE's customers in southeastern Wisconsin, northeastern Wisconsin and Michigan's Upper Peninsula. From the start of nuclear operations at Point Beach until the late 1990s, WE managed its nuclear power program primarily from its headquarters in Milwaukee, first, under the Nuclear Projects Office and then as part of the Nuclear Power Department. WE continues to own Point Beach, but the plant is now operated by a management company affiliated with WE, the Nuclear Management Company ("NMC"), under a contract with WE. WE, along with several other Midwestern utilities, formed NMC to consolidate and potentially to increase efficiencies in nuclear plant operating activities.

Point Beach fuels the two reactors with enriched uranium in the form of processed pellets that are stacked into long metal tubes called fuel rods. The fuel rods, in turn, are placed into an array called an assembly. The assembly is placed into the reactor for operation. Once the usable energy in the uranium in a particular assembly is depleted for the purposes of generating electricity, the fuel is "spent" and discharged from the reactors to the spent fuel pool via a transfer canal running alongside the pool. The spent fuel pool is located in the Point Beach Auxiliary Building between the Unit 1 and Unit 2 reactors. SNF can be prepared and loaded in the adjacent truck bay for shipment off-site.

When the NRC approved WE's second, 1979, re-rack application, WE installed racks in the spent fuel pool capable of holding 1502 assemblies. *See* 2002 Nuclear Fuel Data Form RW-859 (Aug. 13, 2003), PX654 (§ 4.2, installed capacity: 1502). Two door hinges on the pool walls each block access to one space, rendering those two spaces unusable. *Id.* (§ 7, comments). A few other spaces also have been, from time to time, administratively controlled. *Id.* Subtracting the two blocked spaces from the 1502 total, the Point Beach pool

has 1500 usable spaces. DOE has used the term "Maximum Established Storage Capacity"[6] to describe usable spaces. *See* Energy Information Administration, *Spent Nuclear Fuel Discharge from US Reactors*, 1993 ("EIA SNF Discharge Report"), PX278, p. 33, 40. In 1993, WE reported to DOE that Point Beach had a Maximum Established Storage Capacity of 1500 spaces. *See* 1993 Nuclear Fuel Data Form RW-859 (Feb. 2, 1994), PX327 & 328, § II.B.2.f; EIA SNF Discharge Report, PX278, p. 39.

The Point Beach pool is comprised of two (north and south) attached pools. Both pools are of identical dimension – 34'-0" (north-south) by 18'-4" (east-west). The south pool is licensed to hold 803 assemblies while the north pool is licensed to hold 699 assemblies. A portion of the north pool does not contain racks. This area, designated the cask loading area or "cask pit," is used to accommodate the insertion of a canister or cask to move fuel assemblies out of the pool.

WE will present testimony regarding the capacity of the Point Beach spent fuel pool and how Point Beach Reactor Engineering has managed the pool's capacity over time.

### D. By the Late 1980s, Both Parties Recognized that DOE's Performance Under the Standard Contract was Subject to Extended Delay

WE closely followed DOE's early implementation of the NWPA and publicly voiced its reliance on DOE's commencement of performance in 1998. The late Sol Burstein, then Vice Chairman of the Board of WE, was in the forefront of the Company's efforts in this regard.[7] In a speech to the Atomic Industrial Forum in 1985, Mr. Burstein stated that WE's

---

[6] DOE defined Maximum Established Storage Capacity as "the maximum number of intact assemblies that will be able to be stored at some point in the future (between the reporting date and the reactor's end of life) considering any established or current studies or engineering evaluations, at the time of submittal for licensing approval from the NRC." EIA SNF Discharge Report, PX-278, p. 33, 40.

[7] In recognition of Mr. Burstein's standing on nuclear waste issues, DOE appointed him to a peer review committee in the early 1980s addressing options for Monitored Retrievable Storage ("MRS").

"first imperative is to make absolutely certain that the Federal government, in compliance with The Act and our individual contracts, begins to accept spent nuclear fuel no later than January 1, 1998." "A Utility Perspective on DOE's Implementation of the NWPA" (Mar. 14, 1985), PX81, at 2. Despite the imperatives of the NWPA and the Standard Contract, Mr. Burstein expressed concern regarding several scheduled program dates already missed by DOE. *Id.* at 8.

In 1987, Mr. Burstein testified before Congress regarding the SNF issue. He stated that the industry "was extremely concerned over the current state of affairs surrounding the NWPA implementation." Statement of Sol Burstein (WE) before Subcommittee on Energy Research and Development Committee on Science, Space and Technology, U.S. House of Representatives (Mar. 19, 1987), PX116, at 3 . Moreover, in planning for their on-site storage capacity, utilities had to "take into account the DOE schedule for operation of the high-level radioactive waste disposal system." *Id.* at 7. Mr. Burstein stated that, if any utilities' SNF was not taken from the reactor site by DOE "under the original NWPA schedule," utilities expending additional sums to continue on-site storage "could very well seek recovery of those expenditures from the Federal Government due to its failure, for whatever reason, to live up to its contractual obligation." *Id.* at 5.

Also in 1987, DOE issued a Mission Plan Amendment announcing a five-year schedule delay until 2003 for the waste acceptance starting date at the repository. OCRWM Mission Plan Amendment, PX124, at 6. The same year, DOE submitted to Congress a proposal for the construction of an MRS facility in Oak Ridge, Tennessee, theoretically to operate by 1998. *Id.* at 43-4. Absent congressional approval of the MRS, however, DOE stated that it "may not be able to begin" transfer of the waste to DOE facilities in 1998. *Id.* at 63. Congress subsequently authorized DOE to build an MRS, but only when DOE met certain milestones in the development of a permanent repository ("linkages"). Pub. L. No. 100-203, § 5021, 101 Stat. 1330-227, 1330-236 (1987) (codified, as amended, at 42 U.S.C.

§ 10168(d)(1)). In 1988, DOE reaffirmed that "waste acceptance at a waste-management facility cannot begin in 1998" under "current conditions." U.S. DOE, OCRWM, Draft 1988 Mission Plan Amendment (June 1988), PX148 at 18-19.

Despite DOE's hope to one day open an MRS, by 1987 WE came to believe that timely performance by DOE was extremely unlikely. In a memorandum to senior WE executives, Mr. Burstein noted Representative Udall's view that DOE's implementation of the NWPA was a "shambles." Memorandum from Burstein to Britt and McNeer (July 6, 1987), PX132. It was, as Mr. Burstein bluntly put it, "more and more evident that actions by the Congress itself are delaying implementation of NWPA and will make it impossible for DOE to have a repository of any type available for receipt of utilities' spent nuclear fuel in 1998." *Id.*

In 1989, DOE announced a "significant" additional seven-year delay (*i.e.*, from 2003) in the start of permanent repository operations, projecting a new date of "approximately" 2010. U.S. DOE, *Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program* (Nov. 1989), PX183, at vii. DOE speculated that it might nevertheless perform at a hypothesized MRS facility "on a limited basis, as early as 1998," but with significant conditions, namely, if (1) a Nuclear Waste Negotiator was able to obtain a voluntary MRS site, and (2) Congress modified statutory linkages between the NWPA, the MRS, and the permanent repository. *Id.* at 11. If the Nuclear Waste Negotiator failed to find a volunteer MRS site, DOE admitted that even limited operations in 1998 would be impossible. *Id.* at 12.

**E. WE's Plan to Mitigate DOE's Anticipated Inability to Perform Under the Standard Contract Until 2003 and Beyond**

DOE's anticipated failure to perform until at least 2003 directly affected WE's SNF storage planning. WE officials will testify that WE began to plan to meet Point Beach's SNF

storage requirements assuming that DOE would not perform until at least 2003, and likely much later.

WE had to plan ahead to mitigate the impact of DOE's anticipated failure to perform. If WE did nothing and DOE did not timely perform, Point Beach would eventually have to shut down once it lost the ability to discharge fuel from the reactors. Shutting down Point Beach was not a preferred option to WE and its customers, who would incur significant expenditures in replacement power costs.

**1. In 1989, WE Selected a Dry Storage System as a Flexible Long-Term Solution to DOE's Failure to Perform**

In the late 1980s, because of the anticipated DOE breach of its contractual obligations, WE began exploring options to handle its long-term spent fuel storage requirements. WE considered a variety of options such as constructing an additional spent fuel pool and fuel rod consolidation. It eventually decided that a dry storage system, consisting of an ISFSI and concrete overpack cask technology, the VSC-24 cask proposed by Sierra Nuclear, represented the most economical option. The Company favored dry storage as the best solution to mitigate DOE's breach because of the flexibility offered by its modular nature, *i.e.*, WE could purchase and load casks as needed. The Company also favored the VSC-24 concrete overpack cask technology which was substantially cheaper than casks constructed of all metal.[8]

The WE Major Projects Review Committee authorized proceeding with the dry storage project in 1989. Work Order Requisition (authorized May 22, 1989), PX803, KRGWE002216-26. Actual expenditures for the project, however, would have to be

---

[8] In 1988, WE participated, along with Sierra Nuclear and the Electric Power Research Institute ("EPRI"), in a DOE demonstration program leading to the development of a dry storage cask using a concrete overpack. The demonstration cask held 17 assemblies and, therefore, was termed the VSC-17. It was the forerunner of the VSC-24 that WE later used at Point Beach.

approved annually by the Board of Directors as part of the Corporate Budget approval process.[9] At the time, WE planned for the project to have sufficient capacity for the entire original license periods for both reactors – 45 casks and an appropriately sized ISFSI pad. The initial outlays for the project were low and significant capital expenditures were not planned until after the project received approval by the PSCW. Wisconsin State regulations required the PSCW to approve WE capital projects exceeding $2 million. *See* Wis. Admin. Code PSC § 112.05(1)(b) (1982). Construction of the ISFSI would exceed this monetary threshold.

From 1989 until 1991, WE proceeded with initial design and analysis of the ISFSI and the casks. Nothing during this period suggested that DOE would perform in 1998. To the contrary, the signs all pointed in the other direction – that DOE would not be able to perform until much later than 2003, perhaps 2010 or later. WE also discounted DOE's potential performance in 1998 with an MRS. Planning for dry storage at Point Beach became a public safety and business imperative.

Given that WE could not rely on DOE to dispose of its SNF in 1998, WE decided to apply for authority to construct dry storage well before 1998. WE informed the PSCW prior to its submittal that the dry storage application would be forthcoming. During those discussions, the PSCW requested that WE prepare an extensive Environmental Screening Report as part of the application.

Additionally, the PSCW suggested that WE reduce the number of casks for which it was requesting authority from 48 to 12.[10] WE did so, but the ISFSI that WE requested

---

[9] Beginning in 1989, the Nuclear Power Department collected costs for this work under Work Code 33664.

[10] WE estimated that "approximately 45 casks" would be required to provide storage through the life of the operating licenses in its 1989 Work Order Requisition. PX803. In its 1991 application, however, WE applied to allow the construction of an ISFSI comprised of two storage pads, each sized

remained sized to accommodate extended DOE nonperformance (*i.e.*, through the end of the Point Beach reactor licenses). In November 1991, WE submitted its application to the PSCW, under the signature of David Porter, a WE Senior Vice President (PSCW Docket No. 6630-CE-197). Letter from Porter (WE) to Reynolds (PSCW) (Nov. 15, 2001), PX236. The application was not frozen in time, but rather was the beginning of a thorough review by the PSCW. *See* Deposition Testimony of David Porter, 94 (Jan. 18, 2006) ("The application itself, was a starting point. It was not the end point. The end point never occurred until the Commission actually made a decision.").

In order to motivate prompt PSCW consideration of its dry storage application, WE's initial discussion of the remaining capacity in its SNF pool in the Environmental Screening Report submitted with the application was based on certain assumptions. One of those assumptions was that the dry storage project would enable WE to have sufficient room in the pool for two full core offloads (*i.e.*, 242 SNF assemblies) in addition to providing long-term SNF storage given the strong likelihood that DOE's performance would be substantially delayed. WE, however, conducted other analyses during this same period that contained different assumptions and, in practice, has rarely, if ever, maintained room in the pool for two full core offloads. WE estimated that the gross cost of the project would be $12,865,000. PX236.[11]

---

to accommodate 24 casks, for a total of 48 casks. PX 236 at 2 ("The project will include construction of a storage facility with a maximum capacity for 48 casks.").

[11] This assumed that the 12 casks were included in the capital cost of the project. WE later decided to treat these cask costs as fuel expense rather than as a capital cost. *See* Letter from Porter (WE) to Dorr (PSCW) (Mar. 16, 1993), PX290.

**2. WE Applied for Authority to Implement Dry Storage Based on the Strong Likelihood that DOE Would Fail to Perform Under the Standard Contract**

A few months after WE submitted the dry storage application, Robert Link became the Vice President, Nuclear Power. He was the leader for the strategy, development, and implementation of the dry storage project at Point Beach. From the onset of his involvement in the project, Mr. Link wanted to be fully aware of all of Point Beach's SNF storage options and whether it was advisable to proceed with the ISFSI application before the PSCW. He anticipated a long and arduous process to obtain the necessary authority because the dry storage project concerned two controversial topics in Wisconsin, namely, the Point Beach Nuclear Plant and the local storage of nuclear waste. He expected substantial opposition, including intervention in the PSCW proceedings by dry storage project opponents and possible litigation. He also expected that the PSCW would request detailed information that would demand WE resources and time.

Accordingly, he directed that alternate SNF storage scenarios be evaluated in addition to the dry storage program. These analyses examined various means to extend operations without dry storage, including changing fuel cycle lengths, changing reactor core and fuel designs, the recovery of inaccessible wet pool spaces, and the use of a temporary rack. They showed that Point Beach could operate until 1998 and that it could preserve full core reserve through the use of a temporary rack.[12] These studies also confirmed that the most cost-effective means of providing <u>long-term</u> SNF storage was the dry storage program.

Given WE's belief that DOE was not going to perform for many years, WE then pressed on with the PSCW application for the ISFSI and 12 casks because that alternative

---

[12] As it has asserted in other SNF cases, we expect the Government to contend here that WE would have built the ISFSI even if DOE had performed under the Standard Contract. As discussed in this Memorandum and as WE will show at trial, the Government's contention is mistaken.

was the lowest-cost, long-term storage option and offered some flexibility in the acquisition and loading of casks. As expected, the dry storage project as well as the later Unit 2 steam generator replacement application[13] were highly controversial. A number of project opponents intervened in the PSCW dry storage proceeding. The PSCW staff and the intervenors submitted numerous requests for information, and WE had to respond to each of the requests. In addition, the PSCW decided to prepare an Environmental Impact Statement. There also were public hearings. Further, under Wisconsin law, WE also had to reimburse the intervenors. WE retained experts and outside counsel to work with it during the prolonged and contentious PSCW proceedings that continued until early 1995.

During its extensive proceedings on the issue, the PSCW concluded that Point Beach had the capability to operate both units through the spring of 1998 without dry storage, but would need to use dry storage or ship fuel off-site to operate beyond that point. For example, the PSCW assumed that Point Beach could operate until shutting down during 1998 in its economic analyses. Draft Public Service Commission Staff Economic Analysis (Nov. 19, 1993), PX317. Moreover, the PSCW concluded in both the draft and final Environmental Impact Statements ("EISs") that Point Beach could operate until 1998. State of Wisconsin, *Draft Environmental Impact Statement, Point Beach Nuclear Power Plant Projects Proposed by Wisconsin Electric Power Company* (Feb. 1994), PX326, p. 90 ("Point Beach Unit 2 can operate until the fall of 1998 and Point Beach Unit 1 can operate until the spring of 1998."); State of Wisconsin, *Final Environmental Impact Statement, Point Beach Nuclear Power Plant Projects* (Aug. 1994), PX346, pp. 40, 94-5.

---

[13] On October 1, 1992, WE applied to the PSCW for approval to replace the Point Beach Unit 2 steam generators. The PSCW draft and final Environmental Impact Studies addressed both the dry storage and Unit 2 steam generator replacement applications. Several PSCW hearings also addressed both applications.

Similarly, during this period, WE reported to DOE an ability to operate until 1998. The RW-859s submitted in 1992, 1993, and 1994 all stated that the Point Beach Units 1 and 2 could operate until the spring and fall 1998 outages, respectively, with only wet storage. *See* 1991 Nuclear Fuel Data Form RW-859 (Feb. 14, 1992), PX242 & 243; 1992 Nuclear Fuel Data Form RW-859 (Feb. 5, 1993), PX281; 1993 Nuclear Data Form RW-859 (Feb. 10, 1994), PX 327 & 328.

The ability to operate through 1998 was partly attributable to the anticipated and then actual use of an offset handling tool to free up several rows of pool spaces underneath platforms at either end of the pool and partly attributable to WE's determination that additional spaces in the pool were usable. In a December 1993 memorandum, the Company outlined the spaces that could be emptied, made accessible, or fixed to allow 1500 spaces to be used. *See* Memorandum from Fieldhack (WE) re: Spent Fuel Pool Summary (Dec. 16, 1993) PX321.

**3. DOE's Formal Notice that it Would Not Timely Perform in 1998**

Even though WE was convinced that DOE would not timely perform under the Standard Contract, it continued to emphasize to DOE that agency's contractual obligations during this time frame and the importance of DOE's performance no later than 1998. Nevertheless, in May 1994, DOE published a "Notice of Inquiry" in the Federal Register stating that it would not be able to begin disposing of SNF in 1998 because a repository would not be operational until 2010 at the earliest. DOE stated that it had "no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994), PX339. In May 1995, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues" reiterating the allegedly conditional nature of its obligation to

accept SNF under the Standard Contract. DOE also projected that the earliest possible date for acceptance of waste for disposal of a repository was 2010. 60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995), PX385.

**4. PSCW Approval of Dry Storage at Point Beach**

It was not until February 1995 that the PSCW approved the dry storage project. PSCW, Findings of Fact, Conclusions of Law, Certificate, Order, and Interim Order, Docket Nos. 66309-CE197 and 6630-CE209 (Feb. 9, 1995), PX374. In this Order, the PSCW recognized that Point Beach could operate without dry storage until 1998. *Id.* at 4-5, 13, 21. It also recognized, however, that the length of time that Point Beach would have to store fuel was a "function of the federal government's actions in siting and licensing a permanent repository or retrievable storage facility, and taking possession of the waste." *Id.* at 16. The PSCW did not expect DOE to have a repository until 2023 and considered the actual DOE acceptance date to be "a matter of speculation." *Id.* at 4, 22. The Commission's Order endorsing the 12 casks for dry storage noted that the ISFSI was a means to address these future "uncertainties." *Id.* at 17.

**5. Spent Fuel Management and Alternate Storage Option Costs**

In addition to investigating and implementing dry storage at Point Beach, WE incurred costs throughout this period in management of SNF issues to mitigate DOE's partial breach of the Standard Contract. This activity is denominated as Other SNF Management and Oversight Activities in the foregoing Summary of Damages (on page 4) and included some interaction with industry groups regarding SNF issues and dry storage engineering support activities.

WE also incurred costs to identify, investigate, and develop potential off-site storage facilities that could be used for interim storage of Point Beach SNF. Given DOE's inability to perform, WE undertook these activities to find an alternative SNF storage option in case

there were delays or other problems in its dry storage project. WE participated for a time in pursuit of storing SNF in cooperation with the Mescalero and later the Goshute Indian tribes as part of the Private Fuel Storage project. After initially investing in the Private Fuel Storage project an alternative to the performance promised by DOE (*i.e.* removing fuel from Point Beach), WE eventually decided to withdraw from the Private Fuel Storage project because it began to have doubts regarding the project's viability.

In addition, WE investigated other domestic locations, including DOE facilities in Oak Ridge, Tennessee and the Owl Creek project being developed by Newcorp in Wyoming. WE also made some modest efforts to investigate the possibility of shipping SNF overseas. WE developed a proposal that it presented to two foreign nuclear companies, but the venture did not advance beyond initial exploratory discussions.

### F. WE Would Not Have Incurred Costs for Dry Storage and Alternative Storage Options if DOE Had Timely Performed

If, pursuant to its obligations under the Standard Contract, DOE had commenced acceptance of SNF in 1998, WE's SNF storage options would have been far different. As discussed, WE's OFF priority assured WE of acceptance rights in 1998 and thereafter that were sufficient to avoid the necessity for additional storage beyond Point Beach's existing wet storage pool.

If DOE had timely performed in this "Would Have Been" world, WE will show at trial that WE would not have built an ISFSI and would not have loaded and stored casks at the ISFSI. Instead, WE would have managed Point Beach's SNF without exceeding the existing pool's capacity. In addition, WE likely would have taken reasonable steps to preserve FCR capability pending DOE's performance without constructing an ISFSI and

loading casks.[14] WE likely would have acquired a temporary rack in case it became necessary to offload a full core during the 1996-1998 period. Because of its significantly lower cost, the temporary rack would have been a far more desirable option than the dry storage project.[15]

Dr. Krishna Singh will testify as an expert regarding the cost of the temporary rack and its technical feasibility. *See* Revised Written Testimony of Krishna p. Singh (June 13, 2006), PX827. He will discuss how such racks are routinely used in WE's circumstances. Additionally, WE personnel will present testimony that the spent fuel pool cooling system could have handled placement of a full core of assemblies in the cask laydown area with 1500 assemblies in the permanent racks. In the Would Have Been world, WE would have removed debris or nonfuel components from the pool racks and freed up additional spaces that were damaged or needed modifications to be made accessible. WE actually did accomplish these routine tasks later when the dry cask project was delayed.

WE also will present evidence through expert witness Eileen Supko establishing that an acceptance rate that avoided utilities having to add SNF storage after 1998 and worked off the backlog of SNF at a reasonable rate would have approximated 3,000 MTU annually on an industrywide basis. Ms. Supko will show that, based on the Standard Contract's OFF

---

[14] While not a regulatory or design basis requirement, FCR capability was considered a good operating practice for Point Beach.

[15] WE would not have needed the PSCW's authorization to acquire the temporary rack. The cost to acquire the rack, to remove the seismic restraint in the cask laydown area to allow temporary installation of the rack, and certain other capital costs would not have exceeded the $2 million dollar threshold for PSCW approval. *See* Wis. Admin. Code PSC § 112.05(1)(b) (1982). Instead, WE would have reported the temporary rack project to the PSCW. *See* Wis. Admin. Code PSC § 112.05(2)(a) (1982). WE has offset its claim by slightly more than $2 million for the temporary rack. This sum also includes certain non-capital costs, including cask installation and removal costs, that WE would have incurred in the Would Have Been world. WE would not have considered those non-capital costs, however, in determining whether WE would need PSCW approval for acquisition of a temporary rack.

acceptance priority, WE would have had acceptance allocations in 1998 and every year thereafter through 2005.[16]

In addition to the testimony of fact witnesses, WE will present evidence through its damages experts that WE would not have built dry storage if DOE had performed as required by the Standard Contract. Messrs. Sieracki and Metcalfe will present a fuel management model based on WE information identifying DOE's acceptances against Point Beach's discharges and establishing that Point Beach would not have exceeded its effective pool capacity. Instead, DOE would have removed sufficient SNF so that WE would have been able to accommodate its SNF discharge in its wet pool as was intended by the NWPA, the Standard Contract, and the parties. The following shows this information in summary form:

[16] We expect the Government to contend that a 900 rate is the appropriate rate and to cite the Court's recent decision in *Pacific Gas & Electric Company v. United States*, No. 04-74C (Oct. 13, 2006). We are analyzing the *PG&E* decision and expect to address it at trial and in post-trial briefing. However, we do note that, in *Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 43 (Sept. 30, 2006), the Court was highly critical of the credibility of any rate (such as the 900 rate) that is "based on a proposed MRS which could exist only in conjunction with an approved repository."

**SUMMARY OF POINT BEACH SPENT FUEL POOL STATUS**
**(DOE PERFORMANCE; ACTUAL DISCHARGES; 1500 EFFECTIVE CAP.)**[17]

| YEAR | START TOTAL | DOE PICKUP | DISCHARGES | END TOTAL |
|---|---|---|---|---|
| 1998 | 1,422 | (48) | 98 | 1,472 |
| 1999 | 1,472 | (96) | 40 | 1,416 |
| 2000 | 1,416 | (96) | 40 | 1,360 |
| 2001 | 1,360 | (168) | 37 | 1,229 |
| 2002 | 1,229 | (120) | 76 | 1,185 |
| 2003 | 1,185 | (144) | 41 | 1,082 |
| 2004 | 1,082 | (96) | 40 | 1,026 |
| 2005 | 1,026 | (144) | 81 | 963 |

*See* Kenrich Binder BB, Revised Fuel Management, at KRGWE003254, PX796.

Point Beach's fuel inventory would not have exceeded the pool's capacity in the relevant period (*i.e.*, it would have stayed below 1500 spaces). Moreover, as discussed, WE would have maintained FCR capability by having a rack available for temporary use in the cask laydown area as needed.

**G. WE Would Not Have Incurred NRC Fees Related to Dry Storage if DOE Had Performed**

WE has paid a significant amount of money to the NRC in fees related to SNF storage that it would not have paid if DOE had timely performed under the Standard Contract. These fee expenses fall into two categories. First, WE paid approximately $1 million in NRC inspection and application fees related to its implementation of an ISFSI at the Point Beach site. The NRC charged a fee for WE's ISFSI pursuant to its authority under 10 C.F.R.

---

[17] This chart is responsive to the third issue raised in the Court's Oct. 8, 2004 Order ("the quantity of SNF that would have been required to be removed from the pool to obviate any need for ISFSI construction"). WE would have avoided dry storage had DOE performed its Contract obligations.

§ 171.16. As discussed, WE built the Point Beach ISFSI because of DOE's failure to timely perform. If the Government had performed, WE would not have built the ISFSI and, therefore, would not have incurred these ISFSI-related NRC inspection and application fees.

Second, since 1999, WE has paid nearly $3 million to the NRC for the spent fuel storage fee portion of the annual fee paid by reactor operators. In 1999, the NRC initiated a spent fuel storage charge as part of the spent fuel storage/reactor decommissioning fee following DOE's breach of the Standard Contract. *See* NRC, Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. 31448 (June 10, 1999).

The NRC's imposition of the fee relates to DOE's breach of the Standard Contract with all contract holders (*i.e.*, the "entire nuclear electric industry"). *Maine Yankee*, 225 F.3d at 1342. The NRC's rationale for imposing the spent fuel storage charge was to implement its "statutory mandate," contained in the Omnibus Budget Reconciliation Act of 1990 ("OBRA-90"), Pub. L. No. 101-508, to charge "a class of licensees for NRC costs attributable to that class of licensees." 64 Fed. Reg. at 31462. Therefore, the NRC's decision necessarily was a determination that spent fuel storage was being incurred by reactor licensees as a class and, therefore, that the NRC was required to impose a SNF storage fee to recover the costs that the agency was spending on spent fuel storage issues. The NRC recognized that SNF was not being moved off-site because DOE was not performing, but nevertheless found that it had no alternative to imposition of the fee. Specifically, it stated that the fact that "DOE has not taken possession of the spent fuel does not relieve NRC of the OBRA-90 requirement to recover . . . those costs associated with generic spent fuel storage activities." 64 Fed. Reg. at 31455.

If DOE had begun accepting the nuclear industry's SNF in accordance with its contractual obligations, the need for reactor spent fuel storage activities in the nuclear industry, if any, would have been far less acute. In fact, WE will present evidence showing

that, if DOE had performed in 1998 at a reasonable rate, the majority of utilities likely would have had sufficient wet storage capacity to avoid building dry storage.

Given that the nuclear utilities as a class would not have needed to build dry storage ISFSIs if DOE had performed its Standard Contract obligations, the NRC would not have started imposing a classwide spent fuel storage fee in 1999. Therefore, the NRC would not have charged these fees to WE for its operation of the Point Beach reactors. Because DOE failed to timely perform and WE has incurred and paid these fees, they are properly included in its claim.

### H. WE's Implementation of Dry Storage at Point Beach

Notwithstanding that Point Beach could have operated until DOE's scheduled performance in 1998, WE proceeded with dry storage in 1995 based on its belief that DOE's performance would be substantially delayed. As described below, WE has incurred tens of millions of dollars in costs implementing dry storage at Point Beach.

#### 1. WE's Construction of an ISFSI and Initial Loading of VSC-24 Casks

WE deferred incurring significant costs on the dry storage project until it expected the PSCW to approve the project in 1994 or 1995. Then, during 1994 through 1996, WE incurred costs for the design, engineering, and construction of the ISFSI pads and acquisition of ancillary equipment to operate the ISFSI, including security systems and a cask transporter. WE also proceeded with fabrication of VSC-24 casks. In February 1995, WE entered into a contract for construction of the ISFSI and the first eight VSC-24 casks.

WE loaded an initial VSC-24 cask in December 1995. Cask loading stopped shortly thereafter because several parties petitioned the Dane County Circuit Court for review of the PSCW's EIS for the dry storage project. The Circuit Court vacated the PSCW's dry storage

Order and remanded the matter to the PSCW for further consideration.[18] On remand, the PSCW prepared two supplemental EISs, held related hearings, and issued a May 1996 Order reauthorizing WE to continue loading its dry storage casks. WE incurred legal expenses in litigating the judicial challenge to the project and in the remand proceedings before the PSCW.

WE then loaded a second cask in May 1996. In May 1996, during the loading of a third VSC-24 cask, a hydrogen gas ignition incident occurred, causing WE to abort the loading and return the spent fuel assemblies to wet storage. WE determined that water from the spent fuel pool had interacted with a zinc-based paint coating used in the VSC-24 cask design, resulting in the creation of hydrogen gas. The hydrogen gas then ignited while the canister was being welded.

**2. WE's Acquisition of TN-32 Backup Casks**

In addition to WE's investigation of the foregoing VSC-24 incident, the NRC began its own investigation and stopped the loading of VSC-24 casks industrywide. On June 3, 1996, the NRC issued Confirmatory Action Letter No. 3-96-0005, suspending further use of VSC-24s pending NRC's review and acceptance of any corrective action necessitated by the hydrogen gas ignition incident. On June 27, 1996, it issued a Supplemental Confirmatory Action Letter, and on July 5, 1996, issued NRC Bulletin 96-04 regarding the VSC-24. Meanwhile, NRC concerns regarding welding of the lid on the VSC-24 cask resulted in the issuance of a new Confirmatory Action Letter, No. 97-7-004, on May 16, 1997.

---

[18] In its review of the facts, the Circuit Court found that Point Beach could have operated until 1998 without dry storage. *CUB v. PSCW*, No. 95 CV 676 (Dane Cty. Cir. Ct. Dec. 22, 1995), PX481, at 2-3. The Court of Appeals of Wisconsin subsequently reversed the Dane County Circuit Court opinion, but likewise noted that Point Beach could have operated until 1998. *CUB v. PSCW*, 565 N.W.2d 554, 564 (Wis. Ct. App. 1997), PX452. Moreover, the Court of Appeals noted that the PSCW approved the dry storage application "to preserve flexibility in light of the uncertainties regarding DOE fuel removal activities." *Id.*

WE took several steps to deal with its inability to load VSC-24s for this indefinite period of time. First, it conducted a campaign to clean out additional spaces from the spent fuel pool, making them usable for SNF storage. It removed unused brackets on the side of the pool walls, freeing several spaces. Additionally, it evaluated the contents of waste material containers in the spent fuel pool to determine whether the containers could be sent to off-site lower-level waste handling facilities. Most of the containers qualified for off-site shipment and WE so disposed of these containers. The newly opened spaces, and the 48 spaces emptied by the loading of SNF into two VSC-24 casks that were placed at the ISFSI, meant that Point Beach could operate until the spring 2000 outage without additional casks. WE also considered using a temporary rack in the cask laydown area, and contacted Northern States Power to discuss borrowing a temporary rack from the Prairie Island Nuclear Plant.

Second, WE identified a cask storage system – the TN-32 – that could be procured as a substitute for the now unavailable VSC-24s. WE issued a purchase order for three TN-32 casks on May 1, 1998. The Company needed the TN-32 casks as backup casks because of several uncertainties: the outstanding Confirmatory Action Letters, the fact that Sierra Nuclear had not satisfied the NRC's October 6, 1997 Demand for Information, and a change in Sierra Nuclear's ownership and how that change might impact future support for the VSC-24 cask design. *See* Letter from Sellman (WE) to NRC (May 7, 1998), PX502. WE submitted an application to the PSCW to acquire these casks and to potentially use them in lieu of the eight VSC-24 casks previously approved by the PSCW. The PSCW approved WE's Supplemental Application on August 11, 1998. PSCW, Findings of Fact, Conclusions of Law, Certificate and Supplemental Order, Docket No. 6630-CE-197 (Aug. 11, 1998), PX524.

Third, WE requested that DOE accept emergency deliveries of Point Beach SNF. DOE was unwilling to accept any such emergency deliveries.

On August 13, 1998, the NRC issued a letter to WE, closing out the final outstanding Confirmatory Action Letter and granting WE's request to resume loading of the VSC-24 casks contingent upon WE's taking further corrective actions. Letter to Sellman (WE) from Paperiello (NRC) (Aug. 13, 1998), PX525. Even after the NRC lifted its Confirmatory Action Letters and the loading of VSC-24 casks resumed at Point Beach, the Company remained concerned regarding the long-term viability of Sierra Nuclear and the performance and sustainability of the VSC-24 cask. British Nuclear Fuels plc ("BNFL") eventually purchased Sierra Nuclear, but WE was concerned whether BNFL would continue to support the VSC-24 cask as opposed to other cask designs owned by BNFL. Moreover, WE remained concerned that additional problems with the VSC-24 might arise, resulting in further NRC suspensions of its use. If any such further incidents arose, WE would not have time to procure a backup cask system before the fuel pool was full. WE's sound business judgment dictated that it proceed with the procurement of the TN-32 casks as a backup system.

**3. WE Loads Additional VSC-24 Casks**

With the closure of the NRC Confirmatory Action Letters, Point Beach was ultimately able to resume loading VSC-24s. WE's ability to load VSC-24s was the culmination of a long and difficult recovery process requiring significant resources. WE will present testimony regarding WE's recovery efforts and the resumption of VSC-24 loading.

Around the time of the spring 2000 outage, WE had loaded a total of eight VSC-24 casks and decided that it was now appropriate to issue a notice of suspension to Transnuclear regarding the TN-32 casks. It requested that Transnuclear suspend performance of its work on the TN-32s just prior to shipping the casks. The casks continued to serve their backup role in the event that additional issues arose with the VSC-24s. WE also has pursued the sale of the TN-32 casks, but has not yet been successful in such efforts. As of this date, the TN-32s remain at the fabricator's facility.

In order to load more than 12 casks (of any design), WE had to apply to the PSCW for authority to procure such additional casks. On May 2, 2000, WE applied for authority to procure and to load 36 additional casks given DOE's failure to accept the Company's SNF under the Standard Contract and DOE's plan to not accept SNF until 2010 at the earliest. Letter from Salustro (WE) to Dorr (PSCW) re: Application for Additional Dry Fuel Storage Casks, PX575. The additional casks would allow operation of Point Beach through the end of each Unit's then-current licensed life. WE estimated that the gross project cost for additional casks and related operations and maintenance would total approximately $45 million. The PSCW approved this expenditure. Final Decision of the PSCW, Docket No. 6630-CE-275 (Mar. 27, 2001), PX592 at 9-10.

WE loaded eight more VSC-24s with the last loading occurring in 2003, resulting in 16 loaded VSC-24 casks. WE will present testimony regarding the costs associated with these cask-loading activities, including preparation, planning, and ongoing operation and maintenance activities for the casks.

### 4. Implementation of the NUHOMS Dual-Purpose Dry Storage System at Point Beach

WE and NMC continued to evaluate the best cask for future use at Point Beach. They were concerned with continued reliance on the storage-only VSC-24 cask. In addition, there had been significant improvements in dual-purpose cask technology. Further, the use of dual-purpose casks should avoid the need to unload casks placed at the ISFSI in order to transport the spent fuel assemblies off-site. This, in turn, will avoid cask-loading costs and reduce radiation exposure to workers. In its Order allowing WE to acquire and load an additional 36 casks, the PSCW urged WE to move toward using a transportable cask design for this reason, stating "it encourage[d] WEPCO to consider dual-purpose casks in the future

because they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport." *Id.*[19]

WE also was interested in dual-purpose casks for other reasons. WE wanted to start loading its SNF into dual-purpose casks so that if the Private Fuel Storage facility or another site became available, WE had greater ability to ship the waste to an off-site location. Moreover, the Point Beach Units were then nearing the end of their operating licenses. If WE decided to decommission Point Beach, dual-purpose casks would facilitate such decommissioning efforts. WE would not need to unload the dual-purpose casks to transport the spent fuel assemblies contained therein off-site.[20]

WE will present testimony regarding developments in the nuclear industry's use of casks and the cask choices provided by vendors. Many of the ISFSIs that began operations in the 1980s and 1990s are transitioning to dual-purpose cask systems. Moreover, nearly all dry storage facilities commissioned since 2000 have loaded SNF into dual-purpose cask systems. Dry storage vendors are no longer marketing storage-only designs.

In addition, WE will present evidence at trial, including the testimony of expert witness Eileen Supko, that DOE has encouraged utilities to use dual-purpose cask designs. DOE has considered dual-purpose casks as part of the waste management system from the start of that program. Moreover, DOE endorsed and encouraged nuclear operating utilities to utilize dual-purpose canister systems for at-reactor storage and considered compensating companies for avoided DOE program costs. *See, e.g.*, *Yankee Atomic Electric Co. v. United*

---

[19] In its earlier February 9, 1995 Opinion and Order granting WE's ISFSI application, the PSCW stated that the "licensing and fabrication of a multi-purpose cask for storage, transportation and disposal" appeared to be "environmentally superior to dry cask storage" because handling of spent fuel assemblies would be reduced. PX374, at 11. The PSCW further noted, however, that this option was not "available now, or likely to be available soon." *Id.*

[20] WE also has expended some costs in attempting to certify for transportation its existing VSC-24 canisters. These costs also are recoverable.

*States*, No. 98-126C (Sept. 30, 2006) slip op. at 49-52. Additionally, even DOE's current planning basis assumes that DOE will accept some commercial SNF in dual-purpose canisters at the permanent repository. *See* U.S. DOE, *Final Environmental Impact Statement for a Geologic Repository for Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada*, DOE/EIS-0250F, Vol. 1, pp. 2-21 – 2-23 (Feb. 2002), PX619; DOE Supplement to Final EIS for Yucca Mountain, 71 Fed. Reg. 60490, 60492 (Oct. 13, 2006).

Under these circumstances, the Point Beach Dry Storage Group undertook to select a next-generation dual-purpose cask for use at Point Beach and other NMC sites. On March 7, 2001, NMC issued a request for proposal for a dual-purpose cask. The Point Beach Dry Storage Project Manager, James Becka, will explain how this source selection evaluation process developed and was implemented, resulting in the selection of the NUHOMS TN-32PT dual-purpose cask for use during the 2003-2007 time frame.

In May 2002, NMC entered into a purchase order for Point Beach under its contract with Transnuclear for use of the NUHOMS system. *See* WE's February 2005 Initial Damages Disclosures, 3.0182 – TN-32PT Casks, PX812, at WISC 7820, 7845-7858, 7821-7833. The NUHOMS design required minor modifications to the ISFSI pad and ancillary equipment. During 2004, Point Beach loaded four NUHOMS canisters and placed them on the ISFSI's east pad.

The casks that Point Beach has loaded through 2005 because of DOE's failure to perform under the Standard Contract are as follows:

**SUMMARY OF POINT BEACH CASK LOADINGS**

| YEAR | NO. CASKS LOADED | NO. ASSEMBLIES |
|---|---|---|
| 1995 | 1 VSC-24 | 24 |
| 1996 | 1 VSC-24 | 24 |
| 1997 | NONE | NONE |
| 1998 | 3 VSC-24 | 72 |
| 1999 | 3 VSC-24 | 72 |
| 2000 | 4 VSC-24 | 96 |
| 2001 | 1 VSC-24 | 24 |
| 2002 | 2 VSC-24 | 48 |
| 2003 | 1 VSC-24 | 24 |
| 2004 | 4 NUHOMS (TN-32PT) | 128 |
| 2005 | NONE | NONE |
| Total | 16 VSC-24 / 4 NUHOMS | 512 |

**I. DOE's Current "Best Achievable" SNF Acceptance Schedule Begins in 2017**

To date, DOE has not begun acceptance of SNF under the Standard Contract. On July 19, 2006, the current head of OCRWM informed Congress that the "best-achievable schedule" for DOE's commencement of acceptance of SNF is 2017. Statement of Edward F. Sproat, III, Director, OCRWM, before the Subcommittee on Energy and Air Quality (July 19, 2006), PX719, at 4.

## III. ISSUES OF FACT AND LAW

**A. Issues of Law**

With one exception, this case merely requires that the Court apply well-established principles of contract damages to the facts presented here. The established legal principles involved in this case are set forth below at pages 35-36. The one legal issue for the Court to

resolve is whether WE's cost of capital is legally recoverable. To the extent the Government identifies any additional legal issues that it believes need to be resolved, WE will respond as appropriate.

**B. Issues of Fact**

Resolution of WE's damages requires the application of well-established principles of contract damages to the following issues of fact:

1. Whether DOE's anticipated or actual breach of the contract caused WE to incur the costs that it claims as damages?

2. Whether WE's damages were reasonably foreseeable to the Government?

3. Whether WE has proven its damages with reasonable certainty?

4. Whether the Government can satisfy its burden to prove that any item of cost claimed by WE is not reasonable mitigation of the effects of DOE's breach of contract?

5. Whether the Government can satisfy its burden to establish any additional offsets in the Would Have Been world?

WE addresses each issue below.

## IV. LEGAL AUTHORITY

**A. WE's Damages Were Foreseeable, Caused by DOE's Breach, and Will Be Proven with Reasonable Certainty**

The remedy for breach of contract "is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Ind. Mich.*, 422 F.3d at 1373. Damages for a breach of contract "are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). All three elements are questions of fact. *Bluebonnet Sav. Bank, F.S.B. v. Unites States*,, 266 F.3d 1348, 1356 (Fed. Cir. 2001).

Expectation damages include mitigation expenses incurred by the nonbreaching party, including the party's costs of arranging alternatives to the breaching party's required performance. *See* Restatement (Second) of Contracts § 347 cmts. a, b (1981); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1067-68 (Fed. Cir. 2001) (awarding costs for mitigation expenses). Once a party has "reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise."' *Indiana Mich.*, 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350 cmt. B (1981)). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* (citing *Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002)).

Mitigation decisions must be commercially reasonable. *Hughes*, 271 F.3d at 1067. A mitigating party, however, is "'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss."' *Ind. Mich.*, 422 F.3d at 1375. (citing Restatement (Second) of Contracts § 350(2) (1981)). Mitigation damages must have been reasonably foreseeable by the breaching party at the time of contracting. *Ind. Mich.*, 422 F.3d at 1373. The breaching party – here the Government – bears the burden of proving that any of the mitigation efforts of the non-breaching party – WE – were unreasonable. *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) (Government did not meet burden to establish actual expenditures were not reasonable).

In determining whether a decision was substantially caused by DOE's delay, "reasonable not absolute certainty suffices." *Yankee Atomic*, slip op. at 25. This is because the "defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

WE will show that its damages were reasonably foreseeable and caused by DOE's breach of its contract with WE. WE also will prove these costs with reasonable certainty. Further, the Government will not be able to meet its burden of establishing that WE's efforts to mitigate DOE's breach were unreasonable.

### 1. The Government Caused and Should Have Foreseen that WE Would Incur Dry Storage Costs

That WE would incur dry storage costs was reasonably foreseeable by DOE. The intent of the NWPA and the parties to the Standard Contract was to ensure that utilities would not have to build additional at-reactor storage after 1998. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 519. That WE would incur storage expenses of the nature and magnitude sought here was reasonably foreseeable. *Yankee Atomic*, slip op. at 21. WE's substantial dry storage costs are exactly the type of expenses that DOE foresaw and that the parties sought to preclude through DOE's acceptance of SNF under the Standard Contract, beginning no later than January 31, 1998.

#### a. WE Reasonably Built an ISFSI and Loaded VSC-24 Casks to Mitigate DOE's Partial Breach of Contract

WE's decision to investigate and eventually to license and construct dry storage at Point Beach is directly attributable to its knowledge that DOE would not begin performance until well after 1998. The Company was aware of and concerned about DOE schedule slippages as early as 1985. In 1987 and 1988, WE observed DOE's lack of progress and, based on the Government's public pronouncements, concluded (correctly) that DOE would not timely commence performance until well after 1998. From that point forward, WE did not make spent fuel storage decisions assuming DOE's performance. Instead, WE planned a substantial dry storage program premised on DOE's failure to perform until 2003, then 2010, and now 2017. WE started the dry storage process early to provide itself adequate time to

overcome anticipated regulatory and technical hurdles to dry storage. However, it did not actually commit itself to construction of the ISFSI until 1995.

WE constructed an ISFSI with capacity for 48 casks and commenced loading storage casks because of DOE's failure to perform. It would not have built this facility or loaded the casks if DOE had performed. WE recognizes that, had DOE performed, the Company may have taken modest steps to handle its SNF management needs. In the Would Have Been world, WE probably would have taken some of the steps that it eventually took in the breach world, such as removing non-fuel waste and recovering and repairing spaces in the spent fuel pool. WE also likely would have acquired a temporary rack with a capacity of 121 assemblies to ensure full core offload capability. WE has included an offset to its damages claim in favor of the Government for the cost of a temporary rack as a conservatism in its claim.

**b. WE's Acquisition of Three TN-32 Casks Was Commercially Reasonable Given the Risks Associated with the VSC-24 Cask**

WE took commercially reasonable mitigation measures following the VSC-24 hydrogen ignition incident. When the incident occurred, Point Beach had loaded only two VSC-24s and risked closure in 2000 due to the potential unavailability of additional VSC-24s. Even after the NRC lifted the Confirmatory Action Letters and again allowed WE to load VSC-24s, WE still had concerns regarding the long-term viability of the VSC-24 cask. WE could not risk relying solely on the VSC-24 cask.

In these circumstances, WE's decision to fabricate three backup TN-32 casks was eminently reasonable. *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (reasonableness of the injured party's mitigation action is "judged by the facts and circumstances at the time the action is taken"). If Point Beach had to shut down because of future VSC-24 problems and no cask alternative was readily available, then the Company

(and therefore DOE) risked exposure to significant replacement power costs – potentially millions of dollars, depending on the duration of the problem. In these circumstances, WE's expenditures on the TN-32 casks were reasonable.

**c. Acquisition of the Dual-Purpose NUHOMS TN-32PT Cask Was Commercially Reasonable**

WE's eventual decision to switch to a dual-purpose cask "was not only foreseeable, but foreseen." *Yankee Atomic*, slip op. at 52. WE will present evidence at trial that DOE was aware of, and planned for, the use of "multi-purpose storage and transportation containers to store SNF at reactor sites if the repository was significantly delayed." *Id.*

WE acquired the NUHOMS system to accommodate SNF discharges in light of DOE's acknowledged long-term breach of the Standard Contract. As discussed, WE moved to a dual-purpose cask design for a variety of reasons. The nuclear industry had become focused on dual-purpose cask technology and the improvements in technology occurred with these casks, not storage-only casks. Dual-purpose casks also should eliminate the need to unload a cask prior to transport. This will reduce radiation exposure and will most likely ease transport of WE's SNF off-site. This factor was important to not only WE, but also to the PSCW. WE also wanted to start loading its SNF into dual-purpose casks so that it could ship SNF off-site to Private Fuel Storage or other potential alternate sites as well as preparing its SNF for eventual off-site shipment following decommissioning. Finally, DOE encouraged the use of dual-purpose casks and recently indicated that it will accept some such casks at Yucca Mountain.

WE's decision was certainly reasonable under these circumstances.

**d. DOE's Partial Breach of the Standard Contract Has Caused WE to Incur Foreseeable NRC Licensing Fees**

WE has incurred several million dollars in fees paid to the NRC as a result of DOE's breach of the Standard Contract. As the Federal Circuit observed, "the production of energy

from nuclear sources is one of the most highly regulated human activities." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc) (quotations and citation omitted). The additional regulatory activity and resulting fees relating to additional SNF storage is a direct result of DOE's failure to perform. As discussed, DOE's breach caused WE to build an ISFSI at Point Beach for which it paid site-specific license and inspection fees until 1998. Since 1999, WE has paid additional spent fuel storage-related fees to the NRC that the Commission has levied on an entire class of nuclear utilities following DOE's partial breach of the Standard Contract. Had DOE performed, the utilities would not in the aggregate have needed such additional SNF storage and there would have been no reason for the NRC to impose classwide SNF storage fees.

**2. The Government Caused and Should Have Foreseen that WE Would Incur Costs Managing SNF and Investigating Alternate Storage Facilities Because of DOE's Breach**

WE will establish at trial that it incurred approximately $4.4 million (2007 dollars) in managing SNF and investigating alternate SNF storage site locations because of DOE's breach. WE's investigation of off-site options was foreseeable to DOE. Indeed, DOE itself had been directed under the NWPA to investigate alternate sites for both an MRS and the permanent repository. *See* NWPA, Pub. L. No. 97-425, §§ 112-113, 141, 96 Stat. 2201, 2208-12, 2241-44 (1983) (codified as amended at 42 U.S.C. §§ 10132-10133, 10161); *see also* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5011-5021, 101 Stat. 1330-228 to 1330-236 (1987) (codified as amended at 42 U.S.C. §§ 10162-10169). In fact, one of the sites that WE investigated was the Oak Ridge facility, the same location that DOE considered for an MRS facility.

Given the anticipated long-term failure of DOE to perform, WE had to investigate alternative SNF storage facilities. WE had no assurance that the PSCW would approve WE's ISFSI application or subsequent requests for casks. Given the modest investments required

for most of these investigations of alternatives, it was commercially reasonable for WE to pursue them. WE will present testimony that DOE's long-term failure to perform caused WE to have to investigate Private Fuel Storage and other alternatives to store Point Beach's SNF.

That Private Fuel Storage in particular was a potentially reasonable option to investigate is confirmed by DOE's own documents. DOE has stated that Private Fuel Storage could serve as an available alternative for storing SNF for another utility, Northern States Power. *See* DOE, Spent Fuel Management Alternatives Available to Northern States Power Company Inc. & the Federal Government for the Prairie Island Nuclear Plant, Units 1 & 2 (Jan. 2001), PX590.[21] Finally, WE never earned any profit from any of its alternate storage projects. With the success of its dry storage project to date, WE has currently withdrawn from Private Fuel Storage.

Additionally, it was foreseeable that WE would both coordinate with other nuclear utilities through industry associations to attempt to find solutions to DOE's long-term failure to perform under the Standard Contract and would undertake engineering activities to support evaluation and implementation of SNF storage options. These SNF management efforts are reasonable as acknowledged by the PSCW's Order authorizing WE to purchase the TN-32 casks. PSCW, Findings of Fact, Conclusions of Law, Certificate and Supplemental Order, Docket No. 6630-CE-197 (Aug. 11, 1998), PX524, at 3-4.

**3. Reasonable Certainty**

WE need only provide sufficient evidence "from which the court could 'make a fair and reasonable approximation of the damages.'" *S. Cal. Fed. Sav. & Loan Ass'n v. United*

---

[21] DOE produced this report in response to a congressional request to identify "all alternatives that are available to Northern States Power Company and the Federal government to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company . . . ." PX590 at 3. DOE stated that Northern States Power could use "the proposed Private Fuel Storage facility which is currently undergoing licensing review by the NRC" *Id.* at 7, to meet its SNF storage requirements.

*States*, 422 F.3d 1319, 1336 (Fed. Cir. 2005) (quoting *Bluebonnet Sav. Bank*, 266 F.3d at 1357). WE will present testimony and evidence establishing with reasonable certainty that WE incurred the ISFSI, cask and other costs that it seeks to recover in this case. Most of these costs (or the underlying activities) have already been approved by the PSCW and the NRC. This factor merits consideration. *Yankee Atomic*, slip op. at 26.

**B. The Government Cannot Meet its Burden of Showing that WE's Mitigation Efforts Were Unreasonable**

The law requires only that WE, the nonbreaching party, make "those efforts that are fair and reasonable under the circumstances." *Home Savings of Am., FSB v. United States,* 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Ind. Mich.*, 422 F.3d at 1375. As discussed, the Government has the burden of showing that WE's mitigation efforts were unreasonable. *Old Stone Corp*, 450 F.3d 1360 (Fed. Cir. 2006); *Tenn. Valley Auth.*, 69 Fed. Cl. at 523. As the court stated in *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950):

> The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.

WE will show at trial that there is no basis for any criticism of WE's eminently reasonable commercial decisions in this matter.

**1. WE Should Recover Its Internal Labor Costs**

In his report, the Government's proffered damages expert has proposed removal of more than $6 million in WE's internal labor charges. One of his primary contentions is that the labor charges relating to any salaried employee should be rejected unless the employee charged a majority of his or her time to a dry storage project number during the period

April 1999 through December 2005 asserting that these labor costs are not "incremental" damages. June 2006 Report of Stephen Kiraly at 11-13.[22]

As the Court has explained, such an "incremental" labor cost argument should be rejected:

> [T]he fact that [the utility] used its own internal resources to support its mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other projects. That [the utility] would have paid its employees in all events is not material to this inquiry.

*Tenn. Valley Auth.*, 69 Fed. Cl. at 539; *see also Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 376 (2006) ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs.")

WE used internal labor to mitigate the Government's breach and WE is entitled to recover these costs.

**2. No Offset Should Be Taken for Would Have Been World Loading Costs**

The Government's proffered expert, Warren Brewer, alleges that, in the Would Have Been world, WE would have incurred costs to load casks had DOE actually performed and that these costs can be estimated. *See* Brewer Report at 28, PX880. Mr. Brewer further alleges that there should be an offset of $3.1 million against WE's claim for these purportedly avoided cask-loading costs.

This proposed offset should be rejected for at least two reasons. First, WE will not avoid the cost of loading casks for DOE's acceptance. These costs are merely deferred until DOE performs. WE is bringing an action against DOE for partial breach and both parties to

---

[22] Mr. Kiraly has raised additional objections that WE continues to address through the audit process and will address at trial, if necessary.

the Contract continue to operate under the assumption that DOE will eventually perform. It is legally incorrect, as well as unfair, to now deduct amounts for cask loading that WE has not incurred, but will incur in the future.

In *Tennessee Valley Authority*, the Court rejected such an offset:

> [T]he government claims that in the non-breach, but-for world, [the utility] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the utility] has temporarily avoided these costs, that [the utility] has received a benefit as a result, and that the government should be credited with an offset to [the utility's] damages to reflect this benefit.
>
> The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

69 Fed. Cl. at 542-43 (citations omitted).

Second, these costs are necessarily speculative because they will be incurred so far in the future. As the Court stated in rejecting such an offset in the SMUD case: "Since DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to [the utility], because of delayed loading costs, would be entirely speculative." *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372. *See also Tenn. Valley Auth.*, 69 Fed. Cl. at 543.

### 3. WE's Financing of Its Mitigation Costs Is Recoverable

WE has had to finance the costs that it has incurred because of DOE's failure to perform in accordance with its contractual obligations from the time that WE incurred those costs. The Federal Circuit has allowed the recovery of cost of capital. In *Wickham Constr.*

*Co. v. Fischer*, 12 F.3d 1574, 1582-83 (Fed. Cir. 1994), it held that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment."

In *Tennessee Valley Authority*, the Court applied *Wickham* to find that TVA's Allowance for Funds Used During Construction ("AFUDC") costs were recoverable as damages against the Government for breach of the Standard Contract, notwithstanding the general restriction against recovering interest as set forth in 28 U.S.C. § 2516(a). *See Tenn. Valley Auth.*, 69 Fed. Cl. at 541-42. Because TVA used "a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities," its AFUDC costs were recoverable. *Tenn. Valley Auth.*, 69 Fed. Cl. at 542.

WE's cost of capital incurred in constructing the ISFSI, fabricating and loading dry casks, and alternate storage facilities likewise is the type of cost recoverable under the *Wickham* and *TVA* standards and should be recoverable in this case. It is an economic cost borne by WE and its ratepayers. Indeed, the PSCW routinely allows WE to recover its cost of capital. One of WE's damages experts, Mr. Metcalfe, will testify further regarding this issue at trial.

## V. CONCLUSION

For the foregoing reasons and based upon the evidence to be presented at trial, WE respectfully requests that the Court award WE $91.0 million for the damages caused by DOE's partial breach of its contract with WE.

Dated: October 27, 2006

Respectfully submitted,

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2001
(202) 434-1675

s/Richard W. Oehler by s/Donald J. Carney
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on October 27, 2006, I caused a copy of the foregoing "Wisconsin Electric Power Company's Memorandum of Contentions of Fact and Law" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney