No. 00-697C
(Senior Judge Merow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

WISCONSIN ELECTRIC POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202)305-7583
Facsimile: (202)307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
RUSSELL A. SHULTIS
SONIA M. ORFIELD
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 30, 2007

Attorneys for Defendant

**TABLE OF CONTENTS**


SUMMARY OF ARGUMENT ........ 1

STATEMENT OF FACTS ........ 5

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT ........ 5

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER ........ 6

A. The Proposed Rule ........ 6

B. Public Comments ........ 7

C. The Final Rule ........ 9

III. WEPCO'S EXECUTION OF ITS STANDARD CONTRACT ........ 12

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT ........ 12

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT ........ 13

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS ........ 15

A. The 1987 Through 1990 Annual Capacity Reports ........ 15

B. The 1991 Annual Capacity Report ........ 15

C. The 1992 Through 1995 Annual Capacity Reports ........ 18

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY ........ 19

A. Program Reassessment And 1991 Draft Mission Plan Amendment ........ 19

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program ........ 20

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES ........ 21

IX. WEPCO'S DELIVERY COMMITMENT SCHEDULES ........ 23

DISCUSSION ..... 24

I. WEPCO BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY ..... 24

A. WEPCO Has The Burden Of Proving All Elements Of Its Case ..... 24

B. WEPCO Must Prove That Its Damages Were Directly Caused By The Government's Breach ..... 25

C. WEPCO Cannot Shift Its Burden Of Proof Upon The Causation Issue By Characterizing Its Damages As "Mitigation Expenses" ..... 29

D. WEPCO Bears The Burden Of Establishing A Reasonable "But For" World Against Which To Measure Whether Its Claimed "Mitigation Damages" Were Incremental Costs That Were "Caused" By DOE's Delay ..... 34

E. The Damages Available To WEPCO For Breach Of Contract Are Limited To Those That Are Foreseeable As The Probable Outcome Of The Breach ..... 37

F. WEPCO Must Prove Its Damages With Reasonable Certainty ..... 38

II. DETERMINATION OF THE PROPER RATE OF ACCEPTANCE TO BE APPLIED TO THE STANDARD CONTRACT IS CRUCIAL TO WEPCO'S CLAIM ..... 39

A. WEPCO Would Have Pursued Dry Storage Regardless Of The Manner In Which DOE Performed ..... 39

B. To The Extent That WEPCO's Causation Theory Is Predicated Upon DOE's Rate Of Acceptance, WEPCO Cannot Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF Pursuant To A Two-Part Test Or At An Annual Rate Of 3,000 MTUS ..... 42

1. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard ..... 42

2. The Standard Contract Did Not Require Acceptance of SNF At Any Particular Rate Or Pursuant To Any Particular Test ..... 43

C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract ..... 46

1. The Acceptance Schedule Was Established In The Dealings Between The Parties ..... 46

III. WEPCO CANNOT MEET ITS BURDEN OF PROVING THAT ITS COSTS TO IMPLEMENT DRY STORAGE WERE CAUSED BY DOE'S DELAY ...................... 49

IV. WEPCO CANNOT MEET ITS BURDEN OF PROVING THAT ITS COSTS FOR NRC ANNUAL FEES FROM 1999 THROUGH 2005 WERE CAUSED BY DOE'S DELAY OR THAT ANY DAMAGES RELATING TO THOSE FEES CAN BE SHOWN WITH ANY REASONABLE CERTAINTY ................................................................... 59

V. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR THE PURCHASE OF THE THREE TN-32 CASKS BECAUSE THEY DO NOT CONSTITUTE REASONABLE MITIGATION ........................................................... 63

VI. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR THE PURCHASE OF THE DUAL-PURPOSE NUHOMS TN-32PT CASKS AND FOR THE LICENSING OF ITS VSC-24 CASKS FOR TRANSPORTATION BECAUSE THEY WERE UNFORESEEABLE, DO NOT CONSTITUTE REASONABLE MITIGATION AND WERE NOT CAUSED BY DOE'S DELAY ................................ 65

VII. WEPCO SHOULD NOT RECOVER THE COSTS INCURRED FOR PRIVATE FUEL STORAGE BECAUSE THEY WERE UNFORESEEABLE AS A MATTER OF LAW AND DO NOT CONSTITUTE REASONABLE MITIGATION ................................... 67

VIII. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR OTHER SNF MANAGEMENT AND OVERSIGHT ACTIVITIES BECAUSE THEY WERE UNFORESEEABLE AND DO NOT CONSTITUTE REASONABLE MITIGATION ............................................................................................................ 69

IX. WEPCO'S FAILURE PROPERLY TO ACCOUNT FOR "BUT FOR" LOADING COSTS CONSTITUTES A FAILURE TO MEET ITS BURDEN OF PROOF AND WOULD PROVIDE WEPCO WITH A $3.1 MILLION WINDFALL ........................... 70

X. WEPCO SHOULD NOT RECOVER ITS FIXED, NON-INCREMENTAL COSTS FOR SALARIED EMPLOYEES .............................................................................. 73

XI. WEPCO SHOULD NOT RECOVER CERTAIN OF ITS CLAIMED COSTS FOR EMPLOYEE EXPENSES AND OVERHEAD ............................................................. 76

XII. WEPCO'S CLAIM FOR THE COST OF CAPITAL IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST .......................................... 77

CONCLUSION ................................................................................................................ 83

# TABLE OF AUTHORITIES

## CASES


PAGE(S)

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) .......... 74

Autotrol Corp. v. Cont'l Water Sys. Corp.,
918 F.2d 689 (7th Cir. 1990) .......... 74

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113 (1990) .......... 38

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) .......... 82

Blake v. Califano,
626 F.2d 891 (D.C. Cir. 1980) .......... 77

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) .......... 34, 36, 70

Bluebonnet Sav. Bank, FSB v. United States,
266 F.3d 1348 (Fed. Cir. 2001) .......... 25

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... 24, 30, 34

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) .......... 37

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) .......... 73

Brookfield Constr. Co. v. United States,
228 Ct.Cl. 551, 661 F.2d 159 (1981) .......... 78

California Federal Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) .......... 25

Castle v. United States,
48 Fed. Cl. 187 (2000),
aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002) .......... 78, 81

Chevron U.S.A., Inc. v. United States,
71 Fed. Cl. 236 (2006) .......... 79

Citizens Federal Bank v. United States,
No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007) .......... 26, 33

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000),
rev'd on other grounds, 309 F.3d 1353 (Fed. Cir.2002),
vacated, 320 F.3d 1338 (Fed. Cir. 2003) .......... 34

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) .......... 26, 28

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984) .......... 46

Craft v. United States,
233 F.3d 358 (6th Cir. 2000) .......... 77

District of Columbia v. United States,
67 Fed. Cl. 292 (2005) .......... 77, 80, 81

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) .......... 25

England v. Contel Advanced Sys., Inc.,
384 F.3d 1372 (Fed. Cir. 2004) .......... 77, 78

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) .......... 26

Fifth Third Bank v. United States,
71 Fed. Cl. 56 (2006) .......... 25

Fleet Nat'l Bank v. Anchor Media Television, Inc.,
45F.3d 546 (1st Cir. 1995) .......... 32

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .......... 34, 36

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd,, 422 F.3d 1369 (Fed. Cir. 2005) .......... passim

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... passim

Jetco, Inc. v. United States,
11 Cl. Ct. 837 (1987) .......... 77

Koby v. United States,
54 Fed. Cl. 493, 497 (2002) .......... passim

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) .......... 26

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) .......... 27

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64, 111 (1999) .......... 67, 68, 69

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .......... 28

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) .......... 37

Library of Congress v. Shaw,
478 U.S. 310 (1986) .......... 78, 81

Locke v. United States,
283 F.2d 521 (Ct. Cl. 1960) .......... 28

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) .......... 2, 24, 78

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) .......... 27

Myerle v. United States,
33 Ct. Cl. 1 (1897) .......... 25

National By-Products, Inc. v. United States,
186 Ct. C 405 F.2d 1256 (1969) .......... 43

Nebraska Public Power Dist. v. United States,
73 Fed. Cl. 650 (2006),amended, No. 01-116C,
2006 WL 3754809 (Fed. Cl. Dec. 19, 2006) .......... 3

Nebraska Public Power Dist. v. United States,
No. 01-116C, 2006 WL 3754809 (Fed. Cl. Dec. 19, 2006) .......... 3

Northern Helex,
207 Ct. C 524 F.2d at 714 ........................................................................................ 37

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997) ...................................................................................... 2

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006) ............................................................................... 33, 34

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) .................................................................................... 35

PSEG Nuclear, LLC v. United States,
No. 05-5162 (Fed. Cir.) ................................................................................................. 2

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 333 (2006) ........................................................................................... passim

Pacific Gas & Electric v. United States,
58 Fed. Cl. 1 (2003) ..................................................................................................... 81

Point Prods. A.G. v. Sony Music Entm't, Inc.,
215 F. Supp.2d 336 (S.D.N.Y. 2002) .................................................................... 27, 36

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) .................................................................................... 37

Ramsey v. United States,
101 F. Supp. 353 (Ct. Cl. 1951) ................................................................................... 25

Robinson v. United States,
305 F.3d 1330, 1333 (Fed. Cir. 2002) ................................................................... passim

Roseburg Lumber v. Madigan,
978 F.2d 660, 667 (Fed. Cir. 1992) ............................................................................... 38

S.W. Eng'g Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) ........................................................................................ 74

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006) ........................................................................................... 28, 65

Sacramento Mun. Utility Dist. v. United States,
No. 98-488, 2006 WL 3490940 (Fed. Cl. Dec. 1, 2006) ............................................... 45

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) .......................................................................................... 73

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 24

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 26

Sandstrom v. Principi,
358 F.3d 1376 (Fed. Cir. 2004) .......... 79, 80, 81

Shyface v. Secretary of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) .......... 26

Singer Co. Librascope Div. v. United States,
215 Ct. Cl. 281, 568 F.2d 695 (1977) .......... 77

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) .......... passim

Town of Grantwood v. United States,
55 Fed. Cl. 481 (2003) .......... 81

United States v. Mescalero Apache Tribe,
207 Ct. Cl. 369, 518 F.2d 1309 (1979) .......... 79

United States v. Thayer-West Print Hotel Co.,
329 U.S. 585 (1947) .......... 78

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) .......... 28, 38, 66

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002) .......... 26

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) .......... 24

Wickham Contracting Co. v. United States,
12 F.3d 1574 (1994) .......... 82

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) .......... 74

Wilner v. United States,
23 Cl. Ct. 241 (1991) .......... 73

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) ........ 74

Yankee Atomic v. United States,
73 Fed. Cl. 249 (2006) ........ passim

## STATUTES AND REGULATIONS

28 U.S.C. § 2516(a) ........ 77, 78, 82

41 U.S.C. §§ 601-613 ........ 78

42 U.S.C. §§ 10101-10270 ........ 5, 78

42 U.S.C. § 10132 ........ 5

42 U.S.C. § 10134 ........ 5

42 U.S.C. § 10135 ........ 5

42 U.S.C. § 10139 ........ 2

42 U.S.C. § 10161 ........ 6, 13

42 U.S.C. § 10162(b) ........ 14

42 U.S.C. § 10168(d)(1) ........ 14, 49

42 U.S.C. § 10172(a) ........ 14

42 U.S.C. § 10221 ........ 12

42 U.S.C. § 10222(a)(1) ........ 6

42 U.S.C. § 10222(a)(2) ........ 20

42 U.S.C. § 10242(a) ........ 14

10 C.F.R. § 961.11 ........ passim

10 C.F.R. Part 170 ........ 59, 60

## MISCELLANEOUS

48 Fed. Reg. 16590 .......... 10

64 Fed. Reg. 3144860 .......... 61

48 Fed. Reg. 5458 .......... 6, 7, 8, 9, 43

S. Rep. No. 100-152 .......... 13, 14

Prosser & Keaton, The Law of Torts (5th ed. 1984) .......... 27

C. McCormack, Handbook on the Law of Damages (1935) .......... 27

5A Corbin on Contracts (1964) .......... 27

3 Dobbs, Law of Remedies (1993) .......... 30

*Black's Law Dictionary* 1002 (6th ed. 1990) .......... 32

11 A. Corbin, Corbin on Contracts (rev. ed. 2005) .......... 72

Restatement (Second) of Contracts § 344(a) (1981) .......... 24

Restatement (Second) of Contracts § 347(a) (1981) .......... 29

Restatement (Second) of Contracts § 351 cmt. a .......... 38, 66

Restatement (Second) of Contracts § 352 cmt. a .......... 38

Am. Jur. 2d Damages § 416 (2004) .......... 74

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-697C |
| | ) | (Senior Judge Merow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Appendix A, ¶ 14(b), of the Rules of the Court of Federal Claims ("RCFC") and this Court's order dated December 20, 2005, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, Wisconsin Electric Power Company ("WEPCO"), for approximately $48.4 million in costs and $42.6 million in prejudgment interest[1] that it allegedly has incurred through December 31, 2005, at its Point Beach nuclear power plant, associated with the storage of spent nuclear fuel ("SNF"). The majority of WEPCO's claim, aside from its prejudgment interest claim, seeks costs relating to the engineering, design, licensing, and construction of a type of dry SNF storage facility known as an Independent Spent Fuel Storage Installation ("ISFSI") at the Point Beach plant. WEPCO contends that the Government is liable for these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31,

[1] In its pretrial brief, WEPCO characterizes its $42.6 million interest claim as "cost of capital." Contrary to WEPCO's characterization of this claimed "damage," WEPCO's experts have merely "grossed up" WEPCO's claimed damages to account for the time value of money. This type of imputed interest charge is not recoverable against the United States.

1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and WEPCO. The issue in this case, as in many of the SNF cases, is WEPCO's entitlement to the amount of damages that it is seeking to recover.[2]

---

[2] As the Court is aware, the DOE contracting officer, in 1997, made a preliminary determination that DOE's delay was unavoidable under the "Unavoidable Delays" clause of the Standard Contract. That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added). Included in the excusable bases for a failure to perform are delays in the scheduled delivery, acceptance, or transport of SNF arising out of causes beyond the "reasonable control of . . . [the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual capacity:" Id. The United States Court of Appeals for the Federal Circuit has held that DOE's delay in accepting spent nuclear fuel constitutes a "[f]ailure to perform." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Nevertheless, following the contracting officer's issuance of her preliminary determination, the United States Court of Appeals for the District of Columbia Circuit issued a writ of mandamus, ordering DOE "to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Northern States Power Co. v. United States, 128 F.3d 754, 760 (D.C. Cir. 1997). The D.C. Circuit, after barring "DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," held that the "Unavoidable Delays" clause, "insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty" and issued its writ to preclude DOE from relying upon that provision. Id. at 760-61.

We have consistently argued, most recently in briefing before the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.), that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters) and, further, that the "Unavoidable Delays" clause in the Standard Contract was wholly appropriate and legal. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. The effect of the D.C. Circuit's elimination of at least a portion of this contract clause from the Standard Contract, 14 years after the contract was entered, has a staggering effect upon the United States: rather than excusing DOE's liability for the course of the unavoidable delay, DOE now faces billions of dollars in damages claims. The writ of

WEPCO's causation theory is meritless. When WEPCO first disclosed its damages claim in July 2005, the claim was predicated upon the argument that, had DOE performed by beginning acceptance of SNF from WEPCO's Point Beach plant in 1998, WEPCO would not have needed any additional storage at the site. As such, WEPCO argued that it was entitled to all of the costs that it incurred to add dry storage at Point Beach. After extensive discovery by the Government, and after the WEPCO company witnesses had been confronted with the many company documents establishing that, when it made its decision to implement dry storage, WEPCO believed that it would run out of SNF storage capacity before DOE was obligated to begin SNF acceptance from the Point Beach plant, WEPCO reformulated its claim.

WEPCO now contends that it had known all along that it would need additional SNF storage capacity before DOE was to begin acceptance in 1998. WEPCO further contends that, had it believed that DOE would have performed as expected, it would have handled that problem

---

mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, further bringing into question the appropriateness of a liability finding here. Nevertheless, because the D.C. Circuit's writ of mandamus is continuing, it affects our ability to rely upon the "Unavoidable Delays" clause. In Nebraska Public Power Dist. v. United States, 73 Fed. Cl. 650 (2006), amended, No. 01-116C, 2006 WL 3754809 (Fed. Cl. Dec. 19, 2006), the Court recently found that the D.C. Circuit's writ of mandamus was invalid because that court was without jurisdiction to issue the writ and there was no waiver of sovereign immunity permitting the writ. Id. at 674. On December 19, 2006, the Court certified the issue of the validity of the D.C. Circuit's writ of mandamus for interlocutory appeal. Nebraska Public Power Dist. v. United States, No. 01-116C, 2006 WL 3754809 (Fed. Cl. Dec. 19, 2006).

Although the Court has determined liability in this case, that decision does not constitute law of the case, and the Court has not had the benefit of considering whether DOE's delays fall within the Unavoidable Delays clause of the Standard Contract. Plainly, whether the Government's delay in SNF acceptance constitutes an "Unavoidable Delay" under the Standard Contract is relevant in this case. We respectfully reserve our right to raise any appropriate defenses based upon the "Unavoidable Delays" clause to the extent that, in the future, we are permitted to do so.

by the use of a temporary storage rack in the cask laydown area of its spent fuel pool. WEPCO contends that this project would have been performed during the 1993 through 1996 time period, but that its belief that DOE was not going to begin SNF acceptance in 1998 caused it to implement dry storage instead.

We will establish at trial that WEPCO's reformulated damages claim is based upon a SNF storage management model that could only have been developed with the clarity of hindsight and is not supported by evidence. We will establish through contemporaneous evidence that, when WEPCO's management decided to implement dry storage, WEPCO believed that it needed additional permanent SNF storage in an amount in excess of what could have been provided by the newly-minted temporary solution that it has only recently identified. At that time, dry storage was the only SNF storage alternative that WEPCO believed could have provided it with the permanent SNF storage capacity that it needed to allow it to continue to operate until DOE was scheduled to begin acceptance from Point Beach. Because WEPCO's decision to implement dry storage was based upon its belief about its storage needs rather than what it believed about DOE's performance, the costs that WEPCO incurred to implement dry storage were not caused by DOE's delay in performance.

At trial, WEPCO bears the burden of proving that its damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. As part of that legal obligation, WEPCO must establish that it properly has accounted for costs that would have been incurred had DOE performed beginning in 1998. This legal burden is real, and WEPCO must do more at trial than simply identify costs that it has incurred in connection with the storage of SNF and shift to the Government the burden of disproving foreseeability, causation, and reasonable certainty.

WEPCO apparently intends to characterize all of its claimed costs as "mitigation efforts" in an attempt to place the burden on the Government to disprove their reasonableness, without ever establishing as an initial matter that the need for these efforts was actually caused by DOE's delay and would not have been necessary in the "but for" world. It has no basis for avoiding its own need to meet its own burden of proof.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage

of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982).[3]

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not

---

[3] By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1).

identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which acceptance of particular SNF would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a permanent repository for disposal of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI"), an association of the nuclear power industry to which WEPCO belonged, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit

> DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 501.34, Attachment A at 2 (ARC0010334).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 501.63 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan that DOE was to prepare in accordance with statutory requirements for ultimate submission to Congress, for its review and consideration. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 501.43, attachment 1 at 1 (ARC0010439).

WEPCO sent a letter to DOE on March 9, 1983. In that letter, WEPCO, like many other utilities, endorsed EEI's comments upon the draft Standard Contract. DX 42.

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 501.34, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at 5 (ARC0010337); see DX 501.14 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 501.69 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the

final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. The Government will show at trial that DOE determined it could not obligate itself to satisfy such a commitment because the number of uncertainties concerning the development of the program, the development of the contemplated disposal facilities, and the potential capabilities for accepting SNF that could be developed by 1998. Accordingly, DOE specifically declined to create any commitment to accept SNF beginning in 1998 at a specific minimum rate or based upon any mandatory minimum criteria. Instead, the contract provided that the acceptance rate would be developed later through the promulgation of the 1991 ACR.

The utilities acknowledged that DOE rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence

with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole.

DX 526, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983); see also DX 532 at 1 (YDK023771) (Yankee Atomic memorandum, dated January 20, 1984). Similarly, in a letter to Robert Morgan of DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 528, Attachment 1 at 1 (SN011049).[4] Finally, the Standard Contract contained an integration clause, which precluded reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[5]

---

[4] DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 501.43, Attachment 1 at 1 (ARC0010439).

[5] The Standard Contract also included a "Disputes" clause that provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

III. WEPCO'S EXECUTION OF ITS STANDARD CONTRACT

On June 16, 1983, WEPCO executed its Standard Contract with DOE, which covered the SNF generated at the Point Beach nuclear plant, and which contained essentially the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 169.

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued and submitted to Congress the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221, which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 536, Volume 1 at 25-26 (HQR0031129-30). The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[6] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 536 at 29 (HQR0031133). The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will

---

[6] Today, utilities discharge approximately 2,000 MTU of SNF per year.

> begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

Id.

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for Fiscal Year 1987, and budget uncertainty for Fiscal Year 1988. However, DOE noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[7] DX 543 at 6 (HQR0031634). The 1987 Mission Plan Amendment acknowledged the importance of the Annual Capacity Report that would be issued in 1991 – namely, that it would be used as the basis for the DCS process. DX 543 at 60 (HQR0031687).

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public

---

[7] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, they also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[8]

---

[8] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 542 at 2 (HQR0012713), DX 549 at 1 (HQR0012617), DX 558 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 542 at 2 (HQR0012713), DX 549 at 2 (HQR0012618), DX 558 at 2 (HQR0012494).

### B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 566 at 1-2 (HQR0020797-HQR0020798). The 1991 ACR was significant because it was the last ACR that would be issued before the contract holders were to begin submitting DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery

Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 566 at 2 (HQR0020804). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at 2, 7.

As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 566 at 5 (HQR0020807). This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored

Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be eliminated. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 570 (EDB0011764).

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 571 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms"); DX 572 at 2 (SN170373) (same); DX 544 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding").

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 578 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 578 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 584 at 1 (HQR0290676). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at 4 (HQR0290681). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance

> rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at 3-4 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at 1.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a permanent repository until 2010, because there was insufficient time to perform the scientific investigation necessary. DX 553 at vii-ix (DB001448-50). However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. at ix-x (DB0001450-51). DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 564 at ___ (HQR0030799). In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS.

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy

> Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Id. at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit upon the MRS until the repository began operations in 2010. Id. at 205-206.

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS was also reflected in the cost analyses that it performed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was established by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates, and other factors. The current program plans, including acceptance rate projections, type and location of receiving facilities, and scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian

Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 557 at A-1 (PNL-107-1666). The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU of SNF would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted at a permanent repository. In years thirteen through seventeen 1,800 MTU would be accepted. And only in year eighteen (2015) would the system accept 3,000 MTU. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to WEPCO and other utilities, along with the instructions for the submission of DCSs. DX 497 and 573. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." DX 497 at HQR0012045; DX 573 at SN172070. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser

has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the proposed method – whether by truck, barge, or rail – that they intended to deliver the DOE-supplied transportation cask to DOE at the delivery location gate, f.o.b. carrier, and the maximum loaded cask lifting weight of the cask that the given utility intended to use at the SNF delivery location based upon the present or planned capacity of its SNF cask lifting crane. DX 497 at HQR0012049-50; DX 573 at SN172074-75.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 562 (Minutes of Standard Contract Task Force meeting, during which members met with DOE to discuss and provide comments upon the draft DCS instructions); DX 565 at 3 (SN169920) (UWASTE memorandum advising members that Standard Contract Task Force had provided comments to DOE upon another draft of the DCS instructions); see DX 554 at SN168530 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that "[b]y 1/1/92, each utility is required to submit a DCS to DOE" and that the task force would be "following this closely."). After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 562 and 573.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. WEPCO submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with allocations in 1998 and 1999, with the exception of one utility, submitted a DCS for those

allocations. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

## IX. WEPCO'S DELIVERY COMMITMENT SCHEDULES

During the period from September 1992 through March 1993, WEPCO obtained approval of the ten DCSs that it submitted, providing for acceptance allocations for the Point Beach plant for the ten-year period from 1998 through 2007. DX 466, 467, 468 (WISC713-22) and 469 (WISC910-19). The DCSs that WEPCO submitted comported with the rate of acceptance set forth in the 1991 ACR and reflected WEPCO's allocations under that rate. WEPCO did not challenge or object (formally or informally) to DOE's instructions concerning the submittal of DCSs. Each of WEPCO's DCSs indicated that WEPCO was proposing that DOE deliver its transportation cask by truck, but also that it intended to use a cask at the Point Beach site with a maximum loaded cask lifting weight of 125 tons. Given that a truck cask normally weighs 20 to 40 tons, and that a larger cask with a maximum loaded cask lifting weight of 125 tons would require shipment by rail or barge, the DOE contracting officer sent WEPCO a letter asking it to clarify whether it desired "to use only truck casks or heavy-haul a larger cask from the nearest rail/barge facility." DX 467 at 2. WEPCO replied that, even though, as indicated on its DCSs, it had a crane with the lifting capacity capable of lifting a larger 125-ton cask, it anticipated using truck casks for the delivery of its SNF to DOE because "there is neither rail nor barge access to the Point Beach site" and it did "not intend to heavy haul a larger cask from the nearest rail or barge facility." DX 468 at 1 (WISC713).

DISCUSSION

I. WEPCO BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

A. WEPCO Has The Burden Of Proving All Elements Of Its Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). We acknowledge that, in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit held that DOE's failure to begin accepting SNF from the nuclear utility contract holders by January 31, 1998, constituted a breach of the Standard Contract. More recently, in Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005), the Federal Circuit held that breach to have been a partial breach.

The parties agree that the damages remedy that WEPCO is seeking is its "expectation interest" in the Standard Contract, consisting of "damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed." Pl. Br. 35 (citing Indiana Michigan, 422 F.3d at 1373); see Restatement (Second) of Contracts § 344(a) (1981). Conversely, however, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."[9] Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003); see White v. Delta Constr. Int'l, Inc.,

[9] To the extent that SFI asserts that the "but for" world is speculative and, therefore, not susceptible of proof, and given SFI's burden of proof, it is unclear how SFI will meet that burden.

285 F.3d 1040, 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 385 (2006) (same), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007).

The parties also agree that to recover expectation interest damages for a breach of contract, WEPCO must prove three elements: causation, foreseeability, and reasonable certainty in the amount of damages. California Federal Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002). The parties further agree that these three elements involve questions of fact. Fifth Third Bank v. United States, 71 Fed. Cl. 56, 86 (2006) (citing Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001)); Pl. Br. at 35 (Issues of Fact Nos. 1-3). As such, WEPCO must prove these three elements by a preponderance of the evidence. Energy Capital, 302 F.3d at 1324-25.

### B. WEPCO Must Prove That Its Damages Were Directly Caused By The Government's Breach

According to the well-established precedent of this circuit, WEPCO bears the burden of introducing clear proof that it was injured as a direct result of the defendant's breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 101 F. Supp. 353, 357 (Ct. Cl. 1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. In other words, WEPCO must establish that, "but for" the breach of contract, the claimed damages would not

have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)).

WEPCO may argue that the Federal Circuit's recent decision in Citizens Federal Bank v. United States, No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007), somehow reduces or eliminates WEPCO's burden of establishing causation. WEPCO would be incorrect.[10] In Citizens Federal, the Federal Circuit recently stated that, in determining whether to apply the "substantial factor" test or the "but for" test for evaluating causation, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." Id. at *3. Yet, even if the Court in this case were to apply the "substantial factor" test to evaluate causation in this case, WEPCO could not avoid its obligation to establish that, absent DOE's delay, it would not have incurred the costs that it is seeking in this action.

The plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999); see Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 105

---

[10] The deadline for the Government to seek rehearing en banc of the Citizens Federal decision has not yet expired.

(2004) ("Plaintiff must prove that the changes . . . that were imposed by the breaching provisions of FIRREA were a substantial factor causing the alleged loss, that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks.").[11] Even in tort cases, where the "substantial factor" test for causation developed, that test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury." Menne v. Celotex Corp., 861 F.2d 1453, 1461(10th Cir. 1988). Similarly, in the contract context, when claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F. Supp.2d 336, 344 (S.D.N.Y. 2002).

WEPCO relies upon certain statements in this Court's opinion in Yankee Atomic v. United States, 73 Fed. Cl. 249 (2006), as support for its contention that, under a "substantial factor" causation analysis, it somehow has a lesser burden of proof than under the "but for"

---

[11] The "substantial factor" test originated in tort law to analyze concurrent cause cases. Prosser & Keaton, The Law of Torts 266-68 (5th ed. 1984). A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if, had CBS not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73, at 261 (1935), for the proposition that, in a breach of contract case, a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 & 997 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.'" Krofft, 653 F. Supp. at 1534 (quoting Corbin, supra, § 992, at 6).

causation standard and that it need only show that its damages were "reasonably certain" to have been caused by DOE's delay. Pl. Br. 36. We acknowledge that, in Yankee Atomic, this Court held that the reasonable certainty standard should be applied to the plaintiff's burden of proof on causation in the same manner that it is applied to the plaintiff's burden proof on the quantum of its damages. Yankee Atomic, 73 Fed. Cl. at 268. However, and with all due respect, the authorities cited in support of this proposition do not go so far. Rather, they permit the Court to award damages in situations in which, after causation has been definitively established, there is reasonable certainty in the amount of damage. See LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1374 (Fed. Cir. 2003); Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960). Nothing in these authorities compels any change to the plaintiff's burden of proof on causation. When parties negotiate a contract, they negotiate for the allocation of risk, with each party agreeing to assume certain risks in return for the assumption of other risks by the other party. In a typical contract, it is reasonable to assume that the Government assumed the risk that it would perform or pay damages for injuries caused by the breach. However, to hold the Government responsible for damages that were only "reasonably certain" to have resulted from the breach expands the risk that the Government assumed beyond that originally contemplated, remaking the parties' contract. Such a result would be unfounded. Regardless of whether the Court applies the "but for" or "substantial factor" test for causation, the well-established contract law test for causation in contract cases before this Court is whether the claimed damages were "directly related" to the breach. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996); see Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 360 (2006) ("there must be a direct causal relationship between the breach and any claimed losses"); Columbia First

Bank, FSB v. United States, 60 Fed. Cl. 97, 105 (2004) (applying substantial factor causation analysis, finding that "[p]laintiff must prove . . . that the breaching provisions directly and primarily caused the lost profits damages it seeks").

C. WEPCO Cannot Shift Its Burden Of Proof Upon The Causation Issue By Characterizing Its Damages As "Mitigation Expenses"

The expectation interest damages that WEPCO is seeking are the lost value of DOE's performance allegedly caused by DOE's failure to begin accepting SNF in 1998. Pl. Br. 1; see Restatement (Second) of Contracts § 347(a) (1981). WEPCO argues that DOE's performance would have obviated its need to add additional SNF storage to the Point Beach site beyond the use of a temporary rack in its spent fuel pool. Pl. Br. 3. Therefore, it further argues that the measure of the majority of the value of DOE's performance is the costs that it incurred in arranging for a substitute transaction – in this case, by implementing dry SNF storage at Point Beach. Id.; see Restatement (Second) of Contracts § 347(a) cmt. a (1981). WEPCO asserts that the costs it is seeking to recover fall within the Federal Circuit's definition of recoverable "mitigation damages." Pl. Br. 36. WEPCO then argues, however, that the Government has the burden to prove that any of its mitigation efforts or any item of cost claimed as a result of those efforts was unreasonable. Id. at 35 (Issue of Fact No. 5) (asserting that the Government has the burden to prove that "any item of cost claimed by [WEPCO] is not reasonable mitigation") (emphasis added); Id. at 36 (asserting that the Government "bears the burden of proving that any of the mitigation efforts of [WEPCO] were unreasonable") (emphasis added)).

WEPCO's analysis places the cart before the horse. It attempts to eliminate WEPCO's obligation to establish that its damages were actually caused by DOE's delay and caused

WEPCO to engage in "mitigation" activities. However, the characterization of damages as "mitigation damages" does not eliminate the requirement that the plaintiff establish causation for each of its claimed damages.

The doctrine of mitigation prevents a party from recovering damages "for loss that he could have avoided by reasonable efforts." Indiana Michigan, 422 F.3d at 1375. "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." Id. The doctrine only requires a plaintiff "to make fair and reasonable efforts under the circumstances, and the government has the burden of proving that [the plaintiffs] efforts were anything other than fair and reasonable." Home Savings of America, FSB v. United States, 339 F.3d 1341, 1352-53 (Fed. Cir. 2005). However, the breaching party's obligation to "disprove" the reasonableness of mitigation activities exists only if the breaching party alleges that the non-breaching party's incurrence of costs already shown to have been caused by a breach were unreasonable. That is, this burden only arises under the legal doctrine of "avoidance of consequences" where a breaching defendant claims that a plaintiff's damages recovery should be reduced because the steps that the plaintiff took or failed to take to minimize its damages were not reasonable.[12] 3 Dobbs, Law of Remedies 128 (1993) (describing second of two rules for the reduction of damages under the "avoidance of consequences" rule). However,

[12] Therefore, each time WEPCO uses the term "any" in any of its assertions regarding this issue on the burden of proof only confuses the issue. Later in its brief, WEPCO argues that the Government "bears the burden of proving that any of the mitigation efforts of [WEPCO] were unreasonable." Pl. Br. 36 (emphasis added). To the extent that "any" as used in the statement refers to a specific effort that WEPCO made that the Government contends was unreasonable, or one that the Government might contend that WEPCO did not make, but reasonably should have, the proposition would be correct. However, there is no authority for the proposition that, as a general principal, the Government has a burden to prove that each of WEPCO's claimed mitigation costs are unreasonable.

before the Court reaches the question of whether mitigating activities were reasonable, the plaintiff must first prove that the costs being claimed were actually caused by the breach and would not have been incurred absent the breach.

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), as in this case, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for the rerack and expansion of its spent nuclear fuel pool. Id. at 1372. In addressing these costs, which (like WEPCO here) it characterized as "mitigation damages," the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. The Federal Circuit's application of this standard in Indiana Michigan and, critically, its holding that the utility in that case had not met its burden provide clear guidance as to the scope of a SNF plaintiff's tripartite burden. Specifically, the Federal Circuit affirmed the trial court's determination that the utility had failed to demonstrate that it would not have performed a rerack of its spent fuel pool were it not for the breach of the standard contract: "[A]ppellant's decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to purse irrespective of DOE's partial breach." Id. Stated differently, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance.

Similarly, as the United States Court of Appeals for the First Circuit recognized in rejecting an argument substantially similar to WEPCO's position argument in this case, the fact

that an entity characterizes its damages as "mitigation damages" does not somehow eliminate the causation requirement that the entity prove, "as an element of its case, the extent to which it was *damaged* by the . . . breach." Fleet Nat'l Bank v. Anchor Media Television, Inc., 45F.3d 546, 560-62 (1st Cir. 1995) (italics in original). The First Circuit specifically addressed the position that the trial court adopted here, finding that any consideration of mitigation presupposes causation:

> Anchor argues . . . that, in order to prove its damages, all it had to do was quantify Narragansett's ill-gotten revenue. In its view, once it had quantified such revenue, it became Narragansett's and Pfeiffer's burden to prove the extent to which the revenue was replaceable (as part of their burden of proving failure to mitigate damages).
>
> *  *  *
>
> While ingenious, it is incorrect to suggest that Narragansett and Pfeiffer bore the burden of proving the extent to which the ill-gotten income was replaceable as part of their duty to prove failure to mitigate damages. The doctrine of mitigation of damages imposes on a party injured by either a breach of contract or a tort the duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages. *Black's Law Dictionary* 1002 (6th ed. 1990). **The doctrine thus *presupposes*, as a threshold matter, the existence of a causal nexus between the damages sought and the breach or tort, looking at whether and to what extent an intervening cause (i.e., a plaintiff's own negligence) may have contributed to these damages**. Here, the question is not whether and to what extent Anchor's own conduct contributed to its damages; it is, rather, the threshold question of whether the damages Anchor sought were caused by the conduct of which Anchor complained. Accordingly, the doctrine of mitigation of damages is completely inapposite.

Id. (italics in original; underlining and bold added); see id. ("In the face of the uncontroverted evidence showing that KVOC still would have generated most of the revenues it obtained by

running local commercials when it should have been running the ABC newsbrief, it is apparent that Anchor, by proving only the amount of revenue traceable to the improper practice, failed to provide the jury with a basis upon which to premise a reasoned *damages* finding.").

The application of the "substantial factor" test for causation does not change this requirement or somehow place upon the Government the burden of disproving that "mitigation" costs were "caused" by the breach. In Citizens Federal, the Federal Circuit, approving of this Court's use of the "substantial factor" causation test in a Winstar context, recognized that "mitigation damages" relate to damages "incurred in attempting to rectify the injury the breach caused it." Citizens Federal, 2007 WL 162820, at *5 (emphasis added). They are not intended to compensate a plaintiff for costs that, even absent any breach, the plaintiff would have incurred anyway. The precedent of the Federal Circuit makes clear that, regardless of whether expectancy damages involve a mitigation element, the non-breaching party still bears the burden of establishing that it would not have incurred those costs absent any breach. Indiana Michigan, 422 F.3d at 1376.

The principal authority upon which WEPCO relies supports our position. In Old Stone Corp. v. United States, 450 F.3d 1360, 1367-70 (Fed. Cir. 2006), the Government raised three challenges to this Court's award of recovery of the Winstar plaintiff's "post-breach" contributions to replace supervisory goodwill that had been made in an effort to minimize its other damages. The first two challenges related to this Court's ruling on proof of causation, and the third was a challenge as to whether the mitigation cost award should be reduced as unreasonable. Id. This third challenge was not a challenge to whether the cost was "caused" by the breach, but, instead, related to whether the cost was reasonably incurred following a

causation finding. It was only on this third challenge that the Federal Circuit held that Government had the burden of proof. Id. at 1370.

D. WEPCO Bears The Burden Of Establishing A Reasonable "But For" World Against Which To Measure Whether Its Claimed "Mitigation Damages" Were Incremental Costs That Were "Caused" By DOE's Delay

To prove causation, WEPCO must establish the "but for" world so that the Court can identify whether WEPCO's claimed damages are, in fact, incremental to DOE's partial breach. See PG&E, 73 Fed. Cl. at 386 ("[p]laintiff bears the burden of 'establishing a what might have been' with reasonable certainty had the defendant performed the Standard Contract"); Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). A plaintiff cannot recover as damages from the Government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet Sav. Bank, 339 F.3d at 1345. Without establishing that "but for" world, WEPCO leaves the Court with no mechanism by which to determine whether WEPCO's claimed costs were incremental to the Government's partial breach, regardless of whether it applies a "but for" or "substantial factor" causation analysis.

In Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), this Court, adopting the rationale set forth in Indiana Michigan Power Co. v. Unitd States, 422 F.3d 1369 (Fed. Cir. 2005), recently recognized the general principle that, when seeking expectancy

damages of an identical type to those at issue here, a plaintiff must establish a plausible "but for" world against which to measure causation. In PG&E, the court recognized that "[t]he goal of awarding damages for breach of contract – that of placing the injured party in as good a position as it would have had the breaching party fully performed the contract – is well settled," id. at 378, but that "the non-breaching party is 'not entitled to be put in a *better* position by the recovery than if the [other party] had fully performed the contract.'" Id. at 385 (quoting Rumsfeld v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). In addressing the issue of DOE's contractual obligation regarding a rate of acceptance under the Standard Contract, the court recognized that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see also id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach"). The court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations.").

The principle upon which the Federal Circuit relied in Indiana Michigan and upon which the Court relied in PG&E is not unique to spent nuclear fuel cases or to cases involving the "mitigation damages" that WEPCO seeks. Indeed, any plaintiff who seeks to be placed back in

the position it would have occupied had the contract been performed bears the burden of establishing a "plausible but-for world," Bluebonnet Savings, 67 Fed. Cl. at 238, aff'd, 466 F.3d 1349 (Fed. Cir. 2006), and of demonstrating "what might have been," Glendale, 239 F.3d at 1380. Even using a "substantial factor" causation analysis, the plaintiff must still "establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Prods., 215 F. Supp.2d at 344. It cannot do so if it does not define the parties' obligations under the contract and establish those costs that it would have had to incur had no contract breach occurred. Otherwise, it cannot establish that costs which it seeks to recover were actually an incremental result of the breach. As a matter of well-established contract law, the failure of a plaintiff to prove that certain costs would not have been incurred absent the breach precludes a finding that the incurrence of costs was caused by the breach, regardless of the causation analysis applied.[13]

---

[13] WEPCO's apparent belief that the Government bears the burden of demonstrating the "but for" world relies on this Court's decision in Tennessee Valley Authority v. United States, ("TVA") 69 Fed. Cl. 515 (2006). However, in TVA, the Court recognized that the plaintiff had the burden of "showing that it built the dry storage facilities to respond to DOE's breach," and it found that TVA had established that DOE's delay caused TVA to construct dry storage facilities in the time frame that it did. Id. at 526 (citing Indiana Michigan, 422 F.3d at 1373). The Government challenged the timing of plaintiff's decision to pursue dry storage and argued that, absent DOE's delay, the plaintiff would have pursued dry storage, but at a later date than it did in the actual world. The Court viewed the Government's position as a challenge to plaintiff's mitigation efforts, rather than a challenge concerning causation. Id. at 530. Here, this case presents the opposite situation. WEPCO admits that, even if DOE had timely begun SNF acceptance, it still would have run out of storage space and would have to have taken some action to create additional space. Although WEPCO contends that it would have engaged in activities other than dry storage to increase its storage capacity, the evidence will show that, because of the scope of impending storage needs absent any delay by DOE in performing its obligations, WEPCO would have constructed dry storage even had DOE performed in the "but for" world, at the same time that WEPCO actually constructed dry storage. The amount of dry storage that WEPCO would have constructed absent any DOE delay will also be an issue. These issues can only be resolved through the determination of the Government's contractual

There is no question that, if DOE had performed, WEPCO would have incurred some costs in loading the transportation casks that DOE would have supplied. Indeed, the only issue that WEPCO raises as to these costs is whether they can be proven with any reasonable certainty. Yet, unless WEPCO can establish the costs that it would have incurred absent any delay by DOE, it cannot establish that it would not have incurred these particular costs absent that delay or that the costs were, therefore, "caused" by the delay. In the same manner, WEPCO bears the burden of proving the scope of DOE's obligations with regard to acceptance of its SNF were under the contract, the SNF storage activities in which it would have to have engaged had DOE timely performed those obligations, and that it would not have implemented dry storage absent DOE's delay. If it fails to do so, WEPCO cannot establish that DOE's delay "caused" it to construct dry storage facilities. WEPCO's efforts to place upon the Government the burden of disproving causation is unsupported.

### E. The Damages Available To WEPCO For Breach Of Contract Are Limited To Those That Are Foreseeable As The Probable Outcome Of The Breach

WEPCO also must establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682, 524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986). As part of the foreseeability determination, WEPCO must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal

---

obligations regarding the rate and schedule of SNF acceptance.

Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable); Wells Fargo, 88 F.3d at 1024-25 (rejecting remote and conjectural damages claim because type of damages were not foreseeable at time of contract formation). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351 cmt. a (cited in Landmark Land, 256 F.3d at 1378).

F. WEPCO Must Prove Its Damages With Reasonable Certainty

WEPCO also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, WEPCO must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992)(plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, WEPCO cannot meet its burden of establishing reasonable certainty.

## II. DETERMINATION OF THE PROPER RATE OF ACCEPTANCE TO BE APPLIED TO THE STANDARD CONTRACT IS CRUCIAL TO WEPCO'S CLAIM

### A. WEPCO Would Have Pursued Dry Storage Regardless Of The Manner In Which DOE Performed

WEPCO spends a considerable amount of time in its pretrial brief asserting that it would not have had to implement dry storage "if DOE had performed as required by the Standard Contract." Pl. Br. at 24. WEPCO further asserts that the rate at which DOE was obligated to performed is derived from program documents such as DOE's 1983 Draft Mission Plan and statements by DOE officials in 1983. Pl. Br. at 8-10. In short, WEPCO is arguing that DOE was obligated to perform at a particular rate, and that, because DOE did not do so, WEPCO was forced to implement dry storage. Pl. Br. at 22-25. We will establish at trial that these assertions are wrong as a matter of fact and law.

As a factual matter, we will establish at trial that WEPCO's decision regarding the implementation of dry storage was predicated upon its SNF storage needs prior to the time that DOE was obligated to begin SNF acceptance, rather than DOE's obligation to accept WEPCO's SNF at any particular rate. Indeed, WEPCO made its decision to implement dry storage even before DOE issued its 1991 ACR, the document mandated by the Standard Contract upon which DOE was to begin making contractual commitments regarding the rate of SNF acceptance. Accordingly, the Court could, and indeed should, determine that WEPCO's pursuit of dry storage was not caused by DOE's delay in acceptance regardless of what that performance would have looked like. Although the Court can find that there is no causation regardless of DOE's performance, the Court cannot find for plaintiff in this matter unless it (1) makes a determination

regarding the minimum rate of acceptance under the Standard Contract and (2) agrees that WEPCO's asserted rate of acceptance is the rate at which DOE was obligated to perform under the Standard Contract. As we establish below and will further explain at trial, the rate at which WEPCO asserts DOE must perform is invalid in that it is not a rate based upon the terms of the Standard Contract.

WEPCO's assertion that, if DOE had performed as it was obligated to under the Standard Contract, WEPCO would not have incurred the costs it now claims as damages begs the obvious question of exactly what DOE was obligated to do under the Standard Contract. This matter goes to the very core of WEPCO's burden of proof as to causation. Simply put, without establishing DOE's obligations under the Standard Contract, WEPCO would fail to provide the Court with a baseline against which to determine the effect that a breach of those obligations had upon WEPCO, as measured in damages.[14]

Indeed, WEPCO recognizes this obligation throughout it pretrial brief. For example, WEPCO has provided a chart in its pretrial brief presenting its contentions about its storage capacity for the years 1998 through 2005, using the rate of acceptance under which it contends that DOE was obligated to perform. Pl. Br. 25. The chart purports to establish that, under its "but for" scenario, WEPCO, after DOE began SNF acceptance, would not have needed any additional storage that it could not have satisfied with a temporary rack. Pl. Br. 22-25. For example, the chart assumes that DOE accepts 48 MTU of SNF from WEPCO's Point Beach facility in 1998, and thus, in a world where WEPCO asserts that DOE would have met its

[14] As previously discussed, the Court would reach the same result whether it applied a "but for" or a "substantial factor" causation analysis.

contractual obligations, WEPCO further asserts that it would have projected that it would been able to avoid dry storage by not exceeding its maximum installed 1500-space capacity of its permanent storage racks. Id. However, if the Court were to assume that DOE's acceptance obligation in 1998 was anything less than 20 assemblies, the same would not be true. The end total of assemblies that WEPCO would have needed to store would have been 1510. If that had happened, WEPCO would not have had enough storage in its permanent storage racks to store the extra ten assemblies. In that event, WEPCO also would not be able to load them into its temporary rack because, if it were to place the temporary rack in its cask laydown area to accomplish this goal, it would not be able to load any additional casks to DOE. Therefore, the lack of sufficient permanent storage to accommodate these 10 assemblies would likely result in the shutdown of the last reactor scheduled to be refueled that year.[15] This same type of problem might exist in any year if the Court were to assume that the DOE acceptance rate obligation was significantly different than that assumed by WEPCO. Therefore, WEPCO's use of this chart reflects its recognition that to win this case, WEPCO must establish that DOE was obligated to perform under the Standard Contract at a rate of acceptance that comports with its theory of causation. Because the rate at which WEPCO asserts that DOE must perform was not the rate

---

[15] The 1998 fuel discharge amount of 98 assemblies reflected in the chart reflects WEPCO's actual annual fuel discharges from both of its reactors. Normally, about the same number of assemblies are discharged from each reactor. Therefore, for 1998, WEPCO expected to discharge approximately 49 assemblies from each of its two reactors. As such, there would have been enough room to discharge the assemblies from the first reactor to refuel that year (1422 + 49 = 1471), but, even assuming that DOE accepted the 10 assemblies before the next refueling outage (1471 - 10 = 1461), the 39 remaining spaces (1500 - 1461 = 39) would have been too few to accommodate the second reactors discharge of 49 assemblies. Therefore, the second reactor would have had to shut down because it could not be discharged.

determined by the mechanism within the Standard Contract, the Court should find the 900 MTU rate described in the 1991 ACR to be the only rate at which DOE was obligated to perform.

B. To The Extent That WEPCO's Causation Theory Is Predicated Upon DOE's Rate Of Acceptance, WEPCO Cannot Meet Its Burden Of Proving That DOE Was Obligated To Accept SNF Pursuant To A Two-Part Test Or At An Annual Rate Of 3,000 MTUS

1. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard

In its pre-trial brief, WEPCO asserts that its witnesses will establish that WEPCO had "expectations" and an "understanding" that DOE had at least two distinct performance obligations under the Standard Contract. First, WEPCO asserts that "DOE's rate of acceptance would eliminate the need for WEPCO to construct additional storage at Point Beach after January 31, 1998." Pl. Br. 10. Second, WEPCO asserts that "DOE's rate of acceptance . . . would reduce at a reasonable rate the amount of SNF that had built up at Point Beach prior to January 31, 1998." Id. Additionally, WEPCO asserts that "[t]he intent of NWPA . . . was to ensure that utilities would not have to build additional at-reactor storage after 1998."

Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet any two-part obligation set forth by WEPCO in its pre-trial brief. Indeed, as the Court recently concluded in PG&E,

> Plaintiff fails to cite, and the court has not discovered, any provision in the NWPA, or any statement in the legislative history of the NWPA (if the court could consider it – which plaintiff does not address), that indicates that Congress intended to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage. Rather, the plain language of the NWPA clearly states the Act's "purposes," none of which is to eliminate the need for additional at-reactor storage at utilities after January 31, 1998.

PG&E, 73 Fed. Cl. at 389 (citing 42 U.S.C. § 10131(b)). The Court's conclusion in PG&E should apply with equal force in this case.[16]

2. The Standard Contract Did Not Require Acceptance of SNF At Any Particular Rate Or Pursuant To Any Particular Test

The Standard Contract does not require acceptance of SNF at any particular rate or pursuant to any particular test. The parties' understanding that DOE was not obligated to accept SNF at any particular rate continued through the development of the Standard Contract. See PG&E, 73 Fed. Cl. at 395. As previously stated, on February 4, 1983, DOE published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract (48 Fed.

[16] WEPCO refers to the Court's decision in TVA and the Court's reliance in that case upon the testimony of two DOE officials, Lake Barrett and Tom Pollog, as support for the proposition that DOE anticipated performing at a rate that would accomplish these two performance goals. Pl. Br. 9 (citing TVA, 69 Fed. Cl. at 519). Later, WEPCO also makes reference to certain deposition testimony of Lake Barrett, which it contends supports Mr. Barrett's position that "a phased-in 3,000 MTU acceptance rate" is a "reasonable rate." Pl. Br. 10. First, to the extent that the Court in TVA relied upon the testimony of Mr. Pollog and Mr. Barrett for DOE's understanding of the goals of the NWPA, such reliance is inappropriate. As the Court in PG&E explained, "statements made by DOE officials after passage of the NWPA cannot bear the weight plaintiff places on them to determine the government's intent." PG&E, 73 Fed. Cl. at 389. The Court in PG&E properly held that "[a]fter-the-fact statements by proponents of a broad interpretation are not a reliable indicator of what Congress intended when it passed the law, assuming extratextual sources are to any extent reliable for this purpose." Id. at 389 (citing Gustafson v. Alloyd Co., 513 U.S. 561, 579 (1995)). Second, even if such testimony could properly reflect the goals of the NWPA, WEPCO fails to distinguish between goals, on the one hand, and binding promises that can be enforced by the Court through the award of contract damages, on the other. See PG&E, 73 Fed. Cl. at 393; see also National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Absent the identification by WEPCO of a binding promise contained in the NWPA to accept SNF at a rate that precludes at-reactor storage after 1998 and removes the backlog of previously generated SNF, the Court has no basis to award damages based upon such alleged "goals." Finally, Mr. Barrett's statement about his belief as to a "reasonable rate" is completely irrelevant. The only issue in any of these SNF cases regarding the rate of acceptance is the rate at which DOE is obligated to perform under the Standard Contract.

Reg. 5458 (Feb. 4, 1983)), which identified a mechanism for determining the order and rate at which SNF would be accepted. The Government will show at trial that, in January 1983, EEI, an association of the nuclear power industry that submitted comments regarding the Standard Contract, received an advance draft contract and submitted to DOE its own draft contract for DOE to use in its Federal Register notice. EEI's draft contract included language obligating DOE to begin accepting SNF at a rate tied to the amount of SNF that was being generated plus work off the backlog, and there was no mention in this submission of avoiding on-site storage after 1998.

Despite the requests of EEI – and others – to include specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. See PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). Uncertainties surrounding the waste acceptance program that was to commence 15 years in the future prevented DOE from committing to any particular rate of acceptance. See PG&E, 73 Fed. Cl. at 349.[17] Instead of including a rate of acceptance or qualitative test in the contract, DOE included a provision that obligated DOE to begin issuing an APR and ACR as the

[17] After DOE issued the draft contract, EEI provided member utilities with comments upon the draft. A February 18, 1983 letter reflected EEI/UNWMG's consideration that the inclusion of a "repository receiving rate adequate to cover current generation plus working of the backlog on a reasonable schedule" was among the "significant issues" to be addressed in their comments to the draft contract. However, in a March 7, 1983 letter from Mr. Loring Mills of EEI transmitting the formal EEI/UNWMG comments to the draft Standard Contract, EEI requested that DOE permit Standard Contract holders to negotiate with DOE regarding the rate of acceptance after the promulgation of the Standard Contract.

date for commencement drew closer. The Standard Contract obligated DOE to begin publishing ACRs in 1987. The clauses tied to the issuance of the APRs and ACRs defined for contract holders the manner by which DOE would commit to acceptance. See PG&E, 73 Fed. Cl. at 399 ("the parties understood that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule[] would be determined, and the parties substantially carried out this process before DOE's breach.").

Even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance. However, DOE did not accept any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. As late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract.[18]

---

[18] Indeed, two of the documents upon which WEPCO relies in its pretrial brief – the 1983 Draft Mission Plan and the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Feb. 1984), see Pl. Br. 7 – were both issued after the Standard Contract was signed and, therefore, cannot be evidence of any "meeting of the minds" as to the Standard Contract. See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("despite plaintiff's statement that 'the parties understood from the time of contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation," not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983"). The Court in PG&E explained that the Draft Mission Plan contained many "program plans, goals and aspirations that were, at that early date, necessarily based on assumptions that OCRWM recognized may or may not be realistic or accurate as the waste disposal program further developed." PG&E, 73 Fed. Cl. at 356. Similarly, the Court in Sacramento Mun. Utility Dist. v. United States, No. 98-488, 2006 WL 3490940 (Fed. Cl. Dec. 1, 2006), recently characterized the Draft Mission Plans as "rank speculation." Further, although WEPCO cites to one portion of the 1983 Information Meeting,

The evidence will demonstrate that, not only did the Standard Contract not obligate DOE to accept SNF at any particular rate or consistent with any particular test, DOE rejected, both before and after contracting, repeated attempts by the industry to include such terms. These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract). WEPCO should not be allowed to obtain through litigation what it failed to obtain through the contract formation process. PG&E, 73 Fed. Cl. at 396-97 (rejecting imposition of 3,000 MTU rate as contractual obligation because, to do so, "the court would run afoul of the general principle of contract law that 'the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred.")

### C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract

#### 1. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although WEPCO asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an

in another portion of that meeting, Loring Mills, Vice President of Nuclear Affairs for EEI at the time of the meeting – and a witness for the Government in this case – expressed his concern that Mr. Morgan had not committed to any particular performance standards, including a particular rate of acceptance. PG&E, 73 Fed. Cl. at 357-58.

obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay. Indeed, as the Court explained in PG&E:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning

purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later.[19] Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we anticipate establishing at trial, the rates of SNF

---

[19] If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. 10 C.F.R. § 961.11, Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A.

acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[20]

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. After the instructions were issued, numerous utilities, including WEPCO, submitted DCSs for approval by DOE in compliance with this procedure, and without objection or complaint.

## III. WEPCO CANNOT MEET ITS BURDEN OF PROVING THAT ITS COSTS TO IMPLEMENT DRY STORAGE WERE CAUSED BY DOE'S DELAY

The majority of WEPCO's damages claim, other than its prejudgment interest claim, consists of the costs that WEPCO incurred to implement dry storage by the construction of an ISFSI at the Point Beach nuclear plant. Pl. Br. 3-4. It is undisputed that WEPCO's management formally initiated the project to construct the ISFSI at Point Beach plant as far back as May 1989.

---

[20] WEPCO's proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. See, e.g., PG&E, 73 Fed. Cl. at 390 n.49 ("The fact that Congress, in the 1987 Amendment Act, authorized use of an MRS facility to begin acceptance in 1998, and placed a capacity limitation of 10,000 MTU on the MRS facility until operation of a repository . . . supports the court's view that Congress did not intend to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage."). As stated above, in 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

DX 15 (WISC457-465) and DX 41 (WISC466-467); PX 803 (KRGWE2216-26). Likewise, it is undisputed that, at that time, the dry storage project was being implemented to provide additional SNF storage capacity at the Point Beach plant. WEPCO does not contend that, in the "but for" world, it could have avoided this need for additional SNF storage. Instead, as mentioned above, WEPCO contends that, if it had believed that DOE had any chance of performing at the time that it would have needed to make its decision to add storage, it would have decided merely to free some of the spaces in its spent fuel pool and use a temporary rack because it would have only needed to make it to the point when DOE began accepting SNF from Point Beach. Pl. Br. 22-25. Further, WEPCO contends that its belief, when it made its decision to implement dry storage, that the commencement of DOE's SNF acceptance would be "substantially delayed" beyond 1998 justified its decision to use the more long-term solution of dry storage. Pl. Br. 27.

The evidence at trial will establish that WEPCO's causation theory is meritless. It is belied by the fact that, when WEPCO first disclosed its damages claim in July 2005, the claim was predicated upon the notion that, had DOE performed by beginning acceptance of SNF from WEPCO's Point Beach plant in 1998, WEPCO would not have needed any additional storage at the site. DX 498 at 8 (WXE002 0014). As such, WEPCO argued that it was entitled to recover all of the costs that it incurred to add dry storage at Point Beach. Id. at 16 (WXE002 0022). Less than nine months ago, in May 2006, after we conducted considerable discovery on that claim, WEPCO reformulated its claim to arrive at its present contentions. WEPCO now concedes that it would have needed additional storage even if DOE had performed, but provides an offset to damages for certain costs which it contends that it would have incurred in employing the

methods by which it now contends that it would have handled its SNF storage issue. Pl. Br. 3 & 24-25.

WEPCO's causation theory is also belied by many of its own contemporaneous documents. For instance, a May 1989 WEPCO memo seeking management authorization for WEPCO's dry storage project stated that WEPCO believed that the project was needed at that time because "[a]dditional spent fuel storage capacity will be required at Point Beach Nuclear Plant in 1994 to allow for continued operation." DX 15 at 1 (WISC457) (emphasis added).

WEPCO references a discussion in the Environmental Screening Report ("ESR") that it submitted with its application to Public Service Commission of Wisconsin ("PSCW") in November 2001, relating to the fact that the "remaining capacity" of its spent fuel pool at the time was based upon certain assumptions. Pl. Br. 17. The only "assumption" that WEPCO references from the ESR is that implementation of dry storage at Point Beach would allow it to maintain a two full core offload reserve in its spent fuel pool. Id. WEPCO then states in its brief that this "assumption" was somehow linked to a belief that DOE's performance would be "substantially delayed." Id.

First, the statement in the ESR about maintenance of a two full core offload reserve is a statement about an operational practice change that WEPCO believed its implementation of dry storage would allow it to institute based upon "NRC surveillance requirements and to provide additional operational flexibility." PX 236 at WISC14753. More importantly, the statement is not an assumption relating to WEPCO's contemporaneous belief about the "remaining capacity" of its spent fuel pool. Those assumptions are made at the top of the same page of the ESR. Id. One of those assumptions is maintenance of a single full core offload reserve of 121 spaces. Id.

Tellingly, after listing each of the assumptions applicable to its belief about the "remaining capacity" of its spent fuel pool, the ESR states WEPCO's own conclusion that "[g]iven these assumptions, sufficient capacity exists in the spent fuel pool through 1995 for the discharge of spent fuel." Id. (emphasis added). With respect to what the ESR evidences as to WEPCO's contemporaneous belief about DOE's performance, it states that, although, at the time, WEPCO believed that "the earliest a permanent repository could be operational is 2010" and that its "contract with the DOE requires that fuel acceptance begin in 1998," WEPCO also believed that "DOE may still meet this requirement by utilizing a monitored retrievable storage facility (MRS)." Id. The other important thing to note about the ESR is that it was prepared some two years after WEPCO made its May 1989 decision to implement dry storage, establishing that nothing had transpired in the intervening two-year period to change the fact that WEPCO expected to need additional SNF storage to allow it continue to operate prior to the time DOE was obligated to begin acceptance of SNF from Point Beach. Dave Zabransky, the current DOE contracting officer responsible for the Standard Contract, was the WEPCO employee who prepared the ESR and will provide testimony at trial to shed further light on the content of this and many other of the contemporaneous documents.

In fact, several company documents, dated prior to WEPCO's execution of the Standard Contract in 1983, indicate that WEPCO had projected a similar loss of storage capacity resulting in a plant shutdown prior to the time that DOE was scheduled to begin accepting fuel from Point Beach even after accounting for the increase in storage capacity WEPCO expected to gain as a result of its final 1979 re-racking project. DX 181 (WISC52506-07) (June 6, 1977 memo projecting 1996 loss of storage capacity/shut down without return of SNF stored off-site; 1992

loss of storage capacity/shut down without return of SNF stored off-site); DX 182 (WISC52534) (August 5, 1977 memo projecting 1996 loss of storage capacity); DX 13 at 8 (WISC22866) (January 26, 1978 PSCW hearing statement projecting 1996 loss of storage capacity).

Through the use of other more contemporaneous company documents, we will establish at trial that, although WEPCO may have had concerns about whether DOE could meet its performance obligations, its needs for additional permanent SNF storage capacity prior to the date that DOE was obligated to begin accepting SNF from the Point Beach site was the primary reason that it decided to implement dry storage and incur the costs that it hopes to recover in this case.

WEPCO's causation theory also lacks credibility because it is based upon a hindsight analysis as to what it ultimately did to free space in its spent fuel pool as opposed to what it had achieved or anticipated that it could achieve in that regard at the time it made its decision to implement dry storage. In its brief, WEPCO states that the work which it performed to free space in its pool was accomplished as a part of work performed in response to a hydrogen ignition event that delayed loading of VSC-24 casks between 1996 and 1998. Pl. Br. 29. Notably, WEPCO provides no detail as to the number of spaces that were unusable before this work was performed or the number of spaces that it was able to render usable because of this work. Earlier in its brief, WEPCO references the annual RW-859 data that it provided to DOE for the year 1993, and a report by the Energy Information Administration based upon that data, as support for the proposition that its "Maximum Established Storage Capacity" was 1500 spaces in 1993. WEPCO stated that the term "Maximum Established Storage Capacity" describes the number of usable spaces in its pool. In the support documents that WEPCO references, the term

does not have that meaning. Instead, it describes the "the maximum number of intact assemblies that will be able to be stored at some point in the future (between the reporting date and the reactor's end of life) considering any established or current studies or engineering evaluations, at the time of submittal for licensing approval from the U.S. Nuclear Regulatory Commission ('NRC')." PX 278 at 33. In other words, it only describes how much of the maximum possible capacity of its spent fuel pool that WEPCO believed, when a report was made, that it could free at some point in time before the end of a given reactor's licensed life. However, the 1993 RW-859 data does contain information on the number of usable spaces that WEPCO had on February 10, 1994, when the 1993 data was submitted. That information is reported in the line item for "current capacity (accessible slots)," and states that the number of usable spaces at that time was 1468, not 1500. PX 327 at II.B.2-1 (HQR364 0688); PX 278 at 33. Moreover, even utilizing the correct meaning of Maximum Established Storage Capacity, the annual RW-859 data submitted to DOE by WEPCO for the years 1988 through 1990, the years relevant to its decision to implement dry storage and its application to the PSCW to do so, indicates that WEPCO only believed that it could free up at most 1387 spaces in its spent fuel pool during that time period. DX 53 at 3 (1988 RW-859); DX 52 at 3 (1989 RW-859); DX 51 at 4 (1990 RW-859). All three of these documents also indicate that WEPCO believed that it would run out of SNF storage capacity and need to shut down the Point Beach operations in April 1996. DX 53 at 2 (1988 RW-859); DX 52 at 2 (1989 RW-859); DX 51 at 3 (1990 RW-859). The RW-859 data indicates that, by 1991 (when WEPCO submitted its application to the PSCW to implement dry storage), WEPCO's Maximum Established Storage Capacity had increased, but that WEPCO still only

believed that it could free at most 1488 spaces and that it had only 1415 usable spaces. DX 50 at II.B.2-1.

Additionally, WEPCO's theory about its use of the temporary rack is also meritless. As an initial matter, WEPCO's contention regarding the use of this piece of equipment is that its use would be limited to providing for additional temporary storage of SNF during a temporary full core offload of fuel for service and maintenance reasons, as opposed to a permanent discharge of SNF during a refueling outage. At trial, Mr. Brewer, our technical expert, will explain the difference between the notion of the permanent SNF storage of the type provided by the permanent SNF storage racks that installed in WEPCO's spent fuel pool or the casks on its ISFSI, and the temporary SNF storage provided by WEPCO's proposed use of the temporary rack in the cask loading area of its spent fuel pool. As the labels imply, the difference hinges on the fact that a permanent SNF storage location provides for the storage of SNF that has been permanently discharged from the nuclear reactor and will not be reloaded into the reactor until it can be loaded into a transportation cask for removal from the Point Beach site. A temporary SNF storage location, on the other hand, provides for the storage of SNF that has been discharged from on a temporary basis, and that can be reloaded into the reactor.

WEPCO's contention regarding the use of the temporary rack is limited to its use as a temporary SNF storage location. Once the permanent SNF storage racks in the Point Beach spent fuel pool are filled, a temporary rack cannot be used to store permanently discharged fuel assemblies in the cask loading area because there will no longer be any way to lower a cask into the pool to load and remove the fuel in the temporary rack or the permanent racks. This problem is not present in the temporary storage of SNF during a temporary full core offload of fuel for

service and maintenance reasons. Therefore, while WEPCO's proposed use of this piece of equipment for these reasons will allow it to respond to any argument that it would not have sufficient capacity in its permanent SNF storage racks to provide for this type of temporary storage need, WEPCO cannot rely upon this device to resolve any SNF pool capacity issues that might result from the discharge of permanently discharged assemblies into its spent fuel pool. This means that its causation argument regarding the implementation of dry storage still hinges upon what WEPCO believed about its permanent SNF storage capacity when it made its decision to implement dry storage, and the evidence at trial will establish that, at that time, WEPCO believed that it had to implement dry storage to obtain the additional permanent SNF storage capacity that it needed to continue to operate until DOE was scheduled to commence SNF acceptance from the Point Beach plant. Therefore, that decision was not caused by DOE's delay, and WEPCO cannot recover its costs to implement dry storage as damages.

All of the contemporaneous documents relating to WEPCO's decision to implement dry storage indicate that, under even the most favorable SNF capacity projections, WEPCO would lose full core offload capability by 1996. The evidence will show that, at the time of its decision to implement dry storage, WEPCO had concluded that it would either need to replace its Unit 2 steam generator during the Fall 1996 Unit 2 refueling outage or shut down that reactor. The evidence will also show that it is necessary to offload the fuel from the core during the replacement of a steam generator like the one on the Point Beach Unit 2 reactor, precluding any argument that reliance on a temporary rack.capacity in its spent fuel pool could have accommodated the full core offload necessary for the Unit 2 steam generator replacement during the fall 1996 Unit 2 refueling outage.

WEPCO's fuel management model reflects that, through 1995, the year before WEPCO allegedly would have employed the temporary rack, it had a maximum of 1379 spaces available for SNF storage in its permanent storage racks. This was based upon its maximum installed capacity of 1500 spaces minus the 121 spaces that it needed to maintain a full core reserve. Even under the fuel discharge assumptions in WEPCO's model, it would have exceeded this maximum permanent storage capacity of 1379 spaces after its spring refueling outage in 1996[21] and would no longer have had the full core reserve that it needed to unload its entire core during its outages and, more importantly, to accomplish the replacement of its Unit 2 steam generators during the fall 1996 Unit 2 refueling outage. This is why the temporary storage rack is vital to WEPCO's argument. By providing it with an explanation as to how it could gain an additional 121 spaces for the temporary storage necessary to accomplish full core offloads, it allows WEPCO to explain how it could exceed its previous full core reserve limit of 1379 spaces and use the entire 1500 spaces in its permanent racks to be able to make it until the first year of DOE SNF acceptance in the "but for" world.

This analysis is flawed because it is based upon an assumption that WEPCO was able to obtain the full use of 1500 spaces in its permanent storage racks. During discovery, WEPCO never provided any clear evidence that it had accomplished that goal, or, if it had, by when it had done so. However, even if WEPCO had accomplished this goal, and even if that was completed during the 1996-1998 time frame after the hydrogen ignition event, that is not proof of the

[21] The model reflects that WEPCO had filled 1370 of its permanent storage spaces by the end of 1995. This means that, after the spring refueling outage in 1996, it would have filled an additional 26 permanent storage spaces to load a total of 1396 permanently-discharge fuel assemblies.

number of spaces that WEPCO expected to be able to free when it made its decision to implement dry storage. The evidence will show that the total available permanent storage spaces that WEPCO expected at that time was much less than the 1500 it now assumes in its model. WEPCO has attempted to cure this evidentiary shortcoming by basing its fuel management damages model upon a hindsight analysis and purported data about the availability of its permanent storage racks that it did not have at the time of its decision.

We expect that the evidence introduced at trial regarding WEPCO's own analyses of SNF storage alternatives will establish that WEPCO rejected any alternative that involves adding weight to its spent fuel pool. Additionally, we will offer the testimony of our technical expert, Mr. Brewer, that there were a number of technical issues that were not addressed in the expert report of Holtec's Dr. Krishna Singh, WEPCO's expert, regarding the technical feasibility of the use of the temporary rack. Based upon the time when WEPCO claims that it would have started the licensing application on the temporary rack and a review of Dr. Singh's previous licensing applications on similar racks, Mr. Brewer will testify that there is a risk that the licensing of the rack could not have been accomplished by the time necessary for the steam generator replacement and that this problem would only have been compounded by the technical issues that were not addressed in Dr. Singh's report. As mentioned above, the fact that implementation of dry storage provided WEPCO with an assured means of maintaining full core reserve for technical reasons was one of the justifications WEPCO touted in its application to the PSCW for the project's authorization. WEPCO's own records establish that it was these concerns and not a concern about when DOE would begin SNF acceptance that caused WEPCO to implement dry storage.

## IV. WEPCO CANNOT MEET ITS BURDEN OF PROVING THAT ITS COSTS FOR NRC ANNUAL FEES FROM 1999 THROUGH 2005 WERE CAUSED BY DOE'S DELAY OR THAT ANY DAMAGES RELATING TO THOSE FEES CAN BE SHOWN WITH ANY REASONABLE CERTAINTY

WEPCO seeks to recover three categories of fees that it paid to the United States Nuclear Regulatory Commission ("NRC"). First, it seeks to recover inspection and license application fees relating to specific NRC-regulated activities from 1996 to the present pursuant to 10 C.F.R. Part 170. Second, it seeks separate annual fees that WEPCO paid for its ISFSI in addition to the standard annual fees that all utilities with an operating nuclear power reactor paid prior to 1999 pursuant to 10 C.F.R. Part 171. Both of these categories of fees are included in WEPCO's claim as a result of having been recorded to certain project numbers that WEPCO contends relate to its implementation of dry storage and its ISFSI. Because the trial evidence will establish that WEPCO would have implemented dry storage and loaded five casks of SNF to an ISFSI through late 1998, the evidence will also show that, even if DOE had begun scheduled SNF acceptance, WEPCO would have incurred costs relating to inspection and license application fees pursuant to 10 C.F.R. Part 170 until the SNF loaded to its ISFSI was removed from the site or, in any event, through the year 2005. As such, these costs were not incremental to DOE's delay and should be removed from damages. Likewise, WEPCO's implementation of dry storage in the "but for" world would have caused it to have incurred the separate annual ISFSI fees pursuant to 10 C.F.R. Part 171 during the years prior to 1999. As such, these costs were not incremental to DOE's delay and should be excluded from damages.

The third category of NRC fees that WEPCO seeks to recover relates to a portion of WEPCO's annual fee paid in the years 1999 through 2005 based upon its ownership of a power

reactor licensed pursuant to 10 C.F.R. Part 50. As a result of a rulemaking, beginning in Fiscal Year 1999, the NRC reallocated certain of its budgeted costs such that the annual operating power reactor fees included costs budgeted to a fee class that the NRC has denominated as "spent fuel storage/reactor decommissioning." The spent fuel storage/reactor decommissioning ("SFS/RD") fee was assessed on an equal basis to all entities or utilities, such as WEPCO, with an operating nuclear power reactor licensed pursuant to 10 C.F.R. Part 50, to those non-operating Part 50 power reactor license holders (that are storing SNF while decommissioning or after decommissioning their reactors), and to all entities or utilities storing SNF only under a site-specific 10 C.F.R. Part 72 license with no Part 50 license (that are storing SNF without having a power reactor). NRC, Revision of Fee Schedules; 100% Recovery; FY 1999; Final Rule, 64 Fed. Reg. 31448, 31462-66 (June 10, 1999). The SFS/RD fee was not assessed against permanently shutdown reactors with no SNF on-site. Id. The Part 72 license holders without reactors pay the SFS/RD fee as a separate fee. Id. The SFS/RD fee was included into the annual fee paid by the Part 50 license holders. Id.

In its brief, WEPCO implies that the NRC included the SFS/RD fee in its annual fee because of DOE's failure to begin acceptance of SNF under the Standard Contract by placing cites relating to the partial breach next to cites relating to NRC's imposition of the fee as a method of cost recovery, and even a cite that mentions them both together. None of these materials stands for the proposition that WEPCO is promoting.

At trial, we will present the testimony of Peter J. Rabideau, the Deputy Chief Financial Officer of the NRC, to explain the reasons and purposes underlying the rulemaking that resulted in the change in the annual fees charged to WEPCO beginning in fiscal year 1999. We will also

present the testimony of Tammy Croote, a fee analyst in the Office of the Chief Financial Officer of the NRC, to explain how the annual fees are calculated. Their testimony and the documentary records relating to the rulemaking will establish that the change in the NRC's fee structure was not caused by DOE's delay. Instead, the fee change was instituted to accomplish other goals. First, it provided assurance of "equivalent fee treatment for both wet (spent fuel pool) and dry ([ISFSI]) storage of spent fuel." Id. at 31462. Prior to the change in 1999, permanently shutdown and decommissioning reactors that stored SNF wet in their spent fuel pools did not have to pay the separate ISFSI fee in place at the time. This was seen as a disincentive for these plants to choose dry storage. The change was also brought about so that "power reactor licensees who benefit from NRC's generic activities bear a fair portion of these costs relating to the decommissioning of reactors." Id.

The evidence will establish not only that the rationale for the fee change had nothing to do with DOE's delay in the acceptance of SNF, but that it would have occurred even if DOE had performed. As such, WEPCO incurred no incremental harm as a result of the payment of its annual fees in the years 1999 through 2005. This would be true even if the Court were to accept WEPCO's theory of causation because WEPCO's annual fee for operating in the "but for" world without an ISFSI would have been the same as the annual fee it actually incurred for operations with an ISFSI.

Moreover, the evidence will also establish that, after the policy change went into effect, the total annual fees paid by operating power reactors such as WEPCO actually decreased and that, if the policy change would not have occurred in the "but for" world as WEPCO contends, the fees that WEPCO would have paid in that scenario would have been higher than those they

actually paid. As such, once again, WEPCO incurred no incremental harm stemming from the payment of these fees.

Further, WEPCO assumes that the SFS/RD fee relates only to the dry storage of SNF. The evidence at trial will establish that the SFS/RD fee is based upon the NRC's budgeted costs for activities relating to wet storage, dry storage, and decommissioning. Therefore, even assuming for the purposes of argument that WEPCO would not have been assessed a fee relating to the dry storage of SNF in the "but for" world, because the SFS/RD fee payments that WEPCO wants to recover is based upon these other activities, WEPCO's calculation of its damages is in error or at least not calculated with any degree of certainty.

The evidence will further establish that, because of the manner in which the NRC annual fees are calculated, it is impossible to apportion the SFS/RD fee between the different activities upon which it is based with any reasonable degree of certainty. In calculating the SFS/RD fee, the NRC credits against the activity costs upon which it is based an aggregate estimate of the amount that it expects to recover in its Part 170 inspection and license application fees relating to those activities. However, the use of this aggregate estimate does not permit identification of the portion of the estimated credit is applied to each activity. Therefore, even if it were possible to differentiate between which activity related to wet storage, dry storage, or decommissioning, it would still be impossible to ascertain the actual amount of costs relating to any of those specific activities upon which any differentiated portion of the SFS/RD fee was based with any degree of

certainty. As such, WEPCO should not recover any of the approximately $3 million in claimed costs relating to these fees.[22]

V. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR THE PURCHASE OF THE THREE TN-32 CASKS BECAUSE THEY DO NOT CONSTITUTE REASONABLE MITIGATION

As explained in its brief, WEPCO decided to pursue use of the TN-32 cask when the loading of its VSC-24 casks was halted as a result of the hydrogen ignition event. However, Mr. Hamal will provide expert opinion testimony that WEPCO should have cancelled its TN-32 contract no later than the spring of 1999 and should have delayed fabrication of the TN-32 casks under that contract after it recommenced loading the VSC-24 casks in September 1998. By September 1998, long-lead material had been ordered for the TN-32 casks, but the materials had not been delivered and fabrication had not begun. DX 309 (WISC73465). Therefore, had WEPCO not proceeded with fabrication, it would have been in a position to sell the long-lead material it had purchased. Mr. Brewer will provide expert opinion testimony that WEPCO could have sold the long-lead material and recouped the price that it paid for those materials in any sale.

Rather than take any of these actions in further mitigation of its damages, WEPCO waited until March 16, 2000 before requesting that its contractor suspend work on the TN-32 casks after fabrication, and waited until May 2001 to formally request that its contractor attempt to sell the casks. DX 34 (WISC55414); DX 105 at WISC55620. The evidence at trial will establish that

[22] On January 17, 2007, WEPCO provided us with a supplement to its expert report on this issue, which purports to apportion the SFS/RD fee in this manner. Although this supplement purports to result in a reduction of the claimed costs in this category by almost $1 million, we believe that their analysis is flawed for the reasons set forth above. However, we are still in the process of reviewing this material.

WEPCO continued to incur costs relating to fabrication of the TN-32 casks through the mid-2004. The evidence at trial will also establish that, to date, the TN-32 casks have not been sold or used. Instead, they have been sitting in storage. The evidence will further establish that the TN-32 casks could have been sold to Northern States Power Company, another utility that uses TN-40 casks made by the same manufacturer for the storage of SNF at its Prairie Island plant. However, the SNF stored at the Prairie Island plant is the same type as that stored at Point Beach.

For these reasons, the Court should deny WEPCO recovery of, at the very least, all costs incurred for work on the TN-32 casks after the point in September 1998 when loading of the VSC-24 recommenced. Mr. Kiraly has quantified that reduction in WEPCO's damages claim and a reduction for the cost of the long-lead materials that WEPCO should have recouped. Those offsets would result in a reduction of WEPCO's $5 million claim relating to the TN-32 casks by $4.6 million[23] to approximately $385,000. However, the PSCW order authorizing WEPCO to purchase the TN-32 casks only authorized their use if its VSC-24 casks were "not available in time for [WEPCO's] scheduled refueling in Spring 2000." DX 35 at 5; PX 524 at 5 (KRGWE2388). By its own admission, WEPCO had loaded six more VSC-24 casks after loading recommenced and before the end of 1999. Pl. Br. at 34. For this reason, the Court should deny WEPCO recovery of its remaining TN-32 costs as unreasonable mitigation. Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002); Koby v. United States, 54 Fed. Cl. 493, 497 (2002).

---

[23] Again, this $4.6 million amount also includes certain adjustments to WEPCO's claim for incurred costs relating to salaried labor, employee expenses, and G&A that will be addressed separately and more fully below.

## VI. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR THE PURCHASE OF THE DUAL-PURPOSE NUHOMS TN-32PT CASKS AND FOR THE LICENSING OF ITS VSC-24 CASKS FOR TRANSPORTATION BECAUSE THEY WERE UNFORESEEABLE, DO NOT CONSTITUTE REASONABLE MITIGATION AND WERE NOT CAUSED BY DOE'S DELAY

WEPCO is seeking recovery of the costs that it incurred to switch from its use of the VSC-24 cask system to the more expensive NUHOMS TN-32PT dual-purpose cask system. Pl. Br. 31-33 & 39.[24] Likewise, WEPCO is also seeking the costs of licensing the fuel-bearing canister in its VSC-24 cask system for transportation to convert that cask system into a dual-purpose storage system. Id. at 32 n.20.

WEPCO relies upon, and we are aware of, this Court's conclusions relating to the foreseeability of dual-purpose dry storage in Yankee Atomic, and, more specifically, the Court's consideration in Yankee Atomic of the earlier holding on this issue based on the record in Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 373-74 (2005). See Yankee Atomic, 73 Fed. Cl. at 285-89. However, and with all due respect, the Court's conclusions in Yankee Atomic were based upon statements in documents relating to the possible future use of dual-purpose or multi-purpose technology as part of the entire Federal SNF storage system and whether that system utilized a repository or some form of interim storage. Id. The documents did not relate to the type of at-reactor SNF storage technology that would be

[24] We will rely at trial upon the testimony of Mr. Brewer to explain that WEPCO's VSC-24 cask system was initially licensed as a storage-only cask system. This means that the metal canister in which the SNF assemblies are placed could be stored in the cylindrical, concrete overpacks that sit on WEPCO's concrete ISFSI pad, but could not be loaded into a transportation cask for transport to a DOE repository or elsewhere. The metal canister in which assemblies are stored in the NUHOMS TN-32PT cask system, on the other hand, is designed and licensed for the dual-purpose of storage and transportation.

appropriate for a given utility to use in the event of a delay in SNF acceptance by DOE under the Standard Contract, or based upon the types of waste forms that would be acceptable under the Standard Contract. Id. Under the Standard Contract, DOE is the party required to provide transportation casks suitable for use within the DOE acceptance program. DX 169. The Government's witnesses will establish that neither the NUHOMS TN-32PT canister technology purchased by WEPCO nor the VSC-24 canister currently is an acceptable waste form under the Standard Contract. Therefore, when the parties executed the Standard Contract, DOE would have had no reason to foresee that WEPCO would have abandoned a storage-only technology for a higher-cost dual-purpose technology, because the transportation aspect of such a technology was DOE's responsibility under the Standard Contract. Because DOE could not have foreseen that type of result stemming from a delay under the Standard Contract, it should not be liable for such costs. Wells Fargo, 88 F.3d at 1024-25; Restatement (Second) of Contracts § 351 cmt. a. Moreover, because DOE is the party required under the Standard Contract to provide transportation casks suitable for use within the DOE acceptance program, the costs that WEPCO voluntarily incurred to implement dual-purpose SNF storage systems at Point Beach that may not be suitable for DOE's program are not costs that were caused by DOE's delay. Therefore, WEPCO's claim for recovery of these unforeseeable costs should be rejected.

In Yankee Atomic, the Court found that the plaintiffs' use of dual-purpose SNF storage technology was "commercially reasonable." Yankee Atomic, 73 Fed. Cl. at 288. Here, we will establish that WEPCO's switch to dual-purpose technology when it already had a viable storage-only technology was anything but reasonable, even considering the circumstances surrounding the hydrogen ignition event. At trial, we will rely upon Mr. Brewer's expert opinion testimony to

establish that, based upon the NRC's granting of approvals of amendments to the VSC-24 license when WEPCO was applying to the PSCW for authority to switch to the NUHOMS TN-32PT cask system, the lower-cost VSC-24 cask system could have been used to store Point Beach's SNF for another 24 years based upon its current SNF discharge frequency. As such, WEPCO's claim for recovery of the increased costs relating to its switch to the NUHOMS TN-32PT cask system should be rejected as unreasonable mitigation that violates the least-cost principle. Robinson, 305 F.3d at 1333; Koby, 54 Fed. Cl. at 497; LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999).

## VII. WEPCO SHOULD NOT RECOVER THE COSTS INCURRED FOR PRIVATE FUEL STORAGE BECAUSE THEY WERE UNFORESEEABLE AS A MATTER OF LAW AND DO NOT CONSTITUTE REASONABLE MITIGATION

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of WEPCO's costs incurred as an investment in the off-site Private Fuel Storage ("PFS") facility. The issue of recoverability of amounts paid to PFS squarely was addressed by the Federal Circuit. In finding that PFS-related costs were not recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. * * * While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. Because foreseeability is measured from the perspective of the defendant, and given that Indiana Michigan's contract with DOE is materially identical to the contracts at issue here, Indiana Michigan is dispositive of the plaintiff's claim for costs

associated with PFS. Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here. See PG&E, 73 Fed. Cl. at 430 (in rejecting plaintiff's PFS claim, "[t]he court finds that the costs associated with such speculative ventures were not foreseeable by the government at the time of the parties' contracting, and were not the foreseeable result of the government's failure to begin collecting the utilities' spent fuel by January 31, 1998").

Outside of the dispositive precedent precluding recovery for PFS, WEPCO cannot establish that PFS constituted reasonable mitigation. The evidence at trial will establish that the costs that WEPCO seeks to recover relating to its investment in PFS were incurred over the years 1994 through 1997, and that, during that time, WEPCO expected that PFS would not be available until 2003. We will rely at trial upon the expert opinion testimony of Mr. Brewer to establish that, because storage of SNF at PFS would involve transportation of the SNF from Point Beach to the PFS site, aside from the seemingly obvious reasons, there are various technical reasons why the costs of that storage will always be higher than storing fuel at the Point Beach ISFSI. Because of that, and because the PFS facility would not have been available in time to avoid the construction of WEPCO's ISFSI and the procurement of the casks that WEPCO purchased prior to 2003. As such, regardless of its speculative nature, PFS could never have been a least-cost form of mitigation when compared to the dry storage project. Therefore, WEPCO's claim for recovery of the $.9 million costs relating to its investment in PFS should be rejected as unreasonable mitigation. Robinson, 305 F.3d at 1333; Koby, 54 Fed. Cl. at 497; LaSalle Talman, 45 Fed. Cl. at 111.

## VIII. WEPCO SHOULD NOT RECOVER CERTAIN OF THE COSTS INCURRED FOR OTHER SNF MANAGEMENT AND OVERSIGHT ACTIVITIES BECAUSE THEY WERE UNFORESEEABLE AND DO NOT CONSTITUTE REASONABLE MITIGATION

WEPCO seeks recovery of approximately $1.3 million in costs it lumps into a claim category that it denominates as "Other SNF Management and Oversight Activities." Pl. Br. 4. In its brief, WEPCO states that these costs relate to certain interactions with industry groups regarding SNF issues, dry storage engineering support activities, and the identification, investigation, and development of potential off-site storage facilities other than PFS. Id. at 21-22.

For many of the same reasons that WEPCO's claim for recovery of the costs relating to its investment in PFS should be rejected as unreasonable mitigation, so should the portion of these costs that it seeks to recover that relates to investigation of other off-site SNF storage facilities. The evidence at trial will establish that, because none of these projects came to fruition, they were all as speculative as PFS. Moreover, the evidence will establish that, as off-site facilities, they could never have been an attempt to engage in a least-cost form of mitigation when compared to the dry storage project. Robinson, 305 F.3d at 1333; Koby, 54 Fed. Cl. at 497; LaSalle Talman, 45 Fed. Cl. at 111.

Additionally, we will rely upon the expert opinion testimony of Mr. Kiraly to establish that many of the costs in this claim category were billed to project codes relating to WEPCO's implementation of dry storage in the years 1995 through 1998. Therefore, the majority of the costs that we contend should be adjusted out of WEPCO's damages claim are part of the $20.9 million adjustment to WEPCO's damages claim relating to that issue that was addressed above.

A small remainder of the costs in this category were billed to project codes relating to salaried labor, employee expenses, and general and administrative overhead ("G&A"), and the basis for our contention that those costs should be offset against damages are described more fully below.

## IX. WEPCO'S FAILURE PROPERLY TO ACCOUNT FOR "BUT FOR" LOADING COSTS CONSTITUTES A FAILURE TO MEET ITS BURDEN OF PROOF AND WOULD PROVIDE WEPCO WITH A $3.1 MILLION WINDFALL

As discussed above, WEPCO has the burden of demonstrating the scope of activities in the "but for" world and that the costs that it actually incurred are incremental to DOE's delay in acceptance. See Bluebonnet, 67 Fed. Cl. at 238-39 (plaintiffs must establish plausible "but-for world" as part of causation analysis). WEPCO is also seeking to recover the costs of loading as part of the dry storage costs that it is claiming. Pl. Br. 22, 31, 33-34, 37-38. Yet, WEPCO argues that any limitation upon its ability to recover costs that it would have incurred if DOE had performed should be rejected because these costs are not avoided, but are merely being "deferred" to the future date of DOE's performance and that, as such, are "necessarily speculative." Pl. Br. 43-44.

There are several problems with this contention. First, in characterizing these costs as "deferred," WEPCO erroneously assumes that the costs of the future cask loading will be the same as the costs of the loading which would have occurred in the 1998-2005 period. It is that assumption that is based upon speculation because it is impossible to know what types of

transportation casks DOE will use in the future[25] or whether other factors, such as the regulatory environment, will be the same.

Additionally, in estimating what would have happened had DOE begun accepting SNF in 1998, it is only reasonable to assume that a utility with an ISFSI, such as WEPCO, would have loaded SNF to DOE from its spent fuel pool. This way, the utility would have incurred loading costs to obtain additional SNF storage to meet the needs caused by continued spent fuel generation, while avoiding the capital cost of constructing or purchasing additional casks. When DOE begins to accept fuel in the future, this may not be the case. By that time, the utility may already have loaded enough fuel to an ISFSI to meet its storage needs for its licensed operating life, or may be close to doing so. When that would occur, the utility may begin loading fuel to DOE from its ISFSI, rather than its spent fuel pool. In that event, the DOE loading costs from its ISFSI would not equate to the DOE loading costs from its spent fuel pool. These problems with the use of an assumption based upon future DOE performance indicates that there is no assurance that the benefit that WEPCO has received during the 1998-2005 period by not having to load casks to DOE will be properly offset by any detriment that WEPCO may incur as a result of having to undertake such loadings in the future, even if proper consideration is given for the time-value of money.

Second, WEPCO's characterization of these costs being "deferred" is actually a mischaracterization of the "but for" world. Proper characterization of the "but for" world, including any of the costs that would have been incurred in that world, goes to the heart of

---

[25] The fact that it is impossible to know what types of transportation casks DOE will use in the future does not mean that it is impossible to make reasonable conclusions regarding the type of transportation casks that would have been available for DOE's use in the past.

establishing that costs were caused by DOE's delay. PG&E, 73 Fed. Cl. at 397. It appears that WEPCO is arguing that, because this case involves a partial breach, in which performance in the actual world is expected in the future, the "but for" world is more speculative than in a total breach case, in which performance is never expected. Such an argument defies logic. Indeed, rather than the "but for" world being some bizarre construct incapable of proof or being unduly speculative, as WEPCO suggests, courts routinely must resolve what would have happened had a breaching party performed: "[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 A. Corbin, Corbin on Contracts § 53.3 (rev. ed. 2005) (emphasis added), cited in PG&E, 73 Fed. Cl. at 397. Absent consideration of the "but for" world, WEPCO will be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397.

Third, to the extent that the Government cannot adjust WEPCO's claim now for loading costs that WEPCO would have incurred through December 2005 – the date through which damages are being tried in this case – the Government may never be able to account for those costs. WEPCO's present claim includes the cost of purchasing dry storage casks. The Government's ability to require WEPCO to account for the "but for" world should not be tied to WEPCO's unilateral decision to bring future lawsuits and the possibility that the Government might be allowed to raise such arguments there.

We will demonstrate at trial that the correct damages methodology requires the adjustment of those loading costs from the damages claim. Contrary to WEPCO's argument, the methodology that Mr. Brewer uses demonstrates that establishing adjustments for the loading

costs is not speculative at all. We will demonstrate through Mr. Brewer's expert opinion testimony that the "but for" loading costs for the 1998-2005 period are subject to proper determination, and, therefore, the Court should not award such costs in evaluating WEPCO's damages for that period.

## X. WEPCO SHOULD NOT RECOVER ITS FIXED, NON-INCREMENTAL COSTS FOR SALARIED EMPLOYEES

Among the various categories of its claim, WEPCO seeks to recover nearly $8 million in internal labor costs. WEPCO has included in its claim all internal labor costs that were billed to any allegedly damages-related project. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to a project was charged to the damages claim as well.

"It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, WEPCO only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to WEPCO. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee increased wages because of the breach. In this regard, the United

States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp., 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d Damages § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate where WEPCO cannot demonstrate any alternative, profitable responsibilities to which it could have allocated its employees but for the Government's breach. Cf. id. (noting that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").

At trial, the Government will show that WEPCO's damages claim misstates the incremental nature of certain personnel charges and of WEPCO's overhead and unallocated charges. Additionally, WEPCO has provided no evidence concerning the work that would have been performed by these employees had they not been engaged in the damages-related projects. These costs are not incremental simply because WEPCO so asserts. Instead, WEPCO bears the burden of establishing that each of the costs asserted in damages is incremental to DOE's partial breach and must do so with admissible evidence. As a matter of fact, WEPCO will not be able to meet that burden.

In its brief, WEPCO attacks the methodology that Mr. Kiraly used in adjusting certain of these costs in WEPCO's claim because they represent the costs of salaried employees who did not charge a majority of their time to a damages-related project and, therefore, represent fixed costs that are not "incremental" to DOE's delay. Pl. Br. 42-43. WEPCO then relies upon the Court's holding in Tennessee Valley Authority, 69 Fed. Cl. 515 (2006), as support for the contention that Mr. Kiraly's methodology should be rejected in favor of one that focuses upon whether WEPCO was deprived of the use of the subject employees on other projects. Id. at 43 (citing TVA, 69 Fed. Cl. at 539). Contrary to WEPCO's argument, Mr. Kiraly's methodology focuses upon whether WEPCO was deprived of the use of salaried employees. The premise underlying Mr. Kiraly's methodology is that WEPCO is not deprived of the use of employees who do not spend a majority of their time on a damages-related project. The Court accepted this rationale in TVA and declined to award TVA the monies that Mr. Kiraly questioned based upon this methodology. TVA, 69 Fed. Cl. at 539-40 (declining to award $663,429 for salaried labor). Similarly, the Court should decline to award WEPCO these alleged damages.

## XI. WEPCO SHOULD NOT RECOVER CERTAIN OF ITS CLAIMED COSTS FOR EMPLOYEE EXPENSES AND OVERHEAD

At trial, we will rely upon the expert opinion testimony of Mr. Kiraly to establish that certain other costs are not recoverable. Certain employee expenses were recorded to damages related project codes, yet they do not relate to employees who billed time to the relevant project. Therefore, WEPCO should not recover these costs as damages.

WEPCO's damages experts made certain adjustments to the labor costs during the early years covered by WEPCO's claim remove overhead costs relating to employee pensions and benefits and to add a percentage mark-up representing those costs. The mark-up employed by WEPCO's experts resulted in a the use of a higher amount of costs in the claim. Initially, insufficient support was provided to support even the rate utilized by WEPCO's experts in their mark-up. Our auditors have informed us that WEPCO has provided proper support to eliminate that problem. However, no support has been provided for the use of a "higher" mark-up. Regardless of that problem, Mr. Kiraly also will explain that, because these pensions and benefits overhead costs relate to labor costs billed to the dry storage project in its early years, these costs, similar to the labor costs to which they relate, constitute a portion of the costs in the offsets based upon our arguments relating to WEPCO's implementation of dry cask storage in the "but for" world.

In the early years of the dry storage project, WEPCO booked costs representing corporate G&A to the project based upon the salaried labor costs booked to the project. WEPCO's damages experts removed these booked costs and replaced them with a G&A mark-up of their own devise relating to the salaried labor costs booked to the project for the entire claim period.

The evidence at trial will establish that, more recently, it has not been WEPCO's practice to book G&A to its projects in this fashion. We will rely upon Mr. Kiraly's expert opinion testimony to establish that these costs are not incremental to DOE's delay.

XII. WEPCO'S CLAIM FOR THE COST OF CAPITAL IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST

WEPCO inflates its damages claim by $42.6 million, which it categorizes as "cost of capital." Pursuant to 28 U.S.C. § 2516(a) (1976), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted under a contract or Act of Congress. The "no-interest rule is an aspect of the basic rule of sovereign immunity." England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004). Therefore, "[i]nterest is not recoverable in a suit against the government unless it has expressly provided for its recovery." Jetco, Inc. v. United States, 11 Cl. Ct. 837, 850 (1987); see Craft v. United States, 233 F.3d 358, 374 (6th Cir. 2000) ("A plaintiff may not recover interest from the federal government in the absence of an express waiver of sovereign immunity from suit."); District of Columbia v. United States, 67 Fed. Cl. 292, 340 (2005) ("[s]tatutory entitlement to prejudgment interest or a cost escalation factor must be established for the United States to be held liable for these types of claimed costs.").

"There is no doubt as to the historical existence of an entrenchment immunity of the Government from prejudgment interest . . . ." Blake v. Califano, 626 F.2d 891, 893 (D.C. Cir. 1980). In fact, the prohibition on awarding interest against the Government is so well established in this Court that it has been referred to as "the ancient doctrine disallowing interest against the Government." Singer Co. Librascope Div. v. United States, 215 Ct. Cl. 281, 568 F.2d

695, 698 (1977). "In creating the Court of Claims, Congress retained the Government's immunity from award of interest, permitting it only where expressly agreed to under contract or statute." Library of Congress v. Shaw, 478 U.S. 310, 317 (1986). Thus, a provision requiring the Government to pay interest "must be affirmative, clear-cut, [and] unambiguous." United States v. Thayer-West Print Hotel Co., 329 U.S. 585, 590 (1947).

Neither the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270, nor any other act of Congress has mandated that the United States pay interest on damages claims.[26] Further, no provision of the Standard Contract provides for the payment of interest on damages claims. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000). Since there has been no contractual or congressional waiver of sovereign immunity, as a matter of law, plaintiffs are subject to the no-interest rule.

The no-interest rule applies "broadly to claims for interest," Contel Advanced Sys., Inc., 384 F.3d at 1379, and "extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on." Castle v. United States, 48 Fed. Cl. 187, 217 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002) (emphasis added). In apparent violation of the no-interest rule, plaintiffs claim $42.6 million of damages which are attributable solely to an economic adjustment utilizing a "weighted average cost of capital" ("WACC") that WEPCO's experts developed. This adjustment is an interest calculation

[26] Although the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, waives the Government's sovereign immunity with regard to interest on certain claims, see Brookfield Constr. Co. v. United States, 228 Ct.Cl. 551, 559, 661 F.2d 159, 165 (1981) ("Because there can be no award of interest against the United States in the absence of a 'contract . . . or Act of Congress expressly providing for payment thereof,' 28 U.S.C. § 2516(a) (1976), the only way plaintiff can recover interest is if the Contract Disputes Act provides for it."), the Standard Contract is not subject to the CDA. Maine Yankee, 225 F.3d 1336, 1340 (Fed. Cir. 2000).

which accounts for the period of time that elapsed between the incurrence of plaintiffs' claimed damages and the date through which damages are being tried in this case. WEPCO contends that the Government must pay this WACC in order to make plaintiffs whole, implying that the money attributable to the WACC should be considered as part of damages and not interest. However, "the 'No-Interest Rule' precludes circumvention through re-characterizing a claim for interest as a claim for damages." Chevron U.S.A., Inc. v. United States, 71 Fed. Cl. 236, 269 n.19 (2006). Indeed, "the character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it." United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1979).

The United States Court of Appeals for the Federal Circuit has ruled that "the United States government . . . pays all judgments and amounts due in what economists call 'nominal dollars' rather than in economic 'real dollars' . . . ." Sandstrom v. Principi, 358 F.3d 1376, 1377 (Fed. Cir. 2004).[27] In Sandstrom, the Federal Circuit considered circumstances similar to those at issue here and determined that any adjustment made to damages to account for the time value of money constitutes interest. Mr. Sandstrom was a veteran of the United States military who sought a cost of living adjustment on past due benefits. In June 1996, the Department of Veterans Affairs determined that Mr. Sandstrom was entitled to receive "dollar for dollar, the monthly benefits owed to him for the time period from February 1969 through June 1996, *in*

[27] "Nominal dollars retain their number over time, while real dollars retain their value." Sandstrom v. Principi, 358 F.3d 1376, 1377 n.1 (Fed. Cir. 2004). For example, ". . . one nominal dollar in 1969 . . . remained one nominal dollar in 1996 . . . One real dollar in 1969, however, would retain its purchasing power, and would have been worth between four and five nominal dollars by 1996." Id.

*nominal terms*." Id. at 1378. Mr. Sandstrom contended that, to be truly compensated, the Government should pay him retroactive benefits in inflated "real dollars." Id. at 1378-79. In support of his contention that the request did not violate the no-interest rule, Mr. Sandstrom asserted that his request was actually a cost of living adjustment, not interest. Id. at 1379. The Federal Circuit disagreed, holding instead that paying Mr. Sandstrom in real dollars would be equivalent to making interest payments, which the no-interest rule precludes. Id. at 1379-80.

This Court also has determined that a claim for damages in "real" dollars violates the no-interest rule absent a statutory waiver of sovereign immunity. In District of Columbia v. United States, 67 Fed. Cl. 292 (2005), plaintiff, the District of Columbia ("District"), sued the United States, alleging in part that the United States failed to provide it with the necessary funds to repair and renovate Saint Elizabeth's Hospital. The District originally sought approximately $12 million in damages in 1986 dollars, but increased that figure to approximately $19 million to account for inflation. Id. at 344. The District asserted that, because of inflation, it required more money in 2003 to repair the hospital than it required in 1986. Id. at 342. Thus, the District asserted that the escalation costs were "not meant to compensate the District for either a 'loss in the use of money or the value of money,' but rather functions to update the 1986 AEPA cost estimate to a 2003 cost estimate." Id. at 342. This Court disagreed and held that "[t]he inflationary factor sought by plaintiff is precisely the type of award barred by the no-interest rule unless there has been an express waiver of sovereign immunity." Id. at 344.

In another spent fuel case – litigated by the same plaintiffs' counsel – this Court considered, and rejected, a claim for interest identical to plaintiffs' claim here. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd,, 422 F.3d 1369 (Fed. Cir. 2005). In

Indiana Michigan, the plaintiff stated all costs "both in nominal terms, as of the day the costs were or will be incurred, and in present value," with present value "add[ing] an escalation factor for past costs." Id. at 653. This Court found that the application of "plaintiff's average after-tax cost of capital to damages incurred each year . . . is prejudgment interest, which is not allowable against the United States absent a specific waiver of sovereign immunity." Id. at 660.

WEPCO's cost calculation is precisely the kind of economic calculation that the no-interest rule precluded in Library of Congress, Sandstrom, District of Columbia and Indiana Michigan. As a matter of law, such "time value of money" claims are equivalent to claims for interest and are not allowable against the Government. Castle, 48 Fed. Cl. at 217; see Sandstrom, 358 F.3d at 1379-80 (2004); Town of Grantwood v. United States, 55 Fed. Cl. 481, 488 (2003); Pacific Gas & Electric v. United States, 58 Fed. Cl. 1, 2 (2003). Although [e]Economists use interest, COLAs [Cost of Living Adjustments], indices and various other mechanisms to translate time series of nominal dollars into meaningful constant dollars, . . . the purpose of all such adjustment mechanisms is identical. The government relies on its sovereign immunity shield to deny all prejudgment-type interest payments." Sandstrom, 358 F.3d at 1380. Plaintiffs cannot avoid the no-interest rule "by identifying interest as part of the judgment as opposed to interest on the judgment." Castle, 48 Fed. Cl. at 217. "It is clear from the jurisprudence of this court and higher courts that no matter what term plaintiff[s] use [ ], compensation for the belated receipt of money violates the no-interest rule absent an express statutory waiver of sovereign immunity from liability for interest." District of Columbia, 67 Fed. Cl. at 341.

WEPCO asserts that its cost of capital adjustment is "akin to" the type of interest award permitted by the Federal Circuit in Wickham Contracting Co. v. United States, 12 F.3d 1574 (1994), and in this Court's decision in TVA. Pl. Br. 24. However, the TVA decision related to actual interest payments on actual loans that TVA had taken. Here, WEPCO is seeking to recover an imputed interest charge to "gross up" its damages claim. In any event, the TVA Court relied upon a line of cases, including Wickham, involving a contract clause – the "Changes" clause contained in most Federal procurement contracts – authorizing recovery of incurred interest charges in extremely limited circumstances. However, the Federal Circuit and its predecessor, the Court of Claims, have held in the context of equitable adjustments under the "Changes" clause that, "[a]lthough interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract," Wickham Contracting Co., 12 F.3d at 1582, reasoning that the "Changes" clause authorizes such a recovery. Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968). Nevertheless, without a "Changes" clause or similar contractual provision, the statutory provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States . . . ." Bell, 404 F.2d at 984. Here, WEPCO's contract contains no "Changes" or similar clause, and WEPCO is seeking breach damages, not an equitable adjustment. Accordingly, without any statutory or contractual waiver of sovereign immunity regarding the recovery of interest,

WEPCO would not be entitled to recover interest, even if it had actually incurred interest charges.[28]

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court require plaintiff to satisfy its burden of proof and eliminate from plaintiff's claim all damages that are unforeseeable, uncertain, or not directly caused by the Government's breach.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

[28] In addition, to the extent that WEPCO is seeking damages that pre-date November 16, 1994, those damages would be barred by the six-year statute of limitations applicable in this Court.

s/ Kevin B. Crawford
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

MARIAN E. SULLIVAN
RUSSELL A. SHULTIS
SONIA M. ORFIELD
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

January 30, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on January 30, 2007, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kevin B. Crawford