No. 00-697C
(Senior Judge Merow)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

WISCONSIN ELECTRIC POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL EXHIBITS PREPARED BY GOVERNMENT CONTRACTORS

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street NW
Washington, DC 20530
Tele: (202) 305-9640
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
RUSSELL A. SHULTIS
SONIA M. ORFIELD
Trial Attorneys
Civil Division
Department of Justice

January 31, 2007

**TABLE OF CONTENTS**

**PAGE**

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. DOCUMENTS PREPARED BY CONTRACTORS OF THE DEPARTMENT OF ENERGY ARE NOT GOVERNMENT DOCUMENTS AND SHOULD BE EXCLUDED FROM EVIDENCE AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. DOCUMENTS PREPARED BY CONTRACTORS OF THE DEPARTMENT OF ENERGY ARE NOT ADMISSIBLE PURSUANT TO FEDERAL RULE OF EVIDENCE 803(8)(A) . . . . . . . . . . . . . . . . . . . . . . . . 6

A. A Contractor For DOE Is Not An "Agency" Of The United States Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Because The "Contractor" Documents That Plaintiff Identified as Trial Exhibits Were Not Prepared Or Adopted By The "Agency," They Are Not Admissible Under Federal Rule of Evidence 803(8)(A) As Public Records Or Reports Of The Agency's Activities . . . . . . . . . . . . . . . . . . 10

C. The Court's Decisions in *Yankee Atomic* and *Pacific Gas*, Admitting Contractor Documents as DOE "Admissions," Are In Error . . . . . . . . . 13

D. Even If They Were Somehow Considered Evidence Of The Activities Of The Agency, The Preliminary Nature Of The Documents At Issue Precludes Use Of Federal Rule of Evidence 803(8)(A) . . . . . . . . . . . . . 17

III. ANY ASSERTION THAT FEDERAL RULE OF EVIDENCE 803(6) PROVIDES FOR THE ADMISSION OF DOCUMENTS GENERATED BY CONTRACTORS IS UNSUPPORTABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV. ANY ASSERTION THAT "CONTRACTOR" DOCUMENTS CONSTITUTE ADMISSIONS BY DOE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2) CONFLICTS WITH THE ROLE OF CONTRACTORS . . . . . . . . . . 22

V. CONTRACTOR DOCUMENTS DO NOT CONSTITUTE ADMISSIONS BY DOE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**TABLE OF CONTENTS (cont'd)**

**PAGE**

VI. ANY ARGUMENT THAT DOCUMENTS ARE NOT HEARSAY WHERE THE GOVERNMENT HAS MANIFESTED AN ADOPTION OR BELIEF IN THEIR TRUTH UNDER FEDERAL RULE OF EVIDENCE 801(d)(2)(B) IS MISPLACED . . . . . 30

VII. ANCIENT DOCUMENTS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 803(16) ARE SUBJECT TO CHALLENGE AT TRIAL UNDER FEDERAL RULE OF EVIDENCE 805 AS HEARSAY WITHIN HEARSAY . . . . . 31

CONCLUSION . . . . . 32

## TABLE OF AUTHORITIES

**PAGE(S)**

Air Land Forwarders v. United States,
172 F.3d 1338 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

Alexander v. Estepp,
95 F.3d 312 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Blue Water Environmental v. United States,
60 Fed. Cl. 48 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

Brown v. ASD Computing Cntr.,
519 F. Supp. 1096 (S.D. Ohio 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Butler v. Southern Pacific Co.,
431 F.2d 77 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Chemtool, Inc. v. Lubrication Techs., Inc.,
148 F.3d 742 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Coast Federal Bank v. United States,
48 Fed. Cl. 402 (2000), aff'd en banc, 323 F.3d 1035 (Fed. Cir. 2003) . . . . . . . . . . . . . 21

Columbia First Bank, FSB v. United States,
58 Fed. Cl. 333 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31

Ellis v. Kneifl,
834 F.2d 128 (8th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Erickson v. Baxter Healthcare, Inc.,
151 F.Supp.2d 952 (N.D.Ill. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Glendale Federal Bank, FSB v. United States,
39 Fed. Cl. 422 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Hawthorne Partners v. AT&T Technologies, Inc.,
No. 91-C-7167, 1994 WL 63054 (N.D. Ill. Feb. 17, 1994) . . . . . . . . . . . . . . . . . . . passim

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**


Kirk v. Raymark Industries, Inc.,
61 F.3d 147 (3rd Cir. 1995) . . . . . . . . . . 24, 27, 28

Lockheed Martin Corp. v. United States,
50 Fed. Cl. 550 (2001), aff'd, 48 Fed. Appx. 752 (Fed. Cir. 2002) . . . . . . . . . . 7, 25

Marsee v. United States Tobacco Co.,
866 F.2d 319 (10th Cir. 1989) . . . . . . . . . . 11

Merrick v. Framers Ins. Group,
892 F.2d 1434 (9th Cir. 1990) . . . . . . . . . . 25

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . 13, 14

Paul v. Federal Mine Safety & Health Review Commission,
812 F.2d 717 (D.C. Cir. 1987) . . . . . . . . . . 29

Reid Brothers Logging Co. v. Ketchikan Pulp Co.,
699 F.2d 1292 (9th Cir. 1983) . . . . . . . . . . 25, 28

Reynolds v. Green,
184 F.3d 589 (6th Cir. 1999) . . . . . . . . . . 7, 10, 14

Rotec Indus. v. Mitsubishi Corp.,
215 F.3d 1246 (Fed. Cir. 2000) . . . . . . . . . . 7, 29

Sabel v. Mead Johnson & Co.,
737 F.Supp. 135 (D. Mass. 1990) . . . . . . . . . . 24, 25, 26

Sanford v. Johns-Mansville Sales Corp.,
923 F.2d 1142 (5th Cir. 1991) . . . . . . . . . . 25

Smith v. Isuzu Motors Ltd.,
137 F.3d 859 (5th Cir. 1998), cert. denied, 525 U.S. 1142 (1999) . . . . . . . . . . 17

United States v. Davis,
826 F.Supp. 617 (D.R.I. 1993) . . . . . . . . . . 15

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

United States v. Guerrero,
114 F.3d 332 (1st Cir. 1997) . . . . . . . . . . 11

United States v. Johnson,
752 F.2d 206 (6th Cir. 1985) . . . . . . . . . . 24

United States v. Loera,
923 F.2d 725 (9th Cir. 1991) . . . . . . . . . . 11

United States v. Lykes Bros. Steamship Co.,
432 F.2d 1076 (5th Cir. 1970) . . . . . . . . . . 16, 17

United States v. Orleans,
425 U.S. 807 (1976) . . . . . . . . . . 8, 9, 28

United States v. Portsmouth Paving Corp.,
694 F.2d 312 (4th Cir. 1982) . . . . . . . . . . 24

United States v. Ramirez,
45 F.3d 1096 (7th Cir. 1995) . . . . . . . . . . 11

United States v. Rojas,
53 F.3d 1212 (11th Cir. 1995) . . . . . . . . . . 11

United States v. Vidaure,
861 F.2d 1337 (5th Cir. 1988) . . . . . . . . . . 11

Wade v. South Bend Public Transportation Corp.,
1989 WL 516281 (N.D. Ind. 1989) . . . . . . . . . . 24

Watts v. City of Hartford,
2004 WL 717132 (D. Conn. 2004) . . . . . . . . . . 16

Westfed Holdings, Inc. v. United States,
55 Fed. Cl. 544 (2003), aff'd in part, rev'd in part,
407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . 31

Westinghouse Electric Corp. v. United States,
1997 WL 1068204 (Fed. Cl. June 4, 1997) . . . . . . . . . . 9

## TABLE OF AUTHORITIES (cont'd)

**PAGE(S)**

Yankee Atomic Electric Company v. United States,
2004 WL 2450874 (Fed. Cl. Sept. 17, 2004) . . . . . . . . . . passim

Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.,
190 F.3d 238 (4th Cir. 1999) . . . . . . . . . . passim

**STATUTES**

28 U.S.C. § 1732 . . . . . . . . . . 19

28 U.S.C. § 1733 . . . . . . . . . . 17, 19

**MISCELLANEOUS**

5 J. Weinstein & M. Berger, Weinstein's Federal Evidence . . . . . . . . . . 23, 24, 27

# INDEX TO APPENDIX

**PAGE(S)**


Table, Contractor Documents Included on Plaintiff's Exhibit List . . . . . . . . . . . . . . . . . . . . . . 1-2

Deposition Testimony of Alan Brownstein,
Yankee Atomic Electric Company v. United States, No. 98-126C
(April 9, April 10, April 11, and May 23, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-13

Deposition Testimony of Lake Barrett,
Yankee Atomic Electric Company v. United States, No. 98-126C
(May 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Deposition Testimony of Ronald Milner,
Yankee Atomic Electric Company v. United States, No. 98-126C
(May 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

Trial Testimony of Christopher Kouts,
Sacramento Municipal Utility District v. United States, No. 98-488C
(March 29, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

Plaintiff's Exhibit No. 70 (Excerpt), 1984 Annual Review of the
Adequacy of the 1 mill/kwh Waste Disposal Fee, September 1984 . . . . . . . . . . . . . . . . . . . 21-22

Trial Testimony of Ronald Milner,
Yankee Atomic Electric Company v. United States, No. 98-126C
(August 11, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

Deposition Testimony of Christopher Kouts,
Yankee Atomic Electric Company v. United States, No. 98-126C
(June 4, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-697C |
| | ) | (Senior Judge Merow) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL EXHIBITS PREPARED BY GOVERNMENT CONTRACTORS

Defendant, the United States, respectfully requests that the Court enter an order excluding the admission at trial of certain exhibits[1] prepared by contractors for the Department of Energy that are included on the trial exhibit list filed by the plaintiff, Wisconsin Electric Power Company ("WEPCO"), on December 18, 2006.

SUMMARY OF ARGUMENT

On its exhibit list, WEPCO has included several exhibits, identified at pages 1 and 2 of our appendix to this motion, that were prepared by contractors to the Department of Energy ("DOE") and were never adopted as policy by DOE. In fact, it appears that some of these documents were never even delivered to DOE and that they, instead, represent internal documents from within the contractors' files of which DOE, during the events at issue in this case, was never aware and that DOE never saw. Yet, WEPCO asserts that the Court should deem all of these documents, including documents that DOE never even saw relating to work that DOE

[1] Attached as pages 1 and 2 of the appendix to this motion is a list of 27 exhibits from WEPCO's exhibit list that the Government has identified as contractor documents. Although we have attempted to identify all "contractor" documents on WEPCO's exhibit list, we reserve the right to assert objections at the pre-trial conference or trial to any additional exhibits that we identify as contractor documents.

never requested, as "admissions" of DOE and admit them into the trial record in this case. For the reasons explained below, the Court should reject WEPCO's wholesale attempt to define every contractor document, regardless of whether DOE ever saw the document, as an admission of the Government.

## DISCUSSION

### I. DOCUMENTS PREPARED BY CONTRACTORS OF THE DEPARTMENT OF ENERGY ARE NOT GOVERNMENT DOCUMENTS AND SHOULD BE EXCLUDED FROM EVIDENCE AT TRIAL

Extensive trial testimony and deposition testimony from prior spent nuclear fuel ("SNF") cases specifically establishes that the contractors for DOE do not operate as part of DOE and that documents created by such contractors do not constitute Government or public documents. For example, Alan Brownstein, then a Senior Policy Advisor to the Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), specifically stated that documents created by the Pacific Northwest National Laboratory ("PNNL") in Richland, Washington, operated by a DOE contractor, do not represent DOE positions:

> Q. You're saying that for something to be adopted as department policy, additional people would have to review it and approve it?
>
> A. What I'm saying is that a contractor product is not departmental policy.
>
> Q. How would a contractor product become departmental policy?
>
> A. One way it would become that would be for it to be issued under DOE letterhead.
>
> Q. By issue, what do you mean?

> A. Number of ways -- issued could be instructions or it could be a report. It could be a letter by a program official or, or contracting officer. Those are three ways.
>
> Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
>
> A. Sure.

Deposition of Alan Brownstein, April 11, 2002, 574:7-576:2 (App. 10-11).[2] Similarly, Mr. Lake Barrett, then Deputy Director of OCRWM, testified that PNNL was a contractor and that DOE used PNNL to provide nothing more than advice, not to make policy decisions:

> Q What is Pacific Northwest Laboratory?
>
> A It's a contractor in Richland, Washington.
>
> Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
>
> MS. HERRMANN: Objection. Vague.
>
> A We use them as advisors and analysts for the waste management system.
>
> * * *
>
> Q Did you ever rely on the work of Pacific Northwest Laboratory?
>
> MS. HERRMANN: Objection. Vague.
>
> A I used it as input.
>
> Q For what purposes?

---

2/ "App. __" refers to the appendix attached to this motion.

A For advice on systems analysis.

Deposition of Lake Barrett, May 10, 2002, Tr. 1150:3-1151:4 (App. 15).

In fact, Mr. Brownstein reiterated this point on several occasions with regard to contractor documents generally. With regard to another contractor document, he stated that "[t]his was a, this was, clearly was a contractor document. . . . That automatically means to me that it was, it was a, it was something that DOE had not signed off on. . . . The contractor documents . . . regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document." Deposition of Alan Brownstein, April 10, 2002, 319:23-320:11 (App. 5). When questioned about a third contractor document, he clarified that "[t]his is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it." Deposition of Alan Brownstein, May 23, 2002, 140:3-9 (App. 13). Further, with regard to a fourth document, Mr. Brownstein stated that "the contractor often made a lot of statements. . . . They write words, but because the contractor writes words does not mean it's departmental policy." Deposition of Alan Brownstein, April 11, 2002, 596:18-597:1 (App. 9).

Mr. Ronald Milner, then Chief Operating Officer of OCRWM, similarly testified that contractor documents do not speak for DOE:

A. . . . In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.

Q. You say it would never relate to a position?

A. It would never reflect, I'm sorry; not relate, it would never reflect the Department's position, it would simply input data to it.

> Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
>
> A. The Department would take a position based on information from a number of sources including its contractor's input.

Deposition of Ronald Milner, May 3, 2002, Tr. 443:19-444:8 (App. 17-18).

Mr. Christopher A. Kouts, Director, Office Systems Analysis and Strategy Development of OCRWM, similarly testified that contractor documents do not speak for DOE:

> Q. How does DOE regard these types of reports prepared by contractors?
>
> A. They're essentially the view of the contractor, and unless the Department issues its won report under its own letterhead, with the DOE stamp, as well as a document number, that's not DOE position or DOE policy.
>
> Court. Right. You're just getting advice?
>
> A. Yes, that's correct.
>
> Q. And in terms of, I think you said putting it on DOE letterhead or the equivalent of that, who makes that decision regarding a contractor report or study or document?
>
> A. It's typically a DOE official, and that's routed through senior management, and a decision is made that that document is acceptable and will be issued under a DOE letterhead. Let me give you an example. For instance, when we went through the site recommendation process [for Yucca Mountain], we went through many, many drafts of documents that were related to the Secretary's recommendation. And those drafts were prepared by contractors, but it wasn't until the Department issued those final documents that became part of the site recommendation that we adopted and we accepted the language in those reports, and therefore, it was issued under a DOE identification number, and it was considered a DOE document.

Testimony of Christopher A. Kouts, March 29, 2005, Tr. 2110:25-2112:4 (App. 20).

Given the significant evidence that these "contractor" documents do not constitute DOE documents and the lack of any evidence to the contrary, the Court should reject the underlying premise for WEPCO's apparent evidentiary argument to support the admission of these documents at trial.

## II. DOCUMENTS PREPARED BY CONTRACTORS OF THE DEPARTMENT OF ENERGY ARE NOT ADMISSIBLE PURSUANT TO FEDERAL RULE OF EVIDENCE 803(8)(A)

### A. A Contractor For DOE Is Not An "Agency" Of The United States Government

WEPCO seeks to introduce as substantive evidence numerous documents created by contractors to DOE. Documents created by Government contractors do not constitute Government or public documents admissible under Federal Rule of Evidence ("FRE") 803(8)(A) as records, reports, statements, or data compilations of public offices or agencies setting forth the activities of the offices and agencies.

The first hearsay exception upon which WEPCO may rely in seeking wholesale admission of all "contractor" documents for the truth of the matters asserted in those "contractor" documents is Federal Rule of Evidence 803(8)(A). That rule provides an exception to the hearsay rule for "[r]ecords, reports, statements, or data compilations, in any form, of public offices and agencies, setting forth (A) the activities of the office or agency . . . ." The public records exception to the hearsay rule is justified by "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Zeus Enterprises, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999)

(quoting Fed. R. Evid. 803(8), Advisory Committee's Note to Paragraph (8)) (emphasis added); see Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999) (quoting same).

To the extent that WEPCO is claiming that activities performed by a contractor to an agency are the same as those performed by the agency itself, and that all contractor activities should be attributed to the agency, WEPCO is simply wrong. To the extent that WEPCO may assert that management and operations ("M&O") contractors function as DOE, there is no support for that assertion. Although the United States Court of Appeals for the Federal Circuit has found that "an agency relationship can be created by contract," it has determined that "not all contracts create agency relationships and not all conduct creates agency relationships." Rotec Indus. v. Mitsubishi Corp., 215 F.3d 1246, 1256 (Fed. Cir. 2000) (quoting Chemtool, Inc. v. Lubrication Techs., Inc., 148 F.3d 742, 745 (7th Cir. 1998)). The determination of whether the relationship between contracting parties creates an agency relationship "focuse[s] on contract provisions [and] not day-to-day Government involvement in the performance of the subcontract." Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 558-59 (2001) (involving M&O contractor) (citing United States v. Johnson Controls, Inc., 713 F.3d 1541, 1551 (Fed. Cir. 1983)), aff'd, 48 Fed. Appx. 752 (Fed. Cir. 2002). Specifically, the test for determining agency "requires an interpretation of the contract" and findings that "(1) the prime [M&O] contractor was acting as a purchasing agent for the Government; (2) the agency relationship between the Government and the prime contractor was established by clear contractual consent; and (3) the contract stated that the Government would be directly liable to the vendors for the purchase price." Lockheed, 50 Fed. Cl. at 562.

In Blue Water Environmental v. United States, 60 Fed. Cl. 48 (2004), this Court held that (1) a private contractor which operated a laboratory under an M&O contract with DOE could not be deemed a Federal "agency" for purposes of Tucker Act bid protest jurisdiction even if, as alleged, DOE exercised day-to-day supervision of the contractor's activities. Id. at 52. The Court further determined that, even if such supervision was sufficient to establish "agency," evidence was required to establish that DOE supervised or directed the subcontracting process about which the plaintiffs was complaining. Id. In sum, the plaintiffs was required to prove that an agency relationship was established by the contract, and that it created an agency relationship with regard to the specific work about which agency was being claimed, before the contractor could be deemed an "agent" for purposes of that work.

The difficulty with WEPCO's apparent assertion (given the inclusion of such contractor documents on its exhibit list) that the contractor statements at issue represent the views of DOE is highlighted by the United States Supreme Court's decision in United States v. Orleans, 425 U.S. 807 (1976). The Supreme Court explained that the critical element in distinguishing an "agency" of the Federal Government from a "contractor" for purposes of the Federal Tort Claims Act is the power of the Federal Government to control the detailed physical performance of the contractor. Therefore, the issue is not whether the entity receives Federal money and must comply with Federal regulations, but whether its daily operations are supervised by the Federal Government. Id. at 814. The Supreme Court explained that any contrary finding would be inconsistent with general contracting principles:

> Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United

> States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation . . . . Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs or state governmental bodies into federal government acts.

Id. at 815-16.

Other spent nuclear fuel plaintiffs have cited as support for this "agency" argument the Court of Federal Claims' decision in Westinghouse Electric Corp. v. United States, Nos. 93-445C & 93-446C, 1997 WL 1068204, at *2 (Fed. Cl. June 4, 1997).[3] Yet, that decision only describes the general character of an M&O contractor. It does not purport to identify an M&O contractor as an "agent" of the Federal Government. As previously discussed, both this Court and its appellate court have rejected the concept that M&O contractors constitute "agents" of the Government. As explained in Orleans, the simple fact that the documents at issue were generated by DOE M&O contractors does not establish that any DOE contractor is an "agent" of DOE or that the contractor's documents are those reflecting the activities of the "agency." In fact, many documents evidence on their face that they are not expressing the views of an agency, as indicated by the disclaimer on the second page of WEPCO's Exhibit No. 70: "The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof." App. 21-22. WEPCO's otherwise unsupported assertions of agency cannot provide a basis for admitting documents under FRE 803(8)(A).

---

[3/] The plaintiffs in Yankee Atomic Electric Company v. United States, No. 98-126C (Fed. Cl.), Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.) previously cited to this case in support of its argument for the admission of contractor documents at trial.

B. Because The "Contractor" Documents That Plaintiff Identified as Trial Exhibits Were Not Prepared Or Adopted By The "Agency," They Are Not Admissible Under Federal Rule of Evidence 803(8)(A) As Public Records Or Reports Of The Agency's Activities

As previously discussed, the public records exception to the hearsay rule is justified by "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Zeus Enterprises, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999) (quoting Fed. R. Evid. 803(8), Advisory Committee's Note to Paragraph (8)) (emphasis added); see Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999) (quoting same). WEPCO would expand this exception to the hearsay rule to include not only public records issued by "public officials" and Federal agencies, but also internal contractor documents prepared by Government contractor employees working under a contract with the Government, and WEPCO apparently believes that the fact that these documents may have been prepared by a contracting party, albeit working for DOE, is irrelevant to their admissibility as public records. Yet WEPCO's apparent interpretation of the rule would create a ridiculous result. For example, under WEPCO's theory, all documents generated by a construction contractor with a contract to construct a Federal courthouse would become "public records" that are admissible in court proceedings without regard to their hearsay nature. A contractor could potentially generate documents that could be used against the Government in any litigation arising from that contract. Thus, documents created in the course of these working Government relationships with private industry would also appear to constitute the "public records" of DOE in WEPCO's view.

WEPCO's apparent assertions that Government contractor documents, even those of M&O contractors, somehow constitute Government documents for the purposes of FRE 803(8)(a) are unsupported by relevant case law. As an initial matter, the documents that courts have found appropriate to admit under the first clause of FRE 803(8) are typically classic public records – the type of documents that would spring to mind when thinking of a "public" record. See, e.g,, Hawthorne Partners v. AT&T Technologies, Inc., No. 91-C-7167, 1994 WL 63054, at *5 (N.D. Ill. Feb. 17, 1994) ("the fact that the preliminary report is preliminary and that certain sections were not released until Hawthorne Partners subpoenaed them suggest that the preliminary report would not be easily construed as a public record under Rule 803(8)"). For instance, courts have admitted copies of a conviction, see United States v. Vidaure, 861 F.2d 1337, 1340-41 (5th Cir. 1988); an automobile's title history, see United States v. Ramirez, 45 F.3d 1096, 1101 (7th Cir. 1995); a county's registry of applicants for firefighter position, Alexander v. Estepp, 95 F.3d 312, 314 (4th Cir. 1996); a certified copy of docket entries in another court, United States v. Loera, 923 F.2d 725, 730 (9th Cir. 1991); and certifications specifically authorized by statute to made by a cabinet official or his designee, United States v. Guerrero, 114 F.3d 332, 340 (1st Cir. 1997); United States v. Rojas, 53 F.3d 1212, 1214 (11th Cir. 1995). Such documents are a far cry from the reports and memoranda, including those internal to the contractor that were never shared with DOE, that WEPCO would have this Court admit as substantive evidence of DOE policy or decisions.

More importantly, the "contractor" documents identified by WEPCO should not be admitted under FRE 803(8) simply because, as previously explained, they are not agency documents in any sense. See Marsee v. United States, 866 F.2d 319 (10th Cir. 1989) (neither an

International Agency for Research on Cancer nor a National Institute of Health report qualified as a Government record under FRE 803(8)(B) because their contents were drawn from "a conference attended by scientists from various countries" and "a panel of scientists and non-scientists after a conference at which invited speakers presented papers," rather than the agencies themselves). As such, they do not fit the rationale for the FRE 803(8) hearsay exception. See Zeus Enterprises, Inc., 190 F.3d at 241. There is simply no reason to believe that the reliability attributed to documents created by public officials should be attributed to documents created by their contractors, especially where the relevant public officials have generally disavowed those documents as not representing the Government's position. WEPCO cannot establish that the documents at issue are, in fact, public records in the first place. Only after WEPCO makes that showing would the burden shift to require the Government to establish reasons that the public records in question should not be admitted.

Even where the admission of contractor documents as public records has been contemplated, in situations in which the Government has essentially adopted reports as its own, an analysis has been conducted to demonstrate reliability that simply cannot be assumed for these documents. See, e.g. Hawthorne Partners, 1994 WL 63054, at *5 (discussing trustworthiness in the context of FRE 803(8)(C)). Courts have carefully considered whether the "work was performed at the direction and under the guidance of" the agency; whether "proposed work plans were reviewed for conformity with [agency] methodology and standards;" whether the agency "remained in charge of and closely involved with," "remained in close contact with," and "closely managed" the contractor; whether the agency "required its contractors to submit regular reports concerning the project;" and whether the agency "reviewed prior drafts . . . requiring all

necessary changes and additions to ensure the report's accuracy." Id. at *5 (citing United States v. Davis, 826 F. Supp. 617 (D.R.I. 1993)).

WEPCO cannot make a showing that the contractor documents have these indicia of "trustworthiness." In fact, the record in other spent nuclear fuel cases establishes that there was great variability in the degree of involvement and control that DOE exercised over contractor work. For instance, Alan Brownstein testified that "PNNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them," and that DOE may, or may not, comment on PNNL documents. Deposition of Alan Brownstein, April 11, 2002, 562:18-564:2 (App. 7-8). Without specific showings of DOE involvement as well as adoption of contractor documents, such documents should be found to lack sufficient trustworthiness to be admitted as "public records" under FRE 803(8). See Hawthorne Partners, 1994 WL 63054, at *5 (finding "no indicia of reliability" where agency's working relationship and supervision of contractor was unknown).

### C. The Court's Decisions in *Yankee Atomic* and *Pacific Gas*, Admitting Contractor Documents as DOE "Admissions," Are In Error

In two decisions, this Court has recently found that documents created by contractors of DOE should constitute "public records" of the United States pursuant to FRE 803: Yankee Atomic Electric Co. v. United States, No. 98-126C, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004)[4]

---

[4] The Court deferred ruling on the admissibility of contractor documents as admissions of the defendant under Federal Rule of Evidence 801(d)(2) (finding that the circumstances "counsel against finding statements made in these documents to be 'admissions' by the DOE absent specific evidence that the contractual relationship included binding the government in this regard"). Id. at *11-12. The Court also deferred ruling on any additional theories of admissibility for the contractor documents, including the admission of such documents for their truth as business records under Federal Rules of Evidence 803(8) or 801(d)(2)(B). Id. at *12.

(unpublished), the rationale of which was adopted by the Court in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006). However, as previously discussed, it is well-settled that even an M&O contractor is not the "agent" of the United States absent specific language in the contract between the M&O and the Federal agency that creates such a relationship. With all due respect, for the reasons discussed above, both of these decisions were wrongly decided.

The Court in Yankee incorrectly found that Government contractors working on behalf of DOE were essentially "public agencies" for purposes of FRE 803(8)(A). The legal authorities that the Court cited were construed much too broadly and do not support its conclusion that FRE 803(8)(A) automatically extends to Government contractors, because a contractor for DOE is not an "office" or "agency" of the Federal Government. The public records exception to the hearsay rule is justified by "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Zeus Enterprises, 190 F.3d at 241 (quoting Fed. R. Evid. 803(8), Advisory Committee's Note to Paragraph (8)) (emphasis added); see Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999) (quoting same).

The Government contractors that WEPCO has identified are not public officials as characterized by FRE 803(8)(A). WEPCO's argument in support of the admission of contractor documents effectively discards any distinction between the work conducted by a DOE employee within OCRWM (for example, Thomas Pollog, a long-time DOE employee working within OCRWM, including service as technical assistant to the contracting officer for the Standard Contract), and an engineer employed by Batelle, working at a Government laboratory managed by Batelle and writing a report or recommendation under a Government contract. The conclusion that a report authored by such an engineer meets the standard for a report of a public

office or agency, when not approved in final form by DOE and not accepted and identified as an official DOE document, is unsupported by a plain reading of FRE 803(8)(A).

The cases that the Court cited in Yankee do not support the conclusion that Government contractors are the equivalent of public offices or agencies under FRE 803(8)(A). For example, Erickson v. Baxter Healthcare, Inc., 151 F.Supp.2d 952 (N.D.Ill. 2001), involved a report prepared by the Institute of Medicine. The Court explained that, although the parties agreed that the Institute of Medicine was not a public office or agency, the National Academy of Sciences - the parent of the Institute of Medicine - was "created by an Act of Congress specifically to conduct investigations for, and report to, Congress." Baxter, 151 F.Supp.2d at 966 (citing 36 U.S.C. §§ 251, 253). The Court concluded that the National Academy of Sciences is a "quasi-public agency" created to assist the Government and that "it was performing that function in this case." Id. at 966-967. The Court found that the Institute of Medicine had a "legal duty" to provide reports and the report at issue was a "report of a public office or agency." Id. at 967. The Court analyzed the admissibility of the report under Federal Rule of Evidence 803(8)(C), not Rule 803(8)(A), and never addressed the issue of Government contractors under FRE 803.

In United States v. Davis, 826 F.Supp. 617 (D.R.I. 1993), the Government moved the Court *in limine* for the admission of a final Draft Remedial Investigation Report in a CERCLA case, pursuant to FRE 803(8)(C). In its findings, the Court explained that, although the work for the remedial investigation and feasibility study for the site was performed by a contractor, "[i]n November 1986, the [Remedial Investigation] Report was approved by the EPA and released to the public." Id. at 619 (emphasis added). This type of approval by the Government agency is

absent from all of the contractor documents at issue in this case, and most were not released to the public.

In Watts v. City of Hartford, No. 00-681, 2004 WL 717132 (D. Conn. March 31, 2004) (unpublished), the Court concluded that an annual report prepared by Hartford's Civilian Police Review Board "is admissible, in substantial part at least, under the public records exception to the hearsay rule." 2004 WL 717132 at *4. The Court explained that the review board was "established by ordinance" and was required to "submit an annual report to the City's Human Relations Commission . . . ." Id. at *3. The Court determined that such a non-governmental entity may be deemed a public agency for purposes of this exception when "it has a ongoing legal duty to provide the government with information or when it is a quasi-public entity created by the government to serve its needs." Id. at *4 n.8. Again, the Court never discusses or references any Government contractor in its decision. These cases and others that the Court in Yankee cites fail even to address documents created by Government contractors (versus quasi-public agencies or offices created by ordinance or statute) and fail to provide any legal authority for the proposition that documents created by Government contractors were the equivalent of documents created by public or governmental offices or agencies.[5]

---

5/ The Court's decision in United States v. Lykes Bros. Steamship Co., 432 F.2d 1076 (5th Cir. 1970), a case cited by other SNF plaintiffs seeking the admission of contractor documents, also fails to support the Yankee Court's finding that "public agency" should be construed broadly under FRE 803(8)(A). In Lykes, the United States Court of Appeals for the Fifth Circuit addressed the admissibility of evidence in Federal courts under a former version of Federal Rule of Civil Procedure ("FRCP") 43(a), which read, in relevant part: "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held." See Butler v. Southern Pacific Co., 431 F.2d 77, 79 (5th Cir. 1970). The Court reviewed "several documents certified by the Department of Agriculture as being

The documents that courts have found appropriate to admit under the first clause of FRE 803(8) are typically classic public records. See, e.g., Hawthorne Partners, 1994 WL 63054, at *5 ("the fact that the preliminary report is preliminary and that certain sections were not released until Hawthorne Partners subpoenaed them suggest that the preliminary report would not be easily construed as a public record under Rule 803(8)"). Such documents are far different from the reports and memoranda that WEPCO would have this Court admit as substantive evidence of official DOE policy and decisions under FRE 803(8)(A).

D. Even If They Were Somehow Considered Evidence Of The Activities Of The Agency, The Preliminary Nature Of The Documents At Issue Precludes Use Of Federal Rule of Evidence 803(8)(A)

Even if WEPCO somehow could view "contractor" documents as the equivalent of records or reports of public officers or agencies, those documents still would not fall within the hearsay exception of FRE 803(8)(A) because of their preliminary or interim nature. In Smith v. Isuzu Motors Ltd., 137 F.3d 859 (5th Cir. 1998), cert. denied, 525 U.S. 1142 (1999), the plaintiffs attempted to introduce three memoranda prepared by staff members of the National

authenticated government documents, . . . all offered in evidence as official records under Title 28, U.S.C. § 1733, the government records statute." Lykes, 432 F.2d at 1079. The documents at issue were prepared by Republic of Korea officials pursuant to specific Federal Government regulations setting forth the method for preparation of certain commodity shipment reports, the substantive contents required for each report, and the process for inspecting the commodity shipments that were detailed in the reports. Id. at 1079. Emphasizing the "liberal application" of FRCP 43(a), and citing specific Government regulations applicable to the commodity-related reports, the court found that the duty to prepare the reports could be delegated, under Government regulations, to an independent agency or foreign government "without the report losing its character, when submitted through the appropriate United States agency, as a report of a 'department or agency of the United States.'" Id. The court emphasized the existence of Government regulations – not present in the instant case – that permitted and authorized the delegation to prepare the reports. Lykes fails to provide support a broad interpretation of "public agency" under FRE 803(8)(A).

Highway Traffic Safety Administration relating to a petition filed with the agency by Congressman Wirth, which asked the agency to establish stability standards for certain types of passenger vehicles. Although the agency ultimately rejected the Wirth petition, the plaintiffs sought to introduce the three memoranda in which the staff members expressed opinions supporting the petition and the plaintiffs' theory of their case. The United States Court of Appeals for the Fifth Circuit rejected the plaintiffs' argument that the preliminary memoranda fell within FRE 803(8)(A), finding that FRE 803(8)(A) does not apply to allow the admission of preliminary or interim evaluation opinions of agency staff members:

> Smith first argues that the memoranda qualify as public records within the meaning of Rule 803(8)(A). We disagree. Although NHTSA staff members prepared the memoranda in the course of evaluating the Wirth petition, the memoranda do not "set forth" the "activities of the agency" within the meaning of Rule 803(8)(A).
>
> Smith cites no case law in which Rule 803(8)(A) has been applied to allow the admission of the preliminary or interim evaluation opinions of agency staff members. Indeed, to apply Rule 803(8)(A) in the fashion Smith suggests would swallow whole Rule 803(8)(C) and its limitations. Rule 803(8)(C) provides a hearsay exception for "factual findings resulting from an investigation made pursuant to authority granted by law" unless those findings lack trustworthiness. If memoranda reflecting the preliminary opinions of agency staff members were admissible under Rule 803(8)(A), then Rule 803(8)(C)'s limitations would be meaningless.

Id. at 862 (emphasis added; citations omitted).

If the contractor documents were adopted by DOE and issued as the agency's public positions, WEPCO would have much better grounds for attempting to introduce "contractor" documents as public records. However, the contractor documents on WEPCO's exhibit list are not the agency's adopted positions, but, instead, at best, are nothing more than preliminary or

interim evaluations of various issues that may, or may not, have ever been communicated to DOE. Even if these evaluations had been conducted by DOE employees, they would not necessarily fall within the requirements of FRE 803(8)(A), given their preliminary or interim nature.

"Prior to the adoption of the Federal Rules of Evidence in 1975, hearsay contained in agency memoranda or records could be admitted into evidence either under 28 U.S.C. § 1732 (1970) (hereinafter § 1732), as writings made in the ordinary course of business, or under 28 U.S.C. § 1733 (1970) (hereinafter § 1733) as official records of an agency . . . ." Brown v. ASD Computing Cntr., 519 F. Supp. 1096, 1103 n.2 (S.D. Ohio 1981). "When the Federal Rules of Evidence were enacted, Rule 803(8) was considered to have been derived from § 1733 . . . ." Id. (citing H.R. Rep. No. 93-650, 93rd Cong., 2d Sess. reprinted in 1974 USCCAN 7051, 7075, 7091). "The assumption must be made that Congress was aware of the current status of court interpretations of [section] . . . 1733 when it enacted Rule[] . . . 803(8)." Id. (citing United States v. Smith, 521 F.2d 957, 968 n.24 (D.C. Cir. 1975)). "Despite this awareness, Congress failed to manifest an intention to alter the traditional interpretation of [section] . . . 1733 . . . ." Id. "Although Rule 803(8)(A)," on its face, "appears to be broad enough to include hearsay which is contained in agency documents not required or authorized by law, that provision cannot be read in so expansive a manner," and "interpreting subsection (A) to include matters such as internal agency memoranda would establish an undesirable precedent." Id. "[T]he House debate on the Proposed Rules of Evidence indicates that Congress intended to restrict, rather than broaden, the application of Rule 803(8)" from the admissibility standards contained in section 1733, as evidenced by Congressional debate regarding the need to narrow the exception contained in FRE

803(8)(B). Id. (citing various Congressional Record provisions). Given "the express concern of Congress over restricting subsection (B)" of FRE 803(8), "it would be incongruous to conclude that legislative intent could be circumvented by interpreting subsection (A) so expansively . . ." to render the limitations imposed upon FRE 803(8)(B), and (C), irrelevant. Id.

## III. ANY ASSERTION THAT FEDERAL RULE OF EVIDENCE 803(6) PROVIDES FOR THE ADMISSION OF DOCUMENTS GENERATED BY CONTRACTORS IS UNSUPPORTABLE

To the extent that WEPCO asserts that the Court can admit the "contractor" documents as "business records" pursuant to FRE 803(6), the United States Court of Appeals for the Federal Circuit's decision in Air Land Forwarders v. United States, 172 F.3d 1338 (Fed. Cir. 1999), makes plain that the contractor documents cannot be admitted on that basis. The Air Land Forwarders case involved claims by service members for damage to property by common carriers and freight forwarders. Id. at 1340. The service members submitted their claims to the United States with estimates done by third parties. Id. The United States adjudicated the claims and, where appropriate, compensated the service member and sought reimbursement from the carriers or offset against payments due to the carriers. Id. The trial court admitted the third party estimates, which were in the files of the military, as "business records" of the military, and the carrier appealed. Id. at 1341-42.

In reaching its decision, the Federal Circuit reviewed authorities regarding the circumstances in which documents produced by third parties have been considered the business records of another entity in whose files they appear. Id. at 1342-43. It concluded that a third party document may be admitted as another entity's business record where "the incorporating business rel[ies] upon the accuracy of the document incorporated and . . . there are other

circumstances indicating the trustworthiness of the document." Id. at 1343. The circumstances upon which the Court relied included the fact that military personnel could be fined or imprisoned for submitting a false claim and that "Military Claims Office personnel were responsible for becoming familiar with the competency of estimators." Id. at 1343-44. The Court also held that admission of such documents would require "foundation testimony of a witness with first-hand knowledge of the record keeping procedures of the incorporating business." Id. at 1343; see Coast Federal Bank v. United States, 48 Fed. Cl. 402, 447 (2000) (testimony of individual could not secure the admission as business records of the records of various institutions because it did not establish requisite foundation), aff'd *en banc*, 323 F.3d 1035 (Fed. Cir. 2003).

This Court adopted the Air Land Forwarders approach in Columbia First Bank, FSB v. United States, 58 Fed. Cl. 333 (2003), finding that, "when a document produced by a third party is incorporated into the business records of another entity this circuit applies a two-factor standard of reliability in order to admit a record that has an otherwise appropriate foundation." Id. at 339. With regard to the requirement that the entity must have "rel[ied] upon" the accuracy the document, the Court found that "[r]eliance can be shown if the entity used the document in its dealings." Id. With regard to the requirement that there be "other circumstances indicating the trustworthiness of the document," the Court determined that "indicia of trustworthiness can be shown, to cite one example, by demonstrating the existence of legal consequences for falsity or inaccuracy in the document." Id. It further found that "[t]hird party documents," such as documents created by DOE's contractors, "kept in the records of a party in this case must be shown to have been received and incorporated, to have been relied upon, and to have indicia of

trustworthiness to meet the Air Land Forwarders test for the business records exception in Fed. R. Evid. 803(6)" and that "[t]he proponent of such evidence at trial must show that this test has been met to overcome a hearsay objection." Id.

Under the applicable case precedent, there is no basis for admitting the "contractor" documents under FRE 803(6). With regard to contractor materials that made their way to DOE files or into individual files of employees at DOE, WEPCO cannot establish the foundation necessary to admit the documents. WEPCO has not identified as a trial witness anyone who is familiar with DOE's record-keeping procedures, will not establish whether particular documents came from individual employee files or official DOE files, will not call any witness to establish the reliability of the record-keeping practices of individual employees regarding documents that might have come from their own personal files or that they kept these documents "in the regular course of business," will not be able to establish that DOE has relied on the accuracy of the documents, and will not be able to identify other circumstances that support the trustworthiness of the documents. Indeed, it is difficult to imagine how they could do so, even with a knowledgable witness, considering the significant previously discussed testimony to the contrary at trial and in the depositions.

## IV. ANY ASSERTION THAT "CONTRACTOR" DOCUMENTS CONSTITUTE ADMISSIONS BY DOE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2) CONFLICTS WITH THE ROLE OF CONTRACTORS

WEPCO may also assert that the documents generated by contractors to DOE are admissible pursuant to FRE 801(d)(2)(C) or 801(d)(2)(D). FRE 801(d)(2) provides that a statement is not hearsay if:

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment . . . . The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), [or] the agency or employment relationship and scope thereof under subdivision (D) . . . .

FRE 801(d)(2).

With regard to subdivision (C), WEPCO has not identified any testimony or documents to establish that the DOE contractors were "authorized" to speak for the Government under FRE 801(d)(2)(C). In fact, other spent nuclear fuel plaintiffs have not cited to a single case in which a Government contractor was found to be "authorized" to make admissions upon behalf of the Government. To the contrary, for the same reasons previously explained, a contractor serves as just that: a contractor. It does not make policy for DOE, and it does not speak for DOE, unless that authority is expressly identified in a contract. WEPCO and the other spent nuclear fuel plaintiffs have not identified any basis for finding DOE's contractors "authorized" to make admissions upon DOE's behalf.

FRE 801(d)(2)(C) treats as a statement as non-hearsay if it is "offered against a party" and is "a statement by a person authorized by the party to make a statement concerning the subject." However, even with regard to "many forms of employment, the authority of the declarant to make a statement on behalf of the party must be indicated expressly or demonstrated by particular circumstances, because the relationship between the declarant and the party does not itself imply the authority in question." 5 J. Weinstein & M. Berger, Weinstein's Federal

Evidence § 801.32[1], at 801-68 (2d ed. 2006). Further, "[c]ourts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." Id. § 801.32[2], at 801-68; see Kirk v. Raymark Indus., Inc., 61 F.3d 147, 164 (3rd Cir. 1995) ("Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered"); United States v. Portsmouth Paving Corp., 694 F.2d 312, 321 (4th Cir. 1982) (FRE 801(d)(2)(C) "demands as a prerequisite to admissibility a showing based on evidence independent of the alleged hearsay that the declarant is an agent of the party with authority to speak on the subject"); United States v. Johnson, 752 F.2d 206, 210 (6th Cir. 1985) (citing FRE 801(d)(2)(C), "[o]rdinarily, agency doctrine is applied in determining whether a party will be held to the statements of his or her attorney"); Sabel v. Mead Johnson & Co., 737 F. Supp. 135, 138 (D. Mass. 1990) (admissibility under FRE 801(d)(2)(C) "is governed not by the trustworthiness of the statement, but by the existence and scope of the principal-agent relationship as determined under the common law of agency"); Wade v. South Bend Public Transportation Corp., No. S86-488, 1989 WL 516281, at *5 (N.D. Ind. May 16, 1989) ("admissibility of statements under Rule 801(d)(2)(C) and (D) is determined by applying principles of agency law").[6]

---

[6/] To the extent that the Court in Glendale Federal Bank, FSB v. United States, 39 Fed. Cl. 422 (1997), found that the speaker at issue need not be an "agent" of the party, that finding conflicts with the weight of authority regarding FRE 801(d)(2)(C). Nevertheless, in any event, the Court in Glendale recognized that the statement of the expert witness at issue "reflect[ed] the position of the party who retained" him when the Government, by the time of trial, had listed the expert as its testifying witness. Id. at 424. Here, WEPCO is seeking to admit statements of M&O contractor employees, regardless of whether DOE ever adopted their statements as DOE policy or as an official statement of DOE. There has been no showing that the DOE contractor's views are the views of the Government or that they were adopted by the Government. The Government receives numerous reports and statements from contractors and could not possibly adopt or agree with all recommendations or scenarios promoted in these documents. Unlike

"An agency relationship has three essential characteristics: 1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and himself; 2) the existence of a fiduciary relationship toward the principal with respect to matters within the scope of the agency; and 3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency." Sabel, 737 F. Supp. at 138. However, "[t]he courts have looked primarily at the issue of control in determining whether an agency relationship exists." Id. This Court has found in numerous cases that M&O contractors are not agents of the United States agency with which they have a contract. See Blue Water Environmental v. United States, 60 Fed. Cl. 48, 52 (2004); Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 558-59 (2001), aff'd, 48 Fed. Appx. 752 (Fed. Cir. 2002); see also Sanford v. Johns-Mansville Sales Corp., 923 F.2d 1142, 1149-50 (5th Cir. 1991) (doctor hired by asbestos makers to examine claimants was independent contractor, not agent); Merrick v. Framers Ins. Group, 892 F.2d 1434, 1440 (9th Cir. 1990) (proponent failed to show that speakers were agents as opposed to independent contractors).

---

Glendale, there was not any explicit authorization for any of the contractors at issue to speak on behalf of DOE prior to the contractor documents at issue being officially approved by DOE and issued as DOE documents.

In another case previously cited by SNF plaintiffs as support that agency is not a requirement for the application of FRE 801(d)(2)(C), Reid Brothers Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292 (9th Cir. 1983), the appellate court held that an employee of a subsidiary company of the party challenging the admission of the document at issue was "authorized" under FRE 801(d)(2)(C) to make statements regarding the entire scope of a company's operations, the subject of the report prepared by the employee. The court's findings and analysis focused on the fact that individual at issue was a company employee, that he was given extensive access and guidance in order to prepare a report, and that the report was presented to company executives and circulated to company officers and managers. Id. at 1306. In sum, neither Glendale nor Reid Brothers supports the argument that DOE contractors are authorized to make statements that qualify as admissions under FRE 801(d)(2)(C).

WEPCO may assert that DOE "authorized" its M&O contractor to make statements concerning the subjects in the documents that it seeks to admit as "party admissions" of DOE in this case. Even for those matters that DOE specifically requested the M&O contractor to consider and upon which it requested the contractor to report that action does not render the M&O contractor an "agent" of DOE or make its recommendations "admissions" of the Government:

> In addition to Mead Johnson's apparent lack of control, there is no evidence that the consultants were empowered to speak or act on Mead Johnson's behalf. *See Ellis v. Kneifl*, 834 F.2d 128, 131 (8th Cir.1987) (statements of clerk of state court not admissible in suit against state court judge because clerk not authorized to act on judge's behalf). Mead Johnson never expressed an intent to be bound by the recommendations of the outside experts, nor did it even authorize or request them to prepare a written report on their findings and recommendations. The diversity of opinions expressed at the meeting, and the lack of resolution of differences among the experts, supports defendant's characterization of the meeting as a "brainstorming session," intended to generate ideas for defendant's further consideration, but not meant to establish its official position in any way.

Sabel, 737 F. Supp. at 139 (emphasis added).

WEPCO may also assert that some of the documents are admissible on their face under FRE 801(d)(2)(C) because some of them contain language providing that "[t]his report was prepared as an account of work sponsored by an agency of the United States Government." See App. 21-22 (PX 70). Although WEPCO may assert that this statement is tantamount to an assertion that the report is authorized by the Government, the statement merely reflects that the contractor preparing the document did so pursuant to a contract. It says nothing about the M&O contractor being "authorized" as an "agent" of the Government to prepare public reports or

statements speaking for the agency. Further, under FRE 801(d)(2), the "contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C)." "Thus, the trial court will consider the declarant's statement in making the preliminary determination, but independent proof of the existence of the declarant's authority to speak for the party will also be required." 5 J. Weinstein & M. Berger, supra, § 801.32[3], at 801-69. Here, WEPCO relies on language in draft documents, without any other evidence or testimony, to suggest that the documents are actually final and "authorized" by DOE. WEPCO cannot meet its burden of establishing authorization simply through the documents themselves.

In the case at hand, WEPCO has not identified any evidence to show that the DOE contractor's views are the views of the Government or that they were adopted by the Government. The Government receives numerous reports and statements from contractors and could not possibly adopt or agree with all recommendations or scenarios promoted in these documents. Further, M&O contractors are not "agents" of the United States. The Court should find the challenged documents are not admissible under FRE 801(d)(2)(C).

In Kirk v. Raymark Industries, Inc., 61 F.3d 147 (3rd Cir. 1995), the Court held that the testimony of an expert witness on behalf of a party could not later be used against that party in unrelated litigation unless there was a finding that the expert witness was "authorized to speak" on behalf of that party under FRE 801(d)(2)(C). The Court stated that "Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered." Id. at 164. The Third Circuit continued that, "since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness can not be deemed an agent." Id. Further, "one can call an expert

witness even if one disagrees with the testimony of the expert," so that proof must exist that an agency relationship was established. Id. In addition, even if the Court finds factual evidence of authorization to speak for a party, the statements must be in the scope of that authorization. See, e.g., Reid Brothers Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306 (9th Cir. 1983) (holding that an employee was "authorized" under FRE 801(d)(2)(C) to make statements regarding the entire scope of a company's woods operations, the subject of the report prepared by the employee).

Barring evidence that the DOE contractors were subject to the control of the Government, or "authorized to speak" on behalf of DOE under FRE 801(d)(2)(C), the contractor documents at issue are inadmissible. Similar to an expert witness that can be called "even if one disagrees with the testimony of the expert," and is therefore not "authorized to speak" for that party, a DOE contractor could produce a report for the Government with which the Government disagrees. Kirk, 61 F.3d at 163. Analogous to the problem discussed by the Supreme Court in Orleans, under the spent nuclear fuel plaintiffs' broad interpretation of the hearsay exception, all reports or statements by an M&O contractor, or any contractor, would become statements of the Government, regardless of whether the Government adopted, agreed with, or even was aware of these statements.

## V. CONTRACTOR DOCUMENTS DO NOT CONSTITUTE ADMISSIONS BY DOE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(D)

WEPCO may also assert that the contractor documents at issue may be admissible under Federal Rule of Evidence 801(d)(2)(D) under the theory that an agency relationship can be created by contract. However, WEPCO has not identified or cited to any contract creating an

agency relationship between DOE and its M&O contractors. Instead, WEPCO simply relies upon the fact that DOE has entered into contracts with its M&O contractors in an attempt to create an agency relationship. Indeed, other plaintiffs' reliance upon Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246 (Fed. Cir. 2000), actually demonstrates the fallacy in its argument.

In Rotec, the Federal Circuit affirmed the trial court's rejection that certain statements fell within FRE 801(d)(2)(D), explaining that a contract must contain language creating an agency relationship for that rule to apply:

> Although "an agency relationship can be created by contract or conduct, not all contracts create agency relationships and not all conduct creates agency relationships." The court must decide "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal."

Id. at 1256 (citations omitted).[7] Here, WEPCO has not demonstrated that DOE has the right "to control the manner or method" in which its M&O contractors carried out their work. Consequently, any contention that the DOE contractor documents are admissible under FRE

---

[7] Any reliance upon Paul v. Federal Mine Safety & Health Review Commission, 812 F.2d 717 (D.C. Cir. 1987), is equally unavailing. In Paul, a mining engineer worked under contract for Battelle Memorial Institute ("Battelle") in connection with "an experimental program for the underground storage of nuclear waste," known as the Exploratory Shaft Facility ("ESF"). Id. at 717-18. The ESFs, which occurred in 1981 – before the Nuclear Waste Policy Act was passed -- "were designed to permit testing of underground salt formations as a medium for storing nuclear waste." Id. at 718. The court explained that the ESF was sponsored by DOE and, in passing, explained that it was sponsored by DOE's "agent" for the project, Battelle. Id. However, this passing reference to Battelle as DOE's "agent" should be accorded little, if any significance. First, this statement was dicta. Second, the project to which this case refers is not the permanent Federal repository, but, rather, related to DOE's early exploratory efforts that pre-dated the NWPA.

801(d)(2)(D) is without merit. Absent such evidence, WEPCO has failed to satisfy its burden of proof regarding admissibility under FRE 801(d)(2)(D).

With regard to subdivision (D), it is clear that a contractor – even an M&O contractor – is not an "agent" of DOE. As previously discussed, WEPCO and the other spent nuclear fuel plaintiffs have failed to present any evidence that any of the particular contractors which authored documents that WEPCO now seeks to admit as admissions by DOE are agents of DOE, as evidenced by specific contractual provisions granting them that authority. Absent such evidence, WEPCO has failed to satisfy its burden of proof regarding admissibility under FRE 801(d)(2)(D).

## VI. ANY ARGUMENT THAT DOCUMENTS ARE NOT HEARSAY WHERE THE GOVERNMENT HAS MANIFESTED AN ADOPTION OR BELIEF IN THEIR TRUTH UNDER FEDERAL RULE OF EVIDENCE 801(d)(2)(B) IS MISPLACED

Any claim that DOE's actions in making certain documents publicly available constitutes a manifestation of "an adoption or belief in the truth of such documents," making them admissible pursuant to FRE 801(d)(2)(B), must fail. FRE 801(d)(2)(B) provides that a statement is not hearsay where it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth." This Court has rejected the application of FRE 801(d)(2)(B) where the party seeking to introduce the evidence failed to establish either an agency relationship or adoption by the agency:

> Beyond its conclusory argument in briefing that Westfed relied upon the statements of these consultants, defendant did not demonstrate a manifestation of adoption. In order for a statement to be admitted as an adoptive admission, the proponent of the evidence must show "a manifestation of [the other] party's intent to adopt another's statements, or evidence of the party's belief in the

> truth of the statements . . ." United States v. Rollins, 862 F.2d 1282, 1296 (7th Cir.1988). Absent a showing of either an agency relationship or adoption, the statements made by these individuals and entities were not admitted as party admissions.

Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544, 565 (2003), aff'd in part, rev'd in part, 407 F.3d 1352 (Fed. Cir. 2005).

As in Westfed, the conclusion, unsupported by any case law, that certain exhibits prepared by DOE's M&O contractors are admissible under FRE 801(d)(2)(B), absent a showing that DOE had an agency relationship with these contractors or otherwise adopted the contractor's statements, should be rejected.

## VII. ANCIENT DOCUMENTS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 803(16) ARE SUBJECT TO CHALLENGE AT TRIAL UNDER FEDERAL RULE OF EVIDENCE 805 AS HEARSAY WITHIN HEARSAY

A number of the contractor documents on WEPCO's exhibit list may be "ancient documents." Pursuant to FRE 803(16), statements in ancient documents may not be excluded by the hearsay rule if the document has been in existence 20 years or more and the authenticity of the document is established. However, hearsay statements that are contained within ancient documents, which themselves may be admissible pursuant to FRE 803(16), are not automatically admissible. In Columbia First Bank, FSB v. United States, 58 Fed.Cl. 333 (2003), the Court reasoned that "[c]ourts that have dealt with the issue of hearsay statements within ancient documents that are brought in by Fed.R.Evid. 803(16) have concluded that the hearsay within hearsay problem persists, and that excluding parts of such documents because of double hearsay is an appropriate application of [FRE] 805." Id. at 338 (emphasis added). Ultimately, the Court concluded that it "will consider at trial Fed. R. Evid. 805 hearsay within hearsay challenges to

hearsay statements incorporated within documents admitted under Fed. R. Evid. 803(16)." Id. If the documents identified as ancient documents are admitted under FRE 803(16), the Government reserves its right to assert FRE 805 hearsay challenges to statements contained within the documents.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion and exclude from evidence at trial all documents prepared by Government contractors that are identified on WEPCO's trial exhibit list.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Kevin B. Crawford
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
RUSSELL A. SHULTIS
SONIA M. ORFIELD
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

January 31, 2007

# APPENDIX

Wisconsin Electric Power Company v. United States, No. 00-697C

Contractor Documents Included on Plaintiff's Exhibit List

| | Wepco... | Bates - Begin | Bates - End | Full Name | Government Objections | Doc Date |
|---|---|---|---|---|---|---|
| | 0055 | PNL0230176 | PNL0230196 | Memo from Fletcher (Battelle Pacific Northwest Laboratories) to Hall re: Revised Waste Acceptance Schedule from Draft Mission Plan | Relevance, Hearsay, Authenticity, Foundation | 1/24/1984 |
| | 0070 | PNL0290003 | PNL0290080 | DOE, 1984 Annual Review of the 1.0 Mill per kWh Waste Disposal Fee (PNL-5241), prepared by Pacific Northwest Laboratory, Sept. 1984 | Relevance, Hearsay, Authenticity (regarding contractor created doc) | 9/1/1984 |
| | 0101 | PNL1072117 | PNL1072223 | 1986 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee | Authentication, Foundation, Hearsay, Relevance | 5/1/1986 |
| | 0121 | PNL0201491 | PNL0201657 | U.S. DOE, OCRWM, Preliminary Analysis of Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program, Final Draft, April 27, 1984 | Authentication, Foundation, Hearsay, Relevance | 4/27/1987 |
| | 0131 | PNL1071901 | PNL1072003 | U.S. DOE, OCRWM, 1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee, PNL-6288, Prepared by Pacific Northwest Laboratory, July 1987 | Authentication, Foundation, Hearsay, Relevance | 7/1/1987 |
| | 0196 | WISC00032439 | WISC00032489 | Commercial Spent Fuel Management and Concrete Cask Testing Programs Monthly Progress Report | Authentication, Foundation, Hearsay, Relevance | 05/1990 |
| | 0197 | HQR0442620 | HQR0442631 | Facility Interface Capability Assessment (FICA) Project, Cask-Handling Assessment Point Beach Units 1 and 2 | Authentication, Foundation, Hearsay | 5/1/1990 |
| | 0215 | PNL0412110 | PNL0412119 | Pacific Northwest Laboratory under DOE Contract No. DE-AC06-76RLO 1830, "Determination of Cost Effective Waste Management System Receipt Rates," presented at Second Annual High-Level Radioactive Waste Management conference, January 1991 | Relevance, Hearsay, Authenticity | 1/1/1991 |
| | 0223 | NET0010715 | NET0010725 | Memo from McDuffie to Langstaff Re: Recommended DOE Positions on 18 Contract Implementation Issues | Relevance, Hearsay, Authenticity | 6/28/1991 |
| | 0230 | HQX19910918. 0011.00001 | HQX19910918. 0011.00059 | Martin Marietta Energy Systems, Inc., Site and Facility Waste Transportation Services Planning Document, Point Beach Nuclear Plant Unit 1, Wisconsin Electric Power Company, Draft, Revision 0 | Hearsay, Authentication, Foundation | 9/1/1991 |
| | 0341 | WISC00124473 | WISC00124520 | TRW Environmental Safety Systems Inc., Request for Proposal for the Multi-Purpose Canister (MPG) System, No. VA.CS.WLS.6/94.015 | Authentication, Foundation, Hearsay | 6/3/1994 |
| | 0361 | MOL.19970623. 0415 | MOL.19970623. 0415 | TRW Clearance Request, attaching Williamson, "Lessons Learned from the DCS Process" | Relevance, Hearsay, Authenticity | 11/11/1994 |
| | 0396 | CTR0010362 | CTR0010363 | Blumford (TRW) letter to Rousso (DOE) re: DE-AC01-91RW-00134; Waste Acceptance Support: DCS Monthly Status Report - October 1995 | Relevance, Hearsay, Authenticity | 10/25/1995 |



-1-

Wisconsin Electric Power Company v. United States, No. 00-697C

Contractor Documents Included on Plaintiff's Exhibit List

| Wepco... | Bates - Begin | Bates - End | Full Name | Government Objections | Doc Date |
|---|---|---|---|---|---|
| 0564 | HQR-078-0402 | HQR-078-0473 | DOE, OCRWM, Report to Update Total System Life Cycle Cost Estimate for Site Recommendation/License Application, TDR-CRWE-Selma, AL 36701-000001 Rev 1 | Hearsay, Authentication, Foundation | 12/1/1999 |
| 0593 | CTR0450697 | CTR0450725 | Independent Cost Estimate Review of the Civilian Radioactive Waste Management Program 2000 Total Life Cycle Cost for DOE, OCRWM | Authentication, Foundation, Hearsay, Relevance | 4/1/2001 |
| 0774 | DER0062120 | DER0062131 | Pacific Northwest Nuclear Labs memo re: Need for Maintenance of Full Core Reserve | Authentication, Foundation, Hearsay, Relevance | |
| 0912 | PNL1173151 | PNL1173154 | Overcast and Carney memo to Emmett Moore re: MRS Institutional Report | Authentication, Foundation, Hearsay, Relevance | 02/26/1984 |
| 0918 | HQR0360182 | HQR0360202 | Basis for the VA and TSLCC Cost Estimate Operational Waste Stream | Authentication, Foundation, Hearsay, Relevance | 06/11/1988 |
| 0922 | EDB0012423 | EDB0012425 | Letter from E.F. Benz to A. Brownstein, OCRWM DOE, re: Review of Draft Annual Capactiy Report | Authentication, Foundation, Hearsay, Relevance | 10/19/1990 |
| 0923 | PNL0300063 | PNL0300070 | Spent Fuel Acceptance Rate | Authentication, Foundation, Hearsay, Relevance | 00/00/0000 |
| 0928 | | | Memo from P.A. McDuffie/S.A. Vance to D.C. Langstaff/A.B. Brownstein re: Recommended DOE Positions on 17 Contract Implementation Issues | Authentication, Foundation, Hearsay, Relevance | 06/28/1991 |
| 0931 | | | Memo from P.N. McDuffie/S.A.Vance to A.B. Brownstein/D.C. Langstaff re: Commentrs on EEI/UWASTE Positions on Eleven Issues | Authentication, Foundation, Hearsay, Relevance | 05/22/1991 |
| 0937 | | | 1984 Annual Review of the Adequacy of the 1-Mill/KWH Waste Disposal Fee, PNL-5241 | Authentication, Foundation, Hearsay, Relevance | 09/00/1984 |
| 0938 | HQR0282750 | HQR0282762 | CRWMS Program Baseline Change -- Justification for Changing to a Multipurpose Canister-Based System | Authentication, Foundation, Hearsay, Relevance | 00/00/0000 |
| 0940 | PNL1500157 | PNL1500161 | Memorandum from R. Liikala (Battelle) to Distribution re: Waste Management Program Strategy, attachment | Authentication, Foundation, Hearsay, Relevance | 03/12/1984 |
| 0952 | HQR0381488 | HQR0381490 | Document entitled Commercial Spent Nuclear Fuel Additional Storage Installations, Plans and Requirements | Authentication, Foundation, Relevance | 05/25/2000 |
| 0969 | | | TSLCC rec. ltr report 2002/02 | Authentication, Foundation, Hearsay, Relevance | 02/00/2002 |



-2-

Page 243

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 244

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 245

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 246

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 78

A. Let me just read it again.
Q. Sure.
(The witness reviewed the document.)
THE WITNESS: Okay. I agree it says it discusses it, yes.
BY MR. TOMASZCZUK:
Q. Okay. Was it your understanding that DOE's intention was to begin to dispose of spent fuel at a rate which would allow utilities starting in 1998 to store their discharges in their pools?
MR. BANES: Objection -- vague as to the meaning of intention.
THE WITNESS: I really don't understand the question. I need you to --
BY MR. TOMASZCZUK:
Q. It may not have been very artfully worded.
This document, and in particular the second and third sentences of the first paragraph, as I read them, suggest to me that DOE was considering a commitment to begin in 1998 removing spent fuel at a rate which would be sufficient to allow storage in those pools of subsequent reactor discharges.

Page 79

That's the subject we're talking about?
A. Yes.
Q. And my question to you is do you agree that that was DOE's intention at or about the time that this document was prepared in July of 1986?
MR. BANES: Objection -- vague.
THE WITNESS: I must tell you that contractor, contractors prepare a number of documents for many different parts of the organization to do many things.
I can agree with what this is. This is separate from the department policy.
Contractors do contractor work, provide input to the department. The department considers that.
So this is a contractor document, not a DOE document, and that's why I'm hesitating in your answers.
BY MR. TOMASZCZUK:
Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?

Page 80

MR. BANES: Objection -- vague. Go ahead.
THE WITNESS: The best as I recall, the, you know, the goal of the department was, was to have the facilities available as soon as we could and start accepting waste as soon as we could and as much as we could.
That was a goal of the department.
BY MR. TOMASZCZUK:
Q. So it was not a specific goal, that the utilities would not need to expand their storage capacities after 1998?
A. That, that was a goal. That was a goal.
Q. And was that goal communicated to the utilities at any point in time?
A. To the best of my recollection, in, I believe that that may have been communicated in, for example, in Congressional testimony by the director of what the department's goals are.
It may have been reflected in documents.
I would have to look at them. It has been a long time.
(There was a pause in the

Page 81

proceedings.)
MR. TOMASZCZUK: I'm going to hand you, Ms. Reporter, and ask you to mark as Brownstein Exhibit 5 a document entitled, "OCRWM Mission Plan Amendment" dated June 1987.
And let me represent, Mr. Brownstein, that this is an excerpt from that rather lengthy document, and what I'm going to hand you is Appendix F to that mission plan amendment, which is entitled, "Waste-Acceptance Schedule."
THE WITNESS: Sure.
(Brownstein Exhibit No. 5 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen that document before today?
A. Yes.
Q. Mr. Brownstein; and have you used the document in your work at DOE?
A. I have.
Q. And in what context have you used the document?
A. I believe I used this as the waste


Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 319

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.

I would encourage you to make your objection. Fine, go ahead make it.

MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document.

He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.

That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.

BY MR. TOMASZCZUK:

Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A. This was a, this was, clearly was a contractor document.

Contractors prepare studies all the

Page 320

time at DOE's direction.

That automatically means to me that it was, it was a, it was something that DOE had not signed off on.

Now whether this was the first draft or the last draft, who knows? But it was a contractor document.

The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document.

Q. After you received the document, did you do anything other than read it?

A. I cannot specifically recall. My normal operation would be to, to read it.

If I had comments, I would make those comments either verbally or in writing. I use both.

Q. And do you recall sitting here today whether you made any comments on this particular document?

A. I honestly cannot recall.

Q. All right.

(There was a pause in the proceedings.)

Page 321

MR. TOMASZCZUK: Mr. Brownstein, let's mark as, and Ms. Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991.

It has on it the Bates stamp numbers HQR-001-2357 through 2373.

(Brownstein Exhibit No. 30 was marked for identification.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. And have you seen the document before today?

A. Yes.

Q. And were you responsible for preparing it?

A. Consistent with how I have testified about those documents, yes.

Q. All right. At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified.

Page 322

Are those, or when you wrote the term linkages there, were you referring to the linkages that I asked you about in your testimony this morning?

A. Yes.

Q. This paragraph goes on to state that during the first ten years following commencement, projected commencement of federal waste management system operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU.

And my question to you, Mr. Brownstein, is do you know what the source of that statement is or was.

(The witness reviewed the document.)

THE WITNESS: I don't specifically recall.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, are you comparing this ACR to the previous ACR?

A. I am.

Q. And that would be, you would be comparing it to Brownstein Exhibit 24, the

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)
McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 560

me -- so I have nothing further at this time.
(Whereupon, at 12:05 o'clock, p.m., the deposition was recessed, to reconvene at 1:00 p.m. the same day.)

Page 561

AFTERNOON SESSION
(1:02 p.m.)
Whereupon,
ALAN BROWNSTEIN,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:^
EXAMINATION BY COUNSEL FOR PLAINTIFF
SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. NESLIN:
Q. Mr. Brownstein, my name is Dave Neslin.
I'm an attorney representing Sacramento Municipal Utility District, also known an SMUD, which is another of the plaintiffs in these cases.
I'll be asking you questions, and I would like to follow the same ground rules that Mr. Tomaszczuk set up with you.
If you don't understand my question, please tell me, and I'll try to rephrase it. Okay?
And if you want to take a break at any point in time, just let me know, and we'll stop.
A. Okay

Page 562

(Brownstein Exhibit No. 50 was marked for identification.) ^
BY MR. NESLIN:
Q. Mr. Brownstein, you're being handed what's been marked as Exhibit 50 to your deposition.
It's an August 30, 1988 letter from Mr. B.M. Cole to Joseph Sutey with an attachment titled, "Delivery Commitment Schedule Processing, Approval, and Management Control System" stamped as Bates Numbers PNL-098-1106 through 1126.
Are you familiar with these documents?
(The witness reviewed the document.)
THE WITNESS: I vaguely recall seeing this.
BY MR. NESLIN:
Q. Was this work undertaken at your direction?
A. As I testified previously, PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them.

Page 563

This was probably done at my direction.
Q. The upper right of the attached document, there is a date August 30, 1988, and then Rev 4.
Would that to your mind refer to Revision 4?
A. Yes.
Q. Did you typically comment on different drafts and revisions?
A. It could have gone one of two ways. It could have been because I commented on it and went through it, or because they went through their internal reviews before it was presented to DOE and went through revs.
It could have been either way.
Q. What was your practice as they were preparing work that you requested them to do, going through different drafts?
Was it your practice to provide input to them to review drafts?
A. It depended on time associated with a particular product.
If there was some time urgency, I would review an early draft.

- 7 -

Page 564

If there wasn't, it would go through the normal course of internal reviews.
That's how I recollect it.
Q. Would others at DOE have reviewed drafts PNL prepared as well?
A. As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division.
I have to go back and think about whether in 1988, I was still a one man, or I had staff.
If I had staff at that time, they would review it, yes.
Q. Do you recall reviewing this attached document?
A. I don't have a specific recollection of that.
Q. If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. Mr. Brownstein, 24 through 32 state exchange requests should be approved if, and

Page 565

then they set forth in bullets five criteria.
Would you agree that an exchange should be approved if it meets these criteria?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Those were important criteria.
There may be other things that we would want to have considered, and I don't recall those now, but, but these, these criteria were appropriate.
I agree with them.
BY MR. NESLIN:
Q. Let me ask again if an exchange request meets these four criteria, should it be approved?
MR. BANES: Objection -- asked and answered.
THE WITNESS: I think I did answer that, and the reason for the hesitation is upon review of this, and upon discussion with others in the department ranging from the contracting officer, my peers, my superiors, we may have -- it's conceivable that this, these contractor-proposed criteria may have evolved,

Page 566

been modified, added to, deleted.
BY MR. NESLIN:
Q. Do you recall discussing these criteria with anyone else at the department, these criteria set forth on page 6?
A. I don't have a specific recollection of that.
Q. Do you recall discussing them with the contractor PNL?
A. The only way I can answer you is I don't specifically recall, but that's not saying that I did not.
Q. Do you recall discussing these criteria with anyone at the utility, at the utility?
A. I can't recall whether in the ACR initial resolution process, which was subsequent to this date, whether we discussed, you know, that issue or not.
I don't specifically recall, but again, I don't want to testify that I absolutely never did.
Q. Let me direct you to lines 28 through 29.
That sets forth as one of the criteria

Page 567

that the transportation system and receiving facilities have the capacity to meet the revised commitments?
A. Yes.
Q. What does that mean to you?
A. Okay.
MR. BANES: Objection. Calls for speculation, and lack of foundation.
Go ahead.
THE WITNESS: Okay. When the DCSs were approved, I believe we -- we can go back to it, but I believe one of the pieces of information that we requested from the utilities was that the type of transportation cask that would be required.
One of the concerns we had in this criteria, as I recall, is -- let's take an example.
If we had approved, you know, let's say we had approved 90 percent of our DCSs for a, they would accommodate PWR rail casks.
If somebody wanted to do, you know, exchanges at the last minute, we may have gone through the procurement process to procure the type of casks to be available for who we thought


Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 596

A. Okay.
(The witness reviewed the document.)
BY MR. NESLIN:
Q. This states that DOE has determined that a DCS exchange PAS capable of analyzing, tracking DCS exchanges needs to be put in place, and I'll represent to you that on the preceding page, PAS is defined as a processing approval system.
Is this statement accurate that DOE had determined that such a system capable of analyzing and tracking DCS exchanges needed to be put in place?
A. As I recall, our contractor support suggested that such a system was necessary, and we said, you know, why don't you flush it out?
The words DOE has determined, again, as I testified before, the contractor often made a lot of statements.
This isn't, the department never determined that, that this system was necessary.
We made the request to, you know, explore it, flush it out.
They write words, but because the contractor writes words does not mean it's

Page 597

departmental policy.
Q. Was such a system in fact developed?
A. I don't recall how far they went in it and how much it was used, frankly.
If you have got some documents, that might jog my memory, but I don't recall how far we went with that.
MR. NESLIN: Let's take a break for about five minutes here.
MR. BANES: Okay.
MR. NESLIN: I'll come back with such a document I hope.
(A recess was taken.)
BY MR. NESLIN:
Q. Mr. Brownstein, before the break, we were discussing Exhibit 53 and the proposal to develop an exchange processing approval system, and I think your testimony was that you do not know sitting here today whether such a system was in fact ever developed?
A. I did not recall how far the contractor or we took that.
Q. Do you recall any additional steps towards such a system that were taken?
MR. BANES: Objection -- vague.

Page 598

THE WITNESS: I guess I stand by my answer.
I don't recall if or how far it went.
BY MR. NESLIN:
Q. Do you recall anything else being done regarding the development of such a system beyond this report?
A. If I did, I would have to speculate.
Q. You have no recollection today?
A. Right.
Q. And the system that we're talking about, that would have been a computerized tracking system?
A. I believe that's what they were referring to it as.
Q. Do you have any independent recollection sitting here today how the system would have worked or operated?
A. What I'm testifying to is so many years have passed, I just don't recall.
If you had something to jog my memory, I might, but I don't right now.
(Brownstein Exhibit No. 54 was marked for identification.) ^

Page 599

BY MR. NESLIN:
Q. Mr. Brownstein, Exhibit 54 is a document captioned preliminary draft that appears to be a preliminary draft of a Federal Register notice. Bears Bates Number CTR-024-0043 through 4.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. Do you recall this document?
A. Yeah. I think I have seen it before.
Q. Did you ask that it be prepared?
A. To the best of my recollection, I testified that there were -- contractors did work for us primarily one of two ways.
We would give them a work task to do, something specific, and there would also be a general task order and where they would, you know, develop ideas and present them to us, you know, on related but, but matters specifically asked for.
I think, my recollection is this fell in the latter category.
I don't recall specifically asking for it.

Page 572

Q. The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?
A. Well, that could because that could affect the cask, the availability of the cask.
Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it.
Q. Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?
A. It could, but not necessarily.
Q. I would like to direct you to lines 30 and 31.
A. I just want to clarify all these questions you're asking me were all hypotheticals?
Q. I'm asking you a series of hypothetical questions, sir.
I'm asking for your opinion on how they would apply.
A. Right.

Page 573

Q. Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers.
What does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation. Go ahead.
THE WITNESS: The best way I can try to explain it is by example, if that's okay with you.
If a utility were to give us failed fuel, that might influence the decision.
BY MR. NESLIN:
Q. And why would that influence the decision?
A. Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies.
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day.
Q. Would, would that necessarily delay

Page 574

the acceptance of waste from other purchasers?
A. It could, but not necessarily. It was a concern.
There may have been other concerns associated with that criteria that at this moment, I can't recall.
Q. Do you recall the basis of these criteria?
A. Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department.
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position.
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it.
Q. Evaluated it for what purpose?
A. Of whether that was appropriate or acceptable to the department; in other words, this is not departmental policy.
Q. You're saying that for something to be

Page 575

adopted as department policy, additional people would have to review it and approve it?
A. What I'm saying is that a contractor product is not departmental policy.
Q. How would a contractor product become departmental policy?
A. One way it would become that would be for it to be issued under DOE letterhead.
Q. By issue, what do you mean?
A. Number of ways -- issued could be instructions or it could be a report.
It could be a letter by a program official or, or contracting officer.
Those are three ways.
Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
A. Sure.
Q. How was this information, this report used, do you recall, by the department, used by the department?
A. I don't recall.
Q. Do you recall whether you did anything in response to this report?
A. That's a good question. There are 14

Page 576

years between the report and now, and I just don't recall.

(There was a pause in the proceedings.)

MR. NESLIN: Can we go off the record for a second?

(A discussion was held off the record.)

MR. NESLIN: Mark that as 51.

(Brownstein Exhibit No. 51 was marked for identification.) ^

BY MR. NESLIN:

Q. You've been handed what's been marked as Exhibit 51 to your exhibit -- to your deposition.

This is a document entitled, "Guidebook for Standard Contract for Disposal," stamped preliminary draft.

MR. BANES: Do you have several copies of that?

MR. NESLIN: Yeah. Sorry, counsel.

MR. BANES: No problem. Is this 51?

MR. NESLIN: Fifty-one.

BY MR. NESLIN:

Page 577

Q. Mr. Brownstein, are you familiar with this document?

A. You have to give me a chance at least to glance at it.

(The witness reviewed the document.)

THE WITNESS: I don't recall, I do not recall ever seeing this before.

BY MR. NESLIN:

Q. Do you recall any discussion at OCRWM about preparing a guidebook for the standard contract?

A. Guidebook does not ring any bells. I have no recollection of that.

Q. This includes information, turning to the Table of Contents, this includes information on the ACR issue resolution process?

A. Yes.

Q. On the Delivery Commitment Schedule process, on the delivery commitment, on the Delivery Commitment Schedule exchanges?

A. Um-hm.

Q. Do you recall any discussion at OCRWM about providing written guidance on those issues collectively in a document of this sort, whether it was called guidebook or not?

Page 578

A. As I testified, we had something called this ACR resolution process with the utilities, and there were a number of issues that were identified, and those would be subject to, you know, discussions at meetings.

I would normally have requested a contractor to prepare such things as suggested -- well, analysis of the issue, and potentially suggested positions for DOE recommendations, so these issues are familiar to me.

Responding to your question, I never saw it in this form or this guidebook, but as I have testified previously, contractors may have worked on this as a way to present this to me, but I don't recall the document.

Q. Mr. Brownstein, I've just looked at several pages, for example.

A. Sure.

Q. Pages 1 and 2, 3, have numbering along the left side of the text?

A. The left? You're talking about these?

Q. Yes.

A. Yeah. Yes.

Q. But by these, you're pointing to the

Page 579

numbers along the left side of the page?

A. Yes.

Q. Does that begin --

MR. BANES: Page, on page 2017.

BY MR. NESLIN:

Q. Does that indicate anything to you about the, who might have prepared this document?

A. As I have testified before, this was a characteristic normally employed by PNL.

Q. If I could ask you to turn to page 37? This would be Bates Number CTR-001-2050 in the lower right-hand corner.

A. Okay.

Q. I would ask you to review lines 13 through 20 on the page.

(The witness reviewed the document.)

THE WITNESS: Okay. I'm sorry. You said to 30?

BY MR. NESLIN:

Q. Thirteen through 20.

A. I have read that, yes; 1 through 28, I didn't.

MR. BANES: Just note for the record line 21 and 22 don't seem to be readable.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And



there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.



Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --



Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
------------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
------------------X





Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**



**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest



Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 440

A. No.

(Milner Exhibit No. 53 was marked for identification.)

BY MR. NESLIN:

Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.

Are you familiar with this document?

A. I don't recall it specifically, no.

Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.

Do you recall the DOE or its contractors doing any work on a DCS exchange network?

A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to

Page 441

take an active role, how might that be accomplished.

Q. Who at the Department was involved in that consideration?

A. Well, I guess it would have been myself, members of my staff, the director of the program.

Q. Who on your staff?

A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.

Q. Anyone else?

A. Not that I can recall offhand.

Q. During what period would the Department have been considering this question?

A. In March 31st, 1994.

Q. Do you, sitting here today do you recall over what period of time that consideration extended?

A. No, I don't.

Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

Page 442

THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.

BY MR. NESLIN:

Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: I have no such understanding.

BY MR. NESLIN:

Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?

MR. SHULTIS: Same objection.

THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.

BY MR. NESLIN:

Q. In considering how the Department might take an active role, what sorts of actions did you

Page 443

consider?

A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.

And, you know, the potential of in essence brokering something between the two utilities.

Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?

A. I do now reading this.

Q. But you don't have any independent recollection beyond this document?

A. No, I don't.

Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?

A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.

Q. You say it would never relate to a position?

A. It would never reflect, I'm sorry; not



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 444

relate, it would never reflect the Department's position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
--------------------------------- :

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

Page 1827

APPEARANCES:

ON BEHALF OF PLAINTIFF:

DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:

STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S

THE COURT: Let's go.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. CAYNE:

Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?
A. Yes. I see it.
Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?
A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.
Q. And who is that person?
A. Mr. Piersma used to be with a group called Public Citizen.
Q. And there's also a CC?
A. Yes.

- 19 -

Page 2110

one entity. So essentially, the vast majority of contracting that the program does in order to conduct its activities, both at the repository, through the transportation, the waste acceptance area, for instance, and other areas, systems area, for instance, that I manage, are also done by Bechtel SAIC Corporation, with the help of subcontractors.

Q. Now, in terms of your job, how do you use the contractors that you reference, both the M&O and subcontractors?

A. Well, we have an annual task statement with them under which they do individual studies for us, and when there are specific guidance that we want to give them about a specific report, we will issue a technical direction letter asking them to conduct a certain study for us, and then they provide those studies, and we review them, provide comments, and that's essentially their role.

Q. Are those considered deliverables under this contract?

A. Yes, they are.

Q. Now, how does DOE -- I assume, are these written products that you're referencing as studies?

A. That's correct.

Q. How does DOE regard these types of reports

Page 2111

prepared by contractors?

A. They're essentially the view of the contractor, and unless the Department issues its own report under its own letterhead, with the DOE stamp, as well as a document number, that's not DOE position or DOE policy.

THE COURT: Right. You're just getting advice?

THE WITNESS: Right, that's correct.

BY MR. DAMELIN:

Q. And in terms of, I think you said putting it on DOE letterhead or the equivalent of that, who makes that decision regarding a contractor report or study or document?

A. It's typically a DOE official, and that's routed through our senior management, and a decision is made that that document is acceptable and will be issued under a DOE letterhead. Let me give you an example. For instance, when we went through the site recommendation process, we went through many, many drafts of documents that were related to the Secretary's recommendation. And those drafts were prepared by contractors, but it wasn't until the Department issued those final documents that became part of the

Page 2112

site recommendation that we adopted and we accepted the language in those reports, and therefore, it was issued under a DOE identification number, and it was considered a DOE document.

Q. Within OCRWM, who is responsible for setting policy regarding the Civilian Radioactive Waste Management Program?

A. It's the director of the program.

Q. Now, your description of, I guess, the type of approval needed for -- or that you view for contractor reports or documents, would that also apply to verbal statements by contractors?

A. Verbal statements by contractors have no binding influence on the department. It's just their views of the world as they see it.

Q. Now, Mr. Kouts, you had mentioned, I believe, in your description of your background, the first position or job that you had within OCRWM related to an MRS proposal to Congress. Can you describe for the Court what your job entailed in that position?

A. Okay. Section 141 of the Nuclear Waste Policy Act basically requested the Department submit a proposal on monitored retrievable storage to the Congress for its consideration, so when I joined the

Page 2113

program, there was a small MRS team that was tasked with putting together that proposal. And that's -- my specific responsibilities had to do with the needs and feasibility analysis of the, of the MRS, which was contained in volume two of the proposal. That volume two was an environmental assessment, which was also required by Congress, the needs and feasibility analysis, which was also required by Congress, and a program plan, which was volume three of that. So those were basically my responsibilities. I worked as a member of that team.

Q. And was that team part, or included as part of OCRWM?

A. Yes, it was a small group that worked for an office director within OCRWM at that time.

Q. And just so I'm clear, the Section 141 you reference, that was to the Nuclear Waste Policy Act?

A. That's correct.

Q. Now, as part of this team that you mentioned you were working on, what steps did DOE take to address the MRS provision of the Nuclear Waste Policy Act?

A. Well, the, the, there was fairly specific guidance given in Section 141. They requested a combination of at least five facilities and the -- or

- 20 -

PNL-5241

# 1984 Annual Review of the Adequacy of the 1-mill/kwh Waste Disposal Fee

R. L. Engel
M. K. White

September 1984

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PNL-5241

PENGAD-Bayonne, N. J.
PLAINTIFF'S EXHIBIT 70

**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY, | ) | Case Nos. 98-126C 98-154C 98-474C |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom Number 5

National Courts Building



717 Madison Street, Northwest

Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

JUDGE MEROW: Take a ten-minute break? Is that enough?

MS. SULLIVAN: Yes, thank you.

JUDGE MEROW: Back on the hour then.

MS. SULLIVAN: Okay, thank you.

(Recess taken from 3:48 p.m. through 4:06 p.m.)

MS. SULLIVAN: I apologize, Your Honor.

JUDGE MEROW: Oh, no problem. Continue when ready.

MS. SULLIVAN: Thank you.

Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I



meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q Mr. Milner, do you know what the Pacific National Laboratory is?

A It's one of the national laboratories in the DOE system.

Q And who runs PNL?

A A contractor, an M and O contractor.

Q And what does an M and O contractor do, to

your understanding?

A In the indication of a lab, they operate the entire lab.

Q Has PNL done work for the Office of Civilian Radioactive Waste Management?

A It has, yes, uh-huh.

Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?

A No, they -- they would be treated like another contractor, any other contractor report.

Q And how is that?

A Which is input to -- to the department for -- for consideration.



Q Thank you.

Mr. Milner, could -- could I direct your attention -- do you have the binder of your deposition in front of you?

A Yes.

Q Could you go to the first tab and just have one -- the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?

A Yes, uh-huh.

Q And Mr. Shapiro asked you about a statement that you had made at your deposition

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
---------------X

Washington, D.C.
Friday, June 4, 1999

Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
GLENN S. GREENE, ESQ.
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
TERRY M. PETRIE, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 10150
Washington, D.C. 20530
(202) 307-6289
and
JANE TAYLOR, ESQ.
U.S. Department of Energy
1000 Independence Avenue, N.W.
Washington, D.C. 20585
(202) 586-7530

Page 3

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| CHRISTOPHER A. KOUTS | |
| By Mr. Greene | 5 |

Afternoon Session - Page 77


EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Letter 3/1/99 | 7 |
| 2 | OCRWM Organization Chart | 48 |
| 3 | Annual Capacity Report March 1995 | 70 |
| 4 | Revision 01 Total System Descrip. | 80 |
| 5 | Determ. Cost-effect. Receipt Rates | 94 |
| 6 | Prelim. Anal. Spent Fuel Scenarios | 99 |
| 7 | Annual Capacity Report June 1988 | 103 |
| 8 | Requirements Document Revision 05 | 107 |
| 9 | Throughput Rate Analysis 8/17/93 | 115 |
| 10 | Rev. 02 Contingency Study 12/18/98 | 120 |
| 11 | Rev. 00 Contingency Study 9/24/98 | 130 |
| 12 | Contract DE-CR01-83NE44428 | 141 |
| 13 | Waste Acceptance Schedules | 150 |
| 14 | Facility Inter. Capab. Assessment | 158 |
| 15 | Memo 3/29/91 HQ0003944-46 | 164 |
| 16 | Draft Instr. For compl. Appendix | 165 |


Page 4

EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 17 | Memo, Meeting Notes 7/21/87 | 169 |
| 18 | Memo, attachments HQ0013354-71 | 174 |
| 19 | Memo, 10/13/98 Meeting Minutes | 180 |
| 20 | Meeting Minutes, attendance list | 183 |
| 21 | OCRWM Transportation Program | 189 |
| 22 | Meeting Agenda 10/3/90 | 192 |
| 23 | Two memos HQ0014780-83 | 195 |
| 24 | Letter, Briefing document diagram | 199 |

Page 93

A. Can you repeat the question?
Q. Do you have an understanding as to whether the shipping schedule that DOE is going to use once this program begins is going to be the schedule that's reflected in Table 8 of the total system description or the rate that's reflected in Table 1 of the 1995 annual capacity report?
A. I think the Department will probably plan for the higher rates because these rates that I see in Table 8 are probably also in our system requirements documents. So those would be the ones that the Department will attempt to try to reach. And assuming we reach those, then these would be also dealt with.
Q. But these waste receipt rates reflected in Table 8 are not necessarily binding?
MR. PETRIE: Objection, calls for a legal conclusion.
BY MR. GREENE:
Q. You can answer, if you know.
A. I'm not a lawyer. I couldn't tell you.
Q. But these rates, it's your sense that this is the target that DOE is shooting at?

Page 94

A. The rates in Table 8, my understanding is that these are also in our systems requirements documents, which means that the people who are designing our facilities and who would operate our transportation system would try to meet these rates as identified in Table 8.
(Kouts Exhibit No. 5 was marked for identification.)
BY MR. GREENE:
Q. Do you recognize this document?
A. It's a contractor report to the program by Pacific Northwest Laboratories. I may have seen it in the past. I don't remember exactly. It doesn't bring anything to mind at this point. It's one of many studies that's been done by the program.
Q. Is Pacific Northwest Labs still in operation?
A. PNL? Yes, it is. It's a contracting lab that works out of Richland, Washington.
Q. Do they still currently work for the Department of Energy?
A. For the Department of Energy? Yes. I don't believe they work for our program except in a very minor way right now.

Page 95

Q. I'm going to direct your attention to page 1151 in the second column. The column is headed Logistics and Cost Calculations and I'm looking at the second paragraph in that which says as follows: "The initial ramp-up to the design acceptance rates at the MRS and repository in the first two years of operations, was assumed to be one-fourth and one-half of the design acceptance rate, respectively."
A. Okay.
Q. Taking into account the current thinking as far as the repository is concerned, would it be possible to have a ramp-up similar to that with the current system that DOE is contemplating, the current plan?
A. I go back to my earlier statement. If the resources are available and the lead time is available, potentially it can be done. But there are just so many variables, it's just hard to say.
Q. But generally speaking, with the resources and the lead time, it's achievable?
A. Again, if a great deal of resources are available and management attention, yes, things can be done. You know, America went to the

Page 96

moon.
Q. Turning to page -- it's actually marked as -- it's page 1156. In the first column under the heading Conclusions, it says that, "Receipt rates higher than the current 3,000 MTU per year planning base appear to be economically justified for both the repository and in MRS." Do you have any understanding as to whether that statement would still hold true today?
MR. PETRIE: Objection. There has no foundation been laid to show that Mr. Kouts has an understanding as to what the underlying assumptions were that went into this statement that apparently formed the basis for that statement, much less being able to respond to the question that up just now formulated.
BY MR. GREENE:
Q. I'll reformulate the question. Do you have an understanding as to whether a receipt rate that's higher than 3,000 MTUs per year would be economically justified today?
A. Without undertaking an analysis of all the variables and so forth, it's just too difficult for me to say. It's possible, and it may not be possible. I just can't say at this

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on January 31, 2007, a copy of this "DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL EXHIBITS PREPARED BY GOVERNMENT CONTRACTORS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kevin B. Crawford