No. 00-697C
(Judge Merow)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

WISCONSIN ELECTRIC POWER COMPANY.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, MS. EILEEN M. SUPKO, REGARDING THE IMPACT OF THE RATE OF ACCEPTANCE UNDER THE STANDARD CONTRACT

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
SONIA ORFIELD
RUSSELL A. SHULTIS
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-9640
Fax: (202) 307-2503

January 31, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


PAGE(S)

STATEMENT OF FACTS . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . 5

I. THE COURT HAS THE POWER AND DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES . . . . 5

II. A MOTION *IN LIMINE* IS APPROPRIATE IF THE TESTIMONY OF A PROPOSED EXPERT WITNESS FAILS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* . . . . . . . . . . 6

A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Relevant and Reliable . . . . . . . . 6

B. The Court Must Determine Whether The Proposed Expert Testimony Is Relevant, Including Whether It Is Helpful To The Trier Of Fact . . . . . . . 8

C. The Proponent Must Also Establish That The Methodology Underlying The Expert's Conclusions Is Reliable . . . . . . . . . . 9

III. THE COURT SHOULD EXCLUDE MS. SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE . . . . . . . . . . 11

A. The Court Should Exclude Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable . . . . . . . . . . 11

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case . . . . . . . . . . 11

2. Ms. Supko's Opinions Should Be Excluded Because They Are Not Reliable . . . . . . . . . . 14

B. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support . . . . . . . . . . 19

C. Even If The Court Were To Accept Counsel's Assertions Concerning The Two Key Issues, Under Ms. Supko's Model, A 3,000 MTU Rate Of Acceptance Does Not Satisfy The Goals That WEPCO Claims Were Expectations Of The NWPA And Standard Contract . . . . . . . . . . . . . . . . 27

IV. THE COURT SHOULD EXCLUDE ANY TESTIMONY BY MS. SUPKO REGARDING THE REQUIREMENTS OF THE STANDARD CONTRACT BECAUSE MS. SUPKO WAS NOT INVOLVED IN ITS PROMULGATION AND HER PROFFERED TESTIMONY EXCEEDS THE OPINIONS AND BASES FOR THOSE OPINIONS DISCLOSED IN HER EXPERT REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

Baskett v. United States,
2 Cl. Ct. 356 (1983) . . . . . . . . . . 5

Blake Constr. Co. v. United States,
987 F.2d 743 (Fed. Cir. 1993) . . . . . . . . . . 31

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . 20

Bluebonnet Sav. Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 19

Boston Edison Co. v. United States,
No. 99-447C (Fed. Cl.) . . . . . . . . . . 2

Bourjaily v. United States,
483 U.S. 171 (1987) . . . . . . . . . . 7, 8, 9

Brown v. Wal-Mart Stores, Inc.,
402 F. Supp. 2d 303 (D. Me. 2005) . . . . . . . . . . 15

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part on other grounds, 301 F.3d 1328 (2002) . . . . . . . . . . 20

Commonwealth Edison Co. v. United States,
No. 98-621C (Fed. Cl.) . . . . . . . . . . 2, 17

Consumers Energy Co. v. United States,
No. 02-1894C (Fed. Cl.) . . . . . . . . . . 2

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . passim

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.3d 1506 (9th Cir. 1985) . . . . . . . . . . 19

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) . . . . . . . . . . 9

Duke Power v. United States,
No. 98-485C (Fed. Cl.) . . . . . . . . . . 2

Dynamics Corp. of Am. v. United States,
17 Cl. Ct. 60 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ericsson, Inc. v. Harris Corp.,
352 F.3d 1369 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fuesting v. Zimmer, Inc.,
421 F.3d 528 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Glendale Fed. Bank FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Greco v. Department of the Army,
852 F.2d 558 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Guillory v. Domtar Indus. Inc.,
95 F.3d 1320 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Home Sav. of Am. v. United States,
57 Fed. Cl. 694 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir.
2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . 2, 17

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Microstrategy Inc. v. Business Objects, S.A.,
429 F.3d 1344 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Needleman v. John Hancock Life Ins. Co.,
No. 03-1955, 2006 WL 842370 (N.D. Tex. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . 12

Northern States Power Co. v. United States,
No. 98-484C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22

O'Conner v. Commonwealth Edison Co.,
13 F.3d 1090 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Oddi v. Ford Motor Co.,
234 F.3d 136 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Omaha Public Power Co. v. United States,
No. 01-115C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

PCL Constr. Services, Inc. v. United States,
47 Fed. Cl. 745 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Ralph Larsen & Son, Inc. v. United States,
17 Cl. Ct. 39 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

South Carolina Electric & Gas Co. v. United States,
No. 04-101C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

Southern Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Southern Nuclear Operating Co. v. United States,
No. 98-614 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Southern Pac. Commc'n Co. v. AT&T,
556 F. Supp. 2d 825 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Suess v. United States,
52 Fed. Cl. 221 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Summers v. Missouri Pac. R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

System Fuels, Inc. (Arkansas) v. United States,
No. 03-2623C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 24, 32

System Fuels, Inc. (Mississippi) v. United States,
No. 03-2624C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 14

System Fuels, Inc. v. United States,
No. 03-2623 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

System Fuels, Inc. v. United States,
No. 03-2624 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wisconsin Electric Power Co. v. United States,
No. 00-697C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 14

Zaremba v. General Motors Corp.,
360 F.3d 355 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Zenith Elecs. Corp. v. WH-TV Broad. Corp.,
395 F.3d 416 (7th Cir. 2005), cert. denied, 125 S. Ct. 2978 (2005) . . . . . . . . . . . . . 10, 15

**STATUTES AND RULES**

10 C.F.R. 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29, 30, 33

Fed. R. Civ. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**MISCELLANEOUS**

Amendments, Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

Restatement (Second) of Contracts § 347(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1 J. Strong, McCormick on Evidence § 12 (4th ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00-697C |
| v. | ) | (Senior Judge Merow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, MS. EILEEN M. SUPKO, REGARDING THE EFFECT OF THE RATE OF ACCEPTANCE UNDER THE STANDARD CONTRACT

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC") and the Court's scheduling order dated December 20, 2005, as amended, defendant, the United States, respectfully requests that the Court enter an order to exclude the testimony of plaintiff's expert witness, Eileen M. Supko, at the forthcoming trial concerning her opinions regarding the effect of the rate at which the Department of Energy ("DOE") would have accepted spent nuclear fuel ("SNF") under the Standard Contract, including the reasonableness of a 3,000 metric tons of uranium ("MTU") per year steady-state acceptance rate. In addition, the Government requests that the Court enter an order excluding any testimony by Ms. Supko regarding the Government's obligations under the Standard Contract.

STATEMENT OF FACTS

In support of its damages claims, plaintiff, Wisconsin Electric Power Company ("WEPCO"), retained Ms. Supko to prepare a report pursuant to RCFC 26(a)(2)(B) regarding "the impact of the DOE's rate of acceptance of SNF assemblies from the nuclear industry as a whole" on two issues identified by counsel: (1) the aggregate amount of additional at-reactor storage capacity that nuclear utilities would need to provide to continue operations after January

31, 1998; and (2) the ability of the utilities "timely" to decommission their nuclear power plants. A. 168 [1] (Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate at 1 ("Acceptance Rate Report"), submitted May 8, 2006).[2]

Ms. Supko opined in her Acceptance Rate Report that a 3,000 MTU per year steady-state acceptance rate, with a 400-600-1200-2000 MTU ramp up rate, is "reasonable." A. 191 (Acceptance Rate Report at 19). Ms. Supko explained that her methodology consisted of reviewing various program documents that DOE had published over the years and using her company's SPNTFUEL computer model to perform an analysis of a range of acceptance rates. A. 176 (Acceptance Rate Report at 4). Ms. Supko modeled four different rate "scenarios" assuming that, on January 31, 1998, DOE began to accept SNF from the industry. A. 179-186 (Acceptance Rate Report at 7-14 ). The rates that Ms. Supko modeled included: a 3,000 MTU steady-state rate after a five year ramp up (Scenario 1), a 900 MTU steady-state rate after a three

---

[1] "A. ____" refers to the attached appendix.

[2] To date, Ms. Supko has submitted reports pursuant to RCFC 26(a)(2)(B) in the following spent nuclear fuel cases: Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004) aff'd, 422 F.3d 1369 (Fed. Cir. 2005); Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006) ("SMUD"); Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl.); Commonwealth Edison Co. v. United States, No. 98-621C (Fed. Cl.); Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.); Omaha Public Power Co. v. United States, No. 01-115C (Fed. Cl.); South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.); System Fuels, Inc. (Arkansas) v. United States, No. 03-2623C (Fed. Cl.); System Fuels, Inc. (Mississippi) v. United States, No. 03-2624C (Fed. Cl.); Northern States Power Co. v. United States, No. 98-484C (Fed. Cl.); Boston Edison Co. v. United States, No. 99-447C (Fed. Cl.); Duke Power v. United States, No. 98-485C (Fed. Cl.); and Consumers Energy Co. v. United States, No. 02-1894C (Fed. Cl.). In her deposition in this case, Ms. Supko testified that her testimony in other cases is applicable to her opinions in this case and that her deposition and trial testimony remains accurate. A. 33-38 ; Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.) (deposition testimony of Eileen Supko, June 27, 2006, 11-16).

year ramp up (Scenario 2), a 900 MTU rate of acceptance that ramped up to 3,000 MTU by 2015 (Scenario 3), and a 6,000 MTU steady-state rate of acceptance with an eight-year ramp up (Scenario 4). Id.

In determining the "reasonableness" of a particular rate of acceptance, Ms. Supko has explained that she measures different rates of acceptance based upon how they compare to the two criteria identified by counsel, as well as a third criteria identified by Ms. Supko – the extent to which the maximum annual steady state acceptance capacity would have been fully utilized over the life of the program. A. 181-82 (Acceptance Rate Report at 1, 9-10). Ms. Supko ultimately opined that it is "reasonable" to use the 3,000 MTU steady-state rate of acceptance (Scenario 1), after a brief ramp-up, because, if DOE had begun acceptance of SNF by January 31, 1998, an overall "steady-state" acceptance rate of 3,000 MTU per year would have limited the amount of additional storage capacity needed at nuclear plants after that date, would have kept up with the utilities' annual discharge rate of 2,000 MTU of SNF, would have worked off the 37,000 MTU backlog of SNF in storage at nuclear plants to allow timely decommissioning, and would have ensured that DOE's waste management system was fully utilized and not overbuilt or underutilized. A. 185-86 (Acceptance Rate Report 1, 13-14). However, Ms. Supko's calculations also demonstrate that, had DOE performed under the 3,000 MTU steady-state rate, with a brief ramp up (Scenario 1), 1,030 MTU of additional at-reactor storage would have been required at 14 nuclear plants after 1998. A. 182-83; 99 (Acceptance Rate Report at 10-11; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1404:11-15).

Ms. Supko also prepared a second report regarding the timing of DOE's acceptance of spent nuclear fuel from WEPCO's Point Beach Units 1 and 2 assuming DOE performance on an industry-wide basis at 3,000 MTU per year after a brief ramp-up. A. 138 (Expert Report Regarding Spent Fuel Acceptance Rates Wisconsin Electric Power Company's Point Beach Unites 1 and 2 ("Acceptance Rates Report for Point Beach")). With respect to the methodology that she used to reach the conclusions in her Acceptance Rates Report for Point Beach, Ms. Supko used DOE's historical and projected future discharges through 2002, contained in certain DOE forms called "RW-859s," and then reviewed future projected discharges that WEPCO provided to Ms. Supko in connection with this case. A. 145-46 (Acceptance Rates Report for Point Beach at 3-4). Plaintiff's damages experts, Ken Metcalfe and Richard Sieracki, use Ms. Supko's conclusions regarding the 3,000 MTU rate of acceptance as an input to their damages model, and the calculation of plaintiff's damages relies heavily upon Ms. Supko's rate opinion.[3]

---

[3] As the Court recently explained in another spent nuclear fuel case,

> The higher DOE's acceptance rate, the earlier in time plaintiff's SNF and/or HLW would have been accepted by DOE under the schedule containing the acceptance queue, and the earlier DOE would have completed performance of the parties' contract had it performed beginning on January 31, 1998. The higher DOE's acceptance rate, the greater the amount of continued storage and related costs that would be the direct result of DOE's failure to begin performance of the standard contract by January 1, 1998, and therefore, the greater the award of damages to plaintiff.

Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 339 (2006). In other words, plaintiff's use of a 3,000 MTU rate of acceptance has the effect of maximizing the quantification of alleged damages.

Additionally, WEPCO indicated in its witness list that Ms. Supko would provide expert testimony at trial "concerning the impact of DOE's acceptance rate under the Standard Contract." Plaintiff's Witness List (emphasis added).

SUMMARY OF ARGUMENT

Ms. Supko's opinion regarding the "reasonableness" of a particular rate of acceptance is not relevant to any issue in this case, is not based upon a reliable or testable methodology, and is inconsistent with the plaintiff's theory of DOE's contractual obligations. Further, because Ms. Supko has expressly disclaimed in her previous depositions and trial testimony that she has any opinions regarding DOE's obligations under the Standard Contract, any testimony by Ms. Supko in this case regarding DOE's obligations under the Standard Contract should be excluded.

ARGUMENT

I. THE COURT HAS THE POWER AND DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC 16] and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986); see Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986). In fact, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the

> authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

## II. A MOTION *IN LIMINE* IS APPROPRIATE IF THE TESTIMONY OF A PROPOSED EXPERT WITNESS FAILS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

### A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Relevant and Reliable

To be admissible, the testimony and opinions of an expert witness must satisfy the requirements of FRE 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

FRE 702 imposes upon the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137, require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under FRE 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Further, the party proposing to introduce expert opinion testimony "has the

burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

The United States Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy, 999 F.2d at 569 (rejecting "'let it all in' philosophy" of expert testimony). The Supreme Court requires Federal courts to exercise greater care to prevent the admission of unreliable or irrelevant expert opinion because "Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses upon the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

Further, the United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert, the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302. The burden of demonstrating Ms. Supko's satisfaction of the Daubert standards lies squarely upon SFI-Arkansas. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).

### B. The Court Must Determine Whether The Proposed Expert Testimony Is Relevant, Including Whether It Is Helpful To The Trier Of Fact

An expert's testimony is not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular case.

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pac. R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002). The opinion of an expert is not "helpful" to the Court, and therefore is not admissible, if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-68 (8th Cir. 1995).

C. The Proponent Must Also Establish That The Methodology Underlying The Expert's Conclusions Is Reliable

"To gauge reliability, the [trial] judge must" not only determine whether the expert is qualified in the relevant field, but must also determine "whether the methodology underlying the expert's conclusions is reliable." Masters, 291 F.3d at 991. FRE 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert and Kumho Tire. Pursuant to those decisions, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds', based on what is known." Daubert, 509 U.S. at 590, 593-94; see Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-50.

As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the FRE requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some cases, reliability will depend upon the "scientific foundations" of the opinion testimony, while, in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150. However, "it will at times be useful to ask even of a witness whose expertise is

based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." Id.

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider in determining whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005), cert. denied, 125 S. Ct. 2978 (2005).

In a recent decision, the United States Court of Appeals for the Seventh Circuit concluded that the district court properly excluded proffered expert testimony concerning lost profits because the expert lacked a sufficient methodology. In Zenith Electronics, 395 F.3d at 419, plaintiff, an electronics manufacturer, sued WH-TV, a digital television broadcaster, to recover payments for converter boxes that WH-TV had ordered. WH-TV filed breach of contract and fraud counterclaims alleging defective merchandise and seeking lost profits. WH-TV proposed to rely upon an expert's opinion that its business would have grown rapidly, and its profits greatly increased, had the plaintiff's product been delivered as promised. Id. at 417-418. However, rather than basing his opinions on the actual sales numbers and shares of digital broadcasting business in other markets, the expert "proposed to testify that [the San Juan market] is 'unique' and that all experience in other markets is irrelevant." Id. at 418. When asked to

identify the methods that he had used to generate his projections that defendant's business would have grown rapidly, the expert repeatedly answered "my expertise" or "my industry experience" or made other similar statements. Id. The court concluded that this "is to say that [the proffered expert] either had no method or could not describe one. He was relying on intuition, which we won't do." Id. (citations omitted). The court stated that, if a witness "could or would not explain how his conclusions met [FRE 702] requirements, he was not entitled to give expert testimony." Id.

## III. THE COURT SHOULD EXCLUDE MS. SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE

### A. The Court Should Exclude Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable

#### 1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case

With respect to the first prong of the Daubert inquiry, Ms. Supko's testimony concerning the "reasonableness" of a particular rate of acceptance is not relevant to any issue in this case. Whether a particular rate of acceptance is "reasonable" is simply not at issue in this case. Rather, the only issue in this case is the damages, if any, that flow from the Government's delay in performing its contractual obligations. As the United States Court of Appeals for the Federal Circuit recently noted in another spent nuclear fuel case, "[a]ny issues related to the types of damages permitted under the contract, if any, and the extent of those damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) (emphasis added).

As this Court recently explained in another spent nuclear fuel case, "[t]he impact of DOE's breach is dependent upon . . . the scope of DOE's performance obligation under the standard contract generally, and the parties' contract specifically . . . ." PG&E, 73 Fed. Cl. at 339 (emphasis added). The Court explained in PG&E that "[o]nly by determining the scope of defendant's performance obligation can the court adequately determine which losses claimed by plaintiff are 'the natural and proximate result' of defendant's failure to begin accepting spent fuel from utilities by January 31, 1998." Id. at 375 n.38. Indeed, in rejecting the identical theory concerning the imposition of a 3,000 MTU rate of acceptance upon the Government that the plaintiff advances in this case, the Court in PG&E explained that "[i]nserting a 'reasonable rate' of 3,000 MTU/year into the Standard Contract would impose an obligation on DOE to which the parties never agreed and which plaintiff did not bargain for. The Court declines to do so." Id. at 381.

It is axiomatic that, under FRE 702, as well as Daubert and its progeny, the Court may only admit expert testimony that is relevant to determine a fact in issue. See Rink, 400 F.3d at 1291; Needleman v. John Hancock Life Ins. Co., No. 03-1955, 2006 WL 842370, at *10 (N.D. Tex. Mar. 31, 2006) (holding that expert testimony was not relevant to resolution of issues in case). Ms. Supko admits that she is not offering any opinions concerning DOE's obligations under the Standard Contract. A. 46-47, 64 (System Fuels, Inc. v. United States, No. 03-2623C, deposition testimony of Eileen Supko, July 19, 2006, 18-19, 142). Indeed, Ms. Supko has no basis for offering such opinions, as she has conceded that she had no involvement in the formation of the Standard Contract or the Nuclear Waste Policy Act ("NWPA") and, moreover, did not speak to any DOE employees prior to 1990 regarding issues related to the Standard

Contract – seven years after WEPCO and DOE entered into the Standard Contracts at issue in this case. A. 92 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1355:1-7, 12-16). Ms. Supko has also conceded she is not offering an opinion that DOE would have performed at a 3,000 MTU steady-state rate of acceptance in the "but for" world. A. 91 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1348:3-8); A. 80 (Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, 228).

Simply put, Ms. Supko is offering an opinion as to what she believes is "reasonable," without reference to the Government's contractual obligations. Yet, by ignoring the actual contract requirements, such as DOE's obligation to issue an annual acceptance priority ranking beginning on April 1, 1991 (see 10 C.F.R. 961.11, Art. IV.B.5.(a)), in conjunction with the issuance of the annual capacity report beginning in 1987 (see 10 C.F.R. 961.11, Art. IV.B.5.(b)), which form the only basis for evaluating the Government's contract liability (see PSEG Nuclear, 465 F.3d at 1351; PG&E, 73 Fed. Cl. at 387 (holding that insertion of a 3,000 MTU rate into the Standard Contract would render the ACR process 'inexplicable, inoperative . . ., insignificant, meaningless, [or] superfluous")), Ms. Supko's analysis lacks foundation for any issue properly presented in this case. Because Ms. Supko's opinions fail to address any relevant issue in this case, Ms. Supko's opinions are of no assistance to the Court in determining the Government's contractual obligations concerning the SNF acceptance rate and schedule. Consequently, Ms. Supko's opinions fail to satisfy the first prong of the Daubert test.[4]

---

[4] In SMUD, Ms. Supko offered the same opinions related to the "reasonableness" of the 3,000 MTU steady-state rate of acceptance that she offers in this case. As in this case, the Government moved to exclude Ms. Supko's opinions in SMUD. At trial, the Court admitted into

2. Ms. Supko's Opinions Should Be Excluded Because They Are Not Reliable

Because Ms. Supko has not employed any scientific or readily testable methodology in determining what would be a "reasonable" rate of acceptance under the Standard Contract, her opinions lack any indicia of reliability. Possessing requisite credentials is insufficient to render expert testimony admissible. See Kumho Tire, 526 U.S. at 153 (affirming trial court's exclusion of expert and noting that, despite the trial court's acceptance of expert's qualifications, the expert lacked a reliable methodology); Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005). Rather, the Federal Circuit has explained that the trial court must ensure that the expert testimony is reliable. Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005) (affirming trial court's exclusion of expert witness that used flawed methodology in reaching conclusions).

---

evidence Ms. Supko's written direct testimony, without formally qualifying Ms. Supko, but reserved ruling on the Government's motion in limine. Ultimately, the Court did not qualify Ms. Supko as an expert and concluded that "the evidence presented on the acceptance rate under the terms of the Standard Contract [is] highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record." SMUD, 70 Fed. Cl. at 375 n.40.

Further, as the Court recently observed in the System Fuels-Mississippi trial after hearing Ms. Supko's identical testimony regarding the "reasonableness" of the 3,000 MTU rate of acceptance:

> To the extent I have to get into determining what the acceptance rate is . . . I don't intend to rely on Ms. Supko's opinion in that regard. There is a lot of documents that we have here and that's - I will make my decision based on those documents . . . [B]ut, I don't intend to rely on an expert for something like that.

A. 93-94 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial transcript, 1373:18-1374:7 (emphasis added)). Judge Braden was the judge in both SMUD and System Fuels-Mississippi.

First, Ms. Supko's methodology concerning the "reasonableness" of a rate of acceptance is simply a determination of whether a particular rate of acceptance satisfies the two "key issues" chosen by counsel, A. 173; 36-38 (Acceptance Rate Report at 1; Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, June 27, 2006, 13-15), and, consequently, is not subject to any type of scientific testing. Whether any particular rate of acceptance is "reasonable" is a subjective judgment call made by Ms. Supko. It is not possible to test such a theory, because it is not science.[5] Indeed, Ms. Supko concedes that rates of acceptance lower than the 3,000 MTU steady-state rate may be reasonable, but she has not endeavored to determine what the minimum reasonable rate of acceptance is. A. 95-96 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1400:24-1401:6).

For example, although Ms. Supko utilizes the aggregate annual SNF discharge rate of all utilities, 2,000 MTU per year, as a benchmark for determining the reasonableness of the amount of additional at-reactor storage after 1998, Ms. Supko has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed "reasonable." A. 60-62, 63; 108; 20 (System Fuels, Inc. v. United States, No. 03-2623 (Fed. Cl.), deposition testimony of Eileen Supko, July 19, 2006, 119-121, 139; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1448:4-20);

---

[5] Indeed, Ms. Supko admitted at trial in Southern Nuclear that, were the Court to reject the two "requirements" (which are essentially the same as the "key issues" in this case) upon which she modeled various acceptance rates, she would need to utilize new assumptions against which to measure various rates. A. 9 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 739:5-9). However, Ms. Supko was unable to identify any alternative criteria that could be used to evaluate the "reasonableness" of various DOE acceptance rates. A. 9 (Id. at 739:10-21).

Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24). Indeed, any such determination would necessarily be based upon nothing more than a subjective judgment incapable of scientific testing. Courts have not hesitated to exclude proposed expert testimony based upon subjective judgments or "intuition" such as the testimony that Ms. Supko intends to offer in this case. See Zenith Electronics, 395 F.3d at 418-19; Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 309 (D. Me. 2005) (rejecting expert opinion that "merely places an expert sheen on common sense," without employing any testable methodology).

Second, Ms. Supko has acknowledged that she has never subjected her methodology concerning the reasonableness of a particular rate of acceptance to peer review. A. 129-30 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1486:24-1487:3). Although "[p]ublication, which is an element of peer review, 'is not a *sine qua non* of admissibility,'" it may suggest "good science." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Daubert, 509 U.S. at 593); see Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (affirming trial court's exclusion of expert where expert had not subjected methodology to peer review or publication); Fuesting, 421 F.3d at 537 (affirming trial court's exclusion of expert witness based, in part, upon lack of peer review of opinion or methodology offered by expert). The lack of peer review or publication highlights the fact that Ms. Supko's opinion concerning the "reasonableness" of a particular rate of acceptance is nothing more than a subjective judgment that is incapable of testing.

Third, there is no support that Ms. Supko's methodology is one that is "generally accepted" in the relevant scientific community. "Widespread acceptance can be an important

factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism." Oddi, 234 F.3d at 145 (quoting Daubert, 509 U.S. at 594); see Zaremba, 360 F.3d at 358 (affirming trial court's exclusion of expert where party tendering expert failed to demonstrate that expert's opinion or methodology was generally accepted). In this case, Ms. Supko's expert reports fail to demonstrate or suggest that her methodology in determining the "reasonableness" of a particular rate of acceptance possesses widespread acceptance in the relevant community.[6]

Finally, and perhaps most significantly, with respect to the rate of error in Ms. Supko's methodology, Ms. Supko has continuously revised her analysis based upon previous significant errors in her model. Although Ms. Supko has, to date, authored expert reports on behalf of approximately 13 plaintiffs in spent nuclear fuel cases, the numbers, or outputs, from Ms. Supko's model in these reports have changed – and, in many instances, changed significantly. These changes, which were made after recognition that her model was producing flawed results, call into question the reliability of her overall conclusions in this case.

Although Ms. Supko has offered the same opinion concerning the reasonableness of a 3,000 MTU steady-state rate (Scenario 1) in virtually every acceptance rate report that she has authored to date, the amount of additional at-reactor storage that she calculates has changed dramatically over the course of her reports. In Ms. Supko's expert report in Commonwealth Edison Co. v. United States, No. 98-621C (Fed. Cl.), Ms. Supko concluded that there would be

[6] Similarly, the Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), rejected Ms. Supko's opinions concerning a prediction as to when DOE would open a repository, concluding that "[s]he did not present a 'methodology' that could be used by experts in such a field." Id. at 647.

1,600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. A. 125 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1481:13-24). In Ms. Supko's next expert report in SMUD, however, Ms. Supko concluded that there would be only 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Ms. Supko admitted that the reason for this 1,000 MTU decrease in her calculation of additional storage requirements was her failure to consider linking a utility that had dry storage in 1998 with that utility's wet pool in her SPNTFUEL model. A. 125-26 (Id. at 1481:25-1482:12).

Significantly, Ms. Supko has admitted that she committed another error in her calculations in SMUD and underestimated the amount of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance by 430 MTUs. A. 125-28 (Id. at 1481:18-1484:3). Ms. Supko conceded that, in a report that she subsequently authored for another SNF client in South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.), she calculated 1,030 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate (Scenario 1). A. 128 (Id. at 1484:4-9). Ms. Supko has explained that the reason that she has now increased her calculation of the amount of additional at-reactor storage by 430 MTUs was because she had "underestimated the requirements at the eight sites that had dry storage prior to 1998. I underestimated their requirements post-1998 because of the way that I linked things in the model." A.10-11; 128 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 746:2-747:7; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1484:10-14). Tellingly, and despite these drastic changes in the amount of additional at-reactor storage that Ms. Supko has calculated, Ms. Supko has never modified her opinion concerning the reasonableness of a 3,000 MTU steady-state rate

of acceptance. Indeed, Ms. Supko has conceded that the numbers which she has calculated regarding additional at-reactor storage may change yet again in the future as she receives updated information from utilities whom she represents as clients. A.14 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 756:3-9). Yet, this tremendous variance in at-reactor storage – from a high of 1,600 MTU to a low of 600 MTU to a number somewhere in-between – calls into serious question the reliability of the results of Ms. Supko's analysis in this case.

### B. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support

In determining whether a hypothetical model such as the one that Ms. Supko offers provides a sufficient basis for an award of damages, plaintiff must, as we discussed in our pre-trial brief, establish a realistic and complete "but for" world. See Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1379-80 (Fed. Cir. 2003) (patentee seeking lost profits for infringement must account for the effects of "hypothetically increased price" in "but for" world); Bluebonnet Sav. Bank v. United States, 339 F.3d 1341, 1345-46 (Fed. Cir. 2003) (requiring trial court to determine costs that plaintiff would have incurred in absence of breach); Glendale Fed. Bank FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear the burden of proving "what might have been"); Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.3d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); PG&E, 73 Fed. Cl. at 386 ("[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had the defendant performed the Standard Contract"); Restatement (Second) of Contracts § 347(c).

Where, as here, WEPCO attempts to prove that it has suffered damages using a "computer [model] of the hypothetical 'but for'" world premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal" to the damage claim. Southern Pac. Commc'n Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982); see Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001); LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 93-95 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003); Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 134 (S.D.N.Y. 1998). WEPCO's damages model may not be based upon mere speculation or hypotheticals. Home Sav. of Am. v. United States, 57 Fed. Cl. 694, 727 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected expert models that lack evidentiary foundation, on the grounds that such models are improperly speculative. In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part, & remanded in part on other grounds, 301 F.3d 1328 (2002), this Court rejected the expert's model because it was based upon assumptions that were contrary to facts in the record. Id. at 206. Specifically, this Court held that "[a] claim whose basic structural components lack such factual foundation is simply speculation." Id.

Likewise, in Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected plaintiff's damages model, explaining that:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would,

> even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241; accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999), aff'd in part, vacated in part, remanded on other grounds, 239 F.3d 1374 (Fed. Cir. 2001) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model as "premised on unrealistic assumptions").

In this case, Ms. Supko's model is significantly flawed because it does not represent either the "but for" or the actual world, but rather is a "hybrid" of both worlds. Ms. Supko endeavors to use her company's SPNTFUEL model to calculate the amount of additional storage requirements for utilities after 1998 in the "but for" world where DOE begins industry-wide spent fuel acceptance beginning on January 31, 1998. However, Ms. Supko admits that she includes in her "but for" world model dry storage from utilities such as Northern States Power Company, even though Northern States claimed it would not have needed dry storage had DOE performed in 1998. A. 135 (Northern States Power Co. v. United States, No. 98-484C (Fed. Cl.) trial testimony of Eileen Supko, 2582:5-11) ("[B]ecause [Northern States] had dry storage, maybe I should call this [model] a hybrid because I was trying to reflect the world as it existed in the real world as of 1998 . . ."). As Ms. Supko recently explained at trial in the Northern States case in response to the Court's questions concerning her "hybrid" model:

> Yes, you know, it's difficult to think about where to draw the line in terms of the actual world that the nuclear companies have been operating in and the imaginary but-for world. As I said, I suppose I could have assumed no dry storage into any plant and to see where that would lead into in the analysis.
>
> Or I could have hypothetically changed pool capacities, assuming companies would have reracked. I did not do that. I used information I had available. And, I will, again, remind you that this is a projection, these are projections. They're based on a set of inputs, and if you change the inputs, you make it a different calculation of additional storage requirements.

A. 136 (Id. at 2583:4-20 (emphasis supplied))

Indeed, although Ms. Supko's SPNTFUEL model purports to model a "but for" world, Ms. Supko acknowledges that her model uses spent fuel pool capacities for plants that had added additional storage capacity to their pools after 1998. A. 110-11 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.), trial testimony of Eileen Supko, 1459:20-1460:3). For example, Ms. Supko's model assumes spaces for Southern Nuclear's Plant Hatch spent fuel pool that include not only a post-1998 rerack, but also a temporary rack that was never actually installed. A.111; 112 (Id. at 1460:4-16; 1461:17-22). Additionally, Ms. Supko utilized South Carolina Electric & Gas's 2002 rerack of its spent fuel pool in her model for purposes of modeling DOE performance beginning in 1998. A. 12-13 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 751:23-752:5). These differences in pool capacities decrease the post-1998 additional at-reactor storage calculations in her SPNTFUEL model. Consequently, as Ms. Supko concedes, if 1998 data were properly used, it would increase the number of plants requiring additional at-reactor storage after 1998. A. 114-15 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1465:5-1466:25).

Ms. Supko admitted that she is using post-1998 pool capacity modifications for "about a dozen" plants. A.113-14 (Id. at 1464:14-1465:4). When asked why she used post-1998 actual additional storage for purposes of determining what the "but for" world would have looked like in 1998, Ms. Supko candidly admitted that she did not "go back and try to see what the world looked like for every pool in 1998. That would have required my going back into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments." A.13 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 752:21-25). Yet, that is precisely the type of analytical rigor expected from an expert. Ms. Supko's failure properly to model the "but for" world simply reflects a flaw in her overall analysis and seriously calls into question her overall opinions in this case.

Ms. Supko's inability to "draw the line" between the "but for" and actual worlds in her model in terms of the spent fuel storage situation of the utilities results in her model providing no meaningful information to the Court in terms of the additional storage requirements needed post-1998 in the "but for" world. Absent any reliable determination by Ms. Supko concerning what utility spent fuel storage needs would be had DOE performed beginning in 1998, Ms. Supko's calculation of utility storage needs after 1998 is entirely flawed. Because Ms. Supko's "hybrid" model does not provide any meaningful or reliable information about either the "but for" or actual worlds, her testimony concerning the outputs of this model – including her calculation of post-1998 spent fuel storage requirements in the "but for" world - should be excluded.

Further, Ms. Supko's hypothetical model of the "but for" world is not based upon actual facts, but, rather, is based upon industry-wide assumptions which, in many instances, bear no

relation to the actual or "but for" world. For example, despite Ms. Supko's concession that the determination of an operating reserve[7] is utility-specific, Ms. Supko has not endeavored to apply individual utilities' operating reserve policies in her industry-wide acceptance rate model. A. 130 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1480:10-17). Rather, regardless of what an individual utility's operating reserve policy actually is, and despite the fact that Ms. Supko has endeavored to model what reasonable acceptance would have looked like in the "but for" world, Ms. Supko has simply made a uniform assumption of one full core reserve per pool for each utility, and has not endeavored to determine which individual utilities reserve more space than a full core reserve. A. 130 (Id. at 1480:10-17). Ms. Supko admitted that, had she increased her operating reserve assumption beyond one full core, it could potentially increase the amount of additional at-reactor storage that she has calculated. A. 130 (Id. at 1480:18-24).

In addition, Ms. Supko uses the licensed capacity of the spent fuel pools, rather than 1998 actual usable capacity, in her model for those utilities that are not her clients.[8] A. 119-20 (Id. at 1470:22-1471:4). However, as Ms. Supko has acknowledged, the number of spaces in spent fuel pools may differ between licensed and actual usable capacity. A. 116;117-18 (Southern Nuclear

---

[7] A full core reserve refers to utilities reserving enough space in their spent fuel pools to offload all of the nuclear fuel in the reactor. A. 122 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1478:1-8). Some companies reserve more than a full core. The amount of space a utility actually reserves is referred to as a operating reserve. A. 123-124 (Id. at 1479:23-1480:17).

[8] For those utilities that are her clients, she uses the actual usable capacity in her model to the extent that her clients provide her with this information. A. 116; ; 119; 119-20 (System Fuels, Inc. v. United States, No. 03-2623C (Fed. Cl.), trial testimony of Eileen Supko, 1467:5-12; 1470:22-1471:4; 1471:23-1472:6 ).

Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 1467:5-12; 1468:7-1469:4). Indeed, in WEPCO's case, the difference between licensed capacity and usable capacity in 1997 was 18 spaces. Ms. Supko has not calculated whether her use of licensed capacity over actual usable capacity affects additional at-reactor storage requirements under her model. A. 120-21 (Id. at 1471:23-1472:6). Consequently, Ms. Supko's model does not properly account for available at-reactor storage in the "but for" world.

Ms. Supko has admitted that, despite the fact that she is endeavoring to model a "but for" acceptance scenario, as she represents more utilities in the SNF litigation, it is possible that she will continue to change her model to reflect those utilities' pool capacities, future projected discharges, and other utility-specific information. A. 85-86 (Id. at 787:20-788:1). This concession simply highlights the malleability inherent in her model, and its lack of a relationship to the "but for" world, a world which would have been fixed at some point prior to January 31, 1998. Consequently, the Court should reject Ms. Supko's conclusions and assumptions because they fail properly to account for the "but for" world. See Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1330 (5th Cir. 1996) (limiting expert testimony because it was not "sufficiently grounded in scientific methodology or the facts as presented in the in the testimony of other witnesses").

Another uniform assumption that Ms. Supko has made in her model is the use of license extensions. A.78-79 (System Fuels, Inc. v. United States, No. 03-2623 (Fed. Cl.), Deposition Transcript of Eileen Supko, July 19, 2006, 207-08). Although they both purport to be "but for" analyses, Ms. Supko has made entirely inconsistent assumptions between her industry-wide acceptance model (Acceptance Rate Report) and her WEPCO acceptance rate model (Acceptance Rate Report for Point Beach). A. 16-17 (Southern Nuclear Operating Co. v. United States, No.

98-614 (Fed. Cl.) trial testimony of Eileen Supko, 783:22-784:6). For example, Ms. Supko has assumed that, for purposes of her industry-wide model, no utility seeks a license extension. A. 15 (Id. at 782:18-21). Yet, for purposes of modeling WEPCO's acceptance rights, Ms. Supko assumes that WEPCO seeks and obtains a license extension for its plants. A. 15 (Id. at 782:22-25).[9]

Had Ms. Supko assumed license extensions on an industry-wide basis, this assumption would have had a significant effect upon her calculations in this case. Ms. Supko has testified that, if she assumed license extensions in her industry-wide acceptance model (Acceptance Rate Report), the amount of average post-shutdown storage time would decrease in Scenarios 1, 3, and 4 and would increase in Scenario 2. A. 17 (Id. at 784:9-21). The reason for the decrease in the average post-shutdown storage time if Ms. Supko assumed license extensions is because, with license extension and assuming the requirements for SNF that SFI-Arkansas alleges, DOE would have 20 more years to work off the "backlog" of SNF generated by utilities. A. 18 (Id. at 785:6-10). Ms. Supko has stated that, if she had assumed license extensions in her industry-wide model, the amount of average post-shutdown storage time with respect to Scenario 3 would decrease from 16.5 years to approximately 12 or 13 years. A. 18 (Id. at 785:1-5). Ms. Supko also explained that, under a 3,000 MTU rate of acceptance, which she claims is "reasonable," the

---

[9] Ms. Supko had not endeavored to model whether, in 1998, a particular utility would have sought a license extension. A. 15 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 782:12-17). Indeed, Ms. Supko testified that it "would have been difficult to determine in 1998" whether a particular utility would have sought and received a license extension. A. 15 (Id. at 782:16-17). Whether such an analysis would be difficult does not obviate the need to engage in such an analysis properly to reflect the "but for" world.

range of average post-shutdown storage is "approximately 12 or 14 years for operating nuclear power plants." A. 3-4 (Id. at 689:25-690:2).

C. Even If The Court Were To Accept Counsel's Assertions Concerning The Two Key Issues, Under Ms. Supko's Model, A 3,000 MTU Rate Of Acceptance Does Not Satisfy The Goals That WEPCO Claims Were Expectations Of The NWPA And Standard Contract

WEPCO asserts that performance under the Standard Contract required DOE to accept SNF at a rate sufficient to avoid the need for utilities to acquire additional storage capacity after 1998 and to remove the accumulated backlog of SNF from the utilities' plants. WEPCO Memorandum of Contentions of Fact and Law ("Pl. Br.") at 8-10, 23-24. According to WEPCO, these "goals" required DOE to perform at a steady-state rate of 3,000 MTU (Scenario 1). Id. As support for the "reasonableness" of the 3,000 MTU rate in meeting WEPCO's claimed goals, plaintiff refers to Ms. Supko's opinions. Id. at 23 ("[WEPCO] also will present evidence through expert witness Eileen Supko establishing that an acceptance rate that avoided utilities having to add SNF storage after 1998 and worked off the backlog of SNF at a reasonable rate would have approximated 3,000 MTU annually on an industrywide basis."). In fact, Ms. Supko's analysis demonstrates that a 3,000 MTU steady-state rate of acceptance beginning in the fifth year of the DOE program violates WEPCO's proffered views of both the NWPA and the Standard Contract, because the rate results in significant additional at-reactor storage after 1998. Indeed, under the plaintiff's theory of DOE's contractual obligations, Ms. Supko's modeling establishes that performance by DOE under the 3,000 MTU rate of acceptance constitutes a breach of the Standard Contract with respect to numerous contract-holders. Because the 3,000 MTU rate of acceptance does not attain WEPCO's alleged two goals of the Standard Contract, Ms. Supko's

analysis merely demonstrates that the 3,000 MTU steady-state rate removes more spent fuel from the industry's nuclear plants than other slower rates of acceptance she models (Scenarios 2 & 3), and less spent fuel than faster rates of acceptance she models (Scenario 4). This conclusion – that a higher rate of acceptance results in more spent fuel being accepted – is hardly the subject of expert testimony, but rather, is the result of common sense.

Ms. Supko's conclusion in this case – that, under a 3,000 MTU steady-state rate of acceptance (Scenario 1), there would be 1,030 MTUs of additional at-reactor storage and nine years of average post shutdown storage time, A. 182-83 (Acceptance Rate Report at 10-11) – plainly violates the "goals" of the Standard Contract as WEPCO has articulated them. Indeed, Ms. Supko conceded that, under the 3,000 MTU steady-state rate, she calculated that at least 14 utilities would have to add additional at-reactor storage after 1998.. A. 58-59; 97; 99 (System Fuels, Inc. v. United States, No. 03-2623 (Fed. Cl.), deposition of Eileen Supko, July 19, 2006, at 49-50; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1402:3-12; 1404:11-15).[10]

Moreover, Ms. Supko's analysis reflects that a rate of acceptance lower than 3,000 MTU per year could satisfy these "goals." First, with respect to the first prong of WEPCO's claimed objectives – the amount of additional at-reactor storage after 1998 – Ms. Supko explained that one of the benchmarks that she utilizes to determine whether the amount of additional at-reactor

[10] Of the approximately 14 utilities that Ms. Supko has identified as requiring additional at-reactor storage after 1998 even under a 3,000 MTU steady-state rate of acceptance, four of those utilities had over 100 MTUs of additional at-reactor storage. A. 25 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 823:19-24). For example, Palo Verde Number 1 had 184.9 MTUs of additional at-reactor storage even under Ms. Supko's 3,000 MTU steady-state rate of acceptance. A. 25-26 (Id. at 823:25-824:5).

storage after 1998 is reasonable is how that number compares to the annual cumulative discharge rates of all commercial reactors. A. 19 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 807:3-14). Notably, Ms. Supko has admitted that a 2,000 MTU rate of acceptance would generally keep up with the annual discharge rate. A. 27 (Id. at 831:3-12). Further, Ms. Supko has testified that the amount of additional at-reactor storage after 1998 could be as high as 1,999 MTU and still satisfy the first "objective" identified by counsel. A. 21 (Id. at 809:17-22).[11] Indeed, although Ms. Supko testified that the amount of additional at-reactor storage number would decrease if utilities utilized certain contract provisions such as "exchanges,"[12] Ms. Supko has not endeavored to model how the additional at-reactor storage number would decrease had exchanges been utilized under the Standard Contract or what exchanges would have cost in a "but for" world. A. 65-76; 100-101 (System Fuels, Inc. v. United States, No. 03-2623 (Fed. Cl.), deposition of Eileen Supko, July 19, 2006, 157-168; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1427:17-1428:3).

Similarly, although Ms. Supko claimed that the amount of additional at-reactor storage number could be even lower depending upon individual utilities' decisions regarding matters

---

[11] The amount of "reasonable" additional at-reactor storage could potentially be even higher under Ms. Supko's analysis because, although Ms. Supko utilizes the annual discharge rate of 2,000 MTU as a benchmark for determining the "reasonableness" of the amount of additional at-reactor storage after 1998, she has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed reasonable. A. 20 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24).

[12] Pursuant to Article V.E. of the Standard Contract, utilities have the right to exchange approved delivery commitment schedules with other utilities. However, DOE has the right to approve or disapprove any exchanges. See 10 C.F.R. 961.11, Art. V.E.

such as full core reserve policies and the management of pool capacities and wet storage racks, Ms. Supko admitted that she did not endeavor to model how that number would be affected had utilities made such decisions. A. 124; 22 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.), trial testimony of Eileen Supko, 1480:10-17; Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 813:10-20).[13] Ms. Supko has also admitted that had she assumed license extensions in her utility-wide analysis, under Scenario 3,

[13] Similarly, although Ms. Supko has performed a "sensitivity" analysis in which she models intra-utility exchanges of acceptances rights (i.e., trading of acceptance rights between common owners), she has admitted that the decision to engage in intra-utility trades is very company-specific and that she has not spoken to any utilities regarding their willingness to engage in such trades. A.107-08; 28 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1447:17-1448:3; Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 849:18-21).

Further, Ms. Supko opined that the amount of additional at-reactor storage may decrease if utilities utilized the plus/minus 20 percent provision of the Standard Contract. Articles V.B.2. & C of the Standard Contract permits utilities holding approved delivery commitment schedules to adjust the quantity of SNF to be delivered by plus or minus 20 percent until they submit their final delivery schedule, but DOE must approve the final delivery schedule and, therefore, has the ability to disapprove of the adjustment in quantity. 10 C.F.R. § 961.11, Arts. V.B.2 & V.C. Ms. Supko admitted that she did not analyze how the 20-percent provision would work on a specific utility-by-utility basis. A.77 (System Fuels, Inc. v. United States, No. 03-2623 (Fed. Cl.), deposition of Eileen Supko, July 19, 2006, 184). Indeed, Ms. Supko did not offer an opinion in this case as to the effect of the plus/minus 20 percent provision on any particular utility. Further, Ms. Supko has admitted that utilities could also request that DOE accept 20 percent less fuel under the plus/minus 20-percent provision of the Standard Contract. A. 29 (Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 856:20-25).

Additionally, Ms. Supko concedes that the inter-utility exchanges and the plus/minus 20-percent provisions of the Standard Contract are contingent upon DOE having approved the utilities' delivery commitment schedules under Article V.B. of the Standard Contract. See 10 C.F.R. 961.11, Art. V.B.; A. 109; 102 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1449:16-23; 1432:1-12). However, Ms. Supko does not know which of the 14 utilities had approved DCSs. Consequently, Ms Supko has no factual basis for her conclusions that the amount of at-reactor storage could be lower using her flexibilities. A. 102 (Id. 1432:13-24).

the amount of average post-shutdown time that would decrease from 16.5 years to approximately 12 years, a period of time she deemed "reasonable" under the 3,000 MTU steady-state rate. A. 3; 23-24 (Id. at 689:25-690:2; 814:24-815:5).

In short, Ms. Supko's opinions are irrelevant to any issue in this case, lack any indicia of reliability, and are entirely inconsistent with WEPC's purported understanding of DOE's obligations under the NWPA and the Standard Contract.

## IV. THE COURT SHOULD EXCLUDE ANY TESTIMONY BY MS. SUPKO REGARDING THE REQUIREMENTS OF THE STANDARD CONTRACT BECAUSE MS. SUPKO WAS NOT INVOLVED IN ITS PROMULGATION AND HER PROFFERED TESTIMONY EXCEEDS THE OPINIONS AND BASES FOR THOSE OPINIONS DISCLOSED IN HER EXPERT REPORTS

WEPCO's witness list indicates that Ms. Supko will testify as an expert "concerning the impact of DOE's acceptance rate under the Standard Contract." Plaintiff's Witness List (emphasis added).

First, "[r]egardless of the rule concerning admissibility of opinion upon ultimate facts, courts do not permit opinion on a question of law, unless the issue concerns a question of foreign law." 1 J. Strong, McCormick on Evidence § 12, at 50 (4th ed. 1992). The United States Court of Appeals for the Federal Circuit has recognized that the interpretation of the terms of a contract is an issue of law, the responsibility for which lies with the Court. Blake Constr. Co. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993); Greco v. Department of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988). Therefore, the opinion of an expert on the meaning, effect, or intent of a contract provision is inadmissible:

> Plaintiff's allegation, made at the hearing, that expert testimony is required to interpret the specifications is without merit. To accept such an assertion would result in the untenable situation of

> requiring that every disputed contract be interpreted with expert testimony. Contracts, such as the one at issue here, are not beyond the ability of courts to accurately interpret.

Ralph Larsen & Son, Inc. v. United States, 17 Cl. Ct. 39, 46 (1989); see PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745, 785 (2000) ("[t]he subjective, unexpressed intent of one party, or a post-hoc 'interpretation' of what a bidder is said to have believed when entering into a certain type of contract (especially when offered by a third-party 'expert'), is irrelevant for interpreting the contract"); Dynamics Corp. of Am. v. United States, 17 Cl. Ct. 60, 66 (1989) ("the defendant's expert is not charged with the interpretation of the contract," as it "is the role of the court to make that determination").

Second, Ms. Supko was not involved in the promulgation of the Standard Contract. A. 92 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1355:1-16). Ms. Supko did not begin to work with issues related to the Standard Contract until 1990, seven years after its promulgation. A. 92 (Id. At 1355:1-16). Therefore, she is not competent to provided fact testimony regarding the Standard Contract due to her lack of personal knowledge. Fed. R. Evid. 602, 701. Any testimony that Ms. Supko has to offer on the Standard Contract is simply irrelevant and should be excluded.

Third, such testimony constitutes impermissible parol evidence. Where a contract is integrated, parol testimony is prohibited. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (holding that integration clause of Government contract precluded use of extrinsic evidence to add or modify the contractual terms). The Standard Contract contains a clear and unambiguous integration clause:

> This contract, which consists of Articles I through XXI and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. 961.11, Art. XXII.A; see PG&E, 73 Fed. Cl. at 385 (holding that the "existence of the integration clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term.").

Fourth, RCFC 26(a)(2) requires an expert witness to provide a report with "a complete statement of all opinions to be expressed and the basis and reasons therefor." "A party that without substantial justification fails to disclose information required by RCFC 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." RCFC 37(c)(1). Ms. Supko has not offered an opinion, either in her expert report or deposition in this case, regarding the Standard Contract and has asserted any such testimony calls for a legal conclusion. Indeed, when deposed in System Fuels, Inc. (Arkansas) v. United States, No. 03-2623C (Fed. Cl.), Ms. Supko refused to offer testimony on this point because she claimed that it is a legal issue:

> Q. Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?
>
> A. There is no rate of acceptance in the standard contract specified.
>
> Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?

* * *

> A. As I said, there's no rate in the contract.
>
> Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?
>
> * * *
>
> A. I'm not going to offer an opinion as to what their obligations are.

A. 46-57 (Id. deposition of Eileen Supko, July 19, 2006, 18-29) (emphasis added).

Consequently, Ms. Supko should not be permitted to testify regarding the obligations contained in the Standard Contract.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court exclude the opinions of Ms. Supko as an expert witness at the forthcoming trial concerning the DOE's rate of acceptance, including the reasonableness the 3,000 MTU per year steady-state acceptance rate. In addition, the Government requests that the Court enter an order excluding Ms. Supko's proffered expert testimony regarding the Government's obligations under the Nuclear Waste Policy Act and the Standard Contract, as well as her proposed fact witness testimony concerning general spent fuel storage practices and related technical issues in the nuclear industry.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Kevin B. Crawford by Stephen Finn
KEVIN B. CRAWFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-9640
Fax: (202) 307-2503

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
SONIA ORFIELD
RUSSELL A. SHULTIS
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 31, 2007

Attorneys for Defendant

# INDEX TO THE APPENDIX

Document ... Page

Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614 (Fed. Cl.), Trial Transcript, (October 19, 2005) ... 1

Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614 (Fed. Cl.), Trial Transcript, (October 20, 2005) ... 6

Wisconsin Electric Power Co., v United States, No 00-697 (Fed. Cl.), Deposition of Eileen M. Supko, (June 27, 2006) ... 31

System Fuels, Inc. v. United States, No. 03-2423 (Fed. Cl.), Deposition of Eileen M. Supko, (July 19, 2006) ... 42

System Fuels, Inc. v. United States, No. 03-2424 (Fed. Cl.), Trial Transcript, (September 20, 2006) ... 82

System Fuels, Inc. v. United States, No. 03-2424 (Fed. Cl.), Trial Transcript, (September 21, 2006) ... 88

System Fuels, Inc. v. United States, 03-2424 (Fed. Cl.), Trial Transcript, (September 22, 2006) ... 104

Northern States Power Co. v. United States, No. 98-484 (Fed. Cl.), Trial Transcript, (November 8, 2006) ... 132

Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2 (July 14, 2005) ... 138

Expert Report Regarding Determination of The U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate (May 8, 2006) ... 168

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place N.W.
Washington, D.C.

Wednesday, October 19, 2005

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

them to accommodate it? Would they have needed additional dry storage?

A. As I said earlier, I looked at the numbers for the plants, the additional requirements were typically under 100 metric tons, in some cases one or two reloads of spent nuclear fuel. That type of quantity could have been accommodated by providing additional racks and just some of the flexibilities, unracked areas of the pool, providing temporary racks, for example, in the spent fuel cask. That's been done at some plants.

Using part of the full core discharge capability, there are a wide range of things that could have been done, had they believed performance was going to occur.

Q. Okay. Moving down now to the average post -- you were talking about scenario 1 and walking us through the chart. Tell us what the results are for -- first of all, average post shutdown storage is obviously an industry-wide average?

A. It is an average over all of the plants. There are 70 some sites, so this is based on each site. Some sites have more than one reactor operating.

The range of numbers in this ranges from

five years of post shutdown storage to approximately 12 or 14 years for operating nuclear power plants.

Q. And that's under scenario 1?

A. Under scenario 1, yes.

Q. Could you continue with your discussion of scenario 1, please?

A. Yes. The years maximum acceptance capacity utilized, 28 years, that means that from the start of waste acceptance in 1998, DOE would pick up 3,000 metric tons per year for a total of 28 years over about a 40 year period. So that's about three-quarters of the program.

Q. And what are your views in terms of scenario 1 in terms of its efficiency?

A. The fact that it does minimize the amount of additional storage requirements and it provides a reasonable time post shutdown storage and it provides what I would consider to be an efficient and a practicable time period for utilizing the system capacity, I think this is a reasonable rate of acceptance that would have been practicable.

Q. How about scenario 2?

A. Scenario 2 is the flat 900 metric ton rate. I calculated additional storage requirements after 1998 of 13,130 metric tons. This is more than

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 19, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/19/05

Karen Brynteson, RMR, CRR
Official Reporter
Heritage Reporting Corp.
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Thursday, October 20, 2005

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

BENTINA TERRY, ESQ.
Southern Nuclear
P.O. Box 1295
Birmingham, Alabama 35201

APPEARANCES:

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

Q. I understand, Ms. Supko, it is your belief that these are important factors to consider in the nuclear waste program. But my question to you is slightly different.

All I am simply asking you is if those two factors are rejected by the Court, you would need new assumptions, correct, to measure the various rates against?

A. I suppose that's true.

Q. And, in fact, sitting here today, you can't identify an alternative methodology that you would utilize to determine the reasonableness of a particular rate, correct?

A. As I said, the amount of additional storage at nuclear power plants and how long spent nuclear fuel remains at those sites are the important factors from the nuclear industry perspective.

They are factors that the Department of Energy itself has kept track of. Yes, you are right, I don't know what else one would evaluate.

Q. You had spoken a little bit yesterday about the ERI computer model. Do you recall that testimony?

A. Yes.

Q. And the ERI computer model, that was created

incorrect.

A. As I explained yesterday briefly, what I did was I decided to export data that was calculated by the SPNTFUEL program into an Excel spreadsheet. The reason that I did that was during, I believe it was during my Southern Nuclear deposition, based on questions that were asked me by counsel for the government, it appeared that there were questions such as, well, where is the output from the model? And I said, well, they are in the output files, but it seemed as though it wasn't 100 percent clear as to how it was that the model worked.

And so I thought I would be more transparent and export the results and calculate the additional requirements for each plant so that you could see, everybody knows or most people are very familiar with Excel, and Excel spreadsheets, I would calculate the additional requirements in an Excel spreadsheet.

In doing that, I discovered that I did the calculation differently in the spreadsheet than the code had been using and discovered that I had, what is the word I am looking for -- basically underestimated the requirements at the eight sites that had dry storage prior to 1998. I

underestimated their requirements post-1998 because of the way I had linked things in the model.

In my spreadsheet, it was very clear the way that I calculated it that these results were a better reflection of what would happen at sites not only that had dry storage before 1998 but those that did not.

Q. That was very helpful, thank you, Ms. Supko. And, in fact, stated another way, you have in this case underestimated the amount of storage requirements for those utilities that had dry storage as of 1998, correct?

A. Yes. There were, I believe, about eight sites.

Q. About eight sites. And then yesterday you endeavored to correct that oversight by using the numbers that you used in subsequent reports such as South Carolina, correct?

A. That's correct. It doesn't change my opinion. The numbers are different.

Q. And, in fact, none of the changes in the numbers over the course of the iterations of your report have changed your conclusion about the reasonableness of the 3,000 rate, correct?

A. No. If you look at the various acceptance

Q. Doesn't change the overall result, fair enough.

And with regard to pool capacities generally, your model is not always utilizing pool capacity for utilities as they existed in 1998, correct?

A. That's correct. I think there may be a dozen or so pool capacities that had been upgraded after 1998. Again, it wouldn't change -- I think we discussed this qualitatively in my South Carolina Electric & Gas deposition.

It wouldn't change the overall results because if I modified the pool capacities, all of the scenarios would potentially increase additional storage capacities or additional storage requirements somewhat, and you would have the same relative difference.

Q. Sure. And just so I'm clear, so, in other words, your model utilizes certain pool capacities that were modeled after or modified after 1998, correct?

A. It does, yes.

Q. For example, you include Plant Hatch's post-1998 rack addition in your model in this case, correct?

A. I did include that, yes.

Q. Okay. And, in fact, you also used South Carolina's 2002 post rerack capacity in your acceptance rate model, correct?

A. I did. And it is interesting, that doesn't come into play or it wouldn't come into play if I used the lower capacity in scenario 1 or scenario 4 because South Carolina Electric & Gas would have had plenty of capacity at their old rerack, at their old pool capacity, had DOE begun acceptance at either the scenario 1 or scenario 4 rates.

It would have increased the scenario 2 and 3 rates and by and large I think that's the case for most of the pool capacities in which I used the newer capacities.

Q. But, of course, you do agree, though, using these post-1998 storage additions was simply an oversight in terms of the inputs you were placing into your model, correct?

A. I didn't go back and attempt to try to see what the world looked like for every pool in 1998. That would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments.

acceptance right, correct?
A. For a fraction of the pools.
Q. And you would agree that, in fact, as you continue to change the pool capacities for particular utilities, based upon the information you received from your clients, it is possible these numbers could change again in the future, correct?
A. It is -- if I get new information and I believe that information is useful, I will use it.
Q. Sure. Even if those changes occurred after 1998, correct?
A. I'm sorry, I don't understand that.
Q. Even if those utilities added additional at-reactor storage after 1998, if you received that information in the course of your representation of those clients, you may include those in your 1998 model, correct?
A. I'm not sure that I would. It depends on what it is and how I believe it would affect the analysis. I would use my judgment.
Q. So it is situational when you would choose to use a utility that had that additional at-reactor storage, whether you would put that into your 1998 model?
A. Well, there are plants that are adding or

Q. And you are certainly not looking in terms of 1998 what particular utilities' intentions were with respect to seeking license extensions or not seeking license extensions, correct?

A. Again, the industry has moved forward and is operating their nuclear power plants despite the government's failure to begin acceptance and they are upgrading their plants. They would have done that had the government begun acceptance in 1998. So I am reflecting what has occurred at nuclear power plants.

Q. But the answer to my question is no, you are not looking in terms of 1998 as to what particular utilities would or would not have done with respect to license extensions, correct?

A. That's correct, I think it was, would have been difficult to determine in 1998.

Q. Okay. Now, in fact, in your industry-wide model, you assumed that utilities do not seek license extensions, correct?

A. That's right.

Q. But in calculating acceptance rights for Southern Nuclear, you do assume license extensions, correct?

A. I did, but, again, given the Indiana

Michigan decision regarding the calculation of damages, any of those projected discharges, whether it is through 40 years or through 60 years, don't come into play and don't matter.

Q. Well, whether or not they matter, Ms. Supko, you agree that for overall industry-wide acceptance, no license extensions are assumed, but for Southern Nuclear, you do assume license extensions, correct?

A. That's correct. And I did talk, I believe it was in the, my Southern Nuclear deposition, I did talk qualitatively about what the effect of license extension would have. And, in fact, since then I actually did look at it, I modeled it. And my qualitative discussion in my deposition was correct.

Q. Well, and I would like to talk with you about that, but before we do that, I have one other quick question.

Both analyses, the industry-wide analysis and the utility-specific analysis, they are both but-for nonbreach analyses, correct?

A. I'm sorry. Repeat that, please?

Q. Of course. Certainly. Both the utility-wide projection that you are doing or analysis that you are doing and the utility-specific, the Southern Nuclear analysis you are doing, are both

endeavoring to model a nonbreach but-for world, correct?

A. That's correct, that in both cases I model a nonbreach scenario, but I also model a breach scenario for the utility-specific calculation of acceptance rights.

Q. In this case?

A. Yes.

Q. Yes. Now, if you had modeled license extensions in your industry-wide analysis, your industry-wide model, you would expect the average post shutdown numbers, that's the number in the Plaintiff's demonstrative 6, that third box, average post shutdown storage time, you would expect that number to decrease, correct?

A. I believe what I stated in my deposition was that I believed that scenario 1 and scenario 4 post shutdown storage time would decrease somewhat and, in fact, that is what happens. Scenario 3 also decreased somewhat, but it was still, I want to say, maybe 12 or 13 years.

Q. So -- I'm sorry.

A. I'm sorry.

Q. Please.

A. In scenario 2 it actually increased.

Q. For scenario 3, that's the 1992 ACR rate, the number of average post shutdown storage time you think went from about 16.5 to, what, approximately 12?

A. I think it was 12 or 13. I don't recall the number.

Q. By the way, just so we're on the same page here, the reason these numbers decrease are because you are assuming 20 more years of time for DOE to work off the backlog, correct?

A. That's correct.

Q. I have maybe five more questions and then why don't we take a break. We have been going for a while.

A. The other thing that I also discussed qualitatively was that the, in my Southern Nuclear deposition regarding license extension was that the effect of, assuming license extension in this overall analysis, would be that the additional storage requirements in scenario 1 and scenario 4 wouldn't change, but they would increase in scenarios 2 and 3 and, that, in fact, does occur.

Q. Yes. Now, with respect to all your inputs, you would agree that the inputs you are using in your model are evolving, correct?

A. No. The historical discharges remain the

discharge rate, correct?

A. I'm sorry, I don't understand what you are talking about.

Q. Well, let me reask it and I will try to be clearer. When you are determining the amount of additional at-reactor storage that would or would not be reasonable, you are benchmarking that against the annual discharge rate, correct?

A. That's the annual discharge rate which is 2,000, approximately 2,000 metric tons per year, is one of the benchmarks. But in addition, I also look at the underlying data to see how many plants and how much storage would be required at each. It is not just a simple look at the overall number.

Q. Okay. And, by the way, I think you just said this, did you say that 2,000 is an average, right, annual discharge rate?

A. It has increased in recent years. It is probably a bit above that.

Q. I think it could go as high as 2100, correct?

A. It could go as high as 23 or 2400.

Q. And it could also go as low as 1800 at times, correct?

A. Historically, it has. I would say in

today's environment, it is rare that -- just because of the fact that utilities are operating at fairly high capacity factors and with more and more operating in two-year cycles, it typically doesn't dip below to 1800.

Q. And sitting here today, you can't identify how far above 2,000 the amount of additional at-reactor storage could be and still satisfy the first primary requirement, correct?

A. I don't understand your question.

Q. Okay. We just discussed 2,000 and that is one of the things that you look at to determine reasonableness, correct, among other factors?

A. Yes.

Q. But sitting here today, you cannot tell me how far above 2,000 the additional storage number would be and still satisfy this first primary requirement identified for you, correct?

A. I modeled acceptance rates, overall acceptance rates that I found in Department of Energy documents. I didn't attempt to do -- I don't know if you would call it a break-even analysis, so, no, I have not modeled a scenario that attempts to determine what level.

Q. Okay. Now, if you assumed all the other

numbers in your analysis for scenario 1, the 3,000 rate, you would agree that it is possible that if the number of additional at-reactor storage were, say, as high as 1999 MTUs, that could still satisfy the first primary requirement, correct?

A. I'm sorry, I did not understand your question.

Q. That's fine. Kristin, could you please put up Plaintiff's demonstrative, I believe it is 4, I believe. I'm sorry, it was 6. Ms. Supko, I have put on the screen Plaintiff's demonstrative 6 again, the same slide we were looking at earlier.

My question is you have got three categories here, additional SNF storage requirements, average post shutdown storage time, years maximum acceptance capacity utilized.

Hypothetically, if average post shutdown remained at 9 and the years maximum acceptance capacity remained at 28, if the first number were as high as 1999, that might still satisfy the first primary requirement, correct?

A. It might. It would depend upon a wide range of things such as, as I said earlier, looking at the underlying numbers, how many plants, how much additional storage, but 2,000 metric tons is, I

reserve utilized the plus 20 percent flexibility, that 690 would go down to 552. So I quantified those two numbers. I did not model the inter-utility exchanges.

Q. I see. So you don't know how much further those numbers would get with exchanges, in other words, you haven't done that analysis?

A. No, and, in addition, there are other flexibilities that companies have on their own.

Q. And you haven't looked at those flexibilities. And those flexibilities, by the way, as I think you talked about yesterday, are things like how they manage the full core reserve policies, whether or not they want to add racks, things of that nature, correct?

A. Yes.

Q. And you haven't endeavored in this case to model how those flexibilities affect these numbers on Plaintiff's demonstrative 11, correct?

A. That's correct.

Q. Now, in the South Carolina case, you determined that under the 1991 ACR rate, there would be 4980 MTUs of additional at-reactor storage once intra-utility exchanges are applied, correct?

A. Yes.

Q. And that's, again, reflected in Plaintiff's demonstrative 11. But you don't know sitting here today if it is possible under this 1991 ACR rate to bring the additional at-reactor storage numbers from 4980 to, say, 2,000, if all the flexibilities were exercised, correct?

A. Well, I have reviewed the underlying numbers associated with the rollup of the numbers, the 4980 metric tons, and it is on the order of about 30 plants, 25 or 30 plants, several hundred metric tons per plant of additional capacity.

I haven't modeled how far down that number could come, that's correct, but the other factors that also have to be considered is you don't just look at additional at-reactor storage requirements. One of the other important factors is the average post shutdown storage time of 16.5 years.

That means that, on average, plants would be storing spent fuel for 16 and a half years after they shut down for decommissioning. In some cases, it is 20 years or longer. That's one of the other factors that I also considered. It is not just looking at the additional storage requirements line.

Q. Of course, by the way, if you had assumed license extensions in your model, as I think you

testified earlier, that 16.5 drops down to 12, correct?

A. On average, but, again, the numbers range from 10 to probably, probably still 20 and higher for some plants.

Q. Sure. But, in any event, just to get back to my initial question, you haven't, you don't know sitting here today whether it is possible under the 1991 ACR rate -- or here you used the 1992 ACR rate, called it scenario 3, you don't know whether it is possible to bring that 4980 number for additional storage down to 2,000 if all the flexibilities are exercised, correct?

A. I have not modeled that.

THE COURT: Do you know what would happen if they are probably already shut down plants?

THE WITNESS: I haven't done that in this, Your Honor, but in the early 1990s, that was an issue that was discussed quite extensively in the industry, and I did actually model shutdown reactor priority.

And what I found at that time was that a 3,000 metric ton acceptance rate would help the fuel to move not just from shutdown plants, but would also prevent adding additional storage at operating

Q. So are your workpapers incorrect here when it represents there are 14?

A. No, this is modeling that they would have had to have done something, but it wasn't adding on-site additional capacity.

Q. Okay. But they would have had to have done something after 1998?

A. Yes.

Q. By the way, Ms. Supko, since you mentioned transshipments, are there any costs associated with transshipment of spent nuclear fuel?

A. There is.

Q. Do you know how much?

A. Well, it depends. Particular reactors involved here actually own their own spent fuel transportation casks and have for more than a decade. So it would be the operating costs associated with loading fuel and transferring it.

Q. Ms. Supko, turning to what I just provided to you from your workpapers, by my count there are four utilities here, four reactors, I should say, with over 100 MTUs of maximum additional storage required, correct?

A. Yes.

Q. In fact, one of those, I believe it is Palo

Verde Number 1 has 184.9 MTUs of additional storage, correct? It is the Number 2 plant.

A. Yes, I see it.

Q. Is that correct?

A. That's correct. But those are actually three nuclear power plants with three separate pools, which would average about 61 metric tons per pool, which is a reload and a half maybe.

Q. By the way, with 184.9 MTUs, if they had to go to dry storage, that could be as much as 18 casks, correct, if you assume ten MTUs per cask?

A. Well, actually 15 metric tons per cask is probably a more reasonable number today.

Q. Okay, 15.

A. But I would say that a plant, and just looking at each individual pool, as I said, let me calculate it back, 184.9 divided by 3 is approximately 62 metric tons per pool. I can't imagine that any utility would build on-site dry storage to ship -- or, excuse me, to store just 61 metric tons. There would have been other alternatives that would have made more sense.

Q. And do you know what Palo Verde is doing?

A. They are storing their spent fuel in dry storage today, but that is in the breach world where

generation rate, correct?

A. A rate -- what do you mean?

Q. A rate of acceptance of the 2,000 MTUs per year, it would keep up with the generation rate, correct?

A. Roughly. The number is higher in some years, so --

Q. And lower in others, correct?

A. Right.

Q. So it would approximately keep up with the generation rate?

A. Yes.

Q. But it is also your belief that the DOE acceptance rate must also accept a portion of the backlog of each year or some amount above 2,000, correct?

A. Could you repeat that?

Q. Sure. Not only must the generation -- or not only must the acceptance rate keep up with the generation rate -- sorry, not only must the acceptance rate keep up with the generation rate, it also, you believe, requires it to work off the backlog, correct?

A. It is not my opinion. That's the requirements that were identified to me by counsel. The second issue identified was that spent fuel

utilities here?

A. No.

Q. So, for example, your analysis would allow Georgia Power to exchange acceptance rates with Alabama Power, correct?

A. Southern Nuclear Operating Company is the operator of those three plants within that operating system, yes.

Q. And so Southern could decide that Georgia Power could get the acceptance rights of Alabama Power under your analysis; is that right?

A. I modeled that the three sites for Southern Nuclear, that Southern Nuclear operates could, in fact, use those rights at any of the sites.

Q. They could share rights?

A. Yes.

Q. Now, you would agree that the decision to engage in intra-utility trades is very company-specific, correct?

A. Yes.

Q. It is also very region-specific?

MR. SCHECHTER: I will object on vagueness. I don't know what region-specific means.

THE COURT: Does the witness know?

purport to represent that it is everywhere.

THE WITNESS: No, I don't believe that I state that.

BY MR. GARDNER:

Q. Have you stated that in other reports, Ms. Supko?

A. Not that I recall. What I state on page 17 of my report is that if nuclear operating companies exercised the provision in the standard contract that allows 20 percent flexibility in the amount of spent fuel delivered to DOE, it is possible that the additional storage requirements summarized in table 2 would be at least 20 percent lower.

That's not saying that every nuclear operating company who has acceptance rights in 1998, 1999, whenever, is going to increase their requirements. I was only looking at that portion who had additional storage requirements calculated.

Q. And, by the way, just as utilities could request 20 percent more spent nuclear fuel, they could also request 20 percent less spent nuclear fuel to be accepted, correct?

A. It is a plus or minus 20 percent flexibility, yes.

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 20, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/20/05

Karen Brynteson, RMR, CRR
Official Reporter
Heritage Reporting Corp.
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | : |
| | : |
| Plaintiff | : |
| | : |
| vs. | : NO. 00-697 C |
| | : |
| THE UNITED STATES | : |
| | : |
| Defendant | : |

-----------------------------x

The deposition of EILEEN M. SUPKO was held on Tuesday, June 27, 2006, commencing at 9:22 a.m., at the U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C., before Ronald E. Bennett, Notary Public.

REPORTED BY: Ronald E. Bennett CERTIFIED CO[illegible]

APPEARANCES

DONALD J. CARNEY, ESQUIRE
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
Tel: 202-434-1675
Fax: 202-434-1690
E.mail: Dcarney@perkinscoie.com
On behalf of Plaintiff

JOSHUA E. GARDNER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: 202-305-7583
Fax: 202-514-8624
E.mail: joshua.e.gardner@usdoj.gov
On behalf of Defendant

ALSO PRESENT: Ted Lunsford, Navigant
Hugh Hill and Rachel Anglin, Interns

INDEX

Deposition of EILEEN M. SUPKO

June 27, 2006


| Examination by: | Page |
|---|---|
| Mr. Gardner | 4 |

| No. | Description | Marked |
|---|---|---|
| 1-3 | Documents | 16 |
| 4 | Retention Agreement | 17 |
| 5 | Invoice | 25 |
| 6 | Rebuttal Report | 98 |
| 7 | Document | 121 |
| 8 | Document | 129 |
| 9 | Concept Paper | 142 |
| 10 | Document | 209 |

they have large number of plants. They may have benefits, I've not seen what everybody's contract looks like. I have a snapshot of it, but it's hard to say.

Q. Is it fair to say that in the dry storage industry that all dry storage projects are basically negotiated projects? In other words, there's no off-the-price shelf or no off-the-shelf price regarding storage; is that fair to say?

A. I don't know. The dual purpose casks themselves are typically very similar from site to site, if you are using the same product cask with the same certification. However, the individual sites will, in terms of building a facility, will differ dramatically.

Q. Does that mean that obviously the prices would vary from utility to utility in terms of dry storage cost?

A. They might.

Q. Do you know if they do?

A. I don't.

Q. We have spoken I think at extraordinary lengths about your model, your fuel management models, and your opinions about the 3,000 rate. You recall that, of course?

A. Yes.
Q. May I rely upon your previous testimony with respect to that topic?
A. I suppose that you can.
Q. Okay. For example, we have talked about how your calculations for additional extra storage, they ever changed from report to report; correct; the numbers have changed?
A. They changed from the SMUD report to the Southern Nuclear report and from the Southern Nuclear report to any report issued after that. But I believe that all of the numbers have been the same in reports issued from the middle of last year forward.
Q. Since South Carolina; correct?
A. Yes.
Q. Let me just make sure I have got this right. Your report changed from comment to SMUD, in terms of the numbers of additional at reactor storage?
A. I believe I did some additional analyses there.
Q. Then it changed from Southern Nuclear to South Carolina; correct?
A. That's correct. I did the analysis in a

different way.
Q. I can rely upon all your previous testimony about why it changed; correct?
A. Yes.
Q. We don't need to go into that?
A. Yes.
Q. Thank you.
A. I want to make sure I understood what you meant by rely upon.
Q. Just that I don't have to ask you the same questions about the issues you and I have already talked about?
A. I certainly endorse that.
Q. Me too. I do want to ask one question though. With respect to your opinions regarding the rate and schedule, the reports that you have offered in this case, have you conducted the same type of analysis as you conducted in South Carolina?
A. I don't understand the question.
Q. Well, your initial reports basically made the conclusion that at 3,000 rate of acceptance was reasonable because it satisfied what you understood to be two primary requirements; correct? The amount of additional at reactor storage and average post shutdown time; correct?

A. I believe that is correct.

Q. Okay.

A. I'll have to look at those reports.

Q. Sure. We can if you need to. My understanding is that in South Carolina you have actually done slightly different analysis where you just calculated under various rate assumptions how much additional at reactor storage there would be and what the average post shutdown time is; correct?

A. I performed the same analysis I believe or similar analysis. What I've done that is different in the report from South Carolina and any that I've completed after that was essentially to relate that to measures that were provided to me by counsel which was tell us how much additional a reactor storage would be required. And discussed timely decommissioning and how these various acceptance rates that I analyzed affect those two factors.

Q. You measured, you used the same two measurements in Commonwealth Edison, SMUD and Southern Nuclear; correct?

A. I did.

Q. What are you doing differently --

A. My analysis is the same, essentially the same. I'm just not discussing the requirements of

the contract in order to not make any legal arguments such as the many, many questions you are asking me, whether I was issuing a, making a legal opinion in earlier reports. I'm doing an analysis.

Q. Is it fair to say that one of the differences between some of your original opinions and say your post South Carolina opinions is that you are no longer offering an independent opinion about the two primary requirements?

MR. CARNEY: Objection. Mischaracterizes prior testimony.

A. I wasn't often an opinion about the primary requirements in Southern Nuclear report either. I believe I told you in the SMUD and Commonwealth that counsel had given me those primary requirements. I have just discussed them in the text of the report. I no longer discuss them in the text of the report.

Q. Okay. So for my purposes today you are not offering an independent opinion about the fact there are two primary requirements; correct? You are simply relying upon counsel?

A. That's correct.

Q. Okay. Are there any statements you've made either in deposition or trial testimony that

you believe are incorrect?
A. Not that I can recall.
Q. Okay. Now you have offered three separate reports in this case; correct?
A. Yes.
Q. You have offered two dealing with the written schedule of acceptance; correct?
A. Yes.
Q. You have offered one that calculates WEPCO's acceptance rights under a 3,000; correct?
A. That's correct.
Q. And you offered one given about the overall rate acceptance?
A. Yes.
Q. I think as you alluded to earlier you got a report dealing with the dual-purpose dry storage market; correct?
A. Yes.
Q. Why don't we mark all three of these.
(Deposition Exhibit Number 1-3 marked for purposes of identification.)
BY MR. GARDNER:
Q. I have handed you what has been marked as Exhibits 1, 2 and 3. Can you just confirm for me what those exhibits are.

that's my opinion, that it is reasonable and would have been practicable.

Q. I appreciate you pointing that out to me. I actually did not see that. It looks like when you were offering the summary of opinions, you don't make any statements about reasonableness.

A. I must have been an omission on my part.

Q. At the end of the day you are offering an independent opinion that a 3,000 rate of acceptance is reasonable?

A. Reasonable and practical.

Q. You are not offering any sort of opinions that it's an obligation of the Government under the standard contract?

A. I'm not offering that opinion.

Q. Are you also offering an opinion in this case that scenarios 2, 3 and 4 are unreasonable?

A. I'm offering the opinion that scenarios 2, and 3 don't limit the amount of additional storage capacity, keep up with the annual discharges or work off the backlog, allow timely decommissioning. And as you are aware, I included a third requirement that is based on my experience with the waste program that another measure is whether the system built to sufficient and while scenario 4 would have

WASHINGTON, D.C.

NOTARY PUBLIC, to wit:

I, Ronald E. Bennett, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me according to law, was examined by counsel.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witnessed my hand and notarial seal this 13 day of July, 2006.

Ronald E Bennett

Ronald E. Bennett,

Notary Public

My commission expires:

February 14, 2010

UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,)
Plaintiff, )
v. ) No. 98-484C
THE UNITED STATES, )
Defendant. )
and )
SYSTEMS FUELS, INC., et al., )
Plaintiff, )
v. ) No. 03-2623C
THE UNITED STATES, )
Defendant. )DEPOSITION OF
and )EILEEN M. SUPKO
SYSTEMS FUELS, INC., etc., ) July 19, 2006
Plaintiff, )
v. ) No. 03--2624C
THE UNITED STATES, )
Defendant. ) Job No. 175436

The deposition of EILEEN M. SUPKO commenced at 9:00 AM, at the UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, COMMERCIAL LITIGATION BRANCH, 1100 L Street, N.W.,

Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

APPEARANCES

For Plaintiff:

Jay E. Silberg, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

For Defendant:

Joshua E. Gardner, Esquire
Alan J. Lo Re, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0226

APPEARANCES CONTINUED

For Xcel Energy:

Kerry C. Koep, Esquire
XCEL ENERGY
Assistant General Counsel
414 Nicollet Mall, Suite 500
Minneapolis, MN 55402
(612) 215-4583

Also present:

Eric Heintz and Ted Lunsford

CONTENTS

| EXAMINATION BY | PAGE |
| --- | --- |
| Mr. Gardner | 8 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate | 13 |
| 2 | Expert Report Regarding Spent Nuclear Fuel Acceptance Rights for Northern States Power Company's Prairie Island and Monticello Plants | 13 |
| 3 | Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance | |

BY MR. GARDNER:

Q. Why don't I reask it, and tell me what part you're having difficulty with.

Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?

A. There is no rate of acceptance in the standard contract specified.

Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?

MR. SILBERG: Objection.

That calls for a legal conclusion.

A. As I said, there's no rate in the contract.

BY MR. GARDNER:

Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?

MR. SILBERG: Same objection.

A. I'm not going to offer an opinion as

to what their obligations are.

BY MR. GARDNER:

**Q. I understand you're not going to offer an opinion.**

**Do you have an understanding?**

**Just yes or no.**

A. Yes.

**Q. Yes, you do have an understanding, is that correct?**

**Yes, you have an understanding to what DOE's obligations are with respect to rate under the standard contract?**

A. As I stated, there is no rate in the standard contract.

That's my understanding.

**Q. So is the answer to my question, no, you do not have an understanding as to DOE's obligations with respect to the rate of acceptance under the standard contract?**

MR. SILBERG: Asked and answered.

A. I answered your question that the contract doesn't have a rate in it.

That's my understanding.

BY MR. GARDNER:

**Q. Okay. And therefore if the contract doesn't contain a rate, then you have no understanding otherwise as to what rate DOE's obligated to perform at under the standard contract; is that correct?**

MR. SILBERG: Objection, legal conclusion, asked and answered.

A. I don't know how else to answer your question other than to tell you what I know.

MR. GARDNER: I'm going to have marked what will be exhibit number 7.

(Supko Exhibit No. 7 was marked for identification.)

BY MR. GARDNER:

**Q. All right. Ms. Supko, I've handed you what's been marked as exhibit number 7.**

**And before I describe the document, have you ever seen that document before?**

**I'll represent to you it's an**

excerpt, because I'm trying to save the environment today.

A. I don't recall.

Q. I'll describe it to you.

It is plaintiff's -- and this is Northern States now.

This is plaintiff's objections and responses to the defendant's first set of interrogatories and requests for production of documents. This is basically a pretrial discovery document, and we -- which we asked the plaintiff for certain information, and they purport to give us that information through written responses.

And if you turn to the second page of this document, the excerpt -- actually page number 7 on the bottom, you'll see there's an interrogatory number 7 on the top.

Do you see that?

A. M-hm.

Q. And the interrogatory -- this is an interrogatory by the way -- this is a question

that the government has asked NSP.

And we ask the following question: Identify those persons both within plaintiff's organization and outside of plaintiff's organization who are the most knowledgeable about the parties' understanding at any time subsequent to the execution of plaintiff's contract as to the rate and/or sequence of SNF and/or HLW acceptance that DOE would be obligated to maintain under the standard contract.

And then it goes on to list some subparts.

Now, if you go to page 7 D, which is the next page of this document, NSP has identified Eileen Supko, which of course is you.

Correct?

A. Yes.

Q. Now, Ms. Supko, do you agree that you are one of the most knowledgeable persons with respect to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, vague and ambiguous.

You can answer it if you understand it.

A. I'm aware of the fact that NSP identified me as such a person.

It also states that the plaintiff's, NSP's, response to this was that the interrogatory was overly broad, et cetera, but they did identify individuals with the most knowledge of these issues, which is the acceptance rate and rate and sequence of spent fuel acceptance.

BY MR. GARDNER:

**Q. That's actually a nonresponsive answer, Ms. Supko.**

**My question is, do you consider yourself to be one of the most knowledgeable persons with respect to DOE's obligations concerning the rate schedule of acceptance under the standard contract.**

MR. SILBERG: Objection,

mischaracterizes the document.

A. I consider myself to be one of the most knowledgeable persons associated with an understanding of the rate and sequence of spent fuel acceptance by DOE.

Whether or not it would be an obligation under the standard contract is a legal issue.

BY MR. GARDNER:

**Q. Let me ask you, do you have any knowledge about the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, legal conclusion.

(Discussion off the record.)

BY MR. GARDNER:

**Q. Ms. Supko, I'm going to read back the last question, because I think there was -- there's some separation.**

**(Reading the realtime screen:) Let me ask you, do you have any knowledge about the**

**rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

A. I believe that I answered the question that discussing DOE's obligation is a legal issue, and I'm not making a legal conclusion.

I'm fully aware of acceptance rates that the Department of Energy has used over the lifetime of the program, and I've analyzed those rates, as you know, in my expert reports.

**Q. Outside of your expert reports, do you have any understanding as to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. From the beginning of the program, the intent of the program was to have an acceptance rate set such that utilities, nuclear operating companies would not be required to add additional storage capacity after 1998, and to

work off the backlog to allow timely decommissioning, and a rate that does that is a rate that reaches 3,000 metric tons with a fairly short 5- to 6-year rampup period.

BY MR. GARDNER:

**Q. So is the answer to my question, no, that you have no knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. I stated I have -- that I believe discussing what DOE's obligation is is a legal issue, and that's not something that I'm opining on.

BY MR. GARDNER:

**Q. I understand you're not opining.**

**I'm asking if you have an understanding.**

**Do you have any knowledge?**

A. I know that my client, NSP -- I don't recall if Entergy or System Fuels Inc. has

submitted reports regarding -- briefs regarding the Department of Energy's -- the facts associated with DOE's obligations regarding spent fuel acceptance.

I know there were many briefs filed. I know that NSP did in fact file one, and their opinion is they were required to pick up spent nuclear fuel at a rate that would have limited the amount of spent fuel storage such that no one would have to add additional storage after '98.

**Q. Now, that's in their brief.**

**I'm asking for your view.**

**Outside of this expert report, do you have any understanding or knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

She gave you the information.

A. As I said, whether DOE is obligated is a legal issue. That's all that I can tell you.

BY MR. GARDNER:
Q. Okay. So you have no knowledge about that?
MR. SILBERG: Asked and answered.
A. I have no legal knowledge about it, no, I don't.
BY MR. GARDNER:
Q. Do you have any nonlegal knowledge about the DOE's obligations under the standard contract?
A. It's a legal issue.
Q. Okay. So the answer is, no, you have no knowledge?
A. No.
Q. Thank you.
Ms. Supko -- and I think you testified to this. You certainly said this in your report -- that the notion of no additional at-reactor storage was a key issue identified by utilities.
Correct?
A. Yes.

Q. Now, that's in fact what you say in your expert report.

Correct?

I believe it's page 1.

MR. SILBERG: Excuse me.

We're referring to the overall --

MR. GARDNER: Yeah.

Why don't we go to exhibit 1 as an illustrative example.

BY MR. GARDNER:

Q. The very first paragraph, it looks like the middle of the paragraph, you say --

A. I don't say that no additional storage.

I say that counsel asked me to provide an opinion on the DOE's rate of acceptance of spent nuclear fuel on -- as a whole on 2 key issues identified by DOE in the nuclear industry.

One of those is the aggregate amount of additional storage that would be required.

Q. Now, are you just relying upon

of SNF equal to the year's generation rate plus a reasonable share of the backlog, to be tantamount to a request that the rate be sufficient to preclude all additional at-reactor storage?

A. That would be the result of doing it, yes.

Q. But of course, even under your analysis, there are utilities that required additional at-reactor after 1998.

Correct?

A. My calculation as we've discussed many times before is based on an oldest fuel first analysis. The -- one of the sensitivity analyses that I do examines the use of acceptance rights within a company at any reactor that that company owns, and it reduces the number fairly significantly such that with the flexibilities in the system, that number -- the amount of additional storage would approach zero, or could approach zero.

Q. So I just want to be sure.

Your opinion is that under the

**analysis you conduct, no utility needs additional at-reactor storage after 1998?**
A. That's not what I said.
**Q. I'm asking you, is that in fact the case?**
A. My calculations in the way that I calculate additional at-reactor storage requirements do show that there would be some amount of additional at-reactor storage.
Looking at exhibit 1, table 3, which is a sensitivity analysis that includes intracompany use of acceptance rights, I calculated 690 metric tons of spent nuclear fuel. That was at maybe a dozen or so nuclear power plants that would require that.
**Q. It's 14, actually, isn't it?**
MR. SILBERG: Excuse me.
If you could let her finish her answer.
A. That may be. I said approximately.
And the additional storage requirements could be accommodated -- they don't

would have been able to exercise.

**Q. Correct me if I'm wrong: You've actually testified that even absent any flexibilities being utilized that 1,030 MTUs of additional at-reactor storage is a reasonable amount of additional at-reactor storage.**

**Correct?**

A. I don't think it's unreasonable. It's a calculated amount based on the information that I used in my analysis.

**Q. And you believe that that amount is a reasonable amount of additional at-reactor storage.**

**Correct?**

A. The number is what it is. It's based on my analysis.

It's not unreasonable given that it's a small number of plants and a relatively -- again this is a calculated number. It's not necessarily what would have occurred had the industry believed DOE was coming.

**Q. Is there a difference between not**

unreasonable and reasonable?
You seem very hesitant to tell me
that 1030 is reasonable.
A. I know that based on what I know
makes up that number in terms of the number of
nuclear power plants that -- whose additional
requirements are calculated within that number
and the amount of storage requirements calculated
at those plants that that number is reasonable
and could have been accommodated within the
flexibilities that existed.
Q. And we've talked about this before I
think most recently in perhaps South Carolina
that your upper limit of reasonable additional
at-reactor storage would be approximately one
year's worth of discharge.
Correct?
A. Yes.
Q. Do you know under scenario 3, had
the flexibilities been utilized, would there have
been more than 2,000 MTUs of additional
at-reactor storage?

A. I have not calculated that.
**Q. So you don't know?**
A. Well, as I stated under scenario 3, even if one were -- this is -- I'll characterize this as a qualitative analysis that I'm doing here as we sit -- that from -- from the period 2005 to 2009, 900 metric tons per year wouldn't have been enough to eliminate even using trading or only those companies who needed requirements would be able to ship their spent fuel. It wouldn't have been enough to eliminate that.
**Q. But do you know if it would have been enough to get the amount of additional at-reactor storage to 2,000 MTU in total?**
A. I have not calculated that number.
MR. GARDNER: I'm having marked what is going to be exhibit number 14.
(Supko Exhibit No. 14 was marked for identification.)
BY MR. GARDNER:
**Q. Ms. Supko, do you recognize what**

going to increase, and they've done that for a long time in their analyses.

Q. I'm asking a different question.

My question is, have you done any analysis to determine whether the number you've calculated here, 1,031.5, would have been different had DOE begun performance in 1998?

A. No.

Q. Have you done any analysis to determine of these 14 utilities whether there would have been a cost for any of these utilities to accommodate those additional storage requirements that you've calculated?

A. No, I haven't.

Q. Now, you don't include shutdown utilities in this calculation.

Correct?

A. No.

This is only looking at operating plants.

Q. Do you know what the views are of, say, PG&E and Humboldt Bay with respect to when

expert opinion from the Yankee case?
A. That's correct.
Q. I take it since you don't know Mr. Graves or his analysis, you don't know if his analysis is consistent with yours.
Is that fair to say?
A. That's correct.
I don't know.
Q. If the court in these cases, Judge Lettow, Judge Braden, and Judge Weiss, if those judges conclude that they need to determine what rate the government is contractually obligated to perform at, you can't address that issue.
Correct?
A. I'm not qualified to make a legal conclusion, so I wouldn't be addressing that.
Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?
A. My conclusion is that scenario 1 -- and I'll -- so I don't misquote myself -- which is a 3,000 metric tons per year rate of acceptance, and I'm looking at exhibit one page

**transit?**

A. Turn-around time.

**Q. What else?**

A. And using that plus some downtime was able to calculate based on an annual rate of acceptance of 3,000 metric tons approximately how many casks would be needed.

**Q. What rampup did you assume for that analysis?**

A. It was either -- it was the rampup rate that was in legislation, so it depended upon the legislation.

**Q. Do you recall the different rates, the rampup rates?**

A. I know that the very first rampup rate was consistent with the 1990 ACR shown in table 4 of exhibit 1. The rest of them I don't recall.

**Q. And what was the -- was your analysis -- you say that you did it on NEI; is that correct?**

A. Yes.

Q. Was the purpose of that for NEI to demonstrate that 1020 was a good idea?

Is that kind of the purpose behind that?

MR. SILBERG: Objection, calls for speculation.

A. It also included a cost analysis, because part of the discussion was what would the impact on budget be.

MR. GARDNER: Off the record.

(Recess.)

BY MR. GARDNER:

Q. Ms. Supko, now, I want to change gears a bit and talk about exchanges, specifically not intracompany exchanges, but intercompany exchanges.

And I believe that one way utilities could have additional storage requirements after 1998 met was through the use of exchanges.

Correct?

A. Could you repeat that?

Q. Sure.

That one way that utilities -- the numbers you've calculated for additional at-reactor storage after 1998, one way that could be met is through the use of exchanges.
Correct?
A. This is a flexibility in the contract, yes.
Q. Do you think exchanges would cost money?
A. I don't know.
Q. You haven't done any analysis to determine what a potential exchange would cost.
Correct?
A. No.
Q. Do you think they'd be free?
A. I don't know.
Q. Have you ever thought about it?
A. Not in any level of detail.
Q. You've never done any analysis to determine how much a utility would be willing to pay to engage in an exchange.
Is that fair to say?

A. That's correct.
I have not.
**Q. Have you done any analysis to determine how exchanges would actually work?**
A. Since the current system where the government is not coming now until 2017 or 2018 if we're lucky, it's highly unlikely that anybody would exchange acceptance rights.
**Q. Let me be clear: I'm talking about the but-for world and you're running but-for world scenarios.**
**My question relates to have you conducted any exchanges analysis in these but-for worlds that --**
A. I have not.
**Q. I presume you'd agree that an analysis could be done to determine what an exchange marketplace would have looked like in the but-for world.**
**Correct?**
A. I suppose so.
**Q. Do you believe that you've got the**

expertise to develop such an exchanges model?
A. I haven't thought about it.
Q. So you don't know one way or the other?
A. No.
Q. Hypothetical question for you: Let's take Boston Edison. They come to you and say, Ms. Supko, could you model exchange rights across the industry.
Would you be able to do that for them?
A. I don't know if I would be able to do it. I don't know that I would be willing to do it.
Q. Why wouldn't you be willing to do it?
A. There are a lot of variables and factors involved in such an analysis, and I think it would be difficult to try to capture all of those variables and factors.
Q. I'm curious, what do you view as being the different variables and factors that

would go into an exchange analysis?

A. I haven't thought about it.

Q. I had thought previously you had testified and maybe it was the Southern Nuclear trial. Maybe it was SMUD -- I can't remember -- but I recall that in the past you had said you had run an analysis of exchanges; is that correct?

A. I ran analyses of decommissioning shutdown reactor priority in the early 1990s.

Q. Offering -- in other words, taking the OFF queue as it exists but affording priority to the Yankees and SMUDs of the world?

A. Yes.

Q. Then I'm misremembering that you have not engaged in any type of analysis exchanges?

A. I don't recall that I've ever done any.

Q. Based on -- you've read the standard contract many times.

Correct?

A. Yes.
Q. Based on your reading of the standard contract, what is actually being exchanged if you know?
A. I'd have to look at the contract.
Q. Why don't we do that.
For the record, I am going to give you New England states standard contract. I'll represent to you it's my understanding that they should be identical between all 3 sites and in fact all the 103 reactors I suppose.
MR. GARDNER: This will be exhibit 15.
(Supko Exhibit No. 15 was marked for identification.)
BY MR. GARDNER:
Q. Ms. Supko, I've handed you what's been marked as exhibit 15, which I'll represent to you is the standard contract between Northern States and the United States Department of Energy.

Have you seen the standard contract before?

A. This specific one?

Q. I knew you were going to ask that.

No. More generally.

A. I have seen the standard contract as it's identified in part 961 of title 10 of the United States Code of Federal Regulations.

Q. Okay. Fair enough.

If you could turn to page 12 of the document. It's got a Bates label of COF double 0 21679.

You should see a section there entitled, E exchanges.

Do you see that?

A. Yes.

Q. The second paragraph says: Purchaser shall have the right to exchange approve delivery commitment schedules with parties to other contracts for disposal of SNF or HLW.

Do you see that?

A. Yes.
Q. And is that consistent with your recollection that in fact exchanges would have taken place between approved delivery commitment schedules?
A. Honestly, I haven't thought about it much. That's what the language in the contract says.
Q. But you haven't really thought about exchanges?
A. I haven't analyzed it other than to know that it is a flexibility that does exist.
Q. Do you know -- if we can go back to your spreadsheet, which is exhibit 14, do you know which of these utilities that you've identified as having additional storage requirements have approved DCSs?
A. I don't.
Q. Okay. Ms. Supko, do you have an opinion as to when the market for exchanges would have developed?
MR. SILBERG: Objection, vague and

ambiguous.
We're referring to the but-for
world, I assume?
A. I haven't thought about it.
BY MR. GARDNER:
**Q. Do you remember in the Southern
Nuclear trial Judge Merrill asked you that exact
question?**
A. I recall he asked me a question
about exchanges and whether I thought they would
have been possible.
**Q. Do you recall giving a time frame
for that?**
A. I don't.
**Q. I assume sitting here today you
haven't really given any thought as to the timing
of when that market would have developed.
Is that fair to say?**
A. Well, if the government had
performed in '98 -- and I believe this is what I
said to Judge Merow -- if they had performed at a
3,000 metric tons rate of acceptance and if in

fact it appeared that performance was going to continue uninterrupted, the market most likely would have developed.

**Q. When?**

A. After 1998.

It could have happened before. I have not really thought about it, but there would have been sufficient flexibility in the system to allow exchanges once the rampup rate started increasing.

**Q. You do no analysis to determine the timing at which a market would have developed?**

A. I have not.

**Q. You also recall -- this goes back to the SMUD trial I think -- that you offered testimony that you thought an exchanges market would work similar to a uranium enrichment exchanges market.**

**Do you recall that?**

**That was in your written direct testimony.**

A. Yes.

The companies have exchanged uranium in its various forms since the mid-1980s. And it works in a fairly seamless way.

**Q. When were the uranium enrichment contracts originally signed?**

A. Well, there have been a range of them.

Are you talking about the enrichment contracts with the Department of Energy, with USEC, with European --

**Q. When you've made the conclusion in your written direct testimony before Judge Braden that you think that exchanges of acceptance rates would work like exchanges of uranium enrichment contracts, to what were you referring?**

A. At the time, it was associated with toll enrichment services under Department of Energy contracts. Those no longer exist. Companies still do exchange and borrow material from time to time.

**Q. So were you basing your conclusion about the similarities between those 2 markets to**

taking that 20 percent from another utility.
Correct?
A. It doesn't make an assumption per se.
It just assumes that those companies who had additional requirements could potentially have requirements that were 20 percent less. I didn't analyze the effect on an annual basis.
Q. You've done no analysis, then, as to what would happen if DOE were to grant a particular utility's request for an additional 20 percent, what impact that would have on other purchasers as that term is used in the standard contract.
Correct?
A. I did not.
Q. It's your understanding that utilities that have approved delivery commitment schedules may adjust their allocations by 20 percent in either direction subject to DOE approval.
Correct?

Q. And then it says: The total systemwide spent fuel arisings are projected to be approximately 86,000 MTUs.

Do you see that?

A. Yes.

Q. Does your analysis in these spent fuel cases assume these same assumptions or make these same assumptions?

A. No.

Q. How have your assumptions changed between, say, this private fuel storage analysis in 2000 and the analysis you're doing for this litigation?

(Pause.)

A. I don't wish to misspeak as to what my current assumptions are, and I don't have them committed to memory, so I'll give you some approximate answers.

BY MR. GARDNER:

Q. Okay.

A. The overall analysis that I've done for the various clients assumes 40-year licenses,

but I've also done the analysis assuming license extension for all plants. And I believe that analysis has been provided to you.

**Q. I want to take them one at a time.**

**The license extension analysis you're not offering that in your actual opinion.**

**Right?**

A. I didn't change my opinion. It doesn't change my opinion. The results are similar.

**Q. You don't even provide that analysis in any of your reports.**

**Correct?**

A. It's not in the report, no.

It is a sensitivity to show that my opinion wouldn't change.

**Q. So 40-year licenses you still assume that for what I'll call your base case?**

A. The overall analysis, yes.

**Q. That assumption will stay the same.**

A. For the projection, although it doesn't matter for the projection of acceptance

A. There would have been summaries of the spent fuel discharges that were provided to the client.

**Q. Do you know if you produced those in connection with the other things you produced in this litigation?**

A. I didn't.

As I would update an analysis, those would have been written over by the new analyses.

**Q. Do you recall the outputs of that preliminary estimate and how those compared to the conclusions you've reached in this report?**

A. I recall that things didn't change significantly. Plant operating schedules are in general pretty consistent, and you don't see major differences from one projection to another unless something drastic happened, and nothing drastic has happened in the nuclear industry with respect to operating schedules.

**Q. When you say that you would have overwritten any preliminary estimate or**

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl Lord

CHERYL A. LORD
Notary Public in and for the
District of Columbia

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :NO. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, September 20, 2006

VOLUME 3

The parties met, pursuant to the notice of the Judge at 10:27 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

(Index appears at end of transcript)

alternatives considered and then ultimately, depending upon the size of the project, you put all of that into a proposal, if you will, that is presented to the different levels of authority required for approval of that particular magnitude of investment. The larger the project, the terms of magnitude, the higher up in the organization it goes to for signature, review, and approval.

Q. Are the processes you just described reduced to writing?

A. Yes, they are.

MR. TOMASZCZUK: Your Honor, I'd like to hand the witness what's been marked as Plaintiff's Exhibit 15-A-2. These are in the binders that the Court has, but I also have just a copy for the Court and for the government and for the witness, just to expedite.

BY MR. TOMASZCZUK:

Q. And, Mr. Eaton, can you identify the document I've handed you, which has been premarked as Plaintiff's Exhibit 15-A-2?

A. I can. It's a copy of a policy entitled, "Capital Project Approval Policy."

Q. And what is this document?

A. Well, it's a document that provides some overarching guidance on what's required of a capital project in terms of information necessary to support the approval of a project.

Q. Can I direct your attention -- and I'll put this up on Elmo -- to the page in the lower right-hand corner marked KRG-GG005449. And this is, I believe, the third page from the back of the document. Do you have that?

A. I do, I see it.

Q. And can you tell us what this, which appears to be marked as an attachment, attachment one to the document, what this page of the document represents?

A. It's simply a table that identifies which level of authority, or which level of individual in the organization must ultimately approve a particular transaction capital procurement, a contract, payment, or project authorization, so it describes, as you go up in responsibility level, from a supervisor all the way to the corporate board of directors.

It talks about the approval authority limits, if you will, that are allowed for any

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: Systems Fuels v. U.S

HEARING DATE: September 20, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 9/20/06

Cynthia R. Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :NO. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
715 Madison Place, NW
Washington, D.C.

Thursday, September 21, 2006

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

***Index appears at end of transcript***

acceptance, correct?

A. I hadn't discussed it with them, no.

Q. Now, you are not offering an opinion that the 3,000 rate of acceptance would have been utilized by DOE in the nonbreach world, correct?

A. I'm not offering an opinion regarding what DOE would have done.

Q. Now, I believe you indicate this on your written direct, and I am going to put it up in a second, but you have essentially evaluated various acceptance rates to determine how they would impact, I think it is three criteria, correct?

A. Yes.

Q. Okay. Why don't we pull up, and I think we have it electronically, paragraph 16 of that written direct. And I believe you have a copy in front of you, right, Ms. Supko?

A. Yes.

MR. GARDNER: And, Your Honor, do you have a copy of Ms. Supko's report?

THE COURT: You are going to put it up? I will read it off the ELMO.

MR. GARDNER: Okay, that's fine. As

Q. Now, you were not involved in the DOE program in 1983, correct?

A. That's correct.

Q. And you weren't involved in any contract holder's discussions with DOE before the execution of the standard contract?

A. That's correct.

Q. Now, I believe you say in your written direct that you began working at ERI in 1990. Is that right?

A. Yes.

Q. Okay. Now, prior to working at ERI in 1990, you never had any discussions with DOE employees regarding issues related to the standard contract, correct?

A. Prior to 1990, no.

Q. Now -- but you have, in your capacity working at ERI, you have reviewed portions of the administrative record concerning the rulemaking leading up to the standard contract, correct?

A. I have.

Q. Okay. And, in fact, you believe that some utilities may have identified the two key issues during that rulemaking, right?

found that to be strange, but that's your choice so here we are. I thought you were going to argue relevance. Go ahead.

BY MR. GARDNER:

Q. Ms. Supko, I will repeat the last question then. It is fair to say that despite the utilities' request for the inclusion of a rate that would meet the discharge rate plus work out the backlog, TVA's view is that DOE did not accept those comments, correct?

A. That's what the document says.

Q. And, again, that's consistent with your understanding that DOE did not include a rate or any qualitative test on the standard contract, correct?

A. I believe that's what I said earlier.

THE COURT: Counsel, maybe this would be helpful to you and to your colleagues. To the extent I have to get into determining what the acceptance rate is, maybe I can fix some clever way around that.

MR. GARDNER: Then you are more clever than me, Your Honor.

THE COURT: But if I do, I don't intend to rely on Ms. Supko's opinion in that

regard. There is a lot of documents that we have here and that's -- I will make my decision based on those documents. This is nothing to do with your work or anything else like that. I'm sure you have done a very thorough job, but I don't intend to rely on an expert for something like that.

MR. GARDNER: Your Honor, that is precisely the government's point in the motion in limine.

THE COURT: This may shorten your cross substantially. You have my promise on that.

MR. GARDNER: Well, then I guess we are left in a bit of an awkward position, Your Honor, because unless the Court strikes Ms. Supko's testimony, which has already been filed.

THE COURT: I don't have to strike it. I can do --

MR. GARDNER: Then it is in the record, Your Honor.

THE COURT: So what?

MR. GARDNER: Then it is for the Federal Circuit. So unless I explore --

scenarios I modeled. And I would point out that scenario 1 is the scenario that was used by the other experts for Grand Gulf, the Kenrich Group, in modeling damages. Scenarios 2 and 3 are two of the three scenarios that the government's expert, Mr. -

Q. Dr. Hartman?

A. Dr. Hartman used in his expert report. There was a third one that I happened not to have modeled, but this is, if one wanted to look at the effect of the various rates to the industry as a whole, not just to this case, you could look at what I believe Mr. Gardner would put up as another demonstrative later to see the results, that it is label -- one of the tables in my expert report, which I'm sure we will get to later.

Q. We will, Ms. Supko. Now, you believe there is a possibility that rates lower than 3,000 may be reasonable, correct?

A. I have not modeled in my analysis any rates lower than 3,000 that appeared to be reasonable.

Q. But you believe there is a possibility that rates lower than 3,000 may be reasonable,

correct?

A. It is possible.

Q. And you haven't endeavored to determine what the minimum reasonable rate of acceptance is, correct?

A. I have not.

Q. Now, you would equate APPA's request to accept at a rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional at-reactor storage after 1998, correct?

A. I'm sorry, can you repeat that?

Q. Sure. You recall we discussed a little bit earlier the APPA?

A. Yes.

Q. Okay. And what the APPA had been requesting to be included in the draft standard contract?

A. Yes.

Q. And you would equate the APPA's request for an accepted rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional

at-reactor storage after 1998, correct?

A. Yes.

Q. But you would agree, Ms. Supko, that even under your scenario 1, your 3,000 rate, there are utilities that require additional at-reactor storage after 1998, correct?

A. In my calculation, for scenario 1, using a strict oldest fuel first acceptance priority, I do calculate additional storage requirements. However, using flexibilities in the contract, those numbers could be decreased significantly.

Q. And we will talk about those flexibilities, maybe not today, but we will see how far we get. Now, Ms. Supko, the next demonstrative I have put up here is table 2 of your written direct testimony, which can be found on page 18, correct?

A. Yes.

Q. And when we were talking about the calculations under the different scenarios, the additional storage requirement calculation that you have calculated under scenario 1 results in 1,030 MTUs of additional at-reactor storage, correct?

A. Yes, it does.

Q. Now, it is your understanding that under the standard contract, spent fuel acceptance is generally governed by the oldest fuel permanently discharged being accepted first, correct?

A. No. The oldest fuel permanently discharged provides a utility with their place in the acceptance queue. That specific fuel may not necessarily be the fuel that's accepted.

Q. That's fair. I appreciate that clarification. Now, that concept that you and I were just discussing, that's also known as OFF, right?

A. Yes.

Q. Oldest fuel first. Now, you agree that OFF priority will not necessarily meet the needs of individuals -- individual plant sites to avoid adding dry storage capacity, correct?

MR. SILBERG: Are you saying OFF priority under any scenario?

BY MR. GARDNER:

Q. No. Let's actually do your scenario 3 -- scenario 1, 3,000 MTU. You would agree that

under your scenario 1, OFF priority will not necessarily meet the needs of individual plant sites to avoid adding dry storage capacity?

A. That's correct. That was recognized even by the Department of Energy at the beginning of the program, that the oldest fuel first acceptance rate in the aggregate may not meet everyone's needs. I believe that was discussed in one of the mission -- draft mission plans in the early 1980s.

Q. And under your scenario 1, in fact, you have calculated that there are 14 utilities that had additional at-reactor storage needs after 1998, correct?

A. I did.

Q. And why don't we take a look at that demonstrative. Ms. Supko, this next demonstrative we're handing up here, I believe it is also referred to as Supko demonstrative 3.

A. Yes.

Q. You recognize this to be an extract from your spreadsheet that calculates additional at-reactor storage under 3,000 rate, correct?

In year one on this chart, if you go down, I don't know, maybe 10 or 12 lines, the U.S. Department of Energy actually has allocations in the queue for 29.5 metric tons in year one under this scenario.

Because they took title to some commercial spent nuclear fuel. And so they get allocations in the queue. And that fuel is being stored at Idaho National Engineering Lab and some other national laboratories. You know, could those allocations, could DOE possibly have traded them? I don't know. But that's the type of thing.

Obviously, they wouldn't have needed additional storage capacity at those sites.

BY MR. GARDNER:

Q. Ms. Supko, you talked about the flexibility for exchanges being a possibility, but, again, you don't know how much the amount of additional at-reactor storage would have decreased had utilities engaged in exchanges, correct?

A. I have not modeled that.

Q. And you haven't done any analysis to determine what a potential exchange would cost,

correct?

A. I have not. I have not done that either, no.

Q. You have never done any analysis to determine how much a utility would be willing to pay to engage in an exchange, correct?

A. Let me think. No, I don't believe I have looked at that.

Q. And you have not conducted any analysis to determine the timing of when an exchange's market really developed in the but-for world, correct?

A. I haven't, but I believe I did offer a response to a question from Judge Merrow in the Southern Nuclear trial regarding that issue. And I will repeat more or less what I said, is that by the time the acceptance rate reached 3,000 metric tons or exceeded the annual generation rate, meaning it was more than 2,000 metric tons per year, there would have been significant flexibility that may have allowed trading.

Q. So you think after the ramp-up period is when the exchanges market could have taken place?

A. What the contract -- excuse me. What the contract says is that the purchaser shall have the right to adjust the quantities of SNF and/or high level waste, plus or minus 20 percent, and the delivery schedules up to two months until submission of the final delivery schedule.

Q. And you understand that that adjustment of the amount and timing relate to the amounts contained in the delivery commitment schedule, correct?

A. Yes.

Q. Okay. Now, going back to Supko demonstrative 3 one more time here, of the 14 utilities you have identified as having additional storage requirements after 1998, you do not know which one of these utilities have acceptance rights in 1998, correct?

A. I didn't analyze it. It would be very easy to determine by looking at the information in my model which ones did or did not.

Q. Yeah. But that wasn't part of your analysis in this case, correct?

A. It was not.

Q. Now, you have not done any analysis to

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: System Fuels, Inc.

HEARING DATE: September 21, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 21, 2006

Karen Brynteson, FAPR, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH : No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, September 22, 2006

VOLUME 5

The parties met, pursuant to the notice of the Judge at 9:06 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

***Index appears at end of transcript***

company-by-company and determined what it is that in 1998, say, Entergy would have done with respect to swapping its allocations between it plants?

A. I didn't, between the oldest fuel first analysis that I've done, which we see the results of in scenario one, and the sensitivity for intrautility trading, you cover all, the whole range.

Q. Now, you're aware that there are some plants that are owned by multiple entities, correct?

A. Yes.

Q. For example, Southern Company has co-owners of particular plants, correct?

A. That sounds right.

Q. And you've never had any discussions with co-owners of a particular plant about their willingness to engage in intrautility exchanges, correct?

A. I would assume that the operating companies would have those discussions if they needed to do it at the time. I would have no reason that I would speak to the co-owners.

Q. So you've not had any discussions with

the co-owners about their willingness to engage in such trading, correct?

A. No.

Q. Now, when you're confirming the reasonableness of the 3,000 rate, one way in which you measure the reasonableness of additional at-reactor storage is by how it compares to one year's worth of discharges, correct?

A. That's one unit of measure you could use. Nuclear operating companies as a whole in the U.S. discharge approximately 2000 metric tons per year.

Q. And that is in fact one of the metrics you use, correct, to determine the reasonableness, is how the number of additional storage requirements compare to the 2000 MTUs, which is one year's worth of discharge, correct?

A. Yes.

Q. Now, going back to table two here, we can put this up, for scenario three, you've calculated the additional storage requirements to be 6200 MTUs, correct?

A. Yes.

Q. And under your sensitivity analysis for intracompany use of acceptance rights, scenario three drops from 6200 MTU to 4980 MTU, correct?

A. Yes.

Q. And in fact, that number for scenario three goes from 4980 MTU to 3980 MTU, if you assumed the use of the plus or minus 20 percent provision, correct?

A. It could be as much as that. It might not be that much.

Q. It could be less?

A. As we discussed yesterday, it would depend on whether or not there were delivery commitment schedule.

Q. That's right. Now, it could be the case that had the flexibilities you identified in the contract been utilized, there could have been 2000 MTUs of additional at-rector storage under scenario three, correct?

A. I have not calculated that number, so I can't answer your question.

Q. You don't know?

A. I don't.

Q. Now, in addition to modelling the

A. Yes.
Q. And System Fuels, the Arkansas case, correct?
A. Yes.
Q. And Boston Edison?
A. Yes.
Q. By my count, that's 13, does that sound right?
A. That sounds correct.
Q. And it's fair to say that with the exception of the Indiana Michigan case and Entergy Northwest, you're offering the same opinion in each of these cases regarding the reasonableness of the 3000 rate, correct?
A. I suppose that's true.
Q. Now, you're modelling a world in which DOE began performance on an industry wide basis beginning in 1998, correct?
A. Yes.
Q. Now, with regard to pool capacities, your model is not always utilizing pool capacities for utilities as they existed in 1998, correct?
A. I believe there are maybe a dozen utilities that I inadvertently used pool

capacities from the 1999, 2000 period. There were a small number that had increased their storage capacity at that time.

Q. For example, let's take Southern Nuclear's plant Hatch. Now, you've included Southern Nuclear's plant Hatch's post 1998 rerack in your model, correct?

A. I was directed by Southern Nuclear to include one of their temporary racks in the analysis, yes.

Q. And that direction in Southern Nuclear, that's maintained in your model to this day, correct?

A. I believe it is. I don't recall. I believe it is. I don't believe I've changed it.

Q. You believe you have not changed it?

A. That's correct.

Q. I just didn't hear you. Now, in addition to the post 1998 Southern's plant Hatch rerack that they actually installed, you also included a second bathtub rack that wasn't installed, correct?

A. That, I don't recall. I would have to look at the numbers.

Q. Let me see if I can refresh your recollection, the transcript I have previously given you for Southern Nuclear, and I want you to read this to yourself. I want to direct you to page 753.

THE COURT: Can we have some lines here?

MR. GARDNER: I was going to wait until Ms. Supko got to the page.

BY MR. GARDNER:

Q. Then I was going to direct you.

A. Okay.

Q. If you look at lines 3 through 6, if you can just look at those and let me know when you're done?

A. Okay.

Q. Does that refresh your recollection, Ms. Supko, in addition to the rerack post 1998, the plant Hatch actually did install, that your model also assumed the second backup rack that wasn't installed?

A. Yes.

Q. And I think you've said this, but I want to make sure I understand, you include about a dozen utilities post 1998 reracks in

any report after that, so anything done in the past year-and-a-half, that delta between the SMUD scenario two and Southern Nuclear scenario two is related to a smaller pool capacity. I believe it was for plant Farley.

Q. So let me see if I understand this because I may have misunderstood you. You're saying 500 delta is related to smaller pool capacity, not for plant Hatch, but for plant Farley?

A. I believe that's correct because if I increased the capacity for plant Hatch, the number would be lower, not higher.

Q. Now, you did not endeavor to determine what the world looked like for every pool, for every plant, as of 1998, correct?

A. I have not gone back and changed my analysis.

Q. And you're relying upon post 1998 pool modifications modelling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world, correct?

A. I am, and I believe that these are representative, even using several plants,

their post '98 pool capacity that I believe was representative, the analysis and the results would not change significantly if I changed the pool capacities.

Q. You agree that the amount of at-reactor storage you've calculated would be even greater if you omitted the 2000 plant Hatch rerack from your pool capacity analysis, correct?

A. It would be somewhat greater. It would depend on which scenario one was looking at. It would definitely be greater in scenarios two and three.

Q. In fact, if you did not assume the post 1998 rerack for Southern Nuclear, you would have calculated Southern Nuclear as requiring additional at-reactor storage after 1998, is that correct?

A. That's possible.

Q. And that would take additional utilities with additional at-reactor storage on this demonstrative from 14 to 15, correct?

A. That's possible, but in looking at intrautility use of acceptance rights, they wouldn't necessarily increase those numbers if

they were able to in fact use the rights at different plants.

Q. But that's only after you've done your calculation, correct, because there's two issues, right? You do the calculation to see who has additional storage requirements, and then you determine whether there are flexibilities that could somehow reduce those requirements, correct?

A. No, I do two separate calculations. I calculate additional storage requirements using oldest fuel first priority ranking, which is what we're looking at here, and I calculate additional storage requirements assuming intracompany trading. I can do them in any order. I don't have to know what the results are using oldest fuel first.

Q. I think we're saying the same thing, but based upon a strict oldest fuel first calculation, if you were to calculate pool capacities as of 1998, these 14 that you've calculated, this 1031, you would have to put plant Hatch on there as the 15th utility, correct, or 15th plant?

A. That's possible.

Q. Now, Ms. Supko, is there a difference, do you know, between a pool's licensed capacity and a pool's usable capacity?

A. There may be, not always.

Q. Does your model use licensed capacity or actual usable capacity?

A. I use licensed capacity for the majority of plants. However, for a good, since a good number of the nuclear operating companies are clients of mine, I also have usable capacity for a significant portion of the plants, I have that information.

Q. Now, is it fair to say that a pool's licensed capacity would be greater than a pool's actual capacity?

A. They may be the same.

Q. Are they often the same?

A. They can be.

Q. I know they can be. Are they often the same?

A. I would have to say it would depend on the individual nuclear plant and the pool configuration and what else they're storing in their pool.

Q. And have you done any analysis,

Ms. Supko, to compare all of the utilities' license capacity versus actual capacity?

A. I believe those numbers are typically reported by the operating companies in RW-859, so to the extent that I have that information, I would use it.

Q. And I guess I'm a little confused. You say to the extent you have that information, you use it, but in fact, you said for the majority of the plants, you aren't using it. You're using the license capacity, correct?

A. It would depend. I would use the information as it's reported. In some instances, the reported information may have changed after that, after the fact.

Q. And I guess I'm getting confused, I understand you to be saying that the RW-859 data -- and let's back up so we have a clear record. What is the RW-859 data, Ms. Supko?

A. The RW-859 data is information nuclear operating companies supply to the Department of Energy in accordance with the standard contract. It's supposed to be on an annual basis, but that doesn't happen anymore. I

mean, it includes historical spent fuel discharges and also information regarding the spent nuclear fuel pools and parameters associated with that.

Q. Thank you. Now, and you're using the 2002 RW-859 data, correct?

A. Yes, but I'm using the historical discharges from the RW-859 information and some of the projected information from that. I am not using information, with respect to where the fuel is located, I'm still assuming the location of fuel in 1998 because a significant amount of fuel moved from spent fuel storage pools into dry storage after 1998 because of the government's default.

The pool information also, for the most part, came from 1998, but also from my discussions with nuclear operating company clients.

Q. Let me see if I can break that down a little bit. When you're looking at pool capacities in your model, are you taking that information from the 2002 RW-859s?

A. No.

Q. Where are you taking the pool capacity

information from?

A. It would have originally come from the 1998 RW-859s, some of it between 1998, and I would say 2002, I would have updated, and there were just a few plants that had changes to the pool capacities during that period of time.

Q. Now, the 1998 RW-859 data that you're using to determine pool capacity, I understand you to say that the RW-859 provides both license pool capacity and usable pool capacity, correct?

A. I don't recall if that's the terminology that's used, but there are two numbers sometimes reported. Many times, the two numbers are the same.

Q. And whatever the actual term is, you understand they are conveying the concept of what the plant's licensed to store versus what it can actually store, correct?

A. Yes, and both numbers are actually in my model.

Q. Now, when you're doing your calculation of additional storage requirements, for those utilities who aren't your clients, are you using the licensed pool capacity or the

actual pool capacity?
A. I believe that the model uses the maximum pool capacity, which would be as it's reported.
Q. Now, do you know, let's take Grand Gulf as an example, do you know how their licensed capacity compares to their actual usable capacity?
A. I believe that, and I don't recall the exact number, there may be somewhere between 10 and 30 assemblies difference between the two.
Q. And is that assuming the cell recovery that took place after 1998?
A. I don't recall.
Q. So you don't know?
A. I don't recall the numbers. I have the information.
Q. Now, it's fair to say that on the whole though, the usable capacity will be less than the licensed capacity, correct?
A. It may be. It depends on the plant and the pool configuration.
Q. And do you know, Ms. Supko, if you used actual capacity, rather than licensed capacity, do you know if the additional storage

requirements for the 14 utilities you've listed here, did they go up?

A. I haven't calculated that. In some of those instances, I know I'm using usable capacity, but I haven't calculated it for all of those plants.

Q. And by the way, when we say, "license capacity," again, we're talking maximum license capacity, correct? I believe that's the term you used?

A. I used maximum capacity. Licensed capacity is the capacity that the Nuclear Regulatory Commission has approved.

Q. And, again, that doesn't take into, for example, nonrecoverable cells or unusable cells or boroflex degradation issues, correct?

A. It may.

Q. The license capacity would?

A. In my model, I have two columns, one is maximum, and the other one might be nominal for pool capacity. If I know, from talking to a nuclear operating company that -- and I'll just use a hypothetical number -- their pool capacity is 1,000 cells, that's been approved by the Nuclear Regulatory Commission, but for

A. Well, first of all, nuclear operating companies are not required by regulation to maintain a full core reserve, meaning the space to discharge their core into the fuel. It's typically for ease of plant outage management that that, a company would offload the entire core before reloading new fuel and leaving the discharged fuel in the pool.

So at a minimum, companies typically will reserve one full core. However, as I said, it's not required, and one can impinge on full core reserve if it's necessary because of delays, for example, in getting your dry storage facility up and running.

THE COURT: What do you mean by impinging?

THE WITNESS: Well, say a nuclear power plant has 173 assemblies in their reactor core, and they'll take about a third of those out every 18 months, and that becomes spent fuel, and then they'll put new fuel in, so one-third new fuel back in.

And if they keep 172 spaces open in their pool, they can take all the fuel out, put it in the pool and then put the new fuel and

the not quite -- the irradiated fuel that they're going to continue to use back in the reactor core. They could, only -- if they didn't have 172 spaces open, they could take out just the assemblies that they didn't want that were going to be spent fuel, that were going to be permanently discharged, say it was 172, it was 50 assemblies.

Take 50 assemblies out, put them into the pool because there are 150 spaces left, not 172, and then move the assemblies that are left in the core around to their new spaces and then bring in the new fuel and put the new fuel in, so if their full core reserve was 172 assemblies, but they only had 150, they've technically impinged on having one full core reserve in their pool.

BY MR. GARDNER:

Q. Now, you just talked about the concept of full core reserve. Now, actual operating reserve could potentially be higher than full core reserve, correct?

A. That's right. Some companies reserve additional space for new fuel in their pool for staging. Some companies, because of the

configurations of their pools, need additional open spaces because of worker shielding in and around the pool during outages, and there may be other reasons.

Q. Now, your model, your industry wide model assumes one full core reserve per pool, correct?

A. When I ran for these cases, that is the assumption that I made, yes.

Q. So your acceptance model does not take into account what a particular utility's operating reserve policy is, correct?

A. It does not.

Q. And you're not endeavoring to determine what each utility's operating policy were as of 1998, correct?

A. That's correct.

Q. Now, if you were to increase the amount of operating reserve that a particular utility would want to maintain, that could increase the additional storage requirements calculated for that particular utility, correct?

A. It might.

Q. Now, we've talked a bit about some of

the assumptions that go into the inputs of your model, and now, I want to shift gears a little bit and talk about outputs or results of those models.

Now, Ms. Supko, you'd agree that the amount of additional at-reactor storage you've calculated has changed over the course of the various expert reports you've authored in the spent fuel cases, correct?

A. Yes, in part because I've used different information or made different -- used a different methodology to calculate.

Q. Now, Ms. Supko, what I have just put up here is Supko Demonstrative 5, and what Supko Demonstrative 5 is, is a summary of your table two from five different cases, and I want to walk through them with you.

Now, in the Commonwealth Edison case, which was, I believe, the second expert report you issued in the spent fuel cases, you assumed under a 3000 rate of acceptance that there would be 1600 MTUs of additional at-reactor storage under scenario one, correct?

A. Yes.

Q. And in the report after that, the SMUD

case, that number went down to 600 MTUs, correct?

A. Yes.

Q. Now, the reason for that drop was that you changed the way that you were modelling the calculation of additional at-reactor storage, correct?

A. Yes, somewhat. In Commonwealth Edison, I modelled a strict oldest fuel first by pool. For example, looking at the chart, if we can bring up the, just the chart that's on the floor there, I'll just give an example.

Q. Which chart would you like?

A. That one right there.

Q. The one in my hand?

A. Yeah.

Q. The Supko Demonstrative 2?

A. Thank you. Palos Verdes is actually three nuclear power plants, and they all have separate pools, and when I modelled Palos Verdes in Commonwealth, I assumed that when Arizona Public Service was using their acceptance allocation, they would be used from -- the acceptance rights would go to the pool from which they were granted.

In SMUD, I changed that and assumed they would shift them from whichever pool needed it, which is the way a company would actually operate.

Q. So just so I understand, the 1000 MTU drop is the result of your failure to consider linking a utility that had dry storage in 1998 with its wet pool, is that correct?

A. No. If it's a strict oldest fuel first by pool rather than by site, in the SMUD and Southern Nuclear cases, I linked, allowed the shipments to occur from any pool at that site. The other thing that I did is I also -- there were maybe eight or nine plants that had dry storage prior to 1998, and most of the fuel that's in dry storage is the older fuel.

The companies would actually likely ship from their pools and not from dry storage. I also attempted to link that together.

Q. That's, I think, what I was just talking about with you, and so when you connected that the dry storage and the pool, that's one of the reasons why the numbers in Com Ed to SMUD dropped by 1000 MTUs, correct?

A. That's part of it, but that's not the

whole reason. The other reason was just linking or allowing the shipment of spent fuel from any pool on a given site.

Q. Now, you just mentioned Southern Nuclear. You, again, calculated 600 MTUs under your scenario of the 3000 rate. Now, in the South Carolina report, it then goes from 600 to 1030 MTUs, correct?

A. Yes.

Q. And the reason for that 430 MTU increase from your report in Southern Nuclear and South Carolina was because you underestimated the storage requirements at the eight sites that had dry storage as of 1998, correct?

A. Well, during my -- I believe it was my Southern Nuclear deposition, it was clear to me that the results of my model were not -- and how the results were calculated were not transparent to the government and its consultants. There's input, and there's output, and I wasn't certain that you were able to understand all of my output files because it's a Fortran code and it's ASCII characters.

And so in order to make my analysis

correct?
A. Yes.
Q. And once you conducted that sensitivity analysis of intrautility exchanges, that significantly changed the numbers for calculation of additional at-reactor storage, correct?
A. Well, one would expect that the additional storage requirements would drop as my analysis shows, and I believe my qualitative analysis in Commonwealth Edison stated that, and I quantified it in subsequent analyses.
Q. And once you quantified it, that significantly dropped the number of additional storage requirements, correct?
A. Absolutely.
Q. I want to change gears for just one second and talk about your publications. I think you list a number of them in your written direct testimony. You've published several articles in peer reviewed publications, correct?
A. Yes.
Q. And none of your peer reviewed articles discuss the methodology for

determining the reasonableness of a particular rate of acceptance, correct?

A. That's correct.

Q. I'm going to change gears just a couple more times. Your industry wide model projects that DOE will accept 90,000 MTUs of spent fuel over a 40-year period, correct?

A. The scenario that assumes licenses, nuclear power plants operate for 40 years, calculates approximately 90,000 metric tons, yes.

Q. And you assume that DOE will in fact accept all 90,000 MTUs, correct?

A. Yes. That's also the way the Department of Energy models spent fuel acceptance in its calculation of the adequacy of the Nuclear Waste Fee. They assume that they will accept all fuel in an uninterrupted manner.

Q. Now, you're aware in 1987, Nuclear Waste Policy Act amendments limited DOE to a single repository at 70,000 MTUs, correct?

MR. SILBERG: Objection, calls for legal conclusion. We're also getting into areas that are, it seems to me, beyond the

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: Systems Fuels v. U.S

HEARING DATE: September 22, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 9/22/06

Cynthia R. Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 8, 2006
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:


ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562


(Index appears at end of transcript)

a little while ago. It was about a dozen, but for the most part, it is reflective of information that was available in 1998 because pool capacities haven't changed.

Q. And in your but-for world model, Ms. Supko, you have Prairie Island in dry storage, correct, prior to 1998?

A. Yes, because they had dry storage, maybe I should call this a hybrid because I was trying to reflect the world as it existed in the real world as of 1998, and my projection went from there out. I did not attempt, and I haven't actually thought of that, I was attempting to reflect what had occurred up to 1998 and then project from there on.

Maybe if I had just assumed that there was no fuel in dry storage at any plant prior to 1998, to see how those -- I did not do that analysis.

Q. So this model, Ms. Supko, as you just described, it's a hybrid between the actual world and the but-for world, correct?

MR. SILBERG: Objection, she characterized it as a model that showed things as they were in 1998.

THE COURT: Well, I think the witness self-described this as possibly better referred to as a hybrid.

THE WITNESS: Yes, you know, it's difficult to think about where to draw the line in terms of the actual world that the nuclear companies have been operating in and the imaginary but-for world. As I said, I suppose I could have assumed no dry storage into any plant and to see where that would lead into in the analysis.

Or I could have hypothetically changed pool capacities, assuming companies would have reracked. I did not do that. I used information I had available. And I will, again, remind you that this is a projection, these are projections. They're based on a set of inputs, and if you change the input, you make it a different calculation of additional storage requirements.

But it's not going to be something that's going to be significantly different than what's represented in my expert report or in the government's Supko Demonstrative 1 in terms of overall results.

CERTIFICATE OF REPORTER

DOCKET NO.: 98-484C

CASE TITLE: Northern Power States v. U.S

HEARING DATE: November 8, 2006

LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 11/8/06

Cynthia Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

7/14/05
WEPCO
8.1.1

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0501

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0501

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2

**© 2005 Energy Resources International, Inc. All Rights Reserved.**

Prepared For:

Wisconsin Electric Power Company

Prepared by:

Eileen M. Supko

July 14, 2005

Eileen M. Supko 7/14/05

**1015 18th Street, NW, Suite 650**
**Washington, DC 20036**
**USA**
**Telephone: (202) 785-8833**
**Facsimile: (202) 785-8834**

# NOTICE

This report contains information proprietary and confidential to Energy Resources International, Inc. (ERI). It is for the use of Wisconsin Electric Power Company and, except for such use, reproduction of this report, or parts thereof, in any form is expressly prohibited without the written permission of ERI. The report, in its entirety or portions thereof, may not be given to other parties without the written permission of ERI.

ERI believes the information in this report to be accurate. However, neither ERI nor any of its subcontractors make any warranty, express or implied, nor assume any legal liability or responsibility for the accuracy, completeness, or usefulness of any information contained herein, nor for any consequent loss or damage of any nature arising from any use of this information.

## TABLE OF CONTENTS


| | | |
|---|---|---|
| 1. | Scope of Report and Summary of Opinions | 1 |
| 2. | Background and Qualifications | 1 |
| 3. | Methodology Used and Materials Considered in Reaching Opinions | 3 |
| 4. | Overall DOE Acceptance Rate for Commercial Spent Fuel | 5 |
| 5. | Description of ERI Spent Fuel Model | 7 |
| | 51 SPNTFUEL Description | 7 |
| | 5.2 Acceptance Priority | 7 |
| 6. | Point Beach Spent Fuel Acceptance Rights | 9 |
| | 6.1 Projection of Acceptance Rights Under 1998 Non-Breach Scenario | 9 |
| | 6.2 Projection of Acceptance Rights Under 2010 Actual Scenario | 9 |


## LIST OF TABLES


| | | |
|---|---|---|
| Table 1 | System Wide DOE Spent Fuel Acceptance Rates | 6 |
| Table 2 | Spent Nuclear Fuel Historical and Projected Discharges, Point Beach Units 1 and 2, 60 Year License Term, Based on 2002 RW-859 Data | 10 |
| Table 3 | Projection of Point Beach Spent Nuclear Fuel Acceptance Rights, 1998 Non-Breach Spent Fuel Acceptance Scenario | 11 |
| Table 4 | Projection of Point Beach Spent Nuclear Fuel Acceptance Rights, 2010 Actual Spent Fuel Acceptance Scenario | 12 |

## APPENDICES

Appendix A Projection of Spent Fuel Discharge Information Using SPNTFUEL
Appendix B Detailed Resume of Eileen M. Supko
Appendix C Publications List, Eileen M. Supko
Appendix D Written Materials Reviewed By Eileen Supko in Preparing This Report

## 1. SCOPE OF REPORT AND SUMMARY OF OPINIONS

I have been asked by Perkins Coie LLP, Counsel for Wisconsin Electric Power Company (Wisconsin Electric), to offer an expert opinion regarding the rates at which the U.S. Department of Energy (DOE) would accept spent nuclear fuel assemblies from Wisconsin Electric's Point Beach Units 1 and 2, assuming an overall acceptance rate of 3,000 MTU per year. It is my understanding that ERI's projections of spent fuel acceptance rights for the Point Beach nuclear plant provided in this report will support calculation of the damages that Wisconsin Electric has or will incur as a result of the DOE's failure to commence acceptance of spent nuclear fuel (SNF) from commercial nuclear power plants by January 31, 1998.

As described more fully below, I have calculated spent fuel acceptance rights for Point Beach Units 1 and 2, based on an overall steady-state spent fuel acceptance rate of 3,000 MTU per year, with a five year ramp up. Had DOE begun acceptance of spent nuclear fuel by January 31, 1998, in accordance with the Nuclear Waste Policy Act of 1982 (NWPA) as amended and the Standard Contract[1], I have determined that the first spent fuel acceptance rights for Point Beach would have occurred in 1998 and the final spent fuel would have been accepted by the DOE by 2038.

I have also calculated the spent fuel acceptance rights for Point Beach Units 1 and 2 based upon the presumption that DOE will not begin acceptance of spent fuel until 2010, at the earliest using the overall rates identified above. Under this scenario, I have determined that the first spent fuel acceptance rights for Point Beach would occur in 2010 and the final spent fuel would be accepted by 2049.

ERI's fees for this engagement range from $170 to $255 per hour and are not contingent in any way upon my findings.

## 2. BACKGROUND AND QUALIFICATIONS

I am a senior consultant and an owner of Energy Resources International, Inc. (ERI).

I hold a bachelors of science degree in Nuclear Engineering from Pennsylvania State University. From 1985 to 1990, I was employed by Carolina Power and Light Company (now Progress Energy), a nuclear operating company, as a Nuclear Fuel Projects Engineer and then a Nuclear Services Department Incore Analysis Engineer. At Carolina Power and Light Company, my responsibilities included nuclear fuel procurement and nuclear reactor core design and analysis. As a function of nuclear reactor core design and analysis work that I performed, I was responsible for ensuring that the nuclear fuel and nuclear reactor

[1] U.S. Department of Energy, *Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*, Title 10, U.S. Code of Federal Regulations, Part 961 (Standard Contract)

core operated within the regulatory limits approved by the U.S. Nuclear Regulatory Commission (NRC) in the plant license. I joined ERI in 1990. I have extensive experience in providing advice to clients in the areas of spent nuclear fuel, nuclear waste management and radioactive materials transport, and I analyze the technical, economic, regulatory, legislative, and policy issues associated with the storage, acceptance, transport, and disposal of spent nuclear fuel and high-level radioactive waste. My clients include nuclear power plant operating companies, a foreign government, industry organizations, private companies, and a private spent fuel management organization.

ERI has developed a computer model, SPNTFUEL, that has the capability to model spent fuel acceptance rates, determine acceptance rights for individual nuclear power plants, and determine the effect of these acceptance rates on utility requirements for additional spent fuel storage capacity, including the amount of time that spent fuel must remain at nuclear power plant sites following plant shutdown for decommissioning. SPNTFUEL also has the capability to project nuclear power plant discharge data, including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup. In *Indiana Michigan Power Company v. United States*, the parties stipulated that the ERI and DOE computer models used to project spent fuel discharges and acceptance rates rely on similar assumptions and similar input data. Further, the parties stipulated that "the annual acceptance allocations calculated by either the ERI or DOE models should not result in any material differences for the purposes of assessing damages."[2] Additional details regarding the SPNTFUEL program can be found in Appendix A to this report.

On behalf of clients, using the SPNTFUEL model, I have analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. These analyses have been performed to determine the effect of DOE acceptance rates on the commercial nuclear power plants' spent fuel storage requirements, for the overall U.S. nuclear industry, and for individual nuclear power plants as requested by individual clients. Acceptance rate analyses that I have performed include analysis of postulated DOE acceptance rates for nuclear industry organizations; analysis to support nuclear industry legislative efforts regarding changes to the DOE waste program in the 1990s; analysis on behalf of the nuclear industry of proposals to "take title" to spent nuclear fuel; spent fuel acceptance scenarios to support individual client decommissioning analyses; and spent fuel acceptance scenarios to support individual client spent nuclear fuel damages claims, such as the analysis supporting this case.

I have been a direct participant in technical exchanges between the nuclear industry and DOE since 1990 regarding such topics as DOE plans for accepting commercial SNF, industry positions on outstanding Standard Contract issues, and DOE's conceptual designs

[2] Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004 (2004 Joint Stipulation).

for surface facilities for acceptance of commercial SNF. I have assisted in the preparation of nuclear industry comments and feedback on various DOE program documents, including but not limited to Mission Plans, Annual Capacity Reports, Acceptance Priority Ranking reports, Environmental Impact Statement documents, and transportation plans. My detailed resume is attached as Appendix B, providing additional details on my background and qualifications as an expert in this matter.

In addition to numerous client-specific analyses, evaluations, and reports, over the past fifteen years I have authored over 35 reports, presentations, and publications in leading nuclear energy journals and have been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. A detailed list of my publications and presentations is attached as Appendix C.

## 3. METHODOLOGY USED AND MATERIALS CONSIDERED IN REACHING OPINION

In developing my expert opinions regarding spent fuel acceptance rights for Point Beach Units 1 and 2, I have reviewed DOE and DOE contractor methodologies for the projection of spent nuclear fuel discharges[3,4] as well as DOE's model for projecting spent nuclear fuel discharges. I also have reviewed DOE's recently published Acceptance Priority Ranking and Annual Capacity Report.[5] I have reviewed the Standard Contract and associated documents such as Annual Capacity Reports and Acceptance Priority Rankings. I have incorporated into my SPNTFUEL database the historical and projected spent fuel discharge information provided to the DOE by nuclear operating companies through DOE form RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859). Assuming similar input assumptions, both the DOE model and ERI's SPNTFUEL model will result in similar projected spent nuclear fuel acceptance rights for individual nuclear power plants.[6]

As requested by Counsel, ERI has calculated the rate at which the DOE would accept spent nuclear fuel from the Point Beach nuclear plant under two scenarios using the SPNTFUEL computer model: (1) a 1998, "Non-Breach" spent fuel acceptance scenario that projects the rate at which the DOE would have accepted spent fuel from Point Beach had it begun acceptance of spent fuel in 1998; and (2) a 2010, "Actual" spent fuel acceptance scenario that projects the rate at which the DOE is expected to accept spent fuel from Point Beach if

[3] Bechtel SAIC Company, LLC, "Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges," TDR-WAT-NU-000002 Rev 1, February 2002.

[4] McLeod, Barrie, JAI Corporation, and Pollog, Thomas, U.S. DOE, "Methodology for the Projection of Spent Nuclear Fuel Discharges," conference paper, date unknown.

[5] U.S. DOE, OCRWM, *Acceptance Priority Ranking and Annual Capacity Report,* DOE/RW-0567, July 2004.

[6] 2004 Joint Stipulation.

it were to begin receipt of spent nuclear fuel at a Yucca Mountain repository in 2010. This report presents spent nuclear fuel acceptance rights for Point Beach Units 1 and 2 on an annual MTU basis. The acceptance rights calculated by ERI's SPNTFUEL model are based on a plant-by-plant, oldest-fuel-first (OFF) acceptance priority ranking.

Counsel for Wisconsin Electric requested that I assume that DOE would begin overall acceptance of spent fuel at a Yucca Mountain repository in 2010. While this analysis assumes that DOE will begin acceptance of spent fuel at a repository in 2010, recent evidence regarding DOE's repository schedule leads me to conclude that DOE will not begin operation of a repository by 2010.[7] Nonetheless, I understand that Wisconsin Electric, in order to simplify its damages presentation at trial, has based its damages calculations in this proceeding on an assumption that DOE will begin spent fuel acceptance at a repository in 2010.

A list of the written materials that I have reviewed and considered in forming my opinions in this report is included in Appendix D. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional rationale for these opinions as additional documents are produced, the transcripts of expert and fact witness depositions become available for my review, and new facts are introduced during discovery and trial.

[7] For example: (1) On July 9, 2004, the U.S. Court of Appeals for the D.C. Circuit invalidated the Environmental Protection Agency's radiation protection standards for Yucca Mountain and the Nuclear Regulatory Commission rule insofar as it incorporates the EPA's radiation protection standard. The court directed the EPA to rewrite the standards. EPA has announced that it expects to issue a draft standard for comment in mid to late 2005. This new standard will have to go through a rulemaking process. (2) Under NRC regulations, the DOE is required to certify to the NRC that all of the documents on which it will rely during the licensing proceeding for Yucca Mountain are electronically available six months prior to DOE's submittal of its license application to the NRC. DOE made its initial certification on June 30, 2004, to support a December 2004 license application submittal. In an order issued in August 2004, an NRC licensing board ruled that DOE's certification did not meet the NRC regulations. DOE has reported to the NRC that it expects to recertify its licensing documents in August 2005. (3) In November 2004, DOE announced that it would miss its scheduled date of December 2004 for submittal of a license application (LA) for construction authorization for the proposed Yucca Mountain repository. DOE has stated that it plans to complete its LA by the end of 2005, but it has not announced a firm schedule for submittal of the LA. (4) DOE resumed the Delivery Commitment Schedule (DCS) process in July 2004 only to cancel the process in December 2004, saying that recent developments relating to the FY 2005 budget and other issues led DOE to conclude that the resumption of the DCS process was premature and that the DCS process would resume when DOE has determined a revised date for the initial operation of the Yucca Mountain repository. (5) In February 2005, Margaret Chu, then-OCRWM Director, stated that DOE was "hoping" that a repository would be available in 2012. In March 2005 during testimony before Congress, an OCRWM official presented funding profiles assuming a 2012 or 2015 date for the start of repository operations.

## 4. OVERALL DOE ACCEPTANCE RATE FOR COMMERCIAL SPENT FUEL

As requested by Counsel for Wisconsin Electric, ERI's analysis of acceptance rates for both the 1998 Non-Breach and a 2010 Actual spent fuel acceptance scenarios assumes that the overall rate of spent fuel acceptance by the DOE would reach a 3,000 MTU steady-state rate within a five-year ramp up period.

The overall spent fuel acceptance rates used in this report assume that the DOE would accept 400 MTU in the first year of spent fuel acceptance, 600 MTU in the second, 1,200 MTU in the third, 2,000 MTU in the fourth year, and 3,000 MTU thereafter until all spent nuclear fuel has been removed from civilian nuclear power plants. The five-year ramp up period assumed in ERI's analysis is consistent with recently published DOE Total System Life Cycle Cost Analysis (TSLCC)[8,9] which DOE has used as the basis for determining the overall cost of the disposal program to ensure that the fees collected from nuclear power plant operators are adequate to cover the life cycle costs of the program, as well as a recent DOE Annual Capacity Report.[10] It is my opinion that this ramp up rate represents a reasonable ramp up period and annual acceptance rate for the start of repository operations.

A summary of the system-wide spent fuel acceptance rates used in this study for the 1998 Would-Have-Been and the 2010 Actual spent fuel acceptance scenarios is provided in Table 1.

[8] U.S. Department of Energy, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program,* DOE/RW-0510, December 1998, Table 3 (1998 TSLCC).

[9] U.S. Department of Energy, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program,* DOE/RW-0533, May 2001, Table 4-1 (2001 TSLCC).

[10] U.S. Department of Energy, *Acceptance Priority Ranking and Annual Capacity Report,* DOE/RW-0567, July 2004.

**Table 1 System-Wide DOE Spent Fuel Acceptance Rates**

| Year | 3000 MTU Base Case Acceptance Rates | |
|---|---|---|
| | 1998 Non-Breach Scenario (MTU/Year) | 2010 Actual Scenario (MTU/Year) |
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 1,200 | |
| 2001 | 2,000 | |
| 2002 | 3,000 | |
| 2003 | ... | |
| 2004 | ... | |
| 2005 | ... | |
| 2006 | ... | |
| 2007 | ... | |
| 2008 | ... | |
| 2009 | ... | |
| 2010 | ... | 400 |
| 2011 | ... | 600 |
| 2012 | ... | 1,200 |
| 2013 | ... | 2,000 |
| 2014 | ... | 3,000 |
| Thereafter... | 3,000 | 3,000 |

# 5. DESCRIPTION OF ERI SPNTFUEL MODEL

## 5.1 SPNTFUEL Description

In forming my opinions, I have projected spent fuel acceptance rights for spent fuel discharged from Point Beach Units 1 and 2 using the SPNTFUEL model. Appendix A describes how the SPNTFUEL program calculates future spent fuel discharges along with a description of the various input parameters and assumptions.

According to Article IV of the Standard Contract, contract holders are required to provide DOE with information on actual discharges and projected discharges on a periodic basis as determined by DOE. This data is submitted to DOE's Energy Information Administration (EIA) by nuclear operating companies via DOE Nuclear Fuel Data Form, RW-859. DOE requested submittal of RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859). The projection of spent fuel acceptance rights for Point Beach is based on industry-wide historical spent fuel discharges from U.S. commercial nuclear power plants as reflected in the 2002 RW-859 data. In addition to historical discharge data, the RW-859 database also includes five cycles of projected spent fuel discharges provided to DOE by contract holders. ERI's SPNTFUEL database has been updated to reflect the historical and projected spent fuel discharge data contained in the 2002 RW-859 data.

Since the RW-859 data only includes five cycles of projected spent fuel discharges for nuclear power plants, ERI must project additional spent fuel discharges for each plant through the end of its operating license. SPNTFUEL is capable of projecting future spent fuel discharges for each operating nuclear power plant. The projected spent nuclear fuel discharge data calculated with SPNTFUEL are used in combination with historical and projected RW-859 data to determine the overall spent fuel acceptance queue. SPNTFUEL then applies the overall DOE acceptance rate, as identified in Table 1, to determine the acceptance rights for Point Beach Units 1 and 2.

## 5.2 Acceptance Priority

Since DOE's acceptance capacity will be finite in any given year (e.g., up to an overall rate of 3,000 MTU), DOE must allocate the annual spent fuel acceptance capacity to contract holders[11] using a priority ranking process. According to the Standard Contract,[12] the priority ranking for assigning spent fuel acceptance rights to the contract holders is based on the age of the SNF as determined from the date that the SNF was permanently discharged from the contract holders' nuclear power plant(s). This priority ranking

[11] The term "contract holders" refers to companies who have signed the Standard Contract with DOE.

[12] Standard Contract, Article IV.B.5 and Article VI.B.1(a).

methodology is typically referred to as "Oldest Fuel First"[13] or "OFF." For example, the age of each fuel assembly discharged from Wisconsin Electric's Point Beach nuclear plant determines the relative position of this fuel in the spent fuel acceptance "queue" (i.e., the chronological list of all spent fuel permanently discharged from all commercial nuclear power plants). Spent fuel acceptance "rights" are expressed in MTU of allocated acceptance capacity.

It should be noted that while the Standard contract priority ranking is based on an OFF methodology, the Standard Contract contains additional provisions that might affect the acceptance of spent nuclear fuel, providing additional flexibility to contract holders. For example, the Standard Contract, Article V.E, "Exchanges," allows Standard Contract holders the right to exchange delivery commitment schedules with other Standard Contract holders. The contract provision allows DOE to approve or disapprove any such exchanges within thirty days after receipts. The Standard Contract, Article V.B.2, also allows Contract holders to "adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until submission of the final delivery schedule."

[13] DOE, *Annual Capacity Report, DOE/RW-0294P*, December 1990, p. 8-9.

## 6. POINT BEACH SPENT FUEL ACCEPTANCE RIGHTS

The acceptance rights ERI has projected for Wisconsin Electric's Point Beach nuclear plant are based on the following information.

- Overall DOE spent fuel acceptance rates presented in Table 1.
- Historical and projected discharges as provided to DOE by contract holders via the 2002 RW-859 data collection.
- Projected industry-wide discharges, assuming that all plants operate for 60-year license terms, as calculated by ERI's SPNTFUEL program, described in this report.
- An Oldest Fuel First acceptance priority.

Table 2 provides a summary of the historical and projected spent nuclear fuel discharge data contained in the RW-859 database for Point Beach Units 1 and 2, as well as projected discharge data calculated by the SPNTFUEL model assuming that the plants operate under extended licenses for terms of 60 years.

### 6.1 Projection of Acceptance Rights Under 1998 Non-Breach Scenario

Projected spent nuclear fuel acceptance rights for Point Beach Units 1 and 2, on a MTU and fuel assembly basis for the 1998 Non-Breach acceptance scenario, are provided in Table 3.

Under the 1998 Non-Breach acceptance scenario, the first spent nuclear fuel would have been accepted from Point Beach beginning in 1998, and the final spent nuclear fuel assembly would be accepted by the DOE by 2038.

### 6.2 Projection of Acceptance Rights Under 2010 Actual Scenario

Projected spent nuclear fuel acceptance rights for Point Beach Units 1 and 2, on a MTU and fuel assembly basis for the 2010 Actual acceptance scenario, are provided in Table 4.

Under the Actual acceptance scenario, the first spent nuclear fuel would have been accepted from Point Beach beginning in 2010, and the final spent nuclear fuel assembly would be accepted by the DOE by 2049.

**Table 2 Spent Nuclear Fuel Historical and Projected Discharges
Point Beach Units 1 and 2, 60 Year License Term
Based on 2002 RW-859 Data**

| Year | Point Beach Unit 1 Assy. | Point Beach Unit 1 MTU | Point Beach Unit 2 Assy. | Point Beach Unit 2 MTU | Year | Point Beach Unit 1 Assy. | Point Beach Unit 1 MTU | Point Beach Unit 2 Assy. | Point Beach Unit 2 MTU |
|---|---|---|---|---|---|---|---|---|---|
| 1972 | 41 | 16.280 | | | 2003 | | | 41 | 14.495 |
| 1973 | | | | | 2004 | 40 | 14.076 | | |
| 1974 | 74 | 28.630 | 36 | 14.370 | 2005 | 41 | 16.048 | 40 | 15.644 |
| 1975 | 16 | 6.367 | | | 2006 | | | 40 | 15.829 |
| 1976 | 32 | 12.800 | 34 | 13.390 | 2007 | 40 | 15.840 | | |
| 1977 | 48 | 19.120 | 37 | 14.260 | 2008 | 40 | 15.844 | 40 | 15.836 |
| 1978 | 33 | 13.210 | 44 | 17.610 | 2009 | | | 40 | 15.840 |
| 1979 | 24 | 9.640 | 29 | 11.620 | 2010 | 39 | 15.407 | | |
| 1980 | 8 | 3.210 | 32 | 12.840 | 2011 | 38 | 15.012 | 36 | 14.251 |
| 1981 | 25 | 10.060 | 32 | 12.860 | 2012 | | | 35 | 13.855 |
| 1982 | 20 | 8.040 | 29 | 11.680 | 2013 | 37 | 14.617 | | |
| 1983 | 42 | 16.860 | 26 | 10.370 | 2014 | 36 | 14.221 | 34 | 13.460 |
| 1984 | | | 22 | 8.830 | 2015 | | | 34 | 13.460 |
| 1985 | 31 | 12.420 | 22 | 8.680 | 2016 | 35 | 13.826 | | |
| 1986 | 34 | 13.630 | 29 | 11.680 | 2017 | 34 | 13.431 | 34 | 13.460 |
| 1987 | 37 | 14.850 | 35 | 13.570 | 2018 | | | 34 | 13.460 |
| 1988 | 33 | 12.930 | 34 | 12.550 | 2019 | 34 | 13.431 | | |
| 1989 | 33 | 12.340 | 32 | 11.650 | 2020 | 34 | 13.431 | 34 | 13.460 |
| 1990 | 38 | 13.900 | 33 | 12.130 | 2021 | | | 34 | 13.460 |
| 1991 | 29 | 10.820 | 29 | 10.650 | 2022 | 34 | 13.431 | | |
| 1992 | 29 | 10.440 | 29 | 10.460 | 2023 | 34 | 13.431 | 34 | 13.460 |
| 1993 | 29 | 10.440 | 28 | 10.090 | 2024 | | | 34 | 13.460 |
| 1994 | 29 | 10.440 | 29 | 10.380 | 2025 | 34 | 13.431 | | |
| 1995 | 32 | 11.480 | 32 | 11.470 | 2026 | 34 | 13.431 | 34 | 13.460 |
| 1996 | 32 | 11.460 | 20 | 7.200 | 2027 | | | 34 | 13.460 |
| 1997 | | | | | 2028 | 34 | 13.431 | | |
| 1998 | 45 | 16.200 | 53 | 18.980 | 2029 | 22 | 8.691 | 34 | 13.460 |
| 1999 | 40 | 14.350 | | | 2030 | 121 | 47.800 | 34 | 13.460 |
| 2000 | | | 40 | 14.360 | 2031 | | | | |
| 2001 | 37 | 13.190 | | | 2032 | | | 21 | 8.313 |
| 2002 | 40 | 14.080 | 36 | 12.770 | 2033 | | | 121 | 47.900 |
| | | | | | **Total** | 1672 | 646.017 | 1624 | 627.933 |

**Table 3 Projected Point Beach Spent Fuel Acceptance Rights
1998 Non-Breach Spent Fuel Acceptance Scenario**

| Year | Point Beach Unit 1 Assy. | Point Beach Unit 1 MTU | Point Beach Unit 2 Assy. | Point Beach Unit 2 MTU | Total Assy. | Total MTU |
|---|---|---|---|---|---|---|
| 1998 | 41 | 16.280 | | | 41 | 16.280 |
| 1999 | 74 | 28.630 | 36 | 14.370 | 110 | 43.000 |
| 2000 | 48 | 19.167 | 34 | 13.390 | 82 | 32.557 |
| 2001 | 81 | 32.330 | 81 | 31.870 | 162 | 64.200 |
| 2002 | 32 | 12.850 | 93 | 37.320 | 125 | 50.170 |
| 2003 | 87 | 34.960 | 55 | 22.050 | 142 | 57.010 |
| 2004 | 31 | 12.420 | 44 | 17.510 | 75 | 29.930 |
| 2005 | 71 | 28.480 | 64 | 25.250 | 135 | 53.730 |
| 2006 | 66 | 25.270 | 34 | 12.550 | 100 | 37.820 |
| 2007 | 38 | 13.900 | 65 | 23.780 | 103 | 37.680 |
| 2008 | 58 | 21.260 | 29 | 10.650 | 87 | 31.910 |
| 2009 | 29 | 10.440 | 57 | 20.550 | 86 | 30.990 |
| 2010 | 61 | 21.920 | 29 | 10.380 | 90 | 32.300 |
| 2011 | 32 | 11.460 | 52 | 18.670 | 84 | 30.130 |
| 2012 | 45 | 16.200 | | | 45 | 16.200 |
| 2013 | | | 53 | 18.980 | 53 | 18.980 |
| 2014 | 40 | 14.350 | 40 | 14.360 | 80 | 28.710 |
| 2015 | 37 | 13.190 | 36 | 12.770 | 73 | 25.960 |
| 2016 | 40 | 14.080 | 41 | 14.495 | 81 | 28.575 |
| 2017 | 40 | 14.076 | | | 40 | 14.076 |
| 2018 | 41 | 16.048 | 40 | 15.644 | 81 | 31.692 |
| 2019 | 40 | 15.840 | 40 | 15.829 | 80 | 31.669 |
| 2020 | 40 | 15.844 | 40 | 15.836 | 80 | 31.680 |
| 2021 | 39 | 15.407 | 40 | 15.840 | 79 | 31.247 |
| 2022 | 38 | 15.012 | 36 | 14.251 | 74 | 29.263 |
| 2023 | | | 35 | 13.855 | 35 | 13.855 |
| 2024 | 37 | 14.617 | 34 | 13.460 | 71 | 28.077 |
| 2025 | 36 | 14.221 | 34 | 13.460 | 70 | 27.681 |
| 2026 | 35 | 13.826 | 34 | 13.460 | 69 | 27.286 |
| 2027 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2028 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2029 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2030 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2031 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2032 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2033 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2034 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2035 | 143 | 56.491 | 34 | 13.460 | 177 | 69.951 |
| 2036 | | | | | 0 | 0.000 |
| 2037 | | | 21 | 8.313 | 21 | 8.313 |
| 2038 | | | 121 | 47.900 | 121 | 47.900 |
| **Total** | **1,672** | **646.017** | **1,624** | **627.933** | **3,296** | **1273.950** |

Proprietary and Confidential
Protected Material to be Disclosed Only In Accordance With U.S. Court of Federal Claims Protective Order

**Table 4 Projected Point Beach Spent Fuel Acceptance Rights 2010 Actual Spent Fuel Acceptance Scenario**

| Year | Point Beach Unit 1 | | Point Beach Unit 2 | | Total | |
|---|---|---|---|---|---|---|
| | Assy. | MTU | Assy. | MTU | Assy. | MTU |
| 2010 | 41 | 16.280 | | | 41 | 16.280 |
| 2011 | 74 | 28.630 | 36 | 14.370 | 110 | 43.000 |
| 2012 | 48 | 19.167 | 34 | 13.390 | 82 | 32.557 |
| 2013 | 81 | 32.330 | 81 | 31.870 | 162 | 64.200 |
| 2014 | 32 | 12.850 | 93 | 37.320 | 125 | 50.170 |
| 2015 | 87 | 34.960 | 55 | 22.050 | 142 | 57.010 |
| 2016 | 31 | 12.420 | 44 | 17.510 | 75 | 29.930 |
| 2017 | 71 | 28.480 | 64 | 25.250 | 135 | 53.730 |
| 2018 | 66 | 25.270 | 34 | 12.550 | 100 | 37.820 |
| 2019 | 38 | 13.900 | 65 | 23.780 | 103 | 37.680 |
| 2020 | 58 | 21.260 | 29 | 10.650 | 87 | 31.910 |
| 2021 | 29 | 10.440 | 57 | 20.550 | 86 | 30.990 |
| 2022 | 61 | 21.920 | 29 | 10.380 | 90 | 32.300 |
| 2023 | 32 | 11.460 | 52 | 18.670 | 84 | 30.130 |
| 2024 | 45 | 16.200 | | | 45 | 16.200 |
| 2025 | | | 53 | 18.980 | 53 | 18.980 |
| 2026 | 40 | 14.350 | 40 | 14.360 | 80 | 28.710 |
| 2027 | 37 | 13.190 | 36 | 12.770 | 73 | 25.960 |
| 2028 | 40 | 14.080 | 41 | 14.495 | 81 | 28.575 |
| 2029 | 40 | 14.076 | | | 40 | 14.076 |
| 2030 | 41 | 16.048 | 40 | 15.644 | 81 | 31.692 |
| 2031 | 40 | 15.840 | 40 | 15.829 | 80 | 31.669 |
| 2032 | 40 | 15.844 | 40 | 15.836 | 80 | 31.680 |
| 2033 | 39 | 15.407 | 40 | 15.840 | 79 | 31.247 |
| 2034 | 38 | 15.012 | 36 | 14.251 | 74 | 29.263 |
| 2035 | | | 35 | 13.855 | 35 | 13.855 |
| 2036 | 37 | 14.617 | 34 | 13.460 | 71 | 28.077 |
| 2037 | 36 | 14.221 | 34 | 13.460 | 70 | 27.681 |
| 2038 | 35 | 13.826 | 34 | 13.460 | 69 | 27.286 |
| 2039 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2040 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2041 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2042 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2043 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2044 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2045 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2046 | 34 | 13.431 | 34 | 13.460 | 68 | 26.891 |
| 2047 | 143 | 56.491 | 34 | 13.460 | 177 | 69.951 |
| 2048 | | | 21 | 8.313 | 21 | 8.313 |
| 2049 | | | 121 | 47.900 | 121 | 47.900 |
| **Total** | **1,672** | **646.02** | **1,624** | **627.93** | **3,296** | **1273.950** |

# APPENDIX A
# PROJECTION OF SPENT FUEL DISCHARGE INFORMATION USING SPNTFUEL

## A.1 Projection of Cycle Discharge Data

The SPNTFUEL program has the capability to project nuclear power plant discharge data including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup.

The SPNTFUEL program reads in the historical and projected spent fuel discharge data provided in the DOE's 2002 RW859 data and calculates cycle-by-cycle discharge data through the end of each plant's operating license expiration date – either for 40 year licenses or 60 year extended licenses. SPNTFUEL cycle discharge data is calculated as described below.

- Projected discharge dates are calculated by adding a plant's cycle length (the period of time between plant refueling outages) to the last historical/utility discharge date (e.g., last utility projected date of 9/2005 plus 18 month cycle length to produce projected discharge dates of 3/2007, 9/2008, etc.).

- Projected discharge burnups for the industry are based on last historical/projected discharge burnup, using this burnup as the starting point in the calculation. ERI specifies future maximum burnups for PWR and BWR fuel as well as an annual rate of increase in burnup for PWR and BWR fuel. For example, if the last projected discharge burnup for a PWR is 46,800 MWD/MTU and the PWR burnup rate of increase is 1.7% per year, a discharge in the next year is projected at 47,596 MWD/MTU (46,800 x 1.017), 48,405 MWD/MTU two years out, etc. The projected burnup is increased in whole year increments. The projected burnup will increase each year until a maximum projected for that reactor type is reached (e.g., PWR maximum burnup is 58,000 MWD/MTU).

- Projected capacity factors (CF) are based on the historical CF for each nuclear power plant or on plant-specific values supplied by nuclear operating companies to ERI. ERI specifies a future minimum CF (e.g., 90%) that it believes all plants can achieve in future operations. This future minimum CF is based on the industry-wide average CF, currently 90%. If the historical CF for an individual plant is below the ERI-specified future minimum CF, the individual plant CF is gradually increased from the study start year (e.g., 1998) to the specified future minimum CF over an ERI specified number of years. For example, if a plant's current CF is 80%, and ERI specifies a future minimum CF of 90% is to be reached over a period of 10 years, the projected CF will increase 1.0% [ (90%-80%) / 10 years] each year until the future minimum CF is reached in the year 2010. CFs for plants that have current CFs that are greater than the future

minimum CF (90%) are not adjusted by the SPNTFUEL program but instead that higher CF is assumed through the end of the plant's license.

- The projected amount of spent fuel discharged in MTU is based on a plant's licensed thermal rating (MWT), discharge burnup (BUP in MWD/MTU), capacity factor (CF in %), cycle length (CYL in years) as shown below:

  *MTU = (MWT) x (CYL) x (CF/100) x (365 days/year) / (BUP)*

  For example, 3000 MWT x 1.5 years x 90/100 x 365 / 45,000 MWD/MTU = 32.85 MTU

- The projected number of discharged assemblies (ASSY) is calculated by dividing the MTU discharge size by the assembly unit weight. The assembly unit weight is calculated by dividing an individual plant's core weight by the number of assemblies in the core. Since fuel assembly discharges are in whole assembly increments, the adjusted assembly discharge (ASSY*) is calculated by rounding ASSY and the adjusted discharge weight (MTU*) recalculated based on the assembly unit weight. The adjusted discharge burnup (BUP*) is then recalculated based on the adjusted discharge size MTU* as shown below:

  *BUP* = (MWT) x (CYL) x (CF/100) x (365 days/year) / (MTU*)*

## A.2. DESCRIPTION OF DATA INPUT

The SPNTFUEL Program utilizes several data input files:

Historical discharge data is consistent with the DOE's RW-859 database for spent fuel discharges through December 31, 2002. Data input into SPNTFUEL includes: plant name, storage location, storage location identification number, spent fuel discharge date, number of assemblies permanently discharged, weight (MTU) of assemblies discharged, and fuel assemblies burnup (MWD/MTU).

Projected discharge data for five future cycles was also included in the RW-859 data submittal. The SPTNFUEL program utilizes this projected discharge information. Data input to the SPNTFUEL code includes: plant name, storage location, storage location identification number, spent fuel discharge date, number of assemblies permanently discharged, weight (MTU) of assemblies discharged, and fuel assemblies burnup (MWD/MTU).

Each nuclear power plant has specific plant operating parameters that must be taken into account in order for the SPNTFUEL code to project future spent fuel discharges. Parameters in ERI's plant data base file that are used to calculate future spent fuel discharges include: the plant name, nuclear operating company, reactor type (PWR or

BWR), rated thermal power (MWT), capacity factor, start of operating license, cycle length, number of assemblies per core, core weight (MTU). These parameters are used to calculate future cycle discharges as described in Section A.1.

Because nuclear power plant operators can change the plant operating parameters either through a change in operating practice (such as implementing longer cycle lengths) or through changes to the facility license (such as an increase in rated thermal power), it is necessary to modify the plant data parameters in response to such changes.

ERI relies on the U.S. Nuclear Regulatory Commission (NRC) Information Digest to determine a plant's thermal power (MWT),[14] as modified by license amendments to an individual plant's operating license. Nuclear power plants continue to uprate the plant thermal power to higher levels. ERI's SPNTFUEL database reflects power uprates that were approved by the U.S. NRC through the end of 2004.

Nuclear plant operators decide upon the cycle length for their nuclear power plants. Cycle lengths range from 18 months to 24 months for most U.S. nuclear power plants. ERI maintains its data base of nuclear power plant cycle lengths by monitoring dates for plant refueling outages and through discussions with its contacts at the various nuclear operating companies. ERI has used the best available information for plant cycle lengths in its analysis.

Plant capacity factors have risen steadily over the past ten years, from 71% industry-wide annual average capacity factor in 1991 to a 90% industry-wide annual average capacity factor in 2003.[15] ERI uses plant-specific capacity factors calculated based on a multi-year average of the plant's capacity factor (e.g., 2001 to 2003). As described in A.1, for cases in which a plant's historical capacity factor is below a specified level (90%), the SPNTFUEL program will increase that capacity factor over a specified period of time until it reaches the specified capacity factor (90%).

[14] U.S. Nuclear Regulatory Commission, *Information Digest*, 2002 Edition, NUREG-1350, Volume 16, June 2204, Revised February 2005, Appendix A.

[15] U.S. Nuclear Regulatory Commission, *Information Digest*, 2002 Edition, NUREG-1350, Volume 16, June 2204, Revised February 2005, Table 7.

# APPENDIX B
# DETAILED RESUME OF EILEEN M. SUPKO

## Summary of Experience:

**1990 - Present** **Energy Resources International, Inc.**
**Senior Consultant**

Consultant in the area of nuclear waste management and radioactive materials transport. Provides analysis of the technical, economic, regulatory and policy issues associated with the storage, acceptance, transport and disposal of spent nuclear fuel and high-level radioactive waste to nuclear power plant operating companies, foreign governments, industry organizations, private companies and private spent fuel management programs.

Dry Spent Fuel Storage. Provides analysis and consultation regarding the technical, regulatory, and economic evaluation of dry spent fuel storage and transportation technologies; technical and economic analyses in support of dry storage facility licensing efforts for nuclear operating companies including projections of dry storage life cycle costs and schedules and issues associated with dry storage licensing; technical and economic analyses in support of private spent fuel management program licensing efforts; analysis in support of industry efforts to increase the allowable burnup of spent fuel contained in dry storage systems and presentation of results to U.S. Nuclear Regulatory Commission (NRC) staff; and analyses of changes to NRC regulatory requirements for storage and transport. Authored an industry *Spent Fuel Storage Handbook*, on behalf of the Nuclear Energy Institute, to assist nuclear operating companies in decision-making, planning and licensing activities related to the dry storage of spent nuclear fuel. Served as a U.S. representative for an International Atomic Energy Agency (IAEA) Consultancy on International Spent Fuel Storage Experience resulting in preparation of an IAEA technical report on this subject.

Spent Nuclear Fuel and Radioactive Materials Transport. Provides analysis and consultation regarding spent nuclear fuel and radioactive materials transport including analysis of U.S. Department of Energy (DOE) plans for transporting spent nuclear fuel to a repository; preparation of comments on NRC proposals for spent fuel transportation cask testing; analysis of proposed changes to NRC and U.S. Department of Transportation, and International Atomic Energy Agency regulations for the transport of radioactive materials. Principal Investigator and author of *Spent Nuclear Fuel Transportation – An Overview* on behalf of the Electric Power Research Institute, to summarize the technical, regulatory and policy framework for transporting spent nuclear fuel.

Analysis of DOE Civilian Waste Management Program. Provided consultation and analysis to support nuclear waste legislative initiatives and developments including analyses of technical, economic and regulatory issues associated with proposed legislation and evaluation of legislative proposals on nuclear power plant spent fuel storage requirements and on Nuclear Waste Fund adequacy. Analyzed DOE proposals for acceptance and transportation of spent nuclear fuel including review of regulatory,

technical, logistical issues as well as schedule milestones. Analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. Provided technical support to industry organizations during industry-DOE staff-to-staff technical exchanges regarding outstanding issues and possible changes to the Standard Contract, DOE plans and conceptual designs for fuel receipt facilities at Yucca Mountain, and DOE-utility interface requirements for the acceptance of spent nuclear fuel. Reviewed and analyzed Congressional appropriations to DOE for the Yucca Mountain program, including monitoring and analysis of the adequacy of the Nuclear Waste Fund.

International Waste Management Activities. Provides technical and policy consultation and analysis to a foreign government regarding programs for the long-term management of spent nuclear fuel including review of projected spent fuel disposal system costs and schedules; review of technical proposals and conceptual designs; review of decommissioning cost study assumptions; and review of long-term planning efforts.

Nuclear Fuel Cycle. Provides technical, economic and policy support to utilities in the areas of fuel cycle management, economics, and procurement. Assists utility clients with procurement planning activities, commercial bid evaluation related activities, preparation of responses to public utility commission (PUC) nuclear fuel related audits, and performs reviews and audits of utility nuclear fuel procurement practices.

Public Outreach. Provides third party expertise for the Nuclear Energy Institute and other nuclear industry clients, communicating on nuclear waste storage, transport and disposal issues; radioactive materials transport; fuel cycle issues; and nuclear energy benefits. In addition to interviews with the news media, these activities have included briefing members of the U.S. Congress, Congressional staff, and state and local officials on nuclear waste transportation and disposal issues and nuclear energy benefits; and participating in moderated debates with members of U.S. anti-nuclear organizations for Public Broadcast System and National Public Radio programs. In addition to numerous client-specific analyses, evaluations, and reports, author of over 35 reports, presentations, and publications in leading nuclear energy journals and an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry.

Testimony. Indiana Michigan Power Company v. United States, Docket 98-486C, U.S. Court of Federal Claims (Deposition and Trial Testimony); Commonwealth Edison Company v. United States, Docket 98-621C, U.S. Court of Federal Claims (Deposition); Sacramento Municipal Utility District v. United States, Docket 98-488C, US. Court of Federal Claims (Deposition); Southern Nuclear Operating Company, Alabama Power Company and Georgia Power Company v. United States, Docket 98-614C, U.S. Court of Federal Claims (Deposition).

**1988 - 1990** **Carolina Power and Light Company**
**Nuclear Services Department**
**Incore Analysis Engineer**

Responsibilities included nuclear power plant reload core design, analysis and design review; nuclear fuel cycle management activities including preparation of nuclear power plant fuel cycle management reports, rod pattern improvements, and core operating recommendations to ensure that the nuclear fuel and nuclear reactor core operated within the regulatory limits approved by the NRC in the plant license. Provided control blade management support and technical review of control blade bid proposals. Performed detailed technical and economic analysis of control blade management alternatives.

**1985 - 1988** **Carolina Power and Light Company**
**Nuclear Fuel Projects Engineer**

Responsibilities included participation in nuclear fuel procurement activities including preparation of bid specifications, co-ordination of bid evaluations, and evaluation of economic and commercial contract terms. Prepared annual long-range nuclear fuel cycle cost projections; administered BWR channel contract and DOE enrichment contract; assisted in administration of BWR fuel fabrication contracts, uranium management activities, and fuel cycle analyses.

**1984 - 1985** **GPU Nuclear Company**
**TMI Environmental Controls Department**

Responsibilities included computerization and data analysis for the TMI Radiological Environmental Monitoring Program; routine maintenance and data analysis for a real-time gamma monitoring system; participation in NRC emergency drills performing off-site dose calculations. Served on environmental monitoring team for TMI-2 headlift operation.

## Education:

B.S., Nuclear Engineering, Pennsylvania State University, 1985

## Memberships, Licenses and Honors:

Member and past chairman, Mechanical and Nuclear Engineering Division, Industrial and Professional Advisory Council to the Pennsylvania State University's College of Engineering, 1998 to 2004

Founding Member, Board of Directors (2003 –2005), Pennsylvania State University, Nuclear Engineering Society

Member, American Nuclear Society

# APPENDIX C
# PUBLICATIONS LIST
# EILEEN M. SUPKO

In addition to numerous client specific analyses, evaluations, and reports, Ms. Supko has authored the following representative reports, presentations, and publications.

Supko, E.M., and Robert Jones, *Options for Pursuing Moderator Exclusion for Application to Spent-Fuel Transportation Packages,* EPRI Technical Report 1009692, Final Report, December 2004.

Supko, E.M., and Robert Jones, *Spent Nuclear Fuel Transportation, An Overview*, EPRI Technical Report 1009226, Final Report, February 2004.

Supko, E.M., *User Friendly Instruments for Enhancing Communications,* Presented on behalf of the World Nuclear Transport Institute, International Conference on the Safety of Transport of Radioactive Materials, International Atomic Energy Agency, July 7-11, 2003, Vienna, Austria.

Supko, E.M., *Utility – DOE Dry Storage Interface*, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M., *Nuclear Transport – The Impact of International Regulations*, Presented on behalf of the World Nuclear Transport Institute, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M, and J.A. Vincent, *High Burnup Spent Nuclear Fuel Storage Analysis,* Presented to the U.S. Nuclear Regulatory Commission on behalf of the Nuclear Energy Institute, Spent Fuel Project Office, March 5, 2002.

Supko, E.M, *Countering the Fear Campaign -- Transportation Specifics,* Presented at the NEI Yucca Mountain Strategic Briefing, Washington, DC, January 15, 2002.

Supko, E.M., *Used Nuclear Fuel Transportation Safety*, Presented at the Utah Association of Realtors Convention, Tucson, Arizona, September 6, 2001.

Supko, E.M, *High Burnup Fuel Considerations For Storage & Transport*, Presented at the Nuclear Energy Institute Fuel Cycle 2001, San Francisco, California, April 1-4, 2001.

Schwartz, M.H., and E.M. Supko, *And Then There Were Three…",* Nuclear Engineering International, September 2000.

Supko, E.M., *Spent Nuclear Fuel Transportation – An Update of Current Issues,* Presented at the Nuclear Energy Institute Fuel Cycle 2000, Memphis, Tennessee, April 2 - 5, 2000.

Supko, E.M., *Industry Perspective on the Update of the "Modal Study"*, Presented at the Waste Management Symposium 2000, Tucson, Arizona, February 27 – March 2, 2000.

Supko, E.M., *Nuclear Fuel Waste – How Long Must We Wait And What Are We Going To Do?,* Presented at: Center For Business Intelligence Conference, Profit with Nuclear Power – Business Opportunities, Regulatory Reform and Restructuring Options, Chicago, Illinois, November 8-9, 1999.

Supko, E.M., *Projected Needs for Dry Spent Fuel Storage Equipment – The Next Five Years,* Presented at the PCC Annual Workshop for Manufacturing of Spent Fuel Equipment April 7, 1999.

Schwartz, M.H., and E.M. Supko, *The Potential for Change in A Static Market,* Nuclear Engineering International, September 1999.

Supko, E.M., *How Spent Nuclear Fuel, and Low- and High-Level Waste Will Be Disposed and At What Price*, INFOCAST Conference, Nuclear Power Plants, Coming to Grips with Your License Expiration Options – Sell, Decommission, or Renew Your License, January 25-27, 1999.

Supko, E.M., *Industry Spent Fuel Storage Handbook,* Nuclear Energy Institute, NEI 98-01, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues*, presented to the State of Tennessee, Special Committee Meeting of House Conservation and Environment Committee and Senate Environment, Conservation, and Tourism Committee, March 3, 1998.

Supko, E.M., *Minimizing Risks Associated with Post-Shutdown Spent Fuel Storage and LLW Disposal*, Presented at the Infocast "Nuclear Power In the Competitive Era," Post Conference Workshop, "Developing Risk Strategies for a Successful Decommissioning" January 30, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues*, presented to the Joint Transportation Committees of the Colorado State Legislature, January 8, 1998.

Supko, E.M., *Storing Up Problems*, Nuclear Engineering International, July 1997.

Schwartz, M.H. and E.M. Supko, *Fierce Competition in the U.S. Fabrication Market*, Nuclear Engineering International, September 1996.

Supko, E.M., *Technical Considerations Associated with Spent Fuel Acceptance*, Electric Power Research Institute, ERPI TR-106226, June 1996.

Supko, E.M., *United States Experience With Dry Spent Fuel Storage*, Presented at the International Atomic Energy Agency, Advisory Group Meeting on "Survey of Experience with Wet and Dry Storage", October 30-November 3, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Requirements and Costs*, Nuclear Waste Issues Forum, Nuclear Waste Program Office, National Association of Regulatory Utility Commissioners, May 25, 1995.

Supko, E.M., *Integrated Waste Management System Costs in a MPC System*, Presented at the Sixth Annual International High Level Radioactive Waste Management Conference, April 30- May 5, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Plans*, Nuclear Energy Institute Fuel Cycle '95, Coronado, California, April 5, 1995.

Buchheit, J.M. and E.M. Supko, *Impacts of MPCs on the Utility Spent Fuel Management System*, Institute of Nuclear Materials Management Spent Fuel Management Seminar XI, January 1994.

Supko, E.M., *Proceedings: 1993 EEI/UWASTE-EPRI-USCEA Spent Fuel Storage Workshop II, Regulatory and Communications Strategies*, Electric Power Research Institute, EPRI TR-103253, December 1993.

Schwartz, M.H., P.J. Marsico, E.M. Supko, *EEI Nuclear Fuel Fabrication Handbook*, Edison Electric Institute Nuclear Fuel Committee, NFC-93-001, November 1993.

Supko, E.M., C.J. Henkel, M.H. Schwartz, *EEI/UWASTE Oversight of the DOE Repository Program by the Repository Information Exchange Team*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Rasmussen, R., E.M. Supko, J.M. Jordan, M. Smith, *Utility-DOE Interface Considerations of the Universal Container System Concept*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Stigers, R., M. Alissi, E.M. Supko, D.K. Zabransky, *Non-Fuel Components: Regulatory Issues*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Supko, E.M., *Proceedings: 1991 EEI/UWASTE-EPRI Workshop on At-Reactor Spent Fuel Storage*, Electric Power Research Institute, EPRI TR-100676, May 1992.

Steyn, J.J, M.H. Schwartz, E.M. Supko, *Overview of Fuel Management Analysis - Supply Issues and Procurement Strategy Development for the 1990s*, USCEA Fuel Cycle Conference 91, March 24-27, 1991.

Supko, E.M., M.H. Schwartz, *Spent Fuel Storage Handbook*, Edison Electric Institute, Utility Nuclear Waste and Transportation Program, December 1990.

## APPENDIX D
## WRITTEN MATERIALS REVIEWED BY EILEEN SUPKO IN PREPARING THIS REPORT

1. Public Law 97-425, *Nuclear Waste Policy Act of 1983*, January 7, 1983.

2. Public Law 100-203, Title V, *Nuclear Waste Policy Amendments Act of 1987*, December 22, 1987.

3. U.S. DOE, *Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,* Title 10, U.S. Code of Federal Regulations, Part 961.

4. U.S. DOE, OCRWM, *Annual Capacity Report*, DOE/RW-0191, 1988.

5. U.S. DOE, *Annual Capacity Report*, DOE/RW-0294P, December 1990.

6. U.S. DOE, *Annual Capacity Report,* DOE-RW-0331P, December 1991.

7. U.S. DOE, Annual Capacity Report, DOE/RW-0412, March 1992.

8. U.S. DOE, OCRWM, *Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW-0457, March 1995.

9. U.S. DOE, RW-859 Data, December 31, 1998.

10. U.S. DOE, RW-859 Data, December 31, 2002.

11. U.S. NRC, *Information Digest,* 2002 Edition, NUREG-1350, Volume 14, June 2002.

12. U.S. NRC, *Information Digest,* 2004-2005 Edition, NUREG-1350, Volume 16, February 2005.

13. Bechtel SAIC Company, LLC, *Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges*, TDR-WAT-NU-000002 Rev 1, February 2002

14. McLeod, Barrie, JAI Corporation, and Pollog, Thomas, US DOE, *Methodology for the Projection of Spent Nuclear Fuel Discharges*, conference paper, date unknown.

15. Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004.

16. U.S. DOE, OCRWM, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004.

17. U.S. nuclear power plant capacity factors through 2003.

18. U.S. nuclear power plant power uprates through 2004.

19. U.S. EPA, Public Health and Environmental Radiation Protection Standards for Yucca Mountain, NV, Final Rule 140 CFR 197, FR Vol 66. No 114, 32074-32135, June 13, 2001.

20. Nuclear Energy Institute v. Environmental Protection Agency, No. 01-1258, U.S. Court of Appeals for the District of Columbia Circuit, Argued January 14, 2004, Decided July 9, 2004.

21. Zabransky, David, Contracting Officer, U.S. DOE, Sample Letter to Contract Holders, July 27, 2004.

22. Zabransky, David, Contracting Officer, U.S. DOE, Letter to Contract Holders, December 1, 2004.

23. U.S. NRC, Atomic Safety and Licensing Board, Memorandum and Order (Ruling on State of Nevada's July 12, 2004, Motion to Strike), In the Matter of U.S. Department of Energy (High Level Waste Repository: Pre-Application Matters), Docket PAPO-00, ASLBP No. 04-829-01-PAPO, NEV-01, August 31, 2004.

24. Garrish, Theodore, Deputy Director, OCRWM, U.S. DOE, Statement to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives, March 10, 2005.

25. Statement of Theodore J. Garrish, Deputy Director, OCRWM, US. DOE, FY 2006 Senate Energy and Water Appropriations Hearing, March 10, 2005.

26. U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Energy and Air Quality, Hearing on Funding Options for the Yucca Mountain Repository Program, March 10, 2005, Archived webcast of hearing, http://energycommerce.house.gov/108/Hearings/03102005hearing1450/hearing.htm.

27. V.C. Summer Spent Fuel Information, April 22, 2005.

28. NSP Outage Est 2005-05-20.xls.

29. 2004 Nuclear Fuel Budget Update Basis; HF2004_1122_2004BudgetBassisiy.xls, 11/11/04; FF2004 1119 2004BudgetBasis.xls, 11/19/04; VF2004 1122_2004OpBudgetBasis.xls, 11/22/04.

30. Ritter, Ken, *Energy Department Official Says Yucca Project Delayed, Not Dead,* Las Vegas Sun, February 9, 2005.

31. Struglinski, Suzanne, *DOE Official Says Yucca Unlikely to Open on Time*, Las Vegas Sun, February 8, 2005.

32. Tetreault, Steve, *Energy Officials Turn Shy in Talk About Yucca Schedule*, Las Vegas Review Journal, March 11, 2005.

33. Struglinski, Suzanne, *Energy Department Says It Needs Cask To Move on Yucca*, Las Vegas Sun, March 11, 2005.

34. U.S. Environmental Protection Agency, Office of Radiation and Indoor Air, EPA Information on Yucca Mountain, undated.

35. U.S. DOE, The Department of Energy's First Monthly Status Report Regarding LSN Certification and License Application Submittal, In the Matter of U.S. Department of Energy, High Level Waste Repository: Pre-Application Matters, Docket PAPO-00, ASLBP No. 04-829-01-PAPO, June 1, 2005.

36. U.S. DOE, The Department of Energy's Second Monthly Status Report Regarding LSN Certification and License Application Submittal, In the Matter of U.S. Department of Energy, High Level Waste Repository: Pre-Application Matters, Docket PAPO-00, ASLBP No. 04-829-01-PAPO, July 1, 2005.

5/8/06
WEPCO
8.1.1

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0601

*Protected and Confidential Material to be Disclosed only in Accordance With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0601

*Protected and Confidential Material to be Disclosed only in Accordance With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate

**© 2006 Energy Resources International, Inc. All Rights Reserved.**

Prepared For:

Wisconsin Electric Power Company

Prepared by:
Eileen M. Supko

Eileen M. Supko 5/8/06

**1015 18th Street, NW, Suite 650**
**Washington, DC 20036**
**USA**
**Telephone: (202) 785-8833**
**Facsimile: (202) 785-8834**

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## NOTICE

This report contains information proprietary and confidential to Energy Resources International, Inc. (ERI). It is for the use of Wisconsin Electric Power Company and, except for such use, reproduction of this report, or parts thereof, in any form is expressly prohibited without the written permission of ERI. The report, in its entirety or portions thereof, may not be given to other parties without the written permission of ERI.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## TABLE OF CONTENTS


1. Scope of Report and Summary of Opinions 1
2. Background and Qualifications 2
3. Methodology Used and Materials Considered in Reaching Opinions 4
4. Description of ERI SPNTFUEL Model 5
   - 4.1 SPNTFUEL Description 5
   - 4.2 Acceptance Priority 5
5. Determination of Steady-State Annual Spent Fuel Acceptance Rate in the Non-Breach World 7
   - 5.1 Acceptance Rate Scenarios Analyzed 7
   - 5.2 Evaluation Criteria 9
   - 5.3 Results of Acceptance Rate Analysis 10
   - 5.4 Sensitivity Analysis Regarding Intra-Company Use of Acceptance Rights 14
   - 5.5 Sensitivity Analysis Regarding Ramp Up Rate to 3,000 MTU 16
6. DOE Acceptance Rate Planning Since Program Inception 20
   - 6.1 DOE Documents that Support Opinion Regarding 3,000 MTU Acceptance Rate 20
   - 6.2 DOE Documents that Support Opinion Regarding Ramp Up Rate 21
7. Conclusion 23


## LIST OF TABLES


Table 1 Spent Fuel Acceptance Rate Scenarios 9
Table 2 Comparison of Factors Important to Spent Fuel Acceptance 11
Table 3 Sensitivity Analysis Regarding Intra-Company Use of Acceptance Rights, Comparison of Factors Important to Spent Fuel Acceptance 14
Table 4 DOE Ramp Up Rates to 3,000 MTU 17
Table 5 Sensitivity Analysis Regarding Ramp Up Rates to Steady State Rate, Comparison of Factors Important to Spent Fuel Acceptance 17


## LIST OF FIGURES


Figure 1 Comparison of Maximum Steady State Spent Fuel Acceptance Rates, Assuming a Minimum Spent Fuel Cooling Time of Five Years 12

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## APPENDICES

Appendix A Projection of Spent Fuel Discharge Information Using SPNTFUEL
Appendix B Detailed Resume of Eileen M. Supko
Appendix C Publication List, Eileen M. Supko
Appendix D Written Materials Reviewed and Considered by Eileen Supko in Preparing This Report

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## 1. SCOPE OF REPORT AND SUMMARY OF OPINION

Perkins Coie LLP, counsel for Wisconsin Electric Power Company (Wisconsin Electric), requested that I offer an opinion concerning the effects of the overall rate of performance by the U.S. Department of Energy (DOE) under the Standard Contract.[1] Counsel for Wisconsin Electric requested that I assume the start of DOE acceptance of spent nuclear fuel (SNF) by January 31, 1998, the date called for in the Standard Contract. Given that assumption, Counsel for Wisconsin Electric asked me to provide an opinion on the impact of the DOE's rate of acceptance of SNF assemblies from the nuclear industry as a whole on two key issues identified by both DOE and nuclear utilities: (1) the aggregate amount of additional at-reactor storage capacity nuclear utilities would be required to provide in order to continue operations after January 31, 1998; and (2) the utilities' ability to timely decommission their nuclear power plants, i.e., the length of any delay in decommissioning caused by the continued presence of SNF. In conducting this analysis, I also took into account issues associated with the efficient and cost effective operation of the DOE waste management system.

As described more fully below, I have determined that, if DOE had begun acceptance of spent nuclear fuel by January 31, 1998, an overall steady-state spent fuel acceptance rate of 3,000 metric tons of uranium (MTU) per year, reached after a five-year ramp up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning.[2] In addition, a 3,000 MTU acceptance rate would have been fully utilized for almost 30 years of the waste acceptance program, ensuring that the waste management system capacity has not been overbuilt and underutilized. Furthermore, the 3,000 MTU overall steady-state acceptance rate, with a five year ramp up, is consistent with the overall acceptance rate contained in more than a dozen DOE program documents and with statements and testimony made by DOE officials and witnesses.

ERI's fees for this engagement range from $170 to $266 per hour and are not contingent in any way upon my findings.

---

[1] U.S. Department of Energy, *Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,* Title 10, U.S. Code of Federal Regulations, Part 961 (Standard Contract).

[2] U.S. commercial nuclear power plants annually generate approximately 2,000 MTU of SNF. By January 31, 1998, the date that DOE was to have started SNF acceptance, the inventory of SNF that had been permanently discharged from commercial nuclear power plants was approximately 37,000 MTU.

## 2. BACKGROUND AND QUALIFICATIONS

I am a senior consultant and an owner of Energy Resources International, Inc. (ERI).

I hold a bachelor of science degree in Nuclear Engineering from Pennsylvania State University. From 1985 to 1990, I was employed by Carolina Power and Light Company (now Progress Energy), a nuclear operating company, as a Nuclear Fuel Projects Engineer and then a Nuclear Services Department Incore Analysis Engineer. At Carolina Power and Light Company, my responsibilities included nuclear fuel procurement and nuclear reactor core design and analysis. As a function of nuclear reactor core design and analysis work that I performed, I was responsible for ensuring that the nuclear fuel and nuclear reactor core operated within the regulatory limits approved by the U.S. Nuclear Regulatory Commission (NRC) in the plant license. I joined ERI in 1990, and I am currently a senior consultant and an owner of the company. I have extensive experience in providing advice to clients in the areas of spent nuclear fuel, nuclear waste management and radioactive materials transport, and I analyze the technical, economic, regulatory, legislative, and policy issues associated with the storage, acceptance, transport, and disposal of spent nuclear fuel and high-level radioactive waste. My clients include nuclear power plant operating companies, a foreign government, industry organizations, private companies, and a private spent fuel management organization.

ERI has developed a computer model, SPNTFUEL, that has the capability to model spent fuel acceptance rates, determine acceptance rights for individual nuclear power plants, and determine the effect of these acceptance rates on utility requirements for additional spent fuel storage capacity, including the amount of time that spent fuel must remain at nuclear power plant sites following plant shutdown for decommissioning. SPNTFUEL also has the capability to project nuclear power plant discharge data, including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup. In *Indiana Michigan Power Company v. United States*, the parties stipulated that the ERI and DOE computer models used to project spent fuel discharges and acceptance rates rely on similar assumptions and similar input data. Further, the parties stipulated that "the annual acceptance allocations calculated by either the ERI or DOE models should not result in any material differences for the purposes of assessing damages."[3] Additional details regarding the SPNTFUEL program can be found in Appendix A to this report.

On behalf of clients, using the SPNTFUEL model, I have analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. These analyses have been performed to determine the effect of DOE acceptance rates on the commercial nuclear power plants' spent fuel storage requirements, for the overall U.S. nuclear industry, and for

[3] Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004.

individual nuclear power plants as requested by individual clients. Acceptance rate analyses that I have performed include analysis for nuclear industry organizations of potential DOE acceptance rates; analysis to support nuclear industry legislative efforts regarding changes to the DOE waste program in the 1990s; analysis on behalf of the nuclear industry of proposals to "take title" to spent nuclear fuel; development of spent fuel acceptance scenarios to support individual client decommissioning analyses; and development of spent fuel acceptance scenarios to support individual client spent nuclear fuel damages claims, such as the analysis supporting this case.

From 1990 to 2004, I was a direct participant in technical exchanges between the nuclear industry and DOE regarding such topics as DOE plans for accepting commercial SNF, industry positions on outstanding Standard Contract issues, and DOE's conceptual designs for surface facilities for acceptance of commercial SNF. I have assisted in the preparation of nuclear industry comments and feedback on various DOE program documents, including but not limited to Mission Plans, Annual Capacity Reports, Acceptance Priority Ranking reports, Environmental Impact Statement documents, and transportation plans. My detailed resume is attached as Appendix B, providing additional details on my background and qualifications as an expert in this matter.

In addition to numerous client-specific analyses, evaluations, and reports, over the past fifteen years I have authored over 35 reports, presentations, and publications in leading nuclear energy journals and have been an invited speaker at over a dozen conferences. A detailed list of my publications and presentations is attached as Appendix C.

## 3. METHODOLOGY USED AND MATERIALS CONSIDERED IN REACHING OPINIONS

In developing my expert opinions regarding the overall DOE SNF acceptance rate, I have performed analyses of a range of overall acceptance rates using the SPNTFUEL program, including the overall steady-state acceptance rate used most frequently by DOE since the program inception (3,000 MTU per year), to determine the effect of these acceptance rates on commercial nuclear power plant spent fuel storage requirements. I also have reviewed and analyzed DOE and DOE contractor reports regarding DOE plans for accepting SNF. These include, but are not limited to: DOE Mission Plans, Total System Life Cycle Cost Analyses, Fee Adequacy Assessments, and Waste Acceptance System Requirements Documents. I also have reviewed deposition and trial testimony of knowledgeable DOE staff.

A list of the written materials that I have reviewed and considered in forming my opinions in this report is included in Appendix D. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional rationale for these opinions as additional documents are produced, the transcripts of expert and fact witness depositions become available for my review, and new facts are introduced during discovery and trial.

## 4. DESCRIPTION OF ERI SPNTFUEL MODEL

### 4.1 SPNTFUEL Description

In forming my opinions, I have performed analyses of a range of overall DOE spent fuel acceptance rate scenarios using the SPNTFUEL program – a spent fuel acceptance simulation model developed by ERI, described further in Appendix A.

According to Article IV of the Standard Contract, contract holders are required to provide DOE with information on actual discharges and projected discharges on a periodic basis. This data is submitted to DOE's Energy Information Administration (EIA) by nuclear operating companies via DOE Nuclear Fuel Data Form, RW-859. DOE requested submittal of RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859).

The analyses described below rely on industry-wide historical spent fuel discharges from U.S. commercial nuclear power plants as provided to DOE via the 2002 RW-859. Since many nuclear operating companies have added dry storage since December 31, 1998, using the storage locations identified in the 2002 RW-859 data base would not reflect spent fuel inventories that were in wet storage in 1998 but were moved to dry storage by 2002. For the purposes of this analysis, I used the 2002 RW-859 data but assumed that spent fuel placed in dry storage after December 31, 1998 remained in spent fuel storage pools. This ensures that the analysis does not underestimate the additional storage requirements.

Since the RW-859 data only includes five cycles of projected spent fuel discharges for nuclear power plants, ERI must project additional spent fuel discharges for each plant through the end of its 40-year operating license. SPNTFUEL is capable of projecting future spent fuel discharges for each operating nuclear power plant. The projected SNF discharge data calculated with SPNTFUEL are used in combination with historical and projected spent fuel discharge data to determine spent fuel acceptance rates, industry wide spent fuel storage requirements, as well as the timing associated with the removal of SNF from plants following shutdown for decommissioning.

### 4.2 Acceptance Priority

Since DOE's acceptance capacity will be finite in any given year (e.g., up to an overall rate of 3,000 MTU), DOE will allocate the annual spent fuel acceptance capacity to contract holders[4] using a priority ranking process. According to the Standard Contract,[5] the priority ranking for assigning spent fuel acceptance rights to the contract holders is based, with limited exceptions, on the age of the SNF as determined from the date that the SNF was

[4] The term "contract holders" refers to companies who have signed the Standard Contract with DOE.

[5] Standard Contract, Article IV.B.5 and Article VI.B.1(a).

permanently discharged from the contract holders' nuclear power plant(s). This priority ranking methodology is typically referred to as "Oldest Fuel First"[6] or "OFF." The age of each fuel assembly discharged determines the relative position of this fuel in the spent fuel acceptance "queue" (i.e., the chronological list of all spent fuel permanently discharged from all commercial nuclear power plants). Spent fuel acceptance "rights" are expressed in MTU of allocated acceptance capacity.

It should be noted that while the Standard Contract priority ranking is based on an OFF methodology, the Standard Contract contains additional provisions that might affect the acceptance of spent nuclear fuel, providing additional flexibility to contract holders. For example, the Standard Contract, Article V.E, "Exchanges," allows Standard Contract holders the right to exchange delivery commitment schedules with other Standard Contract holders. The contract provision allows DOE to approve or disapprove any such exchanges within thirty days after receipt. The Standard Contract also allows Contract holders to "adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until submission of the final delivery schedule."[7]

[6] DOE, *Annual Capacity Report, DOE/RW-0294P,* December 1990, p. 8-9.
[7] Standard Contract, Article V.B.2

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## 5. DETERMINATION OF STEADY-STATE ANNUAL SPENT FUEL ACCEPTANCE RATE IN THE NON-BREACH WORLD

As noted previously, U.S. commercial nuclear power plants generate approximately 2,000 MTU of SNF on an annual basis. By January 31, 1998, the date that DOE was to have started SNF acceptance, there were approximately 37,000 MTU of SNF that had been permanently discharged from commercial nuclear power plants.[8]

Based on my analysis of the effect that various spent fuel acceptance rates would have on utility requirements for additional SNF storage capacity as well as the effect on the time that spent fuel would remain at nuclear power plants following plant shutdown for decommissioning, I have determined that an overall steady-state SNF acceptance rate of 3,000 MTU per year had DOE begun acceptance of spent fuel acceptance by January 31, 1998: (i) would have kept up with the annual discharge rate of 2,000 MTU of spent fuel, thereby limiting the amount of additional storage capacity needed at nuclear power plants after that date; and (ii) would have worked off the 37,000 MTU backlog of SNF as of 1998 allowing nuclear power plants to be decommissioned at the end of their operating licenses without extensive delays. In addition, DOE would have used a steady-state spent fuel acceptance rate of 3,000 MTU per year for almost 30 years of waste acceptance – an indication that the 3,000 MTU capacity would have been an efficient system that fully utilized system capacity. In contrast, use of other lower acceptance rates suggested by the Government in other spent fuel cases would have resulted in utilities having to provide much larger amounts of additional at-reactor storage after January 1998, and would have resulted in the continued presence of spent nuclear fuel at nuclear power plants for longer time periods following plant shutdown for decommissioning.

In forming my opinion, I have performed analyses of a range of overall DOE spent fuel acceptance rate scenarios using the SPNTFUEL program – a spent fuel acceptance simulation model developed by ERI, described further in Section 4 and in Appendix A. I analyzed the results from the SPNTFUEL program using a spreadsheet that I developed to calculate additional spent fuel storage requirements under the scenarios described in the following sections. The analyses described below rely on industry-wide historical spent fuel discharges from U.S. commercial nuclear power plants as provided to DOE via data survey RW-859 through December 31, 2002.

### 5.1 Acceptance Rate Scenarios Analyzed

I performed an analysis to demonstrate the effect that different acceptance rates would have on commercial nuclear power plant spent fuel storage requirements and on the time that spent fuel would remain on site following plant shutdown for decommissioning.

---

[8] U.S. DOE, OCRWM, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004.

Scenario 1, the 3,000 MTU per year steady-state acceptance rate scenario that assumes acceptance of 400 MTU in 1998, 600 MTU in 1999, 1,200 MTU in 2000, 2,000 MTU in 2001, and 3,000 MTU thereafter (3,000 MTU scenario), was analyzed because this rate is consistent with the overall SNF acceptance rates assumed throughout the majority of the program's history since its inception in 1983. In addition to the 3,000 MTU scenario, three other scenarios were analyzed:

- Scenario 2, with a 900 MTU steady-state acceptance rate that assumes acceptance of 400 MTU in 1998, 600 MTU in 1999, and 900 MTU thereafter (900 MTU scenario);

- Scenario 3, with a 3,000 MTU steady state capacity and a ramp up period of 18 years that assumes acceptance of 400 MTU in 1998, 600 MTU in 1999, 900 MTU in 2000 through 2009, 1,800 MTU in 2010 through 2014, and 3,000 MTU thereafter (1992 ACR scenario)

- Scenario 4, with a 6,000 MTU steady-state acceptance rate that assumes acceptance of 400 MTU in 1998, 600 MTU in 1999, 1,200 MTU in 2000, 2,000 MTU in 2001, 3,000 MTU in 2002, 4,000 MTU in 2003, 5,000 MTU in 2004, and 6,000 MTU thereafter (6,000 MTU scenario).

It should be noted that Scenario 2 is based on an acceptance rate scenario that DOE used in the early to mid-1990s in conjunction with its efforts to develop a monitored retrievable storage (MRS) facility, a facility that DOE never built and had no authority to operate beginning in 1998.[9] This acceptance scenario is based on the acceptance rates found in DOE's 1991 Annual Capacity Report (1991 ACR)[10] and the 1995 ACR,[11] which assumed a 900 MTU spent fuel acceptance rate for the first ten years of waste acceptance by DOE (the DOE made no assumption in those ACR reports regarding what acceptance rate would apply after the first ten years). Scenario 3 is also based on an acceptance rate scenario that DOE used in conjunction with the MRS facility. It is based on acceptance rates found in the 1992 ACR[12] and the 1990 Total System Life Cycle Cost Report (1990 TSLCC).[13]

---

[9] DOE was prohibited by the 1987 Nuclear Waste Policy Amendments Act from operating an MRS facility until the proposed repository received construction authorization from the NRC. Hence DOE could not have begun operation of an MRS facility in 1998. DOE recognized this fact in its 1991 ACR when it stated that "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007." (1991 ACR, p. 4).

[10] U.S. DOE, OCRWM, "Annual Capacity Report," DOE/RW-0331P, December 1991.

[11] U.S. DOE, OCRWM, "Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0457, March 1995.

[12] U.S. DOE, OCRWM, "Annual Capacity Report," DOE/RW-0412, March 1993.

[13] U.S. DOE, OCRWM, "Preliminary Estimates of the Total System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total System Life Cycle Costs for the Civilian Radioactive

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

Table 1 provides a summary of the ramp up rates and overall steady-state acceptance rates assumed in the four acceptance rate scenarios.

**Table 1: Spent Fuel Acceptance Rate Scenarios**[14]

| Year | Scenario 1 3,000 MTU | Scenario 2 900 MTU | Scenario 3 1992 ACR, 3000 MTU | Scenario 4 6,000 MTU |
|---|---|---|---|---|
| 1998 | 400 | 400 | 400 | 400 |
| 1999 | 600 | 600 | 600 | 600 |
| 2000 | 1,200 | 900 | 900 | 1,200 |
| 2001 | 2,000 | 900 | 900 | 2,000 |
| 2002 | 3,000 | 900 | 900 | 3,000 |
| 2003 | 3,000 | 900 | 900 | 4,000 |
| 2004 | 3,000 | 900 | 900 | 5,000 |
| 2005 | 3,000 | 900 | 900 | 6,000 |
| 2006 | 3,000 | 900 | 900 | 6,000 |
| 2007 | 3,000 | 900 | 900 | 6,000 |
| 2008 | ... | ... | 900 | ... |
| 2009 | ... | ... | 900 | ... |
| 2010 | ... | ... | 1,800 | ... |
| 2011 | ... | ... | 1,800 | ... |
| 2012 | ... | ... | 1,800 | ... |
| 2013 | ... | ... | 1,800 | ... |
| 2014 | ... | ... | 1,800 | ... |
| 2015 | ... | ... | 3,000 | ... |
| | 3,000 Max Capacity | 900 Max Capacity | 3,000 Max Capacity | 6,000 Max Capacity |

### 5.2 Evaluation Criteria

As stated, I evaluated the acceptance rates described above to determine how they would impact the following two criteria:

(1) The amount of additional spent fuel storage that utilities would have had to add had DOE begun acceptance of SNF in 1998; and

(2) The number of years that SNF remains on site after each plant is shut down for decommissioning.

Waste Management System, DOE/RW-0295P.

[14] Any section of this Report including the charts, quotations and text, may be used as a demonstrative exhibit during the trial in this action.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

In addition, I also considered a third criterion that has been referenced by DOE witnesses:

(3) The number of years that the maximum annual steady-state acceptance capacity is fully utilized over the life of the waste acceptance program.[15 16]

### 5.3 Results of Acceptance Rate Analysis

I used these factors to evaluate the four non-breach-world acceptance rate scenarios that are summarized in Table 1. The results for each of the four scenarios are explained below and summarized in Table 2.

Scenario 1. Under the 3,000 MTU scenario, DOE would have started waste acceptance by January 31, 1998, ramping up to the steady-state acceptance rate of 3,000 MTU over a five year period. Assuming an OFF acceptance priority ranking, nuclear operating companies would have needed to add approximately 1,030 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately nine years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 28 years.

Scenario 2. Under the 900 MTU scenario, DOE would have started waste acceptance by January 31, 1998, and would reach the steady-state acceptance rate of 900 MTU by the third year of waste acceptance. Assuming an OFF priority ranking, nuclear operating companies would have needed to add approximately 13,130 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 65 years. In addition, at a steady-state acceptance capacity of 900 MTU per year, DOE would not complete spent fuel acceptance until over a century after the program began, the year 2101.

Scenario 3. Under the 1992 ACR scenario, DOE would have started waste acceptance by January 31, 1998, but would not reach the steady-state acceptance rate of 3,000 MTU until eighteen years after the start of waste acceptance. Assuming an OFF acceptance priority ranking, nuclear operating companies would have needed to add approximately 6,200 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 16.5 years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 24 years.

[15] Pollog, Thomas, DOE, OCRWM, Rule 30(b)(6) Deposition, April 11, 2002, p. 96-97.
[16] Barrett, Lake, DOE, OCRWM, Deposition, May 10, 2002, p. 1332-34.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

Scenario 4. Under the 6,000 MTU scenario, DOE would have started waste acceptance by January 31, 1998, and would ramp up to the steady-state acceptance rate of 6,000 MTU over an eight year period. Assuming an OFF acceptance priority ranking, nuclear operating companies would have needed to add approximately 740 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately six years. In addition, the steady-state acceptance capacity of 6,000 MTU per year would be fully utilized by DOE for approximately six years.

**Table 2 Comparison of Factors Important to Spent Fuel Acceptance**

| Spent Fuel Acceptance Evaluation Factors | Spent Fuel Acceptance Rate Scenario | | | |
|---|---|---|---|---|
| | Scenario 1 3,000 MTU | Scenario 2 900 MTU | Scenario 3 1992 ACR | Scenario 4 6,000 MTU |
| Additional Storage Requirements (MTU) | 1,030 | 13,130 | 6,200 | 740 |
| Average Post Shutdown Storage Time (Years) | 9 | 65 | 16.5 | 6 |
| Years Maximum Acceptance Capacity Utilized | 28 | 101 | 24 | 6 |

Figure 1 below presents the projected spent fuel acceptance rates that could be sustained by the available inventories of spent fuel that have been cooled for a minimum of five years for each of the spent fuel acceptance scenarios evaluated. The maximum annual spent fuel acceptance rate of 3,000 MTU can be sustained for 28 years. While the 3,000 MTU rate can be sustained for 24 years in the 1992 ACR scenario, the average number of years that spent fuel must be stored on site following plant shutdown for decommissioning is 16.5 years compared to the 3,000 MTU scenario in which the average is only nine years. In addition, the 3,000 MTU scenario only requires 1,030 MTU of additional storage capacity, while the 1992 ACR scenario requires approximately 6,200 MTU of additional storage capacity, approximately three times the annual rate of spent fuel discharges.

The 900 MTU scenario results in a spent fuel acceptance program that lasts for more than 100 years, requires approximately 13,130 MTU of additional storage capacity and results in spent fuel remaining at nuclear power plant sites for an average of 65 years following plant shutdown for decommissioning.

For the 6,000 MTU scenario, the maximum annual spent fuel acceptance rate of 6,000 MTU can be sustained by utility spent fuel inventories for only six years and then the amount of spent fuel that has cooled for a minimum of five years drops off dramatically. Under this last scenario, the amount of spent fuel shipped from approximately 2014 forward is equal to the amount of spent fuel discharged five years previously.

Thus, while the 6,000 MTU scenario results in the need for a somewhat smaller amount of additional storage capacity than the 3,000 MTU scenario (740 MTU vs. 1,030 MTU), a maximum capacity of 6,000 MTU cannot be sustained by the amount of spent fuel that is in inventory and is expected to be generated. For spent fuel acceptance beginning in 1998, a system built to accommodate an acceptance rate of 6,000 MTU per year would not have been an efficient system that fully utilized system capacity, as more than two-thirds of the maximum system capacity would go unused for more than 30 years of a 40 year waste acceptance program.




**Figure 1** **Comparison of Maximum Steady-State Spent Fuel Acceptance Rates, Assuming A Minimum Spent Fuel Cooling Time of Five Years**

It should be noted that these calculations are based on available data from nuclear utilities. Each individual nuclear utility is likely to have the most complete up to date information regarding its individual storage needs. In addition, this analysis has calculated industry-wide spent fuel storage requirements and the time that spent fuel remains on site following plant shutdown for decommissioning for each spent fuel storage pool or reactor site assuming an OFF priority ranking. That is, the analysis has calculated the amount of additional storage needed at each reactor site for a given spent fuel acceptance rate scenario. Nuclear operating companies that have multiple nuclear power plant sites may apply their acceptance rights to any nuclear power plant that they operate. Thus, a

particular nuclear operating company may apply its spent fuel acceptance rights to a different nuclear power plant site than the plant site assumed by this analysis. While this analysis may calculate additional storage requirements for a nuclear power plant, an individual company may use acceptance rights from one site to prevent the need to add additional storage capacity at another site. In much the same way, a nuclear operating company with multiple plant sites may also apply acceptance rights from one nuclear power plant to a second plant in order to facilitate the decommissioning of the second plant. The scenarios I have analyzed conservatively assume that, in the non-breach world, acceptance rights are applied to the individual nuclear power plants that generated those rights.

The results presented in Table 2 estimate the maximum amount of additional storage required and the maximum average time that spent fuel remains at nuclear power plants following shutdown for decommissioning. These two parameters likely would be lower in each of the scenarios evaluated if nuclear operating companies with multiple sites ultimately choose to allocate their acceptance from one plant to another plant in their systems. In the next section of this report, I have conducted a sensitivity analysis to confirm my understanding regarding this issue.

It should be noted that this analysis of the overall spent fuel acceptance rate does not reflect all spent fuel storage alternatives that may have been considered by nuclear operating companies had these companies had confidence that DOE was going to begin waste acceptance in 1998 under a non-breach scenario. For example, nuclear operating companies may have been able to add additional storage capacity in spent fuel storage pools to avoid having to construct dry storage facilities in a non-breach scenario.

It should also be noted that, if a nuclear operating company exercised provisions under the Standard Contract that allow exchanges of delivery commitments between contract holders, this could further decrease the amount of additional storage capacity required.[17] The use of the exchange provision in the non-breach world could also decrease the amount of time that spent fuel is stored on site following plant shutdown for decommissioning.

If nuclear operating companies exercised the provision under the Standard Contract that allows twenty percent (20%) flexibility in the amount of spent fuel to be delivered to DOE, it is possible that the additional storage requirements summarized in Table 2 would be at least twenty percent lower or 820 MTU for the 3,000 MTU case; 10,500 MTU for the 900 MTU case; 4,960 MTU for the 1992 ACR case, and 590 MTU for the 6,000 MTU case.

Based on the comparison of the three factors presented in Table 2, it is clear that use of a 3,000 MTU steady state acceptance rate, with a reasonable ramp up period (in this case five years), would result in minimizing the amount of additional spent fuel storage capacity needed at reactor sites, would work off the backlog of spent fuel inventories at reactor

[17] Standard Contract, Article V.E, Exchanges.

sites, and would remove spent fuel from reactor sites in a reasonable period of time following reactor shutdown for decommissioning. This rate would also ensure that the waste management system capacity has not been overbuilt and underutilized.

### 5.4 Sensitivity Analysis Regarding Intra-Company Use of Acceptance Rights

As discussed in Section 5.3, I calculated the amount of additional on-site storage capacity needed under various spent fuel acceptance rate scenarios based on OFF acceptance priority ranking. Nuclear operating companies that operate plants at multiple nuclear power plant sites may apply their acceptance rights to any nuclear power plant that they operate.[18] Thus, a particular nuclear operating company may apply its spent fuel acceptance rights to a different nuclear power plant site than the plant site assumed by the analysis described in Section 5.3. As discussed in Section 5.3, the amount of additional storage required would be somewhat lower in each of the scenarios evaluated if nuclear operating companies with multiple sites ultimately choose to allocate their acceptance rights from one plant to another plant in their systems.

I performed a sensitivity analysis to determine the effect on overall additional spent fuel storage requirements if companies that own multiple nuclear power plants utilized their acceptance rights to alleviate the need to add additional storage capacity at their power plants. This analysis is summarized in Table 3 and described below.

**Table 3 Sensitivity Analysis Regarding Intra-Company Use of Acceptance Rights Comparison of Factors Important to Spent Fuel Acceptance**

| Spent Fuel Acceptance Evaluation Factors | Spent Fuel Acceptance Rate Scenario | | | |
|---|---|---|---|---|
| | Sensitivity1 3,000 MTU | Sensitivity 2 900 MTU | Sensitivity 3 1992 ACR | Sensitivity 4 6,000 MTU |
| Additional Storage Requirements (MTU) | 690 | 9,500 | 4,980 | 540 |
| Average Post Shutdown Storage Time (Years) | 9 | 65 | 16.5 | 6 |
| Years Maximum Acceptance Capacity Utilized | 28 | 101 | 24 | 6 |

<u>Sensitivity 1: 3,000 MTU.</u> Under Sensitivity 1, 3,000 MTU with intra-company exchanges, the same acceptance rate is analyzed as in the 3,000 MTU Base Case. However, nuclear operating companies with multiple nuclear power plant sites are assumed to use the acceptance rights from one reactor to alleviate adding additional storage capacity at another reactor if needed. Analyzing this sensitivity scenario, nuclear operating companies would have needed to add approximately 690 MTU of additional spent fuel storage capacity after

[18] U.S. DOE, OCRWM, 1992 Annual Capacity Report, Revision 1, May 1993, p.7..

spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately nine years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 28 years.

Sensitivity 2: 900 MTU. Under Sensitivity 2, the 900 MTU scenario with intra-company exchanges, nuclear operating companies would have needed to add approximately 9,500 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 65 years. In addition, at steady-state acceptance capacity of 900 MTU per year, DOE would not complete spent fuel acceptance until over a century after the program began, the year 2101.

Sensitivity 3: 1992 ACR. Under Sensitivity 3, the 1992 ACR scenario with intra-company exchanges, nuclear operating companies would have needed to add approximately 4,980 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 16.5 years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 24 years.

Sensitivity 4: 6,000 MTU. Under Sensitivity 4, the 6,000 MTU scenario with intra-company exchanges, nuclear operating companies would have needed to add approximately 540 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately six years. In addition, the steady-state acceptance capacity of 6,000 MTU per year would be fully utilized by DOE for approximately six years.

It should also be noted that, if nuclear operating companies exercised the provision under the Standard Contract that allows twenty percent (20%) flexibility in the amount of spent fuel to be delivered to DOE, it is possible that, in the non-breach world, the additional storage requirements summarized in Table 5 would be at least twenty percent lower, or 550 MTU for the 3,000 MTU case; 7,600 MTU for the 900 MTU case; 3,980 MTU for the 1992 ACR case, and 430 MTU for the 6,000 MTU case.

This analysis confirms my conclusion in Section 5.3, that the results presented in Table 2 for the amount of additional storage required in the non-breach world would be somewhat lower in each of the scenarios evaluated if nuclear operating companies with multiple sites ultimately chose to allocate their acceptance rights from one plant to another plant in their systems. It should be noted that the relative differences between the various acceptance scenarios in this sensitivity analysis are similar to the results presented in Table 2. That is, the additional storage requirements and average post shutdown storage time are similar for the 3,000 MTU and 6,000 MTU scenarios. The 1992 ACR scenario has higher additional

storage requirements and longer average post shutdown storage times than the 3,000 MTU or 6,000 MTU scenario. The 900 MTU scenario has the highest additional storage requirements and the longest average post shutdown storage times.

This sensitivity analysis further confirms my opinion that a steady state acceptance rate of 3,000 MTU per year, with a five-year ramp up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning.

### 5.5 Sensitivity Analysis Regarding Ramp Up Rate to 3,000 MTU

Scenario 1, the 3,000 MTU scenario, assumes that DOE would have started waste acceptance by January 31, 1998, ramping up to the steady-state acceptance rate of 3,000 MTU over a five year period. The ramp up rate used assumes acceptance of 400 MTU in 1998, 600 MTU in 1999, 1,200 MTU in 2000, 2,000 MTU in 2001, and 3,000 MTU thereafter. It is my opinion that this ramp up rate represents a reasonable ramp up period and annual acceptance rate for the start of waste acceptance by DOE. The five-year ramp up period assumed in my analysis is consistent with most recently published DOE Total System Life Cycle Cost Analysis (TSLCC),[19,20] which DOE has used as the basis for determining the overall cost of the disposal program to ensure that the fees collected from nuclear power plant operators are adequate to cover the life cycle costs of the program. This rate was also used by DOE in its recently published Annual Capacity Report (ACR) provided to Standard Contract holders in July 2004.[21]

It should be noted that DOE previously used other ramp-up rates with an overall 3,000 MTU steady-state acceptance capacity. These other ramp-up rates can be found in various program documents DOE has published since the program's inception. Based on my examination of DOE program documents, DOE principally has used four ramp up rates to the overall 3,000 MTU steady-state acceptance rate, as described in Table 4.

[19] U.S. DOE, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0510, December 1998, Table 3 (1998 TSLCC).

[20] U.S. DOE, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0533, May 2001, Table 4-1 (2001 TSLCC).

[21] U.S. DOE, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004, Table 1, p. 2

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

**Table 4: DOE Ramp Up Rates to 3,000 MTU**

| Year | 1983 Draft Mission Plan | 1985 Mission Plan | 1990 ACR | 1998 TSLCC (3000 MTU Base Case) |
|---|---|---|---|---|
| 1998 | 1,800 | 400 | 1,200 | 400 |
| 1999 | 1,800 | 400 | 1,200 | 600 |
| 2000 | 1,800 | 400 | 2,000 | 1,200 |
| 2001 | 1,800 | 900 | 2,000 | 2,000 |
| 2002 | 1,800 | 1,800 | 2,700 | 3,000 |
| Thereafter | 3,000 | 3,000 | 3,000 | 3,000 |

I evaluated each of the factors described in Section 5.2 for the four ramp up rates that are summarized in Table 4, including three sensitivity cases and the Base Case.[22] The results for each of the four scenarios are explained below and summarized in Table 5.

**Table 5 Sensitivity Analysis Regarding Ramp Up Rates to Steady State Rate Comparison of Factors Important to Spent Fuel Acceptance**

| Spent Fuel Acceptance Evaluation Factors | Spent Fuel Acceptance Rate Scenario | | | |
|---|---|---|---|---|
| | 1983 DMP | 1985 Mission Plan | 1990 ACR | 3,000 MTU Base Case |
| Additional Storage Requirements (MTU) | 660 | 1,650 | 720 | 1,030 |
| Average Post-Shutdown Storage Time (Years) | 8.5 | 10 | 8.5 | 9 |
| Years Maximum Acceptance Capacity Utilized | 26 | 28 | 26 | 28 |

<u>1983 Draft Mission Plan:</u> DOE's 1983 Draft Mission Plan (1983 DMP) contained a ramp up rate of 1,800 MTU per year for the first five years of waste acceptance, reaching the overall 3,000 MTU acceptance rate by year six and maintaining this overall rate thereafter. Evaluating this sensitivity case using the three factors identified above, nuclear operating companies would have needed to add approximately 660 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 8.5 years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 26 years.

<u>1985 Mission Plan:</u> DOE's 1985 Mission Plan (1985 MP) contained a ramp up rate of 400 MTU for the first three years of waste acceptance, 900 MTU per year in year four, 1,800

[22] This sensitivity analysis assumes Oldest Fuel First acceptance priority ranking.

MTU in year five, reaching the overall 3,000 MTU acceptance rate by year six and maintaining this overall rate thereafter. Evaluating this sensitivity case, nuclear operating companies would have needed to add approximately 1,650 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately ten years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 28 years.

<u>1990 Annual Capacity Report:</u> DOE's 1990 Annual Capacity Report (1990 ACR) contained two acceptance rates. The upper bounding acceptance rate assumed a ramp up rate of 1,200 MTU in 1998 and 1999, 2,000 MTU in 2000 and 2001, 2,700 MTU in 2002, reaching the overall 3,000 MTU acceptance rate by year six and maintaining this overall rate thereafter. Evaluating this sensitivity case, nuclear operating companies would have needed to add approximately 720 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately 8.5 years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 26 years.

<u>3,000 MTU Base Case.</u> As discussed earlier, under the base case scenario, the ramp up rate assumed that 400 MTU would be accepted in 1998, 600 MTU in 1999, 1,200 MTU in year 2000, 2,000 MTU in year 2001, reaching the overall steady state rate of 3,000 MTU by 2002 and maintaining that rate thereafter. Under the Base Case, nuclear operating companies would have needed to add approximately 1,030 MTU of additional spent fuel storage capacity after spent fuel acceptance began. The average number of years that spent fuel would have to be stored at reactor sites after plant shutdown for decommissioning is approximately nine years. In addition, the steady-state acceptance capacity of 3,000 MTU per year would be fully utilized by DOE for approximately 28 years.

Both the 1983 DMP and the 1990 ACR ramp up rates use somewhat higher ramp up rates during the first four years of waste acceptance than those used in the 3,000 MTU Base. As a result, the calculated additional storage requirements are somewhat lower for these two scenarios, approximately 660 MTU for the 1983 DMP case and 720 MTU for the 1990 ACR case compared to 1,030 MTU for the 3,000 MTU Base Case. The 1985 MP ramp up rates are lower than the rates used in the 3,000 MTU Base Case, as well as those used in the 1983 DMP and 1990 ACR. Thus the calculated additional storage capacity is higher for the 1985 MP case – approximately 1,650 MTU. All four scenarios produce similar results for the average post shutdown storage time ranging from 8.5 years for the 1983 DMP and the 1990 ACR, 9 years for the 3,000 MTU Base Case, and 10 years for the 1985 MP. Based on this analysis, the ramp up rates assumed in either the 1983 DMP, the 1990 ACR or the 3,000 MTU Base Case would limit the amount of additional storage required at nuclear power plants sites after the start of waste acceptance, would work off the backlog of spent fuel inventories to allow timely decommissioning, and would ensure that the waste management system capacity has not been overbuilt and underutilized.

I have concluded that it is reasonable to use the 3,000 MTU base case with a five year ramp up period because it is both conservative and consistent with DOE's current planning basis for waste acceptance.

# 6. DOE ACCEPTANCE RATE PLANNING SINCE PROGRAM INCEPTION

## 6.1 DOE Documents that Support Opinion Regarding 3,000 MTU Acceptance Rate

The numerous DOE documents that have used the 3,000 MTU steady-state annual acceptance rate or a similar rate include the following:

- December 1983 Draft Mission Plan. The 1983 draft Mission Plan, dated December 20, 1983, assumes a 3,000 MTU annual acceptance rate. The document described the 3,000 MTU annual rate as the rate "set to prevent, in the aggregate, the need for utilities to provide additional storage on-site after 1998."[23]
- April 1984 Draft Mission Plan.[24]
- 1984 Total System Life Cycle Cost Analysis. The 1984 Total System Life Cycle Cost Analysis (1984 TSLCC) provided an analysis of the total system costs for the OCRWM program.[25]
- June 1985 Mission Plan. The final Mission Plan issued by OCRWM in June 1985 assumed a 3,000 MTU annual steady-state acceptance rate. [26]
- 1985 Total System Life Cycle Cost Analysis.[27]
- 1986 Total System Life Cycle Cost Analysis.[28]
- 1988 Draft Mission Plan Amendment.[29]
- 1988 Annual Capacity Report.[30]
- 1995 Total System Life Cycle Cost Analysis.[31]

[23] DOE 1983 Draft Mission Plan, p. 2-2 to 2-3.
[24] DOE, OCRWM, Draft Mission Plan,DOE/RW-0005 DRAFT, April 1984, p. 2-2.
[25] DOE, OCRWM, "Preliminary Analysis of Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program," April 27, 1984, p. 2-4.
[26] DOE, OCRWM, "Mission Plan for the Civilian Radioactive Waste Management Program," DOE/RW-0005, June 1985, p. 26.
[27] DOE, OCRWM, "Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program," DOE/RW-0024, April 1985, p. 2-3.
[28] DOE, OCRWM, "Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program," April 1986, DOE/RW-0047, p 14, p. 22.
[29] DOE, OCRWM, Draft 1988 Mission Plan Amendment,DOE/RW-0187, 1988, p. 19.
[30] DOE, OCRWM, Annual Capacity Report,DOE/RW-0191, 1988, p 5.
[31] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0479, September 1995, p. 8.

- 1998 Total System Life Cycle Cost Analysis.[32]
- 1998 Viability Assessment.[33]
- 1998 Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management.[34]
- 2001 Total System Life Cycle Cost Analysis.[35]
- 2002 Waste Acceptance System Requirements Document.[36]
- 2004 Acceptance Priority Ranking and Annual Capacity Report.[37]
- 2004 Civilian Radioactive Waste Management System Requirements Document.[38]

In his deposition taken by the utilities in coordinated discovery, Lake Barrett, the former acting director of the DOE waste program, testified that the 3,000 MTU annual steady-state rate is the "proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have—you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on [studies performed in the] early 1980s, seemed like a reasonable number to use."[39]

## 6.2 DOE Documents that Support Opinion Regarding Ramp Up Rate

Recent DOE planning documents for acceptance of SNF at a Yucca Mountain repository project a 3,000 MTU steady-state annual acceptance rate with a five year ramp up period. These documents include the following:

[32] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0510, December 1998, p. 15.
[33] DOE, OCRWM, "Viability Assessment of a Repository at Yucca Mountain, Preliminary Design Concept for the Repository and Waste Package," DOE/RW-0508, Volume 2, p. 3-2.
[34] DOE, OCRWM, Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management, Draft RFP, DE-RP01-98RW00320, September 1998, Table 1-2, C App.1-2.
[35] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0533, May 2001, p. 4-2.
[36] DOE, OCRWM, Waste Acceptance System Requirements Document, Revision 4, DOE/RW-0351, January 2002, Table 7-1, p. 46.
[37] DOE, OCRWM, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004, Table 1, p. 2.
[38] DOE, OCRWM, Civilian Radioactive Waste Management System Requirements Document, Revision 6, DOE/RW-0406, September 2004, Table 1, p. 8.
[39] Barrett, Lake, DOE, OCRWM, Deposition, May 10, 2002, p. 1332-34.

- 1995 Total System Life Cycle Cost Analysis.[40]
- 1998 Total System Life Cycle Cost Analysis.[41]
- 1998 Viability Assessment.[42]
- 1998 Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management.[43]
- 2001 Total System Life Cycle Cost Analysis.[44]
- 2002 Waste Acceptance System Requirements Document.[45]
- 2004 Acceptance Priority Ranking and Annual Capacity Report.[46]
- 2004 Civilian Radioactive Waste Management System Requirements Document.[47]

As discussed in Section 5.5, the 1983 DMP and the 1990 ACR contain six-year ramp up rates that have higher rates for the early years of operation than the rates in the 3,000 MTU Base Case. The rates contained in the 3,000 MTU Base Case assume a steady increase in the acceptance rate from 400 MTU in 1998; to 600 MTU in 1999; 1,200 MTU in 2000; 2,000 MTU in 2001, and achieving the overall acceptance rate of 3,000 MTU by 2002. This steady increase in the acceptance rate could be compared to low-power testing at a nuclear power plant – the system begins to build up to its steady-state capacity over a period of time to ensure that all of the system elements are working properly.

[40] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0479, September 1995, p. 8.
[41] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0510, December 1998, p. 15.
[42] DOE, OCRWM, "Viability Assessment of a Repository at Yucca Mountain, Preliminary Design Concept for the Repository and Waste Package," DOE/RW-0508, Volume 2, p. 3-2.
[43] DOE, OCRWM, Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management, Draft RFP, DE-RP01-98RW00320, September 1998, Table 1-2, C App.1-2.
[44] DOE, OCRWM, "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," DOE/RW-0533, May 2001, p. 4-2.
[45] DOE, OCRWM, Waste Acceptance System Requirements Document, Revision 4, DOE/RW-0351, January 2002, Table 7-1, p. 46.
[46] DOE, OCRWM, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004., Table 1, p. 2.
[47] DOE, OCRWM, Civilian Radioactive Waste Management System Requirements Document, Revision 6, DOE/RW-0406, September 2004, Table 1, p. 8.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## 7. CONCLUSION

As discussed above, I have determined through the analysis described in Section 5 that an overall steady-state spent fuel acceptance rate of 3,000 MTU per year, with a five-year ramp up rate to the steady-state capacity based on the design of DOE's waste management system, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning. In addition, a 3,000 MTU acceptance rate would have been fully utilized for almost 30 years of a 40-year program, ensuring that the waste management system capacity has not been overbuilt and underutilized. The overall 3,000 MTU rate is consistent with DOE's planning bases from the outset of the waste management system as well as with DOE's current plans for the waste acceptance operations.

It is also my conclusion that the 3,000 MTU Base Case ramp up rate currently employed by DOE is a reasonable rate of acceptance and a rate that would have been practicable for the start of waste acceptance in a non-breach scenario, particularly in the early years of waste acceptance.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

# APPENDIX A
# PROJECTION OF SPENT FUEL DISCHARGE INFORMATION USING SPNTFUEL

## A.1 Projection of Cycle Discharge Data

The SPNTFUEL program has the capability to project nuclear power plant discharge data including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup. Projected spent fuel discharge information supplied to ERI by nuclear operating companies can also be used as input to the model.

The SPNTFUEL program reads in the historical spent fuel discharge data provided in the DOE's 2002 RW859 database. The program also utilizes projected spent fuel discharge data either from the 2002 RW-859 database or provided to ERI by nuclear operating companies and then calculates the remaining cycle-by-cycle discharge data through the end of each plant's assumed operating license expiration date – either for 40-year licenses or 60-year extended licenses. SPNTFUEL cycle discharge data is calculated as described below.

- Projected discharge dates are calculated by adding a plant's cycle length (the period of time between plant refueling outages) to the last historical/utility discharge date (e.g., last utility projected date of 9/2005 plus 18-month cycle length to produce projected discharge dates of 3/2007, 9/2008, etc.).

- Projected discharge burnups for the industry are based on last historical/projected discharge burnup, using this burnup as the starting point in the calculation. ERI specifies future maximum burnups for PWR and BWR fuel as well as an annual rate of increase in burnup for PWR and BWR fuel. For example, if the last projected discharge burnup for a PWR is 46,800 MWD/MTU and the PWR burnup rate of increase is 1.7% per year, a discharge in the next year is projected at 47,596 MWD/MTU (46,800 x 1.017), 48,405 MWD/MTU two years out, etc. The projected burnup is increased in whole year increments. The projected burnup will increase each year until a maximum projected for that reactor type is reached (e.g., PWR maximum burnup is 58,000 MWD/MTU).

- Projected capacity factors (CF) are based on the historical CF for each nuclear power plant or on plant-specific values supplied by nuclear operating companies to ERI. ERI specifies a future minimum CF (e.g., 90%) that it believes all plants can achieve in future operations. This future minimum CF is based on the industry-wide average CF, currently 90%. If the historical CF for an individual plant is below the ERI-specified future minimum CF, the individual plant CF is gradually increased from the study start year (e.g., 1998) to the specified future minimum CF over an ERI-specified number of years. For example, if a plant's current CF is 80%, and ERI specifies a future minimum CF of 90% is to be reached over a period of 10 years, the projected CF will increase

1.0% [ (90%-80%) / 10 years] each year until the future minimum CF is reached in the year 2010. CFs for plants that have current CFs that are greater than the future minimum CF (90%) are not adjusted by the SPNTFUEL program but instead that higher CF is assumed through the end of the plant's license.

- The projected amount of spent fuel discharged in MTU is based on a plant's licensed thermal rating (MWT), discharge burnup (BUP in MWD/MTU), capacity factor (CF in %), cycle length (CYL in years) as shown below:

$$MTU = (MWT) \times (CYL) \times (CF/100) \times (365 \text{ days/year}) / (BUP)$$

For example, 3000 MWT x 1.5 years x 90/100 x 365 / 45,000 MWD/MTU = 32.85 MTU

- The projected number of discharged assemblies (ASSY) is calculated by dividing the MTU discharge size by the assembly unit weight. The assembly unit weight is calculated by dividing an individual plant's core weight by the number of assemblies in the core. Since fuel assembly discharges are in whole assembly increments, the adjusted assembly discharge (ASSY*) is calculated by rounding ASSY and the adjusted discharge weight (MTU*) recalculated based on the assembly unit weight. The adjusted discharge burnup (BUP*) is then recalculated based on the adjusted discharge size MTU* as shown below:

$$BUP^* = (MWT) \times (CYL) \times (CF/100) \times (365 \text{ days/year}) / (MTU^*)$$

## A.2. DESCRIPTION OF DATA INPUT

The SPNTFUEL Program utilizes several data input files:

Historical discharge data is consistent with the DOE's RW-859 database for spent fuel discharges through December 31, 2002. Data input into SPNTFUEL includes: plant name, storage location, storage location identification number, spent fuel discharge date, number of assemblies permanently discharged, weight (MTU) of assemblies discharged, and fuel assemblies burnup (MWD/MTU).

Projected discharge data for five future cycles was also included in the RW-859 data submittal. The SPTNFUEL program utilizes this projected discharge information or projected spent fuel discharge information supplied to ERI by nuclear operating companies. Data input to the SPNTFUEL code includes: plant name, storage location, storage location identification number, spent fuel discharge date, number of assemblies permanently discharged, weight (MTU) of assemblies discharged, and fuel assemblies burnup (MWD/MTU).

Each nuclear power plant has specific plant operating parameters that must be taken into account in order for the SPNTFUEL code to project future spent fuel discharges.

Parameters in ERI's plant data base file that are used to calculate future spent fuel discharges include: the plant name, nuclear operating company, reactor type (PWR or BWR), rated thermal power (MWT), capacity factor, start of operating license, cycle length, number of assemblies per core, core weight (MTU). These parameters are used to calculate future cycle discharges as described in Section A.1.

Because nuclear power plant operators can change the plant operating parameters either through a change in operating practice (such as implementing longer cycle lengths) or through changes to the facility license (such as an increase in rated thermal power), it is necessary to modify the plant data parameters in response to such changes.

ERI relies on the U.S. Nuclear Regulatory Commission (NRC) Information Digest to determine a plant's thermal power (MWT),[48] as modified by license amendments to an individual plant's operating license. Numerous nuclear power plants have uprated their plant thermal power to higher levels. ERI's SPNTFUEL database reflects power uprates that were approved by the U.S. NRC through the end of 2004.

Nuclear plant operators decide upon the cycle length for their nuclear power plants. Cycle lengths range from 18 months to 24 months for most U.S. nuclear power plants. ERI maintains its data base of nuclear power plant cycle lengths by monitoring dates for plant refueling outages and through discussions with its contacts at the various nuclear operating companies. ERI has used the best available information for plant cycle lengths in its analysis.

Plant capacity factors have risen steadily over the past ten years, from 71% industry-wide annual average capacity factor in 1991 to a 90% industry-wide annual average capacity factor in 2003.[49] ERI uses plant-specific capacity factors calculated based on a multi-year average of the plant's capacity factor (e.g., 2001 to 2003). As described in A.1, for cases in which a plant's historical capacity factor is below a specified level (90%), the SPNTFUEL program will increase that capacity factor over a specified period of time until it reaches the specified capacity factor (90%).

[48] U.S. Nuclear Regulatory Commission, *Information Digest,* 2002 Edition, NUREG-1350, Volume 16, June 2204, Revised February 2005, Appendix A.

[49] U.S. Nuclear Regulatory Commission, *Information Digest,* 2002 Edition, NUREG-1350, Volume 16, June 2004, Revised February 2005, Table 7.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## APPENDIX B
## DETAILED RESUME OF EILEEN M. SUPKO

**Summary of Experience:**

**1990 - Present** **Energy Resources International, Inc.**
**Senior Consultant**

Consultant in the area of nuclear waste management and radioactive materials transport. Provides analysis of the technical, economic, regulatory and policy issues associated with the storage, acceptance, transport and disposal of spent nuclear fuel and high-level radioactive waste to nuclear power plant operating companies, foreign governments, industry organizations, private companies and private spent fuel management programs.

Dry Spent Fuel Storage. Provides analysis and consultation regarding the technical, regulatory, and economic evaluation of dry spent fuel storage and transportation technologies; technical and economic analyses in support of dry storage facility licensing efforts for nuclear operating companies including projections of dry storage life cycle costs and schedules and issues associated with dry storage licensing; technical and economic analyses in support of private spent fuel management program licensing efforts; analysis in support of industry efforts to increase the allowable burnup of spent fuel contained in dry storage systems and presentation of results to U.S. Nuclear Regulatory Commission (NRC) staff; and analyses of changes to NRC regulatory requirements for storage and transport. Authored an industry *Spent Fuel Storage Handbook*, on behalf of the Nuclear Energy Institute, to assist nuclear operating companies in decision-making, planning and licensing activities related to the dry storage of spent nuclear fuel. Served as a U.S. representative for an International Atomic Energy Agency (IAEA) Consultancy on International Spent Fuel Storage Experience resulting in preparation of an IAEA technical report on this subject.

Spent Nuclear Fuel and Radioactive Materials Transport. Provides analysis and consultation regarding spent nuclear fuel and radioactive materials transport including analysis of U.S. Department of Energy (DOE) plans for transporting spent nuclear fuel to a repository; preparation of comments on NRC proposals for spent fuel transportation cask testing; analysis of proposed changes to NRC and U.S. Department of Transportation, and International Atomic Energy Agency regulations for the transport of radioactive materials. Principal Investigator and author of *Spent Nuclear Fuel Transportation – An Overview* on behalf of the Electric Power Research Institute, to summarize the technical, regulatory and policy framework for transporting spent nuclear fuel.

Analysis of DOE Civilian Waste Management Program. Provided consultation and analysis to support nuclear waste legislative initiatives and developments including analyses of technical, economic and regulatory issues associated with proposed legislation and evaluation of legislative proposals on nuclear power plant spent fuel storage requirements and on Nuclear Waste Fund adequacy. Analyzed DOE proposals for

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

acceptance and transportation of spent nuclear fuel including review of regulatory, technical, logistical issues as well as schedule milestones. Analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. Provided technical support to industry organizations during industry-DOE staff-to-staff technical exchanges regarding outstanding issues and possible changes to the Standard Contract, DOE plans and conceptual designs for fuel receipt facilities at Yucca Mountain, and DOE-utility interface requirements for the acceptance of spent nuclear fuel. Reviewed and analyzed Congressional appropriations to DOE for the Yucca Mountain program, including monitoring and analysis of the adequacy of the Nuclear Waste Fund.

International Waste Management Activities. Provides technical and policy consultation and analysis to a foreign government regarding programs for the long-term management of spent nuclear fuel including review of projected spent fuel disposal system costs and schedules; review of technical proposals and conceptual designs; and review of long-term planning efforts.

Nuclear Fuel Cycle. Provides technical, economic and policy support to utilities in the areas of fuel cycle management, economics, and procurement. Assists utility clients with procurement planning activities, commercial bid evaluation related activities, preparation of responses to public utility commission (PUC) nuclear fuel-related audits, and performs reviews and audits of utility nuclear fuel procurement practices.

Public Outreach. Provides third party expertise for the Nuclear Energy Institute and other nuclear industry clients, communicating on nuclear waste storage, transport and disposal issues; radioactive materials transport; fuel cycle issues; and nuclear energy benefits. In addition to interviews with the news media, these activities have included briefing members of the U.S. Congress, Congressional staff, and state and local officials on nuclear waste transportation and disposal issues and nuclear energy benefits; and participating in moderated debates with members of U.S. anti-nuclear organizations for Public Broadcast System and National Public Radio programs. In addition to numerous client-specific analyses, evaluations, and reports, author of over 35 reports, presentations, and publications in leading nuclear energy journals and an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry.

Testimony.

- Indiana Michigan Power Company v. United States, Docket 98-486C, U.S. Court of Federal Claims (Deposition and Trial Testimony);
- Commonwealth Edison Company v. United States, Docket 98-621C, U.S. Court of Federal Claims (Deposition);
- Sacramento Municipal Utility District v. United States, Docket 98-488, US. Court of Federal Claims (Deposition and Trial Testimony);
- Southern Nuclear Operating Company, Alabama Power Company and Georgia Power

Company v. United States, Docket 98-614C, U.S. Court of Federal Claims (Deposition and Trial Testimony);

- South Carolina Electric and Gas Company and South Carolina Public Service Authority v. United States, Docket 04-101C (Deposition).

**1988 - 1990** **Carolina Power and Light Company**
**Nuclear Services Department**
**Incore Analysis Engineer**

Responsibilities included nuclear power plant reload core design, analysis and design review; nuclear fuel cycle management activities including preparation of nuclear power plant fuel cycle management reports, rod pattern improvements, and core operating recommendations to ensure that the nuclear fuel and nuclear reactor core operated within the regulatory limits approved by the NRC in the plant license. Provided control blade management support and technical review of control blade bid proposals. Performed detailed technical and economic analysis of control blade management alternatives.

**1985 - 1988** **Carolina Power and Light Company**
**Nuclear Fuel Projects Engineer**

Responsibilities included participation in nuclear fuel procurement activities including preparation of bid specifications, co-ordination of bid evaluations, and evaluation of economic and commercial contract terms. Prepared annual long-range nuclear fuel cycle cost projections; administered BWR channel contract and DOE enrichment contract; assisted in administration of BWR fuel fabrication contracts, uranium management activities, and fuel cycle analyses.

**1984 - 1985** **GPU Nuclear Company**
**TMI Environmental Controls Department**

Responsibilities included computerization and data analysis for the TMI Radiological Environmental Monitoring Program; routine maintenance and data analysis for a real-time gamma monitoring system; participation in NRC emergency drills performing off-site dose calculations. Served on environmental monitoring team for TMI-2 headlift operation.

## Education:

B.S., Nuclear Engineering, Pennsylvania State University, 1985

## Memberships, Licenses and Honors:

Member and past chairman, Mechanical and Nuclear Engineering Division, Industrial and Professional Advisory Council to the Pennsylvania State University's College of Engineering, 1998 to 2004

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

Founding Member, Board of Directors (2003–2006), Pennsylvania State University, Nuclear Engineering Society

Member, American Nuclear Society

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

# APPENDIX C
# PUBLICATIONS LIST
# EILEEN M. SUPKO

In addition to numerous client specific analyses, evaluations, and reports, Ms. Supko has authored the following representative reports, presentations, and publications.

Supko, E.M., and John H. Kessler, *Calculation of Incident-Free Spent Fuel Transportation Risk*, presented on behalf of EPRI, 2006 International High-Level Radioactive Waste Management Conference, May 3, 2006, Las Vegas, Nevada.

Supko, E.M., and John H. Kessler, *Risk Insights Associated with Incident-Free Transportation of Spent Nuclear Fuel To Yucca Mountain Using RADTRAN 5.5*, presented on behalf of EPRI, Waste Management Symposium '06, February 26-March 2, 2006, Tucson, Arizona.

Supko, E.M., and Robert Jones, *Options for Pursuing Moderator Exclusion for Application to Spent-Fuel Transportation Packages,* EPRI Technical Report 1011815, Final Report, December 2005.

Supko, E.M., *Assessment of Incident-Free Transport Risk for Transport of Spent Nuclear Fuel to Yucca Mountain Using RADTRAN 5.5*, EPRI Technical Report 1011821, Technical Update 1, September 2005.

Supko, E.M., and Robert Jones, *Options for Pursuing Moderator Exclusion for Application to Spent-Fuel Transportation Packages,* EPRI Technical Report 1009692, Final Report, December 2004.

Supko, E.M., and Robert Jones, *Spent Nuclear Fuel Transportation, An Overview*, EPRI Technical Report 1009226, Final Report, February 2004.

Supko, E.M., *User Friendly Instruments for Enhancing Communications,* Presented on behalf of the World Nuclear Transport Institute, International Conference on the Safety of Transport of Radioactive Materials, International Atomic Energy Agency, July 7-11, 2003, Vienna, Austria.

Supko, E.M., *Utility – DOE Dry Storage Interface*, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M., *Nuclear Transport – The Impact of International Regulations,* Presented on behalf of the World Nuclear Transport Institute, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M, and J.A. Vincent, *High Burnup Spent Nuclear Fuel Storage Analysis,* Presented to the U.S. Nuclear Regulatory Commission on behalf of the Nuclear Energy Institute, Spent Fuel Project Office, March 5, 2002.

Supko, E.M, *Countering the Fear Campaign -- Transportation Specifics,* Presented at the NEI Yucca Mountain Strategic Briefing, Washington, DC, January 15, 2002.

Supko, E.M., *Used Nuclear Fuel Transportation Safety,* Presented at the Utah Association of Realtors Convention, Tucson, Arizona, September 6, 2001.

Supko, E.M, *High Burnup Fuel Considerations For Storage & Transport*, Presented at the Nuclear Energy Institute Fuel Cycle 2001, San Francisco, California, April 1-4, 2001.

Schwartz, M.H., and E.M. Supko, *And Then There Were Three...* ", Nuclear Engineering International, September 2000.

Supko, E.M., *Spent Nuclear Fuel Transportation – An Update of Current Issues,* Presented at the Nuclear Energy Institute Fuel Cycle 2000, Memphis, Tennessee, April 2 - 5, 2000.

Supko, E.M., *Industry Perspective on the Update of the "Modal Study"*, Presented at the Waste Management Symposium 2000, Tucson, Arizona, February 27 – March 2, 2000.

Supko, E.M., *Nuclear Fuel Waste – How Long Must We Wait And What Are We Going To Do?,* Presented at: Center For Business Intelligence Conference, Profit with Nuclear Power – Business Opportunities, Regulatory Reform and Restructuring Options, Chicago, Illinois, November 8-9, 1999.

Supko, E.M., *Projected Needs for Dry Spent Fuel Storage Equipment – The Next Five Years,* Presented at the PCC Annual Workshop for Manufacturing of Spent Fuel Equipment April 7, 1999.

Schwartz, M.H., and E.M. Supko, *The Potential for Change in A Static Market,* Nuclear Engineering International, September 1999.

Supko, E.M., *How Spent Nuclear Fuel, and Low- and High-Level Waste Will Be Disposed and At What Price*, INFOCAST Conference, Nuclear Power Plants, Coming to Grips with Your License Expiration Options – Sell, Decommission, or Renew Your License, January 25-27, 1999.

Supko, E.M., *Industry Spent Fuel Storage Handbook,* Nuclear Energy Institute, NEI 98-01, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues,* presented to the State of Tennessee, Special Committee Meeting of House Conservation and Environment

Committee and Senate Environment, Conservation, and Tourism Committee, March 3, 1998.

Supko, E.M., *Minimizing Risks Associated with Post-Shutdown Spent Fuel Storage and LLW Disposal*, Presented at the Infocast "Nuclear Power In the Competitive Era," Post Conference Workshop, "Developing Risk Strategies for a Successful Decommissioning" January 30, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues*, presented to the Joint Transportation Committees of the Colorado State Legislature, January 8, 1998.

Supko, E.M., *Storing Up Problems*, Nuclear Engineering International, July 1997.

Schwartz, M.H. and E.M. Supko, *Fierce Competition in the U.S. Fabrication Market*, Nuclear Engineering International, September 1996.

Supko, E.M., *Technical Considerations Associated with Spent Fuel Acceptance*, Electric Power Research Institute, ERPI TR-106226, June 1996.

Supko, E.M., *United States Experience With Dry Spent Fuel Storage*, Presented at the International Atomic Energy Agency, Advisory Group Meeting on "Survey of Experience with Wet and Dry Storage", October 30-November 3, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Requirements and Costs*, Nuclear Waste Issues Forum, Nuclear Waste Program Office, National Association of Regulatory Utility Commissioners, May 25, 1995.

Supko, E.M., *Integrated Waste Management System Costs in a MPC System*, Presented at the Sixth Annual International High Level Radioactive Waste Management Conference, April 30- May 5, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Plans*, Nuclear Energy Institute Fuel Cycle '95, Coronado, California, April 5, 1995.

Buchheit, J.M. and E.M. Supko, *Impacts of MPCs on the Utility Spent Fuel Management System*, Institute of Nuclear Materials Management Spent Fuel Management Seminar XI, January 1994.

Supko, E.M., *Proceedings: 1993 EEI/UWASTE-EPRI-USCEA Spent Fuel Storage Workshop II, Regulatory and Communications Strategies*, Electric Power Research Institute, EPRI TR-103253, December 1993.

Schwartz, M.H., P.J. Marsico, E.M. Supko, *EEI Nuclear Fuel Fabrication Handbook*, Edison Electric Institute Nuclear Fuel Committee, NFC-93-001, November 1993.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

Supko, E.M., C.J. Henkel, M.H. Schwartz, *EEI/UWASTE Oversight of the DOE Repository Program by the Repository Information Exchange Team,* Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Rasmussen, R., E.M. Supko, J.M. Jordan, M. Smith, *Utility-DOE Interface Considerations of the Universal Container System Concept*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Stigers, R., M. Alissi, E.M. Supko, D.K. Zabransky, *Non-Fuel Components: Regulatory Issues*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Supko, E.M., *Proceedings: 1991 EEI/UWASTE-EPRI Workshop on At-Reactor Spent Fuel Storage*, Electric Power Research Institute, EPRI TR-100676, May 1992.

Steyn, J.J, M.H. Schwartz, E.M. Supko, *Overview of Fuel Management Analysis - Supply Issues and Procurement Strategy Development for the 1990s*, USCEA Fuel Cycle Conference 91, March 24-27, 1991.

Supko, E.M., M.H. Schwartz, *Spent Fuel Storage Handbook*, Edison Electric Institute, Utility Nuclear Waste and Transportation Program, December 1990.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

## APPENDIX D
## WRITTEN MATERIALS REVIEWED AND CONSIDERED BY EILEEN SUPKO IN PREPARING THIS REPORT

1. Public Law 97-425, *Nuclear Waste Policy Act of 1983*, January 7, 1983.

2. Public Law 100-203, Title V, *Nuclear Waste Policy Amendments Act of 1987*, December 22, 1987.

3. U.S. DOE, *Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,* Title 10, U.S. Code of Federal Regulations, Part 961.

4. 10. U.S. Department of Energy, Office of the Secretary, Nuclear Waste Policy Act Project Office, *Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste*, DOE/S-0020/1, July 1983.

5. U.S. DOE, OCRWM, *Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans*, Draft, December 20, 1983.

6. U.S. DOE, OCRWM, *Mission Plan for the Civilian Radioactive Waste Management Program, Overview and Current Program Plans*, Volume 1, DOE/RW-0005 DRAFT, April 1984.

7. U.S. DOE, OCRWM, *Preliminary Analysis of Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program*, April 27, 1984.

8. Battelle Pacific Northwest Laboratories, J. F. Fletcher to R. J. Hall, Memo, *Revised Waste Acceptance Schedule from Draft Mission Plan*, January 24, 1984.

9. U.S. DOE, OCRWM, *Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program*, DOE/RW-0024, April 1985.

10. U.S. DOE, OCRWM, *Mission Plan for the Civilian Radioactive Waste Management Program*, DOE/RW-0005, June 1985.

11. Public Comments on the Draft Mission Plan for the Civilian Radioactive Waste Management Program, Volume III, DOE/RW-0005, June 1985

12. U.S. DOE, OCRWM, *Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program*, April 1986, DOE/RW-0047.

13. U.S. DOE, OCRWM, *Draft Mission Plan Amendment*, DOE/RW-0128 Draft, January 1987.

Protected and Confidential Material to be Disclosed Only In Accordance
With U.S. Court of Federal Claims Protective Order

14. U.S. DOE, OCRWM, *OCRWM Mission Plan Amendment*, DOE/RW-0128, June 1987.

15. Pacific Northwest Laboratory, R. L. Engel, *1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee*, Prepared for the U.S. Department of Energy under Contract DE-AC06-76RLO 1830, PNL-6288, July 1987.

16. U.S. DOE, OCRWM, *Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program*, DOE/RW-0047, June 1987.

17. U.S. DOE, OCRWM, *Draft 1988 Mission Plan Amendment*, DOE/RW-0187, 1988.

18. U.S. DOE, OCRWM, *Annual Capacity Report*, DOE/RW-0191, 1988.

19. U.S. DOE, OCRWM, *Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program*, DOE/RW-0236, May 1989.

20. U.S. DOE, OCRWM, *Preliminary Estimates of the Total System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management System*, DOE/RW-0295P, December 1990.

21. U.S. DOE, *Annual Capacity Report*, DOE/RW-0294P, December 1990.

22. U.S. DOE, *Annual Capacity Report,* DOE-RW-0331P, December 1991

23. U.S. DOE, Annual Capacity Report, DOE/RW-0412, March 1992

24. U.S. DOE, OCRWM, *Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW-0457, March 1995.

25. U.S. DOE, OCRWM, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0479, September 1995.

26. U.S. DOE, OCRWM, *Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management,* Draft RFP Number DE-RP01-98RW00320, September 1998

27. U.S. DOE, OCRWM, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0510, December 1998.

28. U.S. DOE, RW-859 Data, December 31, 1998.

29. U.S. DOE, OCRWM, *Viability Assessment of a Repository at Yucca Mountain, Preliminary Design Concept for the Repository and Waste Package*, DOE/RW-0508, Volume 2, December 1998.

30. U.S. DOE, OCRWM, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0533, May 2001.

31. U.S. DOE, OCRWM, Civilian Radioactive Waste Management System Requirements Document, Revision 06, DOE/RW-0406, September 2004.

32. DOE, OCRWM, Waste Acceptance System Requirements Document, Revision 4, DOE/RW-0351, January 2002.

33. U.S. DOE, RW-859 Data, December 31, 2002

34. U.S. NRC, *Information Digest,* 2002 Edition, NUREG-1350, Volume 14, June 2002.

35. Barrett, Lake, U.S. DOE, OCRWM, Deposition, April 22, 2002; April 23, 2002, April 26, 2002, May 8, 2002, May 10, 2002, May 14, 2002.

36. Bechtel SAIC Company, LLC, *Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges*, TDR-WAT-NU-000002 Rev 1, February 2002

37. Brownstein, Alan, US DOE, OCRWM, Deposition, April 9, 2002; April 10, 2002; April 11, 2002; May 23, 2002; June 14, 2002.

38. Lawrence, Michael J., Former Director, Nuclear Waste Policy Act Implementation Office, DOE; Deposition, May 20, 2002; May 21, 2002.

39. McLeod, Barrie, JAI Corporation, and Pollog, Thomas, US DOE, *Methodology for the Projection of Spent Nuclear Fuel Discharges*, conference paper, date unknown.

40. Milner, Ronald, US DOE, OCRWM, Deposition, May 1, 2002, May 2, 2002; May 3, 2002; May 7, 2002.

41. Morgan, Robert, Acting Director, OCRWM, "Program Overview", Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983, February 1984.

42. Morgan, Robert, Former Acting Director, OCRWM, Deposition, March 21, 2002; March 22, 2002, June 25, 2002.

43. Pollog, Thomas, US DOE, OCRWM, 30(b)(6) Deposition, April 11, 2002; April 12, 2002.

44. Zabransky, David, U.S. DOE, OCRWM, Yankee Atomic, et al, versus United States, Case Nos. 98-126C, 98-154C, and 98-474C, Trial Transcript 2004/08/05, August 5, 2004.

45. Zabransky, David, U.S. DOE, OCRWM, Deposition, January 28-19, 2004.

46. Kouts, Christopher, U.S. DOE, OCRWM, 30(b)(6) Deposition, April 11, 2005.

47. Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004.

48. U.S. DOE, OCRWM, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567, July 2004.

49. Supko, Eileen, ERI, Email to Steven P. Nesbit, Duke Energy, September 22, 2005; Nesbit, Steven P., Duke Energy, Email to Eileen Supko, September 20, 2005.

50. Supko, Eileen M, ERI, email to Charles Franklin and Jager Smith, Entergy, Entergy Spent Fuel Discharges w attachment, November 11, 2005.

51. U.S. nuclear power plant capacity factors through 2003.

52. U.S. nuclear power plant power uprates through 2004.

53. V.C. Summer Spent Fuel Information, April 22, 2005.

54. NSP Outage Est 2005-05-20.xls

55. 2004 Nuclear Fuel Budget Update Basis; HF2004_1122_2004BudgetBassisiy.xls, 11/11/04; FF2004 1119 2004BudgetBasis.xls, 11/19/04; VF2004 1122_2004OpBudgetBasis.xls, 11/22/04.

56. Tennessee Valley Authority v. United States, No. 01-249C, Defendant's Initial Post Trial Brief, September 21, 2005.

57. Plaintiff's Proposed Findings of Uncontroverted Fact in Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Fuel Acceptance, Wisconsin Electric Power v. United States, In the U.S. Court of Federal Claims, No. 00.697C, December 16, 2002.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of January 2007, a copy of foregoing "DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, MS. EILEEN M. SUPKO, REGARDING THE EFFECT OF THE RATE OF ACCEPTANCE UNDER THE STANDARD CONTRACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s\Stephen Finn