WASHINGTON, D.C.

NOTARY PUBLIC, to wit:

I, Ronald E. Bennett, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me according to law, was examined by counsel.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witnessed my hand and notarial seal this 13 day of July, 2006.

Ronald E Bennett

Ronald E. Bennett,

Notary Public

My commission expires:

February 14, 2010

UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,)
Plaintiff, )
v. ) No. 98-484C
THE UNITED STATES, )
Defendant. )
and )
SYSTEMS FUELS, INC., et al., )
Plaintiff, )
v. ) No. 03-2623C
THE UNITED STATES, )
Defendant. )DEPOSITION OF
and )EILEEN M. SUPKO
SYSTEMS FUELS, INC., etc., ) July 19, 2006
Plaintiff, )
v. ) No. 03--2624C
THE UNITED STATES, )
Defendant. ) Job No. 175436

The deposition of EILEEN M. SUPKO commenced at 9:00 AM, at the UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, COMMERCIAL LITIGATION BRANCH, 1100 L Street, N.W.,

Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

APPEARANCES

For Plaintiff:

Jay E. Silberg, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

For Defendant:

Joshua E. Gardner, Esquire
Alan J. Lo Re, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0226

APPEARANCES CONTINUED

For Xcel Energy:

Kerry C. Koep, Esquire
XCEL ENERGY
Assistant General Counsel
414 Nicollet Mall, Suite 500
Minneapolis, MN 55402
(612) 215-4583

Also present:

Eric Heintz and Ted Lunsford

CONTENTS


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Gardner | 8 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate | 13 |
| 2 | Expert Report Regarding Spent Nuclear Fuel Acceptance Rights for Northern States Power Company's Prairie Island and Monticello Plants | 13 |
| 3 | Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance | |

BY MR. GARDNER:

Q. Why don't I reask it, and tell me what part you're having difficulty with.

Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?

A. There is no rate of acceptance in the standard contract specified.

Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?

MR. SILBERG: Objection.

That calls for a legal conclusion.

A. As I said, there's no rate in the contract.

BY MR. GARDNER:

Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?

MR. SILBERG: Same objection.

A. I'm not going to offer an opinion as

to what their obligations are.

BY MR. GARDNER:

Q. I understand you're not going to offer an opinion.

Do you have an understanding?

Just yes or no.

A. Yes.

Q. Yes, you do have an understanding, is that correct?

Yes, you have an understanding to what DOE's obligations are with respect to rate under the standard contract?

A. As I stated, there is no rate in the standard contract.

That's my understanding.

Q. So is the answer to my question, no, you do not have an understanding as to DOE's obligations with respect to the rate of acceptance under the standard contract?

MR. SILBERG: Asked and answered.

A. I answered your question that the contract doesn't have a rate in it.

That's my understanding.

BY MR. GARDNER:

**Q. Okay. And therefore if the contract doesn't contain a rate, then you have no understanding otherwise as to what rate DOE's obligated to perform at under the standard contract; is that correct?**

MR. SILBERG: Objection, legal conclusion, asked and answered.

A. I don't know how else to answer your question other than to tell you what I know.

MR. GARDNER: I'm going to have marked what will be exhibit number 7.

(Supko Exhibit No. 7 was marked for identification.)

BY MR. GARDNER:

**Q. All right. Ms. Supko, I've handed you what's been marked as exhibit number 7.**

**And before I describe the document, have you ever seen that document before?**

**I'll represent to you it's an**

excerpt, because I'm trying to save the environment today.

A. I don't recall.

Q. I'll describe it to you.

It is plaintiff's -- and this is Northern States now.

This is plaintiff's objections and responses to the defendant's first set of interrogatories and requests for production of documents. This is basically a pretrial discovery document, and we -- which we asked the plaintiff for certain information, and they purport to give us that information through written responses.

And if you turn to the second page of this document, the excerpt -- actually page number 7 on the bottom, you'll see there's an interrogatory number 7 on the top.

Do you see that?

A. M-hm.

Q. And the interrogatory -- this is an interrogatory by the way -- this is a question

that the government has asked NSP.

And we ask the following question: Identify those persons both within plaintiff's organization and outside of plaintiff's organization who are the most knowledgeable about the parties' understanding at any time subsequent to the execution of plaintiff's contract as to the rate and/or sequence of SNF and/or HLW acceptance that DOE would be obligated to maintain under the standard contract.

And then it goes on to list some subparts.

Now, if you go to page 7 D, which is the next page of this document, NSP has identified Eileen Supko, which of course is you.

Correct?

A. Yes.

Q. Now, Ms. Supko, do you agree that you are one of the most knowledgeable persons with respect to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, vague and ambiguous.

You can answer it if you understand it.

A. I'm aware of the fact that NSP identified me as such a person.

It also states that the plaintiff's, NSP's, response to this was that the interrogatory was overly broad, et cetera, but they did identify individuals with the most knowledge of these issues, which is the acceptance rate and rate and sequence of spent fuel acceptance.

BY MR. GARDNER:

Q. That's actually a nonresponsive answer, Ms. Supko.

My question is, do you consider yourself to be one of the most knowledgeable persons with respect to DOE's obligations concerning the rate schedule of acceptance under the standard contract.

MR. SILBERG: Objection,

mischaracterizes the document.

A. I consider myself to be one of the most knowledgeable persons associated with an understanding of the rate and sequence of spent fuel acceptance by DOE.

Whether or not it would be an obligation under the standard contract is a legal issue.

BY MR. GARDNER:

**Q. Let me ask you, do you have any knowledge about the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, legal conclusion.

(Discussion off the record.)

BY MR. GARDNER:

**Q. Ms. Supko, I'm going to read back the last question, because I think there was -- there's some separation.**

**(Reading the realtime screen:) Let me ask you, do you have any knowledge about the**

**rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

A. I believe that I answered the question that discussing DOE's obligation is a legal issue, and I'm not making a legal conclusion.

I'm fully aware of acceptance rates that the Department of Energy has used over the lifetime of the program, and I've analyzed those rates, as you know, in my expert reports.

**Q. Outside of your expert reports, do you have any understanding as to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. From the beginning of the program, the intent of the program was to have an acceptance rate set such that utilities, nuclear operating companies would not be required to add additional storage capacity after 1998, and to

work off the backlog to allow timely decommissioning, and a rate that does that is a rate that reaches 3,000 metric tons with a fairly short 5- to 6-year rampup period.

BY MR. GARDNER:

**Q. So is the answer to my question, no, that you have no knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. I stated I have -- that I believe discussing what DOE's obligation is is a legal issue, and that's not something that I'm opining on.

BY MR. GARDNER:

**Q. I understand you're not opining.**

**I'm asking if you have an understanding.**

**Do you have any knowledge?**

A. I know that my client, NSP -- I don't recall if Entergy or System Fuels Inc. has

submitted reports regarding -- briefs regarding the Department of Energy's -- the facts associated with DOE's obligations regarding spent fuel acceptance.

I know there were many briefs filed. I know that NSP did in fact file one, and their opinion is they were required to pick up spent nuclear fuel at a rate that would have limited the amount of spent fuel storage such that no one would have to add additional storage after '98.

**Q. Now, that's in their brief.**

**I'm asking for your view.**

**Outside of this expert report, do you have any understanding or knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

She gave you the information.

A. As I said, whether DOE is obligated is a legal issue. That's all that I can tell you.

BY MR. GARDNER:

Q. Okay. So you have no knowledge about that?

MR. SILBERG: Asked and answered.

A. I have no legal knowledge about it, no, I don't.

BY MR. GARDNER:

Q. Do you have any nonlegal knowledge about the DOE's obligations under the standard contract?

A. It's a legal issue.

Q. Okay. So the answer is, no, you have no knowledge?

A. No.

Q. Thank you.

Ms. Supko -- and I think you testified to this. You certainly said this in your report -- that the notion of no additional at-reactor storage was a key issue identified by utilities.

Correct?

A. Yes.

Q. Now, that's in fact what you say in your expert report.
Correct?
I believe it's page 1.
MR. SILBERG: Excuse me.
We're referring to the overall --
MR. GARDNER: Yeah.
Why don't we go to exhibit 1 as an illustrative example.
BY MR. GARDNER:
Q. The very first paragraph, it looks like the middle of the paragraph, you say --
A. I don't say that no additional storage.
I say that counsel asked me to provide an opinion on the DOE's rate of acceptance of spent nuclear fuel on -- as a whole on 2 key issues identified by DOE in the nuclear industry.
One of those is the aggregate amount of additional storage that would be required.
Q. Now, are you just relying upon

**of SNF equal to the year's generation rate plus a reasonable share of the backlog, to be tantamount to a request that the rate be sufficient to preclude all additional at-reactor storage?**

A. That would be the result of doing it, yes.

**Q. But of course, even under your analysis, there are utilities that required additional at-reactor after 1998.**

**Correct?**

A. My calculation as we've discussed many times before is based on an oldest fuel first analysis. The -- one of the sensitivity analyses that I do examines the use of acceptance rights within a company at any reactor that that company owns, and it reduces the number fairly significantly such that with the flexibilities in the system, that number -- the amount of additional storage would approach zero, or could approach zero.

**Q. So I just want to be sure.**

**Your opinion is that under the**

**analysis you conduct, no utility needs additional at-reactor storage after 1998?**

A. That's not what I said.

**Q. I'm asking you, is that in fact the case?**

A. My calculations in the way that I calculate additional at-reactor storage requirements do show that there would be some amount of additional at-reactor storage.

Looking at exhibit 1, table 3, which is a sensitivity analysis that includes intracompany use of acceptance rights, I calculated 690 metric tons of spent nuclear fuel. That was at maybe a dozen or so nuclear power plants that would require that.

**Q. It's 14, actually, isn't it?**

MR. SILBERG: Excuse me.

If you could let her finish her answer.

A. That may be. I said approximately.

And the additional storage requirements could be accommodated -- they don't

would have been able to exercise.

Q. Correct me if I'm wrong: You've actually testified that even absent any flexibilities being utilized that 1,030 MTUs of additional at-reactor storage is a reasonable amount of additional at-reactor storage.

Correct?

A. I don't think it's unreasonable. It's a calculated amount based on the information that I used in my analysis.

Q. And you believe that that amount is a reasonable amount of additional at-reactor storage.

Correct?

A. The number is what it is. It's based on my analysis.

It's not unreasonable given that it's a small number of plants and a relatively -- again this is a calculated number. It's not necessarily what would have occurred had the industry believed DOE was coming.

Q. Is there a difference between not

unreasonable and reasonable?
You seem very hesitant to tell me that 1030 is reasonable.
A. I know that based on what I know makes up that number in terms of the number of nuclear power plants that -- whose additional requirements are calculated within that number and the amount of storage requirements calculated at those plants that that number is reasonable and could have been accommodated within the flexibilities that existed.
Q. And we've talked about this before I think most recently in perhaps South Carolina that your upper limit of reasonable additional at-reactor storage would be approximately one year's worth of discharge.
Correct?
A. Yes.
Q. Do you know under scenario 3, had the flexibilities been utilized, would there have been more than 2,000 MTUs of additional at-reactor storage?

A. I have not calculated that.

**Q. So you don't know?**

A. Well, as I stated under scenario 3, even if one were -- this is -- I'll characterize this as a qualitative analysis that I'm doing here as we sit -- that from -- from the period 2005 to 2009, 900 metric tons per year wouldn't have been enough to eliminate even using trading or only those companies who needed requirements would be able to ship their spent fuel. It wouldn't have been enough to eliminate that.

**Q. But do you know if it would have been enough to get the amount of additional at-reactor storage to 2,000 MTU in total?**

A. I have not calculated that number.

MR. GARDNER: I'm having marked what is going to be exhibit number 14.

(Supko Exhibit No. 14 was marked for identification.)

BY MR. GARDNER:

**Q. Ms. Supko, do you recognize what**

going to increase, and they've done that for a long time in their analyses.

Q. I'm asking a different question.

My question is, have you done any analysis to determine whether the number you've calculated here, 1,031.5, would have been different had DOE begun performance in 1998?

A. No.

Q. Have you done any analysis to determine of these 14 utilities whether there would have been a cost for any of these utilities to accommodate those additional storage requirements that you've calculated?

A. No, I haven't.

Q. Now, you don't include shutdown utilities in this calculation.

Correct?

A. No.

This is only looking at operating plants.

Q. Do you know what the views are of, say, PG&E and Humboldt Bay with respect to when

**expert opinion from the Yankee case?**

A. That's correct.

**Q. I take it since you don't know Mr. Graves or his analysis, you don't know if his analysis is consistent with yours.**

**Is that fair to say?**

A. That's correct.

I don't know.

**Q. If the court in these cases, Judge Lettow, Judge Braden, and Judge Weiss, if those judges conclude that they need to determine what rate the government is contractually obligated to perform at, you can't address that issue.**

**Correct?**

A. I'm not qualified to make a legal conclusion, so I wouldn't be addressing that.

**Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?**

A. My conclusion is that scenario 1 -- and I'll -- so I don't misquote myself -- which is a 3,000 metric tons per year rate of acceptance, and I'm looking at exhibit one page

**transit?**
A. Turn-around time.
**Q. What else?**
A. And using that plus some downtime was able to calculate based on an annual rate of acceptance of 3,000 metric tons approximately how many casks would be needed.
**Q. What rampup did you assume for that analysis?**
A. It was either -- it was the rampup rate that was in legislation, so it depended upon the legislation.
**Q. Do you recall the different rates, the rampup rates?**
A. I know that the very first rampup rate was consistent with the 1990 ACR shown in table 4 of exhibit 1. The rest of them I don't recall.
**Q. And what was the -- was your analysis -- you say that you did it on NEI; is that correct?**
A. Yes.

Q. Was the purpose of that for NEI to demonstrate that 1020 was a good idea?
Is that kind of the purpose behind that?
MR. SILBERG: Objection, calls for speculation.
A. It also included a cost analysis, because part of the discussion was what would the impact on budget be.
MR. GARDNER: Off the record.
(Recess.)
BY MR. GARDNER:
Q. Ms. Supko, now, I want to change gears a bit and talk about exchanges, specifically not intracompany exchanges, but intercompany exchanges.
And I believe that one way utilities could have additional storage requirements after 1998 met was through the use of exchanges.
Correct?
A. Could you repeat that?
Q. Sure.

That one way that utilities -- the numbers you've calculated for additional at-reactor storage after 1998, one way that could be met is through the use of exchanges.

Correct?

A. This is a flexibility in the contract, yes.

Q. Do you think exchanges would cost money?

A. I don't know.

Q. You haven't done any analysis to determine what a potential exchange would cost.

Correct?

A. No.

Q. Do you think they'd be free?

A. I don't know.

Q. Have you ever thought about it?

A. Not in any level of detail.

Q. You've never done any analysis to determine how much a utility would be willing to pay to engage in an exchange.

Is that fair to say?

A. That's correct.
I have not.
Q. Have you done any analysis to determine how exchanges would actually work?
A. Since the current system where the government is not coming now until 2017 or 2018 if we're lucky, it's highly unlikely that anybody would exchange acceptance rights.
Q. Let me be clear: I'm talking about the but-for world and you're running but-for world scenarios.
My question relates to have you conducted any exchanges analysis in these but-for worlds that --
A. I have not.
Q. I presume you'd agree that an analysis could be done to determine what an exchange marketplace would have looked like in the but-for world.
Correct?
A. I suppose so.
Q. Do you believe that you've got the

expertise to develop such an exchanges model?
A. I haven't thought about it.
Q. So you don't know one way or the other?
A. No.
Q. Hypothetical question for you: Let's take Boston Edison. They come to you and say, Ms. Supko, could you model exchange rights across the industry.
Would you be able to do that for them?
A. I don't know if I would be able to do it. I don't know that I would be willing to do it.
Q. Why wouldn't you be willing to do it?
A. There are a lot of variables and factors involved in such an analysis, and I think it would be difficult to try to capture all of those variables and factors.
Q. I'm curious, what do you view as being the different variables and factors that

would go into an exchange analysis?

A. I haven't thought about it.

Q. I had thought previously you had testified and maybe it was the Southern Nuclear trial. Maybe it was SMUD -- I can't remember -- but I recall that in the past you had said you had run an analysis of exchanges; is that correct?

A. I ran analyses of decommissioning shutdown reactor priority in the early 1990s.

Q. Offering -- in other words, taking the OFF queue as it exists but affording priority to the Yankees and SMUDs of the world?

A. Yes.

Q. Then I'm misremembering that you have not engaged in any type of analysis exchanges?

A. I don't recall that I've ever done any.

Q. Based on -- you've read the standard contract many times.

Correct?

A. Yes.

Q. **Based on your reading of the standard contract, what is actually being exchanged if you know?**

A. I'd have to look at the contract.

Q. **Why don't we do that.**

**For the record, I am going to give you New England states standard contract. I'll represent to you it's my understanding that they should be identical between all 3 sites and in fact all the 103 reactors I suppose.**

MR. GARDNER: This will be exhibit 15.

(Supko Exhibit No. 15 was marked for identification.)

BY MR. GARDNER:

Q. **Ms. Supko, I've handed you what's been marked as exhibit 15, which I'll represent to you is the standard contract between Northern States and the United States Department of Energy.**

Have you seen the standard contract before?

A. This specific one?

Q. I knew you were going to ask that.
No. More generally.

A. I have seen the standard contract as it's identified in part 961 of title 10 of the United States Code of Federal Regulations.

Q. Okay. Fair enough.
If you could turn to page 12 of the document. It's got a Bates label of COF double 0 21679.
You should see a section there entitled, E exchanges.
Do you see that?

A. Yes.

Q. The second paragraph says:
Purchaser shall have the right to exchange approve delivery commitment schedules with parties to other contracts for disposal of SNF or HLW.
Do you see that?

A. Yes.
Q. And is that consistent with your recollection that in fact exchanges would have taken place between approved delivery commitment schedules?
A. Honestly, I haven't thought about it much. That's what the language in the contract says.
Q. But you haven't really thought about exchanges?
A. I haven't analyzed it other than to know that it is a flexibility that does exist.
Q. Do you know -- if we can go back to your spreadsheet, which is exhibit 14, do you know which of these utilities that you've identified as having additional storage requirements have approved DCSs?
A. I don't.
Q. Okay. Ms. Supko, do you have an opinion as to when the market for exchanges would have developed?
MR. SILBERG: Objection, vague and

ambiguous.
We're referring to the but-for world, I assume?
A. I haven't thought about it.
BY MR. GARDNER:
**Q. Do you remember in the Southern Nuclear trial Judge Merrill asked you that exact question?**
A. I recall he asked me a question about exchanges and whether I thought they would have been possible.
**Q. Do you recall giving a time frame for that?**
A. I don't.
**Q. I assume sitting here today you haven't really given any thought as to the timing of when that market would have developed.**
**Is that fair to say?**
A. Well, if the government had performed in '98 -- and I believe this is what I said to Judge Merow -- if they had performed at a 3,000 metric tons rate of acceptance and if in

fact it appeared that performance was going to continue uninterrupted, the market most likely would have developed.

**Q. When?**

A. After 1998.

It could have happened before. I have not really thought about it, but there would have been sufficient flexibility in the system to allow exchanges once the rampup rate started increasing.

**Q. You do no analysis to determine the timing at which a market would have developed?**

A. I have not.

**Q. You also recall -- this goes back to the SMUD trial I think -- that you offered testimony that you thought an exchanges market would work similar to a uranium enrichment exchanges market.**

**Do you recall that?**

**That was in your written direct testimony.**

A. Yes.

The companies have exchanged uranium in its various forms since the mid-1980s. And it works in a fairly seamless way.

**Q. When were the uranium enrichment contracts originally signed?**

A. Well, there have been a range of them.

Are you talking about the enrichment contracts with the Department of Energy, with USEC, with European --

**Q. When you've made the conclusion in your written direct testimony before Judge Braden that you think that exchanges of acceptance rates would work like exchanges of uranium enrichment contracts, to what were you referring?**

A. At the time, it was associated with toll enrichment services under Department of Energy contracts. Those no longer exist. Companies still do exchange and borrow material from time to time.

**Q. So were you basing your conclusion about the similarities between those 2 markets to**

taking that 20 percent from another utility.
Correct?
A. It doesn't make an assumption per se.
It just assumes that those companies who had additional requirements could potentially have requirements that were 20 percent less. I didn't analyze the effect on an annual basis.
Q. You've done no analysis, then, as to what would happen if DOE were to grant a particular utility's request for an additional 20 percent, what impact that would have on other purchasers as that term is used in the standard contract.
Correct?
A. I did not.
Q. It's your understanding that utilities that have approved delivery commitment schedules may adjust their allocations by 20 percent in either direction subject to DOE approval.
Correct?

Q. And then it says: The total systemwide spent fuel arisings are projected to be approximately 86,000 MTUs.

Do you see that?

A. Yes.

Q. Does your analysis in these spent fuel cases assume these same assumptions or make these same assumptions?

A. No.

Q. How have your assumptions changed between, say, this private fuel storage analysis in 2000 and the analysis you're doing for this litigation?

(Pause.)

A. I don't wish to misspeak as to what my current assumptions are, and I don't have them committed to memory, so I'll give you some approximate answers.

BY MR. GARDNER:

Q. Okay.

A. The overall analysis that I've done for the various clients assumes 40-year licenses,

but I've also done the analysis assuming license extension for all plants. And I believe that analysis has been provided to you.

**Q. I want to take them one at a time.**

**The license extension analysis you're not offering that in your actual opinion.**

**Right?**

A. I didn't change my opinion. It doesn't change my opinion. The results are similar.

**Q. You don't even provide that analysis in any of your reports.**

**Correct?**

A. It's not in the report, no.

It is a sensitivity to show that my opinion wouldn't change.

**Q. So 40-year licenses you still assume that for what I'll call your base case?**

A. The overall analysis, yes.

**Q. That assumption will stay the same.**

A. For the projection, although it doesn't matter for the projection of acceptance

A. There would have been summaries of the spent fuel discharges that were provided to the client.

**Q. Do you know if you produced those in connection with the other things you produced in this litigation?**

A. I didn't.

As I would update an analysis, those would have been written over by the new analyses.

**Q. Do you recall the outputs of that preliminary estimate and how those compared to the conclusions you've reached in this report?**

A. I recall that things didn't change significantly. Plant operating schedules are in general pretty consistent, and you don't see major differences from one projection to another unless something drastic happened, and nothing drastic has happened in the nuclear industry with respect to operating schedules.

**Q. When you say that you would have overwritten any preliminary estimate or**