CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl Lord

CHERYL A. LORD
Notary Public in and for the
District of Columbia

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :NO. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

--------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, September 20, 2006

VOLUME 3

The parties met, pursuant to the notice of the Judge at 10:27 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

(Index appears at end of transcript)

alternatives considered and then ultimately, depending upon the size of the project, you put all of that into a proposal, if you will, that is presented to the different levels of authority required for approval of that particular magnitude of investment. The larger the project, the terms of magnitude, the higher up in the organization it goes to for signature, review, and approval.

Q. Are the processes you just described reduced to writing?

A. Yes, they are.

MR. TOMASZCZUK: Your Honor, I'd like to hand the witness what's been marked as Plaintiff's Exhibit 15-A-2. These are in the binders that the Court has, but I also have just a copy for the Court and for the government and for the witness, just to expedite.

BY MR. TOMASZCZUK:

Q. And, Mr. Eaton, can you identify the document I've handed you, which has been premarked as Plaintiff's Exhibit 15-A-2?

A. I can. It's a copy of a policy entitled, "Capital Project Approval Policy."

Q. And what is this document?

A. Well, it's a document that provides some overarching guidance on what's required of a capital project in terms of information necessary to support the approval of a project.

Q. Can I direct your attention -- and I'll put this up on Elmo -- to the page in the lower right-hand corner marked KRG-GG005449. And this is, I believe, the third page from the back of the document. Do you have that?

A. I do, I see it.

Q. And can you tell us what this, which appears to be marked as an attachment, attachment one to the document, what this page of the document represents?

A. It's simply a table that identifies which level of authority, or which level of individual in the organization must ultimately approve a particular transaction capital procurement, a contract, payment, or project authorization, so it describes, as you go up in responsibility level, from a supervisor all the way to the corporate board of directors.

It talks about the approval authority limits, if you will, that are allowed for any

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: Systems Fuels v. U.S

HEARING DATE: September 20, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 9/20/06

Cynthia R. Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :NO. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
715 Madison Place, NW
Washington, D.C.

Thursday, September 21, 2006

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

***Index appears at end of transcript***

acceptance, correct?
A. I hadn't discussed it with them, no.
Q. Now, you are not offering an opinion that the 3,000 rate of acceptance would have been utilized by DOE in the nonbreach world, correct?
A. I'm not offering an opinion regarding what DOE would have done.
Q. Now, I believe you indicate this on your written direct, and I am going to put it up in a second, but you have essentially evaluated various acceptance rates to determine how they would impact, I think it is three criteria, correct?
A. Yes.
Q. Okay. Why don't we pull up, and I think we have it electronically, paragraph 16 of that written direct. And I believe you have a copy in front of you, right, Ms. Supko?
A. Yes.
MR. GARDNER: And, Your Honor, do you have a copy of Ms. Supko's report?
THE COURT: You are going to put it up? I will read it off the ELMO.
MR. GARDNER: Okay, that's fine. As

Q. Now, you were not involved in the DOE program in 1983, correct?

A. That's correct.

Q. And you weren't involved in any contract holder's discussions with DOE before the execution of the standard contract?

A. That's correct.

Q. Now, I believe you say in your written direct that you began working at ERI in 1990. Is that right?

A. Yes.

Q. Okay. Now, prior to working at ERI in 1990, you never had any discussions with DOE employees regarding issues related to the standard contract, correct?

A. Prior to 1990, no.

Q. Now -- but you have, in your capacity working at ERI, you have reviewed portions of the administrative record concerning the rulemaking leading up to the standard contract, correct?

A. I have.

Q. Okay. And, in fact, you believe that some utilities may have identified the two key issues during that rulemaking, right?

found that to be strange, but that's your choice so here we are. I thought you were going to argue relevance. Go ahead.

BY MR. GARDNER:

Q. Ms. Supko, I will repeat the last question then. It is fair to say that despite the utilities' request for the inclusion of a rate that would meet the discharge rate plus work out the backlog, TVA's view is that DOE did not accept those comments, correct?

A. That's what the document says.

Q. And, again, that's consistent with your understanding that DOE did not include a rate or any qualitative test on the standard contract, correct?

A. I believe that's what I said earlier.

THE COURT: Counsel, maybe this would be helpful to you and to your colleagues. To the extent I have to get into determining what the acceptance rate is, maybe I can fix some clever way around that.

MR. GARDNER: Then you are more clever than me, Your Honor.

THE COURT: But if I do, I don't intend to rely on Ms. Supko's opinion in that

regard. There is a lot of documents that we have here and that's -- I will make my decision based on those documents. This is nothing to do with your work or anything else like that. I'm sure you have done a very thorough job, but I don't intend to rely on an expert for something like that.

MR. GARDNER: Your Honor, that is precisely the government's point in the motion in limine.

THE COURT: This may shorten your cross substantially. You have my promise on that.

MR. GARDNER: Well, then I guess we are left in a bit of an awkward position, Your Honor, because unless the Court strikes Ms. Supko's testimony, which has already been filed.

THE COURT: I don't have to strike it. I can do --

MR. GARDNER: Then it is in the record, Your Honor.

THE COURT: So what?

MR. GARDNER: Then it is for the Federal Circuit. So unless I explore --

scenarios I modeled. And I would point out that scenario 1 is the scenario that was used by the other experts for Grand Gulf, the Kenrich Group, in modeling damages. Scenarios 2 and 3 are two of the three scenarios that the government's expert, Mr. -

Q. Dr. Hartman?

A. Dr. Hartman used in his expert report. There was a third one that I happened not to have modeled, but this is, if one wanted to look at the effect of the various rates to the industry as a whole, not just to this case, you could look at what I believe Mr. Gardner would put up as another demonstrative later to see the results, that it is label -- one of the tables in my expert report, which I'm sure we will get to later.

Q. We will, Ms. Supko. Now, you believe there is a possibility that rates lower than 3,000 may be reasonable, correct?

A. I have not modeled in my analysis any rates lower than 3,000 that appeared to be reasonable.

Q. But you believe there is a possibility that rates lower than 3,000 may be reasonable,

correct?
A. It is possible.
Q. And you haven't endeavored to determine what the minimum reasonable rate of acceptance is, correct?
A. I have not.
Q. Now, you would equate APPA's request to accept at a rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional at-reactor storage after 1998, correct?
A. I'm sorry, can you repeat that?
Q. Sure. You recall we discussed a little bit earlier the APPA?
A. Yes.
Q. Okay. And what the APPA had been requesting to be included in the draft standard contract?
A. Yes.
Q. And you would equate the APPA's request for an accepted rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional

at-reactor storage after 1998, correct?

A. Yes.

Q. But you would agree, Ms. Supko, that even under your scenario 1, your 3,000 rate, there are utilities that require additional at-reactor storage after 1998, correct?

A. In my calculation, for scenario 1, using a strict oldest fuel first acceptance priority, I do calculate additional storage requirements. However, using flexibilities in the contract, those numbers could be decreased significantly.

Q. And we will talk about those flexibilities, maybe not today, but we will see how far we get. Now, Ms. Supko, the next demonstrative I have put up here is table 2 of your written direct testimony, which can be found on page 18, correct?

A. Yes.

Q. And when we were talking about the calculations under the different scenarios, the additional storage requirement calculation that you have calculated under scenario 1 results in 1,030 MTUs of additional at-reactor storage, correct?

A. Yes, it does.
Q. Now, it is your understanding that under the standard contract, spent fuel acceptance is generally governed by the oldest fuel permanently discharged being accepted first, correct?
A. No. The oldest fuel permanently discharged provides a utility with their place in the acceptance queue. That specific fuel may not necessarily be the fuel that's accepted.
Q. That's fair. I appreciate that clarification. Now, that concept that you and I were just discussing, that's also known as OFF, right?
A. Yes.
Q. Oldest fuel first. Now, you agree that OFF priority will not necessarily meet the needs of individuals -- individual plant sites to avoid adding dry storage capacity, correct?
MR. SILBERG: Are you saying OFF priority under any scenario?
BY MR. GARDNER:
Q. No. Let's actually do your scenario 3 -- scenario 1, 3,000 MTU. You would agree that

under your scenario 1, OFF priority will not necessarily meet the needs of individual plant sites to avoid adding dry storage capacity?

A. That's correct. That was recognized even by the Department of Energy at the beginning of the program, that the oldest fuel first acceptance rate in the aggregate may not meet everyone's needs. I believe that was discussed in one of the mission -- draft mission plans in the early 1980s.

Q. And under your scenario 1, in fact, you have calculated that there are 14 utilities that had additional at-reactor storage needs after 1998, correct?

A. I did.

Q. And why don't we take a look at that demonstrative. Ms. Supko, this next demonstrative we're handing up here, I believe it is also referred to as Supko demonstrative 3.

A. Yes.

Q. You recognize this to be an extract from your spreadsheet that calculates additional at-reactor storage under 3,000 rate, correct?

In year one on this chart, if you go down, I don't know, maybe 10 or 12 lines, the U.S. Department of Energy actually has allocations in the queue for 29.5 metric tons in year one under this scenario.

Because they took title to some commercial spent nuclear fuel. And so they get allocations in the queue. And that fuel is being stored at Idaho National Engineering Lab and some other national laboratories. You know, could those allocations, could DOE possibly have traded them? I don't know. But that's the type of thing.

Obviously, they wouldn't have needed additional storage capacity at those sites.

BY MR. GARDNER:

Q. Ms. Supko, you talked about the flexibility for exchanges being a possibility, but, again, you don't know how much the amount of additional at-reactor storage would have decreased had utilities engaged in exchanges, correct?

A. I have not modeled that.

Q. And you haven't done any analysis to determine what a potential exchange would cost,

correct?

A. I have not. I have not done that either, no.

Q. You have never done any analysis to determine how much a utility would be willing to pay to engage in an exchange, correct?

A. Let me think. No, I don't believe I have looked at that.

Q. And you have not conducted any analysis to determine the timing of when an exchange's market really developed in the but-for world, correct?

A. I haven't, but I believe I did offer a response to a question from Judge Merrow in the Southern Nuclear trial regarding that issue. And I will repeat more or less what I said, is that by the time the acceptance rate reached 3,000 metric tons or exceeded the annual generation rate, meaning it was more than 2,000 metric tons per year, there would have been significant flexibility that may have allowed trading.

Q. So you think after the ramp-up period is when the exchanges market could have taken place?

A. What the contract -- excuse me. What the contract says is that the purchaser shall have the right to adjust the quantities of SNF and/or high level waste, plus or minus 20 percent, and the delivery schedules up to two months until submission of the final delivery schedule.

Q. And you understand that that adjustment of the amount and timing relate to the amounts contained in the delivery commitment schedule, correct?

A. Yes.

Q. Okay. Now, going back to Supko demonstrative 3 one more time here, of the 14 utilities you have identified as having additional storage requirements after 1998, you do not know which one of these utilities have acceptance rights in 1998, correct?

A. I didn't analyze it. It would be very easy to determine by looking at the information in my model which ones did or did not.

Q. Yeah. But that wasn't part of your analysis in this case, correct?

A. It was not.

Q. Now, you have not done any analysis to

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: System Fuels, Inc.

HEARING DATE: September 21, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 21, 2006

[signature]

Karen Brynteson, FAPR, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH : No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, September 22, 2006

VOLUME 5

The parties met, pursuant to the notice of the Judge at 9:06 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

***Index appears at end of transcript***

company-by-company and determined what it is that in 1998, say, Entergy would have done with respect to swapping its allocations between it plants?

A. I didn't, between the oldest fuel first analysis that I've done, which we see the results of in scenario one, and the sensitivity for intrautility trading, you cover all, the whole range.

Q. Now, you're aware that there are some plants that are owned by multiple entities, correct?

A. Yes.

Q. For example, Southern Company has co-owners of particular plants, correct?

A. That sounds right.

Q. And you've never had any discussions with co-owners of a particular plant about their willingness to engage in intrautility exchanges, correct?

A. I would assume that the operating companies would have those discussions if they needed to do it at the time. I would have no reason that I would speak to the co-owners.

Q. So you've not had any discussions with

the co-owners about their willingness to engage in such trading, correct?

A. No.

Q. Now, when you're confirming the reasonableness of the 3,000 rate, one way in which you measure the reasonableness of additional at-reactor storage is by how it compares to one year's worth of discharges, correct?

A. That's one unit of measure you could use. Nuclear operating companies as a whole in the U.S. discharge approximately 2000 metric tons per year.

Q. And that is in fact one of the metrics you use, correct, to determine the reasonableness, is how the number of additional storage requirements compare to the 2000 MTUs, which is one year's worth of discharge, correct?

A. Yes.

Q. Now, going back to table two here, we can put this up, for scenario three, you've calculated the additional storage requirements to be 6200 MTUs, correct?

A. Yes.

Q. And under your sensitivity analysis for intracompany use of acceptance rights, scenario three drops from 6200 MTU to 4980 MTU, correct?

A. Yes.

Q. And in fact, that number for scenario three goes from 4980 MTU to 3980 MTU, if you assumed the use of the plus or minus 20 percent provision, correct?

A. It could be as much as that. It might not be that much.

Q. It could be less?

A. As we discussed yesterday, it would depend on whether or not there were delivery commitment schedule.

Q. That's right. Now, it could be the case that had the flexibilities you identified in the contract been utilized, there could have been 2000 MTUs of additional at-rector storage under scenario three, correct?

A. I have not calculated that number, so I can't answer your question.

Q. You don't know?

A. I don't.

Q. Now, in addition to modelling the

A. Yes.
Q. And System Fuels, the Arkansas case, correct?
A. Yes.
Q. And Boston Edison?
A. Yes.
Q. By my count, that's 13, does that sound right?
A. That sounds correct.
Q. And it's fair to say that with the exception of the Indiana Michigan case and Entergy Northwest, you're offering the same opinion in each of these cases regarding the reasonableness of the 3000 rate, correct?
A. I suppose that's true.
Q. Now, you're modelling a world in which DOE began performance on an industry wide basis beginning in 1998, correct?
A. Yes.
Q. Now, with regard to pool capacities, your model is not always utilizing pool capacities for utilities as they existed in 1998, correct?
A. I believe there are maybe a dozen utilities that I inadvertently used pool

capacities from the 1999, 2000 period. There were a small number that had increased their storage capacity at that time.

Q. For example, let's take Southern Nuclear's plant Hatch. Now, you've included Southern Nuclear's plant Hatch's post 1998 rerack in your model, correct?

A. I was directed by Southern Nuclear to include one of their temporary racks in the analysis, yes.

Q. And that direction in Southern Nuclear, that's maintained in your model to this day, correct?

A. I believe it is. I don't recall. I believe it is. I don't believe I've changed it.

Q. You believe you have not changed it?

A. That's correct.

Q. I just didn't hear you. Now, in addition to the post 1998 Southern's plant Hatch rerack that they actually installed, you also included a second bathtub rack that wasn't installed, correct?

A. That, I don't recall. I would have to look at the numbers.