Q. Let me see if I can refresh your recollection, the transcript I have previously given you for Southern Nuclear, and I want you to read this to yourself. I want to direct you to page 753.

THE COURT: Can we have some lines here?

MR. GARDNER: I was going to wait until Ms. Supko got to the page.

BY MR. GARDNER:

Q. Then I was going to direct you.

A. Okay.

Q. If you look at lines 3 through 6, if you can just look at those and let me know when you're done?

A. Okay.

Q. Does that refresh your recollection, Ms. Supko, in addition to the rerack post 1998, the plant Hatch actually did install, that your model also assumed the second backup rack that wasn't installed?

A. Yes.

Q. And I think you've said this, but I want to make sure I understand, you include about a dozen utilities post 1998 reracks in

any report after that, so anything done in the past year-and-a-half, that delta between the SMUD scenario two and Southern Nuclear scenario two is related to a smaller pool capacity. I believe it was for plant Farley.

Q. So let me see if I understand this because I may have misunderstood you. You're saying 500 delta is related to smaller pool capacity, not for plant Hatch, but for plant Farley?

A. I believe that's correct because if I increased the capacity for plant Hatch, the number would be lower, not higher.

Q. Now, you did not endeavor to determine what the world looked like for every pool, for every plant, as of 1998, correct?

A. I have not gone back and changed my analysis.

Q. And you're relying upon post 1998 pool modifications modelling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world, correct?

A. I am, and I believe that these are representative, even using several plants,

their post '98 pool capacity that I believe was representative, the analysis and the results would not change significantly if I changed the pool capacities.

Q. You agree that the amount of at-reactor storage you've calculated would be even greater if you omitted the 2000 plant Hatch rerack from your pool capacity analysis, correct?

A. It would be somewhat greater. It would depend on which scenario one was looking at. It would definitely be greater in scenarios two and three.

Q. In fact, if you did not assume the post 1998 rerack for Southern Nuclear, you would have calculated Southern Nuclear as requiring additional at-reactor storage after 1998, is that correct?

A. That's possible.

Q. And that would take additional utilities with additional at-reactor storage on this demonstrative from 14 to 15, correct?

A. That's possible, but in looking at intrautility use of acceptance rights, they wouldn't necessarily increase those numbers if

they were able to in fact use the rights at different plants.

Q. But that's only after you've done your calculation, correct, because there's two issues, right? You do the calculation to see who has additional storage requirements, and then you determine whether there are flexibilities that could somehow reduce those requirements, correct?

A. No, I do two separate calculations. I calculate additional storage requirements using oldest fuel first priority ranking, which is what we're looking at here, and I calculate additional storage requirements assuming intracompany trading. I can do them in any order. I don't have to know what the results are using oldest fuel first.

Q. I think we're saying the same thing, but based upon a strict oldest fuel first calculation, if you were to calculate pool capacities as of 1998, these 14 that you've calculated, this 1031, you would have to put plant Hatch on there as the 15th utility, correct, or 15th plant?

A. That's possible.

Q. Now, Ms. Supko, is there a difference, do you know, between a pool's licensed capacity and a pool's usable capacity?
A. There may be, not always.
Q. Does your model use licensed capacity or actual usable capacity?
A. I use licensed capacity for the majority of plants. However, for a good, since a good number of the nuclear operating companies are clients of mine, I also have usable capacity for a significant portion of the plants, I have that information.
Q. Now, is it fair to say that a pool's licensed capacity would be greater than a pool's actual capacity?
A. They may be the same.
Q. Are they often the same?
A. They can be.
Q. I know they can be. Are they often the same?
A. I would have to say it would depend on the individual nuclear plant and the pool configuration and what else they're storing in their pool.
Q. And have you done any analysis,

Ms. Supko, to compare all of the utilities' license capacity versus actual capacity?

A. I believe those numbers are typically reported by the operating companies in RW-859, so to the extent that I have that information, I would use it.

Q. And I guess I'm a little confused. You say to the extent you have that information, you use it, but in fact, you said for the majority of the plants, you aren't using it. You're using the license capacity, correct?

A. It would depend. I would use the information as it's reported. In some instances, the reported information may have changed after that, after the fact.

Q. And I guess I'm getting confused, I understand you to be saying that the RW-859 data -- and let's back up so we have a clear record. What is the RW-859 data, Ms. Supko?

A. The RW-859 data is information nuclear operating companies supply to the Department of Energy in accordance with the standard contract. It's supposed to be on an annual basis, but that doesn't happen anymore. I

mean, it includes historical spent fuel discharges and also information regarding the spent nuclear fuel pools and parameters associated with that.

Q. Thank you. Now, and you're using the 2002 RW-859 data, correct?

A. Yes, but I'm using the historical discharges from the RW-859 information and some of the projected information from that. I am not using information, with respect to where the fuel is located, I'm still assuming the location of fuel in 1998 because a significant amount of fuel moved from spent fuel storage pools into dry storage after 1998 because of the government's default.

The pool information also, for the most part, came from 1998, but also from my discussions with nuclear operating company clients.

Q. Let me see if I can break that down a little bit. When you're looking at pool capacities in your model, are you taking that information from the 2002 RW-859s?

A. No.

Q. Where are you taking the pool capacity

information from?

A. It would have originally come from the 1998 RW-859s, some of it between 1998, and I would say 2002, I would have updated, and there were just a few plants that had changes to the pool capacities during that period of time.

Q. Now, the 1998 RW-859 data that you're using to determine pool capacity, I understand you to say that the RW-859 provides both license pool capacity and usable pool capacity, correct?

A. I don't recall if that's the terminology that's used, but there are two numbers sometimes reported. Many times, the two numbers are the same.

Q. And whatever the actual term is, you understand they are conveying the concept of what the plant's licensed to store versus what it can actually store, correct?

A. Yes, and both numbers are actually in my model.

Q. Now, when you're doing your calculation of additional storage requirements, for those utilities who aren't your clients, are you using the licensed pool capacity or the

actual pool capacity?

A. I believe that the model uses the maximum pool capacity, which would be as it's reported.

Q. Now, do you know, let's take Grand Gulf as an example, do you know how their licensed capacity compares to their actual usable capacity?

A. I believe that, and I don't recall the exact number, there may be somewhere between 10 and 30 assemblies difference between the two.

Q. And is that assuming the cell recovery that took place after 1998?

A. I don't recall.

Q. So you don't know?

A. I don't recall the numbers. I have the information.

Q. Now, it's fair to say that on the whole though, the usable capacity will be less than the licensed capacity, correct?

A. It may be. It depends on the plant and the pool configuration.

Q. And do you know, Ms. Supko, if you used actual capacity, rather than licensed capacity, do you know if the additional storage

requirements for the 14 utilities you've listed here, did they go up?

A. I haven't calculated that. In some of those instances, I know I'm using usable capacity, but I haven't calculated it for all of those plants.

Q. And by the way, when we say, "license capacity," again, we're talking maximum license capacity, correct? I believe that's the term you used?

A. I used maximum capacity. Licensed capacity is the capacity that the Nuclear Regulatory Commission has approved.

Q. And, again, that doesn't take into, for example, nonrecoverable cells or unusable cells or boroflex degradation issues, correct?

A. It may.

Q. The license capacity would?

A. In my model, I have two columns, one is maximum, and the other one might be nominal for pool capacity. If I know, from talking to a nuclear operating company that -- and I'll just use a hypothetical number -- their pool capacity is 1,000 cells, that's been approved by the Nuclear Regulatory Commission, but for

A. Well, first of all, nuclear operating companies are not required by regulation to maintain a full core reserve, meaning the space to discharge their core into the fuel. It's typically for ease of plant outage management that that, a company would offload the entire core before reloading new fuel and leaving the discharged fuel in the pool.

So at a minimum, companies typically will reserve one full core. However, as I said, it's not required, and one can impinge on full core reserve if it's necessary because of delays, for example, in getting your dry storage facility up and running.

THE COURT: What do you mean by impinging?

THE WITNESS: Well, say a nuclear power plant has 173 assemblies in their reactor core, and they'll take about a third of those out every 18 months, and that becomes spent fuel, and then they'll put new fuel in, so one-third new fuel back in.

And if they keep 172 spaces open in their pool, they can take all the fuel out, put it in the pool and then put the new fuel and

the not quite -- the irradiated fuel that they're going to continue to use back in the reactor core. They could, only -- if they didn't have 172 spaces open, they could take out just the assemblies that they didn't want that were going to be spent fuel, that were going to be permanently discharged, say it was 172, it was 50 assemblies.

Take 50 assemblies out, put them into the pool because there are 150 spaces left, not 172, and then move the assemblies that are left in the core around to their new spaces and then bring in the new fuel and put the new fuel in, so if their full core reserve was 172 assemblies, but they only had 150, they've technically impinged on having one full core reserve in their pool.

BY MR. GARDNER:

Q. Now, you just talked about the concept of full core reserve. Now, actual operating reserve could potentially be higher than full core reserve, correct?

A. That's right. Some companies reserve additional space for new fuel in their pool for staging. Some companies, because of the

configurations of their pools, need additional open spaces because of worker shielding in and around the pool during outages, and there may be other reasons.

Q. Now, your model, your industry wide model assumes one full core reserve per pool, correct?

A. When I ran for these cases, that is the assumption that I made, yes.

Q. So your acceptance model does not take into account what a particular utility's operating reserve policy is, correct?

A. It does not.

Q. And you're not endeavoring to determine what each utility's operating policy were as of 1998, correct?

A. That's correct.

Q. Now, if you were to increase the amount of operating reserve that a particular utility would want to maintain, that could increase the additional storage requirements calculated for that particular utility, correct?

A. It might.

Q. Now, we've talked a bit about some of

the assumptions that go into the inputs of your model, and now, I want to shift gears a little bit and talk about outputs or results of those models.

Now, Ms. Supko, you'd agree that the amount of additional at-reactor storage you've calculated has changed over the course of the various expert reports you've authored in the spent fuel cases, correct?

A. Yes, in part because I've used different information or made different -- used a different methodology to calculate.

Q. Now, Ms. Supko, what I have just put up here is Supko Demonstrative 5, and what Supko Demonstrative 5 is, is a summary of your table two from five different cases, and I want to walk through them with you.

Now, in the Commonwealth Edison case, which was, I believe, the second expert report you issued in the spent fuel cases, you assumed under a 3000 rate of acceptance that there would be 1600 MTUs of additional at-reactor storage under scenario one, correct?

A. Yes.

Q. And in the report after that, the SMUD

case, that number went down to 600 MTUs, correct?

A. Yes.

Q. Now, the reason for that drop was that you changed the way that you were modelling the calculation of additional at-reactor storage, correct?

A. Yes, somewhat. In Commonwealth Edison, I modelled a strict oldest fuel first by pool. For example, looking at the chart, if we can bring up the, just the chart that's on the floor there, I'll just give an example.

Q. Which chart would you like?

A. That one right there.

Q. The one in my hand?

A. Yeah.

Q. The Supko Demonstrative 2?

A. Thank you. Palos Verdes is actually three nuclear power plants, and they all have separate pools, and when I modelled Palos Verdes in Commonwealth, I assumed that when Arizona Public Service was using their acceptance allocation, they would be used from -- the acceptance rights would go to the pool from which they were granted.

In SMUD, I changed that and assumed they would shift them from whichever pool needed it, which is the way a company would actually operate.

Q. So just so I understand, the 1000 MTU drop is the result of your failure to consider linking a utility that had dry storage in 1998 with its wet pool, is that correct?

A. No. If it's a strict oldest fuel first by pool rather than by site, in the SMUD and Southern Nuclear cases, I linked, allowed the shipments to occur from any pool at that site. The other thing that I did is I also -- there were maybe eight or nine plants that had dry storage prior to 1998, and most of the fuel that's in dry storage is the older fuel.

The companies would actually likely ship from their pools and not from dry storage. I also attempted to link that together.

Q. That's, I think, what I was just talking about with you, and so when you connected that the dry storage and the pool, that's one of the reasons why the numbers in Com Ed to SMUD dropped by 1000 MTUs, correct?

A. That's part of it, but that's not the

whole reason. The other reason was just linking or allowing the shipment of spent fuel from any pool on a given site.

Q. Now, you just mentioned Southern Nuclear. You, again, calculated 600 MTUs under your scenario of the 3000 rate. Now, in the South Carolina report, it then goes from 600 to 1030 MTUs, correct?

A. Yes.

Q. And the reason for that 430 MTU increase from your report in Southern Nuclear and South Carolina was because you underestimated the storage requirements at the eight sites that had dry storage as of 1998, correct?

A. Well, during my -- I believe it was my Southern Nuclear deposition, it was clear to me that the results of my model were not -- and how the results were calculated were not transparent to the government and its consultants. There's input, and there's output, and I wasn't certain that you were able to understand all of my output files because it's a Fortran code and it's ASCII characters.

And so in order to make my analysis

correct?

A. Yes.

Q. And once you conducted that sensitivity analysis of intrautility exchanges, that significantly changed the numbers for calculation of additional at-reactor storage, correct?

A. Well, one would expect that the additional storage requirements would drop as my analysis shows, and I believe my qualitative analysis in Commonwealth Edison stated that, and I quantified it in subsequent analyses.

Q. And once you quantified it, that significantly dropped the number of additional storage requirements, correct?

A. Absolutely.

Q. I want to change gears for just one second and talk about your publications. I think you list a number of them in your written direct testimony. You've published several articles in peer reviewed publications, correct?

A. Yes.

Q. And none of your peer reviewed articles discuss the methodology for

determining the reasonableness of a particular rate of acceptance, correct?

A. That's correct.

Q. I'm going to change gears just a couple more times. Your industry wide model projects that DOE will accept 90,000 MTUs of spent fuel over a 40-year period, correct?

A. The scenario that assumes licenses, nuclear power plants operate for 40 years, calculates approximately 90,000 metric tons, yes.

Q. And you assume that DOE will in fact accept all 90,000 MTUs, correct?

A. Yes. That's also the way the Department of Energy models spent fuel acceptance in its calculation of the adequacy of the Nuclear Waste Fee. They assume that they will accept all fuel in an uninterrupted manner.

Q. Now, you're aware in 1987, Nuclear Waste Policy Act amendments limited DOE to a single repository at 70,000 MTUs, correct?

MR. SILBERG: Objection, calls for legal conclusion. We're also getting into areas that are, it seems to me, beyond the

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: Systems Fuels v. U.S

HEARING DATE: September 22, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 9/22/06

Cynthia R. Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 8, 2006
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)

a little while ago. It was about a dozen, but for the most part, it is reflective of information that was available in 1998 because pool capacities haven't changed.

Q. And in your but-for world model, Ms. Supko, you have Prairie Island in dry storage, correct, prior to 1998?

A. Yes, because they had dry storage, maybe I should call this a hybrid because I was trying to reflect the world as it existed in the real world as of 1998, and my projection went from there out. I did not attempt, and I haven't actually thought of that, I was attempting to reflect what had occurred up to 1998 and then project from there on.

Maybe if I had just assumed that there was no fuel in dry storage at any plant prior to 1998, to see how those -- I did not do that analysis.

Q. So this model, Ms. Supko, as you just described, it's a hybrid between the actual world and the but-for world, correct?

MR. SILBERG: Objection, she characterized it as a model that showed things as they were in 1998.

THE COURT: Well, I think the witness self-described this as possibly better referred to as a hybrid.

THE WITNESS: Yes, you know, it's difficult to think about where to draw the line in terms of the actual world that the nuclear companies have been operating in and the imaginary but-for world. As I said, I suppose I could have assumed no dry storage into any plant and to see where that would lead into in the analysis.

Or I could have hypothetically changed pool capacities, assuming companies would have reracked. I did not do that. I used information I had available. And I will, again, remind you that this is a projection, these are projections. They're based on a set of inputs, and if you change the input, you make it a different calculation of additional storage requirements.

But it's not going to be something that's going to be significantly different than what's represented in my expert report or in the government's Supko Demonstrative 1 in terms of overall results.

CERTIFICATE OF REPORTER

DOCKET NO.: 98-484C.

CASE TITLE: Northern Power States v. U.S

HEARING DATE: November 8, 2006

LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 11/8/06

Cynthia Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

7/14/05
WEPCO
8.1.1

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0501

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0501

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2

**© 2005 Energy Resources International, Inc. All Rights Reserved.**

Prepared For:

Wisconsin Electric Power Company

Prepared by:

Eileen M. Supko

July 14, 2005

Eileen M. Supko 7/14/05

**1015 18th Street, NW, Suite 650**
**Washington, DC 20036**
**USA**
**Telephone: (202) 785-8833**
**Facsimile: (202) 785-8834**

## NOTICE

This report contains information proprietary and confidential to Energy Resources International, Inc. (ERI). It is for the use of Wisconsin Electric Power Company and, except for such use, reproduction of this report, or parts thereof, in any form is expressly prohibited without the written permission of ERI. The report, in its entirety or portions thereof, may not be given to other parties without the written permission of ERI.

ERI believes the information in this report to be accurate. However, neither ERI nor any of its subcontractors make any warranty, express or implied, nor assume any legal liability or responsibility for the accuracy, completeness, or usefulness of any information contained herein, nor for any consequent loss or damage of any nature arising from any use of this information.

## TABLE OF CONTENTS


| | | |
|---|---|---|
| 1. | Scope of Report and Summary of Opinions | 1 |
| 2. | Background and Qualifications | 1 |
| 3. | Methodology Used and Materials Considered in Reaching Opinions | 3 |
| 4. | Overall DOE Acceptance Rate for Commercial Spent Fuel | 5 |
| 5. | Description of ERI Spent Fuel Model | 7 |
| | 51 SPNTFUEL Description | 7 |
| | 5.2 Acceptance Priority | 7 |
| 6. | Point Beach Spent Fuel Acceptance Rights | 9 |
| | 6.1 Projection of Acceptance Rights Under 1998 Non-Breach Scenario | 9 |
| | 6.2 Projection of Acceptance Rights Under 2010 Actual Scenario | 9 |


## LIST OF TABLES


| | | |
|---|---|---|
| Table 1 | System Wide DOE Spent Fuel Acceptance Rates | 6 |
| Table 2 | Spent Nuclear Fuel Historical and Projected Discharges, Point Beach Units 1 and 2, 60 Year License Term, Based on 2002 RW-859 Data | 10 |
| Table 3 | Projection of Point Beach Spent Nuclear Fuel Acceptance Rights, 1998 Non-Breach Spent Fuel Acceptance Scenario | 11 |
| Table 4 | Projection of Point Beach Spent Nuclear Fuel Acceptance Rights, 2010 Actual Spent Fuel Acceptance Scenario | 12 |

## APPENDICES

Appendix A Projection of Spent Fuel Discharge Information Using SPNTFUEL
Appendix B Detailed Resume of Eileen M. Supko
Appendix C Publications List, Eileen M. Supko
Appendix D Written Materials Reviewed By Eileen Supko in Preparing This Report

## 1. SCOPE OF REPORT AND SUMMARY OF OPINIONS

I have been asked by Perkins Coie LLP, Counsel for Wisconsin Electric Power Company (Wisconsin Electric), to offer an expert opinion regarding the rates at which the U.S. Department of Energy (DOE) would accept spent nuclear fuel assemblies from Wisconsin Electric's Point Beach Units 1 and 2, assuming an overall acceptance rate of 3,000 MTU per year. It is my understanding that ERI's projections of spent fuel acceptance rights for the Point Beach nuclear plant provided in this report will support calculation of the damages that Wisconsin Electric has or will incur as a result of the DOE's failure to commence acceptance of spent nuclear fuel (SNF) from commercial nuclear power plants by January 31, 1998.

As described more fully below, I have calculated spent fuel acceptance rights for Point Beach Units 1 and 2, based on an overall steady-state spent fuel acceptance rate of 3,000 MTU per year, with a five year ramp up. Had DOE begun acceptance of spent nuclear fuel by January 31, 1998, in accordance with the Nuclear Waste Policy Act of 1982 (NWPA) as amended and the Standard Contract[1], I have determined that the first spent fuel acceptance rights for Point Beach would have occurred in 1998 and the final spent fuel would have been accepted by the DOE by 2038.

I have also calculated the spent fuel acceptance rights for Point Beach Units 1 and 2 based upon the presumption that DOE will not begin acceptance of spent fuel until 2010, at the earliest using the overall rates identified above. Under this scenario, I have determined that the first spent fuel acceptance rights for Point Beach would occur in 2010 and the final spent fuel would be accepted by 2049.

ERI's fees for this engagement range from $170 to $255 per hour and are not contingent in any way upon my findings.

## 2. BACKGROUND AND QUALIFICATIONS

I am a senior consultant and an owner of Energy Resources International, Inc. (ERI).

I hold a bachelors of science degree in Nuclear Engineering from Pennsylvania State University. From 1985 to 1990, I was employed by Carolina Power and Light Company (now Progress Energy), a nuclear operating company, as a Nuclear Fuel Projects Engineer and then a Nuclear Services Department Incore Analysis Engineer. At Carolina Power and Light Company, my responsibilities included nuclear fuel procurement and nuclear reactor core design and analysis. As a function of nuclear reactor core design and analysis work that I performed, I was responsible for ensuring that the nuclear fuel and nuclear reactor

[1] U.S. Department of Energy, *Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*, Title 10, U.S. Code of Federal Regulations, Part 961 (Standard Contract)

core operated within the regulatory limits approved by the U.S. Nuclear Regulatory Commission (NRC) in the plant license. I joined ERI in 1990. I have extensive experience in providing advice to clients in the areas of spent nuclear fuel, nuclear waste management and radioactive materials transport, and I analyze the technical, economic, regulatory, legislative, and policy issues associated with the storage, acceptance, transport, and disposal of spent nuclear fuel and high-level radioactive waste. My clients include nuclear power plant operating companies, a foreign government, industry organizations, private companies, and a private spent fuel management organization.

ERI has developed a computer model, SPNTFUEL, that has the capability to model spent fuel acceptance rates, determine acceptance rights for individual nuclear power plants, and determine the effect of these acceptance rates on utility requirements for additional spent fuel storage capacity, including the amount of time that spent fuel must remain at nuclear power plant sites following plant shutdown for decommissioning. SPNTFUEL also has the capability to project nuclear power plant discharge data, including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup. In *Indiana Michigan Power Company v. United States*, the parties stipulated that the ERI and DOE computer models used to project spent fuel discharges and acceptance rates rely on similar assumptions and similar input data. Further, the parties stipulated that "the annual acceptance allocations calculated by either the ERI or DOE models should not result in any material differences for the purposes of assessing damages."[2] Additional details regarding the SPNTFUEL program can be found in Appendix A to this report.

On behalf of clients, using the SPNTFUEL model, I have analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. These analyses have been performed to determine the effect of DOE acceptance rates on the commercial nuclear power plants' spent fuel storage requirements, for the overall U.S. nuclear industry, and for individual nuclear power plants as requested by individual clients. Acceptance rate analyses that I have performed include analysis of postulated DOE acceptance rates for nuclear industry organizations; analysis to support nuclear industry legislative efforts regarding changes to the DOE waste program in the 1990s; analysis on behalf of the nuclear industry of proposals to "take title" to spent nuclear fuel; spent fuel acceptance scenarios to support individual client decommissioning analyses; and spent fuel acceptance scenarios to support individual client spent nuclear fuel damages claims, such as the analysis supporting this case.

I have been a direct participant in technical exchanges between the nuclear industry and DOE since 1990 regarding such topics as DOE plans for accepting commercial SNF, industry positions on outstanding Standard Contract issues, and DOE's conceptual designs

[2] Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004 (2004 Joint Stipulation).

for surface facilities for acceptance of commercial SNF. I have assisted in the preparation of nuclear industry comments and feedback on various DOE program documents, including but not limited to Mission Plans, Annual Capacity Reports, Acceptance Priority Ranking reports, Environmental Impact Statement documents, and transportation plans. My detailed resume is attached as Appendix B, providing additional details on my background and qualifications as an expert in this matter.

In addition to numerous client-specific analyses, evaluations, and reports, over the past fifteen years I have authored over 35 reports, presentations, and publications in leading nuclear energy journals and have been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. A detailed list of my publications and presentations is attached as Appendix C.

## 3. METHODOLOGY USED AND MATERIALS CONSIDERED IN REACHING OPINION

In developing my expert opinions regarding spent fuel acceptance rights for Point Beach Units 1 and 2, I have reviewed DOE and DOE contractor methodologies for the projection of spent nuclear fuel discharges[3,4] as well as DOE's model for projecting spent nuclear fuel discharges. I also have reviewed DOE's recently published Acceptance Priority Ranking and Annual Capacity Report.[5] I have reviewed the Standard Contract and associated documents such as Annual Capacity Reports and Acceptance Priority Rankings. I have incorporated into my SPNTFUEL database the historical and projected spent fuel discharge information provided to the DOE by nuclear operating companies through DOE form RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859). Assuming similar input assumptions, both the DOE model and ERI's SPNTFUEL model will result in similar projected spent nuclear fuel acceptance rights for individual nuclear power plants.[6]

As requested by Counsel, ERI has calculated the rate at which the DOE would accept spent nuclear fuel from the Point Beach nuclear plant under two scenarios using the SPNTFUEL computer model: (1) a 1998, "Non-Breach" spent fuel acceptance scenario that projects the rate at which the DOE would have accepted spent fuel from Point Beach had it begun acceptance of spent fuel in 1998; and (2) a 2010, "Actual" spent fuel acceptance scenario that projects the rate at which the DOE is expected to accept spent fuel from Point Beach if

---

[3] Bechtel SAIC Company, LLC, "Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges," TDR-WAT-NU-000002 Rev 1, February 2002.

[4] McLeod, Barrie, JAI Corporation, and Pollog, Thomas, U.S. DOE, "Methodology for the Projection of Spent Nuclear Fuel Discharges," conference paper, date unknown.

[5] U.S. DOE, OCRWM, *Acceptance Priority Ranking and Annual Capacity Report,* DOE/RW-0567, July 2004.

[6] 2004 Joint Stipulation.

it were to begin receipt of spent nuclear fuel at a Yucca Mountain repository in 2010. This report presents spent nuclear fuel acceptance rights for Point Beach Units 1 and 2 on an annual MTU basis. The acceptance rights calculated by ERI's SPNTFUEL model are based on a plant-by-plant, oldest-fuel-first (OFF) acceptance priority ranking.

Counsel for Wisconsin Electric requested that I assume that DOE would begin overall acceptance of spent fuel at a Yucca Mountain repository in 2010. While this analysis assumes that DOE will begin acceptance of spent fuel at a repository in 2010, recent evidence regarding DOE's repository schedule leads me to conclude that DOE will not begin operation of a repository by 2010.[7] Nonetheless, I understand that Wisconsin Electric, in order to simplify its damages presentation at trial, has based its damages calculations in this proceeding on an assumption that DOE will begin spent fuel acceptance at a repository in 2010.

A list of the written materials that I have reviewed and considered in forming my opinions in this report is included in Appendix D. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional rationale for these opinions as additional documents are produced, the transcripts of expert and fact witness depositions become available for my review, and new facts are introduced during discovery and trial.

[7] For example: (1) On July 9, 2004, the U.S. Court of Appeals for the D.C. Circuit invalidated the Environmental Protection Agency's radiation protection standards for Yucca Mountain and the Nuclear Regulatory Commission rule insofar as it incorporates the EPA's radiation protection standard. The court directed the EPA to rewrite the standards. EPA has announced that it expects to issue a draft standard for comment in mid to late 2005. This new standard will have to go through a rulemaking process. (2) Under NRC regulations, the DOE is required to certify to the NRC that all of the documents on which it will rely during the licensing proceeding for Yucca Mountain are electronically available six months prior to DOE's submittal of its license application to the NRC. DOE made its initial certification on June 30, 2004, to support a December 2004 license application submittal. In an order issued in August 2004, an NRC licensing board ruled that DOE's certification did not meet the NRC regulations. DOE has reported to the NRC that it expects to recertify its licensing documents in August 2005. (3) In November 2004, DOE announced that it would miss its scheduled date of December 2004 for submittal of a license application (LA) for construction authorization for the proposed Yucca Mountain repository. DOE has stated that it plans to complete its LA by the end of 2005, but it has not announced a firm schedule for submittal of the LA. (4) DOE resumed the Delivery Commitment Schedule (DCS) process in July 2004 only to cancel the process in December 2004, saying that recent developments relating to the FY 2005 budget and other issues led DOE to conclude that the resumption of the DCS process was premature and that the DCS process would resume when DOE has determined a revised date for the initial operation of the Yucca Mountain repository. (5) In February 2005, Margaret Chu, then-OCRWM Director, stated that DOE was "hoping" that a repository would be available in 2012. In March 2005 during testimony before Congress, an OCRWM official presented funding profiles assuming a 2012 or 2015 date for the start of repository operations.

## 4. OVERALL DOE ACCEPTANCE RATE FOR COMMERCIAL SPENT FUEL

As requested by Counsel for Wisconsin Electric, ERI's analysis of acceptance rates for both the 1998 Non-Breach and a 2010 Actual spent fuel acceptance scenarios assumes that the overall rate of spent fuel acceptance by the DOE would reach a 3,000 MTU steady-state rate within a five-year ramp up period.

The overall spent fuel acceptance rates used in this report assume that the DOE would accept 400 MTU in the first year of spent fuel acceptance, 600 MTU in the second, 1,200 MTU in the third, 2,000 MTU in the fourth year, and 3,000 MTU thereafter until all spent nuclear fuel has been removed from civilian nuclear power plants. The five-year ramp up period assumed in ERI's analysis is consistent with recently published DOE Total System Life Cycle Cost Analysis (TSLCC)[8,9] which DOE has used as the basis for determining the overall cost of the disposal program to ensure that the fees collected from nuclear power plant operators are adequate to cover the life cycle costs of the program, as well as a recent DOE Annual Capacity Report.[10] It is my opinion that this ramp up rate represents a reasonable ramp up period and annual acceptance rate for the start of repository operations.

A summary of the system-wide spent fuel acceptance rates used in this study for the 1998 Would-Have-Been and the 2010 Actual spent fuel acceptance scenarios is provided in Table 1.

[8] U.S. Department of Energy, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0510, December 1998, Table 3 (1998 TSLCC).

[9] U.S. Department of Energy, *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, DOE/RW-0533, May 2001, Table 4-1 (2001 TSLCC).

[10] U.S. Department of Energy, *Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW-0567, July 2004.

**Table 1 System-Wide DOE Spent Fuel Acceptance Rates**

| Year | 3000 MTU Base Case Acceptance Rates | |
|---|---|---|
| | 1998 Non-Breach Scenario (MTU/Year) | 2010 Actual Scenario (MTU/Year) |
| 1998 | 400 | |
| 1999 | 600 | |
| 2000 | 1,200 | |
| 2001 | 2,000 | |
| 2002 | 3,000 | |
| 2003 | ... | |
| 2004 | ... | |
| 2005 | ... | |
| 2006 | ... | |
| 2007 | ... | |
| 2008 | ... | |
| 2009 | ... | |
| 2010 | ... | 400 |
| 2011 | ... | 600 |
| 2012 | ... | 1,200 |
| 2013 | ... | 2,000 |
| 2014 | ... | 3,000 |
| Thereafter... | 3,000 | 3,000 |

# 5. DESCRIPTION OF ERI SPNTFUEL MODEL

## 5.1 SPNTFUEL Description

In forming my opinions, I have projected spent fuel acceptance rights for spent fuel discharged from Point Beach Units 1 and 2 using the SPNTFUEL model. Appendix A describes how the SPNTFUEL program calculates future spent fuel discharges along with a description of the various input parameters and assumptions.

According to Article IV of the Standard Contract, contract holders are required to provide DOE with information on actual discharges and projected discharges on a periodic basis as determined by DOE. This data is submitted to DOE's Energy Information Administration (EIA) by nuclear operating companies via DOE Nuclear Fuel Data Form, RW-859. DOE requested submittal of RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859). The projection of spent fuel acceptance rights for Point Beach is based on industry-wide historical spent fuel discharges from U.S. commercial nuclear power plants as reflected in the 2002 RW-859 data. In addition to historical discharge data, the RW-859 database also includes five cycles of projected spent fuel discharges provided to DOE by contract holders. ERI's SPNTFUEL database has been updated to reflect the historical and projected spent fuel discharge data contained in the 2002 RW-859 data.

Since the RW-859 data only includes five cycles of projected spent fuel discharges for nuclear power plants, ERI must project additional spent fuel discharges for each plant through the end of its operating license. SPNTFUEL is capable of projecting future spent fuel discharges for each operating nuclear power plant. The projected spent nuclear fuel discharge data calculated with SPNTFUEL are used in combination with historical and projected RW-859 data to determine the overall spent fuel acceptance queue. SPNTFUEL then applies the overall DOE acceptance rate, as identified in Table 1, to determine the acceptance rights for Point Beach Units 1 and 2.

## 5.2 Acceptance Priority

Since DOE's acceptance capacity will be finite in any given year (e.g., up to an overall rate of 3,000 MTU), DOE must allocate the annual spent fuel acceptance capacity to contract holders[11] using a priority ranking process. According to the Standard Contract,[12] the priority ranking for assigning spent fuel acceptance rights to the contract holders is based on the age of the SNF as determined from the date that the SNF was permanently discharged from the contract holders' nuclear power plant(s). This priority ranking

[11] The term "contract holders" refers to companies who have signed the Standard Contract with DOE.

[12] Standard Contract, Article IV.B.5 and Article VI.B.1(a).

methodology is typically referred to as "Oldest Fuel First"[13] or "OFF." For example, the age of each fuel assembly discharged from Wisconsin Electric's Point Beach nuclear plant determines the relative position of this fuel in the spent fuel acceptance "queue" (i.e., the chronological list of all spent fuel permanently discharged from all commercial nuclear power plants). Spent fuel acceptance "rights" are expressed in MTU of allocated acceptance capacity.

It should be noted that while the Standard contract priority ranking is based on an OFF methodology, the Standard Contract contains additional provisions that might affect the acceptance of spent nuclear fuel, providing additional flexibility to contract holders. For example, the Standard Contract, Article V.E, "Exchanges," allows Standard Contract holders the right to exchange delivery commitment schedules with other Standard Contract holders. The contract provision allows DOE to approve or disapprove any such exchanges within thirty days after receipts. The Standard Contract, Article V.B.2, also allows Contract holders to "adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until submission of the final delivery schedule."

[13] DOE, *Annual Capacity Report, DOE/RW-0294P*, December 1990, p. 8-9.