engineering from Texas A & M University from 1955. Post graduate work at Ohio State in business management. Did not get my master's.

Q. Are you currently employed?

A. Happily retired.

Q. What is your age, sir?

A. Geez, 69.

Q. Have you ever been deposed before?

A. No.

Q. By the way, if you'd like coffee or water, they're here.

A. Thank you.

Q. Could you summarize for me your employment history after graduating from college?

A. Okay. Convar, C-o-n-v-a-r, in San Diego. Also now known as General Dynamics. I was an engineer in the Atlas missile program. Four years in the Air Force mostly Wright Field, some part of it flight training in North Carolina. After that, I went to work for General Precision which was in commercial navigation guidance and business, worked in Huntsville, Alabama for General Precision and for Ford Motor Company aerospace division, it's Ford Aerospace now, also in Huntsville. Then moved to California in '64 and worked as the manager of marketing for the defense

products group at Ford Aerospace or Ford Aeronautronic, A-e-r-o-n-a-u-t-r-o-n-i-c, as it was known in those days. After Ford, I worked for Merrill Lynch in Santa Ana, eight years as a stockbroker, eight or nine. And left there to go to Columbia Engineering in Richland, Washington which was a job shop type operation. I was about to buy a partnership in it when the world fell in so I didn't buy.

Q. What year was that, just a time frame on it?

A. '77, '78, somewhere in that area. And after that, I worked at Battelle, B-a-t-t-e-l-l-e, in Richland for 16 years at which time I retired.

Q. Could you tell me the years at which you worked at Battelle?

A. Probably '78 to '95. Or '95 minus 16. That's the best way to go at it.

Q. '95 minus 16; okay.

A. Memory is the second thing to go.

Q. Sounds like about 1981 to me?

A. Sounds good.

Q. Or maybe no, 1979. My math is not so good.

A. Whatever. Pick a number. So that's the history. Left there, all the kids got out of college, at Washington State, WSU, they all moved to California. I said what the hell are we doing here. Came back to

California.

Q. You moved back down here in 1995?

A. No. It was '97, I believe. February of '97.

Q. And you've been retired here in California since 1997?

A. Yeah. Retired in '95.

Q. All right. I'd like to focus on your work at Battelle. Can you tell me what your duties were during the 16 years you worked there, tell me about what you did?

A. Sure. I started off in what they call program management which was Battelle was trying to become certified by the government as some special management, have a special management capability based on -- are you familiar with PERT charts and all of that?

Q. I would make no assumptions about my knowledge.

A. Program management by the books is what it amounts to. Spent four years doing that, writing procedures for Battelle on how to implement the management of programs, supposedly the most cost-effective method to meet their objectives.

Then I worked on loss of coolant program, which was a nuclear program we ran out of Battelle and used the nuclear facilities, Chalk River in Canada,

Northwest Labs; is that the same organization?

A. Battelle is the corporate structure out of Ohio. Columbus, Ohio. PNL, Pacific Northwest Laboratories, operated an independent Battelle facility and managed the government operations at Richland, Washington. Partly government operations, the research part. It's since been renamed Pacific Northwest National Laboratory, PNNL. It's operated by Battelle/PNNL for DOE, DOE/ER, I think, research department.

Q. So your corporate employer was Battelle?

A. Yes.

Q. And within Battelle you were working at PNL?

A. PNL. That's fine.

Q. Can you tell me a little bit about what was happening contractually between the Department of Energy and Battelle/PNL? Do you understand my question?

MR. BANES: Objection. Vague.

BY MR. TOMASZCZUK:

Q. Do you understand my question?

A. Yes. Every five years DOE evaluated Battelle's ability to meet their needs at the research lab in Pacific Northwest Laboratory. If we were doing a good job, we always did, they renewed the contract.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

1

## DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 1, Pgs. 1 - 212

C&C Court Reporting
541/485-0111 • 172 East 8th Avenue • Eugene, Oregon 97401
1-800/344-0983 • FAX 541/485-0926 • Salem Office 503/362-9193
E-MAIL depos@ccreporting.com • INTERNET http://www.ccreporting.com

CERTIFIED COPY

Q. Are you currently employed, Mr. Morgan?

A. No.

Q. Are you retired?

A. Yes.

Q. How long have you been retired?

A. I retired from the Government in 1988, worked for a small 8(a) company in Washington, D.C., for five years after that, and have consulted with several people and companies up until last year.

Q. Let's go backwards. Who have you consulted for since you worked for the 8(a) company? Let me ask you a different way since that rocked you back in your chair.

A. There are numerous companies and corporations.

Q. On what subjects have you consulted?

A. Mainly defense program activities within the Department of Energy.

Q. Have you consulted for any electric utilities that you know of?

A. Yes.

Q. Who are they?

A. It was the V.G. Sumner plant in

South Caroline when they were proposing to use their reactor for tritium production.

Q. All right, sir. Anybody else?

A. Any other utilities?

Q. Yes, sir.

A. None.

Q. Have you consulted at all with the United States Department of Energy?

A. Indirectly for their contractors.

Q. For which DOE contractors have you consulted?

A. Kaiser in Los Alamos. Sandia in Albuquerque. I can't recall of any other directly for Department of Energy.

Q. Since you left the 8(a) company, have you consulted with any entity on issues that involve the management, storage, or disposal of spent nuclear fuel?

A. I have not.

Q. What was the 8(a) company that you worked for?

A. Meta, M-e-t-a.

Q. What business is it in?

A. We were doing environmental assessments for the Department of Energy.

Q. And the years you worked for Meta, that was 1988 through 1993? Is my math right?
A. I think there was a year in between -- or two years that I consulted. I started working for them in 1990 and ended in 1995.
Q. Did any of your work for Meta involve spent nuclear fuel in any way?
A. It did not.
Q. Is there a two-year period between '88 and '90 when you also consulted? Did I understand that correctly?
A. Yes. That's correct.
Q. Did any of your consulting work during that period involve spent nuclear fuel?
A. No.
Q. Did any of that work -- was any of that work for electric utilities during that period of time?
A. I think it was that period of time that I did the consulting at the V.G. Sumner plant.
Q. On tritium production?
A. Yes. I'm not sure of the dates.
Q. Does that take us back to the date of your retirement from the Government?

A. Yes.

Q. What was your position when you retired from the Government?

A. Manager, the Savannah River Operations Office in Aiken, South Carolina.

Q. What does the Savannah River site -- What is the Savannah River site?

A. What is it?

Q. Yes, sir. What is it?

A. It's basically a material production site for the production of plutonium and tritium for nuclear weapons. It ran four production reactors, two separation canyons, waste tank area, and tritium loading facilities.

Q. Are there other resource and development activities that go on at Savannah River other than weapons production?

A. No.

Q. How long were you in that job?

A. Seven years.

Q. So that takes us back to 1981?

A. That's correct. No. Excuse me. Eight years. Eight years as manager, then seven years as deputy manager. So I was at Savannah River for 15 years.

During that period I had various details to Washington, D.C., where I commuted.

Q. Describe for me, if you would, what a "detail" is in U.S. Government parlance?

A. A detail is an assignment to a specific job at another location.

Q. Check my math, but in some form or fashion you were at Savannah River either as manager or deputy manager from 1973 to 1988. Is that accurate?

A. '73 to '88. Yes. Yes, that's correct.

Q. What details were you assigned to during that 15-year period away from Savannah River?

A. Acting Assistant Secretary for Defense Programs on two occasions.

Q. Do you remember the dates?

A. No, I don't.

Q. All right, sir.

A. I think I can construct that for you. The first time was in February after the inauguration of President Reagan. And I held that job for about six months until a political appointment was made.

Then was detailed to Washington just after the passage of the Nuclear Waste Policy Act from February -- I guess it was 1983 -- through the about one-year period.

I was again detailed as Acting Assistant Secretary for Defense Programs, again awaiting a new appointee in that position, and that lasted for approximately six months.

Q. What was the scope of your authority as Acting Assistant Secretary for Defense Programs? What does that include?

A. The entire weapons complex, which included the laboratories -- Sandia, Livermore, Los Alamos -- and all the weapon production facilities, which included Savannah River; Rocky Flats; Richland; Oak Ridge, Tennessee. And that's all I can -- oh, Pantex plant in Amarillo and Bendix plant in Kansas City. Approximately about a $5 billion operation.

Q. After your detail to -- your second detail as Acting Assistant Secretary for Defense Programs, did you return to Savannah River?

A. Yes, I did.

Q. And did you stay at Savannah River until your retirement?

A. That's correct.

Q. There were no further details after that?

A. No.

Q. As Acting Assistant Secretary for Defense Programs, were you involved at all in the issues of spent nuclear fuel management or storage?

A. Only the spent nuclear fuel from the defense program activities. Nothing to do with commercial fuel.

Q. All right. At that time was defense spent fuel intended to be part of the DOE program that was initiated under the Nuclear Waste Policy Act?

A. During the last detail, that's correct.

Q. That would have been from the first quarter of '84 until --

A. Mid -- until mid --

Q. I didn't get how long that lasted.

A. I think that one was about six months.

Q. As manager of the Savannah River site, did you also have some involvement with

spent fuel produced in weapons production?
A. Yes.
Q. In that job did you have any involvement in the DOE spent fuel program at all?
A. The commercial spent --
Q. Yes, sir.
A. None.
Q. All right. Prior to Savannah River, just briefly describe your career for me, prior to 1973.
A. I had graduated from the Military Academy in 1952, was commissioned, spent 13 years in the Army Corps of Engineers.
First assignment was the Korean War; second in Japan; third, 82nd Airborne at Fort Bragg; fourth was a year in Indonesia as a special assistant to the Ambassador for Civic Action; and then resigned my commission in 1965 and went to work for the DOE -- or the Atomic Energy Commission at that time.
Q. What was your job at the AEC?
A. Director of the heavy water organic tool reactor program at Savannah River for one year from '65 to '66.

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC COMPANY, PLAINTIFF, ) CA NO. 98-126C
VS.
THE UNITED STATES, DEFENDANT.

MAINE YANKEE ATOMIC POWER COMPANY, PLAINTIFF, ) CA NO. 98-474C
VS.
THE UNITED STATES, DEFENDANT.

CONNECTICUT YANKEE ATOMIC POWER COMPANY, PLAINTIFF, ) CA NO. 98-154C
VS.
THE UNITED STATES, DEFENDANT.

ORIGINAL

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

the other things that I'm doing, I'm doing through MTR.

Q. All right. So I think you just may have answered this question, but this Management Technical Resources you described as your consulting company, would you say generally you are employed in the consulting business?

A. Beg your pardon?

Q. Are you today generally employed in a consulting business? Is that what you do for a living?

A. On a part-time basis, yes.

Q. Part-time basis?

A. Yes. It's far from full-time.

Q. And the other part-time is what? Are you --

A. My wife's husband and my son's father and so forth.

Q. Play golf?

A. I occasionally go out, but some would argue whether I play.

Q. All right. What business is this Swedish nuclear company in? And are they -- is it a generating company?

A. No. They are a waste treatment company.

Waste Policy Act?
MR. MILLER: Objection. Compound.
THE WITNESS: What does that mean?
MR. MILLER: Go ahead. Go ahead and answer.
THE WITNESS: I did not, other than being aware with the Secretary that it was a matter that needed urgent attention.
Q. (Mr. Stouck) So during '81, '82 you were aware or is it true that the legislation was being developed at that time, do you know, or --
A. I do not know, but I presume so.
Q. But you weren't working on it?
A. I was not.
Q. Directly?
A. Not directly.
Q. Or indirectly?
A. Or indirectly.
Q. Okay. Back up to you were appointed as director of OCRWM, I believe, in early 1984; is that right? Do you recall when you started?
A. When I started or when the appointment was?
Q. Well, when was the appointment? Let's start with that.

A. I think it was in January of '84 that I visited the White House. And the appointment followed thereafter.

Q. And when did you actually start working?

A. March, I believe, of '84 I was confirmed.

Q. Okay. And can you tell me generally -- we're going to come back to some of these things and go into a little more detail, but from 1984 -- when did you leave the Department? I think you said -- earlier today you said early 1988, I think is what you said?

A. I believe -- I believe that my actual retirement date from the Department was late November of '87.

Q. Okay. Well, starting in March of 1984, you know, when you started as director can you just tell me first generally, and as I say we'll come back to some of these things in more detail, but what were your major duties? What were you working on, let's say, when you first got there? What was the task?

A. I think the most explicit statement that I could refer to would be my confirmation statement.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

(Caption continued on the next page)

Deposition of LAKE H. BARRETT

Washington, D. C.

Monday, April 22, 2002

9:31 a.m.

CERTIFIED COPY

Job No.: 11792-4

Pages 1 through 272, Volume 1

Reported by: Diane Gomez, RPR

L.A.D. REPORTING COMPANY, INC.
1100 Connecticut Avenue, NW • Suite 1150, Washington, D.C. 20036 • 202.861.3410
Fax: 202.861.3425 • 800.292.4789 • Website: ladreporting.com • E-mail: lisa@ladreporting.com
NATIONWIDE COURT REPORTERS AND VIDEOGRAPHERS

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

A In the last five years.
Q Before Congress? Have you testified anywhere in the last five years other than before Congress?
A What do you mean by testify?
Q You just referred to testimony you gave in the last five years, correct?
A Oh, Congress. Yes, I've testified before Congress regarding storage approval times in the last five years.
Q And you testified that the period in which -- the period that it would take to license an MRS facility would approximate 2.5 years, correct?
A It could be done that fast.
Q You testified to Congress that that was an appropriate projection of the required time, correct?
A I believe so. I would have to go back and look.
(Deposition Exhibit Barrett 5 was marked for identification and was retained by counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 5.

The first page states Annual Capacity Report Briefing for OCRWM Executive Committee, November, there's no date, 1986. Do you have that before you?

A Yes, I do.

Q Were you a member in November 1986 of the OCRWM executive committee?

A I don't think so.

Q In November 1986 you were a division director, correct?

A Correct.

Q And you don't believe that in that capacity you would have been a member of the executive committee?

A No, I was not then.

Q Have you taken a moment to leaf through this document?

A Okay.

Q I would like to turn your attention, on the left-hand side it says HQ 0002904.

A 290 --

MR. CRAWFORD: Wait a minute. Oh, I got you.

A Positions by decision group, current status?
Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?
A I see it.
Q That's consistent with your testimony today, correct, that --
MR. CRAWFORD: Objection.
MR. CAYNE: Could I finish, counsel.
MR. CRAWFORD: Sorry.
Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?
MR. CRAWFORD: Objection, vague.
A Seems consistent.
Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?
A Not the specific one.
Q Do you have a general understanding of the

system study being referred to here?

MR. CRAWFORD: Objection. Asked and answered.

A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.

Q And these system studies looked at system issues, correct?

A Yes.

Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?

MR. CRAWFORD: Well, objection, vague.

A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.

Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?

MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.

A Yes.

Q I'll ask you to turn to page HQ 0002909 of this same exhibit.

A Okay.

Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?

A I see it.

Q Do you understand that statement?

A No.

Q Do you understand that statement to refer

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Certified Copy

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

acceptance, it shows 2,200 pre-1998, yes.
Q. Okay. And the first table that we looked at, the one at page 26, makes no or does not rely upon the availability of an MRS, is that correct?
A. That's correct.
Q. I'm going to hand you, Mr. Brownstein, another document, Brownstein Exhibit 4.
Ms. Reporter, if you would mark it? And it is a document entitled, "Spent Fuel Acceptance Rate," and it appears to be an eight-page document with a Bates number stamped in the lower right-hand corner PNL-030-0063 through 0070.
(Brownstein Exhibit No. 4 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. I have no recollection of this document.
Q. So the answer to my question is no, you haven't seen it before today?

A. I don't believe I have seen it before today.

Q. You don't know who prepared it?

A. I can read the bottom of the page and know the organization that purportedly prepared it, but it says PNL.

Q. Do you recall any discussions with PNL personnel concerning the document?

A. I don't recall seeing the document before, so I do not.

Q. Could you read the first paragraph of the document?

A. Sure.

Q. You don't have to read it out loud. You can just read it to yourself.

A. Thank you.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Do you agree with the first sentence as stated in the first paragraph of this document?

MR. BANES: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: I do agree with it.

BY MR. TOMASZCZUK:

Q. You would agree the current contracts do not commit the department to accept spent fuel on any specific schedule?

A. I am agreeing to that, yes.

Q. And therefore do not provide a basis for utilities to plan for meeting their storage needs?

You agree with that part of the schedule?

A. Yes.

MR. BANES: Objection. Calls for a legal conclusion.

MR. TOMASZCZUK: I'm sorry. What about that calls for a legal conclusion?

MR. BANES: You're asking him about, to interpret the contract.

Every time you ask him to interpret the contract, we file a motion for summary judgment on the contract because it's a question of law and interpreting the contract, so every time you ask him to interpret the contract, I'm going to say calls for a legal conclusion.

BY MR. TOMASZCZUK:

Q. Well, I'm not sure I have asked you, at least in this most recent question, to interpret the contract, and it's not my intention to ask you for legal conclusions, but you were here for ten years, as I understand it, responsible for administering the contract, and I think it's fair that, that I should be entitled to ask you some questions about that, and that's what I'm going to purport to do.

Okay?

MR. BANES: I'm not going to prevent you from asking those questions.

I'm just going to preserve my objection for the record because it doesn't, we don't need testimony to interpret the contract.

MR. TOMASZCZUK: Well, we don't agree with that statement of the law, but we don't need to debate it here.

MR. BANES: Okay.

BY MR. TOMASZCZUK:

Q. Do you see the second sentence in this first paragraph, Mr. Brownstein?

A. Yes.

Q. Would you agree or disagree with that sentence as written?

A. Let me just read it again.
Q. Sure.
(The witness reviewed the document.)
THE WITNESS: Okay. I agree it says it discusses it, yes.
BY MR. TOMASZCZUK:
Q. Okay. Was it your understanding that DOE's intention was to begin to dispose of spent fuel at a rate which would allow utilities starting in 1998 to store their discharges in their pools?
MR. BANES: Objection -- vague as to the meaning of intention.
THE WITNESS: I really don't understand the question. I need you to --
BY MR. TOMASZCZUK:
Q. It may not have been very artfully worded.
This document, and in particular the second and third sentences of the first paragraph, as I read them, suggest to me that DOE was considering a commitment to begin in 1998 removing spent fuel at a rate which would be sufficient to allow storage in those pools of subsequent reactor discharges.

That's the subject we're talking about?
A. Yes.
Q. And my question to you is do you agree that that was DOE's intention at or about the time that this document was prepared in July of 1986?
MR. BANES: Objection -- vague.
THE WITNESS: I must tell you that contractor, contractors prepare a number of documents for many different parts of the organization to do many things.
I can agree with what this is. This is separate from the department policy.
Contractors do contractor work, provide input to the department. The department considers that.
So this is a contractor document, not a DOE document, and that's why I'm hesitating in your answers.
BY MR. TOMASZCZUK:
Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?

MR. BANES: Objection -- vague. Go ahead.

THE WITNESS: The best as I recall, the, you know, the goal of the department was, was to have the facilities available as soon as we could and start accepting waste as soon as we could and as much as we could.

That was a goal of the department.

BY MR. TOMASZCZUK:

Q. So it was not a specific goal, that the utilities would not need to expand their storage capacities after 1998?

A. That, that was a goal. That was a goal.

Q. And was that goal communicated to the utilities at any point in time?

A. To the best of my recollection, in, I believe that that may have been communicated in, for example, in Congressional testimony by the director of what the department's goals are.

It may have been reflected in documents.

I would have to look at them. It has been a long time.

(There was a pause in the

CERTIFICATE OF FILING

I hereby certify that on this 9th day of February, 2007, a copy of foregoing "DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS AND, IN THE ALTERNATIVE, MOTION *IN LIMINE* TO PRECLUDE RELIANCE UPON THOSE DESIGNATIONS AS SUBSTANTIVE EVIDENCE PURSUANT TO RCFC 32(a) AND FEDERAL RULE OF EVIDENCE 801(d)(2)," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan