IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 00-697C<br>(Senior Judge Merow) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO <u>EXCLUDE THE EXPERT TESTIMONY OF MS. EILEEN M. SUPKO</u>**

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

<u>Of Counsel</u>:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1675

Dated: February 20, 2007

# TABLE OF CONTENTS

**Page**


I. BACKGROUND ..... 2

II. ARGUMENT ..... 3

A. Ms. Supko's Reliable and Relevant Testimony Satisfies the Liberal Standard for the Admission of Expert Testimony ..... 4

1. Ms. Supko's Opinions Are Reliable and Relevant in This Case ..... 5

2. Ms. Supko's Opinions Will Assist the Court With Regard to the Acceptance Rate Issue ..... 8

B. Ms. Supko's Testimony "Concerning the Impact of DOE's Acceptance Rate" Is an Appropriate Use of Expert Testimony That Does Not Supplant This Court's Role as Interpreter of Law ..... 9

III. CONCLUSION ..... 11

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .................................................5

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004) .............................2, 6

*Kopf v. Skyrm*, 993 F.2d 374 (4th Cir. 1993) ..........................................................................8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...........................................................5

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003).......................................5

*Northern States Power Co. v. United States*, No. 98-484C (Wiese, J.) ..................................2

*Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) ...............................5

*Southern Nuclear Operating Co., et. al. v. United States*, No. 98-614C (Merow, J.) ..........2, 7

*Thomas v. Newton Int'l Enters., Inc.*, 42 F.3d 1266 (9th Cir. 1994) ......................................4

**Statutes**

42 U.S.C. § 10131(a)(4).........................................................................................................8

42 U.S.C. § 10131(a)(5).........................................................................................................8

**Regulations and Rules**

Fed. R. Evid. 702 ......................................................................................... 1, 4, 5, 6, 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 00-697C<br>(Senior Judge Merow) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF MS. EILEEN M. SUPKO**

Plaintiff Wisconsin Electric Power Company ("WE") hereby responds to Defendant's January 31, 2007 Motion In Limine To Exclude The Testimony of Plaintiff's Expert Witness, Ms. Eileen M. Supko, Regarding the Impact of the Rate of Acceptance Under the Standard Contract ("Gov't Motion"). Ms. Supko's testimony reflects her application of technical and specialized knowledge to issues of importance in this case and will assist the Court in understanding the evidence and determining facts at issue. Therefore, Ms. Supko's testimony satisfies the requirements of Rule 702 of the Federal Rules of Evidence ("Rule 702") and is admissible.

The Government's motion is premised upon (1) a mischaracterization of the nature and scope of Ms. Supko's proffered testimony and (2) a narrow interpretation of the "acceptance rate" issue[1] and its relevance in this case. Ms. Supko's expert opinions readily satisfy the liberal requirements of Rule 702. Most of the Government's arguments here are

[1] As the Court is aware, the term "acceptance rate" refers generally to the annual rate at which the Department of Energy ("DOE") accepts spent nuclear fuel ("SNF") from this nation's plants in the aggregate, consistent with the purposes of the Nuclear Waste Policy Act (the "NWPA") and the Standard Contract.

identical to those that have been rejected in other spent nuclear fuel ("SNF") damage cases. Similar to her testimony regarding the acceptance rate issue in other SNF cases, Ms. Supko's testimony in this case reflects an application of her specialized knowledge regarding spent fuel storage by commercial nuclear utilities—knowledge that will assist the Court in understanding the practical implications of the acceptance rates that the parties have proffered in this damages case.[2] Thus, for the reasons detailed below, the Government's motion in limine should be denied.

## I. BACKGROUND

Ms. Supko has more than 20 years experience working in the nuclear industry, with primary expertise in the storage and disposal of SNF and the Department of Energy's ("DOE") plans regarding SNF storage and disposal. Ms. Supko holds a Bachelor of Science in Nuclear Engineering from Pennsylvania State University. Appendix ("App.") at 2. After graduation, Ms. Supko began working on nuclear fuel issues, beginning as a Nuclear Fuel Projects Engineer at the Carolina Power and Light Company. App. at 2. Since 1990, Ms. Supko has worked as a consultant at Energy Resources International ("ERI"), consulting in the area of SNF, nuclear waste management, and radioactive materials transport. App. at 3.

In her work, Ms. Supko assisted and advised commercial utilities, members of the U.S. Congress, Congressional staff, state and local officials, and the Nuclear Energy Institute ("NEI") on a variety of nuclear fuel issues, including analysis of DOE's civilian waste

---

[2] For example, Ms. Supko has testified in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 646-47 (2004) (Hodges, J.) (accepting Supko as an expert on acceptance rates and SNF storage and licensing); *Southern Nuclear Operating Co., et. al. v. United States*, No. 98-614C (Merow, J.) ("*Southern Nuclear")*, Trial Tr. at 880-81, App. at 27-28 (Supko testimony admitted on the acceptance rate issue); and *Northern States Power Co. v. United States*, No. 98-484C (Wiese, J.), Trial Tr. at 2104-05, App. at 35-36 (Supko testimony admitted on the issue of acceptance rate, spent fuel management, spent fuel transportation, and utility treatment of those issues).

management program, nuclear fuel storage, SNF transport and disposal issues, and nuclear fuel cycle issues. App. at 3, 5-7. She has authored more than 35 reports, presentations, and publications in leading nuclear energy journals and has been an invited speaker at more than a dozen conferences sponsored by leaders in the nuclear industry. App. at 3, 5-10.

Ms. Supko's experience has given her expertise not only in the broad subject matter of the nuclear industry, but on matters highly relevant to the present case, specifically SNF storage and acceptance rate issues. App. at 3, 5-7. At DOE's recommendation, she was invited to serve as a U.S. technical expert to the International Atomic Energy Agency ("IAEA") and has assisted that agency's preparation of an IAEA technical report concerning international spent fuel storage by contributing an overview of the U.S. dry storage licensing and operations experience. App. at 14.

Relying on her more than 20 years of experience and her resulting specialized knowledge of the field, Ms. Supko's testimony provides opinions regarding the impact of different SNF acceptance rates. Ms. Supko's testimony therefore provides highly relevant context to assist the Court in its factual determinations.

## II. ARGUMENT

When DOE and WE entered into the Standard Contract, the intent of the parties was that DOE would accept SNF at a rate that: (1) would generally eliminate the need for additional on-site SNF storage capacity after 1998, and (2) reduce the accumulated backlog of SNF at nuclear facilities at a reasonable rate. *See* Plaintiff's October 27, 2006 Memorandum of Contentions of Fact and Law at 8-10 ("WE Pretrial Brief"). Ms. Supko's testimony is exactly what this Court needs in order to evaluate WE's damage claim. Ms. Supko's expert analysis and industry knowledge evaluates, as a factual matter, whether certain acceptance rates would accomplish these purposes. WE Pretrial Brief at 23-24. Ms. Supko's report evaluated several options, ultimately finding that DOE performance at a

steady-state rate of 3,000 MTU after a five-year ramp-up period most efficiently met these two purposes. WE Pretrial Brief at 23. Ms. Supko performed an extensive analysis regarding the effect that various spent fuel acceptance rates would have on utility requirements for additional spent fuel storage capacity and the effect on the timely decommissioning of nuclear power plants. Appendix to Gov't Motion ("Gov't App.") at 179-191.

Contrary to the Government's suggestions, Ms. Supko's testimony does not require her to opine on DOE's legal obligations under the Standard Contract. Such determinations are reserved for the Court. Rather, as explained below, Ms. Supko's opinion falls squarely within the province of an expert—to assist the Court in considering the damages resulting from DOE's breach of the Standard Contract.

### A. Ms. Supko's Reliable and Relevant Testimony Satisfies the Liberal Standard for the Admission of Expert Testimony

Rule 702 sets forth a "liberal standard" for the admission of expert testimony. *See, e.g.*, *Thomas v. Newton Int'l Enters., Inc.*, 42 F.3d 1266, 1269 (9th Cir. 1994) ("[Rule] 702 . . . contemplates a broad conception of expert qualifications."). As amended in 2000, Rule 702 permits expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also* Rule 702 advisory committee note ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule").

While the U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), impose on the Court a "gatekeeper obligation" to ensure that expert testimony is relevant and reliable, "these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002). The *Daubert* inquiry is a "flexible one," and the analysis depends "on the nature of the issue, the witness's expertise, and the subject of the testimony." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003) (citing *Kumho Tire Co.*, 526 U.S. at 150).

**1. Ms. Supko's Opinions Are Reliable and Relevant in This Case**

Ms. Supko's modeling of the effect of different acceptance rates is precisely the type of work that requires expert analyses and requires the application of the specialized knowledge that she has developed over two decades of advising commercial nuclear utilities regarding their operations and long-term planning. The Government's criticism of Ms. Supko's methodology and the relevance of her conclusions simply reflects a difference of opinion between her report and how the Government would prefer to frame the acceptance rate and the calculation of damages in this case. A party's disagreement with an expert, however, is not a sufficient basis for her exclusion. Ms. Supko's opinions are derived from a principled methodology that meets the requirements of Rule 702.

In her report, Ms. Supko models the effect of a wide range of annual acceptance rates on the utility industry. The acceptance rates modeled—900 MTU, 3,000 MTU, and 6,000 MTU—are taken from the universe of DOE waste acceptance program documents from the last 25 years. Gov't App. at 179-180, 207-10. She also incorporated sensitivity analyses regarding different ramp-up rates and the intra-utility use of acceptance rights. Gov't App. at 186-88. Further, Ms. Supko "reviewed DOE and DOE contractor methodologies for the

projection of spent nuclear fuel discharges as well as DOE's model for projecting spent nuclear fuel discharges." Gov't App. at 145.

In conducting her analysis, Ms. Supko used a computer simulation model for SNF acceptance developed by her company, ERI, called the "SPNTFUEL model" and noted that, assuming similar input assumptions, "both the DOE model and ERI's SPNTFUEL model will result in similar projected spent nuclear fuel acceptance rights. . . ." Gov't App. at 145. After considering a number of acceptance rates, Ms. Supko compared the results of her analyses using the SPNTFUEL model against the aforementioned acceptance rate criteria, namely, to reduce the backlog of SNF at utility sites and to limit the amount of additional at-reactor storage needed after 1998. Ultimately, Ms. Supko concludes that DOE performance at a 3,000 MTU steady state rate after a five-year ramp-up period is reasonable, because such performance would reduce the backlog of SNF at utility sites and limit the amount of additional at-reactor storage needed after 1998 on an industry-wide basis. Gov't App. at 190-91.

The Government's focus on a minimum reasonable rate, Gov't Motion at 15, may reflect its own litigation-based view of how damages should be calculated in the SNF cases, but is not itself a valid criticism of Ms. Supko's opinions and methodology. Indeed, "minimum reasonable acceptance rates" are a theoretical issue at best and have no bearing on this Court's adjudication of damages. Thus, Ms. Supko's decision not to undertake such efforts is irrelevant. Rather, Ms. Supko's methods are valid because she tested the reasonableness of concrete acceptance rates that are actually found in DOE's own program documents. In other words, Ms. Supko based her model on sufficient data and has applied her methods "reliably to the facts of this case." Fed. R. Evid. 702.

The Government's other criticisms of Ms. Supko's opinions are similarly grounded in flawed assumptions regarding how this Court should adjudicate damages in the SNF cases.

For example, the Government characterizes Ms. Supko's model as lacking "evidentiary support" because it does not represent either the "but for" or actual worlds. Gov't Motion at 19-27. The Government argues that Ms. Supko inconsistently mixes information from the but-for and actual cases. Gov't Motion at 21-23. The Government focuses on pool capacities, criticizing Ms. Supko for not consistently assuming pre-1998 capacity. Gov't Motion at 23. This criticism is misplaced. First, the Government mischaracterizes Ms. Supko's testimony. As Ms. Supko testified in *Southern Nuclear*, she decided whether to include post-1998 storage modifications depending on whether such an addition would be appropriate in the non-breach world. *See Southern Nuclear*, Trial Tr. at 750-757, App. at 17-24. Second, post-1998 pool capacity changed for only 12 plants out of the 122 plants with SNF. App. at 22. Ms. Supko testified in that case that the inclusion of these modifications would not affect her conclusions. Trial Tr. at 750, 755, App. at 17, 22.

Thus, the purpose of Ms. Supko's testimony is to demonstrate for the Court how a 3,000 MTU steady state acceptance rate would remove an industry-wide need for additional on-site storage capacity after 1998 and reduce the accumulated backlog of SNF at utility plant sites.[3] The fact that these opinions may conflict with the Government's theory of the case does not render them irrelevant or unreliable for purposes of satisfying Rule 702.

---

[3] As explained in its pretrial brief, WE's oldest fuel first priority assured WE of acceptance rights in 1998 and thereafter that were sufficient to avoid the necessity for additional storage. Plaintiff's Memorandum of Contentions of Fact and Law at 22. In an obtuse attack on Plaintiff's theory of the acceptance rate, the Government, argues that, if any utility required any additional at-reactor storage under DOE spent fuel acceptance at a 3,000 MTU acceptance rate, such performance would somehow constitute a "breach" of the Standard Contract for that utility contract holder because the NWPA's "goals" of avoiding additional at-reactor storage capacity after 1998 and removing of accumulated SNF backlog at plant sites would allegedly not be satisfied. Gov't Motion at 27-28. No utility has made such an argument, and as the breaching party the Government is hardly in a position to argue the point. Furthermore, assuming that DOE was actually picking-up waste at a 3,000 MTU steady-state rate, utilities facing potential additional at-reactor storage needs would have had a number of alternatives available short of adding more permanent storage capacity to meet their requirements, including but not limited to the use of exchanges and other flexibilities built into the Standard Contract, the use of temporary wet storage capacity (temporary rack(s)), and changes to fuel management plans. Like the Government's earlier suggestion in this litigation that its pick-up of one spent fuel rod would satisfy its

**2. Ms. Supko's Opinions Will Assist the Court With Regard to the Acceptance Rate Issue**

Ms. Supko's expert opinions provide this Court with the necessary context in which to address the acceptance rate issue. Testimony from an expert is presumed to be helpful unless it concerns matters within the "everyday knowledge and experience of the [trier of fact]." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). The acceptance rate, although not necessarily a complex technical concept, is sufficiently outside everyday knowledge and experience that expert testimony on the issue would assist (but not supplant) the Court's fact-finding role.

For example, Ms. Supko's SPNTFUEL model illustrates the effect of various SNF acceptance rate scenarios (as contained in DOE waste acceptance program documents) on the industry-wide need for additional on-site storage capacity after 1998 and the accumulated backlog of SNF at utility plant sites. By comparing and contrasting these scenarios, Ms. Supko can help the Court understand and determine the type of DOE performance that would have been consistent with the purposes of the NWPA and the Standard Contract.

Similarly, Ms. Supko also can assist the Court by explaining how these acceptance rate scenarios apply specifically to WE—in particular, the acceptance rights that would be projected for the WE's nuclear plant and how DOE acceptance of SNF at that plant, under different acceptance rates, would (or would not) work off the backlog at the plant given its actual and projected spent fuel discharges.

In summary, Ms. Supko's expert opinions provide a technical basis for why performance by DOE at a steady-state rate of 3,000 MTU after a five-year ramp-up period is

statutory and contractual obligations, the Government's latest position ignores the fundamental purposes of both the NWPA and the Standard Contract (i.e., avoiding the need for additional at-reactor storage and working off the backlog). While the NWPA lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5).

consistent with WE's theory of the acceptance rate discussed above (and in its pretrial brief). Her testimony meets the standard set forth in Rule 702 and is therefore admissible.[4]

**B. Ms. Supko's Testimony "Concerning the Impact of DOE's Acceptance Rate" Is an Appropriate Use of Expert Testimony That Does Not Supplant This Court's Role as Interpreter of Law**

As noted, Ms. Supko has more than two decades experience advising commercial nuclear utilities regarding their operations and long-term planning. Based on this experience, she is more than qualified to testify regarding general SNF storage practices and related technical issues in the nuclear industry. Nonetheless, the Government seeks exclusion of Ms. Supko's testimony based on the fact that Ms. Supko was not involved in the promulgation of the Standard Contract. Gov't Motion at 31-32. In addition, the Government mistakenly supposes that Ms. Supko's role would be to opine upon the intentions of the parties in their execution of the Standard Contract, citing authority regarding the role of an expert witness in interpreting a contract clause. Gov't Motion at 32.

As demonstrated above, Ms. Supko's testimony will assist the Court in two ways: (1) she brings considerable knowledge of the issues, background, and history surrounding the SNF dilemma that will provide this Court a proper context for evaluating the terms of the Standard Contract; and (2) her detailed analyses of the role of different acceptance rates will help this Court decide, as a factual matter, the reasonableness of a given acceptance rate. Ms. Supko's testimony leaves the ultimate interpretation of the Standard Contract clauses to this Court. Instead, it provides context and facts to assist the Court in its endeavor—which is the primary role of an expert witness.

---

[4] The data underlying Ms. Supko's rate report also is relevant because it establishes that, had DOE performed in 1998 at a reasonable rate under the Standard Contract, the majority of utilities likely would have had sufficient wet storage capacity to avoid building dry storage. Therefore, the Nuclear Regulatory Commission ("NRC") would not have imposed, at least in part, the spent fuel storage fee upon power reactor licensees as a class.

The Government has misinterpreted Ms. Supko's role in this trial, and seems to suggest that her testimony regarding spent fuel storage practices and related technical issues somehow supplants this Court's role in interpreting the law. This position lacks merit. Ms. Supko's opinions on acceptance rate scenarios, based on her first-hand experience, and decades of knowledge regarding the storage of SNF by commercial nuclear utilities, will assist the Court in understanding the reasonableness of potential acceptance rates both as an historical matter as well as specific to WE's circumstances. Without her testimony, this Court is left with only the bare suggestions of each party to the litigation as to what is a reasonable acceptance rate. Ms. Supko's testimony provides historical benchmarks by which this Court can measure each party's suggestion. Thus, the Government's argument that Ms. Supko's testimony is somehow inconsistent with her role as an expert witness is unfounded.

Ms. Supko has testified at trial in five SNF damages cases before this Court (and been deposed in several more). In recent trials where Ms. Supko has testified,[5] the Court did not report any problems distinguishing between Ms. Supko's role as expert and the Court's role as interpreter of law. In the *Southern Nuclear* trial, for example, the Court found her testimony very helpful, stating, "Well, I need all the help I can get in this case, so I will say that I will admit the testimony and I do consider the witness qualified to be expressing expert opinion in that regard." Trial Tr. at 880, App. at 27 (admitting Ms. Supko's opinions regarding reasonable acceptance rates). Contrary to the Government's suggestions that Ms. Supko's factual analysis will be merely "the result of common sense," Gov't Motion at 28, Ms. Supko's highly technical work and expert testimony will provide this Court critical context to assess WE's actions as it reaches its determinations of fact. Besides, the

---

[5] *See* footnote 2.

Government will have more than ample opportunity through cross-examination to challenge her expert opinion regarding a reasonable acceptance rate.

## III. CONCLUSION

Ms. Supko's expert opinions are derived from her specialized knowledge regarding the spent fuel storage in the commercial nuclear industry—reliable and relevant knowledge that will assist the Court in understanding the practical implications of the acceptance rate theories that the parties have proffered in this and other spent nuclear fuel damages cases. For the foregoing reasons, the Government's motion in limine should be denied.

DATED: February 20, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Donald J. Carney

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8419 Phone
(206) 359-9419 Fax

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2001
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on February 20, 2007, I caused a copy of the foregoing "Plaintiff's Response to Defendant's Motion in Limine to Exclude the Expert Testimony of Ms. Eileen M. Supko" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Donald J. Carney
Donald J. Carney

# APPENDIX

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0501

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding Spent Nuclear Fuel Acceptance Rates For Wisconsin Electric Power Company's Point Beach Units 1 and 2

© 2005 Energy Resources International, Inc. All Rights Reserved.

Prepared For:

Wisconsin Electric Power Company

Prepared by:

Eileen M. Supko

July 14, 2005

Eileen M. Supko

Eileen M. Supko 7/14/05

1015 18th Street, NW, Suite 650
Washington, DC 20036
USA
Telephone: (202) 785-8833
Facsimile: (202) 785-8834

## 1. SCOPE OF REPORT AND SUMMARY OF OPINIONS

I have been asked by Perkins Coie LLP, Counsel for Wisconsin Electric Power Company (Wisconsin Electric), to offer an expert opinion regarding the rates at which the U.S. Department of Energy (DOE) would accept spent nuclear fuel assemblies from Wisconsin Electric's Point Beach Units 1 and 2, assuming an overall acceptance rate of 3,000 MTU per year. It is my understanding that ERI's projections of spent fuel acceptance rights for the Point Beach nuclear plant provided in this report will support calculation of the damages that Wisconsin Electric has or will incur as a result of the DOE's failure to commence acceptance of spent nuclear fuel (SNF) from commercial nuclear power plants by January 31, 1998.

As described more fully below, I have calculated spent fuel acceptance rights for Point Beach Units 1 and 2, based on an overall steady-state spent fuel acceptance rate of 3,000 MTU per year, with a five year ramp up. Had DOE begun acceptance of spent nuclear fuel by January 31, 1998, in accordance with the Nuclear Waste Policy Act of 1982 (NWPA) as amended and the Standard Contract[1], I have determined that the first spent fuel acceptance rights for Point Beach would have occurred in 1998 and the final spent fuel would have been accepted by the DOE by 2038.

I have also calculated the spent fuel acceptance rights for Point Beach Units 1 and 2 based upon the presumption that DOE will not begin acceptance of spent fuel until 2010, at the earliest using the overall rates identified above. Under this scenario, I have determined that the first spent fuel acceptance rights for Point Beach would occur in 2010 and the final spent fuel would be accepted by 2049.

ERI's fees for this engagement range from $170 to $255 per hour and are not contingent in any way upon my findings.

## 2. BACKGROUND AND QUALIFICATIONS

I am a senior consultant and an owner of Energy Resources International, Inc. (ERI).

I hold a bachelors of science degree in Nuclear Engineering from Pennsylvania State University. From 1985 to 1990, I was employed by Carolina Power and Light Company (now Progress Energy), a nuclear operating company, as a Nuclear Fuel Projects Engineer and then a Nuclear Services Department Incore Analysis Engineer. At Carolina Power and Light Company, my responsibilities included nuclear fuel procurement and nuclear reactor core design and analysis. As a function of nuclear reactor core design and analysis work that I performed, I was responsible for ensuring that the nuclear fuel and nuclear reactor

[1] U.S. Department of Energy, *Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*, Title 10, U.S. Code of Federal Regulations, Part 961 (Standard Contract)

core operated within the regulatory limits approved by the U.S. Nuclear Regulatory Commission (NRC) in the plant license. I joined ERI in 1990. I have extensive experience in providing advice to clients in the areas of spent nuclear fuel, nuclear waste management and radioactive materials transport, and I analyze the technical, economic, regulatory, legislative, and policy issues associated with the storage, acceptance, transport, and disposal of spent nuclear fuel and high-level radioactive waste. My clients include nuclear power plant operating companies, a foreign government, industry organizations, private companies, and a private spent fuel management organization.

ERI has developed a computer model, SPNTFUEL, that has the capability to model spent fuel acceptance rates, determine acceptance rights for individual nuclear power plants, and determine the effect of these acceptance rates on utility requirements for additional spent fuel storage capacity, including the amount of time that spent fuel must remain at nuclear power plant sites following plant shutdown for decommissioning. SPNTFUEL also has the capability to project nuclear power plant discharge data, including the number of fuel assemblies discharged, fuel weight (MTU) discharged, and fuel burnup. In *Indiana Michigan Power Company v. United States*, the parties stipulated that the ERI and DOE computer models used to project spent fuel discharges and acceptance rates rely on similar assumptions and similar input data. Further, the parties stipulated that "the annual acceptance allocations calculated by either the ERI or DOE models should not result in any material differences for the purposes of assessing damages."[2] Additional details regarding the SPNTFUEL program can be found in Appendix A to this report.

On behalf of clients, using the SPNTFUEL model, I have analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. These analyses have been performed to determine the effect of DOE acceptance rates on the commercial nuclear power plants' spent fuel storage requirements, for the overall U.S. nuclear industry, and for individual nuclear power plants as requested by individual clients. Acceptance rate analyses that I have performed include analysis of postulated DOE acceptance rates for nuclear industry organizations; analysis to support nuclear industry legislative efforts regarding changes to the DOE waste program in the 1990s; analysis on behalf of the nuclear industry of proposals to "take title" to spent nuclear fuel; spent fuel acceptance scenarios to support individual client decommissioning analyses; and spent fuel acceptance scenarios to support individual client spent nuclear fuel damages claims, such as the analysis supporting this case.

I have been a direct participant in technical exchanges between the nuclear industry and DOE since 1990 regarding such topics as DOE plans for accepting commercial SNF, industry positions on outstanding Standard Contract issues, and DOE's conceptual designs

[2] Joint Stipulations Regarding Testimony on Spent Fuel Discharges and Cask Loading Costs, Indiana Michigan Power Company v. United States, No. 98-486C, March 2, 2004 (2004 Joint Stipulation).

for surface facilities for acceptance of commercial SNF. I have assisted in the preparation of nuclear industry comments and feedback on various DOE program documents, including but not limited to Mission Plans, Annual Capacity Reports, Acceptance Priority Ranking reports, Environmental Impact Statement documents, and transportation plans. My detailed resume is attached as Appendix B, providing additional details on my background and qualifications as an expert in this matter.

In addition to numerous client-specific analyses, evaluations, and reports, over the past fifteen years I have authored over 35 reports, presentations, and publications in leading nuclear energy journals, and have been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. A detailed list of my publications and presentations is attached as Appendix C.

## 3. METHODOLOGY USED AND MATERIALS CONSIDERED IN REACHING OPINION

In developing my expert opinions regarding spent fuel acceptance rights for Point Beach Units 1 and 2, I have reviewed DOE and DOE contractor methodologies for the projection of spent nuclear fuel discharges[3,4] as well as DOE's model for projecting spent nuclear fuel discharges. I also have reviewed DOE's recently published Acceptance Priority Ranking and Annual Capacity Report.[5] I have reviewed the Standard Contract and associated documents such as Annual Capacity Reports and Acceptance Priority Rankings. I have incorporated into my SPNTFUEL database the historical and projected spent fuel discharge information provided to the DOE by nuclear operating companies through DOE form RW-859 data for spent fuel discharged from commercial nuclear power plants through December 31, 2002 (2002 RW-859). Assuming similar input assumptions, both the DOE model and ERI's SPNTFUEL model will result in similar projected spent nuclear fuel acceptance rights for individual nuclear power plants.[6]

As requested by Counsel, ERI has calculated the rate at which the DOE would accept spent nuclear fuel from the Point Beach nuclear plant under two scenarios using the SPNTFUEL computer model: (1) a 1998, "Non-Breach" spent fuel acceptance scenario that projects the rate at which the DOE would have accepted spent fuel from Point Beach had it begun acceptance of spent fuel in 1998; and (2) a 2010, "Actual" spent fuel acceptance scenario that projects the rate at which the DOE is expected to accept spent fuel from Point Beach if

---

[3] Bechtel SAIC Company, LLC, "Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges," TDR-WAT-NU-000002 Rev 1, February 2002.

[4] McLeod, Barrie, JAI Corporation, and Pollog, Thomas, U.S. DOE, "Methodology for the Projection of Spent Nuclear Fuel Discharges," conference paper, date unknown.

[5] U.S. DOE, OCRWM, *Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW-0567, July 2004.

[6] 2004 Joint Stipulation.

# APPENDIX B
# DETAILED RESUME OF EILEEN M. SUPKO

## Summary of Experience:

**1990 - Present** **Energy Resources International, Inc.**
**Senior Consultant**

Consultant in the area of nuclear waste management and radioactive materials transport. Provides analysis of the technical, economic, regulatory and policy issues associated with the storage, acceptance, transport and disposal of spent nuclear fuel and high-level radioactive waste to nuclear power plant operating companies, foreign governments, industry organizations, private companies and private spent fuel management programs.

Dry Spent Fuel Storage. Provides analysis and consultation regarding the technical, regulatory, and economic evaluation of dry spent fuel storage and transportation technologies; technical and economic analyses in support of dry storage facility licensing efforts for nuclear operating companies including projections of dry storage life cycle costs and schedules and issues associated with dry storage licensing; technical and economic analyses in support of private spent fuel management program licensing efforts; analysis in support of industry efforts to increase the allowable burnup of spent fuel contained in dry storage systems and presentation of results to U.S. Nuclear Regulatory Commission (NRC) staff; and analyses of changes to NRC regulatory requirements for storage and transport. Authored an industry *Spent Fuel Storage Handbook*, on behalf of the Nuclear Energy Institute, to assist nuclear operating companies in decision-making, planning and licensing activities related to the dry storage of spent nuclear fuel. Served as a U.S. representative for an International Atomic Energy Agency (IAEA) Consultancy on International Spent Fuel Storage Experience resulting in preparation of an IAEA technical report on this subject.

Spent Nuclear Fuel and Radioactive Materials Transport. Provides analysis and consultation regarding spent nuclear fuel and radioactive materials transport including analysis of U.S. Department of Energy (DOE) plans for transporting spent nuclear fuel to a repository; preparation of comments on NRC proposals for spent fuel transportation cask testing; analysis of proposed changes to NRC and U.S. Department of Transportation, and International Atomic Energy Agency regulations for the transport of radioactive materials. Principal Investigator and author of *Spent Nuclear Fuel Transportation – An Overview* on behalf of the Electric Power Research Institute, to summarize the technical, regulatory and policy framework for transporting spent nuclear fuel.

Analysis of DOE Civilian Waste Management Program. Provided consultation and analysis to support nuclear waste legislative initiatives and developments including analyses of technical, economic and regulatory issues associated with proposed legislation and evaluation of legislative proposals on nuclear power plant spent fuel storage requirements and on Nuclear Waste Fund adequacy. Analyzed DOE proposals for acceptance and transportation of spent nuclear fuel including review of regulatory,

technical, logistical issues as well as schedule milestones. Analyzed possible overall DOE acceptance rates and the effect that DOE acceptance rates would have on utility spent fuel storage requirements and the period of time that spent fuel must remain at nuclear power plant sites following reactor shutdown for decommissioning. Provided technical support to industry organizations during industry-DOE staff-to-staff technical exchanges regarding outstanding issues and possible changes to the Standard Contract, DOE plans and conceptual designs for fuel receipt facilities at Yucca Mountain, and DOE-utility interface requirements for the acceptance of spent nuclear fuel. Reviewed and analyzed Congressional appropriations to DOE for the Yucca Mountain program, including monitoring and analysis of the adequacy of the Nuclear Waste Fund.

International Waste Management Activities. Provides technical and policy consultation and analysis to a foreign government regarding programs for the long-term management of spent nuclear fuel including review of projected spent fuel disposal system costs and schedules; review of technical proposals and conceptual designs; review of decommissioning cost study assumptions; and review of long-term planning efforts.

Nuclear Fuel Cycle. Provides technical, economic and policy support to utilities in the areas of fuel cycle management, economics, and procurement. Assists utility clients with procurement planning activities, commercial bid evaluation related activities, preparation of responses to public utility commission (PUC) nuclear fuel related audits, and performs reviews and audits of utility nuclear fuel procurement practices.

Public Outreach. Provides third party expertise for the Nuclear Energy Institute and other nuclear industry clients, communicating on nuclear waste storage, transport and disposal issues; radioactive materials transport; fuel cycle issues; and nuclear energy benefits. In addition to interviews with the news media, these activities have included briefing members of the U.S. Congress, Congressional staff, and state and local officials on nuclear waste transportation and disposal issues and nuclear energy benefits; and participating in moderated debates with members of U.S. anti-nuclear organizations for Public Broadcast System and National Public Radio programs. In addition to numerous client-specific analyses, evaluations, and reports, author of over 35 reports, presentations, and publications in leading nuclear energy journals and an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry.

Testimony. Indiana Michigan Power Company v. United States, Docket 98-486C, U.S. Court of Federal Claims (Deposition and Trial Testimony); Commonwealth Edison Company v. United States, Docket 98-621C, U.S. Court of Federal Claims (Deposition); Sacramento Municipal Utility District v. United States, Docket 98-488C, US. Court of Federal Claims (Deposition); Southern Nuclear Operating Company, Alabama Power Company and Georgia Power Company v. United States, Docket 98-614C, U.S. Court of Federal Claims (Deposition).

**1988 - 1990** **Carolina Power and Light Company**
**Nuclear Services Department**
**Incore Analysis Engineer**

Responsibilities included nuclear power plant reload core design, analysis and design review; nuclear fuel cycle management activities including preparation of nuclear power plant fuel cycle management reports, rod pattern improvements, and core operating recommendations to ensure that the nuclear fuel and nuclear reactor core operated within the regulatory limits approved by the NRC in the plant license. Provided control blade management support and technical review of control blade bid proposals. Performed detailed technical and economic analysis of control blade management alternatives.

**1985 - 1988** **Carolina Power and Light Company**
**Nuclear Fuel Projects Engineer**

Responsibilities included participation in nuclear fuel procurement activities including preparation of bid specifications, co-ordination of bid evaluations, and evaluation of economic and commercial contract terms. Prepared annual long-range nuclear fuel cycle cost projections; administered BWR channel contract and DOE enrichment contract; assisted in administration of BWR fuel fabrication contracts, uranium management activities, and fuel cycle analyses.

**1984 - 1985** **GPU Nuclear Company**
**TMI Environmental Controls Department**

Responsibilities included computerization and data analysis for the TMI Radiological Environmental Monitoring Program; routine maintenance and data analysis for a real-time gamma monitoring system; participation in NRC emergency drills performing off-site dose calculations. Served on environmental monitoring team for TMI-2 headlift operation.

## Education:

B.S., Nuclear Engineering, Pennsylvania State University, 1985

## Memberships, Licenses and Honors:

Member and past chairman, Mechanical and Nuclear Engineering Division, Industrial and Professional Advisory Council to the Pennsylvania State University's College of Engineering, 1998 to 2004

Founding Member, Board of Directors (2003 –2005), Pennsylvania State University, Nuclear Engineering Society

Member, American Nuclear Society

# APPENDIX C
# PUBLICATIONS LIST
# EILEEN M. SUPKO

In addition to numerous client specific analyses, evaluations, and reports, Ms. Supko has authored the following representative reports, presentations, and publications.

Supko, E.M., and Robert Jones, *Options for Pursuing Moderator Exclusion for Application to Spent-Fuel Transportation Packages,* EPRI Technical Report 1009692, Final Report, December 2004.

Supko, E.M., and Robert Jones, *Spent Nuclear Fuel Transportation, An Overview*, EPRI Technical Report 1009226, Final Report, February 2004.

Supko, E.M., *User Friendly Instruments for Enhancing Communications,* Presented on behalf of the World Nuclear Transport Institute, International Conference on the Safety of Transport of Radioactive Materials, International Atomic Energy Agency, July 7-11, 2003, Vienna, Austria.

Supko, E.M., *Utility – DOE Dry Storage Interface*, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M., *Nuclear Transport – The Impact of International Regulations*, Presented on behalf of the World Nuclear Transport Institute, INMM Spent Fuel Management Seminar XX, January 15-17, 2003, Washington, D.C.

Supko, E.M, and J.A. Vincent, *High Burnup Spent Nuclear Fuel Storage Analysis,* Presented to the U.S. Nuclear Regulatory Commission on behalf of the Nuclear Energy Institute, Spent Fuel Project Office, March 5, 2002.

Supko, E.M, *Countering the Fear Campaign -- Transportation Specifics,* Presented at the NEI Yucca Mountain Strategic Briefing, Washington, DC, January 15, 2002.

Supko, E.M., *Used Nuclear Fuel Transportation Safety*, Presented at the Utah Association of Realtors Convention, Tucson, Arizona, September 6, 2001.

Supko, E.M, *High Burnup Fuel Considerations For Storage & Transport*, Presented at the Nuclear Energy Institute Fuel Cycle 2001, San Francisco, California, April 1-4, 2001.

Schwartz, M.H., and E.M. Supko, *And Then There Were Three...",* Nuclear Engineering International, September 2000.

Supko, E.M., *Spent Nuclear Fuel Transportation – An Update of Current Issues,* Presented at the Nuclear Energy Institute Fuel Cycle 2000, Memphis, Tennessee, April 2 - 5, 2000.

Supko, E.M., *Industry Perspective on the Update of the "Modal Study"*, Presented at the Waste Management Symposium 2000, Tucson, Arizona, February 27 – March 2, 2000.

Supko, E.M., *Nuclear Fuel Waste – How Long Must We Wait And What Are We Going To Do?*, Presented at: Center For Business Intelligence Conference, Profit with Nuclear Power – Business Opportunities, Regulatory Reform and Restructuring Options, Chicago, Illinois, November 8-9, 1999.

Supko, E.M., *Projected Needs for Dry Spent Fuel Storage Equipment – The Next Five Years*, Presented at the PCC Annual Workshop for Manufacturing of Spent Fuel Equipment April 7, 1999.

Schwartz, M.H., and E.M. Supko, *The Potential for Change in A Static Market*, Nuclear Engineering International, September 1999.

Supko, E.M., *How Spent Nuclear Fuel, and Low- and High-Level Waste Will Be Disposed and At What Price*, INFOCAST Conference, Nuclear Power Plants, Coming to Grips with Your License Expiration Options – Sell, Decommission, or Renew Your License, January 25-27, 1999.

Supko, E.M., *Industry Spent Fuel Storage Handbook*, Nuclear Energy Institute, NEI 98-01, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues*, presented to the State of Tennessee, Special Committee Meeting of House Conservation and Environment Committee and Senate Environment, Conservation, and Tourism Committee, March 3, 1998.

Supko, E.M., *Minimizing Risks Associated with Post-Shutdown Spent Fuel Storage and LLW Disposal*, Presented at the Infocast "Nuclear Power In the Competitive Era," Post Conference Workshop, "Developing Risk Strategies for a Successful Decommissioning" January 30, 1998.

Supko, E.M., *Used Nuclear Fuel Transportation Issues*, presented to the Joint Transportation Committees of the Colorado State Legislature, January 8, 1998.

Supko, E.M., *Storing Up Problems*, Nuclear Engineering International, July 1997.

Schwartz, M.H. and E.M. Supko, *Fierce Competition in the U.S. Fabrication Market*, Nuclear Engineering International, September 1996.

Supko, E.M., *Technical Considerations Associated with Spent Fuel Acceptance*, Electric Power Research Institute, ERPI TR-106226, June 1996.

Supko, E.M., *United States Experience With Dry Spent Fuel Storage*, Presented at the International Atomic Energy Agency, Advisory Group Meeting on "Survey of Experience with Wet and Dry Storage", October 30-November 3, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Requirements and Costs*, Nuclear Waste Issues Forum, Nuclear Waste Program Office, National Association of Regulatory Utility Commissioners, May 25, 1995.

Supko, E.M., *Integrated Waste Management System Costs in a MPC System*, Presented at the Sixth Annual International High Level Radioactive Waste Management Conference, April 30- May 5, 1995.

Supko, E.M., *Utility At-Reactor Spent Fuel Storage Plans*, Nuclear Energy Institute Fuel Cycle '95, Coronado, California, April 5, 1995.

Buchheit, J.M. and E.M. Supko, *Impacts of MPCs on the Utility Spent Fuel Management System*, Institute of Nuclear Materials Management Spent Fuel Management Seminar XI, January 1994.

Supko, E.M., *Proceedings: 1993 EEI/UWASTE-EPRI-USCEA Spent Fuel Storage Workshop II, Regulatory and Communications Strategies*, Electric Power Research Institute, EPRI TR-103253, December 1993.

Schwartz, M.H., P.J. Marsico, E.M. Supko, *EEI Nuclear Fuel Fabrication Handbook*, Edison Electric Institute Nuclear Fuel Committee, NFC-93-001, November 1993.

Supko, E.M., C.J. Henkel, M.H. Schwartz, *EEI/UWASTE Oversight of the DOE Repository Program by the Repository Information Exchange Team*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Rasmussen, R., E.M. Supko, J.M. Jordan, M. Smith, *Utility-DOE Interface Considerations of the Universal Container System Concept*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Stigers, R., M. Alissi, E.M. Supko, D.K. Zabransky, *Non-Fuel Components: Regulatory Issues*, Fourth International Conference on High-Level Radioactive Waste Management, April 26-30, 1993.

Supko, E.M., *Proceedings: 1991 EEI/UWASTE-EPRI Workshop on At-Reactor Spent Fuel Storage*, Electric Power Research Institute, EPRI TR-100676, May 1992.

Steyn, J.J, M.H. Schwartz, E.M. Supko, *Overview of Fuel Management Analysis - Supply Issues and Procurement Strategy Development for the 1990s*, USCEA Fuel Cycle Conference 91, March 24-27, 1991.

Supko, E.M., M.H. Schwartz, *Spent Fuel Storage Handbook*, Edison Electric Institute, Utility Nuclear Waste and Transportation Program, December 1990.

ENERGY
RESOURCES
INTERNATIONAL, INC.

ERI-2098-0602

*Proprietary and Confidential*
*Protected Material to be Disclosed Only in Accordance*
*With U.S. Court of Federal Claims Protective Order*

# Expert Report Regarding The Development of Dual-Purpose Casks

**© 2006 Energy Resources International, Inc. All Rights Reserved.**

Prepared For:

Wisconsin Electric Power Company

Prepared by:

Eileen M. Supko

Eileen M. Supko 5/08/06

**1015 18th Street, NW, Suite 650**
**Washington, DC 20036**
**USA**
**Telephone: (202) 785-8833**
**Facsimile: (202) 785-8834**

## 1. SCOPE OF REPORT AND SUMMARY OF OPINIONS

I have been asked by Perkins Coie LLP, Counsel for Wisconsin Electric Power Company (Wisconsin Electric), to offer an expert opinion regarding the U.S. Department of Energy's actions to encourage or agree without objection to the development and the use of dual-purpose casks (i.e., storage and transport) by the nuclear operating companies for dry cask storage of spent nuclear fuel and for transportation of spent nuclear fuel.

It is my understanding that this expert report will be used to support damages being claimed by Wisconsin Electric for DOE's failure to commence acceptance of SNF by January 31, 1998 as required by the Standard Contract between the parties in its pending U.S. Court of Federal Claims action.

As described more fully below, based on more than twenty years of nuclear fuel-related experience in the nuclear industry, including fifteen years as a consultant to U.S. nuclear operating companies on spent nuclear fuel storage, transportation and disposal issues, I have determined that:

(1) From the start of the DOE waste management program in the early 1980s, DOE considered the use of dual-purpose casks as part of the waste management system and encouraged the development of dual-purpose casks through a cooperative agreement;

(2) DOE endorsed and encouraged nuclear operating companies to utilize dual-purpose canister systems for at-reactor storage, and considered compensating companies for the avoided DOE program costs; and

(3) DOE's own planning basis assumed that DOE would accept commercial spent nuclear fuel in dual-purpose canisters at the permanent repository as identified in numerous DOE technical and environmental documents as well as DOE system requirements documents.

These actions by DOE clearly indicate that DOE encouraged the development and use of dual-purpose cask systems for at-reactor storage of spent fuel and planned to integrate these systems as part of its system for waste acceptance and transportation.

ERI's fees for this engagement range from $170 to $266 per hour and are not contingent in any way upon my findings.

## 2. BACKGROUND AND QUALIFICATIONS

I am a senior consultant and an owner of Energy Resources International, Inc. (ERI).

I hold a bachelors of science degree in Nuclear Engineering from Pennsylvania State University. From 1985 to 1990, I was employed by Carolina Power and Light Company (now Progress Energy), a nuclear operating company, as a Nuclear Fuel Projects Engineer and then a Nuclear Services Department Incore Analysis Engineer. At Carolina Power and

Light Company, my responsibilities included nuclear fuel procurement and nuclear reactor core design and analysis. As a function of nuclear reactor core design and analysis work that I performed, I was responsible for ensuring that the nuclear fuel and nuclear reactor core operated within the regulatory limits approved by the U.S. Nuclear Regulatory Commission (NRC) in the plant license. I joined ERI in 1990. I have extensive experience in providing advice to clients in the areas of spent nuclear fuel, nuclear waste management and radioactive materials transport, and I analyze the technical, economic, regulatory, legislative, and policy issues associated with the storage, acceptance, transport, and disposal of spent nuclear fuel and high-level radioactive waste. My clients include nuclear power plant operating companies, a foreign government, industry organizations, private companies, and a private spent fuel management organization.

With respect to experience specifically related to spent nuclear fuel storage issues, including those associated with the development of dual-purpose cask systems, I provided consulting services to Private Fuel Storage LLC (PFS), a consortium of nuclear utilities seeking to establish a private spent fuel storage facility. At the recommendation of DOE, I was invited to serve as a U.S. technical expert to the International Atomic Energy Agency (IAEA). In that capacity, I assisted the agency in preparing an IAEA technical report concerning international spent fuel storage to which I contributed by providing an overview of the U.S. dry storage licensing and operations experience; and I participated at a Workshop on Safety Assessment for Spent Fuel Storage held in Prague, Czech Republic, as an expert to the IAEA regarding U.S. regulations for interim storage of spent fuel.

I have prepared two handbooks on spent fuel storage, including dry storage of spent nuclear fuel, for the Nuclear Energy Institute and its predecessor organizations; organized workshops for U.S. nuclear operating companies regarding experience with dry storage of spent nuclear fuel; and participated as a speaker on spent fuel storage technical issues at industry conferences. I have also presented the results of technical analyses on behalf of the Nuclear Energy Institute (NEI) to NRC staff regarding the need for changes to NRC staff regulatory guidance for storage and transport systems that would increase the allowable burn-up of the spent fuel contained in those systems. As part of my consulting practice, I monitor the dry storage market including the licensing status of dual-purpose systems, assess market share for various dry storage systems that are being marketed in the U.S. and project spent fuel storage requirements for U.S. nuclear power plants.

I was a direct participant in technical exchanges between the nuclear industry and DOE between 1990 and 2004 regarding such topics as DOE's plans for accepting commercial SNF, DOE's interpretation and application of the Standard Contract, and DOE's conceptual designs for surface facilities for acceptance of commercial SNF. I have assisted in the preparation of nuclear industry comments and feedback on various DOE program documents, including but not limited to Mission Plans, Annual Capacity Reports, Acceptance Priority Ranking reports, Environmental Impact Statement documents, multi-purpose canister proposals, and transportation and waste acceptance plans. My detailed

resume is attached as Appendix A, providing additional details on my background and qualifications as an expert in this matter.

In addition to numerous client-specific analyses, evaluations, and reports, over the past fifteen years, I have authored over 35 reports, presentations, and publications in leading nuclear energy journals and have been an invited speaker at over a dozen conferences sponsored by leaders in the nuclear industry. A detailed list of my publications and presentations is attached as Appendix B.

## 3. METHODOLOGY USED AND MATERIALS CONSIDERED IN REACHING OPINION

In developing my expert opinions in this matter, I have reviewed DOE documents associated with its plans for acceptance and transport of spent nuclear fuel including DOE Mission Plan documents; a DOE cooperative agreement with a nuclear operating company to develop a dual-purpose cask system; DOE plans and draft procurement specifications for waste acceptance and transportation services; DOE procurement plans for development of transportation casks; DOE reports to Congress on waste program activities; and DOE acceptance criteria for commercial spent nuclear fuel canister systems. I have reviewed DOE correspondence with nuclear operating companies regarding the acceptance of dual-purpose cask systems. I have reviewed DOE system requirements documents and waste acceptance system requirements documents.

I have reviewed NRC regulations governing spent fuel storage and radioactive materials transportation, NRC storage and transport cask certification activities, and NRC rulemaking activities.

I have reviewed documents associated with industry plans for implementation of dual-purpose storage and transport technologies at nuclear power plants sites including NRC regulatory documents and presentations from industry conferences associated with the development of dual-purpose storage and transport casks. On an ongoing basis, I regularly track the number of storage-only and dual-purpose cask systems that have been loaded at nuclear power plant sites.

Based on my extensive review of relevant documents and my extensive experience in the commercial nuclear industry, I believe that my research regarding the development of dual-purpose casks in the U.S., as reflected in this report, has been comprehensive. A list of the written materials that I considered in forming my opinions in this report is included in Appendix C. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional rationale for these opinions as additional documents are produced, the transcripts of expert and fact witness depositions become available for my review, and new facts are introduced during discovery and trial.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Thursday, October 20, 2005

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

of the assumptions that are in your computer model, the ERI model. I would like to start with pool capacity, if we could now.

You agree your assumptions concerning particular pool capacities have changed over time, correct?

A. They have for several clients where I have gotten updated information.

Q. For example, in the SMUD case, you assumed under the steady state 900 MTU rate, which would be scenario 2 here, that the amount of additional at-reactor storage would be 12,100, correct?

A. Yes.

Q. And the reason for this 500 MTU difference between 12,100 and 12,600 is that you included different pool capacities for certain of the Southern Nuclear pools, correct?

A. Yes, I had updated information regarding what Southern Nuclear believed they would have done had DOE begun acceptance in '98.

Q. So you included those pool capacities and the number between SMUD and Southern Nuclear jumped up by about 500 MTU, correct?

A. It did, but, again, it doesn't change the overall results of my opinion.

Q. Doesn't change the overall result, fair enough.

And with regard to pool capacities generally, your model is not always utilizing pool capacity for utilities as they existed in 1998, correct?

A. That's correct. I think there may be a dozen or so pool capacities that had been upgraded after 1998. Again, it wouldn't change -- I think we discussed this qualitatively in my South Carolina Electric & Gas deposition.

It wouldn't change the overall results because if I modified the pool capacities, all of the scenarios would potentially increase additional storage capacities or additional storage requirements somewhat, and you would have the same relative difference.

Q. Sure. And just so I'm clear, so, in other words, your model utilizes certain pool capacities that were modeled after or modified after 1998, correct?

A. It does, yes.

Q. For example, you include Plant Hatch's post-1998 rack addition in your model in this case, correct?

A. I did include that, yes.

Q. Okay. And, in fact, you also used South Carolina's 2002 post rerack capacity in your acceptance rate model, correct?

A. I did. And it is interesting, that doesn't come into play or it wouldn't come into play if I used the lower capacity in scenario 1 or scenario 4 because South Carolina Electric & Gas would have had plenty of capacity at their old rerack, at their old pool capacity, had DOE begun acceptance at either the scenario 1 or scenario 4 rates.

It would have increased the scenario 2 and 3 rates and by and large I think that's the case for most of the pool capacities in which I used the newer capacities.

Q. But, of course, you do agree, though, using these post-1998 storage additions was simply an oversight in terms of the inputs you were placing into your model, correct?

A. I didn't go back and attempt to try to see what the world looked like for every pool in 1998. That would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments.

Q. And that would be a pretty big burden, huh?

A. I didn't believe that it was necessary.

Q. And, by the way, while we are on this topic, you include Plant Hatch's second bathtub rack in your calculation for Southern's pool capacity, correct?

A. Yes, I did.

Q. And you are aware that Plant Hatch never installed that rack, correct?

A. They did not, but my understanding in talking to staff at Southern Nuclear, had DOE, had it looked like DOE was going to perform in 1998, they would have used that additional rack if they needed to.

Q. And so you have simply included that in your analysis of the 1998 would-have-been world acceptance rate, correct?

A. Yes.

Q. In fact, if you omitted that second bathtub rack from your analysis, you would agree that Southern would have had to add additional at-reactor storage after 1998, isn't that correct?

A. Not necessarily. I don't recall, I don't know what the number of assemblies would have been outside of one full core reserve, but there would have been alternatives that Southern Nuclear had at

its avail to, such that it may not have had to have done that, to either -- they certainly wouldn't have had to build dry storage for a small quantity of material.

And as I discussed yesterday during my direct testimony, utilities have a lot of alternatives available to them, including making changes to their fuel management plans. It is difficult to look back because the paradigm that we're in is that DOE didn't perform and utilities took the actions that they took in the 1990s knowing that the government wasn't going to perform.

So had it -- in the 1990s, had it looked like the government was going to perform, there are plants who probably would have done things differently.

Q. And perhaps, again, my question was inartful and for that I apologize, Ms. Supko. Whether or not they would have done something differently, you would agree that if you took that second, the bathtub rack, the second rack that was never installed out of your analysis, the additional storage requirements would reflect them having numbers on the board, let's say?

A. I would have calculated a number and there would have been a calculated number in my model,

yes.

Q. And, in fact, that number would be even bigger if you took out the first additional rack they did, correct, that calculated number?

A. I suppose that's correct.

Q. And so you are relying on post-1998 pool modifications in modeling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world; isn't that right?

A. For a fraction of the plants. As I said, I believe there were about a dozen plants that I used the current pool capacities for because that was the information that I maintained in my database.

We have 103 operating nuclear plants, there are 104 licensed nuclear power plants, 122 total plants with spent nuclear fuel. So 100 of the plants, as I said, it was about a dozen, would have been affected, which is a fraction. It really doesn't -- I'm an engineer. In terms of the analysis and my results, it doesn't affect the outcome.

Q. And whether it affects your outcome or not, the answer to my question is yes, you are relying upon post-1998 pool modifications modeling a 1998

acceptance right, correct?

A. For a fraction of the pools.

Q. And you would agree that, in fact, as you continue to change the pool capacities for particular utilities, based upon the information you received from your clients, it is possible these numbers could change again in the future, correct?

A. It is -- if I get new information and I believe that information is useful, I will use it.

Q. Sure. Even if those changes occurred after 1998, correct?

A. I'm sorry, I don't understand that.

Q. Even if those utilities added additional at-reactor storage after 1998, if you received that information in the course of your representation of those clients, you may include those in your 1998 model, correct?

A. I'm not sure that I would. It depends on what it is and how I believe it would affect the analysis. I would use my judgment.

Q. So it is situational when you would choose to use a utility that had that additional at-reactor storage, whether you would put that into your 1998 model?

A. Well, there are plants that are adding or

making changes to their pools today. I would not include that in this analysis. Would I include it in another analysis that I am doing for clients to model the current situation of spent fuel storage, absolutely.

Q. So it is situational?

A. No, I don't think that characterizes what it is.

Q. You just are making a judgment call, though, in terms of when you would include it and when you wouldn't?

A. And whether it is important to the analysis.

Q. Fair enough. Let's talk for a second about dry storage pre-1998 for a second, those utilities that had to have dry storage before 1998.

In your South Carolina report, the number for the steady state 900 rate, that's scenario 2 right there, changes once again to 13,130, correct?

A. Oh, I'm sorry, yes. I am following you, yes.

Q. And changes once again from your previous expert reports that we discussed earlier?

A. Yes.

Q. Right? To tie that up. And that's over 100

matters, Ms. Supko rejects the MRS concept that did exist in 1991 because of other statutory linkages, so apparently it is appropriate to assume that some statutory linkages could be abrogated but other statutory linkages would not be abrogated.

THE COURT: Let me understand. You don't object to Ms. Supko's qualifications for computational purposes?

MR. GARDNER: For computation purposes for the acceptance rights of Southern Nuclear's acceptance allocations, in other words, and let me try to be clear about this, we do object to Ms. Supko's testimony about what is a reasonable rate of acceptance because there is no testable scientific methodology that goes into that determination.

But Ms. Supko's determination that under a 3,000 rate, here are their projections, the government would not object to Ms. Supko's testimony in that regard, Your Honor. And nothing further, thank you.

THE COURT: Thank you.

MR. SCHECHTER: Needless to say, we disagree. Nothing I heard -- first of all, nothing I heard in Mr. Gardner's statement challenge any of

Ms. Supko's background, her overall qualifications, her experience in the nuclear industry, other than the absence of articles on the subject in question.

I would agree with Mr. Gardner on one thing. We thought the issue of the acceptance rate was a legal issue. We cross-moved for summary judgment. The Court rejected our argument and concluded that there were disputed issues of fact.

We might have had a shorter trial, but the Court in its wisdom rejected our motion. And because it is a disputed issue of fact, we are presenting factual and expert testimony regarding it.

In rejecting both parties' motions for summary judgment, the Court adopted the Commonwealth Edison decision by Judge Hewitt and the Court's own decision in Yankee, in which both courts, both Judge Hewitt and yourself, concluded that there was no acceptance rate in the standard contract. Judge Hewitt rejected the DCS argument, rejected the 900 rate, said the issue was a reasonable -- what a reasonable rate was. So the issue is an issue of fact in this case.

The arguments that the government has made with regard to the other rates really are law of the

case, so the issue of the reasonableness of the rate is before the Court.

We think that the methodology that Ms. Supko used is reliable, the model that she used is reliable, the kinds of projections that she has made have been relied upon by the Nuclear Regulatory Commission, and in granting the license for PFS.

She explained in some degree of detail the inputs. The inputs are largely based on the data inputs and are largely uncontradicted. The judgments as to whether to use -- you know, extend the license for everybody or not extend the license, one full core, two full cores, were fully explained.

We think that she clearly has the knowledge, skill, and experience to issue the opinions here, that she obviously has sufficient facts and data, she has reliable principles and methods and she applied them appropriately. So we would ask that she be admitted in the subjects already covered. Thank you.

THE COURT: Well, I need all the help I can get in this case, so I will say that I will admit the testimony and I do consider the witness qualified to be expressing expert opinion in that regard. And I guess so I overrule the objection, in

this respect.

I do -- I forgot to say one thing. If I ask a question of any witness, counsel are perfectly entitled to object. And I will try to rule on the objection with a great deal of objectivity. Having tried other cases, I realize that judges can blunder into things that you don't particularly want involved in the litigation for good reason, on both sides, and so I did forget to say that, first of all.

But with that, I am going to ask Ms. Supko a question.

MR. SCHECHTER: Certainly, Your Honor.

THE COURT: You can object if you wish. And that is in connection -- you did do the intra-corporate sensitivity analysis.

THE WITNESS: Yes, I did.

THE COURT: There has been at least allegations in other cases made that a market would develop for acceptance rights when DOE gets around to actually starting and going forward, if ever. But, I mean, when they actually start going and the market would develop for acceptance rights, trading that is, and I was curious as to your view if that occurred, would it have an impact on your opinion in

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff, ) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 7, 2006
Volume 7

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



d30c4c0f-45e5-4358-a1ac-449e68a00390

I'm not trying to break Mr. Silberg's flow, it seems now we're moving into the substantive testimony, and I was wondering if Mr. Silberg was going to endeavor to qualify Ms. Supko.

THE COURT: I was wondering that too. We were going on quite a while, Mr. Silberg.

MR. SILBERG: I'm sorry. I would ask that Ms. Supko be qualified as an expert in the areas of spent fuel management, spent fuel storage, spent fuel transportation, and utility treatment of those issues.

THE COURT: Mr. Gardner?

MR. GARDNER: Yeah. And, Your Honor, I don't want to waste the Court's time. I think the Court's aware of our position about Ms. Supko. We obviously continue to hold that position about Ms. Supko. Our objection to Ms. Supko is not based upon what Ms. Supko's experiences are, it's the relationship between those experiences and the opinion she's offering today.

That is the subject of our objection. And I guess, with respect to what Mr. Silberg has offered her to be qualified in with respect to spent fuel transportation, I don't think



d30c4c0f-45e5-4358-a1ac-449e68a00390

that's even an issue that is part of her expert opinions in this case. With respect to the utility treatment of those issues, that to me, Your Honor, sounds like a whole lot of hearsay.

I mean, obviously, I would not expect Ms. Supko to be testifying about what a particular utility's treating of a particular issue is. That seems to go a little far, so if Mr. Silberg may want to narrow the qualification, I think maybe we can take another stab at it, but as currently proffered, the government would object.

THE COURT: Mr. Silberg, what do you hope to develop through this witness?

MR. SILBERG: Well, this witness has prepared two expert reports, which have been submitted to Your Honor, and we intend to have testimony that supports the information in those reports and ultimately to offer those reports into evidence.

THE COURT: And those reports deal with what specifically?

MR. SILBERG: The acceptance rate issues, Northern States Power's allocation, and how that fits in to what DOE would have



d30c4c0f-45e5-4358-a1ac-449e68a00390

performed, what DOE would have taken, had it performed on time, the various scenarios that DOE has looked at over the years and how those scenarios fit in with the factors that Ms. Supko will identify.

MR. GARDNER: And, Your Honor, if I may, one, we would obviously object to the introduction into evidence of Ms. Supko's expert reports, those are hearsay. And --

THE COURT: Her reports are hearsay?

MR. GARDNER: Sure.

THE COURT: We have the witness here on the stand, Mr. Gardner.

MR. GARDNER: They're reports offered by another party for the truth of the matter asserted.

THE COURT: Mr. Gardner, I'm not following that argument at all. We're dealing with an expert.

MR. GARDNER: We agree with that, you're on point, this isn't the statements of Mr. Howard who's a party. He's a percipient fact witness. Ms. Supko is a paid expert witness. She doesn't speak for NSP. Her statements contained in an expert report

prepared for this litigation are out-of-court statements offered for the truth of the matter asserted.

They're hearsay, and they're not business records.

THE COURT: I've never heard of a expert report being referred to as hearsay.

MR. GARDNER: I'm trying to break new ground, Your Honor.

THE COURT: That's a novel approach, sir. Ms. Supko has testified in how many cases now, Mr. Gardner?

MR. GARDNER: At trial, she has testified in part in the Indiana Michigan case, although on different issues than she's testifying today, the Court rejected her methodology in part. In the SMUD case, she testified with a written direct and a cross-examination. In the Systems Fuel Mississippi case, she testified, although Judge Braden said she's not going to rely upon her testimony.

And finally, she testified in the Southern Nuclear trial, and I believe, to the best of my recollection, that encompasses it.



d30c4c0f-45e5-4358-a1ac-449e68a00390

THE COURT: And in all those cases, she was qualified as a witness?

MR. GARDNER: No, Your Honor, that's not correct. In the SMUD case, Judge Braden actually deferred qualifying her until after she heard all the evidence, and then ultimately, Judge Braden issued an opinion in which she concluded the rate was speculative and never relied upon Ms. Supko.

In the SFI Mississippi case, again, my recollection is the Court did not qualify Ms. Supko, but rather allowed for cross-examination, then concluded she was not going to rely upon her. In Indiana Michigan, her testimony was actually different than the testimony she is offering today. In Indiana Michigan, she offered a prediction as to when Yucca Mountain was going to open.

And the Court ultimately, in the published opinion that was affirmed on appeal by the Federal Circuit, the Court, Judge Hodges rejected those opinions. So I think the only Judge, to my recollection, that's actually qualified Ms. Supko at this point in time is Judge Merow in Southern Nuclear, and of course,



d30c4c0f-45e5-4358-a1ac-449e68a00390

Judge Merow hasn't issued his opinion yet.

THE COURT: And, Mr. Silberg, Ms. Supko is going to testify about the acceptance rate as identified by DOE in the various delivery commitment schedules and their effect upon Northern States' operations?

MR. SILBERG: She will testify about the DOE acceptance rates, as described in DOE's own documents, of a large variety going back to 1983, to show what DOE would have performed, had it not breached the contract. She will also analyze what allocations NSP would have received at its various plants and how those allocations would have been affected by the DOE acceptance rates.

And I would note that I don't think Mr. Gardner's characterization of Ms. Supko's treatment in the cases he's described is completely accurate, but I don't think we need to go into that.

THE COURT: Well, I'm going to accept her as an expert, and by that, I mean one who is knowledgeable in the management of spent nuclear fuels. I'm not at all sure that the testimony she's going to offer has anything to

do with her expertise. What I'm expecting of her is her surmise of what DOE -- strike the word "surmise" -- what she reads DOE is saying over the course of many years about how it's going to perform the contract. We can all read that.

MR. SILBERG: And how those various prognostications fit in with the test that she identifies --

THE COURT: Tests.

MR. SILBERG: Tests as to what the purpose of the program should be, moving fuel.

THE COURT: The purpose of the program, really, is not at all what we're concerned about in this case. The purpose of the program would be as seen in the statute itself and in no other source. I'll let you proceed, but I must say I've expressed my view about DOE's expected performance as sort of an exercise in mythology.

And I don't see that this testimony can ever, ever have anything, any substance beyond what we can all read in DOE's documents.

MR. SILBERG: Well, I think there are some --



d30c4c0f-45e5-4358-a1ac-449e68a00390

THE COURT: And it would be helpful to me to have somebody who can pull it all together. That's about --

MR. SILBERG: And she can do that. And I think, as we've said many times before, we don't think it's necessary to establish what the but-for world is, we think our damages --

THE COURT: I think I'm coming to that conclusion as well, we have Ms. Supko here, and I'm certainly not going to send her home without hearing what she has to say.

MR. SILBERG: Thank you, and since the government is raising that issue, we feel honor-bound to put our information before this court.

MR. GARDNER: Thank you, Your Honor.

BY MR. SILBERG:

Q. Ms. Supko, first, could you just summarize the conclusions you reach, so that when you go through the documents, we can understand where we are?

MR. SILBERG: And, Your Honor, we have a series of demonstratives, they've been previously distributed to the parties to the government. If I might approach? Ms. Supko



d30c4c0f-45e5-4358-a1ac-449e68a00390