IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Thursday, October 20, 2005

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

of the assumptions that are in your computer model, the ERI model. I would like to start with pool capacity, if we could now.

You agree your assumptions concerning particular pool capacities have changed over time, correct?

A. They have for several clients where I have gotten updated information.

Q. For example, in the SMUD case, you assumed under the steady state 900 MTU rate, which would be scenario 2 here, that the amount of additional at-reactor storage would be 12,100, correct?

A. Yes.

Q. And the reason for this 500 MTU difference between 12,100 and 12,600 is that you included different pool capacities for certain of the Southern Nuclear pools, correct?

A. Yes, I had updated information regarding what Southern Nuclear believed they would have done had DOE begun acceptance in '98.

Q. So you included those pool capacities and the number between SMUD and Southern Nuclear jumped up by about 500 MTU, correct?

A. It did, but, again, it doesn't change the overall results of my opinion.

Q. Doesn't change the overall result, fair enough.

And with regard to pool capacities generally, your model is not always utilizing pool capacity for utilities as they existed in 1998, correct?

A. That's correct. I think there may be a dozen or so pool capacities that had been upgraded after 1998. Again, it wouldn't change -- I think we discussed this qualitatively in my South Carolina Electric & Gas deposition.

It wouldn't change the overall results because if I modified the pool capacities, all of the scenarios would potentially increase additional storage capacities or additional storage requirements somewhat, and you would have the same relative difference.

Q. Sure. And just so I'm clear, so, in other words, your model utilizes certain pool capacities that were modeled after or modified after 1998, correct?

A. It does, yes.

Q. For example, you include Plant Hatch's post-1998 rack addition in your model in this case, correct?

A. I did include that, yes.

Q. Okay. And, in fact, you also used South Carolina's 2002 post rerack capacity in your acceptance rate model, correct?

A. I did. And it is interesting, that doesn't come into play or it wouldn't come into play if I used the lower capacity in scenario 1 or scenario 4 because South Carolina Electric & Gas would have had plenty of capacity at their old rerack, at their old pool capacity, had DOE begun acceptance at either the scenario 1 or scenario 4 rates.

It would have increased the scenario 2 and 3 rates and by and large I think that's the case for most of the pool capacities in which I used the newer capacities.

Q. But, of course, you do agree, though, using these post-1998 storage additions was simply an oversight in terms of the inputs you were placing into your model, correct?

A. I didn't go back and attempt to try to see what the world looked like for every pool in 1998. That would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments.

Q. And that would be a pretty big burden, huh?

A. I didn't believe that it was necessary.

Q. And, by the way, while we are on this topic, you include Plant Hatch's second bathtub rack in your calculation for Southern's pool capacity, correct?

A. Yes, I did.

Q. And you are aware that Plant Hatch never installed that rack, correct?

A. They did not, but my understanding in talking to staff at Southern Nuclear, had DOE, had it looked like DOE was going to perform in 1998, they would have used that additional rack if they needed to.

Q. And so you have simply included that in your analysis of the 1998 would-have-been world acceptance rate, correct?

A. Yes.

Q. In fact, if you omitted that second bathtub rack from your analysis, you would agree that Southern would have had to add additional at-reactor storage after 1998, isn't that correct?

A. Not necessarily. I don't recall, I don't know what the number of assemblies would have been outside of one full core reserve, but there would have been alternatives that Southern Nuclear had at

its avail to, such that it may not have had to have done that, to either -- they certainly wouldn't have had to build dry storage for a small quantity of material.

And as I discussed yesterday during my direct testimony, utilities have a lot of alternatives available to them, including making changes to their fuel management plans. It is difficult to look back because the paradigm that we're in is that DOE didn't perform and utilities took the actions that they took in the 1990s knowing that the government wasn't going to perform.

So had it -- in the 1990s, had it looked like the government was going to perform, there are plants who probably would have done things differently.

Q. And perhaps, again, my question was inartful and for that I apologize, Ms. Supko. Whether or not they would have done something differently, you would agree that if you took that second, the bathtub rack, the second rack that was never installed out of your analysis, the additional storage requirements would reflect them having numbers on the board, let's say?

A. I would have calculated a number and there would have been a calculated number in my model,

yes.

Q. And, in fact, that number would be even bigger if you took out the first additional rack they did, correct, that calculated number?

A. I suppose that's correct.

Q. And so you are relying on post-1998 pool modifications in modeling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world; isn't that right?

A. For a fraction of the plants. As I said, I believe there were about a dozen plants that I used the current pool capacities for because that was the information that I maintained in my database.

We have 103 operating nuclear plants, there are 104 licensed nuclear power plants, 122 total plants with spent nuclear fuel. So 100 of the plants, as I said, it was about a dozen, would have been affected, which is a fraction. It really doesn't -- I'm an engineer. In terms of the analysis and my results, it doesn't affect the outcome.

Q. And whether it affects your outcome or not, the answer to my question is yes, you are relying upon post-1998 pool modifications modeling a 1998

acceptance right, correct?

A. For a fraction of the pools.

Q. And you would agree that, in fact, as you continue to change the pool capacities for particular utilities, based upon the information you received from your clients, it is possible these numbers could change again in the future, correct?

A. It is -- if I get new information and I believe that information is useful, I will use it.

Q. Sure. Even if those changes occurred after 1998, correct?

A. I'm sorry, I don't understand that.

Q. Even if those utilities added additional at-reactor storage after 1998, if you received that information in the course of your representation of those clients, you may include those in your 1998 model, correct?

A. I'm not sure that I would. It depends on what it is and how I believe it would affect the analysis. I would use my judgment.

Q. So it is situational when you would choose to use a utility that had that additional at-reactor storage, whether you would put that into your 1998 model?

A. Well, there are plants that are adding or

making changes to their pools today. I would not include that in this analysis. Would I include it in another analysis that I am doing for clients to model the current situation of spent fuel storage, absolutely.

Q. So it is situational?

A. No, I don't think that characterizes what it is.

Q. You just are making a judgment call, though, in terms of when you would include it and when you wouldn't?

A. And whether it is important to the analysis.

Q. Fair enough. Let's talk for a second about dry storage pre-1998 for a second, those utilities that had to have dry storage before 1998.

In your South Carolina report, the number for the steady state 900 rate, that's scenario 2 right there, changes once again to 13,130, correct?

A. Oh, I'm sorry, yes. I am following you, yes.

Q. And changes once again from your previous expert reports that we discussed earlier?

A. Yes.

Q. Right? To tie that up. And that's over 100

matters, Ms. Supko rejects the MRS concept that did exist in 1991 because of other statutory linkages, so apparently it is appropriate to assume that some statutory linkages could be abrogated but other statutory linkages would not be abrogated.

THE COURT: Let me understand. You don't object to Ms. Supko's qualifications for computational purposes?

MR. GARDNER: For computation purposes for the acceptance rights of Southern Nuclear's acceptance allocations, in other words, and let me try to be clear about this, we do object to Ms. Supko's testimony about what is a reasonable rate of acceptance because there is no testable scientific methodology that goes into that determination.

But Ms. Supko's determination that under a 3,000 rate, here are their projections, the government would not object to Ms. Supko's testimony in that regard, Your Honor. And nothing further, thank you.

THE COURT: Thank you.

MR. SCHECHTER: Needless to say, we disagree. Nothing I heard -- first of all, nothing I heard in Mr. Gardner's statement challenge any of

Ms. Supko's background, her overall qualifications, her experience in the nuclear industry, other than the absence of articles on the subject in question.

I would agree with Mr. Gardner on one thing. We thought the issue of the acceptance rate was a legal issue. We cross-moved for summary judgment. The Court rejected our argument and concluded that there were disputed issues of fact.

We might have had a shorter trial, but the Court in its wisdom rejected our motion. And because it is a disputed issue of fact, we are presenting factual and expert testimony regarding it.

In rejecting both parties' motions for summary judgment, the Court adopted the Commonwealth Edison decision by Judge Hewitt and the Court's own decision in Yankee, in which both courts, both Judge Hewitt and yourself, concluded that there was no acceptance rate in the standard contract. Judge Hewitt rejected the DCS argument, rejected the 900 rate, said the issue was a reasonable -- what a reasonable rate was. So the issue is an issue of fact in this case.

The arguments that the government has made with regard to the other rates really are law of the

case, so the issue of the reasonableness of the rate is before the Court.

We think that the methodology that Ms. Supko used is reliable, the model that she used is reliable, the kinds of projections that she has made have been relied upon by the Nuclear Regulatory Commission, and in granting the license for PFS.

She explained in some degree of detail the inputs. The inputs are largely based on the data inputs and are largely uncontradicted. The judgments as to whether to use -- you know, extend the license for everybody or not extend the license, one full core, two full cores, were fully explained.

We think that she clearly has the knowledge, skill, and experience to issue the opinions here, that she obviously has sufficient facts and data, she has reliable principles and methods and she applied them appropriately. So we would ask that she be admitted in the subjects already covered. Thank you.

THE COURT: Well, I need all the help I can get in this case, so I will say that I will admit the testimony and I do consider the witness qualified to be expressing expert opinion in that regard. And I guess so I overrule the objection, in

this respect.

I do -- I forgot to say one thing. If I ask a question of any witness, counsel are perfectly entitled to object. And I will try to rule on the objection with a great deal of objectivity. Having tried other cases, I realize that judges can blunder into things that you don't particularly want involved in the litigation for good reason, on both sides, and so I did forget to say that, first of all.

But with that, I am going to ask Ms. Supko a question.

MR. SCHECHTER: Certainly, Your Honor.

THE COURT: You can object if you wish. And that is in connection -- you did do the intra-corporate sensitivity analysis.

THE WITNESS: Yes, I did.

THE COURT: There has been at least allegations in other cases made that a market would develop for acceptance rights when DOE gets around to actually starting and going forward, if ever. But, I mean, when they actually start going and the market would develop for acceptance rights, trading that is, and I was curious as to your view if that occurred, would it have an impact on your opinion in

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff, ) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 7, 2006
Volume 7

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



d30c4c0f-45e5-4358-a1ac-449e68a00390

I'm not trying to break Mr. Silberg's flow, it seems now we're moving into the substantive testimony, and I was wondering if Mr. Silberg was going to endeavor to qualify Ms. Supko.

THE COURT: I was wondering that too. We were going on quite a while, Mr. Silberg.

MR. SILBERG: I'm sorry. I would ask that Ms. Supko be qualified as an expert in the areas of spent fuel management, spent fuel storage, spent fuel transportation, and utility treatment of those issues.

THE COURT: Mr. Gardner?

MR. GARDNER: Yeah. And, Your Honor, I don't want to waste the Court's time. I think the Court's aware of our position about Ms. Supko. We obviously continue to hold that position about Ms. Supko. Our objection to Ms. Supko is not based upon what Ms. Supko's experiences are, it's the relationship between those experiences and the opinion she's offering today.

That is the subject of our objection. And I guess, with respect to what Mr. Silberg has offered her to be qualified in with respect to spent fuel transportation, I don't think



d30c4c0f-45e5-4358-a1ac-449e68a00390

that's even an issue that is part of her expert opinions in this case. With respect to the utility treatment of those issues, that to me, Your Honor, sounds like a whole lot of hearsay.

I mean, obviously, I would not expect Ms. Supko to be testifying about what a particular utility's treating of a particular issue is. That seems to go a little far, so if Mr. Silberg may want to narrow the qualification, I think maybe we can take another stab at it, but as currently proffered, the government would object.

THE COURT: Mr. Silberg, what do you hope to develop through this witness?

MR. SILBERG: Well, this witness has prepared two expert reports, which have been submitted to Your Honor, and we intend to have testimony that supports the information in those reports and ultimately to offer those reports into evidence.

THE COURT: And those reports deal with what specifically?

MR. SILBERG: The acceptance rate issues, Northern States Power's allocation, and how that fits in to what DOE would have



d30c4c0f-45e5-4358-a1ac-449e68a00390

performed, what DOE would have taken, had it performed on time, the various scenarios that DOE has looked at over the years and how those scenarios fit in with the factors that Ms. Supko will identify.

MR. GARDNER: And, Your Honor, if I may, one, we would obviously object to the introduction into evidence of Ms. Supko's expert reports, those are hearsay. And --

THE COURT: Her reports are hearsay?

MR. GARDNER: Sure.

THE COURT: We have the witness here on the stand, Mr. Gardner.

MR. GARDNER: They're reports offered by another party for the truth of the matter asserted.

THE COURT: Mr. Gardner, I'm not following that argument at all. We're dealing with an expert.

MR. GARDNER: We agree with that, you're on point, this isn't the statements of Mr. Howard who's a party. He's a percipient fact witness. Ms. Supko is a paid expert witness. She doesn't speak for NSP. Her statements contained in an expert report

prepared for this litigation are out-of-court statements offered for the truth of the matter asserted.

They're hearsay, and they're not business records.

THE COURT: I've never heard of a expert report being referred to as hearsay.

MR. GARDNER: I'm trying to break new ground, Your Honor.

THE COURT: That's a novel approach, sir. Ms. Supko has testified in how many cases now, Mr. Gardner?

MR. GARDNER: At trial, she has testified in part in the Indiana Michigan case, although on different issues than she's testifying today, the Court rejected her methodology in part. In the SMUD case, she testified with a written direct and a cross-examination. In the Systems Fuel Mississippi case, she testified, although Judge Braden said she's not going to rely upon her testimony.

And finally, she testified in the Southern Nuclear trial, and I believe, to the best of my recollection, that encompasses it.



d30c4c0f-45e5-4358-a1ac-449e68a00390

THE COURT: And in all those cases, she was qualified as a witness?

MR. GARDNER: No, Your Honor, that's not correct. In the SMUD case, Judge Braden actually deferred qualifying her until after she heard all the evidence, and then ultimately, Judge Braden issued an opinion in which she concluded the rate was speculative and never relied upon Ms. Supko.

In the SFI Mississippi case, again, my recollection is the Court did not qualify Ms. Supko, but rather allowed for cross-examination, then concluded she was not going to rely upon her. In Indiana Michigan, her testimony was actually different than the testimony she is offering today. In Indiana Michigan, she offered a prediction as to when Yucca Mountain was going to open.

And the Court ultimately, in the published opinion that was affirmed on appeal by the Federal Circuit, the Court, Judge Hodges rejected those opinions. So I think the only Judge, to my recollection, that's actually qualified Ms. Supko at this point in time is Judge Merow in Southern Nuclear, and of course,



d30c4c0f-45e5-4358-a1ac-449e68a00390

Judge Merow hasn't issued his opinion yet.

THE COURT: And, Mr. Silberg, Ms. Supko is going to testify about the acceptance rate as identified by DOE in the various delivery commitment schedules and their effect upon Northern States' operations?

MR. SILBERG: She will testify about the DOE acceptance rates, as described in DOE's own documents, of a large variety going back to 1983, to show what DOE would have performed, had it not breached the contract. She will also analyze what allocations NSP would have received at its various plants and how those allocations would have been affected by the DOE acceptance rates.

And I would note that I don't think Mr. Gardner's characterization of Ms. Supko's treatment in the cases he's described is completely accurate, but I don't think we need to go into that.

THE COURT: Well, I'm going to accept her as an expert, and by that, I mean one who is knowledgeable in the management of spent nuclear fuels. I'm not at all sure that the testimony she's going to offer has anything to



d30c4c0f-45e5-4358-a1ac-449e68a00390

do with her expertise. What I'm expecting of her is her surmise of what DOE -- strike the word "surmise" -- what she reads DOE is saying over the course of many years about how it's going to perform the contract. We can all read that.

MR. SILBERG: And how those various prognostications fit in with the test that she identifies --

THE COURT: Tests.

MR. SILBERG: Tests as to what the purpose of the program should be, moving fuel.

THE COURT: The purpose of the program, really, is not at all what we're concerned about in this case. The purpose of the program would be as seen in the statute itself and in no other source. I'll let you proceed, but I must say I've expressed my view about DOE's expected performance as sort of an exercise in mythology.

And I don't see that this testimony can ever, ever have anything, any substance beyond what we can all read in DOE's documents.

MR. SILBERG: Well, I think there are some --

THE COURT: And it would be helpful to me to have somebody who can pull it all together. That's about --

MR. SILBERG: And she can do that. And I think, as we've said many times before, we don't think it's necessary to establish what the but-for world is, we think our damages --

THE COURT: I think I'm coming to that conclusion as well, we have Ms. Supko here, and I'm certainly not going to send her home without hearing what she has to say.

MR. SILBERG: Thank you, and since the government is raising that issue, we feel honor-bound to put our information before this court.

MR. GARDNER: Thank you, Your Honor.

BY MR. SILBERG:

Q. Ms. Supko, first, could you just summarize the conclusions you reach, so that when you go through the documents, we can understand where we are?

MR. SILBERG: And, Your Honor, we have a series of demonstratives, they've been previously distributed to the parties to the government. If I might approach? Ms. Supko



d30c4c0f-45e5-4358-a1ac-449e68a00390