IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-697C (Senior Judge Merow) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF MS. EILEEN M. SUPKO

Pursuant to Rule 16 of the Rules of the United States Court of Federal Claims ("RCFC"), as well as the Court's March 6, 2007 order, defendant, the United States, respectfully submits this reply to the February 20, 2007 response that plaintiff, Wisconsin Electric Power Company ("WE"), filed to the Government's motion *in limine* to exclude the expert testimony of Ms. Eileen Supko. In our motion, we explained why Ms. Supko's opinions concerning the "reasonableness" of the 3,000 MTU rate of acceptance is not relevant to any issue in this case, and why her analysis is inherently unreliable. Nothing in WE's response brief directly responds to these two key issues.

## DISCUSSION

### I. MS. SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A 3,000 MTU STEADY-STATE ACCEPTANCE RATE IS NOT RELEVANT TO ANY ISSUE IN THIS CASE

As we explained in our motion, the sole issue regarding the rate of acceptance of spent nuclear fuel ("SNF") is the determination of the scope of the Government's contractual

obligation under the Standard Contract. Def. Mot. 11-13.[1] WE does not even attempt to suggest that Ms. Supko's opinions are relevant to this critical issue. Rather, in its response, WE claims that when DOE and WE entered into the Standard Contract, "the intent of the parties was that DOE would accept SNF at a rate that: (1) would generally eliminate the need for additional on-site SNF storage capacity after 1998, and (2) reduce the accumulated backlog of SNF at nuclear facilities at a reasonable rate." Pl. Resp. 3.[2] WE contends that Ms. Supko's expert testimony is relevant "in order to evaluate WE's damages claim," because she "evaluates, as a factual matter, whether certain acceptance rates would accomplish these purposes." Id. We further claims that "Ms. Supko can help the Court understand and determine the type of performance that would have been consistent with the purposes of the NWPA and the Standard Contract." Pl. Resp. 8.

First, WE cannot establish the predicate for Ms. Supko's analysis – namely, that the parties agreed at the time of contract formation to the inclusion of any qualitative "two part test," or that DOE performance under such a qualitative two-part test "would have been consistent with the purposes of the NWPA and the Standard Contract." Indeed, the "purpose" of the NWPA is expressly stated in the NWPA, and does not include any reference to DOE acceptance either at such a rate as to "generally eliminate the need for additional at-reactor storage after 1998" or at a rate that reduces the backlog of SNF at nuclear facilities. Similarly, the Standard Contract contains no reference to WE's claimed qualitative test. As we explained in our motion, the Standard Contract contains an integration clause that would expressly preclude reading into

---

[1] "Def. Mot. __" refers to the Government's January 31, 2007 motion *in limine* to exclude the testimony of Eileen Supko.

[2] "Pl. Resp. __" refers to plaintiff's February 20, 2007 response to the Government's motion *in limine* to exclude the testimony of Eileen Supko.

the Standard Contract the qualitative test that WE urges the Court to adopt, and upon which Ms. Supko bases her entire analysis. See 10 C.F.R. 961.11, Art. XXII.A.

Indeed, there is no ambiguity in the Standard Contract regarding the rate and schedule of SNF acceptance. Instead, the Standard Contract contains a contractual mechanism for the determination of the rate and schedule of SNF acceptance:

> 5. (a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.
>
> (b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. 961.11, Art. IV.B.5. Once DOE indicated through its 1991 annual capacity report ("ACR") and annual priority ranking ("APR") the amount and schedule of SNF that DOE would accept, contract holders were to submit delivery commitment schedules ("DCSs") to DOE which would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. 9611.11, Art. V.B. Consequently, WE's suggested reading into the Standard Contract of any qualitative two-part test in the face of the Standard Contract's integration clause and in light of the unambiguous language contained in the Standard Contract is inappropriate.

Second, as Ms. Supko has acknowledged, despite the utilities' request for the inclusion of these two objectives into the Standard Contract at the time of contract formation, DOE expressly rejected this request. A.8 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 23, 2007, Tr. 2515:9-23).[3] In fact, Ms. Supko conceded that her analysis is based upon a benchmark that DOE rejected at the time of contract formation. A.9 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 23, 2007, Tr. 2516:6-10). Consequently, Ms. Supko's analysis – in which she measures different acceptance rates against a qualitative test that DOE expressly rejected at the time of contract formation, simply has no relevance to any issue in this case.

Finally, as we explained in our motion, even if WE could establish the predicate for Ms. Supko's opinion – that DOE had somehow obligated itself at the time of contract formation to accept SNF under WE's claimed two-part qualitative test – Ms. Supko's own analysis demonstrates that a 3,000 MTU rate of acceptance results in significant additional at-reactor storage after 1998. Ms. Supko's analysis reflects that, under a 3,000 MTU rate of acceptance, there would be 1030 MTUs of additional at-reactor storage at 14 plants after 1998. Def. Mot. 28. Consequently, to the extent the Court were to conclude that the Government is contractually obligated to accept at a rate that precludes utilities from adding additional at-reactor storage after 1998, Ms. Supko's analysis actually refutes WE's contention that a 3,000 MTU rate of acceptance satisfies that obligation.

[3] "A.__" refers to the appendix attached to this reply brief.

## II. WE HAS FAILED TO DEMONSTRATE THAT MS. SUPKO USES A RELIABLE METHODOLOGY IN REACHING HER OPINIONS

### A. Ms. Supko's Four Acceptance Rate Scenarios Lack Any Evidentiary Support

In our motion to exclude Ms. Supko's opinions, we described the numerous methodological errors contained in her analysis, as well as her inability to satisfy the standards contained in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 570 (1993). Specifically, we explained that Ms. Supko's analysis: (1) has never been subjected to peer review; (2) has never been generally accepted in the relevant scientific or technical community; (3) has a significant error rate; (4) lacks any testable methodology; and (5) lacks evidentiary support. Def. Mot. 14-27.

Rather than directly address each of these significant flaws, WE contends in its response brief that Ms. Supko's opinions "are derived from a principled methodology" and that she modeled four acceptance rates that were "taken from the universe of DOE waste acceptance program documents from the last 25 years." Pl. Resp. 5. WE argues that "Ms. Supko's methods are valid because she tested the reasonableness of concrete acceptance rates that are actually found in DOE's own program documents." Pl. Resp. 6 (emphasis added). In fact, as Ms. Supko has admitted, none of the four rate scenarios that she has modeled in this case have any basis in DOE program documents.

For example, Ms. Supko's Scenario 1 represents a 3,000 MTU rate of acceptance, after a five-year ramp-up, beginning in 1998. Def. Mot. 2. Ms. Supko has acknowledged, however, that no DOE document reflects this rate of acceptance beginning shortly after 1998. A.3, 10-11 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 22 & 23,

2007, Tr. 2396:5-11; 2538:7-2541:14).[4] Similarly, Ms. Supko's Scenario 2 assumes a 900 MTU steady-state rate of acceptance through 2015, which she claims is based upon DOE's 1991 and 1995 Annual Capacity Reports. However, Ms. Supko concedes that her Scenario 2 is inconsistent with the 1991 Annual Capacity Report, because those reports assume a 900 rate only through 2010, with a ramp-up to 3,000 MTUs by 2015. A.3-4 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 22, 2007, Tr.2397:5-10; 2399:20-2400:1). Further, Ms. Supko acknowledges that her Scenario 4, which is a 6,000 steady-state rate after a seven-year ramp-up, is not based upon any DOE program documents. A.4 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 22, 2007, Tr.2401:9-15). Indeed, the only scenario that Ms. Supko models that is similar to a DOE program document is her Scenario 3, which assumes a 900 MTU rate of acceptance, after a two-year ramp-up, and then ultimately ramping up to a 3,000 MTU rate of acceptance by 2015. Although this scenario is similar to DOE's 1990 Preliminary Estimate of Total System Costs, Ms. Supko has altered the ramp up in the scenario she uses in her analysis. A.4-5 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 22, 2007, Tr.2401:16-2402:22). Simply put, Ms. Supko's analysis of rates that have no relationship to DOE program documents, and based upon a benchmark that DOE rejected at the time of contract formation, demonstrates that she is not relying upon sufficient facts or data, and that she has not applied her methods "reliably to the facts of this case." Fed. R. Evid. 702.

---

[4] In fact, of the 16 DOE documents that Ms. Supko claims "support [her] opinion regarding [the] 3,000 MTU acceptance rate," Ms. Supko admits that none of those documents represent DOE performance at a single Federal repository at a 3,000 MTU rate of acceptance shortly after 1998. A.15 (Northern States Power. Co. v. United States, No. 98-484C, trial testimony of Eileen Supko, Nov. 8, 2006, Tr. 2519:24-2520:14).

### B. The Fact That Ms. Supko's Opinions Do Not Change Despite Her Use Of A "Hybrid" Model Reflects Her Lack Of A Testable Methodology

In our motion *in limine*, we explained how Ms. Supko's model produces unreliable results because, among other reasons, although she is purporting to model a "but for" world, she inconsistently mixes SNF storage information from the "but for" and actual worlds. Def. Mot. 21-23. Specifically, Ms. Supko assumes dry storage in the "but for" world for utilities, including WE, that claim they would not have used dry storage in the "but for" world, and assumes post-1998 reracks in determining what utility pool capacities would have looked like in the "but for" world as of 1998. Id. In its response brief, WE does not even address the fact that Ms. Supko includes dry storage in the "but for" world for utilities, like WE, that contend they would not have used dry storage had DOE performed. Indeed, the only response that WE has to Ms. Supko's flawed and inconsistent modeling assumptions is that her inclusion of post-1998 reracks does not affect her conclusions. Pl. Resp. 7.[5]

WE actually makes the Government's point. Despite the significant flaws in Ms. Supko's model, which both lacks evidentiary support and inconsistently mixes actions in the

[5] In its response, WE claims that the Government "mischaracterizes" Ms. Supko's testimony because Ms. Supko purportedly claimed that she decided whether to include post-1998 reracks in her analysis based upon whether "such an addition would be appropriate in the non-breach world." Pl. Resp. 7. In fact, Ms. Supko's explanation as to why she included post-1998 reracks in her "but for" world model is much more telling. Ms. Supko explained during the Southern Nuclear trial that the reason she did not go back and look at pool capacities as they existed in 1998 was because that "would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments." A. 19 (plaintiff's attached appendix). Indeed, Ms. Supko conceded during the Southern Nuclear trial that, had she excluded Plant Hatch's post-1998 reracks from her "but for" world model, she would have calculated Plant Hatch as having additional at-reactor storage after 1998. A. 21-22 (plaintiff's attached appendix). Simply put, the only reason that Ms. Supko mixes information between the "but for" and actual worlds in her model is a lack of scientific or technical rigor.

"but for" and actual worlds, her conclusions concerning the "reasonableness" of a 3,000 MTU acceptance rate do not change. This simply highlights the fact that her opinion concerning the "reasonableness" of the 3,000 MTU rate of acceptance are incapable of testing, because they do not depend upon the results of her "model," but, rather. depend upon her subjective judgment that 3,000 MTU accepts more SNF, and more quickly, than a slower rate of acceptance. This conclusion is a product of common sense, not expert analysis. Ms. Supko has acknowledged as much. A.12 (System Fuels, Inc. v. United States, No. 03-2623, trial testimony of Eileen Supko, Feb. 23, 2007, Tr.2617:16-23). Consequently, Ms. Supko's opinions are inherently unreliable and incapable of testing and, therefore, are not helpful to the Court in determining the scope of the Government's contractual obligations in this case.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court exclude the opinions of Ms. Supko as an expert witness at the forthcoming trial.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Gregory T. Jaeger
GREGORY T. JAEGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7955
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
RUSSELL A. SHULTIS
SONIA M. ORFIELD
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

March 16, 2007

# APPENDIX

**Systems Fuels, Inc., & Entergy Arkansas v. U.S No. 03-2623C February 22, 2007**

**Heritage Reporting Corporation**

**Page 2070 to Page 2407**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, February 22, 2007

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:32 a.m.

BEFORE THE HONORABLE CHARLES LETTOW



APPEARANCES.
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500



APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ.
KEVIN CRAWFORD, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
LISA DONOHUE, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

(Index appears at end of transcript)



P R O C E E D I N G S
(9:32 a.m.)

THE COURT: Good morning. The Court presumes -- is it fair to presume or assume that we are going to follow the schedule outlined at the close of yesterday?

MR. TOMASZCZUK: Yes.

THE COURT: Mr. Tomaszczuk.

MR. TOMASZCZUK: I have one preliminary matter, Your Honor, and I have spoken with counsel for the government about this. We are moving to amend, yet again, our exhibit list, with the addition of one exhibit in two volumes, and these two volumes, one of which I have here, are the set of delivery commitment schedule forms that counsel for the government provided to me shortly before this trial commenced.

And I would expect to use at least some of these during the testimony of some of the witnesses that are going to be presented during the government's case. Counsel for the government has said they don't oppose the motion to amend reserving their right, as has been the practice in this case, to object to

Page 2394

report?
A. It's one of the documents that I reviewed and considered it, listed in the appendix, in one of my appendices.
Q. Can you point that out to me?
A. It's number 26, acquisition of waste acceptance and transportation services for the Office of Civilian Radioactive Waste Management. There was a request for proposal, draft request for proposal dated September 1998.
Q. So September 1998 document, correct?
A. Yes.
Q. By September 1998, DOE had announced it wasn't going to be able to perform by 1998, correct?
A. Well, they were – that's true, but as I said, there were bills going through Congress, which was the reason that this draft request proposal was issued, the first of which I believe was issued in 1996.
Q. So even if that legislation had passed this September 1998 document, how was DOE going to begin performing in 1998?
A. This was still the rate that they had

Page 2395

listed in their RFP.
Q. All right. Now, what's the answer to my question, how was DOE going to be able to perform in 1998, based upon a request contained in the September 1998 document?
A. It was highly unlikely that they would have been able to do that.
Q. It's actually, we know, impossible, right, if you have a September 1998 document that's suggesting, I guess, legislation passed, obviously, DOE is not going to perform before September 1998, right?
A. That's correct.
Q. So that document, whatever it may say about performance in 1998, that wasn't going to happen, right?
A. Well, it hadn't happened.
Q. But we knew it wouldn't happen, right?
A. Yes.
Q. So aside from that document that you just identified for me, can you identify any other documents that assumed a single federal repository began acceptance at 1998 at a 3000 rate?
A. I believe all of the earlier documents

Page 2396

identified by the, that have been published by the Department of Energy, program documents between 1983 and 1987 all assumed that there would be two repositories.
Q. Okay. So the answer to my question, Ms. Supko, is you cannot identify a single DOE program document, other than this one from September 1998, assumed a single federal repository beginning performance in 1998, correct?
A. I don't believe that there is one.
Q. Now, scenario number two here, Ms. Supko, is the 900 MTU rate you define as the 1991 ACR rate, correct?
A. Yes. The first 10 years are based on the 1991 ACR.
Q. And in fact, that's all the 1991 ACR does, is provide 10 years' worth of acceptance rights, right?
A. That's correct.
Q. So you've had to make an assumption that that 900 rate in the 1991 ACR extends out, correct?
A. That's correct.
Q. But in fact, that assumption is

Page 2397

inconsistent with the assumptions contained in the 1991 ACR itself, correct?
A. The 1991 ACR simply lists the first 10 years of waste acceptance.
Q. In fact, Ms. Supko, the 1991 ACR assumes in 2010 that there would be a federal repository, correct?
A. I believe that it states that there's a presumption that there would be a repository in 2010, yes.
Q. In fact, your own demonstratives state that, correct?
A. Yes.
Q. Okay. So the assumption in the 1991 ACR is that there would be a 900 rate through – what, 2010, and then a federal repository comes online, correct?
A. Yes.
Q. And that federal repository would start accepting at about 3000 MTUs beginning in about 2015, right?
MR. SILBERG: Objection, lack of foundation.
THE WITNESS: That would be the –
THE COURT: Just a moment, Ms. Supko,

Page 2398

let me think about this just a millisecond. You're a lot quicker than I am. Overruled.
MR. SILBERG: Thank you, Your Honor.
BY MR. GARDNER:
Q. Is that correct, Ms. Supko?
A. *I'm sorry. Could you repeat the question?*
Q. That under the assumptions contained in that 1991 ACR, you identify scenario two, that the rate of acceptance actually becomes 3000 by 2015, correct?
A. Yes, that's what I modelled in scenario three.
Q. That's exactly right. So, really, if you were to model the assumptions properly contained in the 1991 ACR, it would look an awful lot like scenario three, correct?
A. It would, as I stated, I used the 1991 ACR as the basis for the first 10 years. This was what I referred to as a lower bounding estimate, just to provide a, the information of what the effect would be, had in fact the repository not begun operation in 2010, but for some reason, the MRS facility would have been able to continue operating, or it's a lower

Page 2399

bounding estimate.
Q. But your scenario two is inconsistent with the assumptions contained in the 1991 ACR, correct?
A. The 1991 ACR does assume a repository would begin operation in 2010.
Q. So your scenario two is inconsistent with the assumptions contained in the 1991 ACR, correct?
MR. SILBERG: Objection, asked and answered.
THE COURT: It's just the second time. Overruled.
THE WITNESS: The first 10 years in scenario two are consistent with the rates that are outlined in the 1991 ACR. I did not assume that a repository began operating in 2010 in that scenario.
BY MR. GARDNER:
Q. So the answer to my question is, yes, your scenario two is inconsistent with the assumptions contained in the 1991 ACR, correct?
MR. SILBERG: By my count, Your Honor, objection, that's three.
THE COURT: Well, it is.

Page 2400

THE WITNESS: Yes.
THE COURT: That also – you have the answer twice, Mr. Gardner.
MR. GARDNER: I think I got a yes the third time, so I think I'm satisfied.
BY MR. GARDNER:
Q. Now, Ms. Supko, scenario four, the 6000 MTU rate, as you stated, there's no DOE document that is consistent with your scenario four, correct?
A. No, the early documents that included two repositories would have had different ramp-up rates. I just stepped this up over a periodic basis, to show what the effect would be of picking up 6000 metric tons per year. As I stated, I saw this as an upper bounding case, you know, there were some in the industry who did want the rate to be higher than 3000 metric tons, and this shows the effect of that.
Q. But in fact, if you were to model a 6000 rate as reflected in those early DOE program documents you talked about, that would be a different 6000 rate than contained in your scenario four, correct? Because that 6000 rate in the early DOE program documents is a two

Page 2401

repository system, correct?
MR. SILBERG: Objection, compound.
THE COURT: Sustained.
BY MR. GARDNER:
Q. Let me back up. Ms. Supko, the early DOE program documents that assume a 6000 rate, those are two repository systems, correct?
A. Yes.
Q. And those documents reflect a different acceptance rate in the aggregate, with that two repository system in your scenario four, correct?
A. Yes, the 1983 draft mission plan shows hitting the 6000 rate by 2008, whereas I believe I ramp-up to that in 2006.
Q. And finally, Ms. Supko, your scenario three, as I believe you testified, is actually an aggregate of two different DOE program documents, correct?
A. Yes, it is. That's why I listed both documents.
Q. Because if you were to take just the 1990 TSLCC – let me even back up, there is no 1990 TSLCC, correct, it's a preliminary estimated total system life cycle document,

Page 2402

correct, from 1990, PETSLC?

A. Well, it was an addendum to an earlier total system life cycle cost analysis based on the restructured program that occurred because of the 1987 Amendments Act, so it is in fact an estimate of total system life cycle cost.

Q. What's the title of the document?

A. Preliminary estimates.

Q. So it's a preliminary estimate of the total system life cycle cost, it's not a TSLCC, is it?

A. Well, it certainly does estimate the total system life cycle cost to the program, whether it's – none of the estimates have been final estimates, so I would stick with my nomenclature.

Q. That's fine. If you were to have applied a single DOE program document like, say, the 1990 – I'm going to call it the PETSLC, that 600 there in 1999 would be 400 MTUs, correct?

A. That's the only difference, yes.

MR. GARDNER: Your Honor, at this point, the government would move to strike Supko Demonstrative Number 2. It is not an

Page 2403

accurate depiction of the documents upon which Ms. Supko models.

THE COURT: Mr. Silberg.

MR. SILBERG: Yes, Ms. Supko described exactly how she chose the scenarios, exactly where they came from, and why she relied on the documents that she did, why she modified the information in the documents as she did. She's made it perfectly clear why these scenarios are the ones she modelled. We're not saying that these are the government scenarios. They are Ms. Supko's scenarios, and she's entitled, as an expert, to pick her scenarios and to model them.

THE COURT: Putting aside the reference to something being perfectly clear, motion to strike is denied, and that's not to say that we're going to deal with admissibility as a demonstrative right at this point.

MR. GARDNER: Okay. Your Honor, and just so the government is clear, when does the Court anticipate dealing with the admissibility of the demonstratives, at the end of the cross?

THE COURT: Yes.

MR. GARDNER: Okay. That's fine, Your

Page 2404

Honor. Thank you.

THE COURT: Are we at our – we're way past time, our evening break, Mr. Silberg.

MR. SILBERG: That would be fine with us, Your Honor.

THE COURT: Mr. Gardner.

MR. GARDNER: That's fine, Your Honor.

THE COURT: Ms. Supko.

THE WITNESS: Thank you.

THE COURT: We are in recess until 9:30 tomorrow morning.

(Whereupon, at 5:43 p.m., the trial was recessed, to reconvene at 9:30 a.m., on Friday, February 23, 2007.)

Page 2405

C O N T E N T S

WITNESS DESIGNATIONS READ COUNTERDESIGNATIONS READ
ALAN BROWNSTEIN 2074 2084
VICTOR TREBULES 2095 2103
DAVID ZABRANSKY 2132 2186
ROBERT MORGAN 2221 2244
DESIGNATIONS READ
NANCY SLATER-THOMPSON 2251
COUNTERDESIGNATIONS READ
NANCY SLATER-THOMPSON 2259
DESIGNATIONS READ COUNTERDESIGNATIONS READ
THOMAS POLLOG 2264 2274

WITNESS DIRECT VOIR DIRE
EILEEN SUPKO 2288 2389

AFTERNOON SESSION: 2207

E X H I B I T S

EXHIBIT NO: MARKED RECEIVED
Plaintiff
PX-7-J..............................2375
PX-169.............................2384
PX-173.............................2385
PX-175.............................2378

**System Fuels, Inc., & Entergy Arkansas v. U.S No. 03-2623C February 23, 2007**

**Heritage Reporting Corporation**

**Page 2408 to Page 2740**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2408

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------------x

SYSTEM FUELS, INC., and ENTERGY ARKANSAS, INC.,
Plaintiffs, :NO. 03-2623C
vs.
THE UNITED STATES,
Defendant.

------------------------------------x

Courtroom 6
National Courts Building
715 Madison Place, N.W.
Washington, D.C.

Friday, February 23, 2007

VOLUME 9

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE CHARLES LETTOW

Page 2409

APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

Page 2410

APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
KEVIN CRAWFORD, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
LISA DONOHUE, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

(Index appears at end of transcript)

Page 2411

P R O C E E D I N G S

- - - - -

THE COURT: Are there any preliminary matters this morning, Mr. Gardner?

MR. GARDNER: Your Honor, just one and we had just raised this with Mr. Tomaszczuk. As of now, it looks like the way the schedule is going, obviously, we anticipate getting through Ms. Supko today and at least, getting to at least the direct of Mr. Metcalfe, if not starting the cross.

That means, next week, we've got the two days that begin at 2:00 and then the 1st; and I just mentioned this to Mr. Tomaszczuk. I think the government's preference would be we obviously would like to put our case-in-chief on at one time and not truncated between different days. What we would propose is, assuming Mr. Metcalfe does go over to Monday, we take up that Monday at 2:00, we finish up Mr. Metcalfe.

We could even read in Mr. Morgan's NSP designations because that seems like pretty easy going and then set aside another three-or-four-day chunk after the next trial

Page 2512

testimony?
A. I was not.
Q. Okay. Now, are you aware that Mr. Mills testified that DOE did not accept the request for the inclusion of that qualitative test in the standard contract?
A. I wasn't aware of it, but I do know that the test is not in the contract.
Q. And you're aware that Mr. Morgan has previously testified that DOE rejected the inclusion of a particular rate in the standard contract, correct?
A. I am aware of that. I have also read the Federal Register notice that accompanied the promulgation of the final standard contract, and the issue of acceptance rate is not mentioned in there, the specific language that talks about performance standards, meaning milestones for certain things to happen within the DOE program, there are other issues that were requested by the various parties that are discussed and said we didn't accept this for one reason or another, but they don't specifically talk about the acceptance rate.
Q. Are you aware that Mr. Mills has

Page 2513

testified that the performance standards that EEI identified included the rate of acceptance?
A. That doesn't surprise me, based on the language in this document. However, when you read the discussion of the performance standard in that Federal Register notice, it appears to only be referring to milestones.
Q. So you're interpreting the Federal Register notice when it says that it rejected the inclusion of certain performance standards, you interpret that as excluding the rate of acceptance?
A. It's not clear.
Q. Okay. So there's some ambiguity in the Federal Register notice?
A. Yes.
Q. And obviously, as between you, Ms. Supko, and Mr. Morgan, Mr. Morgan would be better situated to know what was accepted and what was rejected, correct?
MR. SILBERG: Objection, calls for speculation, among other things.
THE WITNESS: As I said earlier –
THE COURT: Just a moment, Ms. Supko, again, you may answer it, if you know of your

Page 2514

own personal knowledge. Otherwise, you may not.
THE WITNESS: Could you repeat the question?
BY MR. GARDNER:
Q. Sure. As between yourself and Mr. Morgan, who was there at the time, who was on the ground, Mr. Morgan would clearly be in a better position to know what was rejected and what was accepted, correct?
A. What I stated earlier when you asked me a similar question was that, clearly, the issue of acceptance rate was not included in the contract, so one could imply that that means it was not accepted.
Q. And in fact, you had no reason to disagree with Mr. Morgan's testimony that DOE rejected the inclusion of a particular rate in the standard contract, correct?
A. Correct.
Q. And you're aware that Mr. Morgan has previously testified that DOE rejected the inclusion of a qualitative two-part test in the standard contract, correct?
A. I don't recall testimony about a

Page 2515

two-part test.
Q. And by two-part test, you understand that I mean a rate that is consistent with meeting the generation rate, plus working off the backlog, that's what you understand I mean, or do you understand that is what I mean when I talk about a two-part test?
A. I do now.
Q. Okay. Fine. I figured we talked about this so many times, that it was implicit. Defining the two-part test as I have, meaning meeting the generation and working off the backlog, you are aware that Mr. Morgan has previously testified that DOE rejected the inclusion of that qualitative two-part test in the standard contract?
A. I believe that's true.
Q. And, again, you have no reason to disagree with Mr. Morgan on that count, correct?
A. Yes.
Q. Yes, you have no reason to disagree?
A. That's correct.
Q. Okay. Got a little confusing there. Now, some utilities expressly recognize that

Page 2516

DOE rejected the industry's request for the inclusion of any qualitative test after the final standard contract was promulgated, correct?

A. Yes.

Q. And in your analysis in this case, you're analyzing four different rate scenarios based upon a benchmark that DOE rejected at the time of contract formation, correct?

A. Yes, but that doesn't mean that the two criteria were not important criteria to the nuclear industry.

Q. And in fact, we'll take it a step further, whether DOE rejected the industry's request for the inclusion of a 3000 rate at the time of contract formation or rejected the inclusion of a two-part test is irrelevant to your opinion concerning the reasonableness of a 3000 rate of acceptance, correct?

MR. SILBERG: Objection, compound, there's an awful lot in the question.

THE COURT: Sustained.

BY MR. GARDNER:

Q. In fact, Ms. Supko, whether DOE rejected the industry's request for the

Page 2517

inclusion of a 3000 rate in the standard contract is irrelevant to your opinion concerning the reasonableness of the 3000 rate, correct?

A. That's correct. My opinion is based on the analysis that I performed that's summarized in my expert report.

Q. And whether DOE rejected the industry's request for the inclusion of a two-part test in the standard contract, that's irrelevant to your opinion concerning the reasonableness of the 3000 rate, correct?

A. That's correct, for the same reason I just stated.

Q. Now, you're aware, Ms. Supko, after the standard contract was signed in 1983, utilities sought to amend or modify the standard contract to include a qualitative requirement similar to the ones counsel's instructed you to model in this case, correct?

A. Could you repeat that?

Q. Sure. You're aware the standard contract was signed in June of 1983, correct?

A. For most plants, yes.

Q. For most plants. And you're aware

Page 2518

that after that signing in 1983, utilities sought to amend or modify the standard contract to include a qualitative requirement similar to the one counsel's asked you to model in this case, correct?

A. Yes.

Q. Okay. And in fact, after that final standard contract was promulgated, UNWMG sought a petition for rule-making to amend or modify the standard contract, correct?

A. Yes.

Q. Why don't we take a look at that petition for rule-making? And it's Defendant's Exhibit 55, which has already been admitted into evidence.

A. It's sitting here in front of me. I'm organized.

Q. I think you know my playbook, Ms. Supko. Ms. Supko, Defendant's Exhibit 55, which has previously been admitted into evidence, is a letter to Mr. Jedrey, the contracting officer of DOE, on UNWMG letterhead, dated April 28th, 1987, correct?

A. Yes.

Q. And if you look at the left-hand

Page 2519

margin, you'll see a list of UNWMG members, right?

A. Yes.

Q. And if you look on that left-hand side on the middle, you'll see a reference to Middle South Services, Inc., correct?

A. Yes.

Q. And without getting too deep into the whole corporate structure, you understand the Plaintiffs in this case are basically the successors to Middle South Services, correct?

A. Yes.

Q. Now, you've seen this document before, right, Ms. Supko?

A. I have.

Q. Now, this letter states that UNWMG is proposing to DOE a ruling interpreting, clarifying, or amending the scope of the standard contract, correct?

A. That's what the first sentence says, yes.

Q. And if you turn to the second page of this document, the very top has a header A which says, "The contract should be interpreted, clarified, or amended to include

Page 2536

rate to preclude all additional at-reactor storage after 1998, correct?

A. I know that some have, yes.

Q. But you agree that even under your 3000 steady state rate, your scenario one, there are utilities that require additional at-reactor storage after 1998, correct?

A. Yes, as I calculated it, there are, and as I demonstrated through the sensitivity analysis that uses intracompany trading, those rights can be reduced by using that. And if one employs the other flexibilities in the standard contract, such as the ability of companies to exchange rights, it's possible to approach no additional storage after 1998.

MR. GARDNER: And why don't we talk about those flexibilities after lunch, Your Honor? Because I see it's the 12:30, I'm happy to go forward, if you wish, but it seemed like a good breaking point.

THE COURT: All right. Mr. Silberg, do you have a view?

MR. SILBERG: We're perfectly willing to take our lunch break at this point.

THE COURT: Ms. Supko, would you mind

Page 2537

a break for lunch?

THE WITNESS: That would be lovely.

THE COURT: All right. We're in recess for one hour for lunch.

(Whereupon, at 12:31 p.m., a lunch recess was taken.)

Page 2538

A F T E R N O O N S E S S I O N

(1:38 p.m.)

THE COURT: Mr. Gardner, you may proceed.

MR. GARDNER: Thank you, Your Honor.

BY MR. GARDNER:

Q. Ms. Supko, yesterday, you had mentioned a document that you believed represented a 3000 rate beginning in 1998, do you recall that?

A. Yes.

Q. It was the acquisition of waste acceptance transportation services for the Office of Civilian Radioactive Waste Management, correct?

A. Yes.

Q. September 1998 document, correct?

A. Yes.

Q. And in fact, that document is an RFP, correct?

A. It was, yes.

Q. Request for proposal, right?

A. Yes.

Q. And do you understand what DOE was requesting a proposal for?

Page 2539

A. Waste acceptance and transportation services.

Q. So this isn't a document, in other words, that was going to contract holders, correct?

A. No, it was not.

Q. It was being put out on the street to get services, correct?

A. That's correct, but there was a waste acceptance schedule in it.

Q. And let's talk about that. That waste acceptance schedule doesn't have specific years like 1998, 1999, 2000, correct?

A. It may have been identified as year one, year two, year three.

Q. Okay. So it's year one, year two, and year three. If it's year one, year two, and year three and the document states September 1998, on what basis do you believe that that document reflects acceptance beginning in 1998?

A. Well, in the prior versions of it, which I believe the first RFP came out in 1996 or '97, at the time the legislation that was being contemplated was looking at trying to expedite acceptance starting in 1998.

Page 2540

Q. Okay. But as of the time of this September 1998 document that you cited to in your report, this does not, this document, reflect 1998 as the first year of performance, correct, it reflects year one, year two, and year three?
A. It's ambiguous.
Q. It's ambiguous as to –
A. As to when the acceptance would begin.
Q. Well, let me back up. You do understand that the document reflects acceptance in year one, year two, and year three, correct?
A. Yes.
Q. And it's a September 1998 document, correct?
A. Yes.
Q. So it can't be too ambiguous that year one isn't 1998, correct?
A. That's correct.
Q. Okay. So you would understand, at that point in time, year one more likely than not would be 2010, correct?
A. No, that was not what was contemplated at that time.

Page 2541

Q. Well, if year one isn't 1998 and isn't 2010, what year do you understand year one to be representing in a September 1998 document?
A. Well, at the time, as I've said, there was legislation before Congress, the first legislation was introduced in 1995, and I believe legislative efforts continued through the year 2000 that would have cited an interim storage facility, the date to be determined, because the legislation was never finalized at that time.
Q. But in any event, year one in a September 1998 document isn't 1998, correct?
A. That's correct.
Q. Now, I think when we left off for the break, we were talking about the amount of additional at-reactor storage that you've calculated under your different rate scenarios, correct?
A. Yes.
Q. I'm making sure that I do have a correct recollection there. And I think, as you testified, you've calculated – what, 1030 MTUs of additional at-reactor storage after 1998 under your scenario one, correct?

Page 2542

A. Under a strict oldest fuel first by site, that's correct.
Q. And you don't know how high the rate of acceptance would have to be to preclude all additional at-reactor storage under a strict oldest fuel first schedule, correct?
A. I've not attempted to determine that.
Q. Now, you know, of course, the rate would have to be greater than 6,000 MTU, correct?
A. I'm sorry, repeat that.
Q. You know that the rate would have to be greater than 6,000 MTU to preclude all additional at-reactor storage under oldest fuel first priority, correct?
A. No, I don't agree with that.
Q. Well, let's take a look at your demonstrative again, Demonstrative Number 9, I believe. I'm sorry, back up one, one more. Thank you. Now, Ms. Supko, on PDX-7, this is your Supko Demonstrative 7, correct?
A. Yes.
Q. And your scenario four is a 6,000 MTU rate scenario, correct?
A. Yes.

Page 2543

Q. And under a strict oldest fuel first calculation, you've calculated 740 MTUs of cumulative additional spent fuel storage requirements after 1998, correct?
A. Yes.
MR. SILBERG: Objection, vague, we're talking about strict oldest – not strict oldest fuel first priority, but there are two demonstratives that are strict oldest fuel first priority.
THE COURT: Mr. Silberg, the Court gets the point, and technically, I think Mr. Gardner is talking about PDX-2-7, which deals with it by plant site.
MR. SILBERG: Thank you. I just wanted to make the record clear.
THE COURT: The Court is well aware of that.
BY MR. GARDNER:
Q. Am I right that by plant site, Supko PDX-7, you've calculated 740 MTUs of additional storage after 1998 under a 6,000 rate?
A. That's correct.
Q. So in order for that number, meaning the cumulative additional estimate storage

Page 2616

greater, yes.
Q. And in fact, if you assumed – or, sorry, if you did not assume the post 1998 rerack for Southern Nuclear, you would have calculated Southern Nuclear as having additional at-reactor storage after 1998 based upon a strict oldest fuel first basis, correct?
A. I believe that's correct, yes.
Q. So in other words, that would take the total number of plants with additional at-reactor storage under your scenario one from 14 plants to 15 plants, correct?
A. Yes.
Q. Now, you didn't endeavor to determine what the world looked like for every pool as of 1998, correct?
A. As I stated earlier, I started with my existing database when I first did this analysis in 2004. There have not been many companies who made changes to the pool capacities after 1998. As I said, I believe there was about a dozen of them that have had some change in their capacity.
Q. And, of course, had you wanted to, you have the technical ability to know what the

Page 2617

pool capacities were for all the 104 operating reactors as of 1998, correct?
A. Yes. It was a decision on my part to leave the analysis that I performed in my expert report as it was, recognizing that I had used some post '98 pool capacities, but knowing what I know about how those capacities impact, potentially impact the analyses, I do not believe that it would have made – would it have changed the numbers as I said earlier? Yes. Would it have changed my opinion regarding the reasonableness and the efficiency and practicality of a 3000 rate? No, it would not have.
Q. I mean, because, really, at the end of the day, we know that a 3000 rate after a short ramp-up is going to take more fuel faster than a smaller acceptance rate, correct?
A. That's correct.
Q. I mean, that's just common sense, right?
A. Well, it is. However, the calculation of additional storage requirements is a combination not just of what the rate is, but

Page 2618

where reactors fall in the queue, based on their own physical capacities and spent fuel inventories.
Q. Let's talk about some of those capacities. Your model assumes a pool's licensed capacity for a majority of the plants, correct?
A. Nuclear utilities report information to the Department of Energy through form RW-859, and DOE asks them to report two parameters for their pools. One is the maximum capacity, which is typically the licensed capacity, and then there's a second field, which is maximum usable capacity, one might call it operating capacity. Some companies report the same number for both numbers, for both of the two pool parameters, my calculation uses the, the lower of the numbers, if there's a difference, for example, with Arkansas Nuclear one, I believe the pool capacity is 968 assemblies. The operating capacity that was reported in 1998 was 900 – I'm guessing 953 assemblies or thereabout. I used the 953 assemblies that was

Page 2619

reported in 1998 at that time.
Q. And so let me see if I get this right, you're relying upon the RW-859 data for your pool capacity information, correct?
A. For the most part, yes. There have been some, as we noted with Southern Nuclear, there have been some pool capacities that the specific companies have given me additional information, and I've also used some information from licensing documents, companies have to have their pool capacities approved through a license amendment. If they're changing, if they're reracking their pool, they have to request a license amendment from the Nuclear Regulatory Commission, so in some cases, the numbers come from those documents.
Q. Is it fair to say, for the majority of plants though, you're looking at the RW-859 data in your model for pool capacity?
A. Yes, because the information, as it was reported in 1998, coincides with, you know, this period of time for which I was doing the analysis.
Q. And if I understand you correctly, the

**Northern States Power Company v. U.S No. 98-484C November 8, 2006**

**Heritage Reporting Corporation**

**Page 2290 to Page 2618**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2290

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff, ) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant. )

National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 8, 2006
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

Page 2291

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

Page 2292

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 2293

P R O C E E D I N G S

\- - - - -

THE COURT: Mr. Silberg, good morning to you.

MR. SILBERG: Good morning.

THE COURT: Did you have an enjoyable commute this morning?

MR. SILBERG: Not a problem, sir.

THE COURT: Not a problem. You must start in D.C.

MR. SILBERG: No, I start in Maryland, but very early.

THE COURT: Do we have any preliminary matters?

MR. SILBERG: None from our side.

MS. HERRMANN: Briefly, from our side, Your Honor, Mr. Lo Re.

MR. LO RE: Your Honor, just to follow up from our discussion yesterday evening, we have endeavored to address the Court's concerns regarding the proximate cause issue, and we have worked on a little bench brief that --

THE COURT: Oh, I only wanted a paragraph.

MR. LO RE: No, it's very short, not a

Page 2518

priority ranking was to be published. I believe the utility submittals occurred in 1992.

Q. Based upon that 1991 publication by DOE, correct?

A. Yes.

Q. Now, you also believe, Ms. Supko, that the 1988 draft mission plan and the 1988 annual capacity report also identified a 3000 MTU rating, correct? And I can refer you, again, to Supko Demonstrative 4, the government's.

A. I'm sorry, you said 1988?

Q. Yes, the 1988 draft mission plan amendment.

A. Yes.

Q. The 1988 annual capacity report, you believe those are also two documents that reflect a 3000 rate, correct?

A. Excuse me, it's Demonstrative 11. That's Demonstrative 4.

Q. I'm talking about, sorry, government Supko Demonstrative 4.

A. Okay.

Q. The peril of having competing demonstratives.

Page 2519

A. Yes, I was confused.

Q. Let me see if I can get a clean transcript. You believe the 1988 draft mission plan and the 1988 annual capacity report identify a 3000 MTU rate, correct?

A. It did.

Q. Now, these two documents assume performance at a permanent federal repository in 2003, correct?

A. Yes.

Q. With no performance before 1998, correct?

A. That's correct.

Q. Ms. Supko, of the 60 documents you refer to in your report and which we pulled up here as government Supko Demonstrative 4, none of them have performance at a steady state 3000 rate at a single facility beginning in 1998, correct?

A. No, all of the single facilities have a 3000 rate, some of them start in 1998, some of them don't, and some of the documents have more than one facility.

Q. And what I'm saying, Ms. Supko, just to be clear, none of the documents you referred

Page 2520

to talk about a program with a single facility beginning at a 3000 rate beginning in 1998, correct?

A. Yes, that's correct.

Q. In fact, Ms. Supko, none of your demonstratives, the demonstratives you prepared, illustrate or indicate a document in which DOE performs at a 3000 MTU steady state rate at a single facility shortly after 1988, correct?

A. I suppose that is correct, that the facilities there were either two facilities, an MRS facility and a repository or two repositories.

Q. Now, Ms. Supko, changing gears a little bit, I want to talk about your Supko Demonstrative 36, your demonstrative you prepared, if you can put that up on the chart, on the board? I'm sorry. Demonstrative 36 purports to compare your spent fuel computer model results to the 2004 ACR/APR, right, as a benchmark, I think you said?

A. Yes, and if we were clarifying this, if one just looked at the annual, excuse me, the acceptance priority ranking, which is

Page 2521

simply a list of when spent nuclear fuel was discharged from the beginning of, I believe it was like 1969, 1970 time period through 2002, and used that to extract the numbers in the right-hand column, rather than referring to the tables in the appendix B that I did yesterday, you could calculate this, independent of what the acceptance rate and schedule was.

Q. So if you were to have used, say, the 1991 annual priority ranking, would those numbers in blue have been the same?

THE COURT: Which numbers?

MR. GARDNER: I'm talking about the numbers in blue, and I recognize now that that won't mean anything for the transcript, so I guess what I'd like to say is the total column under MTUs, and the 2004 DOE APR/ACR MTUs those two blue columns.

BY MR. GARDNER:

Q. Ms. Supko, do you see those?

A. Yes.

Q. Would those two blue columns have the same numbers in them if you used the 1991 annual priority ranking, acceptance priority ranking, I mean?

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on March 16, 2007, a copy of this "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF MS. EILEEN M. SUPKO" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner