**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE**
**A SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

Pursuant to Rules 15(a) and (d) of the Rules of the Court of Federal Claims ("RCFC"), plaintiff Wisconsin Electric Power Company ("WE") moves for leave to file a Second Amended and Supplemental Complaint (Attachment A to this motion) in order to update its claim to include the damages that WE incurred in 2006 and in early 2007 and to update its weighted average cost of capital ("WACC") claim to reflect the new September 2007 trial date. The costs at issue are the same type of costs that WE has previously claimed in this litigation including cask acquisition costs, cask loading costs, spent fuel storage-related Nuclear Regulatory Commission ("NRC") fees, and costs to attempt to license WE's existing VSC-24 casks as transportable casks. In addition, as noted, WE seeks to update its WACC claim to reflect the new trial date of September 10, 2007.

## I. BACKGROUND

On November 16, 2000, WE filed its original Complaint, alleging a continuing partial breach of contract arising from the failure of the Department of Energy ("DOE") to remove SNF from WE's Point Beach Nuclear Plant ("PBNP") as required by WE's Standard Contract with the DOE, as well as other claims. Compl. at 7-10. WE's original Complaint alleged that its damages, estimated at $35 million by August 2000, "continue to accrue." Id. at ¶ 21.

Further, WE reserved the right to recover presently unascertainable damages that may be caused by the DOE's future partial breaches of the Standard Contract. Id.

On December 20, 2005, the Court issued an Order that moved the WE trial date from July 2006 to March 27, 2007. Thereafter, on February 6, 2006, WE moved for leave to file its First Amended and Supplemental Complaint ("First Amended Complaint") to update its damages since WE filed its original Complaint. On April 6, 2006, the Court granted WE's motion for leave and WE filed its First Amended Complaint on April 7, 2006. The First Amended Complaint updated WE's damages through 2005 and computed WE's claim in present dollars through the then applicable trial date of March 27, 2007.

In a February 23, 2007 Order, the Court recently rescheduled trial from March 27, 2007 to September 10, 2007. WE now seeks leave to file a Second Amended and Supplemental Complaint to update its damages since the filing of its First Amended Complaint, i.e., to claim damages incurred in 2006 and early 2007 and to reflect Wisconsin Electric's total damages in present dollars up through the September 10, 2007 trial date. These damages are the same type of costs that WE has previously claimed in this litigation including cask acquisition costs, cask loading costs, spent fuel storage-related NRC fees, licensing costs to have the VSC-24 cask licensed as transportable and the WACC of WE's damages to reflect the new trial date of September 10, 2007.

## II. ARGUMENT

### A. WE Should Be Granted Leave to Amend Its Complaint Under Rule 15(a).

WE's motion for leave should be granted in the interests of justice and to facilitate the speedy and inexpensive determination of this action. See RCFC 1. Rule 15(a) states in pertinent part: "A party may amend the party's pleadings . . . by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The decision to grant leave to amend a Complaint is within the sound discretion of the trial court. Holland v. United States, 62 Fed. Cl. 395, 406 (2005). The broad policy of granting

amendments freely is based in part on the belief that decisions on the merits should be made whenever possible, absent countervailing considerations. Id.

The U.S. Supreme Court has identified the types of limited considerations that can justify denial of a motion for leave to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962) (mandate of freely allowing amendment under Rule 15(a) "is to be heeded").

No such considerations are present here. There has been no undue delay, bad faith or dilatory motive on the part of WE. Further, there has not been repeated failure to cure deficiencies by amendments previously allowed. With trial now rescheduled for September 2007, WE simply seeks to claim those damages incurred since 2005 and to update its WACC to reflect the new September 2007 trial date. These are the same type of costs claimed in WE's original Complaint and in WE's First Amended Complaint. Because the costs at issue were incurred in 2006 and early 2007, there obviously has been no undue delay by WE.

Further, there will be no "undue prejudice" to the Government. From the beginning of this action, the Government has been on notice that WE's damages would continue to accumulate after the filing of its Complaint. See Compl. ¶ 20. The Government also is extremely familiar with the types of costs at issue, namely, cask acquisition costs, cask loading costs, spent fuel storage-related NRC fees, VSC-24 licensing costs, and WE's WACC. Indeed, the Government has conducted extensive discovery and audit verification activities regarding these same types of costs. This development also is not a surprise to the Government. When trial was rescheduled from July 2006 to March 2007, WE updated its damages to include costs incurred through the end of 2005. It naturally follows that WE would seek leave to update its damages to include costs incurred through February 2007 and to incorporate the WACC for its past damages as of the new trial date of September 10, 2007.

Moreover, contemporaneous with the filing of this motion, WE is providing to the Government the information that the Government has sought previously to verify past costs and WE's Third Supplemental Disclosures and Damages Schedules. WE's document production also includes an errata for the Kenrich Group expert report that will identify WE's updated damage claim. It also includes supporting documentation including invoices, checks, purchase orders/contracts, and the labor reports previously provided to the Government (CATS data from both WE and NMC).

With the documentation that is being provided contemporaneously with this motion, the Government's damages consultants have more than sufficient time to verify that the claimed costs have been incurred. There are a few additional supporting documents that WE will provide to the Government within the next several weeks. Further, while WE does not believe that the Government will require any additional discovery regarding this claim update, there also is time available for limited discovery. Trial is not for more than five months. Moreover, to provide as much advance notice as possible, WE notified government counsel in a March 9, 2007 letter that WE intended to move for leave to amend its Complaint. See Attachment B.

**B. WE Should Be Allowed to Supplement Its Complaint Under Rule 15(d).**

Rule 15(d) permits a party to set forth "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims that arise after the initial pleadings are filed. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1057 (9th Cir. 1981) (applying parallel Fed. R. Civ. P. 15(d)). Further, it is an abuse of discretion to deny an amendment when a supplemental Complaint "relates to the same cause of action originally pleaded." Intrepid v. Pollock, 907 F.2d 1125, 1129 (Fed. Cir. 1990).

Rule 15(d) allows a plaintiff to supplement its Complaint when there has been an increase in damages identified in the original Complaint. J. F. Shea Co. v. United States, 4 Cl. Ct. 46, 54-55 (1983), aff'd, 754 F.2d 338 (Fed. Cir. 1985) ("it must be recognized that additional facts may be developed which could increase or decrease the amount of a claim"); see also St. Paul Fire & Marine Ins. Co. v. United States, 1994 WL 874400, at *15 (Fed. Cl.) (citing Shea and Rule 15(d), the Court stated: "[T]he rules of this court allow for amendments or supplemental pleadings that increase previously-categorized damages which have changed during the course of the litigation."). Indeed, an important purpose of supplemental pleading is to bring into the record new facts which will enlarge or change the kind of relief to which the plaintiff is entitled. Southern Pac. Co. v. Conway, 115 F.2d 746, 750 (9th Cir. 1940).

In the instant case, WE's proposed Second Amended and Supplemental Complaint alleges damages incurred after the damages sought by WE's First Amended Complaint, resulting from the Government's same continuing partial breach of the Standard Contract. For example, in its original Complaint, WE alleged the following:

> As a direct and proximate result of DOE's partial material breach of the Standard Contract, WE has incurred and will incur damages in a substantial amount which, as noted, exceeded $35 million dollars by August, 2000. WE's damages continue to accrue. The rate at which WE's damages will continue to accrue is dependent upon when and on what schedule DOE finally performs its contractual obligation. WE reserves its rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contract.

Compl. ¶ 21. The damages that WE incurred prior to filing its Complaint included, among other things, the cost to construct and maintain a dry storage facility and to develop and purchase casks for use at that facility. Id. ¶ 17. WE had paid $168 million into the Nuclear Waste Fund at that time, November 2000. Id. ¶ 10.

In its First Amended Complaint, WE alleged that it continued to pay fees to DOE under the Standard Contract. First Amended Compl. ¶ 34. WE further alleged:

> From November 2000 and continuing through December 2005, as a direct and proximate result of the Government's continuing partial breach of WE's Standard Contract and continuing taking of WE's property without just compensation, WE has incurred substantial damages. The amount of damages suffered by WE during this period exceeds $26 million (present dollars as of March 27, 2007), the exact amount to be determined at trial. These costs related to the following transactions, occurrences, or events, among others: fabrication oversight, purchase, and delivery of dry storage containers; loading and handling of dry storage containers; operation and maintenance of WE's ISFSI; and spent fuel management activities to address the long-term disposal of spent fuel.

Id. ¶ 36.

WE's Second Amended and Supplemental Complaint alleges that it continues to pay fees to DOE under the Standard Contract and that, as of January 30, 2007, it had already paid more than $217 million into the Nuclear Waste Fund pursuant to the Standard Contract. Second Amended and Supplemental Compl. ¶ 34 (Attachment A). WE further alleges:

> From January 1, 2006 and continuing through February 28, 2007, as a direct and proximate result of the Government's continuing partial breach of WE's Standard Contract and continuing taking of WE's property without just compensation, WE has incurred substantial damages. The amount of damages suffered by WE during this period exceeds $5.9 million (present dollars as of September 10, 2007), the exact amount to be determined at trial. These costs related to the following transactions, occurrences, or events, among others: fabrication oversight, purchase, and delivery of dry storage containers; loading and handling of dry storage containers; operation and maintenance of WE's ISFSI; and spent fuel management activities to address the long-term disposal of spent fuel.

Id. ¶ 36.

In sum, the allegations of WE's proposed Second Amended and Supplemental Complaint all concern damages resulting from DOE's same and continuing breach of the Standard Contract. WE's Second Amended and Supplemental Complaint merely describes the damages previously alleged and updates these damages. Since WE filed its First

Amended Complaint in April 2006, WE has incurred approximately $5.4 million in nominal dollar damages ($5.9 million present dollars as of September 10, 2007) and WE's updated total claim in present dollars as of September 10, 2007 is $97.6 million. These additional damages are attributable to DOE's continued failure to perform under the Standard Contract. The Second Amended and Supplemental Complaint is permitted under Rule 15(d) because it is "part of the same claim arising out of the government's acts." Intrepid, 907 F.2d at 1129-30. Accordingly, the Court should grant WE's motion for leave to file its Second Amended and Supplemental Complaint.

**C. WE Should Be Allowed to Amend Its Complaint in the Interests of Judicial Efficiency**

Judicial efficiency would be served by allowing WE to file a Second Amended and Supplemental Complaint to update its damages. WE has entered into a Letter of Intent to sell its nuclear plant to Florida Power and Light ("FPL"), and WE expects the sale to close in October 2007. By updating its claim as sought in this motion for leave, WE expects to claim its remaining damages against DOE. WE expects that, upon closing of this sales transaction, FPL will assume all rights and obligations under the Standard Contract, including the right to recover post-Closing damages resulting from DOE's continuing failure to commence acceptance and removal of SNF for disposal as required by the Standard Contract.

Again, the Government will not be prejudiced by the granting of leave to WE to update its damages claim. The costs at issue are the same type of damages that WE has previously claimed and the Government is extremely familiar with the type of costs at issue. The Government has already conducted extensive discovery and audit verification activities regarding these types of costs. Under the applicable Rule 15 standard, WE's motion should be granted so that the damage totals may be updated through February 28, 2007 and to permit WE to supplement its pleading to allow these updated damages to be resolved in this proceeding.

## III. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court grant WE's Motion for Leave to File a Second Amended and Supplemental Complaint under Rules 15(a) and 15(d), and allow WE to file its Second Amended and Supplemental Complaint (see Attachment A).

Dated: April 10, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on April 10, 2007, I caused a copy of the foregoing "Plaintiff's Motion for Leave to File a Second Amended and Supplemental Complaint" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Emily C.C. Poulin
Emily C.C. Poulin

# ATTACHMENT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

Plaintiff Wisconsin Electric Power Company ("WE") files this Second Amended and Supplemental Complaint pursuant to Rules 15(a) and 15(d), through its undersigned counsel, and states as follows:

## I. NATURE OF THE CASE

1. This is an action for money damages based on a breach of contract claim that WE brought against the United States, acting through the U.S. Department of Energy ("DOE"). More specifically, the DOE undertook an unconditional obligation to begin disposing of spent nuclear fuel and high-level nuclear waste (collectively, "SNF") generated by the commercial nuclear facility owned and operated by WE. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101, et seq. ("NWPA"), DOE and WE entered into a contract in 1983 under which WE has paid and continues to pay substantial fees in return for DOE's obligation to begin removal and disposal of WE's SNF no later than January 31, 1998. WE has fully complied with its fee payment obligations under the contract. DOE, however, has failed to begin disposal of SNF as of January 31, 1998 and has stated that it will not do so until 2017 at the earliest. WE has incurred and will continue to incur significant costs and other damages as a result of DOE's partial material breach of its contractual obligations.

## II. PARTIES

2. WE is a Wisconsin corporation with headquarters in Milwaukee, Wisconsin. It is primarily a public utility, providing energy to residential and business users. WE's parent corporation is Wisconsin Energy Corporation. WE is the owner and operator of Units 1 and 2 of the Point Beach Nuclear Plant ("Point Beach"). WE's nuclear plant has generated and continues to generate SNF, which is stored at the Point Beach site.

3. Defendant is the United States, acting through the DOE.

## III. JURISDICTION

4. The Court has jurisdiction over this action under 28 U.S.C. § 1491.

5. WE and DOE entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") pursuant to which DOE is to accept and dispose of the SNF generated by WE's nuclear plant in return for payment of fees by WE. DOE's failure to begin disposal of SNF by January 31, 1998 constitutes a partial material breach of its Standard Contract with WE for which WE may seek recovery of its damages without exhausting any administrative remedies. Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000).

6. Furthermore, Article XI of the Standard Contract states: "Nothing in this Contract shall be construed to preclude either party from asserting its rights and remedies under the Contract or at law." This provides another basis for WE to pursue its legal claims without exhausting any administrative remedies.

## IV. FACTS

7. In 1982, Congress enacted the NWPA, codifying the Federal Government's commitment to accept responsibility for and to provide for the timely disposition of commercial SNF. Pursuant to the NWPA, DOE was required to commence disposing of commercially-generated SNF no later than January 31, 1998, in return for the payment of

fees by utilities and others that generated or held title to the SNF. The fees are paid into the Nuclear Waste Fund, which is the source of funds to cover DOE's costs of disposing of the SNF.

8. Pursuant to the NWPA, DOE developed the Standard Contract in 1983. The Standard Contract embodies the reciprocal obligations mandated by the NWPA, pursuant to which the utilities agreed to pay fees into the Nuclear Waste Fund in return for the provision of the SNF disposal services by DOE, beginning no later than January 31, 1998. The Standard Contract provides: "The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." See 10 C.F.R. Pt. 961.11, art. II.

9. Consistent with the NWPA, WE entered into a Standard Contract with DOE on June 16, 1983. A copy of WE's contract as executed with DOE is attached as Exhibit 1. The Standard Contract requires DOE to commence disposal of WE's SNF no later than January 31, 1998. The Standard Contract also requires DOE to arrange for and to provide transportation casks and all necessary transportation of the SNF from WE's site to a DOE facility. The Standard Contract permits DOE, in order to carry out its obligations under the contract, to use any appropriate facility operated by or on behalf of DOE.

10. WE's Standard Contract provides that WE will pay the Government fees which, together with fees paid by other utilities pursuant to contracts under NWPA, will be sufficient for DOE to implement and to operate a program for the prompt disposal of all the SNF that WE will be ready to deliver. As of January 30, 2007, WE had paid more than $217 million into the Nuclear Waste Fund pursuant to the Standard Contract and continues to pay fees into the Fund.

11. WE's Standard Contract provides that, in return for the payment of such fees, DOE will implement and operate a program for the prompt disposal of all the SNF that WE

will be ready to deliver. In the more than twenty-four years since the enactment of the NWPA, DOE has failed to take reasonable actions to develop and to implement an SNF disposal program or to perform its obligations to dispose of WE's SNF.

12. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation") wherein DOE indicated that it would not have either a permanent repository or an interim storage facility available by 1998 and that it would not commence disposal of the SNF at a repository until 2010 at the earliest. 60 Fed. Reg. 21973, 21974 (May 3, 1995). The Final Interpretation also stated DOE's conclusion that the NWPA did not impose an obligation on DOE to dispose of the utilities' SNF in 1998 in the absence of a disposal or interim storage facility.

13. Several nuclear utilities then sought review of DOE's Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit ruled in favor of the utilities and held that the NWPA imposed upon DOE an unconditional obligation to begin disposing of SNF by January 31, 1998. Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The court further held that this obligation was reciprocal to the utilities' obligation to pay fees into the Nuclear Waste Fund. The court remanded the matter to DOE for proceedings consistent with the opinion.

14. Notwithstanding the D.C. Circuit's ruling, DOE advised WE and other Standard Contract holders that it would not begin disposal of the SNF by the January 31, 1998 deadline. Furthermore, DOE took the position that its failure to meet this deadline was excused, arguing that its delay was unavoidable.

15. In response to DOE's action, the utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel DOE to comply with the mandate in Indiana Michigan. In Northern States Power Co. v. United States, 128 F.3d 754 (D.C. Cir. 1997), the D.C. Circuit reiterated that DOE had an unconditional obligation under both the NWPA and the Standard Contract to begin disposal of the utilities' SNF by January 31, 1998. The court

held that DOE had a clear duty to act in accordance with this unconditional obligation and issued a writ of mandamus precluding DOE from arguing that its failure to meet the January 31, 1998 deadline was unavoidable.

16. Despite the ruling in Northern States, DOE made no effort to meet the contractual deadline. DOE did not begin disposal of the SNF by January 31, 1998, as required by the NWPA and the Standard Contract, and has indicated that it will not begin to dispose of the SNF until 2017 at the earliest. DOE has failed and refused to provide any firm commencement date for the disposal of WE's SNF.

17. As a direct consequence of DOE's breach of contractual obligations, WE has been and will be forced to incur substantial additional costs. For example, WE has had to construct and maintain a dry storage SNF facility known as the Independent Spent Fuel Storage Installation ("ISFSI"). Construction of the ISFSI required substantial evaluation by WE, including preparation of an environmental analysis; efforts to seek the approval of the Public Service Commission of Wisconsin; and efforts to seek the approval of the Nuclear Regulatory Commission for WE's use of casks at the ISFSI. WE has also had to spend substantial monies in developing and purchasing these casks, and incurred costs relating to the delivery, loading, and handling of dry storage containers. Moreover, WE incurred costs for spent fuel management activities to address the long-term disposal of spent nuclear fuel. As of February 28, 2007, such costs exceeded $97.6 million (present dollars as of September 10, 2007).

## V. COUNT ONE: PARTIAL MATERIAL BREACH OF CONTRACT

18. WE incorporates by reference paragraphs 1 through 17 of this Complaint as if set forth herein.

19. WE has complied with and continues to comply with all of its obligations under the Standard Contract, including the payment of all required fees into the Nuclear Waste Fund.

20. The DOE has failed to perform its obligation under the Standard Contract to dispose of all of WE's SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contract.

21. As a direct and proximate result of DOE's partial material breach of the Standard Contract, WE has incurred and will incur damages in a substantial amount which, as noted, exceeded $91.7 million (present dollars as of September 10, 2007) by December 2005. WE's damages continue to accrue. The rate at which WE's damages will continue to accrue is dependent upon when and on what schedule DOE finally performs its contractual obligation. WE reserves its rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contract.

## VI. COUNT TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

22. WE incorporates by reference paragraphs 1 through 21 of this Complaint as if set forth herein.

23. The Standard Contract between WE and DOE contains an implied covenant of good faith and fair dealing pursuant to which DOE has a duty to perform its obligations under the contract in good faith and not to take actions detrimental to WE's contractual rights. DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning disposal of SNF; by attempting to avoid its obligations under the Standard Contract as defined by the D.C. Circuit; by failing to make any effort to dispose of WE's SNF or even to provide WE with a firm date on which DOE will begin to perform the SNF disposal operations; and by insisting on WE's continued performance of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

24. DOE's failure to act has not been a result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been below the level of

annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its obligations under the Standard Contract.

25. In contrast to DOE's failure to take any action to meet its Standard Contract commitments, DOE has taken action to receive, transport and store the SNF from other utilities. For example, DOE continues to accept and store the SNF from foreign research reactors.

26. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, WE has suffered and will continue to suffer damages in excess of $10,000.

## VII. COUNT THREE: UNCOMPENSATED TAKING

27. WE incorporates by reference paragraphs 1 through 26 of this Complaint as if set forth herein.

28. WE's interests in Point Beach and related land are property rights within the meaning of the Fifth Amendment to the U.S. Constitution.

29. DOE's failure to dispose of WE's SNF denies WE the use and value of its Point Beach site for the foreseeable future until DOE performs its obligation to dispose of WE's SNF.

30. DOE's failure to dispose of WE's SNF effects a taking by DOE of WE's property interests for a public purpose, which requires DOE to pay WE just compensation for that property under the Takings Clause of the Fifth Amendment to the U.S. Constitution.

31. DOE's failure to dispose of WE's SNF has destroyed WE's reasonable investment-backed expectations arising from the NWPA and WE's Standard Contract with DOE regarding WE's use of its Point Beach site for the foreseeable future.

32. By reason of the foregoing, the Government has taken WE's property without compensation and is liable to WE for just compensation for that property under the Takings Clause of the Fifth Amendment to the U.S. Constitution.

## VIII. COUNT FOUR: SUPPLEMENTAL PLEADING

33. WE incorporates by reference paragraphs 1 through 32 of this Complaint as if set forth herein.

34. Since filing the Amended and Supplemental Complaint on April 7, 2006, WE has continued to pay fees to DOE pursuant to the Standard Contract. As of January 30, 2007, WE had paid more than $217 million into the Nuclear Waste Fund pursuant to the Standard Contract and continues to pay fees into the Fund.

35. Since filing the Amended and Supplemental Complaint on April 7, 2006, WE has incurred and continues to incur additional damages at Point Beach, which damages arise from the Government's same and continuing partial breach of WE's Standard Contract and the Government's same and continuing taking of WE's property without just compensation.

36. From January 1, 2006 and continuing through February 28, 2007, as a direct and proximate result of the Government's continuing partial breach of WE's Standard Contract and continuing taking of WE's property without just compensation, WE has incurred substantial damages. The amount of damages suffered by WE during this period exceeds $5.9 million (present dollars as of September 10, 2007), the exact amount to be determined at trial. These costs related to the following transactions, occurrences, or events, among others: fabrication oversight, purchase, and delivery of dry storage containers; loading and handling of dry storage containers; operation and maintenance of WE's ISFSI; and spent fuel management activities to address the long-term disposal of spent fuel.

37. WE continues to reserve its right to recover future damages that may be caused by the Government's future partial breaches of the Standard Contract and the Government's continuing taking of WE's property without just compensation.

## IX. PRAYER FOR RELIEF

WHEREFORE, WE respectfully requests that the Court enter judgment in its favor and against the United States as follows:

1. On Count One, for damages in an amount in excess of $91.7 million (present dollars as of September 10, 2007), the exact amount to be proven at trial;

2. On Count Two, for damages in an amount to be proven at trial;

3. On Count Three, for damages in an amount to be proven at trial;

4. On Count Four, for damages in an amount in excess of $5.9 million (present dollars as of September 10, 2007), the exact amount to be proven at trial;

5. Prejudgment and post-judgment interest as permitted by law;

6. Costs of this action, including reasonable attorneys' fees, as permitted by law; and

7. Such other relief as the Court deems just and equitable.

Dated: April 10, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1675

**EXHIBIT 1**

July 20, 1983

Mr. J. H. Goetsch:

CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

Attached for Corporate files is the original signed copy of the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste between Wisconsin Electric Power Company and the U. S. Department of Energy.

Also attached is copy of a letter in which we acknowledge receipt of this contract.

Sol Burstein

Attachments

Copies to Messrs. R. W. Britt )
C. W. Fay )
J. R. Donahue )
W. J. Dundas )
T. J. Conlin )
D. K. Porter )

Since you were previously provided a copy of the contract, only the first sheet (containing the contract number) and the signature page are attached.

EXHIBIT 1

Department of Energy
Washington, D.C. 20585

Mr. R. W. Britt
Wisconsin Electric Power Company
231 W. Michigan Street
P. O. Box 2046
Milwaukee, Wisconsin 53201

Dear Mr. Britt:

Subject: Contract Number DE-CR01-83NE44425

Enclosed herewith is one fully executed copy of subject contract.

Please acknowledge receipt of this contract by completing the "Acknowledgement" below and returning it to:

U.S. Department of Energy
Office of Procurement Operations
Attn: Thomas S. Keefe
Room Number 1J-027
1000 Independence Avenue, SW
Washington, DC 20585

Sincerely,

Thomas S. Keefe
Contracting Officer
Office of Procurement Operations

Enclosure

ACKNOWLEDGEMENT:

R. W. Britt, President

Contractor's Authorized Representative
Name and Title (Type/Print)

Signature

July 21, 1983

Date

EXHIBIT 1

**Wisconsin Electric** POWER COMPANY
231 W. MICHIGAN, P.O. BOX 2046, MILWAUKEE, WI 53201

June 15, 1983

U.S. DEPARTMENT OF ENERGY
Procurement and Assistance
Management Directorate
Office of Procurement Operations
Washington, D.C. 20585

Attention: Mr. T. S. Keefe, MA-453

Gentlemen:

CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

Enclosed are four copies of the Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste signed on behalf of Wisconsin Electric Power Company.

We have signed the Contract at this time because of the June 30, 1983 deadline imposed (we believe erroneously) by the U.S. Department of Energy. Our signing should not be interpreted as agreeing with either the Final Rule or the Standard Contract. We are not waiving our rights to seek changes in the rule and the Contract or to submit claims based upon the imposition of inappropriate or inequitable provisions contained therein.

Very truly yours,

R. W. Britt

President and Chief Operating Officer

Blind copies (wo/enc.) to Messrs. Sol Burstein
J. H. Goetsch
C. W. Fay
J. R. Donahue
W. J. Dundas
T. J. Conlin
D. K. Porter

EXHIBIT 1

U. S. DEPARTMENT OF ENERGY CONTRACT NO. -CR01-83NE44425

# CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE.

THIS CONTRACT, entered into this 16th day of June 19 83, by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereafter referred to as "DOE") and WISCONSIN ELECTRIC POWER COMPANY, (hereinafter referred to as the "Purchaser"), a corporation organized and existing under the laws of the State of WISCONSIN

WITNESSETH THAT:

WHEREAS, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

WHEREAS, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and

WHEREAS, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

EXHIBIT 1

WHEREAS, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

WHEREAS, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

WHEREAS, the Purchaser desires to obtain disposal services from DOE; and

WHEREAS, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

WHEREAS this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, 42 U.S.C. 7101 et seq.) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, 42 U.S.C. 10101 et seq.)

NOW, THEREFORE, the parties hereto do hereby agree as follows:

ARTICLE I - DEFINITIONS

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.
2. The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

3. The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(b) of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2133, 2134(b)).

4. The term "Commission" means the United States Nuclear Regulatory Commission.

5 The term "contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer of the DOE; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "delivery" means the transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

8. The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.



EXHIBIT 1

9. The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

10. The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

11. The term "full cost recovery," means the recoupment by DOE, through Purchaser fees and any interest earned, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles consistently applied, of providing disposal services and conducting activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "cost" includes the application of Nuclear Waste Fund monies for those uses expressly set forth in section 302(d) and (e) of the said Act and all other uses specified in the Act.

12. The term "high-level radioactive waste" (HLW) means -

(a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.



EXHIBIT 1

13. The term "kilowatt hours generated" means electricity generated by nuclear fuel at a civilian nuclear power reactor specified in Appendix A hereto as measured at the output terminals of the turbine generator.

14. The term "metric tons uranium" means that measure of weight equivalent to 2,204.6 pounds of uranium and other fissile and fertile material that are loaded into a reactor core as fresh fuel.

15. The term "Purchaser's site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "quarterly Treasury rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the Federal Register prior to the beginning of the affected quarter.

17. The term "shipping lot" means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date.

18. The term "spent nuclear fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

19. The term "spent nuclear fuel and high-level radioactive waste of domestic origin" means irradiated fuel material used, and radioactive wastes resulting from such use, in nuclear power reactors located only in the United States.

20. The term "year" means the period which begins on October 1 and ends on September 30.

EXHIBIT 1

ARTICLE II - SCOPE

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

ARTICLE III - TERM

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A.

ARTICLE IV - RESPONSIBILITIES OF THE PARTIES

A. Purchaser's Responsibilities

1. Discharge Information

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next



EXHIBIT 1

discharges to date and projected discharges for the next ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 A.M. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. Preparation for Transportation

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

EXHIBIT 1

B. DOE Responsibilities

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such casks(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

   (a) written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

   (b) training for Purchaser's personnel in cask handling and loading, as may be necessary;

   (c) technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

   (d) sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

EXHIBIT 1

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5.(a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

ARTICLE V - DELIVERY OF SNF AND/OR HLW

A. Description of SNF and HLW

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.



EXHIBIT 1

B. Delivery Commitment Schedule

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

C. Final Delivery Schedule

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an



EXHIBIT 1

approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

D. Emergency Deliveries

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

E. Exchanges

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; provided, however, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date

specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

ARTICLE VI - CRITERIA FOR DISPOSAL

A. General Requirements

1. Criteria

(a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

(b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

2. Procedures

(a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of any changes in said SNF and/or HLW as soon as they

become known to the Purchaser.

(b) DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

B. Acceptance Procedures

1. Acceptance Priority Ranking

Delivery commitment schedules for SNF and/or HLW may require the disposa of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in subparagraph (b) below and Article V.D of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the

date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V.

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

2. Verification of SNF and/or HLW

During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot shall be subject to verification by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices E and F, DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above-named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U. S. Department of Transportation."



EXHIBIT 1

3. Improperly Described SNF and/or HLW

(a) Prior to Acceptance - If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) After Acceptance - If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such finding. In the event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days. In the event of a failure by the Purchaser to provide such proper designation, DOE may hold in abeyance any and all deliveries scheduled hereunder.

ARTICLE VII - TITLE

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be

solely responsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

ARTICLE VIII - FEES AND TERMS OF PAYMENT

A. Fees

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s). The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule



EXHIBIT 1

are listed below:

| Nuclear Spent Fuel Burnup Range | Dollars per Kilogram (1982 Dollars) |
|---|---|
| 0 - 5,000 MWDT/MTU | $ 80.00 |
| 5,000 - 10,000 MWDT/MTU | $ 142.00 |
| 10,000 - 20,000 MWDT/MTU | $ 162.00 |
| over 20,000 MWDT/MTU | $ 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of uranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans to reinsert. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.



EXHIBIT 1

4. DOE will annually review the adequacy of the fee and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

B. Payment

1. For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983 to June 30, 1983. A one time adjustment period payment shall be due on N/A, for the period N/A to N/A. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin July 1, 1983

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) OPTION 1 - The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee

balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) OPTION 2 - The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the



EXHIBIT 1

outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) OPTION 3 - The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

3. Method of Payment

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to "Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.



EXHIBIT 1

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

$$\text{Interest} = \text{Unpaid Balance Due To DOE For Assigned Three Month Period} \times \text{Quarterly Treasury Rate Plus Six Percent (6\%)} \times \frac{\text{Number of Months Late Including Month Of Payment (Fractions Rounded Up to Whole Months)}}{12}$$

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice for interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

ARTICLE IX - DELAYS

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE -- such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather--- cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.



EXHIBIT 1

B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

ARTICLE X - SUSPENSION

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion

of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

ARTICLE XI - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

ARTICLE XII - NOTICES

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

U.S. Department of Energy
Procurement and Assistance Management Directorate
Office of Procurement Operations
Washington, D.C. 20585
Attention:
__________

To the Purchaser:

Vice President, Nuclear Power Department
Wisconsin Electric Power Company
231 W. Michigan Street
P. O. Box 2046
Milwaukee, Wisconsin 53201
__________

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; provided, however, that notice of such changes shall be given by registered mail.



EXHIBIT 1

ARTICLE XIII - <u>REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY</u>

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

ARTICLE XIV - <u>ASSIGNMENT</u>

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; <u>provided</u>, <u>however</u>, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.



EXHIBIT 1

ARTICLE XV - AMENDMENTS

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; provided, however, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April ___, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

ARTICLE XVI - DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.



EXHIBIT 1

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; <u>provided, however</u>, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

ARTICLE XVII - <u>OFFICIALS NOT TO BENEFIT</u>

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.



EXHIBIT 1

ARTICLE XVIII - COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

ARTICLE XIX - EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

ARTICLE XX - PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.



EXHIBIT 1

ARTICLE XXI - RIGHTS IN TECHNICAL DATA

A. Definitions.

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and



EXHIBIT 1

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B. Allocation of rights.

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

LIMITED RIGHTS LEGEND

This "proprietary data," furnished under "Contract No. ______________" with the U. S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.



EXHIBIT 1

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

ARTICLE XXII - ENTIRE CONTRACT

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

C. Appendices:

A. Nuclear Power Reactor(s) or Other Facilities Covered

B. Discharge Information (Ten Year; Annual)

C. Delivery Commitment Schedule

D. Final Delivery Schedule

E. General Specifications

F. Detailed Description of Purchaser's Fuel

G. Standard Remittance Advice

WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

UNITED STATES OF AMERICA
UNITED STATES DEPARTMENT OF ENERGY
BY: _______________
(Contracting Officer)
Thomas S. Keefe

WITNESSES AS TO EXECUTION ON BEHALF OF PURCHASER

Barbara C. Kwaitkowski
(Name)

231 W. Michigan St.
(Address)

_______________
(Name)

231 W. Michigan St
(Address)

WISCONSIN ELECTRIC POWER COMPANY
(Purchaser's Company Name)

By: _______________

Title: President

I, J. H. Goetsch, certify that I am the Secretary of the corporation named as Purchaser herein; that R. W. Britt who signed this document on behalf of the Purchaser was then President of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said corporation this 16th day of June, 1983

(Corporate Seal)

_______________
(Signature)



EXHIBIT 1

**ATTACHMENT B**

Perkins Coie

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

Richard W. Oehler
PHONE: (206) 359-8419
FAX: (206) 359-9419
EMAIL: R.Oehler@perkinscoie.com

March 9, 2007

**BY FACSIMILE AND FIRST CLASS MAIL**

Harold D. Lester, Jr.
Marian Sullivan
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

**Re: Wisconsin Electric v. United States, No. 00-697C**

Dear Counsel:

In a February 23, 2007 Order, the Court rescheduled the trial from March 27, 2007 until September 10, 2007. Accordingly, Wisconsin Electric ("WE") intends to move for leave to file a second amended and supplemental complaint to update its damages through early 2007. WE intends to move for leave to amend by early April 2007, but is providing this advance notice to the Government now in case this information would assist the Government in planning audit verification activities.

The damages that WE will seek in this update are the same type of costs that WE has previously claimed in this litigation including cask acquisition costs, cask loading costs, NRC fees for SNF management, licensing costs to have the VSC-24 cask licensed as transportable and the weighted average cost of capital of WE's damages to reflect the new trial date of September 10, 2007.

Contemporaneously with WE's motion for leave, WE will produce to the Government documentation and electronic files in support of the claim update. This documentation

will be the same type of documentation that the Government has previously requested to support WE's costs.

If you have any questions, please call me.

Very truly yours,

Richard W. Oehler

cc: Catherine Phillips
Donald J. Carney