IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 00-697C<br>(Senior Judge Merow) |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE ITS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

In its Response, the Government argues against amendment by Wisconsin Electric Power Company ("WE") of its Complaint, contending that such amendment would "require the dedication of significant resources and impinge upon the Government's trial preparation." Response at 6. To the contrary, amendment of WE's Complaint in no way requires the dedication of significant Government resources. WE merely seeks to update its costs from January 1, 2006 through February 2007 after, at the Government's request, the trial was postponed from March 27, 2007 until September 10, 2007. The costs at issue are the same type of costs previously claimed by WE including cask acquisition costs, cask loading costs, NRC license fees and costs incurred in support of an attempt to license one of WE's existing casks, the VSC-24, as transportable. WE has provided to the Government precisely the same types of supporting documentation previously provided. Now, all that the Government needs to do is have its damages consultant verify the costs and, if the Government believes that it is appropriate, request that its damages expert issue an errata to his expert report to address WE's newly-claimed costs.[1]

[1] WE's damages experts have prepared errata to their report to address the newly-claimed costs.

As noted in our Motion, WE is selling the Point Beach Nuclear Plant ("Point Beach") and the sale is expected to close in October 2007. If the Court permits WE to amend its Complaint to update its costs through February 2007 and the sale transaction closes in October 2007, WE does not expect to file an additional action to claim damages that it incurs from March 2007 through October 2007. Thus, even if some additional effort on the part of the Government's damages expert and consultants is required to respond to WE's Second Amended Complaint, that minimal effort, when balanced against the efficiencies of permitting WE to amend its Complaint and avoid the necessity of filing an additional lawsuit, compels the conclusion that WE's motion for leave to amend should be granted.

## I. BACKGROUND

In its Background section, the Government's Response generally implies that the Government lacks the documentary evidence that it needs to review the WE costs at issue. To the contrary, on April 10, 2007, the same day that WE filed its motion for leave to amend its Complaint, WE served upon the Government the same type of supporting documentation that the Government previously requested to verify WE's prior costs.[2] Thereafter, when the Government requested three additional pieces of data, WE provided that data on May 10, 2007. See Appendix 1-2 (Govt. May 2, 2007 letter) and 3-4 (WE May 10, 2007 letter) (hereinafter "Appx."). WE is not aware of any outstanding Government request for additional data with regard to WE's newly-claimed costs.

The data produced by WE to the Government in April and May 2007 includes the following in support of the 2006-2007 costs:

[2] WE's April 10, 2007 letter to the Government explained that "less than a dozen" documents were not included in the production of cost support documentation. Subsequently, on May 18, 2007, WE produced to the Government the five final documents in support of its 2006-2007 costs. These final five documents included two revised purchase orders and three checks.

- electronic labor data (CATS data) from both WE and the Nuclear Management Company ("NMC") (which operates Point Beach), including descriptions for entries in selected fields;
- electronic files used by WE's expert, the Kenrich Group, in a format that can be manipulated by the Government;
- paper copies of purchase orders, contracts, invoices and checks for any transactions greater than $5,000;
- paper copies of monthly bills from NMC to WE;
- paper copies of accounting reports from WE;
- an electronic file of a "data dump" from WE's SAP accounting system, reflecting data from all fields of the accounting system; and
- an electronic file of a "data dump" from NMC's SAP accounting system, reflecting data from all fields of the accounting system.

These productions to the Government include the exact same documents and data that the Government has previously requested to conduct its audit verification. Through its previous audit verification process, the Government was able to confirm that it was not challenging the accuracy of WE's costs for NRC Annual Fees, employee expenses, Pension & Benefits costs, Administrative & General costs, or the labor costs for November 1988 through March 1999.[3] See Appx. 5-9 (Govt. January 26, 2007 letter).

The Government's Response identifies issues that it contends it would investigate through discovery and that its experts would be required to address in the event WE is permitted to file its Second Amended Complaint. Response at 1-6. The Government misstates the need for discovery and exaggerates the minimal effort required by the Government's damages expert and consultants.

If the Government requires depositions of fact or expert witnesses, which WE doubts are necessary, the Government will only need to depose, at most, the supervisor of Point Beach cask loading efforts and possibly WE's damages expert. Neither deposition should take more than a half-day. The Government also asserts that WE will want to depose the

[3] The Government had already agreed to the accuracy of WE's labor costs from April 1999 through December 2005 based on Mr. Kiraly's expert report.

Government's experts again after they issue updates to their reports. Assuming that these updates raise no new issues (and we see no reason why they should), WE does not anticipate the need to depose any of the Government's experts again.

**A. Labor Costs**

The Government asserts that it would need additional discovery regarding WE's newly-claimed labor costs to determine the "appropriate manner in which to respond to them" and alleges that WE has "not provided all of the data necessary to analyze [the] newly claimed labor costs." Response at 3. To the contrary, by May 10, 2007, WE provided all of the data regarding labor costs that the Government – and its damages expert, Mr. Stephan Kiraly – previously required in order to analyze and verify WE's labor costs. This data was provided by WE to the Government in spreadsheet format on compact disks labeled as WISC 00135472-75 and WISC 00136526.

Further, the Government gives no indication how its analysis of WE's newly-claimed labor costs might differ from its analysis of WE's already-claimed labor costs. There is no indication that Mr. Kiraly would engage in a new analysis in order to determine whether WE's newly-claimed costs are subject to the same objections that he has already made against WE's already-claimed labor costs. We would expect that Mr. Kiraly would voice the same objections that he previously voiced. Given that WE has already provided all supporting documentation for the newly-claimed costs, no additional discovery on this issue should be required.

**B. Employee Expenses**

The Government argues that further discovery is required to determine "whether there will be additional claim adjustments for employee expenses" included in WE's Second Amended Complaint. Response at 3-4. WE understands that Mr. Kiraly, the Government damages expert, made adjustments to WE's already-claimed employee expenses when he was unable to identify that a person was working on the dry fuel storage project at the time their expense was charged. On April 10, 2007, WE provided all of the data regarding employee

expenses that Mr. Kiraly previously required in order to make any such adjustment to WE's claim for 2006-2007 employee expenses.

Moreover, on October 26, 2006, WE provided a sample of receipts for its previously-claimed employee expenses. WE provided supporting documentation for 260 randomly-chosen employee expense transactions and, after its review, the Government responded on January 26, 2007 by stating: "[b]ased upon the additional documentation, the Government no longer denies the accuracy of the Employee Expenses included in the claim." Appx. 5-9. Given the Government's admission that WE's claimed employee expenses accurately reflect WE's books and records, WE sees no justification for further sampling of WE's 2006-2007 employee expenses.

In sum, the Government's damages expert already has all the data necessary to conduct the same Government analysis previously conducted with regard to WE's claimed employee expenses and no additional discovery should be required.

**C. General & Administrative ("G&A") Costs**

The Government states that, assuming that the newly-claimed G&A costs do not differ in nature from WE's previously-claimed G&A costs, the Government will apply the same adjustment that it made to WE's previously-claimed costs. Response at 4. WE represents that the newly-claimed G&A costs do not differ in nature from WE's previously-claimed G&A costs.

In addition, in its April 10, 2007 production, WE provided to the Government the same G&A information previously provided so that the Government can verify this point. This documentation was produced by WE to the Government as KRGWE003859-63. Thus, the Government already has all of the information required to make "the same adjustments" that the Government previously made to WE's G&A costs.

With regard to G&A costs recorded by NMC, the Government argues that WE "has not provided the detailed accounting data that would allow these determinations[, in the form of claim adjustments,] to be made." Id. To the contrary, on April 10, 2007, WE provided all

detailed accounting data in support of NMC's G&A costs. The following chart identifies the pages in WE's April 10 production that would reflect NMC's G&A charges and would enable Mr. Kiraly to perform the same G&A calculations that he previously performed.

| Bates Range | WE Binder/Code | NMC Bill |
|---|---|---|
| WISC 00135664-66 | Q – 3.0264 | January 2006 |
| WISC 00135669-71 | Q – 3.0264 | February 2006 |
| WISC 00135674-76 | Q – 3.0264 | March 2006 |
| WISC 00135681-83 | Q – 3.0264 | April 2006 |
| WISC 00135692-94 | Q – 3.0264 | May 2006 |
| WISC 00135735-37 | Q – 3.0264 | June 2006 |
| WISC 00135763-65 | Q – 3.0264 | July 2006 |
| WISC 00135783-85 | Q – 3.0264 | September 2006 |
| WISC 00135810-12 | Q – 3.0264 | October 2006 |
| WISC 00135895-97 | R – 3.0182 | January 2006 |
| WISC 00135901-03 | R – 3.0182 | February 2006 |
| WISC 00135951-53 | R – 3.0182 | March 2006 |
| WISC 00136013-16 | R – 3.0182 | April 2006 |
| WISC 00136106-08 | R – 3.0182 | May 2006 |
| WISC 00136170-72 | R – 3.0182 | June 2006 |
| WISC 00136228-30 | R – 3.0182 | July 2006 |
| WISC 00136297-99 | R – 3.0182 | August 2006 |
| WISC 00136339-41 | R – 3.0182 | September 2006 |
| WISC 00136377-79 | R – 3.0182 | October 2006 |
| WISC 00136381-83 | R – 3.0182 | November 2006 |
| WISC 00136409-11 | R – 3.0182 | December 2006 |
| WISC 00136413-15 | R – 3.0182 | January 2007 |
| WISC 00136417-19 | R – 3.0182 | February 2007 |

Therefore, the Government already has all relevant information and no additional discovery should be required on this issue.

### D. Annual NRC Fees

The Government has already questioned all of WE's previously-claimed NRC fees. Response at 4. So, no additional discovery should be needed on this issue, particularly given that the Government already has access to NRC personnel and NRC documents.

The Government also asserts that Mr. Kiraly's expert report "will likely require updating to reflect the additional claimed costs." Id. WE agrees that Mr. Kiraly may need to

issue an errata to his prior expert report to question all of WE's newly-claimed NRC fees. That minimal effort hardly justifies denial of leave for WE to amend its Complaint.

**E. Dual-Purpose Cask Costs**

The Government asserts that Mr. Kiraly's report "will likely need modification" because of WE's claim for costs to attempt to license the VSC-24 casks for transportation. Response at 5. The cask licensing costs at issue are only approximately $138,000, and minimal effort will be required of Mr. Kiraly to address these costs in an errata. Again, that minimal effort in no way justifies denial of WE's motion to amend its complaint.

The Government also asserts that it needs additional discovery regarding the 2006 costs that WE incurred to purchase NUHOMS casks. WE has previously sought NUHOMS acquisition costs in this action and the Government has previously questioned these costs. The Government asserts that it needs additional discovery to permit it "to determine whether similar adjustments are necessary." Id. WE's 2006 NUHOMS cask costs were incurred under the same 2001 contract as WE's prior NUHOMS cask costs. WE produced that contract (and related Purchase Order P4500424608) to the Government in February 2005 as WISC 00007821-94. The Purchase Order identified progress payments scheduled through 2006. Thus, WE's newly-claimed cask costs are precisely the same in character as WE's previously-claimed NUHOMS cask costs. As a result, the Government need not conduct discovery to address WE's newly-claimed NUHOMS costs.

Further, Mr. Kiraly's report explains the analytical method that he applied to WE's NUHOMS cask costs. For WE's newly-claimed NUHOMS costs, we expect that Mr. Kiraly will use the same analysis.

**F. NUHOMS Cask Loading Costs**

The Government requests additional discovery to determine the basis for 2006 NUHOMS cask loading costs that WE incurred "in a different manner than previous claim submissions." Response at 5. The Government's assertion is misleading and requires correction. In 2006, WE incurred costs in the same manner that it has always incurred costs.

The only difference is that, effective January 1, 2006, NMC created a new accounting code specifically for cask loading costs in order to more efficiently identify and track such costs. For cask loading campaigns prior to 2006, WE employees charged time to the specific functional areas corresponding to their respective positions. For instance, an Operations employee would charge the time that he spent on cask loading efforts to an accounting code with functional area "10" and work activity code "0055." The functional area code of "10" referred to Operations personnel and the work activity code referred to high level waste management. Given that the only change is the use of a new accounting code, we fail to see what discovery the Government would need to conduct regarding this issue.

**G. Avoided Loading Costs**

In this action, the Government contends that WE's damages should be offset by the loading costs that WE would have incurred in the non-breach world. With regard to that issue, the Government asserts that WE's 2006 actual loading costs appear to be higher than the estimate for 2006 loading costs that WE once prepared earlier in this litigation when it was claiming future damages. The Government further asserts that it needs to investigate the reasons for these increased actual costs in order to determine the proper methodology for the Government's calculation of its claimed offset. Response at 5-6.

With regard to a Government investigation of the reasons for the increased 2006 actual loading costs compared with WE's prior 2006 cask loading estimate, we explained above the use of a new accounting code focused on cask loading beginning in 2006. The implementation of this new, dedicated accounting code may have resulted in a better identification of the loading costs incurred by WE than the prior accounting codes. That is the explanation and we do not see what the Government needs to investigate.

The Government further notes that one of its experts, Mr. Brewer, may need to update his report to explain his position on the avoided loading cost issue and that Mr. Kiraly may need to reflect that change in his report. Response at 6. This modest effort on the part of the

Government's experts does not come close to constituting justification for denial of WE's motion for leave to amend its Complaint.

**H. Weighted Average Cost of Capital**

The Government asserts that Mr. Kiraly's report will need to be updated to address WE's calculation of the weighted average cost of capital ("WACC") on the newly-claimed costs and the calculation of WACC up to the new September 10, 2007 trial date. Id. WE does not disagree that Mr. Kiraly may need to issue an errata to his expert report, but that minimal effort hardly justifies denial of WE's motion.

The Government also claims that it needs discovery to investigate the circumstances under which WE's WACC was incurred. Id. No additional discovery is required. The new WACC claimed by WE is based on the same circumstances as the WACC previously claimed by WE.

## II. ARGUMENT

**A. WE Should Be Granted Leave to Amend its Complaint Under Rule 15(a)**

WE's motion explained there is a broad policy of granting amendments freely based in part on the belief that decisions on the merits should be made whenever possible, absent countervailing considerations. WE Motion at 2-3. The Government does not and cannot challenge this authority. Indeed, the Rules of this Court permit a party to amend its Complaint in the interests of justice and to facilitate the speedy and inexpensive determination of this action. RCFC 1.

WE does not deny that the Government is entitled to test the bases of WE's Second Amended Complaint through audit verification activities or possibly limited discovery and that the Government's experts should be permitted to respond accordingly. However, as demonstrated above, this effort (most of which will be performed by the Government's experts and consultants) does not require the dedication of significant resources. Any effort required of the Government pales in comparison to the penalty that WE will suffer if WE is not permitted to amend its Complaint. Given this Court's ability to freely grant leave to

amend and the heavy burden that WE will bear if leave were denied, WE's motion for leave to amend should be granted.

The Government cites cases in which courts have denied parties leave to amend. While the Government correctly articulates the legal standard for such denial, the cases cited by the Government are inapposite. E.W. Bliss Co. v. United States, 77 F.3d 445, 449-450 (Fed. Cir. 1996) (leave to amend denied when plaintiff sought to "add five more issues to the thirteen already asserted" seven months after moving for summary judgment and after plaintiff admitted that it could have earlier requested the documentation that gave rise to the new issues); Essex Electro Engineers, Inc. v. United States, 960 F.2d 1576, 1582-83 (Fed. Cir. 1992), cert. denied, 506 U.S. 953 (1992) (leave to amend denied as untimely when the motion to amend was made in a motion for reconsideration, and the motion to amend was only implicit);[4] Te-Moak Bands of W. Shoshone Indians of Nevada v. United States, 948 F.2d 1258, 1260-63 (Fed. Cir. 1991) (leave to amend denied when the supplemental exceptions could have been filed at the time the original exceptions were filed, the records forming the bases for the new exceptions were available to the movant eight years prior to the new exceptions being filed and the exceptions appeared to raise new issues); First Interstate Bank of Billings v. United States, 61 F.3d 876, 881 (Fed. Cir. 1995) (leave to amend denied when defendant sought to mount a new defense close to the time for trial); Spalding & Son, Inc. v. United States, 22 Cl. Ct. 678, 680 (1991) (leave to amend denied as untimely when plaintiff's new theory of replacement damages was "plainly obvious" at the time of the alleged injury, which was nine years prior to the original complaint, and plaintiff had been considering the theory for two years since filing its original complaint); Tenneco Resins, Inc. v. Reeves Brothers, Inc., 752 F.2d 630, 633 (Fed. Cir. 1985) (leave to amend denied where party failed to couple original claim of patent invalidity with a defense of non-

[4] The Government's Response confused the citations for Essex Electro and First Interstate Bank. Response at 7.

infringement for five years and, after its original motion for leave was denied, party did not appeal the denial of leave for another five years); and Datascope Corp. v. SMEC, Inc., 962 F.2d 1043, 1045 (Fed. Cir. 1992) (leave to amend to pierce the corporate veil denied when evidence on the record long-supported the movant's awareness that defendant-corporation would not be able to satisfy a large judgment).

The circumstances of WE's motion for leave to amend are completely dissimilar from these cases. There has been no undue delay or dilatory behavior by WE. Indeed, WE filed its motion for leave to amend and the supporting documentation for the newly-claimed costs forty-one days after the close of the accounting period in question and forty-six days after trial in this matter was rescheduled for September 10, 2007.

The Government mischaracterizes the costs at issue in WE's Second Amended Complaint as presenting "new issues" and including "costs that were not previously known" and the Government complains that WE's actual costs differ from WE's previously-claimed costs. Response at 8. To the contrary, WE is not presenting any new claims, defenses or issues. As explained above, each cost claimed in WE's Second Amended Complaint is precisely the same as costs previously-claimed. This is confirmed by the fact that, in its Response, the Government groups the newly-claimed costs into the same categories as the costs previously-claimed: labor costs, employee expenses, G&A costs, annual NRC fees, cask costs, cask loading costs and WACC. Response at 3-6.

The bases for WE's amended claim are the same as the bases for WE's existing claim. The Government still has not picked-up WE's spent nuclear fuel. Thus, WE still has to store its spent fuel somewhere (namely, dry storage) and, not surprisingly, WE continues to incur the same type of damages that it previously incurred.

The Government next argues that its potential cask loading offset for 2007 is too difficult to compute because it is "much more difficult to model when within 2007 [WE's] assemblies would have been loaded [for pickup by DOE]." Response at 9 (emphasis in original). There are several responses. First, the Government's assertion simply provides

further indication that the Government's claimed offset for avoided cask loading costs is too speculative as this Court has previously held. See Tennessee Valley Authority v. United States, 69 Fed.Cl. 515, 542-43 (2006); Sacramento Mun. Utility District v. United States, 70 Fed.Cl. 332, 372 (2006); and Pacific Gas & Elec. Co. v. United States, 73 Fed.Cl. 333, 416 (2006).

Second, while WE believes that the Government's claimed offset is too speculative, we see no reason why the Government's experts could not calculate the claimed offset based on assumed loading dates. Third, when Government counsel recently advised WE counsel of this concern and explained that it was based on WE's inclusion of a partial year (the first two months of 2007) in its damages update, WE proposed to use a December 31, 2006 damages cutoff to resolve this Government concern. Appx. 10-11 (WE May 16, 2007 letter).

The Government next asserts that WE has offered insufficient proof for its Second Amended Complaint by providing "vague generalities" and by not submitting "specific evidence." Response at 9-10. This Government assertion strains credulity. WE's April and May 2007 productions provide all the data that the Government has previously requested in order to analyze and verify WE's previously-claimed costs. See Section I, supra.

**B. WE Should Be Allowed to Supplement Its Complaint Under Rule 15(d)**

WE's motion demonstrated that the purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by permitting a plaintiff to supplement its Complaint when there has been an increase in the damages identified in the original Complaint. WE Motion at 4-5. The Government does not and cannot challenge this authority.

Here, the allegations of WE's Second Amended Complaint all concern damages resulting from DOE's same and continuing breach of the Standard Contract. The Government insists that its experts be permitted to analyze WE's newly-claimed costs and to issue updates to their previous reports. Response at 10. The Government also seeks "complete discovery" regarding WE's updated costs. Id. WE agrees that Government

experts likely will have to update their reports, but this is hardly a significant burden. The Government – and its experts – have all the data and documentation upon which to base such updates.

Further, the Government is entitled to conduct an audit verification of WE's newly-claimed costs. Again, however, this is not a significant exercise because the same types of costs are at issue and only a little more than a year of costs is at issue. Further, this work will be performed by consultants who work for the Government, not Government counsel. Thus, it will not impact Government counsel's preparation for trial. The Government's consultants have five months from now to complete audit verification and WE placed the Government on notice of the potential need to review and verify additional costs in March 2007, seven months before the trial date. Appx. 12-13 (WE March 9, 2007 letter).

As noted, if the Government requires depositions of fact or expert witnesses, which WE doubts are necessary, the Government will only need to conduct, at most, two half-day depositions. Assuming that any updates to the Government's expert reports raise no new issues (and we see no reason why they should), WE does not anticipate the need to depose any of the Government's experts again.

**C. WE Should Be Allowed to Amend Its Complaint in the Interest of Judicial Efficiency**

WE's motion explained that judicial efficiency would be served by allowing WE to amend its Complaint to update its damages. As explained, WE expects to sell Point Beach in October 2007. If the transaction closes as scheduled, WE expects that allowing WE to amend its Complaint will obviate the need for WE to file another action to seek future damages. WE Motion at 7-8.

Incongruously, the Government argues that WE will suffer minimum prejudice if WE's motion is denied. Response at 10. The Government argues that WE should claim the costs at issue in an entirely new and separate lawsuit. The Government's assertion is devoid of merit. It will obviously be extremely prejudicial to WE if WE is required to file an

entirely new lawsuit to claim one or two years of costs when WE can include all of its claims in this lawsuit. Further, the Government fails to consider the interests of judicial efficiency. The Government cannot seriously contend that it is more efficient for this Court to hear two WE lawsuits rather than one such lawsuit.

An additional consideration is the Government's pending motion for partial summary judgment seeking to deny WE's claim for WACC. If the Government were to prevail in this motion, WE will suffer significant economic harm in having its receipt of the newly-claimed costs delayed by the years necessary to litigate a second lawsuit. Another consideration is that WE will have to incur the costs for counsel to litigate a second lawsuit.

Moreover, requiring WE to litigate another lawsuit to seek the costs at issue would place a serious burden on the WE witnesses. As the Court knows, it has taken seven years to get to trial in this current action and a number of WE witnesses are becoming quite elderly. Asking these same personnel to testify in another seven years in a second lawsuit places a heavy burden on these individuals.

Finally, although this issue was not raised by the Government, WE submits that the filing of the Second Amended Complaint to update WE's damages will not lengthen this trial because no new issues are raised by the damages update.

In sum, both judicial efficiency and basic fairness compel the conclusion that WE should be permitted to file its Second Amended Complaint and thereby update its damages.

## III. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court grant WE's Motion for Leave to File Its Second Amended and Supplemental Complaint under Rule 15(a) and 15(d) and allow WE to file its Second Amended and Supplemental Complaint.

Dated: May 21, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1675

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on May 21, 2007, I caused a copy of the foregoing "Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Leave to File Its Second Amended and Supplemental Complaint" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Emily C.C. Poulin
Emily C.C. Poulin

# APPENDIX

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:SASnyder
D.J. No. 154-00-697

Telephone: (202) 616-0347
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

May 2, 2007

**VIA FACSIMILE AND UNITED STATES MAIL**

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, Washington 98101-3099

Re: Wisconsin Electric Power Co. v. United States,
Fed. Cl. No. 00-697C

Dear Mr. Oehler:

We are preliminarily reviewing the new claim and supporting documents that you provided to us that ostensibly support your Second Amended Complaint. While we currently anticipate that we will have to oppose your motion seeking leave to file that complaint and the new claim, we need additional information to assist in our preliminary review. Please provide us with the following data, information, and documents as soon as possible.

First, we do not have the NMC cost data for 2006 and 2007 and, therefore, we request that you produce additional NMC cost data from the SAP accounting system for relevant claim accounts and periods to support your updated claim and the electronic files located at Bates WISC 00135471 – WISC 00135475. Those files comprise WE Cost Data, WE Employee Names and Numbers, WE Timesheet Data and NMC Timesheet Data for 2006 and 2007. We request that Wisconsin Electric Power Company ("WEPCO") provide electronic cost data for all work orders from which NMC bills costs are included in the April 10, 2007 claim update. The submission should include NMC WBS Elements 3.0182-54-0001, 3.0182-54-0055, 3.0182-54-2055, 3.0264-79-0055 and 3.5055-54-0055. I understand that you have previously provided the NMC cost data from the SAP accounting system, as indicated in a March 27, 2006 letter from Don Carney to Kevin Crawford attaching the CD Bates numbered WISC 00085632.

In addition to the NMC accounting records, we request the Kenrich Electronic files for the April 10, 2007 updated claim. These electronic files should include all files used to compile the April 10, 2007 Errata for Kenrich Group Expert Report located within Bates range KRGWE 003828 – KRGWE 003901.

Richard W. Oehler
May 2, 2007
Page 2

Third, please provide more detailed descriptions for the entries in the column titled "A/A Type" from the file titled "WISC 00135474_NMC_2006_Timesheet Data.xlsm," also provided as support for the April 10, 2007 claim. The detailed descriptions should provide more descriptive language than was provided. The production should be similar to the WE data file, Bates numbered WISC 00123294, provided in response to Request 2 referenced in Mr. Oehler's April 20, 2006 letter.

Please produce this information as quickly as possible. In the event that the Court, over our objections, grants plaintiff's motion to amend the complaint, it will be necessary for us to conduct discovery on this new claim quickly, before the trial begins on September 10, 2007.

Please do not hesitate to call me at (202) 616-0347, or Russ Shultis at (202) 305-7571, if you have any questions.

Very truly yours,

Sharon A. Snyder

Sharon A. Snyder
Trial Attorney
Commercial Litigation Branch

cc: Donald J. Carney (via facsimile:(202) 434-1690)

Perkins Coie

607 Fourteenth Street N.W.
Washington, D.C. 20005-2011
PHONE: 202.628.6600
FAX: 202.434.1690
www.perkinscoie.com

Richard W. Oehler
PHONE: (206) 359-8419
FAX: (206) 359-9419
EMAIL: R.Oehler@perkinscoie.com

May 10, 2007

**BY HAND DELIVERY**

Sharon A. Snyder
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

**Re: Wisconsin Electric v. United States, No. 00-697C**

Dear Ms. Snyder:

Wisconsin Electric Power Company ("WE") hereby produces to the Government additional documents relating to its Second Amended Complaint and supporting damages schedules.

The production consists of spreadsheets responsive to the Government's letter requests of May 2, 2007. The spreadsheets are on compact disks ("CDs"), labeled WISC 00136524 – 00136526. The data responsive to the Government's first request, for NMC cost data, is on CD WISC 00136524. The data responsive to the Government's second request, for Kenrich electronic files for the updated claim, is on CD WISC 00136525. The data responsive to the Government's third request, for detailed descriptions of entries from the 2006 NMC Timesheet Data, is on CD WISC 00136526.

The enclosed CDs are marked as "Protected Material to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order."

3

Sharon A. Snyder
May 10, 2007
Page 2

Please contact me if you have any questions.

Very truly yours,

Richard W. Oehler by Emily A Poulin

Richard W. Oehler

cc: Catherine Phillips
Donald J. Carney

**U.S. Department of Justice**

Civil Division

PDK:DMC:HDL:KBCrawford
D.J. No. 154-00-697

Telephone: (202) 305-9640
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

January 26, 2007

**VIA FACSIMILE AND UNITED STATES MAIL**

Richard W. Oehler
Perkins Coie LLP
Suite 4800
1201 Third Avenue
Seattle, Washington 98101-3099

Re: Wisconsin Electric Power Co. v. United States, Fed. Cl. No. 00-697C

Dear Mr. Oehler:

This responds to your letters dated December 22, 2006 and January 5, 2007, with respect to the audit verification process. On June 30, 2006, the United States submitted Defendant's Statement Admitting or Denying the Accuracy or Admissibility of Plaintiff's Schedules and Summaries ("Defendant's Statement") pursuant to subparagraph (c) of the Court's November 8, 2002 pretrial order. On October 27, 2006, WEPCO submitted Plaintiff's Response to Defendant's Statement Admitting or Denying the Accuracy or Admissibility of Plaintiff's Schedules and Summaries ("Plaintiff's Response"). In your letters, you have asked us to inform you whether the positions set forth in Defendant's Statement have changed in view of your response and your subsequent productions of time recording documentation and WEPCO A&G calculation documentation on October 11, 2006 (WISC 131201-135035), and of employee expense report records on October 26, 2006 (WISC 135036-135470). We describe below the extent to which our position on each of the audit issues has changed.

A&G Costs

The A&G expenses that WEPCO included in its claim consist of corporate overhead costs that were simply allocated to the all projects. For example, the rate includes costs relating to Corporate Services, including Legal Services, Information Technology, Corporate Affairs, and Corporate Finance. The amount in the claim is based upon the application of the budgeted A&G rate for a given year multiplied by the labor costs charged to the dry fuel storage project.

Initially, the Government took issue with this part of the claim, both because much of the

supporting documentation provided for the rates used consisted merely of the rates themselves and not the underlying calculations, and because the A&G adders totaling $1,815,366 included in the claim did not accurately depict actual costs incurred by WEPCO because they were based on budget numbers.

Based upon the documentation provided on October 11, 2006, and in conjunction with previous documentation provided, the Government agrees that WEPCO has provided underlying calculations of the A&G adders. However, the Government has additional questions about the accuracy of the A&G amounts. First, the variances between the budgeted A&G rates and the actual A&G rates for 1996 – 1999 appear to be inordinately larger than other years. For example, the absolute value of the variances for 1996 – 1999 range from 6.64% to 9.70%, whereas, the absolute value of the variances for 2001 – 2005 range from 1.17% to 2.87%. Please explain the reason for the large variances for the 1996 – 1999 A&G budgeted vs. actual rates. Second, please confirm that the budgeted A&G rate for both 1996 and 1997 was 24.24% and the budgeted A&G rate for both 1998 and 1999 was 24.84%. Third, please confirm that consistent cost pool assumptions were used to calculate both the budgeted A&G rates and the actual A&G rates. We are uncertain about this because it appears that the budgeted rates for 1996 – 1999 were calculated using "pre-impact" information,[1] see WISC 00065079, whereas the actual rates for those given years was recently prepared by WEPCO personnel. See Letter from Oehler to Crawford of 10/11/06. If there is a variation in the cost pools used for budgeted and actual A&G rates, please provide an updated calculation using consistent cost pools.

NRC Annual Fees

WEPCO included NRC Fees for 1999 – 2005 in the claim based upon its view that a portion of the Power Reactors Annual Fees related to dry storage and would not be incurred in the event a utility did not have a dry fuel storage facility ("ISFSI"). The total amount WEPCO contends relates to the ISFSI is $2,989,750. The Government initially took the position that the fees identified as incremental costs were not supported by invoices and were not accurately recorded on WEPCO's books. Although WEPCO has now produced invoices for all of the NRC fees incurred during the period at issue, these documents demonstrate that the NRC did not invoice WEPCO specifically for a fee related to the ISFSI. Moreover, there are no accounting records demonstrating that WEPCO paid the NRC a fee specifically because of the presence of an ISFSI, or that the fees that it paid would have been different without an ISFSI. Thus, the Government disagrees with the methodology WEPCO used to allocate a portion of the Annual Fee to include as damages and still denies that these costs were incremental. However, the Government does not deny the accuracy of the NRC Power Reactors Annual Fee recorded on the

[1] "Pre-Impact" refers to the period prior to the implementation of the Impact cost accounting system. The manual for this system (Impact Costing Manual) was issued in February 1998 (WISC 00055012 – 00055106).

company's books and records in total, or the fact that the NRC Power Reactors Annual Fee costs were incurred as recorded.

Would-Have-Been Temporary Cask Pit Rack Costs

WEPCO has alleged that it would have incurred costs for the use of a temporary cask pit storage rack to handle its spent fuel storage needs had DOE begun accepting spent nuclear fuel in 1998. WEPCO's experts estimated, and included an offset of $2,047,641 for the Temporary Cask Pit Racks. Since these cost are based upon estimates, and there is no contemporaneous company documentation, the Government continues to deny the accuracy of these costs.

Interest Costs

WEPCO has alleged that it would have incurred interest costs on all items it included in its claimed damages. WEPCO's experts estimated, and WEPCO claimed interest costs of $42,666,000. Since these cost are based upon estimates, and there is no documentation linking the interest costs to the items WEPCO is including as damages, the Government continues to deny the accuracy of these costs.

Employee Expense Costs

WEPCO's claim includes costs for transactions relating to the reimbursement of employee expenses in the amount of $612,642. At the time of Defendant's Statement, the Government denied the accuracy of the Employee Expenses class of transactions because WEPCO had not provided invoice support for transactions under $5,000, and most of the costs involved in this class of transactions involved amounts below that level. To help facilitate agreement regarding the accuracy of these costs, WEPCO produced 260 transactions and documentary support as a sample of Employee expenses on October 26, 2006. Based upon the additional documentation, the Government no longer denies the accuracy of the Employee Expenses included in the claim. However, the Government continues to deny its liability for these costs for the other reasons described more fully in the expert report of Stephen Kiraly.

Pensions & Benefits Costs

In preparing its claim, WEPCO included adjustments to the labor costs to include Pension and Benefits costs in the claim for the costs recorded during the time period when the MSA accounting system was in use. Originally, when recording costs to project 33664, WEPCO included Pension and Benefits costs totaling $132,156 on Journal Entry 316 (Transfer Payroll Taxes for Work Orders). WEPCO removed the amounts actually recorded and included a mark-up totaling $536,444 by using percentage rates.

Initially, the Government took issue with fact that the support WEPCO provided for the A&G rates only contained the end result of the budgeted rate calculation for 1988 through 1999, and not the pool of accounts used to calculate the rates themselves. Without the pools, the Government could not verify the accuracy of the rates or ensure that there was not double counting. See WISC 65050-65118. On October 11, 2006, WEPCO provided additional documentation, to support the P&B rates for 1988 through 1995. See WISC 132465-135017. Based upon the October 11, 2006 production in conjunction with the prior documentation, the Government does not deny the accuracy of the budgeted Pensions and Benefits rates. However, the Government continues to deny its liability for these costs because WEPCO has provided no justification for the use of the higher mark-up rates.

Labor Costs

WEPCO's claim includes labor costs that were recorded in two different ways. From November 1988 through July 1996, WEPCO recorded approximately $1,977,979 of labor costs to its MSA accounting system. From August 1996 through March 1999, WEPCO recorded another $2,594,546 to WEPCO's SAP accounting system without the use of the CATS labor recording system. Thus, WEPCO has claimed a total labor cost of $4,572,525 for the time period of November 1988 through March 1999.

At the time of the Defendant's Statement, insufficient support was provided by WEPCO to determine whether these costs were properly supported. Therefore, to the extent that each line item of cost in Exhibits 1 and 2 to Defendant's Statement reflected the inclusion of some portion of these claimed labor costs, the Government denied the accuracy of that portion of each line item, and denied the accuracy of the total $4,572,525 in claimed labor costs. WEPCO provided a sample of supporting documents for the June 1995 time period, which Mr. Kiraly agreed was reasonable to support the labor costs for the entire year of 1995. To help facilitate agreement regarding the accuracy of the remaining costs, on October 11, 2006, WEPCO produced additional timesheets and documentary support samples for one-month periods in each of the other years.

Based upon the additional documentation provided, the Government no longer denies the accuracy of the $4,572,525 of labor costs included in the claim for the time period of November 1988 through March 1999. However, the Government requests some additional information relating to these labor costs. First, WEPCO has represented that timecards for represented employees for October 1994 were destroyed per document retention policies. Because timecards for managerial personnel relating to that same October 1994 time period were not destroyed, please provide an explanation as to why the document retention policy only applied to the represented employees and not the management employees.

Second, please explain why the dates on the timecards for represented employees all correspond to the dates to which the time cards relate, while some of the dates on the timecards

for management employees do not correspond to the dates to which the time card purportedly relates. For instance, the timecards for management employees for the months of May 1996, December 1996, May 1997, August 1998 and October 1998 were all dated the month prior to the requested months. This anomaly appears both during the MSA time period (May 1996) and the SAP time period (May 1997 and later). In addition, please explain the process by which the hours from the time cards eventually appear in the accounting system.

If you have any additional questions regarding our responses, please call.

Sincerely,

Kevin B. Crawford
Trial Attorney
Commercial Litigation Branch

cc: Donald J. Carney - via facsimile (202) 434-1690

Perkins Coie

607 Fourteenth Street N.W.
Washington, D.C. 20005-2011
PHONE: 202.628.6600
FAX: 202.434.1690
www.perkinscoie.com

Donald J. Carney
PHONE: (202) 434-1675
FAX: (202) 654-9113
EMAIL: DCarney@perkinscoie.com

May 16, 2007

**BY FACSIMILE AND FIRST CLASS MAIL**

Sharon A. Snyder
Russell A. Shultis
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

**Re: Wisconsin Electric Power Co. v. United States, No. 00-697C**

Dear Counsel:

This letter confirms my telephone discussions with each of you yesterday.

First, Wisconsin Electric Power Company ("WE") offered to exchange copies of the parties' respective trial exhibits on Friday, May 18, 2007. The Government is looking into the feasibility of this date and will get back to us.

Second, the parties tentatively have agreed to meet at 9 am on June 7, 2007 at the Washington D.C. offices of Perkins Coie LLP regarding exhibit and audit verification issues. The agenda that WE envisions for the meeting includes: (1) review and resolve exhibit objections; (2) determine which exhibits are on both parties' lists so that a joint exhibit list can be created; and (3) work towards completion of the audit verification process in case it is not completed as of that date. WE would very much like to meet on June 7 or sometime during the week of June 4 because Rick Oehler expects to be in D.C. that week.

Third, this confirms that we received by email the Government deposition exhibits previously requested in WE's May 8 letter.

Fourth, Russ raised the possibility of the parties stipulating to a damages cut-off of December 31, 2006 to resolve the pending Plaintiff's Motion for Leave to file its Second Amended and Supplemental Complaint. We have conferred with WE and WE is willing to agree to this stipulation. Please inform us within the next day or so whether the Government is willing to agree to this stipulation.

If you have any questions, please feel free to contact us.

Very truly yours,

Donald J. Carney

cc: Catherine Phillips
Richard W. Oehler

Perkins Coie

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

Richard W. Oehler
PHONE: (206) 359-8419
FAX: (206) 359-9419
EMAIL: R.Oehler@perkinscoie.com

March 9, 2007

**BY FACSIMILE AND FIRST CLASS MAIL**

Harold D. Lester, Jr.
Marian Sullivan
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

**Re: Wisconsin Electric v. United States, No. 00-697C**

Dear Counsel:

In a February 23, 2007 Order, the Court rescheduled the trial from March 27, 2007 until September 10, 2007. Accordingly, Wisconsin Electric ("WE") intends to move for leave to file a second amended and supplemental complaint to update its damages through early 2007. WE intends to move for leave to amend by early April 2007, but is providing this advance notice to the Government now in case this information would assist the Government in planning audit verification activities.

The damages that WE will seek in this update are the same type of costs that WE has previously claimed in this litigation including cask acquisition costs, cask loading costs, NRC fees for SNF management, licensing costs to have the VSC-24 cask licensed as transportable and the weighted average cost of capital of WE's damages to reflect the new trial date of September 10, 2007.

Contemporaneously with WE's motion for leave, WE will produce to the Government documentation and electronic files in support of the claim update. This documentation





ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES
MENLO PARK · OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates

will be the same type of documentation that the Government has previously requested to support WE's costs.

If you have any questions, please call me.

Very truly yours,

Richard W. Oehler

cc: Catherine Phillips
Donald J. Carney