# In the United States Court of Federal Claims

No. 00-697 C
**(FILED UNDER SEAL August 16, 2007)**[1/]

WISCONSIN ELECTRIC POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## ORDER

This is one of a series of some fifty pending cases involving contracts between the Department of Energy ("DOE") and nuclear electric utilities for the disposal of spent nuclear fuel ("SNF"). Citing *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), defendant was found liable for partial breach of contract for failure to commence acceptance and disposal of SNF by January 31, 1998, and Plaintiff's Motion for Partial Summary Judgment on liability was granted. (Order of October 8, 2004, Dkt. 172.) Trial on damages will commence on September 10, 2007. Before the court are:

(1) Defendant's Motion *in Limine* to Exclude from Trial Exhibits Prepared by Government Contractors ("Contractors Motion");

(2) Defendant's Motion *in Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Ms. Eileen M. Supko, Regarding the Impact of the Rate of Acceptance Under the Standard Contract ("Supko Motion");

---

[1/] Because it addresses documents submitted under seal, this Order is **sealed**. By motion or stipulation, parties shall submit any proposed redactions on or before **August 27, 2007**. Until that date, and pending resolution of any disagreements concerning proposed redactions, this Order shall not be publically available.

(3) Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Claim for Prejudgment Interest ("Cost of Capital Motion"); and

(4) Defendant's Motion to Strike Plaintiff's Deposition and Trial Testimony Designations and, in the Alternative, Motion *in Limine* to Preclude Reliance Upon Those Designations as Substantive Evidence Pursuant to RCFC 32(a) and Federal Rule of Evidence 801(d)(2) ("Deposition and Trial Testimony Designations Motion").

Plaintiff's filed Responses and defendant filed Replies.

**Contractors Motion**

According to defendant, included in plaintiff's Exhibit List filed December 18, 2006, are twenty-seven documents authored by companies under contract with DOE to develop a repository or other facility to store SNF – performance required by DOE under the Standard Contract. Authors include: Pacific Northwest Laboratories ("PNL"); Martin Marietta Energy Systems, Inc. ("Martin Marietta"); TRW Environmental Safety Systems, Inc. ("TRW"), and Battelle Memorial Institute ("Battelle").

Defendant seeks to preclude admission of these exhibits because:

(1) These contractors were hired to give advice, not to make policy decisions. They are not part of DOE, and their writings, some of which were never seen by DOE, are not government documents;

(2) The documents are not admissible under Fed. R. Evid. 803(8)(A) because they are not records, reports, statements, or data compilations of public officers or agencies setting forth the activities of the office or agency;

> (A) they are not public documents because DOE's contractors are not agents of the government; and
>
> (B) they were not prepared or adopted by DOE, so they are not public records or reports of DOE's activities;

(3) The contractor documents are not records of regularly conducted activity under Fed. R. Evid. 803(6);

(4) The contractors were not authorized to speak on DOE's behalf, so are not admissible under Fed. R. Evid. 801(d)(2)(C) or 801(d)(2)(D) as admissions of DOE;

(5) DOE has not adopted any statement contained therein, so they are not admissible under Fed. R. Evid. 801(d)(2)(B); and

(6) While some of the documents may be "ancient" (more than twenty years old), hearsay statements therein are not admissible.

Pointing to the critical role of DOE's contractors, plaintiff cites to the denial of substantially similar motions in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) and *Yankee Atomic Electric Co. v. United States*, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004). Plaintiff argues these documents are admissible under (1) Fed. R. Evid. 803(8)(a) as public records or reports of DOE's activities; (2) Fed. R. Evid. 801(d)(2)(C) as statements authorized by DOE; (3) Fed. R. Evid. 801(d)(2)(D) as statements of agents or servants of DOE; (4) Fed. R. Evid. 801(d)(2)(B) as documents in which DOE has "manifested an adoption or belief;" (5) Fed. R. Evid. 803(6) as business records; and/or (6) Fed. R. Evid. 803(16) as "ancient documents." Plaintiff also points out that some of the challenged documents are not contractor documents, and asserts that any objection that a document is a "draft" goes to its weight, not its admissibility.

In pursuit of its contractual responsibilities for which nuclear utilities were and are paying, DOE entered into management and operations ("M & O") contracts with highly-skilled entities, including national laboratories, authors of the contractor documents. To a significant extent, DOE's performance of its responsibilities under the Nuclear Waste Policy Act ("NWPA") and the Standard Contracts has been conducted through M & O contractors. *Yankee Atomic*, 2004 WL 245087, at *3. Plaintiff cites the trial testimony of Dr. John Bartlett, former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), that OCRWM had about 65 employees; its M & O contractor (then TRW Systems), with about 5,000 employees, did DOE's work. As noted by the undersigned's prior decision in *Yankee Atomic*, PNL, located in Richland, Washington, is one of ten national laboratories managed by DOE's Office of Science. PNL provides scientific and technical research

and "currently has approximately 4,200 staff members and a business volume of $750 million . . . . Battelle has operated [PNL] for DOE and its predecessors since 1965." www.pnl.gov/about (last visited July 27, 2007). *See Yankee Atomic*, 2004 WL 245087, at *2 (noting PNL's ".gov" web address and the Office of Science' fiscal 2005 budget request of $108 million for PNL); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 336 n.1 & 362 n.27 (2006) (granting in part a motion to file designated trial and deposition testimony as substantive evidence pursuant to Fed. R. Evid. 801(d) and RCFC 32(a), including that of "Mr. Michael Lawrence, Associate Laboratory Director for Energy Science & Technology at DOE's Pacific Northwest National Laboratory," and citing an April 1984 memorandum authored by Battelle, "DOE consultant").

Without prejudging (particularly since only parts of only some of the documents are provided), but in order to possibly narrow disagreements and encourage stipulations concerning admissibility, the court notes the following from plaintiff's Exhibit List:

1. PX55: January 24, 1984, "Memo from Fletcher (Battelle [PNL]) to Hall re: Revised Waste Acceptance Schedule from Draft Mission Plan." (Def.'s Contractors Mot., App. 1.) Neither Hall nor Fletcher are identified. The document is ancient. Fed. R. Evid. 803(16).

2. PX70: September 1, 1984, "DOE, 1984 Annual Review of the 1.0 Mill per kWh Waste Disposal Fee (PNL-5241), prepared by [PNL]." (Def.'s Contractors Mot., App. 1) The document is ancient and recites that it was prepared by PNL, operated by Battelle, under contract with DOE. (Pl.'s Resp. to Def's Contractors Mot., App. 3.)

3. PX101: "1986 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee." (Def.'s Contractors Mot., App. 1.) The document is ancient and contains the same representation, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 5-6.)

4. PX121: April 27, 1984,[2/] Final Draft of "Preliminary Analysis of the Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program," prepared under contract by Roy F. Weston, Inc. for OCRWM. The document page provided has DOE's seal on the lower right-hand corner. (*Id.* at App. 7.) The document is ancient.

5. PX131: "1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee," dated July 1987 prepared by PNL. It contains the same representation as PX101, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 8-9.) By the time of trial, the document will be ancient.

6. PX196: May, 1990 "Commercial Spent Fuel Management and Concrete Cask Testing Programs Monthly Progress Report" was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 10-11.)

7. PX197: May 1, 1990, "Facility Interface Capacity Assessment (FICA) Project, Cask-Handling Assessment Point Beach Units 1 and 2." (Def.'s Contractors Mot., App. 1.) Other than an entry on plaintiff's Exhibit List, no part of this document was provided.

8. PX215: January 1, 1991, "Determination of Cost Effective Waste Management System Receipt Rates" by PNL operated by Battelle for DOE and noted as (1) presented at the Second Annual High-Level Radioactive Waste Management Conference, Las Vegas, Nevada, April 28 - May 3, 1991; and (2) "supported" by DOE. (Pl.'s Resp. to Contractors Mot., App. 12-13.)

9. PX223: June 28, 1991, "Memo from McDuffie to Langstaff Re: Recommended DOE Positions on 18 Contract Implementation Issues." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List attached to defendant's Contractors Motion, no part of this document was provided, nor is the author or recipient identified.

10. PX230: September 1, 1991, "Martin Marietta Energy Systems, Inc., Site and Facility Waste Transportation Services Planning Document, Point Beach Nuclear

[2/] Plaintiff's Exhibit List records the document's date as April 27, 1987. The date is April 27, 1984. (Pl.'s Resp. to Contractors Mot., App. 7.)

Plant Unit 1, Wisconsin Electric Power Company, Draft, Revision 0." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided. Martin Marietta Energy Systems, Inc. was or is one of DOE's contractors. *Yankee Atomic Elec. Co. v. United States*, 2004 WL 2450874, *1 n.2. *See* www.oakridge.doe.gov/ornlseb/General%20Information%20Files/Small%20 Business%20Subcontracting%20Plan.htm (last visited July 19, 2007) (reporting that Martin Marietta Energy Systems, Inc. was awarded a contract in 1984 to manage and operate three Oakridge sites).

11. PX341: June 3, 1994, "Request for Proposal (RFP) for the Multi-Purpose Canister (MPC) System" by TRW, M & O Contractor for OCRWM. (Pl.'s Resp. to Contractors Mot., App. 14-17.) TRW was, or is, one of DOE's M & O contractors. *Yankee Atomic*, 2004 WL 2450874, *1 n.2, *3 n.5.

12. PX361: November 11, 1994, Clearance Request for Public Release of Information for material entitled "Lessons Learned From the DCS Process," signed by TRW. (Pl.'s Resp. to Contractors Mot., App. 18-19.)

13. PX396: October 25, 1995, letter from Blumford ("TRW") to Rousso ("DOE") regarding monthly status report on Delivery Commitment Schedules ("DCSs"). Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

14. PX564: December 1, 1999, "Report to Update Total System Life Cycle Cost Estimate for Site Recommendation/License Application" prepared by TRW for DOE. (Pl.'s Resp. to Contractors Mot., App. 20-21.)

15. PX593: April 1, 2001, "Independent Cost Estimate Review of the Civilian Radioactive Waste Management Program 2000 Total Life Cycle Cost for DOE, OCRWM." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

16. PX774: undated PNL memorandum "re: Need for Maintenance of Full Core Reserve." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

17. PX912: February 26, 1984, memorandum "re: MRS Institutional Report." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

18. PX918: June 11, 1998, "Basis for the VA and TSLCC [Total System Life Cycle Costs] Cost Estimate Operational Waste Stream" prepared by TRW under contract with DOE/OCRWM. (Pl.'s Resp. to Contractors Mot., App. 22.)

19. PX922: October 19, 1990, "[l]etter from E.F. Benz to A. Brownstein, OCRWM DOE, re: Review of Draft Annual Capacity Report." (Def.'s Contractors Mot., App. 2.) No other information was provided.

20. PX923: "Spent Fuel Acceptance Rate." (Def.'s Contractors Mot., App. 2.) No other information was provided.

21. PX928: June 28, 1991, "Memo from P.A. McDuffie/ S.A. Vance to D.C. Langstaff/ A.B. Brownstein re: Recommended DOE Positions on 17 Contract Implementation Issues." (Def.'s Contractors Mot., App. 2.) No other information was provided.

22. PX931: May 22, 1991, "Memo from P. A. McDuffie/ S. A. Vance to A. B. Brownstein/ D. C. Langstaff re: Comments on EEI/UWASTE Positions on Eleven Issues." (Def.'s Contractors Mot., App. 2.) No further information was provided.

23. PX937: "1984 Annual Review of the Adequacy of the 1-Mill/KWH Waste Disposal Fee" dated September, 1984 prepared by PNL for DOE. (Pl.'s Resp. to Contractors Mot., App. 23.) The document is ancient.

24. PX938: "CRWMS [Civilian Radioactive Waste Management System] Program Baseline Change – Justification for Changing to a Multipurpose Canister-Based System." (Def.'s Contractors Mot., App. 2.) No other information was provided.

25. PX940: March 12, 1984, "Memorandum from R. Liikala (Battelle) to Distribution re: Waste Management Program Strategy, attachment." (Def.'s Contractors Mot., App. 2.) The document is ancient. No further information was provided.

26. PX952: May 25, 2000, "Document entitled Commercial Spent Nuclear Fuel Additional Storage Installations, Plans and Requirements." (Def.'s Contractors Mot., App. 2.) No additional information was provided.

27. PX969: February 2002 "Total System Life Cycle Cost for Site Recommendation Letter Report," prepared by Bechtel SAIC Company for DOE. (Pl.'s Resp. to Contractors Mot., App. 24-25.) There was testimony at the *Yankee Atomic* trial that Bechtel SAIC Company was OCRWM's M & O contractor. *See Yankee Atomic*, 2004 WL 2450874, at *9 n.15.

"A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissable for any purpose." *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006). However, "'[s]ome evidentiary submissions [] cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment.'" *Id.* at 469-70 (alterations in original) (citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)).

From the *Yankee Atomic* case, the court is generally familiar with M & O contractor documents in this context. However, the evidentiary rulings in that case concerning contractor documents were made in connection with trial proceedings. Although the DOE contractors are the same, required foundation, authenticity and other evidentiary requisites must be established for each document in this case, absent stipulation. In this regard, contractor documents may be relevant not only on planning, but also on issues of foreseeability, commercial reasonableness, or what performance was possible, reasonable or probable. Factors cited by defendant, including DOE's knowledge or possession of the document, the scope of the authoring contractor's employment, etc. are fact-intensive inquiries, best vented at trial. The court is not ruling on the admissibility of these documents, either individually or collectively. These determinations await trial. However, because the wholesale exclusion of these documents has not been established, and they are best evaluated at trial after appropriate foundations have been laid, the Contractors Motion *in limine* is denied without prejudice to renewal during, or after, trial to the extent a contractor document is proposed for admission, or cited as support for a proposed factual finding.

**Supko Motion**

Defendant seeks to preclude the testimony of Ms. Eileen Supko, one of plaintiff's proffered expert witnesses. Ms. Supko testified as an expert in several SNF trials to date, including before the undersigned.[3/] Applying different annual rates, Ms. Supko opines on the impact of those rates on two criteria identified by plaintiff's counsel: (1) the aggregate amount of additional at-reactor storage capacity that nuclear utilities would need to continue operations after January 31, 1998, and (2) the ability of utilities to "timely" decommission (permanently shut down) their nuclear power plants. Defendant objects to her testimony in this regard as not relevant, not based on a reliable or testable methodology, and inconsistent with plaintiff's theory of DOE's contractual obligations. Reasonableness of any particular rate is simply not an issue in this case according to defendant. As Ms. Supko admits no expertise in construing the Standard Contract or the NWPA, and is not offering an opinion as to how DOE would have performed, her expertise and opinion would not be helpful to the court, the hallmark of, and reason for, expert testimony, defendant argues.

Plaintiff counters that under the Rule 702 of the Federal Rules of Evidence, Ms. Supko's expert analysis and opinions, applying her specialized knowledge regarding SNF storage by commercial nuclear utilities, will assist the court "in understanding the practical implications of the acceptance rates that the parties have proffered in this damages case." (Pl.'s Resp. to Supko Mot., 2.)

Ms. Supko has more than twenty years of experience in the nuclear industry, with emphasis on storage and disposal of SNF. She holds a Bachelor of Science degree in Nuclear Engineering from Pennsylvania State University, and her

---

[3/] Ms. Supko was qualified as an expert witness in *Northern States Power Co. v. United States*, No. 98-484C (Wiese, J.) (Pl.'s Resp. to Supko Mot., App. 35-36) (qualifying on issues of acceptance rate, spent fuel management, spent fuel transportation and utility treatment of those issues), in *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Merow, J.) (Pl.'s Resp. to Supko Mot., App. 35-36 (qualifying on DOE's nuclear waste management program, storage and disposal of SNF, modeling of acceptance rates, and allocations of SNF acceptance rights), in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 646-47 (2004) (Hodges, J.) (accepting as expert on acceptance rates, SNF storage and licensing). Briefing available electronically indicates she also testified at the trials in *System Fuels, Inc. v. United States*, No. 03-2624C (Braden, J.) and *System Fuels, Inc. v. United States*, No. 03-2623C (Lettow, J.).

employment and professional background is outlined in her expert report. She is not being offered as an expert in determining DOE's obligations under the Standard Contract, which is a matter for the court. Rather, her modeling of the effect of different acceptance rates on the industry involves specialized knowledge that may be of assistance to the court. Defendant's specific objection in this regard is that the four alternative acceptance scenarios she applied are not found in any DOE document. Regardless, the application of various rates industry-wide can be of assistance to the court, not necessarily in construing DOE's contract obligations, but in resolving causation, foreseeability, reasonableness or windfall. In any event, however, her opinions and applications do not supplant the court's role as interpreter of legal obligations herein. *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 433 (2006) ("Expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the court."). Defendant's objections to her methodology and support, or lack thereof, and the asserted inconsistencies in her calculations and applications, can be vented in cross-examination, with resulting impact on the weight the court may give to her opinion(s) and analysis. The Supko motion is **denied** without prejudice to renewal at trial.

**Cost of Capital Motion**

Defendant's motion for partial summary judgment titles a category of plaintiff's claimed damages as prejudgment interest. Plaintiff calls it weighted average cost of capital. Regardless of its label, these costs are included in the report of plaintiff's expert witnesses, Richard Sieracki, Chief Executive Office, and Kenneth Metcalfe, President, of the Kenrich Group, LLC ("Kenrich").[4/] (Pl.'s Resp. to Cost of Capital Mot., App. 1-22.) Defendant asserts the report presents plaintiff's damages in nominal[5/] or actual dollars ($48.4 million) and then adjusts that number upwards by more than forty million dollars to reflect the time value of money, to arrive at

[4/] Defendant has not objected to the qualifications of these experts.

[5/] "Nominal dollars retain their *number* over time, while real dollars retain their *value*." *Sandstrom v. Principi*, 358 F.3d 1376, 1377 n.1 (Fed. Cir. 2004) (emphasis in original) (rejecting claim that cost of living adjustment was not prejudgment interest). "[O]ne nominal dollar in 1969 . . . remained one nominal dollar in 1996 . . . . One real dollar in 1969, however, would retain its purchasing power, and would have been worth between four and five nominal dollars by 1996." *Id. See also District of Columbia v. United States*, 67 Fed. Cl. 292, 344 (2005) (inflationary increase would violate statutory bar).

"2007 dollars" ($91 million). Under the undisputed material facts, this increase is the substantive equivalent of prejudgment interest, defendant alleges, and since prejudgment interest is barred by statute, 28 U.S.C. § 2516(a), as a matter of law, defendant is entitled to a judgment of dismissal of this component of damages.

While agreeing that prejudgment interest is statutorily barred, plaintiff asserts its claim here is for the actual expense of raising the millions of dollars to pay for the additional SNF storage needed because of DOE's delay(s) in commencing performance. Plaintiff asserts it incurred costs to finance its mitigation expenditures including the construction of an Independent Spent Fuel Storage Installation ("ISFSI"). Costs were financed through the company's general capital structure, from public capital markets, not specific loans. Rates used to attract public funds were established by the Wisconsin Public Service Commission.

Consequential cost of capital resulting from a partial breach differs from prejudgment interest and is not barred as a matter of law, plaintiff adds, because: (1) weighted average cost of capital is the real economic cost of capital spent on SNF storage; while prejudgment interest is a statutory addition to all damages or costs; (2) weighted average cost of capital varies from year to year, while the rate of prejudgment interest remains constant regardless of capital market fluctuations; and (3) prejudgment interest is most often calculated as simple, not compound. Plaintiff concludes that: (1) recovery of its costs of financing is not precluded as a matter of law, and (2) sufficient material facts have been submitted that such costs were incurred; accordingly, defendant's motion for partial summary judgment should be denied.

Prejudgment interest against the United States is precluded by 28 U.S.C. § 2516(a) (2000).[6/] In *England v. Contel Advanced Systems, Inc.*, the Federal Circuit construed the "no-interest rule" broadly:

> [T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: "[T]he character or nature of 'interest'

[6/] 28 U.S.C. § 2516(a) provides:
(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

> cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it."

384 F.3d 1372, 1379 (Fed. Cir. 2004) (citing *Library of Congress v. Shaw*, 478 U.S. 310, 321 (1986) (alterations in original) (quoting *United States v. Mescalero Apache Tribe*, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1975)). *See also Columbia First Bank v. United States*, 54 Fed. Cl. 693, 699 (2002) (rejecting plaintiffs' claim for $4.4 million to "'compensat[e] the plaintiff for the lost use of the money for the intervening period'" because of the ban on prejudgment interest) (alteration in original) (record citations omitted).

However, there is a difference between interest *on* a claim (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues through the pendency of the action) vice interest *as* a claim – such as interest actually paid to obtain capital to mitigate a breach or as a consequence of a breach, the latter being recoverable. "[The] distinction 'between interest as an element of damages and "interest on a claim"' is well-recognized." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005).[7/] *See also Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts

---

[7/] Defendant is also mistaken in claiming error in plaintiff's reliance on *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) and in asserting that two cases cited therein are "inapposite to an analysis of whether waiver of sovereign immunity exists that would permit [plaintiff] to recover its [weighted average cost of capital] damages from the Government pursuant to the no-interest rule." (Def.'s Reply at 4-5 n.3.) While the two cases cited do not concern the statutory ban on prejudgment interest against the United States, both cases do concern statutory bans on prejudgment interest, and both award consequential increased financing costs, rejecting claims an award would violate a statutory bar. *Pacific Gas and Electric Co. v. Howard P. Foley Co.*, Civ. No. 85-2922SW, 1993 WL 299219, at *4 (N.D. Calif. July 27, 1993) (rejecting claim that cost of capital was prejudgment interest barred by statute in private antitrust or RICO actions, commenting "[t]he mere fact that [] damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest"); *United Power Ass'n v. L. K. Comstock & Co.*, Civ. No. 3-89, 1992 WL 402906, at *8 (D. Minn. Oct. 27, 1992) (similar).

may treat as an element of compensation. For that reason, . . . foreseeable financing costs can be an element of expectancy damages.”).

Accordingly, financing costs are not interest and have been awarded in appropriate circumstances. “The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet’s increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive.” *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001). Financing costs have been included in mitigation damages. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1368 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1831 (2007). *See also LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331, 1334-35 (Fed. Cir. 2006) (noting that all raised capital has a cost); *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that “capital is not ‘costless,’” and concluding the trial court erred in not allowing recovery of costs incurred in obtaining equity capital, because “the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings.”); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994) (“Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government’s delay in payments and used on the delayed contract.”). *Cf. J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Fed. Cir. 1972) (“Interest paid on bank loans made because of financial stringency resulting from a breach by the [g]overnment of a contract between it and the borrower is not recoverable as an item of damage.”)

Foreseeable costs of obtaining financing because of the government’s breach are recoverable. *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1354-58 (Fed. Cir. 2001). Defendant asserts *Bluebonnet* is distinguishable, limited to its facts – a contract was to infuse funds into an acquired thrift. (Def.’s Reply to Cost of Capital Mot., 4.) *Bluebonnet*, however, is not so factually limited; neither is its holding. While the underlying Assistance Agreement in *Bluebonnet* included the government’s agreement to provide financial assistance, including promissory notes, asset coverage and yield maintenance, the government also agreed that for ten years the thrift could maintain regulatory capital at levels lower than required by regulation and could include subordinated debt in calculating required regulatory capital. Dividend forbearances would cover the costs of the acquisition. Passage of FIRREA breached the regulatory capital and dividend forbearances, which led to the thrift’s

search for capital, at a cost. "The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs . . . ." 266 F.3d at 1356. The Federal Circuit did not carve out the narrow allowance defendant urges.

Recoverability of incurred financing costs as a result of a government breach of contract was recently reiterated:

> In *Bluebonnet*, this court affirmed the Court of Federal Claims' finding that it was foreseeable that a thrift would be 'forced to seek even more capital to meet heightened regulatory requirements' and that it was also foreseeable that the costs and risks associated with meeting these requirements would have other negative economic consequences such as 'increas[ing] the costs of securing debt or equity financing.' 266 F.3d at 1356; *see also Home Sav. [of America, FSB v. United States*, 399 F.3d 1341,] [] 1355 (Fed. Cir. 2005); *cf. S. Cal. Fed. Sav. v. United States*, 422 F.3d 1319, 1336-37 (Fed. Cir. 2005).

*Citizens Fed. Sav. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (first alteration in original).

Both parties cite *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006), *appeal dismissed*, 188 Fed. Appx. 1006 (2006) – plaintiff in reliance; defendant asserting error. *Tennessee Valley Authority*, another SNF case, included in mitigation damages a category of costs referred to as an Allowance for Funds Used During Construction ("AFUDC"). For rate-making purposes, AFUDC was added to the amount of capital used on construction projects to compensate for the cost of those funds. This industry-wide practice is consistent with FERC regulations. 18 C.F.R. pt. 101 Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17) (AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used."). "TVA's cost of capital is equal to the interest rate that it pays on debt; as an entity of the federal government, TVA finances capital projects either through operating cash flows or through debt, and has no equity." 69 Fed. Cl. at 541. TVA's AFDUC was the average monthly interest charge on its short-term and long-term debts allocated to different projects based on the percentage of that project's

capital cost to the total capital projects of the plant. *Id.* Accordingly, a percentage of the total AFUDC was added to the costs of TVA's mitigating efforts. As the court there observed:

> Building the dry storage facilities required that TVA muster the financial resources to do so. The AFUDC represents the costs TVA incurred in so doing. The record is bereft of any evidence that TVA had sufficient financial resources derived from its cash flow to fund the tens of millions of dollars that were required for the dry storage facilities.

69 Fed. Cl. at 542. Likewise, here, defendant does not suggest that plaintiff had sufficient cash flow to pay the millions required to construct dry storage.

*Tennessee Valley* relied upon *Wickham Contracting Co. v. Fisher*, 12 F.3d 1574 (Fed. Cir. 1994). Under the Contracts Disputes Act ("CDA"), 41 U.S.C. § 607(g)(1) (1988), in *Wickham*, the non-breaching party sought to include in recovery of damages for the government's payment delay, interest on equity capital used to cover expenses. "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." 12 F.3d at 1582 (citing *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987) (applying 28 U.S.C. § 2516(a)).

*Tennessee Valley Authority* rejected the government's argument that a match between capital expenditures and a specific debt instrument was necessary for any recovery, holding that TVA's general debt costs, allocated by the size of the mitigation projects was sufficient. 69 Fed. Cl. at 541-42.

In *Richlin Security Service Co. v. Chertoff,* 437 F.3d 1296 (Fed. Cir.), *cert. denied*, 127 S.Ct. 253 (2006)[8/] the Federal Circuit, applying the CDA, held that a contractor could not recover interest on amounts paid by agency to discharge back wage liability because the contractor had not actually paid any interest. "[I]nterest is allowable only when the contractor has incurred a cost of money to finance [the] additional work." 437 F.3d at 1301 (quotations omitted) (second alteration in

[8/] The Federal Circuit's *Richlin* decision was issued on January 31, 2006, the same date as the CFC's decision in *Tennessee Valley.*

original). Actual out-of-pocket expenditure was described as a Congressional "bright-line rule for the computation of interest." 437 F.3d at 1302. The "changed work either must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987). "In the latter situation, the allowance of interest depend[s] upon a specific showing that the course of borrowing was affected by the change in question, i.e., that apart from the normal borrowing pattern, there was a necessity to borrow specifically due to the change in question." *Singer Co. Librascope Div. v. United States*, 215 Ct. Cl. 281, 322, 568 F.2d 695, 718 (1977); *Framlau Corp. v. United States*, 215 Ct. Cl. 185, 198, 568 F.2d 687, 694 (1977) (To recover interest, plaintiff must establish that it was "forced to borrow to perform the changed work," and "prove what part, if any, of its large borrowings were attributable to compensable changes.") (footnote omitted); *Bell v. United States*, 186 Ct. Cl. 189, 404 F.2d 975, 984 (1968) (allowing a contractor to recover interest on borrowing caused by government changes to contract); *Dravo Corp. v. United States*, 219 Ct. Cl. 416, 427, 594 F.2d 842, 847 (1979) ("[I]t is clear that this court still holds to the view that direct tracing to a specific loan or necessity for increased borrowing is still required to be proven in order for a contractor to recover for interest costs under an equitable adjustment theory.").

Defendant has not established that, as a matter of law, under the undisputed material facts, plaintiff's claims for increased financing costs are prejudgment interest under 28 U.S.C. § 2516(a).

The Kenrich report quantifies plaintiff's claimed damages from 1998 through 2005, in both nominal and in "2007 dollars." The two categories are described in various ways, some supportive of defendant's position that the time-adjusted claim represents inflation, the time value of money – in short, interest, or its surrogate. The categories are described as "the nominal dollar and present value estimate of costs incurred by [plaintiff] in excess of those costs that would have been incurred if DOE disposed of spent fuel from the nuclear industry in 1998, at the assumed rate of acceptance." (Pl.'s Resp. to Cost of Capital Mot., App. 7.) "Nominal dollars are unadjusted for the effects of financing or the time value of money." (*Id*. at n.10.) In other parts of the report, however, actual out-of-pocket costs are described. "[P]ast damages are restated in 2007 dollars by applying [plaintiff's] after-tax weighted average cost of capital from the middle of each year in which damages were incurred

through March 27, 2007, *appropriately increasing past damages to account for the utility's financing costs*." (*Id.* at App. 8 n.13, emphasis supplied.)

> An additional element of past damages is the increased financing costs associated with the money spent by [plaintiff] to address the impacts of DOE's failure to pick up spent fuel from the nuclear industry in 1998. [Plaintiff] has had to finance the costs that it has incurred because of DOE's failure to perform in accordance with its contractual obligations from the time those costs were incurred. [Plaintiff's] after-tax weighted average cost of capital rates were used to calculate [plaintiff's] increased financing costs. The applicable annual rates were applied to the total nominal damages incurred each year from the middle of that year through March 27, 2007.

(*Id.* at App. 17.)

Mr. Metcalfe testified in deposition that plaintiff's weighted average cost of capital was calculated after-tax, because most of these mitigating expenses were deducted from income. "If you use a pre-tax rate, you would be overcompensating the plaintiff in this case. The pretax rate would be higher." (*Id.* at App. 25.) Without the cost of capital adjustment, "plaintiff is not made whole[;] . . . it spent money that it otherwise would not have spent. That money has a value including this pure time value of money, including inflation, since the dollars the utility spent are not worth what they were when they spent them, and including risk factors." (*Id.* at App. 25-26.) Mr. Metcalfe testified these risk factors were market-place driven. Plaintiff is a public, regulated utility that seeks both debt and equity capital from public markets.[9/] Rates for equity capital are approved by the Wisconsin Public Utility Commission and paid to investors who purchase common or preferred stock. Components of weighted average cost of capital include expenses of common equity, preferred stock, long-term debt and short-term debt. (*Id. at* App. 43.) "[Plaintiff's] weighted average costs of capital mean that its financing costs are greater than it otherwise would have had." (*Id.* at App. 58.)

---

[9/] Mr. Metcalfe also testified that Wisconsin Energy, a holding company, holds all the common stock of plaintiff. (*Id.,* App. 28-29.)

Historical components and calculations of plaintiff's capital structure from 1975 through 2000 were submitted with its Response, except for years 1994 and 1999, years in which the prior ratios and costs were used. The after-tax weighted average cost of capital goes through 2005. Apparently, there were no rate cases from 2000 until 2006. (*Id.* at App. 77-78.)

Plaintiff also submits an excerpt of the deposition of Ione Straub, Nuclear Power Department Budget Coordinator at the time plaintiff constructed the ISFSI. For the time period of 1989 through July of 1996, "the company issues commercial paper daily to cover its cash flow needs, so any costs that the company would incur would primarily be met with some form of – require some form of financing." (Pl.'s Resp. to Cost of Capital Motion, App. 82.) On the other hand, she testified that because funds were used to finance these mitigating projects, plaintiff and its ratepayers lost earning opportunities.

> [I]f the company would not have had to incur the charges associated with these projects, it would have been able to use those funds to go out and, if it had additional funds, to procure commercial paper or some other means to which it would have accrued some earnings, so there's alternatives to using the funds for this project. Lost opportunity, if you will, that the company lost by virtue of having to build these casks in the facility.

(*Id.* at App. 83-84.) In short, rates were higher because funds used for mitigation could have earned income.

David Ackerman, plaintiff's business consultant, testified in deposition that plaintiff's capital costs are financed proportionately with debt and equity capital. (*Id.* at App. 74, 78.) Operations and maintenance costs, and to a certain extent fuel expenses, are paid from rate revenue. (*Id.* at App. 75.)

In response to Interrogatory No. 63, after objections, plaintiff responded to inquiry as to the source, date and amount of funded capital:

> [Plaintiff] generally does not conduct financings for specific projects, and did not do so with respect to the ISFSI project. Therefore, all capital costs incurred by [plaintiff] were financed at the overall cost of

> capital, as detailed in Binder C, "Cost of Capital." The increased financing costs included in [plaintiff's] damage claim are based on the company's overall costs of capital as determined and authorized in rate cases by [plaintiff's] primary regulatory agency, the Public Service Commission of Wisconsin ("PSCW").

(*Id.* at App. 63-64.)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must resolve all reasonable inferences in favor of the nonmoving party. *Id.* at 255. The burden on the moving party is to demonstrate that there is no genuine issue of material fact, and may be discharged upon a showing "that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex,* 106 S.Ct. at 2554). The burden then shifts to the nonmoving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249-50, 256; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) (holding that the nonmovant "must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial."). To create "a genuine issue of fact, the nonmovant must do more than present some evidence on an issue it asserts is disputed." *Avia Group Int'l v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

Plaintiff has set forth sufficient genuine issues of material facts such as to preclude summary dismissal of its claim for costs of raising capital. *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (reversing summary judgment on lost profits, because the existence and amount of economic damages are factual matters, not amenable to summary adjudication if there are genuine issues of material fact). Defendant did not meet its burden of establishing

that recovery of actual costs incurred to raise the capital needed to fund the mitigating efforts is precluded as a matter of law.

**Deposition and Trial Testimony Designations Motion**

Plaintiff's Deposition and Trial Testimony Designations filed December 18, 2006 (Dkt. 256), asserts the identified testimony transcript pages are from government agents and employees, are of statements concerning matters within the scope of their employment or agency, and therefore, are admissions of a party-opponent, admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence and *Globe Savings Bank, FSB v. United States*, 61 Fed. Cl. 91, 96-97 (2004).

Defendant moved to strike the designations and, alternatively to preclude their admission. Defendant argues admission should have been sought by motion, not notice,[10/] and in any event, the designations do not meet the requisites of Rule 801(d)(2)(D). If not stricken, the court should first rule on any objections defendant has to the admissibility of each particular statement, any admitted statement should be read into the record by plaintiff, and then defendant could read any counter-designations to complete the record.[11/]

Defendant's assertions that admission of deposition testimony requires witness unavailability, and counters the general preference for live testimony, are rejected. To admit statements of a party-opponent, plaintiff need not establish the witness is unavailable. Neither is the general preference for live testimony a consideration in this context. "Under [Rule 801(d)(2)(D)], the proffering party need not prove that the witness is unavailable nor does the party need also to invoke RCFC 32(a)(2) regarding admissibility of deposition testimony." *Rodriguez v. United States*, 69 Fed. Cl. 487, 494 n.8 (2006) (citing *Globe Sav. Bank,* 69 Fed. Cl. at 94-97). Likewise, in *Long Island Savings Bank, F.S.B. v. United States*, 63 Fed. Cl. 157, 164 (2004), the

---

[10/] Under RCFC, Appendix A, paragraph 15(b), "[a]ny party intending to present substantive evidence by way of deposition testimony, other than as provided by Fed. R. Evid. 801(d), shall serve and file a separate motion for leave to file the transcript of such testimony." To the extent required, the court construes plaintiff's Deposition and Trial Testimony Designations as a motion.

[11/] Defendant notes that deposition excerpts were required to be read into the record in the *Tennessee Valley Authority* and *Systems Fuels, Inc.* (No. 03-2623C) trials. (Def.'s Dep. Designation Mot. at 19, n.10.)

court noted a party "need not demonstrate that any of the declarants whose deposition testimony it seeks to admit at trial pursuant to Fed. R. Evid. 801(d)(2)(D) will be unavailable as witnesses at trial," and the "common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Id.* at 163.

To be admissible under Rule 801(d)(2)(D), a statement must: (1) be offered against a party; (2) concern a matter within the scope of the employment with or for the party against whom the statement is offered; and (3) be made "during the existence of [his or her] relationship" with the United States. *Globe Savings*, 61 Fed. Cl. at 97 (citing cases). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility.'" *Id*. at 96 (citing *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003)).

Defendant does not dispute that plaintiff seeks to offer statements "against" defendant, satisfying the first requirement. As for the second, defendant argues that the witnesses were not authorized to make binding "admissions" on behalf of the government, and plaintiff has not matched the job descriptions for each witness with the statement sought to be admitted. Thirdly, that some of the witnesses were not employed by the government at the time of their depositions, defendant concludes, prevents their use.

An "admission" of a party-opponent, in this context, is broader than an "admission" of liability or other legal conclusion. Illustratively, "yes, we owe the money" may generally be a binding legal admission and conclusion; but, in determining whether a statement is hearsay, "admissions" are statements made in furtherance of the deponent's government job or contract. "Simply put, to qualify as an admission, the statement need only be related to the declarant's duties." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.33[2][c], 801-74.3 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2007). "A statement is not hearsay if – . . . the statement is offered against a party and is . . . a statement by a person authorized by the party to make a statement concerning the subject." Fed. R. Evid. 801(d)(2)(D). In this context, a witness is authorized to make statements within the scope of his or her governmental responsibilities. "[I]n order to constitute an admission under FED. R. EVID. 801(d)(2)(D), the statements of the agent must concern a matter within the scope of the agency, made during the relationship." *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 369, 376 (2006) (citing *Nekolny*

*v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981)). *See also Rodriguez*, 69 Fed. Cl. at 493 n.8; *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 473 (2006).

Defendant concedes that the following twelve of the seventeen[12/] witnesses were employed by DOE or the Nuclear Regulatory Commission ("NRC") at the time of their trial or deposition testimony:

1. Mr. Lake Barrett,
2. Mr. Alan Brownstein,
3. Ms. Tammy Croote,
4. Ms. Susan Klein,
5. Mr. Christopher Kouts,
6. Mr. Ronald Milner,
7. Mr. Thomas Pollog,
8. Mr. Peter Rabideau,
9. Mr. Robert Roselli,
10. Ms. Nancy Slater (Thompson),
11. Mr. Victor Trebules,
12. Mr. David Zabransky.

Nevertheless, defendant argues, their designated testimony must concern matters within the scope of their duties for DOE's OCRWM or NRC, and that foundational requisite is missing. Defendant points out that in *Globe* and *Long Island*, the court required the plaintiffs match the subject matter of the designated deposition testimony with the deponent's job or position description.[13/] In response, plaintiff asserts that depositions of all of these witnesses concerned their work with either DOE's OCRWM or NRC. Presumably, deposition testimony that may not have been designated or other knowledge covers these concerns, and foundational issues can be

[12/] Defendant's Motion states deposition or trial testimony of **nineteen** present or former government or government contractor employees was proffered. Plaintiff's Deposition and Trial Testimony Designations, filed December 18, 2006, Dkt. 256, Attachment A, lists **seventeen.** Tammy Croote and Peter Rabideau are on defendant's list, but not on plaintiff's Designation. (*Cf.* Def.'s Dep. Designation Mot., 2 n.1 with Pl.'s Dep. and Trial Test. Designation, Dkt. 256, filed Dec. 18, 2006.) Counsel should address this matter at the Pretrial Conference.

[13/] In *Long Island*, the court matched job descriptions with proffered testimony. 63 Fed. Cl. at 164 n.15.

resolved through cooperation of counsel before trial. These designations are not stricken.

As for five individuals, Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote – "whom the government expects to call in its case-in-chief, the designation of deposition testimony may not be necessary. *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C, Order at 2 (Fed. Cl. March 16, 2005) (unpublished) (denying motion to designate prior testimony of witnesses who were scheduled to testify at trial.) Accordingly, in the event defendant calls any of these witnesses, Plaintiff's Deposition and Trial Testimony Designations as to Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote, which the court construes as a motion, is **denied** and is otherwise **deferred** as set forth herein.

The following are four government officials who testified in deposition or trial in other SNF cases about their roles in the formation of the Standard Contract, the passage of the NWPA and early DOE planning in the 1980s and early 1990s, but were not federally employed at the time of deposition, twenty-some years later.

Michael Lawrence was Acting Director of OCRWM, Deputy Director of the NWPA Project Office at the time the Standard Contracts were signed, and Associate Laboratory Director for Energy Science and Technology at DOE's Pacific Northwest National Laboratory. *Southern Nuclear Operating Co. v. United States*, __ Fed. Cl. __, 2007 WL 2005164, at *15 (July 9, 2007); *Pacific Gas and Electric*, 73 Fed. Cl. at 389; *Yankee Atomic*, 73 Fed. Cl. at 266; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 336 n.1. He was also identified in response to interrogatories in this case, among "DOE Personnel" who were "involved with and may have knowledge of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste contained within the notice of proposed rule-making at 48 Fed. Reg. 5458 (Fed. [sic] 4, 1983)." (Pl.'s Resp. to Dep. Designation Mot., Exh. A, unn.3.)

Robert Morgan, was Director of the Nuclear Waste Policy Act Office, the precursor to the Office of Civilian Radioactive Waste Management within DOE from January 1983 to January 1984. He testified in at least four prior SNF trials. *Yankee Atomic*, *Tennessee Valley Authority*, *Pacific Gas and Electric,* and the recent trial in *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.) where he testified on November 16, 2006. Def's Unopposed Mot. to Designate Prior Test. of Mr. Robert L. Morgan at 1-2, *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. Jan. 5, 2007). In *Southern Nuclear*, defendant also designated prior trial

testimony of Mr. Morgan. Def.'s Objection to Pls.' Designations of Dep. and Trial Test. at 9, *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Mar. 16, 2006). In two other SNF cases, defendant's unopposed Motions to Designate Prior Trial Testimony of Mr. Morgan, citing Mr. Morgan's retirement from federal service in 1988, the passage of time and his extensive prior testimony, were granted. Order, *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl. January 8, 2007) and Order, *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. January 8, 2007).

Dr. Daniel Dreyfus also held high-level positions at DOE, including Director of DOE's Office of Civilian Radioactive Waste Management – a position requiring Presidential appointment and Senate confirmation. While he was retired at the time of his deposition, presumably his testimony, including the segments plaintiff wishes to admit, concern his work for DOE. Dr. Dreyfus is also on plaintiff's witness list.

Bernard Rusche was the "former first presidentially appointed and confirmed director of the Office of Civilian Radioactive Waste Management . . . ." (Pl.'s Resp. to Mot. to Strike, Exh. C, *Yankee* Trial Transcript Excerpt at 3697.) Defendant's witness list in *Yankee Atomic* included Benard Rusche:

> Mr. Rusche, former Director of the Office of Civilian Radioactive Waste Management, will provide testimony about the implementation of the NWPA and the 1987 Amendments to the NWPA, including the issuance and content of the 1985 Mission Plan and 1987 Mission Plan Amendment, the issuance and content of the ACRs, and the technical, legal, and political obstacles to the implementation of the NWPA, as well as other relevant matters.

(Pl.'s Resp. to Dep. Designation Mot., Exh. B, 7.)

Defendant cites cases for the general rule that the employment or contractual relationship must have been intact at the time of the statement, or here, the deposition. For example in *Young v. James Green Mgt., Inc.,* 327 F.3d 616, 622-23 (7th Cir. 2003), in a letter, an employee resigned because of illegal racially discriminatory acts he was asked to perform, and referred any questions to his attorney. Plaintiffs sought to admit this letter as evidence of racial discrimination. "The district court determined that the letter was not admissible under this provision. We cannot say

that, in light of the totality of the circumstances, this ruling was an abuse of discretion. [The resigning employee's] assertions regarding discrimination were not made during the existence of his employment relationship [with defendant]. [The resigning employee's] letter of resignation is not admissible under Rule 801(d)(2)(D) because the justification for the rule simply is not present in this situation." 327 F.3d at 622.

Assuming the prior sworn testimony of these individuals concerned matters within the scope of their government employment or agency (indeed, that is why they were deposed - they were not questioned about their retirement plans), does their retirement or civilian employment at the time of their deposition change the evidentiary nature of their sworn testimony? While plaintiff does not advocate this position, and cites no authority therefore, it seems eminently reasonable in this case as to these former high-level government officials regarding matters that occurred in the 1980s and 1990s when they held those positions. Also, concerns have been raised about duplicative testimony, age and travel restrictions. For example, Mr. Morgan retired from the government in 1988 and does not live in close proximity. Deposition testimony of these witnesses has been admitted in other SNF cases, and efficiency would encourage at least the limited use of depositions. The court has heard live testimony of several of these witnesses in prior SNF trials. Defendant does not suggest any bias.

Presumably recognizing these four individuals were not federally-employed at the time of their depositions, plaintiff cites alternatively, Rule 801(d)(2)(c) which defines as non-hearsay statements of a party-opponent if the statements are (1) offered against a party opponent, and (2) the statement is by a person "authorized by the party to make a statement concerning the subject." Again, neither the unavailability of the witness not the general preference for live testimony, prevents admission.

These four individuals are not authorized to make statements on the government's behalf and plaintiff did not meet its burden in this regard, defendant replies. The court's determinations of agency here are not based upon the mere fact that these individuals were listed as having knowledge. They held high-level positions, and the court assumes the testimony tendered concerns their work done within the course and scope of those positions. For example, the deposition designation of Mr. Lawrence concerns his congressional testimony in 1984 after the contracts in issue were signed. Apparently, he was chosen or had authority to testify

to Congress about the contracts and/or early program developments. That his Congressional testimony was shortly after the contracts were signed does not alter the court's conclusion in this regard. Likewise, Mr. Morgan's deposition testimony concerning his presentation to the nuclear industry after the contracts were signed exemplifies his authority. That his public representation of DOE was after the contracts were signed goes to the weight of his statements, not the admissibility. Moreover, any statements he made on DOE's behalf concerning early program developments may be relevant. Certainly, government officials who testify before Congressional hearings on DOE's behalf, represent DOE at industry conferences, were "authorized" to say what they said. Defendant apparently concedes that at least Mr. Dreyfus, who held a series of senior positions within DOE and was staff director for the Senate Energy Committee "was authorized to make statements on behalf of DOE when he was employed by DOE does not make him an "agent" of DOE for the purposes of his deposition testimony given many years after he left Government service." (Def.'s Reply to Dep. Designation Mot., at 5-6.) Presumably, the subject deposition testimony concerns his time when he was so authorized, and not his activities after he left government service. That these gentlemen were authorized agents, deposed after that agency ended, but about that agency, goes to the weight of those statements, not their non-hearsay character.

Under the circumstances of this SNF litigation, under either Rule 801(d)(2)(C) or (D), and alternatively, under Rule 807 and RCFC 32(a)(3)(f), the court will not preclude the admission of these deposition designations. Accordingly, defendant's Motion to Strike and Motion in Limine on Rule 801(d)(2)(D) grounds is **denied**. *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1344 (Fed. Cir. 1999) (noting "significant additional assurances of reliability" may allow admissibility under Rule 807, the residual exception to the hearsay rule); *Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999) ("Although Burrough had retired at the time of these depositions, he continued to perform consulting services for Gehl on projects he had overseen during his full-time tenure with the company. Moreover, prior to being deposed in this case, current project engineer Viesselmann met with Burrough to review the former structure of Gehl's engineering department and the evolution of Gehl's closed-throat balers' designs. The preceding facts, both of which were established through Viesselmann's testimony, constitute independent and sufficient corroboration of Burrough's authority to make statements on behalf of Gehl and/or the scope of Burrough's employment. Because the topics discussed in Burrough's deposition excerpts all concerned events and policies occurring during his

employment, the district court did not err in admitting this testimony pursuant to Rule 801(d)(2).").

After arguing plaintiff should not be able to admit trial testimony of Mr. Morgan from the trials in *Tennessee Valley Authority, Yankee Atomic, Pacific Gas and Electric*, and most recently, *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.)[14/] or excerpts from his deposition, defendant turns around and requests that Mr. Morgan's prior trial testimony be admitted in defendant's case, citing RCFC 32(a). Mr. Morgan was deposed extensively in early coordinated discovery proceedings and has testified in four trials. Plaintiffs in all SNF cases presumably have had, and still have, similar motives to query Mr. Morgan about his recollection of the formation of the Standard Contract some twenty years ago – the same standardized contract shared by all plaintiffs, and the same breach by DOE. "The breach involved all the utilities that had signed the contract – the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Plaintiff objects, asserting it had no opportunity to cross-examine Mr. Morgan in the three prior SNF cases cited, and Mr. Morgan is needed to authenticate "the substantial number of documents on the Government's exhibit list, which documents were apparently submitted to him when DOE developed the Standard Contract." Plaintiff did, however, take Mr. Morgan's deposition and designated testimony from his deposition taken in this case on March 21, 2002; March 22, 2002; June 25, 2002; August 3, 2004; July 14, 2005 and November 15, 2006. Plaintiff does not suggest any questions that were not asked or any opportunity to fully vent at these depositions, nor does plaintiff suggest that counsel in any of the three prior trials did not adequately examine Mr. Morgan, nor that counsels' interests were other than co-extensive, nor that plaintiff has some additional party-specific area of questioning Mr. Morgan about events that occurred more than twenty years ago. While there may be some factual differences that may have affected the breath or vigor of examination by plaintiffs' counsel in these other matter, plaintiff does not suggest such. As negotiations are continuing between counsel on stipulations as to authentication of certain documents, presumably consensus can be reached in this regard.

---

[14/] In *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) and *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl.), the court granted defendant's motion to designate the entirety of Mr. Morgan's testimony from *Northern States* as substantive evidence.

As for the statements of the remaining witnesses whose depositions were designated, defendant objects because the deponent or witness was a government contractor. In this regard, the court adopts the reasoning of the court in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) that contractor documents, in addition to being admissible under Fed. R. Evid. 803(A) (as "[r]ecords, reports, statements, or data compilations, in any from, of public offices or agencies, setting forth (A) the activities of the office or agency," were non-hearsay admissions of parties. That testimony and not documents are the subject of inquiry here does not alter the result. The same Rule is cited in both cases. *See also Beck v. Haik*, 377 F.3d 624, 639-40 (6th Cir. 2004). Accordingly, the deposition excerpts of Messrs. Edward Benz, Billy Cole and Patrick McDuffie are not precluded.

The question is not, as defendant suggests, whether the contractor was authorized to make admissions on behalf or, or bind, the government. Again, an admission is not as to legal liability. In this context, an "admission" may be that the design rate or other input or analysis used by the contractor within the scope of its contract with DOE was "X". Of course, data either directly or indirectly, must have been conveyed to DOE. That two of the deposition witnesses were retired at the time of their deposition, goes to the weight of those statements, not their nonhearsay character.[15/]

Rather, the inquiry is "whether (a) statements made by DOE contractors were beneficial to, and offered by, plaintiff, and (b) such statement were 'authorized by the party to make a statement concerning the subject." *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 440 (2006) (citing *Yankee Atomic*, 2004 WL 2450874, at *8) ("recognizing that the 'authorized' nature of statements made by contractors in performing work for DOE [was] 'not in dispute'"). As the court in *Pacific Gas and Electric Co.* observed, the contractors were "'authorized'" – indeed, in some cases, contracted by DOE to make such statements. *Id.* These contractors were hired by DOE to do DOE's work. To the extent that any statement was made was inconsistent with DOE's position, contrary evidence or argument can be advanced.

---

[15/] Mr. Cole is on defendant's witness list. Accordingly, the court defers admission of his testimony, pending defendant's decision to call him as a witness. If he is, to the extent that defendant may object that cross-examination goes beyond the scope of direct, the court will allow cross-examination into the areas of the deposition designation, with re-direct, etc. as appropriate.

Before any of plaintiff's designations should be allowed, defendant asks that the court first rule on its objections to each particular designation, and then, to the extent that the court admits any designated testimony, the court should consider first, defendant's counter-designations. Plaintiff objects to the nature of some of defendant's objections. Any objections made at the time the deposition was taken are preserved. To the extent a designation or counter-designation is cited as support for a finding, any objections as to lack of foundation, etc. may then be raised. Plaintiff's objection to defendant's counter-designations will be addressed, to the extent required, at such time as plaintiff's deposition designations are cited in post-trial briefing in support of a factual finding. Any issues concerning exhibits referred to in deposition testimony will have to be resolved in that event.

Defendant asks that any deposition designations be read into the record which would encourage reduction in volume. Defendant asserts that the court's order that designations be read aloud in *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) significantly reduced volume. Another advantage is that objections can be ruled on upon offering the testimony, and defendant could then offer and read its counter designations, which would streamline the court's consideration of the same. If the court orders designated testimony be read into the record, plaintiff is prepared to stipulate that designations read into the record in *Tennessee Valley* and *Systems Fuels*, would not have to be read into the record again. Defendant objects to wholesale adoption of testimony in prior cases, arguing that "[h]aving opposed repeatedly any effort to consolidate these cases in the past, WEPCO cannot now seek 'consolidation' for the purpose of avoiding the need to read into the record the testimony that it seeks to designate as substantive evidence in this case." (Def.'s Reply at 14.) By limiting deposition designations to those cited in support of a proposed finding, the number may be reduced. Also, as the court has previously encouraged stipulations of facts (and continues to encourage the same), record size may also be lessened. Accordingly, the request that deposition designations be read into the record, is denied. RCFC 32(c) ("Except as otherwise directed by the court, a party offering deposition testimony pursuant to this rule may offer it in stenographic or nonstenographic for. . . ."). *Cf. Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. at 166.

Upon representation that some of the witnesses whose testimony has been designated may testify at trial, and upon consideration of the foregoing, deposition designations of any witness called to testify at trial will be disregarded. In that event,

the court will allow cross-examination, re-direct, etc. to go beyond direct to address designated areas. *Pacific Gas and Electric,* 73 Fed. Cl. at 442 (striking deposition designations not relied upon by parties in post-trial briefing), *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 645 (2005) (citing *United States v. Int'l Bus. Machs. Corp.*, 90 F.R.D. 377, 382 (S.D.N.Y. 1981) (disregarding designated deposition testimony of witnesses who testified at trial); Order at 2, *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (Fed. Cl. March 16, 2005) (denying motion to designate prior testimony of witnesses who were to testify at trial).

Accordingly, it is **ORDERED**:

(1) Defendant's Contractors Motion is **DENIED** without prejudice to renewal during, or after trial, as set forth above, to the extent a contractor document is proposed for admission, or cited as support for a proposed finding;

(2) Defendant's Supko Motion is **DENIED** without prejudice;

(3) Defendant's Cost of Capital Motion is **DENIED;** and

(4) Defendant's Deposition and Trial Testimony Designations Motion is **GRANTED in part, DENIED in part and DEFERRED** as set forth above.

s/ James F. Merow
James F. Merow
Senior Judge