IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, Plaintiff, | ) | |
| v. | ) | No. 00-697C (Senior Judge Merow) |
| UNITED STATES, Defendant. | ) | |

DEFENDANT'S UNOPPOSED MOTION TO
DESIGNATE DEPOSITION TESTIMONY OF MR. BILLY COLE

Defendant, the United States, respectfully requests that it be allowed to designate the testimony of Mr. Billy Cole from the depositions conducted in Yankee Atomic Electric Co. v. United States, Fed. Cl. No. 98-126C, and the coordinated discovery proceedings conducted in the spent nuclear fuel ("SNF") cases in 2001-2002. Allowing the designation of this testimony would preclude the need to have Mr. Cole, who retired in 2002 from his employment with a Government contractor, appear to testify in this case. Plaintiff, Wisconsin Electric Power Company ("WEPCO"), is not prejudiced by the designation of this testimony because counsel for WEPCO participated in the deposition of Mr. Cole that was conducted in the coordinated discovery proceedings. Counsel for WEPCO, Mr. Richard Oehler, has represented that WEPCO does not oppose this designation of testimony. The deposition testimony that the Government seeks to designate is attached to this motion.

Before his retirement, Mr. Cole was an employee of JAI Corporation, a contractor that was hired to assist the Office of Civilian Radioactive Waste Management ("OCRWM") within the Department of Energy ("DOE") in its implementation of the Standard Contract. Mr. Cole had been employed by several different contractors fulfilling this role, since the contracts were

signed in 1983. In the course of his employment, Mr. Cole assisted in the development of the Annual Capacity Report in 1991, which is the subject about which the Government has designated his testimony. Mr. Cole retired in 2002, very shortly after his depositions were taken.

Mr. Cole was deposed about his involvement in the activities of OCRWM during four days of deposition conducted in 2002, two days in the coordinated discovery proceedings and two days in Yankee Atomic. Counsel for WEPCO, Mr. Carney, participated in the coordinated discovery depositions upon behalf of WEPCO.

This Court's rules are designed to ensure the "just, speedy, and inexpensive" determination of every action. RCFC 1. Similarly, RCFC 32(a) permits the use of deposition testimony, in lieu of live testimony, when a witness "is at a greater distance than 100 miles from the place of hearing" unless other factors not present here should preclude that use, RCFC 32(a)(3)(E), or when, "upon application and notice, . . . such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."

In this instance, we seek permission to designate Mr. Cole's deposition testimony to save Mr. Cole the burden of having to travel to Washington D.C. to testify. Mr. Cole now lives in western Washington state, two hours from Seattle, Washington. Mr. Cole had scheduled a trip to occur during much of the trial time that would have required that he travel to Washington during the second week of trial. However, he also had an illness in the family that would have made it difficult for him to travel during that time. We sought to have Mr. Cole testify via video telephone, but counsel for WEPCO opposed this arrangement.

For the foregoing reasons, the Government requests that it be allowed to designate the attached deposition testimony of Mr. Cole as substantive evidence in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Phone: (202) 305-9640
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

September 27, 2007

Attorneys for Defendant

# ATTACHMENT

# ATTACHMENT A

**March 12, 2002**

1:1-10:10
22:18-24:1
128:11-131:20
151:24-152:13

**March 13, 2002**

303:12-307:10

**June 4, 2002**

11:19-15:23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100



APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| Billy M. Cole | PLAINTIFF | DEFENDANT |
| By Ms. Hewitt | 8 | |

Afternoon Session - Page 105


EXHIBITS


| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 80 |
| 2 | 197 |




PROCEEDINGS

Whereupon,

BILLY M. COLE,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:

Q. Good morning, Mr. Cole. My name is Devon Hewitt, and I represent ten of the Plaintiffs in the nuclear utility cases or the spent fuel cases as we call them.

We are here to do your deposition today.

Have you ever had your deposition taken before?

A. No.

Q. Generally what happens is that people ask you questions, and you're required obviously to tell the answers to the best of your recollection truthfully.

Today you will be asked questions by me primarily, but after I'm completed with my questions, other attorneys here representing



other Plaintiffs in the action will be allowed to also ask you questions primarily as a follow-up or something that I may have missed.

A. Um-hm.

Q. If you don't understand a question that I have asked, will you agree to ask me to rephrase it or explain what I'm saying so you absolutely understand the question?

A. Certainly, I will.

Q. And if at any time after you have answered a question, if you feel the need to amend something or clarify something that you remembered later, feel free to raise it at a break or on the record, and we'll clarify your earlier answer.

A. Okay.

Q. Will you agree to do that?

A. Yep.

Q. Okay. Also we're relatively informal here, so if you would like a break at any time, please feel free to raise it.

I think what we might do today is go maybe straight through until 12:30 and then break for lunch, but we may stop halfway if we think we all need to just stretch our leg or

Page 10

something, but if you need a break at any other time, feel free to raise that.
A. Okay.
Q. I want to clarify you're not represented by counsel here today?
A. That's correct.
Q. And the government has offered to represent you, but my understanding is you have declined that representation?
A. That is correct.
Q. Okay. I asked you to read a copy of something called the protective order.
Did you read that?
A. Yes, I did.
Q. I want to just advise you that many of these documents that you may have actually seen or authored before were actually provided to the Plaintiffs under this protective order which required that we keep those, the information in those documents and actually those documents confidential and not disclose them to anyone outside this litigation.
I would ask that you would follow that principle as well.
Do you agree to do that?

Page 11

A. I do.
Q. Okay. Just a couple of other preliminary matters -- have you met with the government before this deposition?
A. Yes, I have.
Q. And when did you do that?
A. I think it was, I think it was January some time.
Is that correct, Alan?
Q. He can't answer.
A. He can't. Why not?
Q. Well, because we're looking for what you remember.
A. Well, I think it was January some time, couple months ago. May have been February.
I don't know. I didn't --
Q. And what was, what were the circumstances of that meeting?
A. The circumstances --
Q. Did you do it by phone or did you come up in person?
A. I went to their office.
Q. Here in D.C.?
A. In Washington, D.C., yes.

Page 12

Q. And how long did that meeting last?
A. Three or four hours.
Q. Did they show any documents during the meeting?
A. The only one that was shown to me was the one I asked for, which was a copy of the contract.
Q. And are you referring to the standard contract?
A. Yes.
Q. Okay. Who attended the meeting?
A. Well, Mr. Miller and a, some young man. I forgot his name.
My short-term memory is not good.
Q. And what were the topics that were covered at the meeting?
A. The, how, primarily the discussion focused on how the acceptance rates were established by DOE.
Q. Since that meeting, have you had any conversations with the government regarding your deposition here today?
A. Yes.
Q. And can you describe those conversations?

Page 13

A. I talked to them. Mr. Miller called me to let me know that the deposition was going to happen and that someone from Shaw Pittman would be contacting me with times and dates and place.
The next time we talked was yesterday for some clarification on -- oh, now I'm trying to -- oh, on the, I think we talked -- I can't remember specifically because I talked to you guys yesterday for about an hour, and I get mixed up on the topics, but they're all the same thing basically on the, how did this rate get established and things like that.
Q. Have you talked with anybody else about your deposition here today?
A. My wife.
Q. Anyone else?
A. I told Mr. Vance that I was going to be doing it.
I told my compatriots at my company that I was going to have to talk to you people today.
Q. And what company is that?
A. JAI Corporation.
Q. And what was the nature of the

Page 22

It was a thermal electric conversion. The heat from that was sent down into thermal electric thermacouples basically, generated heat and generated electricity, very low.
It was physically with all of the cooling, and it was cooled by sodium, liquid metal, and it's, the whole thing stood probably 12 feet tall. Like I said, the reactor sat right on top.
Q. Did you receive any specialized training while you were at Atomics International?
A. No.
Q. And how long did you stay with that company?
A. Three years until they shut the program down.
Q. And what did you do after that?
A. I went looking for a job, and I applied at, since I had been in that field, I applied for a job at Idaho, INEL, Idaho National Engineering Laboratory and Pacific Northwest Laboratory.
I was offered a job at both places. I took the one at Pacific Northwest Laboratory.

Page 23

Sounded better.
Q. And what position were you hired for initially when you joined?
A. As a laboratory technician to build sodium loop for what -- they were trying to get a contract called the FFTF, the fast flux test reactor, and they had 8,000 people out there, and nobody had any experience with liquid metals, and I walked in the door.
My resume said I had built components for the space reactors, and they were liquid metal cooled, and so I got hired, set up their first liquid metal safety programs for dealing with sodium, built the first sodium loop for the FFTF.
That was one of my first responsibility, and until I decided that the laboratory environment was a dead end street for me professionally, and then moved to become an engineering technician.
Q. You became an engineering technician at PNL or another entity?
A. No. I stayed with PNL for 13 and a half -- no. I'm sorry -- 23 and a half years that go-around. Had probably 15 different jobs

Page 24

while I was there.
Q. How long were you a laboratory technician?
A. Year, year and a half maybe at PNL.
Q. And then following that position, you moved into the engineering technician position?
A. Um-hm, as a computer programmer and supporting the engineers and emulating whatever they were coming up with, emulate that kind of, all their engineering concepts on computers.
Q. Was this in support of any particular federal program?
A. Oh, God, yes, lots of them. That's what PNL did. It was a prime contractor for the Department of Energy, well, the Atomic Energy Commission first, and then ERDA, and then the Department of Energy, and we had lots of different contracts.
My primary areas that I worked on in that position were looking at the economics of the nuclear power industry related to, you know, you have got to remember it was fledgling back in those days.
We didn't have a lot of reactors, and so we were doing economic analyses does it make

Page 25

sense to build nuclear power plants versus other sources?
Q. When was this? What period of time?
A. Sixty-four, five, in there.
Q. And --
A. I worked on the PNL, was hired by the Bonneville Power Administration to site nuclear power plants in the Pacific Northwest.
Then I worked on that project, got the sites, all the reactors sited.
This was back when a turnkey thousand megawatt plant was oh, about a hundred million dollars with fuel.
I worked on siting nuclear power plants for Korea.
After a while, I got promoted to the exempt status for the, non-exempt status at the company, became a, what they called a specialist.
Q. When was this?
A. 1970 I think, around that time, maybe a little before.
Q. And your title at that point?
A. Specialist.
Q. And what were you a specialist in?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 126

given that DOE recognized that the facility would not be available in 1998?
A. No, because the Annual Capacity Report is required under the contract, and it's put out there based on all the knowledge and based on all the planning as a planning document.
There was never any discussion of whether it should be put out.
It was, its contents were always under discussion, of course.
Q. Did you ever have discussions with DOE about the appropriateness of using an upper bounding and a lower bounding case?
A. Yeah. I said I didn't like it.
Q. And to whom did you relay these concerns?
A. To Mr. Brownstein.
Q. And what were their responses or his response?
A. Well, bottom line is this is the way it's going to be done.
I mean I don't remember the details of the conversation.
I just remember I never liked it, and when I don't like something, I tell people, so I

Page 127

know I would have told him.
Q. And why didn't you like it again?
A. Because it's supposed to be a planning document, and there is not enough specificity there for anybody to plan to.
If I were a utility, I couldn't use it.
Q. Why not? Could you be more specific?
A. Because it doesn't tell me how much capacity is going to be available for me in any given year.
It just gives me a range, and I can't plan to that.
That's just my own opinion.
Q. And did DOE ever expressly disagree with your opinion?
A. Obviously; they printed it anyway.
Q. Well, they could have printed it but still agreed that you were, that you had the right opinion.
A. Yeah. There were a lot of people that agreed with it, yeah.
Q. Agreed with your opinion?
A. Yes, most definitely, yes.
Q. Do you recall who --

Page 128

A. No.
Q. Those people were?
A. No. Mr. Brownstein was probably one of them, but his hands were tied, too.
Sometimes politics controls what we do. Reality doesn't. Science doesn't. Politics does.
Sometimes those of us down in the trenches don't know what all the political problems that are going on, either.
Q. I'm going to now turn to the December 1991 annual acceptance, Annual Capacity Report, and is it correct to assume that you had some role in producing that document as well?
A. Yes, I had a role in it.
Q. All right. I'm going to hand you a document entitled Annual Capacity Report with the date 1991 on it, and if you would just confirm that that's the document that we are both speaking about?
(The witness reviewed the document.)
THE WITNESS: Um-hm. That's it.
BY MS. HEWITT:
Q. And I see you have located the page which has the acceptance rates on them?

Page 129

A. Right.
Q. Do you know how those acceptance rates were developed?
A. Yes. I developed them.
Q. And how did you develop those acceptance rates?
A. This was using information out of the nuclear waste policy amendments which made the statement that you couldn't -- well, first of all, back up.
By this point in time, DOE, it basically had the MRS as part of its mission, part of its planning. It was going to be there they were hoping.
And in order to do it, under the requirements of the Nuclear Waste Policy Amendments Act, the act stated if you had an MRS, it could not accept more than 10,000 metric tons of fuel until the repository became either operational or licensed, was something like that.
The mission I think at that point in time showed MRS they could maybe could get one going in 1998, a limited capacity probably.
Repository wouldn't start probably

Page 130

until 2010, 12 years later, so they asked me, you know, what would be a reasonable rate because, you know, we can't build a big full-blown facility to get started, but we would like to make sure that we have something that's useful, so I came up with this rate which recognized the 10,000 ton limit over a 12-year period even though we only published ten years here because that's all that was required in the contract, to publish the first ten years, but if you add the other two years in here, you get another 1800 tons, and you have got 10,000.

It also recognized what the utilities had told us were their storage requirements, their need for out of tool, out of tool storage, recognizing the ability or inability to keep a full core reserve.

Information fed to us through a form they filled out every year called the RW 859; based on that information, in 1998, there was less than 400 tons of allocable storage capacity required on the aggregate by all utilities.

Now this takes us back to my statements earlier about issues of operations versus issues of equity.

Page 131

This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity.

The second year, 1999, they were telling me that it was like 575 tons required.

The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.

Q. And why was that a factor in your consideration of developing the acceptance rate?

A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new

Page 132

storage so they could keep operating.

Q. And in your opinion, did the standard contract reflect those purposes?

A. Did the contract reflect those purposes?

(There was a pause in the proceedings.)

THE WITNESS: Don't know. Don't know if it had anything to do with the contract as far as purpose goes.

The contract was a mechanism of roles and responsibilities, not purpose.

The act, the Nuclear Waste Policy Act was the purpose.

The contract was a way of implementing it, and that's how this rate came about.

BY MS. HEWITT:

Q. And was it your contention that this was a reasonable rate to you to use?

A. Absolutely; if you can only do a limited amount of capability, it would be nice to do it, so it really helped solve some problems, which was the initial problem they were trying to solve.

Q. And could you state again what that

Page 133

problem was?

A. Keep the utilities from having to add additional storage.

Q. Did DOE consider this to be a reasonable rate?

A. Yes. Obviously they published the report.

Q. Why were you involved in developing the acceptance rate at this juncture since you weren't involved previously?

A. I was asked what I would do, and I also -- well, I can't remember if I was asked or if I went and told them what I would do since I knew they needed something done, and they liked the idea.

They thought well, you know, we can live with this. We have a basis now for our -- all the rates in the past were pulled out of old stuff or sometimes WAGS, came out of the old CRWMS reports, somebody made something out of transportation requirements, but nobody had a real solid basis.

Here was something that says if you can go build a facility, as limited as it is, that still solves a problem and buy you some

Page 150

like, you know, this is what our facility will look like once Congress allows us to build it, and this is what it's going to be in the first year of operation.
If it's '98, hallelujah.
Q. Did you believe that their recognition that they would not meet the 1998 date in the contract was a breach of that contract?
MR. MILLER: Objection. Calls for a legal conclusion.
THE WITNESS: Do I believe it? I don't like the term breach of a contract.
It meant that DOE could not live up to its, all of its roles and responsibilities, yes, I felt, but I have to qualify that.
It's only because -- it's not because DOE didn't do everything it could to do it, to get the job done.
Their hands were tied. They tried. Congress wouldn't let them do it.
BY MS. HEWITT:
Q. What do you mean by that?
A. Every time they came up with a solution, Congress changed the rules.
They had solutions, interim solutions

Page 151

along the way that if somebody would allow them to implement, we would have had a facility starting to take fuel in '98, but they kept changing the rules, and they're still changing them today.
Q. And is it your opinion that the MRS was one of those solutions?
A. Yes. The MRS was a solution. They had an MRS sited. They had it designed. I think the company Golder Associates or something designed the first one.
It was to be sited at Clinch River, Tennessee, land that was owned by the federal government. Was all ready to go. Even part of the facilities were already there.
DOE said let's go do it. Whoa, wait a minute. We can't have a solution. Hence the Waste Management Amendments Act.
Well, you can't have MRS until you have this. Maybe that's why that came about.
The license for repository, you don't have a license, so we're not going to let you have it.
Q. Did, did DOE at that time believe it wasn't living up to its responsibilities in

Page 152

that?
A. Absolutely it believed it. These guys are -- they're hard working, dedicated people. They were trying to solve this problem they were given, and most definitely they believed it.
Q. Did they have any concerns about liability they may have to the utilities for failing to meet those responsibilities?
A. No, not the people that I dealt with weren't concerned with liabilities.
We were concerned with solving the problem, you know, getting fuel moved and getting facilities built.
Q. Did you develop the acceptance rates that are included in the 1992 Annual Capacity Report?
A. Yeah. They're the same as the other.
Q. And are they based on the same factors that you used?
A. Yes. From that point on, from '91 on, the fundamental acceptance rate used by the program, and I think it's still probably being used today, is this one.
That's the only one ever had any kind of bases, and may have changed something in the

Page 153

last year or two, but I doubt it, because I think once the, once the litigation and stuff started, then everything kind of broke down.
Q. Do you recall whether or not this capacity report was amended or revised in any way?
A. I remember one of them, that we had to come out with a revision, and I can't remember which one it was and the purpose right now, but I do -- yeah.
There was one that we had to put out an amendment to. I wonder what it was.
Q. I'm going to hand you a document that's entitled 1992 Annual Capacity Report Revision 1 dated May 1993.
A. Oh, yeah.
Q. Take a look at that, and if you would give me back the 1992 or the, well, whatever, 1992 Annual Capacity Report that stated 1993. Make me crazy!
(The witness reviewed the document.)
THE WITNESS: I'm trying to remember what the revision was.
There was an error in the data that we got from the Energy Information Administration

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 246

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 247

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 248

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
ALEX D. TOMASZCZUK, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 249

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

Page 302

be saying in that letter?
Is that the way you interpret that?
A. What he's saying is it was -- Steve Kraft is a junk yard dog, and he kind of looks for things, and somebody probably mentioned to him hell, we've only got to take one assembly to meet the contract, and then he throws that back probably to Jedrey.
It was never anybody's intent to do anything other than start a process where you can relieve the utilities of their storage problems, and I think he's just echoing that.
That wouldn't -- can't even imagine why he felt he even had to honor that question. It was kind of a, Kraft kind of asked some stupid things sometimes.
I don't know why he would have sent that to McKee. That's the part of it I don't understand.
Q. Why Mr. Jedrey would have sent it to McKee?
A. Um-hm.
Q. Mr. McKee was above you in the organization, or same level, or below you?
A. What was the date?

Page 303

Q. October 2, '87.
A. He was -- like I say, we had a matrix organization.
I was in the program office, and he was in the engineering department.
Q. Okay. He was just horizontal to you?
A. He was, yeah, an engineer cranking out research.
It's possible he had contacted Jedrey and asked him for some information.
I don't know.
Q. Did you use the -- well, strike that. Let me ask you about the rate you developed for the is it '92 ACR that reflected the rate you developed?
A. Ninety-one I think, wasn't it?
MS. HEWITT: I can check.
THE WITNESS: I think it was '91.
BY MR. BLANTON:
Q. Whichever one it was.
A. Yeah.
Q. Whichever one it was.
A. Yeah, whichever.
Q. Was your work on that a back-of-the-envelope kind of calculation, or did

Page 304

you produce a formal analysis and document that reflected that acceptance rate?
A. Of the two choices, it was back of the envelope, although I think I used a full page of white paper and no envelope.
Q. Did you, did you send it to anybody?
A. Yeah. I wrote it all down, what my analysis was, and gave it to Mr. Brownstein.
Q. Okay. So --
A. And we discussed it, logic behind it, and he representing the DOE, how far he went up the ladder for approval, I don't know, but told me they thought it was a good idea and let's do it.
Q. Did you all have -- by you all, I mean PNL -- have formal procedures about how you communicated things to DOE under the contract?
A. For certain things, yes, but for more programmatic, when there was -- DOE functioned differently than other federal government entities.
DOE basically manages research and development as opposed to companies that go out and build things, build tanks or airplanes or something, does that kind of thing.

Page 305

They just manage contracts. They toss stuff over the fence saying go do this, and you toss the product back.
In the case of DOE, it's hands-on program management, so you work, the contractor becomes extension of staff, and so you work on a daily basis over the phone if you're not physically there or in their face in their office if you are.
Sometimes you write down in document things if it's necessary.
Sometimes you just discuss it and go forward to solve the problem.
The analysis that was done there was based on, as you saw, the information out of the storage department report, which was a published document.
Q. What should we look for if we wanted to try to find whatever you gave Mr. Brownstein reflecting that acceptance rate?
A. I can't even remember what form it was in, so I don't know.
May have just been a piece of paper where I show it to him.
It may have been, I may have just

Page 306

copied the table out of the back of the storage requirements report and said hey, you know, if we do it this way, we can have an acceptance rate that you might be able to do, still have the utilities, and he bought it.
Q. Okay.
A. They were concerned about getting there just like you guys were concerned about them showing up.
Q. Assume for the purpose of argument with me a minute that there was a legislative prohibition on beginning construction of an MRS until you had a construction permit for the repository.
A. Okay.
Q. Would that have affected either the rates you developed, the schedule you developed, or the viability of it?
A. Yes.
Q. How so?
A. That was, the rate was to accommodate that particular situation from the Nuclear Waste Policy Amendments Act that said you couldn't -- if you had an MRS, and I know they were planning on having one because they were feeling at that

Page 307

time it was the only way they were going to be able to meet a '98 date, and it could only store 12,000, I mean 10,000 tons, and projected repository operating date was not until 2010, so there was 12 years, that I divided the 10,000 tons up and still was able to show where, if you did it at this rate, it would still be enough acceptance capacity to keep the utilities from having to add additional at-reactor storage on the aggregate.
Q. Okay.
A. And it would then say if you could do that, would say I could build an MRS. It didn't have to be a huge one, but I could get something going.
Q. All right. I didn't make my question clear.
A. Maybe I didn't make my answer clear.
Q. Did you assume in doing that rate, in developing that rate, did you assume that DOE would be able to begin construction of an MRS before DOE received a license to build the repository?
A. I assumed that somehow, DOE was going to be able to have a small interim storage

Page 308

facility, MRS, whatever, AFR, whatever you wanted to call it, available in '98, and that was part of that, yeah, I assumed, yes, operating in '98.
Somehow they would do it because the getting the license for repository, you had to precede operation of an MRS by a lot of years.
They could get a license for repository much sooner than 2010, of course. They would have to.
That's when the 2010 would be the operating date, so construction would start many years before that and license many years before that, so it was, timing was about right.
Q. What was the estimate on the schedule for the construction of the repository from the date they got their license to build the repository?
A. I do not remember the dates. Don't remember.
Q. I'm still not sure I understand your answer on the development of the rate.
Did you assume that they could not start the repository, I mean -- excuse me -- the MRS construction until they got a repository

Page 309

license?
A. No. I assumed they could not start MRS operations.
Q. Okay.
A. Not construction; they could start constructing something, and if they don't get a license, nobody uses it. You just waste the money.
Q. All right. So back to my original question -- if for the purpose of my question right now, you assumed that they could not have started construction of the MRS --
A. Oh.
Q. Until they had a repository license, until they had a license to start construction on the repository --
A. I did not, no.
Q. Would that have had an effect on the rate you developed?
A. It's possibility it would have. I would have to go back and reanalyze, but at the point in time, I assumed that they could have an MRS operating at that date.
Not -- it doesn't do it getting permit for it.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - -x

VOLUME I

Pages 1 - 228

Deposition of BILLY M. COLE, held at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Ninth Floor, Washington, D.C., commencing at 10:30 a.m., Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR, CRR, Notary Public.

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFFS:

FOR YANKEE ATOMIC ELECTRIC POWER COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, AND MAINE YANKEE ATOMIC POWER COMPANY:

SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK, ESQUIRE
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5389

ON BEHALF OF THE DEFENDANTS:

FOR THE UNITED STATES:

U.S. DEPARTMENT OF JUSTICE
BY: HEIDE L. HERRMANN, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290



INDEX

WITNESS

| ON BEHALF OF THE PLAINTIFFS: | Examination by: | Page |
|---|---|---|
| B. M. Cole | Mr. Stouck | 5 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 8 | Defendant's witness list | 20 |
| 9 | Deposition transcript | 24 |
| 10 | Memo (Coles to McKee and Wegeng) | 37 |
| 11 | Letter dated 4-11-83 | 112 |
| 12 | CSFM program document | 116 |
| 13 | Article | 118 |
| 14 | Article | 126 |
| 15 | Letter dated 12-15-86 | 129 |
| 16 | Contract | 136 |
| 17 | Letter dated 12-30-86 | 140 |
| 18 | Letter dated 2-8-87 | 151 |
| 19 | Letter dated 3-5-87 | 151 |
| 20 | Memo dated 6-5-87 | 157 |
| 21 | Letter dated 12-22-87 | 169 |
| 22 | Memo dated 10-5-90 | 174 |
| 23 | '89 ACR draft | 174 |
| 24 | Memo dated 8-14-91 | 182 |
| 25 | Letter dated 3-13-97 | 195 |



EXHIBITS (Continuing)

| No. | Description | Page |
|---|---|---|
| 26 | Memo dated 4-22-91 | 200 |
| 27 | Memo dated 6-28-91 | 200 |
| 28 | Memo dated 6-18-92 | 202 |
| 29 | Memo dated 6-29-92 | 205 |
| 30 | Letter dated 12-29-92 | 216 |



BILLY M. COLE, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Cole. We've met briefly before we went on the record. I'm Jerry Stouck. I'm a lawyer. I represent three utility companies in this litigation, Yankee Atomic Electric, Connecticut Atomic Power Company, and Maine Yankee Atomic Power Company.

I'm aware that you were previously deposed for several days in another phase of this litigation, and I'm familiar with that testimony, and I will ask you some questions, just some follow-up questions, about some of the things you said then.

My first question, though, is have you done anything subsequent to the last deposition to prepare for today's deposition?

A. Nothing.

Q. Okay. Prior to the last deposition did you do anything different to prepare for today's deposition? For instance, today's deposition is in the three cases I mentioned.

A. I didn't do anything to prepare for either, because I didn't really know what to prepare. This is,

published in the annual capacity report after the 1200-ton rate was another rate of like, I think, 300, 700, something like that, and that was based on what the transportation function could claim they could do. They could not transport any more than that. But they really didn't have a basis for it at that time.

Along came around 1990, 1991, and I was asked could I come up with a basis, a real acceptance rate and a basis for it, based on what we knew at that time, and I developed the 400, 600 and 900 at that time.

Q. Right, which you testified about previously.

A. Right. And that's -- you know, that's -- their position has always been, well, that's it. Because they sent out notices prior to publishing that to all the utilities explaining how they were going to do things, why they were going to do it this way; speak now or forever hold your peace. They were given a three-month comment period. Nobody had any objections to it that I remember.

Q. Right.

A. Most of the utilities' positions at that time was, I don't care if it's 1200, 400, just do something; you know, start taking fuel. That's what they were concerned about. They didn't care if it went



in a hole or where it went; they only wanted to get rid of it so they could continue operating. The main thing was keeping on generating power. That was the big concern.

Q. Okay. Are you done?

A. Yeah.

Q. Okay. But you have no specific -- is this right? You have no specific understanding -- well, let me ask it this way:

Have you reviewed any of the court filings the government has made in this litigation?

A. No.

Q. So, you have no specific knowledge of what position they're taking in this --

A. Not with specificity, no.

Q. What you just told me is your understanding from working on the program?

A. That's absolutely true.

Q. Okay. Now, tell me -- you mentioned in your prior testimony that Mr. Vance, Scott Vance, had started working -- the date that sticks in my mind is 1986, from your testimony. Does that sound right?

A. I think that was about when he started working on the program.

Q. And, first of all, do you know what he did



prior to that?

A. Yeah. He was in school. I hired him out of MIT.

Q. Okay. And can you tell me -- why did you hire him?

A. Why did I hire him?

Q. Yeah.

A. Well, I was short-handed, for one thing, and I was at that time on the Department of Energy's program for -- it was a scholarship/fellowship program where six of us in the United States were chosen to review the scholarship and/or fellowship request, stipends they could get from the government to work on various things.

I was one of the people on that committee to decide who got what, and we gave out, from funding out of this, out of the spent fuel program, seven or eight stipends every year.

When the program first got started, Mr. Vance was one of the early applicants on the program. That was my first encounter, was seeing his application, and when he -- he -- you know, I followed his career path through school and stuff, and he was one of the best candidates I had ever seen. I said, I'd like to have him, partly because he got his Master's



degree in nuclear engineering, but it was what we called fuzzy nuclear engineering. He understood the nuclear aspects, but he understood what really ran the program. It was more policy. His thesis was basically the economic impact on the utilities by delaying the repository. So, he understood what the real problems were. They weren't technical.

Q. That was his master's thesis at MIT?

A. Uh-huh.

Q. And what was his role -- first of all, he started in about '86?

A. It was around '86, if I remember right.

Q. And do you remember when he left?

A. Well, I left before he did.

Q. Okay.

A. He was working for me up until I left in -- I think I left in December of '88, and then I still worked on the program after I left through JAI, and, so, I still had contacts with him.

He left probably -- I'm guessing 1990, sometime in that time frame.

Q. 1990?

A. Sometime in that time frame, '89, '90.

Q. Okay. And what did he do while he was there? He worked for you?

14

A. He worked for me, and then after I left he worked for my successor.
Q. In relation to, for example, Pat McDuffy what was --
A. They both worked for me.
Q. Okay. Did they have similar rolls?
A. Yes and no. Pat was more senior, and Scott supported him a lot. Scott had his own projects that he was responsible for, also, but he supported Pat quite a bit.
Q. Okay.
A. You know, he left and went to work for CH2M Hill, I think, out in Boise, out in that area. And I kept trying to hire him to come back out here, and he wanted to live in Boise. And then he decided he wasn't going anywhere in his career if he stayed in Boise and if he was going to work in his area of education he needed to get back here. So we hired him again, and he worked out of his house there for a while until he made the decision to move the family back here.
Q. Now, did he work with you on developing the '91 ACR?
A. At that time I was not -- it's kind of a complicated relationship.
In '91 I was not responsible for the ACR,

15

although I was -- I shouldn't say I wasn't responsible for it. I was responsible for it but not -- well, Pacific Northwest Laboratories had the contract to do the job. DOE gave it to them. I no longer worked for them, but I was under subcontract to them --
Q. Okay.
A. -- to support them on this as more or less a consultant. I developed all this stuff, gave it to Pat McDuffy and all that stuff and published the report.
Q. What did Scott Vance do?
A. He was working with Pat. He was aware of it. He was not party to the development of that rate. I developed that rate, along with Mr. Brownstein of DOE, sitting in the Forrestal Building.
Q. Was Mr. McDuffy involved in the development of the rate?
A. I can't remember. I know he was involved at least to the point of I had to get his approval because I was under subcontract to him at that time and explain everything to him and get his okay. I don't remember how much physical involvement. I'm sure I bounced all this off of him before I did anything with it to get his approval, since he signed the contract.
Q. Do you know who Ivan Stewart is?
A. Ivan Stewart? Yes, I do. He worked for

16

NUS Corporation for many years. I don't know where he is now.
Q. Okay. Did you ever work with him?
A. No, not really. You know, we've known each other because we've been in the business for years, but I never really worked with him.
Q. What about Ed Davis?
A. I know Ed Davis.
Q. Who is Ed Davis?
A. He was president and CEO of NUS for quite a few years. I don't know where he is now.
Q. Do you know what he was doing at the time of the Nuclear Waste Policy Act?
A. Huh-uh.
Q. Okay.
A. I don't remember if he took over NUS before or after the Act.
Q. Okay. And what about E. R. Johnson?
A. Oh, yeah.
Q. You know him?
A. I know him. He's my boss -- well, he likes to think he's my boss.
Q. Right.
A. He's not really.
Q. What was he doing at the time of the

17

Nuclear Waste Policy Act?
A. What was Ed Johnson doing?
Q. Yeah.
A. President of E. R. Johnson Associates. He had several jobs working for the Department of Energy through various laboratories. I think at that time he had a lot of funding through Oak Ridge, at the time it was passed.
Q. The program was ongoing at the time of the Nuclear Waste Policy Act?
A. Uh-huh.
Q. Was Ed Johnson working --
A. He probably was. I didn't know him at that time. I met him after the Act got passed. He became one of my subcontractors when he was at PNL.
Q. Okay. What about Tom LaGuardia?
A. Tom LaGuardia? Never heard of him.
Q. What about Micky Buchheit?
A. I've heard the name. I think he was with one of the utilities, wasn't he?
Q. Yeah, he worked for Yankee Atomic.
Let me ask about the companies. Did you in your work in relation to this program that we're talking about ever have a direct relation with Yankee Atomic?
A. I don't know how you qualify "direct."

CERTIFICATE OF FILING

I hereby certify that on this 27th day of September, 2007, a copy of foregoing "DEFENDANT'S UNOPPOSED MOTION TO DESIGNATE DEPOSITION TESTIMONY OF MR. BILLY COLE," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan