**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE**
**CERTAIN DEMONSTRATIVES AND ANY RELATED TESTIMONY**

Wisconsin Electric Power Company ("WE") files this motion *in limine* to exclude Defendant's demonstratives DDX 2-9 through 2-15 relating to a hypothetical spent fuel pool ("Pool Slides") and DDX 2-25 relating to the purported reasonableness of purchasing additional VSC-24 casks for use at the Point Beach Nuclear Plant ("Point Beach") instead of the NUHOMS system ("NUHOMS Slide").[1] Both sets of demonstratives contain information, in whole or part, outside the scope of Mr. Brewer's report. Moreover, the Pool Slides are irrelevant to any issues in this case.

## I. BACKGROUND

The Government served Mr. Brewer's original expert report on WE on June 30, 2006 and served a supplemental report on August 28, 2007 (collectively, the "Brewer Report"). On October 3, 2007, the Government produced to WE the demonstratives at issue.[2] All of Mr. Brewer's demonstratives are attached as Exhibit A to this motion.

---

[1] Wisconsin Electric reserves the right to conduct *voir dire* of Mr. Brewer's qualifications at trial.

[2] The Government did not provide a cover letter with the demonstratives at issue. WE presumes that the demonstratives are for use during the testimony of Mr. Brewer. To the extent the Government

Wisconsin Electric has established at trial that the licensed capacity of the Point Beach spent fuel pool is 1502 spaces. (WE Trial Tr. 137:24-138:15, September 10, 2007). An excerpt of the trial transcript is attached as Exhibit B to this motion. Defendant's Pool Slides, however, apparently depict an analysis of spent fuel in a spent fuel pool having 2343 permanent spaces. Some slides also include a cask pit rack boosting apparent capacity for Mr. Brewer's hypothetical pool to 2464 spaces. The hypothetical pool of over 2,000 spaces is therefore an entirely new creation by Mr. Brewer.

With regard to the NUHOMS slide, the Brewer Report does not discuss whether it would have been reasonable to continue purchasing VSC-24 casks for use at Point Beach after the decision was taken to pursue dual-purpose NUHOMS storage systems. Instead, the Brewer Report is limited to discussing whether the VSC-24 was minimally technically sufficient for Point Beach's spent fuel storage needs. See June 30, 2006 Brewer Report at 25-28, DX 391. Yet, Defendant's NUHOMS Slide states "continued use of VSC-24 casks reasonable," and then proceeds to list several additional sub-bullets, some of which also are brand new assertions by Mr. Brewer.

## II. LEGAL STANDARDS

The purpose of demonstrative exhibits is to illustrate or convey the testimony of the witness, and demonstrative exhibits are therefore derivative of witnesses' testimony. Thus, any demonstrative exhibits must be relevant, authentic and based on adequate foundation before they can be considered by the Court. "Evidence which is not relevant is not admissible." Federal Rule of Evidence 402. Even when evidence is relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues." Fed. R. Evid. 403.

---

seeks to use the slides at issue during any presentation other than Mr. Brewer's, WE similarly seeks exclusion of the demonstratives and related testimony.

In addition, expert testimony and, correspondingly, demonstratives used during expert testimony, must be limited to the scope of that expert's pre-disclosed opinions. The rules of this Court require disclosure of expert opinions, and WE would be materially prejudiced by any testimony that is outside the scope of the expert opinions the Government has already proffered. Rule 26(a)(2) of the Rules of the Court of Federal Claims ("RCFC") governs the disclosure of expert opinions and requires that designated expert witnesses provide a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." RCFC(a)(2)(B) (emphasis added). Because demonstrative exhibits are derivative of witness testimony, any demonstratives unrelated to pre-disclosed expert opinions are inadmissible at this time.

## III. ARGUMENT

The Pool Slides are irrelevant and prejudicial. The Pool Slides relate to a spent fuel pool having no apparent relation to Point Beach. The hypothetical pool purportedly holds hundreds more assemblies than Point Beach. Mr. Brewer's related analysis, therefore, can have no relation to Point Beach. Even more importantly, Mr. Brewer's expert report does not even address a spent fuel pool with such a capacity, or attempt to analyze in detail fuel movements at the Point Beach spent fuel pool. Indeed, during his deposition, Mr. Brewer stated that he had "not really analyzed" the extent of additional time and money, if any, relating to spent fuel movements using a Region II temporary rack. (Dep. Tr. of W. Brewer 541:10, August 23, 2006). An excerpt of the deposition transcript is attached as Exhibit C to this motion. If Mr. Brewer is going to now make such analyses in Court, WE is materially prejudiced by not having deposed Mr. Brewer on these issues so as to know what fact and or expert testimony would have been required for a full airing of the issues. Applying the relevance standards of the Federal Rules of Evidence and the expert disclosure rules of this Court, DDX 2-9 through DDX 2-15 and any related testimony should not be considered by this Court.

The NUHOMS Slide is also inadmissible and Mr. Brewer should not be permitted to use it at trial. The Brewer Report only addresses specific technical issues regarding the VSC-24 – not the reasonableness of additional purchases of VSC-24s for Point Beach. Again, Mr. Brewer's last minute inclusion of a new opinion has deprived WE of the ability to probe during discovery Mr. Brewer's second-guessing of the seasoned judgment of Point Beach spent fuel professionals regarding the reasonableness of the decision to procure NUHOMS storage systems. Applying the relevance standards of the Federal Rules of Evidence and the expert disclosure rules of this Court, DDX 2-25 and any related testimony should not be considered by this Court.

## IV. CONCLUSION

For the foregoing reasons, WE respectfully requests that the Court exclude Government demonstratives DDX 2-9 through 2-15 and DDX 2-25 as well as any related testimony (or other Government expert opinions not previously disclosed to WE). In addition, WE reserves the right to *voir dire* Mr. Brewer at trial regarding his qualifications.

Dated: October 8, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 434-1675

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, on October 8, 2007, I caused a copy of the foregoing "Plaintiff's Motion *In Limine* to Exclude Certain Demonstratives And Any Related Testimony" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Emily C.C. Poulin
Emily C.C. Poulin

EXHIBIT A

# Expert Report of Warren K. Brewer Summary of Opinions

1. WEPCO's damage claim for NRC annual fees relating to its operating reactors is unsupported
2. WEPCO's proposed use of a temporary cask pit rack in the but-for world fails to adequately address inherent technical problems
3. WEPCO's efforts related to off-site dry storage activities would have resulted in greater fuel storage costs
4. Long-lead materials purchased for three TN-32B metal casks were not needed for storage of spent fuel at PBNP
5. WEPCO's switch to the use of NUHOMS casks after 2003 was unnecessary
6. The costs WEPCO would have incurred for fuel transfer to DOE in the but-for world can be estimated

Brewer DDX 2-1

# WEPCO's damage claim for NRC annual fees relating to its operating reactors is unsupported

Brewer DDX 2-2

# NRC Annual Fees

- WEPCO's contention is that the change in annual fee structure that occurred in FY 1999 would not have occurred had DOE started accepting spent fuel
- There is no evidence that WEPCO paid any annual fee specific to the ISFSI after FY 1998
- There is no evidence that this change would not have occurred in the but-for-world

Brewer DDX 2-3

# NRC Annual License Fee Structure




*Fee is the same for facilities with or without an ISFSI

Brewer DDX 2-4

# Post FY1999 Fees Have Not Consistently Increased With Increasing Number of ISFSIs Even Though Number Of Payers Has Remained Constant

| Fiscal Year | Operating Reactor Fee | Spent Fuel Storage/ Decommissioning Fee |
|---|---|---|
| 1999 | $2,776,000 | $206,000 |
| 2000 | $2,815,000 | $206,000 |
| 2001 | $2,753,000 | $266,000 |
| 2002 | $2,849,000 | $239,000 |
| 2003 | $3,251,000 | $319,000 |
| 2004 | $3,283,000 | $203,000 |
| 2005 | $3,155,000 | $159,000 |
| 2006 | $3,704,000 | $173,000 |
| 2007 | $4,043,000 | $159,000 |

Brewer DDX 2-5

# WEPCO's proposed use of a temporary cask pit rack in the but-for world fails to adequately address inherent technical problems

Brewer DDX 2-6

# Use of Cask Pit Rack in But-For World

- Not based on analysis of contemporaneous data
- Cask pit rack would have to be removed to load casks, and therefore could only provide full core reserve capacity, not long term storage capacity
- Did not offer sufficient capacity to address 1991 projections of fuel storage requirements
- Use of a temporary cask pit rack would add more weight to the pool than the load assumed in the pool expansion analysis
- Ignores concerns, considerations and conclusions expressed in the early 1990's
  - Pool expansion dismissed due to conclusion that some structural limits would be exceeded by 7%*

* DX 351

Brewer DDX 2-7

# Use of Cask Pit Rack in But-For World

- Would require the removal of the “anti-tipping frame” and re-licensing of the existing racks
  - Irregular geometry creates removal challenges
  - Frame segmentation in the pool poses significant radiological hurdles
- Licensing timelines present a high degree of risk that the steam generator replacement project would be delayed
  - First of-a-kind project
- Need to repeatedly install and remove temporary rack to accommodate both FCR and DOE cask loading would create additional risk and cost
- Proposed rack would be a Region II rack, thus requiring significant extra fuel movements to use the rack

Brewer DDX 2-8

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Pool Nearly Full)




Brewer DDX 2-9

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Install Temporary Rack)




Brewer DDX 2-10

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Move Assemblies From Pool To Temporary Rack)




Brewer DDX 2-11

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Move Assemblies From Reactor To Racks)




Brewer DDX 2-12

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

## (Move Assemblies From Racks Back To Reactor)




Brewer DDX 2-13

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Move Assemblies From Temporary Rack)




Brewer DDX 2-14

# Extra Fuel Movement Needed For Use of Region 2 Temporary Cask Pit Rack

(Remove Temporary Rack - Pool Nearly Full)




Brewer DDX 2-15

# WEPCO's efforts related to off-site dry storage activities would have resulted in greater fuel storage costs

Brewer DDX 2-16

# Off-Site Dry Fuel Storage

- Activities took place between 1994 through 1997 with an expected operational date of 2003
- Private Fuel Storage (PFS) would not have eliminated the need for and cost of design, licensing and construction of the WEPCO ISFSI
- Assuming a PBNP ISFSI, cost to store fuel at PFS would be greater than to store the fuel at PBNP
  - Transport to PFS (casks and conveyance)
  - Transfer to PFS storage casks
  - O&M (paying for share of separate dedicated staff vs. in-house)
  - Potential additional PBNP plant modifications

Brewer DDX 2-17

# Long-lead materials purchased for three metal TN-32B metal casks were not needed for storage of spent fuel at PBNP

Brewer DDX 2-18

# Long-Lead Materials for TN-32B Metal Casks

- Three TN-32B metal casks were procured as contingency for concerns associated with VSC-24 casks
  - NRC CAL issued June 3, 1996 prohibiting VSC-24 loading
  - Second NRC CAL issued May 16, 1997
  - First CAL closed on September 12, 1997
  - PSCW authorization to load 6 TN-32 casks **if** VSCs not available to support outage in 2000 (Requested on May 20, 1998 and granted on August 11, 1998)
  - Second NRC CAL lifted August 13, 1998

Brewer DDX 2-19

# Long-Lead Materials for TN-32B Metal Casks

- Long-lead materials were purchased at a time when uncertainties with VSC-24 casks had already been addressed
  - Signed contract with Transnuclear on May 8, 1998
  - In July 1998, released Transnuclear to order long-lead materials
  - Delivery of materials expected January 1999
  - In August 1998, after second CAL was lifted, WEPCO negotiated with Virginia Power to receive Virginia Power's long-lead materials, thereby allowing late 1998, early 1999 cask fabrication
- Long-lead materials were common to TN-32B customers and could have been transferred (sold)
- Therefore, TN-32B metal casks, and the materials to construct them, were not needed for PBNP storage of spent fuel
- The milestone payment for procurement of the long lead materials should be used as a proxy for the recovered value

Brewer DDX 2-20

# WEPCO's switch to the use of NUHOMS casks after 2003 was unnecessary

Brewer DDX 2-21

# Switch to NUHOMS was Unnecessary

- WEPCO applied for PSCW authorization to load additional casks and use dual-purpose casks based on*:
  - More flexible fuel technical parameters
  - Longer operating lifetimes
  - Avoidance of repackaging spent fuel for transport
- At the time of WEPCO's application (May 2000), PBNP had sufficient spent fuel assemblies that could be loaded in VSC-24 casks to provide storage for at least 5 additional years
- The VSC-24 Certificate of Compliance amendment approved by the NRC in 2003, could have provided 24 years of additional storage capacity

* DX 136

# Switch to NUHOMS was Unnecessary

- Design life of VSC-24 cask is comparable to several dual-purpose casks, including the NUHOMS 32PT
- Licensed life of VSC-24 cask is the same as several dual-purpose casks, including the NUHOMS 32PT
- It is speculative that DOE will bring a transport cask that can accommodate the NUHOMS 32PT canister
  - NUHOMS 32PT is a large rail cask
  - There is no operational rail or barge facility at Point Beach
- It is speculative that the NUHOMS 32PT canister can be transported off-site
  - Ability to transport large rail cask uncertain
  - No currently licensed transport cask can accommodate the NUHOMS 32PT canister
  - No certainty that a transportation license would still be in effect when needed

Brewer DDX 2-23

# Switch to NUHOMS was Unnecessary




Brewer DDX 2-24

# Switch to NUHOMS was Unnecessary

- No radiation exposure savings if fuel is repackaged
- Continued use of VSC-24 casks reasonable
  - 58 loaded in the industry
  - License must be maintained to support existing casks
  - WEPCO manufactured its own casks
  - Loading effort comparable to welded dual purpose casks
- I conclude that WEPCO could have continued to use the VSC-24 cask to meet its spent fuel storage needs as the VSC-24 cask was:
  - Safe
  - Suitable for continued use at the PBNP site
  - Capable of accommodating a sufficient number of PBNP spent fuel assemblies

Brewer DDX 2-25

# The costs WEPCO would have incurred for fuel transfer to DOE in the but-for world can be estimated

Brewer DDX 2-26

# But-For World Cask Loading Costs

- Most recent claim includes costs for loading spent fuel to ISFSI casks, and recognizes, but provides no offset for the but-for world costs of loading spent fuel to DOE
- To establish but-for world fuel transfer costs, the following must be estimated:
  - Costs per campaign
  - Costs per cask
  - Number of casks loaded
- I considered a range of cask types and sizes that might have been provided by DOE
- Loading effort, challenges and difficulties would be the same (but not necessarily identical) in both worlds

# But-For World Cask Loading Costs

- 2005 WEPCO claim presented loading costs from 2004
  - Per campaign costs
    - Mobilization - $179,253
    - Demobilization - $47,851
  - Per cask costs (based on a 24 assembly bolted cask)
    - WEPCO excludes $17,000 related to welding and leak testing
    - WEPCO also applies 5/6 multiplier based on assumption that loading a bolted cask would take one fewer day than loading a welded cask (five vs. six days)
- I'm not in agreement with either of the per cask costs adjustments made by WEPCO, but correct for only the 5/6 multiplier, and therefore conclude the proper per cask cost is $119,206 for a large rail-type cask

DX 248

Brewer DDX 2-28

# But-For World Cask Loading Costs

- Assume use of legal-weight truck casks
- PBNP has no rail or barge service
- Largest currently licensed legal-weight truck cask is GA-4, which has capacity of 4 PWR assemblies
- Consistent with WEPCO Final Delivery Schedules (FDS) and RW-859s data submitted in 1995
- I assume time to load cask is one day, conservatively based on actual data of 1-2 days
- Therefore, cost to load four-assembly truck cask is 1/6 the cost of loading a large cask, i.e., $119,206 / 6 or $19,868 per cask

DX 74, 452

Brewer DDX 2-29

# But-For World Cask Loading Costs

Number of Truck Casks Loaded Based on 1991 Annual Capacity Report*

| Year | Allocation (MTUs) | Assemblies | Casks |
|---|---|---|---|
| 1998 | 16.28 | 41 | 11 |
| 1999 | 43.01 | 110 | 28 |
| 2000 | 19.77 | 50 | 13 |
| 2001 | 27.07 | 69 | 18 |
| 2002 | 36.74 | 92 | 23 |
| 2003 | 24.83 | 62 | 16 |
| 2004 | 9.7 | 24** | 6 |
| 2005 | 12.84 | 32 | 8 |

* DX 566

** DX 584, Reflects one reinserted assembly

Brewer DDX 2-30

# But-For World Cask Loading Costs

- WEPCO submitted an amended claim in 2007
- This claim included updated loading costs for the 2006 ISFSI loading campaign
- WEPCO's allocation for 2006 in the 1991 ACR is for 40 assemblies*
- The updated costs should be used together with WEPCO's 2006 allocation to calculate the but-for world cask loading costs for 2006

* DX 566

Brewer DDX 2-31

EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :

---------------------------------------x

Courtroom 6
National Courts Building
715 Madison Place, N.W.
Washington, D.C.

Monday, September 10, 2007

VOLUME 1

The parties met, pursuant to the notice of the Judge at 10:02 a.m.

BEFORE THE HONORABLE JAMES MEROW

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

RICHARD OEHLER, ESQ.
JAY GRIFFITHS, ESQ.
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101
(206) 359-8000

and

EMILY POULIN, ESQ.
DONALD CARNEY, ESQ.
MARY ROSE HUGHES, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 628-6600

A. It was.
Q. Can you please pull the binder that has Exhibit 381?
A. I have it.
Q. Do you recognize this document?
A. Yes, I do.
Q. And what is it?
A. It is the RW-859 nuclear fuel data form. This one is for Point Beach I.
Q. Can we please turn to the next page which is Bates HQR364-0805?
A. I'm on that page.
Q. Do you see item three, "authorized signature/certification"?
A. Yes, I do.
Q. Is that your signature on the line?
A. It is my signature.
Q. What was your role in this document?
A. As you note on the document, under item two, Mr. Smith Moore was the individual who prepared the document, and then I reviewed and signed it before it was transmitted to the Department of Energy.
Q. Did you agree with the contents in this document?

A. Yes, I did.
Q. Can you please turn to Bates number page HQR364-0809? It's page II.b.2-1 of the document?
A. I'm on that page.
Q. Can we please highlight -- zoom in on part two through letter G? Do you see item 2.1a, current license capacity?
A. Yes, I do.
Q. Okay. What did that mean?
A. That was the number of spaces in the spent fuel pool that were licensed by the Nuclear Regulatory Commission.
Q. And what is the number on that entry?
A. 1502.
Q. Do you see item B, current capacity?
A. Yes, I do.
Q. What did that title mean?
A. It was the number of spaces in the spent fuel pool that were accessible at that point in time.
Q. And what's that number?
A. 1468.
Q. Do you see item C, number of slots that will never be used for spent nuclear fuel?

EXHIBIT C

In the United States Court of Federal Claims

------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :

Plaintiff, :

: No. 00-697C

v. : Senior Judge Merow

THE UNITED STATES OF AMERICA, :

Defendant. :

: Volume II

------------------------------x

Wednesday, August 23, 2006

Washington, D.C.

The continued deposition of WARREN K. BREWER, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, commencing at 9:00 a.m., which was taken at Perkins, Coie, 607 Fourteenth Street N.W., Eighth floor, Washington, D.C., before Michael Feuer, a notary public in and for the District of Columbia, when were present on behalf of the parties:

Q. Isn't it true that Wisconsin Electric also for a number of years refueled without unloading the core?

MR. CRAWFORD: Objection to the vagueness of that.

THE WITNESS: I believe they have conducted refuelings without that. Like most utilities, I think that's not the preferred way.

Given the fact that as I said yesterday, there is a desire on most people's part at nuclear plants to not handle the fuel more than you need to, the reason that people do full core offloads refueling is because there is a perceived benefit to do so.

At some point in time WEPCO may have reassessed all that, concluded they didn't do to do it. It's my understanding in the recent past that's not the way they've done it but it may be different now. They may have concluded that the right way is without offloading the fuel core.

BY MR. OEHLER:

Q. You indicated that Wisconsin Electric

certain could insert the temporary rack, remove it, insert it, remove it.

There's nothing that precludes them from taking that activity, correct?

A. Time and money, that's all.

Q. What kind of time and money are we talking about?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: I've not really analyzed that but it depends on what state they leave it in.

As I pointed out before, the cask pit rack by definition or by I think Dr. Singh's agreement as well would be a region two rack.

I probably could not simply offload the entire core to that rack. To the extent that I'm limited on space elsewhere in the pool what I would end up having to do is move some of the fuel that's in the pool already into this rack to make room for some of the higher enrichment or lower burn-up assemblies I'm going to remove from the core.

Now, if at the end of the process I put