# ATTACHMENT A

**POLLOG, THOMAS**

**Deposition Testimony (April 11, 2002)**

122:13-18
124:11-125:13
156:14-157:24
175:15-177:16
213:20-214:8

**Deposition Testimony (April 12, 2002)**

119:19-121:12

**Deposition Testimony (May 16, 2002)**

415:1-416:19

**Yankee Atomic Trial Testimony, *Yankee Atomic, et al. v. US*, August 4, 2004**

3994:18-3995:5
4010:1-5
4011:19-4012:18
4038:5-4039:21

When you say repository receipt rate, there could be two receipt rates at a repository. One is a receipt that's coming through the door and the second could be an in-placement rate.

It could be storage at the repository itself. And the difference between what's taken and put into placement right away, it may be a difference between what is accepted at the gate at the repository and what's actually been placed underground. That difference would be lag storage as we referred to at the repository that is separate from an MRS.

Q And when we use the term acceptance rate or when the DOE uses the term acceptance rate, what does it mean? Does it mean the repository receipt rate or a system design receipt rate? What does it mean?

A System.

Q System design receipt rate. Thank you. No more question on this document.

This will be Exhibit Number 7.

(Whereupon, Pollog Deposition Exhibit No. 7 was marked for identification.)

BY MS. HEWITT:

Q Are you familiar with this document,





Mr. Pollog?

A Yes.

Q You had a chance to read it before this deposition?

A Yes.

Q Why don't we look at page one in the upper right hand corner and in the section titled introduction.

The last paragraph of that page indicates that the --

MS. POWELL: Can we wait a second until he's there.

MS. HEWITT: I'm sorry.

BY MS. HEWITT:

Q The last paragraph on that page talks about the one fundamental objective of the activities of the Mission Plan. And that is as set forth in the underlined portion, To accept commercial high level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998. Do you see that provision?

A Yes, I do.

Q What does the term, firm schedule, mean as used in that phrase?





A I would say it refers to a real schedule.

Q What do you mean by real?

A A real one that purchasers could expect to see DOE operating to.

Q Does that definition also include a schedule that utilities could rely on?

A To the extent considering the legal, technical and financial considerations, it was one they could use to plan upon.

Q The term used in here, the firm schedule from -- indicates that that is different from some other type of schedule. What other kind of schedule would you implement if it's not a firm schedule?

A I don't know.

Q Do you have any knowledge about why the term, firm, was included in this document to describe the schedule?

A No, I do not.

Q In the next sentence it indicated that the schedule -- I guess, another objective of the schedule would be to preclude need for additional reactor storage after January 31st, 1998 and ultimately remove from reactor storage all waste





more than five years old. Do you see that phrase?

A Yes.

Q Is that consistent with what you have testified to be objective in the mid-eighties of the Nuclear Waste Management Program?

A Yes. Actually, that's one of the objectives.

Q And is it fair to say that this was a objective of DOE at the time this Mission Plan was -- this draft of the Mission Plan was produced?

A Yes.

Q There's reference in this sentence to, remove from reactor storage all fuel more than five years old. That's a little different specification than what we talked about earlier. What is that in reference to?

A I believe that that refers to standard fuel that is defined in the standard contract.

Q And that definition includes a time limit on it or --

A The standard contract designates standard fuel amongst other things as being older than five years old.

A When the department was negotiating with the local counties, people located and situated in the area of Clinch River, Tennessee, one of the points that they tried to negotiate was keeping a limit so that it never became a de facto repository.

And it was a negotiating point between the Department of Energy and the local people. The people living in the vicinity of where a potential MRS may go.

Q So why was 15,000 chosen?

A Through negotiation with the local people.

Q Did the acceptance rates projected in the documents preceding MRS proposal factor into that -- what the capacity would be for the MRS?

A Say that again please.

Q Did the acceptance rates that's included in the document preceded, did they factor into the capacity limit proposed for the MRS?

A I don't believe so.

Q I'm going to have you take a look at the 1988 DCR. Are you familiar with this document, Mr. Pollog?





A Pardon.

Q Are you familiar with this document?

A Yes, I am.

Q Would you take a look at Table 2.1 on page five. It contains an acceptance rate or something called an illustrative waste acceptance schedule. Are you there?

A Yes.

Q What is the basis for the acceptance rates included in this table?

A 1988 Mission Plan Amendment.

Q And do you know how the numbers were derived to be included in the draft 1998 Mission Plan Amendments?

A I have not reviewed the '88 Mission Plan Amendment.

Q Do you know how this plan derived, this acceptance plan in this table 1988?

A The numbers included came from the '88 Mission Plan Amendment. I didn't look to see how the numbers in the amendment were derived.

Q So you don't know how these numbers were derived by the Department of Energy?

A That's correct.

Q This acceptance rate schedule included





in table 2.1 starts in the year 2003 whereas the previous acceptance capacity report included a schedule started in 1998. What was the reasons for shifting from 1998 to 2003 as a start date for acceptance?

A I believe it was the start of the repository was delayed. Official announcement for the start of repository shifting from 1998 to 2003 had been announced.

Q Were the acceptance rates included in 2.1 reflective of the receipt rate at the repository or at an MRS?

A I would have to see what the draft 1988 Mission Plan stated regarding what is the basis of those rates.

Q I'm going to hand you Annual Capacity Report dated 1990.

MS. POWELL: Off the record.

(Discussion held off the record.)

BY MS. HEWITT:

Q Are you familiar with this document, Mr. Pollog?

A Yes.

Q I think you've already turned to page seven, which includes two tables. One is a -- is





entitled, projected waste acceptance rate for spent nuclear fuel for the, quote unquote, upper bounding case.

And then a projected waste acceptance rate for spent nuclear fuel for the, quote unquote, lower bounding case.

The first question I want to ask with regard to these two tables is, in this table or these two tables, the date of acceptance begins in year 1998, which is the departure from what we saw in the earlier ACR where the date of acceptance began, I think, in year 2003.

Why is the date back to 1998 in this ACR?

A I would assume because this included an MRS in the waste -- the Federal Waste Management System, the system itself.

Q Do you know or are you assuming?

A I believe so.

Q Why were there two, quote unquote, cases presented in this ACR, which is a departure from the way the acceptance rate has been published in the earlier ACRs?

A The 1987 Nuclear Waste Policy Amendments Act put new restrictions on the

Page 4, Table 2.1. Do you know what the basis was for the derivation of these numbers included into Table 2.1 on page four?
A It was taken from the prior years' ACR.
Q There's no other input in these numbers other than just physically taking it from a prior ACR?
A As far as I know, it was just copied from the prior years' ACR.
Q And the same considerations that led to including those numbers in the prior year's ACR, would they be the same considerations for including these numbers in this 1993 ACR?
A Yes.
Q I'm actually not going to hand you this, but there's a '92 Annual Capacity Report that was published again as revision dated 9 May, 1993?
A Yes.
Q Do you know why this revision was published?
A I don't recall at this time.
Q All right. I'm going to hand it to you. Have you seen this document before, Mr. Pollog?





A Yes, I have.
Q If you look at page four, again, and there's another Table 2.1 which contains the same acceptance rates that were included in the earlier version of this document.
With regards to these numbers, if you take a look at page three, the page before, the first or the second paragraph. And I'm right in the middle of the page. It says, The acceptance rates included in Table 2.1 are nominal and do not reflect the MRS facility linkages with repository developed imposed by MWPA.
First of all, what does the term nominal mean in that sentence?
A I would suggest it means, just for example, illustrative.
Q And it says in the same sentence that they do not reflect the schedule linkages with the repository development. I believe that with regard to these rates and I may be wrong, but please clarify if I am.
You said the rates were chosen here because of the restrictions imposed by the Nuclear Waste Policy Amendments Act of 1987 and that one of those restrictions was the linkages





with the operation of the repository or the construction of the repository?
A The operation of the repository.
Q Operation of the repository. And does this sentence on page three indicate otherwise?
A There are linkages in addition to the one I've stated about the 10,000 MTU limit that reflect into when the MRS becomes operational and excepting it. So it does not reflect all of the linkages in the Amendments Act of '87.
Q Which doesn't it -- does it reflect?
A It reflects the 10,000 MTU capacity limit prior to repository operations. In addition to that limit -- in addition to that linkage, there are additional linkages also in the Amendments Act that it does not reflect.
Q Now, going back through -- because I don't think that was clear with regard to some of the other capacity reports. Would that be true of the prior version '92 Annual Capacity Report, which includes the exact same numbers on page 4, Table 2.1?
A Yes, that would be true of the Exhibit 13.
Q Okay. And if we go back then to 1991





and in particular I'm referring to page five?
A That would be true also of Exhibit 12.
Q Okay. Is that 1991?
A That is December, 1991 Annual Capacity Report.
Q And then let's look at December, 1990. And this is on page seven and there's an upper bounding case and a lower bounding case.
I think you testified that you did not know how the numbers were derived for the upper binding case, but with regard to the lower bounding case which linkages were reflected in those numbers, if any?
A It would also be true for Exhibit 11.
Q So -- and that's 1990?
A That's December, 1990.
Q So, if Table 2.2 only reflects the capacity limitations on the MRS and none of the other linkages that were found in the Nuclear Waste Policy Amendments Act of 1987?
A Yes.
Q I'm going to hand you the ACR Combined Report for 1995, which we'll also mark as an exhibit. I'm pretty sure you're familiar with this document as well.

rates DOE relied on in the total system life cycle cost?

A There are many documents, so I can't respond, X rate was in X document at this point in time. Just my general response would be they would have used --

Like the ACR used a generally published schedule at that time, such as mission plans, other documents, program plans, ACR, whatever was the current published document or one of the design requirement documents.

Q Okay. Is it your understanding that a TSLCC document that was published after the Nuclear Waste Policy Amendments Acts of 1987, which included the capacity limitation on the MRS as you previously testified, would the TSLCC document reflect the acceptance rates that reflected those capacity limits?

A It could have.

Q Do you know whether it did or not?

A There have been many TSLCC publications, so I can't speak for every document whether they incorporated the rates you referenced earlier or a moment ago.

Q I'm talking about TSLCC documents that





would have been issued after the acceptance act?

MS. POWELL: Object to beyond the scope, but if you have personal knowledge.

THE WITNESS: There have been several issued. And without having them in front of me, I couldn't tell you what rates would be effective for the TSLCC, what they would do. I'm a similar basis.

Q Just for the record, one of the topics he was suppose to speak on was TSLCC included by various documents?

MS. POWELL: I'm looking at 207, Topic 1, says '87. I thought your question went beyond '87.

MS. HEWITT: I'm talking about Topic 6, rate of acceptance plan to use.

MS. POWELL: I don't think we actually -- I think it's limited.

MS. SULLIVAN: No, Topic 6 here.

MS. POWELL: Yeah, that's what I -- I think Topic 6 has a limitation in there that we haven't -- but, my objection will stand.

BY MS. HEWITT:

Q Okay. I think you testified earlier that you were familiar with the RFP for





transportation of waste acceptance issued by DOE?

A Yes.

Q How did you become familiar with that document?

A I was aware of the ongoing efforts to produce the document. I have looked at it in passing. I have not studied the document or aware of very few specifics.

Q Do you -- are you aware it includes acceptance rates in that document?

A Yes.

Q And do you know what the acceptance rates are?

A I don't recall what the specific acceptance rate is in that document.

Q Do you know what the basis of the acceptance rates in the document would have been?

A Not without knowing the specific acceptance rate. I wouldn't know the basis.

MS. HEWITT: Can we just take a break and I'll talk to my colleague. Otherwise, we can break for today.

MS. POWELL: Want us to step out?

MS. HEWITT: Yeah, if you would.

(Brief recess.)





MS. HEWITT: Okay. I think that's it for today. Sorry, but we're reconvening tomorrow. So I think we'll just convene tomorrow at 9:30 and I'll continue with the Mission Plan, and I expect to be done and yield to my colleagues.

(Whereupon, at 4:40 p.m. the above proceedings adjourned.)

________________________

Signature of the Witness

SUBSCRIBED AND SWORNED before and to me this day of __________________, 20__.

________________________

NOTARY PUBLIC

My Commission Expires: ____________________________

issue.

BY MR. MACDONALD:

Q. Have you been involved with presentations, either preparing them or listening to them in which Lake Barrett discussed overhauling the DCS-FDS process?

A. I would not say it in those words, so no.

Q. Well, I apologize, I'm not trying to characterize it. What's a better way to characterize?

MS. SULLIVAN: Objection, vague.

THE WITNESS: We, the waste acceptance team, had discussions with Lake Barrett about what we think we needed for waste acceptance transportation program planning and what was supplied by the current contract. Lake didn't -- I would not say discussed anything but more but listened to what our concerns were.

BY MR. MACDONALD:

Q. Do you know in the current program plan what the rate of acceptance DOE is planning to use for the repository when it opens in 2010?

MS. SULLIVAN: Objection. Beyond the scope. That's covered in another topic, but you can answer as to your personal knowledge.





THE WITNESS: This may sound bad, but I don't usually read the program plans.

BY MR. MACDONALD:

Q. Let me ask it a different way. Do you have any knowledge as to the DOE's plan for the rate at which it will accept fuel beginning in 2010?

MS. SULLIVAN: Same objection. You may answer as to your personal knowledge.

THE WITNESS: Yes, I do.

BY MR. MACDONALD:

Q. Okay. And tell me what that rate DOE is planning to use when it begins operation in 2010.

A. I will use what I refer to and is commonly referred to in the RW program as a document called a CRD, which is I believe an acronym for Office of Civilian Radioactive Waste Management System Requirements Document.

Q. SRD then?

A. CRD. It doesn't make sense, but it's called a CRD. Stands for Civilian Requirements Document.

Q. Gotcha.

A. This is the overall systems requirements document. That document I believe specifies a design rate for the repository yucca mountain of 4, 6,





12, -- excuse me. 400, 600, 1200, 2000, 3000, starting in 2010 and 2011 being 600, 2012 being 1200, 2013 being -- you understand what I'm saying.

Q. So it's 400, 600, 1200?

A. 2000.

Q. 2000.

A. 3000.

Q. 3000 by the fifth year?

A. Yes.

Q. And then operating at a steady state 3000 going forward after that?

A. Yes.

Q. And what year is the -- what's the most recent CRD document that you're aware of?

MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.

I believe 2001, although it could be 2000.

BY MR. MACDONALD:

Q. And if the program operated with the acceptance rates in the systems requirement document that you're referring to at 400, 600, 1200, 2000, then at 3000 steady state, the DCSs -- the approved DCSs wouldn't fit that schedule, would they?

A. I would say they would fit it very well.

Q. And why would you say that when the DCSs





were submitted based on a schedule that was 400 ramping up to a 900 steady?

A. Because in every year they're less than what the design rate of the facility would be, so they would fit very well in with the design rate of the facility.

Q. If the approved DCSs have a maximum allocation of 900 and you're suggesting the steady state receipt by the third -- oh, I'm sorry. Even by the third year, the acceptance rate would be 1200, how would DOE allocate the additional, in the third year 300, in the fourth year 1100, and by the fifth year the additional 2100 MTU above the 900 MTU on which the DCSs were?

MS. SULLIVAN: Objection. Calls for speculation. You can answer.

THE WITNESS: No decision has been made on that at this point in time.

BY MR. MACDONALD:

Q. No decision is made, but has that issue been considered, to your knowledge?

A. We have had a general discussion on how would we allocate the additional acceptance capacity. No one has recommended -- it's sort of like, we need to think about how we would do this but we have never

Q. And why do you still believe that, in view of the Department's the "proposed delivery date is dependent on the existence of an operational repository or interim storage facility?"

MR. CRAWFORD: Object to the extent it calls for a legal conclusion.

THE WITNESS: The court told us that our belief that we did not have an obligation absent an operating facility in 1998 was incorrect, and we still had an obligation regardless whether there was a facility operating or not. I believe in Indiana-Michigan but I'm not a lawyer so don't quote me, but I believe that's the case. But I'm not sure.

BY MR. SKALABAN:

Q. So the Department's original intent was to create a nonbinding conditional DCS for 2001, is that correct?

MR. CRAWFORD: Objection to the vagueness of that. Objection to the extent it calls for a legal conclusion.

THE WITNESS: When you say original intent, when are you talking about?

BY MR. SKALABAN:

Q. Okay, the date is fuzzy on here, but let's assume it's '96. Let's say in early 1996 when it put





this legend on the DCS, by putting this legend saying the delivery date is dependent upon the existence of the facility, the Department's original intent at this time was to create a conditional nonbinding DCS.

MR. CRAWFORD: Objection to the extent it calls for speculation or a legal conclusion, but you can go ahead and answer.

THE WITNESS: I think that the Department's intent was to condition the proposed delivery year at this time.

BY MR. SKALABAN:

Q. And that was the purpose of putting this legend on the DCS?

MR. CRAWFORD: Objection. Asked and answered.

THE WITNESS: It was to put a condition on the proposed delivery year on the existence of an operational repository or an interim storage facility constructed under the act.

BY MR. SKALABAN:

Q. And the condition that we've been talking about and that's reflected here has been realized, so regardless of what the court said, doesn't that make this DCS nonbinding?

MR. CRAWFORD: Objection to the foundation





of that and to the vagueness of it and to the extent it calls for a legal conclusion.

THE WITNESS: I don't believe so. I believe what the court said is what we're operating under now.

BY MR. SKALABAN:

Q. So even though the original intent was to rate a conditional approved DCS and that condition has been realized, it's now the Department's position that despite the fact that it intended to create a conditional DCS, that DCS is now still in effect for 2001?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, asked and answered.

THE WITNESS: The court corrected our erroneous thinking.

BY MR. SKALABAN:

Q. Did the court correct -- did the court change the conditional -- or did the court say what was originally intended by the Department to be conditional DCSs are now nonconditional and binding?

MR. CRAWFORD: Objection to the foundation of that, objection to the extent it calls for a legal conclusion, objection to the mischaracterization of





prior testimony, objection, asked and answered. I think that's enough.

THE WITNESS: I believe the court stated that our obligation under the contract proceeded regardless of whether there was a facility operating or not.

BY MR. SKALABAN:

Q. But the court said nothing about the DCSs that the Department had originally approved conditioned upon the existence of a facility as far as you know, right?

A. As far as I know, they did not mention the DCSs.

Q. If we look at the next letter in this series, it's a letter dated September 26 from Mr. Buchheit, the senior fuels engineer, and it's addressed to Ms. Beth Tomasoni and it's copied to Mr. David Zabransky. Now, if I understand correctly, at the time of this letter you were at waste acceptance?

A. Yes.

Q. Do you recall receiving this letter from Mr. Buchheit?

A. No.

Q. Do you recall any discussions about Yankee

A F T E R N O O N   S E S S I O N

(2:04 p.m.)

MR. STOUCK: Your Honor, thank you for that. I do hope we can be a little more efficient. I'm just using the last couple minutes of break here. Finishing off the efficiency.

THE COURT: Okay, fine.

BY MR. STOUCK:

Q. Good afternoon, Mr. Pollog.

A. Good afternoon.

Q. Just one, perhaps, minor point that I wanted to clear up from this morning before we move on. You told me this morning that the contracting officer had a responsibility for making determinations about what the standard contract meant. Do you recall that?

A. Yes.

Q. You told me at your deposition, or you told us, Mr. Skalaban's here with me, at your deposition in May of 2002, that it was Mr. Brownstein who had the responsibility to make any determinations on what provisions of the contract meant. Do you recall that?

MS. SULLIVAN: Objection. Can we ask the witness be shown the statement?





MR. STOUCK: I'm asking him if he recalls it. If he recalls it and says yes, then I think we're done.

THE WITNESS: Not specifically, I don't recall that.

BY MR. STOUCK:

Q. You don't recall that testimony?

A. I don't explicitly recall making that statement in my deposition.

Q. Let's show it to you then. In fact, there might be some more testimony, so in an abundance of caution, I will hand out the whole package now. There's a number of depositions, transcripts here, Mr. Pollog. If you would take a look behind tab five -- I'm sorry, that's wrong, behind tab four, on page 63, bottom of 63, the last line of page 60. If you can let me know when you're there?

A. Can you repeat those pages for me again?

Q. Tab four, page 63.

A. Yes, I'm there.

Q. You see there are four on the page, it's actually page 17, but page 63 of the deposition, do you see that?

A. Yes.

Q. Line 25, "Was part of your function, in





working with Mr. Brownstein on these matters, was part of your function reading and trying to understand the standard contract?

"Yes.

"Did you have responsibility to issue or make any determinations on what the provision of the contract meant?"

And your answer was on line nine, "No, Mr. Brownstein may have asked my opinion, but he was the branch chief for logistics and utility interface that was responsible for making the determinations." Do you see that?

A. Yes, I do.

Q. That was your testimony?

A. Apparently so.

Q. That was your testimony then?

A. Yes, it was.

Q. Okay. Now, let's talk a little bit more about DCSes. Is it correct that DOE received some DCS and FDS submittals from utilities in the '98, '99, 2001 time frame?

A. Yes, we did.

Q. And DOE wrote back to those utilities saying it was not approving any DCSes or FDSes at that time, right?





A. Some words to that effect, yes.

Q. And you were not involved in discussions about whether to continue processing DCSes in the fall of '96 or '97?

A. No, I was not.

Q. Right. But you were involved, to some extent, your duties and responsibilities for the waste acceptance and transportation division did involve, to some extent, processing DCSes, is that right?

A. To some minor extent, yes.

Q. Okay. Do you know when the Department stopped processing or stopped reviewing and approving DCSes or FDSes?

A. I believe I do.

Q. When was that?

A. I believe it was either the end of 1996 or in the very beginning of 1997.

Q. And your understanding is that the Department of Energy stopped processing these DCS and FDS submittals to limit its contractual liability, isn't that right?

MS. SULLIVAN: Objection, legal conclusion.

THE WITNESS: I'm not sure.

THE COURT: What's the objection?

make our day a little brighter.

And this served the purpose that day. It made our day a little brighter because it's a topic we opined on many times with different parties. They seemed to not like the answer and kept asking us the same question.

Q. And you thought that was funny?

A. Yeah, at times, it was humorous.

Q. And DOE did not consider at all the approval or disapproval of this final delivery schedule, isn't that right?

A. That's correct.

Q. And in 1997 or 1998, the Department sent all three Yankee facilities letters saying DOE would not consider any further DCS or FDS submissions, correct?

A. I have no specific recollection of that, but I would not be surprised if that happened.

Q. Those letters went out to many utilities?

A. Not many, but they went out to quite a few utilities.

Q. That was the Department's position at that time, was that you were not going to consider any further DCSes or FDS submissions, isn't that right?

A. That's right.





Q. Okay. And it was your view at the time -- let me ask it this way, it is your view that once DOE stopped processing DCSes, it stopped. It had no further obligations to Yankee Atomic, is that right?

A. Yes.

Q. So DOE has no obligations to Yankee Atomic, assuming there's no approved DCS in these years, in 2002, 2003, 2004?

MS. SULLIVAN: Objection, legal conclusion.

MR. STOUCK: I'm asking for his understanding.

MS. SULLIVAN: That's fine with that clarification. That wasn't in the original question.

BY MR. STOUCK:

Q. That's your understanding?

A. Yes, that is my understanding, assuming that they had indeed allocations for the years you mentioned in your question.

Q. And if DOE did not begin performing until 2025, then it's your understanding the Department would still have no obligation to Connecticut Yankee, Yankee Atomic or Maine Yankee, beyond an obligation to pick up the fuel that's described in approved delivery commitment schedules, is that right?

A. Yes, that's correct.





Q. So your view is that, by stopping the approval of the DCSes, your understanding is that the Department could unilaterally cut off its obligations to all purchasers, correct?

A. Yes.

Q. What is that based on, Mr. Pollog? Is that based on the contract instructions we've talked about or some language in the contract? Where does it say, this is my question, that the approved DCSes are the limit of DOE's obligation?

A. Can you repeat that again? Because I didn't quite catch the last part of your question, that was confusing me a little bit.

Q. As I understand what you're saying, DOE is obligated to pick up spent nuclear fuel that's described in an approved delivery commitment schedule, right?

A. I think I've testified to that, yes.

Q. And your understanding is, if there's spent fuel out there that is not described in an approved delivery commitment schedule, then DOE has no obligation to pick that up?

A. Yes, that was my belief.

Q. Skip over the first part. Let's assume you're right, that they have an obligation to pick up





the fuel that's described in an approved delivery commitment schedule, and we can find some basis for that somewhere. Take that off the table. With respect to that other fuel that's not described in approved delivery commitment schedule, what do you base your -- on what do you base your understanding that there's no obligation as to that fuel? Got the question?

A. I think so.

Q. And I was just suggesting maybe it's the instructions, maybe it's the contract, maybe it's something else, but I'd like to hear your answer.

A. It's just my belief, since there was no signed document obligating DOE to pick up that specific fuel, that we didn't have an obligation to accept that fuel.

Q. Any other basis than your belief?

A. No.

Q. Now, the acceptance rate in the 1991 ACR that you testified about, that was not consistent -- I think you actually you may have said this on your direct, but let me just ask anyway. That was not consistent with the schedule linkages that Congress placed in the Nuclear Waste Policy Act of 1987, correct?

sense, but I'm not sure how I can put any specifics on that, but generally speaking, I guess.

THE COURT: Okay.

BY MR. STOUCK:

Q. Do you agree, do you remember the question? Do you want me to rephrase it?

A. Yeah, I remember the question. I think it's always been a goal of the Department to operate the system efficiently.

Q. An objective?

A. A goal.

Q. Is there a difference?

A. It's always been a goal of the Department to try and operate the system efficiently.

Q. How about an objective?

A. A goal of ours.

Q. I'm just curious, "objective" was the word at the deposition, so is there a difference?

A. I don't know. Is there a -- to me? Probably not.

Q. And that efficiency would extend beyond just DOE's operations and also would include utility needs, in your view, isn't that right?

MS. SULLIVAN: Objection, vague as to what "that efficiency" means.





THE COURT: You mean the, the utility would have to be efficient as well?

MR. STOUCK: Of course, I'm asking for his understanding, but he testified about this extensively, and I would just like to have the Court hear the benefit of it.

THE WITNESS: Okay. I think I mean both parties, contract holders and the Department, would agree that if we can operate with efficiency for both sides, it's beneficial for everyone.

BY MR. STOUCK:

Q. And minimize costs for both sides?

A. If we could do that, yes, that would be beneficial.

Q. Okay. And you agree that, at least at one point in time during the course of this program since the Nuclear Waste Policy Act was enacted, DOE had the objective of minimizing utility reactor storage costs, right?

A. I believe words to that effect were published in mission plans in the 1980s, yes.

Q. And I'm trying to wrap this up, but I've got one question, or a couple questions, I'm looking for them in my notes here.

There was one exhibit -- let me get my copy





of the exhibit that you were asked about by Ms. Sullivan, if I may. It's Defendant's Exhibit 23. Would you take a look at that? It's a memorandum from Mr. Milner to the director, and I think she called your attention to a sentence on page two. Let's take a look at it again, last sentence of the carryover paragraph. Are you there?

A. You said the last sentence?

Q. The last sentence, it starts, "While not stated in the ACR," do you see that?

A. Yes, I do.

Q. "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out of pool storage starting in 1998." Do you see that?

A. Yes, I see that sentence.

Q. Do you agree that's a consequence of that rate? Do you know if that's true?

A. Are you asking me, is the statement correct? I'm not sure exactly what you're asking me. The word "consequence" there, I wasn't quite sure what you meant.

Q. I'm asking if you know that that rate is sufficient to eliminate in the aggregate the need for





at-reactor out of pool storage starting in 1998?

A. I believe I have seen something in the past that showed where in the aggregate, if that rate was used, that it would eliminate the need for additional at-reactor storage.

Q. Do you remember when you saw that?

A. No, I don't.

Q. Do you remember what it was that you saw?

A. Yeah, I think it was a chart or table broken out by year showing the need for additional at-reactor storage.

Q. Do you know who prepared it?

A. My best recollection was Billy Cole, but I'm not positive about that.

Q. Do you know what the assumptions were that went into that analysis?

A. No, I don't.

Q. Can you tell me any one of them?

A. I would be guessing. I have certain beliefs, but I don't know any of the assumptions that went into the analysis.

Q. Do you remember testifying at your deposition, Mr. Pollog, when you were asked this question, that you don't know factually if those rates were adequate or not to accomplish that