# ATTACHMENT B

# WE'S COUNTER-DESIGNATIONS FOR MR. BILLY COLE

**March 12, 2002**

39:1-41:10
56:25-57:19
78:2-80:19
102:3-104:12
131:21-132:6
158:5-165:2
180:25-183:1
198:18-202:11
225:15-226:1

**March 13, 2002**

245:1-251:25
344:24-346:10

**June 4, 2002**
109:5-19
158:25-160:2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

38

the sand.
You can't say it's going to operate forever. Otherwise your study continues forever.
You draw a line saying okay, we're going to cut the study off here. Everybody shuts down. All these reactors that are operating, they're shut down, and the system dwindles down, the facility closes up.
Q. Now that goal of trying to develop a rate that would keep up with discharges and work off of the backlog, was that a goal that PNL articulated, or was it something that DOE --
A. That was not a goal. You're misinterpreting what this report was about.
The goal was not to establish acceptance rates or anything in that report.
It was a, purely an Environmental Impact Statement. If these things happened, what was the impacts to the environment.
Had nothing to do with acceptance rates. That was just one little, less than 1 percent of the piece of the thing.
Q. But is it accurate to say one of the factors was developing an acceptance rate that

39

would keep up, to use your term, with discharges and work off the backlog?
A. Sure.
Q. And that factor, was that something that you suggested or PNL suggested be considered in this report, or was that a factor that was indicated to PNL by DOE or another agency?
A. I can't answer that question because it's neither.
It's just part of an analysis that you do. If I do it this way, I've got all this stuff, and it's going to be generated at this rate, and I've got to dispose of it, so I dispose of it. I build a facility to handle it.
It's a hypothetical situation, purely hypothetical, hypothetical repositories, hypothetical reactors. They didn't exist.
Q. To your knowledge, was this the first time an analysis had been done about disposing of spent nuclear fuel?
A. No, it wasn't the first time. There was programs ongoing the government had. I think one was called AFR program, where they were looking at ways of not necessarily

40

disposing, but AFR meaning away from reactor, how you get maybe central facilities built to handle spent fuel.
Later they called them MRSs and ISFSIs and all this other kind of stuff.
The government had a lot of programs ongoing before that.
This was just the Environmental Impact Statement, what the impacts are going to be to the environment.
There was another study that just preceded that, was kind of started sooner, ended sooner, but was overlapping a little called the GEIS, G-E-I-S, Generic Environmental Impact Statement.
You did a generic, and then you do a specific.
Q. What did you do after this mission plan was or impact statement was published?
A. What did I do after that? In the, this was published I think around 1980.
In the early 1980s, DOE started its, what was called -- the terminology may be incorrect, but it's, it's the implication, the spent fuel management program.

41

PNL, and I don't remember all the details of the transition, but PNL became the manager of that program for the government, or M&O if you will, whatever they called them, about 1981 some time, '81, '82 in there.
When the program was given to PNL to take over, Mr. Darrell Newman was the first, was the manager of that program, and I was consulted, installed as the deputy manager of the program.
Q. What were your responsibilities as deputy manager of this program?
A. Predominantly some of the things I discussed before; one of the, well, one of the primary things that was going on that we were doing was called the storage requirements report that we were developing for the DOE.
This was DOE's way of trying to find out how big a problem the utilities had after the President had shut down reprocessing, and utilities were complaining to the government that they had problems.
You know, the government screws them there. They were looking to the government to help them out, and so we were doing spent fuel



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

A. No, none other than I explained. Oh, the contract -- no. No. Nope.
Just had a big role in trying to interpret it.
Q. And when did your role trying to interpret the standard contract begin?
A. At July 1983, after the contract was signed by the utilities and became public, we had to, as deputy manager of the program at this time, I had to try to sit down and interpret the contract and figure out what roles and responsibilities were for both sides, and I can keep talking while I fill up my coffee cup.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any initial impression about the standard contract, Mr. Cole?
MR. MILLER: Objection -- vague.
MS. HEWITT: You can still answer. I'm not sure you can say objections on behalf of a witness you don't represent.
MR. MILLER: I can. I think certainly that I'm entitled to enter objections concerning the form of the question, sure.



BY MS. HEWITT:
Q. Did you have any initial impressions, Mr. Cole?
A. My impression of the contract, whether it be initial or later, is the same.
It was put together in haste. It was fraught with ambiguities, contradictions, incorrect statements, but it was pretty damned good under the circumstances.
Q. And what circumstances are you referring to?
A. How quick it had to be put together.
Q. Why did it need to be put together so quickly?
A. Because the law required it. It said you had to have one in place and signed by July something '83.
The Nuclear Waste Policy Act didn't get passed until January 7th, '83.
It was a short period of time to get the right people together, to put it -- and it was my understanding, even though I wasn't part of putting it together, there were people from the government and the utilities both were helping write the language.



Consequently, you know, you get a lot of things in there that didn't line up later on.
That was one of the first things I was trying to do was interpret the contract to figure out on a time line basis who was to do what to whom, and that's what we did.
That's how we found these problems, and then we came up with issues, things that need to be resolved because it didn't make any sense.
Q. What didn't make any sense?
A. Some of the things in the contract.
Q. Did you have understanding about whether or not the utilities could or could not sign the contract?
A. It was my impression that they were required to sign the contract. They had no choice.
Q. Why did they have no choice?
A. I don't know. That was my impression. If they wanted this service I guess.
I had just always been told they didn't have a choice.
Sometimes I do what I'm told.
Q. I presume, Mr. Cole, you're familiar



with the standard contract?
A. Fairly familiar, yes.
Q. I'm going to give you a copy of the standard contract, and this copy is actually that which is published in the Code of Federal Regulations at Part 961.11.
I'm, I didn't make copies for everybody. I presume everybody is familiar with it.
And I'm going to hand it to you, if you want to just take a moment to look at it?
A. What part do you want me to look at? Because there is a lot of pages.
Q. Well, we're going to, I'm going to take you through some aspects of it, so you can start at the beginning and just flip through to see if that's what you recognize as the standard contract.
A. Um-hm. Yep. That's it.
Q. I would like to ask you about first of all, the second whereas clause, and that's on page 521.
A. Five what?
Q. Twenty-one at the bottom; oh, I'm sorry. It's, on your copy, it would be 570.

comments.
Q. Do you know whether DOE had any guidelines that it relied on in developing the acceptance rate?
A. Like I told you, I think the first acceptance rate came from the commercial radioactive waste management impact statement, which was their document. That's all they had.
I don't know. There may have been some other thing. I was not privy to it.
Q. Are you familiar with a meeting that occurred in December of 1983?
The meeting was titled proceedings of the 1983 civilian radioactive waste management information meeting.
A. I'm not familiar with the report, no.
Q. I'm going to --
A. But the meeting sounds interesting. I'm trying to figure out what meeting it was.
Who was there?
Q. I'm going to give you a couple of excerpts from the report that was issued from that.
A. Who issued the report?
Q. It's the report that says on the title



that it was sponsored by U.S. Department of Energy Office of Civilian and Radioactive Waste Management.
A. Sponsored by, but who, was this an -- what's the report number?
Q. There is a number in the upper left-hand corner. I show you the --
A. That makes a difference. What's the report number? Is it EI report?
Q. I don't see that designation, and I don't know if it has -- there is a CONF?
I'll give you this title. Take a look at it. It's got a forward. I've got excerpts, Table of Contents of that meeting, and then I've got a couple of pages from that report which actually excerpt the program overview given by Robert Morgan, so just take a look at it and see if you have any familiarity with this that might refresh your recollection on the top.
A. Like I said, I'm not familiar with the report, but maybe the meeting.
(The witness reviewed the document.)
THE WITNESS: No, I was not party to this.
This was a high-level meeting, Bob



Morgan and his staff.
This was not the information meetings I thought it was.
(The witness reviewed the document.)
BY MS. HEWITT:
Q. You can see that there is a portion of that Robert Morgan program overview that I have highlighted?
A. Um-hm.
Q. That indicates --
A. Basic strategy.
Q. Yes. Can you take a look at that?
A. Um-hm. I did.
Q. And we're going to make this probably Billy Cole Exhibit No. 1 to the deposition.
(Cole Exhibit No. 1 was marked for identification.)
BY MS. HEWITT:
Q. Does that strategy sound familiar to you at all?
A. Oh, yeah.
Q. How are you familiar with that strategy?
A. That was a, that was the purpose. The



basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel.
You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing.
This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage.
That was one of the major goals of the program.
Q. Do you know that was one of the major goals of the standard contract?
MR. MILLER: Objection. Lacks foundation.
THE WITNESS: I don't know if the contract had a goal or not.
The contract was roles and responsibilities and who does what to whom and when.
BY MS. HEWITT:
Q. In this testimony, Mr. Morgan states that during the first year of operation of the

says, it constrained by the capacity of the system.
Q. Was DOE projecting that utilities would want to give DOE spent nuclear fuel in excess of 3,000 metric tons per year?
A. Sure.
Q. Why would that be the case?
A. Because the utility said so.
Q. Why would they have said that?
A. Most of it was informal, but comments that were coming in and stuff on this report, for example, some comments came in says, from some utilities, it said what do you mean I'm only going to get 30 tons acceptance in the first year? I've got a contract that says you're going to come pick up all my fuel in 1998.
I mean, yes, some of them were being, reading and interpreting how they wanted to interpret it and being obstinate like a lot of people can be.
Q. The second sentence in that paragraph says that the acceptance capacity available for allocation through the purchasers will equal the system operating capacity?



A. Um-hm.
Q. Unless part of that operating capacity is used to accommodate contingencies?
A. Um-hm. All that means is that if you've got a 3,000 ton capacity, that's all we're going to allocate, and if something comes up, you've got an emergency, you have to interrupt that, if it could handle it without any other problems, fine, but if it's not, it may slip everybody in the queue.
Q. So is it correct to say that DOE developed the acceptance rate based on the capacity of the system to take spent nuclear fuel?
A. Yes. That's exactly what it is.
Q. Was that always its guidelines in developing the acceptance rate do you know?
A. They are equal. The acceptance rate is the, the system capacity is the ability for it to accept spent fuel.
Q. Well, you could have a system capacity that is 3,000, but DOE could choose to accept less than 3,000?
A. That's different.
Q. Why is that different?



A. If they chose to accept less than 3,000, then they're not allocating the system capacity, and that's what it said it did.
Wouldn't make much sense to build a facility for 3,000 tons and only take 2,000 tons if you're, unless you're in a ramp-up phase and had problems, and planning, mission plans, things like that don't recognize those kind of contingencies.
You build a 3,000, you operate a 3,000 once you ramp up. Doesn't really recognize the other.
Q. Lunch is ready, so I think this might be a good time, we have been going for about two hours, to take a break.
A. Okay.
MS. HEWITT: Unless somebody disagrees?
Okay. Why don't we take why don't we say 45 minutes for lunch?
Why don't we go off the record?
(Whereupon, at 12:27 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)



AFTERNOON SESSION
(1:17 p.m.)
MS. HEWITT: Why don't we go back on the record?
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:
Q. Mr. Cole, I would like to finish up just getting an outline of your professional history.
We sort of got detoured a little bit on the substance of your duties there, but how long did you work on the waste management program for PNL?
A. The period of time that I worked on waste management problems, whether you call it -- the waste management program has some official connotation to it, but working in the waste management area for PNL, probably from early '70s, maybe late '60s, early '70s off and

130

until 2010, 12 years later, so they asked me, you know, what would be a reasonable rate because, you know, we can't build a big full-blown facility to get started, but we would like to make sure that we have something that's useful, so I came up with this rate which recognized the 10,000 ton limit over a 12-year period even though we only published ten years here because that's all that was required in the contract, to publish the first ten years, but if you add the other two years in here, you get another 1800 tons, and you have got 10,000.

It also recognized what the utilities had told us were their storage requirements, their need for out of tool, out of tool storage, recognizing the ability or inability to keep a full core reserve.

Information fed to us through a form they filled out every year called the RW 859; based on that information, in 1998, there was less than 400 tons of allocable storage capacity required on the aggregate by all utilities.

Now this takes us back to my statements earlier about issues of operations versus issues of equity.

131

This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity.

The second year, 1999, they were telling me that it was like 575 tons required.

The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.

Q. And why was that a factor in your consideration of developing the acceptance rate?

A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new

132

storage so they could keep operating.

Q. And in your opinion, did the standard contract reflect those purposes?

A. Did the contract reflect those purposes?

(There was a pause in the proceedings.)

THE WITNESS: Don't know. Don't know if it had anything to do with the contract as far as purpose goes.

The contract was a mechanism of roles and responsibilities, not purpose.

The act, the Nuclear Waste Policy Act was the purpose.

The contract was a way of implementing it, and that's how this rate came about.

BY MS. HEWITT:

Q. And was it your contention that this was a reasonable rate to you to use?

A. Absolutely; if you can only do a limited amount of capability, it would be nice to do it, so it really helped solve some problems, which was the initial problem they were trying to solve.

Q. And could you state again what that

133

problem was?

A. Keep the utilities from having to add additional storage.

Q. Did DOE consider this to be a reasonable rate?

A. Yes. Obviously they published the report.

Q. Why were you involved in developing the acceptance rate at this juncture since you weren't involved previously?

A. I was asked what I would do, and I also -- well, I can't remember if I was asked or if I went and told them what I would do since I knew they needed something done, and they liked the idea.

They thought well, you know, we can live with this. We have a basis now for our -- all the rates in the past were pulled out of old stuff or sometimes WAGS, came out of the old CRWMS reports, somebody made something out of transportation requirements, but nobody had a real solid basis.

Here was something that says if you can go build a facility, as limited as it is, that still solves a problem and buy you some

158

before that.
There were some that had to add storage prior to that, that date. A lot of them had to.
Q. Did you have a role in publishing or producing the Annual Capacity Report and acceptance priority ranking that's dated March 1995?
A. My only role in that one was as a reviewer because I was back working at PNL on the mixed nuclear waste program at that time, and I was asked to review the thing before it went to press.
Q. Do you know why this document was published concurrently with the APR, the ACR and the APR were published concurrently as opposed to separately as they had previously?
A. Didn't make any sense to keep them separate.
It's cheaper to do one document, and since the information, since we originally back in the '87, '88, '89 documents, it was one, even though we didn't call it that, it made sense to make one out of it.
Q. I'm going to hand you the APR/ACR

159

dated March 1995 to see if you remember reviewing that document.
(The witness reviewed the document.)
THE WITNESS: Um-hm. Yeah. I think it was kind of a cookie cutter report.
BY MS. HEWITT:
Q. Can you secure or find the page with the acceptance rates on it, please?
A. Um-hm.
Q. Did you have any role in developing those acceptance rates that are included in the March 1995 report?
A. Yeah.
Q. And what was your involvement in securing those acceptance rates?
A. I have already told you; 1991 they were developed, and they were used every year since then.
Q. So those were the same rates?
A. Yeah, 469, yeah.
Q. But in this report, if I remember correctly, they don't have calendar year designation?
A. Right. They finally did year one, year two, year three, yeah.

160

Q. And that was based on your recommendation?
A. I don't know by then. I had recommended earlier. Somebody finally thought it was a good idea I guess, and I, my career, I got a lot of these they finally get around to doing something five years later and I go nanner, nanner, nanner, told you so, I told you so.
Well, that happens in this business. The government moves slower than the contractors want them to.
Q. Do you recall that DOE announced in 1995 that they would not be able to take spent nuclear fuel by the January 31st, 1998 deadline?
A. I think back then they were publicly announcing it, yeah.
Q. Did you have any discussions with DOE about the appropriateness of publishing an APR/ACR given that announcement?
A. No. No. They were still obligated to publish one.
It just, just didn't make a lot of sense to have a report with a date if you couldn't meet the date, and so that's why they

161

finally did that I guess.
Q. Is it your opinion that this APR/ACR dated March 1995 provided utilities with a reasonable basis for planning?
A. At that point in time, I don't, to be honest with you, I don't think anything was published that would provide anybody with a reasonable basis for planning, either the DOE contractors itself or the utilities, because they were struggling at that point in time trying to work with Congress to get some new legislation, some new authority to allow them to get the damn job done, and they couldn't get -- kept having roadblocks.
They were frustrated, and I know that it was frustrating to the utilities, too. It was a two-way street.
DOE never had any motives, the people I worked with never had any motives other than trying to get, meet the rule of the law in the contract.
Q. In your opinion, was it reasonable for the utilities to rely on any of the ACRs that were published by DOE?
A. Yes.

162

Q. Which ones?
A. All of them probably through '91, '92, in that area, because at that point in time, everything was not on the schedule DOE had hoped for, but they still were, had some hope that they could have something going by '98 to help relieve the problem.
That was, they were trying every which way to make that happen. Every time they got a roadblock, they'd try to go around the roadblock, find a way, and then it got to the point where they just got so many roadblocks thrown up that it was impossible.
Q. Now the 1995 APR/ACR was the last ACR or APR that was published by DOE, is that right?
A. As far as my, I remember, yes.
Q. Did you have any discussions with DOE about publishing a report after this?
A. Oh, yeah. Me developed those reports. They just never got published.
Q. And why is that?
A. They said it was moot because they didn't know what the start date or anything was going to be.
Q. But they were using a date of 2010,

163

weren't they, at that point in time?
A. I think as far as a repository goes, yeah.
They were still hoping there was some way they could get some interim facility sooner, but I think by then, they were using 2010 as a repository date, and if they started a repository, I guess they were using these acceptance rates.
No one has ever changed the acceptance rate as far as I know, even though the bases for it no longer existed if you start in 2010.
Q. And that would have been known in 1995 when this APR/ACR was published?
A. If that was based on 2010, probably so.
Q. Did you ever have any discussions with anybody at DOE about the reasonableness of 2010 being the date that the repository would begin operations?
A. That has nothing to do with the reasonableness.
It's, it has to do with will a particular state allow you to build something in his state and how long it's going to take you to

164

get it built.
It's not, not something, it's not a date you pull out of the air.
It's what can be done and when can it get done.
Q. And did DOE think that everything that needed to be done would get done by 2010?
A. Based on the current rules that were, that they were facing, and making the assumption that in this case, the State of Nevada could not override what they wanted to do, that would be the best they could do.
It's still unclear whether they could do that unless Congress steps in and tells Nevada this is not state land, it's federal land, go dig the hole, but you know, DOE, you've got to separate Congress from DOE in this program.
DOE is a messenger that tried damn hard to do the job.
They haven't been able to.
Q. Did DOE think they could meet the 2010 start date for the repository without Congressional interaction?
A. I don't know. I know they're moving

165

forward and trying everything they can to meet it.
Q. During the 1990 to 1995 period, DOE published fee adequacy reports, isn't that right?
A. There was a couple of them published. I don't think too many.
Q. I thought they were required to be published on an annual basis?
A. Yeah, they were, but I'm not sure they did them every year.
They may have, but I can't remember. It seems to me that they weren't done all the time.
Q. To the best of your knowledge, did you participate in the production of those documents when in fact they were produced?
A. Yes.
Q. And did the acceptance rate factor at all in those documents?
A. Not specifically; most of that is based on the total system life cycle cost, what it cost to build a system divided by how much stuff you got divided by who's doing it.
That's how you develop the adequacy of

178

A. Okay.
Q. I want to ask you a couple more questions about the acceptance rate which was first introduced I believe in the 1991 Annual Capacity Report.
A. Okay.
Q. And to refresh your recollection, the acceptance rate that was used started in year 1998 with a 400 MTU annual rate and ramped up in about two years up to 900 MTU annual rate, and if I'm correct in my recollection, you stated that you helped develop this acceptance rate that was included in this Annual Capacity Report?
A. It was my -- I developed it personally.
I mean I can't pass that one off to anybody else.
That was my idea.
Q. Okay. The Annual Capacity Report, when it reports this rate, only goes for a period of ten years, right?
A. That's correct.
Q. Was there an understanding or an intention with regard to what an acceptance rate

179

would be following the ten years?
A. No. We never really did one for greater than the ten-year period.
Q. If I remember correctly --
A. Not for the purpose of allocating capacity.
Q. Now you stated earlier that it was your opinion that the 900 MTU annual rate was a reasonable rate in your view, is that right?
A. Yes, based on the information given to us by the utilities.
Q. Do you have an opinion about whether or not it would be a reasonable rate to use for more than ten years?
A. I would have to look at the data given by the utilities, and I could tell you yes or no then, but I can't remember what it was beyond that point in time.
If they were still saying that they didn't need any more capacity than that for additional storage, then it would be reasonable. If they needed more, then it wouldn't be because that was, the bases for that was what could we do at a minimum and still keep them from getting in trouble?

180

Q. Now when we talked about the genesis of the 900 MTU rate and compared it to the numbers in the storage requirements document, I think it was evident from your review that the numbers that were included in the acceptance rate 1991 document were greater than the total storage requirements that were needed, that were reflected in the storage requirements documents?
A. Nominally.
Q. What do you mean by nominally?
A. Well, there may have been one year when it creeped a little more than 900, but most of the years were under 900.
Q. And was there any reason that you chose a figure that was higher than what those rates were in the storage requirements document?
A. Yes.
Q. What was the reason?
A. I had 10,000 tons to divide up over 12 years, and it worked out pretty slick.
If you do 900 tons a year for 11 years, and -- I mean for ten years, and you do four and six, voila, you've got 10,000. I didn't even need my calculator for that one.
Q. You also referred in your earlier

181

answers to, on occasion to program guidance that you received from DOE?
A. Um-hm.
Q. In what form was that program guidance provided?
A. Comes in as written guidance.
Q. Were there actual documents that were provided to PNL with regard to preparation of the acceptance in the Annual Capacity Report?
A. Yes. Yes. Said to go do it. You know, program guidance is fairly, oh, sometimes vague, sometimes with the understanding that you know what you have to do anyway.
Sometimes you write your own guidance, give it to DOE, and then they officially give it to you, but the program guidance in this case would come in and say the contract specifies da, da, da, you do this, go develop this report.
Q. Did you ever receive program guidance in a written form from DOE that instructed you to use a certain acceptance rate in an Annual Capacity Report?
A. I don't remember specifically getting an acceptance rate in written guidance, no.
When the guidance comes in, it comes

from DOE headquarters to DOE Richland operations, from DOE Richland operations to our contract officer.

It's a contract to contract, and along with some budget authority, and then it dribbles down to people like myself as program managers, and it's usually one or two lines saying what you're supposed to do, and then you get together, and you, you as the contractor, start putting together a more detailed set of, if you will, guidance, what you really think they want, and then you echo it back to them.

You meet with them. You get on a plane, you fly to D.C. and you meet with them and say here is what I'm proposing to do, is this really what you had in mind?

And then you start discussing content and things like this, and they tell you what, you know, if they have some requirements or not, and that's when it all happens.

Q. As far as you recall, were there any written exchanges on the issue of what acceptance rates to use in the ACR?

A. I don't recall any, but I don't know. There may have been.



I just don't recall.

Q. Earlier you referred to some efforts that DOE was undertaking to get Congress to do something about the lack of a repository or other facilities to take spent nuclear fuel by 1998.

Do you recall any specific actions dealing with taking with Congress?

A. Several times a year, several, I know a couple, sometimes more, the director of the DOE waste management program was called, would meet, give testimony to Congress about the status of the program and what was happening, what the problems were, and what, kind of what he needed from them.

I mean this is all Congressional public record and stuff in these meetings, so --

Q. And it was your impression that at these meetings, they were requesting Congressional intervention in order to allow them to fulfill their responsibility?

A. Oh, I don't know how those discussions go.

It's not so much Congressional intervention, no.



It's Congress wrote the law. Congress changed the law on them, and they're going in there and telling them because you changed the law, this is all I can do. I just want you to know it.

I don't know what took place specifically in those meetings.

I just know they happened.

Q. Um-hm. Okay. The last follow-up I have is that regarding the testimony you gave on the fee adequacy reports, and you said at one point in time, the fee was not adequate?

A. That is correct.

Q. Was that ever reported in a report that PNL produced or that you participated in?

A. No. It was not produced at PNL. That was produced by, when I was working under the program, of TRW in '92 or somewhere around then, and DOE decided not to publish that I think.

I think, well, I'm not sure. I can't remember now if they -- I know they decided not to publish the fact that it wasn't adequate.

They may have published a fee adequacy report saying for right now, it's adequate, knowing full well it wasn't because they felt



that the timing was not good to come out and make a decision like that when they could really -- you know, they were struggling with what was going to happen to the program.

They didn't feel it was, my impression was that DOE people who were focusing on getting this job done didn't feel that it was appropriate to come out and tell the utilities oh, the fee is not adequate by 25 percent, and by the way, we can't make the '98 date, dah, you know, so one's bad, you know, that once you drop, don't drop both shoes at the same time. That was my opinion.

Q. Did you have knowledge of whether or not DOE published a report that indicated that the fee was adequate when in fact they knew it was not adequate?

A. If they put out a report that year, probably it said it was okay for right then, and it would be revisited again, or that, you know, they probably weasled some words that to the, to the effect that, you know, it's premature to say something or something like that.

I don't remember what it said. I just know we did the calculations, and the

198

We would run, if somebody asked can you tell us what this is all about, this program and stuff, and how this process works, and so I would either slip my name in it or he would slip his name in and we would go give the presentation.

This is the same, actually the same, exact same information is in here.

Q. Did you develop the, either of those documents?

A. I was the manager in charge of getting the work done.

People who worked for me developed the information in there, and I reviewed it and said yep, that's correct at that time.

This was just keeping track of the DCSs that came in.

Q. Were you familiar with the instructions that were provided to all fours in connection with the Delivery Commitment Schedule?

A. The instructions that were provided to whom?

Q. To, to the utilities.

(A discussion was held off the

199

record.)

THE WITNESS: It was some, there was some letter or instructions that went out to the utilities from the DOE explaining what they were supposed to do, and give them a sample form I think.

BY MS. HEWITT:

Q. I'm going to give you --

A. I just don't remember.

Q. A copy of the document entitled U.S. Department of Energy instructions for completing the Appendix C Delivery Commitment Schedule general instructions.

And actually I have the document number here which I have covered up, but it's SN 120564.

Why don't you take a look at these pages and see if that seems familiar to you in any way?

(The witness reviewed the document.)

THE WITNESS: Yeah, it's familiar, but I, I wasn't with TRW at that time.

I was off working for PNL again on the mixed waste program, but I know what was in it.

BY MS. HEWITT:

200

Q. Did you have any role actually drafting these instructions?

A. No.

Q. There is a paragraph here that talks about the ACR?

A. Wait a minute. Back up. To be honest, yeah, probably because I think we started drafting those before I left, but it all got completed later.

It was just trying to give guidance to the utilities on how to fill these things out.

Q. Well, there is a section in here that talks about the annual acceptance rates in the ACR, and in particular, it states that the process described herein, and I believe that it refers to the Delivery Commitment Schedule process, assumes that the FWMS will be able to accept the purchaser's SNF beginning in 1998?

A. Correct.

Q. According to the acceptance rate reflected in the ACR; then it goes on to say in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers.

Do you recall that at all from the

201

instructions?

A. If that's what they said, that makes sense, yeah, because things can change.

Q. So was the Delivery Commitment Schedule a final commitment by DOE to take the fuel reflected therein from the utility?

MR. MILLER: Lack of foundation.

THE WITNESS: I, my personal belief is that it was a commitment by DOE to take this stuff and a commitment by the utilities to deliver, yes.

And I guess I need to leave it at that because, yes, I think that's true. It is, it did represent a commitment, and I, you know, I know that things changed afterwards.

They couldn't get a facility done in '98, as we all know, and things like that, but it does not excuse an obligation.

Q. What do you mean by that?

A. DOE had an obligation to take something under the contract.

Now how much, that could be debated because it doesn't tell, quote, amounts in the contract.

If you read the language, I think

literally they could have taken one spent fuel assembly in and met their obligation.
Q. Was that ever expressed as the intent of DOE?
A. Of course not. Their intent was to get a facility operating in '98, to take the stuff away fast enough so the utilities would not have to add additional storage.
That was the intent.
Q. And do you think that DOE had that intent when they signed the standard contract?
A. Of course.
MR. MILLER: Objection. Calls for the -- lack of foundation.
Sorry.
BY MS. HEWITT:
Q. On what do you base that opinion of yours?
A. They were given that job by Congress, and the job they were given was to, between the DOE and the utilities, to develop a contract and enter into this contract and carry out the roles and responsibilities of the contract, and they went to work trying to do it.
Q. Did you ever have discussions with



people at DOE about their obligations under the standard contract in this regard?
A. Oh, of course. Of course I did. I said you guys are liable. You guys are required to take this stuff.
Q. Did they agree?
A. No, not necessarily. Some of them, you know, when you get, when you, when you get somebody in the corner and there is no way out, then they can make other statements.
They can say well, according to this, it says commencement of facility operations, we don't have a facility to operate, so we don't have to do anything, but they were instructed by their legal counsel to say that, in my opinion.
I don't necessarily think that the people I dealt with were technical people.
I don't think necessarily that those were their feelings or words or anything.
It had just gotten to the point where now we have got to fall back on other provisions in the contract, things like I think there were some provisions in here in case you can't do your job, things beyond your control, stuff like that. There are -- all that stuff is in there.



Q. Did there come a time where utilities stopped submitting Delivery Commitment Schedules?
A. Yes. I think it was around '95. I think, because I think DOE basically said you don't need to send anymore because that's when things kind of fell apart.
They couldn't make the '98 date, so they didn't have that much meaning anymore.
Q. Can you describe in greater detail what DOE said to utilities in that regard?
A. Nope. Don't know. I wasn't there when I think that stopped. I can't remember specifically the stop date.
It was some time in '95, and if I was there, it was right after I came back from PNL.
The guy who probably has some of the most knowledge on that is a Dr. Williamson.
He was the man responsible for doing the DCSs at TRW. He worked for me -- Douglas Williamson.
Q. But it is your recollection that DOE did instruct the utilities to stop submitting the DCSs?
A. No. They stopped -- I don't know how



they stopped.
I don't know if it was under DOE direction or the utilities just decided to stop, why it stopped. I don't know.
I know it stopped. I don't know why.
I really don't recall the thing that triggered stopping the DCSs.
Q. Did there come a point in time where it was apparent that submitting the Delivery Commitment Schedules would be a useless exercise in your opinion?
A. In some respects, that's going to have a two-part answer.
I felt that probably should continue the DCSs even if you couldn't make the '98 date if you were to qualify saying that this is your piece of the allocation, whenever the thing starts, so complete the process, and then put it on the shelf for whatever reason made more sense than just quitting to me, but if it was date specific, I could see where people would say hey, this is worthless, waste of time.
Q. And when would that have become apparent to utilities in your opinion?
A. Whenever DOE made a statement that

been a long time.
Just glancing at them, it looks like they were focusing on heat in these studies.
Heat's a problem on two things -- maximum loading of transportation cask, and maximum loading off interim, interim storage or repositories.
Keep the heat down, squeeze more in.
Q. All right. The last document I'm going to hand you on this discussion is another PNL document, and the PNL Bates number is PNL hyphen 041 hyphen 2110.
It's entitled determination of cost effective waste management system receipt rates, and the two names on this report are R.W. McKee and A.H. Huber.
The date of the document is January 1991, and it states here that it was for presentation at the second annual high-level radioactive waste management conference in Las Vegas, Nevada, April 28th through May 3rd, 1991, and I'm going to give you this document.
A. Interesting.
(The witness reviewed the document.)
THE WITNESS: Yeah. That was another



one where we were looking at if you do these various scenarios on receipt rates looking at trying to figure out optimizing the costs of doing this if you had an MRS in the system, looking at various discount rates for money.
BY MS. HEWITT:
Q. Did you happen to attend that conference?
A. Oh, yeah. I didn't see the paper, but I mean there were 300 papers given, so --
Q. Do you know Mr. McKee?
A. I certainly do.
Q. What's his full name?
A. It's Robert W. McKee.
Q. And did he work with you or for you?
A. I used to work for him when I was a young engineering technician.
Then later he -- I don't think he ever worked for me.
Q. How about Mr. Huber?
A. Harland Huber, didn't know him that well. I was gone from PNL by then.
Q. Had you ever seen this paper before?
A. Um-um, but like I said, it doesn't surprise me. People were out researching that,



this reactor receipt rate to death.
Everybody had their own idea on how it should be done, but the contract spelled out how you're going to receive the stuff.
Then these guys were basically more worried about how do you load the repository? How do you design a transportation facility to take this stuff?
Can we maybe ask the utility at some point in time hey, in exchange for your rights, can we dictate to you which fuel you give us? I'm not going to tell you not to give us this amount, but I would like something a little colder than you might want to give us.
Delivery schedules were supposed to give that specificity, which specific fuel.
Now if I'm a utility, I'm going to want you to take the hottest stuff out of my pool you can take just in case the system shuts down and I have got to store some, I can store more cold fuel, but I don't want to take hot fuel because I can only put, I can put fewer amount of assemblies, transportation casks, I can put fewer assemblies in storage casks and things like this.



They're just looking at coming up with rationale to, if needed, to tell the utilities can we negotiate this, what we get?
This is getting back in the early days when everybody thought, hey, '98 is so not a problem. We'll be there.
MS. HEWITT: Could we go off the record for about a couple minutes?
(A recess was taken.)
MS. HEWITT: Let's go back on the record.
We'll try to finish up in about 20 minutes.
BY MS. HEWITT:
Q. I have a follow-up question on the infamous 900 MTU annual acceptance rate.
A. Okay.
MR. MILLER: Your characterization.
MS. HEWITT: Right, for the record.
BY MS. HEWITT:
Q. Was that rate sufficient enough to attack the backlog that utilities would have had on the site?
A. No. It was purely for, to be able to take enough away, keep them from adding

226

additional storage in the aggregate.
Q. In your opinion, could DOE physically have taken spent nuclear fuel in January 1998?
A. Yes.
Q. Where would they have put it?
A. Wherever in the heck Congress would let them; we had a few little facilities. Maybe at Idaho you could stick some of them.
You have federal nuclear reservations all around the country -- Idaho, Hanford, Savannah River, Oak Ridge, Tennessee.
These are isolated guarded facilities. All you had to do was build some concrete pads and stick some casks on it.
They could do that, and they could do that, and have from the day they were told to go do it, they could have something in two or three years just like that, but that was not allowed.
That was not part of the law. That wasn't part of the rules, part of the game.
Sure, they could have. It's just like a utility. A utility runs out of storage. About three years before he runs out of storage, he knows he's going to, and about two, three years later, he's got a cask setting outside to

227

move that stuff in.
That's only time it takes, and most of that time is needed just to fabricate the cask. That's it.
Doesn't take much to build a concrete pad a couple feet thick.
Q. I'm going to ask you to identify or see if you know a couple of DOE individuals that we're intending to depose.
A. Okay.
Q. And if you could, if you know them, if you could tell me what role they played in the program to the extent that you have any knowledge on that topic?
A. Okay.
Q. James Carlson, do you know him?
A. I know Jim Carlson very well.
Q. And what was his role in the waste management program?
A. When I first started working with Jim, he was with TRW. I think he was a branch chief responsible for the MRS program.
He later moved up to be a, I think they called him division, division something, division not chief -- division head, director.

228

That's it, division director for waste acceptance transportation, and those kind of things, and he just retired about, I don't know, three, four months ago.
Q. With regard to the matters that we have talked about today, Delivery Commitment Schedules, the acceptance rate, does he have any particular knowledge on, that you know of on any of these topics?
A. Jim will have a cursory knowledge of it, but not detailed knowledge because he was a little bit too high up to get into the details. That's my opinion.
Now he may surprise me. Maybe he has got more knowledge than that, but I don't think so.
Q. How about Mr. McDuffie?
A. Oh, Patrick McDuffie, yes, he will be intimately knowledgeable on this subject because he was the man who had rolled up his sleeves and basically was responsible for developing the issues that were discovered in the contract, first ACRs and all of that.
Q. And did Mr. McDuffie work for you?
A. Yes.

229

Q. Does he have knowledge --
A. I shouldn't say -- I was his manager. He didn't work for anybody.
Q. I'll make sure I tell him that!
A. Yeah.
MR. MILLER: He'll tell you that!
THE WITNESS: I signed his time cards.
BY MS. HEWITT:
Q. Does he have a knowledge in any areas that you don't have knowledge in?
A. I don't think so.
Q. Does he have any better knowledge in certain topics than you do?
A. He has more detail, probably more detail, be able to give you more detailed description of some of these things we did because he, he was the guy physically reading every word in the contract, comparing it to the next word in the contract, things like that, you know.
Q. And how long was he involved in the program, do you know?
A. From the time we started in January of '83, he was still working on the program when I left, and I assume he worked on it until he

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 246

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 247

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 248

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
ALEX D. TOMASZCZUK, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 249

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

Page 250

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE

Page 251

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| Billy M. Cole | PLAINTIFF | DEFENDANT |
| By Ms. Hewitt | 259 | |
| By Mr. Blanton | 260 | |
| By Mr. Eidukas | 331 | |
| By Mr. Macdonald | 347 | |
| By Mr. Miller | | 504 |
| Afternoon Session - Page 347 | | |

EXHIBITS

| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 3 | 381 |
| 4 | 398 |
| 5 | 410 |
| 6 | 442 |
| 7 | 459 |


Page 252

PROCEEDINGS

Whereupon,

BILLY M. COLE,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MS. HEWITT:

Q. Back on the record; good morning, Mr. Cole.

This is day two of your deposition. As I mentioned yesterday afternoon, I was pretty much finished with my questions, and I was going to yield to my esteemed colleagues here around the table to allow them to ask questions, but I did find one document or one e-mail when I was going through some documents last night that I was hoping perhaps you could place in context for me, if you have ever seen it or know anything about it.

I think you're a recipient. The document number, Bates number, there are two that I have.

One is HQR hyphen 061 hyphen 0007, and

Page 253

the other document number is PNL 0102216, and it's an e-mail message from Abe Van Luik?

A. Um-hm.

Q. To Steve Brochum and a host of other people, and I think you're cc'ed on it, and its subject is repository capacity expressed in MTU.

A. Okay.

Q. So I'm going to provide that to you and see if you have ever seen it or are familiar with the topic of the e-mail.

(The witness reviewed the document.)

THE WITNESS: Yeah, they're talking about the -- there was a document they put out a couple of years ago, what was this latest -- I can't remember the title of it.

It was the latest document that the DOE was required to publish and give to Congress on the, some of the viability assessment. I think that was it. That's what they were talking, wondering where some numbers came from that were in that document.

BY MS. HEWITT:

Q. And give that document back to me. When you say they, do you mean DOE?

A. I mean, yes, Abe Van Luik, who I think

Q. Okay. I appreciate that.
A. He's a good one to talk to. He's also responsible for the later years, couple years ago, or last year, in developing the new projections for the amount of spent fuel that will be discharged to feed to TSLCC, that kind of stuff.
Q. Okay.
A. Got a lot of knowledge.
Q. Good. And then finally, I'm going to ask you just one or two more questions on the 1991 ACR acceptance rates. I would feel left out if I didn't get a chance to ask about it, too!
A. Okay.
MR. MILLER: As long as it's not repetitive hopefully.
THE WITNESS: It's going to be interesting if I haven't heard the question, but go ahead.
BY MR. EIDUKAS:
Q. I'll try to be new.
A. That's all right. I was being facetious.
Q. Okay.



MR. MILLER: I wasn't.
THE WITNESS: Oh.
MR. EIDUKAS: I knew that.
BY MR. EIDUKAS:
Q. In developing the 400, 600, 900 MTU rate that appeared for the first time in the 1991 ACR, I believe you testified that you developed that rate by taking a look at what the spent fuel needs of the utilities would be, projected to be in the aggregate?
A. That is correct.
Q. And then try to match that up with the 10,000 MTU that was projected to be available from an MRS that you anticipated to start operating in 1998, is that a fair characterization?
A. That's 90 percent correct. It, basically what I tried to do was to see if, what the storage requirements in the aggregate would be and to see if that 10,000 ton would accommodate it, and when I did the numbers, yeah, it will accommodate it.
Now can it accommodate it on an annual basis, too, and how would I divide it on an annual bases as a receive rate, and that's, that



sort of fit.
Q. And you divided the 10,000 up, MTU up over a 12-year period?
A. Right.
Q. And could you again -- I think you probably said this in relation to another question or another context, but where did that 12-year period come from that you were dividing that 10,000 up?
A. That assumption was that --
MR. MILLER: Asked and answered.
THE WITNESS: MRS could get started in 1998 and repository in 2010, and subtract one from the other.
BY MR. EIDUKAS:
Q. Okay. And when you were developing that rate, was it your anticipation that, or strike that.
What did you anticipate would happen to the rate after that 12-year period when a repository was expected to be opened?
A. I did not have an anticipation. That was not my job.
Q. Okay. Did anyone expect, did you expect that the 900 rate would continue past the



time when a repository would be opened?
MR. MILLER: Asked and answered.
THE WITNESS: I assumed that if you had a facility operating, that you had a repository, starting in 2010, that after you get some kind of a ramp-up, yeah, you're probably going to be up to 3,000 tons.
How quick, I don't know, but that was an assumption, but I didn't -- that had nothing to do with this analysis on the early day acceptance rate.
BY MR. EIDUKAS:
Q. So when you created that acceptance rate in the 1991 ACR, you did not, you did not anticipate past there -- that was based on the 12-year period and you didn't anticipate --
A. Actually was only 10 years. The ACR only goes for ten years.
I just used the 12 year because that was the -- you couldn't get ten, more than 10,000 tons in an MRS under the law prior to that repository operating, so I divided over those 12 years.
Q. Thank you. And so I guess what I was trying to get at and may have been misphrasing

Page 346

it was you didn't intend or anticipate one way or the other that the 900 rate would continue in perpetuity or indefinitely past that ten-year period?
A. No.
MR. MILLER: Asked and answered.
THE WITNESS: I did not intend that it would, and I assumed that it wouldn't, but that was not even a consideration at that time. Didn't look at it.
MR. EIDUKAS: That's all I have.
MR. MILLER: No questions.
MS. HEWITT: Why don't we break for lunch? And then I think we'll finish up.
MR. CARNEY: I don't have any questions.
MS. HEWITT: So the only remaining attorney asking questions will be Mr. Macdonald.
THE WITNESS: Okay.
MS. HEWITT: Okay. We're off the record.
MR. EIDUKAS: Okay.
(Whereupon, at 12:37 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)

Page 347

AFTERNOON SESSION
(1:33 p.m.)
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. MACDONALD:
Q. Good afternoon, Mr. Cole. We met yesterday.
My name is Tim Macdonald, and I represent Sacramento Municipal Utility District which I will refer to out of habit as SMUD.
A. I know SMUD, yes.
Q. And the same ground rules as have been described to you before -- if you don't understand a question that I ask, please stop me, and I will try to clarify it.
I'm handing you a document entitled spent fuel storage requirements 1990 dash 2040, a November 1990 document that we talked about yesterday.
A. Um-hm.

Page 348

Q. And here is a copy.
MR. MILLER: Oh, thank you.
BY MR. MACDONALD:
Q. And from your prior testimony, this is the document that you have used in coming up with the 1991 ACR acceptance rates, is that correct?
A. I think this was it, yes. Yeah, that looks like it.
Q. And if you flip to B94, which I think is also the page you took a look at yesterday when Devon was questioning you, and this is a chart entitled annual storage requirements by utility, comma, maximum inpool capacity, comma, MTIHM dash no new orders forecast.
And just to clarify for me, that the MTIHM, is that a, essentially the same as what we have been talking about as MTU?
A. For all practical purposes, yes. That's metric tons initial heavy metal.
Q. Okay. And the rates across the bottom of that chart starting in 1998 are 362, 385, 551, 381, 811 on down the line?
A. Um-hm. No. Go ahead. I just noticed the same table exists on page B62. I can't

Page 349

figure out why.
Go ahead.
Q. And these, at least to the best of your recollection, are the numbers you used?
A. I think this was the source, yes.
Q. And you said the acceptance rates that you came up with in the '91 ACR which were 400, 600, 900, 900 on forward, satisfy on an aggregate these needs starting in 1998?
A. Um-hm. Pretty close, yes. Yeah. There is a couple of years when it went a little over 900, some years went under 900, but nominal.
Q. And when you say in the aggregate, explain again what you mean.
A. What I meant was that if you take all the reactors, all the utilities who claim they had reactors that were going to need additional storage capacity beyond what their pools could handle, for example, in 1998, and you add up all that capacity requirement, it was 362 metric tons.
Q. Would the oldest fuel first allocation of acceptance rights satisfy these needs with the rates that you came up with in the 1991 ACR?

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------x

YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :

-----------------------x

VOLUME I

Pages 1 - 228

Deposition of BILLY M. COLE, held at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Ninth Floor, Washington, D.C., commencing at 10:30 a.m., Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR, CRR, Notary Public.

indeed that should have been plenty, because I knew a lot of the utility reps personally; we talked off the record personally. They just wanted to see the thing get going, and that would have been okay.

Q. But my first question was when you developed this in '91 at that time was there discussion and consideration of whether the 4-6-9 rate would be adequate to meet the obligation, or was it just a matter of this could be done?

A. It was more the latter, at least from my involvement.

Q. Okay.

A. There probably was discussion in the upper ranks of the department; will that meet our obligation if we do that? Somebody comes back down and says, go with it.

Q. But you were not privy to those discussions?

A. I was not.

Q. Okay. Do you know the date by which DOE is obligated to finish removing -- finish removing -- all commercial spent fuel?

MS. HERRMANN: Objection; calls for a legal conclusion.

THE WITNESS: I do not remember if there





was a date ever in the law or the contract. The planning was always like five years after the last reactor discharged, the last discharge from the last reactor.

They would take the fuel and then start decommissionings, you know, at their facilities and so forth.

BY MR. STROUCK:

Q. Right.

A. But I don't remember a date that they had to do it. The dates that they developed for planning purposes hinged on the TSLCC, what makes sense. It doesn't make sense to try to do it all in one year or to stretch it out over a thousand years. Somewhere in there is an optimum economic time frame to take it off and close it out.

(There was a pause in the proceedings.)

BY MR. STROUCK:

Q. Now, do you know the -- what is -- and, you know, you testified quite a bit about the ACRs, but just let me ask you this:

Just what is your understanding of the effect of the ACRs, the annual capacity reports provided for in the contract, on the schedule by which DOE is obligated to pick up spent fuel.





MS. HERRMANN: Objection; calls for legal conclusion.

THE WITNESS: It's the other way around. The contract specifies the ACRs to be provided on a certain date to provide planning guidance for the utilities.

BY MR. STOUCK:

Q. Okay.

A. That's what the contract reads.

Q. Okay. Now, do you know, Mr. Cole, what DOE's plans or projections were as of June, 1983 with respect to the annual rate of acceptance for spent fuel when facility operations commenced or when the program started working?

MS. HERRMANN: Objection; foundation.

THE WITNESS: In June of '83 we were -- "we" as a contractor for the Department of Energy -- we were using acceptance rates, I think the first year starting at 1200 tons, went up to 2,000, and then to 3,000 over a period of four or five years, something like that.

And that's just recollection. I --

BY MR. STOUCK:

Q. Okay. All right.

A. I can't give you any examples from anyplace





that I -- I guess I would have to go back into the Commercial Radioactive Waste Management Impact Statement to get that out of there, because that's what we were using.

Q. That was the 1980 document?

A. Yeah, that was about 1980.

Q. What about the mission plan? Would that --

A. The mission plan probably had something, but I don't know what it was, and I don't know what it used, and I can't remember when they published the first mission plan.

Q. Okay.

MR. STOUCK: Let's mark this Number 11, please.

(The document was marked as requested.)

BY MR. STOUCK:

Q. Mr. Cole, the reporter has marked as Exhibit Number 11, a two-page copy of a letter from you to Mr. Philip Craig dated April 11th, 1983.

A. That's the guy I was trying to remember at DOE Richland Operations.

Q. And tell me about this guy again.

A. He was responsible for this program out of DOE Richland.

Q. And you mentioned him because I was -- what

Q. Let's take a look now at Number 20, Exhibit Number 20. It's a -- it looks like a memo on Battelle stationery, two pages, to you from J. L. Braitman, June 5, '87, two pages. Attachment A we have, which is a list of names, and Attachment B we have, which is entitled "Standard Contract Task Force Meeting Summary Agenda."

(The document was marked as requested.)

THE WITNESS: Okay.

BY MR. STOUCK:

Q. Do you recall this?

A. I --

Q. Not specifically?

A. Not specifically. I mean, we went to various meetings.

Q. This is your signature?

A. Yes.

Q. Okay. Could you say whether this was the first meeting that you were invited to as this process was getting going, or do you know?

A. Let me look here.

(There was a pause in the proceedings.)

THE WITNESS: I guess it was probably the thing that spawned the process. This may have been the meeting.





BY MR. STOUCK:

Q. Okay. Let me know when you're finished looking at it.

(There was a pause in the proceedings.)

THE WITNESS: Yeah, I think this is when we tried to make our point, let's get this process going.

BY MR. STOUCK:

Q. Okay. And in the next-to-the-last paragraph of the first page it says, "My discussion related to the Activity Interaction Diagram development..."

A. This is -- the activity interaction diagram was this long thing that was laid out that we showed the interaction between the activities.

Q. Yeah. I think Alan Brownstein referred to that as the Star Wars --

A. Star Wars. Pat McDuffy probably referred to it like that, also.

Q. You've heard of that?

A. Pat coined that term.

Q. And that's because it looks like a spaceship? Why do you call it "Star Wars"?

A. I can't remember. It's just when you laid it out and -- it looked like a battleship to me, but...

Q. There's a reference here to a 20 percent





variation.

A. Uh-huh.

Q. What's that all about?

A. The contract allowed for -- I've got to start digging in the memory cells here.

I can't remember if it was a DOE or a utility. It allowed that the utilities could give us plus or minus 20 percent of what they were allocated in any given delivery.

DOE, I think, felt that that's a good option to have in there because it allows you to do cask rounding. You don't want to send a shipping cask to somebody that holds 24 assemblies and he only has rights for 20 and so you partially fill it, so you round up, you know, plus or minus 20 percent.

And, consequently, on the other hand, if he needs to send you 26 you don't want to -- you only take 24, maybe.

Q. Okay. That's your understanding?

A. That was the purpose of it. It was for operational efficiencies.

Q. But you didn't need to specify that, according to this statement, in the delivery commitment schedule.

A. No. You -- the specification of that took





place at the final delivery schedule, if I remember right.

Q. All right. Now, there's this sentence at the bottom of this same paragraph which says, referring to you and Mr. Brownstein, "We both then reemphasized the importance of developing a joint working arrangement to avoid as many legal battles as possible."

Do you recall that?

A. Uh-huh.

Q. What's that about?

A. Well, if you can sit down with the technical people across the table and come to an agreement on these issues you avoid having the courts solve them for you.

Q. Was there a concern at that time, June of 1987, that some of these issues might rise to the level of legal battles?

A. There was always a concern that any issue can get to that point.

Q. Okay. When you say "always" --

A. Any time, any issue in this business. If you can't come to an agreement with somebody who is on the other side of a contract, it can always wind up in court, no matter what it is, and we always want to try to solve these things beforehand.