**Yankee Atomic v. U.S. No.: 98-126C July 12, 2004**

**Heritage Reporting Corporation**

**Page 1 to Page 302**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY.

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY ) Case Nos 98-126C 98-154C 98-474C

Plaintiffs

v

THE UNITED STATES ) Consolidated

Defendant

Courtroom Number 7

National Courts Building
717 Madison Place N W
Washington D C

Monday, July 12 2004

VOLUME 1

The parties met pursuant to the notice of the Judge at 10 04 a m

BEFORE THE HONORABLE JAMES F MEROW



APPEARANCES

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY

JERRY STOUCK, ESQ
ROBERT SHAPIRO, ESQ
PETER J SKALABAN JR ESQ
Spriggs & Hollingsworth
1350 I Street, N W
Washington D C 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY

GERALD GARFIELD ESQ
General Counsel
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY

JOSEPH D FAY, ESQ
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT

HAROLD LESTER, JR., ESQ
JOHN EKMAN ESQ
MARIAN E SULLIVAN ESQ
HEIDE L HERRMANN ESQ.
R ALAN MILLER ESQ
KEVIN B CRAWFORD ESQ
RUSSELL SHULTIS, ESQ
U S Department of Justice
1100 L Street N W
Washington, D C 20530
(202) 305-7562

** Index appears at the end of transcript ** .



P R O C E E D I N G S

THE COURT. Well, we're here for the opening of the trial of Yankee Atomic and related cases, consolidated. And let's identify ourselves for the record I'm Judge Merow. And I have Ms. Strandell with me as an assistant

For the plaintiff.

MR. STOUCK: Good morning Jerry Stouck for Yankee Atomic and Maine Yankee. With me at counsel table is Robert Shapiro, my co-counsel, who is going to be trying the case with me. Joe Fay, I believe you've met before. He's the general counsel with Maine Yankee. This is Mr. Jerry Garfield, the general counsel of Yankee Atomic and Connecticut Yankee. And Pete Skalaban

THE COURT: And for the defendant.

MR. LESTER: Your Honor, Harold Lester from the Department of Justice for the defendant. And with me is John Ekman, Marian Sullivan, Alan Miller, Heide Herrmann and Kevin Crawford

THE COURT· Okay.

MR. LESTER: Oh, and Russ Shultis, I'm sorry. I didn't mean to forget him. I just looked around the table. He was hiding from me.

THE COURT: I think it – depending on what

Page 261

Mr Stouck

MR STOUCK Yes, Your Honor We would like to call our first witness I know it's late. But he's been here waiting since this morning. And I think if we can get his credentials in tonight, we can probably get a couple hours – I think the total direct for Mr. Mills is maybe 3 hours If we can get an hour in tonight and a couple hours in the morning. My goal is to get him back He's got a lovely home on the water in Kent Island, and I'm sure he wants to get back there tomorrow night.

THE COURT: Would the reporter like a short break

THE COURT REPORTER. That would be appreciated

THE COURT Why don't we take a break until 20 after.

MR LESTER We're going to be in trial for 7 weeks I hope we're not going to be going until 7 o'clock every night.

THE COURT Well, I had thought we were heading towards 6 00.

MR. STOUCK· It's really to accommodate the witness, Your Honor

THE COURT· Yes.

Page 262

MR LESTER I mean, I guess my understanding is that Mr. Mills is going to be returning tomorrow morning anyway –

THE COURT Right.

MR. LESTER· – regardless of what we do now.

MR STOUCK· And I would like to get him out tomorrow night, so we would like to start tonight. Thanks

THE COURT I think Mr Stouck just wants to get him on the stand to get the formalities going.

MR LESTER We would request, Your Honor, that we do break at 6 o'clock instead of, you know, 6.30, 7 o'clock. I understand how these things tend to go on sometimes.

THE COURT Okay We'll return at 20 after and go to it.

MR. LESTER: Thank you, Your Honor.

MR. STOUCK Thank you.

(Whereupon, a recess was taken at 5.13 p.m., and the proceedings reconvened at 5:23 p m.)

MR. STOUCK: I would like to call Mr. Loring Mills, Your Honor, who is in the courtroom with us.

PRESIDING JUDGE: Yes. Mr. Mills.

Page 263

Whereupon,

LORING MILLS

was called as a witness, and, having first been duly sworn, was examined and testified as follows

PRESIDING JUDGE· Please have a seat

MR. STOUCK: Your Honor, we have copies of the exhibits that we'll be using with Mr. Mills. Two copies for the government – I'm sorry. One for the government and one for you and your clerk if that's okay

And if there is some other arrangement that we ought to be making for future witnesses, I will be happy to do that But I thought this would be suitable.

And before the break, I mentioned getting through Mr. Mills' credentials I really meant background He's a fact witness He's got credentials, but that's not the only reason he's here

PRESIDING JUDGE: He's from Kent Island. He must be a sailor, too.

THE WITNESS· Yes

DIRECT EXAMINATION

BY MR STOUCK·

Q Good afternoon, Mr Mills. Thank you for joining us Would you please state your name for the record.

Page 264

A Loring Mills.

Q And can you briefly describe for the Court your educational background

A Yes I received a – was awarded a Bachelor of Science Degree in civil engineering from the union – from Union College in Schenectady, New York in 1950. And I was later awarded a Master of Business Administration from the University of Washington in 1962 where I did that studies while I was working at the Hanford Laboratory.

Q Okay. And when did you become – first become involved with the nuclear industry?

A My first involvement was in 1958 when I was asked by the General Electric Company to transfer from the electronics laboratory in Syracuse, New York to the Hanford Laboratories in Richland, Washington.

Q All right. And what was the focus of your work at General Electric?

A Well, at Hanford, the focus was on the plutonium recycle program in which my assignment was that of identifying the technology, getting the equipment, and actually fabricating the fuel assemblies from the plutonium recycle test reactor.

Q Okay. And for how long were you with

Page 265

General Electric?
A I was with General Electric for 14 years.
Q And how long did you stay at Hanford?
A I was at Hanford for 5 years, from 1958 through 1963
Q And working on the project that you just described?
A Yes, working on the plutonium recycle program, yes
Q And what did you do in 1963 for General Electric?
A General Electric transferred me to the general purpose control department in Bloomington, Illinois
Q Okay And you left General Electric in 1967?
A In 1967 I left General Electric and went to work for Kerr-McGee Corporation in Oklahoma City
Q And what did you do there?
A I was the project manager for designing and operating a facility to produce components of nuclear fuel
Q Okay. The name of the facility?
A The name of the facility was a Cimarron facility, the uranium dock side portion.

Page 266

Q Okay. And can you very briefly describe the fuel manufacturing process.
A The function that we were performing there is receiving uranium hexafluoride from the federal government enrichment program and converting it to uranium dioxide and making the individual uranium dioxide pellets that were then fabricated by Babcock & Wilcox in combustion engineering into fuel assemblies.
Q And how long were you with Kerr-McGee?
A I was with Kerr-McGee from 1967 to 1971.
Q Okay And then what did you do?
A I was invited to join the Nuclear Fuel Services in Rockville, Maryland to perform similar work; and that is to design and identify getting into the nuclear fuel fabrication business.
Q Okay. And what was Nuclear Fuel Services in other businesses? And generally describe the business of that company.
A They had two manufacturing facilities One in Irwin, Tennessee, which was producing weapon – not weapons, but producing nuclear fuel for nuclear submarines. And they also were operating the reprocessing plant in West Valley, New York.
Q All right. And what projects did you work on when you were at Nuclear Fuel Services?

Page 267

A The desire of Nuclear Fuel Services at that time was to continue to perform other functions beyond those that I just described that they were doing They wanted to get into the fuel fabrication business. So we were designing and planning on building a fuel fabrication facility.
Q Okay And your specific duties in that regard?
A I was a project designer and project manager for that particular activity. And that was one of the activities of many that I did perform while with Nuclear Fuel Services.
Q Okay And how long were you with Nuclear Fuel Services?
A From 1971 to 1976.
Q Okay. And did you have involvement at Nuclear Fuel Services with the reprocessing business?
A My involvement with the reprocessing had to do with serving as the quality assurance manager for that particular facility for a period of time, yes.
Q Okay. That facility being?
A The reprocessing plant.
Q At West Valley?
A At West Valley
Q All right. And then you left Nuclear Fuel Services in 1976?

Page 268

A That is correct.
Q And what did you do then?
A I was invited to join the Edison Electric Institute in Washington, D.C.
Q Okay. And how did – what was the Edison Electric Institute?
A Edison Electric Institute is the – a trade association for investor-owned electric utility companies.
Q Okay. And how is it that you came to be invited, as you said, to go to the Edison Electric Institute?
A Edison Electric Institute was performing functions related to the financial activities of utilities, public relations. But they had very limited activity on the nuclear side of the business. And the electric utilities were relying on the Atomic Industrial Forum for their representation on their nuclear issues. There became some disenchantment with those activities, and the utility industry very much wanted to build their own capability of addressing some for the issues. And, predominantly, at that moment, it was the fuel cycle issues.

Page 269

Q That moment being 1976?
A 1976.
Q And what were the fuel cycle issues?
A The fuel cycle issues related to the uranium enrichment program, the fact that the cost of uranium had jumped in value to a great extent. And there was concern about what they were going to do with the spent fuel that was being generated at the nuclear plants
Q And what was – what was EEI's role after you arrived with respect to representing the nuclear utility members?
A My personal function was to listen to the utilities, to identify their particular interest and relate that interest – relay that interest to various areas within the federal government, including the Department of Energy At that time, it was ERDA. It was not yet the Department of Energy. And to the Nuclear Regulatory Commission. And to share this information where appropriate staff members in Congress
Q Okay. And what – can you just give us a progression of the titles or the positions that you held at EEI
A Yes Over the time I was with EEI, I

Page 270

started out as the manager of the fuel – nuclear fuels I then became director of nuclear fuels, then director of nuclear activities, and then vice president of nuclear activities.
Q All right And just briefly, we'll get into this further later, but what was your involvement with the Nuclear Waste Policy Act?
A I was very much involved in discussions with the Department of Energy and with – in discussions with staff members in both the Senate and the House during the development of that legislation
Q All right. Again, briefly, because we will be getting further into it later, perhaps tomorrow morning, what was your involvement briefly in developing the DOE spent fuel contracts?
A Well, the spent fuel contracts were one of the requirements of the Nuclear Waste Policy Act. And I was instrumental in arranging for the utilities to come together to evaluate the regulation that was being proposed as a regulation and to provide – draft the comments and submit those comments to the Department of Energy in response to their proposed contract
Q All right And how long did you work for EEI?

Page 271

A I worked for EEI from 1976 until 1993
Q And what have you done since then?
A I have done a little of consulting work on nuclear activities since then, but not a great deal of work in that regard I do enjoy my activity of teaching computer classes at Chesapeake College
Q Okay And a little sailing; is that right? A little sailing?
A Yes. I do enjoy my 16-foot Hobie Cat
Q All right. Now, in the – let's turn to events leading up to the Nuclear Waste Policy Act. In the years, really, from the beginning of commercial and nuclear power in this country, say, in the late '50s, mid to late '50s, up until the early '70s, what would nuclear utilities typically due with their spent nuclear fuel
A It was planned right from the start in the '50s –
MR MILLER: Objection, Your Honor. Foundation
PRESIDING JUDGE: Ask why he would know
MR. STOUCK. I thought he already testified to that.
BY MR. STOUCK:
Q Why would you know the answer to the

Page 272

question.
A Because I started working in the nuclear industry in 1958. And the activity that I was involved in related to the commercial nuclear fuel cycle.
Q Okay And were you specifically involved with the answer to the last question, the planned reprocessing?
A I was aware of the preprocessing activity and the plan for the utilities and the plan of the federal government. It was not just the utilities. It was supported by the federal government, the Atomic Energy Commission at that time, that the spent fuel from nuclear power plants would be reprocessed at reprocessing plants to recycle the energy values that were still in the spent fuel once they became spent fuel.
Q Right. And you may have just answered what was going to be my next question. Let me ask it and see if there is more you want to add. What is reprocessing?
A Reprocessing is the step in the nuclear fuel cycle which the spent fuel, which is no longer useful for producing energy in the nuclear power plants, is then dissolved, and the nuclear waste products, the

Page 273

high radioactive fission products are separated from the uranium and plutonium, which are useful from an energy standpoint The nuclear waste products, radioactive waste products are set aside. The plan was that the uranium and the plutonium would be recycled into new fuel and reinserted into nuclear power plants

Q Okay. And is that what you refer to as the fuel cycle?

A That was a step in the fuel cycle, yes.

Q Okay. And what other – describe this fuel cycle you've mentioned a couple of times. I just figured we'd get it out.

A It starts with uranium being procured, uranium being enriched, uranium them being fabricated into fuel assembles. The fuel assemblies being placed in a nuclear power plant The fuel assemblies coming from the nuclear power plant going to the reprocessing plant where the energy values of uranium and plutonium are recovered and fabricated again into nuclear fuel assemblies and put back into the nuclear power plant That was the cycle

Q Were there companies in the United States that were reprocessing spent nuclear fuels in the 1970s or that had plans to?

Page 274

A There was one organization, Nuclear Fuel Services Corporation, which did reprocess spent fuel from 1966 to 1972 at West Valley, New York. The General Electric Company had constructed a plant in Morris, Illinois to do the reprocessing; however, it did not get put into service. Another company was – had designed and were constructing the larger nuclear – not larger plant, reprocessing plant at Barnwell, the Barnwell plant in South Carolina.

Q All right

A So there were three very active plans for reprocessing.

Q Okay. And what happened to these three companies' reprocessing plans or programs?

A Well, the West Valley program was a demonstration facility that operated from 1966 to '72. Its capacity was too small to be economically viable. So they shut the plant down in 1972 with the full intention of modifying it. And the engineering was completed to modify that plant to increase its capacity to what was considered to be a commercial activity. However, it – it did not continue through on that particular program because of various

Page 275

difficulties of achieving the licensing under the Nuclear Regulatory Commission. As for the General Electric plant, which was constructed, and they – they operated it without using spent fuel, they operated it with nonradioactive materials, and had considerable technical difficulties with the plant, and decided it was not economical to proceed there. That was in the early to mid '70s. The Barnwell plant proceeded to want to go forward And it was expected to go forward until, in 1977, President Carter at the time stated in April of 1977 that reprocessing of civilian nuclear fuel would be indefinitely deferred

Q All right

A That put a crimp in their program, and they were unable to really go forward at that time.

Q And following that government pronouncement, how did the nuclear utility industry react to that indefinite deferment?

A Well, it was a concern at that point because we now could not see how to close that fuel cycle. And we also did not know what was going to happen to the spent nuclear fuel.

Q Do you know whether – well, strike that Well, without reprocessing, what were the

Page 276

nuclear utilities supposed to do with the spent nuclear fuel they were generating?

A Well, it had – from the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program.

MR. MILLER: Objection, Your Honor. Foundation as to the witness' knowledge concerning what was always understood.

BY MR. STOUCK:

Q How do you know that, Mr. Mills?

PRESIDING JUDGE: You better explore understood by whom.

MR STOUCK: Okay. Let's start with that.

BY MR. STOUCK:

Q Understood by whom?

A This was understood by me. And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that. That was not necessarily true for spent

Page 277

fuel. We didn't know whether that would be applicable to the spent fuel itself at that time. We knew it did for high-level waste But within the spent fuel – and it was anticipated that the high-level waste was not separated. But since it was not separated, then it raised the question what is to be done with the spent fuel.

MR. MILLER Your Honor, the same objection. I don't believe that answer establishes the witness' foundation to opine about this subject matter. And – and we would object to relevance about the whole line of reprocessing and what to do in lieu of reprocessing

PRESIDING JUDGE I'll overrule the objection I think the witness has been qualified as knowledgeable about the industry at the time and through his activities and can express his view of the matter in that regard So you may continue, Mr. Stouck.

MR MILLER: I'm sorry, Your Honor. The scope of Rule 701, as I understand it, which was amended substantially in 2000, is that, if Mr. Mills is going to give his opinion about – about what the industry believed needed to be done or, you know, thought they were going to do with spent fuel, it

Page 278

seems to me that it – it has to be within the limits of Rule 701; that is, he has to talk about facts, facts which were the subject of his first-hand knowledge or observation and matters that require no specialized knowledge

And there's still been no foundation He's not testifying about facts He's talking about what the industry's opinion was about what it was going to do with its spent nuclear fuel

MR STOUCK: That's not true, Your Honor. He is testifying about facts. He was there. He was the principal Washington representative of the largest trade association in this area. He had an understanding. His members had an understanding. And he's testifying about it.

PRESIDING JUDGE: I agree I'll overrule the objection It goes to weight. You may continue, Mr. Stouck.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q Well, what was to happen with the spent nuclear fuel, Mr Mills after President Carter essentially said –

A At the time that President Carter made his announcement in April of '77 that reprocessing of

Page 279

commercial fuel was indefinitely deferred, there was also a proposal by the administration to establish away-from-reactor storage facilities for spent fuel That was proposed by the administration.

There was also at that point a program initiated within, let's see, it's still ERDA for the next few months. The program was initiated for an environmental impact statement to address that particular question, what should be done with the spent fuel and the high-level nuclear waste.

Q Okay. And did you have any involvement with this environmental impact statement?

A Yes. I was following it very closely, visiting with personnel in the Department of Energy. I – I attended all of the public meetings in the development of that environmental impact statement.

Q And –

A And followed it very closely.

Q Okay. And what – do you recall when it was finalized or issued?

A It was finalized, I believe, in 1978 or '79. I am not sure just what the date was when that was completed.

Q And what was the result of that EIS?

A That EIS had evaluated nine different

Page 280

options of how to dispose of spent fuel and high-level waste

Q Okay.

A And the recommendation that came down through that environment impact statement was that it should go in deep underground geologic repositories.

Q Do you recall other options that were considered in that EIS?

A Yes There were a number of options. Deep seabed disposal. Even one of the options was considered shooting it off into space. Deep well disposal. There were other options there. I cannot relate all nine of them at this point.

Q Okay. Can you summarize at all the basis for the recommendation of geologic disposal?

A The purpose here was to isolate these wastes – nuclear radioactive waste for an extended period of time and the – and to do it in a controlled manner.

And the apparent – the apparent ability to do that or the ability, as we saw it or they saw it at that time to do it, was in stable geologic formations and to do so in deep underground stable geologic formations.

Q Apart from the N3 processing, was there

Page 281

another development or other developments during this period that focused attention on the problems that nuclear facilities were having with spent nuclear fuel?

A Well, there were other problems at that particular time. The one that became most vivid was the Three Mile Island accident which occurred in March of 1979 which made nuclear energy a very vivid concern in many quarters.

Q All right. Now, during the – this period preceding the Nuclear Waste Policy Act, did you visit with ERDA, the Department of Energy officials about these fuel cycle matters, spent fuel disposition matters?

A Yes During – excuse me During the time that the – excuse me again. During the time that the environmental impact statement was being developed, Department of Energy also had a program going forward looking at the various choices, and there were staff people working on that particular issue in addition to working on the environmental impact statement. And, yes, I had many conversations with these individuals during that period of time

Q This is at the Department of Energy?

A That is correct

Page 282

Q Okay And what was the focus of that effort, that staff effort?

A To identify where there were geologic – actually, geologic deposits, salt, rock, duff, where were these locations that might serve as a disposal area for spent fuel

Q Okay. And was – what happened next in terms of the development of what became a Nuclear Waste Policy Act? We have the EIS. We have the staff effort going on at DOE. What –

A Well, at the end of the preparation of the EIS, the Department of Energy felt that they had authority to proceed

MR. MILLER: Objection, Your Honor. Foundation as to, you know, what the Department of Energy felt they had the foundation for. He can't speak for DOE here, Your Honor.

MR. STOUCK: He can speak to what DOE officials told him. So why don't you tell us that.

MR. MILLER: That's hearsay, Your Honor.

PRESIDING JUDGE: He can express his view of what the policy was at that time.

THE WITNESS. Through conversations, my own personal conversations with employees of the Department of Energy –

Page 283

MR. MILLER. Same objection, Your Honor, as to hearsay matters.

MR. STOUCK: The testimony is his understanding, I think.

PRESIDING JUDGE: That's right. You're asking for his understanding –

MR. STOUCK: Yes.

PRESIDING JUDGE – of what the –

MR. STOUCK: I thought – if I didn't ask that, that's what I meant to get at.

BY MR. STOUCK:

Q So what was your understanding of what happened next after the EIS and the staff –

A My understanding was that, once the decision was made to go with geologic repositories, a mechanism needed to be put in place that would make sure that that was the national policy. And this was – I participated in discussions on this with the industry, utility individuals and others in the government. And the consensus came down that we really should try to seek legislation to codify this particular requirement

Q Okay. And how did that legislation develop?

A Over a – it really developed over a period of about 4 years, starting at the completion of the

Page 284

EIS. And it was – here I can say because I was participating at the time of the Department of Energy was suggesting to the Congress and we, as the utilities, were also suggesting to the Congress and to various committees and were testifying to the fact that we believed it appropriate to have a nuclear waste policy established. This was developed in the period of 1979 and 1980. And, in fact, the question was related to the disposal of all radioactive waste from commercial facilities. High-level waste, low-level waste. There were to be no orphan wastes. And that legislation that was drafted during 1980 was brought and actually a portion of it was passed by Congress in December of 1980.

MR. MILLER. Objection, Your Honor. Relevance.

PRESIDING JUDGE: I'll overrule the objection. You may continue.

MR. STOUCK: Thank you.

THE WITNESS: The – the Nuclear Waste Policy Act, as drafted in 1980, did not make it all the way through Congress. What happened at the last – near the end of

Page 285

the session in 1980, there were objections to including the disposal of high-level waste in that particular legislation So that the legislation that was passed in 1980 was the low-level waste Policy Act. That did not complete the story that we were attempting to do, and that is to have we, the utilities, and the industry –

MR MILLER. Once again, Your Honor, we'd object to the witness' foundation. He's not competent to testify about the statute. The statute is what it is And his interpretation of the statute is not competent to interpret the law or the NWPA in 1980 or this – this witness also is not competent to talk about the legislative history of any statutes regardless of whether he opines that they became the basis for the NWPA or not

MR STOUCK He was involved in the industry at that time, Your Honor It seems to me I can't think of what could be more relevant to the development of a contract than the need for it, the purpose of it, the origins of it. That's why we're here.

PRESIDING JUDGE· I don't think this is going to lead to any big problem that requires all these objections This is almost a direct quote from

Page 286

the 4th Circuit opinion and the early-on case dealing with the history of all of this development. I'm recognizing the whole steps as he goes through So this has been found by Courts before. And I just overrule the objection. You may go forward

MR MILLER: Your Honor, we'd enter a standing objection then to the witness' testimony in this regard

BY MR. STOUCK:

Q Let me try to pick up the thread, Mr Mills. You mentioned objections to high-level waste Were those from utilities? Were those objections from utilities?

A No Those were from – from other than the utilities. Again, this is what I was told

MR MILLER: Objection. Hearsay, Your Honor.

BY MR. STOUCK·

Q Any other – any other way you know that the defense – where were the objections coming from? I just want to go back – and we'll deal with the objection if we can't establish the nonhearsay basis for it. I think you said –

A It was the defense side of the Department of

Page 287

Energy that objected to the high-level waste elements that were in that legislation.

Q You said that's what you were told. Is there any other way, conversations that you had that understanding?

A It was well known at that time. But I don't know what the other particular inputs would have been in that regard

Q Okay. But in any event, the utility industry at that time was not objecting to dealing with high-level waste in the '80s statute?

A No. We were disappointed that it was not included in that particular legislation And we continued to urge through testimonies that – I prepared many of the testimonies for utility officers, utility company office members to encourage Congress and several committees to continue to work on the legislation to address all of the nuclear waste issues that related to the civilian nuclear reactor program.

Q Did you have – during the course – well, what happened next? How did you get from that statute to what was eventually enacted?

A Through continual emphasis by various officers of electric utility companies with their members of Congress. We pushed for and carried the

Page 288

message to Congress that this was needed. And eventually, we – they did – Congress did pass the Nuclear Waste Policy Act in December of 1982.

Q Now, did you, yourself, have any involvement in the development of the so-called 1-mill fee that was established by the statute.

A Yes. I was very interested in establishing that particular number

Q Okay. Tell us about that.

A In the conversations with the Department of Energy and with other members of the nuclear industry, it was understood that the cost, the probable cost – and this was a guesstimate at this time because it was a long-term program – could not be estimated over an easy great detail, that that particular cost was considered to be less than 1 mill per kilowatt hour. There were others that were advising Congress at the time – I was well aware of it – that were saying, no, this is not enough. It's just another subsidy by the federal government for the nuclear industry

I personally had been responsible for arranging a study that would address the question of what the nuclear utilities would have to do and what it would cost if they were to store this spent fuel

Page 289

for 100 years. I was well aware of what that estimate would be. That estimate was close to the 1 mill per kilowatt hour. Thus, I suggested and I encouraged our members to support the concept that it be included as 1 mill per kilowatt hour in the legislation.

Q And did that gain acceptance in the industry?

A Yes, it did

Q Okay. Do you know why?

A There was considerable concern about what was to be done with the spent fuel and how it was to be paid for

At that point, it appeared to the industry to be an unfunded liability And they did not have an opportunity to include this unfunded liability in their rate considerations.

This appeared to provide a mechanism to address that unfunded liability. And it was encouraged to achieve that – that was one of the reasons it was encouraging to include that in that legislation.

Q Was there any concern the amount was too high?

A There were some people that thought the amount was too high, yes. There were – there were a

Page 290

number of the utility folks who thought that number was higher than it should be.

But it appeared to be a reasonable number and an understandable number And we wanted no excuse for the program to be delayed as a result of funds not being available.

MR STOUCK All right. I would just like to take a 1-minute break or 30-second break if I may, Your Honor.

PRESIDING JUDGE Sure.

MR STOUCK. I want to turn to the first exhibit, Your Honor, and I notice I do not have a book for the witness, so if I may approach.

PRESIDING JUDGE: Sure.

BY MR. STOUCK·

Q Mr Mills, if you would turn to tab 1 of this book, I think you will find a copy of the Nuclear Waste Policy Act. Do you see that?

A Yes, I do.

Q Okay Would you please, on this version of the statute, turn to page 51, which is – actually it's kind of in the middle of section 302.

A Yes.

Q And the subsection I'm interested in is 302(a)(5)(B). It's about halfway down 51. (5)(B).

Page 291

There is the provision which provides that the contracts entered under this section shall provide that, in return for the payment of fees – and I'm paraphrasing – beginning not later than January 31, 1998, the Secretary will dispose of high-level radioactive waste and spent nuclear fuel. Do you see that?

A Yes, I do.

Q Okay. How does this date become a part of the statute?

MR. MILLER: Your Honor, once again, I'm not able to understand, one, the relevance of this And we would have to enter our continuing objection to the witness testifying about the meaning of the statute. The meaning of the statute is a parlance for the Court. It's a legal question And how it – besides the fact that it's irrelevant as to how January 31st, 1998 became a part of the statute.

MR. STOUCK: Your Honor, there's only one party in the courtroom that's been putting forth a theory of what a reasonable schedule – pickup schedule would be, and that's us.

And this will lead, along with lots of other evidence that you're going to hear, to what a reasonable schedule would be.

Page 292

PRESIDING JUDGE: If the witness has personal knowledge as to the origin of the date that he could testify to, I will listen to the testimony. If he has personal knowledge.

THE WITNESS: I do have personal knowledge for establishing that particular date. Through my own participation with the electric utilities and with the staff in Congress that were drafting this particular legislation.

MR. MILLER: Your Honor, I just ask once again if you'll allow us to maintain a standing objection.

PRESIDING JUDGE: Of course. Of course.

MR. MILLER: Thank you, Your Honor.

PRESIDING JUDGE: Sure.

BY MR. STOUCK:

Q Okay. And how did this date become part of the statute?

A The anticipated time by my – by the utility industry to achieve this particular task was 10 years based on the experience that we had at that time.

Q Excuse me for interrupting The task being?

A To achieve the location and operation – the start operation of a nuclear waste repository.

There were other bodies that objected to

Page 293

that time and thought it would take a lot longer And this particular date was established as a compromise between the 10 years – remember this was 1982 – the 10 years being 1992 versus a longer time that was well beyond that. And the date of 1998 became an understood reasonable time frame for this to be achieved

Q Who was advocating for the longer date?

A The anti-nuclear organizations.

Q And did the Department of Energy have a view about the length of time that would be needed to build a repository?

A Based on my interaction, my personal interaction –

MR MILLER: Objection Foundation, Your Honor.

PRESIDING JUDGE: If you have knowledge.

THE WITNESS: My personal exchange of information with individuals who are working on this program in the Department of Energy. They believed that it could have been done within 10 years That was their position at that time as they stated to me.

PRESIDING JUDGE Do you remember any particular individuals you dealt with

THE WITNESS: There was a Frank Kaufman at

Page 294

that point, a Wade Ballard. I believe Mike Lawrence also indicated it at that time. This was as the Nuclear Waste Policy Act was being developed.

BY MR STOUCK

Q Did Congress have a view about the date, Mr Mills?

A Well, Congress –

MR. MILLER: Same objection, Your Honor. Foundation as to Congress' knowledge or view about the date.

MR. STOUCK: I'll withdraw that.

PRESIDING JUDGE: That's getting afar –

MR. STOUCK: I'll withdraw that one.

PRESIDING JUDGE: There are a number of congressmen involved.

MR. STOUCK: It's been a long day.

MR. LESTER: Your Honor, if I can interrupt, do we have a time we were going to break? We were going to break at 6:00. We're already after 6.00.

PRESIDING JUDGE: All right.

MR. STOUCK: Let me –

PRESIDING JUDGE Pick an appropriate period of time you want to take a break on this, and we'll adjourn.

MR. STOUCK: I am getting a little tired

Page 295

myself. It's been a long day. Let me look for a good place to break.

THE COURT: We're sort of running a sauna today. I talked to the maintenance people one, two, three times now, but I'll try again

MR STOUCK: Let me – I think I see a place coming up that would be a good place to break.

PRESIDING JUDGE. Okay

MR. STOUCK: A few more minutes, Your Honor

BY MR. STOUCK.

Q Mr. Mills, the '98 date was established by the statute, right?

A That is correct.

Q Okay. Now, at that time, when this statute was enacted, was there an understanding in the utility industry about the amount of on-site storage capacity that utilities would need between the time of the passage of the act and the '98 date?

A Yes. That was directly discussed within the utilities and myself that – and it was accepted as an understanding at that time that the utilities would be responsible for storage on site of all spent fuel. And they had to provide the capacity for storing that on site for all spent fuel up until that date of January 31, 1998

Page 296

Q Okay. And then what would happen?

A It was understood by the utilities at that time that they would not have any responsibility for costs, additional costs for additional facilities for storage of spent fuel beyond that date

Q Did the Department of Energy share that understanding about the date?

MR. MILLER Same objection, Your Honor. Foundation.

PRESIDING JUDGE: Well, if you bring out any particular individuals that you dealt with at Energy.

THE WITNESS: Yes. Frank Kaufman. I'm not sure who the Assistant Secretary of Energy was at that particular time. But I personally spoke to these individuals. And these were – that was identified as the understanding for why the utilities would be willing to pay the money up front, to make sure that the program was in place so that the costs after 1998 were taken care of.

BY MR. STOUCK:

Q You had discussions about the '98 date issue?

A Very definitely

Q Did you have discussions on Capitol Hill about that issue?

Page 297

A Yes, we did. I did.
Q Do you recall any specificity about those, the Capitol Hill discussions about the '98 date?
A Well, there were several committees on Capitol Hill. Both the environment and energy committees on the Senate side and the House side. And there were conversations going on on a regular basis with these staffs on many issues of the Nuclear Waste Policy Act. And that was one that was discussed. And I personally discussed it with several staff members.
Q Okay Now, did the Nuclear Waste Policy Act set forth a schedule of deadlines for repository development? Do you recall?
A Yes, it did
Q Okay
MR. MILLER. Objection. Legal conclusion, Your Honor.
MR. STOUCK It's a foundational question, actually We're about to look at it, Your Honor
PRESIDING JUDGE I overrule it. He just talked about what the – what was in the statute itself
MR STOUCK. Right
BY MR. STOUCK:
Q Now, take a look at page 9 of the same copy

Page 298

of the statute, if you will, Mr Mills.
PRESIDING JUDGE: Page 9?
MR. STOUCK Yes. Section 112.
THE WITNESS: Yes.
BY MR. STOUCK:
Q Do you see under 112(a), guidelines. Do you see that –
A Yes.
Q – at the top of the page.
A Yes.
Q And, again, I'll paraphrase because it's here in the document. But not later than 180 days after the date of enactment of this Act, following consultation with people and so forth, the Commission shall issue general guidelines for the recommendation of sites for repositories. Do you see that?
A Yes
Q Okay. And then under (b), just these are examples, I'm just – to set up a question I want to ask you about these. Subsequent to such nominations, the Secretary shall recommend to the President three of the nominated sites not later than January 1, 1995 for characterization as candidate sites.
A Yes, I see that.
Q And (c), again another example, not later –

Page 299

one of these deadlines. Not later than July 1, 1989, the Secretary shall nominate five sites and recommend – and make recommendations for the development of those sites and so forth.
A Yes. I see that
Q Okay. Now, with respect to those statutory deadlines, what was the purpose of those? What was your understanding about the purpose of those deadlines?
A I had conversations on these particular aspects of the legislation And the purpose of those particular dates was to verify that the program would go forward on a robust basis to achieve what was being called for in the legislation.
MR STOUCK: If it's okay with the Court, why don't we stop here.
PRESIDING JUDGE: Okay. We'll adjourn at this point and reconvene at 10.00 a.m. tomorrow morning.
MR. STOUCK. Thank you, Your Honor.
(Whereupon, at 6:10 p.m., the hearing was adjourned, to be reconvened at 10 a.m. on Tuesday, July 13, 2004.)

Page 300

C O N T E N T S

WITNESS DIRECT CROSS REDIRECT RECROSS
LORING MILLS 263

AFTERNOON SESSION: 165

E X H I B I T S

EXHIBIT NO. MARKED RECEIVED
PX-17 54
PX-23 59
PX-88 60
PX-124 61
PX-127 63
PX-633 72
PX-678 79
PX-683 79
PX-793 80
PX-856 82
PX-870 83
PX-873 89
PX-899 86
PX-951 88
PX-971 91
PX-1053 91
PX-1069 91

Page 301

EXHIBITS
EXHIBIT NO. MARKED RECEIVED
PX-1148 94
PX-1150 94
PX-1181 98
PX-1228 103
PX-1648 112
PX-1659 114
PX-1729 CY 130
PX-1741 131
PX-1745 136
PX-1751 MY 136
PX-1785 138
PX-1802 138
PX-1845 142
PX-1846 142
PX-1905 143
PX-1906 144
PX-1916 152
PX-1918 154
PX-1920 156
PX-1925 163

Page 302

CERTIFICATE OF REPORTER
DOCKET NO.. 98-126C
CASE TITLE: Yankee Atomic v. U.S
HEARING DATE: July 12, 2004
LOCATION· Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date July 12, 2004

Vicky J. Stallsworth, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019