**Yankee Atomic Electric v. U.S Nos.: 98-126, 98-154C, 98-474C July 13, 2004**

**Heritage Reporting Corporation**

**Page 303 to Page 573**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY, Plaintiffs,

V

THE UNITED STATES, Defendant

Case Nos. 98-126C, 98-154C, 98-474C

Courtroom Number 7

National Courts Building
717 Madison Place N W
Washington, D C

Tuesday July 13, 2004

VOLUME 2

The parties met, pursuant to the notice of the Judge at 10 02 a m

BEFORE THE HONORABLE JAMES F MEROW



APPEARANCES

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY

JERRY STOUCK, ESQ
ROBERT SHAPIRO ESQ
PETER J SKALABAN, JR. ESQ
Spriggs & Hollingsworth
1350 I Street, N W
Washington D C 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY

GERALD GARFIELD, ESQ
General Counsel
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY

JOSEPH D FAY, ESQ
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT

HAROLD LESTER, JR. ESQ
JOHN EKMAN, ESQ
MARIAN E. SULLIVAN ESQ
HEIDE L HERRMANN ESQ
R ALAN MILLER, ESQ
KEVIN B CRAWFORD, ESQ.
RUSSELL SHULTIS ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

THE COURT Mr. Stouck, whenever you're ready

MR STOUCK Yes Your Honor We've got a couple of preliminary matters if we can take up before we get back to Mr Mills

THE COURT. Sure

MR. STOUCK First, I meant to mention yesterday and didn't the video is on the Connecticut Yankee Web site under Yankee Atomic Oddly it's under Connecticut Yankee Web site under Yankee Atomic

I forget to mention yesterday we have a model here of the spent fuel transfer loading process we'll get to later in the trial So if anyone is wondering what that is it's scale model of the process

We have the four exhibits from yesterday that I would like to take up if the government is ready

THE COURT Okay

MR STOUCK And I don't see Mr. Ekman Mr Lester, is that something you want to do now or do you want to wait for John?

MR LESTER No, we can do it

MR STOUCK Okay

Page 327

dollars or a million-two I think as an offset. which is what loading this to DOE costs and we included as an offset in accordance with his original opinion. the cost that he says -- that he says the Yankees spent loading from the pool into the ISFSIs is a number like 21 million 25 million. and interestingly. in the third case. 6 5 million

And that's the cost that Mr Abbott says we should include as an offset for the pool to DOE Okay

Well we think -- as a result -- we thought it was settled We accepted his criticism the first time. Now he comes back with this different opinion The companies did take a close look at what -- rather than just accepting Abbott's word for it again they did take a close look at what they think the cost of loading from the pool to DOE would be how much labor how much material and so forth

And we question -- Mr. Abbott's deposition just ended a week or 10 days ago But I wanted -- we have and were prepared to hand it over but I want to provide this explanation an estimate of what we now think in light of this history of first accepting and then the change and then understanding the basis for his new opinion what our companies now think and will

Page 328

testify they believe the appropriate offset in a nonbreach world from pool to DOE loading should be

I want to explain that to the Court I have copies of it here I think what I would like to do is put a cover on it and fax it over to Mr Lester tonight I just want to explain that so that. at least our -- our explanation for what's going on is on the record

MR LESTER Well. actually if he's going to provide it to the Court now I would like a copy as well and we will look at it and respond to it if we deem appropriate

MR STOUCK· As I said. I'll put it a cover letter on it and fax it over at the end of the day

MR LESTER· We haven't heard of this before so this is new news to me

THE COURT Why don't you keep it between counsel now And if there's some problem that erupts as a result of this I ll deal with it

MR STOUCK Okay.

THE COURT But hopefully it can be arranged between counsel to be prepared for whatever is going to occur in this respect

MR. STOUCK. Thank you. Your Honor With that I would like to continue with Mr Mills

Page 329

THE COURT Fine Mr. Mills If you will resume the witness stand

MR. LESTER Your Honor just for the record with regard to Mr Stouck's description of Mr Abbott's report and testimony. I'm not prepared. sitting right here. to say whether that's accurate or not But I would ask the Court to allow us to explain Mr Abbott's testimony

THE COURT Of course

MR LESTER When he gets on the stand

THE COURT Of course testimony of -- counsel is not testimony

MS SULLIVAN Exactly

THE COURT· Unfortunately because there are a lot of lawsuits in which counsel could testify Unfortunately counsel probably know more about this case than most of the witnesses at this point So

Whereupon

LORING MILLS

having been previously duly sworn was examined and testified further as follows

DIRECT EXAMINATION (Continued)

BY MR STOUCK

Q Good morning Mr Mills

A Good morning

Page 330

Q Welcome back I wanted to start by briefly revisiting a couple of things that we've touched upon yesterday or that you testified about yesterday So let me start with that

You testified -- this is at the time you came to EEI in 1976. I believe you testified that there was some I think the word you used was disenchantment about the advice or input that EEI was getting from the Atomic Industrial Forum Do you recall that?

A Yes. I recall

Q And can you give us just a little explanation of what the issue there was?

A Prior to my joining Edison Electric Institute in 1976. the organization that was addressing all of the nuclear issues was the Atomic Industrial Forum. This was a membership organization of which the contractors were members of that organization The nuclear system suppliers. General Electric. Westinghouse and so forth. were members of that organization The mining companies were members of that organization. And the electric utilities with nuclear programs were members of that organization

Well. there became conflicts between the electric utilities and the suppliers over supply

Page 331

arrangements And thus the utility industry became concerned whether they were properly being represented in that particular forum particularly on the nuclear fuel issues
And that was when they asked me to join and to represent the utilities' interest on the nuclear programs as distinct from those of all the contractors and suppliers
Q Okay And what were the nuclear issues that you were asked to help EEI with at that time?
A One of them was what are we going to do with the disposal of nuclear -- spent nuclear fuel
Another was the question with regard to uranium enrichment contracts How were we going to get a reasonable balance on supply and demand
The third one was the supply of uranium, how we get a reliable supply of uranium since the price of uranium had jumped in that very short period from $8 a pound to $40 a pound And it was a major concern of the utilities at that point
Q And when you joined EEI to perform this role that you just described or after you joined EEI to perform this role how would you characterize your position in terms of representation of the industry?
A I was the point person in Washington D C

Page 332

for the investor-owned electric utilities that had nuclear power programs on these issues
And with regard to being the point position that meant that I interfaced with the Nuclear Regulatory Commission At that time it was ERDA the Energy Research and Development Administration and with the staff members in Congress
Q Okay And what kind of access did you have at the Department of Energy?
A Well --
Q Or in ERDA I guess it was at that time
A I had a -- a security clearance which had been granted in 1959 when I was working for the Hanford Laboratories That security clearance was a government security clearance It had been renewed when I was working for Kerr McGee Corporation It had been renewed again when I was working with the Nuclear Fuels Corporation, and it was renewed again when I was with the Edison Electric Institute
Now the security requirements within the ERDA and subsequently DOE changed over time but there were many times that this security clearance allowed me access unescorted access within the offices
Q Now, within EEI or I guess, related to EEI were there other organizations or was there another

Page 333

organization that focused exclusively on the interest of nuclear utilities -- the nuclear interests in particular as opposed to the interest of the electric power industry in general?
A No the Edison Electric Institute in which I was performing the function was the organization representing the electric utilities with nuclear programs
Q Okay Now do you recognize the acronym UNWMG?
A Yes I do
Q Okay What is that?
A Utility Nuclear Waste Group UNWMG Nuclear Waste Management Group I believe the word became It became such an acronym it was hard for me to remember what the full name was
Q Okay And what was that?
A At the time that the nuclear waste issue became a significant one. which was after the -- after President Carter had indicated indefinite deferral of all commercial nuclear waste reprocessing it -- the cost of dealing with that particular issue was an increased cost within Edison Electric Institute that its board of directors had a little difficulty with Because 176 members approximately is the number of

Page 334

members of Edison Electric Institute. only about 40 or less than 40 actually had nuclear power programs
And there was some concern whether they should use on the normal Edison Electric Institute dues to cover this particular issue which was increasing in cost
So that it was recommended at that time that a separate function a separately funded activity, be established in which it was funded by those companies that had nuclear programs And thus we established this separately funded group called -- it had different terms at different times, but the final name that you'll see quite office is the UNWMG
Q And what was your role with respect to that?
A I was responsible for that particular activity That separately funded activity is one of my functions at Edison Electric Institute
Q And during this period leading up to the Nuclear Waste Policy Act in of 1982 early '83 was there -- strike that Let me move on to something else
We talked yesterday about the 1 mill fee and the document of the so-called 1 mill fee under the statute in the contracts Do you recall that?
A Yes, I do

Page 335

Q Do you recall any specific discussions that you had about that issue with ERDA or elsewhere in Washington?
A Well, the most vivid discussion that I recall having was a meeting that I had with Jim Esselstein who was a staff person of the Senate committee, one of the Senate committees. And another person his first name was Paul I cannot recall his second name
But I was asked by the utility industry to go forward to those staff people on the Hill and talk to them about the fee, the 1 mill per kilowatt-hour fee And it was at that particular meeting that we did discuss it and we supported I personally carried that message to the staff on the Hill, that that was a supportable number that the utility industry would consider acceptable
Q All right Now apart from the environmental impact statement that you also testified about yesterday, were there other -- did you participate in other studies or investigations or activities -- investigatory activities, you know, in the years leading up to the Nuclear Waste Policy Act that were addressed to how this problem ought to be dealt with?

Page 336

A Yes As -- as the sequence of events occurred when President Reagan took office in January of 1981 and shortly thereafter, he rescinded the position that had been established by President Carter that reprocessing would be indefinitely deferred
And he said it was now permissible, but it was going to have to be done on a commercial basis And the question was how -- how -- the question for us as the owners of the spent fuel was, how could that be accomplished?
The -- the organizations that had tried to do reprocessing during the '70s had no longer any interest commercially in getting involved with it since they had been badly burned But we knew that there was reprocessing going on in Europe at the time
So that I put together a group of utility individuals, Sol Burstein from -- it was Sol Burstein from Wisconsin Electric and Power Bob Tomonto from Florida Power and Light And it included Ralph Bostian from Duke Energy Duke Power at that time. It included another gentlemen from Southern California Edison who I have trouble with recalling the name at this point, and several others
And we made a specific effort to evaluate what others were doing in the world on handling their

Page 337

spent fuel and the question of reprocessing
And I arranged for a 2-week information investigatory visit in which we went to Sweden Germany France and England to evaluate what was going on in those countries And we actually visited several of the sites in those countries including the LaHague Reprocessing Plant in France
And that particular activity was performed with the idea of trying to help us come to a conclusion of what are we really going to do and how can we accomplish this resolution of either reprocessing or disposal of the spent fuel?
After that particular -- as a result of that particular session we came back and talked to the utility industry through our committee activities And it further enforced our concept that we really need to push to get this Nuclear Waste Policy Act passed
Q All right Thank you
Now, the Nuclear Waste Policy Act calls for utilities to enter into contracts with DOE for the disposal of their highly radioactive waste, as you know What is your understanding of the why the statute was developed or drafted to require contracts rather than regulations?

Page 338

MR MILLER Once again, Your Honor, we'd ask that our standing objection about the meaning or intent of the NWPA be allowed to stand.
THE COURT. Okay And the witness can testify as to his understanding. So he may testify You may testify
THE WITNESS My understanding very clearly was that we the utility industry, of which I was being the spokesperson at that particular point, the kind of the point person at that point for the industry felt it important to have this codified in a contract between the federal government and the utility industry so that this would be accomplished on a contractual basis
BY MR STOUCK
Q And why was that important?
A Well if you didn't have a contract, you really didn't know whether -- what was going to happen If it turned out to be a regulation the possibility of changing regulatory actions over time was just not a firm enough position for us We wanted a firm contract to accomplish the task
Q And did the -- I believe you alluded to this but did the utilities, nuclear utilities have prior experience contracting with the federal

Page 339

government?
A Yes they did They had very successful experience in dealing with -- it was originally with the Atomic Energy Commission for the enrichment of uranium which was one step in preparing fuel for commercial power plants And this was done strictly by the federal government and only by the federal government and it was done under contract with the federal government And the federal government as AEC then by ERDA and then by the Department of Energy delivered under those contracts with good quality on time and a reasonable cost
Q All right Do you have the notebook of exhibits in front of you?
A Yes. I do
Q Let's turn back to the Nuclear Waste Policy Act which is at tab 1 of your notebook And if you would turn please to the same -- I believe it was the same page we were looking at yesterday 51
A Yes, I have that.
Q Let's see Under the subsection 5 this is section 302(a)(5) just in the middle of page 51 do you have that?
A Yes I do
Q Okay Let me read the 302(a)(5)(A) is the

Page 340

subsection It says quote Following the commencement of operation of repository, the secretary shall take title to the high level radioactive waste or spent fuel involved as expeditiously as practical upon the request of generator or owner of such waste of spent fuel
Do you see that?
A Yes I do
Q Do you have -- do you have an understanding of this phrase "as expeditiously as possible" and why it was included in relation to the acceptance of fuel at the time of the Act
A Yes I personally was involved in the discussions with the staff both in the Senate and in the House with regard to how was this to be accomplished And if we were going to commit to the 1 mill per kilowatt-hour what were we going to get in return?
And it was emphasized that we needed to have a program put in place to achieve this task as expeditiously as practical and that it be done at the request of the generator and owner of the waste activity
Q And what is your understanding of the significance of the latter phrase the "at the

Page 341

request' phrase?
A Well it was the purchaser the owner or whoever had control of it at that particular time that would ask for the amount that would be disposed of at any particular time by the Department of Energy under the contract
Q Did you have discussions at the time of the development of the Nuclear Waste Policy Act of the -- the rate of acceptance issue with anyone at the Department of Energy?
A Yes I did
Q Okay Do you recall specifically with whom you discussed the subject?
A There was a considerable turnover as there is in personnel within all departments of the federal government But I do recall discussions with Frank Kaufman, who had responsibilities for the waste program at that time I recall conversations with Shelley Myers I recall conversations with Mike Lawrence I recall conversations with Shelby Brewer On the rate of acceptance Yes
Q And what was the substance of these conversations?
A That basically --
MR MILLER Objection Calls for hearsay

Page 342

MR STOUCK I think it's an admission if it's from the gentleman he mentioned
THE COURT We're dealing with parties
MR MILLER Withdrawn Your Honor
THE COURT Okay You may testify
THE WITNESS It was generally understood that the -- the bargain that would have been -- that had been -- was being developed here was that the utilities would be storing their spent fuel on their sites until 1998 And they would bear that cost
But any cost associated for additional facilities beyond that would not be something -- would be prevented by the DOE carrying out a robust program
And the concept of how much was an appropriate amount to be delivered from an industry-wide standpoint, not an individual contract standpoint but from an industry-wide standpoint was that it was the amount that was being discharged from the reactors at that year plus some amount, to work off a backlog, which was tens of thousands of tons of spent fuel by that particular point
So that it was understood at that time that it was our understanding it was related and conveyed through these discussions, that yes it would be an amount equivalent to the discharged quantity from

Page 343

the – from the utilities at that point, plus some amount to work off the backlog.

BY MR. STOUCK:

Q And did the discussions with the individuals that you mentioned at DOE include specific numbers about quantity of acceptance as opposed to the qualitative issues that you just described?

A Well, there was considerable discussion of what should the capacity be for receiving this waste or spent fuel at a repository. And the capacity that was discussed at that time and has been documented in many ways was the planned activity would be at a quantity of about 3,000 metric ton per year.

Q All right. Do you recall when the Nuclear Waste Policy Act was signed into law?

A Yes, I do.

Q When was that?

A That was January 7th, 1983.

Q Okay. And how is it that you recall that date?

A I had the opportunity of being invited to the White House for that particular signing. And I was in the room when President Reagan signed that particular bill into law.

Page 344

Q Okay. And what was the industry, the utility and the nuclear utility industry's reaction to enactment of the statute? How was this accomplishment of this development regarded in the industry?

A It was regarded as a very favorable and a very important step; that this did define how we were going to dispose of spent fuel and high-level waste. It defined when it was going to be done. And it defined a process of how it was going to be done and where.

Q All right. Now, after the Nuclear Waste Policy Act became law, how soon did work begin on drafting the contract?

A Immediate.

Q And about how long did it take to develop the contract?

A Well, the Department of Energy made the decision that they were going to have the contract in the form of a regulation. They held a meeting on January 19, 1983 to discuss their plan for developing that particular regulation. It was a public meeting, well-attended meeting. I was there. And at that particular meeting, I asked if we could have a copy of the draft that they had at that time. I specifically asked that at the meeting.

Page 345

And they acknowledged that they would give us an early draft, which we did receive within the next few days. But then the draft was actually modified during that process to a time of February 4, I believe, of 1983, when they actually published the draft contract as a regulation within the Federal Register. And it was submitted for comment by the industry

Q Okay And just generally can you describe your role in the development of the standard contract.

A Yes. Even before the January 19th meeting, we were – the Utility Nuclear Waste Management Group was actively looking at what should be included in the contracts. We had an outline of what should be included in that contracts that we developed without – without DOE involvement. That particular information was provided to the Department of Energy. We also had a task force that was actively put together. We invited every utility that was a member of – of the member programs, whether it was a member of EEI or the members of the UNWMG which included other than investor-owned utilities, to participate in a task force to evaluate and provide comments as soon as that draft contract was made public.

Page 346

So we put together a task force to do that. And we proceeded to comment on that draft contract with our comments being submitted within the deadline of March 7th, 1983, which meant it was 30 days. We had 30 days to comment on a contract that was going to last for tens of – for decades and had a value of tens of billions of dollars.

Q Would you turn in your notebook to tab number 2, please. This is marked as Defendant's Exhibit No. 398. Do you see that?

A Yes, I do.

Q Do you recognize this document?

A Yes, I do.

Q What is this?

A This is a – this particular document – first page is a cover letter of the distribution of the draft contracts that were available – made available as a result of the request for them in the January 19th meeting so that these were – on January 24th, those early comments, draft comments were distributed – I received a copy and we distributed it all of our members that had nuclear programs.

Q Right. And this L.M. Mills on the cover sheet is you?

Page 347

A Yes, it is

Q And – okay And is this the draft that you mentioned before that DOE distributed prior to the February 4 publication?

A Yes, it is.

Q Okay. Now, how was this contract negotiated?

A There was not an opportunity to negotiate the contract. The contract, because it was put together as a regulation, the rules of regulations restrict nongovernment employees from actually participating in the drafting of the regulation. Thus, it was put out as a draft in February of 1983. We had 30 days to provide comments on that particular draft. And then the Department of Energy took those comments and, in their own, by themselves, without any opportunity to communicate at that point, tried to resolve the comments and include what they thought was appropriate and not include what they did not think was appropriate when they finally came out with their final rule, which I believe was early April of 1983.

Q Okay. Flip to page – turn to page, excuse me, tab 3 of the notebook, please This is another exhibit.

Page 348

A Yes.

Q That's market as Plaintiffs' Exhibit No. 437. Do you see that?

A Yes, I do.

Q Okay And this is a memo that refers to, in the first paragraph, the January 19 meeting and January 20 meeting. Do you see that?

A Yes, I do

Q And I don't believe you mentioned the January 20 meeting What was the January 20 meeting?

A The January 20 meeting was held the day after that public meeting of the Department of Energy, which was held, as stated here, it was held at the Hyatt Regency Hotel. That was a public meeting in which it was strictly an information meeting one way. We could ask questions but it was not an exchange-type meeting

We, the industry, asked all of our members to join us in a meeting on January 20th immediately following that. And we invited the Department of Energy to participate in the meeting so we can have a dialogue between the Department of Energy and the purchasers to try to resolve or exchange thoughts on what should be included in the contracts

Q Okay. And you see the attachments to this

Page 349

exhibit appear to be attendance lists for the respective January 20 and January 19 meetings?

A Yes, I do.

Q And I notice your name at the top of January 20. Does that look like an attendance list?

A Yes, it does.

Q And likewise for the January 19 meeting?

A Yes.

Q Where I see you listed as number 25.

A Yes. That is correct

Q All right. Now, you mentioned the proposed rule. And if you turn to tab four of your notebook, you'll see a Federal Register notice which I believe you will – has been marked as Plaintiffs' Exhibit 29 And I believe you'll recognize that as the Federal Register notice with the proposed rule.

A Yes, it is. It is the Federal Register notice that was issued officially in the Federal Register for comment.

Q And what was EEI's involvement in this process of developing this contract subsequent to the publication of this proposal?

A Well, we had a task force that was specifically assembled to provide comments on this draft contract. And these were long hours, I can tell

Page 350

you, during that period of 30 days of developing the extensive comments that we provided on the contract itself or proposed contract. And the attachments.

Q Before we move forward, was there an opportunity, or did EEI provide comments on the draft, the prepublication draft that's at the tab 2 that we looked at?

A Yes. We had provided comments. Yes. We had seen that draft and we had some thoughts that we wanted to have DOE included and we provided those comments.

Q Okay. And EEI provided, I take it, formal written comments to the proposed rule; is that right?

A Yes, we did.

Q Did those comments reflect – the EEI comments reflect the views of every individual utility?

A It was a consensus set of comments. Consensus meaning that we had work through the position of the opinions of many different utilities. And each company has its own idea of what should be in the contract.

And it was a challenge for us to get a consensus opinion on what should be in the contract. It represented a consensus opinion in which all the

Page 351

utilities – every one of the utilities did not agree to. They had their own opinion.

And we encouraged the individual utilities to make their own comments in addition to our comments on this particular draft proposal.

Q All right. Now, what became of the utility's request, you know, the comments – request for changes that were made? What did DOE do with those comments?

A Well, in the process, after they were received by DOE, and I – I – all I know is we submitted them to DOE. The next thing that we saw, because we were not allowed to have contact based on their regulatory rules, the next thing that we saw was the issued draft – or not the draft, the final rule, which I believe is in April, early April of 1983. And in that particular final rule, they identified how they addressed many of the comments that were submitted to them. They had received comments from a large number of organizations in addition to us and from a number of utilities in addition to us, meaning the EEI and the UNWMG.

Q Now would you turn to tab 5 of your exhibit notebook, to a document which is marked as Plaintiffs' Exhibit 30. This is a memorandum to the Secretary of

Page 352

Energy, April 8, 1983, apparently transmitting the final rule making. You'll see on the first page there, it says: The attached rule making is ready for publication in the Federal Register.

A Yes, I see that.

Q Now, the first sentence under background, let me read it for the record, it says: A critical item in implementing the Nuclear Waste Policy Act, which is a waste disposal contract that will be signed by DOE and the industry.

Do you have a similar understanding of the importance of the contract and the significance?

A Very definitely.

Q And do you know whether DOE had that understanding?

MR. MILLER Objection, Your Honor. Once again, I object on the grounds of foundation. I mean, for this witness to testify about what this document means or the content of the document, Mr. Morgan was deposed by plaintiffs' counsel. They certainly could have called Mr. Morgan in their case in chief and asked him his understanding of the meaning of this document. So we object on foundation grounds.

THE COURT: It's kind of hard to express the DOE as a whole. But perhaps he had contacts with

Page 353

people that would give him a view of that and you could ask about.

MR. MILLER: But once again, Your Honor. They could call Mr. Morgan, they could have called Mr. Morgan in its case in chief. He was deposed. They had two opportunities, I believe, to attend Mr. Morgan's deposition. Mr. Stouck himself deposed Mr. Morgan on one occasion. They could have called Mr. Morgan for the purposes of determining what Mr Morgan's understanding was of this document or – or any of the documents that Mr. Morgan offered.

MR. STOUCK: Your Honor, this is really disruptive I mean, Mr. Morgan's signature is on this document. It's in evidence. It's his statement. My understanding of the purpose of the admission exception of the hearsay rule is that the government could call Mr. Morgan if he wants to disclaim this document. It's really kind of a just a background point.

THE COURT: I think your question was to get an overall viewpoint of DOE. And maybe the argument is that Mr. Morgan doesn't represent the views of DOE. It is approved by Mr. Hodel

MR. STOUCK: Yes. Thank you, Your Honor. Let me move on.

Page 354

BY MR. STOUCK:

Q Mr. Mills, what was Mr. Morgan's role at this time in April?

A Mr. Morgan had first appeared on this particular program late in January of 1983. He was detailed from the Savannah River Office of the Department of Energy to serve as the project director of the Nuclear Waste Policy Act project office. And he was there, and he was the person that was the named person to which we submitted our comments in March of 1983.

Q Had you met with him at this time?

A I had met with Mr. Morgan in January, late January of 1983 As soon as I saw his name, it was my normal routine that, as soon as someone else's name showed up in the program, I wanted to know that individual and get to know them. I was not allowed to spend time with him during the process of the rule making once it was published as a draft rule.

Q All right. If you would turn in the same document, there are several attachments, to one that's marked at the top, tab D, on the right. And the number at the bottom is 899.

A Yes.

Q Do you see that?

Page 355

A Yes, I do.

Q It says Policy issues addressed during nuclear waste contract comment period

A Yes.

Q And under Number 1, spent nuclear fuel exchange rights. Do you see that?

A Yes, I do.

Q And then under the first number, it's – I'm sorry, it says: Spent nuclear fuel exchange rights. And then, quote, the majority of utilities commented that they should have exchange or swapping rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex recordkeeping, this poses no problem – no great problem to us and consequently, we have accepted this suggestion. It will require our approval and we intend to be reasonable. Do you see that?

A Yes, I do

Q Is that consistent with your understanding of the exchange issue?

A Yes, it is. As – the exchange was not included in the draft of February 4. In our comments, we asked that that particular capability of swapping allocation rights be included in the contract as one

Page 356

of a majority of utilities that commented And we felt that it was a necessary component to make that system work efficiently. And this is our understanding, yes.

Q All right Let's move on to the final rule, which is the next tab, number 6. And you've seen this before?

A Yes, I have.

Q This was marked as Plaintiffs' Exhibit No 31. What was the industry's view of the final contract? The way this came out after your comments and after the process, what was the overall view that the industry had about the contract?

A If it had been a true commercial relationship of being able to negotiate a contract and had the option of whether you would sign it or not, we wouldn't have signed it. It was not covering all of the things that should be covered in a contract. However, it was mandated by Congress, and the penalty for us not signing the contract was that we might lose our license to operate the nuclear power plants if we didn't sign it. Thus, we believed that it was a reasonable representation of what we were going to be able to

Page 357

depend on in the disposition of spent fuel and high-level waste.

Q Okay. Was it your understanding that all of the issues that you would have liked to have seen resolved were resolved in this final rule making?

A No, they were not. No, they were not This final rule did include many of the comments that we had offered It included many of them. And the preamble, as you look at this final rule, the Department of Energy talks about how they had received a large number of comments, both in a public hearing and in the written comments. And they proceeded to talk about and how – their – their review of those comments and how they were disposed of or not disposed of. They commented on – or most of the comments, individual comments that were provided to them, but not all of them

Q All right. Let's move on to tab 7, please, the next exhibit is marked as Plaintiffs' Exhibit 458. Do you see that?

A Yes, I do.

Q This appears to be an account of what, a talk that you gave at a conference?

A Yes, it is.

Page 358

Q On May 4, 1983?

A That is correct.

Q Does this – do you recall the talk?

A Yes, I do.

Q Does this document accurately reflect the substance of the remarks that you made at that time?

A Very closely. The only difference is that I recall doing it on May 5th, not May 4th.

Q Okay. Maybe it was scheduled for May 4th.

A It was scheduled for May 4th. And there was some flexibility in the program and they asked me to do it on May 5th instead.

Q All right. And who was in attendance at this program?

A There were a large number of electric utility members. There were contractors for the nuclear industry. There were suppliers of uranium. Department of Energy was also included representatives. I do not know what other government agencies might have been there, but I do know there were several members of the Department of Energy there.

Q Do you recall anyone in particular?

A I'm quite convinced that Mike Lawrence was at that particular meeting, but I'm not sure who other

Page 359

of the members of DOE were there.
Q Okay. Now on page 1 of this – I just want to look at a couple of items here – it says at the bottom of the first paragraph, it says: Now, for the first time in the 30 years of work on commercial nuclear energy, we can correctly and honestly state that a national policy is in place for the safe disposition of nuclear waste Much effort is needed implement the policy but the policy is defined.
Do you see that?
A Yes, I do.
Q And that was your understanding?
A We were elated there was a policy, yes.
Q Likewise, at the bottom of the second paragraph: However, now it's with pleasure that we can say that the Act signed into law on January 7 states how we are going to dispose of nuclear waste, parentheses, geologic disposal. It states when we will do it, paren, the first repository in 1998. And provides a program for selecting where it will be achieved.
Do you see that?
A Yes, I do.
Q And that, again, was your understanding at the time?

Page 360

A Very much so.
Q Now, just one or two other items here. On page 4, there's a subsection that says: Allocation of delivery
A Yes, I see that.
Q Just for variety, would you like to read that into the record?
A Yes
When DOE opens its door in 1998, or whenever, it will have a limited capacity that needs to be allocated over the contract holders. DOE may be able to receive about 3,000 tons a year during the initial operation. But there will be about 60,000-ton of spent fuel available for delivery. On what basis will the limited available space will allocated over all contract holders? Should it be based on the age of spent fuel only? Will allocations be transferable? We urge DOE to provide a reasonable mechanism for this allocation in the contract – we urged DOE to provide a reasonable mechanism for this allocation in the contract. Of course, this will take effect 15 years from now. So it is likely that some improvement will be made between now and then. But as we understand it, DOE will provide individual allocations to contract holders. Once an annual allocation is

Page 361

assigned, contract holders will be permitted to substitute other spent fuel and swap allocations to mesh with operating needs. If one company can accommodate its spent fuel longer than another, it may be able to swap its allocation space with another organization. It is important to have an allocation procedure that treats all purchasers on a reasonably equitable basis
Q And that was your understanding at the time?
A Yes, it was.
Q And that was the substance of the remarks you made at this conference?
A Yes. This represents my comments.
Q And was there any disagreement from Mr. Lawrence or anyone else from DOE about that?
A No.
MR. MILLER: Same objection, Your Honor, as to foundation testimony. Mr. Lawrence was also deposed by plaintiffs' counsel. They could have called Mr. Lawrence to testify about, one, whether or not he attended, two, whether or not he dissented from the statements Mr. Mills made.
First of all, there's been no testimony that there was a – an opportunity of dissent or comment from Mr. Lawrence or anyone else.

Page 362

THE COURT: That can be explored on cross-examination, counsel. So objection is overruled.
MR. STOUCK: Thank you, Your Honor.
BY MR. STOUCK:
Q Now, lastly on this account of your talk, Mr. Mills – well, let me ask this. Does this paragraph that you just read, does that reflect your expectations at that time of how this – the swaps process would work?
A It was a general overview of how it would work. The individual details of how it would work were going to be worked out, we believe, over this next 15 years.
Q And why is that you mentioned that the – your comments, the EEI comments had requested the exchange provision in the contract. Why did the industry want this provision?
A The allocation procedure of how – process of how DOE determined who would be able to have their spent fuel delivered first was based on oldest fuel first. And the – the amount at any particular site, nuclear power plant, of the oldest fuel first, was not an appropriate amount that you would transfer. You should be transferring an amount that

Page 363

would be equivalent to filling up transport casks. It should be done in a campaign arrangement so that it's really – there should be an opportunity here to balance the system to gain greater efficiency. And that efficiency could be achieved. And both – on behalf of both the Department of Energy and the purchasers through this exchange program.

Q All right. Now, did the industry have any prior experience with exchanges of contract allocations?

A Yes, they did. In fact, under the uranium enrichment contracts, the contracts that were offered by the ERDA, or it was the Atomic Energy Commission, I'm not sure when that change occurred, were called long-term fixed commitment contracts, which required the utilities to commit to take enriching services from the Department of Energy on a particular date and over a particular schedule. And the Department of Energy or its – the organizations were able to supply it on that rate, and they were requiring the utilities to take it on that rate even though many of the nuclear power plants' construction schedules were delayed and other situations occurred where that the utilities didn't need that particular service. So that there was an arrangement between

Page 364

utilities, some who had surplus capacity or – not capacity, but surplus quantities of enriched uranium, they would swap their allocation with others who had later commitments for that enrichment services. And in some cases, they simply sold that allocation to others. And it was a rather robust market of exchanges between utilities. And the experience worked quite well

Q Now, under these enrichment contracts that you've just described, what was DOE's role with respect to the exchanges of the – as I understand it, the purchase rights?

MR. MILLER Objection. I assume the witness is going to testify about what his understanding of DOE's role was.

BY MR. STOUCK:

Q Yes. What was your understanding?

THE COURT: Or if he has personal knowledge as to what the role was. He can testify.

THE WITNESS: I do have personal knowledge. The – there was very little participation by the supplier DOE, ERDA, whoever it was at that time, in this exchange activity which went – was among the utilities, either among themselves or through a broker And DOE did not object to this particular

Page 365

activity going forward. But they did not actually participate. They were still delivering the same material. It just went to a different location.

BY MR. STOUCK:

Q All right. And is that how you expected the spent nuclear fuel exchanges to function under the standard contract?

A We expected it to operate similar in that the efforts to identify and actually arrange for these exchanges would be done between utilities or with a broker arranging it between utilities, with a limited amount of impact by the Department of Energy.

Q All right

A I would add the DOE had approval rights for those exchanges. But those approval rights were understood by us and we were told by Robert Morgan that we would do it in a reasonable basis. As a matter of fact, that shows up in the comments of the final rule.

Q All right. Thank you
Now, take a look at the page 4 of the document, I guess it's next to the last section. It says: Contract negotiation and program review.

A Yes.

Q In the first sentence it says: There's no

Page 366

real opportunity to negotiate a contract with the DOE, only a very short comment period of 30 days
The beginning of next paragraph says this:
One area of considerable concern to us is the mechanism or control for the expenditure of monies from the Nuclear Waste Fund. The funds are flowing from the utility companies, and there is a great interest on their part to see to it that the monies are properly and efficiently spent.
Do you see that?

A Yes, I do.

Q Was that concern shared by the industry?

A Yes, it was. The industry was providing the money for this particular program on a full cost recovery basis. And it was in the interest of the utilities to see to it that those funds – and certainly desired to have those funds expended efficiently.

Q Were there specific steps that you took at that time to try to assure that funds were spent efficiently?

A Well, we had asked, as one of our comments on the draft, we had asked for specific milestones to be included in the contract, similar to the milestones that were included in the legislation, that would

Page 367

identify that DOE was proceeding in a proper way to carry out the contract. And we had asked for that particular capability to have those milestones and to also perform some form of an audit over the progress on DOE on the program. As stated in the final rule, we were denied those opportunities.

Q Now let's turn to Exhibit 8, which has been marked Plaintiffs' Exhibit 459 And it appears to be notes of another meeting Do you see that?

A Yes, I do

Q Okay. And this is on May 12, 1983. That's what the notes say.

A Yes. That is correct.

Q And do you recall that meeting?

A Yes, I do I was there.

Q And you were there And I think that's reflected on the attendance list that's attached to the exhibit?

A Yes, it is.

Q Okay. What was the purpose of this meeting?

A This meeting was after the final rule was published And it was called by us, the Utility Waste Management Group and EEI, inviting the Department of

Page 368

Energy to talk about that particular program that we had just – we had before us, the contracts that were before us.

The contracts had not been signed yet, but they were in the final rule state. And we wanted to just discuss various elements of it with the Department of Energy to determine – make sure that we understood what they meant.

And there were deviations considered from the standard contract.

Q All right. Now, on page 2 here, we have a provision, again, about the exchange provision. And the title of the subbullet there is· DOE approval of transfers

Do you see that?

A Yes, I do

Q I'll read it: DOE would not unnecessarily withhold approval for transfer of shipping, quote, slots, close quote, and that the provision in the contract was there for administrative purposes, period.

Do you see that?

A Yes, I do.

Q DOE agreed, however, that reasons to with withhold approval could develop as experience with the

Page 369

transportation system is gained. Right?

A That is correct.

Q And that was discussed at this meeting?

A Yes, it was.

Q And that was your understanding at the time?

A Yes, it was

Q And in particular, I think this statement reflects this, but was your understanding – does this accurately reflect your understanding of the kind of involvement, the level of involvement that DOE would have in this exchange process?

A Yes, it does. As it states there: DOE agreed, however, that reasons to withhold approval could develop. But that it was their understanding it would not be – would not unnecessarily withhold approval.

Q All right. We've been going about an hour How are you doing? Do you want to take a break?

A I'm doing fine.

THE COURT: Why don't we take a 10-minute break.

MR. STOUCK: Thank you, Your Honor

THE COURT: We can return at 20 minutes of.

(Whereupon, a recess was taken at 11:29 a.m., and the proceedings reconvened at

Page 370

11:40 a.m.)

THE COURT: Back on the record.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q Mr. Mills, let's turn now to tab number 9 in your book, which is marked as Plaintiffs' Exhibit 461. And if you take – do you – this is a letter from Mr Morgan to Mr. Kearney, do you see that?

A Yes, I do.

Q Who was Mr. Kearney?

A Mr. Kearney, at that point, was my immediate supervisor. I was the vice president of nuclear activities within the department – within the Edison Electric Institute, and I reported directly to Mr. Kearney, the senior vice president.

Q In the third paragraph here, recognizing the stringent time constraints, do you see that?

A Yes, I do.

Q Recognizing the stringent time constraints on meeting the Act as imposed on the department, we clearly cannot reexamine any issue of concern on the utility's prior to the June 30, 1983 deadline. However, as you mentioned in your letter, any issue can be readdressed by the industry and, I would add, by the government as well, after individual contracts

Page 371

are signed with utilities.
Issues of concern to the industry and the government can be reexamined, and modifications may be made to the standard contract, provided that sufficient justification exists and it does not change the intent of the final rule.
And then it goes on to refer to the amendments provision of the contract. Do you see that?
A Yes, I do
MR. LESTER. Excuse me, Your Honor can I interrupt. Is there a parallel Defendant's Exhibit because I can't find it in our exhibits for the plaintiff?
MR STOUCK: Yes, Your Honor I paused because – let me explain. This document, it turns out, was not on our will-use exhibit list and, therefore, was not part of the long discussion that we had yesterday morning. I was about to raise that and maybe we can get some direction here.
I was mindful the Court said you didn't want to spend trial time in the exhibits, so I thought I would raise that indirectly into the day.
This document has not been entered into evidence. If you like, we could take that up right

Page 372

now. This was just something that came up in the course of chatting with Mr. Mills, you know, recently. It's on our exhibit list, but it's not on the will-use list
So you, again, how would you like to handle it? I don't think there would be much – many – most of the documents that we tend to use at the trial have already been admitted and posed this kind of an issue.
THE COURT: You can move for admission if you wish, as long as it was on an exhibit list in the pretrial
MR. STOUCK It was on an exhibit list and I would like to have this entered as an exhibit in the case in evidence if that's how you want to handle it.
THE COURT: Does it bare the same number on the exhibit list or –
MR. STOUCK: It does. Oh, yes. This is our sticker, yes.
MS. SULLIVAN: Your Honor, the government has no objection to the admission of this new exhibit.
MR. STOUCK· Thank you, Your Honor, and ---
THE COURT· Okay. Plaintiffs' Exhibit 461 is admitted
(Exhibit Number PX-461 was received into evidence.)

Page 373

MR. LESTER· Your Honor, just for the future reference, I think that one issue with this is it's just going to end up being a need for a little bit of preplanning or some leeway from the Court. We don't actually have the may-use exhibits in the courtroom with us. They're elsewhere
So although Mr. Miller has a copy of it, and we've got a binder of the documents that he was going to use with Mr. Mills, we don't have the copy for the rest of us to follow on. So we can move forward at this point, but we're going to have to figure out how, I guess, how to pull all the may-use exhibits into the courtroom
MR. STOUCK: We talked about that, and we will take care of that in the future I didn't realize this would be an issue this way. So starting tomorrow, maybe this afternoon, we'll either have – I don't think there will be many examples like this. If there are, we will provide copies for you.
THE COURT: Okay.
MR. STOUCK: If that's okay.
THE COURT. Fine. Well, whatever can be done to make sure that we don't surprise back and forth
MR STOUCK: Yes, Your Honor. And as I

Page 374

said, now we know how the Court wants to handle it, we will try to take care of it.
THE COURT: I don't object to ruling during the trial. What I wanted to do is get as much as we could in evidence before so we're not continually interrupting testimony with admissions.
But, obviously, both sides will have documents that come up that they didn't anticipate using, that they'll disclose prior to trial that they will want to introduce during testimony. And there are documents we reserved for testimony. So this will obviously occur during the trial.
MS SULLIVAN: Your Honor, just a note on that, and I know we can move on. If there are exhibits that are on the plaintiffs' may-use list, there's not an issue – there are some exhibits that Mr. Stouck was using with Mr. Mills that are on the defendant's will-use list, and that doesn't present a problem for us because we have them available in the courtroom.
But to the extent that plaintiff plans to pull exhibits from their may-use list that are not also common defendant's exhibits, we ask for a couple days' notice. Their may-use list take up many, many shelves in our offices and it's going to be a burden

to have to pull those and copy those.
THE COURT: I think the agreement was that both sides would make an attempt to give advance notice in this regard.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: To the extent feasible.
MR STOUCK. Yes, we will. We will do that going forward. And, like I said, we will also make an effort to provide copies in the courtroom. I don't think there will be many of these. But if there are, we will endeavor to provide advanced notice.
BY MR. STOUCK:
Q Mr. Mills, back to the paragraph that I read for you, how does that compare with your understanding at the time?
A That was our understanding at the time. As we received this back from Mr. Morgan, yes, we concurred that was a way to resolve some of the unresolved issues.
Q Okay. And in the final version of the contract, what was your understanding of why there were unresolved items?
A Well, the contracts were actually contracts with the individual utilities. There was – or waste holders. There were something like 60, 65, 70



contracts. I'm not sure which – what the number was.
And the – the question of many of the issues that were not addressed in the contract related to the overall industry plan or understanding. The overall industry understanding. And it was difficult to put those in the contract.
Also, there was – the framework that was provided in the contract talked about how this was going to evolve in a program of actually having this waste delivered to the Department of Energy. And it was a framework that needed to be fleshed out because it was not fully fleshed out at that time.
Q All right. And why do you say that it was difficult to put provisions in individual contracts, if I understood you correctly?
A That, because there would be an allocation assigned to different contracts and different years, the amount of information that was available at that time to actually put down a definitive schedule was just not available, nor was there a really good understanding of the mechanism of how we would actually transfer this particular material.
Q Any other reasons that contributed to your understanding – or that you understood there were unresolved items in the contract?



A Well, we actually had disagreement with some of the items that were in the contract, such as the gross versus net consideration, which was later resolved through a court action.
But the – there simply was not a very good description of what the utilities were actually receiving for the large amount of money that was being paid to the federal government for the services under the contract.
Q How did you understand the – that the unresolved terms would be dealt with?
A Well, many of them were – we expected to simply be able to have the individual contract holders sit down with the Department of Energy and actually resolve some of these issues on a one-on-one basis if there was a need for a deviation from the contract.
We also expect – were planning to have the industry as a group meet with DOE to resolve the various elements of the contract that were less than fully resolved.
Q Okay And did those – did subsequent efforts such as you described occur in attempts to resolve these unresolved items?
A Well, one of the ways to resolve them would be a petition for rule making. And yes, the industry



prepared several drafts for a petition for rule making addressing these unresolved issues.
The – there – we never did proceed with a petition for rule making, however, because the program was – was a moving target. It was not possible to resolve many of those issues because the program was not proceeding in the robust manner that we believed was necessary to accomplish it.
The Department of Energy recognized those unresolved issues also. And they had set an issue resolution group of some sort, which they had representatives and the utility industry had representatives, to sit down and discuss these unresolved issues and try to find a way to resolve them.
Q All right. Take a look at tab 10 in your book, please. This is a copy of the June 1988 annual capacity report It's Plaintiffs' Exhibit 54. And I apologize. I don't have a cross-reference. But we will in the future.
Do you see that, Mr. Mills?
A Yes, I do.
Q And have you seen this before?
A Yes, I have.
Q Okay. At or about the time it was issued?

Page 379

A Yes
Q And take a look at page 3 in the first paragraph there at the top, 1.3. It says. The annual capacity report issue resolution process. Do you see that?
A Yes, I do
Q Take a look at that for a moment. Is this the process that you just described?
A This is the process which included the Department of Energy and the purchases in cooperation with the Utility Nuclear Waste Management Group to resolve many issues. That was – the date of this, I believe, is 1988 And the consideration for actually resolving the issues occurred before then.
Q Okay. What do you mean by consideration for –
A The utility group and the utility purchasers had identified many issues that they thought should be resolved before this particular group came together
Q I see. Take a look at page 10 of this same document, please Okay. At the top we have a little further description. Let me read this one, if I may, for the record.
It says. Last year's ACR indicated that

Page 380

many issues will require analysis and resolution so that the WMS – I believe that's waste management system – can achieve maximum efficiency while attempting to assure equity among the parties Last year's report presented selected examples of contract-related issues that could affect the capacity available for allocation, capacity allocation, delivery schedules, and acceptance criteria. These examples range from technical waste acceptance specifications to management-related issues.
And then I'll skip down to the last sentence DOE fully supports the objectives of these technical exchanges as an aid in resolving contract-related issues
Do you see that?
A Yes, I do.
Q And is that consistent with your understanding of this process?
A Yes, at that time, that was consistent
Q Were you involved personally in this process?
A I was not involved directly with the process. But persons that were working for me in my group were involved in the process.

Page 381

Q And who would that have been?
A That would have been Stephen – Steve Kraft.
Q Okay. Did this process, this issue resolution process ever result in the resolution of the issues that were identified?
A No, it did not
Q Okay. And do you have an understanding as to what happened to the process eventually?
A The resolution of those particular issues would have been achieved if the program was moving forward in a robust manner the way we expected it to. Since the program had – was not moving forward as we had expected it to, or as we thought we had contracted for, then it was not possible to resolve these many open issues.
Q All right. Thank you Let's turn now this question. You know, as someone who represented the nuclear utility industry at the time the standard contract was written, can you tell us what the industry understood the purpose of this contract to be?
A The purpose of the contract provided a mechanism for a program to go forward by providing sufficient funds to achieve full cost recovery of a program to carry out the disposition of disposal of

Page 382

nuclear waste and spent fuel on an expeditious manner and on a reasonable basis.
Q All right. And at the time the contracts were signed, what did EEI and the industry expect would happen in 1998?
A Well, we really expected that the program would have started receiving spent fuel or nuclear waste a few years prior to 1998. And ramp up to a 1998 date in which the delivery amount that was due be accepted by the federal government, was equivalent to that amount discharged from the reactors in that year, plus some amount to work off the backlog.
Q Okay. And what was the basis of that expectation?
A Many discussions that had occurred between myself and members of Congress when we were developing the waste program – or Waste Policy Act. And with individuals within the Department of Energy that worked on that particular program.
Q Okay. And what did the individuals within the Department of Energy expect with respect to this issue?
A That – at the time the contract was signed, that was our understanding. It was a discussion that was – that entailed this particular understanding;

Page 383

that, yes, we would be receiving in 1998 a quantity of spent fuel equivalent to that amount discharged from the reactors plus.
Q And did – was – did you have an understanding, and did EEI have an understanding about the timetable for development of the repository?
A Well, yes There was – there was an understanding that was codified in the Nuclear Waste Policy Act.
Q Okay. And what was that?
A That there was a date set forth citing criteria. There was another date set for identifying sites. There was another date set for submitting a license to NRC. There was actually a date which NRC was supposed to have approved that application for a license. And there was a date of January 31st, 1998 that DOE was to receive spent fuel no later than January 31st, 1998.
Q And were there expectations about whether or not a repository would be available at that time?
A Yes.
Q In 1998?
A Yes
Q Were there expectations in 1983 or thereabouts, about whether or not a repository would

Page 384

be available in 1993?
A Yes. There were expectations of that nature in 1982 as the legislation was drafted. And there was expectations as indicated by the members of the Department of Energy. I came name Frank Kaufman specifically, stating that yes, we can satisfy that date. Actually, we believe we can have a repository before that time.
And we fully believed that the 15-year advance time was sufficient for this program to actually carry out what was requested.
Q And it's your understanding that the Department of Energy believed the same thing?
A That is correct.
Q All right. Now, with respect to the rate of spent fuel acceptance, putting aside for the moment, and you may have touched on this before, but putting aside for the moment any particular tonnage capacity or number, what did you and the industry expect the acceptance rate to achieve as a qualitative matter?
A Well, as we commented on the draft contract, we commented suggesting that a qualitative value be included in the contract which would be equivalent to the amount of spent fuel that was discharged from the reactors, which could be identified reasonably well.

Page 385

And that it would also include a quantity above that amount that was being discharged that would actually be transferred to the Department of Energy in – starting in 1998. But actually starting prior to 1998.
Q Okay. And was there an understanding on your part at that time about what – what actual tonnage capacity would be necessary to achieve that?
A Yes. We knew that the discharge rate would be something less than 3,000-ton per year So that – yeah, it was somewhere in the range of 2,000 to 2,500 metric ton per year that was expected to be discharged from the operating reactors in the year 1998.
Q Okay. And did that lead you to have an expectation about the acceptance rate that DOE would achieve in 1998?
A Yes. And there were discussions on what was a reasonable rate of receipt at a repository from a design standpoint. This is the Department of Energy identifying what is a reasonable design quantity for a repository.
And it was discussed. That quantity was discussed while the legislation was being developed. And it was understood that the design rate would be about 3,000 metric ton per year.

Page 386

Q Did you have discussions about the 3,000-ton rate with DOE officials at that time?
A Yes, I did.
Q Do you recall specifically with whom?
A I am convinced I had those discussions with Frank Kaufman, with Wade Ballard, with Mike Lawrence. And you know, this was over several years' time that this was being developed. So the number of people that were involved in the program at that time were changing. And I believe at that particular time that Shelby Brewer was the assistant secretary for nuclear energy. And I recall having conversations with Mr. Brewer.
There was another individual who had responsibility for the program just before the Nuclear Waste Policy Act, which was Shelley Myers. And I remember having similar conversations with Mr. Meyers.
Q These were conversations in which the 3,000-ton rate was discussed?
A There were many issues discussed. And I am convinced that many times we discussed that rate of 3,000 metric tons. It shows up in many different ways.
Q Okay. And it's your understanding from those conversations that the Department of Energy

Page 387

officials, at least the ones that you mentioned and discussed this with, expected the 3,000-ton rate to be achieved by 1998; is that right?

A They – they had said the geologic repository receiving rate would be designed for 3,000-ton per year and they had expected they would be able to achieve that by 1998

Q Thank you. Take a look now at tab 11, please. This is Plaintiffs' 978. Again, I'm sorry I don't have the cross reference. I'll try to fix that in the future.

Do you – this is a – this is a document Mr. Mills entitled· Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High Level Radioactive Waste, dated June 1983. Have you seen this before?

A Yes, I have

Q About the – would you have seen this at about the time it came out?

A Yes.

Q Now, on page 8 – this is contemporaneous with the execution of the contracts, correct?

A That is correct.

Q All right. Now on page 8, there is a subsection that says: Facility schedule and material

Page 388

flows.

A Yes.

Q And in the second paragraph there, again, for variety, would you like to read it? It says: It is assumed....

A It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002 respectively.

Each repository has a design rate – design receipt rate of 3,000 metric tons a year. Although a receiving rate of 1800 metric ton annually is assumed for the first 5 years.

Q Okay. Now, how does this compare with your understanding about the expected rate of acceptance at the time in 1983?

A The 3,000 metric ton was a used, an item that everyone in the Department of Energy and every one of the purchasers understood was a design rate

And it also – remember, that the 60 or 70 contracts that were there had in it that they would receive spent fuel and high-level nuclear waste no later than January 1998.

In order to practically achieve this of all – with all contracts, and this was in every

Page 389

single contract, it required DOE to begin receiving spent fuel and nuclear waste prior to 1998.

Otherwise, they would not meet that date with all of their contract holders.

This particular number of 1800 metric ton that they have assumed here for the first few years of operation was a surprise to us It was a surprise to me when I saw that. Because it was less than what we believed would be the amount of material that was being discharged from the nuclear reactors in that year.

Q So I guess for that reason, it was not consistent with your understanding in '83 about the expected rate of acceptance in '98?

A That is correct

Q Okay. Now, did you have discussions with the officials of the Department of Energy about this issue of accepting spent fuel before 1998 that you just mentioned?

A I had discussions about the acceptance rate before the Nuclear Waste Policy Act was passed. I had discussions between the time the Act was passed and the draft contract was issued in the Federal Register.

And, yes, there were many times I had discussions with the Department of Energy officials on that particular

Page 390

rate.

Q Now, was the 3,000 MTU annual rate of acceptance concept developed because of or as a result of the Nuclear Waste Policy Act or these contracts?

A I'm not sure of the origin of 3,000 metric ton, as to how it arrived. But it was certainly a reasonable quantity to be expected for a facility to be designed to receive in a year Because there were other facilities that had been designed in transferring spent fuel, both in the United States and in Europe, that this particular quantity of material coming to one particular facility was a reasonable number. The fact that it did match the expected discharge rate of the utilities plus a little more to work off the backlog makes it look like, yes, they were – they were – that was the reason for the 3,000 metric ton.

I'm not sure that that was really the reason. But it certainly was an understood design capacity and a reasonable design capacity for a repository.

Q At the time of the Nuclear Waste Policy Act?

A Yes.

Q Okay. But, again, do you know whether the concept of 3,000 – or the – yeah, the concept of

Page 391

3,000 MTU as an annual rate of acceptance was
developed because of or as a result of the Act or
whether it preexisted, for example?
A I think –
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Based on discussions that I
have –
THE COURT: I'll overrule. You can go
ahead
THE WITNESS: Thank you. Based on
discussions that I had with the Department of Energy
officials prior to the passage of the Nuclear Waste
Policy Act, this number was known. This number was
not as a result of the Nuclear Waste Policy Act. It
was – it was in the preliminary work that was going
on within the Department of Energy prior to the
passage of the Nuclear Waste Policy Act.
BY MR. STOUCK:
Q All right. Take a look at tab 12, please.
This is marked as Plaintiffs' Exhibit 633 And,
again, I have no parallel Defendant's Exhibit
referenced, but we will try to get that in the future.
Mr. Mills, this document is a September 15,
1983 memorandum. Subject: Mission Plan Strategy.
Distributed to a number of individuals that you

Page 392

mentioned here today and I think some that you haven't
mentioned.
And apparently – attached is a document
that says: Nuclear waste strategy and overview
proposal
Do you see that?
A Yes, I do
Q Okay. Now, do you know what this document
is?
A This is an internal document within the
Department of Energy.
Q Okay. This – on page 2 of the attachment
at the very bottom, I want to ask you about one
provision here. It's the very last bullet point
there It's actually part sub B of the last bullet
point.
It says, if – well, let me identify this a
little further. On the front cover, it says:
Attached is a revised mission plan strategy overview
based on the discussions in our last planning session.
Okay. Just to orient the discussion.
Please review to determine if this version
represents your understanding.
Do you see that on the first page?
A Yes, I do.

Page 393

Q Okay. Now let's turn back to page 2. At
the bottom, the bullet point, it says: If by 1994 it
is known that the first repository would be delayed
but by an expected period of less than 2 years, then
DOE will take either or both of the following actions
to be able to accept fuel in 1998.
And subparagraph B there says: DOE will
take title to the spent fuel, have it placed in dry
storage casks and pay a rental fee to the utility to
store the casks on site at the reactor.
Do you see that?
A Yes, I do.
Q Did you have an understanding about this
"take title and pay fee" concept at the time, in 1983?
A In fact –
MR. MILLER: Is the question independent of
this document, Your Honor, because the witness lacks
foundation as to testimony on this internal DOE
document.
BY MR. STOUCK:
Q Independent of this document, do you have an
understanding about that concept, Mr. Mills?
A Yes, I have an understanding about that
concept which was not favored by the utility industry.
Q And why is that?

Page 394

A Because it did not satisfy the understanding
and the intent of the contract or the legislation.
Q Okay. And why is that?
A Because it was the responsibility of the
federal government to remove the spent fuel from the
nuclear power plant sites starting from – or at least
by 1998.
Q Did you ever communicate the industry's
views about this "on site take title pay fee" concept
to the Department of Energy?
A Yes, we did. Subsequent to this particular
document, the Department of Energy did issue a draft
mission plan. That draft mission plan included that
as an item within the – I believe it was the 1984
version of the mission plan. And we commented on that
and indicated that we did not favor that particular
approach in resolving the commitments that DOE had.
Q Uh-huh. And was that – how was that
comment resolved? Was that comment accepted?
A Well –
Q Well, let me ask you this. How many drafts
of the mission plan were there, do you recall, because
we're about to get into this?
A There was a draft provided in December of
1983. That was provided as information. That was not

Page 395

provided for comment. It was provided as early
information
Then in 1984, another draft was submitted as
a draft for comment. And we did comment on that draft
back to the Department of Energy.
And then the final, the first mission plan
was issued, I believe it's in June of 1985. So that
there were really three basic versions. There was the
one of December '83 Another one of '84. And the –
the 1985 version. And then there were subsequent
versions of the mission plan.
Q Okay. And your understanding is that this
"take title on site and pay a fee" concept was
included in the '84 draft. Is that what you're
saying?
A It was included in the '84 draft. And the
utility industry and I drafted that response,
indicated that that was, in our view, not an
acceptable alternative.
Q Okay. And what was the disposition of that
issue in the final '85 mission plan?
A It did not appear in the final '85 mission
plan.
Q All right Now let's turn to tab 13, which
is marked as Plaintiffs' Exhibit 636, which is a

Page 396

draft –
MR. STOUCK And it wasn't clear before,
Your Honor, unless otherwise mentioned, these exhibits
have all been admitted already.
But I will note for the record that this
document may be incomplete. We've been trying –
there are some pages missing at the end, I think. And
we've been looking for those. We continue to look for
those. But this is what was produced in discovery.
And we'll continue to look for the rest.
BY MR STOUCK:
Q Do you – this is Plaintiffs' Exhibit 636,
as I said, Mr. Mills Is this the draft, the '83
draft that you mentioned?
A Yes This is the December 1983 draft of
that mission plan.
Q And you've seen this before?
A Yes, I have.
Q When?
A Oh, I believe I saw it in December, late
December of 1983.
Q Okay. Now, and what does – what's your
understanding of – you say it was distributed for
information but not for comment. Spell that out a
little. Why was it distributed for information but

Page 397

not for comment?
A Well, this was a major document that would
identify how that program was to be implemented. The
legislation actually stated when that document should
have been available. DOE was supposed to have
completed it by a certain date.
This was already past the date of when that
was – I believe this was past the date. But it was
stated that – that they would not be meeting that
particular date.
And in – the Department of Energy felt it
was important to get out a draft early to indicate
that they were proceeding with a program that was a
reasonable ability to try to get a mission plan in
place.
So that this program – this particular
draft was made available as an early draft prior to
the one that they actually submitted as a draft for
comment.
Q All right. Take a look at page 2-3 of this
document, so just a few pages in, please. There's
a – it's a table or a schedule that's entitled Waste
Acceptance Schedule.
A Yes.
Q All right. Now, how – this table shows,

Page 398

just for identification, on the left side is year
Then there's a column that says: Annual spent fuel
generation.
There's a column that – the next column
says: Discharge from decommissioned reactors.
Do you see that?
A Yes, I do.
Q And then: Cumulative spent fuel generation.
First repository acceptance, second repository
acceptance. Cumulative acceptance, and so on
Now, how does – how do the acceptance rates
shown here under the first and second repository
acceptance, how does this table accord with your
expectations in 1983 regarding the waste acceptance
schedule?
A Well, the first repository was the – the
only thing that was authorized at that time by the
Nuclear Waste Policy Act. The second repository was a
study to be – to come forward.
But you can identify down this list that
they talked about, after the year 2003, that they
would be receiving at the first repository the 3,000
metric ton per year.
The first few years they indicate a year
that they would be receiving 1800 metric ton per year,

Case 1:00-cv-00697-JFM Document 368-3 Filed 11/09/2007 Page 21 of 21

Page 399

which was equivalent to what was proposed in that draft letter that we looked at a few moments ago. That does not satisfy what we understood would be the amount of material that would be moving from the utilities, the purchasers, to the Department of Energy in those first 5 years.

Q Okay.

A It was less than the amount that we had understood when we engaged in the agreement of the 1 mill per kilowatt-hour and the development of the waste – or the Nuclear Waste Policy Act and also in the contract That number did not – was not equivalent to what we understood would be their rate.

Q Because your understanding was?

A That it would really be 3,000 metric ton per year in 1998.

Q All right Now this table shows that spent fuel from decommissioned reactors was included in these calculations. That's the third column, I think, as I indicated when I described the exhibit. Do you see that?

A Yes, I do.

Q Did the industry, the nuclear utility industry consider that to be reasonable at the time and consistent with the overall program purpose here?

Page 400

A The – the contract, as signed, did identify that the Department of Energy could provide priority for shutdown reactors in the – in the allocation for receiving spent fuel. And with that contract understood, this did fall within what we understood might occur.

Q Okay. And it was reasonable for the Department of Energy to factor that into its planning, the discharge from the – the spent fuel that had been discharged from decommissioned reactors?

A Yes, it was a reasonable approach to include that.

Q Now, if you would turn now, please, to tab number 14. By the way, even though this '83 mission plan was distributed only for information and not comment, Mr. Mills, do you recall, did EEI comment in some way on the contents?

A Absolutely.

Q Uh-huh. And how did that happen?

A I personally met with various officials within the Department of Energy. Mike Lawrence, particularly, who was acting director there in early 1984. And later with Ben Rusche and later in 1984 when – after he had become confirmed as the first director of the program.

Page 401

Yes, we conveyed our disappointment that this did not, in fact, reflect the quantities we had understood would be included when we signed the contracts.

Q You personally conveyed that?

A Yes, I did.

Q All right Now, tab 14, please.

A Yes.

Q This – it may be another one of these that was on our may-use list. Let me just check.

MR. STOUCK: Yeah, Your Honor – this document has been admitted.

BY MR. STOUCK.

Q It's Plaintiffs' Exhibit 1925. And it appears to be a letter on US House of Representatives Committee on Science and Technology letterhead, November 17, 1983, addressed to Secretary of Energy Hodel. Do you see that, Mr. Mills?

A Yes, I do.

Q Again, for variety, would you like to read this for us?

A Yes. Dear Mr. Secretary, we have recently been advised that DOE has a draft mission plan which calls for a later start update, up to 5 years, for the

Page 402

first nuclear waste repository than is required under the Nuclear Waste Policy Act of 1982. We would hope that the Department would recognize that the dates in this law are not subject to continuing change, but reflect a congressional attempt to establish firm planning deadlines which should be adhered to, if at all possible. The Congress attempted to strike a fine balance between the competing concerns when it established these deadlines over the 4-year period during which it considered and drafted this legislation. We realize that the Department cannot simply ignore these competing concerns, but nevertheless should strive to meet the intent of Congress. The Department has already missed one deadline in the Act relative to site guidelines. But we would hope that this one instance should not be the rule of the Department of Energy's performance in implementing this Act. We respectively request that you inform the department's nuclear waste project office regarding congressional intent with respect to the deadlines in this Act.

Q All right. How did this sentiment expressed