Page 403

in this letter comport with the industry's –
A It was directly – it was a direct
relationship It was what we believed at that time
also.
Q The industry shared these concerns?
A Yes, they did.
Q Okay. And can you elaborate. Why was this
of concern at that time?
A Because of the draft mission plan which
showed a quantity less than was understood to be the
quantity that was to be delivered in 1998 And it
also had missed the first, the very first – not the
very first, but it missed one of the early milestones
that had been established by Congress, and that is
submitting the citing guidelines.
Q And why was that of concern?
A If DOE was missing the very first
commitments, early commitments, then it could impact
the overall program in being able to achieve the 1998
date, which was understood.
Q Did you ever have discussions with any of
these members in particular about this issue?
A Yes, I did.
Q Can you tell us about that?
A Yes, I had discussions with the individual

Page 404

members themselves, Marilyn Lloyd and a Robert Walker.
I do not recall having a discussion with Larry Winn
I also had a discussion with the staffs of those
particular Congresspersons.
We had testified, we the utility industry,
had testified before this committee as only one, we
had testified before many committees, but we had
testified before this committee on science and
technology with regard to the development of Nuclear
Waste Policy Act.
So there was a good – there had already
been established a relationship with that committee
and with the members of that committee on what the
intent was of the Nuclear Waste Policy Act
And the relationship and the discussions
were often one on one with these particular
Congresspersons, as well as with their staff.
Q All right. Turn now to tab 15, please.
This is marked as Plaintiffs' Exhibit 1800.
MR. STOUCK And, Your Honor, for the
record, this is also Defendant's Exhibit No. 1 –
well, this – the Defendant's Exhibit No. 1 is a
complete copy of these proceedings of this conference.
Plaintiffs' Exhibit No. 1800 is excerpts which consist
of materials that are identified to Mr. Morgan on the

Page 405

one hand, and secondly, materials that are identified
to Mr Mills. So that the complete copy of the
proceedings is Defendant's 1. The excerpts are
Plaintiffs' 1800.
BY MR. STOUCK:
Q Mr. Mills, do you recognize this document?
A Yes, I do.
Q What is this?
A This is a recording, I believe it's really a
transcript in many respects, of the proceedings of a
meeting in 1983 of the Civilian Radioactive Waste
Management as an information meeting which occurred in
December, over a 3-day period, December 12 to 15 in
1983.
Q Okay. And did you attend this conference?
A Yes, I did.
Q Uh-huh. And did you give a talk at this
conference?
A Yes, I did.
Q Okay. And if you page forward a couple of
pages, you'll see the materials entitled: Program
overview, Robert Morgan, Acting Director, and so
forth.
A Yes. I see that.
Q Okay. This was an account of the talk given

Page 406

by Mr. Morgan?
A Yes, it was.
Q And you think it's pretty close to a
verbatim transcript?
A Yes, I do
Q Why do you think that?
A Because I was there and I heard the talk.
And I was impressed in certain ways by his
presentation.
Q Uh-huh. Okay. And you've had a chance to
review this document before today?
A Yes, I have.
Q Recently?
A Yes.
Q And does this report accurately reflect what
you recall the substance of Mr. Morgan's talk to have
been?
A Yes, it does.
Q Okay. How can you remember these details?
A The intensity of activity that was occurring
during the period of 1981, 1982, 1983 was so great
that – and the hours that were spent on this
important issue were of such a significant – had such
a significant meaning to the utilities and to me
personally because I was a point person for the

Page 407

utilities at that time, that it even amazes me, my
recall that I have of the particular meetings and what
was said in those particular meetings and what my
interpretation was of those comments.
Q All right Take a look at – and I believe
on this page that I've called you attention to,
page 11, program overview, there is a paragraph that
has actually come up prior to this trial in this case
that's part of Mr. Morgan's remarks. It starts: I
would like to talk a little bit about
Do you see that?
A Yes, I do.
Q Let me read this. I would like to talk a
little bit about the strategy as laid out in the
mission plan and what we intend to do. I think most
of you know that the Act requires that we receive
waste from the utilities by January 1, 1998
Technically, the Act does not specify how much waste
or spent fuel we must begin receiving at that time.
In fact, if we accepted one spent fuel element in
1998, we would technically be in accordance with the
Act. However, we do not believe that that meets the
intent of the Act.
The basic strategy which we've outlined in
the mission plan is that, beginning in 1998, utilities

Page 408

will not have to provide any additional storage
facilities on-site. During the first year of
operation of the repository in 1998, we should be
receiving fuel at a rate so that no utility would have
to add any further storage facilities either on-site
or at any other location.
Do you see that?
A Yes, I do.
Q Okay. Now, did – what was your reaction to
that statement at that time?
A I guess it was one of great anxiety because
it did not satisfy our understanding earlier in the
year when we signed the contract.
Q Okay. And can you elaborate and explain why
that did not satisfy your understanding?
A Well, certainly the thought of accepting one
fuel assembly from each of the contract holders was
such a foreign thought, such an unrealistic thought
that that – that just wouldn't at all be
representative of the contract or the understanding of
the Nuclear Waste Policy Act.
It is true there was not a quantity
specified in the Nuclear Waste Policy Act, but there
was an understanding, and it was stated that it should
be – it should be received as expeditiously as

Page 409

practical, at the request of the purchaser.
And the quantity that he talked about, went
on to talk about, saying that it would be the amount
of spent fuel received so that no utility would have
to add additional storage capacity, was a lower number
than the amount that was being discharged at the
reactors at that time.
That lower number was not what we understood
was the agreement that we had with the Department of
Energy and the understanding at the time we signed the
contract.
Q Now, when you say it was a lower number, had
there been discussion of this idea of – of the amount
of acceptance necessary to avoid further storage
capacity? How was it at that time that you had an
understanding of what quantity was being talked about?
A Well, the – the utilities had to build,
spend money to build storage capability for whatever
was discharged up through 1998. They knew they had
that responsibility.
Some of the utilities believed that they
better cover their bets because they wanted the plants
to continue operating. And they built a capacity for
storage at their sites that was greater than would be
necessary to satisfy that amount discharged up through

Page 410

1998.
Thus, some utilities really didn't fall
within this category as he defined here, that they
would take fuel from those who needed to have
additional storage capacity in order to have that
capacity available.
And it did not really correspond to the OFF
allocation, the O-F-F allocation, that was identified
as a mechanism for the receiving fuel from the
utilities.
So that the amount of fuel that really
needed to move to prevent utilities from spending
extra money was less than the understanding that we
had that they would be removing the amount equivalent
to what was being actually discharged that year plus
some quantity to move off – work off the backlog.
Q All right. Which, again, was how much?
A Somewhere in the range of 3,000 metric ton.
Q All right. Why do you say this didn't
accord with the OFF concept?
A Well, some of the utilities that had early
discharged material did not, in fact – or had
capacity at their plants, which would – which meant
that they didn't really need, from a need standpoint,
to have DOE move the fuel at that early point.

Page 411

Thus, in order to satisfy this requirement, it would – the allocation would then be arranged differently than was in the contracts. It would be arranged to those utilities who had not built the extra capacity beyond the – beyond the amount accumulated by 1998

Q Okay. Now let's turn to your talk or the account of your talk here, which, again, is the second part of this excerpt that's the exhibit. It says: Nuclear Waste Fund management, Loring Mills.
And this is an account of a talk that you gave at this conference.

A That is correct

Q And who attended this conference, by the way?

A It was a very large attendance. I recall that there were contractors at that meeting. There were – DOE was the predominant representation there. Electric utilities with nuclear programs were there. The reactor suppliers were there. The National Laboratories were represented. The contractors who wanted to work for DOE on this issue were there. It was a widely represented group of people that attended this conference

Q It says on the front cover: Sponsored by US

Page 412

Department of Energy
Is that your recollection?

A That is correct

Q And, in general, what was the purpose of the conference?

A It was an information meeting basically to share information on what – where DOE was on the program and how they were planning to proceed with the program.

Q Okay. Now do you believe that this – you had a chance to look at your account of the talk prior to today?

A Yes, I did.

Q And do you believe this is a pretty close transcription or –

A Yes, I believe it's pretty close transcription. And that's identified when you look at the second sentence which says: I have crossed out a lot of the words that I have prepared.
So this was really more a transcription than it was the submitted document.

Q All right. Now, at – was this – where was this given in relation to Mr. Morgan's, before or after?

A This was after.

Page 413

Q Okay. And in the first column, the third paragraph, which says – wait a minute. Yeah. In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day at some unspecified rate, hopefully starting in 1998 The DOE promise must be carried out and it's our task as contract holders to do everything we can to assure that it is achieved.
What was behind this "some unspecified rate, some unspecified day" statement?

A One must put this in context. That the timing here was close to the end of the first year of having had the waste – Nuclear Waste Policy Act passed, the contract signed DOE's beginning to have a mission plan.
And I had heard earlier in that conference Mr Morgan's statement that suggested some different quantity of spent fuel would be – would be actually disposed of And it was kind of a response ad lib in frustration, in response to Robert Morgan's earlier statement.
That, hey, look, they're saying that they have – they're going to take the fuel, but at some unspecified date and some unspecified rate, hopefully starting in 1998. That was kind of a statement of

Page 414

frustration. What do you mean that? That wasn't really what we had an understanding to believe.
I went on to say that DOE must carry out its responsibility, and it's our task as contract holders to see – do everything we can to see that they carry out the contract as we understood it, which was a specific rate that we understood it would be.

Q Right. And subsequent to – was Mr. Morgan's speech the first time that you had heard in public – we saw the internal, I think what you described as an internal DOE document. Well, no, there was – the '83 plan, I guess, came out in December, that's contemporaneous with this –

A That was after. By about two weeks after.

Q Was Mr. Morgan's speech the first time you had heard the statement about the rate of acceptance that gave you anxiety?

A It was the first time there was a public meeting on that, at which it was stated publicly, yes.

Q Had you heard it privately?

A Well, there were inklings that there was some concern about how they were going to achieve about what they understood they were responsible to achieve, yes.
I was having various discussions with the

Page 415

Department of Energy people working on this program throughout this period of time

Q Now, subsequent to Mr. Morgan's speech, did you, on behalf of EEI, take any steps to, you know, specific steps to advocate that the – what you understood the original understanding of 3,000 MTU per year be from retained in the mission plan or other planning documents?

A Yes. I personally, and I know that others did also, met at different times one on one with particular individuals in the Department of Energy. I know that I met with Mike Lawrence in early 1984 when he was acting director of the program. And I know I met many times with Ben Rusche who became the confirmed director of the program in, I believe, about midyear 1984.

Yes, I conveyed with – on a continuing basis that what they had proposed in the draft mission plan really was not what we understood the commitment to be.

Q Okay. And what specifically did you tell those DOE officials that you understood the commitment to be? Or did you tell them specifically?

A Oh, absolutely. This was discussed that, hey, guys, we had agreed. We're paying the money.

Page 416

We're paying a large amount of money for a program in which our understanding was that you were going to proceed on a basis that, well, we had the responsibility of storage of all fuel discharged prior to 1998. That starting in 1998, they would be receiving the spent fuel at the rate equivalent to what was being discharged from the nuclear power plants, plus some additional amount to work it off.

Q Did those discussions include the specific number that you mentioned here, the 3,000-ton?

A Yes. The 3,000 metric ton was viewed in many fronts as being the number, the most effective number that would satisfy that requirement

Q Satisfy the requirement of discharge plus?

A Yes.

Q Plus backlog.

All right. Now, in terms of the development of the mission plan, did you have any success in advocating with Mr Lawrence or Mr. Rusche or others that the – well, you understood the original intent of 3,000 tons and discharge plus be included in the mission planning documents?

A Yes. And it was included in the mission plan – final mission plan which was completed in June of 1985.

Page 417

Q Okay. We'll take a look at that in a moment. Turn now to page – I mean to tab 16, please. This is another document that my handwritten note says here has not yet been admitted.

MR. SKALABAN: No, I think it was admitted the first day.

MR. STOUCK: It was admitted the first day. We'll check while I'm talking. We'll assume that's true.

BY MR. STOUCK:

Q This is marked Plaintiffs' Exhibit 647. Have you seen this before, Mr. Mills?

A Yes, I have

Q Did you – did you see this about the time it came out, or would you have?

A Yes, I would have seen this at about the time that it was – it was an internal document within the Department of Energy from Richland Operations Office to Ben Rusche, who was then the director of the office.

Q Okay. And this was a letter from Mr. Lawrence at the Richland Operations Office?

A That is correct. He had been transferred within the Department of Energy from the acting director of the waste program to the manager of the

Page 418

Richland Operations Office in 1984.

Q Okay. And for what period of time was he, approximately, if you recall, the acting director of the program?

A It was a few months. And I believe it started either in January or February of 1984. And it was just a few months that he served in that capacity.

Q Okay. And then he goes to the Richland Operations Office apparently?

A As the manager of the office.

Q As the manager of the office. And this is identified as comments on the draft mission plan provided by Mr. Lawrence or his office; is that right?

A That is correct.

Q Okay. Now, on the very first page, if I could just call your attention under the – it's just under the four bullet points there, it says: The most significant comments

Do you see that?

A Yes I do.

Q Some of which are discussed in detail in the enclosures are as follows.

Why don't you read for us just, again, for variety, the next paragraph there.

A Number one. It should be noted that to

eliminate the need for additional at-reactor storage
after January 31st, 1998, the initial waste acceptance
rate for 1998 should be about 2800 MTU, plus some
amount up to 630 MTU, depending on the extent federal
interim storage is utilized
Q Now, how does this statement square with the
description you gave before of your understanding
about the amount of material that – or the amount of
spent fuel that would need to be removed in order to
satisfy this need to eliminate additional at-reactor
storage?
A Well, this actually relates very closely to
my understanding of what we believed we had agreed to
when we signed the contracts as the quantity.
Q All right But this – with that –
Mr. Morgan did not use the numbers in his speech, but
he used this comment of eliminating the need for
additional at-reactor storage space. And without the
number included, Morgan's comments gave you some
anxiety. But this – this is closer to the 3,000.
I'm just asking for an explanation.
A Yeah. This is closer to the 3,000 than
was – was identified by Mr. Morgan. And my own
analysis, and that of the utilities at that time,
suggested that, really, the 2800-ton probably was not



needed to be moved to satisfy this no need for
additional at-reactor storage But that's what
Mr. Lawrence believed at that time
Q Okay Well, was there some flexibility to
the way in which this amount of material needed to
satisfy this could be calculated?
A Yes. That was one of the problems with the
whole concept of being able to satisfy what
additional – what needed to be moved so that
additional capacity would not have to be built at the
reactor sites, because it depended on whether the
utilities did rod consolidation, which would allow
them to put more fuel in their spent fuel pool.
It made a difference on whether a utility
had actually built their pool large enough so that
they could store beyond them
There were some utilities that didn't have
all the confidence in the world in the Department of
Energy having achieved the 1998 date, so they had made
themselves more capacity than was necessary
So it was a moving target. You could
identify different amounts depending on your analyses
as to what was actually needed to prevent the addition
of at-reactor storage.
Q Okay. All right. Let's move then to tab



number 17, if we can
This is the – this is – I believe
Plaintiffs' Exhibit 95 is an excerpt of the 1995
mission plan, which is, or soon will be in evidence as
Defendant's Exhibit No – and I don't have the
cross-reference, I'm sorry, Your Honor. Do you have
that handy?
MR. SKALABAN. It's not handy.
MR STOUCK: We will have this handy in the
future days, I can assure the Court. And I'm quite
confident this is on the government list. I know the
full plan is. I just can't give the – the
defendant's exhibit number for the record at the
present time.
BY MR. STOUCK.
Q Take a look at this, Mr. Mills
A Yes.
Q Have you seen this before?
A Yes, I have.
Q And can you just briefly describe the format
of the 1985 mission plan?
A Well, this was the final version that was
submitted to Congress to satisfy that requirement of
the Nuclear Waste Policy Act for the Department of
Energy to have developed a mission plan for the



overall program.
And as we discussed earlier, there had been
an early draft in December of 1983, and there was
another draft in 1984 on which we submitted comments
to the Department of Energy on that draft
And this was the actual draft – or actual
mission plan as completed by the Department of Energy
and submitted to Congress.
Q Okay. And actually, if I may, and I'm sorry
for this, but let me just go back to the prior
document and ask one more question in which I had
intended to ask about, the Lawrence comments on the
'84 plan.
If you could just turn back to that.
Because, really, in terms of this concept of avoiding
at-reactor storage concept, in terms of fulfilling the
intent of the Nuclear Waste Policy Act as you
understood it, which was more important, the assuring
the 3,000-ton per year rate, or implementing a rate
that would avoid additional storage after 1998?
A There's no question in that. It was to take
the waste at a rate that was the understanding that we
had for the contracts. That was the important thing,
to get that quantity of waste moved as we understood
it because we had already paid or were in the process

Page 423

of paying for it.
Q Okay. Now let's go back to the final mission plan. Did you – did you have, on behalf of EEI, have input into this?
MR. MILLER: Excuse me, Your Honor, it's afternoon. We're approaching 1 o'clock. We've been going more than an hour, is it possible to take a lunch break before we get started with the document with this witness?
MR. STOUCK: I was actually hoping to finish before lunch, Your Honor. I really – I'm mindful the Court generally prefers lunch on the late side. I don't know for sure that I can absolutely finish with Mr. Mills, but I can get pretty darn close and I might be able to finish by 1:00 or 1:15.
THE COURT: Oh.
MR. STOUCK: That was sort of my goal.
THE COURT. Whatever your plan is, we'll continue.
MR. STOUCK: Okay.
THE COURT. If anybody needs a break, speak up. But otherwise, we'll continue on
MR. STOUCK: Well, should we take a short break and try to finish before lunch if we can?
THE COURT: I'm okay.

Page 424

THE WITNESS I'm okay
THE COURT: All right. Let's go.
BY MR. STOUCK.
Q All right. Mr. Mills, if you would turn – again, this is an excerpt, but the page numbers I think are included. But if you would turn to page 26 and 27 of this document, you will again see a couple – two different of these receipt rate schedules?
A Yes, I see those.
Q Okay. And one on page – actually, my copy is page 26 is a little, fuzzy but I've got a better one here. Actually 26 is on the side there. It's table 2.2, Waste Acceptance Schedule Authorized System.
Do you see that?
A Yes I do.
Q And the next page, which is marked 27 at the bottom, it's identified as Waste Acceptance Schedule Improved Performance System.
Do you see that?
A Yes, I do.
Q And if we look at these schedules, I guess if we go back to the first one, again, you have the first and second repository concepts. Under first

Page 425

repository, you see a – the rate there that does eventually get to 3,000 MTU.
And on the second, on page 27, if you look under the column that says, either MRS acceptance gets to 3,000, I guess, in 1998.
So both of these schedules ramp up to the 3,000 MTU annual rate. But the commencement date and the ramp-up rates differ –
A That is correct.
Q – is that right? And the first schedule you have the 400, 400 – starting in 1998, 400, 400, 400, 900, 1800 and then 3,000.
Whereas in the second schedule, so-called performance system, it indicates pre '98, 2200 and starting in '98, 3,000.
Okay. What can you tell us about the significance of these two schedules?
A Well, the first one, Table 2.2, which is labeled Waste Acceptance Schedule Authorized System, the authorized system at that particular time was the first repository, but it also included the second repository which was not authorized, but they – they provided it as an example of what might happen.
It was even more disturbing when we saw the numbers here because now it was – it was less than

Page 426

the amount that was to be received in 1998 in the earlier draft mission plans.
It had gone from 1800 on down to 400 now.
It was – it was a – it appeared to be a moving target.
And during that period from December 1983 until this document was issued, which was June of 1985, I had impressed personally on anyone that I could in the Department of Energy that somehow, some way we need to put a program in place, identify a program that would allow us to get back to what we believed was the understanding when we signed the contracts.
And that is what happened in the ability to get back to that particular understanding. It was identified here as Table 2.3, Waste Acceptance Schedule Improved Performance System, that was an identified way to get back to what we understood was to be the quantities delivered in the years as identified
Q Okay. And that understanding included pre 1988 activities?
A Yes, it did.
Q And can you just, again, explain how that is shown on this chart?

Page 427

A Yes. What's on the chart is that there would be a monitored retrievable storage facility included in the overall system And that the Department of Energy would start receiving the spent fuel at the monitored retrievable storage facility and then transfer it to the repository.

And they would be able to receive, start receiving spent fuel from the contract holders prior to 1998, and it was expected that they would do it prior to 1998 in order to satisfy the contracts that they had. They had 60 to 70 contracts that said no later than January of 1998 In order to satisfy that date in those contracts, it did require moving a little before 1998.

And it showed a system that could be – could achieve what we had thought was the appropriate quantity of spent fuel and high-level waste to be moved and satisfy our understanding as we signed the contract

Q You personally discussed this schedule or something like it with Mr Rusche?

A I would say using a crowbar, yes, I personally emphasized the importance of getting a program together that would satisfy our contract.

Q With Mr Rusche?

Page 428

A Yes, with Mr Rusche.

Q Do you recall others that you discussed that subject with?

A Oh, there were many people on the program at that point of the Office of Civilian and Radioactive Nuclear Waste And I did talk with many of the people on that particular program And I can assure you this was emphasized in many ways with more than just Mr. Rusche.

Q Does the schedule on page 26 accord with the utility – nuclear utility industry's understanding – original understanding of the purpose and intent of the MWPA?

A No, it does not.

Q Okay. And how would you answer that question with respect to the schedule that is shown on page 27? Does that accord with the industry's understanding originally about the purpose and intent of the statutory program?

A Yes, it does.

Q Do you recall the phrase that we looked at in the statute, and I think you mentioned a couple times here, let me call your attention back to the phrase, as expeditiously as possible?

A Yes.

Page 429

Q Now, did that phrase have implications for the schedule of pickups, in other words, the sequence, now turning from rate to sequence of pickups, was there a relationship between the "as expeditiously as possible" phrase, in your understanding, and the sequence of pickups?

A Yes, there was. If you were going to have an efficient system that allowed you to do this expeditiously as practical, you would establish campaigns for transferring a significant quantity from each of the purchasers to the Department of Energy because it required casks to be available. It required training of personnel at each particular site

In order to achieve that as expeditiously as practical, it really did require an allocation of a significant amount from each of the purchasers.

Q Okay. And "allocation" meaning what in that context?

A Meaning the amount of material that should be transferred to operate efficiently.

Q Okay. Now you've mentioned previously the concept of OFF. Can we, again, get a brief explanation of what that is in terms of the contract?

A Yes. OFF, or oldest fuel first, the concept

Page 430

was that, if the utilities asked the Department of Energy to take more spent fuel than they were able to in any one particular year, that DOE would allocate their capacity to receive, among the purchasers, based on the fuel that had been discharged from the reactors at the earliest date, having first priority

So the priority would be established based on which fuel had been out of the nuclear reactors for the longest period of time

Q And for what purpose was this OFF allocation established?

A This was established simply to allocate space for each utility and how they would stack up in this order of moving spent fuel.

Q Okay. Did OFF create any obligations, in your understanding, on the part of the utilities?

A Oh, no. Nor did we expect it to be delivered according to the allocation.

Q Why did you say you didn't expect that?

A Because the OFF concept identified that some of the – a relatively small quantity of spent fuel would be allocated to several different locations. And it just did not make sense from running an efficient program to proceed to those particular utilities that had the oldest fuel first and take a

Page 431

small quantity from them and go to another, take a small quantity, go to a third and take a small quantity. That was not an efficient system. And it was known at that time that was not an efficient system.
But it was a way to allocate space.
Q Okay.
MR. MILLER: Your Honor, once again, we just renew our standing objection about Mr. Mills' testimony concerning the meaning of the terms of the standard contract.
THE COURT: Certainly. It's understood there's a continuing objection.
BY MR. STOUCK:
Q Mr. Mills, did this, you know, suggestion of actual pickups according to OFF have implications for operations at reactor sites?
A Oh, yes. Oh, yes. There are times, and it's about once a year, that the utilities are removing fuel from the core of the reactor. They shut down the reactor, they are removing fuel and putting new fuel in. And during those periods of time, there's a very active – activity being – proceeding at the utilities
And they simply wouldn't want that to be an

Page 432

interruption based on the fact that they were to deliver a certain amount of fuel and it might come at the time – that particular time.
There are other instances in which other things are occurring at the utility's site that would basically preclude an efficient means of transferring spent fuel to the federal government at a particular time.
So that, yeah, there was an interference here of using OFF as a mechanism for defining when the fuel would move from a particular site.
Q Okay. And that was understood by the utilities in 1983?
A It was understood by the utilities and understood by the Department of Energy.
Q Well, if not by the OFF schedule, how would the actual schedule – or sequence of pick ups be established in your understanding?
A Well, the – the Nuclear Waste Policy Act stated that the Department of Energy was to receive the fuel as expeditiously as practical when the utility or purchaser requested them to take it. That was also included in a "whereas", within the contract itself.
And a utility, which may have the OFF

Page 433

allocation in a particular year, might say, no, I don't want to do it that year. I would rather not do it that year. I would rather do it the next year or 5 years from now. So that they would not necessarily want to remove their fuel on that basis.
Q Okay. And how would the allocations be adjusted?
A Well, that was where we got into this swap allocation. Between the utilities, they could work out among themselves who would get the credit for that particular allocation. And they actually could exchange allocation space in the exchange concept under the contract.
Q And did you have an understanding in 1983 about how the mechanics of those exchanges would work?
A Well, we had a general idea because of the arrangements that had been performed earlier on the uranium enrichment exchanges that had occurred among utilities.
It had not been worked up in detail, but we had a pretty good idea of how it would work.
Q Okay. Was there discussion at that time of brokering?
A Yes, there was. The – the major broker, Swuco, S-W-U-C-O, who was brokering many of the

Page 434

arrangements on the uranium enrichment, had spoken up. Walter Wolf was running that particular company, spoke up and said he would be willing to make these arrangements to assist the utilities in exchanges.
Q Okay. Did you yourself ever consider getting involved in facilitating exchanges?
A Well, I knew that by 1998 or before 1998 that I was going to have retired. And a fleeting thought went through my mind at that time that maybe I would help arrange those brokered arrangements. But it did not go forward in any fruition.
Q All right. Now what did – you've mentioned in some of your prior testimony – well, what – what did the industry see as the most important advantages of these exchanges, if you can comment on that.
A It was primarily to improve the efficiency of the overall operation and also accommodate the flexibility that was needed at the purchaser sites to be able to schedule their particular fuel deliveries in a way that would not interrupt their operations.
Q Okay. And you've used the term "campaign" in your testimony. And you – we were all talks about swaps. Of course, is there – can you just explain what this campaign concept is and what's the relationship with the exchange policies.

Page 435

A Moving spent fuel is a challenging task. And it requires the use of specific license – specifically licensed casks. It might be moved by trucks or it might be moved by rail Most of it we expected would be moved by rail. And it required the availability of these casks that were actually to be provided by the Department of Energy. And it required a training program for the particular people at the reactor sites to be able to move their spent fuel into these casks of DOE. And DOE was to provide that. DOE was to provide other interface items to allow this to occur To achieve an efficient program, you would not send one truck or one railroad car to a particular purchaser, but you would do it in a reasonable quantity. That reasonable quantity might be four to 10 railroad casks at any one time So that you would have a good campaign of doing a significant amount of fuel, if each cask held 10-ton and you sent 6-casks at a time, that might be 60-ton as a reasonable quantity that would be transferred in a particular campaign

Q And were these issues being discussed in the industry at the time the contract was developed?

A Yes.

Page 436

Q All right. Now, take a look at, if you would, the next tab in your book, which is number 18. This is a letter. It's Plaintiffs' Exhibit 145. And it's a letter on Department of Energy letterhead from Mr. Dreyfus to Dr Kadak. That is 1995. I believe that was after the time that you left EEI. Is that right?

A That is correct.

Q Okay Nonetheless, in the bottom of the second paragraph here, about halfway down on the right side, there's a sentence that starts: This provision – I think referring back to the exchange provision – this provision was included.

A Yes.

Q Do you see that?

A Yes.

Q Why don't you read that for us.

A This provision was included in the standard contract in response to comments received during the standard contract rule making. In order to allow purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance – of waste acceptance capacity to meet individual utility needs without the

Page 437

overt involvement of the department

Q And how does that statement by Mr. Dreyfus compare with your understanding of the exchange issue?

A It's directly –

MR. MILLER: Your Honor, once again, we would object to a foundational basis for Mr. Mills testifying about what Mr Dreyfus meant in his letter to Mr. Kadak

THE COURT. Well, the question is: How does this comport with your understanding of the situation, the statement in the letter.

THE WITNESS: And it does –

THE COURT: Without reference to Mr. Dreyfus.

THE WITNESS: It does comport with my understanding of what we had agreed to on the exchange basis in the contracts.

MR. STOUCK: All right. Your Honor, I regrettably am not going to be able to finish probably before a very late lunch. I can push through, but in light of the comments – I mean, I've got maybe – well, I think I might be able to finish in 15 minutes. But I did want to –

THE COURT: It's up to you. If you want to continue, fine.

Page 438

MR. STOUCK: Okay. If you're okay.

THE WITNESS: Yes, I am.

MR STOUCK: We've been going about an hour and a half

THE WITNESS: Yes, I am.

MR. STOUCK: All right. Let's try to do it. I would like a glass of water.

THE COURT: Sure

MR. STOUCK: Somebody had the graciousness to provide larger cups today, after yesterday.

THE COURT As long as there's nothing floating it in, you're all right.

BY MR. STOUCK.

Q Mr. Mills, I would now like to turn to the subject of shutdown priority, priority for acceptance of spent nuclear fuel for shutdown reactors. When the contracts, the DOE contracts were developed in 1983, what was the industries' position on priority for decommissioning reactors?

A In the comments that were submitted to the Department of Energy by the Edison Electric Institute and the utility of Nuclear Waste Management Group, we discouraged the concept of providing priority to the decommissioned reactors. This is a consensus position. It was not

Page 439

agreed to by all of our utilities, but that was a consensus position at that time that we discouraged it.
Q Okay. There were utilities who disagreed with that consensus position?
A That is correct.
Q And do you know how the consensus formed around that?
A Well, every utility wanted to make sure they had capability of transmitting their –
MR. MILLER: Objection. Hearsay.
THE COURT: Overruled. Continue.
THE WITNESS: My comments with the utilities revealed that they each had their own particular interest in making sure that, as much spent fuel from each of their reactors could be transmitted to the Department of Energy.
And one of the concerns was why give a priority to an organization that already has shut down versus my priority where I'm operating a plant and may need that particular fuel to move.
So there was a difference in opinion. And most of the utilities, of course, were those that had operating power plants.

Page 440

BY MR. STOUCK:
Q Well, were there any decommissioned reactors at that point, the commercial reactors?
A I do not recall when the first one was shut down But there was a concern. Yes, there were some people that believed they were going to be shutting down their nuclear power plants earlier
Q All right. Now what was DOE's position at that time at shut down – at the time that contracts were developed on shut down priority?
A The standard contract, as provided in the Federal Register, included – in the draft form, included this concept of providing a priority under emergency basis and also for plants that had been shut down.
They reviewed and commented on our comments about not having that as a priority and decided that they would provide it – provide that capability and that priority. And they so stated in their comments of the rule, that it would be unreasonable for them not to be provide it.
Q Let's take a look at that just briefly. It's tab number 6 if you would, please. This is in the rule making. Tab number 6 at the top right, you'll see page 16593 in the left-hand column, first

Page 441

new paragraph. I'll read it. Article 6(B)(3)(b) gives priority to SNF/HLW from permanently shutdown reactors.
This is the rule making that went with the final rule.
And four commenters recommended that this provision be deleted. This type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity. Therefore, we have not accepted the recommendation.
Do you see that?
A Yes, I do.
Q And that's your understanding at that time –
A Yes
Q – of DOE's position?
Did you have discussions about the shutdown priority issue with DOE officials?
A I do not recall specific discussions on that issue. Of course we were not open to discussions during the rule-making period. And I just do not recall having discussions with them on that issue.
Q Okay. Well, do you know – do you know from – what about discussions afterwards? Do you

Page 442

know why they took this position that they wanted – that – do you know other than what's stated here why DOE took the position that they wanted to retain this provision?
MR. MILLER: Objection. Foundation.
THE COURT: Overruled.
THE WITNESS: Yes. It was – it just seemed reasonable in that the industry would have an ability to decommission shutdown plants and be able to decommission them, return those particular sites to whatever use was appropriate, and to be able to do so in a reasonable time period after they were shut down.
BY MR. STOUCK:
Q All right. Now, was there – did you have expectations at the time in 1983 about how the shutdown priority reaction would work, I mean after the contract came out, obviously, because – no, let me withdraw that.
Did you have expectations during this period of development of the contract about how it would ultimately work?
A No. We – it was a – that was an element. The framework that had to be fleshed out later, we really did not have discussions of how that would be implemented.

Page 443

Q All right. In 19- – let's turn to failed fuel. In 1983 – do you understand the term "failed fuel"?
A Yes, I do It's described in the appendix to the contract.
Q Okay Without reference to the contract, is it a term that's used in the industry other than in connection with this contract?
A Yes, it is.
Q Okay. In that context, what is your general understanding of what failed fuel is?
A Failed fuel could consist of several different situations. Generally, it might be a – a fuel bundle that had a pinhole somewhere in one of the fuel rods that allowed gases to leak. So they were what we call leakers. Radioactive gases were able to get out of the fuel rod.
And/or they might actually be a damaged fuel rod that actually had a slit in the fuel rod itself so that the fuel was exposed.
Generally, when the spent fuel is removed from the reactor as having served its life in the reactor, it looks almost identical to what it was when it was put in the reactor. Physically, there's no difference. It's not like burning coal where the

Page 444

structure changes. They physically look the same.
You did inspect these particular fuel assemblies as they came out of the reactor And you could see if there was a defect on the outside of these particular fuel assemblies.
And it was visual contact or the leaker concept that was considered to be failed fuel.
Q All right. In 1983, did those who were involved in developing the spent fuel contracts believe that this failed fuel would be an issue for the Department of Energy in terms of running the program?
A No
Q Operating the program?
A No.
Q And why do you say that?
A No. Because as I said, the fuel assemblies look very much the same when they come out of the reactor as they did when they went into the reactor.
And a failed fuel assembly might simply be a leaker, which is a pinhole somewhere or a slit on the rods.
Or it might be of such a nature that they would actually put it in a container, actually put the fuel – failed fuel assembly in a container.
But there was no indication that it would be

Page 445

handled any different than the other fuel when it came to transferring to the Department of Energy.
Q You say there was no indication Was there discussion of this issue at that time in 1983?
A Well, not real discussion because it was understood that that was not an issue.
Q Okay. Was there an understanding in the industry about the Department's, at that time in 1983, about the Department's obligations with respect to the acceptance of failed fuel?
A Well, the understanding was that it would be accepted on the same schedule as unfailed fuel.
Q And why – where did that understanding come from? How did you know that? Was there any discussion that it would be a different schedule?
A There was no discussion of it being a different schedule. I'm trying to think. I believe there was a communication from DOE to the utilities, but I'm not sure I can point to it right now, that reference that that would stay on schedule, would be transferred on schedule.
Q Okay. There is – do you recall without – you know, without looking at it, do you recall the provisions in the standard contract about handling of failed fuel? Do you recall generally what was said

Page 446

there?
A In the standard contract, it was simply a requirement for the utilities to identify those particular elements that were considered to be failed fuel.
And they had – they had to provide information to the Department of Energy on the integrity of the fuel that they were delivering and what the condition was and whether it was a failed fuel or a nonfailed fuel.
Yes, those were required to be information only provided to the Department of Energy so they knew what it was that they were receiving.
Q All right. And in your understanding, did those involved in developing the spent fuel contract believe that handling spent fuel in this program would present any significant issues?
A No, it would not. Whether it was failed fuel or not failed fuel, it was not considered to be a real significant issue.
Q Okay. Now let's look at Number 18. Had you – let's look at – tab number 18 is another letter It's Plaintiffs' Exhibit 989. This is a letter from Mr. Bauer to Mr. Hall.
A I believe that's a 19, not 18.

Page 447

Q I'm sorry.
THE COURT: Tab 19.
BY MR. STOUCK:
Q Did I say –
A You said 18, I believe.
Q I apologize. It is tab 19. Thank you. Mr. Bauer to Mr. Hall. Do you see that?
A Yes, I do
Q Who was Mr. Hall?
A Mr. Hall, at that time, was working directly for me as the director of the Utility Waste Management Group.
Q All right. And Mr. Bauer at that time, did you know him?
A Mr. Bauer, yes. I knew Robert Bauer at that time. He was the associate director for resource management in the Office of Civilian Radioactive Waste Management.
Q This letters refers in the first paragraph to an incoming letter apparently to Mr. Rusche requesting clarification of two issues. Do you see that?
A Yes I do.
Q And would that have been a letter from you from Mr. Kearney, who would have signed that letter?

Page 448

A I'm not sure. It might have been a letter transmitted by Mr Hall. It might have been Mr Kearney. I'm not sure.
MR. MILLER: It calls for speculation, Your Honor.
THE COURT. I'm not sure what the objection is But it's overruled.
BY MR. STOUCK
Q Would you have been involved in this exchange on this discussion of this issue?
A Yes, I would.
Q Okay. And at the bottom of the first paragraph in the letter, without going through the whole letter, the last sentence – excuse me, the second paragraph The last sentence in the second paragraph reads: Failed – this is failed fuel can in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel. Do you see that?
A Yes, I do.
Q Is that – how does that comport with your understanding in that – at the time the contract was developed about how spent fuel would be –
A That is our understanding that the failed

Page 449

fuel would go on a same-schedule procedure as other unfailed spent fuel.
Q Okay. And then as a last issue here, and I hope – I think we can finish. I would like to turn to the subject of Greater Than Class C waste, Mr. Mills, or what is now known as Greater Than Class C waste. How was the issue of Greater Than Class C waste viewed by the industry when the contracts were signed?
A The terminology Greater Than Class C as a category of waste, to my knowledge, was not identified as such at the time of the passage of the Nuclear Waste Policy Act or when the contracts were signed. We knew there was radioactive waste which did not satisfy the class A, class B and C waste which were identified to be the responsibility of the states. We knew that all other waste that was generated by the commercial nuclear industry would be the responsibility of the federal government. So that that implied by the legislation – by the way, this was by legislation that that was stated. So that told us that any waste that did not satisfy – that was greater radioactivity than class C would be the responsibility of the Department of

Page 450

Energy. And we believed at that time of the contracts that those wastes that had a radioactivity Greater Than Class C, which later became called GTCC, were covered under the contract.
Q Okay. And was there much of this material, waste material around at the time of the standard contract?
A There was almost none at the particular time. However, there were components that we knew were Greater Than Class C, the so-called definition of Greater Than Class C, such as the control rods. Some of the other components, nonfuel components, we knew those had radioactivity that were greater than approved under class C. And those were accommodated within the contract specifically.
Q And what other types of Greater Than Class C material were, you know, was in existence or thought about as being a federal responsibility?
A Well, the anticipation was, at the time of decommissioning, there were components of internal reactor components that would have been exposed to high, intense radioactivity and would have achieved a level of radioactivity that was greater than that that would be allowed for it to be buried in the low-level

Page 451

waste disposal facilities that was the responsibility
of the state.
Q And why did you and EEI understand at the
time of the Nuclear Waste Policy Act that DOE would
have responsibility for this GTCC waste?
A Because the Nuclear Waste Policy – or the
Low-Level Waste Policy Act of 1990, as amended, plus
the plus the Nuclear Waste Policy Act of 1982, as
amended, indicated the mechanism and the
responsibility for the disposal of all radioactive
waste, all radioactive waste from commercial power
operation
And it specified that class A, class B and
class C waste were the responsibilities of the states
And it was licensed – these facilities were licensed
by the Nuclear Regulatory Commission
And anything that did not satisfy those
criteria was the responsibility of the federal
government. And the Department of Energy was the
entity that was doing this particular activity
Q Was there an understanding in 1983 about the
disposal site for GTCC waste, whether it would be the
repository or some other site?
A We had in the contracts specific items
identified, it's called, I believe, NS2, nonfuel

Page 452

components, nonstandard fuel components, which fell in
the category of GTCC as we now know it. And we
expected those to go to the repository at the time in
1983
Q Any expectations about these reactor
internals?
A Would be the same
Q Was that a subject of discussion during the
time period in which the contracts were developed?
A Oh, yes. We had considerable discussion
with regard to the – to the control rods and the BW
– BWR fuel channels and other elements such as some
of the utilities were actually disassembling their
fuel assembles so they could put it in a more compact
arrangement.
And the spacers that were removed would be
items that fell in that particular category, and they
would be transferred to DOE at the same time that the
spent fuel was transferred
Q What about the reactor internals? Was there
discussion in 1983 about the description of that
material?
A There was very little discussion at that
point The volume was small, and we were not dealing
with decommissioned reactors at that particular time

Page 453

So we did not talk about reactor internals.
Q Let's take a look at tab 20, which is NRC
rule, final rule, I believe, May 25th, 1989, published
in the Federal Register, titled Disposal of
Radioactive Wastes. Have you seen this before? Would
you have seen this at about the time it was issued?
A Yes. I saw it in the draft form. And I
also saw it when it was issued. And I have reviewed
it recently.
Q All right. Now, the – I think it's the
last page of this exhibit is where they actually,
after a lot of discussion, get to the actual one or
two paragraphs they're adding to the Federal
Register – to the, excuse me, to the CFR.
And you'll see in the first column on the
middle of that very last page, I think it's page
number 22583 a new section 61.55. Do you see that?
A Yes, I do.
Q Okay. And it says in the – well, let me
just read it again· Waste that is not generally
acceptable for near surface disposal is waste for
which form and disposal methods must be different and
in general more stringent than those specified for
class C waste.
In the absence of specific requirements in

Page 454

this part, such waste must be disposed of in a
geologic repository, as defined in part 60 of this
chapter, unless proposals for disposal of such waste
in a disposal site licensed pursuant to this part are
approved by the Commission
Do you see that?
A Yes, I do.
Q How does that – do you recall this, when it
was issued?
A Yes, I do.
Q Okay. And how does that rule comport with
your understanding of how the GTCC waste would be
handled in the spent fuel program – excuse me, how
GTCC waste would be handled in the spent fuel program?
A We knew that any waste with a radioactivity
Greater Than Class C was the responsibility of the
federal government. And it was DOE's responsibility
to provide the safe disposal of that particular waste.
We had thought at the time of the contracts
that any of those wastes would go to the geologic
repository. This rule by the Nuclear Regulatory
Commission says that it should go to the geologic
repository.
But, DOE, if you want to come up with
another way, and can convince us that another way is

Page 455

workable, DOE, it's your responsibility to do that. It's not the responsibility of the utilities or anyone else. It's the responsibility of the federal government.

And in the discussion that leads up to this wording that you read, the NRC stated that we do not believe that such an alternate will be provided.

Q Now, did you – strike that. Let me move on here.

Actually, yeah, let me just –

MR. STOUCK A couple more questions, and I think we can break for lunch, Your Honor.

After the contracts were signed in 1983, Mr. Mills –

Actually, Your Honor, I am just looking down here. I think a lot of this has been covered. I'm looking down the list of questions, and it just came out. So let me try to wrap up here.

I think – I think I'm done, Your Honor. I would like – with Mr. Mills. I would like, if we could, if I could have a little leave to just consider that over lunch.

THE COURT: Sure.

MR. STOUCK. And maybe if there's a question or two, come back.

Page 456

THE COURT: Fine. Why don't we adjourn now and come back at 2:30.

(Whereupon, at 1:29 p.m., the trial was recessed, to be reconvened at 2:30 p.m. this same day.)

Page 457

AFTERNOON SESSION (2:34 p.m.)

MR. STOUCK· Yes, Your Honor, I am done with Mr. Mills.

THE COURT: All right. Any cross-examination?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay. Mr. Miller.

Whereupon,

LORING MILLS

having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. MILLER:

Q Hello, Mr. Mills, how are you?

A Good afternoon. And I'm warm

Q I'm Alan Miller. You and I, of course, met at your deposition back a while ago. You remember me, don't you?

A Yes, I do.

Q Okay. The first question I wanted to ask you, Mr Mills, do you recall if – if the Yankee plaintiffs in this case, that is Yankee Atomic, Connecticut Yankee, Maine Yankee, were those utilities members of the EEI at the time that you were working there?

Page 458

A Yes, I believe they were.

Q Okay Thank you. And what about representatives from those utilities? Did they work on the task force that you were in charge of that EEI constituted with respect to standard contract issues?

A I believe there were representatives from those utilities in that task force.

Q Okay. Do you remember who those people were?

A There were so many people going through the office at that particular time, and it was different – at different days it would be represented by different individuals. But I do believe that one of the names was Rudy Gruby.

Q Okay. So you remember Mr. Gruby but none others?

A That's correct.

Q Okay. And what about, oh boy, the acronym, UNWMG. I believe you testified that was a subset of the EEI members. Is that correct?

A No, it included more than a subset of the EEI members.

Q I apologize. I didn't mean to mischaracterize your testimony.

And what about the three Yankee plaintiffs

Page 459

in this case, were they represented on that I'm sorry,
I'll – yeah, you looked at me, on that – on the
UNWMG group, were they represented?
A Yes, they were.
Q Now, Mr Mills, you had testified that you
had many meetings with DOE program leaders and
specifically you've mentioned, I believe, Mr. Morgan
and Mr Lawrence. And that they told you that they
intended – that they were in agreement with you, that
the contract rate of acceptance would be the
generation rate plus some amount to work off the
backlog; is that correct?
A I believe that you asked if I had had
discussions with these individuals, and I did
Mr. Morgan did not come into the program
until late in January of 1983. So that any of the
discussions that related to those quantities would
have been after that time for Mr. Morgan. But it was
prior to that time with many others.
Q Yes, sir. And I believe – and I believe
those individuals you mentioned were Frank Kaufman, I
believe was one of those individuals?
A Yes, it was
Q Prior to 1983, I'm assuming that DOE did not
have – and if you know, maybe you don't know, but I'm

Page 460

assuming that DOE did not have an office that was in
charge of implementing the statute because the statute
hadn't been passed yet, is that correct?
A That is correct. But they had an office
that was related to nuclear waste disposal.
Q Right. And is that the office that
Mr Kaufman worked in?
A Yes, it is.
Q Do you know if he assumed later
responsibility for the program after the statute was
passed?
A I do not recall.
Q And what about Mr. Brewer? Do you know –
the same question with respect to him. Do you know if
he assumed responsibility for the program after the
statute was passed?
A Mr. Brewer, at that time, was the assistant
secretary for nuclear energy.
Q Right
A The Nuclear Waste Policy Act required that
it be directed by an individual director that reported
directly to the secretary so that it was a separate
office from that of Mr. Brewer.
Q Okay. So Mr. Brewer wouldn't have been
later associated with the program after the statute

Page 461

was passed?
A Not directly responsible for it.
Q Okay, now I'm sorry, just for purposes of my
questions, is it all right with you if we talk about
the rate that you've discussed in your testimony, the
generation rate plus some amount of spent fuel to work
off the backlog; is it all right that we just refer to
that as the Mills rate for purposes of my questions
for you?
A You may, but it wasn't just my rate.
Q I understand I understand. But just for
purposes of my question, is that okay?
A Yes
Q Okay. These conversations I believe you
testified about that you had with Mr. Morgan,
Mr. Lawrence, early in the program, you don't remember
the specific dates on which those conversations took
place, do you?
A No, I do not because I was in the offices of
the Department of Energy many, many times.
Q Right.
A And those conversations occurred many, many
times.
Q Sorry. I didn't mean to interrupt you.
So you don't remember specific times other

Page 462

than – on any specific dates that you had those
conversations?
A I do not remember specific dates. I have a
general idea of time, yes.
Q Okay. Now, the 3,000 rate that you say you
discussed with program officials prior to the
formation of the contract, can you identify any EEI
documents that were generated in the time of the
formation of the contract where you expressly state
that DOE was – that it was your understanding that
DOE was going to use that rate when it began
performance?
A The document that I used personally was
actually the one on May 5th in which I did comment on
the 3,000 rate. That was after the contracts had been
issued as final rules, but before they were signed.
Q Okay. Well, I guess my – I'll go with a
broader question, then.
Are there any documents, EEI documents, that
you can recall that were generated by you or that –
or the group that you supervised prior to the
formation of the contract wherein you indicated your
understanding that 3,000 MTU per year was the – was
the expected rate?
A At this point, I do not recall any specific

Page 463

documents that would answer that question.
Q Okay And in all the numerous conversations that you had with DOE officials, both before and – I'm sorry, before the contract was formed, did you memorialize those conversations in any way in writing, memos to yourself, memos to your file, anything like that?
A We had committees like the Nuclear Fuels Committee and the Utility Nuclear Waste Group meetings, which were documented, yes. The minutes were documented, not as a transcript, but as a general subject area, yes.
Q Okay And those documents were maintained in EEI's files?
A That is correct.
Q And I'm sorry, just to clarify, those meeting minutes, you say memorialized the conversations that you had with DOE officials prior to the publication of the final rule, the final contract?
A No, that's – I beg to differ. Those meeting notes represented what went on during the meetings of those particular groups. If there was a Nuclear Fuel Committee meeting, that particular document that related to that meeting referred to what went on in that particular

Page 464

meeting.
If there was a Utility Nuclear Waste Management Group meeting, then the document related to that meeting discussed what happened in that particular meeting.
Q I understand. But sitting here today, you can't recall any meeting minute notes that reflected your conversations with DOE officials prior to the contract concerning the 3,000 rate?
A That is correct. I do not know a specific document that covers that.
Q Now, in your conversations with – I'm sorry. I already asked that question. And I believe you've testified several times on your direct testimony concerning the purpose you understood for DOE's performance rate, if you will, acceptance rate, under the contract. And I believe you testified that that was to prevent utilities from incurring the costs of additional storage capacity after 1998.
A That was one of the understandings, yes.
Q Okay. All right. Can we look at Defendant's Exhibit 2.002. Mr. Mills, I'll refer you to the monitor there. Can you see this document okay?

Page 465

A Yes, I can.
Q Okay. And I believe you testified that you're familiar with the – with this document.
A Yes, I am.
Q And I'm sorry, I'll identify it for the record. This is, is it not, the final rule as published in the Federal Register on the standard contract?
A That is correct.
MR. STOUCK: Your Honor, excuse me for a second. I thought – do you have a paper copy for Mr. Mills? I thought we had an understanding at the pretrial that there will be paper copies available for witnesses.
MR. MILLER: I certainly have a paper copy if he's not comfortable with the image
MR. STOUCK: I would like him to be provided one.
MR. MILLER: I would be happy for him to tell me if he's not comfortable doing it this way. Would you like a paper copy, Mr. Mills?
THE WITNESS: I do find it more comfortable to work with a paper copy.
MR. MILLER: All right. I am sorry for the delay, Your Honor.

Page 466

BY MR. MILLER:
Q Okay. Mr Mills, I'm handing you Defendant's 2.002. Does that appear to be the same document that I just described for the record?
A Yes. It does.
Q Okay. I believe if you'll refer to page 16605, which should be reflected in the upper right-hand corners of those pages. Can you find that page?
A Yes, I have that page.
Q Okay. And specifically I'd refer you to Article XXII A. Do you see that?
A Yes.
Q Now, do you remember this clause being contained in the final rule?
A Yes, I do.
Q And do you see the language that reads there, and I'll quote: Any representation, promise, or condition not incorporated in this contract shall not be binding upon either party.
A Yes, I see that.
Q Do you recall whether this language, the same language was in the draft that was published in 1983?
A I do not know.

Page 467

Q All right Let's go to Exhibit 2.001.
MR. MILLER· Your Honor, would you like a paper copy as well?
THE COURT. I'm fine.
MR MILLER: Counsel.
MR. STOUCK: If you can call out the numbers, I think we can get them
MR. MILLER: Let the record reflect I'm handing Mr. Mills Defendant's 2 001.
BY MR. MILLER·
Q Now, if you look towards the end of that document Mr Mills, I apologize the page numbers are difficult to read, and find Article XVI, I believe.
A Entire contract.
Q Yes, sir, that article is entitled Entire Contract. Do you see that?
A Yes, I do.
Q And along about the middle of that paragraph, sir, do you see the sentence that reads: Any representation?
A Yes.
Q Any representation, promise, or condition not incorporated in this contract shall not be binding on either party.
A Yes, I see that.

Page 468

Q Do you see that? Okay. So my question, Mr. Mills is, doesn't this clause mean that the understandings that you say you had with Mr. Morgan, Mr. Lawrence, other program leaders is not binding on DOE now?
A No. I do not believe that
Q Why do you say that?
A Because any contract that's a commercial contracts of sorts where there are two parties to a contract, there needs to be a recognition of the obligations of the two parties.
We asked for that in comments on our – on this draft of February 4th and DOE did not include it that.
Q That was sort of my question. This is not a commercial-type contract, is it, Mr. Mills?
A Well, it has a great deal of similarity to commercial activity, yes.
Q Right. But it's not – it wasn't formed in the way that you – that commercial contracts that you're more familiar with was, was it?
A That is correct.
Q Okay And you say you asked for the provisions that you're talking about, the understandings that you're talking about, you asked

Page 469

that they be put into the contract but they weren't, right?
A That is correct.
Q Okay. Didn't DOE even refuse to include the qualitative language that you suggested, the whereas clause that described the performance standard that you wanted included in the contract?
A One of the interesting aspects of this final rule on April 18 was that DOE went through the process of talking about the various comments that were submitted and how they reacted to the comments. And they did that right down the list of covering almost all comments.
The particular question -- or particular aspect where we asked them to put in a qualitative statement with regard to the quantities, they did not comment on at all. They did not comment on it. They did not counter it. They did not include anything that related to it.
Q Right. But that provision wasn't included in the final contract; is that correct?
A That's correct. It's not included
Q The whereas clause that you had requested?
A That is correct
Q Okay. Isn't it true that you're not aware

Page 470

of any document that was published by DOE prior to the execution of the contracts wherein DOE expresses its intent to include the Mills rate in the contract or even the qualitative statement of the Mills rate?
A You're asking me if I know of a particular document?
Q That's correct.
A No, I do not know of a particular document, but I do know that there was a lot of discussion with regard to the design rate for the repository which was to receive the waste, and that that design rate was understood by everyone that I talked to in the program, both before the contract – before the legislation, before the contract, and shortly thereafter; that it was understood that that design rate of 3,000 metric ton per year was a mechanism that – to define the quantity of fuel that they would be able to receive.
Q Well, okay. I understand. And you testified to that effect many times. But how does that testimony square with this plain language right there on the screen. Do you know?
MR. STOUCK: Your Honor, I understand it's cross-examination. It's getting a little argumentative.

Page 471

THE COURT: Well, it's okay. He can continue.

THE WITNESS: If the contract is silent on a very important aspect, then there's something wrong with the contract.

BY MR. MILLER:

Q That doesn't answer my question, Mr. Mills

A And this particular contract was silent. Not only did they not accept our words of trying to put in a quantity or a qualitative quantity, they did not counter it with any other alternative. There was no reference in this particular contract to that very important aspect of the contract.

Q Was DOE required to counter it with any alternative in the final rule?

A They did with every other comment. Every other comment.

Q I beg your pardon?

A They did with all the other comments that were made on their contract.

Q DOE countered –

A They commented on how they treated those comments.

Q Okay But I believe your answer to the previous question was that they didn't offer an

Page 472

alternative Was DOE required to offer an alternative to suggestions that utilities made or anyone made, for that matter?

A In that particular – on that particular item, it would have – it certainly was appropriate to – for them to say why what they did – what we had asked for, they did not concur with.

Q That doesn't answer the question, Mr. Mills. Do you know if DOE was required to provide an alternative to suggestions that were made to DOE concerning clauses or provisions to be included in the contract?

A The word "required" has a nature to it that I don't believe they were required to do that.

Q Well, I'm sorry. It's just your words. Now, the industry discussions with DOE about – about a contract that was required by the NWPA, they actually started before DOE published the draft in the Federal Register in February, didn't they?

A Excuse me. Who started to do what?

Q Okay. I'll ask it again. The industry discussions that utility representatives – and I believe you've testified you as – as an employee of EEI, those industry

Page 473

discussions that you had with DOE about a contract, they actually began before DOE published the draft in the Federal Register in February, didn't they?

A That is correct.

Q Okay. And I believe that you testified that – I believe you testified that that began at a meeting in January of 1983; is that correct?

A We started the first of January.

Q I beg your pardon?

A We had started talking about input on the contracts just as soon as the legislation was passed.

Q Okay. We –

A Early in January, before that meeting of December – or of January 19.

Q Okay. I wasn't clear. Then industry discussions with DOE didn't begin – or began in – at that January meeting that you've already testified about; is that correct? Or are you saying that's not correct?

A There were discussions with the Department of Energy personnel before the January 19th meeting. But the January 19th meeting was the information meeting that DOE put together to publicly display their plan for developing this contract.

Q Okay. But the discussions that you had

Page 474

prior to January, those were with DOE officials who later had no responsibility for the program after the statute was passed; isn't that what you said?

A No. No. Mike Lawrence was involved in those discussions. And he was involved in the program after that.

Q Right. Right. And Mr. Lawrence, where was he working at the time that you had those pre-NWPA discussions, do you recall?

A He was in the Department of Energy. Just what his position was, because the titles were hard for me to understand all the way, I'm not sure just where he was in the program. But he was dealing with nuclear waste issues, as well as others.

Q Okay. Okay. Can we go to 399 please, Defendant's Exhibit 399.

MR. MILLER: I'm handing the witness Defendant's Exhibit 399, Your Honor.

BY MR. MILLER:

Q I believe you've already testified about this document, haven't you, Mr. Mills?

A No, I don't believe so.

Q Oh, I apologize. Do you recognize it?

A I have not – I undoubtedly saw it at the time. I have not reviewed this document in the last

Page 475

20 years
Q All right All right. Well, for the record, it's a letter, is it not, dated January 21st, 1983 to Mr. Thomas Dillon at the Department of Energy from the American Public Power Association Do you see that?
A That is correct as I see it
Q Okay. Now can I refer you to the second paragraph there And can you just read that to yourself?
A To myself. Okay. Yes. I have read that second paragraph
Q Okay. And I apologize. And the language in that paragraph indicates that representatives of private power companies and the Edison Electric Institute worked with the APPA representatives, that is the American Public Power Association representatives, to prepare language to be inserted into the contract Do you see that?
A Yes, I do.
Q Do you recall working with those individuals on language to be inserted in the contract?
A Yes, I do.
Q Okay. Can we go to – the pages on the attachment are numbered – well, a little differently

Page 476

than I'm used to. Excuse me. If you'll go to the page that's numbered 2-2-2-2
A Is there a TV 1204 or something?
Q I'm sorry I believe it's TV 1239
A That would be most helpful, to identify it that way.
Q Well, the letters I was referring to are in the upper left-hand corner. But the TV number is on the lower right-hand page. Do you have that page?
A Yes, I do.
Q Could you refer to the paragraph B there entitled Term.
A Yes.
Q Now do you remember whether or not the term language that's suggested here was incorporated by DOE into the draft rule that it published in 1983?
A I do not know whether this language was, but the concept was
Q Okay. And the concept, what concept does this language embody to you?
A That the term of the contract would extend until all of the spent fuel has been delivered or all the waste has been delivered from the purchaser to the Department of Energy.
Q Okay All right Now, if you can, will you

Page 477

go to – well, I'll refer to it as page 3-3-3-3. And I guess the Bates number – I hope it's the following page. Okay. And, actually, I want to look at two pages together here. The language that begins at the bottom of page TV 1240 and continues on to the top of the following page
A Yes. I see that –
Q Entitled – the paragraph specifically entitled Exchanges?
A – yes, I see that
Q You recognize that language, don't you?
A Well, let me read the language
Q Please, sir
A Yes I've read that language and I agree with it
Q Now, do you recall whether that language was contained in the draft that DOE released to the utilities in January prior to publication of the draft rule?
A No, it was not
Q Okay. But it was incorporated in the final rule or the substance of it was incorporated in the final rule?
A In the final rule. But it was not incorporated in the proposed rule that was on the

Page 478

Federal Register of February 4.
Q Okay But, once again, the utilities after the draft rule was published in the Federal Register, once again, the utilities, EEI specifically, suggested an inclusion of the substance of that exchange provision, did they not?
A That is correct.
Q And it was incorporated into the final rule?
A Yes, it was.
Q Okay. All right On page TV 1241, can you look at paragraph 4 (b)(4).
A Labeled: DOE responsibilities?
Q Yes The larger heading is at paragraph 4 (b), DOE responsibilities. I would like for you to look down at Number 4 under that heading. Do you see it?
A Yes, I do.
Q Could you read that into the record, please, sir?
A DOE shall start accepting delivery of SNF and/or HLM not later than January 31, 1998, at not less than the annual rate SNF and/or HLW is then being produced from purchasers' nuclear power plants specified in Appendix A.
Q Okay. Thank you, sir.

Page 479

Do you recall, was that provision
incorporated in DOE's draft published in the Federal
Register in February?
A No, it was not
THE COURT. Just out of curiosity, what was
HLM?
THE WITNESS: High-level waste. HLM. That
should have been HLW. It's a typo. Excuse me.
MR. MILLER: But I believe Mr. Mills read it
fatefully when he was reading it into the record, Your
Honor.
BY MR. MILLER:
Q Okay. Thank you, Mr. Mills. Can we go to
Defendant's Exhibit 400.
MR MILLER: Your Honor, I'm handing
Mr. Mills 400.
BY MR. MILLER
Q I believe this is a document that you
testified about?
A Yes, it is.
MR. STOUCK· Can we have a little better
focus on the screen. I have a paper copy.
MR. MILLER. Better focus
MR. STOUCK: Maybe not. Good
MR. MILLER I believe the screen takes it

Page 480

as the document it is. Can you read it better now?
MR. STOUCK· Yes.
MR MILLER: And, Mr. Mills, can you read
it?
THE WITNESS: Yes, I can.
MR. MILLER: And, Your Honor, can you read
it okay?
THE COURT: Yes.
BY MR. MILLER:
Q Okay Now I believe you've already
testified about the reference in the first paragraph
to the sessions on January 19th and 20th, 1983 that
were sponsored by the APPA, have you not?
A The meeting of January 19 was sponsored by
the Department of Energy. The meeting of January 20th
was sponsored by the utility representatives of AA –
APPA, Atomic Industrial Forum, NERCA and EEI, Edison
Electric Institute
Q Thank you. And I believe you testified that
you attended those sessions?
A Yes, I did.
Q I believe you also testified that – that
the first session on the 19th was an information
meeting where DOE provided information but you
weren't – you, the other attendees at the meeting,

Page 481

were not allowed to ask questions or conduct a
discussion with DOE representatives; is that correct?
A We were not allowed to have a discussion, a
back-and-forth discussion. We did have an opportunity
to ask a few questions.
Q I understand. Thank you.
Now, the meeting on the 20th, I believe you
testified that that was a more interactive meeting
with the DOE representatives, did you not?
A That is correct.
Q And at that time, you already had the draft
that the DOE representatives had provided the previous
day?
A I do not recall when that draft was actually
available. We – they did not pass out that draft on
January 19. I asked for a copy of it, and they
indicated that they would make it available. And in
the – as I testified earlier in the day, it was
distributed, I believe, on January 24. So I'm not
sure what we had in our hands-on January 20th.
Q Okay. Well, the reason I ask the question,
Mr. Mills, was that, in this first paragraph, on this
document, it said: A briefing was – a briefing by
the Department of Energy officials on the recently
passed nuclear waste bill and DOE-utility obligations

Page 482

in signing nuclear waste disposal contracts was held
Wednesday, January 19th at Washington's Hyatt Regency
Hotel.
And I believe that sentence continues
through the over stamp there: A DOE draft waste
disposal contract was made available to the attendees
at this meeting
So that was the basis. You don't recall it
being handed out on January the 19th?
A No, I do not recall it being handed out on
January the 19th. I do remember asking for a copy.
But I do not recall it being passed out at that time.
So I cannot confirm that actually happened as stated
in this memo.
Q Any reason you can think of why, if asked to
pass out – if asked to pass out a draft, that DOE
representatives wouldn't have given you a draft?
A They wouldn't have had copies there.
Q Okay. So it's possible that this document
is just wrong?
A It's possible.
Q Now, I believe there's also a reference at
the – in the last sentence of that first paragraph
that makes a reference to the, in addition to the
APPA, it makes a reference to the Atomic Industrial

Page 483

Forum, the National Rural Electric Cooperative Association, and your organization, is that correct?
A That's correct.
Q Are you aware that those other organizations were also working on standard contract matters?
A Yes
Q Okay. But I believe you testified, at least with respect to the Atomic Industrial Forum, that as far as representative of electric utilities with nuclear interests, they had sort of split out of the AIF and were then being represented by you; is that correct, at EEI?
A I was representing them on these issues. They were still members of the Atomic Industrial Forum.
Q I understand. They were members of both?
A They were members of both.
Q Okay. Excuse me, Mr. Mills, I'm just trying to find my place I'm sorry, Mr. Mills, I'm just trying to get the computer to sync up with me. Okay. Let's go to, please, Defendant's Exhibit 401. I'm sorry, Mr. Mills, I'm through with that one.
MR. MILLER. Your Honor, are you still okay with the computer?

Page 484

THE COURT Yeah. Fine
MR. MILLER: Okay. I'm handing Mr. Mills Defendant's Exhibit 401
BY MR. MILLER
Q Do you recall seeing this document, Mr. Mills?
A I do not recall seeing this specific document.
Q Okay The first paragraph there refers in the second sentence, I believe, to a document which is – I'm sorry, the first paragraph makes reference to an annotated copy of a draft contract that was prepared by Jay Silberg and several utility representatives Do you see that?
A Yes, I do.
Q Presumably you received such an annotated copy.
A Yes.
Q Because you were one of the several representatives that was working on these issues?
A That is correct.
Q Jay Silberg. Do you know him?
A Yes, I do.
Q How do you know him?
A He is a lawyer that we used and called upon

Page 485

his law firm, and with him being the specific representative, to assist us. "Us" being the utility industry, in addressing this particular issue at that time.
Q Okay. And I assume when you say "we", you're talking about EEI specifically engaged his services?
A The Utility Nuclear Waste Management Group actually had his services.
Q Okay. Thank you. Okay. Let's go to Defendant's 402, please.
MR. MILLER: I'm handing Mr. Mills Defendant's 402
BY MR. MILLER:
Q Now this is a pretty lengthy document, Mr. Mills, but at least the cover letter is a letter on EEI letterhead dated January 24th, 1983 and it's signed by S.F. Kraft, is it not?
A Yes, it is. S.P. Kraft.
Q I apologize. My eyesight. Maybe I should be using the paper copy. Is that Stephen Kraft that worked for you?
A Yes, it was
Q Now this letter refers, does it not, to an EEI marked up version to the DOE draft. Do you see

Page 486

that reference?
A Yes, I do.
Q As the lead person at EEI on the standard contract issues, you would have reviewed this draft before it went out, wouldn't you?
A Yes, I would
Q And you recall reviewing it?
A Yes, I do
Q Okay. Now the attachment that follows the cover letter, do you recognize that as EEI's marked up draft?
A Yes, I believe it is the marked up draft based on markups that the group had made.
Q If you will take a look at page 3 of the attachment, that is the draft, and actually pages 3 and 4, it will be the language that is handwritten down at the bottom that continues over, I believe, to the top of page 4.
A Yes, I see that.
Q Okay. And that handwritten language says Article II A, Term.
A Yes.
Q And that's the – that's the suggested language that we've already talked about that DOE published when it published the draft contract in

Case 1:00-cv-00697-JFM Document 368-4 Filed 11/09/2007 Page 22 of 22

Page 487

February of 1983, isn't it?
A Yes, I believe it was in the draft contract of February 4th
Q Okay Now, on to page 4. No, I'm sorry. Yes, sir. Page 4. I want to make reference to the paragraph that's Xed out in the middle of the page there. Do you see that?
A Yes, I do.
Q And to the left in the margin it says see insert III B, C, D and E. Do you see that?
A Yes, I see that markup.
Q Okay. Can you turn on to the next page Okay. Without the zoom, let's look at that page, if you will. Now, does this appear to you to be the insert that was referenced on the previous page, Mr. Mills?
A Yes, it does.
Q Okay. And the portion down at the bottom that's – that's headed Exchanges, do you see that?
A Yes, I do.
Q Now, do you recall – or maybe you've already testified, if you have, I apologize for repeating, was that language contained in DOE's January draft that was handed out to representatives?

Page 488

A The exchange – you're talking about the exchange paragraph labeled E?
Q Yes, sir.
A That was not in the draft.
Q Okay And what about the draft that DOE published in February of 1983 in the Federal Register, was it contained in there?
A No, it was not.
Q But it was published in the final draft?
A A – I'm not sure this is the precise language, but the concept was in the final contract.
Q Thank you, sir. All right. Let's go to the page that's marked up at the top 5A. Do you see that, upper right-hand corner?
A I'm looking at 1325 in the lower left – lower right; yes, I see that.
Q Okay. Now, please refer to paragraphs 4 and 5 on this page. You can just read them to yourself.
A Yes, I have read them.
Q Do you recognize that language from having reviewed this document?
A Yes.
Q Now, that language incorporates the concept that you – the concept of the Mills rate, doesn't it?
A Yes.

Page 489

Q And this – this is language that you were suggesting that DOE include in the draft contract?
A This was suggested before they actually published their draft contract, yes. And it was somewhat different language than that when we made the comments on the draft.
Q On the draft itself. But this language wasn't included in the federal draft, was it?
A No, it was not.
Q Okay. And as far as you recall, it wasn't published in the final draft either, was it?
A It was not.
Q Now, isn't it true that it appears that this annotated draft was – was sent to DOE at some time prior to the publication of the February draft?
A Yes, it was. I am not sure that it was precisely this one. But something with an annotated was provided to DOE. This particular one is attached to a distribution that was made to two members of the Tennessee Valley Authority.
Q I understand.
A And it was a very dynamic process at that time.
Q Okay. But I believe you testified that some of the concepts in this marked up draft, this EEI

Page 490

marked up draft, were incorporated by DOE in the February draft, right?
A That is correct.
Q So at least the substance of those items that were incorporated in the February draft were probably communicated to DOE before it published the February draft?
A That is correct.
Q Okay. Now, isn't it true that DOE – I apologize. Isn't it true that EEI, on behalf of utilities, had another opportunity, yet another opportunity to submit suggested changes for the standard contract?
A Other than this one prior to February 4th; is that what you're asking?
Q Yes.
A Yes. Once they – once – these comments were transmitted to DOE prior to the publication of the February 4th draft in the Federal Register. The February 4th draft gave us an opportunity to issue formal comments.
Q And you recall submitting those on behalf of EEI; is that correct?
A Very extensive comments, yes, we did.
Q Okay. Let's go to Defendant's 2.034. Do