Case 1:00-cv-00697-JFM Document 368-5 Filed 11/09/2007 Page 1 of 21

Page 491

you already have that in front of you, in paper copy, Mr. Mills? Never mind.
MR. MILLER: Your Honor, I'm handing Mr. Mills Defendant's Exhibit 2.034.
BY MR. MILLER:
Q Now, Mr. Mills, this is also an extensive document. If you can just flip through it and see if you can recognize it as EEI's letter dated March the 7th, 1993 with attachments providing comments on the draft standard contract that DOE had published in February of '83.
A I recognize it vividly.
Q Now, even though it's signed by Mr Kearney, you – you drafted the comments, did you not?
A It was a committee effort that drafted the comments. I participated in that committee activity extensively, yes
Q And you were the lead for that committee; is that correct?
A Yes, I would say I was the responsible point person for that activity.
Q Now, you remember that vividly, you remember this document vividly because it represents about, what, 16 hours a day for an intense 2-month period for you?

Page 492

A No, it was not a 2-month period, fortunately. We received the draft comments on February 4th and we had to submit our comments on March 7th. So the time limit over which we had to work with this was simply that 30 day comment period
Q Right. But you had gotten that DOE draft in January, had you not?
A That is correct A couple of weeks earlier, yes.
Q Right. And you testified that at least the members of EEI were working on your own concept of what you thought a contract in this regard should be even prior to that, were you not?
A That is correct.
Q Okay Now, you believed at the time you sent this letter that it represented the – the members of EEI's position on the issues that were addressed in it, didn't you?
A This was a consensus position. It did not represent all of the positions of all of the utilities. And it was provided to the Department of Energy on behalf of both the Edison Electric Institute and the Utility Nuclear Waste Management Group.
Q Okay. Thanks for that clarification. Now, in the second paragraph on that first

Page 493

page, do you see – oh, I'm sorry, I already asked you that.
Do you remember a person named Nancy Montgomery who worked for you when she was at EEI?
A Yes, I do.
Q She worked on that nuclear – I'm sorry, Utility Nuclear Waste Management Group, did she not?
A Yes, she did.
Q Okay. You supervised her?
A Stephen Kraft was supervising her and Stephen Kraft reported to me.
Q All right. So she was two below you in the food chain, as it were?
A Yes.
Q Okay.
A But she was not there at the time this was drafted.
Q I understand. I would like to direct your attention, if you would, to pages 6 and 7 of the letter, specifically the paragraph that begins at the bottom of page 6, Priorities. And it continues on to the top of page 7.
A Yes. Unfortunately, here, I may need to work with the computer version because the left-hand margin of this particular hard copy is missing.

Page 494

Q Well, that won't help you, Mr. Mills because what's on the computer is what's on the hard copy, okay. We'll try to muddle through. This is the condition in which we got the document at the – from EEI, I believe.
But at any rate, we'll see if we can work it out. So I'm sorry Back to that provision entitled Priorities, that begins at the bottom of page 6 that runs to the top of page 7. Do you see that?
A Yes, I do.
Q Now the sentence in that paragraph, and I'm paraphrasing, so correct me if I don't paraphrase it correctly, but that sentence says that the proposed contract recognizes that utilities may request to deliver more SNF than DOE has the capacity to accept. Is that the basic substance of that?
A Yes, that is correct.
Q Now, going on to page 7, to correct what you, you at EEI thought were apparent contract ambiguities or an improper set of priorities, you urged DOE to form its acceptance capacity in – and basically split that up, didn't you?
A The allocation, the allocation approach would be split up, yes.
Q Yeah. The allocation approach. And you

urged that DOE split that up between the oldest fuel and that the remaining half be based upon the purchaser's share of the industry-wide inventory; is that correct?

A That is correct.

Q So at least the consensus position of EEI was that any priority for shutdown reactor acceptance should be eliminated from the draft contract; is that correct?

A The consensus position on that, yes. We did not support that allocation of priority.

Q Okay. Thank you.

A That was not the position of all utilities.

Q As you've testified, yes, sir. Now, if you will, can you go to page 2 of Attachment A. Specifically, there, sir, the paragraph numbered 2.

A Yes, I see that

Q Do you see that?

A Yes, I do.

Q Now – now, that paragraph states, and I'll quote: The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the



accumulated backlog of SNF/HLW. Do you see that?

A Yes, I do.

Q It goes on to state that, we believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. Do you see that?

A Yes, and that corresponds with what you referred to as the Mills rate.

Q The Mills rate. That embodies the Mills rate constant, correct?

A Yes, it does

Q Now, you go on to say there: While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs. Do you see that?

A Yes, I do.

Q And I believe you go on to the next page to suggest that qualitative language, do you not?

A That is correct.

Q If you'll turn to that page. Now that



qualitative language is contained in the quotation marks and indented section there at the top of page 3, is it not?

A Yes, it is

Q And this qualitative statement, as I believe you testified, embodies your concept, the Mills rate?

A Yes, it does.

Q Okay. So at least the consensus position of the industry at this time, the time that EEI submitted its comments, was that it was not appropriate to put a specific acceptance rate in the – in the contract; isn't that correct?

A That is correct, because the contracts were related to individual utilities. And this concept related to the overall industry

Q Right. And, also, I believe you testified at your deposition that you thought it was impossible at the time to put in a specific rate because, in 1983, it wasn't possible to include a specific rate because it just wasn't possible to say what was going to happen 15 years hence, or that kind of substance; isn't that correct?

A That is correct. And there simply was not sufficient information available to the Department of Energy at that time to allow them to put a specific



rate in the contract for each utility. That is why we ask for this qualitative comment.

Q Okay. But the qualitative statement, as you've testified before, that wasn't included in the final contract, was it?

A No, it was not.

Q Okay.

A And DOE did not comment on it when they referred to their final rule, nor did they put in something that was equivalent to it.

Q Well, I understand. And we had a little discussion about that before, didn't we? Okay. Now, isn't it true that the utilities didn't really expect DOE to include a specific rate or pace of acceptance in the contract?

A No, we did not expect each individual utility's specific schedule to be included in the contract at this time. That specific number – those specific numbers would come at a later date based on the framework established with this contract.

Q Okay. And I believe you talked a little bit about the framework of the contract. I believe you've also referred to that as the mechanism in the contract, have you not, for –

Page 499

A Yes, I have.
Q – for fleshing out that specific individual utility schedule
A Yes. That is correct.
Q Okay. If we can go to Defendant's Exhibit 1
MR. MILLER. Excuse me a minute, Your Honor, please
THE COURT. Yes.
MR MILLER. Actually, Your Honor, before we begin with this exhibit, it's been about an hour, it's getting kind of warm. Can we take a 10-minute break?
THE COURT· Sure. We'll break now and return at half past
MR MILLER. At quarter till, Your Honor?
THE COURT· Did I look at the clock wrong? Yes, quarter till. Thanks
(Whereupon, a recess was taken at 3:35 p.m., and the proceedings reconvened at 3:50 p.m.)
THE COURT: Okay, Mr. Miller.
MR. MILLER Your Honor, I left my coat on my chair I hope that doesn't offend you.
THE COURT: No. That's fine If we are going to work in sauna conditions, we ought to address appropriately here.

Page 500

MR. MILLER· I guess in the South, we would have sear-sucker suits on so we wouldn't have to worry about heat in the courtroom.
THE COURT: Well, the problem is the air-conditioning quits about two doors down. So I don't see where we can do anything about it.
MR. STOUCK: Which way are we moving when we get the other courtroom?
THE COURT: We're moving in the right direction. So there's hope for the future.
BY MR. MILLER:
Q Okay Mr. Mills, we're going to look at Defendant's Exhibit 1, which you've already looked at in your binder If you want to refer to your binder and the statement that's contained in it rather than the computer, you're more than welcome to.
A Yes. I have a paper copy, a portion of it.
Q Right. I understand. I'm just going to ask you about some questions about your statement that's contained in that larger volume. I can give you the whole volume if you'd rather. I just thought it might be more convenient for you to use that one Okay. In the first page of that, I believe you testified about this previously when Mr. Stouck was asking you questions.

Page 501

A Yes, I did.
Q Okay. Now, if you'll turn to your statement And in the right-hand column, the first full paragraph, that third sentence, do you see that?
A Yes, I do.
Q The portion that's highlighted there, I believe you already testified about that. But that sentence says, does it not: We really never were under an illusion that we would get a fair and equitable contract with DOE with firm commitments and detailed performance standards with penalties for nonperformance. We were really not looking for that, however, there were many concerns expressed by the utilities that were not resolved, and we believe equitably – as we believe equitably during the contract generation process. Do you see that?
A Yes, I do
Q Okay. If you will, please, sir – I believe your testimony with respect to that statement was that you were expressing disappointment or frustration with what DOE had indicated to you were going to be its proposed performance standards prior to making this statement; is that correct?
A This was in reaction to – to some extent a

Page 502

reaction made to the statements made by Robert Morgan earlier in those proceedings –
Q Okay
A – where it related to a different – a specific quantity associated with the – with their mission plan
Q Okay. Now, this is a large meeting, wasn't it, Mr. Mills?
A Yes, very large.
Q Over a thousand people?
A I'm unable to state that, but in that range.
Q Okay. People From DOE?
A Yes.
Q People from the nuclear utility industry?
A That is correct?
Q People with – with whom you had worked long and hard in developing the industry's position on the provisions of the contract?
A That is correct.
Q Okay. Now, so when you stood up and said this highlighted language here, you – are you telling us you didn't mean what you said there?
A One must put it in perspective of the time and the place. This was about the end of the year of the first year of tremendous intense activity. And I

Page 503

had just heard a statement earlier in the proceedings that differed from what we, as an industry, understood the commitment to be under the contracts.
So that this was stated somewhat in frustration, but it also states the reality that there was not a good way to put firm commitments in each of the individual contracts.

Q Okay.

A But that it did not -- however, there are many concerns expressed by the utilities that were not resolved.

Q I understand. And we'll get to that in just a minute But you don't make any reference to your disappointment, frustration, pique, if you will, at Mr. Morgan's statement in the text of your statement here, do you?

A I do not specifically point to his comments.

Q Okay.

A But they do relate to it.

Q I understand. If you'll go back to the first paragraph on -- in the left-hand column. And at the sentence that begins "As indicated" Do you see that?

A Yes, I do.

Q Would you read that, please, sir, to the end

Page 504

of the contract.

A As indicated, we have 70 contracts in existence. The process of developing that contract language last spring was a rather interesting one in which a lot of us had some dialogue. Four-letter words were exchanged also.
The Department of Energy, DOE, did consider the contract concerns of utilities and others.
Consequently, substantial improvements were made over the initial draft as a result of the rule-making process. But there are still some open questions.

Q Okay. So you said substantial improvements were made and that utility concerns were considered; is that correct?

A That is correct.

Q Okay. Now, I believe you testified earlier about a potential rule-making petition that I believe you said members of EEI had drafted; is that correct?

A That is correct.

Q Sir, do you recall if drafts of such a petition were contained in the files at EEI?

A I do not know

Q Okay. If EEI had made such drafts, would they have been -- in the normal course of EEI's business, would they have been maintained in EEI's

Page 505

records?

A They may have been, they may not have been, because the nuclear function within the Edison Electric Institute was transferred to another organization in 1994. And whether the records were retained and how complete those records were within Edison Electric Institute, I am not sure.

Q Okay.

A I do know that the record retention within the Edison Electric Institute was not equivalent to what one would like to think is a perfect record retention in the nuclear program.

Q The concerns that the utilities had, which I believe you indicate here were not addressed in the final rule, those were important concerns to the industry, were they not?

A Yes, they were.

Q Okay. So it would seem to me, and maybe not to you, and you can answer, would it not seem to you that something that important, a potential rule making, copies would have been maintained in EEI's records if they existed?

A They probably should have been retained.

Q Okay.

A But it was an evolving process.

Page 506

Q Now, I believe you made reference earlier to the contractual procedure mechanism, if you will, that the parties intended to use to flesh out individual contracts; is that correct?

A To flesh out the commitment schedule and delivery schedule and individual contracts, yes.

Q Yes, sir.

A Yes.

Q Okay And do you recall -- and I believe you do, but tell me if you recall. The delivery-commitment schedule, wasn't that to be based upon a particular utility's allocation of DOE's acceptance capacity for any given year?

A The framework as established in 1983 with -- was assuming a robust program with operation beginning in 1998 or a little earlier so that it would have been appropriate to have allocations that then would be recognized with the delivery-commitment schedule, which was a planning document.

Q Yes, sir, I understand. But the -- the delivery-commitment schedule, if you recall, was to be based, was it not, upon a particular utility's allocation of DOE's capacity, acceptance capacity?

A You see, the framework that was provided in the contract did not work out the details of how that

Page 507

would work
Q I understand the details are not in there but –
A And if the allocation was not provided reasonably as the first step in the allocation report, then the deliverly-commitment schedules did not correspond with what you just indicated If there had been an appropriate allocation schedule of an appropriate quantity, then the delivery-commitment schedules would have been appropriately matched to that allocation
Q I understand. And I believe you're making reference to events that transpired or to actions that DOE took after the contract was formed; is that correct?
A Yes.
Q Okay. But at the time that the contract was formed, okay, was it your understanding that the delivery-commitment schedules or DCSs were intended to be based upon a particular utility's allocation of DOE's acceptance capacity?
A Yes, that is correct.
Q Okay. Thank you, sir. Now, DOE's acceptance capacity, I believe you've testified earlier that it was your

Page 508

understanding that DOE would have an acceptance capacity sufficient to accommodate the Mills rate, is that correct?
A That is correct
Q Okay. And that's what you contemplated at the time the contracts were formed?
A Yes, it was.
Q Okay At the time the contracts were formed, did you anticipate a situation where DOE might not have that acceptance capacity available to it in 1998?
A I do not recall that we did consider a different rate because it was indicated by the law, the Nuclear Waste Policy Act, and by the contracts that the operations were to begin prior to January of 1998 And we believe that it appeared to be a reasonable program that was outlined to accomplish that.
Q I understand that, sir. But my question goes to the parties' consideration of DOE's acceptance capacity. And my question specifically was Did the parties contemplate at the time – at the time the contract was formed, that DOE might not have that Mills rate acceptance capacity when it was due to begin performance?

Page 509

A I do not recall any discussions or evaluations based on other – on any different number.
Q Okay. So you didn't consider it?
A I didn't consider it.
Q Okay. I believe you testified at your deposition, if you recall, that this mechanism in the contract for fleshing out individual utility schedules was essentially an agreement to agree in the future about the amount of acceptance from that individual utility, did you not?
A That is correct.
Q Okay.
A From each individual – under each individual contract.
Q Okay. We're leaping over huge sections of my questions, Mr. Mills We'll be there Now, I believe, sir, that you've testified that the Mills rate quantified, if you will, was, at least in your understanding, and you testified DOE officials concurred, that that was to be in about the 3,000 MTU range per year; is that correct?
A That is correct.
Q Okay. And the generation rate portion of the Mills rate, do you recall what that was anticipated to be at the time the contracts were being

Page 510

formed?
A Yes. We actually knew at that time which nuclear power plants were operating. We knew which ones were under construction. We knew how much fuel would be discharged from each reactor pretty much each year And so we were able to calculate out that the rate – or the amount of spent fuel that was expected to be discharged in the year 1998 was somewhere between 2000 and 2500 ton.
Q And I believe – correct me if I'm wrong – but DOE published reports, and for a long time annually, that contained those kind of predictions, did it not?
A Actually, some of the DOE reports indicated much higher discharge rates.
Q Okay. But your concept, anyway, of the Mills rate was about 2,000 for the generation, rate?
A 2,000 to 2500, yes.
Q Okay. Do you anticipate – no. Do you remember what in 1983 was the anticipated backlog going to be in 1998?
A I made a statement there on May 5th in – in the presentation that I made that I testified to earlier today –
Q Yes, sir.

Page 511

A – that it would be 60,000 metric ton.
Q Right.
A However, I do not believe it was going to be that much. But that's what I said at that time, 60,000 metric ton
Q Okay. You believe at the time, anyway, that you made that statement on May 5th?
A That it might have been as great as 60,000 metric tons.
Q Okay. Okay. And at that time, I believe you've also testified that it was your understanding that a reasonable share of the backlog that you anticipated DOE would pick up would be about 1,000 MTU; is that correct?
A Yes, in that range.
Q Okay All right. Well, if I were to represent to you that, around that time period, DOE reports, anyway, anticipated about – a backlog of about 40,000 MTU, you wouldn't quarrel with that, would you?
A No, I would not.
Q Okay. So at – at the Mills rate, anyway, what – how long did you anticipate at the time that DOE would take to work off the backlog?
A Well, in 1983, it was recognized that the

Page 512

design rate for the first repository would be about 3,000 metric ton per year. And the design rate for the second repository, which would be following it by several years, would also be 3,000 metric ton per year
So that that gave a total capacity of transferring spent fuel early in the 21st Century to be 6,000 metric ton per year. So that it's – if the discharge rate was 2,000 metric ton per year, and they were receiving 6,000 metric ton per year, and the total backlog was 40,000 metric ton, it would be done in 10 years
Q Okay. Do you recall whether that kind of representation was made in any of the documents that EEI submitted to DOE prior to the contract formation, that rationale that you just gave us?
A I don't know of a document in which that is placed.
Q Okay. Now –
A But I will say it's reflected in DOE's document, in the mission plan
Q Well, the mission plan was post-contract formation, was it not, Mr. Mills?
A That is correct.
Q Okay. You're not aware of any DOE document

Page 513

published prior to the signing of the contracts that contained any of those figures, are you?
A Yes, I am.
Q What is that?
A The Fee Adequacy Report, which was issued in June of 1983, included the 3,000 metric ton per year –
Q Now the Fee Adequacy Report –
A – in both the first and second repository.
Q I'm sorry. I didn't mean to interrupt you. I thought you were through.
That document that you looked at – let's look at that document that you testified about earlier. I believe that's tab 11.
A That's Plaintiffs' Exhibit P 0978.
Q Thank you for the help. Now, the front page of that document says June '83. Do you see that?
A Yes, I do
Q Do you know anywhere where it had a specific publication date?
A No.
Q So you don't know that this was officially published prior to the – to the contracts in this case being signed, do you?
A Well, as to when in June it was actually

Page 514

distributed, I do not know. The contracts – the last of the contracts were signed, I believe, in the last week of June of 1983.
Q Okay. Now, is it possible that this document, even though it's dated June of '83, might have been published later?
A I do not know.
Q Okay. You don't know when it was actually published, do you? I mean, it has a date of June '83, but you don't know when it actually reached the public's hands?
A No, I do not know.
Q Okay. So you don't know that this document is a DOE document published publicly before the contracts were signed, do you?
A No. I don't really know if they did that. But –
Q Okay. Thank you.
A – it certainly appears that way.
Q Okay. Can we go to Defendant's 98, please.
MR. MILLER: I'm sorry. Excuse me a minute, Your Honor.
THE COURT: Sure.
MR. MILLER: Your Honor, I'm showing Mr. Mills what's been marked as Defendant's 98.

Page 515

BY MR. MILLER:
Q This is a statement you've already testified about, is it not, Mr. Mills?
A Yes, it is
Q Okay. Can you refer to page 4, the section entitled Allocation of Delivery.
A Yes.
Q In the first sentence there, you acknowledge that When DOE opens its door in 1998, it will have a limited capacity that needs to be allocated over the contract holders
Do you see that?
A Yes, I do
Q Okay. And, I'm sorry, your statement here is dated May the 4th, 1983, sir?
A That is correct.
Q All right. So at least as represented in your statement, the utilities were aware before they signed their contracts, the latest of which was the end of June '98, that DOE would have a limited capacity when it – that it needed to allocate over the contract holders
A Yes. And it may be at a 3,000-metric-ton rate during the initial operation.
Q Yes, sir, I see that.

Page 516

But, once again, that 3,000-ton rate, that's not incorporated in the contract, is it?
A No, it is not
Q Okay. Now, why did you use the word "may" there? DOE may be able to receive about 3,000 tons a year. Do you recall?
A Well, I was aware that, at that time, the design capacity of the repository, which was identified prior to the Nuclear Waste Policy Act being signed and prior to the contracts being signed, I was aware that the design capacity for that repository was in the range of 3,000 metric ton.
That design was not completed, so it might have been 3,000. It might have been 3100. It might have been 2900. But that was the – the approximate design rate for the receiving of the spent fuel.
Q Okay. I want to point to the sentence that begins, "But as we understand it". It's about halfway down. Do you see that?
A Yes
Q Could you just read from there to the end of the paragraph.
A But as we understand it, DOE will provide individual allocations to contract holders. Once an annual allocation is assigned, contract holders will

Page 517

be permitted to substitute other fuel – spent fuel and swap allocations to mesh with operating needs If one company can accommodate its spent fuel longer than another, it may be able to swap its allocation space with another organization. It is important to have an allocation procedure that treats all purchasers on a reasonably equitable basis.
Q Okay. And that sort of – that, in a kind of summary form, embodies your concept of the contract mechanism that you and I talked about just a minute ago, correct?
A The exchanges?
Q Well, the allocation. Once an annual allocation is assigned, contract holders –
A Yes, an allocation. It also refers to the exchanges.
Q Yes, sir. And so it embodies both of those concepts?
A Yes, it does.
Q Now, your understanding at the time about this annual allocation once it was assigned – and I believe you testified that that was as a result of the DCS process, was it not?
A There was a – there was a framework here which included a document – what was it, the annual

Page 518

capacity report and the DCS and then the final delivery schedule. There was a framework that incorporated activities that had not been fleshed out yet on just how that was going to work.
Q Yes, sir.
A And the question was?
Q I'm sorry. Can you read the question back.
(The reporter read the record as requested.)
THE WITNESS: Yes. That allocation would incorporate the DCS process.
BY MR. MILLER
Q Okay. And isn't it true that until – until an individual utility, pursuant to the contract, had an approved DCS, that it couldn't exchange that acceptance slot represented by the DCS? It had to have an approved DCS to exchange?
A Yes, I believe that's correct.
Q Okay. Okay. I think we're done with that.
Mr. Mills, I believe you testified extensively about the 1-mill fee And more specifically, I believe you testified that the utility industry was behind that; is that correct?
A That is correct.
Q And can you remind me or remind the Court, anyway, why it was that the utility industry supported

Page 519

the payment of the fee before services began kind of scheme that's incorporated.

A The primary reason for that was to make sure that there was sufficient funds available to the federal government to perform the task of carrying on and fulfilling the contract.

Q Because the industry understood, did it not, and envisioned that that program was going to require a significant amount of funds?

A That is correct.

Q Okay Okay. Let's have a look at Defendant's – I'm sorry Yankee's Exhibit 636.

THE COURT: The choice of the 1 mill had nothing to do with your name, I assume.

THE WITNESS The choice of the 1 mill, no, that doesn't refer to my name.

THE COURT: I wondered why he hadn't referred that as the Mill's fee.

MR. MILLER: Okay, Your Honor, I'm handing Mr Mills Plaintiffs' Exhibit 636.

BY MR. MILLER.

Q Mr. Mills, you testified about this document earlier in your direct testimony, did you not?

A Yes, sir, I did.

Q If you would turn to page 2-2, the first

Page 520

paragraph

A Yes.

Q Just a minute. Let me – the human is faster than the computer this time, Mr. Mills. If you'll look at the first paragraph there in section 2-2. It says, does it not, that: Based on the criteria described below, the Department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear wastes that the program will accept beginning in 1998. Do you see that there?

A I see that, but there's one word different. You said "below", and it's "above".

Q I apologize. Based on the criteria above. You're correct in the first phrase there. Okay Do you have an understanding or did you at the time have an understanding with the members of the industry, with DOE even, as to the meaning of the phrase "in the aggregate"?

A In the aggregate was for the total contract holders, including all contract holders.

Q Okay. So the rates that are contained in this mission plan and even subsequent mission plans, DOE and the utilities understood, did they not, that that was an industry-wide total?

Page 521

A Yes, that is correct.

Q Okay. If you'll look at the last paragraph on this page, please, sir. And, actually, it continues on to the top of the next page. Do you see the language that begins: It is possible?

A Yes.

Q Would you read that out loud, please, sir, to the end of the paragraph.

A You're talking about the middle of the third line?

Q Yes, sir. It begins: It is possible that an individual utility.

A Yes. It is possible that an individual utility may face a need of expanded storage due to the timing of shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation subject to prior approval by the Department based on the submittal of a request no less than 6 months prior to the scheduled delivery date. The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize

Page 522

transshipments.

Q Okay. Is that commensurate with your understanding about DOE's obligation concerning the acceptance rate, the aggregate acceptance rate?

A It comports with, but it's not the total.

Q Why is that?

A Because this refers to a rate that would prevent utilities from having to add extra capacity. It does not refer to the rate which is the Mills rate, as you qualify, that was the total amount discharged from the reactors plus some amount to work off the backlog.

Q Okay. But at least DOE, in December '83, they're proposing that that is the way that individual utilities should handle the need for additional storage, the cost for additional storage capacity after '98; is that right?

A That is a mechanism as they described here in this document.

Q Okay. Now, if you'll look on page 2-3. That's the table with 2-1.

A Yes.

Q Do you see the column there that –

MR. MILLER: I think I've thrown my assistants a few curve balls, Your Honor, I apologize.

Page 523

BY MR MILLER:
Q Okay I'm sorry There, Mr. Mills. Do you see the column on the far right there that specifies remaining backlog?
A Yes, I do
Q Do you understand that column to represent the amount of backlog that remains after beginning – well, beginning in 19- – well, beginning in 1998, represents the amount of backlog that remains, at least pursuant to this schedule, after DOE has accepted the amounts in those years?
A That last column does provide a set of numbers that is extracted from the prior columns that's generated by using the prior columns. I questioned the first – or the second column which says annual spent fuel generation, which shows an increasing number for the annual spent fuel generation. And by so showing that increased number, which I think is – is based on US Energy Information Administration, and, in my mind, is erroneous, thus this last column becomes erroneous, also.
Q All right Well, upon what grounds do you believe that the data from the US Energy Information Administration document, which apparently is referenced there, is erroneous?

Page 524

A We – I knew at the – in 1982 – '83, which is the time frame of this, how many nuclear power plants were in operation, how many were under construction, and how many more that we expected to have by 1998. And I could calculate from that known information what the discharge rate would be in 1998
Q And you actually ---
A And it shows it there as 2739. We knew that, in 1983, which was 3 years after the Three Mile Island accident, that the increase in the use of nuclear energy was not going to track what is implied here by this US Energy Information Administration document
Q You've examined that document and you know that the basis for that document is not the same basis as the evaluations that you're referring to that you did?
A That is correct.
Q Okay. Well, what figures would you put in that – in that second column, then, there, in the annual spent fuel generation?
A Well, as –
Q Approximately.
A As noted, in 1998, it shows 2,739.
Q Yes, sir.

Page 525

A That is not far from my 2,000 to 2500 that I had indicated and testified to earlier.
Q Indeed.
A And I believe that it was not going to increase
Q Okay
A At that point, by 1998, all the nuclear power plants that were going to be built in that time period would have been discharging spent fuel in 1998
Q Okay. So, in other words, you're saying that that column 2, in your estimation, should just be a flat rate for the rest of the foreseeable future?
A Yes.
Q Okay. But even if that's the case, looking at the remaining backlog amounts, they still continue to increase as a result of DOE's 1800 acceptance rate at the first repository, correct?
A They increased for the first 5 years; that is correct –
Q Okay
A – based on what they indicated in the first repository acceptance.
Q Right. And this is what DOE published in December of 1983.
A Yes.

Page 526

Q Okay. Can we go to Plaintiffs' 683.
MR. MILLER Your Honor, I'm handing Mr Mills a copy of Plaintiffs' 683. The cover page indicates that it's volumes I and II, but it can't possibly be, so I think it's probably an excerpt.
BY MR MILLER:
Q Do you have that with you now, Mr. Mills?
A Yes, I do
Q I believe you testified this draft was published for comment, was it not?
A Yes, it was.
Q Okay. Look at the first page, if you will, which is actually the letter that forwards it to the recipients, is it not?
A Yes, it is.
Q Okay. And down at the bottom, the language that's highlighted in that – well, the last portion of text there, it says, and I quote: This draft mission plan incorporates changes in response to comments on a preliminary version of volume I distributed on December 20th, 1983. Do you see that?
A Yes, I do
Q Okay. So that indicates, does it not, that DOE considered the comments that were submitted to the

Page 527

recipients of that December draft, does it not?
A It implies that, yes.
Q Okay. Now if you'll refer to page 1-1, please, sir, and specifically number 3, paragraph numbered 3 on that page.
A Yes.
Q Do you see the language that reads: To assure acceptance of waste for disposal by January 31, 1988, in accordance with the acceptance schedule provided for in the Department's disposal contracts, and in conformance with the Nuclear Waste Policy Act of 1982 Do you see that?
A Yes, I do.
Q Now, that subparagraph 3, looking at the larger page, Mr. Mills, that subparagraph 3 is under the larger heading Program Objectives, is it not?
A Yes, it is
Q Okay. And so does it seem to you that the language there indicates that the acceptance schedule is provided in the Department's disposal contracts? At least that was DOE's language, was it not?
A That was DOE's language.
Q Okay. Now, to page 2-1, please, sir. Do you see the language there at the bottom of the page that specifies: The disposal contracts with the

Page 528

utilities specified that priority will be given to the oldest spent fuel or high-level waste. In 1991, the Department will begin publishing firm individual acceptance schedules in accordance with the contracts, including shipment allocations
Do you see that?
A Yes, I do see that.
Q Okay. That appears to be the statement of DOE's intent with regard to the contract, does it not?
A Yes, it does.
Q Okay. And once again, in paragraph A, on that same page, do you see that language contained, let's see, in the first paragraph under the heading Waste Acceptance?
A Waste Acceptance Schedule?
Q Yes, sir. I'm sorry. Do you see the sentence that begins: These contracts specify the terms under which?
A Excuse me, I'm not with you.
Q All right, sir.
A I believe that's in the first paragraph at the top of the page.
Q Thank you for correcting me, Mr. Mills. Okay. Let's move on. I don't want to hold us up because I can't remember what I was going to ask

Page 529

about that.
Let's go to -- let's go to Yankee Exhibit 95, please.
My questions are going to pertain only to volume I, Mr. Mills, so I'm not going to give you this whole voluminous thing, unless you feel like you need volume II.
MR. MILLER. Your Honor, I'm handing Mr. Mills Plaintiffs' 95, volume I of the June 1985 mission plan.
BY MR. MILLER:
Q Do you have that big bulky thing there in front of you, Mr. Mills?
A Yes, I do.
Q If you would refer to page 4.
A Roman Numeral IV or number 4?
Q I believe it's page 4, sir. Do you see the second paragraph there that indicates in substance that, as of the end of 1984, approximately 10,000 MTU of SNF was contained in the industry backlog?
A Yes, I see that.
Q Okay. Can you go on to table 2 dash -- I'm sorry, table 1-1. Do you see that line diagram there?
A This is figure 1-1 or table?
Q I apologize. It's figure 1-1

Page 530

A Yes.
MR. MILLER: Now, the blue lines that are shown on the computer, Your Honor, we've inserted those as approximates.
BY MR. MILLER:
Q But I want to ask Mr. Mills if he would agree that at least this chart shows that, as of 1998, approximately 40,000 metric tons of uranium would be contained in the backlog.
A I believe that to be a reasonable number, yes.
Q Okay. Go to page 7, please, sir. And paragraph 3 at the top of the page there, do you see that?
A Yes, I do.
Q And, once again, that's under the heading Program Objectives, is it not?
A Policy Goals and Program Objectives, yes.
Q Yeah. I apologize for the omission. Policy Goals and Program Objectives.
And that third paragraph says: To ensure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided in the DOE's standard disposal contracts and in conformance with the Act.

Page 531

Do you see that?
A Yes, I do
Q Okay. This was DOE's official statement, the final version of its first mission plan, was it not, Mr. Mills?
A Yes, it was.
Q Now – strike that. Can we go to page 25, please. And we will be looking at section 2.7.
A I have that in front of me
Q I just want you to read over that language, if you will, sir, to yourself, that first paragraph and the first couple of sentences of the one that follow.
A I have read through the first paragraph on page 28 Is that the extent that you wish?
Q That's fine Thank you, sir.
The first paragraph back on page 25, the second sentence says: Table 2-2 shows a schedule that is based on the current estimated emplacement capabilities of the two planned geologic repositories, one of which is currently authorized.
Is that correct?
A That is correct.
Q And that comports with your understanding that, at that time, June '85, there was only one

Page 532

repository authorized?
A That is correct
Q All right. Now, if we can go on to page 26, and we'll be looking at table 2-2. And I just wanted to point out to you that this table is awful blurry.
MR. MILLER I apologize for that, Your Honor
BY MR MILLER
Q But the far right column that indicates spent fuel backlog, do you see that?
A Yes, I do
Q Those backlog figures, at least in DOE's document here, the final version mission plan, show an increase in the backlog until 2006, do they not?
A Yes, they do. But the same comment applies that we discussed a few minutes ago with regard to the spent fuel generation, which is in the second column. It, too, is dependent on a forecast of the EIA – or report of EIA, which does not comport with our understanding of what was going to be accumulating each year.
Q I understand. But even if that was flat, as you indicated earlier was your assumption, the backlog would still increase until 2006 at the rates that are listed in this table, would they not?

Page 533

A No. They would increase until 2003.
Q 2003.
A Because, in 2003, the first repository on this table was accepting 3,000 metric ton per year.
Q Okay.
A Which is greater than the amount that would have been discharged in that year. So that would have been the peak amount.
Q So it would have leveled off after the first 5 years.
A Yes.
Q Okay. Thank you for the correction Can we go on to page 29, please, sir. I want to look at the second paragraph, please, sir.
A The one numbered 2? We're on page 29?
Q Yes, sir. I'm looking at the language that specifies that, without a monitored retrievable storage, table 2-2 is the likely plan. Do you see that language?
MR. STOUCK: Page 29?
THE WITNESS: I do not see it on page 29.
MR MILLER: I apologize. Hold on.
BY MR MILLER
Q It's right in the middle of the page, I believe, Mr. Mills?

Page 534

A There is a paragraph that says: Should the Congress decide not to authorize an integrated MRS facility, the waste acceptance schedule shown in table 2.2 is an example of a plan that DOE is likely to follow.
Q Okay. So, apparently, this June mission plan – strike that.
The language in the paragraph that follows at the bottom of that next paragraph that says, "In 1991", do you see that?
A Yes
Q In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.
A I read that. Yes.
Q You saw that. Okay. Mr. Mills, you testified that, when these early drafts – even when the early draft of the mission plan came out, you were surprised because the rates that were indicated, the words that DOE put in the mission plan, were not commensurate with your understanding, your – the utility industry's understanding of what DOE obligations were, is that correct?
A That is correct.
Q And you said you had conversations with the

Page 535

program leaders at the time concerning the industry's concerns; is that correct?
A That is correct
Q Did you write those down anyway, Mr. Mills? Did you write letters to DOE? Did you memorialize those conversations you had with DOE program leaders about the industry's concerns?
A Well, they are included in the comments, the official comments that Edison Electric Institute provided to the Department of Energy on the draft mission plan.
Q Yes, sir. But you're – I'm asking you about your conversations with program leaders concerning those concerns.
A I do –
Q Did you memorialize any of those conversations?
A I do not recall them being put down in writing.
Q Okay. So everything that you've testified about were verbal – were verbal conversations that you didn't reduce to writing.
A A majority of it was verbal, yes, indeed.
MR. MILLER: Your Honor, we've been going about another hour. Can I take a short break?

Page 536

THE COURT: Sure
MR. MILLER: And I should be able to finish up with Mr Mills.
THE COURT. Can we limit it to 5 minutes?
MR. MILLER: Thank you.
MR. STOUCK. Can I just ask a question – I can ask you off the record. It's okay.
(Whereupon, a recess was taken at 4:46 p.m., and the proceedings reconvened at 5:00 p.m.)
THE COURT: Mr. Miller, are you ready?
BY MR. MILLER:
Q Just a few more questions, Mr. Mills If you remember before the break, you were taking issue with one of the reports of the Energy Information Administration; is that correct?
A That is correct.
Q And isn't it true that one source of the data for EIA's forecast is the RW 859 reports that are submitted by utilities?
A I'm just not – not acquainted with this particular detail. I do not know.
Q You don't know what the source for the EIA reports was?
A No, I do not.
Q So you don't know whether or not the report

Page 537

contains both actual discharged data, historical and projections for future discharges that's provided by the utilities?
A I do not know that.
Q The petition for rule making that you testified to earlier that you believed EEI had contemplated, was the lack of an acceptance rate or standards for an acceptance schedule in the contract itself, was that one of the proposed actions in that petition for rule making?
A Yes, it was. And that evolved into the issue resolution program that included both the Department of Energy and utility representatives to resolve many of the issues that were open issues.
Q Okay. Thank you, sir. I believe you testified earlier on direct testimony about transportation campaigns. And I believe you said that, prior to the formation of the contract, you had discussed those transportation campaigns with – with DOE program leaders; is that correct?
A That is correct.
Q Did you memorialize – you didn't memorialize any of those conversations, did you?
A There were many, many conversations with different personnel within the Department of Energy.

Page 538

And as you are – you probably recognize, that, if you want access to be able to continue to communicate with a lot of folks on a lot of details, the documentation is minimized. And I can say that a great deal of minimization was, in fact, followed with regard to these conversations and discussions.
Q Why was that, Mr. Mills? Why would – why would DOE want documentation minimized?
A In order to maintain the freedom of discussions.
Q All right. Well, they weren't – these conversations that you had about transportation campaigns, they weren't memorialized in the comments that EEI submitted on the proposed draft contract, were they?
A No, I don't believe the campaigns were discussed in that contract. I do not remember that at this point.
Q And as far as you recall, they're not memorialized in any other EEI documents?
A There was a utility transportation group of members which were nuclear electric utilities that addressed the transportation issues. That particular group did address many of the things that related to campaigns for transport of spent fuel.

Page 539

Q You weren't involved with that group?
A Not directly.
Q So you're not aware that they memorialized anything in writing to DOE before the formation – before the contracts were signed?
A I do not recall.
Q Okay. I wanted to ask you a little bit about the priority for shutdown reactors. Isn't it true that you don't know at what rate the industry and DOE intended that DOE would take spent fuel from shutdown reactors?
A Well, I do not what that rate might have been
Q And isn't it true that you don't know at what pace the parties intended for DOE to take fuel from shutdown reactors?
A No, I do not know what that detail was.
Q Okay. Can we go to Defendant's 109. Mr. Mills, I'm handing you Defendant's Exhibit 109. And I would refer you to the numbers in the lower right-hand corner of the pages and ask you – first of all, do you recognize this to be a memorandum to members of the High-Level Waste Spent Fuel Storage Working Group on the subject of changes to the standard contract that's dated June 24th, 1987?

Page 540

A Yes, I do recognize that.
Q Okay. Can I refer you, please, sir to the page that's numbered YDK 038298.
A Yes. I have that in front of me.
Q I would like to read a portion of the last paragraph It says: This first ACR and the next three ACRs issued annually through 1990 are not contractually binding. While developing the first ACR, OCRWM and their contractor, PNL, compiled a list of contractual and technical issues identified as important to the report's acceptability. Although the utilities will be asked to formally comment on this list of issues, OCRWM would also like assistance from the industry through an informal interchange to resolve satisfactorily as many of these contractual and technical issues as feasible. This last sentence says: This will improve the acceptability of future ACRs before they become contractually binding in 1991. Do you see that language?
A Yes, I do
Q Mr. Mills, that understanding that's reflected in that portion I read regarding the ACRs, that was the utility's understanding as of 1987; is that correct?

Page 541

A I have to take exception with the last sentence. I do not believe the last sentence reflects the utility's position on this even though this was a document that was prepared as an internal document distributed because at no time was the ACRs a contractually binding document
Q Okay. So you published something in this memo to your members that wasn't correct as you believe it?
A It appears that that may be the case. This is the first I have read this now since 1987. And this was an internal document. And what happened to it afterwards I'm not sure.
Q Right. These were memos authored by Ms. Montgomery, were they not?
A That is correct.
Q She worked for you?
A She worked in my group, yes.
Q Okay. A little bit about exchanges, Mr. Mills. You don't know anything about specific Yankee utility proposed exchanges, do you?
A No, I do not.
Q Okay. You weren't involved in the review or the signing or assisting any of the Yankees in reviewing or signing their individual contracts, were

Page 542

you?
A No, I was not.
Q Now, I believe you testified about Greater Than Class C waste; isn't that true?
A Yes, I did
Q Isn't it true, at the time of the formation of the contracts, that the parties did not consider the issue of GTCC?
A GTCC, as an expressed title for waste, was not in the lexicon at that particular time.
Q Okay. And I believe you testified, also, that your belief that GTCC was covered under the contract, one of the bases for that was the fact that DOE was responsible for all waste except classes A, B and C; isn't that correct?
A That is correct.
Q Now, I believe you said that that concept was based upon the fact that the NWPA, in combination with the Low-Level Waste Policy Act – Policy Amendments Act required DOE to be responsible for all waste; is that correct?
A It required the federal government to be responsible for all waste above the class A, B and C.
Q Okay. Now, the Low-Level Waste Policy Amendments Act, that was passed in 1985, was it not?

Page 543

A That is correct.
Q Okay. So that was after the contracts were formed and signed?
A That is correct.
Q Okay. So how can a statute that was passed after the – after the time that the contracts were formed have been a basis for your belief?
A The understanding was there early on before the amendments were passed. The amendments were passed to codify to make sure that everybody knew that that was what was intended
Q Right. But the Low-Level Waste Policy Amendments Act, that doesn't require a contract be issued by DOE, does it?
A No. No, it does not
Q Okay. Does it have a deadline wherein DOE is required to begin acceptance of the materials that are covered in that Act?
A Not in that Act. But you do recognize –
Q That was my only question, Mr. Mills. Thank you.
Now, earlier today, Mr. Mills, you testified that, when the standard contract was promulgated, you and the industry thought that GTCC was covered by the standard contract and that DOE had to take it pursuant

Page 544

to the standard contract; is that correct?
A That is correct
Q Now, GTCC is not spent nuclear fuel; is that correct?
A That is correct.
Q Can we go to Plaintiffs' Exhibit 4, please.
All right. I apologize. We're not to go look at plaintiffs' 4
I'm sorry. I lost track, Mr. Mills. I believe you said GTCC is not spent nuclear fuel; is that correct?
A That is correct.
Q And if that's the case, the NWPA only covers spent nuclear fuel and high-level waste, right?
A No. As defined – the high-level waste as defined in the Nuclear Waste Policy Act does include material that the Nuclear Regulatory Commission determines needs permanent isolation.
Q Right. But those rules for the Nuclear Regulatory Commission, they were established – that you discussed in your direct testimony, they were established after the contract was formed, were they not?
A That is correct
Q Okay. So how could the parties have had

Page 545

that in their contemplation at the time the contract was formed?
A In the exhibit to the contract, there is a definition of various fuel forms. There are standard fuel and there are nonstandard fuel. Within the nonstandard fuel, class 2, they specifically state these are nonfuel components. The nonfuel components consist of control rods, but not – it refers to specific items there which are now identified as GTCC. There's no question they're GTCC.
Q Yes, sir.
A That those are to be disposed of. And the DOE has agreed that they – in letters to – from Bauer to Hall that we discussed earlier, testified to earlier, that they would take that material at the same time they were taking spent fuel.
Q Yes, sir, those specific components. But do those specific components define the entire class of GTCC?
A The specific wording I would like to look at in the contract. It says these items – and the wording is of such a nature, but not all exclusive. I would like to look at the particular phrase in the appendix of the contract so I can get the wording correctly. But it does not say those would be the

Page 546

only components that would be taken care of at that point.
Q Are you aware that the utility plaintiffs had previously argued that GTCC waste became high-level waste in 1989 when the NRC issued its rule in the Federal Register?
A I am not aware of that discussion, no.
Q But it's your position that GTCC waste was covered by the standard contract that was formed in 1983?
A It is my position, yes.
Q And that, as of 1983, DOE was required to take it under the standard contract?
A Yes.
Q Now, the Low-Level Waste Policy Amendments Act of 1985, we talked about that, did we not?
A Yes.
Q Okay. And you're aware, are you not, that it was that Act that said it was DOE's responsibility to dispose of GTCC waste; is that correct?
A That particular Act did not refer to GTCC. It referred to class A, class B, class C and all other waste above the radioactivity level of class C. Now, you can say that's GTCC, but they did not refer to GTCC in the Act.

Page 547

Q Okay But that's – that's not your understanding of what the Act meant? Greater than – all other waste with a radioactivity level of higher than class C doesn't refer to GTCC?
A That is correct. Just as in the Nuclear Waste Policy Act and in the contracts that were signed by the utilities, they, too, were referring to that material that had a radioactivity above class C even though they didn't call it GTCC.
Q Okay. So I'm not sure –
MR MILLER: Could you read me question back, please
(The reporter read the record as requested.)
BY MR MILLER·
Q Okay. On to another subject, Mr. Mills. You discussed earlier in your direct testimony uranium enrichment contracts –
A Yes.
Q – and that you had knowledge of uranium enrichment contracts as part of your responsibilities at EEI
A That is correct
Q And I believe you also talked about the market exchange of uranium enrichment allocations, did you not?

Page 548

A Yes, I did.
Q Now, isn't it true that utilities purchased uranium fuels several years in advance of their requirements?
A Yes, that is correct.
Q Okay. Isn't it true that fresh nuclear fuel, as I believe you use the term, is not – is not irradiated?
A It is radioactive. But it is not irradiated yet in the nuclear power plant, yes.
Q Okay. And the transportation of fresh nuclear fuel has been occurring since the early 1960s, has it not?
A Could you repeat that sentence or question for me, please.
MR. MILLER: Sure. Would you read it back, please.
(The reporter read the record as requested.)
THE WITNESS: That is correct. Yes, it has.
BY MR. MILLER:
Q Okay. Once again on the subject of shutdown reactors, I believe you testified you don't know if there were any shutdown reactors in 1983, correct?
A I do not recall whether there were any shut down at that point. There may have been because there

Page 549

were early demonstration plants that may have been shut down
Q So if I told you that there were three that were shut down as of 1983, you couldn't identify them, correct?
A That is correct.
Q Other than Mr. Gruby, you don't remember who the specific representatives were from the Yankee plaintiffs that were working on the task force that you were in charge of, EEI; is that correct?
A You were referring to the task force for commenting on the standard contract in February of 1983?
Q Yes, sir.
A I do not recall who they were. I mean, there were a large number of people coming and going in the office each day. The number of people that were in the office on any one particular day might be different than those on the prior today. So, no, I just do not recall which individuals were there from each utility.
Q So you can't testify as to the specific intentions of any specific representative from any of the plaintiffs in this case concerning their contractual intent, can you?

Page 550

A No, I cannot
Q And that's because you just don't know what the specific intentions of those individuals were.
A That is correct. We were trying to produce consensus comments and encourage the individual utilities to prepare their own comments.
Q Mr Mills, you've been paid for – prior to today at least, you've been paid for the time you've spent on consulting on this case; isn't that true?
A That is correct.
Q And who are you paid by?
A I am paid by Spriggs and –
MR. STOUCK: Hollingsworth.
THE WITNESS: Hollingsworth.
BY MR MILLER:
Q And what about today, sir, did they pay you for your time today?
A I expect them too, yes.
Q But you haven't been paid yet?
A That is correct.
Q But you anticipate that Spriggs & Hollingsworth is going to pay you for your time today?
A Yes, I do.
Q Mr. Mills, you've never been a Member of Congress, have you?

Page 551

A No, I have not.
Q And so you didn't vote as a Member of Congress on whether to pass the Nuclear Waste Policy Act, did you?
A No, I did not vote.
Q And you didn't debate that bill that became the NWPA on the floor of the House or the Senate, correct?
A That is correct.
MR. MILLER: If I could take just a 1-minute break in place, Your Honor.
THE COURT: Sure.
MR. MILLER: I have no further questions at this time.
THE COURT: Mr. Stouck, any redirect?
MR. STOUCK: Your Honor, I've got just what I hope will be a handful of questions. But can we take a stand-in-place break for a minute?
THE COURT Sure.
MR. STOUCK: Or if the Court wishes to – I'm absolutely not going to be more than 15 minutes. I think much less than that. But I would just like to get organized.
THE COURT: Why don't we take a brief break and come back at 25 of.

Page 552

MR. STOUCK: Okay. Great. Thank you
(Whereupon, a recess was taken at 5:24 p.m., and the proceedings reconvened at 5:35 p.m.)
MR. MILLER I'm sorry, Your Honor. One more housekeeping duty.
THE COURT: Sure.
MR. MILLER: I would like to move into admission Defendant's Exhibit 109
THE COURT: Okay. Which is?
MR. MILLER: Which is the June 24th, 1987 memorandum from Ms. Montgomery who worked for Mr. Mills on the Utility Nuclear Waste Management Group.
MR. STOUCK: May I just take a look at it, Your Honor?
THE COURT: Sure.
MR. STOUCK: Your Honor, this indicates that it came from Yankee Duke files, which is not Yankee Atomic. It's a third party.
I think, on its face, it's hearsay. It may be a business record of Duke. I would like to have an opportunity to check it. I don't know why this was kept or why this was produced from our files.
MR. MILLER: Your Honor, if I may, Mr. Mills has testified about this document. He authenticated

Page 553

it. It obviously is a document that was produced by a group that he was in charge of and by one of the employees he supervised. He's testified about the issue resolution process. And this document is all about the ACR issue resolution process.
The Yankees obviously must have received this document during the course of its business because it's to the members of that high-level waste spent fuel storage working group of which the Yankees were a member.
So it seems to overcome the hearsay objection, Your Honor.
MR. STOUCK: I would just like to have an opportunity to check with the folks and see why they kept it. It may be that they have a regular practice of keeping all these things. If they do, it's a business record; and I'm not make the government produce testimony on that issue. I would like to have an opportunity to check that, and I will.
MR. MILLER: Well, Your Honor, we're not moving for admission on the grounds that it's a business record but because of the grounds I've stated.
MR. STOUCK: What other exception is there?
THE COURT: I can't remember. It's on the

Page 554

letterhead of the working group, is it?
MR MILLER: I'm sorry, Your Honor. I have a copy of it.
MR. STOUCK: Your Honor, let me also say Mr. Mills just pointed out to me – I should have noticed myself – this document does contain – apparently contain a number of separate documents. It's not clear that they're all intended to be purchasers. One June 24 letter on the top and a June 23 letter on top and June 24 letter on top. Again, there's a June 24 meeting agenda, the standard contract task force, an April 14, 1987 letter of – from a financial consultant to Mr. Kraft, and some additional things.
So, again, I would like to have an opportunity to find out why this was in Duke's files, and maybe we can avoid further ado. Or, if not, we'll come back and tell you whether we have an objection.
MR. MILLER: That's fine, Your Honor. We'll let Mr. Stouck check.
MR. STOUCK: Actually – well, let's take this up. But it doesn't even seem – I mean, some things aren't even connected or – there's a second page of something, no first page. So we will discuss this with the government, Your Honor, and see what we

Page 555

can do and see if there's anything left to bring back to you, and we'll bring it back. Is that okay?

THE COURT Yeah, I'm just looking through.

MR STOUCK It seems to be a hodgepodge of stuff. It looks like an individual's file, Your Honor, but we will investigate and come back

MR. MILLER· Your Honor, I misspoke before – I'm sorry, Your Honor Never mind.

THE COURT: Well, I notice that it includes documents like the working group meeting at which Yankee Atomic was represented, March 25, 1987. So I think it would be a good idea for counsel to get together and discuss exactly what the document is and whether there – the parts of it are independently admissible or – it doesn't appear necessarily that they're part of the cover.

MR STOUCK: That was my conclusion after I looked at it, Your Honor. But it's not –

THE COURT Okay Paging is consecutive so – on the Bates Numbers.

MR. MILLER: That's fine, Your Honor. We'll discuss it amongst ourselves

THE COURT: If you wanted to have further identification with this witness as to the parts –

MR MILLER: Not at this time, Your Honor.

Page 556

THE COURT· Okay Well, if counsel want to get together on that and see what the position is

MR. STOUCK: Okay. We will do that, Your Honor. We will report back to you As I said, I have just a small number of questions for Mr. Mills

REDIRECT EXAMINATION

BY MR. STOUCK:

Q Mr Mills, you testified, I believe, a little bit on direct, and certainly in response to Mr Miller's questions, that, in response to comments from EEI and comments from other utilities suggesting that DOE insert into the contract something either quantitative or qualitative about the specific acceptance obligation, the contract that was eventually published and then later signed by the utilities was silent on this, that issue, correct?

A That is correct.

Q Suppose the Department of Energy had not responded with silence but had responded with language that disclaimed any 3,000-ton-per-year obligation or specifically disclaimed any obligation to satisfy any particular rate, what would the reaction of the industry have been at that time?

A My recommendation to the industry would have been that we not sign the contracts and that we would

Page 557

take that message to Congress and indicate to Congress that DOE was not fulfilling their Nuclear Waste Policy Act.

Q And why – why would that – why would you make that recommendation in the face of that situation?

A The understanding that we had when the Nuclear Waste Policy Act was compiled or put together and the contracts were compiled was that the 1 mill per kilowatt-hour that was being paid was to be paid to the Nuclear Waste Fund, was to be done so to achieve a robust program that would achieve the actual use of the nuclear waste repository in 1998 at a reasonable schedule.

Q All right. Now, if you still have the notebook that I gave you or one of my colleagues gave you first thing this morning, turn to tab 2, which is the draft of the contract that I believe you testified was distributed by DOE prior to the February publication of the proposed rule

And Mr. Miller asked you some questions, I think, about a different document that I think had some comments on this draft – handwritten comments on this draft. Do you recall that?

A Yes, I recall it.

Page 558

Q But this is the typewritten draft that was distributed by DOE to the utilities.

A Yes. This was received by the Department of Energy

Q Okay Take a look at page 4 under Article III (B)(1), Article III (B)(1). And B is titled Schedule for Delivery Commitments. I'll read you part of the first subparagraph. It says: Delivery-commitment schedules, as set forth in appendix A and next hereto and made a part hereof, for SNF and/or HLW, shall be furnished to DOE by purchaser and, if approved by DOE, shall become a part of this contract, close quote.

Do you see that?

A Yes, I do

Q Okay. Do you know why that provision was not made part of the contract?

A Because the delivery-commitment schedule was not final commitment of what would be delivered.

Q Now, that was your understanding about delivery-commitment schedules?

A That is correct.

Q And I believe you testified on direct when we were talking about the OFF, the oldest-fuel-first concept, that your understanding was that utilities

Page 559

under the final contract as it was promulgated and then signed, your understanding was that the utilities will be able to submit to DOE or propose to deliver to DOE as much spent nuclear fuel as they desired to deliver. Was that your understanding?
A Yes. That is correct.
Q Okay Let's take a look at – and then how did that relate to the OFF concept? I think you testified about that in direct.
A Well, it was not directly related to the OFF concept. The Nuclear Waste Policy Act indicated that the DOE was to proceed with a program on a – as expeditiously as practical and to take the waste that the purchaser asked DOE to take. And so it was the purchaser's initiative to tell DOE how much it was that they would take.
Q All right.
A And the OFF allocation would come into play only if the utilities had asked DOE to take more spent fuel than they were able to take.
Q Okay And it's your recollection that that understanding was reflected in the final contract?
A Yes.
Q Okay. And it just – it's in the contract. But for the record here, let's take a look at tab –

Page 560

so we'll have it in place, tab 6 – tab 6 is the final rule making. On page 16601. In the middle column under Article V (B)(1), Plaintiffs' Exhibit 31 this is Article V (B)(1), delivery-commitment schedules, do you see that?
A Yes, I do.
Q Delivery-commitment schedules in the form set forth in appendix C, and next hereto and a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by purchaser after DOE has issued its proposed acceptance priority ranking as described in paragraph (B)(5) of Article IV hereof beginning January 1, 1992. The purchaser shall submit to DOE the delivery-commitment schedules which shall identify all SNF and/or HLW the purchaser wishes to deliver to DOE beginning 63 months thereafter. Do you see that?
A Yes, I do.
Q And that's consistent with your understanding as you just testified?
A Yes, it is.
Q And if you turn the page and look on – under 16602, Article VI, Criteria for Disposal, under B, Acceptance Procedures in the left column, do you see that?

Page 561

A Yes, I do
Q And let me read it again. Acceptance priority ranking delivery commitment schedules for SNF and/or HLW may require the disposal – it says here or. I think it's intended to be of. It's a typo – of more material than the annual capacity of the DOE disposal facility or facilities can accommodate The following acceptance priority ranking will be utilized, colon. And there's a reference then to exchanges and emergency deliveries. And let me ask you: Is that consistent with your understanding as you just testified?
A Yes, it is.
Q Would it be fair to say that this might have been phrased to read: The delivery-commitment schedules may require the disposal of more material than the annual capacity of the DOE's disposal facility can accommodate. The following acceptance priority ranking then will be utilized? Is that consistent with your understanding?
A Yes. That is consistent with my understanding.
Q Thank you. Now, you – Mr. Miller asked you whether you knew the acceptance rate that would be applicable to any shutdown nuclear reactor. Do you

Page 562

recall that?
A Yes, I do.
Q And I think your testimony there was that you did not know that.
A I did not know.
Q But do you know – or what is your understanding of whether shutdown reactors and spent nuclear fuel at shutdown reactors would be included within the overall industry-wide capacity figures, either the Mills rate or the 3,000 MTU? What is your understanding of that?
A That it would be included and it could receive a priority standing in its allocation.
MR. STOUCK: Your Honor, that's all that I have. Thank you.
THE COURT: Any recross?
MR. MILLER: Excuse me, Your Honor. Your Honor, just to preclude the necessity of having to call Mr. Mills back, I would like to ask just a very few questions about defendant's – that relate to Defendant's 109, if you don't mind.
THE COURT: Sure.
MR. MILLER: Would you like another copy, Your Honor?
THE COURT: That's fine. I went through it.

Page 563

MR. MILLER: I'm handing Mr. Mills Defendant's 109.

RECROSS-EXAMINATION

BY MR. MILLER:

Q Mr Mills, in general, Ms. Montgomery was knowledgeable about the activities of the UNWMG concerning the review of the standard contract, was she not?

A Yes, she was.

Q Was she not also knowledgeable about EEI's monitoring, if you will, of the waste disposal issues?

A Yes, she was.

Q Okay. And didn't she also routinely deal with industry members?

A Yes, she did

Q Okay. Was it EEI's practice to regularly make reports to its members?

A Yes.

Q Was it also a regular practice of EEI to monitor issues of importance to its members and to analyze those issues?

A Yes, it was.

Q Wasn't it also a regular practice to – of EEI to attempt to coordinate the views of its members – to coordinate the views of its members?

Page 564

A I'm not sure how the – how to apply the word "coordinate". It was certainly our desire to achieve consensus views. As coordinating the views, I'm not sure how used – how one would coordinate the views of them We should share the views of members between members if that's the intent of "coordination". We would share the views of members between other members, yes.

Q Okay. And is this document, Defendant's 109, is it one that would have been kept by either by the UNWMG or EEI in the regular course of its business?

MR. STOUCK Can we break that down, Your Honor, because, again, there are a number of documents here.

MR. MILLER: Sure. It's compound – no, I mean the entire document.

MR. STOUCK: Well, some of this document I don't even know what it is. The letters – the letters are pretty straightforward, and you can ask about those maybe collectively

MS. SULLIVAN Your Honor, as we've been sitting here, I've looked at this document a little bit more closely, and this was on our original exhibit list. And I think that somebody other than I, but

Page 565

somebody else on the government identified this was, in fact, an entire packet, at least beginning with YDK 038296, which is the meeting notes for June 4th, 1987 to the members of the Standard Contract Task Force. And what tells me that is, if you go to the next page, YDK 038297, in the middle of that page, there's a note: The following meeting notes briefly summarize the highlights of the meeting Copies of the agenda and attendance lists are attached and copies of the handouts not previously provided as part of the regular mailings.

And based on the topics that were discussed at that meeting, I believe that all of the attached materials are those previous handouts, et cetera.

I don't have a problem with – I know that Spriggs wants to go back and check This document came from – this set of documents came from Mr. Buchheit's files. But I would posit that, at least YDK 038296 through YDK 038416 is, in fact, one document. And these questions for Mr. Mills go to that document.

MR. STOUCK: Okay.

THE COURT: Of course Mr. Mills could verify that or not verify it.

Page 566

BY MR. MILLER

Q You've got the Bates Number range that Ms. Sullivan referred to, or do you not? Did you not –

A I have the complete document which includes testimony before Congress and includes congressional –

Q Yes, sir Yes, sir.

A – letters. It includes quite a conglomerate of information

Q I appreciate that, Mr. Mills. I'm talking about the pages beginning YDK 038296 through the end. Will you look at that and –

A Through the end?

Q Through the end of the document, yes, sir. Calling attention to you, sir, page YDK 038297, that language right in the middle of the page above the heading Defense Waste: Following, meeting notes briefly summarize the highlights of the meeting. Copies of agenda and attendance list are attached, as are copies of handouts not previously provided as part of regular mailings.

A Well, I – that states that. But the total package, which includes testimony that I actually wrote, it includes letters signed by Members of

Page 567

Congress, I don't know whether those were actually items that were distributed with this cover letter.
Q Okay. So let me –
A It does not list them as to what was distributed with this cover letter.
Q Yes, sir. I wasn't talking about the cover letter. I was talking about the document beginning at YDK 038297 to the end.
A Yes. In that one, it indicates, as you read The following meeting notes briefly summarize the highlights of the meeting. Copies of the agenda and attendance list are attached, as are copies of the handouts not previously provided as part of regular mailings.
Q Right.
A But it does not list there what those handouts were.
Q Yes, sir.
A So were those handouts all of these that were attached here? I have no way of knowing.
Q All right So you just don't know?
A I don't know.
MR. STOUCK: Your Honor, Ms. Montgomery works for DOE and is on their witness list. Maybe we can make some progress on this and narrow it

Page 568

MS SULLIVAN: Your Honor, I have a way to short circuit this even further if we could.
THE COURT: Okay, Ms. Sullivan.
MS. SULLIVAN: I apologize, Your Honor. We didn't expect Mr. Mills to be knowledgeable about the – this subject. So it was a surprise that we could possibly get this document in through him So that's what we're trying to do.
Mr. Mills, could I ask you to look at pages YDK 038296 through YDK 038302. Just flip through those pages, please
THE WITNESS: Yes.
MS. SULLIVAN: Let me ask Mr. Miller's last question again referring to those pages that I just cited to. The document bounded by that Bates range, is that document one that would be kept by UNWMG or EEI in the regular course of business?
THE WITNESS: Yes, it is.
MS. SULLIVAN· Okay. And this memo dated June 24th, 1987, that memo is made at the time in 1987?
THE WITNESS: I believe it was. Yes.
MS. SULLIVAN· Okay Your Honor, I don't think we need anything further on this document. We would ask that plaintiffs' counsel conduct the

Page 569

investigation that they feel necessary and get back to us.
THE COURT: Okay.
MS SULLIVAN: Thank you, Your Honor.
THE COURT: Any further –
MR. STOUCK: Hopefully we can chat about it, too.
MS. SULLIVAN: That's fine.
MR. MILLER: Nothing further, Your Honor.
THE COURT: Anything further?
MR. STOUCK: Thank you, Your Honor. No.
THE COURT: I just have one question, and counsel object if you don't want me to get into it. But I was kind of intrigued by the proposal that was thrown out and opposed by the industry to take title on site and pay rental. And I just wondered if Mr. Mills would know that – whether or not were there any details ever discussed about that. In other words, would the title be taken if they – if that had been followed, of course it wasn't, but if title were taken on site, would that be the way the nuclear fuel was in place, or would it have required some kind of transfer on site? Was there any discussion about that at the time, and who would pay for the storage facilities,

Page 570

things like that?
THE WITNESS: Your Honor, that was discussed in some detail. And we commented on that particular approach in our comments to the 1984 draft mission plan.
THE COURT: All right. It's probably on the record.
THE WITNESS: And we did not encourage – we discouraged that concept. And the main reason we discouraged that concept, because it did not really satisfy what the Nuclear Waste Policy Act was attempting to do; and that is, that the waste would be taken from the nuclear power plant sites and placed in some other location that was a safe location.
THE COURT: Oh, so the plan contemplated that it would remain – oh, I see your point.
THE WITNESS: It was going to stay right there on the site. It was just going to change title, and DOE would have responsibility for it, but it would stay right there where it was.
THE COURT: Which may well be the result that eventually happens anyway.
MR. STOUCK: Well, hopefully including the payment part.
THE COURT: That remains to be seen. Okay.

Page 571

Any further questions if I raised a problem or anything? No Nothing

MR. MILLER: No questions, Your Honor

THE COURT: All right You're excused, and thank you very much for your testimony.

THE WITNESS: Thank you.

MR. STOUCK. Your Honor, Mr. Shapiro has a few words, I think.

MR SHAPIRO: Given the hour, we certainly wouldn't manage to start another witness. Our next witness will be Dr. John Bartlett who will testify both as a fact witness and as an expert witness for the program.

THE COURT: And tomorrow morning, I take it.

MR. SHAPIRO: That's when we would propose to start.

THE COURT: Okay. Well, unless you – maybe we better call it quits and start fresh in the morning Maybe they'll run the air-conditioning a little longer So we'll now adjourn and reconvene at 10:00 a.m. tomorrow morning

(Whereupon, at 6:05 p.m , the hearing was adjourned, to be reconvened at 10 a.m. on Wednesday, July 14, 2004 )

Page 572

CONTENTS

WITNESS DIRECT CROSS REDIRECT RECROSS

LORING MILLS 329 457 556 563

AFTERNOON SESSION: 457

EXHIBITS

EXHIBIT NO. MARKED RECEIVED

PX-461 372

PX-970 309

PX-1157 313

Page 573

CERTIFICATE OF REPORTER

DOCKET NO : 98-126C, 98-154C, 98-474C

CASE TITLE: Yankee Atomic Electric Co v. U S

HEARING DATE: July 13, 2004

LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims

Date: 7/13/04

Vicky J Stallsworth, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington, D C 20005-4019