**Pacific Gas & Electric v. U.S. No. 04-74C June 5, 2006**

**Heritage Reporting Corporation**

**Page 1 to Page 410**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------x
PACIFIC GAS & ELECTRIC
COMPANY, No 04-74C
Plaintiff, .
vs .
THE UNITED STATES,
Defendant .
-----------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C.

Monday, June 5, 2006

VOLUME 1

The parties met, pursuant to the notice of the Judge at 9.00 a m

BEFORE THE HONORABLE EMILY C HEWITT



APPEARANCES.
ON BEHALF OF PLAINTIFF.
JERRY STOUCK, ESQ
ROBERT L SHAPIRO, ESQ
DAVID CALLET, ESQ
ERIC ROWE, ESQ
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest Suite 500
Washington, D C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT·
JOHN EKMAN ESQ
ALAN LO RE, ESQ.
SCOTT R DAMELIN, ESQ.
SHARON A SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ
MARIAN SULLIVAN ESQ.
U S Department of Justice
1100 L Street, Northwest
Washington D C. 20036
(202) 514-2000



APPEARANCES (Continued)·

ALSO PRESENT DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



P R O C E E D I N G S
- - - - -

THE COURT. We are on the record in Case Number 04-74C into which has been consolidated Case Number 04-75C, Pacific Gas & Electric Company versus the United States, for the purpose of hearing evidence. Counsel for the parties will now introduce themselves and those assisting them in the courtroom For Plaintiff?

MR. STOUCK· Yes, Your Honor I'm Jerry Stouck representing Pacific Gas & Electric Company. I'm here with Mr Robert Shapiro David Callet and Eric Rowe, whom I think you know Gabrielle Butler is going to be helping with documents at the end of the day.

THE COURT: For Defendant?

MR. EKMAN· Good morning, Your Honor John Ekman on behalf of United States With me today are Joshua Gardner, Scott Damelin, Alan Lo Re, Sharon Snyder, from the Department of Energy, Mr David Zabransky, and in the first row is Jane Taylor who is DOE counsel

THE COURT Good morning

Page 113

asked about page 13 of the attachment, the comments from PG&E.

A. Yes.

Q. And on page 13, there is discussion of particular limitations on a monitored retrievable storage facility that PG&E was requesting - or suggesting that they be lifted, and in your cross-examination, you wanted to explain the connection between those and the 10,000 MTU limitation that was also limiting the monitored retrievable storage facility.

A. Yes I think the context of the answer elimination of the ban on colocation of an MRS to a permanent repository site was in the context of whatever it took in terms of assuring that the DOE had the ability to meet the 1998 date.

If that meant the ban on colocation and any restrictions on storage at a colocated site needed to be revised by Congress, certainly, PG&E was supportive of that. By no means does this, what I would consider a bit of an out of context reference to number one, mean that the letter did not intend to support a

Page 114

change in any metric ton limitation on storage at a colocated MRS.

MR. SHAPIRO: Thank you, Mr. Warner.

THE COURT: Counsel, any questions on cross?

MR. GARDNER: Nothing further, Your Honor.

THE COURT. Wrong counsel, sorry. I didn't specify. Mr. Shapiro, you were also up on the Private Fuel Storage direct, if you wish to be on cross on that subject.

MR. SHAPIRO: I appreciate the opportunity, Your Honor, but we don't have any further questions.

THE COURT: Now, for the United States.

MR. GARDNER: I apologize, Your Honor, no further questions.

THE COURT· Before I excuse you, I want to give you a directive that I'm giving all witnesses that testify in the case as fact witnesses. The parties have requested, as they are entitled to under Federal Rules of Evidence, that the witnesses be excluded from the courtrooms, so that each witness can give

Page 115

his or her testimony fresh without being distracted by other's testimony.

And my order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be a witness, please ask counsel. Thank you for your testimony.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may step down. Plaintiff may call its next witness.

MR. STOUCK: Thank you, Your Honor. Our next witness is Mr. Loring Mills. I believe he's here. Let me bring him in.

Your Honor, I believe just a little housekeeping matter, we have a tech problem that I don't fully understand, which my assistant is trying to explain to me, on one of the screens here. I was just saying there's a blue arrow on the screen that I believe is either coming from the podium or from your monitor.

We're not getting a feed on this monitor because of something going on. We can

Page 116

still display documents, but the arrow will still be there, so maybe we can fix it at lunch. I'm sorry.

THE COURT: The source of the arrow, I don't know, I'm sorry, but we will try to clear it up.

MR. STOUCK: Thank you. I misunderstood. I thought it was more of a problem. Mr. Mills is here and is our next witness, Mr. Loring Mills.

THE COURT: Mr. Mills, good morning.

THE WITNESS: Good morning.

THE COURT: Before you are seated, please indicate you are ready to take the oath by raising your right hand.

Whereupon--

LORING MILLS

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Please state your full name for the record

THE WITNESS: My name is Loring Mills.

THE COURT. Thank you, sir. Please be seated. Would someone from Plaintiff's table please switch off the water glasses here so we

Page 117

can remove the glass from the last witness?
Would someone from Plaintiff's table switch off
the water glasses so we can remove the prior
glass? We just need to remove the one that was
used by the last witness. Thank you so much.
MR. STOUCK: Yes, Your Honor. We've
got a notebook for Mr. Mills, if I may
approach.
THE COURT: Yes
MR. STOUCK: Are we ready, Your Honor?
THE COURT: Yes.
MR. STOUCK: Has the witness been
sworn?
THE COURT: The witness has been
sworn.
MR. STOUCK: Thank you.
THE COURT: This is the direct
examination of Mr. Mills by Mr. Stouck.
MR. STOUCK: Thank you, Your Honor.
DIRECT EXAMINATION
BY MR. STOUCK:
Q. Good morning, Mr. Mills. Can you
please describe your educational background for
the Court?
A. Yes. In 1950, I received and was

Page 118

awarded a Bachelor of Science degree in civil
engineering from Union College, and in 1962, I
was awarded a Master of Business Administration
from the University of Washington in Seattle.
Q. I want to get to some questions about
your work at the Edison Electric Institute, but
first, would you please tell us about your work
in the nuclear industry before you joined EEI?
A. Yes. I had a 43-year career in the
industry, of which 31 years were devoted to the
use of nuclear energy to produce electricity.
I started my first introduction to nuclear
energy when I was transferred by the General
Electric company to the Hanford Laboratories,
which was an Atomic Energy Commission
laboratory in Richland, Washington
I was transferred there by General
Electric from the Electronics Park Research
Laboratory in Syracuse, New York. The Hanford
Laboratory had a program called the plutonium
recycle program, which was in response to
President Eisenhower's announced program of
Atoms For Peace.
And the purpose of that particular
program was to demonstrate to all, including

Page 119

future users of nuclear energy, that you would
take fuel that would be used in commercial
nuclear power plants, remove the high-level
waste from those fuels, recover the uranium and
plutonium, and recycle that uranium and
plutonium useful energy values back into new
fuel assemblies.
And we actually, hands-on, did that
work at Hanford Laboratory and demonstrated
that we could do that with fuel assemblies that
we tested in the plutonium recycle test
reactor. General Electric wanted out of its
prime contract at Hanford in 1963.
And at that point, they transferred me
to a non-nuclear program of general purpose
control in Bloomington, Illinois, and I worked
there on advanced engineering and control panel
design for a number of years. That was 1963.
In 1967, the Kerr & McGee Corporation invited
me to come to Oklahoma City as a project
manager to design, build, and operate a
facility to produce uranium components for
commercial nuclear power plants.
We did that, and we actually produced
the uranium components for the early nuclear

Page 120

power plants at the Oconee plants of Duke Power
Company and the Omaha Power Plant, we actually
produced those uranium components in that
facility, and that was in the period of 1967 to
1971.
In 1971, I was invited by Nuclear Fuel
Services to come to Rockville, Maryland on a
similar project, where they wanted to build a
fuel fabrication facility that would take the
uranium and plutonium that they were recovering
in their reprocessing plant at West Valley.
They were recovering that, and they wanted to
build a facility similar to the one that we had
in Oklahoma that would take that uranium and
plutonium and convert it back into fuel that
would be used by the utilities.
That was in 1971. They did have the
only commercial program that operated a
reprocessing plant. It was a development
plant It actually reprocessed fuel from 1968
to 1972. When they started to upgrade that
particular plant, there were a number of
nuclear issues that became a concern, a lot of
them with nuclear fuel at that time.
And the Edison Electric Institute

Page 121

invited me to join them in 1976 to represent the utilities on those nuclear fuel issues.

Q. Okay. And what is the Edison Electric Institute, and what is its role in the nuclear industry?

A. Edison Electric Institute is a trade association for the investor owned electric utilities, of which at that time there were about 176 different utilities in the country, all of which were members of the Edison Electric Institute who had its offices in New York City, but they wanted to, they realized that they needed to interface with the, on the nuclear side in Washington, D.C. And they asked me to join them and set up an office in Washington, D.C., to represent the utility industry on the nuclear fuel issues, and only about 40 of the 176 utilities that were members of EEI had nuclear programs.

Q. And just briefly, can you tell us your progression of positions at EEI from '76 until –

A. Well, to start, that program in 1976, it was focused on just fuel, so I was the nuclear fuel manager at that point, and then I

Page 122

was promoted to director of nuclear fuel, then director of nuclear activities, and then to vice president of nuclear activities, where I retained that position until I retired in 1993.

Q And what have you done since your retirement from EEI?

A. I've enjoyed fishing and sailing and done a very minimal amount of consulting work, but I also enjoy teaching seniors computer operation at Chesapeake College.

Q. I want to go back to the years from the time period from the beginning of the commercial nuclear power industry in this country, Mr. Mills, up until the 1970s. What is it that nuclear utilities typically would do with their spent nuclear fuel at that time?

A. The whole nuclear program for commercial production of electricity was based on recommendations of the Atomic Energy Commission that you would have fuel that would be made from uranium, purchased by the utilities. That uranium would be built into fuel assemblies, not untypical of what here is in front of us. Those fuel assemblies would go into a

Page 123

nuclear power plant, and they would reside in the nuclear power plant anywhere from two to five years, depending on the design characteristics of that fuel. When the fuel was removed from the – during that time, there was used – the nuclear reaction would result in the buildup of high-level radioactive waste which, some of it was strontium and cesium. And those high-level wastes would absorb neutrons and cause the ability to generate energy from the system to decrease, so the fuel elements were then taken out of the reactor. They were then to be sent to a reprocessing plant where they would be dissolved, and the high-level waste would be removed from the rest of the material. The high-level waste consisted of less than five percent of the spent fuel, and the uranium and plutonium would be recovered and put back into fuel assemblies for future use. And that was the plan cycle. And the high-level waste was determined, that was something that had to be stored safely for a long period of time. That was known – actual ly, you refer

Page 124

back to a 1957 document of the American Physical Society that recommended that high-level waste be disposed of in deep underground geologic formation. At that time, they recommended it to be in salt formations, so it was intended that the high-level waste would be handled by the federal government.

Q. And what happened to this reprocessing process in the United States?

A. In the early 1970s, the Atomic Energy Commission, which was the one organization, federal organization in the executive branch responsible for all of the nuclear activities, it was decided to break it up, and they spun out of it the Nuclear Regulatory Commission for the regulatory process. When they did that, the regulation, the new regulatory, independent Nuclear Regulatory Commission had not put together the regulations that were really definitive enough for the reprocessing program to go forward as it was hoped, and thus, that particular reprocessing activity did not progress as one expected it to in the mid-'70s. And in fact, we know that president –

Page 125

well, Jimmy Carter was elected president in the fall of 1976, and on April 22nd of 1977, he issued a statement that called for a moratorium on all commercial reprocessing, just a moratorium, it was going to stop doing it at that point. He also proposed at that point to form a Department of Energy to replace the ERDA that was operating then.

And he also proposed, because there was going to be a problem now in what do you do with the spent fuel, he proposed an away from reactor storage program that the federal government would offer for storing this spent fuel until disposition was determined.

Q. And just to be clear about reprocessing, this moratorium, what ultimate impact did it have on reprocessing in this country?

A. It was very significant. It actually just shut it down, basically shut down the reprocessing at that point because there was no way to proceed with the regulatory aspects and get a license to do any reprocessing.

Q. And how did the nuclear energy industry react to the shutdown of reprocessing?

Page 126

A. With considerable anxiety, what are we going to do with this spent fuel that we are accumulating, and what are we going to do to make sure that we have the fuel material that we have, that we will need for 40 years to run these particular nuclear plants that were built and operating and were being built? So it was of considerable concern to the utility industry.

Q. Well, without reprocessing, what options did nuclear utilities have for disposition of their spent nuclear fuel?

A. We had no good alternative at that point. We considered that we might have to store it for 100 years, but we did not have any good alternatives other than to store it

Q. And at that time then, did the federal government take any action to address this situation that resulted in the wake of the reprocessing – termination, I guess, of reprocessing?

A. Yes, they did. As I indicated, President Carter had indicated the federal government will provide away from reactor storage for the spent fuel, but that triggered

Page 127

a requirement for environmental impact statement. As we all know, the Environmental Policy Act of 1969 required an environmental impact statement for any major changes, policy changes.

That was a major policy change, so it required the Department of Energy to proceed with an environmental impact statement. They proceeded starting, I believe, in 1977 and '78, to develop an environmental impact statement to identify what should be done with spent fuel and the high-level nuclear waste.

And that was done over a period of two or three years, they identified nine different alternatives. One was the AFR long-term storage. Another was to place it in deep seabed disposal. They even had one concept of firing it off into space, unreal.

Q. And what was the ultimate result of the environmental impact statement?

A. It resolved down to the fact that the best solution was to dispose of the waste either in the form of spent fuel or as separated high-level waste in deep underground geologic repositories.

Page 128

Q. Now, were you personally involved, did you have some personal involvement with this environmental impact statement?

A Yes, I did. I was visiting with the individuals in the Department of Energy at that particular time It was, you know, it started under ERDA, but really continued under the Department of Energy, which was formed at that time. The first Assistant Secretary for Nuclear Energy was Woody Cunningham, and I spent considerable time with Woody Cunningham on that.

Shelby Brewer was in the Department of Energy at that time working on that issue, and there were a number of others in which I interfaced with them, I participated in their public meetings, I provided written comments to them on, suggestions on the environmental impact statement, yes.

Q. And this is in the late '70s, I guess. When was the environmental impact statement issued?

A. I'm not sure whether it was 1979 or 1980. It was in that time frame, very close there, I believe it was '79.

Page 129

Q. And you were at the Edison Electric Institute at that time?
A. Yes, I had joined Edison Electric Institute in the fall of 1976 and was very much involved. Actually, I spent, that was one of my activities, I visited with the Department of Energy people at least for one full day a week throughout that period.
Q. Now, after this environmental impact statement identified deep geologic disposal, I believe you said as the preferred alternative, is that what you said?
A. That is correct.
Q. For disposing of the high-level waste, what happened next?
A. Well, we recognized that that was the preferred route, but how were we going to codify it as a national policy? It was understood that it was a preferred route. We, the utility industry, wanted to have it codified as a national policy.
And it appeared the best way to do that was with legislation, and in the conversation with the Department of Energy, they also agreed that it was probably best to

Page 130

go forward and get legislation that codified that as the route for the disposal of both spent fuel and high-level waste.
Q And what was your personal involvement in the development of that legislation?
A. Well, I personally wrote testimonies, probably more than a dozen, I'm sure it was more than a dozen different statements that we had chief executive officers of the utilities that had nuclear programs come in and testify before these committees in Congress, both the energy and environment committees in the House of Representatives and the energy and environment committees in the Senate.
And they held hearings, and you may recall that that particular time was shortly after the accident at Three Mile Island, so there was a lot of anxiety about nuclear energy, and Congress was very much interested in resolving nuclear energy issues. And so there was a considerable number of hearings related to the potential of what to do with high-level waste and spent fuel in that time period of 1980, 1981, and 1982.
Q. In that time period, in connection

Page 131

with this work, did you have involvement with Department of Energy officials?
A. Yes, I did Before 1981 – well, we recognized that Ronald Reagan became president in the fall of 1980. Prior to that time, Woody Cunningham was the Assistant Secretary of Nuclear Energy, and so I had communications with Woody Cunningham and Frank Coffman and Mike Lawrence prior to that.
Then when Ronald Reagan became president in January of 1981, he appointed Shelby Brewer as the Assistant Secretary For Nuclear Energy. Shelby Brewer had been working in the Department on the nuclear waste issue He was now the Secretary For Nuclear Energy, and I had communication with him on this particular subject.
Q. Now, what at that time was the principal provision that the utilities wanted to have included in this legislation?
MR. LO RE: Your Honor, at this point, the government will object on the basis that I believe this question is eliciting hearsay.
THE COURT: I'm going to overrule on the basis that he is the mouthpiece.

Page 132

MR. LO RE: Thank you, Your Honor, with that understanding, thank you.
BY MR. STOUCK:
Q. Do you remember the question?
A. No. May I have the question repeated please?
MR. STOUCK: Would the reporter please read it back?
(The reporter read the record as requested.)
THE WITNESS: Yes. We wanted some definitive indication of how it would be resolved, what the cost was going to be, and when it was going to be done. And we recognized that the mechanism for achieving that was to assure that there were contracts between the utilities and the federal government for achieving that particular need.
BY MR. STOUCK:
Q. You referred to how "it" would be resolved
A. "It" being the disposition of spent fuel and any high-level waste.
Q. Now, how was it determined, Mr. Mills, at that time who would pay for the program?

Page 133

A It was well understood and accepted that there was going to be a full recovery cost program that the electric utilities would pay for.
Q. And why was that?
A. We wanted to make sure that program went forward without having to depend on other people's appropriations. We accepted the responsibility that it was the electric utilities who should see to it that that job was done and were willing to pay for it
Q. Now, did you have a particular involvement in the development of the particular fees that ultimately came to be imposed?
A. Yes, I did. There were many numbers tossed around, of course, because this was going to be a program that was going to extend over many decades. There were various estimates of what it was going to cost by the Department of Energy, by others, by ourselves. I personally had a study made in which I contracted with Bechtel, the Bechtel company and the Westinghouse Electric Corporation, to determine what it would cost if we didn't get

Page 134

this legislation and if we had to store the fuel for 100 years, what would it cost us. And in that particular evaluation, we came up with our best guess that it was going to cost somewhere about the equivalent of $120 per kilogram, which amounted, when you calculated it out, to about 1 mil per kilowatt hour. That was a higher number than DOE had estimated that it was going to cost, but we realized if we were going to get this legislation and if we were going to get what was needed to put this in codified form so it would be done, that we couldn't be bashful about offering the amount of money. So that we, I say this we – I personally carried the message to the committee staff in the Senate, Jim Epstein and Paul – I've forgotten Paul's last name – in which we discussed the amount, and we said that we, the utility industry – and I had gotten this permission from our members – we, the utility industry, were willing to accept the 1 mil per kilowatt hour to be put in the legislation.
Q. What was –
A. Excuse me, I thought Jim Epstein was

Page 135

going to fall off the chair when he realized we were willing to accept that because he thought we were going to be arguing for a lot smaller number.
Q. What was DOE's proposal at that time with respect to the fee?
A. It was considerably less than 1 mil per kilowatt hour, and the numbers were always soft, but it was probably one-quarter of that.
Q. Thank you. I want to ask you a question about a provision of the Nuclear Waste Policy Act from 1982, which we're about to have on the screen.
MR. STOUCK: And it's not an exhibit, Your Honor, it's a statute. But do we have copies for the Court?
THE COURT: It's on the screen.
BY MR. STOUCK:
Q. I just want to direct your attention – can you see it?
A. Yes.
Q. Here we go. This is Section 302(a)(5)(b) of the Nuclear Waste Policy Act of 1982. Let me just ask a prefatory question, which is, did – legislation ultimately

Page 136

resulted, of course, from your efforts and the efforts of others who were working on this problem?
A. Yes, it did.
Q. And that was the Nuclear Waste Policy Act of 1982?
A. That is correct.
Q. Now, we're looking at Section 302(a)(5)(b), which states, "In return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle." Did you have discussions during the period leading up to the enactment of this statute, Mr. Mills, with DOE officials about this January 31, 1998 date?
A. Yes, I did.
Q. Okay. And how did this date come about?
A. This was a compromise date. Again, we were dealing with a program that was going to last for several decades. We, the electric utility industry, believed that this job could

Page 137

be done in a 10-year period. In my discussions with Shelby Brewer and with Frank Coffman and with Mike Lawrence, they concurred that probably they should be able to do this in 10 years, which we're now talking we're in 1982 And there were other people that were arguing, no, it's going to take a lot longer. And so it was kind of a compromise. If you think you can do it in 10 years, let's stay with 15 years, 15 years should be a reasonable number. And that is basically how we arrived at that number because it was longer than many of us believed it would take, but it was less than – some people argued that it was going to be a lot longer.

Q. Now, did this date, this January 31, 1998 date that is set forth in the statute, was there some relationship between that date and the need that utilities had for on-site storage or increased on-site storage capacity for the spent fuel?

A. Yes, there was We understood that we were going to have to store the fuel on-site until the Department of Energy started the program and took the spent fuel from us. And

Page 138

we knew that some of the reactors were not capable of storing that fuel with the present configurations of fuel storage up through 1998. So they were going to have to make some modifications in their power plants in order to accommodate that spent fuel up to 1998, but they agreed to do that as part of the overall understanding. They would agree to do that as long as, in 1998, we had a sure commitment that we would no longer have to spend additional money for additional storage at reactor sites.

Q. And did you have discussions about that point with Department of Energy officials?

A. Yes, I did, with Mike Lawrence, with Frank Coffman, with Shelby Brewer. Yes, we did.

Q. And your understanding was shared by the DOE officials?

A. Yes, it was.

Q. Now, the Nuclear Waste Policy Act calls for utilities to enter into contracts with the Department of Energy. We referred to the contracts before, I think, and in fact, you may have answered this question, at least in

Page 139

part, but let me ask again in part. What is your understanding of why the Nuclear Waste Policy Act was drafted to provide for contracts, rather than implementation through regulation? Which I think it's fair to say is more common.

MR. LO RE: Your Honor, the government would lodge an objection here, to the extent that this question calls for Mr. Mills to discuss his understanding of why the Nuclear Waste Policy Act was drafted any particular way.

THE COURT: Recognizing that, as with the prior witness, that we're not relying on the witness for an interpretation, legal interpretation as one of the negotiators, I'm happy to hear his view about how this came about.

MR. LO RE. Thank you, Your Honor.

MR. STOUCK: Thank you, Your Honor.

THE WITNESS: Yes, there were really two options. One is that it could be put in a contractual form, which it was asked for to be a contract, or it could have been established as a regulation. We were concerned about it

Page 140

being established as a regulation because regulations are soft. They tend to maneuver, they tend to manipulate, they tend to change year to year, which would not give us the definitive result that was needed. If we were going to pay the 1 mil per kilowatt hour and start 15 years before the service was provided, we wanted to make sure there was a firm commitment to achieve what we wanted to achieve, and that would be obtained in a contract, and that's why we encouraged the call for a contract.

BY MR. STOUCK:

Q. And when you say, "we," the industry?

A. The utility industry, yes.

Q. Had the utility industry at that time, the nuclear utility industry, any prior experience with contracting with the federal government in connection with nuclear fuel matters?

A. Yes In fact, every single utility that had a nuclear program had a contract with the Atomic Energy Commission, ERDA, DOE, in that succession, for the enrichment of uranium to be used in the fuel. When one obtains

Page 141

uranium from mining, it has an isotopic content of uranium-235 and uranium-238, which was not conducive to being fuel.

So we had to enrich it, and the only enriching service was a classified one performed by the federal government, and thus, the utilities contracted with the federal government for this enriching service and had been receiving enriched uranium from the federal government for years, on time, within reasonable cost, in good quality.

Q And what was roughly the time period over which those enrichment contracts were enforced between nuclear utilities and the government?

A. Well, the first enrichment contracts were called requirements contracts, which were early contracts, that whatever the utility needed, DOE said they would provide, AEC at that time said they would provide. In early 1970, when the growth of nuclear power commitments increased substantially, the Department – still, it was AEC, indicated, well, wait a minute, we're getting close to our capacity, so we've got to know how much we're

Page 142

being committed to here.

So they established what was called long-term fixed commitment contracts for all future contracts, and these long-term fixed commitment contracts covered a period of 10 years. They had to commit how much they were going to receive over a 10-year period. The contracts were actually for the life of the plant, but they had to have firm commitments of what they were going to receive each year for 10 years.

Q. And the industry's experience in contracting, what I'll call the front end of the fuel cycle, the enrichment process with the government was generally successful?

A. Yes, it was.

MR. STOUCK. Let me just say here, we're scheduled to go for another 50 minutes. If we're going to take a break, a short one right now, it might be a good time if we want to do that. Otherwise, I mean, you can take a break if you want any time, but now would be a good time, I guess, is what I'm saying Would that suit you? Is that okay with the Court?

THE COURT: Let me ask the witness.

Page 143

Are you ready to go another 50 minutes, or would you like to take a break?

THE WITNESS: I'm ready to go another 50 minutes.

MR. STOUCK: Very well. Thank you, Your Honor.

BY MR. STOUCK:

Q. Then let's take a look at another provision of the statute up here, Mr Mills, Section 302(a)(5)(a)

THE COURT: But anyone can ask for a humanitarian break at any time, including the witness most especially.

THE WITNESS· Thank you.

MR. STOUCK. Thank you, Your Honor. You know, I am going to take that leave because 50 minutes is 50 minutes. Thank you. Let's take five.

THE COURT: We'll be in recess for seven minutes on the grounds that no one can accomplish anything in five.

(Whereupon, a short recess was taken.)

THE COURT: The witness can return to the chair, and the witness continues under oath.

Page 144

MR STOUCK: Thank you, Your Honor

BY MR. STOUCK:

Q. Mr Mills, actually, we're going to call up another section of the Nuclear Waste Policy Act This is Section 302(a)(5)(a), which reads, you can see on the screen, "Following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel." Now, during this time period when the statute was being – or the legislation was being developed, the problem was being addressed, did you have discussions with anyone at the Department of Energy about this expeditiously as practicable concept?

A. Yes, I did. This, again, was with Shelby Brewer, Frank Coffman, Mike Lawrence, and others that related to the question of how rapidly should this program proceed, and we wanted to make sure it was a robust program that went forward efficiently.

We knew there was a propensity at

Page 145

times for government programs not to move as fast as you would like to have them, and we specifically wanted to urge and provide the funding that would permit that program to go forward as expeditiously as practicable

Q. Okay Based on your discussions at that time, did you have, or do you have an understanding, or did – do you have an understanding of what this phrase was intended to accomplish?

MR LO RE: Objection, Your Honor. Again, this calls for Mr. Mills to testify about the intent of a statute, which we believe violates the canons of Sutherland.

THE COURT: I agree. I'm going to permit the answer, however. He's entitled to say what he thinks or hopes possibly it means.

MR. LO RE: Thank you.

MR. STOUCK: Thank you, Your Honor.

THE WITNESS: We had had the date of 1998 for when the program would begin. We knew that at that point, the utilities had agreed that they would store, be able to store the fuel that they had discharged from the reactors up to that point, but after that point, there

Page 146

was to be sufficient progress in the program so that there would not be a need for the utilities to have to add additional capacity for storage.

And thus, it was going to be, the request would be by the owner or the generator of how much fuel needed to be transferred so that would not happen, they would not have those extra costs, and the program needed to be moving along expeditiously to be able to achieve that.

BY MR. STOUCK:

Q. Did you have any specific discussions in that time period leading up to the enactment of the statute of the rate of acceptance, discussions with the Department of Energy personnel that you've mentioned or others at DOE?

A. Oh, very definitely over that time period. See, this was developed over about a four-year time period, from the end of the EIS, until at least the Act was passed, which was December of '82. There was a lot of conceptual design work going on in the Department of Energy, and I was aware of what was going on in

Page 147

the Department of Energy.

And they had proposed drafts of what the facility would look like if they were to accomplish this task, if this got codified. They had scheduled ideas of how it would work, and they had in their design criteria 3,000 metric ton per year. It was their design criteria for those facilities, and I knew that.

It was before the Act was passed that this number was used by the Department of Energy, and we knew that we were going to be disposing of or actually discharging, "we" being the utility industry, were going to be discharging at the rate of somewhere between 2,000 and 2,500 metric ton per year.

You could calculate this, you knew how many reactors were in operation, you knew how many were under construction and would probably be running at that particular time, and it was fairly easy to calculate about how much spent fuel would be discharged from a reactor in a year.

So the 3,000 metric tons, which was the design capacity of the facilities DOE was talking about even before the waste act was

Page 148

passed, and our needs matched reasonably well, so that we would be able to, they would be able to take the amount that was being discharged in the year 1998, plus some to work off the backlog.

Q. Okay. And was this discharge amount rate, the 2,000 to 2,500, were there DOE documents that reported the discharge amounts at that time?

A. I believe there were, I believe there were, but I cannot identify just what they were at that time. I know there was a document that identified it in June of 1983, but I'm not sure what documents there were prior to that, but, yes, they were aware.

Q. When did the Nuclear Waste Policy Act become law?

A. On January 7th, 1983.

Q. Is there some reason you recall the date?

A. I had the privilege of being invited to the White House for that signing. I was in the room when Ronald Reagan signed that particular bill into law. I didn't get a pen, but I was there.

Page 149

Q. Now, a couple of individuals you've mentioned, I'd like to ask you about. Frank Coffman, what was his role at the DOE at that time?
A. At that time, he was responsible, he was, his office was in Germantown, he was responsible for the waste program at that particular time under Shelby Brewer.
Q. So is this prior or after the Act?
A. This is prior to the Act.
Q. All right.
A. And at the time of the Act, actually, he was there in January of '83
Q. Okay And you also mentioned Mike Lawrence
A. Yes.
Q. What was his role at that time?
A. Mike Lawrence was working on that program also. I don't know what his position was.
Q. He worked for, under Mr. Coffman, or with Mr. Coffman?
A With Mr. Coffman, I'm not sure what the relationship was, but he was an active participant in the Department of Energy.

Page 150

Q. And these are individuals that you also work with?
A. Yes, indeed
Q Now, what was the industry's overall view of the final legislation that came out in – I guess it was signed in early 1983?
A. We were quite pleased that we now had a national policy that defined what was going to be done with the spent fuel and the high-level waste, that was codified as to how it was to be done, it was codified as to how much it was going to cost, at least initially, and it was codified on a process of where it would be located.
So we were quite satisfied with it.
Matter of fact, we had a few celebrations over that, yes.
Q After the statute became law, how soon did work begin on drafting the contract?
A. Immediately, from our standpoint, ours being the electric utility standpoint, we were immediately putting together various comments or various segments that we believed these things should be in the contract.
Q. And how long did it take to draft the

Page 151

contract?
A. Well, to actually have a contract drafted, well, let me indicate that on January 19th, 1983, the DOE held a major meeting, an information meeting, which was attended by hundreds of people, defining how they were going to proceed in developing the contract They had already received some input from us on suggestions that should be in the contract.
But they had this public meeting on the 19th. We then had another meeting that was a meeting in which we could ask questions, but it was not a dialogue where you could have a back and forth. We had a meeting the next day on January 20th at the University Club, "we" being the utility industry.
And we invited Department of Energy individuals there, and five Department of Energy individuals came to that meeting, they were also at the January 19th meeting, in which we did have an opportunity to dialogue to some extent to what we believed was necessary to be in the contract. They had not passed out any draft contract as of the January 19th meeting
I remember standing up in that meeting

Page 152

and asking if we could get an early draft of the contract. They indicated, yes, they would, and I just don't remember whether we got it the next day. I know they didn't have it at the meeting, but within a day or two, we had a draft contract.
We actually marked up that draft contract and sent back information to DOE, but they were responsible for drafting it. It was not a negotiated thing. They were responsible for drafting the contract, and they came out with their proposed contract on February 4th, 1983 in the Federal Register.
Q. Okay. And what was your – I think you've perhaps answered this question in part as well, but tell us a little more about your personal, after the meetings, I guess, your personal role in commenting on contract or in the development of the contract during that early 1983 period.
A. Well, the utility industry put together a task force calling members in from, calling people to come in from our membership to sit down with us and review the draft that we had received from DOE and to develop

Page 153

comments on that draft and also identify things that were not in that draft that could be, that we believed should be in it, so we had an active program going on.

I mean, it was going on almost – I won't say 24 hours a day. It wasn't 24 hours, but it was long days. There were long days, and there were people coming from around the country, different utilities, with thoughts on how to proceed with the contract. And that occurred before February 4th.

Once we then had the draft contract in the Federal Register, we took that specific contract and put our individual comments on that, and we developed what we called consensus comments. All utilities didn't agree with everything we did. You know, you get 10 people in the room, it's hard to get them all to agree, but we ended up getting consensus comments on that draft comment.

And as I recall, we had 52 pages of comments that we submitted to the Department of Energy on the agreement itself and another 20 pages or so on the attachments to the contract.

Q. Now, in the period before the February

Page 154

4 publication in the Federal Register of the contract, would you characterize the discussions you had with DOE officials as negotiating sessions?

A. They were give-and-take sessions. They were not negotiating sessions, discussions of what needed to be in the contract. There was never really a negotiation, what you would think would be a negotiation of the contract. There was not an opportunity for that.

Q. And why do you say that?

A. Well, just the way the contract was going to be put together, as a regulation, physically, you're not allowed to. The federal government doesn't allow you to sit down and negotiate. It's their responsibility to draft the contract.

Q Let's take a look at Plaintiff's 36, please, if we could, which is the February 4th Federal Register entry on – it's on our exhibit list. I'm frankly not sure if we need to make it an exhibit, but I think we will be referring to it later. So do you recognize this? Would you like to see a paper copy, or do you recognize this?

Page 155

A. Oh, I recognize this.

Q. And this is the February 4, assuming this – well, let's take a look at the paper copy. Why don't you turn to tab 36 of your notebook, and you've got the full copy there?

A. Yes, yes, I do.

Q. This is the Federal Register material you've referred to?

A. Yes, it is.

MR. STOUCK: Again, Your Honor, I'm not sure it's necessary, but if we could have that entered as an exhibit?

THE COURT: Without objection, Plaintiff's Exhibit 36 is admitted.

(Plaintiff Exhibit Number 36 was received in evidence.)

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q. And let's turn now to – going to the comments that EEI and the industry provided after the publication of the draft contract in the Federal Register, what became of the utilities' request for changes or other comments on the contract?

A. We had 30 days to provide our

Page 156

comments. Once the Federal Register notice hit the street on February 4th, it allowed us to make comments up until March 10th, which is when we submitted our comments They also had a public meeting, I've forgotten when that was, on March 3rd, March 8th something like that. They had a public meeting. We participated in that also. But once the comments went into DOE, we were no longer able to communicate with the Department of Energy. That was a verboten task. It was their job now to take those comments and do with them what they wanted to.

And they proceeded to work on that, and they included some of our comments, did not include other comments. When they issued the final rule, they identified how they addressed each one of the comments that had been provided by all of the people. They actually identified this comment was such and such, and this is how we addressed it. We did not use it, or we did use it, or they modified accordingly.

And they did that for almost all of the comments that were submitted.

Q. Why do you say, "almost"?

Page 157

A. Well, there was one that they kind of ignored.

Q. And which was that?

A. To us, it was a pretty important one We knew that you could not include in each of these 60 to 70 contracts a specific amount allocated to each one, there wasn't enough knowledge to do that, so that we wanted them to include a comment that would state qualitatively that they would, in 1998, according to our understanding, be able to receive the amount of material that was discharged, being discharged from the reactors, plus some to work off the backlog. We asked for that to be included in the contract. They didn't even comment on our comment. We specifically put that in, and we did that because that was our understanding. We had that understanding before the contract hit the books – or hit the street. They just didn't comment on it.

Q. Let's turn to another exhibit, which is 47, it's in your notebook as well. And if we can call it up here, this – let me ask you if you recognize Exhibit 47. I guess the first

Page 158

page is kind of a blank page. I mean, that's where the sticker is, but the exhibit really starts on the next page. Do you recognize this, and if so, what is it?

A. Yes, I recognize it. It is a memorandum from Morgan Moore – not Morgan Moore – Robert Morgan to Secretary Hodel, identifying what they had done with the receiving with regard to developing the contract and was recommending that the Secretary approve this final –

MR. LO RE: Your Honor, excuse me I'm sorry to interrupt the witness, but I believe that Mr. Mills is testifying about a document to which he has absolutely no firsthand knowledge, and he's now making representations about what is represented in that letter, which is, we believe, to be hearsay.

THE COURT: Let me ask the Plaintiff to respond to the objection.

MR. STOUCK: I don't think it's hearsay, Your Honor, it's a government document

BY MR. STOUCK:

Page 159

Q. I believe, Mr. Mills, may I ask if you've seen this before?

A. Yes, I have seen this I saw that very close to the time it was issued.

THE COURT: A hearsay objection would not stand up.

MR. LO RE: Your Honor, and to be clear –

THE COURT: What is the other problem?

MR. LO RE: And admittedly, this document was written by a party proponent, there's no question there, but to the extent Mr. Mills is going to testify about it, there is, first of all, no foundation with respect to his knowledge of this document, other than that snippet we heard a moment ago And then secondly, perhaps more importantly, are representations that Mr. Mills is making about this document and what's represented in the document, we do believe that the testimony is in fact hearsay.

THE COURT: We could, of course, have him read the entire document, but he's already read it before, and he's talking, as the Court understands it, about a process that was

Page 160

ongoing in which he is a major participant, and now, he's going to comment on something that happened that spring And I'm going to allow the testimony, and I take the point from the colloquy about his ability to interpret what's on the document, which itself would be the best evidence of its contents, but how it fits into a negotiation that's ongoing, his view would be of interest to the Court

MR. LO RE: Thank you, Your Honor.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q. Mr. Mills, would you please, I'd like to direct – well, I'm not sure we identified this. What is this? Let me just say it's an April 8th, 1983 memorandum on Department of Energy letterhead, action memorandum, final rulemaking on standard contract and nuclear waste disposal. What is your understanding of what this document is?

A. This was a document from the project director at that time in the Department of Energy to the Secretary, Secretary Hodel, identifying how they were progressing with the

Page 161

standard contract that was to be signed between the electric utilities and the Department of Energy.

Q. Let me direct your attention on the first page under background to the first sentence, which reads, "A critical item in implementing the NWPA is the waste disposal contract that will be signed between DOE and the industry." Do you see that?

A. Yes, I do.

Q. And did the nuclear industry have the same understanding of what role the contract played?

A. Yes.

Q. Now, if you would turn to a few pages back, there's an attachment, I believe, under tab – actually, it's referred to on the first page, so I apologize. Let's go back to the first page and look at the last sentence under discussion, if we could have that highlighted? It says, "Eight general policy issues arose from the comments, and we appropriately resolved these issues (tab D)," do you see that?

A. Yes, I do.

Page 162

Q. Now, let's turn to tab D, and if you are there, the document or this portion of the document is titled, "Policy Issues Addressed During Nuclear Waste Contract Comment Period." I want to call your attention to the first numbered paragraph, which is entitled, "Spent Nuclear Fuel Exchange Rights." Do you see that?

A. Yes, I do.

Q. Let me read it into the record. It says, "The majority of utilities commented that they should have 'exchange' or 'swapping' rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex recordkeeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval and we intend to be reasonable." Do you see that?

A. Yes, I do.

Q. Had EEI commented on the exchange issue, Mr. Mills?

A. Yes, we did. In the 52 pages of comments, this is one of the comments we had included and that also many of the other

Page 163

electric utilities had commented accordingly.

Q. And the EEI comment was that you proposed that this provision be included?

A. That is correct.

Q. And why did EEI suggest adding the exchange provision?

A. This appeared to be necessary, really, in order to achieve an efficient operation. The basis of the allocation rights, which was in the contracts, was based on oldest fuel first, OFF, and the allocation was not a good way to efficiently transfer material from the utilities to the federal government because the sequence was just not compatible with a good, efficient operation.

So to achieve an efficient operation and also to accommodate some flexibility in the system so that some utilities might have a reason not to want to deliver on the allocation year and want to do it another year, we believed to make it more efficient, it was appropriate for them to be able to swap their allocation rights.

Q. And what was your understanding at that time of why it is that particular

Page 164

utilities might be interested in exchanging? Again, I think you've touched on that in part, but I'd like a little elaboration on why –

A. On the oldest –

Q. Why exchanges would be useful or beneficial to utilities?

A. With the oldest fuel first concept, there were some utilities that had very small quantities of fuel that were discharged early in their operation and to move small quantities of fuel, when in fact the best way to move it was at least 10-ton at a time, that was a normal shipping cask for transferring spent fuel, would be a railroad cask that weighed approximately 100-ton.

Within that 100-ton shipping cask, you would load about 10-ton of spent fuel. And you didn't want to put one ton of spent fuel in a railroad cask It was a very inefficient approach. So it was appropriate to try to work out an arrangement so that you would have the shipping cask filled when they left a reactor site.

And there were other times when a utility simply had some problems on their site,

Page 165

may have had some problems on their site that would have made it difficult for them to actually ship in a particular year, so we wanted to have the flexibility that they could arrange to swap that commitment with some other utility.

Q. Now, did the nuclear utility industry have any experience with exchanging or swapping of other items or contract rights, let's say?

A. Yes, as a matter of fact, we did We had, because of a long-term fixed commitment contracts that we had on uranium enrichment, I referred to those a few minutes ago, there were firm commitments for receiving enrichment that weren't needed because programs were sliding. There was actually an exchange on those enrichment contracts from one utility to another, where one utility needed the enrichment and another one didn't, they would exchange that, and those were done as private exchanges And many of them were brokered by a brokering organization to make sure that it was a more efficient operation, and it worked well. The Department of Energy accepted that sort of an exchange. They were not involved in

Page 166

those exchanges, except to agree that they were still delivering the same amount of material, so we did have that experience, yes.

Q And, again, what would have been the time frame for the exchanges under the enrichment contracts?

A The time frame there was in the period the late '70s and early '80s.

Q. And these were, just to be clear, these were the enrichment contracts that utilities had with the Department of Energy or its predecessor organization?

A. That's correct.

Q. Now, you mentioned the brokering organization for those enrichment right, contract right exchanges, I guess. Can you just tell us a little more about the brokering organization?

A Well, there was an organization called SWUCO. It was formed by a gentleman by the name of Walter Wolf. Why was it called SWUCO? Because the enrichment subject was delineated as separately worked units, and so it was SWU, and it was CO, SWUCO, and that was his, how he started. He began to operate as a broker with

Page 167

these exchanges of separate work units.

Q. Now, let's turn to –

MR. STOUCK· If we could, Your Honor, I believe I did, but I don't know, maybe I didn't, can we please move Plaintiff's Exhibit 47 into evidence?

THE COURT: PX-47 is admitted

(Plaintiff Exhibit Number 47 was received in evidence )

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q. Let's go to 57 of your notebook, Mr. Mills. I apologize for the slight delay there. And if we could have it on the screen? Excuse me. I would like you –

MR. STOUCK: Your Honor, a little logistical issue, the witness does not have a copy of Defendant's 57 in his notebook, and I would like to –

THE COURT: You may approach.

MR. STOUCK – ask him about that. Is the Court ready, Your Honor?

THE COURT: Yes.

MR. STOUCK· Thank you.

BY MR. STOUCK:

Page 168

Q. Do you recognize this document, Mr. Mills?

A. Yes, I do.

Q. What is this?

A. This is a printed copy of a presentation that I made at a meeting in Crystal City I actually made it on May 5th, not May 4th, at the Institute of Nuclear Management material meeting.

Q And who was in attendance at that meeting?

A. We had a large number of utility representatives at that meeting. There were uranium suppliers at that meeting. There were reactor manufacturers at that meeting. There were also Department of Energy people at that meeting

Q. Do you recall any specific DOE participants in that meeting?

A. I do remember that Mike Lawrence was at that meeting I know there were others who were at the meeting, but I do not recall at this particular time who those others might have been.

Q. What was the subject of your

Page 169

presentation?

A. Well, they had asked me to just comment on the utilities' position with regard to the Nuclear Waste Policy Act and the contract – see, the timing of this of May 4 and May 5 was after the final contracts had been issued in the Federal Register, so I was commenting predominantly on the legislation, but it also related somewhat to the contracts.

Q. Okay. And if I could direct your attention to page four of this document, there is a section that says, that's titled, "Allocation of Delivery." Do you see that?

A. Yes, I do.

Q. And take a look at it, this – well, you've seen this document before today in preparation. Does this accurately reflect the presentation that you gave at the conference?

A. Yes, it does.

Q. Let's put this into the record and go through it. I will read it, if I may. It says, "When DOE opens its doors in 1998 or whenever, it will have a limited capacity that needs to be allocated over the contract holders. DOE may be able to receive about

Page 170

3,000 tons a year during the initial operation, but there will be about 60,000 tons of spent fuel available for delivery.

On what basis will the limited available space be allocated over all contract holders? Should it be based on age of spent fuel only? Will allocations be transferable? We urged DOE to provide a reasonable mechanism for this allocation in the contract. Of course, this will take effect 15 years from now, so it is likely that some improvement will be made between now and then.

But as we understand it, DOE will provide individual allocations to contract holders. Once an annual allocation is assigned, contract holders will be permitted to substitute other spent fuel and swap allocations to mesh with operating needs. If one company can accommodate its spent fuel longer than another, it may be able to swap its allocation space with another organization.

It is important to have an allocation procedure that treats all purchasers on a reasonably equitable basis." Do you see that?

A. Yes, I do.

Page 171

Q. And what is the reference there to – and that was an understanding – was that an understanding about these exchanges that you discussed with DOE officials at that time?

A. Yes, this was an understanding that had been discussed with the utility members, with DOE officials, and it basically was codified in the contract.

Q. What is the reference to the 60,000 tons available for delivery?

A Actually, that reference came from a DOE document.

Q. And just what is being referred to there? We'll get to the document in a moment.

A I was continually in contact with the Department of Energy, visiting with the various people in the Department of Energy, and I knew there was a document being prepared by Bill Sprechler, Sprecher, Sprechler, I'm not sure just how the pronunciation is of that word. Now, Sprecher is what it is, I now recall, and he had these numbers in the draft document as it was being prepared.

And I was aware of that, and that was information that was available to me that I

Page 172

used at that time.

Q. Okay. We'll get to that in just a moment because I have a couple questions about that document, but let me just ask one more about DX-57.

A. May I expand just a little bit? The 3,000 metric ton was not only from that document, by the way. The 3,000 metric ton we knew and had been discussed and had been in the planning documents prior to the passage of the Nuclear Waste Policy Act as the design criteria rate for building the facilities that DOE was planning to have to handle this material.

Q. Thank you Let's go to that document now. It's a little out of order on my outline.

THE COURT: If you want to move into evidence –

MR. STOUCK: Thank you, Your Honor. Defendant's 57, we the Plaintiff, would like to move into evidence at this time

THE COURT· DX-57 is admitted

(Defendant Exhibit Number 57 was received in evidence.)

BY MR. STOUCK:

Q. Let's look now in your notebook,

Page 173

Mr. Mills, to Plaintiff's Exhibit 51, since you've mentioned it. Is this the document to which you were referring?
A. Yes, it is
Q. And I believe you testified that you had seen this at about the time it was issued?
A. I saw it before it was issued
Q You saw it before?
A. I saw drafts of it as it was being prepared.
Q. Well, on that basis, let's take a look at – well, what is your understanding of what this document is? It's titled, "Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, June 1983 " What is this, Mr. Mills?
A. There was an effort by the Department of Energy to look carefully at the 1 mil per kilowatt hour that was in the legislation to determine if in fact that was going to be enough to do the overall program, and this effort was put together to try to identify, was that going to be sufficient to fund it? And that's why this document was being prepared

Page 174

Q. Take a look at page 10 of this document, please. There's a table which is entitled, it's table 3-2, "Nuclear Electric Forecast," do you see that?
A Yes, I do.
Q What is your understanding of what this table shows?
A. This table shows their interpretation at that point of the installed capacity, that would be nuclear power installed capacity with electric utilities, the annual spent fuel discharge each year, the cumulative spent fuel discharge, and the electrical generation that was expected from those nuclear plants
Q. Okay. And if you look at, let's look at the years that are highlighted on the screen for us, 1998 and 1999, we see under the column, "Cumulative Spent Fuel Discharge," figures of 57,000-plus and almost 61,000. Do you see that?
A Yes, I do
Q. And this correlates to the 60,000 tons of available material that was referenced in your speech we just looked at?
A. That is correct.

Page 175

Q. And this was the source of that information at that time?
A. That is correct.
Q. Now, I've got a couple other questions about this document, but before that, if I may, without regard to the document, when the contracts were signed in 1983, what was the industry's expectation about what would happen in 1998, how the program would be implemented in 1998?
A. We expected that there would be a program that started actually ramping up to 1998. We didn't expect things to start on January 31st, 1998. Remember, there were 60 to 70 contracts, all of which had the January 31st, 1998 date in them. There was no way that DOE was going to arrive at all 60 facilities at the same time.
So we expected that there would be a ramp-up sometime before 1998, maybe in a year or two, that would allow them to satisfy their contracts of 1998. And by the time of 1998, it was our understanding that they would be able to receive spent fuel equivalent to the amount that was being discharged in that year, plus an

Page 176

amount to work off the backlog. That was our understanding
MR. LO RE: Your Honor, if I may be heard?
THE COURT Oh, sorry. You can say objection If I'm not looking at you, feel free. I won't consider it at all rude
MR. LO RE. Your Honor, we object to this line of questioning, and we would renew our motion to strike Mr. Mills at this time, in that he is now clearly testifying about a term that directly varies from the express terms of the standard contract.
THE COURT: The Court does not hear Mr. Mills for an interpretation of the contract, which is going to speak for itself, but he is, as I understand it, talking about activities that he was engaged in and views that he had as a negotiator and observer, and I will hear his views.
MR. LO RE. Thank you, Your Honor. If I just may be heard? One point I didn't make, we believe that the testimony is inadmissible because it is rendered inadmissible by the parol evidence rule, in that it varies the