Page 177

terms, the express terms of the contract.
THE COURT: Well, I think we said in colloquies at the pretrial that the parol evidence rule is something that you look at the evidence and then look at the contract and it's – I think for most of this type of colloquy, which is probably the most intense piece of this we have, given the witness list, I think that's something which I'll look at after I hear the evidence and decide in an overview of the contract and an overview of the evidence, whether there's a particular piece which would fit within the rule. So your objection is noted.
MR. LO RE: Just so the record is clear, we just wanted to point that out because this is one of those instances. Thank you.
THE COURT: Yes, it is noted.
MR. STOUCK: Thank you, Your Honor.
BY MR. STOUCK:
Q. Mr. Mills, why do you say that the industry expected that DOE would begin to accept spent fuel and other high-level waste, radioactive waste before 1998?
A. Well, the electric utility industry

Page 178

was paying into the program from 1983 onward, and they were paying 15 years in advance of actually receiving service, and the contract specified that DOE was to start taking fuel from each of the 60 or so contract holders by 1998.
Q. Were there discussions with DOE on this point?
A. Oh, yes, oh, yes, many discussions, back-and-forth discussions, this was almost a given. We knew that was, that was understanding, our understanding.
Q. Let me call your attention back now to Exhibit 51, if I may. We looked at the chart or the table showing the cumulative, the annual and cumulative spent fuel discharges. Now, I'd like to direct your attention to page eight of this document, and I will note for the record, if I may, it's dated June 1983 on the cover. Is that your understanding of when this was actually issued?
A. Yes, it is.
Q. Okay. On page eight, if you would look at – there's a paragraph under, there's a section 3.2, "Facility Schedule and Material

Page 179

Flows," the second paragraph there as well, I'd like to direct your attention, it reads as follows: "It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002 respectively. Each repository has a design receipt basis of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT annually is assumed for the first five years." Do you see that?
A. Yes, I do.
Q. How does that statement compare with your understanding at the time of what the Department's – of what the program operation would be?
A. Well, the utility industry understood and knew that the design criteria for the receiving rate was this 3,000 metric ton. That was not a new number. That had been used by Department of Energy in many conceptual designs prior to that period, so 3,000 metric ton was not a surprise to us. The 1,800 metric ton that he talks about being the first year was a little

Page 180

surprise to us because that was not really equivalent to what we had, as our understanding, it was going to be equivalent to the amount – at least the amount that was being discharged by the reactor, which we believed was between 2,000 and 2,500.
MR. STOUCK: Okay. And, Your Honor, I'm about to turn to another document. I'm just looking at the clock. It might be a good time –
THE COURT: Do you want to move PX-51 in?
MR. STOUCK: Thanks, Your Honor. I would like to move PX-51 in. Thank you.
(Plaintiff Exhibit Number 51 was received in evidence.)
THE COURT: Let us try to get back here by 1:30 or as closely as we can.
(Whereupon, at 12:32 p.m., a lunch recess was taken.)

Page 181

A F T E R N O O N S E S S I O N
(1:29 p.m.)
THE COURT: Good afternoon. Please be seated. Continue with the direct examination of Mr. Mills. The witness continues under oath.
MR. SHAPIRO: Your Honor, if I may, I have a small housekeeping issue. The parties have conferred right at the beginning of the break about the expected duration of Mr. Mills' testimony, and it's expected he'll probably go the rest of the day. He was actually scheduled to go some of tomorrow.
As long as the Court does not mind, we'd prefer not to have to bring Dr. Bartlett, who really wasn't planning to be here today, over especially. He's 70. I'd rather not have him make a second trip, if we could avoid that.
THE COURT: That's agreeable to the Court. I take it that you're expected to be able to stay within your time on other witnesses?
MR. SHAPIRO: Definitely, Your Honor.
MR. STOUCK: Mills was planned to go until tomorrow morning for a couple hours, but

Page 182

we think we might finish him today. There might be a little excess time.
THE COURT: Yes. Thank you. We will turn to our various housekeeping matters, including exhibits and conforming with the exhibit list as soon as the cross-examination of Mr. Mills is concluded, if that concludes today. Mr. Stouck to examine.
MR. STOUCK: Thank you, Your Honor.
BY MR. STOUCK:
Q. Mr. Mills, are you familiar with DOE's mission plan for the Civilian Radioactive Waste Management Program?
A. Yes, I am.
Q. What was that?
A. The mission plan was called for in the Nuclear Waste Policy Act to outline the overall program of how the Department of Energy was going to satisfy the requirements of the legislation.
Q Okay. Would you please take a look at Plaintiff's Exhibit Number 57, which is at tab 57 of your notebook, as you've come to understand how our notebooks work? And I would like to ask you whether you recognize it, this

Page 183

document, and if so, what is it?
A. Yes. This is an internal Department of Energy document that identifies mission plan strategy as they were talking about it, in September of 1983.
Q. And you've seen this before?
A. Yes, I have.
Q. Before we get to the substance, there's a distribution list here with some names that we –
MR. LO RE: Excuse me, Your Honor, objection. I, once again, would like to put on the record an objection to Mr. Mills testifying about this document. I think there was a question as to whether he had seen the document. We don't know whether he saw it yesterday or when he saw it.
And further, to the extent he is going to testify about it, we would object to him making any representations about what is in the document, as that would be hearsay and certainly covered by the best evidence rule.
THE COURT: Thank you, Counsel. We will be, I'm assuming, without knowing that this is going to be a springboard for a

Page 184

discussion of the witness' views, but if it turns out to be a springboard for a discussion of the Department's views, other than what's expressed in the document, your objection to that extent is sustained.
MR. LO RE: Thank you, Your Honor.
MR. STOUCK: Thank you, Your Honor.
BY MR. STOUCK:
Q. The distribution list mentions some names that you've mentioned, Mr. Mills, and some names that you haven't mentioned. I think it might be helpful or of interest to know which of these individuals you, yourself, had discussions with in 1983 about the requirements of the nuclear waste program, the DOE nuclear waste program.
A. I had personal discussions with Mike Lawrence, with Bill Bennet, with Bob Bauer, with Bob Rosselli, with Charles Head, with Carl Conner, with Jim Fiore, with Keith Klein, and with Ralph Stein.
Q. And these discussions were in what context?
A. Basically about the program and how they were proceeding with the program.

Page 185

Q. Now, I'd like to direct your attention
to the second page, the numbering is a little funky, but the second page of this exhibit, and if you would take a look at the top of the page, there's a couple lines that starts "central focus." Do you see that?
A. Yes, I do.
Q. I'll read it just for convenience. "Central focus of waste management strategy: DOE will begin accepting spent fuel in significant quantities in 1998." Do you see that?
A. Yes, I do.
Q. And was that consistent with your understanding of the requirements at the time?
A. Yes, it was.
Q. What is your understanding of what this document is overall?
MR. LO RE: Excuse me, Your Honor, I'm going to object again to the extent that Mr. Mills is now testifying about his understanding about a document that he didn't author, and we have no foundation whatsoever about his knowledge of this document.
MR. STOUCK: I'll withdraw the

Page 186

question, Your Honor.
BY MR. STOUCK:
Q. Let's look at the first page, Mr. Mills, the second paragraph. If you'd take a look at that? I'll read it again for convenience. "If this overview strategy meets with your approval, it will be used to guide the authors of the different volumes of the mission plan in the completion of the next draft.
Also, this overview will serve as the basis for writing chapter 4 of volume I." Do you see that?
A. Yes, I do.
Q. Have I read that correctly?
A. Yes.
Q. Do you have reason to know whether that purpose, whether that was what this document was intended to do, other than what it says?
A. That's what it was intended to do.
Q. Let's take a look then at the next page, continue. Did you have involvement with the Department of Energy during the time period in which the mission plan was being developed,

Page 187

and if so, can you tell us about your involvement in that process?
A. Yes, I was spending considerable amount of time actually in the Department of Energy offices with people who were working on this program. Those that I identified from the list of the distribution of the document were the individuals that I was visiting with and having conversations with and discussing the needs of the utility industry and observing how they were approaching putting together the plan.
Q. You knew in September, or at approximately this time period in 1983 that the mission plan was in the process of being developed, is that correct?
A. Oh, yes.
Q. And when was it eventually issued, do you recall?
A. It was eventually completed as a final mission plan, I believe, in May or June of 1985.
Q. Let's go back to this second page of this exhibit then. First, we looked at the central focus point. Now, I'd like to go down

Page 188

to the third bullet point. If you would follow with me there, it says, "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel." Do you see that?
A. Yes, I do.
Q. Was that consistent with your understanding?
A. That was my understanding.
Q. At the time?
A. That was my understanding.
Q. And then under, "Waste Acceptance Schedule," do you see that?
A. Yes.
Q. Actually, if we could – yes, thank you. Let me just read some of this into the record. It's going to be a similar question about whether it's consistent with your understanding at the time. It says, "As an initial planning base, DOE will accept spent fuel in quantities indicated in table," blank. Blank is not a word that's here. There's a blank space there. "Shipment allocations will be made on a quarterly basis."
And then it says, "The central

Page 189

criteria for this schedule is: An acceptance rate during the first five years, such that no utility would have to build additional storage facilities after 1998." Do you see that?
A. Yes, I do.
Q. And then it goes on, as a second part of the central criteria for this schedule, it says, "an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year." Do you see that?
A. Yes, I do.
Q. Now, is that consistent with your understanding of what the program was to achieve?
A. No, it is not.
Q. Why do you say that?
A. We had believed that the arrangement for which we made the deal to pay for was going to have an acceptance rate starting in 1998 equivalent to the amount that was being discharged in that year, plus some amount to work off the backlog, so this was less than what we had understood earlier to be the arrangement.

Page 190

Q. Now, let's go to the next bullet point here. It says, "The planning basis assumes that individual utilities after 1998 whose turn to ship spent fuel to DOE has not occurred based on the contractual specification of oldest fuel first and the DOE rate of acceptance and who would thus need to administer on-site interim storage will either, (1) arrange to transship spent fuel to a utility that has available storage (e.g., a utility who has already shipped spent fuel to DOE), or 2) will purchase the right to ship spent fuel to DOE from a utility who is next in the queue." Do you see that?
A. Yes, I do.
Q. How does that comport with your understanding of how the program was to work?
A. Well, the point one of arrange to transship spent fuel to a utility that had available storage was not going to work. Physically, that was not going to work.
Q. Why do you say that?
A. No utility was going to accept the spent fuel from some other utility. That just was not going to be an acceptable arrangement.

Page 191

The second element there, "will purchase the right to ship spent fuel to DOE from the utility who is next in the queue," that was the swapping arrangement that we talked about earlier, that, yes, that would be a mechanism for which some utilities could satisfy their need to ship spent fuel.
Q. Okay. Now, let's turn to the next page, if we could. This one is numbered two, so maybe the numbering picks up here. Actually, can we just take a look at the top, the title in the top sentence here, see, just to orient us to this page?
It says – yeah, and actually the first sentence also. Thank you. It says here, at the top of page two, "Facilities needed in 1998 and beyond." Do you see that?
A. Yes, I do.
Q. "With DOE accepting fuel beginning in 1998 and afterwards, it is obvious that some facility must be in place to accommodate this fuel." Do you see that?
A. Yes, I do.
Q. And then I'd like to direct your attention now to the bottom of the page, the

Page 192

last bullet point here, "if by 1994," are you with me?
A. Yes, I am.
Q. It says, "If by 1994 it is known that the first repository will be delayed, but by an expected period of less than two years, then DOE will take either or both of two actions to be able to accept fuel in 1998: (a) DOE will design the size of the buffer storage at the repository to accommodate the spent fuel accepted from the utilities." Or (b), or is my addition, it doesn't say or, "(b) DOE will take title to the spent fuel, have it placed in dry storage casks, and pay a rental fee to the utility to store the casks on-site at the reactor." Do you see that?
A. Yes, I do.
Q. Now, how does that comport with your understanding of DOE's basic obligations?
A Well, the (a) portion would accommodate our understanding in the fact that they would be taking the spent fuel and doing something with it. Whether the repository was ready or not ready, they would find some

Page 193

mechanism for a accommodating the spent fuel that they would accept from the utilities. The second item, the (b) item, which is one where DOE would take title of spent fuel and place it in dry casks at the reactor site, was not viewed as an acceptable item, but it was viewed by DOE as a mechanism to satisfy their commitments. We did not believe that was an appropriate approach to take because it just didn't solve the problem of getting that spent fuel moved away from the reactor sites.

Q. Okay. Now, if you would just turn to the next page, I've got one more question or one more passage from this I'd like to call your attention to. At the top of page three, it says, "If by 1994 it is known that the first repository will be more than two years late, then DOE will initiate construction of one or two MRS facilities to be operational by 1998." Do you see that?

A. Yes, I do.

Q. And it says, "Should this contingency plan be executed, the MRS facilities may then continue to be used and receive and store fuel up until and concurrent with repository

Page 194

operations to provide additional aging of spent fuel before emplacement in the repository." Do you see that?

A. Yes, I do.

Q. Let me ask about your understanding of how, if at all, what was your understanding about the MRS concept in connection with the Nuclear Waste Policy Act when it was originally enacted?

A. There was a push by certain people to have MRSes instead of a repository, and actually, Senator Johnson was a great proponent of MRSes, and he was one of the authors of the legislation. He believed that you really should use MRS, which was MRS, monitored retrievable storage. You compare that with a prior program that they talked about away from reactor storage. They're very similar concepts. So there wasn't a new concept at that point. It was just a new name. And the legislation authorized a repository, but it did not authorize an MRS. It asked for a study of the MRS concept, and the MRS concept could be used if

Page 195

it was authorized at a later point, but it was identified as a possible alternative to actually having a repository operating in 1998.

Q. And, again, this passage that I read from page three, how does that discussion of MRS comport with your understanding of what the –

A. That would satisfy our understanding of moving spent fuel from the utilities to the responsibility to the Department of Energy.

MR. STOUCK: Your Honor, I would like to move Plaintiff's 57 into evidence.

THE COURT: PX-57 is admitted.

(Plaintiff Exhibit Number 57 was received in evidence.)

MR. STOUCK: Thank you.

BY MR. STOUCK:

Q. Let's now move to Exhibit 59, Mr. Mills. Do you have that in your notebook?

A. Yes, I do.

Q. Do you recognize this document, and if so, what is it?

A. Yes. It is the draft of mission plan, volume 1, it was only volume 1, there was a volume 1 and volume 2, but only provided volume

Page 196

1 distributed as a draft in December of '83.

Q. And did you see this at that time, about that time?

A. Yes, the last week of December of 1983 was when this was available to us.

Q. And this was the first draft that was distributed to you?

A. That is correct.

Q. Take a look please at, if you would, take a look at page 2-1 first, under, "Program Strategy." Do you see that?

A. Yes, I do.

Q. Let's take a look at the last couple of sentences here, please. You see this on your screen?

A. Yes, I do.

Q. It says, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years, such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." Do

Page 197

you see that?
A. Yes, I do.
Q. And, again, let me ask you, is that consistent with your understanding of what the obligation was?
A. Yes, yes, it is. It showed that, subsequent to January 31st, the acceptance rate would be equal to or greater than the annual discharge rate. Wait a minute. I read this wrong Excuse me.
The acceptance schedule designed in the first five years is that no utility would provide additional storage capacity after January 31st. That's understood. The second one, when it says subsequent, what it's subsequent to, it's subsequently to January '98 or subsequent to the five years.
Q. And why is that significant?
A. Because we believe that January – or 1998, they would be receiving the material at a rate equal to or – and greater than the actual annual discharge rate, so I read this first as being subsequently, meaning subsequent to 1998, not subsequent to the five years after 1998.
Q. Okay. And how do you read it, now

Page 198

that you've looked at it again?
A. Now that I read it, it shows that they were not accepting spent fuel in 1998 equivalent to what our understanding was of the amount that was being discharged from the utilities, plus additional to work off the backlog.
Q. And that –
A. That was not our understanding.
Q. That was not your understanding. Now, take a look at – there's a chart here, a table here, a schedule of pickup, a so-called waste acceptance schedule, which I think we had up a minute ago. There's a column that's entitled, "First Repository Acceptance." Do you see that?
Or, actually, we've got more of the chart up there, for years, it shows years '98 through 2003. It's an excerpt from this page 2.3 of the Exhibit 59. Do you see that?
A. Yes, I do.
Q. And how do these acceptance rates, I'll call them, of 1,800 per year for five years and then 3,000, it's the same question, does that comport with what your understanding

Page 199

was at the time the contracts were entered into – what DOE would be doing? Excuse me.
A. The 3,000 metric ton of uranium was the design capacity rate for the facilities. That was something that had been going on for some period of time as an understood number. That was the number that we really expected, and that was our understanding of what they were going to do starting in 1998. We were somewhat surprised at this point that they were dealing with a rate that was lower than that for the first five years.
Q. Did you do anything in response to your surprise?
A. Yes. We commented on this to Department of Energy, and as you progressed down here, we're going to find that they did recognize that there was a larger number, and they used a larger number in the final report.
Q. Let's take a look at pages – there's a paragraph that carries over from 2.2 to 2.4 of this document, 2.3, the intermediate page being the schedule we just looked at. And, again, let me read this one into the record. I'm just trying to save your voice, is what I'm

Page 200

trying to do. I'm not sure what it's going to do to my voice.
It says here, "While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation.
The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department, based on submittal of a request no less than six months prior to the scheduled delivery date).
The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments." Do you see that?
A. Yes, I do.
Q. Have I read it correctly?

Page 201

A. Yes.
Q. And I take it from your prior answers – I won't take anything from your prior answers. How does this comport with your understanding of how the DOE program was supposed to work?
A. Well, if the utilities asked the Department to accept more than the Department could accept, then it was appropriate for an allocation to come into place. The allocation would be based on the oldest fuel first. And if a utility needed to ship material, but they weren't on that allocation list of oldest fuel first, then they could exchange their commitment to one who had a commitment, if that other person had capacity to store it. So this was a mechanism for brokering arrangements for storing it. Now, as for the – this doesn't discuss what the acceptance rate was or would be. This only talks about during that initial five years, to prevent additional expanded storage. This doesn't relate to what their actual acceptance rate was.
Q. Now, I'd like to turn to Plaintiff's

Page 202

Exhibit 61, which is next in your –
MR. STOUCK: Let me move into evidence, Your Honor, Plaintiff's Exhibit 59, the December 20, 1983 draft admission plan.
THE COURT: PX-59 is admitted.
(Plaintiff Exhibit Number 59 was received in evidence.)
BY MR. STOUCK:
Q. PX-61, Mr. Mills, I want to get this right, I believe – well, do you recognize this document?
A. Yes, I do.
Q. What is this?
A. This document is a transcript that was issued in February 1984 on an information meeting that the Department of Energy held on December 12th through 15th of 1983.
Q. And were you at that meeting?
A. Yes, I was.
Q. Now, for the record, I believe what we have as Exhibit 61 is an excerpt. I want to, let me make sure, is that right, or do we know?
MR. STOUCK: I know the entire proceedings are also on the exhibit list, Your Honor, and I believe this – yes, Exhibit,

Page 203

Plaintiff's Exhibit 60 is the entire proceedings, pages 1 through 426. Plaintiff's Exhibit 61 is an excerpt.
BY MR. STOUCK:
Q. Do you see that in the paper copy you have, the excerpt before you?
A. Yes, I do.
Q. And that's Plaintiff's 61?
A. Yes.
Q. And what is excerpted here from the entire proceedings?
A. This is a transcript of Robert Morgan's presentation on the morning of December 12th.
Q. Were you present when he gave the talk?
A. Yes, I was.
Q. You call this a transcript. Were you referring to the entire volume of proceedings? Was the whole conference transcribed?
A. Yes, it was. Yes, it was. It was what was presented at the meeting.
Q. My questions today focus on the excerpt that we have as Plaintiff's 61. Were you in attendance during the entire conference?

Page 204

A. Yes, I was.
MR. STOUCK: May I move to admit both exhibits, Your Honor? We're going to be talking just about Exhibit 61, but I believe we've got testimony that would allow both Plaintiff's 60 and 61 to be admitted.
THE COURT: Unless he's going to discuss specific portions of 60, I'm not moving it in.
MR. STOUCK: Okay.
THE COURT: But if you're going to talk about a specific portion of 61, I would allow the admission of that.
MR. STOUCK: Yes, we're going to talk about Mr. Morgan's talk.
THE COURT: Then you can make your motion, and I'll remind you, if you don't, to take in 61 when it comes in. Is there an objection?
MR. LO RE: Your Honor, actually, for completeness, we would prefer that the entire Exhibit 60 be moved in because we believe it represents the entire –
THE COURT: If you're discussing with a witness some other portion, we can move it

Page 205

in.
MR. LO RE: Thank you, Your Honor.
BY MR. STOUCK.
Q. Okay. On this, I'd like to direct your attention, Mr. Mills, this transcript as you've described it accurately reflects what Mr. Morgan said that day?
A. Yes, I believe it does.
Q. Let's take a look at what's marked as page 11. I think we can get it up on the screen. It's the first page of text, really. The title is, "Program Overview." What was Mr. Morgan's role at that time?
A. Mr. Morgan was the project manager for proceeding with implementing the Nuclear Waste Policy Act.
Q. And I'd like to call your attention, direct your attention to, excuse me, the fifth paragraph down on the right side which, again, I will read for the record. It says, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998.

Page 206

Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site.
During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities, either on-site or at another location." And now, I will continue – well, let me stop there. What was your reaction when you heard Mr. Morgan say that?
A. I think I came off my chair, but that was simply a surprise to us at that point, that a statement would be made that accepting one fuel assembly would satisfy the law, when in fact he had between 60 and 70 contracts, all of which said they would accept fuel from those 60

Page 207

or 70 suppliers by January 1st, 1998. It's a little hard to relate the fact that he had all those contracts and said that he could only accept one fuel assembly from somebody.
Q. Any other reaction?
A. Yes. The last sentence which says, "During the first year of operation, we should be receiving fuel at a rate so that no utility would have to add any additional storage facility, either on-site or at another location," and we concurred with that logic that, yes, we accepted the fact that we were responsible for the cost of fuel up to 1998. But beyond 1998, it was, we were not supposed to have to add additional cost or additional facilities to store fuel, DOE was going to be taking it. Now, again, he didn't say right there how much he was going to be taking. Our understanding was that it would be equivalent to the amount discharged in the year 1998, plus some amount to work off the backlog.
Q. Okay. And I think you've previously testified the amount of discharge, plus some amount to work off the back log, would have

Page 208

required approximately what annual acceptance rate?
A. Well, we had believed that it was going to be about 3,000 metric ton a year.
Q. Subsequent to Mr. Morgan's speech, did you take any steps on behalf of EEI to try to assure that the 3,000 MTU rate would be retained in the final mission plan?
A. Yes, we did, over the time period, this now was December of 1983, as he said in this statement, he was going to be releasing the mission plan, a draft mission plan later that month, which he did, the last week of December in 1983. It was a draft mission plan. I met with many people, including Mr. Morgan, in December, he was not in the program after January of 1984, but I met with him indicating that that was an insufficient number. I met with Mike Lawrence, and we encouraged them to find a mechanism to get back on the schedule that we understood would be the amount that was going to be received in 1998, which was about this 3,000 metric ton a year.
Q. You mentioned Mr. Lawrence. And, I'm sorry, who else?

Page 209

A. Well, I had met with Mr. Morgan there in December.
Q. Anyone else from the Department of Energy?
A. And Frank Coffman also.
Q. Now -
A. Excuse me, excuse me. I may have misspoken. I'm not sure that Frank Coffman was there at that point. I know I met with Mr. Morgan, and I know I met with Mike Lawrence, but I'm not sure that it was with Frank Coffman.
MR. STOUCK: I'd like to move Plaintiff's 61 into evidence, Your Honor.
THE COURT: PX-61 is admitted.
(Plaintiff Exhibit Number 61 was received in evidence.)
MR. STOUCK: Thank you.
BY MR. STOUCK:
Q. Let's turn now, Mr. Mills, to Plaintiff's 62, which should be next in your book. Do you recognize this, and if so, what is it?
A. Yes. It is a statement that Mike Lawrence made to the Subcommittee on Energy

Page 210

Conservation and Power on February 22nd, 1984. As I had indicated earlier, Robert Morgan was in the program during 1983, but then early in 1984, Mike Lawrence was assigned as the acting director for the program, and he was making this presentation on behalf of Department of Energy as acting director of the Office of Civilian Radioactive Waste Management.
Q. Okay. Did you testify at this hearing?
A. I do not recall for sure whether we had a utility testifying before this because, generally, the federal government comes up with their budget request, which this is, it's a budget request, and it's all federal government input, and then we get to testify at a later date with regard to our input. So I'm not sure that we testified at that particular date.
Q. Can we take a look at page two of this? I'd like to draw your attention to a portion that starts – if we could actually just open this up a little bit to the sentence before. Can you take a look at just the sentence before, sorry, and then come back to that?

Page 211

Do you know what the purpose of Mr. Lawrence's testimony was, overall purpose?
A. The purpose was to seek funding for his program for fiscal year 1985.
Q. And then if we could look here, start in that second sentence here we've got pulled out, "these activities," do you see that? "These activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982 (NWPA), which is: 'To accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.'" Do you see that?
A. Yes, I do.
Q. And then it says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998 and ultimately remove all eligible waste from at-reactor storage." Do you see that?
A. Yes, I do.
Q. And, again, let me ask you, does that

Page 212

comport with your understanding of what DOE's obligations were?
MR. LO RE: Your Honor, I'd like to place another objection on the record here, in that we simply seem to be having Mr. Stouck read documents into the record. Mr. Lawrence is not on the Plaintiff's witness list. We will not be hearing from Mr. Lawrence, as I understand it. There haven't even been deposition designations from Mr. Lawrence, and I fear at this point, we are now apparently trying to put Mr. Lawrence on the stand in absentia through Mr. Mills, and the government objects to that.
THE COURT: Would you like to respond?
MR. STOUCK: My response is, first of all, it's an admissible ancient document and an admission, and my understanding why this is an admission and outside the hearsay rule – the government is welcome to bring Mr. Lawrence here if he wants to explain that when he told Congress what I just read, he didn't mean it. I mean, that's, this evidence – I mean, this is a statement to Congress by the director, acting director of the program, and

Page 213

our position is that it's an admission, and you've heard already from Mr. Mills, and you will hear subsequently that this raised concerns.

And they talked to Department of Energy people, and the ultimate mission plan got back to an acceptance rate that was more in line with Mr. Mills' understanding, and that's the story we're trying to present to the Court.

THE COURT: I'm having a hard time understanding why it isn't admissible evidence, and it seems to be part of a story. Whether the story is relevant to the ultimate resolution of the case is something I don't yet know.

But if Plaintiff is going to put this story on and they put it on through a percipient witness who was there at the time these documents were written, I guess I don't see why it shouldn't come in. It may ultimately not be relevant to a resolution, but we're not going to determine that today

MR. LO RE: And, again, Your Honor, we understand well that the admissibility of this particular document has been determined. We

Page 214

objected, I believe, and the Court allowed that in. However, what we object to is the characterizations by Mr. Mills about this document. Thank you.

THE COURT: Thank you.

MR. STOUCK: I'd like to move it into evidence, Your Honor, 62.

THE COURT: PX-62 is admitted.

(Plaintiff Exhibit Number 62 was received in evidence.)

MR. STOUCK: Thanks.

BY MR. STOUCK:

Q. Let's turn now, Mr. Mills, to Plaintiff's 66. Do you have that before you, and do you recognize Plaintiff's 66, and if so, what is it?

A. Yes, this is an internal document from Mike Lawrence, who was acting director of the Office of Civilian Radioactive Waste Management, on March 28th, 1984, in which he was distributing drafts of the mission plan to a number of people within the program, giving them guidance on how to proceed to get to a point where they would issue it to the public for comment.

Page 215

Q. And was this issued for comment?

A. Yes, but not at that time, not at March '84. It was issued at a later date.

Q. Did you see this draft at this time?

A. I was in the Department of Energy's offices frequently, and I believe I – there was so many drafts. Whether I saw this actual draft or not, I'm not sure.

Q. Okay.

A. I saw the one that was issued in May, I believe it was May of 1984, is when it was actually issued for public comment, April or May. I'm not sure what the date was.

Q. Please take a look at 2.2 of this document which – now, the numbering of this one, I believe, is kind of funny, so let me give you a Bates number, which I think will help you find it. It ends in 0042, is the page I'm interested in.

A. I have that.

Q. This is another waste acceptance schedule, and if we can look at the – do you have the relevant portions pulled up here on the screen? You can see it there, or you can see it in the document, Mr. Mills. It was a

Page 216

little fuzzy from the copying. I think you'll see pre-1998, 1999, and so forth?

A. Yes.

Q. And then the first repository acceptance rate of 400, 400, 400, 900, 1,800, 3,000. Have I read that correctly?

A. Yes.

Q. How would that comport with your understanding of –

A. We were losing ground. The 3,000 metric ton per year in year 2003 was the same as it was in the draft that was issued in December of that year, but they had in the December draft 1,800 metric ton in '98, '99, 2000, and 2001. And here, a few months later, the number was reduced further to 400, 400, 400, 900, and then 1,800.

But they still show the 3,000 metric ton as the amount they would be receiving in year 2003 here, which was the amount we had believed we had a deal for receiving that in 1998.

Q. Did you see schedules with rates this low in that time period, in the time when the 1994 draft was either being prepared or

Page 217

circulated for comment?
A. Yes, those were the numbers that actually came out in the draft that came out for comment about a month or two later than this date here.
Q. These same rates?
A. Yes.
Q. Did you take steps at that time to try to express your views about those rates to people inside the Department?
A. Yes, I did. I had several conversations with Mr. Mike Lawrence on that while he was there as the acting director from about January until May or June, I'm not sure just when his time, final time period. But I had conversations with him about it at that time, saying, hey, look, this is not according to our understanding. It was at that, very close to this particular point, when the president nominated Mr. Ben Rusche to be the permanent director of the program, and he did become the permanent director of the program, I believe, in June of 1984. I'm not sure just when it was that he became – a month or two from that. And I

Page 218

spent a great deal of time talking with Mr. Rusche, saying, hey, this is not what we had as an understanding with the Department of Energy, we really need to find a mechanism, find a way to get back to the 3,000 metric ton in 1998.
MR. STOUCK: Thank you, Your Honor. I will move this into evidence as well, Plaintiff's 66, and ask that that motion be granted.
MR. LO RE: Your Honor, before –
THE COURT: Is that an objection?
MR LO RE: It is an objection, Your Honor.
THE COURT: Feel free to say that.
MR. LO RE: Thank you. I do believe no foundation has been laid with respect to this document, as Mr. Mills testified that he did not know even whether he had seen the document.
THE COURT: Is there a copy of the May report in evidence?
MR. STOUCK: That was distributed.
THE COURT: Yes, the one that the witness knows. I mean, I would take that the

Page 219

numbers were, his memory that the numbers were the same, but do you have a May document? Maybe that's what we ought to be looking at.
MR. STOUCK: Yes, Your Honor, we do have that.
THE COURT: Why don't we go ahead and use that? I take this witness' memory, it's a very important point on his memory, but let's just get the final document that was in fact issued. We'll turn now from PX-66 to PX-68.
MR. STOUCK: Thank you, Your Honor.
THE COURT: And we'll go ahead and look at II.2, I think, if the numbering stays the same.
THE WITNESS: The number does stay the same.
MR. STOUCK: The number does stay the same, Your Honor. I will say for the record that I believe that, at least what I have here, and forgive me and us, Plaintiff's 68, I believe an excerpt, but it does run up through that page and beyond. I don't believe it's the entire document. If we may proceed on that basis?
THE COURT: Sure.

Page 220

MR. STOUCK: We'll try to get a complete copy in short order.
THE COURT: Well, what the witness is testifying on is on the numbers, I think.
MR. STOUCK: And the numbers are here. May I approach?
THE COURT: Yes. He has it on the screen also.
MR. STOUCK: Oh, it's up on the screen.
BY MR. STOUCK:
Q. Would you like a paper copy?
A. No, this is fine.
Q. Let's go to the cover and try to identify it and make sure we've got the right document. Do you recognize this as the April draft that was distributed for comment?
A. Yes, I had indicated in my opinion, April or May, I wasn't sure, didn't remember, but it is an April date on this particular draft that was distributed for comment, yes.
Q. Thank you. Now, let's go to the schedule on page II.2, and you can see in the column there that we've got the same 400, 400, 400?

Page 221

A. It has exactly the same numbers in that first repository acceptance column.

THE COURT: PX-68 is admitted.

MR. STOUCK: Thank you.

(Plaintiff Exhibit Number 68 was received in evidence.)

BY MR. STOUCK:

Q. Now, I'd like to turn your attention, Mr. Mills, to Plaintiff's 66. I'm sorry, not 66. That was the last one, that was the one – Plaintiff's 73, I apologize, Plaintiff's 73. Do you recognize this, and if so, what is it?

A. Yes, this is a document that is commenting on the draft mission plan that was dated April of 1984, and it is a set of comments that were sent to Ben Rusche, who had been confirmed as the director of the Office of Nuclear Waste Activity – Radioactivity, at that time. I don't know when it was he officially became the director, but he certainly was by this time in July, and it was detailed comments from the Richland operation office of the Department of Energy.

Q. And who was providing these comments?

Page 222

A. These comments were provided by Mike Lawrence, who had been assigned the task of being the manager of the Richland operation office once he left the acting position on the Office of Radioactive Nuclear Waste Management.

Q. Now, I would like to direct your attention to the first page of this cover letter, I guess you'd call it, or transmittal later, which is dated May 23, 1984. At the bottom, we have a paragraph that starts, "the most significant comments," do you see that?

A. Yes, I do.

Q. "The most significant comments, some of which are discussed in detail in the enclosures, are as follows, colon," are you with me?

A. Yes, I am.

Q. "Number 1, it should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU, plus some amount up to 630 MTU, depending upon the extent federal interim storage is utilized." Do you see that?

A. Yes, I do.

Page 223

Q. And, again, let me ask how that comports with your understanding of the DOE obligation.

MR. LO RE: Objection, Your Honor. Again, now, we're talking about a document that Mr. Mills has testified he knows anything about.

THE COURT: Not yet, let's ask if there's a foundation. You might start by asking if he's ever seen the document before.

MR. STOUCK: I think he understood the question he was about to answer, but I will ask him if he's seen the document before.

THE WITNESS: Yes, I have.

THE COURT: When?

THE WITNESS: I saw this document when it was received by Ben Rusche in the Department of Energy because I was visiting with Ben Rusche on a regular basis, and I saw all the comments that came in on that mission plan. And I will say that the statement here that notes that the initial waste acceptance rate for 1998 should be about 2,800 metric ton, plus, was very much in line with what we understood our arrangement was to-date, or

Page 224

arrangement was that we had with the Department of Energy under the contract.

BY MR. STOUCK:

Q. Did you discuss that with Mr. Rusche?

A. I had discussed it with Mike Lawrence before he went, while he was still in the Forrestal building, and, yes, I discussed it with Mr. Rusche.

THE COURT: Before you go off that page, do you have an understanding, from your time with Mr. Rusche or otherwise, what's being referred to by the phrase "depending upon the extent federal interim storage is utilized"?

THE WITNESS: Yes, there was, as part of the Nuclear Waste Policy Act, an opportunity for the federal government to provide an interim storage for a limited quantity of material in case a utility really needed some storage space, and they needed to have that capability, DOE was to provide this federal interim storage capability.

THE COURT: In what time period?

THE WITNESS: In this country.

THE COURT: In what time period?

THE WITNESS: In the time period

Page 225

before the repository was available.
THE COURT: Thank you.
THE WITNESS: Now, it did not come about, but it was to be separately funded actually from the 1 mil per kilowatt hour. It was a separate item.
THE COURT: Thank you.
BY MR. STOUCK:
Q. All right. Mr. Mills, now, I'd like to also call your attention to, I guess, the attachment enclosure one to this exhibit 73, which is the third page back, if you're looking at the paper copy. I'm sure it will come up on the screen if you prefer that. The title in enclosure one is, "RL comments on draft mission plan dated April 1984." Do you see that, or do you have that?
A. Yes, I do.
Q. And then under RL, would you consider that probably refers to?
A. RL refers to Richland operation office
Q. Okay. Page three, excuse me, paragraph three, there's a reference to page 2.1, first paragraph states – and I'll just

Page 226

read this again for the record. "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories."
And then apparently, the comment goes on to read, "Based upon our interpretation of the NWPA, the minimum acceptance rate that should be based upon the rate at which spent fuel should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.
Then according to table II-1, P2-2, the first repository acceptance rate should start at 2,800 MTU per year and increase to 3,500 MTU per year in six years, rather than starting at 400 MTU per year and increasing to 3,000 MTU per year. We understand that as a practical matter, the achievable initial acceptance rate of the first repository will likely be less than the design rate, probably on the order of the 400 MTU per year indicated in table II-1.

Page 227

The implication here is that the first repository should start acceptance operations two to three years before 1998 in order to meet the 1998 and beyond acceptance rate requirements intended in the NWPA." Have I read that correctly?
A. Yes, you have.
Q. And, again, how does that comport, if at all, with your understanding of what the DOE's obligations were?
A. If I hadn't known it was written by somebody else, I might have thought I had written that because it does comport with our understanding, with the 2,800 metric ton that they indicate was needed. It is very close to the 2,000 to 2,500 that we expected to be discharged, and they ramped up actually even to a higher number of 3,500 metric ton. That was more than what we had expected.
Q. Do you have any insight into how the Richland operations office came up with these comments or –
A. No, I do not.
MR. STOUCK: May I move this into evidence, Plaintiff's 73, please, Your Honor.

Page 228

THE COURT: PX-73 is admitted.
(Plaintiff Exhibit Number 73 was received in evidence.)
BY MR. STOUCK:
Q. Now, I would like to turn, if I may, Mr. Mills, to Plaintiff's 82, which is the 1985 mission plan, although, again, I believe we have an excerpt here, and let me just confer for one second about that.
I've been advised – I've been reminded, I should say, that 82 is the full document. What's in our binder is just an excerpt, so I apologize for that interruption.
Mr. Mills, do you recognize this Plaintiff's Exhibit 82 as the June 1985 mission plan?
A. Yes, I do. This was the final mission plan that was issued by the Department of Energy to Congress to fulfill that particular requirement for a mission plan.
Q. And, again, did you have some involvement in the development of this? You've told us a little bit about that.
A. Well, in addition to the regular visits with Mr. Rusche and Mike Lawrence, we

Page 229

had an opportunity to compile a detailed set of comments on the draft mission plan, which was issued in April of '84. That was a year before it became final, and we did submit substantial written comments on that mission plan draft before this was issued, so that we did have significant input.
And I can say without any hesitation at all that I spent a great deal of energy talking with Mr. Rusche about how are we going to get back to the deal that we understood we had of being able to have about 3,000 metric ton of fuel moved in 1998, and this draft, or this final mission plan found a way to do it.
Q. Let's take a look then at pages 26 and 27 of this document, probably one page at a time, although you can look at them on paper, maybe just first generally before we look at the numbers. These are waste acceptance schedules as well. Before we look at the numbers, can you just tell us what these two schedules represent, you know, in general terms?
A. They had two schedules. The first one was what they identified as their authorized

Page 230

system, authorized meaning that Congress had authorized them to have a first repository. It had not authorized them to have an MRS yet. It asked them to study, but it hadn't authorized it. The second one is what they called their improved performance system, which did include MRSes that would allow them to achieve what we thought we had as an understanding in 1983 when we signed the contracts.
Q. Well, let's look at the specifics then. First, on page 26, the table II-2, waste acceptance schedule authorized system, and the copy here has been made a couple too many times, but can you see the acceptance rates under the spent fuel? Can we get a little broader picture on the screen?
A. No. I can see that where we're looking at the spent fuel numbers in the years 1998 through year 2003, in which those are exactly the same as was identified in the draft of April of '84.
Q. And then, now, let's look at the page 27, table II.3 schedule entitled, "Waste Acceptance Schedule Improved Performance System." And what do we have here?

Page 231

A. We now see that the acceptance rate will be, in 1998, 3,000 metric tons per year, and in fact, they show 2,200 metric tons haven't been received prior to 1998, and they were actually accepting fuel on this schedule earlier than 1998, which was what we thought they were going to do when we signed the contracts.
Q. Thank you. If you would please turn to page 24?
MR. STOUCK: Yes, let's take a look at page 17 first, if we could, Scott, please?
BY MR. STOUCK:
Q. There's a subsection here entitled, "The Improved Performance Plan," Mr. Mills. Do you see that?
A. Yes, I do.
Q. And under the second paragraph here – well, let's start with the first sentence. It says, "The improved performance plan (see figure 2-2) reflects the opportunities built into the Act to evaluate options for enhancing the authorized plan in meeting the requirements of the Act." And then in the second paragraph, the second sentence there starts, "in

Page 232

particular," do you see that?
A. Yes, I do.
Q. "In particular, the Act requires the DOE to complete a detailed study of the need for and the feasibility of monitored retrievable storage and submit a proposal to Congress for the construction of one or more MRS facilities. Analyses to-date continue to reinforce the tentative conclusion that an MRS facility fully integrated into the overall waste management system can significantly enhance several important program objectives." Do you see that?
A. Yes, I do.
Q. And how does that comport with your understanding of the role a possible MRS would play in the overall program?
A. I agree with that. That was our understanding at the time, that, yes, an MRS could play a valuable role in the overall program.
Q. And listed here under the improvements, if you turn to the next page, you will see under number three, "improved confidence in the DOE's ability to meet

Page 233

schedules, particularly in beginning to accept quantities of waste no later than January 31, 1998," do you see that?
A. Yes, I do.
Q. "The integral MRS facility would be scheduled for initial operation as early as 1996." Do you see that?
A. Yes, I do.
Q. And, again, that would comport with your understanding –
A. Yes, it would.
Q. – of what the original bargain was?
A. Yes, indeed.
Q. And then if you would turn now to page 24. Actually, let's move on. Let's just move on. I think we're done with that document, but thanks.
MR. STOUCK: That's the admission plan which I would now like to move the entire document into evidence, Your Honor, although as I noted, the witness only has an excerpt, but the exhibit list certainly includes the entire thing.
THE COURT: PX-82 is admitted.
(Plaintiff Exhibit Number 82 was

Page 234

received in evidence.)
MR. STOUCK: Thank you.
BY MR. STOUCK:
Q. I would now like to turn to the concept of oldest fuel first. What is your understanding of that concept, I guess, let's start with that, as it relates to the DOE spent fuel contracts?
A. The contracts called for the utilities to identify to DOE the amount of fuel that they wanted to have DOE take from them in each year, and they would do that five or six years in advance, I forgot what the time schedule in advance, if the utilities asked DOE to take more fuel than they were able to take, then there was a question of how do you allocate between the various contract holders, who gets to deliver what fuel to the Department of Energy.
That brought the allocation process into play, which was called OFF, oldest fuel first, and DOE was going to allocate their receiving of these deliveries based on the oldest fuel first. They would give preference for the oldest fuel, since that was the longest

Page 235

time that people had to store it.
They gave preference to them as a means of allocating the window for utilities to supply the fuel, if in fact utilities asked for them to take more than they would receive. OFF would not come into play unless they had taken more than they had received.
Q. Let's take a look at the contract provisions, this is Plaintiff's Exhibit 54, which is the PG&E contract with the Department of Energy dated June 30, 1983.
MR. STOUCK: And I believe this is not in Mr. Mills' notebook, so I'd like to approach, if I may, Your Honor.
THE COURT: You may.
BY MR. STOUCK:
Q. Have I correctly identified this document, Mr. Mills?
A. Yes, you have.
Q. Let's look at page 11, please, under, "Delivery Commitment Schedules."
A. Yes.
Q. If you would look at the second sentence here, again, trying to save your voice, I'm not sure what I'll do with mine, let

Page 236

me read this, "after DOE has issued," do you see that?
A. Yes, I do.
Q. "After DOE has issued its proposed acceptance priority ranking as described in paragraph (b)(5) of Article IV hereof beginning January 1, 1992, the purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the purchaser wishes to deliver to DOE beginning 63 months thereafter." Do you see that?
A. Yes, I do.
Q. And that is consistent with the understanding you just reported before we looked at this document?
A. Yes, it is.
Q. And then let's take a look at page 14, under, "Acceptance Procedures." Actually, 14 and 15, it carries over under, "Acceptance Priority Ranking." Are you there with me?
A. Yes, I am.
Q. And then it says here, "Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility or

Page 237

facilities can accommodate." Do you see that?
A. Yes, I do.
Q. "The following acceptance priority ranking will be utilized: Except as may be provided for in subparagraph (b) below and Article V.D of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B, D, and E of Article V." Have I read that correctly?
A. Yes, you have.
Q. Is this consistent with the understanding you described before we looked at this provision?
A. Yes, it is.
Q. And, again, how is it that the OFF concept comes into play in your understanding of this?
A. The concept of OFF comes into play if the utilities asked DOE to accept more than

Page 238

they're able to in any particular year.
Q. And then it says here, "except as may be provided for in subparagraph (b) and Article V.D, acceptance priority shall be based on the oldest fuel first," and so forth, and can we just take a moment to see what the subparagraph (b) below covers?
A. Yes.
Q. And what is that?
A. That covers shutdown, permanently, reactors. If there were shutdown, permanently shutdown reactors, there was an opportunity for the Department of Energy to accept that fuel as an allocation separate from the OFF allocation.
Q. And do you know what the exceptions provided in paragraphs B, D, and E of paragraph V refer to?
A. I would have to go back and look at them.
Q. I think you can be helped on pages 11 and 12, 12, on the bottom is B, D, and E, I guess.
A. There were emergency deliveries, that was D, i if there happened to be a need, a real need because of an emergency, which we hoped

Page 239

would never happen, but if it did happen, they would be able to allocate that and take that instead of their OFF schedule.
The E item was exchanges. If utilities were willing to exchange or did arrange for these exchanges, where one would exchange their commitment on the OFF allocation schedule with somebody else that had a commitment in an earlier date, that would be accommodated through this allocation routine.
Q. And the last one?
A. What was the other one?
Q. B like boy.
A. Was B?
Q. Yeah.
A. Delivery commitment schedule.
Q. See if I can refresh your recollection, look at the last three lines there.
A. "In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for disapproval and request the revised schedule."
Q. What about B2? See if it refreshes your recollection, then if it does –

Page 240

A. Oh, yes, oh, yes, very clearly. Once there had been the established schedule for what was to be delivered under the delivery commitment schedules, then there was a plus or minus quantity. It wasn't going to be exactly what we said. We might have plus or minus 20 percent from the allocated item, so, yes.
Q. Okay. Thank you for that. Now, is it your understanding, Mr. Mills, that OFF, this oldest fuel first concept, was to be the actual sequence for pickups of spent fuel by the Department of Energy?
A. No.
Q. And why do you say that?
A. It would not be efficient, and it would not provide the flexibility that was needed in order to run the program in an expeditious way The oldest fuel first approach allowed – well, it really said that once you had the system working, all 60 contracts would be delivered in one year. Something from each of the 60 would be delivered in one year.
Well, that's sending shipping casks to many different parts of the country, where if

Page 241

they worked in campaigns, whether they would take a reasonable quantity from one utility and then another reasonable quantity from another utility, it would not match the OFF schedule, and to make the system more efficient, there would be considerable exchanges of this OFF allocation. It was expected to happen.

Q. You mentioned that OFF, an OFF pickup sequence would not be efficient. Could you just elaborate on that a little bit about why, in your understanding, an OFF pickup sequence would not be efficient?

MR. LO RE: Objection, Your Honor. I'm going to object once again on the grounds in violation of the parol evidence rule. Mr. Mills has testified and is about to begin to testify about terms that vary from the express terms of the standard contract.

THE COURT: I'm not sure that that is the testimony that's being elicited. He is describing the purposes for a process from industry view, and I'm going to allow the testimony, as I did before.

MR. STOUCK: Thank you, Your Honor.

THE COURT: Overruled.

Page 242

BY MR. STOUCK:

Q. Do you recall the question, Mr. Mills?

A. Yes, I do. If you look at the early schedules of the amount of fuel that was discharged in the early years that would be the first list on the oldest fuel first, you would find relatively small quantities from a whole number of different utilities, and that particular quantity, as I had indicated earlier, was not equivalent to a normal efficient quantity that would fit in a shipping cask.

Most of the fuel was expected to be shipped by railroad in a cask that would weigh 100-ton, that would have 10-ton placed in it for moving to the repository, or wherever they were going to move it to, and many of these oldest fuel first allocations were less than that quantity in any particular year, in the early years, so it just didn't make sense to operate strictly on the oldest fuel first allocation.

Q. Well, if not by OFF, then how would the actual schedule for pickups be determined, in your understanding?

Page 243

A. Once the allocation had been defined by the OFF sequence, then the utilities would arrange for exchanging these OFF allocation rights, and this would be done independent of the Department of Energy, and this was discussed in considerable detail among the utilities, that they wanted to be able to exchange these rights so that they could then permit their own operation to be more efficient, as well as DOE's operation to be more efficient.

Q. And do you have an understanding of how the mechanics of the swaps, these exchanges, were at least intended to work?

A. Well, yes, certainly. It was a matter of making a brokered deal between the utility contract holders, and there was experience, similar experience to that, as we mentioned earlier, with the enrichment contracts on exchanging commitments.

Q. Okay. Let me turn your attention now to the subject of shutdown priority, which you touched on briefly, I guess we touched on briefly, when we looked at that provision of the contract. This is back in 1983. Let me

Page 244

take you back to that time period.

What was the nuclear power industry's position on priority of acceptance by the Department of Energy of spent nuclear fuel from decommissioning reactors?

A. When the Department of Energy made available their draft contract in February, on February 4th of 1983, they had included the reference to being able to provide storage or provide the service for shutdown permanent reactors. We had a task force working on the comments for that particular draft contract, and most of the utilities that were in that task force had operating nuclear power plants. And they were not exactly sympathetic to those utilities who had a shutdown reactor, so that we had a consensus position that all utilities didn't agree with that, we recommended to the DOE that they not provide that particular capability for early shutdown, and that was one of the comments we had made on that draft contract.

DOE took a look at our comments, and they responded to our comments, and they indicated that it would be unreasonable for

Page 245

them not to accommodate these shutdown reactors, so they did not accept our comments at that point. They did keep that in the contract.
Q. Can we take a look at Plaintiff's Exhibit 48, please, which is the April 18, 1983 Federal Register material accompanying the final form of the standard contract on page – I think it's page 16593 of the Federal Register, is that right? That's the best I can do with the copy.
It's Bates ADM0010697. There's a paragraph here addressing the matter you just discussed. Do you see that, Mr. Mills?
A. Yes, I do.
Q. Again, let me read it. "Article VI.B.3(b) gives priority to SNF/HLW from permanently shutdown reactors and four commenters recommended that this provision be deleted." Do you see that?
A. Yes, I do.
Q. And I'll go on to read, "This type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.

Page 246

Therefore, we have not accepted the recommendation." Do you see that?
A. Yes, I do.
Q. I've read that correctly?
A. Yes, you have.
Q. And that's consistent with your –
A. Yes, it is.
Q. – recollection of what happened, the background?
A. Yes.
Q. Now, did you expect at that time, notwithstanding the industry's consensus comment, did you expect that the shutdown priority issue would be an issue, a problem in 1998 when the program started up?
A. Not really. It was – well, we had a consensus position that we did not really want to give priority for decommissioning those shutdown plants. In fact, we didn't view it as a significant problem because of the quantities of spent fuel that were involved with the shutdown plants were relatively small. They could be accommodated without totally disrupting the system.
So it was not a major issue for us in

Page 247

the sense of how was the system going to operate because it would operate quite effectively with that arrangement.
Q. And apart from this Federal Register comment which we looked at, did you have discussions with the DOE officials, who you've mentioned several times here already, did you have discussions with DOE officials at that time in 1983 about the shutdown priority issue?
A. No, I did not. I did not have discussions about that because it was not a major issue.
Q. All right. Let's turn to the subject of failed fuel. What is your understanding of the term or – what is failed fuel?
A. Failed fuel encompasses a number of things. As you see with this sample of the fuel assembly in front of you, a fuel assembly consists of individual rods. This particular assembly has, what is it, six rods on each side. A typical PWR fuel assembly would have 11 fuel rods on each side. It would be a much bigger cross-section.
And periodically, in the manufacture of those systems, there might be a defect

Page 248

somewhere in a tube or in the closure at the end of those rods that might allow some radioactive gases to be released, and that would be determined by a sampling operation. They would sample each of these fuel assemblies when they came up to determine if there were radioactive releases because of some kind of a pinhole or some defect, and that was one type of defect fuel. Other times, you might find that the fuel actually, as they were taking it in and out of the reactor, got damaged, just physically damaged, because of the way it was rammed through the equipment, of taking it in and out of the reactor.
And you could see dents or damage on the outside portion of the fuel. Those were considered failed fuels. There were even times when one of these tubes, this is a metal tube around the uranium oxide fuel that's inside that, that metal tube may have had a failure in it where there would be a crack in the tube that you could actually visually see. That would be failed fuel.
So the failed fuel consisted of a number of things as defined by – we had to