Page 249

identify those failed fuel items to DOE as a part of the material that we were going to deliver to them, the utilities were going to deliver to them.

Q. And in 1983, did those involved in developing the spent fuel contracts believe that failed fuel would be an issue for the Department?

MR. LO RE: Objection, calls for speculation.

THE COURT: Your question refers, Mr. Stouck, "those involved in developing the spent fuel contracts," and what they believed. Possibly, you'd like to rephrase that, since the contract was largely developed inside the Agency.

BY MR. STOUCK:

Q. Did the industry members that you represented, Mr. Mills, believe that failed fuel would be an issue for the Department in operating this program?

A. No, they did not. The structure of the failed fuel was basically the same physical structure. The failed fuel would at times require that you had to place it in a canister

Page 250

to retain it in the configuration and capture the failed fuel assembly in a canister. It was not viewed as a major issue, and this was discussed in considerable detail with the Department of Energy at the time before the contracts were signed.

They issued the contract on April 18th in the Federal Register and between Federal Register, April 18th, and the time of signing, and this particular one was signed June 30th, there was considerable discussion about failed fuel, is it to be accommodated? And, yes, it was.

Q. Was there experience in the industry, the nuclear industry, at that time in transporting failed fuel?

A. Oh, yes, the industry had transported both good fuel and some failed fuel in the same shipping containers.

Q. And in what context were they being transported?

A. They would be transported from the utility. Some went to the West Valley reprocessing site. Some went to the Morrison, Illinois General Electric site, where they were

Page 251

stored. There was a considerable amount of fuel that had been transported, and some of it included failed fuel.

Q. Let me call your attention now to – or direct your attention to Plaintiff's Exhibit 84, which is also in your notebook in front of you, please. Do you have that, Mr. Mills?

A. Yes, I do.

Q. This is a September 13, 1985 letter from Robert H. Bauer on Department of Energy letterhead to James B. Hall. Is that what you have?

A. That is correct.

Q. Do you recognize this, and if so, what is it?

A. Yes. It is a letter that was written by Robert Bauer, who I knew and met with on a regular basis in the Department of Energy, to a gentleman who worked directly for me, James Hall. He was my point man at that particular point on the utility waste management group, and it related to the issue that was described here of clarification on two aspects of the standard contract.

Q. Okay. Mr. Hall worked for you at that

Page 252

time?

A. Yes, he did.

Q. And the Utility Nuclear Waste Management Group, what does that refer to?

A. Edison Electric Institute had about 176 members of the Institute. Only about 40 of them had nuclear power plants, so that the funding activity for dealing with the nuclear issues, they really didn't want to take it out of the overall EEI budget, so we set up a separately funded activity for the nuclear waste activity.

And it was the Utility Nuclear Waste Management Group, and that group consisted of those 40 utilities that were members of EEI that had nuclear power plants, and it also consisted of – Tennessee Valley Authority was a member of the utility waste management group, and there were utilities that had nuclear power plants that were not members of EEI, the public power, and the cooperatives.

Those also were members of the Utility Nuclear Waste Management Group, which I was responsible for that particular program.

Q. And this letter from Mr. Bauer,

Page 253

according to the first paragraph, is a response to Mr. Hall's letter that was addressed apparently to Mr. Rusche. Do you see that?
A. Yes, that is correct.
Q. And let's take a look at the first sentence in the second paragraph. It's not highlighted previously.
MR. STOUCK: But let's take a look at the first sentence in the second paragraph, first, please, if we can, Scott. Thank you.
BY MR. STOUCK:
Q. It says here, "With regard to 'other than standard fuel,' it is the Department's intent that all currently designed nuclear fuel, including that falling outside the maximum physical dimensions specified in Appendix E, will be subject to the same scheduling procedures." Do you see that?
A. Yes, I do.
Q. And that's consistent with your understanding?
A. That is correct.
Q. And with the industry's understanding?
A. Yes, it is.
Q. And Appendix B refers to -- excuse me,

Page 254

Appendix E to the --
A This is to the contract.
Q. Thank you. And then the last paragraph of this paragraph, which we did have previously highlighted, reads as follows: "Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." Do you see that?
A. Yes, I do.
Q. And that is consistent with --
A. Yes, it is.
Q. -- the industry's understanding at the time?
A. Yes, it is.
Q. And yours?
A. Yes, it is.
MR. STOUCK: Your Honor, I would like to move Plaintiff's Exhibit 84 into evidence, please.
THE COURT PX-84 is admitted.
(Plaintiff Exhibit Number 84 was received in evidence.)
THE COURT: And, Counsel, we kind of blew by PX-54, which is the standard contract.

Page 255

Did you intend to move that in?
MR. STOUCK: Yes, Your Honor. Thank you very much. We would like to move Plaintiff's 54 into evidence.
THE COURT: PX-54 is admitted, and PX-84 is admitted.
(Plaintiff Exhibit Number 54 was received in evidence.)
BY MR. STOUCK:
Q. Now, let me ask you about the subject of Greater-Than-Class-C waste. Do you understand the subject?
A. Yes, I do.
Q. How was the issue of Greater-Than-Class-C waste viewed by the industry at the time the DOE spent fuel contracts were signed?
A. I need to provide a little history here. In 1980, the low-level Nuclear Waste Policy Act was passed, which included all the low-level waste of class A, class B, and class C, and that was to be disposed of under the control of the states with NRC overview, NRC licensing.
Anything above the class C waste that

Page 256

were at nuclear utility plants were covered under the Nuclear Waste Policy Act of 1983, '82, 1982 -- the one that was signed in '83. So that there were some materials that would be, fall in the category of Greater-Than-Class-C, that were at nuclear utility sites, and they were covered under the Nuclear Waste Act of 1982, which stated that any radioactive material that the NRC decided had to go into a waste repository was covered under that contract or covered under that law and the contract.
Q. And what material are you talking about when you refer to Greater-Than-Class-C waste at a nuclear power plant?
A. Well, if I again, again, just looking at this fuel assembly in front of us, there were some instances where those fuel assemblies were disassembled and the fuel was bundled together, the fuel rods were bundled together, and those straps that you see around it, which were the actual brackets, top and bottom, those were highly radioactive.
They fell into the Greater-Than-Class-C activity, so those

Page 257

particular components were covered as an item Greater-Than-Class-C within the contract. There were control rods that went down through the PWR, and there were crucifix coal rods that went down through the BWR channel fuel assemblies, and there were actually metal channels that the fuel assemblies went through in the BWR reactors.
Those were all highly radioactive and would fall within this category Greater-Than-Class-C covered by low-level waste, so those were part of the elements that were included in the contract to be delivered right along with the fuel. There were also other components that would come into play at the time of decommissioning reactors.
There were the internals, those internal structures that were close to the fuel had achieved a higher reactivity than would be permitted to allow them to go into the low-level waste facilities under the 1980 Act, and those were covered under the contract.
Q. Just for the record, you referred to PWR and BWR. Could we just have a brief explanation for the Court and maybe others of

Page 258

what that is?
A. Yes. There were two basic types of designs of nuclear power plants. One was a pressurized waterpower plant, pressurized water reactor, that was the PWR. Those were built by Westinghouse, Combustion Engineering, and Babcock & Wilcox. And then there were the boiling water reactor systems, which were built by General Electric. They were similar systems, but they were different.
Q. And back to, I think, my first question on GTCC waste, I'm not sure I got a complete answer to, you've described what the waste is. How was the issue of GTCC waste viewed by the nuclear industry in 1983 when the contracts were signed? Was this a significant issue, not a significant issue?
A. It was not a significant issue. It was understood and it's included as NS2 in the contracts as items that are known to be Greater-Than-Class-C, so the volume is relatively small, compared to the spent fuel itself, and it was not considered to be a significant issue, but it was believed to be covered.

Page 259

Q. And would that include the reactor internals that you also described?
A. Yes, it would.
Q. And how does, how is it that DOE's – well, strike that.
Let's turn now to what I believe may be the final exhibit we will look at today, Number 112, it's in your notebook, final exhibit you will look at, maybe not, with me anyway, 112 in your notebook. And let me ask you if you've seen this before, and if so, what is it?
A. Yes, I have. This is an annual capacity report issued by the Department of Energy in 1988, and it was required as part of the Nuclear Waste Policy Act to issue these annual capacity reports.
Q. And are these also referred to in the contract?
A. Yes, they are.
Q. Take a look at page three of this document. At the top of page three, there is a reference to – well, can we highlight this paragraph, please? 1.3.
There's a section, a small section,

Page 260

but a section nonetheless, that's titled, "The Annual Capacity Report Issue Resolution Process." Do you see that?
A. Yes, I do.
Q. What is that, or what was that?
A. We had identified a significant number of issues that we did not feel were completely taken care of in the contracts, "we" being the utility industry, and we had put a task force together identifying these particular issues, and we had invited the Department of Energy to participate with us.
And the Department of Energy did so, willingly, to try to work out these details of unresolved issues. And this was an indication, this, in this annual capacity report at this point, that that was an ongoing process.
Q. And can you see that this paragraph that I've directed your attention to addresses those matters?
A. Yes, it does, and it addresses the Utility Nuclear Waste Management Group which was under my responsibility.
Q. Now, let's take a look at page 10, where I think the same subject is also touched

Page 261

on, if you will, Section 4.1, which is actually referred to in the section we just looked at.
A. Yes.
Q. Are you there?
A. Yes, I am.
Q. And I guess, excuse me, let's look at the bottom of this paragraph on page 11, that was the reference I was looking for, the very last paragraph. It says, "DOE and the ACR response team are currently evaluating the issues presented at the meetings and plan to select a subset of the issues to begin the process of intensive study and evaluation. The next meeting has tentatively been scheduled for September 1988." Do you see that?
A. Yes, I do.
Q. And that was a process that, as reported here, the Edison Electric Institute and I guess this nuclear –
A. The nuclear waste management group.
Q. Was involved in that?
A. Was a part of, yes.
Q. Who was the particular point person on that, do you recall, from EEI at that time?

Page 262

A. There was several of us involved in that. I'm unable to say who the particular point person was at that point in time. It might have been Steven Kraft, but I would have to verify that was true. It might have been someone working for him, but it was an active item in our group.
Q. And did that process ever result in the resolution of the identified issues?
A. No, it did not.
MR. STOUCK: Your Honor –
THE COURT: PX-112, do you desire that be admitted as an exhibit?
MR. STOUCK: Yes, please.
THE COURT PX-112 is admitted.
(Plaintiff Exhibit Number 112 was received in evidence.)
MR. STOUCK: We've been going for about an hour-and-a-half. Could we take a short break?
THE COURT: Is this before passing the witness for cross-examination or not?
MR. STOUCK: I'm either close to being done or done.
THE COURT: Then I want to get you

Page 263

done because we're going to afford the break to when we pass the witness.
MR. STOUCK: May I confer then with my colleagues?
THE COURT: You may, something we normally do on cross.
MR. STOUCK: Your Honor, I believe the only item that I have for Mr. Mills, which may have already been covered, I guess it's really a question for the Court, whether PX-51, which is the report on financing, was admitted into evidence, and we would certainly like –
THE COURT: PX-51 was not admitted before, which we believe it was, it's admitted now.
MR. STOUCK: Thank you. Then I am done with Mr. Mills.
THE COURT: We'll resume at quarter past the hour. We are in recess until 3:15. The witness may step down.
(Whereupon, a short recess was taken.)
THE COURT: Good afternoon. Our witness continues to be Mr. Mills. The witness continues under oath. The cross-examination is by Mr. Lo Re. Cross-examination is limited to

Page 264

direct, the scope of direct. Mr. Lo Re?
MR. LO RE: Good afternoon, Your Honor.
CROSS-EXAMINATION
BY MR. LO RE:
Q. Good afternoon, Mr. Mills. My name is Alan Lo Re. I'm an attorney with the Department of Justice. Mr. Mills, the NWPA doesn't say anything about performance required before 1998, does it, under the standard contract?
A. No, it does not.
Q. And the standard contract that Pacific Gas & Electric signed, which is standard to all utilities, that's the same contract that all utilities signed for removal of their spent nuclear fuel, correct?
A. That is correct.
Q. That standard contract doesn't include a requirement that the utilities, excuse me, a requirement that performance begin prior to 1998, does it?
A. No, it includes January 31st, 1998 for all of the contracts, which were 60 to 70 contracts.

Page 265

Q. And so there is no statutory requirement or contractual requirement that DOE begin performance before 1998 under the standard contract, is there?

A. That's correct.

Q. Mr. Mills, you testified a little bit about the 1985 mission plan. Why don't we take a look at that?

MR. LO RE: I have it as DX-90, but I'm sure, Your Honor, it was moved in with a PX number, and we can get that for you in one second.

THE COURT: Thank you.

MR. LO RE: That's 82, PX-82.

BY MR. LO RE:

Q. Now, Mr. Mills, do you have a hard copy of that in front of you as an exhibit from your direct examination?

A. Only a portion.

Q. I think I may be moving the same portion that Mr. Stouck used. If you could turn to the table that's marked as II-3, please? And it's a little hard to read on the screen. I think you went through this with Mr. Stouck, but, Mr. Mills, this is the

Page 266

representation that DOE made that you believed represented something that met the intent of both the NWPA and requirements under the standard contract, is that right?

A. That is correct.

Q. Now, in the time that you were working for EEI, I believe you testified under direct examination that that was from 1976 to 1993?

A. That is correct.

Q. This is the only representation that you ever saw from DOE of a schedule that met what you believed were the requirements under the NWPA and the standard contract, correct?

A. I don't recall whether this was the only one or not. This was the primary one because it was the mission plan that was required by the Nuclear Waste Policy Act for the Department of Energy to describe what they were going to do. It was the primary thing.

Q. It was the primary representation of what you understood to be DOE's statutory and contractual obligations under the standard contract, is that right?

A. Yes.

Q. Mr. Mills, this schedule is illegal,

Page 267

is it not?

A. Excuse me, I don't understand the question.

Q. Is it legal, is the representations set forth in this chart legal?

THE COURT: If you don't have an answer, say that.

THE WITNESS: I don't know how to answer that.

BY MR. LO RE:

Q. Are you aware of whether or not Congressional action needed to take place in order for this schedule to occur, sir?

A. Yes, I am aware of that.

Q. And what was that Congressional action?

A. It would require them to approve going forward with a monitored retrievable storage facility.

Q. And at the time that this mission plan was issued, 1985, there was no authorization for monitored retrievable storage system, was there?

A. There was not an authorization for monitored retrievable storage facility. There

Page 268

was a requirement that the Department of Energy provide to Congress study of an MRS as part of the overall system. That was part of the original Nuclear Waste Policy Act.

Q. Right, sir. But my question was the MRS wasn't authorized, was it?

A. Not at this point, but you wouldn't have expected it to have been authorized at this point if you followed the sequence of things.

Q. Now, there's a reference here to a second repository, do you see that, sir, on the right-hand side?

A. Yes, I do.

Q. Now, and that second repository was to come on in what year, according to this schedule?

A. As I read it, according to this schedule, it would come on in year 2005.

Q. Now, in 1985, the second repository was not authorized by Congress, was it?

A. That is correct.

Q. Now, with respect to the MRS, you expected there to be a statutory change that would allow for the MRS, correct?

Page 269

A. Yes.
Q. And you expected there to be a statutory change that allowed for the second repository, correct?
A. No. I was not convinced personally. You're asking me a personal question, was I believing that. I wasn't sure we were going to have a second repository because the first repository, if you look at the list, would take care of our needs, so I was not convinced that we were going to have a second repository.
Q. But you believed that there would be an MRS?
A Yes, I did.
Q. Now, looking at this chart, Mr. Mills, on the right-hand side, there is, very far right, it says, "spent fuel backlog." Do you see that, sir?
A. Yes, I do.
Q. Now, when does that backlog start to get worked off?
A. According to this schedule or according to reality?
Q. No, according to this schedule, sir.
A. According to this schedule, it becomes

Page 270

a maximum – I'm having a little trouble with the fuzzy numbers here.
Q. It's not easy. I appreciate that.
A. It appears to be a maximum in about year 2005 or 2006
Q. And then the backlog is worked off after that?
A. Yes, but that's according to this schedule, which has a – I have a difficulty with that particular column and with the column number 2, which is spent fuel annual generated.
Q. Yes, yes.
A. Because that particular spent fuel generated value is significantly more, a higher number than we knew at that time it was going to be.
Q. Well, we may get to that, sir, but what I want to talk about now is the spent fuel backlog column, if you don't mind?
A. You can only get to the number in the last column, if you use the numbers that are in the first column.
Q. So I'm a little confused, Mr. Mills, you told me a moment ago, and I believe you said on direct examination that this chart

Page 271

represented what you thought was a depiction of DOE meeting its statutory and contractual obligation, is that right?
A. That is correct.
Q. And I asked you about the backlog and my question simply is, sir, how does this chart show that the backlog is worked off in order to meet the two-part test that you testified about on direct examination?
A. This chart does not show that, but if you take the information that's in column 4, column 5, column 6, column 7, column 8, and column 9, it does represent our understanding.
Q. So just to cut to the chase here, sir, are you saying that this chart does or does not represent DOE meeting its contractual obligation, yes or no?
A. Yes.
Q. And however, it's, if I'm – just to be clear, you're telling me that it is not clear on its face that it meets that obligation, is that right?
A. No, it does represent that, but the whole chart represents, covers more than their obligation by more than – it covers material

Page 272

that's not part of their obligation.
Q. And how about that spent fuel backlog, sir, when does that spent fuel backlog get worked off?
A. According to this table, it got worked off down in year 2029 or 2030.
Q. When does, and forgive me if I misspoke, when does it begin to get worked off? In other words, when does DOE, under this chart, start to take fuel, such to begin to work off the backlog?
A. In year 1998.
Q. And where is that reflected, sir?
A. We know that the amount of fuel generated by the utilities and the amount that was going to be generated by the utilities was between 2,000 and 2,500 a year. We knew that the amount that was taken by DOE according to column 4 in this particular chart was 3,000 metric ton per year, in that year. So if they were taking 3,000 metric ton a year in 1998, and we were discharging, the utilities were discharging from the reactor somewhere between 2,000 and 2,500, they would be starting to take off, take work off the

Page 273

backlog in year 1998.
Q. So is it fair to say, sir, that you are not relying on this chart, but instead – or the numbers depicted on this chart, you are imposing your own numbers on to this chart to infer that DOE was to meet its contractual obligations?
A. No, sir.
Q. Under the mechanisms set forth in this chart?
A. No, sir. I'm relying on this chart.
Q. Show me in the backlog where it's worked off, looking at that chart, sir, no other column, can you show me, looking at the far right column, spent fuel backlog, where the backlog begins to get worked off?
A. If I include all of the columns on this chart, which included the second repository, which wasn't a part of what we considered was going to really happen at that time, and it included what's in the first column of spent fuel discharge, which was a number that was generated by EIA, which is a division of DOE, which was a rather peculiar set of numbers, then the backlog starts working

Page 274

off when – here, I guess in year 2007 or 2008, but that's not what we expected to happen, not according to the numbers that are here.
Q. So in other words, sir, you can't show me on this chart, looking on the far right-hand column, spent fuel backlog, looking at the numbers on this chart, that the backlog begins to get burned off until 2005, is that right?
A. I cannot show it on this chart.
Q. Thank you. Now, Mr. Mills, you testified about performance beginning, on this chart that we were just looking at, before 1998; is that right?
A. Yes.
Q. And just so we're clear, that pre-1998 performance is not spelled out in either the Nuclear Waste Policy Act or the standard contract, is it?
A. No, but the standard contract call for 60 to 70 individual contract holders to have moved fuel to the Department of Energy by January 31st, 1998. How could that possibly be accomplished if you did not start before 1998?
Q. So, sir, the answer to my question is, "no," is that right?

Page 275

A. The specific answer, yeah, is no, but it's misleading.
Q. Thank you.
THE COURT: Let me advise that if you have a question that calls for a yes or no answer, give the answer, and if you need an explanation in order for it to be properly complete, ask if you can explain, and he'll say yes or no. And if he says no, then your answer is not satisfactory, your counsel for the Plaintiff will then pick it up on redirect.
MR. LO RE: Thank you, Your Honor.
BY MR. LO RE:
Q. Just so the record is clear, sir, so the answer to my question is no, is that right?
A. That is correct.
Q. Thank you. Mr. Mills, you're a paid consultant in this case, are you not?
A. Yes, I am.
Q. And Mr. Stouck's law firm is paying you, is that right?
A. That is correct.
Q. Now, during your tenure at EEI, sir, you were primarily responsible for industries related to the advocacy of nuclear issues, is

Page 276

that right?
A. That is correct.
Q. And during that, the time of the promulgation of the NWPA and the regulations that became the standard contract, EEI represented many privately owned nuclear utilities, correct?
A. That is correct.
Q. And I believe you testified about this on direct, you – strike that. I believe you testified on direct that EEI also administered a group called the utility, excuse me, nuclear waste management group?
A. That is correct.
Q. Also known as UNWMG?
A. Yes.
Q. And I have to confess that may be the most difficult acronym to say that I have ever run across.
A. UNWMG.
Q. I think you guys finally changed your name to make it a little easier to pronounce, as I understand. Now, you administered UNWMG on behalf of EEI, is that correct?

Page 277

A. On behalf of EEI and other utilities that were not members of EEI that were part of the UNWMG activity.

Q. And those were the utilities that you discussed with Mr. Stouck, they were investor owned utilities, such as PG&E, but also other utilities, is that right?

A. That is correct.

Q. Including, I think you said, was that Dairyland?

A. Dairyland was one of them, TVA was another on that, and there was the public power representatives also.

Q. And UNWMG supplied comments both to the draft NWPA and the standard contract, is that right?

A. That is correct.

Q. Now, as part of your duties at UNWMG and EEI, you were responsible for gathering comments by many utilities, is that right?

A. That is correct.

Q. And is it fair to say that UNWMG/EEI worked as a clearinghouse for comments from across the spectrum of nuclear utilities?

A. Yes, you could refer to it as a

Page 278

clearinghouse, but we also contributed.

Q. I understand. Did you consider yourself to be a spokesman for the utility industry, sir?

A. In many instances, that is correct, yes.

Q. In fact, Mr. Mills, I think you testified on direct examination that you prepared much of the testimony that utilities provided on Capitol Hill during the Congressional hearings that led to the NWPA, is that right?

A. That is correct.

Q And do you have a belief, sir, that it was largely through those efforts that Congress passed the NWPA?

A. I believe we were a significant contributor, yes.

Q. Mr. Mills, I'd like to show you a copy of the NWPA. Now, Mr. Mills, if you turn to – I apologize that these pages are not numbered. I am very sorry about that. If you turn to four pages from the back of this document, are you with me, sir?

A. I hope I'm on the same page.

Page 279

Q. And this is the page that starts with four, not later than 180 days?

A. I have that.

Q. Thank you. Now, if you turn down to Section 5 there, and just so the record's clear, we're talking about Section 302, the Nuclear Waste Fund, if you turn to the previous page, you'll see that, sir. Now, if you turn to the page we were just looking at a moment ago under Section 5, it says, "Contracts entered into under the section shall provide that," and there are two dashes, do you see that?

A. Yes, I see that.

Q. And under A, it says, "Following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel," and there's a semicolon. Do you see that?

A. Yes, I see that.

Q. Now, Mr. Mills, you interpret, if I understand your direct examination, your

Page 280

testimony under direct examination properly, you interpret that phrase to be the phrase that creates the obligation for DOE to meet the two-part test that you talked about on direct examination, is that right?

A. Yes.

Q. And just so the record is clear, that two-part test is that fuel will be accepted so that, as beginning in 1998, to meet the generation rate, plus begin to work off the backlog of spent fuel, is that right?

A. That is correct.

Q. Now, that language doesn't specifically say anything about the two-part test, does it?

A. No, it does not.

Q. You need to infer from that language that the two-part test is in existence, is that right?

A. This language does not achieve that, but the understanding that was in place when the contracts were signed did include that.

Q. And, again, sir, the answer – my question was, do you need to infer that, if one were to look at the statute, does one need to

Page 281

infer that the language, that the obligation
with respect to the two-part test is there?
A. Yes, you would have to infer it.
Q. Thank you. Mr. Mills, just a little housekeeping note, I'm going to be showing you documents, you unfortunately don't have the advantage of having a binder as you had with Mr. Stouck. What we're going to do is provide you with hard copies of all the exhibits that we show you.
And you are certainly entitled to look at either the screen in front of you or the hard copy that I am providing to you.
MR. LO RE: Your Honor, may I approach the witness?
THE COURT: You may.
MR. LO RE: Would the Court like to have hard copies of the exhibits we're providing to the witness?
THE COURT: Are they already in an exhibit?
MR. LO RE: Yes.
THE COURT: Well, then we're going to get them from the books we have, we have everything back here.

Page 282

MR. LO RE: Thank you.
THE COURT: As long as they're in there, we'll use them.
MR. LO RE: Thank you.
THE COURT: Thank you.
BY MR. LO RE:
Q. Mr. Mills, this is a document dated December 23rd, 1982 on UNWMG letterhead to the members of the steering committee, subject, "High-Level Waste Policy Act of 1982," and if you turn to the second page of this document, it's signed by Mr. – or I don't know if it is a mister, it is an R.E.L. Stanford, program manager. Mr. Mills, are you familiar with this document?
A. Yes, I am.
Q. And what is it, sir?
A. It is a distribution made by Russell Stanford, it is a gentleman, who worked directly for me. He was responsible for the activities at that particular time of the Utility Nuclear Waste Management Group. He was helping me with that, and this lists the members of that group.
Q. And the members are the members of the

Page 283

steering committee that's referenced on the To line, is that right?
A. No, the members – wait a minute.
Excuse me, the question was again?
Q. No, no. I just wanted a clarification, I'm sorry. When you said, "members of the group," were you referring to the members of the steering committee or the members of another group?
A. No, what I was referring to was the list of members along the –
Q. I see.
A. – left side of the page, which were the members of the Utility Nuclear Waste Management Group.
Q. The utility members?
A. Yes.
Q. Who were the members of the steering committee, if you know?
A. These would be individuals that had been identified with each of these companies as a member of the, representing the company in the UNWMG.
Q. I see. And this document went out with your approval, is that right?

Page 284

A. Yes, it did.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-12 into evidence.
THE COURT: Let me just ask you to ask a question that's about the document.
MR. LO RE: Certainly, Your Honor.
THE COURT: Thank you. And then we'll consider admission.
BY MR. LO RE:
Q. Mr. Mills, why was this document written, if you know?
A. Congress actually passed legislation on December 22nd, 1982, and we wanted to inform the members of the Utility Nuclear Waste Management Group that that had been achieved.
Q. And I see the letter starts out with all capitals and explanation point, "WE WON," is it fair to say that you were pretty excited about this victory on Capitol Hill?
A. Yes, we were. Yes, we were.
Q. And you were using this letter and the accompanying attachment to inform the members of what had happened on Capitol Hill with respect to the Act?

Page 285

A. That is correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-12 into evidence.
THE COURT: DX-12 is admitted.
MR. LO RE: Thank you, Your Honor.
(Defendant Exhibit Number 12 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, this document refers to, in the first paragraph, it says, "Enclosed is a copy of the Nuclear Waste Policy Act of 1982, as passed by both the Senate and the House on December 20th, 1982 and as printed in the Congressional record."
Then it says, "After the holidays, we will provide a section-by-section analysis of the new Act. For your use in the meantime, there is also enclosed a discussion of some of the highlights of the bill." Do you see that?
A. Yes, I do.
Q. And you were issuing this discussion of the highlights. Why, sir?
A. Just as information to the members.
Q. Now, if you go down under the second

Page 286

paragraph there, it says, "Important Features of the Act," do you see that?
A. Yes, I do.
Q. And there are four bullets on the first page and I believe four bullets on the second page, do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, feel free to take a look at these bullets for a moment.
A. Yes.
Q. Mr. Mills, none of these bullets mention that the two-part test that you discussed on direct testimony are included in the Act, do they?
A. That is correct.
Q. Could we look at DX-18, please?
Excuse me, I apparently have a mismarked exhibit. Let's look at DX-19.
MR. LO RE: May I approach, Your Honor?
THE COURT. Yes.
BY MR. LO RE:
Q. Mr. Mills, this is a letter written January 11th, 1982 from the EEI, signed by you to the members of the nuclear power executive

Page 287

advisory committee, do you see that?
A. Yes, I do.
Q. And is that your signature on the second page, sir?
A. Yes, it is.
Q. Do you recognize this document, sir?
A. Yes, I do.
Q. And what is it?
A. It was a document on which I was informing the members of the nuclear power executive advisory committee, which was a different committee than the UNWMG. This was the executive advisory committee of EEI, strictly investor owned electric utilities, and I was sharing with them the Nuclear Waste Policy Act information.
Q. And why were you doing that, sir?
A. For information, just to bring them up-to-date on what was there, what, excuse me, bring them up-to-date on what had happened.
Q. I understand. And the date on this says January 11th, 1982. If you turn to the second page of this document, you'll see it says January 11th, 1983. Do you see that?
A. Yes, and that was an error –

Page 288

Q. Okay.
A. – of '82 on the first page. It should have been '83.
Q. I make that mistake every beginning of the year myself. So the real date should be January 11th, 1983?
A. That is correct.
Q. And did you personally write this cover letter?
A. Yes, I believe I did.
MR. LO RE: Your Honor, the government at this time would move for the admission of DX-19 into evidence.
THE COURT: DX-19 is admitted.
(Defendant Exhibit Number 19 was received in evidence.)
BY MR. LO RE:
Q. Now, you'll see on the bottom of the first page here, it says, "Enclosed for your information are two items related to the Nuclear Waste Act and three items on safety goal policy." Do you see that?
A. Yes, I do.
Q. And let's look at the two items, on the second page are those two items related to

Page 289

the NWPA, that is, one, the highlights of importance to electric utilities of the Nuclear Waste Policy Act of 1982 prepared by UNWMG, and then two is view graphs obtained on January 10, 1983 that relate to the waste management legislation and the disposal fund.
Mr. Mills, I would like to talk about number one here, the highlights of importance prepared by UNWMG. And if you turn to the next page, I think you'll see those, there's a stamp date of January 6th, 1983.
A. Yes, I see that.
Q. Mr. Mills, were you responsible for putting together this document that is the highlights of importance?
A. I was involved with it and was my staff, my staff and I put this together, yes.
Q. Was that Mr. Stanford?
A. Mr. Stanford was involved, Steven Kraft was involved, and I'm not sure who others were involved. But, yes, Mr. Stanford and Mr. Kraft were involved.
Q. And can you tell me why you put together this document, sir?
A. It was an information item to help

Page 290

identify just what the highlights were of importance to the electric utilities.
Q So you were reporting back to the utilities as to exactly where the dust had settled after the NWPA was finally approved, is that right?
A. Yes.
Q. Thank you. Now, if you turn to the second page of the attachment, there's a heading that says, "Repository, title one, subtitle A," do you see that?
A. The second page of the –
Q Attachment, the number ends in 737.
A. All right. I am there.
Q. And under that heading, it says, "Repository," and then it says, "title one, subtitle A." Is that tracking the statute, do you know?
A. Yes, it is.
Q. Okay. Now, under the heading of, "Findings," if you roll over to the next page, the very top of the page says, starting with, "the generators," do you see that?
A. Yes.
Q. It says, "The generators and owners of

Page 291

high-level waste and spent fuel have the primary responsibility to provide for and the responsibility to pay the costs of the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by DOE." Do you see that?
A. Yes, I do.
Q. Now, that clause doesn't include any reference to DOE – strike that.
That clause doesn't include any reference to the monetary obligation being lifted from the utilities for spent fuel storage after January 31st, 1998, does it?
A. This phrase does not.
Q. Now, Mr. Mills, if you would turn to what is marked as Bates number 753, it's also page 18 of this document, under the heading, "Nuclear Waste Fund"?
A. Yes.
Q. Under the last, there's a plus sign there at the bottom, beginning of the paragraph, the last plus sign or bullet says, "DOE is authorized." Do you see that?
A. Yes, I do.
Q. It says, "DOE is authorized to enter

Page 292

into contracts with generators or owners of spent fuel or high-level waste for the acceptance of title, transportation, and ultimate storage or disposal of the waste or spent fuel. These contracts must provide that," then it goes on, "one, upon commencement of repository operation, DOE will take title to spent fuel or waste as expeditiously as possible upon request of the generator or owner," and I'll stop there for the moment.
Actually, I'll go on, and if we go to the next page, "two, in return for the payment of fees, DOE will dispose of such spent fuel or waste beginning 1/31/1998." Do you see that?
A. Yes, I do.
Q. Now, this statement that I read, this two-part statement that I read does not include any discussion that the contracts must provide that the two-part test that we discussed previously and that you discussed on direct examination is met, do they?
A. That is correct.
Q. By the way, before we go on, there's a reference here to – and I'm going back to page 18, under clause one, it says, "DOE will take

Page 293

title to spent fuel or waste as expeditiously
as possible." Is that really what the statute
said?
A. No.
Q. Do you know why this word is
"possible"?
A. A mistake.
Q. That's a mistake?
A. That's a mistake. It should have
quoted the bills directly, which I think is
"practicable."
Q. "Practicable," thank you. Now,
Mr. Mills, you testified on direct examination
about the design requirements for the
repository. Do you recall that testimony, sir?
A. Yes.
Q. And when were those design
requirements established? I'll ask a better
question. When were those design requirements
first discussed, to your knowledge?
A. It was before the completion of the
Nuclear Waste Policy Act. It was during the
period after the environmental impact statement
had been completed, and we didn't decide what
that date was, but I think it was 1979, and

Page 294

this 1982 date when the Act was passed, it was
during that period when they had conceptual
designs being worked up within DOE, was when
they had established that particular number of
3,000 metric ton per year.
Q. And to be clear, that number was
3,000, design requirement was 3,000?
A. That's correct.
Q. Mr. Mills, I'd like to look at DX-57
which is, I believe, a document you looked at
on direct examination. Mr. Mills, this is
the – I don't want to misstate what it is.
MR. STOUCK: Excuse me for one second,
Alan, I apologize. I do need a copy.
BY MR. LO RE:
Q. This is a memorialization of the
presentation that you gave to the Institute of
Nuclear Waste Materials Management, and the
date on this document is May 4th, 1983, but you
really provided it on May 5th?
A. That's correct.
Q. This is a fair depiction of what you
talked about?
A. Yes, it is.
Q. Mr. Mills, if you would turn to page

Page 295

four of the document, which is the number
ending in 128, under the title, "Allocation of
Delivery," do you see that?
A. Yes, I do.
Q. Now, this paragraph starts, "When DOE
opens its doors in 1998 or whenever, it will
have a limited capacity that needs to be
allocated over the contract holders. DOE may
be able to receive about 3,000 tons a year
during the initial operation," then it goes on.
That sentence, "DOE may be able to receive
about 3,000 tons a year during the initial
operation," that's what you said, correct?
A. That is correct.
Q. You didn't say there that DOE is
obligated to accept 3,000 tons per year, did
you?
A No, I did not.
Q. Now, if you go halfway down this
paragraph, and I think you talked about this
with Mr. Stouck, the sentence started with,
"once an annual allocation," do you see that,
sir?
A. Yes, I do.
Q. "Once an annual allocation is

Page 296

assigned, the contract holders will be
permitted to substitute other spent fuel and
swap allocations to mesh with operating needs."
Do you see that?
A. Yes, I do.
Q. Now, by that statement, you understood
that before swaps could occur, a particular
utility's allocations would have to be assigned
or authorized, correct?
A. That is correct.
Q. Now, I believe you testified about
this on direct examination, Mr. Mills, but it
was really almost immediately after the passage
of the NWPA that EEI and UNWMG began working
hard to assist, if you will, DOE in
promulgating the regulations that became the
standard contract, is that right?
A. That is correct.
Q. And you were contacting many utilities
across the country at this time, is that right?
A. That is correct.
Q. And I think you also testified that in
early January – strike that.
In January of 1983, you submitted
comments to DOE on the draft standard contract,

Page 297

is that right?
A. Yes, we did. Well, we did not have a draft standard contract. We submitted comments of what we believed should be in the contract.
Q. I see.
A. Before they actually came out with a draft standard contract.
Q. I understand. Thank you for that clarification. Could we look at DX-29, please?
MR. LO RE: If I may, Your Honor?
THE COURT: You may.
BY MR. LO RE:
Q. Mr. Mills, do you have the document before you?
A. Yes, I do.
Q. Mr. Mills, do you recognize this document?
A. Yes, I do.
Q. What is it, sir?
A. It was a transmittal that Steven Kraft, who worked directly for me, made to two people at the Tennessee Valley Authority, sharing with them what we had done in the prior 24 hours of marking up with annotation our view of that contract that we had received. This

Page 298

was a draft we had received after the January 19th meeting.
I mean, things were happening fast, so that it was right after the January 19th meeting that we received a copy of this draft. We spent a couple of days working on it, and then we're transmitting it to different people, and this is a letter transmitting it to TVA personnel.
Q. And when you said you – I believe you used the term what, "we had done in the prior 24 hours," and when you say, "we," who are you referring to, sir?
A. I'm talking about my staff and some consultants that we had assisting us at that time.
Q. And who were those consultants, if you recall?
A. Well, I know that one of them was Jay Silberg, and I'm not sure who else it was at this particular point.
Q. And what was, if you recall, what was your goal when you were drafting this or preparing this draft language?
A. Our goal was to share with the other

Page 299

utilities our views on how we believed, what we thought would make improvements to the draft contract, and I am not sure when we actually transmitted our comments to DOE at this particular point. Now, we had transmitted comments to DOE earlier than that, before we had this draft.
Then we shared with them some comments after we had this draft, and then they issued the February 4th draft in the Federal Register, and we subsequently had comments on that.
Q. So it's fair to say this was an iterative process that was going on?
A. Yes, it was.
Q. Mr. Mills, could you turn to the page that is marked 1325?
A. Yes, I have that.
Q. And it's under the heading IV.B, "DOE Responsibilities," do you see that?
A. Yes, I do.
Q. Now, if you could just go to paragraph four there?
A. Yes.
Q. This says, "DOE shall start accepting delivery of spent nuclear fuel and/or HLW not

Page 300

later than January 31, 1998, at not less than the annual rate SNF and/or HLW is being produced for purchaser's nuclear power plants specified in Appendix A." Do you see that?
A. Yes, I do.
Q. Mr. Mills, that is the first part of the two-part test that you discussed with me a moment ago and with Mr. Stouck on direct examination, correct?
A. Yes, and it also includes – it says, "not less than," which means more.
Q. Okay. So that includes the backlog as well?
A. Yes.
Q. So that encompasses, in your opinion, the two-part test that we've discussed?
A. Yes.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-29 into evidence.
MR. STOUCK: Your Honor, we object to this on a couple of different grounds. First of all, including the page that was just testified about, if you'd notice in the bottom right, this came out of TVA's files. I'm not

Page 301

sure this is all one document, number one, there's different type. There's two different sets of handwritings. And I believe that the gist, if you look at – I mean, let me take it slowly.

There's a document that starts on TV1318, which seems to be a draft of a contract. The fourth page, fourth – the fifth page in is different type, which seems to be an insert by somebody. The sixth page is in a third set of type with handwritten references, TVA, so I mean the objection is hearsay, number one, and authentication, number two

And I think that if – I wouldn't want to leave an impression that any or all of these – or certainly not all of these delineations and different typewritten pages were products of EEI's work, I think it's a little misleading in that sense, so that's not the evidentiary objection, but that's the concern.

If Mr. Mills or someone from TVA can tell us what this document, each page is, I just, -I can only notice the different types and different pages in the different

Page 302

handwriting, and it is hearsay

THE COURT: The colloquy at the pretrial wasn't as extensive as this last colloquy that we've just had. I did note that they were from TVA files, and we're not looking in, I think, as much detail. The witness has testified about, besides the ID of the top page, which is 1317, has only testified about 1325, and he appears to the Court to be a percipient witness about 1325. Am I missing something?

MR. STOUCK: Well, again, I don't know the answer to the question, but I would notice that – I mean, I don't know the answer to the following question, the page before is different type than 1325, I don't know the answer, but it may be that 1325 is TVA's comments. I mean, that's my, that's where I'm coming from.

THE COURT: Well, why don't we inquire of the witness? He recognized the first page, and he's commented on 1325 as if it were his position, as to the enclosure, but I – the top page is certainly – these are business records. No one's objected to that. They're

Page 303

'ancient documents, even if they were in TVA files, kind of where they'd be expected to be, since it was directed to TVA, so the document, or at least some portions of it, if we can get a coherent understanding of what we're looking at here –

MR. STOUCK: Yes, Your Honor. It is ancient, and I stand corrected on that statement.

THE COURT: Or the document, certainly, the top sheets can come in, and X the handwriting, unless someone can –

MR. LO RE: I understand that.

THE COURT: So someone needs to help the Court understand how part IV.B fits in to the rest of the document, since that's the one the witness is testifying about.

BY MR. LO RE:

Q. Mr. Mills, if you can turn to the first page of this document, it says, "Enclosed is a copy of the EEI marked up version of the DOE draft HLW/SNF contract." Do you see that?

A. Yes, I do.

Q. Then it says, "We began with the language we developed on Friday morning," I

Page 304

think we talked about that, "and then cut and pasted together a revised version of the contract, making changes based on the meeting last week." Do you see that?

A. Yes, I do.

Q. Now, looking at that sentence, does that indicate to you exactly how this document was put together, sir?

A. Yes, it indicates the frantic approach that we were making to try to get something into the hands of our members.

THE COURT: Just as we move forward, the Court notes on TV1324, TVP0041110, there's a total X out of parts B.1 and 2, then there's a caret that's in handwriting, which the Court is going to take notice of, not for the truth of the matter, but if it turns out to be true, because then there's, "see inserted pages," so we are looking at a cut and paste that appears.

MR. STOUCK: Thank you, Your Honor.

THE COURT. And then after that B, those two inserted pages, it picks up with some more X out. Okay.

BY MR. LO RE:

Q. And, Mr. Mills, does that comport with

Page 305

your understanding of how things were going in January of 1983?

A. Yes.

THE COURT: Back to the motion, I'm sorry to interrupt you, sir, but while I remember, DX-29 is admitted.

MR. LO RE: Thank you.

(Defendant Exhibit Number 29 was received in evidence.)

THE WITNESS: Yes, that is my understanding.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Thank you, Mr. Mills. Mr. Mills, do you recall that individuals from TVA represented to you that because the standard contract merely required that DOE begin acceptance of spent nuclear fuel and high-level waste no later than January 1998, that they may need to build dry storage facilities past 1998?

THE COURT: Before you answer that, are you offering this answer for the truth?

MR. LO RE: Yes, Your Honor.

THE COURT: And just how would you be doing that?

Page 306

MR. LO RE: Your Honor, Mr. Mills testified for, I think, at least three hours about how he was the mouthpiece for the industry and how he could represent what the industry was thinking at the time, and we think, given that Plaintiff has opened the door on that issue, that it is appropriate. I understand the concerns about hearsay, but I believe that it is appropriate to hear what industry members were telling Mr. Mills at that time about their understanding of what was and was not in the standard contract.

MR. STOUCK: It is hearsay, Your Honor.

THE COURT: True. I also believe that the door is open. You may answer the question.

THE WITNESS: I do not recall specific discussions with TVA on the issue as you described it.

BY MR. LO RE:

Q. Can we look at DX-44, please?

MR. LO RE: May I approach, Your Honor?

THE COURT: You may.

Page 307

BY MR. LO RE:

Q. Mr. Mills, this is a document dated March 2nd, 1983 from – I shouldn't say that. It is with the names W.F. Willis, general manager, and H.G. Parish, manager of power, and the Re line says, "Nuclear Waste Policy Act of 1982 Act, comments on draft contract between the Department of Energy, DOE, and utilities for disposal of spent nuclear fuel, SNF, and high-level radioactive waste." Now, Mr. Mills, if you would turn to the last page of this document, you'll see that under the attachments there, CC with attachments, there's an L.M. Mills. Do you see that?

A. Yes, I do.

Q. That's you, is it not, sir?

A. My middle initial is E, but I think that was me, yes.

Q. Now, Mr. Mills –

A. I do not recall this specific document, receiving this specific document, but I may have.

Q. Thank you. Now, Mr. Mills, if you look in the middle of that last full paragraph,

Page 308

starting with, "Both the Brown's Ferry"?

A. Yes.

Q. It says, "Both the Brown's Ferry and Sequoyah Nuclear Plants and probably the Watts Bar Nuclear Plant will have utilized all presently available spent fuel pool storage capacity before 1998. Also, as mentioned previously, DOE's draft contract commitment is merely to start accepting SNF and high-level waste no later than January 31, 1998. There are no stipulations as to the rate of acceptance in the draft, and there may not be any in the final contract which is offered for execution. For these reasons, we plan to continue our interim on-site spent fuel storage project activities." Do you see that?

A. Yes, I do.

Q. And, Mr. Mills, does that refresh your recollection as to what TVA was telling you about their plans and their understanding of what was and was not in the standard contract as of March 2nd, 1983?

A. Yes.

Q. Thank you.

MR. LO RE: Your Honor, the government

Page 309

at this time would move for the admission of DX-44 into evidence.

MR. STOUCK: Your Honor, I do object. It's hearsay, notwithstanding the testimony we just heard, but it may have been waived at this point in light of what he said about his initial.

THE COURT: He stated it refreshed his recollection. It doesn't say how it's refreshed, might want to follow that up.

MR. STOUCK: Refreshed doesn't mean the document comes in, Your Honor.

THE COURT: We're going to – that's my point.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Mr. Mills, how does it refresh your recollection? Strike that. Thank you. Does what I just read comport with your understanding, looking at this document, as to what TVA's understanding was in March of 1983?

A. Yes, it is. Yes, it does.

Q. Thank you. And that –

THE COURT: I'm going to admit DX-44,

Page 310

based on that.

(Defendant Exhibit Number 44 was received in evidence.)

MR. LO RE: Thank you, Your Honor.

THE COURT: DX-44 is admitted, if that's the language you're trying to find in the transcript.

MR. STOUCK: Thank you, Your Honor.

BY MR. LO RE:

Q Now, Mr. Mills, staying with the theme of TVA, do you recall discussions with TVA after the issuance of the final draft of the standard contract about what was and was not accepted into the standard contract?

A. I know during the month of May '83, which was after the contract was issued on April 18th, that we held a meeting in our offices with many utility representatives there to discuss the elements. I don't recall whether Tennessee Valley Authority was at that particular meeting.

Q. Do you recall TVA officials ever representing to you that their request that the contract should at a minimum state that DOE shall start accepting spent nuclear fuel and

Page 311

high-level waste in 1998 at a rate not less than which it was being produced by the civilian radioactive power industry was rejected by DOE?

A. Excuse me, I'd like to have that read back.

Q. Sure. I apologize for that. I got halfway through that question and realized it was not –

THE COURT: Let me just ask, can you see it on your screen?

THE WITNESS: It's not on here.

THE COURT: That's okay. Go ahead.

BY MR. LO RE:

Q. Do you recall in the May 1983 time frame anybody from TVA representing to you that they had made a request for the two-part test and that DOE had in fact denied that request?

A. No, I was not aware of that.

Q. And when I misspoke, I meant to say May of 1983. Is your answer the same?

A. Yes, I had assumed that was the '83 time frame.

Q. Thank you. Let's look at DX-64.

MR. LO RE: Your Honor, I'm going to

Page 312

show this to the witness to refresh, I'm not planning to publish this document right now.

BY MR. LO RE:

Q. Mr. Mills, this is a document dated May 24th, 1983, with the names Eric Kvaven, chief nuclear procurement branch, and Alan T. Mullins, director of fuels. The Re line is, "Requisition For Contract With DOE Required By the Nuclear Waste Policy Act of 1983." Mr. Mills, are you familiar with this document?

A. I do not recall seeing this document before.

Q. Now, Mr. Mills, if you could turn to the third page under, "Comment," do you see that?

A. Yes.

Q. It says, "The contract should, as a minimum, state that DOE shall start accepting delivery of SNF and high-level waste in 1998 at a rate not less than that at which it was being produced by the civilian nuclear power industry as a whole."

A. Excuse me, I'm not with you on that page, which page, is this 1469 or –

Q. I'm sorry, it's 1471. I threw you off

Page 313

by saying number three. I bet there are several number threes. It's TV1471.

A. I am there now.

Q. Thank you. And under, "Comment," it says, "The contract should, as a minimum, state that DOE shall start accepting delivery of SNF and high-level waste in 1998 at a rate not less than that at which it is being produced by the civilian nuclear power industry as a whole. It should also provide for acceptance within a reasonable time thereafter of the backlog of SNF and high-level waste then in existence on a schedule consistent with decommissioning plans for individual nuclear power plants." Then under, "Response," it says, "DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and high-level waste in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue not later than January 1, 1987 an annual capacity report for planning purposes and, beginning April 1, 1991, annual acceptance

Page 314

priority rankings, the oldest SNF and HLW having priority for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal program plans and cost projections." Now, Mr. Mills my question is, looking at this document, does this refresh your recollection that as of May 1983, representatives from TVA indicated to you that they had asked for the two-part test, that the two-part test had been rejected, and that indeed DOE had provided a provision whereby APRs and ACRs would be issued under the contract?

A. I had not seen this document before. When you read it, you inserted the word, "other than July 1st, 1987," you used a different date when you read it.

Q. I'm sorry, I bet I did. I'll hear about that from my colleagues too.

A. This does convey that they asked for, in their comments to the draft contract, asked for that particular thing to be included in the contracts. The Edison Electric Institute comments had also asked for this, and I would

Page 315

not be surprised if you found other documents from other utilities that also asked for this same sort of a element within the contract, and DOE did not acknowledge that one.

Q. It says DOE did not accept TVA's suggestion. Does that comport with your understanding?

A. That is correct.

Q. Can we look at DX-35, please, okay, Mr. Mills?

A. Yes.

Q. Thank you Mr. Mills, this is a document that I've just put before you marked as DX-35, with the Edison Electric Institute letterhead, dated February 18th, 1983, signed by a Steve Kraft, nuclear program manager.

A. Yes.

Q. Did we discuss Mr. Kraft earlier?

A. I had mentioned his name before. He worked for me, yes.

Q. Thank you. And do you recall this document, sir?

A. Yes, I do.

Q. What is it, sir?

A. This was a document to transmit to the

Page 316

members of the nuclear fuels committee, who recognized that within Edison Electric Institute, where we had a lot of different utilities, we had a lot of different committees. You had asked me about a transmittal that we made to the nuclear power executive advisory committee a few minutes ago, and this is simply another transmittal to a different group, a nuclear fuels group, on February 18, that includes comments that we were recommending at that time to be submitted to DOE by the March 7th or March 10th date, I believe it was March 10th date, as our comments on that draft contract.

Q. And just so we're clear, you were doing this, you were providing this memorandum and attachment to the nuclear fuels committee, why, sir?

A. To provide them with the information that we had at that time, so that they in turn could proceed with their own comments. We were sharing our comments with our member companies as they were preparing their own comments. It was a shared arrangement at that particular

Page 317

time.
Q. And to your knowledge, this was the most up-to-date information that you had as of February 18th, 1983?
A. As of February 18th, but the way things were going at that particular time, I think there were other transmittals.
Q. Understood, understood. And were you responsible for the information that was included in this exhibit, sir?
A. I would accept responsibility. Steven Kraft worked for me, and we were working as a team, and I recognize what's here, yes.
Q. Thank you.
MR. LO RE: Your Honor, the government would move for the admission of DX-35 into evidence.
THE COURT: DX-35 is admitted.
(Defendant Exhibit Number 35 was received in evidence.)
BY MR. LO RE:
Q. Now, if you look at the first paragraph – excuse me, the first page of this document, on the third paragraph, it starts with, "Our comments track the draft contract

Page 318

article-by-article."
A. Yes.
Q. And it says, "Our comments track the draft contract article-by-article with no attempt made to highlight major issues. These we consider to be," is that a typo, sir, do you know, should that be an attempt?
A. No.
Q. Okay. That's fine.
A. We didn't try to characterize which ones were the major documents.
Q. Got you. Okay. Thank you. Now, if you turn to the next page, it says, "Other significant issues addressed in the comments are," and then the last, there are four bullets there?
A. Yes, I see them. There are five.
Q. Thank you. That last bullet says, "Repository receiving rate adequate to cover current generation, plus working off the backlog on a reasonable schedule." Do you see that?
A. Yes, I do.
Q. Now, that is the two-part test that we discussed?

Page 319

A. Yes, it is.
Q. And that was part of the comments that you included to the draft standard contract, is that right?
A. That is correct.
Q. Now, if you could turn to the attachment here, sir, which begins – it is the, I believe it's the draft comments on DOE waste disposal contract starting on page three. The first heading is, "Identification of Parties," and below that, it says, "Whereas Clauses," do you see that?
A. Yes, I see that.
Q. And then if you go to the next page, under the whereas clause heading, it says, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/high-level waste at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." It goes on to say, "We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus their reasonable share of the backlog." Do you see

Page 320

that?
A. Yes, I do.
Q Then it goes on and says, "While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs." Do you see that?
A. Yes, I do.
Q. Now, below that, there is a proposed whereas clause. Do you see that?
A. Yes, I do.
Q. Now, that whereas clause says as follows: "Whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste." Do you see that?