Page 321

A. Yes, I do.
Q. Now, ultimately, Mr. Mills, the whereas clause that you requested was not incorporated into the contract, correct?
A. No, it was not, but recognize the date you're talking about here. This was our drafting as of February 18th. Our comments went to DOE on March 10. I am not positive that this is exactly the comment that we made to DOE. It may have been, but things were changing so rapidly, there may have been some word changes, but the concept was the same. And DOE did not accept that comment, and they didn't comment on it either.
Q. But they did not accept the whereas clause that you provided?
A. No, they did not.
Q. Thank you. Mr. Mills, I'd like to show you another document. This is DX-2.034. Mr. Mills, this is a document dated March 7th, 1983 to Robert Morgan, project director, Nuclear Waste Policy Act project office of the Department of Energy, on EEI letterhead, and this document is signed by John J. Kearney. Am I pronouncing that name right, sir?

Page 322

A. He pronounces it as Kearney.
Q. And did you work with Mr. Kearney, sir?
A. Mr. Kearney was my immediate supervisor.
Q. Did you prepare this document, sir?
A. Yes, I did.
Q. When did you prepare it?
A Probably on March 6th or even March 7th.
Q Late that evening, maybe?
A. Yes.
Q Why were you transmitting this letter, sir?
A. This was in direct response, these were our official comments, direct response to the Federal Register notice of February 4th, requesting comments on the proposed contract.
MR LO RE: Your Honor, at this time, the government would move for the admission of DX-2.034 into evidence.
THE COURT: DX-2.034 is admitted.
(Defendant Exhibit Number 2.34 was received in evidence.)
THE COURT: It's actually 2.34, no

Page 323

zero.
MR. LO RE: Excuse me, Your Honor, I've got a vestige from another trial.
THE COURT: DX-2.34 is admitted.
MR. LO RE: Thank you.
BY MR. LO RE:
Q. Now, Mr. Mills, I'd actually like to start with the attachment here, and that is attachment A, dated March 7th, 1983, and it says below, "Detailed comments on DOE draft disposal contract," do you see that?
A. Yes, I do.
Q. And then below that, it says, "in identification of parties," and then the first heading after that is, "Whereas Clauses," do you see that?
A. Yes, I do.
Q. Now, if you could turn to the next page, under the heading 2 or number 2?
A. Yes.
Q. I won't bore you with reading that into the record, but could you look at that and tell me whether that is identical to the language I just read a moment ago when I was reading from Exhibit DX-35, which was your

Page 324

February 18th draft comments?
A. The essence is there. I would have to look at it word-for-word to see if it's identical.
Q. I understand.
A. The same reference is there, yes.
Q. Same reference there. And then the same, the next page is the whereas clause, the proposed whereas clause?
A. Yes.
Q. And –
A. And whether it's exactly as it was in the February 18th draft, I'm not sure whether there's a change or two, I'm not sure.
Q. I'll read that one into the record. "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and

Page 325

waste."
First, is that the same language, to your recollection, of what was in the original draft comment?
A. Word-for-word, I don't know, but the essence is there.
Q. The essence is there?
A. Yes.
Q. Thank you. And this is the official proposed whereas clause?
A. This is what we transcribed.
Q. And this clause was not adopted by DOE, is that right?
A. No, it was not.
Q. Now, Mr. Mills, let's turn back to the cover letter here, and the cover letter is some eight pages long. Was there a particular sentiment that you were getting across to DOE in this cover letter, if you recall?
A. I have not read this cover letter recently.
Q. That's fair enough. Now, if you could turn to page seven, which is the last page of the cover letter – excuse me, page eight, starting with "although"?

Page 326

A. Yes, I see that.
Q. It says, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent – DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included." Then it goes on to say, "nor does the contract commit DOE to accept any given quantity of SNF/HLW." Did I read that correctly, sir?
A. That is correct.
Q. Now, halfway down the paragraph, it starts with, "we recognize."
A. I see that.
Q. The letter continues, "We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated. We would therefore strongly urge that DOE meet with purchasers to negotiate a

Page 327

mutually acceptable solution to these open issues." Do you see that?
A. I see that, yes.
Q Now, Mr. Mills, when you drafted this language, you were representing to DOE that there were issues with respect to acceptance rates that you wanted to discuss after the contract was promulgated through the regulation, correct?
A. With regard to the acceptance rates and other items.
Q. Thank you. And in fact, Mr. Mills, you did engage in that rulemaking process after the contract, did you not?
A. We initiated discussions. We did not actually engage in rulemaking petition, but we had discussions and had an issue resolution group working on that.
Q. Okay. That's fair enough. So you kept the lines of communication open after the contract was signed?
A. That is correct.
Q. Now, Mr. Mills, I'd like to show you PX-60, and that is the big document. I believe you looked at excerpts of it with Mr. Stouck.

Page 328

A. Yes, as I recall, this is 400 pages.
Q. Now, we know why we used excerpts, Mr. Stouck used excerpts. Thank you. Now, Mr. Mills, I believe you testified on direct examination that this was a transcription of the meetings that occurred or proceedings that occurred in December 1983 after the standard contract was promulgated and signed by the utilities, is that right?
A. That is correct.
Q. And you attended those meetings?
A. Yes, I did.
Q. And in fact, you spoke at the meeting, did you not?
A. Yes, I did.
Q. And I think you said on direct examination that you were there for the entire meeting?
A. Yes, I was.
Q. And your understanding was that this was a transcript of everything that was said at that meeting, to the best of your understanding?
A. To the best of my knowledge, it is.
MR LO RE: Thank you. Your Honor,

Page 329

the government would move for the admission –
THE COURT: After you chat with him about something that's not inside PX-61.
MR. LO RE: I'm sorry, Your Honor?
THE COURT: After you discuss something with him –
MR. LO RE: Okay. Thank you.
THE COURT: – beyond the title page, which we've already seen.
MR. LO RE: I appreciate that, Your Honor.
BY MR. LO RE:
Q. Mr Mills, if you could turn to page, it's 31 of the document number, and I believe it ends in 619 on the Bates number.
A. Yes, I have that page.
Q. Thank you. Now, Mr. Mills, this is a proceeding statement that's stated, "Nuclear Waste Fund management, Loring Mills, vice president, nuclear activities, Edison Electric Institute." Do you see that?
A. Yes, I do.
Q. This is really a transcription of the presentation that you made at the meetings that occurred between December 12th and December

Page 330

15th, 1983, correct?
A. That is correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of the entirety of DX-60 into the record.
MR. STOUCK: Well –
THE COURT: We're still waiting for you to talk with him about the exhibit.
MR. LO RE: I'm happy to do that, Your Honor, whenever you want me to move it in.
BY MR. LO RE:
Q. If we look at the right-hand column here, there's a paragraph that starts, "There are some who are concerned," and before I talk specifically about this, you were addressing the import of the standard contract and the NWPA at this meeting, isn't that right?
A. Yes, and I had been requested to focus on the nuclear fund management.
Q. And the nuclear fund management is that part of what was Section 302 of the Nuclear Waste Policy Act?
A. I would have to check back to see if it was.
Q. Okay.

Page 331

A. But it was in the Nuclear Waste Policy Act, just which section, I'm not sure.
Q. Okay. Thank you. Now, Mr. Mills, you said at this meeting, "There are some who are concerned about the equity associated in the contracts, but we are pleased to have them. They provide the lubrication to get the job done. We were never really under an illusion that we would get a fair and equitable contract with DOE with firm commitments and detailed performance standards with penalties for nonperformance. We were not really looking for that. However, there were many concerns expressed by the utilities that were not resolved, as we believe, equitably during the contract generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rulemaking to achieve a more reasonable understanding on several issues." And it goes on to say, "The money question is not involved. It is a matter of some of the performance assurances to include some of the things we heard this morning, which

Page 332

are not embodied in the contract." Do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, when you made this statement, you were representing that this would be a continuing negotiation between the DOE and the utilities, even after the standard contract was initiated, was signed, isn't that right?
A. I wouldn't characterize it as a negotiation, but we certainly were in discussions with them to determine if we needed a petition for rulemaking.
Q. And the reason you wanted to continue with those discussions, vis-a-vis the possibility of a petition for rulemaking, was that there were certain issues that weren't resolved during the note and comment period, right?
A. That is correct.
Q. And one of those issues included the acceptance rate for spent nuclear fuel, correct?
A. I do not believe that was one of the unresolved issues that was included in our

Page 333

discussions as I talked to them, talk about it here. There were many others, but whether it was – I do not recall it being the one with regard to rate because we believed that we had the rate determined.

Q. Certainly, performance standards was something –

A. Yes.

Q. – that you wanted to discuss with them?

A. Yes.

Q. And acceptance rate is a performance standard, is it not?

A. It could be a performance standard.

Q. Thank you.

MR. LO RE: Your Honor, I am going to move on to another topic.

THE COURT: Okay. Then let's ask for the admission of –

MR. LO RE: Thank you, Your Honor.

THE COURT: – this exhibit before we go on.

MR. LO RE: Thank you. The government moves for the admission of DX-60 into evidence.

MR. STOUCK: Your Honor, we certainly

Page 334

have no objection to Mr. Mills' statement, but just for parallelism, there are a bunch of other portions of this.

THE COURT: We're moving an exhibit in, and then you're going to come up on –

MR. STOUCK: There's statements of other people in here, and I thought you said before, we weren't admitting any of the 400 pages that didn't get talked about.

THE COURT: They're coming in. I can just disregard it if it isn't discussed.

MR. STOUCK: Oh, okay.

MR. LO RE: Thank you, Your Honor, and for the record, it's PX-60.

THE COURT: Thank you, so PX-60 is admitted.

(Plaintiff Exhibit Number 60 was received in evidence.)

MR. LO RE: Thank you, Your Honor. I am about to –

THE COURT: Moving on.

MR. LO RE: I am about to move on to another topic. If the Court prefers, we can take a break or just continue to move on, unless Mr. Mills would like to take a break.

Page 335

THE COURT: Mr. Mills, it's your call.

THE WITNESS: I would like to take a break, please.

THE COURT: Let's try for eight minutes. Return in 5 minutes to 5:00.

(Whereupon, a short recess was taken.)

THE COURT: Continue.

MR. STOUCK: May I raise a brief housekeeping matter, Your Honor?

THE COURT: Yes, in just a minute. We continue with the cross-examination of Mr. Mills, and the witness continues under oath. What is the issue?

MR. STOUCK: Well, just first time it came up in this trial, we did not have any discussion with Mr. Mills during the break, some courts have a pretty firm rule to that effect during cross-examination, and I just wanted to inquire whether the Court has that kind of a rule because we didn't want to be the only ones not talking to the witnesses during cross, if the Court's a little bit indifferent about that.

THE COURT: The Court is interested in the views of the parties.

Page 336

MR. LO RE: Your Honor, our understanding of the sequestration Rule 615 precludes not only discussions among witnesses, but also discussions to witnesses while they are on the stand

THE COURT: The Court doesn't have a firm view of this, although I think that the main point is that both parties be doing the same thing.

MR. STOUCK: That's my point. Why don't we discuss it after today?

THE COURT: Well, we can discuss it at the end of the evening, but since someone does have a view, and your view is that they ought to be doing the same thing, we'll go ahead and decide that we won't be having conversations that are substantive during the different cross and direct with counsel.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q Mr. Mills, we talked a little bit before the break about the rulemaking process. I'd like to show you what's been marked as DX-88, please. Mr. Mills, this is a document dated March 18th, 1985, with the heading,

Page 337

"Memorandum in Support of Petition For Rulemaking," and it is an unsigned document for the signature of Mr. Kearney. Mr. Mills, are you familiar with this document?

A. Yes, I recall this document, but it has been a long time since I'd seen it.

Q. Were you involved personally in preparing the memorandum in support of petition for rulemaking?

A. I personally was not, but my staff was that was working for me.

Q. Okay. And so ultimately, were you responsible for making contributions to this document?

A. Yes, I was.

MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-88 into evidence.

THE COURT: Again, if you would just learn whether the witness has anything to say on this –

MR. LO RE: Sure.

THE COURT: – that either supports or makes less likely a fact that could be an issue in the case.

Page 338

MR. LO RE: Sure.

BY MR. LO RE:

Q. Mr. Mills, if you would turn to – before we do that, do you recall why you were engaging in this effort in March of 1985?

A. Well, yes. As we had expressed in earlier communications, there were elements of the standard contract that needed further resolution.

Q. And –

A. And this was a mechanism for achieving those.

Q. I understand. And is this a follow-on to the discussions that, the comments that you made at the December 1983 symposium?

A. Yes.

Q. Okay Thank you. Do you know whether these comments were ever submitted?

A. They were not.

Q. They were not?

A. They were not.

Q. Now, Mr. Mills, if you would turn to B, part B, which is on page six of this document, the heading is, "The contract should include," do you see that?

Page 339

A. Yes, I see that.

Q. "The contract should include additional performance standards by which DOE's progress may be evaluated." Now, again, this is among the issues that EEI believed should be addressed as part of the initiation of the rulemaking process, is that right?

A. That is correct.

MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-88.

THE COURT: DX-88 is admitted.

(Defendant Exhibit Number 88 was received in evidence.)

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Now, Mr. Mills, if you could turn to page eight of this document, starting with the paragraph that says, "while the contract," do you see that?

A. Yes, I see that.

Q. It says, "While the contract is very clear in establishing the purchasers' obligation to make payments, it is correspondingly silent on the standards for

Page 340

DOE's performance in accepting spent fuel from purchasers. If DOE fails to commence receipt of significant amounts of spent fuel by January 31, 1998, the purchasers – including many of the members of EEI/UNWMG – could be subject to substantial expense and considerable operational constraints.

The contract also fails to address the interim milestones established by Congress for repository development." Then below, the next paragraph says, "Accordingly, EEI/UNWMG proposes that DOE provide for a minimum receiving rate of SNF – an annual receiving rate not less than the rate at which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a 10-year period.

Furthermore, the contract should reflect the performance milestones set by Congress for repository development." Do you see that?

A. Yes, I do.

Q. And that was your understanding – excuse me, and that comports with your understanding of what EEI was asking or

Page 341

considering asking DOE to do at that time?
A. Yes.
Q. Now, Mr. Mills, this is a variation, if you will, on the two-part test that we discussed today, isn't that right?
A. Yes.
Q. And when I say, "variation," I mean on the one hand, it is now you're receiving at the minimum rate that is being discharged, but now, you're working off the entire backlog in 10 years, is that right?
A. That is what was stated here, yes.
Q. If we could turn to DX-111, please? Mr. Mills, this is a document dated April 28th, 1987 from UNWMG to Christopher Jedrey, contracting officer, U.S. Department of Energy, signed by Mr. Kraft. Are you familiar with this document, sir?
A. Yes, I am.
Q. And how are you familiar with it, sir?
A. Steven Kraft reported directly to me, and it was a document that was transmitted, seeking guidance from the Department of Energy at that time.
Q. And were you ultimately responsible

Page 342

for the material that is set forth in this transmittal letter?
A. Yes, I am. Yes, I was.
Q. And why were you making this request to DOE at this time?
A. Well, I have not looked at this particular document in some time, so that I would have to review this before I would identify why we were specifically asking them at this point.
Q. Okay. But do you recall that you were making a request in 1987?
A. Yes, we were.
Q. If you could turn to the second page of this document, under A, it says, "The contract should be interpreted, clarified, or amended to include additional performance standards by which DOE's progress may be evaluated." Do you see this?
A. Yes, I do.
Q. Now, looking at that heading, does that refresh your recollection as to why you were providing these comments to DOE at this time?
A. Partially so.

Page 343

Q. How is that, sir?
A. Because we had an ongoing consideration, as you saw in the prior document, which was dated back in March of 1985, an ongoing consideration of issue resolution, and this was just another step of that issue resolution process, where we had a back and forth between ourselves and DOE. I'm trying to get resolution with some of these issues.
Q. And, again, when you say, "I'm trying to get," this is something that you were involved and ultimately responsible for on behalf of UNWMG?
A. That is correct
MR. LO RE: Thank you. Your Honor, at this time, the government moves for the admission of DX-111 into evidence.
THE COURT: DX-111 is admitted.
(Defendant Exhibit Number 111 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, under heading A, three-quarters of the way down that paragraph, it says, "The performance standards should be

Page 344

based on DOE's rate of receiving spent fuel. The requirements of Article IV, Section B, paragraph 1, should be interpreted, clarified, or amended to include the following."
Then it says, "Commencing no later than January 31, 1998, DOE shall accept SNF at an annual rate not less than the annual rate at which SNF is being discharged from civilian nuclear power reactors. Subject to this and other such contracts with DOE, by no later than January 31, 2008, DOE shall have accepted all SNF which has been discharged from such reactors and has been stored for at least five years." Do you see that?
A. Yes, I do.
Q. And that was a request that you were making at that time of DOE?
A. Yes.
Q. Mr. Mills, do you know whether that request was accepted?
A. There was no resolution to any of these issues that we were dealing with on issue resolution because the program simply was not progressing in a way that would allow any of the issues to be resolved.

Page 345

Q. So the answer to my question is this request was not accepted?
A. That's correct, it was not accepted.
Q. Thank you. Now, Mr. Mills, you were a member of something called ACORD?
A. That is correct.
Q. And can you describe for the Court what that is, sir?
A. Let me see. The acronym meant American Committee on Radioactive Waste Disposal.
Q. And that was a group that consisted of?
A. Chief executive officers of several nuclear utilities, utilities that had nuclear power plants.
Q. And what was the mission of that group?
A. The mission of that group was to provide the overall – they were the senior group to provide overall guidance to us, the rest of us and to other utilities, on the nuclear waste issue and to interface with the DOE, which we did.
Q. Now, what was your role in ACORD, sir?

Page 346

A. I was the staff person for that particular group, and when you mean staff person, I arranged the meetings, I set the agendas, I transmitted all the documents that related to ACORD.
Q. And did you do substantive work on ACORD, did you brief them on issues?
A. Absolutely, yes.
Q. And advise them?
A. Yes.
Q. Mr. Mills, I have just handed you what's been marked as DX-236. This is a document that is entitled, "ACORD HLW goals for mid-1993," and on the lower right-hand section, there is a date that says 12/3/1992. Do you see that?
A. Yes, I do.
Q. And there are several pages behind, and three or four, three pages in, there's a chart that says, "Rulemaking," and then below there, there's a date of 8/7/92. Do you see that?
A. I do not yet. What page?
Q. It's the number ending in 349.
A. I am there.

Page 347

Q. Thank you.
A. And what were you pointing to there?
Q. The date on there is 8/7/92, do you see that?
A. Yes.
Q. Mr. Mills, are you familiar with this document?
A. Yes.
Q. And what is it, sir?
A. This was a document that was prepared as background information for ACORD on the goals that they were trying to achieve.
Q. And were you involved in producing this document?
A. Yes, I was.
Q. What was your involvement, sir?
A. I wrote it.
Q. Thank you.
MR. LO RE: Your Honor, at this time, the government moves for the admission of DX-236 into evidence.
THE COURT: DX-236 is admitted.
(Defendant Exhibit Number 236 was received in evidence.)
BY MR. LO RE:

Page 348

Q. Now, Mr. Mills, why was ACORD considering rulemaking as of the end of 1992?
A. As I indicated earlier, we had been considering the rulemaking question since 1983 and had not gone forward with it, and the question then was raised here in 1992 as to the fact of whether we should or should not proceed with the rulemaking.
Q. If you could turn to the fourth page, which is the page ending in 349, do you see that?
A. Yes, I do.
Q. Under rulemaking, it says, "Industry Goals," do you see that?
A. Yes, I do.
Q. If you look on the left-hand side under, "DOE performance," number five, it says, "Establish a minimum spent fuel acceptance rate," do you see that?
A. Yes, I do.
Q. And that was one of the issues that ACORD was looking at, at this time, correct, that is this document is dated 8/7/92?
A. That is correct.
Q. Thank you. Now, Mr. Mills, you

Page 349

testified on direct examination that the 1985 mission plan was the document that you thought represented a depiction of DOE's contractual and statutory obligations, isn't that right?
A. That is correct.
Q. Was the industry of the opinion that that document was a binding obligation upon DOE?
A. It was certainly DOE's position at the time they issued it as to how they were going to proceed with their program.
Q. But I'm wondering, sir, did you believe, or did the industry believe that that document, the 1995 mission plan, represented a contractual obligation on the part of DOE?
A. No, I did not.
Q. Thank you. In fact, Mr Mills, during the rulemaking process, before the promulgation of the standard contract, the utility industry had asked that the mission plan become a contractual obligation, isn't that right?
A. I do not recall. I'd have to go back and look at our 52 pages of comments to see if that was one of the things we asked for. At this point, I do not recall that statement.

Page 350

Q. Okay. Why don't we look at it?
THE COURT: What exhibit are we on?
MR. LO RE: This is Defendant's Exhibit 2 0, Your Honor.
BY MR. LO RE:
Q. Mr. Mills, this is a transcript of a hearing on the standard contract dated March 3rd, 1983, at the Forrestal building. First, Mr. Mills, do you recall this hearing.
A. Yes, I do.
Q. Were you in attendance?
A. This was a public meeting. I don't believe you could call this a hearing. This was the public meeting that was required as part of the rulemaking process.
Q. Okay. And you attended this meeting, is that right?
A. Yes, I did.
Q. Now, I believe Mr. Draper from EEI provided testimony there?
A. Lynn Draper was a senior vice president of Gulf State Utility Company at that time, and he presented our particular comments at that particular meeting, yes.
Q. Okay.

Page 351

A. When I say, "our comments, "the EEI and utility comments.
Q. I understand. Now, there's a reference here also on page eight, that's the Bates number that ends in 08, by Mr. Michael Cooke, vice president of contracts, fuels, and corporate development for Florida Power & Light?
A. Yes.
Q. Do you know who Mr. Cooke is?
A. Yes, I knew Mr. Cooke.
Q. And was FP&L a member of EEI and UNWMG?
A. Yes, they were a member of both.
Q. Now, if you look at the page, page ending in 9, you'll see Mr. Cooke, the middle of the paragraph, that's line 12, it says, "And in fact, if any inconsistencies exist between the previous comments I made and those that you will be receiving from EEI/UNWMG, I would actually give preference to the EEI version, since they do represent the industry consensus." Do you see that?
A. Yes, I do.
Q. Now, if you go to the next page, which

Page 352

is page 10, starting at line 10, Mr. Cooke says, "And what I am proposing is that once this mission plan has been approved by the Congress, it become the standard by which the contract performance by the Department of Energy is judged." Do you see that?
A. Yes, I do.
Q. And then Mr. Cooke goes on to suggest an amendment to Article V.B.3 of the contract, is that right?
A. Yes, he does.
Q. Now, that amendment was never included in the standard contract, isn't that right?
A. That is correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-2.0 into the record.
THE COURT: DX-2.0 is admitted.
(Defendant Exhibit Number 2.0 was received in evidence.)
BY MR. LO RE:
Q. Mr. Mills, you talked about the 1985 mission plan. Let's take a look at that again, please. This is PX-82.
THE COURT: Can we have that number

Page 353

again?
MR. LO RE: PX-82, Your Honor.
THE COURT: Thank you.
MR. LO RE: Thank you.
THE WITNESS: I have the extract.
BY MR. LO RE:
Q. Thank you. There may be some pages in this, I'm not exactly sure what's in your extract, so maybe we should go with the copy – excuse me, did I hand you DX-90 earlier, sir?
THE COURT: If you think the colloquy is going to cover a document that's in evidence, let's use that.
MR. LO RE: Yes, Your Honor. The concern we have is that, I believe, I know that PX-82 is in evidence, but that is an excerpted version of this much larger document, and I'm afraid, as I start to examine Mr. Mills, that some of the pages that I'm going to ask him about are not in that excerpt.
So I think to be on the safe side, I would like to hand the witness DX-90, which is, unfortunately, a much larger version. Thank you.
THE WITNESS: This is only volume 1,

Page 354

isn't it.
BY MR. LO RE:
Q That is correct. I think there are multiple volumes of that document, but the parts that I want to ask about are in that exhibit.
MR. LO RE. Which is, Your Honor, for the record, DX-90.
BY MR. LO RE:
Q. Mr. Mills, you testified –
THE COURT: Does the Plaintiff's table have a copy of this handy?
MR. STOUCK: We do, Your Honor.
THE COURT· Very good.
MR. STOUCK: As long as there's a pause –
THE COURT: There's not. Go ahead.
MR. STOUCK: Thank you, Your Honor.
BY MR. LO RE:
Q Now, if you, again, this mission plan includes the tables that you discussed were – represented a format whereby DOE would meet its contractual obligation, is that right?
A. That is correct.
Q. And that's table II 3?

Page 355

A. That is correct.
Q. Now, if you would turn to – and table II.3 is page 27 of the document. If you could turn to page 28 of the document for me, please, page 28 under the first full paragraph that starts with, "included"?
A. I see that.
Q. It's a reference there to tables II.2 and II.3, do you see that?
A. Yes, I do.
Q. Now, at the bottom of that paragraph, it says, "These schedules are for illustrative purposes only at this time," then he goes on to talk about defense waste Do you see that?
A. Yes, I see that.
Q. Now, if you turn to the next page – I'm sorry, before we do that, at the very bottom of that page, 28, it says, "The representative waste acceptance schedule for the improved performance system described in this chapter is designed to achieve the following DOE objectives," do you see that?
A. Yes, I see that.
Q. Now, that improved performance system, that is table II.3 correct?

Page 356

A. It is depicted in II.3, yes.
Q. Now, if you go to the next page, at the bottom of those numbered paragraphs is a sentence that starts with, "it should," do you see that?
A. Yes, I do
Q. It says, "It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." Do you see that?
A. Yes, I do.
Q. And that was your understanding at the time that you received this mission plan, correct?
A. That is correct.
Q. And then it goes on, there's a reference here to, below, there's a reference to table II.2. Do you see that?
A. Yes, I see that.
Q. Okay. It says, "Should the Congress decide not to authorize an integrated MRS facility, the waste acceptance schedule shown

Page 357

in table II.2 is an example of a plan the DOE is likely to follow." Do you see that?
A. Yes, I do.
Q Now, that plan, that II.2 did not meet your two-part test, is that right?
A. It did not meet our understanding of the commitment, that is correct.
Q. Now, if you go down below there, there's a paragraph starting with, "under the terms," a sentence, excuse me, that last paragraph, there we go, there's a sentence starting with, "under the terms." Do you see that, sir?
A. Yes, I see that.
Q. It says, "Under the terms of the contracts for disposal services that have been signed between DOE and the utilities, an annual capacity report and projected annual receiving capacities and rankings will be issued by the DOE in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations." Do you see that, sir?
A. Yes, I see that.
Q. And that's exactly what DOE did, isn't

Page 358

that right, Mr. Mills?
A. DOE issued an ACR that is called for, the annual capacity report. DOE did not have within the contract the ability to establish firm waste acceptance schedules. That was not in the contract that they had that authority.
Q. So you were of the opinion that that phrase that I just read violates the authority of DOE?
A. It's not in accordance with the contracts that DOE had signed with the utilities.
Q Did you ever tell DOE that?
A. I don't know.
Q. Now, Mr. Mills, Mr Stouck showed you what has been marked as PX-73. Do you have that document, sir?
A. Yes, I do.
Q. And this was a document that I believe, it's a document with a cover letter from Mr Lawrence, and then there's a reference to RL comments on the draft mission plan, do you see that?
A. Yes, I do.
Q And that's at page ending in 40 –

Page 359

THE COURT: Counsel, DX-90 is not in evidence, according to the records.
MR. LO RE: Thank you, Your Honor. The government would, at this time, move for the admission of DX-90 into evidence.
THE COURT: DX-90 is received in evidence.
(Defendant Exhibit Number 90 was received in evidence.)
BY MR. LO RE.
Q. And, Mr. Mills, looking at PX-73, under the page that ends in 40, it says, "RL comments on draft mission plan, dated April 1984."
A. Yes.
Q If you look at the last paragraph there, it says, "It should be reasserted that the financial responsibility for interim storage of spent nuclear fuel prior to January 31, 1998 is clearly with the operators of civilian nuclear power reactors, as specified in the NWPA and in the DOE/utility disposal contracts " Then it says, "Assuming DOE would be financially responsible for the additional

Page 360

spent fuel storage after 1997 as reflected in the 17-year excess in the 'remaining backlog' of table II.1, something of an order of 1 billion 1983 dollars would be required for this additional interim storage at power reactor sites." Do you see that?
A. Yes, I see that.
Q. Then it goes on to say, "Quoting federal storage to meet waste acceptance comments, neither this post-1997 federal storage cost, nor the cost of extending any federal interim storage that may be required beyond 1997 have been included in the Nuclear Waste Fund fee analysis to date." Do you see that?
A. Yes, I see that.
Q Now, Mr. Mills, this indicates that whoever wrote this document thought that the utilities might owe 1 billion 1983 dollars if in fact they were to have their at-reactor storage requirements removed, isn't that right?
A No, no, not at all. That refers to a specific element within the legislation called this interim – where is the right term here? Interim fuel storage, there was a specific

Page 361

separate item within the legislation that would allow the federal government to provide interim storage at the reactor sites, totally independent of the nuclear waste policy 1 mil per kilowatt hour for taking the fuel in 1998. If there was a need and if utilities contracted with the Department of Energy, this would be a separate contract, and it would be done and paid for separate from the 1 mil per kilowatt hour. What they're saying here is it may cost 1 billion dollars in order to accommodate that particular element of the waste or of the Nuclear Waste Policy Act. That never became operative. Interim storage, the federal interim storage concept never became operative.

Q. Now, this document, what I just read doesn't say anything about the subtlety that you just put on this, does it?

A. But that's what it is.

Q. How do you know that?

A. Because I know that from the words, looking at it.

Q. But you didn't write this?

A. No, I did not, but I can read exactly

Page 362

what that means.

Q. Do you know who wrote it?

A. I don't know whether Mike Lawrence wrote it or not, but it was written by the Richland operation office, and while they did not have that specific words in there that made it quite clear, it is clear to me what they were talking about.

Q. It's clear to you?

A. I'm sure it was clear to them because of the words that are here.

Q And those words that were clear are what, sir?

A. "It should be reasserted that the financial responsibility for the interim storage of spent nuclear fuel prior to January 31, 1998," that is, that particular language specifically addresses an element of the Nuclear Waste Policy Act.

Q. And then it goes on to say, "Assuming DOE would be financially responsible for additional spent fuel storage after 1997, something in the order of 1 billion 1983 dollars would be required for this additional interim storage at power reactor sites." Do

Page 363

you see that?

A. Yes, I see that.

Q. It doesn't delink the two, does it, that sentence?

A. No, it doesn't. It goes on the basis that if in fact you have this interim storage and you do not remove the fuel from that interim storage, but it stays there, there's an additional cost.

Q. But, of course, you don't know who wrote this document?

A. No, I do not.

Q. And you didn't talk to them before they wrote the document?

A. No, I did not.

Q. And you didn't talk to them after they wrote the document?

A. No, I did not

Q. Thank you. Mr. Mills, I'm going to hand you what's been marked as DX-187. Mr. Mills, this is the annual capacity report dated December 1991. Are you familiar with this document?

A. I had seen this document before. I wouldn't say that I'm familiar with it.

Page 364

Q. Now, if you would turn to page ending in 8 – excuse me, in 0807.

A. Yes, I see that.

Q. Table II.1, "Projected Waste Acceptance Rates For Spent Nuclear Fuel," do you see that?

A. Yes, I do.

Q. Now, this projected waste acceptance rate does not meet your two-part test, does it?

A. Not close.

Q. And are you familiar with the 1987 annual capacity report that was issued by DOE?

A. I have seen that document, yes.

Q. And that document had a 3,000 rate of acceptance in year five, did it not?

A. Yes, it did, I believe, I had to look at it to verify it, but as I recall it, it did. And I believe it had a 1,200 metric ton per year for each year for the first five years.

Q. You know what, let's make this easy. Why don't we look at PX-112, which is the 1998 annual capacity report?

A. '88 or '98

Q. '88. That should be in your binder, sir.

Page 365

A. That's the one that's on the screen.
Q Right. And that should be in your binder from your direct examination.
A. What was the number?
Q. 112, 112.
A. Yes, I have it.
Q. Now, this document, if you would turn to page five of the document, which is the Bates number ending in 106?
A. Yes.
Q Here is table II.1, "Illustrative Waste Acceptance Schedule For Spent Nuclear Fuel," do you see that?
A. Yes, I see that.
Q. Now, this document has acceptance beginning, first of all, in 2003, but also at a rate of 1,200 MTU per year, is that right?
A. That is correct, for the first two years.
Q. And that rate, putting aside the year for a moment, that rate does not meet your two-part test, right?
A. That is correct
Q. Now, looking at that, does that refresh your recollection as to what the 1987

Page 366

ACR acceptance schedule set forth?
A. I do not recall the difference between '87 and '88, and you're now giving me '91. These were annual reports in which the numbers seemed to wander around.
Q. Did you ever see an ACR issued that you thought met your two-part test, sir?
A No, sir.
Q. Thank you.
THE COURT: If you wish to move in 187?
MR. LO RE: Certainly, Your Honor, we can do that with this witness
THE COURT: It's your call, but I'm going to permit you to do it before you sit down
MR. LO RE: Thank you. The government moves for the admission of DX-187, please.
THE COURT: DX-187 is admitted.
(Defendant Exhibit Number 187 was received in evidence.)
THE COURT PX-112 is already in evidence.
BY MR. LO RE:
Q Now, Mr. Mills, we were talking about

Page 367

ACORD before, and ACORD actually considered suing the Department of Energy for breach of the standard contract around the 1989 time frame, isn't that right?
A. I do not recall. They may very well have, but I do not recall at this point whether that was a conclusion that they came to. They may have considered it, but it would not have been ACORD that sued the DOE It would have to be a contract holder, so that would be a member of ACORD may have considered that, not ACORD itself.
Q. Do you have a recollection of the ACORD members discussing the possibility of suing DOE in the 1989 or 1990 time frame?
A I do not have a vivid recall of that, but there were so many subjects that we covered over the years, that I believe that was probably discussed.
Q. Do you recall that ACORD, rather than sue, made a decision to work with DOE to see if they could put the schedule back on track in the 1990 time frame?
A. No, I do not recall that.
Q. Now, Mr. Mills, I'm going to direct

Page 368

you to PX-60 again, and this is Mr. Morgan's testimony or presentation in December of 1983, and he talks at page 12 –
A. I believe that's 61, isn't it?
Q. Well, I think it's in 60
A. Okay. It's in 60, yes.
Q It's in the big, PX-60, page 12, it ends in 600.
A. Yes.
Q. Now, middle of the way down this paragraph, this column, it says, "we are concerned," do you see that?
A. Yes.
Q. Mr. Morgan said, "We are concerned with the schedule on the repository as extremely optimistic for getting to 1998. We believe there are challenges and that some will say risks to obtaining that date. Therefore, we must have an alternative plan or a parallel plan to begin receiving waste by January 31, 1998.
Monitored retrievable storage could serve as that alternative. The mission plan will also cover the federal interim storage waste packaging and other interrelated issues "

Page 369

Do you see that?
A. Yes, I do.
Q. Now, Mr. Mills, you were actually asked personally to perform an evaluation on the MRS in the 1983 time frame, were you not?
A. Your question was that I was asked –
Q. Yes.
A. – to perform an evaluation –
Q. Yes.
A. – of the MRS?
Q. Yes.
A. I do not recall who asked me to do that.
Q. Do you recall being asked to perform such an analysis?
A. I do not recall that I may have been, but I don't recall that.
Q. If you could turn, Mr. Mills, to page 35 of this document – actually, we'll start with 34, which is a presentation by Mr. Bauer.
A. Yes.
Q. And you remember Mr. Bauer?
A. Yes, I knew Robert Bauer.
Q. Do you remember that he made a presentation at this meeting?

Page 370

A. Yes.
Q. And if you could turn to page 35 of this document, there's a reference there, if you can just take, starting with the MRS mission, there's a reference there to the MRS. It says, "The MRS mission, you have heard it alluded to here this morning, is a parallel or backup storage capability in case there is an unavoidable delay or failure in a repository program or until such unforeseen events occur that would require early deployment. As a minimum, it is our evidence guarantee that we will be able to take spent fuel by" – it says, "1988," but I believe that's a –
A. That would have been nice, wouldn't it?
Q. We wouldn't be here. 19 – I believe it is '98, "to the extent that such guarantees are possible," do you see that?
A. Yes, I see that.
Q. And then below, Mr. Mills – excuse me, Mr. Bauer talks about the MRS, and he says, one paragraph, two paragraphs below that, "The conceptual design is under independent review

Page 371

during the course of these meetings. Representatives of external organizations are meeting and reviewing our work to-date, and these include representatives of the National Conference of State Legislatures, the Edison Electric Institute, the National Academy of Sciences, and others." Does that refresh your recollection as to whether you were asked to look at the concept of the MRS?
A. Yes, it does, and I was asked to participate in that activity
Q. Now, Mr. Mills, the MRS that you looked at had a throughput rate of 1,800 MTU per year, isn't that right?
A. I do not recall that particular number. The only number I recall on a monitored retrievable storage was the design rate of 3,000 metric ton per year. I do not recall an 1,800 one.
Q. Could you turn to page 96 of this document, sir?
A. I have that.
Q. And, Mr. Mills, this is a presentation entitled, "Selection of Concepts For Monitored

Page 372

Retrievable Storage," and there are four individuals listed there. Below, it says they're from Battelle Pacific Northwest Lab, Richland, Washington. Do you see that?
A. I see that.
Q. And then the next page, it says, "Candidate, MRS concepts," do you see that?
A Yes, I see that.
Q. And then there's a paragraph on the right-hand side, right-hand column, starting with, "to facilitate," and there's several bullets below there. Do you see that?
A. Yes, I see that.
Q. It says, "To facilitate an equitable comparison of the concepts, a conceptual design analysis was performed for each concept by independent and experienced contractors. These contractors were selected for their various technical evaluation work on the MRS concept designs. A common set of design requirements for storage of spent fuel was specified to facilitate this analysis." And then there's several bullets The first bullet says, "15,000 MTU storage capacity," and the second bullet says, "1,800

Page 373

MTU per year throughput rate," do you see that?
A Yes, I see that.
Q. With the possibility, two bullets down, to expand to 3,000, do you see that?
A. Yes, I see the 3,000.
Q. Now, does that refresh your recollection, sir, that as of December 1983, DOE was at least examining the possibility of having an MRS that had an 1,800 MTU throughput rate?
A. Yes, that does refresh my memory, and as you pointed out, the fourth bullet said it was expandable to 3,000.
Q. Thank you. Now, Mr. Mills, I'd like to show you Exhibit DX-138, please. Mr. Mills, this is a document entitled, "Civilian High-Level Waste Program," and it's got background and a series of bullets, and at the bottom, there are a series of acronyms, including ACORD, EEI, and several others, including UWASTE. UWASTE is what UNWMG became, correct?
A I think so. I think so.
Q. Mr. Mills, are you familiar with this document?

Page 374

A. Yes
Q And what is it, sir?
A. It stands for itself. I do not know who prepared this document, nor do I know what its purpose was. As you commented, it shows at the bottom that it includes a large number of groups, the ACORD group, EEI, ANEC, EPRI, NUMARC, USCEA. These were all organizations that were representing the contractors or representing the utilities and were interested in this issue I do not know what the purpose of this document was at the time.
Q. Mr. Mills, the last bullet of this document says, "An MRS unlinked to the repository could play an essential role in the high-level waste disposal system. It could be the vehicle for DOE to meet the 1998 obligation and be a cost-savings to the electricity consumer." Do you see that?
A. Yes, I do
Q. Does that comport with the EEI/UWASTE or UNWMG understanding at the time?
A. Yes.
Q Now –
THE COURT: Let me just ask a question

Page 375

on that –
MR. LO RE: Sure.
THE COURT: – in context, so we don't have to get back to it. Why would it be a cost-savings to the electricity consumer, Mr. Mills, if you know?
THE WITNESS: Yes. If we had the MRS operating and the repository was not operating, then we would not engage – would not be responsible for additional storage after 1998, which would be a cost that would be passed on to the rate payer
THE COURT: Thank you.
BY MR LO RE:
Q. Now, at this time, 1998, Mr. Mills, do you know what the throughput rate was for the MRS that DOE was projecting?
A. At this particular time, I don't believe they had an MRS approved in 1989 – or they did have one authorized, that was right, the 1987 amendments did authorize a small MRS.
Q. Do you know what the throughput rate was on that?
A You'd have to refresh me, I do not recall what it was. I know it had a limit in

Page 376

how much capacity it was allowed to have before the repository came online. That particular authorization in 1987 by the Congress put many different limits on that MRS, significant limits on the MRS
Q. Now, do you know what PG&E's opinion was with respect to whether the MRS could represent performance under the standard contract? And when I say, "the MRS," I mean the MRS as authorized by Congress in the 1987 amendments.
A. I do not know what PG&E's position was on that
Q. Mr. Mills, I've just handed you what's been marked as DX-196. This is a document with an EEI heading and the Re line here, the Re line is, "UWASTE report, dated December 23rd, 1991."
A. Yes, I see that
Q Are you familiar with this document, sir?
A. I have not looked at it in some time, but, yes, because of the date and the subject, I am sure that I participated and was aware of it at the time it was prepared

Page 377

Q. And you'll see here, under, "Standard Contract," which is page two, there's a name Mike Alissi, do you see that, sir?
A. Yes, I see that.
Q. Who is Mr. Alissi, if you know?
A. Alissi was working in the group for, in my group at that time working on the UWASTE activities.
Q. Now, there's a discussion about the delivery commitment schedules, APR and ACR, set forth below that. Sitting here, do you know whether you were responsible, ultimately, for the content of that discussion?
A. These people reported to me, so I had that responsibility, yes.
Q. Thank you
MR. LO RE Your Honor, the government moves for the admission of DX-196.
THE COURT: Let's learn –
MR LO RE: I'm not learning my lesson here, Your Honor
BY MR. LO RE:
Q. Mr. Mills, the document, paragraph two says, "The DCS instructions and forms (as submitted by DOE to OMB for approval) are

Page 378

expected to be sent to utilities in January 1992." Then it says, "Also, the acceptance priority ranking APR is currently being printed and should be available at the end of this year, while the annual capacity report (ACR) will probably be available during mid to late January. These documents are necessary to properly complete the DCS forms." Now, do you remember that UWASTE was advising its members about the proper way to complete DCS forms?
A. I don't know that they were recommending them how to complete the forms, but they were sharing with them when the forms would be available.
Q. And were you part of that effort to share information with respect to the DCS process?
A. Yes.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-196 into evidence.
THE COURT: DX-196 is admitted.
(Defendant Exhibit Number 196 was received in evidence.)

Page 379

BY MR. L O RE:
Q. Now, below that, it says, "EEI/UWASTE is planning to organize a workshop where utility personnel designated to complete the DCS forms will have an opportunity to resolve questions with representatives from DOE." Do you see that?
A. Yes, I see that.
Q. Now, in fact, UWASTE/EEI did hold such workshops, isn't that right?
A. I believe they did, yes.
Q. And those workshops, Mr. Mills, were based on the 1991 ACR and APR, isn't that right?
A. It does not say that here, but I believe that is the case.
Q. Do you know whether PG&E filled out delivery commitment schedules in response to the 1991 APR and ACR?
A. I do not know.
Q. Do you recall that your organization did assist in the filling out of forms?
A. I do not believe we assisted in the filling out of forms. We provided the workshop that would – a lot of people from the

Page 380

different utilities, to share information on how they would go about doing it. I don't know that we assisted them in doing it.
Q And, again, that was based on the 1991 ACR, correct?
A. I believe that's correct.
Q. And APR?
A. Yes.
Q. Thank you. Mr. Mills, you talked a little bit about GTCC on your direct examination. Do you remember that?
A. Yes, I did.
Q. And I think you referred to the Low-Level Waste Policy Act of 1980?
A Yes, I did.
Q. That authorized the acceptance of GTCC?
A. No, I did not.
Q. What did it do?
A. The 1980 law, the Low-Level Waste Policy Act of 1980 defined the disposition for low-level waste of grades A, B, and C. It did not address anything of Greater-Than-Class-C waste.
Q. Was there an amendment to that statute

Page 381

that did address Greater-Than-Class-C waste?
A. Yes, there was there was an amendment in 1985.
Q. And what did that amendment say, to your recollection?
A That amendment stated that DOE was responsible for the disposal of Greater-Than-Class-C waste
Q. And that amendment was issued after the signing of the standard contracts, isn't that right?
A. That is correct, but that amendment did not apply to the utility piece of Greater-Than-Class-C That amendment applied to the seal source units that were used for well logging, that were used in the medical field. After the 1982 Waste Act was passed, that 1982 Act covered all radioactive waste other than the Low-Level Waste Act when it came to the utilities.
After that was passed, some concern was raised, there are other Greater-Than-Class-C wastes that are not owned by utilities, there are sealed units, there are medical waste that were not covered by the

Page 382

Waste Act of '82, and so they came forward and said, what are we going to do to cover those?
Q I see.
A. And they amended the '80 Act to include those other Greater-Than-Class-C wastes.
Q. So your testimony is that the Nuclear Waste Policy Act covered Greater-Than-Class-C waste, is that right?
A For the utilities.
Q. Could you point to me where in the statute that is?
A. I would have to search it, but it says any waste that was required by NRC to be disposed of in a deep geologic repository is covered.
Q. So it's not expressly stated, but you are, again, inferring from the language that you just quoted that GTCC is covered? It's a yes or no question, sir.
A. It is covered, yes.
Q No, my question is it's not expressly stated, but you are inferring from the language that you just quoted that GTCC is in fact covered by the Nuclear Waste Policy Act?

Page 383

A. That is correct
Q. And sitting here today, you can't point to that actual language?
A. The language that covers it in the Nuclear Waste Policy Act?
Q. Yes, yes.
A. I would have to look for it. It's in the Act, the essence of what I stated.
THE COURT· I think you might have your chance to look for it. We're very close to the break for 6:00.
MR. LO RE Your Honor, I have really not much more I can soldier on, if that's the Court's druthers.
THE COURT: I think it would be useful to the witness to be through the cross-examination before the end of the evening. Do you agree with me, Mr. Mills?
THE WITNESS: Yes, it would.
THE COURT. Please soldier on
MR. LO RE: Thank you.
BY MR. LO RE:
Q. Do you know whether the utilities paid into the Nuclear Waste Fund for the removal of GTCC?

Page 384

A. Yes.
Q. How do you know that?
A. It was included in the 1 mil per kilowatt hour.
Q. And is that documented? Strike that. You were involved in the development of the 1 mil per kilowatt hour?
A. Yes, I was.
Q. And was the inclusion of GTCC included in that development?
A I have to answer your questions yes or no, but there's a great explanation here.
Q. Why don't you start by answering the question, sir?
A. It was not specifically stated
Q. Thank you. Now, the rates that we looked at for GTCC – excuse me, the rates of acceptance that we looked at in the mission plan from 1985, for instance, did that include the acceptance of GTCC?
A That particular table we were looking at did not include any waste other than spent fuel and high-level waste.
Q. So did you ever perform an analysis of how much GTCC would have to be accepted in

Page 385

order to meet your two-part test?
A. No, I did not do an analysis.
Q. Do you know what PG&E's view is with respect to the acceptance of GTCC?
A. I do not.
Q. Have you ever reviewed the decommissioning plans that they've submitted to the NRC?
A. No, I have not.
Q. Mr. Mills, you testified about campaigns. Is it your position that campaigns would have been required for DOE to meet its contractual obligation on the standard contract?
A. No.
Q. How could DOE have met its obligation without engaging in campaigns?
A. By supplying a large number of casks that were only partially used, which was very inefficient.
Q. Do you know whether DOE ever looked into such a possibility?
A No, I do not.
Q. Now, you also talked about OFF or oldest fuel first. Is it your position that in

Page 386

order to meet its obligations under the standard contract, DOE would have accepted on a queue other than the OFF queue?
A. Yes.
(6:00 p.m.)
BY MR. LO RE:
Q. Now, other than the OFF queue, which is set forth in the standard contract, is there any other acceptance queue that's laid out in the standard contract?
A. Yes.
Q. What is that?
A. The utilities would, the contract holders could identify to DOE the amount of spent fuel and waste that they wanted to deliver to DOE. If that total that they asked for in a particular year was less than the quantity the DOE could receive, then OFF did not come into play. OFF only came into play if the quantity that was requested to be delivered to DOE was greater than the amount that they were willing to accept.
Q. Why don't we briefly look at the contract on that, please?

Page 387

MR. LO RE: Your Honor, if you just bear with me, we're looking for the PX number because I have the DX number.
MR. STOUCK: 54.
BY MR. LO RE:
Q. If you could look at PX-54?
A. I have it.
Q. And if you were to look at the OFF section, which I believe is page 10 of the contract, 5(a), do you see that? Do you see that, sir?
A Yes, I do.
Q. And it says, "The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs," and then it goes on.
A. Yes.
Q. Now, what you just described to me as to how the OFF would only apply in particular circumstances, is that set forth in that paragraph?
A. This paragraph sets forth what would happen if the utilities requested DOE to take more spent fuel than they wanted to take.
Q And where is that enumerated in the

Page 388

contract, sir?
A. I would have to search for it. At this point, I cannot point to that particular item, but the utilities have to provide, according to the contract, a delivery commitment schedule. If that delivery commitment schedule calls for a quantity that is less than DOE would be willing to accept, OFF does not come into play.
Q. And, again, why don't you turn to the delivery commitment schedule page, which is the next page, is what you just described, is that set forth on this page?
A. It identifies that the purchaser provides to the Department of Energy delivery commitment schedules, and if the delivery commitment schedules total less than the amount of fuel that DOE wants to receive, then the OFF requirement does not come into play.
Q. Could you show me where it says that, sir?
A. Well, if you read them combined together, that's the way it works out. If you read the contract detail wise, that's the way it works out.

Page 389

Q. And when you say, "detail wise," can you show me that, please?
A. I could draw you a picture.
Q. I'd like to see where it is in the contract, please.
A. DOE here, under B, "1, delivery commitment schedules in the form set forth in Appendix C annexed hereto and made a part thereof for delivery of SNF and high-level waste shall be furnished to DOE by the purchaser. After DOE has issued its proposed acceptance priority ranking as described above, the purchaser shall submit to DOE the delivery commitment schedules which shall identify all the waste that they wish to have delivered to DOE."
Now, once they have submitted this schedule to DOE, if that schedule is less than the amount that DOE wants to receive, then you have to raise the question, how do they allocate that space across the contractors?
Q. And where does it say that in the clause you just read, sir?
A It doesn't say it that way. It tells you how it's going to work.

Page 390

Q It doesn't say?
A. It doesn't use the word you're asking for, but it tells you how it's going to work
Q. So you need to infer that from reading that clause, is that right?
A It is there, yes.
Q. You need to infer it?
A. Well, I guess you need to infer it, but it's there.
Q. Thank you. Mr. Mills, you talked about failed fuel. Have you ever testified about whether a utility has failed fuel in its facility?
A. I have never testified, no.
Q You don't hold yourself out as an expert as to what is or is not failed fuel?
A No, I do not
Q. Do you know whether PG&E has failed fuel?
A. I do not know that.
Q. Do you know what – if you could turn back to the contract, page 14 of the contract, under procedures, under B?
A. Acceptance procedures?
Q Yes. It says, "DOE's obligation for

Page 391

disposing of spent nuclear fuel under this contract also extends to other than standard fuel. However, for any SNF which has been designated by the purchaser as other than standard fuel as the term is defined in Appendix E, the purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery.
The DOE shall advise purchaser within 60 days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel," and it goes on. Do you know what the requirements are for DOE to determine the technical feasibility of failed fuel?
A. No, I do not. May I answer your prior question? You asked me where in the contract it talked about the disposal of more material.
Q. Yes
A. If you look under acceptance priority ranking on that particular page, number one says, "Delivery commitment schedules for SNF and/or high-level waste may require the disposal of more material than annual capacity for the DOE disposal facility. The following

Page 392

acceptance priority ranking will be utilized."
So it brings in the OFF only after we've arrived at that. That is the words you were asking for.
Q So in other words, it says, "The following acceptance priority ranking will be utilized," and you read that to mean the following acceptance priority ranking will only be utilized in that sentence?
A That is correct.
Q. But it doesn't say, "only," though?
A. It doesn't say, "only," but that's how it works.
Q. That's how you read it?
A. That's how it works.
Q. No, no. That's how you read it, sir?
THE COURT: You're being argumentative, Counselor.
MR. LO RE Thank you. I'll move on
BY MR. LO RE:
Q. You talked about the plus or minus 20 percent provision under the standard contract. Do you know whether, Mr. Mills, if a particular utility asked for more, 20 percent more of its fuel to be taken, that DOE would have to take

Page 393

that from someone else's allocation?
A. We never got to that point. That didn't come into play.
Q. So you don't know?
A. No.
Q. Okay. Now, you talked about exchanges under the contract. Mr. Mills, you never actually investigated whether exchanges would be a possibility under the standard contract, did you?
A. I looked at the options that would be available for exchanges, yes. Did I investigate them to define who might exchange with who else? No, I did not.
Q. You really performed no analysis as to how an exchange market might work, did you?
A. No, we did not perform an analysis.
Q. You made an analogy during your direct examination to the uranium or the enriched uranium contracts or the uranium enrichment contracts.
A. Yes.
Q. Thank you. Now, those contracts were signed. Do you know when they were signed?
A. Some of them were signed in the 1960s.

Page 394

Others were signed in the 1970s.
Q. Do you know when exchanges of those slots occurred?
A Most of it was in the latter part of the 1970s and the early part of the 1980s.
Q. Some 10 to 15 years after the original contracts were signed, is that right?
A. No, it was a shorter period of time because I'm talking about the exchanges as they related to the long-term fixed commitment contracts, which were a secondary form of contract that really were signed about 1974, so that most of the exchanges occurred within a 10-year period after that.
Q. Now, enriched uranium has a very different market than spent nuclear fuel, does it not?
A Enriched uranium is what the utilities were buying
Q. And it's a fungible commodity, is it not?
A. Yes, it is.
Q Spent nuclear fuel is not a fungible commodity, is it?
A. Yes, in the sense of exchanging rights

Page 395

for delivery, yes.
Q. But the fuel itself is maybe very different, depending on whether it's damaged, for instance, or whether it's a BWR reactor fuel?
A. Yes, there might be differences there.
Q. Did DOE, when it provided enriched uranium, did it actually deliver the uranium to the utilities?
A. No, the utilities picked it up from the – the utilities were responsible to pick it up from the DOE facility.
Q. So the exchange that occurred for the enriched uranium was a piece of paper, is that right, that is, utility one had a right, and then it traded that right with someone else?
A. Utility one had an obligation to take
Q. And instead of taking it –
A. Instead of taking it –
Q. It said, utility two, you go take it?
A. You go take it.
MR. LO RE: Your Honor, if I may have one moment?
THE COURT: Yes.
MR. LO RE: Mr. Mills, I have no

Page 396

further questions.
THE WITNESS. Thank you.
MR. LO RE: Thank you.
THE COURT: Mr. Mills, I'm going to suggest that we pick up with redirect tomorrow morning at 9:00, so that you can be excused for the evening, and if you'd be good enough to come back –
THE WITNESS: Thank you.
THE COURT: – tomorrow morning at 9:00, we'll return you to the hands of PG&E counsel.
THE WITNESS: Thank you.
THE COURT: You have a pleasant evening
THE WITNESS· Thank you.
THE COURT: You may step down. The Court is going to continue with a housekeeping session on evidence. At this time, I'll ask Plaintiff's counsel to approach, hand back your in camera documents which didn't become useful.
MR. STOUCK: The Warner documents, yes.
THE COURT: So those can be destroyed. The Plaintiff delivered this morning, at the