# Pacific Gas & Electric Company v. U.S No. 04-74C June 6, 2006

## Heritage Reporting Corporation

## Page 411 to Page 780

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 411

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------x
PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, vs THE UNITED STATES, Defendant. : No 04-74C
-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C

Tuesday, June 6, 2006

VOLUME 2

The parties met pursuant to the notice of the Judge at 8 59 a.m

BEFORE THE HONORABLE EMILY C. HEWITT

Page 412

APPEARANCES
ON BEHALF OF PLAINTIFF
JERRY STOUCK, ESQ.
ROBERT L SHAPIRO ESQ
DAVID CALLET, ESQ.
ERIC ROWE, ESQ
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ
HEIDE HERRMANN, ESQ.
SCOTT R DAMELIN, ESQ.
SHARON A SNYDER, ESQ
JOSHUA E. GARDNER, ESQ
MARIAN SULLIVAN, ESQ
U S Department of Justice
1100 L Street, Northwest
Washington, D C. 20036
(202) 514-2000

Page 413

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 414

P R O C E E D I N G S

THE COURT: The examination of Mr. Mills continues. The witness continues under oath, ready for redirect Before we turn to that let me ask if there are any housekeeping matters at this time Plaintiff?

MR STOUCK: No, Your Honor, there's a matter that's under discussion, but we'll take it up later

THE COURT: United States?

MR EKMAN. None from us, Your Honor

THE COURT. Thank you Mr. Reynard will hand out to Ms. Ott and each of the parties the time sheet that we're keeping so that you know what we're doing here and we try to be transparent, not everyone's clocks and watches will agree when they look at their watch instead of the clock If you see an evident error, it should be arithmetic, and feel free to suggest a correction.

Mr. Stouck, you may proceed your examination when you are ready.

Whereupon--

LORING MILLS

Page 415

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

REDIRECT EXAMINATION

BY MR STOUCK:
Q Good morning, Mr Mills
A. Good morning
Q. How are you this morning?
A Just fine
Q. Did you have a good night?
A. Yes, I did.
Q You and I did not -- you did not speak with anyone from our team last night?
A No, I did not but I had the pleasure of just walking around working off some energy.
Q Did you do anything last night related to the case?
A. Yes I did
Q. What was that?
A. I reviewed a number of the documents that I had commented on yesterday, and I found that on one of the documents that I had misspoken in response to some questions that were provided
Q. And when did you first discuss that

Page 416

with us?
A. This morning.
Q. You called that to my attention?
A. Yes, I did.
Q. Would you like to tell the Court about it?
A. Yes, I would.
Q. Which exhibit? I believe it's Exhibit Number 73.
A. Exhibit Number 73.
Q. You ready?
A. Yes.
Q Which page are we on?
A. It's enclosure one.
Q. Okay.
A. To document 73.
Q. And what did you discover when you looked at it last night?
A. This is not the only one I looked at last night, but this is one that I did look at last night, and I wish to apologize to the Court and to the Defendant's lawyer that I did not respond properly to the questions that were asked there. He was asking about the last paragraph.

Page 417

And I interpreted as a federal interim storage, which was the sentence, the line just above that particular paragraph, and I was interpreting that as the part of the federal interim storage program, when in fact the questions related to a little different program.
Q. And what does this paragraph in fact relate to?
A. This paragraph relates to the cost at the utilities for storage of fuel prior to 1998 and also cost to the utilities for storage after 1998.
Q. And what is – well, let's take – can we take a look at the second sentence here, just direct your attention to that, and have it for the record.
It says, "Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17-year excess in the 'remaining backlog' of table II-1, something on the order of 1 billion 1983 dollars would be required for this additional interim storage at power reactor sites," and then there's another parenthetical,

Page 418

period, close quote. Do you see that?
A. Yes, I do.
Q. How does that comport, if at all, with your understanding of what DOE's obligations under this program were?
A. That is my understanding, that the utilities were responsible for the cost of all storage on the reactor site up until the 1998 date. After the 1998 date, there was to be no additional costs to the utilities for added capacity to store spent fuel, and this particular sentence here indicates that it would be the federal responsibility after 1998.
Q. Thank you. Now, yesterday – anything else on that?
A. No, that's it.
Q. Yesterday, Mr. Lo Re asked you a number of questions about comments that EEI made to DOE on the draft standard contract, and I think some other parties as well, but the comments – TVA was one, I don't recall all the questions.
But EEI certainly commented to the effect that in the written comments, to the effect that something should be put into the

Page 419

contract, a provision, a whereas clause or something to reflect either performance standards in a qualitative sense or even rate of acceptance, and the questions were variously phrased.
And I just want to get a clear record of your understanding of what happened with those comments. Sometimes, Mr. Lo Re asked you if the comments were rejected; sometimes, were they accepted; sometimes, other formulations, but what is your understanding of DOE's response to those comments?
A. This is the comments with regard to including an acceptance rate?
Q. Or a –
A. Performance?
Q Or a performance standard of –
A Performance standard.
Q – discharge, plus backlog.
A. It was interesting to us that the Department of Energy just did not respond to those comments. They were silent. They simply did not respond to it It was our understanding that the program was designed to accept 3,000 metric ton per year, which would

Page 420

accommodate the amount being discharged from the reactors, plus some to work off the backlog
And that was our understanding at the time When we tried to get that included in the contract itself and we asked for that, Department of Energy just did not respond They did not offer an alternative.
Q Did the Department of Energy at that time formally or informally tell the industry, tell EEI that they were rejecting the 3,000-ton rate?
A. At no time did they reject that element They just didn't include it, but they did not tell us that they rejected it.
Q. All right. Let me turn your attention just to a couple of documents now that Mr Lo Re asked you about. And do you still have those up there that he handed you?
A. I have all, I believe I do.
Q. Okay. Well, might take a moment then, can you find Defendant's Exhibit 111? It's on UNWMG letterhead, addressed to Mr. Jedrey.
A. Yes, I have that.
Q This is a April 28th, 1987 letter,

Page 421

Defendant's 111. Do you recall Mr. Lo Re asking you about this?
A. Yes, I do.
Q You can see from the first sentence that this is a request to the contracting officer to issue a ruling interpreting, clarifying, or amending, that's a paraphrase from, a quote from the letter, the standard contract and so forth
A Yes, I see that.
Q. And I believe Mr. Lo Re asked you something to the effect of why was this request being made at this time, do you recall that?
A Yes, I do.
Q. And I believe I would like to direct your attention to page three, where I think the letter, at least to some extent, seems to answer that question. Can you look at the first paragraph?
A. Recent developments?
Q. Yeah, can we – you want to read that? Or how's your voice this morning? I can read it for you.
A. I'm still hoarse. I can handle it.
Q. Why don't I do it? "Recent

Page 422

developments with the waste program make the inclusion of an additional performance standard even more important. In January 1987, DOE issued its draft mission plan amendment," a document reference number is there, "that announced that the first repository would not be ready to begin receiving spent nuclear fuel until 2003.
DOE stated that it remained committed to meeting the 1998 date, but was now relying upon the MRS facility, as yet unauthorized by Congress, to compensate for the first repository's delay. These added uncertainties increase the need for some quantifiable measures of DOE's performance under the contract." Do you see that?
A. Yes, I do.
Q. And that's consistent with your understanding of why this request was being made at that time?
A. Yes, it was. Yes, it is.
Q. Thank you And now, if you can find in your pile, Exhibit Defendant's 236, which is a draft document with ACORD at the top. "ACORD HLW goals," it says.

Page 423

A. I have it in front of me.
Q. First question is, there's handwriting on the first page that says, "early draft," do you see that?
A. Yes, I do.
Q Is that your writing?
A. No, it is not.
Q Do you know whose it is?
A. No, I do not.
Q And, again, I believe there was a question from Mr. Lo Re to the effect of why this matter was being discussed at this time Again, subject matter is generally the same, if you look under, "background," it says, "ACORD is seeking to achieve the following A firm legal commitment from DOE to accept," and so forth. Do you see that?
A. Yes, I do.
Q. And, again, I think we have at least some indication in this document of why these matters were being discussed at that time. If you would turn to the third page, under, "recommended approach"?
A Yes, I see that.
Q. And actually, did you say that you

Page 424

wrote this? Or that you –
A I believe I did write this.
Q. Okay Under, "recommended approach," it says "A firm commitment on 1998 from DOE or any compensation mechanism is not likely to be established by mid-1993 or within any time thereafter without the extreme," and "extreme" is underlined, "dedication of senior DOE and administration officials on this issue " Have I read that correctly?
A Yes, you have
Q. And the date of this document is December '92?
A The date of this draft, yes
Q And so what was the import of that comment on the recommended approach at that time?
A. We realized that the program was not proceeding as we had expected it to proceed, so we were very concerned that while we had an understanding of what the program was supposed to have achieved, that in fact it was not achieving it, and we were very concerned how were we going to achieve and verify these commitments that we thought we had.

Page 425

Q Mr. Mills, did your – oh, actually, let me ask you one more question about another document. And did your understanding of DOE's obligation change, Mr. Mills, at any time during the course of your work on this program from before 1983 until you left EEI in the early '90s?
A. No, it did not change at all
Q. Let's take a look at the last document I want to ask you about. It's the mission plan. It's in your notebook, and I'm going to refer to Plaintiff's 82. And do you have that?
A. Yes, I do
Q We have an excerpt in the notebook. I believe the entire document is in evidence, I know that the entire document is in evidence as Plaintiff's 82, and I think it's the last page actually of the excerpt that you have. It's page 29 of Plaintiff's 82.
A. Yes, I see that.
Q If you look at the first paragraph under the numbered paragraph, it starts, "it should be emphasized," that's page 29.
A. I see that.
Q. First paragraph under the numbers, it

Page 426

says, "It should be emphasized that this schedule," referring back to the schedules we talked about yesterday, "is only an approximation of how the system may operate and is subject to considerable variation." Do you see that?
A. Yes, I do
Q. What's your understanding of why the mission plan characterized those schedules as approximations?
MR. LO RE: Objection, Your Honor, calls for speculation. Mr. Mills did not write this document.
THE COURT: I'm going to overrule it on the basis that he was a major consumer of it at the time.
MR. LO RE: Thank you, Your Honor.
THE COURT: I'm taking it as a consumer's view of the government activity.
MR. LO RE: Thank you, Your Honor.
THE WITNESS: This was a document that was issued in 1985, which was still 13 years prior to the time that they were going to start taking the spent fuel, or the waste, and it was understood that there was no way to actually

Page 427

give the precise numbers of what was going to happen in 13 years in advance.

So this provided a general plan, the outline of which was there well-defined on how it was going to work, even though it might have varied somewhat from that particular plan.

BY MR. STOUCK:

Q. Okay. You say, "even though it might have varied somewhat." What's the "it"?

A. "It" meaning the actual numbers in the schedule which it was referring to here might have varied somewhat from year-to-year in the total quantities.

Q. Okay. And how does that square with your prior answer just a minute ago that your understanding of the obligation did not change?

A. It wouldn't have changed that obligation because small changes, the variations are small variations that would have occurred in the practical operation, still did not change the overall concept of the commitment we had with Department of Energy.

MR. STOUCK: Thank you. Just give me a moment, Your Honor, and I think we can wrap this up.

Page 428

Your Honor, I have nothing further

I just was having a colloquy with Mr Ekman. There are two versions of the mission plan in the notebook, I believe. One is Plaintiff's 82, one is Defendant's 90, and I think we're in agreement that we can use Plaintiff's 82 Mr. Ekman believes that 90 was never moved in, so I just wanted to make sure you didn't have two copies you were working from.

THE COURT: 90's in, but if you can use one, we will agree on 82, since that's the one we've been working with up here

MR EKMAN: And just to make sure, Your Honor, this was an exhibit which we objected to as incomplete, and I spoke with, I think it was Todd Monroe at Greenberg Traurig about this issue, and I understand they actually took our mission plan document and put the Plaintiff's exhibit sticker on it.

So as long as the binders are complete for the Court and are obviously what the witnesses talk about, we're fine with using the Plaintiff's exhibit

MR. STOUCK: And we'll check that to

Page 429

be sure we have a complete copy.

THE COURT: Subject to a colloquy to be had, we'll be using PX-82, and we will strike 90 at the end, at some point, when the parties tell me, I can do so to make it easier for the record. Thank you

MR. EKMAN. Thank you, Your Honor.

MR. STOUCK: Thank you, Your Honor, I'm done with Mr Mills. Thank you very much.

THE COURT: Thank you, Counsel.

United States to recross.

MR LO RE: Very briefly, Your Honor.

THE COURT: Recross is going to be conducted by Mr. Lo Re, and recross is in the scope of redirect.

RECROSS-EXAMINATION

BY MR. LO RE:

Q. Good morning, Mr. Mills.

A. Good morning.

Q Mr Mills, on redirect a moment ago, Mr Stouck showed you several documents. I'd like you to look at a couple of them. Could you put up DX-236? Mr. Mills, that is the ACORD high-level waste goals?

A. Yes, I have that in front of me.

Page 430

Q. Thank you. Now, if you would turn to the page that Mr. Stouck asked you about, which is the third, I believe the third page of that document?

A It starts with, "recommended approach"?

Q. That's right. And that paragraph, if we could look at that? There are two paragraphs there. Mr. Stouck pointed you to the first paragraph. And is it your recollection that this was the approach that ACORD did end up taking?

A Yes, I believe that's – yes.

Q. Thank you. The second paragraph there, starting with "in parallel"?

A. Yes, I see that.

Q Okay. Would you read that into the record, please?

A. "In parallel with this activity, the industry should focus on urging DOE to get a spent fuel storage facility (MRS site, MRS at government facility, MRS co-located at Yucca Mountain) in place of or immediately begin to evaluate alternative approaches because the current management structure and program are

Page 431

not likely to succeed."
Q. Thank you. Mr. Mills, could you turn to – this was a document we discussed which version to use, I believe we're using PX-82 – PX-82, which is the mission plan?
A. Yes.
Q. And I think Mr. Stouck directed you to page 29 of that document, is that right?
A. Yes, and I have that in front of me.
Q. Now, he asked you about the paragraph starting with, "it should be emphasized," is that the paragraph he looked at?
A. Yes, it is.
Q. Okay. I'd like to go down below that, please, and there's a following paragraph, yeah, that's it. Thank you. Now, was it your understanding that when this mission plan was issued, DOE was, you had no reason to think that DOE was – strike that.
DOE was trying to be as truthful as possible with you in this document?
A. We believed that, yes
Q. And then if you could look at the last sentence, starting with, "under the terms," do you see that?

Page 432

A Yes
Q Could you read that into the record, please?
THE COURT I'm sorry?
MR LO RE· I'm sorry, bottom of the last paragraph
THE COURT Next to last sentence
THE WITNESS. "Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987."
BY MR LO RE
Q And then could you read the next sentence, please?
A. "In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations."
MR. LO RE: Thank you. Mr. Mills, I have no further questions.
THE COURT: Thank you. Let me just make sure, is Mr. Mills a party's representative here?

Page 433

MR. STOUCK: No. Actually, we have not introduced our representative.
THE COURT: That's fine. That would change my 615 guidance if he were. I want to give you a directive, sir, that I'm giving all witnesses that testify in the case. The parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could become a witness, please ask counsel
Thank you so much for your testimony, sir. You are dismissed as a witness. You may step down.
THE WITNESS: Thank you.
THE COURT: Plaintiff, call its next witness.

Page 434

MR. SHAPIRO Your Honor, our next witness is John Bartlett. I apologize. I have to go look for him.
THE COURT. Will the Plaintiff assist with clearing the witness stand? Thank you.
MR. STOUCK: Your Honor, Mr. Bartlett appears not to be here. We made arrangements, my office did, that we deemed to be reliable to have him here by now, and we're looking for him.
THE COURT: Tell me what time – what have you been able to learn that would give us some guidance on when he's expected?
MR. STOUCK: If you can give me one minute, Mr. Shapiro is on the phone right now, and I'll come right back.
THE COURT. That would be of assistance.
MR STOUCK: It turns out one minute is not enough time for a good report, so just not to inconvenience everyone, I'd suggest taking a 10-minute break and sending Mr. Reynard back and see if we can find him.
We're looking for him everywhere we can think of