**System Fuels, Inc., & Entergy Arkansas v. U.S No. 03-2623C February 21, 2007**

**Heritage Reporting Corporation**

**Page 1776 to Page 2069**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1776

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
SYSTEM FUELS, INC , and ENTERGY :
ARKANSAS INC , :
Plaintiffs ·NO. 03-2623C
vs.
THE UNITED STATES, ·
Defendant :

-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington D C

Wednesday, February 21, 2007

VOLUME 7

The parties met pursuant to the notice of the Judge at 9:30 a.m.

BEFORE THE HONORABLE CHARLES LETTOW

Page 1777

APPEARANCES.
ON BEHALF OF PLAINTIFF·
ALEX D TOMASZCZUK, ESQ.
JACK Y CHU, ESQ
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D C 20037
(202) 663-8000
and
L. JAGER SMITH JR , ESQ
Wise Carter Child & Caraway P A
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

Page 1778

APPEARANCES (Continued )
ON BEHALF OF THE DEFENDANT:
JOSHUA E GARDNER, ESQ.
KEVIN CRAWFORD, ESQ
ALAN J. LO RE, ESQ
SCOTT DAMELIN, ESQ
LISA DONOHUE ESQ
U S Department of Justice
1100 L Street, NW
Washington, D C 20036

(Index appears at end of transcript)

Page 1779

P R O C E E D I N G S
(9.30 a.m.)
THE COURT Welcome back Mr Rives
THE WITNESS· Good morning.
THE COURT Mr. Lo Re, you may proceed
MR. LO RE· Thank you, Your Honor
Whereupon--
FRANK RIVES
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows
CROSS-EXAMINATION (continued)
BY MR LO RE:
Q. Good morning Mr Rives
A. Good morning.
Q Mr Rives on direct examination and also yesterday on cross-examination, you testified that DOE with respect to linkages for construction and capacity regarding the MRS, do you remember that?
A. Yes, I do.
Q. And you testified that DOE, as part of the 1991 admission plan, removed one linkage, that is the construction authorization -- or

Page 1880

THE COURT: Overruled.

THE WITNESS: My understanding of the 10,000 capacity limit MRS, that would not meet the criteria.

MR. SILBERG: I have no further questions, Your Honor.

THE COURT: Mr. Lo Re, recross?

MR. LO RE: Nothing further, Your Honor.

THE COURT: Mr. Rives, I may excuse you at this point, and given that you're the party representative, I need not read the evidentiary instruction. So thank you very much for your patience during lengthy testimony.

THE WITNESS: Thank you very much.

THE COURT: Thank you. Now, Mr. Gardner, I presume we have one of your witnesses?

MR. GARDNER: We do, Your Honor, we have Mr. Mills who – it's 12:15 now. Mr. Lo Re will be presenting him, so it's up to the Court what it wishes. We can start him for 15 minutes, which is great, given that we're getting a little behind schedule, or we can

Page 1881

have lunch early, whatever the Court wishes.

THE COURT. Well –

MR. GARDNER: Whatever Mr. Lo Re prefers as well.

THE COURT: I was going to say –

MR. LO RE: It's your courtroom, Your Honor.

THE COURT: No, it's your trial.

MR. LO RE: Thank you. Whatever the Court prefers is fine.

THE COURT: Do you mind taking the preliminary matters for 15 minutes?

MR. LO RE: I can do that, Your Honor.

THE COURT: I know you worked hard this morning.

MR. GARDNER: In that respect, I guess the government will call its second witness, Mr. Mills. And just, again, as Mr. Lester said a few days ago, we want to make sure this still preserves our rights to move under 52(c).

THE COURT: Absolutely.

MR GARDNER: Perfect.

THE COURT: Mr. Mills, if you would please approach the bench to be sworn? If you would take a spot near the court reporter and

Page 1882

if you would raise your right hand to be sworn, please, sir?

Whereupon–

LORING MILLS

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Thank you. Please be seated in the witness stand or box, make yourself comfortable, and if you would please state your full name for the record.

THE WITNESS: My name is Loring Mills.

THE COURT: Mr Lo Re, your witness.

DIRECT EXAMINATION

BY MR. LO RE:

Q. Good afternoon, Mr. Mills.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Good to see you again. Mr. Mills, from 1976 to 1993, you were an executive with the Edison Electric Institute, correct?

A. That is correct.

Q. And you held various titles in that organization, including nuclear fuel manager, director of nuclear fuel, director of nuclear activities, and vice president of nuclear

Page 1883

activities, correct?

A. That is correct.

Q. And EEI is another name for Edison electric institute, correct?

A. Yes, it is.

Q. And EEI is a trade association for investors owned utilities, isn't that right?

A. That is correct.

Q. And during your tenure at EEI, you were primarily responsible for issues related to the advocacy of nuclear issues on behalf of member utilities, correct?

A That is correct.

Q. And during the time of the passage of the Nuclear Waste Policy Act and the promulgation of the regulations that became the standard contract for the removal of spent fuel, you represented many privately owned utilities, correct?

A. I was a spokesperson for them in many of those forums, yes.

Q That's fine, thank you. And one of those utilities was Middle South Services, correct?

A. I think I knew it as Middle South

Page 1884

Utilities.
Q. Thank you. Now, EEI also administered a group known as the Utility Nuclear Waste Management Group or UNWMG, correct?
A. That is correct.
Q. And you personally administered UNWMG on behalf of EEI, correct?
A. It was one of the tasks for which I was responsible, yes.
Q And Middle South Services – or, excuse me, Middle South Utilities was a member of UNWMG, correct?
A. I believe they were, yes.
MR. LO RE: Your Honor, at this time, the government would request that, pursuant to Rule 611(c), that we be allowed to lead the witness, given his status as an affiliate of an adverse party.
THE COURT: Mr. Chu?
MR. CHU: No objection, Your Honor.
THE COURT: Allowed.
BY MR. LO RE:
Q. Now, Mr. Mills, I mentioned the Nuclear Waste Policy Act or NWPA a moment ago. You were actively engaged in the lobbying that

Page 1885

went on before the Act was passed, correct?
A. I was a technical resource and actually wrote many of the testimonies that were presented at the various committee hearings on that subject.
Q. So it was something that you were intimately involved in, is that fair to say?
A. That is correct.
Q. Let's look at an exhibit. Could we look at DX-5, please? Mr. Mills, I've handed you what's been marked as DX-5. This is an exhibit –
MR. CHU: Counsel, could I have a minute, please?
MR. LO RE: Sure, Counsel, absolutely.
MR. CHU. Thank you.
MR. LO RE: Sure.
BY MR. LO RE:
Q. Mr. Mills, for the record, this is a document on UNWMG letterhead, dated December 23rd, 1982, to members steering committee, subject, High-Level Waste Policy Act of 1982. Do you see that, sir?
A Yes, I do.
Q. Now, this document was prepared by a

Page 1886

gentleman who worked for you, Mr. Rel Stanford, correct?
A. That is correct.
Q. And you reviewed this document before it went out?
A. Yes, I believe I did.
Q. And this document went to all members of UNWMG, correct?
A It went to the members of the steering committee I'm not sure whether all of the members actually had a person on that steering committee, but, yes, it went to the steering committee membership.
Q. And you were preparing this document to inform members of what you had achieved on Capitol Hill with respect to the NWPA, right?
A. We were informing them of what had happened on Capitol Hill.
Q. Okay. Provided highlights of what had happened, is that fair to say?
A. Yes.
Q. Now, if you look at the first page there, there's a paragraph that says, "Important features of the Act are" –
MR. CHU: Your Honor.

Page 1887

THE COURT: Mr. Chu.
MR. LO RE: Excuse me, you're absolutely right, the government would move for the admission of DX-5 into evidence.
MR. CHU: Your Honor, there's no foundation that's been laid that Middle South Utilities was a member of the steering committee at this time.
THE COURT: Well, it doesn't really have to be, in the sense that the foundation has been provided by the testimony of Mr. Mills as to the preparation of the document. The document is admitted.
(Defendant Exhibit Number DX-5 was received in evidence.)
MR CHU: Thank you, Your Honor.
BY MR. LO RE:
Q Now, Mr. Mills, under the heading, "Important Features of the Act," there are several bullets on the first page, and then they roll over to the next page, I think it's seven bullets in all. Do you see that?
A. Yes, I do.
Q. Now, none of those bullets refer to the acceptance of spent fuel at any particular

Page 1888

rate, correct?
A. That is correct.
Q. They don't refer to accepting at the rate of generation by nuclear utilities, correct?
A. That is correct.
Q. And none of those bullets address or reference the concept of working off the backlog of accumulated fuel, correct?
A. These points do not address that, that's correct.
Q. Now, let's look at another document, this is DX-7. And for the record, this is a document with a cover letter dated January 11th, 1982, but I think that should be 1983, isn't that right?
A. That is correct. That was a typo error, but you can recognize, if you look at page two, it actually did have '83 on it.
Q. Thank you. And this letter is to members, nuclear power executive advisory committee, subject, Nuclear Waste Policy Act of 1982 and safety goal policy statement. Now, Mr. Mills, on the second page of that document, that's your signature, correct?

Page 1889

A. That is correct.
Q. And you prepared this letter?
A. Yes, I did.
Q. And you were responsible for the attachment to this document?
A. I was responsible for it. I do not know whether I actually prepared the attachment.
Q. And to be clear, the attachment is a document entitled, "Highlights of importance to electric utilities of the Nuclear Waste Policy Act of 1982 as passed by Congress, December 20th, 1982," that's the document that you were ultimately responsible for, correct?
A. That is correct.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-7 into evidence.
MR. CHU: Your Honor, we would object on relevance grounds, statute is best evidence.
THE COURT: Mr. Lo Re.
MR. LO RE: Your Honor, we have heard quite a bit of testimony over the last several days about the NWPA, and certainly, while the government would agree that the statute is the

Page 1890

best evidence of what it says, interpretations of that statute have been submitted or offered by the Plaintiff in this matter, and we think it's only fair that in response to that, the government be permitted to provide this document which we will examine Mr. Mills about.
THE COURT: Well, well, presumably, the analysis – the analysis that follows or highlights, as it's called, reflects Mr. Mills' understanding of the Act, but we really don't know that. Would you complete the foundation?
MR. LO RE: Sure, absolutely, absolutely, Your Honor.
BY MR. LO RE:
Q. Now, Mr. Mills, you prepared this analysis – or your team prepared this analysis in order to inform members of the executive advisory committee about the NWPA, correct?
A. That is correct.
Q. And the effort there was – or the admission there was to bring these folks up to speed on where the dust had settled, if you will, on the NWPA, correct?
A. Yes, there was an attempt to do that, whether we included everything in all details,

Page 1891

I don't believe I could attest to that.
Q. I understand, but you wanted to highlight what you consider, as a spokesperson for the industry, you wanted to highlight what you considered to be the important aspects of the Act?
A. Yes.
MR. LO RE: Thank you. At this time, Your Honor, the government would renew its motion for the admission of DX-7.
MR. CHU: Your Honor, we would object to the extent that the government is implying that the views expressed herein apply to the Plaintiffs in this case, as opposed to EEI.
THE COURT: Well, let's take it a step at a time. Certainly, Middle South was a member of EEI and was relying to some extent on Mr. Mills and the other staff at EEI for information. The highlights and then the – it almost looks like, it almost looks like copies of a PowerPoint presentation or slides that follow it are a little bit what the Court is having trouble with. It might be of limited utility, but the Court will admit it.
(Defendant Exhibit Number DX-7 was

Page 1892

received in evidence.)
MR. LO RE: Thank you, Your Honor.
BY MR. LO RE:
Q. Mr. Mills, I'd like to turn to the first page, first substantive page of the attachment, which is -- and I'm going to refer to these, what we call Bates numbers. It's the upper number on the lower right-hand corner. You'll see there's a number that ends in 736 after the table of contents.
A. Yes, I see that.
Q. And this is entitled, "Highlights of importance to electric utilities of the Nuclear Waste Policy Act of 1982, as passed by Congress December 20th, 1982." Now, you'll see different section numbers there. The first one says, "Selected definition, section two," and then at the bottom of the page, it says, "Severability, section three, "do you see that?
A I see that, yes.
Q. Now, this was your staff working on your behalf, actually tracking the NWPA with comments, correct?
A. Yes, it was.
Q. Now, I'd like to turn to the next

Page 1893

page, which ends in 737, and I'd like to focus your attention on the section that says, "Repository title 1, subtitle A."
A. Yes, I see that.
Q. And then it rolls on to, there's a subheading there, it says, "Finding Section 111."
A. Yes, 111(a)
Q Now, that tracks back to Section 111(a) of the statute, is that right?
A. I believe it does I don't have the statute in front of me, but I believe that is the case.
Q. Okay. Now, there are several bullets there, it says, the first one says, "The Federal Government has responsibility to provide for the permanent disposal of high-level waste and spent nuclear fuel." Do you see that?
A. Yes, I do
Q. Now, looking at those paragraphs, and you don't need to read through each of them, looking at those paragraphs, none of those paragraphs state that there is a requirement under the NWPA that DOE accept at any

Page 1894

particular rate of acceptance, correct?
A I would have to review these to verify that, but I think you're correct.
Q. Why don't you go ahead and take a moment to verify that?
A. Under the 111(a), it does not include any specific rate of receiving the material, yes.
Q. And --
THE COURT: Mr Lo Re, are you at an appropriate stopping point?
MR. LO RE: Very, very close, Your Honor, within seconds.
BY MR. LO RE:
Q. Mr. Mills, you can keep track of that. Mr. Mills, there's no reference in these paragraphs to accepting in such a way so as to meet the generation rate of spent fuel, correct?
A Not in this area 111(a), as I just looked at.
Q. Yes.
A. That's correct.
Q. And there's no reference in these paragraphs to accepting in such a way so as to

Page 1895

work off the backlog of spent nuclear fuel?
A. It is not included in this listing.
MR. LO RE: Great. Your Honor, this would be a fine time for a break.
THE COURT: Mr. Mills, you've only been on the stand a brief point in time, but if we could take a break now for lunch, we would all -- the rest of us would appreciate that. Do you mind?
THE WITNESS: That's fine.
THE COURT: All right. Thank you. We shall take a one-hour recess. I'm sorry, Mr. Lo Re.
MR. LO RE: Your Honor, if I may, just one housekeeping matter, and I would imagine that the parties know this, but Mr. Mills, I believe, is represented by a counsel who's not party to this trial, and I would just like, if I may, have the Court remind the parties that we are under Rule 615.
THE COURT: Well, not only are we under Rule 615, that is, a witness may not talk with anyone who could be a witness, anyone else who could be a witness about the matters at trial, but once a witness begins the testimony,

Page 1896

then there is to be no substantive conversation with the witness during the time that witness is on the stand.

MR. LO RE: Thank you, Your Honor.

THE COURT: All right. Thank you. We're in recess for one hour for lunch.

(Whereupon, at 12:35 p.m., a lunch recess was taken.)

Page 1897

A F T E R N O O N S E S S I O N

(1:43 p.m.)

THE COURT: Thank you, Mr. Lo Re.

MR. LO RE: Thank you, Your Honor.

THE COURT: I appreciate the extra five minutes.

MR. LO RE: Certainly, Your Honor.

BY MR. LO RE:

Q. Mr. Mills, at UNWMG and EEI, you were involved in providing comments to DOE as the standard contract was promulgated, isn't that right?

A. That is correct.

Q. And just so we're clear about that, the standard contract – and when I refer to standard contract, I mean the standard contract for the disposal of spent fuel, that contract was set forth and promulgated through the rule-making process, correct?

A. That is correct.

Q. And that was done through a issuance of a draft standard contract in the Federal Register?

A. That is correct.

Q. And then eventually, the final

Page 1898

standard contract was promulgated also in the Federal Register, correct?

A. That is correct.

Q. And from the time of the draft standard contract, promulgation or issuance of the draft standard contract in the Federal Register, between that time and the time the final standard contract was set forth, that's when you provided comments, is that right?

A. No, the comment period was limited to 30 days –

Q. Okay.

A. – from the time the draft was made available for comment in early February of 1983, and we were required to provide our comments by March, I don't know whether it's March 8th or just what the date was, but it was within 30 days. And then the final contract was issued, I believe, in the Federal Register on April 18th of 1983. The only opportunity we had to comment was during that 30-day period.

Q. Okay. You have a very good memory. Now, during that period that you were providing comments, UNWMG shared information among utility members, is that right?

Page 1899

A. Yes, that's correct.

Q. And you provided comments on the draft standard contract on behalf of those members, is that right?

A. Yes, we had, the Edison Electric Institute and the Utility Waste Management Group provided joint comments, I believe they were close to 90 pages of joint comments that were filed as the formal comment required.

Q. Okay. Let's take a look at those. Can we have DX-2.34, please? And, Mr. Mills, the document before you is a document entitled – or dated March 7th, 1983 on Edison Electric Institute letterhead to a Mr. Robert Morgan, and that document is signed by John Kiernan, do you see that?

A Yes, I do.

Q. Now, in the second paragraph there, it says, "On behalf of the Edison Electric Institute and the Utility Waste Management Group, we are pleased to comment on the proposed contract," do you see that?

A. Yes, I do.

Q. Now, prior to this submission of these comments, you had been in touch with the UNWMG

Page 1900

members, correct?
A. Very much so, we had a task force including members of the UNWMG companies that worked with us on developing these comments.
Q. And one of those members, I think we talked about before the lunch break, was Middle South Utilities, is that right?
A. Yes, I noticed that on the letterhead that you handed me in the earlier draft, that they do show up as Middle South Services there, but I knew them as Middle South Utilities.
Q. Okay. Fair enough. And do you recall personal interaction with individuals from either Middle South Utilities or Middle South Services in this timeframe?
A. I do not remember just who we might have conversed with and who might have been in our office because we had dozens of people coming into the office daily representing different views and different utilities, so I do not recall the individual who might have been there from Middle South Utilities.
Q. Okay. And did the utilities generally, do you know whether they took the position as to whether they adopted EEI's

Page 1901

comments?
A. We encouraged all of the utilities to send in their own individual comments. We did attempt to share with the members our comments in draft form before they were submitted and encouraged them to understand and realize what we were submitting and for them to also proceed to submit their own comments.
Q. Okay. Now, this letter is signed by Mr. Kiernan, and I'm talking now about the cover letter. You actually drafted this, correct?
A. I was very active in drafting this particular letter, yes. Mr. Kiernan was my immediate supervisor.
Q. Now, if we look at the attachments – and by the way, the attachment is attachment A, which starts at the Bates number 278.
A. Yes, I see that.
Q. Did the member utilities actually engage in helping you draft these comments that is this attachment?
A. We had a task force that included members of the utilities that were participating during that 30-day period.

Page 1902

Different individuals drafted different components. As to who drafted this particular attachment A, I would not be able to identify that.
Q. But ultimately, this was a document you had responsibility for, is that right?
A. That is correct.
Q. Now, if we turned to the second page of this attachment and we're under the heading, "Whereas Clauses," and that's on the first page, but let's go to the second page under paragraph two, the paragraph we're looking at says, second sentence in says, "We believe that DOE should be able to take the delivery of SNF/HLW equal to that year's generation rate, plus a reasonable share of the backlog." Do you see that?
A. Yes, I do.
Q. And then it goes on below that, it says, "A new clause should be added," and there's a colon, and then it rolls to the next page, and that whereas clause that's set forth there, that includes that those two notions that we discussed on the previous page, that is meeting the generation rate and working off the

Page 1903

backlog, is that right?
A. Yes, it does.
Q. Now, that clause was not incorporated into the standard contract, correct?
A. The contract is totally silent on this item, that's correct. This clause was not included, nor did DOE provide an alternative to it.
Q. Okay. Now, there is a clause in the standard contract, a whereas clause that refers to acceptance of spent fuel as expeditiously as practicable, correct?
A. I believe there is. I don't have the document in front of me, but as I recall it, yes.
Q. Okay.
A. And it also, I believe, included the "upon the request of the owner and generator."
Q. Okay.
A. The generator who had the opportunity to request it.
Q. Now, let's go back to page eight of this cover letter. It's in the Bates number 277.
A. 277 is the signature page.

Page 1904

Q. Yes, that's right, signature page, and there's a paragraph starting with "although."
A. Yes.
Q. And it says, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is signed," and the first, "DOE performance standards and purchaser remedies," do you see that?
A. Yes, I do.
Q. Okay. Then it says, after the words "are included," it says, "nor does the contract commit DOE to accept at any given quantity of SNF/HLW." And then it says, "and of more significance to utilities, the contract provides no specific remedies in the event DOE fails to meet its 1998 deadline." Do you see that?
A. Yes, I do.
Q. Okay. And then below that, it says, "We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft of the contract has been promulgated." Do you see

Page 1905

that?
A. Yes, I do.
Q. Now, the reference in that paragraph to performance standards, that includes the rate of acceptance, correct?
A. That would be a performance standard, yes.
Q. Then at the very bottom of this paragraph, it says, "We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open issues," do you see that?
A. Yes, I do.
Q. Now, in fact, DOE – excuse me, EEI did engage in multiple discussions with DOE regarding a possible rule-making to include the rate of acceptance in the standard contract, right?
A. I want to make sure I answer the question as you asked it.
Q. Sure.
A We had established, after the contracts were signed, not before the contracts were signed, an issue resolution task force. That issue resolution task force included

Page 1906

members of both the Edison Electric Institute, some utilities, and I believe members of DOE were invited to participate in that activity.
Q. Okay.
A I would not call it a negotiation, per se, it was an area of where we were trying to identify a mechanism for us to resolve these open issues.
Q. Okay. Now, I'd like to look at another document. This is a document marked as PX-196. Bear with me.
A. I believe I have a copy of that.
Q. Is there a copy up there?
A. December 12th to 15th, 1983.
Q. That's it.
A. It's a rather voluminous document.
Q. A lot of people have a lot to say about this, I guess. Now, this is, as you said, this is a transcript of the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, and the meeting itself occurred December 12th through the 15th 1983, and the publication appears to be or is February 1984.
Now, Mr. Mills, you attended these

Page 1907

meetings over these several days?
A. Yes, I did.
Q. And in fact, you spoke during the proceedings, correct?
A. Yes, I did.
Q. And let's take a look at your presentation. This is at page ending in Bates 619, and this particular passage is entitled, "Nuclear Waste Fund Management, Loring Mills, Vice President of Nuclear Activities, Edison Electric Institute." Do you see that, sir?
A. Yes, I do.
Q. Okay. Now, there's a paragraph on the right-hand column saying, "There are some who are concerned."
A. Yes, I'm familiar with that paragraph.
Q. Okay. Now, you say right in the second paragraph, "We really never were under an illusion that we could get a fair and equitable contract with DOE with firm commitment and detailed performance standards with penalties for nonperformance."
And then you go on at the bottom of that paragraph, you say, starting with – I'm sorry, three-quarters of the way down, "because

Page 1908

several concerns were not handled satisfactorily." Do you see that?
A. Yes, I do.
Q. Now, before we read that, again, that performance standards, you're referring, again, to, among other things, the rate of acceptance, correct?
A. It would have been one of the items referred to there, and that paragraph goes on to describe specifically what I had heard earlier in the morning.
Q. And heard earlier in the morning, is that Mr. Morgan you're referring to?
A. Yes, Mr. Morgan's station.
Q. Now, you say, "Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding of several issues." Now, you're representing here that it was your expectation that discussions between EEI on behalf of utilities and DOE would continue even after the contracts were signed, correct?
A. That is correct.
Q. And the reason you wanted to continue

Page 1909

discussions about a possible rule-making was that there were certain issues that weren't resolved prior to the promulgation of and signing of the standard contract, correct?
A. That is correct.
Q. And, again, that includes the, among other things, the rate of acceptance?
A. That is correct. The contract is silent on that rate of acceptance.
Q. Now, Mr. Mills, the final version of the standard contract – and I think you correctly referred to it as coming out on April 18th, 1983, do you remember that?
A. Yes, I do.
Q. That actually addresses specifically the request for performance standards, correct?
A. I believe it does make reference to that. It did not make reference to the rate, nor did it make reference to the whereas clause that we were looking at a few minutes ago.
Q. And in fact, DOE in that final register notice indicated that it was not going to put performance standards, such as the ones you requested, into the final contract, correct?

Page 1910

A. I do not have that document in front of me. I'm unable to respond directly.
Q. Sure, fine I can make that happen. I'm going to hand you, Mr. Mills, what has been marked as DX-2.02, okay. Mr. Mills, for the record, this is a document entitled, "Federal Register, Part II, Department of Energy," dated Monday, April 18th, 1983. And, Mr. Mills, this document is that final Register notice that became the standard contract, correct?
A. Yes, I believe this is the actual standard contract, with some comments in addition.
Q. Let's look at some of those comments. Could you turn to the page again – I'm going to go with the upper Bates number, so I'm looking at the lower right-hand corner, upper Bates number, there's a number ending in 0025.
A. I have that in front of me.
Q. And this is an awfully densely packed set of columns here, so I'd like to draw your attention to the first column on the left, second, or first full paragraph starting with, "similarly."
A. Yes, I see that.

Page 1911

Q. Do you see that? Okay. And it says, "Similarly, seven commentators addressed the question of DOE performance standards and purchaser remedies with respect to performance. In essence, these commentators pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance." See that?
A. Yes, I do, but I would say the word is "commenters," not commentators.
Q. Thank you. It's difficult for me to read that. Now, if you go down, oh, I don't know, two-thirds of the way down that column, it says, "We recognize that these issues are of concern to the utilities However, we believe that we should be consistent with the language of the Act, the 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date. If the intent of the Act was to have intermediate performance standards or dates, they could have been specified in the Act." Do you see that?
A. Yes, I do.
Q. And that's what DOE was saying at the

Page 1912

time it issued the final registered notice that became the standard contract, correct?

A. That is what they stated. I would question whether that statement is actually accurate.

Q. Now, Mr. Mills, UNWMG saw that statement as a rejection of your proposed request for performance standards, including performance standards related to rate?

A. No. We observed that as a response to our requesting performance standards. It did not mention at all the particular whereas clause that we had suggested be put in there that would have identified the rate, so they stayed silent on that particular clause. They did not reference it at all.

Q. Mr. Mills, I'm going to show you what's been marked as DX-48. And for the record, this is a document dated March, March 18th, 1985, and it says, "draft," and it says, "memorandum in support of petition for rule-making." Do you see that?

A. Yes, I do.

Q. Now, this was a document that your staff put together, correct?

Page 1913

A. I am not sure whether my staff put it together or a contractor put it together, I'm not sure what it was. I do know that we had a large number of drafts as we were considering the petition for rule-making, which we did anticipate that would proceed, but we never did file a petition for rule-making, and there was a reason for that.

Q And you were ultimately responsible for this draft, correct?

A. I do not know whether I was responsible for this draft. This draft, obviously, was one that I was familiar with at the time.

Q. And how were you familiar with it, sir?

A. Because I was familiar with all of the drafts that went forward on petition for rule-making, I don't know that that makes me responsible for it because it is a draft, and I'm not sure at what stage this draft was. To my knowledge, there was never a final document put together called a petition for rule-making.

Q. But you did review this draft?

A. Yes, I believe I did.

Page 1914

Q. And this draft was something you kept in your files?

A. I expect I had it in my file.

MR. LO RE: Your Honor, the government would move for the admission of DX-48 into evidence.

THE COURT: Mr. Chu.

MR. CHU: Your Honor, Mr. Mills has testified that not only this was a draft, but it was never submitted, and we would object on relevance grounds.

THE COURT: Mr. Lo Re.

MR. LO RE: The fact this document is a draft, Your Honor, doesn't make it irrelevant to this litigation. The draft is something that clearly was a document that was being considered by EEI and UNWMG, both of which represented the Plaintiff in this matter, or a spokes group for the Plaintiff.

THE COURT: You haven't established that.

MR. LO RE: Certainly, we've established with Mr. Mills that EEI and UNWMG were speaking on behalf of AP&L or ANO, Your Honor.

Page 1915

THE COURT: Not necessarily.

MR. LO RE: In addition, Your Honor, this document speaks to – the relevance of this document, it certainly addresses what was in the minds of the utilities or the representatives of the utilities after the final promulgation of the standard contract and therefore is relevant because, as we've said, we have heard quite a bit of testimony as to the mindset or the expectations of the parties as the contract was promulgated and as it moved forward.

THE COURT: The Court will defer ruling until Mr. Mills establishes a foundation, and he might establish a foundation that explains why such a petition was never submitted.

BY MR. LO RE:

Q. Mr. Mills, you've testified that it was your belief there was no petition for rule-making ever submitted. Why is that?

A. One of the unwritten rules, I might say on proceeding with a petition for rule-making, is you would only file a petition for rule-making if you had a reasonable

Page 1916

understanding that the result would be satisfactory, something that would be useful. I had personal conversations with Mr. Robert Morgan on this particular issue during the summer of 1983 and the fall of 1983. I had personal communications on this with Michael Lawrence in the spring of 1984, when he was the acting director, and I had personal conversations with Ben Rusche after he became elected, and they indicated to me in each of these conversations that they would not entertain interchanges to the contract. Thus, we did not file a petition for rule-making because they were not receptive to trying to resolve these issues that were open issues.

Q. And in fact, Mr. Mills, at this time, you viewed that section that we just looked at from the final rule-making as a rejection of your request for performance standards to be put into the standard contract, including rate of acceptance?

A. I did not believe that it included the rate of acceptance. It referred to the performance standards as were requested, but it

Page 1917

did not refer directly to that particular proposed whereas clause that would have included the item as was discussed.

Q. Now, at this point, you didn't question the accuracy of what was being presented in this draft, right?

A. We're now talking about this draft?

Q. Yes, this particular draft.

A No, I don't question the accuracy of this.

MR. LO RE: Your Honor, at this time, the government would renew its motion for the admission DX-48 into evidence.

THE COURT: Would you explain the relevance?

MR. LO RE· Yes, I'll be happy to make a proffer. This document shows that, in fact, the utilities or EEI and UNWMG did in fact consider the section of 2.02 to be a rejection of their, a request for performance standards, and thus, they considered actually asking for those two particular tests that we've talked about with Mr. Mills earlier, they considered asking that those, in light of that rejection, they considered asking that two-part test be

Page 1918

included in the standard contract.

THE COURT: Mr. Chu.

MR. CHU: We would renew our relevance objection and also note that this document is irrelevant as to the Plaintiffs in this case in particular.

THE COURT: Well, Mr. Lo Re, we have no indication that Middle South adopted the draft, had anything to do with the draft, urged the draft, it just doesn't seem to be pertinent to Middle South specifically, and especially in light of the fact that nothing was ever done with it, the Court has real questions about it.

MR. LO RE: If I may just follow up with some questions on this?

THE COURT: Yes.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Mr. Mills, the members of UNWMG were certainly aware that you were considering a rule-making, correct?

A. That is correct.

Q. And you certainly were meeting with members of UNWMG after the contracts were promulgated and signed, isn't that right?

Page 1919

A Yes, there were a number of meetings.

Q. And you discussed with them at those meetings, you and your staff discussed with them the possibility of going forward with a rule-making, correct?

A. Yes, that would have been discussed

Q And it's likely that you would have shared any draft petitions that you were considering with your members of UNWMG, correct?

A. I'm not sure of that because we had a large number of drafts, and I'm not sure of which vintage this draft is compared to the others and which ones might have been shared with them, I'm unable to answer.

Q. Okay. But they certainly were aware that the petition for rule-making was a possibility?

A. Yes.

MR. LO RE· Your Honor, again, understanding that we have not established that Middle South Services necessarily saw this document, but they certainly were aware at this time of what was going on, and frankly, whether or not they even saw this document, it reflects

Page 1920

the mindset because Mr. Mills has been very clear, there's nothing that's inaccurate about this document.

The only reason they didn't submit the document was because they didn't think that things would change, but it certainly indicates the mindset of Mr Mills who as an executive at EEI and UNWMG, as he stated previously, was acting as a spokesperson for the utilities, including Middle South Services or Middle South Utilities.

THE COURT: Mr. Chu.

MR. CHU: Your Honor, we would still maintain that the link, to the extent there is any between the Plaintiffs and this document, is quite attenuated.

THE COURT: Well, the Court will not admit the document. Frankly, this particular document appears to be an uncertain draft, and to take it into evidence for whatever assertions or facts or recitations might be made in, it seems problematic. In addition, any number of proposals can be made in draft form to a person or entity, and if they're not accepted, all you have is the fact that they

Page 1921

were not accepted.

We have Mr. Mills' testimony for that, and Mr. Mills' testimony stands on its own footing and provides adequate evidence on this matter before the Court.

MR. LO RE: Thank you, Your Honor.

Your Honor, I did neglect to move for the admission of DX-2.02, which is the Federal Register notice. The government would request that the Court admit that into evidence.

THE COURT: I noticed, Mr. Lo Re, but I didn't say anything at the time. Mr. Chu.

MR. CHU: No objection.

THE COURT: Admitted

(Defendant Exhibit Number DX-2.02 was received in evidence.)

BY MR. LO RE:

Q Now, Mr. Mills, UNWMG did in fact submit a letter to DOE requesting that the Department of Energy issue a rule-making with respect to the standard contract, isn't that right?

A. No, it did not.

Q. Mr. Mills, I'm handing you what's been marked as DX-55, and this is a document on

Page 1922

UNWMG letterhead dated April 28th, 1987. It's to a Mr. Christopher Jedrey, signed by Mr. Steven Kraft Now, Mr. Mills, the first question is, looking at this document, does this refresh your recollection that in fact, as of April 28th, 1987, UNWMG did submit a letter requesting that the Department of Energy issue a rule-making with respect to the standard contract?

A. This letter does not request a rule-making. This is not a way of proceeding with a petition for rule-making. This was a letter written in frustration, frankly, at that particular time because DOE had not been forthright and forthcoming in trying to resolve the issues of the issue resolution.

Both Mr. Kraft and Mr. Jedrey were members of that issue resolution item, and there needed to be some clarification, and this was a request for some clarification, official request for a clarification of that particular activity. It was not a petition for rule-making.

Q. And you're absolutely right about that. The petition here was for a ruling, not

Page 1923

for a rule-making, but a ruling from DOE, correct?

A. May I look at the words? I don't know just where the words are

Q. Sure, if you look, and I'll be happy to point you there, the very first sentence of this letter.

A This letter to request the Department to issue a ruling interpreting, clarifying, amending –

MR. CHU: Your Honor.

THE COURT: Mr. Chu.

MR CHU. This document has not yet been admitted.

THE COURT: Yes, it has been admitted. It was admitted yesterday.

MR. CHU: Sorry, Your Honor.

THE WITNESS: I believe, in the document itself, it clarifies, asking Mr. Jedrey, please give us something, a ruling, an indication, some kind of a verification that you are going to implement what DOE had indicated as its intent in 1983.

BY MR. LO RE:

Q. So let's take a look at that. If you

Page 1924

could turn to page two of this document, this is the Bates number ending 248. There's a paragraph starting with, "commencing," but above that, it says, "The requirements of article IV, section B, paragraph 1 should be interpreted, clarified, or amended to include the following."
And then it says, "Commencing no later than January 31, 1998, DOE shall accept SNF at an annual rate not less than the annual rate at which SNF is being discharged from civilian nuclear power reactors, subject to this and other contracts with DOE. By no later than January 31, 2008, DOE shall have accepted all SNF which has been discharged from such reactors and has been stored for at least five years." Do you see that?
A. Yes, I do.
Q. Now, that request, I want to break that in two parts, the first part of that asks for an annual acceptance rate at which SNF is being discharged. Do you see that?
A. Yes, I do.
Q. Now, that is the same request that you made in your comments to the draft standard

Page 1925

contract, correct?
A. I believe the comments that we made to the draft contract indicated the rate of discharge, plus some to work off the backlog. This wording here is different than that.
Q. Yeah, exactly, because that's just the generation rate, correct?
A. Yes.
Q. But that generation rate was certainly included in that first request that you made –
A. That is correct, and it was also included in the intended statements of Robert Morgan in 1983.
Q. Then below, it says, "By no later than January 31, 2008, DOE shall have accepted all SNF which has been discharged from reactors and has been stored for at least five years." Now, that is not a request that you had previously made, correct?
A. That is correct.
Q. Because, now, you're asking for removal within 10 years after the program begins.
A. That is correct.

Page 1926

Q. Now, Mr. Mills, you were ultimately responsible for the submission of this request, right?
A. Yes, I was, it was Steven Kraft who signed this and forwarded it, and he was working directly for me.
Q. Now, this request was not accepted by DOE, correct?
A. That is correct.
Q. And in fact, DOE responded that it was unable to commit to any acceptance rate under the standard contract at this time, isn't that right?
A. I do not know. I know there was a response, I've not looked at that response in detail, so I don't know. Perhaps you can provide that to me.
Q. Certainly. DX-59, Mr. Mills, I've handed you what's been marked as DX-59. This is a document dated October 2nd, 1987 to S.P. Kraft, director, UNWMG, from Mr. Christopher Jedrey. Do you see this?
A Yes, I do.
Q. Now, Mr. Mills, this document is the response that you just referred to a moment

Page 1927

ago, correct?
A. It appears to be that because the first sentence refers to that April 28th letter, yes.
Q And this letter came to Mr. Kraft who was working for you at the time, correct?
A. That is correct.
Q. And you understood this to be the totality of what DOE was saying at that time in response to your request for a ruling?
A. Yes.
Q. And this is a document that EEI kept in its files?
A. I believe it probably did. I would like to point to the second page on the paragraph that starts "however."
Q. Sure. We're going to get to that in one moment, but first, I want to talk a little bit about your understanding of this document. This document was part of the back and forth between DOE and UNWMG with respect to these performance standards that you have been talking about for some time, correct?
A. It included performance standards and other issues

Page 1928

MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-59 into evidence.
MR. CHU: Your Honor, I would only raise the same objection with respect to relevance to the Plaintiffs in this case.
THE COURT: Admitted.
(Defendant Exhibit Number DX-59 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, I'd like to turn to the second page of this document, under the heading, "Additional Performance Standards."
A. I see that.
Q. And there is a statement here starting with – there's a description of the MRS, you'll see above, and then three-quarters of the way down, it says, "therefore." Do you see that?
A. Is this in the first paragraph?
Q. Very first paragraph, yeah, first paragraph under number one.
A. "Therefore," yes, I have that.
Q. Can you read that into the record, starting with, "therefore," down to the end of

Page 1929

that paragraph?
A. "Therefore, given the current status of the WMS, the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel, SNF, which will equal or exceed the annual rate at which SNF is being discharged from reactors."
Q. And you certainly took Mr. Jedrey at his word when he made that statement, correct?
A. Yes.
Q. Now –
A. Before leaving that page, may I comment on the next paragraph?
Q. Why don't you do that with counsel from Plaintiff? Mr. Mills, in response to this letter that you received from Mr. Jedrey, UNWMG provided a response back to DOE, correct?
A. I do not know. I don't have that in front of me. I do not know whether there was or not.
MR. LO RE: This is DX-60, Your Honor.
BY MR. LO RE
Q. Mr. Mills, I've handed you what's been marked as DX-60.
A. Yes.

Page 1930

Q. And this is a document on UNWMG letterhead, with the member utilities on the left-hand side, dated November 10th, 1987, and this letter is signed by a Nancy S. Montgomery. Do you see that?
A. Yes, I do.
Q. And are you familiar with this document, sir?
A. This is the first I have seen this document in 19 years, so at the present time, I can't say I'm familiar with it, but I probably saw it at the time.
Q. And Ms. Montgomery, did she work for you at UNWMG?
A. She reported directly to Steven Kraft, who –
Q. Was working for you, okay. And this is a document you said a moment ago that you would have expected to see before it was submitted to DOE, correct?
A. Yes, I would have expected to see this.
Q. And, again, this is more of that back and forth between UNWMG and DOE with respect to performance standards that we've been

Page 1931

discussing about today?
A. And other things, yes, performance standards and other things.
MR. LO RE: Your Honor, at this time, the government would move for the admission of DX-60 into evidence.
MR. CHU: We would, again, simply preserve the same objection with respect to its relevance to the Plaintiffs here.
THE COURT: Admitted.
(Defendant Exhibit Number DX-60 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, there is a reference here to an annual capacity report in the second paragraph, and that paragraph refers to procedures for effective and equitable implementation of the waste management system and an iterative process with respect to the waste management system. Do you see that paragraph?
A. Yes, I do.
Q. And then below that, it says, "This viewpoint is further endorsed in the contracting officer's October 2nd, 1987

Page 1932

response to the Utility Nuclear Waste Management Group's request for certain interpretations, clarifications, and amendments to the contract."
And then it goes on and says in his response, "The contracting officer suggested that we might wish to address some contractual issues not adequately addressed in his response by holding follow-up discussions with the Department via the process described in the annual capacity report." Do you see that?
A. Yes, I do.
Q. Now, if you turn to the next page, the third paragraph, second full paragraph starting with, "since."
A. I see that paragraph.
Q. Okay. And I pointed you to the wrong paragraph, I'm sorry, the paragraph below it says, "We would like to invite you to meet with us in the near future." Do you see that?
A. Yes.
Q. "We would like to invite you to meet with us in the near future to 'kick-off' this cooperative effort. We have tentatively scheduled a meeting at our offices for December

Page 1933

8th and 9. Enclosed is a preliminary agenda and a list of participants." And then it says, "As indicated," I think it says, above and in the enclosed agenda, "we would like to discuss our perspectives on the issues raised in the ACR." Do you see that?
A. Yes, I do.
Q. Now, this is what became known as the ACR resolution process, correct?
A. I'm not sure what the name was. I remember it as the ACR response team.
Q Okay.
A. But it may have been referred to as a resolution.
Q. And that ACR resolution process or response team addressed a number of outstanding issues?
A. Yes, it did.
Q. And one of those issues was the rate of acceptance, correct?
A. I believe that was included.
Q. And specifically, the utilities renewed their request that a rate of acceptance be initiated, such that the rate would meet the generation rate and work off the backlog, isn't

Page 1934

that right?
A. I do not know that because I don't believe that's in this letter, and I don't know what the attachment might have said.
Q. But in just putting aside the letter for the moment, the ACR resolution or response team effort did include outstanding performance issues, including this rate of acceptance issue?
A. It should have, yes.
Q. And certainly, it is your recollection, is it not, that even after this 1987 timeframe, the utilities or the response team continued to ask that this so-called two-part test be included in the contract, right?
A. Yes. May I comment further?
Q. Sure, absolutely.
A. This was four years after the contract was signed. There had been this effort of issue resolution over that four-year period, the frustration that existed after four years of not having the normal good-faith response from DOE and getting any issues resolved kept putting us into this box of urging them to try

Page 1935

to come with some sort of a resolution. So that, yes, we were continuing to request that in frustration because they had not been participating in this process in a manner that would resolve issues, and they would not recognize what had been indicated by Robert Morgan in 1983 as the intended way DOE would operate the program.
Q. And up with those issues was this rate of acceptance, right?
A. Yes
Q. Mr. Mills, I want to shift gears a little bit. I want to talk to you about the MRS, monitored retrievable storage. You're familiar with that term, aren't you?
A. Yes, I am
Q. And DOE, as early as 1987, was proposing to Congress an MRS system that would be the way that DOE could begin performance under the standard contract, correct?
A. The Nuclear Waste Policy Act required the Department of Energy to proceed and evaluate whether an MRS would be useful in the program and to come back to Congress with a proposal if they believed it should be, and