Page 1936

it's my understanding that that's what they did.

Q. And in that proposal, DOE proposed an MRS that was, one, linked to the construction authorization for a repository, correct?

A. I do not have the details in front of me, but there were restrictions and linkages that I recalled that were in place, yes.

Q. Okay. And there was also a restriction with respect to the total capacity of the MRS, correct?

A. I believe that was requested, yes.

Q. Now, EEI got a chance to respond to that proposal that DOE submitted to Congress for the MRS, correct?

A. I assume we had an opportunity to present testimony before the committees that were evaluating it. I do not recall. I don't have a document in front of me, but I assume that we probably did.

Q. And not only, at the time, DOE was not only making a proposal to Congress, but making a proposal to amend its mission plan with respect to the entire proposal, correct?

A. Yes, they were modifying their mission

Page 1937

plan also.

Q. And that modification of the mission plan included an MRS that was one whereby the construction was linked – or the opening of the MRS was linked to the construction authorization of a repository, correct?

A. I have to confess that I do not know the details, the mission plan is a bulky voluminous document, and I am very familiar with the first mission plan. Just what was included in this regard in that mission plan amendment of 1987, I simply cannot attest to.

MR. LO RE: Sure Excuse me, Your Honor.

THE COURT: Yes, certainly.

MR. LO RE: I'd like to show the witness DX-53.

BY MR. LO RE:

Q. Now, Mr. Mills –

MR. TOMASZCZUK: Could we have just a moment?

MR. LO RE: Absolutely.

BY MR. LO RE:

Q. Mr. Mills, for the record, this is a document entitled, "Monitored retrievable

Page 1938

storage submission to Congress, volume 1," it's a proposal dated March 1987. Mr. Mills, are you familiar with this document?

A. I believe that I saw the document at the time. I don't know that I could say that I'm familiar with it.

Q. Is this one of the program documents that you reviewed in your position at UNWMG?

A. It probably was, yes.

Q. And because you were keeping abreast as to what was going on with the program, correct?

A. That is correct.

Q. And this is a document that EEI kept in the normal course of business?

A. I would expect so.

MR. LO RE: Your Honor, the government would move for the admission of DX-53 into evidence.

MR. CHU: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-53 was received in evidence.)

BY MR. LO RE:

Q. Now, Mr. Mills, I'd like you to turn

Page 1939

to page five of this document.

A. The document page number five?

Q. Yeah, page number five, it's 315 on your –

A. Yes, I have that one.

Q. Now, this document discusses the proposal to Congress with respect to that MRS, correct?

A. I believe it does, yes.

Q. Now, there's a paragraph there that says, "some potential adverse," do you see that?

A. Yes, I do.

Q. It says, "Some potential adverse programmatic effects have also been postulated by various parties, but most are perceived and avoidable, rather than inevitable. One most often cited is concern that a MRS facility would diminish the resolve to develop a geologic repository. To allay such concerns and to reinforce this country's unwavering commitment to a geologic repository program, the DOE proposes that the Congress link the start-up of the MRS facility to the schedule of the

Page 1940

repository. No waste may be accepted at the MRS facility until a construction authorization for the first repository is received from the Nuclear Regulatory Commission. Further, the DOE proposes that Congress limit the MRS storage capacity to 15,000 MTU." Do you see that?
A. Yes, I do.
Q. Now, that's what DOE was proposing to Congress, right?
A. That is what they were proposing to Congress at that time, and it differed with what they included in their mission plan of 1985.
Q. We can talk about the 1985 mission plan, but I want to focus on this document for a moment. Now, in response to this document or as part, at the – strike that.
At the same time, DOE, I think you mentioned a moment ago, was actually also proposing to amend its mission plan?
A I believe they were, yes.
Q. And that amended mission plan included this sentiment here, that is an MRS with a construction authorization linkage to the

Page 1941

repository, plus a capacity limit, correct?
A. I believe it did, but I don't have that document in front of me to confirm it, but I believe you're probably correct.
Q. In response to that proposal, that two-part proposal, EEI took the position that it wanted DOE to break the linkage with respect to construction authorization, but not necessarily break the linkage with respect to the capacity limit, correct?
A. I don't know that. There may be a document that identifies that We certainly would like to have seen the linkage removed. I don't know whether we made reference to the size.
Q Okay. Let's take a look at a document that might help. This is DX-54 And for the record, this is a document on Edison Electric Institute letterhead dated April 3rd, 1987, re draft mission plan. And this document is signed by Mr. Kiernan, John Kiernan. Now, Mr. Mills, this document is a response or a comment – strike that.
This document encapsulates the comments of EEI to the draft mission plan

Page 1942

amendment that we've been talking about, correct?
A Yes, it does
Q. And Mr. Kiernan was your boss at this time, correct?
A. My supervisor, yes.
Q. And this was a document that, at the time, you would have been familiar with, correct?
A. Yes, at the time, I would have.
Q. And certainly, a document that would have been kept in the files at EEI, correct?
A. I would expect it to, yes.
MR. LO RE: Your Honor, the government moves for the admission of DX-54.
MR. CHU: Your Honor, same objection with respect to relevance to the Plaintiffs.
THE COURT: Admitted
(Defendant Exhibit Number DX-54 was received in evidence.)
BY MR. LO RE:
Q. Now, Mr. Mills, if you were to turn, please, to the fourth page into this document, there's a heading there, "II, Monitored Retrievable Storage," do you see that?

Page 1943

A. Yes, I do.
Q. And it says, "DOE has a statutory contractual obligation to take spent fuel starting in 1998. The five-year delay in first repository operation to 2003 obviously means the repository will not be available to meet this obligation. The DMPA" – that's the draft mission plan amendment, correct?
A. That's correct.
Q. "Recommends handling this dilemma through use of the MRS. The MRS, if authorized by Congress, can be available to begin accepting spent fuel by 1998, if not earlier. Previously, EEI/UNWMG/NTG indicated strong support for the MRS concept for numerous and still valid reasons. Now, the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation." Do you see that?
A. Yes, I do.
Q. And that's what EEI believed at the time, correct?
A. Yes, it is.
Q. Now, if we go on to the next

Page 1944

paragraph, it says, "One aspect of DOE's MRS strategy that EEI/UNWMG/NTG cannot agree with is the so-called linkage between MRS operation and receipt of the NRC construction authorization for the first repository. DOE suggests that such linkage is needed 'to allay concerns that the MRS facility could become a substitute for a permanent repository.' The linkage concept is inconsistent with the purpose of the MRS as described in the DMPA. The effect of the proposed linkage would be to raise a significant question whether DOE will be able to meet its statutory and contractual commitment to begin to accept spent fuel in January 1998."
And then it goes on, "If the construction authorization process does not meet DOE's 36-month target or if other contingencies should occur, MRS operation would be delayed, and the January 1998 commitment would be violated." Do you see that?
A. Yes, I do.
Q. Then it rolls to the next page, still under the heading of MRS, it says, "As a reference to a revising of the DMPA," and then

Page 1945

the very last sentence on this first paragraph on page ending in Bates number 477 says, "In revising the DMPA for formal submission to Congress, DOE, to demonstrate its commitment to the 1998 date, should delete the linkage between MRS start-up and first repository construction authorization." Do you see that?
A Yes, I do.
Q. Now, there is no reference in this passage to the capacity limitation at the MRS, correct?
A. Not in that passage, I would have to read the whole document, whether somewhere else in the document, it might have included that, but the primary concern that we had at that time was the linkage.
Q. The construction authorization linkage?
A. Yes.
Q. And you had that concern because you were concerned that if that linkage didn't get broken, DOE wouldn't be able to meet, or might not be able to meet the 1998 date, correct?
A. Their contractual commitments, that's correct.

Page 1946

Q. Now, subsequent to this, EEI and UNWMG believed that an MRS unlinked to a repository could be a vehicle for DOE to meet its 1998 contractual obligation under the standard contract, right?
A. That is correct.
Q. And in fact, Mr Mills, EEI, through a new group called UWASTE, which was a successor to UNWMG, actually held workshops for contract holders regarding filling out delivery commitment schedules in connection with the MRS, correct?
A. I don't know that the DCS was necessarily linked to the MRS, and that was at a later date from this, and you are correct, the UWASTE was simply a successor to UNWMG. It was not a different organization.
Q. That wasn't a particularly artfully worded question, so let me try to show you a document. It says DX-96.
MR. LO RE: Your Honor, I'm pretty close to finishing this examination.
THE COURT: Thank you, Mr. Lo Re.
MR. LO RE: Thank you.
BY MR. LO RE:

Page 1947

Q. DX-96. Now, Mr. Mills, this document is a document, for the record, entitled, "UWASTE report," dated December 23rd, 1991 on Edison Electric Institute letterhead And your staff put together this report, correct?
A. Yes, they did. This was four years after the prior document we were looking at.
Q. Okay. Now, at this point, the 1991 ACR or annual capacity report had been issued, correct?
A. At this point, I don't think it had been. I believe this letter refers to it will be becoming available shortly.
Q. Absolutely, you're exactly right about that. The 1991 ACR is about to be issued. Now, the 1991 ACR was an ACR that relied on performance beginning at an MRS, correct?
A. Well, the ACR is a planning document I don't know at this time whether that was based on receiving at an MRS or what the plan was here at this particular point.
Q. Okay.
A. The ACR was one of those elements that was a planning document to help flesh out the delivery to satisfy the commitments that had

Page 1948

been made back in 1983.
Q. And you were putting out this document to assist the utilities, the member utilities as they filled out these DCSes as part of the upcoming 1991 ACR issuance, correct?
A. This letter was simply a report of the activities that had happened in the year 1991. I'm looking to see whether this was the letter that indicated there were some workshops, I don't recall it being in this letter, perhaps it is.
Q. Sure, and maybe I can help you out there. If you turn to page two of the document –
MR. LO RE: And before we do that, Your Honor, the government would move for the admission of DX-96 into evidence.
MR. CHU: Same objection with respect to relevance to the Plaintiffs, Your Honor.
THE COURT: Well, we do not, at this point, have enough foundation through Mr. Mills, Mr. Lo Re. The Court will defer ruling.
MR. LO RE: That's fine, Your Honor.
BY MR. LO RE:

Page 1949

Q. Mr. Mills, as we said, this document was a report that you were issuing to UWASTE members, correct?
A. Yes.
Q. And you were issuing that to keep them up to speed as was the mission of UNWMG, which became UWASTE, to keep members up to speed on developments in the standard contract, correct?
A. It was to share information with them on a number of issues, including the standard contract.
Q. Okay. And, again, you were ultimately responsible for the issuance of this document, correct?
A. Yes, I was. It was put together by my staff.
MR. LO RE: Thank you. Your Honor, the government would renew its motion for the admission of DX-96.
THE COURT: Mr. Chu.
MR. CHU: Same relevance objection
THE COURT: Admitted.
(Defendant Exhibit Number DX-96 was received in evidence.)
BY MR. LO RE:

Page 1950

Q. Now, if you turn to the second page here under standard contract, you'll see a reference to delivery commitment schedule APR, ACR?
A. As the first paragraph?
Q. First paragraph, right, and there's a reference there, "The standard contract with DOE calls for the submission of completed DCS forms starting on January 1st, 1992." Do you see that?
A. Yes, I do.
Q. And then there's a reference to the requirement to get the forms in at least 63 months prior to the year in which a particular utility's allocation occurs?
A. That is correct.
Q. Now, the next paragraph down says, "The DCS instructions and forms are expected to be sent to the utilities in January 1992." Do you see that?
A. Yes, I do.
Q. Now, just from a programmatic standpoint, this was the first time the DOE was actually issuing an ACR and APR that required a response, that required a submission of DCSes,

Page 1951

correct?
A. I'm not sure that I can – the ACR itself did not require DCSes. The ACR was a stand-alone report. The DCSes were part of this element with the contract that defined how we were going to flesh out the delivery program. So the ACR really wasn't saying, wasn't the mechanism that said, you must fill out a DCS.
Q. I understand and I appreciate that clarification. What I'm saying or trying to say inartfully is that this was the first time, early 1992, under the standard contract, pursuant to the clauses of the standard contract, this was the first time that utilities were going to be actually submitting DCSes, correct?
A. That is correct.
Q. And one of your missions was to assist them just in the process of how to make it work so that they properly filled out their DCSes?
A. We were providing the form, the workshop where they could communicate and receive information from DOE on the process for filling them out. We were not providing

Page 1952

guidance on their filling out, we were simply serving as a mechanism to allow them to exchange information, and their responsibility would be to fill them out.

Q. These DCSes were going to be filled out, the DCSes contemplated in this document were going to be filled out in conjunction with the 1991 APR/ACR, correct?

A. They were related, yes.

Q. Okay. And you didn't tell member utilities that the 1991 ACR was somehow invalid, did you?

A. I don't believe we did.

Q. You personally had no reason to believe that the 1991 ACR was invalid, did you?

A. I personally knew that the ACR of 1991 did not correspond with the contract as was discussed and intended, the DOE had indicated would be the case of how they would carry out the contract. I was well aware that it did not correspond to the intended program that DOE had stated they would follow when they signed the contract.

Q. But you didn't correct your member utilities not to -- or suggest that member

Page 1953

utilities not fill out the DCSes?

A. No, they were in a box at this time. DOE was in control and putting them in a box, they had to do that, or they were subject to losing an opportunity.

Q. Now, you talked about the intent of the Act. Let's talk a little bit about that and some of the schedules that you saw over the years. PX-185.

THE COURT: Are we back again to PX-7-B?

MR. LO RE: I'm sorry, PX-7-B, can't seem to get that one right, Your Honor.

BY MR. LO RE:

Q. Okay. Mr. Mills, do you have that document that I just handed you in front of you?

A. Yes, I do.

MR. LO RE: And, Your Honor, just so the record is clear, Mr. Mills is looking at PX-185, but I believe the document admitted is 7-B. With the Court's indulgence, I'll examine on the document before him, but I believe it's identical.

BY MR. LO RE:

Page 1954

Q. Mr. Mills, this is the draft 1983 mission plan, correct?

A. That is correct.

Q. And this is a document that you reviewed in the course of your work at UNWMG and EEI, correct?

A. Yes, I did.

Q. Now, if you could turn to table II-1 on this document?

A. Which is on page 2-3, Bates 174?

Q. That's it, there's a table that says, "II-1, waste acceptance schedule," do you see that?

A. Yes, I do.

Q. Now, Mr. Mills, you believed that -- and by the way, this document shows a repository beginning in 1998 and then a second repository coming online in 2003, do you see that?

A. Yes, I do.

Q. Okay. And the repository begins in 1998 at a rate of 1800 MTU and then ramps up to 3000 MTU in the fifth year of operation, correct?

A. It appears to me it's actually in the

Page 1955

sixth year.

Q. Excuse me, you're right, the sixth year. Now, Mr. Mills, you thought that the amounts set forth, the acceptance amounts set forth here were insufficient to meet the intent of the NWPA, correct?

A. That is correct.

THE COURT: Now, Mr. Lo Re, the Bates numbers are different, this is, as the Court has it, 385 in PX-7-B, and it would get confusing otherwise.

MR. LO RE: Okay.

THE COURT. You're referring to table II-1, is that correct?

MR. LO RE: That's correct, Your Honor.

BY MR LO RE:

Q. And the reason you thought these rates were insufficient is because they did not begin acceptance at a rate of 3000 MTU in 1998, correct?

A. They did not indicate a rate that was equivalent to the amount being discharged in that year, plus some to work off the backlog which, as I think I mentioned earlier, we had a

Page 1956

pretty good idea of the amount that was going to be discharged, which was 2000 to 2500 metric ton.
Q. Okay. Now, let's look at another exhibit. Mr. Mills –
MR. TOMASZCZUK: I'm sorry, Mr Lo Re, what number?
MR. LO RE: 186. Your Honor, I'm just checking to make sure we don't have the same problem with this exhibit. I know this exhibit was admitted into evidence.
THE COURT: It was admitted as PX-186.
MR. LO RE: Okay. Thank you, Your Honor.
BY MR. LO RE:
Q. Now, Mr. Mills, I'd like you to turn to page 2-2 of this exhibit, and this is another waste acceptance schedule. By the way, this is the '94 draft mission plan that we're looking at, this is another document.
A. This is 1984.
Q. Thank you, 1984 draft mission plan, this is another document that you reviewed as part of your work during UNWMG and EEI, correct?

Page 1957

A. Yes, I did.
Q. Now, this document has a first repository starting in 1998 at a rate of 400 MTU and then ramping up to 3000 MTU in –
A Sixth year.
Q. Sixth year, okay, thank you. And there's a second repository that comes online in 2006 – is it 2006 that that second repository comes online?
A Yes.
Q. Now, Mr. Mills, you believed that the amounts set forth here in this waste acceptance schedule II-1 are also insufficient to meet the intent of the NWPA and standard contract, correct?
A Yes, I do. In fact, we had lost ground from December to this issue of April.
Q. And, again, the reasons that you thought this was insufficient is for the same reasons you believed the draft 1983 mission plan waste acceptance rates were insufficient, correct?
A. That is correct.
Q. I want to look at just one more document, Mr. Mills. That's the good news.

Page 1958

The bad news is it's 500 pages, but I'm only going to ask you about one of them. Mr Mills, this is PX-187.
MR. LO RE: Your Honor, this document was admitted into evidence as PX-187.
BY MR. LORE:
Q. And this document is entitled, "Mission Plan for Civilian Radioactive Waste Management Program," dated June 1985. Now, Mr. Mills, this is another one of the documents that you reviewed as part of your employ at EEI and UNWMG, correct?
A. Yes, it is.
Q. And this is the final mission plan that was issued in 1985, correct?
A. Yes, it is.
Q. Now, I'd like to turn your attention to page 26 of this document, please. And I believe that's table 2-2?
A. I have that.
Q. Now, this table is referred to as the authorized system, do you see that?
A. Yes, I do.
Q. And this table has got a repository starting in 1998 and a rate of 400 MTU per

Page 1959

year, then it goes to 900 MTU in year four of the contract, and then it ramps up to 3000 MTU in year five, correct?
A. Year six.
Q. Year six, thank you. Now, Mr. Mills, and, again, this has also got the second repository coming online after that, after year six, right?
A. Yes.
Q. Now, Mr. Mills, you believe that the amounts set forth in this waste acceptance schedule are also insufficient to meet the intent of the NWPA and the standard contract, right?
A. Yes, I do.
Q. And, again, the reason you thought that this schedule was insufficient was for the same reasons that you believed the draft '83 mission plan waste acceptance schedule and the draft '84 waste acceptance schedule were insufficient?
A That is correct.
Q. Now, there is another schedule on this, and let's take a look at that. This is table 2-3. And this table is entitled, "Waste

Page 1960

Acceptance Schedule – Improved Performance System." Do you see that?
A. Yes, I do.
Q. Now, this schedule is a little different, this schedule has got an MRS coming online before 1998. It says pre-1998, right?
A. That is correct.
Q. And on this schedule, it looks like 2200 MTUs are accepted before 1998?
A. That is correct
Q. And then by the time you hit 1998, you've reached a steady state acceptance rate of 3000 MTU?
A. That is correct.
Q. At the MRS?
A. Yes.
Q. Okay. And then you've also got the repository coming online, correct?
A. Yes
Q. Now, unlike the other schedules that we've looked at over the last couple minutes, you believed that this schedule did meet the intent of the NWPA and the standard contract, correct?
A. The columns 4, 5, 6, 7, 8, 9 did

Page 1961

represent that, yes.
Q. And those columns represent acceptance rates, is that right?
A. That is correct.
Q. Now, this chart that we're looking at, this improved performance system has acceptance at an MRS before January 31st, 1998, correct?
A. That is correct.
Q. Now, the standard contract did not require that the DOE begin performance prior to 1998, correct?
A. That is correct.
Q. And the NWPA did not require that DOE begin performance under a standard contract prior to 1998, correct?
A. That is correct.
MR. LO RE: Okay. Thank you. One moment, Your Honor.
THE COURT: Yes
MR. LO RE: Mr. Mills, I thank you for your time. I have no further questions.
THE COURT: Thank you, Mr. Lo Re. Mr. Mills and Mr. Chu, it is reasonably close to our break time. Would you mind if we took our afternoon break at this point before you do

Page 1962

your cross-examination, Mr. Chu?
MR. CHU: Not at all, Your Honor.
THE COURT. Thank you. Mr. Mills, do you mind?
THE WITNESS: No, that's fine.
THE COURT: All right. Fine. We're in recess for 15 minutes.
(Whereupon, a short recess was taken )
THE COURT: Mr. Chu, you may proceed with your cross-examination, which will be taken as if it's a direct examination.
MR. CHU: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CHU:
Q. Good afternoon, Mr. Mills.
A. Good afternoon.
Q. Before we start talking about your work at EEI, I have a couple of preliminary questions. First, what is your educational background?
A. My first four years was in a one-room schoolhouse, but I received, was awarded a Bachelor of Science degree in civil engineering from Union College in Schenectady in 1950, and I was also awarded a Master of Business

Page 1963

Administration degree from the University of Washington in Seattle in 1962.
Q. And if I recall your testimony on direct correctly, you worked at EEI from 1976 to 1993?
A. That is correct
Q. Can you briefly describe your work, your employment history prior to joining EEI in 1976?
A. Well, starting in 1950, I worked in industry for 43 years, of which 31 of those years was directly related to the use of nuclear energy for the production of electricity. My first year was with New York Central Railroad. Then I had two years where I worked as an engineer for a small fabricating company in Syracuse, New York, called Bentley Weldery.
In June of 1953, I was invited by the General Electric Company to join their research laboratory at Electronics Park, where I worked on development activities as it related to the production of a large number of electronic equipment. I was transferred by General Electric to the Hanford Laboratory in 1958.

Page 1964

That was an Atomic Energy Commission laboratory, of which General Electric was the prime contractor, and my assignments there was working on what was referred to as the plutonium recycle program. It was one of those programs that came under the auspices of atoms for peace, as president Eisenhower at that time had initiated, and which we were developing the technology of processing nuclear materials into fuel components.

It would be typical of those used in a nuclear plant that would be used for producing electricity. We did that with both uranium and plutonium, and we actually, hands-on, physically working with in the laboratory, building these fuel assemblies, which were tested in the plutonium recycle test reactor.

In 1963, General Electric transferred me to the general purpose control department, where I worked on advanced engineering and was manager of control panel design. In 1967, Kerr-McGee Corporation in Oklahoma City invited me to join them as project manager for the design, construction, and operation of a facility to produce nuclear components, which

Page 1965

we did.

We produced the nuclear components for the Oconee reactors, the first cores for the Oconee reactors at Duke Power Company and also for the Omaha reactor and others. In 1971, I was invited to join the Nuclear Fuel Services Corporation in Rockville, Maryland, where they were putting together a program to design, build, and operate a larger facility to build a complete fuel assemblies.

It was in the 1970s that many changes occurred on the energy picture total, as well as on the nuclear aspects, that was when the Atomic Energy Commission was dissolved into two other organizations, and also, the joint committee on atomic energy at Congress was dissolved, and the program was assigned to other committees.

And so EEI invited me – EEI was headquartered in New York City, they invited me to establish an office in Washington, D.C., to interface with the Federal Government, both the executive and legislative branches, as it related to the issues of nuclear energy, with emphasis at that time on nuclear fuel

Page 1966

activities.

Q. And during your direct testimony, if I recall correctly, you said that while at EEI, you were involved with the development of the Nuclear Waste Policy Act?

A. Yes, I was.

Q. And you also said that you were a technical resource, did I hear that correctly?

A. That is correct. I served as a technical resource providing information wherever appropriate and also writing testimonies that were presented by various executives of the utilities, wherever the opportunity existed in hearings in Congress.

Q. And did your work at EEI on the NWPA involve any interaction with the Department of Energy?

A. Oh, very much so, I was spending a great deal of time actually visiting the Department of Energy, individuals there.

Because I had a federal security clearance, I was allowed unescorted access within the DOE headquarters, so I had the opportunity to visit with a large number of different offices that were working on this particular program.

Page 1967

And as the Nuclear Waste Policy Act was being developed, DOE was in the process of putting together conceptual designs of how they would in fact implement such legislation.

Q Now, you said that you had these meetings at DOE headquarters. How often did these meetings take place?

A. It was usually at least once a week, sometimes more often.

Q. And how long would these meetings last?

A. Well, I would generally spend at least one day a week within the DOE offices and be exchanging information with a significant number of people during those visits.

Q. Mr. Mills, do you recall specifically with whom you had these meetings?

A. Yes, in different timeframe, prior to the time that president Reagan was elected, the meetings were held with Woody Cunningham, who was the assistant secretary for nuclear energy at that time, Michael Lawrence was also an official in DOE, I do not know what his title was, also Frank Coffman, Shelby Brewer, and there were others, there were a large number of

Page 1968

different individuals that I spoke to.
After President Reagan came into office, he appointed Shelby Brewer as the assistant secretary for nuclear energy. Now, I had been communicating with him prior to that time, but also continued to after that, and I know that Frank Coffman was working for him, with emphasis focused on the nuclear waste program, as was Mike Lawrence.
Q. And you mentioned that you had these meetings at DOE. Did you ever have meetings with these individuals elsewhere?
A. There may have been opportunities where we actually invited them to join one of our committee meetings and describe their program to a committee meeting, but I'm not able to identify specific times at this point.
Q. So it's fair to say that most of your meetings with these individuals took place at DOE?
A That is correct.
Q. Now, what was the substance of these conversations regarding the NWPA?
A. Well, to back up just a moment, the environmental impact statement which was at

Page 1969

issue either in 1978 or '79 specifically recommended that the waste be disposed of in deep underground geologic repositories.
I had worked with DOE as they were developing that environmental impact statement, continuing our discussions with DOE, how were we going to implement that activity, and the discussions led to the fact that we really, even though that was the recommendation of the environmental impact statement, that we really needed to codify it into a legislative national policy.
Q. And when did that take place?
A. That took place over a four-year period, from 1979 through 1982, and was finally completed in December, I think, 22nd of 1982.
Q. And turning back to your conversations with Messieurs Cunningham, Lawrence, Coffman and Brewer, do you recall what was discussed at those meetings with respect to the Nuclear Waste Policy Act?
MR LO RE· Your Honor, I'm going to object on the grounds of relevance here. What these individuals said prior to the issuance of the NWPA is not really relevant to this

Page 1970

inquiry.
THE COURT: Well, if we get a verbatim report of what they say, it's hearsay.
Mr. Chu?
MR. CHU· I'm simply laying the foundation for future questions regarding testimony that Mr. Mills already covered with topics that Mr. Mills already covered with counsel for the government on direct.
THE COURT· You may ask about the topics addressed with these officials, but not any details about the conversations.
MR. LO RE: Thank you, Your Honor.
BY MR. CHU:
Q. What specific topics did you discuss with these individuals?
A. We talked about the quantities that would be appropriate in establishing a program to implement what was being drafted in the Nuclear Waste Policy Act, so that there was, they had worked on conceptual designs, and they were sharing with me the information on their conceptual designs of how they would participate in a program and have a repository and whether it should be a repository or

Page 1971

whether it should include an MRS.
Those were discussions that were included at that time.
Q. And you gained this understanding from your discussions with DOE?
A. Yes, I did.
Q. And did these discussions with DOE cover any quantitative performance measures in addition to those you just described?
A. It generally talked about how long it would take to get the job done, as well as the fact that it appeared that 3000 metric ton per year was an appropriate number to be using as the value for their receiving rate, but really, the receiving rate and the time period over which it could be completed.
Q. And you had these discussions regarding the 3000 MTU rate with individuals at DOE?
A. Yes, I did.
Q. And how often were these meetings?
A. Well, this was all part of my continuing dialogue with DOE on those weekly meetings that I would spend within DOE, and so it came into the discussion, I know it was in

Page 1972

the discussion in 1980, 1981, and 1982.
Q. And based on these discussions with DOE, what was your understanding at that time as to how the 3000 MTU rate was developed?
A. It was my understanding that they had evaluated what others had done, like the Barnwell plant in South Carolina, which was designed for 1500 metric ton facility, we had also – "we" being the Edison Electric Institute and TVA had also performed a study of moving spent fuel and what we would have to do if we were required to store it for a hundred years.
DOE participated with us in that activity, so it consisted of what was an appropriate reasonable rate that could be achieved for running a program.
Q. And do you know why 3000 MTU was discussed as a reasonable rate?
MR. LO RE: Objection, Your Honor, calls for speculation, and I believe it's calling for hearsay, in that we're now talking about reports done at the Barnwell plant, for instance.
THE COURT: Overruled.

Page 1973

THE WITNESS: Excuse me, could I have the question reread?
(The reporter read the record as requested.)
THE WITNESS: DOE was looking at what would be a reasonable rate for handling that quantity of, a quantity of spent fuel, and the 3000 metric ton came out of the issue as a reasonable rate for handling spent fuel.
BY MR. CHU:
Q. And what kind of a plant was being contemplated at Barnwell?
A. That was a reprocessing plant which would have received spent fuel and reprocessed the spent fuel and recovered the uranium and plutonium values to recycle back into fuel cycles, into the fuel cycle, and also to separate the high-level waste, which would be disposed of.
Q. And what was your understanding as to why this was discussed?
MR. LO RE: Objection, calls for speculation.
THE COURT: Sustained.
BY MR. CHU·

Page 1974

Q. Now, Mr. Mills, based on your understanding of these meetings, these same meetings with DOE, to what extent would it have been unconscionable for DOE to commit to an acceptance rate in 1983, assuming future uncertainties in the waste acceptance program?
MR. LO RE Objection, calls for speculation, compound, Your Honor.
THE COURT: Sustained.
BY MR. CHU:
Q. Mr. Mills, do you have an understanding about DOE's decision to commit or not to commit to an acceptance rate in 1983?
A. Yes.
Q. And what was that understanding?
A. The understanding in 1983, which was – are you asking what was the intent of DOE, as we understood it in 1983?
Q. Well, let's take that first.
MR. LO RE: Objection, calls for speculation. Mr. Mills cannot talk about the intent of DOE.
THE COURT: No, that's right, let's read the question back, please.
(The reporter read the record as

Page 1975

requested.)
THE WITNESS· That understanding was on the basis that we did not have one contract with one utility or one industry. We had a total of 60-plus contracts, and it was not reasonable to identify at that time, we simply did not have enough information to reasonably identify how much material would be delivered from each one of the 60-plus contracts.
So it was not reasonable to try to include a particular number in each of these contracts at that time.
BY MR. CHU:
Q. Why was it not reasonable?
A. Because you just didn't have enough information and it was dividing the pie of the 3000 metric ton or whatever they were going to receive over 60 contracts and that was not – you couldn't identify that at that time, but we did have an indication of what the overall amount would be that they would receive.
Q And what was that indication?
A. This indication was stated by – well, was stated in several ways, but it was understood at that time that – this was now

Page 1976

four years after the Three Mile Island accident, so I personally had an idea of how many nuclear plants were running, how many were under construction that would be completed. And we could identify from that, and we knew we weren't going to order any new nuclear power plants for a long time, we could identify that in 1998, quite accurately, that the amount of spent fuel that would be discharged was between 2000 and 2500 metric tons. And we recognized that this quantity related somewhat to the quantity of 3000 metric ton that DOE had indicated they were planning to receive in a year, so there was a reasonable match there of what was going to be discharged and what DOE had indicated that they would receive.

Further on, that 3000 metric ton, of course, was documented, as we've seen in some of the earlier exhibits, as their ongoing receiving rate. And Robert Morgan had stated on December 12th of 1983 that DOE intended to operate the program on the basis that no utility would have to add additional storage capacity for spent fuel discharged after

Page 1977

January 31st, 1983.

Since you knew what was going to be discharged in 1983, the 2000, 2500 ton, and he indicated that was the plan, the intended amount at that time, that this established a reasonable intent of DOE in 1983 at the time of the contracts.

Q. So, just so the record is clear, in your previous answer, you had alluded to, I believe, the phrase "four years after Three Mile Island," is that right?

A. That is correct. It was four years after the Three Mile Island accident, so we had a good feel at that point what was going to happen in the nuclear industry.

Q. And what year was that?

A. Well, we're now talking 1983, the accident occurred in March 30th, 1979. In that four-year period, we could identify, a number of nuclear power plants that had been ordered in the '70s were being canceled, we could identify how many were operating, we could identify how many that were under construction that would probably be completed, and we also knew, because of the accident, that it would be

Page 1978

a long time before any new plants were brought online

So that gave us a quite reasonable estimate of the amount of fuel that would be discharged during the year of 1998, which was the year that DOE committed to 60 different contracts that they would be receiving spent fuel.

Q. Now, Mr. Mills, turning back to the Nuclear Waste Policy Act, do you recall when it was signed into law?

A. Yes, it was on January 7th, 1983.

Q. And how do you remember?

A. Because of the work I had participated in, in the four years of developing that particular legislation, I was invited to the White House and was in the room when President Reagan signed that particular document.

Q. And as a utility representative at EEI, what was your understanding of how utilities reacted to the signing of the NWPA?

A. They were very pleased to have it We now had a national policy that established what we were going to do with the spent fuel, when we were going to do it, and a process in place

Page 1979

of how it could be completed.

Q. And after the NWPA was signed, this process you've just alluded to, do you know how soon after that work began on the development of the contract?

A. Immediately.

Q. And do you know what steps DOE took to initiate this development of the contract?

A. I had personal discussions with individuals at DOE, sharing thoughts on what should be in the contract early in January of 1983. DOE held a information meeting on January 19th of 1983, in which they outlined how they were going to proceed with developing the contract.

Q Were you at this meeting?

A. Yes, I was.

Q. And what did you do at that meeting, if anything?

A. This was an information meeting. It was not really an opportunity for dialogue, but we did have a chance to ask questions. I personally asked the question, would they please provide us as early a copy of their draft plan as they could, and they responded

Page 1980

positively.
They did not have those drafts there at the meeting, but within the next day or two, we did receive a copy of the draft contract, as that was looked at, at that point.
Q. And if I understand your testimony on direct, this draft contract was submitted for comment by the industry in the Federal Register?
A. No, there were additional comments that we exchanged with DOE on that particular draft. This was an early draft, the draft that was in the Federal Register in February, I've forgotten which date of 1983, early in February of 1983, was the final draft on which we were able to comment, and we had just the 30 days to comment on it.
Q. You said 30 days?
A. 30 days.
Q. And following this opportunity to comment, do you know if utilities engaged in any negotiation on the standard contract with DOE?
A. It is not an opportunity to negotiate. It simply was a closed process. DOE took the

Page 1981

comments, they closed the door, we could not speak to them at all. They would not allow me to speak to them, and they proceeded to take the comments and modify the draft that they had submitted in the Federal Register in early February and finalize what they believed was an acceptable contract and published in the Federal Register, I believe it was April 18th of 1983.
Q. Now, you said that it was a closed process, and you said that you couldn't participate. Do you know who could participate?
A. Only the Department of Energy employees, government employees and their contractors, as I understood it.
Q. And after that, what was the next step in the process?
A. Sign the contracts, there was a requirement to sign these contracts, the Nuclear Waste Policy Act required these contracts be signed by dates certain, which turned out to be June 30th, 1983, and the penalty for not signing them was so harsh, the penalty was if they didn't sign these

Page 1982

contracts, no matter what they were, that they would be subject to losing their operating license for the nuclear power plant.
That was such a harsh position that they had no choice, they had to sign them.
Q. And what is your basis for that statement?
A. The Nuclear Waste Policy Act required them to sign these contracts
Q. And as a utility representative, what was your understanding of the utilities' reaction to the contract that they signed?
A. They were not happy with it, there was a letter which I helped draft, which was dated May 20th, 1983, signed by Jack, John Kiernan, that went to Robert Morgan, outlining the dissatisfaction with that particular contract.
And I identified that this was a long-term contract, and it's a long-term, it's many decades with progress payments, which were going on starting in 1983 of billions of dollars, at least hundreds of millions of dollars each year
And there needed to be, within a good contract, it was a credible contract, but it

Page 1983

did not have in it what you would normally have in a contract, providing performance objectives and performance milestones, they simply didn't have that, that you would expect to be in a contract. And that was so indicated to Mr. Morgan before the contracts were signed.
Q. Can you elaborate on that performance milestones, is that what you said?
A. Yes, performance milestones, one of the things which was included in the Nuclear Waste Policy Act was a series of milestones of what DOE was supposed to have accomplished in putting the program together. DOE did not include those milestones in the contract. We thought they should have. They indicated they would not put them in and indicated it wasn't in the Nuclear Waste Policy Act, but in fact, it was. That's why I questioned one of the statements earlier.
Those milestones should have been in the contract. There was other need in the contract to have performance objectives, so you would know whether the program was progressing on a basis that would allow DOE to satisfy their commitments.

Page 1984

Q Now, earlier, you had testified about meetings that you had with DOE, and based on those meetings, what was your understanding, as of the time the standard contracts were signed, as to what DOE believed was the acceptance rate to be employed under the standard contract?

THE COURT: Mr. Lo Re.

MR. LO RE: Objection, calls for speculation, Your Honor.

THE COURT: Sustained.

BY MR. CHU:

Q. Do you have an understanding as to what the utilities believed?

A. Yes, I do. And it was incorporated in that whereas clause that we talked about earlier on direct, whereas the utilities believed that they were paying for a task that was going to provide delivery to DOE, starting in 1998, equivalent to the amount that was being discharged from the reactors, plus an amount to work off the backlog.

That was the utilities' understanding at that time.

Q Now, Mr. Mills, I'm going to turn your attention to what has previously been admitted

Page 1985

as PX-196, which I believe you discussed on direct with counsel for the government, and I believe these are the transcript of proceedings from the December 1983 OCRWM meeting. Do you have those in front of you?

A. Yes, I do.

Q. And if I could have you turn to the Bates page that ends in 9619? Let me know when you've found it

A. I have apparently mixed up the pages. They were loose pages, and I have not yet found 9619 I have 9615, 16, 18, 17, and 18. Somehow, I have mixed them up and do not know where that is.

THE COURT: Mr. Mills, I have a sneaking suspicion that it's because you addressed this particular page on direct examination with Mr. Lo Re.

MR. CHU: Your Honor. Perhaps it would help if I handed Mr. Mills a copy of that page.

THE COURT: I could do the same thing, if Mr. Mills would hand it back after he's finished.

THE WITNESS: I have that page.

Page 1986

BY MR. CHU:

Q. Now, Mr. Mills, during your direct, you testified about a paragraph on the right-hand column, the first full paragraph starting with, "there are some"?

A. Yes.

Q. Do you recall that?

A. Yes, I do.

Q. And there's also a sentence in that paragraph that says, that starts with, "We really were never under an illusion that we would get a fair and equitable contract with DOE with firm commitments and detailed performance standards with penalties for nonperformance." Do you see that?

A. Yes, I do.

Q. Do you recall making that statement?

A. Yes, I do.

Q. And do you recall why you made that statement?

A. Yes, I do. The contracts were put together in that basis we discussed a few moments ago, where there was not an opportunity for us to negotiate a contract. We simply did not have that opportunity, the ground rules

Page 1987

that DOE had established in January of 1983 precluded us from being able to negotiate a fair and equitable contract.

The fact that you could not put in firm commitments was understood because there were 60 different, 60-plus different contracts, and it was just not reasonable to try to identify what the firm commitment would be in quantity numbers for each of these individual contracts. It was not one contract. DOE had issued these contracts in which every single one, all 60-plus, indicated that they would be receiving spent fuel by January 31, 1998 from each of 60 different contracts.

It just wasn't possible, 15 years in advance, to identify the details that would give them a firm commitment on those numbers That had to be fleshed out later.

Q. And why wouldn't it not have been possible to predict 15 years in advance?

A. There simply wasn't enough information available at that time to identify how one would actually implement the contract in allocating across the board who would be able to deliver how much material. It just wasn't

Page 1988

practical at that time. There wasn't enough information.

Q. And how does that pertain to the acceptance rate, if at all?

A. Well, the acceptance rate that we've talked about is the overall industry acceptance rate from the combined 60 contracts, and that acceptance rate was stated by Robert Morgan in that meeting of how they intended to proceed. And that included everybody, but it didn't allocate how much was to each one of the 60 contracts, that just simply was not – you couldn't do that at that time.

Q. Now, Mr. Mills, I'm going to turn your attention to another document that you discussed on direct, and this would be Plaintiff's Exhibit 59.

A. May I explain one more item on this document?

Q. Sure.

A. At the end of that same paragraph, if I might read it into the record, "It is a matter of some question" – no, "It's a matter of the performance assurances to include some of the things we heard this morning which are

Page 1989

not embodied in the contract." And in that morning, Robert Morgan had spoken, and that's what I was referring to specifically by that statement, and Robert Morgan had stated earlier in the day that DOE intended to operate the program on the basis that no utility would have to add additional capacity to store spent fuel that was discharged after January 31st, 1998. That was the intention of DOE and how they were going to operate the program.

Q. And so that's why you made the statement?

A. And that was saying, well, let's put it in the contract, if that's your intention, let's put it in the contract.

THE COURT: Thank you, Mr. Mills, for the return of the page.

BY MR. CHU:

Q. Now, Mr. Mills, if I could turn your attention to what had previously been admitted as Defendant's Exhibit 59? And I believe that should be in the materials in front of you.

A. What is the subject?

Q. This would be the October 2nd, 1987

Page 1990

letter from DOE to Mr. Kraft.

A. Yes, I have that.

Q Now, if I could please turn to the second page of DX-59? Do you see that?

A. Yes, I do, additional performance standards.

Q. Yes, and you had answered questions from counsel for the government regarding the first full paragraph under that heading, "Additional Performance Standards," is that right?

A. Yes, I did.

Q. And you had also said you wanted to comment on the second paragraph.

A. Excuse me, I'll have to take a moment to glance at it.

Q. Please take your time.

A. Because there's been a number of things that have happened since I last looked at this a few hours ago. Oh, yes, the second paragraph starts, "However, with respect to your concern that DOE could in theory meet its contractual obligation to begin the waste acceptance process by accepting a single assembly in 1998 and no more until decades

Page 1991

later, I can assure you that the Department intends to honor both the letter and the spirit of the Nuclear Waste Policy Act and the contract."

This was the contract officer saying they were going to honor the spirit of the contract, and the spirit of the contract had been established in 1998.

Q. 1998?

A. 1983, excuse me, 1983, these dates flow, the spirit was in 1983 that they were going to be taking the spent fuel at a rate equivalent to that amount, so that no utility would have to add additional capacity for storage of spent fuel storage discharge after January 31st, 1998, and that was the spirit of the contract. So he's saying here that he would be honoring them. In fact, their discussions did not.

MR CHU: Your Honor, could I have a moment, please?

THE COURT: Yes.

MR. CHU: Your Honor, I have no more questions at this time. Thank you, Mr. Mills.

THE COURT: Thank you, Mr. Chu.

Page 1992

Mr. Lo Re?
MR LO RE: Thank you, Your Honor.
REDIRECT EXAMINATION
BY MR. LO RE:
Q. Mr. Mills, you just discussed with counsel for ANO the spirit of the NWPA and the spirit of the contract, remember that?
A. Yes, I do.
Q. And the spirit, as you understand it, was, of both the Act and the statute – excuse me, the Act and the contracts, were what, sir?
A. There was an understanding that the utilities would be paying the Department of Energy several hundred million dollars a year for a service that was to be performed starting in 1998 and that the activity in 1998 was going to be taking spent fuel from each of the 60-plus contracts somehow and that it was going to be equivalent to the amount, so that no utility would have to add additional capacity for storage of spent fuel after January 31st, 1998.
Q. Now, Mr. Mills, the NWPA does not include language stating that, as of 1998, fuel will be accepted in such a way so that contract

Page 1993

holders would not have to add additional capacity after January 1st, 1998, does it?
A. That is correct. It does not state that.
Q. And the standard contract that we've been talking about today does not include specific language that says, as of 1998, fuel will be accepted in such a way so that the contract holders will not have to add additional capacity, storage capacity after January 31st, 1998, is that correct?
A. The contract is silent on that particular item. I agree, the contract is silent. It doesn't include those words, and because the contract is silent on that important issue, you have to look at the intent at the time.
Q. So the answer is it's not in there, right?
A. It's not in the contract, but the intent stated that.
MR. LO RE: Thank you. Excuse me, one moment, Your Honor.
BY MR. LO RE:
Q The contract itself is embodied in the

Page 1994

actual individual contracts that the utility signed, correct?
MR. CHU: Objection, vague
THE COURT: Mr. Chu.
MR. CHU: Also calls for a legal conclusion.
THE COURT: Grammatically, the question is not appropriate, and because it's not appropriate, it has certain ambiguities that will make it vague
MR. LO RE: I'll rephrase.
THE COURT: Sustained.
MR. LO RE. Thank you.
BY MR. LO RE:
Q. Mr. Mills, the intent of the contract that you were discussing a moment ago, that intent is embodied where in the standard contract?
A. It is not embodied in the standard contract.
MR. LO RE: Thank you. No further questions.
THE COURT: Mr. Lo Re and Mr. Chu, may the Court excuse Mr Mills as a witness?
MR. CHU: Yes, Your Honor.

Page 1995

MR. LO RE: Certainly, Your Honor.
THE COURT: Mr. Mills, before I do that, I'm obliged to read you an instruction. The Court has a sneaking suspicion this has happened to you before I believe if I read you the instruction, you will understand it. If you don't, if you would please say so and if you would ask any question you may have, that would be appreciated.
The parties have requested, as they are entitled to do, under Federal Rule of Evidence 615, and you might have accumulated a lot of knowledge in your years, but probably not about the text of that rule, but as you might know from not being present in the courtroom during the testimony of other witnesses, that fact witnesses be excluded from the courtroom during the testimony of other witnesses so that each fact witness can give his or her testimony fresh, without being either influenced by or distracted by other's testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, and we're running way over the time

Page 1996

when it was scheduled to be concluded, that you not discuss your testimony with anyone who either is or could conceivably be a witness If you have any question about who could be a witness, you may ask counsel, and your counsel can consult with Mr. Lo Re and Mr. Chu and their colleagues and sort that out. Does that help?

THE WITNESS: I understand it completely, and fortunately, I'm far enough away from Washington that I do not believe that will be a problem

THE COURT: Where are you, by the way?

THE WITNESS: On Canta Island on the eastern shore of the Chesapeake Bay.

THE COURT: Wherever it is, I hope you keep it up because, by the Court's reckoning, you must be at or approaching 79 years of age, and you're doing extraordinarily well, and the Court appreciates that, appreciates your memory and your competence and your willingness to appear and to testify here today. Thank you.

THE WITNESS: Thank you

THE COURT: Mr. Tomaszczuk

MR. TOMASZCZUK: We are pleased.

Page 1997

THE COURT: At the witching hour?

MR. TOMASZCZUK I wish, but no such luck, nor for the Court as well We have a series of designations we plan to proceed with at this time.

THE COURT: If you would, please? You have counsel, presumably yourself, who will direct this endeavor?

MR TOMASZCZUK: I will.

THE COURT: And you have a designated counsel appearing for yourself and a designated witness?

MR. TOMASZCZUK: Mr. Smith was going to be the designated witness. I was going to be the questioner.

THE COURT. Thank you. And, Mr. Gardner, you and Ms. Sullivan?

MR. GARDNER: Your Honor, the way I anticipate it was going to work, as we've spoken with Plaintiff's counsel, is they would read in their designations, we would resolve whatever objections we have, and then right after the designations for the particular witness, we would then put on our counterdesignations for that particular

Page 1998

witness.

THE COURT: You aren't going to put the designations and counterdesignations on as they flow naturally in the testimony?

MR. GARDNER: Well, I thought that's almost what I said. For example, after the designation for, let's say, Mr. Brownstein's, for example, were to be completed, it would be our expectation that we would then do our counterdesignations for Mr. Brownstein sequentially, rather than do all the designations, then all the counterdesignations, because then there's really no context, but if the Court has a preference, obviously, we'll go with whatever the Court wants to do.

THE COURT: Well, modestly, it is very modestly because it is your case and Mr. Tomaszczuk's case, it sometimes helps if you have a designations and then a counterdesignation before you get to a further designation, if you have them all in sequential order. It just, otherwise, you have a stutter-step.

MR. GARDNER: I completely understand, and I think that makes a lot of sense, Your

Page 1999

Honor. And why don't we approach it that way? We actually had a separate witness, I guess, or actor to play a witness, Mr. Gilbert Schnitzler, who you may remember from TVA.

THE COURT: Yes, I do

MR. GARDNER: So I don't know if it'll be too disruptive to move Mr. Smith and Mr. Schnitzler around, but we'll just do the best we can do, if that's acceptable.

THE COURT. Let's take it the way you've planned it, and we'll not fuss.

MR. TOMASZCZUK: My problem, Your Honor, in our effort to significantly reduce the amount of designations, and as the Court heard me yesterday, I think we reduced them by more than two-thirds, in some instances, we have very short designations, and then the government has some interspersed designations. I personally think I would at least like to try for the first witness, and that would be Mr. Barrett, to try and go through ours and then have the government go through theirs.

THE COURT: It's not the Court's preference, but the Court will accede to your