Page 3832

follows the first repository by four or five years.
We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel. In addition, by that time, there may be some reactors which have reached the end of their design lifetime, and that will be shutting down. If so, we would have the second repository to receive fuel from the basins of those reactors, so that they can go through the appropriate decommissioning aspects."
Mr. Morgan, do you recall this portion of your statement?
A. Yes, I do.
Q. And why did you make this statement?
A. This is a preamble to what we were coming out with in the mission plan, and this was later shown in the mission plan just what we were trying to do here.
Q. At the time you made this statement, did DOE know how much spent nuclear fuel would be discharged from operating reactors on an annual basis?
A. Yes, we did.

Page 3833

Q. How did you know that?
A. From the estimates from the utilities.
Q. And your statement also mentions backlog To begin to work off the backlog, did DOE expect a second repository would be needed?
A Yes.
Q. Mr. Morgan, I'd now like to jump down to the paragraph that begins, "we have learned a lot in the consultation process."
"We have learned a lot in the consultation process. There are some very difficult issues that have been identified and we are attempting to work with the states on the resolution of those issues. It is our intent to continue and, in many cases, expand the consultation process. The timetables set out in the Act and those discussed in the mission plan are clearly optimistic
While we are making a number of assumptions in laying out the schedules contained in the mission plan, we are trying to identify those areas where we know there is inadequate time available to meet a mandated milestone, such as the time allowed in the Act for site characterization. For example, the

Page 3834

Act specifies that in January 1985, we recommend to the President three sites for site characterization.
Then in March 1987, the President must recommend a site for the first repository.
Clearly, two years, from 1985 to 1987, is insufficient for conducting site characterization." Mr. Morgan, what is the consultation process mentioned in that paragraph?
A. We consulted with the states, Indian tribes, and other interested parties as required by the Nuclear Waste Policy Act.
Q. And what did you consult with them on?
A. The repository, the MRS, the transportation issues, the entire content of the program.
Q. And why were you consulting with these entities?
A. Because it was required by the Nuclear Waste Policy Act.
Q. And I believe you mentioned at the beginning of your testimony letters that were sent to governors and other entities, was that part of the consultation process?

Page 3835

A Yes.
Q And what do you recall about the schedule set forth in the Nuclear Waste Policy Act for the development of the program?
A. I don't understand the question.
Q. I believe that this statement, and you've testified about various requirements in the Act with regard to program activities, what do you recall about the schedule laid out in the Nuclear Waste Policy Act?
A. They're extremely tight, and that example I used here was the two years for characterization of a site.
Q. Mr. Morgan, I'd like to now go back up a paragraph. "We are concerned with the schedule on the repository is extremely optimistic for getting to 1998. We believe that there are challenges, and that some will say risks, to obtaining that date. Therefore, we must have an alternative plan or a parallel plan to begin receiving waste by January 31st, 1998.
Monitored retrievable storage could serve as that alternative. The mission plan will also cover federal interim storage, waste

Page 3836

packaging, and other interrelated issues."
Mr. Morgan, why did you say in this paragraph that the schedule for the repository was extremely optimistic?
A. Because of the uncertainties of that noted before.
Q. In the development of the repository, let me go down to the last paragraph on this page, and I'll read that in. "To summarize, the basic strategy is to have a repository in operation in 1998. We will, however, keep a parallel program going on, an MRS, so that if a repository is not available by 1998 or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law – to begin accepting waste in 1998."
Mr. Morgan, at the time you were director, did DOE view the MRS as an alternative way to meet the 1998 date?
A. Yes.
Q. And in your work in the program at this time on the repository and the MRS, did you consult with state governments?
A. Yes.

Page 3837

Q. And why were you consulting with state governments?
A. Because of transportation issues, the MRS issues, and the repository issues.
Q. And what were those issues?
A. Well, basically, the NIMBY or not in my backyard syndrome, that the states would talk to us, but they were not interested in either having a repository or an MRS in their state, and the Act set out a process by which those could be resolved.
Q. Thank you. Let's look at one last document, Plaintiff's Exhibit 275.
MS. SULLIVAN: Your Honor, Plaintiff's Exhibit 275 has already been admitted into evidence.
BY MS. SULLIVAN:
Q. Mr. Morgan, could you identify Plaintiff's Exhibit 275 for the record?
A. This is the draft mission plan that we published in December of 1983.
Q. And is this the draft of the mission plan that is the subject of your comments at the information meeting held in December of '83?

Page 3838

A. Yes, but the plan had not been published at that point in time.
Q. Mr. Morgan, I'd like to direct your attention to page 2-2 of this document, and I'd like to read the second or third paragraphs of that document.
"This waste acceptance schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element.
Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes beginning in 1987. The disposal contracts with the utilities specified that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm, individual utility acceptance schedules in accordance with the contracts, including

Page 3839

shipment allocations " I'll stop there
Mr. Morgan, at the time this document was issued, when did DOE expect to be able to establish a schedule for acceptance?
A. 1991.
Q. Mr. Morgan, I'd like to read the next sentence, the next paragraph into the record, which starts on 2-2, and then there's an intervening waste schedule and finishes on 2-4.
"While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that the individual utility may face a need for expanded storage, due to the timing of its shipment allocation.
The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date)."

Page 3840

Mr. Morgan, what did the "in the aggregate language" mean in that sentence, in that paragraph that I've just read?

A. In the total sense of the word, the aggregate, the total totality of the spent fuel.

Q. In formulating this sentence, was there a determination made as to the individual, the storage requirements that an individual utility might face?

MR. TOMASZCZUK: Objection, leading.

THE COURT. Would you restate your question?

MS. SULLIVAN: Sure.

BY MS. SULLIVAN:

Q. Mr. Morgan, did you look at, at the time this mission plan was issued, the individual storage requirements of a utility?

A. At this time, no.

Q. Mr. Morgan, at the time the language, the paragraph was placed in the mission plan that I've just read, did you understand that DOE had a contract obligation to prevent the need for additional on-site storage after 1998?

A. No.

Page 3841

Q. Mr. Morgan, if you could look at the schedule on 2-3? Mr. Morgan, what is the information set in this schedule?

A. This starts with the annual spent fuel generation in MTUs, discharge from the decommissioning of the reactors, cumulative spent fuel generation, that's a total of all the fuel that's out there, and then the work down is shown by the first and second repository or then the cumulative acceptance and then the remaining backlog. So we start working off the backlog in 2003 after the opening of the second repository, which I think is consistent with the earlier statement, that we would need the second repository to work down the early backlog.

Q. And the information set forth in the annual spent fuel generation column, that second column on the page, are these the generation estimates that you referenced earlier?

A. Yes, and the footnote on that, this is data from U S. Energy Information Administration document dated July 26th, 1983,

Page 3842

that's a source of those numbers.

Q. And where did you understand that the Energy Information Administration got those numbers?

A. From the utilities.

Q. And at the time this schedule was issued in the draft mission plan, how many repositories did DOE plan to operate?

A. Two.

Q. And, Mr. Morgan, each of those repositories, do you understand the steady state rate for each of those repositories to be 3000 MTU?

A. Yes.

Q. What was your understanding as the relationship between the design of the repository and the 3000 MTU rate?

A. We felt that was the optimum level in the conceptual designs that we had that we could accept rate at the 3000 metric tons per year, this was a design requirement that we had on the repository.

MS. SULLIVAN: One moment, Your Honor. Nothing further, Your Honor.

THE COURT: Thank you.

Page 3843

MS. SULLIVAN: Could we ask the witness if he needs a break before the –

THE COURT: Maybe we all should take a break. Let's come back – it's 7 after, let's come back at 20 after.

(Whereupon, a short recess was taken.)

MR. TOMASZCZUK: Your Honor, before I start cross, with respect to the witness scheduling issue, we were having a discussion about – I don't know if the Court would be amenable to this or not. I would expect my examination of Mr. Morgan to last roughly a half-hour or so because we've been advised that the next witness to be called by the government, Mr. Mills, and his counsel have some scheduling concerns. Would it be possible for us to go until about 2:00 today? Is that possible.

THE COURT: Just right through?

MR. TOMASZCZUK: And then take a lunch break at 2:00?

THE COURT: Well I guess we'll have to go a little bit before 2:00 because Roberto's closes downstairs at 2.00.

MR. LO RE: Yes, Your Honor, I think

Page 3844

so, what we're hoping to do, in consultation with Mr. Tomaszczuk, be completely finished with Mr. Mills hopefully before 1:00, and the next witness, I think, may be – my estimate is rather brief on direct and I think also is rather brief on cross.

THE COURT: We're going to have to stop by quarter to 2:00.

MR. TOMASZCZUK: And it's not of our doing, Your Honor.

MR. LO RE: To be clear, this is – we have a witness represented by someone else who has a conflict.

THE COURT: Quarter to 2:00 is when we will have to stop, in the middle of a sentence, otherwise, we'll be forced to go outside, and we won't be able to accomplish lunch in an hour outside.

MR. LO RE: We appreciate the Court's indulgence.

THE COURT: You may question the witness, Mr. Tomaszczuk.

MR. TOMASZCZUK: Thank you, Your Honor.

CROSS-EXAMINATION

Page 3845

BY MR TOMASZCZUK:

Q. Good afternoon now, Mr. Morgan.

A. Good afternoon.

Q. We spoke yesterday, you may recall?

A. Yes, I do.

Q. Now, Mr. Morgan, as I understand it, you've testified in the Yankee case, is that correct?

A. That's correct.

Q. And that occurred in 2004?

A. I'm not sure of the date, sir.

Q. Does that sound about right to you?

A. Yes.

Q. And then you testified in the TVA case, is that correct?

A. That's correct.

Q. And that was in 2005?

A. I believe so.

Q. And then most recently, you testified in the Pacific Gas & Electric case, is that correct?

A. That's correct.

Q. And that was in 2006?

A. That's correct.

Q. And that was in about June of 2006?

Page 3846

A. Yes.

Q. So this will be the fourth spent nuclear fuel case in which you've appeared as a witness?

A. Yes.

Q. And your testimony in the TVA case, as I understand it, that was by video conference, is that right?

A. Yes, it was.

Q. And at that time, you were in New Mexico?

A. Yes, I was at Los Alamos National Laboratories.

Q. Working as a consultant?

A. Yes

Q All right. And in connection with, or at or about the time that you testified in the TVA case, you entered into an agreement with the Justice Department concerning your work in connection with these cases, isn't that correct?

A. Yes.

Q. And that agreement provides that you review your prior testimony and charge $125 an hour for review of that testimony, is that

Page 3847

correct?

A. It was for preparation for the hearing.

Q. And that preparation entailed reviewing your prior testimony?

A. Included reviewing.

Q. Including reviewing –

A. Yeah.

Q. – your prior testimony. And for those services, you're charging the Department of Justice $125 an hour, correct?

A. That's correct.

Q. And subsequent to your testimony in the TVA case, you billed the Department of Justice for your work associated with trial preparation, is that correct?

A. Yes.

Q. And you expect to bill the Justice Department for your work in preparing for your trial testimony here today, is that correct?

A. That's correct.

Q. Let me turn first, Mr. Morgan, if I can, to the comments of Northern States. And this was Defendant's Exhibit 2.12, do you have that handy?

Page 3848

THE COURT: Let me go off the record
one moment.
(Discussion off the record )
THE COURT: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Morgan, yes, sir, the Northern
States comments?
A. Yes, I have both.
Q. And counsel for the government showed
you those, that was Defendant's Exhibit 2.12.
A. Yes.
Q. All right. Now, there's no reference
in these comments, Mr. Morgan, is there, to an
acceptance rate?
A. I believe there is in paragraph,
under, "DOE commitment."
Q. All right. And where is the reference
in paragraph 1, DOE commitment to an acceptance
rate?
A. "The contract should be restated as in
terms of acceptance commitments as a binding
obligation placed upon DOE," in the first
paragraph, and further in the third paragraph,
"The contract should have a clear statement and
intent to DOE shall incur a contract obligation

Page 3849

to take delivery of all spent fuel and
high-level waste at earliest practicable time,
upon the request of the owner or generator of
such fuel and waste."
Q. And as I understood your testimony,
Mr. Morgan, the comment reflected in the
paragraph that you just read, the third
paragraph under section 1, that was actually
adopted by the Department of Energy in the
final version of the contract, is that correct?
A. Yes.
Q. And in the first paragraph, you would
agree, would you not, sir, that there's no
reference to an acceptance rate of any kind,
isn't that correct?
A I interpret it to be an acceptance
rate.
Q. You would agree, sir That the words
"acceptance rate" don't appear in that first
paragraph?
A. I agree.
Q. You would agree, sir, that there is no
reference to a particular acceptance rate in
that first paragraph?
A. It says, "acceptance commitments as a

Page 3850

binding obligation based on DOE." That to me
is an acceptance rate. You can't have a
binding agreement without an acceptance rate
Q. So are you saying the parties'
agreement is not binding because there's no
acceptance rate in it?
MS. SULLIVAN: Objection, Your Honor,
to the extent it calls for a legal conclusion,
and argumentative.
THE COURT: Yes, but it's one of those
issues that we have explored through a number
of witnesses, and I would like to hear what
this witness says in response to this question.
MS. SULLIVAN. I understand, with the
Court's guidance from yesterday, that the
witness may have a different understanding than
the Court might interpret terms like "binding"
and "commitment."
THE COURT: Oh, I would hope so.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: I surely don't expect the
Court to be bound by whatever a witness might
say on a question of law.
MS. SULLIVAN: Understood. Thank you,
Your Honor.

Page 3851

THE WITNESS: Would you –
THE COURT: Mr. Tomaszczuk, what
exhibit are we on?
MR. TOMASZCZUK: I'm sorry, Your
Honor, we're at Defendant's Exhibit 2.12.
THE COURT: Was that part of a larger
exhibit?
MR. TOMASZCZUK: It was part of this
2.0 – no, it's part of the government's
Exhibit 2 0, it's the large binder which we had
some colloquy about, and the binder encompasses
the comments of various entities, NSP.
THE COURT: Was that binder given to
the Court?
MS. SULLIVAN: No, Your Honor, I did
provide the Court with a copy of Defendant's
Exhibit 2.12, which are Northern States Power's
comments. I believe it was the second document
I handed the Court.
THE COURT: I didn't keep it in order.
MR. TOMASZCZUK: If I can approach
THE COURT: 2.12, I have that now, and
that's what we are, we have on the screen.
MR. TOMASZCZUK: Yes, sir.
THE COURT: Very good.

Page 3852

MR. TOMASZCZUK: And, I'm sorry, could I have the question read back?

(The reporter read the record as requested.)

THE WITNESS: I still don't understand the question. I read this paragraph one as a fact that there would be a commitment by DOE to accept fuel at a given rate, and we did not accept that as a condition of the contract.

BY MR. TOMASZCZUK:

Q. And I understood that testimony, Mr. Morgan, and I moved beyond that. Is it your view that the parties do have a binding contract, given that there's no specified acceptance rate in the contract?

A. There's a binding contract.

THE COURT: What does that contract bind DOE to do, Mr. Morgan?

THE WITNESS: It requires us to accept fuel as rapidly as we can, and the concern that I had initially is that I felt the uncertainties that were in the program identified, and of course, many of them have come to pass, such as the MRS not being allowed in Tennessee as a political issue. The

Page 3853

problems with Nevada relative to the repository at this time, I had litigation with GE and Westinghouse early on.

And I was concerned that we would not be able to make the commitment of an acceptance rate because we didn't even have an MRS, that was our alternate program, and we didn't have a design for that MRS at this point in time to say that we would accept at a given rate in that facility. So I felt it was too early to commit to an acceptance rate by the government. I felt that would be unconscionable on my part, and I didn't want to obligate the government because it wasn't required in the Nuclear Waste Policy Act.

THE COURT: If DOE were not able to perform until, say, for example, until the year 2050, yeah, 2050, in your view, would DOE be in compliance with the contract?

THE WITNESS: No, because it wouldn't be in compliance with the Act, but –

THE COURT: It would or would not be?

THE WITNESS: Would not be in compliance with the Nuclear Waste Policy Act.

THE COURT: Why is that?

Page 3854

THE WITNESS: Because that says, "accept fuel in 1998," there was no requirement, well, this whole program was an off-budget program. In other words, in my view that we did not get any funds from Congress, Congress said that the utilities would pay 1 mil per kilowatt and that that rate could be changed based on future allocations or future understandings. It was an entirely off-budget contract and program.

In other words, the utilities were going to have to pay whatever the price was, that was my understanding of the intent of the Nuclear Waste Policy Act.

THE COURT: So you acknowledge then that DOE is not in compliance with its contract by virtue of the 1998 date having come and gone?

THE WITNESS: I say it was not in compliance with the Nuclear Waste Policy Act.

THE COURT: I meant to say the same thing

THE WITNESS: Not the contract, I'd have to look at what the word were in the contract, and that's beyond my scope.

Page 3855

THE COURT: Yes, I understand. You don't hold out the view that the contract could supplant the statute – strike the question, and I'll stop.

We've gone far enough.

Mr. Tomaszczuk, would you continue, please?

BY MR. TOMASZCZUK:

Q. Sure. Mr. Morgan, several responses ago, I believe you, in referring to NSP's comments, paragraph one, I understood you to be saying that NSP was asking for a given acceptance rate, is that what you said?

A. Yes.

Q. And what given rate were they asking for in these set of comments?

A. Well, I just said acceptance commitment, and that says in order to have a commitment, you have to have something you're committing to, which would be a rate. That was my interpretation of these words.

Q. You never discussed that interpretation with Mr. Peterson who signed these comments on behalf of Northern States, did you?

A. Not that I recall.

Page 3856

Q. In response to the Court's question, I believe you referred to this as a, "this" meaning the nuclear waste program, as off-budget, is that correct?
A. Yes.
Q. But that's not true, is it, doesn't the Department of Energy have to get budgetary approval each year?
A. The funds are not provided by the government. The funds that were to be used in this program were provided by the utilities and the rate payers involved. Even though the funds went into the government process, the program could only spend what Congress authorized of those funds. In other words, there wasn't a pocket of money that the government or that the program could use. It had to get authorization from Congress to use the funds in the Nuclear Waste Policy Act.
Q. So to that extent, the Department of Energy has to get authority to appropriate monies for purposes of the operation of the program?
A. The money is not appropriated, the

Page 3857

money is in the Nuclear Waste Policy Act Fund, and DOE had to get authorization from Congress annually to use money from those funds.
Q. And to that extent, to the extent it requires an annual submission, it's not off-budget, isn't that true?
A. It's what?
Q. It's not off-budget, as you used that term?
A. Yes, it is. It's not in the United States Congressional budget authorization process.
Q. These NSP comments, Mr Morgan, Defendant's Exhibit 2.12, can I direct your attention to the last page and, in particular, the last paragraph? And you recall that Ms. Sullivan asked you some questions about this paragraph?
A. I believe so.
Q. And as I understood your testimony in response to those questions, you testified that, in these comments, Northern States Power Company was endorsing the positions taken by EEI?
A. I believe that's what this says,

Page 3858

generally endorses the positions taken by EEI.
Q. And I believe you testified that those comments were the ones that are embodied in Defendant's Exhibit 2.34. Do you have that handy?
A. Yes.
Q. Now, I'd like to ask you some questions about both of these, so keep both documents handy for just a moment, if you can. Let's go back to Defendant's Exhibit 2.12, and that last paragraph of the letter, page five, if we can get that on the screen, and can you read, Mr. Morgan, the first sentence of the last paragraph?
A. Yes.
Q. Would you do so, for the record?
A. "With the above comments (notable exceptions being comments 2 and 3)" –
Q. I think the word was "Northern" that counsel volunteered.
A. "Northern States Power Company generally endorses the positions taken by the joint" –
Q. And then maybe the next word is "submittal"?

Page 3859

A. "Submittal of the Edison Electric Institute and Utility Nuclear Waste" –
Q. "Management Group," perhaps.
A. "Management Group. If I may be of any help or if you wish further clarification, please feel free to contact me. Sincerely."
Q. Now, that language you just read refers to NSP endorsing a joint submittal, correct?
A. Yes
Q. And what do you understand the word "joint" to mean?
A. I assumed that this was the joint submittal we had received from Edison electric.
Q. Well, Edison Electric Institute and the Nuclear Utility Waste Management Group, correct, isn't that what the comments say?
A. Yes.
Q. And do you see any reference in Defendant's Exhibit 2.34 to the Utility Nuclear Waste Management Group?
A. In the last paragraph.
Q. Okay.
A. Page eight.
Q. Okay. And can you read that? That's

Page 3860

the reference to --
A. "EEI/UNWMG commend you and your staff for the substantial effort which has gone into the development of the proposed contract."
Q. But you would agree that these comments themselves are submitted by EEI, isn't that correct?
MS. SULLIVAN: Objection, Your Honor.
THE WITNESS: This is an EEI submitted letter.
MS SULLIVAN: Best evidence, the document speaks for itself, and it mischaracterizes the first page of Defendant's Exhibit 2.34, which I believe answers counsel's question.
THE COURT: I thought the last paragraph addressed the point as well.
MS. SULLIVAN: Just another statement that answers it on the first page, second paragraph.
BY MR. TOMASZCZUK:
Q. Now, what is the date of the Northern States comments, Mr. Morgan?
A. March 3rd.
Q. 1983?

Page 3861

A. Yes.
Q. And what is the date of what we now understand to be the joint EEI/UNWMG comments?
A. March 7th, 1983.
Q So do you understand NSP to be endorsing, four days in advance, EEI comments?
A. I am convinced that there were open discussions between EEI and all of the utilities and that EEI shared their comments with all the utilities That's my understanding. That did not even cross my mind as to the dates of these letters.
Q. All right. And isn't it true that EEI submitted various comments in response to the Federal Register notice of the draft contract in February of 1983?
A. I don't recall that right now.
Q. You don't recall that?
A. No, I don't.
Q. You would agree, would you not, sir, that the NSP letter is dated four days after the EEI -- I'm sorry, four days prior to when the EEI letter was submitted?
A. That's what this reflects.
Q. Now, Mr. Morgan, you were not involved

Page 3862

in commercial spent nuclear fuel activities prior to assuming the position of acting director, is that correct?
A. Not completely. We did some studies and analysis of storage of spent fuel in commercial facilities such as Barnwell, for the Assistant Secretary of Nuclear Energy, but regarding the program in total, I had no responsibilities.
Q. And that Barnwell activity you referred to, that was limited to temporary storage, as I understand it?
A. Yes, sir.
Q. And Barnwell was not a reactor, is it?
A. No, it was a facility erected in South Carolina adjacent to the Savannah River plant that was planning to reprocess spent nuclear fuel that, based on a decision by President Carter, that there would be no reprocessing, that facility never operated.
Q. And it would be fair to say, Mr. Morgan, that you had no involvement in the legislative activities leading up to the enactment of the Nuclear Waste Policy Act?
A. That's absolutely correct.

Page 3863

Q. And it would be fair to say you had not even read the statute prior to its enactment, is that fair?
A That's fair.
Q. And as I understood your testimony in the direct examination with Ms. Sullivan, at the time you became acting director in January 1983, the draft standard contract had already been submitted to the Federal Register, is that correct?
A. Yes.
Q. And once that contract was published in final form in April 1983, NSP had no choice but to sign it, isn't that correct?
MS. SULLIVAN: Objection, Your Honor, calls for a legal conclusion.
THE COURT: I think it's a question of what happened at the time, it's a question of fact that's being elicited from this witness.
MS. SULLIVAN: Very good, Your Honor, thank you.
THE WITNESS: My understanding is that NRC, which regulates reactor operation, said that or directed the people that if they didn't sign the contract, they would have to shut down

Page 3864

the reactors. That was not a DOE initiative.
BY MR. TOMASZCZUK.
Q. That's a fair qualification, but your understanding was that if NSP didn't sign the contract, it would essentially have to shut down the Prairie Island and Monticello plants?
A. It's my understanding that NRC probably would require them to shut down, but I can't, you know, state what NRC would do.
Q. Now, as I understand it, you served as acting director for a period of about one year, is that right?
A. That's correct.
Q. And you were never confirmed by the Senate as the director of the Office of Civilian Radioactive Waste Management?
A. That is correct.
Q. And after you left the program in or about January of 1984, you had no involvement in DOE's development of the program, isn't that correct?
A. That's correct.
Q. And that means you had no involvement in the promulgation of annual capacity reports?
A. That's correct.

Page 3865

Q. And you had no involvement in the promulgation of acceptance priority rankings?
A. That's correct.
Q. You had no involvement in the promulgation of delivery commitment schedules?
A. That's correct.
Q. You had no involvement in the promulgation of delivery commitment schedule instructions?
A. That's correct.
Q. Now, during that one-year period that you were acting director – and when I use the term "OCRWM," you'll understand what I mean?
A. Yes, sir.
Q. You spent, as I understood your testimony, most of your time working on the repository, is that right?
A. That's correct.
Q. And indeed, you testified yesterday in your deposition that about 90 percent of your time was spent on repository efforts and 10 percent was spent on MRS activities?
A. That's correct.
Q And as I understood your testimony both yesterday and here this morning, one of

Page 3866

the activities you personally worked on was consultations with the states?
A. Yes.
Q. And you sent letters to governors, as I understood it?
A. Yes.
Q. And you also –
A. In fact, that was the first requirement under the Nuclear Waste Policy Act, letters had to go out within X number of days, and I can't recall what that was, but that was a first official correspondence that we got out.
Q. And as I understood it, you were also, as I understood your testimony, you were also working on consultations with Indian tribes?
A. Yes.
Q. And you were also consulting with local authorities around the country?
A. Yes.
Q. And you did that in part because it was required by the Nuclear Waste Policy Act?
A. Yes.
Q. And in the course of conducting that activity, you consulted with officials in,

Page 3867

among other states, Washington, the state of Washington?
A. Correct.
Q. Nevada?
A. Correct.
Q. Texas?
A. Yes.
Q. And Louisiana?
A. Yes.
Q. And isn't it fair to say that those officials were interested in having you not cite any spent nuclear facilities in their state, is that fair?
A I think that's a fair statement.
Q. And it would be fair to say that in 1983, when you were acting as acting director of OCRWM, you were aware that there was opposition in local communities to the storage of any spent nuclear fuel in those communities?
A. That's correct.
Q. And you were actually concerned that a state might actually enact legislation that could make it more difficult for you to select that state as a site for a disposal facility, isn't that correct?

Page 3868

MS. SULLIVAN: Objection, Your Honor, to the extent it calls for a legal conclusion and as to what legal laws state legislatures can pass.
THE COURT: No, it doesn't call for a legal conclusion, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: You may answer the question, Mr. Morgan.
THE WITNESS: Please repeat the question, I'm sorry.
BY MR. TOMASZCZUK:
Q. You were concerned that a state might actually enact legislation that might make it more difficult for you to select that state as a site for a disposal facility?
A. That's correct.
Q. Now, Mr. Morgan, let me ask you a few questions about the Federal Register notice of April 18th, 1983. Do you have that handy?
A. Yes, I do.
Q. And I presume you were in the position for several properties prior to the release of this Federal Register notice. Is that correct?
A. That's correct

Page 3869

Q. And you certainly reviewed it prior to its issuance?
A. That's correct.
Q. And you were trying to make it as accurate as possible?
A. Correct.
Q. If I could direct your attention, Mr. Morgan, to the page that counsel for the government, Ms. Sullivan, was asking you about, and the Federal Register notice page is 16598, it's a little hard to read in the upper left-hand corner.
A. Can you refer me to a number on a lower portion of that document?
Q. I will, but I'm going to have to look at the binder, unless counsel can help me.
THE COURT: 1792, the last four, 1792.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Yes, sir.
BY MR. TOMASZCZUK:
Q. The copy I'm working from doesn't have those magic numbers. And if I can turn back, Mr. Morgan, to the actual page that counsel for the government asked you about, and I can pull the binder and give you that if you need it.

Page 3870

It's the Federal Register notice number 16598.
A. Yes, I have that page.
Q. There we go.
THE COURT: Mr. Morgan, would you tell the Court what page that is?
THE WITNESS: Oh, 1792, the one you gave me.
THE COURT: I don't think that was counsel's reference.
MR. TOMASZCZUK: No.
THE WITNESS: Well, it's 16598 on the upper left-hand corner.
MR. TOMASZCZUK: And I've got two different numbers in the binder.
MS. SULLIVAN: Your Honor, I apologize. The copy we handed Mr. Morgan was a cleaner copy and has a different Bates number than Defendant's Exhibit 2.02.
MR. TOMASZCZUK: Unfortunately, my copies don't have Bates numbers at all, so I've got either the official version –
MS. SULLIVAN: Yeah, the Court is correct, Your Honor, it's the Bates number ending 1792 for Mr. Morgan and the Court, and then, Counsel, this is Federal Register page

Page 3871

16598.
MR. TOMASZCZUK: Thanks.
BY MR. TOMASZCZUK:
Q. Are you with me, Mr. Morgan?
A. I'm sorry, what's my number, the lower –
THE COURT: Yours is going to be 1792
MS. SULLIVAN: Counsel, I think the problem is what's on the screen doesn't match.
THE WITNESS: I've got 1792 and 598, but that is not what I see on the screen
BY MR. TOMASZCZUK:
Q. Well, maybe that's – all right, need to go two pages further back. You're at 596, and we need 598, and it's very hard to read. If we could blow up that column on the left-hand side, starting with the word "similarly"? There we go.
A. Yes.
Q. And you recall counsel for the government asked you some questions about this language, correct?
A. Yes.
Q. Now, I want to call your attention, Mr. Morgan, to about two-thirds of the way down

Page 3872

in that paragraph, starting with, "The 1998 date is called for in the Act," do you see that, about three-quarters of the way down, that paragraph, right after the word "however"? There we go.
A. "The 1998 date," yes.
Q. "The 1998 date is called for in the Act, and we believe it to be a realistic date," correct?
A. Yes.
Q. And that reflects a true statement at the time, does it not?
A. That reflects a situation that says I had discussions with several staff members in Congress, and they advised me that if I said it was not an acceptable date or a reasonable date, that they would throw the Nuclear Waste Policy Act into open discussion, and it would be lost, so when I said those words, that's on an optimistic schedule with everything going right and none of the uncertainties that I mentioned earlier.
It's a realistic date, if there were no uncertainties and –
Q. I'm sorry.

Page 3873

A. And that's the way I interpreted that.
Q. You would agree that the add-on phrase that you just appended there, "with no uncertainties," does not appear in this text?
A. It does not
Q. And you were telling the world that the 1998 date, the Department of Energy believed it to be a "realistic date," correct?
MS. SULLIVAN: Objection, Your Honor, relevance. We're not disputing the DOE did not start performance by 1998.
THE COURT: I don't know where Mr Tomaszczuk is going with this, but at this point, I can't exclude this as not relevant. It certainly is a statement that doesn't align well with his apprehensions about the request to fix an acceptance date. As you recall that testimony, there was simply so many uncertainties, we couldn't do it. This is a statement that stands in contrast to that.
MS SULLIVAN: Your Honor, my problem is I believe Mr. Morgan's testimony was with regard to the uncertainties in the acceptance rate, and the issue here seems to be the '98 date itself and –

Page 3874

THE COURT: Oh, no, I think Mr. Tomaszczuk is heading towards what I just identified, his statement doesn't reflect the witness' concerns about the many imponderables that implementation of the statute faced in his judgment.
MS. SULLIVAN: Understood, Your Honor, thank you.
BY MR. TOMASZCZUK:
Q. And that was, in point of fact, my next question. The statement that I just asked you about does not reflect the imponderables that you testified about on direct?
A. It does reflect, however, that we had an alternate program of the monitored retrievable storage, and if we were running into problems with the repository and its uncertainties, we would have the full back of the monitored retrievable storage to accept fuel in 1998. That's the interpretation I put on this thing.
Q. All right. And you would agree with me, Mr. Morgan, that there's no reference to an MRS, either in this sentence or, indeed, I believe, in this paragraph?

Page 3875

A. No, but he's talking about the 1998 date for acceptance of fuel.
Q. And then the next sentence says, "Our performance will be judged by meeting this date," correct?
A. That's correct.
Q. And it's true that DOE has not met the 1998 date?
A. That's correct.
Q. Are you saying, Mr. Morgan, that the MRS didn't face the uncertainties and imponderables that the repository faced in your view?
A. Not as many imponderables as a repository.
Q. And that's because it was temporary storage, right?
A. Yes.
Q. But when you started talking about permanent storage with the Indian tribes or with the states or with local communities, that raised a major concern for them, didn't it?
A. Yes.
Q. It would be fair to say, sitting here in 2006, Mr. Morgan, if DOE's performance was

Page 3876

to be judged by meeting this date, that DOE's failed in its performance?

MS. SULLIVAN: Objection, Your Honor, same objection, the issue is not about whether or not we met the 1998. We acknowledged we did not meet the 1998 date.

THE COURT: Yes, but we've had this question several times in the past, and it goes to the question of what constitutes performance under this contract. It seems to be DOE's position that it breached the contract by not meeting the date, but yet that performance, having never been specified with any certainty itself, has not been breached. There's an awkward problem there, so that's a long way of saying I've allowed this question to be asked and answered many times, and I shall again.

MS. SULLIVAN: Yes, Your Honor. Thank you.

BY MR. TOMASZCZUK:

Q. I'll bet you forgot the question.

A. Exactly

MR. TOMASZCZUK: Ms. Reporter, could you read that one back?

(The reporter read the record as

Page 3877

requested.)

THE WITNESS: Yes.

BY MR TOMASZCZUK:

Q. Now, Mr. Morgan, on direct examination, I understood you to say, correct me if I'm wrong, that in this paragraph we're looking at, starting with the word "similarly" that's up on the screen, you understood that the Department of Energy was rejecting the utility's request to adopt a particular acceptance rate, did I understand that?

A. Yes, and that's performance standards, and that's in several of the letters it received, it's under performance standards that a rate of acceptance was covered, and that's what we meant in this performance standards.

Q Now, you would agree that this paragraph doesn't say anything about a particular acceptance rate, does it?

A. In my mind, the performance standards commented on by the utilities, I believe there was seven of them, several – it was in the area of performance standards that this was raised, and that's what we were dealing with in this entire paragraph.

Page 3878

Q. Well, performance standards could also mean meeting the 1998 date, isn't that correct?

A. What I'm referring to or what I referred to at the time is the performance standards of an acceptance rate.

Q. And you would agree with me, Mr. Morgan, that there's no reference to the words "acceptance rate" in this paragraph or DOE's rejection of such an acceptance rate?

A. We objected to the performance standards which we interpreted because of the letters that we received, that it was under performance standards that they had raised the acceptance rate, and that's what this paragraph is dealing with.

Q. The proceedings of the 1983 meeting, I was going to ask you some questions about that, and that's Plaintiff's Exhibit 286.

A. Yes.

Q. And as I understand it, Mr. Morgan, you actually prepared this program overview, is that right?

A. Yes.

Q. And you both prepared the written words on the text, and you presented it orally

Page 3879

in this meeting in or about December of 1983?

A. Yes.

Q. And this document reflected your intent as the head of the program with respect to how the program was going to work, correct?

A. Yeah.

Q. And there were various utility representatives in attendance at this meeting right?

A. Yes.

Q And it was your intent to provide them accurate information at the meeting?

A. Yes.

Q. And directing your attention to the first page of the overview, page 11 is the text page that appears at the bottom, and I'd like to look at that paragraph on the right-hand column, starting with, "I would like."

A. Yes.

Q. And the sentence that begins, "technically," do you see that?

A. Yes.

Q. "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time," and then it goes on to

Page 3880

say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act."

A. Yes.

Q. And I'd like to ask you some questions about that. Is there a – strike that. What, in your view, would meet the intent of the Act, if one assembly pick-up does not?

A. If you read the following sentence: "However, we did not believe that this meets the intent of the Act."

Q. Would two assemblies meet the intent of the Act?

THE COURT: I think, Mr. Tomaszczuk, the witness didn't hear your question.

MR. TOMASZCZUK: I'm sorry.

THE COURT: It was phrased obliquely, given the text that we were looking at, so go back, look at your questions, Mr. Tomaszczuk, and then rephrase it, and then we'll start again.

BY MR. TOMASZCZUK:

Q. All right. Mr. Morgan, in this highlighted text, you say here that one spent

Page 3881

fuel element in 1998, you opined that if you did that, you would be technically in accordance with the Act, right?

A. Yes.

Q. And then the next sentence says, "However, we did not believe that that meets the intent of the Act," right?

A. Yes.

Q. So you're telling industry here at this meeting that if you picked up one, that would not meet the intent of the Act?

A. That's correct.

Q. How about if you picked up two?

A. No.

Q. How about 10?

A. We started on this looking at the one fuel element as one bounding limit of the program. We looked at the other end or the bounding, which would be accepting fuel at the rate of discharge, plus the work down to the backlog, okay? So we were trying to get in the mission plan as far to that right as we could. That was the intent we were trying to do. I don't know what the intent of the Act was, but my interpretation of it was within

Page 3882

those two bounds.

Q. And then your interpretation was revealed in the next sentence when you talked about the strategy, right?

A. Right.

Q. And why don't you read that for us?

A. "The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site"

Q. And that was the strategy that you adopted and told the utilities about at this meeting, correct?

A. Yes.

Q. And that strategy, in your view, was consistent with your understanding of the purposes of the Act, is that correct?

MS. SULLIVAN: Objection, Your Honor, legal conclusion to the extent he's being asked to interpret the Act, and mischaracterizes his prior testimony.

THE COURT: The objection is overruled. This gentleman was the acting director, the first director, he is setting out the philosophies of the program, and he has

Page 3883

said he really doesn't know what the intent of the Congress is, but he, by virtue of his position, is obliged to give some meaning to the statute. It's the same problem we all find ourselves in now, so this is a very fair question to ask this particular witness.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Now, there, again, Mr. Tomaszczuk, I'm sure the witness has forgotten the question.

MR. TOMASZCZUK: And I'm going to ask, once again, the court reporter to read it back.

(The reporter read the record as requested.)

THE COURT: Now, the strategy that was being referred to, Mr. Morgan, is the strategy that is outlined in your statement as read by Mr. Tomaszczuk. So take a moment to look at the highlighted text on the screen, that is the question that Mr. Tomaszczuk has put to you.

THE WITNESS: Okay. The answer is yes.

THE COURT: Okay

BY MR. TOMASZCZUK:

Q. And then in this last sentence,

Page 3884

Mr. Morgan, you were embellishing upon that strategy, were you not?
A. Yes.
Q. And you were telling utilities, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location," and it was fair for utilities to rely on your statement in that regard, wasn't it?
A. That's what our strategy was at the time. Following down below, it says, hey, we will be able to start working off the backlog in here, I said when we opened the second repository, and that's what is then in the sheet on the mission plan, which came out subsequent to this meeting.
Q. All right. Well, let's look at the mission plan.
A. Fine.
Q. And that is Plaintiff's Exhibit 275, and that's the thicker document Ms. Sullivan handed to you.
A. Yes, I have it.

Page 3885

Q. And as I understand it, Mr. Morgan, you were responsible for the preparation of this first draft mission plan?
A. Yes, I was.
Q. And this document was actually required by Congress in the Nuclear Waste Policy Act?
A. Yes.
Q. And would it be fair to say, sir, that in this mission plan, you were trying to effect the intent of Congress in enacting the statute as you understood it?
A. Yes.
Q. Let me turn first to page 2-2 of this document and in the third paragraph there and the second sentence starting, "in 1991."
A. Yes.
Q. And I believe Ms. Sullivan asked you some questions about this particular sentence?
A. I believe so.
Q. Are you okay?
A. Yes.
Q. Ms. Sullivan asked you some questions about this?
A. Yes.

Page 3886

Q. And this reference to 1991, that assumes that the Department of Energy is going to commence performance in 1998, right?
A. Yes.
Q. Now, the next -- let's just skip over the chart for a minute and go to page 2-4, and I'm not sure Ms. Sullivan, I know she asked you some questions about the text at the bottom of the previous page. I'm not sure she asked you about this text at the top of page 2-4 of the draft mission plan.
But this goes on to say, in the first full sentence at the top of page 2-4, "The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department, based on submittal of a request no less than six months prior to the scheduled delivery date)."
And then it goes on to say, "The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments." Do you see that?
A. Yes.
Q. And in essence, here, you were sanctioning, if you will, the use of exchanges after the program was up and running?
A. Yes.
Q. And the Department understood that the use of exchanges was another vehicle that would allow the utilities to avoid the need for at-reactor storage?
A. Yes.
Q. Now, let's look at the table that appears on the page which separates those two pages we're taking a look at, table 2-1, and this schedule, Mr. Morgan, as I understand it, shows both a first and second repository, is that correct?
A. That's correct.
Q. And it shows an acceptance rate of a first repository starting in 1998 at an acceptance rate of 1800 metric tons?
A. Yes.
Q. And then it ramps up in the sixth year of performance to 3000 metric tons?

Page 3887

Page 3888

A. Yes.
Q. And that continues through 2021, is that correct?
A. Yes.
Q. And then the second repository per this chart does not come online until 2003, is that right?
A. That's correct.
Q. And it also starts at a rate of 1800?
A. Yes.
Q. Sorry about your nasty cough. It also starts at 1800 and then ramps up to 3000 metric tons in the sixth year of performance, is that right?
A. Yes.
Q. And at the time you published this draft mission plan, you were intending to effectuate the intent of Congress, as you understood it, in enacting the Nuclear Waste Policy Act, correct?
A. Yes.
Q. And that intent is also embodied in the last column, is it not, the remaining backlog column?
A. Yes.

Page 3889

Q. And here, this shows a backlog in metric tons of 40,809 tons?
A Yes.
Q. And then it actually increases for a few years, do you see that?
A. That's correct.
Q And can you explain why that's so – why it actually increases for a few years?
A. Because the discharge rate in the first column is greater than the acceptance rate in the repository.
Q. So the discharge rates are greater than the 1800 metric tons of pick-up contemplated by the operation of the first repository?
A. Yeah
Q. And that starts to change in the sixth year of contract performance, is that right?
A. Yes, in 2003, we actually start working off the backlog.
Q. And then that backlog continues to decrease for a period of 17-plus years?
A. Right.
Q. Did anyone from Congress ever tell you that they disagreed with the rates reflected in

Page 3890

this mission plan?
A. Not to my knowledge. This was a draft mission plan, it. Had not gone out in final form. It went out for comments, and I believe that there were, you know, many comments received on this plan after my departure. And there was a revision of the plan after I left. To my knowledge, by the time I left, there was not any comments from Congress relative to this mission plan.
MR. TOMASZCZUK: Can I just have a moment, Your Honor?
THE COURT: Yes.
MR. TOMASZCZUK: Thank you, Mr. Morgan, no further questions.
THE COURT: Thank you, Mr. Tomaszczuk. Ms. Sullivan?
MS. SULLIVAN: Your Honor, I have three questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, how does the term "expeditiously as practicable" relate to the bounding that you discussed both in your direct and in the cross testimony?

Page 3891

A. That's kind of in-between the two bookends.
Q. And how does that language, "expeditiously as practicable," comport with your understanding of the intent of the NWPA?
A. It complied to the NWPA.
Q. And the draft mission plan which you said you were attempting to effectuate the intent of Congress, did that intent require a particular acceptance rate?
MR. TOMASZCZUK: Objection, leading.
THE COURT: I'm going to allow the question. We're deep into the only issue that counts, at least for this morning. You may answer that question. But I think you should restate it, Ms. Sullivan.
MS SULLIVAN: Sure, Your Honor, just –
THE COURT: Just restate the question.

BY MS. SULLIVAN:

Q. The draft mission plan, you were attempting to effectuate the intent of Congress, is what you testified with regard to Mr. Tomaszczuk's questions?
A. Yes.

Page 3892

Q. Did that intent require a particular acceptance rate?
A. I believe that it did.
Q. And what was that rate?
A. Well, we felt it was somewhere within the bookends, and this was not accepting fuel at a rate of discharge as of 1998, which some people felt was an obligation. We were backing off from that by saying, hey, we can put so much in the first repository and at a given rate. There's always a ramp-up of at the start of any facility. We designed the facility for 3000 metric tons. The first five years of operation is to work out the bugs, if you will, of the operational facility, to get to the design flow, design rate.
If possible, we would increase that rate more rapidly and almost meet the discharge rate of 2800 in the first year, I mean so we were putting, a number out for review of the utilities and Congress. That's what the intent was from the mission plan.
Q. And the rates set forth in the 1983 draft mission plan, were those the only rates that DOE could perform at to meet the intent of

Page 3893

the NWPA?
A. Oh, no.
MR TOMASZCZUK: Objection, leading.
THE COURT: I'm going to allow the question.
THE WITNESS: I don't think so.
BY MS. SULLIVAN:
Q. And why don't you think so?
A. Because there was no rate given by Congress, we were establishing a plan of which we thought would reflect what the intent of Congress was, that was our plan. Whether that increased or decreased depended on reaction of Congress, which we hadn't received at the time that I was in charge
MS. SULLIVAN: Thank you. No further questions, Your Honor.
THE COURT: Mr Morgan, how did it come to be that the implementation of this Act was – that a contract was chosen as the means by which to implement this Act? Were you involved in that decision? And let me make my question clear.
The administrative agencies normally discharged their statutory responsibilities

Page 3894

through issuance of regulations and invite public comment and then issue rules, and the rules have broad application that affects all those that fall within the scope of the rule. Implementation of statutes in the administrative arena generally don't require contracts to reach those that the agency needs to effect, and I'm sure it's occurred to you that contract, DOE's doing business through a contract has created much mischief, and I'd like to know why the agency chose to do this, to implement this Act through a contract?
THE WITNESS: Sir, that was the requirement of the Act, the Nuclear Waste –
THE COURT: The Act says –
THE WITNESS: Nuclear Waste Policy Act.
THE COURT: Then I'm under a misapprehension, I thought that was a choice.
THE WITNESS: No, sir, I had nothing to do with that.
THE COURT: Okay.
THE WITNESS: And the process of the contract, the record, if you will, of – the administrative record was – that was a given

Page 3895

when I walked in the door.
THE COURT: Okay.
THE WITNESS: That there would be a contract and I didn't think it was – that was Congress's business, not mine, sir
THE COURT: Okay. I didn't realize that, and I appreciate your answer very much.
THE WITNESS: Thank you, sir.
THE COURT: Mr. Tomaszczuk, I may have cut you off from a recross, and I didn't mean to, and I'm not suggesting that there should be any, but I wanted to give you the – not in response to my question, but as a follow-up to Ms. Sullivan's.
MR. TOMASZCZUK: I have no further questions of this witness.
THE COURT: And Ms. Sullivan?
MS. SULLIVAN: No, Your Honor, thank you very much.
THE COURT: Mr. Morgan, thank you very much. Your testimony was excellent.
THE WITNESS: Thank you, Judge.
THE COURT: And I can understand why they chose you as the first director.
THE WITNESS: Thank you, sir.