**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**

Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?

A **That their recommendations didn't make any sense but we were being nice about it.**

**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**

Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?

A **Yes.**

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage



review commission.

Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?

A **I believe so.**

Q Let me turn your attention to page bearing Bates number PA-172244.

A **Okay.**

Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?

A **Yes.**

Q Could you read that paragraph up to including number five.

A **I've read that.**

Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible



for an MRS to be operational more than three years before the repository." Do you see that statement?

A **Yes.**

Q Do you agree with that statement?

MR. CRAWFORD: Objection. Asked and answered.

A **In general, yes.**

Q Do you agree with it as stated here to be accurate and correct?

A **It's a judgment call.**

MR. CRAWFORD: Same objection.

A **I don't disagree with it -- I don't disagree with that statement.**

**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?

A **Yes.**

Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the



U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?

A **I think so.**

Q What was your role, Mr. Barrett?

A **I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**

Q Do you know whether you would have been a drafter or a reviewer of this document?

A **I did not draft it. I was a reviewer. I was a participant in its generation and development.**

Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?

A **I don't remember if I signed this or not.**

Q You might have?

A **I might have. I wasn't the final, because**

429

**I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.**
Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?
MR. CRAWFORD: Objection to foundation.
A **Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.**
Q You might have signed it?
A **I might have signed it. But I might not have.**
Q I would like to turn your attention to page -- you see page ten?
A **Yes.**
Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced

430

schedule for restructure program, Figure 1?
A **I would have been involved in it. So, yeah, I would have reviewed it probably, yes.**
Q And would you have been in agreement with its contents before this report was issued?
A **Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.**
Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?
A **I would have supported it, yes.**
Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?
A **In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.**

431

**That's my recollection of what it was.**
Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?
MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.
MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.
Q Could you please respond to the question, Mr. Barrett.
MR. CRAWFORD: I was speaking to you.
A **Repeat the question, please.**
Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A **What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to**

432

**Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.**
Q You said it would have a proposal to Congress.
A **Right.**
Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?
A **A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.**
Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

A Did I use the word "confident"?
Q That's my question, sir.
A No, I'm asking you, did I use the word "confident"?
Q I don't recall. My question is are you confident that federal legislation in fact would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting and operation of an MRS facility on its property?
A I would say --
MR. CRAWFORD: Objection, vague.
A -- high probability of success. I would not use the word "confident."
Q What do you base your conclusion that there would be a high probability of success? Let me ask this, have you ever participated in the legislative process?
A Yes.
Q By providing testimony to Congress?
A Yes.
Q And in 1987 did you -- you are aware in



1987 that there was an effort to obtain legislation that failed, correct? An effort to obtain legislation by the Department of Energy that failed when Congress imposed linkages that the Department of Energy did not like, correct?
A Correct.
Q But, nevertheless, you sitting here today are confident that if you went back to Congress for legislation to approve a volunteer that came along that was willing to allow the siting of an MRS repository, that Congress would enact and the President would sign into law legislation that would authorize that siting and operation in a form that you would find satisfactory?
MR. CRAWFORD: Objection. Vague.
A I believe that would have a reasonably high chance of success, because the difference being between the two cases is the MRS was proposed to be in Tennessee, which was vigorously opposed by the State of Tennessee and its elected officials, whereas if we had a volunteer site, the premise is that they would not be opposing it because they wouldn't have



volunteered. So there would be a very different legislative outcome of the two cases.
Q What states -- an Indian tribe could have been a volunteer, correct?
A Correct.
Q And would it have been just Indian tribes located in certain states?
A No. It could be an Indian tribe federally recognized.
Q Are you aware that there are Indian tribes today located in the State of Connecticut?
A Yes.
Q And are you aware that the Indian tribes in the State of Connecticut run gambling casinos?
MR. CRAWFORD: Objection. Relevance.
Q Are you aware of that?
A Yes, I am.
Q Well, let me ask you to assume that the Indian tribe in the State of Connecticut receives investment advice from its Wall Street bankers that you guys can make more money siting an MRS facility than competing with Donald Trump in Atlantic City. Do



you understand the situation I'm posing to you?
A Yes.
MR. CRAWFORD: I object to that.
Q And let me assume the Indian tribe came into your office and said, Mr. Barrett, we're here to volunteer. Let's get moving. We want to set up an MRS facility in our tribe location, which is within spitting distance of Stamford, Westport and Greenwich, Connecticut. But it's our land, our property and we think we would be doing good for the United States of America so we're ready to move. If you had a proposal like that, that would be the type of volunteer you're talking about, correct? The tribe would be volunteering to enter into an agreement with the United States to site and operate an MRS facility on its sovereign land in the State of Connecticut. That would constitute a volunteer under your hypothetical, correct?
A No. You invented some totally hypothetical, incredible situation and I wouldn't consider that credible.
Q I'm asking you if a tribe from the State of

calls for speculation.
A **I believe they could have and would have.**
Q And do you believe then that the political establishment, using your phraseology, of the State of New York, would also support the siting and operation of an MRS facility in the Adirondack Mountains in New York State?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **They may not have vigorously opposed it.**
Q And on what do you base that testimony?
A **Since you're asking me to speculate on these line of questions, it's my opinion based on working with organizations and political establishment.**
Q Do you know who the senators were of the State of New York at the time of the proposals referenced in Exhibit 18?
A **I don't know specifically, but it was Senator Moynihan I think and I forget the other one. I think a republican.**
Q And do you believe that Senator Moynihan,



Senator D'Amato would have supported the establishment and operation of an MRS facility in the Adirondacks in 1989 or after?
MR. CRAWFORD: Objection. Speculation.
A **I didn't use the word "support." I said not vigorously oppose. I don't think they would support it.**
Q Do you think they would not vigorously oppose it?
A **I think it would have been more difficult for them to oppose a sovereign Indian nation who volunteered to do a national service arrangement. I think it would have been a better situation certainly than was in Tennessee.**
Q And why would it be better than Tennessee?
A **Because you would have a sovereign Indian nation standing up and saying I would go along with this.**
Q Have there been any sovereign Indian nations in Nevada or elsewhere that have offered or expressed interest in the siting of an MRS facility or a permanent repository?



A **Yes.**
Q And where did that occur?
A **New Mexico, Oregon and Utah.**
Q And were those -- have those proposals been advanced -- are those proposals still under consideration?
A **No.**
Q And why not?
A **Because Congress didn't provide the funding in FY '94 to go forward and develop it.**
Q And did the local politicians of each one of those states that you just referenced, New Mexico, Oregon and Utah, oppose the siting of an MRS or repository within their state borders?
A **Not to my knowledge.**
Q You don't think the state officials challenged it?
MR. CRAWFORD: Objection. Asked and answered.
A **I don't recall them.**
Q Why did Congress not provide funding?
A **The -- I don't know who started it, but**



**clearly the Senate and House of Representatives canceled the funding before it got going.**
Q What was the proposal before the Congress in 1994 that was not funded?
A **The proposal was to provide grants to those three -- the tribes to develop proposals to Congress, and Congress did not provide that funding for us to be able to do that.**
Q When did the process begin that led to the consideration of those proposals? Was it in '92 or '93?
A **It started in, you know, earlier than that. Probably '89, '90. '89 I think.**
Q Was there ever a time between '89 and '94 when Congress failed to provide the funding that you believed that those three proposals or one of those three proposals would likely be approved by the United States Congress?
A **Say that again.**
Q Did you ever believe that any of the three proposals involving the States of New Mexico, was it Utah, and Oregon would be approved by Congress?

445

**A If the process was allowed to proceed, yes, I had -- I believed it could happen.**
Q You believe what?
**A I believed it could happen, it could be approved.**
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
**A Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.**
Q And you thought you had a reasonable possibility of success, correct?
**A Yes.**
Q And you thought wrong, didn't you?
**A History turned out that that wasn't the way it's going to be.**
Q It's not easy to get fair legislation, is

446

it?
MR. CRAWFORD: Objection to the vagueness of that.
**A That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.**
Q But what you saw is sometimes you can't even get your proposal before Congress?
**A That's correct. That was cut off before the proposal was ever given to them.**
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it, right?
**A Say that again.**
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
**A Yes.**
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --

447

the projected date of repository operations?
**A Yes.**
Q What was the process that led to the extension of that date, the delay of that date out to 2010?
**A I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.**
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
**A There was a review done by the staff in the program that came up with the schedule you see on Figure 1.**
Q And who would have been involved, what offices would have been involved in that review?
**A Pretty much all the offices in the program.**
Q Who would have signed off on that

448

determination to delay the projected start date of the permanent repository?
**A You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.**
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
**A Yes.**
Q You see that that refers, does it not, to the start -- what type of construction is that referring to? Construction of what?
**A That's the MRS facility.**
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
**A Construction?**
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.

461

Q And the premise that I put on it you understand to be that the law remained as it stood on February 5th -- federal law remained as it stood on February 5th, 1990, correct?

MR. CRAWFORD: Objection. Vague.

**A Under that premise what you say is true.**

Q What I say is that under that premise the MRS could not begin to accept spent nuclear fuel until approximately October 2006 according to your calculations, correct?

MR. CRAWFORD: Objection. Asked and answered.

**A With your assumptions, yes.**

Q The only -- when you say your assumptions, what are you referring to? Are you simply referring to the fact that -- strike that. What assumption are you referring to?

**A You make the statement there would be no change in the linkages. The premise that we had for January '98 was that there would be a change in the linkage which could accompany any year with the appropriations process, and it could be changed. In**

462

**that time period, in the 1990s and eighties it was very -- relatively simple to change statute regarding this program, because Bennett Johnston ran both authorized and appropriations committee and that's how he made the amendment in '87. And he could have done it like that.**

Q You're confident of that?

**A Confident? I believe that that was a very plausible scenario, and that's why we adopted that as an approach for the program.**

Q Was Senator Johnston able to push through the legislation desired by the Department of Energy in 1987?

**A No.**

Q He was unsuccessful that time around?

**A Correct. Because it wasn't done in appropriations.**

Q You believe that the congressmen, senators should have followed different legislative procedures in order to accomplish the goals of the Department of Energy at that time, correct?

**A No. There's a lot of flexibility for the**

463

**legislative branch to do what they wish to do.**

Q Let me ask you, back to Exhibit 19. You indicated that this projection was based on the premise that federal law would be amended, correct?

**A Correct.**

Q And specifically the linkages would be repealed or modified, correct?

**A Correct.**

Q If that assumption was being made, why was there not also a proposal to increase the statutory MTU limit of 10,000 to a higher figure such as 15,000 or greater?

**A I don't recall exactly why the program at the time chose to deal with the linkage and not with the mass limits.**

Q You have no knowledge of that issue?

**A Say your question again.**

Q I'm asking why -- let me step back. The projections and proposals referenced on Exhibit 19 assume the enactment of federal legislation, correct?

**A Correct.**

Q In light of the fact that your office was

464

assuming that the law was changed, why wasn't your office also assuming that that change in law would increase the MTU limit that I believe that the Department of Energy had initially opposed in 1987?

**A My -- I don't know if it's speculation, but my belief, okay, when this was discussed was that there had to be a balance in the eyes of the volunteer that they had some protections. We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 tons was a reasonable quantity, as soon as we could with '98. So we did not -- my recollection is we did not try to remove everything because it would have been harder to ever get a volunteer or to get it through the political process, that we chose to leave the linkages and not make the linkages a statutory initiative like we did the time linkages, because it was secondary and would have detracted our ability to ever get it approved by Congress as you asked earlier.**

**So in my mind, as I recall this, was we**

465

chose not to try to force the tonnage, as we chose to really address the time linkage. Because it was a secondary -- of secondary importance relative to the time. So that is why we left the metric tonnage there. Although we initially never wanted the metric ton limits, they were a fact and they were law at that time, period. So we were trying to make the best of a bad statutory situation we found ourself in with the '87 amendment.

Q Did the Department of Energy have a congressional lobbyist in 1990?

A **We don't have lobbyists.**

Q Do you have officials whose primary duty is dealing with the federal legislature?

A **We have an Office of Congressional Affairs.**

Q And who was that office run by in 1990?

A **I don't recall.**

Q Do you frequently deal with that office?

A **No.**

Q Did you deal with that office in 1990?

A **Probably.**

Q But maybe not?

466

A **I don't remember.**

Q Do you recall whether in 1990 you sought advice from that office on the likelihood of federal legislation being enacted to modify or amend the statutory linkages?

A **I don't remember the Office of Congressional Affairs really ever being in tune with much of this at all. This was done primarily with Secretary Watkins' office.**

Q But the Office of Congressional Affairs did deal with congressmen, senators on a daily basis, correct?

A **I don't know what they did.**

Q You don't know the function?

A **I know -- no, I don't.**

Q And I take it you never involved that office in discussions relating to efforts to cause Congress to consider the repeal or amendment of the linkages, correct?

MR. CRAWFORD: Objection. Foundation.

A **There were probably some congressional affairs staffers around at meetings.**

467

Q But you're not sure?

A **I'm not sure.**

Q And you don't recall ever having a conversation with the head of that office or any staffer relating to the likelihood of congressional legislation -- the likelihood that congressional legislation would be enacted to modify or repeal the statutory linkages, correct?

MR. CRAWFORD: Objection to the foundation. Objection to the form of the question.

Q Correct?

A **I don't recall any ones that I did. Sam Ruosso or Frank Peters, who were my superiors, might well but I didn't. That I recall. I know there were staffers around. I never recall having a meaningful discussion with somebody from that office who really knew anything.**

Q And don't recall ever having such a conversation in 1990 or any other time, correct?

MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.

A **You're talking about 1990.**

468

Q Did you ever have a conversation with anyone from that office concerning the issue of congressional legislation to amend or repeal the linkages at any time, 1990 or at any time prior to or subsequent to 1990?

MR. CRAWFORD: Objection to the form and foundation.

A **Probably did in '93ish. But not in 1990. I don't recall any in 1990, '89 or 1990.**

Q Can you recall a specific discussion in '93ish?

MR. CRAWFORD: Objection to the form. Objection to the foundation.

Q Or do you just think you might have had such conversations?

A **No, I know in '93, '93 was different because I was now -- a change of time. I was acting director in '93. So I can't remember who it was but there was -- and I did have discussions with that office regarding all my testimony and dealing with stuff with Secretary O'Leary, so, yeah, I worked with that office but I don't remember like who was in**

8K



527

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR

528

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

530

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

need to find out if you have an understanding of what's in this document, sir.
This morning you testified that DCS stood for delivery commitment schedule. Do you recall that?
A **Yes.**
Q What, without looking at the document, are you able to tell me is the purpose of a DCS?
A **I believe they were something to do with the planning for the receipt of material into our system in the future, ten years or something in the future. And it related to the contract.**
Q Why did you view it as administrivia?
A **Because I did not consider it pertinent to the primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive it.**
Q What consideration did you personally give to the data produced by a DCS?
A **What?**
Q What consideration did you give to the data produced on a DCS?
MR. CRAWFORD: Objection, vague.



Objection, foundation.
Q Did you give any?
A **What consideration -- repeat the question again.**
Q A DCS form contains certain data, correct?
A **I really don't know if it has data in it or not.**
Q Let me ask you to look at item number two on the first page, "Who should submit." Do you see that item?
A **Yes.**
Q Why does that item provide that the DCS should be submitted by all purchasers with allocations in the '91 annual capacity report?
MR. CRAWFORD: Objection, foundation, vague.
A **I don't know.**
Q Do you know why the '91 annual capacity report was a report that was chosen?
MR. CRAWFORD: Objection, foundation.
A **No.**
Q Could a nuclear utility that submits a DCS



or submitted a DCS request an allocation amount that was different than the amount specified in the 1991 annual capacity report?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection, foundation.
A **I don't know.**
Q Let's turn to page two. Can you read, take a look at entry 7C.
A **Okay. I've read it.**
Q Now, you see that it states that the DCS -- do you know what FWMS stands for? Is that federal waste management system?
A **I think so.**
MR. CRAWFORD: Objection, best evidence.
Q You see the statement that "The process described herein assumes that the federal waste management system will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR"?
A **I see that.**
Q Based on your testimony earlier today, as of what date in your opinion would that have been an



unreasonable assumption that spent fuel acceptance would be beginning in 1998? Did you indicate earlier today that that projection became unreasonable sometime in mid to late 1993?
MR. CRAWFORD: Objection. Mischaracterizes his prior testimony.
A **In late '93 it became, you know, in my mind unlikely to happen.**
Q Do you know why this instruction form for completing DCSs contains that assumption?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **No.**
Q Do you know what the relevance of that assumption was in connection with the DCS process?
MR. CRAWFORD: Objection, foundation, vague, and objection to the extent it calls for any kind of a legal conclusion.
Q Let me strike that question and ask you to -- subparagraph C, it says "In the event that such circumstances change" -- referring to the assumption that you and I just discussed, Mr. Barrett. Do you

**the contract holders for some equitable arrangement regarding our inability to have a facility capable to move the fuel. So that offer to work out some sort of arrangement was there for many years.**
Q Turn to page six. Under Interim Storage Issues, do you see that?
A **Yes.**
Q There's an entry "What role, if any, should the department play in the development of private interim storage facilities." Can you describe for me the department's deliberations on that point?
A **I don't remember deliberations about that question in this thing.**
Q Was there any consideration of that proposal after this release went out for comment?
A **Not that I recall. We must have said something about it in the final.**
Q But you don't recall any internal discussions about that point?
A **No.**
Q Why is there the reference to, further down, "should the department pursue" -- why was the



suggestion that the department should pursue with Congress the elimination of existing restrictions on MRS site construction and operations? Had you not already pursued that with Congress at this point?
MR. CRAWFORD: Objection, vague.
A **I don't remember why that's there.**
Q This is basically what Congress had already shot down, correct? When the grants were denied.
A **Well, they stopped the volunteer process for purposes of putting grants in. Doesn't mean you still couldn't try to do it, and at this time -- this is circa '94 -- I think they were starting -- there was discussions starting about interim storage.**
Q Well, at the time on May 25th, 1994, when this notice of intent went out, was there any question in your mind, Mr. Barrett, that for all practical purposes the MRS proposal was dead?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
A **No, I wouldn't say it was dead. I didn't use that word, "dead." I said it was unlikely. It wasn't dead.**



Q Was part of your program plan waste management system at that time an MRS facility?
A **I'm not sure of the timing, but we basically shifted from site-specific MRS to generic, and so we submitted a topical report to the Nuclear Regulatory Commission so that if a site could be developed through some process, you could expedite the licensing much faster and ran on line as quickly as possible close to 1998. And that's why we did that, spent money on that topical report. So hopefully there could have been maybe a breakthrough with a volunteer who didn't need grant money or some other arrangement through some other designating process that I don't know what it would have been, but could have been.**
Q But at this point you did not expect it to happen, correct?
A **It was less likely than it was likely.**
MR. CRAWFORD: Objection.
Q Excuse me?
A **It was less likely than it was likely.**
Q It was a lot less likely than it was likely



at this point, wasn't it, Mr. Barrett?
MR. CRAWFORD: Objection, asked and answered.
A **I don't know what "a lot" is, but I said it was unlikely.**
Q We're saying it was unlikely that an MRS facility would be operational, be pursued and made operational, correct?
MR. CRAWFORD: Objection, vague. Objection --
A **It was unlikely is what I said.**
Q Was it part of your program plan waste management system at this time in mid-1994?
MR. CRAWFORD: Objection to form.
A **I think the MRS was still there. We didn't take it out.**
**(Deposition Exhibit Barrett 35 was marked for identification and was retained by counsel.)**
Q The court reporter has handed you a document marked for identification as Exhibit 35. It is a predecisional draft, Volume 3 of the Waste Acceptance Storage and Transportation Project

739

readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.

Q You believe that's the only reference in this document to an MRS?

A My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.

Q Turn your attention to page one. Bates 174286.

A I'm sorry, page one?

Q Page one on the bottom, paragraph one.

A Okay.

Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?

A Yes.

MR. CRAWFORD: Where is that?

MR. CAYNE: Last sentence of the

740

introduction.

A Yes, I see it.

Q What was the then-current approach that's being referred to in that statement?

A That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.

Q So that was no longer a viable option?

A I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.

Q The department used the word "viable," correct?

A That's what it says.

Q And you would have seen this document before it was issued, correct?

A Yes.

Q And I assume you were in the chain of command that had to approve this document?

A I was responsible, I'm sure. I don't know if I ever signed it off or not.

Q You would have been satisfied with the

741

language of this document, correct, before it became final?

A Yes.

MR. CRAWFORD: Objection, asked and answered. Argumentative.

A I would have accepted those words there.

Q The words being "no longer a viable option," correct?

MR. CRAWFORD: Objection, asked and answered. Argumentative.

Q Correct?

MR. CRAWFORD: Objection, asked and answered, argumentative.

A Correct.

Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?

A Yes.

742

Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A Just what it says.

Q Do you understand what that means?

A The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.

Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?

MR. CRAWFORD: Objection --

Q Correct?

MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.

A I wasn't there. I wasn't involved in a

**program then, so I don't know what they envisioned.**
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
**A Yes.**
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says, The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
**A Yes.**
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
**A Yes.**
Q Is that referring to an MRS facility?
**A Site-specific MRS facility is what that**



**refers to.**
Q And again by "site-specific MRS facility," specifically what are you referring to?
**A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.**
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
**A There was a low probability.**
Q Low probability did you say?
**A Yes.**
Q And, in fact, such a specific site never did become available through today?
**A Correct.**
**(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)**
Q Exhibit 36, under Fiscal -- on page 14,



under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
**A Yes, it says that.**
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
**A I see the chart.**
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
**A Yes.**
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
**A Close.**
Q What's close? It occurred two years after the date, correct?
**A Including FY '02, but depending on when in**



**the year, a little less than two years.**
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule, as reflected by the major milestones for program success?
**A As defined back in '94, yes.**
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
**A Yes.**
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
**A Yes.**
Q Could you please refer to Bates 057-1498. First, what would your involvement in this, in the preparation or review of this document have been?
**A I would have signed off on a final total**

779

**A What's the question again?**
Q What was the status of a volunteer MRS facility that would have required the enactment of affirmative congressional legislation modifying certain linkages, what was the status of such a facility in 1995?
MR. CRAWFORD: Same objection.
**A Unlikely.**
Q And weren't there answers that you even gave stronger than unlikely? Do you recall that, sir?
**A Unlikely or --**
MR. CRAWFORD: Objection, argumentative.
Q Unlikely or what?
**A Unlikely is what I said.**
Q Okay. What did the department say in the plan that we looked at before? Did it use the words "not viable"?
**A It did.**
MR. CRAWFORD: Objection.
Q And you said you would have approved that document, didn't you?
MR. CRAWFORD: Objection --

780

Q Didn't you?
MR. CRAWFORD: -- argumentative.
**A I said I might have. I would not have objected to those words.**
Q But you were comfortable with them, right?
MR. CRAWFORD: Objection, argumentative.
**A I could support those words.**
Q Okay. So by early 1995 an MRS facility was either not likely or, in the words of the department, not viable, correct?
**A Correct.**
Q If an MRS facility is not viable in early 1995, tell me, based on your understanding of the capacity limits, which I know you understand, what is the relevance of capacity limits as set forth in the first sentence of page four of Exhibit 39?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q And take as much time as you need, sir, to study the document.
**A Just rephrase it. Now I'm in 39. What sentence?**

781

Q The first sentence I'll read into the record. "The project nominal acceptance rates also reflect the capacity limit imposed by the act in such a storage facility prior to repository operations."
**A That sentence is consistent with the table there, Table 1, and it describes what Table 1 is.**
Q Thank you. What is the relevance of Table 1 in early 1995 when the department has publicly taken the position in a document that Lake Barrett has signed off on that states an MRS facility is not viable?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A I didn't say I signed that document, by the way.**
Q But you were comfortable with it. Do you recall that, sir?
**A I would support that.**
MR. CRAWFORD: Objection, argumentative.
Q Thank you, sir.
What is the relevance of the table on page four of Exhibit 39?

782

**A I don't know what the relevance of that is.**
Q Does it have any relevance to projected acceptance rates as of early 1995 when the MRS no longer is viable, according to the Department of Energy, in official agency promulgations and publications?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for a legal conclusion.
**A I don't have an opinion nor a feeling nor -- I just don't have any position regarding what this would be in a thing called an ACR or DCS that were very low priority. This was administrational activities regarding, you know, this, and I did not personally get involved in that. So the appropriateness or inappropriateness one would have of a table of a list that wasn't central to what the highest priority items were, I personally did not get involved in. So I really don't know if it is or isn't or -- your question, try it again.**
Q For your purposes did you consider the projected nominal waste acceptance rates set forth in Table 1 on page four to be relevant?

MR. CRAWFORD: Objection, best evidence. Objection to the extent it calls for a legal conclusion. Objection, asked and answered:
A This is relative to -- relevant to what? They were relevant to the -- they were created, and their genesis was with the MRS limitations. They were relevant to that. When the system changed and the MRS became unlikely, I have no opinion nor idea about the relevance of these tables in any of these subsidiary documents. I never got involved in them, and I don't have an opinion one way or the other.
Q But sitting here now looking at this document with everything you know as a director and deputy director of the Office of Civilian Waste Management over the last decade, can you perceive any relevance of the acceptance rate set forth in Table 1?
MR. CRAWFORD: Objection, vague. Same objections.
A I have no opinion nor ideas regarding the relevance or irrelevance of this in any of these documents at all. Because they are not central to the primary focus that I've had and still have of trying



to perform and build a facility.
Q Let me ask it this way: What relevance, if any -- and let's go outside the context of this exhibit, this ACR. What relevance, if any, do projected nominal waste acceptance rates as reflected in Table 1 have in an environment where the department has concluded that an MRS facility such as the volunteer facility we have discussed is not viable?
MR. CRAWFORD: Same objections as before. It's the same question.
A None of these projected nominal waste acceptance rates in any of these subsidiary documents have any relevance at all on anything as far as I'm concerned, because my focus is on building a facility that can receive the material, and we want to have that facility perform as best as it reasonably can, and we're focused on doing exactly that. These -- such things as this, relevance or nonrelevance of this or that is not on my radar screen. It's not a priority for me.
Q Do you recall we spoke this morning about meetings you had with senate staffers concerning the



Fitzgerald Amendment?
A Yes.
Q Did you use the projected nominal waste acceptance rates set forth in Table 1 during those meetings?
MR. CRAWFORD: Objection. Asked and answered.
A Yes.
Q For what purpose?
A That these to show -- the question was -- from them was does this make any difference if we put in numbers or not regarding this obligation rate. And we used that as an example to show them, yes, it does make a difference because for exactly the things we're doing here today, that this will become important if litigation and all of this continues on like it is. People argue over this, and be careful if you go there.
Q But the projections in Table 1 you testified related to an environment where there would be a volunteer MRS facility, correct?
A That's how they were originally generated.



Q In 1999 or 2000 when you had the meeting with the senate staffers, there no longer was a viable hope of a volunteer MRS facility, correct?
A Correct.
Q So why did you use these projected nominal waste acceptance rates from the MRS environment at least five or six years after the department determined that the MRS alternative and the volunteer MRS alternative was not viable?
MR. CRAWFORD: Objection. Asked and answered. Objection, vague. Objection to the extent it calls for a legal conclusion.
A As illustrative that when they used the words "obligation rates" or "obligations" in statute, this was a complex matter for American society to work out. That's exactly what happened. It was used to caution them, if you go doing this be careful what you do. Okay, because it will be -- it will -- potentially could be involved in defining contracts and contract issues, which is exactly what it is.
Q But you did not believe at that time that the projections reflected in Table 1 any longer

826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR

827

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

828

Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

829

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

938

**executive branch, and we followed that.**

Q So the position advanced by your office was consistent with the administration policy that you just stated, correct?

MS. HERRMANN: Same objections.

**A We accepted that, and we followed that as a member of the administration.**

MR. CAYNE: We're going to the next document. It's 11:55. Why don't we break for an hour lunch now, and we'll return at one.

(There is a discussion off the record.)

(A luncheon recess is taken.)

939

AFTERNOON SESSION

Q Mr. Barrett, between the time of the last session of this deposition and today did you discuss your testimony with any person?

**A No.**

Q Did you review any documents in preparation for today's session of the deposition?

**A No.**

Q Did you have any conversations with counsel following the completion of the last session and the beginning of today's session?

**A Just to set up the date for today.**

Q Do you recall, Mr. Barrett, that you testified today that the obligation rate is not equal to the system operating capacity?

**A Yes.**

Q What is the basis for that testimony?

**A In designing any system, from an engineering point of view you design the system to meet or exceed the system requirements. In this case -- not case. In this situation designing the system -- I don't want to confuse this with legal**

940

**cases. We want to design the system to operate at a rate that exceeds the requirements. The requirements that we have are a combination of many factors, which one of them is in the contract, as I understand, relates to the ACR which is the four, six, 900 number. We want to exceed that by a substantial margin. Which the design rate of -- our present reference rate of four, six, 12, 2,000, 3,000, does that.**

Q Your testimony on that point is inconsistent with the position taken by the Department of Energy in 1987, isn't it?

MS. HERRMANN: Objection. Foundation.

**A Not that I know of.**

Q Your testimony that the obligation rate would not equal the system operating capacity, isn't that inconsistent with the position taken by the department in 1987?

MS. HERRMANN: Objection. Foundation.

**A Not that I know of.**

Q Let me turn your attention to Exhibit 6 of this deposition, page ten, which bears Bates --

**A Hold on now. Six? Do you want me to find**

941

**it?**

Q Yes.

MR. CAYNE: I'll just state for the record that I'm turning the witness' attention to PA-103165.

**A What page number should I be at?**

Q Page ten. Bates 103165.

**A Okay.**

Q Under Section 3.2 there is the following statement: "The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the purchasers. The projected WMS capacity equals the system operating capacity," and then you see it continues.

**A I see it.**

Q That statement is inconsistent with the testimony you just gave, is it not?

MS. HERRMANN: Objection. Asked and answered.

**A Yes, I think so.**

Q Who was responsible for issuing this annual capacity report? Was it your predecessor?

**A I don't think it was me. Yeah, Ben Rusche,**

950

Q What lower receipt rate studies were you just referring to?
**A Oh, I don't know. Some of those ones you had back here.**
Q Could you go through the exhibits and please identify for me which ones you were referring to.
**A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.**
Q You mean Exhibit 42?
**A 43 I think.**
Q 43?
**A I think 43 had some lower receipt rates in it.**
Q And those lower receipt rates in Exhibit 43 were based upon what?
**A Funding constraints.**
Q Funding constraints imposed by Congress?
**A Yes.**
Q Did Congress impose such funding constraints?
**A They certainly have.**

951

Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
**A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.**
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A They've slowed us down.**
Q Substantially?
**A Months.**
Q Years?
**A If you add them all up, probably a year or so.**
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?

952

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
**A I don't know.**
Q Is there any?
MS. HERRMANN: Same objections.
**A Only as it relates to the legalities of contracts.**
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
**A That's my understanding.**
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
**A That was the basis at that time.**
Q At that time, you're referring to what time?
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
Q So in the late eighties, early nineties

953

when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
**A Correct.**
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
**A I think so.**
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
**A I generally don't.**
Q Have you ever heard it used?
**A Yes.**
Q Do you have an understanding what it means?
**A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.**
Q And the overall system as described back at that time involved what?

954

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in

955

'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)

Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.

956

A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.

957

Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

about the nuclear waste negotiator, correct?
A Yes.
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A I don't know the exact date, but somewhere in the mid-nineties.
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A No.
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A Not appreciable that I recall.
Q Did it have any effect on your



consideration, for example, of the viability of an MRS facility?
A No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A Uh-huh.
Q Does that indicate that the negotiator's activities terminated in 1995?
A It looks like it.
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste



Negotiator's Office terminated?
A Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A Not really.
Q Do you recall discussing it at all?
A We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.
Q You're referring to Exhibit 39?
A 39. I have it.
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A What's the question? I see an ACR.
Q Do you recall that we discussed this ACR?



A Yes.
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Something that relates to the contract.
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A No.
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A I'm sure people in the office used it, okay.
Q For what purpose?
A For whatever they used it for. I don't know.
Q You didn't use it for any purpose?
A Does this have the table in it that I do use?
Q Which table are you referring to?
A The only thing I'm familiar with in this is

966

**page six, Table 2. That's the only thing I ever personally used out of this document.**
Q The only thing you ever used is the summary of the purchaser's annual allocations?
A **Right.**
Q And for what purpose did you use that chart?
A **I used that to have an understanding of which utilities had what allocations in the year one, year two, year three, year four. For policy reasons is why I wanted to know.**
Q What policy reasons?
A **Just if I ever have to talk to various executors from various companies where they stood in the queue.**
Q Look at page four, please.
A **Yes.**
Q Did you use the table on page four for any purpose?
A **No.**
Q None at all?
A **No.**

967

Q What was your position in March 1995?
A **I think I was the deputy director.**
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
A **I don't know. Some people in the waste acceptance area.**
Q People who worked for you?
A **Yes.**
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
A **Part of what they consider the business of the office, which I agreed with.**
Q You agreed with what?
A **Them doing what they felt they needed to do.**
Q In March 1995 you did not expect to be picking up spent nuclear fuel at the rates referenced in Table 1, correct?
MS. HERRMANN: Objection. Vague.
A **Repeat the question again.**
Q In March 1995 you did not expect that the Department of Energy would be picking up spent nuclear

968

fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
A **It was my desire and intention that we would pick up in year two, three, four a rate higher than this.**
Q But there was no, in 1995 there was no expectation in the Office of Civilian Radioactive Waste Management that spent fuel would, in fact, be picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
A **Did you say no expectation?**
Q Right. In March 1995, at which time, as you've testified, the MRS was not viable, your office did not expect that spent fuel would be picked up at the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
A **I ask you to clarify the word "expect." I didn't know what to expect. It was our intention and desire with all our energies to pick it up at a rate that we desired to pick it up, which was a higher rate than this.**
Q That was the rate that moved up to 3,000

969

MTUs per year, correct?
A **That was our desire, that was our goal, and we strived to do that. What actually would happen we did not know. So my expectation was very uncertain.**
**So you asked to say what I expect. The expectation, I have to say that I don't know what to expect. We were trying to run it as high as we could run it.**
Q But you had various -- your office, the Office of Civilian Radioactive Waste Management Control, had various plans that it followed pursuant to which your activities were conducted, correct? You had various plans?
A **We had plans and goals in trying to achieve the intent of the act.**
Q Right. And in 1995, March of 1995, there was not a plan in effect that would have called for the acceptance of spent fuel at the rates reflected in Table 1, correct?
A **Correct.**
Q In fact, the plan that was in place in 1995 called for the acceptance of spent fuel at a rate that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**



**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest



Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

1340

answered.
A It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A I thought we just described it a little bit. The 300 to 400. Other than that, I think

1341

they're the same.
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A Yes.
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A Restate that question again, please.
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste

1342

acceptance operating-type document. It should reflect what the system was at that time.
Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A Mine geologic disposal system I believe.
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?

1343

MS. HERRMANN: Objection. Best evidence.
A I think that the '95 ACR has the four-six-nine constant in it.
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A Well, that's different than these.
Q It is different?
A Yes.
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A This is a performance document on what we thought we could perform at. That has something to do with the contract.
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A Yes.
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A Okay.

1344

Q I'm going to refer your attention to Table 1 on page four.
A **Yes.**
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
A **Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.**
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
A **It appears to.**
Q Do you know why it only sets forth projected acceptance rates for ten years?
A **No.**
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would

1345

have been in year 11?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
A **Repeat the question, please.**
**(The record is read.)**
A **I don't know a relationship between this table and what we'll actually perform at.**
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.

1346

A **I don't know.**
Q How would you figure that out?
A **You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.**
Q Does DOE have information on what you call pool overflow rates?
A **We have data reported by utilities in their 859 reports that you could derive that from.**
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
A **I don't know. I don't think so.**
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A **Not that I know of.**

1347

Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A **Not specifically, but in a gross national sense, yes.**
Q And how in a gross national sense?
A **By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.**
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
A **Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not**

1348

perform at all.
Q And do you recall at all what that figure of 500 tons was based on?
**A Based on somebody's guesstimate of what they realistically thought the pool overflows would be in the 2010 to 2015 time frame.**
Q And was the pool overflow figure that was cited to you, 500 metric tons per year, did that reflect an aggregate number based on all the utilities, do you know?
**A My recollection was that was a national number. You couldn't really do it on a -- we didn't have the data to do it on a utility-by-utility number very clearly.**
Q Well, did the utilities report individually with respect to them this data on their RW 859 documents that they submitted to DOE?
**A I don't know exactly what's on an 859. I think that's being derived from the 859s.**
Q We spoke a little earlier today about the viability assessment. Do you recall that conversation?

1349

**A Vaguely.**
Q And the conversation centered around a reference case for a repository that would be available in 2010 that was actually described in the viability assessment that was published I think by DOE in 1998. Is that correct?
**A I believe so.**
Q And if I remember correctly, the reference case is a repository that is -- I think you described as a nonmodular system. Is that right?
**A Correct.**
Q What are the major milestones that are left between now, May 2002, and 2010 that have to be accomplished before the repository and nonmodular repository can take spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
**A Have to prepare the license application, go through the licensing process of the NRC, receive a construction authorization, construct it, receive an operating license, build the transportation system, both the hardware aspects of it and the institutional aspects of the transportation system, and then be**

1350

**ready to operate in 2010.**
Q What is a reasonable estimate of time that it would take to construct a nonmodular repository?
MS. HERRMANN: Objection. Speculation.
**A Under normal circumstances a building like that would be approximately five years.**
Q And what's a reasonable time or a reasonable estimate of time that it would take to get your license approved to build such a facility?
MS. HERRMANN: Same objection.
**A The statute says three years.**
Q Do you consider that reasonable?
**A It could be tight.**
Q Why?
**A Well, I think the hearings will be difficult for the NRC to complete within that time period, but it's doable.**
Q And I believe you said in addition to the licensing and the construction there are concerns about building a transportation system as well and getting an operating license. Is that correct? Those are two additional milestones?

1351

**A Two additional milestones. I didn't use the word "concerns."**
Q But they are two additional milestones?
**A They are milestones, yes.**
Q And is the time to get an operating license the same as the time to get your -- for a licensing procedure, is that the same milestone or are those two separate actions?
**A What I refer to in a general sense as the operating license is actually an amendment to our license that we would receive when we get the construction authorization. So it's a license amendment, which should take less time than the original licensing proceeding itself.**
Q And how long would that licensing amendment take?
MS. HERRMANN: Speculation.
**A It will take a couple of years. The actual operating license proceeding will probably start just about when the construction authorization is given.**
Q From what you said it does not appear likely that DOE will accomplish all these milestones