# Edward Benz

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY :
Plaintiff, :
v. : Case No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C

- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, May 10, 2002

Deposition of EDWARD BENZ, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 8:30 a.m., Friday, May 10, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 22

were all being investigated up to when the Nuclear Policy Act was laid out. And the waste package design for each of those was somewhat specialized to be compatible with the geology. There was a lot of materials work and corrosion work --
Q. Okay.
A. -- concerns.
Q. And just in general, what kind of package are we talking about? Are we talking about metal or are we talking about what?
A. Well, for the most part the materials under consideration were metals. From time to time we considered things like ceramics.
Q. And was it clearer at that time in the early '80s that there would be a package or was there also consideration of disposing of the fuel bare, do you recall?
A. To the best of my recollection, nobody ever thought about putting it in there bare.
Q. Did there come a time as your work at Jacobs Engineering Group progressed in time from 1983 forward that your duties and responsibilities changed significantly away from managing the waste package group and issues pertaining thereto?
A. Yes.

Page 23

Q. When was that about?
A. About 1987.
Q. And what were your new or changed duties and responsibilities?
A. I began to work in the waste acceptance area.
Q. Okay. And what does that mean?
A. It's the relations between the DOE program and the various owners and custodians of high-level waste and spent fuel.
Q. Okay. And so prior to your beginning to work in the waste acceptance area in about 1987, that is when you were managing the waste package group, you for the most part were not concerned with the dealings between DOE and the various utilities?
A. That's correct.
Q. You were focused on things that were internal to DOE or internal to the program rather than relationships with the customers or with the purchasers?
A. Yes.
Q. Okay. And how is it that you came to make this transition into the waste acceptance area?
A. The Nuclear Waste Policy Act did away with all the, with two of the three sites that were then

Page 24

under consideration and focused on Yucca Mountain and so there wasn't any need to coordinate all that activity.
Q. The Amendments Act, the '87 Amendments Act?
A. Yes, yes. And I needed to find something else to do.
Q. Okay. Was somebody doing what you started to do before you got there and you replaced that person, do you recall?
A. As I recall, and I don't know who the people were, but there had been a number of people that were unsuccessful in that regard. They didn't get along with the DOE person who was working.
Q. And who was the DOE person?
A. At the time it was Alan Brownstein.
Q. Okay. And do you recall some of the individuals who had started to work in the waste acceptance area but had not for whatever --
A. Before that, I have no recollection.
Q. But you do recall there was some people who just had personality issues?
A. I know there were people that had -- well, there were people that had those kind of issues, yes. And they were unsuccessful with dealing them and they

Page 25

kept replacing them.
Q. But were you successful?
A. Fairly, yeah.
Q. How long did you work in the waste acceptance area from '87 forward?
A. Till '91 or '92.
Q. And during that period, again, those four years or so, can you sort of summarize exactly what you were doing, writing reports, studying, what kinds of issues were you looking at?
A. For the most part I was dealing with the West Valley situation where West Valley had no contract and DOE was attempting to get them under the same type of contract as the rest of the purchasers, is what we call them in standard contract language.
Q. And who, who owned the fuel at West Valley at that time?
A. It was not so much the fuel that was at issue.
Q. What was at issue?
A. It was the high-level waste.
Q. And who owned the high-level waste?
A. New York State Energy and Research Development Authority.
Q. So you were dealing with those folks

Page 26

trying to get them under contract?
A. I was dealing with DOE and DOE was dealing with those folks.
Q. And what were you doing for DOE in support of that?
A. Well, I wrote a draft contract and we -- I'm not sure whether they called it a contract or a memorandum of agreement but it was along those lines that they were trying to get some sort of an agreement with New York State. And at the same time as I was doing that I was working on a memorandum of agreement between RW, which is the OCWRM program and EM which is the people with all the waste in DOE and we were driving the two along parallel, in parallel. And that was pretty much the bulk of my activities.
Q. Okay. Now, this draft contract or memorandum of understanding that you prepared, do you know was it ever consummated?
A. It's still an issue between the two.
Q. Still an issue. Okay. Was the document that you prepared the draft contract or memo of understanding modeled after the standard contract?
A. To a certain extent. There was considerable review to make sure that we had parallel terms and conditions.

Page 27

Q. Okay. During the four years that you were in the waste acceptance area, or about four years from 1987 to 1991 at the Jacobs Engineering Group, did you do -- was there anything else of a significant nature that you recall that you did other than supporting DOE's work in trying to get the West Valley situation under control?
A. I don't know what significant means.
Q. Do you recall any -- okay, that's a very fair point. Do you recall -- what else, anything else you worked on that was unrelated to that that you recall?
A. Yeah. From time to time we would get involved with issues with the utilities.
Q. Okay. What kinds of issues?
A. Well, utilities were seeking -- let's call it preferential treatment.
Q. Okay.
A. Preference for shutdown reactors in sequence. There was a preference for reactors that had been in the DOE's early efforts where the, the promotional efforts under the AEC, they wanted to achieve some preference in terms of getting their spent fuel removed so they can shut those plants down.

Page 28

Q. And do you recall, did you personally deal with those utilities?
A. Not with the utilities, no.
Q. You dealt with DOE?
A. I dealt with DOE on those and basically what we would do is draft answers to these requests.
Q. And the requests came in the form of letters from the utilities?
A. To DOE.
Q. And you would prepare, prepare responses?
A. Yeah.
Q. Okay. And do you recall any of the utilities that were seeking preferential treatment at that time?
A. The Trojan reactor, Portland General Electric, that's the reactor and utility. Lacrosse, and that's the Dairy Land Power Cooperative. I don't recall whether any of the Yankees were involved.
Q. Let's go back a step. On the work that involved the -- what you call the West Valley situation or what I'll call the West Valley situation, was that something that on the DOE side was under Alan Brownstein's purview?
A. Yes.
Q. Okay. And what about this issues with the

Page 29

utilities that would come up from time to time, when you drafted responses, did you -- was Brownstein involved in that?
A. Yes, usually.
Q. Were there others at DOE that you recall that were involved in dealing with these requests for preferential treatment from utilities that you worked with?
A. Well, I worked with Tom Pollog, would have been in those days. I don't recall whether we were involved in those things at the same time or not.
Q. Okay. So during that time period you recall working with Pollog but you don't recall whether it was on the preferential request or on the West Valley situation?
A. That's right.
Q. Anything other than West Valley and issues with utilities for preferential treatment that you recall working on when you were in the waste acceptance area at Jacobs Engineering from 1987 to 1991?
A. Anything else. I worked on other things.
Q. Just don't recall?
A. I don't recall. I mean, you know, I was there every day.

Page 30

Q. And what happened in 19 -- excuse me, I think I said '81 before, I meant '91. What happened in 1991, did you leave the waste acceptance area?
A. I left the Weston team for a while and did some other things for Jacobs.
Q. And what were those other things?
A. I managed a contract doing environmental assessment and the environmental impact statement for the new production reactor. It was a DOE contract.
Q. Okay.
A. I managed a contract doing cleanup work for the Corp of Engineers at Anniston Army Depo and later managed a similar contract up at Aberdeen Proving Grounds.
Q. Did any of that work involve high-level waste?
A. No.
Q. And did there come a time after 1991 when you again got involved with high-level waste issues?
A. Yes.
Q. When was that?
A. It was about '94 or so.
Q. Okay. And what happened then?
A. What do you mean what happened?
Q. Well, what did you get, you know, what

Page 31

work did you then start doing that involved high-level waste?
A. I was back in the waste acceptance business.
Q. Okay. Sort of the same office?
A. Same sort of thing, yeah.
Q. Was it the same office at Jacobs?
A. It was --
Q. I don't know about physically but the same --
A. It was the Weston team, yeah.
Q. And why did you come back to waste acceptance -- to the waste acceptance area?
A. The other projects that I was managing got done and I didn't have anything to follow them up with.
Q. Okay. And what did you, what kind of work did you do -- it looks like it was just, if my notes are correct from 1994 until you left Jacobs in '97?
A. Uh-huh.
Q. What did you do during that period?
A. It was all waste acceptance work.
Q. Did you go back to the West Valley problem?
A. No, I was managing, I think about three

Page 32

people that were involved in it at the time.
Q. And who were those people?
A. Steven Egace was one, Joy Russell, Mike McAvey. That's in the '94 to '97 time frame.
Q. Okay. And what were you and those people doing?
A. Primarily -- well, we were doing the general waste acceptance stuff. We would be responding to the questions that would come down from on high. We were doing some analyses of dry storage needs amongst the various utilities. We would --
Q. I'm sorry, go ahead.
A. We were just on call to support, I think it was Dave Zabransky at the time.
Q. During that '94 to '97 period?
A. Yeah.
Q. And the questions on high would be questions from Mr. Zabransky or otherwise from DOE?
A. Within DOE. Sometimes they originated in Congress.
Q. And what kinds of -- other than dry storage needs of utilities, can you give me some examples of what kinds of questions that you fielded then?
A. I guess they were primarily concerned with

Page 33

the, at the time the MRS was, monitored retrievable storage system, that's an acronym, was on its last legs. DOE had to bank all its hopes on a volunteer host for that and that didn't pan out and it was very clear by the '94 time frame that it wasn't going to pan out and it was also pretty clear that there wasn't going to be a repository in '98. And so these were, you know, what are the consequences of that and what does it mean to the program kind of questions.
Q. Okay. And then in 1997 you left Jacobs?
A. In 1997, yeah, that's right.
Q. And you joined JAI Corp.?
A. Yes.
Q. And again let me ask, was there anything related to your performance that led to that job?
A. No, there was no performance related issues. Weston lost the recompetition for the contract and I was laid off for a bit and then --
Q. Who got the contract at that time?
A. Booz-Allen.
Q. And that was a contract for technical support or for --
A. That was a technical support services contract, yes.
Q. And Booz-Allen -- who was the prime at

Page 54

Q. Okay. All right. Well, this document that I've just handed to you does refer in a general way to some topics and I'd like to ask you about those. Under paragraph 15, you see your name there and if you just read the sentence beneath that I've got a couple questions for you.
A. Okay.
Q. Okay. Now, it says you, says here "You will testify about the technical aspects of the standard contract and so on."
Do you have an understanding of that phrase, the technical aspects of the standard contract?
A. Not particularly, no. I'm not sure what it refers to.
Q. All right. What about the ACR issue resolution process that's referred to in the next clause?
A. I have a general understanding of what that is.
Q. What's your general understanding of that?
A. There was a construct between where DOE and the number of the utilities identified some issues, I think there were 30 plus issues associated with the standard contract and they met periodically

Page 55

to try to resolve those things. I don't believe they ever came to closure on anything.
Q. Were you involved in that?
A. I knew it was going on. I was not directly involved in it.
Q. Okay. Was there a team? Do you know what the time period that it was going on?
A. Late '80s, early '90s.
Q. Okay. All right. What about the next clause here in this sentence. It says, it refers to "the technical and legal basis for acceptance rates contained in the ACRs/APRs." Do you have an understanding about what that is?
A. Well, I don't know what the term technical and legal basis means but I know what the acceptance rates in the ACRs and APRs are.
Q. And in the course of your career were you involved in developing or studying those acceptance rates?
A. How do you mean studying them?
Q. Let's start with developing. Were you involved in developing the rates that would be put in these documents?
A. At any time?
Q. Yes.

Page 56

A. The rates that are where?
Q. That are in the ACRs or APRs.
A. I was not involved in that.
Q. But you're aware of it?
A. Yes.
Q. Are you aware of them because you worked with the ACRs and APRs?
A. Yes.
Q. And in what, just in a general sense, how did you become aware of them and how did you work with those documents?
A. Well, we've used those rates in the studies that I told you about before talking about what dry storage was and what it might have been and those sort of things.
Q. So that's relatively recent?
A. Going back to '94, yeah.
Q. These dry storage studies?
A. Yes.
Q. That you referred to before, I thought that was -- oh, it does go back to '94, yeah. All right. I was for some reason thinking that was more recent but okay. Let's go back to this, the technical aspects of the standard contract. Are you familiar with appendix F to the standard contract?

Page 57

A. I have a general knowledge of it, yeah.
Q. Just in general, what is that?
A. It specifies the information that a utility would have to turn over along with the spent fuel whenever it turned it over, and at the time of turnover.
Q. And during the course of your career have you worked with appendix F?
A. Yeah. We have a draft revision of appendix F that I believe has been circulated among the utilities. I'm not certain it was circulated amongst all utilities but it's out there.
Q. And were you involved in developing that?
A. I supervised the fellow that was developing it, and came in at the tail end of it as it was being finalized before it was issued.
Q. Who is that person?
A. I believe it was Scott Vance.
Q. And what was the time frame in which this revision to appendix F was developed?
A. It was getting finished up in '97, '98 time frame.
Q. Prior to that time frame, had you worked with appendix F in the course of your work, your career?

Page 70

(Exhibit No. 4 was
marked for identification.)
BY MR. STOUCK:
Q. Okay. Ready?
A. Ready for what?
Q. Well, have you had a chance to read the document?
A. Yes, I have.
Q. All right. This appears to me to be a letter from you to Mr. Brownstein dated October 19, 1990, is that your signature?
A. Yes. This one's my signature.
Q. Do you recall this letter?
A. Do I recall this letter? Not specifically.
Q. Well, did you write this letter?
A. Probably.
Q. Okay. Do you recall commenting on the draft 1990 Annual Capacity Report?
A. I don't recall, but it's not surprising that, you know, that I might have.
Q. Would it have been you yourself or would this letter have been prepared by someone else for your signature?
A. I think in that time frame it was probably

Page 71

me, there may have been others involved in it. I might have consolidated comments.
Q. Who else would have been involved at that time?
A. Pete Bolton perhaps.
Q. I'm sorry Pete?
A. Pete Bolton, he's one of the distribution --
Q. There's a reference at the bottom to a records facility, do you see that, Weston Records Facility. Do you know where that is?
A. I don't see it on here.
Q. It's the very bottom left of the first page?
A. Oh, yeah. I wasn't, I have no specific knowledge of where it is. I think it's somewhere in Pennsylvania.
Q. Take a look, I've got a question for you about paragraph 3 on the second page that's highlighted here. Is that, do you know why or can you tell me why, aside from paying for interim storage, the utilities were not interested or would not be interested in other help from DOE concerning interim storage problems? Just amplify that a little bit.

Page 72

A. Well, in my opinion, utilities had a negative view of DOE involvement on their site. You know, they were capable of taking care of their own problems, they don't need any help from the government, and I believe most of them didn't want it.
Q. And do you believe they were capable of taking care of their own problems?
A. Sure.
Q. Okay.
A. They're doing it now.
Q. Paragraph 5, I've got a question also, if you could look at that.
A. Okay.
Q. Do you recall what that was all about?
A. Well, I don't know what was in the preliminary draft of the 1990 ACR but the suggestion here is that, you know, there wasn't any sound basis for rates in the ACR. I'm assuming that -- I don't recall what they were. But I know they weren't the maximum that the system might be able to do until they get to this 10,000 MTU cap which is what the maximum allowable quantity to be stored in the MRS, which was popular at the time, until a repository is in operation.

Page 73

But the suggest is that DOE could accept at higher rates, get to 10,000 and then stop until the repository's in operation. And all this says is you don't explain why you don't do something other than what you did.
Q. Was it your view at the time that the system should have been operated at the fastest achievable rate?
A. No. The question -- this is just a question, why not do that? It was to get to the point of you didn't say enough about why you did what you did.
Q. Do you recall why they did what they did? Do you recall what the explanation was for the stretch-out of the 10,000?
A. It wasn't explained in the report.
Q. Okay.
A. Okay. Why they did it? You know, you're asking me to guess why somebody else did something. I wasn't involved in the discussions or the preparation of the report, just the review of it.
Q. Okay. And if you would just take a look at paragraph 6 again I've got just a question about that.
A. Do you have the draft of the --

Page 74

Q. I'm sorry, I don't. We couldn't figure out -- I've got the final here if that would help. Let me try the question and see if, I'd be happy to show you the final version of the '90 ACR but we couldn't figure out which draft you were commenting on here, so I apologize for that.
What I'm interested in is this statement that it's unlikely that the system would actually be operated in this fashion, this fashion being a reference to partially filled casks, that's where my question is going to aim. Is that your view, that it's unlikely that the system would actually be operated with partially filled casks?
A. Yeah, it's uneconomical for DOE to do it that way.
Q. And my next question was going to be why and the reason is because it's uneconomical?
A. Yeah.
Q. Okay. And there's a reference further down to, because it's uneconomical to make shipments with partially loaded casks, that DOE's evaluating alternatives to reduce the frequency of occurrence of these instances. Do you see that? Do you recall what alternatives were being looked at? There's one mentioned here, expand allocation. Do you recall

Page 75

other ways to deal with this problem of partially loaded casks that were being looked at?
A. There's one way in the standard contract that allows utilities to mark up their allocations by 20 percent that would have allowed them to do this. The expanded allocation periods was another one where instead of taking it on an annual basis you go two to three years at a time. But --
Q. And were those, do you recall that those things were being looked at or do you know whether they were being looked at at the time?
A. I believe they were, yeah.
Q. But you were not involved in that or were you?
A. I think I was aware they were going on. I might have been involved in some discussions on them but I wasn't directly involved in the studies themselves.
Q. And who would have been?
A. Bill Wowak's name's on here, he was in charge of the Weston system studies efforts, it may have been being done there. Or it may have been being done at PNL who was producing these ACRs at the time. I don't know specifically at this point.
Q. Okay. And I may have covered this at

Page 76

least in part previously but I just want to make sure that I'm correct in understanding that you yourself were not involved in developing the acceptance rates that are contained in any of the ACRs that were published from 1987 to 1995, to the best of your recollection, is that right?
A. Yeah, I was not personally involved in that, that's correct.
Q. You were aware of them, you may have read the things?
A. And I've currently reviewed them.
Q. You're aware of them but somebody else developed them?
A. Yes.
(Recess.)
BY MR. STOUCK:
Q. Can you take a look back at, I just want to -- the first thing we looked at, the witness list, that's marked number 1, I think. And I think your name is on page 7. And with respect to the last phrase here, the technical and legal basis for acceptance rates, do you see that?
A. Uh-huh.
Q. Okay. Now correct me if I'm wrong, but I take it from what you've said that you do not know

Page 77

the legal basis for acceptance rates contained in the ACRs and APRs, is that right?
A. I don't profess to be a lawyer so I don't profess to know anything about legal things.
Q. Do you know the technical basis or do you have an understanding of the phrase -- let's start with that. Do you have an understanding of what is meant here by the technical basis for acceptance rates contained in those documents?
A. Well, I know what, you know, technical means to me, I'm not sure what it means in this context.
Q. I realize you didn't write this, but what does it mean to you?
A. Well, for the acceptance rates contained in the ACRs and the APRs, I assume that you're referring to the tables of 4-6-9, is that what you're talking about there? Or are you talking about the ones with the individual utilities in them?
Q. Let's start with the first. The 4-6-9 would be the industry-wide rates?
A. Yes.
Q. Do you know the technical basis for those rates?
A. Yes, I believe I do. I believe they were

Page 78

set up to ensure that the 10,000 metric ton limit that was in the Nuclear Waste Policy Act for the MRS before the repository began operating with the cap is not exceeded before the repository was ready to start picking up the load. I think that's the way they were determined. I wasn't involved in it but I believe that's what --
Q. Just something you've picked up from working in the program?
A. Yes. And you know, I told you the process that's used once you have those to get to the individual utility.
Q. Now, there were some ACRs that had rates different from the 4, 6, 9 that you just referred to. Some of these ACRs, do you know, do you know what some of the other rates were that were used in some of the other ACRs?
A. I've worked with many rates over the years, I don't remember what was in the early ones.
Q. Okay.
A. In the early ACRs.
Q. Okay. But do you recall whether there were ACRs that had a 3,000 ton a year rate after a ramp up?
A. Not specifically, no.

Page 79

Q. You don't recall that, okay. What is your understanding of the basic purpose of the Nuclear Waste Policy Act?
MS. POWELL: I'm going to object to the extent that it calls for a legal conclusion but you can answer.
THE WITNESS: The basic purpose was to set up a framework for the disposal of spent fuel and high-level waste.
BY MR. STOUCK:
Q. And do you have any understanding about schedules or time frames for disposal that were intended by the act itself?
MS. POWELL: Same objection to the extent it calls for a legal conclusion and also vague, but you can answer.
THE WITNESS: Well, it's my recollection that the Nuclear Waste Policy Act also has the January 1998 date in it.
BY MR. STOUCK:
Q. Okay.
A. That the start of waste disposal was supposed to be underway by January 31st, 1998.
Q. Okay. Anything else about schedules or rates that you understand to have originated with the

Page 80

act or set forth in the act?
MS. POWELL: Same objections. You can answer.
THE WITNESS: To the best of my recollection there's nothing in the act about rates.
BY MR. STOUCK:
Q. What about the idea of allowing utilities to avoid additional storage cost after 1998. Do you know if that's something that the act was intended to accomplish?
MS. POWELL: Objection to the extent it calls for a legal conclusion, but you can answer.
BY MR. STOUCK:
Q. I'm just asking if he knows.
A. To my knowledge there's nothing in the act to that effect.
Q. Do you know if that was something the act was supposed to accomplish?
MS. POWELL: Same objection.
THE WITNESS: I'm not familiar with that.
BY MR. STOUCK:
Q. So you just don't know one way or another if that was a purpose?
A. Well, if it's not written in the act and the act is always binding, that's the end of it. The

Page 81

judges sometimes go back to the legislative record and I'm not sure what they'll find in the legislative record. Somebody might have said that's a good thing to do. I don't know.
Q. Why do you say that if it's not written in the act that's the end of it. That's just your understanding of how it works?
A. I would not know what was on the mind of the legislators.
Q. Okay. But you do know that the act required DOE to start picking up fuel in 1998, is that right?
MS. POWELL: Same objection. You can answer.
THE WITNESS: I do know that the act has the 1998 date in it.
BY MR. STOUCK:
Q. And the contract does also?
A. Yes.
Q. Okay. Do you know whether or not DOE could have fulfilled its obligations under the act by picking up one fuel assembly in 1998?
MS. POWELL: Objection to the extent it calls for a legal conclusion. But you can answer.
THE WITNESS: I have heard people suggest

# Alan Brownstein

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)
McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C.. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 14

Q. What did you do when you worked at GPU from 1978 to 1980?
A. I was a, I worked on the corporate planning division.
Q. Can you describe for me briefly your duties at that time?
A. Generally we worked on, on planning future resources for the company, generation of resources for the company, doing economic evaluations of power plants, load capacity forecasts.
In general, that was it.
Q. And you said you left GPU in 1980?
A. Yes.
Q. Why did you leave?
A. Opportunities from Washington.
Q. It was at that time that you accepted a position at GAO?
A. Yes.
Q. Okay. And you said you worked at GAO for five years?
A. Yes.
Q. What were your, what was your title at GAO?
A. I was a, I think they called it a

Page 15

senior evaluator.
I was a electricity specialist they hired me in as.
I don't recall the exact title, but I worked in doing studies involving various electricity policy issues.
Q. To whom did you report at GAO?
A. The top gentleman, first level or --
Q. Who was your immediate supervisor? Why don't we start there?
A. I believe Billy Oakers.
Q. Could you spell the last name for me?
A. Actually I don't remember.
Q. Were you within a, an office at GAO, or a division of GAO?
A. I was, and it was called the energy division I believe.
Oh, actually excuse me -- Energy and Minerals Division.
Q. And why did you leave GAO in 1985?
A. Opportunities at the Energy Department working on this program.
Q. And when you say working on this program, what do you mean by this program?
A. The Office of Civilian Radioactive

Page 16

Waste Management.
Q. What I referred to earlier as OCRWM?
A. That's correct.
Q. So if I use that acronym, we'll both understand what I'm talking about?
A. OCRWM or RW, yes.
Q. And you have been with OCRWM or RW since 1985?
A. Correct.
Q. To the present day, correct?
A. Correct.
Q. Did you have any involvement or participation in discussions relating to the enactment of the Nuclear Waste Policy Act of 1982?
A. I did not.
Q. Now you were a GAO employee at the time that bill was enacted, right?
A. That's correct.
Q. At GAO, did you have any involvement in the discussions relating to the enactment of that statute?
A. None whatsoever.
Q. Were you aware while you were at GAO that the statute was enacted?

Page 17

A. No.
Q. Your first awareness of the statute occurred in 1985 when you became a DOE employee?
A. Correct, when I was considering employment at DOE.
Q. While you were at GAO, did you work on spent nuclear fuel issues?
A. No.
Q. Did you work on nuclear issues?
A. Tangentially to the extent that they involved electricity policy issues.
Q. Is it fair to say that your first real involvement with spent nuclear fuel occurred in 1985 when you assumed the job at DOE?
A. Correct.
Q. What caused you to take the job at DOE in 1985?
A. The, really the mission of the program, opportunities; it was a professional promotion at the time, and I was intrigued by the mission of the office and my, potentially my role in that.
Q. What GS position did you assume when you joined DOE in 1985?
A. Fourteen.

Page 58

A. I do not recall. This is, the date is June '85. It was before my time.
Q. I appreciate that. Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?
A. I believe I read excerpts from it.
Q. Did you use the document to implement the terms of the standard contract?
A. I used -- yes, in part.
Q. And what parts did you use?
A. I used the waste acceptance rates. Hesitation in the response is whether I used the '85 or the subsequent mission plan.
I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates.
Q. Do you know whether there was an earlier version of this mission plan?
A. I don't believe there was.
Q. The reason I ask, sir, is because I believe you used the term this document or its predecessor. I was trying to --
A. Subsequent documents; it's amended documents after. I'm sorry.

Page 59

Q. Let me hand you, Mr. Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983.
(Brownstein Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you ever seen that document before?
A. I cannot recall ever seeing this document.
Q. Can I direct your attention to page 2-1 under the heading II, program strategy?
I would direct your attention to the first paragraph under that heading, program strategy.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of that paragraph?
A. Yes.
Q. It states, "The waste materials will be accepted in accordance with a Waste

Page 60

Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year."
That's what is stated there, correct?
A. Correct.
Q. Was that DOE's policy at the time you became an employee?
A. I've never seen this document.
MR. BANES: Objection -- vague.
THE WITNESS: And I do not believe it reflects the policy.
BY MR. TOMASZCZUK:
Q. It does not reflect the policy?
A. I do not believe it does.
Q. It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?
MR. BANES: Objection -- asked and answered.

Page 61

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.
May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.
BY MR. TOMASZCZUK:
Q. And it's your testimony that you haven't seen this document before today as best you can recall?
A. As best I recall, I have not seen this document.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.
And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?
A. And --
MR. BANES: Objection. Go ahead.
BY MR. TOMASZCZUK:
Q. I understood that to be your

Page 62

testimony?
A. In the mission plan or the mission plan amendments.
Q. Okay. And how did you go about doing that?
Explain to me what you mean by that.
A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.
Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?
A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.
I don't recall who was responsible for that.
Q. What office within DOE was responsible for preparing this data, do you know?
A. OCRWM.
Q. Was there a division or branch within OCRWM that was responsible for preparing the

Page 63

waste acceptance schedule at page 26 of Brownstein 2?
A. There probably was, but I just don't recall.
Q. Do you see the first sentence of this section under the heading 2.7, waste-acceptance schedules, on page 25?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?
A. Yes.
Q. Is that an accurate statement?
MR. BANES: Objection. Calls for a legal conclusion.
It's vague.
BY MR. TOMASZCZUK:
Q. I'm not asking for your understanding as a, as an attorney.
A. The statement is what it is. You read it correctly.
Q. Is it an accurate statement? Do you

understand my question?
A. I don't.
MR. BANES: Same objection.
BY MR. TOMASZCZK:
Q. Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?
MR. BANES: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: I don't believe that. I believe that this is a, a goal.
I don't believe that it accurately represents what the contract calls for.
BY MR. TOMASZCZUK:
Q. Did you ever discuss that view with anyone?
A. I'm sure that I must have, but I don't recall specifically who or circumstances.
Q. You would at least agree the first sentence doesn't talk about goals, does it?
MR. BANES: Objection -- vague, argumentative.

Page 65

THE WITNESS: The word goal is not used in the first sentence.
BY MR. TOMASZCZUK:
Q. Do you know to whom this mission plan was disseminated?
A. The document was public. It was all -- it was public, all interested parties, all interested people.
I don't know the mailing list.
Q. Do you know why it was prepared?
A. I believe, I believe it was required under the NWPA.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There are two tables which appear near the end of this excerpt on pages 26 and 27.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And are you familiar with these two tables?
A. I have seen them before, generally familiar with them.
Q. Do you know what they purport to

Page 74

acceptance, it shows 2,200 pre-1998, yes.
Q. Okay. And the first table that we looked at, the one at page 26, makes no or does not rely upon the availability of an MRS, is that correct?
A. That's correct.
Q. I'm going to hand you, Mr. Brownstein, another document, Brownstein Exhibit 4.
Ms. Reporter, if you would mark it?
And it is a document entitled, "Spent Fuel Acceptance Rate," and it appears to be an eight-page document with a Bates number stamped in the lower right-hand corner PNL-030-0063 through 0070.
(Brownstein Exhibit No. 4 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. I have no recollection of this document.
Q. So the answer to my question is no, you haven't seen it before today?

Page 75

A. I don't believe I have seen it before today.
Q. You don't know who prepared it?
A. I can read the bottom of the page and know the organization that purportedly prepared it, but it says PNL.
Q. Do you recall any discussions with PNL personnel concerning the document?
A. I don't recall seeing the document before, so I do not.
Q. Could you read the first paragraph of the document?
A. Sure.
Q. You don't have to read it out loud. You can just read it to yourself.
A. Thank you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you agree with the first sentence as stated in the first paragraph of this document?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.

Page 76

THE WITNESS: I do agree with it.
BY MR. TOMASZCZUK:
Q. You would agree the current contracts do not commit the department to accept spent fuel on any specific schedule?
A. I am agreeing to that, yes.
Q. And therefore do not provide a basis for utilities to plan for meeting their storage needs?
You agree with that part of the schedule?
A. Yes.
MR. BANES: Objection. Calls for a legal conclusion.
MR. TOMASZCZUK: I'm sorry. What about that calls for a legal conclusion?
MR. BANES: You're asking him about, to interpret the contract.
Every time you ask him to interpret the contract, we file a motion for summary judgment on the contract because it's a question of law and interpreting the contract, so every time you ask him to interpret the contract, I'm going to say calls for a legal conclusion.
BY MR. TOMASZCZUK:

Page 77

Q. Well, I'm not sure I have asked you, at least in this most recent question, to interpret the contract, and it's not my intention to ask you for legal conclusions, but you were here for ten years, as I understand it, responsible for administering the contract, and I think it's fair that, that I should be entitled to ask you some questions about that, and that's what I'm going to purport to do.
Okay?
MR. BANES: I'm not going to prevent you from asking those questions.
I'm just going to preserve my objection for the record because it doesn't, we don't need testimony to interpret the contract.
MR. TOMASZCZUK: Well, we don't agree with that statement of the law, but we don't need to debate it here.
MR. BANES: Okay.
BY MR. TOMASZCZUK:
Q. Do you see the second sentence in this first paragraph, Mr. Brownstein?
A. Yes.
Q. Would you agree or disagree with that sentence as written?

Page 86

Q. For the first repository; sitting here today, do you recall what, if anything, changed between the original mission plan in 1985 and this mission plan amendment in June 1987 which caused the data on these tables to change a little bit?
MR. BANES: Objection -- lack of foundation.
Go ahead.
THE WITNESS: Section F.2 talks about the key changes between the rates in the two documents you talk about, so there is a list of --
BY MR. TOMASZCZUK:
Q. All right.
A. Causal factors if you will.
Q. Did you prepare any of this, any of the items on this list at F.2 that you just alluded to?
A. I'm going to review the list.
Q. Absolutely.
A. One more time.
Q. Please, take your time.
(The witness reviewed the document.)
THE WITNESS: I, I do not believe that

Page 87

I wrote any of these.
BY MR. TOMASZCZUK:
Q. Okay. Did someone tell you to use the data in these tables in the preparation of the ACR?
A. When you say tell you, you mean like nobody ordered me to do it.
I discussed what I was going to do with, with my superiors and peers, so I think, you know, discussing it is the better acronym.
Nobody told me.
Q. Okay. And with whom did you discuss that subject?
A. In '87, I certainly would have discussed it with Mr. Brandt.
I certainly would have discussed it with Mr. Milner.
I'm sure I discussed it with the then director, who I believe was Rusche at the time, and there was a reporting chain above me, so you know, those people that I knew that were going to have to concur in the document, you know, I coordinated with them beforehand, so I spoke to a number of people about that.
Q. Was it your decision to use the data

Page 88

in the mission plan amendment in the first ACR, or was it someone else's within DOE?
A. I believe it was my recommendation that others concurred on.
Q. And why did you use the data in Table F-1 to prepare the first ACR?
A. I have not looked at the ACR in a long time, so I'm assuming based on your statement that, that I did.
I mean I need to review it to make sure.
Q. That's fair. And I base my statement on what I understood your testimony to be.
A. Okay.
MR. BANES: Objection -- lack of foundation.
THE WITNESS: In implementing the terms of the contract, the, I didn't view -- there are many factors that go into the waste acceptance rate that are not contractual.
There are logistical. There are engineering. There are other concerns that, responsibilities of other parts of the office, not mine.
I needed a waste acceptance rate in

Page 89

order to carry out my responsibilities in the contract.
It was not my responsibility to, to do, to put that together, so I took information that the department was publishing at the time and used that.
It was, it was more simple as opposed to more complicated in terms of the decision.
BY MR. TOMASZCZUK:
Q. In or about June of 1987, Mr. Brandt was your immediate supervisor?
A. Yes.
Q. Okay. And where was Mr. Milner in the supervisory chain?
A. To the best of my recollection, in June of '87, he was not in my supervisory chain.
He was, he was I believe a division director in another division within one of the offices within RW, so he was someone that I regularly consulted with on a number of issues associated with the contract.
Q. Okay, but you, just so I understand your testimony, you didn't report to him directly at that time?
A. At that time, I did not.

Page 110

responsible for it under my direction.
Q. Okay.
(There was a pause in the proceedings.)
MR. BANES: The draft has been produced. It was produced in the initial production.
MR. TOMASZCZUK: Do you know under what identification?
MR. BANES: Just for the record, I don't have the Bates stamp with me, but it's in there.
BY MR. TOMASZCZUK:
Q. Did any entities provide comments to you on the ACR after it was published?
A. I believe we did get some letters from some of the utilities.
Q. And do you recall the contents of those letters?
A. No, I don't.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did you ever have any occasion to meet with utility representatives concerning the

Page 111

acceptance rate schedule referenced in the ACR?
MR. BANES: Objection -- vague. In this ACR?
MR. TOMASZCZUK: Yes.
MR. BANES: Okay. All right.
THE WITNESS: No.
BY MR. TOMASZCZUK:
Q. Do you recall when the first draft of the ACR was prepared?
A. No.
Q. Were drafts of the ACR prepared?
A. Yes.
MR. TOMASZCZUK: Let me ask the reporter to mark another document as Brownstein Exhibit No. 7, and it is, appears to be a letter dated April 28, 1987, to Mr. Christopher Jedrey, and the letter is signed by S. Kraft on behalf of an organization I believe is UNWMG.
(Brownstein Exhibit No. 7 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you recall seeing this letter before today?

Page 112

A. Yes.
Q. And in what context had you seen it before?
A. In my review of carrying out my program responsibilities.
Q. Mr. Jedrey at the time was the contracting officer responsible at DOE for the standard contract?
A. Yes. He was part of procurement. He was the contracting officer.
Q. And did you have occasion to work with him at this time?
A. I did.
Q. Okay. So presumably he gave a copy to you at or about the time you received it?
A. I'm sure he did.
Q. Okay. And did you do anything about the issues identified in this letter?
MR. BANES: Objection -- compound and vague.
BY MR. TOMASZCZUK:
Q. What did you do with this letter after you got a copy of it, if anything?
A. I can't recall whether we responded to it or not, to be frank with you.

Page 113

I mean I know we worked on and analyzed it. I know it was discussed.
I can't tell you what we did with it. I don't recall.
Do you have the letter we can see?
Q. Did you ever have occasion to discuss the subjects in the letter with the author, Mr. Kraft?
A. I, I spoke to, to Kraft on a relatively regular basis, so I'm sure we discussed at least parts of this at some point, yeah.
Q. Do you recall anything specific with respect to your discussions with Mr. Kraft?
A. That was a long time ago. I don't recall the specific conversations.
I'm sure that I had them with him, but I just don't recall the specifics.
It was a long time ago. I can't even recall what we, as a department, how we responded to it.
Q. Directing your attention to page 2 of the letter?
A. Okay.
Q. The heading A, which is underlined at

Page 114

the top of the page, there is a reference in that underlined language to performance standards?

A. Yes.

Q. Do you recall that issue being discussed at this time?

A. Generally, I do.

Q. And what do you recall about that subject, if anything?

A. To the best of my recollection, I believe we didn't think that was necessary and was something that the department was not willing to agree to.

We thought the law and the contract were sufficient clarity, so we weren't, as I recall, we weren't amenable to do that, and I'm sure the conversations reflected that.

Q. The DOE was not amenable to the inclusion of performance standards in the contract?

A. Right. We thought they were unnecessary.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Page 115

Q. When you got this letter and saw the reference to performance standards, did you understand that to be milestones in meeting the January 31, 1998 date, or did you have a different understanding of that term?

MR. BANES: Objection -- vague and lack of foundation.

I think the words are additional performance standards.

MR. TOMASZCZUK: I appreciate that. That's fair.

THE WITNESS: Okay. Could you restate the question?

BY MR. TOMASZCZUK:

Q. When you got this copy of this letter from Mr. Kraft, what did you understand the term additional performance standards to mean in your mind?

A. In my mind, they, they wanted us to be clearer in terms of what we were going to do and when we were going to do it than was included in either the NWPA or the contract itself.

We felt both documents were sufficiently clear.

Q. And did you understand the term

Page 116

additional performance standards to mean milestones for meeting the January 31, 1998 date, or did you understand it to mean something other than that?

MR. BANES: Objection -- compound, vague.

THE WITNESS: In my mind, the January 31st, 1998 date, as I have stated previously, was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations, and so while we, as I indicated to you earlier today, we had, I think you used the word goals or objectives of accepting fuel as early as possible, that is separate and apart from the contractual, conditional contractual commitment which predicated the acceptance on commencement of facility operations.

That's how I used it.

BY MR. TOMASZCZUK:

Q. Did you understand when you saw the term additional performance standards that the utilities were asking DOE to adopt a minimum acceptance rate for the facility?

A. One of the things that was implied in

Page 117

the letter that Mr. Kraft was concerned about was in his mind, the department could potentially meet its obligation again in my mind, following commencement of facility operations by accepting a single fuel assembly from a utility, and, and they were concerned about that.

Q. Did you have a view about that issue?

A. We viewed the contract and the law, you know, contain sufficient performance standards.

It was clear that in return for payment, ultimately and conditionally, we would be required to take their waste, and that's the ultimate performance standard.

Everything else were intermediate milestones or goals as opposed to contractual commitments.

Q. Do you know whether the federal Courts of Appeal have adopted your view as to the conditional nature of DOE's performance that you just articulated?

A. They have not, but that is how we, that is what we believed, and that's how we acted really at all times prior to that decision

Page 118

you referred to.
Q. And what decision did you understand me to be referring to?
A. Whether we had an obligation on January 31st, 1998, whether in fact that was conditional or not.
Q. And you understand now that the courts have concluded that that obligation was not conditional, is that correct?
A. That's correct.
MR. BANES: Calls for a legal conclusion.
THE WITNESS: Sorry. That's correct.
BY MR. TOMASZCZUK:
Q. Do you think the courts were wrong about that?
A. Can I answer that?
MR. BANES: Yeah.
THE WITNESS: My --
MR. BANES: Objection -- irrelevant, but you can answer that.
THE WITNESS: I, my personal opinion is I absolutely believed my interpretation was correct.
And the reason for that is there are

Page 119

words in the law and there are words in the contract in order for me to agree with that ruling I have to ignore, so yes, I believe I was correct, and I believe I still am.
That's my personal opinion.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's have another document marked as Brownstein Exhibit 8.
It appears to be a, it appears to be a memorandum to file dated June 29, 1987, and it has Mr. Brownstein's name on it.
(Brownstein Exhibit No. 8 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you recall this document?
A. Vaguely.
Q. Did you prepare it?
A. Yes.
Q. That's your signature on the document?
A. It is, and my initials at the bottom.
Q. All right. And in the first paragraph, the document reflects that on June

Page 120

26, 1987, you met with Mr. Kraft, right?
A. It does.
Q. For purposes of discussing his previous letter?
A. Um-hm.
Q. Brownstein Exhibit No. 7?
A. Right.
Q. All right. Why did you meet with Mr. Kraft to discuss his letter to Mr. Jedrey?
A. I don't recall. Before you showed me this letter, I didn't even recall this memo, so as I testified previously, I knew I had talked with him, but I met on many occasions with Mr. Kraft on a host of contract-related issues.
I don't recall this specific meeting or how we --
Q. And what, why is it that you were meeting with Mr. Kraft on contract issues?
A. He, he represented, he was the director of the Utility Nuclear Waste Management Group, and he represented a large number of utilities who had interests in the contract.
I told you my responsibilities, and that's what -- we had regular interactions over

Page 121

various contract issues.
Q. Okay. Do you recall who was present at the meeting with Mr. Kraft on June 26, 1987?
A. No.
Q. Do you recall where the meeting took place?
A. No.
Q. Do you recall how long it lasted?
A. No.
Q. Do you recall discussing with Mr. Kraft two issues where DOE could be responsive, namely, issues C and E as reflected on his earlier letter?
A. As I testified before you showed me this letter, I knew I had regular interactions with Mr. Kraft.
I knew I had discussed a lot of issues.
I knew I discussed this at some point in general terms.
I did not even recall this meeting. I did not recall preparing this until you showed it to me.
I don't recall any of the details of that conversation.

Page 126

impression that you had that they were positioning themselves for quote, unquote, future action, right?
A. Yes.
Q. What about the conversation left you with that impression?
A. I testified before I didn't, don't recall.
This is the best reflection of what I believed at the time, and I have no reason to either add to it or take away from it.
I mean that's what I wrote, and that's what I believed at the time.
I don't recall anything else.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Was it your common or regular practice to prepare memos to file like this?
A. I did it on occasion. It was not common, and it was not regular.
Q. Do you recall other occasions where you prepared such memoranda?
A. In terms of memos to the files?
Q. Yes, like this.

Page 127

A. Irregardless of the subject?
Q. Well, I guess yes is the answer to my question?
A. Yes, on occasion.
Q. And do you recall the topics with which they dealt?
A. I recall several that dealt with personnel-related matters.
Q. Do you recall any dealing with spent nuclear fuel disposal or acceptance?
A. I do not. I do not even recall this one.
Q. Do you know whether you prepared a memo to file after each of your meetings with Mr. Kraft or not?
A. I am, I am sure that I did not. This was a rare -- I can't, I cannot testify it was the only, but it was rare.
I met with Steve Kraft regularly.
Q. And sitting here today, you don't recall why you prepared this memo after this meeting and follow-up discussion?
A. My conjecture is that this was a formal letter he sent into the contracting officer, and that since it was, it was, it was

Page 128

dealing with something a little informally submitted that I wanted to be careful since it dealt with legal issues as well as contractual and policy issues that I memorialized that conversation, so it was different than other conversations that I had with him.
Q. Correct me if I'm wrong, but did you not always deal with him on legal and contractual and policy matters?
What else would you have dealt with him on?
A. Well, the distinguishing point of that list was that he had sent in, you know, formal letter to the contracting officer, so because of that distinguishing feature, I'm guessing now that that's why I decided to treat that conversation differently.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit No. 9, that's a copy of a letter from Mr. Jedrey to Mr. Kraft dated October 2, 1987?
(Brownstein Exhibit No. 9 was marked for identification.)
THE WITNESS: I'm anxious to read it.

Page 129

MR. TOMASZCZUK: I'm sure all the warm and fuzzy feelings are coming back!
THE WITNESS: Yes, sir.
(The witness reviewed the document.)
THE WITNESS: Okay. Before we get into this, I'm going to ask for a five-minute break.
MR. TOMASZCZUK: Absolutely.
THE WITNESS: And then I'll read it.
MR. TOMASZCZUK: That's fine. Any time you want a break, just speak up.
THE WITNESS: Okay. Thank you.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I actually want you to go back and look at Exhibit No. 7 for just a moment.
That's the April 28, 1987 letter from Mr. Kraft to Mr. Jedrey.
A. Um-hm.
Q. You should have that handy.
A. Yes.
Q. And directing your attention to page 2, under the heading rationale, there is a

Page 130

sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later.
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?
A. No, I don't.
Q. And why not?
A. We believe that's, that was not the department's intent, and that's a radical view of the contract.
Q. And it wasn't your view?
A. It was not. It was no one's view at the department.
Q. Going back to Brownstein Exhibit No. 9, and I think we took a break just as I was going to start asking you some questions about this one, do you recall this document?
A. It's, it's been 15 years. I didn't when you asked me before, but I certainly do now.
Thank you for jogging my memory.

Page 131

Q. And this document appears to be the DOE contracting officer's response to Mr. Kraft's earlier letter, right?
A. It is.
Q. Okay. Did you help prepare this response?
A. Yes, I did.
Q. Did you draft it?
A. Large parts of it, not the entire thing.
Q. Can you identify sitting here today what parts you drafted?
A. How about if I do it the other way, the parts that I know that I did not?
Q. Okay. That's fair. I'll take it that way.
A. I know that I was not the primary author on No. 4 beginning on page 3, nor on No. 5.
Q. So it would be fair to assume then that you had a significant hand in drafting responses delineated 1, 2 and 3?
A. I just -- I want to be clear on one thing.
Q. Of course; take your time.

Page 132

(The witness reviewed the document.)
THE WITNESS: Not solely, but, but had a large hand in the others, yes.
BY MR. TOMASZCZUK:
Q. Okay. And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties."
Do you see that on page 1, first paragraph.
A. Oh, yes.
Q. Last sentence?
A. Yes. I'm sorry. Yes.
Q. And does that accurately reflect a desire of the department at that time?
A. Yes.
Q. What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for

Page 133

funding the system, and that we were responsible ultimately to accept their fuel.
BY MR. TOMASZCZUK:
Q. Directing your attention to page 2 of the document --
A. Um-hm.
Q. Under the heading No. 1, additional performance standards?
A. Yes.
Q. Do you see that? Would you look at the second paragraph under this heading?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Do you recall sitting here today whether you drafted this language in this paragraph?
A. I am sure I played a major role in it.
Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one, additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to

Page 134

circumvent its obligations"?
A. Yes.
Q. What did you understand by that language, seek opportunities to circumvent its obligations, to mean?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I believed what it meant was responding to Mr. Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away.
That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about.
BY MR. TOMASZCZUK:
Q. And that would constitute circumventing its obligations under the contract?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: That's how I interpret it, that sentence.
We're responding to his specific concern.

Page 135

BY MR. TOMASZCZUK:
Q. Could you look at the last sentence of this same paragraph under the heading additional performance standards?
A. Yes.
Q. Last phrase in pertinent part says they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly?
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is that a true statement?
MR. BANES: Objection. Calls for speculation.
BY MR. TOMASZCZUK:
Q. You can disagree.
A. I do not disagree. I agree with that sentence.
Q. In the intervening language in this paragraph, there's a discussion about schedules illustrating a planned acceptance rate of 1200 MTU for each of the first five years and then an acceleration to 2,650 metric tons thereafter.
Do you see that?

Page 136

A. I do.
Q. And if my recollection is right, I believe those are the figures that were used in the first ACR which had been published a couple of months prior to this October 1987 letter?
A. They are.
Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?
What was he supposed to do with that?
A. This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.
Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?
A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

Page 137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be.
Q. We saw language that says it's for planning purposes, right?
A. Yes.
Q. And I guess my question to you, Mr. Brownstein, is as a practical matter, what does that mean to a utility that gets it?
What are they supposed to do with it?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Since the contract was, you know, evolved between two parties, we didn't just write the contract.
The utilities signed it. It was a two-party contract. The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement. The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process.

Page 138

They asked for it for planning purposes, not for binding purposes.

That's what we stated in the contract, and that's what we tried do.

We tried to keep them updated on what our plans, recognizing and as we stated in all the documents that those plans would change as laws changed, as situations changed, as the system evolved in developing a very complex system.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the next page of this response?

A. Sure.

Q. At the top of page 3 in particular, if you would just focus on that paragraph?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Okay. There is a sentence in the middle of the paragraph at the top of page 3 that says that, quote, "The Department will continue to give Purchasers' views due

Page 139

consideration, and utilities will continue to have access to such program documents as the ACR, Mission Plan, Annual Report, System Requirements Documents, Fee Adequacy Report, Congressional budget submittals, and testimony before the Congress."

A. Yes.

Q. What process existed for the department to give purchasers' views due consideration as that phrase is used here in the language I just quoted?

A. I think that comes in many forms. In terms of the contract, we met on a regular basis with utilities to discuss their concerns, and tried to address them.

We reported that in the, in subsequent issues of the ACR.

They would testify before Congress. We would, you know, look at their statements.

There were regular meetings with other parts of RW other than mine, and they, you know, as an example, they would regularly go out to Nevada and -- to look at the Yucca Mountain project.

They met with project people. They

Page 140

made their views known, and I believe there was a, an effort on everybody's part to understand, you know, what their concerns were, what their points were, and try to address them.

I believe we ran this whole program, I think we did, and I think we do today, run this as an open and transparent program, and ignore no one's views, and that's how I interpret due consideration.

Q. Was there any advantage or benefit to be gained by the utilities in having access to program documents and in particular the program documents that are referenced here?

A. I don't understand.

Q. Okay. What was the purpose of giving the utilities access to the program documents such as the ACR, mission plan, annual report, system requirements document?

A. I see.

MR. BANES: Objection. Calls for a legal conclusion in part.

THE WITNESS: I think all those documents describe different aspects of what the program was doing.

In other words, this program was

Page 141

spending the utilities' money, and the utilities; this was a way to impart, make sure the utilities knew how their money was being spent.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. In the previous page, there is a, this reference to letter and spirit of the NWPA and the contract.

What was the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and calls for speculation.

THE WITNESS: I believe I have already answered the question actually.

BY MR. TOMASZCZUK:

Q. That it was, that it was to, simply to take one spent fuel rod?

That was the answer that you're referring to?

MR. BANES: Objection. Calls for a legal conclusion.

MR. TOMASZCZUK: I'm trying to clarify what his answer was.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) :

NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese,J.) :

DUKE POWER, A Division of :

DUKE ENERGY CORP. :

(98-485C)(Sypolt,J.) :

INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) :

SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) :

SOUTHERN NUCLEAR OPERATING COMPANY, :

et al. :

(98-488C)(Yock, S.J.) :

COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) :

BOSTON EDISON COMPANY :

(99-447C)(Allegra, J.) :

GPU NUCLEAR, INCORPORATED :