(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 275

10135(d) of this title?
A. Right. And you know, in my mind, I was also referring to (3) and (4), not really (2).
Q. Okay. All right. And (3) refers to a 10,000 metric ton limitation for the MRS?
A. Correct.
Q. And then (4) refers to a total limitation of 15,000 metric tons for the MRS, right?
A. Right. The 10,000 as stated here is linked to the acceptance of fuel at the repository itself, and 15,000 is irregardless of that, the overall limit.
Q. Right. And just stated in sort of layman's terms, what is your understanding of the limitation that you just referred to in (d)(1)?
A. That we could not proceed within an MRS, and MRS -- I'll just use the acronym -- until we had gotten a license from the Nuclear Regulatory Commission.
Q. A license for what?
A. For construction of a repository.
Q. Okay. So in Brownstein Exhibit 20, at

Page 276

page 4, your understanding is when that term linking is used, that that's a catchall term to encompass at least these three conditions or linkages that you just testified about?
A. That's what I was referring to, yes.
Q. Okay. Do you know whether those linkages were repealed or still exist today?
MR. BANES: Objection. Calls for legal conclusion.
Go ahead, sir.
THE WITNESS: They have never been repealed.
The MRS was never successful. The Office of Negotiators that was established by the Amendments Act never successfully identified an MRS, and so we, the idea, that facility came to an end.
BY MR. TOMASZCZUK:
Q. And was, when was that?
A. I don't recall.
Q. You don't, you have no approximate understanding of when that occurred?
A. There were two, there were two negotiators appointed to implement the Amendments Act.

Page 277

Both served terms. Both ended their terms unsuccessfully.
I don't recall the dates of those terms.
Q. Would it have been between 1990 and 1995?
A. It would have been.
Q. So somewhere in that timeframe?
A. Yes. That's a guess.
Q. That's fair. I just ask for your best recollection.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. If I said that decision was made in or about December of 1992, would that sound roughly accurate to you?
MR. BANES: Object. It calls for speculation.
THE WITNESS: I would rather stand by my last answer.
BY MR. TOMASZCZUK:
Q. Okay. Let me ask you another question, Mr. Brownstein, about this document. Could you turn to page 7?

Page 278

A. Okay.
Q. Do you know whose handwriting that is on this document?
A. No. I can't even distinguish a word.
Q. Okay. Can you tell whether it's your handwriting or not?
A. I can tell that it is not my handwriting.
Q. All right.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.
(Brownstein Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. You had a hand in its preparation?
A. I did.
Q. Is this one of the documents you

Page 279

looked at to prepare for your deposition?
A. I looked at excerpts from an ACR and never read the whole ACR, and I cannot testify that it was in 1990, the ACR.
I have reviewed excerpts of an ACR.
Q. Okay. By the way, did you review any documents last night between the time we adjourned and when we recommenced this morning?
A. No. You wore me out. I did not.
Q. If I could direct your attention to the summary page, Roman Numeral Five, do you recall whether you prepared the summary?
A. I prepared the summary in this document consistent with how I testified yesterday and how all the ACRs were prepared.
Q. Okay. The first paragraph, second sentence states, "This report is currently scheduled to be the last in the series of ACRs to be published by DOE." Okay?
A. Yes.
Q. Do you know why this was scheduled to be the last in the series of ACRs to be published by DOE?
A. Well, they go on to explain in the next sentence consistent at that time with my

Page 280

understanding of the contract, the ACR was then going to be replaced by the annual Acceptance Priority Ranking report.
Q. So with replacement of the ACR by the APR, there would be no more need for an ACR?
A. Correct.
Q. Okay.
A. That's how I interpreted the contract.
Q. Okay. And the next paragraph appears to reflect what we saw in the draft with respect to an upper and lower bounded waste acceptance schedule, right?
A. Correct.
Q. And those upper and lower bounded schedules are reflected at page 7?
A. They are.
Q. There is no source identified for the lower bounding case in Table 2.2, is there?
A. That's correct.
Q. And do you know what the source of this, of the data on this table was?
A. I don't.
MR. BANES: You are not limited to that page in order to answer that question.
BY MR. TOMASZCZUK:

Page 281

Q. And I imposed no such limitation in my question.
A. Okay. Let me refresh my memory.
(The witness reviewed the document.)
THE WITNESS: I honestly don't recall. I'm referring back to page 5 in the middle paragraph where we talk about the source for the upper bounding case, and identified that, and have the sentence the lower bounding case requires early MRS siting, but complies with the current 10,000 MTU storage limit part of the repository operation.
That is referring to the linkages that we just talked about, so I do not recall how we were consistent with the 10,000 MTU, but came up with these exact numbers.
I just don't recall that.
BY MR. TOMASZCZUK:
Q. Is it your best recollection that you did not develop the data on this Table 2.2?
(The witness reviewed the document.)
THE WITNESS: I'm hesitating because I'm deeply trying to think about, about how that was developed.
(There was a pause in the

Page 282

proceedings.)
THE WITNESS: I'm sorry. I just don't recall.
BY MR. TOMASZCZUK:
Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Could you clarify what you mean?
BY MR. TOMASZCZUK:
Q. Sure. There was no MRS?
A. That's correct.
Q. Right. And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?
A. That's correct. That process never, never materialized.
Q. So there would be no reason to use the data in Table 2.2 for any purpose now, would there?

based could have caused perturbations really to the utilities, some to us.

That's an example.

Q. Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?

A. Right.

Q. And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?

A. Correct.

Q. Did you agree with that statement?

A. Yes, I did.

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Sorry. Yes, I do.

BY MR. TOMASZCZUK:

Q. Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?

A. Correct.



Q. And is that statement consistent with your understanding of the rejection of this option?

A. Yes, it is.

Q. The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?

A. Yes.

Q. Do you know why?

MR. BANES: Objection -- lack of foundation.

Calls for speculation.

BY MR. TOMASZCZUK:

Q. Let me go back. Did you have any discussions with utility representatives concerning this issue?

A. I did.

Q. And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?

A. We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions.



We discussed many issues associated with the contract, some of which are listed in this paper.

When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on.

They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course.

This is many years ago, but that's how I recall the, the events.

Q. And did any of those utility personnel explain that to you or tell you anything further about that?

A. My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them



in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.

Q. Okay.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?

A. Correct.

Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?

A. Correct.

Q. Do you see that?

A. Yes, I do.

Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?

MR. BANES: Objection -- vague.

THE WITNESS: In my mind, there's a

Page 295

fundamental difference between goals and objectives and policy and contractual commitments.
There was no contractual commitment to do any such thing.
Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment.
BY MR. TOMASZCZUK:
Q. So at least in that context, you understood a distinction between contractual commitments and other things?
MR. BANES: Objection. Mischaracterizes prior testimony.
THE WITNESS: Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?
And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking.

Page 296

It has on it the Bates numbers HQR-001-1538 through 1539.
(Brownstein Exhibit No. 26 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen the document before today?
A. I have.
Q. Did you draft it?
A. To the best of my recollection, I did, or played a major role in doing so.
Q. All right. Your name appears in handwriting in the upper right-hand corner?
A. That's my name, not my handwriting, but yes.
Q. And this was a memorandum sent through the deputy director of OCRWM to the director, correct?
A. Correct.
Q. And at that time, Mr. Milner was acting as the deputy director?
A. I don't believe that's accurate, no.
Q. But Mr. Milner signed the memo on the

Page 297

second page of it?
A. Yes, that's correct.
Q. And he sent it through RW-2, the deputy director's office?
A. That's correct.
Q. And who would that have been at the time, do you know?
A. We can clearly go back to the charts if I had to.
Q. Can you tell from that initial there next to RW-2 who that might be?
(The witness reviewed the document.)
THE WITNESS: I really can't.
BY MR. TOMASZCZUK:
Q. Okay. Can you tell who approved the action?
A. Yes.
Q. As set forth in the memorandum?
A. Yes, I can.
Q. And who is that?
A. That signature there is J.B., stands for John Bartlett, and a guess, that, that mark may have been Frank Peters.
Q. Okay. And the subject of the memo is the front office approval if you will for

Page 298

issuance of a draft of the APR?
A. Well, for a comment draft of the Acceptance Priority Ranking report, yes.
Q. Do you see in the second paragraph under the heading discussion?
A. Yes.
Q. Can you read the first sentence for me?
A. The publication?
Q. Um-hm.
MR. BANES: You're not limited to that.
THE WITNESS: "The publication of the APR begins the contractually binding waste acceptance process."
BY MR. TOMASZCZUK:
Q. Did you write that?
A. I did, or am responsible for it, yes.
Q. Is it a true statement?
MR. BANES: Objection -- vague, and calls for a legal conclusion.
THE WITNESS: It is, it is accurate in the context that I have testified earlier today and yesterday of how I interpret contractually binding.

BY MR. TOMASZCZUK:
Q. I'm not sure I understand what you mean.
How did you interpret contractually binding as you used the words in this memo?
MR. BANES: Objection -- asked and answered three times.
THE WITNESS: I agree with counsel. I don't know what I'm allowed to do here.
I go back to how I answered you just before and yesterday.
I tried to distinguish between the ACR and the APR.
BY MR. TOMASZCZUK:
Q. The publication of the ACR was to be contractually binding on whom?
MR. BANES: Objection. Mischaracterizes the document.
THE WITNESS: No one; the ACR was going to be contractually binding on no one.
BY MR. TOMASZCZUK:
Q. I said the APR.
A. Oh, the APR?
Q. At least I meant to say the APR. The publication of the APR was to be contractually



binding on whom?
MR. BANES: Objection. Mischaracterizes the document.
THE WITNESS: The parties to the contract, and consistent with how I used those terms and how I have testified to the use of those terms.
BY MR. TOMASZCZUK:
Q. Once the APR was published, was it going to be subject to contractual modification?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I would have to ask you to clarify the meaning of that.
BY MR. TOMASZCZUK:
Q. Okay. Let's look at the next paragraph and read the first sentence.
MR. BANES: You're not limited to that. You can read the entire document.
BY MR. TOMASZCZUK:
Q. Absolutely. That's been true of every question I have asked you about any document.
A. Okay. Do you want me to read it aloud?
Q. Please.



A. "Since the APR will become the basis for allocating waste acceptance capacity as well as for approving DCSs and exchanges, it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification."
And that's the sentence, and I believe I have tried to explain why that was important, and actually, this memo reinforces in my mind in a very powerful way what this memo is asking the director to do is to take a, a first-of-a-kind document, and before we issue it, to actually issue it to the utilities, to comment on before it's officially issued to make sure that the information is accurate, and this is, it shows to me the import of the document to both sides.
Q. Do you know whether comment draft of the APR was issued?
A. To the best of my recollection, we did either issue a comment draft, or we issued or we put out the table with the data showing how the allocations would be based on the information that we had.
I forget which we did, but we did one of those, to the best of my recollection.



Q. Did any utilities comment on the draft APR?
A. I honestly can't recall. I have a general impression that we did receive comments, but I'm hard pressed to tell you from who or how many.
I just can't recall.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And was the, was an APR issued?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, can you mark as Brownstein No. 27 a document dated December 1991 entitled, "1991 Acceptance Priority Ranking"?
(Brownstein Exhibit No. 27 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. I have.
Q. Did you help prepare it?

Page 319

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.

I would encourage you to make your objection. Fine, go ahead make it.

MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document.

He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.

That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.

BY MR. TOMASZCZUK:

Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A. This was a, this was, clearly was a contractor document.

Contractors prepare studies all the

Page 320

time at DOE's direction.

That automatically means to me that it was, it was a, it was something that DOE had not signed off on.

Now whether this was the first draft or the last draft, who knows? But it was a contractor document.

The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document.

Q. After you received the document, did you do anything other than read it?

A. I cannot specifically recall. My normal operation would be to, to read it.

If I had comments, I would make those comments either verbally or in writing. I use both.

Q. And do you recall sitting here today whether you made any comments on this particular document?

A. I honestly cannot recall.

Q. All right.

(There was a pause in the proceedings.)

Page 321

MR. TOMASZCZUK: Mr. Brownstein, let's mark as, and Ms. Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991.

It has on it the Bates stamp numbers HQR-001-2357 through 2373.

(Brownstein Exhibit No. 30 was marked for identification.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. And have you seen the document before today?

A. Yes.

Q. And were you responsible for preparing it?

A. Consistent with how I have testified about those documents, yes.

Q. All right. At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified.

Page 322

Are those, or when you wrote the term linkages there, were you referring to the linkages that I asked you about in your testimony this morning?

A. Yes.

Q. This paragraph goes on to state that during the first ten years following commencement, projected commencement of federal waste management system operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU.

And my question to you, Mr. Brownstein, is do you know what the source of that statement is or was.

(The witness reviewed the document.)

THE WITNESS: I don't specifically recall.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, are you comparing this ACR to the previous ACR?

A. I am.

Q. And that would be, you would be comparing it to Brownstein Exhibit 24, the



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 387

Energy's plans for nuclear waste at Yucca Mountain?
A. What time period are you referring to?
Q. March 14th of this year.
A. No.
Q. Did you ever discuss that testimony with Mr. Barrett?
A. Not that I recall.
Q. Do you know whether Mr. Barrett testified on the Hill on March 14th?
A. I believe he did.
Q. And what do you know about that subject?
A. I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony.
I wasn't involved in that one at all.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Give me just a second, okay?
A. Sure.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, at

Page 388

this time, I don't have any further questions for you.
I would like to thank you for your time and your cooperation. I very much appreciate it.
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions.
THE WITNESS: Okay.
MR. BANES: We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BANES:
Q. So Mr. Brownstein, let's see here if you could just get out Exhibit 1.
It's the contract. It's in there

Page 389

somewhere.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Let's see. Turn to page, there is a Bates stamp number the bottom. It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A. Okay.
Q. Mr. Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract.
Do you remember that testimony?
A. Yes.
Q. Turn to paragraph or Article V.B that's located down there on this page 660.
A. Okay.
Q. Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A. Yes.
Q. Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE

Page 390

the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR. TOMASZCZUK: Objection. It's compound, calls for a legal conclusion.
(The witness reviewed the document.)
THE WITNESS: I combined that paragraph with Appendix C of the contract.
BY MR. BANES:
Q. Okay. And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule. Pull that out for a minute. That was Exhibit 34.
A. Yes.
Q. Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A. We used the Appendix C as a basis for that, yes.

Page 391

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A. It's clear in our mind you would have to subtract 63 months from that date.
Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.
Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A. In my mind, it was.
Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they

Page 392

wished delivery to occur?
MR. TOMASZCZUK: Objection to the form.
I don't know what "this" is.
BY MR. BANES:
Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A. Yes.
Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.
If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.
Q. In the documents you prepared, did you

Page 393

convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this

Page 394

schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan.
Why did you include that language in this Annual Capacity Report?
A. We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change.
Q. In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2.1 in this 1987 Annual Capacity Report without reading the entire document?
A. Well, I believe it's always inappropriate to pull out any excerpt from a document.
A document's prepared. All words have meaning, and should be read in the context of

the document.
Q. And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule.
They were in different places in different, different documents as the document evolved, but they were there.
We didn't put them in the same place in the same time.
They were always there somewhere.
BY MR. BANES:
Q. Let's see. Mr. Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan.
Before we get to that, let me ask you a couple of questions.
Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?
MR. TOMASZCZUK: Objection -- lack of



foundation.
THE WITNESS: There was no rate in the Nuclear Waste Policy Act.
BY MR. BANES:
Q. Okay. And with respect to the standard contract, which is located at Exhibit 1 --
A. Yes, I have that.
Q. Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?
A. There was no rate in the standard disposal contract.
Q. Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?
A. No.
Q. All right. Now Mr. Brownstein, Mr. Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30. He was referring to page --
A. Wait a second.
Q. I'm sorry. Did you find it?



A. No -- Number 30?
Q. Exhibit 30.
MR. HANDWERTER: The ACR.
BY MR. BANES:
Q. Was that the ACR? Excuse me. The ACR is the one I want to talk to you about.
A. I'm sorry. I don't have these things in order.
Okay.
Q. Page 4 for a second of the document under 2.0, waste acceptance projections?
A. Yes.
Q. Mr. Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2.1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility.
Do you recall that question?
MR. TOMASZCZUK: Object to the form.
THE WITNESS: Yes.
BY MR. BANES:
Q. All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A. Yes, an MRS facility, yes.



Q. Now with respect to every, in every document that you, that contained a rate that you worked on, did, did all of those projected rates assume the existence of some type of repository, either repository or MRS, prior to the acceptance of spent nuclear fuel?
MR. TOMASZCZUK: I'm going to object to the form of the question.
I don't understand it.
THE WITNESS: I can still answer?
BY MR. BANES:
Q. Sure, if you understand it, you can.
A. I made the statement in all the documents, as I have testified -- I'm looking at page 4 -- that assumed the commencement of facility operations.
Q. Okay.
A. And I defined facility as either an MRS or a geologic repository.
Q. So in any document in which you would have incorporated a rate, is it fair to say that you would have assumed the, an operational facility being either an MRS or a repository?
A. Yes.
(There was a pause in the

proceedings.)
MR. BANES: Okay, sir. Just a second here.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Turn to Exhibit 26 for a minute, sir?
A. I really need to organize this. If these are going to be the subjects of questions, I have to get them in some order.
Twenty-six, I've got it.
Q. Okay. Okay. All right. Turn to Exhibit 26.
Let's go back to that paragraph you were discussing with Mr. Tomaszczuk. It starts the publication of the ACR, APR.
If you would just read that entire paragraph for me?
You don't have to read it outloud. You can read it to yourself.
A. Thank you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. BANES:



Q. All right. Now in the statement there, I think Mr. Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process.
Does the remainder of that paragraph refresh your recollection what, why that word begins is there?
A. Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS.
That's what I was referring to.
Q. Okay. And all right. So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?
A. No. Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance.
Q. And with respect to the process, while it hasn't been marked as an exhibit, Mr. Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?



A. Yes.
Q. Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?
A. That was, that was its intent.
Q. And looking at this, we just I guess won't mark it, but --
MR. TOMASZCZUK: I'm going to come around.
THE WITNESS: If we're going to do it, could we move it closer?
This is not the easiest thing in the world to read.
Can you see it from here?
(A discussion was held off the record.)
BY MR. BANES:
Q. All right. Now I wanted to ask a little bit about the mechanics of the chart?
A. You understand I haven't seen this in, I haven't looked at this in years.
Q. Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report.



Where is that?
A. That's right there.
Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.
And on the far left of the chart, towards the far left of the chart, now there is a dark line here.
A. Right.
Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A. The dark line under the legend indicates the optimum path.
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
\- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings.)
BY MR. BANES:
Q. Okay. Let's see here. Turning back to Exhibit 43, Mr. Brownstein --
MR. HIRSCH: Which one is 43?
MR. BANES: I think that's one of the, one of these vugraphs.
MR. HIRSCH: Off the record.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment.
And then let's see. I have got now Brownstein Exhibit 36.
Now yesterday we were talking about the, with Mr. Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A. Right.
Q. Do you recall that testimony now?
A. Yes, I do.

Page 549

Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct.
A. Yes.
Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.
BY MR. BANES:
Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?
MR. HIRSCH: Objection -- vague, no foundation.
Calls for a legal conclusion.
THE WITNESS: I don't know how to identify these boxes.
This exhibit shows the path. If -- once we have completed our review, which is

Page 550

indicated in the box.
BY MR. BANES:
Q. The number in the upper left-hand corner?
A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.
We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.
We then go through another review process, and again, we then have two options.
We can approve the DCS, or we can disapprove it.
If we disapprove it again, there is, appears to be two links.
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.
Do you want me to continue on with the steps?
Q. Sure.
MR. HIRSCH: I'm going to make the

Page 551

same objection I made to the previous question.
THE WITNESS: There is another review process.
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.
BY MR. BANES:
Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.
A. Okay.
Q. All right. And turn to page 660 of the Exhibit 1.
A. Okay.
Q. And is the process you have just described located, contained somewhere in the contract here?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. BANES:
Q. And where is that?
MR. HIRSCH: Same objection.
THE WITNESS: Under Article V.B.1 and



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 580

THE WITNESS: That's true.
BY MR. NESLIN:
Q. This is the best version that we had available.
The top of page bears the date of August 14th, 1991, and the first sentence states that the importance of the exchange process is becoming more apparent as the projected early receipt rates result in insufficient annual capacity allocations to avoid additional at-reactor storage by some purchasers.
Mr. Brownstein, what does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation.
THE WITNESS: Okay. See if we can pull out an APR, any one. It doesn't matter to me.
Twenty-seven is the first one I picked up.
MR. HANDWERKER: Twenty-seven and 33.
BY MR. NESLIN:
Q. Do you have 27?
A. Wait a second. I want to use a

Page 581

different table.
MR. BANES: Exhibit 32.
MR. NESLIN: Thirty-two.
THE WITNESS: Yeah. This is an example.
I would like to go to Table 3.1 to try to respond to your question. Okay?
BY MR. NESLIN:
Q. 3.1?
A. Yes. Yes. I'm just picking, picking that one, 3.1. That's on page 8.
Q. Yes.
A. What, what this sentence tells me is, is that there is a recognition that on any particular year of when acceptance would begin, around Year One, that the, those utilities that have an allocation may not match exactly what those utilities that have or are projected to have storage difficulties.
Q. And was that a potential problem with the oldest fuel first priority system to your mind?
MR. BANES: Objection -- vague.
THE WITNESS: The oldest fuel first was a condition, was a term laid out in the

Page 582

contract.
That's how the parties, that was a, a key criterion that the parties negotiated in '83 to allocate acceptance capacity.
As a result of that mutual negotiation, did that result in a difference between those that were, had the allocations and those that had storage problems, recognizing that, you know, until DOE accepted storage problems with responsibility of the utility, in my mind, that's an equity issue, you know, among utilities.
BY MR. NESLIN:
Q. Well, Mr. Brownstein, didn't you testify previously that one of the OSM or one of DOE's objectives with this system was to avoid the need for utilities to have to add additional on-site storage after 1998?
MR. BANES: Objection -- vague.
THE WITNESS: I did, and I put the caveat on that their goals and objectives, apart from contractual commitments, I viewed the oldest fuel forecasts as a contractual commitment.
I viewed the, I viewed as a goal as

Page 583

opposed to contractual commitment to avoid additional on-site storage.
BY MR. NESLIN:
Q. As a goal, wouldn't the mismatch between those utilities which had allocations and those utilities that needed additional storage, running into storage problems, would not that mismatch frustrate that goal?
Do you understand my question?
A. I do.
MR. BANES: Objection. Calls for speculation.
THE WITNESS: A contractual commitment in my mind is a higher priority than a goal.
BY MR. NESLIN:
Q. My question was simply would the goal that you had identified, and understanding that it is a goal and that's the form in which you're speaking to it, wouldn't that be frustrated by the mismatch between those utilities which have allocations, annual allocations and those utilities which need additional storage?
A. It certainly could.
Q. Okay. And wouldn't that problem be addressed by exchanges?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 138

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And

Page 139

there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.

Page 140

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

Page 141

Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Q. Okay. Can I ask, do you know an answer to my question without telling me the answer?
MR. CRAWFORD: He's asking you if you know an answer to his question.
THE WITNESS: I'm going to ask it to be repeated so I can answer you accurately.
MR. STOUCK: Let's have it read back.
THE REPORTER: "Question: Have you reviewed, Mr. Brownstein, any briefs or legal filings by the government in this litigation?"
MR. CRAWFORD: The pending question is different than that.
BY MR. STOUCK:
Q. Right. Your counsel has instructed you not to answer that question. I'm just asking in your mind, without telling me the answer, do you know an answer to that question?
A. Yes.
Q. Do you know the position that the Department of Justice has taken in these cases, I'm talking now about the Yankee cases, about the significance under the standard contract of delivery commitment schedules? Do you know the Department of Justice's position?
MR. CRAWFORD: Objection, vague,



overbroad, and to the extent it calls for a legal conclusion.
THE WITNESS: I think I do.
BY MR. STOUCK:
Q. Okay. What is your understanding of the Department of Justice's position with respect to the significance under the standard contract of delivery commitment schedules?
MR. CRAWFORD: Same objection or objections. And let me add one, foundation.
THE WITNESS: I think Justice believes that the extent of damages or breach is determined by approved DCSs.
BY MR. STOUCK:
Q. Okay. Is that the same thing as saying that -- is it your understanding that the Department of Justice has taken the position in this litigation that the Department of Energy has no obligation to accept any spent fuel that is not described in an approved delivery commitment schedule? Do you know whether the Department of Justice has taken that position?
MR. CRAWFORD: I'm going to object, vague, foundation, to the extent it calls for speculation, to the extent it calls for a legal conclusion, and



overbroad.
THE WITNESS: I really don't know.
BY MR. STOUCK:
Q. You don't know one way or the other?
A. No.
Q. Okay. Well, do you believe that the Department of Energy -- or do you know whether the Department of -- let me ask it this way, without regard to whatever position the Department of Justice has taken, do you know whether the Department of Energy has an obligation under the standard contracts to accept spent fuel that is not described in an approved delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and foundation since he's not a 30(b)(6) witness.
THE WITNESS: That's an issue in question. I always viewed that both parties had to do the steps required in the contract. The DCSs are -- there's another step in the process which is the final delivery commitment schedules.
So you're asking about DCSs. Where I'm going to ask you for clarification is you're asking me about what happens if there's an approved DCS but there never is an approved FDS.



BY MR. STOUCK:
Q. I believe you testified that is the situation we're in, correct?
A. Yes.
Q. There are no approved final delivery commitment schedules that I'm aware of. Are you aware of any?
A. There are not to my knowledge.
Q. Okay. So do you know whether -- well, I don't know if that clarifies the question. But my question is, with respect to spent fuel, commercial spent fuel, utility spent fuel that's out in the world somewhere in the United States that is not described in a delivery commitment schedule that has been submitted by a utility and approved by the Department of Energy, okay, you agree there is such spent fuel out there?
A. Yes.
Q. Okay. With respect to that spent fuel that's not described in a delivery commitment schedule that has been submitted to the Department of Energy and approved by the Department of Energy, do you know whether or not DOE is obligated under the standard contract to accept that spent fuel for disposal at some point in time? The question does

not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: I'm going to try to ask a clarification.
BY MR. STOUCK:
Q. Sure.
A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?
Q. Actually the question I just asked was about all of the fuel that's not described and approved.
A. Okay.
Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?
MR. CRAWFORD: Same objections.
THE WITNESS: I really don't know because



that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.
BY MR. STOUCK:
Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.
A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.



Q. So you had no understanding one way or the other about that subject during the time you were responsible for these matters; is that a fair statement?
A. I just want to take time and think about the question.
Q. Okay. I did not mean to rush you.
MR. CRAWFORD: Same objections as to the original question.
THE WITNESS: We never -- if we had a discussion about that, we never took that to its logical conclusion. In other words, we always said, you know, we needed to do this, whether it's publishing the ACR, APR, and the DCSs, and the utilities had these responsibilities in order to do it.
And we may have made some statements in these documents indicating that the utilities, you know, needed to do it or are required to do it, I don't know the exact words. But I don't recall a discussion where we said, well, if a utility did not do this, how would you balance them not meeting a specific term of that contract with the ultimate responsibility, irregardless of time, if they paid their fees, that we would have to accept their waste.



You know, that's a much broader question. Does that help?
BY MR. STOUCK:
Q. That does help. I think what that means is you did not have any understanding one way or the other on this question during the time you were working on these matters; is that right?
MR. CRAWFORD: Objection.
THE WITNESS: I think, if you boil it all down, that would be fair. I mean that's a complex situation.
MR. STOUCK: Can we go off the record.
(Discussion off the record.)
MR. STOUCK: Can you mark this?
(Brownstein Exhibit No. 82 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, I must ask you, while you were off the record you had a conversation with your counsel?
A. Yes.
Q. Anything else you want to tell me about our recent exchange?
A. No.
Q. Okay. Do you know what this is?

Page 166

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.

Page 167

Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,

Page 168

and to the foundation and to the extent it calls for a legal conclusion.

THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.

In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.

BY MR. STOUCK:

Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?

MR. CRAWFORD: Objection, asked and

Page 169

answered.

THE WITNESS: If that was the only information we have, that could be a problem.

BY MR. STOUCK:

Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?

MR. CRAWFORD: Same objection.

THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.

And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.

So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the

# Billy Cole

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 5

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

It's in the lower right-hand corner, and it starts whereas DOE has the responsibility following commencement of operation of repository to take title to the spent nuclear fuel or high level radioactive waste involved as, quote, expeditiously as practicable, upon the request of the generator or owner of such waste or spent nuclear fuel, close quote.

A. Um-hm.

Q. Do you have an understanding of what that phrase or that whereas clause means?

A. I have a, my opinion of what it means.

Q. What is your opinion?

A. It means that utilities are going to give the DOE some money. They're going to develop a facility, and as soon as they can get this thing going, they're going to start taking their fuel.

Q. Did you have any discussions with anyone at DOE about what the phrase, quote, unquote, as expeditiously as practicable meant?

A. No. Just assumed that it meant, you know, get out there and do your best job, get the stuff done.

You know, time lines were presented in



the law. They wanted something, you know, done, and the contract reflected that, January 31st, 1998.

Everybody thought at that time, God, we've got 14 years. As Secretary Hodel at that time said, can't see why it's going to take more than 14 damn years to dig a hole in the ground.

Well, we all know there were problems.

Q. Did you have an understanding of the significance or the date that's included in Article 2 of the contract, January 31st, 1998?

And that should appear on your copy 572 up until 573, at the end of 572, on the first page of 573.

A. Yep.

Q. In particular, the phrase, quote, the services to be provided by DOE under this contract shall begin, comma, after commencement of facility operations, comma, not later than January 31st, 1998.

A. Um-hm.

Q. The term services used in that phrase, what were the services being referred to there in your opinion?

A. In my opinion, services were



transportation and take the stuff away, but there was always a controversy on part of the statement, though, which was after commencement of facility operations, if you haven't got a facility, you can't take anything, and that's been DOE's problem.

Every time they got close to having a solution, Congress changed the rules on them.

Q. The latter part of that phrase says that after commencement of facility operations, comma, not later than January 31st, 1998, and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A.

Was there an understanding --

A. Um-hm.

Q. By PNL or DOE about how long that period would be that DOE would take or dispose of spend nuclear fuel?

A. As long as it was being generated. And like I said earlier, the projections of what was going to be generated, how much was going to be generated, changed with time.

When we first started this program, they were predicting twice as much stuff than



they're predicting right now.

There has not been a nuclear power plant ordered since 1978, so projections have fallen off as to how much you were going to need.

Facility sizes change. New life cycle costs have to be developed. New acceptance rates have to be developed based on that.

Q. Let's flip farther down into the contract and look at Article 4B, which outlines DOE's responsibilities, and in particular, I'm looking at 2D, and for you, that should be on page --

A. 4B, 2D -- okay, I've got it. Sufficient documentation on the equipment supplied?

Q. Actually let's move on down to four, DOE shall annually provide to the purchaser pertinent information on the waste disposal program, including information on cost projections, project plans and progress reports?

A. Right.

Q. Did you in your role as a, as a PNL manager on the waste program have occasion to interpret this provision?

Page 62

A. Yeah.
Q. And what was your --
A. Well, my role was, one of these things that had to be provided was the Annual Capacity Report, and I was responsible for developing the Annual Capacity Report, which the contract specified had to be published 1986 if I remember, the first one.
Q. Do you have an understanding about this paragraph about what other kinds of documentation DOE was supposed to issue or provide to purchasers?
A. Yeah. I annually, besides Annual Capacity Report, they had to put out, if I remember, a total system life cycle cost, and they had to have mission plans.
They had to have, do fee adequacy analysis every year. It was a lot of things. I could go through the contract or the document and delineate them, but I don't remember.
The one I spent more time working on was the Annual Capacity Report work.
Q. Did you have any input or work on the production of something called the annual acceptance priority ranking?

Page 63

A. The APR, oh, yes. We had to do that before you could do an Annual Capacity Report.
Now the contract, though, had them backwards.
It said do the Annual Capacity Report and then couple years later, published an APR, but you can't do the ACR without the APR, so we always did it first, developed the information for the ACR, although we didn't publish it.
Q. Does the standard contract set forth an acceptance rate?
A. No.
Q. Do you know why that was omitted from the standard contract?
A. I was not party to developing the contract.
Q. Did you have any discussions with DOE following enactment or execution of these contracts about the acceptance rate?
A. Of course; that's how we developed the Annual Capacity Report.
That was what the purpose was. The contract required the DOE to develop that, and my job as contractor to the DOE, that was it. Develop that report, which you had to go in

Page 64

there and figure out based on the language in the contract and what the, what the mission plans and analyses told you on what the overall acceptance rate would be how are you going to allocate that capacity and to whom?
The contract implied and interpreted was that oldest fuel first would have the rights.
We interpreted that to mean not necessarily the specific fuel would be the age, you know, the fuel that's that age is not going to be necessarily the fuel that you're going to take, but it's going to buy you a right, and the utility had the right to give you that old fuel or not.
The first year, you would have, the guy with the most stuff in the first year would be General Electric. Wasn't even a utility.
Q. When did you begin working on developing the Annual Capacity Report?
A. 1985.
Q. And who at PNL did you work with in developing this report?
A. Pat McDuffie, Barbara Coles, those were the primary people.

Page 65

Q. And who at DOE did you work with in developing the Annual Capacity Report?
A. Annual, Alan Brownstein.
Q. Anyone else?
A. Not for the development of that report, no; he was my main contact.
Q. Before I get into more depth about the Annual Capacity Report, can you tell me a little bit about the issues that were raised following execution of the standard contracts with regard to what was in or not in the standard contract?
A. I don't know if I quite understand your question.
The issues that we discovered in the contract were not mainly what was in or not in the contract, but where there were contradictions, references to one article referencing another article that didn't exist or referencing an article that obviously was incorrect, or ambiguities or things that needed some clarification because there was not enough information.
Q. And when you use the term we in your prior answer, does that refer to PNL?
A. That refers to me and Mr. McDuffie