Page 66

predominantly.

Q. And could you tell me what you remember about what the nature of those issues were?

A. Oh, God, there was a lot of them. Somewhere you should have a list of those issues.

They wound up -- we started out with like 54 of them and wound up with I think 32 or so.

There was everything from what constitutes -- you know, the contract provided exceptions to the OFF rule.

One was for emergencies. One was for fuel from shutdown reactors, that kind of stuff, and so those kinds of things like what constitutes an emergency, should priority be given to spent fuel from shutdown reactors?

Oh, I remember the first one -- what's the definition of a year was the dumbest one, but there was no definition in there.

What does it mean? You know, minor things like that all the way to it did not really do a good job of delineating the non-fuel components.

Page 67

Did a very poor job of defining what failed fuel was. A lot of it was down in the technical end of things like that, and we had -- like I said, you should have those documents. I turned them over, all those issues.

Q. Did PNL generate those issues?

A. Yes, we generated the issues. Then we would take them to the Department of Energy, in this case, Mr. Brownstein, and we would discuss them with them.

We had rationale. We had background information for each issue.

DOE then would make a decision as to whether this issue was really worth it, you know, worrying about or not, and then they were used in further discussions with the utilities.

Now at some point in time, and it was around '86 or so, we were still working that, another person got involved.

Q. And who was that?

A. Mr. Vance; I think it was around then.

Q. 1986 you said?

A. Yes.

Q. And you're referring to Mr. Scott Vance?

Page 68

A. Right there, yeah.

Q. What was the purpose or intent behind developing this list of issues?

A. As I tried to explain earlier, it was for the purpose of clarifying contradictions, ambiguities and stuff in the contract, so we could figure out roles and responsibilities.

The contract is predominantly set up so that I do something, you do something, I do something, you do something, and there is a time line, and each side, in this case, utilities and the government, had certain roles and responsibilities.

If one did something, then the other one, there is a reaction to that. Did it work?

So we set up a time line, something that was probably about the length of this table, or we drew a line down a little piece of paper the size of this table, put DOE responsibilities on the top, utility responsibilities on the bottom, and then you link them time-wise, and all of a sudden, sometime the links didn't connect, so that became an issue.

Q. Was there an understanding about how

Page 69

these issues would ultimately be resolved?

A. There was a process that was developed called, and it's the dumbest name of anything I ever worked on, the ACR issue resolution process.

Q. What does ACR stand for?

A. Annual Capacity Report; the primary function of going through and looking at the contract roles and responsibilities was when we started developing the Annual Capacity Report, we started finding little problems.

Anyway, we, the government, the DOE set up this in conjunction with the utility representatives which was the predecessor to NEI, the MUDWAMS or whatever the heck that name was back then. I can't remember. Some weird -- it was a collection of words that you couldn't make a reasonable acronym out of, so we called them MUDWAMS.

The utility -- and they were, everybody thought this is a great idea. It was a technical exchange across the table.

The utilities as a group voted to have five people on their side of the table. One would be Chair of this committee, and the DOE

Page 74

get-togethers, and I can't remember what the circumstances were.
I was thinking about that last night. I was trying to remember what the circumstances were that caused this thing to stop because it was really healthy, and I don't remember whose side decided to stop it and why, but I enjoyed it.
We were really getting something done I thought.
Q. Did the issue of acceptance rate come up in these discussions on the issues to be resolved with regard to the standard contract?
A. Yes, if I remember. Like I say, if you give me that list of issues, I could point it out.
I think there was one or two issues that related to interpretation, the oldest fuel first and then kind of stuff which impacts not necessarily the rate.
The rate was not an issue, but how you allocate the rate.
Q. And why was rate not an issue?
A. It just wasn't. We had a rate that we were working with. We were told by the program

Page 75

what the rate was going to be at that time. I think a full-blown system, everybody projecting it was going to be 3,000 tons a year ramping up from, I don't know, 600, 1200 tons, something like that, ramp up to 3,000, and that's the rate we dealt with.
Q. When was that rate provided to you or PNL?
A. As soon as the program began, 1983.
Q. And that was provided to you by?
A. By DOE.
Q. And anybody particularly within DOE?
A. No. It was part of the program guidance you get.
Q. Do you recall in what form this program guidance was given to PNL?
A. There is a terminology that the government used back then.
I can't remember what it was called. Just comes in as a set of guidance, go forth and do the following things. Here is how much money you're going to get, and there is a budget process, and you get the guidance, and you go to work trying to interpret the guidance, and you go back to DOE and say this is really what you

Page 76

want? Is this this kind of stuff? And everybody agrees okay, this is what I really meant to say, and go do this, and here is, here is information you need to work with. Here is an acceptance rate, for example.
Q. Did you have any knowledge of how DOE came up with this 3,000 number?
A. Not first-hand, but it is my opinion that it derived from the old commercial radioactive waste management impact statement that a repository could handle, and I think in there they were showing repositories could handle about 3,000 tons a year, and I think that was the basis.
Later somebody said whoa, wait a minute. The impact statement was based on a hypothetical program that was going to take a lot more stuff in, so that may be too high a rate, but that's how it started I think.
Q. Do you know whether or not this rate was the rate that DOE contemplated taking spent nuclear fuel at the time it signed the standard contract?
A. Whether it -- I don't think it was more, as much of a plan at that time as it was

Page 77

a, as a druther, what they would like to do, what they tried to do.
It was a, yeah, I guess you would call it -- it was a planning base, okay? Here is a goal. Let's, what have we got to do to achieve it?
Q. Do you have any knowledge about what either the utilities' or DOE's intentions were with regard to the rate of acceptance when either party signed the standard contract?
A. No. No, nothing to do with signing the contract, no.
Q. But do you have an understanding what the parties thought would likely happen at this time?
A. No, because the contract specified DOE would go away and develop an acceptance rate and publish it in 1986, and it would called the Annual Capacity Report, and the utilities were given, if I remember right, prior to publishing each one, every year the utilities were given advanced copies for comment, and then we would incorporate their comments, and sometimes we had, I remember in some of the early ones, we had appendices which delineated and echoed their

Page 78

comments.
Q. Do you know whether DOE had any guidelines that it relied on in developing the acceptance rate?
A. Like I told you, I think the first acceptance rate came from the commercial radioactive waste management impact statement, which was their document. That's all they had.
I don't know. There may have been some other thing. I was not privy to it.
Q. Are you familiar with a meeting that occurred in December of 1983?
The meeting was titled proceedings of the 1983 civilian radioactive waste management information meeting.
A. I'm not familiar with the report, no.
Q. I'm going to --
A. But the meeting sounds interesting. I'm trying to figure out what meeting it was.
Who was there?
Q. I'm going to give you a couple of excerpts from the report that was issued from that.
A. Who issued the report?
Q. It's the report that says on the title

Page 79

that it was sponsored by U.S. Department of Energy Office of Civilian and Radioactive Waste Management.
A. Sponsored by, but who, was this an -- what's the report number?
Q. There is a number in the upper left-hand corner. I show you the --
A. That makes a difference. What's the report number? Is it EI report?
Q. I don't see that designation, and I don't know if it has -- there is a CONF?
I'll give you this title. Take a look at it. It's got a forward. I've got excerpts, Table of Contents of that meeting, and then I've got a couple of pages from that report which actually excerpt the program overview given by Robert Morgan, so just take a look at it and see if you have any familiarity with this that might refresh your recollection on the top.
A. Like I said, I'm not familiar with the report, but maybe the meeting.
(The witness reviewed the document.)
THE WITNESS: No, I was not party to this.
This was a high-level meeting, Bob

Page 80

Morgan and his staff.
This was not the information meetings I thought it was.
(The witness reviewed the document.)
BY MS. HEWITT:
Q. You can see that there is a portion of that Robert Morgan program overview that I have highlighted?
A. Um-hm.
Q. That indicates --
A. Basic strategy.
Q. Yes. Can you take a look at that?
A. Um-hm. I did.
Q. And we're going to make this probably Billy Cole Exhibit No. 1 to the deposition.
(Cole Exhibit No. 1 was marked for identification.)
BY MS. HEWITT:
Q. Does that strategy sound familiar to you at all?
A. Oh, yeah.
Q. How are you familiar with that strategy?
A. That was a, that was the purpose. The

Page 81

basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel.
You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing.
This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage.
That was one of the major goals of the program.
Q. Do you know that was one of the major goals of the standard contract?
MR. MILLER: Objection. Lacks foundation.
THE WITNESS: I don't know if the contract had a goal or not.
The contract was roles and responsibilities and who does what to whom and when.
BY MS. HEWITT:
Q. In this testimony, Mr. Morgan states that during the first year of operation of the

Page 82

repository in 1998, comma, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location?
A. That's right.
Q. Do you have any knowledge about whether or not this strategy was used in developing the acceptance rate?
A. At that time, probably not.
Q. What do you mean?
A. I don't think that Mr. Morgan was, I don't think the initial acceptance rate was based on what it was going to take to solve the utilities' problems on spent fuel storage.
That's my own opinion. I think it was purely a rate that you could operate a repository.
I don't think -- it wasn't until later years that we started worrying about whether, you know, specific utilities had problems or not and what, and what would be a reasonable rate for that.
Now recognizing that if you start receiving it for a 3,000 ton system with a ramp-up starting at 1200 tons, there would have

Page 83

been plenty of storage capacity to make sure that the utilities would not need additional storage, so that was, it was secondary because there is plenty capacity there.
If you did it at that rate, that was a rate that a repositor could operate, and by chance, it was plenty to keep the information storage.
The first utility that said he was going to have storage problems turned out not to be the first utility with storage problems, but they were telling us information, but they had legal problems and they couldn't tell us necessarily the whole truth all the time, and so we were planning our program based on the information given to us by the utilities.
You know, the first one that had a storage problem that did something was Virginia Power, but the first one who said he was going to have one was Portland General Electric, and then because they were worrying about some hand ties, they couldn't tell us the truth.
Q. When DOE provided you with the 3,000 rate, did you have an understanding about whether or not DOE believed this would be a rate

Page 84

that would be sufficient to make sure that utilities would not have to have additional storage?
A. I just answered that question -- No, I don't think so.
I think it was the date that a repository could operate, and just so happens that it is, was plenty, and because I know based on the information, that was my job to know how much storage problems these utilities had and when they had them, and there was plenty, but if they were considering all of that, I was not privy and not party to that information.
Q. Initially it was intended there would be two repositories to take spent nuclear fuel?
A. That was the initial thinking in the law, yes.
Q. Why?
A. One in the east, and one to share the burden of, the political burden predominantly, of mostly electricity generate nuclear. Consequently the spent fuel it generates is in the east.
Most of the places where it was probably going to be best to site a repository

Page 85

were in the west, so they had two programs going.
The first repository would be in the west because it would be the easiest to get built, sited, built, et cetera, start this process.
Second one would be in the east, was to follow it by a few years, but that was also back when we thought we were going to have a lot more stuff than we were going to have.
One repository now is probably plenty.
Q. Are you familiar with the name of Shay?
A. Michael Shay?
Q. I believe it is. It's Michael Shay.
A. That's the only Shay I know.
Q. And who is he?
A. He worked at PNL. He may still be there. I don't know.
Q. Did you work with him, or did he work for you?
A. I worked with him at times, yeah, but not a lot.
Q. I'm going to hand you a document that we received in the document production that's

entitled how much fuel should DOE commit to accept authored by M.R. Shay and dated November 19th, 1984.
A. Okay.
Q. Have you ever seen this document or know anything about it?
MR. MILLER: Can we note for the record if it was produced the Bates range number just for commonality?
MS. HEWITT: I think I've got a number on there.
THE WITNESS: I think this was an internal, internal document.
MR. MILLER: Thank you.
THE WITNESS: I don't think it was published.
Shay, as well as a lot of other researchers, went out and tried to, like a lot of scientists do, uncover stones -- a-huh, see what I found.
He was hoping to be the guy to come up with what would be the panacea for rates. A lot of other people think like this, too.
Yeah, I've seen that.
BY MS. HEWITT:



Q. Did you participate in that analysis at all?
A. I gave him information, you know, what utilities were going to, you know, require storage and in what years, yeah.
There was a lot of people used a lot of different types of assumptions when they had the basic data.
My job was the basic data.
MS. HEWITT: For the record, the number I have on this document is capital MOV period 19990831.0021, and I don't know what the Bates range is. I can try to find that out and get back to you.
MR. MILLER: That would be great just for purposes of commonality I mean since these are common depositions.
THE WITNESS: I think the, MOV I think was his secretary's initials.
I'm trying to, trying to remember because I don't think it ever got -- there was a lot of internal analyses done that was fed up through the programs, and if DOE rejected it, then it never got published.
BY MS. HEWITT:



Q. There is a reference in this document to conclusions, and one of the conclusions is, quote, acceptance rate of at least 3200 required to maintain or reduce reactor inventory.
A. In 1984, that's probably about right because they were projecting a lot more discharge in '84 than they are now.
If you look at the total amount of discharge, I haven't looked at it, but I can guarantee you it was a hell of a lot more than what they are projecting right now, and so you needed a little bit more to do that if you were going to do it at a rate to keep up with it over the life, and that was only like in a few years, they needed 3200, if I remember right, but that's nominal stuff.
You know, it's like when somebody says they right now generate nominal 2000 tons a year, sometimes it's 2200. Sometimes it's 1800, but --
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any discussions with DOE when they provided you with the 3,000 number



about whether or not this was an appropriate number to use for the Annual Capacity Report?
A. I would have to look back at the first reports, but no, I didn't question DOE on whether it was appropriate or not.
My job was to figure out how to allocate the capacity that they were planning to build.
I wish I had brought that first report because I can't remember if we allocated 3,000 in that first report.
By 1986, I'm not sure we did.
Q. Do you remember the date of the first Annual Capacity Report?
A. Some time in '86 I think, middle of '86, around in there, and I could be wrong.
Tomorrow I will bring those in. I have a copy of every one ever published.
Q. We have a copy of them. I'm going to try to get a copy right now.
A. I mean original of every one that was ever published.
Q. Okay. I'm going to hand you a copy of what is titled as the Annual Capacity Report with a date on it of June 1987.

Page 118

Q. When did they change the rules again? What are you referring to?

A. 1987 Nuclear Waste Policy Amendments Act; I think it was '87.

Q. Do you have knowledge about those amendments?

A. Basically it said yeah, you can have an MRS, but it put constraints and things like this on an MRS and on the repository.

It just, it also recognized things were slipping.

I think it said if you had an MRS, you couldn't have more than 10,000 tons stored at the MRS until license was granted for a repository or operation. I can't remember which it was, operation, repository license, so the program then changed its mission again or its plan again, be an MRS, and then 12 years later, it would be a repository.

That was our, that was the thinking. MRS could get started maybe in '98, and repository, 2010, something like that.

Q. Now in the 1988 Annual Capacity Report which is before you, did PNL or DOE assume that the MRS and the repository would operate

Page 119

concurrently?

A. I don't think -- I'm not sure they had much to do with this report.

Q. Okay.

A. An acceptance rate was just an acceptance rate.

Where you stuck the stuff was a different issue.

Q. And did you have discussions with DOE about whether or not this was the appropriate acceptance rate to include in the report?

A. It wasn't my role to determine whether it was appropriate or not.

DOE had developed this rate based on their work they did in, to develop the new mission plan amendment.

Q. Did they give that to you as program guidance?

A. Yes.

Q. Did you do any independent work on determining what an appropriate acceptance rate would be to use in connection with preparing this Annual Capacity Report?

A. No. I mean there is -- we were never in a position to determine what's appropriate

Page 120

for an acceptance rate.

They tell us the size of the facility, when it's going to get built, and then we allocate capacity based on that facility size.

If they say it's going to start in 2003 and it's going to have 1200 tons, that's what we use.

We don't tell them no, two, three thousand. That's not our role. We're not building the facility.

Q. Do you recall whether or not the acceptance rates listed in the June 1988 Annual Capacity Report were consistent with the rates in the previous 1987 report?

A. No, they were not.

Q. What was the main difference, if you recall?

A. Well, the ramp-up rate is different. In the previous report, had a longer ramp-up rate because you didn't -- I don't think it recognized an MRS in the system.

In this report, they recognized an MRS in the system, so they could ramp up a little faster and start taking fuel a little faster if my recollection is correct.

Page 121

Q. Okay. Can you hand that back to me, please? I think we're done with that.

(There was a pause in the proceedings.)

BY MS. HEWITT:

Q. Mr. Cole, what was your role in developing or producing the 1990 Annual Capacity Report?

A. I was responsible for developing it.

Q. I'm going to hand you a document that's entitled the Annual Capacity Report, a date on it December 1990, and just take a quick look like you have earlier to confirm that is indeed the report that we're speaking about.

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MS. HEWITT:

Q. And if you could locate the page that has the acceptance rates on it? I don't know offhand from here where they appear.

A. Oh, yeah. Upper and lower bounds, yes.

Q. Did you have any role in developing the upper or lower bounds as they are reflected in the 1990 Annual Capacity Report?

Page 126

given that DOE recognized that the facility would not be available in 1998?
A. No, because the Annual Capacity Report is required under the contract, and it's put out there based on all the knowledge and based on all the planning as a planning document.
There was never any discussion of whether it should be put out.
It was, its contents were always under discussion, of course.
Q. Did you ever have discussions with DOE about the appropriateness of using an upper bounding and a lower bounding case?
A. Yeah. I said I didn't like it.
Q. And to whom did you relay these concerns?
A. To Mr. Brownstein.
Q. And what were their responses or his response?
A. Well, bottom line is this is the way it's going to be done.
I mean I don't remember the details of the conversation.
I just remember I never liked it, and when I don't like something, I tell people, so I

Page 127

know I would have told him.
Q. And why didn't you like it again?
A. Because it's supposed to be a planning document, and there is not enough specificity there for anybody to plan to.
If I were a utility, I couldn't use it.
Q. Why not? Could you be more specific?
A. Because it doesn't tell me how much capacity is going to be available for me in any given year.
It just gives me a range, and I can't plan to that.
That's just my own opinion.
Q. And did DOE ever expressly disagree with your opinion?
A. Obviously; they printed it anyway.
Q. Well, they could have printed it but still agreed that you were, that you had the right opinion.
A. Yeah. There were a lot of people that agreed with it, yeah.
Q. Agreed with your opinion?
A. Yes, most definitely, yes.
Q. Do you recall who --

Page 128

A. No.
Q. Those people were?
A. No. Mr. Brownstein was probably one of them, but his hands were tied, too.
Sometimes politics controls what we do. Reality doesn't. Science doesn't. Politics does.
Sometimes those of us down in the trenches don't know what all the political problems that are going on, either.
Q. I'm going to now turn to the December 1991 annual acceptance, Annual Capacity Report, and is it correct to assume that you had some role in producing that document as well?
A. Yes, I had a role in it.
Q. All right. I'm going to hand you a document entitled Annual Capacity Report with the date 1991 on it, and if you would just confirm that that's the document that we are both speaking about?
(The witness reviewed the document.)
THE WITNESS: Um-hm. That's it.
BY MS. HEWITT:
Q. And I see you have located the page which has the acceptance rates on them?

Page 129

A. Right.
Q. Do you know how those acceptance rates were developed?
A. Yes. I developed them.
Q. And how did you develop those acceptance rates?
A. This was using information out of the nuclear waste policy amendments which made the statement that you couldn't -- well, first of all, back up.
By this point in time, DOE, it basically had the MRS as part of its mission, part of its planning. It was going to be there they were hoping.
And in order to do it, under the requirements of the Nuclear Waste Policy Amendments Act, the act stated if you had an MRS, it could not accept more than 10,000 metric tons of fuel until the repository became either operational or licensed, was something like that.
The mission I think at that point in time showed MRS they could maybe could get one going in 1998, a limited capacity probably.
Repository wouldn't start probably

Page 130

until 2010, 12 years later, so they asked me, you know, what would be a reasonable rate because, you know, we can't build a big full-blown facility to get started, but we would like to make sure that we have something that's useful, so I came up with this rate which recognized the 10,000 ton limit over a 12-year period even though we only published ten years here because that's all that was required in the contract, to publish the first ten years, but if you add the other two years in here, you get another 1800 tons, and you have got 10,000.

It also recognized what the utilities had told us were their storage requirements, their need for out of tool, out of tool storage, recognizing the ability or inability to keep a full core reserve.

Information fed to us through a form they filled out every year called the RW 859; based on that information, in 1998, there was less than 400 tons of allocable storage capacity required on the aggregate by all utilities.

Now this takes us back to my statements earlier about issues of operations versus issues of equity.

Page 131

This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity.

The second year, 1999, they were telling me that it was like 575 tons required.

The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.

Q. And why was that a factor in your consideration of developing the acceptance rate?

A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new

Page 132

storage so they could keep operating.

Q. And in your opinion, did the standard contract reflect those purposes?

A. Did the contract reflect those purposes?

(There was a pause in the proceedings.)

THE WITNESS: Don't know. Don't know if it had anything to do with the contract as far as purpose goes.

The contract was a mechanism of roles and responsibilities, not purpose.

The act, the Nuclear Waste Policy Act was the purpose.

The contract was a way of implementing it, and that's how this rate came about.

BY MS. HEWITT:

Q. And was it your contention that this was a reasonable rate to you to use?

A. Absolutely; if you can only do a limited amount of capability, it would be nice to do it, so it really helped solve some problems, which was the initial problem they were trying to solve.

Q. And could you state again what that

Page 133

problem was?

A. Keep the utilities from having to add additional storage.

Q. Did DOE consider this to be a reasonable rate?

A. Yes. Obviously they published the report.

Q. Why were you involved in developing the acceptance rate at this juncture since you weren't involved previously?

A. I was asked what I would do, and I also -- well, I can't remember if I was asked or if I went and told them what I would do since I knew they needed something done, and they liked the idea.

They thought well, you know, we can live with this. We have a basis now for our -- all the rates in the past were pulled out of old stuff or sometimes WAGS, came out of the old CRWMS reports, somebody made something out of transportation requirements, but nobody had a real solid basis.

Here was something that says if you can go build a facility, as limited as it is, that still solves a problem and buy you some

Page 134

time to get the bigger facility going, and that's what I, why I approached them with this.
Q. Do you recall reviewing any particular documents with regard to determining what the utility storage requirements were?
A. Sure.
Q. And what are those documents?
A. The spent fuel storage requirements document, which I also published.
Gee, it sounds likes a college professor sitting there reading his own works, teaching from his own books.
Q. How often would this, how often was this document published, the storage requirements document?
A. We did that annually also.
Q. In preparing the 1991 Annual Capacity Report, which storage requirements document would you have reviewed to prepare these acceptance rates?
A. The, whatever the latest one was, but the report itself wasn't what was used.
It was, the information that was used to develop the report was what was used.
It came in on the RW 859. The report,

Page 135

the Annual Capacity Report is a higher level thing.
It kind of shows you in the aggregate what, what the problems are and identifies a few specific utility problems and stuff.
The RW 859 gave us all the specificity of the utilities that had problems and when their problems are going to happen.
This was information provided to us by the utilities under penalty of law. This was accurate, correct information. So they claimed.
Q. And am I correct in understanding that your testimony is that the rates listed in the 1991 Annual Capacity Report were sufficient to address utilities' storage needs in the aggregate?
A. That's correct.
Q. What do you mean by that?
A. If you take all of the utilities that claim they had a storage problem in 1998, and you summed it up, it would have been less than 400 tons of allocable storage required.
Q. Per utility?
A. On the aggregate, total, not per utility -- total, less than 400 tons total for

Page 136

all utilities.
Q. But in fact there may be one utility that had greater than that amount?
A. No.
Q. No?
A. Impossible if it totals less than that.
Q. Okay.
A. None of them had -- if you summed up all the utility allocable storage requirements for those years, it did not exceed 400 tons in 1998.
This is what they told us.
Q. Who is they?
A. The utilities via the form RW 859 under penalty of law.
Q. I'm going to hand you a document that actually has a DOE document number.
It's DOE backslash or RL hyphen 90 hyphen 44.
It's entitled spent fuel storage requirements 1990 through 2040, and it's dated November 1990.
A. Okay.
Q. I'm going to hand it to you and see if

Page 137

that document looks familiar to you.
A. Oh, yes, it is.
Q. Is that the document you were referring to earlier that you helped publish?
A. Um-hm. I don't know if that was the one referenced that we used here, whether this one or the previous year, but yes, it's that document.
That series, this was a series of documents started back in, I think the first one we published was '82 or three.
Q. And is there information in there that you would rely on to develop the acceptance rates here for the 1991 ACR?
A. It should be in here. Let's see.
Q. Take your time, and if you find it, I would just appreciate you letting us know.
(The witness reviewed the document.)
THE WITNESS: It's probably inferred in these numbers on page 313.
Unfortunately, all of these tables are cumulative.
The annual rates aren't here, so you would have to back it out and subtract one year from the other.

Page 138

I'm not sure. Like I said, it was the data that was used went into this report.
Let's see. Okay.
(The witness reviewed the document.)
THE WITNESS: There were several cases in here with a lot of different assumptions.
BY MS. HEWITT:
Q. Take your time.
A. In this particular case here, annual storage requirements with inter-utility transshipment shows 1998, only 273 tons were required, 281, 449, 311, with -- let's see -- one without transshipments.
Q. What is transshipment?
A. That's where utilities ship amongst their own reactors of like kind to solve their own storage requirements, which was felt, that was a common practice in Houston utilities, so that's what was used.
(The witness reviewed the document.)
THE WITNESS: Yeah. It shows only 273 tons were required in 1998, 281 in '99, 449 in 2000, getting up to nominal 900.
BY MS. HEWITT:
Q. Do you know whether those are

Page 139

cumulative or annual numbers?
A. Those are annual numbers I just read you, yes.
Q. Do you want to just tell me what the page number of that document is?
A. That was on page C14. Like I said, there were a lot of different cases that this thing took into consideration.
There was another case here. Okay. Cumulative; I hate cumulative, but that's what they want.
(The witness reviewed the document.)
THE WITNESS: Okay. Here is one without, without inter-utility transshipment, 362. This is page B.94, and this looks like the one that we used to do this -- 362, 385, 551, 381, 811, you know, all right there.
BY MS. HEWITT:
Q. Okay.
A. Looks like the numbers.
Q. Thank you. To your knowledge, did DOE use these storage requirements documents in preparing acceptance rates previously in the prior two ACR reports?
A. Not to my knowledge, they did not, and

Page 140

mainly because acceptance rates they used before were far greater than that, so it was not of concern.
Q. Now the acceptance rates that were listed in the 1991 Annual Capacity Report, they don't take into account the linkages between the MRS and the need to have a construction permit for the repository, isn't that right?
A. No. They do take into account the linkages.
Q. And how do they do that?
A. Because you can only have 10,000 tons of fuel in an MRS until you had a repository, and that's what this represents.
Q. But you couldn't have an MRS unless you had a constructed permit for the repository?
A. No. No. I don't think so. You couldn't, you couldn't -- how did that go?
I guess you couldn't start operating it, but you could start -- I mean they assumed that they were going to -- somehow it was all going to be linked together.
I can't remember the exact language, but that's what this was based on.
It was based on getting a small MRS

Page 141

started in '98, and a repository operating in 2012. It was a 12-year hiatus -- or 2010. Excuse me.
Q. All right. Was it your opinion that if, the utilities were, had a stronger basis to rely on this Annual Capacity Report rather than the previous one that was based on the upper boundaries and lower boundaries?
A. Yes.
Q. And why is that?
A. Because before we published this, we sent it out to the utilities and said this is what we're planning right now. This is how you individually would line up with your peers and how much of this capacity you would get, the basis behind this capacity, speak now or forever hold your peace, and they didn't object.
Q. You did not receive any comments on this?
A. We got some comments, and like I said, you got the handful out there or one or two that always say my contract says you're going to come pick up all my fuel the first year. You've got those kind, and they're going to say that every year, but in general, the 60 something

Page 142

utilities, you get one or two of those.
Most of them said, you know, if you build that facility, great. Get it going. You know, start taking this stuff, and if you can take the stuff away faster than we have to add additional storage, that's what they wanted as a minimum once you get something operating, and then it gets bigger and bigger, then you can work off backlog, but this was the minimum you could do to bail them out.
And DOE says okay, let's try to do something like that. Let's get something going.
We didn't get there.
Q. All right. Can you give me that document back?
A. Um-hm.
Q. In 1991 was the first time the DOE published the annual priority ranking, is that right?
A. I think it was about then, yes.
Q. And did you have a role in producing that document?
A. Oh, yes.
Q. And what was your role?
A. I had to produce it.

Page 143

Q. How did you do that?
A. Well, PNL produced it.
A. In '91, I was with JAI, but I was working with PNL and producing it, and APR, as I stated this morning, was required -- it's an annual, it's an acceptance priority ranking. It was required to do that before you could generate the annual capacity report.
It was just not required to publish it before like '91, but we did one every year, and it was included I think in most of the others as an appendix. Just wasn't called that, but it showed how the capacity that the DOE was planning for would be allocated to the individual utilities and the bases for allocating it, which was the old fuel first.
It delineated, if you look in the appendix, it shows every stick of spent fuel that was being discharged, what the discharge dates were and who it belonged to, and you go down that list, and you accumulate it.
You draw a line in this case 400 tons. You draw a line the next year, and that's stuff that gets allocated to those utilities in that year.

Page 144

Q. Did you have any discussions with DOE about how to produce this report?
A. Oh, of course.
Q. And what was the nature of those discussions if you can recall?
A. How to produce the report; I mean like what are we going to put in? How much can we put in it? What information is useful to somebody, those kinds of discussions?
Q. Was there a discussion about whether or not oldest fuel first should be the basis?
A. No. The contract says that's the basis.
Q. Did --
A. And they always published that in these reports.
We stated it in the summaries. We stated it in the text that that was the bases for allocation was oldest fuel first, and we gave everybody an opportunity to say you disagree or you don't disagree.
A lot of people didn't like it because it made them -- a lot of people I say -- utilities didn't like it because it made them go later in the queue, but that's the way it was.

Page 145

Q. When you said you gave the utilities an opportunity to say whether they like it or not, what was the mechanism by which they had the opportunity to voice those concerns?
A. Draft of this report was sent out to each of the utility contact, contracting officer contacts from the DOE's contracting officer.
Q. And do you know what kind of instructions DOE gave with regard to making --
A. There was a letter that went along with it, told them to, you know, you know, it was a page and a half letter probably, but bottom line was speak now or forever hold your peace because this is what we're planning.
If you don't have any objections, substantive, this is the way it's going to be.
Q. Was it originally contemplated the Annual Capacity Report would be issued after the annual priority ranking was issued?
A. Had nothing to do with contemplation. It was all in the rules of the contract.
The contract said that the Annual Capacity Report was to be published starting -- I guess my mind went a while ago -- '87.
APR, start publishing that in '91, so

Page 146

that's what we did, but we had to develop the information for the APR before we could do the ACR even though the contract didn't say to publish it.

It was in the back, though, if I remember correctly.

Q. And did you have a role in drafting the nineteen --

A. See, right here -- this is the '88 or '87 report.

All this information in the back is the APR. That's what it amounts to.

Q. Did you have a role in developing the 1992 Annual Capacity Report?

A. Ninety-two, yes.

Q. And I'm going to hand you the 1992, if you could hand back to me what I hope is the 1991 document?

A. No. It's '87.

Q. Oh.

A. I gave you the '91 back.

Q. Okay. I'm going to hand you the 1992 Annual Capacity Report, which actually has a date on it of March 1993.

A. Things were starting to slip.

Page 147

Q. Do you know why it was published in '93 rather than in 1992 which you would expect since it has the title of 1992 on it?

A. Um-hm.

Q. Why?

A. Because the approval process started getting -- there were some people in the upper chain of command in DOE who wouldn't buy, you know, they wouldn't buy it like it was they wanted minor changes made, so it goes back down. You start over. Are there -- whatever their political reasons were.

They started slipping. They started worrying about other things. I don't know.

We never could get them out in time.

Q. When you're talking about they wouldn't buy them as it was, who is they and what was what they were buying?

A. Whoever the powers that be in DOE at this point in time; look at the roster and see who the people were in charge.

I don't know.

Q. But they didn't approve of the report or other things?

A. Most of it was the way it was texted.

Page 148

We can't say this, we can't say that, I don't like these words, I want these words installed, you know, this kind of thing.

Everybody makes their mark. That's how you justify being a manager, mark up something.

Q. But why was this -- was there something different about this report than prior reports?

A. I don't think there was anything different about it.

It's just at this point in time in the program, things were getting a little heated.

It was getting more and more evident that the program was not going to be able to probably have facilities in time.

People worried about publishing things that implied that it did, probably a lot of reasons like that.

Q. Were you privy to any of those discussions?

A. No.

Q. So on what do you form the basis of your knowledge?

I mean where does that come from?

Page 149

A. Just hearsay, but I, you know, since I had to publish the thing, you know, physically go to press, I knew that things were being held up by upper management approvals.

Q. Were there discussions about the acceptance rate to be included in this Annual Capacity Report?

A. The only discussions that were going on about that point in time was the necessity to maybe recognize the acceptance rate as a function of a non-specific year, call it year one, year two, year three, and I kind of thought that this report did that by -- see, it's got a '98 on here, because I, I had recommended that they do, just do year one, year two, year three.

Q. Why had you made that recommendation?

A. Because I didn't think they were going to meet '98, and that's poor guidance.

This is -- for planning purposes, it's hard to plan if you can't do the job.

Q. But isn't it also hard to plan if you just have a year one and don't know what actual calendar year year one is?

A. Yes, most definitely, but one thing you can do in there is you can make statements

Page 150

like, you know, this is what our facility will look like once Congress allows us to build it, and this is what it's going to be in the first year of operation.
If it's '98, hallelujah.
Q. Did you believe that their recognition that they would not meet the 1998 date in the contract was a breach of that contract?
MR. MILLER: Objection. Calls for a legal conclusion.
THE WITNESS: Do I believe it? I don't like the term breach of a contract.
It meant that DOE could not live up to its, all of its roles and responsibilities, yes, I felt, but I have to qualify that.
It's only because -- it's not because DOE didn't do everything it could to do it, to get the job done.
Their hands were tied. They tried. Congress wouldn't let them do it.
BY MS. HEWITT:
Q. What do you mean by that?
A. Every time they came up with a solution, Congress changed the rules.
They had solutions, interim solutions

Page 151

along the way that if somebody would allow them to implement, we would have had a facility starting to take fuel in '98, but they kept changing the rules, and they're still changing them today.
Q. And is it your opinion that the MRS was one of those solutions?
A. Yes. The MRS was a solution. They had an MRS sited. They had it designed. I think the company Golder Associates or something designed the first one.
It was to be sited at Clinch River, Tennessee, land that was owned by the federal government. Was all ready to go. Even part of the facilities were already there.
DOE said let's go do it. Whoa, wait a minute. We can't have a solution. Hence the Waste Management Amendments Act.
Well, you can't have MRS until you have this. Maybe that's why that came about.
The license for repository, you don't have a license, so we're not going to let you have it.
Q. Did, did DOE at that time believe it wasn't living up to its responsibilities in

Page 152

that?
A. Absolutely it believed it. These guys are -- they're hard working, dedicated people. They were trying to solve this problem they were given, and most definitely they believed it.
Q. Did they have any concerns about liability they may have to the utilities for failing to meet those responsibilities?
A. No, not the people that I dealt with weren't concerned with liabilities.
We were concerned with solving the problem, you know, getting fuel moved and getting facilities built.
Q. Did you develop the acceptance rates that are included in the 1992 Annual Capacity Report?
A. Yeah. They're the same as the other.
Q. And are they based on the same factors that you used?
A. Yes. From that point on, from '91 on, the fundamental acceptance rate used by the program, and I think it's still probably being used today, is this one.
That's the only one ever had any kind of bases, and may have changed something in the

Page 153

last year or two, but I doubt it, because I think once the, once the litigation and stuff started, then everything kind of broke down.
Q. Do you recall whether or not this capacity report was amended or revised in any way?
A. I remember one of them, that we had to come out with a revision, and I can't remember which one it was and the purpose right now, but I do -- yeah.
There was one that we had to put out an amendment to. I wonder what it was.
Q. I'm going to hand you a document that's entitled 1992 Annual Capacity Report Revision 1 dated May 1993.
A. Oh, yeah.
Q. Take a look at that, and if you would give me back the 1992 or the, well, whatever, 1992 Annual Capacity Report that stated 1993. Make me crazy!
(The witness reviewed the document.)
THE WITNESS: I'm trying to remember what the revision was.
There was an error in the data that we got from the Energy Information Administration



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 178

A. Okay.
Q. I want to ask you a couple more questions about the acceptance rate which was first introduced I believe in the 1991 Annual Capacity Report.
A. Okay.
Q. And to refresh your recollection, the acceptance rate that was used started in year 1998 with a 400 MTU annual rate and ramped up in about two years up to 900 MTU annual rate, and if I'm correct in my recollection, you stated that you helped develop this acceptance rate that was included in this Annual Capacity Report?
A. It was my -- I developed it personally.
I mean I can't pass that one off to anybody else.
That was my idea.
Q. Okay. The Annual Capacity Report, when it reports this rate, only goes for a period of ten years, right?
A. That's correct.
Q. Was there an understanding or an intention with regard to what an acceptance rate

Page 179

would be following the ten years?
A. No. We never really did one for greater than the ten-year period.
Q. If I remember correctly --
A. Not for the purpose of allocating capacity.
Q. Now you stated earlier that it was your opinion that the 900 MTU annual rate was a reasonable rate in your view, is that right?
A. Yes, based on the information given to us by the utilities.
Q. Do you have an opinion about whether or not it would be a reasonable rate to use for more than ten years?
A. I would have to look at the data given by the utilities, and I could tell you yes or no then, but I can't remember what it was beyond that point in time.
If they were still saying that they didn't need any more capacity than that for additional storage, then it would be reasonable. If they needed more, then it wouldn't be because that was, the bases for that was what could we do at a minimum and still keep them from getting in trouble?

Page 180

Q. Now when we talked about the genesis of the 900 MTU rate and compared it to the numbers in the storage requirements document, I think it was evident from your review that the numbers that were included in the acceptance rate 1991 document were greater than the total storage requirements that were needed, that were reflected in the storage requirements documents?
A. Nominally.
Q. What do you mean by nominally?
A. Well, there may have been one year when it creeped a little more than 900, but most of the years were under 900.
Q. And was there any reason that you chose a figure that was higher than what those rates were in the storage requirements document?
A. Yes.
Q. What was the reason?
A. I had 10,000 tons to divide up over 12 years, and it worked out pretty slick.
If you do 900 tons a year for 11 years, and -- I mean for ten years, and you do four and six, voila, you've got 10,000. I didn't even need my calculator for that one.
Q. You also referred in your earlier

Page 181

answers to, on occasion to program guidance that you received from DOE?
A. Um-hm.
Q. In what form was that program guidance provided?
A. Comes in as written guidance.
Q. Were there actual documents that were provided to PNL with regard to preparation of the acceptance in the Annual Capacity Report?
A. Yes. Yes. Said to go do it. You know, program guidance is fairly, oh, sometimes vague, sometimes with the understanding that you know what you have to do anyway.
Sometimes you write your own guidance, give it to DOE, and then they officially give it to you, but the program guidance in this case would come in and say the contract specifies da, da, da, you do this, go develop this report.
Q. Did you ever receive program guidance in a written form from DOE that instructed you to use a certain acceptance rate in an Annual Capacity Report?
A. I don't remember specifically getting an acceptance rate in written guidance, no.
When the guidance comes in, it comes

Page 186

calculations, if I remember right, showed it 1.2, 1.2 something, 1.25 mils.
It was getting up there, but this is because also to get the job done, we're going to have to get MRS into the program, and this is raising the costs.
Fortunately for them, it went away when the feds coughed up their money, and fortunately for the utilities.
Q. I'm going to address a new topic.
A. Okay.
Q. Do you have an understanding about the role of delivery commitment schedules in the standard contract?
A. Yes, I do.
Q. And what is your understanding of the role of those what we call DCSs?
A. According to the contract, and I believe it is 63 months prior to taking this stuff from the utilities, the utilities would start giving to DOE Delivery Commitment Schedules based on their allocations that came out in the Annual Capacity Report.
These Delivery Commitment Schedules basically was a recognition by the utilities

Page 187

that okay, for these rights you have given me, Mr. DOE, this is the fuel I intend to deliver to you that year, not with a lot of specificity.
Mostly there is a range of discharge dates, but it does not exceed the allocated capacity, their portion of the allocation, 50, whatever their piece of the allocation was.
And DOE would review this. It was, it was an attempt by somebody at some point in time who thought that these rights had some value to allow the utilities to have stock in this.
It was a piece of paper that said I own these rights. I can sell these rights. I can exchange these rights. They're mine, and once that is approved, they had that piece of paper, but whomever came up with this didn't think it through. It was not a very good idea.
Q. Why?
A. Well, think for a minute. The, if you have a waste management system that is still setting there in design, no one has ever started building anything, and you have got an allocation, a piece of paper, Delivery Commitment Schedule, whatever you want to call it, that says I have the right to this much

Page 188

delivery in that year, until you have a facility that is built or looks like it's going to be built, it's a worthless piece of paper. Has no value.
As you get closer and closer to time, all of a sudden license, they start digging ground, building facilities, that piece of paper starts taking on some value.
When you start operating, it's got a lot of value, so you're not going to get rid of it. There is no way you can give up those rights.
You're going to deliver your fuel because even if you didn't need it, that capacity at home, you're still going to deliver it because there is no guarantee that two years after operation, some little old lady is not going to lay down in a crosswalk and shut the program down, and then you might need it.
So somebody didn't think the thing through. It was kind of a worthless exercise in my opinion.
Q. How did DOE regard the delivery commitment, Delivery Commitment Schedule process when it started in I guess the late, early

Page 189

1990s?
A. They had to do it by -- it was their responsibility under the contract, and so they did it even though, you know, after a while, they thought about yeah, we agree, but we have to do it. We provide that. That's something that's part of their responsibility, and they did it.
There was a process developed called the, well, Delivery Commitment Schedule process and approval system was a way to do a review of the things when they came in, looking at them for administrative problems, glitches, whatever, technical problems, this kind of thing, recommending to DOE should this be approved, disapproved, why?
DOE had -- I can't remember all those dates and stuff. DOE had a certain period of time to review them, get them back to the utility, and tell them why it's disapproved.
They had a certain time to get it back to them and bounce back.
Most of them were cookie cutter approved, no big deal.
A few of them, most of those that were

Page 190

disapproved were disapproved for administrative purposes.

They didn't -- fill out the contract number incorrectly or misspelled their name or something. Forgot to sign it, something, you know.

One or two were disapproved because these handful of obstinate utilities would say what do you mean this is all the rights I have? I'm going to ship you a gazillion tons that year. I've got a contract says so, so we get some of those disapproved.

Q. Now there were two types of Delivery Commitment Schedules that were going to be submitted, isn't that right?

A. No.

Q. Well, the contract I believe contemplates that the, the submission of a Delivery Commitment Schedule, and then there were final delivery schedules?

A. Final delivery schedules, yes. There, that was not a commitment.

That was, that was the one that had specificity, that says, okay, getting down to the wire. You've got facilities that are going

Page 191

to start operating, and I have government fuel I'm going to send you, here it is.

This defines the fuel I'm going to send you, so the DOE will show up at the door with the right kind of transportation cask to put that fuel in and the right number of casks, but basically the right kind.

What fuel do you -- see, a utility can operate more than one kind of reactor, and when he has a right to send so many metric tons of fuel, it doesn't have to be from the reactor that earned that right.

It's a chit. It's a right. He can say, well, instead taking 509 tons from San Onofre -- well, not San Onofre because that's not the one.

What's the one -- Surry. Take it from North Anna, that's okay. They're the same kind of reactor, but I'm a utility, so I'm happy to -- I don't know what kind of cask to show up with because they're not the same, but he has the right to tell me that, and that's what that was for.

Q. So is it fair to say that the purpose of the Delivery Commitment Schedules was to

Page 192

provide utilities with the right to exchange with other utilities?

A. That was one of the purposes, yes.

Q. And what were the other purposes?

A. The other purpose was a recognition by the utilities that they -- it was a kind of an agreement that yes, this is my piece of allocation. I agree with that based on the rules for allocating, and it was for exchange, but it also gave DOE a little bit of information for the purpose of helping in the system design.

It said the range of discharge dates of the fuel they wanted to send so I can look back in the data, and I know that range of discharge dates.

I know which fuel it is they want to send so I can tell how hot it is, and I can tell whether it's a PWR or BWR.

I can tell a lot of information about it, so it helps me in the design of the transportation system.

Q. Now the allocations that were reflected in the Delivery Commitment Schedules came from the Annual Capacity Reports, is that correct?

Page 193

A. Came from the Annual Capacity Report, from the one that was published in '91.

Q. And am I right that --

A. I believe.

Q. Am I right that utilities couldn't propose to deliver more than the amount of spent nuclear fuel they were allocated in a particular year?

A. They could propose it, but it would be disapproved.

Q. So is it fair to say that the rights that utilities had to deliver a certain amount of spent nuclear fuel came from the ACR?

A. Yes.

Q. As opposed to from the Delivery Commitment Schedules themselves?

A. No. The Delivery Commitment Schedule's based on the ACR.

It told them, the ACR told them what they had.

This is why in '91, we knew that starting some time soon, I can't remember the dates, they were going to be '93 or so, they're going to be two or three are going to be submitting Delivery Commitment Schedules.

Page 194

That's why we told them, to give them like a three-month comment period and review of the '91 report that said speak now or forever hold your peace.

This is the portion of the capacity that's allocated to your utility, and here is how it was given to you and why it was given to you, and so they knew that information.

Then I can't remember, '92 or '93, they start submitting Delivery Commitment Schedules based on that information.

Q. Now I think you said earlier that the utilities had a reasonable basis to rely on some of the ACR reports, but not on the other ones.

Do you recall that testimony?

A. Yeah, I agree.

Q. And would it be fair to say that for those ACR reports, ACR reports for which they did not have a reasonable basis to rely on, the Delivery Commitment Schedules then were also not reliable documents?

A. The delivery schedule process started out, like I said, I think in '92 or three based on the information out of the '91 report.

At that point in time, everybody felt

Page 195

that that was a good reliable basis. Everything was still fairly on track, or at least DOE kept hoping they could meet that date.

After some time in, oh, I think some time '94, '95 when it, '95 or so when it became apparent that they weren't going to meet the dates, the Delivery Commitment Schedule process was terminated. No longer were required to send them in because they didn't have any meaning anymore.

I'm not that sure of those dates, but it's right in that period of time.

Q. I'm going to hand you a document that I believe you authored when you were at E.R. Johnson & Associates that actually does have a Bates number on it, thank God, and it's -- actually we have two numbers.

One is PA hyphen 222543 is the beginning Bates number, and there is also a PNL number, which is 0081286.

The document is entitled, "Department of Energy Delivery Commitment Schedules for Spent Nuclear Fuel," and it has two names on the document, a Marlies Klose.

A. Marlies Klose.

Page 196

Q. From TRW, and then your name, Billy M. Cole.

Will you take a look at this document and see if it's familiar to you?

(The witness reviewed the document.)

THE WITNESS: Yeah. This was for some technical symposium somewhere.

It was not really considered a document.

It's a presentation.

BY MS. HEWITT:

Q. Did you make the presentation?

A. Probably not; I can't remember when this was.

What's the date?

Q. Well, that was going to be one of my questions.

A. This was probably I'm guessing around '92 or so based on -- all this does is just reiterate and summarize what's in the ACR and how the, how the allocation process worked, and I can't remember what technical meeting this was for.

Q. I'm going to, I would like to make that Cole Exhibit No. 2 to the deposition.

Page 197

(Cole Exhibit No. 2 was marked for identification.)

BY MS. HEWITT:

Q. And I'm going to give you another document which I believe --

A. This must have been around '92 because it references '91 documents.

Q. I believe this document that I'm about to hand you was developed around the same time.

It's on the same topic. It discussed -- the title of the document is status of Delivery Commitment Schedules.

This, it has got your name written on it. It's got Alan Brownstein's name.

It says EEI slash U waste meeting November 6th, 1992.

It also has a Bates number on it CTR hyphen 003 hyphen 1772, and the first part has Alan Brownstein and then your name written, and then attached to this document is a, the same title with your name written in type on it.

A. Yeah. We did up a lot of generic presentation material. And in those days, Alan and I were kind of interchangeable.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 198

We would run, if somebody asked can you tell us what this is all about, this program and stuff, and how this process works, and so I would either slip my name in it or he would slip his name in and we would go give the presentation.

This is the same, actually the same, exact same information is in here.

Q. Did you develop the, either of those documents?

A. I was the manager in charge of getting the work done.

People who worked for me developed the information in there, and I reviewed it and said yep, that's correct at that time.

This was just keeping track of the DCSs that came in.

Q. Were you familiar with the instructions that were provided to all fours in connection with the Delivery Commitment Schedule?

A. The instructions that were provided to whom?

Q. To, to the utilities.

(A discussion was held off the

Page 199

record.)

THE WITNESS: It was some, there was some letter or instructions that went out to the utilities from the DOE explaining what they were supposed to do, and give them a sample form I think.

BY MS. HEWITT:

Q. I'm going to give you --

A. I just don't remember.

Q. A copy of the document entitled U.S. Department of Energy instructions for completing the Appendix C Delivery Commitment Schedule general instructions.

And actually I have the document number here which I have covered up, but it's SN 120564.

Why don't you take a look at these pages and see if that seems familiar to you in any way?

(The witness reviewed the document.)

THE WITNESS: Yeah, it's familiar, but I, I wasn't with TRW at that time.

I was off working for PNL again on the mixed waste program, but I know what was in it.

BY MS. HEWITT:

Page 200

Q. Did you have any role actually drafting these instructions?

A. No.

Q. There is a paragraph here that talks about the ACR?

A. Wait a minute. Back up. To be honest, yeah, probably because I think we started drafting those before I left, but it all got completed later.

It was just trying to give guidance to the utilities on how to fill these things out.

Q. Well, there is a section in here that talks about the annual acceptance rates in the ACR, and in particular, it states that the process described herein, and I believe that it refers to the Delivery Commitment Schedule process, assumes that the FWMS will be able to accept the purchaser's SNF beginning in 1998?

A. Correct.

Q. According to the acceptance rate reflected in the ACR; then it goes on to say in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers.

Do you recall that at all from the

Page 201

instructions?

A. If that's what they said, that makes sense, yeah, because things can change.

Q. So was the Delivery Commitment Schedule a final commitment by DOE to take the fuel reflected therein from the utility?

MR. MILLER: Lack of foundation.

THE WITNESS: I, my personal belief is that it was a commitment by DOE to take this stuff and a commitment by the utilities to deliver, yes.

And I guess I need to leave it at that because, yes, I think that's true. It is, it did represent a commitment, and I, you know, I know that things changed afterwards.

They couldn't get a facility done in '98, as we all know, and things like that, but it does not excuse an obligation.

Q. What do you mean by that?

A. DOE had an obligation to take something under the contract.

Now how much, that could be debated because it doesn't tell, quote, amounts in the contract.

If you read the language, I think



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 246

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 247

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 248

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
ALEX D. TOMASZCZUK, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 249

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

BY MR. BLANTON:
Q. I'll rephrase what I've said. Fee, the acceptance rate's an element in the total life cycle cost estimate, is that correct?
A. The rate at which, yes, in a broad sense, when you get down to the nitties of 400, 600, 900, that's not going to make any difference in the total system life cycle cost, but when you deal with the overall system in general when it's operating at full capacity, 3,000 tons a year over how many years are necessary to work off, get the new stuff, work off the backlog, yes, it is.
MR. MILLER: To the extent that you have questions about rate that are contained in those kinds of documents, I think those inquiries are appropriate.
MR. BLANTON: That's what I intend to be asking him.
MR. MILLER: And to the extent that you're discovering other witnesses or his knowledge about documents that might contain rates, but beyond that, I think, I think that's beyond the scope of this.
MS. HEWITT: The other issue, too, of



course is that we need to lay foundation rather than just jump into something, so I think that's one of the reasons we ask some of these preliminary questions.
MR. MILLER: Right. Other than -- I don't think up to now other than my objections to the fact that Mr. Cole can't speak for DOE, I haven't made any foundation objections as far as I know, but --
MS. HEWITT: You did make one yesterday. That's why I remember.
MR. MILLER: All right. Well, all right.
To the extent that you're going to lay foundation for asking questions about rates and financial documents or fee adequacy documents, that's fine, too, but as far as the substance of the adequacy of the fee and, and all that stuff, I think that's beyond our inquiry here.
MR. BLANTON: I assure you that's not what I'm asking about, okay?
MR. MILLER: Okay.
MR. BLANTON: And I think that will be clear.
THE WITNESS: I want to interject an



opinion here.
We're dealing with acceptance rates relative to this litigation.
My own opinion, the only thing that's relevant is the rate that was agreed to, that was published by the DOE and agreed to by the utilities after 1991 as required by the contract.
Everybody signed up to it. It says this is the rate, this is what we submit our DCSs on and everything else. That's the relevant rate.
Prior to that, everything was just planning, getting something going and everything, but nobody at, prior to that, really talked about how many trucks I had to build, how much stuff I was going to pick up from whom and when.
That was the thing that decided what the acceptance rate was in the early years, and everybody -- and the utilities signed up to it and the DOE signed up to it also in making a commitment.
That's what the APR was all about.
BY MR. BLANTON:



Q. Let me ask you this question. What did Alabama Power Company or Georgia Power Company sign that agreed to the 1991 Annual Capacity Report rate?
A. They were allowed to comment. The contract said that the DOE would publish the acceptance priority ranking and Annual Capacity Report that year, and that was going to be the rate by which the DOE would commit to have something, and the utilities would commit to deliver, and they would allow a three-month period to comment on that.
If they didn't like that, they were supposed to say so. Whom -- I don't have all the documents that came in from all at the utilities. DOE does, but it was assumed after that point in time, those were commitments on both sides.
Q. I don't intend to go back through what we went through yesterday at all, but none of that --
A. Okay.
Q. This isn't the 1991 ACRs in the contract, is it?
A. Yes. The contract says publish that

Page 282

ACR with that information in it.
Q. But the rate that was published in the 1991 ACR was not in the contract?
A. Of course not, no. The contract preceded it, and it established the mechanism for developing ACR.
Q. Is there -- just going back to Mr. Miller's question, are you aware of a fee adequacy, or excuse me, a total life cycle cost estimate that did not include a waste acceptance schedule that reflected an acceptance rate?
A. No, I'm not. All total system life cycle cost analyses have to calculate, in order to calculate the life cycle cost, you have to have assumptions first on how much total spent fuel am I going to be dealing with over what period of time? How big of a facility do I have to build to accommodate that? And how long do I need to operate it at a reasonable rate to work off backlogs, handle new stuff, and still not -- and still make it as economical as possible.
That's what the whole process is about.
Once that's done, that information is then used to determine okay, now I know what

Page 283

it's going to cost, and you know, how much electricity we're projecting to be generated in the future times one mill per kilowatt hour, if I've got enough money or not. Is the fee adequate?
Q. Let me show you this document I think we have already identified PNL dash 1072117.
It's titled the 1986 annual review of the adequacy of a one mill per kilowatt hour waste disposal fee.
A. Um-hm.
Q. And it's dated May 1996, and it has Mr. R.L. Engel and Mr. J.R. Young listed?
A. Okay.
Q. As authors; it also has a green tab and a blue tab that somebody working for me put on there, and some handwritten stuff on the front of it, but feel free to look at it or ignore it as your pleasure.
A. Yes. I'm familiar with this document.
Q. Mr. Engel was working for you when he produced that document?
A. Yes.
Q. Was that document produced under, at the request of DOE?

Page 284

A. Yes, as required by, I think it was -- I can't remember if it was the contractor.
I think it was the Nuclear Waste Policy Act that required publish, look at the adequacy of the fee every year, report to Congress, and if it wasn't adequate, Congress would go back and tell the utilities cough up more money.
Q. You've got the only copy of that, and you're sitting across the table, so I'm going to have to get you to help me with this, but look at page 1.4.
A. Okay.
Q. Is there a reference in that document to, at that page about what happens in the event of a repository delay?
A. Yes.
Q. Would you read that for the record, please, sir?
A. It says the effects of delays on the availability of waste disposal capability were evaluated for a five-year delay and a ten-year delay in the repository development schedules.
So they were doing some case analyses to try to bracket the adequacy of the fee.

Page 285

If you delayed, is it still going to be okay?
If you take -- they didn't say if you take it early.
Q. Do you mind if I scoot around here where I can look over your shoulder at it?
A. Not at all.
Q. The paragraph before that refers to DOE acceptance commitments.
Do you know what that refers to? I guess for everybody's benefit, if you would read the sentence that I pointed to?
A. It is assumed that the MRS facility will receive fuel at a rate that satisfies DOE's spent fuel acceptance commitments.
Q. In 1986, what were DOE's spent fuel acceptance commitments?
A. My opinion, it was to start receiving fuel by January 1st, 1998.
Those were its commitments at that point in time, because at that point in time, they had not developed any receipt rate, so -- with any specificity.
Q. Take a look at page 4.7 of the document if you would.

Page 342

Q. Okay. I appreciate that.
A. He's a good one to talk to. He's also responsible for the later years, couple years ago, or last year, in developing the new projections for the amount of spent fuel that will be discharged to feed to TSLCC, that kind of stuff.
Q. Okay.
A. Got a lot of knowledge.
Q. Good. And then finally, I'm going to ask you just one or two more questions on the 1991 ACR acceptance rates. I would feel left out if I didn't get a chance to ask about it, too!
A. Okay.
MR. MILLER: As long as it's not repetitive hopefully.
THE WITNESS: It's going to be interesting if I haven't heard the question, but go ahead.
BY MR. EIDUKAS:
Q. I'll try to be new.
A. That's all right. I was being facetious.
Q. Okay.

Page 343

MR. MILLER: I wasn't.
THE WITNESS: Oh.
MR. EIDUKAS: I knew that.
BY MR. EIDUKAS:
Q. In developing the 400, 600, 900 MTU rate that appeared for the first time in the 1991 ACR, I believe you testified that you developed that rate by taking a look at what the spent fuel needs of the utilities would be, projected to be in the aggregate?
A. That is correct.
Q. And then try to match that up with the 10,000 MTU that was projected to be available from an MRS that you anticipated to start operating in 1998, is that a fair characterization?
A. That's 90 percent correct. It, basically what I tried to do was to see if, what the storage requirements in the aggregate would be and to see if that 10,000 ton would accommodate it, and when I did the numbers, yeah, it will accommodate it.
Now can it accommodate it on an annual basis, too, and how would I divide it on an annual bases as a receive rate, and that's, that

Page 344

sort of fit.
Q. And you divided the 10,000 up, MTU up over a 12-year period?
A. Right.
Q. And could you again -- I think you probably said this in relation to another question or another context, but where did that 12-year period come from that you were dividing that 10,000 up?
A. That assumption was that --
MR. MILLER: Asked and answered.
THE WITNESS: MRS could get started in 1998 and repository in 2010, and subtract one from the other.
BY MR. EIDUKAS:
Q. Okay. And when you were developing that rate, was it your anticipation that, or strike that.
What did you anticipate would happen to the rate after that 12-year period when a repository was expected to be opened?
A. I did not have an anticipation. That was not my job.
Q. Okay. Did anyone expect, did you expect that the 900 rate would continue past the

Page 345

time when a repository would be opened?
MR. MILLER: Asked and answered.
THE WITNESS: I assumed that if you had a facility operating, that you had a repository, starting in 2010, that after you get some kind of a ramp-up, yeah, you're probably going to be up to 3,000 tons.
How quick, I don't know, but that was an assumption, but I didn't -- that had nothing to do with this analysis on the early day acceptance rate.
BY MR. EIDUKAS:
Q. So when you created that acceptance rate in the 1991 ACR, you did not, you did not anticipate past there -- that was based on the 12-year period and you didn't anticipate --
A. Actually was only 10 years. The ACR only goes for ten years.
I just used the 12 year because that was the -- you couldn't get ten, more than 10,000 tons in an MRS under the law prior to that repository operating, so I divided over those 12 years.
Q. Thank you. And so I guess what I was trying to get at and may have been misphrasing

Page 350

A. The concept of oldest fuel first did not have anything to do with developing this rate.
It had that's how you allocate this rate.
Once you have established what your rate is, then you do an allocation based on the age of the fuel.
That did not enter into this.
Q. When you say it didn't enter into it, I guess maybe my question was poorly worded.
One of the, one of the goals or one of the purposes that I thought you said was that the rates you had chosen would allow, would be such that no reactor --
A. Would have to add additional storage in the aggregate.
Q. In the aggregate?
A. Um-hm.
Q. If the acceptance rate, if the acceptance slots were not allocated to those utilities with storage needs, you would have a disconnect there?
A. No. As we said, it was an equity issue. It was if the utilities, we would

Page 351

provide that amount of storage capacity, we, the DOE, and if some utilities had a need and others didn't have a need, they could work that out as an internal equity issue.
They had DCSs. They could exchange them or do whatever.
Q. Was it your expectation when you came up with the 1991 ACR that that is in fact what would happen to prevent any utility from having to build that reactor storage?
A. No, I did not anticipate that would happen honestly, but it was the, about the only thing we could come up with that looked feasible and a facility that could get started at that point in time where it could do something for the utilities, and the utilities had recognized that any, most of these issues, whether it be emergencies, whether it be shutdown reactors, whether it be whatever issue, was really equity.
They could choose to redistribute that capacity once it has been allocated.
Q. Is it fair to say that without a reallocation --
A. You would need more capacity.
Q. You would need more capacity?

Page 352

A. Absolutely. If that's where you were going, that's the answer, because without a reallocation, you would have certain utilities that are running out of storage in a given year, others that are not.
You're just not going to -- some of those utilities that are running out of storage did not have allocations in those years, and some utilities that were, that weren't running out of storage did have allocations.
That's just the way the system works. Some were smarter planners, had bigger pools. Some didn't.
Q. When you said they were smarter planners, weren't the pools designed in a much earlier time?
A. On some reactors; the older reactors, yeah, and they were designed to hold initially what, 180 days of fuel, to cool it long enough to send it off to reprocessing, and that didn't happen.
They had to re-rack, so maybe they had more than that. Maybe they had a year, two years worth of storage.
When the later reactors were being

Page 353

built, they recognized probably fuel is going to be 10, 15, 20 years old before we ship it off, so they built bigger pools.
Q. The reactors that would have slots in the early portion of the queue --
A. Most of those were older reactors that had smaller pools, yes.
Q. Had smaller --
A. But, but this was based on per utility, not per reactor, and some utilities built bigger plants later with pools, and they could move that fuel over just like they did at San Onofre from the old San Onofre I, San Onofre II, III, pool. They moved the stuff there like they did from Dresden I. Moved it over to Dresden II or III or moved it to Morris, Illinois.
They still have Dresden II fuel sitting in Morris, Illinois, 721 assemblies.
Q. One of the goals that I understood you to say was that with these rates, no reactor would have to build additional on-site storage in the aggregate?
A. In the aggregate, that's correct.
Q. Well, if that, if that goal wasn't



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 354

realized or wouldn't be realized without some sort of reallocation of the slots, what purpose does the setting the rate in the aggregate matter?
A. It was a way of DOE providing what they thought was a, a rate that they might be able to accommodate with a small MRS facility, getting it operated, and it just happened to be a rate that would satisfy out-of-pool storage in the aggregate.
No one ever thought that it probably would satisfy all the out-of-pool storage.
I didn't think it would. I didn't think a utility is going to trade away his right to another one, but it was laid out that way.
How the utility was going to use it was up to them.
Q. Did you have discussions with DOE about the prospect that utilities would, in connection with these rates, swap or trade allocation rights?
A. They, the only discussions were that they were allowed to do it if they so choose to do it, but as you look down this list, it shows you reactor.

Page 355

This one is based on utilities, right. It shows you per utility how much they have.
Q. Who at DOE would you have had discussions with about this prospect of utilities exchanging slots?
A. Mr. Brownstein.
Q. Anybody else?
A. Probably a hundred people; I don't remember.
I mean he was my primary person that I dealt with on these issues and on this program.
Anybody else around asking questions or something, you know --
Q. Does anybody come to mind?
A. No, because it was never anything specific with anybody.
I'm sure I discussed it with people that worked for him.
I may have discussed it with his boss, whomever that was at the time. He has had a lot of them, but the purpose was the DOE knew it couldn't provide a big facility right away.
We were trying to figure out can you provide something small, and if you can, what should we shoot for?

Page 356

And it had to be damn small relative to what anybody wanted. They figured they could get something going at a minimum like this. It may have been bigger. That would be nice, but at a minimum, they could do this, but they also felt that by the current law, they could only take 10,000 tons over the next 12 years.
How are we going to divide that 10,000 up and allocate it? Here is a way of allocating it.
It just accidentally so happens that it would meet the out-of-pool storage requirements in the aggregate.
That was not the intent of it. It was to allocate all that capacity, that 10,000 tons over 12 years.
I could have put it all in one year, but that wouldn't have made any sense.
It just so happens it, when you look at it, kind of fit.
Now some of them, as you can see, go over a thousand. It's not 900. There is a thousand, 22. There is a thousand, 59. Nominal 900 will take care of it, but that wasn't the intent of the allocation.

Page 357

That was a result just so happened to fall out.
Q. Did Mr. Brownstein share your view or did he express the same view about the prospect of exchanges and the likelihood that utilities would engage in them in light of these rates?
A. I don't know if he shared my view. My view was they probably wouldn't exchange.
Whether he had a view they would exchange, I can't remember.
That was not something we were concerned about. That was a utility problem.
We were having to, we could only have, based on the current rule, we could only have a facility that would take 10,000 tons over 12 years.
This was a way of dividing it up and allocating it.
It just so happens that it fell within what the storage requirements were in the aggregate.
That was secondary. That was not the purpose.
Q. It wasn't the purpose of these --
A. It wasn't the purpose of these numbers