earlier, say the upper bound of the 1990 ACR that went something like 1200 ramping up to 3,000?
A. If you need ten or 12 for 900, you've have got 3,000, you need about three times that many.
I think that the maximum number of casks that they had calculated at one time that they were going to need was somewhere in the neighborhood of 50.
I don't know. You're talking to the wrong guy.
You need to talk to Bill Teer. He's the transportation guy. He can tell you exactly how many they were planning.
Q. Would the, would procuring 50 casks take significantly longer for DOE than --
A. You're just limited then by manufacturing capabilities, so it's a matter can this country turn them out or do you have to go to Japan or Spain or somewhere and get them to build some for you also, so I don't know. I don't know what their plans were on how they were going to phase in and procure casks.
Q. Bill Teer would be the guy?



A. Teer, T-e-e-r.
Q. And he's, who at DOE would -- is he at DOE?
A. JAI.
Q. He's JAI?
A. Um-hm. He ran the transportation department for many years there.
Q. And who at DOE do you think would have been the transportation person?
Is that Lemeshewsky?
A. Lemeshewsky was the transportation guy for some time.
I don't know who took his place. I don't know.
(There was a pause in the proceedings.)
THE WITNESS: Mr. Teer did a lot of research on cask turnaround times, how quick you could move from a, load it at the utility, move it across country, unload it, move it back to another one. Keep the things moving.
And I think they came up with for 900 tons, they will need 10 or 12 casks.
(There was a pause in the proceedings.)



MR. MACDONALD: I think that's it for my questions.
MR. MILLER: I just have a couple.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. MILLER:
Q. Mr. Cole, you have never worked for DOE, have you?
A. No, other than just as a contractor.
Q. Right, but you have never been a DOE employee?
A. I have never been a DOE employee, no.
Q. So other than having voiced your opinion on the things that the people at DOE with whom you worked told you, you can't speak for DOE, can you?
A. No, I cannot.
Q. No further questions.
A. DOE always made it pretty clear to me. I mean it was just a understood rule as a contractor you don't speak for the department.
MR. MACDONALD: I think we would like to leave the deposition open pending some of the privilege and document issues.
MS. HEWITT: There is a lot, whole lot



of privilege documents that we're contesting.
MR. MILLER: You know, in that case, I don't know a thing about those issues, so I can't speak to that.
(Whereupon, at 5:39 p.m., the taking of the instant deposition ceased.)

--------------------------
BILLY M. COLE

SUBSCRIBED AND SWORN to before me this---------
day of-----------------------------, 20------.

--------------------------
NOTARY PUBLIC

My commission expires:

# Daniel Dreyfus

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :

COMPANY, :

Plaintiff, :

v. : No. 98-126C

THE UNITED STATES, : (Senior Judge Merow)

Defendant. :

\- - - - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, May 15, 2002

Deposition of DANIEL A. DREYFUS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

kept it pretty well sorted out as to who was supposed to do what.
Q. And the acting director, you're referring to Lake Barrett?
A. Lake Barrett was acting when I arrived and until I was confirmed.
Q. And then Mr. Barrett became your deputy director?
A. Yes, he did.
Q. When you became director of RW, how did you view your mission at that time?
A. I'm not sure what you mean, how I did view the mission.
Q. What were your goals as director?
A. My goals as director, my view of the program at that time was that it was intended to provide the necessary information for a major policy decision to be made about the repository. And my goal was to focus the program, the organization to get to that point in an efficient and effective way.
Q. Did you have any other major goals of the program at that time?
A. Well, the program was as it had been, a multifaceted program with a number of concurrent activities. And each of the activities had some end



point, some near-term and long-term objectives. Yes, there were a subset of goals. But principally it was the ability to permit a decision on a repository to be made by those who had to make it under the provisions of the act.
Q. And the decision you're referring to or the work you're referring to is what's otherwise been called a characterization of Yucca Mountain, is that a fair description of it?
A. That was the central activity at that time.
Q. What other activities were important to you as director of RW when you came into that position?
A. Well, at that particular time, as I recall we had a research program, we had a program that was still doing conceptual designs of monitored storage sites. We had a responsibility to support the nuclear waste negotiator's office in the event that they brought -- found and brought forward a potential site for a storage or repository facility. We had responsibilities to support them.
And then there was an international coordination program, a variety of other -- a multipurpose canister development program, a number



of programs.
Q. Let me ask briefly about the organization of RW and its relationship to the department. Who did you report to during your time as director of RW?
A. I reported to Secretary O'Leary.
Q. Was there an undersecretary of DOE during your tenure as director of RW?
A. There was, yes.
Q. And what was the relationship between your position as director of RW and the position of the undersecretary?
A. The act says that the director reports to the Secretary. And that was the way we did it. There were coordinative meetings, keeping people advised, several including the undersecretary that had other responsibilities. But direct report was to the Secretary.
Q. Who was undersecretary when you were director of RW?
A. We had two. But my problem is trying to remember who held which of the several positions over there. White I believe was the original undersecretary. But I'm not -- there's a deputy and an undersecretary as I recall.
Q. Most departments there's a Secretary, the



deputy Secretary, and then sometimes there's an undersecretary.
A. That's what my problem is, I can't recall who held those positions. They changed a couple of times. We had Grumbly and White.
Q. An individual named Curtis?
A. Curtis. And I really don't remember how the triumvirate shook out at that particular time. As I say I reported to Secretary O'Leary and the other positions were more of a collaboration and coordination.
Q. So none of the individuals who may or may not have been in the hierarchy between you and Secretary O'Leary took a supervisory role over the Office of Civilian Radioactive Waste management?
A. In my judgment, no. Now, obviously what the Secretary -- how the Secretary took advice from those people I'm not sure of. I don't recall a feeling of a supervisory role intervening between me and the Secretary on any issues. There were things like budget issues, of course, where the deputy and undersecretary were ultimate arbiters of numbers and that sort of thing.
Q. And how about in Secretary O'Leary's office, when you were director of RW, was there a



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 54

Do you recognize this document?
A. No. What is it? I mean I understand what the title says and I see annual report to Congress below, but I don't know where it came from.
Q. I'll represent to you that this came from a compilation that was part of RW's annual report to Congress. And the particular part, what I've handed to you, was titled Testimony of Daniel A. Dreyfus before the Senate Committee of Energy and Natural Resources, September 22, 1993. And it appears to be prepared testimony that you gave to the Senate committee as it was considering your nomination to become director of RW. Does that refresh your recollection as to what's in this document?
A. Okay. I have read enough of it now. It is I think my prepared statement from my confirmation hearing which I gather was included as an appendix to the annual report to Congress that was sent up at some later date. So yes, I guess I know what it is.
Q. I want to point your attention -- I mean feel free to refer to any part of the two pages that you would like. I'm going to point your attention to a particular section on the second page of this two-page exhibit, the back page of it, Dreyfus 2.
Do you see there are columns, and I'm

Page 55

looking at the bottom of the first column, where it says, to improve the existing program, at least two considerations should be addressed quickly. The expectation has been that beginning in 1998 the spent fuel at nuclear power plant sites would begin to be accepted by the federal government and removed to a federally operated facility. Do you recall that testimony?
A. Oh, yes.
Q. I want to focus back on the words the expectation has been that beginning in 1998 the federal government would start removing the spent fuel. What was your understanding of what that expectation was?
A. At the time that I did this, my understanding was that the act provided for the Secretary to take -- begin taking -- accepting fuel in '98. That was a provision of the act. And I understood that very well.
The circumstances on this date which was 1993 was that -- and that was the circumstances, that there were a number of important investment decisions pending in utilities and in utility commissions having to do with on-site storage investments that needed to be made.

Page 56

And the outlook for the federal government to take acceptance was becoming a rather significant question in those proceedings. That was what this alludes to. I think I did earlier this morning mention that.
Q. Now, the expectation that the federal government would start removing spent fuel from utilities in 1998, regarding that expectation, did you have any understanding of how fast the government was expected to start taking spent fuel from utilities in 1998?
MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Dreyfus is not a 30(b)(6) witness.
THE WITNESS: Did I have any understanding of it?
BY MR. SHAPIRO:
Q. Yes.
A. By the time that I prepared this statement, I was aware of the technical aspects of moving waste and accepting of waste and had some sense of the pace of doing that, yes. I don't recall what the contemporary assumptions in the documents were regarding acceptance.
I know that they changed over time and were -- there were schedules and various assumptions

Page 57

for fee adequacy determinations and that sort of thing. I can't recall what that was. But at the time I'm sure I had a sense of pace, yes.
Q. What was your understanding of what -- let me ask this differently.
Was it your understanding that the pace of spent fuel acceptance was a matter of technical ability of RW to accept the waste?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: If I could make a statement about this document before us, the point of this remark here is not the pace of acceptance but the probable inability to initiate it -- of initiating waste acceptance on the date in the act.
BY MR. SHAPIRO:
Q. You're referring to some meaningful amount of acceptance, though, in 1998 that utilities were concerned about?
MR. SHULTIS: Objection, vague, calls for a legal conclusion.
THE WITNESS: My concern -- this is, of course, my statement to the committee as the nominee. So my view of the situation. What I was saying here essentially is that a lot of people were out there

Page 58

trying to figure out what they ought to do about on-site storage.

And there was no expression as to what we were going to do. The '98 expectation hung there without further elucidation, at least that was my feeling at the time, and that we needed clarification on that. And I was not focused on how much would be taken in the first year. That question was what was the first year.

So, while I can speak to statements of pace, it has nothing to do with this statement really. This statement was the more difficult matter that nobody had said we that we would not start in '98. And decisions were having to be made predicated on whether we would or not.

So I simply want to draw the distinction that, if you want to talk about the acceptance rate, fine. But that was not the point of this remark.

BY MR. SHAPIRO:

Q. Let me see if I can try to focus in on where I might see the connection. The focus of the remark in your testimony, Dreyfus 2, was that utilities were planning on-site dry storage or other storage of spent fuel in lieu of DOE coming to pick the fuel up, correct?

Page 59

A. That's correct.

Q. And, to some extent then, how fast DOE might come to pick up the spent fuel might influence how much storage utilities might have to provide or whether they might have to provide storage at all, true?

A. Yes, that's true. But again, if you don't start at all, then the rate is sort of moot. Until you start the rate is not important. At this point there was no -- there had been no expression of when might we start as opposed to '98. That was the essence of what I thought was an important issue.

And I will not refute the fact that once you start how fast you do it is important, that's true, yes. That wasn't what I was aiming at here. We weren't at that level of abstraction, we were back from it aways.

Q. Let me just confirm then from Dreyfus 2, you understood by September of 1993 that utilities were already spending money in anticipation that DOE would not pick up -- start picking up spent fuel in 1998?

MR. SHULTIS: Objection, the document speaks for itself.

THE WITNESS: I don't know that I say for

Page 60

the utilities that they were spending money in the expectation we would not pick it up. They were spending money on additional storage which most probably they would have had to spend in any event. But I don't know that.

I mean an individual reactor-by-reactor basis, I don't know whether the expenditures were -- at that particular time were because of their expectation in '98 they would not be made. What I was aware of was that there was a good deal of investment going on.

Those making it needed to have some sense of what future they were playing into. And the '98 date was no longer an operational assumption for planning purposes because at that point we were already beyond the ability to do anything by '98 in my judgment.

So that point I thought was important. And I was very conscious of the fact that big bucks were being spent based on planning outlooks without a government statement of what the planning outlook ought to be. That's the essence of those paragraphs.

BY MR. SHAPIRO:

Q. And, in September of 1993, what was your understanding as to what the planning horizon was as

Page 61

to when DOE might start removing spent fuel from utility sites?

A. My understanding is probably a matter of record because I testified ad nauseam at the time. And that was a very common question, always caveated by if, in fact, the Yucca Mountain characterization proves -- leads to a recommendation.

I cannot recall what might have been the best bet on this date. I believe that planning documents that came out under my auspices suggested a beginning of fuel acceptance in about 2010 or thereabouts, but I haven't looked at those documents recently and I don't remember exactly.

And I don't remember whether that would have been the date in '93. It's the one that sticks in my mind predicated I think on licensing about now of the repository.

Q. And, given that relatively distant time horizon to start accepting spent fuel, issues such as the rate of acceptance once you start were of lesser significance to you as director then, when you were director of RW?

A. They were secondary and not -- I don't know about lesser. It depends on what particular issue is before you at the time. As a technical

Page 62

matter, in planning a transportation program, they're pretty significant.
So, if that was the day you were talking about transportation, preparation for transportation campaign, then pace is not insignificant and certainly not secondary. They have an important implication on long-term expenditure rates.
So I wouldn't relegate them to I didn't think about it because I was focused on the date. But they were a longer horizon question and of importance I think to everyone secondary to the date. It's zero until you start.
Q. And, focusing on one of the examples you gave, for instance, the budget projection document, you wanted to use the most accurate projection of rate of acceptance in such a document as you could?
A. You're not talking about a budget document for annualized appropriation, you're talking about the long-term?
Q. Long-term budget of the program.
A. And specifically what? The budget profiles we provided for appropriation didn't go that far or get that detailed. But we did look at rates in the context of planning documents for transportation, acceptance at the repository,

Page 63

technical questions of placement and acceptance above ground facilities at the repository, a variety of other circumstances where we looked at it, yeah.
When we did that, we anticipated trying to be realistic, the best case scenario, the best assumption as to what the pace would be.
Q. When you say best case scenario, best assumption, do you mean the fastest rate or the most accurate projection of what the rate would be?
A. Well, for a financial determination, what you would like is an internally consistent and reasonable view of the future. That would be what -- in a financial outlook, total system life cycle cost we used to call it I think, what will it cost all the way out to closure of the repository.
One seeks a reasonable and internally consistent scenario. With regard to the technical business of the transportation campaign, of course, that gets you into availability of equipment and rational use of the railroads and utilities' individual capabilities to facilitate the acceptance, all of that.
(Dreyfus Exhibit No. 3 was marked for identification.)
BY MR. SHAPIRO:

Page 64

Q. Dr. Dreyfus, we have handed you what we've marked as Dreyfus 3. Just looking at the cover, do you recognize this document?
A. I know what this is, yeah.
Q. What is this document?
A. Well, this is a total system life cycle cost analysis. And this is the 1995 version.
Q. Let me represent to you also that this is an excerpt of the document. You probably remember the documents can get to be quite thick in their entirety. This is basically the introduction and summary of the document. Dreyfus 3 then is one of these total system life cycle cost studies that you just referred to?
A. Uh-huh.
Q. And what was the purpose of these studies?
A. Well, these studies had several purposes actually. They were part of a planning effort to project the budgetary requirements for the long term. They were one input into the fee sufficiency determination required by the act and a management tool to fundamentally keep track of costs past, current, and future on what the program was doing. And, of course, a basis for responding to the most frequently asked questions in reviews and

Page 65

Congressional oversight and budgetary oversight and everybody else's oversight.
Q. I want to refer you, Dr. Dreyfus, to page 8 of Dreyfus 3, this excerpt of the September 1995 total system life cycle cost study, specifically to the table marked table 1-2. Do you see that table?
A. Uh-huh.
Q. What is this table supposed to represent?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: The question that I'm having myself is that the title here says receipt and emplacement rate. And it doesn't say acceptance rate, it says receipt and emplacement rate. And I can no longer recall what that -- what the -- what definitional considerations there might be in that.
Let's see, this was '95. It appears to -- this appears to state the rate of receipt of fuel at the repository. So it would be the transportation rate. It is not clear in this context and the material in here. I'm used to seeing it in a different format which may be a later format.
BY MR. SHAPIRO:
Q. And the receipt rates that are noted in this table 1-2 in Dreyfus 3, those were intended to

Page 114

Q. And, if a utility was going to use a canister, it had to be licensed by the NRC?
A. Yes.
Q. Was there ever any consideration of which you were aware when you were director of RW that DOE was not going to accept spent fuel in such NRC licensed canisters from utilities?
MR. SHULTIS: Objection, it calls for a legal conclusion.
THE WITNESS: You want to tell me that one again. I didn't follow it.
BY MR. SHAPIRO:
Q. Was there ever any consideration of which you were aware when you were director of RW that DOE would not accept the spent fuel inside of a dry storage canister that utilities had procured on their own that were licensed by the NRC?
MR. SHULTIS: Same objection.
THE WITNESS: There are a multiplicity of issues about the acceptance of spent fuel which are related to the whole regulatory safety oversight having to do with the characterization of fuel that's in the canister, the pedigree of the fuel, and a determination as to what it is which would affect putting it into a repository.

Page 115

And at some point those certifications have to be made. So, depending on whether you are going to be repackaging along the way -- in other words, what I'm saying is the department would have an interest in what's in a dry storage canister when it comes to pick it up.
The department might have an interest in the technology of the canister if it was intended to travel. But there are regulatory considerations as to what the character of the fuel is.
BY MR. SHAPIRO:
Q. I'm asking I guess not clearly enough something more specific, not sort of the theoretical interest that the department might have had. But, given the fact the department knew that utilities were putting spent fuel in these dry storage canisters, did the department ever consider that, heck, we're not going to be accepting that stuff in canisters, we're not supposed to take canisters, was that ever a consideration?
A. It was always a consideration as to what the condition and character of the fuel would be when you came to acceptance, yes, definitely. And there was conversations continually about that. But not -- but in the context of how do you accomplish what you

Page 116

have to accomplish, both parties being regulated by the commission.
There had to be coordination on what you did with the fuel, if anybody was going to come and move it away, because both parties were going to be regulated by the commission. And there are very critical issues as to knowing precisely what fuel rods and with what characteristics and what age are in particular canisters.
So is that an issue? You bet. There was a lot of concern about, as the utilities went forward and made decisions, what they were doing and what the implications would be for fuel acceptance.
Q. Was the concern then that DOE have an appropriate opportunity to inspect the fuel before it got sealed into the canister?
A. It's a lot more complicated than that.
Q. Was there a concern about the canister itself?
A. If the canister traveled, there would be a concern about that, the transportation vehicle. If it was repackaged -- I mean there are so many different possible scenarios there. And, of course, the multiplication of technologies makes things more difficult because you have to handle them all when

Page 117

the time comes.
So it was a coordination question, a substantial coordination question that everybody knew what everybody was doing and didn't create problems for the future, cost or regulatory.
Q. So you were working with utilities to make sure that it didn't become a problem?
A. Yeah, that was something of a consequence in the coordination with utilities, yes, as they selected technologies, certainly.
Q. So the effort at DOE when you were director was to ensure that there wouldn't ultimately be a problem with DOE taking the spent fuel that utilities had put into the canisters?
A. Yes, that was the objective, was that there would not be a problem. And there were a lot of complicated technical issues as choices were being made.
Q. When you say technical issues, are these engineering type technical issues or were there ever any I think previously you referred to as legal technical issues? When you say technical issues in this context, what are you referring to?
A. In this context there were two kinds of things. One would be the mechanical question of how

Page 118

are we going to deal with the fuel that's in that can and get it into a transportation mode. That's one.

The other one is this pedigree consideration of the characterization of the fuel and the stream of custody that would convince the commission and at a time regulators and others that what was going into the repository was what we said it was. And that is a nontrivial problem.

And, therefore, you can't lose the trace somewhere at the reactor or anywhere else in moving fuel from one container to another. So both of those things are important in managing the right fuel coming out of the pool and putting it into containers.

At a minimum you can cause a lot of additional costs in going back and trying to undo something that didn't get done right. So that is -- it was an important coordination issue, a fair amount of attention given to it in that era.

Q. Do you recall, did you ever get to a problem with respect to this coordination that caused you to think that, gee, we're not going to be able to get it done?

A. Not going to be able to what?

Q. That we're not going to be able to accept

Page 119

the fuel ultimately because we can't get it coordinated?

A. I have no recollection that I ever was aware of an impasse in that regard; no. I was aware of the complexity of the coordination. But I don't remember it as a showstopper of any kind.

(Dreyfus Exhibit No. 10 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 10 which says on its cover Fiscal Year 1994 Annual Report to Congress, a Report by the Office of Civilian Radioactive Waste Management. It's dated May of 1995. It's kind of a long document. We're not entirely changing subjects. I'm going to focus on page 34 of the document. And that section starts on page 33 dealing with addressing waste acceptance issues.

A. These are excerpts, they're not continuous I guess. Yes, some of them.

Q. Right.

A. Yes. Where are we?

Q. Page 34. Again I want to focus in on whether or not the Department of Energy was, in fact, encouraging utilities to use dry storage. And the

Page 120

particular phrase that got my interest on that is in the first column on page 34, the third paragraph down, the one that says one storage option is to construct dry storage facilities at reactor sites. The first of these began to operate in 1986 and additional facilities have been put into operation since.

It says dry storage offers the advantage of being passive while pool storage requires more active maintenance. Then it says that the NRC has stated a preference for dry storage. And then the next paragraph says OCRWM has helped utilities develop dry storage technologies.

Does that passage refresh your recollection at all as to whether or not DOE was encouraging utilities to use dry storage to manage their spent fuel?

A. Not really. It says Nuclear Regulatory Commission has stated its preference for dry storage. I presume they were basing that on their view of what was most -- the safest approach at the reactor site which they regulate.

Q. The next paragraph says OCRWM has helped utilities to develop dry storage technologies through cooperative demonstration projects?

Page 121

A. Yes, we had the R&D program. There was an R&D program on dry storage beyond the multipurpose canister program. There also was a research program on monitoring the very early dry storage canisters to see how they behaved over time. So we had a couple of activities in aid of developing a dry storage technology.

Q. But you didn't view that as DOE encouraging the use of dry storage?

A. No, I viewed your question as did we go out and try to talk people into doing more rather than less dry storage. And I don't remember that we did. And this only says that the commission presumably felt that it was advantageous to have a few out of the pool and into dry storage. And quite frankly I don't remember that. I mean I see it now and it sounds like I guess I knew it.

Q. Was RW indifferent as to whether or not the fuel was in pools or in dry storage?

A. I don't recall ever being involved in analysis of that specific question. There's a limit to how much wet storage you can put in an average reactor site after which it will be dry storage.

So, from the point of view of providing an enhanced ability to do dry storage, we would be

Page 122

obviously doing that whether we thought it was good, bad, or indifferent. It was going to happen. It's the only option when the pool can't be expanded which -- so you don't need a normative view of which is best to know that you need dry storage and you need technological advancement in the form of dry storage and coordination in how it gets down so that, when it comes time to take it away, you can do it.

Those things are indicated regardless of any preference for one or the other. And I just don't -- I mean I don't remember anything happening in that regard. You know, it doesn't come back to me that I spent a lot of time on it, the decision as to whether I liked dry storage better than wet storage.

Q. Then we won't spend a lot of time on it. Changing subjects, something that I think was mentioned very briefly earlier which is consideration of whether or not priority should be given to shutdown reactors and the acceptance of spent fuel. Do you remember considering that issue?

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SHAPIRO:

Q. I'm sorry, I didn't hear your answer.

A. I do remember the issue.

Page 123

Q. How did the issue come up when you were director of RW?

MR. SHULTIS: Same objection.

THE WITNESS: How did it come up? Well, utilities that were, in fact, managing shutdown reactors brought forward the contention that it would be useful and desirable to take that fuel first. So the sites could be denuclearized and maybe decommissioned.

BY MR. SHAPIRO:

Q. And what happened with those proposals?

A. My recollection is that there were discussions in the community of interest about that and, of course, differences of opinion. And I cannot recall whether any -- whether there was any real action to develop a different set of -- a different approach to the sequence.

A goal was discussed. And I know it was discussed among the utilities. I don't remember whether anything took place that could be considered actually a decision or an action.

Q. Do you remember any particular utilities that were arguing in favor of giving priority to shutdown plants for the acceptance of spent fuel?

A. I think everybody that had a shutdown

Page 124

reactor was in favor of going to the head of the line and for presumably the same reason. It was one way of being down with the reactor, whereas an operating reactor was going to have fuel on-site until it shut down regardless.

Q. Well, my client is Yankee Atomic Electric Company. Do you recall Yankee Atomic Electric Company asking you for priority?

A. I remember that they were one of the proponents of doing that, yes.

Q. Do you recall ever discussing this issue with Yankee Atomic's president, Andrew Kadak?

A. Yes, I think that I did.

Q. What do you recall about those discussions?

A. Oh, other than the general gist of the thing, I don't recall much.

Q. Can we go off the record for a minute.

(Recess.)

(Dreyfus Exhibit No. 11 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, we're up to Exhibit 11 which you've been handed which is a letter from Andrew Kadak who we've just been talking about to yourself.

Page 125

Why don't you take a look at it and tell me if you recall this correspondence.

A. I recall getting letters on this general topic from Mr. Kadak. I don't recall this particular letter.

Q. Would you have dealt with letters like this yourself or is this the kind of thing that you likely would have delegated down for someone else at RW to deal with?

A. Well, I would have certainly delegated it to staffing, a letter like this. I wouldn't have responded without having staff input. So I would have routed it to whatever portion of the organization dealt with the issue and got staff input, possibly a draft response.

Q. But ultimately you would have worked on the response at some level yourself?

A. I certainly would have read it and, if need be, edited it.

Q. In this letter Dr. Kadak makes several arguments as to why DOE should grant priority to at least his shutdown plant. And one of his arguments is that, in the absence of such priority, that DOE's delay in picking up spent fuel is causing an unfair burden on a small single-asset plant such as Yankee

Page 178

discussion of that topic. It's not coming back to me.

BY MR. SHAPIRO:

Q. Are you aware of any reason why DOE would not take spent nuclear fuel on the same schedule as -- not take failed fuel on the same schedule as other spent nuclear fuel?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: On a technical basis, I am aware that the characterization of fuel and the ability to describe it and to deal with it in terms of a repository's analyses, all of the complex notions of behavior of fuel in a repository, that this is going to have special considerations, probably special packaging. That seems evident.

So I can see that there could be some sort of issue there, but I do not recall at this moment any discussion of it or any treatment of it at the time I was director, I just don't remember anything specific about it.

MR. SHAPIRO: Let's move to another subject.

(Dreyfus Exhibit No. 17 was marked for identification.)

Page 179

BY MR. SHAPIRO:

Q. Dr. Dreyfus, we have had marked as Dreyfus Exhibit 17 a memorandum dated March 27, 1995, from Samuel Rousso to the director of RW which I assume was you at that time regarding approval of what's called the 1994 acceptance priority ranking and annual capacity report. And behind it is the draft report. Do you have any recollection of this 1994 acceptance priority ranking and annual capacity report that was ultimately published in 1995?

A. I know what it is, yes.

Q. What is the acceptance priority ranking and annual capacity report?

A. I can't give you a definition of what it is that would be technically valid. I just don't remember that much about the requirements of it. So I don't think I should characterize it.

Q. What was your understanding of the purpose of the report, Dreyfus Exhibit 17?

MR. SHULTIS: Objection, the document speaks for itself.

THE WITNESS: Well, the objective of it is to update periodically the planning assumptions regarding the taking of the fuel under the contracts. Beyond that I don't remember what the objectives --

Page 180

the criteria of what the report would contain. I've seen them.

BY MR. SHAPIRO:

Q. The draft report in Dreyfus Exhibit 17 has some handwritten marginalia on it. Is that your writing?

A. No. You mean the markings on the draft report?

Q. Yes.

A. They're not mine.

Q. Do you recognize whose writing that is?

A. No.

Q. I turn your attention to page 5 of the draft, table 1 there. It has projected nominal waste acceptance rates for spent nuclear fuel?

A. Yes.

Q. Do you recall those acceptance rates?

A. No, not specifically. I see a 400 year one as I said earlier was my recollection of the first year.

Q. Going back to Exhibit 3, the TSLCC analysis that we looked at a couple times earlier that had a different table of acceptance rates, looking at Dreyfus 17, this other table, does that help refresh your recollection as to whether there

Page 181

was two different projected acceptance rates?

A. No, I don't know.

MR. SHULTIS: Objection, the documents speak for themselves.

THE WITNESS: I don't know. I'm too away from these two documents to be able to recall what would be the basis of two different schedules. I see that this one now starts with a year one instead of a specific calendar year which recognizes presumably that the specific calendar year has dropped off the radar screen. But I don't know why these rates would be different from the rates in the other report.

BY MR. SHAPIRO:

Q. Which rates were you relying upon in your work as director of RW as to how the program was going to work?

MR. SHULTIS: Objection, assumes facts not in evidence and vague.

THE WITNESS: The numbers that I recall as being more in line with my customary discussions with people, and I haven't looked at my testimony before the Congress, are the numbers in the planning reports that -- they start about like these but go up to 3,000 in an earlier time frame. Which document was it that had the other table in it?

Page 182

BY MR. SHAPIRO:
Q. Exhibit 3, the TSLCC.
A. The TSLCC. That is closer to the schedule that I recall working with the most frequently. And that's a planning document. This may be predicated on some entirely different basis. And I may have known it when I was the director, but I do not know it now.
And, without a staff meeting, I wouldn't be able to reconstruct it out of whole cloth. I see 400, 600, 900. And that other table had in it what? It has 300, 600. I remember, when I looked at it, I thought I remembered 400 for the first number. But a table that goes 400, 600, and then ramps up eventually to a steady state of 3,000 is pretty much what I recall as to the schedule I most frequently was using.
Q. Let me represent to you, without having to go through all the details of this draft annual capacity report and a couple earlier ones, that part of the explanation for the justification of these acceptance rates in the first ten years that totaled 8,200 MTU was that they were limited by the statutory limit on how much spent fuel a monitored retrievable storage system could accept at least prior to

Page 183

licensing of a repository. Do you recall that issue, what the cap was on the size of a monitored retrievable storage system?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't -- I recall there is something there, but I don't recall the specifics of it. There was no monitored retrievable storage system in my planning horizon when I was there. And the other table, of course, presumes going -- the table that's in the planning documents assumes going to a repository that is available.
So that may well be the explanation between the two tables since this one may not make that assumption. But I don't remember. If this is predicated on the assumption of an interim stop and a monitored retrievable storage facility, then maybe that's the recollection. But that's the reason. But I don't know.
BY MR. SHAPIRO:
Q. Would it have made sense to have based a projection of acceptance of spent nuclear fuel on the existence of a monitored retrievable storage system in 1995?
MR. SHULTIS: Objection, calls for a legal

Page 184

conclusion and asks for speculation.
THE WITNESS: I can't put myself back into the context of what was going on when I signed this report. So I don't know whether there was a reason why this one should have been predicated on one thing.
And I don't even know whether these two are contemporaneous without constructing some kind of a diagram of when did they write them. So I really can't respond to why that difference exists, if it does exist, in a contemporaneous situation.
BY MR. SHAPIRO:
Q. But your recollection is that, during your tenure as director of RW, monitored retrievable storage was not an option that was under active consideration?
A. Well, no, one can't say that. It was always under active consideration one way or the other. In the early days, there was a negotiator who was actively seeking a site which, had he found one, might have been in the scenario.
And then, about the time that the negotiator went out of business, Congress started to entertain bills to put a monitored storage facility somewhere in Nevada. All these things were somewhere

Page 185

in the mix.
I can only tell you that, in my benchmark scenario that I was referring to and discussing things with -- on a day-to-day basis, the buildup was more like the one that you see there than this one. And it was not predicated on a stopping off at some other facility because there wasn't at that time an authorized other facility in the planning horizon.
One wouldn't preclude it when there was a policy in place that said there might be one. And there was when the negotiator was looking for one. But I wouldn't -- I didn't use it as a basis for my own view of the future.
Q. When you were at DOE, do you ever recall consideration that the lower acceptance rates shown in the table in Dreyfus Exhibit 17 should govern DOE's obligations under its contracts with utilities as opposed to the higher acceptance rates that are reflected in Exhibit 3 in the TSLCC document?
MR. SHULTIS: Objection, calls for a legal conclusion and assumes facts not in evidence.
THE WITNESS: I don't have a recollection of a contingent on what the limitations might be on a particular rate in conjunction -- in that context, no. I looked at these rates primarily as a part of

Page 186

the planning for a transportation effort and a facility at the repository capable of dealing with it.

And I was not -- I don't remember doing any thought process that involved the limitation on acceptance in a context of the contract, it was more in the context of what we were able and trying to accomplish with the program.

BY MR. SHAPIRO:

Q. Did you ever differentiate between what you were trying to accomplish in the program as opposed to what you felt you might be obligated to do under the standard contracts?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: Yeah, the use of the term obligate does involve a legal conclusion.

BY MR. SHAPIRO:

Q. I'm not asking for a legal conclusion. I'm asking, when you were director of RW, did you ever feel there was a distinction between what you were trying to accomplish in the program versus what you felt RW was obligated to do under the standard contracts?

MR. SHULTIS: Same objection.

Page 187

THE WITNESS: Again I can't -- what we were trying to do in the program was as aggressive as the powers and limitations on us would let it be. Therefore, if there was an obligation to do more, you couldn't anyway. So I don't think there's a distinction.

But I don't know what you mean by the obligation word. As a legal thing, I'm not responding to whether there is a legality there. But, from the point of view of what were we trying to do, we were trying to get to a decision on a repository at the earliest time, put in place those other considerations that were necessary so that, if the repository were approved, you could move into waste acceptance.

And we did work on approaches to establishing a transportation capability. A lot of that, much of it was formative at the time, but it was different than it had been. And it was all aimed at doing it as quickly and as aggressively as the abilities would permit, the budgetary and logistical abilities would permit.

BY MR. SHAPIRO:

Q. Did you ever get a sense that you were trying to do things in the program that went beyond

Page 188

what DOE was obligated to do under its contracts?

MR. SHULTIS: Same objection.

THE WITNESS: Again there's paperwork in here that essentially says DOE determined while I was there it had no obligation or words to that effect. But I don't -- leaving aside the legal question of what was obligated, we were in the position when I went there of discovering, but from my point of view of going into the program and determining that we were not able to do the primary thing of starting to take fuel in '98.

Therefore, the mind-set was what is the earliest that we can do it and in every sense to do it as rapidly as the practical considerations would let us. The practical considerations are constrained by the ability to move the material, handle it at both ends, at the reactor end and at the emplacement end, and deal it on the ground at Yucca Mountain.

And I think the history of the evolution of the plan at Yucca Mountain, if one were to go through it, would reveal more and more of a strategy of taking it to Yucca Mountain more rapidly than it would be emplaced so as to relieve the emplacement constraint.

The railroad constraint, the ability to

Page 189

manage shipments is difficult to deal with. But again the rates that are in those planning documents are pretty aggressive, certainly as compared with these.

So I think, no, I mean I think that the mind-set of the program was to do it as quickly as they could do it assuming that Yucca Mountain was approved. And everything else that could have been done in this time frame hinged on Yucca Mountain.

BY MR. SHAPIRO:

Q. Let me go back to one of the things that you said you noted from some of the earlier documents that we discussed, that the department made a final determination it did not have an obligation to pick up spent fuel in the absence of a repository or another facility constructed under the NWPA. Do you recall a decision by the United States Court of Appeals for the District of Columbia circuit addressing that final interpretation?

A. I'm not familiar with those -- I think they postdated my tenure. I was otherwise occupied with entirely different issues by that time. I didn't follow the court cases. I'm aware of them, I read what was in the paper, I heard about it from -- on social occasions. But I didn't follow them.

# Susan Klein

# Susan Klein

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274

Page 2

THE UNITED STATES, :
Defendant. :
--------------------------------------------X

Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539

Page 3

April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

# Susan Klein

Page 61

you can answer to your personal knowledge.
BY MR. HIRSCH:
Q. And what was the acceptance rate in the 1995 ACR report from the DOE?
MS. POWELL: Same objection. You can answer.
THE WITNESS: Okay. 400 the first year, 600 the second year, 900 the third year, and then steady state 900, and that was just through the first 10 years of operation.
BY MR. HIRSCH:
Q. So when the utilities started submitting DCS forms, they were relying on whether they had an allocation in what was then I guess the 1991 ACR; is that correct?
MS. POWELL: Objection, beyond the scope. You can answer.
THE WITNESS: Yes, I think. Yeah.
BY MR. HIRSCH:
Q. And I take it from your -- strike that?
Referring to the 1995 ACR rates that you just recited, I take it from your earlier testimony that the

Page 62

D OE is not planning on using those rates in terms of when it starts accepting spent nuclear fuel?
A. No. Well, once there's an operational repository, we are planning to use the larger rates that were -- that I have mentioned. I don't know if we'll be accepting it outside of a repository. That's yet to be. It depends upon your definition of accept I guess.
Q. Do you know when the last time the DOE used the acceptance rates in the 1995 ACR for planning purposes?
MS. POWELL: Object to beyond the scope. You can answer to your personal knowledge.
THE WITNESS: No, I don't.
BY MR. HIRSCH:
Q. I --
A. I don't know.
Q. Let me say, I don't think this one is beyond the scope because I think it relate to the acceptance rate question.
Well, I take it from your answer that the DOE is not currently planning on using the acceptance rates

Page 63

stated in the 1995 ACR; is that correct?
A. We are planning to use the larger rates for an operational repository. If for some other reason we would accept it in a different way, we view the 4, 6, 9 as the binding legal obligation.
Q. And why is the 400, 600, 900 considered to be a binding legal obligation?
MS. POWELL: Object again, beyond the scope. You can answer.
THE WITNESS: Those are the rates in the 1995 ACR upon which the current DCSs are based and the department views the DCSs as the binding legal obligation of the department.
BY MR. HIRSCH:
Q. You mean the approved DCS is binding?
A. Approved. Yes, thank you. Approved.
Q. Will you look at page 2 of the general instructions, Ms. Klein.
A. Yes.
Q. And in particular, I'd like you to look at paragraph 7(b) of the instructions.
A. Uh-huh.

Page 64

Q. You see where it says: "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation. The DCS does not restrict the purchaser to deliver the specified SNF that was the basis for the allocation."
Do those instructions reflect that once a utility had a place in the ACR cue by virtue of the age of its spent nuclear fuel, it could supply any spent nuclear fuel from any reactor as long as it met the basic contract requirements?
MS. POWELL: Objection to beyond the scope. You can answer.
THE WITNESS: Yes, any of their own reactors.
BY MR. HIRSCH:
Q. Their. You mean the utilities' own reactors?
A. I mean that utility's reactor, yeah.
Q. All right. Now, is it also correct that in terms of the DCS instructions that utilities did not have to identify specific fuel assemblies in responding to the DCS instructions?
MS. POWELL: Same objection, but you can

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :275 - 533



THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Susan Klein
Washington, DC
Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144540



April 25, 2002
9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

# Susan Klein



(202) 347-6000
BY: Kristi L. Remington, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334
BY: Timothy R. Macdonald, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW



Washington, DC 20530
(202) 307-6288
BY: Erin E. Powell, Esq.
Marian E. Sullivan, Esq.

I N D E X


EXAMINATION OF SUSAN KLEIN PAGE
BY MR. HIRSCH 8

KLEIN DEPOSITION EXHIBITS: PAGE
No. 1 Notice of Deposition. 10
2 Letter of 3-4-92, DOE to Commonwealth Edison. CE03656 through 3664. 42
3 Zabransky 4-17-02 Rough Draft Excerpt. Pages 1 through 52. 97
4 Indiana Michigan Power Company v. DOE Citation, pages 2 through 7. DC Circuit. 102
5 Acceptance Priority Ranking & Annual Capacity Report. March 1995. HQR-039-0597 through 0666. 114
6 Zabransky 4-17-02 Rough Draft Excerpt.





Page 113. 120
7 Letter of 9-25-96, ComEd to DOE. COF-001-2165 through 2172. 123
8 US DOE Appendix C, Commonwealth Edison. 0284 through 0290. 123
9 Letter of 3-13-97, DOE to Commonwealth Edison. CE04064. 129
10 Letter of 9-28-95, ComEd to DOE. COF-001-2141 through 2146. 134
11 Letter of 9-26-97, ComEd to DOE. CE04069 through 4070. 137
12 OCRWM Annual Capacity Report. December 1991. HQR-001-2357 through 2418. 146
13 Letter of 2-14-02, Secretary of Energy to The President. Recommendation by the Secretary of Energy. 167
14 42 Section 10134. Repositories. Pages 753 through 757. 175
15 Viability Assessment of a Repository at Yucca Mountain. Overview. December 1998. 187
16 Analysis of the Total System Life Cycle Cost of the CRWM Program. May 2001. 193





17 Letter of 4-8-02, Governor Guinn to Senator Byrd. Statement of Reasons. 198
18 Statement of Lake H. Barrett, OCRWM, March 14, 2002. 208
19 GAO Report to Congressional Requesters. Nuclear Waste. Yucca Mountain Repository Project. December 2001. GAO-02-191. 215
20 GAO Testimony before the Subcommittee. Nuclear Waste. Yucca Mountain Repository Project. GAO-02-539T. 226
21 YMP.GOV Web site. Timeline/Milestones. 4/20/2002. 232
22 Viability Assessment. Preliminary Design Concept. US DOE OCRWM. Volume 2. 249
23 Analysis of the Total System Life Cycle Cost of the CRWH Program. September 1995. 251
24 CRWMS Management and Operating Contractor. TSLCC for Site Recommendation. Letter Report. February 2002. 259
25 Draft Letter of 10-30-01, CO Rep Waisley to Bess/BSC. CTR-045-1118 through 1121. 267

**Exhibits are attached.

# Susan Klein (vol 2)

Page 351

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.
BY MR. TOMASZCZUK:
Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?
A. Yes, I do.
Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?
A. Yes.
Q. And you used that term planning purposes in your answer?
A. Yes.
Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?
A. No, not that I know of.
Q. Is that 3,000 MTU rate the rate that DOE was

Page 352

to use to determine if the fees are sufficient?
MS. SULLIVAN: Objection, beyond the scope. Answer if you know.
THE WITNESS: I don't know. I'd have to look at the TSLCC to know.
BY MR. TOMASZCZUK:
Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.
A. That's the most recent one. I have a few of them here. And would you repeat the question?
MR. TOMASZCZUK: Ms. Reporter, could you read it back.
(Requested material was read.)
THE WITNESS: (Pause). I haven't found it. I'm working on it.
BY MR. TOMASZCZUK:
Q. That's all right. Take your time.
A. It appears from this document that those are the rates that we assumed in determining the cost of the program.
Q. And did you have a page of the document that

Page 353

you referred to?
A. Well, page 4-14 has the -- actually 4-13 says assumptions about. These are the assumptions on waste acceptance. The table that's on page 4-14. That's what I based my answer on.
Q. All right. Can I just direct your attention also to the letter, which is the third page in Exhibit 16. It's the third page. I think you passed it.
A. Not the iii page you mean. Where is it? There we go.
Q. And you're welcome to read the entire letter. I was going to direct your attention to the third paragraph, first sentence.
A. Okay. I've read the third paragraph, yes.
Q. All right. Could you read the first sentence for me out loud.
A. "The TLSCC analysis provides the basis for assessment of the adequacy of the Nuclear Waste Fund fee as required by the NWPA."
Q. And that's in a letter from Mr. Barrett, right, to the readers?
A. That's correct.

Page 354

Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?
MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?
A. Yes.
Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?
A. Yes.
Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

Page 355

Oh, also to the extent it calls for legal conclusion.
THE WITNESS: That seems to be a legal conclusion, but I'm thinking, though, whether this is only for this litigation. I would say no.
BY MR. TOMASZCZUK:
Q. What other purpose is it using that for?
MS. SULLIVAN: Objection, beyond the scope.
THE WITNESS: We have always thought of the DCSs -- approved DCSs as our legal obligation even before the litigation. So that's why I would say no. But we do use it for purposes of determining our legal obligation and -- yeah.
BY MR. TOMASZCZUK:
Q. Did you want to add to your answer or are you finished?
A. No.
MR. TOMASZCZUK: Ms. Reporter, I'd like to mark as Klein Exhibit 32 a set of documents which were attached to the government's Motion for Summary Judgment on the spent nuclear fuel acceptance rate and these are a series of DCSs -- since you've just

Page 356

referred to DCSs in your answer -- and related correspondence from one of my clients, Duke Energy Corporation.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 32.)
MS. SULLIVAN: I'm sorry. Exhibit?
THE WITNESS: 32.
MR. TOMASZCZUK: 32 I believe.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Have you seen any of those pages of that document before today?
A. I've seen some of them, yes.
Q. Okay. And it appears to reflect as I represented, a series of DCS forms and letters back from the DOE to Duke, correct?
A. Yes.
Q. Can I direct your attention, Ms. Klein, to the DCS which has the page number Bates number 0297 at the bottom. It's about I guess --
A. I have it.
Q. -- five, six pages back.

Page 357

A. I have it.
Q. All right. And this appears to be a DCS form and in Section 4.0 the "Approved" box is checked, correct, at the bottom of the page?
A. Yes, it is.
Q. And do you know whether that's Mr. Zabransky's signature?
A. It kind of looks like it. It is hard to tell, but I think that he was the person to sign that during -- what year was this? 199 -- when was this?
Q. This looks like 1995.
A. '5. Yes.
Q. Can I direct your attention about a third of the way down.
A. Yes.
Q. And you see there's two asterisks on the right-hand side of the page with some text which follows?
A. Yes, I do.
Q. All right. And can you read that for me, that text?
A. "The proposed delivery date is dependent upon

Page 358

the existence of an operational repository or an interim storage facility constructed under the" -- and I assume it says "Act." I can't read it and I assume it means the Nuclear Waste Policy Act.
Q. Do you know the source of that notation on this page?
A. No, I don't.
Q. Do you know whether you drafted that notation?
A. I did not. I don't remember drafting that notation.
Q. Do you know whether somebody within OCRWM drafted it?
A. No, I don't know.
Q. Do you know whether someone within the DOE Office of General Counsel drafted it?
A. No, I don't. I don't remember this being done, actually. I'm not saying it wasn't directed by the Office of General Counsel. It could have been, but I don't remember.
Q. You don't recall any discussions with anyone at OCRWM concerning the insertion of this notation on this DCS?

# Susan Klein (vol 2)

Page 375

MR. TOMASZCZUK: I believe that's the page that's in front of the witness.
MS. SULLIVAN: That's what she's looking at. I want to make sure.
THE WITNESS: Personal knowledge at the time. We have discussed this. I have some knowledge because I just discussed it with my counsel, but I was not involved with it. I don't remember. I might have been involved. I just do not remember what happened here. I'm sorry.
BY MR. TOMASZCZUK:
Q. You have no knowledge independent of that which you just obtained from discussion with your counsel?
A. And a discussion with counsel last, yeah.
MS. SULLIVAN: Don't --
THE WITNESS: Yeah, just instruction with counsel.
MS. SULLIVAN: I instruct you.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. All right. I'm going to move on and reserve

Page 376

the right to seek testimony from an appropriate Rule 30(b)(6) witness on those issues.
Ms. Klein, can I ask you to get in front of you Klein Exhibit Number 5.
A. Yes.
Q. And this document is the APR and ACR for March of 1995; is that right?
A. That's right.
Q. And as I understood your testimony, this was the last APR/ACR issued by the government; is that correct?
A. Yes.
Q. And this was the APR/ACR on which the utilities were to or which the utilities were to use in submitting the DCS forms submitted after it was published in March of 1995?
A. Yes.
Q. Could I direct your attention to page 1 of this document.
A. Got it. Introduction.
Q. You're welcome to read the whole page.
A. Yes.

Page 377

Q. I'm going to ask you some questions about the text which appears at the bottom.
A. Okay.
Q. All right. And the last sentence states: "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Is that right?
A. That's what it says here, yes.
Q. All right. And is that to the best of your knowledge a true statement?
MS. SULLIVAN: Objection, beyond the scope. You can answer the question.
THE WITNESS: Well, once it was sent out with the CO's instructions and made a requirement of the contract, the department believes it is a requirement of the contract. Once it was sent out by the contracting officer to each individual purchaser, it became a commitment.
BY MR. TOMASZCZUK:
Q. I'm sorry. What became a commitment?
A. The allocation for each particular -- well, it

Page 378

became a commitment if -- the conditioned upon the allocation for each purchaser became a commitment between the department and that purchaser if they submitted a DCS and it was approved. It became a commitment.
Q. But it was a commitment that was based on underlying data which was not contractually binding; is that fair?
MS. SULLIVAN: Objection, beyond the scope. You may answer.
THE WITNESS: It was -- I don't see what relevance it has. There was a commitment that we made based on information. Most commitments are based on information that are not contractually binding, I mean. I guess I don't understand the question.
BY MR. TOMASZCZUK:
Q. Well, I guess I don't understand your testimony.
A. Yeah.
Q. In all candor.
A. Uh-huh.
Q. Is it your testimony that the ACR is now a

Page 379

contractually binding document?
MS. SULLIVAN: Objection, beyond the scope. You may answer.
THE WITNESS: What I am testifying is that the allocation once it's -- not until the DCS based on this allocation is submitted to the department and the department approves it. Then it becomes a contractually binding commitment. Then there is a legal obligation. And whether or not the background that got us to that amount was legally binding or contractually binding I don't think is relevant to the fact that the DCS becomes a legally binding commitment between the department and the purchaser.
BY MR. TOMASZCZUK:
Q. Do you know in what document, if any, the utilities were so advised?
MS. SULLIVAN: Objection, vague.
THE WITNESS: It was the 1991 -- it's in here somewhere. Letter that the contracting officer sent with instructions.
BY MR. TOMASZCZUK:
Q. Okay. Let's look at that.

Page 380

A. Do you know what exhibit number that is? I think it was 30. Exhibit 2. Actually, this is not the whole letter. I don't think we have it in the exhibits. Attached to it are the instructions. I think there's actually more information in the 1991 letter from the contracting officer to the utilities. But this will do.
Q. All right. And where in this document, Klein Exhibit 2, were utilities advised that once their DCSs based on the then-current ACR were submitted and approved that that represented a binding commitment of the parties?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.
THE WITNESS: The allocations in the --
BY MR. TOMASZCZUK:
Q. I'm sorry. I just was asking where are you reading, please?
A. I'm sorry. Right now I'm reading the beginning of the second paragraph. "The allocations in the 1991 Annual Capacity Reports should be the basis for the DCS submittals. Once purchaser has an

Page 381

allocation, an equivalent quantity of spent fuel owned by the purchaser can be designated for delivery within the limits of that allocation." There's also a provision -- I'm not sure where it is here -- where this becomes a basis for exchanges is the DCS. That's the basis for exchanges with other utilities.
"Once a purchaser has an allocation" --
Q. I'm sorry. Where are you reading?
A. I'm sorry. Page 27-B. "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation." That's not the exchange provision, but that's consistent with what I read in the beginning.
Q. Does any of the language you just referred to advise the utilities that the DCS based on the then-current APR once submitted and approved represents a binding commitment of the parties?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.
THE WITNESS: Does not use those exact words, but that appears to me to be a commitment. It's a delivery commitment schedule.

Page 382

BY MR. TOMASZCZUK:
Q. Are you still --
A. I think I'm done. I just couldn't find it, but exchange provision in there somewhere.
Q. Just so the record is clear. Do you believe that somewhere in that exhibit the utilities were advised that once their DCS had been submitted and approved, it represented a binding commitment on both the government and the utility?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion, and asked and answered.
THE WITNESS: And what?
MS. SULLIVAN: Asked and answered, but you can answer again.
THE WITNESS: Okay. It does not have those exact words binding commitment, but it does have the word commitment and it does say this is your allocation once approved. And I believe that is and the department believes that is a binding legal commitment of the department.

Yeah, we were waiting to get the response to Beth's request for the views of all contractors -- contract holders before we would respond to the statement. I mean, that seems quite logical and appropriate to me. If we got one tomorrow, we might respond and just repeat what we said, also. When we said it a few times, maybe we wouldn't keep on repeating it, but that the ACR -- 1995 ACR is the basis for these submissions.

BY MS. REMINGTON:

Q. Maybe I misunderstood your testimony earlier.

A. Uh-huh.

Q. Did you actually see response letters that went out that used that language that the utilities' allocations were based on the '95 ACR and that's --

A. Yes, I have. I have seen those letters.

Q. Do you recall who those -- what utilities received such response?

A. I do remember that letters have come in over the years which would be as you said. They didn't use the word protest, but they would say -- I think it came -- it happened -- actually it happens most often



when they're talking about priority for shutdown reactors, and we would respond to them and say that we're using the cue as in the 1995 ACR. And then in that case we'd often attach a letter where we, Lake or someone had said that. So I have seen -- I have seen those letters.

Q. Could you explain to me how whether or not the utility has a DCS would affect its rights to have its fuel picked up?

MS. SULLIVAN: Objection, beyond the scope. Objection, calls for a legal conclusion. You may answer the question.

THE WITNESS: If a utility has an approved DCS, that would be the legally binding commitment of the department to accept their spent fuel.

BY MS. REMINGTON:

Q. And if the utility does not have an approved DCS, does it have the right to have its fuel picked up?

A. It does --

MS. SULLIVAN: Objection, vague. Objection, calls for a legal conclusion. Objection, beyond the scope.



THE WITNESS: If they have a standard contract with the department, they do have a right to have their fuel picked up, but the timing would perhaps be different than what's in the ACR if they did not submit the DCS on time.

BY MS. REMINGTON:

Q. And if they did submit their DCS on time but it just wasn't approved, then what are their rights?

MS. SULLIVAN: Objection, beyond the scope. Objection, asks for a legal conclusion. You may answer the question.

THE WITNESS: I think that is a legal conclusion. That it would seem to me that they would -- if they had submitted a timely DCS, that once we began operation and started the approval process, they would be in their proper place in the cue that as in accordance with the ACR.

BY MS. REMINGTON:

Q. Does DOE have any current plans to publish a new ACR?

MS. SULLIVAN: Objection, beyond the scope. You may answer the question.



THE WITNESS: I can't say that we have a plan for specific date or time, but I would -- I would guess we'd have to reevaluate the situation once we get a facility, and it might result in a new ACR. I don't know.

BY MS. REMINGTON:

Q. But currently there's no -- there's nothing being done to publish a new ACR at this time?

A. That's correct.

Q. I think you mentioned in your testimony several times that DOE plans to begin acceptance at a repository in 2010?

A. That's correct.

Q. How would a utility know when to begin resubmitting their DCSs or submitting DCSs for that new repository?

MS. SULLIVAN: Objection, beyond the scope. You can answer the question.

THE WITNESS: I assume at some time the department will send -- the contracting officer will send letters to the purchasers. I don't believe we have a plan set forth right now on how that will be

# Michael Lawrence

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington