# Patrick McDuffie

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
(98-126C) (Merow, S.J.), )
et al., )
)
Plaintiffs, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

full caption on page 3

DEPOSITION OF PATRICK MC DUFFIE
VOLUME I, PAGES 1 - 184
TAKEN ON
MONDAY, MARCH 18, 2002

VICTORIA MELEKIAN
CSR NO. 6996

Page 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,)
(98-126C) (Merow, S.J.), )
et al., )
)
Plaintiffs, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

full caption on page 3

THE DEPOSITION OF PATRICK MC DUFFIE, taken on behalf of Plaintiffs at 6450 Carlsbad Boulevard, Chandler Board Room, Carlsbad, California, commencing at 9:50 A.M., Monday, March 18, 2002, before VICTORIA MELEKIAN, Certified Shorthand Reporter, License No. 6996, for the State of California, pursuant to Notice.

---o0o---

Page 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
(98-126C) (Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER COMPANY)
(98-154C) (Merow, S.J.) )
MAINE YANKEE ATOMIC POWER COMPANY )
(98-474C) (Merow, S.J.) )
FLORIDA POWER & LIGHT COMPANY )
(98-483C) (Wilson, J.) )
NORTHERN STATES POWER COMPANY )
(98-484C) (Wiese, J.) )
DUKE POWER, A Division of DUKE ENERGY )
CORP. )
(98-485C) (Tidwell, S.J.) )
INDIANA MICHIGAN POWER COMPANY )
(98-486C) (Hodges, J.) )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
(98-488C) (Yock, S.J.) )
SOUTHERN NUCLEAR OPERATING COMPANY, )
et al., )
(98-614C) (Merow, S.J.) )
COMMONWEALTH EDISON COMPANY )
(98-621C) (Hewitt, J.) )
BOSTON EDISON COMPANY )
(99-447C) (Allegra, J.) )
GPU NUCLEAR, INCORPORATED )
(99-440C) (Bush, J.) )
WISCONSIN ELECTRIC POWER COMPANY )
(00-697C) (Merow, S.J.) )
POWER AUTHORITY OF THE STATE OF NEW )
YORK )
(00-703C) (Damich, J.) )
OMAHA PUBLIC POWER DISTRICT )
(01-115C) (Bush, J.) )
NEBRASKA PUBLIC POWER DISTRICT )
(01-116C) (Weinstein, J.) )
TENNESSEE VALLEY AUTHORITY )
(01-249C) (Bruggink, J.) )
)
Plaintiffs, )
)
vs )
)
THE UNITED STATES, )
)
Defendant )
)

Page 4

APPEARANCES OF COUNSEL
On Behalf of Plaintiffs
For FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
SHAW PITTMAN, LLP
BY: ALEX D. TOMASZCZUK, ESQ.
1650 Tysons Boulevard
Mc Lean, Virginia 22102-4859
(703) 770-7940
For SACRAMENTO MUNICIPAL UTILITY DISTRICT:
ARNOLD & PORTER
BY: DAVID S NESLIN, ESQ
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

For WISCONSIN ELECTRIC POWER COMPANY:

PERKINS COIE, LLP
BY. DONALD J. CARNEY, ESQ
607 Fourteenth Street, N W
Washington, D C. 20005-2011
(202) 434-1675

For COMMONWEALTH EDISON COMPANY

JENNER & BLOCK
BY CHRISTOPHER P TOMPKINS, ESQ
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

For SOUTHERN NUCLEAR OPERATING COMPANY

BALCH & BINGHAM, LLP
BY: KRISTI L. REMINGTON, ATTORNEY AT LAW
1275 Pennsylvania Avenue NW
Tenth Floor
Washington, D.C 20004
(202) 347-6000

Page 5

APPEARANCES OF COUNSEL (Continued):
On Behalf of the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: BRYANT S. BANES, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0516

-and-

HEIDE L. HERRMANN, ATTORNEY AT LAW
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
-and-
R. ALAN MILLER, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0383

Page 18

that we could identify all the problems before we ran out of water.
Q. Did you enjoy it?
A. I loved it. Great nitpicking. I'll never understand how you guys agreed to sign the damn thing, but that's not my point.
Q. Did you have any role in the development of the standard contract?
A. No. That was done by as far as I can tell a group in Washington, D.C.
Q. And that was done before you --
A. A utility group, advisory group. I had no involvement in that.
Q. And that contract had been drafted and signed --
A. Before 1961.
Q. So your involvement commenced shortly thereafter?
A. Yes.
Q. Then your involvement continued for up until 1995?
A. Basically, yeah. It was, you know, it was part time for a while because there wasn't much to do. It was not a full-time job.
Q. What percentage of your time did you spend on

Page 19

this work from '83 to '95?
A. The first five or eight years it was a hundred percent of my time because it was constantly changing. Nothing was ever resolved. It was a new question.
Q. And --
A. I'd say roughly hundred percent during that time. I had some other little projects we played with. At the end it was 50 to 60 percent of my time.
Q. So a hundred percent for the first five to eight years?
A. Yes. Through the ACR series up to about 1991 or '92 I believe. '90, '91.
Q. Who did you report to?
A. Billy Cole in the end. And actually, he was in another group at the time. I reported to a guy by the name of Bob -- I can't remember. But Billy Cole was the primary one. And then Gary Mc Nair was the department manager so after Billy left, Billy left and went to work for E.R. Johnson where he was doing effectively part-time work on the contract and so we had reason to be in contact. Then he came back to Battelle in the Washington office, but I don't think he was working on the contract then.
Q. Physically during this period from 1983 until you retired in 1995, you were located in Richland,

Page 20

Washington?
A. Yes. Kenneweick originally, K-e-n-n-e-w-e-i-c-k.
Q. Are there aspects of the civilian radioactive waste program that you are more familiar with than others?
MR. BANES: Objection. Irrelevant.
I may object periodically, sir.
THE WITNESS: It's your party.
MR. BANES: My only reason for objection will be just to preserve an objection for later. You can still answer a question. Unless it involves privileged material that you'd learned while you were working for -- with DOE at PNL. If I object to that and say don't answer then we'll talk about it, but unless I say don't answer, you can answer any question after I object.
THE WITNESS: Do you want to repeat your question?
BY MR. TOMASZCZUK:
Q. Are there aspects of the civilian radioactive waste program that you are particularly familiar with or knowledgeable about?
A. The monitored retrieval storage program. I think they were going to revise the nuclear waste monitored retrievable storage program after they got a

Page 21

licensed repository. I reviewed all the technical work in the documents for that whole proposal as the manager of administration for the monitored retrieval storage program so that's my basis for knowledge of nuclear waste, commercial. And I worked on the contract ad infinauseum (Sic).
Q. You worked on the standard contract?
A. 10 CFR 961.11. For ages. Met with the utility groups which I really enjoyed because they were intelligent people trying to get a job done. There was at one time a proposal to locate a repository at Richland, a basalt waste isolation program, and I monitored that as a casual interest type device so I'm familiar with repository work. Having managed the program or worked on the program, rather, to disassemble a nuclear reactor, I had a feeling for what kind of waste you were going to have as a result of that activity. I think I expressed to one of you gentlemen on the phone my concern was the inclusion of GTCC in the repository fee. No additional fee for disposal of GTCC to a utility because of the way the contract is worded, I tried in all my revisions to get that taken out.
Q. I'm not sure I understood what you just said.
A. Do you know what GTCC is?

the squawk box.
Q. Just answer to the best of your recollection.
A. Let me dig it out. I think I scratched it down somewhere.
Q. Okay. Good.
A. Time out. 34 issues. You want them?
Q. Absolutely.
A. Somebody said they had them.
Q. I'm happy to have whatever you brought with you today.
A. These are documents.
Q. We'll copy them and distribute them.
A. Make sure he gets a copy.
Q. I will.
MR. BANES: Let's mark that. We can just copy --
MR. TOMASZCZUK: There's a whole bunch of stuff we're going to mark. I don't have copies of what you presented to him. I assume you brought copies for me.
MR. BANES: We have the Bates stamp numbers.
MR. TOMASZCZUK: I have Bates stamped numbers as well. If you insist I bring copies of everything, I'll ask for the same courtesy with respect to documents you sent to the witness.
MR. BANES: That was the first time I heard that.
THE WITNESS: I missed that conversation.



BY MR. TOMASZCZUK:
Q. That's all right. We didn't want to distract you from your search.
A. I don't know that I'm going to find anything. That's the problem.
Q. The question was whether you recall who you spoke with during your last discussion with Counsel.
A. There were two male and one female. I recognize Mr. Banes' name. He's the one who placed the call and the other two representatives from the DOE that are here -- DOJ. That is my recollection.
Q. Okay. What was the purpose of that call, this last call?
MR. BANES: Objection. Lack of foundation.
BY MR. TOMASZCZUK:
Q. To the extent you know.
A. We just talked about a lot of things. Can we ask you a few questions. Sure, what do you want to know. So we talked about ACR. He asked if I received the documents. I told him I got all of them, I appreciated it, however, the first one was illegible. And I had asked you to send me one and you sent me the pages I requested. Actually, your assistant sent me those. We talked about -- just the whole range of stuff we're talking about right now. Transportation



problems. I think I brought up GTCC. I'm not sure. I'll rely on their integrity to make sure you'll get the information.
Q. Did they offer to represent you again?
A. No.
Q. I propose we take a short break. Is that all right with you?
A. Fine with me.
(A brief recess was taken.)
MR. TOMASZCZUK: Back on the record.
Q. Mr. Mc Duffie, you're still under oath.
A. I'm under oath.
Q. That's not going to redo anything though. I understood your testimony to be that you left Battelle in 1995; is that right?
A. Yes.
Q. And were you asked to leave or you just retired?
A. They offered an early retirement program.
Q. And you accepted?
A. I accepted. I got the e-mail at 6:30 a.m. 9 o'clock I was in the social security office ready to go.
Q. When you used the term Battelle in the documentation there's also a reference to Pacific



Northwest Labs; is that the same organization?
A. Battelle is the corporate structure out of Ohio. Columbus, Ohio. PNL, Pacific Northwest Laboratories, operated an independent Battelle facility and managed the government operations at Richland, Washington. Partly government operations, the research part. It's since been renamed Pacific Northwest National Laboratory, PNNL. It's operated by Battelle/PNNL for DOE, DOE/ER, I think, research department.
Q. So your corporate employer was Battelle?
A. Yes.
Q. And within Battelle you were working at PNL?
A. PNL. That's fine.
Q. Can you tell me a little bit about what was happening contractually between the Department of Energy and Battelle/PNL? Do you understand my question?
MR. BANES: Objection. Vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. Yes. Every five years DOE evaluated Battelle's ability to meet their needs at the research lab in Pacific Northwest Laboratory. If we were doing a good job, we always did, they renewed the contract.

Page 62

the box were the same.
Q. Do I understand, Mr. Mc Duffie, that this list of 11 issues, description of 11 issues is a distillation of a larger number of issues?
A. 34. Some of them have two numbers. Second one down has two numbers.
Q. Yes. For example, 19 and 24.
A. Okay. 19 and 24 on this disk were part of the original 32 that were similar enough that if you solved one, you solved the other. We just highlighted where there was a difference. Grouped them into workable groups that could be discussed with the different utilities.
MR. BANES: Let the record reflect Mr. Mc Duffie picked up the disk he brought with him when he referred to this.
MR. TOMASZCZUK: That's fine.
THE WITNESS: I threw away all my records, and I found that on my computer. That's it.
BY MR. TOMASZCZUK:
Q. Let me just say that we attempted to download it during the short break. I'll try again at lunch.
A. If you can't, I'll run it off and send you a copy. Or take it with you if you want. I don't care.
Q. How was the list of 34 developed?

Page 63

A. Started first paragraph, the government's obligated to, bottom issue, whatever the last word is, and went through each step and used that chart that I referenced, the PERT chart, looked at what had to be done, wherever there was conflict, wherever there was ambiguity as to whose responsibility it was, so on, so forth. Transportation from Oak Ridge said they'd take the cask, they'd put the cask in the tank, they'd do this, they'd do that. The utility said no. You can send one representative to observe. That issue had to be resolved. As far as I know, they resolved it.
Q. You used the PERT chart to help develop the list of 34 issues?
A. We had to know what the contract said so we laid it out to look at it. Visual is much better than verbiage. It was one part of the process, you know, we can read the document obviously, but when you do the detail work, you can find the little holes.
Q. When you say read the document, you're referring to the contract?
A. Yeah. The contract.
Q. And there were --
A. Read the contract and you can find some gaping holes, things that are missing.
Q. Like what?

Page 64

A. Purchasers -- the Department of Energy, DOE, will deliver shipping casks appropriate for use at the purchaser's site. That's pretty broad. Oak Ridge boys said if they don't have a hundred-ton crane, we won't deal with it. Wait a minute. This is appropriate for use at that site. If they can lift 500 pounds, you've got to give them a cask they can ship fuel. They won't modify their facility to handle your cask. They were not going to take the Westinghouse XL fuel, WXL, some number, fuel. Westinghouse made a 200-inch fuel rod. There was only one reactor using it, still a standard fuel form, has to be shipped. You've got to build a cask for it whether you like it or not. You have to provide a cask suitable for the purchaser's site to do the job.
These are the types of things that jump out at you. There's innuendoes in the relationships between DCS, final delivery schedules, the rejection of the DCS, the approval of the DCS, after it's been rejected once, how do you resolve the issues, take it to negotiation. For how long? You've got a delivery date out here you've got to meet. We picked these types of things out of the network. God, I worked hard, didn't I?
Q. Other than the two you just testified about,

Page 65

were there other areas where the contract had quote unquote gaping holes?
MR. BANES: Objection as to form.
THE WITNESS: Yeah. The government shall accept nuclear fuel beginning January 1998 upon opening commencement of facility operations of a nuclear repository. That's a crock. That is a glowing error. That's like I'll pay you a million dollars a month starting March the 31st of 1999 or 2002, whatever year it is, after the first man lands on Mars and establishes a colony. Now, have we got a contract? It was open-ended really. That's what it was. These are the type of things that came up.
I could sit here and scan through the issue list. A lot of them are identified in here. Definitions spent fuel, failed fuel types, canister specifications. Consolidated fuel was another problem. What to do with the parts left over from consolidation. You take the fuel rods out, you've got all kinds of pieces of dirty metal. What is it supposed to be put in. How much did you have to consolidate. That is a utility decision. Oak Ridge said you must consolidate one point 45 to one. Under what basis? All these fuel rods, they're this big, one foot by one foot square, and I want to put them in six inch by six inch square

Page 66

so I push in as many as I can, doesn't matter, my job as a utility, I'm paying for it. DOE will take it as standard form. Consolidated fuel is a standard form. These are the type of issues we brought up. We brought them up. They brought them up.

MR. BANES: Let the record reflect that when the witness testified they're all identified in here, he pointed to the April 22nd, 1991 document we've been discussing.

THE WITNESS: They're not all in here. Most of them are in here.

BY MR. TOMASZCZUK:

Q. What tasks were you involved in to implement provisions of the standard contract?

A. To implement the provisions --

MR. BANES: Objection. Vague.

BY MR. TOMASZCZUK:

Q. Do you understand my question?

A. I understand. We worked very diligently on the delivery commitment schedule, instructions for delivery commitment schedule because it's very vague. It had things in there that were of no use to DOE. We pointed that out and they admitted it and the instructions said ignore this entry. Something to do with plutonium or enrichment after discharge. That was

Page 67

strictly something you would have to take a hundred years, how many hours it was exposed, it was of no value to anyone. Except as reprocessing. That's why I say if you're going to reprocess it, you need to know how much of it can be burned off. That was taken out of the DCS and the review process. We worked a long time on that. If you gave a DCS and you didn't have an allocation, what did you do with it. We being DOE, if you gave us a DCS and you had allocation for the wrong year, how do we resolve that conflict?

Our biggest battle, I call them battles because that's fun to call them battles, our biggest discussion related to oldest fuel first as allocation of annual capacity versus identification of spent fuel for delivery. There were two problems. Oldest fuel first as a basis for allocation so if you discharge fuel in 1962 and nobody else has any, you've got the oldest fuel first, you get the first allocation acceptance capacity. Selection for delivery is standard fuel. If you have an allocation to deliver, let's say, ten MTU, 12 assemblies maybe. You're obviously not going to give me your oldest assemblies, they're the cheapest to store, they're cold, not bothering anybody. If you have seven year old stuff or five year old stuff and you want to get those out, you

Page 68

can deliver those. Fuel selected for delivery was to be done by the purchaser. The allocation for that delivery capacity was done on oldest fuel first basis. It had to be queued up. We'll take the oldest fuel first. That's what we mean in the contract. Okay. He's got four assemblies over here, send the truck. This guy has the next oldest batch, go get that. They realized you can't take the oldest fuel first for delivery. It's for allocation. It's not acceptable to do it by delivery. They're scattered all over the nation.

That was a major battle and they finally agreed. The utilities were of that position. DOE, parts of, specially Oak Ridge boys were against it. They wanted oldest fuel first until they figured it out. We proved the contract didn't mean it because they allowed you to exchange the delivery commitment. I can't do that if I have the oldest fuel because if he has the oldest fuel, he doesn't need my delivery. I need his. It was a fungible document. Also, reactor utilities that owned multiple reactors could designate the delivery site and the reactor and the fuel because they may have a place -- who's here for Commonwealth? How many reactors do you have? Ten? Twelve?

Q. I would encourage you not to -- he can answer

Page 69

at the break.

A. Multiple reactor owning utilities have different storage needs. They have to deliver from the storage pool that has the biggest problem although allocation two weeks from shutdown, they need to be shipped from one going full bore. They finally accepted yes, the utilities will deliver selected fuels. Tell us 65 months in advance where it is, what kind of cask it is, and we'll be there all smiles with one guy watching. That put to rest finally, I hope, the oldest fuel first for allocation. These are the type of problems that needed to be resolved. You'd think you could do it in a meeting or two or five. It goes on for years. Everybody is looking for the hidden message in the acceptance -- somebody has an agenda here. What is it.

Q. You've referred several times in your testimony this morning to Oak Ridge boys which I presume are DOE personnel at Oak Ridge?

A. Transportation group. They came in relatively late into the discussion and they were under the general impression that they were running the thing. The contract didn't bother them. If the utility didn't have a hundred-ton crane, they're supposed to build one so they can handle the rail cask that they had.

Page 150

MTU. The acceptance rate to peek at 2,650. Even though 3,000 MTU were discharged, storage -- additional storage requirements may only kick in at 2,200 MTU so there was room for exchanges to meet the needs of those who had to -- to avoid excesses.
BY MR. TOMASZCZUK:
Q. I understand. At least, I think I understand.
A. Don't feel bad. Takes a long time to get there, but don't get old too fast.
Q. Continuing on the section onto page 8, there is a couple of references in this paragraph to acceptance capacity available equaling system operating capacity.
A. Right.
Q. What is meant by that?
A. If the system can accept 1,200 MTU, all of that would be allocated. In the funding parts of the contract it says the purchaser has the right to exchange DCSs and to increase the quantity on the final delivery schedule by plus or minus 20 percent and delay the delivery schedule plus or minus two months after you get the approved final delivery schedule. That's one of the things we had to get taken care of because if you're going to allocate the system capacity expecting everyone to use their 20 percent flexibility

Page 151

you won't allocate 1,200 MTU, you'll only allocate 80 percent of it or less than 80 percent of it because everyone will kick it up. We said we'd allocate the entire amount and we hoped to have that problem resolved by then. The only control we had was to reject DCSs and explain that way and go back into the -- that was the flexibility in the contract that needed clarification. I think it's one of the issues in the Mc Duffie 2, one of the 34 issues.
Q. What would be one of the 34 issues?
A. Plus or minus 20 percent, plus or minus two months flexibility on the final delivery schedule. That was fine when we were going to be reprocessing. The government didn't care just as long as they had enough to keep their chemical plants running. If they didn't get enough, the tanks sat there and bubbled. When it came in, they dumped it in. That's why I said the contract was extracted from the reprocessing contract. The contract didn't get tuned up enough.
Q. All right. Section 4.1.
A. Page?
Q. Page 13.
A. Okay. We're making progress. 8 to 13.
Q. Only got about 40 more to go.
A. Okay. What's up?

Page 152

Q. Would it be fair for me to presume you had some role in the drafting of this section?
A. Yep.
Q. The first paragraph under section 4.1, second sentence says the standard disposal contract does not specify the annual acceptance capacity that will be available for allocation. Is that a true statement?
A. Absolutely. Still true. This is where we said it may differ from the acceptance priority ranking due in 1991.
Q. Right. Pressing on here with this document, there is an appendix A, last page of this Exhibit 6; right?
A. I think it's in here. I don't know. Appendix A was a preface to the table -- here it is.
Q. And tell me what this appendix A represents.
A. It tells how the tables A-1 through A-10 were derived so that the utilities could check it against their records to make sure that the RW-859 data had been entered correctly into the discharge fuel inventory and the projected annual discharges and how we summed them to give each utility from each reactor capacity allocation and some goes to each purchaser which may own more than one reactor. Here are the parts, here's the pieces, here's how they fit, here's

Page 153

how it's allocated.
Q. Did you actually prepare the tables in Exhibit 6?
A. Yes. Scott and I did, taken out of data files.
Q. Were they pretty accurate; do you know?
MR. BANES: Objection. Lacks foundation.
THE WITNESS: As far as I know. I think after the first one, there were three or four comments sent to us about you've got the wrong data like a total of two MTU out of 6,000 so that's pretty accurate I'd say. I know it was a very small amount.
BY MR. TOMASZCZUK:
Q. Okay.
A. We were happy to see the utilities taking the time to review it because it was a review of the data that they had submitted to DOE.
Q. All right. Over what period of time did you work on this -- on the drafts that resulted in the initial ACR?
A. I would guess four or five months getting up to the final working paper that was sent to Alan.
Q. I'll hand you your original back and I guess this is what I'll mark as Mc Duffie 7.
(Mc Duffie Exhibit 7 was marked

Page 154

for identification by the reporter
and is attached hereto.
MR. BANES: Do you have a question pending?
MR. TOMASZCZUK: No. The witness was reading the document.
THE WITNESS: I was looking for the reference. All right.
BY MR. TOMASZCZUK:
Q. What is this document?
A. Annual capacity report dated June 1988.
Q. Did you have any role in the preparation of this document?
A. Yes. I prepared the draft working papers that were submitted to DOE headquarters, basis for this report.
Q. This one looks a lot like, at least to my relatively unskilled eyes, looks a lot like the '97 version. Are there any significant differences between the two?
A. Acceptance rates and excuses.
MR. BANES: Objection as to form.
MR. TOMASZCZUK: You can't object to form after he's answered the question.
MR. BANES: I'm objecting because you said 1997 instead of '87.

Page 155

THE WITNESS: See, don't get old.
MR. TOMASZCZUK: Could you read the witness' answer back.
MR. BANES: It was your question. You said 1997.
MR. TOMASZCZUK: I understand your objection.
Now, could you read the witness' answer back.
(The record was read.)
THE WITNESS: That was my answer.
BY MR. TOMASZCZUK:
Q. In the answer that the court reporter just read back, did you understand that I was asking you to compare the 1987 ACR to the 1988 ACR?
A. In general content, yes.
Q. Can you tell me what you meant in your answer when you attempted to explain the difference?
A. I meant to say the June 1988 ACR is substantially identical to the June 1987 ACR with the exception of the acceptance rate table and the excuses for not making the 1998 date, the operation of the repository.
Q. All right. Is there discussion in the ACR about DOE's inability to make the 1998 date?
A. There should be. I couldn't tell you without going through the whole thing. I think Roman numeral V, second paragraph talks about the system

Page 156

configuration being used being the draft Mission Plan Amendment. Third sentence, the illustrative waste acceptance schedule for this waste management system configuration reflects the amended first repository schedule and a proposed schedule for the MRS facility. Those were not in the first ACR. During the first ten years of waste management systems operation, the total quantity of spent fuel that could be accepted is projected to be 24,100 metric tons uranium as opposed to the 18,600, whatever the other number was.
Q. This represents, if you will, an increase in the capacity of WMS operation?
A. Right.
Q. I believe the other change you testified about was differences in the spent nuclear fuel acceptance schedule?
A. Well, the rate.
Q. Did you say there was a difference?
A. Yes, previous one said 18,6 for --
Q. What does this one say?
A. Let me find it. Hold on. Page 5, table 2.1 again, illustrative waste acceptance schedule for spent nuclear fuel, 12, 12, 2,000 to 24,100 total MTU. Source, draft 1998 Mission Plan Amendment June 1988 extracted from table 2.2, page 19. So that was that

Page 157

year's marching orders.
Q. Did somebody direct you to use the data that's reflected on this table?
A. Yes. DOE headquarters directed us to use the data from the draft 1998 Mission Plan Amendment.
Q. Would that have been Mr. Brownstein who gave that direction?
A. Yes. He may have received it from somebody else, but that's where it came from.
Q. Do you know why he directed you to use this draft 1988 Mission Plan Amendment data for this table?
MR. BANES: Objection. Lack of foundation.
THE WITNESS: Because DOE has one position all the time. It may change from day to day, but they have one position and that was the position on the day this was issued. Now, if you go to page 5, the first paragraph, second sentence, first one starts with although the draft Mission Plan Amendment projects a five-year delay in waste management system operation, the projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operation simultaneously. That did not transpire.
BY MR. TOMASZCZUK:
Q. I did not hear the last word you said.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 158

A. That did not come about. That's why there is a 5,500 MTU increase in total acceptance.
Q. What did not come about, the MRS facility and repository were operating together?
A. Yes; that's correct.
Q. So if you compare this table 2.1 to the previous one, there is a five-year delay in the commencement date reflected on the table; right?
A. Yes.
Q. But an increase from 18,600 metric tons as a receipt rate to 24,100?
A. Yes. The subliminal reason for that is certain utilities were starting to shut down reactors and they would have received priority and this would allow them to accept the fuel on a non contract basis if it was needed for additional storage capacity.
Q. Another change that I observe in the two tables is it appears that the ramp-up if you will, proceeds slightly more aggressively on the 1998 table.
A. Uh-huh.
Q. Do you know why that is?
MR. BANES: Objection as to form.
THE WITNESS: Okay. The assumption was the MRS and the repository would commence operation simultaneously. The MRS is a function of dollars that you want to spend

Page 159

for the receipt rate you want. The repository is limited in how fast they can get the stuff into the hole. The MRS and the facility, they could have stored 10,000 MTU per year if they wanted to pay the price because it's a transfer facility out of the garbage can into the tank out in the back. As long as you've got enough out in back, you can put it all out there in casks. So that's the beauty of the MRS.
BY MR. TOMASZCZUK:
Q. Sitting here today, do you recall any discussions with Mr. Brownstein about the data that's reflected on table 2.1 of this Exhibit 7?
A. Not really. The draft Mission Plan, that's the DOE position today. That's what we used. It could change tomorrow, the next day, we were used to that. We did the best we could in an engineering basis to accommodate the users with the capacity we expected to have on hand. You'll find that on a lot of the paragraphs, reference to plus or minus 20 percent and cask handling limitations.
Q. Yes.
A. We were all trying to be nice guys.
Q. Now, this document is dated June of 1988; right?
A. Yes.

Page 160

Q. And at this point in time, this utility group had been meeting; is that correct?
A. I think that's -- let's see if there is a reference to the meeting, the discussion of the makeup of the group or at least the responses. Yes. If you turn to page 10, please. Under section 4.0, the annual capacity report issue resolution process discussed the fact that we met with the utility user groups. Those days they were the UNWMG and the USCEA. I think we had -- I think there were only two utilities that didn't participate.
Q. That did not participate?
A. Yeah. I think one of them was Fort St. Varain, V-a-r-a-i-n. So that was the basis for our staff-to-staff technical discussions which resulted in working on things like Exhibit 2, issues identified in Exhibit 2 among other things. The things that I participated in related to Exhibit 2.
Q. Okay. All right.
MR. BANES: Off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. I'm returning to you another document. Let's get copies of this one marked as Mc Duffie 8.
(Mc Duffie Exhibit 8 was marked

Page 161

for identification by the reporter and is attached hereto.)
THE WITNESS: First comment about issue number 8.
BY MR. TOMASZCZUK:
Q. What is this document?
A. This document is labeled Office of Civilian Radioactive Waste Management 1989 Annual Capacity Report dated June 1989. However, this is not the published copy of this document. Because it has my line numbers. This was a draft which apparently was submitted to DOE headquarters. It may have been our final submission. The cover sheet is missing. The cover sheet would have draft working papers stamped on that about that long about an inch high.
Q. Did you have a role in the preparation of this document?
A. It is my impression that I prepared this draft. I have two cover sheets. Anybody need one?
Q. All right. This is one of the documents that government counsel had sent to you; is that right?
A. Yes. You can tell this is an edited version. It has editing marks. We used brackets and stars to indicate where changes were required.
Q. Are you referring to the cover page? The cover letter?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
(98-126C) (Merow, S.J.), )
et al., )
)
Plaintiffs, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

full caption on page 187

DEPOSITION OF PATRICK MC DUFFIE
VOLUME II, PAGES 185 - 431
TAKEN ON
TUESDAY, MARCH 19, 2002

VICTORIA MELEKIAN

CSR NO. 6996

Page 186

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY.)
(98-126C) (Merow, S.J.), )
et al., )
)
Plaintiffs. )
)
vs. )
)
THE UNITED STATES. )
)
Defendant. )
)

full caption on page 187

THE DEPOSITION OF PATRICK MC DUFFIE, taken on behalf of Plaintiffs at 6450 Carlsbad Boulevard, Chandler Board Room, Carlsbad, California, commencing at 8:40 A.M., Tuesday, March 19, 2002, before VICTORIA MELEKIAN, Certified Shorthand Reporter, License No. 6996, for the State of California, pursuant to Notice.

---o0o---

Page 187

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
(98-126C) (Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER COMPANY)
(98-154C) (Merow, S.J.) )
MAINE YANKEE ATOMIC POWER COMPANY )
(98-474C) (Merow, S.J.) )
FLORIDA POWER & LIGHT COMPANY )
(98-483C) (Wilson, J.) )
NORTHERN STATES POWER COMPANY )
(98-484C) (Wiese, J.) )
DUKE POWER, A Division of DUKE ENERGY )
CORP. )
(98-485C) (Tidwell, S.J.) )
INDIANA MICHIGAN POWER COMPANY )
(98-486C) (Hodges, J.) )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
(98-488C) (Yock, S.J.) )
SOUTHERN NUCLEAR OPERATING COMPANY, )
et al., )
(98-614C) (Merow, S.J.) )
COMMONWEALTH EDISON COMPANY )
(98-621C) (Hewitt, J.) )
BOSTON EDISON COMPANY )
(99-447C) (Allegra, J.) )
GPU NUCLEAR, INCORPORATED )
(99-440C) (Bush, J.) )
WISCONSIN ELECTRIC POWER COMPANY )
(00-697C) (Merow, S.J.) )
POWER AUTHORITY OF THE STATE OF NEW )
YORK )
(00-703C) (Damich, J.) )
OMAHA PUBLIC POWER DISTRICT )
(01-115C) (Bush, J.) )
NEBRASKA PUBLIC POWER DISTRICT )
(01-116C) (Weinstein, J.) )
TENNESSEE VALLEY AUTHORITY )
(01-249C) (Bruggink, J.) )
)
Plaintiffs, )
)
vs )
)
THE UNITED STATES. )
)

Page 188

Defendant )
)

APPEARANCES OF COUNSEL
On Behalf of Plaintiffs
For FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
SHAW PITTMAN, LLP
BY ALEX D TOMASZCZUK, ESQ
1650 Tysons Boulevard
Mc Lean, Virginia 22102-4859
(703) 770-7940
For SACRAMENTO MUNICIPAL UTILITY DISTRICT
ARNOLD & PORTER
BY DAVID S NESLIN, ESQ
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

For WISCONSIN ELECTRIC POWER COMPANY

PERKINS COIE, LLP
BY DONALD J. CARNEY, ESQ
607 Fourteenth Street, N W
Washington, D C 20005-2011
(202) 434-1675

For COMMONWEALTH EDISON COMPANY

JENNER & BLOCK
BY CHRISTOPHER P TOMPKINS, ESQ
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

For SOUTHERN NUCLEAR OPERATING COMPANY

BALCH & BINGHAM, LLP
BY KRISTI L. REMINGTON, ATTORNEY AT LAW
1275 Pennsylvania Avenue NW
Tenth Floor
Washington, D C 20004

Page 189

(202) 347-6000
APPEARANCES OF COUNSEL (Continued):
On Behalf of the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: BRYANT S. BANES, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0516

-and-

HEIDE L. HERRMANN, ATTORNEY AT LAW
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
-and-
R. ALAN MILLER, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0383

Page 190

INDEX

WITNESS
Patrick Mc Duffie


| EXAMINATION | PAGE |
|---|---|
| By Mr. Tomaszczuk | 193 |
| By Mr. Banes | 321,401,425 |
| By Mr. Neslin | 322 |
| By Mr. Carney | 403 |
| By Mr. Tompkins | 409 |
| By Ms. Remington | 426 |

EXHIBITS

| PLAINTIFFS' | | PAGE |
|---|---|---|
| 10 | Letter, dated 2-27-89 | 199 |
| 11 | ACR, dated December 1991 | 201 |
| 12 | General Instructions | 214 |
| 13 | Letter, dated 8-28-89 | 233 |
| 14 | Memo, dated 10-26-89 | 245 |
| 15 | Letter, dated 1-8-90 | 256 |
| 16 | Memo, dated 4-12-90 | 262 |
| 17 | Memo, dated 5-14-90 | 265 |
| 18 | Memo, dated 9-24-90 | 267 |
| 19 | Letter, dated 10-29-90 | 268 |

Page 191

| | | |
|---|---|---|
| 20 | Memo, dated 2-26-91 | 273 |

INDEX (Continued

EXHIBITS

| PLAINTIFFS' | | PAGE |
|---|---|---|
| 21 | Memo, dated 4-22-91 | 278 |
| 22 | Briefing Paper | 292 |
| 23 | Memo, dated 7-23-91 | 298 |
| 24 | Spent Fuel Acceptance Rate | 300 |
| 25 | Reactor Data Analysis | 302 |
| 26 | Memo, dated 4-13-92 | 309 |
| 27 | Letter, dated 9-8-87 | 326 |
| 28 | Letter, dated 8-30-88 | 332 |
| 29 | Letter, dated 2-27-90 | 339 |
| 30 | Memo, dated 5-16-90 | 345 |
| 31 | The DCS Exchange Process | 347 |
| 32 | Exchange Request Evaluation Methodology | 353 |
| 33 | Section 2.0 DCS Exhange Evaluation Criteria | 356 |
| 34 | Letter, dated 9-25-95 | 359 |
| 35 | Guidebook for Standard Contract for Disposal | 360 |
| 36 | Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis | 377 |
| 37 | Memo, dated 9-11-90 | 378 |
| 38. | Memo, dated 9-18-90 | 383 |

Page 192

| | | |
|---|---|---|
| 39 | Memo, dated 6-28-91 | 389 |

INDEX (Continued)

EXHIBITS

| PLAINTIFFS' | | PAGE |
|---|---|---|
| 40 | Preliminary Draft Proposed OCRWM Position | 396 |
| 41 | Priority Acceptance for Shutdown Reactors | 398 |
| 42 | APR/ACR, dated March 1995 | 410 |
| 43 | Memo, dated 12-5-89 | 418 |
| 44 | Letter, dated 5-28-86 | 420 |


Page 193

CARLSBAD, CALIFORNIA, TUESDAY, MARCH 19, 2002
8:40 A.M
---o0o---

PATRICK MC DUFFIE,
having been previously placed under oath, was examined and testified as follows:

EXAMINATION (Continued)

MR. TOMASZCZUK: Back on the record.
Q. Good morning, Mr. Mc Duffie.
A. Good morning.
Q. I want to remind you you're still under oath.
A. Yes.
Q We talked yesterday about acceptance rates and the various tables in the ACR reports Do you recall that?
A Yes
Q. What was the acceptance rate that was used for purposes of designing the geologic repository?
MR BANES: Objection. Vague.
BY MR TOMASZCZUK:
Q Do you understand my question?

Page 194

A. I understand your question. And I'm trying to consider how to answer it. Because the repository was a separate entity from DOE/RW. DOE/RW. Alan Brownstein derived the acceptance rates, the acceptance ranking report from documentation that supported the development of the repository and the MRS so no, I don't know how the receipt rates were developed for the repository. I know that the rates that were used in the ACR were reflective of the governing repository in the MRS. It's circular.
Q. So the -- it would be fair to say that the early ACRs would reflect the governing view at DOE with respect to the acceptance rate to be used in the ultimately designed geologic repository?
MR. BANES: Objection. Calls for a legal conclusion and lacks foundation.
THE WITNESS: This is not a legal conclusion. The acceptance rates used in the ACRs reflected the then current issue of the acceptance rates in the latest DOE submissions to Congress for the development of the repository. And like many other things in Washington, the then current issue changes every time there is a good reason to change it. There was no fixed rate. I don't think any of them lasted more than a year and a half, two years.

Page 195

///
BY MR. TOMASZCZUK:
Q. Those submissions to Congress were reflected in what documents? Do you know?
A. Most of them were Mission Plan statements. There are references in several documents we discussed yesterday that present the source for the acceptance rates in the ACRs. Most of them relate to a Mission Plan document or a repository design document.
Q. If I believe I understood you correctly yesterday, you did not have a role in the preparation of those documents?
A. No, but I have a belief that the people who developed those documents looked at what was being done in the MRS study and the ACR to make their acceptance rates.
Q. So what was the chicken and what was the egg?
A. Scrambled is the answer.
Q. One didn't necessarily direct the other?
A. No. In the early days of the ACR, probably the first and second ACR, I think they were using numbers that were out of the MRS repository just as a target because they were concerned about receipt rates, geologic features. Receipt rate is a function of dollars and they were already concerned about it at

Page 196

that time. After a while, they had to put something in their design criteria to define what type of facility it had to be, receiving facility for the repository so if you have to receive 2,000 MTU a year trucked and rail, you have to have a big parking lot.
(Whereupon Mr. Neslin entered the deposition room.)
BY MR. TOMASZCZUK:
Q. Did you ever discuss with anyone at DOE the notion that the repository might only accept one MTU of spent nuclear fuel a year?
A. Frankly, I didn't care what the repository accepted. We had an obligation to issue the acceptance ranking report based on the numbers they give us. The physical acceptance of fuel ended our responsibility for the document. DOE took title, took purchase at the site, and what DOE did with it didn't make a bit of difference to me.
Q. So the answer to my question is no, you didn't have any discussions with anyone at DOE?
A. No, I did not have any discussions with anyone concerning any amount of fuel at a repository.
Q. What about under the contract? Did you ever discuss with anyone at DOE the notion that DOE could satisfy its obligations under the contract by accepting

Page 197

one metric ton of fuel a year?
A. No. Because the annual capacity report was called for in the contract as a planning document and the unit one MTU per year was never used as acceptance for the ACR. The ACR was the basis for the APR. The APR would not accept one. However, utilities with an approved DCS for delivery could use one MTU for delivery if they elected to do so.
Q. Do you know if any of them ever intended or elected to do so?
A. No. None of them. They wanted as much capacity allocation as they could get.
Q. And why was that?
A. Because they had problems --
MR. BANES: Objection. Lack of foundation.
THE WITNESS: -- they had problems with storage. If you have trouble storing stuff, you want to get rid of it. If you have a contract to get rid of it, you want the contract to be exercised to get rid of it. You're paying for it. I'm paying for it.
BY MR. TOMASZCZUK:
Q. Did you understand that the utilities wanted a robust vibrant waste disposal program?
MR. BANES: Objection. Vague.
THE WITNESS: Yes, they did want a robust viable

Page 198

program.
BY MR. TOMASZCZUK:
Q. And that's what you were working towards as well?
A. Yes. In the ACR to allocate the available capacity the government said they had in a manner that would allow them to get the effect of a robust program. The effect being no more at-reactor storage.
Q. Did DOE succeed in that effort?
A. No. I don't think --
MR. BANES: Objection. Lack of foundation.
BY MR. TOMASZCZUK:
Q. I didn't hear your answer.
A. I don't think they're accepting spent fuel yet so I'd say no.
Q. Do you understand, Mr. Mc Duffie, that the utilities including my clients have brought suit against DOE alleging among other things breach of contract for DOE's failure to meet the January 31, 1998 date specified in article II of the contract?
A. Yes. I found that out this morning.
Q. What was the nature of your discussion with Mr. Banes on that subject?
A. I asked him what are we here for. He said it had a lawsuit -- the utilities had sued DOE for failure

Page 199

to perform by January 1998 and the court partially found that the government failed to do their job and now they're arguing about acceptance rates. I said what for, he said to determine if there's any damages to be collected.
Q. Since your deposition adjourned yesterday, have you had any other discussions with counsel for the government?
A. Nope.
MR. BANES: I would note for the record the discussion was in the presence of all the other counsel in this room except you and him.
THE WITNESS: Yeah.
MR. TOMASZCZUK: That's fine.
THE WITNESS: Just wanted to let you know.
BY MR. TOMASZCZUK:
Q. Let me hand you, Mr. Mc Duffie, another document. We'll go through a series of them today. I hope to go through them a little more quickly than some of the ones we went through yesterday. Depends on what you have to say about them to some extent.
A. I'm not on per diem. Go ahead.
Q. We'll mark this as Mc Duffie Exhibit number 10.
(Mc Duffie Exhibit 10 was marked

Page 200

for identification by the reporter and is attached hereto.)
BY MR. TOMASZCZUK:
Q. It is a one-page document with writing on the front and back. I believe the front page is a letter dated February 27th, 1989 from you.
A. This is what number?
Q. Number 10.
A. All right.
Q. And can you identify this document for me?
A. Well, it was sent by me to a fellow by the name of Sutey, director of research and development division of DOE. Transmittal letter for the draft of the third ACR, I think. Yeah. Third annual capacity report.
Q. Why would you be transmitting a draft of the ACR to Mr. Sutey?
A. Because Mr. Brownstein, A.B. Brownstein directed us to send it there.
Q. Do you know, Mr. Mc Duffie, whether this transmittal from you to Mr. Sutey was accompanied by what we marked yesterday as Mc Duffie 8?
A. That's the one that was the rough draft?
Q. Yes, it is.
A. I don't know. Because I don't remember ever

Page 201

talking to this guy Sutey. He worked at DOE/RL. He must have been Dave Langstaff's boss at one time.
MR. BANES: This was 10?
THE WITNESS: Yes.
MR. TOMASZCZUK: We just marked this one as 10, yes.
THE WITNESS: Was '89 the third ACR?
BY MR. TOMASZCZUK:
Q. I believe that it was.
A. I think it was the draft. It had my numbers on the side so this may be the cover letter that went with that draft to DOE/RL.
Q. You don't remember, sitting here today, any discussions with Mr. Sutey concerning the ACR at any point in time, do you?
A. No. As a matter of principle, DOE/RL had virtually zero input into what we were doing. Alan Brownstein ran that show. The other stuff was okay, give me a copy type stuff.
Q. Okay. I'll hand you another document. We'll mark this as Mc Duffie number 11. It has on the cover annual capacity report with a date of December 1991.
(Mc Duffie Exhibit 11 was marked for identification by the reporter and is attached hereto.)

Page 202

THE WITNESS: Wasn't this an exhibit from yesterday?
BY MR. TOMASZCZUK:
Q. It was not, sir.
A. This is Mc Duffie what?
Q. This is Mc Duffie number 11.
A. Oh, we had one to go yesterday. I'm sorry.
MR. BANES: Just for the record, I think this is an incomplete copy of this.
MR. TOMASZCZUK: In what respect?
MR. BANES: I think appendix A is missing.
THE WITNESS: A note for the record, all the copies that I received had all the appendices. I left them all away when I brought the documents here. It's just repetitive historical data on discharges and inventory and have no bearing on the intent of the document. It was a source of who would get the benefit of any acceptance priority ranking, allocation -- acceptance capacity allocations. You can put it in.
MR. TOMASZCZUK: Let me state for the record, I copied what the witness brought yesterday. If they're incomplete, it's because of the witness' description of what happened.
Q. Mr. Mc Duffie, what is this document?
A. It appears to be annual capacity report dated

Page 203

December 1991.
Q. This is a document a copy of which was sent to you by counsel for the Justice Department?
A. Yes. I think so. Yes.
Q. You hadn't asked for this document, but it was transmitted to you; correct, by counsel for the government?
MR. BANES: Objection. I understood that he asked for this.
MR. TOMASZCZUK: Hold on.
MR. BANES: You're putting on the record -- trying to put on the record that we gave him a series of documents. That we selected various documents and just sent them to him. That is not what happened. We gave him all the ACRs up through '91. We also gave him all the documents as we said yesterday that we could find that he authored. So that is what happened. That's what we understood he requested. So Mr. Mc Duffie may have asked for something different, but what we understood he requested was different.
BY MR. TOMASZCZUK:
Q. Mr. Mc Duffie, did you request that the government send you this document?
A. I requested that someone send me a copy of the first ACR.

Page 204

Q. So the answer to my question is no, you didn't ask them to send you this ACR?
A. I did not ask them to send me this document.
Q. With whom was that conversation?
A. It was either you or --
MR. BANES: It was with me.
THE WITNESS: -- Brian Henderson.
MR. TOMASZCZUK: I object to interjection of your own testimony while the witness is answering. If you have an objection, make it; otherwise, I respectfully request that you let the witness finish his answer.
MR. BANES: All right. Objection. Irrelevant to this entire line of questioning.
BY MR. TOMASZCZUK:
Q. Go ahead, Mr. Mc Duffie.
A. I think it was Bryant that I asked about it.
Q. All right. Let's move on.
Did you have a role to play in the preparation of this document?
A. Yes. It looks like the same format and content that they had in all the previous ACRs modified for the then current whatever the receipt rate was at the DOE.
Q. So it's substantially similar to the documents we discussed yesterday?

Page 205

A. Right.
MR. BANES: Objection. Lack of foundation.
BY MR. TOMASZCZUK:
Q. Why don't you review the document and then tell me if it's substantially similar to the documents that we reviewed yesterday. Particularly, the ACRs.
A. Okay The verbiage is similar to previous documents. The acceptance rate is different. By virtue of the fact that the -- I think this included an MRS that was restricted to 10,000 MTU or 12,000 MTU.
Q. You discern that how, sir? Are you looking at a page of the document?
A. I'm looking at page 4, second paragraph, table 2.1. The acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the Nuclear Waste Policy Act, but are consistent with the 10,000 MTU storage capacity limit contained in the Nuclear Waste Policy Act for an MRS facility before a repository starts operation. The table on page 5, table 2.1, projected waste acceptance rates for spent nuclear fuel reflect the acceptance rates that would allow for ten years. Total 8,200 MTU so the DOE could accept fuel and maintain that rate of acceptance at 900 MTU per year until the 10,000 MTU limit was reached and

Page 206

quote. a repository was opened in 2010. The MTU only -- ACR only covered ten years projected. That's why the rate is 8,200 instead of 10,000. The limiting factor was 10,000 MTU storage capacity of the MRS facility before operation of a repository.
Q. Why don't the -- following that line of analysis, can you explain for me why the total listed in table 2.1 is 8,200 instead of 10,000?
MR. BANES: Objection. Asked and answered.
THE WITNESS: I'll explain again for you.
BY MR. TOMASZCZUK:
Q. Thank you.
A. The ACR, ten years, the Nuclear Waste Policy Act said 10,000 MTU -- 10,000 limit total. That is until 2010 which is 13 years, 12 years, whatever it is. This only covers the first ten years. We expected to show a rate of 900 per year in this which could be continued for two more years and then stay within the 10,000 limit at the MRS facility.
Q. So if the chart were extended, it would show a 900 MTU rate for 2008 and a 900 MTU rate for 2009?
A. Right. Deposit January 31st, 2010, everybody's happy. I hope I get there to see it.
Q. Do you know where the figures that appear on table 2.1 came from?

Page 207

A. Nuclear Waste Policy Act, restrictions on receipt rate up to 10,000 MTU total storage capacity.
Q. Are you reading part of the document?
A. No. Just digging through my mind.
Q. Okay.
A. It would appear without having a reference to all the detailed calculations that the 400 MTU rate in 1998 was the absolute minimum to avoid at-reactor storage whether they had an allocation or not. 4,000 MTU that had to go into storage somewhere, whoever had the storage problems had to do an exchange to get it. That appears to be why that rate was selected. Our primary goal was to prevent additional at-reactor storage.
Q. That goal was not met, as I understand it?
A. That goal was not met. The following rates were adjusted with that goal in mind and we topped out at 900 because that's as far as we thought we could go and stay within the boundary of 10,000 MTU by 2010.
Q. Do you know sitting here today in 2002 what has happened to this MTU? For example, the 400 MTU for 1998 represented the bare minimum, the 600 in 1999, the 900 MTU in 2000, the 900 in 2001, do you know what the utilities are doing with that if anything?
A. A lot of dry storage is taking place. I don't

Page 208

know what volume it is. A lot of pools have been reracked. I think consolidation has lost favor because it's such a dirty operation. A lot of reactors, some reactors are shut down just using their pools again. San Onofre has one they're using the pool from, getting ready to put it in dry storage. All the fuel is at a reactor site owned by a purchaser somewhere, may have been transshipped, double racked, reracked. Nothing to my knowledge has been disposed of by the government legally.
Q. Is that result consistent with the terms of the contract?
MR. BANES: Objection. Calls for legal conclusion.
THE WITNESS: It is not -- yes and no. If you think starting in 1998 upon receipt of operation capability of repository so you pick the one you like and say it's not in compliance.
BY MR. TOMASZCZUK:
Q. I'm not sure I understand.
A. The contract has two dates for starting acceptance of fuel. January 31st, 1998. And whatever that verbiage is with respect to -- hold on. Anybody has a citation, I'd appreciate it.
Q. I'm not sure I have another date to give you.
A. In the contract it states a date when the

Page 209

government will start to accept, January 31st, 1998.
Q. Right. In article II.
A. Yes, article II, scope. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31st, 1998 and shall continue until such time as all SNF has been accepted. So yes and no. January 31st, 1998, no. After commencement of facility operations, they haven't commenced so they haven't failed to meet that criteria. That's why I never did understand what the value of this thing was other than to collect money.
Q. Are there any other differences of any significance -- you talked about the differing acceptance rates in the 1991 ACR as compared to the 1990 ACR. Are there any other differences of significance that you recall with respect to those two ACRs?
MR. BANES: Objection as to form.
THE WITNESS: There was a little more discussion of delivery commitment schedules in this document than the previous documents on page 7. It's incidental.
BY MR. TOMASZCZUK:
Q. Okay.
A. We were preparing to give out DCS instructions

///
BY MR. TOMASZCZUK:
Q. We'll talk about it during a break.
A. Oh, off the record. Just teasing.
Q. Let me ask you. I mentioned that I represent PSE&G. Do you know whether the government has argued that because PSE&G didn't submit a DCS, it therefore wasn't damaged?
A. No idea. I didn't know PSE&G didn't submit or was eligible to submit If you go back to the area of acceptance rates, you've got to have allocations available for the first year submission.
Q. That was one of the two examples we just looked at. They had an allocation in the year seven.
A. That was for 900 MTU a year. When did they have one that was 2.800 MTU a year? Was it for the year seven or year two?
Q. We can go back and look.
A. I don't have the summary tables. They are in the summary tables for the ACRs.
Q. Just so I'm clear, the instructions indicated in the DCS instructions we just looked at, they were supposed to use the 1991 ACR data; is that right?
A. Acceptance priority ranking data.
Q. Let's --



A. That was supposed to be the basis.
Q. That would be Mc Duffie 12, section 2?
A. Yes. Allocated in the latest 1991 ACR, the contract specified an APR.
Q. That 1991 ACR we just looked at showed --
A. 900.
Q. With respect to the circumstance of PSE&G, you may remember it -- I'm looking at page 9 of Exhibit Mc Duffie 11.
MR. BANES: I would renew the objection especially for this line of questioning because this is incomplete.
MR. TOMASZCZUK: I'm sorry. It's incomplete?
MR. BANES: The document's not complete. The ACR is not attached to it.
BY MR. TOMASZCZUK:
Q. Did you --
A. I see your allocation 17.5 MTU in the year seven.
Q. In the year seven?
A. Yes.
Q. So when was PSE&G supposed to submit a DCS?
MR. BANES: Calls for legal conclusion.
THE WITNESS: Not later than 63 months prior to year seven.



///
BY MR. TOMASZCZUK:
Q. Assuming a year one at some future point in time?
A. Right.
Q. Did you have any role to play, Mr. Mc Duffie, in the preparation of the 1995 ACR, APR?
A. I don't think so. I retired in April.
Q. You retired in April of '95?
A. Right. April of '95.
Q. Do you know whether the ACR that was issued in 1995 was combined with an APR?
A. I've never seen it.
Q. Never seen it?
A. No. '91 is the latest I've seen.
Q. Do you know what the most recent APR, ACR is that the DOE has issued?
A. No.
Out of curiosity, what is the latest?
Q. I believe it's 1995.
A. Okay.
MR. TOMASZCZUK: I'm about to go through a series of other documents. Let's take a short break now.
MR. BANES: Okay.
THE WITNESS: What time is it now?



MR. TOMASZCZUK: Take ten minutes. Till 10 o'clock.
MR. BANES: That's fine.
(A brief recess was taken.)
MR. TOMASZCZUK: Back on the record.
THE WITNESS: Can we go off the record?
MR. TOMASZCZUK: It's up to counsel for the government.
MR. BANES: Sure.
(A discussion was held off the record.)
THE WITNESS: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Mc Duffie, I'll hand you a document. Let's mark this as Mc Duffie Exhibit number 13.
(Mc Duffie Exhibit 13 was marked for identification by the reporter and is attached hereto.)
BY MR. TOMASZCZUK:
Q. And Mr. Mc Duffie, this document appears to be a letter from you dated August 28th, 1989 to Mr. Sutey and then it has an attachment investigation of alternatives for providing acceptance priority for shutdown reactors. Just tell me when you're ready. Have a moment to review the document and then I'd like to ask you a few questions about it.

Page 270

that are made.
Q. What is your familiarity with the comments in the letter?
A. I recognize the phraseology that we used. I know Billy's method of writing, a form of writing, a style. I think most of them were probably incorporated. A lot of it is word engineering. Acceptance queue instead of acceptance. Little things like that. There were no substantive changes in the content or the intent of the ACR.
Q. Was he in this letter expressing a concern or an objection to this concept of upper and lower waste acceptance rates schedules?
MR. BANES: Objection. Lack of foundation.
THE WITNESS: It was his opinion although it didn't count for anything that the utilities would be better served by having a target whether it's upper or lower. If you give them two, it creates more confusion. The DOE position was there are two acceptance rates so they will be presented.
BY MR. TOMASZCZUK:
Q. Did you share Mr. Cole's opinion?
A. By that time, you know, when you're cranking out numbers it doesn't matter what table you use to crank them out from. You put in the parameters and it

Page 271

spits out the rate. It didn't bother me. I knew it would bother a lot of people. Nothing I could do about it. Nor could Alan Brownstein for that matter.
Q. Who could do something about it?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: No one except the Congress. They had to approve a facility somewhere.
BY MR. TOMASZCZUK:
Q. He says here at the bottom of the text under the heading general, and he's commenting apparently on the 1990 ACR, draft ACR, it says at present the report is without substance.
A. Uh-huh.
Q. A goal minimum receipt rate and the resolution to several key issues would go a long way toward reestablishing utility confidence in DOE's ability to manage the civilian waste program, close quote. Did you discuss those issues with him?
A. Not particularly. He's saying it's without -- what did he say here -- without substance because it had two rates. How are you going to plan. If I'm doing a planning job, I need to know the parameters. This rate or that rate. It's without substance in effect for anybody trying to do planning work. Goal minimum receipt rate would be fine. Resolution of the

Page 272

several key issues are the ones that are part of the 32, or 11, went on and on, they still hadn't defined canister specs last time I noticed. Progress was attempted to be made. You can't get agreement between 47 or 57 utilities and everybody else on practically any subject especially if it involves money, their money. I think it reflects the frustration felt throughout the system. At this time, E.R. Johnson also worked for a number of utilities, if I'm not mistaken, doing certain kinds of utility-related activities. They were familiar with the problems of at-reactor storage and cost much more so than DOE was.
Q. Were you sympathetic with the frustrations he had expressed in this letter?
A. They were sort of a no never mind. You grind and you grind. That's what you are paid to do so you keep grinding. Grist for the mill. Not trying to be rude or crude, but there was not a thing I could do about it nor could I identify anybody who could be forced to do anything about it except for Congress.
MR. TOMASZCZUK: I'd like to take a short break, please. Maybe ten minutes.
MR. BANES: That's fine.
(A brief recess was taken.)
MR. TOMASZCZUK: Back on the record.

Page 273

Q. Mr. Mc Duffie, I'd like to hand you and have the court reporter mark as Mc Duffie Exhibit number 20 what appears to be a memorandum from you and Mr. Walling dated February 26th, 1991.
(Mc Duffie Exhibit 20 was marked for identification by the reporter and is attached hereto.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Did you prepare any portions of this memorandum?
A. Yes. I prepared the portion called waste disposal contracts analysis.
Q. All right. And what were you reporting on in this short paragraph?
A. We had a requirement to report to I guess it was DOE, Dave Langstaff, on a weekly basis what we were doing so we sent him these things. This references a meeting at EEI's Washington office, a meeting of the technical working group between the DOE and the utilities and it states the revised cask designs for BWR were presented to the utilities at the meeting. This is the one. BWR would handle the standard fuel now. Had some discussions about the APR, acceptance priority ranking reports, and the continuation of the

Page 274

publication of the ACR, the annual capacity report. Concluded to continue to publish both of the documents. The APR would be a separate document sent to the purchaser's contracting officer. And the APR was to be the basis for submission of the delivery commitment schedules therefore it went to the utilities, the purchasers, the people buying the services of the waste disposal.
Q. And the memorandum concludes that the ACR will continue to be published as a planning document?
A. Right.
Q. Did you participate in these discussions that are referenced in the memorandum?
A. Yes. I was at the meeting.
Q. There was a meeting apparently held on February 21, 1991?
A. February 19th.
Q. I'm sorry. There was a meeting on February 19th. Thank you. Then it goes on to say additional discussions were held on February 21, 1991?
A. Yes.
Q. Do you recall whether you participated in both sets of discussions?
A. I know I was at the meeting with the utilities. I think the second meeting is with Alan in

Page 275

the Washington office at DOE headquarters just to continue the ACR.
Q. And did you attend that meeting at Mr. Brownstein's office?
A. I would assume that the meeting -- his office wasn't half this big, no more than three people could get in there.
Q. And what was the nature of that discussion?
A. Should we continue the ACR over the contract, it was over. Alan thought we should continue it, apparently discussed it with the utilities and they wanted it continued. That's my impression.
Q. What do you mean that the ACR was over?
A. The contract said that the DOE will publish an acceptance priority ranking whatever date it is. Prior to that they published an annual capacity ranking. You don't need an annual capacity report if you have an acceptance priority ranking. The theory in my mind is that the acceptance priority ranking is commitment on the part of DOE to receive delivery commitment schedules based on allocations in that document whereas the ACR report is a planning document. Is that what the contract says?
Q. Well, let me just ask you. You've got a copy of Mc Duffie 1 which is the contract there.

Page 276

A. What section are you in?
Q. I was looking at the bottom of page 524, the top of page 525. Is that what you had in mind in the testimony you just gave?
A. Yes.
MR. BANES: Objection. Calls for legal conclusion.
THE WITNESS: Yes. I'd draw your attention to 524, item 5 at the bottom of the page, right-hand side column. Beginning on April 1st, 1991 DOE shall issue an annual acceptance priority ranking for receipt of spent nuclear fuel. Then in paragraph B, page 525, left-hand corner, beginning not later than July 1st, 1987 DOE shall issue an annual capacity report for planning purposes. The two would be redundant if the APR were issued, we'd have to take the information from the last ACR as a basis for allocation.
BY MR. TOMASZCZUK:
Q. There's no reference to the APR being issued for planning purposes, is there, in the contract section you just read?
MR. BANES: Objection. Calls for legal conclusion.
MR. TOMASZCZUK: Just asking him what the contract says.
THE WITNESS: What page are you on?
BY MR. TOMASZCZUK:

Page 277

Q. Page 524.
MR. BANES: We're just saying you don't have to ask him what the contract says. It speaks for itself.
MR. TOMASZCZUK: That is a different objection.
MR. BANES: Well, we've filed a summary judgment motion based on the contract.
THE WITNESS: No, it does not say it's for planning purpose. It states no particular use. It just says you'll publish it. Acceptance priority ranking. The schedule says you'll submit a delivery schedule based on the acceptance priority ranking.
BY MR. TOMASZCZUK:
Q. Did you have any views with respect to the conclusion that's articulated at the bottom of Mc Duffie Exhibit number 20?
A. It was concluded that the APR will be sent to the purchaser's contracting officer as a freestanding document, and that the ACR will continue to be published as a planning document. As stated earlier, the acceptance priority ranking was offering delivery services to the purchaser's contracting officer. The contracting officer is the one who signed the APR. They had to pay the bill. The ACR was of a general nature probably just spent fuel management people in the reactor business. The purchasing officer had no

Page 306

future?
A. Appears they were taking over responsibility for the acceptance priority report and annual capacity report.
Q. Was that happening?
A. As far as I know, probably was. 1993 was -- because I was gone a year and a half after that. This was December '93 so almost '94 and I left in April of '95. They may have prepared the 1995 ACR for all I know. Because I don't remember working on it.
Q. Do you know when this transition occurred from PNL to TRW?
A. No, I don't. I don't remember ever meeting with the TRW people. I don't remember meeting with the TRW people at all.
Q. Going back to the following page, issues.
A. Give me a number.
Q. 1732.
A. Okay.
Q. Under the heading general under the caption issues. OCRWM management pushing for all work through the M and O and generally done by the M and O, do you know what that is referring to or describing?
A. No. They had just put TRW in charge and TRW was trying to, I guess, corral all the players. Seemed

Page 307

like every field office in DOE tried to get a piece of the action. The Chicago office had something in there. Oak Ridge boys, everybody was trying to get a contract out of them. TRW apparently was supposed to take over the whole pile and do it, manage it properly.
Q. That decision had been made by OCRWM management?
A. I'm sure it had if TRW had the contract.
Q. Do you know who made that decision?
A. Admiral Watkins maybe, whoever was in charge of RW. It wasn't Watkins. He was DOE/HQ.
Q. What is the reference on this page of issues to SFDB?
A. Where are we talking?
Q. About halfway down the page. There is --
A. Spent fuel data base.
Q. Then there's two lines of text following.
A. Lack of PNL programs to support decreases knowledge base. PNL had been doing that, Rick Walling and his predecessor had been doing the spent fuel data base 15, 18, whenever the second discharge was, all the records, all the stuff, all the corrections to it.
Q. Was there dissatisfaction at PNL with respect to this transfer of responsibilities from PNL to TRW?
A. For 218, $232,000, we didn't really care.

Page 308

There were other things to do, more interesting things to do. Got to where you were pushing a rope.
Q. And that figure you referred to was the figure that appears at page 1733?
A. Right. Funding status for '93 and '94 requested funding.
Q. Under the heading waste disposal contracts analysis?
A. Yes. And spent fuel data base.
Q. The work you were doing was waste disposal contracts analysis?
A. Right. But we had to have the spent fuel data base in order to do it.
Q. I'm sorry. Where do you see a reference for spent fuel data base on this funding chart?
A. FY '93 spending?
Q. Yes.
A. Left-hand column, spent fuel data base.
Q. I'm sorry. Thank you.
A. That's all right.
Q. Do you know Nancy Slater?
A. Doesn't ring a bell.
Q. She's referenced on the next page of this document, page 1734, as the client contact for waste disposal contracts analysis.

Page 309

A. We talked a lot with Mary Lee Payton. I don't remember Nancy Slater. I don't remember.
Q. You don't recall sitting here today for whom that briefing was prepared?
A. No. I don't.
Q. Time to move on, Mr. Mc Duffie, unless you want to add to or comment on your answers?
A. Move on.
Q. Let's have you review and have the court reporter mark as Mc Duffie 26 a memorandum from you to Mr. Langstaff and N. Montgomery dated April 13th, 1992.
(Mc Duffie Exhibit 26 was marked for identification by the reporter and is attached hereto.)
THE WITNESS: Could someone explain what's written in here? I can't read it.
BY MR. TOMASZCZUK:
Q. The handwritten language in the middle of the first page appears to read copy of PNL proposed contract changes.
A. Okay. The title. Proposed contract. All right. There they are. 1, 2 -- 24.
Q. What is this document?
A. We had discussed over and over again how can we resolve the 32 issues without a contract change and

Page 310

concluded in general a contract change would be required and probably be shortest to go through the rule-making process rather than negotiate the changes for each and every one of the contract holders. Alan asked if I would draft up a proposed contract reflecting the changes and send it to him for staffing and review. Now, I don't know whose comments -- there are handwritten comments throughout the document. I don't know whose they are.
Q. It's not your handwriting?
A. No.
Q. Mr. Brownstein asked you to prepare this memorandum?
A. Yes.
Q. Do you know why he's not identified as a recipient of the memo?
A. No. Because it went to Nancy Montgomery. I think she worked in Brownstein's office at that time.
Q. Do you know whether her married name is Nancy Montgomery or Nancy Slater?
A. I have no idea. I just remember Nancy Montgomery. Yes. I'd refer you to 1886, line 19. Does that look familiar? It doesn't say high-level waste, does it?
Q. In line 19, there's no --

Page 311

A. Line 12. Between 10 and 12. Definition number 19, the term spent nuclear fuel and high-level radioactive waste, doesn't discuss the high-level waste gap that was in there as B in the original contract. Which was my concern about getting GTCC under the same -- remember that discussion?
Q. Yes, I do. And what were you purporting to do with this proposed contract change?
A. This was to incorporate the -- I think all but one of the issues was incorporated, resolution of the 33 of the 34 issues were included.
Q. What were you purporting to do with the GTCC issue?
A. Take it out of being considered as part of the contract. Remember our discussion under this contract, two good lawyers could get together and make GTCC be accepted under this contract in my opinion.
Q. You were trying to get it out of there?
A. Yes. Undue risk associated with DOE's activities. Risk being cost.
Q. You purported to do that by changing definition that appears at --
A. Eliminated the part that's described high-level waste. I think in 12, is that the other one, definition 12 on page 1884, at line 9, you note on

Page 312

line 14. I tried to get that out of there. At line 21, it gives you the reason why it's out of there. We're trying to remove the future contention of GTCC as covered under the contract. That was not the intent of the contract. The contract is worded so that it could be assumed to be the intent.
Q. You had no role in the drafting of the initial contract; right?
A. None.
Q. Why in the cover memo do you state that quote unquote rule making as the most efficient method of revision of the contract?
A. If you go through the rule-making process, whatever comes out is going to be agreed to by DOE and the bulk of the parties, not all of them, but that's the law. If you say now, here's a new contract for you to sign, everybody has to sign it. They can't negotiate all the nitpicking garbage that everybody wants to. Some guy out there, I don't know who he is or where he is, but he wants the date of his first discharge of fuel for his date of acceptance priority ranking even though he reinserts every 15 times over ten years, he wants his first date of discharge to be used for acceptance priority ranking. That is not a true representation of the intent of oldest fuel first.

Page 313

Oldest fuel first says date of final discharge. You'd have to negotiate with him on that subject. Somebody else wants absolute priority for shutdown reactors. Somebody else wants all their allocation all at one time. Rule making says these are new rules, sign up, keep making payment of one mill.
Q. There is a reference in the cover memo in the second paragraph to article XXII. Can you explain that to me? I assume it is article XXII of the contract?
A. Right.
Q. What were you intending to convey by this language here?
MR. BANES: Article -- never mind.
MR. TOMASZCZUK: Roman numeral XXII.
THE WITNESS: Anybody find a page, holler.
BY MR. TOMASZCZUK:
Q. 531.
A. Article 22. The entire contract. Article XXII relates to the entirety of the contract and I think it says any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement blah, blah, blah, blah, blah so we couldn't make these a change to the contract without

Page 314

a formal rule-making procedure because it wasn't allowed. It was too complex, too deep. I figured it would be faster to go through the rule-making process.
Q. The language in this last sentence at the end of the second paragraph of the cover memo says in pertinent part article XXII appears to rule for the desired changes. I'm not sure I understand what you meant by that language. Can you explain that to me?
A. I think it's improperly written myself. It precludes the desired changes being incorporated without rule making. That's my opinion. I may be brilliant, but I'm dumb at times. Don't put that in. You guys don't know what you missed. You had a good chance here.
Q. I direct your attention to the Bates number in the lower right-hand corner 1887.
A. Yes, sir.
Q. There is some starred language here suggestions of changes and no changes to this article. What were you purporting to propose with respect to article II of the contract in this memo?
A. Article V. Okay. Let me see. We took out the reference at item 12, line 12 to remove the reference to high-level waste from civilian nuclear power reactors.

Page 315

Q. Why were you suggesting that change?
A. Because at that time DOE didn't have sufficient capacity, didn't anticipate having sufficient capacity to accept that spent fuel. It hadn't even been made to a law yet. Hadn't been classified. It was non transportable. It was liquid so there was no need for it in the contract with the utilities.
Q. Okay. As reflected at lines 15 to 24 of this page, you were not recommending a change to the January 31, 1998 date?
A. No. We were referring to a line 9, SNF, high-level waste, as provided in article V below. We recommended it stay there and the reason why is stated here.
Q. The reason for my question is the statement that begins at line 18.
A. Okay. Let me give you a brief on the format.
Q. Please.
A. Four stars, no change. That's item 1. Line 9. That is discussed on line 15. Four stars, no change. Four stars if you go down to line 12, four stars, change 1, that line 25 four stars change 1 is discussed. Try to get you reading the top and bottom in the right order. Now, I have to figure that out

Page 316

myself. Don't feel bad.
Q. Thank you.
A. That's fine. You learn something.
Q. Well, let me ask this question, were you or were you not proposing a change to the January 31, 1998 date?
A. I was proposing no change. The reason is the January 1998 date cannot be changed by rule making codified in the Nuclear Waste Policy Act, section 302. Does that make sense?
Q. Yes.
A. Too many people running the show in this program.
Q. Then finally, there's change 3.
A. Yes.
Q. And you are proposing to change the term disposed of and replace that with removed from the purchaser's site.
A. Right. Because it can be taken to a MRS facility, not disposed of, but it is removed from the purchaser's site and that's all the purchaser cares about.
Q. The reason for that proposed change was what?
A. Line 8, reason 3. DOE's obligation to each purchaser is fulfilled when all SNF and or high-level

Page 317

waste has been removed from purchaser's site regardless of when it is disposed of.
Q. What are the proposed changes that apply to reasons 1 and 2 that appear at this page 1888 from lines 3 to 7?
A. What are the proposed changes?
Q. Yes. There are two reasons stated there; right? At lines 3 through 7?
A. Yes. One relates to GTCC. Article I-12. The definition 12. Remember that's the one that says --
Q. I'm asking you to which change does that reason apply?
A. This would be change 3 -- right now. I can't figure it out.
Q. Well, in any event in the interests of expediency, it's fair to say that one of your concerns in preparing those proposed modifications was to try to avoid arguments about GTCC; right?
A. One of them, yes.
Q. Were there other purposes in your mind that you were trying to meet in the preparation of this document?
A. To answer or resolve the issues, state a DOE position that might be acceptable to the utilities to resolve 33 of the 34 issues.

Page 318

Q. Did you have any discussions with Mr. Langstaff or Ms. Montgomery or Mr. Brownstein concerning this document after you submitted it to DOE?
A. I don't know what the disposition of this activity was, but I'm sure we did.
Q. Do you recall any of those discussions?
A. I'm doing good to remember where I live these days. No. It never went further than Alan's office because they didn't elect to amend the contract as far as I know.
Q. At or about the time that Mr. Brownstein asked you to prepare this, did he express a concern about possible litigation from the utilities concerning the contract?
A. I don't think so. Alan's big concern was DOE might look bad. That was -- looking bad was his greatest concern. That was not my concern. That was Alan's. He never discussed litigation at that time as far as I can remember.
Q. Did you discuss potential litigation by the utilities with anyone?
A. No. It was of no concern to me.
MR. TOMASZCZUK: I just need a minute or two to look at my notes.
MR. BANES: Want to break now?

Page 319

MR. TOMASZCZUK: Off the record.
(At the hour of 1:08 p.m. a luncheon recess was taken. The deposition was resumed at 2:05 p.m., the same persons being present.)

Page 320

CARLSBAD, CALIFORNIA, TUESDAY, MARCH 19, 2002
2:05 P.M.
---o0o---

EXAMINATION (Continued)

MR. TOMASZCZUK: Back on the record.
I do not have any further questions for you at this time. I however, need to adjourn the deposition and reserve the right to recall you as a witness in the event additional documents we've requested are produced and with that, I'm going to turn it over to my colleagues who have some questions. Let me say with respect to the procedures here, the court reporter will produce a transcript of your testimony and it will be submitted to you for review and you'll have the opportunity to review it and make any corrections that you deem appropriate to the transcript. And I'd ask that you sign it and send it back to the court reporter and typically you'll get some instructions with that
THE WITNESS: You didn't want the attachments.
MR. TOMASZCZUK: For purposes of the plaintiffs I represent, for my copy of the deposition I don't require copies of the attachments. And they will be bound with the original and you should get those from

Page 321

her when you receive the original transcript for review and signature. I want to thank you for your patience and cooperation during the last day and a half.
THE WITNESS: My pleasure.
MR. TOMASZCZUK: I've appreciated the opportunity to chat with you and learn what you know about these important subjects.
With that, I'll turn it over to Mr. Neslin.
MR. BANES: I think we had an understanding that we at the conclusion of each attorney's examination of the witness, that we would have an opportunity to cross-examine. I don't have very much. I just have a couple of questions.
MR. TOMASZCZUK: All right.

EXAMINATION

BY MR. BANES:
Q. Mr. Mc Duffie, in any of your testimony that you've given today and yesterday have you purported to speak on behalf of the Department of Energy or any of its employees?
A. Not voluntarily. I may have alluded to statements made by them. But I don't speak for them.
Q. Okay.
MR. BANES: I have no further questions.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY; :
CONNECTICUT YANKEE ATOMIC :
POWER COMPANY and MAINE :
YANKEE ATOMIC POWER COMPANY, :
Plaintiffs, :
: Discovery
vs. : Judge
: (Judge
THE UNITED STATES, : Sypolt)
Defendants. :
:

Deposition of PATRICK MCDUFFIE
(Taken by Plaintiffs)
Carlsbad, California
June 26, 2002

Reported by: Monica M. Cline, RPR, CSR No.8933