Page 2

APPEARANCES OF COUNSEL:
ON BEHALF OF PLAINTIFFS:
YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY:
SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK
1350 I Street, N.W., Ninth Floor
Washington, D.C. 2005-3305
(202) 898-5839

ON BEHALF OF THE DEFENDANTS:
FOR THE UNITED STATES:
U.S. DEPARTMENT OF JUSTICE
BY: R. ALAN MILLER
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-6288

Deposition of PATRICK MCDUFFIE taken by Plaintiffs, held at the Hilton Garden Inn, 6450 Carlsbad Boulevard, Chandler Boardroom, Carlsbad, California, commencing at 9:30 a.m., Wednesday, June 26, 2002, before Monica M. Cline, RPR, CSR No. 8993.

Page 3

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| PATRICK MCDUFFIE | |
| By Mr. Stouck | 5 |

EXHIBITS

| PLAINTIFFS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 45 | Draft Federal Register Notice | 25 |
| 46 | Revised Draft APR Alternatives | 56 |
| 47 | Thoughts on the Exchange Process | 77 |
| 48 | Acceptable vs. Standard Waste | 92 |
| 49 | Functional Description for the Delivery Commitment Schedule Processing, Approval, and Management Control System | 95 |
| 50 | Milestones 1034-B | 103 |
| 51 | Milestone 1037-A | 118 |
| 52 | Technical Coordination Between PNL MRS Systems Study Tasks and ACR Shutdown Priority Task | 121 |
| 53 | Technical Coordination Between PNL MRS Systems Study Tasks and ACR Shutdown Priority Task | 127 |


Page 4

EXHIBITS (Continued)


| PLAINTIFFS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 54 | Memo to Tom Pollog from Pat McDuffie, September 18, 1990 | 131 |
| 55 | Defendant's Witness List | 134 |
| 56 | Milestone 1032-C | 140 |

EXHIBITS PREVIOUSLY MARKED AND REFERENCED

| Exhibit No. | Page No. |
|---|---|
| 26 | 34 |
| 14 | 57 |
| 12 | 68 |
| 23 | 90 |


Page 5

CARLSBAD, CALIFORNIA;
WEDNESDAY, JUNE 26, 2002; 9:30 A.M.

PATRICK MCDUFFIE,
having been duly administered an oath in accordance with Code of Civil Procedure Section 2094, was examined and testified as follows:

EXAMINATION
BY MR. STOUCK:

Q. Good morning, Mr. McDuffie. I'm Jerry Stouck. We met briefly before we started here. I want to thank you for coming.

And I know that you've been deposed for a couple of days previously in this litigation, so you're generally familiar with the ground rules. I'll review those in a second.

As I told you before we started, I represent three utility companies in this litigation: Yankee Atomic Electric, Connecticut Yankee Atomic Power Company and Maine Yankee Atomic Power Company.

Each of those three companies, as you may know or as you may recall, has one nuclear power plant which is permanently shut down. So they're

Page 10

we're interested in?
A. It was my interpretation that the primary goal was to find out what was a definitive date to start acceptance of spent nuclear fuel by the Department of Energy, SNF, spent nuclear fuel.
Since that time I thought about this and there are two scenarios which they'll never have to take.
Q. All right.
A. The first one would be the overzealous environmental administration that would shut down all nuclear power plants and eliminate the 1 mil, m-i-l, per kilowatt hour fee for nuclear waste disposal.
Q. Okay.
A. The other one would be for a repository not to be licensed and reactors are shut down due to age, therefore, no additional 1 mil per kilowatt hour fee.
Those are two scenarios which the government is no longer obligated to take.
Q. What led you to conclude that the primary goal -- let me ask first, what do you mean when you say the primary goal was to determine the definitive date for the start to accepting spent

Page 11

fuel?
A. My interpretation of the first two days of deposition was the utility industry was trying to determine when the DOE should have started taking spent fuel. And what the DOE should have done is not take spent fuel starting on that date.
Since they haven't started taking spent fuel, we were trying to find a date. There is none firm.
So there are no provisions of the contract for penalties to DOE if they did not start.
Q. Okay. That's your general understanding --
A. That's my general understanding.
Q. -- of what the litigation is about?
A. What the litigation is about.
Q. Let me ask you a couple of questions. As I said, I have some follow-up to your prior deposition. Some of these you may not need to refer to the testimony, although you're certainly welcome to. I can point you to some pages.
My first pages are about your background. You indicated that you at some point after you were working with Battelle,

Page 12

B-a-t-t-e-l-l-e, but before you started working on standard contract matters, you worked on an NRC program for decommissioning of nuclear reactors.
A. Right.
Q. And this is on Page 14 of the transcript. It says that was a three- to four-year project.
A. Uh-huh.
Q. What was that? Can you tell me a little bit more about that?
A. Okay. The NRC financed Battelle to do a study of the decommissioning of a reactor. We chose the one in Portland -- outside Portland, over there at Portland General Electric.
Q. Trojan?
A. Trojan was the model. How do you take it apart? What are the labor costs? What are the environmental costs? What are the radiation loads?
So we worked on that about four years.
Q. And produced a report?
A. Produced volumes, yes.
Q. For the NRC?
A. For the NRC.
Q. Who was in charge of that?

Page 13

A. Richard I. Smith.
Q. Is he still with Battelle, do you know?
A. He's probably retired by now. He had been there 30-some-odd years at that time.
Q. And your best recollection is still that was a three- to four-year project?
A. I think that's all I worked on it. I don't know how long it was going on.
Q. Because my next question is that I want to try to see if we can nail down more specifically the time at which you started working on standard contract matters. Because the transcript, as I read it, was a little fuzzy on that, whether it was '82, '83, '84, '85, '86. It is not clear.
A. Before that, before the contract, I worked on the MRS proposal, monitor retrievable storage.
Q. After the NRC decommissioned the project?
A. It probably overlapped. It wasn't full time. MRS became a full-time job for a number of years.
Q. The MRS project was for the Department of Energy?
A. Right.

Page 14

Q. That was the office of the Department of Energy prior to the Nuclear Waste Policy Act that was looking at --
A. Monitor retrievable storage, MRS.
Q. Just for both of our benefits actually, and also for the reporter's benefit, maybe most importantly, try to wait for me to finish my question and likewise. We both have been, I think, speaking over one another.
The reporters I know, most of the good ones, can deal with that, but it is tough. So let's try to not step on each other here.
The monitor retrievable storage project you referred to was done for the Department of Energy?
A. Yes.
Q. And this was the office at the Department of Energy that was looking at spent fuel disposal issues prior to the Waste Policy Act; is that your recollection?
A. Yes.
Q. And that was the customer for this project?
A. This particular one, yes. There was also a study on commercial spent fuel management.

Page 15

Q. Prior to the Nuclear Waste Policy?
A. Well, all of them were going on at the same time. And the Nuclear Waste Policy, I think, was passed in 1982.
Q. Right.
A. Which authorized the contract to be signed, I think, by June of '83.
Q. Yes.
A. So I worked on the monitor retrievable storage and a little bit on the commercial spent fuel management. Then I got onto the waste contract analysis program after that.
Q. Okay. Who was in charge of the monitor retrievable storage?
A. Dr. Robert Hall, H-a-l-l.
Q. Okay. And again, this was a big report?
A. A big report. Fluor was the construction management. Fluor Corporation was the A&E manager for the study. They designed the facility.
Q. So this was a full-blown design?
A. No, it is not a built spec, but design criteria type things, proto type -- not proto type, but layouts, all of the stuff you have to do to get a facility up and ready to put out for bid.
Q. Was it prior to or after the Nuclear

Page 16

Waste Policy study?
A. Probably during.
Q. Okay. Well --
A. I can't tell you the specifics. That's 15 years ago.
Q. Fine.
In terms of your work on the standard contract, though, Mr. Cole told me that -- or testified more precisely at his deposition that the way that he got into working on standard contract issues was first a project for EEI to look at issues, if you will, under the standard contract.
Do you recall that?
A. I did not work with him at that time. The MRS program office was here and right next door was Billy Cole. And I saw Billy and we talked to each other.
Q. So you had no involvement with any work that Battelle may have done for EEI on standard contract issues?
A. That's correct.
Q. Okay. Now, Mr. Cole also testified, I will represent to you, that -- I was there -- that his work for Mr. Brownstein at DOE on the same

Page 17

issues evolved out of the work that they had done -- in other words, it was subsequent in time to the work for EEI.
A. It may have been, yes.
Q. That was in the mid-1980s and that was '85 or '86, as I recall.
Okay. Now you know I'm asking for your best recollection about the time at which you and your group started working on standard contract matters.
A. If you can go find out the date the MRS proposal was submitted, within, I'd say, three months of that is when I started working with Billy Cole. But I don't know what that date is.
Q. You just can't place it?
A. No.
Q. Even with what I just told you?
A. No, the sequence of events was that.
Q. It was obviously prior to the 1987 ACR?
A. Oh, yes, definitely.
Q. Well, with reference to the 1987 ACR, can you place it? Was it a year before, three years before?
A. Probably a year, year and a half before.
Q. Thank you for that.

# Ronald Milner

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 26

MR. SHULTIS: Objection -- vague.
THE WITNESS: I don't know that I could call out any particular area.
BY MR. TOMASZCZUK:
Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?
MR. SHULTIS: The same objection.
THE WITNESS: Probably.
BY MR. TOMASZCZUK:
Q. Do you know what they are?
A. I would be hard pressed to call it out.
Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.
If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.
Are there any areas that you feel you have particular expertise or knowledge in?

Page 27

A. No, I wouldn't say so.
Q. In preparation for your deposition here today, did you review any documents?
A. No, I did not.
Q. Did you speak with anyone concerning your deposition?
A. Very briefly with the two Justice Department attorneys.
Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?
A. No, not concerning the deposition.
Q. Did you speak with anyone at OCRWM concerning their deposition?
A. No.
Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?
A. No.
MR. SHULTIS: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and

Page 28

high-level radioactive waste?
A. Yes.
Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?
A. No, I did not.
Q. It had already been executed at the time you became an OCRWM employee?
A. Correct.
Q. At the time you became an OCRWM employee, did you have occasion to read the contract?
A. Yes.
Q. At the time that you became an OCRWM employee, did you read any other documents?
A. I'm not sure I understand that question.
Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?
A. Um-hm.
Q. Right. And you have testified you have read the standard contract?
A. Um-hm.
Q. At or about that time, correct?
A. Um-hm.

Page 29

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.

Page 66

(Milner Exhibit No. 4
was marked for
identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. Very vaguely. This would appear, judging by the date, to be an early draft.
Q. Early draft of a Mission Plan?
A. Yes.
Q. And is this a document that you read at or about the time you became an employee of OCRWM?
A. I don't believe I would have reviewed this draft.
Q. You would have reviewed another draft?
A. Subsequent draft.
Q. A later draft do you think? And why do you say that?
A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.
Q. And why do you make that assumption?
A. Typically over that intervening period, the document would have been refined and

Page 67

further drafts produced.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A. I don't recall that being a goal.
Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?
A. Oh, 2-1.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of the first paragraph on page 2-1?
A. Yes.
Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

Page 68

A. Um-hm.
Q. And you disagree that that was an intention of DOE at or about this time?
MR. SHULTIS: Objection. Mischaracterizes the prior testimony.
Calls for calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I didn't mean to mischaracterize your testimony.
I understood it to be that you did not agree with that statement.
A. I did not recall that that was a goal at that time.
Q. Okay. Having read it, do you now recall that that was a goal?
A. I don't recall whether that language was in the final Mission Plan.
Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: I don't recall it.
BY MR. TOMASZCZUK:
Q. The text of this paragraph goes on to

Page 69

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.
At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I didn't recall that.
BY MR. TOMASZCZUK:
Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.
This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

Page 130

speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)

Page 131

MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?

Page 132

A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my

Page 133

understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 298

BY MR. TOMASZCZUK:
Q. Is it possible that they would constitute GTCC from a technical standpoint?
A. It's possible.
MS. HERRMANN: Objection. Calls for a legal conclusion, speculation.
BY MR. TOMASZCZUK:
Q. Could I ask you to look at page 2 of your letter?
At the top of this page, there is the phrase as we proceed with final cask design, then you go on to request assistance from Mr. Zabransky in developing and implementing a plan to obtain data.
Was OCRWM at this point in the process of final cask design?
A. Yes, that's correct.
Q. Did that task get completed?
A. In one instance, it did, yes.
Q. And what instance is that?
A. There were essentially three cask designs that were being worked on.
Two of the designs were for a truck cask, and one was for PWR assemblies. One was for BWR assemblies, and at that point in time,

Page 299

another was rail cask.
My recollection was that as a result of these discussions indicated here, we dropped the rail cask design, and I believe, I can't recall for certain whether the department actually completed the final design or whether the contractor completed the design on their own because at some point in time, one of the appropriations acts, the Congress basically directed us to cease cask design work.
Q. Is cask design work ongoing today at OCRWM?
A. No, it's not.
Q. It's being held in abeyance for some reason?
A. It's not being accomplished. Congress directed us to stop cask design activity.
Q. Okay.
A. And we did, have continued to stop it.
Q. Do you know why Congress made that direction?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: I have no idea.
BY MR. TOMASZCZUK:

Page 300

Q. Would these assemblies with channels that you described in your testimony a few moments ago constitute non-fuel components at that time as used in the contract?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: They would, in my opinion.
MR. TOMASZCZUK: Let's mark as Milner Exhibit 37 a memorandum dated April 15th, 1991, signed by Mr. Milner concerning approval for issuance of a comment draft of the annual Acceptance Priority Ranking.
(Milner Exhibit No. 37 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recognize this document, Mr. Milner?
A. Offhand, I do not, no.
Q. That's your signature that appears at the second page of it, right?
A. That's correct.
Q. Is that also your handwriting that

Page 301

appears on this second page next to the third paragraph and in the third paragraph?
A. It does not appear to be my handwriting, no.
Q. You understand what I'm asking you about?
A. Yes.
Q. The marginalia there?
A. Yes.
Q. Turning back to the discussion set forth in the memo at the first page, second paragraph starts off by saying publication of the APR begins the contractually binding waste acceptance process system.
Is that a true statement in your view?
A. In my view, yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. The next sentence says the ACR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report as the basis for purchasers to submit Delivery Commitment Schedules beginning in January 1992 for the department's approval.

Page 302

Do you know who made the decision to use the 1991 ACR as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Did you make that decision?
MS. HERRMANN: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Did I just ask you that question? I'm sorry if I did.
I thought I asked you if you knew who did, but maybe I misspoke.
Do you know who made the decision to use the 1991 ACRs as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Would Mr. Brownstein have made that decision, or would that have been somebody higher up in the chain than him?
MS. HERRMANN: Objection -- asked and answered.
He told you he doesn't know.
MR. TOMASZCZUK: I asked him a different question.
THE WITNESS: I don't know who would

Page 303

have made the decision.
Could have been Mr. Brownstein. Could have been the director of the program. Could have been the deputy director of the program.
BY MR. TOMASZCZUK:
Q. You have absolutely no recollection?
A. I have no recollection.
Q. Could it have been a contractor?
A. No, sir.
MS. HERRMANN: Asked and answered.
BY MR. TOMASZCZUK:
Q. It would have had to have been somebody within DOE?
A. That's correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. The last sentence of that paragraph says in turn, purchasers will have the opportunity to exchange approved DCSs also subject to departmental approval.
Was that an accurate statement of the department's position at the time with respect to the exchange of DCSs?
MS. HERRMANN: Objection -- foundation.

Page 304

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: In my opinion, that was an accurate statement.
BY MR. TOMASZCZUK:
Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.
Why was that of the utmost importance?
A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.
MR. TOMASZCZUK: Want to take a break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.
Do you see that?

Page 305

A. Yes.
Q. What is your understanding of that term?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.
Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.
BY MR. TOMASZCZUK:
Q. Binding on both the government and the utility?
A. Correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?
A. It would have originally stemmed from my review of the contract, yes.
Q. And have you discussed that view with others at OCRWM?
A. I can't specifically recall, but yes,

Page 314

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility

Page 315

could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I

Page 316

was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

Page 317

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

Page 318

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.
Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?
A. I don't know that there was an individual that made that decision.
It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.
The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.
Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

Page 319

in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.
Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?
A. No, I don't.
Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Standard contract is the best evidence of its contents.
THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.
BY MR. TOMASZCZUK:
Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?
MS. HERRMANN: Same objections.
THE WITNESS: Best of my recollection,

Page 320

it does.
BY MR. TOMASZCZUK:
Q. It does?
A. It does.
Q. Could you identify for me where in the contract you find that language or direction?
A. I could try.
Q. Thank you.
MS. HERRMANN: Could you give him an exhibit number?
MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.
(The witness reviewed the document.)
MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --
A. Yes, that's where I'm looking.
(The witness reviewed the document.)
THE WITNESS: And I do not see ACRs

Page 321

referenced there.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Have you finished your answer, Mr. Milner, or do you want more time?
A. Another minute.
Q. Sure.
(The witness reviewed the document.)
MS. HERRMANN: Could we have the question read back just so that I'm clear?
THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"
MS. HERRMANN: If it speeds things up at all, could I refer him to another section?
MR. TOMASZCZUK: Sure.
MS. HERRMANN: Or are we just hunting? Do you want him to hunt?
MR. TOMASZCZUK: No, I don't want him to hunt.
MS. HERRMANN: Okay -- right before Article V.
THE WITNESS: Yes. Actually I was just reading that paragraph 5.
Yes, it references both the ACR and

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for



the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations



as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?



MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :

Plaintiffs, :

v. :

UNITED STATES OF AMERICA, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

A. No.
(Milner Exhibit No. 53 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.
Are you familiar with this document?
A. I don't recall it specifically, no.
Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.
Do you recall the DOE or its contractors doing any work on a DCS exchange network?
A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to



take an active role, how might that be accomplished.
Q. Who at the Department was involved in that consideration?
A. Well, I guess it would have been myself, members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.



THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.
BY MR. NESLIN:
Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I have no such understanding.
BY MR. NESLIN:
Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?
MR. SHULTIS: Same objection.
THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.
BY MR. NESLIN:
Q. In considering how the Department might take an active role, what sorts of actions did you



consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q. You say it would never relate to a position?
A. It would never reflect, I'm sorry; not

Page 444

relate, it would never reflect the Department's
position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the



program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?



A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of



the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY       )
(98-126C)(Merow, S.J.)               )
CONNECTICUT YANKEE ATOMIC POWER      )
COMPANY                              )
(98-154C)(Merow, S.J.)               ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY)   Washington, D.C.
(98-474C)(Merow, S.J.)               ) Tuesday
               Plaintiffs,           ) May 7, 2002
               v.                    )
THE UNITED STATES,                   )
               Defendant.            )
- - - - - - - - - - - - - - - - - - -)
```

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

Page 3

APPEARANCES CONTINUED:

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

Page 4

CONTENTS


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 5 |


EXHIBITS

(No exhibits were marked.)

Page 5

PROCEEDINGS

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SKALABAN:

Q. Hello, Mr. Milner. My name is Pete Skalaban. I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company in this litigation.

I'd like to apply the same general ground rules that occurred in the common deposition. If you don't understand a question, if you can let me know, and I'll try to clarify it.

A. All right.

Q. And that way, we can have a common understanding for my questions and your answer.

A. Fine.

Q. If you need a break at any time, please let me know. I'll be happy to stop. I just request that the break doesn't occur when a question is pending.

Is that okay?

Page 22

again?
MR. SHULTIS: That was just the cover. Right?
MR. SKALABAN: Yep.
A. Okay.
BY MR. SKALABAN:
Q. And here again, sir, on page 5, you see that the beginning paragraph, the last sentence of the beginning paragraph appears to estimate the possibility that the MRS could be ready three years prior to the repository operations.
Is that fair?
A. Correct.
Q. And that would again be the department's best estimate of when it could feasibly get an MRS up and running before a repository?
A. Yes.
MR. SHULTIS: The document speaks for itself.
BY MR. SKALABAN:
Q. And we did look at this document before, and there was the upper and lower bounding case?
A. I believe that's true, yeah.
Q. I just want to call your attention in the first full paragraph on page 4 -- almost in the

Page 23

middle of the paragraph, it refers to the lower bounding case, and it says: The lower bounding case represents a receipt rate that would be in compliance with the amendments act restriction on storage limits at an MRS before a repository starts operations.
Do you see that?
A. Yes.
Q. And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act.
In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yes, because it removed one of the linkages.
BY MR. SKALABAN:
Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?
A. That's correct.
Q. If we could turn to Milner 42, which is

Page 24

the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.
Do you see that in the middle paragraph?
A. I do.
Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?
A. Correct.
Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. Is that fair?

Page 25

A. Correct.
Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.
Do you see that, sir?
A. Yes.
Q. And this is a waste acceptance schedule that is based on the assumption of again like the 1990 ACR a change in the law?
A. Correct. I think at that point in time, it was envisioned that if the nuclear waste negotiator were successful in finding a volunteer site for an MRS that that volunteer host would certainly support a change in the schedule linkage.
Q. And it would still, however, would still require Congress to change the law, presumably the president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would require a change in law to make the schedule linkages go away?
A. Correct.
Q. Now, this waste acceptance schedule on page 5, which is based on the absence of the schedule linkages in the statute, these were the basis for the DCS submittals; is that correct?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY (98-126C)(Merow, S.J.) | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | Volume II |
| (98-154C)(Merow, S.J.) | Washington, D.C. |
| MAINE YANKEE ATOMIC POWER COMPANY | Wednesday |
| (98-474C)(Merow, S.J.) | May 8, 2002 |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.