APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



CONTENTS


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


EXHIBITS


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |




EXHIBITS CONTINUED


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |




PROCEEDINGS

Whereupon,
RONALD A. MILNER
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Okay. Hello, Mr. Milner. How are you today?
A. Morning. Fine.
How are you?
Q. And just before we begin this morning, the same ground rules that we discussed apply.
Is that okay?
A. Fine with me.
Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.
I mean, do you recall that exchange?
A. Yeah. My recollection was that

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.
And perhaps I misunderstood your question, but --
BY MR. SKALABAN:
Q. Okay. I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU.
It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?
MR. SHULTIS: Asked and answered.
A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.
And if I can try to think of a hypothetical example.
If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand



MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.
BY MR. SKALABAN:
Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.
A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.



BY MR. SKALABAN:
Q. Well from the department's perspective, if there was no -- if it could be shown that there's no economic impact to other utilities, in other words, because of this grant of priority, the other utilities are not going to have to add some additional storage facilities, they're not going to have to incur those costs, what other adverse impacts would there be that the department would be concerned about?
MR. SHULTIS: Same objections, including asked and answered.
A. Well, to characterize adverse impacts that the department would be concerned about, I think our concern more related to the allocation in our view under the contract specified oldest fuel first. To change that really would require I think the agreement on certainly the bulk of the contract holders.
BY MR. SKALABAN:
Q. But can you think of any other adverse economic -- I mean, any other adverse impacts other than economics?
MR. SHULTIS: Same objections, asked and answered.



A. Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.
BY MR. SKALABAN:
Q. Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR: is that correct?
We looked at that earlier?
A. Right.
Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?
A. Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR. Excuse me.
Q. Well, I'd like you to take a look at the contract section -- it's the page of the Federal

Page 212

Register 16601. And in the article five, part B, delivery commitment schedule, it says on the top of column three: The purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW that the purchaser wishes to deliver to DOE beginning 63 months thereafter.
Do you see that, sir?
A. I do, yes.
Q. What was your understanding of that part of this provision of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my personal interpretation is that they would in fact submit DCSs which were consistent with their allocation.
BY MR. SKALABAN:
Q. If it says that the purchaser shall submit DCSs which shall identify all the SNF and/or HLW the purchaser wishes to deliver -- if the purchaser is required to by the instruction to, say, only submit up to the level of their allocation in MTUs, they can't then provide or can't identify -- they can't -- or more specifically, they're precluded from identifying all of the SNF that they may wish to deliver?

Page 213

MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yeah. In my personal opinion, I would read that -- I don't know that you can read any provision of the contract separate and apart from other provisions of the contract. And I guess I would be reading that in conjunction with the prior article, which talks about DOE issuing an annual acceptance priority ranking and an annual capacity report, which delineates our receiving capacity.
And in reading those two together, in my personal opinion, I think you would not -- I can't see a reason why you would infer that you would submit a DCS which was greater than your allocation.
BY MR. SKALABAN:
Q. Well, the language, all SNF and/or HLW that they wish to deliver, that language in that provision is -- it's not tied to an ACR allocation, is it?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. In my opinion, it is. I mean, I guess if I were to read that provision -- you know, hypothetically if I were to read that provision separate and distinct from any other provision in the

Page 214

contract, I could conceivably read that as requiring the utility to deliver that fuel to the repository.
BY MR. SKALABAN:
Q. All the fuel that it wishes to deliver?
A. To the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:
Q. So it can conceivably be read to allow the utility to identify all the fuel that it wishes to deliver, aren't the DCS instructions in effect changing the terms of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion, mischaracterizes prior testimony.
A. Yeah, I think you are mischaracterizing my response.
I was saying a hypothetical that if you read that provision separate and apart from anything else in the contract, you could probably infer any number of things. But I think you read one provision in the contract in conjunction with other provisions. And to me you read that in conjunction with annual capacity report limitations and allocations.
BY MR. SKALABAN:
Q. Well, I guess what -- yeah, I definitely don't want to mischaracterize your prior answers.

Page 215

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and

Page 216

answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.
MR. SKALABAN: Thank you. January 11th, 1994.
BY MR. SKALABAN:
Q. Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose

Page 217

canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no. They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A. Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress.
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it

Page 218

essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q. And it references contingencies evaluated for the MPC system.
Can you tell me what this is about, what contingencies were evaluated for MPC?
A. My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall.
Q. Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

Page 219

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed; hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which.

Page 4614

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos. 98-126C, 98-154C, 98-474C

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 4615

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***

Page 4616

P R O C E E D I N G S

JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.
Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining

Page 4617

misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

memo to which the plaintiffs have referred that Mr. Rusch had – that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch – anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break



for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.

A Good afternoon.

Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?



A Yes, I am.

Q What is your current position?

A Chief operating officer.

Q What are your responsibilities as chief operating officer?

A I assist the deputy director for strategy and program development in the day-to-day management of that office.

Q And do you report to the deputy director?

A Yes, I do.

Q And who is the department director?

A Ted Gerrish.

Q Does anybody report to you?

A Not directly.

Q How long have you served as chief operating officer?

A In total, about four years.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A I believe it was April of '84.

Q What was your first position? And I'm going to refer to it as RW, if that's all right.

A Okay.

Q What was your first position with RW?

A I was the branch chief of the



organization.

Q What were your responsibilities in that position?

A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.

Q What position did you next hold in RW?

A I was a division director.

Q And what were your responsibilities in that position?

A Budget, human resources, total system life cycle costs, fee adequacy analyses.

Q And what position did you next hold in RW?

A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.

Q And do you remember when you became acting director of the Office of Storage and Transportation?

A Roughly 1990.

Q And how long did you serve as director of the Office of Storage and Transportation?

A About four years.

Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?

A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.

Q You said that you were responsible for management of the MRS process. What specifically were you doing?

A At that point in time, we were attempting to find a volunteer site to construct an MRS.

Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?

A Yes, he was.

Q Did you report to Dr. Bartlett?

A Yes.

Q After serving as the director of office – of storage and transportation, what position did you next hold?

A Director of the Office of Program Management and Integration.

Q And what were your responsibilities in that position?

A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.

Q Did you also have responsibility for regulatory interface with the NRC?

A Yes, uh-huh.

Q And then what position did you hold next after you were director of program management and integration?

A After that, I was appointed the acting deputy director of the program.

Q Do you recall approximately when that was?

A I believe that was 1996.

Q And how many times have you served as deputy director of the program?

A I was acting deputy two different times.

Q And what time periods were those?

A It was '96 through '99, roughly, and then 2001 through 2002, roughly.

Q What position did you hold in between these periods that you were data director?

A Chief operating officer.

Q And were your responsibilities as the chief operating officer then substantially the same as they are today?

A Substantially the same, yes.

Q And then in 2002, is that when you became

Page 4716

chief operating officer again?

A Yes, uh-huh.

Q Mr. Milner, prior to joining RW, where were you employed?

A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.

Q Prior to becoming a DOE employee, where were you employed?

A Prior to that, I served eight years as a Naval officer.

Q Mr. Milner, do you hold a Bachelor's degree?

A Yes, I do.

Q In what?

A Mechanical engineering.

Q Where did you obtain that degree?

A University of Mississippi.

Q When?

A 1966.

Q And do you also hold a Master's degree?

A I do.

Q In what subject?

A Also mechanical engineering.

Q When did you obtain that degree?

Page 4717

A 1967.

Q Was that also from the University of Mississippi?

A Yes.

Q Can we have Plaintiff's Exhibit 95, please?

MS. SULLIVAN: May I approach?

JUDGE MEROW: Sure.

MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.

JUDGE MEROW: All right.

MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.

BY MS. SULLIVAN:

Q Mr. Milner, do you have water there? Do you want a cup of water?

A Yeah, that would be great.

MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?

JUDGE MEROW: Of course.

BY MS. SULLIVAN:

Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4722

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?
A Yes, it did.
Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?
A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.
Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?
A Yes, it certainly was.
Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.
A That's correct.
Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?
A I believe there was, yes.
Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

Page 4723

to be the provision that sets forth the requirements of the mission plan?
A Yes, I do.
Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?
A I did not.
Q Why did DOE include acceptance rates in the mission plan?
A Well, one of the requirements for the mission plan was to provide an estimation of -- of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the -- the program might be operated.
Q Thank you. And that requirement, is that set forth on -- as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?
A Yes.
Q Thank you. Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

Page 4724

reason our electronic copy -- I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's -- same information is there. I think the information just got squeezed. Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?
A Yes. That was an example of -- of how the authorized system might operate.
Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?
A Two.
Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs? Mr. Milner, can you read that section, that highlighted material?
A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

Page 4725

A Yes, it does.
Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?
A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.
Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?
A That would be the schedules that DOE was committing to to accept the waste.
Q Did DOE publish, if I recall, waste acceptance schedules in 1991?
A Yes, it did.
Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?
A They were to utilize those to develop

Page 4726

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a – an estimate at any given time of – of the total costs of – of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and – and ultimately decommissioning.

Page 4727

Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the – the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the – the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's – it's good to keep track of the estimate of the program costs but principally is – is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear –
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes.

Page 4728

Q Can we have Plaintiff's Exhibit 248, please?
Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it – again, it's – the title basically says preliminary estimate of the restructured program, which was an addendum to a prior – prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data

Page 4729

necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does – just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those – the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in – specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Page 4730

A Yes, I do.

Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.

A Yes.

Q Do you recall that reassessment?

A Yes, I do.

Q Do you recall what the result of that reassessment was?

A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.

Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?

A 1998.

Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?

A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

Page 4731

derived in the same manner as those presented in May 1989, since the majority of the assumptions and methodologies have remained unchanged; however, a major change in the schedule had a significant impact on the updated estimates. Thus, the difference between the May 1989 estimates and the updated estimates represent the overall cost impact due to the restructured program.

Q Mr. Milner, were you responsible for the preparation of the 1989 TSLCC?

A I believe I was.

Q It was a long time ago. Could we go to appendix A, page A1? Mr. Milner, what information is presented in table A1 of this document?

A That's the waste acceptance schedule, which included acceptance rates, amount of material that would be stored at the MRS at any given point in time, cumulative numbers.

Q So is it your understanding that these are the waste acceptance assumptions for the preparation of this TSLCC?

A Yes.

Q This is an addendum to the 1989 TSLCC. Can we have Plaintiff's Exhibit 976, please?

Page 4732

Mr. Milner, do you recognize what's been marked as Plaintiff's Exhibit 976?

A Yes. It's the 1986 TSLCC estimate.

Q Were you involved in the preparation of this document?

A I believe I was, yes.

Q Can we go to page 2? And can we highlight the first three sentences of the first paragraph? Mr. Milner, could you read the highlighted portion, please?

A Two important program developments pertinent to the TSLCC analysis have emerged since the previous analysis in January 1985. First, the president has determined that defense high-level waste, parentheses, DHLW, should be emplaced in the civilian geologic repositories. Second, the DOE has announced its plans to seek Congressional approval for a monitored retrievable storage, parentheses MRS, facility that will be fully integrated into the overall waste management system.

Q Thank you. Mr. Milner, based upon what you just read, do you recall what the basis for the 1986 TSLCC was?

A Essentially would have been the mission plan.

Page 4733

Q Thank you. Can we have Plaintiff's Exhibit 982, please?

MS. SULLIVAN: Your Honor, I should note that on Plaintiff's Exhibit 976, I provided to counsel and to the witness just an excerpt of that document. It also is a multivolume – volume document.

BY MS. SULLIVAN:

Q Mr. Milner, do you recognize Plaintiff's Exhibit 982?

A Yes. It's the 1998 TSLCC analysis.

Q Were you responsible for the preparation of this document?

A Not directly, no.

Q Okay. Would you have reviewed it prior to its issuance?

A Yes.

Q Can we go to page 1 of this document, please? Paragraph one, second sentence. Mr. Milner, can you read that highlighted material, please?

A This estimate is consistent with the viability assessment of a repository at Yucca Mountain, parentheses, VA, design basis and cost estimate, parentheses, DOE 1998, extended to address total system costs for all waste planned for disposal in a geologic repository for the total system life

Page 4734

cycle.
Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?
A The viability assessment that was submitted to Congress.
Q Can we go to page little Roman numeral v, the introduction by – actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?
A Acting deputy director, yes.
Q Thank you.
Could we highlight the second paragraph, bring up the second paragraph?
Mr. Milner, could you read that portion, the highlighted portion into the record?
A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included.
Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept

Page 4735

open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring.
Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.
Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?
A No, it is not.
Q Why not?
A Well, you would issue a new one once the assumptions have changed, the program has evolved.
Q Does DOE prepare a test TSLCC every year?
A Not every year.
Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 – or the preparation of the 1991 ACR, correct?
A Yes.
Q Were you – was your office also responsible for the preparation of the 1990 ACR?
A Yes, it was.
Q Could I have Defendant's Exhibit 130,

Page 4736

please? Mr. Milner, do you recognize this document?
A Yes, I do.
Q Could you identify it for the Court, please?
A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.
Q Who was the director at the time you prepared this memo?
A Dr. John Bartlett.
Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?
A Yes, it is.
Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?
A Yes.
Q Or Dr. Bartlett, excuse me.
A Yes.
Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it?
Mr. Milner, would you please read that, the highlighted portion, into the record?
A The ACR is required to project both the

Page 4737

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.
Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?
A Yes, it does.
Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?
A Yes, I do.
Q Would you identify it for the Court, please?
A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.
Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?
A Yes, at that time.

Page 4738

Q At the time you prepared this memo, were you responsible for MRS siting activities?

A Yes.

Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?

A Oh, probably something like 30 or 40 percent of my time.

Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?

A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from – letter from the department's contracting officer.

Q Thank you. Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?

A Yes, it does.

Page 4739

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?

A Yes, it is.

Q Do you recognize the other signature to be that of Mr. – Dr. Bartlett?

A Yes.

Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?

A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.

Q Mr. Milner, what was your understanding as to the – about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?

A Well, if – if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

Page 4740

Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?

A Yes, I do.

Q Would you identify it for the Court, please?

A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.

Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?

A Yes.

Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?

A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

Page 4741

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.

Q Thank you. Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?

A It does, yes.

Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?

A I believe I am, yes.

Q What is that rate that you're familiar with?

A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.

Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?

A No.

Q During your tenure at DOE, are you aware of any planning basis by which – by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

Page 4742

A No, not that I'm aware.
Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?
A No.
Q Why not?
A At – at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.
Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?
A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.
Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?
A No.

Page 4743

Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?
A I – I would have, yes.
Q Mr. Milner, do you recall attending industry meeting – sorry, attending meetings with utility representatives with Dr. Bartlett?
A Yes.
Q Was attending utility meetings with Dr. Bartlett among your responsibilities?
A It was, yes.
Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?
A No.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.
MR. SHAPIRO: We have no objection, Your

Page 4744

Honor.
JUDGE MEROW: Plaintiff's 629 is admitted in evidence.
(PX Exhibit 629 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?
MR. SHAPIRO: Certainly.
JUDGE MEROW: Do you want to take a – sure. Return about – on the hour?
MR. SHAPIRO: 3 o'clock?
JUDGE MEROW: 3 o'clock.
MS. SULLIVAN: Thank you, Your Honor.
(Recess taken from 2:47 p.m. through 3:03 p.m.)
JUDGE MEROW: Mr. Shapiro?
MR. SHAPIRO: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q My name is Robert Shapiro.
A Uh-huh.
Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination.
Now, if I understand correctly, the

Page 4745

Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for – for planning purposes, correct?
A Well, in the mission plan at – at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.
Q What about the mission plan amendment?
A Oh, I think that might have been suitable for some very early planning.
Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for – for meeting the – the legislative milestones, correct?
A True.
Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?
A Well, if you're talking about from – from

Page 4758

Q And that's because that – that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?

A Correct.

Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?

A Yes.

Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?

A Correct.

Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?

A Yeah, I think it was probably closer to 1994.

Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

Page 4759

might not be sited at all. True?

A I don't recall that, but potentially.

Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.

MS. SULLIVAN: Which day?

MR. SHAPIRO: It's May 2.

BY MR. SHAPIRO:

Q Are you on that page, Mr. Milner?

A Yes, sir.

Q Start on line 5. Do you recall being asked the following question and giving the following answer?

Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?

Answer: We were certainly doing contingency planning for that, yes.

That was your testimony, Mr. Milner?

A Yes, it was.

Q And that was accurate testimony?

A Yes, at the time.

Q Do you have a different opinion now,

Page 4760

Mr. Milner?

A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.

Q Now, as of December 1994, that – the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?

A By that time no, I don't believe so.

Q And DOE has no current plans to site an MRS?

A No.

Q Do you believe that – that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?

A Yes, I do.

Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?

A Well, I certainly recall discussions as to what would – what would happen in that case and yeah,

Page 4761

I think we would have certainly had to reevaluate what would have occurred.

Q So the delivery commitment schedules could change if circumstances change?

A Potentially, that would have to be evaluated, yes.

Q If circumstances change, the DCSs could change. True?

A I'd have to know what the circumstances were before I knew whether they would change or not.

Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?

A No, I viewed the DCSs as a binding commitment.

Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?

A Yes, I have.

Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?

Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

Page 4778

list of utilities that might be running out-of-pool space and utilities with sufficient pool space and considering brokering something between those utilities?
A Yeah, certainly we maintained a list of the approved DCSs, we knew the status of utilities' pool storage, and there had been some general discussion about brokering exchanges should – should utilities desire that.
Q You believe that brokering exchanges for utilities could serve a useful purpose?
A Yeah, I – I think it could have.
Q And one of those purposes would be potentially precluding the need for – for dry storage?
A Yes, uh-huh.
Q At one point, the department was planning for the possibility of exchange requests and began looking at criteria for approving or disapproving them?
A Yeah, I think again we – we started looking at if – if we got exchange requests, what would be the criteria, how would we handle them, but again, we never – never received any.
Q By 1994 you envisioned that swap market

Page 4779

would develop that could accommodate Yankee Atomic's spent fuel?
A I could have envisioned that, yes.
Q In fact, you did envision that, didn't you?
A I seem to have some recollection of that, yes.
Q And others at the department held that belief as well, didn't they?
A I think so, I think so.
Q But you have thought that the uncertainty of the department meeting the 1998 acceptance date had the ability to hinder that swap market from ultimately developing?
A Yes.
Q You believed that as a practical matter, it would – I'm sorry, I cut off that question. If I could have a moment, Your Honor?
JUDGE MEROW: Surely.
MR. SHAPIRO: Apologize for that delay. We have no further questions.
JUDGE MEROW: Any redirect?
MS. SULLIVAN: Yes, Your Honor. May we take a break? I don't think we're going to go very long this afternoon.

Page 4780

JUDGE MEROW: Take a ten-minute break? Is that enough?
MS. SULLIVAN: Yes, thank you.
JUDGE MEROW: Back on the hour then.
MS. SULLIVAN: Okay, thank you.
(Recess taken from 3:48 p.m. through 4:06 p.m.)
MS. SULLIVAN: I apologize, Your Honor.
JUDGE MEROW: Oh, no problem. Continue when ready.
MS. SULLIVAN: Thank you.
Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q Mr. Milner, do you know what the Pacific National Laboratory is?
A It's one of the national laboratories in the DOE system.
Q And who runs PNL?
A A contractor, an M and O contractor.
Q And what does an M and O contractor do, to

Page 4781

your understanding?
A In the indication of a lab, they operate the entire lab.
Q Has PNL done work for the Office of Civilian Radioactive Waste Management?
A It has, yes, uh-huh.
Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?
A No, they – they would be treated like another contractor, any other contractor report.
Q And how is that?
A Which is input to – to the department for – for consideration.
Q Thank you.
Mr. Milner, could – could I direct your attention – do you have the binder of your deposition in front of you?
A Yes.
Q Could you go to the first tab and just have one – the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?
A Yes, uh-huh.
Q And Mr. Shapiro asked you about a statement that you had made at your deposition

Page 4782

regarding your understanding of the intent of the program was to work off the backlog. Do you remember that testimony in the cross-examination?
A Yes, yes.
Q When you say intent was to work off the backlog, what do you mean?
A Intent to me would be that that would be a – a program goal or – or one of the planning assumptions.
Q Are you referring to a contractual intent when you use the word "intent" in that statement?
A No, not at all.
Q Mr. Milner, you were also asked about the approval of DCSs being conditioned upon the existence of a facility or the delivery date being conditioned upon the existence of a facility. Do you remember that testimony?
A Yes, uh-huh.
Q Do you recall whether all DCSs were approved with that conditional statement?
A I – I don't recall whether all of them were.
Q Okay. Can we look at – and I apologize, I don't have the exhibits for the witness. We'll have to rely on the computer. I am going to look first at

Page 4783

29, I believe. Yeah, 29.003. Can you put that on the computer, please?
Mr. Milner, I apologize, I don't have a paper copy for you. Defendant's Exhibit 29.003 has been talked about by other witnesses, is a letter from contracting officer to M.E. Thomas of Maine Yankee.
Do you recall Mr. Thomas at Maine Yankee?
A No, I don't offhand.
Q Okay. And it – the first sentence of that letter reads: The Department of Energy has reviewed and approved the six delivery commitment schedules by Maine Yankee, and it goes on to provide the numbers. Copies of the accrued DCSs are enclosed for your records.
And attached to this document, if we could go to the next page, are a series of DCSs. Do you see that they have been approved?
A Yes, uh-huh.
Q And how do you know that those have been approved?
A I see the approved by DOE signature.
Q Okay. And do you – do you see the conditional statement that you testified about earlier regarding the delivery date?
A No, I don't.

Page 4784

Q Okay. And could we go to –
JUDGE MEROW: Do you recall, Mr. Milner, though, before the Court of Appeals for the District of Columbia told us otherwise, that it was DOE's position, which you attempted to establish by rule making, that the obligation of DOE to perform under this contract was subject to the existence of a – of a repository?
THE WITNESS: I do. I recall that had been the department's position until the court decision, sir.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Could we go to Defendant's Exhibit 30.018? Mr. Milner, this is a letter from Beth Tomasoni dated June 14, 1995 to Mr. Buchheit at Yankee Atomic again forwarding approved delivery commitment schedules. The third sentence in the first paragraph reads: The proposed delivery date is dependent upon existence of an operational repository or an interim storage facility constructed under that – the act. Do you see that language?
A Yes, I do.
Q Okay. Do you recall – does that refresh your recollection as to Department of Energy's

Page 4785

statements to that effect at or about this time?
A Yes.
Q 1995?
A Yes, yes.
Q Okay. If we could go to the next page, and could you enlarge the section 2.0, delivery information, commitment information?
And, Mr. Milner, do you see the statement that's been typed in there? The proposed delivery date is dependent upon the existence of an operational repository or interim storage facility constructed under the act.
A I do.
Q Is that the conditional language that you recall?
A Recall, yes.
Q Mr. Milner, do you recall your testimony – one second, Your Honor.
Let's actually go to something else.
Mr. Milner, do you still have Defendant's Exhibit 23 in front of you?
A Yes.
Q Okay. Could we go to the second page of Defendant's Exhibit 23 in that second – that last – second – first paragraph, the last sentence. And

Page 4786

Mr. Shapiro asked you about the analysis with regard to that statement that was highlighted.
A Yes, uh-huh.
Q And he asked you specifically whether that -- the rate in the 1991 ACR would take care of the needs of shutdown reactors for storage. Do you remember that?
A Yes, uh-huh.
Q Mr. Milner, do you have an understanding as to whether shutdown reactors have any additional out-of-pool storage needs?
A Certainly once the reactor shuts down, it's no longer generating spent fuel and would, no, have no further need for -- beyond what they already had.
Q Okay, thank you.
Mr. Shapiro also asked you if the 900 MTU rate would require shutdown reactors to store fuel for an extended period of time. Do you recall that?
A Yes, uh-huh.
Q Would a 3,000 MTU rate require shutdown reactors to store fuel for an extended period of time?
A That would also have, yes.
Q Mr. Shapiro also asked you a couple questions about exchanges.

Page 4787

A Uh-huh.
Q Did any utilities approach DOE to broke current exchange?
A Certainly none that I was aware of.
Q And did any utility submit exchange requests to the department?
A No, no.
Q Mr. Milner, I think you also testified that uncertainty about the acceptance date or DOE's ability to meet the acceptance date could hinder the development of the market for exchanges. Do you recall that testimony?
A Yes, uh-huh.
Q Are there other factors that might have hindered the development of a market?
A Very definitely, there were other factors. I -- I think certainly the public opinion and the locality would have been a major factor. I think pressure from the Public Utility Commission on the utility who was giving up its right in the queue would have been significant, political pressures.
Q Thank you. Mr. Milner, could you go in your binder to the deposition, the deposition May -- of May 3rd, pages 474?
A Uh-huh.

Page 4788

Q Actually, let's -- let's do something else first. I'm a little scattered and I apologize.
Mr. Milner, do you recall Mr. Shapiro asked you about whether DOE had put the -- about the statutory linkages and whether DOE had requested those?
A Yes.
Q Okay. And I think you explained to him your deposition testimony. I just have one question.
The Clinch River proposals that DOE submitted --
A Yes.
Q -- what happened to that?
A Congress voided that.
Q Mr. Milner. could you go to tab 2 of your deposition, the binder containing your deposition testimony, page 391. Do you recall Mr. Shapiro asked you whether or not you believed that DCSs were binding?
A Yes, uh-huh.
Q Could you read your deposition testimony on pages 391 beginning at line 20, going through 392, ending at line 14.
A Question: Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?

Page 4789

Answer: That was my opinion, yes.
Question: And the DCSs as indicated by this paragraph are based on the capacity allocations as listed in the ACR. Right?
Answer: Correct.
Question: Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
Mr. Shultis: Objection, calls for a legal opinion.
The witness: The DCSs were submitted by the utilities to the department based upon the information in the ACR. The allocations -- then the department would either approve or disapprove those and if approved, then in my opinion, that became a binding commitment -- a binding agreement, I'm sorry.
Q Okay. And actually, your answer continues -- continues on there, but I don't think we need to -- to go there.
Mr. Milner, is that your belief at the time you testified on May 2, 2002?
A Yes.
Q Does that remain your belief today?
A Yes.
Q Now I'd like to go to page 394 through 397

Page 4790

of that deposition. If you could review those pages to yourself, you don't need to read those into the record.

A Yes, okay.

Q Thank you. Having reviewed those pages, do you now recall whether you could recall at your deposition whether the DCSs could be adjusted up or down by 20 percent?

A Well, from this, apparently at my deposition I did not recall that plus or minus 20 percent adjustment. The attorney pointed that out to me and I recognized that at that time.

Q And the question about the binding nature of the DCSs was in the context of that 20 percent provision, correct?

A The plus or minus 20 percent.

Q Thank you.

Could you go to tab 3 of the deposition binder, page 474?

A Okay.

Q Mr. Shapiro read the question and answer that begins on line 23 of page 74. Could you read the material that's set forth at lines 1 through 21 of that – on that page into – out loud?

Page 4791

A Question: If I could direct your attention to the third paragraph on the first page, the second sentence states that the department has not determined whether or not priority would be accorded shutdown reactors or if priority is granted under what specific circumstances. Was that accurate as of 1990?

Mr. Shultis, objection. Mr. Milner's not a 30(b)(6) witness.

The witness: I suspect it probably was.

Mr. Neslin: That's your recollection sitting here today?

Mr. Shultis: Same objection.

The witness: Yes.

By Mr. Neslin: Would that be accurate to the –

Mr. Shultis: Same objection.

The witness: I think at this point in time today, the department has not decided to give priority to shutdown reactors.

Q Thank you.

And similarly, Mr. Milner, could you go to page 419 of that same deposition?

A Okay.

Q Mr. Milner, I believe Mr. Shapiro read the question and answer that begin on page 418, line 18.

Page 4792

Could you read the question and answer that follows that exchange beginning on line 1, page 419 through line 7?

A Question: The department – would it be fair to say that the department had an objective of allowing shutdown reactors to decommission in a timely manner?

Mr. Shultis: Same objection.

The witness: Well, again, I think it was more a case that the department preferred not to preclude that ability.

Q Could you continue to line 14?

A By Mr. Neslin, question: What do you mean by "not preclude that ability"?

Answer: The department did not, as I recall, have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.

Q And your use of the word "objective" on line 12 of that deposition, is that – your use of that term then is the same as your – how you define "objective" today?

A Yes, yes.

Q Mr. Milner, you were asked by Mr. Shapiro whether it was DOE's goal to remove spent nuclear fuel

Page 4793

from shutdown reactors to prevent long-term storage. Do you recall that testimony?

A Yes, uh-huh.

Q Okay. Would that be goal – would that goal be implemented if it came at the expense of operating reactors?

A No, absolutely not.

MS. SULLIVAN: One moment, Your Honor.

JUDGE MEROW: Sure.

MS. SULLIVAN: Nothing further, Your Honor.

MR. SHAPIRO: We have nothing further, Your Honor.

JUDGE MEROW: Well, Mr. Milner, I don't know if you can answer this, but under the current posture of the VOICE program, is it subject to being shut down by executive branch action at this point or would that require legislation?

THE WITNESS: I believe it would require legislation.

JUDGE MEROW: You're committed to file a license application at this point?

THE WITNESS: Yes, sir. Yes, sir.

JUDGE MEROW: Okay. Any questions?

MS. SULLIVAN: Nothing further, Your

# Robert Morgan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

**DEPOSITION OF ROBERT L. MORGAN**

**March 21 and 22, 2002 Volume 1, Pgs. 1 - 212**

2

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

4

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

41

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from

42

the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the

43

mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I

44

understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not uananimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort onto the repository program."

So there was a balancing act that we -- we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.

Do you understand what I'm saying?

Q. Let me ask you a question and I'll see. You can answer my question, and I'll figure that out.

You got conflicting statements from members of Congress --

A. Yes.

Q. -- based on the tactics, for lack of a better word, outlined in the mission plan for meeting the goal.

A. Yes.

Q. Not on the goal.

MR. BANES: Objection. Vague.



A. Well, the goal -- I think that there was -- you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.

BY MR. BLANTON:

Q. All right, sir. Did the people who said, "Focus on an MRS," was their purpose that you won't be able to get a repository done, so you won't be able to move fuel by '98?

MR. BANES: Objection. Lack of foundation.

A. I cannot -- I cannot, you know, attribute any background or what they felt about it. I just don't know.

BY MR. BLANTON:

Q. As the head of the -- or the acting director of the Civilian Radioactive Waste Management Program, you determined that, as far as your office was concerned, the mission plan at the time you left was the proper way to accomplish the goals?

A. Yes.

(A discussion was had off the



record.)

BY MR. BLANTON:

Q. Back on the record. Mr. Morgan, still looking at Morgan Exhibit 2 and still looking at the seventh paragraph of your Program Overview, the last sentence says, "During the first year of operation" -- the last sentence of the seventh paragraph says, "During the first year of operation of the repository, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."

At this point in time, did you know what that rate was in terms of what quantity of fuel in a year?

MR. BANES: Objection. Calls for a legal conclusion. Go ahead.

A. As I recall, we generally knew the discharge rates from the reactors. There was information available to us. And I recall that there was a company in Atlanta -- and I can't remember the company -- that provided that information. They had it in their database.

BY MR. BLANTON:

Q. Not NAC, is it?



A. Could have been.

Q. So as far as you were concerned, was the rate that was sufficient such that no utility would have to add further storage facilities either on site or at another location, was that rate equivalent to the discharge rate?

A. You notice the next paragraph?

Q. Yes, sir.

A. It says, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being . . . ."

Q. Right?

A. So there was a time from '98 to 2001, and in '98 the utilities would be making commitments or possibly commitments for dry storage that would be delivered in the 2000, 2001, but that they wouldn't have to make new commitments for ordering, in that time lag, of commitment to additional storage and then actually having that storage.

So we're talking about hopefully -- In other words, when you start receiving fuel in '98, we're not going to be at full run. There's a start-up lag time. So we felt by the year

49

2000 or 2001 that we would be meeting the discharge rate.

Q. During your meeting with Congressional staffers when you first received this detail, did the subject of what the rate under the Act should be come up?

MR. BANES: Objection. Irrelevant.

A. I don't recall.

BY MR. BLANTON:

Q. Do you recall what process you went through at DOE internally in arriving at the plan that during the first year of operation we should be -- of the repository in 1998 we should be receiving fuel at a rate so that no utility would have to add any further storage facilities?

Do you recall what the process in DOE was to arrive at that?

A. That was debated and discussed within my staff there. And that was my conclusion.

Q. Okay. Who worked on that issue beside yourself?

A. I would say all the first level

50

people. I believe in a -- what you would call a collaborative approach to management. I like to have the input discussed before I make a decision.

Q. And by first level people, you are referring to the people who were your direct reports on that organizational chart?

A. Yes, plus Mike Lawrence and McElvey.

Q. Where is Mike Lawrence now? Do you know where he lives?

A. In Richland, Washington.

Q. Does he still work for the Department of Energy as far as you know?

A. No.

Q. Is he retired?

A. No.

Q. Do you know who he worked works for?

A. PNL.

MR. BLANTON: Off the record.

(A discussion was had off the record.)

BY MR. BLANTON:

Q. Do you recall how far in advance of this meeting on December 12 through 15th that DOE arrived -- and really you arrived at this

51

strategy of picking up fuel at a rate such that utilities would not have to add storage space after 1998?

A. Do I recall?

Q. How far in advance of this December 12 through 15 meeting.

A. I think it was quite some time.

Q. Was it something that evolved over time from the time you got there?

A. Yes.

Q. If I could, let me back up for a second and ask you: Did formal notices go out to various stakeholders about this meeting? Do you recall how it was advertised?

A. There's a certain requirement that I can't recall which says all the stakeholders -- the states, utilities -- had to be involved in a notice. And I believe -- well, I believe that that was accomplished.

Q. All right, sir. It says it was sponsored by the U.S. Department of Energy. Did the Department of Energy fund the meeting?

A. Yes.

Q. Do you recall where it was held? Was it at DOE headquarters, or was it at

52

someplace else?

A. It was someplace else, as I recall.

Q. Do you know whether you ever discussed the issues that are set out in this Program Overview and specifically the issues discussed in paragraphs seven and eight of the Program Overview?

A. Issues?

Q. Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraph of this Program Overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?

A. Oh, yes.

Q. Did you review this paper with him before you presented it at these proceedings?

A. I had reviewed the initial schedule, a layout of the program, with him in order to get from Point A to 1998.

And in that discussion I do recall saying that this was extremely optimistic, as stated on the next page, that there were many things that were impediments to getting there -- NRC licensing, siting, the siting criteria,

litigation. We had, as I recall, three lawsuits in the period of time that I was acting director -- some of which could cause delays.

The fact that we were dealing with three different media -- basalt, tuff, and salt. Excavation in salt is a lot quicker and easier than excavation in basalt.

So that the characterization by 1987 we thought was an extremely difficult milestone to meet. So there were many uncertainties that we had to face. And we tried to put a schedule together balancing all those and saying, yeah, if it works, this is how you are going to do it.

Q. When you say the schedule, do you mean the schedule for the development of the various facilities described in the Act?

A. The schedule to accept fuel in 1998 I considered extremely optimistic.

Q. Did you ever discuss with him your characterization of the intent of the Nuclear Waste Policy Act?

A. In an overall basis, but not specifics. You know, in other words, we are going to accept fuel in 1998. That was the goal.



Q. All right, sir.

A. And I discussed with him the schedule, all the items that had to be implemented and laid out in a PERT network in order to get there. You had to do A before you do B. And sometimes B defines back to A, so that you do a logic network to get there. And that was discussed with him.

Q. Did you discuss with him your strategy that beginning in 1998 utilities would not have to provide any additional storage facilities on site?

A. I don't recall.

Q. Based on your conversations with the Secretary of Energy at the time, did you feel that the Program Overview as you gave it in these proceedings in December of 1983 were consistent with his views of the Nuclear Waste Policy Act?

MR. BANES: Objection. Lack of foundation.

A. That's presumption on my part, you know. But overall, trying to accept fuel in 1998, that was discussed with him. But again, I described that as a very optimistic schedule.



BY MR. BLANTON:

Q. But he agreed with it?

A. He didn't object to it, to me.

Q. How did DOE go about developing the standard contract?

A. That was a consensus between my office, contracts, and legal.

Q. Was there a team that did the drafting? Do you recall who the specific individuals were?

A. I believe Rosselli was one of the members, but I don't think he was the only one.

Q. Can you describe how the process worked? Would somebody generate a draft and then circulate it and take comments, or what happened?

A. Yes.

MR. BANES: Objection as to form. Go ahead.

A. There were several discussions that we had in resolution of some of the items.

BY MR. BLANTON:

Q. Do you recall any specific items that were discussed?

A. Oh, boy.



MR. BANES: Objection to the extent it requests discussions with counsel. Don't answer those questions, sir.

THE WITNESS: Pardon?

MR. BANES: Don't answer it insofar as it requests discussions with counsel.

A. I know that we discussed the -- how to deal with the fuel that was already discharged as to the fact that some of it was low exposure fuel and some was high exposure fuel, that we had to charge an average of one mill per kilowatt for that.

But we felt that those people that had failed fuel elements that we would have to insert in the repository required a greater amount of effort on our part than those that had high exposure.

In other words, digging the hole, encasing it in the repository, took X amount of dollars to do that. So the only thing that you can do is --

Basically, a repository is heat-loaded limited so that you could put the less exposed fuel closer together. But you still had to excavate and drill for those as you

A. I have no recollection.

BY MR. BLANTON:

Q. Let me refer you back to Exhibit 4 now, which is the final rulemaking, and get you to look with me at the second page of that document. It's got page 16591 up in the upper right-hand corner.

A. Yes.

Q. In the second full paragraph in the far left-hand column, there's a paragraph that says, "A new second 'Whereas' clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable,' has been added to the following language of the Act." And then in a parenthetical it has a citation of the Nuclear Waste Policy Act.

Do you see that?

A. Yes.

Q. Do you recall any of the discussions that led to the inclusion of the second "Whereas" clause that that refers to?

A. This is what the mission plan was trying to do; in other words, get to the acceptance. That was a goal established. And this was part of that goal.



Q. Do you recall whether any of the commenters suggested inclusion of that clause?

A. In order for it to be changed, there would have to be a comment.

Q. Okay. So you --

A. I don't think there were any changes made that had not been commented on either in the written or the oral comment period.

Q. So if there is a change from the proposed contract to the standard contract, that tells us there was a comment on that change. Is that right?

A. That would be my assumption.

Q. DOE did not change anything just of its own volition?

A. Not to my knowledge.

(Deposition Exhibit No. 6 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, the court reporter has handed you a document marked Exhibit 6 to your deposition, which is a letter dated March 4, 1983, from F. L. Clayton, Senior Vice President, Alabama Power Company, I presume to you, Robert Morgan, Project Director, Nuclear Waste Policy



Act.

A. Yes.

Q. Take your time, review that letter, and let me know when you're ready for me to ask you a question.

(Pause.)

A. All right.

Q. All right, sir. On the numbered page 8 of that letter --

A. Yes?

Q. -- there's a paragraph 7 that says Spent Fuel Receipt Rate at DOE Facility.

A. Yes, I've read that.

Q. Do you recall receiving comments -- either this comment or comments like it in the comment process on the contract?

A. There were many comments, as you know. And we collectively reviewed those comments.

And I can see from paragraph 7 that "as expeditiously as practicable" is in this paragraph. And that was -- and the contract was modified to make that statement.

Q. All right, sir.

A. I mean this is -- Never mind.



Q. Go ahead.

A. Never mind.

Q. You see the sentence in paragraph 7 that says, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible."

A. Yes.

Q. "Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."

Did the sentence that says "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible" -- was that the goal of DOE in implementing the