period.
BY MR. BLANTON:
Q. Do you think your strategy was consistent with the Act, though?
MR. BANES: Objection. Calls for a legal conclusion. Go ahead.
A. The Act specified that I accept spent fuel in 1998. Regarding that, yes, it was consistent with that.
BY MR. BLANTON:
Q. How about the goal of utilities not having to add storage facilities after 1998? Was that consistent with the Act?
A. I don't think it specifies that. The Act doesn't specify that.
Q. Did you think it was inconsistent with the Act?
A. I did not think it was inconsistent with the Act. But the Act didn't require it.
(Deposition Exhibit No. 7 marked for identification.)
BY MR. BLANTON:
Q. We've marked as Exhibit 7 to your deposition a memorandum dated April 8, 1983. It has as the subject, Action Memorandum, Final



Rulemaking on Standard Contract for Nuclear Waste Disposal, the second page of which has a signature line, Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office.
Do you recognize that?
A. Yes, sir.
Q. Did you draft that memorandum?
A. I signed that memorandum.
Q. Did somebody draft it for you? Or do you know?
A. I don't recall.
Q. Attached to it are three tabs, Tab A, Tab B, Tab C, and Tab D. Do you see those?
A. Yes.
Q. Do you recall how those tabs would have been produced during the time that you were at the Department of Energy -- excuse me -- during the time that you were at the Nuclear Waste Project Office?
A. Do I recall how?
Q. How they -- the process for producing these descriptions of the contract.
MR. BANES: Objection. Compound.
A. The process is -- My recollection



would be that it came from Rosselli's office for my approval.
BY MR. BLANTON:
Q. Let me just back up and ask you: What was the purpose of this memorandum to the Secretary?
A. The purpose of this memorandum was to get approval from the Secretary in order to publish the final rulemaking. That's what I wanted.
Q. And the tabs, the purpose of the tabs are to describe the contract to the Secretary? Is that correct?
A. I think it really gives him background of what was happening in defining what was in the contract. Tab B covers those. Tab C is the time sequence of events in the process.
Q. What is Tab A? What is that intended to do?
A. That says Disposal Fund Contract.
Q. I guess my question is: What is the difference between Tab A and Tab B, which is Section by Section Contract Analysis?
A. Tab A is a summary. And then Tab B



is the section by section contract analysis. That's what it reads.
Q. Looking at Tab B, Section by Section Contract Analysis, there's a section that is titled Scope of the Contract. Do you see that?
A. Yes.
Q. The last sentence of that section says, "The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder." Do you see where I just read?
A. Yes.
Q. Now, you told us a minute ago what you thought "disposal services" meant. Does "contract services" mean the same thing to you as used in that contract? Does "contract services" mean acceptance of spent fuel from utilities?
A. Yes.
Q. What does the phrase "continue until disposal of all SNF and/or HLW accepted by DOE hereunder" mean? What does that mean?
A. That this continues until all the spent fuel is removed from the commercial reactors and from DOE, high-level waste.
Q. Does that mean that DOE would not

Q. Were the obligations of DOE under the contract a factor in the development of the mission plan?
A. Could you rephrase that question?
Q. Well, when you developed the mission plan --
A. Yes.
Q. -- was the performance of the contract what you were trying to accomplish through the mission plan?
A. You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. We did not.
And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet. Okay?
Q. Did you understand that the utilities also wanted you to meet that goal?
A. Oh, yes.
MR. BANES: Objection. Argumentative.
BY MR. BLANTON:
Q. Did you understand that at the time



the contracts were signed?
MR. BANES: Objection. Irrelevant.
A. We had those comments from the utilities and chose not to accept and put in the contract a given rate. That was a -- that was a clear understanding on our part -- on my part.
BY MR. BLANTON:
Q. Well, then what was the objective of the mission plan? If it wasn't to perform the contract, what was the objective?
A. It was our goals that we were trying to reach in conformance with the Nuclear Waste Policy Act.
Q. Mr. Morgan, I've lost may place. I'll be with you in a minute. Let's go back to Exhibit 4, which is my Tab 2. Let me refer you to page 16591.
A. Right.
Q. In the middle column there is a paragraph that says, "The definition of 'DOE facility'" --
A. Yes.
Q. -- "was expanded to expressly state, in accordance with the Act, that there may be an



interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository."
A. Yes.
Q. Would that definition have included a monitored retrievable storage facility?
A. Yes.
Q. What was the purpose of expanding the definition of DOE facility? I understand what that says, but what goal were you trying to reach by expanding the term?
A. It's saying that in order to comply with the Act we may have to operate a monitored retrievable storage facility to meet the '98 date.
Q. Might it also have been possible to use a, quote, DOE facility to accept fuel before the 1998 date?
MR. BANES: Objection. Calls for a legal conclusion and speculation.
A. I don't think it limited that we couldn't accept it before. But it certainly said we wanted to accept it by January 31st, 1998. So that could be before.
BY MR. BLANTON:



Q. Was there any -- At the time you were director of the program, was there any distinction between a monitored retrievable storage facility and a repository in terms of how much fuel DOE could accept in a given year?
MR. BANES: Objection. Calls for a legal conclusion.
A. I -- I have no recollection of -- you know, it was -- In my mind, the monitored retrievable storage was the fall-back position on a repository. In other words, if you couldn't get the repository done, then you had the capability of having monitored retrievable storage to accept fuel.
BY MR. BLANTON:
Q. Going further down that page under Article II, Scope, there's a sentence that says, "This clause was amended to more closely reflect the statutory language found in Section 302(a)(1) of the Act, as well as the fact that the services to be provided would occur in the future."
What I'd like for you to do is refer to Article II of the contract -- and I suppose you are going to need to compare that to Article

149

A. I have no recollection.
BY MR. BLANTON:
Q. Are you aware of any analysis by DOE of the cost of storing fuel at the reactor site if the repository was delayed?
MR. BANES: Objection. Irrelevant. Beyond the schedule issues.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what stage the mission plan was in at the time you left?
A. I believe it was in draft.
Q. There are several drafts. Do you remember which draft was being worked on?
A. I have no idea.
Q. I'm going to show one to you.
(Deposition Exhibit Nos. 9 and 10 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, we've handed you a document marked Exhibit 9, which is a cover letter dated December 20, 1983, to Russell Stanford, who is identified as the Program Manager, Utility Nuclear Waste Management Group,

150

and signed by you.
And it says it's enclosing the draft -- most recent working draft of the mission plan that's being prepared. And it's dated December 20, 1983.
And then Exhibit 10 is a document titled Civilian Radioactive Waste Management Program Mission Plan, Volume One, Overview and Program Plans, also dated December 20, 1983.
Do you see those?
A. Yes.
Q. Was this cover letter the cover letter for this version of the mission plan, as far as you can tell?
A. Yes. As far as I can tell.
Q. Was this, this 1983 draft, was it the first draft of the mission plan that you are aware of? Or was there one previous to this?
A. I just don't know.
Q. Okay.
A. I believe this is the first one that was disseminated outside of DOE. Whether there were earlier drafts -- I assume there may have been, but not distributed. You understand what I'm saying?

151

Q. There might have been working drafts of this document, but this is the first one circulated to the public?
A. That's my feeling regarding it.
Q. What was your involvement in the production of this document?
A. Review. My responsibility to send it out, so I have to accept what's in it.
Q. I think you mentioned earlier in your deposition who all was involved in preparation of the mission plan. Would that have applied to this document?
A. Yes.
Q. Was there any approval authority above you for the mission plan? Did the Secretary have to approve it?
A. No. I think I advised him that I was sending it out as a matter of information. He did not review it.
Q. Did you advise him of -- in general of the contents of it, what was said?
A. I don't believe I did.
Q. What is meant by "firm schedule" in the third paragraph of page 1-1?
A. That would be an acceptance

152

schedule.
Q. Do you recall who within your office would have been responsible for writing the introduction to this?
A. I have no idea. Probably Head. Head probably.
Q. Mr. Head, the division director?
A. Yes. He's the one that was responsible for putting it together. And he is referenced on page 2 of my cover letter.
Q. The second paragraph or -- Excuse me. Go to page 2-1. Beg your pardon. Page 2-1.
A. Yes.
Q. If it helps, it's -45172 of the stamped number.
A. Got it.
Q. The second paragraph of that Program Strategy says, "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by January 1998."
What went into that decision?
A. The MRS.
Q. Is there a difference in the term "delay" or "postpone" in that sentence? Do

those mean the same thing, or do they mean different things, "delay" and "postpone"?
A. My answer to that would only be speculation. I'm sorry.
Q. Was that an accurate statement of what the Department's intention was?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. We had an MRS program while I was there. And we would accept fuel in the MRS program by January 19 -- or January 31st, 1998, if we didn't have a repository. That was our plan. That was our goal.
Q. Take a look at Table II-1, Waste Acceptance Schedule.
A. Yes.
Q. Do you recall who developed that schedule?
A. No, I don't. I think this is the same schedule we talked about before.
Q. In the financing document?
A. Yes.
Q. Did you approve that schedule going



into the mission plan?
A. Yes.
Q. Do you recall having any conversations with anybody about it?
A. I'm sure we had discussions about it, but I can't recall any because this was one of the things we put in there based, you know, on the financial thing and the goal of the mission plan.
Q. Was there any discussion about whether this schedule or a different one should go into the mission plan, that you recall?
A. We had several discussions on what to put in the mission plan. And I don't recall, you know, other numbers. But there were discussions regarding this type of table.
Q. Referring back to this page 2-1, which is stamped SN045172 --
A. Right.
Q. -- the last sentence of that document -- of that page says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the Federal Interim Storage Program." Do you see



that?
A. Yes.
Q. Is there an Interim Storage Program provided for in the Nuclear Waste Policy Act?
A. I don't recall.
Q. Was it your understanding that after 1998 utilities were not responsible for providing their own additional on-site interim storage?
MR. BANES: Objection. Calls for a legal conclusion.
A. Discussions were that until we took possession of the fuel FOB at the reactors, that they were responsible for storage on site.
BY MR. BLANTON:
Q. Did you understand that was to occur in 1998?
MR. BANES: Objection. Asked and answered.
A. We discussed earlier that -- in my discussion, the presentation in December, that it would be about 2001 when we would match that rate.
We go back to this discussion of they did not have to order new things in '98,



but they would -- we would not match the discharge rate until 2000, 2001.
So there is an inference, clearly, that they may have commitments and there would be delivery of reactor storage in 2000, 2001 that had been ordered in '98, the same issue we talked about earlier.
Q. Right. What I'm trying to understand is what this last sentence of this page means, then.
A. Again, this is the mission plan. And what we were trying to do, our goal, was to accept fuel from the reactors in 1998, and by 2001 we would match the discharge rate. That's what the goal was.
Q. Did you approve this sentence that says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage"?
A. I approved the document -- as a planning document.
Q. Let me get you to look at page 2-2. And really, from the bottom of that page and the paragraph that starts, "While the Department's acceptance rate in the initial five

213

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

**DEPOSITION OF ROBERT L. MORGAN**

**March 21 and 22, 2002 Volume 2, Pg 213 - 330**

214

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:

BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

215

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:

JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:

PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

216

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:

SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:

ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

APPEARANCES

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



INDEX



| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 1 | Organizational charts | 25/25,64,79,311 |
| 2 | Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 | Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 | Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 | Report on Financing | 93/93,102,104 |



(continued)



INDEX



EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 6 | 3/4/93 letter from Alabama Power | 106/106 |
| 7 | 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 | 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 | 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 | 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 | Mission Plan, Volumes I and II | 159/159,162 |
| 12 | U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 | 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 | 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 | 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 | 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 | FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |



(continued)



INDEX



EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 18 | 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 | Remarks before IAEA, 10/12/83 | 230/231 |
| 20 | Letter to Governor Alexander | 275/275,279 |
| 21 | Draft letter to Governor Bryan | 278/278 |
| 22 | 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 | 2/8/83 comments from Duke Power Company | 282/283 |

INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

(The deposition was resumed on Friday, March 22, 2002, at 8:00 a.m. as follows:)

MR. BANES: We've had an opportunity to review the excerpts of the testimony.

While we think that the question concerning Table II-1 is just the same question that's been asked before in a different context regarding acceptance rate, we will allow the question at this time, although we would caution the Plaintiffs' counsel that there was an agreement not to be repetitive in this case, and we will enforce that agreement. Thank you.

E X A M I N A T I O N

BY MR. HIRSCH:

Q. Okay. Mr. Morgan, do you recall that we were talking about Morgan Deposition Exhibit 10, the December 20th, 1983 draft mission plan, yesterday?

A. Yes.

Q. Can you refer to Table II-1, the Waste Acceptance Table -- or Schedule in that document. Do you see that table?



A. Yes.

Q. Was Table II-1 in Exhibit 10 the schedule of the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after January '98.

MR. BANES: Objection. Calls for speculation. You can answer, sir.

A. When I look at the table -- you see the backlog, the far column on the right?

The backlog does increase through the year -- up until 2003, so that it would be speculative on my part to say specifically there would be no requirement for any reactor to have additional storage.

Do you understand my answer?

Q. Well, I'm not sure I do, Mr. Morgan. You are saying that because there is an increasing backlog for some period you are not sure whether --

A. That's correct.

Q. -- utilities wouldn't have to provide additional storage?

A. That's correct. Specific.

Q. I'm sorry. Specific? What do you



mean?

A. A specific utility, a specific reactor. It would be speculation on my part whether any one of them would need additional on-site storage.

Q. All right. Recognizing that there might be an individual utility that might need on-site storage, is it true that Table II-1 was the acceptance rate that DOE had generally determined was sufficient to prevent the utilities from having to provide additional on-site storage after January of 1998?

MR. BANES: Objection. Calls for speculation.

A. You know, clearly this says that initially the first repository acceptance is at a low rate for the first five years and then jumps up to 3,000. Those are numbers that were used in planning.

Certainly the first year of operation would have much less than that number, and there would be a gradual growth in my mind.

This was used as a mission plan that we were shooting for in the Nuclear Waste Policy Act. And there is an increase in the backlog



through the year -- through the year 2003.

BY MR. HIRSCH:

Q. When you said -- I think you said, at some point, a low rate. Does this show that in the -- does the table show that in the first five years the rate is 1800 metric tons per year?

A. That's what it says.

Q. Would you look back at page 1-1 -- excuse me -- at page 2-1 of the document, Exhibit 10.

A. Got it.

Q. You see in the first paragraph there is this statement, next-to-last sentence, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998"?

A. That's what it says.

Q. All right. Will you look on the next page, 2-2.

A. Yes.

Q. At the top it says, "Based on the

and beyond the scope of the schedule issues. We are talking about acceptance rates in this deposition. If the question goes beyond that, then it's irrelevant.

BY MR. TOMASZCZUK:

Q. I understood your last answer, Mr. Morgan, to refer to acceptance rates, and I was asking perhaps a slightly different question. And I just wanted to make sure I understood your answer.

And my question is: Was the distinction between contractual requirements and planning goals provided to the utilities?

MR. BANES: Objection. Asked and answered.

A. The distinction is evident from the two documents, the contract and the mission plan. I don't think I can make it any clearer.

MR. BANES: Do you have much more, Alex? Do you want to take a break?

MR. TOMASZCZUK: If you want to take a break, that's fine with me.

THE WITNESS: Thank you.

(A recess was taken.)

BY MR. TOMASZCZUK:



Q. Mr. Morgan, were the utilities to rely in any way upon the planning documents that your office issued?

MR. BANES: Objection. Vague.

A. I really don't understand your question.

BY MR. TOMASZCZUK:

Q. All right. Well, it's fair to say that during your testimony you referred to planning documents. Right?

A. That's correct.

Q. And there are a bunch of them, aren't there? There are extensive planning documents?

A. The mission plan is the primary planning document.

Q. A document of substantial size just in terms of its physical size. Right?

A. Yes.

Q. What were the utilities supposed to do with it when they got these documents, these planning documents?

A. This was to inform them of what our plans were relative to reaching the goals that we felt were appropriate for the Nuclear Waste



Policy Act.

Q. Was it your understanding that the utilities would rely on those planning documents to manage their own spent nuclear fuel requirements?

MR. BANES: Objection. Lack of foundation and vague.

A. I think this outlined meeting the goals that were established by the Nuclear Waste Policy Act as to the identification of the repository, the date and time and selection process, and informed them how we were trying to get someplace.

I think that it was clear that -- the uncertainties relative to this document. I think clearly they have been stated as representing optimistic goals, difficult to meet, and that it was a document that -- as time progressed, there would be adequate time for the utilities to provide for on-site storage until the repository or MRS were opened.

BY MR. TOMASZCZUK:

Q. Do you know whether today the utilities are indeed providing on-site storage?

MR. BANES: Objection. Lack of



foundation.

A. I have no idea.

BY MR. TOMASZCZUK:

Q. Between the time your deposition adjourned last night and when it recommenced this morning, did you discuss your testimony with anyone?

MR. BANES: Objection to the extent it calls for discussions with counsel.

A. I didn't discuss it with anyone because when I left here I went to my room, later went to dinner by myself, and I did not meet with anyone.

I had a phone call with my wife. I told her that I was, you know, still in the deposition and I probably would leave here by noon today, to inform her of when she could expect me home.

MR. TOMASZCZUK: I don't have any further questions at this time, Mr. Morgan. I, like my colleagues, need to reserve the right to call you back. So I'm adjourning the deposition pending receipt of additional documents relevant to your testimony.

THE WITNESS: I understand.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, :
Plaintiffs, :
v. : No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C

-----------------------------X

Eugene, Oregon
Monday, June 25, 2002

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH SOLHEIM, Oregon Certified Shorthand Reporter, at 9:25 a.m., June 25, 2002, and the proceedings taken down by DEBORAH SOLHEIM, CRR, with computer-aided transcription and prepared under her direction.

APPEARANCES:

On behalf of the Plaintiffs
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
R. ALAN MILLER, ESQ.
United States Department of Justice
Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530
(202) 305-7594



CONTENTS

WITNESS EXAMINATION BY COUNSEL FOR PLAINTIFFS
ROBERT L. MORGAN
By Mr. Stouck Page 5

Afternoon Session - Page 91

EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| 24 | Organization Chart, DB 100228 | 16 |
| 25 | 1-24-83 Eileen Peerless memo, TV 1226-1235 | 47 |
| 26 | 1-21-83 letter to Dillon from Hobart, SP 109687-701 | 47 |
| 27 | 5-3-83 DOE hearing transcript, DC 107987-108041 | 52 |
| 28 | 4-29-83 letter to Yankee Atomic Electric from Keefe, RA 103094-96 | 63 |
| 29 | 5-27-83 letter to Yankee Atomic Electric from Keefe, RA 103207-210 | 63 |
| 30 | 1-28-83 DOE memorandum, DE 106951-55 | 80 |
| 31 | 8-19-83 DOE memorandum, DE 106917-919 | 80 |
| 32 | 5-21-84 DOE letter to Senator Johnston, from Rabben, DE 105113-123 | 80 |
| 33 | 3-4-83 letter to Morgan from Soucy, PA 189728-732 | 102 |





| | | |
|---|---|---|
| 34 | 3-3-83 letter to Morgan from Erk, CDB 021 0180-0184 | 105 |
| 35 | 5-23-78 letter to Holloway and Askew from Morgan, DE 104744-746 | 106 |
| 36 | 8-19-83 letter to Yankee Atomic Electric from Morgan, YDK 026 102921-924 | 111 |
| 37 | 10-26-83 letter to Morgan from Davis, DER 002 2095-97 | 116 |
| 38 | 5-13-83 statement of Robert L. Morgan, DE 100456-474 | 121 |
| 39 | Defendant's witness list | 125 |
| 40 | 9-15-83 DOE memorandum from Williamson, PNL 173 1282-1288 | 147 |
| 41 | 12-22-83 DOE memorandum from Charles Head, HQZ 19870304.0814.0001-02; EDB 004 1963-1969 | 160 |
| 42 | 4-9-84 letter to Frei from Bates, ZAB 001 1304-1308 | 163 |




PROCEEDINGS

Whereupon,

ROBERT L. MORGAN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. STOUCK:

Q. Mr. Morgan, good morning. My name is Jerry Stouck. We met briefly before we started here. I'm a lawyer. I represent three utility companies in this litigation: Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company.

A. Right.

Q. And as you may know or you may recall, each of these three companies has only one nuclear plant that is currently shut down permanently and in the process of decommissioning. They have that in common.

I want to thank you for coming today. I know you've been through this before. I have been through the transcript of the prior deposition sessions, and I do have a couple of follow-up questions to that. But it's not my intent, certainly, to ask you the same

A. Yes.
Q. Okay. So, what could you say, under oath, about the intention of the other parties?
A. I can't speak to their intention. I do know that they wanted a rate of acceptance in the contract.
Q. Okay.
A. And it was denied.
Q. But you could not testify to their intention about the rate of acceptance.
A. No, I can't attribute intent to other people. Excuse me.
Q. I'm trying to find out the boundaries of what you can and cannot testify about. So that's fair enough.
The next little phrase here, parsing this sentence, it says that Mr. Morgan will provide testimony concerning the formation of the standard contract, including priority for shut-down reactors.
And we talked about that earlier today.
A. Yes.
Q. You are able to testify about --
A. Yes.
Q. -- the provisions of the standard contract that relates to priority; yes?
A. Yes.



Q. Okay. What about the delivery commitment schedule process?
A. I have no idea what that means.
Q. You don't know what that is?
A. I have no idea what that means.
Q. Okay. Do you know what a delivery commitment schedule is?
A. I have no idea.
Q. Okay. Take a look -- thanks.
Take a look at -- don't take a look at.
I believe you said in your prior deposition sessions -- thanks. We're done with this one for now, anyway.
A. Beg your pardon?
Q. We're done with No. 39 for now.
A. Okay.
Q. I believe you said in your prior deposition sessions in March that it was your understanding that the contracts, these contracts that we're talking about, contained a mechanism for developing a schedule.
A. Yes.
Q. Do you remember that?
A. Yes.
Q. Okay. What mechanism is that? How does that mechanism work?



A. When the schedules of a repository were identified, that then one had the capability of making commitments to receipt of fuel. That's what that process was.
Q. Okay.
A. But that was in the future because we had no repository identified, the type of media, had any idea of the licensing requirements. And it was the uncertainties.
Q. Right. But just generally, if there was a process in the contract for developing a schedule at that later future time that you just referred to, how did that process work?
A. It hadn't kicked in.
Q. But it would kick in in the future.
A. Yes.
Q. I'm asking when it did -- I understand it hadn't kicked in yet. When it did kick in, do you know how it would have played out?
A. I wasn't dealing with that.
Q. Okay. And at the time you were in the office from January 28 or thereabouts --
A. Whenever.
Q. -- to sometime in '84, during that time you did not have an understanding of how the contractual



process for setting a schedule worked; is that right?
You knew it was in the future, but did you have an understanding of how the process was going to work when it did kick in?
A. I didn't deal with it.
Q. Okay.
A. I just didn't deal with it. That was not a focus of my attention.
Q. Okay. Did you -- can you identify for me someone on Exhibit 1 or elsewhere who at that time in 1983 and '84 did deal with it?
A. No.
Q. Was there anyone who was dealing with it at that time?
A. I don't know.
Q. Okay. But if there was, you don't know who they are.
A. That's right. That was not on my scope.
Q. All righty. Take a look at -- do you have Exhibit 4?
A. Yes.
Q. This is the final rulemaking.
A. Yes.
Q. Actually -- yeah, let's take a look at Exhibit 4, which is the final rulemaking.

Page 142

Q. Okay. Just take a look at that. You'll see part B there does refer to delivery commitment schedule C. See if we can make some progress here.
A. (Reading.)
Yeah, this is the '92 kick-in date.
Q. Okay.
A. The top there. It was not on my focus. That was long after I'm gone.
Q. Okay. So you didn't have any understanding of how these --
A. I had --
Q. Let me just finish the question.
You didn't have any understanding at the time you were there of how these provisions were going to work; is that right? These provisions, meaning article 5 provisions.
A. I did not focus on this at all.
Q. Okay. Because it was to happen later.
A. That's correct.
Q. Fine. Can we go off the record for a second.
(Recess.)
BY MR. STOUCK:
Q. Before we move forward, I just want to make sure I understand this right.
When you say that you did not focus on this

Page 143

process, is that the same thing as saying that at the time you worked on the program in 1983, 1984, you did not have an understanding of how this process was going to work when it kicked in in the future? Is that a correct statement?
A. I don't like the connotation that I have no understanding whatsoever.
Q. Okay.
A. I mean, you can read that and say, okay, here is what the utilities have. This is what we're going to be able to take. Then you go through a prioritization. That much I understand.
I did not focus on every detail of that process.
Q. Okay. You did not work with that process at that time.
A. I did not work with that process. I had a basic understanding of it. There's a difference.
Q. Okay.
A. Rather than saying I don't know anything about it.
Q. Okay. You knew that it existed.
A. Yes.
Q. And you could read the words in the contract.
Would you be able to testify about how that

Page 144

process was going to work when -- at such time in the future as it kicked in?
A. From the rudimentary approach, yes. From the standpoint it says, okay, we have these deliveries, now we can identify our acceptance rate, and then you go into the prioritization and contract requirements.
So, did I do any of that process? Absolutely not. Did I have a basic understanding of it? Yes.
Q. Okay. Was it your understanding at that time, though -- I think we touched on this -- that this process could not kick in, this scheduling process, until such time as a repository had been developed?
A. Until the repository had been identified. And that was in the '92 framework. There was a date, a commitment in the Nuclear Waste Policy Act to identify a repository by 1992, as I recall.
Q. Okay.
A. And it would be at that point in time that you would start dealing with that process.
Q. Because you would need to know -- why is it that the identification for a repository was significant for this process? You would need to know the capacity of the repository before you do this?
A. Exactly.
MR. MILLER: Calls for a legal conclusion.

Page 145

THE WITNESS: Well, yeah. But -- you know what it's going to be designed to do. And it will have a different rate based on the design of it.
BY MR. STOUCK:
Q. Okay. There were parameters that had to be understood about the program before this scheduling process could begin.
A. Yes.
Q. Such as the capacity of the --
A. Yeah. And you can't -- you can't predict that without a design.
Q. Okay. And do you know whether in 1992 there was a design that DOE had for the repository?
A. I have no idea. I have not been following the program.
Q. Okay. Let me just take a look at these exhibits. I would like to turn now to some questions generally about the mission plan.
We looked at some exhibits earlier today that indicated -- well, there was the one about the letters out to the states that was dated January 28. Do you remember that? The letter to the states about site identification?
A. Right.
Q. And I think you told me that it was

Page 3378

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3379

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

Page 3380

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

Page 3381

P R O C E E D I N G S

MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

Page 3606

the defense appropriation, and you're going to have to come up with the other 749 million. And right now my understanding is that there are discussions at very senior levels within the Office of Management and Budget and Congress in order to try to address this. But the simple answer to your question, and I didn't mean to go on, is we do not have direct access to that fund. It has to be appropriated by Congress.

And the industry over the years has made several attempts to try to get the waste fund used for its original purposes. And that legislation up until this point has not been passed.

THE COURT: Okay. Anything further?

MS. SULLIVAN: Nothing further, Your Honor. Thank you.

THE COURT: Okay. You're excused. And thank you very much for your testimony.

MR. MILLER: Your Honor, our next witness will be Mr. Robert Morgan.

THE COURT: Okay.

Whereupon,

ROBERT L. MORGAN

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

Page 3607

DIRECT EXAMINATION

BY MR. MILLER:

Q Good afternoon, Mr. Morgan. Would you state your full name for the record, please, sir.

A Robert L. Morgan.

Q And you are a former director of what started out to be the Nuclear Waste Policy Act project office, and what during your tenure became the Office of Civilian Radioactive Waste Management; is that correct?

A Yes. That's correct.

Q As we're talking here today, Mr. Morgan, you have to try to remember to let me finish my question before you answer so the court reporter doesn't have to try to decide which one of us she wants to reflect in the record. Do you think you can do that, sir?

A Yes.

Q All right. Thank you.

THE COURT: You can ask him questions, too.

MR. MILLER: I beg your pardon, Your Honor.

THE COURT: Go ahead. Off-the-record comments here.

BY MR. MILLER:

Q Mr. Morgan, I would like before we begin your substantive testimony to ask you just a few

Page 3608

questions about your educational background and your work experience.

So I'll ask you first, sir, if you graduated from the United States Military Academy in 1952?

A Yes.

Q And what degree did you obtain when you graduated?

A It's a bachelor of science in military engineering.

Q Okay. And at that time, you were commissioned as a second lieutenant in the United States Army?

A Yes. In the United States Army Corps of Engineers.

Q Okay. And if you will, please, sir, if you could just summarize for the Court what your subsequent assignments in the Army were.

A After graduation, there was an interim assignment of about 2-1/2 months in Fort Lewis, Washington on my way to Korea. I served with the 25th infantry division in Korea. After the war ended, I transferred to Japan. From Japan, I went to Fort Bragg with the 82nd airborne division. And after 2 years there, the Army selected me to go to MIT. I spent 2 years there and received a

Page 3609

master of science in civil engineering and a master of science in nuclear engineering.

Subsequent to that, I went to Idaho Falls, Idaho, assigned to the U.S. -- to the Atomic Energy Commission. Following that, I went to an advanced course at Fort Belvoir. Then to Indonesia as a special assistant to the ambassador for civic action. After my return from there, I resigned my commission from the military and joined the Atomic Energy Commission in 1965. Initially assigned for a year in Savannah River. I transferred to Southern California for reactor development. Spent 7 years there. I was selected as the deputy manager at Savannah River. I spent 7 years as deputy manager and then 8 years as manager before I retired from DOE at that time.

Q Okay, sir. And you retired from DOE in what year?

A 1988.

Q Okay, sir. Your assignment to the -- to Idaho Falls -- and I believe you mentioned that you were working with the Atomic Energy Commission at that time?

A That's correct.

Q And what was -- what did that assignment

Page 3610

involve generally?
A Two Army reactor programs that were being developed for the DEW Line system. I was the AEC project officer and also commanding officer of the operators that were at the site.
Q Okay, sir. And the DEW Line project was what?
A The SL-1 and GCREML-1.
Q All right, sir. And can you explain what those were.
A Those were names of the various reactors that the Army was developing.
Q Okay. All right, sir. And during your – I apologize. During your assignments to Savannah River, what work is – does Department of Energy do at Savannah River?
A Savannah River operations office is responsible for, at that time, three production reactors that were operating, two chemical separation facilities, a fuel manufacturing facility, and waste handling facilities.
Q Okay.
A It was for the production of tritium and plutonium for the weapons systems.
Q During your tenure at Savannah River, did

Page 3611

you have occasion to be detailed to any other jobs with DOE?
A Yes. During the time that I was manager there I was detailed to Washington on three different occasions. First one was to the acting assistant secretary for defense programs. When Secretary Edwards came in, he asked me to come up and help until they could get a presidential appointee to fill the job.
After I finished that, I spent about 3 months acting assistant deputy to the deputy secretary. And then returned to the Savannah River.
The second detail was for the OCRWM program.
Secretary Hodel asked me to come in shortly after the Nuclear Waste Policy Act was passed in January of 1983.
Again, that was to be a temporary assignment until they again got a presidential appointee.
I stayed in that position for approximately one year. And the assistant secretary for defense programs left. And I was again detailed back as assistant secretary for defense programs because the deputy there could – he was a major general in the Air Force and he could not act in that capacity. So that's when Mike Lawrence, who was my deputy in OCRWM,

Page 3612

took over the Nuclear Waste Policy Act activities.
Q All right, sir. Now, do you recall when you were approached about taking the job as the director of the Nuclear Waste Policy Act project office?
A It was shortly after the act was passed. I would say it was mid-January, in about mid-January. I remember a Thursday afternoon where the special assistant said we would like to have you come up and do that. I said I would like to think about it. And he said well, the secretary intends to announce it on Monday morning. So I figured that I should stipulate with him certain conditions for my accepting that job, which he accepted. And so it was announced the following Monday.
Q Okay. So I assume having taken the job, that the – the conditions you asked for were met by the secretary?
A Yes, they were.
Q Okay. What were those conditions?
A To be separated from where the current program resided, which was in the assistant secretary for nuclear engineering, or nuclear energy. And report directly to the secretary, as required by the Nuclear Waste Policy Act.
I wanted some offices on the seventh floor.

Page 3613

And I wanted to be able to pick from the people who were currently working on the program. I would like to have my choice of those I want to bring with me over to the new office. And also some support personnel from the secretary's office.
Q Okay. And at the time do you recall who the assistant secretary for nuclear energy was?
A Shelby Brewer.
Q Okay. And at the time is it correct that the – that DOE's program existing – I'm sorry, let me start over again.
At the time you took over the Nuclear Waste Policy Act project office, which became OCRWM, I believe, as you pronounce the acronym, do you understand OCRWM to be the Office of Civilian Radioactive Waste Management?
A Yes, I do.
Q All right, sir. Is it almost if we refer to that as RW so we can shorten our tongue wagging?
A Yes, sir.
Q All right, sir. At the time you took over RW, Mr. Morgan, was there an existing repository program at DOE?
A Yes.
Q And where – who had responsibility for that

Page 3614

program?
A Under Shelby Brewer, his deputy was Tom Dillon. And program responsibility resided with Frank Coffman.
Q Okay. Now I believe you asked – was that one of the conditions that you asked Secretary Hodel for was to have a separate organization from Mr. Brewer; is that correct?
A That's correct.
Q Why did you ask to do that?
A Because the Nuclear Waste Policy Act identified a separate office under the act.
Q Okay. Any other reasons?
A I felt that it was inappropriate for me to report to Shelby Brewer.
Q And why is that?
A Because it was not called for in the act.
Q Okay. And what about the existing program that was operating under Mr. Brewer at the time? What – after you took over RW, what, if anything, did you learn about the existing program under Mr. Brewer – Mr. Brewer?
A Well, first, I read – when I first came in, I read the Nuclear Waste Policy Act, of course, over the weekend. And then I started visiting some of the

Page 3615

Hill staffers on the committees that had oversight responsibility. And I learned that they were concerned about, they called it the horse race as to which repository might get there first, and it might not be the best. And that they wanted all three investigations to go along in parallel and that it be – a selection be made on a technical basis rather than a horse race.
Q All right, sir. So when you took over RW, did you view yourself as starting with a clean slate?
A Absolutely.
Q And were you able to hand-pick your staff?
A Yes.
Q And did you get everyone you asked for?
A Yes.
Q Did you have a deputy in the office while you were the director of RW?
A Yes.
Q And who was that?
A Mike Lawrence.
Q Okay. All right, now, Mr. Morgan, you indicated you read the act. I assume you're referring to the Nuclear Waste Policy Act.
A Yes, sir.
Q Once again, I'll use "the act" as a

Page 3616

shorthand for that. Is that okay?
A Yes, sir.
Q Okay. Did you come to an understanding of what the act required you to do?
A After meeting with the Hill staff, I learned that there was not a conference report that resolved the differences between the House-passed version and the Senate-passed version. And the direction that I received from staffers was to follow the nuclear waste – the act as best I could and as I – as written. And if I got out of line, we would hear from them.
Q All right, sir. And is that the policy that you employed while you were the director of RW?
A Yes.
Q Okay. After you took over RW, what did you view as your primary requirements when you took over the job?
A To meet the requirements of the act, the first thing was getting organized to get people on board that could take care of the near-term requirements of the act. Get office space and the other support activities that I needed. And then meet the near-term requirements of the act.

Page 3617

Q Okay. And what did you view as the near-term requirements of the act?
A Well, the first requirement, as I recall, was the June 30th date for contract signing with the utilities. And there was a draft that was into the rule-making process that was published in the Federal Register on the 4h of February. So the first thing we had to deal with was the comments received on that and get that out into a final rule, which I believe was published on the 18th of April.
Q All right, sir. So the contracts, I assumed, you thought was one of your primary requirements.
A Yes, sir.
Q What did you view as your other primary requirements when you took over the job, if any?
A Well, to establish a program that meets the requirements of the act. And so the next big issue, as I recall, was the mission – the draft mission plan in addition to meeting all the other notifications of the states where there was a potential for repository. And doing the other stakeholder notifications, and just compliance with the act.
Q Okay, sir. And did you – did you also view as one of your requirements to begin to investigate

Page 3618

where the repository might be located?
A Well, there was three – well, we were down to three, not formally, but from the nine that was down to six and then the three, but were actually programs going on at Yucca. And at Hanford. And the other one that was about to be initiated was in Texas in the salt dome.
Q Okay, sir. Mr. Morgan, have you heard the term full cost recovery in the context of the act?
A Yes.
Q What does that term mean to you?
A Full cost recovery means to me that the utilities through the one mill per kilowatt-hour would pay for all the incurred costs through the lifetime of the program, and that we were required on an annual basis to review that one mill per kilowatt to see if that was adequate to cover the program over its full course.
Q All right, sir. Since you mentioned first as your first requirement to get the contracts signed, I'll ask you about those first if that's okay with you. Is that okay with you?
A Yes, sir.
Q All right. I believe you mentioned that the status of the contract effort when you took over was

Page 3619

that a draft contract had been published in the Federal Register?
A Yes. It was dated 4 February. And I had – I think the first memorandum that I signed that has been brought to my attention during the course of deposition was January 28th. So I know I was there on January 28th. I did not review the draft contract before it was submitted to the Federal Register. There's normally a week or so lag time between the time it leaves the Department and published in the federal register.
Q So you didn't – I'm sorry. You didn't have an opportunity to review the draft contract prior to its going for publication then?
A That's correct, I did not.
Q Okay. Mr. Morgan, do you recognize the name Loring Mills?
A Yes, I do.
Q How do you recognize his name?
A He is a lobbyist with Edison Electric Institute.
Q Okay. And what occasion did you have to learn who Mr. Mills was?
A Well, he visited me on, I'd say several

Page 3620

occasions when I first got there. And felt that there should be input on the program from the utilities, and particularly EEI. And I told him that was not part of the Nuclear Waste Policy Act. That that was my responsibility to run the program.
Q Okay. I'm sorry. EEI is your – is the acronym for Edison Electric Institute?
A Yes, sir.
Q Now, you do recall what Edison Electric Institute was?
A I believe that it's a Washington lobbying group for the utility.
Q All right, sir. Now, one of the things – is one of the things that Mr. Mills came to talk to you about was – did he come to talk to you about the contract?
A Yes, he did.
Q Okay. By the way, do you recall ever seeing any drafts of a contract prior to the one that you came to be aware had been published in the Federal Register?
A No.
Q Okay. What about Mr. Mills? Did he have any contact with you prior to your taking the job as director of RW?

Page 3621

A Not that I can recall.
Q Okay. So you don't recall any discussions with him prior to taking over as director?
A That's correct.
Q Okay. About the contract or any other matter?
A That's correct.
Q All right, sir. Mr. Morgan, Mr. Mills testified previously in this trial that he had many conversations with you and other DOE officials about several aspects of the program. Do you recall having many conversations with him?
A I would say I had several.
Q All right, sir. After you became director of RW – I'm sorry, I already asked that question. That's what I get for reading my list, isn't it? Do you recall what the substance of the conversations were that Mr. Mills had with you about the contract?
A As I recall, he felt that there should be an acceptance rate in the contract. And I disavowed that because, at that point in time, I felt that the Nuclear Waste Policy Act requirements were extremely difficult because of the licensing, potential litigation, technical issues, stakeholder issues, that

Page 3622

it was going to be difficult to meet the '98 date. And that I felt that it would be inappropriate and not required by the act to have a rate of acceptance in the contract.

Q All right, sir. Now I believe you also mentioned that he desired to have – well, this is my phrase, but I believe it paraphrases your testimony. He desired that the utilities be able to participate in the program. Is that correct?

A That's correct.

Q Okay. And do you recall what he meant by – or what was meant by utility participation in the program?

A Well, I think that he wanted to have input into the program, and that I felt that that was inappropriate.

Q And why do you – why did you think that was inappropriate?

A Because the Nuclear Waste Policy Act didn't call for it.

Q All right, sir. I believe you mentioned earlier that the utilities were paying the 1-mill fee into the program as required by the act; is that correct?

A That's correct. That they would be paying

Page 3623

that upon signing the contract in June – on June 30th.

Q All right, sir.

A And that the inference was that they wanted to participate in the program because it was their money. And I felt that it was the ratepayers' money.

Q All right, sir. Well, in your view, what was the reason for the payment of the fee, the 1-mill fee?

A Full cost recovery for the program.

Q All right, sir. And I believe you mentioned earlier that was, in your view, paying for the program was – was the entire program itself; is that correct?

A That's correct.

Q All right, sir. In your view, what other purpose was there for the contract, if any, other than payment of the 1-mill fee?

A Well, the contract was required for them to retain their license from NRC. And it also outlined the process by which we would accept fuel in the future from the company utilities.

Q All right, sir. In your opinion, was the 1-mill fee being paid solely to fund DOE's activities under the contract?

A I don't understand the question.

Page 3624

Q All right, sir. Let me try to rephrase that then. The – I'll come back to the question, Mr. Morgan.

The concept of full cost recovery that we talked about just a few minutes ago, I believe you talked about its application to the entire program; is that correct?

A That's correct.

Q All right. So in your view, was it – is that concept, the concept of full cost recovery, is that only applicable to the contract activities?

A It was applicable to the research and development that went on, the exploratory activities at potential sites. If there was an MRS to be built, it would include the cost of the MRS. It would include the transportation from the utility sites to the repository, opening of the repository, building the repository, and closing the repository. All those activities would be covered under the 1 mill per kilowatt-hour.

Q All right, sir. Did you feel a responsibility during the time you were director of the program to run it economically and efficiently?

MR. SHAPIRO: Objection. Leading. We've had quite a few leading questions, Your Honor. I

Page 3625

would like to hear Mr. Morgan's testimony.

MR. MILLER: Your Honor, just because it evokes a yes or no answer doesn't make it leading. He can certainly say no. The question I asked was whether or not he felt it was his responsibility to run the program economically and efficiently.

THE COURT: I'll allow the question at this point. I'll overrule the objection. Go ahead.

THE WITNESS: Yes.

BY MR. MILLER:

Q All right. Why did you feel that way?

A That's the way I felt every government activity should be run.

Q All right, sir. As far as you were concerned, how did that translate into – into your directorship of the program, if it did?

A It would apply to – just about everything you did would apply directly to nothing. In other words, you wouldn't want to do anything that was wasteful of the nuclear waste, you know, fund, and that you wanted to do it on an efficient and economic basis.

So you didn't want to do duplications, so you looked at all the activities relative to duplication and such things as that. It's just a

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract -- I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities -- I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was -- several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being -- I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific --
A No.
Q -- rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific -- I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you -- did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3630

written input on their position?
A Yes.
Q All right. I would like to show you what's been identified as Defendant's Exhibit 2.034.
MR. MILLER: Your Honor, I have a paper copy for the Court if you would like it.
THE COURT: Thank you, Mr. Miller.
MR. MILLER: Mr. Morgan, do you need a paper copy?
THE WITNESS: No, thank you.
BY MR. MILLER:
Q Mr. Morgan, I'm showing you now on the screen what's been admitted as Defendant's Exhibit 2.034. And I'll ask you if you recognize that.
A Yes, I do.
Q What is it? What do you recognize it to be?
A It's a letter from Edison Electric Institute to me as the project director on -- the subject being the standard contract.
Q All right, sir. And do you recognize this to be EEI's comments on the draft contract?
A Yes.
Q All right. Specifically, I'll refer you to page 8 of that letter in the first paragraph. Do you see that?

Page 3631

A Yes.
Q All right, sir. It's been blown up on the screen for you there. Can you see it?
A Yes.
Q All right, sir. If you would, sir, read the first sentence into the record, please, sir. It begins with although.
A Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article 2 states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act.
Q All right, sir. I'm sorry. Would you go on and just read the next two sentences?
A However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW, period.
Q All right, and SNF refers to spent nuclear fuel?
A Yes. And HLW is high-level waste.
Q All right, sir. And do you recall that statement to be true, that last statement that you read, that is, that the draft does not -- the draft

Page 3632

contract did not commit DOE to accept any given quantity of SNF?
A That's correct.
Q All right, sir. I'll next refer you to page 2 of appendix A, which is an attachment of this letter. And if you'll look at the second paragraph, please, sir.
All right. Do you see that blown up on the screen for you, sir?
A Yes.
Q All right, sir, beginning in the sentence in the middle of the page that begins while the contract, do you see that?
A Yes.
Q Would you read that, please, sir?
A While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least quantitatively, the need to have adequate annual receiving capacity to handle industry needs.
Q All right, sir. Please go on.
A This would be consistent with the direction of section 302(a)(5) of the act that DOE will take title to spent nuclear fuel and high-level waste as expeditiously and practicable upon request of the

Page 3633

generator or owner.
Q All right. That's "as expeditiously"?
A Expeditiously as practical. Right. Excuse me.
Q That's all right, sir. Start with the sentence that begins with "a new clause."
A A new clause should be added, and then there's a clause.
Q All right, sir. Would you just read that?
A Whereas DOE recognizes that its ability to take the delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.
Q All right, sir. Now, do you recall that to be the acceptance rate that Mr. Mills discussed with you when he came to talk to you about the contract acceptance rate?
A Yes.
Q And, sir, when you published the final rule in April of 1983, did you include that qualitative

Page 3634

whereas clause that was requested?

A No.

Q And why? For what reason did you take that – did you not include it, if you will?

A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.

Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?

A No.

Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?

A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.

Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?

A No. I did not agree with that.

Q All right. The question of – I'm sorry. I'll start again.

I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?

A I don't really recall.

Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?

A No.

Q Why is that?

A It was premature.

Q Why was it premature?

A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.

Q All right.

A And that it was to be dealt with in the

Page 3636

mission plan.

Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?

A No. No.

Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?

A Yes.

Q And what was that concept?

A The concept was to take the oldest fuel first –

Q All right, sir.

A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.

Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?

A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.

Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?

A No.

Q And why was that, sir?

A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.

Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?

A Yes.

Q Do you recall if that was requested by the utility?

A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.

Q All right, sir. I'll show you now Yankee Exhibit Number 30.

MR. MILLER: All right, Your Honor, I'm

Page 3638

afraid I only have one copy. Is the computer image okay for you?
THE COURT: Sure.
BY MR. MILLER:
Q What about you, Mr. Morgan?
A We have just a cover sheet.
Q Yes, sir. I'll refer you to the next page of that.
Okay. Mr. Morgan, I'll ask you now – I'm sorry. The first page that we looked at, I believe, indicated that that's Plaintiffs' Exhibit Number 30. Do you recognize this document now, Mr. Morgan?
A Yes.
Q And do you recall what it is?
A It's my memo to the secretary regarding final rule-making on the standard contract.
Q All right, sir. And the purpose of the memorandum was what?
A To advise the secretary of the resolution process and to keep him informed before it went to the Federal Register.
Q All right, sir. Specifically, I refer you to the first paragraph of tab A. Do you see that now?
A Yes.
Q And the title of that first paragraph is

Page 3639

disposal fund contract. Do you see that?
A Yes.
Q It looks like I referred you to the wrong – I'm sorry, Dawn, would you unexplode that, please.
Excuse me a moment, Your Honor.
I'm sorry, Dawn, that would be the first paragraph of tab D.
Okay. I'm sorry for the confusion there, Mr. Morgan. Do you see the paragraph that's been exploded for – on the computer there?
A Yes.
Q And the heading of that paragraph is spent nuclear fuel exchange rights. Do you see that?
A Yes.
Q Would you read that into the record, please, sir?
A The majority of the utilities commented that they should have exchange or swapping rights to ship their spent nuclear fuel and/or high-level waste to our repository. After consideration, aside from some complex recordkeeping, this poses no great problem to us, and, consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.

Page 3640

Q All right, sir. Do you recall what you meant by the phrase we intend to be reasonable?
A That we – basically we would approve it if the fuel met the acceptance requirements.
Q All right, sir. Did you have any specific criteria in mind as far as – beyond what you've already testified to? Any other specific criteria in mind when you – when you sent this memo to Secretary Hodel?
A No.
Q All right, sir. Thank you.
MR. MILLER: Your Honor, can I take just a short break?
THE COURT: Yeah.
(Discussion off the record.)
MR. MILLER: All right. Your Honor, on second thought, is it all right if we take a 10-minute break?
THE COURT: All right. I have the wrong glasses on. Pick a time.
MR. MILLER: It's about 25 till 6:00 now, sir. So about quarter till 6:00.
THE COURT: Okay.
MR. MILLER: Okay. Thank you, sir.
(Whereupon, a recess was taken at 5:35 p.m.,

Page 3641

and the proceedings reconvened at 5:47 p.m.)
BY MR. MILLER:
Q Okay, Mr. Morgan, I believe earlier I asked you about the principles of economy and efficiency and how you felt those principles applied to the program. Do you recall that?
A Yes, I do.
Q Did you feel like the – those principles, economy and efficiency, were contractual requirements that the Department had assumed under the standard contract?
A No.
Q All right, sir. I believe you mentioned earlier when we were talking about acceptance rates under the contract that you felt that you should deal with the acceptance rate in the mission plans. Do you recall that?
A Yes, I do.
Q All right. I want to show you now what's been – what's been identified as Yankee Atomic Exhibit or Plaintiffs' Exhibit 678. Now, this is a cover page of the – oh, I'm sorry. Your Honor, would you like a paper copy?
THE COURT: No. I can –

Page 3642

BY MR. MILLER:
Q Can you see that okay, Mr. Morgan?
A Yes.
Q The cover page of this document says that it's the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th to the 15th, 1983. Do you see that?
A Yes.
Q All right. Do you recall this proceeding, Mr. Morgan?
A Yes.
Q All right. Specifically, I'll refer you to page 11. And do you recognize – recognize page 11, Mr. Morgan? Can you see it?
A Yes.
Q I've got a paper copy.
A No, I can see it.
Q Do you recall making a presentation at this December '83 information meeting?
A Yes.
Q All right. I'll refer you specifically to the second column – I'm sorry, to the right-hand column, the second paragraph. And I believe this document refers to your having just received a

Page 3643

preliminary draft of volume 1 of the mission plan. And you hoped to have that available to interested parties, the states and others, by Christmas. Do you see that?
A Yes.
Q And do you recall whether or not you were able to make that draft mission plan available at or around that time?
A I know we put out the mission plan around that time. But I'm not sure whether it made the Christmas date or not.
Q All right. How about the fourth paragraph, sir. Would you have a look at that. I'm sorry. It's the next paragraph. Okay. Do you see that paragraph now, the one that's highlighted, Mr. Morgan?
A Yes.
Q Would you read that first sentence, please, sir?
A I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the act requires that we receive waste from the utilities by January 1, 1998.
Q All right, sir. I'm sorry. I was just referring to the first sentence there.

Page 3644

And long about the middle of the paragraph where it says the basic strategy, do you see that?
A Yes.
Q Would you read that, please, sir?
A The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on the site.
Q All right, sir. Now the word you used there was strategy. Did you believe that the information you set out in the mission plan was a contractual requirement?
A No.
Q What was it then?
A As required by the act, section 3, it was an informational document, clearly not contractual.
Q All right, sir. And in your mind what did it represent to the program?
A It represented the goals and what we would like to accomplish relative to specific activities.
Q All right, sir. And so with respect to your previous statement about dealing with the acceptance rate in the mission plan, we'll talk a little bit about the mission plan in a minute, but did you perceive the rates in the mission plan to be

Page 3645

contractual requirements?
A No.
Q All right, sir. Now, I would like to refer you to the last sentence in that paragraph – I'm sorry, Dawn. The last sentence in that same paragraph. Would you just read that, please, sir?
A During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.
Q All right, sir. Did you feel that statement reflected contractual intent on the part of the Department?
A No.
Q All right, sir. Once, again, sir, what did you think it represented?
A It was in the plan to notify or let the utilities realize that they would not have to make additional commitments for on-site storage after the beginning of 1998. But they would – if you look at the mission plan, it shows –
Q Which we're going to do in just a minute.
A It shows an increase of stored fuel because

Page 3646

the rate starting in 1998 did not meet the discharge
rates until later on in the program.
Q All right, sir. We'll look at that now, if
you don't mind.
Yankee Atomic Exhibit 636. All right.
Mr. Morgan, I'm showing you now what's Plaintiffs'
Exhibit 636. Do you recognize this document, sir?
A Yes.
Q And is this the document that was – that
was produced by the program during your tenure?
A Yes.
Q All right, sir. If you'll look at page 1-2,
please, sir, and the last paragraph. And the first
sentence in that paragraph, sir, would you just read
it.
A It is the department's intent to update this
mission plan periodically as the program progresses.
Q I'm sorry, sir. The first sentence that's
highlighted there.
A Oh, the first sentence.
Q Yes, sir. In that paragraph?
A The mission plan has been prepared as a
means of both planning the program and demonstrating
its conformance to the requirements of the act.
Q All right, sir. And do you recall that –

Page 3647

that that's what you intended the mission plan to be
at the time you published this document?
A Yes. It was an informational document.
Q All right, sir. What relationship did it
have to the department's contract with the utilities?
A None.
Q And once again, sir, did this statement
that's contained in the – I apologize. Let me move
on to page 2-1, please.
And actually, I want to – sorry. Can you
blow this up.
The last paragraph is the one I wanted to
ask you about there, Mr. Morgan. Do you see that?
A Yes.
Q All right, sir. Once again, that first
sentence there, would you read that?
A This approach is designed to ensure that all
utilities will be able to establish firm planning
schedules for the disposition of their radioactive
waste sufficiently early to determine their on-site
interim storage needs prior to 1998.
Q All right, sir. And just go on. Read
the –
A Until 1998, each utility will be responsible
for providing its own additional on-site interim

Page 3648

storage unless the utility applies for and is
certified for the Federal Interim Storage Program.
Q All right, sir. Do you recall that that
represented your view at the time, that was that
utilities were responsible for providing their own
additional on-site interim storage?
A Yes.
Q And once again in your mind, you intended
this plan to inform the utilities about what they
could anticipate as far as their additional storage?
A Yes.
Q All right, sir. If we go to the bottom of
2-2 and the top of 2-4.
All right, now, Mr. Morgan, I believe that
in between pages 2-2 and 2-4 there's a table that
we'll talk about in a minute. But I believe that this
language that's highlighted here on 2-2, 2-4 – 2-4 is
a continuation of 2-2. So I'll ask you to read
that – just read it to yourself and let me know when
you're finished.
A I'm finished.
Q All right, sir. Now in the first sentence
there you say: While the department's acceptance rate
during the initial 5 years is set to prevent, in the
aggregate, the need for utilities to provide

Page 3649

additional on-site storage after 1998. Do you see
that there?
A Yes.
Q In that part of that sentence that I read,
what does in the aggregate mean? Do you recall?
A The total discharge from the utilities
versus the acceptance at the repository.
Q Okay. I'm sorry. When you referred to the
in the aggregate, as far as the department's
acceptance rate is concerned, what was –
A The total.
Q What did you mean?
A The total. In the aggregate means if you
look at the discharge – well, in total, you don't –
most of the utilities won't have to add on-site
storage.
Q All right, sir. And the sentence that
begins the planning basis, do you see that?
A Yes.
Q I'll read that. The planning basis assumes
that, after 1998, individual utilities who actually
realize this need – and that is the need for expanded
storage, I believe – will arrange for the right to
ship spent fuel to the Department from a utility who
is next in the queue in shipment allocation.

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.