Page 3654

And I didn't have any agreement with Mr. Mills.
Q All right, sir. I believe you said that you recalled Mr. Mills discussing with you the rates that are reflected in the draft mission plan –
A Yes.
Q – that we've been talking about –
A Yes.
Q – is that correct? Do you recall that he said that the rates, the schedule there didn't comport with the utilities' understanding that he thought he had with you and other DOE officials about the acceptance rate that they expected under the contract?
A I did not have any agreements with Mr. Mills or any of the utilities as to rates of acceptance.
Q Under the contract?
A Under the contract or relative to this schedule, this table.
Q All right, sir. Just a few more questions and I believe I'll be finished with my direct testimony, Mr. Morgan. Do you recall if before the Nuclear Waste Policy Act, was there a specific statutory direction to DOE to develop a repository?
A Not that I know of.

Page 3655

Q Okay. By the way, after you took over the program, did Mr. Brewer, Mr. Coffman, did they have anything to do with decision making on the program?
A No.
Q All right. So you and your new staff in the – in the office were the – were you the sole individuals responsible for implementing the act?
A I was responsible –
Q You were?
A – for implementing the act.
Q The buck stopped with you; is that correct, sir?
A Yes, sir.
Q I'm sorry?
A Yes, sir.
Q And you reported to Secretary Hodel; is that correct?
A That's correct.
Q Okay. Between the time the draft contract was published and the final contract was published, had you begun to develop the design for the repository?
A That was in the process. So, yes, we would have started development of a design.
Q Okay. What about specific design –

Page 3656

repository design receipt rates? Had you begun to do that at the time the contract was formed?
A No.
Q Do you recall Mr. Mills representing to you or arguing to you that the acceptance rate under the contract should be the repository design receipt rate?
A There wasn't a receipt rate under – in the contract.
Q Yes, sir.
A So the question again?
Q Yes. Do you recall that Mr. Mills asserted to you that that's the rate that should be in the contract, the repository design receipt rate?
A I don't – I'm sure that he could have. I don't know.
Q Okay, sir. Had he done so at the time, would you have made a representation to him that the contract receipt rate would be the repository design receipt rate?
A Absolutely not.
Q And why was that? Why would you not have done so?
A Because we dealt with that in the rule-making process. And there was no way that I would go through a rule-making process without, you

Page 3657

know, in the contract, and denying a receipt rate and turn around and make a – an agreement otherwise. That's ludicrous.
Q All right, sir. Do you recall if the contract did address the manner in which DOE would accept spent nuclear fuel from the utilities?
A Yes. In the appendices.
Q All right. And do you recall what the contract said about it in general?
A That there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time.
Q All right, sir. At the time the contract was finalized, did you know what that rate would be?
A No.
MR. MILLER: All right, sir. Just one moment, Your Honor, to make sure –
THE COURT: Take all the time you need.
MR. MILLER: All right. Your Honor, due to the lateness of the hour, is it all right that we break for tonight? It may be I have a few additional questions. I would sort of like to, especially considering the hour, to consider that.
THE COURT: Sure. We can do that.
MR. MILLER: All right. Thanks, Your Honor.

Page 3658

We will be happy to start again with Mr. Morgan in the morning.

THE COURT: Okay. We'll adjourn and reconvene at 10:00 a.m. tomorrow morning.

MR. MILLER: Thank you, sir.

MR. STOUCK: Thank you, Your Honor.

(Whereupon, at 6:10 p.m., the hearing was adjourned, to be reconvened at 10:00 a.m. on Tuesday, August 3, 2004.)

Page 3659

CONTENTS

WITNESS DIRECT CROSS REDIRECT RECROSS
CHRISTOPHER KOUTS 3444 3470 3585 3597
ROBERT L. MORGAN 3607

AFTERNOON SESSION: 3470

EXHIBITS

EXHIBIT NO. MARKED RECEIVED
PX-1726 3436
DX-664 3468

Page 3660

CERTIFICATE OF REPORTER

DOCKET NOS.: 98-126C, 98-154C, 98-474C
CASE TITLE: Yankee Atomic Electric v. U.S
HEARING DATE: August 2, 2004
LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 8/2/04

Vicky J. Stallsworth, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington,D.C. 20005-4019

Page 3661

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs. ) 98-474C
)
THE UNITED STATES. )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3662

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

Page 3663

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 3664

P R O C E E D I N G S
- - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.

THE COURT: Go ahead, whenever you're ready.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MILLER:

Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

Page 3693

proceeding, there might have been a little bit of confusion on that point. But ultimately, we're talking about the same relevancy. Thank you for your time.
THE WITNESS: You're welcome.
THE COURT: Any redirect?
MR. MILLER: Short redirect, Your Honor.
THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. You thought you were going to get away, didn't you, Mr. Morgan?
THE COURT: I don't blame you, you want to go back to Oregon, I think.
THE WITNESS: I now live in Colorado.
THE COURT: Oh, Colorado.
BY MR. MILLER:
Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?
A. Yes.
Q. Was that a deliberate choice on your part?
A. Yes.
Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.
Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?
A. Not in total because of the fact that NRC had not identified the requirements for licensing.
Q. Okay.
A. And quite honestly –
Q. I'm sorry.
A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.
Q. So that was a concern of yours?
A. Yes, that was a concern of mine.
Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.
Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?
A. No.
Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?
A. No, that was not part of the Act.
Q. Was that a program goal that you had at the time you were director –
A. That was a program goal that we identified in the mission plan.
Q. And is that a goal that DOE specifically declined to put in the contract?
A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?
A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.
MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.
THE COURT: Anything further?
MR. SHAPIRO: Nothing further, Your Honor.
THE COURT: All right. You're excused, and thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.
Whereupon–
BENARD C. RUSCHE
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:
Q. Are you all set, Mr. Rusche?

**Tennessee Valley Authority v. U.S. No. 01-249C July 14, 2005**

**Heritage Reporting Corporation**

**Page 2078 to Page 2330**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2078

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, Defendant. )

Courtroom 4
National Courts Building
717 Madison Place, NW
Washington, D.C.

Thursday, July 14, 2005
Volume 10

The parties met, pursuant to the notice of the Judge, at 9:31 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 2079

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 2080

P R O C E E D I N G S

\- - - - -

THE COURT: Good morning. Mr. Lo Re.
MR. LO RE: Good morning, Your Honor. Just one housekeeping note before we begin. We had been scheduled to start Mr. Morgan's video conference at 11:00 a.m. the video conference worked fine. However, there was a little bit of a delay in getting the documents to Mr. Morgan that we'll be using with him, so we are now anticipating doing that at noon, rather than 11.
We are anticipating less than an hour of testimony with Mr. Morgan, and what we would propose is that perhaps we could push our lunch break to closer to 1 p.m., rather than the usual 12:30, and that way, I believe that, I've spoken with counsel from TVA on this, and I believe that we could get Mr. Morgan finished maybe, just with the consequence being we just take a slightly later lunch.
THE COURT: Mr. Shea?
MR. SHEA: We're certainly agreeable, Your Honor.
THE COURT: Thank you. We will do that.
MR. LO RE: Thank you, Your Honor.
THE COURT: Mr. Crawford.

Page 2081

MR. CRAWFORD: Thank you, Your Honor.
THE COURT: See, if I don't hear Chapman's name, I'm fine.
MR. CRAWFORD: Well, unfortunately, we'll probably hear it a couple more times today, but no problem, I respond to either one. Just point at me, and I'll know who you're talking about.
Whereupon--

STEPHEN KIRALY

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. CRAWFORD:
Q. All right. Mr. Kiraly, where we left off yesterday, you had just told us about the fact I think you had received some more support from TVA after the time of, after the submission of your report. And once again, can you just tell us what that labor support consisted of?
A. Yes, excuse me. After the submission of my report, I received the same type of labor data that I had received for Browns Ferry for fiscal year 2004. This labor support was for the rest of Browns Ferry during the claim period, as well as for Sequoyah, and it allowed me to do the same type of analysis that I

Page 2190

January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

Page 2191

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

Page 2192

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.
Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?
A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.
Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?
A. Could you repeat the question, please?
Q. Yes. How have you been employed since you retired from DOE in 1988?
A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

Page 2193

impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.
Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?
A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register. We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.
Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

Page 2194

Civilian Radioactive Waste Management?
A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then --
THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?
A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

Page 2195

A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

Page 2196

lawsuit, and they're hearsay.
THE COURT: Well, let's sort out relevance first. Ms. Sullivan?
MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.
THE COURT: Mr. Small, do you have anything further?
MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.
THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?
MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

Page 2197

because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.
THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?
MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.
BY MS. SULLIVAN:
Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?
A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than

Page 2198

there was from Westinghouse.
So we were trying to formulate a way to make it an equitable cost for both GE and Westinghouse. This is the fuel that existed prior to the establishment of the 1 mil per kilowatts. The average of the expenses to GE and Westinghouse had to be an average of 1 mil per kil watt for the aggregate of that fuel.
Q. Thank you, Mr. Morgan. Turning back to what you recall about your discussions regarding the rate of acceptance, I believe you testified that the request of the utilities with regard to the rate of acceptance was rejected. Why was the request rejected?
A. The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders. But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I

Page 2199

would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.
Q. Mr. Morgan, do you have the exhibits that comprise Defendant's Exhibit 5 before you?
MS. SULLIVAN: Ms. Herrmann, could you provide those exhibits to Mr. Morgan? Your Honor, this is a binder that's been provided to the Court.
THE WITNESS: Yes, I have.
MS. SULLIVAN: Thank you. And, Your Honor, we elected not to use the Trial Director because, if we did do that, we would lose Mr. Morgan's picture.
BY MS. SULLIVAN:
Q. So, Mr. Morgan, did you have an opportunity to review the stack of materials that's been placed in front of you prior to before we began today?
A. This entire record was transmitted to me by e-mail yesterday, and I spent last evening and a little time this morning going through these records.
Q. Mr. Morgan, do you recognize the set of documents before you to be the administrative record to the standard contract?
A. Yes, I do.
Q. Do you recall receiving these documents in the course of the development of the standard

Page 2200

contract?
A. Yes.
Q. And were these documents sent directly to you?
A. I beg your pardon?
Q. Were these documents sent directly to you?
A. Some of them were sent directly to me. Some were sent to the contracting officer who had signed the rule. But I did review all of these records when they came in.
Q. And why did you review these documents?
A. Because I was held responsible for the contract by the Secretary of Energy and I felt that I had to review those in the rule-making, and I had the responsibility of making the decision as to whether they were included or not.
Q. Thank you, Mr. Morgan.
MS. SULLIVAN: Your Honor, at this time, the government moves for admission of Defendant's Exhibit 5, which is the administrative record for the development of the standard contract. I have questions about two particular sets of comments in this document -- I mean, in this set of documents, but I would like to move for admission of the entire record.

Page 2201

THE COURT: Before we get Mr. Small's reaction to that request, would you please, Ms. Sullivan, identify for the Court exactly what you mean by Defendant's Exhibit 5?
MS. SULLIVAN: Yes, Your Honor. Defendant's Exhibit 5, which are Defendant's exhibits, they're broken up through Defendant's Exhibit 5.000 through Defendant's Exhibit 5.086.
THE COURT: Does that, and this is not going to make sense to Mr. Morgan, but does that essentially comprise this first volume?
MS. SULLIVAN: Yes, Your Honor, that has been provided to the Court.
THE COURT: All right. Mr. Small?
MR. SMALL: Your Honor, we do not dispute that the volume contains letters that were received by DOE regarding the standard contract, apparently, in 1983, but we just had a few minutes to look at it. On the other hand, Your Honor, the letters predominantly -- I mean, I think there might be one in there from TVA, but predominantly, they're from other utilities, not TVA. And to that extent, they're hearsay, and also, Your Honor, the vast bulk of this record is totally irrelevant to any issue in this case, and to

Page 2202

allow it into the record without any showing of how it might be relevant to this case would seem to me to be not the correct way to try to build the record in the case, Your Honor.

THE COURT: Well, we probably don't have a hearsay objection if counsel can verify to the Court that this is and was the administrative record to the proceedings to establish the standard contract.

MS. SULLIVAN: Yes, it is, Your Honor, and it has been produced to TVA and all of the other spent nuclear fuel utility Plaintiffs with cases before this court.

THE COURT: Was this the record that was supplied to the D.C. Circuit in their review of various issues, actually, associated with the standard contract?

MS. SULLIVAN: Your Honor, I don't know the answer to that question, but Mr. Lester is in the courtroom.

MR. LESTER: I don't believe that the administrative record for the terms of the standard contract has been an issue in any of the D.C. Circuit cases.

THE COURT: The early ones, if I recall correctly, related specifically to the rate.

Page 2203

MS. SULLIVAN: The fee payments, Your Honor.

THE COURT: Yes.

MR. LESTER: If you're referring to Indiana Michigan and Northern States –

THE COURT: No, General Electric uranium.

MR. LESTER: Oh, way back when.

THE COURT: Yeah, I'm talking about the cases – I'd have to think about, maybe '85. It's been a month or so since I've looked at those.

MR. LESTER: Your Honor, I do not know what the record was that was produced there. The administrative record here is the administrative record that was developed in response to the Federal Register notice that was issued in February 1983, and comments were requested in that notice, and then these comments were received, and then a responsive final rule was published in April of 1983.

THE COURT: No, I understand that. What I'm driving at, I suppose, is whether this is something that could be certified or even has been certified.

MS. SULLIVAN: For the purposes of overcoming a hearsay objection, Your Honor?

THE COURT: Well, yes, exactly.

Page 2204

MS. SULLIVAN: Because I was going to suggest that another exception to the hearsay rule may allow it, the record to come in, and that is the ancient documents exception because all these documents are more than 20 years old.

THE COURT: I'm not a fan of the ancient documents exception, I'm sorry, because ancient is 20 years or more, and I'm guessing Mr. Morgan is 75 years old, and I don't think Mr. Morgan is ancient, and so I hear you, Ms. Sullivan, but I'm looking at 902(4), certified copies of public records. Now, if you can assure me that this is the official record and can be certified, that's another matter.

MS. SULLIVAN: I think we had a question because we didn't know if it was the record that was presented in the D.C. Circuit.

THE COURT: No, I asked a specific question, and I probably shouldn't have done that.

MS. SULLIVAN: One moment, Your Honor. Your Honor?

THE COURT: Yes.

MS. SULLIVAN: Mr. Lester tells me this is the record that the Office of General Counsel of DOE maintains as the official record of comments that were developed in response to the preliminary, or the

Page 2205

draft standard contract prior to the issuance of the final standard contract in the Federal Register in 1983.

THE COURT: Now, Rule 902 just deals with authenticity, but nonetheless, that also works in large part for the application of Rule 803(8), public records and reports, and the certification would be helpful, but I'll take the representation of counsel, so I'll pass over and overrule the hearsay objection, Mr. Small.

Now, we had the discussion regarding relevance. We really haven't gotten into the rate issues and so on yet, but we will. We had mention of it a few minutes ago, so I'm going to overrule that objection too, Mr. Small.

MS. SULLIVAN: Thank you, Your Honor. So is Defendant's Exhibit 5 admitted?

THE COURT: Any other objection, Mr. Small?

MR. SMALL: No, Your Honor.

THE COURT: The Court admits Defendant's Exhibit 5.

MS. SULLIVAN: Thank you, Your Honor.

(Defendant's Exhibit Number 5 was received in evidence.)

BY MS. SULLIVAN:

Page 2206

Q. Mr. Morgan, could I ask you to turn to what is marked as Defendant's Exhibit 0.34?
A. Yes, I have that document.
Q. Okay. Mr. Morgan, do you recognize this to be a copy of the Edison Electric Institute's comments on the standard contract, the draft standard contract?
A. Yes.
Q. Do you recall reviewing this set of comments at the time it was submitted?
A. Do I recall receiving this?
Q. No, my question, do you recall reviewing this document?
A. It's still – I still didn't hear the question.
Q. My question was whether you recalled reviewing this document.
A. Yes, I reviewed this document.
Q. Thank you. Mr. Morgan, what is your understanding as to what the Edison Electric Institute is?
A. The Edison Electric Institute is an association of electric generating companies, and I believe that they are a Washington lobbying group.
Q. Thank you. Mr. Morgan, would you please

Page 2207

turn to page eight of the letter from EEI?
A. Page eight?
Q. Yes. And, Mr. Morgan, I would like to read a portion of that first paragraph into the record and then ask you a question. The paragraph begins, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW." Do you see where I've read, Mr. Morgan?
A. Yes, I see that.
Q. Mr. Morgan, do you recall the concern from EEI that is raised in the portion of the paragraph that I just read?
A. Yes, I recall this concern.
Q. And could I direct your attention to two pages later in the document, the second page of the attached detailed comments, do you have that page in front of you, Mr. Morgan?
A. Yes, I do.

Page 2208

Q. And that second paragraph on that page reads, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated, together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize at least qualitatively the need to have adequate annual receiving capacity to handle industry needs. This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added." And then, Mr. Morgan, if you turn the page, the clause reads, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and

Page 2209

waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste." Mr. Morgan, do you recall reviewing the material that I just read from EEI's comments on the draft standard contract?
A. Yes, I recall that.
Q. Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. We considered it and rejected it.
Q. And why was it rejected?
A. Because of the uncertainties of the program that I mentioned earlier; and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.
Q. Mr. Morgan, would you please turn your attention now to what's marked as Defendant's Exhibit 5.063?
A. Yes, ma'am.
Q. Mr. Morgan , do you recognize this document

Page 2210

to be TVA's comments on the standard contract?

A. This document that I have does not have a cover letter on it, and so I can't say whether this was addressed to me, but I do know that we've reviewed comments from TVA.

Q. And if I could direct your attention to the first page of the exhibit, I believe the fourth line down in the first paragraph reads, "TVA believes a separate contract should be made for each reactor unit." Do you see that?

A. No, I don't. This is on page -- the first page?

Q. The first page under general comments, the fourth line in that first paragraph.

A. Yes.

Q. "TVA believes."

A. Yes.

Q. Okay. Does that provide any insight as to whether these were TVA's comments on the contract?

A. I don't understand that question, I'm sorry.

Q. I'm being inartful, and I apologize. You said that it doesn't have a cover letter, but you do recall receiving comments from TVA that were reviewed, is that correct?

Page 2211

A. That is correct.

Q. Okay. But without a cover letter, you don't know whether these were TVA's comments?

A. I can't, you know, say whether these were TVA comments sent to me, and, again, it's been a long time since I looked at some of these records.

Q. Well, let me ask you this, do you agree that there are statements with regard to, that mention TVA in them, in this document?

A. Yes.

Q. Mr. Morgan, would you please turn to page five of this document?

A. Yes.

Q. And I direct your attention to the middle of that page, and I'm going to read a section into the record that begins, "In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industry

Page 2212

wide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V: DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998 at not less than the annual rate of SNF and/or HLW is then being produced from civilian nuclear power plants covered by the contract with DOE for disposal of SNF and/or HLW.

After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to set date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchasers, nuclear power plants specified in Appendix A."

Mr. Morgan, do you recall reviewing the provision or the request and the comments that I just read?

A. I recall reviewing these comments, and they were denied.

Q. And why were they denied?

A. It would be unconscionable for me as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program that I discussed earlier. I don't know

Page 2213

how else to say it, but it is not, it was not required by Nuclear Waste Policy Act, and we did not include it.

Q. Mr. Morgan, would you now look at Defendant's Exhibit 28, please?

MS. SULLIVAN: Your Honor, I understand that Defendant's Exhibit 28 has already been admitted into evidence.

THE COURT: Yes, on the 21st of June.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Morgan, I'd like you to turn to the third page of this document, which is titled, "Summary of Disposition of Major TVA Comments."

A. Yes.

Q. Do you have that in front of you?

A. Yes.

Q. And I'd like to read the comment and the response and then ask you a question.

"Comment: The contract should address at least the minimum duties DOE must perform in return for payments to the Nuclear Waste Fund.

"Response: DOE made little in the way of substantive changes defining their responsibilities. The second recital was changed by adding the phrase

Page 2214

'as expeditiously as possible regarding DOE's responsibilities for taking title to spent nuclear fuel or high-level radioactive waste.' Some clarifications were made regarding establishment of the acceptance priority ranking of purchasers. However, no substantive dates or rates of removal of SNF are established beyond the requirements of the Act, which requires DOE to start accepting SNF by 1998."
Mr. Morgan, the last sentence of that response that I read regarding some clarifications were made, but no substantive dates or rates of removal of SNF were established, that statement, does it comport with your recollection of DOE's consideration of TVA's comments regarding the acceptance rate?
A. Yes.
Q. I now direct your attention to what is page five of this document, but it's marked page three at the top.
A. Page five?
Q. Page five of the document, but it's marked page three, and it's with the third comment. The number three is at the top.
A. Yes.

Page 2215

Q. Great. I'll forego reading the comment, but I'll read the response and then ask you a question.
"Response: DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue not later than January 1st, 1987 a capacity report for planning purposes and, beginning April 31st, 1991, annual acceptance priority ranking the oldest SNF and HLW having priority for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal program's plans and cost projections."
Mr. Morgan, the response that I just read, does that comport with your recollection of DOE's consideration of TVA's comments regarding what should be included in the contract with regard to acceptance rate?
A. Yes.
Q. Mr. Morgan, could I now ask you to look at Defendant's Exhibit 27?
A. I have that.
Q. Mr. Morgan, this is a copy of a May 20th,

Page 2216

1983 letter from Edison Electric Institute to you. Have I described the document correctly?
A. Yes, I recall this document.
Q. And do you recall receiving this document?
A. Yes, specifically.
Q. And why do you recall receiving this document?
A. I beg your pardon?
Q. Why do you recall receiving this document?
A. Because it was the same theme after the final rule-making that they had presented to us during the rule-making process.
Q. And what did you do in response to this letter?
A. I'm not sure what the response was. I don't have that – I don't know whether it was answered specifically or not. I can't say right now. I don't recall.
MS. SULLIVAN: Your Honor, at this time, I'd like to move for admission of Defendant's Exhibit 27.
THE COURT: Mr. Small?
MR. SMALL: Your Honor, I don't understand that the proper foundation has been laid for 27. It appears to be a copy of an Edison Electric Institute

Page 2217

letter that was sent to DOE in May of 1983. However, it was not part of the rule-making for the standard contract. It was, as I understand his testimony, it was sent after the close of the rule-making, and the witness is unable to say what, if anything, was done in response to it.
THE COURT: Well, I don't have a difficulty with the foundation in that respect because Mr. Morgan just testified he recalls specifically receiving it. I've got a small problem on relevance because it appears that this letter and the attachment relate to the controversy in the early mid-'80s over the way in which the fee would be computed.
MS. SULLIVAN: Your Honor, I agree that that is the primary focus of the letter. However, there is an issue with regard – there's a mention made of the acceptance rate issue, and that's what I wanted to ask Mr. Morgan about, not about the fee issues, but I understood that I was not to ask any substantive questions prior to seeking admission of the document.
THE COURT: That's right. Where?
MS. SULLIVAN: If you look at the bottom paragraph that begins, "Considering," there's a

Page 2218

sentence five lines down that begins, "Several of these" -- sorry, "However, many problems remain. Several of these are of such magnitude," and then it continues, "These include the lack of standards or milestones for DOE's performance."

And that was the section of the letter that I was planning to ask Mr. Morgan about.

THE COURT: Mr. Small?

MR. SMALL: I have no objection to the letter coming in for discussion of that particular topic.

THE COURT: All right. It's admitted, granted, of limited relevance.

MS. SULLIVAN: Thank you, Your Honor.

(Defendant's Exhibit Number 27 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Morgan, can I direct your attention to that last paragraph on the first page, which I was just discussing with the Court, and I'd like to read that paragraph into the record and then ask you a question about it.

"Considering the compressed schedule under which it was drafted, the disposal contract is a credible, although by no means a perfect document.

Page 2219

DOE staff worked hard in its development and did accommodate many of the comments that we submitted on the proposed draft contract.

However, many problem areas remain.

Several of these are of such magnitude that were it a normal commercial transaction, the contract would never be signed in its current form. These include a lack of standards or milestones for DOE's performance, absence of utility review rights on the DOE program, inadequate protection for utilities against nuclear and nonnuclear liability," and it continues.

Mr. Morgan, my first question is, does this statement comport with your recollection as to DOE's consideration of comments submitted by EEI?

A. Yes.

Q. And the statement about the lack of standards or milestones for DOE's performance, does that also comport with your understanding as to DOE's treatment of EEI's comments?

A. The understanding of the Nuclear Waste Policy Act, it was an off-budget item, and that the, that fees collected from the utilities would be utilized to run the program and develop a repository or a monitored retrievable storage. The idea here,

Page 2220

or the concept was that it was to be paid for by the utilities, whatever that cost was, and that annually, we were to look at the rates that were charged to see if that covered the cost of the activities that we were doing in the program.

So we did not commit to specific receipt rates because of the uncertainties that faced us in this program.

Q. Thank you, Mr. Morgan. You can set that document aside. Mr. Morgan, at the time the standard contract was drafted, what was the status of the design for a repository?

A. I'd say it was preconceptual. In other words, we didn't have a complete conceptual design, but we had been working on a design for the repository.

Q. And at the time the standard contract was drafted, what was the status of DOE's plan for transporting spent nuclear fuel to a repository?

A. There were inadequate licensed casks by NRC to move the amount of fuel that would be projected, and we entered into a fuel cask development program, so that we would have casks available to move the fuel when they were needed.

Q. Mr. Morgan, what information would DOE have

Page 2221

needed in 1983 to be able to either put a firm acceptance rate or a qualitative statement like EEI suggested into the contract?

A. Could you repeat the question, please?

Q. Sure. What information would DOE have needed in 1983 to be able to either put a firm acceptance rate or a qualitative statement regarding the acceptance rate like EEI suggested into the standard contract?

A. Well, we would have had to known, know the licensing requirements placed upon us by NRC. We would have had to know the potential interventions or lawsuits that could come at us from the stakeholders. We would have to have all the information down whole in the repository to make sure it was an acceptable location for spent fuel, and I guess, you know, excuse me, but we'd need a crystal ball.

Q. Mr. Morgan, how was the specific acceptance rate to be determined?

A. I don't understand that question. I guess it was -- we were at that point in time looking at a later date of establishing the acceptance rates. I believe it was something like 1991, that by that time, we felt that we would have information available to make some commitments, whether it be at

Page 2222

the repository or at the monitored retrievable storage facility.

Q. Mr. Morgan, after the contract was issued in the Federal Register and the contracts were signed, what did you next focus upon as director of the Office of Civilian Radioactive Waste Management?

A. We had interactions with the states and stakeholders. We focused primarily on putting together a program that would reach the goals of the Nuclear Waste Policy Act with a repository, the transportation requirement and the monitored retrievable storage. We worked on what we called a mission plan of how to get there which integrated all these various parts.

Q. Mr. Morgan, would you please look at Defendant's Exhibit 37? Mr. Morgan, Defendant's Exhibit 37 is titled, "The Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," that took place December 12th through 15th of 1983. Have I correctly described Defendant's Exhibit 37 that you have before you?

A. Yes.

Q. Do you recall this meeting in December of 1983?

A. Yes, I do.

Page 2223

Q. What was the purpose of the meeting?

A. To provide information to the utilities, the contractors, stakeholders, of what we had been doing and where we were trying to go.

Q. Could I direct your attention to pages 11 and 12 of Defendant's Exhibit 37?

A. Yes.

Q. Mr. Morgan, do you recognize those pages to be a written set of your comments at the meeting?

A. These are my comments at this meeting.

Q. Do you recall that you and others prepared written comments that were compiled into a meeting record?

A. I don't understand the question.

Q. Do you recall that you and others prepared written comments, and that those written comments were compiled into a meeting record?

A. Yes.

Q. And why was that record compiled?

A. We wanted to be totally open and have records of what transpired in the process.

MS. SULLIVAN: Your Honor, at this time, the government would move for admission of Defendant's Exhibit 37 into evidence.

THE COURT: Mr. Small?

Page 2224

MR. SMALL: Your Honor, I have no objection to the admission of the cover page and pages 11 and 12, which this witness has testified to as being the statements that he provided at the conference. However, the document itself is, I think, almost 500, if not over 500 pages long. Let's see, it's about 426 pages long and contains many papers and statements by many people.

I don't see any relevance to all those statements, Your Honor. I do understand the relevance of Mr. Morgan's statement, and I have no objection to the admissibility of it, the cover and his statement, pages 11 and 12.

THE COURT: Ms. Sullivan?

MS. SULLIVAN: Your Honor, I understand there's been previous discussion about the admission of this exhibit, and I would ask Mr. Lo Re address the issue.

MR. LO RE: Yes, Your Honor, you may recall that this was an exhibit, this exhibit is a larger version, if you will, of PX-8. PX-8 is exactly what Mr. Small just described, which is the cover of this meeting and I believe the paper that Mr. Morgan presented. At the time that Plaintiffs moved for the admission of this document, we objected on the

Page 2225

grounds of completeness and explained that in fact DX-37, which we have before, us was the complete version of the document.

I will note for the record that there are, as Mr. Small points out, several -- a number of other reports, written papers, including several papers that were written by TVA employees. For purposes of completeness, we waited until we put Mr. Morgan on, but I believe he's just testified that the document itself is a compilation of papers from that meeting and therefore admissible.

THE COURT: Mr. Small?

MR. SMALL: Your Honor, I believe it is a compilation of papers from the meeting. That's certainly what it appears to be. There has been no testimony, however, that it's an official public document or anything like that adopted by the Department. Also, while there's been a reference to there were papers by TVA employees, to my knowledge, there's been no identification of which papers were by TVA employees.

As I recall, there was a reference perhaps to one, but I don't recall any reference other than to one single one, and Mr. Lo Re just, I think, used the word plural, and I'm not aware that there are,

Page 2226

Your Honor. There may well be, but I'm unaware if there are. The other thing I would say about completeness –

THE COURT: Yes.

MR. SMALL: – is to the extent Mr. Morgan gave a presentation of his views, I think all of his views are contained in pages 11 and 12. I don't think his views are contained anywhere else in the compilation, so it doesn't complete Mr. Morgan's views.

THE COURT: Mr. Small, do you recall whether PX-8 consisted of the cover page and Mr. Morgan's overview?

MR. SMALL: It did, Your Honor, it was the cover page, the table of contents, and pages 11 and 12, Mr. Morgan's overview. At that time, the Court reserved ruling on PX-8 for foundation purposes that I recall, and of course, based on Mr. Morgan's testimony, we would say that that foundation has now been satisfied, with respect to the pages marked PX-8.

THE COURT: Well, the Court did reserve on a motion to admit what you describe and did that on June 24th. Mr. Lo Re, a foundation has been established. What do we do? I mean, we've got a

Page 2227

very large document here. We could certainly ask Ms. Sullivan to ask some more questions of Mr. Morgan –

MR. LO RE: Yes, Your Honor.

THE COURT: – to complete the foundation. I have no doubt that that can be done.

MR. LO RE: And that would be fine with us, Your Honor, if you'd like us to lay a little bit more foundation with respect to the entire document. Just again, our concern here is we just don't want – this is a compilation of papers together in one document. We think it should all come in together.

THE COURT: All right. Ms. Sullivan, you need to ask several more questions.

MS. SULLIVAN: Okay. I will do that, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Morgan, looking through – I believe you've answered my question as to why this record was compiled and why the record, why the meeting was held. Do you recall the other presentations that were made at the meeting?

A. I didn't understand the question.

Q. Do you recall the other presentations that were made at this meeting?

Page 2228

A. I recall some of those presentations. They were made by my staff.

Q. Okay. And why were those presentations made?

A. To advise the industry what we were doing and what our goals were and how we were trying to get there. Also, I recall Mr. John Davis from NRC also presented something.

Q. And, Mr. Morgan, do you recall presentations made by representatives of utilities?

A. It was an open forum, and, yes, there were other presentations we allowed for a time.

Q. Okay. And, Mr. Morgan, do you recall that – do you know a name, are you familiar with a gentleman by the name of Loring Mills?

A. I don't recall that specifically.

Q. I'm sorry, Mr. Loring Mills of EEI?

A. I say I don't recall specifically at this point in time whether he made a presentation. I think he did.

Q. Okay. But you are familiar with Mr. Mills, correct?

A. Beg your pardon?

Q. You are familiar with Mr. Mills?

A. Yes, I am.

Page 2229

Q. Okay. Mr. Morgan, what did DOE do with this compilation?

A. What did I do with it?

Q. Yes.

A. We presented it as part of – we made it public, and we provided it to people who were interested in it. It was distributed to people who were interested.

Q. And interested in what?

A. In the Nuclear Waste Policy Act and the program that we were pursuing.

Q. And the written comments that were compiled in this document, do they capture what you understood to be everybody's comments and opinions that were expressed at that meeting?

A. I believe so.

Q. And those opinions focused on the Nuclear Waste Policy Act in the program that you were then the director of, correct?

A. Yes.

MS. SULLIVAN: Your Honor, is that sufficient foundation for the document?

THE COURT: Mr. Small?

MR. SMALL: Your Honor, if the witness was present during the entire meeting, then I suppose it

Page 2230

would be a sufficient foundation. I heard him testify that these were what everyone said, but I did not hear the witness testify that he was present at the entire meeting.

THE COURT: Well, no, but I think it's been established by Mr. Morgan that this was intended to be a complete compilation of the presentations at the meeting, and accordingly, DX-37 is admitted, and it's admitted in lieu of PX-8.

(Defendant's Exhibit Number 37 was received in evidence.)

THE COURT: I just note for the record that pages five through seven of this document appear to contain a statement by Daniel Boggs, Deputy Secretary, U.S. Department of Energy. It's a good thing this case isn't in the Sixth Circuit or Chief Judge Boggs would be recused from the case, and that's a relief to my family because one of my sons, my youngest son is going to be clerking for Chief Judge Boggs in about a month.

Ms. Sullivan, you may continue.

MS. SULLIVAN: Thank you, Your Honor, these are my last questions.

BY MS. SULLIVAN:

Q. Mr. Morgan, could I ask you to turn to

Page 2231

pages 11 and 12 of Defendant's Exhibit 37?

A. Yes.

Q. And may I direct your attention to the paragraph in the right-hand column which begins, "I would like to talk," and I'll read this paragraph into the record and ask you a question or two.

"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act.

However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of the operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."

Mr. Morgan, do you recall that portion of

Page 2232

your comments?

A. Yes, I do.

Q. Why did you make that statement?

A. Why did I make that statement?

Q. Yes.

A. I made it because the Nuclear Waste Policy Act clearly did not specify a repeat rate, but that we recognized that it may be the intent, or our program should be put together to meet the acceptance rate that we were going to put into the mission plan which, as I recall, there was an increase in backlog that went until 2003, but with a lead time of about five years to provide on-site storage that, in '98, that they would not have to make any further commitments for storage of fuel on-site.

And that's what we were, that was a goal we were trying to achieve.

Q. Was DOE obligating itself to accept fuel at the rate set forth in the mission plan?

A. Was it a DOE obligation to accept fuel?

Q. Yes.

A. Is that right?

Q. At the rate set forth in the mission plan.

A. No.

Q. Why not?

Page 2233

A. Because there's a, one of the – a commitment, a contractual commitment is one thing, and another is the mission goal that we were trying to meet. It was not a contractual requirement, but this is what we interpreted the Nuclear Waste Policy Act to say. I will have to say that there were two separate bills, one passed by the House and one passed by the Senate, and that we did not have the benefit of a conference report to get to the final language.

So we had to assume the intent because it was not specified. Some of the members of Congress wanted total emphasis on monitored retrievable storage. Others wanted emphasis on the repository. So we walked a fine line between the different directions that we were hearing from Congress.

Q. Mr. Morgan, you just testified about the intent of the NWPA, and your statement, the portion of your statement that I read makes a reference to regarding the intent of the NWPA or the Nuclear Waste Policy Act. How did you determine what you believed to be the intent of the Nuclear Waste Policy Act?

A. How did we determine that?

Q. Yes.

A. By reading the Nuclear Waste Policy Act;

Page 2234

that was our, that was our direction.
Q. From your review, did you have an understanding that the NWPA contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel from the utilities?
A. It was silent on rate acceptance.
Q. Did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would preclude utilities from having to add further storage facilities on-site?
A. No, that was not a commitment or a requirement of the Act.
Q. And did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would work down the backlog of spent nuclear fuel in a specific amount of time?
A. No, that was not part of the Act either.
Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement, and I'd like to read that into the record and then ask you a couple questions. That portion reads, "After the initial operation of the repository through the first few years, we would anticipate that the weight of acceptance of fuel should be the rate of discharge from reactors that are in operation at

Page 2235

the time.
So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, we would look at bringing home a second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel." And then the statement continues.
Mr. Morgan, do you recall that portion of your statement?
A. Yes, I do.
Q. And why did you make that statement?
A. I made it because I thought that that's what we had in the mission plan, though it had not been published at that point in time, but when the mission plan, when we finally published that in late December of the numbers, I think, working down backlogs started in the year 2003, so I was off, so there's an inconsistency between my statement here and the mission plan that came out after that.
Q. At the time you made the statement, did DOE know how much spent nuclear fuel would be discharged

Page 2236

from operating reactors on an annual basis in 2000 or 2001?
A. We had estimates from the industry what discharge weights were going to be, but those changed every year somewhat, so these were estimates only.
Q. And to meet the goal set forth in the portion of your statement that I just read, did you envision that a second repository would be needed?
A. Yes.
Q. And could I direct your attention back to that first paragraph that I read? You described the mission plan as containing a strategy. Why do you describe it as containing a strategy?
A. It was a strategy to integrate all the activities under the Nuclear Waste Policy Act, and it was a plan that we would hope to accomplish, but we were not contractually required to do it.
Q. So did you understand this strategy, as you termed it, to be a contractual requirement?
A. I beg your pardon?
Q. Did you understand this strategy, as you've described it to be, a contractual requirement?
A. Absolutely not.
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Yes.

Page 2237

MS. SULLIVAN: Nothing further, Your Honor, thank you. Mr. Morgan, we're finished with our questions, but I believe that opposing counsel has some questions, so if you'll just stay where you are.
THE COURT: Mr. Morgan, I believe Mr. Small representing the Tennessee Valley Authority will have time for cross-examination now. Mr. Small, you may proceed.
MR. SMALL: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Morgan, you've testified that at least some utilities had serious reservations about the standard contract because of the absence of a rate term, isn't that correct?
A. I cannot understand, I didn't understand you at all, sir.
Q. I'll try again, Mr. Morgan. In the summer of 1983, some utilities -- let me start over again, Mr. Morgan. Can you hear me okay now?
THE COURT: Mr. Morgan?
THE WITNESS: I still didn't hear. I'm sorry. I'm not -- I don't understand.
BY MR. SMALL:
Q. Mr. Morgan, can you hear me now?

Page 2242

Q. Yes, sir, what I was saying though is that the pickup, in order to maintain a full core reserve so that the utility could keep operating, would be proper, regardless of what the Nuclear Regulatory Commission said, wouldn't it?

A. Considered proper by whom? NRC regulated the utilities and put requirements on full core reserve. That was not a part of our responsibility. If there was a shutdown because of spent fuel, we would consider that an emergency.

MR. SMALL: That's all I have, Your Honor.

THE COURT: Ms. Sullivan and Mr. Small, the Court has one question for Mr. Morgan. You may object either to form or to substance. And, Mr. Morgan, if you'd just hesitate a moment before answering the question to give counsel a chance to ask it.

Mr. Morgan, by entering into the standard contract with utilities, what obligations do you believe DOE undertook for itself?

THE WITNESS: Should I answer now?

THE COURT: Yes, please.

THE WITNESS: Okay. Excuse me. The obligation was the best effort to develop a repository or a monitored retrievable storage in

Page 2243

order to meet what we considered as the intent. We had a goal, but it was not a contract provision. It was not a contract commitment. The contract, as specified and required by the Nuclear Waste Policy Act, did not include what DOE should provide in return, and we were trying to follow exactly what was in the Nuclear Waste Policy Act, sir.

THE COURT: Thank you. Ms. Sullivan, you may redirect.

MS. SULLIVAN: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, could I ask you to look at the emergency deliveries provision that Mr. Small just asked you about in the standard contract?

A. All right. Which article?

Q. It's page, it should be page 12 of the document that you're looking at.

A. Yes.

Q. Article V.

A. Emergency deliveries.

Q. Do you have that in front of you?

A. Yes, I do.

Q. Mr. Morgan, did you have an understanding as to whether or not an emergency delivery would be

Page 2244

requested – an emergency delivery requested by a utility would be subject to DOE's approval?

A. Yes, there was the, one of the provisions was the federal interim storage portion of that, and of course, we'd have to approve acceptance of fuel. They couldn't just bring it to the door.

Q. And, Mr. Morgan, do you recall any consideration as to whether or not an emergency delivery would require – that DOE would require the payment of an extra fee for that emergency delivery?

A. We never had a request for an emergency delivery while I was acting director of this office.

Q. So do you recall whether there was any consideration of the fee issues that would be, that would be raised by a request for emergency delivery?

A. Absolutely.

Q. And what consideration was given to those fee issues?

A. What was what? I'm sorry.

Q. Let me slow down and back up. My question, my initial question to you was whether or not you knew or recalled whether or not DOE might require the payment of an additional fee from a utility if a utility sought to make an emergency delivery?

A. I still don't understand the question. I'm

Page 2245

sorry.

Q. Not a problem; I apologize for the problems caused by the technology. The emergency deliveries provision of the contract, if a utility – do you recall from your time at DOE any consideration of the issue of whether or not, if a utility made a request under this provision to make an emergency delivery, whether DOE considered whether a fee, an additional fee would have to be paid?

A. I don't recall whether that was discussed or not. There was never a request for emergency delivery, and I don't know if that's covered in other portions of the contract.

MS. SULLIVAN: Thank you. One moment, Your Honor.

THE COURT: Yes, Ms. Sullivan.

MS. SULLIVAN: Hold on one second, Mr. Morgan. Thank you, Your Honor, no further questions.

THE COURT: Mr. Small, do you have any recross?

MR. SMALL: No, Your Honor.

THE COURT: Mr. Morgan, I believe I may excuse you as a witness in a moment. Let me ask Ms. Sullivan whether it's necessary for me to give

**Pacific Gas & Electric Company v U.S No. 04-74C June 13, 2006**

**Heritage Reporting Corporation**

**Page 2286 to Page 2632**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2286

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, vs. THE UNITED STATES, Defendant. : No. 04-74C

-------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, June 13, 2006

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2287

APPEARANCES:

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

Page 2288

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2289

PROCEEDINGS

-----

THE COURT: We continue with the Plaintiff's case, the last witness, Dr. Cornell. Before we turn to that, are there any housekeeping matters at this time?

MR. EKMAN: Your Honor, the government just wanted to inform the Court that the deposition of Mr. David Duke is scheduled for today at 2:00 by telephone.

THE COURT: All right. And how does that impact the schedule in court? Do you have other persons who are working with that?

MR. EKMAN: Indeed, we do.

THE COURT: Thank you. Plaintiff can call its next witness.

MR. STOUCK: Thank you, Your Honor. Plaintiff calls Professor Brad Cornell.

THE COURT: Mr. Cornell, good morning, sir. When you arrive at the witness chair to my left, before you sit down, if you would indicate that you're ready to take the oath by raising your right hand?

Whereupon--

BRADFORD CORNELL

Page 2458

disposal of GTCC waste, and the schedule for acceptance of GTCC has not been developed. PG&E's damages claim, however, fails to account for the cost of storage or, even under their theory, acceptance of GTCC in the but-for world.

Further, PG&E has not accounted in any way for how it would have stored or handled its grossly failed fuel in Humboldt Bay. And finally, PG&E fails to account for but-for crane rental or upgrade building modifications, failed fuel cans, visual inspection, among other real and material significant and, most importantly, known costs in the but-for world.

At the conclusion of trial, Your Honor, we will respectfully request that the Court find that PG&E's claim does not provide an appropriate basis for awarding damages in this case. Thank you, Your Honor.

THE COURT: Thank you, Mr. Ekman, You're as good as your word, slightly five minutes better. We will be in recess until 20 minutes of two, at which time we will hear the United States' first witness.

MR. EKMAN: Thank you, Your Honor.

Page 2459

MR. STOUCK: Thank you very much, Your Honor.

THE COURT: We're in recess.

(Whereupon, at 12:40 p.m., a lunch recess was taken.)

Page 2460

A F T E R N O O N S E S S I O N

(1:45 p.m.)

THE COURT: I'm a few minutes late. I apologize. The United States to put on its first witness. Are there any housekeeping matters at this time before we begin.

MR. EKMAN: None from the government.

MR. STOUCK: Not from us, Your Honor.

THE COURT: United States to call its first witness.

MR. LO RE: Thank you, Your Honor. Your Honor, the government calls its first witness, Mr. Robert Morgan.

THE COURT: Mr. Morgan, good afternoon. Please approach the witness chair, and when you arrive there and are ready to take the oath, before you sit down, if you would so indicate by raising your right hand.

Whereupon–

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Please state your full name.

THE WITNESS: Robert Morgan.

Page 2461

THE COURT: Thank you so much. The water that's there is for you, if you'd like to pour yourself some.

THE WITNESS: Thank you.

THE COURT: Mr. Lo Re to examine.

DIRECT EXAMINATION

BY MR. LO RE:

Q. Good afternoon, Mr. Morgan.

A. Good afternoon.

Q. Could you please state your full name for the record?

A. Robert L. Morgan.

Q. And, Mr. Morgan, are you currently employed?

A. I am a consultant at times now.

Q. Now, did you at any time work for the Office of Civilian Radioactive Waste Management?

A. I beg your pardon?

Q. Did you ever work for the Office of Civilian Radioactive Waste Management?

A. Yes, I did.

Q. And when was that, sir?

A. Late January 1983 until – I believe it was January 1984.

Page 2462

Q. And what was your role in that office, sir?

A. I was the director of that office.

Q. Now, prior to your time – and I'm going to refer to it as OCRWM, is that okay?

A. Yes.

Q. Prior to your time at OCRWM, did you work at DOE or any of its predecessor agencies?

A. Yes.

Q. And what were those?

A. I resigned my Army commission in 1965, joined the Atomic Energy Commission at Savannah River operations office, a year later, I was transferred to Canoga Park under reactor development office, and then 1980 – or 1973, I was selected as deputy manager for the Savannah River operations office and then 1980, became the manager, retired in 1988.

Q. And the time that you spent at OCRWM, how did that relate to your work at Savannah?

A. I was on detail from Savannah River operations office to Washington during that period of time.

Q. Thank you. I'd like to fill in a little bit of your background. Can you just,

Page 2463

up to the time that you began working for the Atomic Energy Commission, could you just describe for the Court your educational background after high school?

A. I received a Bachelor of Science degree from the United States Military Academy, entered the Army Corps of Engineers, went to Korea, transferred to Japan, and then the 82nd Airborne Division at Fort Bragg. And from there, I was sent to graduate school by the military at MIT, Massachusetts Institute of Technology.

I spent two years there, received two Master's degrees, one in civil engineering and one in nuclear engineering. I was sent on detail from the military to the Atomic Energy Commission in Idaho Falls, where I spent four years. Then had a tour in Indonesia, and that's when I resigned my commission.

Q. And, again, what year was that, sir?

A. 1965.

Q. Now, you mentioned a moment ago consulting work. What have you done since you retired from DOE?

A. For two years, 1988 to 1990, I did

Page 2464

consulting with various companies that were doing work for the atomic – or the Department of Energy, and then I joined a small 8A firm called Meta, and we did the environmental impact statement for environmental management, looking at the entire – well, all the sites in the Department of Energy, did that for five years.

Q. Now, Mr. Morgan, let's focus on your detail as the director of OCRWM. Can you describe for the Court how you came to take that position?

A. As I recall, it was a Thursday when I was in Washington, D.C., on a business trip that I was asked by the special assistant to the Secretary to take this job, and I told him I'd like to think about it. And he said, well, the Secretary intends to announce it on Monday morning at staff meeting, so I didn't have much of a choice.

Q. Now, while you were filling out your tenure as the director of OCRWM, what were your primary responsibilities?

A. Management of the Nuclear Waste Policy Act, which included the repository, the MRS

Page 2465

transportation, near-term goals were requirements to notify affected governors what the program was to be, work on the contract for the utilities, which was required to be signed by the 30th of June, as I recall, and then work on a mission plan.

Q. Now, you mentioned work on the contract. How was the contract developed, sir?

A. There was a notice in the Federal Register for rule-making that was dated 4th of February that was published after I was there, but I had not reviewed that before it went to the Federal Register. And then we had comments from looking at some of the documents, I think it was 85 interested parties, and we tried to resolve those in order to get on with the final rule-making.

Q. And when was the final rule-making published, sir?

A. I believe it was in April.

Q. Of 1983?

A. '83.

Q. Now, prior to the actual final rule-making submission, did you have any discussions with utilities or utility

Page 2466

representatives?
A. Yes.
Q. And who were the groups that you talked to, if you recall?
A. I was invited to EEI, to where I spoke to several of the utilities. I had met with representatives from GE and Westinghouse, and I think Loring Mills from EEI, Loring Mills.
Q. And did you have discussions with Mr. Mills?
A. Yes.
Q. Now, during those discussions with Mr. Mills, do you remember the issue of the rate of acceptance under the standard contract?
A. Yes, I do.
Q. And what do you recall about those discussions?
A. He wanted to have us put in the contract a rate of acceptance by the Department of Energy.
Q. And what was your response to that?
A. The response was basically it was too early to tell with the uncertainties of the program, and I just couldn't feel that I could commit to any rate, but we did change some of

Page 2467

the wording in the final rule-making, but it did not give an acceptance rate.
Q. Now, you mentioned a moment ago uncertainties of the program. Could you elaborate on that a little bit?
A. Well, starting with the law itself, there was no conference report on the Act, it was just the words, so there was nothing to fall back on, on resolution of the differences that existed between the House and Senate. The second thing was the licensing process. Licensing of the repository was going to be required by NRC. There were no rules established for that or requirements at that time. There was potential intervenors, stakeholders. I was aware of the potential lawsuit by GE due to the rule -- or to the rule-making. It was a very difficult time to put together a program that would meet the requirements of January 31, 1998. I felt that it was extremely difficult, and it was an optimistic schedule.
Q. Now, you mentioned intervenors. What do you mean by that, sir?

Page 2468

A. Well, we had to deal with the states, Indian tribes, and there was potential for intervention by them.
Q. And how about citizens' groups?
A. Yes.
Q. And what was the involvement of those or potential involvement of those groups?
A. They had the same issue of a potential intervention in the program.
Q. Now, Mr. Morgan, one housekeeping note, you should have there two binders. Do you have any binders at all back there?
A. Not that I see.
THE COURT: Not yet.
MR. LO RE: Thank you, Your Honor, just one moment. We're going to work to get copies of two binders to Mr. Morgan. In the meantime, we'll just talk to this issue.
BY MR. LO RE:
Q. Mr. Morgan, can you talk about the procedures that you went about with respect to receiving, reviewing, and responding to comments that were provided during the rule-making process?
A. I read all the comments when they came

Page 2469

in. They were given to staff within OCRWM, plus contracts, DOE contracts office, and DOE legal office, and the three representatives tried to resolve the comments and put those together. And I reviewed the results of those, and if there was not a total agreement, then I got involved in the resolution of those.
Q. Now, did you have somebody who was responsible for physically putting together the comments?
A. Bob Rosselli.
Q. And what was he tasked to do?
A. He was a deputy to me.
Q. And what was he tasked to do?
A. He was tasked to resolve the comments.
Q. Before we get to the resolution, I mean, just physically, what did he do with respect to the comments? Did he put them together in some form?
A. Well, he and the other people from legal office and contracts office put together the resolution, if you will, the draft resolution of the comments, which I then reviewed.
Q. And did they actually put together the