Page 2470

comments themselves in an administrative record or something like that, that you used, that you referred to?

A. I don't know whether they –

Q. Maybe I can refresh –

MR. LO RE: Your Honor, I would like to refresh, if I may, if I may approach.

THE COURT: You may.

BY MR. LO RE:

Q. Mr. Morgan, I have just handed you two binders, and what I'd like you to do is turn to the tab number two on, I believe, the binder you have before you, and there are tabs inside the binders. Do you see them running along the front?

A. Yes.

Q. I think it may be the binder, one of the binders has the number 2.0, do you see that?

A. Yes.

Q. And then behind that, you'll see there are other, 2.1, 2.2, et cetera, do you see that?

A. Yes.

Q. Okay. And looking at that binder,

Page 2471

does that refresh your recollection, sir, as to whether DOE put together an administrative record of comments?

A. Well, I know they kept records, but I'm not familiar with the term "administrative record."

Q. Fair enough. Looking at this group of documents together, does that refresh your recollection as to –

A. Yes.

Q. – how these documents, comments were put together?

A. Yes.

MR. LO RE: Your Honor, at this time, the government would move for the admission of the entire – what I'm referring to as administrative record, which is the entirety of the comments that were provided to DOE during the notice of comment period. I believe that is Exhibit 2 of – it's DX-2.

MR. SHAPIRO: Your Honor, subject only to the objection of the hearsay within the hearsay, we have no objection to it.

THE COURT: DX-2 is admitted. Objections to hearsay are deferred until an

Page 2472

appropriate time.

(Defendant Exhibit Number 2(all subparts) was received in evidence.)

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Now, Mr. Morgan, you can put those two binders aside for the moment. Thank you. I'd like to show you, and what we're going to do procedurally here, sir, is we're going to hand you hard copy exhibits. The exhibits will also be put up on the screen, so whatever you're more comfortable with, please feel free to use. I'd like to start by showing you –

THE COURT: I'm also going to interrupt you to remind counsel that exhibits, portions of exhibits are discussed with the witness to explain the import, either supporting or not supporting an issue in the case, may be disregarded by the Court. Thank you.

MR. LO RE: That's fine, Your Honor. Thank you.

BY MR. LO RE:

Q. I'd like to show you what's been marked as DX-2.34.

Page 2473

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

MR. LO RE: Your Honor, just one housekeeping note, I believe this document may have – was previously admitted as PX-463.

THE COURT: I would appreciate, if it's the same document, if you'd just remind us because we're going to be using it from the one that we've already looked at.

MR. LO RE: That's fine, Your Honor.

THE COURT: This is 2.34.

MR. LO RE: 2.34 equals, by my notes, PX-463.

THE COURT: Thank you.

MR. LO RE: Thank you.

BY MR. LO RE:

Q. Mr. Morgan, do you recognize this document, sir?

A. Yes.

Q. What is it?

A. It's the comments we received from Edison Electric Institute regarding the rule-making.

Q. I see that there is a date of March

Page 2474

7th, 1983. Do you see that?
A. Correct.
Q. Does that comport with your recollection as to when these comments were submitted?
A. Yes.
THE COURT: Hold on, Counsel.
MR. LO RE: Thank you, Your Honor.
THE COURT: It's not clear to me, Counsel, that 463 is in evidence. We have a lot of paper without doubling up, so this is why you're being slowed down here.
MR. LO RE: I'm getting a sign here that it was not admitted, that that particular exhibit was not admitted, so perhaps we can just move forward with this 2.34 for the time being.
THE COURT: Yes, continue to examine on that.
MR. LO RE: Thank you.
BY MR. LO RE:
Q. Now, Mr. Morgan, there's a cover letter here, and I'd like to go past that, and I'd like to look at the attachments. There is an attachment A, which is on page, it's 273 on

Page 2475

the Bates numbers in front of you. Do you have that, sir?
A. Yes.
Q. This is entitled, "Detail Comments of DOE Draft Proposal Contract." I'd like to turn to the second page of this attachment, and there's a paragraph number two, do you see that?
A. Yes.
Q. Let's take a look at that, please. This paragraph says, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle the industry needs."

Page 2476

And then it says, "This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner." Do you see that language there?
A. Yes.
MR. SHAPIRO: I'm sorry to interrupt, Mr. Lo Re, but I want to make sure the record is correct. I found that passage, but not on a page marked 273. I want to make sure we all have the same number.
MR. LO RE: I'm sorry, on mine, it's 279.
MR. SHAPIRO: That's what I have.
MR. LO RE: I'm sorry, maybe I misspoke. Thank you.
BY MR. LO RE:
Q. Mr. Morgan, as the recipient of these detailed comments, how did you interpret that statement I just read?
A. That EEI wanted us to commit to an acceptance rate that would equal the discharge and also work off the backlog.
Q. And what was your response to that

Page 2477

request?
A. We did make a modification to the rule regarding -- I think it was an '87 date that we were talking about getting planned numbers with -- to the utilities, and then '91 to make commitments to the utilities, when hopefully we understood the licensing requirements, and had schedules that we could rely on, excuse me. We did add words that, acceptances as expeditiously as possible.
Q. Let's turn to the next page. There is a proposed whereas clause there. Do you see that?
A. Yes.
Q. It says, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."

Page 2478

Mr. Morgan, did DOE accept that proposed language?
A. No, we did not. We did accept as expeditiously as possible, but we did not commit to delivery dates in the contract.
Q. And why is that, sir?
A. Because of the uncertainties of the program.
Q. Now, Mr. Morgan, I'd like to go back now, if I may, to the cover letter and page eight of the cover letter, which is the Bates number ending in 277, the first full paragraph on that page starting with the word, "although the contract."
A. Yes.
Q. It says, second sentence in there says, "Article II states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given amount of SNF/HLW, and of most significance to utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998

Page 2479

deadline."
Then it goes on, I'll skip ahead a little bit, it says, "We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated. We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items." Do you see that language, sir?
A. Beg your pardon?
Q. Do you see that language I just read?
A. Yes.
Q. Now, as the recipient of this cover letter, Mr. Morgan, how did you interpret these statements?
A. They still wanted an acceptance rate in the contract, and it appears that they wanted to continue negotiations as to an acceptance. And we, again, had added some words in the rule-making that said that we would discuss acceptance rate at a later point in time.
Q. Now, you said they wanted to continue

Page 2480

negotiations as to an acceptance. When was your understanding that EEI – when did EEI want you to continue these negotiations?
A. Well, they wanted to discuss them right away.
Q. And in relation to when the standard contract was actually signed?
A. After the contract was signed, we received other letters from EEI or another letter that I'm aware of.
Q. And what was the effect of that letter, sir?
A. It was the same issue that they wanted to resolve, acceptance rate.
Q. Thank you. Now, Mr. Morgan, I'd like you now to look at DX-2.63, please.
MR. LO RE: May I approach, Your Honor?
THE COURT: Yes.
BY MR. LO RE:
Q. Mr. Morgan, do you recognize this document, sir?
A. I read in the first paragraph, it evidently is from TVA, but there's no cover letter on it.

Page 2481

Q. And was this part of the comments, to your knowledge?
A. That's my recollection.
Q. If you could please turn to page five of this document, and it's article, it's number VII, Article VII, responsibilities of the parties, do you see that?
A. Yes.
Q. And I'd like to look, let's see, there were two bullets on this page, just above the second bullet, it says, "accordingly," do you see that, and then there's a bullet below that?
A. Yes.
Q. And the bullet below, please, thank you. Now, I'll start reading with, "Accordingly." It says, "Accordingly, the following DOE responsibilities should also be added to section B of Article V," and then it goes on to say, "DOE will start accepting delivery of SNF or HLW not later than January 31, 1998 and not less than the annual rate SNF and/or HLW that is then being produced from civilian nuclear power plants covered by contracts for disposal of SNF and high-level waste or HLW."

Page 2482

The next bullet says, "After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchaser's nuclear power plants specified in Appendix A."

Now, Mr. Morgan, as the recipient of these comments from TVA, how did you interpret those two requests that I just read?

A. They were similar to what we just discussed about the comments from EEI. They wanted an acceptance rate equal to the discharge and also work off the backlog.

Q. And, again, what was DOE's response to that request?

A. Well, we, again, as expeditiously as possible and then committing to a discharge for an acceptance rate at a later point in time.

Q. Now, could we look at PX-54, please?

THE COURT: Mr. Lo Re, we're still a little at sea on your intentions with regard to DX-2, there is something called DX-2, and then there's a series of documents that are DX-2.1, et cetera, et cetera, and I'm not sure what the

Page 2483

Plaintiff understood at its table, and I'm not sure what I understood.

And I hope the Plaintiff will pay attention at this moment so we can follow and get a common understanding. What was the intention of your motion?

MR. LO RE: Your Honor, because the administrative record is an aggregate of all of the comments put together and kept by DOE in the normal course of the rule-making process, we believe it's best that those documents travel together, that is, that the entirety of the administrative record, the two binders marked as Exhibit DX-2, come into evidence. I understand the Court's admonition with respect to referencing other pages of that administrative record, but we think, just for the rule of completeness, it would be best if that exhibit came in, in total, and then with respect to the documents that Mr. Morgan has testified to, those would be the documents that we are relying upon as we move further in the case.

THE COURT: Is that the understanding of the Plaintiff? There being no objections,

Page 2484

the understanding is that all of the sub parts of DX-2 were admitted earlier. Go ahead.

MR. LO RE: Thank you, Your Honor.

THE COURT: DX-54 is the document we're looking at now. Thank you.

BY MR. LO RE:

Q. Mr. Morgan, you have in front of you what's been marked as DX-54. Do you have this contract in front of you?

A. Yes.

Q. What is it?

A. It's a contract for disposal of spent fuel and high-level waste.

Q. And when you say, "contract," is it the standard contract?

A. Beg your pardon?

Q. Is it the standard contract?

A. This is a copy of the standard contract.

Q. Now, I'd like you look at the very first page. There is a whereas clause, I believe it's the second whereas clause on this page. It says, "whereas the DOE has the responsibility." Do you see that, sir?

A. Yes.

Page 2485

Q. "Following commencement of operation of a repository to take title to spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and," you've talked several times about this term, "as expeditiously as practicable," is this the language that you incorporated as a result of the comments that we looked at?

A. Yes.

Q. And what was your understanding as to the meaning of the phrase "as expeditiously as practicable"?

A. We were going to do the best job we could to conform to the Nuclear Waste Policy Act.

Q. Now, was there any particular rate associated with that, sir?

A. No.

Q. I'd like to have you look at DX-2.60, please. I'm sorry, yes, DX-2.60.

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

Page 2486

BY MR. LO RE:
Q. Mr. Morgan, do you have the document 2.60, DX-2.60 in front of you?
A. Yes.
Q. Do you recognize this document, sir?
A. It's the comments regarding the proposed rule for contracts submitted by Pacific Gas & Electric Company, but, again, there's no cover letter on it addressed to me.
Q. And looking at --
A. But I do know that they did send in comments, but I can't say if these were the specific ones that we received.
Q. Thank you. Mr. Morgan, this was, just so we're clear, this document was, it's your understanding, looking at what we've marked as DX-2, this was part of what Mr. Rosselli put together?
A. Yes.
Q. Okay. Thank you. Do you have any reason to believe that these are not the comments of PG&E?
A. No.
Q. Thank you.
A. I have no reason to believe that.

Page 2487

Q. Now, Mr. Morgan, if you could turn to page 11 of this document, please? Under paragraph 2, it says, "Article V.B, DOE responsibilities"?
A. Yes.
Q. And then there are two bullets below. Let's take a look at those, please. First bullet says, "Following commencement of operation of a repository, DOE shall take title to the SNF and/or HLW of the purchaser as expeditiously as practicable upon the request of the purchaser." And then below that, number two, says, "In return for payment of fees specified in Article VIII, DOE, beginning not later than January 31, 1998, will dispose of the SNF and HLW of the purchaser as provided in the Nuclear Waste Policy Act of 1982." Do you see that?
A. Yes.
Q. Mr. Morgan, as the director of OCRWM at the time that these comments were submitted, what is your interpretation of those two statements?
A. We accepted the first statement and did modify the rule-making or the contract to

Page 2488

add that, and item number two was, is in conformance with the Nuclear Waste Policy Act.
Q. And to be clear, what is your understanding of what those two requests are, what are they asking for, what were they asking for?
A. They were asking for us to be in compliance with the Nuclear Waste Policy Act.
Q. How did those questions, if at all, relate to your understanding of DOE's obligations under the Nuclear Waste Policy Act?
A. There's no, again, there's no rate mentioned here. It just said we accept fuel not later than January 31st, 1998, which is part of the Act, and we felt that they wanted to have us accept the rate as expeditiously as practicable, and we accepted that comment.
Q. Thank you. Now, Mr. Morgan, I'd like to take a look at what's been marked as DX-2.43, please.
MR. LO RE: May I approach, Your Honor?
THE COURT: Yes.
BY MR. LO RE:
Q. Thank you. Mr. Morgan, thankfully,

Page 2489

there is a cover letter with this dated March 7th, 1998. The addressee is Robert Morgan, and the cover letter says FP&L, Florida Power & Light. Mr. Morgan, do you recognize this document, sir?
A. Yes, I do.
Q. What is it?
A. It's the comments on rule-making from Florida Power & Light.
Q. Now, I'd like you to turn, please, to the second page of this document. It says attachment one, DX-2.43. Okay. Mr. Morgan, I'd like to go to the second page now, have our technology catch up here. Thank you. If we look at attachment one, now, what I'd like to focus on is the middle of that paragraph that's marked as 1.0, performance standards, starting with the words, "the Nuclear Waste Policy Act," and then going down to the bullet below there.
A. Yes.
Q. It says, "The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a mission plan detailing a schedule for the construction of repositories and their

Page 2490

capacities (Section 302). It is proposed that once this mission plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged.

*It is suggested that Article V.B.3 be* modified to include the statement: 'Should the DOE fail to meet its schedule and capacities detailed in the approved 1984 DOE mission plan because of force majeure or other causes, DOE *shall, to the extent permitted by the Nuclear* Waste Policy Act of 1982, as it may be amended from time-to-time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the *purchaser.'"*

Now, Mr. Morgan, as the recipient of this comment, how did you interpret what FP&L was asking for?

A. FP&L wanted to tie the mission plan, which was a goal oriented document or planning document, to the contract, which is a commitment type of situation, and we did not feel that, again, at the time, the draft

Page 2491

mission plan was put out that we could accept those rates we had specified in the mission plan to the contract because of the uncertainties of the program.

Q. Now, with respect to that quoted paragraph that I read, what did DOE do with that proposed language?

A. I believe that we modified, again, that a contract in the rule-making, to make commitments for acceptance rates at a later point in time when the program was better known.

Q. Was this language that I just read, this quote, was that included in the contract?

A. No.

Q. Thank you. Mr. Morgan, I'd like to show you what's been marked as PX-47, please.

MR. LO RE: If I may approach, Your Honor?

THE COURT: You may.

BY MR. LO RE:

Q. Mr. Morgan, I've handed you what's been marked as PX-47. There's a blank sheet or marginalia, sheet with marginalia on the first page, and the second page is a U.S. Department

Page 2492

of Energy memorandum dated April 3rd, 1983, subject, "Action memorandum, final rule-making of standard contract for nuclear waste disposal." The second page of this document has a name, Robert L. Morgan, and above that appears to be your signature. Mr. Morgan, are *you familiar with this document?*

A. Yes, I am.

Q. What is it, sir?

A. This is a memo that I sent to the Secretary prior to sending in the final *rule-making.*

Q. And why were you sending in this letter, sir?

A. Beg your pardon?

Q. Why did you send the Secretary this letter?

A. To keep him informed and let him know the status of where we were and what we were doing.

Q. Now, on the first page of this document, the bottom of the paragraph marked discussion, it says, last sentence says, "Eight general policy issues arose from the comments, and we appropriately resolved these issues (tab

Page 2493

D)." Then if you turn to tab D, which is the document ending with the Bates number 899, you'll see a list of these eight issues that you addressed. Mr. Morgan, was the issue of the rate of acceptance, did you include the issue of the rate of the acceptance in these eight?

A. No, I did not.

Q. And why is that, sir?

A. Because I thought we had dealt with that in the rule-making, to deal with it at a later point in time.

Q. Now, I'd like to look, if we can, at the final rule-making document that you referred to previously. We're going to look at DX-2.02.

MR. LO RE: And, Your Honor, I'm going to step into the breach here again. I understand this document was marked and admitted as PX-48.

THE COURT: This is also known as DX-2.02?

MR. LO RE: Correct, Your Honor.

THE COURT: Well, he has that up there, so why don't we have him look at the

Page 2494

copy that he has?
BY MR. LO RE:
Q. Now, Mr. Morgan, you have what's been marked as DX-2:02 and also PX-48 in front of you. It's a Federal Register notice dated Monday, April 18th, 1983. Do you recognize this document, sir?
A. Yes, I do.
Q. And what is it?
A. It's a final rule-making regarding the contract.
Q. Now, if you were to turn to the second page after the cover page here, there is a discussion on, this is on the right-hand column, it says, "Sectional analysis of the contract." Do you see that? Now, Mr. Morgan, were you responsible for the issuance of this document?
A. Yes.
Q. Now, I'd like to look at the section, it says B, far right column, lower right, "B, sectional analysis of contract." Do you see that? Just the heading. And, Mr. Morgan, what were you describing here? In other words, what was the mission of this section of the

Page 2495

rule-making?
A. This was to clarify or let people know what, how we resolved the comments that were submitted to us.
Q. Thank you. Now, if you turn to the next page, you'll see just above where it says Article I, and I am afraid this is not the easiest document to read, there's a paragraph starting with, "a new second whereas clause," do you see that?
A. Yes.
Q. And if it's helpful, sir, you can look on the screen. That's sometimes more helpful. It says, "A new second whereas clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable' has been added to follow the language of the Act," and then it cites the Act. Mr. Morgan, as the person responsible for this sectional analysis of the contract, what did you mean by the inclusion of that language?
A. We'd do the best job we could.
Q. Now, if you turn to the next page, and this is under the heading Article IV,

Page 2496

responsibilities of the party, and that heading that I just read is actually on the page that ends in Bates number 018, if you turn to the next page after that, which is the Bates number 019, in the left-hand column, 90 percent of the way down, there's a paragraph that starts, "in addition." Do you see that, sir?
A. Yes.
Q. Let's take a look at that, please. It says, "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes," then there's an ellipsis, and it goes on, "setting forth the projected annual receiving capacity for the DOE facility."
Do you see that, sir?
A. Yes.
Q. Now, why did you include that language in the standard contract?
A. That was a response to the numerous people that wanted us to commit to an acceptance rate in the contract at the time of the rule-making, and, again, that was

Page 2497

premature, in my mind.
Q. Now, Mr. Morgan, this final rule-making behind the section that I was just reading is actually a copy of the standard contract, is that right?
A. Yes.
Q. Let's look at –
MR. LO RE: Your Honor, the language, sorry, the print of this is not particularly easy to read, so what I'd like to do is once again look at PX-54.
BY MR. LO RE:
Q. PX-54 was the document we looked at a few moments ago, the standard contract, do you see that?
A. Yes.
Q. Now, looking at this document, sir, is this the language, this standard contract is a copy of what followed in that Federal Register notice we were just looking at?
A. Yes.
Q. Let's look at page 10 of that, please. I'd like to look at two paragraphs, it's under IV.A and B. Let's start with B, please. It says, "Beginning not later than July 1st, 1987,

Page 2498

DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facilities and the annual acceptance ranking related to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for 10 years following the projected commencement of operation of the initial DOE facility."
Do you see that language, sir?
A. Yes.
Q. Now, how does that language that I just read relate to the response that DOE made to requests regarding the rate of acceptance?
A. Well, this said that we would issue a document in 1987 for the planning purposes of getting an annual acceptance rate from the utilities.
Q. And why was it added?
A. Because of the comments we received from the utilities.
Q. Now, let's look at IV.A for the moment, which is above this. It says, "Beginning on April 1st, 1991, DOE shall issue an annual acceptance priority ranking for

Page 2499

receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance," then it goes on.
Now, simple question, Mr. Morgan, why is the clause related to 1991? Why does that come before the clause related to 1987?
A. There was initially -- I guess IV.A was already in the draft rule-making, and we added the B part because of the comments we received from the utilities.
Q. And just so we're clear, in your mind, how do those two clauses relate to the rate of acceptance that DOE will follow under the standard contract?
A. This was, again, a commitment that would be made by DOE for an acceptance rate at a later point in time because of the uncertainties of the program.
Q. Now, Mr. Morgan, you talked about the mission plan. I'd like to look at PX-59,

Page 2500

please.
MR. LO RE: Your Honor, before I do that, I did not move -- the documents under 2.0, that would be 2.34, 2.60, and 2.43, I did not move those into evidence because I understood they were in under DX-2. I, however, neglected to move for the admission of PX-47 into evidence.
THE COURT: It's already in evidence.
MR. LO RE: It's already in. Thank you, Your Honor.
BY MR. LO RE:
Q. Let's look at PX-59. Mr. Morgan, what is this document, sir?
A. This was the draft program mission plan that we distributed on December 20th, 1983.
Q. And why did you distribute this document, sir?
A. We wanted comments on it, and the mission plan was a requirement within the Nuclear Waste Policy Act.
Q. And what, if anything, is the significance of the stamp on this document that says, "draft"?

Page 2501

A. It was a draft that we'd sent out for comment.
Q. Now, Mr. Morgan, could you turn to the Bates number, it's 2-5 of this document, it's the Bates number that ends in 074, and as we're doing that, Mr. Morgan, were you responsible for putting together this document?
A. Yes.
Q. There's a paragraph starting with, "the main plan and primary effort," see that?
A. Yes.
Q. It says, "The main plan and primary effort is to an operating geologic repository in 1998." Do you see that?
A. Yes.
Q. Very first sentence, what does that mean?
A. That the government was going to provide transportation casks for the fuel and it would be FOB at the utility site.
Q. I'm sorry. Maybe I pointed you to the wrong paragraph. I'm looking at 2-5. Yeah, it's the first sentence on your screen. It says, "the main plan and primary effort." Do you see that, sir?

Page 2502

A. Yes.

Q. I'm just talking about the first sentence there, "The main plan and primary effort is to an operating geologic repository." That's the sentence I'm asking about.

THE COURT: What's your question, Counsel?

BY MR. LO RE:

Q. What does it mean, why did you put that in?

A. Well, that was a requirement of the Nuclear Waste Policy Act, that we were to provide a geologic repository in 1998. If that didn't work, then we would have a monitored retrievable storage program to back that up.

Q. Thank you. Mr. Morgan, let's look at two pages forward from there, 2-7, under the heading, "D, Challenges to the repository schedule."

A. Yes.

Q. Let's look at those first two paragraphs there. Now, this makes a reference to a repository beginning operation on January 31, 1998. It says, "In order for the first repository to begin operation January 31, 1998,

Page 2503

a demanding set of technical regulatory institutional challenges will have to be met. The schedule leading to the 1998 initial operation date is optimistic, as it is based on the assumption that all problems with each of the activities in the schedule will be resolved without impacting the schedule. Although the Department will make every responsible effort to meet the 1998 initial operation date, the potential for further delays must be considered in the program planning." What does that mean?

A. Just what it says, is that there were several challenges, and everything had to go right in order to meet that schedule, and we did put a program together, or a schedule together that did meet that, but it meant that we didn't have any problems along the way, which is optimistic.

Q. Now, the next paragraph says, "By the date on which the maximum lead time necessary to construct a monitored retrievable storage (MRS) facility by 1998 is reached, the Department will assess the progress on the first repository.

Page 2504

If by this date, it is known that the first repository is not available by January 31, 1998, then the Department will request Congressional authorization to construct a MRS facility to be in operation by January 31, 1998 (if Congress has not already approved such action)." What does that mean?

A. This is the contingency plan. If we couldn't meet the requirements of the opening date for a repository, we had the backup plan for an MRS that required the Congressional approval and that we would ask for that at a later point in time, if we felt the repository schedule was in jeopardy.

Q. Thank you. One more document. Mr. Morgan, I'm sorry, I neglected to point out one thing on that draft mission plan we just looked at, which is PX-59. If you would turn to the page numbered 2-2, waste acceptance schedule? That's it. There's a paragraph that starts, "The disposal contracts with the utilities," do you see that, sir?

A. Yes.

Q. It says, "The disposal contracts with the utilities specify that priority will be

Page 2505

given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations." Do you see that?

A. Yes.

Q. And what did you mean by that?

A. That we would, in January or in 1991, make commitments to the utilities for an acceptance rate.

Q. How does that phrase comport with the clause that we looked at with respect to acceptance rates in the standard contract?

A. That's consistent with that.

Q. Thank you.

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

MR. LO RE: Your Honor, we would, before we move on, we move for the admission of PX-59.

THE COURT: It's already in.

MR. LO RE: It's already in. Thank you.

BY MR. LO RE:

Page 2506

Q. Let's look at PX-60, please, which I am informed from a reliable source is in evidence. Now, this is a document, the cover of which says, "Proceedings of the 1983 Civilian Radioactive Waste Management information meeting." Do you see that, sir?
A. Yes.
Q. What was this meeting, if you recall?
A. This was a meeting we had, it was an open meeting with utilities, manufacturers, intervenors, or whatever, to give them a preview of what we were trying to get out in the mission plan.
Q. And did you make a presentation at that meeting?
A. Yes, I did.
Q. Let's take a look at that presentation. Can we go to page 11 of this document, please? Now, there is a paragraph on the right-hand side, starting with, "I would like to talk a little bit about," do you see that?
A. Yes.
Q. In the middle of that paragraph, you say, "the basic strategy which we've outlined

Page 2507

in the mission plan." Do you see that?
A. Yes.
Q. What did you mean by, "basic strategy," there?
A. That was our proposed goal of how we would get to meeting the requirements of the Nuclear Waste Policy Act.
Q. Now, if you turn to the next page, and when you say the requirements of the Nuclear Waste Policy Act, what do you mean by that, sir?
A. The Nuclear Waste Policy Act had specific requirements in it, and we're trying to meet the, you know, the requirements of the Act.
Q. And what were those requirements with respect to acceptance?
A. Said we would accept fuel January 31, 1998, but did not specify any acceptance schedule.
Q. Thank you. Now, Mr. Morgan, if you turn to the next page of this document, at the bottom, very last paragraph there, starting with, "to summarize"?
A. Yes.

Page 2508

Q. It says, "To summarize, the basic strategy is to have a repository in operation in 1998."
A. Yes.
Q. "We will, however, keep a parallel program going on an MRS, so that if a repository is not available by 1998 or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law – to begin accepting waste in 1998." What did you mean by that, sir?
A. Just what it says, that we had the primary goal or strategy of the geologic repository and the alternate program of an MRS, if it looked like the schedule for the repository would be delayed.
Q. Now, Mr. Morgan, how long did this conference go on?
A. Several days.
Q. And did you attend the entire conference?
A. I believe that I did, but I might have been called out. Things were a little hectic at that time.

Page 2509

Q. Mr. Morgan, you mentioned Mr. Loring Mills earlier?
A. Yes.
Q. Do you recall whether Mr. Mills gave a presentation at that meeting?
A. Yes.
Q. Could we turn to page 31 of this document? And in the right-hand column, there's a second paragraph starting with, "there are."
A. Yes.
Q. And halfway through, it says, "because several," do you see that?
A. Yes.
Q. It says, "Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances to assure some of the things we heard this morning, which were not embodied in the contract." Now, Mr. Morgan, as a participant in this conference, listening to

Page 2510

Mr. Mills' speech that day, how did you interpret this statement?
A. They were still going after a commitment of fuel acceptance rate, and it's a repeat of what we had received in the rule-making process.
Q. And when you say, "they," who do you mean by that?
A. EEI.
Q. Thank you.
MR. LO RE: If I may have one moment, Your Honor?
THE COURT: Certainly.
MR. LO RE: Mr. Morgan, Your Honor, I have no further questions. Thank you.
THE COURT: Thank you. Mr. Morgan, would you like a break before cross-examination, or would you like to go straight ahead? What's your --
THE WITNESS: I'd like to go straight ahead, ma'am.
THE COURT: The Plaintiff to cross-examine.
MR. SHAPIRO: Thank you, Your Honor.
THE COURT: Mr. Shapiro to

Page 2511

cross-examine. Cross-examination will be within the scope of direct.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good afternoon, Mr. Morgan.
A. Good afternoon, sir.
Q. I want to start out to make sure we understand that the contours of your involvement with the issues that are before the Court today, I recall that you testified that you became acting director. Actually, I think you testified that you became director of the program in January of 1983, but in fact, you were appointed acting director in 1983, correct?
A. I'm not sure at what point in time titles changed or whatever, but, yes, I was acting director of the Nuclear Waste Project Office at that point in time that later became OCRWM.
Q. Let me ask a series of questions, you were not involved in the legislative process leading up to the passage of the Nuclear Waste Policy Act?
A. Not at all.

Page 2512

Q. And prior to your detail from Savannah River to the Nuclear Waste Project Office, you had no knowledge of the details of the Nuclear Waste Policy Act?
A. That's correct.
Q. And you're not here to provide any testimony about the implementation of the NWPA during the time period prior to your arrival as director of the project office, correct?
A. That's correct.
Q. And you recall that there certainly were issues that DOE dealt with in terms of nuclear utility spent nuclear fuel, but you were not involved in those issues prior to your involvement in the project office, correct?
A. That's not totally correct. One of my offices in Savannah River was looking at storage of nuclear fuel at other locations, but it was not -- that was in support of NE, which had the responsibility for handling waste at that time.
Q. Now, let's cover the period after your departure as director of the project office in January 1984.
A. I believe that's correct.

Page 2513

Q. After that time, you cannot provide any testimony about the implementation of the NWPA subsequent to your departure, correct?
A. That's correct.
Q. And I know that you mentioned you did some consulting on some energy issues after you left the government in 1988, but since that time, you haven't been hired to consult on the disposal of commercial spent nuclear fuel, correct?
A. That is correct.
Q. And in fact, even immediately after you left the Nuclear Waste Project Office, you did not keep up with what was going on in the nuclear waste program because you had your hands full in your next position, correct?
A. Yes. The Secretary asked me to take the position of Assistant Secretary for defense programs, which was a 5, at that time, a 5 billion dollar activity a year, which had the production facilities and the laboratories, and that was more than I could take care of.
Q. Mr. Morgan, I'd like to go back to some of the things you testified about in your direct examination. You recall you were asked

Page 2514

some questions about comments from the Edison Electric Institute to the draft standard contract that was Defendant's Exhibit 2.34?

A. Yes.

Q. And specifically, you were asked about page eight of that document, the first paragraph on that page, noting EEI's concerns, if you could turn back to that page?

A. What page is that, please?

Q. Page eight.

A. Yes, I have page eight.

Q. And if you recall, I'm just directing this for your reference, do you know where this question comes from? You recall having it pointed out to you, I believe it's the third or fourth sentence in there, that the draft contract does not permit DOE to accept any given quantity of SNF/HLW, do you recall that language?

A. Yes.

Q. And at the bottom of that paragraph, you recall that EEI asked DOE to meet with purchasers to negotiate solutions to what EEI referred to as open items, correct?

A. Yes.

Page 2515

Q. And you agreed that, ultimately, the acceptance rate issue wasn't even an open item in the contract, you didn't have an acceptance rate term in the contract, correct?

A. That's correct.

Q. And that's intentional that you left that open because you didn't want to commit the Department of Energy, correct?

A. Correct.

Q. Now, you testified also in your direct examination, Mr. Morgan, that you received a variety of comments from EEI and others that the Department of Energy should commit itself to receiving enough spent nuclear fuel to do really two different things. One term was, suggested term was to take enough spent fuel to avoid the need for additional at-reactor storage after January 31, 1998, do you recall that?

A. I think the words were "acceptance rate at the rate of discharge," which would be commensurate to the same thing.

Q. Well, you think those are the same thing, that taking spent fuel consistent with the discharge is the same as utilities' needs

Page 2516

for at-reactor storage?

A. Yes.

Q. Just because utilities are discharging a certain amount of spent fuel, it's your understanding that that means that utilities need additional storage capacity for every amount of such discharge?

A. If DOE is accepting discharge rate of fuel, then there should be no need for further additional storage at reactors because we're taking as much as they're removing.

Q. Well, let me go back perhaps a little bit out of order because it was my understanding that these were two separate concepts, and I thought you had referred to them as separate concepts.

A. Well, the other concept was working down the backlog, which was another increment on top of what was being discharged.

Q. Well, let me go to help clarify this issue, so I think it was the last exhibit that was discussed with you, you should have it in front of you as Plaintiff's Exhibit 60. That's the large document discussing the proceedings of the 1983 Civilian Radioactive Waste

Page 2517

Management information meeting. I want to go back to your statement in those proceedings.

A. Yes.

Q. Now, if you go back to the, basically, the same paragraph that you were focused on in the direct examination, that the passage that starts the basic strategy, do you see that passage, it's on the right-hand side, the one paragraph up from the bottom of that column?

A. Yes.

Q. It says, "The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities, either on-site or at another location." Do you understand that?

A. Yes.

Q. So that's one concept, but then further down in your explanation of the DOE basic strategy, at that time, you said that, "After the initial operation of the repository

Page 2518

through the first few years, we should anticipate that the weight of acceptance should be the rate of discharge from the reactors that are in operation at the time." So aren't those two different concepts?

A. They mean almost the same thing. The first start-up phase in any operation of any facility is, you know, undertaking, is that it requires a ramp-up or beginning stage of operation, so we were talking about the ramp-up rate, and when the facility got into operation, it would be meeting the discharge rate.

Q. Well, doesn't the first concept, referring to enabling, to taking enough spent fuel so that no utility would have to add any further storage facilities, don't you have to know something about the needs of nuclear utilities for additional facilities?

A. We had hoped that there was adequate space available at several of the reactors to where they would not require additional storage on-site and that we would take those from the utilities that had the emergency type of requirement first off on the schedule.

Q. So it was your expectation that if a

Page 2519

utility was going to face a situation where it was going to run out of space in its pool, that you would go to that utility first to pick up their spent fuel?

A. If the Nuclear Regulatory Commission stated that that was an emergency, that was not our call, if the NRC stated an emergency, I think that was the requirement of the time, as I recall, was to keep a full core reserve space available in the reactor site, or at the reactor site.

Q. Suppose the Nuclear Regulatory Commission didn't call that an emergency, was it your plan to just force that utility to run out of space and shut down?

MR. LO RE: Objection, Your Honor, it calls for a hypothetical.

MR. SHAPIRO: Your Honor, I think it calls for his understanding at the time.

THE COURT: I agree with the examining counsel.

MR. LO RE: Thank you, Your Honor.

THE COURT: You may answer, you may answer the question.

THE WITNESS: Would you repeat the

Page 2520

question? I'm sorry.

THE COURT: After you hear it again, you may answer it.

BY MR. SHAPIRO:

Q. Let me rephrase the question to set it up again. You referred to the possibility that if the Nuclear Regulatory Commission characterized an emergency as a situation where a nuclear utility running out of space in its spent fuel pool might have to shut down, then it would go to that reactor first. I'm asking you for an alternative situation. Suppose the same fact, the utility is running out of spent fuel, but the Nuclear Regulatory Commission hasn't made a definition of that as an emergency one way or the other. Was it your understanding that that utility would have to shut down, or were you planning to go to that reactor first?

A. Of course, we would go to that reactor first on the whole basis of the utilization of that ramp-up rate of the 1,800 metric tons that we had for the first year acceptance. Of course, we'd go to them, makes sense.

Q. In fact, during the time when the

Page 2521

standard contracts were signed and in this initial planning for the spent fuel program, DOE had available to it a documentation that made clear the needs for utilities for additional at-reactor storage, isn't that correct?

A. During the time of the rule-making?

Q. During this entire 1983 period, from the time that you were director –

A. There were some reactors that had on-site storage outside of basins, as I recall.

Q. I think you misunderstood my question. Let me try to rephrase it, and let me point more specifically to where I'm coming from. You said in your program overview in the proceedings before the Radioactive Waste Management information meeting that the basic strategy was to be receiving waste in 1998, such that no utility would have to add any further storage facilities either on-site or at another location. You had information to tell you at that time of how much spent fuel that was, didn't you?

A. Yes, and I will have to say to you

Page 2522

that in reviewing the mission plan, you will see on the acceptance rate schedule that there was additional storage, or there was more fuel coming out of reactors that we did not get to that acceptance rate until 2003, that's in the schedule in the mission plan.

Q. Well, let's –

A. What should have been said is that commitments for additional facility for additional storage would not have to be made after 1998.

Q. Let me deal with what you actually said, Mr. Morgan, which was that no utility would have to add any further storage facilities after 1998. And I think you said that there was a document that told the Department of Energy just how much spent fuel that was, and I want to show that to you and make sure that we're on the same page as to what these requirements are.

A. This statement was made prior to the mission plan being published.

Q. That's correct. Let me show you Plaintiff's Exhibit 35. Mr. Morgan, you've been handed what has been marked for

Page 2523

identification as Plaintiff's Exhibit 35. It's titled, "Spent fuel storage requirements, an update of DOE/SR-0007," dated June 1982.

A. Yes.

Q. You understand what this document is, don't you?

A. I see it's an update of fuel storage requirements as of June 1982.

Q. And you understand that this was one of a series of reports that DOE was publishing to set out just what utility storage requirements were projected to be?

A. These were the projections of 1982.

Q. And you understand that these were the projections that in fact that you would have had available to you, you know, when the standard contract was being promulgated in the first half of 1983, correct?

A. I don't know if – what these numbers are. I haven't seen this document. I used the numbers that were given to me by the system, if you will, that are in the mission plan. Those are the numbers we were working with on spent fuel storage.

Q. As you just testified a few minutes

Page 2524

ago, the mission plan hadn't been published as of 1983, but you did have this document available, didn't you?

A. I have not seen this document before.

Q. You never considered the documentation available to the Department of Energy, in fact, that the Department of Energy itself was publishing, as to just what utility spent fuel storage needs were projected to be as of 1998?

MR. LO RE: Your Honor, I'm going to object on the grounds –

THE COURT: Just before you answer, let me sort this out before you answer.

MR. LO RE: I'm going to object on the grounds that this is argumentative and also, Your Honor, it mischaracterizes Mr. Morgan's testimony. He said nothing about not considering documentation available.

THE COURT: I agree with the argumentative point. You can approach this if you have a theory on how to approach this. If he hasn't seen it before and his recollection isn't refreshed, you can ask him, of course, about the types of documents that they used.

MR. SHAPIRO: Well, I do want to see

Page 2525

if I can refresh Mr. Morgan's recollection about a couple of the passages, Your Honor.

BY MR. SHAPIRO:

Q. If you would take a look, Mr. Morgan, to the summary on page three?

A. Yes.

Q. And if you'd take a look at the first paragraph there, it's referring to projections to the year 2000, using information supplied by utilities and that projections through the year 2000 are combined with fuel discharge projections of utilities with typical reactors in looking at, and I'm summarizing here to see if it refreshes your recollection, to see if there were going to be additional storage needs at each reactor, given those projected discharges. Don't you recall the Department of Energy studying that issue?

A. We updated information of what we had relative to the discharge rates and when, I was familiar several years before when Savannah River did some information on that, and there were three levels of a low case, a medium case, and a high case, okay.

Page 2526

We wanted to have a set of numbers that we could put in the mission plan that we could deal with, and that's what we wanted and had in the mission plan, and I don't believe these numbers were used in that process.

Q. Well, let me have you turn to another page that perhaps is similar to a notion you just discussed, Mr. Morgan, maybe it will refresh your recollection.

If you would turn to page 14 and if you see here, there are in fact three columns of cumulative spent fuel storage requirements that are projected in this document, three different cases, the first column being a case looking at current at-reactor capacity, a middle column, another case looking at maximum at-reactor capacity, and then a final column on the right looking at maximum capacity at reactors, plus transshipment.

Isn't that the kind of data that you recall?

A. To answer directly, yes, that's a type of information that I recall, but the number specifically, I don't recall at all.

Q. Well, let me just point out a couple

Page 2527

to see if you recall at least being in the ballpark of what's shown here and at least see if you agree with how I'm interpreting the numbers.

If I look at the first column and if I want to see how much additional storage is needed between 1997 and 1998 to avoid additional at-reactor storage, don't I simply subtract the 1998 figure of 13,470 from the 1997 figure of 11,250, to see that something somewhat over 2,000 MTU of additional at-reactor storage is needed using that case between those two years?

A. That would be a reasonable assumption from the numbers that are given, yes.

Q. That's how you used this data?

A. I didn't use this information.

Q. You used information like this?

A. Correct.

Q. Because you wanted to know just how much spent fuel the Department had to accept in order to prevent utilities from having to add at-reactor storage, correct?

A. Correct. And those numbers were in the mission plan.

Page 2528

Q. And just so I think I, so I can understand the nature of your questioning, the numbers here in PX-35, PX-35 is dated June of 1982. You think you might have used somewhat updated numbers from that time?

A. Yes.

Q. Do you have any reason to think, Mr. Morgan, that the numbers in the June 1982 version of the Department of Energy's look at this issue were substantially different than the data?

A. I have not compared them. I haven't looked at this document before.

Q. I'm just asking, do you have any reason to think that the data would have changed significantly from one year to the other?

A. Information has changed from one year to the other. It has changed. The projections from the utilities has changed each year.

Q. Do you have any idea if the data that you used was showing greater or lesser need for at-reactor storage than what was shown here in Plaintiff's Exhibit 35?

A. I have no idea. I have not compared

Page 2529

the numbers.

MR. SHAPIRO: Your Honor, at this time, Plaintiff moves that PX-35 be admitted into evidence.

MR. LO RE: Your Honor?

THE COURT: Yes, Mr. Lo Re.

MR. LO RE: I'm not sure what the status of the objection list is on this, but we would object on the ground that there is no, no foundation has been laid in respect to Mr. Morgan's ability to talk about this document, and therefore, we'd object to the admission at this time.

MR. SHAPIRO: There's no objection noted from our records from the pretrial discussion. We've certainly discussed it with Mr. Morgan. The witness has personal knowledge. There's never been a requirement for admission of a document –

THE COURT: I think there could be understood that this makes some fact in dispute more or less likely to have occurred, namely, that there were, which the witness has mentioned, that there were high, low, and middle studies of this type. We don't know how

Page 2530

this interacts with documents that the witness has discussed, at least in this point in the examination.
But I'm going to allow the admission with the caveat that it goes to weight in terms of how it fits in with the documents that we're ultimately, the documents that were relied on by the parties. PX-35 is admitted.
(Plaintiff Exhibit Number 35 was received in evidence.)
BY MR. SHAPIRO:
Q. Mr. Morgan, looking back, how we got into the discussion of PX-35, I was actually starting with your discussion of various comments that you received in response to the draft of the standard contract and the fact that some utilities wanted a specific rate term, and some of them wanted a rate term that would have said that DOE would take enough spent fuel to avoid at-reactor storage.
Do you recall that?
A. Yes.
Q. And some other utilities and in a slightly different articulation said, well, DOE should take enough spent fuel to at least equal

Page 2531

the discharge rate from utilities, do you recall that?
A. Yes.
Q. But in fact, your testimony was that there was a decision not to accept those comments, but in fact, you never rejected them, did you?
A. We accepted the comment as it relates to a later point in time, when the '87 and '91 time frame was modified in the rule-making, so we in effect said that we're not accepting that now, but when the program is better defined, that is a reasonable thing to approach.
Q. But the specific request that utilities had for putting in specific rate terms, you didn't put those into the contract, but you also didn't discuss those comments in your rule-making, correct?
A. I thought we had.
Q. Well, let me bring to your attention a couple of the documents that I believe you did discuss in your direct examination. If we could start with Plaintiff's Exhibit 47, if you have that available to you? That's your April 8th, 1983 memorandum --

Page 2532

A. Yes.
Q. -- to the Secretary of Energy?
A. Yes.
Q. And at this time, you had only been director of the project office for -- what? Two or three months as of April 8th, 1983?
A. Correct.
Q. And you hadn't written that many memoranda to the Secretary of Energy, I suspect?
A. I hadn't what?
Q. You hadn't written many memoranda to the Secretary of Energy as of April 8, 1983, correct?
A. No, I hadn't.
Q. So you obviously wanted this memorandum to be correct, didn't you?
A. Yes.
Q. And you wanted it to be complete for the Secretary, didn't you?
A. We did not, in sending this information to the Secretary, did not go through every comment that we received.
Q. So you intentionally left out comments?

Page 2533

A. No, we didn't. Well -- yes.
Q. Now, looking at your cover memorandum and the paragraph that was discussed with you in the direct examination under discussion, the last sentence, which I think was pointed out to you, it says, "Eight general policy issues arose from the comments, and we appropriately resolved these issues."
A. Yes.
Q. But in fact, comments that you reviewed in your direct examination concerning utilities' desires for a greater specificity on an acceptance rate, those comments don't fall into any of those eight policy issues, do they?
A. No.
Q. And the other document, and just to make clear, the Plaintiff's Exhibit 47, your memorandum, as I understand it, that's your request to the Secretary of Energy to approve the final rule-making?
A. Yes.
Q. For the final contract?
A. Yes.
Q. So let's look at the final rule-making itself, that's Defendant's Exhibit 2.02.

Page 2534

A. I have it.
Q. Now, since the Department of Energy decided to develop the standard contract through rule-making, it was important for the Department of Energy to follow regular administrative procedures with respect to the development of the standard contract, correct?
A. Yes.
Q. And that's one of the reasons, I think this was covered in your direct examination, why the Department was very careful to catalog the -- I think you referred to 85 comments in response to the draft --
A. 85 documents.
Q. 85?
A. With many more comments.
Q. Because it was important for the Department of Energy in the context of a rule-making to take account of what it was doing with those documents sent in response to the draft rule-making and what it was doing in response to the many comments, correct?
A. Yes.
Q. Now, for the most part, if the Department of Energy decided to reject a

Page 2535

suggestion or a comment, you made that clear right here in the rule-making, didn't you?
A. I think in the rule-making, you'll see where we did commit in the '87 time frame to talk about acceptance rate.
Q. Well, if you could answer my question that for the most part, when the Department of Energy was rejecting a comment, it made that plain in the rule-making, correct?
A. Correct.
Q. Let's make sure we're on the same page. Let me find a couple of examples of that, and I know this is difficult to read. If we look at the page at the upper left-hand corner, I think it's 16596, and if you look at the left-hand column, there are a couple of comments being discussed with respect to particular articles near the bottom of that column.
The second one starting from the bottom discussing Article XVII, it says that, "No significant comments have been received, and accordingly, no change has been made." Even when there wasn't a comment, you tended to note that and to note what you were doing in

Page 2536

response, correct?
A. Correct.
Q. And then the next one down from that, it's discussing Article XVIII, it says, "Some commenters suggested that this clause be deleted," but then it says at the bottom of that paragraph that, "Accordingly, we have not adopted this suggestion," correct?
A. Correct.
Q. But there's no comparable passage in this document addressing utility requests for more specificity on the rate of acceptance, correct?
A. I thought there was a heading on that relative to the modification that we made under IV.B of, I believe it was.
Q. Well, it was pointed out to you in direct that two changes were made. And let me see if I can find those for you.
THE COURT: I think you're looking for Bates 0696 on the left column.
THE WITNESS: Line 2 on the left-hand column?
BY MR. SHAPIRO:
Q. Yes. You see where there's the

Page 2537

discussion added that you're referring to, Mr. Morgan?
A. "In addition, at the request of a substantial number of commenters. A new provision has been added as subparagraph IV.B, IV.B, which states that DOE will issue an annual report for planning purposes, setting forth the projected annual receiving capacity for the DOE facility."
Q. Now, that statement doesn't say that it's in response to comments asking for specificity on the rate of acceptance to which the Department of Energy was going to be obligated to, does it?
A. I thought it was plain, dealing with annual receiving capacity.
MR. SHAPIRO: Your Honor, in agreement with a note I just saw Ms. Ott flash, if we could perhaps have -- this might be a good time for a break.
THE COURT: That's agreeable to the Court. We'll take a 10-minute break, and the witness may step down, and we will continue examination when we return. We are in recess for 10 minutes.

Page 2538

(Whereupon, a short recess was taken.)
THE COURT: Cross-examination continues. The witness continues under oath.
MR. SHAPIRO: Thank you, Your Honor.
BY MR. SHAPIRO:
Q. Mr. Morgan, I want to transition to a different topic. We were talking about utility comments to the draft standard contract, and then we were talking about the Department of Energy's response to those, and I want to focus on the two changes that you testified to in your direct examination that you said you implemented in response to those utility concerns about the absence of an acceptance rate.
And I'm going to refer, as Mr. Lo Re did, to Plaintiff's Exhibit 54 because it is indeed easier to read than the rule-making. Do you still have that document in front of you?
A. Yes.
Q. Now, the whereas clause, that was one of those two changes that you said you made to the contract in response to the utility comments?
A. Yes.

Page 2539

Q. Now, the whereas clause, that was simply acknowledging a requirement that was already in the statute, correct?
A. It was not in the contract.
Q. But it was already in the statute, you were simply acknowledging that, weren't you?
A. That would have been my interpretation of the Act, that we would do the best job possible and accept that fuel as expeditiously as practicable, but those words were not in the contract.
Q. And in fact, in addition to simply being something that was in the statute, the whereas clause does not commit the Department to any particular action, does it, it's simply saying DOE has a responsibility, correct?
A. This was a specific comment that had been made to add the whereas clause, and we thought that that was appropriate to add it.
Q. You certainly didn't view the whereas clause as committing the Department to a particular rate of acceptance, did you?
A. No.
Q. Let me turn to the other clause that you said you added in response to utility

Page 2540

concerns. That's the one in Article IV. If you'd turn to page 10 of Plaintiff's Exhibit 54, I think that's where you'll find it. And that's the language at subparagraph IV.B?
A. Yes.
Q. And in response to the utility comments, you decided to put in the provision for an annual capacity report started for 1987, correct?
A. Yes.
Q. And as certainly stated in the language of the contract itself, the ACR was not included in the contract for any purpose other than planning, correct?
A. Can I refer to the Federal Register notice?
Q. Of course.
A. It was setting forth the projected annual receiving capacity for the DOE facility.
Q. My question, if you could answer, please, the ACR was not included in the contract for any purpose other than planning, correct?
A. That's what it states.
Q. And that was your understanding when

Page 2541

you had it put in the contract, correct?
A. I thought we were committing to an acceptance rate at a later date.
Q. You thought there was some purpose other than planning?
A. No, it states planning.
Q. I'm not asking what it states. I'm asking your understanding.
A. My understanding, it says planning.
Q. Again, I'm not asking for your understanding of what it says. I'm asking your understanding of what the clause is intended to do. Your understanding was that –
MR. LO RE: Your Honor – I'm sorry, Counsel. Please go ahead.
BY MR. SHAPIRO:
Q. Your understanding was that you were putting this clause in for no purpose other than planning, correct?
MR. LO RE: Objection, Your Honor, this question has been asked and answered several times..
THE COURT: Well, it's been asked and answered in a contradictory fashion. I'm going to allow it. I'm going to just say to the

Page 2542

witness, at one point, you stated, I thought we were committing to an acceptance rate at a later date.

THE WITNESS: Yes.

THE COURT: And several times, counsel has asked you on both sides of that statement whether it's put in for the purposes of planning.

THE WITNESS: The following sentence says, "This report shall set forth the projected annual receiving capacity for DOE and an annual acceptance ranking relating to DOE contracts for the disposal." And I thought that that was dealing all of – it says planning earlier, I thought it says an annual acceptance ranking to the DOE contracts for the disposal of –

THE COURT: We're reading right along with you. Let me ask counsel to put his question again, which is about the meaning, or your interpretation, if you will –

MR. SHAPIRO: Thank you, Your Honor.

THE COURT: – before we move on.

BY MR. SHAPIRO:

Q. Your understanding of this language

Page 2543

was that the ACR was not included in the contract for any purpose other than planning, correct?

A. We're dealing with things that happened 23 years ago. I'm sorry, but when it mentions the contract in that same paragraph, an annual acceptance ranking relating to DOE contracts for the disposal of fuel, I thought we had dealt with it at that time.

Q. Mr. Morgan, you recall having your deposition taken?

A. Oh, yes.

Q. Multiple times in these spent fuel cases, correct?

A. Correct.

Q. And one of those instances was on March 21st of 2002, do you recall, one of those instances was on March 21st, 2002?

A. I don't know the specific date. I can't remember that.

Q. Well, the particular deposition that I'm referring to, it might have been memorable in that there were a whole bunch of utilities that were parties to that particular deposition.

Page 2544

A. I remember my deposition being taken in Oregon, where there were a number of –

THE COURT: Lawyers, we're called.

THE WITNESS: Lawyers, I'm sorry.

BY MR. SHAPIRO:

Q. I think that's the one we're referring to, Mr. Morgan, and since you seem to be having some trouble recalling just what your thoughts were with respect to this clause, I'm going to bring up some testimony that you gave at that time and see if that isn't indeed your better recollection.

I think you've just been handed a copy of the transcript from that deposition, if you would turn to page 140 of that transcript, and these pages can be a little confusing because there are four pages of transcript on each sheet of paper.

A. Yes, I have it.

Q. And if you would look at line 5, weren't you asked the following question and gave the following answers:

"Is this the annual capacity report? Is that what that ended up being called?

"ANSWER: Yes, yes.

Page 2545

"QUESTION: Is that document included in the contract for any purpose other than planning?

"ANSWER: No."

That was your testimony?

A. Yes.

Q. You don't intend to change your testimony now, do you?

A. No.

Q. Now, going back to the Plaintiff's Exhibit 54, page 10, you referred to the entirety of that subparagraph five as being the clause that you thought was established in 1991 as the time frame when DOE would be committing itself to firmer acceptance rates?

A. Yes.

Q. As I read subparagraph IV.A, doesn't that simply provide for the issuance in 1991 of an annual acceptance priority ranking by the Department of Energy, isn't that all that that subparagraph does?

A. Yes.

Q. And as stated right there in the second sentence of that paragraph, "the priority ranking is basically just a list of

Page 2546

spent fuel discharges from the oldest to the youngest, isn't that correct?
A. Yes.
Q. , where is it in this paragraph that you think it sets out some sort of a firm acceptance rate from the Department of Energy beginning in 1991?
A. I don't see it.
Q. Mr. Morgan, I want to go back, and I think I initially signaled I was getting a little out of order in my discussion, I want to go back to your program overview that is set out in PX-60.
A. Yes.
Q. And particularly, the part of your statement where you discussed the basic strategy that, as of 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities, either on-site or at another location. Now, first of all, you referred to that as your basic strategy, correct?
A. Yes.
Q. You didn't refer to that as an aggressive strategy, did you?

Page 2547

A. The whole program was aggressive.
Q. Then why did you refer to this as a basic strategy?
A. I don't understand the question.
Q. If you thought that what you were proposing was aggressive, why did you refer to it as a basic strategy?
A. The whole program was aggressive, and we talked about the difficulties of the program and the uncertainties of the program, and the basic strategy was an aggressive strategy.
Q. Well, one of the reasons that you adopted this particular strategy is that you thought you understood that to be the intent of Congress and the Nuclear Waste Policy Act, correct?
A. I thought it was a requirement of the Nuclear Waste Policy Act. I find it hard and difficult to categorize the intent of Congress because of the difficulty of not having a conference report and the fact that I was getting mixed direction from both sides of the House and mixed comments on intent from the House and the Senate. It was obvious that it was difficult to really categorize the intent

Page 2548

of Congress.
Q. I'm going to go back to that deposition we handed out a little bit earlier, Mr. Morgan. If you would turn this time to page 43, do you have that in front of you?
A. Yes.
Q. And I'm going to start reading from line 7.
"QUESTION: The last two sentences of -- what did I say that was? The seventh paragraph states that, 'The basic strategy that we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site.' Do you see that sentence?"
You answered, "Yes."
"QUESTION: How did that basic strategy come about?
"ANSWER: That was my input.
"QUESTION: Why did you decide that, that that was the strategy?
"ANSWER: That's what I felt was the intent of Congress, and I think listening to some of the staffers is how I got to that conclusion, but it was my conclusion."

Page 2549

A. That's correct, it was my conclusion because I was getting different input from different staffers on different committees within Congress.
Q. And that was your understanding of Congress' intent?
A. No, that was my understanding, and it was my input, based on the fact that there was a spread of input from Congressional staffers. Some of them didn't even want to go with a repository. They wanted to go with an MRS. So after some discussions, one of the Congressional staffers said, Morgan, read the Act, and interpret it, and do the best you can. And that's what I did.
Q. And another reason why you set out the basic strategy the way you did, in addition to your understanding with respect to the NWPA and Congress, is you thought that your basic strategy made sense, didn't you?
A. Yes.
Q. And you reached that conclusion that the strategy made sense, even though this conclusion was not something that was well-defined by Congress in a conference

Page 2550

report, correct?
A. It was not.
Q. And the subject matter, this basic strategy, that wasn't just something that you, by yourself, decided to put forward. You discussed this statement with the Secretary of Energy, didn't you, your statement about a basic strategy, so that by 1998, you'd be receiving fuel so that utilities would not have to add additional storage, you discussed that with the Secretary of Energy, didn't you?
A. I don't recall that I discussed that with the Secretary of Energy.
Q. Well, let's go back to your deposition, Mr. Morgan.
A. Okay.
Q. It's the same deposition, page 52 this time.
A. Page what?
Q. 52, I'll read from line 9. Weren't you asked the following question and gave the following answer:
"QUESTION: Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraphs of this program

Page 2551

overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
"ANSWER: Oh, yes."
Wasn't that your truthful testimony?
A. Yes.
MR. LO RE: Your Honor, I'm going to object at this point in that I believe counsel has read this out of context, and I'd be happy to show the Court where that is the case.
MR. SHAPIRO: Your Honor, I think that's something to be handled on redirect. I'm not sure how that fits into a cross-examination.
THE COURT: I think that will – you're actually entitled to bring it in.
MR. LO RE: Thank you, Your Honor.
BY MR. SHAPIRO:
Q. Now, we spent some time, Mr. Morgan, about the part of your program overview talking about the amount of acceptance that would meet this criteria of enough spent fuel so that no utility would have to add further capacity, but as we also discussed, there was another criteria that, after the initial operations of

Page 2552

the repository, you anticipated that you'd be receiving spent fuel at least at the discharge rate from reactors. Do you recall what that acceptance rate was?
A. I believe that's in the mission plan.
Q. Well, let's turn to Plaintiff's Exhibit 59. That's the draft of the mission plan that came out while you were still serving as director of the project office. Do you have that in front of you, Mr. Morgan?
A. Yes.
Q. And just to make sure we are on the same page, Plaintiff's Exhibit 59, that is the mission plan you referred to where those acceptance rates are?
A. Yes.
Q. Since you seem to be knowing where you're going, can you point us out where those are located in the draft mission plan?
A. 2-3.
Q. And to make sure we're on the same page, in order to find out how much spent fuel the Department needed to be taking to meet the discharge rate, that's the amount in that, the first column after the dates, is that correct?

Page 2553

The header of the column is marked, "Annual Spent Fuel Generation"?
A. I looked at the remaining backlog MTU, the right-hand column that shows it's increasing until 2003 when it begins to go down. When the second repository is open, the actual, the backlog remaining is beginning to reduce.
Q. Let me focus your attention, just again, to compare the statement and your basic strategy to the mission plan. Your basic strategy refers to the weight of acceptance of fuel should be the rate of discharge from the reactors that are in operation at the time. That rate of discharge from reactors, isn't that shown in the draft mission plan as the first column on page 2-3 of Plaintiff's Exhibit 59 that, for example, in 1998 shows 2,739 MTU?
A. Yes.
Q. So consistent with your basic strategy, you wanted to be receiving fuel, at least those acceptance rates noted in that column, correct?
A. Yes.

Page 2554

Q. And in fact, it's also noted in that same page, you had a, as of the time of this draft mission plan, you had at least an initial projection of waste acceptance as noted by the first repository acceptance column, correct?
A. Yes.
Q. And in fact, during your tenure as director of the project office, the Department published other documents that were not in fact draft documents, like this draft mission plan, that had that same acceptance rate provided in it, isn't that correct?
A. I don't know what documents you are referring to.
Q. Well, let's take a look at one. Let's give you a copy of Plaintiff's Exhibit 51. Mr. Morgan, I will represent to you that the first page is kind of a copying service page, but if you turn to the next page, that's the actual cover of the historical document. It's entitled, "Report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste."
A. Right.
Q. There's a date in the upper left-hand

Page 2555

corner dated June 1983.
A. Right.
Q. And it says there in the middle that, "This is published by the Nuclear Waste Policy Act project office." That was your office, correct?
A. That's correct.
Q. And the purpose of this study was to evaluate whether the collection of the fee would provide sufficient revenues to offset the cost of disposal of commercially generated spent nuclear fuel, isn't that correct?
A. Yes.
Q. And you recall your office publishing this document, Plaintiff's Exhibit 51?
A. No, I don't.
Q. You don't recall this at all?
A. I don't recall this particular document.
Q. You recall though the need for your office to look at the adequacy of the 1 mil per kilowatt hour fee to make sure that it was going to cover the projected cost of the program?
A. This document, although it has those

Page 2556

numbers in it, I don't recall this document, and I don't believe it was ever published under my signature. It was basing information on previous data that -- in fact, I think it was using 1980 information in the references. I've seen this document, I think, within the last 24 hours. Yes.
Q. Let me show you, and I don't know if the next document I'm going to show you is going to help clarify things or confuse things further, but let's also show you Plaintiff's Exhibit 55.
And as you can see, Mr. Morgan, Plaintiff's Exhibit 55 is also titled, "Report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste." And it has a, if you flip a couple pages, I think the better version of the cover is a couple pages in, and you'd see in the upper left-hand corner, there's a date this time of July 1983.
A. Yes.
Q. And in the middle of this cover page, it also refers to the Nuclear Waste Policy Act project office.

Page 2557

A. Yes.
Q. Is this the version of this report that you recall from the time when you were director of the project office?
A. No, this is a version that I recall within the last 24 hours of having seen it.
Q. Do you have any understanding, Mr. Morgan, as to why there would have been two versions of what seem to be the same report published during your tenure as --
A. I have no idea.
Q. While we've got Plaintiff's Exhibit 55 in front of us, why don't we turn to the table that notes the key references? If you turn to page nine?
A. Yes.
Q. And you understand that this page notes key references for the assumptions for the study of financing the disposal of commercial spent nuclear fuel?
A. I beg your pardon?
Q. You understand that's what listed here are the key assumptions for the study that's in this report?
A. Yes.

Page 2558

Q. To look at the adequacy of the fee?
A. Yes.
Q. And if you look at the third one down there, it says that, "Repository design receipt rates, first 5 years at 1,800 MT per year, next 21 years at 3,000 MT per year."
A. Yes.
Q. So these are the same acceptance rates that were ultimately later, that we later found in the draft mission plan from December 1983, correct?
A. Yes.
Q. So in fact, your office was publishing those acceptance rates even right when the contracts were signed?
A. I don't believe they were publishing it. You'll notice in line item four, on that same table, it says, "transuranic," it's under types of waste for disposal, "transuranic contaminated waste," that's not part of the Nuclear Waste Policy Act.
And I think on page, I also read this, I believe last evening, first paragraph on page 30, "It should be noted, however, that considerable uncertainty surrounds long-range

Page 2559

costs and revenue projections of a program of this magnitude." This was not an accepted report on fee adequacy that we sent, we did not send this to Congress.
And it compares it to previous work, and I'm looking for the references that they used. And by the way, the capacity, the repository capacity is listed as 72,000 metric tons, not 77. References on page 40, it talks about using information from 1982. I did not forward this report to anyone that I recall. It just, it has errors in it.
Q. You're looking at Plaintiff's Exhibit 55 right now?
A. Yes, sir.
Q. And what about Plaintiff's Exhibit 51, if you would turn to page 30 and then to page 40, I think you'll see this version of the report has the same language that you pointed out in it. You don't think you reported – you sent either of these versions of the report on?
A. No, I do not believe so. We were to determine the fee adequacy a year after, and that was not done, that I can recall, during the time that I was there. I would not have

Page 2560

forwarded this report.
Q. Well, looking, and I don't think it matters at this point which one, although I'll represent to you that Plaintiff's Exhibit 51 has been accepted into evidence, why don't we use that one, if we look at page 11 of that report, do you have that in front of you, sir?
A. Yes.
Q. And that has a table 3-3 in front of it, and if you look at the column with the header, "Repository one," that has these acceptance rates we've been talking about, 1,800 MTU for the first five years and then 3,000 MTU thereafter?
A. Yes, that's what's in the mission plan you – excuse me, you asked me what other, you said that I had used these numbers in other documents.
Q. Yes, that was how we got into this, yes.
A. I did not use these numbers. I did not forward these documents. If you have a document that I forwarded, other than the mission plan, I'd be happy to deal with that.
Q. Well, let me ask you the question this

Page 2561

way, Mr. Morgan, you don't have any recollection of any consideration in June or July 1983 time frame within the Department of Energy regarding the acceptance of amounts less than those shown here in table 3-3, do you?
A. No.
MR. SHAPIRO: If I could have a moment, Your Honor? Your Honor, I have no further questions for Mr. Morgan. Thank you, sir.
THE WITNESS: You're welcome.
THE COURT: United States to redirect. Redirect will be within the scope of cross.
REDIRECT EXAMINATION
BY MR. LO RE:
Q. Can we go to DX-2.34, please? I'd like to show you an exhibit that you looked at both with me and Mr. Shapiro. It is DX-2.34. It is the EEI letter.
MR. LO RE: Your Honor, if we could have the screen switched, thank you?
BY MR. LO RE:
Q. Okay, Mr. Morgan?
A. Yes.
Q. Mr. Morgan, if we could go to page

Page 2562

eight of that cover letter, it's the page that Mr. Shapiro asked you some questions about, and the last portion of that first paragraph, it's that last sentence starting with, "we." "We would therefore strongly urge," do you see that, sir, on the screen, it says, "We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items." Do you see that?
A. Yes.
Q. Mr. Morgan, in the time frame that this letter was sent to you, March of 1983, did you consider the rate of acceptance for DOE, did you consider DOE's obligation to begin accepting fuel to be an open item?
A. No.
Q. And why is that, sir?
A. Because the Nuclear Waste Policy Act said you would accept fuel.
Q. Did you consider that whether the issue of whether DOE would meet a so-called two-part test under the standard contract to be an open item as of this time?
MR. SHAPIRO: Objection, leading.

Page 2563

THE COURT: You may answer.
BY MR. LO RE:
Q. Go ahead and answer, Mr. Morgan.
A. Did I consider it to be an open item?
Q. Yeah.
MR. LO RE: I'm going to actually ask the court reporter to read the question back so the record is clear.
(The reporter read the record as requested.)
THE WITNESS: No.
BY MR. LO RE:
Q. Why is that?
A. Well, this was prior to the final rule-making, and therefore, it was a comment that they had sent to us that I think some of the discussions that I'd had with Loring Mills, who had clearly stated that he wanted a rate in the contract, that I told him, this was before receiving this, that I told him that that would -- I could not at this point in time put in receiving rate in the contract.
Q. After the contracts were signed, or promulgated, Mr. Morgan, did you consider there to be an open item as to whether DOE was

Page 2564

required under the standard contract to meet the two-part test?
A. No.
Q. Thank you. Mr. Shapiro asked you about emergency acceptance, do you remember that?
A. Yes.
Q. And you said, I think you used the term that, of course, you would go to utilities in certain circumstances, do you remember that?
A. Yes.
Q. And what were the circumstances that you were thinking about when you made that statement on cross-examination?
A. NRC had to declare an emergency, and then we would accept fuel under the federal storage program.
Q. And what would have to happen for NRC to declare such an emergency, if you know?
A. That would be an NRC call, not our call.
Q. Thank you. Now, can we look at PX-54, please?
A. Which is?
Q. I'm sorry, it's the standard contract

Page 2565

with PG&E.
A. Yes.
Q. Now, I believe Mr. Shapiro asked you about page 10 of this contract. If we could go there, please?
A. Yes.
Q. And specifically, he asked you about IV.A, do you see that? And I'd like to look at both of those, if we could look at IV.A and B together, please, paragraph IV.A and IV.B? Now, Mr. Shapiro asked you, I think, specifically about IV.A, do you recall that?
A. Yes.
Q. And he asked you about whether there was any obligation, I believe he asked about whether there was some obligation with respect to rates of acceptance there in IV.A, do you remember?
A. Correct.
Q. Now, I want you to also look at paragraph IV.B. Reading those two clauses together, do you have an understanding as to whether there is an obligation with respect to rates of acceptance?
A. Yes.

Page 2566

Q. And what is that obligation, sir?
A. That obligation would be that these acceptance rates would be a commitment by the Secretary when it was published, I believe.
Q. How did those two clauses work together, if you know – you know what, strike that question.
Let's look at the next page, which is the delivery commitment schedule. Do you see that next page there?
A. Yes.
Q. It's one, it says delivery commitment schedules in the form set forth in Appendix A, et cetera.
A. Yeah.
Q. Then it says, "After DOE has issued its proposed acceptance priority ranking as described in paragraph B.5 of Article IV here of beginning January 1, 1992, the purchaser shall submit to DOE the delivery commitment schedule," then it goes on. Do you, sir, do you know how that clause I just read interrelates with the two clauses on the previous page?
A. Well, it references paragraph B.5, and

Page 2567

based on that information, it says DOE shall approve or disapprove such schedules within three months of receipt, so that this is a commitment to receive the fuel that is identified.
Q. Now, Mr. Shapiro asked you about some of the statements you made in your deposition, and I believe this is from March 21st and 22nd 2002, and he asked you about the intent of Congress. I'd like to go to the Elmo, if I could.
Mr. Lo Re: Your Honor if I could use the overhead projector?
BY MR. LO RE:
Q. Now, Mr. Morgan, if you could turn to the transcript that Mr. Shapiro provided to you?
A. Yes.
Q. Do you remember Mr. Shapiro was asking you about the intent of Congress?
A. Yes.
Q. And I'm looking at page 44 of the transcript here, and there's a question posed to you.
"So in your view, as director of the

Page 2568

program – strike that.
Did the mission plan when you left as director effectuate the intent of Congress as expressed, et cetera?"
And you said, "I believe so."
And then you said, "Could I add a couple things?"
Do you see that? I'm looking at the screen now. Can you see it on the screen, sir?
A. I can see it on the screen.
Q. You say, "Could I add a couple things? There was not unanimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill, or the House and the Senate. And I felt as long as we were getting stoned from both directions, that we were about in the right place, so I don't think that I can state what the intent of Congress was."
Do you see that?
A. Yes.
Q. Now, looking at that, Mr. Morgan, how does that comport with your testimony today about the intent of Congress?
A. I think that's consistent with what I

Page 2569

said today.
Q. Thank you. Now, you also talked about, on cross-examination, about discussions that you had with Mr. Hodel, who was the Secretary of Energy at the time, do you remember that?
A. Yes.
Q. Mr. Shapiro asked you some questions about that?
A. Yes.
Q. And Mr. Shapiro read into the record part of your deposition, on the next page, and this is at page 53, he read from 52. I want to read from 53 of the transcript, talking about your discussions with Mr. Hodel.
"QUESTION: Did you ever discuss with him your characterization of the intent of the Nuclear Waste Policy Act?
"ANSWER: In an overall basis, but not specifics, you know, in other words, we are going to accept fuel in 1998, that was the goal."
Now, Mr. Morgan, having looked at that transcript, that portion of the transcript that I just read for the record, how does that