Page 2570

comport with your understanding of what DOE was obligated to do under the Nuclear Waste Policy Act?
A. My understanding is we were to accept fuel in 1998, January 31.
Q. And how does that transcript cite that I just read comport with that understanding?
A. That's consistent.
Q. Thank you. Now, the last item I believe Mr. Shapiro asked about was your comments you made about planning and the ACR being for planning purposes. Do you remember that? On cross-examination, Mr. Shapiro read to you from this transcript about planning?
A. Yes.
Q. I'd like to read another portion of the transcript that wasn't read.
MR. SHAPIRO: Your Honor, I'm going to object to, you know, putting up parts of a transcript on the page, that it's one thing if it's right above or right below, if Mr. Lo Re feels we read out of context, but it looks like –
THE COURT: Sustained.
MR. SHAPIRO: It's searching through.

Page 2571

THE COURT: Sustained.
BY MR. LO RE:
Q. Now, when you talked about planning in the ACR, did you have an understanding, Mr. Morgan, as to whether the utilities would have to plan for their fuel to be accepted?
A. Of course.
Q. And how would they have to do that?
A. They would have to understand the acceptance rate. They would have to have on-site storage to take care of their requirements. Is that what you –
Q. No. What I'm getting at is, once DOE said we were going to come, had submitted an acceptance schedule?
A. Yes.
Q. Was there some commensurate planning that the utility had to undergo as part of that?
A. Yes, yes.
Q. And what was that planning?
A. Well, they had to plan for the cask's arrival, transfer of the spent fuel into the casks. It was our responsibility to take control at the site. We had to plan that

Page 2572

interface.
Q. And when you talk about planning – strike that.
What is your understanding of how the ACR clause that we read in conjunction with the DCS clause we read from the standard contract, what is your understanding of how that interrelates with the planning that utilities had to engage in?
A. I really don't understand your question.
Q. Sure.
A. They have to get ready for the acceptance of the casks, and I don't understand what you're after.
MR. LO RE: Your Honor, and this is why I put the transcript on the Elmo, and I understand that you sustained the Plaintiff's objection, but the context in which – I can argue this, the context in which the question was posed was really out of context.
And I would, and I think I objected at least at one point, and I would just like to show that when Mr. Morgan testified at his deposition about planning, it was not

Page 2573

necessarily in the same context in which the question was posed to him on direct examination, and I think I can show that.
THE COURT: One of the reasons you're having a little difficulty with me is because you've taken three bites. This is – you've tried for a third bite at an apple, and the first two were not fairly made. I'm surprised you didn't get an objection. I should have just stopped you. Putting up a document, you can show a document to refresh recollection.
MR. LO RE: That's fine.
THE COURT: And you can ask him if – you can impeach. And I said that you could ask him to address, you could read back to him something that he said on cross and ask him if this is, deal with the inconsistency, give him another question that's inconsistent, but you've got to show the Court how it's inconsistent.
And the fact that the world is slightly different when you just look at it another way, that's not an argument for putting in the other 40 pages of the deposition.
MR. LO RE: I understand, Your Honor.

THE COURT: Then we're just taking out-of-court statements for the truth.
MR. LO RE: That's fine, Your Honor. And perhaps I can sidestep this by showing Mr. Morgan his testimony. I don't need to publish it. That's fine.
BY MR. LO RE:
Q. Mr. Morgan, could you turn to page 139 of your deposition testimony? And in fact, are you there, sir?
A. I have 139.
Q. And the next page to the right is 140, do you see that?
A. Yes.
Q. And Mr. Shapiro asked you, you read into the record a question that was posed on line 8. Now, I'm on page 140, line 8. "Was that document included in the contract for any purpose other than planning?" Do you see that?
A. Yes.
Q. And you answered, "No." Do you see that?
A. Right.
Q. I just want to go up to the previous question. It's actually two questions above.



It starts on page 39. Do you see that?
A. Yes.
Q. Okay. And I'd like you to read to yourself the question starting with, "Why was the report like that not in the proposed rule?" And if you can read from there on page, it's page 139, line 16, to page 140, line 4, if you could just read that to yourself, please?
A. Yes.
Q. Okay. Now, Mr. Morgan, having read that deposition testimony to yourself, how does that comport with your testimony earlier that the ACR was or was not for planning purposes?
A. At the request, the answer I gave at the request of substantial number of commenters as a new provision. In other words, this was in response to comments we had received.
MR. SHAPIRO: Objection, Your Honor, we're not refreshing properly. The witness is obviously reading –
MR. LO RE: Yeah. No, I think he misunderstood my question. Thank you. I'll withdraw and ask another question.
BY MR. LO RE:
Q. When you were asked about whether the



ACR related to planning, does this question that you just read, does that shed more light on what you meant when you said in your deposition that the ACR related to planning?
A. Yes.
Q. How is that?
A. My response, or my understanding as followed the paragraph after V.A and V.B, is we were making a commitment to acknowledge an acceptance rate in that period of time.
Q. And how would the utilities use that for planning, if at all?
A. They would not have to provide additional storage facilities on-site if they knew what the receipt rates would be.
Q. And when you say they would not need additional storage facilities on-site, how would they determine what they would need?
A. It would be in the annual acceptance rate.
MR. LO RE: Thank you. Just one moment, Your Honor.
THE COURT: Certainly.
MR. LO RE: Nothing further, Your Honor.



THE COURT: Thank you. Any questions on recross?
MR. SHAPIRO: Very briefly, Your Honor.
RECROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Mr. Morgan, I want to turn to one of the topics Mr. Lo Re discussed with you on redirect, where he pointed you to part of the contract, and the version he was using was Plaintiff's Exhibit 54, and that there were the provisions in Article IV, subparagraph IV.A and B.
And he was asking you about how that referred to the scheduling, how that referred to DOE's commitment to the spent fuel from utilities, and then he referred you to the next section dealing with delivery commitment schedules, do you recall that?
A. Yes.
Q. And you thought that somehow, with the delivery commitment schedules with those prior provisions, that's how the process worked?
A. Yes.
Q. But in fact, you have no idea what a

Page 2578

delivery commitment schedule is, isn't that true?
A. You say I have no idea?
Q. Isn't that correct, other than Mr. Lo Re pointing it out to you, you have no idea what a delivery commitment schedule is, correct?
A. No.
Q. Mr. Morgan, let me direct your attention to another time that you were deposed.
A. I have since read the contract and looked at that.
Q. Well, let's –
A. So I have an idea what it is now.
Q. Let's show that portion of your deposition. This is the one dated June 25th, 2002, and this particular deposition was just taken in the Yankee cases. I believe Mr. Stouck, who's sitting over here, took your deposition. And if you could, do you recall that, Mr. Morgan, Mr. Stouck?
A. I recall the deposition, yes.
Q. And you took an oath to tell the truth?

Page 2579

A. Yes.
Q. And you did tell the truth, didn't you?
A. To the best of my knowledge, yes.
Q. If you could turn to page 131, and I'll start on line 1, and weren't you asked the following questions and gave the following answers – do you have that in front of you, sir?
A. Yes.
Q. "QUESTION: Okay. What about the delivery commitment schedule process?
"ANSWER: I have no idea what that means.
"QUESTION: You don't know what that is?
"ANSWER: I have no idea what that means.
"QUESTION: Okay. Do you know what a delivery commitment schedule is?
"ANSWER: I have no idea."
That was your truthful testimony, wasn't it?
A. Yes.
Q. And while you were at the Nuclear

Page 2580

Waste Project Office as director, the Department of Energy never defined how the scheduling process would work, isn't that correct?
A. Yes.
MR. SHAPIRO: I have no further –
THE WITNESS: I would like to say that I – you're trying to say that I now know what it means and I didn't at that point in time. I think the follow-on discussion I had at that point was I was not dealing with that issue yet because that was down the street. I still feel that we made changes to this contract where we would have an acceptance rate that everybody would understand at a later point in time.
THE COURT: Thank you, Mr. Morgan. That is going to conclude your testimony, but before you leave, I want to give you a directive that I'm giving to all witnesses who testify in a case, and the parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony.

Page 2581

And my order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be a witness, please ask counsel.
Thank you very much for your testimony. You are excused as a witness.
THE WITNESS: Thank you very much.
THE COURT: Thank you. You may step down. Does the United States want to switch off material at the witness table and call its next witness?
MR. LO RE: Certainly, Your Honor. Your Honor, at this time, the government calls to the stand Mr. Chris Kouts, Christopher Kouts.
THE COURT: Is he in the courtroom with us, or has someone gone to fetch him?
MR. LO RE: I think someone just ran to get him.
THE COURT: And, Mr. Lo Re, if you could just fetch off that one water glass that I can't quite reach?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------X

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY, | : | |
| Plaintiff, | : | No. 98-484C |
| v. | : | (Senior Judge Wiese) |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

----------------------------------X

Washington, D.C.

Wednesday, November 15, 2006

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, N.W., Washington, D.C. at 3:32 p.m., Wednesday, November 15, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

APPEARANCES:

On behalf of the Plaintiff:
ALEX D. TOMASZCZUK, ESQ.
JAY E. SILBERG, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
1300 N Street, N.W.
Washington, DC 20037
Phone: 202-663-8000

KERRY C. KOEP, ESQ.
Xcel Energy
414 Nicollet Mall
Minneapolis, MN 55401
Phone: 612-215-4583



APPEARANCES: (CONT.)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Phone: 202-307-6288



CONTENTS


| WITNESS | PAGE |
|---|---|
| ROBERT L. MORGAN | |
| EXAMINATION BY COUNSEL FOR PLAINTIFF | 6 |


EXHIBITS


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 1 | Excerpt from proceedings, December of 1983, Program Overview Question Marked | 16 |
| Morgan 2 | Document dated March 3, 1983, from Northern States Power Company to Mr. Robert Morgan | 64 |
| Morgan 3 | Federal Register notice dated Monday, April 18, 1983 | 79 |
| Morgan 4 | Comments on contract for disposal of spent nuclear fuel and/or high level waste | 99 |
| Morgan 5 | "Comments" cover letter from Mississippi Power and Light Company to Mr. Robert | 101 |




EXHIBITS (CONT.)


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 6 | Document dated March 7, 1983 from Edison Electric Institute to Mr. Robert Morgan, from John Kearney, senior vice president Morgan dated March 4, 1983 | 102 |
| Morgan 7 | Excerpt of a document dated December 20, 1983, draft of the Civilian Radioactive Waste Management program mission plan | 110 |


** Exhibits retained by counsel

Page 10

preparation time?
A. $125 an hour.
Q. And are you being paid at that same rate for your time to travel here as well?
A. No.
Q. Are you being paid at the 125 dollar per hour rate for the time you actually spend testifying?
A. No.
Q. When you say preparation time, what do you mean?
A. Reviewing my previous testimony.
Q. How did you go about doing that?
A. I received copies of my testimony and reviewed it.
Q. Okay. You received copies of your previous testimony from Ms. Sullivan?
A. Yes.
MS. SULLIVAN: I caution the witness not to discuss the substance of any conversations that w had --
THE WITNESS: I beg your pardon.
MS. SULLIVAN: -- not to discuss the

Page 11

substance of any conversations that we have had. Those are privileged.
BY MR. TOMAZCZUK:
Q. What testimony have you reviewed? What previous testimony have you reviewed?
MS. SULLIVAN: Let me ask a clarifying question. Are you asking for -- in preparation for his deposition today?
BY MR. TOMAZCZUK:
Q. I was asking more broadly than that. We can start in connection with your deposition here today.
A. I received copies of testimony from two previous cases, and I also reviewed copies of my deposition in 2002 that I had kept from that deposition.
Q. And the testimony in the two previous cases, do you recall which cases --
A. No, I don't.
Q. Would one be the Yankee case?
MS. SULLIVAN: Answer to the best of your knowledge. I'm not testifying here.

Page 12

THE WITNESS: I believe so. I believe the other was TVA.
BY MR. TOMAZCZUK:
Q. All right. Mr. Morgan, if I understand the facts correctly, and I may not have them perfectly correct, you also testified in the Pacific Gas & Electric case; is that correct?
A. Correct.
Q. Have you had occasion to review your testimony in that case?
A. I don't recall.
Q. That testimony was summer of 2006?
A. I think -- I don't recall.
Q. You may have reviewed it, but you're not sure.
A. That's correct.
Q. Let me ask you, Mr. Morgan. What did you do to prepare for your deposition here today?
A. Nothing.
Q. When did you last have occasion to review your previous testimony, either deposition or trial testimony?

Page 13

A. Would you repeat the question, please?
Q. Absolutely. I was trying to find out when you last had occasion to review any of your previous testimony, be it in trial or at deposition?
A. This last week.
Q. While you were traveling, as I understand it?
A. I received it before I traveled to Europe, and I reviewed it since I came back.
Q. When you say you reviewed "it" --
A. The previous testimony.
Q. So you reviewed it before you left the country and then you just reviewed it recently?
A. That's correct.
Q.. Upon your return?
A. Yes.
Q. Why did you do that?
A. In preparation for testimony tomorrow.
Q. Okay. So you didn't read it in connection with your deposition here today, but you read it in preparation for testimony tomorrow?
A. That's correct.

Page 18

Q. Do you have an understanding why you were selected to leave your position at Savannah River and to take the acting director position of OCRWM?
A. You'll have to ask him.
Q. You have no knowledge about that?
A. No. I believe that I made an offhand comment in a deposition -- which may or may not be correct --
Q. Well, I'm not sure -- I have re-read that deposition. I'm not sure I read the particulars of that comment.
A. You said because I was a good guy, making a smart-aleck comment.
Q. Did you have any questions for Secretary Hodel at the time he detailed you to the acting director position?
A. I was notified I think on a Thursday that the Secretary wanted to name me as director, acting director. And I responded to, I believe it was Earl Gelde, the special assistant, I'd like time to think about it. And he said that the Secretary intended to announce it on Monday morning at the staff meeting.

Page 19

So I suggested to Earl that if there be several conditions imposed, that I would accept.
Q. What were the conditions?
A. Separate office. That I would not report to Assistant Secretary for Nuclear Energy. That I could name the people who would be on my staff from that office. Also office space. And secretarial services.
Q. Why was it -- I'm sorry. Did you finish your answer?
A. I think that's about what I can recall at the moment.
Q. Why did you request that you not report to the Office of the Assistant Secretary?
A. Because the Act said it would be an independent office, and I wanted to make sure that that was the case.
Q. When you say "the Act," you are referring to the Nuclear Waste Policy Act?
A. Yes.
Q. Had you had occasion prior to being tapped by Secretary Hodel to read the Act?

Page 20

A. No.
Q. After you got the phone call on the Thursday --
A. I was in Washington, D.C. at the time. It was not a phone call.
Q. I see. Okay.
Did you then have occasion to read the Act?
A. Yes, of course.
Q. You were in Washington at the time on other official business?
A. Yes. I was on travel at the time.
Q. All right. At the time you were also living in Savannah River, would I understand that correctly?
A. That's correct. I was living in Aiken, South Carolina.
Q. So you had to go back to Aiken and move yourself up here to take the position?
A. I was on temporary duty, and I kept my home in South Carolina and traveled to accommodate this requirement.

Page 21

Q. Okay. What did you do first when you took the position of acting director of OCRWM?
A. I read the Nuclear Waste Policy Act.
Q. A good first step.
After reading it, what was step number two?
A. I reviewed the staff requirements and selected people that I wanted on my staff. And rejected some people who were currently on that staff.
Q. All right.
A. Then I met with the congressional staff members.
Q. You met with congressional staff members?
A. Yes, sir.
Q. And why did you do that, sir?
A. To try to understand what was behind the Act, because there was no conference report relative to this Act that resolved the differences between the Senate and the House.
Q. And were you able to resolve those differences in the course of your communications with

Page 22

staff members on the Hill?
A. No.
Q. And what was your reaction to that circumstance?
MS. SULLIVAN: Objection. Vague. You can answer. I made an objection. Now you can answer the question. If you understand it.
THE WITNESS: Repeat the question, please.
BY MR. TOMAZCZUK:
Q. Sure.
After not being able to resolve these apparent conflicts between the Senate and the House side, what did you go about -- or what was your reaction to that?
A. My reaction was --
MS. SULLIVAN: Objection. Vague. Objection to the extent it mischaracterizes the witness's prior testimony. You can answer.
THE WITNESS: My reaction was to read the Nuclear Waste Policy Act and to best determine how to proceed based on that understanding.
BY MR. TOMAZCZUK:

Page 23

Q. Did you essentially conclude you had to come up with your own interpretation of the Act, not being able to get it from a conference report or other congressional source?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Go back and ask the question again. I'm sorry.
BY MR. TOMAZCZUK:
Q. Sure. Did you basically conclude that you had to come up with your own interpretation of the Act, having no conference report and having not been able to get guidance from meetings with the Hill?
A. Yes.
Q. All right. What did you conclude, Mr. Morgan, was the purpose of the Act?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: The purpose of the Act was to accept spent nuclear fuel in January 1998 from the utilities.
BY MR. TOMAZCZUK:
Q. Were there any other purposes that you

Page 24

derived?
MS. SULLIVAN: Objection, to the extent it calls for a legal conclusion. Vague.
THE WITNESS: The Nuclear Waste Policy Act had several activities that needed to be done, and acceptance of fuel in 1998 was the end product, but there were several intermediate requirements that were required.
BY MR. TOMAZCZUK:
Q. Was one of the purposes of the Act, in your view, the need to avoid utilities having to construct additional at-reactor storage after 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
BY MR. TOMAZCZUK:
Q. You can go ahead unless she instructs you not to answer.
A. Okay. Question again?
Q. Could you read that back?
THE REPORTER: "Question: Was one of the purposes of the Act, in your view, the need to avoid utilities having to construct additional at-reactor

Page 25

storage after 1998?"
THE WITNESS: No.
MS. SULLIVAN: Same objection.
BY MR. TOMAZCZUK:
Q. That was not one of the purposes of the Act, in your view?
MS. SULLIVAN: Same objections.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. Let's look at what's been marked as Morgan Deposition Exhibit No. 1.
You are familiar with this document, correct?
A. Yes.
Q. This is a document that you actually prepared; is that right?
A. Yes.
Q. And if I understand your prior testimony, Mr. Morgan, you prepared this in writing and then actually spoke about this document at the conference which was held in or about December of 1983?
A. That's correct.

Page 26

MS. SULLIVAN: Objection. Compound.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. And I am going to direct your attention -- take a minute and read it if you'd like.
A. No. I don't need to.
Q. Okay. All right.
I was going to direct your attention to the first page, right-hand column, and the second to the last paragraph, starting with "I would like..."
A. Yes.
Q. All right. In the third sentence of that paragraph, you state, "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time."
A. That's correct.
Q. All right. And "at that time" meaning January 1, 1998, correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: Repeat the question.
BY MR. TOMAZCZUK:

Page 27

Q. "At that time" refers to January 1, 1998? The phrase at the very end of the sentence I just read, "at that time," does that refer to the date in the previous sentence, January 1, 1998?
A. Yes.
Q. Thank you. You go on to state, in fact, if we accepted one spent fuel in 1998, we would technically be in accordance with the Act?
A. Yes.
Q. Do you believe that to be true?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
MR. TOMASZCZUK: Let me say for the record, I'm not asking you for legal conclusions. You're not an attorney. I'm asking for your understanding of this language that you wrote in or about 1983.
THE WITNESS: That was a bounding requirement. In other words, you would accept fuel, one element being at one end. And at the other end of that spectrum would be to the following statement, which was to accept it at the rate of discharge.

Page 28

Those were bounding conditions that we were looking at at that point in time.
BY MR. TOMAZCZUK:
Q. What do you mean by bounding conditions?
A. Well, one, what was written in the Act is accept fuel in 1998. So I could accept one or I could accept at the limit of discharge from the utilities. That was the spectrum that we were dealing with.
Q. Okay. And what was your view as to the intent of the Congress in enacting the statute with respect to those boundaries?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And I have to say, notwithstanding Mr. Tomaszczuk's understanding that he's not asking you to make legal conclusions, you're not a lawyer, I do need to put the objections on the record. I'm making the objections. Then you can answer the question. Thank you.
You can ask the question be read back.
THE WITNESS: For me to say what the intent of Congress is would be inappropriate, because

Page 29

the various views that I was hearing from Congress, some were talking about solely using an MRS for storage of fuel. Others were talking about a repository.
It would be inappropriate for me to try to describe the intent of Congress.
BY MR. TOMAZCZUK:
Q. And you had no understanding about the intent of the Congress in enacting the statute?
MS. SULLIVAN: Objection. To the extent -- withdraw that.
THE WITNESS: I would say that that would be a difficult thing for me to determine. The intent of Congress as a whole, because I was hearing different views from various sides of the House and Senate.
BY MR. TOMAZCZUK:
Q. That's fair. And I'm just trying to understand what you're understanding of the intent was. Are you saying that you could not discern the intent because you were getting conflicting signals?
A. That's correct. I was getting conflicting

Page 30

signals.
Q. All right.
MS. SULLIVAN: Can we go off the record
MR. TOMASZCZUK: Sure.
MS. SULLIVAN: Just two minutes. I'm sorry.
(Discussion off the record.)
BY MR. TOMAZCZUK:
Q. You were talking about these two boundaries or bounds, one being one spent fuel rod and the other being what I understood to be the discharge rate?
A. Yes.
Q. All right. Did you ever look at taking a rate or accepting fuel at a rate greater than the discharge rate while you were the acting director?
A. Yes.
Q. Okay.
A. That was in the mission plan which you have a copy of.
Q. Okay. Why did you do that, if you had these two bounds?

Page 31

A. To work off the backlog.
MS. SULLIVAN: Mr. Morgan, I would ask, so the court reporter can take the questions, let Mr. Tomaszczuk ask the question, let me -- let me have a chance to object. Then you can provide the answer. I understand you'd like to get this over with. It makes the job easier for the court reporter. Thank you.
BY MR. TOMAZCZUK:
Q. Did you understand at the time that the Department of Energy had an obligation under the Nuclear Waste Policy Act to take all of the utilities' spent nuclear fuel over some period of time?
A. Yes.
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
MS. SULLIVAN: Thank you.
BY MR. TOMAZCZUK:
Q. Going back to Morgan Deposition Exhibit No. 1, continuing on in the paragraph on the

Page 32

right-hand column, just to go back where I was, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
And why did you believe that accepting one spent fuel element would not meet the intent of the Act?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: It said we have to accept fuel January 1998. To meet that requirement would be to accept one fuel element. Common sense says that that is not the intent of Congress.
The utilities wanted an acceptance rate equal to the discharge rate. And going back, that was the bounding conditions that we were looking at.
We were trying to put together a strategy, a plan that would take care of the discharge rate that we could see.
BY MR. TOMAZCZUK:
Q. And why were you attempting to do that?

Page 33

MS. SULLIVAN: Objection. Vague.
THE WITNESS: That was what the interpretation -- our interpretation of the maximum program that we could comply with.
BY MR. TOMAZCZUK:
Q. Reading on in the same paragraph of the same document, Morgan Deposition Exhibit No. 1, the text continues, "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."
A. Okay.
Q. And --
MS. SULLIVAN: Let him ask the question.
BY MR. TOMAZCZUK:
Q. You wrote that sentence, correct?
A. Yes.
Q. You were the acting director at the time?
A. That's correct.
Q. This reflects your view at the time; is that fair?
A. That reflects what we were trying to

Page 34

accomplish in the mission plan.
Q. Does it also reflect what you were trying to accomplish as the director of the program?
A. Yes.
Q. And is it your view that that strategy comported with the intent of Congress in enacting the statute?
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: That was basically what the utilities wanted us to achieve. That was, again, the bounding condition, from one to the acceptance rate which would be at the discharge rate.
BY MR. TOMAZCZUK:
Q. I appreciate that. But my question was, this strategy which you've articulated, namely that beginning in 1998, utilities will not have to provide any additional storage facilities on site, does that strategy comport with your understanding of the intent of Congress in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection. Legal

Page 35

conclusion. Asked and answered.
THE WITNESS: I do not know the intent of Congress. I think I've discussed that earlier. It was impossible for me to determine what the intent of Congress was.
BY MR. TOMAZCZUK:
Q. Do you think the strategy that I've just read that you adopted was inconsistent in any way --
A. No.
Q. -- with Congress' --
MS. SULLIVAN: Mr. Morgan, let Mr. Tomaszczuk finish.
THE WITNESS: Excuse me.
BY MR. TOMAZCZUK:
Q. Was inconsistent in any way with Congress' intent in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Legal conclusion.
THE WITNESS: No.
BY MR. TOMAZCZUK:
Q. And in the last sentence of this section of the program overview that you authored, it stated, "During the first year of operation of the

Page 36

repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."
A. That's not entirely correct. If you look at the program plan, the mission plan, you will see that there was an increase of the backlog for the first three or four years. The intent was that they would not have to make further commitments for on site storage in 1998, but they would have already provided contracts for those that they would not have to make any additional long-term commitments in 1998. There is a difference.
Q. So this last sentence that I read from the program overview that you drafted is not quite correct?
A. That's correct. And that's in the mission plan that came out subsequent to this meeting.
Q. Earlier in your testimony, Mr. Morgan, I think you used the term or words to the effect that the maximum program that DOE could comply with, or words to that effect. I understood you to be using

Page 37

that term to describe the upper bounding case?
A. Yes.
Q. Do you mean that from a technical standpoint, that there was a technical limitation as to how much spent fuel DOE could accept?
A. There were many, many uncertainties relative to the accomplishment of this program. It's a new technology. It required NRC licensing of the facility. We did not know the licensing requirements. There were political issues.
There were the consultation issues. There was congressional intervention problems, changing the Nuclear Waste Policy Act.
So that the uncertainties in the program led me to the bottom line that says I cannot make a commitment to the utilities to accept X number of fuel elements at any given point in time. It would be unconscionable for me to do that as a public servant.
Q. What were the consultation issues that you just referred to?
A. Consultation required consultation with

Page 38

the states, Indian tribes, local authorities, states for transportation requirements, NIMBY, not in my backyard, which by the way have proven to be the fact relative to a monitored retrievable storage at Clinch River, where I believe it was the Vice President that vetoed or said that there will not be an MRS in Tennessee.

These are political issues that we were having to deal with. These were uncertainties.

Q. In view of those uncertainties, how were you able to commit to commencing performance in 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: We put together a program that had no interventions, no change of law, no litigation. It was a best-efforts, assuming everything would go right. That's what we were trying to accomplish.

The requirements that were stated in the Nuclear Waste Policy Act to accept fuel in 1998. That's what we were after.

BY MR. TOMAZCZUK:

Page 39

Q. And did you succeed?

A. Beg your pardon?

Q. Did you succeed?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I was not in charge of this in 1998.

BY MR. TOMAZCZUK:

Q. Okay. So are you able to answer my question? Are you saying -- I'm not sure I understand your response, sir.

A. Was I able to succeed? The requirement is to accept fuel in 1998. The program did not accept fuel in 1998. Did I succeed? I believe we met the near-term requirements required by the Act.

Q. And what were those requirements?

MS. SULLIVAN: Objection. Calls for legal conclusions.

THE WITNESS: Notification of the states affected, getting the Federal Register notice out for the contract, putting together a program that would show that we would meet the requirements in 1998. Getting a draft mission plan out. Those were things

Page 40

that we accomplished.

BY MR. TOMAZCZUK:

Q. And, Mr. Morgan, you stayed in the position of acting director for one year?

A. Approximately.

Q. And so in or about January of 1984, you left and went back to Savannah River?

A. No.

Q. Okay. In or about January of 1984, you left and did something else?

A. That's correct.

Q. All right. That's when you were tasked to take responsibility for some DOE munitions program, as I understood your prior testimony?

A. I was, again, named by Secretary Hodel to take the job as Assistant Secretary for Defense Programs, which ran the nuclear weapons laboratories and the weapons manufacturing programs. About a $5 billion job.

Q. And were you in Washington when you were performing that job?

A. Yes.

Page 41

Q. And how long did you stay in it?

A. I think it was about six months until they named a permanent person for that activity.

Q. All right. So sometime in the summer of 1984, you left that position?

A. That's correct.

Q. And do I understand that you then returned to Savannah River?

A. That's correct.

Q. I knew you went back there at some point.

A. Yes.

Q. Prior to accepting the position of acting director of what I'll refer to as OCRWM -- when I refer to that, you know what I mean?

A. Yes.

Q. Had you had any involvement in spent nuclear fuel activities?

A. As manager of the Savannah River operations office, we looked at temporary storage at government facilities such as Barnwell, Morris, and other locations in support of requests from the Assistant Secretary for Nuclear Energy.

Page 42

Q. And was that activity -- did that activity involve the storage or disposal of commercial spent nuclear fuel?
A. Yes. Storage.
Q. Storage only?
A. Yes.
Q. Interim or temporary storage?
A. Yes.
Q. Other than that activity, prior to becoming the acting director of OCRWM, did you have any involvement in spent nuclear fuel activities?
A. No.
Q. And how about after you left OCRWM, in or -- as acting director in or about January of 1984, did you have any involvement in spent nuclear fuel activities?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: No.
BY MR. TOMAZCZUK:
Q. Going back to some of the previous testimony, Mr. Morgan, you talked about consultation issues and the need to -- as I understand your

Page 43

testimony -- to consult with states, Indian tribes, local authorities. You mentioned NIMBY in that context.
Why were you consulting with states, Indian tribes, and local authorities?
A. Because it was required by the Act.
Q. What was the nature of those consultations?
A. That's a --
Q. What were you talking with them about?
A. About the potential storage or repositories, as an example, at Hanford. There were Indian tribes involved with that. There were states involved with that. We were also looking at Nevada, and a salt repository in Texas; Louisiana; and I believe two other locations. And we had discussions with the people in trying to draw out their concerns and what their concerns were relative to these activities. That's what consultation is all about.
Q. Were officials in these various locations at Hanford, in Washington, Nevada, Texas, Louisiana were they expressing concern to you about possibly

Page 44

storing or disposing spent nuclear fuel in those locations?
A. Yes.
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Yes.
MS. SULLIVAN: Just give me a chance to interpose an objection, please.
Thank you.
BY MR. TOMAZCZUK:
Q. Do you recall anything about the concerns that those individuals expressed to you?
MS. SULLIVAN: Objection to the extent it is hearsay.
THE WITNESS: Not specifically.
BY MR. TOMAZCZUK:
Q. Would it be fair to say that officials in those locations were interested in having you not site any facilities in their states?
A. Yes.
Q. Did you understand as acting director of OCRWM that there was opposition in local communities to the storage of any spent nuclear fuel in such

Page 45

communities?
A. Yes.
Q. Were you concerned about individual states enacting legislation that would make more difficult your efforts on -- as the head of OCRWM to site facilities in individual states?
MS. SULLIVAN: Objection. Vague. Objection to the extent it calls for a legal conclusion.
THE WITNESS: There was a process outlined in the Nuclear Waste Policy Act that if a specific area was selected, that there was a process that the states could go through in an objection to that.
And yes, I anticipated objections.
BY MR. TOMAZCZUK:
Q. And my particular question was whether you anticipated that a state might actually enact legislation in that state that would make it more difficult for you to select that state or location as a state for a -- a disposal facility?
A. That was --
MS. SULLIVAN: Are you finished?

Page 46

MR. TOMASZCZUK: I was through. Thank you, Ms. Sullivan.
MS. SULLIVAN: Same objections.
THE WITNESS: That was certainly a condition.
BY MR. TOMAZCZUK:
Q. I'm sorry?
A. That was certainly a condition.
Q. When you say it was certainly a condition, you mean it was certainly a concern of yours?
A. Yes.
Q. And turning to the next page of what's been marked as Morgan Deposition Exhibit No. 1, if I could direct your attention, Mr. Morgan, to what is the third full paragraph, it starts -- you can read the whole second page if you like. I was going to ask you about the sentence that starts, "We have learned a lot in the consultation process..."
Do you see that?
A. Yes.
Q. You go on to state in the program overview, "There are some very difficult issues that

Page 47

have been identified and we are attempting to work with the states in the resolution of those issues."
A. Yes.
Q. Does that describe the consultation process that you were engaged in and the concerns that states were expressing about siting a facility in their states?
MS. SULLIVAN: Objection. Vague. Objection. Compound.
THE WITNESS: Yes.
BY MR. TOMAZCZUK:
Q. Then, Mr. Morgan, just the last paragraph of this document. You state, "To summarize, the basic strategy is to have a repository in operation in 1998." You go on to state, "We will, however, keep a parallel program going on an MRS, so that if a repository is not available by 1998 or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law to begin accepting waste in 1998."
And just for the record, what is an MRS?
A. Monitored retrievable storage.

Page 48

Q. And is it fair to say that this program overview reflects that you were thinking about an MRS at or about the time you delivered this paper and talk?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: The answer is yes. That was required by the Nuclear Waste Policy Act, that we would have the alternative program of an MRS.
BY MR. TOMAZCZUK:
Q. Can I ask you, Mr. Morgan, during the year that you were serving as acting director, how much time did you spend on the permanent repository versus the MRS? Do you have some sense about that?
A. 90 percent of it was on the repository. We were trying to accommodate the requirement of 1998 for a repository. An MRS would kick in if we ran into problems. I believed that during the time I was there, there was adequate time to get to an MRS at a later point in time. So the majority of my effort was on a repository.
Q. Did you feel that that was a doable task?
MS. SULLIVAN: Objection. Vague.

Page 49

THE WITNESS: It was --
BY MR. TOMAZCZUK:
Q. Do you understand my question?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe that it was a very optimistic situation, and that because of the uncertainties that I've discussed with you earlier, NRC licensing, intervention, change of law, Congress state intervention, and litigation from -- I think we had three lawsuits during the period of time that I was acting director -- as an indication of problems that we would have.
BY MR. TOMAZCZUK:
Q. All right. So you viewed the 1998 date as optimistic?
A. That's correct. That's clearly stated, I believe, in this document.
Q. Did you feel that it was capable of -- that you were capable and that your organization was capable of meeting it?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: If all went well, yes. But

Q. Have you had occasion to review the particular comments provided by Northern States Power Company in response to the draft contract and its publication in the Federal Register?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Have I had --
BY MR. TOMAZCZUK:
Q. Have you looked at the comments that Northern States Power Company submitted in response to the Federal Register notice?
A. Yes, I did.
Q. When did you do that?
MS. SULLIVAN: I'm going to direct the witness not to answer that question.
MR. TOMASZCZUK: As to when he looked at a document?
MS. SULLIVAN: Uh-huh. It was in preparation for trial testimony.
MR. TOMASZCZUK: All right. We'll mark that question.
MS. SULLIVAN: I believe in Mr. Morgan's previous deposition, you asked him if he had looked



at the comments submitted by NSP. You are already treading on ground you already examined Mr. Morgan about.
MR. TOMASZCZUK: That may be so. But I think Judge Wiese in particular has recognized that I haven't seen Mr. Morgan in four years. Since he's testifying tomorrow, I have the right to update my knowledge base and information.
So you're going to direct him not to answer when he's looked at a document?
MS. SULLIVAN: Uh-huh. It is attorney work product.
BY MR. TOMAZCZUK:
Q. Are you -- do you have a contract with the Department of Justice?
A. No.
Q. The terms of your agreement to be paid $125 an hour for review time, is that in writing?
A. No.
Q. That's a verbal agreement?
A. Yes.
Q. With whom?



A. That was initiated two or three hearings ago, and I can't recall the person's name at this point in time.
Q. How much have you received in payment for your -- for your preparation work, to date?
A. I have no idea.
Q. $5,000?
A. I don't believe so.
Q. Less than 5?
A. Yes.
Q. More than 1, more than $1,000?
A. Yes.
Q. When did you receive your last payment?
A. After the last hearing.
Q. Do you provide an invoice?
A. Yes.
Q. To whom is the invoice sent?
A. In the last case, it was sent to Marian Sullivan.
Q. What was the amount of the invoice?
A. I specifically don't recall. It was less than 2,500.



Q. Does the invoice break out your time?
A. I believe it did.
Q. It identifies the number of hours you've spent in preparation?
A. Yes. Yes.
Q. And does it add to it travel expenses?
A. Travel expenses are paid by the Department of Justice.
Q. Separately?
A. Separately.
Q. Are you a -- do you consider yourself a consultant to the Department of Justice in connection with the spent nuclear fuel cases?
A. No.
Q. How do you find -- how do you define the term consultant?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: Being compensated for time spent.
BY MR. TOMAZCZUK:
Q. And you are being compensated for time spent --

Page 58

A. Yes.
Q. Correct --
MS. SULLIVAN: Objection. Mischaracterizes the witness's previous testimony. Vague.
BY MR. TOMAZCZUK:
Q. Are you being paid for your time that you spend in preparation for either trial or deposition testimony?
A. For trial, yes.
Q. For trial, yes. Deposition, no?
A. That's correct.
Q. So why do you not consider yourself a consultant to the Department of Justice in connection with these trials?
MS. SULLIVAN: Objection. Asked and answered. Argumentative.
THE WITNESS: I have -- you know, I don't know what you're driving at or what you're trying to prove or whatever, but I was being compensated for time being spent on this that arose from initial consideration while I was being -- or while I was a

Page 59

consultant at Los Alamos. And they took time from my consultant activities at Los Alamos for preparation and testimony over a video conference with the court.
And that's how that came to pass. Call it as you may.
BY MR. TOMAZCZUK:
Q. And my question to you, Mr. Morgan, was not to argue with you about the fact you're being paid, but to understand why you do not consider yourself a consultant on these cases?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: I have no idea how to answer that question.
BY MR. TOMAZCZUK:
Q. Okay. Are you working at the direction of counsel for the Department of Justice?
A. No.
Q. Okay. Well, then I would submit there would be no basis for directing the witness not to answer a question on the grounds of it is attorney work product if he's not working at the Department of

Page 60

Justice's direction.
MS. SULLIVAN: Let's go off the record.
MR. TOMASZCZUK: No. I want it on the record.
MS. SULLIVAN: My concern is you're entitled to know what he reviewed for his deposition. You're entitled to take his deposition. Why are you entitled to know what he may have prepared in preparation for his testimony tomorrow? That's my work product.
MR. TOMASZCZUK: I didn't ask that question. I asked him when he reviewed the Northern States --
MS. SULLIVAN: The answer to that question divulges work product. I'm directing him not to answer. That's my problem. You have asked him about the NSP comments in his previous deposition.
MR. TOMASZCZUK: Well, that's a different issue. You're not directing him not to answer because I've asked him about it before, are you?
MS. SULLIVAN: No. I wish I could.
BY MR. TOMAZCZUK:

Page 61

Q. How many sets of NSP comments have you reviewed?
A. How many what?
Q. Sets of comments of -- provided by Northern States Power Company have you reviewed?
MS. SULLIVAN: Objection. Vague. Assumes facts not in evidence.
BY MR. TOMAZCZUK:
Q. Do you understand my question?
A. No.
Q. You said you reviewed comments provided by Northern States Power Company in response to the Federal Register notice?
A. Yes.
Q. Was that one set of comments? Or more than that?
A. I don't recall.
Q. Okay. Did you review any comments provided by Mississippi Power & Light Company in response to the Federal Register notice issued in or about February of 1983?
MS. SULLIVAN: Are you asking him in

Q. Mr. Morgan, it may help a little bit, it is in the middle column there, I believe?
A. And that's --
MS. SULLIVAN: I'm sorry.
THE WITNESS: Beginning in April 1, 1991, DOE shall issue an annual acceptance priority ranking for fuel. That's different from the '87 requirement.
BY MR. TOMAZCZUK:
Q. Right. If you go down one more paragraph, sir?
A. All right. Annual capacity report. Right.
Q. Right. First of all, my question is this reference in Exhibit 2 to annual acceptance allocation reports, as it was adopted in the Federal Register draft contract, wound up being called annual capacity reports?
A. Yes.
Q. Okay. And these reports were for no other purpose than planning purposes, correct?
A. That's my understanding.
Q. And, Mr. Morgan, you weren't actually



involved in the preparation of any annual capacity reports, were you?
A. No.
Q. And you weren't involved in the preparation of any of the annual acceptance priority rankings which are referred to --
A. That's correct, I was not involved in that.
Q. Which were referred to in the immediately preceding paragraph? You were not involved in the preparation of those?
A. Correct.
Q. This standard contract embodied in the Federal Register notice that I've handed you, Exhibit 3, the utilities had to sign that contract to continue operating; isn't that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: That's my understanding.
BY MR. TOMAZCZUK:
Q. What is your understanding of the consequences to a nuclear utility that did not sign



it?
MS. SULLIVAN: Same objection.
THE WITNESS: They operate under NRC regulations, and it would be an NRC determination whether they continued operation or not. It was not a DOE decision.
BY MR. TOMAZCZUK:
Q. Is it your understanding if a utility failed to sign, there might be adverse consequences flowing from the NRC, not from DOE; is that fair?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: That's my understanding.
MR. TOMASZCZUK: Are you okay? Do you want coffee or water?
THE WITNESS: No, I'm fine.
BY MR. TOMAZCZUK:
Q. Mr. Morgan, did you understand that the annual acceptance priority ranking, which has the 1991 date attached to it that we just looked at, does that also relate in some way to the acceptance rate, do you know?



MS. SULLIVAN: Objection. Vague.
THE WITNESS: I believe that it would be.
BY MR. TOMAZCZUK:
Q. Okay. And can you explain for me your belief in that regard?
A. I believe that it would relate to acceptance rate.
Q. And how?
A. I did not participate in the preparation of any documents in '87 or '91, so I don't know what form that that document would take, other than the commitment that's made in the Federal Register to do that document.
Q. Okay. That's fair. But you've also indicated a belief that the acceptance priority ranking which I'll refer to as a APR also had some relationship to the acceptance rate?
A. That would be my understanding.
Q. I'm trying to find out the basis for that understanding. Can you explain that to me, please?
A. Again, we're talking about commitments by the Department of Energy to accept fuel. In 1983,

Page 94

because of the uncertainties of the program, I was not about to commit to an acceptance rate that was requested by the utilities.
My belief is in the Register when we dealt with the '91 and '87 dates, that would be the time where the uncertainties would be resolved and there would be an acceptance rate stated by DOE to the utilities. That's my understanding.
Q. Okay. Why did you believe that by 1987, the uncertainties would be resolved such that you could issue an acceptance rate?
A. By then we would know the NRC requirements for licensing of a repository. We would have the presidential designation of a repository.
We would have gotten through the consultation process with the states and other interested parties, and some of the uncertainties would be resolved.
Also, politically. Those were the uncertainties that we were dealing with and that, as time progressed, you would think the progress of the program would reduce those uncertainties.

Page 95

Q. Did those uncertainties impact or affect the acceptance rate?
A. Of course. Excuse me. Of course.
Q. And why is that?
A. If you can't -- if you can't get a repository going, and/or if you can't get an MRS going, you can't have an acceptance rate. You have to have performed something in order to say that I'm going to accept something.
Q. Earlier in your testimony this afternoon, Mr. Morgan, you referred to comments submitted by Edison Electric Institute or EEI?
A. Yes.
Q. Did you pay particular attention to those comments for some reason?
A. I paid attention to all of the comments that we received.
Q. Did you have occasion while you were serving as acting director during this -- February, March, April of your tenure, did you have occasion to discuss any of the comments with any of the entities that provided them?

Page 96

MS. SULLIVAN: Objection. Vague.
THE WITNESS: I believe so.
BY MR. TOMAZCZUK:
Q. All right. And recognizing the fact that it's been a few years, do you recall --
A. I recall discussions with GE.
Q. Okay. Thank you.
A. I recall discussions with Westinghouse. I recall discussions with EEI.
Q. Do you recall any discussion with Northern States Power Company?
A. They may have been a participant in a meeting that I attended at EEI where there were several utilities present, and I don't know if Northern States Power was present or not. I can't recall.
Q. Do you know who the Northern States Power representative was to EEI at that time?
A. I cannot recall.
Q. That's fair. But I'm just asking what do you recall about your discussions with EEI?
A. They were hell-bent to have an acceptance

Page 97

rate in the contract. And I was hell-bent to not have one.
Q. Okay. I can imagine that was an interesting conversation.
A. Yes.
Q. Why do you say they were hell-bent to have an acceptance rate?
A. Because they kept at it. Even after the final rulemaking. There's a letter in the records that they were still bemoaning the fact.
Q. When you say "they"?
A. EEI.
Q. And was that -- was EEI represented by an individual or individuals?
A. EEI, there's a letter, and I don't know who signed it. I can't recall who signed it.
Q. Are you referring to the letter that was submitted after the -- after the notice --
A. Yes.
Q. -- that is Exhibit 3?
A. Yes.
Q. Did you have -- do you know Mr. Loring

# Robert Rosselli

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs.

UNITED STATES,

DEFENDANT.

Case Nos. 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

NAEGELI REPORTING CORPORATION

Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Seattle, WA (206) 622-3376

National: (800) 528-3335
www.naegelireporting.com
Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

Page 1

APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM

Page 2

BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

Page 3

Also Present:
Peter J. Skalaban

Page 4

folks from within the department where we needed help. And we started interacting with utility representatives.
Q. Did the three of you work on the entire contract, or did you divide up the contract and each focus on a different portion or issue?
A. To the best of my recollection, we worked on the total -- totality of the contract. Although, saying that, clearly, Jay Cavanaugh had a focus on the terms and conditions of government contract and sales instruments, because that's where his expertise was.
Elliott Winneck had, you know, the broad band, you know, the legal aspects and how consistent were we with the legislative history and the statute.
And my focus was more, sort of, the bringing in the technical aspects and the programmatic aspects.
Q. You mentioned that you got input from various people within the department as part of this effort. Do you recall who?
A. No, I don't.
Q. If we go back to Exhibit 1, we could look at the chart showing the office of



management. Do you recall getting input from Mr. Yanoksi, or Mr. Head, or Mr. Brandt?
A. To the degree that I can recall, we certainly had interactions with Mr. Head and got input from his particular group.
Q. If we could turn back to the first page showing the organization of the office. Did you receive input from Mr. Bennett?
A. I don't recall specifically whether we got input from Mr. Bennett.
Q. Do you recall specifically whether you received any input from Mr. Bauer?
A. I don't recall specifically that either.
Q. Do you recall whether you received input from Mr. McElvey?
A. I do not recall that either.
Q. Mr. Lawrence?
A. You know, Mr. Morgan and Mr. Lawrence were my supervisors, you know. So certainly, it was probably discussions with them about the form and substance of the contract. Specifically, things we talked about, I could not recall.
Q. But you would have discussed the contract with them?
A. Yes. That would be fair to assume



that, yes.
Q. On numerous occasions? Would that be fair?
A. I cannot recall that.
Q. Sitting here today, can you recall anyone else within the department who was part of this process?
A. No, I can't.
Q. Now, you testified earlier that you recall beginning work on the contract after the act passed. And I'll represent to you that that occurred on January 7th, 1983. I'll also represent to you that the proposed contract was published for public comment in the federal register on February 4th of 1983.
Would that indicate to you that your group spent something less than a month in developing the initial draft of the contract that was published for public comment?
A. I don't recall.
Q. Sitting here today, do you recall spending more than a month on the initial draft?
A. I think it is fair to say that we spent more than a month in developing the standardized contract draft.



Q. The initial draft that was published?
A. Yes.
Q. Do you recall how much time was spent on that?
A. No, I don't.
Q. Can you describe the contract development process for me? How did you go about developing the first draft of the contract?
A. What I remember and the best of my recollection, there was an iterative process that occurred between the government and the utility industry and then -- and with them within the department, the team. So we would have iterations with the industry, and we'd come back and have iterations, you know, among ourselves. And that was the principal method that was used to development the contract.
Q. What was the basis for the first draft of the contract that was developed?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. No.
Q. In developing the first draft of the contract, did your group use anything as a

MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr. Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.



Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading.
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my recollection.



Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of --
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?



MR. LESTER: Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Q. Would Mr. Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did.
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract.
Q. Were these the most important issues?
A. Yes.
Q. And you included this in the briefing memorandum to the secretary so that the secretary



would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q. It was not an issue from the Government's standpoint?
A. Yes.
Q. Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.



Q. You say it wasn't an issue from the Government's standpoint. Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q. Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall.
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did



not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER: Objection. Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q. Can you answer my question, sir?
A. Yes, we did not have a view.
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either. Is that correct?
MR. LESTER: Objection, leading.
THE WITNESS: To the best of my knowledge, that is correct.
BY MR. NESLIN:
Q. Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund. Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A. It was a management audit.

and said we had to be ready.
Q. If we look down at the next to the last sentence, it states that, "1998 date is called for in the Act, and we believe it to be a realistic date." What's meant by "realistic date?"
MR. MILLER: Objection. Calls for speculation and a legal conclusion. Go ahead.
MR. NESLIN: You may answer.
THE WITNESS: That it's doable.
BY MR. NESLIN:
Q. Did you answer the 1998 date to be doable at that time?
A. Yes.
Q. Did DOE consider the 1998 date to be doable at that time?
A. To the best of my recollection, yes.
Q. What was meant by the statement that, "Our performance will be judged by meeting this date?"
MR. MILLER: Same objections.
THE WITNESS: Whether we would have a repository ready to receive high-level waste or spent nuclear fuel by January 31st

Page 89

1998.
BY MR. NESLIN:
Q. And that would be the standard for determining whether DOE was complying with the contract?
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
BY MR. NESLIN:
Q. In your opinion, sir?
A. Yes.
Q. And so to comply -- in your opinion to comply with the contract, DOE would have to be receiving spent nuclear fuel under the contract by the 1998 date?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what in your opinion was the purpose of the contract?
A. The purpose of the contract was to document the provisions of the statute, and basically, it was for the return for the utilities providing one mill per kilowatt hour. The Department would have a repository in place ready to receive spent nuclear fuel or high-level

Page 90

waste by January 31st, 1998.
Q. And why was that important?
A. A question for clarity, why the date was important or the instrument?
Q. Why was the date important? Well, let me back up. Why was the receipt of spent nuclear fuel by the Department important?
MR. MILLER: Objection, vague.
THE WITNESS: First of all, it was a statutory date that we had to comply with.
Second of all, there was a growing concern within the utility community that they were running out or soon would be running out of space for on-site storage.
And thirdly, that could very well impact the continued utilization of nuclear energy.
BY MR. NESLIN:
Q. So would it be fair to say that one of the purposes of the contract was to prevent utilities from having to shut down?
MR. MILLER: Objection. Mischaracterizes his previous testimony and calls for a legal conclusion.

Page 91

THE WITNESS: No.
BY MR. NESLIN:
Q. No. Well, you earlier testified that there was a growing concern that utilities were accumulating spent nuclear waste. Was there a concern that this may cause individual utilities to have to shut down because of the accumulation of waste?
A. No. There were other avenues available to the utilities to grow with their increased inventory of spent nuclear fuel, re-racking being an example of a potential option.
Q. Or on-site storage?
A. Or dry storage. On site would be another example.
Q. What's your understanding as to why congress decided to adopt this arrangement in which the utilities would provide delivery of the waste to the Department, and the Department would assess a fee in return for that?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I wasn't a party to what was addressed, so I can't answer that.
BY MR. NESLIN:

Page 92