Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?

MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.

THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.

BY MR. NESLIN:

Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?

MR. MILLER: Objection. Calls for speculation.

THE WITNESS: I don't know.

MR. LESTER: Lacks foundation.

THE WITNESS: I don't know the answer to that from a utility perspective.

BY MR. NESLIN:

Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?

MR. MILLER: Same objections.



THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing.

BY MR. NESLIN:

Q. There would be additional planning?

A. Right.

Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

MR. NESLIN: You may answer.

THE WITNESS: Yes.

BY MR. NESLIN:

Q. And isn't that, in fact, what the utilities were receiving in return for the fees



they were paying to the Department?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. NESLIN:

Q. And they were paying hundreds of millions of dollars to the Department. Correct?

A. Yes.

Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?

MR. LESTER: Objection. Asked and answered.

THE WITNESS: Yes.

(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?

A. Yes.



Q. Was this document prepared as part of the fee-adequacy assessment?

A. I don't recall.

Q. Do you recall why it was prepared?

A. Yes.

Q. Why was it prepared?

A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera.

Q. How did that differ from the fee-adequacy assessment process?

A. I don't recall if there was much difference. I really don't.

Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?

A. Do I recall?

Q. Generally, the process that was followed?



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."

Was this letter and the attached report, in fact, forwarded to utility companies?

A. To the best of my knowledge, it was.

Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?

MR. MILLER: Objection -- withdrawn.

THE WITNESS: That was the stated intent, yes.

BY MR. NESLIN:

Q. Is that your recollection?

A. That was my recollection, yes.

Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson. The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."

Do you recall whether you and others in the Department had planning sessions to



work on the Mission Plan or the Mission Plan strategy?

A. I do not recall.

Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?

A. I do not recall.

Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?

A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no.

Q. Would there have been any documentation prepared regarding such meetings?

A. I don't recall.

(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)

BY MR. NESLIN:

Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management



Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?

A. Yes, I was.

Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?

A. No, I don't.

Q. Do you recall when the first draft of the Mission Plan was prepared?

A. No, I don't.

Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?

A. Only this Exhibit 13.

Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?

Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management,



storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

Was it your understanding that that was OCRWM's fundamental objective?

A. Yes.

Q. What do you mean by firm schedule?

MR. MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.

MR. NESLIN: You may answer.

THE WITNESS: Oh --

MR. MILLER: Oh, I'm sorry, yes. Please. Remember you can answer, except when I tell you don't answer that.

THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.

BY MR. NESLIN:

Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?

A. That's correct.

Q. The next sentence states that, "The waste acceptance schedule will initially preclude

MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know the answer to your question.
BY MR. NESLIN:
Q. Do you recall there being multiple drafts of the Mission Plan in December of 1983?
A. I don't recall.
Q. Well, does this letter indicate that the Department circulated a draft of the Mission Plan on or about December 20th to Edison Electric Institute?
A. From the context of this letter, it appears that that is true.
Q. Would you have been involved in that process, sir?
A. I don't remember.
Q. And does this letter indicate that the Department would have requested comment from the Edison Electric Institute on the then current draft of the Mission Plan?
A. Based upon the last paragraph, that is correct.
Q. Does this letter also indicate that the Department would have similarly sought comment



from other federal agencies, congress, state government, Indian tribes, utilities and nuclear industries?
MR. MILLER: Document speaks for itself.
THE WITNESS: Based on the first paragraph, yes, it does.
(Whereupon, a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, was marked Exhibit-16.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 16 is a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, before the Subcommittee on Energy Conservation and Power, of the House Committee on Energy and Commerce, dated February 22, 1984.
Do you recall acting director, Lawrence, appearing before such a subcommittee on or about February 22 of 1984?
A. I don't recall, no.
Q. If you could glance at the document and tell me whether you recall reviewing this



document at any time in the past. Do you recall reviewing this testimony?
A. No, I don't.
Q. Mr. Rosselli, do you recall participating in the preparation of testimony for Mr. Lawrence at any time?
A. No, I don't.
Q. Do you recall participating in the preparation of other congressional testimony during the time that you were at OCWRM?
MR. MILLER: Objection, vague.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. If you could look at page PNL-173-0226. The first paragraph of the -- let me back up. This page is captioned, Summary of Statement by Michael J. Lawrence. First paragraph discusses the budgeting process for OCRWM. Do you see that?
A. Yes.
Q. And if you skip down to the third paragraph, it talks about various accomplishments that have occurred since the passage of the NWPA. And these include establishing a fee collection system. Do you see that, the second



bullet?
A. Yes.
Q. And contracting with the nuclear utilities is the third bullet. Do you see that?
A. Yes.
Q. And this testimony was given on February 22nd, 1984. That would have been the period at which you were still at OCRWM. Is that correct?
A. Yes.
Q. Given the fact that Mr. Lawrence was discussing the budgeting process and the fee collection process and the contracting process, do you believe that you would have reviewed this testimony before it was given?
MR. MILLER: Objection. Asked and answered.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Because he was discussing various facets of the program that you were in charge of?
A. Yes.



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Q. If we could turn to page PNL-173-0228.
If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?
A. Yes.
Q. Would you agree with that language?
A. Yes.

Page 157

Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?
A. Yes.
Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?
A. Yes.
Q. And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?
MR. MILLER: Objection. Calls for a legal conclusion, speculation.
THE WITNESS: What do you mean by the word "intent?"
BY MR. NESLIN:
Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?
MR. LESTER: Same objection.
THE WITNESS: The intent of congress was what?
BY MR. NESLIN:
Q. In enacting the Act?

Page 158

A. Was what?
Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?
MR. MILLER: Same objection, vague.
THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.
In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.
BY MR. NESLIN:
Q. But it reflected the Department's intent at that point in time?

Page 159

MR. MILLER: Objection. Same --
BY MR. NESLIN:
Q. In administering the program?
MR. MILLER: Same objection.
THE WITNESS: Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent. And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.
BY MR. NESLIN:
Q. Let me back up. That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time. Do you understand my question?
MR. MILLER: Same objections.
THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their

Page 160

generation rate and, you know, which would then preclude them from having to build additional on-site storage capacity. That's different from contractual intent.
BY MR. NESLIN:
Q. What do you mean by contractual intent?
A. What do I mean by contractual intent?
Q. Yes, sir.
A. Contractual intent was, I guess, the quid pro quo between, you know, two parties that in exchange for the utilities paying us one mill per kilowatt hour, we would provide a disposal facility to receive and dispose of their spent nuclear fuel.
Q. And what's the basis of that understanding? Where does that understanding come from, sir?
A. That understanding came out of the Department and negotiation of the contract.
Q. So what was, in your mind, the contractual intent? Do you recall that issue?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q. What were the utilities receiving in



return for paying the one mill? Making the one mill payment?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Disposal services.
BY MR. NESLIN:
Q. Disposal services beginning in January of 1998?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q. Is that correct?
A. Yes.
Q. And disposal of substantial amounts of spent nuclear fuel?
MR. LESTER: Same objections.
THE WITNESS: That doesn't talk about the amounts at all.
BY MR. NESLIN:
Q. Well, sir, you -- if we go back to Exhibit 14, second column.
A. Page?
Q. Page SNO69599. Mr. Morgan's testifying or a portion of Mr. Morgan's presentation in which he talks about the fact that he did not



believe that accepting one spent fuel element would meet the intent of the Act. Do you see that language?
A. Yes.
Q. And you would agree with that. Correct?
A. Based upon the plan I would agree with that.
Q. Mr. Rosselli, did you discuss any of your prior testimony with your counsel during the last break?
MR. MILLER: Don't answer that. Objection. Calls for privileged communication.
MR. NESLIN: I'm not asking what was said. I'm simply asking whether he discussed his prior testimony.
MR. MILLER: The substance of our discussions with Mr. Rosselli are subject to attorney/client privilege, and don't answer that.
MR. NESLIN: You're instructing the witness not to answer?
MR. MILLER: That's correct.
(Whereupon, a document entitled Battelle, Human Affairs Research Centers was marked Exhibit-17.)
BY MR. NESLIN:



Q. Mr. Morgan, Exhibit 17 is a memorandum from Thomas Overcast and Susan Carney at Battelle to Emmett Morgan?
MR. LESTER: I think it's Mr. Rosselli.
MR. MILLER: Yeah, you misspoke and said Mr. Morgan.
MR. NESLIN: Mr. Rosselli. Excuse me. I'd like to direct you to page 2 of that document. PNL-117-3152 under heading 3.0, DOE Considers Temporary At-reactor Storage. Would you read those two paragraphs please?
BY MR. NESLIN:
Q. Mr. Rosselli, in the first paragraph, it refers to you speaking at, "An Atomic Industrial Forum Conference in Atlanta." Do you see that?
A. Yes.
Q. Do you remember participating in such a conference?
A. No, I don't.
Q. Do you recall during the time that you were at OCRWM making any presentations to outside groups on the waste management program?
A. Yes, I do. I remember being in the same forum as the conference that Mr. Morgan

spoke at, I believe in Washington, D.C.
Q. That was the proceedings of the 1983 Civilian Radioactive Waste Management information meeting?
A. I believe so.
Q. In December of 1983?
A. I think so, yes.
Q. Do you recall what the subject of your participation was?
A. I vaguely remember it had to do with the Waste Fund and the operation of the Waste Fund.
Q. Did you prepare a written paper that you submitted?
A. Oh, what I remember, yes.
Q. And did you appear and actually present the paper and give a speech?
A. I gave a speech.
Q. Did you retain a copy of that paper?
A. No.
Q. Your remarks?
A. No.
Q. Do you know who might have a copy of those remarks?
A. No.



Q. You say that it addressed the Waste Fund. What aspect of the waste fund did you address?
A. I don't remember the specifics at this point.
Q. What do you remember about it?
A. Very little outside of the fact that I was on the docket to speak.
Q. Do you recall making any other presentations regarding the waste management system during the period that you were at OCRWM?
A. To the last public forum, no, I don't.
Q. And in paragraph 3.0 on page PNL-117-3152 in the second paragraph the last sentence states or attributes to you the statement that, "DOE plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998." Do you see that?
A. Yes.
Q. Does that refresh your recollection at all?
A. I don't remember the speech. I do



remember internal discussions in the Department to be consistent with the Mission Plan that said, utilities would not have to, at their own cost, build additional on-site storage. That we were looking at options, should a repository be delayed beyond 1998. And these were some of the, you know, options that were under consideration.
Q. And internal discussions among who?
A. DOE, OCRWM staff. Specifically, I couldn't remember and tell you.
Q. Would it have been senior staff at your level?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And did you agree with that view that DOE should be accepting waste -- or that DOE planned to accept waste at a rate such that utilities would not be required to add storage after 1998?
A. That was consistent with, you know, the Mission Plan that we were putting together and the intent of that plan.



Q. You agree with that?
A. Yes.
Q. You say that DOE was looking at certain options. Are you referring to the options discussed in the preceeding sentences of this document?
A. Yes.
Q. That's at-reactor cask storage and a monitored retrievable storage system?
A. Yes.
Q. Were there other options that DOE was considering?
A. I honestly don't remember that.
Q. DOE would pay for the implementation of those options?
A. Yes. Let me -- yes, we would. Because we were going to build a monitor retrievable storage out of the -- yes. So whether it was casks at reactor sites or shipment to an interim storage facility, yes.
Q. And the effect of that would be that individual utilities would not have to add storage after 1998?
A. Yes.
Q. Or incur any costs associated with

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C

DEFENDANT.

---

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT.

---

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.



APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: Daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM



BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: Kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: Dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov



Also Present:
Peter J. Skalaban, Jr.



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9:07 a.m.
EXAMINATION
BY MR. NESLIN:
Q. Mr. Rosselli, I remind you that you're still under oath from yesterday. Do you understand?
A. Yes.
Q. And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay. Do you recall?
A. Yes.
Q. Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No.
Q. I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan. Mr. Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A. The intent of the Department as it

Page 190

relates to its plans to fulfill the requirements of the statute, yes.
Q. It reflects how the Department expected to fulfill it's requirements under the statute?
A. Yes.
(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition. This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984. Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document. It's simply, I believe, the first two chapters of a much lengthier document.
A. Given the fact that the Mission Plan was under my responsibility, I would conclude, yes.
Q. And you were still at OCRWM as of April 1984?
A. Yes, I was.
Q. Would you have reviewed this before it

Page 191

was published in this form?
A. I don't recall.
Q. Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published. Pages 1 and 2 indicate that it was circulated to various parties by the Department. Based upon that, would you believe that you would have reviewed it before it was circulated?
A. The transmittal letter on this thing is dated May 2nd, '84. And I do not recall when I started to actually disengage. If memory serves me correctly, I was here in Richland in the first part of May. And so I don't recall the extent and degree of my actual review of this before it went out.
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A. Yes, I did. I have reviewed those documents. Those are per all your documents.
Q. And I'm talking about drafts after, that were prepared after Exhibit 13?
A. No, I don't recall that. I just don't recall.

Page 192

Q. Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A. Specifically, no, I don't recall the exact process.
Q. Do you recall anything about the process?
A. No, I don't.
Q. Do you recall who was involved in attempting to revise the plan?
A. Specifically, no.
Q. I believe you testified yesterday that the Mission Plan work was coordinated by Mr. Head in the operations division?
A. That's correct.
Q. Would Mr. Head have been involved in the preparation of the April 1984 draft?
A. Yes. I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final.
Q. If I could direct you to page 2-1 of

Page 193

the April 1984 draft. If you could look under heading A, Waste Acceptance Schedule. If you could review that portion of the document. Do you see the table 2-1, Mr. Rosselli?
A. Yes.
Q. Do you recall reviewing this table?
A. No, I don't.
Q. At or about March or April of 1984?
A. I don't recall it specifically, no.
Q. Do you know whether this table reflected the Department's intended rate for receiving spent nuclear fuel as of April 1984?
MR. LESTER: Objection. Calls for speculation and a legal conclusion.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes. I believe that in the earlier version, it showed 1800 as the initial acceptance rate for the first five years. And I believe in further thought and discussion, the department felt that they couldn't start at that higher rate, so they made some adjustments to it and they, sort of, prepped for operation and full scale on a different schedule. And that's what I remember



as the terms of why there are changes in the numbers from the previous Mission Plan.
BY MR. NESLIN:
Q. This table reflects the receipt rate of 400 metric tons beginning in 1998, increasing to 900 metric tons in 2001, 1800 metric tons in 2002, and then 3000 metric tons thereafter for the first repository. Correct?
A. Yes.
Q. And a second repository beginning in, I believe, 2005 at 1800 metric tons receipt rate, increasing to 3000 metric ton receipt rate in the year 2010. Correct?
A. Yes.
Q. Did that reflect the Department's expectation as of April 1984, as you recall?
A. Yes.
Q. Mr. Rosselli, was the change to a 400 metric ton receipt rate in 1998, was that because returns repository development was slipping?
A. No. It was much more associated with start-up of a new operation and what was doable relative to the start-up.
Q. Concerns that you could not immediately



begin performing at 1800 MTU?
A. Right.
Q. Even if the facility were operating in 1998?
A. Right. It was as they were starting to look at it, you know, the feeling was that starting at 1800 was too big a number for an initial acceptance rate. And they had to start on a smaller scale and work through the procedures that were in place and get comfortable with them before they got to a steady state operation of 3000. It would take them some time to get there, which is a normal start-up situation, by the way, in anything.
Q. Who at the department was involved in making that change? Do you recall?
A. I don't recall that.
Q. Do you recall who at the department had concerns about the Department's ability to begin receiving waste at the rate of 1800 MTU in 1998?
A. I don't recall that.
Q. Do you recall -- if I could direct you back to Exhibit 1. Do you recall whether that reflected input from the geologic repository



deployment section?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Do you recall whether it reflected input from the storage and systems development?
MR. LESTER: Same objection.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. Is there anything that you can think of that you might look at that would refresh your recollection on this issue?
A. Not off the top, no.
Q. Can you think of who else would be knowledgeable about this issue?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Specifically, no.
(Whereupon, pages of a document from the Justice Department to Mr. Rosselli were marked Exhibit-25.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 25 is a series of pages, the first page of which bears the

CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs. No. 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10:30 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

National: (800) 528-3335

www.naegelireporting.com

Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,
Plaintiff,
vs. No. 98-126C, 98-145C, 98-474C
UNITED STATES OF AMERICA,
Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10:30 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

Page 227

APPEARANCES
SPRIGGS & HOLLINGSWORTH
BY: PETER J. SKALABAN, JR.
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821
E-mail: pskalaban@spriggs.com
Appearing on behalf of Yankee Atomic Company

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L Street, N.W.
Washington, D.C. 20530
202-616-0383
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov
Appearing on behalf of the United States

Page 228

RICHLAND, WASHINGTON,
APRIL 16, 2002,
10:30 a.m.
ROBERT M. ROSSELLI,
having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY-MR.SKALABAN:
Q. Hello, Mr. Rosselli. My name is Peter Skalaban. I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. This deposition has been noticed in Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Main Yankee Atomic Power Company versus the United States under the numbers 98-126C, 98-153C and 98-474C. Could you state your full name for the record?
A. Robert Michael Rosselli.
Q. Procedurally, how this deposition will work is, I'll be asking you a series of questions, and you will be expected to answer the questions. The court reporter is taking everything down, and we will get a written transcript of everything that's said today. Do

Page 229

you understand that?
A. Yes, I do.
Q. Please respond verbally, so that the court reporter can get your answers. So if possible, please avoid shaking of the head. Is that okay?
A. Yes, it is.
Q. If I ask you a question and you don't understand one of my questions, or you're not sure what I'm asking, will you let me know, so I can rephrase it?
A. I will.
Q. And if I ask you a question and provide an answer and later on in the deposition you realize that answer is incorrect or incomplete, will you let me know, so that we can correct or complete your answer?
A. Yes, I will.
Q. Thank you. Sir, where were you born?
A. Youngstown, Ohio.
Q. And when were you born?
A. May 8, 1944.
Q. Did you grow up in Youngstown, Ohio?
A. No. I grew up, basically, in Murray, Ohio which is a southwest suburb of Cleveland.

Page 230

Object to the form. Object because it calls for speculation.
THE WITNESS: I have no basis to respond to that question.
BY MR. SKALABAN:
Q. Is it reasonable to expect that some utilities under an OFF schedule would not have enough of an allocation to meet their storage needs?
MR. LESTER: Objection, vague. Objection, doesn't define the time period. Objection, calls for speculation. And I object to the form.
THE WITNESS: I have no basis to respond to that question.
BY MR. SKALABAN:
Q. When you say you have no basis to respond to my last two questions, you just don't have an understanding of the issue?
A. I don't know what would happen in 1998. It's total speculation. So I have no basis to comment upon that.
Q. Well, when you were involved in drafting the contract in 1983, did you have any expectations of how that would work in the



future?
A. No.
Q. In terms of OFF and exchanges?
A. No. We were setting up a mechanism that would provide for the disposal of spent nuclear fuel based on oldest first.
Q. And that's how you expected it would work in practice?
A. Yes. And there was the exchange provision to address, if for some reason a deviation surfaced.
Q. And that reason would not be to reallocate the acceptance allocations to each utilities in an efficient way?
MR. LESTER: Objection. Asked and answered both in this deposition and in the last one. Calls for a legal conclusion. I object to the form as well.
THE WITNESS: I do not recall.
BY MR. SKALABAN:
Q. In your mind if exchanges would allow for the reallocation of spent fuel acceptance allocations in a manner that was efficient and saved utilities money, would that be a desirable outcome?



MR. LESTER: Objection, vague. Calls for speculation.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. But even sitting here today, would that be a desirable outcome to increase under efficiency?
MR. LESTER: Same objections.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Again, Mr. Rosselli, I'm not asking for your recollection. I'm just asking you for your opinion. If exchanges would allow for utilities to realize cost savings by reallocating among themselves, acceptance allocations, would that be desirable?
MR. LESTER: Objection, vague. Calls for speculation.
THE WITNESS: You're asking me to comment on something that I don't recall was a consideration at the time of the formation of the contract.
BY MR. SKALABAN:
Q. But sitting here today, you have no opinion on whether that would be desirable or



not?
A. No, I don't.
Q. I'd like to call your attention to paragraph 112 on page 24 of this document. That paragraph states, "Under the Yankee Atomic Contract, DOE is required to undertake all reasonable steps necessary for the development, licensing and construction of all transportation casks necessary for use in the spent fuel/HLW program established by the NWPA."
Do you agree with that paragraph, Mr. Rosselli?
MR. LESTER: Objection, vague. Doesn't define the term reasonable. Calls for a legal conclusion. The standard contract is the best evidence of its contents.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Do you have any recollection of any discussions, at all, from the January 1983 time period through June of 1983 regarding DOE's provision of the transportation casks necessary for use in the spent fuel program?
MR. LESTER: Objection, vague.
THE WITNESS: I don't recall.



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

MR. LESTER: Objection, vague, compound. Calls for speculation.
THE WITNESS: I have no basis to respond to that.
BY MR. SKALABAN:
Q. And in the next paragraph it states that, "The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant." Do you see that, sir?
A. Yes, I do.
Q. Do you have any reason to disagree with that statement?
MR. LESTER: Objection, calls for speculation.
THE WITNESS: I have no basis to respond.
BY MR. SKALABAN:
Q. I'd like to call your attention to Rosselli Exhibit 3 which is the standard contract. If you could please take a moment to read -- I'll give you the Bates number of the page. It's HQ0016689.
A. Okay.



Q. If you could take a moment to read Article B.
A. Excuse me what article?
Q. I'm sorry. Article 5, paragraph B, entitled Delivery Commitment schedule and paragraph C, entitled Final Delivery Schedule.
A. Okay.
Q. During the time of contract formation, what was your understanding of how Article 5, subparagraph b, Delivery Commitment Schedule would work in operation?
MR. LESTER: Objection. Calls for a legal conclusion and asked and answered in the prior coordinated discovery depositions.
THE WITNESS: In the development of the contract, we were preparing a process, was an enabling process. I don't recall giving much thought in terms of how it would actually work, because it was so far out into the future.
BY MR. SKALABAN:
Q. So at the time of contract formation, you hadn't thought through all the details of how the process would work and operation --
MR. LESTER: Objection, form.



BY MR. SKALABAN:
Q. -- down the line?
MR. LESTER: Objection, form. Mischaracterizes his testimony.
THE WITNESS: Yes. And at the time of, you know, formulation, I mean, there were still a lot of technical and financial questions that had to be resolved. So we were putting together based on the contract, on the legislation, the instrument that would define the process in terms of how this would all work when all these things got resolved.
MR. SKALABAN: I'm sorry. Could you read back the last answer.
(Record read.)
BY MR. SKALABAN:
Q. Now, I'm sorry, what did you mean by the instrument of the process? I'm not sure if I followed your answer to that?
MR. LESTER: Objection, vague.
BY MR. SKALABAN:
Q. Could you clarify that for me a little bit?
A. The contract was the instrument and that contract outlined the process that would be used



once all the issues were resolved, and we were starting to implement the contract.
Q. And so what did you understand that process to be?
MR. LESTER: Objection, vague.
THE WITNESS: As outlined right here in the article, that utilities would propose. The Department would either accept or reject their proposals. If they were rejected, they were given an opportunity to re-propose or revise.
BY MR. SKALABAN:
Q. Now, what did you understand the criteria to be on whether a DCS was acceptable or not?
MR. LESTER: Objection. Calls for a legal conclusion. Asked and answered in the last deposition.
THE WITNESS: I don't remember.
BY MR. SKALABAN:
Q. And did you anticipate that the exact operation of this provision and this process would be flushed out in the future?
MR. LESTER: Objection. Calls for a legal conclusion.

THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Do you have any understanding of what the provision that says, "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule." Do you have an understanding of what that provision was intended to do?
MR. LESTER: Objection. Calls for a legal conclusion.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Do you have an understanding of what the effect would be if the delivery commitment schedule process was halted or suspended?
MR. LESTER: Objection. Calls for a legal conclusion.
THE WITNESS: I have no basis to respond to that.
BY MR. SKALABAN:
Q. So at the time of contract formation, you hadn't thought of the possible effects of that? Of a halting or suspense in the process?

Page 299

MR. LESTER: Objection, form. Mischaracterizes his testimony.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Do you have any understanding of what the effect of final delivery commitment schedule was intended to be? A final delivery schedule, what the intent -- I'm sorry. Let me rephrase that, maybe, to be a little clearer.
Article 5, paragraph C, refers to final delivery schedule. Do you have any recollection of what DOE's intent was regarding how that provision would operate?
MR. LESTER: Objection. Calls are a legal conclusion. Vague.
THE WITNESS: This was the instrument that the utilities could propose what they finally would be giving the Department according to their acceptance ranking. And it would be the basis upon which future plans would be, you know, made to receive and ultimately dispose of their spent fuel.
MR. SKALABAN: I'd actually like to take to break, Mr. Lester, if that's acceptable to you, because I don't think I have

Page 300

that much longer to go. And if I can organize things then --
MR. LESTER: Sure.
(Recess.)
MR. SKALABAN: I'd like to mark as Rosselli Exhibit 6 the May 7, 1983 EEI comments.
(Whereupon, a document entitled Edison Electric Institute dated March 7, 1983 was marked Exhibit-6.)
MR. LESTER: I'm sorry. You mean to say March rather than May?
MR. SKALABAN: March 7, 1983 EEI comments.
BY MR. SKALABAN:
Q. Mr. Rosselli, if you can look at page 7 of these comments. First of all, do you recognize these comments?
A. Specific form, I mean, I don't. But I do recognize that we got comments from EEI.
Q. Does this --
MR. LESTER: Maybe we could stop the deposition until taping stops.
MR. SKALABAN: Yeah, off the record.

Page 301

(Off the record.)
BY MR. SKALABAN:
Q. Does this appear, Mr. Rosselli, to be the comments that you would have received from EEI?
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: To the best of my recollection, yes.
BY MR. SKALABAN:
Q. I'd like to call your attention to page 7 in the letter. It's YDK-026-103882.
A. Got it.
Q. Do you see in the first full paragraph beginning, "To remedy these shortcomings?"
A. Yes.
Q. EEI states, "We also urge the purchasers be allowed to exchange delivery commitments. This will allow the marketplace to deal with particular utility needs." Do you see that, sir?
A. No. "To remedy these shortcomings?"
Q. Yeah, it's in that paragraph. If you could take a moment, please.
A. Okay.

Page 302

# Ben Rusche

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
MAINE YANKEE ATOMIC POWER ) CA NO. 98-474C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

Appearances:

Representing the Plaintiffs:

JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305

Representing the Defendant:

R. ALAN MILLER, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530



CONTENTS
(Deposition of Ben Rusche)

| | Page |
|---|---|
| Exhibit Index | 3 |
| Stipulations | 4 |
| Examination by Mr. Stouck | 4 |
| Certificate of Reporter | 301 |
| Verification of Deponent | 302 |
| Errata Page | 303 |

* * * * *

EXHIBIT INDEX

Exhibits: Marked at Page
(Copy of exhibits attached to each copy of transcript.)

| No. | Exhibit | Marked at Page |
|---|---|---|
| 1 | Curriculum Vita | 10 |
| 2 | Bates DE-100259 through DE-100266 | 41 |
| 3 | Bates PNL-101-3141 through PNL-010-3145 | 42 |
| 4 | Bates DC-103665 and DC-103666 | 76 |
| 5 | 42 USCA S 10222 | 86 |
| 6 | Bates ZAB-001-0893 through ZAB-001-0902 | 88 |
| 7 | Bates DB-107948 through DB-108009 | 101 |
| 8 | Defendant's Witness List | 118 |
| 9 | Bates PNL-173-2668 through PNL-173-2704 | 136 |
| 10 | Bates SN069588 and SN069599 through SN0069600 | 151 |
| 11 | Bates DER-007-2896 | 165 |
| 12 | Bates CTR-042-1065 through CTR-042-1191 | 168 |
| 13 | Bates CTR-042-1192 through CTR-042-1200 | 196 |
| 14 | Bates PNL-173-1282 through PNL-173-1288 | 202 |
| 15 | Bates DB-105274 through DB-105806 | 221 |

* * * * *



This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Rusche. We have met before, and we greeted briefly before the deposition started. Have you been deposed before?
A. I believe I have.
Q. Okay. Do you recall when?
A. Not for this purpose.
Q. I understand.
A. I think I had -- I was in an arbitration proceeding in the last year.
Q. Within the last year?
A. Yes. For a company which I'm associated with.
Q. Okay. Prior to that had you been



deposed?
A. I don't believe so.
Q. Okay. Well, let me just briefly go over some of the ground rules. I'm going to be asking you --
A. May I have a pad in case I want to jot down something?
Q. Sure. Have you got one? Because I've got a spare.
A. I think I've got one.
Q. Okay. If you've been through it within the last year, you're kind of an old pro, but I'm going to be asking you a series of questions. And we want your best answers.
If you don't understand one of my questions or if you need a clarification, please feel free to ask. And if you -- otherwise I'm going to assume that you understand the questions. Okay?
A. Yes.
Q. And it's very informal, as you can tell. So if you would like a break for any reason at any time, just let me know, or if there's anything else we can do for you during the course of the day, we'll try to accommodate you.

or any other medication you are on that would prevent you from giving your best answers?
A. Absolutely not. It's purely my choice.
Q. All right. I would like to ask you about your professional experiences. And I happen to have --
MR. STOUCK: Well, can you mark this as, I guess, Exhibit 1 to this deposition.
(Exhibit No. 1 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been handed a document that's been marked Exhibit 1. It appears to be a resume or vita for you. It's dated November 1997. Do you recognize this?
A. 19 what?
Q. It's dated at the top of the first page November 1997.
A. Yes, 1997.
Q. Do you recognize this?
A. Yes, I do.
Q. Did you prepare this?
A. Yes.
Q. Okay.
A. It is not current.
Q. Right. I understand that. Let's try to



bring it current. We'll try to bring it current in the course of our discussion here, but would you -- I guess on Pages -- there's a chronological -- the first couple pages are qualitative, I'll call it, the first page and a half, but then there's a chronological listing of your positions that starts on Page 2 and continues on Page 3 and continues on Page -- over all the way almost to the very end.
Would you just take whatever time you need to look at that. And I think we can save a lot of time here with questions if you can just tell me that that's either accurate or point out the respects in which it may not be accurate.
A. It's accurate up to the date that it includes.
Q. All right. Well, let's start there with the date that it includes is 1996 dash. It says you were president of Management & Technical Resources, Inc. Is that still your position?
A. It is one of them, yes.
Q. It's one of them. Okay. So you still hold that position. And if you were to update this -- and also it indicates here, it's still an open matter, that you are chairman Law/Spear,



S-p-e-a-r, LLC. Do you still hold that position?
A. No. The LLC was closed about six months ago.
Q. All right. And the business no longer exists?
A. Correct.
Q. Okay. So do you hold any other positions besides president of Management & Technical Resources?
A. Yes.
Q. All right.
A. I'm on the board of directors of the Swedish nuclear company called STUDSVIK, S-T-U-D-S-V-I-K, Inc., which is a U.S. subsidiary of a parent corporation, STUDSVIK AB in Sweden.
I'm on the Nuclear Advisory Council for the governor of the State of South Carolina. And it is called the Nuclear Advisory Council.
Q. Okay.
A. As a -- the vehicle Management & Technical Resources, Inc. is my consulting company, and I have several contracts through MTR.
Q. All right. And what -- anything else that you can think of?
A. Let me just think a minute. I think all



the other things that I'm doing, I'm doing through MTR.
Q. All right. So I think you just may have answered this question, but this Management Technical Resources you described as your consulting company, would you say generally you are employed in the consulting business?
A. Beg your pardon?
Q. Are you today generally employed in a consulting business? Is that what you do for a living?
A. On a part-time basis, yes.
Q. Part-time basis?
A. Yes. It's far from full-time.
Q. And the other part-time is what? Are you --
A. My wife's husband and my son's father and so forth.
Q. Play golf?
A. I occasionally go out, but some would argue whether I play.
Q. All right. What business is this Swedish nuclear company in? And are they -- is it a generating company?
A. No. They are a waste treatment company.

Page 82

nuclear fuel not later than January 31, 1998," is it your testimony that the Secretary was mistaken?
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
THE WITNESS: It is my opinion that the expression of the Secretary was not founded on information, at least, that I believe was relevant.
Q. (Mr. Stouck) Okay. So you disagree with that statement?
A. I do.
Q. Okay. So the Secretary was mistaken?
MR. MILLER: Objection. Mischaracterizes his testimony.
Q. (Mr. Stouck) You just disagree?
A. I disagree.
Q. You don't know if he's right or wrong? You might be right and he might be right, but you can't both be right?
A. Sure. We both cannot be right.
Q. Okay. And you don't know whether you're right about the legal obligation or whether he's right as we sit here today?
MR. MILLER: Asked and answered.
THE WITNESS: I'm unqualified to speak

Page 83

about the legal obligation.
Q. (Mr. Stouck) Okay. But your understanding, in any event, was different from the understanding in this sentence that I just read to you?
A. Yes.
Q. Okay. And that was true in 1984?
A. Yes. To the best of my recollection.
Q. All right. You haven't followed, I take it from what you told me earlier, the course of this litigation about the -- dealing with obligations with respect to spent fuel?
A. No.
Q. Do you know how long the litigation has been going on?
A. Quite awhile, but I don't have a precise time period. Two or three years I would guess, but that's a pure guess.
Q. All right. Are you aware that a Federal Court of Appeals has ruled in a related case that the Department of Energy's obligation to accept spent nuclear fuel from commercial utilities by January 31, 1998, is "unconditional" and not dependent upon the existence of a repository by that date?

Page 84

A. I am.
Q. You are aware of that?
A. Yes.
Q. Okay. How are you aware of that?
A. I've seen various accounts in the nuclear media.
Q. Okay. Do you review -- nuclear media, does that include like --
A. Nuclear News or something of that sort.
Q. Are those publications that you read today?
A. Maybe once every six months.
Q. Not on a regular basis?
A. I have no access to them regularly.
Q. But that court ruling that I just described to you, would you agree, is also at odds with your understanding that you've just expressed here today?
A. It is indeed.
Q. Okay. Are you familiar with the term standard contract?
A. Yeah.
Q. Okay. What is that?
A. It was an activity in a document to establish the relationship between the Department

Page 85

and the utilities for the acceptance or scheduling of fuel.
Q. All right. When was the first time, Mr. Rusche, that you saw a copy of the standard or a standard contract?
A. To the best of my knowledge, I've never seen a copy.
Q. All right. It was not something you reviewed during the course of your activities as director of --
A. To the best of my knowledge, I did not.
Q. Do you know -- do you know that those contracts were, in fact, executed and entered into with all of the commercial nuclear companies that have spent fuel in the country?
A. I really don't have any recollection of the execution of such contracts. To the best of my knowledge, I've never seen one. And --
Q. Well, is it your understanding that the Act provided that all of the utilities would enter into it?
A. Sure. Indeed. But I just --
Q. You don't have any firsthand knowledge?
A. I just didn't have any firsthand knowledge other than we had programs in which they

were being considered, the forms were being developed. And there were ongoing discussions with utilities looking at queueing procedures and all kinds of things of that sort.
Q. That related to --
A. That related to receiving the fuel, if it could ever be done.
Q. Do you know how -- well, let me --
MR. STOUCK: Let's mark this another exhibit, please. This is No. 5, I think.
(Exhibit No. 5 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, the reporter has handed you a document that's been marked Exhibit No. 5. This is a copy -- an excerpt from the United States Code 42 USC Section 10222. It's part of the Nuclear Waste Policy Act.
The section is titled for some reason Nuclear Waste Fund, as you can see, but the subsection that I am interested in and want to ask you some questions about is Subsection A is entitled Contracts.
Okay. Would you -- and I'm particularly interested in under A in the Subsections 5 and 6. So that goes on to the second page of this



exhibit, but if you would like, you can review -- please take a couple of moments to review whatever you want to review.
Do you recall this provision of the Act generally, that there was a provision for contracts in the statute?
A. I realize -- yes, I recall that there was a provision. I've never seen this piece of paper before.
Q. Correct. But accept my representation that this is a copy of the relevant section of the statute.
A. Sure.
Q. So when you told me earlier today that you had reviewed the Nuclear Waste Policy Act in preparation for this, was this one of the sections that you would have reviewed?
A. Well, I didn't see --
Q. Not this piece of paper, but whatever copy of the statute you had?
A. I just got a copy of the statute which establishes or states some of the factors that are stated here.
Q. Right. And so in -- actually with this -- let's go ahead and mark another exhibit.



I want to ask you about both of them together or maybe more than two.
MR. STOUCK: This one would be No. 6, I guess. Keep that section of the statute handy, please.
(Exhibit No. 6 was marked for identification.)
Q. (Mr. Stouck) Do you know, Mr. Rusche, whether these contracts were entered into -- whether or not they were entered into prior to your arrival at the Department in early 1984?
A. No.
Q. Don't know whether they were?
A. No.
Q. Okay. Take a look at what's been marked now as Exhibit No. 6. Actually when you say -- my question was, I believe, you don't recall or was do you know -- I think my question was do you know.
Are you telling me that you don't recall whether they were or that you recall and you know they were not, I guess is my question?
MR. MILLER: Objection. Compound.
THE WITNESS: I don't recall any discussion on the subject that would have provided



information one way or the other.
Q. (Mr. Stouck) Okay. So they may have been entered into before you got there and they may not have?
A. Correct. That is correct that I don't know and they may or may not have been entered into, but of my own knowledge I do not know whether they have been entered into.
Q. Before or after?
A. Either.
Q. Is that a matter of recollection?
A. Yes.
Q. Okay. So you don't recall whether they were?
A. Correct.
Q. At the time you got there in 1984 when you were working at the Department you would have known whether or not they had already been signed?
A. It was furthest on my list when I got there in 1984.
Q. Well, do you think you would have known?
A. No.
Q. Okay. Why do you say it was furthest on your list?
A. There was so many factors that needed to

1998, I have never seen or heard in my recollection.
Q. Okay. And so does that mean that that was not your understanding at the time you joined the Department in 1984?
A. That there would not have to be any further storage?
Q. That that was the strategy?
A. Wait a minute. Well, strategy --
Q. See, the sentence here says, "The strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
A. I never was a party to such a statement, so far as I know. You may find something to the contrary, but I cannot -- I never recall that being the case.
Q. Okay. And you don't recall there being a strategy to facilitate utilities avoiding additional storage in 1998?
A. Certainly that was a -- that was an intent or a strategy in a sense, but strategy needs to be put in the context of some reality. And in my -- in my time and my awareness that



would -- that was just a completely unreasonable expectation.
Q. Okay. When you say it was a strategy --
A. In my own mind.
Q. Fine. Thank you. You say it was a strategy in a sense. In what sense was it a strategy?
A. Because the statute said we'll begin receiving fuel in 1998. In that sense then I can't deny that.
Q. In that sense there was a strategy of allowing utilities to avoid additional storage on site?
A. I think this statement is trying -- is attempting to say that that strategy was the one that was then being applied or being -- that was understood as the objective of the operation.
Q. Okay. And my question is simply was that your understanding at the time in 1984 that that was the strategy?
A. In 1984 in my mind?
Q. That that was the strategy?
A. Yes. I can agree that was the strategy.
Q. Okay. And what about the next sentence here, "During the first year of operation of



repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location," do you agree that that or do you not agree that that was part of the strategy at the time you were there?
A. In my perception and recollection, I can never remember that being a discussed point or strategy.
Q. Okay. Well, but you do agree that the prior sentence or at least you do agree, I think, in connection with discussion with the prior sentence that there was a strategy of -- tied to the '98 date and commencement of activities, there was a strategy of allowing utilities to avoid additional on site storage? I thought --
A. No.
Q. You didn't agree with that?
A. No. I thought I said that the strategy that I see articulated here and in the context of the Act, as I understood it, that it's not inconceivable that one would say that it was the strategy of the Department to begin receiving fuel at an unidentified rate.
And the sentence earlier on, one fuel,



kind of sounds ludicrous, one fuel element, but it was clearly not -- and I cannot recall ever having -- a discussion that would say that the purpose of the 1998 date was to preempt the necessity for any future storage capacity in any of the utilities.
Q. That was not your understanding in 1984?
A. That's right.
Q. So avoiding some additional on site storage capacity after '98 was part of the strategy, but preempting any possible on site storage facility for utilities after 1998 was not part of the strategy? Is that the distinction you're drawing?
MR. MILLER: Objection. Mischaracterizes previous testimony.
Q. (Mr. Stouck) I'm just trying -- I'm really just trying to understand where the lines are here. Because I thought you had agreed -- I thought you had agreed -- and I may be wrong. So I'm trying to find out.
But I thought you had agreed that a part of the strategy was, at least as reflected in the prior sentence, to allow utilities to not have to provide any additional storage facilities on site? I thought you had agreed that you did have

Page 162

an understanding that that was the strategy?
MR. MILLER: Mischaracterizes previous testimony.
THE WITNESS: The sentence that you read and that I agreed with was that if we accepted one fuel element in 1998, we would be technically in accordance with the Act.
Q. (Mr. Stouck) Okay.
A. I would probably agree with that as a technical statement.
Q. Okay.
A. I don't -- I don't think that -- and I agree with the following sentence that said we did not believe that meets the intent of the Act.
Q. Okay.
A. But whether that means the extreme statement you just made, that that implied that there would be no need for any future discussion, any future storage capacity, and so I think there's a big gulf between those two statements, in my opinion.
Q. Okay. Well, that's helpful. Thank you. That clarifies it for me. And so again, if I understand, there was an intent, a strategy to help utilities avoid some amount of on site

Page 163

storage facilities by commencing operations in 1998, but perhaps not to avoid all possibility that there would be additional on site storage facilities? Is that what you're saying?
A. Yes.
Q. Okay.
A. Although I would say that in the context of the statement by Mr. Morgan, which is what we are referring to, we've had earlier discussion in which I have -- I think I've said even today, and I would be -- I think I would say it again, that when I had the discussions with Senator Johnston and had been there long enough to have had a chance to review to some extent what the circumstances were, the contract and these conditions were far down on the list of things that I was giving attention to.
And in that sense I don't want to mis-convey that that 1998 date in the Act was the thing that was a target on my door. It was not. It was finding a place to put at the earliest possible time, under appropriate conditions, fuel from not only the utilities, but from the Department.
Q. I understand. But in pursuing that

Page 164

objective you were acting to implement the Nuclear Waste Policy Act, correct?
A. Yes.
Q. Okay. Now, do you know whether the mission plan that we referred to earlier, I think it was mentioned in this document we just looked at, was required by the Nuclear Waste Policy Act? Do you recall whether the statute required that the mission plan be prepared?
A. I really don't. When I got there I believe a mission plan was in process or being worked on and it made good sense. I have not looked back at the Act ever to say was that required or just good judgment.
Q. Okay.
A. In the first case I would say it was good judgment, that we needed to have some sort of -- some sort of basis for creating an awareness for the part of all the constituents that were interested in the program as to what was -- what we were about. And in that sense I think that makes good sense or good judgment.
Q. But whether it was required by the statute, as we sit here right now you just don't recall?

Page 165

A. I just don't recall, but the value made it required, whether it was in the Act or not.
Q. I see.
A. In my mind.
Q. I understand. Excuse me. And I apologize sometimes for turning to get a document. I'm listening, even if I turn away from you.
MR. STOUCK: Let's mark this one as No. 11, please.
(Exhibit No. 11 was marked for identification.)
Q. (Mr. Stouck) All right. Mr. Rusche, you've been handed a document which is marked Exhibit No. 11 on United States Department of Energy memorandum stationery, date October 7, 1983, subject Review of OCRWM Mission Plan Working Draft.
The copy is not very good, but I think it says to Phillip Craig, director of Commercial Spent Fuel Management Program Office. And on the back it's signed by Mike Lawrence, correct? That's the document you have?
A. Yes.
Q. And it says --

Page 166

A. That's interesting. That's the first time I can recall seeing Mike's title.
Q. Acting deputy director. And this, of course, is prior to your arrival?
A. Yes. But I was not completely unaware of the fact that there was something there and that Secretary Edwards and I had been very, what shall I say, if not instrumental, at least had a strong view that this course -- that there needed an RWM or something of that sort.
Q. Right. Because, as you said before, it was a big issue, a big problem for the industry?
A. No question about that.
Q. All right. Now, the first sentence here says, "The attachment to this memo," which, of course, is not attached. This is just the cover memo.
A. Sure.
Q. It says, "The attachment to this memo is the latest working draft of the Mission Plan for the Office of Civilian Radioactive Waste Management." Do you see that?
A. Yes.
Q. And it goes on, "This draft is far from the finished product that we will make available

Page 167

for public review and comment."
This indicates that the -- obviously that the mission plan drafting process was in process before you arrived?
A. Certainly.
Q. Were you aware of that?
A. Yes.
Q. Okay. When you got there you were aware that it was in process?
A. I was aware that there was an activity -- there was a document called a mission plan and an activity associated with it.
Q. Okay. In the second paragraph this document asks the -- whoever the distributees were to review it and return comments to Mr. Head. Do you see that?
A. Yes.
Q. Does that refresh your recollection at all about what his role was?
A. Well, it doesn't refresh it so much as tell me.
Q. Okay. Okay. You don't know any more than what you see on this paper?
A. I remember his name.
Q. Okay.

Page 168

A. I did not -- until I see this here, I didn't realize that's what he was doing. At least I don't recall realizing it, if I did.
Q. Okay. And then just the last sentence in that paragraph, it says, "If any areas exist in which the portions of the program discussed in the Draft Mission Plan for which you are responsible do not meet the requirements of the Act, please identify proposed corrective actions wherever possible, or provide as convincing a rationale as possible to support the action we propose to take." Do you see that?
A. Yes.
Q. So you would agree that that suggests that there was an objective here to have the mission plan meet the requirements of the Act?
A. Yes.
Q. All right. Okay. Well, let's move forward in time a little bit and take a look at --
(Off-the-record discussion.)
(Exhibit No. 12 was marked for identification.)
Q. (Mr. Stouck) Okay. We've now handed you a document that's marked Exhibit No. 12, Mr. Rusche.

Page 169

A. Yes.
Q. It's stamped Draft on the front. It says, "Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983."
A. Yes.
Q. Bates number CTR-042-1065 through 1191. Is that what you have?
A. I believe that's right.
Q. Okay. Now, this is dated a couple of months after the memorandum we just reviewed. So I think it's fair to say it's unclear whether this was the draft that was forwarded with the memo, but it may not have been certainly. Probably wasn't, but may have been.
My question though is this is getting pretty close to the time -- not terribly close. If you joined RW in May '84, it's getting closer in time to your arrival, but my question is looking at this, through this, whether you believe that when you did join RW and started working you saw this draft?
A. I really -- I can't recall any specific instance in seeing it. I can't deny that I -- somebody may have showed it to me at some point,

Page 170

but if you'll recall, in our discussion in December of 1983 I was not either involved, nor identified for involvement.
And if indeed I saw it, it would have been maybe somebody handed me a stack of documents and said, "These are things you might ought to look at sometime."
Q. When you arrived in May?
A. When I arrived in May.
Q. Okay. But you have no recollection?
A. I don't have any recollection of it.
Q. Okay. Let's take a look though at the very first page of text, I think, under Introduction.
A. Okay.
Q. The last paragraph on that page. It says that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and" --

Page 171

ultimately misspelled -- "utimately, remove from at-reactor storage all waste that is more than 5-years old." Do you see that?
A. I do.
Q. Okay. Seeing this in this draft mission plan, do you now recall that that was a fundamental objective of the nuclear waste program at that time?
A. I can't say with respect to the program. I can say that it seems consistent with the Act.
Q. Okay.
A. But I really don't have any basis for guessing whether the -- I think -- excuse me. May I answer in a slightly different way?
You say was it consistent with the -- was the program consistent with that statement, I believe is the question you asked, or would you care to rephrase that?
Q. Why don't we have it re-read just to be perfectly clear.
A. All right.
MR. STOUCK: What was my last question?
(The Court Reporter read the record as requested.)

Page 172

MR. MILLER: Objection. Calls for speculation. Go ahead.
THE WITNESS: What I was going to say was that there's no question in my mind that the mention of the January 31, 1998, date is consistent with the Act.
As to whether or not it is -- the program at that moment was designed or aimed or stated to have confidence in being able to meet that, I can't really say. I have an opinion about it, but there's no point in giving you my opinion.
Q. (Mr. Stouck) Okay. Let's put the opinions aside at least for a moment. Maybe we'll come back to it.
But my question is this paragraph that I just read refers to the mission plan and the activities specified in the mission plan being targeted toward one fundamental objective. And then it --
A. Yes.
Q. -- describes what the objective is.
A. Yes.
Q. And then there's a further sentence also. I'm simply asking whether this paragraph refreshes your recollection about whether or not

Page 173

this, meaning what's stated here in this paragraph, was at that time a fundamental objective of the program?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I can only respond by saying this is what those who were there wrote.
Q. (Mr. Stouck) Okay. So beyond that, you have no answer to my question?
A. I don't know how I can answer any further.
Q. Okay. Do you have an opinion about whether -- you mentioned opinion, and I don't remember exactly in what context, but do you have an opinion about whether this was a fundamental objective to the program at the time you arrived, these sentences we just read?
A. Well, you're asking for do I have -- did I have an opinion. In the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is -- that is was there enough data or information that would give confidence that a statement like that was even rationale.