Page 170

but if you'll recall, in our discussion in December of 1983 I was not either involved, nor identified for involvement.
And if indeed I saw it, it would have been maybe somebody handed me a stack of documents and said, "These are things you might ought to look at sometime."
Q. When you arrived in May?
A. When I arrived in May.
Q. Okay. But you have no recollection?
A. I don't have any recollection of it.
Q. Okay. Let's take a look though at the very first page of text, I think, under Introduction.
A. Okay.
Q. The last paragraph on that page. It says that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and" --

Page 171

ultimately misspelled -- "utimately, remove from at-reactor storage all waste that is more than 5-years old." Do you see that?
A. I do.
Q. Okay. Seeing this in this draft mission plan, do you now recall that that was a fundamental objective of the nuclear waste program at that time?
A. I can't say with respect to the program. I can say that it seems consistent with the Act.
Q. Okay.
A. But I really don't have any basis for guessing whether the -- I think -- excuse me. May I answer in a slightly different way?
You say was it consistent with the -- was the program consistent with that statement, I believe is the question you asked, or would you care to rephrase that?
Q. Why don't we have it re-read just to be perfectly clear.
A. All right.
MR. STOUCK: What was my last question?
(The Court Reporter read the record as requested.)

Page 172

MR. MILLER: Objection. Calls for speculation. Go ahead.
THE WITNESS: What I was going to say was that there's no question in my mind that the mention of the January 31, 1998, date is consistent with the Act.
As to whether or not it is -- the program at that moment was designed or aimed or stated to have confidence in being able to meet that, I can't really say. I have an opinion about it, but there's no point in giving you my opinion.
Q. (Mr. Stouck) Okay. Let's put the opinions aside at least for a moment. Maybe we'll come back to it.
But my question is this paragraph that I just read refers to the mission plan and the activities specified in the mission plan being targeted toward one fundamental objective. And then it --
A. Yes.
Q. -- describes what the objective is.
A. Yes.
Q. And then there's a further sentence also. I'm simply asking whether this paragraph refreshes your recollection about whether or not

Page 173

this, meaning what's stated here in this paragraph, was at that time a fundamental objective of the program?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I can only respond by saying this is what those who were there wrote.
Q. (Mr. Stouck) Okay. So beyond that, you have no answer to my question?
A. I don't know how I can answer any further.
Q. Okay. Do you have an opinion about whether -- you mentioned opinion, and I don't remember exactly in what context, but do you have an opinion about whether this was a fundamental objective to the program at the time you arrived, these sentences we just read?
A. Well, you're asking for do I have -- did I have an opinion. In the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is -- that is was there enough data or information that would give confidence that a statement like that was even rationale.

Page 174

Q. Are you done?
A. Yes.
MR. STOUCK: Can we go off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) When you say you had series doubts or series questions about whether that statement could be justified, you're referring to whether the objective could be achieved, right?
A. Yes.
Q. Okay. But that's a -- is that -- I'm not asking whether it could be achieved. I'm asking whether it was an objective, whether it was a fundamental objective of the program at that time, as stated here, to do these things in this paragraph; in other words, to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Was that a fundamental objective of the program at the time you got there, regardless of its achievability?
MR. MILLER: Asked and answered.
THE WITNESS: I would -- I would only suggest that it needs to be put alongside the

Page 175

verbiage in the Act itself. And I'm speaking from my memory that the statement in the Act is not nearly that expansive. I think the Act literally says begin receiving fuel in January, whatever it is, of 1998.
Q. (Mr. Stouck) Right. But you joined the Department of Energy as the head of the program office that was charged with implementing the Act, right?
A. Yes.
Q. And in the course of implementing the Act there was -- we're going to get to the final mission plan, by the way. A mission plan was developed, which you testified was important. Whether or not it was required by the statute --
A. Yes.
Q. -- you had to have it or it was a good idea to have it in order to guide your mission?
A. Yes.
Q. Okay. So you were implementing the statute. And I'm not asking you at this point about what the statute may or may not have required as a legal matter.
What I'm asking you is whether there was an objective, a fundamental strategy -- or

Page 176

fundamental objective, excuse me, is the term used here.
Was there a fundamental objective of the program that included the elements that are stated here? Is it -- you know, do you recall? Is it your understanding? What can you tell me about that? Do you know? Do you not know?
MR. MILLER: Objection. Calls for speculation. Asked and answered.
THE WITNESS: I think the only thing I can say is that this statement is more expansive than I would have guessed one would have made at that time, but I have no knowledge of it.
The Act was the piece of paper that was put in front of me when I was invited to consider taking the position.
Q. (Mr. Stouck) Okay. Just let me clarify the question. This statement, you say, is more expansive than I would have guessed. As we sit here today?
A. Yes.
Q. Okay. But you weren't at -- you weren't there at the time this was written?
A. I certainly was not.
Q. And I could probably find out more from

Page 177

the people who did write this?
A. That's correct. And, for that matter, this is the first time that I recall that I have seen this. It certainly preceded my then imminent arrival.
Q. Okay. Let's turn to Page -- a couple of pages. At the top it says 2-1, Program Strategy. Would you please take a couple of moments or whatever time you need to review the first -- well, to review what's on this page.
A. Okay.
Q. All right. Let's go through this again slowly and see what you recall about it. The first sentence says, "The objective of the Department's radioactive waste management strategy is to accept high-level wastes for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
Very similar, if not identical, to the statement on the preceding page we looked at, right?
A. Uh-huh.
Q. And so again do you recall whether -- now seeing this repeated here, do you recall

Page 178

whether at the time you joined the Department some months after this document was prepared that was an objective of the Department's radioactive waste management strategy?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: I think the simple answer is I do not recall either having someone make that statement to me and telling me that, "This is what you have inherited," or when you read the Act this is undoubtedly what you would say was the objective.
When I joined the Department there was so much -- so much stuff going on that related to this kind of statement or objective, that the objective itself was not a very important consideration.
Q. (Mr. Stouck) Well, when you joined the Department in May of 1984 was there a strategy for implementing the Act?
A. You mean that somebody handed me when I got there or I saw or whether it was my strategy?
Q. Well, I -- it's two different questions, I understand. I was -- let's start with the first one. Was there a strategy in place you

Page 179

inherited, do you recall?
A. I can't answer that other than to say that all of these documents, some of which you're showing me for the first time that I can recall ever seeing, would suggest that there was a strategy, but it was not one that I inherited or that I accepted the job on the grounds that this was my strategy.
Q. Okay. Once you took the job and were working there for sometime, did you participate in the development of a strategy to implement the Act? I mean, did there come a time when there was a strategy that you were a part of?
A. No doubt there was, but, goodness, I don't know -- I'm not familiar enough or can't remember well enough all of the documents that might have been there as to whether or not there was a specific document that made that statement.
I would say that it was clear to me that whatever the strategy was, and obviously I was familiar with the Act itself, that the most important activity that we could engage in was to find a site either for an MRS or for a repository.
And no matter what you said about what you thought you ought to do, that that activity

Page 180

paled in significance until there was some way to have a chance to realize it.
Q. Okay.
A. And I focused my attention on the execution end rather than trying to be -- what shall I say? Trying to dot I's and cross T's from either a legal or a programmatic standpoint.
And I think some of my early testimony, at least as I recall, made those points. Whether it can be found or not, I don't know, but it was clear to me that the 1998 date was a major target.
Q. Okay. But you -- so are you saying that your recollection is that insofar as Ben Rusche was concerned, your predominant strategy was to identify an appropriate disposition site, disposal site?
A. Yes.
Q. That was your predominant --
A. Site or --
Q. -- strategy you were --
A. -- means, yes.
Q. Excuse me for speaking over you. That's what you recall as the predominant strategy for --
A. From my standard. As my own expression, yes.

Page 181

Q. Okay. Now, with respect to the strategy that's outlined in this draft mission plan that we're looking at, Exhibit 12, I think you said that undoubtedly there was a strategy in place when you got there. And this --
A. That's one that --
Q. -- seems to reflect it?
A. Yes.
Q. But are you saying that you just don't recall this strategy being in place at the time you got there?
A. That's clearly the case.
Q. Okay. All right.
A. In fact, I never recalled seeing this document.
Q. Okay. Then let's not spend an undue amount of time on it, but let's, nevertheless, go forward a couple more pages. Actually the top of the next page says, "Waste Acceptance Schedule." Do you see that?
A. That's page what?
Q. 2-2.
A. 2-2, yes.
Q. And it says, "Based on the criteria described above, the Department has prepared a

Page 182

Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the program will accept beginning in 1998." Do you see that?
A. Yes.
Q. This schedule is presented in Table 2-1, which is on the next page?
A. Yes.
Q. Do you recall, Mr. Rusche, that at the time whether -- do you recall that at the time you joined the Department in May of 1984 there were in existence schedules similar to the ones shown here -- similar in the sense of specifying actual quantities and being more than just conceptual, that there were schedules in existence that outlined a plan for acceptance of spent nuclear fuel?
A. At the time that I believe you're referring to I don't believe I had an impression that there were acceptance schedules then existing.
It is clear in the months to follow and the years to follow that acceptance schedule was one of the elements of a strategy or a plan or whatever you want to call it and that there were

Page 183

contracts and as the second paragraph points out on that Page 2-2.
But from my personal standpoint and the leadership of the program, such statements to me were just absolutely hollow, unless there was some way to anticipate some mechanism for accomplishing it. And it was pure rhetoric.
Q. The first step was to find a disposal site or --
A. Absolutely.
Q. And after that you would figure out what the schedule was?
A. Well, it was not -- there was nothing wrong with thinking about it, but to make the kind of absolute statements that these make or -- and I don't mean to be putting words in your mouth, but I think you may be looking for from your personal -- your client's standpoint, that's exactly what I would think you would be doing.
But from the functional standpoint, the mission plan and doing this documentation did nothing to advance the program to achieve the objective which must be met in order for these to even have reality.
Q. And that objective is?

Page 184

A. Find a site and get it in operation.
Q. Well, isn't there -- wasn't the objective to find a site for disposal of the waste that was all around the country?
A. Yes.
Q. So there eventually had to be a plan for getting the waste to the site? If you accomplished Step 1 and find a site, then --
A. Yes. Oh, yeah. And I didn't object to it. And I was told when I got there that this was an exercise that had been begun, I don't know whether it was the first day or the first six months, and that the acceptance schedule and the queuing and the capacities of the receiving basins and so forth were all factors.
And I was made aware of it. And I recognized it, having loaded a few basins here, there, and yonder, but they were so speculative in the absence of the reality or even the potential reality of finding a site, particularly for permanent disposal and the MRS consideration.
And we've talked about my perception even at the time I was confirmed perhaps gives some voice to that fact; namely, that this stated objective then in the Act was so unrealistic, and

Page 185

these are my words at the moment, but I think they were my thoughts at the time, that we just had to do something else to attempt to even move in the direction of accomplishing that objective.
I had no objective -- no difference or no -- what shall I say? I think the Act was a marvelous step forward in political science, if I can call it that, and that it certainly was much more political than it was science.
Now, that's a long answer, but I think I -- it just gives me the chance to try to be more complete. I'm not sure I'm communicating with you.
Q. Well, I'm -- we've got your testimony. I think the question was were you aware at the time you joined the Department whether schedules like this were in existence. And I think the answer is yes?
A. Yes. Yes.
Q. Now, did you have an understanding at the time you joined the Department about what -- excepting your testimony that it might have been premature to have a specific schedule for the moment, excepting -- I think that's the import of what you're saying. It's premature to specify in

Page 186

detail what the schedule would be? Is that what you're telling me?
A. That's certainly an element.
Q. Okay. Excepting that for the moment, did you have an understanding at that time when you joined the Department of what kinds of principles or objectives ought to govern the development of the scheduling?
A. Only in a very crude sense based on some of my own experience in NRC and my experience in the industry earlier on, factors that I could relate in a fairly general way that related to capacities of fuel pools and heat removal capacities and transportation considerations and so forth.
So in that sense, yes, I had some sense as to what the value was, but, very frankly, those details seemed to me to be, at least as I perceive my -- that I recall my recollection, were minor in consideration with where were we going to have a facility physically.
And that exerts a huge influence on sequences and so forth from the shipping and so forth, those kind of standpoints, and whether we could find one, find a site.

Page 187

And so it was not -- it just was not very high on my personal recognition of priorities as to how you dealt with the receiving schedule, acceptance schedule, because it was so speculative.
Q. Okay. But the Act required two repositories, right?
A. It requires that we consider two repositories. There was a first repository and a second repository to be investigated.
Q. Okay. The Act required one repository? Is that your --
A. That's my recollection.
Q. Okay.
A. But there was clearly a provision in the Act to look for a site, a second site for a second repository, if and when it might be needed, as I recall.
Q. And do you recall the capacity of those repositories listed as --
A. I don't recall the relative capacities.
Q. Do you recall if it was 70,000 tons? You don't recall?
A. I just don't remember that.
Q. Okay. Would you agree that these

Page 188

objectives of -- this objective, which is stated here both on Page 1.1 and 1.2, of precluding the need for additional at-reactor storage after January 31, 1998, would you agree that that objective would be relevant in developing an acceptance schedule?
A. Sure, it would be relevant.
Q. Okay.
A. But the question as to relevance would also -- a relevant consideration in that same context would be whether whatever might be developed, MRS at one or two sites, what capacities and what accessibilities and so forth were there. So it was a highly interactive kind of consideration.
And in my -- whatever you want to call it. My thought process was that those details were just very premature until we knew whether we were going to have one large repository, two smaller repositories, an MRS, or what, and that any of those combinations could drastically affect what kind of receiving schedule or shipment schedule you chose and where they were located and factors of that sort, which I just didn't give much attention to.

Page 189

Q. Was it your understanding at that time in 1984 that it was premature to even have this objective stated of --
A. No.
Q. It was not premature to have the objective --
A. No.
Q. -- of precluding the need for additional at-reactor storage?
A. That was a reasonable objective to state, but to make a promise that the -- or a commitment that this program was going to meet that objective in the very, very preliminary state of knowledge that we were in, in my opinion, was premature, to say the least.
Q. Okay. And that's why you think it was ludicrous for the government to sign these contracts in June of 1983? That's one of the reasons?
A. I don't think I said --
MR. MILLER: Objection. Mischaracterizes previous testimony.
THE WITNESS: I didn't say ludicrous, I don't believe. It was -- if I did, I'll stand corrected, but I think it was clearly premature.

Page 218

feeling for the timing primarily from the regulatory involvement.
Q. Is it your testimony that -- I mean, to summarize some things you've said, is it your testimony that at the time you took the job at RW in your view the prospects for achieving the objective of starting fuel acceptance in 1998 were highly uncertain?
A. Highly unlikely.
Q. Highly unlikely? That was your view when you took the job?
A. Yes.
Q. And the reasons it was highly unlikely were?
A. Well, excuse me. I should re-answer that. When I took the job, the moment I got there I did not have the insight that I did after I had been there awhile. And so I really ought to put that context slightly different.
Q. What do you mean by awhile? How long did it take you to get this insight?
A. A couple years.
Q. Okay.
A. Primarily because of the relationships of the states.

Page 219

Q. So after a couple of years it was your view that it was highly unlikely that the '98 date could be achieved?
A. Yes. In fact, early on it was -- it just seemed like a heroic effort to start with, but after those two years it just became, to me, fairly clear.
Q. Okay. But that was not your view at the time you took the job?
A. I did not have that experience at the time.
Q. At the time you took the job did you believe it was an achievable goal?
A. My objective was to do the best I could.
Q. Okay. Did you have any understanding about the achievability of the '98 date objective when you took the job?
A. Well, I believe so in that I placed emphasis in my testimony at the confirmation hearing that I thought an MRS was absolutely essential to have a chance to meet any of those kinds of commitments.
Q. So your view when you took the job was that with an MRS there was a chance?
A. There might be a chance.

Page 220

Q. There might be a chance?
A. Yes.
Q. Okay.
A. And I can't put a probability on it.
Q. Okay. Well --
A. But it certainly enhanced the likelihood of meeting the objectives of the Act.
Q. Did it make it more likely than not?
A. Yes.
Q. If you could get an MRS?
A. Yes.
Q. And that was your view?
A. In my opinion.
Q. In your opinion at the time you took the job?
A. Yes.
Q. Okay. Did you have an opinion at the time you took the job about the likelihood of achieving the '98 date without an MRS?
A. I had an opinion. And my opinion was it was highly unlikely.
Q. Okay. And those opinions were formed from experiences obviously that you had before you took the job, just from an awareness of the industry?

Page 221

A. And largely -- in large extent that's correct.
Q. Okay. Unfortunately, this is a big one, but let's mark it anyway. This is the final mission plan. We finally get to the real --
A. Which I'm sure I haven't seen. What date is that?
Q. June 1985.
A. June '85?
Q. Yeah.
A. Well, I should have seen that one.
Q. Right.
A. I probably even signed it.
Q. Let's find out.
MR. STOUCK: Why don't you mark it for me.
(Off-the-record discussion.)
(Exhibit No. 15 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you have been handed -- actually this is only Volume I of the mission -- it's titled Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, which on the front cover, as it indicates, Overview and Current Program Plans.

Page 230

answer? I'm trying to interpret this successor to the --
A. Successor to me meant it came after that plan. This was not a virgin document.
Q. Okay.
A. It certainly depended on the earlier documents to some extent, and the extent of which I'm not able to describe at the moment.
Q. Okay.
A. But we certainly did not start from scratch.
Q. When you got there?
A. Right.
Q. It was a process that was already in place?
A. Yes.
Q. Okay. Now, you did approve this mission plan?
A. I did indeed.
Q. As the director?
A. I did indeed.
Q. And you were responsible for its contents?
A. I am -- was.
Q. You were?

Page 231

A. I was.
Q. All right. Let's look at your letter.
A. All right.
Q. On the first page or whatever page it is.
A. All right.
Q. You can read the whole thing, if you want. I'm just going to ask you about a couple of sentences. Would you like to read the whole thing?
A. Give me a couple minutes anyway.
Q. Sure.
A. Okay.
Q. Okay. You see in the first paragraph it says, "This document presents our best estimate at the present time of the objectives and the strategy of the Civilian Radioactive Waste Management Program and of the facilities, institutional activities, management approach and information needed to implement the program." Do you see that?
A. I do.
Q. Okay. So this document, unlike the prior documents, is one which you personally endorsed as containing the best estimate at the

Page 232

present time of the objectives and strategy of the program?
A. I think my signature carried that connotation.
Q. Okay. And then at the very bottom of this page you say that, "I am confident the program will succeed." Do you see that?
A. Uh-huh.
Q. Now, this was June 1985?
A. '85, yes.
Q. And you were confident at that time that the program would succeed?
A. Yes.
Q. So these doubts and uncertainties that you testified about previously as a result of your experience as director of the program that led you to conclude at some point that it was unlikely to succeed, those occurred later than this?
A. No.
Q. No?
A. No.
Q. Okay. Well, then --
A. Success is a fairly general term.
Q. All right.
A. I did not intend to imply at that point,

Page 233

nor would I today, that success in this sense is other than that we find a place to put spent fuel and defense waste.
Q. That's what you think you meant when you said here, "I'm confident the program will succeed," that you would find a site?
A. Yes.
Q. Not necessarily that you would meet the '98 date?
A. I surely did not.
Q. Not necessarily that you would achieve --
A. Unless we had the MRS. If we had the MRS -- that caveat or that factor was significant in my testimony. And if you happen to have been around, you would have seen the huge amount of effort that we put to the MRS, to finding a site for the MRS and to moving ahead.
This is neither the time nor the place, but I could relate huge discussions with members of Congress on this subject. It's not relevant to our discussion, nor is it -- I don't think it's -- it's not contained in here either.
Q. Well, it's relevant, I think, probably to the '87 amendment. So we might get to it

Page 270

two sets of words would be the more specific inclusion of MRS as a feature which gave flexibility to the program and perhaps had schedule implications that were valuable.
Q. As part of the improved performance?
A. As part of the improved performance as compared to the authorized plan.
Q. Okay. Well, you want to take a moment to see if reviewing these sections, you know, confirms that?
A. I think that just this quick read would confirm that that was -- my quick read of this compared to this is that the -- particularly the inclusion of the MRS, and perhaps even making more questionable the second repository and so forth, but particularly the MRS from a functional standpoint just added a feature to the system that, in effect, was adding in an electrical sense capacitance to smooth out the ripples and that this was -- this would enhance or lead to improved performance.
Q. There's certainly reference in the section that talks about improved performance, reference to the MRS?
A. Yes.

Page 271

Q. Now, was it your view at the time you joined the Department in May of '84 that the MRS was a feature that should be added to the system?
A. I think my testimony was about as explicit as it could be.
Q. I think you told me that earlier too, right?
A. Yes.
Q. So from the moment you started promotion of the MRS, if you will, or advancement of that concept was something that you thought was a good idea?
A. Yes.
Q. Okay. And that was -- why was that?
A. Why?
Q. Yeah.
A. Because it was certainly more technically achievable. It involved far less uncertainties from the standpoint of design and operation. And it was clearly an interim activity, not a permanent facility.
Q. Do you recall whether the Department of Energy made a recommendation to Congress about approval of an MRS during the time that you were director?

Page 272

A. Sure. I think we did.
Q. Okay.
A. Much discussion on the subject. And this is not the place to get into it, but I had two sides of Congress that I was dealing with that were -- that I must have spent literally days' worth of hours, many days' worth of hours almost negotiating between, "We've got to have it and it's got to be this," and, "You can't have it unless it's this."
Q. Okay. Let's just explore that for a second. What was the, "Got to have it and it's got to be this," cant? I mean, what was --
A. The Senate.
Q. The Senate? Okay. And so -- and the Senate leadership, or at least the people you were dealing with, had some specific views about how the MRS should be implemented?
A. Less views, but agreement on the essential nature or essential value of having it.
Q. The concept?
A. Yes.
Q. Okay. What about location?
A. That was not -- that was not a Congressional consideration, as far as I could

Page 273

tell at the moment.
Q. Okay. And I take it then from what you said, on the House side there was opposition?
A. Not opposition, but constraint.
Q. All right.
A. The great concern was that it not become an excuse for not having the repository or an excuse that could be used for slowing it down or in any way taking away from the absolute essential character of having a repository.
Q. And you spent a good deal of time speaking with members of the House and their staffs explaining -- I presume, since you were advocating the MRS concept, explaining your view and the Department's view that it would not be a substitute for the repository?
A. Right. Exactly.
Q. And do you recall the outcome of that legislative discussion?
A. Well, from this distant view I think there was some agreement reached that the capacity of the facility was going to be limited.
Q. Okay.
A. I'm not sure if I remember the number, but it was limited to a couple thousand tons or

Page 274

something of that sort or somewhere in that region.
Q. All right.
A. For the explicit purpose from that side of the Congress that it not become so effective and so useful that it became a substitute for either the repository or a reason for delay of the repository.
Q. Okay. Do you recall the term linkage in connection with the capacity?
A. Yeah, I guess I remember hearing that term.
Q. Okay. Do you recall whether -- and are we referring now to the '87 amendments to the Nuclear Waste Policy Act?
A. Well, that occurred after this time, but at this time --
Q. No, I'm not talking about -- this time meaning June '85?
A. Yes.
Q. Okay. At this time is when you were having these discussions with Congress?
A. Yes. They started even then.
Q. I see. So the discussions went on for a couple years before we got the '87 amendments?

Page 275

A. You bet.
Q. Okay. But nothing happened in Congress until the '87 amendments, right? Nothing passed?
A. That's right.
Q. Okay. And you would --
A. That's why the program -- I mean, that's why I characterize the program as I do.
Q. Well, explain that to me.
A. I mean, to make adjustments in the program, particularly conceptual adjustments, there were just very strong points of view in different parts of the Congressional bodies.
And they had to be addressed. And sometimes they come slowly. That is, it takes a lot of negotiating and a lot of persuading. And I did it. I mean, that's what I did.
Q. And this is an example -- remember we looked back at the description of the testimony that the Department of Justice thought you might be able to give in this or you would be able to give, if asked, in this case.
And there was a reference there to political obstacles to the implementation of the Nuclear Waste Policy Act. Do you recall that in one of these exhibits?

Page 276

A. I remember the use of those words.
Q. Is this an example of what we are talking about, of that phrase?
A. I would be inclined to call it political considerations that had to be factored in.
Q. Oh, right. You didn't like the word obstacle before either?
A. No. And both parties said, "It's a great idea, but" --
Q. What was the "but" on the Senate side?
A. It was -- there was less "but" there than there was on the House side, but I think that there was still a reservation that an MRS too successful might give rise to a public view that it was unnecessary to proceed at pace with the repository.
Q. You did not share that view?
A. No.
Q. Do you recall -- so when -- the only legislation that was ultimately enacted was the '87 amendments?
A. So far as I know.
Q. Right. And those amendments, to your recollection, contained this capacity limitation on the MRS?

Page 277

A. Yes.
Q. Do you recall whether the '87 amendments to the Nuclear Waste Policy Act also linked the commencement of operations of the MRS to the grant of a construction license for the repository?
A. I haven't looked at it in awhile, but I have some recollection that there was an interaction that -- again that the MRS not give license to delay or to proceed at other than the best possible pace with the repository, which that connotation would exist.
Q. Did you believe that the '87 amendments to the Nuclear Waste Policy Act -- what was your impression about the impact of that legislation on the prospects for implementation of the program?
A. I think a number of the features were very positive. I think that -- and I would have to go back and look at it. I have not -- I don't remember it even as well as I do the original Act, but I think the -- the fact that these kinds of considerations had been sort of put on the floor, namely that you could trade a little bit of this and you might be trapped into taking this if you don't take this, much, much more political consideration emerged from that exercise, in my

Page 286

was ongoing some level of effort in developing these schedules.
Even though you may not have been involved in it, even though you may have not thought it was timely, it was going on somewhere in RW?
A. Oh, yes. And I was aware of it. I mean, it was not a clandestine activity. I was aware of it, but it was not an item that was on my agenda every day or that I got frequent briefings on.
Q. Okay. For all the reasons we've discussed?
A. Yes.
Q. You were focused on finding a site?
A. Yes.
Q. That's what your time was spent on?
A. Well, I was aware of these other things.
Q. Right.
A. But they were not in trouble, as far as I could tell. They didn't need my attention.
Q. Well, it was more than that, I thought, according to your earlier testimony. That may have been part of it, but it was also -- I thought you told me that in your view it was in some sense

Page 287

premature to get too specific about it?
A. Yeah, it was. That's all included in the statement I just made. There was just not an urgency, nor a defined -- definitive problem, that it was a matter of logistics and negotiation as it were.
Q. Do you or did you then have a view about at what point in time it would become more of a front burner item?
A. Well, today I can tell you what I think I would have -- I would have answered that question then.
Q. All right.
A. And it was that if the repository system or the receiving system was long delayed, that the transportation system would be more highly challenged. That is, it would -- there would be more -- it would be a heavier load to take.
Q. Okay. Because of greater quantities?
A. Because of greater quantities.
Q. All right.
A. And that the best solution for that was to get the MRS and the repository in operation. In fact, there was not much other alternative.
Q. Okay. I guess what I was driving at was

Page 288

at what point in time in the development of the overall program do you think that the specifications of the schedules, further specification of the schedules, would have been in order, I mean, if you --
A. This is purely today's view.
Q. Okay. You don't recall if you had a view then or what it was?
A. Well, I don't recall any perception of urgency at the time.
Q. Later that was your view?
A. It was later than that, but when the elements of the system had become clear or the lack of elements in the system created a perception that there was a greater challenge than we thought. And neither one of those were -- the lack of a system was everywhere.
So it was the dominant factor that I thought we should be dealing with. And these secondary factors, though important, we just didn't have a basis for dealing with.
MR. STOUCK: Could we go off the record for one second.
(Off-the-record discussion.)
Q. (Mr. Stouck) On Page 264 of this

Page 289

mission plan that we're looking at, Exhibit No. 15, Mr. Rusche.
A. Excuse me. Do you have a Page 266?
Q. No.
A. Okay. I just --
Q. It may be blank. The Bates numbers are consecutive.
A. Yes.
Q. You see there's a reference to Financial Uncertainty and Adequacy of Funds?
A. Uh-huh.
Q. We were off the record for a moment, and I mentioned to you that I had recently taken a deposition from Lake Barrett.
A. We are off the record?
Q. We are on the record now. When we were off the record I told you that, and I'm telling you now on the record. And do you know what his role in the program has been during the 1990s?
A. Well, I've had relatively little contact with the program.
Q. Okay.
A. More in the last couple years since Lake has been the acting director.
Q. You have had more contact?

Page 290

A. More, but still very little. I think I may have been in the office twice in the last three or four years. And what was the question?
Q. The question was -- well, you just answered it. You know he was acting director during the '90s?
A. Yes. I couldn't remember when he became acting director, but it was several years ago.
Q. Well, he told me, and others have testified, that during that time period at least, the 1990s, funding problems, okay, inadequate funding by Congress was a factor that influenced RW's ability to implement the program. Okay?
Now, my question is whether that factor, namely, appropriation shortfalls, was a factor during the time period in which you were the director?
A. I think the answer would have to be yes.
Q. Do you recall any specifics about appropriation shortfalls?
A. It's difficult for me to recall at the moment any particular programmatic element that was the result of -- that suffered as a result of a shortfall.
The thing that stands out in my memory

Page 291

is the number of times I had discussions in the budget cycle with members of the Budget Committee or the Programmatic Committee of the House, but in particular I think the Budget Committees, as I remember, both the House and the Senate, the chairs of both those Committees I became very personally engaged with.
And I can remember, at least when I was there, even two or three years when the budget that we ~~proposed~~ and the administration ~~we~~ proposed was not authorized by Congress or approved.
Q. Okay.
A. And it produced an anomaly that I think is an unfortunate feature in this piece of legislation. It is that the Department, whether you take the 1998 commitment as a commitment or a mandate or whatever you want to call it, it removed -- or the method of financing the program was left to those who had no sense of what was involved to achieve whatever objective might have been there.
Q. Namely Congress?
A. Congress.
Q. All right.

Page 292

A. And there was a little bit of -- and during my time there was a little bit, but almost no problem, that I had with OMB in the White House, but there were many times in which the Budget Committees' chairs would call me since the program was such a visible program. It's not so huge in terms of the DOE budget, but it was still pretty good size, five or six hundred million dollars or whatever.
And I would get calls on the day, and I can remember two or three in which I got a call and the secretary said, "You need to be at your phone over lunch. There's a lunch meeting of the chairmen of the Senate and the House Appropriations Committee, and they need to talk to you."
And get a call and say, "Well, Ben, we looked at everything. We got everything you've got. Can you get by with X?"
And my first reaction would be, "That was not our request. And we think the request was justified to pursue the program that you've mandated."
"Ben, we ain't got very long. Can you get by with X?"

Page 293

I said, "What's the option?"
They said, "A little less than X."
I said, "I'll take X."
Q. Well, the reason I asked you about this, Mr. Rusche, is that earlier when we were talking about -- when you were talking about impediments and complexities and greater appreciation -- you don't like the word obstacles, but whatever it was that was standing in the way of implementing the original program as outlined by the Act, I think is the way you phrased it, you mentioned a number of things.
You did not mention funding shortfalls. And I was curious about that. But I take it from the testimony you've just given, that that was also a factor? Or not? I mean, is it --
A. Yes, it was a factor. It just did not -- at the point I recall our dialogue on that subject I guess I made an inappropriate assumption that the budget and financing were not technical factors per se. And I just didn't introduce it in the discussion at that point.
Q. But it was another factor?
A. It was a factor. I can't point to a specific instance in which if we had $50 million

Page 294

more, we would have been a year ahead. The program was just not that -- not that explicit, from my recollection.
Q. All right. Well, from your recollection though -- strike that. Do you believe that given adequate funding, adequate funding -- I guess the question I'm about to ask is could money solve the problem?
If given adequate funding, could RW have achieved the objective of accepting -- well, whatever these original objectives were starting by '98?
MR. MILLER: Calls for speculation. Go ahead.
THE WITNESS: I would say that the matters that were the biggest impediment and still are, and they are not amenable to -- funding is not a very effective manner for dealing with them, which is the interaction with the states, the tribes, and so forth.
Q. (Mr. Stouck) Okay. Take a look at Page 385 now, please. And I know it's getting late in the day. I'm going to try to wrap up very promptly.
A. 385?

Page 295

Q. 385. Under -- there's a -- it says Chapter 10, Costs of Managing Commercial Radioactive Waste. Do you see that?
A. Yes.
Q. And there's apparently a quotation -- no. No. No. Forget the quotation. Under the Introduction, 10.1, it says, "As part of its continuing evaluation of the adequacy of the revenues raised by the Nuclear Waste Fund against the expenses of the waste-management program, the DOE maintains a cost-estimating capability.
The most recent cost estimates for the entire program are contained in a January 1985 report entitled Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program." Do you see that?
A. Yes.
Q. Do you recall, during the time you were there, these total system -- or this or any other total system life cycle cost study?
A. That there were such studies?
Q. Yes.
A. Indeed I do.
Q. You do recall those?
A. Yes. I don't recall the details of it

Page 296

at the moment, but I recall that they were done.
Q. Would they have come to your attention?
A. Certainly come to my attention from the standpoint of awareness that there may have been an implication of shortfall or something or other in some analysis that was done, but it was so hypothetical at the time that it was -- particularly early on, that it was not a factor that you could really deal with.
Q. Do you know why they were done?
A. For the purpose of -- my perception at the moment was, and I think it was that then, was that it was an attempt to confirm that the mill per kilowatt hour tariff was providing enough funding for the program to proceed as best we could.
And it turns out that there were some cases of circumstances in which that -- early on that that might not have been as clear as it became, but the problem was not the funding. The problem was the appropriations.
Q. Okay. Now, on Page 396 there is a section titled Storage Costs. And it says, "This section presents the cost estimates for the storage activities required in the 5-year and

Page 297

10-year repository-delay cases." Do you see that?
A. Yes.
Q. All right. Were you aware at the time that your agency, RW, was studying cost impacts on utilities of delays beyond 1998 in implementing the program? Were you aware of that at the time?
A. In a general sense, yes.
Q. Okay.
A. It was not a secret, for sure.
Q. Okay. So you were aware that RW was studying the cost impacts on utilities of delays beyond '98. Okay. What was the reason for that analysis? It wasn't related to fees. What was the reason?
A. The perception was the probability of meeting the '98 date was vanishing.
Q. And so there would be cost impacts on the utilities?
A. Certainly. It's going to extend the time at which the waste acceptance activities and so forth that were programmed in the Act could be implemented.
Q. And that would have a cost impact on utilities?
A. On the whole program. Not just on the

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC COMPANY, PLAINTIFF, VS. THE UNITED STATES, DEFENDANT. ) CA NO. 98-126C

MAINE YANKEE ATOMIC POWER COMPANY, PLAINTIFF, VS. THE UNITED STATES, DEFENDANT. ) CA NO. 98-474C

CONNECTICUT YANKEE ATOMIC POWER COMPANY, PLAINTIFF, VS. THE UNITED STATES, DEFENDANT. ) CA NO. 98-154C

Deposition on oral examination of BEN RUSCHE, VOLUME 2, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Friday, May 17, 2002, at the hour of 8:28 a.m.

Page 305

Appearances:

Representing the Plaintiffs:

JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305

Representing the Defendant:

R. ALAN MILLER, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

CONTENTS
(Deposition of Ben Rusche)


| | Page |
|---|---|
| Exhibit Index | 306 |
| Stipulations | 307 |
| Continued Examination by Mr. Stouck | 307 |


Page 306


| | |
|---|---|
| Certificate of Reporter | 498 |
| Verification of Deponent | 499 |
| Errata Page | 500 |


* * * * *

EXHIBIT INDEX

| Exhibits: (Copy of exhibits attached to each copy of transcript.) | | Marked at Page |
|---|---|---|
| 16 | Bates SP-103944 through SP-104008 | 317 |
| 17 | Bates SN044976 | 337 |
| 18 | Bates SP-103817 through SP-103836 | 345 |
| 19 | Bates CTR-042-1853 | 349 |
| 20 | Bates DE-100958 through DE-101043 | 358 |
| 21 | Bates MNA.19870522.0030.0016 through MNA.19870522.0030.0027 | 366 |
| 22 | Bates HQR-077-0670 through HQR-077-0674 | 389 |
| 23 | Bates HQR-077-2300 and HQR-077-2301 | 395 |
| 24 | Bates YDK-027-111856 through YDK-027-111867 | 401 |
| 25 | Bates PNL-001-1324 through PNL-001-1326 | 408 |
| 26 | Bates PNL-070-0633 through PNL-070-0651 | 414 |
| 27 | Bates YDK-016-0018 | 430 |
| 28 | Bates DB-102705 through DB-102791 | 430 |
| 29 | Bates CTR-037-0307 through CTR-037-0367 | 451 |
| 30 | Bates PNL-169-0836 through PNL-169-0839 | 477 |
| 31 | Bates DA-101226 and DA-101227 | 477 |
| 32 | Bates DC-103767 through DC-103770 | 477 |

* * * * *

This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Page 307

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

CONTINUED EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Rusche.
A. To you too, sir.
Q. And you understand, of course, that you are still under oath?
A. I do.
Q. Now, having thought about and talked about these things at some length yesterday, probably for the first time for you in awhile, is there anything that you've thought about overnight, any of your answers, any things that you've told me, any clarifications, supplementation that you would like to make before we get started?
A. I can't think of anything.
Q. Okay. And have you talked with anyone other than your counsel about your testimony since we last met?
A. My wife asked me whether I was involved. And I did speak to her.

Page 308

Q. Okay. Other than that?
A. No.
Q. Okay. Now, I've been thinking about your testimony yesterday. And I just would like to, you know, try to summarize or at least try to get clear on exactly where we are with this whole business about scheduling and intent and strategy.
So let me see if I understand correctly what you have told me because there's been lots of testimony about it. You understand that the Act, the Nuclear Waste Policy Act, requires the start of waste acceptance by January 31, 1998, right?
A. That's correct.
Q. That's clear?
A. Unmistakable.
Q. Okay. But regarding the intent of the Act with respect to the -- the intent of the Act with respect to the schedule for pick-up after 1998, you don't know what that intent was; is that correct?
MR. MILLER: Objection. Calls --
Q. (Mr. Stouck) The intent of the Act with respect to the schedule for pick-up after January 31, 1998?
MR. MILLER: Objection. Calls for

Page 433

identification, that attempt to identify issues?
MR. MILLER: Objection. Vague.
Q. (Mr. Stouck) Do you recall that there was a process implemented to deal with those issues?
A. I can say in the light of our discussion that I recall that we had discussions in the office, not that I was deeply involved with, but that were aimed at first making proposals, identifying issues, and attempting with our clients, the utilities, to bring a system of receipt of fuel and waste capacity reports or whatever you want to call them into some collectively agreed upon or at least recognized best we could do. It was a very complex process.
Q. Best we could do what?
A. When they have different views from -- I mean, with all the utilities, some had different circumstances, different degrees of spent fuel capacity, and all of these factors that weighed into setting priorities and so forth.
And this was just -- as I recall it, and again I did not have a great deal of specific discussion on the subject, it was -- seemed to me to be a responsible effort we had worked on and it

Page 434

deserved review by those who were affected.
Q. Right. Well, I think we're going to see a term used in some of these documents, issue resolution process, which is kind of a well-recognized term. Is that --
A. And it appears in many places because I -- not only me, but I think most of the people agreed with me that what we were doing was first of a kind.
Q. You recall that process, that there was such a issue --
A. That is a conscious recognition that there were issues that our clients and we would have and that we were not in a position to be unilateral about very many, if any.
Q. Why do you say that?
A. Because we didn't have all the knowledge. The interactive process provided new knowledge to us. And the use of that knowledge was valuable.
Q. All right.
A. And the Department didn't exist for it -- I mean, the office didn't exist for its own benefit. It was an agency or an agency activity that was aimed at serving the interest first of

Page 435

the country and then of those that were involved in the activities.
Q. Okay. Well, a few pages in from this annual -- from this Exhibit No. 28 you'll see another what I will call a transmittal letter. It's a letter signed by you that describes the annual capacity report. Would you take a look at that?
A. I've read it.
Q. You've read it?
A. Yes.
Q. Okay. And so this letter also refers in even more detail to this process?
A. Interactive process, yes.
Q. Now, what was your personal involvement in this interactive process?
A. I was kept aware of what the group of this several group of -- this people that we have identified at least in some form, what they were doing in general. And to the extent that they ever needed my view or thought that I could contribute, I was involved, but I was not actively involved.
I don't think I ever attended a meeting of one of this group of people. I was generally

Page 436

kept involved by being made aware of activities, the documents and so forth.
Q. Your time and attention was focused elsewhere, as I think you said yesterday?
A. I think I've said it 50 times.
Q. Right.
A. This is not to say this was unimportant, but it is to say that my ability to contribute there was much less than my ability to contribute in the other areas.
Q. There being in the schedule process?
A. Yes.
Q. Okay. All right. Now, take a look at -- you know, not to get tied up with numbers again, but as you get into this report there's a page that has a No. 2 in the middle at the bottom.
A. I have it.
Q. There's a reference -- do you know -- well, let me ask you just generally do you know what the purpose of the annual capacity report was under the standard contract?
MR. MILLER: Objection. Vague.
THE WITNESS: It seems pretty self-evident to me.
Q. (Mr. Stouck) Okay.

Page 437

A. But I don't recall a standard definition of something that was tacked up on the wall somewhere.
The annual capacity report was intended, as I recall, to make the utilities aware of the then best estimate of the receipt, sequence, and capacities of fuel that would be considered for acceptance at the repository at sometime in the future.
Q. And why was the Department informing the utilities of --
A. Because they were contract holders.
Q. Well, okay. Any other -- I mean, why would they need or want that information? Why was it --
A. Well, if I were a utility, I would like to know what the prognosis was for moving fuel from the basin.
Q. Okay. Why?
A. Well, there's capacity in the first place, capacity in the basin.
Q. Okay.
A. That would be a pretty important objective, if I were a utility executive.
Q. Okay. I'm just trying to understand

Page 438

why.
A. Let's see. How can I say why capacity is not an important element in a utility executive's or his operating organization's conduct of the operations at the site?
Q. To help plan for management of fuel in the future?
MR. MILLER: Calls for speculation.
THE WITNESS: There are many reasons it would be useful. That's certainly one you could identify. Capacity has two connotations, capacity at the site as well as capacity at the repository.
Q. (Mr. Stouck) Right. Well, I thought you were referring to capacity at the site?
A. Well, I was for that particular purpose, but it -- but these are highly interactive. And that's why the Department needed the benefit of the interaction with the sites.
Q. Right. But I was just trying to explore your understanding of why it is that the utilities would be interested in having information about the capacity at the sites.
A. Because it was a presumption unwarranted, but if I had been a utility

Page 439

executive, I would certainly want to have known about it.
Q. Right. You said that before. And I'm just trying to explore why.
A. I can't tell you any more than -- we've discussed the interactive elements of the thing.
Q. Okay. Take a look at the bottom of Page 2.
A. Yes.
Q. There's a sentence that starts on the next to last line, "DOE also expects to develop and report on procedures for submittal and criteria for approval of Delivery Commitment Schedules, exchanges of approved Delivery Commitment Schedules, Final Delivery Schedules, and criteria for evaluation of requests for emergency deliveries and changes to the acceptance priority." Do you see that?
A. I do.
Q. Okay. Do you have an understanding of the term delivery commitment schedules?
A. I hope I do, but my impression of delivery commitment schedules would be the schedules on which a particular party would be -- would anticipate delivering fuel from the site to

Page 440

the repository or whatever was the next available step.
Q. Do you know whether these delivery commitment schedules are provided for in the standard contract, whether or not they are?
A. I don't -- no, I don't.
Q. You don't?
A. I don't know.
Q. Okay. Is that something that you would -- okay.
A. The standard contract could -- and this is not firsthand knowledge. The standard contract could say there are delivery schedules which would be provided on some such time scale for this purpose.
Q. But you don't know whether they do or not?
A. I don't know.
Q. Is that something you would have known at the time you were at RW?
A. I doubt it.
Q. All right. Same question for this -- there's actually -- you have to sort of piece together the sentence, but I think -- well, let me just ask.

# Nancy Slater (Thompson)

## Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

## Page 2

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U S. Department of Justice
1100 L Street, N.W
Room 10150
Washington, D.C. 20530
(202) 307-6289

## Page 3

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted' to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


## Page 4

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

Page 81

A. Mr. Kraft rarely attended the working group meetings and tended to focus his efforts more on what was going on in the legislative front. And the day-to-day operations for the group were left to me.
Q. You said there was a long list of issues that the utilities looked at that they thought might need some benefit or need some clarification that are in this standard contract. Do you recall any others besides these three?
A. Let's see. The term domestic origin, for example, I do recall that one.
Q. What was the nature of that issue?
A. What does -- what is fuel domestic origin, is it fuel that's mined in this country or is it fuel that's burned in this country. And as you know utilities buy their fuel from a variety of places. And so one of the things that needed to be interpreted and clarified was that it means fuel burned in a reactor in this country.
Q. Did the group reach closure on that issue?
A. Oh, yes, they did. And subsequently,

Page 82

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.
Q. Which way did you answer the question?
A. Burned in a U.S. reactor.
Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?
A. Domestic origin, right, right.
Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?
A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.
(Slater Exhibit No. 2 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?
A. Let me look through it.
Yes, I do.
Q. Can you tell us what the document is?
A. You'll remember that I said that there

Page 83

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved. Some of the issues were coincident, some were not.
And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract.
Q. Now, you'll see in the last page of this document that it's signed by Mr. Kraft. Do you recall, would you have written this document for him?
A. No, I would not.
Q. Were you involved in the creation of this document?
MS. SULLIVAN: Do you need to take time to review the document before you answer any further questions?
THE WITNESS: Yes, I was involved.
BY MR. SHAPIRO:
Q. What was the nature of your involvement?
A. Explaining issues to the individuals

Page 84

who would have been responsible for drafting this response, this request.
Q. Who would have drafted this letter?
A. To the best of my knowledge, it would have been individuals like Jay Silberg at Shaw, Pittman, Potts & Trowbridge and Mike Bauser at Newman, Holtzinger.
Q. So it would have been drafted by outside counsel for the Utility Nuclear Waste Management Group?
A. With some support from perhaps technical contractors if it dealt with technical issues.
Q. I see you looking through the document. Do you want some more time to look through it?
A. No.
Q. Just a moment ago, you said something, and I didn't understand what you said. You had said that utilities had looked at issues and DOE had looked at issues that might need clarification, you said some were coincident and some were not. I guess I'm not sure what you mean.
A. DOE, for example, might not have

Page 105

DOE didn't have any viewpoint?
A. Priority for shutdown reactors was a classic.
Q. Any others?
A. I don't recall specifically. I remember that one in particular because it was so contentious within the industry.
Q. What about issues on which DOE did have a viewpoint, which of those do you recall being worked on?
A. I know we had a viewpoint as DOE on final delivery schedules and what information those FDS's should include. And I know that DOE based that on operational considerations, similar to the safeguards and security operational considerations I explained to you earlier this morning.
Q. Let me make sure I've got the right time frame in mind. We're still talking about the time when you were working for the Utility Nuclear Waste Management Group?
A. Yes.
Q. And during that period do you recall any other issues coming up where DOE was proposing a clarification?

Page 106

A. Not specifically.
Q. What about when you actually started working with Mr. Brownstein over at DOE, this process was still ongoing?
A. It was still ongoing.
Q. And then you sort of reversed roles in some respects and you started working on that process from the DOE side?
A. Yes.
Q. What did you do in this process on the DOE side?
A. For example, on -- I continued to work on developing positions on issues where DOE felt it had an interest, communicating with the utility group.
Q. Which issues do you recall working on once you joined DOE?
A. Delivery commitment schedules, delivery commitment schedule exchanges, final delivery schedules, standardized canisters, oldest fuel first. I don't remember whether domestic origin was one of those issues or not. There were a significant number of issues.
Q. You mentioned delivery commitment schedules. What was the nature of the issue with

Page 107

respect to delivery commitment schedules?
A. Delivery commitment schedule had to be -- the instructions for completing the DCS had to be developed, the DCS itself had to be approved by is it OMB or -- OMB. The DCS's had to be transmitted, actual forms had to be transmitted to the utilities.
Q. What was the issue as part of the ACR resolution process that was trying to be resolved with respect to delivery commitment schedules?
A. One of the issues that I recall, and this was from the utility side, the DCS asks for the discharge date on the fuel. Now, the department would have liked to have had a very specific discharge date because it tells them a lot about the characteristics of the fuel. It lets them plan very accurately.
The utilities didn't want to do that. The utilities wanted to give them a range of discharge dates that might have been for ten years, because they wanted -- they believed they needed to preserve their flexibility to reach into that pool of fuel, pull it out, and give them anything they felt like giving them. And that was the issue. DOE wanted specific

Page 108

discharge date, they wanted broad discharge dates.
Q. Do you recall how that issue got resolved, did it get resolved?
A. By default it did because the DCS's were submitted with a range of discharge dates. And on my side on DOE I recognized that, in the final delivery schedule, I would get the specific discharge dates. So, in fact, it ceased to be an issue.
Q. Do you remember any other issues coming up in this ACR resolution process with respect to delivery commitment schedules?
A. Not that I recall.
Q. What about delivery commitment schedule exchanges, what was the issue there?
A. Do you wish me to address that from the utility side or from the DOE side?
Q. Well, let's start with the utility side.
A. From the utility side, the issue there centered around let's assume that two utilities wanted to make an exchange. Could a utility that had BWR, boiling water reactor, fuel exchange with a utility that had pressurized water reactor

**Page 137**

reorganization.

Q. But otherwise it's basically the same group?

A. Yes. I do believe there was a separate transportation program at the time that UNWMG existed. And I do not recall the name of the law firm that managed that, but I believe that was consolidated with UWASTE.

Q. If you could turn to page 761 in the compilation. Do you see the first issue listed as being of a priority to DOE was whether or not there should be any exceptions to the oldest fuel first priority ranking; do you recall that issue?

A. Yes. The issue there was do I have to give you my oldest fuel. And, from the utility perspective, I have fuel in my pool, I have fuel in the lower forty. I would prefer to give you the newer fuel which is in my pool and free up space there. I'm not interested in giving you the stuff I've already canned.

So, if my oldest fuel is what earns me a place in the ranking based on its discharge dates, must I give that you fuel that earned the ranking. And the answer was no. That fuel earns you a space in the ranking. But on your DCS you

**Page 138**

tell us that you want to give us a range of fuels; and, as long as it meets those minimum conditions, five-year-old being the biggest one.

So that's what OFF was about, because it could have been interpreted -- this was the utility perspective. It could have been interpreted to mean that I had to give you the precise fuel that earned me the slot in the ranking.

Q. I think I understand. Let me point your attention to particular language in the middle of that column. Right about in the middle, it says the resolution of this issue will focus on clarifying that the application of the OFF principle is used only in establishing the acceptance priority ranking, and as such, there should be no exceptions.

Then the next sentence says, any basis other than OFF would result in inequitable assignment of acceptance capacity among the purchasers. Why would that be if you just said that utilities, they've already earned their spot in the queue?

A. No, I think you're not reading that in the proper context. What they're saying is that

**Page 139**

an acceptance priority ranking on any other basis than oldest fuel first on an industry-wide basis would not be equitable. That's what it's saying.

Q. And what was your understanding as to why that would not be equitable?

A. From a DOE perspective, we believe that oldest fuel first applied to the industry as a whole, not to each individual utility.

Q. Is the equity issue to be more specific the same one that we've discussed I guess with respect to the priority for shutdown plants issue, the concern that, if you didn't use the strict oldest fuel first priority ranking, then a utility might somehow incur unexpected storage costs for spent fuel?

A. Yes. And those who have been paying into the fund the longest have had the longest and largest financial obligation and should have their fuel removed first. And the consensus of the industry as I understand it was that was true, they agreed.

Q. And the concern again with the need to have to create more away-from-reactor storage space was linked to the concern at the 1998 date

**Page 140**

for starting acceptance of spent fuel, that that might well not be met?

A. Yes.

Q. Especially by this 1991, 1992 time frame, that was even clearer than it was earlier?

A. I personally would agree with that.

Q. Would DOE's waste acceptance office that you were part of in '91, '92, would that office have had the same view?

A. I can't speak for anyone else in that office. I can speak for myself. And I will tell you that that was my personal perspective in that office.

Q. Can you recall anyone in that office having a different perspective?

A. No. I can't recall anyone in that office specifically having a similar perspective.

Q. What about Mr. Brownstein, do you recall what his perspective was on the likelihood of making the '98 date?

A. I'm trying to think if we had specific discussions on that. I believe that Mr. Brownstein and I did have discussions on the '98 date, significantly after the '91, '92 time

Page 161

address one issue, that you would go to
rulemaking to address the entire suite of issues,
some of which could take longer to resolve than
others. So a timing issue.
Q The timing issue being that DOE wanted
to wait before going further on this issue until
other issues were more ripe?
A. Until we completed the effort, the ACR
issue resolution process, and been able to go to
rulemaking with a more complete set of changes.
(Slater Exhibit No. 8 was
marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what
we've had marked as Slater Exhibit 8 Do you
recognize this document?
A. No, I don't recall this This is my
handwriting. And these appear to be the meeting
minutes from a standard contract task force that
would have been a utility group task force in
August 29, 1991, five days after I joined DOE.
And it looks like it focuses on
completing DCS's. And I believe you will note in
item 3 that we discussed that range of discharge
dates which was one of the issues that was

Page 162

unclear
Q You said that Slater Exhibit 8 that
you're looking at looks to be minutes of a
meeting of utilities. Why would you have
attended the meeting if you were already at DOE
at that point?
A. You recall that we discussed
instructions for completing the DCS form. Prior
to formalizing the instructions for completing
the DCS form, we would have met with the standard
contract task force, the utilities, because we
had provided them with a copy of the instructions
and asked them to review it, asked them if they
had any questions, and agreed to discuss the form
with them so that we were not imposing something
that was unclear and would not work.
And this meeting appears to have done
just that, because, if I am reviewing this
correctly, starting at item 4, page 3, paragraph
1, page 3 paragraph 3, page 4 at the top, these
are all what appear to be pages of the procedure.
Q Let me also confirm something that I
think you said earlier, that Slater Exhibit 8,
the first page of it looks to be a sign-in sheet
for a meeting?

Page 163

A. Yes.
Q. And the subsequent pages appear to be
your own minutes or notes of that meeting?
A. My notes for suggested changes,
because, in fact, if you look, it says page 4 at
the top, article VB, spell it out. And what does
approval mean, it has to be signed. So this is
exactly what this one is. This was to receive
the comments that the utilities had on the DCS
procedure and the form itself and go back and
review them and then incorporate them.
Q. When you say the DCS procedure, you
mean the instructions given to --
A. Instructions.
Q. Given to utilities on how to complete
the DCS?
A. Right.
Q. On the second page of Slater Exhibit 8,
you have it looks like certain items or issues 1,
2, 3, 4. Could you tell me what the second one
is talking about?
A. Let me read it for a moment.
Okay. Submission of the first DCS's
was timed, it's explicitly mandated in the
contract, 63 months prior to the delivery year,

Page 164

and assumes that delivery would commence in 1998,
January 31, '98.
If 1998 were not the year when delivery
commenced, utilities would have submitted DCS's
for 1998. The question was do they get to go
back now and revise their DCS's or are they just
overcome by events, are they calendar year
specific or year one, is it 1998 or year one.
Q. Year one of what?
A. Of any range of dates. So, if it were
year one, no one would have to revise anything.
If it's 1998, do I make them go back and revise
all their DCS's, do I -- if they have to go back
and revise their DCS's, can I revise a DCS or
would I have to treat it as an exchange in a
given year. So there were procedural questions
about that, and that's what this issue is
discussing.
Q. You say year one, you mean year one of
DOE's acceptance of spent fuel under the waste
acceptance system?
A. Yes.
Q. The instructions for the delivery
commitment schedules, did they require utilities
to not request delivery of more spent fuel than

Page 165

was provided for in their allocation in the
published annual priority report?
A. Yes, that would have been the basis for rejection of the DCS.
Q. Was there any discussion of that instruction at this meeting?
A. I don't specifically recall that.
Q. You don't specifically recall that instruction being discussed at any such meetings?
A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.
Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?
A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

Page 166

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.
The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.
So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.
So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

Page 167

to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.
Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?
A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it, that was just not possible.
Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?
A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe

Page 168

thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.
So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.
Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?
A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.
Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

Page 173

and there.
Q. And the bottom paragraph talks about a marathon session and mentions comments from others, you are mentioned and then the next entity is PNL. Is that Pacific Northwest Labs?
A. Yes.
Q. What would the nature of their involvement have been?
A. PNL was involved in -- as a contractor in originally drafting -- helping to draft the standard contract. Now, precisely what their involvement was I don't know. And in this capacity they may have been consulting for Billy Cole.
Q. So PNL would have been a subcontractor of TRW?
A. I think, I'm not sure.
Q. And then the next entity referred to is M&O Transportation?
A. That's TRW, that's management and operating, their transportation group. And the next organization would be the M&O MRS, monitored retrievable storage design group.
Q. What would the nature of those two organizations have been in the process of

Page 174

finalizing those issues?
A. If there were any design considerations for which we were unaware, because, remember, we were focusing on contractually based issues. If there were design considerations that we needed to consider or that we had overlooked, it would be their opportunity to inform us.
Q. At the top of the memo, there's a cc list with a number of people. These people were all individuals involved in DOE's resolution of these issues?
A. Some directly, some indirectly. Alan Brownstein, of course, was my boss. Jim Clark was M&O, the supervisory level, I don't know how directly he was involved. E.R. Johnson is the managing officer of JAI, and I don't know how directly he would have been involved.
M.C. Klose I don't recall. Ernie Leonard, a staffer to the M&O. Nora McDonald, M&O, data manipulation. Doug Williamson, M&O, nuclear engineering background. And Glen Vawter, I don't have the vaguest idea of why he's on this distribution list, he's M&O.
Q. What do you recall Mr. Vawter's position being with the M&O group?

Page 175

A. I don't recall his position with the M&O.
(Slater Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been given what we've had marked as Slater Exhibit 10. Do you recognize it?
A. Yes. I would like to look it over, but it is another OCRWM position on one of the 35 issues, this one dealing with the identity of the amount of waste to be identified on the DCS.
Yes. This is a simple issue, simple. The language at the time in the contract implied that ad infinitum, when it became time to submit on that first opportunity of DCS, that you would have to tell us everything you were ever going to deliver.
So the confusion was do I need to submit ten DCS's, 50 DCS's, do I put it all on one DCS, and what is the amount I'm supposed to submit. This was a simple issue in the sense that what we told them was that the DCS is year specific. It's not to include more than one year.

Page 176

You have a DCS for every year. And the amount you put in the DCS for one year is the amount that you're allocated for that year. So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to.
The questions from the industry were all over the map. Some people thought they didn't have to, some people thought they did. It was just confusion.
Q. Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation; the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?
A. Right, absolutely. That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation.
Q. And DOE shared that understanding?
A. And DOE shared that understanding.

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------- X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

--------------- X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 208

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 209 |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


Page 209

P R O C E E D I N G S

Whereupon,

NANCY H. SLATER,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED

BY MR. SHAPIRO:

Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?

A. Yes.

Q. Do you understand that?

A. Yes, I do.

Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?

A. Yes.

Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.

(Slater Exhibit No. 17 was marked for identification.)

BY MR. SHAPIRO:

Page 242

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.
Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.
So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.
Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?
A. Yes.

Page 243

Q. What was meant there?
A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.
And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.
And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.
And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally

Page 244

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.
Q. So it was not intended that the delivery commitment schedule process be a gotcha process?
A. A static process.
Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?
A. That's correct, it was not our intention to do that.
Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?
A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

Page 245

fuel that earned you the slot.
So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.
So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.
So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.
Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?
A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they