Page 246

were allocated because of the equity issue.
There's only so much system capacity. If I accept more from someone else, I accept less from someone else.
Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?
A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.
Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?
A. Yes.

Page 247

Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.
A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.
Q. It says RW-43, that was his division, Mr. Carlson's division?
A. Forty-three, right.
Q. What division would that have been?
A. I don't recall the name specifically. We've shifted names so many times.
Q. But approximately what --
A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.
Q. And that RW-40 is the designation for that office?
A For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director

Page 248

of the program.
Q. And their office is indicated as RW-2?
A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.
Q. So the director is the only one with RW-1?
A. Yes.
Q. And his support people are RW-2?
A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.
Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?
A. I don't recall.
Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?
A. That depends on the version of this

Page 249

that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.
Q. So there may have been another version of this memo with a concurrence by the contracting officer?
A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.
(Slater Exhibit No. 21 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?
A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

**Page 250**

Yankee that we could not accept.

Q. So, after the director would have proved Slater Exhibit 20, then Slater Exhibit 21 would have gotten drafted?

A. Actually does this have a date on it? I cannot determine whether this is the letter that would have gone with the original DCS's that were incorrect or subsequent to the negotiations. If I were to do a cold reading of this --

Q. You asked about the date. Let me point your attention to the last page on the left, where there's that indication of you as originator that you pointed out in the previous document. It appears to be a date 6/24/93.

A. This would have been the final letter. I've read enough in the letter to know that it's the final letter.

Q. And, in fact, it appears that Slater Exhibit 20 and Slater Exhibit 21 were at least originated by you on the same day?

A. Actually not necessarily originated on the same day. But it was standard practice, when you submitted a memo like this to the director, to provide him with the opportunity to see the

**Page 251**

letter itself so he knew what he was likely to be recommending be signed by the contracting officer. And that's what this would have been. So the total concurrence package would have contained both.

Q. So there would be no disconnect between the approval memo and the actual product that went out of the office?

A. Yes. And I cannot determine whose comments these would be on here.

Q. That was going to be one of my questions. There's some handwriting on the second page of Slater Exhibit 21. And you don't recognize that handwriting?

A. No, I don't.

Q. It's not your handwriting?

A. Certainly not mine. Mine would have been an absolutely clean copy. And actually --

Q. Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?

A. No.

Q. Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

**Page 252**

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?

A. You would have to question the contracting officer particularly concerning that. My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year.

And the utility's understanding at the time I was in the industry was that that's precisely what it meant. And this letter stopped short of saying, guys, the contract has requirements, you signed the contract. You need to behave consistent with the contract.

So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS. But I recall from the utility days that that's one of the things utilities were concerned about.

Q. So it would have been a fair

**Page 253**

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?

A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.

Q. Who would have drafted this particular language, would that have been you?

A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.

Q. Who was Nick Graham?

A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.

Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

**Page 254**

the contract. Can you tell us what part of the contract you were referring to?

A. I can't recall the specific article number. But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules.

And under that section you will find that there are certain steps that must be executed by both the department and the purchaser. And there are timetables associated with each of those steps. And that's in there.

(Slater Exhibit No. 22 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 22. Would you take a look and tell us if you recognize this document?

A. I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract. Knowing that these contracts were subject to individual modifications, for example, payment of fees, the schedule in which fees might be paid, I can't tell you what the particulars are.

**Page 255**

Q. But generally the terms of the contracts were largely the same?

A. Standard.

Q. Can you point us to the language of the contract you were just referring to as far as the Yankee Atomic's obligation with respect to the delivery commitment schedule?

A. Yes, if you turn to page 11, it's Article V B.2., DOE shall approve or disapprove -- actually let's go to B.1., DOE shall approve or disapprove such schedules within three months after receipt. This is the initial submittal. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval, which we discussed, and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.

DOE shall approve or disapprove such revised scheduled within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule. If these are not acceptable to the purchaser, the parties shall promptly seek to

**Page 256**

negotiate mutually acceptable schedules.

The terms and conditions for this process, this iterative process are very clear. And, in fact, you know, we did engage in the negotiations. In fact, another letter came back that said no.

Q. But what in the contract says that after the parties try to come up with a mutually agreeable result, it says that if they can't come up with something that both agree on, that the contracting officer gets to decide the issue?

MS. SULLIVAN: Objection. You're asking her for an interpretation of the contract. And Ms. Slater is not a lawyer. If you would like to ask her a question about her opinion or whether she finds guidance to that effect, that's fine. But her interpretation of the contract, she's not the contracting officer or an attorney.

BY MR. SHAPIRO:

Q. Answer the question.

A. That's why I stated earlier that I have no personal knowledge of how the last paragraph of Exhibit 21 which was the letter to Mr. Buchheit at Yankee Atomic was drafted,

**Page 257**

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff. And I have no knowledge of what led them to those statements.

Q. So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?

A. No, I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract.

Q. You said when a utility refuses to honor the terms and conditions of the contract. What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?

A. Submit an acceptable delivery commitment schedule.

MS. SULLIVAN: Give me a chance to object before you answer the question.

BY MR. SHAPIRO:

Q. What part of the contract tells you that Yankee Atomic's delivery commitment

Page 258

schedules weren't acceptable?
MS. SULLIVAN: Same objection. She can answer as to her opinion.
THE WITNESS: In my opinion I cannot give you a specific section because I haven't looked at this contract in years. I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year.
BY MR. SHAPIRO:
Q. Can you take a look now at the contract and tell me where that would be.
MS. SULLIVAN: Same objection to the extent you're asking for a legal interpretation of the contract.
You can answer the question.
THE WITNESS: You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules. Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to.
One of those issues was delivery

Page 259

commitment schedules. And primarily the issue there was the need for the department to issue instructions on how to complete the form.
One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS. Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday. It was my handwritten meeting minutes from the standard contract task force.
I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions. So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form.
Those instructions were formally issued to the utilities. And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms.
BY MR. SHAPIRO:

Page 260

Q. And I certainly understand that and I understand your counsel's objection that you were never the contracting officer. But, if I understand correctly, I mean you just took a little while to look at Yankee Atomic's contract. And looking at it you can't point to a particular clause or combination of clauses that you would have relied upon to say that Yankee Atomic's submitted delivery schedule were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe that the discussion contained in the contract on the acceptance priority ranking and the annual capacity report, when viewed together and in the context of a theoretical acceptance capacity and repository, fairly clearly indicate what the amount of the allocation is for a utility in any given year.
BY MR. SHAPIRO:
Q. But you can't point to a clause in the contract that sets that out?
A. That sets what out?
Q. That sets out that Yankee Atomic's proposed delivery commitment schedules

Page 261

were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: No, I can't, because I'm not the contractual expert.
BY MR. SHAPIRO:
Q. Beth Tomasoni who was the contracting officer at the time of final denial of Yankee Atomic's proposed delivery commitment schedule, she might be able to tell us more specifically what clause of the contract was being relied upon?
A. She might be able to give you the basis for her approval of this letter.
Q. Who else might be able to tell us more specifically what contract provision was being relied upon?
A. That would be someone in the contracting officer's office, perhaps herself or himself at the time, herself and her staff.
Q. How large was the contracting officer's staff?
A. I really do not know.
Q. You didn't work closely with those people?
A. I worked closely with a couple of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 86

of why we have a revision one and why you have not presented me with Rev. 0.

Q. I'll show you what I have got as the other version. Maybe you can offer a further explanation.

(Thompson Deposition Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater Thompson, I have handed to you what's been marked as Exhibit 8 which has on its title a 1992 ACR with a date of March, 1993. Do you recall this document?

A. Not explicitly, no.

Q. Does this help clear up for you at all the revision one issue that I just asked you about about Exhibit 7?

A. Not at all. In fact, what you have handed me, I can't determine whether or not this is a final or not.

Q. I take it then you don't recall issuing one draft of the 1992 Annual Capacity Report in March and then another one two months later?

A. No.

May I take a moment to read through

Page 87

this?

Q. Sure.

A. Thanks.

(Discussion off the record.)

BY MR. SHAPIRO:

Q. Did you say that you thought that Exhibit 8, the one dated March, 1993, might be a draft? It doesn't have the fancy cover that the other versions had.

A. Right. That's what confused me because this doesn't look like the finals that we have, even the one with the fancier artwork for '95.

No clue; it will remain one of life's mysteries.

Q. Turning to Exhibit 7, the May, 1993 version of the 1992 Annual Capacity Report, again I want to ask you about the acceptance waste projections that are on page 4 of this exhibit.

Do you recall how the acceptance waste -- acceptance rate -- waste projections in Exhibit 7 were developed?

A. No.

Q. I want to go back to the most recent ACR, the 1995 one, for a moment.

Page 88

I believe you testified that those acceptance rates were based in part upon the 10,000 MTU limit on the size of MRS. If that was the concern, why wouldn't it have been appropriate for DOE to accept waste at a faster rate and then have stopped at 10,000 MTU so as to provide more assistance to the utilities who needed waste accepted sooner?

MS. SULLIVAN: Objection, argumentative. Objection, vague. Objection, foundation.

A. My personal opinion, and as we have discussed before, there are numerous factors that would affect the rate at which you would work off delivery of spent fuel from reactor sites, and one of the most important being do you have enough casks in the transportation cask fleet to accept more even if you assumed for a moment that you had a facility that could accept more.

So I'm not entirely sure that you would have had the ability from a transportation cask standpoint to have accepted 10,000 MTU in the first year, for example. What would have prevented you from accepting 10,000 MTU in the first year? Logistically, I don't believe you

Page 89

could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...

Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. I have no knowledge of anything like that.

Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. No, I do not.

Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the contract, which is Exhibit 2. The part that I

Page 146

fuel in any NRC licensed container, licensed by the NRC for transport?

MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.

You can answer.

A. No, I am not focusing on anything related to transportation.

Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?

A. No, it does not. There is a separate transportation group that does that.

Q. The regulatory issues that your division is involved in are limited to those of the repository?

A. The repository, and I would say those in part two issues, that would be license and process issues.

Q. Has the issue of greater than class C waste come up in your role in the regulatory division?

A. No.

Q. Do you recall any discussion of whether or not to include greater than Class C

Page 147

waste in the EIS for Yucca Mountain?

MS. SULLIVAN: Objection. Vague.

A. No, I don't.

Q. Has the issue of high-level waste come up in your role in the regulatory division?

MS. SULLIVAN: Objection, vague. Objection, foundation.

A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.

Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?

MS. SULLIVAN: Objection. Vague.

A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low

Page 148

strategic significance.

Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. I have never heard that.

Q. Has such an interpretation ever played a role in your work in the waste acceptance division?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. I have never heard it, and I don't recall even considering that.

MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.

I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address

Page 149

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

# Victor Trebules

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-----------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.

BY MR. EIDUKAS:

Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.

So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.

A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his



office for I think little over half a year as an adviser to the Secretary.

I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.

A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.

Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal conclusion.

BY MR. EIDUKAS:



Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.

A. Not that I could remember.

Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?

MR. SHULTIS: Objection, vague.

THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.



THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.

BY MR. EIDUKAS:

Q. Are you familiar with the term standard contract?

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?

MR. SHULTIS: Same objections.

THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.

BY MR. EIDUKAS:

Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.

MR. SHULTIS: Keep in order.

BY MR. EIDUKAS:

Q. Keep in order if you have to refer back to something in the future.

Do you know what the parties to the standard contract intended with respect to how fast spent



nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:



Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than



that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

# Victor W. Trebules, Jr.

Page 45

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for

Page 46

speculation.

THE WITNESS: No, I have no knowledge of any waste acceptance schedules proposed prior to the mission plan.

BY MR. EIDUKAS:

Q. Just so I'm clear on the scope of your knowledge or your involvement, is it correct to say that your first involvement or encounter with waste acceptance schedules was when you began working on the mission plan in about 1984?

MR. SHULTIS: Objection, mischaracterizes witness's testimony.

THE WITNESS: Could you repeat the question, please.

BY MR. EIDUKAS:

Q. Sure. I'll rephrase it. I'm trying to make sure I understand whether or not your first involvement with waste acceptance schedules in connection with the Nuclear Waste Policy Act and the standard contract was when you began working on the mission plan in, I believe you said, 1984?

A. I don't remember the exact date, but I think I

Page 47

joined the Civilian Radioactive Waste Management Program in 1984. And my first assignment was working on the mission plan and in that mission plan we did include proposed waste acceptance schedules.

Q. But you personally didn't work on waste acceptance schedules prior to that time? This is what I'm asking.

A. I do not remember working on any waste acceptance schedules prior to that time.

Q. When you joined the Office of Civilian Radioactive Waste Management and you said you were assigned to work on the mission plan, at that time had there already -- had work already been done on preparing the mission plan?

MR. SHULTIS: Objection, asks for speculation.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't remember. I know it was a provision of the Nuclear Waste Policy Act, which I believe was passed by the Congress in December of '82, signed by the President in January '83. As I said, I

Page 48

joined the program in '84. I don't remember if people had worked on that before I did, but I know that when I joined the program, that was the first assignment I was given.

MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --

MR. STOUCK: 528?

MR. EIDUKAS: I'm sorry.

MR. STOUCK: I didn't hear.

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SN 069588D and then it skips some Bates numbers and then you have SN 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

BY MR. EIDUKAS:

Q. Mr. Trebules, as you can see, this is three

Page 49

pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.
A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.
Q. That's correct.
A. That's not included here.
Q. That's correct.
A. All right. I've looked over these two pages.
Q. Okay. Do you recall, have you seen these pages before?
A. I don't ever remember seeing these two pages.
Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.
A. Right.
Q. Were you present for such a conference or meeting, whatever you want to call it?

Page 50

A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.
Q. Right.
A. This was in 1983.
Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."
Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?
A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.
Q. Okay. I want to move down to that same column. It's the largest paragraph there on the

Page 51

right-hand side.
A. Uh-huh.
Q. The paragraph starts out "I would like to talk a little bit about." You see that?
A. Yes.
Q. What I want to refer you to is about midway through that paragraph. There's a sentence that starts, "The basic strategy which we've outlined."
A. Yes.
Q. Okay. I just refer from there on to the end of the paragraph that says: "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at any -- I'm sorry -- or at another location." You see where it says that there?
A. Yes, I see that.
Q. Okay. Do you know whether that was -- or strike that.

Page 52

Do you know was that the intent of the DOE at the time?
MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.
THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.
BY MR. EIDUKAS:
Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?
MR. SHULTIS: Same objections and relevance.
THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

Page 53

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

Page 54

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?

MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.

THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?

MR. SHULTIS: Objection, asks for a legal

Page 55

conclusion. Mr. Trebules is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: Could you help me? Could you clarify what you mean by the word intent?

BY MR. EIDUKAS:

Q. Sure.

A. Because I know we had planning targets or objectives or goals that we were trying to meet, but I know there was concern about the characterization of those and we put in, as I said before, caveats as this document indicates, you know, that represented some of the difficulties. And as I say on page 11 where it says, at the end of the second full paragraph. "Our intent is to fully comply with the act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so." Again, can you clarify your question by what you mean by intent?

Q. Sure. I mean, I think we're talking about DOE here because you said you don't know what the utilities intended. What I mean by intent is what the DOE expected to do when -- and I was talking and my

Page 56

question was referring to the time that the standard contracts were entered into back in 1983. You may not know the answer to that, but that was my question.

MR. SHULTIS: Same objections as before. Legal conclusion, 30(b)(6) witness, calls for speculation.

THE WITNESS: Again, I would have to characterize my answer by saying that our planning targets or our objectives or our strategies were such that, you know, we tried to have the facilities in operation to take the field by 1998. You know, with the caveats that I previously indicated. If that's what you mean by intent, that's how I would answer that question.

BY MR. EIDUKAS:

Q. Look quickly at the section of this paragraph right above where we've been looking. Starting with the sentence "I think most of you know." Do you see where I'm referring to? It's the second sentence of that paragraph. "I think most of you know."

A. I see that.

Q. Okay. Great. "I think most of you know that

Page 73

remember. His name was Tom Longo, who wrote a lot of the geology and hydrology sections of the mission plan, and then we had a support service contractor and I think at that time their name was Weston.
BY MR. EIDUKAS:
Q. And do you recall what Weston worked on for the mission plan?
A. Well, they were, again, support service contractors under DOE direction. They were drafting up various sections of the plan, you know, for DOE review. DOE had final approval and authority over the content of the mission plan, and I was responsible for a lot of the individual sections myself.
Q. I'm sorry. When you say responsible, do you mean to review what Weston had drafted?
A. Yes.
Q. Who else was responsible for reviewing sections of the mission plan drafted by the contractor?
A. Well, it was always DOE individuals within the organization that had to review and give final approval of anything that went out as part of the mission plan. Again, I don't remember the names of many of the

Page 74

people, other than perhaps Tom Longo or Charlie Head or Bob Rosselli that were involved in the review.
And I believe during the time we issued the draft to when we issued the final in June, we actually went through an organizational change. And I think when the June '85 version was issued, I actually ended up working in a different group and that was probably called the office of -- Office of Policy and Institutional something or other, and people there that were involved were people like Tom Isaacs, Roger Gale and Ben Easterling.
Q. Do you recall what their involvement was?
A. Ben Easterling was my immediate supervisor at that time in June of '85 I believe and Tom Isaacs was the director of that office, and I think Roger Gale was the deputy.
Q. I'm going to go back to -- so when you first started, you said your first supervisor was Charlie Head and then when this reorganization occurred, it became Ben Easterling.
Was there anyone in between those two people to whom you reported to?

Page 75

A. Not that I can remember.
Q. Did you have final say over approving the sections of the mission plan that you were responsible for, or did you have to take that to your supervisor for them to have your decision approved?
MR. SHULTIS: Objection, compound.
THE WITNESS: Yeah. Did I have final say. I would say no. I had to get approval of several layers of my management at the time, starting with Ben Easterling, Roger Gale, Tom Isaacs, and ultimately the director of the program had to approve release of the document.
BY MR. EIDUKAS:
Q. So Ben Easterling -- after this reorganization occurred, is that when Ben Easterling became your supervisor?
A. I don't remember the exact time, but I think when we issued the document in June of '85, he was my immediate supervisor.
Q. Okay. And to whom did he report?
A. To Roger Gale and Tom Isaacs.
Q. Did Mr. Gale report to Mr. Isaacs or vice

Page 76

versa, or were they kind of at the same level of management?
A. I'm trying to recollect. I believe Roger Gale was the Deputy of the Office of Policy and Institutional, whatever it was called, and Tom Isaacs was the director. So, in a sense I believe Roger Gale reported to Tom Isaacs.
Q. Okay. And then did Tom Isaacs report to the director of the program?
A. Yes, I believe so, and I think that was Ben Rusche at the time.
Q. You had said I think that you had drafted some of the sections of the mission plan. Is that correct or am I --
A. Yes, I wrote or drafted some of the sections of the mission plan.
Q. Could you just briefly list or describe which of the sections you were responsible for drafting?
A. The one in particular was I think what was called Chapter 1, which was an introduction, which I remember clearly we discussed the kinds of radioactive waste that we intended to deal with, and we put in a

# Victor W. Trebules, Jr.

Page 77

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.

Page 78

MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have

Page 79

these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question was: Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.

Page 80

A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public

review and comment. I would think not, but it's significantly different than the one that got published in June of '85.

Q. I can't recall if you answered this or not. Do you know whether or not -- do you know who prepared this version, this draft of the mission plan?

A. No.

MR. SHULTIS: Objection.

THE WITNESS: I do not know specifically who prepared this.

BY MR. EIDUKAS:

Q. Okay. And I think this follows from what you testified, but do you know whether or not this draft of the mission plan was used in any way in preparing the later drafts and the final mission plan?

A. I don't know. I don't remember how it was used. I mean, normally the process is, you know, drafts evolve, you know, through successive iterations. I'd only be guessing, but I'd assume that is what happened with this one.

Q. When you referred to Chapter 2, you said this was an early version of the strategy and didn't include



the authorized plan and the approved performance plan, but the final version of the mission plan did. Do you know why that was changed?

MR. SHULTIS: Objection, calls for speculation. Asked and answered.

THE WITNESS: I believe, as I indicated, Tom Isaacs was the primary author or inventor of the approach in that strategy chapter where we felt we had to clarify, as the names imply, what the department currently had authorization to execute. At the time that was the first repository in the transportation system, and we included discussion in the improved performance plan as to how that system could operate if we proposed and Congress accepted our recommendation on incorporating a monitored retrievable storage facility.

So we wanted to expand on and clarify that discussion, which I don't see in this document that you've provided me, the one dated December of '83.

BY MR. EIDUKAS:

Q. And you referred to a waste acceptance schedule. Is that the -- were you referring to the table that appears on page 2-3?



A. Yes.

Q. Okay.

MR. SHULTIS: You want to identify the Bates number?

THE WITNESS: CTR-042-1072.

BY MR. EIDUKAS:

Q. Is that the schedule that you were referring to?

A. Yes.

Q. Okay. And you said that this was changed in the eventual mission plan that was published?

A. Yes. This table doesn't look familiar to me, and I think the one that got published in the version of the mission plan in June of '85 was -- is different.

Q. So I take it you don't know the source of this waste acceptance schedule on page 2-3?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I don't remember the source. I don't know.

BY MR. EIDUKAS:

Q. And I think you said you don't recall seeing



this schedule before?

MR. SHULTIS: Go ahead.

THE WITNESS: I don't specifically recall it. I may have, but I don't -- I mean, I don't recollect it at all.

BY MR. EIDUKAS:

Q. Why don't we put this one aside for now. I may come back to this one later.

A. Okay.

MR. EIDUKAS: Would you mark this as Exhibit 5.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

Q. Okay. Turn to page Section I-Introduction. It has in the upper right-hand corner page 1-1. Is this a section that you drafted?

A. That I don't remember.

Q. I guess I'll back up a second. On this particular draft that is marked as Exhibit Number 5,



what specifically was your role in preparing this document?

A. Well, that's tough to answer. Again, when I got there, the mission plan work was underway. I don't remember exactly when or where I picked up because, you know, this is like 16, 17 years ago. I do remember, I believe this is the document that went out for public review and comment. As the cover letter indicates, signed by Mike Lawrence. As I indicated, the comments were due back to Charlie Head, who was my supervisor at the time.

Once we -- and I remember, you know, after this document much clearer that when the comments came back in, we revised some of these chapters and I did write the next version of this Chapter 1, for example, which was much more extensive with the pictures in it and the waste sites. To be honest, I may have been involved in structuring some of these words back then, but this is just about the time when I was, you know, coming into the program to work on it.

We made a lot of changes in response to those comments such as Chapter 1. We changed the strategy



chapter significantly, and I remember very clearly working on, you know, writing sections of the document after this version. To be honest with you, I don't remember exactly what I did with this document because this was the one that had been under work and went for public review and comment.

Q. Okay. Do you know who drafted this Section I of this draft?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: No, I don't remember specifically who might have drafted this.

BY MR. EIDUKAS:

Q. If you look down that second paragraph, page 1-1, the last sentence says, "The program developed by the department to fulfill the requirements of the Act is described in this mission plan."

A. I see that.

Q. Okay. Do you agree that the mission plan describes the program developed to fulfill the requirements of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal



conclusion.

THE WITNESS: I believe that's the case, but I would point out, though, that this was a draft document that went out for public review and comment and does not reflect the final version of the mission plan, which was the June '85 version of the plan.

BY MR. EIDUKAS:

Q. Okay. The sentence in that paragraph says, "Specifically, the following program objectives have been identified to implement the Act," and then it lists five numbered program objectives.

Is it your understanding that these program objectives would fulfill or would implement and fulfill the requirements of the Act?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Give me a second to review them, please.

BY MR. EIDUKAS:

Q. Sure.

A. As I recollect, these are the objectives that the department identified, which they thought would

THE WITNESS: Again, I'm not familiar with the provisions of the contract that, as these words indicate, that included the development of a waste acceptance schedule. I was involved in the subsequent development of the waste acceptance schedules that we used for planning purposes, which we put in the following version of the mission plan that got published in June of '85.

BY MR. EIDUKAS:

Q. Okay.

A. But I'm not clear at all as to the relationship of that to the contract, to the provisions of the contract.

Q. Okay. So if you'll just turn to the back side of that page you're looking at, there is a Table 2-1 Waste Acceptance Schedule.

A. Right.

Q. Did you have any involvement in preparing this particular schedule?

A. As best as I could recollect, I believe I did and, as I indicated, this is -- if I could refer back to the previous --



Q. Sure.

A. -- version that you gave me. The previous document.

Q. You're looking at page 2-3 is the table in that?

A. Yeah. I noted very quickly some changes. For example, in the previous exhibit, okay, if you note that this one began with acceptance rates for the first repository starting at 1800 metric tons, okay, for five years. Then it ramped up to 3,000 metric tons. Again, as best as I could recollect, upon reflection of this ramp-up rate, it was determined that was probably optimistic and unrealistic.

So, in Exhibit 5 that you just gave me, if you note the difference in the first repository acceptance rates, it started out at 400 metric tons, a much lower rate, a gradual ramp-up to 3,000 metric tons. And as I think I've previously indicated in some of my earlier answers, you know, my recollection of the first waste acceptance schedule we published started at 400 metric tons. So I am familiar with the ones in Exhibit 5, but I wasn't familiar with the ones in Exhibit 4.



Q. Okay. Talking about the schedule in exhibit -- strike that.

I think you said that the ramp-up period was revised downward in the schedule in exhibit -- between the schedule in Exhibit 4 and the schedule in Exhibit 5. You said it started at 400 rather than the 1800 metric tons that's set forth in Exhibit 4, and I think you characterized it in order to make it more realistic or probable.

My question is whether or not it's your opinion that the schedule set forth in Exhibit 5 is a realistic schedule?

MR. SHULTIS: Objection, calls for characterization. Legal conclusion.

THE WITNESS: Let me try to correct one thing you said. You said the ramp-up period was revised downward. It's the ramp-up rate that was revised downward.

BY MR. EIDUKAS:

Q. Thank you. That's correct.

A. I think I recollect discussions, you know, back again some 16, 17 years ago where people looked at



bringing a nuclear facility online like the waste receiving facilities of a repository and recognizing that it needs a gradual ramp-up rate before it reaches its full capacity steady state operations. And when we compared the numbers in Exhibit 4 to Exhibit 5, as we just discussed, you know, the ramp-up rate in Exhibit 5 is more gradual and I think in many people's minds, particularly the engineers that were working on it at the time, probably more realistic.

Q. Okay. Who did you have those discussions with, if you can recall?

A. Again, the only names I remember at the time the people I was talking to were people like Charlie Head, who was my immediate supervisor, who is the name indicated in this cover letter to provide comments to. He was, you know, back then he was the one that I talked to most of the time about the work on the mission plan.

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?

MR. SHULTIS: Objection, vague. Asks for a legal conclusion.

THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.



So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.

Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,



which is indicated in the column on the far right.

You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.

I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm



trying to get at what, I guess, first the source for these numbers?

A. Okay.

MR. SHULTIS: Objection, compound.

THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.

There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate .that that repository would operate for about 25 years as this table shows.

And then the second repository would be i operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel t be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the



maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to dat because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, tha equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodatio of all these interrelated factors.



But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.



BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

Page 113

any discussion. To my recollection, at that time I'm sure the answer was yes, but I don't remember any of the details of the discussions. I mean, again, I was fairly new to the program back in 1984. My primary involvement was on developing the numbers that went in the waste acceptance schedule that seemed to make sense, you know, from an operational standpoint.

Again, meeting the two criteria talked about before. You know, beginning in 1998 trying to get up to an acceptance rate that would preclude the utilities from having to add additional on-site storage. In looking at the combination of the two repositories, that would eventually reduce the backlog and accommodate all the waste. I'm sure there were discussions, but if there were discussions, I don't remember the details of them, you know, at this time.

BY MR. EIDUKAS:

Q. And when you were working, to the extent you were working on developing these waste acceptance schedules, did you view yourself as trying to meet a requirement that waste be taken as expeditiously as practicable as set forth as an obligation in the

Page 114

contract? Did you have that in your mind when you were developing these schedules?

MR. SHULTIS: Objection, asks for a legal conclusion. Asks for speculation.

THE WITNESS: I'm trying to remember, you know, again, what was in my mind back at that time. I honestly don't remember if we in the planning group, you know, looked upon that as a, as you say, as a requirement. We're trying to establish what we thought were possible schedules, you know, based on assumptions, strategies, objectives that we thought we could meet. Again, they were -- we were concerned about those becoming fixed dates. We were concerned about that. We put caveats in there.

Some of this documentation shows, you know, we said the schedules may change, you know, as other developments occur. I remember fairly clearly the concern of some people -- and I'd have a hard time remembering exactly who the people were, but the answer that I came up with to address that was incorporating key words in our explanation of the waste acceptance schedules as illustrative. You know, they were

Page 115

examples. They were ways the system could be operated.

You know, we put in words like that to sort of caveat, you know, being overly committal on what we thought we could do. And as you saw the words in some of these other documents, it said that the schedules may change, you know, and if they change, you know, we will have to change.

So, back to your original question, did I consider it as a requirement we were trying to meet? I don't believe so. It was a planning objective more than anything, and I think -- even as this cover letter that transmitted Exhibit 5 and I think I was involved in writing this. The one that starts off "Dear Recipient."

BY MR. EIDUKAS:

Q. Okay. I see that.

A. Signed by Mike Lawrence.

Q. Yes.

A. It states right in the first paragraph that: "The purpose of this report is to provide an informational basis sufficient to permit informed

Page 116

decisions to be made in carrying out the repository program and the research development demonstration programs required under the Act." Again, it was an informational basis sufficient for decision making. So we didn't want to, you know, overly commit or prescribe to anything.

You know, we knew there were a lot of issues that we would deal with. And, in fact, I think as we discussed before, if you compare Exhibit 4 to Exhibit 5, there were significant changes just from that early draft to this May 1984 draft. I mean, we were making changes, you know, in response to comments, you know, and the development of the planning activities at that time.

Q. Okay. In referring to that letter, when you talked about the document being provided as an informational basis that would allow use of people to rely or make decisions upon it, who are you referring to as making those decisions?

A. It would have primarily been the decision-makers in the Department of Energy, you know, who are charged by Congress with responsibility for

Page 121

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate

Page 122

acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections

Page 123

that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we

Page 124

wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

waste, in addition to spent nuclear fuel.

Q. Do you know why was that added? Why was that added in the final mission -- in this schedule that appears in the final mission plan, if you know?

A. I need a second to check one thing before I answer.

Q. Sure.

A. Has to do with Section 8. Okay. Between the time that the April 1984 draft of the mission plan was issued and the publication of the June 1985 version, we completed an evaluation under Section 8 of the Nuclear Waste Policy Act, which basically said unless there are compelling reasons, which basically required us to look at whether or not a separate repository needed to be constructed for the disposal of high level waste from the defense activities in the Department of Energy from the weapons activities.

We completed that evaluation and we made a recommendation to the President that we did not need to construct a separate repository. That it could be combined with the repository for spent nuclear fuel, and the President completed his evaluation and he then



directed the Secretary to proceed for the combined repository option in conformance with the Act.

So, based on that study, we then started incorporating in our waste acceptance schedules provisions for high level waste disposal, in addition to spent nuclear fuel. So you'll see in Table 2.2 of the June '85, Exhibit 6 version, high level waste acceptance beginning around 2003 I guess. So we then combined the total metric tons on an equivalent basis of the spent fuel and the high level waste for the total acceptance at the repository. Up to that same limit of 70,000 metric tons, which meant that there's less spent fuel going in the first repository. Okay?

Also, by this time another key difference in these waste acceptance schedules between Exhibit 5 and Exhibit 6 is that the cumulative amount of spent fuel that we expected to have to deal with in 1984 was still 140,000 metric tons. By 1985, that number was down to 130,000 metric tons. There are a few other differences, but they're relatively minor compared to those. For example, the annual spent fuel generation rate numbers are different in the two versions. The



early one starting out at 2,700 metric tons in 1998. The later one showing 2,900 metric tons in 1998.

Q. But with those changes that you've identified or those differences between the acceptance schedule on page 26 of the 1985 mission plan and the acceptance schedule in Exhibit 5, which was the 1984 draft of the mission plan, just looking at the rate, the ramp-up rate for the acceptance of spent fuel, there does not appear to be a change between those two documents; is that correct? It's 400, 400, 400, 900, 1800, 3,000 for spent fuel in both documents?

A. Right, the early ramp-up rates are the same.

Q. And the steady state rate of 3,000, looking at the first repository, is also the same?

A. I don't believe so.

Q. Well, in terms of maybe not the duration, the number of years at which fuel is accepted at that rate, but it's the same maximum or steady state? The rate itself 3,000 is the same?

A. That's true, but I think the duration is different.

Q. Right. Is that a function of both the



difference in spent fuel generation projections and the acceptance of high level waste?

MR. SHULTIS: Objection, compound.

THE WITNESS: It's primarily a function of the 70,000 metric ton capacity, and now that you're adding high level waste to the spent fuel, you reach that 70,000 metric ton capacity with a combination of the two, which means there's less spent fuel in the first repository.

BY MR. EIDUKAS:

Q. With the determination that there would also begin to be acceptance of high level waste beginning in 2003 at a rate of 400 metric tons per year, in addition to the steady state rate of 3,000 metric tons of spent fuel per year at the repository, did there need to be a change in the design of the repository because of that additional, the additional acceptance of high level waste?

MR. SHULTIS: Objection, vague.

THE WITNESS: I'm not the best person to ask that question of. My intuition says yes, but I can't give you any specifics.

Page 177

BY MR. EIDUKAS:
Q. Okay.
A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.
The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes

Page 178

facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.
BY MR. EIDUKAS:
Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?
A. I believe that's a fair statement.
Q. Okay. Turning to the -- you're looking at

Page 179

the next. Do you need a break? We've been going for a while.
A. I'm okay.
Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?
A. Right.
Q. Okay. Did you work on developing this acceptance schedule?
A. Yes.
Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?
A. To the best of my recollection it is.
Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?
A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the

Page 180

time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.
Q. Okay.
A. I can answer it that way. This is the first one I'm aware of.
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

Q. So, before you go on, so, is it fair to say that that objective, which you've stated several times now, that objective was the basis for the design rate of the MRS you were anticipating at the time of this document?

A. That's correct. If you look at the column on page 27, column 4, MRS Acceptance, you'll see that it starts out at 2200 metric tons first year, 3,000 metric tons the second year and stays at 3,000 metric tons. Again, remember, that was our design target, our design objective. You could have probably designed a smaller MRS, you could have designed a bigger MRS, but this was our designed target.

Inventory at MRS is the next column, column 5, which increases the first couple of years but then in 1998 starts to discharge to the repository. So it continues to increase until its rate of receipt equals its rate of discharge where then it stays constant, you know, until the MRS ceases operation and then the MRS eventually unloads into the repository. Okay?

Let me caution you one thing about this Table 2.3. The first year was 2200 metric tons does not



necessarily mean that in 1998 we would have accepted 2200 metric tons. That column is entitled, if you look over on the far left, Pre-1998 and, again, it looked like there was a chance we could get the MRS into operation in 1996. So it would be '96, '97, '98 the total of those three years that would have gotten us up to 2200 metric tons. Again, we thought we needed a ramp-up during that period before we reached a steady state rate of 3,000 metric tons.

Q. Okay. And would that ramp-up rate be similar to what would be the ramp-up rate that was proposed for the repository in the other schedule; the 400, 400, 400, 900, 1800?

A. I don't remember what the exact numbers are.

Q. Okay.

A. I mean, the only thing I could refer you to was the number in the table where it says pre-1998, you know, 2200.

Q. And as this proposed system would work, would there be -- would the MRS -- would any of the spent fuel accepted at the MRS be accepted or moved to the second repository, or was it planned that waste would



be received directly at the second repository from the utilities?

A. I need a second because I believe we talked about that as an option, but I don't remember where. (Pause). All right. Let me refer you to page 25. The bottom paragraph, the one starts: "On the basis of the integrated system approach described in the approved performance plan, the DOE has identified many possible waste acceptance schedules."

Again, one of the caveats, this is only an illustrative schedule that we're talking about. There were many others, you know, with all the questions and uncertainties. Depending on the size and operating characteristics of the system facilities. That's MRS and the repository. One such waste acceptance schedule that illustrates -- and again illustrates was the word we coined to try to, again, sort of serve as caveat.

That illustrates the quantity of waste that we feel we could accept beginning in 1996 with the completion of the integral MRS facilities presented in Table 2-3. The schedule assumes that one MRS facility



services the first repository. Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories or two MRS facilities serving two repositories.

Again, a lot of different ways you could design and operate the system. The schedules we presented were illustrative only for those two concepts. But we indicated that, again, there were lots of different ways to do the job.

Q. Even though that -- so, if these are illustrative schedules and as this section indicates that the DOE has in effect many possible ways to do acceptance schedules, to your knowledge, were all those schedules, though, consistent with the objective you've identified of ramping up to a steady state rate that would act to eliminate the need for additional at-reactor storage?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: There are a couple of places in this chapter. If I had more time I could probably find better words, but let me just show you a few that

I think get to your question. On page 24 under Section 3. Assumptions about an MRS facility.

BY MR. EIDUKAS:

Q. Okay.

A. If you look down to B, waste receipt rate. "The waste acceptance rate will be approximately 3,000 metric tons per year of spent fuel or equivalent high level waste." Again, the 3,000 was based on the EIA projection of the amount of spent fuel we thought would be generated in that time frame. So, again, that was sort of like our target. That was a design objective.

If you also look on page 28, for example. These are just some I can find relatively quickly. Down at the bottom of the page, it's got numbers 1 and 2.

Q. Yes.

A. Number 1 says, if you look at the sentence: "The rate at which an integral MRS facility would accept spent fuel is based on two major considerations. The need to relieve the utilities of on-site fuel storage pressures that could result in the disruption of orderly nuclear reactor operations after January



1998." Again, the need to relieve utilities of on-site fuel storage pressures. Those were some of our considerations, our planning objectives. Our targets that, you know, we incorporated into the plan.

Jumping ahead, the unfortunate thing about all these references to the MRS facility is that when we proposed it to Congress, they didn't accept it.

Q. Or didn't they accept it with certain linkages that made it possible to --

A. We proposed a specific site and a design for the MRS. We proposed the Clinch River breeder reactor site down in Tennessee with a number of different design concepts. Congress said, if I remember right, we accept the concept of an MRS, but don't build it at Clinch River. You know, go find another site. And then they put linkages on it, too, like it couldn't begin until a repository goes into operation or it passes a certain licensing phase, which made it impractical. I mean, the real one is you got to have a site to build it, okay, and that's a whole other story with the nuclear waste negotiator, the volunteer siting process and all that other stuff.



MR. EIDUKAS: Okay. Why don't we take off record.

(Recess, 3:30 to 3:43 p.m.)

BY MR. EIDUKAS:

Q. Mr. Trebules, we've looked at Chapters 1 and 2 of the section of the '85 mission plan that's contained in Exhibit 6. What other, if any, portions of what's in Exhibit 6 here did you have involvement in preparing yourself? You know, if it would be easier, if you want to look at the table of contents, if that would help.

A. Yeah, I think so. For example, at page 55, the small section on sub-seabed disposal, I was involved in probably writing or getting the information from the other office in DOE that was in charge of that activity to put it in the plan.

I think the easiest way to answer this was my job was to coordinate the preparation of the mission plan, which meant I had to write individual sections if there was no one else in the program that was the recognized expert, or I had to make sure that we had people assigned to these other areas to draft up the



material. In most cases, I would review and comment on their input to make sure it was consistent in content and style and level of detail with other parts of the plan.

There were probably some other individual sections that I wrote, but I'd have to go through sort of page by page to try to remember which those are. But, for example, Chapter 9 and 10 of Volume II, the waste generation rates, requirements for disposal of past or repository schedules, I believe I wrote or compiled, you know, much of that information directly.

Chapter 10, cost of managing the program. I played a substantial part in that. Chapter 11, which is not even in this exhibit, I contributed to that. Probably the list of acronyms and abbreviations, which, you know, is a very important. I probably put that together. And the other two volumes that aren't in here, the responses to comments, you know, I wrote many of those sections individually. In general, that was my responsibility with this document at that time.

Q. Turning to -- you said you did some work on Chapter 9. I just want to direct your attention. We

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396



THE UNITED STATES, :
Defendant. :
------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459



April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

adequacy reports that DOE issues; is that correct?
A. Input into the fee adequacy report.
Q. And what kind of input do you provide to the fee adequacy report?
A. I work on the Yucca Mountain cost and schedule and plans. So I'm right now responsible for coordinating the input of the Yucca Mountain part of the fee adequacy report in the total system life cycle cost.
Q. Are you familiar with the actual fee adequacy reports that DOE issues?
A. Yes.
Q. Do acceptance rates factor into that report?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I believe the answer is yes. It's a fairly complicated analysis that needs to be prepared, but I believe acceptance rates are one of the parameters that needs to be evaluated.
BY MS. HEWITT:
Q. And how do the acceptance rates affect the fee adequacy analysis?



MR. SHULTIS: Objection, vague.
THE WITNESS: This may be a rather long, complicated answer. But basically the fee adequacy analysis, which is required by the Nuclear Waste Policy Act, is analysis that the Secretary of the department has to conduct to evaluate whether the one mill per kilowatt hour fee is judged to be sufficient to cover the total cost of the program.
(Mr. Stouck entered.)
To do that, we prepare what's called a total system life cycle cost analysis, which looks at the cost of basically the facilities we have to build to accept fuel. That would include the surface facilities of the repository, the underground facilities of the repository, the waste package that the waste would be disposed in, the transportation system, equipment needed to move the waste, and we have to estimate the cost of that and balance that against the incoming money from the one mill per kilowatt hour.
And you have to relate the timing of those facilities and when they need to be online to be able to accept the waste. And since there's a time related



cost of money depending upon when you build and construct and have facilities in operation, in that sense it relates to the waste acceptance rates.
BY MS. HEWITT:
Q. You mentioned that the total system life cycle cost analysis -- and is that also called the TSLCC analysis?
A. That's the common acronym to describe it; that's correct.
Q. You testified that that analysis comprises cost of the system, which include the facilities; is that right?
A. That's correct.
Q. And when you use the term facilities, are you referring to facilities that would store or dispose of the waste? What do you mean by facilities when you used that term in your prior answer?
A. Generally it's meant to include the waste handling surface facilities at the repository location, the underground area of the repository in which the waste will be placed, and another major component which may or may not fall under the term facilities is the



waste package that the spent fuel elements will be placed in for disposal underground. That's a major cost contributor.
Q. So, is it fair to say that when you use the term facilities, you are not including possibility of an MRS in that term?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
THE WITNESS: At one time in the program's evolution, we did include I believe the cost of an MRS facility, but over the past 10 years or so when Congress never acted or we were never able to get an MRS facility authorized, we haven't included it in our TSLCC estimates.
BY MS. HEWITT:
Q. So, the acceptance rates that are used in the TSLCC estimates reflect an acceptance rate of a repository; is that correct?
A. That's correct.
MR. SHULTIS: Object.
THE WITNESS: That's correct.
BY MS. HEWITT:

Page 378

need for storage beginning in 1998, but a utility with an immediate need for additional storage in 1998 did not have an allocation for that year?

MR. SHULTIS: Objection.

BY MR. NESLIN:

Q. Wouldn't that exchange allow those utilities to exchange their rights for that year?

MR. SHULTIS: Objection, calls for speculation. Lack of foundation.

MR. NESLIN: Let me finish my question, counsel.

BY MR. NESLIN:

Q. And would that not assist the system in meeting the objective of avoiding the need for additional storage beginning with that year?

MR. SHULTIS: Same objection, and asked and answered.

THE WITNESS: Yeah, it sounds possible. That's the best way I could answer it now. It sounds reasonable.

BY MR. NESLIN:

Q. You never thought about that before?

Page 379

MR. SHULTIS: Objection, relevance.

THE WITNESS: I probably have. I don't remember specifically at this time, you know, thinking about it in detail or in-depth, but, you know, I'm sure over the course of 20 years I probably, you know, thought about it to some extent.

BY MR. NESLIN:

Q. Do you recall in your work on the mission plan in 1984-1985 any consideration of exchanges as part of the mission?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I'm fairly certain back in the '84-'85 time frame I probably didn't consider it at all. It was probably subsequent to that.

BY MR. NESLIN:

Q. Mr. Trebules, can you explain to me how you would meet this objective if utilities did not exchange allocations?

MR. SHULTIS: Objection, vague.

THE WITNESS: I'm not sure I --

BY MR. NESLIN:

Page 380

Q. Do you understand my question, sir?

A. If you can repeat it again, please.

Q. How would the department meet the objective of avoiding the need for utilities to have to add storage beginning in January of 1998 if utilities did not exchange -- did not have the right to exchange allocations?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: I'm not sure I'm able to answer that question at this time. Again, as I indicated earlier, our primary objectives when we put together those initial schedules were to twofold. To begin accepting by 1998 and in a grosser aggregate sense to preclude the need for the utilities to add additional storage. Because we based our planning on the EIA projections, which looked at utilities as a whole and came up with that number of about 3,000 metric tons per year.

I don't remember that we focused on particular storage capabilities at individual utilities, you know, within that context of, you know,

Page 381

they would be producing 3,000 metric tons per year. I don't think I ever got into those kind of considerations.

BY MR. NESLIN:

Q. Well, sir, if the objective was that utilities would not have to add additional storage after 1998, wasn't that objective intended to apply either at a gross or at an individual level? You understand my question?

MR. SHULTIS: Objection, vague, and I think he's answered the question.

MR. NESLIN: No.

BY MR. NESLIN:

Q. You may answer, sir.

A. Again, our objective was to try to accept once we reached the steady state operation of 3,000 metric tons, which we thought would be about the generation rate from the utilities as a whole, and I believe we were assuming that up until we reached that point, it was the utilities' responsibility in the aggregate to provide for the storage of the fuel up to 1998 and to continue to add storage up until the time we reached

Page 382

that 3,000 metric tons per year.

So we didn't look at — at least I never looked at individual utilities' capabilities. We just assumed that they would, you know, provide the required storage until we reached that steady state operation. Now, I think your question says now beyond that some utilities might be generating more and not have additional capability. Others may have additional storage capability that they may not need and they were going to try to mix and match. Okay.

But as far as my involvement in the planning process went, I never got into those kind of considerations when we put together our plans, which were, you know, plans sort of in the aggregate.

Q. Do you recall in your work on the planning documents any consideration of exchanges and shutdown reactors?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: Again, I don't remember specifically considering exchanges. I know there were discussions on trying to respond to what I thought were

Page 383

requests from particular utilities to give priority to shutdown reactors, but I don't know that the department ever reached a clear policy decision on how to handle that. I remember people continuing to talk about the basic approach of oldest fuel first.

BY MR. NESLIN:

Q. Do you remember the department receiving requests for priority from shutdown reactors?

A. I believe I heard people talk about -- I was never involved directly in any specific request, but I believe there were discussions within the department about receiving indications or requests from some utilities for that.

Q. Do you know who was involved in those discussions?

A. Again, not specifically. I can't trace it to a particular meeting or particular group of people, other than the ones that I've already mentioned before that were more involved in those issues than I was.

Q. Do you recall the time period that those discussions would have occurred?

A. I can't be specific, you know, other than

Page 384

during my, you know, 18 years of involvement. It was probably in the latter stages more so than the earlier stages. I mean, again back in the time of the early mission plans, the '84 draft, the '85, I don't have any recollection at that time because I maybe didn't understand the issue. But, you know, after I had some experience in the program, I remember that became a topic of discussion.

Q. So, would you be talking about the 1990s, the late '80s?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Again, I can't pin it down other than maybe I just understood it more so, you know, in the '90s rather than the '80s.

BY MR. NESLIN:

Q. Do you recall which utilities were involved in those requests?

A. I remember I believe one of the Yankee plants being mentioned more than others, and I think there was another — well, there were various plants that were shut down, you know, for whatever reason. I think in

Page 385

addition to the Sacramento Municipal District Plant, the Trojan plant I think was shut down. Most of the time I think I heard of --- and I don't know which of the Yankee plants, but it was one of the Yankee plants I think.

Q. Do you recall how that issue was resolved?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. As I think I indicated, I don't remember a clear policy decision on the part of the DOE, other than the oldest fuel first principle, sort of what we were talking about earlier.

BY MR. NESLIN:

Q. Let's come back to exchanges. Mr. Trebules, did you participate in developing any agency guidance or procedures for the agency's review of exchange requests by utilities?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: No, none that I could remember.

BY MR. NESLIN: