**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **WISCONSIN ELECTRIC POWER COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 00-697C**<br><br>**(Senior Judge Merow)** |

# WISCONSIN ELECTRIC POWER COMPANY'S POST-TRIAL BRIEF

**Of Counsel:**

**Donald J. Carney**
**Mary Rose Hughes**
**Emily C.C. Poulin**
**Jay L. Griffiths**
**Perkins Coie LLP**
**607 Fourteenth Street, N.W.**
**Washington, D.C. 20005-2003**
**(202) 434-1675**

**Richard W. Oehler**
**Perkins Coie LLP**
**1201 Third Avenue, Suite 4800**
**Seattle, Washington 98101-3099**
**(206) 359-8419**

**Attorneys for Plaintiff**
**WISCONSIN ELECTRIC POWER COMPANY**

**Dated: December 21, 2007**

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. RELEVANT PROCEDURAL HISTORY ..... 4

III. PROPOSED FINDINGS OF FACT ..... 5

IV. SUMMARY OF ARGUMENT ..... 5

V. ARGUMENT ..... 9

A. The Legal Standard for Recovery of Mitigation Costs for DOE's Breach of Contract ..... 9

1. Breach of Contract Recoverability Standards ..... 9

2. Mitigation Principles for Determining Past Damages ..... 11

3. Applicable Principles of Contract Interpretation ..... 14

B. WE's Costs to Construct the ISFSI and Load 12 Casks Were Caused by DOE's Breach and Were Foreseeable ..... 15

1. It Was Clearly Foreseeable that WE Would Need to Provide Alternate SNF Storage Facilities if DOE Failed to Perform ..... 15

2. DOE Program Developments in 1987-1988 Caused WE to be Extremely Concerned Regarding DOE's Ability to Perform in 1998 ..... 16

3. DOE's Anticipated Failure to Timely Perform in 1998 Drove WE SNF Storage Decision-making from 1988 Forward ..... 20

4. WE's 1991 PSCW Application for Dry Storage Reflected DOE's Anticipated Breach ..... 23

5. WE's Form 10-K's for 1988-1991 Confirm that WE Constructed Its Dry Storage Facility Because of DOE's Breach ..... 25

6. DOE's Anticipated Failure to Timely Perform Caused WE's Continued Pursuit of Dry Storage When WE Reevaluated the Project in 1992 ..... 29

7. In 1995, Following DOE's Announcement that It Would Not Perform in 1998, WE Implemented Its Dry Storage Project ..... 32

C. In the Non-Breach World, WE Would Not Have Built Dry Storage ..... 34

D. In the Non-Breach World, WE Likely Would Have Used a Temporary Rack for Short-Term FCR Capability ..... 37

**TABLE OF CONTENTS**
**(continued)**

**Page**


E. The Court Should Find that DOE Would Accept Spent Fuel in the Non-Breach World at a Substantial Rate ..... 41

1. The Parties' Understanding Was that DOE Would Accept SNF at a Substantial Rate ..... 41

2. DOE's 900 MTU Rate Should Be Rejected as Contrary to the NWPA, the Standard Contract, and the Parties' Understanding ..... 44

F. WE's Procurement of Three TN-32B Backup Casks Was Foreseeable, Caused by DOE's Breach, and Commercially Reasonable ..... 49

1. Background ..... 49

2. WE's Procurement of the TN-32B Casks Was Foreseeable ..... 49

3. DOE's Breach Caused WE to Reasonably Incur Costs to Procure Three TN-32B Casks ..... 50

4. WE Reasonably Continued with TN-32B Cask Fabrication After Loading of the VSC-24 Casks Resumed ..... 52

G. WE's Decision to Procure Dual-Purpose NUHOMS Systems Was Foreseeable and Is Recoverable ..... 53

1. DOE Foresaw Dual-Purpose Systems ..... 53

2. DOE's Continuing Breach and VSC-24 Cask Problems Caused WE to Reasonably Incur Costs to Procure the NUHOMS System ..... 55

H. WE's Costs Incurred in Exploring Private, Off-Site SNF Storage Were Caused by DOE's Breach and Were Foreseeable ..... 59

I. The Dry Storage Fees Imposed by the NRC Since 1999 Were Caused by DOE's Breach and Were Foreseeable ..... 64

1. NRC Regulatory Expenses for Storing SNF Were Foreseeable ..... 65

2. DOE's Breach Caused the NRC to Impose Generic NRC Fees Under 10 C.F.R. Part 171 Across the Nuclear Power Industry ..... 66

3. WE Established at Trial the Spent Fuel Storage Portion of the NRC Fee ..... 68

**TABLE OF CONTENTS**
**(continued)**

**Page**


J. WE Has Established Its Damages with Reasonable Certainty ....................... 69

1. The Joint Stipulation and Other Indicia of the Accuracy of WE's Costs ....................... 69

2. WE Should Recover Its Internal Labor Costs ....................... 72

3. WE Should Recover Its Administrative & General Costs ....................... 75

4. WE's Financing of Its Mitigation Costs Is Recoverable ....................... 77

5. WE Has Estimated the Temporary Rack Offset to a Reasonable Certainty ....................... 83

K. WE May Reasonably Rely on Rebuttal Evidence ....................... 84

L. DOE's Claimed Cask Loading Offset Is Speculative and Should Not Be Allowed ....................... 87

VI. CONCLUSION ....................... 90

**TABLE OF AUTHORITIES**

**Cases**

*Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007)........76

*Black v. Finantra Capital, Inc.*, 418 F.3d 203 (2d Cir. 2005)........26

*Blinderman Constr. Co. v. United States*, 695 F.2d 552 (Fed. Cir. 1982)........15, 45

*Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)........61, 69, 77, 79

*Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269 (1877)........15, 45

*Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)........10, 28

*Centex Corp. v. United States*, 55 Fed. Cl. 381 (2003)........79

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)........9, 10, 61, 77

*Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) (en banc)........65

*CUB v. PSCW,* 565 N.W.2d 554 (Wis. Ct. App. 1997)........34

*CUB v. PSCW*, No. 95 CV 676 (Dane Cty. Cir. Ct. Dec. 22, 1995)........34

*Dep't of Water & Power v. United States*, 131 F. Supp. 329 (S.D. Cal. 1955)........79

*Franconia Assocs. v. Unites States*, 536 U.S. 129, 122 S. Ct. 1993 (2002)........13

*Gevyn Construction Corp. v. United States*, 827 F.2d 752 (Fed. Cir. 1987)........80

*Home Savings of Am., FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)........14

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001)........11, 14

*In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950)........14

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), *reg'g denied* (Nov. 24, 2005)........passim

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004)........61, 63

*Koby v. United States*, 53 Fed. Cl. 493 (2002)........14



[28795-0001-000000/13687843_1.DOC]

**TABLE OF AUTHORITIES**

*LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) .................. 77, 79, 81

*Locke v. United States,* 283 F.2d 521 (Ct. Cl. 1960) .......................................................... 10

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336
(Fed. Cir. 2000) .......................................................................................... 2, 48

*Martinez v. Union Pac. R.R. Co.*, *82* F.3d 223 (8th Cir. 1996) ............................................ 84

*Northern Helex Co. v. United States*, 524 F.2d 707 (Ct. Cl. 1975) ...................................... 14

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ........................ 2

*Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007) ............................ passim

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006),
*cert. denied,* ___ U.S. ___, 127 S. Ct. 1831 (2007) ..................................................... 2, 14

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) ................................. passim

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) ................................................ 11

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2005) ................................ 14, 48

*Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112 (Fed. Cir. 1996) ................................. 84

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319
(Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 2967 (2006) ...................................................... 69

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) ........................... 44, 89

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557
(Fed. Cir. 1997) ...................................................................................... 9, 10, 68

*SEC v. Koenig*, 469 F.2d 198 (2d Cir. 1972) ....................................................................... 26

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007) .................... passim

*Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135 (2007) ..................... 46, 47

*System Fuels, Inc. & Entergy Arkansas, Inc. v. United States*, No. 03-2623C,
2007 WL3033659 (Fed. Cl. Oct. 16, 2007) .............................................................. passim

*System Fuels, Inc. v. United States*, 78 Fed. Cl. 769 (2007) ........................................... 81, 82

**TABLE OF AUTHORITIES**

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006), *appeal dismissed*, 188 Fed. Appx. 1004 (2006) ........ passim

*United States v. Chiarella*, 588 F.2d 1358 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980) ........ 27

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1483 (2007) ........ 27

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part & rev 'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005) ........ 78

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) ........ 77, 78, 80

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ........ passim

**Statutes**

15 U.S.C. § 78ff(a) ........ 27

15 U.S.C. § 78j(b) ........ 26

15 U.S.C. § 78m(a)(2) ........ 25

15 U.S.C. § 78r ........ 26

15 U.S.C. § 78u(d) ........ 26

28 U.S.C. § 2501 ........ 13

42 U.S.C. § 10131(a)(4) ........ 47

42 U.S.C. § 10155(h) ........ 62

42 U.S.C. § 10168(b) ........ 46

42 U.S.C. § 10168(d)(3) ........ 46

42 U.S.C. § 10168(d)(4) ........ 46

42 U.S.C. § 2214(c)(4) ........ 68

Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-10270) ........ 1

**TABLE OF AUTHORITIES**

Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001–5065, 101 Stat. 1330 (1987) (codified in scattered sections of 42 U.S.C. §§ 10101–10270) ........ 18

Pub. L. No. 101-508, the Omnibus Budget Reconciliation Act of 1990........ 65

Wis. Admin. Code PSC § 112.05(1)(b) (1982)........ 22

**Regulations and Rules**

10 C.F.R. Part 170........ 64

10 C.F.R. § 170.16 ........ 67

10 C.F.R. § 171.15(c)........ 64

10 C.F.R. Part 171 ........ 66

10 C.F.R. Part 171.16........ 64

17 C.F.R. § 240.10b-5 ........ 26

17 C.F.R. § 240.12b-20........ 26

17 C.F.R. § 240.13a-1 ........ 25

17 C.F.R. § 249.310(a)........ 26

18 C.F.R. Part 101 ........ 79

64 Fed. Reg. 31448 (June 10, 1999) ........ 67

71 Fed. Reg. 60490 (Oct. 13, 2006)........ 56

Cost Accounting Standards 410 ........ 76

Federal Acquisition Regulation 31.203........ 76

Federal Acquisition Regulation 31.205-6 ........ 74

Regulation S-K, 17 C.F.R. Part 229........ 26

Sec. Exchange Act Release 11079, 5 SEC Doc. 380 (1974) ........ 26

# TABLE OF AUTHORITIES

## Other Authorities

4 Louis Loss & Joel Seligman, *Securities Regulation* 1854 (rev. 3d ed. 2000).....................26

*Restatement (Second) of Contracts* § 347 (1981)..............................................................9, 11

*Restatement (Second) of Contracts* § 350(2) (1981) ......................................................passim

*Restatement (Second) of Contracts* § 352 (1981)............................................................10, 68

Richard A. Lord, 11 *Williston on Contracts* § 32:14 (4th ed. (2007) .............................15, 45

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>Senior Judge Merow |

## WISCONSIN ELECTRIC POWER COMPANY'S POST-TRIAL BRIEF

Pursuant to the Court's October 29, 2007 Order and the October 26, 2007 Joint Stipulation, Plaintiff Wisconsin Electric Power Company ("WE") respectfully submits this post-trial brief in support of WE's partial breach of contract damages claim of approximately $96.5 million. WE has submitted under separate cover Plaintiff's Proposed Findings of Fact ("PFF").

## I. INTRODUCTION

Trial in this matter presented the Court with WE's compelling claim for damages arising from the partial breach by the U.S. Department of Energy ("DOE") of Contract No. DE-CR01-83NE44425 (the "Standard Contract" or "Contract"). As required by the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10101-10270), DOE entered into contracts with all nuclear utilities. In return for very substantial fees, DOE assumed responsibility for storage and disposal of commercial spent nuclear fuel ("spent fuel" or "SNF") and high-level radioactive waste ("HLW") "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B) (2000). WE paid over $215 million in Contract fees to the Nuclear Waste

Fund as of December 31, 2006, but has received no performance from DOE in return. DOE currently estimates that its "best-achievable" schedule for commencing acceptance of spent fuel is 2017 or 2018. PFF 1-2.

On October 8, 2004, the Court granted WE's Motion for Partial Summary Judgment on Liability, finding that DOE's failure to timely begin disposal activity with respect to WE's SNF constituted a partial breach of contract. *See* October 8, 2004 Order, Dkt. 172. *See also Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."). Therefore, the purpose of trial was to determine the amount of WE's damages for the Government's partial breach of WE's contract.

In *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), *reh'g denied* (Nov. 24, 2005), the U.S. Court of Appeals for the Federal Circuit set forth the legal standard applicable for determining damages in partial breach cases, including DOE's partial breach of the Standard Contract. That DOE's impending delay required utilities to take measures mitigating the cost of DOE's failure to perform is "beyond debate." *Id.* at 1375. In order to recover its incurred mitigation expenditures, WE must establish foreseeability, causation, and reasonableness. *Id.* at 1376. As the breaching party, the Government bears the burden of showing that WE's mitigation efforts were unreasonable. *Id.* at 1375 (quoting *Restatement (Second) of Contracts* § 350(2) (1981)); *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) (Government did not meet its burden to establish that actual expenditures were not reasonable), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1831 (2007) .

WE's damages fall into four general categories. First, WE seeks to recover the costs of constructing an Independent Spent Fuel Storage Installation ("ISFSI") at the Point Beach Nuclear Plant ("Point Beach") located north of Milwaukee in Manitowoc County. This

category of costs includes significant expenditures that WE made to obtain the approval of the Public Service Commission of Wisconsin ("PSCW") for the storage facility, as well as SNF-related fees imposed by the Nuclear Regulatory Commission ("NRC").

Second, WE seeks to recover the costs for the dry storage casks that it acquired to store SNF at Point Beach and related plant modifications to accommodate these casks.

Third, WE seeks to recover costs relating to investigation of Private Fuel Storage as an alternate SNF storage facility.

Finally, WE seeks its costs for managing SNF issues and investigating other potential off-site SNF storage sites.

WE's damages calculation also includes an offset to the Government for costs that WE may have incurred in the non-breach world, i.e., the world where DOE performed its obligations under the Standard Contract. The offset concerns the acquisition of a temporary rack for potential use in the cask laydown area in the Point Beach wet pool. WE's damages also include its cost of capital through September 10, 2007.

A summary of WE's damages is as follows:

**SUMMARY OF DAMAGES (in millions of dollars)**[1]

| CATEGORY | NOMINAL DOLLARS | WITH COST OF CAPITAL |
|---|---|---|
| *Engineering, design, licensing, and construction of an ISFSI, including NRC fees* | $20.7 | $49.1 |
| *Dry Storage Cask Costs* | $31.5 | $48.8 |
| *Private Fuel Storage* | $0.9 | $2.2 |
| *Other SNF Management and Oversight Activities* | $1.2 | $2.3 |
| *Temporary Cask Pit Rack* | ($2.0) | ($5.9) |
| TOTAL | $52.3 | $96.5 |

PFF 236 (including subparagraphs).

## II. RELEVANT PROCEDURAL HISTORY

WE filed its initial Complaint in this matter in November 2000, seeking past and future damages. In *Indiana Michigan*, the Federal Circuit limited the nuclear utilities to claims for past costs in these SNF partial breach of contract cases. 422 F.3d at 1376. Based on the *Indiana Michigan* decision, in April 2006, the Court granted WE's motion for leave to file an Amended and Supplemental Complaint to update its damages claim through December 2005. *See* April 6, 2006 Order, Dkt. 227. Then, on June 7, 2007, the Court granted WE's motion for leave to file a Second Amended and Supplemental Complaint. This permitted WE to update its claimed costs from January 1, 2006 through February 28, 2007.

[1] As noted, the cut-off date for nominal damages in this case is February 28, 2007 with cost of capital damages through the beginning of trial, September 10, 2007. Nominal dollars means the actual dollars spent in each of the relevant years. Nominal dollars are unadjusted for the effects of financing.

At that time, WE also updated its cost of capital to the start of the rescheduled trial, September 10, 2007.

On September 21, 2007, the parties executed a Joint Stipulation Regarding Accuracy of Plaintiff's Costs, which stipulated as follows:

> The parties agree, with the two exceptions noted below, that all costs through February 28, 2007 that are included in WE's claim were incurred by WE and are traceable to and supported by WE's accounting records. These costs include (1) outside services and materials costs, (2) the NRC Power Reactors' Annual Fees, (3) employee expenses, (4) the Pension and Benefits Labor Adder, and (5) labor costs. In addition, the Government does not deny the accuracy of the budgeted Administrative and General cost rates used by WE in its claim. The Government, however, contests whether WE legally is entitled to recover these claimed monies in this action.

Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007) ("Joint Stipulation Re: Accuracy of Costs, Dkt. 350"). The two exceptions noted in the Joint Stipulation Re: Accuracy of Costs, Dkt. 350 were that the Government contests the accuracy of the calculation of WE's cost of capital and the accuracy of the calculated offset for the procurement and installation of a temporary rack.

## III. PROPOSED FINDINGS OF FACT

WE submits under separate cover Plaintiff's Proposed Findings of Fact and refers the Court to WE's proposed findings ("PFF") for the relevant facts and supporting citations.

## IV. SUMMARY OF ARGUMENT

Based on the established precedent and credible testimonial and documentary evidence, WE methodically and thoroughly established at trial its entitlement to the damages that it seeks in this action. It established that DOE's failure to timely perform under the Standard Contract was a substantial causal factor in WE's incurrence of foreseeable spent fuel storage damages. Indeed, WE established that DOE's breach was *the* causal factor in WE's incurrence of these damages. WE also established these costs with reasonable

certainty. Finally, the Government has not established that these costs were not reasonably incurred by WE.

WE demonstrated that it acted reasonably in response to delay in DOE's program by storing highly radioactive spent fuel in dry storage containers at Point Beach and in investigating off-site storage alternatives. Those costs clearly were a foreseeable response to DOE's failure to perform. WE further showed that it exercised reasonable commercial judgment in all of its mitigation activities given the long lead times to implement such activities as well as engineering, business and regulatory considerations. The Government failed to meet its burden of proving that any of WE's expenditures were unreasonable.

The overwhelming evidence showed that the predominant factor in WE's SNF storage decision-making from 1988 forward was the reasonable certainty that DOE would not timely perform. Prior to 1988, WE had no plans to store spent fuel at Point Beach other than in its spent fuel pool. By 1988, however, DOE was not planning on accepting SNF at any facility in 1998 and amendments to the NWPA substantially delayed spent fuel acceptance by DOE. Testimonial and documentary evidence established that, in 1988, WE then began planning for additional spent fuel storage because of delays in DOE's spent fuel program. As a result, in 1988, WE began planning on providing additional storage capacity through at least through 2003 and, indeed, through the end of Point Beach's reactor licenses. WE reasonably chose dry storage as the means to satisfy its long-term storage needs caused by delays in DOE's performance.

Because of DOE's breach of contract, it is impossible to know with certainty the actions WE would have taken to manage its spent fuel in the non-breach world. The evidence at trial, however, established that WE would not have built dry storage. WE and NMC engineering personnel familiar with Point Beach testified that Point Beach would have operated at least into 1998 and, if necessary, into 1999 without dry storage. Moreover, WE established that in the non-breach world, the DOE would have accepted SNF at a substantial

rate, not unreasonable and illegal 900 Metric Tons Uranium ("MTU") rate advocated by DOE at trial.

WE further established that, to preserve full core reserve in its spent fuel pool in the non-breach world, WE would have used a temporary rack in the cask pit area – a technique used by many other utilities – from 1996 until full core reserve in the permanent storage racks was restored after DOE began performance. WE presented testimony that WE considered the use of a cask pit rack, as well as other spent fuel management options, during the 1990s. WE also established the technical feasibility of the temporary rack and a reasonable estimate of its cost.

The Court heard evidence regarding a May 1996 incident during the loading of the third cask (a VSC-24 cask) at Point Beach – the "hydrogen ignition incident" – that profoundly impacted WE's dry storage decisions. The incident caused WE to procure three backup TN-32B casks to address uncertainties in the continued use of the VSC-24 cask. WE presented compelling testimony as to the reasonableness of its decision.

WE also presented comprehensive evidence supporting its decision to procure a next-generation, dual-purpose cask – the NUHOMS system. Point Beach personnel responsible for the safe and efficient operation of Point Beach testified to the need to move from the severely limited VSC-24 design to the safer, more flexible, more modern and transportable NUHOMS design.

WE further proved at trial that its off-site private fuel storage expenditures stemmed directly from DOE's failure to perform. WE spent modest amounts investigating private fuel storage from approximately 1994 to 1999. During this timeframe, WE faced major uncertainties in implementation of its dry storage program and faced substantial pressure from its regulators to investigate means to move spent fuel out of Wisconsin. Thus, WE's limited expenditures in investigating such opportunities constituted eminently reasonable and foreseeable mitigation.

WE also established that the NRC has imposed a spent fuel storage fee on all nuclear power plant licensees from 1999 forward as a direct result of DOE's partial breach of the Standard Contract. In imposing this fee, the NRC concluded that, given the lack of a DOE spent fuel storage facility, *all* licensees will need dry storage eventually. Therefore, the NRC decided to impose a generic spent fuel storage fee on all licensees. If DOE had performed, the NRC would have had no basis for imposing such a fee across the entire nuclear industry, including utilities, such as WE, that would not have built dry storage in the non-breach world. Accordingly, these NRC fee payments by WE are recoverable damages.

WE presented more than sufficient evidence for the Court to determine WE's damages with reasonable certainty. In addition to the reasonable certainty reflected in the Joint Stipulation Re: Accuracy of Costs, Dkt. 350, nearly all of WE's claimed costs have already been reviewed and approved as reasonable expenditures by its regulator, the PSCW. Further, at trial, WE's damages experts applied a reliable expert methodology to calculate WE's damages. WE also established at trial that WE's Weighted Average Cost of Capital was a real economic cost to WE that should be recoverable as damages. WE also presented alternative calculations of its financing costs, such as a Weighted Average Cost of Debt calculation. Finally, the Government failed to establish any basis for its proposed offsets, including, but not limited to, its claimed cask loading offset.

In sum, based on an extensive evidentiary record and established precedent, WE has established a compelling entitlement to its claimed damages arising from DOE's breach of the Standard Contract.

# V. ARGUMENT

## A. The Legal Standard for Recovery of Mitigation Costs for DOE's Breach of Contract

### 1. Breach of Contract Recoverability Standards

The remedy for breach of contract "is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan*, 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). "The general principle is that all losses, however described, are recoverable." *Id.*, 422 F.3d 1373 (quoting *Restatement (Second) of Contracts* § 347 cmt. c (1981)).

Damages for a breach of contract "are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.*.

Generally, foreseeability is determined at the time of contracting. *Id*. The Court, however, has recognized that "there may be situations where foreseeability is more appropriately measured at the time of the breach, because that is when the breaching party should be on notice of the ramifications of its actions or failures to act." *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 404 (2007). *See also Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 395 (2006).

While the general response to a breach must be foreseen, the specific response need not be foreseen. *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *Southern Nuclear*, 77 Fed. Cl. at 405 ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."); *System Fuels, Inc. & Entergy Arkansas, Inc. v. United States*, No. 03-2623C, 2007 WL3033659, at *21 (Fed. Cl. Oct. 16, 2007) ("*Entergy Arkansas*").

As to causation, selection of the appropriate causation standard "depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank*, 474 F.3d at 1318. In the SNF cases, the Court has held that the Government's breach of the Standard Contract must be a "substantial causal factor" in WE's mitigation decisions. *See, e.g., Southern Nuclear,* 77 Fed. Cl. at 405; *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006), *appeal dismissed*, 188 Fed. Appx. 1004 (2006). If WE establishes that a causal connection exists between the breach and WE's claimed damages, WE can recover its mitigation damages. *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("[T]he causal connection between the breach and the [claimed damages] must be 'definitely established.' . . . That is not to say that the breach must be the sole factor or sole cause in the [claimed damages.]).

In determining whether a decision was substantially caused by DOE's delay, "reasonable not absolute certainty suffices." *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 268 (2006). This is because the "defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke v. United States,* 283 F.2d 521, 524 (Ct. Cl. 1960). In determining whether DOE's breach is a substantial causal factor, the "long lead time required for these mitigation decisions" also must be taken into account. *Yankee Atomic,* 73 Fed. Cl. at 268; PFF 104.

In addition, WE need only establish the amount of its damages with reasonable certainty. *Yankee Atomic*, 73 Fed. Cl. at 268. The amount of contract damages "need not be 'ascertainable with absolute exactness or mathematical precision.'" *Indiana Michigan*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563)). *See also Restatement (Second) of Contracts* § 352 cmt. a (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.").

Finally, WE is not barred from recovering damages by the fact that its claim is one for partial breach. In *Indiana Michigan*, the Federal Circuit held that there is "no reason why efforts to avoid damages in contemplation of a partial breach should not . . . be recoverable," just as they are recoverable for mitigation upon a total breach. 422 F.3d at 1375. *See also Tennessee Valley Auth.*, 69 Fed. Cl. at 522-23.

**2. Mitigation Principles for Determining Past Damages**

Expectation damages include mitigation expenses incurred by WE as the non-breaching party, including its costs of arranging alternatives to the breaching party's required performance. *Restatement (Second) of Contracts* § 347 cmts. a, b (1981); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1067-68 (Fed. Cir. 2001) (awarding costs for mitigation expenses).

Thus, WE properly claims the costs that it incurred in actions taken to mitigate damages resulting from DOE's breach of the Standard Contract. "Mitigation was required." *Southern Nuclear*, 77 Fed. Cl. at 403. "[O]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" *Indiana Michigan*, 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350 cmt. b (1981)). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* (citing *Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002)). "*Indiana Michigan* altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation." *Yankee Atomic*, 73 Fed. Cl. at 260.

In *Indiana Michigan,* the Federal Circuit held that mitigation was required by 1994 based on DOE's public and formal announcements of delay. 422 F.3d at 1375 ("It is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take

mitigatory steps."). Thus, *Indiana Michigan* indicated that mitigation by 1994 was mandatory. *Indiana Michigan* in no way suggests that a utility could not have determined prior to 1994 that it did not believe that DOE would perform in 1998 and reasonably acted to mitigate the consequences of DOE's anticipated breach.

The *Restatement (Second) of Contracts* makes it clear that the duty to mitigate arises "once a party has reason to know that performance by the other party will not be forthcoming." *Restatement (Second) of Contracts §* 350 cmt. b (1981). *See also Indiana Michigan*, 422 F.3d at 1375. Addressing this specific issue in *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 459 (2007), the Court articulated the following standard:

> The court in *Indiana Michigan* identified only the time when efforts directed to mitigation would be regarded as mandatory and not, as defendant would have it, the time when such efforts might be justified in the first instance. To adopt defendant's understanding of the court's words – that the duty to mitigate in all spent fuel cases is triggered only by DOE's 1994 announcement – would submerge the very principle on which the *Indiana Michigan* was founded: that a party's duty to mitigate arises when there is "reason to know" that performance by the other party will not be forthcoming.

The Court then applied this standard thusly: "In the instant case, the evidence demonstrates that plaintiff [Northern States] had 'reason to know' in 1988 that performance by DOE beginning in 1998 would not be forthcoming." *Id.*

Here, WE established at trial that it reasonably began to incur mitigation damages in 1988. WE understood that the Monitored Retrieval Storage ("MRS") constraints imposed by the NWPA Amendments (as defined below) made it extremely unlikely that the MRS or any other DOE facility would be available in 1998 to begin accepting spent fuel. PFF 77. Then, in 1988, DOE announced that it was unlikely that it would perform significantly before 2003 at any facility. PFF 81-82. Thus, similarly to Northern States, WE had "reason to know" in 1988 that performance by DOE in 1998 would not be forthcoming. Accordingly, it was

appropriate for WE to begin its mitigation activities at that time and to recover such costs in this action. It also should be remembered that WE's mitigation expenditures were relatively insignificant until the PSCW's February 1995 Order approved WE's dry storage project application. At that time, WE made the final decision to implement dry storage by construction of the dry storage facility and fabrication of casks. PFF 121.

During opening arguments, the Court asked whether the statute of limitations would bar recovery of damages more than six years prior to WE's filing of suit in November 2000. Tr. 49:24-50:6 (Sept. 10, 2007). WE respectfully submits that the statute of limitations does not apply to this issue. The statute of limitations applies to whether WE filed its action within six years of accrual of the cause of action. 28 U.S.C. § 2501. A cause of action accrues only "when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Indiana Michigan*, 422 F.3d at 1378 (citation omitted). *See also Franconia Assocs. v. Unites States*, 536 U.S. 129, 142-44, 122 S. Ct. 1993 (2002) (explaining that the time for accrual of a contract claim differs based on whether the non-breaching party sues in repudiation or waits for the date of performance to pass and then sues, noting that "if the injured party instead opts to await performance [as WE did], 'the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation.'" (citations omitted)). Therefore, even though WE was obligated to take mitigation actions once it had reason to know that DOE would not be able to timely perform in 1998, WE's partial breach of contract action did not accrue until January 31, 1998. WE's filing in November 2000 was timely and there is no remaining statute of limitations issue. Instead, WE respectfully submits that whether WE can claim damages beginning in 1988 is an issue governed by mitigation principles, including the aforementioned *Restatement (Second) of Contracts* and the *Northern States* decision.

In determining mitigation damages, the Court considers whether WE acted with "reasonable commercial judgment." *Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975) (citations omitted); *see also Hughes*, 271 F.3d at 1067. The law requires only that WE make "those efforts that are fair and reasonable under the circumstances." *Home Savings of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005), *reh'g and reh'g en banc denied (June 28, 2005)*; *Indiana Michigan*, 422 F.3d at 1375.

A mitigating party is "'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss.'" *Indiana Michigan,* 422 F.3d at 1375. (quoting *Restatement (Second) of Contracts* § 350(2) (1981)). In addition, as the Court stated in *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)):

> The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.

As the breaching party, the Government bears the burden of proving that any of WE's mitigation efforts were unreasonable. *Indiana Michigan*, 422 F.3d at 1375 (citing *Restatement (Second) of Contracts* § 350(2) (1981)); *Old Stone Corp.*, 450 F.3d at 1368, 1370; *Yankee Atomic*, 73 Fed. Cl. at 264 ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable."); *Tennessee Valley Auth.*, 69 Fed. Cl. at 523 ("The government bears the burden of showing that [plaintiff's] mitigation efforts were unreasonable").

**3. Applicable Principles of Contract Interpretation**

Where a contract implements a statutory requirement, the interpretation of the contract is guided by the underlying statute. *Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("For determination of contractual and beneficial intent when, as

here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose."). Thus, the terms of the Standard Contract can be illuminated by the NWPA. *Entergy Arkansas,* 2007 WL 3033659, at *14.

Further, the actions of the parties after execution of the Standard Contract can be extremely useful in its interpretation. *Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273 (1877); *Entergy Arkansas,* 2007 WL 3033659, at *14; Richard A. Lord, 11 *Williston on Contracts* § 32:14 (4th ed. 2007). When a contract is indefinite, the practical construction adopted by the parties is frequently followed because it evidences what the parties believed the contract required before it became the subject of controversy. *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *Entergy Arkansas*, 2007 WL 3033659, at *14.

### B. WE's Costs to Construct the ISFSI and Load 12 Casks Were Caused by DOE's Breach and Were Foreseeable

WE's decision to investigate and eventually to license and construct dry storage at Point Beach is directly attributable to its knowledge that DOE would not begin performance until well after 1998.

#### 1. It Was Clearly Foreseeable that WE Would Need to Provide Alternate SNF Storage Facilities if DOE Failed to Perform

The dry storage costs incurred by WE were reasonably foreseeable by DOE. The intent of the NWPA and the parties to the Standard Contract was to ensure that utilities would not have to build additional at-reactor storage after 1998. *See Tennessee Valley Auth.*, 69 Fed. Cl. at 519, 528; PFF 41, 48, 52, 61, 63, 65, 134. It was reasonably foreseeable that WE would be required to take reasonable and necessary steps to continue to store its spent fuel in a safe and efficient manner and, thereby, incur storage expenses of this nature. Plaintiff's Exhibit ("PX") 52, p. CTR0421070 (Dec. 1983 Draft Mission Plan); Defendant's Exhibit ("DX") 493, p. SNO69702 (Proceedings of 1983 CRWM Info. Mtg.) ("When

licensed, dry storage will probably become the preferred method for expanding interim storage capability."). *See also* PFF 134.

WE's substantial dry storage costs are exactly the type of expenses that DOE foresaw and that the parties sought to preclude through DOE's acceptance of SNF under the Standard Contract, beginning no later than January 31, 1998. *Indiana Michigan*, 422 F.3d at 1376 ("DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its SNF"); *Southern Nuclear*, 77 Fed. Cl. at 404 ("That plaintiffs would generally incur storage expenses of the nature and magnitude sought here was foreseeable."). As the Court stated in *Tennessee Valley Auth.*:

> DOE also recognized that utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal, as reflected by the fact that one of DOE's goals was to preclude the utilities' need to provide storage outside their spent fuel pools. . . . In short, the court finds that it was entirely foreseeable to DOE that failure to perform under the contract would result in damages of the nature and magnitude that [plaintiff] claims.

69 Fed. Cl. at 528. *See also* PFF 41, 48, 52, 61, 63, 65, 134.

**2. DOE Program Developments in 1987-1988 Caused WE to be Extremely Concerned Regarding DOE's Ability to Perform in 1998**

When WE entered into the Standard Contract with DOE in 1983, it had no plans to build dry storage at Point Beach. PFF 49, 66. Based on a comparison of projected discharges against existing pool capacity, WE believed that it could operate until 1998 with its existing pool capacity. *Id.* WE also believed that it would have sufficient storage after that date because DOE's acceptance rate, based on the Oldest Fuel First principle, meant that DOE's acceptance of Point Beach's spent fuel in the early performance years would exceed Point Beach's discharges. *Id.*; Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able

to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage.")[2]

Thus, at the time of execution of the Standard Contract, WE's program for on-site storage of spent nuclear fuel was "based on the contractual promise [they had] with DOE that [DOE] will start taking spent fuel no later than 1998." PX 81, p. 8 (March 1985 Comments by Sol Burstein). From WE's perspective, "[t]hat date must be held firm and inviolate." *Id.* *See also* PFF 65.

WE began to have concerns regarding potential delays in DOE's performance in 1985. PFF 68. WE continued to monitor DOE's implementation of the NWPA and, by 1987, increasingly doubted DOE's ability to timely perform in 1998 based on DOE's statements and congressional action. PFF 69-77. In March 1987, Mr. Sol Burstein, then WE's Senior Vice President and Vice Chairman of WE's Board, testified before Congress that the industry "was extremely concerned over the current state of affairs surrounding the NWPA implementation." PX 116, p. 3 (March 1987 Statement of Sol Burstein); PFF 37, 75. Mr. Burstein further explained that DOE performance in 1998 was critical because, in planning for their on-site storage capacity, utilities had to "take into account the DOE schedule for operation of the high-level radioactive waste disposal system." PX 116, p. 7; PFF 75.

Other developments in 1987 added to WE's concern that DOE would not accept Point Beach's spent fuel in 1998. In 1987, DOE's Mission Plan Amendment announced a five-year schedule delay until 2003 for the waste acceptance starting date at the repository. PFF 69.

---

[2] Mr. Howard Shimon was responsible for spent fuel storage at WE from 1976 until 1990. PFF 21. Mr. Shimon was WE's primary point of contact with both DOE and industry groups at the working level regarding the NWPA and the Standard Contract. PFF 38. Mr. Shimon apprised WE management of all developments regarding the Standard Contract and how these developments related to WE's SNF storage planning. PFF 39.

Then, DOE submitted to Congress a proposal for the construction of an interim MRS facility in Oak Ridge, Tennessee, theoretically to operate by 1998. PFF 70. Absent congressional approval of the MRS, DOE stated that it "may not be able to begin" transfer of the spent fuel to DOE facilities in 1998. PX 124, p. 63 (June 1987 Mission Plan Amendment). Over the industry's objection, DOE proposed certain linkages between use of an MRS and the availability of the permanent repository. PFF 70, 71, 73, 75-77.

WE strongly opposed the linkages. In July 1987, Mr. Burstein, testifying before Congress, attempted to persuade the Government not to "link the use of an MRS to receipt of a first repository construction authorization." PX 134, p. 3 (July 1987 Testimony of Sol Burstein); PFF 75. Nevertheless, when Congress passed and the President signed the Nuclear Waste Policy Amendments Act of 1987, DOE's authority to build an MRS was linked to, among other things, milestones in the development of a permanent repository that were even more restrictive than those proposed by DOE ("linkages"). Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001–5065, 101 Stat. 1330, 1330-227 to -255 (1987) (codified in scattered sections of 42 U.S.C. §§ 10101–10270) ("NWPA Amendments"). PFF 76.

The linkages included the following restrictions. First, Congress precluded construction of the MRS until (1) DOE received a construction license for the repository and (2) the Secretary of Energy recommended approval of a repository site to the President. Second, Congress limited the SNF quantity that an MRS could accept to 10,000 MTU until the permanent repository became operational. Without a change in these linkages, DOE would not be able to have an MRS in operation by January 31, 1998. The NWPA Amendments also established the Office of the Nuclear Waste Negotiator ("the Negotiator"), which was to assist DOE in obtaining either an MRS or repository site and to develop a negotiated agreement with the locality and the state associated with either of those facilities.

The Negotiator was not appointed until approximately four years after the passage of the NWPA Amendments. DOE never initiated its own activities to site an MRS facility. *Id.*

Despite DOE's hope to perform by 1998, WE came to believe that timely performance by DOE was extremely unlikely. In a July 1987 memorandum to senior WE executives, Mr. Burstein noted Representative Udall's view that DOE's implementation of the NWPA was a "shambles." PX 132 (July 1987 WE memo); PFF 75. It was, as Mr. Burstein bluntly put it, "more and more evident that actions by the Congress itself are delaying implementation of NWPA and will make it impossible for DOE to have a repository of any type available for receipt of utilities' spent nuclear fuel in 1998." *Id. See also* Tr. 1305:8-17 (Shimon) ("Q: And focusing on the linkages on the MRS facility [in the NWPA Amendment], what was the significance of that development to Wisconsin Electric? A: We had expressed our concerns that that would make the MRS little comfort to us in being able to count on having our spent fuel removed in 1998. With that linkage, we couldn't come up with a scenario that would enable DOE to have that facility available in 1998."); PFF 76, 77.

In 1988, DOE reaffirmed that "waste acceptance at a waste-management facility cannot begin in 1998" under "current conditions." DOE Draft 1988 Mission Plan Amendment, PX 150, pp. 18-19 (June 1988 Draft Mission Plan Amendment); PFF 81. Moreover, DOE stated that, because of the linkages between the MRS and repository, it would be unlikely to start accepting waste significantly before 2003. PX 150, p. 19. Based on DOE's own statement in 1988 that it was unlikely to perform prior to 2003, WE reasonably concluded that it was extremely unlikely that DOE would timely perform in 1998 and began its planning based on DOE's anticipated breach. Tr. 1306:3-1308:14 (Shimon) ("[The 1988 Draft Mission Plan Amendment] was a confirmation that DOE agreed with our concerns that, given the slippage in the repository schedule and the linkages placed on the MRS, that they would not be able to meet the 1998 date. . . . [The document was] actually

showing pickups in 2003 for both the MRS facility and the first repository, in the same year."). *See also* PFF 77, 78, 81-83.

### 3. DOE's Anticipated Failure to Timely Perform in 1998 Drove WE SNF Storage Decision-making from 1988 Forward

In 1988, WE began planning to meet Point Beach's SNF storage requirements because it believed that DOE would not perform until at least 2003, and likely much later. PFF 75, 77-78. Thus, in a May 1988 memorandum, WE concluded that it could not depend on DOE's performance until 2003 and that even that date was uncertain:

> The current DOE schedule calls for limited operation at the first repository in 2003. Although an MRS has been authorized, its operation is prohibited until the issuance of a NRC construction permit for the repository. The DOE schedule is optimistic and risky, as no backup sites are currently being pursued. At this time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003.

PX 145, p. WISC00061023 (May 1988 Project Authorization); PFF 79.

In these circumstances, WE had to plan to mitigate the impact of DOE's anticipated failure to perform. If WE did nothing and DOE did not timely perform, Point Beach would eventually have to shut down once it lost the ability to discharge fuel from the reactors. PFF 133. WE also had to take account of the "long lead time required for these mitigation decisions." *Yankee Atomic,* 73 Fed. Cl. at 268; Tr. 2179:18-2180:3 (Porter) ("Q: Did your expectation of a long approval process affect the company's planning for dry storage? A: It certainly did, as the expectation that it would be a controversial project meant that we needed to ensure that we had a long lead time and that, in our application, we impressed upon the Commission the need for timely approval . . .")[3]; PFF 104. Based on consideration of these

---

[3] Mr. David Porter was Senior Vice President at WE in November 1991 when he signed WE's dry storage application to the PSCW. PFF 25; PX 236.

same 1987-1988 developments in the implementation of the Standard Contract, the Court in *Northern States* concluded: "In the instant case, the evidence demonstrates that plaintiff had 'reason to know' in 1988 that performance by DOE beginning in 1998 would not be forthcoming." 78 Fed. Cl. at 459. The Court further concluded: "In reality, then, mitigation was no less appropriate in 1988 than it was in 1994 when DOE formally acknowledged that it would not begin performance in 1998." *Id.* at 460.

The primary driver in WE's SNF storage decision-making was to select a long-term spent fuel management strategy because of the anticipated long-term delay in DOE's performance. PFF 80, 87, 111, 115. Options that WE began exploring in 1988 for its long-term SNF storage requirements included constructing an additional spent fuel pool, fuel rod consolidation, and a new ventilated concrete cask storage system ("the VSC"). PFF 78. In 1988, WE participated, along with Sierra Nuclear and the Electric Power Research Institute, in a DOE demonstration program leading to the development of a dry storage cask using a concrete overpack. The demonstration cask held 17 assemblies and, therefore, was termed the VSC-17. It was the forerunner of the VSC-24, a cask that held 24 assemblies. PFF 106. WE eventually decided that a dry storage system, with the VSC-24 cask proposed by Sierra Nuclear, consisting of an ISFSI and concrete overpack cask technology, represented the most flexible, modular, long-term option. PFF 79, 80, 87.

During this period, WE publicly identified DOE's failure to timely perform as the reason for WE's dry storage project. For example, Mr. Shimon told the Midwestern High-Level Radioactive Waste Committee in November 1990 that WE's dry storage project was "a necessary response to the lack of progress in the waste disposal program." PX 208 (Nov. 1990 Summary of Proceedings). *See also* PX 209, p. 2 (Nov. 1990 Shimon Statement to Nuclear Waste Tech. Rev. Board); PFF 93, 94. Similar public statements were included in WE's 1988-1991 SEC Form 10-K's, discussed more fully below.

In 1989, the WE Nuclear Power Department drafted an internal Work Order Requisition for dry storage. The requisition noted that, while DOE had announced a disposal schedule starting in 2003, WE was "not certain" when DOE would actually perform. PX 171 (May 1989 Work Order Requisition), 170 (May 1989 Project Requisition Summary); PFF 87. Accordingly, the Nuclear Power Department planned for ISFSI capacity through the end of the existing operating licenses (then, 2010 and 2013, respectively) by planning for an ISFSI that had an appropriately-sized pad to hold 45 casks. *Id.*; PFF 5.

By regulation, the State of Wisconsin requires that the PSCW approve the costs of capital projects over certain thresholds. *See* Wis. Admin. Code PSC § 112.05(1)(b) (1982). The cost of the dry storage project would exceed the monetary threshold. PFF 104. The initial outlays for the project were low, and significant capital expenditures were not planned until after the project received the PSCW's approval. *Id.*, PX 170, p. 2.

In 1989, DOE announced a "significant" additional seven-year delay in the start of permanent repository operations from 2003 to a new date of "approximately" 2010. PX 183, p. vii (Nov. 1989 DOE Report to Congress); PFF 90. DOE speculated that it might nevertheless perform at a hypothesized MRS facility "on a limited basis, as early as 1998," but with significant conditions that would have to be satisfied before this could occur: (1) the Negotiator would have to obtain a voluntary MRS site, and (2) Congress would have to modify or remove the schedule linkages in the NWPA Amendments. PX 183, p. 11. If the Negotiator failed to find a volunteer MRS site, DOE admitted that even limited operations in 1998 would be impossible. *Id.* at 12.

From 1989 until 1991, WE proceeded with the initial design and analysis for dry fuel storage. Nothing during this period suggested to WE that DOE would perform in 1998. PFF 86-96. To the contrary, the signs all pointed in the other direction – that DOE would not be able to perform until much later than 2003, perhaps 2010 or beyond. WE also did not

believe that DOE would perform in 1998 with an MRS. PFF 75, 77, 79, 80, 83, 85, 87-89, 92-94, 96, 99, 107-108, 115, 117-118.

### 4. WE's 1991 PSCW Application for Dry Storage Reflected DOE's Anticipated Breach

Given that WE could not rely on DOE to dispose of its SNF in 1998, WE decided to apply for authority to construct dry storage well before 1998. WE informed the PSCW prior to its submittal that the dry storage application would be forthcoming and that WE was interested in obtaining approval for 48 casks that would provide sufficient SNF storage through the end of Point Beach's then current licenses. PFF 103. During those discussions, the PSCW requested that WE prepare an extensive Environmental Screening Report ("ESR") as part of the application and recommended that WE reduce the number of casks to 12 in order to facilitate approval. *Id.*

In November 1991, WE submitted its dry storage project application. PX 236 (Nov. 15, 1991 PSCW Application). To accommodate the PSCW, WE only applied for authority to place 12 VSC-24 casks into service in this first request. PFF 103-104.[4] WE used highly conservative assumptions in its application, including the ESR, to create a greater sense of urgency. Tr. 2185:13-22 (Porter) ("Wisconsin Electric made a number of assumptions in support of the application, and since we knew the, at that point, 1991, certainly, we knew that it wasn't going to be possible for the DOE to be able to begin taking the fuel in 1998, and so we made a number of conservative assumptions describing the need for the project, the alternatives for the project, all kinds of assumptions that are in there."); Tr. 1152:1-21 (Zabransky) ("Q: Isn't it true that in crafting this application for the dry storage

---

[4] In its 1989 Work Order Requisition, WE estimated that "approximately 45 casks" would be required to provide storage through the life of the operating licenses. PX 170, p. 2. In its 1991 application, however, WE applied to allow the construction of an ISFSI comprised of two storage pads, each sized to accommodate 24 casks, for a total of 48 casks. PX 236, letter, p. 2 ("The project will include construction of a storage facility with a maximum capacity for 48 casks.").

project to the Public Service Commission, that Wisconsin Electric placed special emphasis on trying to ensure that the Public Service Commission would rule on the application in a timely manner, and not defer consideration of the application? . . . A: I think that's reasonable to say, yes."); PFF 105 (including subparagraphs).

For example, in the ESR, WE justified 12 casks based on the assumption that WE would maintain sufficient room in the pool for two full core offloads (i.e., 242 SNF assemblies) in addition to providing long-term SNF storage given the strong likelihood that DOE's performance would be substantially delayed. PFF 105; PX 236, ESR, p. 15 ("to provide additional operational flexibility, [WE] will maintain 2 full core reserves . . . once the ISFSI is operational"); *id.* at WISC00014727 (letter, p. 1).[5] WE, however, never had a goal or policy of maintaining two full core reserves ("FCR"). PFF 105a, 179.

There are other overly conservative assumptions in the ESR. For example, it included 17 non-fuel baskets in describing unavailable storage locations in the pool even though WE knew that the baskets could have been removed or relocated. PX 236, ESR, pp. 15, 50 (noting that pool contained 1109 spent fuel assemblies at page 50 but counting 1126 spaces as filled with "spent fuel or high-level waste components" at page 15 in discussing capacity requirements); PFF 105. Additionally, the ESR stated that 20 spaces "may be inaccessible" even though WE knew that 1500 spaces could be used. PX 236, ESR, p. 15; Tr. 854:25-856:8; 865:18-866:23 (Hennessy) ("Well, when the Fieldhack memo [PX 321] came out, we had categorized all of the locations, what we knew about those locations, and

[5] With regard to the MRS, WE stated that the Negotiator would need to find a volunteer and Congress would need to approve the arrangement by the end of 1992. PFF 107.

we knew, I knew that, with some effort, that we would be able to regain the use of those spaces.")[6]; PFF 105, 169-173.

Yet another conservative assumption was WE's reliance on the lower-bounded rate in the 1990 Acceptance Capacity Report ("ACR"), resulting in a calculation that DOE would not pick up the first spent fuel from Point Beach until 1999. Even under the Government's 900 MTU rate based on the 1991 ACR, DOE would pick up approximately 41 assemblies from WE in 1998. PX 237, p. A.2 (1991 ACR), PFF 105. Further, no reason exists why WE could not have relied on the upper-bounded acceptance rate in the 1990 ACR.

Notwithstanding these overly conservative assumptions, the ESR recognized: "By combining alternatives which extend the capacity of the existing pool with the alternative of shipping spent to a federal facility, it is possible that Wisconsin Electric could avoid the necessity of building the ISFSI." PX 236, ESR, p. 39; PFF 105. Further, the ESR stated that WE could delay the need for the proposed dry storage project based on a combination of alternatives, but that "the uncertainties of federal acceptance plans limit the meaningful assessment" of the alternatives, and therefore WE "has not attempted to evaluate these potential alternative combinations." PX 236, ESR, p. 59; PFF 105. Thus, it was DOE's breach that caused WE to decide *not* to investigate short-term storage options.

### 5. WE's Form 10-K's for 1988-1991 Confirm that WE Constructed Its Dry Storage Facility Because of DOE's Breach

As a publicly traded company whose securities are registered on a national securities exchange, WE's parent company, Wisconsin Energy Corporation, is required to file an annual report with the U.S. Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78m(a)(2); 17 C.F.R. § 240.13a-1. In most instances, that report is filed on SEC Form 10-K ("10-K")

[6] Mr. William Hennessy is the former Supervisor of WE's Reactor Engineering Group. PFF 20.

annually with the SEC. 17 C.F.R. § 249.310(a). The SEC places great importance on the accuracy of a company's 10-K. The SEC deems the 10-K, even more than prospectuses or proxy statements, to be "'the most effective means of communication between management and security holders.'" 4 Louis Loss & Joel Seligman, *Securities Regulation* 1854 (rev. 3d ed. 2000) (quoting Sec. Exchange Act Release 11079, 5 SEC Doc. 380 (1974)). Accordingly, the SEC prescribes in great detail the information that must be disclosed in the 10-K (in addition to audited financial statements). *See* Regulation S-K, 17 C.F.R. Part 229.

Beyond the information mandated by Regulation S-K, the 10-K must include "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made not misleading." 17 C.F.R. § 240.12b-20. The failure to include information that a reasonable investor would consider important to his investment decision is a material omission that can make an otherwise truthful statement misleading, in violation of the federal securities laws. *See SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972).

Material misstatements in or omissions from the 10-K can have serious consequences. 15 U.S.C. § 78r. If the false or misleading statement or omission is made with reckless disregard for the truth or an intent to mislead, the "fraud on the market theory" potentially allows recovery even by purchasers or sellers who did not review the 10-K, under the presumption that the market price of the security at issue was affected by the false statement or material omission. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005).

The SEC also can take action against persons who make misleading statements in a 10-K. The SEC's remedial arsenal includes the authority to file suit for substantial monetary penalties and injunctive or other equitable relief, including to prohibit malfeasant individuals from serving as directors or officers of publicly traded companies. 15 U.S.C. § 78u(d)(1)-(3), (5).

The same material misstatements or omissions that can result in civil penalties may also support criminal penalties in appropriate cases. 15 U.S.C. § 78ff(a). *See also United States v. Chiarella*, 588 F.2d 1358, 1368, n. 16 (2d Cir. 1978) (observing that, except for issues of intent and burden of proof, criminal and civil liability under the securities laws is coextensive), *rev'd on other grounds*, 445 U.S. 222 (1980); *United States v. Ebbers*, 458 F.3d 110, 117, 129-30 (2d Cir. 2006) (affirming 25-year sentence imposed on WorldCom, Inc. CEO charged with one count each of securities fraud and conspiracy to commit securities fraud, and seven counts of making false statements to the SEC), *cert. denied*, 127 S. Ct. 1483 (2007) . For these reasons, 10-Ks are probably reviewed more thoroughly and carefully than any other company submission. PFF 84; Tr. 4530:2-4533:23; 4536:14-4540:4 (Metcalfe).

Examination of WE's 10-K's during the 1988-1991 period evidences that WE investigated additional SNF storage and applied to construct a dry storage facility because of the anticipated substantial delay in DOE's performance. For example, the 1988 10-K stated in pertinent part:

> *[I]n June 1988 the DOE reported that it would not be able to accept utility spent fuel for disposal before 2003.* Wisconsin Electric is reviewing the options, including advanced technologies for on-site storage and the availability of away-from-reactor storage, for the storage of spent fuel generated at Point Beach after 1995 *until the DOE accepts deliveries of spent fuel for disposal.*

PX 801, p. KRGWE000182 (Kenrich binder J: Historical Financial Information) (Emphasis added); PFF 85.

WE made similar statements in its 1989 and 1990 10-K's except that WE noted that, in November 1989, DOE had announced an additional seven-year delay from 2003 until 2010. PX 801, pp. KRGWE000192, KRGWE000202. Then, in its 1991 10-K, WE stated that it was submitting its dry storage application to the PSCW because of the delay in DOE's performance:

> In accordance with the provisions of the Nuclear Waste Policy Act of 1982 (the "Act"), which require the DOE to provide for the disposal of spent fuel from all U.S. nuclear plants, Wisconsin Electric entered into a disposal contract providing for deliveries of spent fuel to the DOE for ultimate disposal commencing in January 1998. *Because of the DOE's inability to accept spent fuel by the 1998 timeframe as contracted, the company has filed with the PSCW for a Certificate of Authority to construct and operate an Independent Spent Fuel Storage Installation ("ISFSI"). The ISFSI will provide additional storage until the DOE begins to remove spent fuel from Point Beach in accordance with the terms of the contract it has with Wisconsin Electric.*

PX 801, pp. KRGWE00211-12 (Emphasis added); PFF 108. It is hard to imagine a clearer statement by WE that its PSCW dry storage project application was caused by DOE's failure to perform under the Standard Contract.

In sum, when WE investigated its spent fuel management options in 1988-1991, both its internal memoranda and its external statements identified DOE's delay in performance as the driving force in WE's decision to apply for dry storage. PFF 79-85, 87, 92-94, 96, 104; PX 145, 171, 208 (Nov. 1990 Summary of Proceedings), 209 (Nov. 1990 Statement to Nuclear Waste Technical Review Board), 236. WE has established a causal connection between DOE's breach and WE's dry storage project expenditures, and WE can recover these mitigation damages. *Cal. Fed. Bank*, 395 F.3d at 1268. WE also has established that DOE's breach was a "substantial causal factor" in WE's mitigation decisions. *Southern Nuclear*, 77 Fed. Cl. at 405; *Tennessee Valley Auth.*, 69 Fed. Cl. at 523. Finally, as discussed below, WE reevaluated its dry storage decision in 1992 and did not make the final decision to construct the dry storage facility and to fabricate the VSC-24 casks until after the PSCW's February 1995 approval. PFF 109-111, 116, 121.

### 6. DOE's Anticipated Failure to Timely Perform Caused WE's Continued Pursuit of Dry Storage When WE Reevaluated the Project in 1992

Six months after WE submitted the dry storage application, Robert Link became WE's Vice President, Nuclear Power. PFF 109. He was WE's corporate official responsible for decisions concerning the strategy, development, and implementation of the dry storage project at Point Beach. PFF 18, 121. From the onset of his involvement in the project, Mr. Link wanted to be fully aware of all of Point Beach's SNF storage options and wanted to evaluate whether it was advisable to proceed with the dry storage application before the PSCW. PFF 109. He anticipated a long and arduous process to obtain the necessary approvals because the dry storage project concerned two controversial topics in Wisconsin, namely, Point Beach and the local storage of nuclear waste. PFF 104, 109. He expected substantial opposition, including intervention, in the PSCW proceedings by dry storage project opponents and possible litigation. At trial, Mr. Link testified:

> Mr. Abdoo, the CEO, and Bill Boston, the chief operating officer, and myself understood that these projects and the approvals that were necessary for these projects were going to be some of the most contentious projects that Wisconsin Electric would face with the Public Service Commission. I knew this because of my intimate knowledge with the Public Service Commission staff, their motivations, their points of view, because of the advanced planning process. Wisconsin already had a moratorium on any new nuclear, and it was clear that the Public Service Commission staff was not an advocate of nuclear power. Besides that, I knew also of a number of intervening groups that would probably, with some certainty, intervene and fight the approval of both or either of these projects. . . . So that was, call it Achilles heel, but that was the opportunity for the intervenors, that they clearly saw as a mechanism to shut Point Beach down.

Tr. 331:10-332:15 (Link). *See also* PFF 104, 109, 112. Mr. Link also expected that the PSCW and the intervenors would request detailed information that would demand WE resources and time. PFF 109.

Accordingly, Mr. Link directed the Nuclear Department, specifically, Gary Krieser's group,[7] to evaluate WE's current SNF storage capacity, the likelihood of DOE's performance in 1998, and spent fuel storage technologies, including dry fuel storage. PFF 109, 110. These analyses examined various means to extend operations without dry storage, including changing fuel cycle lengths, changing reactor core and fuel designs, recovering inaccessible wet pool spaces, and using a temporary rack. PFF 110. These analyses determined that Point Beach could operate until 1998 and that options were available to preserve full core reserve. PFF 110-111. These studies also confirmed that DOE would be substantially delayed and that the most cost-effective means of providing long-term SNF storage was the dry storage program. Mr. Krieser, who led the team conducting these analyses, testified:

> Q: And what were the results of these evaluations that Mr. Link requested your group to perform?
> A: I would say, in a nutshell, the conclusion was – and, of course, again, this was based on the fact that DOE was not going to be there in 1998. We needed to address the situation in a long-term fashion, so we needed a long-term solution . . . and we also concluded that dry storage was really the best option to solving that particular problem.

Tr. 1523:21-1526:2 (Krieser); PFF 111.

Given WE's belief that DOE was not going to perform for many years beyond its contractual obligation, WE then pressed on with the PSCW application for the ISFSI and 12 casks because that alternative was the lowest-cost, long-term storage option and offered some modular flexibility in the acquisition and loading of casks. PFF 104. As expected, the

---

[7] At this time, Mr. Krieser was the Manager of Industry and Regulatory Services in WE's Nuclear Department and reported directly to Mr. Link. PFF 22.

dry storage project was highly controversial. Numerous opponents intervened in the PSCW dry storage proceeding. The PSCW staff and the intervenors submitted numerous requests for information, and WE had to respond to each request. In addition, the PSCW decided to prepare an Environmental Impact Statement ("EIS"). Further, under Wisconsin law, WE had to reimburse the intervenors. WE retained experts and outside counsel to work with it during the prolonged and contentious PSCW proceedings that continued until early 1995. PFF 111, 115, 119.

During its extensive proceedings, the PSCW concluded that Point Beach had the capability to operate until 1998 or 1999 without dry storage. For example, the PSCW assumed in its economic analyses that Point Beach could operate until it shut down in 1998. Draft PSCW Staff Economic Analysis (Nov. 19, 1993), PX 317. PFF 114a. Moreover, the PSCW then concluded in the draft EIS that Point Beach could operate until 1998 or 1999. PX 326, pp. ix, xvi (Feb. 1994 Draft EIS). PFF 114a. WE reviewed the draft EIS and did not disagree with the PSCW's conclusion. In the final EIS published later that year, the PSCW reaffirmed that Point Beach could operate until 1998 or 1999. PX 346, pp. xxi, 40 (Final EIS); PFF 114b.

Similarly, during this period, WE reported to DOE an ability to operate until 1998. The RW-859s submitted in 1992, 1993, and 1994 all stated that the Point Beach Units 1 and 2 could operate until the spring and fall 1998 outages, respectively, with only wet storage. *See* PX 242 , 243, 280, 281, 327, 328. Mr. Link testified before the PSCW that Point Beach could operate until 1998 without additional storage capacity. PFF 113a. WE also submitted pleadings to the PSCW, stating that Point Beach could operate to 1998. PFF 113b.

The ability to operate at least into 1998 was partly attributable to the use of an offset handling tool to make additional pool spaces available for SNF storage. It also was attributable to WE's knowledge that pool spaces then occupied with trash and other non-fuel items could be made available for the storage of spent fuel. PFF 170-172. Thus, in a

December 1993 memorandum, WE outlined the spaces that could be emptied, made accessible, or fixed to allow 1500 spaces to be used. PX 321 (Dec. 16, 1993 Fieldhack Memo re: Spent Fuel Pool Summary); PFF 169.

Even though WE was convinced that DOE would not timely perform under the Standard Contract, it continued to emphasize to DOE that agency's contractual obligations during this time frame and the importance of DOE's performance as soon as possible. PFF 123. Nevertheless, in May 1994, DOE published a "Notice of Inquiry" in the Federal Register stating that it would not be able to begin disposing of SNF in 1998 because a repository would not be operational until 2010 at the earliest. DOE stated that it had "no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." PX 339 (Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994)); PFF 122b. In May 1995, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues" reiterating the allegedly conditional nature of its obligation to accept SNF under the Standard Contract. DOE also then projected that the earliest possible date for acceptance of waste for disposal at a repository was 2010. PX 385 (60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995)); PFF 122d.

**7. In 1995, Following DOE's Announcement that It Would Not Perform in 1998, WE Implemented Its Dry Storage Project**

It was not until February 1995 that the PSCW approved the dry storage project. PX 374 (Feb. 9, 1995 PSCW Order); PFF 120. In the February 1995 Order, the PSCW recognized that Point Beach could operate without dry storage until 1998. PX 374, pp. 4-5, 13, 21. It also recognized, however, that the length of time that Point Beach would have to store fuel was a "function of the federal government's actions in siting and licensing a permanent repository or retrievable storage facility, and taking possession of the waste."

*Id.* at 167. The PSCW did not expect DOE to have a repository until 2023 and considered the actual DOE acceptance date to be "a matter of speculation." *Id.* at 4, 22. The PSCW's Order endorsing the 12 casks for dry storage noted that the ISFSI was a means to address these future "uncertainties." *Id.* at 17.

Following the PSCW's approval of the dry storage project, Mr. Link, Vice President of the Nuclear Department, made a final decision to commit to this option for Point Beach's long-term dry storage needs. Tr. 414:24-415:7 (Link) ("Q: And when did Wisconsin Electric make a final decision to begin construction of the dry storage project? A: Subsequent to the Public Service Commission ordering, allowing for the construction of the project. Q: So that was after DOE issued its notice of inquiry? A: Yes."); PFF 121. WE had deferred incurring significant costs on the dry storage project until it received PSCW approval, which it expected in 1994 or 1995. PFF 127. Then, from 1994 through 1996, WE incurred costs for the design, engineering, and construction of the ISFSI pads and acquisition of ancillary equipment to operate the ISFSI, including security systems and a cask transporter. *Id*. Once WE constructed the ISFSI, the NRC began to impose ISFSI-related fees on Point Beach.[8] Mr. Kevin Anundson, WE's project manager for the dry storage project (PFF 29), testified at trial that dry storage was indeed a challenging project to implement:

> There was engineering challenges, there was public service commission challenges, NRC challenges, logistics challenges, everything that you can imagine was a challenge. There was no 'Dry Storage for Dummies' books. It was starting from scratch.

Tr. 2735:17-2736:10 (Anundson).

---

[8] The NRC has charged Point Beach ISFSI-related inspection fees from 1996 to the present. Also, during the period from 1996-1998, the NRC imposed generic fees on Part 72 ISFSI license holders including Point Beach. During the period 1999-2007, the NRC has imposed generic dry storage fees on Point Beach, as well as all licensees, that are addressed in Section IV.I, *infra*.

WE also proceeded with fabrication of VSC-24 casks. PFF 127. WE loaded an initial VSC-24 cask in December 1995. *Id.* Cask loading stopped shortly thereafter because several parties petitioned the Dane County Circuit Court for review. The Circuit Court vacated the PSCW's dry storage Order and remanded the matter to the PSCW for further consideration.[9] On remand, the PSCW prepared two supplemental EISs, held related hearings, and issued a May 1996 Order reauthorizing WE to continue loading its dry storage casks. PFF 132. WE incurred legal expenses in litigating the judicial challenge to the project and in the remand proceedings before the PSCW. *Id.* Thereafter, WE loaded a second cask in May 1996. *Id.*

### C. In the Non-Breach World, WE Would Not Have Built Dry Storage

As discussed, from 1988 forward, WE discounted heavily the possibility of DOE's timely performance in 1998 because of DOE's announced program delays; thus, WE operated based on the assumption of a substantial delay in DOE's performance. PFF 75, 77-80, 85, 87-89, 92-94, 96, 107, 108, 115, 116, 121, 123. At trial, WE also presented credible evidence regarding what WE would have done if DOE had performed. That evidence showed that WE would not have built dry storage. PFF 159-211.

Messrs. Hennessy and Link testified extensively that 1500 spaces in the Point Beach pool could have been made available to store SNF. PFF 170-172. Mr. Hennessy, former head of Reactor Engineering at Point Beach, testified that WE could have used these spaces earlier, but had not done so because WE had no need to do so. PFF 171-172. He also

---

[9] In its review of the facts, the Circuit Court found that Point Beach could have operated until 1998 without dry storage. *CUB v. PSCW*, No. 95 CV 676 (Dane County Cir. Ct. Dec. 22, 1995); PX 481, pp. WISC0481-0002, WISC0481-0003. The Court of Appeals of Wisconsin subsequently reversed the Dane County Circuit Court opinion, but likewise noted that Point Beach could have operated until 1998. *CUB v. PSCW,* 565 N.W.2d 554, 564 (Wis. Ct. App. 1997); PX 452. Moreover, the Court of Appeals noted that the PSCW approved the dry storage application "to preserve flexibility in light of the uncertainties regarding DOE fuel removal activities." *Id.*; PFF 114d, 114e.

testified that it was highly likely that WE could have installed mini-racks in several areas of the pool that could have boosted the pool's capacity to 1526 spaces, if necessary. PFF 211.

In addition, Mr. Hennessy and Mr. Michael Baumann[10] explained that, if necessary, WE could have reduced SNF discharges through the use of fuel management techniques. These techniques included the use of higher burn-up fuel assemblies, longer fuel cycles, and other design changes. PFF 161. WE did not implement these techniques at that time because there was no need to do so in the actual (breach) world. *Id.* Therefore, it was understandable that WE "did not focus" on a temporary SNF storage solution because it "would not have satisfied the utility's need for a long-term storage solution." *Northern States*, 78 Fed. Cl. at 461.

Based on WE's SNF inventory and projected discharges, WE presented detailed evidence at trial that, based on information that WE knew at the time, both Point Beach units could have operated at least into 1998. PFF 162. Fuel management options were available to enable Point Beach to operate until 1999 without dry fuel storage. PFF 159-166.

If DOE had performed, WE would have known years in advance when DOE was going to perform within the year 1998 and within subsequent years. WE's preference would have been that DOE pick-up WE's SNF allotments for 1998 and 1999 prior to Point Beach's fall outage. PFF 173. Based on the Standard Contract, WE and DOE would have negotiated a mutually acceptable date when DOE would accept WE's spent fuel. The Standard Contract expressly required that the parties work together to agree upon a mutually acceptable date. PX 41, p. KRGWE002128 (Standard Contract); PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 82:2-85:24 ("My personal opinion of [the DOE objectives on page 29] was that given the

---

[10] Mr. Baumann has been continuously involved with Point Beach for many years, including as Manager of Nuclear Fuel Services at WE and subsequently as the Manager of HLW issues, Manager of Nuclear Fuel Commodities, and Director of Nuclear Fuel Services at NMC. PFF 17.

limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down."))[11]; PFF 59c, 174.

Even if DOE had refused any pickup date prior to late December in 1998 and 1999, WE could have used pool and discharge management techniques to accommodate even that unreasonable DOE acceptance schedule. However, WE would have regarded any such DOE's conduct as violating DOE's obligation to perform in accordance with the Standard Contract in good faith. PFF 176. *Southern Nuclear*, 77 Fed. Cl. at 436 ("[A] provision which calls upon the parties to a contract to agree in the future on a specified point or contract term . . . imposes an obligation on the parties to negotiate in good faith." (Citations omitted.)).

The actual discharge data shows that WE would not have exceeded the spent fuel pool's capacity prior to DOE's acceptance of SNF in 1998. PFF 163. WE's expert, Richard Sieracki, explained the Kenrich Fuel Management Model, which matched WE's spent fuel pool capacity against actual discharges and DOE acceptances and found that the fuel assemblies in the pool would never have exceeded 1500. PFF 163. Thereafter, DOE would have removed sufficient SNF so that WE would have been able to accommodate its SNF discharge in its wet pool as was intended by the NWPA, the Standard Contract, and the parties. PFF 46-52, 174. The following shows this information in summary form:

---

[11] WE designated deposition and trial testimony during the pretrial proceedings in this case and also in post-trial motions. The Court admitted WE's pretrial designations as PX 1052. Tr. 6403:20-6407:8 (Oct. 16, 2007). WE cites to excerpts from PX 1052 by noting the witness's last name, whether the designation is of trial or deposition testimony, the identifying date of the deposition or the identifying name of the trial, and the transcript citation. WE also filed other designated testimony separately.

**SUMMARY OF POINT BEACH SPENT FUEL POOL STATUS IN ASSEMBLIES (DOE PERFORMANCE; ACTUAL DISCHARGES; 1500 EFFECTIVE CAPACITY)**

| YEAR | START TOTAL | DOE PICKUP | DISCHARGES | END TOTAL |
|---|---|---|---|---|
| 1998 | 1,422 | (48) | 98 | 1,472 |
| 1999 | 1,472 | (96) | 40 | 1,416 |
| 2000 | 1,416 | (96) | 40 | 1,360 |
| 2001 | 1,360 | (168) | 37 | 1,229 |
| 2002 | 1,229 | (120) | 76 | 1,185 |
| 2003 | 1,185 | (144) | 41 | 1,082 |
| 2004 | 1,082 | (96) | 40 | 1,026 |
| 2005 | 1,026 | (144) | 81 | 963 |

PX 796, p. KRGWE003254 (Kenrich Binder BB: Revised Fuel Management).

WE presented testimony at trial that the Nuclear Department specifically considered in 1992 whether WE could operate until 1998 without dry storage by cleaning out the pool. PFF 109-111. Messrs. Link and Krieser both testified that, in 1992, WE concluded that it was certainly possible to operate until 1998 and that operating until 1998 would have made building a dry storage facility unnecessary if DOE performed. PFF 109-111, 113, 162-163. Given the many difficulties with dry storage, Mr. Link testified that WE would not have built dry storage had DOE performed. PFF 158-159. Others testified similarly. PFF 158-159.

### D. In the Non-Breach World, WE Likely Would Have Used a Temporary Rack for Short-Term FCR Capability

WE established at trial that, had DOE timely performed, WE's preferred method of preserving FCR during the mid-1990s would have been the use of a temporary cask pit rack that would hold 121 assemblies. As Mr. Link testified:

> A: I think I've already stated that, and if DOE would have performed under the contract, we would have essentially gone forward without the dry fuel storage and relied on the

> temporary strategy, if necessary, to retain the ability to get full core reserve.
> Q: And would a temporary strategy, such as a temporary rack, have permitted you to have maintained full core reserve?
> A: Yes, it would have.

Tr. 549:19-550:6 (Link). *See also* PFF 182, 184-186. As discussed, WE would have been able to operate Point Beach at least into 1998 without dry storage. PFF 158. Starting in approximately 1996, however, Point Beach's pool would have had less than one FCR in the permanent storage racks under projected discharges. PX 794, p. 18 (May 2006 Kenrich Revised Assessment of Damages); PFF 178, 182-184. While no NRC regulation, policy, or technical specification required WE to preserve FCR, WE included this offset as a conservative assumption in the hypothetical non-breach world. PFF 178-179, 182-184.

As DOE itself has explained, whether and how to maintain full core reserve is a matter best left to the discretion of the utility. PX 44 (DOE considers it important that it "not discourage utilities from encroaching on FCR at their own discretion") (June 1983 DOE Letter to NRC); PFF 181. DOE has endorsed using the cask pit area in the pool for the storage of spent fuel assemblies in temporary racks to maintain FCR:

> The definition of Full Core Reserve is understated if it excludes the capacity represented by the cask laydown area. The only argument against the use of the latter is that when doing so, it is not possible for ship [sic] in or out of the pool. This would not appear germane to a utility whose primary problem is to pull a core and make a reactor repair as expeditiously as possible. *Inclusion of cask laydown area postpones loss of FCR by one to five years.*
>
> * * *
>
> *The cask laydown area should be put into use as temporary storage as its use can provide a significant postponement in the need for additional spent fuel storage.*

PX 774, pp. 2-3 (Emphasis added) (Oct. 1983 DOE memo re: FCR); PFF 181.

At trial, WE established through the testimony of its expert witness, Dr. Krishna Singh,[12] and Mr. Hennessy that WE would have received NRC approval for and implemented a 121 assembly temporary cask pit rack at Point Beach. PFF 182-211. Dr. Singh is the President and CEO of Holtec, Inc. More than 70 percent of spent fuel discharged from U.S. nuclear reactors is stored in Holtec storage racks. PFF 34a. Dr. Singh explained to the Court the long-standing NRC technical standard (the O.T. Position Paper) for the design of racks in wet storage. PFF 200. Based on his extensive experience, Dr. Singh testified that no reason existed why WE could not use a cask pit rack at Point Beach based on his analysis of the appropriate structural, criticality, and shielding criteria. PFF 34 (including subparagraphs), 187, 190-198.

Dr. Singh explained that it was technically feasible to install a 121 assembly temporary rack in the cask pit area. From a technical standpoint, the project posed "no intrinsic challenge" and "there would have been no technical basis to deny the license amendment." PX 827, p. 20 (June 2006 Revised Singh Testimony); PFF 187. The 121 assembly rack was not nearly as challenging a racking project as racking projects at other plants at the same time. PX 827, p. 19. Moreover, the pool slab on which the rack would rest was located on grade – not elevated – making the slab "simply not an issue" for the capacity expansion. PFF 187.

Furthermore, Dr. Singh testified that the pool structure would have no difficulty supporting the weight of the loaded cask pit rack as it would weigh less than the loaded transfer cask that was already approved for use at Point Beach in the cask pit area. PFF 191. Dr. Singh summarized the temporary cask pit rack project as follows:

---

[12] Dr. Singh is the President and CEO of Holtec International ("Holtec"). PFF 34. Holtec has been involved in the design of spent fuel racks since 1986, when Dr. Singh founded the company. PFF 34a.

> It could have been done. That's the bottom line, that . . . they could have added a cask pit rack, and it would have been, as I said before, a project, a mundane project, it was not a challenge.

Tr. 4396:15-20 (Singh); PFF 187.

Mr. Hennessy testified that Reactor Engineering conducted a calculation demonstrating that Point Beach's pool cooling capacity was sufficient to handle both a full pool and the discharge of a core into a cask pit rack. In fact, the capacity of the cooling system is so great that the discharge of a core's worth of assemblies into a cask pit rack would have no impact on a typical refueling schedule. PFF 196, 198. Mr. Link, who was the project manager for the installation of Point Beach's improved cooling system in approximately 1979-1980, testified similarly. PFF 197.

Based on this technical data, and based on his experience with dozens of license amendment applications for other pool racking projects, Dr. Singh testified that NRC review of the cask pit rack "would have been an entirely mundane and ordinary regulatory effort." PX 827, p. 19; PFF 34c, 34d, 199. He further testified that the NRC would have approved of the application request for a cask pit rack. PFF 203. He also provided an estimate of the period of NRC review to support a mid-1990s installation date. PFF 206. Indeed, starting in the 1970s, the NRC approved numerous licensee applications to install cask pit racks. PFF 202. Finally, Dr. Singh calculated a cost estimate of approximately $1.9 million for Holtec's effort. WE also likely would have incurred approximately $144,000 in internal labor costs and approximately $66,500 in NRC licensing costs. These total costs were included in WE's offset to the Government. PFF 208, 251-52.

The cask pit rack would have provided sufficient space for any temporary storage needs at Point Beach until 1998 and beyond. For example, the cask pit rack had sufficient space to offload a core for the Point Beach Unit 2 steam generator replacement in 1996. PFF 184. During the trial, the engineer responsible for the steam generator project, Mr. Marlin

Conry, testified that he and Mr. Zabransky[13] considered using a temporary rack to provide space to offload a core into the pool. PFF 185. A temporary cask pit rack also could have been used for regular operations such as refuelings and inspections. Mr. Hennessy testified that, once installed, the rack would have become integrated with plant operations and posed no hindrance or appreciable workload increase to these routine fuel management activities. PFF 209.

The cask pit rack would have provided these benefits to WE at a small fraction of the cost of the dry storage project and, given estimated capital costs, without requiring PSCW approval. PFF 183 (including subparagraphs). WE presented evidence through the testimony of Messrs. Link and Farron[14] that WE definitely would have favored the temporary rack compared with dry storage in the non-breach world. PFF 182-185.

## E. The Court Should Find that DOE Would Accept Spent Fuel in the Non-Breach World at a Substantial Rate

### 1. The Parties' Understanding Was that DOE Would Accept SNF at a Substantial Rate

The testimony of DOE personnel and DOE program documents establish that DOE intended a reasonable DOE acceptance rate under the Standard Contract that (1) was sufficient so that the utilities did not have to add additional at-reactor storage after January 31, 1998, and (2) worked off the backlog of previously discharged fuel at a reasonable rate. PFF 48-49, 52, 54, 63. *See also* PX 41, p. KRGWE002118 ("Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as

---

[13] Mr. Zabransky worked for WE from 1978 until 1994. During the period discussed above, he worked in the Nuclear Fuels group and reported to Mr. Krieser. PFF 19. He began working for DOE in 1994 and is the current DOE Contracting Officer for the Standard Contract. PFF 19.

[14] Mr. Farron worked in the Nuclear Department Strategic Issues Group during Mr. Link's tenure. Mr. Farron is now WE's Manager of State and Regulatory Affairs. PFF 28b, 28c.

practicable upon the request of the generator or owner of such waste or spent nuclear fuel . . . ."); PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 141:21-142:9 ("Ultimately, over time, our objective was to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog.")); *Southern Nuclear*, 77 Fed. Cl. at 413.

Similarly, WE's understanding was that DOE's acceptance rate would be sufficient to eliminate the need for WE to construct additional storage after 1998 and to begin working off the accumulated spent fuel backlog at a reasonable rate. Mr. Shimon testified:

> Q: And during this time period . . . when the standard contract was being developed and executed, what was your understanding of the parties regarding the rate at which Department of Energy would accept spent fuel?
> A: The rate would be sufficient to preclude utilities from having to add additional spent fuel storage capacity after January 31, 1998 and would work off the backlog of spent fuel over a reasonable period of time. . . . Based upon all of the discussions we had with DOE at that time and pronouncements that they made, we believed that they were in agreement with us.

Tr. 1245:18-1246:10 (Shimon); PFF 48-49. WE expected that its spent fuel backlog would be removed by DOE within five to ten years after the reactors ceased operations. PFF 48, 49, 65; PX 67 (July 6, 1984 letter from WE to DOE).

Such a rate also is consistent with the NWPA and the Standard Contract. *Southern Nuclear*, 77 Fed. Cl at 413; PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 80:20-81:22 ("That was . . . the purpose. The basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel. . . . This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage. That was one of the major goals of the program.")).

Further, WE had projected the planned Point Beach spent fuel pool discharges against the existing Point Beach spent fuel pool capacity and determined that WE would be able to

store all of the planned discharges without additional on-site storage until DOE commenced removal of SNF by January 31, 1998. PFF 66, 162. WE also knew that Point Beach would have sufficient storage after that date because DOE's acceptances in the early program years would exceed Point Beach's discharges. PFF 66.

An acceptance rate that would eliminate the need for utilities to construct additional storage after 1998 and work off the accumulated SNF backlog reasonably is a 3000 MTU rate. WE's expert witness, Eileen Supko, conducted a comprehensive analysis that concluded that a 3000 MTU rate met these objectives. PFF 54. Further, DOE personnel repeatedly testified that an annual rate of 3000 MTU is a reasonable rate that accomplishes these objectives. PFF 52. *See also* PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/24/02 Tr. 246:14-18 ("Q: Is it your understanding that the 3,000 rate would keep up with the utility discharge rate? A: Yes.")); PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/24/02 Tr. 247:21-248:2 ("Q: Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton rate – A: No, I'm not.")). DOE has always intended to use a 3000 MTU rate for the Federal Waste Management System ("FWMS"). PFF 53. *Southern Nuclear*, 77 Fed. Cl. at 413-14.

After execution of the Standard Contract, DOE's program documents confirmed DOE's understanding that, under the Standard Contract, DOE would have an operational facility in 1998 that would ramp up to an annual acceptance rate of 3000 MTU, that would eliminate the need for utilities to construct additional storage after 1998, and that would work off the accumulated backlog at a reasonable rate. PFF 61. DOE's intention with respect to repository design receipt rates has stayed constant at 3000 MTUs per year since the execution of the Standard Contract. PFF 61j. The one mill per kilowatt hour fee identified in DOE's July 1984, February 1985, and March 1986 fee adequacy reports was based on repositories that ramped up to 3000 MTU after five years of operation. PFF 61f. Further, one of DOE's RCFC 30(b)(6) witnesses, Mr. Tom Pollog, testified that DOE maintained a 3000 MTU rate

as the design objective for a DOE facility. PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/02 Tr. 96:5-98:9); PFF 53. *See also Southern Nuclear*, 77 Fed. Cl. at 413-14. DOE has not published any documents that indicate otherwise.

Notwithstanding the overwhelming evidence in support of a 3000 MTU rate, the Court has chosen on several occasions to make a final determination of damages without finding a specific acceptance rate. *See, e.g.*, *Entergy Arkansas*, 2007 WL 3033659 at *36, n. 20; *Northern States*, 78 Fed. Cl. at 462, n. 13; *Southern Nuclear*, 77 Fed. Cl. at 439; *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 375, n. 40 (2006); *Yankee Atomic*, 73 Fed. Cl. at 268.

In this case, under any substantial rate, WE has established that, faced with a lengthy DOE delay and the long lead time required to implement mitigation decisions, WE's mitigating decisions were foreseeable, commercially reasonable, and substantially caused by DOE's impending partial breach and lengthy delay. PFF 50, 83, 87-88, 92-94, 96, 103-121, 127-158, 212-237. This is sufficient for WE to recover its dry storage project costs under the aforementioned decisions.

**2. DOE's 900 MTU Rate Should Be Rejected as Contrary to the NWPA, the Standard Contract, and the Parties' Understanding**

Presumably, DOE will continue to argue that the Standard Contract does not contain an express acceptance rate and that the appropriate rate is the 900 MTU steady-state rate contained in the 1991 ACR and used as the basis for the initial submission of Delivery Commitment Schedules ("DCSs") under the Standard Contract. As numerous cases have found, DOE cannot rely on this rate. *Entergy Arkansas*, 2007 WL 3033659, at *36, n. 20; *Northern States*, 78 Fed. Cl. at 449, 457-61, n. 13; *Southern Nuclear*, 77 Fed. Cl. at 415-27; *Yankee Atomic*, 73 Fed. Cl. at 268.

The aforementioned evidence establishes that, until 1990-1991, DOE continually planned on a 3000 MTU annual acceptance rate, not a 900 MTU rate, and that DOE so

informed the utilities. PFF 61. DOE repeatedly indicated that, under the Standard Contract, DOE would have an operational facility in 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would (1) eliminate the need for utilities to construct additional storage after 1998 and (2) work off the accumulated SNF backlog at a reasonable rate. PFF 48, 51, 52, 61. DOE's actions after execution of the Standard Contract evidence the parties' practical interpretation of the Standard Contract and are a useful guide in its interpretation. *Brooklyn Life Ins. Co.*, 95 U.S. at 273; *Entergy Arkansas*, 2007 WL 3033659, at *14; Richard A. Lord, 11 *Williston on Contracts* § 32:14. When a contract is indefinite, the practical construction adopted by the parties is frequently followed because it evidences what the parties believed the contract required before it became the subject of controversy. *Blinderman Constr. Co.*, 695 F.2d at 558 ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation."); *Entergy Arkansas*, 2007 WL 3033659, at *14.

In addition, DOE's 900 MTU rate is contrary to the NWPA and the Standard Contract. In the 1991 ACR, DOE assumed that Congress would remove the MRS schedule linkages, restricting use of the MRS based on the accomplishment of certain permanent repository milestones, but assumed that Congress would maintain the 10,000 MTU capacity restriction. As aptly recognized in *Entergy Arkansas*, "DOE chose selectively which statutory conditions and limitations on a MRS it would put aside and which it would apply." 2007 WL 3033659, at *19.

In the 1991 ACR, DOE recognized that an MRS was not possible by 1998 unless Congress removed the linkages between an MRS and a permanent repository. PX 237, p. 4 (1991 ACR); PFF 98b. By assuming that the schedule linkages would be removed, DOE then was able to assume that the MRS would be operational in 1998. PX 237, p.4 ("These

acceptance rates assume commencement of facility operations in 1998.")[15] By assuming that the capacity limitation would be retained, DOE created an artificially constrained acceptance rate. DOE then spread the 10,000 MTU evenly over a multi-year period and created a steady-state rate of 900 MTU. *Entergy Arkansas*, 2007 WL 3033659, at *19; 42 U.S.C. § 10168(d)(3), (4).

By creating an acceptance rate based solely on an MRS without a permanent repository, DOE's 1991 ACR converted the MRS into *a stand-alone facility* when it was intended as an interim facility to serve as a way-station to the permanent repository. This is directly contrary to the NWPA which provided that the MRS would be part of an integrated FWMS. 42 U.S.C. § 10168(b) ("Once the selection of a site for a monitored retrievable storage facility is effective under section 10166 of this title, the Secretary may submit an application to the [Nuclear Regulatory] Commission for a license to construct such a facility *as part of an integrated nuclear waste management system*." (Emphasis added)). Under the FWMS as articulated in the NWPA, "the MRS would ramp up its acceptance gradually over the initial five-year period to the point where it would begin shipping SNF to a repository and then a steady-state input-output situation would develop at the MRS and the repository." *Entergy Arkansas*, 2007 WL 3033659, at *19. *See also Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135, 40 (2007) ("*Southern Nuclear II*") (denying reconsideration) ("The 1991 ACR rate was premised on the artificially-limited capacity of a stand-alone MRS which was clearly not the facility contemplated by the parties when contracting, or the facility required to carry out the SNF 'disposal' obligation assumed by DOE and reflected in the fee the utilities have paid pursuant to the contract.").

---

[15] WE also questions DOE's assumption that a volunteer MRS site would have agreed to ask Congress to remove the MRS schedule restrictions. In 1987, DOE submitted its proposed MRS schedule linkages to Congress at the behest of the potential volunteer sites that were concerned that an MRS facility would become a de facto permanent storage facility. PFF 71.

Thus, DOE's 1991 ACR attempted to convert the MRS into a permanent repository, something the MRS was never meant to be. "That shift would have negated the foundational premise of the NWPA that 'the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of.'" *Entergy Arkansas*, 2007 WL 3033659, at *19 (citing 42 U.S.C. § 10131(a)(4)). DOE's interpretation is contrary to the statutory scheme set forth in the NWPA. *Id.* at *20. It is hardly surprising then that the DOE person involved in development of the 1991 ACR, Alan Brownstein, informed a DOE contractor, Scott Vance, that DOE had selected the 900 MTU rate to limit its contractual liability to the utilities. PFF 101.

In addition, DOE did not issue the 900 MTU rate in the 1991 ACR until four years after passage of the NWPA Amendments. PFF 41, 98. During these four years, DOE published the 1988 ACR and the 1988 Draft Mission Plan Amendment. Neither contained any significant limitation on the acceptance rate at the MRS. PFF 101b; PX 149 (1988 ACR); PX 150, pp. 18-19 (1988 Draft Mission Plan Amendment); *Southern Nuclear*, 77 Fed. Cl. at 417. DOE's own documents from that timeframe acknowledged, however, that the NWPA Amendments made it unlikely that DOE would accept waste before 2003. PFF 86, 101b; PX 149, 150, 175 (1989 Draft ACR) (noting that linkages made it unlikely that DOE could accept SNF before 2003); *Northern States*, 78 Fed. Cl. at 452-53. Further, during the 1987-1991 period, DOE announced an additional repository delay from 2003 to 2010 and admitted that an MRS would not be available in 1998 with the linkages in place. PX 183, pp. ix-x (Nov. 1989 DOE Report to Congress); PFF 90; *Southern Nuclear II*, 79 Fed. Cl. at 140.

Then, in 1994, DOE announced that "it would not begin SNF collection until 2010 because its planned storage repository would not be ready until then." *Indiana Michigan*, 422 F.3d at 1372. At that time, MRS siting efforts "effectively ceased." *Southern Nuclear*, 77 Fed. Cl at 420. Nevertheless, DOE issued another ACR/APR in 1995. Recognizing that DOE would be unable to perform in 1998, the 1995 ACR/APR no longer identified specific

years of performance, instead referring to them as Year 1, Year 2, etc. PX 378, pp. 4, 6 (1995 ACR). Moreover, DOE continued to use the 900 MTU rate in the 1995 ACR even though it was no longer pursuing an MRS. PX 378 (1995 ACR); PFF 122a.

DOE then imposed its "artificially low" 900 MTU rate upon utilities through the DCS process. PFF 101. Although "DOE lacked a valid basis for the rate and allocation" contained in the 1991 ACR, DOE's DCS instructions required utilities to base their DCS submittals on the rates in the 1991 ACR. *Entergy Arkansas*, 2007 WL 3033659, at *19; PFF 123 (discussing DCS instructions).

DOE did not believe that the DCSs, based on an acceptance rate that was noncompliant with the NWPA and the Standard Contract, were contractually binding. PFF 126. DOE personnel intimately involved with the process in 1992 believed that the DCSs were intended to be "fungible" documents and were not contractually binding. *Id.* Similarly, the ACRs were always planning documents and were never intended to be contractually binding. PFF 59a; PX 378, p.1 (1995 ACR) ("The ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers."); *Southern Nuclear*, 77 Fed. Cl. at 410-11 (DCSs and ACRs are not binding).

In sum, DOE's 900 MTU rate argument is not a credible interpretation of the Standard Contract or the NWPA. The Standard Contract must be read in light of the provisions and purposes of the NWPA. *Roedler*, 255 F.3d at 1352; *Maine Yankee*, 225 F.3d at 1341-42. DOE's 900 MTU rate is in conflict with the NWPA because an "independent MRS could not have been sited, built, and operated in lieu of a repository." *Entergy Arkansas*, 2007 WL 3033659, at *19. "DOE cannot now rely on the flawed ACRs issued from 1991 to 1995 to limit its exposure to damages to those that would be determined based on the overall rates specified in those ACRs." *Id.* at *19-20. Instead, to properly determine causation and damages, "the court must go back to the pre-1991 actions by DOE to determine the parties'

purposes and objectives associated with the rate-allocation collection process set out in the Standard Contract." *Id.* at *19.

**F. WE's Procurement of Three TN-32B Backup Casks Was Foreseeable, Caused by DOE's Breach, and Commercially Reasonable**

**1. Background**

In May 1996, WE experienced a hydrogen ignition event during the loading of the third VSC-24 cask at Point Beach. From 1995 to 1997, Point Beach, Palisades and Arkansas Nuclear One also experienced structural weld cracking in the VSC-24 lids. In response to these incidents, the NRC issued Confirmatory Action Letters ("CALs") and Requests for Additional Information to the VSC-24 cask users and Sierra Nuclear. These CALs prohibited the loading of additional VSC-24 casks at any facility and left WE uncertain as to when Point Beach might resume loading VSC-24 casks. PFF 136.

To manage recovery of the ability to load dry storage casks, WE created the Dry Storage Group at Point Beach. The recovery effort included identifying problems in the VSC-24 design, including the generation of explosive hydrogen gas arising from the reaction of the borated water with the carbo-zinc coating. To remedy that problem, during the VSC-24 loading process, the WE loading team had to continuously purge hydrogen gas to prevent gas buildup to an explosive level. WE incurred costs in its VSC-24 recovery efforts. PFF 137-138.

**2. WE's Procurement of the TN-32B Casks Was Foreseeable**

In view of WE's SNF storage needs, WE identified a cask storage system – the TN-32B cask– that could be procured as a substitute for the VSC-24 cask. WE's decision to procure three TN-32B casks was foreseeable. Spent fuel storage is a complex and relatively new technology that is constantly evolving. It is not surprising that unexpected events with new technologies could occur, causing the pursuit of an alternative or backup SNF storage option. As the Federal Circuit has noted, WE was forced to "accept responsibility to guard

against the environmental impact of improperly-disposed and maintained SNF." *Indiana Michigan*, 422 F.3d at 1375. *See also Southern Nuclear*, 77 Fed. Cl. at 423 ("Dry storage . . . was a complex, time-consuming and expensive endeavor fraught with many unknowns."); PFF 127, 150, 241.

In sum, WE's procurement of three TN-32B casks because of the problems experienced with the VSC-24 casks was foreseeable.

**3. DOE's Breach Caused WE to Reasonably Incur Costs to Procure Three TN-32B Casks**

In May 1998, WE issued a purchase order for three TN-32B casks. At that time, the cask lid welding CAL regarding the VSC-24 cask remained in effect and it was uncertain when it would be resolved. PFF 142.

There also were other significant regulatory, technical and business risks with the VSC-24 casks that motivated WE's decision to acquire an alternative cask. WE was concerned regarding the continued viability of Sierra Nuclear and the VSC-24 cask because of Sierra Nuclear's weak financial status. Even after British Nuclear Fuels, Ltd. ("BNFL") acquired Sierra Nuclear, WE remained concerned regarding the level of support that BNFL would provide for the single-purpose VSC-24 cask compared with Sierra Nuclear's and BNFL's dual-purpose cask models. Sierra Nuclear also was not adequately responding to the concerns of the NRC or the industry regarding the VSC-24 cask. PFF 141.

Based on these circumstances, WE reasonably determined that it was prudent to consider acquisition of an alternative cask. PFF 142. After considerable analysis, WE decided to procure the TN-32B cask based on its availability, the ability to obtain an NRC license for the cask, and the ability of Point Beach to load the TN-32B cask with the fewest plant modifications. WE decided to procure three TN-32B casks in case the VSC-24 cask was unavailable for loading. PFF 142. Thus, its incurrence of this cost was prudent. As Mr. Krieser testified:

> Q: Did you agree with the PSCW that it was reasonable for Wisconsin Electric to purchase the three TN-32Bs?
> A: Absolutely. If you rewind the tape back to 1996 through the period up through 1998, obviously, you'd find a lot of significant issues associated with the VSC-24 cask system. Of course, we had the ignition incident, we had the lid weld issues, we had quality assurance difficulties with Sierra Nuclear, we had commercial and economic problems with Sierra Nuclear. It was a very long list of issues. That clearly did not give any confidence, quite frankly, that we would ever be able to load additional VSC-24 casks, so the approach that we took to employ a backup system, to me, was a completely prudent decision. I think the Public Service Commission agreed with that, and so it was totally appropriate, in my mind, to pursue that particular course of action.

Tr. 1582:15-1583:10 (Krieser); PFF 142.

The prudence of WE's procurement of three TN-32B casks is further supported by the PSCW's Order, approving the acquisition of *up to six* TN-32B casks and stating: "The purchase of these casks, as a method of ensuring the reliability of Point Beach by providing a back-up option in case the VSC-24 cask remains unavailable to [WE], is reasonable." PX 524, p. KRGWE002387 (Aug. 1998 PSCW Order). Based on this PSCW approval, WE then recovered its incurred costs for the three TN-32B cask costs and related costs through its rates. PFF 148. The fact that this decision process and expense were analyzed and approved as reasonable by the PSCW merits consideration. *Yankee Atomic*, 73 Fed. Cl. at 269, 292.

As demonstrated, WE would not have used dry storage in the non-breach world. PFF 161-212. Thus, WE would not have encountered the problems with the VSC-24 cask if DOE had performed under the Standard Contract. DOE's breach, therefore, caused WE to incur costs in procuring the three TN-32B casks which were reasonably procured as an alternate to the VSC-24 cask.

**4. WE Reasonably Continued with TN-32B Cask Fabrication After Loading of the VSC-24 Casks Resumed**

In August 1998, the NRC closed the cask lid welding CAL, which allowed Point Beach to resume loading VSC-24 casks. However, WE reasonably decided to continue fabrication of the TN-32B casks at that time for the following reasons:

First, the NRC conditioned its lifting of the CALs on certain future actions by WE. PX 477 (Dec. 1997 Letter re: CAL closure) 525 (August 13, 1998 NRC letter re: CAL); PFF 139. If WE, in the process of fulfilling those conditions, discovered that problems with the VSC-24 cask remained, the NRC likely would have issued new CALs. *Id.* For example, the NRC required WE to ultrasonically examine the two VSC-24 casks that were stored at Point Beach. PX 525. If WE had discovered any cracks in the welds, the NRC likely would have again prohibited the loading of VSC-24 casks. *Id.*

Second, the numerous problems with the VSC-24 cask raised the prospect of future problems. In these circumstances, WE reasonably determined that it could not rely solely on the VSC-24 cask remaining free of future problems. PFF 139-141. WE's concerns were proven justified when, in June 1999, the Palisades plant experienced another flaming incident during the loading of a VSC-24 cask. PFF 140. WE reasonably feared that the NRC might issue a new CAL, prohibiting again loading of VSC-24 casks. *Id.* Utilities also experienced quality control problems in the fabrication of VSC-24 casks. PFF 141f.

Third, WE remained concerned regarding the continued viability of Sierra Nuclear and support for the VSC-24 storage-only cask as discussed above. PFF 141b.

Fourth, WE believed that, even if WE eventually did not need the TN-32B casks, it could sell these casks to another nuclear plant. WE believed that its sales prospects would be enhanced if it completed the casks. PFF 145. WE began attempting to sell the casks in 2000, but was unsuccessful in its efforts to sell the casks. PX 577 (May 16, 2000 email re: TN-32); PFF 145. A mitigating party, however, is "'not precluded from recovery . . . to the extent that

it has made reasonable but unsuccessful efforts to avoid loss.'" *Indiana Michigan*, 422 F.3d at 1375.

In sum, WE reasonably mitigated DOE's breach by procuring the TN-32B casks. If WE had failed to take this action, it may have resulted in significantly higher damages if the VSC-24 cask was unavailable and WE had to shutdown Point Beach for lack of SNF storage space.

## G. WE's Decision to Procure Dual-Purpose NUHOMS Systems Was Foreseeable and Is Recoverable

WE and Nuclear Management Company ("NMC") continued to evaluate the best cask for future use at Point Beach because of the VSC-24 cask's problems and limitations. PFF 152. WE was concerned about Point Beach's continued reliance on the trouble-plagued VSC-24 cask for the same reasons that WE had procured the TN-32B casks as a backup. PFF 141, 145. The TN-32B, however, was not a long-term solution for Point Beach because WE was interested in implementing a dual-purpose storage system at Point Beach (and had been encouraged to do so by the PSCW). There had been significant improvements in dual-purpose cask technology as discussed below. Therefore, WE reasonably decided to pursue a new cask that satisfied WE's longer-term concerns.

### 1. DOE Foresaw Dual-Purpose Systems

WE's eventual decision to switch to a dual-purpose cask "was not only foreseeable, but foreseen." *Yankee Atomic*, 73 Fed. Cl. at 289. WE presented substantial evidence that DOE was aware of, and planned for, the use of "multi-purpose storage and transportation containers to store SNF at reactor sites if the repository was significantly delayed." *Id.*; PFF 154.

For example, in the 1983 Draft Mission Plan, DOE stated it

> will continue to explore the feasibility of a multipurpose storage cask that could be used for the [federal interim storage] either at commercial reactors or at a Federal site. If feasible, such a cask would be designed so that it could later be used in the repository program, the MRS program, or in the transportation of spent fuel.

PX 52, pp. 2-15 (1983 Draft Mission Plan). *See also* DX 493, p. 114 (Proceedings of 1983 CRWM Info. Mtg.) ("When licensed, dry storage will probably become the preferred method of expanding interim storage capability."); PX 87, p. 109 (1985 Mission Plan) ("Future RFPs will look to more advanced multipurpose casks. Multipurpose casks could be used for storage, transportation, and disposal. Studies that will help to define the feasibility of the various cask concepts are under way.").

In the 1990s, DOE continued to express approval of the use of dual-purpose casks by utilities. PX 587, p. 7 (Report to the House Committee on Appropriations) ("The Department proposed to accept utility-acquired storage/transportation systems, and if they are suitable for use at the Federal Facility the Department would be willing to consider compensation for avoided costs associated with the use of utility-supplied equipment."), PX 711, p. 8 (System Requirements Document, Rev. 07, 5/06) ("CRWMS elements and facilities shall be capable of accommodating a range of storage and transportation technologies, including Transport, Aging and Disposal, dual-purpose, single-purpose, DOE SNF Standard, Naval SNF and HLW canisters, as well as Multi-Canisters Overpacks and limited quantities of bare SNF assemblies."). These later DOE documents are relevant if the Court concludes that "foreseeability is more appropriately measured at the time of the breach, because that is when the breaching party should be on notice of the ramifications of its actions or failures to act." *Southern Nuclear*, 77 Fed. Cl. at 404. *See also Pacific Gas & Elec.*, 73 Fed. Cl. at 395.

Finally, the principle of foreseeability does not limit WE to the use of technology that existed at the time of contracting. Instead, WE may use commercially reasonable means to

mitigate its losses. *Southern Nuclear*, 77 Fed. Cl. at 405; *Entergy Arkansas*, 2007 WL 3033659, at *21.

### 2. DOE's Continuing Breach and VSC-24 Cask Problems Caused WE to Reasonably Incur Costs to Procure the NUHOMS System

In order to load more than 12 casks (of any design), WE had to apply to the PSCW for authority to procure such additional casks. On May 2, 2000, WE applied for authority to procure and to load 36 additional casks because of DOE's continued failure to accept WE's SNF under the Standard Contract and DOE's plan to accept SNF in 2010 at the earliest. PX 575 (May 2000 WE Application to the PSCW); PFF 151. The additional casks would allow operation of Point Beach through the end of each Unit's then-current licensed life.

The use of dual-purpose casks should avoid the need to unload casks placed at the ISFSI prior to transporting the spent fuel assemblies off-site. This, in turn, would avoid duplicative cask-loading costs and would reduce radiation exposure to workers. PFF 152. In its Order authorizing WE to acquire and load an additional 36 casks, the PSCW urged WE to move toward using a transportable cask design for this reason, stating "it encourage[d] WEPCO to consider dual-purpose casks in the future because they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport." *Id.*[16]

WE also was interested in dual-purpose casks for other reasons. WE wanted to start loading its SNF into dual-purpose casks so that if the Private Fuel Storage facility or another private facility became available, WE would have a greater ability to ship the waste to an off-site location. Moreover, the Point Beach Units were then nearing the end of their operating

---

[16] In its earlier February 9, 1995 Order granting WE's ISFSI application, the PSCW stated that the "licensing and fabrication of a multi-purpose cask for storage, transportation and disposal" appeared to be "environmentally superior to dry cask storage" because handling of spent fuel assemblies would be reduced. PX 374, p. 11. The PSCW further noted, however, that this option was not "available now, or likely to be available soon." *Id.*

licenses. If WE decided to decommission Point Beach, dual-purpose casks would facilitate such decommissioning efforts. WE would not need to maintain the spent fuel pool in order to unload the dual-purpose casks to transport the spent fuel assemblies contained therein off-site.

WE also presented testimony regarding developments in the nuclear industry's use of casks and the cask choices provided by vendors. Most of the ISFSIs that began operations in the 1980s and 1990s are transitioning to dual-purpose cask systems. PFF 152e. Moreover, nearly all dry storage facilities commissioned since 2000 have loaded SNF into dual-purpose cask systems. Dry storage vendors are no longer marketing storage-only designs, and no utilities are currently loading VSC-24 casks. PFF 152e, 153. Utilities prefer to employ dry storage systems that are in use at other facilities so that they can share information as a users' group and receive better vendor support. PFF 152e; PX 270 (example of Owners' group meeting minutes).

In addition, WE presented evidence at trial, including the testimony of expert witness Eileen Supko, that DOE endorsed and encouraged nuclear operating utilities to utilize dual-purpose cask designs for at-reactor storage and considered compensating companies for avoiding DOE program costs. PFF 154. *See also, e.g.*, *Yankee Atomic*, 73 Fed. Cl. at 285-88. DOE has considered dual-purpose casks as part of the FWMS from the start of the program. PFF 154. Additionally, even DOE's current planning basis assumes that DOE will accept some commercial SNF in dual-purpose canisters at the permanent repository. PX 619 (Yucca Mountain Draft Environmental Impact Statement, Final Environmental Impact Statement and Engineering Report); DOE Supplement to Final EIS for Yucca Mountain, 71 Fed. Reg. 60490, 60492 (Oct. 13, 2006).

Under these circumstances, the Point Beach Dry Storage Group undertook to select a next-generation dual-purpose cask for use at Point Beach and other NMC sites. This source selection resulted in the choice of the NUHOMS TN-32PT dual-purpose cask for use during

the 2003-2007 time frame. The NUHOMS design offered several advantages, including (1) easier loading than the VSC-24 cask, (2) safer loading than the VSC-24 cask, (3) shorter loading durations and, therefore, lower loading costs than the VSC-24 cask, (4) the ability to store spent fuel assemblies with higher burn-up than under the VSC-24 Certificate of Compliance, and (5) the potential to avoid repackaging the spent fuel assemblies for shipment off-site. PFF 152. WE also was able to gain efficiencies of scale because other NMC fleet plants were also purchasing the NUHOMS system. PFF 152f.

Examining further the safety issue, Point Beach highly disfavored the VSC-24 cask because it had a design flaw – the production of large volumes of explosive hydrogen gas – "a flaw that nobody really wants to live with." Tr. 1780:20-21 (Becka); Tr. 1772:25-1773:15 (Becka) ("You know, we'd been involved in the recovery efforts since the group came together in 1997, and none of us liked the idea of having hydrogen present while we were welding. It was just not conducive with good nuclear safety practices, so we didn't like the VSC-24. We knew there were other designs out there that were better."); PFF 136, 137, 140, 152d. This gas production had resulted in the May 1996 hydrogen ignition incident and the June 1999 flaming incident at the Palisades plant. PFF 136, 140.

With regard to the ability of the newer dual-purpose casks to store spent fuel with higher burn-up, WE informed the PSCW in 2000 that it favored switching to a new design because of the enrichment and burn-up limitations on fuel that could be stored in the VSC-24 cask. PX 575, p. 3 (May 2000 WE Application to the PSCW). In 2001, when WE decided to procure the NUHOMS system, the VSC-24 cask was only licensed to hold lower burn-up spent fuel assemblies, specifically the older and colder "Westinghouse Standard" assemblies discharged at Point Beach through 1987. Tr. 1773:20-1774:5 (Becka); PFF 141c. If WE had continued to load its colder assemblies into VSC-24 casks, Mr. Becka testified that WE was

concerned that it would run out of colder assemblies for future loading campaign flexibility. PFF 141c.[17]

In March 2002, NMC entered into a purchase order with Transnuclear to acquire the NUHOMS casks. PFF 155. By September 2007, Point Beach had procured and loaded nine NUHOMS systems. PFF 16. The casks that Point Beach has loaded through February 2007 because of DOE's failure to perform under the Standard Contract are as follows:

**SUMMARY OF POINT BEACH CASK LOADINGS**

| YEAR | NO. CASKS LOADED | NO. ASSEMBLIES |
|---|---|---|
| 1995 | 1 VSC-24 | 24 |
| 1996 | 1 VSC-24 | 24 |
| 1997 | NONE | NONE |
| 1998 | 3 VSC-24 | 72 |
| 1999 | 3 VSC-24 | 72 |
| 2000 | 4 VSC-24 | 96 |
| 2001 | 1 VSC-24 | 24 |
| 2002 | 2 VSC-24 | 48 |
| 2003 | 1 VSC-24 | 24 |
| 2004 | 4 NUHOMS (TN-32PT) | 128 |
| 2005 | NONE | NONE |
| 2006 | 5 NUHOMS (TN-32PT) | 160 |
| Total | 16 VSC-24 / 9 NUHOMS | 672 |

WE reasonably incurred costs to acquire the NUHOMS casks and to modify Point Beach for their use. PFF 156, 157. If DOE had performed its obligations under the Standard

[17] In 2003, the NRC issued a revised VSC-24 Certificate of Compliance, expanding the fuels that could be stored in the VSC-24 cask, but, by 2003, WE had already moved to the NUHOMS system.

Contract, WE would not have built dry storage. Thus, WE would not have acquired the NUHOMS casks if DOE had performed, and WE must recover these costs to be made whole. Not surprisingly, several other SNF decisions have approved the purchase of dual-purpose casks. *See, e.g., Southern Nuclear*, 77 Fed. Cl. at 424-25; *Pacific Gas & Elec.*, 73 Fed. Cl. at 418-19; *Northern States*, 78 Fed. Cl. at 469-70; *Entergy Arkansas*, 2007 WL 3033659, at *22-23. Similarly, WE should recover the costs that it has incurred in providing financial support to BNFL's effort to have the NRC license the VSC-24 cask for transportation. PFF 141e. *See also Northern States*, 78 Fed. Cl. at 469-70 (Court permitted utility to recover the costs incurred in seeking to qualify the TN-40 cask for transportation as mitigation damages).

### H. WE's Costs Incurred in Exploring Private, Off-Site SNF Storage Were Caused by DOE's Breach and Were Foreseeable

WE investigated the feasibility of several off-site private fuel storage facilities. It investigated these potential off-site SNF storage options during the period from approximately 1994 through 1999. It investigated these options because of uncertainties in its dry storage program. For example, it did not obtain PSCW approval for its dry storage project until February 1995. Then, the PSCW approval was challenged in court and that created additional uncertainty regarding when WE could implement its dry storage project. PFF 212.

In addition, the PSCW only approved the purchase of 12 casks and WE estimated that it would need approximately 36 additional casks to operate until the end of Point Beach's then current licenses. WE reasonably believed that its chances of obtaining any future SNF storage approvals from the PSCW would be enhanced if WE investigated options for transportation of Point Beach's spent fuel out of Wisconsin. After approval of its dry storage project, WE continued to investigate off-site storage options because of problems that it encountered with the VSC-24 cask, including a prohibition on loading such casks for more

than two years. Finally, WE continued to investigate off-site storage because of delays that it encountered in obtaining a fully licensed replacement cask for the VSC-24 cask. PFF 213.

In 1994, WE investigated an off-site storage facility that would be constructed on lands belonging to the Mescalero Indian tribe in New Mexico and eventually became known as Private Fuel Storage ("PFS"). It invested $883,503 in PFS. PX 794 (May 2006 Revised Expert Report of The Kenrich Group). WE expended additional monies on outside legal counsel. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Dkt. 369 (Nov. 20, 2007) ("Joint Stipulation Re: Legal Costs, Dkt. 369"). It decided to terminate its involvement in PFS in 1997 because WE began to believe that the construction and operation of PFS was unlikely. PFF 214.

WE did not invest in PFS because of a desire to make money on an outside investment. Instead, it invested in PFS because DOE's nonperformance required substantial, additional SNF storage and the alternative option, WE's dry storage project, encountered delays and cask performance problems. WE also was interested in trying to move spent fuel from Point Beach. PFF 213.

WE also investigated options for offshore disposal of spent fuel and other off-site storage options including the Owl Creek project in Wyoming and a potential dry storage facility in Oak Ridge, Tennessee. WE incurred legal expenses in connection with these projects. Joint Stipulation Re: Legal Costs, Dkt. 369; PFF 214.

WE established through the testimony of Messrs. Link and Krieser that WE investigated PFS and other alternative storage options to mitigate DOE's partial breach of contract. WE would not have investigated or incurred costs in the PFS activity if DOE had performed under the Standard Contract. PFF 215. *See also* Tr. 1551:3-24 (Krieser) ("Our strategy to deal with DOE's lack of performance always included an intention to pursue away-from-reactor storage facilities, and that would include industry wide initiatives, as well as some of our own.").

It was reasonably foreseeable that WE would investigate options for additional spent fuel storage because of DOE's failure to perform the Standard Contract in a timely manner. *Northern States*, 78 Fed. Cl. at 465-66. WE only investigated off-site private fuel storage facilities because of DOE's contract breach. As demonstrated, WE began its dry storage project because of DOE's nonperformance. Then, when WE encountered delays and other problems with its dry storage project, it had to consider off-site private storage options. PFF 212-216.

We recognize that, based on the facts in *Indiana Michigan*, the Court held that Indiana Michigan's PFS investment was not recoverable because it was "too speculative" and not foreseeable. *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 658-59 (2004). On appeal, the Federal Circuit affirmed. 422 F.3d at 1376. The Federal Circuit, however, limited its findings in *Indiana Michigan* to the factual record in that case. *Id.* (noting that based "on these facts" and the "credited evidence" of utility witnesses that the PFS was "too speculative," neither causation nor foreseeability were established).

Foreseeability and causation are both questions of fact. *Citizens Fed. Bank*, 474 F.3d at 1321 (foreseeability); *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (causation). Therefore, as the Court concluded in *Northern States*, 78 Fed. Cl. at 465, the Federal Circuit's ruling in *Indiana Michigan* does not bind WE regarding its PFS claim, and WE is entitled to its day in court. WE submits that, given the uncertain SNF storage options that WE faced because of DOE's nonperformance, it was not overly speculative to invest the limited funds at issue ($883,000 plus legal fees) in exploration of potential private, off-site storage options. *Id.* at 466.

Indeed, given the anticipated long-term failure of DOE to perform, WE had to investigate alternative SNF storage facilities. WE had no assurance that the PSCW would approve WE's initial dry storage application or its subsequent requests for additional casks. It also encountered delays and uncertainties arising from the performance problems with the

VSC-24 cask. Given the modest investments required to investigate these private SNF storage options, it was commercially reasonable for WE to pursue them, and WE only did so because of DOE's long-term failure to perform. PFF 212-216.

Congress and DOE recognized that, absent a federal repository, utilities would need to investigate private off-site storage. For example, the NWPA references off-site storage. 42 U.S.C. § 10155(h) ("Nothing in this Act shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government [on the date of the enactment of the NWPA]."). Similarly, Robert Morgan, the initial DOE program director, stated in 1983 that "[b]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that *no utility would have to add any further storage facilities* either on site or *at another location*." DX 493, p. SN069599 (Emphasis added).

That private off-site storage may be needed given DOE's nonperformance is also confirmed by DOE's documents. In a 2001 report to Congress, DOE stated that PFS could serve as an available alternative for storing SNF for another utility, Northern States. *See* PX 590, p. 7 (Jan. 2001 DOE, Spent Fuel Management Alternatives Available to Northern

States Power Company Inc., etc.):[18]

> Transport of the [spent fuel] to licensed off-site storage facilities has been successfully done in the United States for many years. This includes trans[s]hipment of [spent nuclear fuel] to other reactor sites owned by the utility. Shipments could also be made to a licensed facility owned by another company, the proposed Private Fuel Storage (PFS) facility which is currently undergoing licensing review by the NRC, or the Owl Creek Project planned for Wyoming by the NEW Company.

DOE also included the PFS in its contingency plans in its 2002 draft Yucca Mountain Environmental Impact Statement. PX 619, pp. 39, 108, vol. III § 9.1 ("DOE recognizes interim storage at the Private Fuel Storage facility in Utah to be a reasonably foreseeable future action and has included this proposed action . . . ."). Thus, WE's investigation of off-site options was foreseeable to DOE. *Northern States*, 78 Fed. Cl. at 466. *See also Indiana Michigan*, 422 F.3d at 1376 ("DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its SNF.").

In *Indiana Michigan*, the Court indicated that Indiana Michigan regarded PFS as having a potential to make a profit. 60 Fed. Cl. at 658-69. As the former VP Vice President of WE's Nuclear Department, Mr. Link explained, WE's motivation in investing in PFS was not to make a profit, but to find additional SNF storage to mitigate DOE's breach of contract. PFF 212-216. In addition, the fact that WE's off-site private storage facility investigations did not prove fruitful does not mean that the investment was too speculative to be recovered. WE is "'not precluded from recovery . . . to the extent that [it] has made reasonable but

---

[18] DOE produced this report in response to a congressional request to identify "all alternatives that are available to Northern States Power Company and the Federal government to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company." PX 590, p. 3.

unsuccessful efforts to avoid loss.'" *Indiana Michigan*, 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350(2) (1981)).

Other decisions have denied recovery of PFS costs either because the high costs were unforeseeable or because the costs were not incurred by the utility, but by its parent corporation. *Southern Nuclear*, 77 Fed. Cl. at 445 ($8.5 million). Here, the total cost for PFS is substantially less (approximately $1.2 million (nominal dollars)). PX 794 (May 2006 Revised Expert Report of the Kenrich Group); Joint Stipulation Re: Legal Costs, Dkt. 369. The PFS costs also were incurred directly by WE. PX 794.

In sum, WE has established that it investigated PFS and other alternative storage options to mitigate DOE's partial breach of contract and that it would not have investigated such options if DOE had performed under the Standard Contract. WE also has established that these costs were foreseeable. Therefore, WE is entitled to recover these costs as mitigation damages.

## I. The Dry Storage Fees Imposed by the NRC Since 1999 Were Caused by DOE's Breach and Were Foreseeable

In 1999, the NRC imposed a generic, ISFSI-related fee on essentially the entire nuclear power industry pursuant to 10 C.F.R. § 171.15(c) in recognition of DOE's long-term failure to perform under the Standard Contract. PFF 225-226.[19] WE presented evidence at trial establishing that the NRC would not have imposed this fee on utilities such as WE that would not have built dry storage in the non-breach world. The specific fee that the NRC imposed due to the impending industry wide implementation of dry storage was part of the

---

[19] This fee is separate and apart from the Part 72 license fees that WE paid from 1996 to 1998 (10 C.F.R. Part 171.16) and ISFSI license and inspection fees (10 C.F.R. Part 170) that WE has paid since it constructed dry storage. As discussed, WE would not have built dry storage and, therefore, also would not have incurred these fees in the non-breach world. PFF 222.

spent fuel storage/reactor decommissioning fee ("SFS/RD fee") levied on all operating nuclear reactor licensees as well as shutdown reactors with ISFSIs. PFF 225-226.

WE has calculated that the dry storage related portion of the SFS/RD fee in the years 1999-2007 as follows:

1999: $107,925
2000: $225,845
2001: $307,177
2002: $333,166
2003: $468,866
2004: $301,780
2005: $251,602
2006: $286,972

PX 1029, p. KRGWE003886 (April 2007 Kenrich Revised Work Papers). WE seeks recovery of these monies because if DOE had performed, the NRC would not have levied these fees on WE. PFF 217-230.

**1. NRC Regulatory Expenses for Storing SNF Were Foreseeable**

That WE and the entire nuclear industry would incur millions of dollars in NRC fees as a result of DOE's breach of the Standard Contract was completely foreseeable to DOE. SNF is highly radioactive and highly regulated. As the Federal Circuit observed, "the production of energy from nuclear sources is one of the most highly regulated human activities." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc) (quotations and citation omitted).

Alternative SNF storage methods such as dry storage necessarily require NRC licensing and regulation. Pursuant to Pub. L. No. 101-508, the Omnibus Budget Reconciliation Act of 1990, as amended ("OBRA-90"), the NRC is required to recover most of its budget authority through fees for licensing, inspection and annual assessments. *See also* PFF 218. It was therefore foreseeable, well before January 1998, that the utilities would incur NRC fees in using dry storage to mitigate DOE's partial breach of the Standard

Contract. *Indiana Michigan*, 422 F.3d at 1376 ("DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its SNF."). *See also* PFF 223-230.

**2. DOE's Breach Caused the NRC to Impose Generic NRC Fees Under 10 C.F.R. Part 171 Across the Nuclear Power Industry**

The NRC had long recognized that the need for dry storage stemmed from the Government's inability to remove utility spent fuel. Starting at least in the early 1990s, the NRC investigated recovering generic dry storage costs from the Nuclear Waste Fund, but concluded on several occasions that it could not do so. PX 947 (Feb. 27, 1998 NRC Memo re: FY 1998 Proposed Fee Rule), 1000 (June 13, 1991 Rulemaking Issue Affirmation); PFF 220, 223. Generic NRC activities include research, rulemaking, development of regulatory guidance, and incident response activities that apply to more than one licensee. PFF 221-222. The NRC recovers these costs under 10 C.F.R. Part 171. PFF 221-222. In 1998, the NRC staff again considered recovering its ISFSI project costs from the Nuclear Waste Fund as a "fair and equitable" alternative to charging licensees, but concluded that this was not a viable option. Instead, the NRC has recovered these costs from its licensees. PX 947; PFF 223.

The NRC initiated a study of its fee structure in 1998 and in the process analyzed which licensees should bear the burden of paying its generic ISFSI project costs. PFF 223. The NRC then recognized that the NRC was incurring ISFSI project costs "as a result of the delays in the DOE's [waste disposal] program." Tr. 4152:25-4153:2 (Rabideau); PFF 223. The NRC found that the class of licensees to be charged was "all licensees" because, in the

absence of DOE performance, then all licensees likely would need dry storage:

> With the continued delay in DOE taking possession of spent fuel, some utilities must then resort to dry storage for more storage capacity . . . . *It is likely that, in the absence of a high-level waste repository, all licensees will need dry storage capacity eventually.* It is estimated that as many as 50 reactors will reach storage capacity during the next 10 years.

PX 947, p. 4; Tr. 2427:1-6 (Gadzala) ("[I]f there was confidence on the part of the NRC that DOE would have a reliable schedule for taking possession of the fuel, then my belief is that they would not have imposed a generic fee on all utilities.")[20]; PFF 225.

WE presented evidence at trial proving that the NRC's belief that the number of ISFSIs would increase dramatically was correct. Ms. Supko testified that the number of nuclear power plant sites that had loaded dry storage had increased from 10 in 1998 to 38 by the time of WE's trial, servicing 63 reactors. PFF 228-229.

The NRC then imposed the dry storage portion of the SFS/RD fee because of the impending industry wide implementation of dry storage. PFF 223-224.[21] The NRC Commissioners voting on the SFS/RD fee and the 1999 NRC Federal Register Final Rule associated the industry wide imposition of generic spent fuel storage activities with DOE's failure to timely perform. PX 947, 1044; PFF 223-225. Specifically, the NRC stated that the fact that "DOE has not taken possession of the spent fuel does not relieve NRC of the OBRA-90 requirement to recover . . . those costs associated with generic spent fuel storage activities." PX 1044 (64 Fed. Reg. 31448, 31455 (June 10, 1999)); PFF 225. The NRC had to recover the fees from its licensees, all of whom it expected to eventually build dry storage. PX 947, p. 4; PFF 223.

---

[20] Mr. Jack Gadzala served with the NRC from 1988 until 1997 and was the resident NRC inspector at Point Beach from 1988 until 1994. PFF 27.

[21] The SFS/RD fee incorporated the prior 10 C.F.R. § 170.16 ISFSI Fee. PX 947; PFF 223.

WE presented compelling evidence that the NRC would not have imposed the generic ISFSI fee that the NRC has assessed from 1999 forward if DOE had performed. In the non-breach world, less than ten ISFSIs would have been constructed. PFF 229. Thus, the class of ISFSI licensees would have been very small. The number obviously would have been far less than "all licensees." The NRC would not have been able to impose the fee across the industry in the non-breach world because the NRC may only allocate generic fees "fairly and equitably" among licensees. 42 U.S.C. § 2214(c)(4). Because WE and many other licensees would not have built dry storage in the non-breach world, it would not have been reasonable to charge them generic ISFSI fees. In the non-breach world, therefore, the NRC would have likely only charged fees to the applicable class – those licensees using dry storage – which would *not* have included WE. PFF 228-229.

### 3. WE Established at Trial the Spent Fuel Storage Portion of the NRC Fee

WE presented evidence at trial regarding its calculation of the spent fuel storage portion of the SFS/RD fee. PFF 226. WE based its calculation on the testimony of the NRC Deputy Chief Financial Officer, Mr. Peter Rabideau, who examined the budgets for the relevant years and provided a breakdown of these costs. *Id.* Mr. Rabideau was able to identify approximately 80 percent of these costs as falling within the spent fuel or reactor decommissioning categories. *Id.* WE then applied the SFS/RD ratio to the unallocated budget items to allocate those amounts. *Id.*

Therefore, WE proved its breach of contract damages resulting from these NRC fees that it paid beginning in 1999 to a reasonable certainty. The amount of contract damages "need not be 'ascertainable with absolute exactness or mathematical precision.'" *Indiana Michigan*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563). *See also Restatement (Second) of Contracts* § 352 cmt. a (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.").

The Government does not contest that WE incurred NRC Power Reactors' Annual Fees. Rather, the Government disputes WE's reasoned attempt to determine that portion of WE's fees for 1999-2007 that were allocable to its dry storage based directly on testimony from a high ranking and knowledgeable NRC representative who the Government put forth during discovery in this case. The NRC possesses all relevant budgetary information and the Government has failed to put forth any contrary evidence suggesting any different allocation of the NRC fees allocable to WE's dry storage. PFF 227. Therefore, WE has established these damages to a reasonable certainty.

## J. WE Has Established Its Damages with Reasonable Certainty

At trial, WE established that its damages were reasonably foreseeable and caused by DOE's breach of its Contract with WE. WE also proved these costs with reasonable certainty. Further, the Government did not meet its burden of establishing that WE's efforts to mitigate DOE's breach were unreasonable.

### 1. The Joint Stipulation and Other Indicia of the Accuracy of WE's Costs

WE need only provide sufficient evidence "from which the court could 'make a fair and reasonable approximation of the damages.'" *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1336 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 2967 (2006) (quoting *Bluebonnet Sav. Bank*, 266 F.3d at 1357). With respect to the certainty of the amount of WE's damages, in the Joint Stipulation Re: Accuracy of Costs, Dkt. 350, the Government stipulated that the costs underlying WE's damages have been incurred in the amounts claimed by WE through February 28, 2007 and that they are sufficiently supported by WE's

accounting books and records:

> The parties agree, with the two exceptions noted below, that all costs through February 28, 2007 that are included in WE's claim were incurred by WE and are traceable to and supported by WE's accounting records. *These costs include (1) outside services and materials costs, (2) the NRC Power Reactors' Annual Fees, (3) employee expenses, (4) the Pension and Benefits Labor Adder, and (5) labor costs. In addition, the Government does not deny the accuracy of the budgeted Administrative and General cost rates used by WE in its claim.* The Government, however, contests whether WE legally is entitled to recover these claimed monies in this action.

(Emphasis added). The Joint Stipulation Re: Accuracy of Costs, Dkt. 350, establishes conclusively that WE has met this burden with regard to the italicized costs. The Government only contests the accuracy of WE's Weighted Average Cost of Capital ("WACC") calculation and the estimated costs for the offset for the procurement and installation of a temporary rack.

To the extent that the Government (or its expert, Stephen Kiraly) still profess to challenge the accuracy of these categories of claimed costs (Outside costs, NRC fees, Employee Expenses, Pension & Benefit ("P&B") costs, Labor costs and Administrative & General ("A&G") costs), we believe that any such challenge is contrary to the terms of the Joint Stipulation Re: Accuracy of Costs, Dkt. 350. But even if the Government somehow still retained the right to challenge the accuracy of these claimed costs notwithstanding the Joint Stipulation Re: Accuracy of Costs, Dkt. 350, WE has clearly established these costs with reasonable certainty.

For example, nearly all of these costs (or the underlying activities) have already been approved by the PSCW. PFF 232; Tr. 4547:24-4650:23 (Metcalfe). This includes all the foregoing costs except for the PFS costs. The approval of the PSCW merits consideration. *Yankee Atomic*, 73 Fed. Cl. at 269, 292.

In addition, WE's damages experts, Richard Sieracki and Kenneth Metcalfe of The Kenrich Group LLC ("Kenrich"), calculated WE's damages pursuant to a sound, professionally accepted methodology. The credentials of Messrs. Sieracki and Metcalfe are set forth at PFF 33, 35. They determined WE's increased costs resulting from the failure of DOE to perform in accordance with the Standard Contract. They obtained inputs and cost estimates from current or former personnel at WE and NMC and from other WE experts. They also worked with WE and NMC personnel to identify those activities and costs related to DOE's breach and analyzed extensive documentation. Kenrich also verified that the costs were incurred and related to DOE's breach. PFF 231. They then calculated the damages proximately resulting from the Government's breach based on the following generally accepted damages formula:

Breach Costs – Non-Breach Costs = Damages

*Id.* Based on this formula and the evidence presented, Messrs. Metcalfe and Sieracki calculated WE's damages to be $96.5 million. PFF 3, 231, 237.

In other spent fuel cases, the Court has awarded substantial damages based on similar evidence. *Entergy Arkansas*, 2007 WL 3033659, at *38 (approximately $48 million); *Northern States*, 78 Fed. Cl. at 468, 472 (approximately $116 million); *Southern Nuclear*, 77 Fed. Cl. at 440-44 (approximately $77 million); *Yankee Atomic*, 73 Fed. Cl. at 316-23 (approximately $142 million); *Tennessee Valley Auth.*, 69 Fed. Cl. at 543 (approximately $35 million).

In considering whether WE has established the amount of its damages with reasonable certainty, it also must be remembered that the costs of regulated public utilities are subject to vigorous review by state regulatory commissions and by the Federal Energy Regulatory Commission ("FERC"). As a result, public utilities traditionally have excellent cost accounting controls and practices. PFF 232. Indeed, Mr. Metcalfe testified that they are the most regulated industry in the United States. *Id.* In the case of WE, it is governed by two

regulatory commissions (Wisconsin and Michigan) rather than one. Yet another control exists in that, beginning in 2000, NMC operated plants for several utilities and each utility naturally does not wish to be charged for an item that does not pertain to that utility. *Id.* Mr. Metcalfe confirmed that the WE accounting controls were equal to, and in some respects better than, other regulated utilities. PFF 231-232.

After considering the propriety of all these inputs and cost estimates, Kenrich determined WE's increased costs due to DOE nonperformance. PFF 237.

At trial, WE provided further evidence of the reasonable certainty of its costs through the testimony of Ms. Ione Straub, who worked in the WE Nuclear Department accounting group for many years. PFF 31. Ms. Straub testified to the following: WE is a highly regulated utility with regard to cost accounting and follows the FERC uniform system of accounts and generally accepted accounting principles; WE is audited internally and externally; costs on WE's nuclear projects have always been tightly controlled because of the extensive scrutiny on nuclear projects; WE has a document matching process to ensure the incurrence of valid expenditures; WE prepares budgets related to the ratemaking proceedings before two state commissions; WE's management regularly tracks and reviews budgets and actual expenditures; WE's Nuclear Department followed accounting and budgeting procedures in a Project Administrators Manual specific to that business unit; over the years, WE has employed various, state-of-the-art accounting systems; and NMC maintained the same accounting controls as WE upon taking over operation of Point Beach. PFF 236.

**2. WE Should Recover Its Internal Labor Costs**

WE's claimed mitigation costs include the cost of the time spent by WE and NMC personnel on the dry storage project and related spent fuel management projects resulting from DOE's breach of contract. Any time spent on the spent fuel management projects were charged to the relevant accounts. These costs are supported by WE's and NMC's books and

records, and the Government has stipulated to the accuracy of the claimed costs. PFF 238-242; Joint Stipulation Re: Accuracy of Costs, Dkt. 350; PDX 61-Metcalfe 21.

As explained by Mr. Metcalfe and WE personnel, the use of internal labor costs is significantly less costly than outside vendors. PFF 240. *See also Southern Nuclear*, 77 Fed. Cl. at 442. If the Court did not permit the utilities to recover the cost of internal labor, that denial would certainly motivate the utilities to use outside vendors for such work. Thus, recovery of internal labor costs incentivizes utilities to use lower-cost internal labor in future dry storage work, where appropriate. PFF 239. *See also Southern Nuclear*, 77 Fed. Cl. at 442-43.

The use of internal labor provides other advantages. WE can ensure that the internal employees have the requisite experience and training to handle spent nuclear fuel management projects, which are dangerous projects. In addition, WE's dry storage project, a large, complex project, requires extensive planning and staffing. Use of internal personnel simplifies with specific knowledge of Point Beach such planning. PFF 239. *See also Southern Nuclear*, 77 Fed. Cl. at 440. Based on extensive experience with dozens of U.S. nuclear power plants, Mr. Metcalfe testified that regulated public utilities such as WE are cost-conscious and minimize staff at nuclear plants for safe and reliable plant operation. *Id.*; Tr. 4605:22-4606:4 (Metcalfe).

Nevertheless, the Government's damages expert, Mr. Kiraly, proposed removal of more than $6 million in WE's internal labor charges. He contends that the labor charges relating to any salaried employee should be rejected unless the employee charged more than 50 percent of his or her time to a dry storage project number during the period April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report).

WE strongly disagrees with Mr. Kiraly's 50 percent standard. If WE personnel are performing work resulting from DOE's contract breach, these personnel are necessarily not available to perform other work for WE. There is clearly an opportunity cost in that WE is

deprived of the right to utilize its personnel on other projects. PFF 240. *See also Tennessee Valley Auth.*, 69 Fed. Cl. at 539-540; *Southern Nuclear*, 77 Fed. Cl. at 442. Given that these personnel are performing work resulting from DOE's breach, it is only fair that DOE pay for these activities. In addition, as Mr. Metcalfe explained, it is appropriate that WE, a regulated public utility, recover these internal labor costs. Public service commissions typically permit regulated public utilities to recover their internal labor costs. PFF 239. It also is typical to recover such costs in performing work under federal procurement contracts. Federal Acquisition Regulation ("FAR") 31.205-6 (Compensation for Personal Services). Further, under the Standard Contract, the Government can recover its internal labor costs. *Id.*

Not surprisingly, the Court has rejected on numerous occasions the labor cost argument being advanced by Mr. Kiraly:

> [T]he fact that [the utility] used its own internal resources to support its mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other projects. That [the utility] would have paid its employees in all events is not material to this inquiry.

*Tennessee Valley Auth.*, 69 Fed. Cl. at 539. In *Tennessee Valley Auth.*, the Court specifically rejected the Government's contention that an employee's time should not be included in recoverable costs unless that employee spent more than 50 percent of his or her time on mitigating efforts. *Id.* at 540.

The Court has held that internal labor costs are recoverable in several other SNF cases. *Entergy Arkansas*, 2007 WL 3033659, at *30 ("In sum, the charges for internal labor shall be allowed as mitigation costs, without any reduction."); *Northern States*, 78 Fed. Cl. at 468 ("Our concern here . . . is . . . whether the cost was incurred to ameliorate the effects of a breach. And since every use of a resource has an opportunity cost – namely, the alternative used of that resource – it is quite appropriate to recognize as a cost of mitigation any

diversion of labor that was applied to the accomplishment of that mitigation."); *Southern Nuclear*, 77 Fed. Cl. at 442 ("Having heard testimony of the efforts required to mitigate, reimbursement of these costs, caused by DOE's partial breach, reasonably foreseeable and established with reasonable certainty, are included in mitigation costs awarded herein."); *Pacific Gas & Elec*., 73 Fed. Cl. at 408 ("To the extent that the costs of [the utility's] internal labor were in fact performed on a 'breach-related project,' . . . the court finds that such labor costs should properly be awarded to plaintiff."); *Yankee Atomic*, 73 Fed. Cl. at 322 ("It is concluded that defendant did not establish that the labor cost cited was not incurred."); *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 376 ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs.").

Even if the Court should decide not to allow internal labor costs, we do not believe that the NMC labor costs constitute internal WE labor costs. NMC is a separate corporate entity that bills WE for the work NMC performs in connection with Point Beach. Even though WE has an ownership interest in NMC, NMC is not a wholly owned subsidiary of WE. Therefore, we believe that NMC labor charges to WE are not "internal labor costs" of WE.

Finally, in incurring its internal labor costs, WE also incurred pension and benefit costs for its employees. Under the Joint Stipulation Re: Accuracy of Costs, Dkt. 350, the Government does not question the accuracy of these costs. It is reasonable that WE should recover these costs in connection with its recovery of its internal labor charges. PFF 242.

In sum, WE reasonably used internal labor to mitigate the Government's breach, and WE should recover these costs in full. PFF 238-242.

### 3. WE Should Recover Its Administrative & General Costs

WE should recover the Administrative & General ("A&G") costs allocable to the SNF management projects resulting from DOE's breach, which are sometimes referred to as

overhead costs. *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 279 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007). These A&G costs were based on WE rates as approved by the PSCW. PFF 243. As explained by WE's damages expert, Mr. Metcalfe, overhead costs are real costs that are actually incurred by WE. WE is not being made economically whole if it does not recover the overhead costs allocable to its SNF storage projects. PFF 244.

In addition, recovery of allocable overhead costs also is typical in Government contracts under the FAR and the Cost Accounting Standards ("CAS"). *See, e.g.*, FAR ; CAS 410; PFF 244. Such costs also are routinely recovered in Government contract claims. PFF 244. The Government also includes such costs in determining its recoverable costs under the uranium enrichment contracts and in determining recoverable Government costs under the Standard Contract. *Id.*

Furthermore, public service commissions also typically permit regulated public utilities to recover such costs. *Id.* As noted in our discussion of internal labor, permitting a utility to recover its A&G costs also incentivizes the utility to continue to perform work resulting from DOE's breach with internal labor, which is less expensive than using outside contractors. *Id. See also Southern Nuclear*, 77 Fed. Cl. at 442-43.

The PSCW requires that WE charge allocable overhead costs to non-utility affiliates to ensure that the ratepayers are not subsidizing work performed for the benefit of outside parties. It is proper for WE to include overhead costs in the damages sought from DOE because the work performed related to dry storage at Point Beach was done because of and, in essence, *for* DOE and not for the benefit of the ratepayers. PFF 244.

Several SNF decisions have authorized the recovery of overhead costs in similar circumstances. *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 441-43; *Pacific Gas & Elec.*, 73 Fed. Cl. at 408. Therefore, WE's overhead costs are recoverable.

**4. WE's Financing of Its Mitigation Costs Is Recoverable**

WE's damages expert, Mr. Metcalfe, testified regarding the cost of funds required by WE to develop additional SNF storage capacity. Whether or not WE borrowed money specifically to finance its dry storage project, Mr. Metcalfe testified that the cost of funds committed to SNF storage costs is a real economic cost to WE and is necessary to make WE economically whole for DOE's partial breach. PFF 246. *See also LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that "capital is not 'costless'") (citation omitted). Cost of capital accounts for the impact of inflation on nominal dollars incurred and the cost of money in the credit and equity markets.

The Federal Circuit has allowed the recovery of financing costs as a result of a Government breach of contract:

> In *Bluebonnet*, this court affirmed the Court of Federal Claims' finding that it was foreseeable that a thrift would be "forced to seek even more capital to meet heightened regulatory requirements" and that it was also foreseeable that the costs and risks associated with meeting these requirements would have other negative economic consequences such as "increas[ing] the costs of securing debt or equity financing."

*Citizens Fed. Sav. Bank*, 474 F.3d at 1321 (citations omitted) (alteration in original). Similarly, in *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582-83 (Fed. Cir. 1994), the Federal Circuit held that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment."

In *Tennessee Valley Auth.*, the Court applied *Wickham* to find that TVA's Allowance for Funds Used During Construction ("AFUDC") costs were recoverable as damages against the Government for breach of the Standard Contract, notwithstanding the general restriction against recovering interest as set forth in 28 U.S.C. § 2516(a). *See* 69 Fed. Cl. at 541-42. Because TVA used "a widely-accepted, FERC-mandated standard for calculating the cost of

the funds used in building the dry storage facilities," its AFUDC costs were recoverable. *Id.* at 542.

WE computed its cost of capital based on its WACC as determined by the PSCW during each year in which WE incurred SNF-related storage costs as a result of DOE's breach. These are the same rates used to calculate its AFUDC. PFF 245, 248. WE's cost of capital incurred in constructing the ISFSI, fabricating and loading dry casks, and investigating alternate storage facilities is the type of cost recoverable under the *Wickham* and *Tennessee Valley Auth.* standards and should be recoverable in this case. It is an economic cost borne by WE and its ratepayers. PFF 247.

Nevertheless, the Government asserts that WE's cost of capital is the equivalent of prejudgment interest and, thus, is not recoverable. Defendant's Memorandum of Contentions of Facts and Law at 77, Dkt. 277 (Jan. 30, 2007). Contrary to the Government's assertions, WE's cost of capital does not constitute prejudgment interest. For example, unlike a fixed statutory prejudgment interest rate, WE's cost of capital rate fluctuates with the debt and equity markets for each year. PFF 246; Tr. 4584:17-4587:2 (Metcalfe).

Indeed, the Court has distinguished between interest "on a claim" (i.e., prejudgment interest which begins accruing when a claim arises and continues to accrue during the entire pendency of the claim on the entire amount of the claim) and interest as a component of a claim – financing costs that represent a claim in themselves. As the Court stated in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part & rev 'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005):

> [T]he court agrees that the "interest" Westfed seeks to recover is not prejudgment interest. Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court.

The Court then has allowed recovery of costs of capital where the costs relate to actually

incurred financing costs, in other words, interest as a component of a claim. *See also Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003). The Federal Circuit also has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank*, 266 F.3d at 1354-58; *LaSalle Talman Bank*, 317 F.3d at 1375-75.

In addition, WE's WACC rates (similar to AFUDC) are subject to the FERC Uniform System of Accounts for Public Utilities. *See* PFF 248, 251; 18 C.F.R. Part 101, Electric Plant Instructions ¶ 3.A(17) (AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). *See also Dep't of Water & Power v. United States*, 131 F. Supp. 329, 331 (S.D. Cal. 1955) (allowing electric utility to recover damages from the government where allocations of costs were made in accordance with "the accounting procedure recommended by the Federal Power Commission [FERC's predecessor] and the California Public Utilities Commission").

Recovery of WACC is also necessary to make WE reasonably economically whole. Only through an award of its WACC can WE be reimbursed for the risk that it experiences in earning its capital related to the expenditures WE was forced to incur because of DOE's breach, as well as taking into account both inflation and the time value of money. Recovery of cost of capital is consistent with utility practice and regulatory requirements. Cost of capital also is consistent with the calculation of WE's financial obligation to the Government when it owes money to the Government under the Standard Contract. Examples include the one-time fee under Article VIII.B.2 (b) and any late payment of an ongoing payment under Article VIII.C. Cost of capital is also recognized and used by the Government's experts in other spent fuel cases, such as in calculating the total value of any damages offsets allegedly due the Government. Finally, the failure to provide cost of capital provides a significant and total disincentive for the spent fuel cases to be resolved in a timely manner. PFF 247.

Moreover, the Court has not required that a plaintiff point to a specific equity or debt instrument as the source of funds used for the activity at issue. As the Court stated in *Tennessee Valley Auth.*:

> TVA does not issue debt to raise proceeds for any specific capital project. . . . In effect, the government argues that because TVA cannot point to a specific debt instrument as the source for the funds used in the dry storage construction projects, TVA does not satisfy the standards set forth in *Wickham* [*Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994)], for inclusion of AFUDC as damages. . . . However, TVA is not required to meet a standard as stringent as the one the government postulates. The rule of *Wickham* and *Gevyn Construction* [*Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987)] was designed to bar "interest" on equity as forbidden by 28 U.S.C. § 2516(a) . *See Wickham*, 12 F.3d at 1582 (citing *Gevyn Constr.*, 827 F.2d at 754). TVA has satisfied that criterion as shown by its capital structure and its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities. Thus, the government's contention that *Wickham* and *Gevyn Construction* should be extended by requiring a match between capital expenditures and specific debt instruments is rejected.

69 Fed. Cl. at 541-42 (Emphasis added).

In *Southern Nuclear*, the Court concluded that the utility could not recover its cost of capital because the utility could not point to a specific or general debt used to finance Southern's dry storage activities. The Court then distinguished the foregoing holding from *Tennessee Valley Auth.* on the grounds that neither the power companies nor the parent corporation in *Southern Nuclear* were federal entities as is TVA. *Southern Nuclear*, 77 Fed. Cl. at 449.

We respectfully believe that this is a distinction without legal significance. In both *Southern Nuclear* and *Tennessee Valley Auth.,* the size of the mitigation projects were of sufficient magnitude that one may reasonably assume that there will necessarily be a diversion of funds from other significant activities. Applying that factor to this case, WE

obviously had to obtain from somewhere the monies to fund $53 million in nominal damages.

Further, in each instance, the utility complies with the FERC-mandated standard for calculating the cost of the funds used in building its dry storage facility. The only distinction is that, as a federal government entity, TVA has no equity. At most, that may argue for utilizing an alternative calculation of this cost, namely, the Weighted Average Cost of Debt ("WACD") alternative, discussed below. It does not compel the conclusion that a private party cannot recover this type of cost in a damages action. Indeed, more recently, the Court in *System Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 807-09 (2007) ("*SFI-Grand Gulf*") rejected the Government's argument that the utility must identify a specific borrowing because "the terms of such borrowing are regulated and supervised by FERC" and determined that a utility's "cost of borrowed funds" can be awarded to the utility provided that this cost can be determined with reasonable certainty.

Finally, WE's cost of capital does not become impermissible merely because it is formed both by debt and equity. *LaSalle Talman Bank*, 317 F.3d at 1375 (concluding that the trial court erred in not allowing recovery of costs derived from equity, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings"). Therefore, WE may recover its costs of capital for each category of damages as proven at trial. In addition, damages law allows WE to recover all damages incurred from the time the cost of capital expense was incurred through September 10, 2007. *See Tennessee Valley Auth.*, 69 Fed. Cl. at 542.

If the Court should decide that WE is not entitled to recover its cost of capital, there are two alternative forms of recovery available to the Court. First, it can award to WE its WACD. This alternative eliminates any concern that may exist with regard to providing WE some return on the equity component of the funds devoted to its dry storage project. PFF 249. Recovery of WACD was recently permitted by the Court provided that it can be proven

with reasonable certainty. *SFI-Grand Gulf*, 78 Fed. Cl. at 807-09. The Court further held: "The Government's position that such costs cannot be recovered, because there is no 'one-to-one' relationship, between costs incurred to mitigate the Government's partial breach and specific debt instruments is misplaced, since the terms of such borrowing are regulated and supervised by FERC." *Id.* at 808.

While the Government objected to WE's presentation of a WACD calculation during the WE rebuttal case, such objection is misplaced because there was nothing new in the WACD calculation. WACD is calculated exactly the same way as WACC and is based on the same sources as WACC, namely, the PSCW's determinations through rate cases of WE's cost of equity and cost of debt. PFF 249, 259-260.

The costs of debt damages associated with specific WE damages categories are as follows:

| CATEGORY | NOMINAL DOLLARS | WITH COST OF DEBT |
|---|---|---|
| *Engineering, design, licensing, and construction of an ISFSI, including NRC fees* | $20,683,000 | $31,752,000 |
| *Dry Storage Cask Costs* | 31,536,000 | 38,639,000 |
| *Temporary Cask Pit Rack* | (2,048,000) | (3,505,000) |
| *Private Fuel Storage* | 884,000 | 1,405,000 |
| *Other SNF Management and Oversight Activities* | 1,282,000 | 1,704,000 |
| TOTAL | $52,337,000 | $69,995,000 |

PFF 250 (including subparagraphs).

Another alternative calculation is, at the very least, to permit WE to recover the AFUDC actually recorded to WE's SNF storage-related accounts. Again, the same rate is used to calculate AFUDC as WACC. AFUDC is permitted by the PSCW and FERC. The

AFUDC for the dry storage facility was $747,865. PFF 248; PX 1029, p. KRGWE003854. As discussed, in *Tennessee Valley Auth.*, the Court permitted recovery of AFUDC in a spent fuel case. 69 Fed. Cl. at 542.

**5. WE Has Estimated the Temporary Rack Offset to a Reasonable Certainty**

WE presented substantial evidence regarding its calculation of an offset to its damages for the fabrication and installation of a temporary rack in the cask pit area in the non-breach world. At the outset, one must remember that these are not actual, incurred costs. Instead, because of DOE's breach, they are necessarily estimated costs regarding actions that WE believes it would have taken in the non-breach world.

More specifically, WE presented the estimate of Dr. Singh regarding the costs that Holtec would expect to charge for the supply and installation of the temporary rack, $1.9 million, and the estimated NRC licensing costs, $66,500. PX 827 (Revised Written Testimony of Dr. Singh); PFF 208, 251. Given the preeminence of Dr. Singh and Holtec in SNF racking projects and NRC license applications, WE could not have found anyone better to provide these estimated costs. PFF 251a, 34.

Kenrich then calculated the estimated internal labor costs that WE might have incurred in connection with the use of the temporary rack. Kenrich made an estimate of the WE personnel who would be required in such an action and their respective hours with the input of Holtec and Mr. Gary Krieser who was Manager of Industry and Regulatory Services for the Nuclear Department from 1992-1996. PX 794 (May 2006 Kenrich Damages Report); PFF 252. Kenrich then obtained the labor rates from Ms. Ione Straub, who served for many years in the accounting area for the Nuclear Department. PX 794; PFF 31, 252. Finally, Kenrich calculated the total nominal damages credit to the Government ($2,048,000) and then with cost of capital applied ($5,865,000). PX 1047 (Trial Damages Model); PX 794; PFF 237, 208, 252.

In sum, WE calculated this offset with reasonable certainty. The Government did not agree with the accuracy of WE's calculation of the temporary rack offset. Joint Stipulation Re: Accuracy of Costs, Dkt. 350. However, the Government presented no contrary evidence.

WE included the temporary rack estimate as a responsible, reasonable attempt to set forth its damages as accurately as possible. If the Court does not wish to include an offset for the temporary rack to WE's damages, that is acceptable to WE. Finally, if the Court should include the offset and should decide that WE can only recover nominal damages, then WE submits that the offset also should be calculated only in nominal damages.

**K. WE May Reasonably Rely on Rebuttal Evidence**

WE presented evidence in rebuttal to the Government's case in chief. We respectfully submit that the Court should consider WE's rebuttal evidence. "[R]ebuttal testimony is offered to explain, repel, counteract, or disprove evidence of the 'adverse party.'" *Yankee Atomic*, 73 Fed. Cl. at 274 (quoting *Martinez v. Union Pac. R.R. Co.*, *82* F.3d 223, 227 (8th Cir. 1996)). The Court has discretion to admit rebuttal evidence, especially when there is no substantial prejudice to the opposing party. *Id.* (citing *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1122 (Fed. Cir. 1996)). The evidence was succinct and properly responded to issues raised by the Government, thus "explaining" and "counteracting" the evidence propounded by the Government.

There also was no unfair surprise in this rebuttal testimony. WE's rebuttal witnesses were already on WE's witness list and addressed issues raised by the Government's case in chief. Therefore, WE's rebuttal evidence does not prejudice the Government.

During its case, the Government called one of its expert witnesses, Cliff Hamal, to testify regarding whether WE should recover the costs that it incurred to purchase three TN-32B casks. Tr. 5897:3-5927:13 (Hamal); DDX 4-21-40. During his testimony, Mr. Hamal stated that an asset needs to be used in order for it to be recovered in rates and that a separate prudence review is required to recover the expenditures. Tr. 5905:12-5906:1 (Hamal).

Mr. Hamal further claimed that WE chose to never submit these costs to the PSCW for a prudence review and that, as a result, the PSCW never included the TN-32B cask expenditures in WE's rates. Tr. 5994:23-5995:6 (Hamal). Notably, Mr. Hamal did not express such an opinion in his expert report. PX 828 (Hamal Report).

While WE believes that Mr. Hamal's new point should not be considered pursuant to RCFC 26(a)(2)(B) because it was not included in his expert testimony disclosure, WE decided to respond and called Mr. Farron to testify in rebuttal. Mr. Farron, WE's Manager of State and Regulatory Affairs, is responsible for seeking PSCW approval of major projects and has been involved in more than 100 such proceedings. PFF 255. He testified that the PSCW's August 11, 1998 Order, which approved the purchase of up to six of these casks as "reasonable," was the PSCW's *only* review of this cost. Tr. 6270:12-6271:20 (Farron); PFF 255. Further, he testified that this Order permitted WE to recover this cost through its rates and that the costs for these three TN-32B casks have indeed been recovered. *Id.;* PX 524, p. KRGWE002387; PFF 149.

Thus, Mr. Farron's testimony properly responded to an issue raised by the Government in its case-in-chief. Its purpose was to disprove the evidence proffered by the Government. There also is no substantial prejudice to the Government, which did not raise this issue until Mr. Hamal's testimony. Therefore, it was proper rebuttal testimony. *Yankee Atomic*, 73 Fed. Cl. at 274.

Mr. Hamal also made a considerable issue regarding the statement in the PSCW Order that WE could use the six authorized TN-32B casks as a substitute for eight VSC-24 casks if the VSC-24 casks were not available for Point Beach's scheduled refueling in spring 2000. Tr. 5903:11-5904:25, 5914:7-22, 5921:13-5923:5; DDX 4-25, 4-30. Mr. Hamal's testimony thus implied that it was unreasonable for WE to continue fabrication past spring 2000. PFF 254.

While WE does not agree with Mr. Hamal's interpretation of the PSCW Order, it recognizes that the PSCW Order mentions the spring 2000 refueling as a significant event. Therefore, WE asked its damages expert, Mr. Metcalfe, to determine the TN-32B cask-related costs that WE would have incurred if it had terminated all TN-32B cask activity in spring 2000. Based on a review of the TN-32B cask purchase order (disclosed to the Government years ago) and the work papers used by the Government's damages expert, Mr. Metcalfe testified that, if WE had terminated the TN-32B effort in Spring 2000, WE would have spent from $2,508,000 to $3,230,000 with the likely cost being at the high end. PFF 149, 257; Tr. 6294:22-6304:13 (Metcalfe); PDX-Metcalfe 63a.

Thus, the purpose of this rebuttal testimony was to explain and counteract evidence submitted by the Government in its case-in-chief. There was no substantial prejudice to the Government. Mr. Metcalfe relied on documents that the Government has possessed for years and simply compiled existing accounting data. Therefore, it too was proper rebuttal testimony. *Yankee Atomic,* 73 Fed. Cl. at 274.

Finally, Mr. Hamal testified that there were a range of options by which a party can calculate the cost of money, including plaintiff's cost of borrowing. Tr.5856:2-5857:6 (Hamal); DDX 4_46. In addition, during cross examination of Mr. Metcalfe, Government counsel asked Mr. Metcalfe a similar question and Mr. Metcalfe responded that a WACD calculation was possible. Tr. 4682:19-4686:5 (Metcalfe).

Therefore, WE asked Mr. Metcalfe to calculate the WACD in this case. WACD is calculated exactly the same way as WACC. Moreover, it is based on the same sources as WACC, namely, the PSCW's annual determinations of WE's cost of capital and cost of debt. PFF 249-250, 259-260. Thus, with Kenrich's Cost of Capital Binder work papers, anyone, including the Government's damages expert, has available (and has had from some time) all the information necessary to calculate the WACD at any time. The only difference is that,

instead of applying the cost of WE's equity and debt to the nominal damages, one just applies its cost of debt to these damages. *Id.*

In sum, this also was proper rebuttal testimony. WE's decision to offer the evidence at trial was made in order to explain and counteract evidence submitted by the Government. *Yankee Atomic*, 73 Fed. Cl. at 274. Indeed, based on the record before the Court, WE could have made this same calculation after trial and presented it for the first time in Plaintiff's Proposed Findings of Fact.

There also was no substantial prejudice to the Government. While the Government made an issue of the length of Mr. Metcalfe's WACD report, the length was solely attributable to Mr. Metcalfe's desire to explain thoroughly the basis for the calculation. The source documents presented were the same documents contained in Mr. Metcalfe's WACC calculation. *Compare* PX 1050, pp. KRGWE004000-36 (Trial Damages Model with Weighted Averages Cost of Debt: Binder AB) *with* PX 797, pp. KRGWE000755-87, KRGWE003234 (Kenrich binder CC: Revised Cost of Capital).

Similarly, the pages containing the calculations are extremely similar to those for the WACC calculation with the exception, of course, that Mr. Metcalfe only applied the cost of debt to WE's nominal damages. Therefore, there was no substantial prejudice to the Government, and it is proper rebuttal evidence.

In sum, Mr. Metcalfe's WACD testimony and his related exhibit (PX 1050) constitute proper rebuttal evidence. *Yankee Atomic*, 73 Fed. Cl. at 274.

## L. DOE's Claimed Cask Loading Offset Is Speculative and Should Not Be Allowed

The Government's proffered expert, Warren Brewer, alleges that, in the non-breach world, WE would have incurred costs to load casks if DOE had actually performed and that these costs can be estimated. PX 880, p. 28 (Brewer Report). Mr. Brewer further alleges that there should be an offset of $3.1 million against WE's claim for these purportedly avoided cask loading costs.

This proposed offset should be rejected for at least two reasons. First, Point Beach will not avoid the cost of loading casks for DOE's acceptance. These costs are merely deferred until DOE performs. The fact that WE recently sold Point Beach to a Florida Power & Light ("FP&L") subsidiary does not change this conclusion. The fact remains that the entity owning Point Beach will incur these loading costs at some point (if DOE does eventually perform). The manner in which WE and FP&L decide to assign these costs in their Asset Purchase Agreement is a contractual matter not before the Court.

In addition, any purported benefit to the utility is speculative. The size and type of casks to be used to transport the spent fuel and the means of transportation are unknown. PFF 261, 262 The date at which DOE will begin to perform is uncertain. PFF 2.

To date, not one SNF decision has granted the Government the DOE cask loading offset. In *Tennessee Valley Auth.,* the Court, in rejecting this offset, explained:

> [T]he government claims that in the non-breach, but-for world, [the utility] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the utility] has temporarily avoided these costs, that [the utility] has received a benefit as a result, and that the government should be credited with an offset to [the utility's] damages to reflect this benefit.
>
> The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

69 Fed. Cl. at 542-43 (citations omitted). *See also Entergy Arkansas*, 2007 WL 3033659, at *35 ("The court accordingly denies a setoff because of the speculative nature of future cask loading with DOE's casks."); *Northern States*, 78 Fed. Cl. at 468 ("Since plaintiff has not been permanently relieved of these costs, there is no compelling reason in contract law to acknowledge them now and we therefore decline to do so" (citations omitted)); *Southern Nuclear,* 77 Fed. Cl. at 450-51 ("Therefore, at this time, deduction from mitigation damages for hypothetical expenses that would (or might) have occurred is not appropriate."); *Pacific Gas & Elec.*, 73 Fed. Cl. at 416 ("Plaintiff's loading costs have been deferred rather than avoided, and the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract."); *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372 ("Since DOE and SMUD both contemplate that DOE will still perform under the Standard Contract at some

future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative.").

In conclusion, DOE's claimed loading offset should be denied because these costs are speculative and will be incurred if and when DOE performs.

## VI. CONCLUSION

For the foregoing reasons and based on the evidence presented at trial, WE respectfully requests that the Court enter judgment on WE's breach of contract claim in the amount of $96,541,000.

Dated: December 21, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on December 21, 2007, I caused a copy of the foregoing "Wisconsin Electric Power Company's Post-Trial Brief" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Emily C.C. Poulin
Emily C.C. Poulin