IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

# WISCONSIN ELECTRIC POWER COMPANY'S PROPOSED FINDINGS OF FACT


**Of Counsel:**

**Donald J. Carney**
**Mary Rose Hughes**
**Emily C.C. Poulin**
**Jay L. Griffiths**
**Perkins Coie LLP**
**607 Fourteenth Street, N.W.**
**Washington, D.C. 20005-2003**
**(202) 434-1675**

**Richard W. Oehler**
**Perkins Coie LLP**
**1201 Third Avenue, Suite 4800**
**Seattle, Washington 98101-3099**
**(206) 359-8419**

**Attorneys for Plaintiff**
**WISCONSIN ELECTRIC**
**POWER COMPANY**


**Dated: December 21, 2007**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION AND OVERVIEW OF WE'S DAMAGES .......... 1

II. BACKGROUND .......... 3

A. WISCONSIN ELECTRIC POWER COMPANY .......... 3

B. POINT BEACH NUCLEAR POWER PLANT .......... 4

III. WE TRIAL WITNESSES (IN THEIR ORDER OF TESTIMONY) .......... 11

IV. THE NWPA AND THE STANDARD CONTRACT .......... 22

A. WE CLOSELY FOLLOWED THE FEDERAL GOVERNMENT'S DISCHARGE OF ITS RESPONSIBILITY TO DISPOSE OF SPENT NUCLEAR FUEL .......... 22

B. DEVELOPMENT OF THE NWPA AND THE STANDARD CONTRACT .......... 25

V. THE STANDARD CONTRACT AND THE PARTIES' UNDERSTANDING .......... 29

A. DOE'S POST-CONTRACT CONDUCT CONFIRMED THE PARTIES' UNDERSTANDING .......... 45

B. WE'S POST-CONTRACT EXECUTION ACTIVITIES .......... 52

VI. BY THE END OF 1987, WE BECAME EXTREMELY CONCERNED WITH THE DOE'S IMPLEMENTATION OF THE NWPA .......... 55

VII. BY 1988, WE'S CONCERN WITH DOE'S LACK OF PERFORMANCE HAD INCREASED, AND WE BEGAN INVESTIGATING LONG-TERM SNF STORAGE PLANNING .......... 62

VIII. IN 1989, WE IDENTIFIED DRY STORAGE OF SNF AS THE MOST COST-EFFECTIVE AND FLEXIBLE POTENTIAL SOLUTION TO THE LONG-TERM UNCERTAINTY OF DOE'S PERFORMANCE .......... 68

IX. WE CONTINUED TO PURSUE DRY STORAGE IN 1990 BECAUSE OF DOE'S LACK OF PROGRESS .......... 74

X. THE 1991 ACR USED AN ANNUAL ACCEPTANCE RATE OF 900 MTU THAT WAS ILLEGAL UNDER EXISTING LAW .......... 76

XI. IN 1991, WE APPLIED TO THE PSCW FOR AUTHORITY TO IMPLEMENT DRY STORAGE BECAUSE DOE WOULD NOT PERFORM UNTIL WELL AFTER 1998, IF AT ALL .......... 82

XII. DURING THE 1990S, DOE'S PLANS FOR AN MRS FAILED, DOE ANNOUNCED THAT IT HAD NO OBLIGATION TO TIMELY PERFORM, AND DOE SUSPENDED THE DCS/FDS PROCESS .......... 105

**TABLE OF CONTENTS**
(continued)

**Page**


XIII. IN 1995, WE COMMITTED TO DRY STORAGE BY CONSTRUCTING AN ISFSI ..... 111

XIV. IN 1996, WE EXPERIENCED A VSC-24 CASK LOADING INCIDENT AND DEVOTED SUBSTANTIAL RESOURCES TO RECOVER THE ABILITY TO USE DRY STORAGE ..... 116

XV. IN 2000, WE APPLIED TO THE PSCW FOR ADDITIONAL CASKS AND SELECTED THE NUHOMS SYSTEM FOR WE'S FUTURE STORAGE NEEDS ..... 129

XVI. IF DOE HAD PERFORMED, WE WOULD NOT HAVE BUILT A DRY STORAGE FACILITY ..... 140

A. WE COULD HAVE OPERATED AT LEAST INTO 1998 AND, IF NECESSARY, INTO 1999 WITHOUT DRY STORAGE ..... 142

B. WE HAD THE ABILITY TO MAKE 1500 POOL SPACES AVAILABLE ..... 148

C. DOE'S ACCEPTANCE OF SPENT FUEL IN THE NON-BREACH WORLD ..... 152

D. WE REGARDED FULL CORE RESERVE AS A GOOD OPERATING PRACTICE ..... 155

E. WE WOULD LIKELY HAVE USED A TEMPORARY RACK IN THE CASK LAYDOWN AREA TO MAINTAIN FCR ..... 159

XVII. WE INVESTIGATED PRIVATE FUEL STORAGE AND RELATED OPTIONS ..... 177

XVIII. THE NRC LEVIED LICENSING, INSPECTION, AND GENERIC FEES ON POINT BEACH ..... 180

XIX. WE ESTABLISHED ITS DAMAGES TO A REASONABLE CERTAINTY ..... 193

A. INTERNAL LABOR ..... 198

B. GENERAL AND ADMINISTRATIVE COSTS ..... 201

C. WEIGHTED AVERAGE COST OF CAPITAL ("WACC") CLAIM ..... 202

D. WE CALCULATED THE TEMPORARY RACK OFFSET IN THE NON-BREACH WORLD WITH REASONABLE CERTAINTY ..... 206

XX. WE MAY REASONABLY RELY UPON REBUTTAL EVIDENCE ..... 207

XXI. DOE CASK LOADING OFFSET ..... 210

XXII. ADDITIONAL FINDINGS ..... 212

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **WISCONSIN ELECTRIC POWER COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 00-697C**<br><br>**(Senior Judge Merow)** |

## WISCONSIN ELECTRIC POWER COMPANY'S PROPOSED FINDINGS OF FACT

Plaintiff Wisconsin Electric Power Company ("WE" or "Wisconsin Electric") submits the following post-trial Plaintiff's Proposed Findings of Fact ("PFF").

## I. INTRODUCTION AND OVERVIEW OF WE'S DAMAGES

1. As required by the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10101-10270), the U.S. Department of Energy ("DOE") entered into Contract No. DC-CR01-83NE44425 ("Contract" or "Standard Contract") with WE. In return for very substantial fees, DOE assumed responsibility for storage and disposal of WE's spent nuclear fuel ("spent fuel" or "SNF") and high-level radioactive waste ("HLW") "beginning not later than January 31, 1998." WE has paid all fees due under the Standard Contract, a total of $215.2 million as of December 31, 2006.

- Tr. 2610:2-5 (Farron) ($215 million in fees paid as of 9/25/07).

- Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-10270).

- PX 41 (Standard Contract).

2. DOE breached its contractual obligation to WE to commence acceptance of spent fuel and HLW by January 31, 1998 and thereafter. In fact, DOE has failed to accept any of WE's spent fuel and now indicates that its "best-achievable" schedule for commencement of accepting SNF is 2017 or 2018.

- *Wis. Elec. Power Co. v. United States,* No. 00-697C, Order (Fed. Cl. Oct. 8, 2004).

- *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry.").

- PX 719 (July 19, 2006 Statement of Edward F. Sproat III, Director, Office of Civilian Radioactive Waste Management ("OCRWM"), U.S. Department of Energy, Before the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, United States House of Representatives).

- Statement of Edward F. Sproat III, Director for Civilian Radioactive Waste Management, U.S. Department of Energy, FY 2008 Appropriations Hearing, March 7, 2007, available at www.ocrwm.doe.gov/info_library/program_docs/testimonies/Testimony_3-07-2007.pdf (last visited Dec. 7, 2007).

- *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 402 (2007).

3. Because of the Government's breach, WE has incurred very substantial damages for investigation, licensing and construction of alternative SNF storage. As detailed below, DOE's partial breach of the parties' Contract has caused WE to incur damages in the amount of $96,541,000 through the time of trial.

- Tr. 4661:19-4662:11 (Metcalfe).

- PDX 61-Metcalfe 22 (Summary of *Total* Past Damages, By Category (Through 2/2007) Including Trial Adjustment).

## II. BACKGROUND

### A. WISCONSIN ELECTRIC POWER COMPANY

4. Wisconsin Electric Power Company is a wholly owned subsidiary of Wisconsin Energy Corporation ("WEC"). WEC is listed on the New York Stock Exchange. WE provides electricity to residential and commercial customers in Wisconsin and the Upper Peninsula of Michigan. WE conducts business as We Energies and also is known as Wisconsin Electric. WE is regulated by the Federal Energy Regulatory Commission ("FERC"), the Public Service Commission of Wisconsin ("PSCW") and the Michigan Public Service Commission.

- Tr. 102:21-103:13 (Baumann).
- Tr. 4550:14-25 (Metcalfe).
- PX 801 (WEC Forms 10-K).

5. In 1970, the Nuclear Regulatory Commission ("NRC") issued a license to WE to operate the first unit at Point Beach Nuclear Power Plant ("Point Beach" or "PBNP") for 40 years, expiring in 2010. In 1973, the NRC licensed WE to operate the second unit, expiring in 2013. In 2005, the NRC subsequently relicensed each unit for an additional 20 years.

- Tr. 108:10-16 (Baumann).
- PX 1, p. 5 (Facility Operating License).
- PX 2, p. 5 (Facility Operating License).

6. The Point Beach Nuclear Plant is a two-unit pressurized water reactor nuclear power plant. It is located approximately 100 miles north of Milwaukee and 35 miles southeast of Green Bay, adjacent to Lake Michigan. The Point Beach dry storage facility is located approximately one-half mile west of the power plant.

- Tr. 107:24-108:5; 110:8-22; 116:17-19 (Baumann).

7. Each Point Beach nuclear power unit has one pressurized water reactor. Each unit is rated at approximately 517 megawatts of power. The latest plant upgrade increased the power generation capacity of each unit to 535 megawatts. Nuclear-generated power supplies approximately 25 percent of WE's power requirements.

- Tr. 108:2-9 (Baumann).

- Tr. 108:17-21 (Baumann).

8. Until 2000, WE managed Point Beach through its Nuclear Power Department with personnel located in Milwaukee and at Point Beach. In 2000, WE, along with several other Midwest nuclear power utilities, formed the Nuclear Management Company ("NMC") to operate their nuclear power plants. Besides Wisconsin Electric, initial NMC members included Wisconsin Public Service, Iowa Electric, Northern States Power, and Consumer's Energy. In 2000, WE transferred the Point Beach operating licenses to NMC but continued to own Point Beach through September 2007. WE also continued to handle Point Beach's regulatory affairs.

- Tr. 104:17-24 (Baumann).

- Tr. 2536:19-24; 2537:7-11 (Farron) (NMC doesn’t "have a state regulatory affairs group . . . for . . . work related to Point Beach." Instead, "[i]t was all coordinated or done by Wisconsin Electric.").

**B. POINT BEACH NUCLEAR POWER PLANT**

9. Point Beach uses uranium fuel. Uranium oxide pellets (little-finger sized) that are composed of U-235 are placed into 12-14 foot metal rods and bundled into assemblies, approximately nine inches square. Assemblies are placed in the reactor core, where fission produces heat, which is converted to steam, which drives turbines and generates electricity.

- Tr. 116:20-123:20 (Baumann).

- PDX 4 (Model: nuclear fuel assembly).

10. Once spent fuel assemblies are discharged from the reactor core, they are highly radioactive and very hot from decay heat. The spent fuel assemblies are discharged from the reactor core into the spent fuel pool, where the spent fuel assemblies cool for a minimum of five years.

- Tr. 115:4-116:19; 128:22-131:17 (Baumann).

- PX 346, p. WISC00003550, Figure C (Aug. 1994 Final Environmental Impact Statement ("FEIS")).

11. Each reactor core at Point Beach can hold 121 fuel assemblies, a "full core." Some of the fuel in the core is replaced during periodic refueling activities. Point Beach operated on 12-month refueling cycles prior to 1998 but currently operates on an 18-month refueling cycle. Refuelings for the two reactors are staggered over time, and the two reactors are refueled at different times. The length of the refueling cycle affects the number of assemblies removed in a given refueling. The current discharge size is typically 36 assemblies for the 18-month cycle and was typically 28 assemblies for a 12-month cycle.

- Tr. 100:9-11; 123:2-125:22 (Baumann).

- Tr. 125:9-12 (Baumann) (explaining that, for annual refueling cycles, 28 assemblies are discharged per year per reactor).

- PX 236, ESR p. 59 (Nov. 1991 ISFSI application and ESR) (28 assembly discharges for 12-month cycles).

- Tr. 646:15-24 (Zabransky) (28 assembly discharges).

12. Point Beach has one spent fuel pool located between the two power units in the Auxiliary Building. The spent fuel pool is about 68 feet by 18 feet and 25 feet deep. Spent fuel assemblies are placed in egg crate-like racks in the pool, and the pool is filled with borated water. The boric acid in the borated water is used to control the reactivity, or criticality, of the spent fuel assemblies stored in the pool. The racks in the PBNP pool also contain a poison, known as Boraflex, to address criticality concerns. WE used to have

mandatory, periodic testing of the effectiveness of the Boraflex periodically. Point Beach, however, no longer relies on the Boraflex for criticality protection and, therefore, no longer conducts Boraflex testing. Point Beach also could have deleted this requirement earlier.

- Tr. 132:7-135:9; 143:2-150:13 (Baumann).

- Tr. 1714:7-24 (Becka).

- Tr. 821:6-823:16; 824:18-830:16; 893:8-12; 909:25-910:17 (Hennessy).

- Tr. 830:17-831:4 (Hennessy) ("Q: Do you have to test Boraflex at Point Beach currently? A: Currently, we do not test the Boraflex at Point Beach. We used to have to test the Boraflex, but we have a new analysis for our spent fuel pool that does not rely on use of Boraflex for criticality, so we don't test our Boraflex anymore. Q: Is there any reason why you could not have done that change earlier, to not test Boraflex? A: No, that change could have been done earlier.").

- PX 318, Figure 2.3 (Dec. 1993 Facility Waste Transportation Services Planning Document).

- PX 346, p. WISC00003627, Figure 6-1 (Aug. 1994 FEIS).

- PX 640, p. WISC00060265-67, section 3.1.2 (Oct. 8, 2002 Point Beach Nuclear Plant, DBD-05 Fuel Handling System Design Basis Document, Rev. 2).

- PX 727 (Drawing 128-57, Point Beach Spent Fuel Pool).

- PX 728.9 (Drawing of Point Beach Nuclear Plant Spent Fuel Pool).

- PX 728.28 (Drawing of Point Beach Nuclear Plant Spent Fuel Pool).

- PX 740.034 (Point Beach Nuclear Plant Photo - Spent Fuel Pool with Racks and Fuel Handling Tools).

- PX 740.040 (Point Beach Nuclear Plant Photo - Spent Fuel Pool with Cask Pit Laydown Area).

- PX 728.1 (Drawing of Point Beach Spent Fuel Pool).

a. "Pool capacity" refers to the maximum number of SNF assemblies that can be stored in the pool. Point Beach is licensed to store 1502 SNF assemblies in its spent fuel pool, and there are currently 1500 usable SNF spaces in the Point Beach pool. WE gained access to spaces previously blocked by catwalks overhanging the pool through the use of an offset fuel handling tool. Two spaces in the pool are not considered accessible without modifications to hinges on the fuel transfer canal doors. Point Beach has had 1500 usable spaces since the early 1990s.

- PFF 168-172.

- PX 381, p. HQR3640809 (Nuclear Fuel Data Form RW-859 for Point Beach Unit 1).

- Tr. 138:6-139:12; 142:18-143:1 (Baumann) (discussing PX 381).

- Tr. 144:22-145:5 (Baumann).

- PX 674 (Point Beach Nuclear Plant Operating Instructions, Offset Spent Fuel Handling Tool, OI 4A Safety Related, Revision 2) ("The offset fuel handling tool is a unique fuel handling tool that allows movement of fuel assemblies 3 rows beyond normal bridge travel. This tool is only used for rows 1, 2, 76, 77, and 78.").

- Tr. 856:14-857:2; 858:3-16; 895:23-896:5 (Hennessy).

- Tr. 1230:5-12; 1231:20-22 (Shimon).

- PX 740.047 (Point Beach Nuclear Plant Photo - Entrance to Transfer Canal).

b. "Full core reserve" or "FCR" refers to the maintenance of sufficient unused space in the pool to discharge all assemblies from a reactor core. WE does not have a policy of preserving FCR, nor is FCR a requirement, and Point Beach has operated without FCR on numerous occasions.

- PFF 178-181.

- Tr. 1977:9-1978:9 (Becka).

- Tr. 2091:3-22 (Holzmann).
- Tr. 893:13-894:15 (Hennessy).
- Tr. 1531:10-1532:2; 1614:17-20 (Krieser).
- PDX 60-Sieracki 17.

c. A section of the Point Beach pool known as the cask pit area, or cask laydown area, is used for the loading and unloading of casks. The cask pit area does not contain permanent spent fuel racks.

- Tr. 133:18-20; 146:4-20 (Baumann).
- Tr. 1761:20-1762:5 (Becka).
- Tr. 826:9-14 (Hennessy).
- PX 740.034 (Point Beach Nuclear Plant - Cask Pit Laydown Area).
- PX 740.040 (Point Beach Nuclear Plant Photo - Cask Pit Laydown Area).

d. Point Beach can move heavy loads in and out of the spent fuel pool with the use of the primary auxiliary building's crane, which is a single failure-proof crane. Such loads include the NUHOMS transfer cask, for which WE has a calculation qualifying the cask loading area for the weight of that load.

- Tr. 831:5-834:13; 835:4-837:20; 846:4-22 (Hennessy).
- PX 740.58 (Point Beach Nuclear Plant Photo – Auxiliary Building Crane).
- PX 1045, pp. WISC1045-0006 to 0010 (Dec. 28, 2005 Point Beach Nuclear Plant Calculation No. 2003/0069).

13. The Point Beach spent fuel pool is a part of the plant Fuel Handling System ("FHS"). The spent fuel pool stores spent nuclear fuel assemblies discharged from the reactors. Point Beach's Reactor Engineering group is responsible for the FHS, spent fuel cooling, and purification and flux map systems. With regard to dry fuel storage, Reactor

Engineering selects the fuel assemblies to be loaded into the dry storage casks and plans and assists Operations staff with the actual loading of the fuel assemblies.

- Tr. 815:9-816:24; 818:8-821:5; 822:14-19; 823:17-21; 834:12-24 (Hennessy).

- PX 652, p. WXE0011043 (Point Beach Nuclear Plant Units 1 & 2 Final Safety Analysis Report).

- PX 640, p. WISC00060265 (Point Beach Nuclear Plant, DBD-05 Fuel Handling System Design Basis Document, Rev. 2).

14. Point Beach was designed based on the assumption that SNF generated at the plant would only be stored on-site for a short time prior to shipment off-site for reprocessing. Reprocessing of SNF involves separating the reusable fuel products from the waste products, storing or disposing of the waste products, and making the reusable products available for new fuel. As a result of the then-use of reprocessing, the initial storage capacity of the original Point Beach pool was relatively low – only spaces for 208 assemblies in the entire pool.

- *Southern Nuclear*, 77 Fed. Cl. at 401.

- *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 253-55 (2006).

- Tr. 2163:18-25 (Porter) ("[W]ith the expectation of reprocessing, Point Beach had relatively limited capacity in its spent fuel pool, it was expected that the fuel would remain on-site for only a short period of time before it would be shipped off-site for reprocessing.").

- Tr. 1226:8-1227:9; 1228:24-1229:1 (Shimon).

15. In 1977, President Carter suspended U.S. commercial reprocessing of SNF, causing an enormous spent fuel storage problem for nuclear power utilities. When President Carter suspended reprocessing, he announced that the Government would take full responsibility for spent fuel, and, in fact, the Government undertook the development of a solution for the disposition of SNF from commercial nuclear power plants. In the meantime,

given President Carter's suspension of reprocessing, WE was unable to reprocess any spent fuel. Therefore, WE sought and received the NRC's approval to rerack the Point Beach spent fuel pool – increasing the licensed pool capacity to 1502 assemblies. Reracking is the replacement of existing SNF storage racks in the spent fuel pool with new racks capable of holding more spent fuel assemblies. WE had reracked the pool once previously from 208 to 351 spaces. At the time of WE's second rerack, WE also increased the cooling capacity of the Point Beach spent fuel pool to accommodate the increased licensed pool capacity.

- PX 1052[1] (Mills Trial Desig. *Yankee Atomic* Tr. 274:14-275:23 ("[I]n 1977, President Carter at the time stated in April of 1977 that reprocessing of civilian nuclear fuel would be indefinitely deferred.")).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co. v. United States* Tr. 125:24-127:18 (noting the nuclear utility industry's "considerable anxiety" in response to the moratorium because there was "no good alternative" for the storage and disposition of SNF, and noting the federal program to develop a solution for disposal of SNF in response to the suspension of reprocessing)).

- Tr. 1228:12-1229:4; 1229:18-1230:12 (Shimon).

- Tr. 2164:24-2166:3 (Porter) (explaining the impact of reprocessing on the design of Point Beach and the impact of the suspension of reprocessing on Point Beach's planning for SNF storage).

- Tr. 313:11-314:6 (Link) (discussing increased cooling capacity).

- PX 11 (April 4, 1979 Letter from NRC to WE transmitting amendments no. 35 and 41 to Facility Operating License).

16. In 1995, WE constructed and placed into operation the dry storage facility at Point Beach, sometimes referred to as an Independent Spent Fuel Storage Installation

[1] WE designated deposition and trial testimony during the pretrial proceedings in this case and also in post-trial motions. The Court admitted WE's pretrial designations as PX 1052. Tr. 6403:20-6407:8 (Oct. 16, 2007). WE cites to excerpts from PX 1052 by noting the witness's last name, whether the designation is of trial or deposition testimony, the identifying date of the deposition or the identifying name of the trial, and the transcript citation. WE also filed other designated testimony separately.

("ISFSI"). As of the time of trial, WE had loaded and placed in service 16 Ventilated Storage Container ("VSC") -24 dry storage casks and nine NUHOMS dry storage systems at the ISFSI.

- Tr. 44:20-45:1 (Baumann).
- Tr. 2745:16-2746:17 (Anundson).
- PX 1029, p. KRGWE003846 (ISFSI Plan View).

## III. WE TRIAL WITNESSES (IN THEIR ORDER OF TESTIMONY)

17. Michael Baumann provided an overview of Wisconsin Electric and the Point Beach Nuclear Plant and discussed fuel management options used and considered by Wisconsin Electric over the years. He has a B.S. in nuclear engineering from the University of Wisconsin in Madison and has worked for Wisconsin Electric or NMC since 1986. During his tenure with Wisconsin Electric and NMC, Mr. Baumann has continuously been involved with the Point Beach plant, first as a radiological engineer, then with responsibilities for nuclear licensing, then as Manager of Nuclear Fuel Services, then as Manager of HLW issues, and ultimately as Manager of Nuclear Fuel Commodities and Supply.

- Tr. 96:8-99:8; 105:23-106:22 (Baumann).

18. Robert Link was the Vice President of WE's Nuclear Department from May 1992 to late 1996. Mr. Link attained a B.S. in nuclear engineering from Kansas State University. Mr. Link also participated in continuing education courses in finance and business from the University of Wisconsin and in strategic marketing courses at Harvard University. Mr. Link worked at Wisconsin Electric from the time he graduated from Kansas State University until he left WE in late 1996, except for a short stint at Impell Corporation. Mr. Link testified extensively regarding his continuing evaluation of the best course of action

for WE to take in response to DOE's expected failure to begin accepting spent fuel from Point Beach in 1998.

- Tr. 312:19-313:1; 315:16-316:23; 323:17-324:7 (Link).

19. David Zabransky has been a DOE employee since July 1994 and was the Government's representative at trial. Mr. Zabransky served as the Contracting Officer's Technical Representative from approximately 1995 to 2002 and has served as the Contracting Officer for the Standard Contract since mid-2002. Mr. Zabransky has testified on behalf of DOE in seven prior trials and in more than 30 depositions. Prior to his employment with DOE, Mr. Zabransky received a B.S. in Civil Engineering from Marquette University. He then worked at WE from 1978 until June 1994 in various engineering and contract administration roles. Mr. Zabransky worked in the Nuclear Department from 1984 until 1994.

- Tr. 567:2-17; 586:24-587:1; 5661:18-22 (Zabransky).

- Tr. 585:17-586:23 (Zabransky) (trials and depositions at which Mr. Zabransky has previously testified).

20. William Hennessy testified regarding the spent fuel pool at Point Beach based on his extensive experience in Point Beach's Reactor Engineering group, where he served as Supervisor for many years. Mr. Hennessy has been employed at Point Beach since September 1989. He has a B.S. and a master's degree in nuclear engineering from Iowa State University. He has been a licensed professional engineer since approximately 1986.

- Tr. 810:1-23 (Hennessy).

a. Mr. Hennessy has numerous plant operating certifications and has worked on spent fuel pool issues at three other nuclear plants (Plant Vogtle in Georgia, the Duane Arnold plant in Iowa, and the Seabrook plant in New Hampshire) prior to his employment at Point Beach. Initially, he was a trainer at Point Beach.

- Tr. 810:24-815:8 (Hennessy).

21. Howard Shimon was responsible for spent fuel storage at WE from 1976 to 1990. Mr. Shimon has a B.S. in industrial engineering and an M.B.A. from Cornell University. He joined WE in September 1971 and continued with WE until February 1995. He was the Manager of Nuclear Fuels and Administrative Services from approximately 1985 until 1990. In that capacity, he was responsible for departmental budgets and administrative services, including issues related to the Standard Contract. Mr. Shimon testified regarding WE's two rerackings of the Point Beach spent fuel pool; his involvement and leadership in nuclear industry groups, particularly regarding enactment of the NWPA and promulgation and implementation of the Standard Contract; WE's SNF management considerations and decisions in the late 1980s; and the composition of WE's Nuclear Power Department from the late 1970s until the early 1990s.

- Tr. 2161:12-2162:6 (Porter).
- Tr. 1219:20-1221:5 (Shimon).

22. Gary Krieser received a B.S. in nuclear engineering from the University of Wisconsin at Madison in 1972. Mr. Krieser began working at Wisconsin Electric in the summer of 1977. Mr. Krieser served as the Manager of Industry and Regulatory Services from 1992 until late 1996 and reported directly to Mr. Link in that position. Mr. Krieser also was the Director of Nuclear Fuel Services for NMC from 2000 until July 2002, at which time he joined Wisconsin Electric Power as Manager of Project Quality Assurance. Mr. Krieser testified regarding WE's spent fuel management activities from 1992 through 2000.

- Tr. 1506:18-22; 1509:5-9; 1511:20-1512:4; 1514:3-19; 1515:11-1518:4 (Krieser).

23. James Becka, who has worked at Point Beach since 1992, is currently the Project Manager, Dry Fuel Storage Group. In that position, he supervised the fabrication of

VSC-24 Cask Nos. 13-16 and the procurement of all of the NUHOMS units at Point Beach. Mr. Becka has been involved in the loading of all dry storage units in place at the Point Beach dry storage facility except for the first two VSC-24 casks. Mr. Becka has a B.S. in civil engineering from Purdue University and has been a licensed professional engineer since 1986. He has attained the rank of Captain in the U.S. Navy Reserve and has commanded several units, including a nuclear submarine squadron and nuclear submarine base. Mr. Becka testified regarding WE's and NMC's dry storage groups, VSC-24 and NUHOMS cask loading campaigns, and the reasons why PBNP decided to shift to the NUHOMS dry storage system.

- Tr. 1679:3-1681:15; 1683:21-1685:3; 1699:13-1700:3; 1771:19-1774:23; 1790:20-1802:23 (Becka).

24. Michael Holzmann is currently PBNP Shift Manager in the Operations group. In 1985, Michael Holzmann graduated from the University of Wisconsin, Eau Claire, with degrees in math and physics. Mr. Holzmann then served 6.5 years in the U.S. Navy as a Nuclear Submarine Officer. He then took a position at Point Beach and has worked there since 1992. Since 1999, he has also served as Dry Cask Loading Supervisor. He testified regarding fabrication of dry storage casks, VSC-24 and NUHOMS cask loadings, problems PBNP encountered with the use of the VSC-24, the impact of those problems on PBNP's operations, PBNP's recovery efforts in connection with the VSC-24, and costs WE incurred in its cask loading campaigns and VSC-24 cask recovery efforts.

- Tr. 2002:1-2017:24 (Holzmann).

25. David Porter, after serving in the Navy nuclear program, joined WE's nuclear projects office in 1969. He worked at WE until he retired in 2002. During his tenure at WE, Mr. Porter served as an inside director of Wisconsin Electric from 1989 to 2000 and on other Boards of Directors. As Senior Vice President at WE in 1991, Mr. Porter signed WE's PSCW dry storage project application. He had responsibility at that time for the Corporate

Planning Department, which was the economic regulatory interface for WE to the PSCW and other regulatory bodies. Mr. Porter testified about WE decision-making leading to dry storage, the process of preparing the 1991 application to the PSCW, and the contentious and lengthy process before the PSCW granted WE authority to build dry storage.

- Tr. 2149:5-2160:13 (Porter).

26. Scott Vance received an engineering degree from Idaho State University in 1985 and master's degrees in nuclear engineering and technology and public policy from the Massachusetts Institute of Technology in 1988. Mr. Vance worked for various contractors performing OCRWM contracts from 1988 to 2000, and assisted in the preparation of documents required by the Standard Contract. Mr. Vance principally reported to Mr. Alan Brownstein who worked at DOE. As a DOE contractor at the Pacific Northwest Nuclear Laboratory, Mr. Vance worked on development of the DOE acceptance rate for the 1991 Annual Capacity Report ("ACR"). Mr. Vance later received a law degree and now works as a nuclear licensing attorney for the Tennessee Valley Authority. Mr. Vance testified about the annual DOE spent nuclear fuel acceptance rate in the 1991 ACR, and his inquiries of DOE regarding the acceptance rate that he was instructed to use in the 1991 ACR.

- Tr. 2288:9-2291:20; 2295:9-15; 2356:14-2357:12 (Vance).

27. Jack Gadzala worked for Wisconsin Electric and then NMC at the Point Beach Nuclear Plant from 1998 to 2007 as a licensing engineer. Mr. Gadzala managed the Point Beach Licensing Group's budget and personally reviewed and approved NRC fee invoices for payment. Mr. Gadzala testified regarding his knowledge of the dry storage-related fees that the NRC charged Point Beach. Prior to joining WE, from 1988 to 1997, Mr. Gadzala worked for the NRC and was a resident NRC inspector at Point Beach from 1989 until 1994. Mr. Gadzala testified regarding his knowledge of the Point Beach spent fuel pool gained while he was an NRC inspector at Point Beach.

- Tr. 2361:7-2362:1; 2362:9-2364:4; 2364:10-18; 2366:14-22; 2394:18-2395:17; 2398:18-2399:2; 2399:5-19 (Gadzala).

28. Paul Farron, who has extensive regulatory and nuclear plant operations experience from work at Commonwealth Edison, the NRC and WE, testified as WE's representative regarding WE's interactions with the PSCW, WE's ability to continue operating until 1998 and beyond if DOE had performed, the potential use of a temporary rack at Point Beach, and dry storage cask-related issues. Mr. Farron received a B.S. in nuclear engineering from the University of Wisconsin in 1974 and is currently working toward a master's degree in mechanical engineering at the same institution.

- Tr. 2494:2-19 (Farron).

a. From 1976 to 1982, Mr. Farron worked at Commonwealth Edison as a nuclear engineer and became a licensed Senior Reactor Operator. From 1982 to 1984, he was employed in the NRC Office of Inspection and Enforcement and was responsible for communicating with power plants in response to events and managing escalated enforcement actions for proper operation of nuclear plants. Mr. Farron also worked as a consultant with Nuclear Energy Consultants, performing consulting services on a number of projects for nuclear utilities, DOE, and the NRC.

- Tr. 2494:20-2501:13 (Farron).

b. Mr. Farron has been employed at WE since June 1995. He joined WE as the Manager of the Strategic Issues group, a position he held until 2000. He was responsible for resolving all issues that could impact PBNP's continued viability including spent fuel storage issues and WE's dry storage project. Mr. Farron also was heavily engaged in industry groups such as the Nuclear Energy Institute ("NEI"), Electric Power Research Institute ("EPRI"), and the Institute for Nuclear Power

Operations ("INPO"). Mr. Farron served as the principal liaison with DOE regarding Standard Contract issues during the period from 1995 until 2000.

- Tr. 2506:3-2507:14 (Farron).

c. In 2000, Mr. Farron became WE's Manager of State and Regulatory Affairs, and he continues to serve in that capacity. He is responsible for seeking PSCW approval of major projects, engaging in state regulatory compliance issues before the PSCW, and coordinating in various activities with the PSCW. He has been involved in more than 100 PSCW proceedings.

- Tr. 2508:8-2509:13 (Farron).

29. Kevin Anundson testified regarding his role as the project manager for the dry storage project while he was at Wisconsin Electric. Mr. Anundson joined WE in January 1987 and the Nuclear Power Department in 1991. He left WE and the utility industry in 1997. He has a B.S. in mechanical engineering from the University of Wisconsin.

- Tr. 2786:23-2791:7 (Anundson).

30. Marlin Conry is a senior process engineer with Power Engineers Collaborative. Mr. Conry was employed at WE from November 1983 through January 2000 as a chemical engineer and later as Supervisor of the Chemical Engineering and Mechanical Engineering groups. Mr. Conry spent a little over 16 years in the nuclear power department at WE and was the project manager for the Unit 2 Steam Generator Replacement project. Mr. Conry has a B.S. in chemical engineering from the University of Missouri and belongs to the American Institute of Chemical Engineers and the American Society of Mechanical Engineers.

- Tr. 2786:23-2791:7 (Conry).

31. Ione Straub testified regarding her more than 20 years of accounting experience at WE, specifically in the Nuclear Power Department, including the period during

which the Dry Fuel Storage project was developed and implemented. Ms. Straub joined WE in 1981 after receiving a B.A. in business administration from the University of Wisconsin, Madison. Ms. Straub retired from WE in 2002 and has since worked part-time in a medical office and as a contract employee for WE in the preparation of WE's claim in this action.

- Tr. 2845:1-12; 2913:11-14 (Straub).

32. Eileen Supko, senior consultant and owner in Energy Resources International, is an expert in nuclear engineering, DOE's nuclear waste management program, the storage and transportation of spent nuclear fuel, and the modeling of acceptance rate scenarios and allocations of spent nuclear fuel acceptance rights. Ms. Supko has an extensive background in analyzing the impact of DOE's Federal Waste Management System ("FWMS") program on the nuclear utilities and has testified as an expert in many spent nuclear fuel cases. She graduated from Pennsylvania State University with a B.S. in nuclear engineering. The scope of Ms. Supko's work and testimony included analyses of (1) DOE's overall spent nuclear fuel acceptance rate, (2) the spent nuclear fuel acceptance rates for WE's Point Beach Units 1 and 2, and (3) DOE's actions to encourage, or agree without objection to, the development and the use of dual-purpose casks by nuclear operating companies for dry cask storage of SNF and for transportation of SNF.

- Tr. 3016:2-3062:24 (Supko).

- PX 792 (ERI Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate, ERI-2098-0601).

- PX 791 (ERI Expert Report Regarding Spent Nuclear Fuel Acceptance Rates for Wisconsin Electric Power Company's Point Beach Units 1 and 2, ERI-2098-0501).

- PX 793 (May 2006 ERI Expert Report Regarding The Development of Dual-Purpose Casks, ERI-2098-0602 and exhibits thereto).

33. Richard Sieracki, Chief Executive Officer of The Kenrich Group LLC ("Kenrich"), is a damages expert with extensive background in, among other things, analyzing cost and schedule issues that arise in connection with power plant project disputes. He graduated from the University of Illinois with a B.S. in civil engineering with a primary focus on construction management. Mr. Sieracki has testified as an expert in numerous cases involving power plants, including several SNF cases. He was qualified by the Court as an expert in damages analyses and construction cost estimating in the regulated public utility, nuclear power, and Government contract arena. The scope of his work and testimony included development of a fuel management model to assess WE's spent fuel requirements in breach and non-breach scenarios, assisting WE personnel in developing the necessary technical and cost inputs, determining WE's breach on-site storage costs, and analyzing WE's non-breach temporary cask pit rack costs.

- Tr. 3674:19-3703:13; 3717:9-23 (Sieracki).
- PX 794, App. A and B (May 8, 2006 Revised Damages Report).
- PDX 60-Sieracki 1-2 (Scope of Rich Sieracki's Work and Testimony, Kenrich's Approach to Determining WE's Damages).

34. Dr. Krishna Singh was qualified as an expert witness on (1) engineering evaluation of spent fuel storage rack technology, (2) the NRC review process and criteria for spent fuel storage rack technology and operating license amendments, (3) the duration and extent of NRC review of operating license amendments, and (4) cost estimating related to spent fuel storage rack technology projects. Dr. Singh is the President and CEO of Holtec International ("Holtec"). Dr. Singh has a master of science and a Ph.D. from the University of Pennsylvania in mechanical engineering and is a fellow in the American Society of Mechanical Engineering. Dr. Singh also is a registered professional engineer in Pennsylvania and Michigan. Dr. Singh has more than 30 years of engineering experience, including over 20 years of experience in wet SNF storage rack projects. Dr. Singh holds

more than a dozen nuclear storage technology-related patents. He has written dozens of articles, papers, and other publications related to SNF storage. Dr. Singh has been qualified as an expert witness in his fields of expertise more than 10 times.

- PX 827 (Revised Written Testimony of Krishna P. Singh, including attachments).

- Tr. 4341:20-4343:20; 4374:4-4379:17 (Singh).

a. Holtec has been involved in the design of spent fuel storage racks since 1986, when Dr. Singh founded the company. Pool storage racks are also known as "wet storage." Holtec racks are used to expand the spent fuel storage capacities consistent with pool topography. Holtec's rack projects include mini-racks, cask pit racks, whole pool reracks, and partial pool reracks. More than 70 percent of spent fuel discharged from U.S. nuclear reactors is stored in Holtec storage racks.

- Tr. 4332:18-22; 4334:1-12; 4335:7-4336:19; 4337:5-8 (Singh).

- PX 827 (Revised Written Testimony of Krishna P. Singh, including attachments).

b. Dr. Singh has patented "detuned honeycomb" spent fuel storage rack technology that is now used in the nuclear industry. Holtec has used this technology in more than 60 rack projects. Holtec racks have allowed rerackings of many spent fuel pools to increase prior estimated capacities.

- Tr. 4344:25-4346:20; 4348:23-4350:21 (Singh).

- PX 827 (Revised Written Testimony of Krishna P. Singh, including attachments).

c. Dr. Singh has led the NRC licensing of more than 50 operating license amendment requests. Holtec's role in the license amendment requests is to prepare a safety analysis report, to prepare all underlying calculations, to modify the plant technical specifications, to provide all of this documentation to the utility, and to

answer any NRC questions. The utility, in turn, submits the license application to the NRC.

- Tr. 4350:22-4351:14 (Singh).

- PX 827 (Revised Written Testimony of Krishna P. Singh, including attachments).

d. Holtec holds licenses for several dry SNF storage technologies and has three dockets with the NRC related to its spent nuclear fuel storage technology.

- Tr. 4338:21-4339:5 (Singh).

35. Kenneth Metcalfe, President of The Kenrich Group LLC, is a Certified Public Accountant and a Certified Valuation Analyst. He is an economic damages consultant with extensive background in accounting and finance issues. He graduated from Georgetown University in 1982 with a B.S. in business administration, majoring in accounting. Mr. Metcalfe has extensive experience in, among other things, preparing economic damages analyses, particularly in the public utility power industry, and has testified as a an expert on numerous occasions in nuclear plant matters, including in a number of SNF cases. He was qualified by the Court as an expert on accounting, financial and economic issues, and economic damages in the regulated public utility, nuclear power, and public contract industries. The scope of his testimony included an articulation of the economic damages theory followed by Kenrich and its application to WE's claim, the economic model used to assess WE's damages, the propriety of damages model inputs, and the overall determination of WE's economic damages.

- Tr. 4476:3-4478:17; 4482:4-4506:5; 4507:4-4510:23; 4517:19-4521:1; 4627:10-4628:5 (Metcalfe).

- PX 794, App. C and D (May 8, 2006 Revised Damages Report).

- PX 1047 (Trial Damages Binder).

- PDX 61-Metcalfe 1 (Scope of Kenneth Metcalfe's Testimony).

## IV. THE NWPA AND THE STANDARD CONTRACT

### A. WE CLOSELY FOLLOWED THE FEDERAL GOVERNMENT'S DISCHARGE OF ITS RESPONSIBILITY TO DISPOSE OF SPENT NUCLEAR FUEL

36. Historically, the disposal of SNF and HLW from the commercial production of nuclear power has been a federal responsibility. Because of the suspension of reprocessing in 1977, the federal government developed a solution for disposal of SNF, namely, deep geologic disposal of SNF.

- *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987) (discussing President Eisenhower's Atoms-for-Peace Program, the passage of the Atomic Energy Act, and other pre-NWPA history).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 276:3-7 ("[F]rom the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program."); 276:18-24 ("And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they [the government] would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.")).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 124:25-125:6 (as to suspension of reprocessing); 127:19-25 (as to the federal solution to create a geologic repository)).

37. WE was extensively involved in industry groups during the NWPA legislation and promulgation and implementation of the Standard Contract. After the suspension of reprocessing, the industry groups focused on the enactment of the NWPA, and the promulgation and implementation of the Standard Contract. The senior WE person who participated in these groups at the senior executive level was the late Sol Burstein. Mr. Burstein, who passed away in 2002, joined WE in 1965 when Point Beach was in the planning stages. He was a Senior Vice President of the company and headed nuclear operations for 23 years. In 1973, he became Executive Vice Chairman of WE and continued

in that role until he retired in the late 1980s. Mr. Burstein held a patent for a boiling water reactor super heat cycle and was a fellow with the American Society of Mechanical Engineers. Mr. Burstein was WE's primary decision-maker regarding nuclear issues. He was one of the early champions of commercial nuclear power and was very well known and respected nationally. He was frequently called upon to speak on behalf of the nuclear industry. Mr. Burstein was a member of the Utility Nuclear Waste Management Group ("UNWMG") Steering Committee and DOE appointed him to a technical review committee to develop criteria for a monitored retrieval storage system ("MRS").

- Tr. 2154:1-8 (Porter).
- Tr. 1217:3-1218:12; 1248:7-1250:8; 1277:12-1278:13 (Shimon).
- PX 53 (December 30, 1983 DOE letter re: MRS).

38. Mr. Shimon was WE's primary point of contact with both DOE and industry groups at the working level regarding the NWPA and the Standard Contract. Mr. Shimon became involved in industry groups regarding spent fuel transportation because of his responsibilities for WE's SNF shipping campaigns to and from off-site facilities in Illinois and New York in the late 1970s and early 1980s. Mr. Shimon was the WE representative to the UNWMG that later became known as UWASTE. UNWMG consisted of representatives from the nuclear utilities who had expertise in the issues raised by the NWPA and responsibilities for monitoring DOE's plans for implementing the Standard Contract. Mr. Shimon also was WE's representative to the Electric Utility Companies' Nuclear Transportation Group ("EUCNTG"). Mr. Shimon eventually became the chairman and spokesman for EUCNTG. When EUCNTG ultimately moved into UWASTE, Mr. Shimon continued as the UWASTE chairman for its Transportation Working Group. Mr. Shimon also served as the chairman of the Edison Electric Institute ("EEI") Nuclear Fuels Committee.

- PX 38 (June 3, 1983 Letter from Burstein to DOE designating WE contact point for Standard Contract to be "D.K. Porter, attention H.S. Shimon").

- Tr. 1215:13-1218:12; 1249:18-1251:18; 1309:10-1310:8 (Shimon).

39. Mr. Shimon apprised WE management of all developments regarding the Standard Contract and how these developments related to WE's SNF storage planning. He reviewed DOE program documents, briefed WE managers regarding the meaning and impact of the documents, and participated in meetings between DOE and the industry groups. Mr. Shimon was extremely experienced and knowledgeable regarding spent nuclear fuel issues during his WE tenure.

- Tr. 1220:13-1222:13; 1247:17-1248:6; 1249:18-1251:4; 1251:19-1252:13 (Shimon).

- Tr. 2161:12-2162:6; 2167:16-22; 2174:8-20 (Porter).

40. A leading industry group involved in the enactment of the NWPA and promulgation and implementation of the Standard Contract was EEI. EEI is a utility trade association for investor-owned electric utility companies. Loring Mills, who had a long career in the nuclear industry, joined EEI in 1976 as Nuclear Fuel Manager. Over the years, Mr. Mills eventually became Vice President of Nuclear Activities. At EEI, Mr. Mills originally worked on nuclear fuel cycle issues, including both front end issues and, after reprocessing was suspending in 1977, on issues concerning the disposal of SNF. Mr. Mills was actively involved in the late 1970s in developing the Environmental Impact Statement that elected geological disposal for SNF and gave rise to the NWPA. Subsequently, Mr. Mills was involved in the enactment of the NWPA and the promulgation of the Standard Contract. During his remaining tenure with EEI until his retirement in 1993, Mr. Mills worked to promote appropriate implementation of the Standard Contract and worked closely with DOE and other government officials.

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 267:25-269:21; 279:11-18; 270:5-11; 279:11-16; 288:4-289:8; 270:16-271:1).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 121:6-8; 121:20-122:4; 129:16-132:23).

- Tr. 1413:4-8 (Shimon).

## B. DEVELOPMENT OF THE NWPA AND THE STANDARD CONTRACT

41. On January 7, 1983, recognizing the federal government's responsibility for the disposal of SNF, President Reagan signed into law the NWPA, which aimed to eliminate the need for additional at-reactor storage after DOE commenced acceptance of SNF from commercial utilities beginning no later than January 31, 1998. The NWPA stated that "[i]n return for the payment of fees established by" the NWPA, DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel."

- NWPA, 42 U.S.C. §§ 10101 through 10270.

- NWPA, 42 U.S.C. § 10222(a)(5) (DOE required (A) to take title in return for fees and (B) to provide SNF disposition services by January 31, 1998).

- H.R. Rep. No. 97-491, Part 1, at 59 (1982) (DOE "is responsible for disposing of [HLW or SNF] in permanent disposal facilities, beginning no later than January 1998, in return for the payment of fees established by this section.").

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 137:16-138:20; 145:6-146:11; 148:16-25).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 80:20-81:22 ("That was . . . the purpose. The basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel. . . . This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage. That was one of the major goals of the program.")).

42. Pursuant to the NWPA, on February 4, 1983, DOE published in the Federal Register a proposed Standard Contract with the nuclear utilities. Utility input was largely limited to providing comments in response to the draft Standard Contract and attendance at a few meetings with DOE officials.

- PX 26 (48 Fed. Reg. 5,458 (Feb. 4, 1983)).

- 42 U.S.C. § 10222(a)(1) (requiring that DOE's obligations to utilities be set out in contracts).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 154:6-10 (DOE drafted the Standard Contract and provided for little input from utilities: these "were not negotiating sessions . . . . There was never really a negotiation, what you would think would be a negotiation of the contract. There was not an opportunity for that.")).

- *Indiana Michigan Power Co. v. DOE*, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

- Tr. 2166:9-2167:15 (Porter) (discussing the short time in which utilities had a chance to comment on the proposed Standard Contract and noting that utilities did not have an opportunity to negotiate).

- Tr. 5069:14-18 (Brownstein).

43. In a letter to DOE, EEI noted that DOE's proposed contract did not specify a rate or a performance standard, which would be appropriate under the NWPA, 42 U.S.C. § 10222(a)(5)(A). EEI, on behalf of WE and other commercial nuclear utilities, requested a performance rate equal to at least the annual rate of SNF production, plus additional acceptance to work off accumulated backlog:

> [t]he contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least qualitatively, the

> need to have adequate annual receiving capacity to handle industry needs.

PX 30 at Attachment A, page 2. EEI urged that the Standard Contract should be revised to add language that DOE take title to SNF "as expeditiously as practicable":

> WHEREAS, DOE recognizes that its ability to take delivery of [SNF] and/or [HLW] must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

- PX 30, p. 8, and Attachment A, pp. 2-3 (March 7, 1983 Letter from EEI to Morgan regarding Standard Contract).

- PX 34 (March 9, 1983 Letter from WE to DOE re: Spent Fuel Disposal Contract).

- PX 40 (March 9, 1983 Letter from Fay to DOE regarding support for industry positions on Standard Contract).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 319:14-320:10).

44. After the formal comment period between February 4, 1983 and March 5, 1983, the utilities only had a short time in which to execute the final contract because the NWPA required that the Standard Contract be signed by June 30, 1983. On April 18, 1983, DOE issued the final Standard Contract in the Federal Register. If utilities did not sign the Standard Contract, they risked losing their NRC operating licenses. The utilities then entered into the Standard Contract in return for their payment of substantial fees.

- 42 U.S.C. § 10222(b)(2)(A) (June 30, 1983 deadline for executing Standard Contract).

- 48 Fed. Reg. 16,590-601 (Apr. 18, 1983).

- 10 C.F.R. § 961.11, pmbl. and art. II.

- *Southern Nuclear*, 77 Fed. Cl. at 399, 401-02.

- 48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (DOE decided not to negotiate the terms of individual contracts with each commercial nuclear utility.).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 156:14-157:21).

- Tr. 2166:16-2167:15 (Porter) ("[T]here were no real negotiations. It was published in the Federal Register. It was sent to the utilities. It had a very short time for the signing of the contract and return to the Department in order to ensure services from the Department for the disposal of the spent fuel, but there were no negotiations for the give-and-take of the terms and conditions of the contract.").

- PX 1052 (Morgan Dep. Desig. 11/15/06 Tr. 91:13-19 (Utilities had to sign the contract to continue operating.)).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 56:13-23 ("It was my impression that [utilities] were required to sign the contract. They had no choice.")).

45. WE executed the Standard Contract on June 16, 1983, but reserved the right to seek modifications of the Standard Contract, which was necessitated by the Government-imposed urgency to sign the contract and the inadequacy of the review period. In a letter sent to DOE prior to signing the Standard Contract, WE stated:

> It is our intention to sign the contract in its current form, though we reserve the right to seek modifications to the Contract which may later prove later necessary pursuant to Article XI-Amendments. Reservation of this right is necessitated by the congressionally imposed urgency of signing a contract and the inadequacy of the review and the negotiation period.

- PX 38, p. 2 (June 6, 1983 Letter from WE to Keefe DOE re: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste).

WE further stated:

> We have signed the Contract at this time because of the June 30, 1983 deadline imposed (we believe erroneously) by the U.S. Department of Energy. Our signing should not be

interpreted as agreeing with either the Final Rule or the Standard Contract. We are not waiving our rights to seek changes in the rule and the Contract or to submit claims based upon the imposition of inappropriate or inequitable provisions contained therein.

- PX 40, p. KRGWE002117(June 3, 1983 Letter from WE to Keefe DOE re: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste).

- PX 41 (WE's Executed Standard Contract).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 53:4-56:24 (The Standard Contract "was fraught with ambiguities, contradictions, incorrect statements . . . .")).

## V. THE STANDARD CONTRACT AND THE PARTIES' UNDERSTANDING

46. The Standard Contract required DOE to "begin" disposal of SNF and HLW "not later than January 31, 1998."

- PX 41, p. KRGWE002123 (WE's Executed Standard Contract).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 383:24-384:14 ("And there was expectations as indicated by the members of the Department of Energy. I came [*sic*] name Frank Kaufman specifically, stating that yes, we can satisfy that date. Actually, we believed we can have a repository before that time. And we fully believed that the 15-year advance time was sufficient for this program to actually carry out what was requested.")).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 382:3-19 ("[W]e really expected that the program would have started receiving spent fuel or nuclear waste a few years prior to 1998. And ramp up to a 1998 date in which the delivery amount that was due [*sic*] be accepted by the federal government, was equivalent to that amount discharged from the reactors in that year, plus some amount to work off the backlog. Q: Okay. And what was the basis of that expectation? A: Many discussions that had occurred between myself and members of Congress when we were developing the waste program – or Waste Policy Act. And with individuals within the Department of Energy that worked on that particular program.")).

47. DOE revised the proposed Standard Contract to add the "expeditiously as practicable" phrase requested by EEI: "Whereas, the DOE has the responsibility, following

commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved *as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel* . . . ."

- PX 41, p. KRGWE002118 (WE's Executed Standard Contract) (Emphasis added).

- PFF 43.

- 48 Fed. Reg. 16,600 (Apr. 18, 1983).

48. Utilities and DOE understood that, consistent with the NWPA, "expeditiously as practicable" meant that DOE's acceptance rate of spent fuel would be sufficient so that utilities would not have to add additional at-reactor storage after January 31, 1998 and DOE would work off the backlog of previously discharged fuel.

- Tr. 1245:18-1246:10 (Shimon) ("Q: And during this time period . . . when the standard contract was being developed and executed, what was your understanding of the parties regarding the rate at which Department of Energy would accept spent fuel? A: The rate would be sufficient to preclude utilities from having to add additional spent fuel storage capacity after January 31, 1998 and would work off the backlog of spent fuel over a reasonable period of time. . . . Based upon all of the discussions we had with DOE at that time and pronouncements that they made, we believed that they were in agreement with us.").

- Tr. 1496:22-1501:23 (Shimon) (The "expeditiously as practicable" language was inserted into the Contract and the parties understood that to mean that DOE would accept fuel at a rate sufficient to avoid additional at-reactor storage after 1998.").

- PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 98:14-99:11 ("The purpose of the contract was to carry out the provisions of the Nuclear Waste Policy Act.")).

- PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 187:15-188:8 (DOE wanted to implement the NWPA so that it would have an acceptance rate after the first five years equivalent to the rate of utility discharge of spent fuel and such that no utility would have to build additional storage facilities after 1998.)).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 51:9-52:22 ("[I]t was significant that [DOE] design a system to remove the backlog of materials that were accumulating under the intent of the act . . . [b]ecause the concept of a Nuclear Waste Policy Act was . . . for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.")).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 145:6-146:11 (as to no additional at-reactor storage); 146:14-148:15 (as to working off the backlog); 157:3-21 (as to working off the backlog); 189:17-25 (as to working off the backlog); 197:3-17 (as to no additional at-reactor storage)).

- PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 106:20-107:1; 108:3-109:15 (Expeditiously as practicable referred to DOE's intent to catch up with the generating rate a few years after beginning to take spent fuel from utilities and to begin working off the backlog.)).

- PX 1052 (McDuffie Dep. Desig. 3/18/02 Tr. 35:15-38:23; 70:7-74:17 ("[T]he intent was in the ACR . . . to devise a receipt rate that would allow the minimum or require the minimum at-reactor storage.")).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 341:7-343:2 (discussing understanding of utility representatives and high-level DOE officials of the two-part requirements for DOE's rate of acceptance)).

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 137:16-138:20 (DOE's spent fuel contracts obligated DOE to help the utilities avoid costs pertaining to spent fuel storage after January 31, 1998.)).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 201:20-202:12 (DOE's "intent was to get a facility operating in '98, to take the stuff away fast enough so the utilities would not have to add additional storage. That was the intent. Q: And do you think that DOE had that intent when they signed the standard contract? A: Of course.")).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 171:9-176:8 ("Not only did [DOE] want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog. Otherwise you've got utilities ultimately shutting their reactors down and sitting there storing that fuel for many, many years. If you only handle a 2,000 ton per year acceptance rate, you would have to operate probably a 60, 70-year repository to finally work off the backlog. Utilities, that's not what they were paying for.")).

- PX 1052 (McDuffie Dep. Desig. 3/18/02 Tr. 110:16-113:14 ("Utilities were paying for waste disposal services starting in January 1998 or when the repository opened. If they're going to pay for disposal services, they want to get rid of it at a rate that saves them money or doesn't require them to spend additional money. To do that you have to provide a service that will remove the fuel at a rate that allows them to avoid the consolidation, et cetera." The receipt rate was set to ensure that no additional storage would have to be provided.)).

- PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3686:18-22 ("Q: The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you? A: I believe that was the intent of Congress and the Act.")).

- PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/02 Tr. 20:8-21:4; 124:21-125:8 ("Q: In the next sentence it indicated that . . . another objective of the schedule would be to preclude need for additional reactor storage after January 31st, 1998 and ultimately remove from reactor storage all waste more than five years old. Do you see that phrase? A: Yes. Q: Is that consistent with what you have testified to be objective [sic] in the mid-eighties of the Nuclear Waste Management Program? A: Yes. Actually, that's one of the objectives.")).

- PX 631 (Apr. 2002 Notice of Deposition of Tom Pollog) (identifying the following subject matters for Pollog's RCFC 30(b)(6) deposition: (1) The rate of acceptance in estimates made by DOE from 1982 to 1987 in the areas of program cost, waste acceptance, transportation planning, and receiving capacity of the program and the basis for those estimates as set forth in certain DOE documents; (2) The role and purpose of the Delivery Commitment Schedules and Final Delivery Schedules in the performance of the Standard Contract; (3) The purpose of Annual Capacity Reports and Acceptance Priority Rankings developed pursuant to the Standard Contracts and the basis for the acceptance rates contained therein; and (4) The rate(s) of acceptance that DOE planned to use under the Standard Contract before DOE determined that it would not begin accepting SNF in a permanent repository in 1998).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 144:16-145:5; 148:21-149:17 ("Q: It goes on to say that, 'The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site.' Is that a true statement? A: That is. Q: And was that, in fact, what the utilities were paying for? Do you understand my question, sir? A: I think the utilities were paying for disposal services. Q: And were they paying for disposal services sufficient that they

would not have to add additional storage on site? A: After 1998, yes. Q: You would agree? A: Yes.")).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 140:6-10 (After 1998, DOE would become responsible for eliminating the need for additional on-site storage.)).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 34:4-36:12; 37:12-38:1 ("You have to make sure you keep up with the discharge.")).

- *Southern Nuclear*, 77 Fed. Cl. at 404, 409.

49. WE's understanding was that the Standard Contract would implement the NWPA and that DOE's spent fuel acceptance rate would be sufficient to eliminate the need for WE to construct additional storage after 1998 and to begin working off the accumulated spent fuel backlog at a reasonable rate. WE expected that its spent fuel backlog would be removed by DOE within five to 10 years after the reactors ceased operations.

- PX 67 (July 6, 1984 Letter from Fay (WE) to Head (DOE) re: Comments on Draft Mission Plan Civilian Radioactive Waste Management Program).

- Tr. 1234:22-1236:18 (Shimon) (WE's understanding of the NWPA was that DOE would pick-up at a rate sufficient to avoid additional at-reactor storage and reasonably reduce the backlog.).

- Tr. 1245:18-1246:10 (Shimon) (WE believed that DOE was in agreement that DOE would pick-up at a rate to avoid additional at-reactor storage and work off the backlog of spent fuel over a reasonable period of time.).

- Tr. 2537:19-2539:23 (Farron) (Expectations regarding the acceptance rate issue came from working with industry groups such as NEI and EPRI.).

- Tr. 603:10-609:2 (Zabransky) ("Q: Just to be clear though, you are saying that the testimony you provided at that time on April 17th, 2002 was accurate based on what you've read here today, is that correct? A: Well, again, I'm not quite sure when, over the 20 or so year's we're talking about, that this is referring to, but I'm not contesting that, at some point in time, 5 to 10 years would have been a reasonable estimate or reasonable guess estimate as to how we felt the fuel might be gotten.").

50. During development of the Standard Contract, DOE was aware that utilities faced enormous SNF storage costs if DOE failed to provide storage facilities for the industry's spent fuel.

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 288:4-290:6).
- PX 68 (July 1984 Letter from Lawrence to Rusche).
- PX 175 (1989 Draft ACR).
- *Southern Nuclear*, 77 Fed. Cl. at 404.
- PFF 135, 150, 216, 230, 250.

51. During development of the Standard Contract, DOE and the industry discussed extensively the rate at which DOE would accept spent fuel. Those discussions confirm that the industry and DOE both understood that DOE would accept approximately 3000 Metric Tons of Uranium ("MTU") of spent fuel annually and that this acceptance rate would be achievable by 1998.

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 343:4-14 ("Well, there was considerable discussion of what should the capacity be for receiving this waste or spent fuel at a repository. And the capacity that was discussed at that time and has been documented in many ways was the planned activity would be at a quantity of about 3,000 metric ton per year.")).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 385:14-387:7 ("And there were discussions on what was a reasonable rate of receipt at a repository from a design standpoint. This is the Department of Energy identifying what is a reasonable design quantity for a repository. And it was discussed. That quantity was discussed while the legislation was being developed. And it was understood that the design rate would be about 3,000 metric ton per year.")).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 386:1-387:7 ("Q: Did you have discussions about the 3,000-ton rate with DOE officials at that time? A: Yes, I did. Q: Do you recall specifically with whom? A: I am convinced I had those discussions with Frank Kaufman, with Wade Ballard, with Mike Lawrence. And you know, this was over several years' time that this was being developed. So the number of people that were involved in the program at that time were changing. And I believe at that particular time that Shelby Brewer was the assistant secretary for nuclear energy. And I recall

having conversations with Mr. Brewer. There was another individual who had responsibility for the program just before the Nuclear Waste Policy Act, which was Shelley Myers. And I remember having similar conversations with Mr. Meyers. Q: These were conversations in which the 3,000-ton rate was discussed? A: There were many issues discussed. And I am convinced that many times we discussed that rate of 3,000 metric tons. It shows up in many different ways. Q: Okay. And it's your understanding from those conversations that the Department of Energy officials, at least the ones that you mentioned and discussed this with, expected the 3,000-ton rate to be achieved by 1998; is that right? A: They – they had said the geologic repository receiving rate would be designed for 3,000-ton per year and they had expected they would be able to achieve that by 1998.")).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 390:24-391:17 (The 3000 MTU rate for the first repository predated the passage of the NWPA.)).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 509:15-511:15 (Parties anticipated annual industry discharges of 2000 to 2500 MTU and that DOE would work off backlog of already discharged spent fuel at a rate of about 1000 MTU/year.); 511:22-512:12 (Parties anticipated in 1983 that repository would have capacity of 3000 MTU/year.); Tr. 343:4-14 (DOE officials planned spent fuel acceptance from utilities in 1983 at about 3000 MTU/year.)).

- PX 1052 (Mills Trial Desig. *System Fuels, Inc. & Entergy Ark., Inc. v. United States* ("*Entergy Arkansas*") Tr. 1971:7-1973:19).

52. Based on the parties' understanding that DOE would accept SNF at an annual rate that would avoid the utilities' having to add at-reactor storage after January 1998 and would work off the accumulated backlog at a reasonable rate, an annual rate of 3000 MTU is a reasonable rate that accomplishes these objectives.

- PFF 49.

- Tr. 1264:16-1266:11 (Shimon) (WE understood that, at the 3000 MTU rate, DOE could meet its acceptance obligations, which were to pick-up at a rate sufficient to avoid additional at-reactor storage after January 31, 1998 and reduce the backlog in a reasonable time.).

- Tr. 5260:24-5261:2 (Kouts) ("Q: Thank you. And a 3000 MTU annual steady state rate of acceptance at a repository is a reasonable rate of acceptance, isn't it? A: Yes, it is.").

- PX 1052 (Mills Trial Desig. *Pac. Gas & Elec. Co.* Tr. 147:9-22 (understood at contract signing that utilities would be discharging in excess of 2000 MTU/year in and after 1998)).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 59:4-11 ("Q: So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct? A: Yes.")).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 149:5-21 (The 3000 MTU/year receipt rate "seemed like a reasonable number to me [in 1985] as it does today.")).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 197:4-198:10 ("There were various studies done in the eighties and also in the very early nineties on system performance rate . . ." that "showed that . . . at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.")).

- PX 1052 (Cole Dep. Desig. 3/12/02 Tr. 171:9-176:8 ("Not only did [DOE] want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog. Otherwise you've got utilities ultimately shutting their reactors down and sitting there storing that fuel for many, many years. If you only handle a 2,000 ton per year acceptance rate, you would have to operate probably a 60, 70-year repository to finally work off the backlog. Utilities, that's not what they were paying for.")).

- PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/24/02 Tr. 10:19-11:19; 246:14-18 ("Q: Is it your understanding that the 3,000 rate would keep up with the utility discharge rate? A: Yes. Q: Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton rate – A: No, I'm not.")).

- PX 632 (Apr. 18, 2002 Notice of Deposition of Susan Klein) (identifying 30(b)(6) subject areas as follows: (1) DOE's response to DCS forms submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS form; (2) DOE's consideration of its obligation to accept Greater-Than-Class-C waste; (3) The date that DOE currently believes that it will begin accepting fuel under the Standard Contract and the acceptance rate that DOE is planning to use once acceptance begins; and (4) The role and

purpose of the provision on priority for shutdown reactors in the performance of the Standard Contract).

- PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/25/02 Tr. 288:21-291:11 ("Q: [I]t's the DOE's expectation, is it not, that they're going to continue to pick up 3,000 metric tons? A: That is the expectation for planning purposes, yes. Q: Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at? A: I would – yes.")).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 53:16-57:2 ("Q: The goal was to make the take rate high enough so that you could eliminate the backlog within a reasonable amount of time without making the rate so high that the complexities would send the cost through the ceiling, correct? . . . A: In a general sense. Q: And you understood the policy behind the act would call for the elimination of the backlog of spent nuclear fuel within a reasonable amount of time, correct? A: Reduction as opposed to elimination. As long as they operate, you don't eliminate it. So reduction, yes. Q: And just explain what you meant by as long as they operate you don't eliminate it? A: Well, when – when reactors operate, there is always going to be some inventory of spent fuel there. We were working to minimize the backlog and reduce the backlog that was at the sites. Q: So in order to be able to minimize the backlog, the acceptance rate would have to be at some level higher than the rate at which spent nuclear fuel was being produced, correct? A: Our intention was to design a system that would reduce the backlog to a reasonable sense. Q: And in 1986 you believed that the 3,000 take rate that you were targeting at that point would accomplish the goals you have been alluding to, correct? And the goal I'm referring to is the reduction of the built up backlog. A: Yes.")).

- PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 141:21-142:9 ("Ultimately, over time, our objective was to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog.")).

- PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 106:20-107:1; 108:3-109:15 ("We would like to have that – the repository not only take the generating rate, but, more than that, to get rid of the backlog. That was the intent of sizing the facility. And that hasn't changed.")).

- PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3681:20-3683:19 ("Q: So you did think it appropriate to have enough waste acceptance capability to meet the . . . discharge rate from utilities? A: Of course. Q: And work off the backlog? A: Yes.")).

- PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3685:10-16 ("Q: And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter? A: Yes. Q: And you thought that was a reasonable acceptance rate for the program, correct? A: At that time, yes.")).

- PX 1052 (Morgan Dep. Desig. 11/15/06 Tr. 109:14-116:22 ("Q: The paragraph goes on to state, 'Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5 years old.' And did you also take responsibility for the sentence of the paragraph I just read? A: Yes. Q: And does this reflect your strategy as head of the program to preclude the need for additional at-reactor storage after January 31, 1998? A: Yes. Q: And ultimately to remove from at-reactor storage all waste more than five years old? A: Yes. . . . Q: Do you have an understanding as to why both the first and second repository ramp up to 3,000 metric tons in their sixth respective years of operation? A: That was the design goal that we had at that time. Q: And what was that goal predicated upon? A: The discharge rate from the reactors plus what we felt a designed repository could handle.")).

- Tr. 587:15-588:16 (Zabransky) ("Q: And when you worked at Wisconsin Electric, did you believe that a reasonable and appropriate acceptance rate was one that would exceed the then current industry aggregate spent fuel discharge rate and would begin to work off the accumulated spent fuel at a reasonable rate? A: Yes, I did. Q: And what was the basis of that belief? A: My basis of my belief was that seemed like a reasonable thing to do. Q: Was it based on any government programmatic documents? A: Well, there were programmatic documents that came up with rates which normalized out at about 3000 tons a year, which either coincidentally or on purpose were a rate that would keep up with the pace of discharge and work off the backlog at a reasonable rate, but I think, independently, the industry and myself had come up with that, the determination that would be a good number. Q: And even after you moved to the Department of Energy, isn't it correct that you continued in that belief? A: I believe that, today, it's a reasonable rate, yes.").

- Tr. 715:10-716:16 (Zabransky) ("Q: . . . You testified that you believed that 3000 was a reasonable rate, do you recall that? A: Yes, I do. Q: Could you explain what you meant by that? A: Well, I think, in the context of the way the question was asked this morning and the way I've answered it previously, is that looking at the fact that the nuclear plants in this country, the 104-odd plants that currently run, and there used to be more, but generate nominally about 2000 tons a year of spent fuel, that to pick up that spent fuel

that's being generated and to work off the backlog at some rate, about 3000 tons a year is a number that lets you work that off in a reasonable fashion.").

- Tr. 1188:2-10 (Zabransky) ("Q: Would it have made sense for DOE to accept spent fuel at a rate at which it would take decades to remove all the spent fuel from the plant sites after they ceased operation? A: And again, I think as we talked earlier, the rate that we had discussed that seem [sic] reasonable was 3000 tons per year that results in it taking a long time to remove the fuel after shutdown.").

53. DOE has always intended to use a 3000 MTU/year steady-state rate for the FWMS.

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 116:21-119:6 (It has been DOE's goal since Mr. Barrett arrived at DOE in 1985 to accept spent fuel at a steady-state rate of 3000 MTU/year.)).

- PX 1052 (Dreyfus Dep. Desig. 5/15/02 Tr. 69:4-9 (When Dr. Dreyfus was Director of RW, DOE planning documents used a ramp-up to a steady-state rate of 3000 MTU per year.)).

- PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/24/02 Tr. 246:14-248:5 (There is no reason why DOE would operate a facility at less than a 3000 MTU per year rate other than ramp-up issues.)).

- PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/02 Tr. 96:5-98:9 (DOE maintained a 3000 MTU rate as the design objective for a DOE facility.)).

- PX 1052 (Milner Trial Desig. *Yankee Atomic* Tr. 4749:16-4750:6 ("Q: It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year? A: Yes, uh-huh. Q: And . . . that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct? A: As far as the steady-state rate, yes. Q: And that's a reasonable rate? A: Yes, I think so.")).

54. WE's expert, Eileen Supko, conducted a comprehensive analysis that concluded: An annual 3000 MTU SNF acceptance rate, reached after a five-year ramp-up period, is a reasonable steady-state rate that would have been both efficient and practicable because that rate (1) would have kept up with an annual discharge rate of 2000 MTU of SNF, thereby limiting the amount of additional storage capacity at nuclear plants after 1998; and

(2) would have worked off the 1998 backlog of 37,000 MTU to allow timely decommissioning. Ms. Supko's conclusions are based in part on the use of ERI's SPNTFUEL Model. The Government has acknowledged, and Ms. Supko has confirmed, that, with the same inputs, the SPNTFUEL Model produces essentially the same results as DOE's fuel acceptance model.

- PX 792 (ERI Expert Report re: Acceptance Rate, ERI-2098-0601).

- PX 791 (ERI Expert Report re: Acceptance Rates for Point Beach Units 1 and 2, ERI-2098-0501).

- Tr. 3097:21-3170:17 (Supko).

- PDX 36-54 (Series of demonstratives illustrating Supko expert reports).

55. Under a 3000 MTU annual acceptance rate as defined by Ms. Supko as "Scenario 1," applying WE's acceptance rights based on Oldest Fuel First ("OFF") priority, and assuming DOE timely commenced performance, DOE would have picked up 1,075 assemblies, or 422.38 MTU, from Point Beach Units 1 and 2 between 1998 and 2007:

| YEAR | OVERALL ACCEPTANCE RATE (MTU) | POINT BEACH UNIT 1 (MTU) | POINT BEACH UNIT 2 (MTU) | TOTAL (MTU) |
|---|---|---|---|---|
| 1998 | 400 | 16.28 | | 16.28 |
| 1999 | 600 | 28.63 | 14.37 | 43.00 |
| 2000 | 1,200 | 19.17 | 13.39 | 32.56 |
| 2001 | 2,000 | 32.33 | 31.87 | 64.20 |
| 2002 | 3,000 | 12.85 | 37.32 | 50.17 |
| 2003 | 3,000 | 34.96 | 22.05 | 57.01 |
| 2004 | 3,000 | 12.42 | 17.51 | 29.93 |
| 2005 | 3,000 | 28.48 | 25.25 | 53.73 |
| 2006 | 3,000 | 25.27 | 12.55 | 37.82 |
| 2007 | 3,000 | 13.90 | 23.78 | 37.68 |
| TOTAL | | 224.29 | 198.09 | 422.38 |

- Tr. 3196:9-3197:17 (Supko).

- PX 791 (ERI Expert Report re: Acceptance Rates for Point Beach Units 1 and 2, ERI-2098-0501).

- PDX 55 (Point Beach Acceptance Allocation 1998 - 2007).

- PX 796 (Kenrich Binder BB: Revised Fuel Management).

56. Wisconsin Electric did not believe that DOE accepting fuel at a 900 MTU rate would be satisfactory performance under the Standard Contract. WE's understanding of DOE's acceptance rate obligations under the Standard Contract did not change over time.

- Tr. 2544:25-2547:10 (Farron) ("Q: Would you consider DOE's acceptance of spent fuel in the 900 MTU rate to be satisfactory performance under the standard contract? [objections omitted] A: No, I would not. Q: Why not? A: It isn't what – the 900 rate isn't what the DOE had told utilities following the signing of the standard contract. It is not what the utilities had expected, nor had they actually paid for during that period of time. What they were paying for was a facility and rate ramping up to 3000 MTU.").

- Tr. 2549:14-18 (Farron) ("Q: Did you ever learn or hear of any changes in Wisconsin Electric's understanding of DOE's acceptance rate obligations under the standard contract? A: No, I did not.").

- Tr. 1340:13-1341:14 (Shimon) (From contract execution until 1992, WE's understanding regarding DOE's acceptance obligations remained unchanged.).

57. WE was familiar with the Standard Contract provisions allowing utilities (1) to have pickups of SNF quantities that were 20 percent less or more than their respective allotment, and (2) to exchange acceptance slots with other contract holders. During Standard Contract development and implementation, the parties' understanding regarding the 20 percent provision was that DOE would accept SNF from utilities in campaigns and accept spent fuel casks that were full to capacity.

- Tr. 1246:11-1247:16 (Shimon).

- PX 41, pp. KRGWE002128-29 (Standard Contract).

- PX 1052 (Benz Dep. Desig. Tr. 73:22-75:12 ("It is uneconomical for DOE to pick up partially filled casks from utilities. To reduce the frequency of DOE picking up partially loaded casks, 'the standard contract . . . allows utilities to mark up their allocations by 20 percent [which] would have allowed' utilities to ensure they were shipping fully loaded casks.")).

- *Yankee Atomic*, 73 Fed. Cl. at 257-58 (and citations therein).

58. DOE was obligated to accept spent fuel using the OFF mechanism, which ordered the pickup of the industry's spent fuel based on the date the spent fuel had been discharged from a reactor.

- PX 41, p. KRGWE002131 (Standard Contract).

- Tr. 1240:41-1241:23 (Shimon).

59. The Standard Contract indicated the manner in which WE would advise DOE of the spent fuel that it expected DOE to pick up from Point Beach beginning in 1998.

a. Beginning July 1, 1987, DOE was responsible for issuing an ACR on an annual basis. The ACR was issued for planning purposes only, and outlined DOE's planned rate for accepting SNF (i.e., how many MTUs DOE might pick up in a given year).

- PX 41, p. KRGWE002127 (Standard Contract).

- PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 138:22-141:4 (The ACR was included in the Standard Contract at the request of utilities and was only included for planning purposes.)).

- PX 1052 (Morgan Dep. Desig. 11/15/06 Tr. 87:6-90:21 (The ACRs were for planning purposes only.)).

b. Beginning April 1, 1991, DOE would issue an annual Acceptance Priority Ranking ("APR"). The APR would specify the order in which DOE would accept spent fuel from utilities based on the OFF principle. The APR was not binding.

- PX 41, p. KRGWE002127 (Standard Contract).

- PX 238 (1991 APR).

c. Beginning January 1, 1992, WE could submit Delivery Commitment Schedules ("DCSs"). The Standard Contract states:

> 1. . . . [T]he Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed

> schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

- PX 41, p. KRGWE002128 (Standard Contract).

- Tr. 5743:15-5744:24 (Zabransky) ("Q: So let me make sure I understand your understanding of this provision. Does this provision provide, if the utility submits the schedule that DOE disapproves, that DOE shall then advise the purchaser as the reasons for that disapproval and submit its own proposed schedule? A: That's what it says, yes. Q: And does it further provide, if the utility then disagrees with DOE's proposed schedule, that DOE and the utility shall negotiate a mutually acceptable schedule? A: That's what it says, yes. Q: And it doesn't say that DOE has the unilateral right to impose the schedule, correct? A: No, it doesn't.").

d. After receiving an approved DCS, the utility then could submit a Final Delivery Schedule ("FDS") not less than 12 months prior to the spent fuel delivery date specified in the FDS. In the FDS, the utility would state a specific date on which it desired DOE to pick up its spent fuel and had an option to adjust the SNF quantity by plus or minus 20 percent. If DOE disapproved the utility's requested pickup date, the parties would negotiate a mutually acceptable schedule. The Standard Contract provides:

> The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the

parties shall promptly seek to negotiate mutually acceptable schedule(s).

- PX 41, p. KRGWE002129 (Standard Contract).

## A. DOE'S POST-CONTRACT CONDUCT CONFIRMED THE PARTIES' UNDERSTANDING

60. After execution of the Standard Contract, DOE established the Office of Civilian Radioactive Waste Management ("OCRWM") to implement the NWPA and to carry out DOE's obligations under the Standard Contract.

- *Entergy Arkansas*, 2007 WL 3033659 at *4.

- PX 25 (Memorandum from Morgan (DOE) to NWPA Project Office Personnel re: Implementation of the Nuclear Waste Policy Act of 1982).

61. After execution of the Standard Contract, DOE's program documents confirmed DOE's understanding that, under the Standard Contract, DOE would have an operational facility in 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would eliminate the need for utilities to construct additional storage after 1998 and that would work off the accumulated backlog at a reasonable rate.

- PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 15:16-18; 69:14-70:22; 71:21-73:22 ("At the point I joined the program [in 1984], my understanding of [DOE's] intent was to work off the backlog.")).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 325:12-329:25 (The ramp-up acceptance rates were sufficient to prevent utilities from having to place spent fuel in dry storage.)).

- Tr. 5257:4-5259:1 (Kouts) (agreeing that DOE has used at least a 3000 MTU rate in its system requirements documents, financial planning documents, fee adequacy assessments, and program planning documents).

- PFF 49, 52.

a. DOE issued a Draft Mission Plan for the Civilian Radioactive Waste Program in December 1983, explaining that DOE would pick up SNF at a rate that would preclude the need for additional at-reactor storage after January 31, 1998:

> Every activity specified in the Mission Plan is targeted toward one fundamental objective: To accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately remove from at-reactor storage all waste that is more than 5 years old.

At that point DOE "[did] not intend to delay or postpone the acceptance of civilian radioactive waste even if a permanent geologic repository [was] not completed by 1998" in order to "ensure that all utilities will be able to establish firm planning schedules for the disposition of the radioactive waste sufficiently early to determine their onsite interim storage needs prior to 1998." The accepted rate in the draft Mission Plan ramped up to an annual rate of 3000 MTU after five years.

- PX 52, pp. 1-1, 2-1, 2-3 (Civilian Radioactive Waste Management Program Mission Plan, Vol. 1, Overview and Current Program Plans, Draft, Dec. 20, 1983) (also explaining that, after five years, the rate would be "equal to or greater than the actual discharge rate of spent fuel each year").

- PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 38:5-39:14; 43:7-44:11 (Morgan believed it was the intent of Congress that, beginning in 1998, utilities would not have to provide any additional storage facilities on-site. The 1983 Draft Mission Plan effectuated that intent of Congress as expressed in the NWPA.)).

- PX 1052 (Morgan Dep. Desig. 3/22/02 Tr. 221:18-21; 223:6-224:1; 225:19-24 (One of the criteria the DOE used in preparing the Draft Mission Plan was that generally no utility would have to provide on-site storage after January 1998.)).

- PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3683:20-3684:15 (The Mission Plan was the primary planning document for the program and DOE would not have put anything in the Mission Plan that was inconsistent

with the NWPA or that DOE did not feel was the proper way to accomplish the goals of the NWPA.)).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 134:19-135:5; 136:24-140:5; 166:13-169:2 (It was DOE's intent at the time it issued the Draft Mission Plan to pick up fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998. It also was DOE's intent to accept spent fuel at a rate equal to or greater than the aggregate industry discharge rate, such that no utility will or have to provide additional storage capacity after January 31, 1998.)).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 143:15-144:6; Roselli Dep. Desig. 4/16/02 Tr. 190:18-191:5 (The acceptance schedules in the 1983 Mission Plan reflected DOE's intentions.)).

b. At the December 1983 Proceedings of the Civilian Radioactive Waste Management Information Meeting, DOE indicated its intent and strategy that, beginning in 1998, utilities would *not* have to provide additional at-reactor storage:

> The basic strategy which we've outlined in the Mission Plan is that beginning in 1998 utilities will not have to provide any additional storage facilities onsite. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either onsite or at another location.

DX 493, p. SN069599. DOE also indicated, for the first time, that it would have an alternative plan to repository acceptance in 1998, that being a MRS.

- DX 493, pp. 11-12 (Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, Program Overview).

- PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3677:1-3680:20 (It was DOE's conclusion that it should take spent fuel from utilities at a rate such that no utility would have to add any storage after 1998 because that was the intent of Congress in the NWPA.)).

- PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/2002 Tr. 102:19-103:12; 104:25-105:6 (The program strategy expressed to utilities was that the utilities would not have to supply any additional storage facilities on-site.)).

- PX 1052 (Morgan Dep. Desig. 11/15/06 Tr. 33:6-34:4 (discussing Morgan's statements at the December 1983 proceedings) ("Q: Reading on in

the same paragraph . . . the text continues, 'The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on site.' A: Okay. Q: And you wrote that sentence, correct? A: Yes. Q: You were the acting director at the time? A: That's correct. Q: This reflects your view at the time; is that fair? A: That reflects what we were trying to accomplish in the mission plan. Q: Does it also reflect what you were trying to accomplish as the director of the program? A: Yes.")).

c. The December 1983 FY 1984 Guidance for Nuclear Waste Fund Evaluations stated that DOE would accept waste starting in 1998 at a rate sufficient to preclude additional at-reactor storage and thereafter at a rate greater than or equal to the utilities' SNF discharge rate.

- PX 50, enclosure at 2 (FY 1984 Program Guidance for NWF Evaluations).

d. In February 1984, Michael Lawrence, the Acting Director of the Nuclear Waste Policy Act Implementation Office, the precursor to OCRWM, testified before the House Subcommittee on Energy Conservation and Power that the "fundamental objective" of the NWPA was to accept SNF "beginning not later than January 31, 1998," and that "achieving [that] fundamental objective and implementing an appropriate waste acceptance schedule will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998 and, ultimately, remove all eligible waste from at-reactor storage."

- PX 58, p. 2 (Feb. 22, 1984 Statement of Michael J. Lawrence before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 154:8-19; 156:7-158:10 (As of February 1984, DOE believed that an appropriate waste acceptance schedule was one that would preclude the need for additional utility at-reactor storage after January 1998.)).

e. DOE issued an April 1984 Draft Mission Plan that set forth specific, quantitative acceptance rates that ramped up to an annual acceptance rate of 3000 MTU.

- PX 59, Table 2-2 (April 1984 Draft Mission Plan).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 206:6-208:15 (The 1984 Draft Mission Plan accurately reflected DOE's plans.)).

f. The one mill per kilowatt hour fee identified in DOE's July 1984, February 1985, and March 1986 fee adequacy reports were based on repositories that ramped up to 3000 MTU after five years of operation. DOE has mostly used a 3000 MTU rate for projecting total life cycle costs.

- PX 66 (July 1984 Nuclear Waste Fund Fee Adequacy: An Assessment).

- PX 76 (Feb. 1985 Nuclear Waste Fund Fee Adequacy: An Assessment).

- PX 96 (March 1986 Nuclear Waste Fund Fee Adequacy: An Assessment).

- PX 121, pp. 2-4 (April 27, 1984 Preliminary Analysis of Total System Life Cycle Cost ("TSLCC") of the Civilian High-Level Radioactive Waste Disposal Program, Final Draft).

- PX 84, pp. 2-3 (April 1985 Analysis of the TSLCC for the Civilian Radioactive Waste Management Program).

- PX 99, pp. 14, 22 (April 1986 Analysis of TSLCC of the Commercial High-Level Radioactive Waste Disposal Program, Vol. I).

- PX 544, p. 15 (Dec. 1998 Analysis of the TSLCC of the Civilian Radioactive Waste Management Program).

- PX 600, pp. 4-14 (May 2001 Analysis of the TSLCC of the Civilian Radioactive Waste Management Program).

- PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 97:9-100:3 (The 3000 MTU rates reflected DOE's plans at the time and were the basis for the one mill per kilowatt hour fee.)).

- PX 1052 (Milner Dep. Desig. 5/3/02 Tr. 570:1-571:9 (The May 2001 TSLCC report, which indicated an acceptance rate schedule ramping up to 3000 MTU per year in the fifth year of system operation, are the Department's current goals for waste acceptance.)).

- PX 1052 (Barrett Dep. Desig. 4/23/02 Tr. 337:10-15; 348:9-350:11 (The TSLCC and fee adequacy studies all used a 3000 MTU or greater steady-state rate, not a 900 MTU rate, including those issued in the 1990s. The rate to be used was important for determining the adequacy of fees assessed against utilities.)).

- PX 1052 (Klein RCFC 30(b)(6) Dep. Desig. 4/25/02 Tr. 351:6-354:16 (DOE uses the 3000 MTU rate for purposes of determining the adequacy of the Nuclear Waste Fund fee charged to utilities and in designing the facility at Yucca Mountain.)).

- PX 1052 (Morgan Dep. Desig. 3/22/02 Tr. 226:2-227:16 (The fee sufficiency analyses performed by DOE were based on the Mission Plan goal that DOE would accept waste at a rate sufficient that utilities would not have to provide additional storage after January 1998.)).

g. DOE issued a 1985 final Mission Plan that included an annual acceptance rate of 3000 MTU. The Mission Plan identified an FWMS objective of having DOE accept the utility's fuel before a utility ran out of pool storage capacity, which might force it to shut down.

- Tr. 1267:12-1268:12 (Shimon).

- PX 97 (1985 Mission Plan).

- PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 82:2-85:24 ("My personal opinion of [the DOE objectives on page 29] was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.")).

h. In fall 1996, senior DOE OCWRM personnel, Lake Barrett and Dan Dreyfus, advised WE that the acceptance rate that DOE would employ was going to be much higher than the 900 MTU annual acceptance rate published in the 1995 ACR. DOE told WE that, whenever DOE finally accepted spent fuel, it would pick

up spent fuel at a rate sufficient that WE would not need to worry about adding additional at-reactor storage after DOE began performing.

- Tr. 2543:8-2545:2 (Farron).

i. In July 2004, DOE issued an ACR that specified an acceptance rate that ramped up to 3000 MTU.

- PX 665 (July 2004 DOE, Acceptance Priority Ranking and Annual Capacity Report, DOE/RW-0567).

j. DOE's intention with respect to repository design receipt rates has stayed constant at 3000 MTU per year since the execution of the Standard Contract. DOE has not published any documents that indicate otherwise.

- PX 711 (May 2006 Civilian Radioactive Waste Management System Requirements Document, Rev. 07).

- PX 1046 (May 2007 Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document, Rev. 5).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 217:8-22; 232:7-16).

- PX 1052 (Milner Dep. Desig. 5/7/02 Tr. 623:2-10; 626:13-628:21; 711:1-712:9).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 261:7-268:5 (A 1990 draft Waste Management System Requirements Document, which was the predecessor to today's System Requirements Document, used a 3000 MTU acceptance rate after a five-year ramp-up.)).

- PX 1052 (Milner Trial Desig. *Yankee Atomic* Tr. 4741:11-4741:21; 4749:21-4750:6 (3000 is DOE's steady-state acceptance rate and DOE has never assumed any other design rate for the repository. The 3000 MTU rate is a reasonable rate.)).

62. The MRS, like the repository, was designed to receive 3000 MTU/year. It was never DOE's intent to operate an MRS at an annual rate less than 3000 MTU prior to the 1987 NWPA amendments.

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 51:9-52:22).

## B. WE'S POST-CONTRACT EXECUTION ACTIVITIES

63. After WE executed the Standard Contract, WE personnel monitored DOE's implementation of the Standard Contract and analyzed OCRWM program documents and, when possible, commented on program documents and encouraged DOE to meet its contractual obligations and perform in accordance with the intentions of the parties. Both Mr. Burstein and Mr. Shimon communicated to DOE WE's understanding that DOE would accept WE's SNF at a rate that would enable WE to avoid adding at-reactor storage after January 1998 and that would work off its backlog at a reasonable rate. Messrs. Shimon and Burstein shared that message through their input in industry groups, through speeches by Mr. Burstein and through correspondence with DOE. WE understood that DOE agreed that it would perform in that manner. DOE also provided written confirmation that it would perform in this manner through various planning documents and status reports.

- Tr. 1247:17-1252:22 (Shimon) (explaining Messrs. Burstein's and Shimon's involvement in industry groups and their communication to DOE that WE would hold firm on (1) the January 31, 1998 date for removal of SNF, (2) priority for the oldest fuel first, and (3) an acceptance rate that would preclude the need for additional at-reactor storage after January 31, 1998).

- Tr. 1254:4-1256:6 (Shimon) (discussing early DOE program documents).

- PFF 61, 66 (including subparagraphs).

64. Mr. Shimon hired David Zabransky in 1983, and supervised Mr. Zabransky's work activities until November 1990. Messrs. Shimon and Zabransky worked very closely together, and Mr. Zabransky took on some responsibilities in the industry groups under Mr. Shimon's supervision starting in approximately 1986. Messrs. Shimon and Zabransky kept each other apprised of developments in the industry groups.

- Tr. 1484:20-1485:10 (Shimon) (Mr. Shimon supervised Mr. Zabransky's work on the dry storage project until 1990.).

- Tr. 1219:14-18; 1327:15-1328:9 (Shimon) (Messrs. Shimon and Zabransky shared information regarding their activities and knew what each other were doing.).

- Tr. 2162:7-16 (Porter) ("[Dave Zabransky] worked under Mr. Shimon and performed the work as directed by Mr. Shimon during the time that I was there.").

65. By letter dated July 6, 1984, WE submitted comments in response to the 1984 Draft Mission Plan. The letter (1) endorsed the comments prepared by industry groups and (2) expressed WE's contention that DOE must accept SNF at a rate that would preclude the need for additional at-reactor storage after January 31, 1998. The letter was intended to indicate to DOE that, however it planned on performing, DOE must be prepared to accept SNF on a schedule and at a rate that would obviate the need for the utilities to construct additional storage after 1998. Mr. Shimon was involved in the drafting of this letter.

- PX 67, p. 1 (July 6, 1984 WE Letter to DOE).

- Tr. 1265:23-1266:11 (Shimon) ("[T]he essential requirement is that DOE firmly commit to employ whatever means are necessary to commence acceptance of spent fuel from utilities on or before the January 31, 1998 date. Now, the significance of that statement is that we may disagree on things like the rate of acceptance, but there should be no disagreement whatsoever on the date that needs to be met, the requirements after that date, and that we're relying on DOE to come up with an acceptance rate that will accomplish the objectives of the Nuclear Waste Policy Act and the standard contract.").

66. When WE executed the Standard Contract, WE understood that it would not need to add additional storage after January 31, 1998 because DOE planned to accept spent fuel under the OFF principal in the Standard Contract. The OFF requirement was of great importance to WE. Point Beach had some of the oldest fuel in the country – and still does – and WE knew that its fuel would be among the first to be picked up as part of the DOE waste acceptance program. WE had projected the planned Point Beach spent fuel pool discharges against the existing Point Beach spent fuel pool capacity and determined that WE would be able to store all of the planned discharges without additional on-site storage until DOE

commenced removal of SNF by January 31, 1998. Further, WE knew that WE would have sufficient storage after that date because DOE's acceptances in the early program years would exceed Point Beach's discharges.

> - Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage.").
>
> - Tr. 1243:2-25 (Shimon) (explaining WE's understanding of the Contract and that WE understood at execution that it would not have to add additional storage after January 31, 1998 if DOE timely performed).
>
> - Tr. 1245:7-1246:10 (Shimon) ("We were aware of the number of storage spaces that we had in the pool. We knew how many spaces were occupied, and we were able to project from our fuel cycles the number of spent fuel assemblies that would be discharged to the pool. Based upon all of those factors, the pool -- we were convinced that the pool capacity would not be exceeded by January 31, 1998. . . . The rate would be sufficient to preclude utilities from having to add additional spent fuel storage capacity after January 31, 1998 and would work off the backlog of spent fuel over a reasonable period of time. . . . Based upon all of the discussions we had with DOE at that time and pronouncements that they made, we believed that they were in agreement with us.").
>
> - Tr. 2173:3-15 (Porter) ("[W]e were among the first nuclear plants to operate and we had among the oldest fuel and that the policy was going to be to remove fuel on an oldest fuel first basis, that we would be early in the queue and that our needs would be met perhaps before those reactors that began operating after we did.").

67. The nuclear industry shared WE's understanding regarding DOE's acceptance rate obligations under the Standard Contract. Mr. Burstein discussed the industry's understanding of the contractual rate at the Atomic Industrial Forum in March 1985, explaining, "[o]ur desire is to have the receiving rate in 1998 at a level at least equivalent to the discharge rate. This receiving rate must be increased to allow all backlog material to be delivered within the first twenty years of the program."

- PX 81, p. 8 (May 14, 1985 comments by Sol Burstein, A Utility Perspective on DOE's Implementation of the NWPA).

- PX 1052 (Mills Trial Desig. *Yankee Atomic* Tr. 341:7-343:2; 345:9-346:7).

68. At the same 1985 Atomic Industrial Forum, WE expressed its increasing concern regarding whether DOE would timely perform in 1998. Mr. Burstein explained that the industry's "first imperative is to make absolutely certain that the federal government, in compliance with the Act and our individual contracts, begins to accept spent fuel no later than January 1, 1998." Mr. Burstein also noted with regard to the OCRWM program that the industry was "not totally satisfied with its efficiency to date, or with the fact that scheduled dates are being missed. Our on-site storage programs are based on the contractual promise we have with DOE that they will start taking spent fuel."

- PX 81, pp. 2, 8 (May 14, 1985 comments by Sol Burstein, A Utility Perspective on DOE's Implementation of the NWPA).

- Tr. 1278:14-1282:4 (Shimon).

## VI. BY THE END OF 1987, WE BECAME EXTREMELY CONCERNED WITH THE DOE'S IMPLEMENTATION OF THE NWPA

69. DOE's January 1987 Draft Mission Plan Amendment and June 1987 Mission Plan Amendment announced a five-year delay in the date for acceptance at a repository ("from 1998 to 2003") and indicated that DOE intended to begin performing in 1998 at an MRS. Despite the fact that DOE's only possibility of timely performance was now through an MRS facility, DOE nonetheless continued to project that it would ramp up to an annual acceptance rate of 3000 MTU.

- PX 109, p. 5 (Jan. 1987 DOE, Draft Mission Plan Amendment, DOE/RW-0128) (announcing delay).

- PX 124, pp. 6, 61 (June 1987 DOE Mission Plan Amendment) (announcing delay and showing table of acceptance rates showing 3000 MTU steady-state rate).

- Tr. 5266:11-5267:7 (Kouts).

70. DOE presented an MRS submission to Congress in March 1987, explaining that DOE planned to meet the January 1998 contract date with an MRS in Tennessee, not with a repository. DOE proposed that Congress *condition* DOE's ability to perform at an MRS by, among other things, limiting the storage capacity at the MRS site to 15000 MTU and precluding waste acceptance at the MRS facility until a construction authorization for the permanent repository is received from the NRC. The proposed MRS facility would have an annual acceptance rate of 3000 MTU at full operation.

- PX 115, p. iii (March 1987 DOE Monitored Retrievable Storage Submission to Congress, Vol. I: The Proposal).

- PX 1003 (March 1987 DOE Monitored Retrievable Storage Submission to Congress, Vol. III: Monitored Retrievable Storage Program Plan).

- Tr. 5266:6-10 (Kouts) ("Q: And, again, as DOE proposed it to Congress, the MRS was to have a throughput rate of close to 3000 MTU annually at full operation, correct? A: That's correct.").

71. Potential volunteer MRS sites had requested that DOE include the linkages in proposed legislation authorizing an MRS.

- PX 1052 (Milner Dep. Desig. Tr. 5/3/2002 554:5-555:12 ("Certainly the DOE was the entity that requested Congress, my recollection of the origin of those linkages were at the time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.")).

- PX 1052 (Barrett Dep. Desig. Tr. 4/23/2002 401:4-403:14 (The linkages were a pure policy request and not based on any technical reasons. Congress had a "strong view" about the linkages. "There is no technical reason for the linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.")).

72. By April 1987, the industry knew that the only way for DOE to perform in 1998 was with an MRS.

- PX 118 (April 3, 1987 Letter from EEI to DOE re: Draft Mission Plan Amendment).

- Tr. 1284:10-1286:13 (Shimon) (WE understood from the January 1987 Draft Mission Plan Amendment that DOE could not perform in 1998 unless it performed with an MRS.).

- Tr. 5802:17-5804:5 (Zabransky) ("A: Yes. 'Now, the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation.' Q: And was that the industry understanding as of April 1987 regarding the DOE program to accept spent nuclear fuel? A: Yes, I believe so.").

73. In June 1987, DOE issued the 1987 ACR, announcing that DOE would not have an operational repository until 2003. DOE continued to project that it would ramp up to an annual acceptance rate of 3000 MTU despite (1) projecting delayed performance at a repository, (2) only projecting timely performance through an MRS facility, and (3) having proposed to Congress in March 1987 that the MRS facility be limited in its acceptance capacity.

- PX 123, p. v (1987 ACR) (noting that repository operations are expected to begin in 2003), p. 7 (acceptance rate schedule using the June 1987 Mission Plan Amendment as its source).

- PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/02 Tr. 117:3-119:4 ("Q: And when we were talking about the 1987 ACR, I believe you testified that one of the objectives in the acceptance rates that were put in that particular document was to cover the discharge or encompass the discharge rate of utilities; is that right? A: Yes. . . . Q: In using these acceptance rates in this particular document, was a concern or an objective of the acceptance rates herein to meet the needs of utilities to avoid additional on-site storage? A: At what point in time? Q: At the point in time this document was issued. A: I believe so. Q: And that would be consistent with what you said one of the objectives was of the 1987 ACR? A: I believe so.")).

- Tr. 5080:24-5083:20 (Brownstein).

74. WE was aware of and reviewed (1) the 1987 Draft Mission Plan Amendment, (2) the March 1987 DOE MRS Submission to Congress, (3) the 1987 ACR, and (4) the 1987 Mission Plan Amendment.

- Tr. 1284:10-21; 1295:17-1296:20; 1429:13-21 (Shimon).

75. In 1987, Mr. Burstein repeatedly expressed to the Government the industry's and WE's concerns regarding the likelihood of DOE performing its obligations under the Standard Contract in 1998. Mr. Burstein also informed senior WE management of his concerns.

a. In March 1987, on behalf of EEI, the American Nuclear Energy Council, UNWMG, EUCNTG, and the Atomic Industrial Forum, Mr. Burstein testified before a House Subcommittee, expressing concern over "the current state of affairs surrounding the NWPA implementation." Mr. Burstein testified that DOE's projected delay was causing the utilities to plan to provide at-reactor SNF storage for longer than expected:

> [T]he utility industry will be faced with providing spent fuel storage at reactor sites for a longer period than originally anticipated. A number of utilities have developed, or are developing, on-site storage alternatives against the day that the spent fuel storage capacity originally built into the reactor plans proves to be insufficient.

PX 116, p. 5. Mr. Burstein further explained that DOE performance in 1998 was critical because, in planning for their on-site storage capacity, utilities had to "take into account the DOE schedule for operation of the high-level radioactive waste disposal system."

- PX 116, pp. 3, 5, 7 (March 19, 1987 Statement of Sol Burstein before the Subcommittee on Energy Research and Development Committee on Science, Space and Technology, U.S. House of Representatives).

b. In July 1987, on behalf of EEI, Mr. Burstein testified before a House Committee that:

> Congress should not link use of the MRS to receipt of a first repository construction authorization. Doing so would make the start-up of the MRS less certain, because it would await not only its own licensing, but also that of the first repository before it can be used. While the MRS would retain much of its strategic value to the disposal system with the linkage, it will not be as useful. Furthermore, the linkage will not convince the MRS host state that the MRS will not be de facto spent fuel resting place. Only an on-going repository program can provide that assurance. Congress should both authorize the MRS and create the conditions that will convince the MRS host state that the spent fuel will not remain at the MRS; S. 1481 provides a mechanism to achieve these dual goals.
>
> - PX 134, p. 3 (July 1, 1987 Testimony of Sol Burstein before the Committee on Energy and Natural Resources, U.S. Senate).

c. Also in July 1987, Mr. Burstein sent a memorandum to senior WE executives explaining that there were extremely serious problems with DOE's waste acceptance program:

> It has also been reported that Representative Udall has characterized the present DOE implementation of the Nuclear Waste Policy Act ("NWPA") as a shambles and said he has reluctantly concluded it was necessary to go back to square one.
>
> * * *
>
> In the light of these activities, it seems more and more evident that actions by the Congress itself are delaying implementation of the NWPA and will make it impossible for DOE to have a repository of any type available for receipt of utilities' spent nuclear fuel in 1998. These actions may, therefore, violate the specific contracts between DOE and utilities and certainly are in conflict with the original NWPA provisions.
>
> - PX 132 (July 6, 1987 Memo from Burstein re: Nuclear Waste Fund Appropriations).

76. In December 1987, Congress passed the Nuclear Waste Policy Amendments Act ("NWPA Amendments"), which authorized the use of an MRS, but imposed more stringent linkages than those advocated by DOE. First, Congress precluded construction of the MRS until (1) DOE received a construction license for the repository and (2) the Secretary of Energy recommended approval of a repository site to the President. Second, Congress limited the SNF quantity that an MRS could accept to 10,000 MTU until the permanent repository became operational. Without a change in these linkages to the progress of the repository, the DOE would not be able to have an MRS in operation by January 31, 1998. The NWPA Amendments also established the Office of the Nuclear Waste Negotiator, which was to assist DOE in obtaining either an MRS site or a repository site and to develop a negotiated agreement with the locality and the state associated with either of those facilities. A Negotiator was not appointed until approximately four years after the passage of the NWPA Amendments. DOE never initiated its own activities to site an MRS facility.

- Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001–5065, 101 Stat. 1330, 1330-227 to -255 (1987) (codified in scattered sections of 42 U.S.C. §§ 10101–10270).

- Tr. 5215:8-5216:19; 5268:9-5269:24; 5286:15-25; 5287:1-24 (Kouts).

- PX 1052 (Barrett Dep. Desig. 4/23/02 Tr. 453:1-455:9; 489:22-491:22 ("[DOE] could not have received waste in 1998 unless [Congress] changed the linkages." As of the passage of the NWPA Amendments, DOE could not perform prior to October 2006 without a change in the linkages.)).

- Tr. 1304:17-1305:7 (Shimon) ("Q. What did [the NWPA Amendment] authorize with regard to the MRS? A. It authorized construction of a monitored retrievable storage facility. I believe the limit on capacity was 10,000 metric tons, rather than the 15,000 proposed by DOE, and it was linked -- construction of the MRS was, despite our objections, linked to the receipt of a construction permit for the – a construction authorization for the repository. It also required, since I don't have the document in front of me, I'm going on memory, I believe that it required that there be a volunteer host for

the MRS facility and that there would be a nuclear waste negotiator attempting to find that volunteer.").

- Tr. 626:8-22 (Zabransky) (identifying the linkages imposed by the NWPA Amendments).

- *Southern Nuclear*, 77 Fed. Cl. at 414-16.

77. Both DOE and WE understood that the MRS constraints imposed by Congress made it extremely unlikely that the MRS or any other DOE facility would be available in 1998 to begin accepting spent fuel.

- Tr. 1284:10-1286:13 (Shimon).

- Tr. 1287:14-1295:15 (Shimon) (Based on his discussions with Mr. Burstein and other members of the Nuclear Power Department and his review of contemporaneous DOE publications, Mr. Shimon understood in mid-1987 that there was a "uniform understanding" among those at WE who were responsible for or interested in the storage programs at Point Beach that DOE would not be able to perform by January 31, 1998).

- Tr. 1305:8-17 (Shimon) ("Q. And focusing on the linkages on the MRS facility [in the NWPA Amendment], what was the significance of that development to Wisconsin Electric? A. We had expressed our concerns that that would make the MRS little comfort to us in being able to count on having our spent fuel removed in 1998. With that linkage, we couldn't come up with a scenario that would enable DOE to have that facility available in 1998.").

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 247:24-248:5; 248:23-249:2; 250:4-251:13 (The NWPA Amendments linkages made it impossible for DOE to begin accepting fuel in 1998.)).

- Tr. 621:8-625:21 (Zabransky) ("Q: And do you recall the issuance of this [1987 ACR]? A: I do. . . . Q: Okay. Fair enough. Let me just ask you, from your own knowledge, at that period of time, again, while you were working at Wisconsin Electric, at this period of time, was there any way DOE was going to have an operational repository in place and operating by 1998? A: No, I don't believe that's the case any more. I don't believe that was the case at that point in time.").

- Tr. 628:15-25 (Zabransky) ("Q: Based on the statute, would simply finding a volunteer site make those linkages in the amendments go away? A: In the statute itself, the answer would be no. Q: Thank you. I think you've

answered my question. So these linkages did raise questions as to DOE's ability to begin accepting spent fuel by any means in 1998, isn't that correct? A: That's correct.").

## VII. BY 1988, WE'S CONCERN WITH DOE'S LACK OF PERFORMANCE HAD INCREASED, AND WE BEGAN INVESTIGATING LONG-TERM SNF STORAGE PLANNING

78. By 1988, WE began considering a variety of SNF management options, including constructing an additional spent fuel pool, consolidating fuel rods, and using dry storage (including both horizontal and vertical storage systems). WE believed that existing dry storage concepts were well conceived but that the casks were extremely expensive. Therefore, WE was interested in finding equally safe but less expensive alternatives.

- Tr. 1328:19-1329:16 (Shimon) (explaining WE's response to growing concerns over DOE performance, WE's investigation of spent fuel storage alternatives being used at other nuclear plants, and WE's interest in pursuing a more economical cask alternative).

- Tr. 1597:8-1599:1 (Krieser) (discussing the portion of the PSCW application (PX 236) in which WE recounted the various alternatives to dry fuel storage that it had considered before deciding to proceed with dry fuel storage).

79. In May 1988, WE accepted Sierra Nuclear's invitation to participate in a Joint Research, Development and Demonstration ("RD&D") program with Sierra Nuclear, DOE and EPRI for a prototype concrete SNF storage cask, the VSC-17. WE was interested because the program would test a new, more economic storage technology.

- PX 145, pp. WISC00061014-61015 (Memo from Bratcher to Fay, et. al re: RD&D Project Authorization – Spent Fuel Storage).

- Tr. 1329:17-1331:8 (Shimon) (explaining the development of the development program for the VSC-17 and WE's interest in the potentially less expensive cask system).

- Tr. 971:6-972:21 (Zabransky) ("Q: And you mentioned an R&D program. Did Wisconsin Electric participate in a demonstration program at some point? A: Yes, I believe – I'm not exactly sure of the year, whether it was '87 or '88, the Department of Energy was looking for cooperative

agreements to develop additional storage technologies, and we were approached by a company which, at that time, was called – I think it might have Reading Associates at that time. In essence, . . . it was cold call, I got a call one day from Dr. John Massey asking if we would be interested in considering a research and development program, a cooperative agreement with that company, the Department of Energy and the Electric Power Research Institute. Q: And why would Mr. Massey have called you specifically, if you know? A: Again, . . . my name would have been out there from my work with the industry groups. I don't know where he got my name though at that point.").

a. WE's senior management authorized the RD&D project in May 1988 to:

> [D]esign, build, test, and document a new and innovative dry eradiated fuel storage system, the Ventilated Storage Cask (VSC). Preliminary estimates suggest[ed] annual savings of approximately $2 million vs. [sic] existing available technology for spent fuel storage. WE [was to] co-fund this work along with EPRI ($200,000), DOE ($400,000) and Sierra Nuclear ($400,000). Products of [the] research [was to] include a VSC delivered to DOE, a NRC licensed application for Point Beach, a generic topical report and technical reports. In addition, WE [was to] be granted a royalty-free license for cask construction.

- PX 145, p. WISC00061015 (May 6, 1988 Memo from Bratcher to Fay, et. al re: RD&D Project Authorization - Spent Fuel Storage).

b. In WE's internal RD&D funding request, WE stated that as of 1988, the earliest that DOE could be expected to perform was 2003, and that WE had to plan to provide SNF storage through at least 2003:

> The current DOE schedule calls for limited operation at the first repository in 2003. Although an MRS has been authorized, its operation is prohibited until the issuance of a NRC construction permit for the repository. The DOE schedule is optimistic and risky, as no backup sites are currently being pursued. At this time, Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent nuclear fuel through at least 2003.

- PX 145 (May 1988 RD&D project authorization for VSC-17 cask).

- Tr. 1331:21-1333:2 (Shimon) ("Q. And what was your understanding regarding when DOE might perform under the standard contract [when the RD&D authorization was approved]? A. My belief at that time was that it would not be before 2003. Q. Did anyone who was involved in this issue express any contrary views on that issue? A. I am not aware of any contrary views.").

- Tr. 635:5-636:21 (Zabransky) ("Q: So this project proposal that you drafted in 1988 is already recognizing that Wisconsin Electric has severe doubts regarding DOE's performance in 1998 and is planning the storage until at least 2003, is that correct? [objections omitted] A: And I think the document says what it says, this is for an R&D project, and at that time, yes, it was saying, we shall plan on storage until 2003. Q: And it is doing so because of risks in DOE's performance, correct? A: That's what this document says, yes.").

- Tr. 1167:14-1169:25 (Zabransky) ("Q: And the 2003 date is selected because that's the earliest date that in this proposal you wrote, DOE could be expected to perform, isn't that correct? A: As of 1988, our thinking was that, yes.").

c. The VSC-17 RD&D program was successful, and the demonstration cask was the forerunner of the dry storage cask that WE later used at Point Beach, the VSC-24.

- Tr. 1333:3-1334:4 (Shimon) (explaining that the RD&D program successfully established the reliability of the computer codes that would permit the VSC cask to be licensed for commercial use).

80. Dry fuel storage was not the only spent fuel management alternative that WE considered at that time. WE, however, believed that the risk of an extended delay in DOE's performance called for a modular storage design that would allow WE to store all the spent fuel that would be generated at WE through the end of the reactor's then-licensed lives of 2010 and 2013. Therefore, WE believed that pursuing the dry storage option was the most feasible. WE's 1988 RD&D project proposal addressed the number of assemblies that PBNP would need to store through the end of the reactor licenses.

- PX 145, p. WISC00061023 (May 6, 1988 Internal WE memo re: RD&D Project Authorization) ("[T]hrough the end of the current operating license, a total of 980 additional storage spaces will be required . . .").

- Tr. 1328:24-1329:3 (Shimon) ("By 1987, our skepticism [in DOE's timely performance] had pretty much turned to disbelief with respect to having our fuel removed in 1998, and Dave initiated a study of the alternative technologies that were being used successfully at other sites.").

- Tr. 1170:1-19 (Zabransky) ("Q: . . . Now, you see the discussion in the first sentence about providing storage capacity for the potential life of the reactor, do you see that? A: Yes. Q: And is one of the reasons why this proposal is discussing the possibility of having storage through the remainder of the then current NRC licenses of units one and two because of a concern there might be a substantial delay in DOE's performance? A: I think I addressed it earlier today there could have been a delay and there could have been an interruption.").

- Tr. 975:15-20 (Zabransky) ("Q: So is it your understanding that, as of April 1988, that one of the objectives at Wisconsin Electric was to implement dry fuel storage? A: Well, that was one of the considerations at that point in time, yes.").

81. In June 1988, DOE issued the Draft 1988 Mission Plan Amendment, which stated: "under current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003." The acceptance rate chart in the document showed the earliest program acceptance, at either an MRS or a repository, in 2003.

- PX 150, pp. 18-19 (including Table 2-2) (Draft 1988 Mission Plan Amendment).

- PX 1052 (Milner Dep. Desig. 5/7/2002 *Yankee* Tr. 17:5-18:25 ("Q: . . . In the bottom paragraph it says: The DOE recognizes that under current conditions waste acceptance a[t] a waste management facility cannot begin in 1998. Furthermore the delay in repository schedule and the linkages between the schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste

significantly before 2003. Do you agree that this accurately describes DOE's beliefs at the time of June 1988? [objection omitted] A: I believe it does, at least the department's opinions given the linkages. Q: And . . . would it be fair for a purchaser to read that to assume that the department is not going [to] make the 1998 date and is unlikely to start accepting waste significantly before 2003? [objection omitted] A: Well, I think to me this would indicate that the department was being candid in terms of its views of a schedule at that point in time. How the purchasers would interpret that, I can't say. Q: And in "candid," you mean you're giving them a frank opinion that . . . they cannot begin in 1998 and it's unlikely to begin much before 2003? [objection omitted] A: Yeah, I believe so.")).

- PX 1052 (Milner Dep. Desig. 5/7/2002 *Yankee* Tr. 14:11-15:13 (At the time the 1988 Mission Plan Amendment was issued, DOE estimated that the MRS would come online at approximately the same time as the repository would be ready in 2003.)).

82. In the June 1988 ACR, DOE acknowledged that:

> [U]nder current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule first noted in the *OCRWM Mission Plan Amendment* published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (the Amendments Act) make it unlikely that DOE will be able to start accepting spent nuclear fuel significantly before 2003.

PX 149, p. 4 (1988 ACR) (Footnotes omitted, Emphasis in original). Despite the linkages in the NWPA Amendments (including capacity limitations on an MRS facility), DOE continued to project an annual acceptance rate of 3000 MTU.

- PX 149, p. 5 (including Table 2.1) (1988 ACR).

- Tr. 5086:4-5087:13 (Brownstein).

83. After DOE published the Draft 1988 Mission Plan Amendment and the 1988 ACR, WE believed that neither an MRS nor a repository would be available prior to 2003 and that DOE "would not be able to meet the 1998 date."

- Tr. 1306:3-1308:14 (Shimon) ("[The 1988 Draft Mission Plan Amendment] was a confirmation that DOE agreed with our concerns that,

given the slippage in the repository schedule and the linkages placed on the MRS, that they would not be able to meet the 1998 date. . . . [The document was] actually showing pickups in 2003 for both the MRS facility and the first repository, in the same year.").

- PX 156 (Aug. 26, 1988 Letter from Fay to Kay (DOE) re: 1988 Draft Mission Plan Amendment (53 Fed. Reg. 22482)) (Adopting EEI's comments on DOE's 1988 Draft Mission Plan Amendment, WE also noted that, despite DOE's announced delays, it was imperative that DOE commence acceptance of SNF by January 31, 1998.).

- Tr. 629:24-631:17 (Zabransky) ("Q: When you were at Wisconsin Electric, was this a publication that Wisconsin Electric followed and reviewed when it was issued? A: Yes, we looked at this, and I'm sure we looked at it, yeah. Q: And did you, yourself, look at it? A: I'm sure I did, yes. Q: And was your understanding of this ACR that DOE was unlikely to begin accepting spent fuel significantly before 2003 at any sort of facility? A: I think that the sentences you read accurately portray what DOE thought at that time and what they led us to believe, yes.").

84. As a publicly traded company whose securities are registered on a national securities exchange, WE's parent company, WEC, is required to file an annual report with the SEC. WE took the utmost care to accurately represent the facts regarding WE in the 10-K forms.

- Tr. 4530:2-4533:23; 4536:14-4540:4 (Metcalfe).

- Post-Trial Brief, Section V.B.5., pp. 25-28.

85. WE explained in its 1988 Form 10-K that it was considering spent fuel storage and management options *because of DOE's delay*:

> [I]n June 1988 the DOE reported that it would not be able to accept utility spent fuel for disposal before 2003. Wisconsin Electric is reviewing the options, including advanced technologies for on-site storage and the availability of away-from-reactor storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal.

- PX 801, p. KRGWE000182 (Kenrich Binder J: Historical Financial Information).

## VIII. IN 1989, WE IDENTIFIED DRY STORAGE OF SNF AS THE MOST COST-EFFECTIVE AND FLEXIBLE POTENTIAL SOLUTION TO THE LONG-TERM UNCERTAINTY OF DOE'S PERFORMANCE

86. DOE did not issue an ACR in 1989 because the waste acceptance program was being reassessed. Nevertheless, based on a draft ACR prepared that year and the testimony of DOE witnesses, it is clear that DOE understood in 1989, almost two years after the passage of the NWPA Amendments, that the conditions imposed by the NWPA Amendments made it unlikely that DOE would be able to start accepting SNF significantly before 2003 and that the delay in the planned start of any facility's operations "will increase the Purchasers' need for at-reactor storage." In recognition of the anticipated costs to Purchasers, DOE was evaluating the costs and impacts of its delay and exploring whether the Nuclear Waste Fund could be used to reimburse these utility costs.

- PX 195 (Apr. 27, 1990 Letter from Rueter (DOE) to Fay (WE) re: non-issuance of ACR for 1989).

- PX 175, pp. 4, 6-7 (1989 Draft ACR) ("DOE is conducting an evaluation of the impacts of dry cask storage of SNF at reactor sites. The study is to consider the costs, the impacts on health, the environment and transportation, and the extent to which Nuclear Waste Fund monies can and should be used to support at-reactor dry cask storage. A summary of the study results and any subsequent actions by the Congress will be reported, as appropriate, [*** add Do we have anything to report yet? ***] in the ACR when available." (bracketed note in original)).

- Tr. 5094:13-5097:15 (Brownstein) (admitting that the conditions imposed on the siting and the construction of an MRS facility were still in place at the time PX 175 was prepared, and such conditions made it unlikely that DOE would be able to start accepting SNF significantly before 2003).

- Tr. 5204:17-5205:3 (Kouts) ("When Secretary Watkins – Admiral Watkins became Secretary of Energy, earlier in this same year, he committed to undertake independent review, if you will, overall implementation of the program, and this review was picked up by Congress and actually requested by Congress in the Appropriations Act of 1990. And this report was

submitted to Congress in fulfillment of the completion of the Secretary's independent review and also that request from Congress.").

87. In May 1989, WE began to pursue the dry storage project as a flexible long-term solution to DOE's failure to timely perform. WE personnel understood that performance at an MRS facility in 1998 was extremely unlikely and that performance at a repository was definitely delayed until at least 2003. Through a Work Order Requisition ("Requisition"), the WE Major Projects Review Committee authorized the dry storage project because of DOE's delayed performance. The Requisition stated that the design basis was intended to provide sufficient additional spent fuel storage to last the life of the then-current operating licenses, noting that WE would require 45 VSC-24 casks to store this spent fuel.

- PX 171 (May 3, 1989 Memo from Fay to Britt and McNeer) ("We are not certain when this service will be provided. DOE has announced a schedule that calls for the operation of a repository in 2003.").

- PX 170, p. 2 (WE, Project Requisition Summary, Budget Item 840330, Additional Spent Fuel Storage).

- Tr. 2175:2-2176:2 (Porter) ("Q. Did the nuclear power department settle on an option? A. They ultimately did and recommended to the management of the company that the option of constructing an on-site storage facility using dry casks would be the preferred method of dealing with the delay in the DOE program and their inability to take the fuel in 1998, as we understood it to be at that time. Q. Did the company approve that option? A. It did.").

- Tr. 1334:5-1339:1 (Shimon) (explaining (1) the scope of the Requisition; (2) his supervisory role in the preparation of the Requisition; and (3) his understanding – to which no one, including Mr. Zabransky, expressed a contrary understanding – that WE was pursuing dry storage because DOE was not expected to perform before 2003).

- Tr. 2806:20-2807:4 (Conry) (There was very little chance, if any, that DOE would be able to begin removal of spent fuel by 1998.).

- Tr. 637:5-640:1 (Zabransky) ("Q: . . . This request to set up this project was based on a schedule where Point Beach did not expect DOE to

begin performing until 2003? A: Well, again, as the memo says, that was the presumption at the time . . .").

- Tr. 1170:20-1174:17 (Zabransky) ("Q: And I don't see on these two pages shorter term solutions such that it would last for a couple of years, do you disagree with me on that? A: No, you don't. Q: So those weren't being listed as alternatives that were being considered in this 1989 memo, correct? A: In that timeframe, the company didn't want to consider options that wouldn't allow for continued plant operation for its lifetime.").

- Tr. 1175:2-8 (Zabransky) ("Q: . . . At the time of this May 1989 memorandum, what was your understanding on the likelihood that DOE was going to be able to perform by 1998? A: And again, I think the memorandum talks to that point, that it doesn't look likely it would be before 2003.").

- Tr. 1179:15-1180:12 (Zabransky) ("Q: So isn't Wisconsin saying here that one of the reasons why the ISFSI is the selection that is being made as to the course to pursue is because of the uncertainties regarding the development and operation of the Federal Waste Management System? A: That's what we said earlier, the development, from the beginning and the operation over time, of the Federal Waste Management System.").

88. WE personnel understood that WE was pursuing dry storage *because of* DOE's delayed performance. For example, Mr. Shimon's understanding, which he believed Mr. Zabransky shared, was that WE was developing the dry storage project because DOE would not perform in 1998.

- Tr. 1337:1-1339:1 (Shimon) ("Q. What was your understanding of why Wisconsin Electric was discussing ISFSI and 45 casks? A. The first part of it was we didn't have capacity for storage beyond 1998. DOE was not coming, so the first increment was to get us to 2003, the second increment was to get us to the end of life of the plant, in the event that DOE never showed up. Q. One moment. And did the people that you work with, anybody, express any contrary understandings of why Wisconsin Electric was pursuing this dry storage project? A. No. Q. And specifically, what was your understanding of the views of Mr. David Zabransky on this issue? . . . A. It was my understanding, in 1989, that Dave also believed that DOE was not coming until at least 2003. Q. And what was his understanding regarding why Wisconsin Electric was pursuing dry storage? A. Because DOE would not be there in 1998.").

- Tr. 2807:6-2808:8 (Conry) (Mr. Farron's understanding was that Mr. Zabransky indicated that WE was doing the dry storage project because the pool at PBNP was going to be full by approximately 1998 and DOE was not on schedule to take fuel away from PBNP.).

- Tr. 1170:20-1174:17 (Zabransky) ("Q: And I don't see on these two pages shorter term solutions such that it would last for a couple of years, do you disagree with me on that? A: No, you don't. Q: So those weren't being listed as alternatives that were being considered in this 1989 memo, correct? A: In that timeframe, the company didn't want to consider options that wouldn't allow for continued plant operation for its lifetime.").

- Tr. 1175:2-8 (Zabransky) ("Q: . . . At the time of this May 1989 memorandum, what was your understanding on the likelihood that DOE was going to be able to perform by 1998? A: And again, I think the memorandum talks to that point, that it doesn't look likely it would be before 2003.").

89. In addition to planning internally for DOE's nonperformance, Mr. Shimon spoke publicly regarding the utilities' perspective on DOE's delay. In July 1989, Mr. Shimon, then-chairman of the UWASTE Transportation Working Group, made a presentation to the Transportation Coordination Group on behalf of nuclear utilities, expressing their view that (1) it was optimistic to assume a permanent repository would be in operation by 2003, and (2) an MRS was only a possibility that required resolution of a number of significant issues.

- PX 178, pp. 2-3 (July 1989 Statement by Shimon at Transportation Coordination Group Meeting) ("The latest schedule we have seen for OCRWM's transportation activities shows the first shipment of spent fuel to a repository *or to monitored retrievable storage* beginning in 2003. It is generally considered optimistic to assume that a repository will begin operation by that date. With regard to monitored retrievable storage, there is the possibility that a federal facility could be operational earlier than 2003 if a host state were supportive of the project and shipments were not constrained by current linkages to the repository schedule. However, many issues must be resolved before a firm planning base for an MRS facility can be established." (Emphasis added)).

- PX 185, pp. 6-7 (Nov. 29, 1989 Letter from Kouts with minutes of the Transportation Coordination Group meeting in Chicago).

- Tr. 1311:8-1313:10 (Shimon).

90. In its November 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program, DOE announced that its performance would be delayed from 2003 until 2010. Thus, a little over six years into the program, the repository was already 12 years behind schedule. DOE also recognized that unless the conditions in the NWPA Amendments were lifted, performance in 1998 at an MRS facility would be impossible because, with the projected operation of the repository being extended to 2010, construction authorization for the repository – a necessary condition to have authority to construct the MRS – was not expected until 2007, or at the earliest 2005-06. DOE further acknowledged that *even if* the statutory linkages were modified, a DOE-directed MRS would not be expected to start operations until 2002.

- PX 183, pp. ix-x (Nov. 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program) ("However, a detailed examination of the repository schedule, allowing the time necessary for sound scientific investigation and design, shows that the DOE cannot meet the anticipated schedule set forth in the Act for the disposal of waste in a repository by 1998; furthermore, the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository."), p. 12 (noting that *even if* the statutory linkages are modified, a DOE-directed MRS would be estimated to start operations in 2002) ("If a site cannot be obtained through the Negotiator but is selected through a DOE-directed siting process and the current statutory linkages are modified, it is estimated that about 2 more years would be added, with the basic MRS facility starting operations in 2002. If the current statutory linkages to the repository are maintained, an additional delay of 5 years would result, with startup estimated at 2007 for the basic MRS facility.").

- PX 183, pp. iii, vii-x, 8-12 (Nov. 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program).

- Tr. 5206:16-5209:10 (Kouts) ("And what that effectively meant was, assuming that the repository schedule was then in 2010, that the construction authorization would not be until somewhere around 2005, 2006, and therefore, we could not begin constructing the MRS facility until 2005 or 2006, which

was essentially seven or eight years beyond the 1998 requirement of the contracts.").

- Tr. 5281:5-5282:18 (Kouts).

- PX 1052 (Milner Dep. Desig. 5/7/2002 *Yankee* Tr. 19:5-20:16 (In November 1989, it was DOE's position that a repository would not be available until 2010, and that with the current statutory linkages, a basic MRS facility could not start until 2007.)).

- Tr. 5031:22-5032:4 (Brownstein) ("Q: Now, as of this timeframe, that is the 1990 timeframe, what was your understanding as to when DOE expected that it could receive a construction authorization? A: I believe, at that time, the schedule for operation of the repository was 2010, so a construction authorization would have been at 2007.").

- PX 205, p. 14 (Nov. 1990, DOE Comment Response Document to Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program) ("Linkages between the repository and MRS schedules in the NWPA, as amended, would make it impossible for the DOE to accept waste at an MRS facility by 1998, given the revised schedule presented in the Report. . . . The DOE considers the MRS facility to be an integral part of the total waste management system, not a separate facility that could replace the repository.").

91. The NWPA Amendments called for the creation of a commission to report on the need for an MRS. In November 1989, the MRS Commission issued its report, concluding that, because MRS construction could not begin until the NRC issued a license for construction of the repository, it would be impossible for an MRS to be operational more than three years before the repository.

- PX 181, p. xvi (Nov. 1989 Monitored Retrievable Storage Commission, Nuclear Waste: Is There a Need for Federal Interim Storage?).

- Tr. 5275:24-5277:5 (Kouts).

92. WE's 1989 10-K form stated that WE was considering dry storage of spent fuel because of DOE's inability to accept spent fuel for disposal before 2010:

> [I]n November 1989 the DOE reported that it would not be able to accept utility spent fuel for disposal at a repository

before 2010. Wisconsin Electric is reviewing the options, including advanced technologies for on-site storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal.

- PX 801, pp. KRGWE000192-93 (Kenrich Binder J: Historical Financial Information).

## IX. WE CONTINUED TO PURSUE DRY STORAGE IN 1990 BECAUSE OF DOE'S LACK OF PROGRESS

93. In November 1990, Mr. Shimon spoke at a meeting of the Midwestern High-Level Radioactive Waste Committee and identified the reason why WE and other utilities were developing dry fuel storage: "This undertaking is a necessary response to the lack of progress in the waste disposal program."

- PX 208, p. 6 (Nov. 15, 1990 Midwestern High-Level Radioactive Waste Committee – Summary of Proceedings).

- Tr. 1321:25-1322:18 (Shimon) ("Q. What did you mean by indicating that this was a necessary response to the lack of progress in the waste disposal program? A. It became necessary to provide for additional spent fuel storage when we believed that DOE would no longer be able to remove our spent fuel beginning in 1998.").

- Tr. 1320:10-23 (Shimon) (explaining that PX 208 was a summary of the Midwestern High-Level Radioactive Waste Committee Meeting, at which he was a speaker).

94. In November 1990, Mr. Shimon also spoke before the Nuclear Waste Technical Review Board and again indicated that DOE's delays were causing utilities to incur additional SNF storage and management costs:

> The interrelationship between DOE/OCRWM's transportation program and the utilities' at-reactor storage plans is another issue that plays an important role in our current position on the CSDP. This issue is becoming increasingly important in light of the repeated delays in the projected schedule for implementation of the NWPA program. *Because of these delays, utilities are being forced to resort to interim actions to expand at-reactor storage capacity, employing such options as*

> *rod consolidation, reracking, transshipment, or at-reactor dry storage*. The particular storage technology choices made by the utilities will ultimately play a significant role in determining the efficiency of spent fuel handling and transfer operations when OCRWM removes spent fuel from the utilities' sites.

- PX 209, p. 2 (Nov. 19, 1990 Statement of Shimon to Nuclear Waste Technical Review Board) (Emphasis added).

- Tr. 1322:19-1323:7; 1323:25-1325:10 (Shimon).

95. In December 1990, DOE issued its 1990 ACR, which provided upper and lower bounding acceptance rates. The upper bounding rate ramped up from 1200 MTU/year to 3000 MTU/year over the first six years. The lower bounding rate projected acceptance of 300, 400, 550 and 875 MTU/year over the first four years and then 875 MTU/year through 2007. The 1990 ACR noted that:

> The acceptance schedules were selected to be representative of upper and lower boundaries for a WMS which includes a Monitored Retrievable Storage (MRS) facility capable of receiving and storing SNF starting in 1998. Use of an MRS in 1998 would require early MRS siting and modifications to the licensing conditions of the Amendments Act.

- PX 211, p. 4 (1990 ACR).

a. The 1990 ACR lower bounding rate, however, was dependent on congressional action to remove the schedule linkage in the NWPA Amendments. The 1990 ACR, commenting on DOE's November 1989 Report to Congress, stated:

> [the Report's] schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations – from the year 2003 to approximately 2010. The current restrictions in the Amendments Act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository. . . . *If the current linkages to the repository are maintained, it is*

*estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007.*

- PX 211, pp. 4-5 (1990 ACR) (Emphasis added).

- PX 1052 (Milner Dep. Desig. 5/7/2002 *Yankee* Tr. 21:21-24:13 ("Q: And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act. In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change . . . in the law? [objection omitted] A: Yes, because it removed one of the linkages. Q: It would require . . . a change in the law to remove some of the – the scheduling? A: That's correct. . . . Q: And here again like in the 1990 annual capacity report the department is estimating that the time – that it could start MRS facility operations until at least 2007 in view of the statutory schedule linkage? A: Correct.")).

96. WE's 1990 10-K stated that WE was continuing to consider options for managing its spent fuel because DOE was not going to begin accepting spent fuel in 1998: "In November 1989 the DOE reported that it would not be able to accept utility spent fuel for disposal at a repository before 2010. Wisconsin Electric is reviewing its options, including advanced technologies for on-site storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal."

- PX 801, p. KRGWE000202 (Kenrich Binder J: Historical Financial Information).

## X. THE 1991 ACR USED AN ANNUAL ACCEPTANCE RATE OF 900 MTU THAT WAS ILLEGAL UNDER EXISTING LAW

97. In September 1991, the General Accounting Office ("GAO") reported that "Operation of [a] Monitored Retrievable Storage Facility is Unlikely in 1998." The report stated that the Negotiator did not believe that it was possible to complete a siting agreement, obtain congressional approval of an agreement, and remove the statutory links by the end of 1992. DOE officials generally agreed with the accuracy of the GAO report.

- PX 229, pp. 3, 5 (Sept. 1991 GAO, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998) ("GAO discussed

the facts in the report with DOE officials who generally agreed with their accuracy. Their comments have been incorporated where appropriate.").

98. In December 1991, DOE used an ACR with an annual acceptance rate of 900 MTUs. The 900 MTU rate purportedly was based on the MRS linkages imposed by the NWPA Amendments.

a. It was never DOE's intent to operate at the 900 MTU rate absent the NWPA Amendments' linkages. It would not have made sense to DOE or the industry to accept fuel at a 900 MTU steady-state annual rate because it then would have taken decades to remove all SNF from the plant sites. With an acceptance rate less than the industry's generation rate, the backlog would only continue to increase and plants would be forced to expand on-site or at other private storage facilities, contrary to the intentions of the NWPA. Other DOE program documents at that time continued to reflect DOE plans for a steady-state annual rate of 3000 MTU.

- PFF 48, 49, 51-54, 56, 61, 62.

- PX 237 (1991 ACR).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 334:20-335:11 (Other DOE documents in 1991 reflected a steady-state spent nuclear fuel acceptance schedule of 3000 MTU.)).

- PX 1052 (Milner Dep. Desig. 5/3/02 Tr. 556:13-562:22 (There was no reason, other than the capacity restrictions on the MRS contained in the NWPA Amendments, for the 900 MTU rate. The MRS facility was actually designed to have a higher capacity than it could accept based on the NWPA Amendments.)).

- Tr. 1189:9-14 (Zabransky) ("But once the MRS or the repository became operational, it was DOE's intent and the company's belief that they would ramp-up to 3000 in a reasonable amount of time, and begin accepting the rest of the spent fuel.").

- Tr. 5701:5-8 (Zabransky) ("Q: And DOE has never used a 900 rate for internal planning purposes for the operation of a repository, has it? A: No, only for an MRS.").

- Tr. 5708:10-17 (Zabransky) ("Q: If there were no capacity limitations on the MRS, there's no reason why the MRS could not have had a steady rate of 3000 MTU, after a ramp-up? A: No, and I think the earlier MRSes – I don't know if that's a word – prior to the amendments did have higher capacities.").

- Tr. 5708:19-5709:4 (Zabransky) ("Q: I want to go back and make sure I understand the use of the rates in the APR/ACR. Was one of the considerations minimizing DOE's potential obligation to utilities under the standard contract? A: I think we talked about this earlier with Ms. Snyder, but the answer that I gave was that it fully allocated what DOE thought it could do, so the extent it minimized the obligations as to what it could possibly do, the answer is yes.").

- Tr. 5692:4-5694:16 (Zabransky) ("Q: Let me ask you to turn to page 158. And I'm going to read the following, line 5: 'Question: Would it make any sense to have a repository or an MRS and accept fuel at such a small rate that it took decades to remove it from the plant sites? [objections omitted] Answer: It wouldn't have made sense to the industry, no. Question: Would it have made sense to anyone, would it have made sense to DOE? Answer: No.'").

b. The 1991 ACR noted that DOE could not start MRS facility operations prior to 2007 because of the linkages imposed by the NWPA Amendments.

- PX 237, p. HQR0040363 (1991 ACR).

- PX 1052 (Milner Dep. Desig. 5/7/02 *Yankee* Tr. 23:25-25:1).

- Tr. 5221:19-5222:2 (Kouts) (The acceptance rate in the 1991 ACR was "premised on the fact that the schedule linkages contained in the 1987 amendments to the [NWPA] were effectively repealed by Congress, and it's done essentially through the, either an act of legislation or through approval of a negotiated – an agreement by the Nuclear Waste Negotiator on a host MRS facility.").

c. The 1991 ACR was not a contractually binding document.

- PX 237, pp. 1-2 (1991 ACR) ("As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers.").

- Tr. 1190:7-14 (Zabransky) ("Q: Okay. Mr. Zabransky, is it your understanding that in themselves, the annual capacity reports are planning

documents and not contractually binding? A: That's my understanding, yes. Q: So the 1991 ACR by itself is not contractually binding, correct? A: That's my understanding, yes.").

- PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 138:22-141:4 (The ACR was included in the Standard Contract at the request of utilities and was only included for planning purposes.)).

- PX 1052 (Morgan Dep. Desig. 11/15/06 Tr. 87:6-90:21 (The ACRs were for planning purposes only.)).

99. The 900 MTU rate in the 1991 ACR was not compliant with the law because of linkages then imposed by the NWPA Amendments. DOE could only accept spent fuel at the 900 MTU rate if the linkages in the NWPA Amendments were removed. Even if the linkages in the NWPA Amendments were removed, there was no assurance that an MRS would be developed by 1998.

- PX 237, p. 4 (1991 ACR) ("The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit in the NWPA for an MRS facility before a repository starts operation. If the current linkages between MRS facility construction and repository construction authorization are maintained, *it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007*." (Emphasis added)).

- Tr. 5295:20-23 (Kouts) ("Q: Between 1991 and 1995, no legislation to remove the linkages was ever reported out of committee, was it? A: Not that I'm aware of, no.").

- PX 1052 (Mills Trial Desig. *Entergy Arkansas* Tr. 1952:14-23 ("Q: You personally had no reason to believe that the 1991 ACR was invalid, did you? A: I personally knew that the ACR of 1991 did not correspond with the contract as was discussed and intended, the DOE had indicated would be the case of how they would carry out the contract. I was well aware that it did not correspond to the intended program that DOE had stated they would follow when they signed the contract.")).

- Tr. 5697:21-5700:25 (Zabransky) ("Q: One moment. Sorry, page 163, line 1: 'Question: Okay. The linkages that you are referring to that would have prevented the MRS development in the way it's suggested in Zabransky 18, are you referring to the linkages in the Nuclear Waste Policy Amendments

Act of 1987? Answer: That's correct. Question: Other than the Nuclear Waste Policy Act Amendments of 1987, is there any other reason why an MRS could not be developed the way it's envisioned to have been – it should be developed in Zabransky 18? Answer: By 1998, as envisioned here, all – were there no linkages, there would still be the issue of siting a development of a facility, just as there is with a repository. [Question:] Okay. But I thought I understood you to say it could not be developed because of the linkages. Answer: And, again, this presumed, this called for an MRS by 19 – or by '98. Even without linkages, there's no assurance one could have been developed by '98. Question: No assurance, but as I understand your testimony, the linkages made development of an MRS as envisioned in Zabransky 18 impossible. Answer: That's correct.'").

- Tr. 2354:16-2355:3 (Vance) (In 1991, DOE contractors had a "general understanding that the MRS was not going to happen.").

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 333:19-334:10 (It was DOE's best projection at the time that it could not commence spent fuel acceptance until at least 2007 if the linkages were maintained.)).

- *Southern Nuclear*, 77 Fed. Cl. at 412, 416-420.

100. In 1991, DOE issued the first APR pursuant to the requirements of the Standard Contract, even though DOE had already told utilities it would not be picking up fuel in 1998.

- PX 238 (1991 APR).

- PX 1052 (McDuffie Dep. Desig. 3/18/02 Tr. 85:14-86:10 ("Somebody had already told the utilities we're not going to make 1998. There was some discussion about what would be in the APR. Obviously, we got instructions from DOE headquarters what the receipt rate would be and what the verbiage would be.")).

101. Mr. Vance testified that, in response to his own inquiries, OCRWM's Mr. Brownstein informed him that DOE's reason for using a 900 MTU acceptance rate in the 1991 ACR was to limit DOE's liability to the utilities.

- Tr. 2295:9-15 (Vance) ("I was told at the time that the reason for the lower rate was because it was clear the Department was not going to meet the 1998 date required by the contract for initiating delivery, and therefore, the desire was to limit the obligation and the liability that DOE had to the utilities.").

- Tr. 2356:14-2357:12 (Vance) ("Q: Mr. Brownstein unambiguously told you during the meeting, . . . that the rationale for the low rates in the 1991 ACR was the Department's desire to limit its liability to utilities? . . . A: What Mr. Brownstein told me was it was clear, at that point, the Department was going to be unable to meet the 1998 requirement in the standard contract, and therefore, the desire was to publish the lower rate, so as to limit the liability to utilities when they failed to meet the 1998 obligation.").

a. Mr. Vance urged DOE, specifically Mr. Brownstein, "to not publish the 1991 ACR with such a low rate [of 900 MTU] because [Mr. Vance] believed that utilities would become frustrated and not view DOE in the same manner that [DOE] had grown accustomed to over the process of that issue resolution process." In fact, after the 1991 ACR was published, "the meetings between that team quickly died off, and very little progress was made after that point."

- Tr. 2351:6-21 (Vance) ("In fact, prior to that time, we had made great progress, in my mind, in terms of coming to consensus with utilities on various issues and being in a position to resolve many of the ambiguities and conflicts that I previously mentioned. In fact, that was the basis for my urging Mr. Brownstein to not publish the 1991 ACR with such a low rate because I believed that utilities would become frustrated and not view DOE in the same manner that we had grown accustomed to over the process of that issue resolution process. And in fact, after the publication of that document, the meetings between that team quickly died off, and very little progress was made after that point.").

b. Mr. Brownstein testified that the rates in the 1991 ACR were contrary to the much higher rates used in other DOE planning documents because the lower rates were "fundamentally pegged to the 10,000 MTU capacity level." However, DOE's 1988 ACR, issued after the NWPA Amendments but before the 1991 ACR, acknowledged the conditions imposed by the NWPA Amendments but did not use the "artificially low" acceptance rate used in the 1991 ACR.

- Tr. 5113:25-5114:18; 5116:17-5102:23 (Brownstein).

- Tr. 2355:7-2356:2 (Vance) ("No, what I was saying was, if you go forward with publishing this 1991 ACR/APR with a rate that is – and *I'll use*

*this as my term, this is not a term that he would have used, but 'artificially low,'* utilities are going to become frustrated, and you will lose all of the momentum in regards to the issue resolution process, and it will impact the ability to finally resolve some of these issues under the contract." (Emphasis added)).

- PX 149 (1988 ACR).

- PX 183 (Nov. 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program).

- PFF 82, 95.

## XI. IN 1991, WE APPLIED TO THE PSCW FOR AUTHORITY TO IMPLEMENT DRY STORAGE BECAUSE DOE WOULD NOT PERFORM UNTIL WELL AFTER 1998, IF AT ALL

102. Wisconsin is a politically liberal state, and WE has experienced very strong opposition to its nuclear power operations since the licensing of Point Beach's Unit 2. There are active groups in Wisconsin who oppose nuclear power. In addition, the PSCW has a large engineering and economic staff that is involved in rate case reviews and major project proposal reviews and is generally anti-nuclear. This environment affected the decisions that WE made with regard to its operation of Point Beach.

- Tr. 2155:15-2157:14 (Porter) (explaining the business and regulatory environment in Wisconsin and its impact on WE's nuclear power operations).

- Tr. 515:14-516:11 (Link).

103. Prior to applying to the PSCW for dry storage project authority, WE, as was its practice, met with PSCW staff to obtain the PSCW's input. WE explained to the PSCW that it intended to apply for 48 casks and for an ISFSI capable of storing 48 casks. This would provide for sufficient SNF storage until the end of the reactor's then-current licenses. As a result of the consultations with the PSCW, WE accommodated the PSCW and only applied for 12 casks. WE, however, applied for an ISFSI capable of storing 48 casks.

- Tr. 2177:3-2178:10 (Porter).

- Tr. 2181:1-2182:19 (Porter) ("Q: Did those consultations have any effect on the application that was ultimately submitted by Wisconsin Electric? A: It did, in a couple of respects. Our initial proposal would have been for a facility that would be for a facility that would be able to store sufficient fuel assemblies to get us to the end of our operating licenses, which would have required some 48 casks in addition to the space in the spent fuel pool and, as a result of those early discussions with the Public Service Commission staff and internally, determined that going to a more modular approach and requesting only 12 casks initially would be appropriate and minimize the cost. So the application, as it was actually presented, was for 12 casks, but for a facility large enough to ultimately hold 48 casks, so we made some changes prior to the submittal in the application to accommodate that and also learned that the Commission intended to do an environmental impact statement, which they weren't required to do for this type of agency action, but because of its controversial nature, they determined they would do a full environmental impact statement for the project.").

- Tr. 1154:3-1155:22 (Zabransky) (WE initially wanted authority for the full 48 casks, but after consultations with the PSCW, decided to pursue only the ISFSI and initial 12 casks.).

104. In November 1991, WE submitted its PSCW application for authority to construct and operate a dry fuel storage facility because WE did not believe that DOE would perform in 1998. WE required PSCW approval for this activity because Wisconsin requires that the PSCW approve the costs of capital projects over certain thresholds. While the initial outlays for the project were low and significant capital expenditures were not planned until after the project received PSCW approval, the total project capital cost exceeded the monetary threshold. WE understood that the application process would be lengthy, protracted, contentious, and controversial. Its understanding was based on its prior experience at the PSCW with its activist staff, the heightened activity of anti-nuclear intervenors in Wisconsin, and the possibility for judicial review of PSCW decisions.

- PX 236 (Nov. 1991 ISFSI application and ESR).

- Tr. 331:10-332:15 (Link) ("Mr. Abdoo, the CEO, and Bill Boston, the chief operating officer, and myself understood that these projects and the

approvals that were necessary for these projects were going to be some of the most contentious projects that Wisconsin Electric would face with the Public Service Commission. I knew this because of my intimate knowledge with the Public Service Commission staff, their motivations, their points of view, because of the advanced planning process. Wisconsin already had a moratorium on any new nuclear, and it was clear that the Public Service Commission staff was not an advocate of nuclear power. Besides that, I knew also of a number of intervening groups that would probably, with some certainty, intervene and fight the approval of both or either of these projects. . . . So that was, call it Achilles heel, but that was the opportunity for the intervenors, that they clearly saw as a mechanism to shut Point Beach down.").

- Tr. 2154:24-2157:14 (Porter) (explaining his experience as WE's regulatory interface with the PSCW as head of the Corporate Planning Department, and noting the opposition that Point Beach faced at the Commission).

- Tr. 2179:7-2180:3 (Porter) (WE expected the PSCW approval process to be lengthy, controversial and subject to intervention. WE had to plan for a long-lead time before the dry storage facility would be operational.).

- Tr. 2509:5-13 (Farron) (Mr. Farron has been involved in over a hundred filings with the Public Service Commissions.).

- Tr. 2574:1-2577:17 (Farron) ("Based on my knowledge and understanding, definitely the utility would have preferred to use something other than dry fuel storage in the nonbreach world. There's many reasons for them. The one I'm most familiar with is the Public Service Commission. The Public Service Commission was not real exciting [sic] about having to take this up, this issue up. And I think you can see in the first application, it was years before a decision was made, and I still got that same feeling from the Public Service Commission when we were going to come in for our second request for dry fuel storage casks. If there was another alternative, they would like to see us exercise it.").

- Tr. 1520:8-1521:8 (Krieser) (explaining his role in the dry storage application, the arrival of Mr. Link as Vice President of Nuclear Power shortly after the application was submitted, and his working relationship with Mr. Link with regard to the dry storage application).

- Tr. 1534:15-1536:9 (Krieser) ("For whatever reason, Wisconsin seems to have a very strong or a large number of organizations within the state that always oppose nuclear projects before the Public Service Commission,

and clearly, that was going to be the case here. The environment in the state capital, for example, in Madison, was extremely antinuclear at that time, so actually, the opposition in this particular case was going to be – and actually was unprecedented. And I think the reason for that is a lot of the opposition viewed this project as an opportunity to actually shut down Point Beach permanently.").

- Wis. Admin. Code PSC § 112.05 (1)(b) (1982).

- PX 801, pp. KRGWE00211-12 (Kenrich Binder J: Historical Financial Information, 1991 10-K).

- PX 266 (Oct. 26, 1992 Letter from Martin to Dorr) ("Indeed, it is the uncertainty with respect to DOE's plans which prompted Wisconsin Electric's development of the flexible spent-fuel storage installation plan proposed in this proceeding.").

- Tr. 1186:15-1187:1 (Zabransky) ("Q: Bates number 14799. I believe we went over this, but just to follow up on the Court's points, and make it clear, the concern at this point, was it not, was that DOE wasn't going to be performing by 1998, not that it would be performing earlier, correct? A: I think the concern was that 1998 was an uncertain date, yes.").

- Tr. 1144:20-1145:5 (Zabransky) ("Q: And did WEPCO ever consider pursuing dry storage without PSC approval? A: . . . And I think we had – there were internal discussions on that, and the conclusion was that we couldn't do that.").

105. WE used highly conservative assumptions in its application to the PSCW and the attached Environmental Screening Report ("ESR") to create a greater sense of urgency.

- Tr. 2185:11-22 (Porter) ("Q. In the application, did Wisconsin Electric make any assumptions? A. Wisconsin Electric made a number of assumptions in support of the application, and since we knew the, at that point, 1991, certainly, we knew that it wasn't going to be possible for the DOE to be able to begin taking the fuel in 1998, and so we made a number of conservative assumptions describing the need for the project, the alternatives for the project, all kinds of assumptions that are in there.").

- Tr. 2225:4-11 (Porter) ("Q. Now, WEPCO was careful to prepare a complete application to the Commission laying out the need for the project and the urgency of the Commission's action, is that right? A. Yes. In our applications, we make assumptions that support the application and the need for Commission approval in a timely fashion, that's what we do.").

- Tr. 2179:18-2180:3 (Porter) ("Q: Did your expectation of a long approval process affect the company's planning for dry storage? A: It certainly did, as the expectation that it would be a controversial project meant that we needed to ensure that we had a long lead time and that, in our application, we impressed upon the Commission the need for timely approval . . .").

- Tr. 1152:1-21 (Zabransky) ("Q: Isn't it true that in crafting this application for the dry storage project to the Public Service Commission, that Wisconsin Electric placed special emphasis on trying to ensure that the Public Service Commission would rule on the application in a timely manner, and not defer consideration of the application? . . . A: I think that's reasonable to say, yes.").

- Tr. 1150:7-15 (Zabransky) ("[W]ere there concerns that prompted Wisconsin Electric to get involved in this public relations campaign? A: Yes, there were. Q: And were those concerns whether the Public Service Commission would approve the application, and if so, when it might approve the application? A: Yes.").

- Tr. 2561:14-16; 2562:9-15 (Farron) (Mr. Farron's understanding was that Mr. Zabransky indicated that WE used highly conservative assumptions to create a sense of urgency to prompt the PSCW to approve the dry storage promptly.).

- Tr. 2558:1-9; 2561:14-16; 2562:9-15; 2563:11-20 (Farron) (There were conservative assumptions used in the ESR to facilitate getting approval from the Public Service Commission.).

a. For example, in the ESR, WE justified its request for twelve casks based on the assumption that WE would maintain sufficient room in the pool for two full core offloads (i.e., 242 SNF assemblies) in addition to providing long-term SNF storage given the strong likelihood that DOE's performance would be substantially delayed. WE, however, never had a goal or policy of maintaining two full core reserves. In addition, WE included 17 non-fuel baskets in describing filled storage locations in the pool even though WE knew that the baskets could have been removed or relocated. Further, the ESR stated that 20 spaces "may be inaccessible" even though WE knew that 1500 spaces could be used. Yet another conservative

assumption was WE's reliance upon the lower bounded rate in the 1990 ACR, resulting in a calculation that DOE would not pick up the first spent fuel from Point Beach until 1999. Even under the Government's 900 MTU rate based on the 1991 ACR, DOE would pick up approximately 41 assemblies in 1998. No reason exists why WE could not have instead relied upon the upper bounded acceptance rate in the 1990 ACR.

- PX 236, ESR p. 15 (Nov. 1991 ISFSI Application and ESR) ("[T]o provide additional operational flexibility, [WE] will maintain 2 full core reserves . . . once the ISFSI is operational.").

- PFF 112, 176, 180.

- Tr. 2185:23-2186:22 (Porter) (explaining WE's assumption in the application to maintain one FCR and then preserve two FCRs once the ISFSI was operational, and noting that WE had operated without FCR when necessary, especially because FCR was not a regulatory requirement).

- PX 236, ESR pp. 15, 50 (Nov. 1991 ISFSI Application and ESR) (noting that pool contained 1109 spent fuel assemblies at page 50, but counting 1126 spaces as filled with "spent fuel or high-level waste components" at page 15 in discussing capacity requirements).

- PX 237, pp. 4, A-2 (1991 ACR).

b. Notwithstanding the overly conservative assumptions in the ESR, the ESR recognized: "By combining alternatives which extend the capacity of the existing pool with the alternative of shipping spent to a federal facility, it is possible that Wisconsin Electric could avoid the necessity of building the ISFSI." Further, the ESR stated that WE could delay the need for the proposed dry storage project based upon a combination of alternatives, but that "the uncertainties of federal acceptance plans limit the meaningful assessment" of the alternatives, and therefore WE "has not attempted to evaluate these potential alternative combinations."

- PX 236, ESR pp. 38-39, 59 (Nov. 1991 ISFSI Application and ESR).

106. WE was not obligated to build dry storage after applying to the PSCW for dry storage project approval in 1991 or even after the PSCW approved the project in 1995. Once WE knew that DOE would be substantially delayed in accepting WE's spent fuel, there was little reason to delay applying for dry storage, particularly because WE expected that PSCW approval would take a long time.

- Tr. 1529:2-1531:3 (Krieser) ("So if you accept that there really was no reason to wait to construct the facility because we were going to need the facility under any circumstances at that point, and so . . . it really made no sense to wait until the eleventh hour and cause us to have to rush to implement the system to load casks and all that sort of thing.").

- Tr. 2179:7-2180:3 (Porter) (WE expected a long PSCW approval process).

- Tr. 2196:21-24 (Porter) ("Q: Was Wisconsin Electric required to construct the dry fuel storage after the Commission approved it? A: No, we were not required to do it.").

- Tr. 2819:23-2821:4 (Conry) (The PSCW deferred a decision on the Unit 2 steam generator replacement project.).

107. WE's 1991 ESR stated that DOE would not have a permanent repository available until 2010 and that, under this schedule, the earliest that DOE could have an operational MRS was 2007. Any earlier MRS availability would require congressional action to remove statutory linkages between the MRS and a permanent repository. Further, the ESR stated that, in order for DOE to begin operation of the FWMS by 1998, a volunteer site for an MRS must be located before the end of 1992.

- PX 236, ESR p. 15 (Nov. 1991 ISFSI application and ESR).

- Tr. 650:21-652:13; 653:7-11 (Zabransky) ("Q: And let me direct your attention to the last sentence, and I'll read it. 'Given the number of legal problems which must be resolved, it is doubtful that 2010 is a realistic date.' Do you see that sentence? A: Yes. Q: And that is discussing whether 2010 is a realistic date for the permanent repository, correct? A: That's what it's discussing, that's correct. Q: And did you agree with that statement at the time it was put into the environmental screening report? A: I don't disagree

with it. I think it's a fine statement. Q: I'm sorry, I didn't hear. A: It's a fine statement. I agree with it.").

108. In its 1991 10-K, WE stated that it was submitting its dry storage application to the PSCW because of the delay in DOE's performance:

> In accordance with the provisions of the Nuclear Waste Policy Act of 1982 (the "Act"), which require the DOE to provide for the disposal of spent fuel from all U.S. nuclear plants, Wisconsin Electric entered into a disposal contract providing for deliveries of spent fuel to the DOE for ultimate disposal commencing in January 1998. *Because of the DOE's inability to accept spent fuel by the 1998 timeframe as contracted, the company has filed with the PSCW for a Certificate Authority to construct and operate an Independent Spent Fuel Storage Installation ("ISFSI").* The ISFSI will provide additional storage until the DOE begins to remove spent fuel from Point Beach in accordance with the terms of the contract it has with Wisconsin Electric.
>
> - PX 801, pp. KRGWE00211-12 (Kenrich Binder J: Historical Financial Information) (Emphasis added).

109. In May 1992, six months after WE submitted its application for dry storage to the PSCW, Robert Link became Vice President of WE's Nuclear Department. From the onset of his involvement in the dry storage project, Mr. Link wanted to be fully aware of all of Point Beach's SNF storage options and whether it was advisable to proceed with the dry storage application before the PSCW. Upon assuming the position of Vice President, he asked that some of his team, specifically, Mr. Krieser's group, conduct an independent examination of the necessity for the dry storage project, including the capacity of the spent fuel pool and alternative spent fuel management options. Based on his considerable past PSCW experience, he knew that the dry storage project would entail lengthy, protracted and contentious proceedings and potentially could result in litigation. He also expected that the PSCW would request detailed information that would demand WE resources and time. Anti-nuclear intervenors hoped that a successful challenge to the dry storage project would

lead to the shutdown of Point Beach. The intervenors were strongly opposed to the dry storage facility because they feared it would become a de facto permanent repository.

- Tr. 515:14-516:11 (Link) ("Q: . . . When you came on as VP of nuclear in 1992, as part of your advocacy responsibilities for the ISFSI in the application for the PSC, you had your staff conduct studies regarding ways that WEPCO could extend the time before the wet pool ran out of space, right? A: Evaluations and assessments, yes. Q: And you had those studies performed because you wanted to assure yourself of all the potential capabilities under a variety of assumptions that the WEPCO plant might have for operation into the future, correct? A: Yes, I wanted to assure ourselves that that was the best overall approach, considering a whole myriad of issues, safety, cost, political viability, a number of issues, yes.").

- Tr. 422:17-423:3 (Link) ("Well, as I think we've discussed already, one of the characterizations by the intervenors and concerns that they represented was that the project at Point Beach, the dry fuel storage project at Point Beach would ultimately become what they called a de facto permanent storage. And they obviously, and the commission staff did not want that to happen because of the high speculation as to not only when, but some of the intervenors questioned whether if DOE would ever fulfill their obligation.").

- Tr. 1521:12-1524:19 (Krieser) ("Q: And when [Mr. Link] took over as vice president of nuclear, do you recall what actions he took with regard to Wisconsin Electric's spent fuel storage status and the PSCW application? A: Well, I think, just to set the stage for a second, at that time, when Bob became vice president, it was already very apparent to people at Wisconsin Electric, and I think probably the majority of the industry, if not all of the industry, that DOE was not going to be performing in 1998, as we all had hoped. . . . Bob was a pretty pragmatic person, I think, in many respects, so he wanted very clearly to understand what the situation was at Point Beach, as far as the spent fuel situation and the spent fuel pool and things of that nature. He wanted to, you know, to make sure that he clearly understood what the situation was and what the conditions were that we were dealing with. He also was very familiar with the Public Service Commission process for obtaining approval for projects, and he knew that the process was going to be a very contentious one. There was certainly going to be opposition, and it was going to be just a huge effort that we would have to put forth to gain approval for that project. So he wanted to, you know, make sure that in fact was the right path to be on. So he requested people, myself and people that reported to me, to conduct an evaluation of all the circumstances, number one, to evaluate whether or not dry storage was the right path to be on.").

- PX 367 (Citizens' Utility Board ("CUB") Reply Brief) (noting that Point Beach's proposed ISFSI may become a de facto permanent high level waste storage facility and claiming the "Commission cannot conclude that the continued production of nuclear waste is in the best interests of the company's ratepayers if it considers the statements by its staff in its initial brief, as well as by the majority of intervenors in this case, that the *waste may never leave Point Beach*" (Emphasis in original)).

110. WE then evaluated a variety of options, including fuel cycle changes, higher enrichment fuel, private fuel storage facilities, construction of another spent fuel pool, expansion of the existing spent fuel pool, recovery of inaccessible spaces in the spent fuel pool, reactor core and fuel design changes, dry fuel storage, and the placement of temporary racks in a variety of locations, including the cask pit area, transfer canals, tool storage locations, and inspection locations.

- Tr. 515:22-519:6 (Link) ("Q: Those evaluations included changing the core design, right? A: I think I already responded to that, but, yes, that's one of the options I'm sure we looked at. Q: And the evaluations included changing assembly design? A: Well, when you talk about assembly design, one of the potential options there was going to a different rod design. . . . Q: Okay. And how about an assessment regarding changing the cycle length? Was that one of the assessments that was performed? A: That was another option that we were looking at for a variety of reasons, none the least of which would have been trying to extend the viable length of time that the spent fuel pool could have supported Point Beach. Q: And those evaluations also included the use of temporary racks, right? A: Well, there was evaluation to satisfy me that a temporary rack was viable, yes." Q: And . . . the temporary racks could be used in the cask laydown area, was that one area that the staff evaluated? A: Well, we looked at a number of possibilities. As I think I mentioned before, the cask laydown area was one, the fuel transfer canals for both of the units were – technically there were two separate areas. There was also a fuel inspection station, we called it, which was a location in the spent fuel pool that was open, meaning there weren't any storage cells in that location.").

- Tr. 1521:24-1524:20 (Krieser) ("We also looked at various other options and alternatives, such as extended fuel cycles, what would be the benefit of that, changing some of our core designs, taking into effect higher enrichments, higher burn-ups of fuel, that type of thing, looking at the fuel pool to determine if we had actually maximized the capacity of the pool, were

there spaces that could be recovered for fuel purposes. And we looked at other things too, like the use of temporary racks in various parts of the pool, and the cask laydown area was one area, the fuel transfer canal, there were areas within the pool that we felt could be used for fuel storage, at least in a temporary basis, if we needed it.").

- Tr. 875:3-876:15 (Hennessy).

111. The results of the spent fuel management analyses were that Point Beach could operate at least into 1998 and potentially beyond without a dry fuel storage facility, that DOE performance would be substantially delayed beyond 1998, and that dry storage was the best long-term SNF storage solution in response to the lengthy delay in DOE's performance. The dry storage project was the lowest-cost long-term storage option and offered some flexibility in the acquisition and loading of casks. Mr. Link then decided to continue with the PSCW application.

- Tr. 352:7-353:2 (Link) ("Q: Given the results of the briefings that you received and the fact that Wisconsin Electric could operate until 1998, as you indicated, why did you decide to proceed with the dry storage application? A: It was clear in my mind that DOE was not going to be picking up fuel as required in 1998. . . .Dry fuel storage had the attribute of modularization, and that is, as I mentioned before, you could build and grow it as necessary, but that means you wouldn't have to overextend your commitment in terms of storage capability.").

- Tr. 1523:21-1526:2 (Krieser) ("Q: And what were the results of these evaluations that Mr. Link requested your group to perform? A: I would say, in a nutshell, the conclusion was – and, of course, again, this was based on the fact that DOE was not going to be there in 1998. We needed to address the situation in a long-term fashion, so we needed a long-term solution . . . and we also concluded that dry storage was really the best option to solving that particular problem. Q: And why would you believe that dry storage was the best option for solving that particular problem? A: . . . Dry storage, at least the system we were pursuing, was essentially a modular system. We could add it incrementally, cask-by-cask. . . . Q: And I believe you mentioned that it was the opinion of folks at Wisconsin Electric and possibly most, if not all, of the industry that DOE would not be performing in 1998, do you remember that discussion? A: Yes, I do. . . . Q: And your belief regarding the unlikelihood that DOE would perform in 1998, did the people that you were

involved with on these issues at Wisconsin Electric, did anyone express a contrary position? A: No.").

- Tr. 2812:8-2814:18 (Conry) (WE, including Messrs. Zabransky and Conry, knew that PBNP could operate until 1998 without dry fuel storage. It was a general understanding throughout the nuclear department and was raised in many meetings.).

- PX 258 (Aug 20, 1992 Memo from Link re: Construction of Dry Storage Facility).

- PX 271 (Nov. 20, 1992 WE Letter to PSCW).

112. In May 1992, Mr. Link set up a public affairs task force to implement a public relations campaign in support of the dry storage project application. He created this task force because he anticipated a significant opposition to the dry storage project based on the experiences of other utilities and Wisconsin's significant anti-nuclear element. Mr. Link also was intimately aware of the problems that Northern States Power had encountered in seeking approval of its dry storage facility in the neighboring state of Minnesota.

- PX 250 (May 1992 Palmer Memorandum).

- PX 254 (May 1992 Link Memorandum).

- PX 274, p. 4 (Dec. 1992 Letter from CUB to the PSCW).

- PX 362, p. 2 (Nov. 14, 1994 R. Link Remarks before the NARUC Business Program).

- Tr. 367:15-369:15 (Link) ("Q: . . . What was the purpose of the task force? A: Well, as I just stated previously, I knew that this was going to be a very contentious case, and it would be critically important to have an excellent communications plan and methodology to ensure, before the Public Service Commission, but also within the public eye, Wisconsin Electric's projects were seen in, hopefully, in an objective and forthright manner. Q: During this period, were you familiar with the circumstances of Northern States Power in seeking approval of their dry storage project in the neighboring state of Minnesota? A: Yes, I was . . . Northern States ran into very contentious issues before their own Public Service Commission and had significant intervention in their case as well. Q: And did that impact your approach to

Wisconsin Electric's dry storage application? A: It just further gave me belief that we were going to be in for a tough road to hoe.").

- Tr. 2155:19-2157:14 (Porter) (explaining WE's experiences with opposition to Point Beach).

- Tr. 1075:23-1078:5 (Zabransky) ("[NSP] had recently had some activities in their state that were not very favorable to their development of their storage facility which they ultimately developed. But we wanted to make sure that we took steps to make sure that those activities didn't cross the river and come over into Wisconsin.").

- Tr. 1147:7-1150:15 (Zabransky) ("Q: . . . my question is, were there concerns that prompted Wisconsin Electric to get involved in this public relations campaign? A: Yes, there were. Q: And were those concerns whether the Public Service Commission would approve the application, and if so, when it might approve the application? A: Yes.").

113. When Mr. Link was reevaluating WE's SNF storage situation, WE knew that Point Beach could operate at least into 1998, and, if necessary, into 1999 without dry storage. WE projected that it would continue to discharge 28 assemblies per refueling outage and knew that it could make available up to 1500 spaces in the spent fuel pool if necessary.

- Tr. 408:9-411:15 (Link) ("Q: Is the Public Service Commission expressing the point here that Wisconsin Electric could operate to the fall of 1998, with no other storage provided? [objections omitted] The Court: Right. I take it the next question is, does he agree with that? . . . Q: Did you agree with that statement? A: Yes, I do. . . . Q: Now, the Public Service Commission is expressing the view that these options would allow operation for an additional year to 1999, is that a correct reading of that paragraph? A: I believe it is, yes. . . . Q: And do you agree with the statement contained in the final environmental impact statement? A: Yes, I do.").

- Tr. 646:15-24 (Zabransky) ("Q: Do you see the next sentence, under present operating plants, "28 additional spent fuel assemblies are discharged annually from each reactor for a total of 56 assemblies per year? A: Yes. Q: Was that, at the time that you wrote this, a reasonable projection of the discharge plans for units one and two? A: Yes, it was.").

- PX 346, App. E (Aug. 1994 FEIS).

- PX 236, ESR p. 57 (Nov. 1991 ISFSI application and ESR) (noting 28 assembly discharges were forecast).

a. In October 1994, Mr. Link testified before the PSCW that Wisconsin Electric could operate until 1998 without additional storage capacity.

- PX 355, p. 6 (Oct. 1994 Testimony of Link).

- Tr. 360:23-362:14 (Link).

b. In November 1994, Wisconsin Electric submitted its Initial Brief in the PSCW proceedings, stating that it was not until 1998 that Point Beach would be shut down as a result of DOE's failure to pick up spent fuel.

- PX 364, pp. 1-2, 31-32 (Nov. 1994 Initial Brief).

- Tr. 360:23-362:14 (Link) ("Q: Now, you testified that the plant could operate until 1998 without additional storage capacity in this answer, is that correct? A: That's correct.").

c. Multiple WE sources confirm that PBNP could have operated into 1998 without dry storage.

- PFF 159-165.

- PX 242, p. HQR3640528 (1991 RW-859 Unit 1).

- PX 243, p. HQR3640565 (1991 RW-859 Unit 2).

- PX 327, p. HQR3640688 (1993 RW-859 Unit 1).

- PX 328, p. HQR3630766 (1993 RW-859 Unit 2).

- PX 280, p. WISC00099055 (1992 RW-859 Units 1 and 2).

- PX 278, pp. WISC00126727, WISC00126750 (Energy Information Administration, Spent Nuclear Fuel Discharges From U.S. Reactors 1993) (noting that WE could operate until 1998 without dry storage and had an established pool capacity of 1500 spaces).

- Tr. 685:3-687:18 (Zabransky) ("Q: Let me ask you to now go down to 2.3, this is language that you just read, so I won't have you read it again, but what is the estimated date identified to which the reactor can operate –

actually, maybe I will have you read it again. It's a confusing form. Could you read it for me, please? A: I can. 'Considering 2.1.f and 2.2.a, what is the estimated date on which you would not continue reactor operation because of a lack of storage space for discharged fuel, absent spent fuel pickup by DOE.' Q: Thank you, Mr. Zabransky. And what is the date that's entered there? A: It looks to be 1998-09. Q: 09, meaning September 1998? A: I would take it to mean that, yes. Q: And to the best of your knowledge, was this form correct at the time that you signed on behalf of Wisconsin Electric and submitted it to DOE? A: Yes.").

- Tr. 1164:16-1165:14 (Zabransky) ("Q: Fair enough. Now, did Wisconsin Electric in the dry storage application proceedings ever indicate to the PSCW that Wisconsin Electric believed it could make it until 1998 without dry storage? . . . A: I don't know. There probably was a Q & A where we told them exactly what it says here, that we could have gone until 1998 and had no place to unload the reactors. Q: I didn't ask that part of it, though, I only asked about the 1998. So it did say – do you agree that Wisconsin Electric did, at times, in this Public Service proceeding, indicate to the Commission that Wisconsin Electric could operate until 1998 without dry storage? A: Yes, but not the second part – not without having the second part of that discussion.").

114. The PSCW believed that Point Beach could operate at least into 1998 and, if necessary, into 1999 without dry storage. Wisconsin courts also recognized the fact that Point Beach could operate at least into 1998.

-Tr. 1158:22-1159:13 (Zabransky) ("Q: Was it the understanding of the Public Service Commission that Point Beach could, in fact, operate until 1998 without dry storage? [objections omitted] A: And again, I think there may have been some documents at the end of my employment that I might have seen, I don't recall specifically which ones, that looked at scenarios without any room in the pool for anything, and might have gone through 1998, yes.").

- Tr. 1162:21-1163:7 (Zabransky) (Point Beach could operate into 1998.).

- Tr. 1544:8-19 (Krieser) ("Q: You mentioned PSCW approved the project in February of 1995. And did the PSCW express any concerning [sic] regarding whether it understood that Wisconsin Electric could operate without dry storage until 1998? A: Yes, they concluded in the proceedings that we could operate through 1998 without a dry storage facility, and that was documented in a number of areas, including the environmental impact

statement, and the, actually, the final order that they issued authorizing us approval for the project.").

a. The February 1994 Draft Environmental Impact Statement ("DEIS") stated that Point Beach could operate at least into 1998 without additional storage. The DEIS also noted that the use of higher enrichment fuels at Point Beach would allow Point Beach to operate into 1999. WE had an opportunity to review and comment regarding the DEIS but did not challenge this statement in the DEIS.

- PX 326, pp. vii, ix, xiv (Feb. 1994 Draft Environmental Impact Statement).

- Tr. 405:3-408:7 (Link).

- Tr. 1159:21-1163:7 (Zabransky).

b. The FEIS stated that Point Beach could operate at least into 1998 without additional storage. The FEIS also noted that Point Beach could operate until 1999 without additional storage by employing other spent fuel management options.

- PX 346, pp. xix, xxi-xxii, 104 (Aug. 1994 FEIS).

- Tr. 408:8-411:15 (Link).

- Tr. 2553:7-2555:20 (Farron).

c. In its February 1995 Order approving WE's dry fuel storage application, the PSCW stated that Point Beach could operate at least into 1998 without additional storage capacity but that DOE would not implement any type of storage facility by 1998.

- PX 374 (Feb. 1995 PSCW Order).

- Tr. 411:16-413:14 (Link) ("It indicates that the plant would operate through 1998 and then shut down.").

- PFF 120.

d. Intervenors challenged the February 1995 PSCW Order in an action in Dane County Circuit Court. In a December 1995 opinion, the court recognized that PBNP could operate at least into 1998 without dry storage.

- PX 481, pp. WISC0481-002 to WISC0481-003 (Dec. 1995 Dane County Cir. Ct. Opinion).

e. The Dane County Circuit Court ruling was appealed to the Wisconsin Court of Appeals. In May 1997, the court of appeals stated that PBNP could have operated at least into 1998 without additional storage.

- PX 452, p. 4 (Opinion, *Citizens' Utility Board v. Public Service Commission of Wisconsin* (May 1997)).

115. During the period after the filing of its PSCW application, WE did not believe that DOE would perform in 1998. By the end of 1992, WE's understanding that the earliest DOE could begin picking up spent fuel from PBNP was 2007 was confirmed because the Negotiator failed to locate a volunteer site for an MRS. Therefore, WE continued to focus on long-term SNF storage options.

- PX 236, ESR p. 53 (Nov. 1991 ISFSI application and ESR).

- Tr. 650:2-5 (Zabransky) (The NWN never located a volunteer site.).

a. Mr. Link was convinced that DOE was not going to perform in 1998.

- Tr. 358:14-23 (Link) ("Q: Did you think that the Nuclear Waste Negotiator would be able to find a volunteer site by the end of 1992? A: No. As you may recall, I came, took the position of vice president of nuclear power mid-'92, and it was in that assessment and review and getting briefed, not only by my staff, but by NEI, that it was clear that the waste negotiator was not going to be successful.").

- PX 355 (Oct. 1994 Testimony of Mr. Link before the PSCW) (testifying that he did not believe that DOE could perform in 1998).

b. Mr. Zabransky also believed in 1992 that there "was a great chance DOE may not have performed in 1998."

- Tr. 613:11-20 (Zabransky) ("Q: In 1992? A: Yes, sir. Q: What was your opinion regarding the likelihood that DOE would begin performing in 1998? A: I believe there was a, certainly, a risk that that would not happen, it certainly wasn't – I don't bet when I go to Las Vegas, but there was a great chance DOE may not have performed in 1998. It was uncertain.").

c. When Mr. Zabransky left WE to join DOE in July 1994, he believed that DOE was not going to perform in 1998.

- Tr. 654:20-657:7 (Zabransky) ("Q: And, again, you already have this in front of you. This is the deposition that you took in what we called consolidated discovery, April 17th, 2002. I direct you to page 221, and I'll read the question that's on page – or line 21 on that page. 'Okay. At the time you went to DOE, there was no expectation that DOE was about to accept spent fuel in 1998, correct? Answer: I think that – I'm not sure when DOE officially made that determination, but I think people had – individuals may have made that determination or drawn that conclusion. I think I had.' A: Right. . . . Q: And what was your confidence that their efforts were going to be fruitful in time for DOE to begin accepting in 1998? A: It would have been a long shot.").

- Tr. 1183:8-11 (Zabransky) ("Q: And do you know when DOE formally abandoned the MRS concept? A: I believe I learned that it was in the latter part of 1994.").

d. Other WE personnel did not expect DOE to perform in 1998.

- Tr. 1521:6-23 (Krieser) ("[W]hen Bob became vice president, it was already very apparent to people at Wisconsin Electric, and I think probably the majority of the industry, if not all of the industry, that DOE was not going to be performing in 1998, as we all had hoped.").

- Tr. 2776:25-2777:3 (Anundson) ("Q: During the entirety of your time in the nuclear power department, did anyone believe that DOE would perform in 1998? A: No.").

- Tr. 2783:2-8 (Anundson) (As of October 1994, WE did not expect DOE to perform in 1998.).

- Tr. 2552:3-11 (Farron) (When Mr. Farron arrived at WE, WE knew DOE was not going to perform in 1998.).

e. In WE's November 1994 Initial Brief in the PSCW proceedings, WE stated that there was a great deal of speculation regarding DOE's performance under the Standard Contract and that the NRC had "made a regulatory determination that DOE will be in a position to take spent fuel by 2025."

- PX 364, pp. 1-2, 31-32 (Nov. 1994 Initial Brief).

- Tr. 392:23-394:24 (Link) ("Q: And is Wisconsin Electric expressing in the first sentence here that there's a great deal of speculation regarding when DOE will discharge its legal obligations to remove spent fuel from Point Beach? A: Yes, it does.").

f. In its December 1994 Reply Brief in the PSCW proceeding, WE stated that the date of DOE's performance was undoubtedly uncertain.

- PX 368, p. 6 (Dec. 1994 WE Reply Brief).

- Tr. 396:22-398:13 (Link).

116. Although WE did not believe that DOE was going to begin picking up spent fuel in 1998 as of the end of 1992, WE had not yet made a final decision to construct dry storage.

- Tr. 358:24-359:7 (Link) ("Q: By the end of 1992, had Wisconsin Electric begun construction of a dry storage facility at Point Beach? A: No, we had not. Q: By the end of 1992, had you made a final decision whether to proceed with construction of a dry storage facility at Point Beach? A: No, I had not made that decision.").

117. Nobody at Wisconsin Electric expressed to Mr. Krieser a position that DOE might perform in 1998. Based on his discussions with Mr. Zabransky, Mr. Krieser's understanding was that Mr. Zabransky did not believe that DOE was going to perform its obligations under the Standard Contract in 1998. Mr. Zabransky was highly critical of DOE's performance in carrying out the SNF disposal program.

- Tr. 1524:20-1527:10 (Krieser) ("Q: And I believe you mentioned that it was the opinion of folks at Wisconsin Electric and possibly most, if not all, of the industry that DOE would not be performing in 1998, do you remember that discussion? A: Yes, I do. . . . Q: And your belief regarding the

unlikelihood that DOE would perform in 1998, did the people that you were involved with on these issues at Wisconsin Electric, did anyone express a contrary position? A: No. Q: Did Mr. Zabransky . . . work for you during this time? A: Yes, he did. Q: Did he express a contrary position on this issue? [objections omitted] A: I think, surely, Mr. Zabransky was as skeptical, maybe more skeptical, about DOE's performance than the rest of us.").

- Tr. 2807:6-2808:8 (Conry) (Mr. Zabransky's belief was that DOE appeared to not be on a schedule to be able to take fuel away from PBNP in 1998.).

118. Others believed that DOE's performance would be substantially delayed beyond 1998.

a. The intervenors believed it was uncertain whether DOE would ever perform. For example, in the PSCW hearings, expert witnesses for the intervenors, Messrs. Kleinhans and Evans, testified that DOE would not have an operational repository until at least 2025. One further testified that there was no reasonable expectation of interim storage. In December 1994 communications and pleadings in WE's PSCW proceeding, intervenors expressed a belief that the earliest that DOE would perform was 2025, if ever. Because they believed that DOE would be substantially delayed, the intervenors strongly opposed the dry storage facility because they feared it would become a de facto permanent repository.

- PX 350, pp. Kleinhans 8, Evans 6, 18 (Sept. 1994 Testimony of Kleinhans and Evans).

- PX 274, p. 4 (Dec. 1992 Letter from CUB to the PSCW).

- PX 366, p. 1 (Dec. 1994 Wisconsin Attorney General Letter to PSCW).

- PX 367, pp. 9, 24-25 (Dec. 1994 CUB Reply Brief).

b. The nuclear industry shared WE's extreme concern in 1991 that DOE would not have an operational MRS or other storage facility by 1998.

- PX 225 (EEI UWASTE Meeting Notes).

- Tr. 661:5-662:22 (Zabransky) ("Q: And do you recall discussing during this period with regard to the MRS specifically, whether the statement that's here, 'However, there is no assurance at this time that an MRS without capacity limits and other ties to the repository could be completed by 1998,' do you recall that being discussed by the EEI UWASTE steering committee during this time? A: Well, again, I think that was the issue, there was no assurance, so we were doing all we could to try to help that, but that was always a problem. There was no assurance of that.").

119. As expected, the dry storage project application was highly controversial. The PSCW staff and the intervenors submitted numerous requests for information, and WE had to respond to each request. Further, under Wisconsin law, WE also had to reimburse the intervenors. WE retained experts and outside counsel to work with it during the prolonged and contentious PSCW proceedings that continued until early 1995.

- Tr. 2186:23-2188:11 (Porter) (explaining the application process).

- Tr. 2193:5-18 (Porter) (explaining that WE was obligated to reimburse the intervenors).

- Tr. 369:5-370:21; 372:24-376:1; 380:15-384:25; 387:14-404:13 (Link) (discussing the intervenor's experts, intervenor arguments against the dry storage project, the rules within the state of Wisconsin that allow for organizations to file for compensation to participate more fully in proceedings before the PSCW, and the PSCW proceedings).

- Tr. 2741:1-15 (Anundson) ("Q: I think you also mentioned PSC challenges. What are you referring to there? A: Well, again, by the time I had got to the nuclear power department, I believe that the environmental screening report had already been submitted to the Public Service Commission, but during their evaluation and writing of the environmental impact statement, we had to provide quite a few answers and information to the Public Service Commission, as well as preparing for and dealing with and going through the public hearings. I can't recall how many hearings we had, quite a few at various places throughout the state.").

- PX 269 (Nov. 19, 1992 WE Letter to PSCW).

- PX 349 (Sep. 8, 1994 CUB Memo).

- PX 274 (Oct. 6, 1992 CUB Application for intervenor compensation).

- PX 367 (Dec. 16, 1994 CUB Reply Brief and transmittal letter).

- PX 350 (Sept. 12, 1994 Radioactive Waste Review Board Memo enclosing direct testimony of James Kleinhans and Thomas Evans).

- PX 364 (Initial Brief of Wisconsin Electric Power Company, PSCW Docket Nos. 6630-CE-197 & 6630-CE-209).

- PX 368, pp. 6, 10 (Wisconsin Electric Power Company's Reply Brief, PSCW Docket Nos. 6630-CE-197 & 6630-CE-209).

- PX 357 (Oct. 11, 1994 Rebuttal testimony of Robert E. Link before the PSCW).

120. In February 1995, the PSCW issued an Order authorizing WE to proceed with the dry storage project, namely the ISFSI pad and 12 casks. The Order recognized (1) the contentious nuclear regulatory environment in Wisconsin, (2) the controversial nature of the preceding proceedings, (3) the unlikelihood of DOE performance in 1998, and (4) that Point Beach could operate at least into 1998 without dry fuel storage if it needed to.

- PX 374, p. 4 (Feb. 1995 PSCW, Findings of Fact, Conclusions of Law, Certificate, Order, and Interim Order) (recognizing the existence of WE's Standard Contract and explaining that "[t]he contract currently requires the DOE to begin accepting fuel in 1998. However, there is no federal facility for storing or disposing of the spent fuel nor is one expected to be operating by 1998. DOE does not expect that any disposal facility will be operational before the year 2010."); p. 12 ("This Commission limited Wisconsin's exposure to the problems of nuclear waste by placing a ban on utility plans containing new nuclear capacity in its first Advanced Plan order in 1978."); p. 16 ("The question of whether nuclear waste should be stored at Point Beach outside the existing plant building created intense controversy among the public, in the local area, throughout the state, and beyond the state's borders. The Commission granted $253,122 in intervenor compensation to citizens' groups to insure that all points of view were adequately represented. Several hundred people appeared at the hearings, and some of them attended more than two weeks of hearing."); p. 17 ("*In this case, the Commissioner's authorization of 12 casks reflects its choice of the most flexible option available to address the uncertainties of whether and when DOE will take the spent fuel.*" (Emphasis added)); p. 21 ("By 1998, assuming present level of plant operation, the spent fuel pool and both reactors will be required to store the spent nuclear fuel generated at Point Beach. Without removing some of

the spent fuel, it will become impossible to operate the plant past 1998."); p. 22 ("It is unlikely that DOE will have a permanent repository in operation before the year 2023. When or whether DOE will begin taking spent nuclear fuel is a matter of speculation.").

- Tr. 2189:6-2195:14 (Porter) (The terms in the PSCW Order were consistent with WE's understanding of the proceedings.).

121. WE made the final decision to proceed with the dry storage project once the PSCW approved the project in February 1995 because of DOE's expected failure to timely perform. The Vice President of WE's Nuclear Department made this decision.

- Tr. 359:3-7 (Link) ("Q: By the end of 1992, had you made a final decision whether to proceed with construction of a dry storage facility at Point Beach? A: No, I had not made that decision.").

- Tr. 414:24-415:7 (Link) ("Q: And when did Wisconsin Electric make a final decision to begin construction of the dry storage project? A: Subsequent to the Public Service Commission ordering, allowing for the construction of the project. Q: So that was after DOE issued its notice of inquiry? A: Yes.").

- Tr. 570:2-571:5; 579:23-580:3 (Zabransky) (The person who had the authority to bind WE was the vice president of nuclear.).

- Tr. 2745:16-2746:11 (Anundson) (WE kicked off the dry storage project in summer 1995.).

- Tr. 176:3-7 (Baumann).

- Tr. 2551:20-2553:6; 2623:12-2624:4; 2625:23-2626:6 (Farron) (When Mr. Farron arrived at WE in 1995, he engaged in briefing sessions with Mr. Link and Mr. Krieser. Mr. Farron understood that WE was not expecting DOE to perform until at least 2010, that WE could have operated without dry fuel storage if DOE had been expected to perform, and that because of DOE's breach, WE needed to plan for long-term additional spent fuel storage.).

## XII. DURING THE 1990S, DOE'S PLANS FOR AN MRS FAILED, DOE ANNOUNCED THAT IT HAD NO OBLIGATION TO TIMELY PERFORM, AND DOE SUSPENDED THE DCS/FDS PROCESS

122. DOE did not make substantial progress on the FWMS during the period from 1991 through 1995.

a. DOE abandoned plans to site an MRS sometime in the 1991-1994 timeframe, and it was clear that DOE would not perform in 1998.

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 88:8-90:1 (As of October 1993, it would have been difficult to establish an MRS by January 31, 1998 and the MRS "certainly waned in [DOE's] thinking because [the] three leading candidate sites were no longer funded.")).

- PX 1052 (Dreyfus Dep. Desig. 5/15/02 Tr. 53:24-57:15; 58:20-60:22 (In September 1993, Dr. Dreyfus, OCRWM Director, told Congress and the nuclear industry that DOE was probably unable to initiate acceptance of spent fuel in 1998. "Those [utilities] making [spent fuel storage decisions] needed to have some sense of what future they were playing into. And the '98 date was no longer an operational assumption for planning purposes because at that point we were already beyond the ability to do anything by '98 in my judgment.")).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 378:20-25 (At least as of November 1994, if not sooner, DOE "no longer assumed an MRS in the system.")).

- PX 1052 (Milner Trial Desig. *Yankee Atomic* Tr. 4758:19-23 (DOE abandoned its effort to site an MRS sometime between 1991 and 1994, probably closer to 1994.)).

- PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 114:23-116:24).

- PX 363 (Nov. 1994 Milner Memo).

b. In May 1994, DOE published a notice of inquiry stating that it did not believe it had an obligation to accept SNF in 1998.

- PX 339 (Notice of Inquiry on Waste Acceptance Issues, 59 Fed. Reg. 27007 (May 25, 1994)).

c. In March 1995, DOE issued another ACR and APR that assumed initial acceptance at an MRS, even though DOE was no longer pursuing an MRS at that time. The 1995 ACR did not identify specific years of acceptance in its acceptance schedule. Thus, it was impossible for utilities to submit DCSs based on the 1995 ACR, because a utility could not know when the DCSs would need to be submitted by.

- PX 378 (1995 ACR/APR).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 398:1-402:4; Milner Dep. Desig. 5/3/02 Tr. 410:15-412:22 (The 1995 ACR was based on the existence of an MRS even though DOE was no longer assuming an MRS facility in the system.)).

- *Southern Nuclear*, 77 Fed. Cl. at 419.

d. In May 1995, DOE issued its final interpretation stating that its obligation to begin picking up spent fuel in 1998 was conditional and that the earliest it might perform would be in 2010.

- PX 385 (Department of Energy Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21793 (May 3, 1995)).

123. During the 1990s, Wisconsin Electric continued to apply pressure on DOE to begin picking up the industry's spent fuel despite WE's grave doubts regarding whether DOE would begin performance in 1998. WE believed it was essential to maintain the pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that it was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. WE also continued to perform its obligation under the Standard Contract because it did not want to give DOE an excuse for nonperformance or take any action that might jeopardize eventual fulfillment of DOE's contractual obligations. For example, WE was required to submit a DCS beginning in 1992 and, in September 1992, WE submitted its DCSs for 1998-2007 to DOE. DOE approved WE's 1998 DCS in December 1992 and WE's

revised 1999-2007 DCSs in March 1993. WE submitted DCSs for all 10 years because DOE's DCS instructions requested that the utility submit DCSs for each year in which the utility had an allocation and WE had allocations in each of the first 10 years. After DOE initially approved WE's revised DCSs, WE then submitted FDSs for each of the 10 years. DOE did not approve WE's FDSs and did not notify WE of that decision.

- Tr. 417:11-418:12 (Link) ("Q: And what was the position Wisconsin Electric was taking on pages two through four in its response to DOE's notice of inquiry? A: Well, it covers a number of issues. Obviously, we believe strongly that the DOE had an unconditional legal and moral obligation to begin accepting fuel in '98. We wanted a federal repository. We supported the concept of an interim storage facility, if that made the most sense. We wanted them to pursue all viable options available. We also believed that their support of even private entities performing that function should be accomplished. We also wanted to assure that flexibility was maintained, both for DOE and the industry, in pursuing those options, basically, a strong support of DOE effectively completing their obligation under the Nuclear Waste Policy Act. . . . Q: Now, in sending that September 1994 letter to DOE, did you believe that DOE would actually be able to perform by 1998? A: No.").

- Tr. 2611:4-2613:2 (Farron) ("Q: What is the basis for your understanding why Wisconsin Electric has continued to perform its obligations under the standard contract? A: Since I've been with Wisconsin Electric, my understanding has been that we do not want to do anything to jeopardize the contract with DOE and end up with a reason or excuse for DOE not to perform under the contract. In fact, I think we've been probably more conservative with that than many of the utilities.").

- PX 246 (DOE's DCS Instructions) (asking utilities to submit DCSs for all the years in which the utility had an allocation).

- PX 259 (WE's DCS submittals) (submitting DCSs for the 10 years in which it had allocations, per DOE's request).

- PX 272 (Dec. 1992 DOE Letter to WE re: DCSs).

- PX 279 (Feb. 1993 WE Letter attaching revised DCSs).

- PX 288 (March 10, 1993 DOE Letter Approving WE's Revised DCSs).

- PX 305 (July 1993 Letter from WE transmitting revised DCSs).

- PX 309 (Sept. 1993 Letter from DOE approving revised DCSs).

- PX 351, pp. 2-4 (Sept. 1994 Letter from Link to Brownstein).

- PX 355, p. 6 (Oct. 1994 PSCW Testimony of R. Link) ("Recently, the DOE has taken a position that it considers the 1998 NWPA requirement to be conditional. It is the position of Wisconsin Electric that DOE has a clear and unconditional obligation to take possession of spent fuel from Point Beach. We will continue efforts to see that DOE meets its obligations. Until DOE takes possession of the spent fuel from Point Beach, however, Wisconsin Electric has a responsibility for its continued safe management.").

- PX 357, p. 10 (Oct. 1994 PSCW Rebuttal Testimony of R. Link) ("We continue to actively work to ensure the DOE continues to move forward in developing a federal waste repository.").

- PX 362, pp. WISC00010632-35 (Nov. 1994 R. Link Remarks before the NARUC Business Program) ("And we have to keep the pressure on DOE to live up to its responsibility for the disposal of nuclear waste.").

- PX 478 (Dec. 1997 Letter transmitting WE's FDS).

- PX 482 (Jan. 1998 Letter to Zabransky re: WE's FDS).

124. In approximately 1997, DOE stopped reviewing DCS submittals at the direction of counsel.

- Tr. 5722:4-12 (Zabransky) ("Q: It's your recollection that DOE stopped reviewing DCS submittals subsequent to the decision of the U.S. Court of Appeals for the D.C. Circuit in the Indiana Michigan case, is that correct? A: I believe that's correct, yes. Q: And that decision was made at the direction of counsel, correct? A: Yes.").

- PX 916 (March 1997 DOE Letter stating that DOE is unable to approve DCSs).

a. DOE was required to approve or disapprove submitted DCSs within three months.

- PX 41, p. KRGWE002128 (Standard Contract).

- Tr. 5743:4-14 (Zabransky) ("Q: . . . Do you see the sentence that says, 'DOE shall approve or disapprove such schedules within three months after receipt'? A: I do. Q: So that then sounds that DOE shall approve or disapprove submitted DCSes within three months after receipt, correct? A: That is correct.").

b. DOE has not approved any DCSs since March 1997.

- Tr. 5722:4-23 (Zabransky).

c. Even though DOE had approved WE's ten DCSs in 1993, DOE refused WE's request in 1998 that DOE accept WE spent fuel assemblies.

- Tr. 710:1-13 (Zabransky) (discussing DOE's refusal to accept spent fuel assemblies from Wisconsin Electric in 1998).

- PX 288 (March 10, 1993 DOE Letter Approving WE's Revised DCSs).

125. DOE restarted the DCS process in 2004, but only for a short period of time. DOE directed WE to use the 2004 ACR as the basis for its DCS submittals. DOE stated that the submittals would replace WE's previously approved DCSs. Although DOE had disregarded the previously approved DCSs, DOE never approved or disapproved any DCSs submitted in 2004.

- Tr. 5756:6-5759:1 (Zabransky) ("A: This is a letter that was sent to the contract holders from DOE announcing or notifying them that we were resuming the DCS process to support the 2010 operations at Yucca Mountain. . . . Q: Now, DOE suspended the DCS process in December 2004, correct? A: That's correct. Q: And the DCSes that were submitted by Wisconsin Electric in response to this letter were never approved or denied by DOE, correct? A: They were returned to Wisconsin Electric. Q: Without any decision by DOE either approving or rejecting them, correct? A: That's correct.").

- PX 665 (July 2004 Acceptance Priority Ranking and Annual Capacity Report).

- PX 669, p. WISC0669-0001 (July 2004 Letter from DOE to WE) ("In developing your DCS submittals, you should utilize the waste acceptance allocations in the July 2004 Acceptance Priority Ranking/Annual Capacity

Report (APR/ACR)."), p. WISC0669-0004 ("DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010.").

- PX 676 (Sept. 2004 Letter from WE to DOE).

- PX 682 (Dec. 2004 Letter from DOE to WE).

126. DOE did not believe that the rates in WE's submitted DCSs were binding.

- PX 246, p. HQR-001-2045 (DOE's DCS Instructions) (noting that utilities should based their DCS submittal on the 1991 ACR "or subsequent ACRs, as appropriate").

- PX 1052 (Slater-Thompson Dep. Desig. 4/21/99 Tr. 243:5-245:4 (The DCSs were not binding.)).

- PX 1052 (Slater-Thompson Dep. Desig. 6/13/02 Tr. 95:19-96:16; 98:1-21; 109:4-15 (DCSs were for planning purposes only and were intended to be fungible.)).

- PX 1052 (Milner Dep. Desig. 5/2/02 Tr. 393:5-394:19 (The DCSs would need to be reevaluated and were not binding if there was no facility available to accept the fuel in 1998.) ("[T]he program and the [DOE] position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.")).

- PX 1052 (Milner Dep. Desig. 5/7/02 *Yankee* Tr. 24:25-32:4 (The DCSs were based on a waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Act's schedule linkages.)).

- PX 1052 (Milner Dep. Desig. 5/8/02 Tr. 154:7-158:7 (The DCSs did not create a binding commitment for a specific year or for any specific amount of SNF.)).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 217:1-220:2 (The DCSs were administrivia. Mr. Barrett did not even have a particular understanding of what function the DCS played in the overall administrative process. The DCS was just another bureaucratic piece of paper and was subservient to the system requirement and description documents. The DCSs "never played a significant role to [Mr. Barrett].")).

- PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 130:7-131:16 (The DCS was merely a planning tool and not a binding commitment. It was too early in the process for either party to rely on it as a commitment. "My general opinion would have been you would have had to get much closer to the actual date of an acceptance before you could actually really commit." The DCSs were "[g]ood faith efforts to work with the utilities and share information so that they could get a reasonable approximation of when they would be able to ship and how much they would be able to ship.")).

- PX 1052 (Morgan Dep. Desig. 6/25/02 Tr. 134:12-135:14 (The "delivery commitment schedule . . . was provided by the utilities. It did not commit acceptance by DOE." DOE just wanted to know what was out there that it had to deal with "[f]or background information.")).

- PX 1052 (Cole Dep. Desig. 6/4/02 Tr. 199:5-200:11 (The DCS is "just a piece of the process." Further, any DCSs that DOE has approved are null and void at this point "because we don't have a 1998 date anymore" and they were "based on a program plan that's no longer valid.")).

## XIII. IN 1995, WE COMMITTED TO DRY STORAGE BY CONSTRUCTING AN ISFSI

127. From 1994 to 1996, WE properly mitigated the Government's breach by constructing the dry storage project and fabricating several VSC-24 casks. WE had deferred incurring significant costs on the dry storage project until it received PSCW approval, which it expected in 1994 or 1995. From 1994 to 1996, WE incurred costs for the design, engineering, and construction of the ISFSI pads and acquisition of ancillary equipment to operate the ISFSI, including security systems and a cask transporter. The dry storage project was complex and required sophisticated engineering analysis. WE loaded the first VSC-24 cask in December 1995.

- Tr. 30:3-4; 178:20-200:19 (Baumann).

- Tr. 2735:17-2746:21 (Anundson) ("There was engineering challenges, there was public service commission challenges, NRC challenges, logistics challenges, everything that you can imagine was a challenge. There was no 'Dry Storage for Dummies' books. It was starting from scratch . . . We did soil testing. These pads had to be engineered. They weren't just a slab of concrete. They were engineered pads. They were designed to withstand all

the natural catastrophes that could occur in that area, as well as a new one that came up called liquefaction, which was the liquefying of the soil underneath the pads during a seismic event. They were pretty significant pieces of concrete.").

- PX 1010 (Dec. 1995 Point Beach ISFSI Evaluations Required by 10 C.F.R. § 72.212 and Summary of Compliance with 10 C.F.R. Part 72).

- PX 740.12 (Point Beach Nuclear Plant Photo - VSC-24 Cask).

- PX 740.111 (Point Beach Nuclear Plant Photo - Transporter).

- PX 740.20 (Point Beach Nuclear Plant Photo - ISFSI View).

- PX 1029, p. KRGWE003846 (ISFSI Plan View).

- PX 1047, p. KRGWE003913 (Kenrich Trial Damages Model).

128. As originally constructed, the ISFSI consisted of two long concrete pads designed to hold a total of 48 VSC-24 dry storage casks.

- Tr. 184:1-9 (Baumann).

129. The VSC-24 dry storage casks consisted of a Multi-Assembly Sealed Basket ("MSB") that is placed within a Ventilated Concrete Cask ("VCC") with a steel liner. The MSB's interior is coated with a zinc-based paint to prevent corrosion. VSC-24 equipment also included a transporter and transfer cask.

- Tr. 185:22–186:22; 188:22-189:10 (Baumann).

- Tr. 2077:16-2078:18 (Holzmann).

- PX 531 (Dry Cask Load WMSB-04).

- PX 346, p. WISC00003600, Figure 5.2 (VSC-24 cask drawing).

- PX 740.111 (Point Beach Nuclear Plant Photo - Transporter).

- PDX 5 (VSC-24 cask model).

- Tr. 1695:4-13; 1715:22-1716:11; 1751:1-6; 1757:7-15 (Becka).

130. WE typically loaded VSC-24s and NUHOMS casks in groups known as loading campaigns. WE performs loading campaigns because campaigns spread mobilization and demobilization costs over multiple cask loadings.

- Tr. 1678:18-24; 1895:24-1896:12; 1897:15-22 (Becka).

131. The training requirements for dry cask loading were substantial. In addition, extensive employee time was necessary for training and the loading campaigns. Employees who were involved in the loading campaigns were unable to perform other duties at the time. This resulted in delay of other projects and a backlog of work orders.

- PX 615 (Qualification Matrix).
- Tr. 1746:24-1748:18 (Becka).

132. After the loading of the first VSC-24 cask in December 1995, cask loading at Point Beach was put on hold because several parties petitioned Wisconsin's Dane County Circuit Court for review of the PSCW's EIS for the dry storage project. The Circuit Court vacated the 1995 PSCW Order approving dry storage and remanded the matter to the PSCW for further consideration. On remand, the PSCW prepared two supplemental EISs, held related hearings, and issued a May 1996 Order reauthorizing WE to continue loading its dry storage casks. WE incurred legal expenses in litigating the judicial challenge to the project and in the remand proceedings before the PSCW. Once the legal challenge ended, WE was able to resume cask loading, and, in May 1996, WE loaded a second cask and started to load a third cask.

- Tr. 419:18-420:13 (Link) ("Q: Did the intervenors take any action in response to the PSCW February 1995 order? A: Yeah, they appealed that order and received, I believe, two levels of judicial review. . . . Q: So the Court did ask the PSCW to take additional proceedings? A: "Well, the Court remanded the order to the Public Service Commission. It was the Commission's decision, in my opinion, to take and have the additional hearings.").

- Tr. 1543:6-1544:19 (Krieser) ("[A] number of the groups joined together and filed suit in Dane County . . . and in fact, in December of that year, a judge or the judge in Dane County actually vacated the original order from the Public Service Commission and remanded it back to them for further consideration, citing deficiencies in the environmental impact statement. That then precipitated additional proceedings before the Public Service Commission, and they ultimately then issued a second order, again, authorizing us to proceed or authorizing Wisconsin Electric to proceed with the project. The intervenors, again, filed suit opposing that particular order, although it was unsuccessful.").

- Tr. 2516:14-2517:15 (Farron) ("The first order, I believe, was in February '95, I'm not certain of that, but it was later remanded back to the Public Service Commission because of intervenor action, they'd taken it to court because they felt there were deficiencies in what was done, as far as long-term environmental impact. And there were two supplemental EISes [sic] that were put together by the Public Service Commission to address those issues.").

- PX 408 (Jan. 1996 Second Supplemental EIS).

- PX 410 (Jan. 1996 PSCW Notice of Reopening).

- PX 481 (Dec. 1995 Dane County Cir. Ct. Opinion).

- PX 452 (May 1997 Opinion, Citizens' Utility Board v Public Service Commission of Wisconsin).

133. WE incurred substantial costs in obtaining approval for and then constructing the ISFSI and VSC-24 casks. Contractors involved in ISFSI work included Selmer, Van Ert's, URS, and Stevenson & Associates. VSC-24 fabrication and loading vendors included Sierra Nuclear Corporation, Edward Gray Corporation, U.S. Tool & Die, Hi-Tech Manufacturing, and Precision Components Corporation.

- Tr. 2735:17-2742:5 (Anundson).

- Tr. 194:1-21 (Baumann).

- Tr. 1823:5-23 (Becka).

- PX 383 (WE Memo re: QA coverage of ISFSI project).

134. DOE's breach of the Standard Contract was a substantial causal factor in WE's incurrence of costs related to the ISFSI and the VSC-24 casks. WE also acted reasonably in incurring these costs given that the alternative would have been the eventual shutdown of Point Beach.

- PFF 3, 88, 108, 150, 157-159.

- Tr. 481:18-485:4 (Link) (discussing the environmental impacts and costs of shutting down PBNP as an alternative to dry storage in the actual world where DOE would not be performing).

- PX 236, pp. 38-39 (Nov. 1991 ISFSI Application and ESR).

- PX 355, pp. 12-13 (1994 Link PSCW Testimony).

135. In addition, it was foreseeable to DOE that WE would incur costs related to spent fuel storage if DOE did not commence SNF acceptance by January 31, 1998. DOE understood that failure to meet the schedule in the Standard Contract and begin accepting fuel on January 31, 1998 would result in the need for utilities to make alternative spent fuel storage planning arrangements and incur costs for those activities.

- PFF 50, 150, 216, 230, 250.

- PX 175, p. 7 (1989 Draft ACR).

- PX 1052 (Barrett Dep. Desig. 4/22/02 Tr. 199:8-201:10 ("Q: So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct? A: The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is . . . when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration. Q: You said the most important part. The most important part to what? A: For a utility deciding what they should do with their storage. The most important – one of the more important aspects of a utility decision will be when will the federal government start taking waste and at what rate from their facility. The most important part of what the federal removal rate would be is not your allocation so much as is when does the federal system start. Q: So a utility would need to know when the federal

system would start in order to most efficiently utilize its available storage space for spent nuclear fuel, correct? A: It's an important consideration.")).

- PX 1052 (Slater-Thompson Dep. Desig. 4/21/99 Tr. 62:20-63:22 ("Q: You mentioned this concern that utilities had need for away-from-reactor storage. To what extent was that concern linked to a concern that DOE would not be able to meet its 1998 obligation to start taking spent fuel? A: That was directly linked to that date. Q: So, to the extent utilities thought that DOE would make the date, they didn't have much concern with need for away-from-reactor storage because the government would just start taking it? A: I heard that sentiment expressed, yes. Q: Was that the general sentiment amongst utilities? A: No. Q: What was the general sentiment? A: The general sentiment among the utilities was that it was unlikely that January 31, 1998, would be met. Q: And it was the cause of that concern that they thought they were going to need away-from-reactor storage? A: It seemed the prudent thing for them to do.")).

## XIV. IN 1996, WE EXPERIENCED A VSC-24 CASK LOADING INCIDENT AND DEVOTED SUBSTANTIAL RESOURCES TO RECOVER THE ABILITY TO USE DRY STORAGE

136. In May 1996, WE experienced a hydrogen ignition event during the loading of the third VSC-24 at Point Beach. The NRC issued Confirmatory Action Letters ("CALs") and Requests for Additional Information ("RAIs") in response to the ignition incident as well as to cask lid welding problems that occurred during the loading of VSC-24 casks at the Point Beach, Palisades and Arkansas Nuclear One plants. These CALs prohibited the loading of additional VSC-24 casks at any facility. WE did not know when it might be able to resume loading VSC-24s.

- Tr. 202:25-203:14 (Baumann).

- PX 1034 (prohibiting the loading of VSC-24s) (NRC CAL No. RIII-96-0005, issued June 3, 1996).

- PX 424 (July 1996 Recovery Team Memorandum).

- PX 1035 (CAL 97-7-01, issued May 16, 1997) (requiring Sierra Nuclear to determine the root cause of the weld cracking and to determine appropriate corrective actions).

- PX 453 (CAL 97-7-04, issued May 16, 1997) (requiring WE to provide reasonable assurance that cracking will not occur in the VSC-24 welds and provide advance notice of any cask loading).

- PX 1036 (CAL 97-7-004A, issued Sept. 5, 1997) (prohibiting any loading of VSC-24 casks).

- PX 477 (Sept. 12, 1997 Letter from NRC to WE) (closeout of CAL RIIII-96-0005).

- PX 1037 (Nov. 6, 1997 NRC RAI re CAL 97-7-001) (requiring Sierra Nuclear to provide responses to additional NRC questions and expressing the NRC's concerns regarding Sierra Nuclear testing).

- PX 525 (Aug. 13, 1998 Letter from NRC to WE) (closeout of CAL 97-7-004A).

- Tr. 1556:14-1558:1 (Krieser).

- Tr. 2019:18-2023:1 (Holzmann).

- Tr. 1684:24-1685:14 (Becka).

137. Following the ignition incident, WE created the Dry Storage Group at Point Beach as a full-time effort, initially staffed by five people, to recover the ability to load dry storage casks. The recovery effort included identifying potential issues that existed in the VSC-24 design, including the generation of explosive hydrogen gas arising from the reaction of the borated water with the carbo-zinc coating. To remedy that problem, during the VSC-24 loading process, the WE loading team had to continuously purge hydrogen gas to prevent gas buildup to an explosive level. WE experienced costs in recovering from the hydrogen ignition incident, and its VSC-24 recovery effort vendors included Sierra Nuclear and Structural Integrity. WE also had to draft revised loading and unloading procedures to deal with the hydrogen buildup.

- Tr. 1558:2-1559:12 (Krieser).

- Tr. 200:20-202:20 (Baumann).

- Tr. 2028:17-2029:17; 2041:23-2042:7 (Holzmann).

- Tr. 1721:12-1724:21 (Becka).

- Tr. 1723:2-1724:21 (Becka) (discussing the revised VSC-24 loading procedures).

- PX 645, p. WISC00130146 (VSC-24 Dry Cask Loading and Storage Procedure) (noting the great care that must be taken in regard to the hydrogen generated during the loading process).

138. The VSC-24 recovery effort required extensive use of Wisconsin Electric personnel and the hiring of several contractors. The in-house groups involved in the recovery effort included operations, maintenance, radiation protection, chemistry, and the nondestructive evaluation group. The contractors involved in the recovery effort included Sierra Nuclear, Structural Integrity, and Master-Lee.

- Tr. 1733:15-1734:16; 1736:4-1738:2 (Becka).

139. When the NRC lifted the VSC-24 CALs, it imposed several conditions on WE's continued use of the VSC-24. If WE failed to comply with the conditions, or if WE in the process of fulfilling those conditions discovered any other VSC-24 problems, the NRC likely would have issued new CALs.

- Tr. 1583:11-1584:8 (Krieser) ("The CAL associated with the lid weld problems was cleared sometime in August of 1998, and that essentially cleared the way for us to load additional SC-24 casks, although there were some conditions associated with that. We had to provide assurance that controls would be implemented to ensure that cask welds in the future would be acceptable, and as you might recall, we also had two casks that had already been loaded, and so we were required to perform ultrasonic inspections of the welds on those two casks. We successfully completed those weld inspections. We didn't identify any particular cracks in those welds, but *it certainly, I think, would have been a situation where had we identified cracks in those welds. I think that the NRC would have, again, imposed a restriction on loading additional VSC-24s until those issues were resolved.*" (Emphasis added)).

- Tr. 2063:7-2064:5 (Holzmann) (explaining that WE had to demonstrate to the NRC processes that resolved the weld cracking issues and use those going forward).

- PX 477 (Sept. 12, 1997 Letter from NRC to WE) (closeout of CAL RIII-96-0005 and requiring WE to revise its procedures to establish actions to minimize the potential for the generation and ignition of explosive gases and to respond to gas ignition events).

- PX 525 (Aug. 13, 1998 Letter from NRC to WE) (closeout of CAL 97-7-004A and requiring WE to provide assurances that it would control fabrication and perform ultrasonic, non-invasive testing of already loaded VSC-24s).

- PX 534 (Readiness Review) (punchlist tasks required to be performed prior to resuming VSC-24 loading).

- PX 758 (Dry Fuel Loading Organization Chart) (listing mobilization and demobilization tasks necessary prior to loading after the CALs were lifted).

- PX 556 (July 1999 Letter from Sierra Nuclear to NRC) (identifying at least 20 corrective actions Sierra Nuclear still had not adequately responded to).

140. In June 1999, the Palisades plant experienced another flaming incident during the loading of a VSC-24. WE feared that the NRC might issue new CALs, prohibiting again loading of VSC-24 casks.

- PX 558 (July 23, 1999 VSC-15 Flaming Incident Report) (describing the flaming incident that occurred while Palisades was loading its 15th VSC-24).

- Tr. 2600:22-2602:24; 2606:7-2607:16 (Farron) (noting that WE was aware of this incident, that it reinforced WE's concerns regarding the VSC-24's viability, that it encouraged WE to continue procuring the TN-32B casks, and that it reinforced WE's decision to begin looking at a new cask technology for use at PBNP).

141. The VSC-24 faced other significant regulatory, technical and business risks, including:

a. Sierra Nuclear was not adequately responding to the NRC's or the industry's concerns regarding the VSC-24 cask.

- Tr. 2043:18-2046:19 (Holzmann) ("Q: Was Sierra Nuclear having a difficult time answering the RAIs? A: They did. Well, they did have some issues, they had quality issues, they didn't have the technical staff really to adequately answer or address the confirmatory action letter, as indicated by the fact that the NRC then had follow-on additional . . . questions to the Sierra Nuclear.").

- Tr. 1559:16-1562:18 (Krieser) ("The NRC, as a result of the quality assurance issues, issued a demand for information, I believe that was October of '97, essentially requested Sierra Nuclear to respond to the various issues that had been identified.").

- Tr. 2598:2-2600:5 (Farron) ("Q: Were there concerns that Wisconsin Electric had with continued use of the VSC-24 during this period, April of 1998? A: Yes, there were concerns, there was the original cask ignition event that was related to coating the new cask, there were other issues that were brought up as well, some related to welding.").

- PX 1037 (Nov. 6, 1997 NRC RAI re CAL 97-7-001) (noting NRC's concerns).

- PX 475 (Dec. 4, 1997 Owner's Group Status Update).

- PX 488 (March 5, 1998 Senior Team meeting).

- PX 498 (April 24, 1998 Draft Response to the NRC Demand for Information).

- PX 506 (May 12, 1998 VSC-24 Owner's Group Conference Call Meeting Notes).

- PX 556 (July 1999 Letter from Sierra Nuclear to NRC).

b. WE remained concerned regarding the continued viability of Sierra Nuclear and the VSC-24 cask because of Sierra Nuclear's weak financial status in addition to NRC regulatory uncertainty. Even after British Nuclear Fuels, Ltd. ("BNFL") acquired Sierra Nuclear, WE remained concerned regarding the level of

support that BNFL would provide for the single-purpose VSC-24 cask compared with Sierra Nuclear's and BNFL's dual-purpose cask models.

- PX 474 (Nov. 1997 Issue Brief).

- Tr. 2598:2-2600:5 (Farron) ("From a technical nature, there were other concerns from the VSC-24 about the ability of Sierra Nuclear to continue to operate or function as a company because they didn't have a lot of resources or money, and they clearly weren't selling casks during this period of time. . . . But the industry was never sure whether or not BNFL bought that company out to continue to support the VSC cask 24s or to market another design.").

- Tr. 2601:13-2602:24 (Farron) (WE's concerns regarding Sierra Nuclear and the VSC-24 cask were never alleviated. WE remained fearful that it would encounter more problems with the VSC-24.).

- Tr. 1559:16-1562:18 (Krieser) ("Q: Sierra Nuclear was also having considerable difficulties from an economic and a commercial standpoint. . . . So there were lots of problems being experienced from a quality assurance standpoint, as well as a commercial standpoint. *In early '98, I think Sierra had gotten to the point where they really had a skeleton crew of employees, they were down to seven or eight employees, and they were very rapidly becoming a nonplayer, if you will, in the cask marketplace.*" (Emphasis added)).

- Tr. 1563:23-1566:5 (Krieser) ("We were very concerned about the continued viability of Sierra Nuclear. In fact, they were, as I had mentioned earlier, in very dire straits at this point. . . . Q: And did you have any concerns about whether the BNFL might be interested in Sierra Nuclear, but not necessarily the VSC-24 cask? A: For sure. BNFL's primary interest in Sierra Nuclear, I believe, was their dual-purpose technology. They expressed interest in continuing to support the VSC-24 design, but clearly, their objective, primary objective was the dual-purpose casks.").

- Tr. 2051:17-2052:8 (Holzmann) ("They were interested in Sierra Nuclear, not in the VSC-24 design, the storage only design. British Nuclear Fuels was interested in Sierra Nuclear because of the transportable design . . .").

- Tr. 1780:8-1781:2 (Becka) ("Sierra Nuclear, at the time, there was some question at our company about their continued viability because now, you know, the casks that they designed was one that had, frankly, a flaw that nobody really wants to live with. The fact that no other, you know, utilities

have ever ordered or used that canister design again is kind of a tribute to that point. So there was some question on the utilities' part at that time of the continued viability of Sierra Nuclear.").

c. WE could not predict what other latent problems remained with the VSC-24 casks. Given Sierra Nuclear's poor quality assurance and the problems that had arisen with the VSC-24 cask, WE could not rely on the VSC-24 cask remaining trouble-free.

- Tr. 2057:21-2058:12 (Holzmann) ("Q: During Wisconsin Electric's work on resolving the CALs, were there any other risks regarding the continued use of the VSC-24? A: There were certainly risks. Really, I think the biggest risk was the concern of, really, were there other issues that we were unaware of, that we had not yet – or had not yet revealed themselves, so that was a concern, going forward.").

- Tr. 1782:21-1784:11 (Becka) (noting the number of corrective actions the NRC was requiring Sierra Nuclear to take and the lack of progress).

- PX 556 (July 7, 1999 Letter from Sierra Nuclear to the NRC).

d. Utilities were experiencing quality control problems with regard to the fabrication of VSC-24 casks.

- Tr. 2043:18-2046:19 (Holzmann) ("Well, they did have some issues, they had quality issues, they didn't have the technical staff really to adequately answer or address the confirmatory action letter, as indicated by the fact that the NRC then had follow-on additional . . . questions to the Sierra Nuclear.").

- Tr. 1559:16-1562:18 (Krieser) ("Since around 1994, Sierra Nuclear, again, the designer and fabricator of the casks, was experiencing considerable problems in a quality assurance area, they were having difficulties meeting some of the requirements. In fact, there was some question as to whether they were actually going to be able to satisfy the certificate of compliance requirement.").

- Tr. 2598:2-2600:5 (Farron) ("Yes, there were concerns, there was the original cask ignition event that was related to coating the new cask, there were other issues that were brought up as well, some related to welding. . . . There were overall QA issues associated with the fabricators. One that's

named here is Hi-Tech, and I think there are others, at least one other fabricator that was being used.").

- PX 358, pp. 11-14 (Oct. 1994 G. Krieser PSCW Rebuttal Testimony).

- PX 364, p. 24 (Nov. 30, 1994 Initial Brief of Wisconsin Electric Power Company).

142. WE reasonably determined that, in view of the inherent risks and disadvantages in the VSC-24 design, it was prudent to consider acquisition of an alternative cask. After considerable analysis, WE decided to procure the TN-32B based on its availability, the ability to obtain an NRC license for the cask, and the ability of Point Beach to load the TN-32B with the least significant plant modifications. WE decided to procure three TN-32B casks in case the VSC-24 cask remained or again became unavailable for loading. In May 1998, WE submitted its application to the PSCW seeking authorization to use TN-32B casks at Point Beach. WE signed the TN-32B purchase order with Transnuclear while the cask lid welding CAL was still in effect and a number of other VSC-24 uncertainties remained unresolved. WE reasonably mitigated the Government's breach by procuring the TN-32B casks.

- Tr. 200:22-204:24 (Baumann) (noting that three TN-32Bs were acquired to ensure that WE could continue loading).

- Tr. 1582:15-1583:10 (Krieser) ("Q: Did you agree with the PSCW that it was reasonable for Wisconsin Electric to purchase the three TN-32Bs? A: Absolutely. If you rewind the tape back to 1996 through the period up through 1998, obviously, you'd find a lot of significant issues associated with the VSC-24 cask system. Of course, we had the ignition incident, we had the lid weld issues, we had quality assurance difficulties with Sierra Nuclear, we had commercial and economic problems with Sierra Nuclear. It was a very long list of issues. That clearly did not give any confidence, quite frankly, that we would ever be able to load additional VSC-24 casks, so the approach that we took to employ a backup system, to me, was a completely prudent decision. I think the Public Service Commission agreed with that, and so it was totally appropriate, in my mind, to pursue that particular course of action.").

- Tr. 6272:15-6275:4 (Farron) (The PSCW was aware that the TN-32B was necessary because of WE's problems with the VSC-24.).

- Tr. 1570:14-1571:23 (Krieser) ("We determined that the availability of the TN-32 casks was probably the best of any we considered. We also believed that the regulatory obstacles, the requirements that would have to be met to use those casks at Point Beach were the least difficult, if you will. We also determined that these casks would be most compatible with Point Beach, that it would require minimal modifications, and so, you know, it would be the easiest cask to implement. We also liked the cask design because it had some features in it, such as no coatings on the inside, and it had a bolted lid, so these were features that were desirable to us, and then lastly, the cost was competitive.").

- Tr. 1574:14-1575:12 (Krieser) ("Q: Now, at the time that Wisconsin Electric signed the purchase order with Transnuclear for the three TN-32B casks, was the NRC CALs prohibiting the loading of VSC-24 casks in effect at that time? A: At that point in time, the CALs associated with the ignition incident had been closed. The CAL associated with the cask lid welds was still in effect at that time. Q: At that time, did you feel that progress was being made in resolving the VSC-24 concerns? A: There was progress obviously being made because one of the CALs had been closed. There still were a lot of outstanding issues at that point, the CAL on the lid welds, the demand for information was still outstanding, of course, there was still the issue with BNFL, whether they were going to continue to support the VSC-24 cask system, so there was progress, but there were still numerous issues that were outstanding.").

- PX 491 (March 1998 Purchase Order with Transnuclear for licensing).

- PX 503 (May 1998 WE purchase order to Transnuclear, Inc. for three TN-32 casks).

- PX 510 (May 1998 WE application to the PSCW).

- PX 513 (June 1998 Meils Memorandum).

- PX 527 (Aug. 1998 Krieser Memorandum).

143. Mr. Warren Brewer agreed that the conditions facing PBNP reasonably led WE to procure the TN-32B as a backup cask.

- Tr. 5616:9-15 (Brewer) ("Q: And you would also agree that there might be circumstances under which it would be a sound practice for a utility to acquire a backup cask, correct? A: There are conditions, there could be – I'll say conditions under which it would be reasonable to procure a backup.").

- Tr. 5651:2-11 (Brewer) ("Q: Now, I think you had indicated that there could be conditions under which it would be reasonable to procure a backup cask, is it your opinion that it's reasonable to procure or fabricate a backup cask in this situation? A: I've never taken exception, and I don't think anyone has taken exception to the idea that the concerns that led WEPCO to starting down the TN-32 metal cask path were unreasonable or irrational.").

144. In offering his opinion regarding WE's decision to procure TN-32B backup casks, Mr. Cliff Hamal did not conclude that WE's initial decision to order the casks was unreasonable. He also agreed that the TN-32Bs could have been used under a subsequent PSCW order.

- Tr. 5898:2-10 (Hamal) ("Sure. I start by looking at the situation WEPCO found itself in, in the spring of 98 when it decided to order the TN-32B casks as a contingency plan in case there were further problems on the VSC-24 casks. I don't disagree with that conclusion. *I do not reach – you know, reach an opinion that it was unreasonable for them to order these casks in the first place*." (Emphasis added)).

- Tr. 5922:13-23 (Hamal) ("But now that they have, they've adopted two parallel paths that they can't execute both of them on their current orders. They can't load 9 through 12 and also load TN-32Bs. They can't. Because the Public Service Commission was explicit on how many fuel assemblies it was going to let sit on the ISFSI pad. *Now, if they had gotten more approval under later storage, they could.* But I'm saying under the current plans, that's as much storage capacity as they could have." (Emphasis added)).

145. Even after it resumed loading the VSC-24 casks in fall 1998, WE continued with fabrication of the TN-32B casks because of its continued concerns regarding the VSC-24 and the potential to use the TN-32B casks for later storage at Point Beach. WE reasonably continued with fabrication of the TN-32B backup casks to have them available for storage and in the belief that it would be easier to sell completed casks. In 2000, WE began attempting to sell the TN-32B casks, without success.

- Tr. 2608:7-2609:4 (Farron) (There were several reasons for WE to continue fabricating the TN-32B: (1) WE could eventually use them to load fuel at PBNP; (2) WE believed it was much more likely that it could sell the TN-32Bs if they were fully fabricated; and (3) the TN-32B was needed as a backup cask until WE acquired a successor cask for use at PBNP.).

- Tr. 6283:20-6284:8 (Farron) (WE was authorized to use the TN-32B casks under the second dry fuel storage approval from the PSCW.).

- Tr. 2609:5-11 (Farron) (Efforts to sell the casks have to this point been unsuccessful.).

- Tr. 1583:11-1585:3 (Krieser) ("Q: Did Wisconsin Electric eventually resume loading of the VSC-24 casks? A: Yes, we did, in the fall of 1998. Q: And why did it continue with the fabrication of those casks? A: The uncertainties with the VSC-24 casks were still fresh in our mind, the track record was not good . . . [t]he consequences of not being able to load casks were too significant to trust, if you will, that the VSC-24s would always be available to us.").

- Tr. 1585:4-1587:3 (Krieser) ("Q: But Wisconsin Electric desired to complete the fabrication of the three TN-32B casks, correct? A: Yes. Q: And why was that? A: Just to reiterate what I said a little earlier, there still were a lot of uncertainties with the VSC-24. The track record was not good. It would have been a poor assumption to make, I think, at that point, that everything was going to be well and good from that point on. And I think another point to be made is, since we had already proceeded pretty far down the path of fabricating the TN-32Bs, it made sense to finish it off if, for some reason, we didn't use those casks at Point Beach, we had interest in trying to sell those casks, *and we felt that they would be much more saleable if they were completed.*" (Emphasis added)).

- PX 552 (March 1999 Letter from the PSCW to Ms. Shillinglaw) (noting that WE would need to request PSCW approval to use the TN-32B casks at Point Beach if WE loaded all 12 of the then-approved VSC-24 casks).

- PX 570 (March 16, 2000 Letter from Makowski (WE) to Hanson (Transnuclear) re: Notice of Suspension).

- PX 577 (May 16, 2000 Email from Adams (WE) to Baumann, et al. re: TN-32 Status – May).

- PX 595 (April 10, 2001 Email from Weaver (WE) re: potential sale of TN-32 casks).

- PX 603 (May 17, 2001 Letter from Weaver (WE) to Hanson (Transnuclear) re: sale of TN-32 Cask).

- PX 607 (June 18, 2001 Letter from Hanson (Transnuclear) to Weaver (WE) re: sale of three TN-32B casks).

- PX 620 (Feb. 11, 2002 Email from Weaver (WE) to Farron re: Action plan for sale of TN-32 casks).

- PX 627 (March 18, 2002 Letter from Weaver (WE) to Hanson (Transnuclear) re: notice of suspension of work).

146. Mr. Brewer limited his opinion regarding the TN-32B to the cost of the long-lead materials. His statement that "[t]hese long lead materials were not needed for storage of spent fuel" is dependent on Mr. Hamal's opinion. Mr. Brewer failed to address any other costs that WE incurred in procuring the TN-32B casks, and he did not dispute the reasonableness of WE's continued procurement of the TN-32B casks.

- PX 880, p. 23 (Brewer report).

- Tr. 5601:8-16 (Brewer) ("Q: And you are not offering any opinion regarding whether Wisconsin Electric should have continued with the TN-32B project after it began loading VSC-24 casks, correct? . . . A: No, I'm not.").

147. It was Mr. Brewer's opinion that WE's decision to continue constructing the partially fabricated TN-32Bs to improve the marketability of those casks was reasonable.

- Tr. 5616:1-8 (Brewer) ("Q: Mr. Brewer, in your opinion, would you agree that it could be reasonable for a utility with partially fabricated backup casks to complete the construction of those casks to increase their marketability? A: I think the answer is, yes, if – and I think only if there is a clear intent and a clear effort to then market them.").

148. The PSCW approved WE's procurement of the TN-32Bs in a August 11, 1998 decision, stating:

> [t]he additional cost of purchasing up to six TN-32B casks, to be used in lieu of eight VSC-24 casks, is $5,000,000. The purchase of these casks, as a method of ensuring the reliability of Point Beach by providing a back-up option in case the VSC-24 cask remains unavailable to WEPCO, is reasonable.

PX 524, p. KRGWE002387. The PSCW also indicated that WE could use the TN-32Bs if the VSC-24 casks were not available for PBNP's scheduled refueling in spring 2000. Based on this PSCW approval, WE then recovered its incurred TN-32B cask costs and related costs through its rates.

- PX 524, p. KRGWE002387 (Aug. 11, 1998 PSCW Order approving the purchase of up to six TN-32Bs).

- Tr. 6272:15-6275:4 (Farron) (The PSCW never directed WE to discontinue purchasing activities related to the TN-32B. Mr. Farron had frequent conversations with the PSCW about cask issues. The PSCW never disallowed the costs for the TN-32B.).

- Tr. 6267:25-6270:5, 6270:12-6271:20 (Farron) (The PSCW's approval of the TN-32B acted as a prudence review and approved WE's recovery of the costs for the TN-32B.).

- Tr. 6291:3-10 (Farron) (The PSCW's August 11, 1998 Order authorized the recovery of TN-32B cask costs.).

- Tr. 6293:15-17 (Metcalfe Rebuttal).

149. WE incurred approximately $5,059,000 in TN-32B cask costs and related costs. If WE had decided to terminate the TN-32B effort in spring 2000 based on the PSCW's August 1998 Order, WE would have spent from $2,508,000 to $3,230,000, with the likely cost being at the high end.

- DX 625, p. WXE0220135 (Updated Attachment to Kiraly Expert Report).

- Tr. 6295:23-6298:12 (Metcalfe rebuttal testimony).

- PX 503 (May 7, 1998 WE purchase order to Transnuclear, Inc. for three TN-32 casks).

- PDX 63a (Range of TN-32 Costs as of March 2000).

150. DOE's breach of the Standard Contract was a substantial causal factor in WE's incurrence of costs related to the VSC-24 recovery effort and the TN-32B cask acquisition.

In addition, it was foreseeable to DOE that WE would incur costs related to spent fuel storage and that WE might encounter difficulties in this complex endeavor if DOE did not commence SNF acceptance by January 31, 1998. WE also acted reasonably in incurring these costs given that it was seeking a backup cask in case there continued to be problems with the VSC-24 cask. If WE was unable to load any casks, this would eventually have resulted in the shutdown of Point Beach.

- PFF 50, 135.

- *Southern Nuclear*, 77 Fed. Cl. at 422-27 (discussing complexity of ISFSIs and casks).

## XV. IN 2000, WE APPLIED TO THE PSCW FOR ADDITIONAL CASKS AND SELECTED THE NUHOMS SYSTEM FOR WE'S FUTURE STORAGE NEEDS

151. WE required another PSCW authorization to load more than the 12 casks approved in the February 1995 Order. WE began preparation of the second dry fuel storage application in 1999 and submitted the application in May 2000. In March 2001, the PSCW approved WE's application for the purchase and use of 36 additional casks at PBNP's dry storage facility. In WE's 1991 dry storage application, WE had applied to use 12 VSC-24 casks, and the resulting PSCW Order limited PBNP to the use of 12 VSC-24 casks. In its second dry storage application, WE elected not to limit itself to a specified cask because of the performance problems that WE had encountered with the VSC-24 cask.

- Tr. 2512:21-2513:8; 2514:11-14; 2517:21-2518:13; 2518:20-2519:9; 2521:6-9; 2522:15-2523:24 (Farron).

- Tr. 1784:12-1785:10; 1785:15-1787:8; 1787:19-1788:8 (Becka).

- PX 236 (Nov. 1991 ISFSI application and ESR).

- PX 374 (Feb. 1995 Order).

- PX 575 (May 2, 2000 Second Dry Fuel Storage ("DFS") Application).

- PX 576 (May 10, 2000 Correction to Second DFS Application).

- PX 592 (March 27, 2001 PSCW Final Decision).

- PFF 136-137, 141.

152. WE and NMC continued to evaluate the best cask for future use at Point Beach. They decided to move to a dual-purpose cask that could be used for both storage and transport. In early 2001, after careful consideration of various dual-purpose casks, the PBNP Dry Storage Group selected the NUHOMS system. The NUHOMS system offered numerous safety and operational advantages over the VSC-24, as well as dual-purpose capability.

- Tr. 1788:9-1789:5 (Becka) (WE sought competitive bids and oral presentations from providers of dual-purpose systems.).

- Tr. 1790:21-1791:7; 1795:7-1808:13 (Becka) (WE's decision-making process in selecting the NUHOMS system).

- PX 602 (May 15, 2001 Memorandum regarding the selection of the next dry cask storage design at Point Beach).

- Tr. 1778:13-1780:7 (Becka) (noting concerns about hydrogen buildup during the unloading of a VSC-24 cask when the spent fuel was moved to a transportation cask).

- PX 692 (NMC Purchase Order P4500424608 with Transnuclear).

a. The NUHOMS system was designed for storage and transport and, when selected by PBNP in 2001, was licensed to store a greater variety of spent fuel than the VSC-24.

- Tr. 1773:16-1774:23 (Becka) (noting that there were limitations on the fuel that WE could load into the VSC-24 cask).

- Tr. 206:17-207:14 (Baumann).

b. As a storage-only cask, the VSC-24 would need to be unloaded into the spent fuel pool and the fuel assemblies transferred to a transportable cask before

the fuel could be shipped offsite. As a result, WE has provided financial support for efforts to have the NRC license the VSC-24 cask as a dual-purpose cask.

- PX 374, pp. 10-11 (1995 PSCW Order).

- PX 592, pp. 9-10 (2001 PSCW Order).

- Tr. 1834:1-1841:17 (Becka) (explaining advantages of not having to unload a storage-only cask and discussing WE's participation in the effort to license the VSC-24 cask as a dual-purpose cask).

- PX 639 (Sept. 18, 2002 BNFL Proposal to VSC-24 owners for transportation licensing feasibility evaluation).

- Tr. 5627:3-14 (Brewer) ("Q: Given what you just said Mr. Brewer, do you think it's reasonable to attempt to license the VSC-24 for transportation? A: Well, let me answer that in a couple ways. One is I'm not sure about the reasonableness, without some certainty that I can actually transport them. On the other hand, the amount of money being spent to license those casks is not very large, so even in the face of uncertainty, if it were up to me, I might believe it was a reasonable thing to spend that money.").

- PX 793, p. 10 (May 2006 ERI Expert Report Regarding The Development of Dual-Purpose Casks, ERI-2098-0602 and exhibits thereto) ("[M]any of the ISFSIs that began operation in the 1980s and 1990s are in the process of transitioning from storage-only dry storage systems to dual-purpose systems, including Wisconsin Electric's Point Beach ISFSI.").

c. WE believed that the costs for dual-purpose casks would be only slightly higher than the costs for storage-only casks because PBNP would not need to transfer fuel from a dual-purpose cask to a transportable cask prior to shipping fuel off-site. The minimized fuel handling also reduced the likelihood of an accident and reduced radiation exposure to WE's employees. Thus, it was safer to load.

- Tr. 2779:5-10 (Anundson) (Opening a VSC-24 to repackage the fuel would expose workers to radiation.).

- Tr. 2531:21-2532:22 (Farron) (noting that the advantage of not having to unload spent fuel prior to shipping it for disposal is a cost-savings issue).

- Tr. 293:25-295:22 (Baumann) (WE is required to do an economic analysis based on dollars per REM of radiation exposure in an effort to minimize dose to workers.).

- Tr. 1726:10-1727:1 (Becka) (reduced radiation exposure).

- Tr. 1719:10-1720:2; 1721:14-21; 1726:12-1727:1 (Becka) (NUHOMS is safer to load than a VSC-24 and reduces the radiation dose to which workers are exposed.).

- PX 575, p. 5 (May 2, 2000 Letter from Salustro to Dorr).

- PX 589, p. 4 (Dec. 2000, Direct Testimony of M. Baumann before the PSCW) ("Our desire and plan is to select a storage system that is certified as a dual-purpose cask, thereby eliminating the potential need to unload a storage cask for placement of the spent fuel assemblies in a cask designed and certified for transport.").

d. It is easier to load a NUHOMS cask than a VSC-24 cask. Fewer people are needed to load a NUHOMS cask. WE expected that the NUHOMS system would have shorter, and therefore less expensive, loading evolutions. In fact, Point Beach has been able to load a NUHOMS cask in as little as five days, compared with eight to nine days to load a VSC-24 cask.

- Tr. 1725:18-1726:4 (Becka) ("For the VSC-24 design, our experience at Point Beach was that the loading evolution [for the VSC-24] lasted approximately eight to nine days. That time period, I should note, is with two 12-hour shifts, so in other words, working around the clock for that period of time. For the NUHOMS system, our experience was that the loading evolution lasts approximately four to five days – or four-and-a-half days.").

- Tr. 2008:2-6 (Holzmann) ("[F]or the VSC-24, it took on the order of 70 to 80 individuals to load a canister. For the newer 32PT design, it takes approximately half of that, 40 to 50 individuals to load a canister.").

- Tr. 2714:20-2716:23 (Farron).

- Tr. 6304:14-6308:18 (Metcalfe).

- DDX 5-56 (Pursuit of Dual-Purpose Casks).

- DDX 5-57 (Pursuit of Dual-Purpose Casks).

- Tr. 5610:23-5611:10 (Brewer) (It is more difficult to load a VSC-24 cask than a NUHOMS cask.).

e. WE prefers to minimize the presence of explosives gases when loading dry storage containers and preferred the NUHOMS because loading a NUHOMS generates far less hydrogen gas than loading a VSC-24.

- Tr. 1715:3-1717:21; 1724:22-1725:9 (Becka) ("Based on my experience, I would say that the VSC-24 MSB probably produced, you know, anywhere from 10 to 100 times more hydrogen than the NUHOMS cask . . .").

- Tr. 1772:25-1773:15 (Becka) ("You know, we'd been involved in the recovery efforts since the group came together in 1997, and none of us liked the idea of having hydrogen present while we were welding. It was just not conducive with good nuclear safety practices, so we didn't like the VSC-24. We knew there were other designs out there that were better.").

f. The nuclear industry was moving toward dual-purpose casks during this period (2000-2001) and, since the NRC licensed the first dual-purpose cask, almost all nuclear utilities have moved dual-purpose casks. A utility wants to use casks that are in use at other facilities so that utilities can share information and receive better vendor support.

- Tr. 1775:20-1777:10 (Becka) (discussing owners' group meetings and the sharing of information among utilities).

- PX 793, p. 10 (May 8, 2006 ERI Expert Report Regarding the Development of Dual-Purpose Casks, ERI-2098-0602 and exhibits thereto) ("Due to the fact that DOE did not begin acceptance of spent nuclear fuel in January 1998, a significant need for at-reactor dry storage of [SNF] now exists – 58 plants at 34 sites have loaded spent fuel into dry storage facilities as of April 2006. The number of plants requiring dry storage will continue to increase as the DOE program continues to experience delays. . . . As shown in Table 1, *nearly all of the dry storage facilities that have been commissioned at nuclear power plant sites since 2000 have loaded spent fuel into dual-purpose storage systems.* In addition, many of the ISFSIs that began operation in the 1980s and 1990s are in the process of transitioning from

storage-only dry storage systems to dual-purpose systems, including Wisconsin Electric's Point Beach ISFSI." (Emphasis added)).

- Tr. 3350:15-3368:17 (Supko) (particularly at 3360-3361: "The majority, 99 percent, have loaded dual-purpose casks [since 2000]. There may be one or two facilities that have continued to load storage only packages, and that has to do with their own unique situation, in that they already have a large quantity of storage only packages loaded. Q: And what about those companies that began loading spent fuel into dry storage before the NRC certified dual-purpose casks in 2000? What is the practice of those companies today? A: They have, . . . , the majority of companies that loaded storage only originally have since transitioned to loading dual-purpose casks. There are one or two facilities that continue to load systems that are only certified for storage, although the new designs may actually be transportable, they don't have certificates for transport, so you can't call them dual-purpose yet. But the vast majority of companies that loaded storage only in the 1980s and 1990s are now putting their fuel into dual-purpose casks.").

- PDX 56 (At-Reactor Spent Fuel Storage Installations).

- Tr. 5608:24-5609:1 (Brewer) ("Q: Mr. Brewer, as of today, no utilities are fabricating any more VSC-24 casks, correct?").

- PDX 57 (At-Reactor Spent Fuel Storage Installations [graph]).

g. WE was able to gain financial efficiencies of scale because the NUHOMS cask and associated rental equipment were purchased at other NMC fleet plants.

- Tr. 1805:25-1808:25 (Becka) (WE received a price break on the NUHOMS systems because another NMC plant used the NUHOMS cask.).

- PX 597 (Transnuclear NUHOMS proposal).

- PX 602, p. WISC000101013 (May 15, 2001 Memo to Reddemann from Becka).

- PX 608, pp. WISC00007822-7833 (Contract Number 30000023).

- PX 724 (NMC Purchase Order P4500424608).

h. Starting in 1995, the PSCW had been urging WE to consider the use of dual-purpose casks once they became available. While WE and NMC independently

selected the appropriate cask for Point Beach, WE had to consider the PSCW's desire that WE be able to move its spent fuel out of Wisconsin as soon as possible with the use of dual-purpose casks because WE needed the PSCW's approval for the additional 36 casks.

- Tr. 1785:11-1786:11(Becka) (discussing the PSCW's desire that WE use dual-purpose casks so that the fuel could be shipped out of Wisconsin as soon as possible).

- Tr. 2656:10-17 (Farron) (Using dual-purpose casks allowed you to just ship the cask right off the Point Beach site.).

- PX 575, pp. 3, 5 (May 2000 Letter to PSCW).

- PX 374, pp. 10-11 (1995 PSCW Order).

- PX 592, pp. 9-10 (2001 PSCW Order).

i. WE was concerned with the narrow range of spent fuel that the VSC-24 was licensed to accommodate. The VSC-24's license, prior to WE's switch to the NUHOMS dry storage system, limited the burn-up and enrichment levels so that not all Point Beach SNF could be stored in the VSC-24.

- Tr. 1567:1-1568:9 (Krieser) ("Q: Were there any other potential issues that you recall with regard to the VSC-24 casks? A: I think there was one having to do with the currently existing certificate of compliance requirements. There were specific limitations on the enrichment and burn-up requirements for the fuel that was placed in those casks, and because of that, the amount of fuel at Point Beach that could be placed in the VSC-24 cask was significantly limited by that. Eventually, BNFL, that was as late as 2003, eventually, BNFL received a revised certificate that expanded those limits, but by that time, Wisconsin Electric had proceeded down a completely different path.").

- Tr. 1773:16-1774:23 (Becka) ("Q: After you had resumed loading, however, were there any other disadvantages to the VSC-24, besides the hydrogen issue, as you planned on your storage needs? A: Yeah. As we looked into the future, the VSC-24 at that time offered a disadvantage in that it was only licensed to be able to handle what were called Westinghouse standard fuel assemblies. Westinghouse standard assemblies are the type of

fuel that we used at Point Beach from initial start-up of unit one in 1970 to approximately 1987. So the only types of fuel assemblies we could use in the VSC-24 were these older, colder fuel assemblies. . . . So one of the things with the VSC-24 was its limitation on the fuel that we could load in it.").

153. There are no utilities currently loading VSC-24 casks.

- Tr. 5608:24-5609:1 (Brewer) ("Q: Mr. Brewer, as of today, no utilities are fabricating any more VSC-24 casks, correct? A: That's correct.").

154. As documented in her expert report and as Ms. Supko explained at trial, DOE foresaw the possible use of multi-purpose casks at the time when the parties executed the Standard Contract. From the start of the FWMS in the early 1980s, DOE considered the use of dual-purpose casks as part of the waste management system and encouraged the development of dual purpose casks through a cooperative agreement. Further, DOE endorsed and encouraged the utilities to utilize dual-purpose canister systems for at-reactor storage and considered compensating companies for the avoided costs to the DOE program. Today, DOE's own planning assumes that DOE will accept commercial spent fuel in dual-purpose canisters at the permanent repository. This planning assumption is contained in numerous DOE technical and environmental documents as well as DOE system requirements documents. DOE continues to consider contract modifications to address acceptance of dual-purpose canisters.

- PX 793 (May 2006 ERI Expert Report Regarding the Development of Dual-Purpose Casks, ERI-2098-0602 and exhibits thereto).

- Tr. 3199:4-3403:3 (Supko).

- PDX 58 (1983 to 2007 Timeline).

- PDX 59 (Summary of Opinions Regarding DOE's Actions Associated with the Development of Dual Purpose Casks).

- PX 52, pp. 2-15 (Dec. 20, 1983 Mission Plan, Vol. 1, Overview and Current Program Plans, Draft) ("As a further contingency, the Department will continue to explore the feasibility of multipurpose storage cask that could be used for the FIS either at commercial reactors or at a federal site. If

feasible, such a cask would be designed so that it could later be used in a repository program, MRS program, or in the transportation of spent fuel."); and pp. 3-E-2 through 3-E-3 ("Waste canisters and transportable storage casks may be provided to the utilities that may also be used to help solve near-term storage problems and minimize additional utility costs. This approach could be developed as an option available to reactor operators that desire it.").

- PX 59, pp. 2-9, 2-12 (Mission Plan, Vols. 1 and II, DRAFT, reprinted July 1984).

- PX 87, p. 110 (June 1985 Mission Plan for the Civilian Radioactive Waste Management Program).

- PX 105, p.2 (July 31, 1986 RFP for Development of From-Reactor Casks) ("It is anticipated that DOE will negotiate and award several cost-reimbursement-type contracts including, if suitable proposals are received, more than one in each category: legal weight truck, overweight truck, rail/barge, and dual-purpose (transport/storage) casks.").

- PX 365, pp. 3-4 (Dec. 12, 1994 DOE Notice of Assistance Award).

- PX 216, pp. WISC00124199, WISC00124201 (U.S. House of Representative Report 101-536, 1991) ("The conferees direct the Secretary of Energy to develop a plan to implement the cooperative research development demonstration project of spent nuclear fuel dual purpose (storage and transportation) casks described in House report 101-586 under nuclear energy programs. Such plan, which shall be submitted to the House and Senate Committees on Appropriations no later than March 31, 1991, shall include a recommendation to insure the full federal funding of the project in fiscal years 1992 and 1993.").

- PX 166 (Feb. 27, 1989 Letter from Berryman to Stein).

- PX 180 (Sept. 20, 1989 Letter from Kraft to Stein).

- PX 276 (Dec. 17, 1992 Letter from Watkins to Johnston).

- PX 348, pp. 1-2, 1-3 (Sept. 1994 Multi-Purpose Canister System Evaluation, A Systems Engineering Approach).

- PX 341 (June 3, 1994 RW Environmental Safety Systems Inc., Request for Proposal for the Multi-Purpose Canister (MPG) System).

- PX 273 (Dec. 1992 EEI Universal Container System Concept Paper, prepared for the Universal Container System Task Force).

- PX 308, p. 1 (Sept. 2, 1993 Letter from Barrett to Shetler) ("Once the Nuclear Regulatory Commission has certified Sacramento Municipal Utility District's transfer-storage system, the department would be willing initiate the appropriate actions to include such a system as an acceptable waste from under the terms of the *standard contract for the disposal of spent nuclear fuel and/or high-level radioactive waste* (10 C.F.R. part 961)." (Emphasis in original)).

- PX 448, pp. 3, 25 (Dec. 27, 1996 Office of Management Support, Headquarters Procurement Operations, Acquisition of Waste Acceptance and Transportation Services, Draft).

- PX 537, pp. 3, C-8, C App 3-1 (Sept. 11, 1998 Letter from Barrett to Potential Offerors.

- PX 420 (June 10, 1996 Status of Standard Canister Definition and RSA Canister Procurement Requirements).

- PX 528 (Aug. 18, 1998 Letter from Shelor to Lanning).

- PX 594 (April 6, 2001 Letter from Zabransky to Redeker).

- Tr. 5775:15-5777:14 (Zabransky) (discussing PX 594 and D. Zabransky's agreement with its contents).

- PX 587, p. 7 (Dec. 2000 Report to the House Committee on Appropriations) ("The Department proposes to accept utility-acquired storage/transportation systems, and if they are suitable for use at the Federal Facility the Department would be willing to consider compensation for avoided costs associated with the use of utility-supplied equipment.").

- PX 1004, p. WISC1004-0025 (March 20, 2003 Testimony of Margaret Chu before the House of Representatives, Subcommittee of Committee on Appropriations) ("The Department believes the best approach is to pursue an overall modification to the disposal contract, which would involve several issues, including acceptance of multi-assembly canister systems. Unfortunately, due to ongoing litigation between the parties to the disposal contract, the Department is limited in what it can presently do.").

- PX 546 (Viability Assessment of a Repository at Yucca Mountain, 12/98).

- PX 786, pp. 2-6, 2-8 (Draft EIS for Disposal at Yucca Mountain).

- PX 601, pp. 2-34, 2-35 (US DOE, Yucca Mountain Science and Engineering Report, Technical Information Supporting Site Recommendation Consideration, [CD]) ("Commercial spent nuclear fuel would arrive as individual fuel assemblies placed directly into transportation casks, or in dual-purpose canisters which would have to be opened to remove the fuel assemblies.").

- PX 619, pp. 2-21 to 2-23 (Chapter 2) (Electronic versions of Yucca Mountain Draft EIS, Final EIS and Engineering Report).

- PX 711, pp. 8, 11 (May 2006 System Requirements Document, Rev. 07) ("CRWMS elements and facilities shall be capable of accommodating a range of storage and transportation technologies, including Transport, Aging and Disposal, dual-purpose, single-purpose, DOE SNF Standard, Naval SNF and HLW canisters, as well as Multi-Canisters Overpacks and limited quantities of bare SNF assemblies.").

- PX 1046, p. 42 (System Requirements Document, Rev. 5/07).

- PX 331 (March 1994 Milner Program Baseline Memorandum).

- PX 330 (Milner Presentation on Interim Storage Options).

- PX 1052 (Milner Dep. Desig. 5/7/02 *Yankee* Tr. 6:10-8:15 ("My understanding is that we're planning on having the capability to accept . . . canistered fuel.")).

- PX 1052 (Milner Dep. Desig. 5/8/02 Tr. 57:13-60:19; 61:6-14; 218:5-221:16; 221:17-226:4 (The FWMS is going to accept dual-purpose canisters. Whether the NRC licenses the canisters for dual-purpose or as multi-purpose will determine whether DOE can dispose of them as is or whether DOE needs to place them in an overpack for disposal. "Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously we would prefer not to have to open them and create another waste stream.")).

- PX 1052 (Dreyfus Dep. Desig. 5/15/02 Tr. 117:10-119:5 (It was DOE's objective to take spent fuel from utilities that had been put into canister.)).

- Tr. 5762:4-9 (Zabransky) ("Q: And it's your view, isn't it, that DOE will ultimately accept dual purpose casks from the utilities? A: It's my view that, ultimately, there'll be at least one contract amendment that will have us do that, yes.").

- Tr. 5762:16-5764:1 (Zabransky) ("Q: I want to make sure we're clear on this then, has DOE asked a repository contractor to design the Yucca Mountain facilities so that they are capable of accepting dual purpose casks? A: And I just answered that the facility design will have the capability of accepting and processing a limited number of canisters.").

155. In March 2002, NMC entered into a purchase order with Transnuclear, Inc., to acquire the NUHOMS casks.

- Tr. 1697:4-12; 1808:14-25; 1868:15-21 (Becka).
- PX 724 (NMC Purchase Order P4500424608).
- PX 1029, p. KRGWE003846 (ISFSI Plan View).
- PX 740.009 (Point Beach Nuclear Plant Photo: NUHOMS System in service).

156. WE incurred costs in making plant changes necessary for the use of the NUHOMS system at Point Beach.

- Tr. 1814:24-1816:17 (Becka) (contractors involved in the start-up of the NUHOMS system at Point Beach).
- Tr. 1819:18-1827:22 (Becka) (ISFSI and PBNP Auxiliary Building modifications and contractors involved in the modifications).
- Tr. 1816:18-1817:19 (Becka) (Costs related to implementation of the NUHOMS system at PBNP were billed to WBS 3.0182. The costs were reported to the PSCW on a monthly basis.).

157. DOE's breach of the Standard Contract was a substantial causal factor in WE's incurrence of costs related to the NUHOMS system. WE also acted reasonably in deciding to utilize dual-purpose casks and in incurring these costs.

- PFF 50, 135.

## XVI. IF DOE HAD PERFORMED, WE WOULD NOT HAVE BUILT A DRY STORAGE FACILITY

158. The WE witnesses, the majority of whom are no longer WE employees and have no current association with WE, understood that WE decided to develop the dry storage

program because of DOE's untimely performance. The only WE witness who may be an exception is David Zabransky, now DOE's Contracting Officer and a principal DOE witness in the SNF litigation. Mr. Zabransky was not the individual at WE who decided whether to implement the dry storage project. He also is not the individual who would have decided what WE would have done in the non-breach world. The WE official who made the actual decision to implement dry storage and who would have made spent fuel management decisions in the non-breach world was the Vice President of the Nuclear Department, Robert Link. Mr. Link testified that, in the non-breach world, WE would have used a temporary rack and would not have built dry storage. Even Mr. Zabransky, however, concedes that WE informed the PSCW that WE could operate at least into 1998 without dry storage.

- Tr. 331:10-338:4; 352:7-21; 414:16-415:7; 549:19-550:6 (Link). (As Vice President of the Nuclear Department, Mr. Link (1) was the decision-maker; (2) finally decided on dry storage in 2/95; and (3) would not have chosen dry storage in the non-breach world.).

- Tr. 427:12-17 (Link) ("Q: Sure. If DOE had performed, would Wisconsin Electric have avoided the need to construct dry storage? A: Yes, if DOE performed under their obligation of the contract, we would not have pursued dry storage.").

- Tr. 352:7-353:22 (Link) ("Q: Given the results of the briefings that you received and the fact that Wisconsin Electric could operate until 1998, as you indicated, why did you decide to proceed with the dry storage application? A: It was clear in my mind that DOE was not going to be picking up fuel as required in 1998. . . . Q: And why was it clear to you that DOE was not going to be picking up fuel as required in 1998? . . . A: Well, my own personal knowledge, as I've stated before, in terms of interactions with NEI, my colleagues of [sic] the industry, our own assessments, but DOE itself, in their proclamations, said they were not going to be ready until, at the earliest, 2003, and then later, later dates were pronounced.").

- Tr. 1530:19-1531:3 (Krieser) ("Q: Wasn't it your understanding at this time that, if DOE had performed under the standard contract, that Wisconsin Electric would not have built dry storage? A: There's no question in my mind that that's what we believed, and that was certainly my understanding, yes. Q: And does that remain your understanding today? A: Yes, it does.").

- Tr. 2174:21-2176:2 (Porter) ("Q: Did Wisconsin Electric start to plan for DOE's anticipated nonconformance [sic]? A: We did, we had to begin planning for that because it was clear to us, by the late 1980s, that the Department was not going to be able to start taking fuel in 1988 [sic].").

- Tr. 844:20-845:18 (Hennessy) ("The nuclear power department told me that the Department of Energy was not going to be picking up fuel in 1998, and therefore, we were planning to do dry storage, so that we could continue to operate the Point Beach Plant.").

- Tr. 2511:11-24 (Farron) ("Q: When you joined Wisconsin Electric, did you gain an understanding regarding why Wisconsin Electric had submitted its dry storage project application to the PSCW? A: Basically, from the minute I took a position with Wisconsin Electric, I was informed that DOE was not going to pick up spent fuel in 1998, and it was a major concern for the utility because, after 1998, the plant did not have permanent storage, spent fuel storage capability in the spent fuel pool.").

- Tr. 2813:25-2814:18 (Conry) (It was the general understanding of the nuclear power department that Point Beach could operate until 1998 without dry storage.).

- Tr. 2913:1-10 (Straub).

- Tr. 1164:16-1165:14 (Zabransky) (WE indicated to the PSCW that Point Beach could operate until 1998 without dry storage.).

- Tr. 570:2-571:5; 579:23-580:3 (Zabransky) (The person who had the authority to bind WE was the vice president of nuclear.).

## A. WE COULD HAVE OPERATED AT LEAST INTO 1998 AND, IF NECESSARY, INTO 1999 WITHOUT DRY STORAGE

159. If DOE had performed its obligations under the Standard Contract, WE would not have built dry storage. WE knew that it had sufficient capacity to operate at least into 1998, and, if necessary, into 1999 without additional spent fuel storage. WE knew that applying to the PSCW for approval for a dry storage facility would have been protracted, contentious and costly. WE would have avoided dry storage in the non-breach world.

- Tr. 1527:12-19 (Krieser) ("Q: Did your group ever make a determination as to whether Point Beach could have operated until 1998 without dry storage? A: We evaluated that issue extensively and regularly,

and we always were able to conclude that we could make it to 1998, and even slightly beyond, in some instances, without a dry storage facility.").

- Tr. 342:13-344:12 (Link) ("A: 'Indeed, it is the uncertainty with respect to DOE's plans which prompted Wisconsin Electric's development of the flexible spent fuel storage installation plan proposed in this proceeding.' Q: At the time that Mr. Martin wrote that sentence [in PX 266], did you agree with that? A: Absolutely.").

- PX 266, p.2 (Oct. 1992 Letter from WE counsel to the PSCW).

- Tr. 337:16-338:1 (Link) ("But the bottom line was that it was clear that, because DOE was not going to perform in '98, we had to implement a long-term strategy, a strategy that had what I call modular characteristics.").

- Tr. 522:13-22 (Link) ("I've already testified that my belief was if DOE would have performed to pick up fuel in 1998, it would have mitigated the requirement to implement an ISFSI.").

- Tr. 892:9-893:7 (Hennessy) ("Q: Let's talk a little bit about what Wisconsin Electric would have done if DOE had actually performed. If DOE had taken spent fuel starting in 1998 from Point Beach, would Point Beach have needed dry storage? A: No, sir. Q: What was your basis for saying so? A: My basis for saying so is that, knowing we recovered spaces in the spent fuel pool and also that we could have changed our core operating strategy, had we chose to do so, we could easily have made it to 1998 without dry storage.").

- Tr. 166:4-171:4; 209:14-20 (Baumann) (demonstrating how Point Beach could have operated until somewhat short of the spring of 1999 without dry storage).

- PDX 7 (Inventory Chart drawn by Baumann).

- Tr. 2552:3-2553:6 (Farron) (WE's belief was that DOE was not going to begin acceptance of spent fuel in 1998 and that Point Beach could have operated into 1999 without dry storage.).

- Tr. 2577:6-16 (Farron) ("Based on my knowledge and understanding, definitely the utility would have preferred to use something other than dry fuel storage in the nonbreach world.").

- Tr. 2807:25-2808:8 (Conry) ("Since the DOE appeared to not be on a schedule to be able to take fuel away from the spent fuel pool, we had to come up with some other means of addressing the spent fuel storage. There

were different options available, but the dry fuel storage option that was ultimately pursued appeared to be the best choice at that time.").

- Tr. 2813:25-2814:18 (Conry) (Point Beach could operate until 1998 without dry storage.).

- Tr. 1532:21-1524:25 (Krieser) ("I would say, in a nutshell, the conclusion was – and, of course, again, this was based on the fact that DOE was not going to be there in 1998. We needed to address the situation in a long-term fashion, . . . and we also concluded that dry storage was really the best option to solving that particular problem.").

- PX 360 (1994 Point Beach Spent Fuel Inventory).

- PX 236, ESR p. 59 (Nov. 1991 ISFSI application and ESR).

160. Any projection of future spent fuel capacity depends on two factors: (1) the projected annual discharges and (2) the spaces in the pool that are available for the storage of spent fuel. In the non-breach world, WE could have used 1500 spaces in the spent fuel pool.

- Tr. 169:6-7; 170:140171:4 (Baumann) (comparing projected discharges against 1500 space capacity).

161. Fuel management options were available to enable WE to operate at least into 1999 without dry fuel storage. WE nuclear personnel had knowledge and expertise regarding various fuel management methods that could minimize the discharges into the spent fuel pool. These methods include increasing uranium fuel enrichment with larger diameter fuel rods, changing the duration of the operating cycles, using a "coast down" at the end of a refueling cycle, or increasing fuel burn-up rates. The earlier that Point Beach employed such methods, the more space in the spent fuel pool that could be saved over a given period of time through reduced discharges. WE did not employ some of the methods available because there was no need to do so in the actual (breach) world.

- Tr. 127:7-128:21; 169:6-173:2; 278:4-281:6; 283:6-286:1 (Baumann).

- PX 236, ESR pp. 38-39, 59 (Nov. 1991 ISFSI application and ESR).

- PX 313 (Oct. 11, 1993 Memo from Kohrt re: 24 Feed Feasibility Team Meeting Minutes).

- Tr. 873:21-875:1; 875:11-876:15; 876:18-881:9 (Hennessy).

- Tr. 2552:12-2553:6; 2588:6-2589:6 (Farron) (WE "likely could have operated into 1999.").

- PX 590, p. 6 (DOE stated that increasing the average burn-up of assemblies used at Prairie Island Nuclear Power Plant "would result in the generation of less spent fuel while maintaining the level of power generation.").

162. Point Beach could operate at least into 1998 without dry storage based on an analysis projecting discharges and available spaces in 1991 when WE submitted its PSCW application or, in 1992, when Mr. Link decided to continue with the PSCW application. Calculating from 1991 forward based on available spent fuel spaces and annual combined discharges of 56 SNF assemblies for the two Point Beach units, WE could have operated at least into 1998 without dry fuel storage.

- Tr. 867:21-874:7 (Hennessy).

- PDX 9 (Running total of discharges).

- PX 236, ESR pp. 38-39, 59 (Nov. 1991 ISFSI application and ESR) (showing that 1361 locations would be filled with SNF in 1996 and noting that WE could have employed a variety of spent fuel management options to avoid construction of an ISFSI had DOE performed).

163. The Kenrich Fuel Management Model calculates the Point Beach spent fuel pool effective capacity and the total annual amount of spent fuel that would have been stored at Point Beach in the non-breach world in which DOE performs. Further, it incorporates the DOE acceptance allocations available to WE to avoid additional SNF storage. It confirms WE's position that, based on Point Beach's actual discharges, a temporary cask pit rack would have provided sufficient storage to maintain FCR at Point Beach and that WE would

not have built dry storage in the non-breach world. The temporary rack issue is discussed more fully below.

- Tr. 3746:18-3765:18 (Sieracki).

- PX 796, pp. KRGWE003253-57 (Kenrich Binder BB: Revised Fuel Management Model).

- PX 1029, pp. KRGWE003838-3847 (April 2007 Errata).

- PDX 60-Sieracki 21-34 (Slides re: Fuel Management).

164. Mr. Gadzala testified that, when he was an NRC resident inspector at Point Beach, he became familiar with the contents of the spent fuel pool. The primary function of NRC resident inspectors is to be the "front line eyes and ears" of the NRC by carrying out the NRC plant inspection program. He also gathered information relating to the Point Beach spent fuel pool pursuant to direction from NRC Region III. Mr. Gadzala learned from his inspection activities that Point Beach could operate at least until mid-1998 and potentially beyond that date before the pool's capacity would be reached. Mr. Gadzala gathered this information from Wisconsin Electric personnel including Bill Hennessy and Mike Baumann.

- Tr. 2365:3-14; 2378:1-4; 2380:16-2383:24; 2384:7-21 (Gadzala).

165. The PSCW believed that Point Beach could operate at least into 1998 and, if necessary, into 1999 without dry storage.

- PFF 114.

166. In the non-breach world, Point Beach would not have switched to 18-month refueling cycles in 1998 if it would have created storage problems in the pool. WE could have switched to 18-month cycles either earlier or later in time. Instead, WE would have taken steps to maximize available spaces in the spent fuel pool during the 1998 time frame.

- Tr. 289:17-293:7; 293:9-16 (Baumann) ("Q: If DOE was going to perform and you wanted to be able to operate until 1998, would you have used 18-month cycles at the time indicated in this chart? [objections omitted] A:

Looking at the column labeled, 'Number of assemblies discharged during the year,' it's obvious that going to an 18-month cycle required additional discharges. At the time, it was assumed 18-month cycles would start the '88 [sic] fuel assembly discharge. *If that was an issue, that certainly would not have been a planned discharge at that point in time*." (Emphasis added)).

- Tr. 293:9-16 (Baumann) ("Point Beach was one of the last utilities to change to 18-month fuel cycles.").

- Tr. 659:13-21 (Zabransky) ("Q: And do you recall during the period, let's say – I'll expand a little bit, 1988 through 1994, whether Wisconsin Electric considered going from 12-month cycles to 18-month cycles? A: I think we considered that, going back as far as I can remember in the mid-'80s, that was something that we looked at every year, from a fuel management perspective.").

167. None of the Government experts analyzed or offered an opinion regarding whether WE would have built an ISFSI if DOE had timely performed in 1998.

- Tr. 5947:17-23 (Hamal) ("Q: Just so I understand the analysis in section 3 of your report always treats as sunk costs the costs incurred by Wisconsin Electric in permitting and constructing the ISFSI and the costs of acquiring four VSC-24 casks and the costs of loading two casks, correct? A: That's right.").

- Tr. 5952:8-21 (Hamal) ("Q: Now, in your report and based on the direction of Department of Justice counsel, did you assume whatever happened prior to January 1998 in the actual world was going to be exactly the same in the would have been world? A: Again, with a soft caveat around necessarily being January '98 as opposed to that general timeframe which might be measured in a couple of months, yes, I assumed everything would have been the same with respect to major decisions being made for spent nuclear fuel storage, but not with respect to language in documents and statements made.").

- Tr. 5970:12-20 (Hamal) ("Q: So you never evaluated whether or not Wisconsin Electric believed earlier in time like in the '80s or '90s whether DOE was going to be substantially delayed. And if so whether that would have impacted Wisconsin Electric's analysis of its spent fuel storage alternatives, correct? A: I haven't offered an opinion on that, no.").

- Tr. 5590:2-17 (Brewer) ("Q: I'd like to go on to your section about off-site storage. Mr. Brewer, you have not done an analysis on whether Wisconsin Electric would have built an ISFSI had DOE timely performed in

1998, right? A: I've not done analysis although, like I said before, I think the application for the ISFSI said they needed it before 1998, but I have not evaluated or analyzed any of that, I'm not testifying one way or the other about that. Q: And you are not offering an opinion on whether Wisconsin Electric actually would have built an ISFSI had DOE timely performed, correct? A: I am not offering an opinion about that one way or the other.").

- Tr. 6073:1-6252:22 (Kiraly).

- PX 880 (Brewer report).

- PX 862 (Kiraly report).

- PX 864 (Aug. 11, 2006 Letter from DOE to Perkins Coie attaching replacement pages for Kiraly report).

- PX 828 (Hamal report) (assuming ISFSI built in 1995 and opining on how many casks would have been loaded in 1998).

## B. WE HAD THE ABILITY TO MAKE 1500 POOL SPACES AVAILABLE

168. Point Beach's Reactor Engineering group keeps track of items that are placed in the pool and performs an annual inventory of the pool to reconcile the record inventory with the physical inventory. The inventory catalogues fuel assemblies as well as other items in the pool. Point Beach uses underwater cameras for this purpose and the cameras are operated from the pool bridge. In the early 1990s, when Mr. Hennessy became supervisor of Reactor Engineering, he performed the mandatory annual inventory so that he could understand exactly the manner in which it is conducted.

- Tr. 845:20-852:25 (Hennessy).

- PFF 13.

- PX 311 (Sept. 30, 1993 Memo from Hennessy to Maxfield).

- PX 740.49 (Point Beach Nuclear Plant Photo – SNF Pool Bridge).

- PX 740.64 (Point Beach Nuclear Plant Photo – Reactor Eng. Equipment).

- PX 136 (Annual Inventory of Fuel Assemblies, 1987).

- PX 154 (Annual Inventory of Fuel Assemblies, 1988).
- PX 179 (Annual Inventory of Fuel Assemblies, 1989).
- PX 203 (Annual Inventory of Fuel Assemblies, 1990).
- PX 234 (Annual Inventory of Fuel Assemblies, 1991).
- PX 260 (Annual Inventory of Fuel Assemblies, 1992).
- PX 311 (Annual Inventory of Fuel Assemblies, 1993).
- PX 360 (Annual Inventory of Fuel Assemblies, 1994).
- PX 394 (Annual Inventory of Fuel Assemblies, 1995).
- PX 432 (Annual Inventory of Fuel Assemblies, 1986).
- PX 437 (Annual Inventory of Fuel Assemblies, 1996).
- PX 468 (Annual Inventory of Fuel Assemblies, 1997).
- PX 529 (Annual Inventory of Fuel Assemblies, 1998).
- PX 559 (Annual Inventory of Fuel Assemblies, 1999).
- PX 585 (Annual Inventory of Fuel Assemblies, 2000).
- PX 1030 (Annual Inventory of Fuel Assemblies, 2001).
- PX 591 (Annual Inventory of Fuel Assemblies, 2002).
- PX 653 (Annual Inventory of Fuel Assemblies, 2003).
- PX 657 (Annual Inventory of Fuel Assemblies, 2004).
- PX 688 (Annual Inventory of Fuel Assemblies, 2005).

169. As of December 16, 1993, there were 217 "empty, good spaces" and 36 "Other" spaces. Wisconsin Electric knew that, with some effort, 34 of the 36 "Other" spaces could be made "empty, good spaces." The 36 "Other" spaces included: 17 spaces with debris baskets that could be removed or relocated to open up the spaces; one space occupied by a "dummy" assembly used for FHS training that could be removed at any time; one space

occupied by a "spacer" that could be removed at any time; nine spaces identified as "damaged" that could be recovered by reinspection or minor repair; six spaces that could be made accessible through the use of the offset fuel handling tool if brackets in corners of the pool were removed; and two spaces under canal doors that were not considered accessible because modifications to the canal doors would have been required.

- Tr. 854:25-856:8; 865:18-866:23 (Hennessy) ("Well, when the Fieldhack memo came out, we had categorized all of the locations, what we knew about those locations, and we knew, I knew that, with some effort, that we would be able to regain the use of those spaces.").

- PX 321 (Dec. 16, 1993 Memo from Fieldhack re: Spent Fuel Pool Summary).

- PDX 11 (blown-up versions of PX 728.9 and 727, side-by-side).

- Tr. 856:9-865:13 (Hennessy).

170. In the early 1980s, Mr. Link worked in Reactor Engineering at Point Beach. When he became Vice President of the Nuclear Department in May 1992, he knew that all but two of the 1502 spaces in the pool could be made available.

- Tr. 338:19-339:19 (Link).

- PX 321 (Dec. 1993 Fieldhack Memorandum).

171. Wisconsin Electric did not immediately recover all 34 of the 36 "Other" spaces because there was no need to take immediate action to recover spaces at that time. After the May 1996 hydrogen ignition incident, WE cleared out non-fuel components and took other actions to recover spent fuel pool spaces in the spent fuel pool, clearing spaces as follows:

a. WE determined that seven of the spaces previously determined to be "damaged" could be used without restriction.

b. WE determined that two of the spaces previously determined to be "damaged" also could be used by exercising special care in placing fuel assemblies in those two slots.

c. WE shipped low-level waste debris baskets off-site, freeing 10 spaces in the spent fuel pool, and then shipped high-level waste debris baskets off-site, freeing four spaces in the spent fuel pool.

d. WE cleared two additional spaces by moving non-fuel components into inaccessible spaces under the canal door hinges. The two non-fuel components included a vacuum device and a reactor vessel specimen basket.

e. WE modified the spent fuel pool to remove two brackets that blocked access to six spaces. The modification made six additional spaces available for use.

f. WE removed the spacer, freeing up one space.

g. WE has not needed to remove the dummy assembly and rod can, but can do so if desired. If those two items were removed, two additional pool spaces would be free for use to store spent fuel assemblies.

- Tr. 860:12-861:2; 862:9-22; 863:3-864:1; 865:8-13; 866:1-23; 882:12-890:7 (Hennessy).

- PX 423 (July 3, 1996 Memo from Hennessy re: SFP Spaces Inspection).

- PDX 10 (Tally of recovered spaces).

- PX 459 (June 1997 "Activated Metals Packaging and Disposal Point Beach Nuclear Plant," report prepared by WMG).

- PX 461 (July 8, 1997 WE Design Change Package).

- PX 321 (Dec. 16, 1993 Memo from Fieldhack re: Spent Fuel Pool Summary).

172. Therefore, WE made accessible, or could easily have made accessible, 34 spaces in the spent fuel pool. Thus, of the 36 spaces categorized in the December 16, 1993

memo (PX 321) as "Other" spaces, WE could have converted 34 spaces to the category of "empty, good spaces." There was no reason that this effort could not have been completed prior to 1996 had Wisconsin Electric needed or desired to do so.

- Tr. 865:14-25; 866:24-867:6; 890:8-11 (Hennessy).

## C. DOE'S ACCEPTANCE OF SPENT FUEL IN THE NON-BREACH WORLD

173. In the non-breach world, if WE did no more than ensure that 1500 spaces were available and took no other spent fuel management actions, WE could have operated until the fall 1998 outage with adequate pool space. WE then would have preferred that DOE pick up WE's 1998 spent fuel allocation before fall 1998 fuel discharge which occurred in late November to early December 1998. Similarly, WE would have sought to have DOE pick up the 1999 allocation prior to WE's November 1999 discharge.

- Tr. 3749:13-3755:2; 3760:14-3761:25 (Sieracki).

- PDX 60-Sieracki 23, 30, 32 (Kenrich Slides re: Fuel Management Model – Non-Breach Scenario).

- Tr. 2565:22-2566:1; 2568:17-2569:8; 2583:21-2584:7; 2585:2-14 (Farron).

- Tr. 432:11-433:21; 549:19-550:2 (Link).

174. WE would have reasonably expected DOE and WE to work together to ensure that DOE accepted WE's annual allocations during the year so that WE's spent fuel pool would not become full and unable to accommodate additional discharges. DOE would have had several years to plan for its 1998 and 1999 acceptances and been aware of WE's spent fuel situation. Thus, WE reasonably would have expected DOE to pick up PBNP's spent fuel in 1998 and 1999 prior to the November/December refueling outages. Such an expectation was consistent with the DCS and FDS provisions in the Standard Contract.

- Tr. 2584:8-2586:19 (Farron).

- Tr. 2586:20-2587:24; 2589:2-6 (Farron) (PBNP's Unit 2 refueling outage in 1998 occurred in December. PBNP's only refueling outage in 1999 occurred in November. WE could have delayed outages until later if necessary.).

- PX 41, pp. KRGWE002128-29 (Standard Contract).

- PFF 59.

- PX 1052 (Milner Dep. Desig. 5/1/02 Tr. 82:2-85:24 ("My personal opinion of [the DOE objectives on page 29] was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.")).

a. DOE was concerned that utilities would run out of spent fuel storage space and considered prioritizing acceptances from those utilities without spent fuel storage capacity. Any Government argument that DOE would have waited until late December 1998 and late December 1999 is contrary to what DOE personnel believed prior to 1998. It also would be contrary to the intent of the NWPA and the Standard Contract.

- PX 1052 (Lawrence Dep. Desig. 5/20/02 Tr. 81:1-83:10 (DOE would give sequence priority within an allocation year to reactors that were running out of space to discharge fuel.)).

- PX 1052 (Pollog RCFC 30(b)(6) Dep. Desig. 4/11/02 Tr. 124:21-125:8 ("Q: In the next sentence it indicated that . . . another objective of the schedule would be to preclude need for additional reactor storage after January 31st, 1998 and ultimately remove from reactor storage all waste more than five years old. Do you see that phrase? A: Yes. Q: Is that consistent with what you have testified to be objective [sic] in the mid-eighties of the Nuclear Waste Management Program? A: Yes. Actually, that's one of the objectives.")).

- PX 1052 (Roselli Dep. Desig. 4/15/02 Tr. 144:16-145:5; 148:21-149:17 ("Q: It goes on to say that, 'The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site.' Is that a true statement? A: That is. Q: And was that, in fact, what the utilities were paying for? Do you understand my question, sir? A: I think the utilities were paying for disposal

services. Q: And were they paying for disposal services sufficient that they would not have to add additional storage on site? A: After 1998, yes. Q: You would agree? A: Yes.")).

175. The Department of Justice directed Mr. Hamal to assume in his analysis of WE decision-making that DOE would not accept SNF from Point Beach until the very end of a calendar year in which WE had an acceptance allocation.

- Tr. 5889:6-15 (Hamal) ("And then I tie in with DOE's acceptance. This is the but-for world. I'm adopting assumptions of the 1991 ACR. This is 41 assemblies in '98, 110 in '99. And I'll note that these happen to match the assumptions of Ms. Supko and WEPCO's, and other people in this case. The assumptions for these two years turn out to be the same by everyone's analysis as presented here. *And I assume acceptance at the end of the year*." (Emphasis added)).

- Tr. 5966:23-5967:4 (Hamal) ("Q: And you were directed to assume by DOJ counsel that DOE does not come in any particular year until possibly the very end of the year; is that correct? A: *I was directed, I was told by DOE counsel to plan on the basis of acceptance as late as the end of the year*." (Emphasis added)).

176. Even if DOE refused to work with WE and insisted on picking up PBNP's SNF during late December in 1998 or early in 1999, WE could have accommodated such a pickup date without resorting to dry storage. However, WE would have regarded any such DOE conduct as violating DOE's obligation to perform the Standard Contract in good faith.

- Tr. 2586:20-2589:6 (Farron) (noting that WE could have employed a variety of fuel conservation alternatives prior to 1998 to account for such a possibility and that engineers could have solved the issue with adequate notice).

- PFF 113-114, 158-159.

177. If necessary, WE could have increased the amount of spent fuel that DOE was expected to pick up by 20 percent.

- PX 41, p. KRGWE002128 (Standard Contract, paragraph B2).

- Tr. 5750:2-5752:20 (Zabransky) ("Q: Now, does [the Standard Contract] provide that, after a DCS has been submitted, a utility may request a

change in its allocation plus or minus 20 percent? A: That's what it provides for, correct. Q: And the 20 percent referred to here would be 20 percent of the amount shown on an approved DCS, is that correct? A: I believe that's what it refers to, yes.").

- PFF 57.

- *Yankee Atomic*, 73 Fed. Cl. at 258.

## D. WE REGARDED FULL CORE RESERVE AS A GOOD OPERATING PRACTICE

178. Without dry storage or other spent fuel management action, WE would have lost FCR in the permanent area of the spent fuel pool in 1996. WE personnel determined that, in the non-breach world, they would have likely taken some action to preserve FCR, namely, by the use of a temporary rack in the cask laydown area (discussed below).

- Tr. 344:17-345:11 (Link) ("Q: If Wisconsin Electric had operated until 1998 without dry storage, would it have had full core reserve in the permanent storage areas of the pool through '98? A: No, it would not have, not in the permanent storage area. Q: Are there ways that you could preserve full core reserve? A: Yes, as part of the assessments that I mentioned earlier, there were, at least conceptually, a number of options that were available, primarily the installation of a temporary rack or racks in a number of locations, including the cask laydown area within the pool or in what we called the transfer canals that were connected to spent fuel pool. Those are just a couple of examples of how we would have been able to have a strategy to attain or retain a full core reserve as necessary.").

- Tr. 2568:15-2570:21 (Farron) ("Q: Yes. And if DOE had performed under the standard contract, were there any full core reserve considerations that Wisconsin Electric would have had to take into account? A: Well, under – I'm trying to think of what the date would be. I'm not sure I know the date. At some point in time prior to 1998, Point Beach would likely lose full core reserve in the permanent spent fuel storage area. Q: And are there actions that Wisconsin Electric could have taken to address that issue? A: Well, there are some ways by which Wisconsin Electric . . . could have done [sic] to maintain that longer within the existing permanent storage area. There's also the option of acquiring a temporary storage rack for spent fuel assemblies, which could be placed in the . . . cask pit at the cask containment area, that would preserve full core offload capability.").

- Tr. 1532:3-1534:13 (Krieser) ("Q: If Point Beach had operated until 1998 without dry storage, would Point Beach have had full core reserve in the permanent storage areas of the pool throughout that time? A: There would have been times, certainly, as we approach 1998, where we would not have had FCR, but, again, like I say, it was a goal, and I think, overall, we would have been comfortable with that condition. Q: If you had thought that DOE was coming in 1998 and you were not going to build dry storage, are there things you could have taken [sic] or actions that the company could have taken to preserve or maintain full core reserve? [objections omitted} A: I mentioned earlier the fact that we had looked into the possibility of temporary racks. As we approach 1998 and we didn't have actual full core reserve in the permanent part of the pool, we certainly could have utilized a temporary rack if the need for full core reserve was required.").

- Tr. 3922:25-3924:5 (Sieracki).

- PX 794, p. 18 (KRG Revised Assessment of Damages, May 8, 2006).

179. While WE preferred to operate with FCR, WE did not have a policy requiring FCR. In addition, Point Beach's technical specifications do not require FCR. The NRC does not require FCR because maintenance of FCR is not a safety issue, but a business risk issue. The PSCW did not require PBNP to maintain full core reserve. The WE Vice President, Nuclear Department would have made the decision whether or not to maintain FCR. Mr. Robert Link testified that the use of a temporary rack would have been a sufficient means to preserve FCR.

- PX 327, 328 (1994 RW-859s for Point Beach 1 and Point Beach 2).

- Tr. 347:5-10 (Link) ("Q: Did Point Beach have a policy that it was required to operate with full core reserve? A: No, it did not. Q: Had Point Beach operated without full core reserve in the past? A: Yes, a number of times.").

- Tr. 349:6-12 (Link) (Maintenance of full core reserve is not an NRC requirement.).

- Tr. 510:13-17 (Link) ("I think I've already stated that I believe that full core reserve is prudent to allow the – both economic, efficient and risk minimization operation of a nuclear power plant, but it's not required.").

- Tr. 2569:21-2570:5 (Farron) ("Q: . . . Does Wisconsin Electric require the maintenance of FCR? A: There is no such policy. It is a goal to maintain full core offload capability, full core reserve, kind of interchange the terms, and there have been many periods in time at Point Beach in which they have not done that, but it is a goal.").

- Tr. 2570:6-25 (Farron) ("Q: Based on your experience with the NRC, do you recall the NRC ever requiring a utility to maintain full core reserve? A: I do recall that that question actually came up. I don't recall the exact circumstances, but it was a question that came up, I think it was related to some enforcement activity, and determination was made that there was no need or no requirement to maintain full core offload capability.").

- Tr. 894:16-19 (Hennessy) ("Q: Would it have been possible to preserve full core reserve through a temporary rack [in the] cask pit? A: Yes, it would be.").

- Tr. 675:22-676:1 (Zabransky) ("Q: Well, let me just follow up on that point you made. Did Wisconsin have a written policy to maintain full core reserve in the spent fuel pool? A: I'm not aware of any.").

- Tr. 685:3-687:18 (Zabransky) (WE's 1993 RW-859 forms, submitted in February 1994 and signed by D. Zabransky, showed that WE did not intend to reserve any spaces for operational flexibility.) ("Q: And to the best of your knowledge, was this form correct at the time that you signed on behalf of Wisconsin Electric and submitted it to DOE? A: Yes.").

- Tr. 679:10-20 (Zabransky) ("Q: Who at Wisconsin Electric would ultimately make the decision whether to operate with or without full core reserve? A: I believe it would be the chief nuclear officer. Q: And at the time that you were manager of nuclear fuel services, 1991 through 1994, who occupied those positions? A: '91, it would be have been Jim Zach, I believe, and '92 on, it would have been Bob Link.").

- Tr. 676:13-19 (Zabransky) ("Q: Does the NRC require that Point Beach maintain a full core reserve? A: No. Q: Do the technical specifications for the operation of Point Beach require maintenance of a full core reserve? A: No.").

180. WE never had a goal or policy of maintaining two FCRs. The sole exception is that WE discussed using two FCRs with regard to the need for dry storage in the ESR to its

PSCW application. WE, however, used conservative assumptions in its PSCW application and ESR in order to prompt timely approval by the PSCW.

> - Tr. 2558:1-9; 2561:14-16; 2562:9-15; 2563:11-20 (Farron) (There were conservative assumptions used in the ESR to facilitate getting approval from the Public Service Commission.).
>
> - Tr. 347:11-15 (Link) ("Q: Was it a goal of Wisconsin Electric to maintain two full core reserves? A: Well, it would have been nice to maintain two full core reserves, but it was not a policy or a goal, as you put it.").
>
> - Tr. 2185:11-2186:10 (Porter) ("Wisconsin Electric made a number of assumption in support of the application, and since we knew the, at that point, 1991, certainly, we knew that it wasn't going to be possible for the DOE to be able to begin taking the fuel in 1998, and so we made a number of conservative assumptions describing the need for the project, the alternatives for the project, all kinds of assumptions that are in there. Q: Did Wisconsin Electric make any assumptions with respect to full core reserve? A: We did. . . . I believe we even made the assumption in some of the analyses that it would be nice to maintain two full core reserves for maximum operating flexibility, so there were assumptions for full core reserve in here as well.").
>
> - Tr. 1612:2-1614:10 (Krieser) (It is not required to have two full core reserves.).

181. In prior statements, DOE has stated that whether and how to maintain FCR is a matter best left to the discretion of the licensee. DOE has previously asserted that the cask pit area should be included in calculating whether a utility has the capability to discharge a full core. DOE further concluded that including the cask pit area in calculating FCR capability postpones loss of full core reserve by "one to five years."

> - PX 44 (June 29, 1983 Letter from Morgan (DOE) to Chilk (NRC) re: storage capacity) (DOE considers it important that it "not discourage utilities from encroaching on FCR at their own discretion.").
>
> - PX 774, p. 2 (Oct. 6, 1983 Memo from Smithson to Bown re: Full Core Reserve) ("The definition of Full Core Reserve is understated if it excludes the capacity represented by the cask laydown area . . . Inclusion of cask laydown area postpones loss of FCR by one to five years.").

- PX 590, pp. 5-6 (Jan. 19, 2001 Letter from DOE enclosing "Spent Fuel Management Alternatives") (DOE identified the placement of SNF storage racks in areas reserved for plant loading operations and utilizing spaces otherwise reserved for full core reserve as an option to address SNF storage at the Prairie Island Nuclear Power Plant.).

## E. WE WOULD LIKELY HAVE USED A TEMPORARY RACK IN THE CASK LAYDOWN AREA TO MAINTAIN FCR

182. If WE had believed DOE was going to begin performance in 1998, WE most likely would have purchased a temporary rack for use in the cask pit area to maintain FCR, if and when necessary, until the permanent storage area of the spent fuel pool regained FCR.

- Tr. 549:19-550:6 (Link) ("A: I think I've already stated that, and if DOE would have performed under the contract, we would have essentially gone forward without the dry fuel storage and relied on the temporary strategy, if necessary, to retain the ability to get full core reserve. Q: And would a temporary strategy, such as a temporary rack, have permitted you to have maintained full core reserve? A: Yes, it would have.").

- Tr. 1532:12-1534:13 (Krieser) ("Q: If you had thought that DOE was coming in 1998, and you were not going to build dry storage, are there things you could have taken or actions that the company could have taken to preserve or maintain full core reserve? [objections omitted] A: I mentioned earlier the fact that we had looked into the possibility of temporary racks. As we approach 1998 and we didn't have actual full core reserve in the permanent part of the pool, we certainly could have utilized a temporary rack if the need for full core reserve was required.").

- Tr. 2571:5-2572:7 (Farron) ("Q: In the nonbreach world, the one, again, in which DOE performs under the standard contract, how do you believe Wisconsin Electric would have recovered full core reserve, assuming that it needed to do so prior to 1998? A: Most likely, and this is the easiest and most straightforward way to do it, is just to procure a temporary storage rack that can be inserted into the cask containment area.").

- Tr. 2568:15-2569:20 (Farron) ("Q: Yes. And if DOE had performed under the standard contract, were there any full core reserve considerations that Wisconsin Electric would have had to take into account? A: Well, under – I'm trying to think of what the date would be. I'm not sure I know the date. At some point in time prior to 1998, Point Beach would likely lose full core reserve in the permanent spent fuel storage area. Q: And are there actions that Wisconsin Electric could have taken to address that issue? A: Well, there are

some ways by which Wisconsin Electric . . . could have done [sic] to maintain that longer within the existing permanent storage area. There's also the option of acquiring a temporary storage rack for spent fuel assemblies, which could be placed in the . . . cask pit at the cask containment area, that would preserve full core offload capability.").

- Tr. 894:16-895:16 (Hennessy) ("Q: Would it have been possible to preserve full core reserve through a temporary rack and a cask pit? A: Yes, it would be. Q: And would there have been any operational impacts to having a cask pit rack for full core offload capability? A: The operational impacts would be that, if we needed to load a cask, we would have to remove the cask pit rack. Q: And would that have been a problem? A: It would have required some additional work, but not a great deal of additional work.").

- PX 794, p. 18 (May 8, 2006 Kenrich Revised Assessment of Damages).

183. A temporary cask pit rack would have been a more desirable option than the dry storage project for many reasons.

a. The temporary rack would have been less complex and intensive than the dry storage project. The dry storage was extremely complex and time-consuming. This was evident in the number of cask issues that WE encountered.

- Tr. 429:5-430:12 (Link) ("Q: Would you have preferred to use a temporary rack, rather than build dry storage, if DOE had performed under the standard contract? A: Yes. If DOE would have performed, the temporary rack concept had advantages over dry storage. One of the first ones would have been cost. Another one would have been, at least in my opinion, the overall risk profile of the strategy, and what I mean by that is a temporary rack is rather simple in concept, and I'll even use the word 'traditional,' in concept. Racks were being, we had reracked the pool, as I said, twice already, a temporary rack is no more than another type of rack, so it was a more simple type of technology to employ, while dry storage offered more complexities and was actually still a developing technologies. It also would have mitigated the need to unload fuel that would have been put into dry storage, which would have cost additional dose and other costs and risks.").

- Tr. 2574:1-2578:16 (Farron).

- Tr. 2735:17-2738:2; 2741:1-15 (Anundson) (discussing the dry storage project's complexity).

b. A temporary rack would have avoided the highly contentious, protracted and expensive PSCW proceedings that WE had to endure for the dry storage project because the capital cost of the project was less than $2 million. Even if the temporary rack required PSCW approval, it would not have been expected to face much, if any, intervenor opposition, unlike the tremendous opposition to the dry storage application.

- Tr. 2577:23-2578:16 (Farron) ("Additionally, the use of a temporary rack, the costs associated with a temporary rack would likely be less than what it is for dry storage, which I think we've since confirmed. What that means is we would not have to go on to the Public Service Commission for approval, so we would have avoided all the hearings, all the intervention that took place, that actually took place beginning of 1991 with the first application. It was also generally accepted that using wet storage, being a temporary rack or interim one, it was a lot easier to implement than dry fuel storage, and the ongoing O&M costs with using a temporary rack were also much, much less, so I think there's clearly a number of reasons why Wisconsin Electric would have elected to use an alternative if DOE was going to show up in 1998.").

- Tr. 366:1-367:10 (Link) ("Well, I'm sorry to say that my prediction came true in the respect that we had multiple intervening parties participating in the hearing process, with – actually, they were even compensated by the Public Service Commission, under the rules of the state of Wisconsin to participate, and there, there were not only members of the public, but expert witnesses supported by that process through the intervenors to testify and present their opposition . . .").

- PX 827, pp. 10-11 (Revised Written Testimony of Krishna P. Singh, including attachments).

- Wis. Admin. Code PSC § 112.05(1)(b) (1982).

c. A temporary rack would have been much cheaper than dry storage.

- Tr. 2577:23-2578:2 (Farron).

- PDX 60-Sieracki 62 (Summary of WE's Total Past Nominal Damages, By Category Including Trial Adjustment).

- PX 805, p. KRGWE003346 (Kenrich Binder N: Would-Have-Been Costs - Temporary Cask Pit Rack).

- PX 1047, p. KRGWE003908 (Kenrich Binder AA: Trial Damages Model).

d. Dry storage required a much greater investment of time by WE employees, which took them away from other plant projects.

- Tr. 2578:8-16 (Farron).

- Tr. 1747:15-1754:19; 1746:24-1748:18 (Becka).

- PDX 61-Metcalfe 19 (Determination of Individual Damages Elements Reasonable of WE Internal Labor).

- Tr. 4605:5-4611:19 (Metcalfe).

e. A temporary rack would have been more consistent with PSCW and ratepayer expectations that WE's spent fuel would be removed from Wisconsin.

- PFF 152g, 213.

184. Use of a temporary cask pit rack would have allowed WE to preserve FCR capability if and when needed. If DOE was coming in 1998, a temporary rack would have provided FCR from 1996 until DOE began accepting spent fuel and Point Beach recovered FCR in the permanent storage area of the pool. A cask pit rack would have allowed the replacement of the Unit 2 Steam Generator, which required FCR capacity in the spent fuel pool.

- Tr. 2658:5-2569:20 (Farron) (To provide FCR after 1996, WE would probably have installed a temporary storage rack in the cask laydown area of the spent fuel pool.).

- Tr. 344:17-347:3 (Link) ("Q: Could a temporary rack hold a full reactor core's worth of assemblies? [objections omitted] A: I was more than satisfied that a temporary rack could hold at least 121 fuel assemblies.").

- Tr. 549:19-550:6 (Link) (WE would've relied on the temporary rack to retain the ability to get full core reserve, if necessary.).

- Tr. 2817:5-2818:16 (Conry) (WE verified it was feasible to use a temporary rack in the cask laydown area.).

- Tr. 2834:1-7 (Conry) (The temporary rack would have been sufficient to allow WE to fully offload the Unit 2 core in 1996.).

185. WE discussed the use of a temporary rack to provide additional storage in the spent fuel pool between 1992 and 1995.

- Tr. 2832:2-17 (Conry) (Messrs. Conry and Zabransky had discussions regarding the use of a temporary rack because of concerns about delays in the dry storage project.).

- Tr. 518:15-519:6 (Link) (One of the analyses that Mr. Link had his team perform when he became Vice President of the Nuclear Department was an evaluation to satisfy Mr. Link that a temporary rack was a viable option.).

- Tr. 1521:6-1523:20 (Krieser) ("And we looked at other things too, like the use of temporary racks in various parts of the pool, and the cask laydown area was one area, the fuel transfer canal, there were areas within the pool that we felt could be used for fuel storage, at least in a temporary basis, if we needed it.").

186. A cask pit rack serves as an alternate location to store spent nuclear fuel and thereby allow fuel to be removed from a reactor. Because the cask pit rack is removed to allow shipment of fuel out of the pool by cask, it is not used for permanent storage. A cask pit rack is structurally and anatomically identical to other spent fuel storage racks. It is placed in the area of the pool that is termed the cask pit, cask laydown area, or cask area.

- PX 827, p. 3 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("Cask pit racks are typically used to provide a temporary increased spent fuel storage capacity, particularly when spent fuel pools have large fuel inventories. Holtec has designed cask pit racks allowing a utility to preserve full core discharge capabilities.").

- Tr. 4428:13-4429:6 (Singh) ("Yes, the standard, the purpose of the cask pit rack is to serve as an alternative location to park the fuel from the reactor").

- Tr. 4407:1-5 (Singh) ("The cask pit rack would have had 121 assemblies, which is about – it's a full core, and a full core is good for about four-and-a half years, so that's about the length of time that a cask pit rack gives you.").

- Tr. 4336:12-19 (Singh).

187. In Dr. Singh's expert opinion and based on his extensive spent fuel rack experience, a project to install a temporary cask pit rack holding 121 assemblies would have been a routine project. The capacity expansion was very modest and posed no technical challenges. The project was not nearly as technically challenging as rack projects being undertaken at the time at other U.S. nuclear power plants. The fact that the Point Beach pool is located on grade rather than being elevated eliminates a potential barrier to pool expansion, making the slab a non-issue for the capacity expansion. The Point Beach spent fuel reinforced concrete pool slab is a robust structure for a pool enclosure of its size. The pool structure, including the slab and pilings, could have supported a loaded temporary cask pit rack. Dr. Singh summarized the cask pit rack project as follows:

> It could have been done. That's the bottom line, that . . . they could have added a cask pit rack, and it would have been as I said before, a mundane project, it was not a challenge.

- Tr. 4396:15-20 (Singh).

- Tr. 4384:8-11 (Singh) ("[I]t's feasible, technically feasible to add a cask pit rack in the pool. It was feasible in the '90s, and it's feasible today.").

- Tr. 4382:6-4283:16; 4385:5-4386:7; 4397:16-4400:9 (Singh).

- PX 827, p. 16 ( June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("Based on a review of the above listed references, Holtec's opinion is that it is technically feasible to install a spent fuel storage rack, which is capable of storing a maximum of 121 spent fuel assemblies in an 11 x 11 array, in the cask loading area of the existing SFP Structure at Point Beach Nuclear Plant.").

- PX 728.1 (Drawing of Point Beach Nuclear Plant Spent Fuel Pool).

- PDX 63 (General Description of Point Beach Cask Pit Rack Project).

- PDX 66 (Point Beach Pool Structure).

- PDX 70 (Vertical Load on Slab).

- PDX 71 (Pilings).

a. The Government's expert witnesses did not seriously dispute Dr. Singh's opinion that a 121-assembly temporary rack could be installed in the Point Beach pool.

- Tr. 5569:8-5570:10 (Brewer) ("Q: In fact, based on studies to-date, it's your view that a temporary rack most likely could be installed in the Point Beach pool, correct? A: I suspect a temporary rack of some size could be installed with whatever limitations come with that rack. . . . Q: Based on the studies to-date, isn't it your view that a temporary rack having 121 spaces most likely could be installed in the Point Beach pool? A: I think it's possible.").

- Tr. 6176:18-6180:3; 6235:12-23 (Kiraly).

188. Spent fuel storage racks come in two types, Region I and Region II. Region I racks are designed to accept spent fuel with any level of burn-up. Region II racks are designed to only accept fuel with a certain minimum level of burn-up (i.e., fuel that has been burned and, therefore, is less reactive). Region II racks are more closely spaced and allow the storage of more spent fuel assemblies in a given space compared to Region I racks. The great majority of cask pit racks are Region II racks. Region II racks do not hinder or otherwise pose operational problems.

- Tr. 4358:6-4361:6 (Singh) ("The utilities accepted the two region design, it was developed around 1981, '82 timeframe readily, and of course, the utilities, the reactor operators are a part of the decision-making process, other than perhaps one or two plants in the country, so my own sense is they don't view a two region storage system with Region II racks in the cask pit as a hindrance or operational problem.").

- PX 743 (Holtec drawings re: racks).

- PX 680, p. WISC0680-0124 (Drawing of typical Region II rack module).

189. The Point Beach spent fuel pool cask pit has sufficient space to hold a Region II rack sized to accommodate 121 spent fuel assemblies.

- PX 827, p. 16 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

- PDX 67 (Cask Pit Space).

- PDX 68 (Cask Pit Rack).

- Tr. 4391:22-4392:6; 4392:17-4393:2 (Singh).

190. The main technical considerations regarding the feasibility of and the ability to license a temporary cask pit rack during the early 1990s and today are the same: (1) structural considerations; (2) nuclear criticality safety; (3) radiation shielding considerations; and (4) pool cooling (heat removal).

- Tr. 4381:23-4382:5; 4384:2-4385:4 (Singh).

- PX 827, pp. 13-16 (June 2006 Revised Written Testimony of Krishna P. Singh).

- PX 6 (O.T. Position Paper)

- PDX 65 (Feasibility of Cask Pit Rack).

- Tr. 2817:5-2819:3; 2833:5-19 (Conry) (During the Unit 2 steam generator replacement application process, WE reviewed the structural loading of the spent fuel pool caused by the additional loading of a temporary rack and found no show stoppers.).

191. The pool structure and pool have sufficient capacity to support the weight and structural loads of a loaded cask pit rack. The cask pit rack itself would not weigh more than 20,000 pounds. When fully loaded with spent fuel, the cask pit rack would increase the load on the pilings by a minor amount less than 0.2%. A loaded cask pit rack would also weigh less than most transfer casks, including the transfer cask used at Point Beach. Dr. Singh also testified that the pool structure is qualified to withstand a small free-fall (few inches) of a loaded transfer cask that could occur before the brake drum on the single failure proof crane

engages. This dynamic load is much greater than the dead load of a loaded cask pit rack. Therefore a loaded cask pit rack could not challenge the Point Beach pool structure.

- PX 827, pp. 14-15 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) (load on slab and pilings within margins).

- PDX 70, 71 (Vertical Load on Slab, Pilings).

- Tr. 4386:1-7 (Singh) ("In addition, the slab has piles, steel concrete piles that go into bedrock, so this pool structure is, in summary, a robust structure for its needs, and there was no concern on our part that the pool structure capacity would be an issue with respect to adding a cask pit rack.").

- Tr. 4396:21-4400:9 (Singh) ("There is sufficient reserve capacity in the pool slab and the pool structure to support the cask pit rack . . . So that's why I provided the statement that the pool slab is not a limitation to reracking the pool. It's simply not an issue").

- Tr. 1848:9-1851:8 (Becka) (WE engineers had done calculations and determined that a fully loaded NUHOMS transfer cask could be accommodated in the spent fuel pool. The "maximum weight of the transfer cask in the spent fuel pool equals 208,520 pounds.").

- PX 1045 (Dec. 28, 2005, Calculation 2003-0069, NUHOMS Dry Cask-SPF Reanalysis).

192. The expected seismic response of the temporary cask pit rack at Point Beach was well within the rack's structural capacity.

- PDX 69 (Application of NRC Guidelines to Point Beach Pit Rack Indicates No Technical Barriers to Licensability).

- PX 827, p. 14 (June 2006 Revised Written Testimony of Krishna P. Singh).

- Tr. 4394:9-10 (Singh) ("I was not able to identify any structural barriers").

193. In Dr. Singh's expert opinion and based on his extensive experience, the Point Beach cask pit contains an anti-tip frame that could have been removed. It is not necessary in case of a seismic event and is not required for safe operation or use of any NRC-certified

canisters. Removing the anti-tip frame from the cask loading area was well within the expertise of contemporary underwater construction. Thus, it was technically feasible to install a temporary cask pit rack in the cask laydown area in the mid-1990s. Compared to other rack projects, a temporary cask pit rack at Point Beach would be, in the expert opinion of Dr. Singh: "Unexciting, technically unchallenging."

- PX 827 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("The seismic restraint is not required for operation or use of any of the NRC-certified canister-based dry cask storage systems. Therefore, the seismic restraint, if removed, would not be reinstalled.").

- PX 728.27 (Drawing of Point Beach Nuclear Plant Spent Fuel Pool).

- Tr. 4390:3-8 (Singh) ("So the bottom line, the basic statement is that I'm present for your consideration, is that this frame is not a safety device. It is a relic of the past, and it should be removed, whether or not a cask pit rack is put in.").

- Tr. 4387:12-4390:2; 4392:5-16 (Singh).

- PDX 67 (Cask Pit Space).

- PDX 72 (Opinion: Technical Feasibility).

- Tr. 4400:10-4401:14 (Singh).

a. The Government's expert agreed that the anti-tipping frame could be physically removed.

- Tr. 5582:2-5583:10 (Brewer) ("I'm not saying [the anti-tipping frame] could never be removed. It physically could be ultimately removed.").

194. Nuclear criticality safety of the temporary cask pit rack would have been ensured through conventional criticality control means and would have been below a .95 neutron multiplication factor.

- PDX 69 (Application of NRC Guidelines to Point Beach Pit Rack Indicates No Technical Barriers to Licensability).

- PX 827, p. 15 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("[N]othing in the existing plant design basis . . . would preclude the installation of a spent fuel storage rack in the cask loading area.").

- Tr. 4395:9-22 (Singh).

195. Radiation shielding would have been satisfied by the 40 feet of water over the cask pit rack and by appropriate management of spent fuel in the cask pit rack locations.

- PX 827, p. 16 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

- PDX 69 (Application of NRC Guidelines to Point Beach Pit Rack Indicates No Technical Barriers to Licensability).

- Tr. 4395:23-4396:20 (Singh).

196. The Reactor Engineering Group routinely calculates the spent fuel pool's decay heat removal capability using the decay heat ("DECAYH") program. The discharge of a full core (121 assemblies) into a cask pit rack with all permanent cells filled was within the capacity of the spent fuel pool cooling system as calculated by the DECAYH program.

- Tr. 837:22-843:17 (Hennessy).

- PX 739 (Point Beach Nuclear Plant Spent Fuel Pool Heat Load Calculation).

- PDX 8 (slide 17) (Spent Fuel Heat Load Calculation).

- PDX 69 (Application of NRC Guidelines to Point Beach Pit Rack Indicates No Technical Barriers to Licensability).

197. Mr. Link had previously served as the Project Engineer for the cooling system modification performed at Point Beach in approximately 1980. Mr. Link was confident that heat and criticality issues would not be a concern in the use of a temporary rack in the cask pit area.

- Tr. 430:13-431:5 (Link).

198. The spent fuel pool cooling capacity is sufficient to allow a full core offload into a cask pit rack with no schedule impact on a typical refueling outage.

- PDX 8 (Slide 18) (Spent Fuel Heat Load Calculation).

- PX 739 (Point Beach Nuclear Plant Spent Fuel Pool Heat Load Calculation).

- PX 505 (May 7, 1998 DECAYH Manual).

- PX 678 (Oct. 20, 2004, Point Beach DBD-13, Spent Fuel Cooling and Filtration Design Basis Document, Rev. 3).

- Tr. 909:9-23 (Hennessy) ("The result was that the discharge of a full core in this hypothetical situation in the cask pit, with all permanent cells filled, for a total of 1623 fuel assemblies was within the capacity of the pool cooling system.").

- Tr. 2817:5-2819:3 (Conry) ("Q: Was there any follow-up work done in support of the temporary rack contingency plan? A: I know there were reviews of the coolant capacity of the spent fuel pool heat exchangers to make sure they had the capacity to maintain cooling within specified limit . . . Q: And do you recall the outcome of the discussions regarding the possibility of using a temporary rack or some other contingency in order to conduct the unit two steam generator replacement project? A: During those reviews, there were no issues identified that would be a show-stopper for doing that.").

199. By the early 1990s, NRC guidance regarding increases in wet storage capacity had been published for more than 10 years. The methodology for performing pool capacity expansion analyses, including computer software, had a long history. By the mid-1990s, capacity densification through Region II racks had matured into a well-articulated technical and licensing process. In the expert opinion of Dr. Singh: "[L]icensing [the] Point Beach cask pit rack would have been a fairly mundane matter."

- PDX 73 (Rack Licensing Issues by 1990s).

- Tr. 4401:22-4402:15 (Singh).

- PX 827, p. 17 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

- PX 6 (O.T. Position Paper).

200. Cask pit racks must be licensed with the NRC if the rack will impact any provision of the plant's technical specifications, such as the spent fuel pool's storage capacity. In 1978, the NRC issued the "O.T. Position Paper" that provides guidance for preparing wet storage-related license amendment requests. The O.T. Position Paper would have provided the relevant guidance for a temporary rack application in 1992 and, in fact, continues to be used at the present time.

- Tr. 4337:12-4338:3; 4370:4-4371:4 (Singh).

- Tr. 4353:4-4354:19 (Singh).

- PDX 65 (Feasibility of Cask Pit Rack).

- PX 6 (O.T. Position Paper).

- PX 827, p. 20 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) (discussing the O.T. Position Paper as the NRC's guidance document for wet storage racks).

201. The NRC assigns a project manager to review an operating license amendment application. The NRC assigns the appropriate technical disciplines to review the application and to conduct a series of questions and answers regarding the application. The duration of NRC review is directly related to the complexity of the application. A complex project requires a longer review period.

- Tr. 4371:5-23 (Singh).

- PX 827, p. 19 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) (extent of NRC review effort is directly related to the complexity of the application).

- Tr. 4372:19-4373:14 (Singh).

202. On numerous occasions, the NRC has approved license amendments for projects related, in whole or part, to cask pit rack projects, at numerous nuclear power plants.

- PX 827, at Attachment 2, Holtec SNF Storage Projects (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) (Part A discussing cask pit racks and Part B discussing reracks, some including cask pit racks as well).

- Tr. 4366:3-4367:8 (Singh).

a. Palisades (NRC approval 1977).

- PX 1049 (June 30, 1977 Letter from A: Schwencer to Consumers Power Company) ("The present spent fuel cask laydown area will be used to accommodate two 50-element rack assemblies which will normally be used to store fuel during full-core offloads. These two racks would be removed to allow placement of the spent fuel cask when fuel shipments resume or to allow fuel inspections or repairs.")

b. Duane Arnold (NRC approval 1994).

- PX 899 (Feb. 2, 1994 Letter from Pulsifer to Liu) ("The licensee intends to accomplish the proposed expansion by . . . providing additional storage capacity of no more than 323 cells in a proposed fuel rack storage module to be located in the cask loading area of the cask pit.").

c. Waterford (NRC approval 1998).

- Tr. 4367:2-4 (Singh).

- PX 894 (July 10, 1998 Letter from Patel to Dugger) (NRC approval).

d. Davis Besse (NRC approval 2000).

- Tr. 4367:4-8 (Singh).

- PX 895 (Feb. 29, 2000 Letter from Pickett to Campbell) (NRC approval).

e. St. Lucie (NRC approval 2004).

- Tr. 4366:25-4367:2 (Singh).

- PX 641 (Nov. 26, 2002 Letter from Jernigan to NRC) (license amendment application).

- PX 893 (July 9, 2004 Letter from Arroyo to Stall) ("These amendments . . . include the design of a new cask pit spent fuel storage rack for each unit.").

f. Turkey Point.

- Tr. 4366:22-25 (Singh).

- PX 642 (Nov. 26, 2002 Letter from McElwain to NRC)(license amendment application).

- PX 681 (Nov. 24, 2004 (Letter from Brown to Stall) ("These amendments . . . include the design of a new cask pit spent fuel storage rack for each unit.").

g. Clinton.

- Tr. 4366:16-21 (Singh).

- PX 671 (Aug. 18, 2004 Letter from Jury to NRC) (license amendment application).

- PX 891 (Oct. 31, 2005 Letter from Jabbour to Crane) ("adding two new 15 by 12 storage racks in the fuel cask storage pool.").

h. Diablo Canyon.

- PX 680 (Nov. 3, 2004 Letter from Oatley to NRC) (license amendment application).

- PX 890, p. WXE0016108 (Diablo Canyon Power Plant Amendments for a Temporary Cask Pit Rack) ("These amendments allow installation and use of a temporary cask pit spent fuel storage rack for Units 1 and 2.").

- Tr. 4366:3-16 (Singh).

203. In his expert opinion and based on his extensive experience with spent fuel racks, Dr. Singh opines that there is no question that NRC would have approved an appropriately supported Point Beach temporary cask pit rack license amendment application.

- PDX 74 (Opinion: NRC Approval).

- Tr. 4402:16-23 (Singh).

- PX 827, p. 20 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("In my considered opinion, NRC was virtually certain to have granted the O.L. amendment to Point Beach had the utility applied to the Commission to add an 11x11 rack in the cask pit of the Point Beach fuel pool.").

204. The NRC has previously requalified racks with seismic restraints removed. Dr. Singh testified that in his expert opinion the pool would have been requalified with this modification.

- Tr. 4361:16-4362:2 (Singh).

- PX 153 (June 24, 1988 Memo from Mroczka to NRC).

- PX 184, p. WISC0184-0006 (Nov. 1989 Facility Operating License Amendment for Millstone Nuclear Power Station) ("The proposed racks are free standing and self-supporting. The existing racks, which will all remain in the pool, also have been seismically requalified as free standing structures.").

- PX 827 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments) ("The pool would need to be requalified for permanent removal of the seismic restraint structure in the cask loading area. Holtec would perform all design analysis activities required to accomplish this modification.").

205. The NRC has approved the use of cask pit racks to maintain full core offload capability for multi-year periods of time. For example, the NRC approved a temporary cask pit rack application to extend full core offload capability at the Diablo Canyon nuclear power plant for 3.5 to 4 years.

- PX 890, p. WXE0016141 (Nov. 21, 2005 Letter from NRC to Pacific Gas & Electric) ("The PG&E amendment request is to allow use of the temporary cask pit racks to maintain FCOC during Cycles 14-16, which is approximately 3-1/2 to 4 years.").

206. The NRC likely would have issued the approval within approximately 14 months of the application and expended approximately 500 hours of staff time, charging $66,500.

- PDX 75 (Opinion: NRC Schedule and Fees).

- Tr. 4402:24-4404:15 (Singh).

- PX 827, p. 19 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

207. The scope of a turnkey project for a temporary cask pit rack would have included design, engineering, and licensing support, installation tools and hardware, site services to modify the pool and install the rack and training for rack removal and reinstallation.

- PDX 76 (Cask Pit Rack Work Breakdown).

- Tr. 4404:16-4406:10; 4407:6-4408:22 (Singh).

- PX 827, pp. 1, 3, 6-11 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

208. The supply and installation charge for the temporary rack would likely have been approximately $1.9 million in Holtec costs. WE also likely would have incurred approximately $144,000 in internal WE labor and approximately $66,500 in NRC licensing costs.

- PDX 77 (Opinion: Cask Pit Rack Cost).

- PX 827, pp. 5, 10-12, 19 (June 2006 Revised Written Testimony of Krishna P. Singh, including attachments).

- Tr. 4408:23-4410:19 (Singh).

- PDX 75 (Opinion, NRC Schedule and Fees).

- PX 805, pp. KRGWE003342-3369 (KRG Supporting Papers).

209. Inserting the temporary rack into or out of the pool would have required only routine fuel handling.

- Tr. 894:20-895:16 (Hennessy).

- Tr. 4408:5-6 (Singh) ("the act of installing a rack would take less than a day after the first time.").

210. During the period from 1988 through implementation of the dry storage project in 1995, WE did not devote serious consideration to the use of a temporary rack because WE expected a lengthy delay in DOE's performance and, as a result, it focused more on long-term SNF storage solutions.

- PX 236, ESR p. 59 (Nov. 1991 ISFSI application and ESR) (noting that WE did not bother considering shorter-term solutions because of DOE's expected lengthy delay in performance).

- Tr. 335:14-338:4 (Link) ("But the bottom line was that it was clear that, because DOE was not going to perform in '98, we had to implement a long-term strategy, a strategy that had what I call modular characteristics, so that it could be expanded or – I won't say, 'contracted,' but it had, it could be implemented in a modular way. That was in the best interest of the customers, to minimize cost, as well as maintain flexibility going into the future.").

- Tr. 1521:12-1524:7 (Krieser) ("I would say, in a nutshell, the conclusion was – and, of course, again, this was based on the fact that DOE was not going to be there in 1998. We needed to address the situation in a long-term fashion, so we needed a long-term solution, we essentially confirmed that that was certainly the case, and we also concluded that dry storage was really the best option to solving that particular problem.").

- Tr. 1170:20-1174:17; 1175:2-8 (Zabransky) (WE was focusing on long-term options.).

211. Small or "mini" racks are racks that are designed to fit into odd or non-rectangular spaces. WE also could have installed small racks where tools are currently stored in the pool, in the periscope area of the pool, in the space occupied by the new fuel elevator, in the fuel transfer canals, and possibly in other areas as well. These racks would have stored fewer than 121 spaces, but provided additional storage options. For instance, the formerly used periscope area could have been used for storage of four SNF assemblies, the new fuel elevator could have been used for storage of six SNF assemblies, and the tool storage area could have been used to store 16 SNF assemblies. In 1996, WE considered installing new spent fuel racks in these various locations in the pool in case WE was not able to load dry casks. WE did not pursue the option further because it was not necessary.

- Tr. 4336:5-11 (Singh).

- Tr. 875:3-10; 890:12-892:8; 951:13-20; 952:22-953:3; 959:7-960:6 (Hennessy).

## XVII. WE INVESTIGATED PRIVATE FUEL STORAGE AND RELATED OPTIONS

212. WE investigated the feasibility of several off-site private fuel storage facilities. It investigated these potential off-site SNF storage options during the period from approximately 1994 through 1999. It investigated these options for several reasons. First, it did not obtain PSCW approval for the WE dry storage project until February 1995. Second, the PSCW approval was challenged in court and that created additional uncertainty regarding when WE could implement its dry storage project. Third, the PSCW only approved the purchase of 12 casks and WE estimated that it would need approximately 36 casks more storage, for a total of 48 casks, to operate until the end of Point Beach's then current licenses. WE reasonably believed that its chances of obtaining any future SNF storage approvals from the PSCW would be enhanced if WE investigated options for transportation of Point Beach's SNF out of Wisconsin. Fourth, after approval of its dry storage project, WE continued to investigate off-site storage options because of problems that it encountered with the VSC-24 cask, including a prohibition on loading such casks for several years. Fifth, WE continued to investigate off-site storage because of delays that it encountered in obtaining a fully licensed replacement cask for the VSC-24 cask.

- Tr. 422:15-423:13 (Link) ("Q: And what was the thinking in pursuing Private Fuel Storage? A: Well, as I think we've discussed already, one of the characterizations by the intervenors and concerns that they represented was that the project at Point Beach, the dry fuel storage project at Point Beach would ultimately become what they called a de facto permanent storage. And they obviously, and the commission staff did not want that to happen because of the high speculation as to not only when, but some of the intervenors questioned whether if DOE would ever fulfill their obligation.").

- Tr. 2512:21-2513:20; 2514:15-24; 2523:7-24; 2531:8-20; 2655:16-2656:17 (Farron).

- Tr. 1551:25-1553:1 (Krieser) (PFS was an away-from-reactor storage opportunity to ship spent fuel from Point Beach.).

213. In 1994, WE investigated an off-site storage facility that would be constructed on lands belonging to the Mescalero Indian tribe in New Mexico and eventually became known as Private Fuel Storage ("PFS"). It invested $883,503 in PFS plus legal fees. WE decided to terminate its involvement in PFS in 1997 because it began to believe that the construction and operation of PFS was unlikely. WE did not invest in PFS in order to make money on an outside investment. Instead, it invested in PFS because DOE's nonperformance required substantial, additional SNF storage and the alternative option, WE's dry storage project, encountered some delays and cask performance problems. WE was very interested in trying to move spent nuclear fuel from Point Beach.

- Tr. 1552:3-1555:4 (Krieser) ("Q: And why did Wisconsin Electric pursue PFS? A: I think what I stated just a minute ago was the reason for that. It was an opportunity, a potential opportunity for us to ship spent fuel from Point Beach, it was an away-from-reactor storage opportunity, if you will. Q: Did there come a time when Wisconsin Electric decided to withdraw from PFS? A: Yes, there was. We were a very active participant in this project from the beginning, up through early 1997, I think I would say. And at that point, the project was beginning to run into considerable opposition from – there were regulatory issues that were involved. . . . And they were going to be requiring a considerable amount of injection of additional equity into the project, and considering all the issues that we felt were out there affecting the possible success of the project, we decided at that point that we were going to withdraw from our participation, and we did.").

- Tr. 421:9-423:13; 425:10-20 (Link) ("Q: In participating in PFS, did Wisconsin Electric have any financial motives? A: No, we were primarily motivated to work with the industry on resolving basically what I'll call an interim problem that DOE was creating by their nonperformance to take fuel, and so we, like some other utilities, were trying to join forces and make some sense out of it. It was simply that. We did not anticipate really making any money out of it in that regard.").

- Tr. 2656:10-2657:8 (Farron) (WE left the PFS group in 1997).

- Tr. 2716:24-2717:24 (Farron) (Withdrawing from the PFS venture does not preclude WE from being a customer of a PFS project.).

- PX 388 (May 1995 Letter from WE to NSP re: participation in PFS).

- PX 454 (May 1997 Letter from WE to Knapp) (noting WE's withdrawal from the PFS program).

- PX 794 (May 8, 2006 Revised Expert Report of the Kenrich Group).

214. WE also investigated options for offshore disposal of spent fuel and other off-site storage options including the Owl Creek project in Wyoming and a potential dry storage facility in Oak Ridge, Tennessee. WE incurred $342,255 in legal expenses in connection with these projects (including PFS).

- PX 389, p. 14 (June 1995 Wisconsin Electric Power Company Proposal for a Nuclear Waste Repository) ("Despite the $600 million paid by the U.S. utilities each year into a special fund for the Yucca Mountain program, it is years behind schedule, billions of dollars over budget, and it is highly questionable whether the repository will ever open. Even if the Yucca Mountain repository did open, it would only have capacity to accept existing stockpiles of spent fuel and could not accept future spent fuel. This could mean the end of the U.S. nuclear power industry.").

- Tr. 1554:5-24 (Krieser).

- Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Doc. 369 (Nov. 20, 2007).

215. WE investigated PFS and other alternative storage options to mitigate DOE's partial breach of contract. WE would not have investigated PFS if DOE had performed under the Standard Contract.

- Tr. 425:10-20 (Link) (WE was motivated to work with the industry on PFS to resolve the problem created by DOE's nonperformance).

- Tr. 1553:25-1554:4 (Krieser) ("Q: And if DOE had performed under the standard contract, do you believe that Wisconsin Electric would have pursued the PFS initiative? A: Not at all.").

- Tr. 1551:3-24 (Krieser) ("Our strategy to deal with DOE's lack of performance always included an intention to pursue away-from-reactor storage facilities, and that would include industry wide initiatives, as well as some of our own.").

216. It was reasonably foreseeable that WE would need to investigate options for additional spent fuel storage because of DOE's failure to perform the Standard Contract in a timely manner. In addition, WE only investigated these off-site private fuel storage facilities because of DOE's contract breach. WE began its dry storage project because of DOE's nonperformance. Then, when WE encountered delays and other problems with its dry storage project, it had to consider off-site private storage options.

- Tr. 1553:25-1554:24 (Krieser).
- PFF 50, 134-135.

## XVIII. THE NRC LEVIED LICENSING, INSPECTION, AND GENERIC FEES ON POINT BEACH

217. WE's claim for NRC fees covers fees that the NRC charged to WE under the following authorities:

a. 10 C.F.R. Part 170.

b. 10 C.F.R. Part 171 (FY 1996-1998).

c. 10 C.F.R. Part 171 (FY 1999-2006).

- PDX 60-Sieracki 39 (Nuclear Regulatory Commission Fees).
- Tr. 3782:2-3783:6 (Sieracki).

218. The NRC must recover most of its budget authority from the licensees it regulates through licensing and inspections and from annual fees each fiscal year.

- Tr. 4032:17-4033:6 (Rabideau) ("At the time, with respect to license fees, the requirements were for NRC to collect approximately 100 percent of its budget and fees charged to licensees . . . It's changed over time. It's currently approximately 90 percent . . . .").

- Tr. 4128:10-4129:3 (Rabideau).

- Pub. L. No. 101-508, the Omnibus Budget Reconciliation Act of 1990, as amended ("OBRA-90").

- PX 1044, p. 31455 (NRC, Revision of Fee Schedules, 64 Fed Reg. 31448-31483 (June 10, 1999)) ("The NRC recognizes that sites will be required to continue to store spent fuel on-site until another solution becomes available. The fact that DOE has not taken possession of the spent fuel does not relieve NRC of the OBRA, Omnibus Budget Reconciliation Act, 1990, requirement to recover approximately 100 percent of its budget authority through fees, including those costs associated with generic spent fuel storage activities.").

- Tr. 4846:8-18 (Croote).

- Tr. 2391:14-25 (Gadzala).

- Tr. 2409:18-2410:10 (Gadzala).

- Tr. 3783:9-3784:5 (Sieracki).

- Tr. 5560:18-24 (Brewer).

219. The NRC charges fees for specific services to identifiable beneficiaries under 10 C.F.R. Part 170. WE constructed its ISFSI in 1995 and the NRC has charged WE ISFSI inspection and related fees pursuant to its authority under 10 C.F.R. Part 170 since 1996. WE has paid those fees. Had DOE performed, WE would not have incurred those costs because WE would not have built dry storage.

- Tr. 4033:17-24 (Rabideau) ("Part 170 fee is a fee for service.").

- Tr. 4129:4-4130:5 (Rabideau).

- Tr. 4846:21-4847:5 (Croote).

- PDX 33 (NRC Fees).

- Tr. 2392:14-2393:15; 2410:23-2411:14; 2429:5-11 (Gadzala).

- Tr. 3782:2-3786:19 (Sieracki).

- PX 1013 (Jan. 17, 2007 Errata for the Kenrich Group Expert Report).

- PX 1029, pp. KRGWE003886-87 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for the Kenrich Group Expert Report).

- PFF 113-114, 157-159, 182.

220. With the advent of dry storage, the NRC began incurring generic costs to regulate ISFSIs. The NRC concluded that it was legally unable to recover its ISFSI costs from the Nuclear Waste Fund. Instead, the NRC decided to recover its ISFSI costs from utilities such as WE.

- PX 1000, p. WISC1000-0003 (June 13, 1991 Rulemaking Issue Affirmation) ("Therefore the staff recommends that the generic costs for independent spent fuel storage be assessed in the annual fee for the licensees (utilities) who have specific or general licenses to use the spent fuel storage casks . . . . With regard to charging the costs to DOE for payment from the NWF, the staff does not believe that the costs are covered by the NWPA and therefore are not recoverable from the NWF.").

- PX 999 (Mar. 3, 1995 Selin (NRC) testimony before Energy and Water Development Subcommittee of the House Appropriations Committee).

221. The NRC charges costs for activities benefiting a class of licensees or type of licensee (or activities not otherwise recovered under Part 170) under 10 C.F.R. Part 171. The NRC terms the Part 171 fees as fees for "generic activities."

- Tr. 4034:1-13 (Rabideau) ("Part 171 annual fee is a fee for the generic activities that NRC conducts. These activities may include research, rule-making, development of other regulatory guidance, incident response activities, those are some examples . . . Generic activities will apply to more than one licensee . . .").

- Tr. 4847:6-14 (Croote).

- Tr. 2393:16-2394:11; 2411:15-2412:22 (Gadzala).

- Tr. 3782:16-23 (Sieracki).

222. From 1996 to 1998, the NRC charged WE fees for its ISFSI as a Part 72 ISFSI license holder pursuant to 10 C.F.R. § 171.16. If PBNP did not have an ISFSI, it would not have paid this fee.

- Tr. 2416:17-2417:16; 2418:13-21 (Gadzala).

- Tr. 3782:2-23; 3784:22-3785:10 (Sieracki).

- PX 1008 (KRG NRC fee supporting documents).

- PX 1013 (Jan. 17, 2007 KRG Errata).

- Tr. 5561:5-10 (Brewer) ("Q: If Wisconsin Electric had not built an ISFSI at Point Beach, would you agree that Wisconsin Electric would not have paid a separate Part 171 license fee or Part 72 ISFSIs from 1996 to 1998? A: I agree with that.").

223. In 1998, the NRC Office of the Chief Financial Officer formed the Spent Fuel Storage/Decommissioning Study Team that studied the NRC's method of recovering ISFSI costs from utilities. The resources that the NRC devoted to its ISFSI program were increasing in the late 1990s. The NRC staff recognized that, as a result of delays in DOE's SNF acceptance program, the NRC would incur additional ISFSI-related costs. The NRC staff opined that it would be "fair and equitable" to recover the money that the NRC was expending on the ISFSI program from the Nuclear Waste Fund but, concluding that it would not be possible, recommended the law be changed to do so. The NRC expected that all licensees would eventually need dry storage because of DOE's failure to perform. The NRC staff recommended that the NRC include the ISFSI fee into a combined fee pursuant to 10 C.F.R. Part 171 covering generic ISFSI, wet storage, and reactor decommissioning expenditures and charge the fee to all operating licensees (not just those with ISFSIs) and to Part 72 ISFSI facilities.

- Tr. 4034:23-4035:8; 4148:8-10; 4162:20-4163:1 (Rabideau).

- Tr. 4152:25-4153:2 (Rabideau) ("It was recognized that as a result of the delays in DOE's program, that there would be costs incurred for this effort.").

- Tr. 4157:4-7 (Rabideau) ("I would say that we were aware in this time frame that we [NRC] were not able to access the waste fund.").

- PX 947, p. 123 (Feb. 27, 1998 NRC Memo re FY 1998 Proposed Fee Rule, Attachment 4) ("Budgeted resources for the independent spent fuel storage program increased from 9.3 FTE and $350 thousand in contract support for FY1995 to 29.3 FTE and $2.1 million in contract support for FY 1998.").

- PX 947, pp. 178-79 (Oct. 1998 Spent Fuel Storage and Decommissioning Fee Study, pp. 10-11) ("Under this alternative [Recover Spent Fuel Storage Costs from the Nuclear Waste Fund], NRC's dry spent fuel storage activities would be funded using the NWF. Since the NWF is off the fee base, activities related to spent fuel storage (dry storage) would no longer be recovered through Parts 170 license and 171 annual fees and licensees would be provided an immediate benefit from the contributions they are making to the NWF. *A fair and equitable approach would be achieved with no new burden on taxpayers or utility customers. This alternative approach requires legislative changes to the Nuclear Waste Policy Act (NWPA) which likely would be difficult to obtain in a timely manner.* As a practical matter, there are also obstacles to overcome in obtaining legislative approval for use of NWFs to fund spent fuel storage activities. Contributions to the NWF are used to balance the national budget, so Congress is reticent about granting expenditures from this source of funds. Legislative relief may be hindered further by the prospect of reducing funds readily available for the DOE repository by diverting them to cover NRC needs. *Nonetheless, because of the delay in the DOE high-level waste repository program, the team recommends that legislation be sought, so that the generic costs associated with NRC's spent fuel storage activities can be derived from the Nuclear Waste Fund."* (Emphasis added)).

- PX 947, p. 172 (Oct. 1998 Spent Fuel Storage and Decommissioning Fee Study, p. 4) ("The annual fee is only one of several financial considerations that licensees must address when choosing a storage option. While it appears that the current fee schedule provides a monetary incentive to choose wet storage over dry storage, despite the high costs of maintaining wet storage, NRC fees may not be a major factor in a licensee's decision. Licensees frequently seek dry storage due to the lack of storage capacity remaining in the spent fuel pool. *With the continued delay in DOE taking possession of spent fuel, some utilities must then resort to dry storage for*

*more storage capacity.* In some cases, licensees have successfully reracked the fuel pool or utilized available capacity in other units at the same site operated by the same utility and do not need dry storage. Other licensees have elected a third alternative i.e., to ship the cask to an off-site ISFSI owned by the licensee or other entity. Finally, other plants have prematurely shut down before reaching storage capacity. A decision by the licensees to forego dry storage would likely result from the high cost to license, construct, and maintain storage in an ISFSI, and not merely the annual fee imposed by the NRC. *It is likely that, in the absence of a high-level waste repository, all licensees will need dry storage capacity eventually. It is estimated that as many as 50 reactors will reach storage capacity during the next 10 years.* According to industry representatives, building another spent fuel pool is not an option because it is too costly and cannot be easily integrated within a plant's configuration. For some licensees, the need for dry storage is so critical that an exemption to current Part 72 regulations has been requested to allow the construction of dry storage casks before the design has been certified by the NRC." (Emphasis added)).

- PX 947, p. 181 (Oct. 1998 Spent Fuel Storage and Decommissioning Fee Study, p. 13) ("For the reasons discussed in this report, the team recommends the following: To recover the agency's generic costs for spent fuel storage and power reactor decommissioning activities, establish a 'spent fuel storage/decommissioning' annual fee and assess the fee to all power reactors holding Part 50 licenses, including those in decommissioning, and to Part 72 licensees who do not hold Part 50 licenses.").

- Tr. 3785:13-3786:7 (Sieracki).

224. The NRC Commissioners approved the Spent Fuel Storage/Decommissioning Study Team recommendations regarding incorporating the ISFSI fee into a combined "spent fuel storage/reactor decommissioning" ("SFS/RD") fee and to charge the SFS/RD fee to all operating licensees, not just those with ISFSIs. In their votes approving the new SFS/RD fee, some of the NRC Commissioners associated the fee with DOE's failure to remove SNF.

- Tr. 4061:3-4062:23 (Rabideau).

- PX 967 (Dec. 4, 1998 Merrifield Notation Vote) ("I agree with the staff's recommendation to establish a spent fuel storage/decommissioning annual fee to be assessed to all Part 50 licensees regardless of their operating status and to Part 72 licensees who do not hold Part 50 licenses, and to recover the remaining generic costs through a surcharge. This should result in a more

even and fair recovery policy for various decommissioning and storage activities. *That having been said, it is unfortunate that the federal government has not provided for permanent disposal of high-level waste.* Because of the delay in the DOE high-level waste repository program, I believe the Commission should seek legislation for FY2000 to amend the Nuclear Waste Policy Act so that generic costs associated with the NRC's spent fuel storage activities can be derived from the Nuclear Waste Fund." (Emphasis added)).

- Tr. 4165:21-4166:13 (Rabideau).

- PX 968 (Dec. 4, 1998 McGaffigan Notation Vote) ("I also support the Spent Fuel Storage/Decommissioning Study Team's recommendation to pursue legislation to amend the Nuclear Waste Policy Act to allow generic costs associated with NRC's spent fuel storage activities from the Nuclear Waste Fund in future fiscal years.").

- Tr. 4167:9-4168:16 (Rabideau).

- PX 1009, pp. WISC1009-0001, WISC1009-0002 (Feb. 2, 1999 NRC Memo re FY1999 Fee Rulemaking) ("The Commission agrees with recommendation 2 to establish a spent fuel storage/decommissioning annual fee to be assessed to all Part 50 power licensees regardless of their operating status, and those Part 72 licensees who do not hold a Part 50 license, and recover the remaining generic decommissioning costs through a surcharge assessed to the various classes of licensees based on their share of the budget. As part of the legislative package submitted to the Commission in February 1999, the staff should provide the proposed legislative language and discuss the positive and negative aspects of pursuing the proposed legislation to allow NRC to recover the generic costs associated with spent fuel storage from the Nuclear Waste Fund beginning in FY 2000.").

- Tr. 4205:21-4206:5 (Rabideau).

225. On June 10, 1999, the NRC published its final rule setting the FY 1999 SFS/RD fee and has continued to do so every year since for subsequent fiscal year fees. The NRC noted that even though it was DOE that had failed to take possession of utility SNF, the NRC would still have to recover the ISFSI fees from utilities. WE has paid these fees.

- Tr. 4067:6-16 (Rabideau).

- Tr. 4140:25-4141:4 (Rabideau).

- PX 1044, p. WISC1044-0009 (NRC, Revision of Fee Schedules, 64 Fed Reg. 31448-31483 (June 10, 1999)) ("The fact that DOE has not taken possession of the spent fuel does not relieve NRC of the OBRA-90 requirement to recover . . . those costs associated with generic spent fuel storage activities.").

- Tr. 2424:18-2425:18 (Gadzala) ("And therefore, the NRC, was, in essence, putting what had previously been a specific fee and turning it into a general fee, since the NRC's expectation appeared to be that this would become applicable to all licensees that were still continuing to generate spent fuel.").

- PDX 35 (1999 and Forward – Part 171.15).

- Tr. 2429:12-24 (Gadzala).

- PX 945, p. KRGWE002051 (NRC final rules for fees for 1998-2005).

- Tr. 3786:24-3787:12 (Sieracki) ("And below that is for the spent fuel storage reactor decommissioning fee for the nonoperating reactors $206,000 . . .").

- PDX 60-Sieracki 40 (Nuclear Regulatory Commission Fees Part 171 Fee – FY 1999-2006).

- PX 1008 (KRG NRC fee supporting documents).

- PX 1013 (Jan. 17, 2007 KRG Errata).

- Tr. 5563:19-24 (Brewer) ("Q: So the NRC would still need to recover the cost of work it does on dry storage in FY '99 and subsequently, right? A: The NRC would need to recover fees that it incurs for generic activities related to dry storage, just like any other activities.").

226. The calculation of the NRC fees that WE has paid from 1999 forward is contained in Kenrich's Binder P (PX 1008). The NRC documented its fees in invoices sent to Point Beach on a quarterly basis. WE's claim does not include the reactor decommissioning portion of the NRC SFS/RD fee. WE deducted the reactor decommissioning portion of the SFS/RD fee based on the deposition testimony of NRC Deputy Chief Financial Officer Peter Rabideau. Mr. Rabideau identified those amounts and personnel – Full Time Equivalent

("FTE") – that were associated with the SFS portion and the RD portion. WE included only the SFS portion in its claim, roughly 54 percent of the fee, varying by year. Mr. Rabideau was unable to allocate approximately 20 percent of the budget line items between SFS and RD. In those instances, WE applied the SFS/RD ratio to the unallocated budget line items to allocate those amounts. As a result of deducting the RD portion of the fee, WE reduced its NRC fee claim by approximately $1 million (in nominal dollars).

- Tr. 2394:12-17; 2399:24-2400:4 (Gadzala).

- PX 1008 (KRG NRC fee supporting documents).

- PX 1013 (Jan. 17, 2007 KRG Errata).

- PDX 60-Sieracki 41 (Nuclear Regulatory Commission Fees Example Calculation For FY 1999).

- Tr. 3787:18-3791:4; 3795:2-3797:19 (Sieracki).

- Tr. 5561:16-5563:17 (Brewer) ("Q: So you agree that the NRC did work on dry storage '98 and prior, and they continued to do that in FY '99 and subsequently? [objections omitted] A: Yeah, . . . there is work being done, how much of that type of work that's being done in any given year is not something I've researched or know, but generically, that work must be ongoing to some degree.").

- Tr. 5562:10-21 (Brewer) (The NRC "clearly did work related to dry fuel storage" after fiscal year 1999.).

- PX 1002 (March 31, 1999 NRC Memorandum re: Fee Workpapers for 10 CFR Parts 170 and 171 Proposed Rule).

a. WE calculated the SFS portion of the FY 1999 SFS/RD fee based on Mr. Rabideau's deposition testimony, which Mr. Rabideau reviewed at trial and adopted as his trial testimony.

- PX 1008 (Kenrich NRC fee supporting documents).

- PX 961 (FY 1999 Fees Rule).

- Tr. 4210:8-24; 4215:23-4216:14 (Rabideau) (Court permits Mr. Rabideau to adopt portions of his deposition testimony as his trial testimony.).

- Tr. 4217 (Rabideau) (relating to Rabideau Dep. Tr. 94:5-108).

- PX 1048 (Excerpts from Rabideau Dep.).

b. The NRC used two methods to establish annual fees in this time frame – "rebaselining" and "percent change." In rebaselining, the NRC would allocate the budget across individual fee categories based on a "complete relook" without reference to prior budgets ("bottoms-up estimate"). By contrast, under the percent change method, the NRC would not reallocate the budget but instead would adjust the fees based on the percent change in the NRC's budget for that year. In FY 2000, the NRC arrived at its fees under the percent change method. It applied the same percent change from the 1999 budget and increased its fees by the same percentage. Similarly, WE applied the same percentage calculated for 1999 to determine the SFS portion of the FY 2000 SFS/RD fee.

- Tr. 4097:15-4098:7 (Rabideau).

- Tr. 3791:9-3792:5 (Sieracki).

- PX 1008 (Kenrich NRC fee supporting documents).

c. WE calculated the SFS portion of the FY 2001 SFS/RD fee based on Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).

- PX 962 (FY2001 Fees Rule).

- Tr. 4223 (Rabideau) (relating to Rabideau Dep. Tr. 111:15-118:9).

- PX 1048 (Excerpts from Rabideau Dep.).

d. WE calculated the SFS portion of the FY 2002 SFS/RD fee based on Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).
- PX 963 (FY2002 Fees Rule).
- Tr. 4225-6 (Rabideau) (relating to Rabideau Dep. Tr. 118:10-123:6).
- PX 1048 (Excerpts from Rabideau Dep.).

e. WE calculated the SFS portion of the FY 2003 SFS/RD fee based on Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).
- PX 964 (FY2003 Fees Rule).
- Tr. 4227 (Rabideau) (relating to Rabideau Dep Tr. 123:7-130:22).
- PX 1048 (Excerpts from Rabideau Dep.).

f. WE calculated the SFS portion of the FY 2004 SFS/RD fee based on Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).
- PX 965 (FY 2004 Fees Rule).
- Tr. 4228-9 (Rabideau) (relating to Rabideau Dep Tr. 131:8-135:13).
- PX 1048 (Excerpts from Rabideau Dep.).

g. WE calculated the SFS portion of the FY 2005 SFS/RD fee based on Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).
- PX 966 (FY 2005 Fees Rule).
- Tr. 4229-30 (Rabideau) (relating to Rabideau Dep Tr. 135:14-139:3).
- PX 1048 (Excerpts from Rabideau Dep.).

h. WE calculated the SFS portion of the FY 2006 SFS/RD fee by designating the budgeted cost categories based on previous years' designations from Mr. Rabideau's deposition testimony.

- PX 1008 (Kenrich NRC fee supporting documents).

- PX 1029, pp. KRGWE003886-3901 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for Kenrich Group Expert Report).

227. The NRC witnesses testified that, to allocate between contract dollars and FTEs that cannot be identified as spent fuel storage or reactor decommissioning would require consultation with NRC program personnel or those NRC personnel performing budget allocations. The NRC witnesses further testified that they have not asked the relevant NRC personnel for this information.

- Tr. 4219:20-4220:8; 4225:3-13; 4226:16-23; 4228:3-11; 4229:16-22; 4230:22-4231:5 (Rabideau).

- Tr. 4883:2-4886:21; 4895:13-16 (Croote).

228. If DOE had performed, WE would not have paid any NRC ISFSI project fees under Part 171:

a. WE would not have paid Part 171 fees from 1996-1998 because WE would not have licensed an ISFSI pursuant to Part 72.

- Tr. 3797:20-3798:3 (Sieracki).

b. WE would not have paid Part 171 fees from 1999 forward because the NRC would not have included its dry storage costs in the Part 171 fees. That is clear because there would have been at most eight ISFSIs in 1998 if DOE had performed. Additionally, there would be few, if any, ISFSIs constructed after 1998 had DOE performed. Pursuant to its past practice, the NRC likely would have only charged those licensees who had dry storage with the NRC dry storage project costs. Given

that WE would not have built an ISFSI if DOE had performed, WE would not have paid those utility-specific fees.

- Tr. 3798:4-3800:18; 3803:4-20 (Sieracki).

- Tr. 4172:18-23; 4187:18-4188:12 (Rabideau).

- Tr. 2426:19-2427:6 (Gadzala) ("My understanding is that the NRC generally invoices specific activities as either an inspection or review fee, and if their – and I'm basing this on basically the 10-some-odd years with the NRC and attending some of the speeches by senior NRC executives and, granted, that this was their understanding also, but they were in a position where they affected policy that, if there was confidence on the part of the NRC that DOE would have a reliable schedule for taking possession of the fuel, *then my belief is that they would not have imposed a generic fee on all utilities.*" (Emphasis added)).

- PX 957, p. 2 (May 3, 1999 Letter from South Carolina Electric & Gas to NRC re: Comments on Proposed FY 1999 Fee Rule) ("Additionally, had the DOE honored its court affirmed obligation to take possession of spent fuel by January 1998, this fee would not be an issue.").

229. In January 1998, there were 10 dry storage facilities in operation. In the nonbreach world, there would have been eight or fewer dry storage facilities in operation as of 1998, and no additional ISFSIs would have been constructed thereafter. At the time of Wisconsin Electric's damages trial, 38 dry storage facilities had been placed in operation, servicing 63 reactors.

- Tr. 3367:2-3368:3 (Supko).

- Tr. 3798:4-3800:18 (Sieracki) ("And based on our work in the spent fuel cases, we know that at least two of the 10 would not have had ISFSIs, so now, we're down to a category where there's – as of the time of DOE's performance, starting to perform, there's eight or less plants that have ISFSIs. Now, since I understand that one of the objectives of the standard contract and the pickups was to avoid additional at-reactor storage, it's reasonable to assume that there would have been no additional ISFSIs beyond the eight that would have existed in 1998.").

- PDX 57 (At-Reactor Spent Fuel Storage Installations).

- Tr. 5564:3-6 (Brewer) ("Q: Mr. Brewer, hasn't the number of ISFSIs in service at nuclear power plants increased since 1998? A: Yes, yes.").

230. That WE would have to pay increased NRC fees was foreseeable. DOE's failure to perform caused WE to incur the NRC Part 170 and 171 ISFSI-related fees. It was commercially reasonable (in fact, required) for WE to pay the NRC fees.

- PFF 50, 135.

## XIX. WE ESTABLISHED ITS DAMAGES TO A REASONABLE CERTAINTY

231. Messrs. Sieracki and Metcalfe of Kenrich LLC calculated WE's damages pursuant to a sound, professionally accepted methodology. They determined WE's increased costs resulting from the failure of DOE to perform in accordance with WE's Standard Contract. Kenrich obtained inputs and cost estimates from current or former personnel at WE and NMC and from other WE experts, Eileen Supko and Dr. Krishna Singh. They also worked with WE and NMC personnel to identify those activities and costs related to DOE's breach and analyzed extensive documentation supporting those costs. Kenrich also verified and evaluated WE's accounting controls as well as those imposed by related federal and state regulations. Kenrich also verified that the costs were incurred and related to DOE's breach. After considering the propriety of all these inputs and cost estimates, Kenrich then determined WE's increased costs due to DOE nonperformance. Kenrich submitted a May 2006 report, a January 2007 errata, an April 2007 errata and a September 2007 Trial Damages Binder.

- Tr. 3719:21-3730:25 (Sieracki).
- Tr. 4521:2-4532:11 (Metcalfe).
- PX 794, App. E (May 2006 Damages Report).
- PX 1013 (Jan. 2007 Errata).
- PX 1028, 1029 (April 2007 Errata and supporting work papers).

- PX 1047 (Kenrich Trial Damages Model).

- PDX 60-Sieracki 14-62 (Kenrich Slides re Damages).

- PDX 61-Metcalfe 1-22 (Kenrich Slides re Overall Determination of WE's Past Damages and Costs).

232. In addition, the costs of regulated public utilities are subject to vigorous review by state regulatory commissions and by FERC. As a result, public utilities traditionally have excellent cost accounting controls and practices. Indeed, Mr. Metcalfe testified that public utilities are the most regulated industry in the United States. In the case of WE, it is governed by two regulatory commissions, the PSCW and the Michigan Public Service Commission ("MPSC"), rather than one. Yet another control exists in that, since 2000, NMC has operated plants for several utilities, and naturally no utility wants to be charged for an item that does not pertain to it. Mr. Metcalfe confirmed that the WE accounting controls were equal to and in some respects better than other regulated utilities.

- Tr. 4519:19-4520:19, 4527:11-4528:1, 4545:23-4551:22 (Metcalfe).

- Tr. 690:9-696:15 (Zabransky) ("Q: And during the period of time that you were at Wisconsin Electric, did Wisconsin Electric's cost procedures seem reasonable to you? A: Yes. Q: And did you manage that budget within the budget, to the best of your recollection? A: Yeah. Well, I think the project was managed appropriately. Q: And if you had found charges to that budget that was inappropriate, would you have removed them? A: I believe, to the extent we found such things, we would have done that, yes.").

- Tr. 2744:7-2745:15 (Anundson) (WE ensured that personnel were correctly charging their time to the projects.).

- PX 387 (May 8, 1995 Email from Anundson re: WE labor hours).

233. The testimony of Ms. Ione Straub, who was the Senior Cost Specialist for WE's Nuclear Department from 1990 to 2002, provides further confirmation that WE has established its damages with reasonable certainty.

a. WE is highly regulated, with regard to its cost accounting, by the PSCW, the MPSC, and FERC. FERC has a uniform system of accounts that WE employs. WE also follows generally accepted accounting principles ("GAAP").

- Tr. 2848:16-2851:4; 2853:13-2854:5; 2877:17-2878:18 (Straub).

b. WE has quarterly and annual audits by external auditors. It also has an internal audit function that was guided by WE's Controllers Accounting Orders, Policy Memorandums, and, more recently, by WE's Policy and Procedure Manual. WE also must comply with the requirements of the Sarbanes-Oxley Act of 2002.

- Tr. 2878:19-2881:5 (Straub).

c. When NMC took over operation of Point Beach, NMC maintained the same accounting controls and budgeting standards that were maintained by WE. Ms. Straub assisted in transition of the accounting from WE to NMC.

- Tr. 2900:8-2908:2 (Straub).

d. Costs on WE's nuclear projects have always been tightly controlled because of the extensive scrutiny on nuclear projects.

- Tr. 2881:6-2882:9; 2913:11-2914:17 (Straub).

e. WE ensures that it is incurring valid expenditures through a three-way matching process in which three pieces of documentation – a purchase order, a receipt, and an invoice – have to be matched against each other for both the quantities and the rate being charged.

- Tr. 2851:17-2852:1; 2882:17-2885:7 (Straub).

f. WE prepares budgets for both manpower and other costs, and WE's budgeting process relates to the ratemaking process with the PSCW and to MPSC. WE's management reviews budgeted and actual expenditures on a regular basis and makes corrections to ensure proper charging.

- Tr. 2854:24-2856:11; 2858:14-2867:8; 2875:6-2876:7 (Straub).

g. Ms. Straub authored the Project Administrators Manual for the Nuclear Power Department in 1991, which "provide[d] the project administrator with the guidance and information needed for proper handling of the financial requirements of a project," including budgeting and tracking actual costs. The manual has been updated and revised over the years and still exists, albeit in a different format.

- Tr. 2856:12-2858:13 (Straub).

- PX 240, pp. 1, 62-63 (Dec. 1991 Nuclear Power Department Project Administrator's Manual).

h. WE has employed various accounting systems that have been used over the years. The various systems have different capabilities, and the systems were updated to reflect new technology when such technology became available.

- Tr. 2882:10-16; 2908:3-2911:24 (Straub).

- PX 766 (Chart - Settlement rules).

234. The Government conducted an audit verification of WE's claim pursuant to which WE made available for review samples of cost records, printouts of financial data, copies of purchase orders, invoices and cancelled checks and electronic records of costs. Ms. Straub also participated in a three-day audit interview in which the Government and its experts were able to inquire about WE's cost accounting and request documents.

- Tr. 2914:18-2916:8 (Straub).

235. On September 21, 2007, the parties executed a Joint Stipulation Regarding Accuracy of Plaintiff's Costs ("Joint Stipulation"), which stipulated as follows:

> The parties agree, with the two exceptions noted below, that all costs through February 28, 2007 that are included in WE's claim were incurred by WE and are traceable to and supported

> by WE's accounting records. These costs include (1) outside services and materials costs, (2) the NRC Power Reactors' Annual Fees, (3) employee expenses, (4) the Pension and Benefits Labor Adder, and (5) labor costs. In addition, the Government does not deny the accuracy of the budgeted Administrative and General cost rates used by WE in its claim. The Government, however, contests whether WE legally is entitled to recover these claimed monies in this action.

The two exceptions noted in the Joint Stipulation were that the Government contests the accuracy of the calculation of WE's cost of capital and the accuracy of the calculated offset for the procurement and installation of a temporary rack.

- Joint Stipulation Regarding Accuracy of Plaintiffs Costs, Doc. 350 (Sept. 21, 2007).

236. The Kenrich Fuel Management Model calculates the Point Beach spent fuel pool effective capacity and the total annual amount of spent fuel that was stored at Point Beach in the actual world. It illustrates WE's historical loading of dry casks and provides a framework to determine the reasonableness of WE's spent fuel management, including its loading of 25 casks at Point Beach through February 2007.

- Tr. 3738:9-3746:5 (Sieracki).

- PX 796, pp. KRGWE003249-52 (Kenrich Revised Fuel Management Model-Binder BB).

- PDX 60-Sieracki 7-20 (Kenrich Slides: Fuel Management Model).

237. Total Nominal Damages are $52,337,000 and Total Damages including Cost of Capital Damages (as of September 10, 2007) are $96,541,000. Damages are as follows:

a. ISFSI Licensing, Engineering, Construction and Maintenance: Nominal Damages are $20,683,000 and Cost of Capital Damages are $49,089,000;

b. Dry Cask: Nominal Damages are $31,536,000 and Cost of Capital Damages are $48,778,000;

c. Cask Pit Rack: Nominal Damages are a credit of $(2,048,000) and Cost of Capital Damages are a credit of $(5,865,000);

d. Private Fuel Storage: Nominal Damages are $884,000 and Cost of Capital Damages are $2,221,000; and

e. Spent Fuel Management: Nominal Damages are $1,282,000 and Cost of Capital Damages are $2,318,000.

- PX 1047 (Kenrich Trial Damages Model).

- PDX 60-Sieracki 62 (Summary of WE's Total Past Nominal Damages, by Category Including Trial Adjustment).

- Tr. 4562:12-4563:12 (Metcalfe).

- PDX 61-Metcalfe 11, 22 (Summary of Total Past Damages, by Category (Through 2/2007) Including Trial Adjustment).

## A. INTERNAL LABOR

238. WE used internal labor on the dry storage project. Internal labor was used where feasible because these employees were more reliable, better trained, more familiar with Point Beach, and less expensive than outside labor. WE preferred to use internal labor on spent fuel storage projects because WE employees are generally more reliable, readily available, trained specifically for operations at Point Beach, and less expensive than outside contractors. Use of internal labor also allowed WE to retain more control over the process. These internal labor charges were supported by books and records evidence. These time allocations were consistent with GAAP as required by the PSCW.

- Tr. 1734:25-1735:24; 1743:16-1745:6 (Becka).

- Tr. 2028:1-16 (Holzmann).

- Tr. 2883:7-17 (Straub).

239. It is appropriate that WE, a regulated public utility, recover the cost of its internal labor expended in activities resulting from the Government's contract breach.

Regulated public utilities such as WE are cost-conscious and minimize staff at nuclear plants for safe and reliable plant operation. Second, WE's dry storage project, a large, complex project, required extensive planning and staffing, either outside contractors, internal labor or a combination of both. If WE personnel are performing work resulting from DOE's contract breach, these personnel are necessarily not available to perform other work for the benefit of WE and its ratepayers. In addition, public service commissions typically permit regulated public utilities to recover their internal labor costs. It also is typical to recover the cost of internal labor in Government contract work. Under the Standard Contract, the Government can recover its internal labor costs. Finally, WE's use of internal labor results in lower costs than would the use of outside contractors. Thus, recovery of internal labor costs will incentivize utilities to use such lower-cost internal labor in future dry storage work when appropriate – further mitigating the cost to DOE for its breach.

- Tr. 4605:2-4611:9; 4620:19-4621:25 (Metcalfe).

- PDX 61-Metcalfe 19 (Determination of Individual Damages Elements Reasonableness of WE Internal Labor).

- *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 537-39 (2006).

a. The Government's expert, Mr. Kiraly, contends that labor charges relating to any salaried employee should be rejected unless the employee charged more than 50 percent of his or her time to a dry storage project number during the period April 1999 through December 2005. But even Mr. Kiraly agreed that no treatise or peer-reviewed study supports the 50 percent standard. Neither did Mr. Kiraly consider any other analyses for different standards.

- Tr. 6198:20-6199:1 (Kiraly) (No treatise or peer review study supports Mr. Kiraly's standard.); 6200:3-23 (no other analyses were considered).

- PX 862 (Expert report of Stephen Kiraly and appendices/attachments).

- PX 864 (August 11, 2006 Letter from DOE to Perkins Coie attaching replacement pages for Kiraly report).

240. But for the dry storage project, WE's internal labor would have had other work, for which they were hired and for which they are paid.

- Tr. 4607:13-4608:4 (Metcalfe).

- Tr. 2007:25-2015:17 (Holzmann) ("Q: Does loading a spent fuel storage cask affect plant manning operations? A: Certainly, it affects, for the VSC-24, it took on the order of 70 to 80 individuals to load a canister. For the newer 32PT design, it takes approximately half of that, 40 to 50 individuals to load a canister. So what in essence that does is it removes the resource that you currently have participating in a dry storage load activity unavailable to perform other maintenance activities at Point Beach.")

- Tr. 1747:15-1754:19 (Becka) (regarding backlog of other projects).

- PX 376 (Feb. 1995 Draft Training Roster) (showing the number of people who had to be trained to participate in the dry storage project).

241. The dry storage project was a major and complex project. It involved a larger number of disciplines compared to an ordinary engineering project. It involved personnel from Operations, Health Physics, Reactor Engineering, Maintenance, Instrumentation and Controls, Non-Destructive Examination, Chemistry, Security, Administration, Civil Engineering, Mechanical Engineering, Electrical Engineering, and Radiological Engineering.

- Tr. 177:11-178:5; 180:19-183:13 (Baumann).

- Tr. 2007:25-2015:17 (Holzmann).

- PX 1010 (Dec. 1, 1995 Point Beach Nuclear Plant Independent Fuel Storage Installation Evaluations and Summary of Compliance).

- PX 615 (Memo from NMC to Becka attaching qualification matrix).

242. In incurring its internal labor costs, WE also incurred pension and benefit costs for its employees. Under the Joint Stipulation, the Government does not question the

accuracy of these charges. It is reasonable that WE should recover these costs in connection with its recovery of its internal labor costs.

- PDX 61-Metcalfe 21 (Summary of Total Past Nominal Damages, by Cost Type (Through 2/2007) Including Trial Adjustment).

- PX 1047, p. KRGWE003917 (Kenrich Trial Damages Model).

- Tr. 4620:19-24 (Metcalfe).

- Joint Stipulation, Dkt. 350 (Sept. 21, 2007).

**B. GENERAL AND ADMINISTRATIVE COSTS**

243. The overhead costs included in the claim were based on the WE overhead rates for Administrative and General ("A&G") costs as approved by the PSCW. Only 3.1 percent of WE's nominal damages are A&G costs.

- Tr. 4611:10-4613:18; 4619:5-20 (Metcalfe).

- PX 1047 (Kenrich Trial Damages Binder) (especially pages KRGWE003917; 3926-3960).

- PDX 61-Metcalfe 21 (Summary of Total Past Nominal Damages, by Cost Type (Through 2/2007) Including Trial Adjustment).

244. It is appropriate that WE recover its overhead costs. Overhead costs are real costs to WE and are actually incurred by WE. WE is not being made whole if it does not recover the overhead costs allocable to WE's spent fuel storage activities at issue. It also is normal practice to identify the overhead costs and allocate them in a fair, reasonable and objective manner to cost objectives. Recovery of overhead costs also is typical in Government contracts under the Federal Acquisition Regulations and the Cost Accounting Standards and in Government contract claims. The Government also includes such costs in determining its recoverable costs under the uranium enrichment contracts and in determining recoverable Government costs under the Standard Contract. Public service commissions also typically permit regulated public utilities to recover such costs. In addition, the PSCW

requires that WE bill allowable overhead costs to nonutility affiliates to ensure that the ratepayers are not subsidizing work performed for the benefit of outside parties. It is proper for WE to include overhead costs in its damages sought from the DOE because the work performed related to dry storage at Point Beach was done because of and, in essence, *for* DOE, and not for the benefits of the ratepayers. Finally, permitting a utility to recover its A&G costs also incentivizes the utility to continue to perform work resulting from the Government's breach with internal labor, which is less expensive than using outside contractors.

- Tr. 4613:19-4621:25 (Metcalfe).

- PDX 61-Metcalfe 20 (Determination of Individual Damages Elements Reasonableness of WE Overheads).

- PX 1047 (Kenrich Trial Damages Binder).

- PX 1043.1 (PSCW Order).

- PX 1043.2 (WE Energies Polices & Procedures).

- Tr. 2885:8-2899:17; 3008:19-3010:22 (Straub).

**C. WEIGHTED AVERAGE COST OF CAPITAL ("WACC") CLAIM**

245. The calculation of WE's WACC for each year of WE's claim is contained in Kenrich's Cost of Capital Binder and Kenrich's April 2007 errata and was further explained in Mr. Metcalfe's testimony. WE's cost of capital damages are based on WE's WACC as determined by the PSCW.

- PX 797 (Kenrich Binder CC: Cost of Capital).

- Tr. 4580:23-4587:24; 4591:13-4597:8 (Metcalfe).

- PDX 61-Metcalfe 14-18 (Slides re: Cost of Capital).

- PX 1028 (Kenrich April 10, 2007 Errata).

- PX 1029, pp. KRGWE003830-3837, KRGWE003848-3852 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for Kenrich Group Expert Report).

- PX 1047 (Kenrich Trial Damages Model).

- PX 1029, p. KRGWE003848 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for Kenrich Group Expert Report).

- PX 1029.1 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for Kenrich Group Expert Report).

- PX 1029.2 (Revised Work Papers from Kenrich Group Binders for April 10, 2007 Errata for Kenrich Group Expert Report).

- Tr. 2868:15-2875:5 (Straub).

246. WE's WACC is not the equivalent of prejudgment interest. WACC is an actual economic cost to WE for having to finance the costs it has incurred as a result of the Government's breach of contract from the time that WE incurred those costs. WE needs to be compensated for its WACC in order to be made economically whole. Only through an award of its WACC can WE be reimbursed for the risk that it experiences in earning its capital as well as taking into account both inflation and the time value of money.

- PX 794, p. 15 (May 8, 2006 Kenrich Damages Report).

- Tr. 4558:10-4559:23; 4561:25-4562:8; 4564:1-4566:3; 4587:25-4589:14 (Metcalfe).

- PDX 61-Metcalfe 13 (Economic Basis for Cost of Capital).

247. The economic basis for cost of capital damages is as follows: Cost of capital is an actual economic damage to WE and its recovery is required to make WE reasonably whole economically. Recovery of cost of capital is consistent with utility practice and regulatory requirements. Cost of capital also is consistent with the calculation of WE's financial obligation to the Government when it owes money to the Government under the Standard Contract. Examples include the one-time fee under Article VIII.B.2 (b) in the

Standard Contract and any late payment of an ongoing payment under Article VIII.C in the Standard Contract. There is also a continuing significant impact in that DOE's delay in accepting WE's spent fuel under the Standard Contract is expected to continue for a number of years. Cost of capital is also recognized and used by the Government's experts in other spent fuel cases, such as in calculating the total value of Government offsets. Finally, the failure to provide cost of capital provides a disincentive for the spent fuel cases to be resolved in a timely manner.

- Tr. 4564:1-4580:21 (Metcalfe).

- PDX 61-Metcalfe 13 (Economic Basis for Cost of Capital).

248. An alternative calculation is Allowance for Funds Used During Construction ("AFUDC"). AFUDC is the cost of capital for an asset during the time that the asset is under construction and prior to the asset going into service. The same rate is used to calculate AFUDC as WACC. Once the asset then goes into service, it then earns WACC. AFUDC is permitted by the PSCW and FERC. AFUDC for the dry storage facility was $747,865.

- Tr. 4566:4-4568:21; 4597:10-4598:4; 4660:12-15 (Metcalfe).

- Tr. 2866:18-2868:15 (Straub).

- PX 1029, p. KRGWE003854 (Revised Work Papers from Kenrich Errata for Kenrich Group Expert Report).

249. Another alternative calculation is Weighted Average Cost of Debt ("WACD"). WACD is calculated exactly the same way as WACC and is based on the same sources as WACC, namely, the PSCW's annual determinations of WE's capital structure and its own cost. Thus, with Kenrich's Cost of Capital Binder work papers, anyone, including the Government's damages expert, has had, for some time, available all of the information necessary to calculate the WACD. The only difference is that, instead of applying the cost of

WE's equity and debt to the nominal damages, one just applies WE's cost of debt to these damages.

- Tr. 6310:17-6313:1 (Metcalfe).

- *Compare* PX 1050, pp. KRGWE003978-4036 (Kenrich Cost of Debt Binder) *with* PX 797, pp. KRGWE000755-787, KRGEW003234 (Kenrich Cost of Capital Binder) and PX 1029, pp. KRGWE003848-3852 (Kenrich April 10, 2007 Errata Workpapers).

250. Total Nominal Damages are $52,337,000 and Total Damages including Cost of Debt Damages (as of September 10, 2007) are $69,995,000. Specific damages categories are as follows:

a. ISFSI Licensing, Engineering, Construction and Maintenance: Nominal Damages are $20,683,000 and Cost of Debt Damages are $31,752,000;

b. Dry Cask: Nominal Damages are $31,536,000 and Cost of Debt Damages are $38,639,000;

c. Cask Pit Rack: Nominal Damages are a credit of $(2,048,000) and Cost of Debt Damages are a credit of $(3,505,000);

d. Private Fuel Storage: Nominal Damages are $884,000 and Cost of Debt Damages are $1,405,000; and

e. Spent Fuel Management: Nominal Damages are $1,282,000 and Cost of Debt Damages are $1,704,000.

- Tr. 6313:2-16 (Metcalfe).

- PX 1050 (Kenrich Cost of Debt Binder).

- PDX 62a (Summary of Total Past Damages, by Category (Through 2/2007), with Weighted Average Cost of Debt).

**D. WE CALCULATED THE TEMPORARY RACK OFFSET IN THE NON-BREACH WORLD WITH REASONABLE CERTAINTY**

251. The temporary rack offset included the costs estimated by the President of Holtec, Dr. Singh, for temporary rack design and engineering services, fabrication, installation hardware and tools and Holtec installation services in the sum of $1,837,272. In addition, Dr. Singh estimated the costs for the NRC to consider and approve a license amendment to permit Point Beach to place the temporary rack in the cask laydown area. These estimated costs were $66,500.

a. Holtec is the dominant supplier of spent fuel pool storage racks in the United States.

- PX 827, pp. 4, 5, 12 (Revised Written Testimony of Krishna P. Singh, including attachments).

- Tr. 4337:6-8 (Singh) (More than 70 percent of spent fuel discharged from U.S. nuclear reactors is stored in Holtec storage racks.).

- Tr. 4401:15-4404:15; 4408:23-4410:19 (Singh).

- PDX 75 (Opinion, NRC Schedule and Fees).

- Tr. 5583:17-22 (Brewer).

252. Kenrich then calculated the estimated internal labor costs that WE might have incurred in connection with the use of the temporary rack. Kenrich made an estimate of the WE personnel who would be required in such an action and their respective hours with the input of Gary Krieser, who was Manager of Industry and Regulatory Services for the Nuclear Department from 1992-1996. Kenrich then obtained the labor rates from Ione Straub, who served for many years in the accounting area for the Nuclear Department. These internal labor costs total $144,199. Finally, Kenrich then calculated total nominal damages ($2,048,000) and damages with cost of capital applied ($5,865,000).

- PX 794 (KRG May 2006 Damages Report).

- PX 805, pp. KRGWE003342-3369 (KRG Supporting Papers).
- PX 1047 (Trial Damages Model).
- Tr. 3821:1-3828:16 (Sieracki).
- PFF 22, 31.

## XX. WE MAY REASONABLY RELY UPON REBUTTAL EVIDENCE

253. WE presented evidence in rebuttal to the Government's case in chief. The evidence was succinct and properly responded to issues raised by the Government, thus "explaining" and "counteracting" the evidence propounded by the Government. There also was no unfair surprise in this rebuttal testimony.

- PFF 254-260.

254. During its case, the Government called upon one of its expert witnesses, Cliff Hamal, to testify regarding whether WE should recover the costs that it incurred to purchase three TN-32B casks. During his testimony, Mr. Hamal stated that an asset needs to be used in order for it to be recovered in rates and that a separate prudence review is required to recover the expenditures. Mr. Hamal further claimed that WE chose to never submit these costs to the PSCW for a prudence review and that, as a result, the PSCW never included the TN-32B expenditures into WE's rates. Mr. Hamal did not express such an opinion in his expert report.

- Tr. 5897:3-5927:13, 5994:23-5995:6 (Hamal).
- PX 828 (Hamal report).
- DDX 4_21-40.

255. WE called Mr. Paul Farron to testify in rebuttal. Mr. Farron, WE Manager of State and Regulatory Affairs, is responsible for seeking PSCW approval of major projects and has been involved in more than 100 such proceedings. He testified that the PSCW's August 11, 1998 Order which approved the purchase of these casks as "reasonable" was the

PSCW's only review of this cost. Further, he testified that this Order permitted WE to recover this cost through its rates. Mr. Farron's testimony responded to an issue raised by the Government in its case in chief. Its purpose was to disprove the evidence proffered by the Government. There also is no substantial prejudice to the Government, who did not raise this issue until Mr. Hamal's testimony. Therefore, Mr. Farron's testimony was proper rebuttal testimony.

- Tr. 6270:12-6271:20 (Farron).
- PX 524, p. KRGWE002387.
- PFF 28e, 148.
- *Yankee Atomic,* 73 Fed. Cl. at 274.

256. Mr. Hamal also made a considerable issue regarding the statement in the PSCW Order that WE could use the six authorized TN-32B casks as a substitute for eight VSC-24 casks if the VSC-24 casks were not available for PBNP's scheduled refueling in Spring 2000. Mr. Hamal's testimony thus implied that it was unreasonable for WE to continue fabrication past Spring 2000.

- Tr. 5903:11-5904:25, 5914:7-22, 5921:13-5923:5 (Hamal).
- DDX 4_25, 4_30.

257. While WE does not agree with Mr. Hamal's interpretation of the PSCW Order, it recognizes that the PSCW's Order mentions the Spring 2000 refueling as a significant event. Therefore, WE asked its damages expert, Mr. Kenneth Metcalfe, to determine the TN-32B cask-related costs that WE would have incurred if it had terminated all TN-32B activity in Spring 2000. Based on a review of the TN-32B purchase order (disclosed to the Government years ago) and the work papers used by the Government's damages expert, Mr. Metcalfe testified that, if WE had terminated the TN-32B effort in Spring 2000, WE would have spent from $2,508,000 to $3,230,000 with the likely cost being

at the high end. The purpose of this rebuttal testimony was to explain and counteract evidence submitted by the Government in its case in chief. There was no substantial prejudice to the Government. Mr. Metcalfe relied upon documents that the Government has possessed for years and simply compiled existing accounting data. Therefore, it was proper rebuttal testimony.

- PFF 149.
- Tr. 6294:22-6304:13 (Metcalfe).
- PDX 61-Metcalfe 63.
- *Yankee Atomic,* 73 Fed. Cl. at 274.

258. Mr. Hamal testified that there were a range of options by which a party can calculate the cost of money including plaintiff's cost of borrowing. In addition, during cross examination of Mr. Metcalfe, Government counsel asked Mr. Metcalfe a similar question and Mr. Metcalfe responded that a WACD calculation was possible.

- Tr. 4682:19-4686:5 (Metcalfe).
- Tr.5856:2-5857:6 (Hamal).
- DDX 4-46.

259. Therefore, WE asked Mr. Metcalfe to calculate the WACD in this case. WACD is calculated exactly the same way as WACC. Moreover, it is based upon the same sources as WACC, namely, the PSCW's annual determinations of WE's cost of capital and cost of debt. Thus, with Kenrich LLC's Cost of Capital Binder work papers, anyone, including the Government's damages expert, has available all of the information necessary to calculate the WACD at any time. The only difference is that, instead of applying the cost of WE's equity and debt to the nominal damages, one just applies its cost of debt to these damages. This also was proper rebuttal testimony. WE's decision to offer the evidence at trial was in order to explain and counteract evidence submitted by the Government. Indeed,

based on the record before the Court, WE could have made this same calculation after trial and presented it for the first time in Plaintiff's Proposed Findings of Fact.

- PFF 249.
- *Yankee Atomic,* 73 Fed. Cl. at 274.

260. There also was no substantial prejudice to the Government. While the Government made an issue of the length of Mr. Metcalfe's WACD, the length was solely attributable to Mr. Metcalfe's desire to explain thoroughly the basis for the calculation. The source documents presented were the same documents contained in Mr. Metcalfe's WACC calculation. Similarly, the pages containing the calculations are extremely similar to those for the WACC calculation with the exception, of course, that Mr. Metcalfe only applied the cost of debt to WE's nominal damages. Therefore, there was no substantial prejudice to the Government. Mr. Metcalfe's WACD testimony and his related exhibit (PX 1050) constitute proper rebuttal evidence.

- *Compare* PX 1050, pp. KRGWE004000-36 *with* PX 797, pp. KRGWE000755-87, KRGWE003234.
- *Yankee Atomic,* 73 Fed. Cl. at 274.

## XXI. DOE CASK LOADING OFFSET

261. It is not known whether or when DOE will perform or, if DOE does perform, the type of cask that it may utilize. Therefore, this offset is speculative and unallowable. For example, the Government's expert, Mr. Brewer and Mr. Kiraly, do not know what type of casks DOE will arrive at PBNP if DOE performs. Mr. Brewer's opinion regarding the loading costs that WE would have incurred in the non-breach world, if any, is based on an assumption regarding what type of casks DOE might use if it performs.

- Tr. 5642:23-5643:24 (Brewer).
- Tr. 6238:4-11 (Kiraly).

- Tr. 4749:5-22 (Metcalfe).

- *Entergy Arkansas*, 2007 WL 3033659, at *35.

- *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 468 (2007).

- *Southern Nuclear*, 77 Fed. Cl. at 450.

- *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 416 (2006).

- *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 372 (2006).

- *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

262. If DOE performs, the loading costs will be incurred at Point Beach at that time. There is no need for DOE to receive an offset now for costs that may eventually be incurred at Point Beach. There are multiple mechanisms for effecting any such offset in the future, if appropriate.

- Tr. 4747:20-4782:20 (Metcalfe).

- *Tennessee Valley Auth.,* 69 Fed. Cl. 515.

- *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. 332.

- *Pac. Gas & Elec. Co.*, 73 Fed. Cl. 333.

- *Entergy Arkansas*, 2007 WL 3033659.

- Tr. 4724:17-4725:16 (Metcalfe).

## XXII. ADDITIONAL FINDINGS

263. During the Unit 2 steam generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the steam generator to Kewaunee by rail. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul crossed some small bridges without problem.

- PX 318 (Dec. 1993 Site and Facility Waste Transportation Services Planning Document).

- PX 346, p. 143 (FEIS).

- Tr. 2798:5-15 (Conry) (The lower piece of the steam generator weighs a little over 200 tons.).

- Tr. 2803:8-14; 2822:10-2827:7 (Conry) (The steam generator was transported by rail to Kewaunee, then by heavy haul to PBNP.).

264. The weight of a fully loaded VSC-24 is less than the 200-ton weight of the lower piece of the steam generator.

- Tr. 2825:17-22 (Conry).

Dated: December 21, 2007

Respectfully submitted,

s/Richard W. Oehler by s/Emily C.C. Poulin
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on December 21, 2007, I caused a copy of the foregoing "Wisconsin Electric Power Company's Proposed Findings of Fact" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Emily C.C. Poulin
Emily C.C. Poulin