**No. 00-697C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**WISCONSIN ELECTRIC POWER COMPANY,**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---


**JEFFREY S. BUCHOLTZ**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**SHARON A. SNYDER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 305-9640**
**Fax: (202) 307-2503**

**Attorneys for Defendant**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of the General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN LO RE**
**Senior Trial Attorney**

**STEPHEN FINN**
**SONIA M. ORFIELD**
**RUSSELL A. SHULTIS**
**Trial Attorneys**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**


**March 25, 2008**

TABLE OF CONTENTS

PAGE

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . 1

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . 6

A. The Proposed Rule . . . . . 6

B. Comments Upon The Proposed Rule . . . . . 11

1. Industry Involvement In Drafting The Standard Contract Terms . . . . . 11

2. Rate Of SNF And HLW Acceptance . . . . . 12

3. Plaintiffs' Comments . . . . . 16

C. The Final Rule . . . . . 16

D. WEPCO's Execution Of The Standard Contract . . . . . 24

E. Industry Activities Following The Execution Of The Standard Contract . . . . . 25

III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING . . . . 27

IV. THE BELIEFS THAT WEPCO EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT . . . . . 35

V. WEPCO's INVOLVEMENT IN INDUSTRY GROUPS, INCLUDING EEI AND UNWMG . . . . . 36

VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM . . . . . 37

TABLE OF CONTENTS (cont'd)

PAGE

VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS . . . . . . . . . . . . . . . . . . . . . 42

A. 1987 and 1990 Annual Capacity Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B. 1991 Acceptance Priority Ranking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C. The 1991 Annual Capacity Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

D. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . . . . . . . . . . . . . 48

VIII. DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IX. TSLCCs AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

X. WEPCO's PARTICIPATION IN THE DCS PROCESS . . . . . . . . . . . . . . . . . . . . . . . 53

XI. WEPCO MAINTAINS FULL CORE RESERVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

XII. WEPCO'S NEED FOR ADDITIONAL AT-REACTOR STORAGE . . . . . . . . . . . . . . 62

A. WEPCO Needed To Bridge The Gap Before DOE Performed in 1998 . . . . . . . 62

1. WEPCO Needed Additional At-Reactor Storage By 1998 . . . . . . . . . . . 62

2. WEPCO's Contemporaneous Documents During The Development Of The ISFSI Project All Indicated A Need For Additional At-Reactor Storage Before 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

3. WEPCO Reported A Need For Dry Fuel Storage Assuming DOE Performance Beginning In 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

B. The Use Of A Temporary Cask Pit Rack Was Not Considered An Option In The But-For World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

1. WEPCO Did Not Evaluate The Use Of A Temporary Cask Pit Rack Until At Least 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

TABLE OF CONTENTS (cont'd)

PAGE


2. WEPCO's Reference To Use Of A Temporary Cask Pit Rack Is A Litigation-Driven Strategy . . . . 79

C. The Use Of Racks in the Transfer Canal Was Not Considered An Option In The But-For World . . . . 83

D. WEPCO Determined That Operating At Reduced Power Would Not Be Cost-Effective . . . . 85

XIII. EVIDENCE OF WEPCO'S POOL CAPACITY DEMONSTRATES THAT WEPCO NEVER USED 1,500 SPACES IN ITS POOL . . . . 85

XIV. WEPCO'S DECISION TO UTILIZE THE VSC 24 CASKS . . . . 87

XV. PROBLEMS AT POINT BEACH HALT THE LOADING OF THE VSC-24 CASKS AND SHUT-DOWN BOTH UNITS 1 AND 2 . . . . 89

XVI. WEPCO USED THE 900 MTU RATE IN ITS PLANNING DOCUMENTS . . . . 91

XVII. THE OPINIONS PROFFERED AT TRIAL BY WEPCO'S EXPERT MS. SUPKO SHOULD BE IGNORED BY THE COURT . . . . 95

A. Ms. Supko's Opinions Are Irrelevant To This Case . . . . 95

B. Ms. Supko's Model Mixes But-For And Actual Worlds . . . . 96

C. The Test Used by Ms. Supko In Her Analysis Is Not Supported By The Evidence . . . . 98

D. Ms. Supko's Rate Does Not Support Her Assertions Regarding DOE's Obligations Under The Standard Contract . . . . 99

E. Ms. Supko's Rate Does Not Support Her Assertions Regarding Removal Of Backlog Or Timely Decommissioning . . . . 101

F. Ms. Supko Did No Analysis Regarding So-Called Flexibilities . . . . 102

1. Ms. Supko Did Not Analyze The Impact Of The Use Of The Exchanges Provision of the Standard Contract . . . . 102

TABLE OF CONTENTS (cont'd)

PAGE

2. Ms. Supko Did Not Analyze The Impact Of The Use Of The Plus Or Minus 20 Percent Provision Of The Standard Contract . . . . . . . . . 103

3. Ms. Supko Did Not Analyze The Effect Of The Use Of The Intra-Utility Exchanges Provision of the Standard Contract . . . . . . . . . . . . . 105

XVIII. ISSUES RELEVANT TO THE ENTITLEMENT ADJUSTMENTS TO WEPCO'S CLAIMED COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

A. Expenditures By WEPCO For Private Fuel Storage And The Newton Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

B. WEPCO'S Payment Of Fees To The Nuclear Regulatory Commission . . . . . . 110

C. WEPCO's Claim For ISFSI Fabrication And VSC-24 Casks 1 Through 5 . . . 128

D. WEPCO Incurred The Costs Of Fabricating Three TN-32B Casks . . . . . . . . . 130

1. WEPCO Sought The TN-32B Casks As A Contingency In The Event That It Could Not Load The VSC-24 Casks By The Spring 2000 Outage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

2. WEPCO Should Have Delayed Fabrication of the TN-32B Casks in September 1998, And Then Cancelled The Contract By April 1999 . . 134

3. WEPCO Should Have Sold Its Long-Lead Materials, Or Its Three Completed TN-32B Casks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

E. WEPCO'S Pursuit Of Dual Purpose Casks . . . . . . . . . . . . . . . . . . . . . . . . . . 141

1. WEPCO's Decision To Switch To The NUHOMS Cask System . . . . . 141

2. WEPCO'S Efforts To License The VSC-24 Cask For Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

XIX. ISSUES RELEVANT TO INDIVIDUAL COSTS IN WEPCO's CLAIM . . . . . . . . . . 148

A. Internal Labor Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

TABLE OF CONTENTS (cont'd)

PAGE

B. Employee Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

C. Payroll Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

D. Overhead Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

XX. AVOIDED COSTS OF LOADING CASKS TO DOE . . . . . . . . . . . . . . . . . . . . . . . . 156

XXI. WEPCO'S CLAIM FOR WEIGHTED AVERAGE COST OF CAPITAL OR WEIGHTED AVERAGE COST OF DEBT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

XXII. TOTAL ADJUSTMENTS MADE TO WEPCO'S DAMAGES CLAIM . . . . . . . . . . . 164

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-697C (Senior Judge Merow) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). Congress specifically determined that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: (1) developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; (2) establishing Federal responsibility and policy for the disposal of SNF and HLW; (3) defining the relationship

between the Federal Government and state governments regarding SNF and HLW disposal; and (4) establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. at § 10131(b).

3. In addition to the process for the siting of a repository, the Secretary of Energy was to "prepare a comprehensive report, to be known as the Mission Plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982).

4. The Mission Plan was to include, among other things,

> (1) an identification of the primary scientific, engineering, and technical information . . . with respect to the siting and construction of a test and evaluation facility and repositories;
>
> (2) an identification of any information described in paragraph (1) that is not available because of any unresolved scientific, engineering, or technical questions, or undemonstrated engineering or systems integration, a schedule including specific major milestones for the research, development, and technology demonstration program required under this chapter and any additional activities to be undertaken to provide such information, a schedule for the activities necessary to achieve important programmatic milestones, and an estimate of the costs required to carry out such research, development, and demonstration programs;
>
> (3) an evaluation of financial, political, legal, or institutional problems that may impede the implementation of this chapter, the plans of the Secretary to resolve such problems, and

> recommendations for any necessary legislation to resolve such problems;
>
> * * *
>
> (7) a description of known sites at which site characterization activities should be undertaken . . .;
>
> * * *
>
> (9) an estimate of (A) the total repository capacity required to safely accommodate the disposal of all [HLW] and [SNF] expected to be generated through December 31, 2020, . . ., (B) the number and type of repositories required to be constructed to provide such disposal capacity; (C) a schedule for the construction of such repositories . . .;
>
> (10) an estimate, on an annual basis, of the costs required (A) to construct and operate the repositories anticipated to be needed . . .; (B) to construct and operate a test and evaluation facility, or any other facilities, other than repositories . . .; and (C) to carry out any other activities under this chapter; and
>
> (11) an identification of the possible adverse economic and other impacts to the State or Indian tribe involved that may arise from the development of a test and evaluation facility or repository at a site.

42 U.S.C. § 10221(a) (1982) (emphasis added).

5. The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the Nuclear Regulatory Commission ("NRC"), and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was then to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, provide the appropriate committees of Congress with the Mission Plan. Id. § 10221(b)(2)-(3).

6. Congress also included in the NWPA provisions that allowed the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the Secretary's proposal could not "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).[1]

7. In addition, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The

[1] In the NWPA, Congress also provided that DOE could create a program for interim SNF and HLW storage in other than a permanent repository "to provide for the utilization of available spent nuclear fuel pools at the site of each civilian nuclear power reactor to the extent practical and the addition of new spent nuclear fuel storage capacity where practical at the site of such reactor . . .," 42 U.S.C. § 10151(b)(1) (1982), or for the establishment of Federally-owned interim storage facilities. Id. § 10151(b)(2); see id. §§ 10151-57. This interim storage program would involve interim storage contracts separate from the Standard Contract at issue in this case, to be funded through a separate interim storage fund. Id. § 10156(a). No utility ever entered such a contract. The possibility of an interim storage facility, to be funded through a separate interim storage fund, expired on January 1, 1990. Id.

contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

8. The NWPA also mandated that:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other requirements for the contracts specified by 42 U.S.C. § 10222(a)(5).

9. The NWPA also "established within the Department of Energy an Office of Civilian Radioactive Waste Management ["OCRWM"]," which would be headed by a Director responsible "for carrying out the responsibilities of the Secretary" under the NWPA. 42 U.S.C. § 10224(a)-(b) (1982).

10. There is no provision in the NWPA that requires the DOE to accept SNF at a rate that would obviate the need for additional at-reactor storage on the sites of nuclear facilities after January 31, 1998. See 42 U.S.C. §§ 10101-10270 (1982); see also Tr.5123:4-14 (Brownstein).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

11. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983); Joint Stipulation No. 8.

12. The proposed "scope" of the Standard Contract provided for the acceptance and disposal of SNF from civilian nuclear power reactors pursuant to the NWPA:

> This Contract applies to the acceptance by DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and with respect to such material, establishes the fees to be paid by the Purchaser for the services rendered hereunder by DOE. The services provided to the Purchaser by DOE under this contract are related to **disposal** of SNF and/or HLW of domestic origin from civilian nuclear power reactors. . . .

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

13. The term "disposal," as referenced in the proposed scope of the Standard Contract, referred to emplacement in a permanent repository:

> The term "Disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

48 Fed. Reg. 5458, 5462 (Fed. 4. 1983) (Art. I.9).

14. Similarly, the term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW:

> The term "DOE Facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high level radioactive waste.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.11).

15. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated or fuel in-core prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

16. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract required DOE to issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. <u>Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate</u>. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, <u>acceptance priority shall be based upon the age of the SNF and/or</u>

> HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility.[2]

17. Although the proposed Standard Contract itself did not identify a specific rate at which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

18. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

---

[2] However, as an exception to the requirement to accept the oldest SNF and/or HLW first, the next paragraph of the proposed rule provided DOE with the discretion to grant priority to SNF and/or HLW removed from a reactor that had shut down permanently. 48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3).

> . . . The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

19. Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

20. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7).

21. The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE with thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.
>
> In addition, the Purchaser may change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract. These adjustments shall be subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

22. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or

> disapprove final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

23. Nowhere in the proposed Standard Contract did DOE propose that it would accept at a rate equal to the annual generation rate of SNF plus some additional quantity necessary to eliminate the backlog of SNF that would accumulate by January 31, 1998. Nor did DOE propose that it would accept SNF at a rate sufficient to eliminate the need to construct additional storage facilities.

24. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

**B. Comments Upon The Proposed Rule**

**1. Industry Involvement In Drafting The Standard Contract Terms**

25. The nuclear utilities and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Almost immediately after the NWPA was signed into law, industry groups began working upon drafting comments to DOE regarding the contracts that DOE was to enter into with industry. Tr.3906:3-3907:21 (Mills designation, Northern States trial, 11/16/06).[3]

---

[3]The designations of Loring Mills are collected in PX1052.

**2. Rate Of SNF And HLW Acceptance**

26. DOE received numerous comments in response to the proposed rule, all of which became a part of the administrative record of the rulemaking. Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 501.63 at ARC001 0537. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

27. Similarly, Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 501.34 at ARC001 0334.

28. However, EEI and UNWMG, like several individual utilities, stated that the Standard Contract should contain a requirement that "DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." DX 501.34 at ARC001 0334.

EEI and UNWMG suggested the inclusion in the Standard Contract of the following language, intended to add an additional obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC001 0335; see Tr.1407:20-1409:19 (Shimon).

29. Mr. Shimon agreed at trial that the "Whereas" clause requiring a specific performance standard, requested by EEI, was not included in the final Standard Contract:

> Q: Mr. Shimon, just so we're clear about it, you testified earlier that there is no specific rate of acceptance in the Standard Contract, that's correct, isn't it?
>
> A: In terms of a metric tons of uranium per year, that's correct.
>
> Q: And there is no requirement that DOE pick up spent fuel at a rate commensurate with the amount being generated along with an obligation to work off the backlog, isn't that right, there's no such language in the contract, correct?
>
> A: I believe that's correct.

Tr.1409:23-1410:10 (Shimon). One of plaintiff's experts, Mr. Sieracki, also agreed that the contract does not contain a rate of acceptance. Tr. 4003:22-25 (Sieracki).[4] Mr. Sieracki was aware that some utilities wanted to add the two-part test for a rate of acceptance, one that would

---

[4] Richard Sieracki and Kenneth Metcalfe work for the Kenrich Group ("the Kenrich Group" or "Kenrich"). They were both retained to work on the damages claim on behalf of WEPCO for the litigation.

result in no additional at reactor storage and working off the back log to the Standard Contract, and that this idea was not added to the contract. Tr. 4004:23-4008:25 (Sieracki).

30. The nuclear industry was concerned that the priority system set forth in the draft contract did not give priority to reactors that might need to ship fuel offsite to ensure continued operation of their plants. Tr.1249:5-1251:4 (Shimon). Specifically, in the cover letter to its comments, EEI recognized that "[n]o priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating (although DOE can, in its discretion, take 'emergency deliveries'). Nor is any consideration given to the size of a Purchaser's SNF inventory." DX 501.34 at ARC001 0331.

31. Florida Power & Light Company, in its written comments, stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
> > "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 501.43, Attachment 1 at ARC001 0439 (Testimony & Comments of Michael Cook, VP, Florida Power & Light).

32. Many commenters suggested that the proposed contract requirement for DOE to provide reports regarding acceptance information beginning in 1991 was insufficient to allow the contract holders to plan for their future SNF interim storage needs. EEI and UNWMG stated that DOE instead should issue an annual report, beginning in 1984 (after submission of the Mission Plan to Congress), "setting out its schedules, projected receiving rates, and projected allocations for all purchasers," with the report "cover[ing] at least 10 years of repository operation."

DX 501.34 at ARC001 0356 (emphasis added); see DX 501.12 at ARC001 0166 (reports beginning in 1984 "are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage"). Others suggested that, "[t]o assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity." DX 501.69 at ARC001 0627 (emphasis added).

33. EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 501.34, Attachment A at ARC001 0336-37. They stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id.; see DX 501.14 at ARC001 0180 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 501.69 at ARC001 0625 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

### 3. **Plaintiffs' Comments**

34. C.W. Fay, the Vice-President of Nuclear Power for WEPCO, received a copy of the draft Standard Contract in February 1983, when it was issued in the Federal Register. PX 27.

35. On March 9, 1983, Mr. Fay sent correspondence to DOE in which he noted that WEPCO had not submitted its own formal comments regarding the draft standard contract but that WEPCO supported the positions taken jointly by EEI, UNWMG, and the Electric Utility Companies' Nuclear Transportation Group. DX 42. In that correspondence, Mr. Fay provided information in response to the February 14, 1983 letter from DOE. Id.; Tr.1238:4-1239:21 (Shimon); PX 30; PX 34.

36. WEPCO did not submit any objections to the proposed Standard Contract, including objections to the issue of rate of acceptance. Id.

## C. **The Final Rule**

37. On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983).

38. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Id. Instead, the final Standard

Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. <u>The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998</u> and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added).

39. The "facility" to which the final Standard Contract refers is <u>either</u> a permanent repository to be constructed pursuant to the NWPA <u>or</u> such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> <u>The term "DOE facility" means</u> a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or <u>such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility</u>.

<u>Id.</u> § 961.11, Art. I.10 (emphasis added).

40. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

41. The final Standard Contract retained the fee requirements identified in the proposed rule, requiring contract holders to pay the one-time fee for waste generated prior to April 7, 1983, and continuing quarterly fees in the amount of 1.0 mill per kilowatt-hour on electricity generated. 10 C.F.R. § 961.11, Art. VIII.

42. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

43. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies)

> and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

44. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." See 10 C.F.R. § 961.11.

45. Similarly, DOE did not adopt EEI and UNWMG's request for additional "performance standards" by adding a contract clause to require DOE to accept SNF and/or HLW "commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated." DX 501.02 (48 Fed. Reg. 16590, 16598 (Apr. 18, 1983)); Tr.3795:4-3798:12 (Morgan designation, Northern States trial, 11/16/06); Tr.2209:9-20 (Morgan designation, TVA trial, 7/14/05).[5]

46. In the final Standard Contract, DOE inserted the following whereas clause, which corresponds, in part, to the language that EEI and UNWMG had proposed in its comments:

> Whereas, DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon request of the generator or owner of such waste or spent nuclear fuel.

10 C.F.R. § 961.11.

---

[5]The designations of Robert Morgan are collected in PX 1052.

47. DOE denied these requests to include either an acceptance rate or qualitative acceptance performance standards in the Standard Contract because DOE did not have enough information regarding how the program would develop to be able provide such a rate. Tr.3798:4-16, 3782:3-20 (Morgan designation, Northern States trial, 11/16/06); Tr.2211:14-2213:3 (Morgan designation, TVA trial, 7/14/05).

48. DOE was unable to commit to an acceptance rate in the contract because of the numerous uncertainties that the program faced. In addition to funding constraints from Congress, Mr. Morgan and other program personnel did not know what licensing requirements the NRC would issue, whether there would be intervenors in the licensing proceedings, or, perhaps most importantly, what type of facility would be designed and built. Tr.3782:3-20 (Morgan designation, Northern States trial); Tr.2220:9-2221:17 (Morgan designation, TVA trial).

49. Given these uncertainties, DOE chose to defer the development of an acceptance rate until the program was more developed. By 1987, DOE planned to have selected the repository site. Tr. 3838:3-3839:5 (Morgan designation, Northern States trial, 11/16/06). By 1991, DOE expected to establish a schedule for acceptance. Id. These were the dates to which DOE was willing to commit in the Standard Contract. Tr. 93:19-94:8 (Morgan designation, Northern States trial, 11/15/06).

50. DOE also denied the request that priority be granted to utilities which need to ship SNF to DOE to keep their plants operating, stating that, "by the time the repository commences operations, utilities will have made adequate preparations to provide on-site storage in order to ensure continued plant operations." 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983).

51. DOE did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan." DX 501.43, Attachment 1 at ARC001 0439.

52. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

53. Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 Annual Capacity Report ("ACR") and Acceptance Priority Ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. <u>After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter</u>. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from

> the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added).

54. Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if DOE found a DCS that a contract holder proposed to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id. The final Standard Contract also included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).[6]

---

[6] In its comments upon the proposed Standard Contract, EEI recognized that the Disputes clause would function to resolve any differences between the parties concerning DCSs. DX 501.34 at ARC001 0346.

55. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

56. The final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.A.

57. The final Standard Contract did not contain any language that expressly required DOE to accept fuel at a rate that would preclude the need for expenditures upon at-reactor storage after January 31, 1998, at a rate equal to the annual generation rate of SNF plus an amount sufficient to work off the backlog of fuel that would have accumulated by January 31, 1998, or at any specific numerical acceptance rate. See 10 C.F.R. § 961.11.

58. The final Standard Contract contained an express recognition that its terms "had been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV.

**D. WEPCO's Execution Of The Standard Contract**

59. WEPCO did not refuse to sign the contract or sue DOE for developing a contract without a rate of acceptance. Tr.1449:10-1450:17 (Shimon).

60. WEPCO did, however, send correspondence to DOE on June 3, 1983, several weeks before it signed the Standard Contract. PX 38. In that correspondence, signed by Sol Burstein, WEPCO's executive vice-president, WEPCO identified its disagreement with the process for generating the one mill fee associated with the contract:

> While you have made it clear in your letter that you are not interested in receiving comments on the Final Rule and/or the disposal contract, we are, nevertheless, compelled to point out your inappropriate, and unjustifiable, adoption of "gross" kilowatt-hours of generation as the basis for assessing the one mil fee.

PX38 at COF-003-0626.

61. On June 16, 1983, WEPCO executed its Standard Contract with DOE, which covered the SNF generated at the Point Beach Nuclear Power Plant ("Point Beach" or PBNP"),

and which contained essentially the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 169A.

62. Soon after WEPCO signed the Standard Contract, WEPCO challenged the basis for the fee that it paid to DOE pursuant to the contract. DX528: Tr.1430:6-24 (Shimon). When WEPCO disagreed with an interpretation of the Standard Contract, it challenged it, in the case of the fee issue, by filing a complaint right away. Id.

### E. Industry Activities Following The Execution Of The Standard Contract

63. After the contracts were signed, the industry continued to pursue the issue of incorporating additional performance standards in the Standard Contract. In September 1983, Mr. Zabransky attended numerous industry meetings with DOE during which the need for such a rulemaking was discussed:

> I believe there were several attempts and at least one that – it was a continuous theme at meetings with DOE, to lobby for such inclusion in the contract. I know there was at least some set of correspondences from the industry that was proposing, on many of the contracts, to include performance standards. I think this was a euphemism that was used, but basically, it was a rate type of amendment.

Tr.721:9-17 (Zabransky). As Mr. Zabransky further testified, the industry continued to lobby DOE because there was no rate included in the contract. Tr.721:18-722:7 (Zabransky).

64. At an informational meeting held in December 1983 with the nuclear industry, Mr. Mills of EEI explained that, in the contract, DOE had promised to take SNF "at some unspecified rate" in the future and that the industry expected to initiate a petition for rulemaking in the future to define additional contractual performance assurances:

> In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day, at some

> unspecified rate, hopefully starting in 1998. The DOE promise must be carried out, and it is our task as contract holders to do everything we can to assure that it is achieved.
>
> * * *
>
> We really were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance. We were not really looking for that, however, there were many concerns expressed by the utilities that were not resolved, as we believed equitably during the contract generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances, to include some of the things we heard this morning which were not embodied in the contract.

DX 493 at SN069619; Tr. 3924:18-3925:9 (Mills designation, Northern States trial, 11/16/06), (one of those performance standards was the rate of acceptance); Tr.1414:1-1416:21 (Shimon).

65. On or about January 1984, UNWMG distributed a draft petition for rulemaking to be submitted to DOE. Tr.3441:19-3444:3 (Supko). The accompanying draft supporting memorandum noted that DOE had rejected its requests for additional performance standards in the rulemaking on the Standard Contract and urged that DOE provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a ten year period. Tr.720:10-722:7 (Zabransky).

66. In April 1987, UNWMG submitted to the DOE contracting officer a request that the Standard Contract be "interpreted, clarified or amended to include additional performance standards by which DOE's progress may be evaluated." DX 541 at CTR-006-0248; Tr.3932:24-3935:10 (Mills designation, Northern States trial, 11/16/06) (letter was a request to DOE to

"reconsider" the issue of the rate of acceptance). Specifically, UNWMG requested that "DOE provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged -- and that DOE commit to accept the entire backlog of SNF over a ten year period." DX 541 at CTR-006-0249; Tr.1450:15-1451:15 (Shimon) ("I'm pretty confident that I didn't say that the utilities did not ask for a rate of acceptance. In fact, they asked for it quite strongly and did not receive it."); Tr.732:10-735:4 (Zabransky); Tr.5059:13-5063:1 (Brownstein) (utilities requested insertion of performance standards into Standard Contract because they recognized it did not contain any such standards).

67. DOE responded to this request by letter dated October 2, 1987. DX 545. In response to the industry's request that DOE commit to minimum receipt rate, the DOE contracting officer explained that, "given the current status of the [waste management system], the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel (SNF) which will equal or exceed the annual rate at which SNF is being discharged from reactors." Id. at PNL-028-1143; Tr.5063:9-5067:16 (Brownstein) (because of uncertainties in the program, DOE could not agree to a specific rate).

## III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING

68. In June 1985, DOE issued a Mission Plan, PX 87, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon various assumptions regarding the availability of two repositories and an MRS facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to

satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

a. In his cover letter providing the Mission Plan to Congress, Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." PX 87 at PA-140164 (emphasis added); see 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. PX 87 at PA-140201 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include An MRS facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." PX 87 at PA-140201-205.

b. Studying an assumption that it would have two repositories and an MRS, DOE projected in the Mission Plan, in Tables 2-2 and 2-3, schedules at which it could potentially accept SNF. Id.. However, these acceptance rates were not intended to be contractually binding, see, e.g., PX 87 at PA-140205; Tr.5153:9-18 (Kouts) (no relationship between Mission Plan schedules and DOE's contractual obligation), and DOE had declined the

utilities' request to include in the Standard Contract a provision making the acceptance rates identified in the 1985 Mission Plan binding. See DX 501.43, Attachment 1 at ARC001 0439.

c. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." PX 87 at PA-140205; see Tr.5152:6-5153:8 (Kouts). Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

PX 87 at PA-140205; Tr.1466:8-1467:12 (Shimon). Accordingly, in the Mission Plan, DOE pointed to the issuance of the 1991 ACR as the beginning of the process for scheduling deliveries from utilities. Tr.5153:24-5154:15 (Kouts).

d. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "may operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are for illustrative purposes only at this time. The amount of Defense waste to be disposed of in the repository, and the actual acceptance rates, have not yet been determined by the DOE.

* * *

> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

PX 87 at PA-140204-205 (emphasis added).

e. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *
>
> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

PX 87 at PA-140205 PX 87 at PA-140195-196 (emphasis added); see PX 87 at PA-140196 ("Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.").

f. DOE issued two drafts of the Mission Plan, both of which contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 52 at CTR-042-1069 ("The Mission Plan . . . defin[es] the program objective, strategy, and current program plans . . ..") (emphasis added). In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.
>
> * * *
>
> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the

> Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date).

PX 52 at CTR-042-1071, 1073 (emphasis added). The purpose of the draft Mission Plan, like the final version, was "to outline the plan that we were going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act." Tr.3827:17-3828:4 (Morgan designation, Northern States trial, 11/16/06). DOE was not obligating itself to accept waste at the schedules set forth in the draft Mission Plan. Tr.3828:5-9 (Morgan designation, Northern States trial, 11/16/06); see also Tr. 135:18-136:23 (Rosselli designation, 4/15/02) (reference to "firm schedule" in the December 1983 draft Mission Plan meant the delivery commitment schedules to be executed by the utilities and approved by DOE). The language regarding "the need for utilities to provide additional on-site storage after 1998 " was removed from subsequent versions of the Mission Plan. Compare PX 17 and 22 and 31.

g. At a conference attended by Standard Contract holders and others in December 1983, Mr. Morgan described the December 1983 draft Mission Plan as containing DOE's "basic strategy." DX 493 at SN069600 (emphasis added). He also explained that a second repository would be necessary to begin working off the backlog of spent fuel. Id. According to the schedule set forth in the December 1983 draft Mission Plan, the second repository would need to begin operation to enable DOE to stay ahead of the projected generation rate of SNF from nuclear utilities. PX 52 at CTR-042-1072; Tr.3832:21-3833:6, 3841:1-3842:9 (Morgan designation, Northern States trial, 11/16/02). However, as of December 1983, Congress had not authorized a second repository. PX 52 at CTR-042-1074 ("upon Congressional approval, the Department will proceed to license the site and construct a second repository."); PX 87 at PA-

140198 ("The Act authorizes the DOE to conduct siting activities for a second repository and submit to Congress a proposal for the authorization of a second repository.").

h. Because there were "a demanding set of technical, regulatory and institutional challenges" to be met in the development of the first repository, the December 1983 draft Mission Plan also discussed DOE's plans to pursue a Monitored Retrievable Storage ("MRS") facility as an alternative for performance in 1998. PX 52 at CTR-042-1076. Mr. Morgan also advised Standard Contract holders and others at the December 1983 conference that the schedule for the repository was "extremely optimistic" and, for this reason, DOE would have "an alternative plan or parallel plan" to begin receiving waste at an MRS by January 31, 1998. Tr.3836:2-21 (Morgan designation, Northern States trial, 11/16/06); Tr.2502:21-2504:12 (Morgan designation, PG&E trial, 6/13/06). However, the program "strategy" with regard to preventing the need for utilities to add additional on-site storage after 1998 did not apply to DOE's plans for the MRS.

69. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to

> 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).[7]

DX 543 at HQR-003-1634; Tr.5187:5-5188:7 (Kouts) (acknowledging at this point that the repository was not going to be operational until 2003, but that we could still begin accepting waste at an MRS by 1998); DX 543 at HQR0032039 (acknowledgment of EEI and UNWMG that DOE could only meet its statutory and contractual obligation to begin acceptance in 1998 with performance at an MRS). Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 543 at HQR-003-1687 (emphasis added); Tr.1469:24-1470:8 (Shimon). Again, these acceptance rates were not intended or understood to be contractually binding. Instead, this language was intended to indicate that the DOE was still trying to figure out exactly how the system was going to operate. DOE understood that there were a variety of uncertainties as to how the program would be implemented and that estimate, while it was the best at the time, it could change. Tr.5189:22-5190:16 (Kouts); Tr.5123:4-5124:8 (Brownstein).

70. DOE also represented in the 1987 Mission Plan Amendment the importance of the Acceptance Priority Ranking and Annual Capacity Report that would be issued in 1991:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to

[7] DOE's ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

> submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 543 at HQR-003-1687. With this statement, DOE was notifying contract holders and the Congress that DOE would essentially begin the contractual planning process as specified in the contracts, beginning in 1991, by issuing an acceptance priority ranking and an annual capacity report from which the utilities would then provide information to DOE, which would then have to be evaluated and approved, which would then form a basis for a commitment for what DOE would be taking from the utility. Tr. 5190:17-5192:11 (Kouts); Tr.5130:6-5133:17 (Brownstein).

## IV. THE BELIEFS THAT WEPCO EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT

71. WEPCO understood that the Standard Contract obligated DOE to begin acceptance of spent fuel beginning in January 1998 and that, because WEPCO had older fuel, WEPCO's allocations would be among the earliest. Tr.576:15-24 (Zabransky).

72. WEPCO provided comments to DOE regarding the 1983 draft mission plan. PX 67. WEPCO endorsed the comments submitted by EEI and UNWMG. Id. WEPCO also stated its belief that DOE "must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998." Id. However, WEPCO did not understand that DOE was obligated contractually to accept SNF from utilities so as to obviate the need for additional at-reactor storage after January 31, 1998. Tr.593:19-597:18 (Zabransky) ("it doesn't mean they were obligated to do it or it was part of the contract."); Tr.1408:8-1410:10 (Shimon).

73. When DOE issued the 1991 ACR, WEPCO believed that the rate identified in that document – 400, 600, 900 MTUs per year for the first ten years – was a reasonable rate. Tr.590:3-21 (Zabransky).

## V. WEPCO's INVOLVEMENT IN INDUSTRY GROUPS, INCLUDING EEI AND UNWMG

74. WEPCO was a member of the industry groups EEI and UNWMG. Tr.593:1-18 (Zabransky); Tr.1251:1-18 (Shimon).

75. Mr. Shimon was a member of UWASTE and Electric Utility Company's Nuclear Transportation Group ("EUCNTG") from 1982 through 1988, and he was the Chairman of the transportation working group of UWASTE during the mid-to-late 1980s. Tr.1251:1-18 (Shimon).

76. In the early 1980s, part of Mr. Zabransky's job was to attend meetings conducted by EEI. Tr.719:18-721:7 (Zabransky).

77. Mr. Zabransky received, either directly or indirectly, correspondence from Shaw Pittman, including Jay Silberg, the Shaw Pittman attorney who took the lead in representing EEI and UNWMG, in the course of performing his responsibilities for WEPCO. Tr.745:17-747:19 (Zabransky).

78. In December 1986, UNWMG's Standard Contract Task Force, of which Mr. Zabransky was a member, discussed a plan to submit a letter to DOE to resolve certain issues relating to the Standard Contract, including the absence of performance standards. Tr.745:17-750:18 (Zabransky).

79. During his employment with WEPCO, David Zabransky was actively involved in several industry committees. Tr.593:1-18 (Zabransky); Tr.719:14-722:7 (Zabransky).

80. Mr. Zabransky was chairman of the High-Level Waste Working Group with UNWMG, later known as UWASTE. Tr.593:6-13 (Zabransky); Tr.720:1-24 (Zabransky).

81. He also acted as chairman of the Electric Power Research Institute[8] ("EPRI") spent fuel division. Tr.593:15-18 (Zabransky); Tr.720:18-24 (Zabransky).

82. During Mr. Zabransky's involvement with these industry groups, these groups lobbied DOE for the inclusion of performance standards in the Standard Contract. Tr.720:25-722:7 (Zabransky); see, e.g., PX 117 at SN000232.

83. Industry groups repeatedly requested that DOE change the Standard Contract to add language that obligated DOE to accept SNF beginning in January 1998 at a rate not less than the annual rate at which SNF is being discharged. See, e.g. DX 541; Tr.732:5-735:4 (Zabransky). DOE declined to change the Standard Contract to include the requested performance standards. In a response to correspondence from Stephen Kraft of UNWMG, Christopher Jedrey, in a letter dated October 2, 1987, explained that:

> [G]iven the current status of the WMS [Waste Management System], the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel (SNF) which will be equal or exceed the annual rate at which SNF is being discharged from reactors.

DX 545; Tr.750:20-753:22 (Zabransky).

## VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM

84. As directed by the NWPA, DOE submitted a proposal to Congress for the construction of an MRS facility in Clinch River, Tennessee, dated March 1987. DX 539;

[8] EPRI is a consortium of utilities that conduct generic research on issues of importance to utilities. Tr.972:8-12 (Zabransky).

Tr.5154:22-5155:16 (Kouts). In the proposal, DOE stated that the "MRS facility would be critical to the DOE's ability to accept waste for disposal in 1998," given the announced delay of the start of repository operations until 2003. DX 539; Tr.5158:25-5160:7, 5165:15-5166:2 (Kouts)(DOE planning to meet 1998 obligation with waste acceptance at an MRS facility). Recognizing concerns that the MRS would become a "de facto repository" and "would diminish the resolve to develop a geologic repository," DOE proposed that Congress link the start of MRS operations to the issuance by the NRC of the construction authorization for the repository and limit the storage capacity of the MRS to 15,000 MTU. DX 539 at PNL-037-0315; Tr.5160:14-5162:17, 5164:6-5165:7 (Kouts). These proposed limits were based upon comments that DOE received from the State of Tennessee and the Clinch River MRS Task Force. DX 539 at PNL-036-0315; Tr.5161:22-5162:6 (Kouts).

85. On December 22, 1987, after DOE had submitted the 1987 Mission Plan Amendment and the MRS Proposal to Congress, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The Committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule

considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition." Id.

86. The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility, 42 U.S.C. § 10162(b), but annulled and voided the siting of the MRS facility that the Department had proposed at Clinch River, Tennessee. However, the 1987 amendments provided that the Secretary could not select a site for that MRS "until the Secretary recommends to the President the approval of a site for development as a repository under section 10134(a)." 42 U.S.C. § 10164(b). Further, Congress provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3). These requirements for the MRS and linkages between the MRS and the repository were more restrictive and onerous than those proposed by DOE. Tr.5268:12-5269:7 (Kouts); Tr.5160:14-5161:11 (Kouts).

87. The 1987 amendments to the NWPA required the establishment of the MRS Review Commission to determine the need for monitored retrievable storage. 42 U.S.C. § 10163 (1987); Tr.5198:3-21 (Kouts) (MRS Commission was to study the MRS and provide its own perspective on the type of MRS, what the linkages should be and implementation should be in the

waste management system). The Commission issued its report to Congress in November 1989, concluding that "the MRS as presently described in the law, which links the capacity and schedule of operation of the MRS to a permanent, geologic repository cannot be justified." PX 181 at HQR-036-3994. The Commission further reported that:

> The Commission notes that the Congress, for many years, has expressed concern that an unlinked MRS might be regarded as a de facto repository and could reduce the impetus for proceeding with permanent geologic disposal. The Commission recognizes this expression of Congressional will, as well as similar sentiments voiced during the course of its hearings. Although the Commission does not believe that there is a technical basis for the linkages, the Commission concludes that some linkages are justified.

Id.; PX 181 at HQR-036-4006; Tr.5199:22- 5202:17 (Kouts).

88. The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a); Tr.5215:8-21 (Kouts). The Negotiator identified several localities and states and several grants were issued to study the feasibility of hosting the MRS facility. Tr.5216:20-5217:25 (Kouts). However, the authorization for that office expired in 1994, 42 U.S.C. § 10250, without any agreements with any states or Indian tribes. Tr.5224:23-5225:18 (Kouts).

89. In the same month that the MRS Review Commission issued its report, DOE prepared a report to Congress from the Secretary of Energy titled "Reassessment of the Civilian Radioactive Waste Management Program," dated November 1989. DX 553; Tr.5204:1-5205:3 (Kouts). As a result of the reassessment detailed in this report, DOE determined that the

repository would not be able to open until 2010, but that DOE would continue to pursue the development of an MRS facility to enable it to begin the acceptance of SNF in 1998. DX 553 at DB-001-1449-1450; Tr.5205:11-5209:10 (Kouts) . With regard to the statutory linkages between the schedule for MRS and repository operations, DOE stated that it would seek congressional modification of the linkages when the site negotiated by the Nuclear Waste Negotiator was approved by Congress. Id. at EDB0011463-64; Tr.5215:8-5216:19 (Kouts).

90. In September 1991, DOE issued a draft Mission Plan Amendment that outlined the current plans for the program and sought comments from interested parties. DX 564. In this draft Mission Plan Amendment, DOE advised that,

> [t]o achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy include a provision to repeal the schedule linkages established in the [1987 NWPA Amendments]. This could also be achieved through congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 564 at HQR-003-0825; see Tr.5213:11-5216:19 (Kouts). DOE also stated that its "current plans" were based upon the current statutory storage capacity limits on the MRS. DX 564 at HQR-003-0826; see Tr.5218:6-5219:6 (Kouts); Tr.5031:3-21 (Brownstein) (capacity limits existed because of continuing concerns that the MRS would become a "de facto" repository). In the 1991 draft Mission Plan Amendment, DOE also published proposed waste acceptance schedules depicting performance at an MRS from 1998-2010 and repository operations beginning in 2010. DX 564 at HQR-003-1001; Tr.5218:1-5219:6 (Kouts)(rates in waste acceptance schedule based upon 10,000 MTU capacity limit upon MRS until repository begins operations).

## VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS

### A. 1987 and 1990 Annual Capacity Reports

91. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of these ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 542 at 2 (HQR0012713), DX 549 at 1 (HQR0012617), DX 558 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding").

92. Each ACR issued between 1987 and 1990 advised contract holders that, beginning in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 542 at 2 (HQR0012713), DX 549 at 2 (HQR0012618), DX 558 at 2 (HQR0012494).

93. The 1987 ACR contained the following admonitions by DOE, warning contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998:

> DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated [waste management system ("WMS")] derives, in part, from decisions yet to be made by Congress. DOE has presented the appropriate issues to Congress in the form of the OCRWM Mission Plan Amendment.
>
> * * *
>
> The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

DX 542 at HQR-001-2714, HQR-001-2715 (1987 ACR, ¶¶ 1.2.1 & 1.2.2) (footnotes omitted). Again, the 1987 ACR also notified contract holders that the projections of future events and rates were only projections and were "not contractually binding." DX 542 at HQR-001-2708.

94. The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF and/or HLW acceptance by DOE. For purposes of simplicity, the "upper bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,100 MTU total acceptance for the first 10 years of WMS operation. DX 558 at HQR-001-2496 - 2499. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR also contained the following admonitions by DOE:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits

> at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

DX 558 at HQR-001-2496 (emphasis added); see Tr.5036:10 - 5039:1 (Brownstein) (explaining assumptions in 1990 ACR). The 1990 ACR also expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." DX 558 at HQR-001-2494.

95. As of December 1990, DOE continued to believe that the prospects of acceptance at an MRS beginning in January 1998 were not insurmountable. Tr.5039:2-5040:21 (Brownstein).

**B. 1991 Acceptance Priority Ranking**

96. Pursuant to Art. VI.B.5.a of the Standard Contract, DOE issued its first official Acceptance Priority Ranking("APR") in December 1991. DX 567. The APR "ranks [SNF] basically starting with the earliest or first discharge coming first." Tr.3921:12-24 (Pollog designation, Yankee trial, 8/4/04); see also Tr.5036:1-9 (Brownstein) ("1991 APR set the allocations for the utilities . . . an important step under the contract process to get to the delivery commitment schedules"). The source of the information that is set forth in the APR are the RW-859 data forms that each of the contract holders are asked to submit periodically describing their fuel discharge information. Tr.3922:2-14 (Pollog designation, Yankee trial, 8/4/04). An excerpt of this information was set forth in the 1991 ACR and provided the basis for the allocations set forth in the 1991 ACR. Tr.170:2-9 (Pollog designation, Yankee deposition, 4/11/02); DX 567 at HQR-004-0429 ("the 1991 APR will be the basis for the annual allocation of waste acceptance

capacity to purchasers in the 1991 ACR."); Tr.279:25-282:6 (Cole designation, Yankee deposition, 3/13/02).

**C. The 1991 Annual Capacity Report**

97. In December 1991, DOE issued its "Annual Capacity Report" for that year, noting that, "[a]lthough the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers." DX 566 at HQR0020803. Like prior ACRs, it provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." Id. at HQR0020803-04.

98. However, the acceptance rate set forth in the 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 566 at HQR0020804; Tr.5046:1-5047:15 (Brownstein). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id.; see DX 566 at HQR0020809 ("[t]hese allocations are the basis for DCS submittals").

99. OCRWM created the acceptance allocations specified in the 1991 ACR with the knowledge that no permanent repository would be available by January 31, 1998, and to be "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS

facility before a repository starts operation." DX 566 at HQR0020806; Tr.128:11-136:16 (Cole designation, Yankee deposition, 3/12/02) (900 rate was reasonable) When DOE issued the 1991 ACR, it assumed that an MRS would be operational in the system by 1998. Tr.5220:12-5222:2 (Kouts). The MRS had a capacity limit of 10,000 metric tons, and the ramp-up and acceptance rate was designed so that DOE would not exceed that amount before the repository was anticipated to begin operation. Tr.5223:3-11 (Kouts); Tr. 4742:2-11, Tr. 4737:22-25 (Milner designation, Yankee trial, 8/11/04); Tr.3907:4-14 (Pollog designation, Yankee trial, 8/4/04) (basis for the rates in the 1991 ACR was compliance with the Nuclear Waste Policy Amendments of 1987, and the 10,000 metric ton statutory restrictions); Tr.140:4-141:3 (Cole designation, Yankee deposition, 3/12/02). DOE anticipated that it would receive relief from the "construction linkage" in the NWPA that tied the operation of the MRS to the receipt of construction authorization for the repository. Tr.5221:3-5222:2 (Kouts); Tr.5055:19-5056:8 (Brownstein) (MRS not a construction challenge, once site was available, it could be ready by January 1998).

100. Based upon anticipated limitations for the projected capacity for the first ten years, DOE identified an 8,200 MTU acceptance, at the rates identified below and stated as follows:

> The waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998 . . . ." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of the Nuclear Waste Negotiator, the head of which is a representative of the Federal Government

appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. . . .

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

DX 566 at HQR-002-0806-7 (emphasis added).

101. Table 3.1 in the 1991 ACR set forth specific allocations for each contract holder derived by applying the list of "oldest fuel first" from the 1991 APR to the rate of SNF acceptance in Table 2.1 of the 1991 ACR. DX 566 at HQR0020811; Tr.3914:15-21 (Pollog designation, Yankee trial, 8/4/04). Pursuant to this chart, WEPCO received its first allocation in 1998.

DX 566 at HQR0020811.

102. DOE worked with representatives of the industry, including EEI and UNWMG, to understand utility concerns and issues regarding the ACR process. DX566 at HQR-00200804; Tr.5057:13-5059:3 (Brownstein).

## D. The 1992 Through 1995 Annual Capacity Reports

103. The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 578 at HQR0012324. The 1992 ACR also provided that, "[d]uring

the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." Id. at HQR0012319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." Id. at HQR0012321-22.

104. In 1995, DOE issued a combined APR and ACR to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 584 at HQR0290676. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 MTUs for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| Year 1 | | 400 |
| Year 2 | | 600 |
| Year 3 | | 900 |
| Year 4 | | 900 |
| Year 5 | | 900 |
| Year 6 | | 900 |
| Year 7 | | 900 |
| Year 8 | | 900 |
| Year 9 | | 900 |
| Year 10 | | 900 |
| | TOTAL | 8,200 |

DX 584 at HQR-029-0681.

105. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

DX 584 at HQR-029-0680-0681 (section 1.2) (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Id. at HQR-029-0678 (section 1.0). However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

106. WEPCO used the allocation rates identified in the 1991 ACR for planning purposes. For example, WEPCO used the allocations in the 1991 ACR to fill in its delivery commitment schedules ("DCSs"). See supra at DFOF ¶¶ 115-125.

107. WEPCO also used the allocation rates identified in the 1991 ACR, and subsequent ACRs for its decommissioning planning. See supra at DFOF ¶¶ 291-295.

## VIII. DELIVERY COMMITMENT SCHEDULES

108. In March 1992, the DOE contracting officer issued a letter to each of the contract holders, including WEPCO, along with instructions for the submission of DCSs. DX 497;

PX 246; PX 247; Tr.703:1-704:9 (Zabransky). Although contract holders had the option to seek approval of any acceptance amount they wanted, subject to their right to exercise the "Disputes" provision of the Standard Contract, Arts. V.B and XVI, the contracting officer recommended that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." E.g., DX 497 at WISC 00000026. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." E.g., DX 497 at WISC 00000028. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. These instructions were consistent with the original intent of the Standard Contract and were necessary for proper implementation of the waste management system.

109. The DCS instructions provided that the contract holders' DCS submissions were to be based upon the allocations set forth in the applicable ACR. DX 497 at WISC 0000029 (Para. 7(a): "The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 ACR for planning purposes, resulting in individual Purchaser allocations. The Purchaser's allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval."). Further, the DCS instructions provided that,

"[d]ue to the limited annual acceptance capacity of the [Federal Waste Management System], only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval." Id.

110. The DCS instructions that the DOE contracting officer distributed to the contract holders were developed pursuant to a cooperative effort with the nuclear utilities, whereby DOE discussed the proper completion of a DCS with utility representatives, drafted the DCS instructions based upon those discussions, and then discussed the draft instructions with utility representatives and obtained their comments upon them. Tr.258:19-259:24 (Slater Designation, Yankee deposition, 4/22/99); Tr.704:3-707:16 (Zabransky) (Mr. Zabransky sent a WEPCO employee to a meet with the industry group in Washington, to discuss the DCS instructions).

## IX. TSLCCs AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS

111. The per-kilowatt-hour fee paid by utilities were established by the original NWPA, 42 U.S.C. § 10222(a)(2) (1982), and have not changed. Tr.5335:9-13 (Kouts).

112. DOE prepares Total System Life Cycle Cost ("TSLCC") reports periodically to analyze the total system life cycle costs of the program. Tr.5226:21-5227:13 (Kouts). DOE requires these reports so it can perform a fee adequacy assessment, which is required by the NWPA. Id. at 5227:17-5228:4 (Kouts). These reports contain assumptions regarding DOE's plans for performance, and the assumptions are taken from the then-current program technical baseline. Id. at 5333:24-5335:8 (Kouts). The assumptions include an assumption regarding acceptance rates, which are also taken from the program technical baseline. Id. at 5333:24-5335:8 (Kouts).

113. Although DOE's program technical baseline has changed significantly over the years in terms of the types of projected facilities and the start of performance, the total system cost has not varied greatly. For example, in the TSLCC dated April 1985, DOE assumed the construction and operation of two repositories, for a total steady state rate of 6,000 MTU. PX 84 at PA-176464; see also PX 84 at PA-176457-458 (description of the evolution of the program strategy between the issuance of the drafts of the Mission Plan issued in December 1983 and April 1984). In the Preliminary Estimates of the Total-System Cost for the Restructured Programs, dated December 1990, which was based upon the Secretary's 1989 Reassessment of the program, DOE assumed the operation of an MRS facility beginning in 1998 and the operation of a single repository beginning in 2010. PX 213 at PNL1071666; Tr.5336:3-5341:11 (Kouts); see also PX 213 at PNL1071613 ("It must be recognized that the waste management system is continually evolving. The TSLCC estimates represent "snapshots" in time which incorporate all available and appropriate information on program activities up to a specific point in time . . . ). In the TSLCC dated September 1995, DOE assumed the operation of a single repository beginning operation in 2010. PX 393 at HQR-025-5084-85; Tr.5227:14-5228:15 (Kouts). Despite the variations in the number and type of facilities assumed and the dates of operation, the total system costs projected in these reports do not vary greatly. Tr.5335:9-13 (Kouts).

## X. WEPCO's PARTICIPATION IN THE DCS PROCESS

114. David Zabransky had primary responsibility for preparing DCSs at WEPCO through July 1994 and was the most knowledgeable about the DCS process. Tr.702:21-708:12 (Zabransky).

115. On or about May 15, 1991, Charles Fay, the Vice-President of Nuclear Power at WEPCO, received a letter from Carol Reuter, DOE's contracting officer, with respect to the Standard Contract, in which she enclosed a draft annual priority ranking, which contained a chronological list of the spent fuel that had been discharged by the nuclear industry contract holders. PX 221. DOE provided WEPCO, and other utilities, the opportunity to review the APR to verify the accuracy of the information because "[t]he APR will be the basis for allocating federal waste acceptance capacity." Id. at WISC00059938.

116. On July 8, 1991, WEPCO issued a letter, prepared by Mr. Zabransky and signed by his supervisor, Mr. Fay, confirming that the information contained in the draft annual priority ranking accurately reflected the spent fuel discharges from the PBNP units 1 and 2. PX 224; see also DX 44; Tr.756:14-757:20 (Zabransky).

117. In March 1992, WEPCO received a set of instructions concerning the preparation of DCSs for DOE. PX 246; PX 247; Tr. 702:21-707:16 (Zabransky).

118. These instructions indicated that the amount of spent fuel to be included on the DCSs should be based upon the 1991 ACR. PX 246 at HQR-001-2066; Tr. 758:2-21 (Zabransky).

119. Upon receipt of the 1991 ACR (DX 566), Mr. Zabransky understood that the amounts listed on page HQR-002-0811 reflected the annual allocations that WEPCO was to receive for the first ten years of the waste acceptance program. Tr.758:2-21 (Zabransky).

120. Mr. Zabransky testified that, at the time of his receipt of the 1991 ACR, WEPCO understood that, pursuant to the Standard Contract, the company had allocations in each of the

first ten years of the waste management program, beginning in 1998, the first year of the program. Tr.758:22-25 (Zabransky).

121. On September 21, 1992, WEPCO submitted its ten DCSs to DOE. The DCSs indicated acceptance of 16.3 metric tons of uranium ("MTU") in 1998 from Point Beach; 43 MTUs in 1999; 19.8 MTUs in 2000; 27.1 MTUs in 2001; 36.7 MTUs in 2002; 24.8 MTUs in 2003; 10.0 MTUs in 2004; 12.8 MTUs in 2005; 16.1 MTUs in 2006; and 21.7 MTUs in 2007. DX 466. Tr.762:7-766:20 (Zabransky).

122. The ten DCSs for 1998 to 2007 that WEPCO submitted comported with the rate of acceptance set forth in the 1991 ACR and reflected WEPCO's allocations under that rate. Compare DX 466 with DX 566 at HQR-002-0811; Tr.760:16-766:20 (Zabransky).

123. Mr. Zabransky testified that he discussed with Mr. Link the necessity for sending in all ten of WEPCO's DCSs so that DOE would sign off on them as soon as possible. Tr. 759:1-14 (Zabransky).

124. Mr. Zabransky understood that, once WEPCO had signed its DCSs and the Government had agreed to the allocations contained in the DCSs, the DCSs would become binding commitments. Tr.759:15-760:15 (Zabransky); Tr.700:17-701:11 (Zabransky); Tr.5730:15-19 (Zabransky).

125. Mr. Zabransky based his understanding on information in letters from the DOE contracting officer. Tr.760:4-15 (Zabransky); DX 497; Tr.701:12-702:9 (Zabransky).

126. Mr. Zabransky also based his understanding on information that he received from technical and legal advisors at industry meetings. Tr.760:4-15 (Zabransky); Tr.705:19-25 (Zabransky).

127. During the period from September 1992 through March 1993, DOE approved the ten DCSs that WEPCO had submitted, providing for acceptance allocations for Point Beach for the ten-year period from 1998 through 2007. DX 466; 467; 468; 469; DX 472.

128. WEPCO ultimately re-submitted one DCS to reflect a reinserted fuel assembly. As a result, the allocation for year 2003 changed from 10.0 MTUs to 9.64 MTUs. DX471.

129. WEPCO did not challenge or object (formally or informally) to DOE's instructions concerning the submittal of DCSs. Tr.5675:7-25 (Zabransky).

130. In corresponding with DOE during the DCS process, WEPCO never complained or suggested to DOE that the allocations contained in the 1991 ACR, or in any other ACR, were inadequate or inconsistent with the Standard Contract, and never submitted any DCS or FDS subject to a reservation of rights. Tr.5675:7-22 (Zabransky).

131. The DCSs submitted by WEPCO indicated that WEPCO wanted DOE to deliver a truck cask and also that WEPCO intended to use a cask at the Point Beach site with a maximum loaded cask lifting weight of 125 tons. DX 468; Tr.767:5-768:18 (Zabransky).

132. Given that a truck cask normally weighs 20 to 40 tons, and that a larger cask with a maximum loaded cask lifting weight of 125 tons would require shipment by rail or barge, the DOE contracting officer sent WEPCO a letter asking it to clarify whether it desired "to use only truck casks or heavy-haul a larger cask from the nearest rail/barge facility." DX 467 at 2 (HQR-387-0003).

133. WEPCO replied that, even though, as indicated on its DCSs, it had a crane with the lifting capacity capable of lifting a larger 125-ton cask, it anticipated using truck casks for the delivery of its SNF to DOE because "there is neither rail nor barge access to the Point Beach site"

and it did "not intend to heavy haul a larger cask from the nearest rail or barge facility." DX 468 at 1 (WISC00000713); Tr.767:5-768:18 (Zabransky).

134. DOE suspended the approval of DCS submissions in 1996, after the United States Court of Appeals for the District of Columbia issued its decision in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996), in which the court held that DOE's obligation to begin accepting SNF was not conditioned upon the existence of a facility to receive the SNF. See Tr.5722:4-23 (Zabransky). DOE determined that it was not appropriate to continue to approve DCSs and make commitments to the utilities for the acceptance of their SNF when DOE knew that it could not meet those commitments before 2010. Id. at 5733:23-5734:12 (Zabransky)("We knew we couldn't go ahead and make those pickups. To commit to do them wouldn't have been acting in the best principles on the utility side. . . .").

135. WEPCO submitted ten Final Delivery Schedules ("FDS") on December 18, 1997. DX74. WEPCO, on its FDS, indicated its delivery estimate for the 41 fuel assemblies to be December 30, 1998 to December 31, 1998. Id. at WISC 00003441; Tr.2636:11-2639:10 (Farron).

## XI. WEPCO MAINTAINS FULL CORE RESERVE

136. Full core offload capability or full core reserve ("FCR") in the Point Beach SNF pool was space for 121 assemblies. Tr.675:7-9 (Zabransky).

137. WEPCO recognized the importance of maintaining FCR and believed that maintaining one FCR was desirable. Tr.1613:17-19 (Krieser); Tr.2186:18-22 (Becka).

138. While WEPCO never had a written "policy," evidence at trial demonstrated that WEPCO's desire and practice was to maintain FCR. Tr.675:10-21 (Zabransky); see e.g., Tr.770:16-771:9 (Zabransky); 2185:23-2186:24; 2211:12-2212:25; 2228:20-2233:11 (Porter);

1613:17-19; 1622:1-1624:13; 1631:17-1632:12 (Krieser); 2753:16-2756:9 (Anundson); PX 236; DX 54; DX 75; DX 171; DX 430.

139. For example, in 1976, WEPCO understood that it was "imperative" to ship fuel assemblies to the G.E. Morris facility in order to permit the refueling of Point Beach Units One and Two. DX 8; Tr.1381:23-1384:14 (Shimon). WEPCO also understood that, in addition to refueling requirements, FCR provided operational flexibility. Tr.1384:15-1385:2 (Shimon).

140. In a 1978 statement in support of WEPCO's application to the Public Service Commission of Wisconsin ("PSCW") to rerack, T.R. Wilson, the Administrator of Nuclear Projects, stated that "prudent operating and engineering practices would dictate that we reserve space in the pool to temporarily store an entire core – not just one refueling – in the event inspection or maintenance might be required which involves temporarily removing all of the fuel from one of the reactors." DX 13 at WISC 00022860; see Tr.1387:22-25 (Shimon) (practice at WEPCO in 1978 to maintain one full core offload capability); Tr.2217:23-2219:19 (Porter). On June 22, 1979, WEPCO advised DOE that it intended to maintain full core reserve because core removal is required for in-service inspections. Tr.2213:1-2217:22 (Porter); DX 170.

141. In its February 1987 RW-859, a document that WEPCO provided to DOE, WEPCO stated that it intended to maintain FCR. DX 444 at HQR 364 0063; see also DX 442 at HQR 364 0032 (March 1986 RW-859 states WEPCO intention to maintain FCR).

142. WEPCO understood that it was good operational practice to continuously maintain FCR because certain types of inspections and repairs, such as the replacement of the steam generator, required fully unloading the core. Tr.771:4-775:16 (Zabransky); Tr.2802:9-2803:7 (Conry); DX 54. In addition, maintaining full core reserve simplified operations at Point Beach.

Id.; see also Tr.5876:2-14 (Hamal); DX 392 at WXE0040005-0006, Hamal Attachment 2, 6/29/2006.

143. Furthermore, in the event that major maintenance may be required, FCR can shorten the length of a maintenance outage, which is desirable because, during an outage, the low cost generation of Point Beach has to be replaced by higher cost generating units or purchased from another source. Tr. 2211:12-2212:25 (Porter); Tr.5876:15-22 (Hamal); DX392/PX828, Hamal Attachment 2, 6/30/2006; Tr.1978:1-9 (Becka).

144. Moreover, scheduled maintenance of the reactor, corrective maintenance, and emergency maintenance may require a full core to be removed. Tr.2219:20-2220:10 (Porter). For example, unloading the full core could be required if there were a wholesale fuel failure of a number of fuel assemblies. Tr.2220:11-16 (Porter).

145. On at least four occasions, WEPCO has had to offload all of the fuel from one of its reactors at Point Beach. Tr.5985:15-5987:8 (Hamal).

146. WEPCO filed documents with the PSCW indicating that it maintained FCR because it was a good operating practice. DX 54 at WISC 00003435-3436; Tr.775:11-780:10; Tr.2217:23-2219:19 (Porter).

147. In some of its calculations, WEPCO assumed maintenance of two FCRs. Tr. 2753:16-2754:4 (Anundson).

148. Kevin Anundson, the former project manager of the ISFSI project at WEPCO, believed it was a good idea to maintain two FCRs. Tr. 2754:5-2756:9 (Anundson).

149. In 1991, when WEPCO applied to the PSCW for permission to build an ISFSI, WEPCO claimed that a 12-cask ISFSI by 1998 was necessary so that WEPCO could maintain two

FCRs in its spent fuel pool. DX171/PX236 at WISC 00014728; Interrogatory response, 3/17/93, DX134/PX291 at WISC 00054807; Tr. 2185:23-2186:24 (Porter); Tr.2228:20-2229:10 (Porter).

150. In a May 21, 1992 response to a Citizen's Utility Board ("CUB") data request, WEPCO explained several reasons that it is important to maintain FCR, including performance of NRC required in-core inspections of the reactor vessel. Tr.2229:11-2233:11 (Porter); DX 54 at WISC 00003435-3436.

151. "An emergency shutdown and the length of the offline period is unknown and unknowable prior to the time that it happens." Tr.2245:16-2246:10 (Porter); DX 179.

152. For instance, in 1997, Point Beach went off line for an extended period of time. The events leading to that action had not been anticipated. Tr.2245:16-2246:10 (Porter); DX 179 at WISC00012618. During that shutdown, it was necessary for WEPCO to obtain replacement power. Tr.2248:9-11 (Porter).

153. One of the reasons that WEPCO wanted to begin loading to its ISFSI after being shut-down was in order to maintain FCR. Tr.2099:23-2100:14 (Holzmann). WEPCO recognized the enormous cost associated with having to shut down the plant for lack of full core reserve. Tr. 2243:14-2244:13; 2251:15-2252:4 (Porter); DX 135. Specifically, it recognized that the consequences of shutting down Point Beach were "broad and extreme." Tr.2243:14-2244:13 (Porter).

154. There were significant costs associated with shutting down a nuclear plant because nuclear plants are usually the most cost-effective resource in the utility's generational resources. Tr. 3976:8-19 (Sieracki). At times, WEPCO calculated the cost of replacement power – a cost

that could be associated with such a shutdown. Tr.2243:14-2244:13 (Porter); see Tr.2251:15-2252:4 (Porter); DX 135.

155. If WEPCO failed to maintain FCR and circumstances developed where it incurred large replacement power costs as a result of its inability to discharge nuclear fuel from one of the units at Point Beach, WEPCO's stockholders, as opposed to its ratepayers, may have been required to pay for those costs. Tr.5877:7-5878:20 (Hamal).

156. The PSCW believed that it was critical for WEPCO to maintain full core reserve. Tr.2266:22-2268:23 (Porter); DX 178. When the PSCW granted WEPCO's application to build an ISFSI, it specifically stated that "it is critical for the Point Beach plant to be able to move at least one whole nuclear core from a reactor into the existing spent fuel pool." DX178 at WPS 001 5341.

157. WEPCO expected that it would continue to strive to maintain FCR in the future, even if it extended its license. Tr.2244:4-2245:7 (Porter).

158. Mr. Sieracki was told by various company personnel that WEPCO would be concerned if it was going to lose full core reserve over an extended period of time. Tr. 3923:3-8 (Sieracki). When Mr. Sieracki presented WEPCO personnel with a hypothetical world where the government is coming to pick up fuel in 1998 and the plant would have to infringe on full core reserve starting in 1996, WEPCO personnel indicated that the company would have found a means to maintain full core reserve. Tr. 3923:9-3924:5 (Sieracki). The specific personnel that took this position included Mr. Bud Fay, Mr. Bob Link, Mr. Jim Sach, Mr. Howard Shimon, Mr. Eric Miles, Mr. Paul Farron, Mr. Dave Weaver, and Mr. Gary Krieser. Tr. 3924:6-23 (Sieracki).

## XII. WEPCO'S NEED FOR ADDITIONAL AT-REACTOR STORAGE

### A. WEPCO Needed To Bridge The Gap Before DOE Performed in 1998

#### 1. WEPCO Needed Additional At-Reactor Storage By 1998

159. WEPCO understood that it was responsible for any at-reactor storage needs that it might have before January 31, 1998. Tr.754:5-757:9 (Zabransky); see also PX 225 at WISC 00023045.

160. As early as June 1977, following its planned re-racking, WEPCO realized that it would need additional at-reactor storage before January 1998. DX 181.

161. In a June 1977 memorandum, Roger Newton, Assistant to the Vice-President, explained to Sol Burstein, then Executive Vice-President and Chief Operating Officer, that, even if WEPCO re-racked its spent nuclear fuel pool and added 1450 spaces, it would still need additional at-reactor storage at Point Beach beginning the spring of 1996. DX 181.

162. Using the best available information at the time, Mr. Newton further explained in his memorandum that, if WEPCO was required to take back the spent fuel that it had shipped to West Valley and G.E. Morris, as it ultimately did, that WEPCO would need additional at-reactor storage as early as the fall of 1992. DX 181; Tr.1358:19-22 (Shimon).

163. In a later memorandum, dated August 5, 1977, Mr. Newton informed Sol Burstein that the evaluation of the reracking proposals had been completed. Mr. Newton explained that "[t]he recommended vendor's design would provide for storage of 1488 assemblies and have sufficient capacity to store spent fuel through 1996." DX 182.

164. Norbert Pitterle, a technician in the Point Beach engineering office who monitored pool inventory, sent a memorandum to J.J.Zach, the plant manager of Point Beach, in March

1986, in which he explained that the then-maximum capacity of the Point Beach spent fuel pool was 1492 fuel assemblies, assuming the use of a special fuel handling tool and ignoring the inaccessible spaces. DX 184; Tr.1361:13-1362:24 (Shimon). Mr. Pitterle explained that the Point Beach spent fuel pool would run out of space in 6.5 to 10 years, depending upon whether Point Beach maintained two FCR, one FCR, or no core offload capability. DX 184. Nevertheless, in explaining when the spent fuel pool would run out of space, Mr. Pittlerle stated that:

> All of these occur long before the DOE is pledged to start accepting spent fuel in 1998. This information should be considered in determining the timing of alternatives such as reconstitution, dry storage, or another spent fuel pit.

Id. (emphasis added).

165. Howard Shimon, who in 1986 was the Manager of Nuclear Fuel and Administrative Services for WEPCO, testified that, if Point Beach were to maintain FCR, without ever encroaching on it, WEPCO would have been forced to shut-down in 1994 or 1995 without additional at reactor storage:

> Maintain it continuously, never encroach on it . . . . Probably sometime in the timeframe of 1994, 1995.

Tr.1368:14-24 (Shimon).

166. WEPCO started discussing additional at-reactor storage in the late 1980s, beginning with a demonstration project in 1987. WEPCO had already reracked its SNF pool twice, and it did not consider a third rerack a viable option so it looked at other technologies, including dry fuel storage. Tr.972:5-973:13 (Zabransky).

167. WEPCO was approached sometime in or around 1987 by Reading Associates and asked to participate in a cooperative research and development ("R&D") project with DOE, EPRI, and Reading Associates to develop storage technologies. DX 40; Tr.970:7-973:13 (Zabransky).

168. The goals of the R&D project included, among other things, providing "licensed dry fuel storage technology for implementation at Point Beach Nuclear Plant." DX 40 at WISC 00061016. In 1988, one of the considerations at WEPCO in participating in the R&D project was the need for additional at-reactor storage by approximately 1994. Id. at WISC 00061017 ("The spent fuel storage demonstration project will develop a technology that can provide storage of spent fuel at Point Beach Nuclear Plant from approximately 1994 through the delivery of spent fuel to the DOE geologic repository."); Tr.975:8-976:23 (Zabransky).

169. As of 1988, WEPCO needed storage for 504 assemblies (DX 40 at WISC 00061023), or 21 24-assembly casks. WEPCO ultimately applied, in its 1991 application to the PSCW, for authorization to store 288 fuel assemblies, or 12 24-assembly casks, based upon DOE performance starting in 1998. DX 171; PX 907B at 534-535 (WPS002 6484-6485) (1994 Link testimony before the PSCW affirming WEPCO's assumption that DOE would begin performance in 1998).

170. In 1988, WEPCO planned to have dry storage or an ISFSI available at Point Beach by 1994 "to allow for the orderly start-up of the interim storage facility and efficient spent fuel management activities. Up to five years may be required to design, license, and implement such additional storage capacity." DX 40 at WISC 00061023; Tr.978:5-16 (Zabransky); Tr.985:20-25 (Zabransky) ("the basis was still on the knowledge that we had received from our contacts at

Virginia Power and Duke Power that it was a good five-year project . . . from start to loading to do dry storage").

171. David Zabransky, the project manager and administrator for the dry fuel storage project, made the presentation to senior management at the major project review committee to gain approval of the ISFSI project in 1989. Tr.980:19-984:7 (Zabransky); DX 41. Messrs. Shimon,[9] Baumann, Farron, Link, and Hennessy were not involved in the presentation of the dry fuel storage project to the major project review committee. Tr.980:19-984:7 (Zabransky).

172. Mr. Fay sent a Work Order Requisition to senior management, Messrs. Britt and McNeer, on May 3, 1989, requesting authorization for a work order that would capture all the costs for the design, licensing, construction, and operation of dry fuel storage at Point Beach. DX 15; Tr.998:22-999:20 (Zabransky). In the request, Mr. Fay stated that: "Additional spent fuel storage capacity will be required at Point Beach Nuclear Plant in 1994 to allow for continued operation. . . . It is not possible to provide additional storage by re-racking the spent fuel pool (this has been done twice previously)." DX 15 at WISC 0000045; Tr.991:12-992:24 (Zabransky). A major rationale for the ISFSI project was WEPCO's desire to maintain FCR. Tr.1000:24-1001:10 (Zabransky).

173. As part of its evaluation of the ISFSI, WEPCO considered other potential options for increasing its SNF storage capacity, including the possibility of re-racking its SNF pool again. However, WEPCO determined, in 1989, that it could not re-rack its SNF pool again because the company did not want to re-open the structural analysis conducted by Bechtel Power Company

---

[9] In fact, Mr. Shimon was asked why WEPCO was planning to have an ISFSI operational by 1994, and he testified that he did not have direct knowledge of that. Tr.1481:1-9 (Shimon).

when WEPCO had re-racked the SNF pool in 1979. Tr.992:25-998:21 (Zabransky). While WEPCO determined that the structure of the SNF pool was safe, WEPCO was concerned that, in the event that the SNF pool was re-racked, during the licensing phase of the re-racking, the NRC might decide to re-open the issue of structural capacity. WEPCO management decided that the possibility of re-opening the structural analysis would be very expensive and could be problematic. Thus, WEPCO decided that re-racking the SNF pool was not an option. Id.; see also DX 130 at WISC 00000925-926 (providing documents and information to CUB regarding WEPCO conclusion that its SNF pool was nearing its structural capacity).

174. In addition to re-racking, WEPCO also considered rod consolidation, construction of a new SNF pool, and early shut-down of Point Beach. DX 15 at WISC 00000459-460; Tr.999:21-1000:23 (Zabransky). WEPCO only considered those alternatives in 1988-1989, when it decided that a modular ISFSI was the best option for additional at-reactor storage. Id. WEPCO planned, as of May 1989, to begin operation of the ISFSI in 1994, and to continue its use as long as necessary. DX 15 at WISC 00000458; Tr, 1001:11-1002:2 (Zabransky).

175. The dry fuel storage project was approved by WEPCO's major project review committee on or about May 23, 1989. DX 365 at 1 (KRGWE002225); Tr.1002:3-1003:10 (Zabransky).

176. In the requisition order, dated May 3, 1989, Mr. Zabransky, who drafted the work order for Mr. Fay's signature, included a request for a modular ISFSI sized to hold approximately 48 VSC-24 casks. DX 365 at 2. Mr. Zabransky explained that 48 casks were presumed in 1989 to be sufficient to store all fuel that would be discharged from Point Beach while maintaining FCR. Because WEPCO had already reracked its SNF pool twice, reracking was not considered a

viable option. Tr.1003:23-1004:14 (Zabransky). Furthermore, Mr. Zabransky determined, from a cost perspective, that sizing the ISFSI for 48 casks would not be any more costly than sizing it for 12 casks. Tr.1004:15-1006:2 (Zabransky); see also DX 132 at WISC 00011072; Tr.1124:23-1126:12 (Zabransky).

177. After WEPCO decided to implement dry fuel storage at Point Beach, WEPCO received a request from Maine Yankee Atomic Power Company, in September, 1990, to store Maine Yankee's spent fuel in the Point Beach SNF pool. DX 18. Mr. Fay explained that WEPCO could not provide any space for Maine Yankee's spent fuel because Point Beach was running out of room in its SNF pool for its own SNF:

> At our present usage rate, full core reserve in our spent fuel pool will no longer be available after 1995. Accordingly, we are proceeding with the development of an independent spent fuel storage installation (ISFSI) to supplement the storage capacity of our spent fuel pool and expect to have this facility operational by 1994.

Id.; Tr.1007:9-1010:13 (Zabransky); see also DX 442 at HQR 364 0032 (March 1986 RW-859 states at section 3.22 that WEPCO loses its ability to operate the Point Beach reactor in September 1996); DX 444 at HQR 364 0063 (February 1987 RW-859 states at section 3.22 that WEPCO loses the ability to operate the Point Beach reactor in September 1996); DX 445 at HQR 364 0072 (February 1988 RW-659 states that WEPCO loses the ability to operate the Point Beach reactor in April 1997).

178. Mr. Link signed an RW-859 on February 5, 1993. DX 274 (Unit 1) at I-.1. That RW-859 reported to DOE that, assuming maintenance of FCR, WEPCO would be forced to shut-down Unit 1 by April 1996. Id. at II.B.2-1; Tr.503:25-507:4 (Link).

179. WEPCO continued to work toward a 1994 operational date for its ISFSI through 1990 and 1991. Tr.1010:6-10 (Zabransky); see also DX 137 (April 4, 1991, memorandum from Mr. Zabransky to G.J.Maxfield, Point Beach plant manager); DX 129 (Sept. 5, 1991, memorandum from Mr. Zabransky to S.L.Parker, supervisor in regulatory affairs); DX 19 (Oct. 14, 1991, memorandum from Mr. Zabransky to M.E. Schindhelm, a WEPCO accountant). As of October 1991, WEPCO was planning on loading 12 casks by June 1998. Id. at WISC 00009878; Tr.1012:7-1014:21 (Zabransky).

180. WEPCO submitted its application to the PSCW for authorization to construct and place into service an ISFSI on November 15, 1991. DX 171. Mr. Zabransky, the project manager, provided technical input for the application to Steven Parker, the supervisor of regulatory affairs at the time. Tr.1021:10-1022:4 (Zabransky). Mr. Zabransky was the primary drafter of the Environmental Screening Report ("ESR") attached to the application. DX 171 at WISC 00014734-825; Tr.1023:10-24 (Zabransky).[10]

181. The PSCW application, assuming DOE performance in 1998, stated that additional at-reactor storage was needed at Point Beach, assuming maintenance of one FCR, and it established an operational date for the ISFSI of 1994. PX 171 at WISC 00014727-28. The project requested authorization for loading 12 VSC-24 casks over the period 1994 through 1998. Id. at WISC 00014728.

---

[10] Mr. Baumann provided radiological calculations to Mr. Zabransky for the ESR. Tr.1023:16-24 (Zabransky). Mr. Zabransky testified that he received no assistance from Messrs. Shimon, Link, Hennessy, Krieser, Farron, or Conry in preparing the ESR. Tr.1023:25-1024:10 (Zabransky); see also Tr.460:18-461:6 (Link); Tr.2615:22-2616:6, 2620:23-2623:11 (Farron); Tr.2829:4-24 (Conry).

182. In addition to the three major alternatives considered by WEPCO – rod consolidation, re-racking the SNF pool, and construction of a new SNF pool – there were a number of other alternatives to the ISFSI discussed in the ESR. DX 171 at WISC 00014729. For example, WEPCO considered, among other options, reduced operation of Point Beach plant, increased in-pool spent fuel storage, and use of higher burn-up fuel. Id. at WISC 00014784-85; Tr.1028:11-1046:8 (Zabransky).

183. WEPCO determined that the option of reducing operations at Point Beach was too costly. DX 171 at WISC 00014789; Tr. 1030:18-1032:9 (Zabransky). WEPCO concluded that operation at reduced power is fundamentally impractical because the majority of costs are fixed and will not decrease with reduced power production and also because power not produced by Point Beach will have to be replaced with more costly resources. Tr.483:22-485:4 (Link). In evaluating increased in-pool spent fuel storage, WEPCO evaluated adding an addition to the pool, building a new pool, reracking the pool, adding two-tiered racks, and rod consolidation. WEPCO determined that none of these options was desirable. DX 171 at WISC 00014792-97; Tr.1037:12-1039:12 (Zabransky); DX 463 at WISC 00010271. WEPCO also evaluated the possibility of achieving higher burn-ups using less than 28 fuel assemblies, but WEPCO determined that achieving higher burn-ups would be too costly.[11] Tr.1045: 3-1046:8 (Zabransky). Later,

[11] WEPCO received, through a contract with Westinghouse, more sophisticated equipment that was used in the 1991-1992 time frame to continue to evaluate the issue of using higher burn-ups and higher enrichments. Tr.1046:9-1048:4 (Zabransky). In October 1993, a WEPCO team tried and failed to reduce reloads at Point Beach from 28 to 24. PX 313. Tr.1048:8-1051:21. Thus, as of the fall of 1993, WEPCO had not been able to achieve higher enrichments or higher burn-ups. Id.

evaluation of this option concluded it to be impossible considering operational safety issues and the existing spent fuel storage rack limits. DX 26 at WISC 00003651.

184. Mr. Zabransky demonstrated that, using the assumptions included by WEPCO in its 1991 application to the PSCW, WEPCO would lose FCR in 1995, and would not be able to operate after the fall 1997 outage. DDX 1-9; Tr.1062:10-1-69:23 (Zabransky).[12]

185. In a video developed for public outreach and stockholder meetings as part of its public relations effort regarding the ISFSI project, WEPCO explained that "the spent fuel pool at Point Beach will be full by mid-1995." DX 146; Tr.785:2-5 (transcription of video); see PX 250 (proposal to increase public relations effort in light of Northern States experience); Tr.1075:23-1078:23 (Zabransky).

### 2. WEPCO's Contemporaneous Documents During The Development Of The ISFSI Project All Indicated A Need For Additional At-Reactor Storage Before 1998

186. The video was developed by WEPCO in the summer of 1992 and conveyed to the public the need for dry fuel storage at Point Beach beginning in 1995. DX 146; Tr.790:15-791:2 (Zabransky).

187. Further explaining the rationale for the dry fuel storage project at Point Beach, WEPCO stated in the video as follows:

---

[12] WEPCO's PSCW application contains two sets of assumptions regarding the number of spent fuel spaces available. On page 15 of the application, WEPCO notes that 1126 storage locations were filled with spent fuel or high-level waste components. On page 50 (WISC 00014796), WEPCO notes that there are 1109 spaces filled with spent fuel. Mr. Zabransky testified that, in its application, WEPCO used the 1126 number because that included the total inventory in the pool and the plan at the time was to leave the high-level waste in the pool so that those storage locations were filled. Tr.1069:5-1079:11 (Zabransky).

> The spent fuel pool was designed to store spent fuel only temporarily, but after 20 years and several reconfigurations, the spent fuel pool at Point Beach is nearing its limit. **By mid-1995, there will be no more room. To bridge the gap until the federal facilities are ready, Wisconsin Electric is proposing to build a temporary dry storage facility.**

DX 146; Tr.786:22-787:6 (Zabransky) (emphasis added).

188. An internal WEPCO publication, Synergy, published in 1992, provided information about the upcoming ISFSI project to WEPCO employees. DX 283; Tr.1081:2-19 (Zabransky). The newsletter described the size of the ISFSI, as follows:

> The facility would be sized for 48 casks to accommodate operation of Point Beach through the end of its current licenses (2010 for Unit 1 and 2013 for Unit 2). The application submitted to the PSCW **requested only 12 casks – enough to bridge the gap between mid-1995, when the spent fuel pool would be full, and the acceptance of fuel at the MRS, scheduled to open in 1998.**

DX 283 at WISC00011138 (emphasis added).

189. In response to the decision to increase WEPCO's public relations effort regarding the ISFSI, Mr. Zabransky assisted in preparing a Question and Answer Brochure that would be used to inform the public about the project. DX 456; Tr.1078:24-1079:19 (Zabransky). The brochure indicates that construction on the ISFSI will begin in late 1992, with usage beginning in 1994. DX 456 at WEP006 0509.

190. Because Mr. Zabransky was focusing his efforts on the PSCW efforts, Robert Link, then Vice-President of Nuclear Power, in a August 1992 memorandum, announced the appointment of Kevin Anundson to head the effort at Point Beach to implement the dry fuel storage project after it was authorized by the PSCW. DX 22; Tr. 1087:12-1089:5 (Zabransky).

191. Mr. Link confirmed the 1994 operation date in his memorandum:

> The dry fuel storage facility planned for Point Beach Nuclear Plant is scheduled for operation in June 1994. The Public Service Commission of Wisconsin (PSCW) is reviewing our application for a Certificate of Authority to allow us to construct this facility. Current estimates call for a PSCW ruling in May 1993.

DX 22 at WISC 00056029.

192. As of August 1992, Mr. Link had not proposed any alternatives to the dry fuel storage project to address the need at Point Beach for additional at-reactor storage. Tr.1089:17-20 (Zabransky).

193. The evaluation of the dry fuel storage project by the PSCW took longer than WEPCO had anticipated. Tr.1093:23-1094:24 (Zabransky). As a result, the project was expected to begin operation in 1995, a year later than planned. DX 134. However, WEPCO informed the PSCW in correspondence dated March 17, 1993, that the delay in commencement did not change the number of casks that WEPCO expected to load through 1998. Id. WEPCO continued to inform the PSCW that it would load 12 casks through 1998. Id. at WISC 00054807; Tr.1094:25-1095:17 (Zabransky); see also DX 23 (July 1993 timetable shows cask loading beginning in June 1995); DX 25 at WISC 00010064 (1994-1998 Nuclear Power Dept. Business Plan, dated Jan. 14, 1994, shows May 1995 implementation of ISFSI to maintain one FCR); Tr.1099:19-1101:22 (Zabransky).

194. In June 1993, WEPCO created a single page question and answer pamphlet for its employees to use as part of its continuing public relations efforts regarding the ISFSI project. In response to a question as to who will pay for the project, WEPCO's position was as follows:

> Wisconsin Electric customers will pay for the dry storage facility at Point Beach.

> The cost of the facility will be factored into the cost of producing electricity at Point Beach. As a part of its review of our application for dry storage, the Public Service Commission of Wisconsin (PSCW) will conduct a detailed economic analysis . . .
>
> **Although some have called for DOE to pay for the facility, the additional storage is needed prior to 1998 when DOE is required to accept responsibility for spent fuel.**

DX 440; see Tr.1095:18-1097:23 (Zabransky) (position of WEPCO in June 1993).

195. Mr. Zabransky left WEPCO in July 1994 and started employment with DOE. Tr.713:1-714:11 (Zabransky). After Mr. Zabransky left WEPCO, he was contacted by Messrs. Link and Krieser[13] and asked to assist WEPCO with the hearing before the PSCW regarding the dry fuel storage project that was scheduled for later in 1994. While Mr. Zabransky was willing to return to WEPCO and assist in those preparations, he was told by DOE that it would not be possible because of a potential conflict of interest. Tr.713:13-714:11 (Zabransky).

196. Throughout the planning for on-site storage, from 1987 to 1995, WEPCO continued to believe that there was a possibility that DOE would perform at an MRS beginning in 1998. See, e.g., DX 283 (1992 newsletter WEPCO anticipated DOE acceptance in 1998); PX 351 (September 1994 Link submission to DOE acknowledged that DOE could meet its contractual obligation with an MRS); Tr.1660:2-24; DX461 (pleading submitted December 16, 1994, stated that DOE had not "abandoned the quest for an MRS"); Tr.2256:2-2258:11 (Porter); DX73 (1995 letter submitted to the PSCW, indicated that acceptance at an MRS in 1998 was a more likely scenario than later acceptance at a repository); Tr.1606:18-1610:10 (Krieser); DX28

[13] Mr. Link was then Vice-President of the Nuclear Power Unit, and Mr. Krieser was then Manager of the Industry and Regulatory Services in the Nuclear Power Business Unit.

(WEPCO decommissioning cost study assumed that it would have to load 12 casks with acceptance commencing at an MRS in 1998); Tr.2764:20-2768:15 (Anundson).

### 3. WEPCO Reported A Need For Dry Fuel Storage Assuming DOE Performance Beginning In 1998

197. Mr. Link testified in October 1994 before the PSCW during hearings regarding authorization of WEPCO's dry fuel storage plan. During live testimony, Mr. Link testified that the dry fuel storage application to the PSCW was based upon the assumption that DOE would begin acceptance of spent fuel from WEPCO in 1998 and that WEPCO needed 12 casks before DOE commenced acceptance in 1998:

> We still need an ISFSI prior to 1998 which is the first date by which we believe DOE is obligated to take fuel. Yes, we considered DOE obligated to take fuel starting in 1998. That does not negate the need for an ISFSI.
>
> . . .
>
> As I stated, that does not negate the need for the ISFSI to be constructed, utilized with the 12 casks we asked for through 1998.
>
> . . .
>
> I can state that the [dry fuel storage] proposal is based on the 1998 take date underneath the provisions of the contract.

PX 907B at 534-535 (WPS002 6484-6485).

198. In his pre-filed testimony before the PSCW, dated October 11, 1994, Mr. Krieser testified that, "after the Unit 1 spring outage in 1997, there will not be enough spaces to accommodate all the spent fuel from another refueling outage." DX 36 at 2-3.

199. In 1994 correspondence to Alan Brownstein of the OCRWM office at DOE, Mr. Link indicated that there might be utilities, as was the case with WEPCO, that would need additional on-site SNF storage even if an MRS was made available in 1998:

> Even if DOE is successful in providing a centralized interim storage facility, utilities may still need to pursue on-site storage or other

> alternatives to satisfy their interim storage needs. The need and use of an on-site or alternative interim storage facility is strictly a utility decision.

DX 139 at WISC 00028402.

200. Eileen Supko, plaintiff's expert witness who developed a model to demonstrate what might happen in the "but-for" world, testified that a table in her model shows the need for dry fuel storage at Point Beach before 1998. Tr.3406:12-17, 3417:9-3418:16 (Supko). Even assuming DOE performance in 1998, WEPCO would have loaded 120 MTUs into dry storage before 1998, assuming a 24-assembly cask, or the equivalent of five casks. Id.

### B. The Use Of A Temporary Cask Pit Rack Was Not Considered An Option In The But-For World

#### 1. WEPCO Did Not Evaluate The Use Of A Temporary Cask Pit Rack Until At Least 1998

201. When WEPCO evaluated options in 1991 for additional at-reactor storage, WEPCO did not consider utilizing a temporary cask pit rack. Tr.1053:22-1056:8 (Zabransky); Tr.1597:8-1599:1 (Krieser); DX 36.

202. A cask pit rack provides only temporary storage, and it must be removed in order to load casks and transfer spent fuel to DOE. Tr. 5430:13-19 (Brewer); DDX 3-7; DX 391 at 13 (WXE011 0015); Tr.5465:8-25 (Brewer); DX 418; Tr.4428:13-4429:6 (Singh).

203. In 1991, WEPCO's projections showed a need for additional permanent storage in 1997. DX 391 at 14 (WXE011 0016). Similarly, in its application for an ISFSI to the PSCW, WEPCO projected that, at its then-current rate of discharge, even with planned improvements to the spent fuel pool, it would exceed the usable capacity with the Fall 1997 discharge, and have to shut down one of the operating units. DX 171 at WISC 00014753; Tr 1062:10-1068:9

(Zabransky); DDX 1-9A (comparing the available space of 1,482 assemblies to the cumulative discharge in fall 1997 of 1,490 assemblies).

204. A temporary cask pit rack would not have solved the storage need foreseen by WEPCO in 1991. Tr.5431:21 - 5432:2, 5571:24 - 5573:5 (Brewer); DDX 3-7; DX 391 at 14 (WXE011 0016).

205. WEPCO did not discuss the possibility of using a temporary cask pit rack until 1998, when Mr. Krieser discussed the possibility with Northern States Power Company. Tr.1589:13-1593:7 (Krieser); see also Tr.2572:8-18 (Farron).

206. In court pleadings filed on August 28, 1995, WEPCO represented to the Court that its storage options consisted of dry storage, a new spent fuel pool, or storage in the reactors. Tr. 2254:21-2255:10 (Porter).

207. To the extent that WEPCO evaluated options, these were not formal studies and did not result in any written documentation. Tr.1587:16-1588:14 (Krieser).

208. Use of a cask pit rack as proposed by WEPCO at trial would have added weight to the spent fuel pool. See DFOF 210. Compare Tr.4393:3-5 (Singh) (weight of the temporary rack proposed by WEPCO loaded with fuel of 93 tons, or 186,000 pounds) with DX 351 at WISC 00064415 (approved weight for the shipping cask to be placed in the cask laydown area, or a cask weighing 136,000 pounds).

209. The analysis done in support of the re-racking that occurred in the late 1970s assumed that a shipping cask weighed 136,000 pounds (Tr.5433:12-24 (Brewer); DX 351 at WISC 00064415), but the weight of the temporary rack proposed by WEPCO loaded with fuel was determined to be 93 tons, or 186,000 pounds. Tr.4393:3-5 (Singh).

210. At the time of WEPCO's ISFSI application to the PSCW, the structural analyses indicated that the fuel pool was essentially at its maximum weight. Tr.1600:12-22 (Krieser).

211. WEPCO advised the PSCW that, with the second re-rack of its SNF pool, the seismic loading of the pool reached its limits. Tr.2207:1-2209:13 (Porter); DX 130.

212. WEPCO did not perform any additional analyses that superceded these conclusions before the ISFSI was loaded. Tr.1600:23-1601:2 (Krieser); Tr.2209:14-21.

213. Thus, in 1991, WEPCO dismissed any alternative that would add weight to the spent fuel pool. Tr.1038:14-1039:12 (Zabransky); DX 171 at WISC 00014792.

214. The notes on the original installation of the racks in the Point Beach spent fuel pool show that the pool walls and the cask containment area were not perfectly square or plumb and the cask containment area was shimmed. Tr.2258:12-2261:19 (Porter); Tr.2263:12-2264:5 (Porter); DX 398; Tr.2264:6-2266:21 (Porter); Tr.5538:15:2-5543:18 (Brewer); DX 398; DX 399.

215. The cask laydown area of the spent fuel pool contains an anti-tipping frame. Tr.1130:9-1133:19 (Zabransky); Tr.5437:9-16 (Brewer); DX 397 at WISC 00025333; DX 455 at WEP072 0020.

216. The anti-tipping frame prevents a spent fuel shipping cask from tipping over and falling against the racks. DX 391 at WXE011 0017. The anti-tipping frame also serves as a path to transfer loads during an earthquake from the spent fuel racks to the spent fuel pool walls. DX at 397 (WISC 00025331).

217. Either the anti-tipping frame or the pool structure have an irregular geometry. Tr.5435:24 - 5436:8 (Brewer); DDX 3-8, DX 399 at WISC 00051684 (notation for 12/14).

218. This irregularity can make removal of the device difficult. Tr.5441:14-21 (Brewer); DDX 3-8, DX 391 at 17 (WXE011 019).

219. The anti-tipping frame must be removed before a temporary cask pit rack can be installed. Tr.5435:8-19 (Brewer); DDX 3-8.

220. Installation of a temporary cask pit rack would require that the spent fuel pool be relicensed to allow it to be used to store fuel without the anti-tipping frame. Tr.5435:15-24 (Brewer); DDX 3-8; Tr.1136:7-1137:19 (Zabransky).

221. Mr. Zabransky testified that management did not want to return to the NRC for re-licensing of the spent fuel pool because of concerns that it might lead to a complete inspection of the pool. Tr.996:16-997:10 (Zabransky); see also Tr.995:1-996:14 (Zabransky).

222. To use a temporary rack in the Point Beach spent fuel pool, the pool would need to be re-qualified for permanent removal of the seismic restraints. Tr.4426:21-4427:1 (Singh).

223. Until a survey is completed, the difficulty or time required to remove the anti-tipping frame cannot be determined. Tr.5460:24 - 5461:8 (Brewer).

224. Rerack applications require 33 months for design and licensing -- 13 months longer than the time assumed by WEPCO.[14] Tr.5463:2-17 (Brewer); DX 391 at 18 (WXE 011 0020).

---

[14] If the licensing and design were to require longer than 27 months, replacement of the steam generators would have been impacted. Tr.5463:18 - 5464:3 (Brewer); DX 391 at 17-18 (WXE011 0019-WXE011 0020). In fall 1995, WEPCO concluded Unit 2 could not restart following its 1996 outage unless its steam generators were replaced. DX 3.

225. NRC approvals of licensee requests have taken longer than requested by licensees, even faced with specific needs by the licensee. Tr.5464:8 - 5465:7, 5467:18 - 5470:21 (Brewer); DX 418; PX 642; PX 681.

226. NRC approvals of licensee requests have included restrictions or limitations not requested by the licensees. Tr.5465:8-21, 5466:1 - 5467:17 (Brewer); DX 418; DX 414.

227. The temporary rack proposed by WEPCO is a region II rack. As a result, the rack could not accommodate all of the fuel that may be in the reactor. Tr.5477:20-5478:7 (Brewer).

228. Every time spent fuel is moved, there is a potential for damage to the fuel. Consequently, licensees avoid moving spent fuel unless it is required. Tr.5584:18-5585:6 (Brewer).

229. A rack in the cask laydown area must be removed prior to loading a spent fuel transportation cask. Tr.4427:22-4428:3;4428:13-4429:3 (Singh)

**2. WEPCO's Reference To Use Of A Temporary Cask Pit Rack Is A Litigation-Driven Strategy**

230. WEPCO relied in large part upon the expert report of Dr. Krishna Singh to support its assertion that it would have used a temporary cask pit rack in the but-for world. Tr.3822:10-13 (Sieracki).

231. However, Dr. Singh's report was a non-rigorous scoping study, which was not supported by any inspection of the Point Beach spent fuel pool. Dr. Singh also never conducted a feasibility study, a more rigorous, time-intensive survey of the SNF pool. Furthermore, Dr. Singh never surveyed the spent fuel pool to determine what, if any, obstructions exist. Tr.4431:10-4432:22; 4436:1-5 (Singh).

232. Dr. Singh did not analyze whether a temporary rack would have met WEPCO's projected storage needs. Tr.4453:19-23 (Singh); see DFOF ¶¶ 202-205.

233. Dr. Singh did not determine whether the fuel in WEPCO's spent fuel pool could have been moved in such a manner as to provide sufficient space to permit the use of divers for the installation of a cask pit rack.[15] Tr.4445:24-4446:5 (Singh). In the event that divers could not be used, Dr. Singh never evaluated the cost of using an alternative means of removing the anti-tipping frame and inserting the temporary cask, for example, the use of remote tools. Tr.5470:22-5474:9 (Brewer). As a result of Dr. Singh's failure to demonstrate that divers could actually be used and his failure to evaluate the cost and schedule necessary to implement alternate means, plaintiff never established the viability of using a temporary cask.

234. Dr. Singh's analysis assumed that full core reserve was available in the 1995 to 1996 period for installation of a cask pit rack, although he had never studied how much space was available. Tr.4450:20-4451:9 (Singh). However, contemporaneous documents demonstrate that Dr. Singh's assumption was false. For example, at the end of 1995, there were 1,346 fuel assemblies in the pool, and 24 fuel assemblies in dry storage – for a total of 1,370 fuel assemblies on site. DX 60. At this point, in order to have FCR, the pool would have needed 1,491 usable spaces or 1,370 + 121 (FCR). However, by 1997, a year after the temporary rack would have

---

[15] Dr. Singh suggested that divers could be used to dismantle the anti-tipping frame that occupied the space in the cask pit, so that the temporary cask could be inserted there. Tr.4445:24-4446:5 (Singh). One of the issues raised, but not resolved, by Dr. Singh's suggestion, was the potential radiation exposure of the divers doing such work. Id. Unless the SNF could be moved a far enough distance away from the area where the divers were working, the radiation exposure would be large enough to give divers a lethal dose in an hour -- clearly, an unacceptable hazard. Tr.5470:22-5474:9 (Brewer).

been installed, there were still 18 unusable spaces, leaving at most 1,484 usable spaces (1,502-18 = 1,484).[16]

235. WEPCO also used the expert report of the Kenrich Group to support its assertions regarding use of the temporary cask pit rack in the but-for world.

236. The Kenrich Group was hired by WEPCO to prepare its damages claim. In its first report, dated July 14, 2005, Kenrich noted that WEPCO was still considering what it would have done in the but-for world to remedy its at-reactor storage issues. Tr.3866:9-3867:9 (Sieracki). The first report of Kenrich did not contain any reference to the use of a temporary cask pit in the but-for world. Id.; see also DDX0001-15 (Defendant's Demonstrative Showing Changes to Plaintiff's Expert Report Over Time).

237. In its second report, dated May 8, 2006, Kenrich noted that it had removed from damages an offset handling tool included in the original report because, at the time that the report was generated, the company was still evaluating what their likely approach might have been if DOE had performed, and it was unclear in 2005 whether they would have tried to free up spaces with an offset handling tool. Tr.3863:1-3864:21 (Sieracki).

238. WEPCO ultimately reached a decision, based clearly on hindsight, regarding what it would have done in the but-for world through a series of meetings in 2005 and 2006. The options that it considered included building an ISFSI. Tr.3867:10-3870:16 (Sieracki).

[16] In 1996, the year the temporary rack was allegedly to be installed, WEPCO determined that 12 spaces were damaged. See DX 206. These 12 damaged spaces alone would have precluded maintenance of FCR, absent dry storage – 1,502 -12 = 1,490, less than the 1,491 spaces needed. Thus, even without considering other unusable spaces, clearly WEPCO did not have the usable space Dr. Singh assumed.

239. WEPCO personnel made the ultimate decision about what course WEPCO would have pursued in the but-for world, but not without a lot of interaction with Mr. Sieracki and his team. Tr.3870:17-3871:1 (Sieracki).

240. WEPCO personnel did not provide written documentation to Kenrich defining the but-for world. Rather, the process was more one of Kenrich describing to them the but-for world that would have existed. Tr.3871:2-3872:17 (Sieracki).

241. Mr. Farron was one of the WEPCO employees who ultimately decided what WEPCO would have done in the but-for world, but he did not have any first hand knowledge of WEPCO's decision-making process because he only began working at WEPCO in 1995 after WEPCO had started to implement dry storage. Tr.3873:3-21 (Sieracki); Tr.2620:1-2627:1 (Farron).

242. Mr. Link was the other employee who ultimately told Kenrich what WEPCO would have done, but Mr. Link arrived at WEPCO in 1992 after WEPCO had submitted its application to the PSCW for dry storage, and Mr. Link testified before the PSCW that WEPCO would need an ISFSI prior to 1998, even assuming performance in 1998. Tr. 3873:22-3878:9 (Sieracki); PX 907B at WPS002 6484-6485 (Link testimony before PSCW).

243. The May 8, 2006 Kenrich report is premised upon the notion that, in the but-for world, the decision not to pursue dry storage would have been made at the same time they started to pursue it in the actual world – that is, in the but-for world, they would have refrained at the outset from taking the actions they took in the actual world. Tr.3878:10-22 (Sieracki); 3882:11-3883:6 (Sieracki). The report is further premised upon the idea that WEPCO would have continued to evaluate its options and would eventually make the decision to install a cask pit rack

prior to 1993 and would implement that decision in 1993. Tr.3885:15-22 (Sieracki). Finally, the report assumes that WEPCO would have been able to make these decisions at that time because it would have had definitive information that DOE would perform beginning in 1998. Tr.3885:23-3886:1 (Sieracki). There would have been no uncertainties over DOE's acceptance of WEPCO's fuel on the schedule assumed in the Kenrich fuel management model. Tr.3888:1-3889:25 (Sieracki).

244. In spite of the fact that, at the time of Kenrich's initial report, WEPCO had not determined what it would have done in the but-for world, Kenrich reached the same conclusion as it did in its final report – that the inventory of spent fuel at Point Beach would never have exceeded the capacity of the spent fuel pool. Tr.3890:1-3892:8 (Sieracki).

245. Kenrich included an offset for the temporary cask pit rack of $2,047,641 in WEPCO's damages claim. That offset was not based upon actual costs incurred by WEPCO. DX 393 at 21.

246. Stephen Kiraly, the Government's expert who calculated an alternative damages claim, in his damages analysis, reversed that offset based upon the assumption that WEPCO would have built an ISFSI in the but-for world and loaded five VSC-24 casks and, thus, would not have needed the temporary cask pit rack. Id.; DDX 5-11.

### C. The Use Of Racks in the Transfer Canal Was Not Considered An Option In The But-For World

247. WEPCO did not consider using racks in the transfer canal in 1991. Tr.1056:9-11 (Zabransky) ("not when I was at Wisconsin Electric").

248. WEPCO did not initially consider the option of using racks in the transfer canal. Tr.1597:8-1599:1 (Krieser); DX 36. WEPCO did not consider the use of racks in the transfer

canal until sometime after the hydrogen gas ignition event ("hydrogen gas event") occurred on May 28, 1996. Tr.1593:14-1594:21 (Krieser).

249. There is no space on the transfer canal floors to install spent fuel racks. Tr. 5482:8-16 (Brewer). The single fuel transfer canal at WEPCO services both reactors. Fuel is moved on carriages which operate in the transfer canal. The tracks for the fuel transfer carriages are continuous along the canal, and when operating, the carriage for one unit overlaps onto the track of the other unit. The canal must be drained for maintenance on the fuel handling equipment. The canal can be isolated from the spent fuel pool by gates which allow the canal to be drained for maintenance on fuel handling equipment. PX 652, Pages 9.4-4, 9.4-9 and 9.4-13 of FSAR; PX 640 at WISC 00060334.[17]

250. Work on equipment in the fuel transfer canal would require that any storage in the transfer canal, were it even possible, would by necessity be temporary storage. Tr.5482:17 - 5483:6 (Brewer).

251. If additional spaces were added to the transfer canal for the storage of spent fuel, WEPCO would need to seek NRC approval. Tr.1137:14-19 (Zabransky).

[17] The Court ruled that, in the event plaintiff includes findings regarding the transfer canal issue in its findings of fact, defendant may in turn include findings on the transfer canal. Tr.5484:5-13.

### D. WEPCO Determined That Operating At Reduced Power Would Not Be Cost-Effective

252. In its application to the PSCW for construction authority to replace the steam generators, WEPCO concluded that it was much more cost effective to incur a $119 million outlay than to operate at a reduced power. Tr. 2237:1-2240:19 (Porter); DX 172. In fact, in its application for authorization to construct an ISFSI, WEPCO concluded that operating at reduced power would be significantly more expensive than construction of an ISFSI. DX 171 at WISC 00014789.

253. Mr. Link testified that the option of reduced power was rejected:

> With respect to the remaining alternatives, reduced operation, new coal-fired base load, and purchased power, all of which address operation of Point Beach at less than full power, WEPCO concluded that operation at reduced power is fundamentally impractical, because the majority of costs are fixed and will not decrease with reduced power production, and also because power not produced by Point Beach will have to be replaced with more costly resources.

Tr.483:22-485:4 (Link)

## XIII. EVIDENCE OF WEPCO'S POOL CAPACITY DEMONSTRATES THAT WEPCO NEVER USED 1,500 SPACES IN ITS POOL

254. WEPCO completed the last re-rack of its SNF pool in 1980. With that rerack, storage locations for 1,502 spaces were installed. However, not all of the spaces were usable. Catwalks located on the north and south sides of the pool made some spaces inaccessible. DX 397; Tr.144:22-145:1 (Baumann).

255. In 1989, the year that WEPCO initiated its dry fuel storage project, there were 1,387 spaces in the spent fuel pool that were available to store fuel assemblies. This number of

available spaces remained the same through the end of 1990.[18] DX 15; DX 53 at HQR364 0241; DX 51 at WISC HQR364 0405.

256. In 1991, when WEPCO applied for authorization to construct its ISFSI, there were 1,415 spaces in the spent fuel pool that were available to store fuel assemblies. In its application, however, WEPCO assumed that most of the spaces that were then unusable could be made available. WEPCO's judgment was that 20 spaces was a reasonable estimate of the number of spaces that would remain inaccessible after WEPCO took additional actions to make spaces available. Tr.647:4-24 (Zabransky); Tr.2210:19-2211:11 (Porter); DX 171 at WISC 00014753; DX 50 at HQR364 0465.

257. By 1994, the year of the PSCW hearings on the dry cask storage project, 1,468[19] spaces had been made available in the spent fuel pool for storage of fuel assemblies. DX 450 at HQR364 0688.

258. After PSCW approval of the dry cask storage facility, the number of usable spaces in the spent fuel pool remained at 1,468. Tr.137:24-138:23 (Baumann); PX 381 at HQR364 0809.

---

[18] Other documents contemporaneous with WEPCO's decision to build an ISFSI also demonstrate that less than 1,500 spaces were available for storage of SNF. See, e.g., DX 28 at WISC 00002797 (decommissioning estimate assumption stated "[o]nly 36 of the 1502 spaces in the spent fuel pool are unavailable"); DX 73 at WISC 00001317 (1,466 spaces currently available); DX 214 at WISC 00009835 (analysis excludes 37 spaces leaving 1,465 usable spaces); DX 58 at HQR364 0809 (1,468 assemblies currently available).

[19] The Final Environmental Impact Statement prepared by the PSCW, and issued in August, 1994, using data provided by WEPCO, assumed that 1,457 spaces were available in the spent fuel pool for storage of fuel assemblies. Tr.2759:20-2760:3; 2760:19-2761:14 (Anundson), PX 346 at WISC 00003759.

259. Even as late as 1997, when WEPCO was unable to load VSC-24 casks, only 1,484 spaces had been made available for storage of fuel assemblies in the spent fuel pool. Tr.2112:23-2113:1 (Holzmann), DX 75 at WISC 00059463.

260. In 1996, WEPCO's annual inventory records indicate that 12 pool spaces were damaged and should not be used for insertion or removal of fuel assemblies. Tr.929:19-930:8 (Hennessy), DX 206, DDX 1-8. For fuel inventory records thereafter, see the following. DX 193 (1997 fuel inventory); PX 529 (1998 fuel inventory); PX 559 (1999 fuel inventory); PX 585 (2000 fuel inventory); PX 591 (2001 fuel inventory); DX 305 (2002 fuel inventory).

261. By 2003, WEPCO's annual inventory records indicate that six spaces were damaged, including some new spaces that were not listed as damaged in the 1996 inventory. Tr.937:20-938:6 (Hennessy); PX653 (2003 fuel inventory); DDX 1-8.

## XIV. WEPCO'S DECISION TO UTILIZE THE VSC 24 CASKS

262. During WEPCO's evaluation of its dry storage options, it worked with Sierra Nuclear to prepare estimates of the cost of unloading the cask and then reloading the fuel into another cask for transportation by DOE. Tr.2747:15-2748:10 (Anundson). WEPCO assumed the VSC-24 casks would not be transportable. Id.

263. Specifically, the estimates assumed that WEPCO would be required to cut the casks open and place the assemblies into a DOE shipping cask. Tr.2748:11-14 (Anundson); DX 171.

264. WEPCO estimated that the total cost of this process would be $55,000 per VSC-24 cask. Tr.2748:15-2749:2 (Anundson); DX 171.

265. Based upon this estimate, WEPCO concluded that, even considering the costs of unloading the casks and reloading the fuel into DOE casks, the cost of a storage-only cask was less than the cost of a dual-purpose cask. Tr.2749:7-12 (Anundson); DX 171.

266. This conclusion was one of the reasons that WEPCO selected the VSC-24 casks. Tr.2749:13-17 (Anundson).

267. WEPCO developed procedures for cutting the VSC-24 casks open for transfer of the SNF into another cask when DOE performed at Point Beach. Tr.2749:18-2750:6 (Anundson).

268. Transportation capability or licensing for transportation was not something that was necessary for the storage of spent nuclear fuel at WEPCO. Tr.2750:7-2751:3 (Anundson).

269. WEPCO was not required to buy the VSC-24 casks through Sierra Nuclear. Rather, WEPCO served as its own general contractor. Tr.2738:18-25 (Anundson) Tr.1562:25-1563:7; 1566:12-25 (Krieser).

270. WEPCO believed it had "a fantastic quality assurance program" for building the VSC-24 casks. Tr.2738:23-25 (Anundson).

271. In addition to the other benefits of using the VSC-24 cask, British Nuclear Fuels Limited ("BNFL"),[20] the company that purchased Sierra Nuclear, received a revised certificate of compliance which expanded the limitations on enrichment and burn-up for fuel stored in the VSC-24s. Tr.1567:1-16 (Krieser); Tr.5509:22-5513:8 (Brewer); DX 409.

272. After BNFL had purchased Sierra Nuclear, WEPCO reached the same agreement with BNFL to continue to fabricate the VSC-24 cask. Tr.1566:12-25 (Krieser).

[20] BNFL purchased Sierra Nuclear in May 1998. Tr.5923:6-19 (Hamal).

## XV. PROBLEMS AT POINT BEACH HALT THE LOADING OF THE VSC-24 CASKS AND SHUT-DOWN BOTH UNITS 1 AND 2

273. On December 16, 1995, WEPCO placed its first VSC-24 cask containing 24 fuel assemblies on the ISFSI pad. Tr.1917:13-1918:14 (Becka); DX 80; DX 616.

274. On May 26, 1996, WEPCO placed the second loaded VSC-24 cask on the ISFSI pad. Tr.1918:15-17 (Becka); DX 80; DX 616.

275. While WEPCO was loading its third VSC-24 cask in May 1996, a hydrogen gas ignition event occurred. WEPCO aborted the loading and returned the SNF fuel assemblies to the spent fuel pool. Tr.2019:6-2020:3, Tr. 2023:2-21 (Holzmann); PX 424 at WISC 00010137-10151.

276. On June 3, 1996, the NRC issued Confirmatory Action Letter ("CAL") No. 3-96-0005, in which it suspended any use of the VSC-24 cask pending review and acceptance of any corrective action necessitated by the hydrogen gas event. Tr.2020:25-2022:11 (Holzmann); PX 1034; DX 78.

277. Shortly after the hydrogen gas event, WEPCO assembled a dry fuel storage group to focus on its goal to resume loading VSC-24 casks to the ISFSI at Point Beach. Tr.2023:22-2024:20 (Holzmann).

278. WEPCO shut-down Point Beach Unit 2 in October 1996 for the steam generator replacement project. DX 479 at WTK001 0479; DX392 at ¶19 (Hamal Report).

279. In December 1996, WEPCO paid $325,000 in civil penalties to the NRC, "for performance deficiencies and violations of NRC requirements in various plant activities." PX 801 at KRGWE000274. On January 27, 1997, the NRC issued a letter informing WEPCO of additional potential violations that it had observed during a special inspection and noting the "declining trend" of operations at Point Beach . Id.; see also DX 479 at WTK0010479.

280. WEPCO committed to keeping Unit 2 shut-down until the issues identified by the NRC were resolved. DX235.

281. In February 1997, WEPCO shut down Unit 1 at Point Beach because of equipment problems, and it remained out-of-service so that WEPCO could focus on the work needed to bring Unit 2 back on line. DX479 at WTK001 0479; DX392 at ¶20 (Hamal Report).

282. On May 16, 1997, the NRC issued a second CAL, No. 97-7-004, which prohibited further use of VSC-24 casks until there was a resolution of the weld cracking problems that had been encountered by other utilities using the VSC-24 casks. Tr.2031:18-2033:8 (Holzmann); Tr. 2035:8-2036:15 (Holzmann); Tr.2040:9-2040:15 (Holzmann); DX 194; PX 1035; DX 479 at WTK0010480.

283. Point Beach Unit 2 went back on-line in August 1997 after the steam generator was replaced, then was shut-down again from mid-1997 through February 1998, because of various equipment issues. DX479 at WTK001 0479; DX392 at ¶20 (Hamal Report).

284. On September 12, 1997, the NRC issued a closure notice relating to the hydrogen gas event. DX 78.

285. On October 20, 1997, WEPCO invited proposals from other cask vendors for casks to be used at Point Beach by early 2000. PX471; DX149.

286. In December 1997, Unit 1 at Point Beach was brought back into service through February 1998, when it began a three-month refueling outage. DX479 at WTK0010479; DX392 at ¶20 (Hamal Report).

287. As a result of these outages, Point Beach had roughly a full year of lost production. DX 392 at ¶20.

288. Because WEPCO's reactors at Point Beach were shut down after 1996, SNF discharges from those reactors were lower than had been previously forecast, ultimately reducing the amount of SNF discharged at Point Beach by approximately 56 assemblies in 1997. Tr.2673:19-2675:5 (Farron); Tr.5867:20-5868:10, Tr.5878:21-5881:7, Tr.5963:9-5964:14 (Hamal).

289. In January 1998, the NRC issued a letter stating that the negative trend at Point Beach had been arrested. DX479 at WTK001 0479.

## XVI. WEPCO USED THE 900 MTU RATE IN ITS PLANNING DOCUMENTS

290. Mr. Zabransky was responsible for developing, for a PSCW decommissioning rate case, the estimate that established the appropriate rate of collection from the ratepayers to set up a reserve that would be used to decommission the Point Beach facility. Tr.1106:15-1108:10 (Zabransky). He developed the estimate over the period 1992 to 1993. Id.

291. Mr. Zabransky contracted with NES, Inc. ("NES"), a Connecticut company that performs decommissioning studies, to evaluate and analyze WEPCO's decommissioning options for the Point Beach facility. Tr.1107:2-1110:1 (Zabransky). NES developed the cost estimate for the decommissioning rate case. Id. WEPCO and NES both made efforts to make sure the decommissioning costs estimates for WEPCO were accurate. Tr.2764:5-9 (Anundson).

292. WEPCO planned to implement a near-term dismantlement decommissioning of Point Beach which would include, after shut-down, taking the plant apart and isolating the spent fuel so the rest of the plant could be dismantled. Tr.1107:12-1108:10 (Zabransky). WEPCO's plans were to keep its SNF in its spent fuel pool and in dry storage. Tr.1108:11-18 (Zabransky).

293. As part of the decommissioning evaluation process, Mr. Zabransky also contracted with Energy Resources International ("ERI") to estimate at what rate of acceptance DOE would perform, after the first ten years of disposal by DOE. DX 86; Tr.1110:9-1111:12 (Zabransky). ERI provided an estimated acceptance schedule to Mr. Zabransky in March 1993. DX 86. The acceptance schedule prepared by ERI used the 1991 ACR rates for the first ten years, then estimated that fuel would be removed from Point Beach at an acceptance rate of 900 MTUs for the following two years, 1800 MTUs for the following five years, and then a steady-state rate of 3000 MTUs thereafter, until 2030. DX 86 at WISC 00000456. The assumption underlying the estimate was a DOE acceptance start-date of 1998. Id. The information provided by ERI was the best estimate of what WEPCO's future allocations would be. Tr.1112:12-16 (Zabransky).

294. Eileen Supko of ERI, one of the expert witnesses WEPCO retained for trial, provided the estimated rate of acceptance to Mr. Zabransky in 1993. DX 86; Tr.1110:9-1115:3 (Zabransky); Tr.3452:23-3454:2 (Supko). At the time Ms. Supko provided WEPCO with these projected allocations and discharges, she believed that the rates were reasonable. Tr.3454:3-3461:2, 3464:12-16 (Supko). WEPCO proffered no other analyses at trial that utilized higher rates. Tr.3458:8-13, 3460:10-25 (Supko).

295. In May 1994, Ms. Supko forwarded to Mr. Zabransky the methodology that ERI used to develop the acceptance schedule for WEPCO. DX 288; Tr.1115:17-1116:19 (Zabransky). The schedule provided by Ms. Supko in that transmission to Mr. Zabransky relied upon the allocation rates identified in the 1992 ACR, which were identical to those in the 1991 ACR. DX 288; Tr.1117:2-13 (Zabransky).

296. NES subsequently prepared a decommissioning cost estimate for WEPCO dated October 1994, and used the acceptance schedule prepared by ERI. DX 28; Tr.2763:12-2764:17 (Anundson); compare DX 288 at WISC 00055983 with DX 28 at WISC 00002806; Tr.1123:17-1124:19 (Zabransky). WEPCO agreed with the information contained in its decommissioning study. Tr.2771:23-2772:11 (Anundson).

297. In its decommissioning cost study, WEPCO assumed that it would load 12 casks, with DOE acceptance commencing at an MRS in 1998. Tr.2764:20-2768:15 (Anundson); DX 28 at WISC 00002797.

298. In its decommissioning cost study WEPCO assumed that it would continue to load fuel to an ISFSI even as it gained space in its spent fuel pool. Tr.2768:16-2770:3 (Anundson); DX 28 at WISC 0000 2806.

299. This was the only scenario considered in the decommissioning cost study. Tr.2757:4-2762:23, Tr.2770:3-2771:22 (Anundson); DX 28; see also PX 346 at WISC 00003758 (charts prepared by Mr. Anundson for the PSCW FEIS show use of 900 MTU rate).

300. David Weaver, the nuclear asset manager at WE Energies, was in charge of updating WEPCO's decommissioning cost study in 1998. Tr.4974:6-10 (Weaver).

301. Mr. Weaver and the finance group at the company reviewed the reports before they were finalized. Tr.4974:24-4975:3, 4983:25-4984:3 (Weaver).

302. The 1998 decommissioning cost study was filed with the PSCW. Tr.4984:4-7 (Weaver).

303. The 1998 decommissioning study was produced because WEPCO was required by the PSCW to provide an updated site specific decommissioning cost estimate every four years. Tr.4985:21-4986:5 (Weaver).

304. The 1998 decommissioning study was used to establish the decommissioning annuity which is paid by WEPCO's customers to fund the decommissioning trust. Tr.4986:6-10 (Weaver).

305. The dollars in the decommissioning fund will ultimately be used to fund the decommissioning effort after the plant is shut down. Tr.4986:15-22 (Weaver).

306. The assumptions in the 1998 decommissioning costs study were WEPCO's assumptions at the time. Tr.4986:23-4987:1 (Weaver).

307. In its 1998 decommissioning cost study WEPCO relied upon the 1995 ACR in making assumptions about the rate at which DOE would accept spent nuclear fuel. Tr.4987:2-22 (Weaver); DX 98 at WISC 0000 2018.

308. WEPCO submitted DCSs in 1992 to DOE which reflected the acceptance rates in the 1991 ACR. DX 466.

309. Furthermore, the final delivery schedules sent to DOE by WEPCO in 1997 reflected the acceptance rates in the 1995 ACR – the same rate as those in the 1991 and 1992 ACRs. DX 74; see also DX73 (data sent to PSCW in 1995 using 900 MTU rate).

## XVII. THE OPINIONS PROFFERED AT TRIAL BY WEPCO'S EXPERT MS. SUPKO SHOULD BE IGNORED BY THE COURT

### A. Ms. Supko's Opinions Are Irrelevant To This Case

310. Ms. Supko was not involved in the DOE program in 1983. She has never worked for the Department of Energy. She was not involved in any contract holder's discussion with DOE before the execution of the Standard Contract. Indeed, prior to working at ERI in 1990, she never had any discussions with DOE employees regarding issues related to the Standard Contract. Specifically, Ms. Supko did not personally begin to work on SNF issues related to the DOE program until 1990.[21] Tr.3430:21-3431:15 (Supko).

311. Ms. Supko's opinion that a 3,000 MTU acceptance rate is "reasonable" is irrelevant to any issue in this case.

312. Ms. Supko is not offering an opinion regarding how DOE would have performed in the non-breach world. Tr.3425:19-22 (Supko).

313. Ms. Supko is not offering an opinion concerning what DOE's obligations are under the Standard Contract concerning the rate of acceptance. Tr.3425:23-3426:3 (Supko).

314. Ms. Supko is not offering an opinion concerning what rate of acceptance is required by the Nuclear Waste Policy Act. Tr.3426:4-8 (Supko).

315. Ms. Supko is not offering an opinion that the 3,000 MTU steady-state rate of acceptance would have been used by DOE in the non-breach world. Tr.3426:9-14 (Supko).

---

[21] Prior to 1990, Ms. Supko had not reviewed documents such as the 1983 draft mission plan, the 1984 draft mission plan, or the 1985 mission plan that was submitted to Congress. Of course, she had no involvement in the preparation of those documents. Tr.3431:16-3432:2 (Supko).

316. Ms. Supko is not offering an opinion that DOE has to satisfy the two key issues identified by counsel in the non-breach world, that is, that DOE was obligated to accept fuel from utilities to obviate the need for additional at-reactor storage after January 1998 and to work off the back-log. Tr.3426:15-19 (Supko).

317. Ms. Supko is not offering an opinion as to what the minimum reasonable rate of acceptance is. Tr.3465:4-8 (Supko).

318. Nor is Ms. Supko offering an opinion in this case that her Scenarios 2, 3, and 4 are unreasonable.[22] Tr.3464:12-16 (Supko).

**B. Ms. Supko's Model Mixes But-For And Actual Worlds**

319. Ms. Supko's analysis is endeavoring to demonstrate a but-for world – that is, how much additional storage would have been required under various acceptance rates had DOE performed in 1998. However, Ms. Supko acknowledged that her model does not actually reflect the "but for" or the actual worlds. Tr.3404:21-3406:17 (Supko).

320. Ms. Supko characterizes her model as a hybrid between the but-for and the actual world. It is a hybrid because she includes in her model dry storage for certain utilities even though they claim they would not have used dry storage had DOE performed. Tr.3405:10-3406:6 (Supko).

321. In fact, Ms. Supko includes dry storage in her but-for world model for WEPCO, despite its claim that it would have added a temporary rack had DOE performed. Specifically,

[22] In fact, Ms. Supko believes that a rate or rates lower than 3,000 MTU may be reasonable, but she has never conducted the analysis to determine what that rate may be. Tr.3464:17-23 (Supko).

Ms. Supko assumed, consistent with the Government's position at trial, that, even had DOE performed, WEPCO would have loaded the equivalent of five 24-assembly casks to dry storage.[23] Tr.3406:12-17; 3417:9-3418:16 (Supko).

322. Ms. Supko's model is also a hybrid between the "but for" and actual worlds because it assumes post-1998 re-racks for about a dozen utilities. Specifically, with regard to pool capacities, Ms. Supko's model is not consistently utilizing pool capacity for utilities as they existed in 1998. In fact, that is true for approximately 10 percent of Ms. Supko's model. Yet, she relies upon post-1998 pool modifications in modeling what she believes the additional at-reactor storage requirements would look like in a 1998 acceptance world. Tr.3407:9-3408:25 (Supko).

323. For example, Ms. Supko includes South Carolina's post-1998 re-rack in her but-for world model. Tr.3408:3-9 (Supko).

324. She also included the Southern Nuclear, Plant Hatch, post-1998 re-rack in her but-for model in this case, as well as a second bathtub rack that was not actually installed.[24] Tr.3408:10-25 (Supko).

---

[23] In addition, Ms. Supko includes dry storage for NSP's Prairie Island plant in her but-for model despite NSP's claim that it would not have used dry storage had DOE performed. Tr.3406:7-11 (Supko).

[24] Ms. Supko acknowledged that the use of post-1998 pool capacity may have an impact upon her calculation of additional storage requirements. For example, the amount of at-reactor storage she calculated would be even greater if she omitted the 2000 Plant Hatch re-rack from her pool capacity analysis and, if she did not assume the post-1998 re-rack for Southern Nuclear, she would have calculated Southern Nuclear as requiring additional at-reactor storage after 1998 based upon a strict oldest fuel first basis. Accordingly, the total number of plants with additional at-reactor storage after 1998 that Ms. Supko calculates would go from 14 plants to 15 plants. Tr.3409:16-3410:23 (Supko).

### C. The Test Used by Ms. Supko In Her Analysis Is Not Supported By The Evidence

325. Ms. Supko's ultimate opinion is that Scenario 1, using the 3,000 MTU rate, reflects a reasonable acceptance rate. Her reasonableness determination is based in part upon the output of her model and how those outputs impact two benchmarks, or the two-part test, that counsel for WEPCO asked her to consider. Those two benchmarks or tests are (1) the amount of additional SNF storage required after 1998, and (2) the number of years of post-shutdown SNF storage required. Tr.3420:1-3421:3 (Supko).

326. However, the WEPCO "benchmarks" lack any factual support. For example, a 3,000 MTU per year rate of acceptance is not included in either the Standard Contract or the NWPA. Tr.3426:20-24 (Supko).

327. Similarly, neither the Standard Contract nor the NWPA contain a reference to the two key benchmarks that counsel for Wisconsin Electric has identified. Tr.3426:25-3427:4 (Supko).

328. Furthermore, Ms. Supko could not identify any DOE documents that discuss these two key benchmarks or two-part test prior to the issuance of the Standard Contract. Tr.3428:2-3429:5 (Supko).

329. In addition, Ms. Supko acknowledged that utilities and industry groups such as EEI requested the inclusion of language into the Standard Contract consistent with the two-part test advocated by counsel for WEPCO, and that language was not included in the Standard Contract. In fact, Ms. Supko acknowledged that Mr. Morgan, the first Director of OCRWM expressly rejected the inclusion of either a particular rate or a qualitative two-part test in the Standard Contract. Tr.3432:25-3436:6 (Supko).

330. None of the 16 documents Ms. Supko identified to support her opinion regarding the "reasonableness" of a 3,000 MTU acceptance rate reflect DOE performance in 1998 at a single repository at a 3,000 MTU rate of acceptance after a 5 year ramp up, which she purports to model in this case. Tr.3535:5-13 (Supko).

331. Ms. Supko acknowledged that her analysis in this case is based upon a benchmark that DOE rejected at the time of contract formation. Tr.3436:23-3438:6 (Supko).

### D. Ms. Supko's Rate Does Not Support Her Assertions Regarding DOE's Obligations Under The Standard Contract

332. Ms. Supko's analysis does not meet WEPCO's claimed obligation of precluding the need for all additional at-reactor storage after 1998. In fact, under her Scenario 1, using the 3,000 rate, she calculated that there are 14 utilities, or 10 percent of the industry, that have additional at-reactor storage needs after 1998.[25] Tr.3473:22-3477:8 (Supko).

333. Ms. Supko did not conduct any quantitative analysis in this case to determine if any of the 14 utilities she identified would have taken a different action regarding spent fuel storage had they believed DOE would perform. Tr.3483:2-9 (Supko).

334. In preparing her "but for" world model, she did not review utility by utility to discern what those utilities would have done had DOE performed in 1998. Tr.3483:10-18 (Supko).

[25] Ms. Supko had no opinion as to the number of plants that would have to have additional at-reactor storage for the number to be unreasonable. Nor could Ms. Supko provide any brightline that a specific number of utilities that require additional at-reactor storage is unreasonable. (Tr. 3477:9-3478:5)

335. Ms. Supko has not done any analysis in her base case scenario to determine whether the 1031.5 MTU number she calculated under Scenario 1 would have been any different had DOE begun performance in 1998. Tr.3484:15-3485:6 (Supko).

336. In fact, Ms. Supko's selected ramp up to 3,000 MTU further demonstrates that a 3,000 MTU acceptance rate does not preclude all additional at-reactor storage after 1998. For example, because utilities discharge approximately 2,000 MTUs annually, Ms. Supko's selected rate ramps up from 400 MTU in 1998, 600 MTU in 1999, 1200 MTU in 2000, neither keeps up with the cumulative discharge rate nor works off the backlog. In other words, for the first three years of acceptance under Ms. Supko's Scenario 1, the acceptance rate does not keep up with the generation rate. Further, for the first four years, Scenario 1 does not reduce the backlog.[26] Tr.3518:20-3520:25 (Supko).

337. Ms. Supko admitted during her testimony that she did not know how high the rate of acceptance would have to be to preclude <u>all</u> additional at-reactor storage under a strict Oldest Fuel First schedule because she has not done the analysis to make that determination. Tr.3574: 18-3591:15 (Supko).

338. Further, Ms. Supko has never conducted any analysis to determine whether, under the criteria that she models, her Scenario 3 would meet that criteria. Specifically, one way that Ms. Supko measures the reasonableness of additional at-reactor storage is by how it compares to one year's worth of discharges. However, Ms. Supko does not know whether, had all the

[26] Ms. Supko's opinion is that the Government would not be capable of accepting at the generation rate in the first year or two of the program because, as an engineer, she believes that you need to walk before you run. Tr.3521:1-3522:1 (Supko).

flexibilities that she identified been utilized, there could have been 2,000 MTU of additional at-reactor storage under Scenario 3. Tr.3510:14-21 (Supko).

### E. Ms. Supko's Rate Does Not Support Her Assertions Regarding Removal Of Backlog Or Timely Decommissioning

339. In addition to modeling rates against the amount of post-1998 additional at-reactor storage, Ms. Supko also evaluated how the rates impact timely decommissioning. Yet, as with the first criteria – precluding all additional at-reactor storage after 1998, Ms. Supko's analysis demonstrates that a 3,000 MTU acceptance rate does not satisfy the test identified by counsel for Wisconsin Electric. Tr.3510:22-3514:1, Tr.3097:25-3098:20 (Supko).

340. Ms. Supko calculated that, under a 3,000 MTU rate, there would be nine years of average post-shutdown time. Tr.3513:13-16 (Supko).

341. However, Ms. Supko testified that early DOE program documents discuss "timely decommissioning" as decommissioning nuclear power plants within five years after plants shut down. Indeed, the goal of "timely decommissioning," as Ms. Supko understands it, is to remove all SNF five years post-shutdown.[27] Tr.3512:9-3513:12 (Supko).

342. In fact, even under Scenario 4, which is twice as great a rate as Scenario 1, and a rate that Ms. Supko believes is inefficient, Ms. Supko calculated the average post-shutdown time as six years. Tr.3128:1-3129:5 (Supko).

343. Ms. Supko cannot identify any document that says nine years of average post-shutdown time is acceptable or reasonable. Rather, this is simply an untestable, so-called "judgment call" that she is making. Tr.3518:4-19 (Supko).

---

[27] The Standard Contract classifies standard fuel as fuel that has been cooled for five years.

## F. Ms. Supko Did No Analysis Regarding So-Called Flexibilities

### 1. Ms. Supko Did Not Analyze The Impact Of The Use Of The Exchanges Provision of the Standard Contract

344. Under the Standard Contract, utilities are permitted, with DOE approval, to exchange approved Delivery Commitment Schedules. PX 41, Article V(E).

345. Ms. Supko did not conduct any quantitative analysis to determine how exchanges would have worked had DOE performed. Specifically, she did not estimate qualitatively what the effect would be on the need for additional storage through the use of exchanges. Accordingly, she does not know how much the amount of additional at-reactor storage she calculated would have decreased had utilities engaged in exchanges. Tr.3615:2-3615:22 (Supko).

346. In modeling her "but for" world, Ms. Supko did not endeavor to model a "but for" exchanges market. Ms. Supko has not conducted any analysis to determine the timing of when an exchanges market would have developed in the "but for" world. Nor did she conduct any analysis to determine which particular utilities move up in the queue as a result of exchanges or, conversely which particular utilities move down in the acceptance queue. Ms. Supko has not performed any analysis to determine what a potential exchange would cost or determined how much a utility would be willing to pay to engage in an exchange. Tr.3515:7-3616:5 (Supko).

347. Ms. Supko agreed that there would have been some companies that would not have even considered trading because of their own political considerations. In fact, this reluctance on the part of utilities to exchange would have manifested itself in the early years of acceptance. Tellingly, despite testifying in 13 SNF cases, she is unaware of any plaintiff indicating its willingness to move down in the SNF queue. Tr.3616:6-19; 3617:12-3619:16 (Supko).

348. Of the 14 plants listed on Ms. Supko's demonstrative that have additional storage needs after 1998, she does not know which of these utilities have approved DCSs. Tr.3616:25-3617:11 (Supko).

349. Plaintiff proffered no evidence at trial showing any evaluation by WEPCO of the use of exchanges under the Standard Contract.

**2. Ms. Supko Did Not Analyze The Impact Of The Use Of The Plus Or Minus 20 Percent Provision Of The Standard Contract**

350. The Standard Contract provides that "[p]urchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." PX 41. Article V(B)(2).

351. Ms. Supko has not conducted any analysis to determine what utilities would have actually done with respect to the 20 percent provision in the Standard Contract. Specifically, Ms. Supko has not looked at how the 20 percent provision would work on a specific utility-by-utility basis. She did not speak to any utility regarding its willingness to use this provision of the Standard Contract. Tr.3619:17-3620:5 (Supko).

352. Ms. Supko assumed that the total amount of additional at-reactor storage could be reduced by as much as 20 percent if utilities used this provision. However, Ms. Supko has not conducted any analysis to determine the impact on other utilities if DOE were to grant a particular utility's request for an additional 20 percent of SNF acceptance. Ms. Supko is aware, based upon her involvement in the ACR Resolution Process, that the industry suggested that the plus or minus 20 percent provision not be exercised. Tr.3620:6-3621:3 (Supko).

353. As with exchanges, under the Standard Contract, utilities that have approved DCSs may adjust their allocations by 20 percent. Yet, as with exchanges, of the 14 plants that Ms.

Supko has identified as having additional storage needs after 1998, she does not know which ones have approved DCSs. Ms. Supko has not done any analysis to see the timing of these 14 plants acceptance needs versus their ability to use the plus or minus 20 percent provision. Yet, based upon the age of some of these plants, she is aware that some of these 14 plants may not be able to take advantage of the plus-or-minus 20 percent provision to alleviate their additional storage requirements. Tr.3621:4-3623:7 (Supko).

354. Notably, in all of the SNF cases in which Ms. Supko has been involved, she is unaware of any utility claiming they would have accepted 20 percent less than their OFF allocation, or any amount less than their OFF allocation. Tr.3623:20-3624:3 (Supko).

355. Plaintiff proffered no evidence at trial showing any evaluation by WEPCO of the use of the 20 percent provision in the Standard Contract.

### 3. Ms. Supko Did Not Analyze The Effect Of The Use Of The Intra- Utility Exchanges Provision of the Standard Contract

356. The Standard Contract provides that "[p]urchaser shall have the right to determine which SNF and/or HLW is delivered to DOE." PX 41, Article V(E)

357. Despite Ms. Supko's acknowledgment that the decision to engage in intra-utility trades is very company specific, she admitted that she has not reviewed data company-by-company and determined what a particular company would have done in 1998 regarding its willingness to engage in intra-utility exchanges. Nor has Ms. Supko had any discussions with co-owners of any particular plant about their willingness to engage in an intra-utility exchange. Tr.3624:19-3626:11 (Supko).

358. Companies who contemplated engaging in intra-utility exchanges would have to consider, for example, the political ramifications of such a swap. Yet, Ms. Supko's analysis does not contemplate political considerations associated with intra-utility exchanges.[28] Tr.3626:12-3627:12 (Supko).

359. When Ms. Supko conducted her sensitivity analysis for intra-utility exchanges, she only analyzed the impact to her calculation for additional at-reactor storage. In other words, she did not do an analysis to see the impact of intra-utility trading on the average post-shutdown calculation. However, she believes that, had she performed such an analysis, the average post shutdown storage time would decrease for Scenarios 1 and 3. Tr.3627:13-3628:2 (Supko).

[28] For example, a utility like Southern Nuclear has different rate payers in different states for the different nuclear plants. To the extent that Georgia's ratepayers had to hold on to certain of their SNF longer to allow Alabama the ability to ship SNF earlier, Ms. Supko has not considered whether that would create certain political impediments. (Tr. 3626:25-3627:8)

360. Kenrich's report relies upon annual discharge information from Ms. Supko's report that reflects actual discharges. Tr. 3899:23-3900:4 (Sieracki).

361. In her model, Ms. Supko projected that DOE would have accepted 41 assemblies in 1998. However, the Kenrich report assumes the number will be rounded up to 48 assemblies. Tr. 3913:23-3914:7 (Sieracki); PX 796 p 3256. If an acceptance of 41 assemblies is assumed, than even assuming 1500 spaces, an acceptance before the fall outage in 1998 is not adequate to prevent WEPCO from exceeding the space in its pool. Tr. 3912:8-3913:22 (Sieracki); DDX-1-9-A. Kenrich did not do any analysis of the programmatic impact of DOE accepting more than WEPCO's allocation. Tr. 3914:8-23 (Sieracki).

## XVIII. ISSUES RELEVANT TO THE ENTITLEMENT ADJUSTMENTS TO WEPCO'S CLAIMED COSTS

### A. Expenditures By WEPCO For Private Fuel Storage And The Newton Project

362. WEPCO contributed from 1994 to 1997, along with other utilities, to the development of an ISFSI on Indian lands, called Private Fuel Storage or PFS. PX 355 at WISC 00010191.

363. The PSCW never required WEPCO to seek off-site storage. Tr.1629:19-1630:5 (Krieser).

364. WEPCO withdrew from the PFS project in 1997 because it would have had to contribute additional funding but it was not confident in the viability of the project. Tr.1625:15-1626:2 (Krieser).

365. WEPCO recognized that, even once PFS was licensed by the NRC, the real battle was yet to be fought. Tr.4979:7-12 (Weaver); DX 90.

366. Specifically, WEPCO believed there would be a level of public, state, and congressional opposition to PFS that would make it very unlikely that PFS would move forward. Tr.4979:13-4980:1, 4980:23-4981:2 (Weaver); DX 90.

367. WEPCO was also concerned that the transportation issues involved in PFS were completely untested. Tr.4979:17-20 (Weaver); DX 90; Tr.1627:9-1628:4 (Krieser).

368. Specifically, the transportation for PFS was in its infant stages. PFS had not selected any kind of transportation mode or packaging or determined any routes. Moreover, on all levels, local, state, and national, there were political issues associated with whether or not spent nuclear fuel would be allowed to move between utilities and the storage site. Tr.1628:16-1629:10 (Krieser).

369. WEPCO was familiar with heated opposition to the transportation of spent nuclear fuel. Tr.2180:4-25 (Porter).

370. In addition to uncertainties regarding the transportation of SNF to the PFS, WEPCO was also concerned about continuing its participation in PFS because there were issues with the tribe, including how much funding it would receive and whether factions who did not support the project would derail it. Tr.1627:24-1628:13 (Krieser).

371. WEPCO recognized that it would be more costly to store fuel with PFS than to store it on site. Specifically, it estimated that the storage costs at PFS would be $1 million per cask and $20,000 per cask per year for storage at a time when its costs at Point Beach were $300,000 per cask and $30,000 per year for O&M for the entire facility. Tr.4980:2-22 (Weaver); DX 90.

372. Additional off-site costs include transportation of casks to the off-site location, transfer of fuel to a storage cask at the off-site location, O&M costs for the off-site location, any return on investment by the off-site storage operator, and any needed equipment or plant modifications for the required cask design. Tr.5484:21 -5488:7 (Brewer); DDX 3-17, DX 391 at 19-21 (WXE011 0021 - WXE011 0023).

373. When WEPCO withdrew from the project, it had already loaded casks to its own ISFSI. Tr.1629:11-14 (Krieser).

374. WEPCO concluded that any decision regarding its re-entry into PFS should not be made until the dry storage application before the PSCW was decided. Tr.4978:15-4979:6 (Weaver); DX 90.

375. Thus, WEPCO ultimately decided to stay out of the PFS project and only pursued its application to the PSCW. Tr.4982:18-4983:11 (Weaver); DX 90.

376. In this regard, WEPCO did not find it necessary simultaneously to pursue alternate storage options while applying to the PSCW to add additional dry storage. DX 90, see also Tr. 2245:8-15 (Porter).

377. Mr Link, then Vice-President of Nuclear Business at WEPCO, testified in pre-filed testimony in October 1994 before the PSCW in the dry fuel storage hearings that, even if the operation of PFS commenced by 2003, that would be too late for WEPCO because Point Beach needed additional at-reactor storage capacity before that date. DX 275 at WISC 00010192.

378. A business plan supporting PFS indicated that there was a possibility that WEPCO would make a profit from that venture. Tr.537:3-7 (Link).

379. In order to recover the costs associated with any investment in PFS, WEPCO would have needed to seek approval from the PSCW, which it did not do. Tr.436:1-25 (Link). In the event that PFS was implemented, and WEPCO had shipped its SNF there, WEPCO would have needed to seek approval from the PSCW to recover its costs.

380. WEPCO also investigated the possibility of developing an international spent fuel repository with other international entities, such as the British company BNFL and the African nation Cape Verde. Tr.537:8-539:24 (Link). Nothing came of those discussions and analyses. Id.

381. Roger Newton, an assistant to Mr. Link, developed a proposal for such an international repository. DX 185; Tr.537:8-539:9 (Link). WEPCO intended to benefit economically from such an undertaking: "The world's spent fuel disposal problems had also created a significant business opportunity and Wisconsin Electric plans to benefit from the opportunity by creating a highly profitable international repository." DX 185 at WISC 00003326; see Tr.537:21-539:24 (Link).

382. While WEPCO expended capital evaluating these business opportunities, which costs are included in the claim before the Court, nothing came of these business ventures. Tr.539:6-24 (Link).

383. WEPCO used money from account 124 to pay the costs of participation in PFS and its other off-site options, and all of the costs were disallowed and excluded from the rates by the PSCW. WEPCO performed a write-down on the PFS costs incurred. Tr.2998:25 - 2999:2; 3007:15 - 3008:2 (Straub); DX 227; see also DX142 at WISC0001 0298.

384. Costs for PFS were interspersed among various project codes included in WEPCO's claim. Tr.6143:6-17 (Kiraly); DDX 5-35; DX 625 (Attachment 6, WXE 0220080 - WXE 0220083).

385. Mr. Kiraly adjusted WEPCO's claim for PFS and off-site storage costs by $883,503. Tr.6143:6-17 (Kiraly); DDX 5-34 and 5-35; DX 625 (Attachment 6, WXE 0220080 - WXE 0220083). There was an additional $342,255 in legal costs relating to legal activities in connection with alternative off-site storage projects, which Mr. Kiraly deducted from plaintiff's claim.[29] Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Doc. 369 (Nov. 20, 2007).

**B. WEPCO'S Payment Of Fees To The Nuclear Regulatory Commission**

386. The NRC issues licenses to operate commercial nuclear power plants pursuant to 10 C.F.R. Part 50. Tr.4035:21-25 (Rabideau).

387. The NRC also issues licenses to operate spent fuel storage installations or ISFSIs pursuant to 10 C.F.R. Part 72. Tr.4036:1-4 (Rabideau).

388. Mr. Peter Rabideau, who testified on behalf of the Government, has been the Deputy Chief Financial Officer of the NRC since 1997. He is responsible for overseeing the financial management of the agency including budget activities, accounting, finance, and license fees. He has been an employee with the NRC in different positions related to finance and budgeting since 1978. Tr.4031:6-4032:10 (Rabideau).

---

[29] The $342,255 had originally been included in ISFSI and VSC-24 cask costs by Mr. Kiraly because he was unable to discern from the documentation provided by plaintiff in discovery whether any of these legal costs related to other activities. See DDX 5-42. During the course of the trial, plaintiff provided additional documentation so that the legal costs could be uniquely identified and properly assigned to offset storage issues. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Doc. 369 (Nov. 20, 2007).

389. Ms. Tammy Croote, who testified on behalf of the Government, is the Deputy Director of the Division of Planning, Budget, and Analysis in the Office of the Chief Financial Officer at the NRC. From 2003 to 2007, Ms. Croote was a senior fee policy analyst in the Division of Financial Management. While in that position, her responsibilities included calculating the fees necessary for the NRC to recover its budget from licensees. Ms. Croote wrote the fee rule for FY2005 and FY2006 and created the associated worksheets. Tr.4841:1-4842:20; 4873:24-4847:15 (Croote).

390. The NRC is required to recover approximately 90 percent of its annual budget in fees from its licensees and applicants. Tr.4846:8-18 (Croote).

391. The NRC charges two types of fees to its licensees and applicants pursuant to 10 C.F.R. Parts 170 and 171. Tr.4846:19-4847:14 (Croote).

392. 10 C.F.R. Part 170 fees are hourly rate fees charged to NRC licensees for site-specific direct services such as inspections, review of license applications, or review of amendments to license applications. Tr.4033:11-16; 4033:17-24; 4079:6-23 (Rabideau); Tr.4846:19-4847:25 (Croote).

393. 10 C.F.R. Part 171 annual fees are fees charged to NRC licensees for generic activities such as rule-making, incident response, research, or development of regulatory guidance that benefit an entire class of licensees or type of license. Tr.4033:11-4034:6; 4079:24-4080:5 (Rabideau); Tr.4846:19-4847:14; 4848:1-16 (Croote).

394. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee encompasses all generic activities that the NRC conducts related to dry storage of SNF, wet

storage of SNF, and reactor decommissioning. Tr.4050:6-11 (Rabideau); 5648:17-5649:2 (Brewer); DX422; PX 945; PX 1044.

395. The activities that comprise the costs paid for by the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee include generic and research activities directly related to reactor decommissioning and spent fuel storage, and other safety, environmental, and safeguards activities related to reactor decommissioning and spent fuel storage that are not recovered under 10 C.F.R. Part 170 specific fees. Tr.4033:25-4034:13, 4050:6-11, 4079:24-4080:5 (Rabideau); Tr.4848:1-16 (Croote); PX 1044.

396. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee became a part of, and was included in, the 10 C.F.R. Part 50 reactor operating fee beginning in FY1999. Tr.4119:25-4120:8; 4140:20-4141:4 (Rabideau); DDX1-13.

397. Beginning in FY1999, all operating reactor licensees who paid a 10 C.F.R. Part 50 operating reactor fee also paid the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. Tr.4263:10-19 (Rabideau); DDX1-13.

398. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee is assessed to all 10 C.F.R. Part 50 operating reactors regardless of whether they utilize dry fuel storage or not. Tr.4262:18-25; 4264:3-10 (Rabideau); DDX1-13.

399. The total annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, is divided, after adjustments, by the total number of licensees to determine the actual fee assessed to licensees. Tr.4865:3-16 (Croote); DX601: DX604.

400. Prior to FY1999, utilities paid the NRC an annual fee under 10 C.F.R. Part 171 for each commercial nuclear power reactor licensed under 10 C.F.R. Part 50. That fee included costs

for generic activities related to reactor operation, wet spent fuel storage, and decommissioning. In 1999, there were 104 10 C.F.R. Part 50 reactor operator licensees. Thirteen of the 104 also held 10 C.F.R. Part 72 licences. Tr.4036:5-4037:16; 4038:22-24; 4107:16-4108:12 (Rabideau); DX612; DDX1-13; Brewer DDX 3-4; Tr.5426:23-5427:6 (Brewer).

401. Prior to FY1999, utilities with dry storage facilities paid the 10 C.F.R. Part 171 annual fee for generic activities related to dry storage of spent nuclear fuel ("SNF"). In FY1998, 15 NRC licensees with dry storage facilities paid generic fees for dry storage of spent nuclear fuel. Tr.4036:5-4037:16; 4038:9-24; 4107:16-4108:12; 4145:12-21 (Rabideau); DX 612; DDX1-13; Tr.5427:6-9 (Brewer); DDX 3-4.

402. Prior to FY1999, utilities that held 10 C.F.R. Part 50 licenses but no longer operated, i.e., shutdown reactors, and did not have dry fuel storage did not pay an annual 10 C.F.R. Part 171 fee. In FY1999, there were 21 10 C.F.R. Part 50 licensees that were shutdown. Tr.4037:20-4038:8; 4107:16-4108:12 (Rabideau); DX 612; DDX1-13.

403. In 1998, the NRC initiated a staff study of the annual 10 C.F.R. Part 171 fees for spent fuel storage because of concerns that the then current fee structure provided a disincentive to licensees related to the use of dry storage because "possession only," i.e., shutdown reactors, that stored SNF in spent fuel pools rather than in dry storage did not pay an annual 10 C.F.R. Part 171 fee. Tr.4034:22-4035:8; 4039:7-4041:20; 4042:13-4045:13; 4143:20-4144:17 (Rabideau); DX 611; PX 947 (March 9, 1998 memo to Jesse L. Funches, CFO, NRC and L. Joseph Callan, Exec. Dir. for Ops., NRC, from John C. Hoyle, Secretary NRC, Subj: COMSAG-98-001/COMEXM-98-001-Annual Fees for Storage of Spent Fuel).

404. On November 5, 1998, Jesse L. Funches, the NRC Chief Financial Officer to the NRC, responded to internal memoranda regarding the annual 10 C.F.R. Part 171 fees for spent fuel storage and noted that the current policy raised two concerns: (1) the fee structure could create a disincentive for licensees to pursue dry storage, and (2) whether it was fair to assess multiple fees to a 10 C.F.R. Part 72 licensee that holds multiple licenses for different dry storage designs. Tr.4051:12-4052:8 (Rabideau); DX612.

405. Mr. Funches recommended that the NRC propose for public comment a revision to its spent fuel storage fee policies in FY1999 for recovery of generic costs under 10 C.F.R. Part 171 by establishing a spent fuel storage/reactor decommissioning fee to be assessed to all reactor operator licensees (10 C.F.R. Part 50) regardless of operating status, i.e., operating or shutdown, and those 10 C.F.R. Part 72 licensees who do not hold a 10 C.F.R. Part 50 license, and recover the remaining generic decommissioning costs through a surcharge. This change would result in all licensees that stored spent fuel on-site paying for generic spent fuel storage costs regardless of whether the licensee used wet storage, dry storage, or both. Tr.4059:18-4060:18 (Rabideau); DX612; DDX1-13.

406. The NRC agreed with Mr. Funches recommendation to establish a spent fuel storage/reactor decommissioning fee and approved publication of the proposed rule. The NRC also required submission and discussion of legislation to allow the NRC to recover generic costs associated with spent fuel storage from the Nuclear Waste Fund. However, there have not been any changes made to the Nuclear Waste Fund that would allow the NRC to recover 10 C.F.R. Part 171 generic costs associated with spent fuel storage. Tr.4060:25-4063:7 (Rabideau); PX 1009.

407. In FY1999, the NRC eliminated its annual 10 C.F.R. Part 171 fee for 10 C.F.R. Part 72 licensees. Tr.4061:12-4062:5; 4067:6-4068:24; 4073:5-15 (Rabideau); PX 1009; PX 1044; DX621; DDX 1-13.

408. In FY1999, the NRC published its proposed and final rule adopting the spent fuel storage reactor/decommissioning fee, and eliminating the 10 C.F.R. Part 72 licensee fee. The notice cited three concerns raised by the prior fee structure: (1) disincentive for licensees to pursue dry storage; (2) the fairness of assessing multiple fees if a licensee holds multiple 10 C.F.R. Part 72 licences for different designs; and (3) not all affected licensees were being assessed the costs of NRC generic decommissioning costs and in the future as the number of operating licensees declined the financial burden on active licensees would increase. Tr.4064:12-4067:5; 4056:9-4057:15; 4067:17-4071:21; 4237:11-4238:11 (Rabideau); DX621; PX 1002; PX 1044.

409. After the FY1999 10 C.F.R. Part 171 fee rule change, all 10 C.F.R. Part 50 licensees with operating reactors paid an annual 10 C.F.R. Part 171 reactor operating fee that included the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. All 10 C.F.R. Part 50 licensed operating reactors utilize wet storage. Each licensed operating reactor is required to have a spent fuel pool. Tr.40712:4073:15; 4119:25-4120:8; 4241:4-17 (Rabideau); DDX1-13.

410. After the FY1999 10 C.F.R. Part 171 fee rule change, all 10 C.F.R. Part 50 licensees that were shutdown and had fuel on-site paid the annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee regardless of how their spent fuel was stored. Tr.4034:22-4035:8; 4067:7-4071:21; 4072:10-4075:21 (Rabideau); DX 621; PX 1044; DDX1-13.

411. The NRC did not revise its 10 C.F.R. Part 171 fees related to the generic costs for spent fuel storage and reactor decommissioning because of DOE's delay in accepting SNF under the Standard Contract. The NRC revised the fee rule to address the issues raised by commission members and the NRC staff, and those issues existed regardless of DOE's delay. Tr.4053:8-22; 4076:16-24; 4176:20-4177:13 (Rabideau).

412. From FY1998 to FY1999, the amount of the 10 C.F.R. Part 171 annual fees paid by operating reactors related to dry storage declined because the number of licensees paying the annual fee for generic costs related to spent fuel storage increased. Prior to FY1999, 15 licensees paid the annual 10 C.F.R. Part 171 fee for dry storage activities. In FY1999, more than 104 licensees paid the annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. Tr.2460:7-2466:13 (Gadzala); 4075:22-4076:8; 4081:16-4082:9; 4082:14-4083:1; 4108:24-4109:22; 4112:22-4114:1 (Rabideau); DX612; DDX1-13; DDX1-14.

413. The amount of 10 C.F.R. Part 171 annual fees for operating reactors, 10 C.F.R. Part 50 licensees, regardless of whether they had dry storage or not, declined from FY1998 (prior to the 10 C.F.R. Part 171 fee rule change creating the Spent Fuel Storage Reactor Decommissioning Fee) to FY1999 (after the 10 C.F.R. Part 171 fee rule change) and remained below the FY1998 fee amount until FY2003.

| | Reactor Operating Fee in thousands (Part 171 Fee for Dry Storage Not Included) | Reactor Operating Fee X 2 (two reactor facilities, i.e., Point Beach) in thousands (Part 171 Fee for Dry Storage Not Included) |
|---|---|---|
| FY1995 | $2,427 | $4,854 |
| FY1996 | $2,746 | $5,492 |
| FY1997 | $2,978 | $5,956 |
| FY1998 | $2,976 | $5,952 |
| | Reactor Operating Fee in Thousands (Part 171 Spent Fuel Storage/Reactor Decommissioning fee included pursuant to 10 C.F.R. § 171.15) | Reactor Operating Fee X 2 (two reactor facilities, i.e., Point Beach) in thousands (Part 171 Spent Fuel Storage/Reactor Decommissioning fee included pursuant to 10 C.F.R. § 171.15) |
| FY1999 | $2,776 | $5,552 |
| FY2000 | $2,815 | $5,630 |
| FY2001 | $2,753 | $5,506 |
| FY2002 | $2,849 | $5,698 |
| FY2003 | $3,251 | $6,502 |
| FY2004 | $3,283 | $6,566 |
| FY2005 | $3,115 | $6,230 |
| FY2006 | $3,704 | $7,408 |

Tr.4115:13-4124:22 (Rabideau); PX 945; PX 961; PX 962; PX 963; PX 964; PX 1044; DX 422; DDX1-14.

414. From FY1999 to FY2006, the total number of full time equivalents, e.g., Government personnel time, allocated to the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee planned activities and the total amount charged licensees for the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee decreased. This decrease occurred despite the increase in dry storage in the nuclear utility industry. Therefore, the amount that the NRC charges utilities annually for the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee does not causally relate to the amount of dry storage in the industry. In all but one year, FY2003, the amount of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee (including wet storage, dry storage, and reactor decommissioning) has been less than the pre-FY1999 10 C.F.R. Part 171 fee for dry storage alone. Tr.4123:8-16 (Rabideau); Tr.3367:2-3368:3 (Supko); PX 945; PX 961; PX 962; PX 963; PX 964; PX 1044; DX 422; DDX1-14.

415. The FY1999 fee policy change resulted in lower fees to 10 C.F.R. Part 50 licensees with operating reactors regardless of whether they had dry storage. If the NRC had not modified the 10 C.F.R. Part 171 fees in FY1999, as WEPCO incorrectly claims would have occurred in the "but-for" world, WEPCO would have paid higher fees regardless of whether they had dry storage or not. Tr.2459:11-2466:9 (Gadzalla); Tr.4055:17-4056:3; 4075:22-4078:16; 4080:15-4082:9; 4115:13-4123:16 (Rabideau); DDX1-14.

416. When the NRC allocates its budget by fee class, those allocations are for resources associated within that fee class. In addition, NRC's policy is to allocate those costs with a resource to the entire fee class. Tr.4136:3-11; 4136:12-4137:4; 4137:12-4138:21 (Rabideau).

417. The NRC assigns its resources for budgeting purposes by programs and sub-programs. Planned activities, also called planned accomplishments, are the activities the NRC performs in a year and are identified by programs or sub-programs. Planned activities are the lowest level of detail to which the NRC budgets. Tr.4085:12-18 (Rabideau); 4866:25-4867:14; 4879:2-9 (Croote); DX 603.

418. The resource allocations for planned activities are determined in the budget formulation process far in advance of the fee calculation process. Tr.4867:19-4868:3 (Croote); DX 603.

419. During the budget formation process, the NRC establishes the actual amount of resources that the NRC is going to use for each planned activity. Tr.4868:4-20 (Croote).

420. The NRC allocates its budgeted resources to the license fee classes during the fee calculation process, a separate process than budget formation. Tr.4868:4-20 (Croote).

421. Planned activities are paid for by both 10 C.F.R. Part 170 and 10 C.F.R. Part 171 fees. Tr.4085:19-4086:1 (Rabideau).

422. In the NRC's calculation of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, an estimate of the amount of 10 C.F.R. Part 170 fees for specific services that the NRC expects to collect per fee class in a year is subtracted from the total amount budgeted to the spent fuel storage/reactor decommissioning fee class. Tr.4086:5-4087:1 (Rabideau); DX 601; DX 604.

423. 10 C.F.R. Part 170 and 10 C.F.R. Part 171 activities are included as budgeted resources allocated to the Spent Fuel Storage/Reactor Decommissioning Fee. However, it is not possible to tell simply by looking at the planned activities which are 10 C.F.R. Part 170 and

which are 10 C.F.R. Part 171 activities. Therefore, an estimate of the 10 C.F.R. Part 170 fees to be collected is subtracted out from the total budgeted resources allocated. Tr.4860:22-486:14 (Croote); DX 601; DX 604.

424. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee includes a budgeted resource amount for generic transportation resources. Tr.4862:15-4863:4 (Croote); DX 601; DX 604.

425. If the DOE had begun to accept SNF from utilities in 1998, it is not clear if the NRC would have conducted fewer Part 171 generic activities related to dry storage. However, the NRC would have had to conduct fewer Part 170 site-specific service activities. Tr.4077:15-24; 4176:5-18 (Rabideau).

426. Some nuclear utilities required dry storage by 1998 regardless of the DOE's performance under the Standard Contract. Tr.2442:15-2443:1 (Gadzala); Tr.3138:8-3139:21 (Supko); Tr.3798:4-3799:11 (Sieracki).

427. Mr. Rabideau reviewed work papers related to the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee and was not able to distinguish whether planned activities listed related to wet or dry storage because the work papers did not provide sufficient information. In addition, Mr. Rabideau's division between spent fuel storage and reactor decommissioning was his general understanding and, as he notified plaintiff's counsel, lacked specific detail. Mr. Rabideau was unable to divide between spent fuel storage and reactor decommissioning for approximately twenty percent of the planned activities he reviewed. Tr.4087:15-25; 4252:23-4253:1; 4254:12-15; 4255:11-14; 4255:24-4256:6 (Rabideau); PX 961; PX 1029; PX 1048.

428. In its calculation of damages, plaintiff failed to segregate wet fuel storage costs, and, therefore, its claim includes generic costs for wet fuel storage, costs that would have been incurred regardless of DOE's delay in accepting SNF. Therefore, plaintiff's calculation of damages attributable to the dry fuel storage portion of 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee is inaccurate. Tr.4112:6-21 (Rabideau); PX 1029 at KRGWE003887-88.

429. To distinguish allocation of resources between spent fuel storage and reactor decommissioning for some planned activities, Mr. Rabideau would have to talk to NRC employees in the program offices or to those employees who allocated the budgeted resources to obtain more information. Tr.4219:20-4220:8; 4225:3-13; 4226:16-24; 4228:3-12; 4229:16-23; 4230:22-4231:6 (Rabideau); PX 961; PX 962; PX 963; PX 964; PX 965; PX 1048; DX 604.

430. To distinguish the Part 171 spent fuel storage/reactor decommissioning fee between spent fuel storage and reactor decommissioning, information must be obtained from the program offices of the NRC by having them apportion their budgeted resources allocated between the two categories. In addition, each line item of the fee calculation process must be divided between spent fuel storage and reactor decommissioning, not merely the budgeting process, between the two categories. Tr.4883:2-17; 4883:18-4886:21 (Croote).

431. Information at the NRC program offices as to whether a budgeted resource allocated is for purposes of the spent fuel storage or reactor decommissioning portions of the spent fuel storage/reactor decommissioning fee is not available. The allocation information does not exist because the NRC's finance office does not ask the program offices to allocate its resources in that manner. The allocations are based upon the qualitative judgments of employees

made at the time and not on quantitative data. Planned activities related to the spent fuel storage/reactor decommissioning fee are work activities that are generic by nature and support whole fee classes. To obtain that information would require talking to the same person who made the judgment as to the resource allocation at the time and getting their recollection about that particular activity. In Ms. Croote's opinion, Mr. Rabideau could make some determinations as to the allocations between spent fuel storage and reactor decommissioning, but not all. Tr.4894:8-13; 4895:17-4898:2 (Croote).

432. There is typically no relationship between the number of licensees in a fee class and the 10 C.F.R. Part 171 generic costs for the NRC because if you perform activities on a particular topic it will cost the same amount regardless of whether there is a handful of licensees or dozens. Tr.4080:15-4081:1 (Rabideau).

433. If the number of licensees in a 10 C.F.R. Part 171 fee class increases, the fee per licensee decreases. Tr.4081:6-15; 4082:5-9; 4082:18-4083:1 (Rabideau); DDX 1-13.

434. The 10 C.F.R. Part 171 Spent Fuel Storage/ Reactor Decommissioning Fee calculation includes a surcharge for those NRC activities that do not directly benefit NRC licensees and have not been paid for through appropriations, such as international activities. The surcharge is allocated based upon a fee classes percent of the budget, e.g., if the power reactor fee class has 80 percent of the budgeted resources, the surcharge to the power reactor fee class would be 80 percent. Plaintiff's calculation of damages is flawed because it failed to remove the surcharge, which is unrelated to DOE's delay in performance, from its calculation of damages. Tr.4852:11-4854:16; 4863:8-15 (Croote); DX 601; DX 604; PX 1029 at KRGWE003887-88.

435. The NRC's program offices determine and submit their allocations for resources as they begin to develop budget requests approximately one and a half years before the start of the fiscal year for which the offices are requesting funds, i.e., in February or March of 2007 for FY2009. The NRC submits its budget to the Office of Management and Budget ("OMB") approximately thirteen months prior to the start of the fiscal year budgeted for. Once agreement is reached between NRC and OMB, the budget is submitted to Congress in early February about eight months before the fiscal year for which the funds are requested. Tr.4244:5-4245:19 (Rabideau); Tr.4845:2-4846:1; 4868:21-4869:10 (Croote).

436. During the budget formation process, budgeted resources are determined by the NRC. Many NRC employees are involved in this activity. Allocations are not made to fee classes during the budget process. Tr.4869:19-4870:10; 4881:6-12 (Croote); DX 604.

437. In the fee calculation process, the NRC program offices determine how resources are allocated by fee class. The resource allocations by fee class is a complex process taking about six months to complete and involving many people. Tr.4870:11-4871:12 (Croote).

438. The fee class allocations made by the NRC program offices are based on some data but also on the judgment of many NRC employees. There is no model that can produce a defined result of exactly what percentage of a regulation benefits a type of licensee. The resource allocation by fee class is a judgment of the program offices performing the activities. Tr.4871:13-4872:16 (Croote).

439. The NRC's fiscal year runs from October 1 to September 31 each year. Tr.4245:23-4246:9 (Rabideau).

440. The fee calculation process is separate from the budget process. The fee rule process begins the April prior to the fiscal year for which the fee rule applies e.g., April 1999 for FY2000 (FY2000 began October 1999). Tr.4846:2-7; 4850:15-24 (Croote).

441. The proposed fee rule for 10 C.F.R. Part 171 fees, including the spent fuel storage/reactor decommissioning fee, is generally published in February or March of the fiscal year in which the fees are assessed, i.e., February or March 2009 for the FY2009 fee. Tr.4245:23-4246:9 (Rabideau).

442. From the beginning of the budget cycle, to include the submission of allocations for resources from program offices, to the publication of the 10 C.F.R. Part 171 fee rule, including the spent fuel storage/reactor decommissioning fee, approximately two years elapse. Tr.4244:5-4246:9; 4247:2-23 (Rabideau); Tr.4845:16-4846:1 (Croote).

443. In calculating the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, the resources budgeted during the budget process (by activity) are allocated by program to the different fee classes. Tr.4856:7-4857:10 (Croote).

444. The program offices make the determinations of what resources are allocated to the fee classes. Tr.4857:11-16 (Croote).

445. The total budgeted resources allocated to the spent fuel storage/reactor decommissioning fee class includes 10 C.F.R. Part 170 and 10 C.F.R. Part 171 activities. Tr.4857:17-4858:1 (Croote); DX 601; DX 604.

446. In calculating the spent fuel storage/reactor decommissioning fee, the subtotal for the fee class is a starting point and it is adjusted prior to determining the fee amount. Tr.4858:2-13 (Croote); DX 601; DX 604.

447. As time passes it is more and more difficult to identify whether a past allocation was for spent fuel storage or reactor decommissioning. Tr.4247:24-4248:14 (Rabideau).

448. Even if more information on past allocations was obtained, it would not assist Mr. Rabideau determine which planned activities related to 10 C.F.R. Part 170 activities versus 10 C.F.R. Part 171 activities. Tr.4248:15-24 (Rabideau).

449. The NRC's work papers do not divide the spent fuel storage/reactor decommissioning fee between spent fuel storage and reactor decommissioning portions and it is not provided in the fee rule published in the federal register. Moreover, Mr. Rabideau does not, as part of his employment with the NRC, distinguish allocations of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee between spent fuel storage and reactor decommissioning activities. Tr.4248:25-4249:8 (Rabideau); Tr.4882:10-4883:1 (Croote).

450. 10 C.F.R. Part 171 fees are determined based on a detailed review of the budgeted resources for each planned activity the NRC performs. Budgeted resources for each planned activity are allocated to the different fee licensee classes regulated by the NRC. Tr.4848:17-25 (Croote).

451. Plaintiff's estimate of damages related to 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fees is based upon the total budgeted resources allocated to the fee class. The total budgeted resources is merely a starting point in determining the annual fee amount. Several adjustments must be made to determine the final fee amount. One of the adjustments is a subtraction of the estimated 10 C.F.R. Part 170 fees, fees for specific services, to be collected from the fee class. Plaintiff based its fee calculation on the total budgeted resources without any adjustments. Plaintiff's calculation is flawed because it fails to subtract the estimated

10 C.F.R. Part 170 fees from the total budgeted resources, as the NRC does, in its determination of the 10 C.F.R. Part 171 fee. Plaintiff has separately claimed 10 C.F.R. Part 170 fees for the period in which the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee was charged. Thus, in addition to inaccurately determining the 10 C.F.R. Part 171 fee amount, plaintiff is also claiming 10 C.F.R. Part 170 fees, one estimated and one actual, in two separate parts of its claim and is, therefore, claiming duplicative damages. Tr.4857:17-4858:13; 4860:5-4864:4 (Croote); PX 1029 at KRGWE003828, 3886-88; PX 1047 at KRGWE003914.

452. Chairman Ivan Selin left the NRC in 1995. Tr.4040:9-14 (Rabideau).

453. Mr. Kiraly adjusted plaintiff's damages claim by removing the entire $2,283,333 in annual NRC licensing fees, based upon the expert opinion of Warren Brewer. DX 393 at 17-17; DX 625 (Attachment 1(Rev.2)); DDX 5-36; DDX 5-37.

454. The FY1999 fee change resulted in lower fees for WEPCO post 1999. Tr. 3948:12-24. (Sieracki).

455. WEPCO has claimed as damages a portion of the post 1999 fee even though Mr. Sieracki acknowledged that WEPCO would have paid the same fee whether or not it had an ISFSI. Tr. 3946:16-3947:22 (Sieracki).

456. Plaintiff's expert, Mr. Sieracki, used Mr. Rabideau's testimony to divide the NRC planned activities fees within the spent fuel storage/reactor decommissioning fee class between fuel storage and reactor decommissioning. Aside from Mr. Rabideau's testimony, he did not have any basis to divide those costs. Tr. 3963:5-22 (Sieracki). Mr. Sieracki did not have any independent knowledge of the scope of the program/planned accomplishments in the NRC budget materials or whether they related to wet storage and Mr. Rabideau was unable to provide this

information in his deposition. Tr. 3964:1-3965:6 (Sieracki); DFOF ¶ 428-432. Mr. Sieracki was not able to identify which of the program activities represent activities for which the costs were recovered under Part 170. Tr. 3965:7-14 (Sieracki).

457. The basis for Mr. Sieraki's opinion regarding the NRC fees were conversations with Mr. Krieser and the depositions of Ms. Croote and Mr. Rabideau. Tr. 3949:15-3950:14 (Sieracki). Mr. Krieser has never worked for the NRC, did not have dealing with the NRC regarding the fee change, and did not testify at trial regarding NRC fees. Tr. 3949:23-3950:8 (Sieracki). Mr. Sieracki did not discuss the basis for his opinion with the NRC. Tr. 3954:10-14 (Sieracki).

458. Mr. Sieracki was not aware of whether, and how, the fee itself would have changed had the fee structure remained the same. Tr. 3952:6-23 (Sieracki).

459. Mr. Sieracki believed that had DOE performed starting in 1998 many utilities that have ISFSIs would not have had ISFSIs, but he had not studied the issue and did not know how many utilities would have had ISFSIs had DOE performed in 1998. Tr. 3950:14-3951:11 (Sieracki). While Mr. Sieracki believed the majority of utilities would not have had ISFSIs had DOE performed, he had not studied the issue, was not aware of anyone else studying the issue, and did not have a belief as to whether that "majority of utilities" consisted of 51 percent or 99 percent. Tr. 3951:12-3952:5 (Sieracki).

460. Mr. Sieracki did not do an evaluation of how many people the NRC added to its staff as a result of the utilization of dry fuel storage in the industry. Tr. 3953:18-3954:3 (Sieracki). He did not do an evaluation of how the NRC annual budget may have changed as a result of the utilization of dry storage in the industry. Tr. 3954:4-9 (Sieracki).

**C. <u>WEPCO's Claim For ISFSI Fabrication And VSC-24 Casks 1 Through 5</u>**

461. As a regulated monopoly, WEPCO is allowed to recover its operating costs and to earn a regulated rate of return on invested capital to the extent such expenditures are deemed prudent in return for taking on the obligation to serve its customers. Tr.5870:13-5872:23 (Hamal).

462. Point Beach provides roughly 25 to 30 per cent of WEPCO's electricity. Tr.5872:23-5873:3 (Hamal); DX 392/PX 828, Hamal Attachment 3.

463. Point Beach has relatively low operating costs while the cost of replacing the power generated by just one of the units at Point Beach was estimated to run from $165,000 to $500,000 per day. Tr.5872:3-12 (Hamal); DX 392/PX 828, Hamal Attachment 4.

464. An outage at Point Beach at the wrong time could result in rolling blackouts which would violate WEPCO's obligation to serve its customers. Tr.5872:13-5874:17 (Hamal).

465. An outage at Point Beach caused by the lack of SNF storage space could last a long time because of the time-consuming effort needed to add SNF storage space by building an ISFSI. Tr.5874:18-5875:12 (Hamal); Tr.2179:18-2180:3 (Porter).

466. At the beginning of 1998, WEPCO had loaded two VSC-24 casks. Two more VSC-24 casks were on site, ready to be loaded. Eight additional casks were in various states of production. Tr.5886:5-5887:2 (Hamal), DDX 4-12.

467. In January 1998, the spent fuel pool held 1,374 assemblies (in addition to having spent fuel in the two loaded VSC-24 casks). To restore full core reserve in the critical 1998-1999 time period, even with DOE accepting spent fuel starting in 1998, WEPCO would have loaded

three additional VSC-24 casks. Loading three additional casks is roughly the cost of a single day of replacement power. Tr.5888:4-6; 5890:10-22 (Hamal), DDX 4-13.

468. Unless additional casks were loaded in 1998, WEPCO would lose FCR throughout 1998 and 1999, and again in 2000, 2001, 2002, 2005, 2006, and 2007, even assuming DOE performance starting in 1998. Loading a total of five casks allows FCR to be recovered in 1998 and maintained through 2007, with DOE performance starting in 1998. Tr.5892:19-5893:21 (Hamal), DDX 4-17, DDX 4-18.

469. The fifth cask at Point Beach was loaded at the end of 1998. The cost of a 12 space ISFSI versus a 48 space ISFSI would have been essentially the same. Tr.1004:15-1006:2, 1124:13-1126:12 (Zabransky); DX 132 at WISC 00011072. Start-up costs for construction of the ISFSI pad and casks would be the same regardless of the number of casks loaded. Tr.6147:3-13; 6241:19-24 (Kiraly); DDX 5-40; DX 616 (ISFSI Plan View); DX 132.

470. The costs that plaintiff is claiming related to the ISFSI fabrication and first five VSC-24 casks are separately identifiable from other costs that plaintiff is claiming. Tr.6147:3-8; 6148:8-16 (Kiraly); DDX 5-42; DX 625 (Attachment 8, WXE 0220088 - WXE 0220133).

471. WEPCO should not recover costs relating to the procurement and loading of the first five VSC-24 casks. DX392 at ¶¶13-21; Tr.5858:5-9; 5860:2-5862:9; 5867:11-5870:4, 5870:13-5881:7, 5884:24-5897:2 (Hamal). Further, $20,550,207 in plaintiff's damages claim constituted the costs of the ISFSI fabrication and five VSC-24 casks, and the claim should be adjusted by that amount. Tr.6145:6-20 (Kiraly); DDX 5-13; DDX 5-38; DDX 5-39. Of the $20,550,207, there is $4,844,381 which could also be disallowed for accounting reasons, such as salaried labor, A&G, and employee expenses.

Tr.6147:14 – 6149:7 (Kiraly); DDX 5-43; DX 625 (Attachment 8, WXE 0220088 - WXE 0220133); DX 625 (Attachment 1-a-4.4, WXE 0220016).

472. Included within the $20,550,207 is $1,222,393 of legal expenses. DDX 5-42. The legal expenses include $880,138 of legal activities relating to WEPCO's on-site dry fuel storage program. The legal expenses also include $342,255 for legal activities in connection with alternative off-site storage projects. See DFOF ¶ 386. Taking into account the off-site storage project's legal expenses, plaintiff should not recover a total of $20,207,952 in costs relating to the ISFSI fabrication and first five VSC-24 casks. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Doc. 369 (Nov. 20, 2007).

## D. WEPCO Incurred The Costs Of Fabricating Three TN-32B Casks

### 1. WEPCO Sought The TN-32B Casks As A Contingency In The Event That It Could Not Load The VSC-24 Casks By The Spring 2000 Outage

473. In early 1998, WEPCO concluded that it faced shut-down in spring 2000, if it was unable to load more VSC-24 casks. Tr.1568:1-9 (Krieser); see PX 510; see also DFOF ¶¶ 465-468.

474. Therefore, WEPCO pursued the TN-32B cask system as a "backup solution," a "contingency plan," or an "insurance policy." Tr.1569:18-25 (Krieser); PX 524 at 4.

475. In an effort to procure TN-32B casks quickly, WEPCO wrote to Virginia Power, on March 25, 1998, seeking to acquire two TN-32B casks from the company's fabrication queue to meet WEPCO's cask delivery needs by the end of 1999. DX 33; PX 492; Tr.1634:15-1635:22 (Krieser).

476. Because WEPCO was unable to procure casks from Virginia Power, it sought to purchase casks from Transnuclear, the license holder of the cask. DX 161. On April 9, 1998, WEPCO requested that the NRC grant Transnuclear an exemption to permit procurement and fabrication of up to six TN-32B casks in time to have additional SNF storage following the spring 2000 refueling outage. DX 223.

477. On April 20, 1998, WEPCO sent another letter to the NRC stating that three TN-32B casks were needed and that WEPCO would lose full-core reserve after the current refueling outage and would run out of space in the pool to refuel in early 2000, if Transnuclear was not granted the requested exemption. DX 153/PX 513 at 2; DX 150; PX 496.

478. On May 1, 1998, WEPCO entered into a contract to purchase three TN-32B casks from Transnuclear, as a contingency in the event that WEPCO could not resume loading the VSC-24 casks. DX 161 at WISC 0006481-84; Tr.1573:7-14 (Krieser).

479. Mr. Krieser testified that WEPCO deliberately included in its purchase order for the TN-32B casks the ability to cancel the contract at any time because WEPCO knew that it might be able to begin using the VSC-24 cask again:

> We wrote into the purchase order as much flexibility as we could. We had a number of exit ramps built into it, if we were able to resolve all of the issues with the VSC-24s, and we had a provision in the contract that allowed us to essentially terminate the contract for convenience at any time.

Tr.1585:13-19 (Krieser); DX 161. The purchase agreement with Transnuclear indeed provided just that flexibility:

> Buyer may terminate work on this order for its own convenience in whole or in part by written notice at any time.

DX 161 at WISC 00064081.

480. On May 7, 1998, WEPCO again asked the NRC to grant Transnuclear an exemption to permit the fabrication of up to six TN-32B casks so that WEPCO would be able to load casks to its ISFSI by the spring 2000 refueling outage. DX 153/PX 513 at WISC 0042538; DX 150; PX 502 at WISC00055674-765.

481. On May 20, 1998, WEPCO sought approval from the PSCW to load six TN-32B casks in lieu of loading eight VSC-24 casks to avoid having to shut down Unit 2 at Point Beach in the spring of 2000. PX 510. WEPCO sought authorization to use the TN-32B casks "<u>if and only if</u> the VSC-24 casks are not available in time for the refueling currently scheduled for 2000." PX 510 at WISC 00073452 (emphasis added); <u>see also</u> DX 152, KRGWE002380; Tr.1641:9-1642:9 (Krieser); Tr.1646:22-1648:10 (Krieser); Tr.5903:11-25 (Hamal); Tr.1577:15-1579:22 (Krieser).

482. The NRC lifted the CAL regarding the use of the VSC-24 casks on July 22, 1998, but included in its correspondence to WEPCO, in Appendices C & D, "corrective actions that the utilities will implement into plant procedures prior to loading until the affected licensing documents can be updated." DX 154 at WISC 00002282; Tr.1574:14-22 (Krieser).

483. On July 31, 1998, WEPCO notified the NRC that it had complied with the CALs initiated in response to issues regarding the welding of the VSC-24s. <u>WEPCO informed the NRC that it was ready to begin loading VSC-24s as soon as the NRC provided written approval</u>. DX 154. WEPCO had taken the actions it believed necessary to close the CAL that prevented WEPCO from using the VSC-24 casks by the end of July 1998. DX 154 at WISC 00002282; Tr.1642:25-1644:18 (Krieser).

484. On July 20, 1998, Transnuclear, on behalf of WEPCO, released Precision Components Corporation (" PCC"), a vendor for Transnuclear, to procure materials for the containment vessel for the three TN-32B casks. Tr.1642:10-24 (Krieser); DX 307.

485. After the NRC closed the CAL and after WEPCO informed the NRC it was ready to begin loading VSC-24s anew, the PSCW conditionally authorized WEPCO to purchase up to six TN-32B casks as a "back-up option" at an additional cost of up to $5,000,000, on August 11, 1998. PX 524; DX 35**;** Tr.1579:23-1582:1 (Krieser); Tr.1644:19-1647:11 (Krieser). However, the approval by the PSCW was conditional:

> WEPCO may only use the TN-32 casks if the VSC-24 casks are not available in time for its scheduled refueling in Spring 2000, and if the NRC issues all necessary approvals for the use of the TN-32 casks at Point Beach.

DX 35 at 5 (emphasis added). The PSCW authorization order did not provide for the recovery of costs from WEPCO's rate base.[30] Id.; Tr.5902:13-5906:1, Tr.5994:11-5998:6 (Hamal).

486. On August 13, 1998, the NRC cleared the VSC-24 casks for additional loading. Tr.1583:11-16, 1632:13-1633:9 (Krieser); DX 77/PX 525 at WISC 00002312-3.

487. On August 24, 1998, Transnuclear notified the NRC that long-lead materials for three TN-32B casks were on order for WEPCO's TN-32B casks, but would not be delivered until

---

[30] On August 28, 1998, the PSCW informed an intervenor, Ms. Fawn Shillinglaw, who had asked the PSCW about the costs of the TN-32B cask program, that any concerns over the cost of the TN-32B program should be deferred until such time as they were actually put into customer rates. DX 79; Tr.5995:25-5996:23 (Hamal). In March 1999, the PSCW stated, in a letter to an intervener, that WEPCO was limited to using only the VSC-24 casks and that the authority the PSCW had granted to use the TN-32B casks was no longer valid. DX 155/PX 552; Tr.5998:8-5999:16 (Hamal). WEPCO did not produce in discovery any documentation that it had recovered the cost of the TN-32B casks in the rate case in spite of certifying that it had produced everything that existed, nor did it produce any documentation to this effect in trial. Tr.6285:2-6289:1 (Farron).

January 1999. Negotiations with Virginia Power and WEPCO were on-going for the transfer of certain materials from Virginia Power for earlier delivery of these materials. Tr.1649:21-1650:10 (Krieser); DX 308.

488. On November 13, 1998, Transnuclear informed the NRC that the long-lead materials for WEPCO's TN-32B casks would not be delivered until December 1998. DX 309.

489. WEPCO loaded the third VSC-24 cask on September 10, 1998. PX 796 at KRGWE 002705**;** Tr.1584:9-11 (Krieser).

### 2. WEPCO Should Have Delayed Fabrication of the TN-32B Casks in September 1998, And Then Cancelled The Contract By April 1999

490. With the loading of the third VSC-24 cask, WEPCO no longer faced a potential shutdown by spring of 2000; it could operate until October 2000. Tr.5914:7-16 (Hamal); DX 392/PX 828; DDX 4, p. 32.

491. Because of the flexibilities that WEPCO had deliberately built into the contract for TN-32B casks, WEPCO could have delayed fabrication of those casks in September 1998 when it resumed loading the VSC-24 casks. DX 161 at WISC 00064081; Tr.1584:13-19 (Krieser).

492. Fabrication of the TN-32B casks had not yet begun. DX 308; DX 309.

493. As of September 1998, long-lead time materials for fabrication of the TN-32B casks had been ordered, but were not expected to be delivered until December 1998 - January 1999. DX 308/PX 530 at WISC 00073502-3; DX309/PX543 at WISC 00073465; Tr.1649:21-1651:1 (Krieser); Tr.5914:23-5915:24 (Hamal).

494. As of September 1998, fabrication of the TN-32B casks using Virginia Power's materials had been discussed, but had not commenced. DX 308; Tr.1650:5-11 (Krieser).

495. In fact, as of November 13, 1998, the materials for the TN-32B casks for WEPCO were not scheduled for delivery by mid-December 1998. At that time, fabrications of the TN-32B cask at PCC was scheduled to commence on January 5, 1999. Tr. 1649:11-1651:1 (Krieser); DX 309.

496. WEPCO should have placed a hold on the fabrication of TN-32B casks under contract with Transnuclear in September 1998. WEPCO's failure to stop progress on the contract, in light of dramatically changed circumstances, was unreasonable. Tr.5913:8-5917:15 (Hamal); Tr.5898:8-18 (Hamal); DDX4 at 32.

497. In fact, since WEPCO had resumed loading casks prior to the spring 2000 outage, WEPCO could not load the TN-32Bs under the terms of the PSCW's conditional order. Tr.1647:12-1648:2 (Krieser).

498. WEPCO's use of the TN-32 casks was authorized only if additional VSC-24 casks could not be loaded before the spring 2000 outage. Tr.1581:23-1582:1 (Krieser).

499. WEPCO loaded the fourth and fifth VSC-24 casks in October and November, 1998. Tr.1917:19-1919:4 (Becka); DX 80; PX 796 at KRGWE 002705**;** Tr.1584:9-11 (Krieser).

500. Even if TN-32B casks were still needed, WEPCO could wait until July 1999 to re-start the fabrication process and have them delivered in time. Tr.5914:7-16 (Hamal); Tr.5916:2-5917:1 (Hamal); DDX4 at 32.

501. WEPCO had full rights to the license for the VSC-24 casks, which it could purchase directly from a fabricator, and WEPCO maintained this right after BNFL[24] purchased Sierra Nuclear Corporation.[25] DX93 at WISC 00041026; Tr.1566:6-25 (Krieser).

502. After WEPCO finished loading the fourth and fifth VSC-24 casks by November 1998, the potential need for TN-32B casks was pushed to May of 2001, and a decision to fabricate the TN-32B casks should have been delayed until February 2000. Tr.5917:5-15 (Hamal); DDX4 at 33; PX 796 at KRGWE 002705.

503. With each VSC-24 that was loaded, the need date for use of the TN-32B casks to provide additional storage was extended by approximately one refueling outage. Tr.5613:17 - 5614:4 (Brewer).

504. By April 1999, after WEPCO had completed loading the sixth VSC-24 cask, WEPCO had added an additional 96 fuel assemblies to its ISFSI, which was equal to the capacity of the three TN-32B casks. Tr.5917:16-5919:13, 5921:22-5922:5 (Hamal); DDX4-35; DX 616. Moreover, WEPCO had three empty VSC-24 casks on site, and four more in fabrication. Tr. 2128:15-2129:24 (Holzmann); DX 80; DX 201.

505. Thus, if no additional casks were loaded after April 1999, Point Beach would not have run out of space in the SNF pool until May 2002. Tr.5917:16-5919:13 (Hamal); DDX4-35.

---

[24] BNFL had previously affirmed WEPCO's right to continue to fabricate VSC-24 casks beyond the original 12 that were ordered, on May 19, 1999. WISC 00041024-27. DX 93.

[25] Sierra Nuclear Corporation was the fabricator of the VSC024, but WEPCO had a special agreement that permitted it to fabricate the VSC-24 cask itself.

506. Further, WEPCO committed to complete the fabrication of VSC-24 casks numbers 9-12 in or around April 1999, demonstrating WEPCO's overall confidence in the VSC-24 cask system. Tr.5922:6-5923:1, 5925:17-5926:20 (Hamal); Tr.2131:24-2132:18 (Holzmann).

507. WEPCO placed the seventh loaded VSC-24 in service ISFSI on August 16, 1999, and the eighth was placed into service on September 19, 1999. Tr.1917:19-1918:21 (Becka); DX 616.

508. When WEPCO loaded VSC-24 cask number eight in September 1999, the earliest date that WEPCO might have needed the TN-32B casks was pushed to October 2002, and WEPCO could have waited until February 2001 to re-order the TN-32B casks, if they were needed. Tr.5919:23-5920:16 (Hamal); DDX4-36.

509. WEPCO chose to fabricate VSC-24 casks numbers 9-12 in 1999 in lieu of using the TN-32B casks. DX201 at WISC00078223; Tr.2128:15-2129:6 (Holzmann); Tr.2133:8-12 (Holzmann).

510. WEPCO purchased four more VSC-24 casks, numbers 13-16, in 2000-2001. Tr.1739:1-7 (Becka).

### 3. WEPCO Should Have Sold Its Long-Lead Materials, Or Its Three Completed TN-32B Casks

511. Long-lead materials are not specific to WEPCO's TN-32B casks, and can be used for casks at other nuclear facilities. Tr.5491:9-18 (Brewer) DDX 3-20.

512. WEPCO's long-lead materials could have been sold to someone else, including Virginia Power.[26] Tr.5491:25 - 5492:4 (Brewer); DDX 3-20.

[26] In 1998, there were 36 TN-32B casks on order. DX 32; Tr. 5492:5-11 (Brewer).

513. The best estimate of the value of the long-lead materials is the milestone payment for those materials in the Transnuclear contract. Tr.5492:14 - 5493:7 (Brewer); DDX 3-20.

514. WEPCO's TN-32B casks were very similar to those being used at Duke's McGuire Nuclear Station and WEPCO's casks could have been sequenced into Duke's loading plans.

DX 315; Tr.4997:2-24 (Weaver). WEPCO was aware that Duke was a potential buyer for its TN-32B casks. DX 231; Tr.4993:25-4994:18 (Weaver).

515. WEPCO was also aware that Virginia Power, Dominion, and Northern States Power could use WEPCO's TN-32B casks. DX 312; Tr.4999:4-5000:8 (Weaver).

516. Like WEPCO, Northern States Power is operated by Nuclear Management Corporation ("NMC").[27] Tr. 5000:9-11 (Weaver).

517. WEPCO made a business decision to complete the casks in order to make them more saleable. Tr.1655:22-1656:15 (Krieser).

518. Prior to 2000, WEPCO management never gave any instructions to suspend work on the TN-32B casks. Tr.1658:22-1659:3 (Krieser).

519. On March 16, 2000, WEPCO notified Transnuclear that it should suspend work on the TN-32B casks prior to shipment. Tr.4988:25-4990:1 (Weaver); DX 34/PX 570 at WISC 00055414.

---

[27] NMC took over the operation of the Point Beach Nuclear Power Plant in January 2000. Tr.96:25-97:2 (Baumann).

520. WEPCO preferred not to load the TN-32B casks because having three different storage systems at Point Beach would be unnecessarily complicated.[28] Tr.1974:10-22; 1975:2-5; 1976:8 – 1977:1 (Becka).

521. By letter dated May 17, 2001, WEPCO asked Transnuclear to pursue the sale of the three TN-32B casks. Tr.4991:19-4992:3 (Weaver); PX 603; DX 105.

522. The decision to try to sell the casks was made by Richard Grigg, the President and Chief Operating Officer, because WEPCO had no plans to load the casks. Tr.4992:4-13 (Weaver).

523. Although WEPCO initially sought to maintain the TN-32B casks as an "insurance policy" or "backup," WEPCO had concluded that the casks had already served this purpose. DX 311; Tr. 4992:14-4993:24 (Weaver); see also DX 315; Tr. 4996:8-4997:1 (Weaver); Tr. 5007:20-5008:6 (Weaver).

524. On August 24, 2001, WEPCO informed the NRC that its decision not to use the three TN-32B casks was based upon a number of factors, including limiting the variety of systems employed, impact on plant resources, and the magnitude of attendant infrastructure changes that would be required (cost versus benefit) of the attendant program, procedure and plant and equipment modifications. PX 609; DX 104. WEPCO already had the VSC-24 systems and this would add another variety of cask to the mix. DX 104; Tr.4991:7-13 (Weaver).

---

[28] Moreover, in order to use the TN-32B casks, WEPCO would have to make plant modifications to Point Beach costing approximately $900,000, including revising operating and loading procedures, making some revisions to a transport vehicle, obtaining a different lifting yoke, making changes to the cask lay down area, making changes to the cask drying area, and making modifications to decontamination. Tr. 1636:9-1637:113 (Krieser). Those plant modifications were never made. Tr.1636:9-1640:3-23,1651:6-11 (Krieser); Tr.2690:22-2691:15 (Farron); DX 151.

525. On October 31, 2001, WEPCO considered the benefits of halting construction and ceasing milestone payments on the casks until serious negotiations with potential purchasers of the three casks began, as under the contract, delaying the work would not increase the total cost. DX 313; Tr.4997:25-4999:3 (Weaver).

526. As of the time of trial, and the sale of Point Beach to FPL Energy,[29] WEPCO had no plans to use the TN-32B casks. Tr.4991:14-18 (Weaver).

527. WEPCO did ultimately sell its TN-32B casks to FPL Energy, as part of the sale of Point Beach. Tr.5013:24-5014:5 (Weaver).

528. No other utility maintains a backup cask system. Tr.5650:20-5651:1(Brewer).

529. The PSCW never held any additional hearings regarding the TN-32B casks. Tr. 6283:13-19 (Farron).

530. Mr. Hamal concluded that, under the circumstances, WEPCO should have delayed the fabrication of the TN-32B casks in September 1998, and concluded that WEPCO should have cancelled its contract for production of the three TN-32B casks after April 1999, and then sold the long-lead materials that were purchased for the project. DX 392 at ¶25 (Hamal Report).

531. Mr. Kiraly reduced plaintiff's claim by $5,058,733, of which $91,507 could also be disallowed for accounting reasons, which represents all costs claimed by plaintiff relating to the TN-32B casks. Tr.6155:11-20 (Kiraly); DDX 5-47; DX 625 (Kiraly Report, Attachment 9, WXE 0220135 – WXE 0220146); DX 625 (Attachment 1-a-4.4, WXE 0220016).[30]

---

[29] The sale of Point Beach to FPL Energy became final in October 2007. Tr.5013:23-5014:4 (Weaver).

[30] If the Court finds that costs incurred by WEPCO for long-lead materials through September 10, 1998 were reasonable, which total $1,246,041, then the adjustment to the claim would be reduced to $3,812,692. <u>See</u> DDX 5-46 at 69.

## E. WEPCO'S Pursuit Of Dual Purpose Casks

### 1. WEPCO's Decision To Switch To The NUHOMS Cask System

532. At the time of WEPCO's application to the PSCW for authorization to load additional VSC-24 casks in May 2000, WEPCO had sufficient spent fuel assemblies qualified to load into those VSC-24 casks to provide sufficient storage for at least 5 additional years.[31] Tr.5507:8-5509:21 (Brewer); DX 391 at 26 (WXE011 0028); DDX 3-22; DX 453; DX 406.

533. In 2000, BNFL, the manufacturer of the VSC-24 cask, indicated to WEPCO its intention to modify its cask license to accommodate all of WEPCO's spent fuel.[32] Tr.5509:22 - 5510:20 (Brewer); DX 255.

534. In 2003, the VSC-24 license modification started in 2000 was completed, allowing a sufficient quantity of WEPCO's spent fuel assemblies to be loaded into VSC-24 casks to provide storage for 24 additional years. Tr.5513:14-19 (Brewer); DX 391 at 26 (WXE011 0028); DX 409.

535. In two cases, WEPCO (directly, or by NMC on its behalf) entered into contracts for casks that had not yet been licensed by the NRC. The first case was in May, 1998, when WEPCO contracted for the purchase of the TN-32B casks, a license for use of those casks at the Point Beach site had not yet been obtained. Tr.1573:5-21 (Krieser). In fact, WEPCO was required to obtain permission to manufacture these casks prior to obtaining a license for them.

[31] At the time WEPCO decided it would not load the TN-32B casks, it had already made the decision to use the NUHOMS system. WEPCO did not perform any evaluation to determine if it was cheaper to use the three TN-32B casks, instead of three completely new and different NUHOMS casks. There would be similar costs to set up and load the TN-32B metals casks as there was for the NUHOMS system. Tr.1974:10-22; 1975:2-5; 1976:8 – 1977:1 (Becka).

[32] In 1999, BNFL had notified the NRC of the status of various licenses, and specifically stated that it intended to maintain the VSC-24 Certificate of Compliance. DX 623.

DX 223. The second case was in 2001, when Transnuclear stated that the license for the NUHOMS 32PT was not expected to be issued until May 2002. In spite of this statement, however, WEPCO still contracted for this cask prior to its license being obtained. The Transnuclear contract for the Point Beach site, dated March 5, 2002, notes that there is still a potential that Transnuclear would be unable to license the TN-32PT. PX 597 at WISC 00018125; PX 692 at WISC 00019211 ("If TN fails to license the - 32PT, TN shall supply the NUHOMS - 24PT2 for the same per-assembly price as the - 32PT").

536. In spite of these facts, WEPCO eventually made the decision to switch to a third type of cask, the NUHOMS or the TN-32PT system, a dual purpose system. Tr.1659:4-16 (Krieser).

537. When WEPCO sought authorization to load additional casks from the PSCW in 2000, WEPCO understood that dual purpose cask were approximately $700,000 more expensive on a per casks basis than the VSC-24 casks that it was using at the time. Tr.272:25-274:16 (Baumann); DX 70 at KRGWE002411; DX 463 at WISC 00010273.

538. WEPCO conceded that it does not need a dual purpose system in order to store its spent fuel on site. Tr.1659:17-20 (Krieser).

539. The fleet dry fuel storage manager working for NMC advised the Point Beach Vice President that Point Beach was "vastly underestimating" the level of effort required to implement a different dry fuel system. DX 5; Tr.5012:7-5013:20 (Weaver).

540. Specifically, he explained that the existing ISFSI would have to be evaluated to show that it was suitable for use with the new system, which would involve repeating a number of previous analyses under more stringent standards than existed when they were originally done.

He further explained that the change would necessitate all new cask loading and handling procedures as well as review and revision of any other site procedures affected by dry storage. He explained that a new 72.212 report would need to be generated for the NUHOMS system and some plant modifications would be required. DX 51; Tr.5012:7-5013:20 (Weaver).

541. Furthermore, the acquisition costs for the number of VSC-24 casks needed to store the same amount of fuel as the NUHOMS casks is less than half the cost of the NUHOMS casks. WEPCO paid more on a unit basis for a NUHOMS cask compared to a VSC-24 cask. Increasing the cost of the new cask system even more, WEPCO paid a premium to move delivery of NUHOMS canisters out to a later time so those costs would be incurred after the conclusion of the rate freeze. WEPCO was also forced to purchase ancillary equipment and perform site modifications in order to use the NUHOMS casks. Tr.1819:22 -1820:3; 1825:15-1827:7; 1829:16-21; 1831:1-9; 1928:14-1929:15 (Becka); Tr. 6158:4-8; 6159:19-24 (Kiraly); DDX 5-51; DDX 5-52; DX 253; PX 597.

542. Moreover, the operating lifetime of the VSC-24 cask is the same or longer than that of a dual purpose cask, including the NUHOMS casks that WEPCO began using in lieu of the VSC-24 casks. Tr.5514:14 - 5515:23 (Brewer); DDX 3-23, DX 391 at 26-27( WXE011 0028 - WXE011 0029); DX 406, PX 658.

543. There is no safety issue with the continued use of the VSC-24 casks. WEPCO believes that the VSC-24s are safe and can continue to be loaded safely. Tr.2699:16-21 (Farron); Tr.1961:7-1963:20 (Becka).

544. The contract for the final four VSC-24 casks that WEPCO purchased included a provision to supply more casks at the same price. Therefore, WEPCO never incurred any increase in the VSC-24 costs over the life of the project. Tr.6233:16 - 6234:6 (Kiraly); DX 70.

545. There is not currently a licensed transportation cask that can accommodate the NUHOMS 32-PT canister used by WEPCO. Tr.5518:23-5519:10 (Brewer).

546. In addition, unless the canister is qualified for disposal at the DOE repository, the content will have to be repackaged. In this event, there is no savings of effort or radiation exposure by use of a dual purpose cask. Tr.5519:25 - 5520:18 (Brewer).

547. Furthermore, WEPCO had no expectation that DOE would accept any fuel except bare fuel that would be loaded directly into a DOE cask. DX 28 at WISC 00002798.

548. It is speculative that a large rail cask, like the NUHOMS cask, could be removed from the Point Beach site. Tr.5519:15-25 (Brewer).

549. First, Point Beach does not currently have a rail or barge facility. Tr.5519:15-16 (Brewer). Previous spent fuel shipments from Point Beach used a truck cask because Point Beach did not have a rail spur. The rail line serving Kewaunee was abandoned in 1998, and there is currently no rail spur in Kewaunee to which a heavy cask could be hauled. Tr.5522:18 - 5523:3 (Brewer); DX 455. Moreover, Point Beach did not in 1998, and does not currently have, an operational barge facility. If Point Beach were to ship fuel today, it would likely be shipped by truck. Tr.1381:23-1382:14 (Shimon); Tr.1978:10-18 (Becka); Tr.2700:23-2701:16 (Farron).

550. Moreover, the path to a second rail spur near the Point Beach site contains bridges with weight limits of 80 tons and 105 tons. Tr.5524:20 - 5527:1 (Brewer).

551. A loaded NUHOMS transportation cask would weigh 140 tons. Tr.5527:2-6 (Brewer).

552. In order to heavy haul a cask to a rail spur, it is necessary to obtain permits to traverse bridges that are not rated for the load of a large, rail cask, and there is no guarantee that these permits will be approved. Tr.5595:22 - 5596:16 (Brewer).

553. There are currently 58 VSC-24 casks loaded and being used to store fuel in the industry. The majority (over 40) of these casks were loaded after the hydrogen ignition and weld cracking events of 1996-1998. The VSC-24 cask license will have to be maintained, and thus renewed, as long as there are VSC-24 casks in use. Tr.5532:14-55:33:4, 5535:12 - 5536:11 (Brewer); DDX 3-25.

554. Switching to the NUHOMS cask system did not eliminate the concern about hydrogen generation in the VSC-24 cask because the NRC noted hydrogen generation with all welded canisters. Tr.5540:3 - 5541:24 (Brewer); DX 624.

555. Loading of the VSC-24 cask is not more labor intensive than loading the NUHOMS cask. Tr.6162:4-13; 6164:23 - 6166:4 (Kiraly); DDX 5-55.

556. A typical loading time for the NUHOMS 32PT casks was six days. Tr. 5654:20 - 5655:22 (Brewer); DX 248.

557. The loading time required for the first VSC-24 cask was six days. Tr. 5655:23 - 5658:12 (Brewer); DX 401; DX 404; DX 80.

558. Furthermore, WEPCO's accounting records demonstrate that the NUHOMS casks took longer than four days to load. Tr.6162:4-13; 6164:23 - 6166:4 (Kiraly); DDX 5-55.

559. The accounting records show that there were fewer hours recorded the ten days prior to VSC-24 casks numbers 13 through 16 going into service, compared to the four days prior to NUHOMS casks 5 through 9 going into service. On average, more hours were recorded during the time that NUHOMS casks were being loaded, compared to the average hours recorded during the time that VSC-24 casks were being loaded. Tr.6163:22 - 6164:1 (Kiraly); DDX 5-56.

560. The accounting records actually show that the five NUHOMS casks loaded in 2006 included eight, seventeen, seven, five and eleven days of labor respectively and not the 4.5 days asserted by plaintiff at trial. Tr.6164:23 - 6166:4 (Kiraly); DDX 5-57.

561. Continuing use of the VSC-24 cask is a reasonable technical and engineering decision. Tr.5537:10-19 (Brewer).

562. Mr. Kiraly determined that WEPCO would have used 19 VSC casks in lieu of the 14 NUHOMS casks that it loaded. DDX 5-51; Tr.6158:1-25 ( Kiraly).

563. Mr. Kiraly calculated that WEPCO incurred $14,695,1127 million to fabricate and acquire the 19 NUHOMS casks. DDX 5-52; Tr.6159:1-6161:17 (Kiraly).

564. Mr. Kiraly calculated replacement costs of $6,299,325 for VSC-24 casks. DDX 5-53; DDX 5-54; Tr.6159:1-6161:17 (Kiraly).

565. Thus, Mr. Kiraly adjusted plaintiff's claim by $8,395,802 which represented the costs incurred by WEPCO for fabrication of the NUHOMS system minus the cost of the VSC-24 casks needed to store the same amount of fuel. Included in the $8,395,802 is $238,337 for fixed labor, A&G, and employee costs that are associated with the NUHOMS system. DDX 5-58; Tr.6167:2-9 (Kiraly); DX 625 (Attachment 10, WXE 0220148 – WXE 0220157); DX 625 (Attachment 1-a-4.4, WXE 0220016).

### 2. WEPCO'S Efforts To License The VSC-24 Cask For Transportation

566. When WEPCO purchased the VSC-24 cask system, it was licensed for the storage of SNF only, under 10 CFR Part 72. Tr. 1778:19-22 (Becka). In 2002, BNFL proposed that it license the VSC-24 cask system for transportation under 10 CFR Part 71. Tr.1834:18-1835:5 (Becka), PX 633. WEPCO pursued this effort, and the license amendment request is currently being reviewed by the NRC. Tr.1837:20-1838:3 (Becka).

567. It is not known if DOE will accept the transportable VSC-24 canister. If DOE does not accept that canister, the cost that WEPCO paid to obtain the transportation license is not a cost savings. WEPCO did not need a transportable VSC-24 canister in order to store fuel. Tr.1971:1-18, 1972:6-9 (Becka).

568. If WEPCO were to ship fuel off site, the only method available is by road. Licensing the VSC-24 canisters for transportation provides no benefit if the large, rail casks cannot be removed from the site. It is less risky to wait to license the VSC canisters until it is determined whether the large casks can be transported off-site. Tr.5654:4-20 (Brewer); Tr.1978:12-18 (Becka).

569. Mr. Kiraly has adjusted plaintiff's damages claim for the effort to license the VSC-24 cask for transportation by removing $383,037 which was the amount paid by WEPCO to BNFL. Tr.6167:2-9 (Kiraly); DDX 5-58; DX 625 (Attachment 10, WXE 0220148 – WXE 0220157); DX 625 (Attachment 1-a-4.4, WXE 0220016).

## XIX. ISSUES RELEVANT TO INDIVIDUAL COSTS IN WEPCO's CLAIM

### A. Internal Labor Costs

570. WEPCO pays its salaried employees regardless of the project on which they are working. If a salaried employee with available free time worked on an internal project, there would be no additional costs to WEPCO for the work that person performed. Tr.4797:4-20; 4784:22 - 4785:2; 4787:13-4788:1 (Metcalfe).

571. Plaintiff produced no evidence demonstrating that its salaried employees were hired to replace employees working on the dry fuel storage project. There was also no documentation produced to demonstrate that WEPCO employees were moved from one project to another to backfill for the dry fuel storage project. There was no documentation identifying requests for personnel from one department to assist another department in covering a shortfall of work allegedly caused by the spent nuclear fuel project. In fact, WEPCO did not perform a search for these types of departmental documents in response to the Government's requests. Tr.2942:11-21; 2943:3-7 (Straub); Tr.4785:3-19; 4800:5-12 (Metcalfe); Tr.6129:7-23 (Kiraly); DDX 5-19.

572. WEPCO could not identify any projects that the company would have pursued but did not because it was occupied by activities related to the partial breach. There is no documentation in the record to demonstrate that projects were not completed because they were deferred or delayed, and no evidence showing that employees could not accomplish other project work along with the dry fuel storage project. Tr.1875:4-9; 1876:4-9; 1922:24-1923:6; 1955:24-1956:5 (Becka); Tr.6135:7-19 (Kiraly).

573. WEPCO provided no analysis to demonstrate that it was deprived of the ability to employ salaried personnel who were determined to be non-incremental. For example, personnel working on the loading campaigns also performed other jobs. There were times during the loading campaigns when crews assigned to the loading campaign would be assigned to other work in the plant. In fact, during the 2006 loading campaign, staff from the loading crews assisted with the control room emergency filtration system. Tr.1875:4-9; 1876:4-9, 1922:24-1923:6, 1955:24-1956:5 (Becka); Tr.6135:7-19 (Kiraly).

574. At times, the dry fuel storage project only utilized internal employee assistance, when those personnel were available and had no other work to perform. Otherwise, outside contractors were used. In these instances, the dry fuel storage project was able to actively utilize otherwise unutilized personnel. Tr.1904:24-1906: 23 (Becka).

575. Once the SNF loading campaigns were completed, WEPCO did not fire the employees who participated in the loading. Tr.1948:24-1950:13 (Becka).

576. Mr. Becka is the senior engineer in charge of the dry fuel storage project whose position was created because of the dry fuel storage project. He would still have been retained by NMC if the dry fuel storage project had not been implemented. Tr.1948:24-1950:13 (Becka).

577. The nuclear power department staffing, especially engineers and operations and maintenance personnel, increased significantly from July 1990 through the 2000s. The increased staffing was primarily due to the fact that Point Beach was an aging plant. Tr.2876:8-24 (Straub).

578. WEPCO conducted no analysis to determine if the overall headcount of salaried personnel changed over time. Tr.2929:19-2930:10; 2934:20-23; 2937:7-10; 2938:11-20; 2950:3-20 (Straub); Tr.4788:16-4789:3 (Metcalfe); DX 332; DX 322.

579. WEPCO did not demonstrate that it experienced any increase in salaried labor as a result of DOE's delay in accepting SNF from Point Beach. The ledger reports that WEPCO produced did not contain detailed hours and amounts per employee. It did not indicate the actual services provided by the salaried staff, nor did it disclose the extent to which most of the employees were committed to the dry fuel storage project. Tr.2928:14-2929:18 (Straub); Tr.6125:3-10; 6125:21 - 6126:1; 6200:24 - 6201:8 (Kiraly); DDX 5-16; DDX 5-17; DX 337.

580. Beyond limiting its inclusion of labor charges to time charged to those projects considered to be partial breach-related, plaintiff made no effort to distinguish between the labor charges that it incurred which were incremental to any partial breach from those that were not. Tr.6195:10-12 (Kiraly).

581. The proper method for determining whether an internal labor charge is incremental is to conduct an analysis to determine what amount of claimed costs associated with internal labor has resulted in economic harm to the company. Tr.6126:14-16, 6121:11-16, 6195:1–12 (Kiraly). Not all work that a company's labor force performs because of a breach results in economic harm to the company. Id.

582. To determine the amount of WEPCO's labor charges that were incremental to the breach, Mr. Kiraly analyzed the labor data produced by the plaintiff and isolated those salaried employees who never worked more than half of their time on a breach-related project in any given year. As a conservative measure, Mr. Becka and Mr. Rogers were included as incremental labor costs because they spent a majority of their time on the project. The dry fuel storage group consists of Mr. Becka and Mr. Rogers, a senior engineer that reports to Mr. Becka. Tr.1712:3-6 (Becka); Tr.6130:9-14; 6130:20 - 6131:2; 6197:22 - 6198:4 (Kiraly).

583. Mr. Kiraly determined that the WEPCO employees who were incremental to the partial breach average nearly 1300 hours per year, or 32 weeks per year, while those determined to be non-incremental average only 42 hours a year, or one week a year. The data and analysis trend indicates that the non-incremental WEPCO employees performed other tasks, and, therefore, the company did not incur any additional costs because they worked on the dry fuels storage project. Tr.6131:22-6132:12 (Kiraly); DDX 5-20; DDX 5-21; DDX 5-22; DX 625 (Attachment 2-a-3.1, WXE 0220030 – WXE 0220037).

584. Mr. Kiraly opined, as an expert in the analysis of economic damages, that, in the absence of any proof of foregone opportunities, WEPCO did not incur economic harm merely because a portion of its salaried work force was required to perform, on average, two additional hours of work per week upon breach-related projects. Tr.6131:22-6232:12 (Kiraly).

585. Mr. Kiraly made no adjustment for labor costs associated with hourly employees or for overtime pay. Tr.6121:7-17 (Kiraly).

586. Mr. Kiraly adjusted plaintiff's claim for internal labor costs to deduct $5,572,636 of non-incremental internal salaried labor costs, corresponding to the amount of work performed by employees who never worked more than half their time on breach-related project activities. In Mr. Kiraly's expert opinion, this amount reflects a "reasoned estimate" of the portion of the approximately $9.2 million in labor charges included in plaintiffs' damage claim that would have been incurred in the absence of a partial breach by DOE. DDX 5-24. Of the $5,572,636, there is $3,426,451 of salaried labor that could be disallowed for other reasons as well: for example, $3.3 million relates to the fixed labor costs incurred prior to loading the fifth cask, and $73,000 relates to the TN-32B cask. Tr.6134:6-16 (Kiraly); DDX 5-24.

**B. Employee Expenses**

587. Employee expenses, e.g., travel expenses and meals, were reviewed to ensure that they were incurred as a result of the partial breach and to ensure that there were corresponding recorded hours for the employee charging expenses. Tr.6136:19 – 6137:3 (Kiraly); DDX 5-26.

588. There was no showing at trial by WEPCO that any employee expenses were incurred as a result of DOE's delay in accepting SNF from Point Beach.

589. Employee expense costs should not be allowed if there are no corresponding recorded hours for the employee charging expenses. Tr.6137: 7-18 (Kiraly); DDX 5-26.

590. Mr. Kiraly adjusted plaintiff's claim by $84,127, which represents employee expenses claimed by plaintiff that are not related to personnel working on a partial breach-related project. Of the $84,127, there are $18,910 of employee expenses that could be disallowed for other reasons as well. Tr.6138:2-15 (Kiraly); DDX 5-27; DX 625.

**C. Payroll Adjustments**

591. The Kenrich Group applied a payroll adjustment (or an adder) to the labor recorded in WEPCO's MSA accounting system to include amounts for pensions and benefits that were not included in the labor rates. The payroll adjustments are tied to the underlying recorded labor. DX 393 at 14 (WXE010 0017); Tr.6138:16-6139:6 (Kiraly); PX 1047.

592. Mr. Kiraly opined, as an expert in analysis of economic damages, that, if the underlying labor during the MSA accounting time period is questioned and removed based upon litigation opinions, all the payroll adjustments should be removed as well. Tr.6138:16 – 6139:6 (Kiraly); DX 625 (Attachment 4-b, WXE 0220070).

593. Plaintiff claimed $536,444 in payroll adjustments all of which are questionable. Therefore, the entire $536,444 should be removed from plaintiff's claim. Tr.6138:16 – 6139:6 (Kiraly); DDX 5-6; DX 625 (Attachment 4, WXE 0220068).

**D. Overhead Costs**

594. Administrative and General ("A&G") costs are corporate level costs have not changed as a result of the DOE's delay in accepting SNF from Point Beach. The Kenrich Group included A&G costs in WEPCO's damages claim. Tr.6139:24-6140:5, 6141:15-6142:11 (Kiraly).

595. A&G costs include costs that do not change as a result of DOE's failure to perform beginning in 1998, such as office supplies, office space, and office furniture. The A&G costs also include the costs of buildings and the expense of buildings which WEPCO would have regardless of the partial breach. The expenses related to these buildings would not change if DOE performed, and there was no evidence in the record that WEPCO would have sold the buildings had the dry fuel storage project not existed. WEPCO would still need the buildings to operate its company. The A&G costs also includes depreciation expenses for Washington Gas, which would have been incurred regardless of the partial breach and, therefore, are not claimable as damages. Any changes in the A&G rates from 2000 to 2001 were the result of the PSCW allowing WEPCO to include additional cost items in the A&G pool. Tr.2968:7-11; 2968:12 – 2969:6; 2976:7-10; 2977:7-17; 2980:12 - 2981:9; 2984:1-5 (Straub); Tr.4808:25 - 4809:5, 4814:6-17, 4815:7-19, 4816:9-20 (Metcalfe); Tr.6140:6–6141:10 (Kiraly); DDX 5-29; DDX 5-30 & 5-31; DX 338.

596. The A&G costs in the claim are not recorded to the project level on WEPCO's books and records, nor are they managed by the project administrators. Thus, claiming them at the project level, as WEPCO does in its damages claim, is inconsistent with company practices.

The company's practice of recording A&G as a period cost, and not allocating them to the project level, is consistent with GAAP. Thus, by claiming costs at the project level in the damages claim, the claim is inconsistent with GAAP. Tr.2951:6-13 (Straub); Tr. 4614:20-4615:1, 4807:22-4808:5, 4812:10-17 (Metcalfe); Tr.6139:24-6140:5; 6185:23-6186:20 (Kiraly); DDX 5-29.

597. For claim purposes, the Kenrich Group, plaintiff's experts, applied the A&G costs to WEPCO's internal labor, thereby increasing the claim for labor to reflect overhead. Tr.2951:6-13 (Straub); Tr.4614:20-4615:1, 4807:22-4808:5, 4812:10-17 (Metcalfe); Tr.6139:24-6140:5; 6185:23-6186:20 (Kiraly); DDX 5-29.

598. The Kenrich Group included more A&G costs in WEPCO's damages claim than the A&G costs recorded to the WEPCO accounting codes. Tr.2951:6-13 (Straub);Tr.4614:20-4615:1; 4807:1-4808:5; 4812:10-17 (Metcalfe); Tr.6139:24 - 6140:5; 6185:23 - 6186:20 (Kiraly); DDX 5-29.

599. Once the actual annual overhead rate is calculated, the rate is compared to the budgeted overhead rate which was used on billings. If the budgeted overhead rate is greater than the actual annual overhead rate, no true-up or true-up calculation is completed. Using budgeted rates that are higher than the actual rates, as the Kenrich Group did in calculating the damages here, results in a windfall to WEPCO because it recovers costs that it did not, in fact, incur. Tr. 2919:14–2920:4 (Straub); PX 1043 (PSCW Order 05-AU-105 (Application for Approval of Affiliated Interest Agreement between Wisc. Energy Cor., WICOR, Inc., WEPCO, Wisconsin Gas Company, and Other Nonutility Affiliates).

600. If the dry fuel storage project was not performed, the A&G costs that WEPCO incurred, regardless of the partial breach, would be allocated to a smaller pool of projects. Tr. 6142:3-8, 6222:5-8 (Kiraly); DDX 5-32.

601. The Kenrich Group conducted no analysis to determine if A&G costs would have been different if the dry fuel storage project had not been implemented. Tr.4808:18-24 (Metcalfe).

602. WEPCO presented no evidence to demonstrate that the A&G costs would have increased as a result of the partial breach. Tr. 2968:7-11; 2968:12 – 2969:6; 2976:7-10; 2977:7-17; 2980:12 - 2981:9; 2984:1-5 (Straub); Tr. 4808:25 - 4809:5; 4814:6-17; 4815:7-19; 4816:9-20 (Metcalfe); Tr. 6140:6 – 6141:10 (Kiraly); DDX 5-29; DDX 5-30 & 5-31; DX 338.

603. WEPCO did not perform any analysis to determine if support staff would have been fired if the dry fuel storage project had not occurred. Tr. 2969:20-2970:6; 2970:13-19; 2974:9-22 (Straub).

604. The PSCW does not require that A&G be added to internal projects. Thus, because the dry fuel storage project was not billed externally, A&G would not be added to that project under PSCW rules. Tr. 2953:13-15; 2959:6-11 (Straub).

605. Mr. Kiraly adjusted plaintiff's claim and reduced it by the entire $1,733,273 of claimed A&G costs. Of the $1,733,273, there is $1,058,009 that could also be disallowed for other reasons; for example, $957,000 related to ISFSI costs, $87,000 related to dual-purpose costs, and $13,000 related to the TN-32B casks. Tr. 6142:15-23 (Kiraly); DDX 5-33; DX 625 (Attachment 5, WXE 0220072 – WXE 0220078).

## XX. AVOIDED COSTS OF LOADING CASKS TO DOE

606. The proper damages calculation is the costs that WEPCO incurred minus the costs that WEPCO would have incurred absent the breach. Tr. 4723:2-7 (Metcalfe); Tr. 6168:10-19; 6237:8-14 (Kiraly); DDX 5-61; Tr. 3858:21-3859:23 (Sieracki); Tr. 3859:24-3860:3 (Sieracki); Tr. 3860: 4-3861:13 (Sieracki).

607. WEPCO would have incurred costs to load fuel to DOE in the but-for world, and it is possible to estimate those costs. Tr.5542:1-5543:5 (Brewer); DDX 3-26; DX 391 at 28-35(WXE011 0030 - WXE011 0037); Tr. 3893:7-3894:6 (Sieracki): DX 248; Tr. 3982:12-3985:19 (Sieracki); Tr. 3895:12-25 (Sieracki); Tr. 4029:6-12 (Sieracki); Tr. 3896:1-6 (Sieracki); Tr. 3896:1-11; DX 498 p 18.

608. Because these loading costs were avoided, a proper damages model would account for them. Tr.4723:2-7 (Metcalfe); Tr. 6168:10-19; 6237:8-14 (Kiraly); DDX 5-61.

609. The costs to load casks to DOE in the but-for world depend on the regulatory environment, the technology, the cask designs, the state of the Point Beach site, and the infrastructure of Point Beach site. Those factors that influence the cost of loading to DOE in the but-for world are known today. Tr.5542:22 - 5543:23 (Brewer).

610. “The question of what would have happened in 1998, while a question that involves some uncertainty, is a question that at least has boundaries and the boundaries being the facts as they existed at the time, the technology that existed at the time, and the regulatory environment that existed at the time.” Tr.5543:24-5544:6 (Brewer).

611. The type of cask that DOE may actually use to accept the spent fuel from Point Beach in the future does not help to estimate what type of cask DOE would have brought to Point Beach had it started accepting spent fuel in 1998. Tr.5642:9 - 5643:24(Brewer).

612. Based on the 1991 and 1995 ACRs, WEPCO would have loaded 11 GA-4 truck casks in 1998; 28 casks in 1999; 13 casks in 2000; 18 casks in 2001; 23 casks in 2002; 16 casks in 2003; 6 casks in 2004; 8 casks in 2005; and 10 casks in 2006. Tr. 5552:4 - 5557:4 (Brewer); DDX 3-30; DDX 3-31; DX 566; DX 584; DX 391 at 33-34 (WXE011 0035 - WXE011 0036); DX 619.

613. But-for loading costs should be based upon real data obtained from cask loading at WEPCO. Tr. 5546:17-21(Brewer).

614. The $179,253 cost calculated by WEPCO in its 2005 claim for mobilization for but-for loading, and the $47,851 cost for demobilization for but-for loading are two parts of the total loading cost calculation that should be used to calculate loading costs to DOE. Tr. 5546:22 - 5547:6 (Brewer); DDX 3-28; DX 391 at 29 (WXE011 0031); DX 248. The basis of the plaintiff's DOE loading estimate was used to prepare the budget for the 2006 loading campaign. Tr. 1896:8-12; 1897:15-22; 1902:19 - 1903:4; 1903:13-20; 1904:18-23 (Becka); Tr. 4710:10 - 4711:2; 4711:20 - 4712:2; 4712:8-11; 4714:19 - 4715:5; 4723:22-25 (Metcalfe); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-63; DX 248.

615. WEPCO included in its 2005 estimated loading costs, a per cask cost with a 5/6 modifier.[33] DX 498. In calculating the per cask cost for but-for loading, Mr. Brewer, the

---

[33] In its estimate of but-for loading costs ("costs to handle DOE containers"), Kenrich assumed that WEPCO would load a bolted 24-assembly cask to DOE in five days, as opposed to loading a welded 24-assembly cask to its ISFSI in six days. Tr.5547:7-21 (Brewer). Kenrich

Government's technical expert, removed the 5/6 modifier for the WEPCO estimate of mobilization and demobilization costs. Tr.1896:8-1897:22 (Becka); Tr.5547:7-5550:1 (Brewer). Based upon the expert opinions of Messrs. Brewer and Kiraly, the per cask cost for a large, 24-assembly rail cask is estimated to be $119,206.[34] Tr.5547:7-5550:1 (Brewer); DDX 3-28; DX 391 at 29-31 (WXE011 0031 - WXE011 0033); DX 248. However, the Government assumed in its calculations a GA-4 truck cask so divided the $119,206 cost by six and then applied that to the 123 casks that WEPCO would have loaded beginning in 1998 through 2005. See DFOF ¶ 613.

616. A legal weight truck cask should be assumed for the transfer of WEPCO SNF to DOE because there is no rail or barge facility at Point Beach to remove large rail casks. Furthermore, WEPCO indicated on its RW-859 form and on its DCS that it intended to use a light weight truck cask. Tr.5550:2-20 (Brewer). Use of a legal weight truck cask is conservative and benefits WEPCO because the loading costs would be less. The cost of loading a legal weight truck cask is $19,867 per cask. Tr.5550:2-5552:3 (Brewer); DDX 3-29; DX 391 at 31-32 (WXE011 0033 - WXE0011 0034).

617. Mr. Brewer assumed in his analysis of but-for loading costs that WEPCO would have used a GA4 legal weight truck cask that holds four PWR fuel assemblies. Tr.5550:2-12 (Brewer).

---

thus estimated that DOE's loading costs would be 5/6s of the WEPCO loading cost. Tr.1893:15-1895:23 (Becka). However, WEPCO conceded that this calculation did not apply to the costs to mobilize and demobilize. Tr.1895:7-1897:22 (Becka).

[34] This $119,206 estimate includes fixed labor, overhead, and other adjustments that the Government has challenged. See DFOF ¶ 615 for total with and without the adjustments.

618. The 2006 but-for loading costs can be calculated based on the actual costs WEPCO's incurred in 2006. Tr.5556:20 - 5557:12 (Brewer); DDX 3-31; DX 619.

619. In its initial report, the Kenrich Group quantified the cost of loading fuel to the DOE based upon use of a 24 assembly bolted cask. Tr.3895:12-25,Tr.3896:1-6, 4029:6-12 (Sieracki); DX 498 at 18; Tr. 3865:8-3866:8 (Sieracki); DX 498; DX 794. The Kenrich Group used t. Tr. 3896:1-11; DX 498 at 18.

620. The Kenrich calculation of but-for loading costs was based upon the quantification of mobilization, loading, and demobilization costs. Tr.3895:12-21 (Sieracki).

621. The offset the Kenrich Group calculated – totaling $4.7 million – was for avoided loading costs from 1998 through 2004. DX 498 at 18.

622. Kenrich later removed the but-for loading cost offset from its damages report dated May 8, 2006, based upon instruction of counsel. Tr.3894:7-3895:11 (Sieracki).

623. The Government's calculation of an offset for avoided DOE loading costs for 1998 through 2005 was based upon the plaintiff's own estimate for "handling DOE casks." The estimate included mobilization, loading, and demobilization costs where the mobilization and demobilization costs would be the same regardless of the cask being loaded. Tr. 1896:8-12; 1897:15-22; 1902:19 - 1903:4; 1903:13-20; 1904:18-23 (Becka); Tr. 4710:10 - 4711:2; 4711:20 - 4712:2; 4712:8-11; 4714:19 - 4715:5; 4723:22-25 (Metcalfe); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-63; DX 248.

624. The Government's calculation of an offset for avoided DOE loading costs for 2006 was based upon the actual loading data from WEPCO for 2006. The 2006 loading started in earnest at Point Beach on or around April 17, 2006. Costs from April 17, 2006 through June 8,

2006 related to loading costs. The costs related to project 3.0264 incurred prior to April 17, 2006 would be related to the mobilization and preparation for the loading campaign. The costs recorded after June 8, 2006 would be demobilization costs. Tr.1920:20-22; 1922:4-13; 1923:14-23; 1924:3 – 1925:1 (Becka); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-64. The actual cost per cask was $30,083 applied to ten casks.

625. Thus, based upon input from Mr. Brewer, Mr. Kiraly deducted a total of $3.68 million in avoided loading costs from WEPCO's damages claim.[35] Tr.6170:1-9 (Kiraly); DDX 5-65; DX 625 (Attachment 13, WXE 0220168 - WXE 0220184).

626. To the extent that a ruling on internal salaried labor or A&G is made in favor of the plaintiff, a higher offset – $5,642,637 – for loading costs would be appropriate. Tr.6170:1-9 (Kiraly); DDX 5-65; DX 625 (Attachment 13, WXE 0220168 - WXE 0220184).

627. The sale of WEPCO to FP&L Energy became final in or around October, 2007. Tr.5013:23-5014:5 (Weaver). Therefore, WEPCO will never incur the cost of loading SNF to the DOE in the future and the avoided costs offset should be taken against the damages claim asserted by WEPCO in this litigation.

## XXI. WEPCO'S CLAIM FOR WEIGHTED AVERAGE COST OF CAPITAL OR WEIGHTED AVERAGE COST OF DEBT

628. WEPCO's financing damages claim is based upon the weighted average cost of capital ("WACC"). Tr.4658:8-16 (Metcalfe).

[35] In the event that the Court rules that the 3000 MTU rate is the proper rate to be applied here, then the but-for loading cost assumptions will change, as follows: 247 casks would have been loaded at a loading cost of $4,259,510 with mobilization costs of $1,328,709 and demobilization costs of $204,795, for a total avoided cost of $ 5,793,014, excluding fixed labor and overheads. If the Court denies our challenge to plaintiff's labor and overhead costs, then the avoided cost increases to $8,805.716.

629. WACC accounts for the time value of money, which includes inflation, increase in the money supply, overall return of money, risk-free return, and the risk of a particular entity. Time value of money and the effects of financing are terms for the same thing. Tr. 4660:3-7; 4663:12-19; 4664:8-12; 4686:6-16 (Metcalfe).

630. WEPCO's alternative financing damages claim is based upon the weighted average cost of debt ("WACD"), essentially assuming SNF costs have been financed entirely at WEPCO's debt costs. Tr.6310:20-6313:16 (Metcalfe).

631. WEPCO's financing damages claims, the weighted average cost of capital or weighted average cost of debt, are based upon interest rates derived from all outstanding debt and equity, regardless of when it was raised, including financing completed long before the SNF expenses were incurred. Tr.5843:13-22 (Hamal).

632. Under the WACC approach, 75 to 83 percent of WEPCO's claimed financing costs are for stockholder profit. Tr.5845:16-5847:17 (Hamal); PDX 61 at 16; Tr.4669:6-4670:23 (Metcalfe).

633. WEPCO continues to finance projects with both debt and equity. Tr.6380:2-18 (Hamal).

634. WEPCO does not finance its expenditures solely through the use of debt. Tr.6358:15-6359:4 (Metcalfe).

635. WEPCO booked Allowance for Funds Used During Construction ("AFUDC") on capital projects and, therefore, has earned a return on some of its dry fuel storage costs. Tr.4661:11-18 (Metcalfe).

636. PSCW orders indicate that dry cask storage costs have been paid by ratepayers and that any costs recovered in this litigation will be returned to ratepayers. Tr.2702:23-2703:7 (Farron); Tr.4825:5-12 (Metcalfe); DX102/PX592 at WISC 00012219, 00012221; PX 686 at WISC 00123295-96.

637. WEPCO's financing damages claim ignores the recovery of costs from ratepayers. Tr.5853:15-5854:10 (Hamal).

638. A review of WEPCO's financing practices needs to consider three categories of costs: operating and maintenance ("O&M") costs, cask costs, and capital costs. Tr.5849:25-5853:14 (Hamal); DDX 4 at 45.

639. A utility recovers its O&M costs each year as they are incurred; its capital cost items over a period of time, depending on the depreciation schedule of each of the assets in question; and its fuels costs (cask costs) over generally shorter periods of time than capital items. Tr.6323:5-19 (Metcalfe); Tr.2994:18-2995:3, 2996:5-8 (Straub); DX 330.

640. WEPCO does not recover any kind of an interest component from its ratepayers relating to O&M costs. There were costs included in the claim that were O&M costs. Tr.2994:18-2995:3 (Straub); Tr.5850:19-25 (Hamal); Tr.6323:5-19 (Metcalfe).

641. WEPCO did not consider the fact that capital costs are recovered from ratepayers over time in its financing damages claim. Tr.5851:8-22 (Hamal).

642. Spent nuclear fuel casks are sold by WEPCO to the Wisconsin Electric Fuel Trust ("WEFT"). When WEPCO sells the casks to WEFT, the casks are sold at a price higher than the total cost, producing a profit for WEPCO. Tr.5852:4-5853:7 (Hamal); Tr.6381:16-6382:5 (Hamal).

643. WEPCO leases the casks back from WEFT over several years, with the lease payments recovered from ratepayers in the year they are incurred. Tr.5852:14-21 (Hamal).

644. WEPCO's financing damages claim based upon WEPCO's after-tax cost of capital does not take WEFT financing and the sale/lease-back arrangement into account. Tr.5852:22-5853:7 (Hamal).

645. Further, financing damages claim calculations based upon either the WACC or WACD are inconsistent with the WEFT. DX 26A/PX 0346 at WISC 00016913; DX 268/PX 679.

646. WEFT financing costs are very low, as low as less than one percent a year, which is much lower than either the WACC or WACD. Tr.6383:6-16 (Hamal).

647. WEPCO's financing damages costs are not tied to specific borrowing. Tr.5842:19-5843:1 (Hamal); Tr.6346:5-10 (Metcalfe); Tr.6379:13-18 (Hamal).

648. WEPCO's financing damages costs are not tied to the raising of specific equity. Tr.5843:1-12 (Hamal).

649. WEPCO has not raised capital through issuing debt or selling equity for its SNF costs. Tr.4666:9-4667:12 (Metcalfe).

650. WEPCO did not change its financing policies during the dry fuel storage project. Tr. 2995:4-11; 2995:21-25; 2996:1-4 (Straub); Tr. 4666:9-20; 4666:25 - 4667:19 (Metcalfe).

651. Mr. Metcalfe, WEPCO's damages expert, utilized the same economic methodology to determine the weighted average cost of capital for WEPCO that he did in Southern Nuclear Operating Company v. United States, 77 Fed. Cl. 396, 449 (2007), Northern States Power Co. v. United States, 78 Fed. Cl. 449, 471-72 (2007), and System Fuels, Inc. v.

United States, 79 Fed. Cl. 37, 67 (2007). Tr. 4660:3-7; 4663:12-19; 4664:8-12; 4686:6-16 (Metcalfe).

652. WEPCO's financing damages claim is simply a claim for prejudgment interest. Tr.5855:15-5857:6, 6378:6-6380:1 (Hamal); DDX4 47; Tr. 4673:25-4676:17, 4678:18-4679:6, 4681:22-4682:14 (Metcalfe); Keir and Keir, Litigation Services Handbook at 9-5.

653. Mr. Kiraly deducted $44,204,521.00 associated with WACC from WEPCO’s damages claim at the direction of counsel. Tr.6117:12-24 (Kiraly); Kiraly DDX 5-13.

## XXII. TOTAL ADJUSTMENTS MADE TO WEPCO’S DAMAGES CLAIM

654. The Government's damages expert, Mr. Kiraly, calculated total adjustments to plaintiff's damages claim, including an adjustment for but-for loading costs and the exclusion of the weighted average cost of capital (or prejudgment interest), of $86,281,996 million. Kiraly DDX 5-8. Therefore, the total adjusted damages claim is $10,259,004 million. DDX 5-8. A graphic representation of Mr. Kiraly's adjustments to WEPCO's claim for nominal costs (excluding interest and the temporary rack offset) is:

| | WEPCO Claim Category | | | | |
|---|---|---|---|---|---|
| | | | Private Fuel | Spent Fuel | |
| **Description** | **ISFSI** | **Dry Casks** | **Storage** | **Mgt** | **Total** |
| Past Costs in Claim | $ 20,682,871 | $ 31,535,692 | $ 883,503 | $ 1,282,054 | $ 54,384,120 |
| **Government Claim Adjustment Categories** | | | | | |
| Non-Incremental Salaried Internal Labor | $ (423,435) | $ (1,592,402) | $ 0 | $ (130,349) | $ (2,146,185) |
| Employee Expenses | (23,909) | (35,818) | 0 | (5,490) | (65,217) |
| Non-Incremental A&G Overhead | (121,628) | (553,067) | 0 | (568) | (675,263) |
| NRC Annual Fees | (2,283,333) | 0 | 0 | 0 | (2,283,333) |
| Private Fuel Storage | 0 | 0 | (883,503) | 0 | (883,503) |
| ISFSI & VSC-24 Casks 1-5 | (16,223,930) | (3,858,313) | 0 | (467,964) | (20,550,207) |
| TN-32B Metal Casks | 0 | (5,054,402) | 0 | 0 | (5,054,402) |
| Pursuit of Dual Purpose Casks | (1,051,043) | (7,727,796) | 0 | 0 | (8,778,839) |
| Total Adjustments to Past Costs | $ (20,127,278) | $ (18,821,798) | $ (883,503) | $ (604,372) | $ (40,436,950) |
| **WEPCO Claim After Adjustments** | **$ 555,594** | **$ 12,713,894** | **$ 0** | **$ 677,682** | **$ 13,947,170** |
| But-For Loading | | | | | (3,688,166) |
| **Net WEPCO Claim** | | | | | **$ 10,259,004** |

Source: Kiraly Demonstrative DDX 5-13.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial Attorney

STEPHEN FINN
SONIA M. ORFIELD
RUSSELL A. SHULTIS
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

March 25, 2008

CERTIFICATE OF FILING

I hereby certify that on this 25th day of March 2008, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Sharon A Snyder