**No. 00-697C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**WISCONSIN ELECTRIC POWER COMPANY**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF

---

**JEFFREY S. BUCHOLTZ**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director.**

**SHARON A. SNYDER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 305-9640**
**Fax: (202) 307-2503**

**OF COUNSEL:**
**JANE K. TAYLOR**
**Office of the General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN LO RE**
**Senior Trial Attorney**

**STEPHEN FINN**
**SONIA M. ORFIELD**
**RUSSELL A. SHULTIS**
**Trial Attorneys**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**

**March 25, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES. . . . . vii

SUMMARY OF ARGUMENT. . . . . 1

STATEMENT OF FACTS. . . . . 5

ARGUMENT. . . . . 5

I. WEPCO FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT DOE'S DELAY IN ACCEPTING SNF CAUSED IT TO IMPLEMENT DRY FUEL STORAGE AT POINT BEACH. . . . . 5

A. To Establish Causation, Wisconsin Electric Power Company Bore The Burden Of Demonstrating A Plausible "But For" Scenario.. . . . . 5

B. WEPCO Implemented Its Dry Fuel Storage Project To Bridge The Gap Between 1995 and 1998, When It Expected DOE To Perform Under The Standard Contract. . . . . 8

C. WEPCO's Application To The PSCW Reflected Its Need For At-Reactor Storage Assuming DOE Performance in 1998. . . . . 12

D. WEPCO's Assertions That The Assumptions It Presented To The PSCW Were Conservative Shed Doubt On Its Presentations To This Court. . . . . 15

E. There Is No Evidence In The Record To Support WEPCO's Assertion That It Re-Evaluated Its Decision To Build An ISFSI In 1992 Or That It Postponed The Final Decision To Implement Dry Fuel Storage At Point Beach Until 1995.. . . . . 16

F. There Is No Evidence In The Record To Support WEPCO's Assertion That It Would Have Used A Temporary Cask Pit Rack In The But-For World. . . . . 19

G. WEPCO's Fuel Management Assertions Do Not Reflect The Information Used By Management in 1989 When The Decision To Implement Dry Fuel Storage Was Actually Made. . . . . 22

TABLE OF CONTENTS (Cont'd)

PAGE(S)

II. IN ANY EVENT, EVEN IF WEPCO BELIEVED THAT DOE WOULD NOT TIMELY PERFORM WHEN IT DECIDED TO CONSTRUCT DRY STORAGE, THAT DECISION, WHICH PRE-DATES DOE'S 1994 ANNOUNCEMENT THAT IT COULD NOT TIMELY PERFORM, CANNOT FORM THE BASIS FOR RECOVERY OF DRY STORAGE DAMAGES. . . . . 25

III. TO THE EXTENT THAT THE COURT FINDS IT NECESSARY TO EVALUATE WEPCO'S ARGUMENTS REGARDING THE RATE AT WHICH DOE WAS OBLIGATED TO ACCEPT SPENT NUCLEAR FUEL UNDER THE STANDARD CONTRACT, WEPCO HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT DOE WAS OBLIGATED TO ACCEPT FUEL IN THE MANNER THAT WEPCO PROPOSES. . . . . 27

A. Because, As Established Above, WEPCO Made Its Decision To Construct Dry Storage Without Reference To DOE's Delay In Performance, The Court Need Not Decide WEPCO's Rate Of Acceptance Arguments In This Particular Case.. . . . . 28

B. To The Extent That The Court Finds It Necessary To Evaluate DOE's Rate Obligations In This Particular Case, WEPCO Must Establish A Rate At Which DOE Was Obligated To Perform To Prove That It Has Been Damaged By DOE's Delay In Accepting SNF From Point Beach. . . . . . 29

1. WEPCO's Argument That The Court Should Apply A Rate Of Acceptance That Is Inconsistent With WEPCO's Approved DCSs Should Be Barred By The Statute Of Limitations. . . . . . . . 29

2. The Standard Contract Contains No Language Imposing, And The History Of Its Formation Is Inconsistent With, The Rate Requirement That Plaintiff Proposes. . . . . 30

3. The Documents Upon Which Plaintiff Relies Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One That Plaintiff Advocates.. . . . . 37

4. The Rate Of Acceptance Should Be Determined In Accordance With The_APR/ACR Process Mandated By The Standard Contract, In Which Plaintiff Willingly Participated. . . . . . . . . . . 42

TABLE OF CONTENTS (Cont'd)

PAGE(S)


a. The Parties Agreed That The DCS Process Would Define The Rate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

b. Plaintiff Voluntarily Participated In The APR/ACR Process And Voiced Concerns To DOE When It Had Them About DOE's Administration Of The Standard Contract. . . . . . . 45

5. The Court Should Not Impose A "Reasonable" Rate Of Acceptance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

IV. WEPCO MAY NOT RECOVER THOSE COSTS ASSOCIATED WITH THE LOADING OF CASKS THAT WOULD HAVE OCCURRED EVEN IF DOE HAD TIMELY PERFORMED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

V. ANY DAMAGES INCURRED PRIOR TO NOVEMBER 16, 1994, THAT WEPCO SEEKS TO RECOVER ARE BARRED BY THE STATUTE OF LIMITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

VI. WEPCO'S DAMAGES CLAIM FAILS BECAUSE IT CONSTITUTES IMPROPER AND UNREASONABLE MITIGATION. . . . . . . . . . . . . . . . . . . . . 51

A. Plaintiff Has Failed Properly To Mitigate Its Damages. . . . . . . . . . . . . . . . 51

B. WEPCO's Investment In the TN-32B Metal Casks Was Unreasonable And, Therefore, Not Recoverable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

C. The Costs That WEPCO Incurred To Procure A Dual-Purpose Cask System Are Not Reasonable Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . 57

1. WEPCO's Investment In The NUHOMS Cask System Is Not Recoverable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2. WEPCO's Investment In Licensing Its VSC-24 Casks For Transportation Is Not Recoverable. . . . . . . . . . . . . . . . . . . . . . . . . 60

D. WEPCO's Investment In Off-Site Storage Is Not Recoverable.. . . . . . . . 62

TABLE OF CONTENTS (Cont'd)

PAGE(S)


1. WEPCO's Investment In Private Fuel Storage And Other Off-Site Storage Projects Was Unforeseeable And Speculative.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2. The Government Established That WEPCO's Investment In PFS Was Not Reasonable Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . 63

3. The Government Established That WEPCO's Investment In Other Off-Site Storage Options Was Not Reasonable Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

VII. WEPCO HAS FAILED TO MEET ITS BURDEN OF PROVING THAT FEES IT PAID FOR THE GENERIC ACTIVITIES OF THE NRC, 10 C.F.R. PART 171, WERE FORESEEABLE, OR CAUSED BY DOE'S DELAY, OR THAT THE ALLEGED DAMAGES RELATING TO THOSE FEES HAVE BEEN DEMONSTRATED WITH REASONABLE CERTAINTY.. . . . . . . . . . . . . . . . . 66

A. The Fees WEPCO Has Paid For NRC Generic Activities Were Not Foreseeable At The Time Of Contract Formation And DOE's Delay In Performance Was Not The Proximate Cause For WEPCO's Alleged Damages Related To NRC Fees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

1. Pre-1999 Fees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2. The 1999 Fee Change Rule And The Spent Fuel Storage/ Reactor Decommissioning Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . 70

B. WEPCO Has Failed To Demonstrate That It Has Been Harmed Because WEPCO Has Paid Less For Generic Fees In The Actual World Than It Would Have Paid In The Non-Breach World. . . . . . . . . . . . . . . . . . . . . . 79

C. WEPCO's Calculation Of Damages For The Spent Fuel Portion Of The NRC's Spent Fuel Storage/Reactor Decommissioning Fee Is Flawed, Includes Costs That Are Not Properly Included As Damages, And Duplicates Damages. . . . . . . . . . . . . . . . . . . 82

TABLE OF CONTENTS (Cont'd)

PAGE(S)


1. WEPCO's Argument That The Government Has Failed To Offer Contrary Evidence Regarding WEPCO's Calculation Of Damages For Costs For The Spent Fuel Storage/Reactor Decommissioning Fee Is Misleading, And Impermissibly Attempts To Shift Plaintiff's Burden Of Proof To the Government. . . . . . . . . . . . . . . . 82

2. WEPCO's Calculation Fails To Properly Account For 10 C.F.R. Part 170 Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

3. WEPCO's Calculation Fails Because It Improperly Includes Costs For A Surcharge That Would Have Been Incurred In The Non-Breach World. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

4. WEPCO's Calculation Fails Because It Improperly Includes Costs For Wet Storage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

5. WEPCO's Calculation Fails Because It Does Not Accurately Divide The Spent Fuel Storage/Reactor Decommissioning Fee Between Its Three Elements, Wet Storage, Dry Storage, And Reactor Decommissioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

VI. THIS COURT SHOULD ADJUST THE DAMAGES CLAIM FOR THE COSTS ASSOCIATED WITH CASKS THAT WOULD HAVE BEEN LOADED TO DOE FROM POINT BEACH ASSUMING DO PERFOMANCE IN 1998.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

VII. WEPCO CANNOT ESTABLISH CAUSATION FOR CERTAIN COSTS THAT IT ALLEGEDLY INCURRED FOR INTERNAL LABOR AND "OVERHEADS". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

A. A Portion Of WEPCO's Internal Labor And Associated Payroll Adjustments And Employee Costs Were Not Incremental. . . . . . . . . . . . 93

B. WEPCO's Claimed Administrative & General Costs Were Not Incremental.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VIII. WEPCO IMPERMISSIBLY SEEKS PRE-JUDGMENT INTEREST IN ITS DAMAGES CLAIM, WHICH IS NOT ALLOWABLE AGAINST THE GOVERNMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

TABLE OF CONTENTS (Cont'd)

PAGE(S)

A. WEPCO Cannot Recover Its Cost Of Capital. . . . . . . . . . . . . . . . . . . . . 100

B. WEPCO's Request To Recover AFUDC Is Untimely And, In Any Event, Unwarranted.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

# TABLE OF AUTHORITIES

CASES PAGE(S)

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978). .......... 95

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968). .......... 105, 108

Bluebonnet Savings Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001). .......... 106

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003). .......... 7

Boeing Co., ASBCA No. 18,916,
74-2 B.C.A. ¶ 10,976 (1974). .......... 33

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970). .......... 94

Campbell v. United States,
661 F.2d 209 (Ct. Cl. 1981). .......... 32

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003), aff'd on other grounds,
395 F.3d 1283 (Fed. Cir. 2005). .......... 106

Columbia First Bank v. United States,
54 Fed. Cl. 693 (2002). .......... 103

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003). .......... 32

Commonwealth Edison Co. v. United States,
271 F.3d 1327 (Fed. Cir. 2001), cert. denied,
535 U.S. 1096 (2002). .......... 69

Convoy Co. v. Sperry Rand Corp.,
672 F.2d 781 (9th Cir. 1982). .......... 95

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) , cert. denied,
532 U.S. 995 (2001)....... 27

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977). ....... 40

Dunn Appraisal Co. v. Honeywell Information Systems, Inc.,
687 F.2d 877 (6th Cir. 1982). ....... 95

England v. Contel Advanced Systems, Inc.,
384 F.3d 1372 (Fed. Cir. 2004)....... 102, 104

Federal Power Commission v. New England Power Co.,
415 U.S. 345 (1974)....... 68

Florida Power & Light Co. v. United States,
846 F.2d 765 (D.C. Cir. 1988), cert. denied, 490 U.S. 1045 (1989)....... 67, 68, 79

Gevyn Constr. Corp. v United States,
827 F.2d 752 (Fed. Cir. 1987)....... 105, 108

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001)....... 7

Hercules Inc. v. United States,
292 F.3d 1378 (Fed. Cir. 2002)....... 32

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005). ....... 26

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005)....... passim

John R. Sand & Gravel Co. v. United States,
128 S. Ct. 750 (2008)....... 30, 51

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). ....... 47

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Koby v. United States,
54 Fed. Cl. 493 (Fed. Cl. 2002). ........ 52

LTV Aerospace Corp., ASBCA No. 17,131,
76-1 B.C.A. ¶ 11,840 (1976)........ 33

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) , rev'd on other grounds,
317 F.3d 1363 (Fed. Cir. 2003)........ 52

Library of Congress v. Shaw,
478 U.S. 310 (1986)........ 101-102

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958)........ 104

Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Commission,
601 F.2d 223 (5th Cir. 1979), cert. denied, 444 U.S. 1102 (1980)........ 67

Monessen Southwestern Railway Co. v. Morgan,
486 U.S. 330 (1988)........ 102

Myerle v. United States,
33 Ct. Cl. 1 (1897). ........ 70

National By-Products, Inc. v. United States,
405 F.2d 1256 (Ct. Cl. 1969). ........ 39

National Cable Television Association, Inc. v. United States,
415 U.S. 336 (1974)........ 67-68

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707, 713 (1975)), rev'd on other grounds,
317 F.3d 1363 (Fed. Cir. 2003)........ 52

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007). ........ 95, 104-105

Old Stone Corporation v. United States,
450 F.3d 1360 (Fed. Cir. 2006)........ 70

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006)........ 7

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal docketed, No. 2007-5046 (Fed. Cir. Jan. 24, 2007) ("PG&E")........ passim

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002)........ 52

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003)........ 30

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006), appeal docketed, No. 2007-5052 (Fed. Cir. Feb. 6, 2007) ("SMUD")........ 95, 99

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961)........ 94

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997)........ 6

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974)........ 40

Skinner v. Mid-America Pipeline Co.,
490 U.S. 212 (1989)........ 68

Southern Nuclear Operating Company v. United States,
77 Fed. Cl. 396 (2007)........ passim

St. Christopher Assocs., L.P. v. United States,
511 F.3d 1376 (Fed. Cir. 2008)........ 40

System Fuels, Inc., System Energy Resources, Inc. et al. v United States,
78 Fed. Cl. 769 (2007)........ 99

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007), appeal docketed, No. 2008-5025 (Fed. Cir. Jan. 9, 2008)........ passim

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

TEG-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006)........................................................................ 33

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). ............................................................... 95, 99, 103-104

United States Steel Corp. v. United States,
618 F. Supp. 496 (Ct. Int'l Trade 1985). ........................................................ 40

Westfed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002). ................................................................................ 106

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002).......................................................................... 8

Wickham Contracting Co. v. Fisher,
12 F.3d 1574 (Fed. Cir. 1994)........................................................................ 104

Wickham Contracting Co. v. GSA,
GSBCA No. 8675, 92-3 B.C.A. ¶ 25040, 1992 WL 88326 (GSBCA 1992),
aff'd, 12 F.3d 1574 (Fed. Cir. 1994)................................................................ 104

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961). .............................................................. 6

Wilner v. United States,
23 Cl. Ct. 241 (1991). ..................................................................................... 94

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980). ........................................................................ 94

Yankee Atomic Electric Co. v. United States,
73 Fed. Cl. 249 (2006). .................................................................................. 27

STATUTES AND REGULATIONS

28 U.S.C. § 2501.......................................................................................... 30, 51

28 U.S.C. § 2516(a). .............................................................................. 105-106

31 U.S.C. § 9701 (1982). ................................................................................ 67

TABLE OF AUTHORITIES


| STATUTES AND REGULATIONS | PAGE(S) |
|---|---|
| 42 U.S.C. § 2214(c)(3). | 73, 78 |
| 42 U.S.C. § 7178 (1982). | 68 |
| 42 U.S.C. § 10168(d)(1). | 43, 44 |
| 42 U.S.C. § 10222(d). | 76 |
| 10 C.F.R. § 72. | 68-69, 74 |
| 10 C.F.R. § 170. | passim |
| 10 C.F.R. § 171. | passim |
| 10 C.F.R. § 961.11, Art. XV.. | 35 |
| FAR § 43.205, 48 C.F.R. § 43.205. | 104 |
| 33 Fed. Reg. 10,923 (Aug. 1, 1968). | 67 |
| 51 Fed. Reg. 33,224 (Sept. 18, 1986). | 67 |
| 51 Fed. Reg. 33,230. | 68 |
| 55 Fed. Reg. 7,510 (Mar. 2, 1990). | 68 |
| 56 Fed. Reg. 14,870 (Apr. 12, 1991). | 69 |
| 56 Fed. Reg. 31,472, 31,482-86 (Jul. 10, 1991). | 69 |
| 64 Fed. Reg. 31,448.. | 71 |
| 64 Fed. Reg. 31,455.. | 71 |
| Pub. L. 99-272, 100 Stat. 82 (1986). | 68 |
| Pub. L. 100-203, 101 Stat. 1330 (1987). | 68 |
| Pub. L. 101-508, 104 Stat. 1388 (1990). | passim |

TABLE OF AUTHORITIES

MISCELLANEOUS PAGE(S)

Fed. R. Evid. 801. .......... 10

Fed. R. Evid. 803. .......... 10

Restatement (Second) of Contracts § 211(b). .......... 35

Restatement (Second) of Contracts § 251 (1981). .......... 27

Restatement (Second) of Contracts § 350(2). .......... 26, 52

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-697C |
| | ) | (Senior Judge Merow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's post-trial scheduling order, defendant, the United States, respectfully submits the following post-trial brief.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, Wisconsin Electric Power Company ("WEPCO"), for approximately $52.3 million in costs and $44.2 million in prejudgment interest that it allegedly has incurred through December 31, 2005, at its Point Beach nuclear power plant, associated with the storage of spent nuclear fuel ("SNF"). The majority of WEPCO's claim, aside from its prejudgment interest claim, seeks costs relating to the engineering, design, licensing, and construction of a type of dry SNF storage facility known as an Independent Spent Fuel Storage Installation ("ISFSI") at the Point Beach plant. WEPCO contends that the Government is liable for these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and WEPCO.

As the Government established at trial, WEPCO's causation theory is meritless. WEPCO has failed to meet its burden of proving that DOE's delay in accepting SNF from Point Beach caused it to implement dry storage. When WEPCO first disclosed its damages claim in July 2005, the claim was predicated upon the argument that, had DOE performed by beginning acceptance of SNF from WEPCO's Point Beach plant in 1998, WEPCO would not have needed any additional storage at the site. As such, WEPCO argued that it was entitled to all of the costs that it incurred to add dry storage at Point Beach. After extensive discovery by the Government, and after WEPCO's company witnesses had been confronted with the many company documents establishing that, when it made its decision to implement dry storage, WEPCO believed that it would run out of SNF storage capacity before DOE was obligated to begin SNF acceptance from the Point Beach plant, WEPCO reformulated its claim.

At trial, WEPCO asserted that it had known all along that it would need additional SNF storage capacity before DOE was to begin acceptance in 1998. WEPCO asserted that, had it believed that DOE would have performed as expected, it would have handled that problem by the use of a temporary storage rack in the cask laydown area of its spent fuel pool. WEPCO asserted that this project would have been performed during the 1993 through 1996 time period, but that its belief that DOE was not going to begin SNF acceptance in 1998 caused it to implement dry storage instead.

However, the evidence at trial demonstrated without question that WEPCO decided in 1988 that it would implement dry fuel storage or an ISFSI to increase the storage capacity for SNF at the Point Beach Nuclear Plant ("Point Beach" or "PBNP"). As we established, WEPCO planned to build its ISFSI to "bridge the gap" between 1995 and 1998, assuming DOE

performance in 1998. Document after document from that period, as opposed to plaintiff's after-the-fact, self-serving testimony, indicate the same thing: WEPCO was running out of room in its spent fuel pool, WEPCO wanted to maintain full core reserve for many operational reasons, WEPCO could not re-rack its SNF pool again, and, therefore, WEPCO must build an ISFSI. As we established at trial, there is no support for WEPCO's assertion that it would have used a temporary rack had it believed that DOE would commence accepting SNF in 1998. Several witnesses, including Gary Krieser,[1] testified that WEPCO never considered using a temporary rack until 1998. There is no mention of a temporary rack in WEPCO's 1991 application to the PSCW for authorization to implement its dry fuel storage project. Furthermore, we established that Dr. Singh's report (the second report that he submitted for WEPCO, on that conflicted with his first report) was not technically sound and could not support WEPCO's assertions. Moreover, we established that, when WEPCO made its decision to build an ISFSI in late 1988, WEPCO management determined that it could not re-rack the SNF pool a third time, or implement any additional at-reactor storage that might increase the weight in the pool because of concerns that the pool had reached its maximum weight capacity. The Government established that WEPCO would have needed an ISFSI in the but-for world, and would have loaded five casks in order to maintain full core reserve ("FCR"). In other words, WEPCO failed to meets its burden of establishing that the DOE delay caused it to implement dry storage.

To determine what, if any damages WEPCO has incurred because of DOE's delay in accepting SNF, the Court must first compare the expenditures that plaintiff actually incurred

---

[1] Mr. Krieser is currently the manager of quality assurance for Wisconsin Energy Power. He began working for WEPCO beginning in 1977. Tr. 1509:8-1518:14 (Krieser).

against the expenditures that it would have incurred in the absence of any partial breach by DOE. If plaintiff fails to prove that it would not have incurred a particular expenditure absent a breach, it is not entitled to a damage award for that expenditure. If WEPCO would have performed a project or incurred a cost absent any partial breach, WEPCO is responsible for that cost. Awarding plaintiff damages for that expenditure would not place it in the same position that it would have occupied absent the breach, but would place it in a better position. No theory of contract law permits an award of damages under this circumstance.

The Government established that WEPCO's damages claim should be reduced to $10,259,000. We established that the fabrication of the ISFSI and the procurement and loading of the first five casks at WEPCO would have occurred even assuming DOE acceptance of SNF beginning in 1998 and, thus, that those costs must be adjusted out of WEPCO's claim. We established at trial that WEPCO's claim for three TN-32B casks, its pursuit of dual-purpose storage (including the NUHOMS cask system and licensing the VSC-24 cask for transportation), and its expenditures on off-site private fuel storage were unreasonable mitigation and those expenditures should be eliminated from WEPCO's damages claim. We further established at trial that WEPCO's claim for NRC fees was not foreseeable and, in any event, that those fees were not caused by DOE's delay in accepting SNF.

WEPCO failed to prove that several of its components of damage were incremental to the partial breach. Most notably, it has failed to demonstrate that certain A&G or overhead costs and internal labor costs would not have been incurred in the absence of the Government's failure timely to commence spent fuel acceptance. In fact, the evidence adduced at trial indicates that WEPCO would have incurred the same costs in these categories irrespective of the delay in

DOE's performance. In the absence of proof that these costs were incremental to the partial breach, WEPCO is not entitled to recover these components of its damages claim.

Finally, we established that WEPCO's claim for weighted average cost of capital, weighted average cost of debt, and AFUDC is nothing more than a claim for prejudgment interest that is not available against the Government unless otherwise provided by contract or statute. WEPCO's cost of capital damages are little more than an attempt to obtain an award of prejudgment interest despite the absence of any waiver of sovereign immunity relating to such an award, and they are not an appropriate component of damage.

## STATEMENT OF FACTS

The Government has submitted a separate document containing its proposed findings of fact.[2]

## ARGUMENT

### I. WEPCO FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT DOE'S DELAY IN ACCEPTING SNF CAUSED IT TO IMPLEMENT DRY FUEL STORAGE AT POINT BEACH

#### A. To Establish Causation, Wisconsin Electric Power Company Bore The Burden Of Demonstrating A Plausible "But For" Scenario

The United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), provides the proper framework for evaluating damages in a spent nuclear fuel case. In that case, in which the

[2] "PX __" and "DX __" refers to plaintiff's and defendant's exhibits, respectively. "Tr. __" refers to the trial transcript or, where the testimony of witnesses has been admitted through the designation of prior testimony, to the applicable transcript and the date upon which the testimony was provided. "DFOF ¶¶ __" refers to paragraphs contained in defendant's proposed findings of fact. In addition, defendant files a separate document containing its responses to plaintiff's proposed findings of fact.

plaintiff purported to seek "mitigation damages," the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its finding that the utility could not show that its actions were caused by DOE's breach and that these actions would have taken place even in the absence of a partial breach. Id. at 1376.

In light of this holding, the question is not simply whether the actions that plaintiff took were the product of a "reasonable" business judgment made in an effort to limit its damages. As a threshold matter, WEPCO must prove, as a means of demonstrating that the costs that it incurred were "caused" by the partial breach, that it would not have incurred these so-called mitigation costs absent any delay. See San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961) ("[T]he measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance.").

Requiring WEPCO to depict an accurate "but for" world is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal docketed, No. 2007-5046 (Fed. Cir.

Jan. 24, 2007) ("PG&E"),[3] recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world against which to measure causation. Specifically, the Court stated that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

To establish causation in this context, Indiana Michigan requires WEPCO to show that, at a minimum, had DOE begun accepting fuel in 1998, it would not have incurred the costs it now seeks as damages. Imposition of this requirement is necessary to ensure that plaintiff is merely restored to the position that it would have occupied in the absence of DOE's delay in performance and is not reimbursed for costs that it otherwise would have been required to incur, and is thus placed in a better position than it would have occupied but for any breach by DOE.

[3] The Federal Circuit heard oral argument of the appeal in PG&E on February 4, 2008.

See Indiana Michigan, 422 F.3d at 1373; Bluebonnet, 339 F.3d at 1344-45 (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party should on no account get more than would have accrued if the contract had been performed." (internal quotation marks and citation omitted)); PG&E, 73 Fed. Cl. at 385 (same).

B. WEPCO Implemented Its Dry Fuel Storage Project To Bridge The Gap Between 1995 and 1998, When It Expected DOE To Perform Under The Standard Contract

WEPCO argues, relying principally on hindsight and the testimony of witnesses that has changed over time, that the only reason it chose to build an ISFSI was because DOE was not going to begin acceptance of its SNF by January 1998. See, e.g., Pl.Br.at 15. In making its case, for example, WEPCO relies upon testimony it elicited at trial, which we demonstrated was directly contradicted by testimony or documents of those same witnesses when WEPCO was actually planning or implementing the dry fuel storage project. WEPCO also relies upon fuel management models that its experts prepared for the litigation, rather than on fuel management information reviewed in 1988, 1989, 1990, and 1991, when the decision to implement dry storage at Point Beach was made. WEPCO seldom relies upon contemporaneous documents that reflect WEPCO's decision, preferring to ignore those documents that do not support its arguments. To determine whether WEPCO would have implemented dry fuel storage in the but-for world, the Court must focus on documents and testimony contemporaneous with that decision, not, as WEPCO would have it, on documents and testimony created long after the decision was made, and after the litigation was filed.

WEPCO first argues that there were no plans for an ISFSI at WEPCO in 1983, when the Standard Contract was signed, and indeed no plans for an ISFSI at any time until WEPCO knew

that DOE would not begin performance of the Standard Contract – a date that shifts in WEPCO's argument depending upon the point it strives to make – from 1985 to 1995. Pl.Br. at 17-18. However, in 1983, WEPCO could not have known if it would need to build an ISFSI, because WEPCO had no idea as to the amount of SNF that would be accepted by DOE beginning in 1998. Indeed, WEPCO expected that the amount of fuel to be accepted would be determined later. Tr. 2203:13-2206:25. (Porter). Furthermore, WEPCO's assertions completely ignore documents in 1977 and 1986, which clearly state that WEPCO would need additional at-reactor storage before 1998. See DFOF ¶¶ 159-165. In March 1986, after the SNF pool had been reracked a second time, one of the Point Beach technicians who monitored pool inventory informed J.J. Zach, the Point Beach plant manager, that, depending upon the assumption that was made – maintenance of one FCR, two FCRs, or no FCR – the Point Beach SNF pool would run out of room in 6.5 to 10 years, before 1998:

> All of these occur long before the DOE is pledged to start accepting spent fuel in 1998. This information should be considered in determining the timing of alternatives such as reconstitution, dry storage, or another spent fuel pit.

DX184 (emphasis added).

WEPCO relies principally on two witnesses – Howard Shimon[4] and Sol Burstein[5] – to argue that WEPCO believed it had sufficient storage space to avoid any at-reactor storage before 1998. And yet, Mr. Shimon testified that he understood, assuming that WEPCO would maintain FCR, that WEPCO would be forced to shut-down in 1994 or 1995, without additional at-reactor storage.[6] DFOF ¶¶ 165.

By the late 1980s, WEPCO internally began discussing the possibility of dry fuel storage, because it had already reracked its SNF pool twice and did not consider a third rerack a viable alternative. DFOF ¶¶ 166. WEPCO agreed to participate in a demonstration project which it believed might result in the acquisition of a dry storage system at a cheaper price. DFOF ¶¶ 167. Mr. Zabransky, who was the project administrator for the demonstration project at WEPCO, testified that because WEPCO had already re-racked its SNF pool twice, another re-rack was not a viable option. Tr.973:1-13 (Zabransky). The proposed demonstration project, using VSC-24

---

[4] Mr. Shimon is a former WEPCO employee who was employed there from 1979 to 1995.

[5] WEPCO relies upon Sol Burstein to support its assertions that WEPCO would never have implemented dry fuel storage if DOE had performed beginning in January 1998. See,e.g., Pl.Br. at 17-19; PFOF at ¶¶ 75, 77. However, WEPCO was unable to introduce any testimony from Mr. Burstein because he passed away prior to this litigation. Plaintiff impermissibly introduced Mr. Burstein's purported testimony into the trial by asking Mr. Shimon to testify about Mr. Burstein's thoughts and understandings. Although there may be ways to introduce some available evidence relating to a witness who is deceased, asking another witness to provide hearsay testimony is not one of them. Fed. R. Evid. 801, 803. The Court cannot properly rely upon Mr. Shimon's testimony to indicate what Mr. Burstein believed or would have testified. Id.

[6] WEPCO knew it would ultimately have to replace the Unit 2 steam generators and that this replacement required removal of the full core. Tr.234:20-22 (Baumann). By the early 1990s, WEPCO anticipated that this replacement would occur sometime in 1996 or 1997. Tr.332:16-22 (Link); PX 251 (1992 correspondence to PSCW indicates steam generator replacement in 1996-1997 period); DX 54; DX 73 at 1315-1318. For WEPCO, maintaining FCR was not optional.

casks, "had the potential for being a lot less expensive than the other technologies that were in use. Id. WEPCO management informed Mr. Zabransky that one goal for additional at-reactor storage must be maintaining FCR. DFOF ¶¶ 176 While FCR was not a policy at WEPCO, it continues to be considered a good operating practice there. DFOF ¶¶ 138-142. In order to maintain FCR in 1988, WEPCO needed storage for 504 fuel assemblies, or 21 24-assembly casks. DFOF ¶¶ 169.

The decision to implement dry fuel storage, instead of pursuing other options, was made in or around 1989 by WEPCO's major project review committee. DFOF ¶¶ 175. At that time, based upon information regarding SNF discharges, as well as the assumed length of time to obtain the NRC license and authorization from the PSCW, WEPCO planned to have the ISFSI ready to be loaded by 1994. DFOF ¶¶ 170. In the 1989 Work Order Requisition, Charles Fay stated that:

> Additional spent fuel storage capacity will be required at Point Beach Nuclear Plant in 1994 to allow for continued operation. . . . It is not possible to provide additional storage by re-racking the spent fuel pool (this has been twice previously).

DFOF ¶¶ 172. In every WEPCO communication sent regarding the ISFSI project, WEPCO stressed the need for dry fuel storage before 1998, even assuming timely DOE performance, in order to continue operations. Mr. Fay sent correspondence to another utility, with similar information:

> At our present usage rate, full core reserve in our spent fuel pool will no longer be available after 1995. Accordingly, we are proceeding with the development of an independent spent fuel storage installation (ISFSI) to supplement the storage capacity of our spent fuel pool and expect to have this facility operational by 1994.

DFOF ¶¶ 177; see also DX 442 at HQR 364 0032 (March 1986 RW-859 states at section 3.22 that WEPCO loses its ability to operate the Point Beach reactor in September 1996); DX 444 at HQR 364 0063 (February 1987 RW-859 states at section 3.22 that WEPCO loses the ability to operate the Point Beach reactor in September 1996); DX 445 at HQR 364 0072 (February 1988 RW-659 states that WEPCO loses the ability to operate the Point Beach reactor in April 1997).

In a video developed for public outreach and stockholder meetings as part of its public relations effort regarding the ISFSI project, WEPCO explained that:

> The spent fuel pool was designed to store spent fuel only temporarily, but after 20 years and several reconfigurations, the spent fuel pool at Point Beach is nearing its limit. **By mid-1995, there will be no more room. To bridge the gap until the federal facilities are ready, Wisconsin Electric is proposing to build a temporary dry storage facility.**

DFOF ¶¶ 185-187 An internal WEPCO publication, Synergy, published in 1992, provided information about the upcoming ISFSI project to WEPCO employees and described the ISFSI, as follows:

> The facility would be sized for 48 casks to accommodate operation of Point Beach through the end of its current licenses (2010 for Unit 1 and 2013 for Unit 2). The application submitted to the PSCW **requested only 12 casks – enough to bridge the gap between mid-1995, when the spent fuel pool would be full, and the acceptance of fuel at the MRS, scheduled to open in 1998.**

DFOF ¶¶ 188, see also DFOF ¶¶ 189 (Question and Answer Brochure indicates construction of ISFSI will begin in late 1992, with usage beginning in 1994). DFOF ¶¶ 189. After Robert Link became Vice-President of the Nuclear Power Department, he too confirmed the original operation date of June 1994 for the ISFSI. DFOF ¶¶ 191.

C. WEPCO's Application To The PSCW Reflected Its Need For At-Reactor Storage Assuming DOE Performance in 1998

WEPCO argues in its brief that its 1991 application to the PSCW for authorization of the ISFSI project reflects the anticipated DOE delay in accepting SNF from Point Beach. Pl. Br. at 23. However, its application reflects a need for additional at-reactor storage before January 1998, and a continuing assumption that DOE would perform.

WEPCO submitted its application to the PSCW in November 1991 for authorization to build its ISFSI and to begin loading the first five casks placed into service in 1994, with a total of 12 casks loaded through 1998. DX171 at WISC 00014727. With respect to WEPCO's rationale for implementing dry fuel storage, while WEPCO was uncertain whether DOE would begin performance in 1998, it was certain about its needs before then. WEPCO stated in its application that:

> Additional spent fuel storage will be required at Point Beach in 1995 to allow for the continued operation of the plant while maintaining the capability to discharge one full-core of fuel assemblies to the spent fuel pool should the need arise.

DX171 at WISC 00014730.[7] The application requested the construction of a storage facility with a maximum capacity of 48 casks, but with an immediate request for only 12 casks. In testifying about the size of the ISFSI, Mr. Zabransky explained that:

---

[7] The application also stated that:

> While the project as proposed addresses only the storage capacity required through 1998, Wisconsin Electric believes that it is necessary to plan for the possibility that the DOE may not meet is schedule.

DX 171 at WISC 00014730.

> Well, as of that point, that was presumed to be enough casks [45] to contain all the spent fuel that would be discharged by Point Beach from that point forward that needed to be stored outside the spent fuel pool, maintaining full core reserve. And the reason we did that was because we had done two major projects previously to expand the spent fuel storage capacity, which was the first two reracks. . . . We didn't want to have to go through an incremental project later on, since again, this required state approval, this required NRC approval, it was going to be the final time we had to create such a project and get it approved. And because of the incremental nature, we only would deploy the storage we needed.

Tr.1003:18-1004:14 (Zabransky). Mr. Zabransky made clear that the reason for the ISFSI at Point Beach was because the SNF pool there was running out of space. If additional at-reactor storage was not implemented, the facility would need to shut-down by 1995. While DOE acceptance was on the WEPCO radar, and the size of the proposed ISFSI was for the life of the plant, the continuing rationale for the project was to bridge the gap in storage in the SNF pool from 1995 to 1998. DFOF ¶¶ 186-188. Plaintiff completely ignores this need for storage as early as 1995 and attempts to use current data and testimony to make its argument. However, the Court must rely upon the same data and assumptions that WEPCO relied upon in the 1987-1991 time in order to understand WEPCO's decision, rather than information that is litigation-driven, as WEPCO now suggests.

In its application to the PSCW, WEPCO assumed two FCRs and assumed that, if DOE performed beginning in 1998, it would use the lower bounding rate in the 1990 ACR. Under those assumptions, WEPCO understood it would require 12 casks through 1998, and an additional two casks through 2007. Id. at WISC 00014753. As Mr. Zabransky explained, WEPCO decided on the ISFSI project to meet its immediate need for additional at-reactor storage

and to meet any additional needs that it might have in the future. DFOF ¶ 176; Tr.1003:23-1004:14, Tr.1004:15-1006:2 (Zabransky).

D. WEPCO's Assertions That The Assumptions It Presented To The PSCW Were Conservative Shed Doubt On Its Presentations To This Court

WEPCO asserts in its brief that it used "highly conservative," "overly conservative," and "conservative" assumptions in its submissions to the PSCW for authorization to implement an ISFSI at Point Beach. Pl.Br. at 23-25. It allegedly did so in an effort to "create a greater sense of urgency." First, there is no contemporaneous evidence to support this assertion. In addition, this raises a number of other issues for WEPCO. First, if WEPCO could manage its SNF inventory without any ISFSI until 1998 and beyond, as it now claims, there was really no reason for any urgency in 1991, as WEPCO describes. Second, a number of witnesses represented that WEPCO endeavored to provide accurate and truthful information to the PSCW. For example, Mr. Porter, a retired WEPCO Senior Vice-President, testified that there was typically an internal vetting of the facts that would be presented to the PSCW by the nuclear power department, first to the nuclear affairs group and then to the officers submitting the application to ensure the accuracy of the document. Tr. 2225:4-21 (Porter); see also Tr.257:12-258:12 (Baumann) (tables representing discharges at Point Beach submitted to PSCW true and accurate); Tr.776:17:780:10 (Zabransky) (information regarding relevance of FCR at Point Beach included in the ISFSI application true and accurate); Tr.1128:21-1130:8 (Zabransky) (WEPCO always endeavored to provide true and accurate information to the PSCW); Tr.1602:2-1603:16 (Krieser) (information provided to PSCW indicated loss of installed capacity by 1997, true and correct).

Furthermore, Mr. Zabransky, the ISFSI project manager, testified that he understood, as he and others at WEPCO were planning the project, that it would take approximately five years to implement. Tr.984:16-986:20 (Zabransky). He based his understanding on discussions with other utilities, for example, Virginia Power, which had already built an ISFSI at its site. In establishing the timetable for the ISFSI project, Mr. Zabransky testified that he considered the time he and others at WEPCO believed it would take the PSCW to make a decision, with a complete understanding of all the potential issues that might arise before the PSCW. WEPCO pointed to no documents that indicated any sense of urgency in the project that needed to be communicated to the PSCW. In fact, there is no contemporaneous evidence in the record to support WEPCO's assertion that the information submitted to the PSCW was overly or highly conservative. WEPCO's after-the-fact trial testimony that contradicts all of the contemporaneous evidence is simply not trustworthy or reliable.

### E. There Is No Evidence In The Record To Support WEPCO's Assertion That It Re-Evaluated Its Decision To Build An ISFSI In 1992 Or That It Postponed The Final Decision To Implement Dry Fuel Storage At Point Beach Until 1995

WEPCO's assertion that Robert Link re-evaluated the decision to implement dry fuel storage at WEPCO in 1992 is likewise not supported by the evidence. Plaintiff cites to an August 20, 1992 memorandum from Mr. Link to WEPCO employees (PX258) as evidence that he re-evaluated the project because he knew that it would be a contentious and arduous process to obtain approval. Pl. Br. at 30; PFOF ¶108. However, quite the contrary, that memorandum reiterated the scheduled operation of the ISFSI beginning in June 1994, and announced the appointment of Kevin Annundson as the project manager. See PX258. In fact, Mr. Link

optimistically estimated that PSCW approval of the project would be announced in May 1993. Id. (see DFOF ¶ 191). Nor does the correspondence from WEPCO to the PSCW, dated November 20, 1992, support WEPCO's assertion that Mr. Link evaluated different options before he decided to proceed with the ISFSI. See PX271 (correspondence providing economic evaluation of ISFSI project); DFOF ¶ 192. The testimony at trial supports the Government's assertion that there were no further evaluations conducted to determine if there were options other than the ISFSI. For example, Mr. Krieser testified that no formal studies, evaluations, or analyses were conducted to evaluate other options besides dry fuel storage. DFOF ¶¶ 207. Mr. Baumann testified that he could not find any studies, evaluations, or analyses regarding options such as fuel management strategies to determine if the amount of fuel discharged from the Point Beach reactors could be reduced. Tr.217:6-221:4 (Baumann). In all of the memoranda created at WEPCO during the period 1989 through 1995, WEPCO never states that it is re-evaluating its decision to implement dry fuel storage. Quite the contrary, in all documents introduced at trial, WEPCO is unwavering in its commitment to implement the ISFSI project beginning in 1994 or 1995. DFOF ¶¶ 186-196.

Mr. Link's contemporaneous testimony before the PSCW in 1994 directly contradicts WEPCO's assertions that he did not make the final decision to build an ISFSI at WEPCO until 1995, after he was certain that DOE would not perform in 1998. Mr. Link testified before the PSCW in 1994 that the dry fuel storage application to the PSCW was based upon the assumption that DOE would begin acceptance of spent fuel from WEPCO in 1998 and that WEPCO needed 12 casks before DOE commenced acceptance in 1998:

> We still need an ISFSI prior to 1998 which is the first date by which we believe DOE is obligated to take fuel. Yes, we considered DOE obligated to take fuel starting in 1998. That does not negate the need for an ISFSI.
>
> * * *
>
> As I stated, that does not negate the need for the ISFSI to be constructed, utilized with the 12 casks we asked for through 1998.
>
> * * *
>
> I can state that the [dry fuel storage] proposal is based on the 1998 take date underneath the provisions of the contract.

PX 907B at 534-535 (WPS002 6484-6485); DFOF ¶¶ 197. In his pre-filed testimony before the PSCW, dated October 11, 1994, Mr. Krieser testified that, "after the Unit 1 spring outage in 1997, there will not be enough spaces to accommodate all the spent fuel from another refueling outage." DFOF ¶¶ 198.

In a response to the PSCW, dated July 21, 1995, Mr. Krieser also recognized WEPCO's need for an ISFSI assuming DOE performance in 1998:

> The date when spent fuel is actually removed from Point Beach is uncertain. The findings of fact in PSCW Docket 6630-CE-197 speculated that a DOE permanent repository may not be in operation until the year 2023. DOE, however, is under contract to begin removing spent fuel in 1998 and WEPCO believes that offsite centralized interim storage or Point Beach fuel beginning about 1998 is a more likely scenario than waiting for the DOE permanent repository to begin operations.

DX73 at WISC 00001305. Mr. Krieser and Mr. Link continued to inform the PSCW as late as July 1995, that DOE performance at an MRS in 1998 was still possible.

WEPCO cites to the final Environmental Impact Statement ("EIS") issued by the PSCW in July 1994 to support its assertion that it could operate until 1998 or 1999. Pl. Br. at 31.

However, WEPCO fails to explain that the economic analysis by the PSCW in that EIS hinges on the issue of whether shut-down of Point Beach in 1998, necessitated by the fact that, without dry fuel storage there would be no room in the SNF pool, was more expensive than continuing to operate Point Beach with dry cask storage and replacement of the Unit 2 steam generators before 1998. DX 26A at WISC 00003583-3596. The PSCW staff determined that, indeed, it was a better option to implement dry cask storage and replace the steam generators. Completely missing from WEPCO's "analysis" of the PSCW order is the fact that the PSCW recognized, that after 1994, WEPCO only had one full core reserve, after 1995, WEPCO could only unload part of a core, and, after 1997, WEPCO could not unload any additional SNF into its pool. DX26A at p. xv. Under these circumstances, WEPCO would not be able to replace its steam generators in 1996, which it asserted to the PSCW was necessary in order to continue operating efficiently. The PSCW's EIS, and all contemporaneous document, including the testimony of Messrs. Link and Krieser before the PSCW in 1994, demonstrate that WEPCO needed dry cask storage assuming DOE performance in 1998, and its commitment to the project was unwavering.

F. There Is No Evidence In The Record To Support WEPCO's Assertion That It Would Have Used A Temporary Cask Pit Rack In The But-For World

WEPCO asserts that it would have used a temporary rack in the but-for world had DOE begun accepting SNF beginning in 1998. Pl. Br. at 37-41. However, WEPCO's arguments are meritless because, as we will explain below, they are based upon a flawed analysis of the actual space that WEPCO had in its SNF pool. Further, WEPCO's assertions that it re-evaluated its options in 1992, and would have used a temporary rack, but did not knowing DOE would not

perform, are based strictly on after-the-fact self-serving testimony of Robert Link and others which is not supported by contemporaneous documents.

WEPCO's witnesses admitted that there was no discussion of the use of a temporary rack at WEPCO until at least 1998, after the DOE breach. DFOF ¶¶ 201, 205-206. That is true because a temporary rack would not have satisfied WEPCO's perceived storage needs in the early 1990's. A temporary rack - as indicated by its name - is a means by which WEPCO might have achieved full-core reserve by placing a rack in the cask laydown area in the spent fuel pool. However, a temporary rack would not have solved WEPCO's storage issues. As long as WEPCO needed to use the cask laydown area to load casks, any rack placed in that area cannot be used for storage of SNF indefinitely. DFOF ¶¶ 202, 204. Further, in its 1991 application for an ISFSI to the PSCW, WEPCO projected that, at its then-current rate of discharge, even with planned improvements to the spent fuel pool, WEPCO would have exceeded the usable capacity of the pool with the fall 1997 discharge, requiring the shut down of one of its operating units. DFOF ¶¶ 203. Finally, use of a temporary cask pit rack would have added weight to the SNF pool and would have necessitated NRC licensing. As Mr. Zabransky testified, WEPCO management ruled out any option for additional storage space in the SNF pool that would have required seeking approval from the NRC because analyses indicated that the pool had reached its maximum weight. DFOF ¶¶ 210, 221.

WEPCO relies upon the expert testimony of Dr. Krishna Singh to support its assertion that the NRC would approve use of a temporary rack. Pl.Br. at 39. However, Dr. Singh's opinion does not address the relevant issue - whether WEPCO would have chosen to procure a temporary rack in the early 1990's instead of building an ISFSI. Dr. Singh admitted that his

opinion was limited to the "technical feasibility" of procuring a rack for the cask laydown area at Point Beach. DFOF ¶ 230-234. He did not offer an opinion regarding the efficacy of WEPCO's procuring a temporary rack in the early 1990's to meet its long-term storage needs. Additionally, Dr. Singh admitted that his report was on the level of a "scoping study" which far short of the analysis required if WEPCO had actually chosen to purchase a temporary rack. Consequently, Dr. Singh never inspected the Point Beach SNF pool to determine whether the fuel in WEPCO's spent fuel pool could have been moved in such a manner to provide sufficient space to permit the use of divers for the installation of a cask pit rack - he simply assumed that full core reserve was available in the 1995 to 1996 period for installation of a cask pit rack. Indeed, the lack of rigor in Dr. Singh's analysis is evidenced by the fact that he submitted two reports in this case, the initial report in May 2006, and a revised report in June 2006.[8] Tr.4429:7-4431:9 (Singh). Dr. Singh never demonstrated the actual viability of using a temporary cask pit rack. See DFOF ¶ 231-234. Dr. Singh's opinion was little more than an after-the-fact technical opinion to support WEPCO's litigation-driven strategy. It was not evidence that shows WEPCO would have considered using a temporary rack.

Further, the Kenrich report is little more than an after-the-fact report, as well. As we demonstrated at trial, Kenrich submitted its first report on July 14, 2005, with no mention of the temporary rack as a potential offset in the but-for world. DDX1-15. The strategy that WEPCO now seeks to embrace as the one that it would have used in the but-for world was not even mentioned in its 2005 expert report. Not until the second Kenrich report, dated May 8, 2006, did

---

[8] For example, in his first report, Dr. Singh did not know how the seismic restraints were attached to the SNF pool at Point Beach, what assumptions were made regarding removal of an anti-tipping frame, or what, obstructions might exist. Tr.4433:1-4440:8 (Singh).

the temporary rack make its appearance as the strategy that WEPCO would have used to alleviate the loss of storage capacity in its SNF pool in the but-for world. In fact, Mr. Sieracki[9] acknowledged that he and certain WEPCO employees not employed by WEPCO during the time when it was actually making its ISFSI decision, invented this theory during a series of meetings in 2005 and 2006. DFOF ¶¶ 238-242. As we have clearly demonstrated, WEPCO had no plans to use a temporary rack, or any other option except an ISFSI, when it was planning for additional at-reactor storage beginning in 1989 and through 1995, when the first VSC-24 cask was loaded at Point Beach.

### G. WEPCO's Fuel Management Assertions Do Not Reflect The Information Used By Management in 1989 When The Decision To Implement Dry Fuel Storage Was Actually Made

Again using hindsight, instead of the data that was available to WEPCO in 1988 and 1989, WEPCO asserts that it would not have needed to build an ISFSI had DOE timely performed. Pl.Br. at 34-37. Relying in large part on the Kenrich fuel management model, WEPCO claims that it would not have exceeded the SNF pool capacity before DOE performed in 1998. WEPCO again asks the Court to turn a blind eye to the information that was actually used by it in making its decision to implement dry cask storage, and rely instead upon after-the-fact litigation testimony and documents. Such a strategy is contradicted by the evidence before the Court.

WEPCO claims that 1,500 spaces in its SNF pool could have been made available to store SNF at Point Beach. Pl.Br. at 34. However, there is no evidence before the Court which

[9] Mr. Sieracki, along with Kenneth Metcalfe, co-own the Kenrich Group and were WEPCO's damages experts.

demonstrates that even today WEPCO is able to use 1,500 spaces in its SNF pool to store fuel assemblies, and yet WEPCO asks the Court to find that those spaces could have been made available in the but-for world. In fact, the evidence showed that in 1991, when WEPCO applied for authorization to construct its ISFSI, there were 1,415 spaces in the spent fuel pool that were available to store fuel assemblies. In its application, however, WEPCO assumed that most of the spaces that were then unusable could be made available. WEPCO's judgment was that 20 spaces was a reasonable estimate of the number that would remain inaccessible after WEPCO took additional steps to make spaces available. Tr.647:4-24 (Zabransky); Tr.2210:19-2211:11 (Porter); DX 171 at WISC 00014753; DX 50 at HQR364 0465. By 1994, the year of the PSCW hearings on the dry cask storage project, 1,468[10] spaces had been made available in the spent fuel pool for storage of fuel assemblies. DX 450 at HQR364 0688. After PSCW approval of the dry cask storage facility, the number of usable spaces in the spent fuel pool remained at 1,468 for several years. Tr.137:24-138:23 (Baumann); PX 381 at HQR364 0809. Even as late as 1997, when WEPCO was unable to load VSC-24 casks because of the hydrogen burn event,[11] only 1,484 spaces had been made available for storage of fuel assemblies in the spent fuel pool. Tr. 2112:23-2113:1 (Holzmann), DX 75 at WISC 00059463. The 2003 fuel inventory shows that there were six spaces still unavailable for the storage of SNF as of August 2003. DFOF ¶¶ 261.

---

[10] The Final Environmental Impact Statement prepared by the PSCW, and issued in August 1994, using data provided by WEPCO, assumed that 1,457 spaces were available in the spent fuel pool for storage of fuel assemblies. 2759:20-2760:3; 2760:19-2761:14 (Anundson), PX 346 at WISC 00003759.

[11] During the welding of the third cask lid, because of a build-up of hydrogen under the shield lid, an ignition occurred, which raised the shield lid. Tr.200:20-201:10 (Baumann); see also DFOF ¶¶ 273-284.

Furthermore, the Kenrich model, based upon hindsight exclusively, never evaluates SNF pool capacity or the potential need for additional at-reactor storage at the time when WEPCO asserts it was re-evaluating its options – in the 1994-1995 time frame.

Moreover, defendant demonstrated several times during the trial that, assuming WEPCO maintained FCR, and using the information known to WEPCO in 1991, WEPCO would have lost FCR in 1995, just as WEPCO had informed the PSCW. For example, Mr. Baumann indicated in his testimony that the Point Beach SNF pool would lose FCR after the fall 1995 refueling outage. P.Dem. 7 [with defendant's markings]; Tr. 235:4-239:24 (Baumann). Mr. Zabransky also testified that, using the assumptions included in the application for the ISFSI submitted to the PSCW, WEPCO would lose FCR in 1995. DDX1-9; Tr.1062:10-1068:16 (Zabransky).[12]

During trial, WEPCO made vague references to the potential for storing SNF in other locations in the pool, in an apparent attempt to support its assertion that running out of space by a modest margin would not be of concern. However, its contemporaneous actions belie this conclusion. As Mr. Hamal testified, the $5 million TN-32B cask program could have been delayed, and ultimately avoided, if WEPCO could have made room for 15 fuel assemblies (or fewer, under WEPCO's claims of spent fuel pool capacity). WEPCO conducted a formal study of SNF storage options in 1998, and selected the TN-32B project over other alternatives. While the 1998 study was motivated by the need in the actual world to address storage concerns brought about by WEPCO's inability to load further VSC-24 casks, in the but-for world, the need for

[12] The assumptions in the 1991 application included the discharge of 28 fuel assemblies each 12-month cycle (or 56 fuel assemblies per year for the facility); starting with a fuel inventory of 1,126 filled spaces in the SNF pool as of July 1991, after the spring 1991 outage, and, at the time, 20 unusable spaces. Tr.1064:3-1068:16 (Zabransky).

additional storage would have been motivated by the need to bridge the gap before DOE acceptance. In either case, the ability to store such additional fuel assemblies would have been based upon the physical properties of the pool. And we have WEPCO's actions and conclusions in the actual world to point out the fallacies of what it now claims it would have done in the but-for world.

WEPCO must demonstrate to the Court that, given the facts it had then, it actually could have changed its option, assuming DOE performance in 1998. WEPCO has provided no analysis or evaluation of that scenario, including whether it could have withstood PSCW oversight under those circumstances. WEPCO has failed its burden of proof in that regard.

## II. IN ANY EVENT, EVEN IF WEPCO BELIEVED THAT DOE WOULD NOT TIMELY PERFORM WHEN IT DECIDED TO CONSTRUCT DRY STORAGE, THAT DECISION, WHICH PRE-DATES DOE'S 1994 ANNOUNCEMENT THAT IT COULD NOT TIMELY PERFORM, CANNOT FORM THE BASIS FOR RECOVERY OF DRY STORAGE DAMAGES

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the United States Court of Appeals for the Federal Circuit held that SNF plaintiffs seeking partial breach damages potentially may recover damages that pre-date the 1998 contract breach, assuming that they establish causation and foreseeability, as part of their duty to mitigate. It stated that "Section 350, comment b of the Restatement of Contracts advises that '[o]nce a party has reason to know that performance by the other party will not be forthcoming," whether pre-breach or post-breach, "he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" Id. at 1375 (emphasis added). Once a party has "reason to know" that the other party will not perform, he is then obligated to attempt to mitigate his damages, and he is "not precluded from recovery . . . to

the extent that [he] has made reasonable but unsuccessful efforts to avoid loss." Id. (quoting Restatement (Second) of Contracts § 350(2)).

Evaluating DOE's announcements regarding its acceptance of SNF, the Federal Circuit held that, "because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps" at that time. Id. at 1375 (emphasis added). In identifying this date, the appellate court rejected the plaintiff's argument that, based upon DOE announcements in 1987 and 1989, plaintiff reasonably believed that DOE would not perform. In the 1987 and 1989 documents to which the Indiana Michigan plaintiff referred, see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649 n.22 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), DOE represented that, although it would not have a repository available by 1998, it still anticipated being able timely to begin SNF acceptance at a temporary facility. A351, 354, 372.

Here, WEPCO made its decision to construct dry storage prior to DOE's 1994 announcement. The only basis for WEPCO's "belief" that DOE would not timely perform beginning in 1998 were the same documents that the Indiana Michigan court rejected as a basis for such a belief. Because the referenced documents clearly indicate DOE's express intention to perform in 1998, WEPCO could have "known" that DOE would not perform. Its mere "suspicions" that DOE might not perform were insufficient to impose a duty to mitigate, especially where DOE repeatedly indicated its expectation that it would timely perform. Mitigation is a duty, not a right, and damages incurred mitigating the consequences of a breach are inappropriate where no such duty has yet arisen. Given that DOE made no pronouncements

that it would delay SNF acceptance until 1994, WEPCO has no basis for arguing that DOE "caused" WEPCO to construct dry storage.

Had WEPCO wanted to confirm a pre-breach "reasonable belief" that DOE would not timely perform, it could have sought assurances from DOE that, if not forthcoming, could have provided a basis for such a belief. In the context of anticipatory repudiation, the Federal Circuit has recognized that, where a party fears future non-performance, "the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." Danzig v. AEC Corp., 224 F.3d 1333, 1337-38 (Fed. Cir. 2000) (quoting Restatement (Second) of Contracts § 251 (1981)), cert. denied, 532 U.S. 995 (2001). In these circumstances, "reasonable grounds [will then] support the obligee's belief that the obligor will breach the contract." Id. at 1337. Although WEPCO has made no claim of anticipatory repudiation, the rationale for creating a reasonable basis for a belief of future non-performance is the same. Yet, WEPCO presented no evidence that it sought "adequate assurance of due performance." Accordingly, it has no basis for seeking to recover costs to which it committed itself before DOE's 1994 announcement.[13]

[13] We acknowledge that, in Yankee Atomic Electric Co. v. United States, 73 Fed. Cl. 249 (2006), this Court held that the Federal Circuit in Indiana Michigan did not preclude a finding that the duty to mitigate might begin before 1994. We respectfully disagree with that decision. In any event, WEPCO has not identified any objectively certain announcement by DOE that pre-dates its 1994 announcement that would rise to the level of a definitive pronoucement of future breach that would give rise to a duty to mitigate.

## III. TO THE EXTENT THAT THE COURT FINDS IT NECESSARY TO EVALUATE WEPCO'S ARGUMENTS REGARDING THE RATE AT WHICH DOE WAS OBLIGATED TO ACCEPT SPENT NUCLEAR FUEL UNDER THE STANDARD CONTRACT, WEPCO HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT DOE WAS OBLIGATED TO ACCEPT FUEL IN THE MANNER THAT WEPCO PROPOSES

### A. Because, As Established Above, WEPCO Made Its Decision To Construct Dry Storage Without Reference To DOE's Delay In Performance, The Court Need Not Decide WEPCO's Rate Of Acceptance Arguments In This Particular Case

WEPCO asserted at trial and in its post-trial brief that it would not have had to implement dry storage if DOE had performed as required by the Standard Contract. Pl.Br. at 5. WEPCO further asserts that the rate at which DOE was obligated to performed is derived from program documents such as DOE's 1983 Draft Mission Plan and statements by DOE officials in 1983. Pl. Br. at 15. In short, WEPCO is arguing that DOE was obligated to perform at a particular rate, and that, because DOE did not do so, WEPCO was forced to implement dry storage. Pl.Br. at 43.

As an initial matter, and as we established above, WEPCO's decision to pursue dry storage was wholly independent of DOE's performance under the Standard Contract. WEPCO's decision regarding the implementation of dry storage was predicated upon its SNF storage needs prior to the time that DOE was obligated to begin SNF acceptance, rather than DOE's obligation to accept WEPCO's SNF at any particular rate. Indeed, WEPCO made its decision to implement dry storage even before DOE issued its 1991 ACR, the document mandated by the Standard Contract upon which DOE was to begin making contractual commitments regarding the rate of SNF acceptance. Accordingly, the Court could, and indeed should, determine that WEPCO's pursuit of dry storage was not caused by DOE's delay in acceptance regardless of what that performance would have looked like. As a result, and because (as we will discuss below) the

number of additional casks that WEPCO had to purchase because of DOE's delay is the same regardless of whether the 900 MTU or the 3,000 MTU rate is applied, there is no need for the Court to decide the rate issue upon which WEPCO is relying.

### B. To The Extent That The Court Finds It Necessary To Evaluate DOE's Rate Obligations In This Particular Case, WEPCO Must Establish A Rate At Which DOE Was Obligated To Perform To Prove That It Has Been Damaged By DOE's Delay In Accepting SNF From Point Beach

#### 1. WEPCO's Argument That The Court Should Apply A Rate Of Acceptance That Is Inconsistent With WEPCO's Approved DCSs Should Be Barred By The Statute Of Limitations

Should the Court find it necessary to examine WEPCO's assertions regarding DOE's obligations under the Standard Contract, it should conclude that, because the rate at which WEPCO asserts that DOE must perform was not the rate determined by the mechanism within the Standard Contract, the 900 MTU rate described in the 1991 ACR is the only rate at which DOE was obligated to perform.

WEPCO contends that the Standard Contract required DOE to accept fuel at a rate that would eliminate the need for additional expenditures upon spent fuel storage after 1998 and therefore asks the Court to identify a "reasonable" rate that satisfies this test. Yet, it submitted DCSs for approval to DOE, without objection or reservation of rights, that did not comply with that alleged requirement, and, in 1992 and 1993, DOE approved those DCSs. Absent the DCS process, there is no basis for DOE's acceptance of any specific amounts of SNF. Essentially, WEPCO is complaining that, in approving DCSs that did not comply with the acceptance standards that WEPCO now proposes, DOE breached the Standard Contract, which presumably required DOE to issue DCSs meeting WEPCO's acceptance standards.

However, WEPCO's DCSs were approved in 1992 and 1993. DFOF ¶ 127. WEPCO did not file this lawsuit until November 2000, more than six years after DOE allegedly "breached" its obligations to set a schedule, through approved DCSs, in compliance with the program contract obligations that WEPCO now argues existed. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This statute of limitations sets a jurisdictional requirement that this Court may not waive. John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753-57 (2008). WEPCO should be time-barred from raising any challenge to DOE's alleged breach of contract in issuing DCSs that do not comport with the schedule that WEPCO now claims is mandatory.

2. The Standard Contract Contains No Language Imposing, And The History Of Its Formation Is Inconsistent With, The Rate Requirement That Plaintiff Proposes

Even if not time-barred, WEPCO's schedule arguments are incorrect. "Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' [citation omitted] the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original); see PG&E, 73 Fed. Cl. at 375 n.38 (damages can be determined "[o]nly by determining the scope of plaintiff's performance obligation"). WEPCO contends that the Standard Contract required DOE to accept fuel at a rate that would eliminate the need for additional expenditures upon spent fuel storage after 1998 and therefore asks the Court to identify a "reasonable" rate that satisfies this test. Yet, there is no basis in either the NWPA or the Standard Contract for

such a test. By arguing that DOE was obligated to perform at the rate that plaintiff (unilaterally) deems to be reasonable, plaintiff is asking the Court to rewrite the contract using terms to which the parties not only never agreed, but that were expressly rejected during the course of the contract formation process.

At trial, WEPCO failed to cite to any language in either the NWPA or the Standard Contract that requires DOE to accept SNF at a rate designed to preclude utility at-reactor storage after 1998. Instead, the witnesses who participated in the formation of the Standard Contract, or who claimed knowledge based largely upon inadmissible hearsay evidence, testified (1) that they "understood" the Standard Contract to contain such a standard (or, alternately, that it required DOE to accept fuel at a rate commensurate with the industry-wide generation rate and that would begin to work off the backlog); or (2) with perfect circularity, that DOE's decision not to accept such a qualitative standard was of no moment because the terms of the contract already required DOE to accept fuel at such a rate. DFOF ¶ 57, 72. Most of these witnesses further testified that they derived their "understanding" not from the Standard Contract itself, but from discussion with other WEPCO employees who apparently had this understanding about the Standard Contract. See e.g., Tr. 441:3-25 (Link). One of the witnesses at trial, David Zabransky,[14] testified that he understood from the start of his work at WEPCO as contract manager of the Standard Contract, that the contract did not include any qualitative test which was why the industry continued to ask DOE to include one in the Standard Contract after 1983. WEPCO attempts to marginalize Mr. Zabransky's efforts at WEPCO, but it is unquestionable that he knew

[14] Mr. Zabransky was employed by WEPCO from 1980 to July 1994. He is currently DOE's contracting officer for the Standard Contract.

first hand based upon his work with industry groups, such as EEI and UNWMG, what the industry was seeking from DOE at the time. Mr. Zabransky's testimony at trial was entirely consistent with the documents that were created contemporaneously with WEPCO's decision to implement dry fuel storage.

WEPCO's arguments are fundamentally flawed for several reasons. First and foremost, there is no dispute that the Standard Contract does not contain or incorporate any language that supports plaintiff's purported understanding. The importance of the absence of any such language, though perhaps lost in the course of a lengthy trial, cannot be overstated. WEPCO asks the Court to endorse an interpretation of a document that would impose billions of dollars in contractual liability upon the United States without even the faintest glimmer of textual support. To endorse such an interpretation is to defy the most fundamental rule of contract interpretation – that it "begins with the plain language of the written agreement." Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 662 (2003) (citing Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002)).

Second, the Standard Contract contains an integration clause providing that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party." DFOF ¶ 56. The language in the integration clause in no uncertain terms precludes WEPCO's attempts to rely upon either the statements of DOE officials or DOE-issued documents, whether pre- or post-contract formation, as the source of DOE's obligation to accept fuel at a particular rate. Where a contract includes an integration clause, "it is a fair bet that the parties agreed to no more than they said." Campbell v. United States, 661 F.2d 209, 218 (Ct. Cl. 1981). It is for precisely this reason that, in PG&E, this Court found that "[t]he existence of the

integration clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term." PG&E, 73 Fed. Cl. at 385.

Third, even assuming that it is appropriate to refer to anything other than the plain terms of the Standard Contract to discern the parties' obligations, the rate that WEPCO has asked the Court to incorporate, though perhaps "reasonable" in the eyes of the utilities that requested such a term, is wholly inconsistent with both the intentional omission from the Standard Contract of any qualitative rate standard and the history of the parties' negotiations. Because the Standard Contract was promulgated through notice-and-comment rulemaking in which WEPCO participated, there is a substantial administrative record containing industry comments and requests regarding the originally proposed contract terms that can assist in interpreting the Standard Contract. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976) (analyzing regulatory administrative history in interpreting contract clause developed through notice-and-comment rulemaking); Boeing Co., ASBCA No. 18,916, 74-2 BCA ¶ 10,976 (1974) (same); see also TEG-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006) (relying upon pre-award discussions between Government and bidders, in which the plaintiff participated, to confirm that the plaintiff's understanding of the contract comported with its plain language). This record conclusively demonstrates that DOE unequivocally rejected the very rate that WEPCO's witnesses now claim to be consistent with their understanding of the Standard Contract and confirms that WEPCO and the industry groups to which it belonged fully understood the clear implications of this rejection.

In response to DOE's February 4, 1983 proposed rule, which contained no rate of acceptance, Edison Electric Institute ("EEI") and Utility Nuclear Waste Management Group

("UNWMG"), utility trade associations of which WEPCO was a member, specifically requested that DOE add a two-part minimum acceptance rate obligation in the Standard Contract that would contractually obligate DOE to accept SNF at a rate (1) commensurate with the amount of such fuel and waste then being generated together with (2) the amount of such fuel and waste previously generated. DFOF ¶ 11, 28; see Tr.3441:10-3443:20 (Supko) (after contract was signed, UNWMG sought, and DOE rejected, an amendment to the contract to include a qualitative test). DFOF ¶ 65-67.

While there was evidence presented at trial that the industry, including WEPCO, wanted assurances that DOE would accept fuel fast enough so as to prevent the need for additional storage, neither those assurances nor the two-part test were incorporated into the Standard Contract. DFOF ¶ 25-58; see PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). In fact, the evidence adduced at trial demonstrated that the utility industry, in general, and WEPCO's witnesses, in particular, were aware of the fact that the final version of the Standard Contract did not incorporate a rate of acceptance. Tr.1388:23-24 (Shimon). DOE explained in the Federal Register notice accompanying the promulgation of the final version of the Standard Contract that it had declined to accept the utilities' suggestion that the Standard Contract include performance standards other than a January 31, 1998, commencement date for spent fuel acceptance. DFOF ¶ 45, 47. The utilities understood that the "performance standards" that DOE chose not to incorporate into the contract included a rate of acceptance. DFOF ¶ 45,

63-67. Adoption of WEPCO's litigation-inspired interpretation of the Standard Contract would require the Court to accept a position that, factually, was not substantiated at trial.

Importantly, the evidence is also undisputed that DOE did not understand the Standard Contract to impose the performance standard that WEPCO advocates. As Robert Morgan, the first director of DOE's Office of Civilian Radioactive Waste Management, testified, the large number of technical, budgetary, and regulatory uncertainties surrounding a complex and unprecedented nuclear waste acceptance program that was to commence 15 years in the future would have made it "unconscionable" for DOE to commit to any particular rate of acceptance in 1983. DFOF ¶ 48. These uncertainties, of course, were the same ones that EEI and UNWMG identified when they recognized, in providing comments to the proposed Standard Contract, that in 1983 it was too early for the parties to commit themselves to any particular set of acceptance criteria. DFOF ¶ 27. The parties expressly recognized as much in the body of the Standard Contract, and they specifically agreed that its terms had been developed "in the light of uncertainties necessarily attendant upon long-term contracts." DFOF ¶ 58 (10 C.F.R. § 961.11, Art. XV).

At trial, WEPCO attempted to distance itself from the understanding of the Standard Contract that EEI and UNWMG, or any other utilities, espoused during the contract formation process was irrelevant to WEPCO and to argue that it should not be bound by those understandings. These arguments fail for a number of reasons. First, the law is clear that standardized contracts are to be interpreted uniformly amongst all contract holders. See Restatement (Second) of Contracts § 211(b). This tenet is particularly apt, where, as here, the negotiations were conducted as part of a public notice-and-comment process in which plaintiff

itself participated. It simply cannot be the case that the obligations of the United States to accept fuel from the industry under a Standard Contract, in a sequence determined by the order in which fuel was discharged by individual members of the industry, are actually subject to dozens of different subjective interpretations.

Second, as WEPCO demonstrated at trial, it was not merely a passive member of these organizations. Both Mr. Shimon and Mr. Zabransky served on task forces for these organizations that were devoted to the Standard Contract. DFOF ¶ 74-81. Mr. Shimon worked on transportation issues, while Mr. Zabransky focused on issues specific to the standard contract. Tr.1327:15-1328:9 (Shimon); Tr.743:6-750:19 (Zabransky); DX 544. Mr. Zabransky was active in EEI, UNWMG, and UWASTE and he was chairman of the high-level waste working group and chairman of the Electric Power Research Institute ("EPRI") spent fuel committee. Tr.593:6-18 (Zabransky); DFOF ¶ 74-81. The industry knew or, at a minimum, was on notice that DOE did not agree to a rate of acceptance when it refused to incorporate specific language that EEI and UNWMG had suggested. Plaintiff ignored DOE's actions at their own peril.

Finally, the evidence showed that, even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add the two-part test to the Standard Contract (requiring DOE to work off the backlog within 10 years) and that, once again, DOE did not accept any industry request for a minimum receiving rate for SNF. DFOF ¶ 63-67; see also Tr.3444:4-3450:21 (Supko) (EEI, in preparation for a rule-making, planned to ask DOE to include a minimum rate of acceptance in the contract).[15] Again,

[15] In fact, Mr. Shimon attended an industry meeting in Washington, D.C., on December 12-15, 1983, of the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. DX493; Tr.1414:5-1415:3 (Shimon). At that industry meeting, Loring

these efforts to amend the contract included the direct participation of Mr. Zabransky. DFOF ¶ 63. The repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the qualitative test which plaintiff now advocates was never a part of the contract between the parties.

#### 3. The Documents Upon Which Plaintiff Relies Do Not Evidence DOE's Intent To Be Bound To Any Rate Of Acceptance, Let Alone The One That Plaintiff Advocates

Plaintiff elicited evidence concerning a series of documents and statements outside the four corners of the Standard Contract that plaintiff claims demonstrates that DOE contractually committed itself to accept spent fuel at the rate that plaintiff advocates. As stated above, resort to these materials to discern the scope of DOE's obligation is unnecessary in light of the plain terms of the Standard Contract, the existence of the integration clause, the history of the formation of the contract, and the rejection of the test plaintiff advocates. However, even assuming arguendo that resort to such materials is proper, these materials do not demonstrate that the parties understood that DOE would commit to the rate that plaintiff advocated, or to any other rate.

First, plaintiff failed to introduce a single document substantiating DOE's obligations under the Standard Contract that pre-dates plaintiff's execution of the Standard Contract. The oldest documents to which plaintiff cites that speak to the issue of a rate of acceptance are a December 1983 draft mission plan, PX 52, and the statements that Mr. Morgan made in December 1983 as part of the Proceedings of the 1983 Civilian Radioactive Waste Management

---

Mills, the Vice-President of Nuclear Activities for EEI, at the time stated clearly that the utility industry intended to initiate a rulemaking on several issues, including the inclusion of detailed performance standards in the contract. DX493 at SNO069619; see also DFOF ¶ 64. And Mr. Mills acknowledged that rate of acceptance was a performance standard. Tr. 3924:18-3925:9 (Mills designation, Northern States trial, 11/16/06).

Information Meeting. DX 493. Of course, both of these statements were made after the Standard Contract was signed and, therefore, cannot be evidence of any "meeting of the minds." See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("[D]espite plaintiff's statement that 'the parties understood from the time of contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation]' [citation omitted], not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983.").

Second, the documents upon which plaintiff relies do not reflect DOE's understanding of its obligations under the Standard Contract. For example, the statements that Robert Morgan made in 1983 concerned only "basic strategy . . . outlined in the mission plan" and clearly stated that the proposed schedule was optimistic and that, in light of the challenges that the program faced, it would be necessary to have an alternate MRS program in place to ensure that waste acceptance could commence on or before January 31, 1998." DFOF ¶ 68 g, h. Similarly, the language in the draft mission plan, which was not even included in the final mission plan actually submitted to Congress, made clear that DOE would not begin publishing firm acceptance schedules until 1991 and that the rate described in that document merely reflected DOE's "planning basis." DFOF ¶ 68 f.[16] These statements are simply not probative of DOE's understanding of what was required under the Standard Contract. Indeed, the documents to which plaintiff cites, most notably the final version of the Mission Plan itself, consistently

[16] DOE chose not to incorporate a request from the industry that the rate contained in the Mission Plan be incorporated into the contract. DFOF ¶ 31, 51. For the same reason that the two-part test cannot be deemed part of DOE's obligation, any statements DOE made in its Mission Plan (and certainly, in a draft mission plan) do not rise to the level of, and are not probative of, a contractual obligation.

indicated that they are merely plans or strategies, that they were not contractually binding, and that it was the ACR process beginning in 1991, identified in the Standard Contract, that would be the means through which a firm delivery schedule was to be reached.. DFOF ¶ 68 e,f As the Court explained in examining the litany of documents that the radioactive waste management program has generated during the last 20 years, and upon which plaintiff now relies, "[t]he court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." PG&E, 73 Fed. Cl. at 391. As a result, "examples of predictions, hopes, goals, or aspirations . . . do not amount to binding promises that can be enforced by the court through the award of contract damages." Id. at 393; see National By-Products, Inc. v. United States, 405 F.2d 1256, 1263 (Ct. Cl. 1969) ("Before a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction.") Id. at 1263.

Importantly, the evidence squarely indicated that WEPCO appreciated the distinction between DOE's obligations and its plans. Mr. Zabransky testified that WEPCO did not believe that the 3,000 MTU rate was a contractual obligation:

> Q: Did Wisconsin Electric believe that an annual 3000 MTU acceptance rate was a contractual obligation?
>
> A: I don't think that's the case, no.
>
> Q: So you believe then that you do understand what the company's position was?
>
> A: I believe the company's position was it would have liked to have that as a contractual obligation, the company signed up to all the industry efforts to have that put into the contract. It never was put into the contract.

Tr.597:20-598:6 (Zabransky).

Third, much of the "evidence" upon which plaintiff relies to support DOE's understanding of the intent behind the NWPA and, apparently, DOE's understanding of its obligations under the Standard Contract, is not even admissible for that purpose. For example, WEPCO elicited evidence at trial concerning the personal understandings of DOE witnesses regarding the intent of Congress in promulgating the NWPA. Such evidence is of no relevance, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for the body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (Ct. Int'l Trade 1985). The opinions of DOE personnel are similarly inadmissible. See PG&E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA").[17]

[17] Undoubtedly, as plaintiff has suggested, it is appropriate to construe a Government contract in a manner consistent with the act that authorizes it. However, we are unaware of any case law suggesting, as WEPCO apparently contends, that the Court should interpret a Government contract so as to include a command that is expressed neither in the contract nor in the authorizing statute. Indeed, the Federal Circuit recently explained in St. Christopher Assocs., L.P. v. United States,511 F.3d 1376, 1383 (Fed. Cir. 2008), that regulations are not properly incorporated into Government contracts merely by implication. The same conclusion holds true with respect to the textually unsupported interpretation of the NWPA that plaintiff advances. It also bears noting in this regard that WEPCO was presented with the opportunity to challenge the terms of the Standard Contract as being inconsistent with the NWPA, but opted not to do so. DFOF ¶ 36. Adjudication of WEPCO's claim – and this Court's jurisdiction – is necessarily

Finally, WEPCO relied at trial upon the fact that DOE has assessed the adequacy of the fees charged the utilities under the Standard Contract based upon the assumption of a 3,000 MTU rate. This reliance is misplaced. As an initial matter, DOE expressly rejected the idea of obligating itself to any particular rate of acceptance at the time of contract formation because of the uncertainties in developing a program 15 years in the future. DFOF ¶¶ 47-58. By relying upon documents relating to fee adequacy, WEPCO would have the Court admit through the back door precisely the proposed obligation upon which DOE closed the front door during the contract formation process. There is no reason why DOE's plans for the program should be converted into obligations simply because they were employed by DOE in connection with DOE's financial planning analyses.

Second, the purpose of the total system life cycle cost analyses that DOE developed was to determine the cost for the entire waste acceptance program, rather than the cost associated with a particular rate of acceptance. DFOF ¶ 112-113. The financial planning documents that DOE generated did not uniformly utilize a 3,000 MTU rate. As a result, even when DOE changed its acceptance rate assumptions to account for performance at an MRS rather than a repository, the total projected system cost did not vary greatly and the per-kilowatt-hour fee did not change, thus belying plaintiff's assertion that it was paying for a particular rate. Id.

In the end, the fee-related documents upon which plaintiff relies focus solely upon how much it would cost to store tens of thousands of tons of ultrahazardous radioactive waste for tens of thousands of years. The initial rate at which DOE assumed, solely for purposes of calculating

---

limited to consideration of what the Standard Contract (and not some other authority) actually requires.

the total cost of the program, that it would accept spent fuel into this facility simply has no bearing upon its obligations pursuant to the contract between the parties.

4. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Plaintiff Willingly Participated

a. The Parties Agreed That The DCS Process Would Define The Rate

Although plaintiff asks the Court to import into the Standard Contract an obligation for DOE to accept 3,000 MTU of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). DFOF ¶ 25-58.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule mechanism seeks to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." DFOF 43.

Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." DFOF ¶¶ 16-17, 42.

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. DFOF ¶¶ 53 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. Mr. Zabransky testified that the schedule would be developed with the input of the utilities. Tr.748:9-750:19 (Zabransky); DX 544. And it was understood by WEPCO and the industry that the 1991 ACR would be contractually binding. Tr. 749:20-750:19 (Zabransky). As established at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTU of SNF for storage at an MRS prior to the operation of a Federal repository. DFOF ¶¶ 86-100; 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the

10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010. DFOF ¶¶ 99-100.

Plaintiff suggested at trial that the rates contained in the 1991 ACR were prohibited by the 1987 NWPA Amendments Act because they violated the statutory "linkage" that prevented construction of the MRS facility prior to the issuance of a license for the construction of a repository. See 42 U.S.C. § 10168(d)(1) . These arguments are unavailing. First, when it promulgated the 1991 ACR, DOE was aware that a repository would not be ready by 1998 and, instead, was making a good faith effort to secure performance at an MRS. Far from seeking to manipulate its obligations under the Standard Contract, DOE promulgated the rates contained in the 1991 ACR as part of its plan to begin performance at a repository in 1998 at the highest rate that existing law would permit. As the evidence demonstrated, and as DOE publicly explained, DOE believed that the best strategy for finding a party to host an MRS would be to leave the linkages in place, thereby alleviating concern from a potential host that the MRS would become a de facto repository. DFOF ¶¶ 84, 87. Once a repository host was located, DOE intended to seek congressional authorization to lift the construction linkage, a change in law that DOE believed would be easier to obtain after an MRS host had been located. DFOF ¶¶ 89. This change in the law is just one of several ways that the performance world would have differed from the world that exists today. However, it does not make DOE's plan "illegal" or demonstrate that the agency somehow acted in bad faith.[18]

[18] Mr. Vance, one of WEPCO's trial witnesses and a former employee of a DOE contractor, testified that he believed the rate in the 1991 ACR was reasonable and that it would meet the requirements of the standard contract. Tr.2307:1-22 (Vance).

Further, WEPCO ignores the fact that its own assumptions about DOE performance, as proposed in the draft mission plan upon which it so heavily relies, would itself require congressional authorization for a second repository. Like the modification of the construction linkage, such authorization would have required congressional approval. DFOF ¶¶ 68 a, g, 69. WEPCO cannot be heard to complain that the Government's conception of the performance world is "illegal" when the world that it seeks to depict would likewise have required legislative action.

In PG&E, the Court explained that plaintiff's interpretation of the Standard Contract does not merely supplement its text, but also cannot be harmonized with it:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted). The same conclusion applies in this case (and in every other spent nuclear fuel case). To accept plaintiff's interpretation is to ignore the mechanism in the Standard Contract for determining the sequence and timing of fuel acceptance and to write a contract to which the parties simply did not agree.

b. Plaintiff Voluntarily Participated In The APR/ACR Process And Voiced Concerns To DOE When It Had Them About DOE's Administration Of The Standard Contract

If plaintiff truly held the understanding of the Standard Contract that it espoused at trial, one would expect to see evidence of it having objected to conduct by DOE that was

fundamentally at odds with that understanding. However, the evidence adduced at trial indicates that precisely the opposite is true. When it had a concern with the Standard Contract or believed there was information that it believed DOE should know, WEPCO notified DOE. For example, WEPCO filed an action against DOE because it believed the fee calculation was unfair. DFOF ¶¶ 62. Yet, the record indicates that, when it was informed of its allocations and of the rate of acceptance that DOE was proposing, WEPCO was silent. The incongruity of this conduct only serves to confirm that WEPCO never held the understanding of the rate of acceptance that it advanced at trial.

Beginning in 1991, WEPCO had all of the information that it needed to begin submitting DCSs to DOE and begin the process of scheduling deliveries of spent fuel to DOE. And WEPCO did begin that process by submitting all ten of its DCSs to DOE for the first ten years of the program. DFOF ¶¶ 114-122. As Mr. Zabransky testified, he believed that the DCSs were contractually binding and WEPCO wanted all ten of its DCSs on file at DOE right from the start. DFOF ¶¶ 123-124. WEPCO submitted its DCSs to DOE in accordance with DOE's instructions using the allocations from the 1991 ACR, and never once complained that the rates or allocations in the 1991 ACR were inconsistent with DOE's obligations under the Standard Contract or invoked the Disputes Clause of the Standard Contract. DFOF ¶¶ 130. Even when DOE suspended the DCS process in 1996, WEPCO subsequently submitted its Final Delivery Schedules ("FDS") using the same allocations it had used in its DCSs. DFOF ¶¶ 134-135.

The fact that plaintiff did not object to the rates promulgated during the ACR/APR process and was an active and willing participant in that process is proof positive that the rate contained in the 1991 ACR was well within the parameters of plaintiff's understanding of DOE's

obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Plaintiff's willing participation in the DCS process is yet another reason to reject its attempt to import an extra-contractual rate of acceptance into the Standard Contract.

5. The Court Should Not Impose A "Reasonable" Rate Of Acceptance

Plaintiff asserted at trial that the Court should adopt a 3,000 MTU rate of acceptance because it is "reasonable." Presumably, plaintiff has selected this number because it comports with some of the planning documents that DOE generated in the early phases of the waste management program and, thus, appears to cloak WEPCO's theory with legitimacy. However, plaintiff never accounts for the fact that this rate, although undeniably higher than a 900 MTU rate, does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998. Tr.1392:24-1393:7 (Shimon); Tr.3407:9-3410:23 (Supko). The rate that plaintiff proposes not only is not contained in the Standard Contract, but does not even satisfy the qualitative test that it proposed because it requires WEPCO and utilities nationwide to make millions of dollars in expenditures to store fuel after January 31, 1998. Thus, even if plaintiff's request that the Court insert a "reasonable" rate of acceptance into the Standard Contract were appropriate, it is evident that it has failed to carry its burden of providing a rate that conforms to its own standard.[19]

[19] Indeed, Eileen Supko, WEPCO's expert witness, testified that, in 1993, when she advised WEPCO regarding DOE's projected allocations and discharges, she believed that the rates published in the 1991 ACR were reasonable. Tr.3454:3-3460:25, 3464:12-16 (Supko).

## IV. WEPCO MAY NOT RECOVER THOSE COSTS ASSOCIATED WITH THE LOADING OF CASKS THAT WOULD HAVE OCCURRED EVEN IF DOE HAD TIMELY PERFORMED

WEPCO failed to establish that its dry fuel storage project was caused by DOE's delay. As previously discussed, the Government established that WEPCO would have implemented dry fuel storage in the "but for" world because it needed additional at-reactor storage at Point Beach by 1995, or it would have been forced to shut-down. In addition, we established, through the testimony of our economic expert Cliff Hamal, that WEPCO would have procured and loaded five casks by the end of 1998, assuming DOE acceptance of SNF from Point Beach beginning in 1998.

Mr. Hamal based his conclusion on the following. First, Mr. Hamal understood that WEPCO would have maintained FCR, as it had in the past. DFOF ¶ 136-158. Second, because of operational issues, including the steam generator replacement, the NRC CAL which kept Unit 2 shut-down after the steam generator replacement, and a January 1997 "negative trend" letter from the NRC, Point Beach Units One and Two were shut-down for most of 1997. DFOF ¶ 275-283. As a result of that lost year of production,[20] the SNF fuel discharges over the period from 1995 through 1998, were reduced, which effected the number of casks that Point Beach would need to "bridge the gap" until DOE commenced accepting fuel. DFOF ¶ 188, 288. Third, Mr. Hamal assumed that DOE would have accepted SNF from Point Beach at the rate identified in the 1991 ACR. This acceptance rate was the same as was assumed in the Kenrich Report for

[20] As a result of being shut-down for a year, Point Beach's production of SNF stopped. This "lost year of production" reduced SNF discharges by approximately 56 fuel assemblies. DFOF ¶¶ 287-288.

1998 and 1999, which were the critical years for Mr. Hamal's analysis.[21] DFOF ¶ 467-468. Finally, Mr. Hamal concluded that WEPCO could have cancelled up to seven of the original 12 VSC-24 casks that it had ordered, and loaded five casks. DFOF ¶ 471. Mr. Hamal focused his review on decisions WEPCO would have made in late 1997 and early 1998 because that was the time when WEPCO felt the full effect operationally of the shut-downs of Units One and Two. Tr.5867:11-5870:4 (Hamal).

By early 1997, WEPCO would have already loaded two VSC-24 casks – one in December 1995, and the other in May 1996. DFOF ¶ 273-274. Because of the hydrogen burn event, in December 1996, WEPCO unloaded the third cask it had been loading and ceased its loading campaign until 1998. Mr. Hamal assumed, based upon actual world data, that WEPCO would discharge 45 fuel assemblies into its pool on February 24, 1998, 53 fuel assemblies on December 15, 1998, and 40 fuel assemblies on November 23, 1999. DDX 4-13; DFOF ¶ 275-276. He assumed, based upon the data available to WEPCO in January 1998, that there were 1,497 available spots in the SNF pool, with five unavailable at that time. DDX 4-13. He further assumed that DOE would accept 41 fuel assemblies in 1998 and 110 fuel assemblies in 1999. Id. In the actual world, WEPCO loaded three more casks by the end of 1998. Mr. Hamal concluded that, even assuming DOE acceptance in 1998, WEPCO would have loaded these same three casks in order to regain FCR, which it lost in January 1998, and in order to maintain FCR going forward. Unless additional casks were loaded in 1998, WEPCO would have lost FCR throughout 1998 and 1999, and again in 2000, 2001, 2002, 2005, 2006, and 2007, even assuming

[21] Ms. Supko testified that the rate of acceptance for 1998 and 1999, 400 MTUs and 600 MTUs respectively, were reasonable. Tr.3518:20-3521:16 (Supko); Tr.5887:6-5890:14 (Hamal).

DOE performance starting in 1998. DFOF ¶ 468. Loading a total of five casks would have allowed FCR to be recovered in 1998 and maintained through 2007 (except for the potential of a brief loss of FCR at the end of 1999), with DOE performance starting in 1998. DFOF ¶ 468.

WEPCO claimed $25,849,477 in costs[22] for fabrication of the ISFSI and the VSC-24 casks that it loaded. Mr. Kiraly, based upon instruction of counsel and Mr. Hamal's opinion, adjusted and reduced WEPCO's claim by $20,550,207. DDX 5-38; DFOF ¶ 471. Of the $20,550,207, Mr. Kiraly opined that $4,844,381 could also be challenged based upon internal labor and A&G reasons. Further, Mr. Kiraly also challenged $841,906 in costs WEPCO claimed for ISFSI fabrication and the VSC-24 casks it loaded solely upon his opinion concerning internal labor, employee expenses, and A&G costs (issues that we will discuss below). Tr.6145:6-6156:5 (Kiraly); DDX 5-11-12-13-38-40-42-43. Mr. Kiraly also concluded that included within the $20,550,207 is $1,222,393 of legal expenses. DDX 5-42. The legal expenses include $880,138 of legal activities relating to WEPCO's on-site dry fuel storage program. The legal expenses also include $342,255 for legal activities in connection with alternative off-site storage projects. See DFOF ¶ 385. Taking into account the off-site storage projects legal expenses, plaintiff has

---

[22] While it was clear at trial that the Court understood the meaning and significance of the Joint Stipulation Regarding Accuracy of Plaintiff's Costs, dated September 21, 2007 ("Joint Stipulation"), plaintiff attempts again to conflate the Government's agreement that costs, with the exceptions noted in the stipulation, were incurred and traceable to WEPCO's accounting books, with "the certainty of the amount of WEPCO's damages." Pl. Br. at 69-70. To be clear, the Government has not agreed that WEPCO has proven that its damages were caused by DOE's delay in accepting SNF from Point Beach - beyond the $10,259,004 that Mr. Kiraly calculated. See DDX 5-13. The stipulation states plainly that "[t]he Government, however, contests whether WE legally is entitled to recover these claimed monies in this action." Joint Stipulation at ¶ 1. Any suggestion otherwise is a willful misunderstanding of the stipulation entered into between the parties and should be summarily ignored by the Court.

overstated its recoverable claim by at least $20,207,952 in costs relating to the ISFSI fabrication and first five VSC-24 casks. See DFOF ¶ 470.

## V. ANY DAMAGES INCURRED PRIOR TO NOVEMBER 16, 1994, THAT WEPCO SEEKS TO RECOVER ARE BARRED BY THE STATUTE OF LIMITATIONS

WEPCO filed its complaint on November 16, 2000. Yet, it seeks to recover significant costs that were incurred more than six years prior to that date and as early as 1988. See PX 1029, at KRGWE003832. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This statute of limitations is a jurisdictional prerequisite that this Court may not waive. John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753-57 (2008). Although the Federal Circuit in Indiana Michigan held that nuclear utility contract holders were required to begin mitigating their damages in 1994, WEPCO's claims are premised upon the notion that, in the late 1980s, WEPCO was already entitled to begin taking action to mitigate against DOE's presumed delay. WEPCO's claims are based upon purported DOE breaches that occurred prior to 1998. Costs that pre-date November 16, 1994 are barred by the statute of limitations.

## VI. WEPCO'S DAMAGES CLAIM FAILS BECAUSE IT CONSTITUTES IMPROPER AND UNREASONABLE MITIGATION

### A. Plaintiff Has Failed Properly To Mitigate Its Damages

WEPCO is claiming damages that should be rejected because those costs represent unreasonable mitigation. Specifically, we established at trial that WEPCO's claim for the TN-32B metal casks, its claim for the new, dual-purpose NUHOMS storage system, its claim for

licensing the VSC-24 casks for transportation, and its claim for off-site storage, including Private Fuel Storage ("PFS"), are improper, unreasonable and, therefore, not recoverable.

The doctrine of mitigation prevents a party from recovering damages "for loss that he could have avoided by reasonable efforts." Indiana Michigan, 422 F.3d at 1375 (citing Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original)). Moreover, plaintiff must mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975)), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." LaSalle, 45 Fed. Cl. at 111. To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (Fed. Cl. 2002). Here, plaintiff failed to undertake certain reasonable mitigation actions resulting in significantly higher costs that now are sought as damages. Indeed, WEPCO's damages claim reflects the implementation of policies post-breach that actually increased the costs associated with SNF storage in the actual world, costs that the Government should not be required to pay as damages.

B. WEPCO's Investment In the TN-32B Metal Casks Was Unreasonable And, Therefore, Not Recoverable

WEPCO is claiming $5 million relating to its procurement of three TN-32B metal casks ("TN-32B cask"), which it procured as "insurance" in the event that it could not begin loading its

VSC-24 casks in time for its spring 2000 outage. DFOF ¶¶ 473-474. However, Mr. Hamal demonstrated at trial, WEPCO should have halted all work on the TN-32B casks when it started loading the VSC-24 casks in September 1998. Mr. Kiraly has adjusted and reduced WEPCO's claim by $5 million to account for the costs that WEPCO incurred in its procurement of the three TN-32B casks.

After the hydrogen ignition event halted WEPCO's loading of the third VSC-24 cask in May 1996, WEPCO decided to evaluate the option of switching to the TN-32B casks for storage of its SNF at Point Beach as an insurance policy or backup solution. DFOF ¶¶ 275-277, 473-474 . The NRC issued two CALs that were relevant to the VSC-24 casks in June 1996 and May 1997, which prevented WEPCO from loading those casks until the CALs were lifted. WEPCO issued a purchase order in May 1998 for the three TN-32B casks in the event that WEPCO could not resume loading the VSC-24 casks. DFOF ¶¶ 276, 282, 478. WEPCO was permitted, under the terms of that purchase order, to terminate work on the casks at any time, at its own convenience:

> Buyer may terminate work on this order for its own convenience in whole or in part by written notice at any time.

DFOF ¶¶ 479. The NRC lifted the last relevant CAL on the VSC-24 casks in August 1998, but WEPCO had already taken the remedial actions it believed necessary so that it could resume loading the VSC-24 casks by the end of July 1998. WEPCO loaded the third VSC-24 casks on September 10, 1998, and loaded its fourth and fifth VSC-24 casks by November 1998. With the loading of the third VSC-24 cask, WEPCO no longer faced a potential shutdown by spring of 2000. Because of the flexibilities that WEPCO had deliberately built into the contract for TN-

32B casks, WEPCO could have delayed fabrication of those casks in September 1998 when it resumed loading the VSC-24 casks. Furthermore, fabrication of the TN-32B casks had not yet begun, and as of September 1998, long-lead time materials for fabrication of the TN-32B casks had been ordered, but were not expected to be delivered until December 1998 - January 1999. And yet, WEPCO continued to pursue the alternative TN-32B casks, in spite of the fact that it had assured itself, and the NRC, that the VSC-24 cask system was reliable for storage of its SNF.[24] In fact, because WEPCO had resumed loading casks prior to the spring 2000 outage, WEPCO could not load the TN-32Bs under the terms of the conditional order issued by the PSCW:

> WEPCO may only use the TN-32 casks if the VSC-24 casks are not available in time for its scheduled refueling in Spring 2000, and if the NRC issues all necessary approvals for the use of the TN-32 casks at Point Beach.

DFOF ¶ 485. Thus, WEPCO's use of the TN-32B casks was no longer authorized.

WEPCO asserts that its continued procurement of the TN-32B casks was reasonable because of the potential for future problems with the VSC-24 casks in light of the past problems. Pl.Br. at 52-53. No other utility owns a back-up system in the event that problems arise with its existing ISFSI. Even if a future problem had developed with the VSC-24 casks, there was more than enough time to re-start fabrication of the TN-32B casks and have them delivered to prevent running out of SNF storage space. DFOF ¶ 500. However, WEPCO let the fabrication of the new cask system continue, in spite of the growing evidence that it was not needed. By November

[24] In fact, WEPCO demonstrated at trial that it preferred not to use the TN-32B casks at Point Beach because using another storage system would be unnecssarily complicated. DFOF ¶. Furthermore, the Government established at trial that the use of the TN-32B casks would have required as much as $900,000 additional cost for plant modifications. DFOF ¶ 520.

1998, after WEPCO loaded the fourth and fifth VSC-24 casks, the potential need for TN-32B casks was pushed to May of 2001, and a decision to fabricate the TN-32B casks should have been delayed until February 2000. DFOF ¶ 502. With the loading of each additional VSC-24 cask, the need date for use of the TN-32B casks to provide additional storage was extended by approximately one refueling outage. DFOF ¶ 503. By April 1999, after WEPCO had completed loading the sixth VSC-24 cask, WEPCO had added an additional 96 fuel assemblies to its ISFSI, which was equal to the capacity of the three TN-32B casks. DFOF ¶ 504. Moreover, WEPCO had three empty VSC-24 casks on site, and four more in fabrication. DFOF ¶ 504. If no additional VSC-24 casks were loaded after April 1999, Point Beach would not have run out of space in the SNF pool until May 2002. WEPCO placed the seventh loaded VSC-24 in service ISFSI on August 16, 1999, and the eighth was placed into service on September 19, 1999, extending the earliest date that it might have needed the TN-32B casks to October 2002. DFOF ¶ 505, 507, 508. At that point, WEPCO could have waited until February 2001 to re-order the TN-32B casks, if they were needed. DFOF ¶ 508. WEPCO chose to fabricate VSC-24 casks numbers 9 through 12 in 1999, in lieu of using the TN-32B casks, and purchased four more VSC-24 casks, numbers 13 through 16, in 2000-2001. DFOF ¶ 509-510. At that point, WEPCO had already decided to switch to the NUHOMS cask system. PX 592.

Claims made at trial by WEPCO that the TN-32B casks were needed are contradicted by its own contemporaneous actions. WEPCO's continued loading of VSC-24 casks without interruption or problem is the strongest evidence that a backup was not needed. WEPCO provided no contemporaneous evidence that it still needed the TN-32B casks, or that it even reconsidered whether continued expenditures for the program was justified. WEPCO itself, in

early 1999, issued orders for a re-start of fabrication of VSC-24 casks 9 through 12. DFOF ¶¶ 506. Under the PCSW authorization for dry storage, WEPCO was explicitly blocked from loading more that 288 fuel assemblies into dry storage, so it could not load both casks 9 through 12 and new TN-32B casks. DFOF ¶ 169, 497-498. Further, in 2000, it went ahead and ordered even more VSC-24 casks – numbers 13 though 16 – whose purpose was to fill the plant needs prior to switching to a dual purpose cask. Before those additional VSC-24 casks were loaded, WEPCO took actions to try to sell the TN-32B casks, definitely demonstrating that the utility concluded the casks were not needed as a backup.[25] DFOF ¶ 521, 523.

After issuing its May 1998 purchase order for the TN-32B casks, the vendor ordered long- lead materials. DFOF ¶ 493 Had fabrication never begun, as we conclude would have been reasonable, those materials could and should have been sold to other utilities who utilize the TN-32B casks. DFOF¶ 496, 511-515. Mr. Brewer testified that there were other utilities at that time that were purchasing TN-32B casks, and the long-lead materials could have been sold to them. DFOF ¶ 511-515. He further testified that the cost of the materials to WEPCO was a reasonable estimate of the price at which WEPCO could have sold them to other utilities. DFOF ¶ 513.

WEPCO's continuing pursuit of the TN-32Bs after it loaded additional VSC-24 casks was unreasonable. WEPCO continued to incur costs relating to fabrication of the TN-32 casks through mid-2004. PX 667 Furthermore, Mr. Weaver testified that the TN-32B casks were sold to FP&L Energy as part of the sale of Point Beach. WEPCO made no attempt during the trial to

[25] Not only were the TN-32B casks never used, but it appears that only two were completed and none were even delivered to Point Beach. DFOF ¶ 526; PX 667; Tr. 2607:10-2608:6 (Farron); Tr. 5897:3-25 (Hamal); Tr. 5018:19-5020:18 (Weaver).

establish that it has not recouped the costs it incurred for the TN-32B casks in its sale to FP&L Energy.

Mr. Kiraly adjusted and reduced plaintiff's claim by $5,058,733, of which $91,507 could also be disallowed for accounting reasons, which represents all costs claimed by plaintiff relating to the TN-32B casks.[26] This adjustment reflects placing a hold on fabrication before the long-lead materials are delivered to the fabricator, and the re-sale of those materials to another utility.

C. The Costs That WEPCO Incurred To Procure A Dual-Purpose Cask System Are Not Reasonable Mitigation

1. WEPCO's Investment In The NUHOMS Cask System Is Not Recoverable

WEPCO's claim for the costs that it incurred to switch to the completely new, and much more expensive cask system – the NUHOMS dual-purpose system – should be rejected by the Court because it is unreasonable mitigation. After expending over $5 million to procure and fabricate three TN-32B casks, which WEPCO never used but now expects the Government to pay for, WEPCO asks the Court to order the Government to pay over $16 million in additional costs for yet another cask system, one that is much more expensive than the original VSC-24 cask system that WEPCO has used for nine years, and continues to use successfully.

WEPCO makes six discrete arguments in support of its claim for costs for the NUHOMS system, each argument should be dismissed because it is unsupported by any evidence in the record. First, WEPCO claims that by using dual-purpose casks, WEPCO will avoid the need to unload its casks and re-load its SNF into transportation casks to be delivered to DOE. Pl.Br.at

[26] If the Court finds that the TN-32B casks should not have been fabricated, but that all costs associated with the casks prior to that step were reasonably incurred ($1,246,041) -- including the procurement of long-lead materials that might not have been resold – then the adjustment to the claim would be $3,812,692. See DDX 5-46 at 69.

55. This argument completely ignores the evidence presented at trial by the Government that established that the NUHOMS cannister is not an acceptable waste form under the Standard Contract, and thus, will not be accepted by DOE when DOE begins accepting SNF from Point Beach. Under the Standard Contract, DOE is the party required to provide transportation casks suitable for use within the DOE acceptance program. DX169. WEPCO knows the requirement that it must ship bare fuel assemblies to DOE when DOE begins acceptance of SNF. DFOF ¶¶ 547. Unless the canister is qualified by DOE for disposal at the DOE repository, the SNF will have to be repackaged. Under those circumstances, there will be no savings of effort or less radiation exposure to workers by use of a dual purpose cask. DFOF ¶¶ 546. WEPCO admitted that the use of the NUHOMS system for shipment to DOE was based purely upon speculation. Tr.2524:18-2525:10, 2655:10-2656:9 (Farron). There is no way now for WEPCO to know what DOE will accept when the repository opens and begins accepting SNF. For WEPCO to expend millions of dollars on the basis of pure speculation, is poor business judgment and not a cost that the Government should be required to pay.

Second, WEPCO asserts that it wanted to use the dual-purpose system "just in case" the PFS became available to accept SNF. Pl.Br. at 55-56. This argument is made without any citation to evidence in the record because none was presented at trial. Moreover, it is nothing more than rank speculation to assume that a private facility will be available and that it will accept the cask system that WEPCO procured.

WEPCO also argues that because many utilities in the industry are moving to a dual-purpose cask system, so should WEPCO. Pl.Br. at 56. However, WEPCO's assertions that dry storage vendors are no longer marketing storage-only designs, ignores the fact that BNFL assured

WEPCO that it would continue to support the VSC-24 casks, and further, WEPCO could have continued to purchase the VSC-24 casks at the same price that it had been purchasing its previous casks. DFOF ¶¶ 544. WEPCO never incurred any increase in the cost of the VSC-24s over the life of the dry fuel storage project. Id.

WEPCO's reliance upon Ms. Supko to support its decision to switch to the more expensive NUHOMS cask system should be dismissed by the Court because it is largely irrelevant. Ms. Supko was not qualified as an expert, or otherwise, to testify as to what cask or cannister DOE would accept when the federal repository system is operational. Tr.3635-3637 (Supko). In fact, Ms. Supko agreed that the Standard Contract was clear that dual-purpose casks were not an acceptable waste form under the contract, and there was no assurance that DOE would accept WEPCO's fuel in the NUHOMS casks:

> Q: In fact, Ms. Supko, to this day, you believe that DOE has not provided assurances to utilities that their spent fuel would be accepted as standard fuel as a result of loading spent fuel to dual-purpose systems, correct?
>
> A: That's correct.

Tr.3636:22-3637:3 (Supko). Ms. Supko has no more information or knowledge about the ultimate parameters of the DOE repository than WEPCO, and thus, her opinions on WEPCO's decision should be ignored.

WEPCO 's assertion that the reason for its shift to the NUHOMS system was because of the safety issues surrounding the VSC-24 cask is also not supported by the record. Indeed, both Mr. Becka and Mr. Holzmann[27] testified that there was no safety concern with the continued use

[27] Mr. Becka is the current project manager of the dry storage project at Point Beach. Tr.1684:9-1685:24 (Becka). Mr. Holzmann is currently a shift manager employed by NMC at

of the VSC-24 cask system. DFOF ¶¶ 506. In addition, in order to transport the NUHOMS system off-site, WEPCO would need to use a rail-size cask and we established at trial that it is speculative that a large rail cask could be removed from the Point Beach site. DFOF ¶¶ 548. Point Beach does not currently have a rail or barge facility. DFOF ¶¶ 549. Previous spent fuel shipments from Point Beach used a truck cask because Point Beach did not have a rail spur. The rail line serving Kewaunee was abandoned in 1998, and there is currently no rail spur in Kewaunee to which a heavy cask could be hauled. DFOF ¶¶ 549. Moreover, Point Beach did not in 1998, and does not currently, have an operational barge facility. If Point Beach were to ship fuel today, it would likely be shipped by truck and there was no evidence in the record to support a finding otherwise. DFOF ¶¶ 549.

Finally, the accounting records maintained by WEPCO, and provided to the Government, do not support the statements made at trial that the VSC-24 loading evolutions were more labor intensive than the NUHOMS loading evolutions, another argument WEPCO used to justify its switch to the NUHOMS, after the fact. Tr.6162:6-13(Kiraly); DDX 5-55; 5-56. Mr. Kiraly demonstrated at trial that WEPCO's accounting records did not support plaintiff's assertion that the NUHOMS only took 4 days to load. Mr. Kiraly estimated, using electronic accounting data, that WEPCO recorded an average of 1,249 hours during the VSC-24 loading evolutions, while the average recorded hours during the NUHOMS loading evolutions was 1,510 hours. Tr.6161:23-6166:12 (Kiraly); DDX5-55; 5-56. Thus, not only is the NUHOMS cask much more expensive than the VSC-24 cask, and not likely to be moveable off-site, but the

---

Point Beach. T.2002:4-23 (Holzmann).

average loading time of that cask is longer and, therefore, it is more expensive to load than the VSC-24.

2. WEPCO's Investment In Licensing Its VSC-24 Casks For Transportation Is Not Recoverable

WEPCO also asks the Court to require the Government to pay the costs it has incurred to license the VSC-24 cask for transportation. Pl.Br. at 59. In spite of asserting that use of the VSC-24 cask system is such a safety issue that WEPCO was forced to invest in the new, expensive NUHOMS system, WEPCO believes that incurring the cost of licensing that VSC-24 cask for transportation is money well-spent and should be paid by the Government. We demonstrated at trial that WEPCO's expenditure is speculative and should not be borne by the Government. First, as the Court is well-aware, it is not certain that DOE will take fuel from WEPCO when it commences the repository program in any cask but one DOE brings to the utility. And WEPCO recognizes that reality. Second, there was absolutely no need for WEPCO to license the VSC-24 for transportation at this point, even if DOE agrees at some point in the future that it will take the cask. WEPCO does not need a transportable VSC-24 canister in order to store its fuel. Tr.1971:1-18; 1972:6-9; 1978:12-18 (Becka). Furthermore, as Mr. Brewer testified, it is not certain that WEPCO will be able to transport a large rail cask off-site given the current restrictions there, specifically that there is no rail line to the site or near the site, and transporting a large rail cask over land would require permits that may not be possible to obtain. DFOF ¶¶ 550-552. Finally, the NRC only licenses a transportation cask for five years, and then the licenses must be re-newed. Tr.5528:4-22 (Brewer). Licensing the VSC-24 casks at this time

is a waste of time and energy and money and WEPCO should not be awarded those costs in its damages.

Mr. Kiraly estimated that WEPCO would have loaded 19 VSC-24 casks in lieu of the 14 NUHOMS casks it loaded. Tr.6158:1-6161:17 (Kiraly); DDX 5-51; 5-52; 5-53; 5-54. Mr. Kiraly calculated that WEPCO incurred $14,695,127 million to fabricate and acquire the 14 NUHOMS casks and he calculated replacement costs of $6,299,325 to load the same number of fuel assemblies into VSC-24 casks. DDX 5-53. Thus, Mr. Kiraly adjusted and reduced plaintiff's claim by $8,395,802 which represented the costs incurred by WEPCO for fabrication of the NUHOMS system minus the cost of the VSC-24 casks needed to store the same amount of fuel. DDX 5-58. Included in the $8,395,802 is $238,337 for fixed labor, A&G, and employee costs that are associated with the NUHOMS system. DDX 5-59. The costs incurred by WEPCO to license the VSC-24 cask for transportation total $383,037. The Government requests that the Court offset WEPCO's claim by $8,778,839, the total included in the claim for dual-purpose casks.

D. WEPCO's Investment In Off-Site Storage Is Not Recoverable

1. WEPCO's Investment In Private Fuel Storage And Other Off-Site Storage Projects Was Unforeseeable And Speculative

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of WEPCO's contributions to the off-site Private Fuel Storage ("PFS") facility. The issue of recoverability of amounts paid to PFS squarely was addressed by the Federal Circuit in Indiana Michigan. In finding that PFS-related costs were not recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. . . . While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. Plaintiff's argument that Indiana Michigan is fact specific and does not apply here is meritless. The Federal Circuit's finding that the investment in PFS was speculative and unforeseeable apply with equal force here, and plaintiff has not supported another finding. Moreover, the court in Southern Nuclear applied the Indiana Michigan ruling there on the same basis to deny the request for costs incurred in PFS. Southern Nuclear Operating Company v. United States, 77 Fed. Cl. 396 (2007). In this case, as in Indiana Michigan and Southern Nuclear, WEPCO did not prove that its investment in PFS and other off-site storage projects was not speculative or that the cost of the venture was foreseeable. Further, because foreseeability is measured from the perspective of the defendant, and given that the contract entered into by Indiana Michigan with DOE is materially identical to the contract at issue here, Indiana Michigan is dispositive of the plaintiff's claim for costs associated with off-site storage. Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here.

2. The Government Established That WEPCO's Investment In PFS Was Not Reasonable Mitigation

WEPCO continued to contribute to PFS and other off-site investments long after it needed to do so. WEPCO made its capital contributions to PFS between 1994 and 1997 and seeks to recover those costs in its damages. Pl.Br. at 59-62. However, during that time, the evidence at trial established that WEPCO did not expect PFS to be available until 2003. DFOF

¶¶ 377. Moreover, WEPCO loaded its first VSC-24 cask in December 1995 and its second cask in May 1996. Thus, WEPCO was already addressing its SNF storage issues with its own dry fuel storage project. Any expenditures in PFS or any other off-site storage project was unnecessary. Put simply, WEPCO did not need the PFS project for its SNF storage. WEPCO contributed to PFS because it wanted to, not because it needed to. WEPCO represented that, in essence, its investment in PFS was no more than an insurance policy in the event that the other options it was exploring were unusable.

Furthermore, WEPCO's assertions here in favor of PFS are inconsistent with other arguments it makes. WEPCO asserts that it invested in PFS because it was concerned that the PSCW might not authorize the dry fuel storage project at Point Beach. And yet, WEPCO does not explain why it believed that a private dry fuel storage project would not face similar obstacles, or an even more concerted effort to block it. In fact, David Weaver, WEPCO's asset manager, recognized that once PFS was licensed by the NRC, the real battle was yet to be fought. Tr. 4979:7-12 (Weaver); DX 90. Specifically, WEPCO believed there would be a level of public, state, and congressional opposition to PFS that would make it very unlikely that PFS would move forward. Tr. 4979:13-4980:1 (Weaver); 4980:23-4981:2 (Weaver); DX 90. WEPCO was also concerned that the transportation issues involved in PFS were completely untested. Tr. 4979:17-20 (Weaver); DX 90; Tr. 1628:1-4 (Weaver); Tr. 2180:4-25 (Porter) (WEPCO familiar with heated opposition to transportation of SNF). Thus, WEPCO was more concerned that the PFS was not a viable SNF storage option than it was with its own ISFSI project. The Government should not be responsible for this speculative investment decision.

Moreover, the Government established at trial that PFS and off-site storage would have been more costly than on-site storage and, therefore, not the least-cost alternative. Specifically, WEPCO estimated that the storage costs at PFS would be $1 million per cask and $20,000 per cask per year for storage at a time when its dry storage costs at Point Beach were $300,000 per cask and $30,000 per year for O&M for the entire Point Beach facility. Tr. 4980:2-23 (Weaver); DX 90. And the PFS costs did not include the costs for transportation of casks to the off-site location, transfer of fuel to a storage cask at the off-site location, any return on investment by the off-site storage operator, and any needed equipment or plant modifications for the required cask design. Tr.5484:2 -5488:7 (Brewer); DDX 3-17, DX 391 at 19-21 (WXE011 0021 - WXE011 0023). Thus, we established that the costs of storing SNF at PFS or other off-site storage facility would be much higher than storing it at Point Beach, and the PFS facility would not have been available in time to avoid the construction of WEPCO's ISFSI and the procurement of casks that WEPCO purchased prior to 2003. The Government established that the investment in PFS was speculative and unforeseeable, and for these reasons, WEPCO's claim for PFS should be rejected.

3. The Government Established That WEPCO's Investment In Other Off-Site Storage Options Was Not Reasonable Mitigation

In addition to PFS, WEPCO also invested in other options for off-site storage, for example, WEPCO investigated the possibility of developing an international spent fuel repository with other international entities, such as the British company BNFL and the African nation Cape Verde. DFOF ¶¶ 380. Roger Newton, an assistant to Mr. Link, developed a

proposal for such an international repository. Documents presented at trial demonstrated that WEPCO intended to benefit economically from such an undertaking:

> The world's spent fuel disposal problems had also created a significant business opportunity and Wisconsin Electric plans to benefit from the opportunity by creating a highly profitable international repository.

DX 185 at WISC 00003326. The same off-site transportation issues exist with such international ventures, except the transportation there is not only across state borders but over the high seas. The controversy and cost of such a venture makes it speculative and highly unlikely and certainly not foreseeable at the time of contract formation here. The Government should not be liable for WEPCO's for-profit investments in such speculative ventures as SNF storage in France, Africa, or any other international locations.

Mr. Kiraly adjusted and reduced WEPCO's claim for PFS and off-site storage costs by $883,503. Tr. 6143:6-17 (Kiraly); DDX 5-35; DX 625 (Attachment 6, WXE 0220080 - WXE 0220083). There was an additional $342,255 in legal costs relating to legal activities in connection with alternative off-site storage projects, which Mr. Kiraly also deducted from plaintiff's claim. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Doc. 369 (Nov. 20, 2007). The Government, therefore, seeks a total adjustment and reduction of plaintiff's claim of $1,225,758.

## VII. WEPCO HAS FAILED TO MEET ITS BURDEN OF PROVING THAT FEES IT PAID FOR THE GENERIC ACTIVITIES OF THE NRC, 10 C.F.R. PART 171, WERE FORESEEABLE, OR CAUSED BY DOE'S DELAY, OR THAT THE ALLEGED DAMAGES RELATING TO THOSE FEES HAVE BEEN DEMONSTRATED WITH REASONABLE CERTAINTY

### A. The Fees WEPCO Has Paid For NRC Generic Activities Were Not Foreseeable At The Time Of Contract Formation And DOE's Delay In Performance Was Not The Proximate Cause For WEPCO's Alleged Damages Related To NRC Fees

#### 1. Pre-1999 Fees

At the time of contract formation, the NRC, like other independent offices of the Federal Government, charged its licensees fees for specific services as authorized under the Independent Offices Appropriations Act of 1952 ("IOAA"), 31 U.S.C. § 9701 (1982). See Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Commission, 601 F.2d 223, 225-27 (5th Cir. 1979) (providing history of NRC's 1978 fee schedule final rule), cert. denied, 444 U.S. 1102 (1980); Florida Power & Light Co. v. United States, 846 F.2d 765, 767 (D.C. Cir. 1988) (providing history of IOAA), cert. denied, 490 U.S. 1045 (1989). Pursuant to IOAA, the Atomic Energy Commission, the predecessor of the NRC, introduced its first fees for specific activities in 1968, which it created in 10 C.F.R. Part 170. License Fees For Facility Licenses and Materials Licenses 33 Fed. Reg. 10923 (Aug. 1, 1968). Accordingly, a utility would be required to pay a fee associated with its receipt of direct services from the NRC, such as the costs of on-site inspections, license application reviews at NRC Headquarters, and other direct services. However, IOAA did not provide the NRC authorization to assess fees for generic activities that applied to the nuclear utility industry as a whole, such as rulemaking or research activities. See Mississippi Power & Light Co., 601 F.2d at 225-26 (citing National Cable Television

Association, Inc. v. United States, 415 U.S. 336 (1974); Federal Power Commission v. New England Power Co., 415 U.S. 345 (1974)).

In 1986, Congress granted the NRC the authority to assess annual fees to recover the costs of its generic activities through the enactment of the Consolidated Omnibus Reconciliation Act of 1985, Pub. L. 99-272, 100 Stat. 82 (1986), which also mandated that the NRC collect approximately 33 percent of its budget through a combination of fees for specific activities and fees for generic activities assessed on its licensees.[28] In response to that statutory authority, the NRC established 10 C.F.R. Part 171, in which it created an annual fee for operating power reactors to recover generic activities costs. See Annual Fee for Power Reactor Licensees and Conforming Amendment, 51 Fed. Reg. 33,224 (Sept. 18, 1986) (creating 10 C.F.R. Part 171 fees); see Skinner v. Mid-America Pipeline Co., 490 U.S. 212, 215-16 (1989) (citing Omnibus Budget Reconciliation Act of 1986 § 3401, 42 U.S.C. § 7178 (1982), as "one of a number of recent congressional enactments designed to make various federal regulatory programs partially or entirely self-financing"); Florida Power & Light Co., 846 F.2d at 767-70 (NRC's imposition of annual fees for generic services authorized under COBRA-1985). However, notwithstanding its broad grant of authority, the NRC initially imposed its annual generic activities fees on nuclear power reactor operator licensees, although not upon other licensee classes like dry storage facility licensees (which are covered by 10 C.F.R. Part 72). See 51 Fed. Reg. at 33,230.

In 1990, Congress passed the Omnibus Reconciliation Act of 1990 ("OBRA-1990"), Pub. L. 101-508, 104 Stat. 1388 (1990), and mandated that the NRC recover 100 percent of its annual

[28] In 1987, Congress increased the required recovery to not less than 45 percent. Omnibus Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330 (1987); Annual License Fees for Fiscal Year 1990 for Power Reactor Licenses 55 Fed. Reg. 7510 (Mar. 2, 1990).

budget through a combination of generic and specific activity fees. Revision of Fee Schedules; 100% Fee Recovery, 56 Fed. Reg. 14,870 (Apr. 12, 1991); DFOF ¶¶ 390-391. In response to the significant change that OBRA-1990 imposed on its budget, the NRC made seven amendments to 10 C.F.R. Part 170 (for specific activity fees), increased its 10 C.F.R. Part 171 operating power reactor annual generic activity fee, and added annual fees for nonpower reactors and five other classes of licenses, including spent fuel casks and facilities. See Revision of Fee Schedules; 100% Fee Recovery 56 Fed. Reg. 31472, 31482-86 (Jul. 10, 1991) ("This action was necessary for the Commission to comply with Public Law 101-508 and to more completely recover costs incurred by the Commission in providing services to identifiable recipients"). Therefore, the NRC implemented its first annual fees related to the storage of SNF seven years after contract formation and eight years before DOE's performance under the Standard Contract was to commence.

WEPCO seeks to recover the pre-1999 Part 171 annual generic activity fees that the NRC required it to pay as a 10 C.F.R. Part 72 licensee. There is no evidence in the record or support in WEPCO's post-trial brief for its assertion that the statutory and regulatory changes were foreseeable to DOE at the time of contract formation. WEPCO's argument that the NRC's annual fees for generic activities were foreseeable rests upon the bare assertion that the nuclear industry is highly regulated. Pl. Br. at 65. WEPCO's citation to Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1348 (Fed. Cir. 2001), cert. denied, 535 U.S. 1096 (2002), is unavailing because that case addresses due process implications of legislatively imposed retroactive obligations, not contract damages. Further, the issues raised by this portion of WEPCO's damages claim do not relate to regulatory matters. They relate to matters of budget at

the NRC. In addition, WEPCO cites to OBRA-1990"), enacted seven years after formation of the Standard Contract, to establish that NRC fees were foreseeable. WEPCO has offered no evidence from the relevant time, 1983, that the cost for the fees it claims as damages were foreseeable at the time of contract formation. Indeed, in 1983, the year that WEPCO entered into the Standard Contract, NRC fees for generic activities did not exist.

Moreover, the assessment of annual fees on utilities by the NRC were not proximately caused by DOE's delay. In 1986, the NRC created annual fees because of statutory changes that gave the NRC the authority and responsibility to assess annual fees for generic activities from its licensees for the first time. Four years later, in 1990, Congress again made significant amendments to the NRC's budget authority as it related to annual fees and the NRC implemented far-reaching changes to its fee structure in response. Because the 100-percent fee recovery in OBRA-1990 was not related to DOE's performance, the overall increase in fees for NRC licensees would have occurred regardless of DOE's delay – a delay that had not yet occurred. As previously discussed, WEPCO constructed its dry storage facility for reasons other than DOE's delay. In addition, WEPCO's claim for the costs of the NRC's annual fees for generic activities related to dry storage prior to 1999 were consequences of congressional and regulatory actions and are, thus, consequential damages remote from DOE's delay. See Old Stone Corp. v. United States, 450 F.3d 1360, 1376 (Fed. Cir. 2006); Myerle v. United States, 33 Ct. Cl. 1 (1897) ("There must not be two steps between cause and damage"). Therefore, WEPCO's costs for

NRC annual fees prior to 1999 were neither foreseeable at the time of contract formation nor proximately caused by DOE's delay in accepting SNF.[29]

2. The 1999 Fee Change Rule And The Spent Fuel Storage/Reactor Decommissioning Fee

In 1999, the NRC amended the 10 C.F.R. Part 171 generic activities fee and created the Spent Fuel Storage/Reactor Decommissioning Fee. This fee is assessed to all licensees of the NRC, regardless of whether the site utilizes dry storage.[30] DFOF ¶¶ 394-399. WEPCO also asserts that this amendment of NRC's 10 C.F.R. Part 171 fees was the result of DOE's delay in performance. Pl. Br. at 65-68. However, even if WEPCO could prove that its decision to build dry storage was the result of DOE's delay in acceptance of SNF, WEPCO cannot prove that any of its alleged NRC fees for generic activities, not solely the Spent Fuel Storage/Reactor Decommissioning Fee, were the result of DOE's delay.

The testimony of Mr. Peter Rabideau, Deputy Chief Financial Officer of the NRC, and the NRC documents presented at trial demonstrated that two commissioners of the NRC, including Chairman Shirley A. Jackson, were concerned that the pre-1999 generic fee for 10 C.F.R. Part 72 licensees may have created a disincentive for utilities to use dry storage because no similar fee existed for wet storage. DFOF ¶¶ 405; Tr. 4039:7-4042:23, DX 611. Because the

[29] The pre-1999 10 C.F.R. Part 171 fees included in WEPCO's claim total $908,700. DX625 (sum of Project/WBS Code 1203430).

[30] Throughout its brief, WEPCO repeatedly refers to "ISFSI project costs" without definition and without reference to corresponding use of the term by NRC witnesses or documents. As further detailed in the Government's briefing and proposed findings of fact, this issue involves the elimination by the NRC of an annual fee for nuclear utilities for dry storage and the creation of a new annual fee for spent fuel storage and reactor decommissioning in FY1999.

NRC had determined that wet storage was equally as safe as dry storage for storing SNF, the NRC ordered a staff study of the issue. DFOF ¶¶ 403; DX 611. The staff study recommended that the NRC create the Spent Fuel Storage/Reactor Decommissioning Fee to address the Commissioners' concern. DFOF ¶¶ 98, 404-405; DX 612. The staff study presented other discussion and reasons for changing the NRC's annual fees under 10 C.F.R. Part 171. DFOF ¶¶ 407; DX 612. After completion of the staff study and approval by the commissioners, the NRC amended 10 C.F.R. Part 171 and created the Spent Fuel Storage/Reactor Decommissioning Fee that responded to three concerns that had been raised by the commission and staff: (1) the disincentive to pursue dry storage because there was no comparable fee for wet storage; (2) the fairness of assessing multiple fees if a licensee holds multiple dry storage licenses; and (3) not all affected licensees were paying generic NRC decommissioning costs and with the future decline in the number of operating licenses the financial burden on active licensees would increase.[31] DFOF ¶¶ 406-408. The new 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee paid the costs for NRC's generic activities related to reactor decommissioning, wet and dry spent fuel storage, and other activities not recovered under 10 C.F.R. Part 170 fees. DFOF ¶¶ 394-395, 409. It applied to all facilities with spent nuclear fuel on-site regardless of how it was stored and, therefore, was neutral regarding the method of spent fuel storage utilized by utilities. DFOF ¶¶ 398, 409-410. With the creation of the Spent Fuel Storage/Reactor Decommissioning

---

[31] The three concerns listed here are those that NRC published in its final rule implementing the fee change. PX1044 at WISC1044-0009 (Revision of Fee Schedules; 100% Fee Recovery, FY 1999 (64 Fed. Reg. 31448, 31455)). The NRC staff study provided additional bases for the fee rule change: (1) it reduces the financial impact of the costs on the operating power reactor licensees because more licensees pay for the costs; (2) reduces the annual fee for each licensee needing to resort to dry storage; and (3) provides a financial incentive for licensees to complete the decommissioning process in a timely manner. DX612 at NRC045 0068-69.

Fee, the NRC also eliminated the fee for generic activities related to dry storage that had been created in 1990. DFOF ¶¶ 407. There has been no compelling evidence presented to refute the unequivocal testimony of Mr. Rabideau and the NRC documents entered into evidence that demonstrate that the Spent Fuel Storage/Reactor Decommissioning Fee was created for the reasons stated at the time by the NRC which were wholly unrelated to DOE's delay. DFOF ¶¶ 403-408, 411, 428.

WEPCO asserts that the NRC had long associated its generic dry storage-related costs to DOE's delay and that the NRC had determined that, because of DOE's delay, all operating reactor licensees would eventually need dry storage. WEPCO further argues that in the non-breach world, less dry storage would have been required and, therefore, under 42 U.S.C. § 2214(c)(3), it would not have been fair and equitable for the NRC to impose annual fees for dry storage on all licensees. WEPCO's arguments miss the mark. The NRC did not decide to create the Spent Fuel Storage/Reactor Decommissioning Fee in 1999 because of DOE's delay. As discussed above, the record demonstrates that the NRC created the Spent Fuel Storage/Reactor Decommissioning Fee in response to concerns raised by the commissioners and as the result of a staff study. The staff study did not, as WEPCO claims, determine the fee was needed because all operating reactor licensees would need dry storage. Rather, the staff study included discussions on the NWPA and the effect of DOE's delay on the industry.[32] DX 612.

[32] The staff study provided five reasons for recommending the Spent Fuel Storage/Reactor Decommissioning Fee: (1) fair treatment for wet and dry storage; (2) providing a fair and equitable method for recovering costs from power reactor operating licensees in decommissioning/possession-only status that directly benefit from the NRC's regulatory services; (3) reduce the financial impact of cost on operating power reactors–such as Point Beach–because more licensees would pay the costs; (4) reduce the annual fee for each licensee needing to resort to dry storage–such as Point Beach; and (5) provide a financial incentive for licensees to

WEPCO's argument rests almost exclusively upon Mr. Jack Gadzala's testimony.[33] Although Mr. Gadzala testified that, in his opinion, the NRC would not have imposed the generic fee on all utilities in the non-breach world, Mr. Gadzala's testimony should be accorded very little weight. Tr. 2426:18-2427:6 (Gadzala). First, in 1998, the year the NRC staff studied the generic fees related to spent fuel storage, Mr. Gadzala was teaching high school physics. Tr. 2364:3-8 (Gadzala). Prior to that, he had been an NRC inspector in Wisconsin. Tr. 2362:3-8; 2452:1-4 (Gadzala). Second, the basis for his opinion is his NRC experience, along with unspecified and unexplained speeches that he attended while working for the NRC in Wisconsin. Tr. 2426:18-2427:6 (Gadzala). Mr. Gadzala never worked at the NRC's headquarters or in the NRC's Office of the Chief Financial Officer, and his vague recollection of the speeches he heard directly contradicts the NRC documents created contemporaneously with the NRC's rulemaking. Mr. Gadzala admitted that his knowledge regarding the FY1999 fee rule change was from the Federal Register notice and that he had never reviewed the related NRC work papers. Tr. 2452:15-21 (Gadzala).

Further, Mr. Gadzala's lack of knowledge on this subject was apparent by his confused testimony regarding annual versus specific fees. As noted above, Mr. Gadzala testified that, in the non-breach world, the NRC would not have imposed the "generic" fee on utilities, i.e., the Spent Fuel Storage/Reactor Decommissioning Fee, but that the NRC would have maintained the "specific" fee, i.e., the 10 C.F.R. Part 171 fee for 10 C.F.R. Part 72 licensees with dry storage.

---

complete the decommissioning process in a timely manner. DX 612 at NRC045 0068-69.

[33] Although Mr. Sieracki offered similar testimony, it provides no support to WEPCO. Mr. Sieracki was not qualified as an expert regarding the NRC or NRC fees. Tr. 3703:8-13; 3717:9-23.

Tr. 2425:12-18; 2426:18-2427:6 (Gadzala). Mr. Gadzala explained his confused understanding that the "specific" fee was for inspections or reviews, i.e., 10 C.F.R. Part 170 fees. Tr. 2426:19-21 (Gadzala). His understanding was wrong because the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee was not imposed to collect fees for specific services. It has always been a fee for costs related to generic activities.[34]

Second, to support its argument that the fee change rule was caused by DOE's delay, WEPCO cites to excerpts from NRC documents related to the fee change rule that discuss DOE's delay. However, these cites, taken out of context by WEPCO, never state, as WEPCO asserts, that the fee change occurred because of DOE's delay. The NRC staff study, the recommendation of the Chief Financial Officer of the NRC, the approval memorandum of the commissioners, and the voting statements of the commissioners simply never state that the Spent Fuel Storage/Reactor Decommissioning Fee was created because of DOE's delay. Id.; PX 1009; PX 967; PX 968. For example, WEPCO's cite to the discussion in the NRC staff study regarding future dry storage needs in the breach world merely reflects that NRC was aware of the obvious – that is, with DOE's delay, more utilities would require additional storage. Pl. Br. at 67. Noticeably absent from the NRC staff's reasons is DOE's delay. Indeed, two of the stated reasons were to reduce the fees related to spent fuel storage for operating reactors such as Point Beach. Further, WEPCO's cites to statements by the NRC, such as the one found in the FY1999 final fee rule, that the NRC recognizes that sites will have to continue to store spent fuel because of DOE's delay, do not support the causal nexus argument it makes. Rather, the statements made

---

[34] Mr. Gadzala's confusion regarding 10 C.F.R. Part 170 fees and 10 C.F.R. Part 171 fees prior to 1999 for dry storage further demonstrates his lack of knowledge on this subject and his testimony should be granted little, if any, weight.

by the NRC in its rulemaking were made by the NRC in response to assertions by commenters that the annual fees were unfair. The NRC consistently responded that the fee is a budgetary issue – by congressional mandate, the NRC must collect fees to recover its authorized budget–not an issue of DOE's performance. PX1044 at WISC 1044-0099. Finally, regardless of WEPCO's attempts to cite the NRC's discussions about the Nuclear Waste Fund as supporting its causation argument, Congress has not amended the statutory provision creating the Nuclear Waste Fund to permit the NRC to recover its budgeted costs for generic activities or specific services of its operating reactor licensees. Tr. 4062:25-4063:7 (Rabideau); 42 U.S.C. § 10222(d).

In contrast to Mr. Gadzala's testimony, the Government presented the testimony of Mr. Peter Rabideau, the Deputy Chief Financial Officer of the NRC. Mr. Rabideau has been an employee of the NRC since 1978 with extensive experience in the areas of budget and finance. DFOF ¶¶ 388. Mr. Rabideau, who was the Deputy Chief Financial Officer of the NRC at the time of the FY1999 fee rule change, explained, and the NRC's rulemaking documents demonstrated, that the 1999 fee change involved eliminating the dry storage generic fee and creating a new generic Spent Fuel Storage/Reactor Decommissioning Fee. DFOF ¶¶ 403-409; Tr. 4036:5-4037:6; 4067:22-4068:24; (Rabideau); DDX1-13. Indeed, Mr. Rabideau testified that, in his opinion, in the non-breach world, the NRC would have made the fee rule change nevertheless because of fairness issues. Tr. 4076:16-24 (Rabideau).

WEPCO misconstrues Mr. Rabideau's testimony that costs would be incurred for the NRC's activities related to dry storage. Pl Br. at 66. Mr. Rabideau was asked to read into the record an excerpt from DX612 that discussed access to the Nuclear Waste Fund to recover NRC fees. Tr. 4151:2-25 (Rabideau). That excerpt concluded that the NRC's "interpretation of the

NWF legislative language is that it precludes the NRC from recovering from the NWF the budgeted costs for spent fuel storage activities and furthermore, licensees cannot be reimbursed from the NWF for costs incurred for obtaining a general or site-specific ISFSI license." DX612 at NRC045 0065. Budgeted costs for spent fuel storage activities are recovered by fees for generic services and specific services such as the license costs referenced in the excerpt from DX 612 read by Mr. Rabideau at trial. Tr. 4032:17-4034:13 (Rabideau); 4848:1-16 (Croote). WEPCO cites this to support its argument for annual fees, not specific fees for services. WEPCO's argument fails because counsel's question and Mr. Rabideau's response were not restricted to fees for generic activities. Tr. 4151:2-25 (Rabideau). Mr. Rabideau's response to counsel's question is consistent with his testimony that, in the breach world, where more dry storage would eventually be required, fees for specific services, 10 C.F.R. Part 170, would increase. Tr. 4087:2-10 (Rabideau). It is also consistent with his testimony that fees for generic services would be required in the non-breach world, provided that some facilities required dry storage, as WEPCO concedes would have occurred in the non-breach world. Tr. 4077:15-24; 4080:15-4081:1 (Rabideau); PPFOF 229. According to Mr. Rabideau, in the non-breach world the fees for specific services, 10 C.F.R. Part 170 fees, would have decreased because of fewer services being required, not 10 C.F.R. Part 171 fees. Tr. 4077:15-24 (Rabideau).

The final link in WEPCO's causation argument is that, in the non-breach world, OBRA-1990 would have prohibited the NRC from eliminating the fee for generic activities related to dry storage and creating the Spent Fuel Storage/Reactor Decommissioning Fee. Pl. Br. at 68. Specifically, WEPCO asserts that in, the non-breach world, less dry storage would have been utilized in the industry and, therefore, imposing the Spent Fuel Storage/Reactor

Decommissioning Fee would not have been "fair and equitable" to those licensees without dry storage. 42 U.S.C. § 2214(c)(3).[35] WEPCO's argument fails because the Spent Fuel Storage/Reactor Decommissioning Fee would have applied as "fairly and equitably" in the non-breach world as it does in the actual world. Indeed, the NRC's rationale for the change to the Spent Fuel Storage/Reactor Decommissioning Fee was to ensure greater fairness for its licensees regardless of which method of SNF storage the utility utilized, wet or dry. DFOF ¶¶ 404-405, 408, 410. Further, WEPCO's fairness argument was not limited to the non-breach world. South Carolina Electric & Gas Company ("SCE&G") made the same argument in comments on the fee rule change. PX 957 (Letter from Gary J. Taylor, SCE&G, to U.S. NRC dated May 3, 1999 re: Comments on Proposed Rule). SCE&G commented that it did not utilize dry storage and would not need it for many years and, therefore, the fee rule change unfairly required them to pay for generic activities related to dry storage.[36] Id. However, the Government cannot find any record of SCE&G or any other utility challenging the NRC's rulemaking on the fee rule change. Such a challenge, as WEPCO asserts would have occurred in the non-breach world, would have had to overcome the "wide discretion" afforded the NRC in determining which licensees are to be

---

[35] 42 U.S.C. § 2214(c)(3) provides:

(3) Amount per licensee

The Commission shall establish, by rule, a schedule of charges fairly and equitably allocating the aggregate amount of charges described in paragraph (2) among licensees. To the maximum extent practicable, the charges shall have a reasonable relationship to the cost of providing regulatory services and may be based on the allocation of the Commission's resources among licensees or classes of licensees.

[36] WEPCO comments on the fee rule change were silent on this issue. DX 610; tr. 4256:24-4259:12 (Rabideau).

charged annual fees for the NRC's generic activities. Florida Power & Light Company, 846 F.2d at 770 (the NRC has wide discretion where statute is silent on which licensees are to be charged the annual fee and where Congress intended the NRC to recover costs associated with regulating various categories of licensees) (emphasis in the original) (citation omitted).

In addition, WEPCO's argument fails because it misconstrues the changes that NRC implemented in FY1999. The Spent Fuel Storage/Reactor Decommissioning Fee includes two categories of NRC activities: (1) spent fuel storage and (2) reactor decommissioning. PX1044 at WISC1044-0016; DFOF ¶¶ 394, 430. The spent fuel storage portion of the annual fee includes NRC's generic activities related to both wet and dry storage. Id.; DFOF 405. All operating reactors require wet storage and, therefore, benefit from the NRC's generic activities related to wet storage. Tr. 4112:6-10 (Rabideau). Prior to the change to the fee rule in 1999, some licensees were not paying NRC fees for generic activities related to spent fuel storage, either wet or dry, because they were not operating reactors and they did not utilize dry storage. DFOF ¶¶ 400, 402. The NRC created the Spent Fuel Storage/Reactor Decommissioning Fee to ensure all power reactor licensees paid annual fees for the NRC's generic activities related to spent fuel storage, thus, treating all licensees more fairly and equitably. DFOF ¶¶ 403-408. Therefore, by treating wet and dry storage equally for the purposes of generic fees, the NRC was entirely consistent with the requirements of 42 U.S.C. § 2214(c)(3). This would have been true in WEPCO's non-breach world in which it asserts it would not have implemented dry storage as it has in the actual world. Indeed, in the actual world the fee rule change has conferred the benefit of reduced fees for WEPCO. DFOF ¶¶ 413-415, 454-455. Because more licensees are paying the NRC's generic costs for spent fuel storage, licensees, such as WEPCO, that had dry storage

prior to the fee rule change, saw a reduction in fees. Id. Further, all licensees, to include those that did not have dry storage, saw a reduction in fees.

B. WEPCO Has Failed To Demonstrate That It Has Been Harmed Because WEPCO Has Paid Less For Generic Fees In The Actual World Than It Would Have Paid In The Non-Breach World

WEPCO asserts that in the non-breach world it would have paid less in NRC annual fees for NRC generic activities because it would only have had to pay the NRC's 10 C.F.R. Part 171 reactor operating fee. Pl.Br. at 67-68. Consistent with this argument WEPCO asserts that in the actual world the NRC's generic costs should be rising because the amount of dry storage is increasing in the industry. However, the evidence adduced at trial does not support WEPCO's theory or assertions and, therefore, its arguments fail.

From 1995 to 1998, prior to the fee rule change, WEPCO paid operating reactor annual fees as follows:

| Year | 10 C.F.R. Part 171 Reactor Op Fees x 2[37] |
|---|---|
| FY1995 | $4,854,000 |
| FY1996 | $5,492,000 |
| FY1997 | $5,956,000 |
| FY1998 | $5,952,000 |

[37] Because the Point Beach Nuclear Plant is a two reactor facility, WEPCO pays an operating reactor annual fee for each facility. In addition, the pre-FY1999 operating reactor annual fee did not include the NRC's fee for generic activities related to dry storage.

DFOF ¶¶ 413; DX 422; PX 961; DDX1-14; Tr. 4115:13-4125:7 (Rabideau). After the FY1999 fee rule change,[38] WEPCO paid the following amounts in operating reactor annual fees that included the Spent Fuel Storage/Reactor Decommissioning Fee:

| Year | 10 C.F.R. Part 171 Reactor Op Fees x 2 |
|---|---|
| FY1999 | $5,552,000 |
| FY2000 | $5,630,000 |
| FY2001 | $5,506,000 |
| FY2002 | $5,698,000 |
| FY2003 | $6,502,000 |
| FY2004 | $6,566,000 |
| FY2005 | $6,230,000 |
| FY2006 | $7,408,000 |

DFOF ¶¶ 413; DX422; PX961; DDX1-14; Tr. 4115:13-4125:7 (Rabideau); DFOF ¶¶ 413. The tables demonstrate that WEPCO's operating reactor annual fees, to include the Spent Fuel Storage/Reactor Decommissioning, were below the FY1998 amount until FY2003. However, the post-FY2002 increase in reactor operating fees cannot be attributed to the Spent Fuel Storage/Reactor Operating Fee because that fee has been decreasing since 2003 as follows:

| Year | Spent Fuel Storage/Reactor Decommissioning portion of Reactor Op Fee x 2 |
|---|---|
| FY1999 | $412,000 |
| FY2000 | $418,000 |

[38] As we described earlier, the NRC combined the new Spent Fuel Storage/Reactor Decommissioning Fee with the reactor operating fee so that licensees paid the Spent Fuel Storage/Reactor Decommissioning Fee as part of their reactor operating fee. Tr. 4072:10-4073:15 (Rabideau); PX1044 at WISC1044-0019-0020; DDX1-13.

| | |
|---|---|
| FY2001 | $532,000 |
| FY2002 | $478,000 |
| FY2003 | $638,000 |
| FY2004 | $406,000 |
| FY2005 | $318,000 |
| FY2006 | $346,000 |

DX 422; PX 961; DDX1-14; Tr. 4115:13-4125:7 (Rabideau).

In WEPCO's non-breach world, a world in which the Spent Fuel Storage/Reactor Decommissioning Fee was not implemented and WEPCO did not institute dry storage, its annual fees likely would have been higher than in the actual world. In the actual world, WEPCO has seen a decrease in the annual fees because its fees for NRC activities related to wet storage, decommissioning, and dry storage have been paid by more licensees. Because the Spent Fuel Storage/Reactor Decommissioning Fee applies to all licensees with spent fuel storage, it substantially increased the number of licensees paying, thus, reducing costs for those facilities, such as Point Beach, whether they utilized dry storage or not. DFOF ¶¶ 412-415. Therefore, the premises to WEPCO's arguments for damages for the costs of the NRC's fees for generic activities related to spent fuel storage fail and its claim should be denied.

C. WEPCO's Calculation Of Damages For The Spent Fuel Portion Of The NRC's Spent Fuel Storage/Reactor Decommissioning Fee Is Flawed, Includes Costs That Are Not Properly Included As Damages, And Duplicates Damages

Even assuming that the Court finds plaintiff's arguments regarding NRC fees for generic activities to be persuasive, WEPCO fails to provide any rational basis for calculating damages. At trial, WEPCO proposed a method for ascertaining the dry storage portion of the Spent Fuel Storage/Reactor Decommissioning Fee. Notwithstanding the fact that WEPCO's method is

based upon the false assumption that the Spent Fuel Storage/Reactor Decommissioning Fee has a separate dry storage component, WEPCO's calculation also fails because it overstates its alleged damages by including estimated costs for specific activities under 10 C.F.R. Part 170, includes costs for generic activities other than those related to dry storage that the NRC would have charged licensees regardless of DOE's delay, and does not, because it cannot, accurately divide the Spent Fuel Storage/Reactor Decommissioning Fee between its components.

1. WEPCO's Argument That The Government Has Failed To Offer Contrary Evidence Regarding WEPCO's Calculation Of Damages For Costs For The Spent Fuel Storage/Reactor Decommissioning Fee Is Misleading, And Impermissibly Attempts To Shift Plaintiff's Burden Of Proof To the Government

WEPCO bases its calculation of damages for the Spent Fuel Storage/Reactor Decommissioning Fee upon the testimony of Mr. Peter Rabideau and his review of NRC work papers related to the NRC's annual fees for generic activities. The NRC annually develops its annual fees by reviewing its budgeted resources and allocating them to licensee classes before calculating the annual fee to be charged its licensees. Tr. 4848:17-4849:7 (Croote). The work papers for this process are the ones WEPCO relies upon. However, the fee calculation process is not the process whereby resources are submitted, determined, and allocated for the NRC's budget. Tr. 4244:5-25 (Rabideau); 4845:2-4846:1 (Croote). The allocation of resources for budget occurs during the budget formation process that precedes the fee calculation by approximately two and a half years. DFOF ¶¶ 418-420, 440-442. As Mr. Rabideau and Ms. Tammy Croote, Deputy Director of the Division of Planning, Budget, and Analysis, at the NRC who drafted the FY2005 and FY2006 fee rule and created the associated worksheets explained, the budget process is a bottom to top review requiring inputs from all of the offices of the NRC,

management review, approval by the commissioners, submission to the Office of Management and Budget and approval by Congress. Tr. 4244:5-25 (Rabideau); 4845:2-4846:1 (Croote).

The NRC's fee calculation process begins in February or March of the spring of each fiscal year for which the fee rule applies, i.e., February 2006 for FY2006, approximately two and a half years after the budget process described above when the resource allocations are determined and submitted by the program offices. DFOF ¶¶ 419-420, 440-442. Therefore, the NRC fee calculation is a subsequent effort to the resource allocation and the work papers are developed at least two and half years after the resource allocations are made.

To calculate the annual fee the program offices determine the allocation of resources to the separate fee classes, i.e., they put them in bins. Tr. 4851:5-14 (Croote); DFOF ¶¶ 443-444. For the Spent Fuel Storage/Reactor Decommissioning Fee, the NRC program offices do not further separate the allocations between spent fuel storage and reactor decommissioning. DFOF ¶¶ 449; Tr. 4895:13-4897:21 (Croote); Tr. 4248:25-4251:14 (Rabideau). This is a complex process that may take six months to complete and is based upon the judgment of the NRC's managers and employees to make the proper determinations. Tr. 4870:25-4872:16 (Croote). Based upon the allocations of resources to fee classes, the NRC calculates a subtotal for the fee class based upon the total contract costs and government employee time allocated. DFOF ¶¶ 445-446. The NRC then calculates adjustments to the subtotal before determining the annual fee and dividing it by the number of licensees. Tr. 4854:17-4865:20 (Croote); DX 601; DX 604.

In propounding its method that attempts to segregate and somehow parse a dry storage portion of the Spent Fuel Storage/Reactor Decommissioning Fee, WEPCO, recognizing the weaknesses in its methodology, asserts that the NRC possesses the relevant budgetary

information and that the Government has not put forth evidence to contradict WEPCO's method. With this assertion, WEPCO attempts to divert attention from the significant flaws in its own calculation, and impermissibly shift the burden of proof to the Government.

The detailed information necessary to calculate damages as propounded by WEPCO, i.e., segregating the dry storage portion, likely does not exist. Therefore, WEPCO's methodology is unsupportable and, therefore, unfounded. As Ms. Croote testified, not only does this information likely not exist but it is an inherently qualitative process, and not solely quantitative:

> Q. So you can't say, as you sit here today, whether, for example, for fiscal year 2000, 2005, 2004, the information exists, can you?
>
> A. Well, actually, I believe it doesn't exist, because we wouldn't ask the program offices to allocate the resources in that way. They wouldn't choose to subdivide resources into another category that we didn't ask for.
>
> * * *
>
> Q. So you don't know whether they would be able to make that allocation if they were asked to do it, do you?
>
> * * *
>
> A. I can say that they don't-they don't have any existing data to base it on. They can't go back into the files and find the answer. They would have to go back, and you know, some of the activities that I talked about before, a lot of activities are generic in nature. And it's based on the judgment for the person at the time doing the work, which fee class this activity supports. So you would have to find the same person that was doing the work at that time, and get their recollection about that particular activity. And at that time, did that activity support more fuel facilities versus spent fuel storage/reactor

> decommissioning. So understanding the process, I think that would be very difficult to do, because it's not based on- these allocations just aren't based on pure quantitative data. It's based on the qualitative judgments of the people doing the work at the time.

Tr. 4895:17-4897:21 (Croote) (emphasis added).

WEPCO nevertheless asserts that its method is grounded in fact and cites Mr. Rabideau's testimony. But, in many instances during his testimony Mr. Rabideau told WEPCO's counsel that he lacked sufficient knowledge to segregate the Spent Fuel Storage/Reactor Decommissioning Fee and that to make the segregation he would need information from NRC employees in the program offices. Tr. 4225:3-13; 4226:16-24; 4228:3-12; 4229:16-23; 4230:22-4231:6 (Rabideau); PX 1048 at passim. Therefore, WEPCO was on notice that it lacked sufficient facts to support its method of estimating the dry storage portion of the Spent Fuel Storage/Reactor Decommissioning Fee. WEPCO failed to pursue that information during discovery and did not offer it at trial. WEPCO's failures to attempt fully develop the factual predicate to its damages is a failure of proof on the part of WEPCO that brings significant uncertainty to their calculation of damages, therefore, its claim is unsupported, and should be denied.

2. WEPCO's Calculation Fails To Properly Account For 10 C.F.R. Part 170 Fees

WEPCO's calculation of the dry storage portion of the Spent Fuel Storage/Reactor Decommissioning Fee uses the subtotal of budgeted resources for the fee class as its starting point or baseline. PX 1029 at KRGWE003828.[39] The subtotal of budgeted resources is an

[39] The subtotal fee amount is found in the "Total Dollars" row of the "Total Costs" subheading at KRGWE003887 of PX1029. The amounts found there correspond with the

unadjusted amount that includes costs that are subtracted during the fee calculation. Other costs are added during the fee calculation. By failing to include some of these adjustments, WEPCO has included costs in its damages that were recovered by the NRC through 10 C.F.R. Part 170 fees for specific activities and not through 10 C.F.R. Part 171 annual fees for generic activities.

For the purposes of the NRC's annual fee calculation, the subtotal budgeted resources requires an initial adjustment of subtracting the estimated 10 C.F.R. Part 170[40] fees to be collected from the fee class during the fiscal year. DFOF ¶¶ 451. Plaintiff failed to make this

---

"FY**** Fee Amounts" row, or similar row designator, under the Spent Fuel Storage/Reactor Decommissioning Fee heading in the NRC worksheets as follows:

| Fee Rule Year | Exhibit |
|---|---|
| FY1999 | PX961 at NRC044 0014 |
| FY2000 | In FY2000 the NRC increased its fees using a percentage method rather than rebaseling method, therefore, there are not applicable worksheets. Tr. 4097:15-4098:16 (Rabideau); 4874:16-4876:21 (Croote). |
| FY2001 | PX962 at NRC046 0001 |
| FY2002 | PX963 at NRC046 0061 |
| FY2003 | PX964 at NRC046 0093 |
| FY2004 | PX965 at NRC046 0136 |
| FY2005 | PX966 at NRC046 0169 |
| FY2006 | DX604 ("FY 2006 Allocations")<br>DX601 ("$ Value of Budgeted Resources Allocated to Fee Class") |

[40] 10 C.F.R. Part 170 fees are for specific services of the NRC. The calculation at issue is for 10 C.F.R. Part 171 fees for generic activities of the NRC.

adjustment, i.e., subtracting this amount, and, therefore, in the first instance, its calculation is flawed. Id. In failing to subtract the estimated 10 C.F.R. Part 170 amount, WEPCO's damages included costs unrelated to the damages it is claiming for the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee.

In addition, even if WEPCO had subtracted the estimated 10 C.F.R. Part 170 fee from its calculation, WEPCO's calculation would be inaccurate. In questions to Mr. Rabidieau, WEPCO failed to ask him what planned activity[41] costs were recovered through specific fees, 10 C.F.R. Part 170, or annual fees, 10 C.F.R. Part 171. Thus, WEPCO included within its calculation, costs that would have been recovered through 10 C.F.R. Part 170 fees. At trial Ms. Croote explained that to accomplish the segregation of the Spent Fuel Storage/Reactor Decommissioning Fee as WEPCO proposed, in addition to distinguishing between spent fuel storage and reactor decommissioning, the planned activities would also have to be segregated between 10 C.F.R. Part 170 and Part 171 fees by line item. Tr. 4885:16-4886:21 (Croote). By failing to separate the planned activities between 10 C.F.R. Part 170 and Part 171, WEPCO has included in its claim costs unrelated to the generic costs for the Spent Fuel Storage/Reactor Decommissioning Fee.

Further, WEPCO has separately claimed damages for 10 C.F.R. Part 170 fees that it paid the NRC during the same period in which it is claiming damages for the Spent Fuel Storage/Reactor Decommissioning Fee. DFOF ¶¶ 451. As noted above, WEPCO's claim for 10 C.F.R. Part 171 annual fees includes in two instances costs for 10 C.F.R. Part 170 fees. By

---

[41] A "planned activity" is the lowest level of planning for budgeting and allocation of resources at the NRC. DFOF ¶¶ 417.

including damages for 10 C.F.R. Part 170 fees in both its claim for 10 C.F.R. Part 171 and separately, WEPCO has double-counted its claim for damages. DFOF ¶¶ 451. Therefore, WEPCO's claim for annual spent fuel storage fees is not reasonably certain and should be denied.

3. WEPCO's Calculation Fails Because It Improperly Includes Costs For A Surcharge That Would Have Been Incurred In The Non-Breach World

Another failure of WEPCO in its calculation of damages for the Spent Fuel Storage/Reactor Decommissioning Fee is not removing the surcharge from the fee calculation.[42] PX 1029 at KRGWE003828. In the fee calculation for the Spent Fuel Storage/Reactor Fee, the NRC adds a surcharge that includes the costs of budgeted resources for those activities that do not directly benefit the NRC's licensees, such as some international activities. Tr. 4852:11-4853:16 (Croote). Congress may appropriate funds to pay for some of those activities but the amount not covered by appropriations is assessed to the NRC's licensees in a surcharge. Id. The surcharge is not related to the SNF storage at all. PX 1044 at WISC1044-0030. Therefore, by failing to remove the surcharge in its calculation of damages, WEPCO seeks compensation for costs unrelated to SNF storage. Further, the surcharge would have been charged to WEPCO in the non-breach world because the surcharge applies to all licensees, not merely those paying the Spent Fuel Storage/Reactor Decommissioning Fee. Under OBRA-1990, the NRC would have been obligated to assess the costs in the surcharge to its licensees regardless of DOE's

[42] In the fee calculation process, the surcharge is added below the subtotal fee amount. DX 601. Unlike the 10 C.F.R. Part 170 estimate that is subtracted from the subtotal fee amount, the surcharge is added to the fee calculation.

performance. The inclusion of this surcharge further supports the Government's challenge to this claim in WEPCO's damages.

#### 4. WEPCO's Calculation Fails Because It Improperly Includes Costs For Wet Storage

All operating power reactors require wet storage for storage of SNF. Tr. 4112:6-10 (Rabideau). Prior to the fee change rule in FY1999, the NRC included its costs for generic activities related to wet storage in the 10 C.F.R. Part 171 operating reactor annual fee. DX612 at NRC045 0065. Therefore, in both the breach and non-breach world there would have been costs for generic activities at the NRC related to wet storage and fees assessed to the appropriate fee class. The Spent Fuel Storage/Reactor Decommissioning Fee includes costs for NRC activities related to wet storage. DFOF ¶¶ 394, 414. WEPCO asked Mr. Rabideau to review NRC work papers related to the Spent Fuel Storage/Reactor Decommissioning Fee and asked him questions regarding the allocation of resources made in those work papers. PX 1048 at 107:17-108:3; 118:3-9; 122:22-123:6; 130:16-22; 135:6-13. Mr. Rabideau was not able to segregate whether given planned activities related to wet or dry storage because WEPCO had not provided him sufficient information to make that determination. DFOF ¶¶ 427-428. Therefore, WEPCO's calculation of damages includes costs for NRC for generic activities related to wet storage that would have been incurred in the non-breach world. Therefore, WEPCO's claim for generic spent fuel storage fees is not reasonably certain, and should be denied.

5. WEPCO's Calculation Fails Because It Does Not Accurately Divide The Spent Fuel Storage/Reactor Decommissioning Fee Between Its Three Elements, Wet Storage, Dry Storage, And Reactor Decommissioning

As we have demonstrated, WEPCO's calculation of damages related to costs for the Spent Fuel Storage/Reactor Decommissioning Fee is fatally flawed because the NRC's generic activities cannot be accurately divided between wet storage, dry storage, and reactor decommissioning. WEPCO concedes that in utilizing its method of segregating costs twenty percent of the costs are unassigned and, therefore, uncertain. Other than simply prorating that amount, WEPCO offers no factual or statistical basis to conclude that its analysis is anything but flawed by at least twenty percent. To the extent that WEPCO's calculation fails to make a demonstrably accurate segregation of the Spent Fuel Storage/Reactor Decommissioning Fee, WEPCO has not proven its claimed damages with reasonable certainty. Therefore, WEPCO's claim for annual spent fuel storage fees is flawed and should be denied.

Mr. Kiraly adjusted and reduced WEPCO's claim by $2,283,333, the entire amount claimed by WEPCO for NRC fees based on the expert testimony of Messrs. Brewer.

VI. THIS COURT SHOULD ADJUST THE DAMAGES CLAIM FOR THE COSTS ASSOCIATED WITH CASKS THAT WOULD HAVE BEEN LOADED TO DOE FROM POINT BEACH ASSUMING DOE PERFOMANCE IN 1998

As we explain above, the proper method of calculating damages is to determine the costs plaintiff would have incurred in the but-for world and award the plaintiff as damages only those costs that constitute incremental costs resulting from DOE's delay. See supra at DFOF ¶¶ 606; see PG&E, 73 Fed. Cl. at 386. Under that proper methodology, the Court identify what costs WEPCO would have incurred for loading casks to DOE had DOE commenced acceptance of SNF from Point Beach beginning in 1998. Tr.6168:10-19 (Kiraly).

Messrs. Brewer and Kiraly testified at trial that there was a reasonable method to determine the but-for loading costs using WEPCO's estimated costs from 2004 and its actual costs from 2006. DFOF ¶¶ 607, 615. Because there is no rail or barge service to Point Beach, we assumed that WEPCO would have used a truck cask in the but-for world, an assumption that is conservative because the utility incurs less cost loading a partial truck cask than it would loading a partial heavy haul or rail cask. DFOF ¶¶ 549. On that basis, we established at trial that, had DOE begun accepting fuel from DOE in 1998 at the 900 MTU rate, WEPCO would have loaded 133 GA-4 truck casks[43] through 2006, and that the cost associated with these loadings, based upon the labor costs that plaintiff employed in this case to compute its own costs to load the VSC-24 and NUHOMS casks, would be at least $3,688,166. DFOF ¶¶ 612, 624, 625.

Plaintiff has asserted that, although damages are measured by actual world expenditures less expenses that would have been incurred, these but-for loading costs should not be included in the would-have-been column because the costs have not been avoided but merely deferred. Pl. Br. at 88-89. This argument is unavailing for several reasons. First, it is not necessarily the case that WEPCO will be required to incur the same or similar costs to load casks to DOE at a later

---

[43] In the early 1990s, ERI conducted an analysis at the request of EEI/UWASTE to look at the maximum amount of spent fuel the industry could ship. In that analysis, Ms. Supko assumed a combination of truck and rail casks. With respect to the truck casks, Ms. Supko assumed the use of the GA-4 or GA-9, which hold four PWR assemblies or nine BWR assemblies. Indeed, Ms. Supko was able to conduct this analysis as to the types of casks DOE would have brought despite the fact that DOE had not yet performed because, in the early 1990s, DOE had an active cask system development program that was ongoing. In 1998, the IF 300 was an available rail cask for both PWR and BWR facilities. Similarly, the NAC-STC, which was a 26 PWR assembly cask, was also available in the 1998 time frame. Tr.3603:7-15; 3605:14-3609:20 (Supko).

date. In fact, the evidence at trial clearly demonstrated that WEPCO will not incur any costs to load SNF to DOE in the future because it has sold Point Beach to FP&L Energy. WEPCO does not intend to seek further damages from the Government as a result of DOE's delay. DFOF ¶¶ 627. Thus, there is no mechanism for the Government to "true-up" the costs of loading when DOE ultimately begins acceptance of SNF from Point Beach. WEPCO will no longer be the owner of the plant and, thus, the Government will be forced to pay a second time for loading the fuel to DOE, but those costs will not necessarily be the same. If FP&L Energy incurs costs to load casks to DOE in the future, that expenditure, by another entity, should be included in damages in future litigation. However, if the Court does not award an offset at this time, there is no mechanism that guarantees the right of the Government to recover an offset in the future for costs that WEPCO has unquestionably avoided. The Government's ability to require plaintiff to account for its costs avoided should not be tied to plaintiff's unilateral decision as to whether it will bring lawsuits in the future. WEPCO in essence will be getting a windfall if the Court does not offset the costs of loading in this litigation. And plaintiff's experts essentially concur with that conclusion. In the first of five reports prepared for plaintiff, Kenrich opined that there should be an adjustment for the costs of loading that would have been incurred. DX 498 at 21-22. Kenrich calculated that offset to be $4.7 million for but-for loading from 1998 to 2004. DX 498**.** Kenrich eliminated that adjustment to WEPCO's damages claim in its second expert report, at the instruction of counsel. PX 794.

Mr. Kiraly adjusted and reduced WEPCO's damages claim by a total of $3.68 million in

avoided loading costs based upon input from Mr. Brewer.[44] DFOF ¶ 625. To the extent that a ruling on internal salaried labor or A&G is made in favor of the plaintiff, a higher offset – $5,642,637 – for loading costs would be appropriate. DFOF ¶ 626.

## VII. WEPCO CANNOT ESTABLISH CAUSATION FOR CERTAIN COSTS THAT IT ALLEGEDLY INCURRED FOR INTERNAL LABOR AND "OVERHEADS"

### A. A Portion Of WEPCO's Internal Labor And Associated Payroll Adjustments And Employee Costs Were Not Incremental

WEPCO cannot meet its burden of establishing causation with respect to certain costs included in its claim associated with internal labor. Because these costs would have been incurred even if DOE had performed under the Standard Contract, they are not incremental to the partial breach and, therefore, not appropriately included as damages.

"It is settled . . . that a [party] is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Thus, WEPCO may only recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to WEPCO.[45] See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980)

[44] In the event that the Court rules that the 3,000 MTU acceptance rate applies here, plaintiff would be required to load 247 4-assembly casks, at a total cost of $5,793,014. DFOF ¶ 625. This figure is less $1,954,472 that represents plaintiff's costs for internal labor and overhead which are adjusted elsewhere by Mr. Kiraly. DX 393; DDX 5-65.

[45] A cost is incremental or a "fixed cost" if it would have been incurred even absent the dry fuel storage project at WEPCO. Simply because a cost has been allocated to a particular cost account, like the ISFSI account, does not automatically indicate that an increased cost was incurred as a result of some work being done on that project. Tr.6106:6-6107:6 (Kiraly).

(rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 942 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"); SMUD, 70 Fed. Cl. at 375-76 (rejecting claimed internal labor where SNF plaintiff failed to demonstrate that incurred labor costs were caused by Government's breach).[46]

As part of its claim, WEPCO included all $9.2 million of the internal labor costs that were billed to any damages-related projects. DFOF ¶ 586. However, as Mr. Kiraly explained at trial, WEPCO's damages claim includes $5,572,636 million of labor costs that would have been incurred regardless of DOE's delay in SNF acceptance. DFOF ¶ 586. Mr. Kiraly concluded, based upon an analysis of a type that WEPCO did not perform, that WEPCO's computation of labor costs included labor charges for salaried employees who spent a relatively minimal amount of time on damage-related projects. DFOF ¶ 586; DDX 5-20. Because reasonable companies

---

[46] In Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), the Court referred to Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), and Dunn Appraisal Co. v. Honeywell Information Systems, Inc., 687 F.2d 877 (6th Cir. 1982), in considering the causation standard necessary for the recovery of internal labor. See TVA, 69 Fed. Cl. at 538. To the extent that these cases can be construed to obviate the requirement that a plaintiff demonstrate that the labor costs incurred would not have been incurred absent the wrongful act, they conflict with the prevailing law in this circuit. See Indiana Michigan, 422 F.3d at 1376. The same goes for the Court's decisions in Northern States Power Co. v. United States, 78 Fed. Cl. 449, 468 (2007) reconsideration denied, Southern Nuclear Operating Company v. United States, 77 Fed. Cl. 396, 442-743 (2007), appeal docketed, No. 2008-5028 (Fed. Cir. Jan. 14, 2008), and System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 67 (2007), appeal docketed, No. 2008-5025 (Fed. Cir. Jan. 9, 2008) ("System Fuels"), all of which rely upon the Court's decision in TVA with respect to internal labor, without conducting an independent analysis of whether the costs of the labor performed was incremental to the breach. The Government respectfully disagrees with the Court's decision in these cases and has appealed the decisions in Southern Nuclear and System Fuels.

generally staff their operations to handle a moderate amount of unexpected work, the salaries of full-time employees who are temporarily assigned to breach-related projects are costs that WEPCO would have incurred in the normal course of its business, and do not constitute damages. DFOF ¶570, 584.

WEPCO bears the burden of proving that its internal labor costs are damages; however, it made no effort to analyze its internal labor charges to prove that the charges were incremental to DOE's delay. DFOF ¶ 571-573, 578-580. Other than the conclusory and unsubstantiated statements made by Mr. Metcalfe that WEPCO does not operate at excess capacity and that some unnamed, unidentified individuals left the company when their work was complete, WEPCO offered no justification for recovering the entirety of the $9.2 million it claimed in internal labor charges. DDX 5-14, DDX 5-19. Rather than seeking to exclude all of the internal labor charges in WEPCO's claim upon the basis that WEPCO has failed to meet its burden of proof, Mr. Kiraly conducted an analysis designed merely to make a reasonable determination of what amount of those charges would have been incurred absent DOE's delay. DDX 5-15, 16, 17, 18, 19. As a result of this analysis, Mr. Kiraly determined that approximately $2.5 million of WEPCO's internal labor costs are properly included as damages. This amount includes charges for hourly labor and the salaries of WEPCO employees including Mr. Becka and Mr. Rogers who spent a majority of their time on the project. DFOF ¶ 582-583.

Mr. Kiraly determined that the WEPCO employees who were incremental to the partial breach averaged nearly 1300 hours per year, or 32 weeks per year, while those he determined to be non-incremental averaged only 42 hours a year, or one week a year, an amount that Mr. Kiraly determined in his expert opinion did not cause WEPCO to incur any measurable economic harm.

DDX 5-21, 22. The data and analysis trend indicates that the non-incremental WEPCO employees performed other tasks, and therefore, the company did not incur any additional costs because these same employees worked on the dry fuel storage project. DFOF ¶ 583. WEPCO has not established that such a minimal amount of time spent working on a damage-related project resulted in additional cost to the company, nor has WEPCO established (or even attempted to establish) that it suffered an opportunity cost because these employees were unable to work on other, non-breach related projects. DFOF ¶ 584. Thus, based upon the expert opinion of Mr. Kiraly, $5,572,363 in internal labor costs should be removed from WEPCO's claim.[47] DFOF ¶ 586; DDX 5-23, 24.

Associated with the internal labor costs are certain payroll adjustments and employee expenses included in plaintiff's damages claim. For example, WEPCO claimed $536,444 for payroll adjustments, or pension and benefits costs, not included in labor rates. DFOF ¶ 594 . Mr. Kiraly opined that, if the Court finds that the internal labor which the Government has challenged should be removed from the claim, the entire $536,444 of payroll adjustments associated with the labor should be removed, as well. DFOF ¶ 592-593; DDX 5-25, 26, 27.

Moreover, WEPCO claimed $617,135 for employee expenses, such as travel reimbursements and meals. There was no evidence proffered at trial that these costs were caused

---

[47] Mr. Kiraly has challenged $6,650,322 in internal labor costs, which includes adjustments for specific causation reasons. However, if the Court denies our challenge, but grants other entitlement challenges, some portion of the internal labor costs will be removed as part of those entitlement claims. For example, if the Court finds that the TN-32B cask project was not reasonable mitigation, $77,869 will be removed from the claim as internal labor costs related to that specific project, in addition to the other TN-32 B costs included in WEPCO's damages claim. See DDX 5-24. If the Court rules that the ISFSI fabrication costs are not proper damages here, $5,056,521 of that claim would be removed as labor costs.

by DOE's delay in accepting SNF from Point Beach. A majority of the employee expenses related to activities which WEPCO would have been required to perform in the but-for world, totaling $458,565. There was a small portion of employee expenses which could not be tied to personnel working on dry fuel storage related activities. Therefore, $65,217 should be adjusted for this reason alone. In total, Mr. Kiraly determined that $523,782 of those claimed expenses should be excluded from the plaintiff's damages claim. DFOF ¶ 587-590, 654.

B. WEPCO's Claimed Administrative & General Costs Were Not Incremental

WEPCO included in its damages claim $1,733,273 of costs associated with administrative & general ("A&G" or "overhead") expenses. DDX 5-28. Defendant challenges the inclusion of those costs in plaintiff's damages claim for two reasons. First, plaintiff did not establish that DOE's delay in accepting SNF from Point Beach caused the A&G costs to increase, as it must to demonstrate that it is a legitimate damage. The Court should not allow plaintiff here to recover the portion of its fixed overhead costs that have been allocated to breach-related projects, because these costs are not incremental to the breach, and doing so would put WEPCO in a better position than it would occupy if DOE had begun accepting fuel in 1998. Second, the A&G costs included by Kenrich in the claim are greater than the A&G costs recorded to WEPCO's accounting books, and, therefore, awarding these costs would constitute a windfall. DFOF ¶ 599.

A&G costs include such items as office supplies, office space, office furniture, and the cost of the upkeep of office buildings. DFOF ¶ 595; DDX 5-30. WEPCO's A&G costs also include depreciation expenses of Washington Gas, which are completely unrelated to the dry fuel storage project and would clearly have been incurred regardless of the partial breach.

DFOF ¶ 595; DDX 5-31. WEPCO's claim for A&G costs is not viable because WEPCO has failed to evaluate or quantify the amount, if any, by which the company's A&G costs changed as a result of breach-related projects and conceded that it had done no analysis to determine if those costs had changed. DFOF ¶ 601-603. Ms. Straub[48] testified that she was unaware of any change to A&G costs that could be attributed to the dry fuel storage project at Point Beach. Tr.2968:7-11 (Straub). This Court has rejected similar claimed A&G or overhead costs where the plaintiff failed to show any relationship to the dry storage project, or that such costs were incremental to the Government's delay in SNF acceptance. See TVA, 69 Fed. Cl. at 542 (rejecting claimed "capital support" overhead expenses reflecting management allocations where plaintiff failed to show any relationship between the claimed cost to the dry storage project); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 377 (2006) (rejecting claimed overhead where plaintiff failed to meet burden of proving that costs were incremental to DOE's delay in SNF acceptance), appeal docketed, No. 2007-5052 (Fed. Cir. Feb. 6, 2007) ("SMUD"); System Fuels, 79 Fed. Cl. at 64 (capital suspense removed from claim where amount excessive); System Fuels, Inc., System Energy Resources, Inc. et al. v United States, 78 Fed. Cl. 769, 800 (2007) ("SERI") (rejecting claimed overhead where plaintiffs did not know whether the damage-related projects had any effect on the overhead expenses).

WEPCO argues that, because the PSCW allows recovery of A&G rates from non-utility affiliates, because A&G rates are routinely recovered in the context of Government contracts, and because other courts have permitted the recovery of A&G rates, this Court should allow recovery

[48] Ms. Straub is a former full-time WEPCO accountant who has been working as a contract employee for WEPCO since 2002. Tr.2845:6-12 (Straub).

against the Government here. However, that argument ignores the basis upon which this Court must decide whether a cost is recoverable in the damages context. Plaintiff has failed to demonstrate that the A&G costs it incurred were caused by DOE's delay in accepting SNF from Point Beach, or that those costs are related to the partial breach in any way. In fact, we demonstrated at trial that WEPCO cannot show any causation with respect to those A&G costs at all and plaintiff does nothing more than improperly allocate the costs to the dry fuel storage costs. Furthermore, as Ms. Straub conceded, the dry fuel storage project is a WEPCO project, not a non-utility project, and thus A&G costs should not be added to it. Tr.2951:22-2952:8; 2953:1-12 (Straub).

Further, the calculation of A&G costs here by WEPCO's expert, Kenrich, is suspect. First, under the old MSA accounting system, used by WEPCO until approximately August 1996,[49] WEPCO recorded A&G costs to the project level. DFOF ¶ 596. However, Kenrich did not use the actual A&G costs recorded by WEPCO to the dry fuel storage project; instead, Kenrich increased the claim. Tr.4805:2-12; 4807:22-4808:5 (Metcalfe). Thus, all of the pre-1996 A&G costs were established by WEPCO's experts, and not by the company itself in the normal course of business. DFOF ¶ 596-598. After May 1996, WEPCO ceased to record A&G rates to the project level. DFOF ¶ 596. To determine the A&G costs for the years after 1996, Kenrich used the budgeted rates, and not the actuals. In some years, the budgeted rates were higher than the actual rates. DFOF ¶ 599. Thus, even assuming that the Court does not agree that the A&G rates are fixed costs, awarding WEPCO the A&G costs under the circumstances

[49] WEPCO used the MSA accounting system from 1976 until August 1996. Tr.2908:3-15 (Straub).

will result in recovery by WEPCO of costs that it did not, in fact, incur. Tr.2919:23-2920:4 (Straub).

Because plaintiff has failed to prove that the A&G costs which it included in the claim were incremental to the breach, or that the A&G costs were accurately calculated, a deduction of $1,733,273 in A&G costs is appropriate.[50] DFOF ¶ 605.

## VIII. WEPCO IMPERMISSIBLY SEEKS PRE-JUDGMENT INTEREST IN ITS DAMAGES CLAIM, WHICH IS NOT ALLOWABLE AGAINST THE GOVERNMENT

### A. WEPCO Cannot Recover Its Cost Of Capital

Plaintiff has improperly included over $44 million in its damages claim associated with the alleged application of a cost of capital to its past costs so as to account for the time value of money. Plaintiff's claims for a "cost of capital" of its past costs fails as a matter of law.

First, interest upon a claim against the United States is precluded under 28 U.S.C. § 2516(a) unless permitted under a contract or Act of Congress. Plaintiff's attempt to circumvent the well-established rule precluding the recovery of prejudgment interest by contending that the cost of capital for its past costs represents "a real economic cost to WE and is necessary to make WE economically whole" Pl. Br. at 77. However, as the United States Supreme Court explained in Library of Congress v. Shaw, 478 U.S. 310 (1986), "'the force of the no-interest rule cannot be

[50] Mr. Kiraly has challenged the total $1,733,273 in claimed A&G cost because they are fixed and, therefore, not incremental to the breach here. However, if the Court denies our challenge, but grants other entitlement challenges, some portion of the A&G costs will be removed as part of those entitlement claims. For example, if the Court finds that the TN-32B cask project was not reasonable mitigation, $13,302 will be removed from the claim as A&G costs related to that specific project, in addition to the other TN-32 B costs included in WEPCO's damages claim. See DDX 5-33. If the Court rules that the NUHOMS cask project was not reasonable mitigation, $87,221 of that claim would be removed as A&G costs. If the Court rules that WEPCO would have needed an ISFSI and would have loaded the first five VSC-24 casks, $957,486 of A&G costs would be removed on that basis.

avoided simply by devising a new name for an old institution: '[T]he character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.'" Contel Advanced Systems, Inc., 384 F.3d at 1379 (citing Shaw, 478 U.S. at 321) (citations omitted). Importantly, the Supreme Court has identified the underlying purpose behind prejudgment interest, which is to make the injured party whole. Monessen Southwestern Railway Co. v. Morgan, 486 U.S. 330, 345 (1988) (Blackmun, J., concurring in part, dissenting in part) (stating that Supreme Court has repeatedly "authorized prejudgment interest for economic injury when the purpose of the overall award is to make the plaintiff whole"). Here, plaintiff's attempt to recover this cost of capital plainly is, according to Mr. Metcalfe, WEPCO's own expert, an attempt to make itself whole based upon the time value of money and, therefore, constitutes interest upon a claim, rather than a distinct element of their damages claim.[51][52] Cliff Hamal, the Government's expert, testified at trial that, from an economic perspective, plaintiff's claim for the cost of capital upon their past damages claim is the equivalent in all material respects to a claim for prejudgment interest. DFOF ¶ 652.

[51] Mr. Metcalfe agreed that weighted average cost of capital is one way to calculate prejudgment interest, as was demonstrated during trial with the Litigation Services Handbook, a text that Mr. Metcalfe recognized as a well-known damages analysis. Tr.4681:9-4682:14 (Metcalfe).

[52] Furthermore, under the WACC approach, 75 to 83 percent of the claimed financing costs are for stockholder profit. Tr.5845:16-5847:17 (Hamal); P Dem 61, Metcalfe 18; Tr.4669:6-4670:23 (Metcalfe).

Further, WEPCO is not entitled to pre-judgment interest because, for the most part, these costs have been recovered from ratepayers.[53] Thus, WEPCO has not suffered any damage. Operating costs are passed on directly to ratepayers, other costs are passed onto ratepayers over time, but are recovered nonetheless. DFOF ¶¶ 637-641. WEPCO's claim ignores the fact that the casks are sold to WEFT, which is then financed independently and leased back to WEPCO. The claimed WACC charges are clearly inappropriate for the cask costs.

This Court has unequivocally rejected claims for the cost of capital as damages because such claims are simply disguised claims for prejudgement interest. See Columbia First Bank v. United States, 54 Fed. Cl. 693, 699-700 (2002) (rejecting plaintiff's claim for $4.4 million to "compensat[e] the plaintiff for the lost use of the money for the intervening period" because such cost violated ban upon prejudgment interest) (citation omitted). Plaintiff's reliance upon the Court's decision in TVA is misplaced. While we disagree with the Court's conclusion that AFUDC is recoverable as a matter of law, here, what is claimed as cost of capital damages is simply a calculation based upon an interest rate assumption made by WEPCO's damages expert, and not AFUDC[54] that was used to earn a return on funds used during the construction of its

[53] We demonstrated at trial that no WEPCO financing costs were incurred because costs are recovered from ratepayers. PSCW Orders indicate that it recognizes that dry cask storage costs have been paid for by ratepayers, and any costs recovered in this litigation will be returned to ratepayers. Tr.2702:23-2703:7 (Farron); Tr.4825:5-12 (Metcalfe); DX 102; PX 686 at WISC 00123295. Mr. Metcalfe admits that most of the SNF damage claim costs have been put into the rate base and already recovered from ratepayers. Tr.4569:25 (Metcalfe). Defendant demonstrated that WEPCO's claim ignores rate making principles where the recovery of costs from ratepayers occurs. Tr.2994:18-2995:3 (Straub); Tr.5850: 19-25 (Hamal); Tr.6323:5-19 (Metcalfe); Tr.5851:8-22 (Hamal): Tr.5852:9-21 (Hamal); Tr.6381:16-6382:5 (Hamal).

[54] Plaintiff throws into its brief, as an after thought, the suggestion that, if the Court does not permit recovery of cost of capital or cost of debt, then perhaps the Court will award it AFUDC. However, WEPCO cannot avoid the no-interest rule by claiming that AFUDC is a

ISFSI. Moreover, unlike AFUDC, the plaintiff applied the cost of capital to all of its damages components, including those components that are not, as a matter of accounting, capitalized. DFOF ¶ 628.

Further, in TVA, the Court incorrectly determined that the plaintiff could recover AFUDC costs based upon its analysis of the Federal Circuit's decision in Wickham Contracting Co. v. Fisher, 12 F.3d 1574 (Fed. Cir. 1994), but Wickham is inapplicable to the Court's analysis here. The contract at issue in Wickham involved a contract clause – the "Changes" clause contained in most Federal procurement contracts – that has been held to authorize recovery of interest on funds borrowed to address a contract change. See Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968).[55] Without a "Changes" clause or similar contractual provision,[56] the statutory

---

financing cost. "[L]ike interest on substantive claims against the government, '[i]nterest on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable.'" England v. Contel Advanced Systems, Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004)); see Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("interest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute"). Moreover, where a plaintiff uses its own money to finance breach-related activities, any claim for the loss of interest that money might have earned him is similarly barred. Southern Nuclear, 77 Fed. Cl. at 447 (quoting England, 384 F.3d at 1379 (Fed. Cir. 2004); System Fuels, 79 Fed. Cl. at 70 n. 31 (2007) (even where the loss of a return on equity is a "real economic cost," . . . it is not one that fits within the exception to the general ban on the recovering interest against the federal government.").

[55] Although the Federal Circuit's decision in Wickham does not specifically mention the "Changes" clause, it is clear that a "Changes" clause was included in that Federal procurement contract, pursuant to the mandatory language in the Federal Acquisition Regulation ("FAR") that requires the inclusion of that clause in all contracts subject to the FAR. See FAR § 43.205, 48 C.F.R. § 43.205; see also Wickham Contracting Co. v. GSA, GSBCA No. 8675, 92-3 BCA ¶ 25040, 1992 WL 88326, at *1 (GSBCA 1992) (discussing 110 change orders upon which claims were based), aff'd, 12 F.3d 1574 (Fed. Cir. 1994).

[56] In Northern States, the Court questioned the recoverability of interest against the Government, even where a "Changes" clause exists, noting that the FAR does not appear to

provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States." Bell, 404 F.2d at 984. Indeed, in Bell, the Court specifically noted that "[t]he demand here is not based upon a 'breach' but upon a change compensable under the 'Changes' article which entitles the contractor to reimbursement for the resulting 'increase * * * in the cost of performance of this contract.'" Id. Here, the Standard Contract contains no "Changes" or similar clause, and plaintiff seeks breach damages, not an equitable adjustment. As a result, the Wickham decision, and the analysis of the Court in TVA, should not govern plaintiff's claim for cost of capital.

Moreover, even if plaintiff was entitled to recover interest on borrowings pursuant to Wickham, to recover under such a theory, "[t]he changed work either must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government." Gevyn Constr. Corp. v United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). However, WEPCO admits that it cannot make any direct link between its generalized borrowing and any breach-related projects. DFOF ¶ 647. Instead, WEPCO funds its capital construction projects through the issuance of generalized debt and equity, and borrows money at the company level. DFOF ¶ 633. Such generalized evidence of borrowings is insufficient to make a claim for interest recoverable. Southern Nuclear, 77 Fed. Cl. at 449 (2007) (denying plaintiff's claim for cost of capital where plaintiffs could not identify any specific or general debt or actual costs incurred as a result of borrowing); Northern States Power Co. v. United States, 78 Fed. Cl. 449, 471-72 (2007) (plaintiff's claim for its cost of

---

waive sovereign immunity with respect to "interest on borrowings." Northern States, 78 Fed. Cl . at 472 n. 16.

capital is barred by 28 U.S.C. § 2516, "absent proof of any borrowings with which the interest claim could be causally identified"). In fact, where utility plaintiffs have failed to show that their claimed financing costs "are directly related to required borrowing through specific debt instruments," this Court – in an opinion authored by the same judge who decided TVA – has denied the plaintiff's claims for cost of capital, cost of debt, and AFUDC. System Fuels, 79 Fed. Cl. at 70.

WEPCO also relies upon Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135 (2002), to support its position with respect to its claim for cost of capital. Pl.Br.at 78-79. Westfed Holdings is one in a series of cases arising out of the passage of the Financial Institution Reform, Recovery And Enforcement Act ("FIRREA"). These FIRREA cases primarily rely upon Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed. Cir. 2001), as support for the idea that interest on a claim may be recoverable. However, Bluebonnet addresses the recoverability of financing costs arising under a contract the very purpose of which was to raise financing to infuse cash into an acquired thrift; it does not support the argument that interest on a claim is generally recoverable absent a contractual or statutory provision waiving the Government's sovereign immunity. Even in cases where a court has recognized the possibility that interest as a claim may be recoverable, the Court has held that the claimant must offer "direct proof that the parties discussed [plaintiffs'] need for borrowed cash in the event of a breach." Centex Corp. v. United States, 55 Fed. Cl. 381, 390 (2003), aff'd on other grounds, 395 F.3d 1283 (Fed. Cir. 2005); see Westfed Holdings, 52 Fed. Cl. at 163 n.22 (original negotiations were "predicated on the fact that Westfed planned to invest $220 million, $60 million of which defendant knew would be borrowed.") (citation omitted). Here, there is no evidence that the

Government understood, in developing the Standard Contract, that plaintiff would require financing in the event of a breach.

WEPCO asserts in its brief that its WACC rates are subject to the FERC Uniform System of Accounts for Public Utilities. Pl. Br. at 79. However, as we have stated previously, whether the WACC rates have been approved by FERC or the PSCW is of no moment here. The issue before the Court is whether the weighted average cost of capital is pre-judgment interest. We established at trial that it is, and, therefore, it is not recoverable here.[57]

Over the objections of the Government, WEPCO presented (in a rebuttal case) the weighted average cost of debt, or "WACD," as an alternative to its weighted average cost of capital calculation. The Government does not waive its initial objections to that rebuttal testimony. As we established through the testimony of Mr. Metcalfe, WEPCO's expert, his "WACD" calculation could have been introduced in one of the five expert reports that Kenrich prepared on behalf of WEPCO. It was not. Presenting that calculation at the final hour of the trial was inappropriate, untimely, and not rebuttal testimony. For this reason, the Court should ignore the untimely presentation of any alternative damages theories here.

In any event, the WACD is, like its claim for WACC, nothing more than plaintiff's attempt to account for the time value of money. Tr. 6345:7-16 (Metcalfe); Tr. 6378:6-6380:1 (Hamal); Tr.6384:22-6385:8 (Hamal). WACD is applied to WEPCO's claim for damages in the very same manner that WACC is applied and should be denied.

---

[57] In Southern Nuclear, this Court found that an interest claim required more than what is required by regulators: "Similarly, while the cost of funds may be de rigeur in regulatory or other proceedings, something more is required to present interest as a claim versus interest as a claim." Southern Nuclear, 77 Fed. Cl. at 448-449.

B. WEPCO's Request To Recover AFUDC Is Untimely And, In Any Event, Unwarranted

In its post-trial brief, WEPCO insists that, if the Court does not award WACC or WACD, the Court could award WEPCO, at the very least, its AFUDC costs. That evidence was never presented to the Court and should be denied out of hand.

However, to the extent that the Court deems that request timely and to the extent that WEPCO bases its theory of recovery of AFUDC upon this Court's decision in TVA, WEPCO's claim should still fail. As discussed above, the Court's analysis in TVA relied upon the Federal Circuit's decision in Wickham, but it misinterpreted Wickham by failing to recognize that, in Wickham, the "Changes" clause potentially authorized the recovery of interest on borrowings at issue there. See Bell, 404 F.2d at 984. Here, the Standard Contract contains no clause authorizing such recovery. Further, even if it did, WEPCO has failed to establish, as it must, (1) a direct match between a specific debt and the project at issue and that interest paid was directly tied to the project at issue; or (2) that the project, necessitated by the Government's delay, necessitated the borrowing, with a specific effect upon the company's normal borrowing pattern. See Gevyn Constr., 827 F.2d at 754; System Fuels, 79 Fed. Cl. at 70. WEPCO's failure to make such a showing dooms its AFUDC claim.

Mr. Kiraly adjusted and reduced WEPCO's damages claim by removing the entire $44,204,521 from the amount claimed by WEPCO as prejudgment interest.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court eliminate from plaintiff's damage claim all costs that plaintiff has failed to demonstrate were directly caused by the Government's breach, foreseeable, and proven to a reasonable certainty, and all costs that are otherwise not recoverable as a matter of law.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-9640
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial Attorney

STEPHEN FINN
SONIA M. ORFIELD
RUSSELL A. SHULTIS
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

March 25, 2008

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on March 25, 2008, a copy of this "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Stephen Finn