**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **WISCONSIN ELECTRIC POWER COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 00-697C**<br><br>**(Senior Judge Merow)** |

**WISCONSIN ELECTRIC POWER COMPANY'S**
**<u>POST-TRIAL REPLY BRIEF</u>**

**<u>Of Counsel</u>:**

**Donald J. Carney**
**Mary Rose Hughes**
**Emily C.C. Poulin**
**Jay L. Griffiths**
**Perkins Coie LLP**
**607 Fourteenth Street, N.W.**
**Washington, D.C. 20005-2003**
**(202) 434-1675**

**Richard W. Oehler**
**Perkins Coie LLP**
**1201 Third Avenue, Suite 4800**
**Seattle, WA 98101-3099**
**(206) 359-8419**

**Attorneys for Plaintiff**
**WISCONSIN ELECTRIC**
**POWER COMPANY**

**DATED: July 10, 2008**

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF ARGUMENT ..... 1

II. ARGUMENT ..... 4

A. The Government Confuses the Proper Legal Standards for Recovery of Mitigation Costs for DOE's Breach of Contract ..... 4

B. WE's Costs to Construct the Independent Spent Fuel Storage Installation ("ISFSI") and Load Twelve Casks Were Substantially Caused by DOE's Breach and Were Foreseeable ..... 7

1. The Government's Claim that, in 1988, WE Planned to "Bridge the 1995-1998 Gap" Is Ill-Founded ..... 7

2. WE's 1991 PSCW Application for Dry Storage Reflected DOE's Anticipated Breach ..... 12

3. The Government's Additional Mischaracterization of Testimonial and Documentary Evidence Does Not Advance Its Cause ..... 22

4. The Government's Argument that the Statute of Limitations Bars WE's Pre-1994 Damages Is Devoid of Merit ..... 35

5. The Government's Argument that Pre-1994 Damages Are Otherwise Unallowable Under Indiana Michigan Is Incorrect ..... 37

C. In the Non-Breach World, WE Would Not Have Built Dry Storage ..... 41

1. The Government's Claim that Point Beach Could Not Use 1500 Pool Spaces Is Both Factually Incorrect and Relies on Breach World Assumptions ..... 42

2. WE Could Have Projected Operating Without Dry Storage into 1998 and Beyond ..... 44

3. The Evidence Shows that WE Could and Would Have Avoided Building Dry Storage in the Non-Breach World ..... 47

4. The Government's Claim that WE Could Not Have Operated into 1998 Is Based on Flawed Assumptions and Unreliable Testimony ..... 48

5. The Government's Removal of WE's Costs for Dry Storage Fabrication and the Purchase and Loading of Five Casks Is Contrary to the Evidence ..... 50

D. In the Non-Breach World, WE Likely Would Have Used a Temporary Rack for Short-Term FCR Capability ..... 52

1. The Government's Claim that Point Beach Did Not Consider a Cask Pit Rack in the Breach World Before 1998 Is Both Factually Incorrect and Irrelevant to WE's Likely Actions in the Non-Breach World ..... 52

**TABLE OF CONTENTS**
**(continued)**

**Page**


2. The Government Did Not Meaningfully Challenge WE's Evidence that, in the Non-Breach World, WE Would Have Selected a Cask Pit Rack over Dry Storage ..... 56

3. The Government's Criticisms of Dr. Singh's Report Are Frivolous ..... 57

E. The Court Should Find That DOE Would Accept Spent Fuel in the Non-Breach World at a Substantial Rate ..... 61

1. The Parties' Understanding Was that DOE Would Accept SNF at a Substantial Rate ..... 61

2. DOE's 900 MTU Rate Should Be Rejected as Contrary to the NWPA, the Standard Contract, and the Parties' Understanding ..... 67

F. WE's Procurement of Three TN-32B Backup Casks Was Foreseeable, Caused by DOE's Breach, and Commercially Reasonable ..... 74

1. WE's Procurement of the TN-32B Casks Was Foreseeable ..... 74

2. DOE's Breach Caused WE to Reasonably Incur Costs to Procure Three TN-32B Casks ..... 74

3. WE Reasonably Continued with TN-32B Cask Fabrication After Loading of the VSC-24 Casks Resumed ..... 75

4. The Government Has Failed to Establish that WE Recovered Monies for Transfer of the TN-32B Casks to a Florida Power & Light Subsidiary as Part of the Sale of Point Beach ..... 78

G. WE's Decision to Procure the Dual-Purpose NUHOMS System Was Foreseeable and Reasonable ..... 79

1. WE's Procurement of the NUHOMS System Was Foreseeable and Caused by DOE's Continuing Breach ..... 79

2. WE Reasonably Procured the NUHOMS System ..... 80

H. WE Reasonably Incurred Foreseeable Costs in Exploring Private, Off-Site SNF Storage that Were Caused by DOE's Breach ..... 88

1. Background ..... 88

2. WE's Expenditures in Pursuit of PFS and Alternative Off-Site Storage Options Are Recoverable Because They Were Foreseeable, Caused by DOE, and Reasonably Incurred ..... 89

I. The Dry Storage Fees Imposed by the NRC Were Caused by DOE's Breach and Were Foreseeable ..... 93

1. The Pre-1999 Fees Were Foreseeable and Caused by DOE's Delay ..... 93




LEGAL14398425.1

**TABLE OF CONTENTS**
**(continued)**

**Page**

2. The Dry Storage Fees Imposed by the NRC Since 1999 Were Caused by DOE's Breach and Were Foreseeable .......... 96
3. DOE's Breach Caused WE to Incur NRC Fees Under 10 C.F.R. Part 171 .......... 97
4. WE Established at Trial the Spent Fuel Storage Portion of the NRC Fee with Reasonable Certainty .......... 100

J. WE Has Established Its Damages with Reasonable Certainty .......... 103
1. WE Should Recover Its Internal Labor Costs, Pension and Benefit Costs and Employee Expenses .......... 103
2. WE Should Recover Its Administrative & General Costs .......... 107
3. WE's Financing of Its Mitigation Costs Is Recoverable .......... 110
4. WE Has Estimated the Temporary Rack Offset to a Reasonable Certainty .......... 115

K. DOE's Claimed Cask Loading Offset Is Speculative and Should Not Be Allowed .......... 115

III. CONCLUSION .......... 118

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) .................. 112

*Carolina Power & Light Co. v. United States*, No. 04-37C, 2008 WL 2154103 (Fed. Cl. May 19, 2008) .................. passim

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) .................. 110

*Edward R. Marden Corp. v. United States*, 803 F.2d 701 (Fed. Cir. 1986) .................. 66

*Fallini v. United States*, 56 F.3d 1378 (Fed. Cir. 1995) .................. 36

*Franconia Assocs. v. United States*, 536 U.S. 129, 122 S. Ct. 1993 (2002) .................. 37

*Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004) .................. 5

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S. Ct. 2224 (1968) .................. 113

*Indiana Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) .................. passim

*Indiana Mich. Power Co. v. United States*, 60 Fed. Cl. 639 (2004) .................. 89, 90

*John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750 (2008) .................. 37

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 S. Ct. 2807 (1990) .................. 113

*LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) .................. 113

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) .................. passim

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .................. 65

*Myerle v. United States*, 33 Ct. Cl. 1 (1897) .................. 95, 96

*Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007) .................. passim

*Old Stone Corp. v. United States,* 450 F.3d 1360 (Fed. Cir. 2006) .................. 95, 96

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006), appeal docketed, No. 2007-5046 (Fed. Cir. Jan. 24, 2007) .................. passim

*Roedler v. Dep't of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) .................. 65

*Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112 (Fed. Cir. 1996) .................. 115

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) ........................ 107, 116

*San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997) ....... 6, 103

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007) .................... passim

*System Fuels, Inc. & Entergy Arkansas, Inc. v. United States*, 79 Fed Cl. 37 (2007) ..... passim

*System Fuels, Inc. v. United States*, 78 Fed. Cl. 769 (2007) ............................ 5, 108, 112, 114

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) .................................. passim

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002), *aff'd in relevant part & rev 'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005) ......................... 112

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) ......................... 110, 111

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ................................ passim

**Statutes**

28 U.S.C. § 2501 ........................................................................................................ 35

28 U.S.C. § 2516(a) .................................................................................................. 111

42 U.S.C. § 10131(a)(4) .............................................................................................. 63

42 U.S.C. § 10131(a)(5) ........................................................................................ 63, 65

42 U.S.C. § 10222(a)(1) .............................................................................................. 35

42 U.S.C. § 10222(a)(5) ........................................................................................ 63, 65

42 U.S.C. § 10222(b)(1)(A) ......................................................................................... 35

42 U.S.C. § 2214(c)(4) ................................................................................................ 99

Pub. L. No. 101-508, 104 Stat. 1388 ...................................................................... 93, 97

**Regulations and Rules**

10 C.F.R. § 50.59 ........................................................................................................ 55

10 C.F.R. Part 170 .................................................................................................... 101

## TABLE OF AUTHORITIES
## (continued)

**Page**

10 C.F.R. Part 171 .......... 97, 98, 100, 101

Cost Accounting Standards 410 .......... 108

Fed. R. Evid. 807 .......... 25

Federal Acquisition Regulation 31.203 .......... 108

Federal Acquisition Regulation 31.205-6 .......... 106

RCFC 26(a)(2) .......... 83, 86, 87

**Other Authorities**

*Black's Law Dictionary* (8th ed. 2004) .......... 111

*Litigation Services Handbook* .......... 111

Restatement (Second) of Contracts (1981) .......... 7, 40, 76, 103

Richard A. Lord, 11 Williston on Contracts (4th ed. 2007) .......... 66

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 00-697C<br>(Senior Judge Merow) |

# WISCONSIN ELECTRIC POWER COMPANY'S POST-TRIAL REPLY BRIEF

Plaintiff Wisconsin Electric Power Company ("WE") respectfully submits this post-trial reply to the Government's post-trial brief. Under separate cover, WE has submitted its Responses to Defendant's Proposed Findings of Uncontroverted Fact ("DFF").

## I. SUMMARY OF ARGUMENT

In its initial post-trial submissions, WE explained that it established at trial its entitlement to the damages that it seeks in this action. Specifically, WE established that the U.S. Department of Energy's ("DOE's") failure to timely perform under the Standard Contract was a substantial causal factor in WE's incurrence of foreseeable spent nuclear fuel ("spent fuel" or "SNF") storage damages. Indeed, WE established that DOE's breach was *the* causal factor in WE's incurrence of these damages. WE also established these costs with reasonable certainty. In addition, the Government has not established that WE's incurrence of these costs was unreasonable or that the Government is entitled to an offset for its claimed avoided loading costs.

Notwithstanding their length, the most remarkable aspect of the Government's post-trial submissions is that they ignore much of the relevant evidence. For example, the

Government asserts that WE "made its decision to construct dry storage without reference to DOE's delay in performance." Government Post-Trial Brief ("Govt. PTB") 28. This ignores that the 1988 and 1989 WE spent fuel storage evaluation documents expressly stated that DOE could not be expected to perform until 2003 and that WE needed to plan to store its spent fuel until 2003 and possibly until the end of the Point Beach Nuclear Plant ("Point Beach" or "PBNP") reactor licenses. Plaintiff's Exhibits ("PX") 145, 170-171; Plaintiff's Proposed Finding of Fact ("PFF") 69-88.

The Government also ignores that WE's Form 10-Ks for 1988-1991 repeatedly stated that WE was reviewing its spent fuel storage options because of the substantial delay in DOE's performance. PX 801, pp. KRGWE00211-12 ("Because of DOE's inability to accept spent fuel by the 1998 timeframe as contracted, the company has filed with the PSCW for a Certificate of Authority to construct and operate an Independent Spent Fuel Storage Installation ("ISFSI")); PFF 85, 92, 96, 108. The Government also ignores the numerous witnesses who testified that WE pursued dry storage because of DOE's delayed performance. WE Post-Trial Brief ("WE PTB") 20-34; PFF 85, 87-88, 93-94, 107, 111, 115, 121.

The Government contends that WE's November 1991 PSCW application, including the Environmental Screening Report ("ESR"), reflected a need for additional at-reactor storage before January 1998 and reflected an understanding that DOE will perform in 1998. Govt. PTB 13-15. That assertion ignores significant passages in the ESR to the contrary. *See*, *e.g.*, PX 236 (ESR), pp. 39 ("By combining alternatives which extend the capacity of the existing pool with the alternative of shipping spent fuel to a federal facility, it is possible that Wisconsin Electric could avoid the necessity of building the ISFSI."), 59 ("the uncertainties of federal acceptance plans limit the meaningful assessment" of the alternatives, and therefore WE "has not attempted to evaluate these potential alternative combinations"). On the issue of DOE performance, the ESR further stated that DOE will not have a permanent

repository until 2010 and that, under DOE's schedule, the earliest that DOE could have an operational MRS was 2007. PX 236 (ESR), p. 15; PFF 107. The ESR also stated that any earlier MRS availability would require congressional action to remove statutory linkages between the MRS and a permanent storage. In addition, the ESR stated that, even if those linkages were removed, DOE would need to find a volunteer MRS site by 1992 in order for DOE to begin accepting SNF at a MRS in 1998. PX 236 (ESR), p. 15; PFF 107. WE witnesses also testified that, by the 1991 PSCW application, WE did not believe that DOE would begin performance by 1998 and that, instead, DOE would be substantially delayed. WE PTB 20-23; PFF 83, 104.

The Government further ignores the overwhelming evidence that showed that WE could operate into 1998 and beyond by making additional spaces in the Point Beach pool available for SNF storage based on the information available to WE at the time. PFF 159-167. The Government also cannot and does not challenge meaningfully the evidence that, in the non-breach world, WE could and likely would have used a temporary rack storing 121 assemblies in the cask laydown area in order to maintain full core reserve ("FCR") pending DOE's performance. WE PTB 37-41; PFF 182-209.

Once one recognizes that DOE's partial breach was a substantial causal factor in WE's decision to construct dry storage, the evidence shows that WE reasonably incurred, and is entitled to recover, mitigation damages for the dry storage project, including ISFSI construction costs, the cost of procuring VSC-24, TN-32B and NUHOMS casks, and the dry storage fees imposed by the Nuclear Regulatory Commission. WE PTB 16-37, 49-69; PFF 104, 108, 121, 134, 149, 157, 230. WE also is entitled to recover the internal costs that WE incurred in connection with its dry storage project, including its internal labor costs, pension and benefit costs, employees' expenses and allocable indirect costs. WE PTB 72-76; PFF 238-244. WE's financing costs incurred in mitigating DOE's partial breach were a real

economic cost to WE and should be recoverable as damages as well. WE PTB 77-83; PFF 245-250. WE also is entitled to recover the limited costs that it expended in exploring private, off-site SNF storage. WE undertook this effort because of DOE's partial breach. WE PTB 59-64; PFF 212-216.

Finally, DOE's claimed cask loading offset is inappropriate because it is speculative. Accordingly, the Court should deny this claimed offset as has every other SNF decision. WE PTB 89-90.

## II. ARGUMENT

### A. The Government Confuses the Proper Legal Standards for Recovery of Mitigation Costs for DOE's Breach of Contract

WE's initial post-trial brief detailed the proper legal standards for recovery of mitigation costs in this partial breach of contract action, the applicable mitigation principles for determining past damages, and relevant principles of contract interpretation. WE PTB 9-15. WE explained that the Federal Circuit's decision in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005), provides that damages for a breach of contract "are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Once WE has made this showing, the burden then shifts to the Government to show the unreasonableness of WE's mitigation costs.

While the Government claims to follow the Federal Circuit's decision in *Indiana Michigan*, it actually misconstrues that decision and related precedent by attempting to impose on WE a greater causation standard than *Indiana Michigan* and subsequent case law require. Govt. PTB 5-8. For example, the Government asserts that WE must establish that DOE's breach was the sole cause of WE's incurrence of the mitigation costs at issue. It

further asserts that the Court must require WE "to depict an accurate 'but for' world." Govt. PTB 6.

To the contrary, *Indiana Michigan* requires that WE establish that DOE's breach was "a substantial causal factor" in the claimed mitigation damages. 422 F.3d at 1373. To meet that standard, WE must establish a causal connection and show that the mitigation costs flowed "inevitably and naturally" from the breach. *System Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 795 (2007) ("*SFI-Grand Gulf*") (quoting *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004)). WE is not required to show that DOE's partial breach was the sole cause of the incurred costs; instead, WE must show that "the alleged mitigation effort was more than a purely business judgment that would have been made irrespective of the breach." *Carolina Power & Light Co. v. United States*, No. 04-37C, 2008 WL 2154103 at *21 (Fed. Cl. May 19, 2008) (citations omitted). Moreover, "in determining whether a WE decision was substantially caused by DOE's delay, reasonable not absolute certainty suffices." *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 268 (2006). *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *22; *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

Contrary to the Government's implication, its proffered causation standard finds no support in *Indiana Michigan*. In *Indiana Michigan*, the Federal Circuit found supportable the trial court's fact finding that "Indiana Michigan's pre-breach costs were not caused by any anticipated DOE delay in performance" and that "the trial court found that Indiana Michigan's rerack schedule was not affected by 1987 and 1989 DOE announcements projecting delays in the scheduled January 1998 acceptance start date." 422 F.3d at 1376. In contrast, as detailed in its initial post-trial submissions and below, WE presented overwhelming testimonial and documentary evidence that WE developed long-term



LEGAL14398425.1

additional spent fuel storage technology in direct response to the announced delay in DOE's performance. WE PTB 15-41.

Another decision cited by the Government, *Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333 (2006), *appeal docketed*, No. 2007-5046 (Fed. Cir. Jan. 24, 2007), also does not support its proffered causation standard. Both *Indiana Michigan* and *Pacific Gas & Electric* stated that the plaintiff-utility must show that the breach was "a substantial factor in the damages," not the "sole" cause as the Government implies.[1] *Compare Indiana Michigan*, 422 F.3d at 1373, *and Pacific Gas & Elec.*, 73 Fed. Cl. at 405, *with* Govt. PTB 6-7. The substantial causal factor standard has been explicitly adopted in numerous other SNF decisions. *See, e.g.*, *Carolina Power & Light Co.*, 2008 WL 2154103 at *20; *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 405 (Fed. Cl. 2007); *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006).

Here, WE has established that DOE's breach was a substantial causal factor in WE's decision to implement dry storage. Even if the Government could prove other causes (which it has failed to do), that is immaterial because the evidence showed that WE's decision to construct dry storage sufficient to store SNF through the end of Point Beach's licensed-life was substantially caused by the Government's impending breach. *Yankee Atomic*, 73 Fed. Cl. at 298 ("That there was an independent or secondary reason for building the ISFSIs does not detract from the primary or substantial causal factor – the delay of over a decade in DOE's acceptance, transportation and disposal.").

Finally, the Government's discussion ignores that, as the breaching party, the Government bears the burden of proving that any of WE's mitigation efforts were

---

[1] The Government cites *San Carlos Irrigation & Drainage District v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997), as support for its but-for causation standard. Govt. PTB 6. In *Indiana Michigan*, the Federal Circuit was well aware of the *San Carlos* decision and cited it in support of its holding that claimed damages need not be ascertainable with absolute exactness. 422 F.3d at 1373. The *Indiana Michigan* decision, however, ignored the causation standard applied in the *San Carlos* case and, instead, articulated the causation standard relied on by WE, namely"a substantial causal factor." *Id.*

unreasonable once WE has made the showing outlined above. *Indiana Michigan*, 422 F.3d at 1375 (citing Restatement (Second) of Contracts § 350); *Yankee Atomic*, 73 Fed. Cl. at 264; *Tennessee Valley Auth.*, 69 Fed. Cl. at 523.

## B. WE's Costs to Construct the Independent Spent Fuel Storage Installation ("ISFSI") and Load Twelve Casks Were Substantially Caused by DOE's Breach and Were Foreseeable

In its initial post-trial submissions, WE explained that, when the parties entered into the Standard Contract in 1983, WE had no plans to store spent fuel at Point Beach other than in its spent fuel pool based on an expectation of DOE's performance. WE PTB 16; PFF 66. In 1985, WE began to express concern regarding DOE's lack of progress in implementing the Federal Waste Management System ("FWMS"). PFF 68; Tr. 1278-1282 (Shimon); PX 81, p. CTR-042-1808 (noting that DOE was already missing scheduled dates in its performance of the Standard Contract).

DOE's program developments in 1987 caused WE to become extremely concerned regarding DOE's ability to perform in 1998. WE PTB 16-19; PFF 69-77. By 1988, it was clear that DOE would not be accepting SNF at any facility by 1998 and, as a result, WE began planning for additional spent fuel storage because of a substantial delay in DOE's performance. WE PTB 18-21; PFF 78-85. Specifically, it planned to provide sufficient additional storage capacity to accommodate a DOE delay until at least 2003 and possibly through the end of Point Beach's then-current reactor licenses. *See* WE PTB 16-34; PFF 80, 87.

### 1. The Government's Claim that, in 1988, WE Planned to "Bridge the 1995-1998 Gap" Is Ill-Founded

In response, the Government asserts that WE implemented its dry storage project to "Bridge The Gap between 1995 and 1998, When It Expected DOE To Perform Under The Standard Contract." Govt. PTB 8. The Government further asserts that WE "made its decision to construct dry storage without reference to DOE's delay in performance" and that

WE's decision "to pursue dry storage was wholly independent of DOE's performance under the Standard Contract." Govt. PTB 28. The Government also asserts that WE committed irreversibly to dry storage in 1989. Govt. PTB 11, 17.

None of the Government's contentions are correct. In 1989, WE merely authorized pursuit of the dry storage project because it believed that DOE's performance under the Standard Contract would be substantially delayed based on the linkages in the 1987 Nuclear Waste Policy Act ("NWPA") Amendments and DOE's own representations that it would not be able to begin accepting spent fuel by 1998. PFF 81-83, 86-92. Moreover, WE, like every nuclear utility, constantly evaluated DOE's likelihood of performance and WE's SNF storage needs. PFF 109-110, 115-116. Thus, the Government's suggestion that WE made a decision in 1989 to construct dry storage and never considered the issue thereafter is illogical and unsupported.

From 1988 on, however, DOE never gave WE a reason to believe that performance by DOE would be forthcoming. WE, therefore, never had any reason to deviate from its dry storage plans. PFF 93-96, 122-126. Nonetheless, WE continued to monitor DOE program developments and its SNF storage options and did not make a final decision to construct dry storage until February 1995 when it received Public Service Commission of Wisconsin ("PSCW") project approval. WE PTB 28-30; PFF 121.

The Government's unwillingness to examine the impact of DOE's breach on WE's planning for long-term SNF storage results in the Government ignoring much of the relevant evidence. That evidence established that, if WE believed at any point that DOE would actually perform by January 31, 1998, WE could have operated into 1998 or beyond without additional storage. PFF 159, 161-162. Mr. Howard Shimon, who was Manager of Nuclear Fuels and Administrative Services, testified that WE did not need additional at-reactor storage before 1998: "The January 31, 1998 date for commencing removal was critical to

Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage." Tr. 1240:18-1241:23 (Shimon). *See also* PFF 66, 159. (This issue is also discussed in Section II.C, below.).

By December 1987, however, both DOE and WE understood that the Monitored Retrieval Storage ("MRS") linkages imposed by Congress at that time made it extremely unlikely that the MRS or any other facility would be available by 1998 to begin accepting spent fuel. PFF 75-77. In its 1988 Acceptance Capacity Report ("ACR"), DOE then announced that "under current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998." PX 149, pp. 4, 5 (including Table 2.1); PFF 82. DOE also made the following statement in its Draft 1988 Mission Plan Amendment: "under current conditions, waste acceptance at a waste-management facility cannot begin in 1998." PX 150, pp. 18-19 (including Table 2-2); PFF 81.

These DOE representations confirmed WE's doubts that DOE would be able to begin performance by January 1998. Tr. 1306:3-1308:14 (Shimon); PFF 83. As a result, in 1988, WE concluded that it could not depend on DOE performing until 2003 at the earliest, that DOE's performance by 2003 was uncertain, and that WE needed to pursue a long-term spent fuel storage alternative such as dry storage. PFF 83, 85, 88. This is reflected in WE's May 1988 internal Research Development & Demonstration ("RD&D") funding request for the VSC-17 cask demonstration program:

> The current DOE schedule calls for limited operation at the first repository in 2003. Although an MRS has been authorized, its operation is prohibited until the issuance of a NRC construction permit for the repository. The DOE schedule is optimistic and risky, as no backup sites are currently being pursued. At this time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003.

PX 145, p. WISC00061023; PFF 79.

Similarly, WE's 1988 Form 10-K stated that WE was investigating additional SNF storage because of the substantial delay in DOE's performance:

> [I]n June 1988 the DOE reported that it would not be able to accept utility spent fuel for disposal before 2003. Wisconsin Electric is reviewing the options, including advanced technologies for on-site storage and the availability of away-from-reactor storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal.

PX 801, p. KRGWE000182; PFF 85.

In 1989, the WE Nuclear Power Department drafted an internal Work Order Requisition for dry storage. The memorandum reflected WE's need to plan for additional SNF storage because of delays in DOE's performance: "[W]e are not certain when this service will be provided. DOE has announced a schedule that calls for the operation of a repository in 2003." PX 170-171; PFF 87. Accordingly, the Nuclear Power Department planned for ISFSI capacity through the end of the then-current operating licenses (2010 and 2013, respectively) by planning to construct an ISFSI sized to hold 45 casks. PX 170-171; PFF 5, 87.

In addition, in its 1989 and 1990 Form 10-Ks, WE again stated that it was investigating spent fuel storage options because of DOE's delay. In these Form 10-Ks, WE further recognized that, in November 1989, DOE had announced an additional seven-year delay in the operation of a permanent repository from 2003 until 2010. PX 801, pp. KRGWE000192, KRGWE000202.

The testimony of WE personnel confirmed that DOE's delay caused WE to plan to add additional at-reactor SNF storage. For example, a senior WE official, David Porter, testified:

> Q. Did the nuclear power department settle on an option?
>
> A. They ultimately did and recommended to the management of the company that the option of constructing an on-site

> storage facility using dry casks would be the preferred method of dealing with the delay in the DOE program and their inability to take the fuel in 1998, as we understood it to be at that time.
>
> Q. Did the company approve that option?
>
> A. It did.

Tr. 2175:17-2176:2 (Porter); *see also* Tr. 2175:2-16 (Porter).

Mr. Shimon also testified that WE decided to construct dry storage because of the delay in DOE's performance:

> Q. What was your understanding of why Wisconsin Electric was discussing ISFSI and 45 casks?
>
> A. The first part of it was we didn't have capacity for storage beyond 1998. DOE was not coming, so the first increment was to get us to 2003, the second increment was to get us to the end of life of the plant, in the event that DOE never showed up.
>
> Q. One moment. And did the people that you work with, anybody, express any contrary understandings of why Wisconsin Electric was pursuing this dry storage project?
>
> A. No.
>
> Q. And specifically, what was your understanding of the views of Mr. David Zabransky on this issue?
>
> A. It was my understanding, in 1989, that Dave also believed that DOE was not coming until at least 2003.
>
> Q. And what was his understanding regarding why Wisconsin Electric was pursuing dry storage?
>
> A. Because DOE would not be there in 1998.

Tr. 1337:1-1339:1 (Shimon). *See also* PFF 87-89.

The Government relies extensively, and in many cases exclusively, on the trial testimony of the DOE Contracting Officer, Mr. Zabransky, on this issue. Neither a WE senior employee nor a WE decision-maker, Mr. Zabransky does not speak on behalf of WE. Tr. 339:22-340:9 (Link); Tr. 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). Moreover, his knowledge regarding these issues was limited. Mr. Zabransky is not a nuclear

engineer and his understanding of WE's storage needs was derived from others in the Nuclear Power Department. Tr. 565:21-566:6; 665:5-13; 770:16-24 (Zabransky). Thus, the Government's reliance on Mr. Zabransky as knowledgeable regarding everything going on at Point Beach is misplaced and unsubstantiated.

Nevertheless, Mr. Zabransky concurred that WE's project was designed to provide storage through at least 2003 because of the delay in DOE's performance:

> Q: . . . This request to set up this project was based on a schedule where Point Beach did not expect DOE to begin performing until 2003?
>
> A: Well, again, as the memo says, that was the presumption at the time . . .

Tr. 637:5-640:1 (Zabransky). Mr. Zabransky further testified:

> Q: . . . At the time of this May 1989 memorandum, what was your understanding on the likelihood that DOE was going to be able to perform by 1998?
>
> A: And again, I think the memorandum talks to that point, that it doesn't look likely it would be before 2003.

Tr. 1175:2-8 (Zabransky). Mr. Zabransky also agreed that WE's dry storage project was proposed because of the uncertainties in DOE's performance:

> Q: So isn't Wisconsin saying here that one of the reasons why the ISFSI is the selection that is being made as to the course to pursue is because of the uncertainties regarding the development and operation of the Federal Waste Management System?
>
> A: That's what we said earlier, the development, from the beginning and the operation over time, of the Federal Waste Management System.

Tr. 1179:15-1180:12 (Zabransky).

### 2. WE's 1991 PSCW Application for Dry Storage Reflected DOE's Anticipated Breach

Given that WE could not rely on DOE to begin accepting its SNF by January 1998, WE decided to apply for authority to construct dry storage well before 1998. Prior to

submittal of its dry storage application, WE informed the PSCW that WE was interested in obtaining approval for 48 casks to provide sufficient SNF storage through the end of Point Beach's then current licenses. PFF 103. In those pre-application discussions, the PSCW recommended that WE reduce the number of casks to twelve in order to facilitate approval and requested that WE prepare an ESR as part of the application. *Id.*

Then, in November 1991, WE submitted its dry storage project application (with the requested ESR). PX 236 (Nov. 15, 1991 PSCW Application). Based on the PSCW's input, WE only applied for authority to place twelve VSC-24 casks into service in this first request. PFF 103-104. Nevertheless, WE proposed an ISFSI with the capability to load 48 casks, which would provide a sufficient SNF storage area for Point Beach to operate through the end of its then-current licensed life. PFF 103.

The Government asserts that WE's PSCW application reflected a need for additional at-reactor storage before January 1998 and assumed that DOE would perform by not later than January 1998. Govt. PTB 13-15. This assertion, however, ignores significant passages in the ESR. For example, the ESR expressly stated that WE could avoid dry storage if DOE timely performed: "By combining alternatives which extend the capacity of the existing pool with the alternative of shipping spent fuel to a federal facility, it is possible that Wisconsin Electric could avoid the necessity of building the ISFSI." PX 236 (ESR), p. 39; PFF 105. The ESR, however, recognized that DOE was not going to perform in a timely manner. It stated that, while WE could delay the need for the proposed dry storage project based on a combination of alternatives, "the uncertainties of federal acceptance plans limit the meaningful assessment" of the alternatives, and therefore WE "has not attempted to evaluate these potential alternative combinations." PX 236 (ESR), p. 59; PFF 105.

On the issue of DOE performance, the ESR stated that DOE will not have a permanent repository until 2010 and that, under DOE's schedule, the earliest that DOE could

have an operational MRS was 2007. PX 236 (ESR), p. 15; PFF 107. The ESR recognized that any earlier MRS availability would require congressional action to remove statutory linkages between the MRS and the permanent repository. The ESR stated that, in order for DOE to begin operation of the FWMS by 1998, a volunteer site for an MRS would have to be located before the end of 1992. PX 236 (ESR), p. 15; PFF 107. Thus, it was the anticipated substantial delay in DOE's performance that caused WE to decide not to investigate short-term storage options.

Given DOE's substantial delay in accepting WE's spent fuel and the resulting need for a long-term storage solution at Point Beach, there was no benefit in delaying Point Beach's pursuit of dry storage. Tr. 1530:4-6 (Krieser) ("it really made no sense to wait until the eleventh hour and cause us to have to rush to implement the system to load casks"); PFF 106. Dry fuel storage was a complex project that WE expected would face substantial opposition in the PSCW proceedings. Consequently, WE expected that PSCW approval would take a long time. PFF 104. The Government's attempt to rely on certain statements in WE's PSCW application to argue that WE needed to "bridge the gap" to 1998 ignores the aforementioned ESR statements.

The Government further ignores that, knowing that DOE would not perform in 1998, WE had to advocate a position before the PSCW that would prompt a favorable decision. As a result, WE used highly conservative assumptions in its dry storage application. Mr. Porter testified as follows:

> Q: In the application, did Wisconsin Electric make any assumptions?
>
> A: Wisconsin Electric made a number of assumptions in support of the application, and since we knew the, at that point, 1991, certainly, we knew that it wasn't going to be possible for the DOE to be able to begin taking the fuel in 1998, and so we made a number of conservative assumptions describing the need for the project, the alternatives for the project, all kinds of assumptions that are in there.

Tr. 2185:11-22 (Porter). *See also* Tr. 531:17-532:7 (Link); PFF 105.

An example of a conservative assumption in the ESR is WE's justification of its request for twelve casks based on the assumption that WE would maintain sufficient room in the pool for two FCRs (*i.e.*, 242 SNF assemblies). It was never WE's practice to maintain two FCRs. WE PTB 24; PFF 105, 179. Indeed, the only suggestion that WE wanted to pursue two FCR capability relates to the dry storage application before the PSCW. The evidence further establishes that WE operated with less than two FCRs on numerous occasions and also operated without one FCR. Tr. 2185:23-2186:22 (Porter); PFF 12b. Given that the Government is unwilling to admit that promoting two FCR capability was conservative, its assertion that there "is not contemporaneous evidence to support" the assertion that WE used conservative assumptions in its PSCW application, Govt. PTB 15, cannot be taken seriously.

As another example, WE assumed that 37 spaces in the Point Beach wet pool were unavailable for spent fuel storage. PX 236 (ESR), pp. 15, 50. WE, however, knew that all but two of these 37 spaces could be made available for SNF storage. PX 321; PFF 160, 169-170. Moreover, even though WE's PSCW application called for the loading of twelve VSC-24 casks by 1998, the Government's assertion that WE needed to load twelve casks to "bridge the gap" between 1995 and 1998 ignores that WE actually loaded only two VSC-24 casks prior to Fall 1998. PX 1029, p. KRGWE003846 (ISFSI Plan View). A temporary rack would hold significantly more spent fuel assemblies (121) than two VSC-24 casks (48).

The Government also contends: "If additional at-reactor storage was not implemented, the facility would need to shut-down by 1995." Govt. PTB 14. Point Beach, however, did not load its first cask until May 1996. Therefore, the failure to load casks by 1995 obviously did not result in shut-down of Point Beach. PX 796, p. KRGWE002705. WE's statements in the PSCW proceeding must be interpreted in recognition of WE's belief

that Point Beach would need to operate without DOE performance until at least 2003, and probably longer and that, to implement the dry storage project, WE needed PSCW approval. PFF 83, 85, 95, 107. Thus, WE presented its dry storage project application in a manner that was best suited to secure approval for the project. PFF 105.

As noted, at the same time that WE submitted its PSCW application, WE's 1991 Form 10-K stated that it was submitting its dry storage application to the PSCW because of the delay in DOE's performance:

> In accordance with the provisions of the Nuclear Waste Policy Act of 1982 (the "Act"), which require the DOE to provide for the disposal of spent fuel from all U.S. nuclear plants, Wisconsin Electric entered into a disposal contract providing for deliveries of spent fuel to the DOE for ultimate disposal commencing in January 1998. *Because of the DOE's inability to accept spent fuel by the 1998 timeframe as contracted, the company has filed with the PSCW for a Certificate of Authority to construct and operate an Independent Spent Fuel Storage Installation ("ISFSI"). The ISFSI will provide additional storage until the DOE begins to remove spent fuel from Point Beach in accordance with the terms of the contract it has with Wisconsin Electric.*

PX 801, pp. KRGWE00211-12 (emphasis added); PFF 108.

The Government ignores the trial testimony of Robert Link, Vice President of the Nuclear Power Department and primary WE decision-maker when WE made the final decision to construct the ISFSI at Point Beach in February 1995. PFF 121. Mr. Link testified that WE knew it could operate until at least Fall 1998 without additional storage, but that, when he became Vice President of the Nuclear Power Department in 1992, he decided to proceed with the PSCW application because it was clear that DOE was not going to begin accepting SNF by January 1998. PFF 111, 113, 115. Mr. Link also testified that, if DOE had performed its obligations under the Standard Contract, WE would not have pursued dry storage. Tr. 427:12-17 (Link) ("Q: Sure. If DOE had performed, would Wisconsin Electric

have avoided the need to construct dry storage? A: Yes, if DOE performed under their obligation of the contract, we would not have pursued dry storage."); PFF 158.

Finally, even Mr. Zabransky acknowledged that WE's spent fuel storage plans in 1992 did not assume that DOE would timely perform by 1998. Tr. 611:16-613:20; 616:18-620:20 (Zabransky). In sum, to the extent Point Beach had any "storage needs," they were caused by the lengthy delay in DOE's performance of its obligations under the Standard Contract. PFF 121, 159, 161-162.

The Government cites PSCW testimony by Messrs. Link and Krieser as suggesting that Point Beach did not have sufficient space to operate into 1998 or beyond and that DOE's performance at an MRS in 1998 was still possible. Govt. PTB 17-18. Mr. Link's October 1994 PSCW testimony (PX 907B, pp. 534-35), however, does not contradict Mr. Link's testimony at trial that WE would not have implemented the dry storage project in the non-breach world. *Compare* PX 907B, pp. 534-35 *with* Tr. 344:5-9; 493:3-9; 522:13-22 (Link).

In his October 1994 PSCW testimony, Mr. Link argued that WE would need dry storage even though WE considered DOE obligated (but not expected) to perform in 1998. By 1994, WE and the PSCW both knew that DOE would not perform in 1998. PFF 115, 117-118, 122. Thus, Mr. Link's breach world testimony continued to be based on the assumption that DOE was not going to perform according to its contractual obligations and, therefore, construction of an ISFSI by 1995 was desired for WE to maintain full core reserve in the permanent storage racks in the pool. Mr. Link testified:

> The current schedule for spent fuel disposal calls for the geologic repository to begin operation as early as 2010. In 1987, when it became clear that DOE's schedules had slipped significantly, Congress revisited the Act, passing amendments which established a voluntary siting process for siting of interim spent fuel storage facilities. While efforts to identify a host site for a temporary spent fuel storage facility initially showed promise, Congressional action has essentially blocked

> further progress. Recently, the DOE has taken a position that it considers the 1998 NWPA requirement to be conditional.

PX 907, pp. 424-425. Mr. Link later testified in this PSCW proceeding:

> Wisconsin Electric is interested in performance to take spent fuel from Point Beach on the least cost overall method. We still need an ISFSI prior to 1998 which is the first date by which we believe DOE is *obligated* to take fuel. Yes, we considered DOE *obligated* to take fuel starting in 1998. That does not negate the need for the ISFSI. We will continue to pursue all reasonable and expected successful paths to get performance under that contract and all provisions under that contract.

PX 907, p. 534 (emphasis added). Thus, Mr. Link's PSCW testimony distinguishes between DOE's obligation to begin acceptance of WE's fuel in 1998 and DOE's actual performance, *i.e.*, the fact that DOE would not perform in 1998 and that no one knew when DOE may perform. PFF 115, 117-118.

Further, Mr. Link testified at trial that these statements during the PSCW hearings were based on assumptions, including WE's belief that DOE would not perform by 1998:

> Q: And that's what you said in response to the question that Mr. Martin posed during PSC hearings, correct?
>
> A: Yes, and that was based on the assumptions and the evaluations under which we have submitted the Public Service Commission request.
>
> Q: And, Mr. Link, those assumptions and that application was that the proposal was based on the 1998 take date under the provisions of the contract, correct?
>
> A: That was based on the belief that *DOE would not perform by 1998*, with a number of assumptions relative to the status of the pool and requiring a long-term solution because of the DOE's nonperformance.

Tr. 531:17-532:7 (Link) (emphasis added).

Mr. Link further testified at trial that WE knew that DOE was not going to perform by 1998 and that, if DOE would have performed by 1998, WE would not have needed to implement dry storage. Tr. 493:3-9 (Link) ("Q: Sure. One of those assumptions is that DOE

would begin picking up fuel in 1998? A: No, in fact, completely the opposite. It was based on the belief that DOE would not pick up fuel in 1998. If they would have picked up fuel in 1998, I wouldn't have needed any casks.); Tr. 344:5-9 (Link) ("A: 'Indeed, it is the uncertainty with respect to DOE's plans which prompted Wisconsin Electric's development of the flexible spent fuel storage installation plan proposed in this proceeding.'"); Tr. 522:13-22 (Link) ("I've already testified that my belief was if DOE would have performed to pick up fuel in 1998, it would have mitigated the requirement to implement an ISFSI."); PFF 159. Thus, DOE's nonperformance forced WE into a situation where WE needed a long-term SNF storage option, and Mr. Link's testimony reflected WE's desire to implement that option before 1998 in order to preserve full core reserve. Tr. 1489:25-1491:13 (Shimon); Tr. 1529:2-1531:3 (Krieser) ("it really made no sense to wait until the eleventh hour and cause us to have to rush to implement the system"); PFF 106.

Mr. Krieser's 1994 testimony that WE would not have sufficient space to reload in Fall 1997 (one cycle shy of 1998) is likewise unsupportive of the Government's position. DX 36, pp. 2-3; Govt. PTB 18. Mr. Krieser's 1994 PSCW testimony was premised on the same assumptions as the ESR, namely, that approximately 37 spaces in the Point Beach pool would be unavailable for SNF storage. PX 236 (ESR), p. 15. The evidence, however, established that WE, in fact, could use 1500 spaces in its pool for SNF storage. WE PTB 31, 32; PFF 12a. At the time of Mr. Krieser's PSCW testimony, however, WE did not need to assume that these spaces would be made available because of the substantial delay in DOE's performance and WE's resulting focus on the longer-term SNF storage option of dry storage. PFF 115, 122b, 169-171.

Moreover, the purpose of Mr. Krieser's PSCW testimony was to support WE's dry storage application, not to explain the various assumptions that one could employ to determine Point Beach's SNF capacity in the extremely unlikely event that DOE timely

performed. Therefore, Mr. Krieser's 1994 PSCW testimony did not concern whether Point Beach could have operated until 1998 or when DOE might perform. In fact, Mr. Krieser testified at trial that WE could have operated into 1998 or beyond without dry storage:

> Q: Did your group ever make a determination as to whether Point Beach could have operated until 1998 without dry storage?
>
> A: We evaluated that issue extensively and regularly, and we always were able to conclude that we could make it to 1998, and even slightly beyond, in some instances, without a dry storage facility.

Tr. 1527:12-19 (Krieser); PFF 159.

Finally, the Government states (Govt. PTB 18) that Mr. Krieser's July 21, 1995 letter to the PSCW "recognized WEPCO's need for an ISFSI assuming DOE performance in 1998" and quotes the letter as follows:

> The date when spent fuel is actually removed from Point Beach is uncertain. The findings of fact in PSCW Docket 6630-CE-197 speculate that a DOE permanent repository may not be in operation until the year 2023. DOE, however, is under contract to begin removing spent fuel in 1998 and WEPCO believes that offsite centralized interim storage of Point Beach fuel beginning *about* 1998 is a more likely scenario than waiting for the DOE permanent repository to begin operations.

DX 73, p. WISC00001305 (emphasis added). The quoted material does not state that WE will need an ISFSI assuming DOE's performance in 1998. Instead, it states that DOE is under contract to accept SNF in 1998 and that there is a better chance that DOE will have an MRS available beginning about 1998 than the possibility of DOE having a permanent repository available. Mr. Krieser's statement does not state that an operating MRS *about* 1998 was likely. In fact, the 1991 ESR stated that WE believed that a voluntary MRS location would need to be located by 1992 in order for an MRS to be operational by 1998. PFF 107.

Again, the purpose of Mr. Krieser's letter was to support WE's dry storage application before the PSCW. By July 1995, WE knew that DOE would not begin performing by 1998. Indeed, two months before Mr. Krieser's letter, DOE issued its final interpretation stating that its obligation to begin picking up spent fuel in 1998 was conditional and that the earliest it might perform would be 2010. PFF 122d. Thus, the Government's assertion that Mr. Krieser and WE still assumed that, as of July 21, 1995, DOE would be performing in 1998 is without merit and contrary to the evidence at trial, including, but not limited to, WE's 1988 and 1989 internal memoranda and WE's public 1988-1991 SEC Form 10-Ks. PX 145; PX 171; PX 801, pp. KRGWE000182, KRGWE000192-193, KRGWE000202, KRGWE000211-212.

The Government asserts that the only scenario that is "accurate and truthful" is the actual, breach world scenario reflected in the Government's interpretation of WE's 1991 dry storage application. Govt. PTB 15. The Government's position is a deliberate misinterpretation of WE's dry storage application and the trial testimony explaining the application. Govt. PTB 15-16. The dry storage project was a complex engineering project with many variables and no one set of variables that WE might have chosen would necessarily have been the "accurate and truthful" assumptions. Tr. 2735:17-2736:10 (Anundson) (". . . it turned out to be quite complex with all the different areas that were required . . . There was no 'Dry Storage for Dummies' books. *It was starting from scratch.*" (emphasis added)). During the application pendency, WE witnesses explained that they used various assumptions to reflect or to explore different options. PTB 23-25; PX 236 (ESR), p. 59, Analysis of Alternatives (noting that "uncertainties in federal acceptance plans limit the meaningful assessment" of alternatives); PTB 29-32; PFF 110-114. Contrary to the Government's assertion, there is no contradiction between the testimony and statements of WE's witnesses in the early 1990s and at trial in this matter regarding WE's 1991 application.

Govt. PTB 16. Instead, the evidence reinforces that WE evaluated different scenarios based on different assumptions to evaluate various options. WE PTB 34-37; PFF 158-159.

The Government's claim that WE should not have imparted urgency through the 1991 application because WE "now" claims that it could have operated into 1998 and beyond also misses the mark. Govt. PTB 15. By 1991, DOE's failure to timely perform was virtually certain. Further, WE expected that PSCW approval would be lengthy and success was not guaranteed. In addition, dry storage technology was still developing and implementation of the dry storage project was challenging. WE PTB 29-32; Tr. 2736:2-10 (Anundson). In these circumstances, WE used valid assumptions that imparted a sense of urgency. WE PTB 23-24; PFF 105. WE's conduct in the early 1990s was accurate, truthful, and represented a sound strategy to implement dry storage given that DOE was not going to perform. *Id.* It was not the strategy that WE would have used, however, had WE expected DOE to timely perform. WE PTB 34-37; PFF 158-159.

### 3. The Government's Additional Mischaracterization of Testimonial and Documentary Evidence Does Not Advance Its Cause

Ignoring the most relevant evidence on this issue, the Government instead mischaracterizes the testimonial and documentary evidence, stating that there is "no evidence" to support WE's assertion that WE constructed dry storage because of DOE's delay. Govt. PTB 8-19. As detailed above and in WE's initial post-trial submissions, there clearly is such evidence, and much of that evidence is contemporaneous with WE's consideration of the dry storage project. WE PTB 16-37; PFF 69-211. The Government simply cannot wish this overwhelming evidence out of the record.

In its attempt to avoid the impact of this evidence, the Government contends that WE has "reformulated its claim." Govt. PTB 2. It alleges that, in July 2005, WE's position was that it would not need to take any steps to provide additional storage at Point Beach, whether by temporary rack or otherwise. *Id.* The Government's allegation mischaracterizes the initial

report filed in this matter by Messrs. Metcalfe and Sieracki in July 2005. This report expressly stated that WE was considering whether it may have incurred additional costs in the non-breach world: "WE continues to consider whether it may have incurred any additional costs had DOE performed in accordance with its contractual obligations. Kenrich reserves the right to supplement this Report based on any additional information that may become available." DX 498, p. 18, n.34. *See also* Tr. 4706:8-4709:25 (Metcalfe); Tr. 3866:10-3867:9; 3892:13-3893:6 (Sieracki). Thus, the Government's contention is without merit.

The Government also describes the testimony of witnesses called by WE as "plaintiff's after-the fact, self-serving testimony." Govt. PTB 3. That assertion is ill-founded and unsubstantiated by the Government's post-trial submissions. Further, it is more than a little ironic. Only one of WE's witnesses, Paul Farron, still worked for Wisconsin Electric Power Company at the time of trial.[2] The Government offers no sound reason why the testimony of numerous individuals should be regarded as "self-serving" when they no longer work for WE. Further, WE itself will not receive any direct financial benefits in this proceeding given that the PSCW has ordered that any net costs recovered from DOE in this case will be returned to the ratepayers. PX 592, p. 13; PX 686; Tr. 4705:9-4706:7 (Metcalfe Deposition Testimony).

To the contrary, it is the Government's witnesses who have substantial interests at stake. Mr. Zabransky, who ceased working for WE in 1994, is the current DOE Contracting Officer for the Standard Contract and is one of DOE's principal witnesses at all of the SNF trials. Tr. 567:2-4 (Zabransky). He also is the former DOE Contracting Officer's Technical Representative. Tr. 567:5-8 (Zabransky). Mr. Zabransky clearly has a vested interest in

---

[2] In addition, Mr. Krieser works for an affiliate, WE Power.

supporting DOE's position and minimizing his agency's liability for damages in the numerous SNF cases before this Court.

This is equally true of Chris Kouts who serves as the director of the Office of Civilian Radioactive Waste Management ("OCRWM") and the acting principal deputy for the waste management program. Tr. 5143:12-16 (Kouts). It also is true of Alan Brownstein who is the OCRWM chief operating officer. Tr. 5024:9-19 (Brownstein). Thus, it is the DOE witnesses who have a vested interest in the outcome of this litigation, not the WE witnesses.

The Government also mischaracterizes the testimony of former WE personnel, such as Mr. Shimon, and cites the discussion of WE's spent fuel storage capacity in isolated memoranda to argue that WE's SNF storage decisions were not driven by DOE's delay from 1988 forward and that WE did not believe it could operate until 1998 without dry storage. Govt. PTB 8-19. The Government's efforts are unavailing.

As to Mr. Shimon's testimony, the Government asserts that he testified that his understanding was that Point Beach would be forced to shut down in 1994 or 1995 if it maintained full core reserve ("FCR") and added no additional storage. Govt. PTB 10; DFF 165. The Government misleadingly implies that this was Mr. Shimon's trial testimony. It was not. The testimony was from his deposition and was read into the record by Government counsel who did not ask Mr. Shimon any questions regarding the deposition testimony.

At trial, Mr. Shimon testified that he could not testify that Point Beach would have had to shut down in the 1994-1995 timeframe if Point Beach was to maintain FCR in the permanent storage areas of the pool. Tr. 1367:23-1368:3 (Shimon). Mr. Shimon further testified that he did not "know why Point Beach [would] shut down simply to maintain a full core reserve" and that a 1994-1995 timeframe was "not a number that [he] would come up with." Tr. 1367:15-1368:5 (Shimon).

Moreover, other deposition testimony by Mr. Shimon contradicts the Government's proposed finding and its mischaracterization of Mr. Shimon's testimony. Mr. Shimon read the following from his deposition testimony: "I would have said that we have enough spent fuel storage capacity to get us to the date when DOE would pick up our fuel if we were willing to temporarily . . . sacrifice the full core reserve." Tr. 1487:7-13 (Shimon).[3]

With regard to documentary evidence, the Government asserts that WE rarely relies on contemporaneous documents. Govt. PTB 8. To the contrary, WE relied on numerous contemporaneous documents, including, but not limited to, the 1988 RD&D Request, the 1989 Project Authorization Memorandum, the 1991 PSCW application (including the ESR), the 1988-1991 SEC Form 10-Ks submitted by WE, WE's RW-859 forms, WE's annual inventories of spent fuel assemblies, the 1994 PSCW Draft and Final Environmental Impact Statements, the February 1995 PSCW Order and many others. *See, e.g.,* PX 136, 154, 170-171, 179, 203, 234, 236, 242-243, 260, 266, 278, 280, 311, 313, 326-328, 346, 360, 374, 381, 801; PFF 12a, 85, 87, 92, 96, 104, 107-108, 111, 113-115, 134, 159, 161-162, 168, 179. These contemporaneous documents establish that WE could have operated into 1998 or beyond without additional storage, but that DOE was not going to begin accepting SNF until 2003 at the earliest and, more likely, quite a bit later than that. WE PTB 17-20, 31-38; PFF 81-82, 107-108, 111, 113, 115, 122, 158-167.

The Government prefers to pretend that WE would have taken the same actions between December 1987 and 1998 if it had believed that DOE would actually perform under the Standard Contract. Govt. PTB 8-22, 48-51; Tr. 4906:22-4907:1 (Snyder). That is

[3] The Government also criticizes on hearsay grounds that portion of Mr. Shimon's testimony where he discusses his dealings with Mr. Burstein. Govt. PTB 10, n.5. The Government, however, did not raise an objection at trial on hearsay grounds to Mr. Shimon's testimony regarding his discussions with Mr. Burstein and, thus, has waived this objection. Tr. 1248:7-1252:13; 1277:12-1283:14; 1286:25-1292:11; 1297:7-1299:25; 1302:4-1306:2 (Shimon). In addition, there is a substantial amount of contemporaneous documentary evidence in which Mr. Burstein expressed his concerns that DOE would not be able to perform by January 1998. PX 116, 132, 134; PFF 75. In these circumstances, there is a sufficient basis to admit Mr. Shimon's testimony under Fed. R. Evid. 807.

extreme and illogical and contradicted by the overwhelming evidence that DOE's failure to timely perform was the driving factor in WE's long range SNF storage plans. WE PTB 16-34, PFF 69-121. Further, the Government cannot seriously contend that the nuclear industry was unaffected by the Government's anticipated breach prior to 1998. Indeed, in *Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007), the Court found that the utility reasonably began mitigating DOE's breach in 1988. 78 Fed. Cl. at 459. In *Indiana Michigan*, the Federal Circuit found that mitigation was *required* by 1994. 422 F.3d at 1375. By simply assuming that WE's activities in the breach and non-breach worlds are identical through January 1998, the Government fails to meaningfully address WE's likely actions in the non-breach world and whether DOE's breach was a substantial causal factor of WE's damages.

The reality is that, in the non-breach world, WE could have taken any number of different actions to ensure that Point Beach could operate without additional storage until DOE performed. WE personnel testified regarding the options that WE would have considered had WE believed that short-term storage solutions would have been useful in mitigating DOE's delay. WE, however, did not pursue those options because it expected DOE to be substantially delayed in its performance and its expectations have been proven accurate with the passage of time. WE PTB 29, 30; PFF 158, 159, 161.

The Government cites June 1977 and August 1977 memoranda by former WE employee, Roger Newton (DX 181, 182). Govt. PTB 9. These documents were drafted before the reracking of the Point Beach pool to its current licensed capacity of 1502 spent fuel assemblies and before enactment of the NWPA. PX 245, p. 2 (the storage racks *installed in 1980* increased the spent fuel capacity of Point Beach from 351 to 1502 spent fuel assemblies) (emphasis added). Thus, the memoranda do not consider "bridging a gap

until January 1998." They also are irrelevant to WE's SNF planning after enactment of the NWPA and WE's execution of the Standard Contract.

Further, the June 1977 memorandum assumed a capacity of 1450 storage locations after reracking, not the eventual, actual 1502 licensed capacity of Point Beach. PX 245, p. 2; DX 181, p. 1. The June 1977 memorandum also assumed annual discharges of 72 assemblies. As noted, in later projections, such as the 1991 ESR, WE used significantly lower projected annual discharges of 56 assemblies. PX 236 (ESR), p. 15. Even with these highly conservative assumptions, the Newton memorandum concluded that Point Beach could operate until the summer of 1996. DX 181.

Mr. Newton's August 1977 memorandum did not identify its assumptions, such as projected annual discharges, the number of pool spaces available for SNF storage after reracking, and whether the calculation assumed maintenance of FCR in the permanent storage area of the spent fuel pool. DX 182. The August 1977 memorandum also made conservative assumptions in assuming that Point Beach would have only 1488 spaces after the 1980 reracking. *Id.*

The Government's reliance upon a one-page March 1986 memorandum by Mr. Norb Pitterle (DX 184) to argue that WE knew that it could not make it to 1998 without dry storage is misplaced. That memorandum made certain assumptions regarding spaces available for spent fuel. For example, it assumed that the 17 spaces with debris baskets were unavailable for SNF storage. In fact, the debris could have been removed and was removed in the 1990's. PFF 171-172. Further, the memorandum assumed an annual discharge of 60 assemblies. In other projections, such as the November 1991 ESR, WE used a lower assumed annual discharge of 56 assemblies. PX 236 (ESR), p. 15 ("Under present operating plans, 28 additional spent fuel assemblies are discharged annually from each reactor, for a total of 56 assemblies per year.").

The Government did not call either Mr. Pitterle or Mr. Newton to testify regarding the assumptions utilized in these documents, the purpose of the documents or whether the documents were considered or relied on by WE management. Thus, the Government cannot create its own interpretation of these documents or attempt to assign a relevance or meaning to them not established by the evidence. For example, Mr. Shimon testified that he had never seen Mr. Newton's memorandum even though Mr. Shimon was responsible for this area and that WE's agreement with the memorandum's contents cannot be implied. Tr. 1213:4-1215:6; 1361:13-1363:11 (Shimon). Further, neither Mr. Newton nor Mr. Pitterle was responsible for WE's spent fuel management decisions during the 1980s and 1990s. Moreover, there are far more authoritative analyses of Point Beach's SNF capacity as discussed below in Section II.C.

The Government next cites WE's May 1988 internal RD&D funding request and argues that WE participated in a cask demonstration project because WE did not consider a third rerack a viable option, not because of DOE's delay. PX 145 (aka DX 40); Govt. PTB 10, 11. To the contrary, this document expressly states that WE is planning to provide storage until 2003 because of the delay in DOE's performance:

> The DOE schedule is optimistic and risky, as no backup sites are currently being pursued. At this time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003.

PX 145, p. WISC00061023. Thus, by 1988, WE's planning was based on and driven by the delay in DOE performance. WE PTB 22; PFF 79. Further, the 1988 RD&D funding request demonstrated that, as of 1988, WE never intended to "bridge the gap" to 1998. Instead, WE was exploring a dry storage option that would "accommodate storage through the end of the current operating license" and last "through the delivery of spent fuel to the DOE geologic repository." PX 145, pp. WISC00061017, WISC00061023.

DOE also argues that WE's May 1989 Work Order Requisition (PX 170-171) supports its "bridge the gap" to 1998 position. Govt. PTB 11. To the contrary, if WE's intent was to "bridge the gap" to 1998, WE would have focused on shorter-term technical solutions that would provide storage until 1998. Instead, WE planned to address DOE's lengthy delay in performance by licensing and constructing an ISFSI that would "provide additional spent fuel storage through life [sic] of current operating license" and that "approximately 45 casks will be required." PX 171, p. KRGWE002226. Nowhere in WE's Work Order Requisition did WE state that the proposed ISFSI was intended to provide storage until 1998.

Further, the analysis of Point Beach's SNF pool capacity in WE's May 1989 Project Authorization Request is consistent with WE's ability to operate into 1998 without dry storage if Point Beach simply made available certain spaces in the pool. WE later made these spaces available and could have done so at this time if it believed that DOE would timely perform. PFF 171-172. The authorization request assumed a capacity of 1502 spaces and an inventory of 940 spent fuel assemblies. Using the assumed annual discharges of 56 assemblies, WE could have operated for another 10 years (until the Fall 1998 refueling outage). If it desired to maintain FCR, it could have used a temporary rack. PFF 158, 178-179, 182. WE did not consider such a short-term option at this time, however, because of the expected substantial delay in DOE's performance. PX 236 (ESR), p. 59 (noting that WE did not bother considering shorter-term solutions because of DOE's expected lengthy delay in performance); PFF 210.

The Government's mischaracterization of the project request is not advanced by the testimony of Mr. Zabransky that one goal for additional at-reactor storage must be maintaining FCR. Govt. PTB 11. As noted, Mr. Zabransky confirmed that the project request was proposed because of delays in DOE's performance and that WE's resulting plan for SNF storage at least until 2003 and potentially for the licensed life of the plant was

because of DOE's delay. Tr. 639:20-640:1; 640:19-641:5; 641:13-24; 642:5-12; 642:25-643:11 (Zabransky).

A Government tactic is to assert that WE made a decision to utilize dry storage and then pretend that WE never considered subsequent DOE program developments or any other considerations. Govt. PTB 16-19; DX 365. To the contrary, WE, like any reasonable utility, continued to monitor DOE program developments and to consider WE's options. For example, WE had to consider its options in preparing the ESR for its PSCW application. PX 236 (ESR), pp. 39-62. Then, when Mr. Link became Vice President of the Nuclear Power Department in 1992, he asked that his staff analyze WE's options and, at that point, he decided to continue with the PSCW application given the continued delay in DOE's program performance. Tr. 515:14-516:11 (Link); PFF 109-111. WE, however, could not begin construction of the dry storage facility until it received PSCW approval. Tr. 2589:22-2590:7 (Farron). Thus, Mr. Link, the WE official who made the decision to proceed with the dry storage project, testified that he did not make a final decision to proceed with the project until February 1995 when the PSCW approved the project. Tr. 414:24-415:7 (Link) ("Q: And when did Wisconsin Electric make a final decision to begin construction of the dry storage project? A: Subsequent to the Public Service Commission ordering, allowing for the construction of the project. Q: So that was after DOE issued its notice of inquiry? A: Yes."); PFF 121.

Thus, the Government's specific contentions regarding this issue are ill-founded. For example, it asserts that the decision to implement dry fuel storage was made in 1989 by WE's major project review committee ("MPRC"). Govt. PTB 11. The MPRC, however, merely authorized WE to begin pursuing the dry storage project option. PFF 87. As noted, Mr. Link asked his team to conduct an independent examination regarding the necessity for the project and to analyze alternative SNF management options. PFF 109-110. If WE had made a final

decision to construct the ISFSI in 1989, WE would not have thoroughly evaluated its options in 1992. Again, a final decision was not made until February 1995 after receipt of PSCW approval. PFF 121.

In addition, the Government ignores that the 1989 project requisition approved by the MPRC stated that the ISFSI was intended "to provide additional spent fuel storage through [the licensed] life of [Point Beach's] current operating licenses" and that "[a]pproximately 45 casks [would] be required." DX 365, p. KRGWE002226. It was never WE's intent to build an ISFSI with the capacity to store 48 casks for the purpose of "bridging the gap to 1998."

The Government asserts that a one-page October 15, 1990 letter from Mr. Fay to Maine Yankee indicates that WE needed dry storage prior to 1998. Govt. PTB 11; DX 18. In his letter, Mr. Fay states that, at Point Beach's present usage rate, FCR will be unavailable after 1995. The letter, however, provides no explanation of the basis for the statement, such as the number of pool spaces available for spent fuel storage. It also does not consider that the use of a temporary rack would have provided FCR for several years of standard operation. PFF 184. Further, in denying Maine Yankee's request to store its SNF at Point Beach, Mr. Fay's short letter does not suggest that he conducted a detailed SNF storage analysis in preparing the response. Thus, this communication is hardly as relevant as the detailed analyses establishing that, in the non-breach world, Point Beach could have operated into 1998 and beyond without dry storage. WE PTB 30-31, 34-37; PFF 159, 162-163. There also was no reason to discuss shorter-term storage options (such as a temporary rack) because, by this point (1990), WE was operating in the breach world, *i.e.*, it knew that DOE's performance would be substantially delayed. PX 236 (ESR), p. 59 (noting that WE did not bother considering shorter-term solutions because of DOE's expected lengthy delay in performance); PFF 81-83, 210.

The Government next asserts that WE's 1985-1987 RW 859s (submitted in 1986-1988, respectively) suggest that Point Beach would lose its ability to operate by Fall 1996 or Spring 1997. DX 442, 444, 445. With respect to these submissions, however, WE would have assumed that numerous spaces in the Point Beach pool were inaccessible or filled with debris. For example, WE had not yet installed the offset loading tool and WE's February 1989 RW-859 noted that pool capacity was reduced by 115 spaces due to obstructions. PX 163, p. HQR3640263.

Subsequent RW-859s reflected the increased, effective pool capacity resulting from the increase in pool locations available for SNF storage. For example, the 1993 RW-859 (submitted February 1994), signed by Mr. Zabransky, explicitly stated that Point Beach could operate until September 1998 without dry storage. PX 328, p. HQR3640766. WE's 1991 and 1992 RW-859s also expressly stated that Point Beach could operate into 1998 without dry storage. PX 242, p. HQR3640528 ("Without a full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998."); PX 280, p. WISC00099055 ("Without full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998.").

Moreover, WE noted in its earlier 1985-1987 RW-859 responses that it did not have plans to apply to the Nuclear Regulatory Commission ("NRC") for Federal Interim Storage ("FIS") eligibility and had not conducted studies on the use of dry storage. PX 77, p. MOV.19970714.0058.000006; PX 98, p. WISC00060022; PX 113, p. HQR3640047. In fact, WE's 1987 RW-859 stated that WE did not have plans to utilize dry cask storage to increase Point Beach's storage capacity. PX 141, p. HQR3640074. If, as the Government asserts, WE knew that it would need to "bridge the gap" until 1998, it would seem likely that WE either would have begun to investigate dry storage or planned to apply to the NRC for FIS eligibility and reflected such intentions in these earlier RW-859s. The evidence, however, shows that WE did not do so. PX 98, 141.

The Government next relies on a WE public relations video from approximately 1992 advocating for public approval of the project and argues that it establishes that WE could not operate into 1998 without dry storage. Govt. PTB 12; DX 146. The video, however, does not state the assumptions on which it relies, such as pool locations available for SNF storage. In addition, as Mr. Zabransky agreed, the video does not explain whether its description of the pool as "full" is based on the maintenance of one FCR or possibly two FCRs. DX 146; Tr. 1156:9-1157:13 (Zabransky). Contemporaneous evidence establishes that WE knew when the video was developed that Point Beach's spent fuel pool would not be completely full until at least 1998. *See, e.g.*, PX 242, p. HQR3640528 (WE's February 1992 RW-859) ("Without a full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998.").

The Government also relies on WE 1992 publications to argue that WE needed dry storage prior to 1998. Govt. PTB 12; DX 283, 456. The assumptions on which these publications relied are unstated. DX 283, 456. They likely were the same conservative assumptions used at points in WE's PSCW application and ESR. For example, the publications do not explain whether the description of the pool as "full" includes the maintenance of one FCR or two FCRs in the permanent storage areas of the spent fuel pool. The publications also do not state the number of spaces assumed to be available for SNF storage. DX 283, 456. Contemporaneous evidence demonstrates that WE knew, as of 1992, that Point Beach's spent fuel pool would not be completely full until 1998. *See, e.g.*, PX 242, p. HQR3640528 (WE's February 1992 RW-859) ("Without a full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998.").

Further, the foregoing discussion makes it clear beyond dispute that the ISFSI that WE proposed to construct in its PSCW application was never designed to provide WE with SNF storage from 1995 until 1998 when DOE ostensibly would perform.[4] From early 1988

[4] In the breach world, dry storage, designed to mitigate DOE's partial breach, offered the potential advantage of freeing up additional space in the Point Beach spent fuel pool prior to 1998. However, this was a secondary

on, WE believed that DOE would not begin performance by 1998 and that DOE would be substantially delayed. PFF 75-77, 81-85, 107, 111. This was stated repeatedly in contemporaneous documents, such as those approving the cask demonstration project and the 1991 PSCW application. PX 170, p. 2 ("provide additional spent fuel storage through life of current operating licenses"); PX 171, p. 3 ("consolidation alone would not provide sufficient on-site storage capacity to allow operation through 2003, the earliest possible date for operation of the federal waste management system"); PX 236 (ESR), p. 53 ("Given current DOE schedules, the earliest an MRS could be operational is 2007."). The same points were made in annual SEC Form 10-K filings that WE submitted from 1988-1991. *See, e.g.*, PX 801, pp. KRGWE000182, KRGWE000192, KRGWE000202, KRGWE000211-12; PFF 85, 108. Moreover, numerous former WE personnel testified to this effect at trial. PFF 75-77, 83, 87-89, 93-94, 104, 107, 111.

The Government also asserts that an August 20, 1992 memorandum by Mr. Link supports the Government's contention that WE could not have operated until 1998 without dry storage. Govt. PTB 16. To the contrary, the memorandum notes only that, in August 1992, WE's plan was to have the dry storage facility operational by 1992. DX 22. It does not analyze or even address Point Beach SNF storage capacity. Moreover, by 1992, WE had determined that DOE would not be performing in 1998 and that Point Beach was going to require dry storage because of the substantial delay in DOE's performance. PFF 115. Thus, there was no reason to delay WE's pursuit of PSCW approval and the implementation of the dry storage project because there was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); Tr. 1529:2-1531:3 (Krieser)

issue, not the primary issue. Again, the primary driver was the delay in DOE's performance. Further, in the breach world, WE only loaded two casks holding 48 assemblies prior to 1998. PTB 58. Forty-eight assemblies is well short of one FCR, 121 assemblies. PFF 11.

("it really made no sense to wait until the eleventh hour and cause us to have to rush to implement the system"); PFF 106.

**4. The Government's Argument that the Statute of Limitations Bars WE's Pre-1994 Damages Is Devoid of Merit**

The Government argues that the statute of limitations, 28 U.S.C. § 2501, bars any damages that WE incurred prior to November 16, 1994. Govt. PTB 51. The Government's argument improperly conflates the statute of limitations issue with a plaintiff's ability to recover pre-breach damages and must be rejected.

WE's claim began to accrue January 31, 1998 when DOE partially breached the Standard Contract by failing to begin acceptance of spent fuel in return for WE's substantial payments to DOE. *Indiana Michigan*, 422 F.3d at 1375. The only contract theory under which WE could have instituted suit prior to January 31, 1998 would have been to allege anticipatory repudiation, which would constitute a total breach and treat the Standard Contract as no longer operative. *Id.* at 1374. In *Indiana Michigan*, however, the Federal Circuit found that utilities could not have claimed anticipatory repudiation because DOE's "actions did not portend an absolute refusal to perform the contract." *Id.* The Federal Circuit further stated that the "NWPA itself, and the Standard Contract's terms drafted pursuant to it, compelled utilities to bring an action for partial, not total, breach. Had utilities brought an action for total breach, DOE would have been discharged from further responsibility under the contract, a situation . . . foreclosed by statute." *Id.* More specifically, the NWPA required that DOE and all nuclear utilities enter into Standard Contracts, 42 U.S.C. § 10222(a)(1), and conditioned the issuance and renewal of NRC operating licenses upon execution of the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). Thus, WE could not have sued DOE for anticipatory repudiation, but, instead, could only sue the Government for partial breach once DOE failed to perform as contractually required. *Indiana Michigan*, 422 F.3d at 1374-75.

With regard to when a cause of action accrues for purposes of the statute of limitations, a cause of action does not accrue until the events occur that "fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Id.* at 1378 (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)). In this case, as explained above, WE's partial breach of contract action did not accrue until January 31, 1998. *Id.* at 1375. Therefore, WE was obligated to file suit within six years of the January 31, 1998 date. WE did so, filing its Complaint on November 16, 2000.

Once WE satisfies the statute of limitations for its cause of action, it is entitled to recover all reasonable pre-breach mitigation damages. As the Federal Circuit explained in *Indiana Michigan*:

> Holding pre-breach damages unrecoverable, or that pre-breach damages are recoverable only for anticipatory repudiation leading to a total breach, would, however, compromise a party's obligation to mitigate damages. The general rule must be reconciled with a party's obligation to mitigate damages which befall it during the periods both antedating and postdating the breach.

*Id.* at 1375. Thus, a partial breach claimant such as WE may recover pre-breach mitigation damages. *Id.* ("mitigation damages are available for pre-breach costs should the obligee elect to treat the obligor's breach as partial").

Thus, the Government's argument that "costs that pre-date November 16, 1994 are barred by the statute of limitations" is not supported factually or legally. Govt. PTB 51. The Government's assertion that "WEPCO's claims are based upon purported DOE breaches that occurred prior to 1998" is factually incorrect. As explained above, WE's *claim* is based on (and first accrued on) January 31, 1998, the date of DOE's partial breach, while WE's *damages* were incurred prior to that date. As the Government acknowledged, in *Indiana Michigan*, the Federal Circuit stated that nuclear utilities were obligated to take mitigatory steps *prior* to the breach in 1998: "It would have been improvident for Indiana Michigan to

have waited until January 1998 before deciding what to do with its nuclear waste." *Indiana Michigan*, 422 F.3d at 1375.

Thus, the Government confuses the statute of limitations period with the time period for which damages may be recovered. Under the Government's reasoning, if WE had filed its suit on January 31, 2004 (six years after the date of the partial breach), it would be entitled to recover only damages *postdating* January 31, 1998, the date of the breach, and could recover no pre-breach mitigating damages. This argument is contradicted by the holding in *Indiana Michigan* that pre-breach mitigation damages are recoverable.

The case cited by the Government, *John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750, 753-57 (2008), does not support its position. Govt. PTB 51. Regarding the statute of limitations claims accrual rule, the Court in *John R. Sand & Gravel* reaffirmed its holding in *Franconia Assocs. v. United States*, 536 U.S. 129, 144-45, 122 S. Ct. 1993 (2002), stating that, in *Franconia*, it rejected "an argument by the Government that the court of claims statute embodies a special, earlier-than-normal rule as to when a claim first accrues." In *Franconia*, the Court held that a claim "first accrued" not on the date of repudiation, but on the date that performance was due. *Id.* at 146. This is fully consistent with WE's position that its partial breach of contract action did not accrue until January 31, 1998. *Indiana Michigan*, 422 F.3d at 1375.

In sum, WE filed its claim within six years of the date of the partial breach and is entitled to recover its pre-breach mitigation damages without respect to the date on which the damages were incurred.

**5. The Government's Argument that Pre-1994 Damages Are Otherwise Unallowable Under *Indiana Michigan* Is Incorrect**

The Government argues that WE made its decision to construct dry storage in 1989 prior to DOE's May 1994 announcement that it would not perform in 1998 and that, therefore, WE cannot argue that DOE caused WE to construct dry storage. Govt. PTB 25-27.

The Government is inaccurate in stating that WE made a final decision to construct dry storage in 1989. The PSCW did not even approve the dry storage project until 1995. PFF 120. Prior to the PSCW's decision, WE could not know whether the PSCW would approve the dry storage project. PFF 102, 104, 112, 119. After the project received initial internal WE authorization in 1989, WE continued to monitor and evaluate both DOE's performance and WE's SNF options for accommodating DOE's breach. PFF 109-110. It would make no sense for WE to make a final decision in 1989 and not continue to evaluate its circumstances and the status of DOE's program efforts. The evidence established that WE did not make the final decision to construct the dry storage facility until February 1995, after PSCW approval and after DOE confirmed that it would not be accepting SNF by January 1998. PFF 81, 116, 121.

Further, the Government asserts that WE could not have known by 1988 that DOE would be unable to begin performance by January 31, 1998. Govt. PTB 26. It contends that WE relies on the same DOE statements in 1987-1989 that the Federal Circuit rejected in *Indiana Michigan* as the basis for such knowledge. *Id.* The Government mischaracterizes the Federal Circuit decision. In *Indiana Michigan*, the Federal Circuit affirmed the trial court's ruling that DOE 1987-1989 statements did not affect Indiana Michigan's rerack schedule:

> Indiana Michigan's pre-breach costs were not caused by an anticipated DOE delay in performance. It authorized the expenditure for its reracking projects in 1989, in the normal course of business, six years before the 1994 Notice of Inquiry announced DOE's inability to begin timely SNF collection. In light of that fact, the trial court found that Indiana Michigan's rerack schedule was not affected by the 1987 and 1989 DOE announcements projecting delays in the scheduled January 1998 acceptance start date. And appellant's decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to pursue irrespective of DOE's partial breach.

*Id.* at 1376. Thus, the Federal Circuit was stating that Indiana Michigan failed to prove that DOE's 1987-1989 announcements had any impact on Indiana Michigan's SNF storage decisions. The Federal Circuit was not addressing the decisions of other utilities.

In contrast, WE provided overwhelming evidence of the impact that DOE's announcements had on WE's SNF storage planning, including multiple statements by Mr. Burstein in 1987, the 1987 NWPA Amendments, WE's May 1988 RD&D project authorization, WE's May 1989 project authorization memoranda, WE's 1988-1991 SEC Form 10-Ks, numerous DOE documents during the 1987-1989 period and the testimony of numerous witnesses. WE PTB 16-23; PFF 69-92. WE continued to monitor DOE program developments until WE finally decided to construct the dry storage facility in 1995. WE PTB 23-34; PFF 93-101, 107-111, 115-118.

Further, DOE asserts that its 1987-1989 statements "clearly indicate DOE's express intention to perform in 1998" and that "DOE made no pronouncements that it would delay SNF acceptance until [DOE issued its May 1994 [Notice]." Govt. PTB 26-27. That assertion is inaccurate. In June 1988, DOE issued the Draft 1988 Mission Plan Amendment, which stated:

> [u]nder current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003.

PX 150, pp. 18-19. *See also* PFF 81. Additionally, the acceptance rate chart in the Draft 1988 Mission Plan Amendment showed the earliest program acceptance, at either an MRS or a repository, in 2003. *Id.* at Table 2-2. Further, Mr. Milner of DOE confirmed that, by this document, DOE was indicating that it was not going to make the 1998 date and it was unlikely that DOE would begin accepting SNF at any facility before 2003. PFF 81.

Then, in the June 1988 ACR, DOE acknowledged that:

> [U]nder current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule first noted in the *OCRWM Mission Plan Amendment* published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (the Amendments Act) make it unlikely that DOE will be able to start accepting spent nuclear fuel significantly before 2003.

PX 149, p. 4 (1988 ACR) (footnotes omitted). *See also* PFF 82. Based on the passage of the NWPA Amendments in December 1987 and these DOE statements, WE clearly had reason to know by early 1988 that DOE would not begin performance by January 1998. This also is consistent with the statement in *Indiana Michigan* in which the Federal Circuit referred to the "1987 and 1989 DOE announcements projecting delays in the scheduled January 1998 acceptance start date." *Indiana Michigan*, 422 F.3d at 1376.

Based upon these events, WE was compelled to take actions necessary to mitigate DOE's damages once it had reason to believe that performance would not be forthcoming. *Id.* at 1375 ("[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.") (quoting *Restatement (Second) of Contracts* § 350 cmt. B (1981)).

Applying *Indiana Michigan*, the Court in *Northern States* found that the 1994 date discussed in *Indiana Michigan* only established when mitigation was mandatory and did not suggest that a utility would not have reason to know prior to 1994 that DOE would not timely perform in 1998. It then found that Northern States had reason to know as of 1988 that DOE would not perform by 1998 and that it was reasonable for Northern States to recover its mitigation costs beginning in 1988. *Northern States*, 78 Fed. Cl. 459-60 ("[T]he evidence demonstrates that plaintiff had 'reason to know' in 1988 that performance by DOE beginning in 1998 would not be forthcoming. Indeed, when plaintiff began to focus on its future spent fuel storage needs in 1988, DOE's own expectation of a delay was a principal element in

plaintiff's planning."). As in *Northern States*, the evidence in this case demonstrates that WE reasonably believed as early as December 1987 that DOE would not begin performance by 1998 and that this was the primary factor driving WE's SNF storage plans. PFF 76-77, 81-83. Therefore, the costs that WE began incurring in 1988 to mitigate DOE's damages are recoverable regardless of when WE made its final decision to construct the dry storage facility.

**C. In the Non-Breach World, WE Would Not Have Built Dry Storage**

In its initial brief, WE explained that the evidence established that WE would not have built dry storage if DOE had performed. WE PTB 34-37; *Yankee Atomic*, 73 Fed. Cl. at 268 (in determining whether a decision was substantially caused by DOE's delay, "reasonable not absolute certainty suffices.").

WE proved that Point Beach could have operated into 1998 and beyond, if necessary, without dry storage. WE PTB 34-37. WE also proved that WE would have preferred to avoid the effort, risk and cost of dry storage in the non-breach world. WE PTB 37. The evidence further showed that Point Beach could have maintained FCR without having to implement dry storage and that WE likely would have chosen this option in the non-breach world. WE PTB 40-41. Consequently, DOE's breach was a substantial causal factor in WE's incurrence of its dry storage project damages. *Yankee Atomic*, 73 Fed. Cl. at 269.

The Government's assertions that WE could not have operated Point Beach without dry storage in the non-breach world are fatally flawed because they reflect breach world assumptions and ignore the evidence at trial regarding the actions available to WE in the non-breach world. Further, the Government seeks to impose on WE a higher causation standard than required by law and we refer the Court to our earlier discussion of this issue in Section II.A.

### 1. The Government's Claim that Point Beach Could Not Use 1500 Pool Spaces Is Both Factually Incorrect and Relies on Breach World Assumptions

The Government claims that documents from 1991 to 1997 show that there is "no evidence" that WE was able to use 1500 spaces in the Point Beach spent fuel pool. Govt. PTB 23-24.[5] The Government's contention is unsound for several reasons. WE's actual, breach world utilization of pool spaces does not illustrate how many spaces that WE would have used in the non-breach world. As Mr. Hennessy testified, in the actual world, WE did not expend resources to make 1500 spaces generally available because Point Beach "had adequate space in the spent fuel pool to continue operations as normal." Tr. 866:24-867:6 (Hennessy).

The significant point is that the evidence established that, if DOE had performed, WE could have made available for SNF as many of the 1500 spaces as were necessary to operate until DOE performed. PX 321; Tr. 865:14-25 (Hennessy) (WE knew that, with some effort, it could have regained the use of all but two inaccessible spaces identified in PX 321, resulting in 1500 usable spaces). The Government's insistence that WE can only prove that it could have used all 1500 spaces in the non-breach world by showing that it did so in the breach world is legally incorrect. It was DOE that wrongfully breached its contract with WE and DOE is not "permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

In addition, the contemporaneous documents show that, in the actual world, WE knew that, if necessary, it could make 1500 spaces available for SNF. For example, in its 1994 RW-859, WE informed DOE that Point Beach had a licensed capacity of 1502 spaces

[5] WE likely would have needed to utilize all 1500 spaces concurrently only if DOE unreasonably failed to perform until after the second (Fall) outage in 1998. As confirmed by the SNF pool capacity projections that WE entered into evidence and the Kenrich report, if DOE had accepted SNF by the first (Spring) outage in 1998, WE would only have needed to store approximately 1473 spent fuel assemblies after the Fall 1997 outage. Tr. 867:21-874:7 (Hennessy); PDX 7, 9; Tr. 166:4-171:4 (Baumann).

and that Point Beach had an "established" capacity of 1500. PX 327, p. HQR36400688. Further, Point Beach Reactor Engineering knew in the 1980s that 1500 spaces could be made available to store SNF, if necessary. PFF 170-172. As later reflected in a December 16, 1993 WE memorandum, there were 217 "empty, good spaces" and 36 "Other" spaces. WE knew that, with some effort, 34 of the 36 "Other" spaces could be made "empty, good spaces." PFF 169; PX 321 (Dec. 16, 1993 Memo from Fieldhack re: Spent Fuel Pool Summary); Tr. 865:18-22 (Hennessy) ("Well, when the Fieldhack memo came out, we had categorized all of the locations, what we knew about those locations, and we knew, I knew that, with some effort, that we would be able to regain the use of those spaces."); Tr. 854:25-866:23 (Hennessy); PDX 11 (blown-up versions of PX 728.9 and 727, side by side). WE subsequently made 32 of the 34 spaces accessible. PFF 171. Two of the 34 spaces (for a total of 34 of 36) could easily be made available whenever Point Beach chose by removing a dummy assembly and a rod can. *Id.* Therefore, the evidence established that WE could have used 1500 spaces if it became necessary to do so. PX 321; Tr. 865:14-25 (Hennessy).

The evidence cited by the Government actually supports, rather than detracts from, the conclusion that WE knew that additional spaces could be made available. The Government cites documents that show that WE was capable of using steadily increasing numbers of pool spaces: 1415 spaces in 1991, 1468 spaces in 1994, 1484 spaces in 1997, and then 1496 spaces in 2003 (six spaces purportedly damaged). Govt. PTB 23. The Government, however, ignores Mr. Hennessy's explanation that the six spaces that the Government claimed were damaged in 2003 were not damaged. Instead, two of the spaces are under the canal door hinges and are assumed to be unavailable (which reduces available spaces from 1502 to 1500). The other four spaces are usable, but require the use of a camera to properly position the SNF assemblies for storage. Tr. 938:10-939:1 (Hennessy). Adding (a) the four spaces that Mr. Hennessy explained are usable to (b) the 1496 spaces not

identified as damaged in any way results in 1500 spaces, confirming again that there are 1500 usable spaces in the Point Beach pool. PFF 12a.

### 2. WE Could Have Projected Operating Without Dry Storage into 1998 and Beyond

The Government contends that WE uses hindsight and fails to consider 1988 and 1989 data in analyzing whether Point Beach could have avoided dry storage in the non-breach world. Govt. PTB 22. To the contrary, the evidence showed that WE knew from the time of the Standard Contract that Point Beach could operate into 1998. PFF 66; WE PTB 16. Moreover, if, in the non-breach world, WE wanted to explore short-term options to preserve FCR, WE would not have had to commit to options (such as a temporary rack) until several years after 1988 or 1989. *See* PX 827, p. 4 (to install temporary cask pit rack by January 1996, WE likely would need to award a contract to a rack supplier by August 1993).

Addressing the likely non-breach world scenario, WE presented highly detailed evidence that contradicts the Government's claim that WE provided "no analysis or evaluation" of the non-breach world. Govt. PTB 25. WE witnesses made projections looking forward from the early-1990s and mid-1990s, based on information available at the time and assumptions that would have been made in the non-breach world. PFF 159-166; WE PTB 35. The evidence showed that, in the non-breach world, WE would have projected that it needed to store 1473 assemblies through the Fall 1997 refueling, allowing WE, at a minimum, to operate into 1998. Tr. 867:21-874:7 (Hennessy); PDX 9; Tr. 166:4-171:4 (Baumann); PDX 7. In other words, the testimony established that, assuming 28 assembly discharges, the projected spent fuel inventory in the Point Beach pool would not have reached or surpassed 1500 until some time in 1998:

| YEAR | DISCHARGE | AFTER SPRING OUTAGE | DISCHARGE | AFTER FALL OUTAGE |
|---|---|---|---|---|
| 1991 | | 1109 | 28 | 1137 |
| 1992 | 28 | 1165 | 28 | 1193 |
| 1993 | 28 | 1221 | 28 | 1249 |
| 1994 | 28 | 1277 | 28 | 1305 |
| 1995 | 28 | 1333 | 28 | 1361 |
| 1996 | 28 | 1389 | 28 | 1417 |
| 1997 | 28 | 1445 | 28 | 1473 |
| 1998 | 28 | 1501 | | |

Tr. 867:21-874:7 (Hennessy); PDX 9; Tr. 166:4-171:4 (Baumann); PDX 7.

Contrary to the Government's claims, WE did not rely solely on the Kenrich model to project WE's SNF storage management options in the 1990s. Govt. PTB 24. Instead, as described above, knowledgeable WE witnesses, such as Messrs. Hennessy and Baumann, also used information available to WE in the 1990s to make the projections that WE would have made in the non-breach world. WE PTB 34-37; PFF 159, 161.

Mr. Sieracki's expert testimony then confirmed WE's analysis that, in the non-breach world, Point Beach would have operated through 1998 until DOE accepted WE's SNF while preserving FCR through a temporary cask pit rack. PFF 163. More specifically, WE's spent fuel assembly inventory in January 1998 was 1422. Tr. 3750:9-20 (Sieracki); PDX 60-Sieracki 24. Mr. Sieracki applied the Kenrich model showing that, in the non-breach world, DOE would have accepted 41-48 spent fuel assemblies in Spring 1998. Tr. 3750:9-20 (Sieracki). WE used 48 assemblies on the assumption that DOE would have accepted two full transportation canisters, but using 41 assemblies does not change the analysis. Tr. 3751:15-3753:2 (Sieracki). In sum, if DOE had removed 41-48 assemblies, WE would have had sufficient space in the pool to accommodate the 98 spent fuel assembly discharges in 1998 using only its wet storage capacity. Tr. 3753:11-3754:10 (Sieracki) (1472 assemblies at year end of 1998 was below the pool's 1500 space capacity); PDX 60-Sieracki 29-30.

The evidence further established that WE could have operated Point Beach Unit 1 (refueled in the Spring 1998 outage) into 1999 through minor fuel management strategies. Tr. 170:14-172:11 (Baumann); Tr. 892:9-893:7 (Hennessy). The most straightforward solution would have been a "shorter" 24-assembly reload that would have allowed it to operate into 1999. Tr. 170:21-171:4 (Baumann). WE would have preferred that DOE pick up WE's 1998 spent fuel allocation before the Fall 1998 discharge, but even if DOE had insisted on picking up WE's SNF during late December 1998 or January 1999, WE could have accommodated such an unreasonable pickup date without resorting to dry storage. PFF 173, 174, 176, 177.

In addition, the evidence showed that WE could have applied for NRC license approval to increase the 1502 permanent storage spaces in the spent fuel pool by installing small permanent racks in the periscope hole (space for four assemblies), tool storage area (space for sixteen assemblies), and the new fuel elevator (space for six assemblies) to expand the pool's capacity beyond 1500 assemblies, if necessary. Tr. 959:7-960:6 (Hennessy).

With an oblique reference to Mr. Hamal's TN-32B opinion, the Government suggests that WE would not have developed these spaces because, in 1998, it ordered TN-32B casks rather than develop and license these spaces. Govt. PTB 24. The Government's argument misses the mark because Mr. Hamal's TN-32B opinion relates to WE's acquisition of those casks in the breach world after DOE had failed to perform. PX 828, pp. WXE004 0009-13. WE applied to the PSCW for authority to order as many as six TN-32Bs because of its serious concerns regarding continued use of the VSC-24 cask and the knowledge that DOE would not be performing for many years. PFF 139-144; WE PTB 50-51. Thus, Mr. Hamal's analysis of the TN-32B issue has no relevance to whether, in the non-breach world, WE may have installed mini-racks to create 28 additional SNF storage locations if needed. Tr. 959:7-960:6 (Hennessy).

The Government asserts that WE should have proven that, in the non-breach world, the PSCW would have approved WE's decision to use a temporary rack rather than construct a dry storage facility. Govt. PTB 25. There are numerous flaws in the Government's argument. WE would not have needed PSCW approval to use a temporary rack in the non-breach world. WE PTB 41; PFF 183. Further, the Government cannot demand proof which is unavailable by reason of the Government's breach. *Locke,* 283 F.2d at 524. Here, neither WE nor the PSCW expected DOE to timely perform in 1998. PFF 115, 120. Therefore, the PSCW did not consider the short-term options available to WE. PX 374 (Feb. 1995 PSCW Order), pp. 4, 22 ("DOE does not expect that any disposal facility will be operational before the year 2010 . . . When or whether DOE will begin taking spent nuclear fuel is a matter of speculation"). There also was very strong opposition to nuclear power operations in Wisconsin and the PSCW staff was generally anti-nuclear. PFF 102. Given these concerns, it is hard to conceive that the PSCW would not have jumped at the opportunity for Point Beach to avoid dry storage in the non-breach world. PFF 102, 104, 109.

### 3. The Evidence Shows that WE Could and Would Have Avoided Building Dry Storage in the Non-Breach World

The Government does not and cannot dispute the overwhelming evidence that WE, PSCW, Dane County Circuit Court, and Court of Appeals of Wisconsin documents all recognized that WE could have operated Point Beach into 1998 without dry storage. PFF 113-114. The Government further ignores the evidence that WE would have avoided dry storage in the non-breach world, claiming that this evidence was contradicted at trial. Govt. PTB 8.

As discussed in Section II.B, WE's evidence was not contradicted. The evidence established that WE did not want to apply to the PSCW for approval for a dry storage facility unless absolutely necessary because WE anticipated that the proceeding would be protracted, contentious, and costly. PFF 158-159. Messrs. Link and Krieser both testified that, in 1992,



LEGAL14398425.1

WE concluded that it would have been possible to operate into 1998, obviating the need for dry storage in the non-breach world. PFF 109-111, 113, 162-163. Moreover, the person who would have made the decision whether to build dry storage in the non-breach world - Mr. Link, the Vice President of the Nuclear Power Department at the time – testified that WE would not have built dry storage. PFF 158-159.

**4. The Government's Claim that WE Could Not Have Operated into 1998 Is Based on Flawed Assumptions and Unreliable Testimony**

The Government claims that WE "projected" in 1991 that Point Beach could not operate into 1998 without dry storage and that WE would have made the same projection in the non-breach world. Govt. PTB 20; DFF 203. Not only is the Government's claim implausible, it is demonstrably incorrect based on the evidence. The Government cites WE's 1991 PSCW dry storage application for the proposition that WE projected that it would exceed the usable capacity of the spent fuel pool in 1997. DFF 203; DX 171/PX 236. To the contrary, the 1991 PSCW application makes no such statement. Indeed, the accompanying ESR stated that WE could defer the dry cask storage project by using combinations of alternatives. PX 236 (ESR), pp. 38-39, 59. The ESR further stated that it did not attempt to evaluate these combinations of alternatives because of the "failure of the DOE to begin accepting spent fuel before 2010" and because of the uncertainty of DOE's performance at any facility, including an MRS. *Id.* at 59.

The Government attempts to fabricate a 1991 "projection" of WE's SNF pool capacity for this litigation through two Government witnesses -- Messrs. Brewer and Zabransky. DFF 203. Mr. Brewer, however, expressly disclaimed offering an opinion as to whether WE would have built dry storage in the non-breach world. Tr. 5590:2-17 (Brewer) ("Q. And you are not offering an opinion on whether Wisconsin Electric actually would have built an ISFSI had DOE timely performed, correct? A. I'm not offering an opinion about that one way or the other."). Nevertheless, in his report regarding WE's use of a temporary cask pit rack,

Mr. Brewer inserted a footnote concluding that Point Beach would have to shut down for lack of storage space in 1997. PX 880, p. WXE011 0016, n.34 ("Without an additional 8 spaced [sic] it would have needed to shutdown the Unit 2 reactor at some point after the planned date of the fall 1997 outage. . . .").

Mr. Brewer's calculation is premised on two flawed assumptions. First, he included seventeen non-fuel components in the total number of filled locations in the Point Beach pool. PX 880, p. WXE011 0016 n.33 (assuming 1126 locations filled in July 1991); DX 171, p. WISC00014796 (1109 spent fuel assemblies in pool). That erroneously boosted the starting inventory in the Point Beach spent fuel pool from 1109 to 1126.

Second, Mr. Brewer assumed that twenty spaces in the spent fuel pool were unavailable for SNF storage, resulting in a pool capacity of 1482 usable spaces. PX 880, p. WXE011 0016 n.33. Based upon these flawed assumptions, Mr. Brewer incorrectly concluded that Point Beach could not operate past the Fall 1997 outage. In sum, he assumed a capacity of 1482 and assumed that 1490 spaces were needed after the Fall 1997 outage. However, the correct capacity is 1500 and only 1473 spaces were needed to store SNF. The other 17 spaces contained non-fuel components that did not need to be stored in the pool. The Government had Mr. Zabransky use the same faulty assumptions to create an identical erroneous calculation at trial. DFF 203.

Thus, the Brewer and Zabransky projections do not reflect WE's SNF storage status in the non-breach world because WE would have removed the non-fuel components in order to operate into 1998. Tr. 859:25-861:2 (Hennessy) (WE would have sent non-fuel components to the Barnwell site or stored them in a mausoleum on-site). WE proved that WE knew during the late 1980s and early 1990s that the non-fuel components could be removed or relocated to make spaces available for SNF assemblies. PFF 168-170. In fact, in the actual world, WE shipped 14 debris baskets off-site and removed another non-fuel

component (a "spacer") from the pool. PFF 171. Additionally, WE could have removed the dummy assembly and rod can from the pool. *Id.*

The Brewer and Zabransky projections also do not reflect WE's SNF storage options because, as discussed above, in the non-breach world, WE would have made sufficient spaces available to operate into 1998. Tr. 892:9-893:7 (Hennessy). WE knew during the 1980s and 1990s that, with minor effort, the pool could store 1500 spent fuel assemblies. PFF 168-170. In fact, WE made 1500 spaces available for SNF storage. PFF 12a, 171-172. WE made the spaces available by inspecting "damaged" spaces. PFF 171. These spaces either did not need repair or needed only minor repairs. *Id.* WE also removed brackets from the pool wall to make spaces available and placed non-fuel components in the two spaces under the canal door hinges that were not used for SNF storage. *Id.*

In sum, the Brewer and Zabransky projections are not relevant for analyzing the non-breach world because of their flawed assumptions. Tr. 859:25-861:2; 892:9-893:7 (Hennessy); PFF 158, 159. Instead, as discussed, the Court should credit the projections and testimony of knowledgeable WE witnesses who explained precisely how WE would have operated into 1998 and beyond if DOE had performed. *See also* WE PTB 34; PFF 159-166.

### 5. The Government's Removal of WE's Costs for Dry Storage Fabrication and the Purchase and Loading of Five Casks Is Contrary to the Evidence

The Government asserts that, in the non-breach world, WE would have built dry storage and procured and loaded five casks by the end of 1998 and, in support, cites the testimony of Mr. Hamal. Govt. PTB 48. Mr. Hamal, however, offered a very limited opinion. He did not offer an opinion regarding whether WE would have built dry storage in the non-breach world. Tr. 5943:20-5944:6 (Hamal). He also did not consider the impact of DOE's statement in 1988 that it would be delayed until 2003 on WE's spent fuel management plans. PFF 167. Instead, he assumed, based on direction from the Department of Justice ("DOJ"), that WE's SNF management actions in a non-breach world, in which DOE accepts

spent fuel commencing no later than January 1998, would have been essentially the same as WE's SNF management actions in the actual world where, by 1988, WE knew that DOE's performance was going to be substantially delayed. PFF 167; *see also* Tr. 4906:22-4907:1 (Snyder). Thus, assuming that WE had already constructed the ISFSI, purchased three casks and loaded two casks, Mr. Hamal merely considered whether WE would have incurred the additional cost to load three additional casks in 1998 and opined that WE would have loaded the three additional casks (as opposed to taking other action). Tr. 5939:19-5940:15; 5942:3-5944:6; 5945:10-5946:8; 5947:17-23; 5952:22-5953:6 (Hamal); PX 828, p. WXE004 0006.

As to DOJ's direction that Mr. Hamal assume that the events in the breach and non-breach worlds would be identical prior to 1998, WE previously explained that the Government cannot reasonably contend that the nuclear power industry was unaffected by the Government's anticipated breach prior to 1998. *Indiana Michigan*, 422 F.3d at 1375 ("It would have been improvident for Indiana Michigan to have waited until January 1998 before deciding what to do with its nuclear waste."); *Northern States*, 78 Fed. Cl. at 459. Given that Mr. Hamal's opinion is premised on a flawed assumption, his opinion on this issue is irrelevant. Indeed, the evidence demonstrated that WE would not have built a dry storage facility had DOE timely performed by 1998. PFF 158-211.

Thus, Mr. Hamal's opinion casts no doubt on WE's ability to operate without dry storage in the non-breach world. PFF 163. In fact, his analysis supports WE's position on this issue. More specifically, Attachment 6 to Mr. Hamal's report reveals that, under his analysis, the Point Beach inventory of spent fuel assemblies never exceeds 1500 provided that DOE accepts WE's spent fuel allocation for 1998 and 1999 prior to the November outages in those two years. Tr. 5975:2-5978:3 (Hamal); PX 828, Attachment 6.

For these reasons, no adjustments should be made to the claimed costs for the ISFSI and the dry casks. The proper amount of damages to be recovered for ISFSI costs is the total

amount claimed, $20,683,000 (nominal dollars). The proper amount of damages to be recovered for dry casks is the total amount claimed, $31,536,000 (nominal dollars). Tr. 3730:7-15 (Sieracki); PDX 60-Sieracki 4.

### D. In the Non-Breach World, WE Likely Would Have Used a Temporary Rack for Short-Term FCR Capability

In its initial brief, WE explained the offset to its claim for a temporary cask pit rack as a conservative assumption in the hypothetical non-breach world. WE PTB 37-41; PFF 178-179, 182-184. No NRC regulation, Point Beach policy or Point Beach technical specification required WE to preserve FCR, but WE generally prefers to operate with FCR. WE PTB 38; PFF 179. The evidence showed that, under projected discharges, Point Beach's pool would have had less than one FCR in the permanent storage racks starting in approximately 1996. Tr. 867:21-874:7 (Hennessy); PDX 9; PX 794, p. 18 (May 2006 Kenrich Revised Assessment of Damages); PFF 178, 182-184. In operating into 1998 or beyond, the evidence showed that WE could and likely would have used a temporary cask pit rack to preserve FCR in the non-breach world. WE PTB 38-41; PFF 182-184.

#### 1. The Government's Claim that Point Beach Did Not Consider a Cask Pit Rack in the Breach World Before 1998 Is Both Factually Incorrect and Irrelevant to WE's Likely Actions in the Non-Breach World

The testimony of multiple witnesses contradicts the Government's claim that WE did not discuss the possible use of a temporary cask pit rack in the Point Beach spent fuel pool until 1998. Govt. PTB 20. Mr. Krieser testified that WE evaluated the concept of using temporary racks, including a cask pit rack, in 1992. WE PTB 30; Tr. 1523:14-20 (Krieser). Mr. Link confirmed that he directed his staff to evaluate whether the use of a temporary rack was a viable option during that period. WE PTB 30; PFF 185. The Government's description of Mr. Link's testimony as "self-serving," Govt. PTB 20, is groundless. Mr. Link is not employed by WE and has no stake in this litigation. PFF 18; Tr. 325:22-327:12 (Link)

(Mr. Link's current position is Manager, Environmental, Health, Safety, and Licensing at the AREVA (formerly Framatone) nuclear fuel facility in Richland, Washington).

In addition, WE personnel, including Messrs. Conry and Zabransky, discussed the use of a temporary rack by no later than 1995 because of delays in the PSCW's consideration of WE's dry storage program application. WE PTB 40-41; PFF 185. Mr. Conry is no longer employed by WE and has no stake in this litigation. PFF 30 (Mr. Conry is a senior process engineer with Power Engineers Cooperative). Mr. Conry's precise recollection of his discussion with Mr. Zabransky regarding the possible use of a temporary rack is more credible than Mr. Zabransky's summary denial that such discussions took place. Tr. 2817:5-2819:12 (Conry); Tr. 5686:16-20 (Zabransky). In addition, as the DOE Contracting Officer and as one of DOE's primary witnesses in the SNF cases, Mr. Zabransky has a considerable interest in DOE prevailing in these cases. PFF 19.

More importantly, WE's consideration of a temporary cask pit rack in the actual, breach world is hardly dispositive of whether or not WE would have used a cask pit rack in the non-breach world. A temporary cask pit rack can provide FCR for a number of years, but is not a long-term SNF storage option. Tr. 4407:1-5 (Singh) ("a full core [rack] is good for about four-and-a half years"); PX 774, p. 2 ("Inclusion of the cask laydown area postpones loss of FCR by one to five years."); PFF 186. Given that WE expected DOE's performance to be substantially delayed, WE concluded that it needed long-term, not shorter-term SNF storage solutions. Tr. 1524:2-4 (Krieser) ("We needed to address the situation in a long-term fashion, so we needed a long-term solution."); WE PTB 22-23; PFF 115, 117.

Thus, the substantial delay in DOE's performance largely eliminated short-term options, such as a temporary cask pit rack, from WE's consideration for spent fuel storage. WE PTB 21; PFF 80, 87, 111, 115. The Government claims that WE's temporary rack is impermissibly based on "after the fact" evidence and further claims that WE essentially

should prove that WE contemporaneously engineered and prepared to use a cask pit rack in the actual world. Govt. PTB 19-22. To the contrary, as the breaching party, the Government cannot be "permitted to reap advantage from his own wrong by insisting on proof" of WE's consideration of short-term SNF storage options which DOE eliminated by its substantial delay in performance. *Locke*, 283 F.2d at 524.

The Government erroneously attempts to deny WE use of a temporary rack to maintain FCR in the non-breach world by claiming that WE would have "exceeded the usable capacity" of the Point Beach pool in Fall 1997. Govt. PTB 20. As discussed in the preceding section, the Government did not reach that conclusion based on contemporaneous documents. Instead, it relies on "after the fact," non-expert projections by Messrs. Brewer and Zabransky that are based upon flawed assumptions that WE would not have made in the non-breach world (such as the capacity of the Point Beach pool and the number of locations available for SNF storage). *See* WE Response to DFF 203. WE established that, in the non-breach world, Point Beach would have operated into 1998 and beyond without dry storage until DOE performed. WE PTB 34-37; PFF 159-166.

The Government then uses these same flawed assumptions to calculate that WE would have lost full core reserve in the permanent pool spaces in 1995. Govt. PTB 24. Using more viable assumptions discussed in the preceding section, WE would not have exceeded the 1379 full core reserve mark until after the Spring 1996 outage, shortening the period in which WE likely would have used the cask pit rack. Tr. 867:21-874:7 (Hennessy); PDX 9.

The Government next mistakenly claims that WE would not have used a cask pit rack because it would have "added weight" to the spent fuel pool which would have invited allegedly unwanted NRC scrutiny. Govt. PTB 20. The evidence contradicts this claim. In the actual world, when WE implemented dry storage in the 1990s, Point Beach performed a

calculation that assumed a heavier load (loaded VSC-24 transfer cask) than assumed in the earlier Bechtel calculation (DX 351) on which the Government relies. PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351); WE PTB 39; PFF 191. Whether WE chose to use a VSC-24 for dry storage or a temporary cask pit rack, it was going to add weight to the spent fuel pool structure. PX 391, p. WISC00123962. Thus, the Government's claim that WE would not have used a cask pit rack because of concerns about adding weight to the spent fuel pool is ill-founded.

In 2005, WE added weight to the spent fuel pool again when Point Beach implemented the NUHOMS system. The NUHOMS transfer cask is heavier than either a VSC-24 transfer cask or loaded cask pit rack. Point Beach, however, performed a calculation showing that this greater load was permissible. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC1045-0006 (over 200,000 lbs.); WE PTB 39; PFF 41. Both the VSC-24 and NUHOMS calculations were "QA-scope calculations." PX 391, p. WISC00123960 (QA-Scope box checked); PX 1045, p. WISC 1045-0001 (QA-Scope box checked). QA-scoped calculations are "part of the safety related evaluation for plant system or components." Tr. 899:12-17 (Hennessy). Safety-related calculations are subject to retention requirements and are subject to NRC review. PX 652, p. WXE0001 0156; 10 C.F.R. § 50.59. Therefore, WE has records that are accessible to the NRC, stating that the aforementioned additional weight could be added to the Point Beach spent fuel pool. Further, Dr. Singh established that the pool structure and pool had sufficient capacity to support the weight and structural loads of a loaded cask pit rack, storing 121 assemblies. Tr. 4392:17-4393:19 (Singh); PTB 39-40; PFF 187, 189, 191.

### 2. The Government Did Not Meaningfully Challenge WE's Evidence that, in the Non-Breach World, WE Would Have Selected a Cask Pit Rack over Dry Storage

The Government essentially does not challenge the evidence that a cask pit rack would have provided Point Beach with FCR capability at a small fraction of the cost of the dry storage project and would not have required PSCW approval. WE PTB 41; PFF 183 (including subparagraphs). WE presented evidence through the testimony of Messrs. Link and Farron (and others) that WE definitely would have favored the temporary rack over dry storage in the non-breach world. WE PTB 41; PFF 182-185.

Instead, the Government argues that WE did not address properly whether WE would have chosen to use a cask pit rack because Dr. Singh did not offer an expert opinion as to whether WE would have used a cask pit rack. Govt. PTB 20-21. The Government's argument is nonsensical. There was overwhelming evidence from knowledgeable WE witnesses that a cask pit rack would have been the favored FCR maintenance option in the non-breach world. WE PTB 41; PFF 182-185. Thus, there was no need for Dr. Singh to address this issue. As discussed below, Dr. Singh testified to the certainty that WE could have installed a cask pit rack. WE PTB 39-40; PFF 186-209. He further testified that, in his experience, cask pit racks are typically used to provide temporary increased spent fuel storage capacity, particularly when spent fuel pools have large inventories. PFF 186.

The Government also asserts that Mr. Sieracki and current and former WE employees "invented" the use of a temporary cask pit rack during meetings in 2005 and 2006. Govt. PTB 22. To the contrary, the evidence demonstrated that Mr. Sieracki's interaction with WE witnesses consisted of orienting the witnesses to the hypothetical non-breach world. Tr. 3872:10-15 (Sieracki). Mr. Sieracki explained that, in evaluating the non-breach world, it was the WE witnesses who provided Point Beach discharge and pool capacity information, and different operating scenarios to him. With that information, WE fact witnesses then

determined that WE would have used a temporary cask pit rack in the non-breach world. Tr. 3871:22-25; 3872:25-3873:2 (Sieracki).

This evidence is the most probative of WE's decision-making regarding maintenance of FCR in the non-breach world because, as discussed, in the actual, breach world, WE expected substantial delays in DOE's performance. WE PTB 22-23; PFF 83, 107. Thus, in the actual world, after 1988, WE had no reason to devote considerable resources into evaluating SNF storage options assuming timely DOE performance. The Government cannot be "permitted to reap advantage from his own wrong by insisting on proof" of WE's evaluation of its short-term SNF storage options that DOE eliminated by reason of its substantial delay in Contract performance. *Locke*, 283 F.2d at 524.

**3. The Government's Criticisms of Dr. Singh's Report Are Frivolous**

The Government's expert, Mr. Brewer, did not disagree that a temporary cask pit rack with 121 spaces could have been used at Point Beach. Tr. 5568:24-25; 5569:19-5570:2 (Brewer). He admitted that a cask pit rack, licensed by the NRC, could be used "for an indefinite period of time if it served your needs." Tr. 5568:14-18 (Brewer). Mr. Brewer testified that there were technical challenges to using a temporary rack, but admitted that none were insurmountable. Tr. 5573:6-13 (Brewer). The Government does not mention Mr. Brewer's admissions in its brief. Instead, it offers trivial objections to Dr. Singh's report that are easily dismissed.

First, the evidence contradicts the Government's contention that Dr. Singh's report is "far short" of the analysis required. Govt. PTB 21. Dr. Singh is the founder and chief executive of Holtec, the preeminent supplier of spent nuclear fuel storage racks for U.S.-designed reactors worldwide. PX 827, p. 2; Tr. 3822:14-21 (Sieracki). Based on his extensive experience with dozens of projects installing hundreds of spent fuel storage racks, Dr. Singh examined Point Beach drawings, calculations and documents, as well as Holtec

software and resources, in order to arrive at his expert opinion that a cask pit rack could have been installed at Point Beach. Tr. 4383:17-4385:4 (Singh). WE did not place any restrictions on Holtec's work. Tr. 4431:20-4432:22 (Singh). Dr. Singh testified that he has performed more than 50 rack license amendment applications before the NRC and that NRC amendment applications frequently relate to more than one rack. Tr. 4401:15-4402:23 (Singh). Therefore, the evidence clearly established that Dr. Singh performed the depth of review required to establish the technical feasibility of the Point Beach cask pit rack project. *Id.*

To the extent that the Government is suggesting that Dr. Singh should have completed an entire cask pit rack application, including a pool survey, suitable for submission to the NRC to prove the technical feasibility of a cask pit rack, Govt. PTB 21, the Government is asking for an unnecessary and unduly burdensome effort. Preparation of such an application likely would have cost WE approximately $1.4 million and no authority requires that WE incur that level of expense in order to establish a credible non-breach world. PX 827, p. 11 (engineering services estimated at $1,428,500 in current dollars).

Second, the Government erroneously contends (without citation) that Dr. Singh should have inspected the Point Beach pool to ensure that divers could have been used to install the temporary cask pit rack. Govt. PTB 21. Dr. Singh repeatedly explained that project technicians could have performed the Point Beach cask pit rack project, including removal of the anti-tipping frame, remotely from the pool deck, without entering the pool water. Tr. 4407:6-13; 4459:12-19; 4463:2-9; 4464:7-11; 4471:7-18 (Singh). The technicians are trained to perform diving operations, but would not have had to do so because of the simplicity and lack of obstacles in the Point Beach cask pit rack project. *Id.*

Dr. Singh further explained that pool modifications, such as the installation of racks, have been performed remotely for decades. PX 899; Tr. 4364:19-23 (Singh) ("A remote

handling tool is a tool that is used from the pool deck or from the fuel handling bridge. In other words, the individual who's operating the tool does not go in the water."). Technicians routinely remove appurtenances from pool walls and perform other tasks through the use of remote tools. Tr. 4456:9-13 (Singh).

Moreover, the Government's own expert agreed that the Point Beach cask pit project could be accomplished using only remote tools. Tr. 5473:23-24 (Brewer) ("I agree that one can use remote tools to do this kind of work."). Consequently, there is no evidence establishing that divers had to enter the spent fuel pool water to perform the Point Beach cask pit rack project.

Dr. Singh further testified that, while the project could have been done remotely, it also could have been completed with divers using proper shielding techniques. Tr. 4459:4-8 (Singh). Dr. Singh testified that techniques such as the use of a lead shield or a lead or steel cage allow divers to safely perform in-pool diving operations in various pool storage configurations. Tr. 4445:6-23; 4446:6-18; 4447:13-4448:6 (Singh). Additionally, the space available in the pool for diving operations can be maximized by placing colder (earlier discharge date) spent fuel assemblies around the work area. Tr. 4445:6-23 (Singh). Thus, while the project could be done remotely, the use of divers remained viable. Tr. 4446:10-18; 4459:16-19; 4472:23-4473:1 (Singh).

Dr. Singh testified that the cost of using divers or remote tools to perform the Point Beach cask pit rack project is essentially the same under either option. Tr. 4472:23-4473:17 (Singh). Remote operations require more tools, but diving operations require significant training and consumable items, such as dive suits, that are treated as contaminated materials. *Id.*

Third, the Government alleges that Dr. Singh's expert opinion somehow lacked "rigor" because Holtec submitted two reports. Govt. PTB 21. More specifically, the

Government claims that, in his first report, Dr. Singh was not aware of how seismic restraints were attached to the pool and what obstructions might exist. Govt. PTB 21, n.8. To the contrary, the evidence showed that the first Holtec report's information was accurate. It simply reflected a conservative assumption that the seismic restraints were welded, not shimmed and, based on this assumption, assumed that obstacles were present. PX 827, p. 9; Tr. 4434:23-4435:1 (Singh) ("I had assumed the worst. I had assumed that in the installation process they actually conducted, did some welding and secured the frame. . ."). Dr. Singh, however, testified that further examination of the drawings showed the restraint to be shimmed, not welded. Tr. 4392:7-12 (Singh). Therefore, the restraints could be easily removed and would not require the use of divers. Tr. 4472:23-4473:1 (Singh). Because the seismic restraints could be removed either by using divers in the pool or by using remote tools, and the cost of both methods was "basically the same," there was no reason for Dr. Singh to revise his report to state that the Point Beach cask pit rack project could have been accomplished even more easily (*i.e.*, by simply lifting out the anti-tipping frame once the shims were removed) than when Holtec originally estimated the project using the conservative assumption that the frame was welded or attached to the pool wall. PX 827; Tr. 4470:13-4773:17 (Singh). Whether to use divers or remote tools was "not really relevant to any conclusions" in Dr. Singh's expert report and testimony. Tr. 4460:2-10; 4462:11-22; 4463:2-9 (Singh).

Finally, the Government's argument that Dr. Singh "never demonstrated the actual viability of a temporary cask pit rack" is based on citations to DFF 231-233 and represents merely a repetition of the Government's invalid criticisms discussed and dismissed above. Govt. PTB 21.[6]

---

[6] The Government did not disagree that the need for radiation shielding of a cask pit rack could have been addressed based upon the depth of the Point Beach spent fuel pool water. Govt. Resp. to PFF 195. Thus, the depth of the spent fuel pool is a moot issue. Nevertheless, WE clarifies the evidence to answer issues raised in the Government's responses to the PFFs. First, the total depth of the Point Beach spent fuel pool from the

In summary, the Government fails to show that WE could not have used and installed a cask pit rack to maintain FCR in the non-breach world. Moreover, the Government fails to show that WE's offset was not the most likely option that WE would have selected to preserve FCR in the hypothetical non-breach world.

## E. The Court Should Find That DOE Would Accept Spent Fuel in the Non-Breach World at a Substantial Rate

### 1. The Parties' Understanding Was that DOE Would Accept SNF at a Substantial Rate

The Court need not determine a rate of acceptance in order to determine either causation or the reasonableness of WE's mitigation of the Government's partial breach. In its initial post-trial submissions, WE explained that, notwithstanding the overwhelming evidence in support of a 3000 MTU rate, the Court has chosen on several occasions to make a final determination of damages without finding a specific acceptance rate. *See, e.g.*, *System Fuels, Inc. & Entergy Arkansas, Inc. v. United States*, 79 Fed Cl. 37, 58, n.20 (2007) ("*Entergy Arkansas*"); *Southern Nuclear*, 77 Fed. Cl. at 439; WE PTB 44 (and citations therein).

More importantly, WE established that, faced with a lengthy DOE delay and the long lead time required to implement mitigation decisions, WE's mitigating decisions were foreseeable, commercially reasonable, and substantially caused by DOE's impending partial breach and lengthy delay. WE PTB 9-41; PFF 50, 83, 87-88, 92-94, 96, 103-121, 127-158, 212-237. This is sufficient for WE to recover its dry storage project costs under the aforementioned decisions.

---

surface of the pool water to the pool floor is approximately 40 feet. PX 640, p. WISC00060265; Tr. 823:5-9 (Hennessy). Dr. Singh explained that this total depth of water would have provided adequate shielding for the use of a cask pit rack. PX 640, p. WISC00060265; Tr. 4395:25-4396:3 (Singh) ("It's more than 40 feet . . . so this is adequate shielding"). In referring to the 40 feet of water "over" the cask pit rack in PFF 195, WE was referring to the depth of the water measured from the base of the rack (which is on the floor of the pool). The 25 feet pool depth identified in PFF 12 referred to the distance from the surface of the pool water to the top of the 14 feet tall spent fuel assembly racks in the pool. Tr. 119:8-9; 146:15-20 (Baumann) (spent fuel assemblies and rack approximately 14 feet tall).

The Government asserts that WE's position is that it was forced to implement dry storage because DOE did not perform at a particular rate. Govt. PTB 28. To the contrary, WE's position is that it was forced to implement dry storage because of the substantial delay in DOE's performance. From early 1988, WE believed that DOE's performance would be substantially delayed. DOE's subsequent lack of progress reinforced WE's belief such that, once the PSCW approved the dry storage project in February 1995, WE proceeded with the project. WE PTB 16-34; PFF 77-78, 81-94, 96-97, 106, 115-117, 120-122.

While WE believes that the parties' understanding was that DOE would perform at a substantial rate, WE has not argued for a specific rate in this proceeding. In fact, WE does not believe that differing DOE acceptance rates result in different WE damages in this case. The important years for WE's SNF storage would have been the early years, 1998 and 1999. The 3000 MTU rate and the 900 MTU rate have the same ramp up rates in those years and would have included virtually identical allocations for Point Beach's spent fuel:

| | 900 MTU RATE | | 3000 MTU RATE | |
|---|---|---|---|---|
| YEAR | SYSTEM-WIDE ACCEPTANCE RATES FROM 1991 ACR (PX 237, p. 5) (ANNUAL MTU) | POINT BEACH ALLOCATION FROM 1991 ACR (PX 237, p. 9) (ANNUAL MTU) | SYSTEM-WIDE ACCEPTANCE RATES FROM SUPKO REPORT (ANNUAL MTU) | POINT BEACH ALLOCATION FROM SUPKO REPORT (ANNUAL MTU) |
| YEAR 1 1998 | 400 | 16.3 | 400 | 16.28 |
| YEAR 2 1999 | 600 | 43.0 | 600 | 43.00 |

PX 237, pp. 5, 9; PX 791, pp. 6, 9, 11 (Supko Report).

Nonetheless, WE notes that, pursuant to the NWPA, DOE was expected to perform its contractual obligations at a rate sufficient for the utilities to avoid adding at-reactor storage after January 31, 1998 and to work off the backlog of accumulated spent fuel at a



LEGAL14398425.1

reasonable rate. The NWPA lodged the responsibility with the utilities to pay for DOE's disposal program and to provide *interim* storage of SNF, but the utilities only had the responsibility for the costs of interim storage "*until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act." 42 U.S.C. § 10131(a)(4), (5) (emphasis added). In pursuit of these objectives, the NWPA required that DOE enter into contracts with the nuclear utilities, providing that DOE shall take title to the SNF "as expeditiously as practicable upon the request" of the utility and begin disposal of the SNF by "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5).

Consistent with the intent of the NWPA, the Standard Contract required that DOE begin acceptance of spent fuel "not later than January 31, 1998" "as expeditiously as practicable upon the request" of the utility. PX 41, pp. KRGWE002118, KRGWE002123; PFF 46-47. Thus, the NWPA and the Standard Contract were designed to forestall the construction of dry storage facilities at nuclear power plants throughout the United States by setting a date certain by which DOE would take responsibility for storage of SNF. *Tennessee Valley Auth.*, 60 Fed. Cl. at 674 n.10.

The utilities and DOE understood that, consistent with the NWPA, the phrase "expeditiously as practicable" in the Standard Contract meant that DOE's acceptance rate of spent fuel would be sufficient for the utilities not to have to add additional at-reactor storage after January 31, 1998 and for DOE to work off the backlog of previously discharged fuel. WE PTB 41-44; PFF 48-49, 51-52, 54, 63. WE demonstrated that a steady-state annual rate of 3000 MTU accomplished these two objectives and that this was the understanding of WE and DOE. WE PTB 41-44; PFF 48-49, 52, 54, 63. Indeed, after execution of the Standard Contract, DOE's program documents confirmed DOE's understanding that, under the Standard Contract, DOE would have an operational facility in 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would eliminate the need for utilities to construct

additional storage after 1998 and would work off the accumulated backlog at a reasonable rate. PFF 53, 61, 61f, 61j.

The Government contends that the utilities, including WE, sought to add a Standard Contract term regarding DOE's acceptance rate during and after promulgation and execution of the Standard Contracts. Govt. PTB 33-36. This suggests that the Standard Contract did not impose on DOE an acceptance rate obligation. To the contrary, as discussed, the Standard Contract and the NWPA imposed on DOE an obligation to accept SNF at a rate that would eliminate the need for utilities to construct additional storage after 1998 and would work off the accumulated backlog at a reasonable rate. WE PTB 41-42; PFF 48-51.

In addition, industry efforts were focused on having DOE "provid[e] a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel." DX 541, p. CTR-006-0248; *see also* WE Response to DFF 27-29, 66. The utility groups noted that the Standard Contract "does not *explicitly* recite the standards for DOE's performance in accepting spent fuel from Purchasers" so they sought clarity regarding this issue, not an additional contract term. DX 541, pp. CTR-006-0248, CTR-006-0249 (emphasis added).

The Standard Contract was drafted by DOE and was not the product of any negotiation. PFF 42, 44. There was little time for review and utilities had no choice but to sign the Standard Contract or risk losing their operating licenses. PFF 42, 44. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *4. Nothing in UNWMG's request (or EEI's letters to DOE), however, is inconsistent with the aforementioned obligations in the Standard Contract regarding the rate of DOE SNF acceptance. WE PTB 41-42; PFF 48-51; WE Response to DFF 1, 27-29, 66.

The Government relies on testimony from Eileen Supko and Messrs. Zabransky, Shimon and Mills to support its contention that utilities sought to add an acceptance rate to the Standard Contract. Govt. PTB 36-37; DFF 63-67. This testimony, however, does not

support the contention that utilities sought to add a contract term that did not already exist. WE Response to DFF 63 (discussing Mr. Zabransky's testimony), 64 (discussing Mr. Mills's testimony and speech and Mr. Shimon's testimony), 65 (discussing Ms. Supko's and Mr. Zabransky's testimonies), 66 (discussing Messrs. Mills's, Zabransky's and Shimon's testimonies), and 67. The terms of the NWPA and the Standard Contract – read in their entireties – required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. WE PTB 41-42; PFF 48-51.

The Government also misapplies the Standard Contract's integration clause, Article XXII.A, in its discussion of the acceptance rate issue. Govt. PTB 32-33. Contrary to the Government's contention, Article XXII.A does not contain language stating that it precludes reliance on any representation not "expressly incorporated into the contract." *Compare* DFF 56 *with* PX 41, p. KRGWE002150. *See also* WE Response to DFF 56. In addition, the Federal Circuit has instructed that, in interpreting the Standard Contracts, it is appropriate to inquire into the NWPA and its purposes. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) (addressing the Standard Contracts with utilities in terms of the NWPA's requirements); *Roedler v. Dept. of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"). As noted, the NWPA required that the Standard Contracts provide that DOE shall take title to the SNF "as expeditiously as practicable upon the request" of the utility and begin disposal of the SNF by "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5). The NWPA further provides that the utilities would be responsible for SNF storage "until such waste and spent fuel is accepted by [DOE]." 42 U.S.C. § 10131(a)(5) .

Given that the Standard Contract does not contain an express acceptance rate for DOE's performance, one must interpret the Contract to determine this rate of performance based on the terms of the Contract and the purpose of the NWPA. *Carolina Power & Light Co.*, 2008 WL 2154103 at *17. As noted, the Standard Contract contains both the "not later than January 31, 1998" and "expeditiously as practicable" language. PX 41, pp. KRGWE002118, KRGWE002123. The Contract also applies to "all" SNF generated by WE and the other utilities, which DOE "shall accept" and "dispose of . . . in accordance with the terms of this contract." PX 41, p. KRGWE002126.

The Standard Contract also should be interpreted in light of the parties' expectations at the time of contract formation and the actions of the parties after execution. *Carolina Power & Light Co.*, 2008 WL 2154103 at *17; *Entergy Arkansas*, 79 Fed. Cl. at 53 ("[T]he post adoption actions of the parties to a contract can be useful in guiding interpretation.") (citations omitted). Thus, while the source of DOE's obligation is the Standard Contract, the Court clearly may look to contemporaneous statements of DOE officials and DOE-issued documents to determine the meaning of its terms. In other words, rather than being offered as evidence of separate agreements or supplements to the Standard Contract, the contemporaneous evidence sheds light on the parties' intentions with regard to the acceptance rate. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.") (citation omitted); *see also Entergy Arkansas*, 79 Fed. Cl. at 53 (citations omitted); Richard A. Lord, 11 Williston on Contracts § 32.14 (4th ed. 2007).

Thus, the Government's argument that WE cannot rely on either the statements of DOE officials or DOE-issued documents, Govt. PTB 32, misses the mark. WE properly relies on such evidence, which clearly shows that both parties understood that, consistent

with the NWPA, "expeditiously as practicable" meant that DOE's acceptance rate of spent fuel would be sufficient such that utilities would not have to add additional at-reactor storage after January 31, 1998 and DOE would work off the backlog of previously discharged fuel. PFF 48-49. Further, based on the parties' understanding that DOE would accept SNF at an annual rate that would avoid the utilities' having to add at-reactor storage after January 1998 and would work off the accumulated backlog at a reasonable rate, an annual rate of 3000 MTU is a reasonable rate that accomplishes these objectives. PFF 52, 54, 55. During Standard Contract development, DOE and industry discussions confirmed that the industry and DOE both understood that DOE would accept approximately 3000 MTU of spent fuel annually and that this steady-state acceptance rate would be achievable by 1998 after a ramp up period. PFF 51. Finally, DOE has always intended to use an annual 3000 MTU steady-state rate for the FWMS. PFF 53.

**2. DOE's 900 MTU Rate Should Be Rejected as Contrary to the NWPA, the Standard Contract, and the Parties' Understanding**

As expected, in response, the Government repeats its standard argument that the 1991 ACR, and the related delivery commitment schedule ("DCS") process, provide the only enforceable DOE acceptance rate under the Standard Contract and that this rate is a 900 MTU annual acceptance rate. Govt. PTB 29-30, 42-47. This is the same argument that has been rejected by the Court in numerous prior decisions. *See, e.g.*, *Entergy Arkansas*, 79 Fed Cl. at 63; *Northern States*, 78 Fed. Cl. at 449, 457-61, n.13; *Southern Nuclear*, 77 Fed. Cl. at 415-21. Therefore, we will briefly respond to the Government's arguments. *See also* WE PTB 44-49.

DOE cannot rely on the ACR and DCS process, pursuant to which DOE established the 900 MTU rate, as the binding statement of the Standard Contract's acceptance rate. Govt. PTB 29-30. This would impermissibly allow DOE to establish unilaterally its own rate of performance in 1991, when DOE knew that it would be unable to perform and sought to limit

its liability. *Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19 (noting that the utilities were not paying millions into the Nuclear Waste Fund "in exchange for DOE unilaterally determining its own obligations *after* it realized that timely performance was not possible"). With regard to DOE's desire to limit its liability, the Court stated in *Carolina Power & Light Co.*, "DOE's David Zabransky conceded at trial that, faced with massive litigation, the 900 MTU rate was an agency attempt to minimize its obligations under the Standard Contract." 2008 WL 2154103 at *18. At WE's trial, Mr. Zabransky testified similarly. Tr. 5708:19-5709:4; 5733:23-5734:16 (Zabransky). *See also* Tr. 2295:9-15 (Vance) ("I was told at the time that the reason for the lower rate was because it was clear the Department was not going to meet the 1998 date required by the contract for initiating delivery, and therefore, the desire was to limit the obligation and the liability that DOE had to the utilities."); PFF 101.

Moreover, the evidence established that DOE believed that the DCSs were not binding and that the DCS process was nothing more than "administrivia." *See* PFF 126. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*

It also is unclear where in the DCS process DOE could possibly have conferred on itself its claimed right to unilaterally set its rate of performance. As noted, DOE witnesses testified that the approved DCSs were not binding. PFF 126. The Government does not argue that the final delivery schedules ("FDSs") conferred such a right. Indeed, DOE never approved any FDSs. PFF 123. Nor can DOE's obligation be defined by the ACRs, which state: "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." PX 237, pp. 1-2. Regardless of where in the purported scheduling process the Government alleges that DOE's

obligation materializes, the plain meaning of the Standard Contract's "scheduling provision" is that it establishes a mechanism to coordinate or "schedule" delivery of spent fuel – it is an administrative planning tool, clearly independent from actual performance by DOE. PX 41, Article V.B. Nowhere is there any indication whatsoever that the "scheduling provision" gives DOE the unilateral right to set its own legal performance obligations under the Standard Contract. *Id.*

Further, the Government's contention that WE supposedly "willingly participated" in this administrative process, Govt. PTB 29-30, 42-47, does not mean that WE agreed that the DCS process would define DOE's acceptance rate. WE submitted its DCSs in accordance with the DCS instructions that DOE issued in 1992. PFF 123. The DCS instructions told utilities that they "should" use the allocations in the 1991 ACR. DX 497, p. WISC0000026. Utilities, however, had no choice but to do so because, if a utility did not comply, DOE's instructions expressly stated that DOE would reject the DCSs. PX 246, p. HQR-001-2047 (8.0 DCS Process) ("if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved"). Thus, these circumstances do not create the sort of accord and satisfaction defense suggested by the Government. *See, e.g.*, *Southern Nuclear*, 77 Fed. Cl. at 419; *Yankee Atomic*, 73 Fed. Cl. at 298 ("Parroting the DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). That WE filled out the DCS forms as directed by DOE does not absolve the Government from liability for its breach.

By the time that DOE issued its DCS instructions in 1992, it was clear that DOE could not perform by 1998. PFF 104, 107, 115. Further, DOE issued DCS instructions that were inconsistent with the intent of the Standard Contract. The instructions required utilities to use the allocations in the 1991 ACR, which used an annual acceptance rate of 900 MTU, that was both illegal under existing law and artificially low, in an effort to minimize DOE's liability to utilities. WE PTB 44-49; PFF 97-101. The Government argues that this WE

argument means that WE's action is barred by the statute of limitations because WE's DCSs were approved in 1992 and 1993 and WE did not file its lawsuit until November 2000, *i.e.*, more than six years after DOE breached its obligations to set a schedule. Govt. PTB 30. That argument assumes a contractual importance for the DCS process that is conclusively refuted by evidence establishing that DOE believed that the DCSs were not binding and that the DCS process was nothing more than "administrivia." *See* PFF 126. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19. Moreover, DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.* Thus, DOE's statute of limitations argument is devoid of merit.

The Government also fails to prove that the 900 MTU rate could achieve DOE's Standard Contract obligations. *See* WE's General Objections to Section XVII (DFF 310-361). Further, Ms. Supko's report and testimony established that the 900 MTU rate would not fulfill the purposes of the Standard Contract and that a 3000 MTU rate is best suited to do so. PX 792. Ms. Supko evaluated, as a factual matter, whether certain DOE acceptance rates would accomplish the following objectives identified by WE counsel: (1) to accept spent fuel so as to limit additional at-reactor storage after January 31, 1998 and (2) to work off the backlog of accumulated spent fuel in order to allow timely decommissioning. PX 792, p. 1. As discussed, WE has previously established that these objectives constitute DOE's acceptance rate obligations. *See also* WE PTB 41-42; PFF 48-51.

Ms. Supko's opinion was limited to modeling four acceptance rate scenarios against these criteria, which were provided by WE counsel. Tr. 3426:13-14 (Supko) ("I'm simply modelling acceptance rates."). When Ms. Supko evaluated the acceptance rate scenarios against those assumptions, she found that DOE performance at a steady-state acceptance rate of 3000 MTU after a five-year ramp up period most efficiently met the two criteria – the

Standard Contract obligations – that she was directed to assume by counsel. Tr. 3098:24-3099:17 (Supko).

The Government's proposed findings seek to diminish the validity of Ms. Supko's analysis by noting that she did not express opinions on other issues such as DOE's contract obligations and DOE's performance in the non-breach world. DFF 310-361. The Government's proposed findings, however, are irrelevant because WE counsel did not ask Ms. Supko to address these issues. Further, the Government has failed to show how WE's damages would have been different – they would not have been – had DOE been obligated to accept fuel at the 900 MTU rate.

The Government's proposed findings also mischaracterize Ms. Supko's expert opinion regarding the "reasonableness" of various DOE acceptance rates. Ms. Supko's opinion is that:

> [I]f DOE had begun acceptance of [SNF] by January 31, 1998, an overall steady-state spent fuel acceptance rate of 3,000 [MTU] per year, reached after a five-year ramp up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning.

PX 792, p. 1; Tr. 3098:24-3099:17 (Supko). Ms. Supko's opinion regarding the 3000 MTU rate, and other possible rates, is not whether they were reasonable in absolute terms, but instead, whether they met the two criteria defined by WE counsel. Ms. Supko addressed this issue in her testimony:

> Q: Now, you're offering an affirmative opinion that the 3000 rate is reasonable, correct?
>
> A: *Based on the analysis that I performed and the criteria against which I was evaluating the, the acceptance rate,* yes, I am.
>
> Q: And you're not offering an opinion in this case that your scenarios two, three, and four are unreasonable, correct?

> A: I've not said they're unreasonable, and my opinion is that scenario one is a reasonable rate of acceptance. However, yesterday, I did go through questions from Mrs. Hughes, where she asked me about, and I don't recall the terms, *whether the rates were efficient, and maybe it was practicable, and I did comment that scenario two was neither, and scenario three might have been practicable from the standpoint of it could have been implemented, but it wasn't efficient.*

Tr. 3463:17-3464:11 (Supko) (emphasis added). Ms. Supko outlined how rates other than the 3000 MTU rate, which she termed scenarios 2, 3 and 4, failed to satisfy efficiently the two criteria that she considered. Tr. 3130:11-3133:13 (Supko); PX 792, pp. 10-13.

In addition, the Government incorrectly contends that a 3000 MTU steady-state acceptance rate would "not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998." The Government cites testimony from Mr. Shimon and Ms. Supko in support of its contention. Govt. PTB 47. With regard to Ms. Supko's testimony, Ms. Supko never claimed that her analysis found a rate that would necessarily preclude *all* additional at-reactor storage after January 31, 1998 and work off the backlog in order to allow timely decommissioning in a *fixed* period of years. Instead, her analysis considered which of several specific acceptance rate scenarios (1) best *limited* additional at-reactor storage after January 31, 1998 and (2) worked off the backlog to allow *timely* decommissioning, based on the available data. PX 792, p. 1; PDX 36; Tr. 3098:21-3099:17 (Supko). When Ms. Supko evaluated the acceptance rate scenarios against those assumptions, she found that DOE performance at a steady-state acceptance rate of 3000 MTU after a five-year ramp up period most efficiently met the two criteria. Tr. 3098:24-3099:17 (Supko).

Ms. Supko also noted that, at the 3000 MTU rate, there would have been a considerable incentive for an exchanges market to develop because of the difference between the required additional at-reactor storage (less than 100 MTU per year) and the rate at which DOE would accept spent fuel (3000 MTU per year). PDX 45; Tr. 3143:25-3145:11 (Supko)

(including Ms. Supko's explanation at page 3145, lines 8-11 that, under scenario 1 (the 3000 MTU rate)).

With regard to Mr. Shimon, the Government asked Mr. Shimon a hypothetical (which does not reflect WE's circumstances) and he responded as follows:

> Q: So if a utility did not have an acceptance from the DOE until *2000, 2001, or 2002* even or even later than that, *it's possible* that a utility would be required to provide its own additional at-reactor storage after January 31st, 1998 under that scenario, isn't that right?
>
> A: Under that scenario, it would be *possible*.

Tr. 1392:24-1393:7 (Shimon) (emphasis added). The Government cannot seriously contend that this testimony stands for the proposition that the 3000 MTU "does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998." Govt. PTB 47.

The Government also erroneously contends that Ms. Supko "believed that the rates published in the 1991 ACR were reasonable" and that "the rate of acceptance for 1998 and 1999, 400 MTUs and 600 MTUs respectively, were reasonable." Govt. PTB 47 n.19, 48-49 n.21. To the contrary, Ms. Supko merely testified that it was reasonable to model the rate published by DOE in the 1991 ACR and it was reasonable to inform the PSCW of the rate published by DOE. She noted that the rate in the 1991 ACR reflected the information contained in "an official DOE document at the time." Tr. 3458:18-20 (Supko). *See also Yankee Atomic*, 73 Fed. Cl. at 298 ("Parroting the DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them.").

Finally, Ms. Supko did not testify that the 900 MTU rate itself was reasonable. Tr. 3459:6-11 (Supko). In her testimony regarding the 400 and 600 MTU rates in 1998 and 1999, Ms. Supko also did not express an opinion that such rates were reasonable. Tr. 3518:20-3521:16 (Supko).

### F. WE's Procurement of Three TN-32B Backup Casks Was Foreseeable, Caused by DOE's Breach, and Commercially Reasonable

In its initial post-trial submissions, WE demonstrated that its costs to procure three TN-32Bs are recoverable mitigation damages because the costs were foreseeable, substantially caused by DOE's partial breach, and established with reasonable certainty. PFF 142-150; WE PTB 49-53.

#### 1. WE's Procurement of the TN-32B Casks Was Foreseeable

The Government's post-trial submissions do not dispute that WE's initial procurement of the TN-32B casks was foreseeable. Govt. PTB 52-57; DFF 473-531. That is hardly surprising given that spent fuel storage is a complex and relatively new technology that is constantly evolving. It is not surprising that unexpected events with new technologies could occur, causing the pursuit of an alternative or backup SNF storage option. *Southern Nuclear,* 77 Fed. Cl. at 423; PFF 127, 150, 241. Thus, WE's procurement of three TN-32B casks because of the problems experienced with the VSC-24 casks was foreseeable.

#### 2. DOE's Breach Caused WE to Reasonably Incur Costs to Procure Three TN-32B Casks

As part of its dry storage project, WE initially procured VSC-24 casks. PFF 127-129; WE PTB 21, 33-34. WE experienced a number of serious problems with the VSC-24 cask, including an NRC prohibition of the loading of these casks for several years. PFF 142. There also were other significant regulatory, technical and business risks with the VSC-24 casks that motivated WE's decision to acquire an alternative cask, namely, the TN-32B cask. PFF 141. In these circumstances, WE prudently acquired three of the six TN-32B casks authorized by the PSCW. PX 524, p. KRGWE002387; PFF 107, 115, 142.

In its response, the Government does not contend that WE acted unreasonably in its initial acquisition of these casks. In fact, the Government's expert witnesses testified that WE acted reasonably in initially procuring the three TN-32B casks. PFF 143, 144.

That is not surprising given that the PSCW approved the acquisition of *up to six* TN-32B casks. PX 524, p. KRGWE002387 (Aug. 1998 PSCW Order). Based on this PSCW approval, WE then recovered from its ratepayers its incurred costs for the three TN-32B casks and related costs. PFF 148. The fact that this decision process and expense were analyzed and approved as reasonable by the PSCW merits consideration. *Yankee Atomic*, 73 Fed. Cl. at 269, 292.

In sum, WE would not have used dry storage in the non-breach world. PFF 161-212. Thus, WE would not have encountered the problems with the VSC-24 cask if DOE had performed under the Standard Contract. Therefore, DOE's breach caused WE to incur costs in procuring the three TN-32B casks which were reasonably procured as an alternative to the VSC-24 cask given the risks associated with the VSC-24 cask.

### 3. WE Reasonably Continued with TN-32B Cask Fabrication After Loading of the VSC-24 Casks Resumed

The Government asserts that, after WE resumed loading VSC-24 casks in September 1998, it should have suspended the TN-32B work until it determined a renewed need for the TN-32B casks. The Government, however, ignores that significant regulatory, technical and business risks with the VSC-24 cask remained even after WE resumed loading these casks. WE PTB 52; PFF 141, 145.

For example, WE feared that other latent problems with the VSC-24 casks would surface because of Sierra Nuclear's poor quality assurance, as well as its past history of ignition and cask lid welding incidents. PFF 141. WE's fears proved well-founded when the Palisades Nuclear Plant experienced VSC-24 cask ignition incidents in June 1999, which encouraged WE to continue procuring the TN-32B casks. PFF 140.

The Government also argues that Point Beach's continued loading of VSC-24 casks without further interruption is the strongest evidence that a backup was not needed. Govt. PTB 55. This argument ignores that problems did arise after WE resumed loading VSC-24

casks, such as the aforementioned flaming incidents at Palisades. PFF 140. WE reasonably was concerned that events such as these might lead the NRC to again prohibit the loading of VSC-24 casks. PFF 140, 141.

Moreover, the fact that Point Beach did not load the TN-32B casks does not establish that they were not reasonably procured. WE needed the TN-32B casks to serve as backup casks in the event that additional problems arose with the VSC-24 casks. The nonuse of this backup option does not render the backup option unreasonable mitigation for the same reason that an unsuccessful but reasonable effort to avoid loss is a recoverable mitigation effort. *Indiana Michigan*, 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350(2) (1981)).

The Government asserts that the PSCW Order authorizing the use of TN-32B casks expired as soon as WE loaded a VSC-24 cask. Govt. PTB 54. The Government, however, points to no language in the PSCW Order that so indicates. To the contrary, the PSCW's approval of WE's *acquisition* of six TN-32B casks was never conditional. PX 524, p. KRGWE002387 ("The purchase of these casks, as a method of ensuring the reliability of Point Beach by providing a back-up option in case the VSC-24 cask remains unavailable to WEPCO, is reasonable."); PFF 148. Only the *use* of the TN-32B casks was conditioned on the unavailability of VSC-24 casks during the spring 2000 loading evolution.

In addition, the PSCW's later March 27, 2001 Order permitted WE to load the TN-32B casks. PX 592; PFF 151. WE, however, declined to do so because, by that time, it had decided to switch to dual-purpose casks and the TN-32B was not a dual-purpose cask. WE PTB 55-58; PFF 152.

The Government discusses at length the date until which Point Beach could have operated based on the number of VSC-24 casks loaded and placed at Point Beach's ISFSI.

This contention, however, ignores WE's numerous legitimate concerns with the VSC-24 cask that made it prudent for WE to continue with procurement of the TN-32Bs. PFF 141.

Further, there is no legal requirement that a utility conduct the sort of after-the-fact analysis prepared by Mr. Hamal. WE contemporaneously made legitimate and reasonable business decisions based on the facts, circumstances and concerns at hand. The evidence demonstrated WE's reasonable concerns regarding the VSC-24 casks. *Id.* Given his lack of experience in operating a commercial nuclear facility, Mr. Hamal is hardly in a position to second-guess the real-time decision-making of WE's experienced commercial nuclear power personnel. Tr. 5928:12-19; 5929:21-23; 5931:15-18 (Hamal).

In sum, WE reasonably continued the TN-32B cask procurement after loading of the VSC-24 casks resumed.

Given that WE reasonably continued the TN-32B cask procurement after loading of the VSC-24 casks resumed, the Government's speculation that WE could have terminated the TN-32B contract in September 1998 without any financial loss is irrelevant. Further, there are numerous infirmities in the Government's assertions.

For example, the Government suggests that WE's TN-32B contract permitted WE to terminate work on the TN-32B casks at any time without cost or penalty. Govt. PTB 53. To the contrary, that contract required that WE compensate Transnuclear, Inc. for all milestones met as of the date of cancellation, in addition to the value of any work then authorized by WE, profit on any in-process work, and all reasonable subcontractor cancellation fees. PX 503, p. WISC00064081. Based on the termination clause, WE would have incurred $2,037,600 in termination costs if it had terminated that contract in September 1998, not including profit and subcontractor cancellation fees that WE also would owe Transnuclear. DX 161, p. WISC00064082.

Similarly, the Government contends that WE could have recovered all the costs that it incurred in pursuing the TN-32B casks if it had cancelled the contract in September 1998. The Government, however, provided no evidence that other utilities were interested in acquiring long-lead materials from WE or that some other utility would have been willing to pay WE's contract price for cask materials. In fact, the Government provides no evidence whatsoever other than noting that other utilities loaded TN-32 casks. Govt. PTB 56. The Government has not established that any utilities placed new orders for TN-32 casks after September 1998, which would be a necessary prerequisite for a market for WE's long-lead materials. *See* DFF 511-516. Instead, the Government relies only on Mr. Brewer's unsupported assertion that WE's long-lead materials could have been sold for the same price that WE paid for them. PX 880, p. 25 (Brewer Report); Govt. PTB 56; DFF 511-513.

Further, although WE believes that it is entitled to recover all of its expenditures on the TN-32B casks, the PSCW Order required that the TN-32B casks be available for the Spring 2000 period. PX 524, p. KRGWE002388; PFF 148. If WE had decided to terminate the TN-32B effort in Spring 2000 based on the PSCW Order, WE would have spent from $2,508,000 to $3,230,000, with the likely cost being at the high end. PFF 149.

In sum, WE reasonably mitigated its damages by procuring three of the six PSCW-approved backup TN-32 casks. The Government has failed to meet its burden of proving that WE's mitigation effort was unreasonable. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear,* 77 Fed. Cl. at 407; *Tennessee Valley Auth.,* 69 Fed. Cl. at 523 .

**4. The Government Has Failed to Establish that WE Recovered Monies for Transfer of the TN-32B Casks to a Florida Power & Light Subsidiary as Part of the Sale of Point Beach**

The Government argues that WE made no attempt during trial to establish that it has not recouped the costs that it incurred for the TN-32B casks in its sale of Point Beach to a Florida Power & Light (FP&L) subsidiary. However, it is the Government, not WE, who

bears the burden of establishing any reduction in WE's mitigation damages. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear*, 77 Fed. Cl. at 407.

There is no evidence that WE received any compensation from FP&L with regard to the TN-32B casks. Tr. 5013:24-5014:5 (Weaver). More importantly, Mr. Weaver testified that WE owns the claim against DOE under the Standard Contract up through the closing date of the transaction selling Point Beach to FP&L. Tr. 5015:7-5016:3 (Weaver). Thus, the claim for the costs incurred in purchasing the three TN-32B casks remains with WE and WE properly seeks these costs in this action.

### G. WE's Decision to Procure the Dual-Purpose NUHOMS System Was Foreseeable and Reasonable

In its initial post-trial submissions, WE demonstrated that its costs for the procurement of the NUHOMS system are recoverable mitigation damages because these costs were foreseeable, substantially caused by DOE's partial breach, and established with reasonable certainty. PFF 151-157; WE PTB 53-59.

#### 1. WE's Procurement of the NUHOMS System Was Foreseeable and Caused by DOE's Continuing Breach

The Government's submissions present no credible evidence that WE's procurement of a dual-purpose system such as the NUHOMS system was not foreseeable. Govt. PTB 57-61; DFF 532-565. In any case, WE presented substantial evidence that its eventual decision to switch to a dual-purpose cask "was not only foreseeable, but foreseen." *Yankee Atomic*, 73 Fed. Cl. at 289. *See* WE PTB 53-55; PFF 154.

The foreseeability of WE's purchase of dual-purpose casks is also supported by the expert testimony of Ms. Supko, who authored an expert report on this issue. PX 793. Contrary to the Government's contention that Ms. Supko's opinion is irrelevant, Govt. PTB 59, Ms. Supko's report provided supporting evidence that DOE foresaw the possible use of multi-purpose casks at the time when the parties executed the Standard Contract. WE

PFF 154. The Government also asserts that the Court should dismiss Ms. Supko's opinion. Govt. PTB 59. To the contrary, the Court qualified Ms. Supko as an expert with regard to this issue, ruling that she was qualified regarding, *inter alia*, "DOE's nuclear waste management program [and] the storage and transportation of spent nuclear fuel." Tr. 3062:17-24 (Hughes). Thus, Ms. Supko was qualified to opine regarding the development of dual-purpose casks and her expert report was admitted into evidence. PX 793.[7] Further, the Government had adequate opportunity to file a motion *in limine* regarding this May 8, 2006 expert report (PX 793) prior to trial, but failed to do so.

The Government also presents no evidence to dispute that WE's procurement of these casks was caused by DOE's breach. Govt. PTB 57-61; DFF 532-565. *See* WE PTB 55-59.

**2. WE Reasonably Procured the NUHOMS System**

The Government presented no meaningful evidence calling into question the reasonableness of Point Beach's decision to shift to the NUHOMS dual-purpose system for future SNF storage at Point Beach. DFF 532-565; Govt. PTB 57-61.

First, the Government claims that Point Beach's safety concerns with the VSC-24 design had nothing to do with Point Beach's switch to the NUHOMS systems. Govt. PTB 59-60. To the contrary, safety is very important in nuclear power plant operations, including cask loadings. Tr. 1735:4-8 (Becka) ("It's not something to be taken lightly. It's the movement of the spent nuclear fuel, which is pretty toxic stuff, and it has to be taken very gingerly and with a high degree of safety involved."). The evidence showed that loading the NUHOMS system is *safer* than loading the VSC-24 casks. Tr. 1719:10-12 (Becka) (Q. "Is loading a TN-32PT NUHOMS safer than a VSC-24? A. Yes, it is.").

---

[7] The Government's citation of Ms. Supko's testimony regarding the ACR issue resolution process to attempt to argue that Ms. Supko is not qualified to opine regarding the dual-purpose cask issue, Govt. PTB 59, is inapposite.

The VSC-24 design uses carbon steel materials with a carbo-zinc coating that reacts with the borated spent fuel pool water to create large volumes of hydrogen gas. Tr. 1715:12-1716:21 (Becka). That was the cause of the VSC-24 hydrogen ignition incident and a later June 1999 VSC-24 flaming incident at the Palisades plant. PFF 136, 140. Unless the VSC-24 is vented during loading, the hydrogen gas will exceed the lower explosive limit. PX 645 (VSC-24 loading procedure); Tr. 1723:7-24 (Becka). Loading the VSC-24 cask creates a volume of hydrogen gas from 10 to 100 times greater than the NUHOMS system, which uses primarily stainless steel materials. Tr. 1716:14-1717:16 (Becka). One of the reasons that Point Beach selected the NUHOMS design was because of its increased safety characteristics and relative ease of use. Tr. 1719:10-1720:2 (Becka) ("[W]e made a selection of the NUHOMS design in 2001 at Point Beach for several reasons, one of which we just spoke about, stainless steel . . . offered a huge advantage in our minds, from both the hydrogen generation point of view, from the VSC-24 design, and from the point of view that stainless steel is easier to weld with."). For this reason alone, WE's selection of the NUHOMS system was reasonable.

A principal reason that WE, the PSCW, and almost all other nuclear utilities have concluded that procuring dual-purpose casks is reasonable is that "they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport." PX 592, pp. WISC00012217-8 (PSCW Order, March 27, 2001); PX 793, p. 11 (Table 1); PFF 152f. The Government cannot dispute the evidence establishing that purchasing additional VSC-24s, and then unloading them later for repackaging (given that they are currently only licensed for storage), raises radiological risks and results in additional costs. Govt. PTB 57-58; PFF 152c.

For example, this process would require WE to unload the canisters in the borated water in the Point Beach spent fuel pool, resulting in the same generation of high

concentrations of explosive hydrogen gas that are encountered when the VSC-24s are loaded. Tr. 1780:1-7 (Becka) ("[W]e'd be facing the same hazards again that we'd face with loading the production of hydrogen, and we'd have to be very careful about that.").

Unloading a storage-only cask also would result in increased radiation exposure to Point Beach workers and increase the likelihood of an accident. PFF 151c. The Government's analysis of the dual-purpose cask issue ignores these costs and risks – focusing instead only on the immediate fabrication costs. Govt. PTB 59. WE believed that the costs for the NUHOMS system would be only slightly higher than the costs for VSC-24 casks because Point Beach would not need to transfer fuel from a dual-purpose cask to a transportable cask prior to shipping fuel off-site. PFF 152c.[8]

The Government also claims that the additional cost associated with procuring a dual-purpose system showed "poor business judgment." Govt. PTB 58. That assertion is contradicted by the evidence. Among other things, it ignores that the PSCW believed that it was reasonable and desirable to transition to a dual-purpose cask. PFF 152h. In fact, WE supported its application for additional casks in part based on its pursuit of dual-purpose casks. PX 575.

Moreover, the evidence at trial showed that *DOE itself* is planning to accept dual-purpose casks and the DOE Contracting Officer expects the Standard Contract to be amended to incorporate DOE's acceptance of dual-purpose casks. PFF 154. Similarly, Ms. Supko testified that DOE continues to consider contract modifications to address acceptance of dual-purpose canisters. Tr. 3315:18-3322:11 (Supko); PFF 154; PX 1004, p. WISC1004-

[8] In recognition of the hazards associated with unloading the VSC-24 cask, WE has provided financial support for efforts to license the VSC-24 for transportation. PFF 152b. The Government claims that this amount is not recoverable, essentially stating that it is unnecessary and premature. Govt. PTB 61-62. The Government has failed to establish that the expenditure was unreasonable given the relatively small expenditure. Indeed, the Government's own expert, Mr. Brewer, believed that such an expenditure may be reasonable. Tr. 5627:4-20 (Brewer). *See also Northern States*, 78 Fed. Cl. at 469-70 (Court permitted utility to recover the costs incurred in seeking to qualify the TN-40 casks for transportation).

0025 (March 20, 2003 Testimony of Margaret Chu before the House of Representatives, Subcommittee of Committee on Appropriations) ("The Department believes the best approach is to pursue an overall modification to the disposal contract, which would involve several issues, including acceptance of multi-assembly canister systems. Unfortunately, due to ongoing litigation between the parties to the disposal contract, the Department is limited in what it can presently do.").

The Government references WE's 1994 Decommissioning Cost Study as purported evidence that WE agreed that DOE would only accept bare fuel loaded directly into a DOE cask. Govt. PTB 58; DFF 547. The Government's reliance on the Decommissioning Cost Study is misplaced. The evidence established that this study contained conservative assumptions as would be expected in the establishment of a financial reserve for decommissioning and, more importantly, that the assumptions contained therein were hypothetical because DOE had already informed the industry by then that it was not obligated to timely perform. DX 28; PFF 122b. Moreover, the Government did not show that the 1994 study had anything to do with Point Beach's selection of the NUHOMS system seven years later in 2001.

The Government also contends that it may not be possible to transport a large cask, such as the NUHOMS system, from Point Beach, because there is no active rail link to the plant. Govt. PTB 60. In support, the Government relies on Mr. Brewer's off-the-cuff analysis. Mr. Brewer's analysis ignores that, under the Standard Contract, transport of spent fuel from the Point Beach site is the responsibility of DOE, not WE. PX 41, p. KRGWE002126. Additionally, Mr. Brewer's analysis of the capacity limits of bridges in the area surrounding Point Beach and of Wisconsin road regulations are outside the scope of Mr. Brewer's expert report and claimed expertise. PX 880.[9] Mr. Brewer's apparent

---

[9] Given that the Government did not disclose this new opinion of its expert witness under RCFC 26(a)(2) , the new opinion of Mr. Brewer should be stricken.

conclusion that transportation issues should preclude the use of NUHOMS canisters at Point Beach also defies common sense because the PSCW encouraged WE to use dual-purpose systems and the State of Wisconsin has demonstrated its interest in shipping SNF off-site from the shores of Lake Michigan as soon as possible. PFF 152h. Further, Mr. Brewer's views on this issue are contradicted by the evidence that WE has successfully moved very heavy objects, such as the Unit 2 Steam Generator components, from railheads to the Point Beach site by heavy haul conveyance. PFF 263-64. Finally, the Government's assertion is undercut by the admission by Mr. Brewer in his report that a large cask could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE0110022, n.64.

The Government also claims that there is no support in the record for WE's belief that dual-purpose casks could be used for shipment to Private Fuel Storage ("PFS") or other private facility. Govt. PTB 58. To the contrary, Mr. Farron testified that WE pursued dual-purpose cask capability for shipment of SNF to either PFS or to a centralized repackaging or transfer facility. Tr. 2531:1-20 (Farron). Further, the Government mischaracterizes the testimony of Mr. Farron by its assertion that he agreed that the use of the NUHOMS system in the FWMS is "based purely on speculation." Govt. PTB 58. In the cited testimony, Mr. Farron testified that dual-purpose casks provide considerable flexibility and can be transported to a private fuel storage facility. He then added: "Possibly, DOE would pick up, and we hoped they would, pick up our spent fuel utilizing those dual-purpose casks." Tr. 2524:18-2525:10 (Farron). Thus, Mr. Farron did not state that the possibility of DOE accepting fuel in the NUHOMS system was "pure speculation." Instead, he did not explain his reasons for believing that DOE might accept fuel in NUHOMS canisters. Nor was he asked by the Government what those reasons might be.

In the other cited testimony, Mr. Farron testified that he could not then recall the correspondence between DOE and utilities regarding acceptability of dual-purpose canisters.

He in no way suggests that such correspondence does not exist. Further, although testifying that WE had no assurance from DOE that DOE would take the fuel in the NUHOMS system, he did not testify that he did not expect DOE to do so or that there was no basis for believing that DOE would do so. Thus, this testimony does not substantiate the Government's contention that WE's belief that DOE would accept WE's SNF stored in NUHOMS canisters was based on "pure speculation."

Again, the evidence showed that DOE is planning to accept dual-purpose casks and that the DOE Contracting Officer expects the Standard Contract to be amended to incorporate DOE's acceptance of dual-purpose casks. PFF 154. Similarly, Ms. Supko testified that DOE continues to consider contract modifications to address acceptance of dual-purpose canisters. Tr. 3315:18-3322:11 (Supko).

Another flaw in the Government's position is that it downplays the serious limitations inherent in the VSC-24 cask operating parameters that were present when Point Beach selected the NUHOMS system in 2001. At that time, the VSC-24 cask was licensed to hold only older, colder fuel assemblies. PFF 152a. The evidence showed that continuing use of the VSC-24 cask and continuing to load only colder assemblies created risks for Point Beach's long-term spent fuel management flexibility. Tr. 1773:20-1774:23; 1771:11-1778:12 (Becka). The Government failed to prove that, in 2001 when Point Beach selected the NUHOMS system, it was known or even likely that the NRC would re-license the trouble-plagued VSC-24 for higher burnup fuel. It also offered no meaningful evidence showing that Point Beach's fuel management would not have been placed at risk if Point Beach had waited for the NRC to issue a license amendment for the VSC-24 design for higher-burnup spent fuel (which the NRC eventually did do in 2003). PX 880, p. WXE011 0028, n.98.

The only support offered by the Government for its position is the testimony of Mr. Brewer. Mr. Brewer, however, did not address the hot/cold spent fuel management issue

in his report. His report stated only that, based on the fuel available in the Point Beach inventory, WE "could have continued to use VSC-24 casks." PX 880, p. WXE011 0030. At trial, Mr. Brewer testified beyond the scope of this report, stating not only that loading additional VSC-24 was possible, but offering the additional new opinion that continued loading of the VSC-24 cask would have been a "reasonable technical and engineering decision." DFF 561. Yet Mr. Brewer offered no additional technical basis for this new opinion. Moreover, the Government failed to disclose this new expert opinion as required by RCFC 26(a)(2). Therefore, this testimony should be stricken. *See* Plaintiff's Motion *In Limine* to Exclude Certain Demonstratives and Any Related Testimony, Dkt. 357 (Oct. 8, 2007).

Moving to the NUHOMS system also offered Point Beach many practical advantages such as information sharing with other utilities and vendor support based on the adoption of the NUHOMS as a common design throughout the nuclear industry. PFF 152f. The Government attempts to dismiss this advantage by claiming that British Nuclear Fuels, Ltd. offered to provide unidentified support for the VSC-24 design. Govt. PTB 58-59. The Government's contention is unsupported by the evidence and hardly constitutes proof of a meaningful commitment to the VSC-24 cask design. To the contrary, the evidence showed that it was important for Point Beach to use a design compatible with the other Nuclear Management Co. nuclear plants, resulting in efficiencies of scale. PFF 152g. By contrast, no utility continues to load VSC-24 casks. PFF 153. WE reasonably considered the lack of other active VSC-24 new purchasers and the industry shift to dual-purpose designs in its cask selection. PFF 152f, g.

Finally, the Government claims that a NUHOMS loading period is longer than the VSC-24 loading period and that the loading is more labor-intensive. Govt. PTB 60-61. Its claim is unsupported by the evidence. In analyzing the VSC-24 loading period, Mr. Brewer

used loading data from before the May 1996 hydrogen ignition incident at Point Beach. DFF 557. The cause of that incident was the generation of explosive hydrogen gas arising from the reaction of the borated water with the carbo-zinc coating of the VSC-24 cask. PFF 137. To remedy that problem, during the VSC-24 loading process, the WE loading team had to continuously purge hydrogen gas to prevent gas buildup to an explosive level. *Id.* WE also had to draft revised loading and unloading procedures to deal with the hydrogen buildup. *Id.* This purge process, among other tasks, resulted in eight to nine day loading periods for a VSC-24 cask after the May 1996 incident. PFF 152d.

The Government also relies on an analysis prepared by Mr. Kiraly. Spent fuel cask loading, however, is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, Appendix A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2). Therefore, this testimony should be stricken. *See* Plaintiff's Motion *in Limine* to Exclude Certain Demonstratives and Related Expert Testimony, Dkt. 360 (Oct. 14, 2007).

More importantly, Mr. Kiraly's methodology was flawed. The evidence established that, while the actual time to load a NUHOMS canister is between four and five days, the accounting records may show a longer duration of time because of delays related to the operations of the Point Beach Nuclear Power Plant. Tr. 1920:23-1921:6; 1924:6-11 (Becka); Tr. 6307:22-6308:18 (Metcalfe). This is illustrated on many dates on chart DDX 5-57 where little, if any, labor was charged on certain days within a loading period. DDX 5-57.

Mr. Kiraly's methodology was also flawed because the evidence showed that it took fewer hours to load a NUHOMS than a VSC-24 on a per assembly basis. Tr. 6304:19-6305:25 (Metcalfe). Further, the evidence established that VSC-24 loading hours likely were understated because, at that time, there was no specific timekeeping account for cask loading activity. Tr. 1907:3-1908:18 (Becka) (it was "a little bit more difficult to come up with all

the costs that were attributed" to campaigns prior to the establishment of project code 3.0264 for the 2006 loading campaign); Tr. 6307:4-17 (Metcalfe). A separate account was not established until the most recent NUHOMS loading campaign. Tr. 1907:3-1908:18 (Becka).

Based on the Government's failure to show that Point Beach's decision to shift to the NUHOMS design was unreasonable in any way, the Government's attempted deduction for the cost of dual-purpose casks should be rejected. This is consistent with the other SNF decisions that have approved the purchase of dual-purpose casks. *See, e.g.*, *Entergy Arkansas*, 79 Fed. Cl. at 49, 58-59 (granting recovery of dual-purpose cask costs to System Fuels, which had previously loaded VSC-24 casks at its Arkansas Nuclear One plant); *Northern States*, 78 Fed. Cl. at 469-70; *Southern Nuclear*, 77 Fed. Cl. at 424-25; *Pacific Gas & Elec.*, 73 Fed. Cl. at 418-19.

## H. WE Reasonably Incurred Foreseeable Costs in Exploring Private, Off-Site SNF Storage that Were Caused by DOE's Breach

### 1. Background

As explained in its initial post-trial submissions, WE expended funds from approximately 1994 through 1999 investigating the feasibility of several off-site private fuel storage facility projects. WE PTB 60; PFF 212-215. At the time of WE's initial 1994 investment in PFS, the PSCW had not yet approved WE's 1991 dry fuel storage application. Although WE finally received PSCW project authorization in February 1995, the PSCW Order was promptly challenged in court, creating additional uncertainty regarding when WE could begin loading spent nuclear fuel to its proposed dry storage facility. PFF 212.

WE continued its investment in PFS thereafter for several reasons. The PSCW February 1995 Order only authorized WE to load twelve VSC-24 casks. Given DOE's substantial delay, WE believed that it would need to provide storage until the end of Point Beach's licenses. PFS offered a potential solution for WE's storage needs if the PSCW denied WE's application for additional on-site storage, a very real possibility given the

PSCW's and intervenors' concerns regarding the storage of spent fuel at Point Beach. PFF 212. WE also believed that its efforts in pursuing spent fuel storage outside Wisconsin through PFS enhanced the likelihood of PSCW approval of any subsequent dry cask loading authorization applications. *Id.*

After ending its investment in PFS because of uncertainties regarding its success, WE also explored other off-site alternative storage options to mitigate DOE's nonperformance. PFF 212, 214.

### 2. WE's Expenditures in Pursuit of PFS and Alternative Off-Site Storage Options Are Recoverable Because They Were Foreseeable, Caused by DOE, and Reasonably Incurred

WE's expenditures for PFS and other off-site storage alternatives were foreseeable, caused by DOE, and established with reasonable certainty. WE PTB 61, 62. Further, the Government has not satisfied its burden of establishing that these limited investments were unreasonable. Govt. PTB 63, 64.

The Government erroneously argues that the *Indiana Michigan* decision precludes, as a matter of law, recovery of WE's PFS expenditures. Govt. PTB 62-63. WE, however, was not a party to that litigation. In *Northern States*, the Court held that Northern States was not barred from recovering its PFS expenditures and that issue preclusion is not applicable against a party whose interests were not represented in the prior suit. 78 Fed. Cl. at 465.

Further, *Indiana Michigan's* holding was limited to the record in that case. The Court found that, based on the evidence in that case, Indiana Michigan's PFS investment was "too speculative" and not foreseeable to entitle recovery. *Indiana Mich. Power Co. v. United States*, 60 Fed. Cl. 639, 658-59 (2004). Conversely, here, WE established that its investments in PFS and other off-site storage options were not overly speculative and that these spent fuel management expenditures were foreseeable to the Government. WE PTB 61, 62; PFF 212-216.

The Government's argument that WE did not prove that its investment in PFS was foreseeable is disingenuous. The NWPA expressly recognized the potential development and use of a private fuel storage facility. WE PTB 62. Additionally, Mr. Morgan acknowledged the construction of private off-site storage facilities in his presentation at the December 1983 Civilian Radioactive Waste Management Information Meeting. DX 493, p. SN069599 ("During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or *at another storage location*." (emphasis added)).

Then, in a 2001 report to Congress, DOE stated that PFS could serve as an available alternative for storing SNF for Northern States. *See* PX 590, p. 7 (Jan. 2001 DOE Spent Fuel Management Alternatives Available to Northern States). DOE also included PFS in its contingency plans in its 2002 draft Yucca Mountain Environmental Impact Statement. PX 619, pp. 39, 108, vol. III § 9.1 ("DOE recognizes interim storage at the Private Fuel Storage facility in Utah to be a reasonably foreseeable future action and has included this proposed action . . . ."). Thus, WE's investigation of off-site options was foreseeable to DOE. *Northern States*, 78 Fed. Cl. at 466.

The Government ignores this evidence. Further, it offers no evidence in support of its argument that PFS and other off-site storage costs were not foreseeable. Instead, the Government relies solely on its erroneous reading of *Indiana Michigan* to assert that PFS was not foreseeable. Govt. PTB 62, 63.

As to causation, WE's pursuit of off-site storage options was caused by the anticipated substantial delay in DOE's performance. WE would not have pursued PFS if DOE had performed its obligations under the Standard Contract. PFF 215.

The Government does not appear to dispute that it substantially caused WE to incur costs related to PFS and other off-site storage options. Govt. PTB 62-66. Instead, the

Government attacks the reasonableness of WE's pursuit of PFS and other off-site storage alternatives as a means of mitigating DOE's damages. DOE, however, bears the burden of showing that WE's mitigation attempts were unreasonable. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear*, 77 Fed. Cl. at 407; *Tennessee Valley Auth.*, 69 Fed. Cl. at 523.

The Government has not met its burden. It asserts that WE continued to contribute to PFS and other off-site investments "long after it needed to do so." Govt. PTB 63. Thus, the Government concedes that, at the very least, WE's initial costs in the development of PFS were necessary and reasonable. The Government then asserts that WE should not have continued to invest in PFS because it did not expect PFS to be available until 2003. Thus, the Government believes that PFS could only have value to WE as a means to "bridge the gap" to 1998. That is incorrect. When WE began to pursue PFS in 1994, WE anticipated that DOE would not begin to accept spent fuel from Point Beach until at least 2007, and likely much later. Thus, PFS had relevance as an alternative storage option until DOE began to perform. PFF 107, 115.

DOE continued to make very little progress towards implementation of the FWMS and WE could not predict when, if ever, DOE would perform. DOE's substantial delay caused WE to plan for the storage of the fuel through the end of Point Beach's operating licenses. Even if PFS was not available until 2003, it could have provided spent fuel storage if the PSCW denied WE's subsequent applications for additional casks. Thus, the clear road hypothesized by the Government in its criticism of WE's PFS investment is contradicted by the evidence.

Additionally, as noted, as of 1994, WE had not received PSCW approval of its November 1991 dry storage project application. *See* PX 374. Even after PSCW approval, intervenors challenged the PSCW approval in the Wisconsin courts. PFF 212. WE eventually was able to begin ISFSI construction and to load two VSC-24 casks. WE,

however, was unable to load VSC-24 casks from June 1996 and August 1998 because of NRC Confirmatory Action Letters ("CALs") concerning an ignition incident and welding problems. PFF 136, 139.

The Government also alleges that WE's motivation to contribute to PFS was as an investment, not a potential alternative spent fuel storage option. The Government fails to cite any support for this assertion and the evidence clearly contradicts it. PFF 212-215.

The Government next argues that WE's assertion that it invested in PFS because WE was concerned that the PSCW might not approve future dry fuel storage applications is inconsistent with WE's pursuit of PFS because PFS faced similar obstacles. WE has never claimed that PFS would not face challenges. However, given that any spent fuel storage option faced considerable challenges, WE believed that it was prudent to investigate a number of spent fuel storage options.

The Government cites testimony from Mr. Weaver regarding PFS as support for the contention that PFS was unlikely to be successful. The Government's argument is misleading. WE invested in PFS from 1994-1997. Mr. Weaver was discussing the prospect of WE rejoining PFS in 2001, four years after WE had withdrawn from PFS for some of the same reasons later identified by Mr. Weaver in 2001. In addition, by 2001, WE had received an additional approval from the PSCW to load sufficient casks to store spent fuel until the end of Point Beach's then-current licenses. Thus, Mr. Weaver's testimony regarding whether WE should rejoin PFS in 2001 is irrelevant to WE's reasonable decision to invest modestly in PFS during the 1994-1997 period. DX 90; Tr. 4975:7-4976:24 (Weaver).

The Government also argues that storage at an off-site facility would have been more costly than on-site storage. WE agrees that is possible. The Government, however, ignores the political and environmental costs embodied in on-site storage. The PSCW and the intervenors strongly opposed the long-term storage of spent nuclear fuel on the shores of

Lake Michigan. PX 274, pp. WISC00010703-04; PX 349; PX 367, pp. WISC00013263, WISC00013266 ("*the waste may never leave Point Beach*" (emphasis in original)); PX 374, p. 16; PX 592, pp. 10-11. There existed the possibility that the PSCW would not approve the loading of additional dry storage casks beyond the twelve casks approved in its February 1995 Order. PX 374. If WE's application for additional casks was denied, the higher cost of PFS would be preferable to a long-term shutdown of Point Beach. Thus, WE's pursuit of PFS was reasonable even if the costs of off-site storage may have exceeded those of on-site storage.

Finally, the Government suggests that WE's withdrawal from PFS indicates that WE's expenditure on PFS was too speculative. That suggestion is contrary to the evidence. The evidence demonstrated that WE believed that PFS would be successful when WE first participated. WE only decided to withdraw after several years based on its belief that the prospects of a successful PFS had diminished. PFF 213.

## I. The Dry Storage Fees Imposed by the NRC Were Caused by DOE's Breach and Were Foreseeable

In its initial post-trial submissions, WE demonstrated that it would not have built an ISFSI in the non-breach world and, accordingly, WE is entitled to recover as damages the pre-1999 NRC ISFSI license fees that it paid. PFF 217-222, 228; WE PTB 64, n.19. Further, WE demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 similarly resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69.

### 1. The Pre-1999 Fees Were Foreseeable and Caused by DOE's Delay

The Government asserts that the pre-1999 NRC ISFSI fees that WE paid were not foreseeable at the time of Standard Contract formation. Its argument is that, given that the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388 ("OBRA-90"), the statutory authority pursuant to which the NRC must recover its annual

budget through a combination of generic and specific activity fees, was not enacted until 1990, DOE could not have foreseen that WE might incur regulatory fees in connection with WE's spent fuel storage activities at the time of contract formation in 1983. Govt. PTB 67-71.

The Government's position reflects a misunderstanding of the doctrine of foreseeability. While the general response to a breach must be foreseen, the specific response need not be foreseen. *Southern Nuclear*, 77 Fed. Cl. at 405 ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."). Foreseeability also "refers to the probability, *i.e.*, the likelihood of the occurrence of a given event or circumstance as assessed in terms of common experience or specific knowledge." *Northern States*, 78 Fed. Cl. at 463 (citations omitted).

Applying the first principle, DOE certainly was aware that, if it failed to pick up WE's SNF, WE would incur costs to store the spent fuel on its own. *See, e.g.*, *Carolina Power & Light Co.*, 2008 WL 2154103 at *20 (and citations therein). The NRC fees are simply another spent fuel management storage cost that WE has incurred. Conceptually, these costs are no different from the costs that WE incurred in obtaining approval for the ISFSI from the PSCW, in constructing the ISFSI or in acquiring and loading casks. Thus, DOE need not have foreseen that WE's specific mitigation activities would result in the imposition of NRC license fees in order for these damages to be foreseeable.

Applying the second principle, given that spent nuclear fuel is highly radioactive and highly regulated, the Government cannot seriously contend that it was unlikely that WE would incur regulatory costs in connection with spent fuel storage issues. The Government admits that the NRC's predecessor, the Atomic Energy Commission, began charging fees for specific activities in 1968. Govt. PTB 67. Thus, the Government cannot contend that the pre-1999 specific fees were not foreseeable. In *Carolina Power & Light Co.*, the Court

allowed recovery of NRC licensing expenses incurred by the utility in connection with construction of a spent fuel pool. 2008 WL 2154103 at *29. *See also Northern States*, 78 Fed. Cl. at 469-70 (Court awards NRC cask transportation license costs).

Further, while foreseeability is determined at the time of contracting, the Court has recognized that "there may be situations where foreseeability is more appropriately measured at the time of the breach, because that is when the breaching party should be on notice of the ramifications of its actions or failures to act." *Southern Nuclear*, 77 Fed. Cl. at 404 . We do not believe that the Court need apply this alternative foreseeability standard in order to determine that the NRC fees were foreseeable here. Nevertheless, if it did so, the Court then would consider what was foreseeable as of January 1998. Clearly, both categories of NRC fees were foreseeable as of January 1998. Indeed, by 1998, the NRC had already assessed the pre-1999 ISFSI fee against WE. PFF 219.

The Government also contends that the pre-1999 NRC ISFSI fees are consequential damages remote from DOE's delay because they involve regulatory actions. The Government cites *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006), and *Myerle v. United States*, 33 Ct. Cl. 1 (1897) as support for its assertion. Govt. PTB 70-71. Neither decision advances the Government's cause. In *Old Stone*, the court did not hold that damages as a result of congressional and regulatory actions generally are too remote to be foreseeable or recoverable. Instead, the Federal Circuit applied the standard foreseeability test and concluded that Old Stone had not proven that the reliance damages that it claimed in that case were foreseeable. 450 F.3d at 1376 ("OSC has not called our attention to any testimony in the record that will support the foreseeability of any of these assumptions, and we have been unable to locate any."). Thus, *Old Stone* does not establish a different foreseeability or causation standard where congressional and regulatory actions are at issue.

Indeed, in *Old Stone*, the Federal Circuit awarded $74.5 million to plaintiff for costs incurred in mitigating congressional and regulatory actions. *Id.* at 1370.

The *Old Stone* decision is also factually dissimilar. The damages in *Old Stone* included lost profits, which the court found imposed a greater burden of causation on plaintiffs. *Id.* at 1377-78. The discussion relied on by the Government also involved consideration of a reliance claim, not a partial breach claim applying mitigation principles. WE is neither asserting a reliance claim nor seeking to recover lost profits.

Similarly, the *Myerle* decision does not suggest that damages resulting from congressional and regulatory actions are too remote to be recovered. Instead, *Myerle* simply required that damages be foreseeable and that there not be an intervening incident "not caused by the defaulting party." 33 Ct. Cl. at 19. Here, the evidence established that the NRC fees were directly caused by DOE's breach and, therefore, are recoverable.

Given that WE has established that DOE's delayed performance was a substantial causal factor in WE's decision, the Government's assertion that the NRC fees are "consequential damages" must be rejected. Indeed, the Court's previous awards of NRC licensing costs in *Carolina Power & Light Co.* and *Northern States* make it clear that these types of damages were proximately caused by DOE's breach. Again, given that SNF is highly radioactive, the possibility of regulatory activity and related fees or costs in connection with the storage of spent fuel is quite likely and hardly remote or consequential. *Northern States*, 78 Fed. Cl. at 463.

### 2. The Dry Storage Fees Imposed by the NRC Since 1999 Were Caused by DOE's Breach and Were Foreseeable

WE explained that the pre-1999 NRC fees were foreseeable in Section II.I.1, immediately above. Based on the same rationale, the dry storage fees imposed by the NRC since 1999 also were foreseeable. *Indiana Michigan*, 422 F.3d at 1376 ("DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its

SNF."); *Carolina Power & Light Co.*, 2008 WL 2154103 at *29; *Northern States*, 78 Fed. Cl. at 469-70. The Government also cannot seriously contend that it could not have foreseen that, at some point, the NRC might change the specific license fee to a generic license fee as it did in 1999. Therefore, the fees assessed beginning in 1999 were foreseeable.

**3. DOE's Breach Caused WE to Incur NRC Fees Under 10 C.F.R. Part 171**

In its initial post-trial submissions, WE demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69. In response, the Government asserts that the NRC fees for generic activities were not the result of DOE's delay. Govt. PTB 71-80.

The Government's response, however, ignores a number of salient facts. WE has established that it was DOE's partial breach that caused WE to implement a dry storage program. *See*, *e.g.*, WE PTB 34; PFF 158, 159. The Government cannot dispute that the NRC expended resources on dry storage activities prior to 1999. Under OBRA-90, the NRC has to recover the costs of this effort through fees and did so by charging the ISFSI license holders, including WE, ISFSI license fees through 1998. WE PTB 64; PFF 217-222, 228.

The cost of the NRC's dry storage activities did not go away in 1999. WE continued to utilize its ISFSI and the NRC continued to incur costs in connection with dry storage activities. In 1999, the NRC simply changed the manner in which it recovered those costs from the nuclear utilities by changing a specific fee to a generic fee. The NRC's dry storage costs continued and its need to recover its budget authority from the nuclear utilities continued.

Once one recognizes that the foregoing points are incontestable, then it really does not matter what rationale prompted the NRC to transform the specific ISFSI fee to a generic

fee. Under either fee, the NRC is imposing a charge for dry storage activities and those charges would not have existed absent DOE's partial breach.

In any case, the Government argues that the NRC fee change was instituted in the actual world in order to avoid a disincentive to use dry storage that was allegedly present in the pre-1999 regulatory system. Govt. PTB 71-80. While that may have been one of the reasons, it is equally true that a substantial cause of the NRC's decision to allocate the cost of its dry storage regulatory efforts was its recognition that, given the lengthy delay in DOE's performance, virtually all operating utilities will be required to have dry storage once their spent fuel pools are full. PFF 223-224. The only utilities that might have a choice in the breach world to avoid dry storage are those that have stopped operating and can choose either wet storage or dry storage as they decide on a plant decommissioning strategy. If DOE had performed, most utilities would not have had to resort to dry storage and it seems highly unlikely that this choice of wet versus dry storage would ever have become an issue. PFF 228; Tr. 2426:19-2427:6 (Gadzala).

Once DOE breached the Standard Contract, these dry storage-related NRC fees should have been charged by the NRC directly to the DOE. Indeed, the October 1998 Spent Fuel Storage and Decommissioning Fee Study recommended that the NRC obtain authority to assess fees to other Government agencies. DX 612; Tr. 4163:3-4164:1 (Rabideau). The FY 1999 Final Rule stated that the "NRC recognizes that sites will be required to continue to store spent fuel onsite until another solution becomes available." PX 1044 (Federal Register), p. WISC1044-0009.

The Government argues that the spent fuel storage/reactor decommissioning ("SFS/RD") fee was created for three "concerns" found in the NRC staff study related to spent fuel storage and decommissioning fees and was unrelated to DOE's delay. Govt. PTB 71-73. To the contrary, the decision to change the NRC's 10 C.F.R. Part 171 fee structure

originated in March 1998, after DOE had already breached the Standard Contract. In the actual world, everyone, including the NRC, was aware of the obvious, namely, that with DOE's substantial delay, more utilities would require dry storage. WE PTB 67; PFF 223. Clearly, these are not the conditions that would have existed in the non-breach world. The Government's continued reliance on actual world documents, without addressing the non-breach world, fails to address what may have occurred in the non-breach world.

WE and its damages expert, Mr. Sieracki, did address the non-breach world. They demonstrated that, in the non-breach world, it is highly likely that WE would not have paid the NRC fees at issue. WE PTB 67-68. WE presented compelling evidence that the NRC would not have imposed the generic ISFSI fee that it has assessed from 1999 forward if DOE had performed. In the non-breach world, less than ten ISFSIs would have been constructed. PFF 229. Thus, the class of ISFSI licensees would have been very small. The number obviously would have been less than "all licensees." Thus, the NRC would not have been able to impose the generic fee across the industry in the non-breach world because the NRC may only allocate generic fees "fairly and equitably" among licensees. 42 U.S.C. § 2214(c)(4). Because WE and many other licensees would not have built dry storage in the non-breach world, it would not have been reasonable to charge them generic dry storage fees. In the non-breach world, therefore, the NRC would have likely only charged fees to the applicable class – those licensees using dry storage – which would not have included WE. PFF 228-229.

The Government's argument that Mr. Sieracki's testimony should be ignored because he is not an expert on NRC fees, DFF 456-460, is misplaced. It ignores that Mr. Sieracki is an expert at linking cause and effect relationships in a non-breach world for the purposes of determining damages, which is exactly the testimony that he has so helpfully provided. PFF 33; PX 794, Appendices A, B.

The Government argues that WE has failed to demonstrate that it has been harmed because WE has paid less generic fees in the actual world than it would have paid in the non-breach world. Govt. PTB 80-82. WE disagrees. In the non-breach world where DOE performs according to the Standard Contract, there would have been fewer ISFSIs and those specific utilities that paid the Part 171 fee for dry storage activities would have continued to pay that specific fee. There would have been no impact on overall generic Part 171 fees. PFF 228.

The Government next asserts that, after 1998, WE's overall generic fee was lower than the 1998 fee until 2003 and that the SFS/RD fee has decreased since 2003. Govt. PTB 80-81. From this assertion, it then claims that this must mean that WE's annual fee in the non-breach world would have been greater than in the breach world. *Id.* The Government's logic is flawed and its assertions are irrelevant. As long as WE is paying a fee for dry storage, that cost is DOE's responsibility because, in the non-breach world, WE would not have incurred that cost. Even assuming that the SNF storage fee may have been reduced when the fee was included as part of the generic fee, that does not mean that this fee is not a recoverable damage. It simply means that the amount recoverable as a damage has been reduced; it has not gone away.

**4. WE Established at Trial the Spent Fuel Storage Portion of the NRC Fee with Reasonable Certainty**

The Government argues that the detailed information necessary to calculate damages likely does not exist. Govt. PTB 82-86. This argument is inaccurate. WE has identified with reasonable certainty the amount of the NRC's dry storage charges included in the NRC's new fee structure starting in 1999. PFF 223-230; WE PTB 64-69. WE's identification of the NRC's dry storage charges was based on the deposition and trial testimony of Peter Rabideau, NRC Deputy Chief Financial Officer. It was the Government who put forth Mr. Rabideau as the knowledgeable person on this issue. Defendant's App. A, Para. 15(a)

Witness List, p. 5, Dkt. 268 (Jan. 24, 2007). Having placed Mr. Rabideau forward as the knowledgeable person on this issue, the Government cannot now assert that Mr. Rabideau may need more information which the DOE never sought or provided to WE.[10] All of the information necessary to segregate dry storage costs from other costs is in the possession of the Government. Thus, any failure to segregate those costs with even greater certainty than WE did is attributable to the Government, as the Government had ample opportunity to do so. PFF 227; WE PTB 69.

The Government asserts that WE's claim fails to properly remove the 10 C.F.R. Part 170 fees. Govt. PTB 86-89. To the contrary, WE's damages experts, The Kenrich Group, used the net fee amount determined by the NRC after removal of Part 170 fees, with the exception of two WE-specific Part 170 charges discussed below. This is confirmed by review of the relevant Kenrich work papers. PX 1008, pp. KRGWE003411, KRGWE003439, KRGWE003502, KRGWE003537, KRGWE003583, KRGWE002619; PX 1029, pp. KRGWE003886, KRGWE003889.

The Government also asserts that WE is claiming duplicative damages. That is incorrect. Beginning with FY 1999 (when the NRC revised its spent fuel storage license structure), WE is only claiming that portion of the Part 171 fees attributable to spent fuel storage. In addition, in 2003, the NRC invoiced for two inspections related to the storage of spent fuel and charged WE separate Part 170 specific fees in the amount of $13,716 for these activities. PX 1029, p. KRGWE003864. WE is properly claiming these separate, specific fees.

In addition, in 2005, the NRC invoiced for another inspection related to the storage of spent fuel and charged WE a separate Part 170 fee in the amount of $12,360. PX 1029,

[10] The Government's attempt to fault WE by saying that WE should have conducted further discovery on this issue is unavailing. The Government did not even identify Mr. Rabideau until after fact discovery had closed and only made Mr. Rabideau available for deposition on a single day in December 2006 with limited notice.

p. KRGWE003864. Thus, these are not duplicative charges, but separate charges assessed by the NRC and incurred by WE. PX 1008, 1029.

The Government next faults WE's calculation, by asserting that it improperly includes costs for a surcharge that would have been incurred in the non-breach world because the surcharge applies to all licensees, not merely those paying the SFS/RD fee. Govt. PTB 89-90. The surcharge is part of the fee that the NRC charges WE for spent fuel activities. PX 1008. Further, WE included only that portion of the surcharge that is allocated to spent fuel storage. *Id.* Given that DOE caused WE to incur the spent fuel storage-related NRC fees, DOE is also responsible for the surcharge applied to those spent fuel storage-related costs. Therefore, the surcharge is properly included in WE's damages. PX 1008, 1029.

The Government argues that WE's calculation improperly includes costs for wet storage. Govt. PTB 90-91. As Mr. Sieracki testified, The Kenrich Group would have considered any additional information provided by the NRC to refine the segregation of the costs, but no additional information was provided by the Government. Tr. 3796:13-3797:19 (Sieracki). WE (with the assistance of The Kenrich Group) made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

The Government does not contest that WE incurred the NRC generic fees at issue. Rather, the Government disputes WE's reasoned attempt to determine that portion of WE's fees for 1999-2007 that were allocable to its dry storage based directly on testimony from a senior, knowledgeable NRC representative whom the Government put forth. The NRC possesses all relevant budgetary information and the Government has failed to put forth any contrary evidence suggesting any different or better allocation of the NRC fees allocable to WE's dry storage. PFF 227.

Therefore, WE proved its NRC fee damages to a reasonable certainty. The amount of contract damages "need not be 'ascertainable with absolute exactness or mathematical precision.'" *Indiana Michigan*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563). *See also* Restatement (Second) of Contracts § 352 cmt. a (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.").

In sum, WE has demonstrated that it would not have built an ISFSI if DOE had performed and, accordingly, it is entitled to recover the pre-1999 NRC ISFSI fees that it incurred. PFF 217-222, 228; WE PTB 64 n.19. Further, WE has demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 also resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69. In addition, as discussed, WE is entitled to recover the two separate, specific SNF storage inspection fees assessed by the NRC against WE in 2003 and 2005, respectively. Finally, WE is entitled to recover that portion of the surcharge applied to the spent fuel storage fees.

**J. WE Has Established Its Damages with Reasonable Certainty**

WE's initial post-trial brief explained that it established its damages with reasonable certainty. WE PTB 69-84. In response, the Government argues that WE should not recover more than $6.2 million in internal labor costs, allocable pension and benefit ("P&B") costs and employee expenses; $1.8 million in Administrative & General ("A&G") costs; and $44.2 million in financing costs. None of these Government positions should prevail.

**1. WE Should Recover Its Internal Labor Costs, Pension and Benefit Costs and Employee Expenses**

The Government attempts to create the misimpression that WE somehow has not met its burden of proof to establish that the internal labor costs that it seeks were caused by DOE's breach. Govt. PTB 96. As previously explained, the WE labor costs at issue concern the dry storage project. The dry storage work was forced on WE by DOE's partial breach of



LEGAL14398425.1

the Standard Contract. Thus, WE had to redirect its limited resources from tasks that were not caused by DOE's breach to those tasks directly caused by DOE's breach. Tr. 4797:4-20; 4784:22-4785:2; 4787:13-4788:1 (Metcalfe); Tr. 3010:11-22 (Straub).

The Government's damages expert, Mr. Kiraly, continues to question nearly $3.5 million in damages in internal labor costs, alleging that these costs lack sufficient detail for Mr. Kiraly to apply his "50 percent standard" and disallowing these costs before even applying his standard.[11] Kiraly DDX 5-18; Tr. 6121:24-6122:14; 6123:19-6124:4; 6127:21-6128:9; 6194:2-11 (Kiraly). Mr. Kiraly's position is contrary to the Joint Stipulation Regarding Accuracy of Plaintiff's Costs, in which the parties stipulated that all costs included in "WE's claim were incurred by WE and are traceable to and supported by WE's accounting records," including "labor costs." Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007).

Moreover, there is no basis for Mr. Kiraly's wholesale disallowance. The Government conducted extensive audit verification activities, including review of sample timecards for labor charges. PFF 234. All of the costs at issue, including the internal labor charges, were fully supported by WE's books and records. *See*, *e.g.*, Tr. 1734:25-1735:24; 1743:16-1745:6 (Becka); Tr. 2028:1-16 (Holzmann); Tr. 2883:7-17 (Straub); Tr. 4605:19-4606:4 (Metcalfe); PFF 238. WE further demonstrated, through the testimony of Ms. Ione Straub, Senior Cost Specialist for WE's Nuclear Department from 1990 to 2002, as well as the testimony of its damages experts, Messrs. Metcalfe and Sieracki, that the internal labor costs that it claimed were established to a reasonable certainty. PFF 231-233. In addition, nearly all of these costs (or the underlying activities) have already been approved by the PSCW, which merits consideration. *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl.

[11] Under his 50 percent standard, Mr. Kiraly disallowed all labor charges relating to any salaried employee unless the salaried employee charged more than 50 percent of his or her time to a dry storage project number during the entire period from April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report); Tr. 6194:2-20 (Kiraly).

249, 269, 292 (2006). In sum, WE established its internal labor costs to a reasonable certainty. *See*, *e.g.*, PTB 69-75; PFF 231-242.

The Government also contends that WE has not "established (or even attempted to establish) that it suffered an opportunity cost because these employees were unable to work on other, non-breach related projects." Govt. PTB 97. To the contrary, the evidence established that, but for the dry storage project, WE's internal labor would have had other work to do, for which they were hired and for which they were paid. Tr. 4607:13-4608:4 (Metcalfe); Tr. 2007:25-2015:11 (Holzmann); Tr. 1747:15-1754:19 (Becka).

Further, the Government's contention reflects a misunderstanding regarding the operation of nuclear power plants. There typically is a backlog of maintenance and other work orders at nuclear power plants which need to be performed. PFF 131, 240. When WE employees are working on activities related to the DOE breach, they are not able to perform these various maintenance activities. Tr. 4494:11-25 (Metcalfe); Tr. 2007:25-2009:10 (Becka); Tr. 2876:18-24 (Straub).

As noted, Mr. Kiraly contends that the labor charges relating to any salaried employee should be rejected unless the employee charged more than 50 percent of his or her time to a dry storage project number during the entire period from April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report); Tr. 6194:2-20 (Kiraly). WE refers to Mr. Kiraly's position as his "50 percent standard."

WE strongly disagrees with Mr. Kiraly's 50 percent standard. If WE personnel are performing work resulting from DOE's contract breach, these personnel are necessarily not available to perform other work for WE. There is clearly an opportunity cost in that WE is deprived of the right to utilize its personnel on other projects. PFF 240. *See also Southern Nuclear*, 77 Fed. Cl. at 442; *Tennessee Valley Auth.*, 69 Fed. Cl. at 539-40.

Given that these personnel are performing work resulting from DOE's breach, it is only fair that DOE pay for these activities. As Mr. Metcalfe explained, it is appropriate that WE, a regulated public utility, recover these internal labor costs. Public service commissions typically permit regulated public utilities to recover their internal labor costs. PFF 239. It also is typical to recover such costs in performing work under federal procurement contracts. Federal Acquisition Regulation ("FAR") 31.205-6 (Compensation for Personal Services). Further, under the Standard Contract, the Government can recover all of its internal labor costs. PFF 239. Moreover, WE's use of internal labor results in lower costs than the use of outside contractors. WE PTB 72-75; PFF 239. Allowing the recovery of internal labor costs incentivizes utilities to use such lower-cost labor in future dry storage work when appropriate – further mitigating the cost to DOE for its breach. *Id.*

The Court has previously rejected the 50 percent standard advanced by Mr. Kiraly. *Tennessee Valley Auth.*, 69 Fed. Cl. at 539-40; WE PTB 74-75. In *Carolina Power & Light Co.*, the Court rejected a Government expert's standard that was more lenient than Mr. Kiraly's proffered standard. In *Carolina Power & Light Co.*, the Government's expert stated that the utility should only recover internal labor costs for salaried personnel who spent more than 50 percent of their hours on a breach-related project *in a given year* (as opposed to the 50 percent in a 6-1/2 year standard used by Mr. Kiraly). 2008 WL 2154103 at *26. The Court in *Carolina Power & Light Co.* rejected this more lenient standard, stating: "Every hour that a Progress Energy employee spent on a breach-related project was an hour that the employee did not spend doing other productive work for Progress Energy." *Id.* at *34.

Further, the Court has held that internal labor costs are recoverable in numerous other SNF cases. *See, e.g.*, *Entergy Arkansas*, 79 Fed. Cl. at 67; *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 442; *Pacific Gas & Elec.*, 73 Fed. Cl. at 408; *Yankee*

*Atomic*, 73 Fed. Cl. at 322; *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 376 (2006).[12]

WE also is entitled to recover the P&B costs allocable to these internal labor costs. The accuracy of these charges is not in dispute. Joint Stipulation Regarding Accuracy of Costs, Dkt. 350 (Sept. 21, 2007). It is only reasonable that WE should recover these costs in connection with its recovery of its internal labor costs. PFF 242.

The Government also has identified no sound reason for disallowing the employee expenses at issue. The Government's contention that WE did not show at trial that these employee expenses were incurred as a result of DOE's delay in accepting SNF from Point Beach, DFF 588, is inaccurate. Similarly to WE's internal labor costs, WE established that the employee expenses were charged to specific dry cask storage projects or accounts that knowledgeable WE personnel determined were established to capture the dry storage project costs caused by DOE's breach. Tr. 2910:12-2915:17 (Straub); Tr. 4519:19-4520:19 (Metcalfe); Tr. 3779:5-3781:12 (Sieracki); PX 831; PX 794, p. 12 (May 2006 Damages Report); PDX 60 – Sieracki 38. These employee expenses then were reviewed and approved by a supervisor or a supervisor's designee prior to these expenses being reimbursed by WE. *See* WE Response to DFF 588.

Again, if the Government is contending that WE has failed to establish these employee expenses with reasonable certainty, the Joint Stipulation Regarding Accuracy of Costs, Dkt. 350 (Sept. 21, 2007) precludes the Government from maintaining this challenge.

### 2. WE Should Recover Its Administrative & General Costs

The Government argues that, in order to recover its A&G or overhead costs, WE must demonstrate that DOE's breach caused WE's A&G costs to increase.

[12] In DFF 582, the Government inaccurately describes Mr. Kiraly's methodology as permitting WE to recover labor costs when one of its salaried employees worked more than half of his or her time on a breach-related project during a given year. As discussed, that is not Mr. Kiraly's methodology. *See also* WE Response to DFF 582.

WE strongly disagrees. As Mr. Metcalfe testified, it is fair and reasonable to include corporate level overhead costs in WE's damages. Tr. 4808:6-11 (Metcalfe). Overhead costs are real costs incurred by WE. WE is not being made whole economically if it does not recover the overhead costs allocable to its dry storage project because WE's other projects would become more expensive than anticipated. PFF 244. Recovery of allocable overhead costs is typical in Government contract claims. *See, e.g.*, FAR 31.203; CAS 410; PFF 244. The Government also includes such costs in determining recoverable Government costs under the Standard Contract. *Id.*

Furthermore, several SNF decisions have authorized the recovery of overhead costs in these circumstances. In *Carolina Power & Light Co.*, the Court stated:

> The Court sees no basis in law or logic for Defendant's position. Plaintiffs' overhead costs were incurred and are properly attributable to mitigation projects and activities. If no overhead charges were allocated to mitigation projects, Plaintiffs' other projects would be more expensive than anticipated. Overhead, by definition is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiffs fully. See *Sys. Fuels, Inc.* 78 Fed. Cl. at 799-800 (rejecting the Government's principle that all "loader costs" [overhead] would have been incurred absent DOE's breach). The Court will allow the recovery of Plaintiffs' stores overhead and indirect overhead expenses.

2008 WL 2154103 at *28. *See also Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 441-43; *Pacific Gas & Elec.*, 73 Fed. Cl. at 408.

Furthermore, public service commissions typically permit regulated public utilities to recover overhead costs. PFF 244. Permitting a utility to recover its A&G costs also incentivizes the utility to continue to perform work resulting from DOE's breach with internal labor, which is less expensive than using outside contractors. *Carolina Power & Light Co.*, 2008 WL 2154103 at *27; PFF 244. *See also Southern Nuclear*, 77 Fed. Cl. at 442-43.

The Government contends that the A&G costs included by Kenrich in WE's claims are greater than the A&G costs recorded to WE's accounting records. For that reason, the Government contends that awarding these costs would result in a "windfall" for WE. Govt. PTB 98.

The Government's "windfall" assertion, DFF 599, is factually incorrect. Neither the cited testimony of Ms. Straub nor PX 1043 supports this assertion. The Government ignores that, if, in a given claim year, the budgeted overhead rate is less than the actual overhead rate, there is no true-up calculation or adjustment for the lower budgeted rate (which favors DOE). Ms. Straub testified that there were just as many years where the actual overhead rate exceeded the budgeted rates than years when the budgeted overhead rates exceeded the actual. Moreover, Ms. Straub testified that the budgeted and actual overhead rates are typically very close. Tr. 3008:19-3010:9 (Straub).

Similarly, the Government's assertion that Mr. Metcalfe improperly increased WE's claim, Govt. PTB 100, is inaccurate. Contrary to the Government's assertion, the budgeted A&G rates were determined by the PSCW, not Mr. Metcalfe. Mr. Metcalfe also testified that using PSCW-approved budgeted A&G rates was appropriate. *See* WE Response to DFF 599.

In addition, when WE does work for someone outside the company, it allocates A&G costs based on the PSCW-approved budgeted rates to those project costs. Tr. 2885:8-24 (Straub). The PSCW also requires that WE allocate overhead costs to projects that it performs for non-utility affiliates to ensure that the ratepayers are not subsidizing work performed for the benefit of outside parties. PFF 244.

Applying that principle here, WE should include allocable overhead costs in the damages sought from DOE because the dry storage project work performed by WE was done because of and, in essence, *for* DOE, not for the benefit of the ratepayers. PFF 244. As

Mr. Metcalfe explained, it is fair and reasonable to include these overhead costs in WE's damages. Tr. 4808:6-11 (Metcalfe).

Furthermore, the Government's contention that Ms. Straub conceded that overhead costs should not be added to this claim, Govt. PTB 100, is untrue. Again, she merely testified that WE generally has no reason to allocate overhead costs to internal projects. The dry storage project, however, is not truly an internal project because it was an outside party, DOE, who caused WE to dedicate its resources to this project. Thus, this project is work that WE is performing for an outside party (DOE) and, as noted above, overhead costs are allocated to such projects in determining the final charges. PFF 244. For these reasons, WE should recover its A&G costs in this action.

**3. WE's Financing of Its Mitigation Costs Is Recoverable**

In its initial brief, WE explained that the Federal Circuit has allowed the recovery of financing costs as a result of a Government breach of contract. *Citizens Fed. Sav. Bank*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582-83 (Fed. Cir. 1994). As in *Wickham*, this case is a construction claim for the costs of constructing the dry storage facility and for purchasing necessary equipment, including, but not limited to, the casks.

In its response, the Government asserts that *Wickham* does not apply because it involved recovery under the Changes clause, which authorizes the recovery of interest on funds borrowed to address a contract change. Govt. PTB 104-105. As the Government concedes, however, the Federal Circuit did not base its *Wickham* decision on this point. In fact, the Court does not mention the Changes clause at all.

The Government's attempted distinction of *Wickham* also is undercut by the fact that the Court applied *Wickham* in another spent fuel partial breach of contract case. In *Tennessee Valley Auth.* 69 Fed. Cl. at 541-42, the Court applied *Wickham* to find that TVA's

Allowance for Funds Used During Construction ("AFUDC") costs were recoverable as damages against the Government for breach of the Standard Contract, notwithstanding the general restriction against recovering interest as set forth in 28 U.S.C. § 2516(a). The Government responds that *Tennessee Valley Authority* was incorrectly decided, but fails to explain why it dismissed its appeal of that decision.

WE computed its cost of capital based on the weighted average cost of capital ("WACC") determined by the PSCW during each year in which WE incurred SNF-related storage costs as a result of DOE's breach. These are the same rates used to calculate its AFUDC. PFF 245, 248. WE's cost of capital incurred in constructing the ISFSI, fabricating and loading dry casks, and investigating alternative storage facilities is the type of cost recoverable under the *Wickham* and *Tennessee Valley Authority* standards and should be recoverable in this case. It is an economic cost borne by WE and its ratepayers. PFF 247.

The Government contends that WE's cost of capital constitutes a claim for "prejudgment interest." That is incorrect. "Prejudgment interest" is defined as "statutorily prescribed interest accrued either from the date of the loss or from the date when the complaint was filed up to the date the final judgment is entered." *Black's Law Dictionary* (8th ed. 2004). In contrast, WE's cost of capital rate fluctuates with the debt and equity markets for each year. PFF 246; Tr. 4584:17-4587:2 (Metcalfe). In addition, it is a WE-specific rate determined by the PSCW, not a general, statutorily prescribed rate. PFF 245, 248.[13]

---

[13] The Government's assertion that Mr. Metcalfe agreed that WACC is one way to calculate prejudgment interest based on the *Litigation Services Handbook*, Govt. PTB 102 n.51, is grossly misleading. That book used the term "prejudgment interest" as a general term including any claim of interest prior to judgment. Mr. Metcalfe clearly differentiated "prejudgment interest" as a statutorily fixed rate from WACC. Tr. 4828:24-4831:1 (Metcalfe). In addition, Messrs. Metcalfe and Hamal did not testify that 75 to 83 percent of the claimed financing costs are for shareholder profit. Both agreed that WE's equity has ranged from 45 to 55 percent of its overall capital. *See* WE Response to DFF 632.

The Government's "pre-judgment interest" argument also ignores the difference between interest "on a claim" and interest as a component of a claim, *i.e.*, financing costs that represent a claim in themselves. In *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part & rev 'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005), the Federal Circuit recognized this distinction and allowed recovery of cost of capital where the costs relate to actually incurred financing costs, in other words, interest as a component of a claim. The Federal Circuit also has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed. Cir. 2001). This Court recently recognized the distinction between "prejudgment interest" and the cost of capital that WE incurred to plan, design and construct the dry fuel storage project at Point Beach in *SFI-Grand Gulf*, 78 Fed. Cl. at 807-09.

Moreover, WACC is a distinct economic cost and only through an award of its WACC can WE be reimbursed for the risk that it experiences in earning its capital related to the expenditures WE was forced to incur because of DOE's breach, as well as taking into account both inflation and the time value of money. PFF 246.

The Government contends that WE's claim for financing costs must be rejected because WE cannot point to a single specific borrowing. Govt. PTB 105. To the contrary, the Court has not in every instance required that a plaintiff point to a specific equity or debt instrument as the source of funds used for the activity at issue. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542. While WE recognizes that some decisions have ruled to the contrary, WE believes that such decisions unfairly penalize utilities that traditionally do not finance on a project-by-project basis and are incurring real financing costs.

Contrary to the Government's contention, WE's cost of capital does not become impermissible merely because it is formed by both debt and equity. *LaSalle Talman Bank*,

317 F.3d 1363, 1375 (Fed. Cir. 2003). Therefore, WE may recover its cost of capital for each category of damages incurred from the time that the cost of capital expense was incurred through the start of trial, September 10, 2007. *See Tennessee Valley Auth.*, 69 Fed. Cl. at 542.

The Government contends that WE cannot recover its financing costs because, for the most part, these costs have been recovered from ratepayers. Govt. PTB 103. This Government assertion is a woefully misguided assertion of the "pass-through defense" which the U.S. Supreme Court and numerous other federal courts have uniformly rejected. *See, e.g., Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990); *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). Thus, this point is irrelevant for both WE's financing costs and its nominal damages. Tr. 4569:1-4572:4; 6321:20-6323:25 (Metcalfe). Indeed, if WE is not awarded the financing costs that it has incurred on its nominal damages, the ratepayers will have been forced to pay the financing costs for the underlying nominal costs that WE incurred because of DOE's breach of contract.

Similarly ill-founded is the Government's assertion that recovery of WACC is inappropriate because WE sold the casks to the Wisconsin Electric Fuel Trust ("WEFT"). The Government offers no explanation why this may be the case and cites no supporting case law. In any event, WE does not make a profit when it sells the cask to WEFT. WE transfers the asset to WEFT, and leases it back. As part of that leasing cost, WE pays a management fee to WEFT under a normal capital operating lease. WE does not make a profit or a return of any kind from the WEFT transaction. Tr. 6324:1-10 (Metcalfe). As Mr. Metcalfe explained, WEFT is simply a cash flow mechanism and has no impact on the WACC issue. Tr. 6319:15-6321:19 (Metcalfe).

WE further explained that there are two alternative forms of recovery available to the Court. First, the Court can award to WE its Weighted Average Cost of Debt ("WACD").

This alternative eliminates any concern that may exist with regard to providing WE a return on the equity component of the funds devoted to its dry storage project. PFF 249. Recovery of WACD was recently permitted by the Court provided that it can be proven with reasonable certainty. *SFI-Grand Gulf*, 78 Fed. Cl. at 807-09. In its post-trial brief, WE provided a chart, identifying specific WE damages categories with the cost of debt. WE PTB 82; PFF 250 (including subparagraphs).

The Government responds by stating that the discussion of WACD by WE's expert, Mr. Metcalfe, was "inappropriate, untimely, and not rebuttal testimony." Govt. PTB 107. The Government, however, cites no authority in support of its position. *Id.* In its initial post-trial brief, WE explained that the evidence of WACD damages properly responded to issues raised by the Government, "explaining" and "counteracting" evidence submitted during the Government's case in chief. This is the appropriate scope of rebuttal testimony. *Yankee Atomic*, 73 Fed. Cl. at 274.

More specifically, the Government's expert witness testified that there was a range of options by which a party can calculate the cost of money, including plaintiff's cost of borrowing. Tr. 5856:2-5857:6 (Hamal); DDX 4-46. In addition, during cross examination of Mr. Metcalfe, Government counsel asked Mr. Metcalfe a similar question and Mr. Metcalfe responded that a WACD calculation was possible. Tr. 4682:19-4686:5 (Metcalfe).

Therefore, WE asked Mr. Metcalfe to calculate the WACD in this case. *See also* WE PTB 81-82. Thus, WE's offer of this evidence was properly made to explain and counteract evidence submitted by the Government. *Yankee Atomic*, 73 Fed. Cl. at 274.

There also was no surprise or prejudice to the Government. WACD is calculated exactly the same way as WACC and is based on the same sources as WACC, namely, the PSCW's annual determinations of WE's cost of capital and cost of debt. PFF 249-250, 259-260. With Kenrich's Cost of Capital Binder work papers, the Government has available (and

has had for some time) all the information necessary to calculate the WACD. The only difference is that, instead of applying the cost of WE's equity and debt to the nominal damages, one just applies its cost of debt to these damages. PFF 249.

Thus, there was no unfair surprise to the Government. This is proper rebuttal testimony and the Court clearly has discretion to admit this rebuttal evidence. *Yankee Atomic*, 73 Fed. Cl. at 274 (citing *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1122 (Fed. Cir. 1996)).

Another alternative calculation is to permit WE to recover the AFUDC actually recorded to WE's SNF storage-related accounts. Again, the same rate is used to calculate AFUDC as WACC. AFUDC is permitted by the PSCW and the Federal Energy Regulatory Commission ("FERC"). The AFUDC for the dry storage facility was $747,865. PFF 248; PX 1029, p. KRGWE003854. The Court permitted recovery of AFUDC in *Tennessee Valley Authority*, 69 Fed. Cl. at 542.

The Government characterizes WE's alternative AFUDC claim as "an after thought." Govt. PTB 103, n.53. To the contrary, WE's alternative recovery of AFUDC and the amount of WE's recorded AFUDC were presented at trial. PFF 248. AFUDC is a cost that is recorded to WE's capital projects in accordance with PSCW and FERC rules. *Id.*

#### 4. WE Has Estimated the Temporary Rack Offset to a Reasonable Certainty

WE's initial brief explained that WE has estimated the temporary rack offset to a reasonable certainty. WE PTB 83-84. The Government does not address this issue in its response.

### K. DOE's Claimed Cask Loading Offset Is Speculative and Should Not Be Allowed

The Government argues that WE would have incurred costs to load casks if DOE had performed and that an offset of avoided loading costs in the amount of $3.68 million is necessary to avoid a windfall for WE. Govt. PTB 93.

The Government carries the burden of establishing that WE would have incurred a loss in the non-breach world. *Southern Nuclear*, 77 Fed. Cl. at 434-35. The Government also must establish the value of any offset with reasonable certainty – speculative costs are not appropriate for an offset. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. Every SNF decision has determined that the Government has failed to establish these necessary criteria for this cask loading offset claim. *Carolina Power & Light Co.*, 2008 WL 2154103 at *33; *Entergy Arkansas,* 79 Fed. Cl. at 70-71 ("The court accordingly denies a setoff because of the speculative nature of future cask loading with DOE's casks."); *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 450-51; *Pacific Gas & Elec.*, 73 Fed. Cl. at 416; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372; *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

None of the Government's arguments compel a different conclusion in this case. As explained in WE's initial brief, the Government failed to establish the reasonableness of an offset for avoided loading costs in this case. WE PTB 88-90. Point Beach will not avoid the cost of loading casks when and if DOE performs. Instead, those costs have simply been deferred. WE's recent sale of Point Beach to an FP&L subsidiary does not change this conclusion. Whether WE or FP&L incurs the costs, these costs will be incurred by Point Beach if and when DOE performs. The disposition of these future loading costs is a contractual matter between WE and FP&L and, as the Court itself recognized, the WE-FP&L contract is not before the Court. Tr. 4755:9-18 (Court).

In addition, an offset is inappropriate for speculative costs, and even less so for costs that are merely deferred to a future point when they will be known with reasonable certainty. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. Here, any purported "benefit" to WE is entirely speculative. While the Government attempts to establish the type of cask that DOE may have brought in the non-breach world, no one, including the Government's expert

witness on this issue, Mr. Brewer, knows what cask DOE will bring to Point Beach if and when it begins to accept fuel. Tr. 5628:24-5629:2 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . . ."); Tr. 961:1-2 (Hennessy) ("No, I have no idea what type of casks will be used . . . ."); Tr. 1897:7-10; 1996:25-1997:6 (Becka); Tr. 2778:5-11 (Anundson).

Thus, the best that the Government can do is speculate regarding the cask that it may bring and there are serious flaws in its speculation. For example, the Government assumes that WE would have used a truck cask in the non-breach world. Govt.. PTB 92. However, it is DOE, not WE, who is responsible for delivering the cask to Point Beach when DOE performs and for transporting the spent fuel from Point Beach. PX 41, p. KRGWE002126 ("DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility."). Thus, one needs to consider what DOE may bring at this indefinite point in the future.

In addition, the Government incorrectly assumes that a rail cask cannot be used at Point Beach. The evidence established that there is a railhead at Manitowoc that is available for heavy-haul shipments in and out of Point Beach. Tr. 2701:8-11 (Farron); Tr. 1830:12-16 (Becka). During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the Steam Generator to Kewaunee by rail. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic, self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul crossed several small bridges without problem. PFF 263. The weight of a fully loaded VSC-24 cask is less than the 200-ton weight of the lower piece of the Steam Generator. PFF 264.

In sum, the Government's unsupported assumptions do not provide the reasonable certainty required to substantiate an offset. *See, e.g.*, *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

The Government also claims that, if avoided loading costs are not offset here, the Government will be forced to pay a second time for loading the fuel to DOE. Govt. PTB 92, 93. The Government's argument is nonsensical. When DOE begins to perform, Point Beach, not DOE, will incur the loading costs.

Finally, the Government suggests that WE's experts concur that WE will be getting a windfall if the Court does not offset these costs. Govt. PTB 93. That is incorrect. Kenrich's July 2005 report included future damages and, for this reason, attempted to estimate avoided DOE loading costs. Kenrich then eliminated the cask loading offset in its May 2006 report. PX 794. Mr. Metcalfe, however, explained that these offset costs were removed from WE's claim because the Court held that future damages were removed from the scope of this proceeding based on the Federal Circuit's decision in *Indiana Michigan*. Tr. 4712:4-7 (Metcalfe).

To date, not one SNF decision has agreed with the Government and granted its cask loading offset. WE PTB 89-90. Under the same reasoning, an offset is not appropriate here.

## III. CONCLUSION

For the reasons above and those reasons stated in WE's Post-Trial Brief and based on the evidence, WE respectfully requests that the Court enter judgment on WE's breach of contract claim in the amount of $96,541,000.

Dated: July 10, 2008

Respectfully submitted,

s/Richard W. Oehler by s/Jay L. Griffiths
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on July 10, 2008, I caused a copy of the foregoing "Wisconsin Electric Power Company's Post-Trial Reply Brief" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Jay L. Griffiths
Jay L. Griffiths