handling tool is a tool that is used from the pool deck or from the fuel handling bridge. In other words, the individual who's operating the tool does not go in the water."). Technicians routinely remove appurtenances from pool walls and perform other tasks through the use of remote tools. Tr. 4456:9-13 (Singh).

Moreover, the Government's own expert agreed that the Point Beach cask pit project could be accomplished using only remote tools. Tr. 5473:23-24 (Brewer) ("I agree that one can use remote tools to do this kind of work."). Consequently, there is no evidence establishing that divers had to enter the spent fuel pool water to perform the Point Beach cask pit rack project.

Dr. Singh further testified that, while the project could have been done remotely, it also could have been completed with divers using proper shielding techniques. Tr. 4459:4-8 (Singh). Dr. Singh testified that techniques such as the use of a lead shield or a lead or steel cage allow divers to safely perform in-pool diving operations in various pool storage configurations. Tr. 4445:6-23; 4446:6-18; 4447:13-4448:6 (Singh). Additionally, the space available in the pool for diving operations can be maximized by placing colder (earlier discharge date) spent fuel assemblies around the work area. Tr. 4445:6-23 (Singh). Thus, while the project could be done remotely, the use of divers remained viable. Tr. 4446:10-18; 4459:16-19; 4472:23-4473:1 (Singh).

Dr. Singh testified that the cost of using divers or remote tools to perform the Point Beach cask pit rack project is essentially the same under either option. Tr. 4472:23-4473:17 (Singh). Remote operations require more tools, but diving operations require significant training and consumable items, such as dive suits, that are treated as contaminated materials. *Id.*

Third, the Government alleges that Dr. Singh's expert opinion somehow lacked "rigor" because Holtec submitted two reports. Govt. PTB 21. More specifically, the

Government claims that, in his first report, Dr. Singh was not aware of how seismic restraints were attached to the pool and what obstructions might exist. Govt. PTB 21, n.8. To the contrary, the evidence showed that the first Holtec report's information was accurate. It simply reflected a conservative assumption that the seismic restraints were welded, not shimmed and, based on this assumption, assumed that obstacles were present. PX 827, p. 9; Tr. 4434:23-4435:1 (Singh) ("I had assumed the worst. I had assumed that in the installation process they actually conducted, did some welding and secured the frame. . ."). Dr. Singh, however, testified that further examination of the drawings showed the restraint to be shimmed, not welded. Tr. 4392:7-12 (Singh). Therefore, the restraints could be easily removed and would not require the use of divers. Tr. 4472:23-4473:1 (Singh). Because the seismic restraints could be removed either by using divers in the pool or by using remote tools, and the cost of both methods was "basically the same," there was no reason for Dr. Singh to revise his report to state that the Point Beach cask pit rack project could have been accomplished even more easily (*i.e.*, by simply lifting out the anti-tipping frame once the shims were removed) than when Holtec originally estimated the project using the conservative assumption that the frame was welded or attached to the pool wall. PX 827; Tr. 4470:13-4773:17 (Singh). Whether to use divers or remote tools was "not really relevant to any conclusions" in Dr. Singh's expert report and testimony. Tr. 4460:2-10; 4462:11-22; 4463:2-9 (Singh).

Finally, the Government's argument that Dr. Singh "never demonstrated the actual viability of a temporary cask pit rack" is based on citations to DFF 231-233 and represents merely a repetition of the Government's invalid criticisms discussed and dismissed above. Govt. PTB 21.[6]

---

[6] The Government did not disagree that the need for radiation shielding of a cask pit rack could have been addressed based upon the depth of the Point Beach spent fuel pool water. Govt. Resp. to PFF 195. Thus, the depth of the spent fuel pool is a moot issue. Nevertheless, WE clarifies the evidence to answer issues raised in the Government's responses to the PFFs. First, the total depth of the Point Beach spent fuel pool from the

In summary, the Government fails to show that WE could not have used and installed a cask pit rack to maintain FCR in the non-breach world. Moreover, the Government fails to show that WE's offset was not the most likely option that WE would have selected to preserve FCR in the hypothetical non-breach world.

## E. The Court Should Find That DOE Would Accept Spent Fuel in the Non-Breach World at a Substantial Rate

### 1. The Parties' Understanding Was that DOE Would Accept SNF at a Substantial Rate

The Court need not determine a rate of acceptance in order to determine either causation or the reasonableness of WE's mitigation of the Government's partial breach. In its initial post-trial submissions, WE explained that, notwithstanding the overwhelming evidence in support of a 3000 MTU rate, the Court has chosen on several occasions to make a final determination of damages without finding a specific acceptance rate. *See, e.g.*, *System Fuels, Inc. & Entergy Arkansas, Inc. v. United States*, 79 Fed Cl. 37, 58, n.20 (2007) ("*Entergy Arkansas*"); *Southern Nuclear*, 77 Fed. Cl. at 439; WE PTB 44 (and citations therein).

More importantly, WE established that, faced with a lengthy DOE delay and the long lead time required to implement mitigation decisions, WE's mitigating decisions were foreseeable, commercially reasonable, and substantially caused by DOE's impending partial breach and lengthy delay. WE PTB 9-41; PFF 50, 83, 87-88, 92-94, 96, 103-121, 127-158, 212-237. This is sufficient for WE to recover its dry storage project costs under the aforementioned decisions.

---

surface of the pool water to the pool floor is approximately 40 feet. PX 640, p. WISC00060265; Tr. 823:5-9 (Hennessy). Dr. Singh explained that this total depth of water would have provided adequate shielding for the use of a cask pit rack. PX 640, p. WISC00060265; Tr. 4395:25-4396:3 (Singh) ("It's more than 40 feet . . . so this is adequate shielding"). In referring to the 40 feet of water "over" the cask pit rack in PFF 195, WE was referring to the depth of the water measured from the base of the rack (which is on the floor of the pool). The 25 feet pool depth identified in PFF 12 referred to the distance from the surface of the pool water to the top of the 14 feet tall spent fuel assembly racks in the pool. Tr. 119:8-9; 146:15-20 (Baumann) (spent fuel assemblies and rack approximately 14 feet tall).

The Government asserts that WE's position is that it was forced to implement dry storage because DOE did not perform at a particular rate. Govt. PTB 28. To the contrary, WE's position is that it was forced to implement dry storage because of the substantial delay in DOE's performance. From early 1988, WE believed that DOE's performance would be substantially delayed. DOE's subsequent lack of progress reinforced WE's belief such that, once the PSCW approved the dry storage project in February 1995, WE proceeded with the project. WE PTB 16-34; PFF 77-78, 81-94, 96-97, 106, 115-117, 120-122.

While WE believes that the parties' understanding was that DOE would perform at a substantial rate, WE has not argued for a specific rate in this proceeding. In fact, WE does not believe that differing DOE acceptance rates result in different WE damages in this case. The important years for WE's SNF storage would have been the early years, 1998 and 1999. The 3000 MTU rate and the 900 MTU rate have the same ramp up rates in those years and would have included virtually identical allocations for Point Beach's spent fuel:

| | 900 MTU RATE | | 3000 MTU RATE | |
|---|---|---|---|---|
| YEAR | SYSTEM-WIDE ACCEPTANCE RATES FROM 1991 ACR (PX 237, p. 5) (ANNUAL MTU) | POINT BEACH ALLOCATION FROM 1991 ACR (PX 237, p. 9) (ANNUAL MTU) | SYSTEM-WIDE ACCEPTANCE RATES FROM SUPKO REPORT (ANNUAL MTU) | POINT BEACH ALLOCATION FROM SUPKO REPORT (ANNUAL MTU) |
| YEAR 1 1998 | 400 | 16.3 | 400 | 16.28 |
| YEAR 2 1999 | 600 | 43.0 | 600 | 43.00 |

PX 237, pp. 5, 9; PX 791, pp. 6, 9, 11 (Supko Report).

Nonetheless, WE notes that, pursuant to the NWPA, DOE was expected to perform its contractual obligations at a rate sufficient for the utilities to avoid adding at-reactor storage after January 31, 1998 and to work off the backlog of accumulated spent fuel at a

reasonable rate. The NWPA lodged the responsibility with the utilities to pay for DOE's disposal program and to provide *interim* storage of SNF, but the utilities only had the responsibility for the costs of interim storage "*until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act." 42 U.S.C. § 10131(a)(4), (5) (emphasis added). In pursuit of these objectives, the NWPA required that DOE enter into contracts with the nuclear utilities, providing that DOE shall take title to the SNF "as expeditiously as practicable upon the request" of the utility and begin disposal of the SNF by "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5).

Consistent with the intent of the NWPA, the Standard Contract required that DOE begin acceptance of spent fuel "not later than January 31, 1998" "as expeditiously as practicable upon the request" of the utility. PX 41, pp. KRGWE002118, KRGWE002123; PFF 46-47. Thus, the NWPA and the Standard Contract were designed to forestall the construction of dry storage facilities at nuclear power plants throughout the United States by setting a date certain by which DOE would take responsibility for storage of SNF. *Tennessee Valley Auth.*, 60 Fed. Cl. at 674 n.10.

The utilities and DOE understood that, consistent with the NWPA, the phrase "expeditiously as practicable" in the Standard Contract meant that DOE's acceptance rate of spent fuel would be sufficient for the utilities not to have to add additional at-reactor storage after January 31, 1998 and for DOE to work off the backlog of previously discharged fuel. WE PTB 41-44; PFF 48-49, 51-52, 54, 63. WE demonstrated that a steady-state annual rate of 3000 MTU accomplished these two objectives and that this was the understanding of WE and DOE. WE PTB 41-44; PFF 48-49, 52, 54, 63. Indeed, after execution of the Standard Contract, DOE's program documents confirmed DOE's understanding that, under the Standard Contract, DOE would have an operational facility in 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would eliminate the need for utilities to construct

additional storage after 1998 and would work off the accumulated backlog at a reasonable rate. PFF 53, 61, 61f, 61j.

The Government contends that the utilities, including WE, sought to add a Standard Contract term regarding DOE's acceptance rate during and after promulgation and execution of the Standard Contracts. Govt. PTB 33-36. This suggests that the Standard Contract did not impose on DOE an acceptance rate obligation. To the contrary, as discussed, the Standard Contract and the NWPA imposed on DOE an obligation to accept SNF at a rate that would eliminate the need for utilities to construct additional storage after 1998 and would work off the accumulated backlog at a reasonable rate. WE PTB 41-42; PFF 48-51.

In addition, industry efforts were focused on having DOE "provid[e] a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel." DX 541, p. CTR-006-0248; *see also* WE Response to DFF 27-29, 66. The utility groups noted that the Standard Contract "does not *explicitly* recite the standards for DOE's performance in accepting spent fuel from Purchasers" so they sought clarity regarding this issue, not an additional contract term. DX 541, pp. CTR-006-0248, CTR-006-0249 (emphasis added).

The Standard Contract was drafted by DOE and was not the product of any negotiation. PFF 42, 44. There was little time for review and utilities had no choice but to sign the Standard Contract or risk losing their operating licenses. PFF 42, 44. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *4. Nothing in UNWMG's request (or EEI's letters to DOE), however, is inconsistent with the aforementioned obligations in the Standard Contract regarding the rate of DOE SNF acceptance. WE PTB 41-42; PFF 48-51; WE Response to DFF 1, 27-29, 66.

The Government relies on testimony from Eileen Supko and Messrs. Zabransky, Shimon and Mills to support its contention that utilities sought to add an acceptance rate to the Standard Contract. Govt. PTB 36-37; DFF 63-67. This testimony, however, does not

support the contention that utilities sought to add a contract term that did not already exist. WE Response to DFF 63 (discussing Mr. Zabransky's testimony), 64 (discussing Mr. Mills's testimony and speech and Mr. Shimon's testimony), 65 (discussing Ms. Supko's and Mr. Zabransky's testimonies), 66 (discussing Messrs. Mills's, Zabransky's and Shimon's testimonies), and 67. The terms of the NWPA and the Standard Contract – read in their entireties – required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. WE PTB 41-42; PFF 48-51.

The Government also misapplies the Standard Contract's integration clause, Article XXII.A, in its discussion of the acceptance rate issue. Govt. PTB 32-33. Contrary to the Government's contention, Article XXII.A does not contain language stating that it precludes reliance on any representation not "expressly incorporated into the contract." *Compare* DFF 56 *with* PX 41, p. KRGWE002150. *See also* WE Response to DFF 56. In addition, the Federal Circuit has instructed that, in interpreting the Standard Contracts, it is appropriate to inquire into the NWPA and its purposes. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) (addressing the Standard Contracts with utilities in terms of the NWPA's requirements); *Roedler v. Dept. of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"). As noted, the NWPA required that the Standard Contracts provide that DOE shall take title to the SNF "as expeditiously as practicable upon the request" of the utility and begin disposal of the SNF by "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5). The NWPA further provides that the utilities would be responsible for SNF storage "until such waste and spent fuel is accepted by [DOE]." 42 U.S.C. § 10131(a)(5) .

Given that the Standard Contract does not contain an express acceptance rate for DOE's performance, one must interpret the Contract to determine this rate of performance based on the terms of the Contract and the purpose of the NWPA. *Carolina Power & Light Co.*, 2008 WL 2154103 at *17. As noted, the Standard Contract contains both the "not later than January 31, 1998" and "expeditiously as practicable" language. PX 41, pp. KRGWE002118, KRGWE002123. The Contract also applies to "all" SNF generated by WE and the other utilities, which DOE "shall accept" and "dispose of . . . in accordance with the terms of this contract." PX 41, p. KRGWE002126.

The Standard Contract also should be interpreted in light of the parties' expectations at the time of contract formation and the actions of the parties after execution. *Carolina Power & Light Co.*, 2008 WL 2154103 at *17; *Entergy Arkansas*, 79 Fed. Cl. at 53 ("[T]he post adoption actions of the parties to a contract can be useful in guiding interpretation.") (citations omitted). Thus, while the source of DOE's obligation is the Standard Contract, the Court clearly may look to contemporaneous statements of DOE officials and DOE-issued documents to determine the meaning of its terms. In other words, rather than being offered as evidence of separate agreements or supplements to the Standard Contract, the contemporaneous evidence sheds light on the parties' intentions with regard to the acceptance rate. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.") (citation omitted); *see also Entergy Arkansas*, 79 Fed. Cl. at 53 (citations omitted); Richard A. Lord, 11 Williston on Contracts § 32.14 (4th ed. 2007).

Thus, the Government's argument that WE cannot rely on either the statements of DOE officials or DOE-issued documents, Govt. PTB 32, misses the mark. WE properly relies on such evidence, which clearly shows that both parties understood that, consistent

with the NWPA, "expeditiously as practicable" meant that DOE's acceptance rate of spent fuel would be sufficient such that utilities would not have to add additional at-reactor storage after January 31, 1998 and DOE would work off the backlog of previously discharged fuel. PFF 48-49. Further, based on the parties' understanding that DOE would accept SNF at an annual rate that would avoid the utilities' having to add at-reactor storage after January 1998 and would work off the accumulated backlog at a reasonable rate, an annual rate of 3000 MTU is a reasonable rate that accomplishes these objectives. PFF 52, 54, 55. During Standard Contract development, DOE and industry discussions confirmed that the industry and DOE both understood that DOE would accept approximately 3000 MTU of spent fuel annually and that this steady-state acceptance rate would be achievable by 1998 after a ramp up period. PFF 51. Finally, DOE has always intended to use an annual 3000 MTU steady-state rate for the FWMS. PFF 53.

**2. DOE's 900 MTU Rate Should Be Rejected as Contrary to the NWPA, the Standard Contract, and the Parties' Understanding**

As expected, in response, the Government repeats its standard argument that the 1991 ACR, and the related delivery commitment schedule ("DCS") process, provide the only enforceable DOE acceptance rate under the Standard Contract and that this rate is a 900 MTU annual acceptance rate. Govt. PTB 29-30, 42-47. This is the same argument that has been rejected by the Court in numerous prior decisions. *See, e.g.*, *Entergy Arkansas*, 79 Fed Cl. at 63; *Northern States*, 78 Fed. Cl. at 449, 457-61, n.13; *Southern Nuclear*, 77 Fed. Cl. at 415-21. Therefore, we will briefly respond to the Government's arguments. *See also* WE PTB 44-49.

DOE cannot rely on the ACR and DCS process, pursuant to which DOE established the 900 MTU rate, as the binding statement of the Standard Contract's acceptance rate. Govt. PTB 29-30. This would impermissibly allow DOE to establish unilaterally its own rate of performance in 1991, when DOE knew that it would be unable to perform and sought to limit

its liability. *Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19 (noting that the utilities were not paying millions into the Nuclear Waste Fund "in exchange for DOE unilaterally determining its own obligations *after* it realized that timely performance was not possible"). With regard to DOE's desire to limit its liability, the Court stated in *Carolina Power & Light Co.*, "DOE's David Zabransky conceded at trial that, faced with massive litigation, the 900 MTU rate was an agency attempt to minimize its obligations under the Standard Contract." 2008 WL 2154103 at *18. At WE's trial, Mr. Zabransky testified similarly. Tr. 5708:19-5709:4; 5733:23-5734:16 (Zabransky). *See also* Tr. 2295:9-15 (Vance) ("I was told at the time that the reason for the lower rate was because it was clear the Department was not going to meet the 1998 date required by the contract for initiating delivery, and therefore, the desire was to limit the obligation and the liability that DOE had to the utilities."); PFF 101.

Moreover, the evidence established that DOE believed that the DCSs were not binding and that the DCS process was nothing more than "administrivia." *See* PFF 126. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*

It also is unclear where in the DCS process DOE could possibly have conferred on itself its claimed right to unilaterally set its rate of performance. As noted, DOE witnesses testified that the approved DCSs were not binding. PFF 126. The Government does not argue that the final delivery schedules ("FDSs") conferred such a right. Indeed, DOE never approved any FDSs. PFF 123. Nor can DOE's obligation be defined by the ACRs, which state: "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." PX 237, pp. 1-2. Regardless of where in the purported scheduling process the Government alleges that DOE's

obligation materializes, the plain meaning of the Standard Contract's "scheduling provision" is that it establishes a mechanism to coordinate or "schedule" delivery of spent fuel – it is an administrative planning tool, clearly independent from actual performance by DOE. PX 41, Article V.B. Nowhere is there any indication whatsoever that the "scheduling provision" gives DOE the unilateral right to set its own legal performance obligations under the Standard Contract. *Id.*

Further, the Government's contention that WE supposedly "willingly participated" in this administrative process, Govt. PTB 29-30, 42-47, does not mean that WE agreed that the DCS process would define DOE's acceptance rate. WE submitted its DCSs in accordance with the DCS instructions that DOE issued in 1992. PFF 123. The DCS instructions told utilities that they "should" use the allocations in the 1991 ACR. DX 497, p. WISC0000026. Utilities, however, had no choice but to do so because, if a utility did not comply, DOE's instructions expressly stated that DOE would reject the DCSs. PX 246, p. HQR-001-2047 (8.0 DCS Process) ("if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved"). Thus, these circumstances do not create the sort of accord and satisfaction defense suggested by the Government. *See, e.g.*, *Southern Nuclear*, 77 Fed. Cl. at 419; *Yankee Atomic*, 73 Fed. Cl. at 298 ("Parroting the DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). That WE filled out the DCS forms as directed by DOE does not absolve the Government from liability for its breach.

By the time that DOE issued its DCS instructions in 1992, it was clear that DOE could not perform by 1998. PFF 104, 107, 115. Further, DOE issued DCS instructions that were inconsistent with the intent of the Standard Contract. The instructions required utilities to use the allocations in the 1991 ACR, which used an annual acceptance rate of 900 MTU, that was both illegal under existing law and artificially low, in an effort to minimize DOE's liability to utilities. WE PTB 44-49; PFF 97-101. The Government argues that this WE

argument means that WE's action is barred by the statute of limitations because WE's DCSs were approved in 1992 and 1993 and WE did not file its lawsuit until November 2000, *i.e.*, more than six years after DOE breached its obligations to set a schedule. Govt. PTB 30. That argument assumes a contractual importance for the DCS process that is conclusively refuted by evidence establishing that DOE believed that the DCSs were not binding and that the DCS process was nothing more than "administrivia." *See* PFF 126. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *18-19. Moreover, DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.* Thus, DOE's statute of limitations argument is devoid of merit.

The Government also fails to prove that the 900 MTU rate could achieve DOE's Standard Contract obligations. *See* WE's General Objections to Section XVII (DFF 310-361). Further, Ms. Supko's report and testimony established that the 900 MTU rate would not fulfill the purposes of the Standard Contract and that a 3000 MTU rate is best suited to do so. PX 792. Ms. Supko evaluated, as a factual matter, whether certain DOE acceptance rates would accomplish the following objectives identified by WE counsel: (1) to accept spent fuel so as to limit additional at-reactor storage after January 31, 1998 and (2) to work off the backlog of accumulated spent fuel in order to allow timely decommissioning. PX 792, p. 1. As discussed, WE has previously established that these objectives constitute DOE's acceptance rate obligations. *See also* WE PTB 41-42; PFF 48-51.

Ms. Supko's opinion was limited to modeling four acceptance rate scenarios against these criteria, which were provided by WE counsel. Tr. 3426:13-14 (Supko) ("I'm simply modelling acceptance rates."). When Ms. Supko evaluated the acceptance rate scenarios against those assumptions, she found that DOE performance at a steady-state acceptance rate of 3000 MTU after a five-year ramp up period most efficiently met the two criteria – the

Standard Contract obligations – that she was directed to assume by counsel. Tr. 3098:24-3099:17 (Supko).

The Government's proposed findings seek to diminish the validity of Ms. Supko's analysis by noting that she did not express opinions on other issues such as DOE's contract obligations and DOE's performance in the non-breach world. DFF 310-361. The Government's proposed findings, however, are irrelevant because WE counsel did not ask Ms. Supko to address these issues. Further, the Government has failed to show how WE's damages would have been different – they would not have been – had DOE been obligated to accept fuel at the 900 MTU rate.

The Government's proposed findings also mischaracterize Ms. Supko's expert opinion regarding the "reasonableness" of various DOE acceptance rates. Ms. Supko's opinion is that:

> [I]f DOE had begun acceptance of [SNF] by January 31, 1998, an overall steady-state spent fuel acceptance rate of 3,000 [MTU] per year, reached after a five-year ramp up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning.

PX 792, p. 1; Tr. 3098:24-3099:17 (Supko). Ms. Supko's opinion regarding the 3000 MTU rate, and other possible rates, is not whether they were reasonable in absolute terms, but instead, whether they met the two criteria defined by WE counsel. Ms. Supko addressed this issue in her testimony:

> Q: Now, you're offering an affirmative opinion that the 3000 rate is reasonable, correct?
>
> A: *Based on the analysis that I performed and the criteria against which I was evaluating the, the acceptance rate,* yes, I am.
>
> Q: And you're not offering an opinion in this case that your scenarios two, three, and four are unreasonable, correct?

> A: I've not said they're unreasonable, and my opinion is that scenario one is a reasonable rate of acceptance. However, yesterday, I did go through questions from Mrs. Hughes, where she asked me about, and I don't recall the terms, *whether the rates were efficient, and maybe it was practicable, and I did comment that scenario two was neither, and scenario three might have been practicable from the standpoint of it could have been implemented, but it wasn't efficient.*

Tr. 3463:17-3464:11 (Supko) (emphasis added). Ms. Supko outlined how rates other than the 3000 MTU rate, which she termed scenarios 2, 3 and 4, failed to satisfy efficiently the two criteria that she considered. Tr. 3130:11-3133:13 (Supko); PX 792, pp. 10-13.

In addition, the Government incorrectly contends that a 3000 MTU steady-state acceptance rate would "not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998." The Government cites testimony from Mr. Shimon and Ms. Supko in support of its contention. Govt. PTB 47. With regard to Ms. Supko's testimony, Ms. Supko never claimed that her analysis found a rate that would necessarily preclude *all* additional at-reactor storage after January 31, 1998 and work off the backlog in order to allow timely decommissioning in a *fixed* period of years. Instead, her analysis considered which of several specific acceptance rate scenarios (1) best *limited* additional at-reactor storage after January 31, 1998 and (2) worked off the backlog to allow *timely* decommissioning, based on the available data. PX 792, p. 1; PDX 36; Tr. 3098:21-3099:17 (Supko). When Ms. Supko evaluated the acceptance rate scenarios against those assumptions, she found that DOE performance at a steady-state acceptance rate of 3000 MTU after a five-year ramp up period most efficiently met the two criteria. Tr. 3098:24-3099:17 (Supko).

Ms. Supko also noted that, at the 3000 MTU rate, there would have been a considerable incentive for an exchanges market to develop because of the difference between the required additional at-reactor storage (less than 100 MTU per year) and the rate at which DOE would accept spent fuel (3000 MTU per year). PDX 45; Tr. 3143:25-3145:11 (Supko)

(including Ms. Supko's explanation at page 3145, lines 8-11 that, under scenario 1 (the 3000 MTU rate)).

With regard to Mr. Shimon, the Government asked Mr. Shimon a hypothetical (which does not reflect WE's circumstances) and he responded as follows:

> Q: So if a utility did not have an acceptance from the DOE until *2000, 2001, or 2002* even or even later than that, *it's possible* that a utility would be required to provide its own additional at-reactor storage after January 31st, 1998 under that scenario, isn't that right?
>
> A: Under that scenario, it would be *possible.*

Tr. 1392:24-1393:7 (Shimon) (emphasis added). The Government cannot seriously contend that this testimony stands for the proposition that the 3000 MTU "does not achieve the goal of eliminating the need for expenditures upon additional at-reactor storage after 1998." Govt. PTB 47.

The Government also erroneously contends that Ms. Supko "believed that the rates published in the 1991 ACR were reasonable" and that "the rate of acceptance for 1998 and 1999, 400 MTUs and 600 MTUs respectively, were reasonable." Govt. PTB 47 n.19, 48-49 n.21. To the contrary, Ms. Supko merely testified that it was reasonable to model the rate published by DOE in the 1991 ACR and it was reasonable to inform the PSCW of the rate published by DOE. She noted that the rate in the 1991 ACR reflected the information contained in "an official DOE document at the time." Tr. 3458:18-20 (Supko). *See also Yankee Atomic*, 73 Fed. Cl. at 298 ("Parroting the DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them.").

Finally, Ms. Supko did not testify that the 900 MTU rate itself was reasonable. Tr. 3459:6-11 (Supko). In her testimony regarding the 400 and 600 MTU rates in 1998 and 1999, Ms. Supko also did not express an opinion that such rates were reasonable. Tr. 3518:20-3521:16 (Supko).

## F. WE's Procurement of Three TN-32B Backup Casks Was Foreseeable, Caused by DOE's Breach, and Commercially Reasonable

In its initial post-trial submissions, WE demonstrated that its costs to procure three TN-32Bs are recoverable mitigation damages because the costs were foreseeable, substantially caused by DOE's partial breach, and established with reasonable certainty. PFF 142-150; WE PTB 49-53.

### 1. WE's Procurement of the TN-32B Casks Was Foreseeable

The Government's post-trial submissions do not dispute that WE's initial procurement of the TN-32B casks was foreseeable. Govt. PTB 52-57; DFF 473-531. That is hardly surprising given that spent fuel storage is a complex and relatively new technology that is constantly evolving. It is not surprising that unexpected events with new technologies could occur, causing the pursuit of an alternative or backup SNF storage option. *Southern Nuclear,* 77 Fed. Cl. at 423; PFF 127, 150, 241. Thus, WE's procurement of three TN-32B casks because of the problems experienced with the VSC-24 casks was foreseeable.

### 2. DOE's Breach Caused WE to Reasonably Incur Costs to Procure Three TN-32B Casks

As part of its dry storage project, WE initially procured VSC-24 casks. PFF 127-129; WE PTB 21, 33-34. WE experienced a number of serious problems with the VSC-24 cask, including an NRC prohibition of the loading of these casks for several years. PFF 142. There also were other significant regulatory, technical and business risks with the VSC-24 casks that motivated WE's decision to acquire an alternative cask, namely, the TN-32B cask. PFF 141. In these circumstances, WE prudently acquired three of the six TN-32B casks authorized by the PSCW. PX 524, p. KRGWE002387; PFF 107, 115, 142.

In its response, the Government does not contend that WE acted unreasonably in its initial acquisition of these casks. In fact, the Government's expert witnesses testified that WE acted reasonably in initially procuring the three TN-32B casks. PFF 143, 144.

That is not surprising given that the PSCW approved the acquisition of *up to six* TN-32B casks. PX 524, p. KRGWE002387 (Aug. 1998 PSCW Order). Based on this PSCW approval, WE then recovered from its ratepayers its incurred costs for the three TN-32B casks and related costs. PFF 148. The fact that this decision process and expense were analyzed and approved as reasonable by the PSCW merits consideration. *Yankee Atomic*, 73 Fed. Cl. at 269, 292.

In sum, WE would not have used dry storage in the non-breach world. PFF 161-212. Thus, WE would not have encountered the problems with the VSC-24 cask if DOE had performed under the Standard Contract. Therefore, DOE's breach caused WE to incur costs in procuring the three TN-32B casks which were reasonably procured as an alternative to the VSC-24 cask given the risks associated with the VSC-24 cask.

### 3. WE Reasonably Continued with TN-32B Cask Fabrication After Loading of the VSC-24 Casks Resumed

The Government asserts that, after WE resumed loading VSC-24 casks in September 1998, it should have suspended the TN-32B work until it determined a renewed need for the TN-32B casks. The Government, however, ignores that significant regulatory, technical and business risks with the VSC-24 cask remained even after WE resumed loading these casks. WE PTB 52; PFF 141, 145.

For example, WE feared that other latent problems with the VSC-24 casks would surface because of Sierra Nuclear's poor quality assurance, as well as its past history of ignition and cask lid welding incidents. PFF 141. WE's fears proved well-founded when the Palisades Nuclear Plant experienced VSC-24 cask ignition incidents in June 1999, which encouraged WE to continue procuring the TN-32B casks. PFF 140.

The Government also argues that Point Beach's continued loading of VSC-24 casks without further interruption is the strongest evidence that a backup was not needed. Govt. PTB 55. This argument ignores that problems did arise after WE resumed loading VSC-24



LEGAL14398425.1

casks, such as the aforementioned flaming incidents at Palisades. PFF 140. WE reasonably was concerned that events such as these might lead the NRC to again prohibit the loading of VSC-24 casks. PFF 140, 141.

Moreover, the fact that Point Beach did not load the TN-32B casks does not establish that they were not reasonably procured. WE needed the TN-32B casks to serve as backup casks in the event that additional problems arose with the VSC-24 casks. The nonuse of this backup option does not render the backup option unreasonable mitigation for the same reason that an unsuccessful but reasonable effort to avoid loss is a recoverable mitigation effort. *Indiana Michigan*, 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350(2) (1981)).

The Government asserts that the PSCW Order authorizing the use of TN-32B casks expired as soon as WE loaded a VSC-24 cask. Govt. PTB 54. The Government, however, points to no language in the PSCW Order that so indicates. To the contrary, the PSCW's approval of WE's *acquisition* of six TN-32B casks was never conditional. PX 524, p. KRGWE002387 ("The purchase of these casks, as a method of ensuring the reliability of Point Beach by providing a back-up option in case the VSC-24 cask remains unavailable to WEPCO, is reasonable."); PFF 148. Only the *use* of the TN-32B casks was conditioned on the unavailability of VSC-24 casks during the spring 2000 loading evolution.

In addition, the PSCW's later March 27, 2001 Order permitted WE to load the TN-32B casks. PX 592; PFF 151. WE, however, declined to do so because, by that time, it had decided to switch to dual-purpose casks and the TN-32B was not a dual-purpose cask. WE PTB 55-58; PFF 152.

The Government discusses at length the date until which Point Beach could have operated based on the number of VSC-24 casks loaded and placed at Point Beach's ISFSI.

This contention, however, ignores WE's numerous legitimate concerns with the VSC-24 cask that made it prudent for WE to continue with procurement of the TN-32Bs. PFF 141.

Further, there is no legal requirement that a utility conduct the sort of after-the-fact analysis prepared by Mr. Hamal. WE contemporaneously made legitimate and reasonable business decisions based on the facts, circumstances and concerns at hand. The evidence demonstrated WE's reasonable concerns regarding the VSC-24 casks. *Id.* Given his lack of experience in operating a commercial nuclear facility, Mr. Hamal is hardly in a position to second-guess the real-time decision-making of WE's experienced commercial nuclear power personnel. Tr. 5928:12-19; 5929:21-23; 5931:15-18 (Hamal).

In sum, WE reasonably continued the TN-32B cask procurement after loading of the VSC-24 casks resumed.

Given that WE reasonably continued the TN-32B cask procurement after loading of the VSC-24 casks resumed, the Government's speculation that WE could have terminated the TN-32B contract in September 1998 without any financial loss is irrelevant. Further, there are numerous infirmities in the Government's assertions.

For example, the Government suggests that WE's TN-32B contract permitted WE to terminate work on the TN-32B casks at any time without cost or penalty. Govt. PTB 53. To the contrary, that contract required that WE compensate Transnuclear, Inc. for all milestones met as of the date of cancellation, in addition to the value of any work then authorized by WE, profit on any in-process work, and all reasonable subcontractor cancellation fees. PX 503, p. WISC00064081. Based on the termination clause, WE would have incurred $2,037,600 in termination costs if it had terminated that contract in September 1998, not including profit and subcontractor cancellation fees that WE also would owe Transnuclear. DX 161, p. WISC00064082.

Similarly, the Government contends that WE could have recovered all the costs that it incurred in pursuing the TN-32B casks if it had cancelled the contract in September 1998. The Government, however, provided no evidence that other utilities were interested in acquiring long-lead materials from WE or that some other utility would have been willing to pay WE's contract price for cask materials. In fact, the Government provides no evidence whatsoever other than noting that other utilities loaded TN-32 casks. Govt. PTB 56. The Government has not established that any utilities placed new orders for TN-32 casks after September 1998, which would be a necessary prerequisite for a market for WE's long-lead materials. *See* DFF 511-516. Instead, the Government relies only on Mr. Brewer's unsupported assertion that WE's long-lead materials could have been sold for the same price that WE paid for them. PX 880, p. 25 (Brewer Report); Govt. PTB 56; DFF 511-513.

Further, although WE believes that it is entitled to recover all of its expenditures on the TN-32B casks, the PSCW Order required that the TN-32B casks be available for the Spring 2000 period. PX 524, p. KRGWE002388; PFF 148. If WE had decided to terminate the TN-32B effort in Spring 2000 based on the PSCW Order, WE would have spent from $2,508,000 to $3,230,000, with the likely cost being at the high end. PFF 149.

In sum, WE reasonably mitigated its damages by procuring three of the six PSCW-approved backup TN-32 casks. The Government has failed to meet its burden of proving that WE's mitigation effort was unreasonable. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear,* 77 Fed. Cl. at 407; *Tennessee Valley Auth.,* 69 Fed. Cl. at 523 .

**4. The Government Has Failed to Establish that WE Recovered Monies for Transfer of the TN-32B Casks to a Florida Power & Light Subsidiary as Part of the Sale of Point Beach**

The Government argues that WE made no attempt during trial to establish that it has not recouped the costs that it incurred for the TN-32B casks in its sale of Point Beach to a Florida Power & Light (FP&L) subsidiary. However, it is the Government, not WE, who

bears the burden of establishing any reduction in WE's mitigation damages. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear*, 77 Fed. Cl. at 407.

There is no evidence that WE received any compensation from FP&L with regard to the TN-32B casks. Tr. 5013:24-5014:5 (Weaver). More importantly, Mr. Weaver testified that WE owns the claim against DOE under the Standard Contract up through the closing date of the transaction selling Point Beach to FP&L. Tr. 5015:7-5016:3 (Weaver). Thus, the claim for the costs incurred in purchasing the three TN-32B casks remains with WE and WE properly seeks these costs in this action.

### G. WE's Decision to Procure the Dual-Purpose NUHOMS System Was Foreseeable and Reasonable

In its initial post-trial submissions, WE demonstrated that its costs for the procurement of the NUHOMS system are recoverable mitigation damages because these costs were foreseeable, substantially caused by DOE's partial breach, and established with reasonable certainty. PFF 151-157; WE PTB 53-59.

#### 1. WE's Procurement of the NUHOMS System Was Foreseeable and Caused by DOE's Continuing Breach

The Government's submissions present no credible evidence that WE's procurement of a dual-purpose system such as the NUHOMS system was not foreseeable. Govt. PTB 57-61; DFF 532-565. In any case, WE presented substantial evidence that its eventual decision to switch to a dual-purpose cask "was not only foreseeable, but foreseen." *Yankee Atomic*, 73 Fed. Cl. at 289. *See* WE PTB 53-55; PFF 154.

The foreseeability of WE's purchase of dual-purpose casks is also supported by the expert testimony of Ms. Supko, who authored an expert report on this issue. PX 793. Contrary to the Government's contention that Ms. Supko's opinion is irrelevant, Govt. PTB 59, Ms. Supko's report provided supporting evidence that DOE foresaw the possible use of multi-purpose casks at the time when the parties executed the Standard Contract. WE

PFF 154. The Government also asserts that the Court should dismiss Ms. Supko's opinion. Govt. PTB 59. To the contrary, the Court qualified Ms. Supko as an expert with regard to this issue, ruling that she was qualified regarding, *inter alia*, "DOE's nuclear waste management program [and] the storage and transportation of spent nuclear fuel." Tr. 3062:17-24 (Hughes). Thus, Ms. Supko was qualified to opine regarding the development of dual-purpose casks and her expert report was admitted into evidence. PX 793.[7] Further, the Government had adequate opportunity to file a motion *in limine* regarding this May 8, 2006 expert report (PX 793) prior to trial, but failed to do so.

The Government also presents no evidence to dispute that WE's procurement of these casks was caused by DOE's breach. Govt. PTB 57-61; DFF 532-565. *See* WE PTB 55-59.

**2. WE Reasonably Procured the NUHOMS System**

The Government presented no meaningful evidence calling into question the reasonableness of Point Beach's decision to shift to the NUHOMS dual-purpose system for future SNF storage at Point Beach. DFF 532-565; Govt. PTB 57-61.

First, the Government claims that Point Beach's safety concerns with the VSC-24 design had nothing to do with Point Beach's switch to the NUHOMS systems. Govt. PTB 59-60. To the contrary, safety is very important in nuclear power plant operations, including cask loadings. Tr. 1735:4-8 (Becka) ("It's not something to be taken lightly. It's the movement of the spent nuclear fuel, which is pretty toxic stuff, and it has to be taken very gingerly and with a high degree of safety involved."). The evidence showed that loading the NUHOMS system is *safer* than loading the VSC-24 casks. Tr. 1719:10-12 (Becka) (Q. "Is loading a TN-32PT NUHOMS safer than a VSC-24? A. Yes, it is.").

[7] The Government's citation of Ms. Supko's testimony regarding the ACR issue resolution process to attempt to argue that Ms. Supko is not qualified to opine regarding the dual-purpose cask issue, Govt. PTB 59, is inapposite.

The VSC-24 design uses carbon steel materials with a carbo-zinc coating that reacts with the borated spent fuel pool water to create large volumes of hydrogen gas. Tr. 1715:12-1716:21 (Becka). That was the cause of the VSC-24 hydrogen ignition incident and a later June 1999 VSC-24 flaming incident at the Palisades plant. PFF 136, 140. Unless the VSC-24 is vented during loading, the hydrogen gas will exceed the lower explosive limit. PX 645 (VSC-24 loading procedure); Tr. 1723:7-24 (Becka). Loading the VSC-24 cask creates a volume of hydrogen gas from 10 to 100 times greater than the NUHOMS system, which uses primarily stainless steel materials. Tr. 1716:14-1717:16 (Becka). One of the reasons that Point Beach selected the NUHOMS design was because of its increased safety characteristics and relative ease of use. Tr. 1719:10-1720:2 (Becka) ("[W]e made a selection of the NUHOMS design in 2001 at Point Beach for several reasons, one of which we just spoke about, stainless steel . . . offered a huge advantage in our minds, from both the hydrogen generation point of view, from the VSC-24 design, and from the point of view that stainless steel is easier to weld with."). For this reason alone, WE's selection of the NUHOMS system was reasonable.

A principal reason that WE, the PSCW, and almost all other nuclear utilities have concluded that procuring dual-purpose casks is reasonable is that "they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport." PX 592, pp. WISC00012217-8 (PSCW Order, March 27, 2001); PX 793, p. 11 (Table 1); PFF 152f. The Government cannot dispute the evidence establishing that purchasing additional VSC-24s, and then unloading them later for repackaging (given that they are currently only licensed for storage), raises radiological risks and results in additional costs. Govt. PTB 57-58; PFF 152c.

For example, this process would require WE to unload the canisters in the borated water in the Point Beach spent fuel pool, resulting in the same generation of high

concentrations of explosive hydrogen gas that are encountered when the VSC-24s are loaded. Tr. 1780:1-7 (Becka) ("[W]e'd be facing the same hazards again that we'd face with loading the production of hydrogen, and we'd have to be very careful about that.").

Unloading a storage-only cask also would result in increased radiation exposure to Point Beach workers and increase the likelihood of an accident. PFF 151c. The Government's analysis of the dual-purpose cask issue ignores these costs and risks – focusing instead only on the immediate fabrication costs. Govt. PTB 59. WE believed that the costs for the NUHOMS system would be only slightly higher than the costs for VSC-24 casks because Point Beach would not need to transfer fuel from a dual-purpose cask to a transportable cask prior to shipping fuel off-site. PFF 152c.[8]

The Government also claims that the additional cost associated with procuring a dual-purpose system showed "poor business judgment." Govt. PTB 58. That assertion is contradicted by the evidence. Among other things, it ignores that the PSCW believed that it was reasonable and desirable to transition to a dual-purpose cask. PFF 152h. In fact, WE supported its application for additional casks in part based on its pursuit of dual-purpose casks. PX 575.

Moreover, the evidence at trial showed that *DOE itself* is planning to accept dual-purpose casks and the DOE Contracting Officer expects the Standard Contract to be amended to incorporate DOE's acceptance of dual-purpose casks. PFF 154. Similarly, Ms. Supko testified that DOE continues to consider contract modifications to address acceptance of dual-purpose canisters. Tr. 3315:18-3322:11 (Supko); PFF 154; PX 1004, p. WISC1004-

[8] In recognition of the hazards associated with unloading the VSC-24 cask, WE has provided financial support for efforts to license the VSC-24 for transportation. PFF 152b. The Government claims that this amount is not recoverable, essentially stating that it is unnecessary and premature. Govt. PTB 61-62. The Government has failed to establish that the expenditure was unreasonable given the relatively small expenditure. Indeed, the Government's own expert, Mr. Brewer, believed that such an expenditure may be reasonable. Tr. 5627:4-20 (Brewer). *See also Northern States*, 78 Fed. Cl. at 469-70 (Court permitted utility to recover the costs incurred in seeking to qualify the TN-40 casks for transportation).

0025 (March 20, 2003 Testimony of Margaret Chu before the House of Representatives, Subcommittee of Committee on Appropriations) ("The Department believes the best approach is to pursue an overall modification to the disposal contract, which would involve several issues, including acceptance of multi-assembly canister systems. Unfortunately, due to ongoing litigation between the parties to the disposal contract, the Department is limited in what it can presently do.").

The Government references WE's 1994 Decommissioning Cost Study as purported evidence that WE agreed that DOE would only accept bare fuel loaded directly into a DOE cask. Govt. PTB 58; DFF 547. The Government's reliance on the Decommissioning Cost Study is misplaced. The evidence established that this study contained conservative assumptions as would be expected in the establishment of a financial reserve for decommissioning and, more importantly, that the assumptions contained therein were hypothetical because DOE had already informed the industry by then that it was not obligated to timely perform. DX 28; PFF 122b. Moreover, the Government did not show that the 1994 study had anything to do with Point Beach's selection of the NUHOMS system seven years later in 2001.

The Government also contends that it may not be possible to transport a large cask, such as the NUHOMS system, from Point Beach, because there is no active rail link to the plant. Govt. PTB 60. In support, the Government relies on Mr. Brewer's off-the-cuff analysis. Mr. Brewer's analysis ignores that, under the Standard Contract, transport of spent fuel from the Point Beach site is the responsibility of DOE, not WE. PX 41, p. KRGWE002126. Additionally, Mr. Brewer's analysis of the capacity limits of bridges in the area surrounding Point Beach and of Wisconsin road regulations are outside the scope of Mr. Brewer's expert report and claimed expertise. PX 880.[9] Mr. Brewer's apparent

[9] Given that the Government did not disclose this new opinion of its expert witness under RCFC 26(a)(2) , the new opinion of Mr. Brewer should be stricken.

conclusion that transportation issues should preclude the use of NUHOMS canisters at Point Beach also defies common sense because the PSCW encouraged WE to use dual-purpose systems and the State of Wisconsin has demonstrated its interest in shipping SNF off-site from the shores of Lake Michigan as soon as possible. PFF 152h. Further, Mr. Brewer's views on this issue are contradicted by the evidence that WE has successfully moved very heavy objects, such as the Unit 2 Steam Generator components, from railheads to the Point Beach site by heavy haul conveyance. PFF 263-64. Finally, the Government's assertion is undercut by the admission by Mr. Brewer in his report that a large cask could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE0110022, n.64.

The Government also claims that there is no support in the record for WE's belief that dual-purpose casks could be used for shipment to Private Fuel Storage ("PFS") or other private facility. Govt. PTB 58. To the contrary, Mr. Farron testified that WE pursued dual-purpose cask capability for shipment of SNF to either PFS or to a centralized repackaging or transfer facility. Tr. 2531:1-20 (Farron). Further, the Government mischaracterizes the testimony of Mr. Farron by its assertion that he agreed that the use of the NUHOMS system in the FWMS is "based purely on speculation." Govt. PTB 58. In the cited testimony, Mr. Farron testified that dual-purpose casks provide considerable flexibility and can be transported to a private fuel storage facility. He then added: "Possibly, DOE would pick up, and we hoped they would, pick up our spent fuel utilizing those dual-purpose casks." Tr. 2524:18-2525:10 (Farron). Thus, Mr. Farron did not state that the possibility of DOE accepting fuel in the NUHOMS system was "pure speculation." Instead, he did not explain his reasons for believing that DOE might accept fuel in NUHOMS canisters. Nor was he asked by the Government what those reasons might be.

In the other cited testimony, Mr. Farron testified that he could not then recall the correspondence between DOE and utilities regarding acceptability of dual-purpose canisters.

He in no way suggests that such correspondence does not exist. Further, although testifying that WE had no assurance from DOE that DOE would take the fuel in the NUHOMS system, he did not testify that he did not expect DOE to do so or that there was no basis for believing that DOE would do so. Thus, this testimony does not substantiate the Government's contention that WE's belief that DOE would accept WE's SNF stored in NUHOMS canisters was based on "pure speculation."

Again, the evidence showed that DOE is planning to accept dual-purpose casks and that the DOE Contracting Officer expects the Standard Contract to be amended to incorporate DOE's acceptance of dual-purpose casks. PFF 154. Similarly, Ms. Supko testified that DOE continues to consider contract modifications to address acceptance of dual-purpose canisters. Tr. 3315:18-3322:11 (Supko).

Another flaw in the Government's position is that it downplays the serious limitations inherent in the VSC-24 cask operating parameters that were present when Point Beach selected the NUHOMS system in 2001. At that time, the VSC-24 cask was licensed to hold only older, colder fuel assemblies. PFF 152a. The evidence showed that continuing use of the VSC-24 cask and continuing to load only colder assemblies created risks for Point Beach's long-term spent fuel management flexibility. Tr. 1773:20-1774:23; 1771:11-1778:12 (Becka). The Government failed to prove that, in 2001 when Point Beach selected the NUHOMS system, it was known or even likely that the NRC would re-license the trouble-plagued VSC-24 for higher burnup fuel. It also offered no meaningful evidence showing that Point Beach's fuel management would not have been placed at risk if Point Beach had waited for the NRC to issue a license amendment for the VSC-24 design for higher-burnup spent fuel (which the NRC eventually did do in 2003). PX 880, p. WXE011 0028, n.98.

The only support offered by the Government for its position is the testimony of Mr. Brewer. Mr. Brewer, however, did not address the hot/cold spent fuel management issue

in his report. His report stated only that, based on the fuel available in the Point Beach inventory, WE "could have continued to use VSC-24 casks." PX 880, p. WXE011 0030. At trial, Mr. Brewer testified beyond the scope of this report, stating not only that loading additional VSC-24 was possible, but offering the additional new opinion that continued loading of the VSC-24 cask would have been a "reasonable technical and engineering decision." DFF 561. Yet Mr. Brewer offered no additional technical basis for this new opinion. Moreover, the Government failed to disclose this new expert opinion as required by RCFC 26(a)(2). Therefore, this testimony should be stricken. *See* Plaintiff's Motion *In Limine* to Exclude Certain Demonstratives and Any Related Testimony, Dkt. 357 (Oct. 8, 2007).

Moving to the NUHOMS system also offered Point Beach many practical advantages such as information sharing with other utilities and vendor support based on the adoption of the NUHOMS as a common design throughout the nuclear industry. PFF 152f. The Government attempts to dismiss this advantage by claiming that British Nuclear Fuels, Ltd. offered to provide unidentified support for the VSC-24 design. Govt. PTB 58-59. The Government's contention is unsupported by the evidence and hardly constitutes proof of a meaningful commitment to the VSC-24 cask design. To the contrary, the evidence showed that it was important for Point Beach to use a design compatible with the other Nuclear Management Co. nuclear plants, resulting in efficiencies of scale. PFF 152g. By contrast, no utility continues to load VSC-24 casks. PFF 153. WE reasonably considered the lack of other active VSC-24 new purchasers and the industry shift to dual-purpose designs in its cask selection. PFF 152f, g.

Finally, the Government claims that a NUHOMS loading period is longer than the VSC-24 loading period and that the loading is more labor-intensive. Govt. PTB 60-61. Its claim is unsupported by the evidence. In analyzing the VSC-24 loading period, Mr. Brewer

used loading data from before the May 1996 hydrogen ignition incident at Point Beach. DFF 557. The cause of that incident was the generation of explosive hydrogen gas arising from the reaction of the borated water with the carbo-zinc coating of the VSC-24 cask. PFF 137. To remedy that problem, during the VSC-24 loading process, the WE loading team had to continuously purge hydrogen gas to prevent gas buildup to an explosive level. *Id.* WE also had to draft revised loading and unloading procedures to deal with the hydrogen buildup. *Id.* This purge process, among other tasks, resulted in eight to nine day loading periods for a VSC-24 cask after the May 1996 incident. PFF 152d.

The Government also relies on an analysis prepared by Mr. Kiraly. Spent fuel cask loading, however, is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, Appendix A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2). Therefore, this testimony should be stricken. *See* Plaintiff's Motion *in Limine* to Exclude Certain Demonstratives and Related Expert Testimony, Dkt. 360 (Oct. 14, 2007).

More importantly, Mr. Kiraly's methodology was flawed. The evidence established that, while the actual time to load a NUHOMS canister is between four and five days, the accounting records may show a longer duration of time because of delays related to the operations of the Point Beach Nuclear Power Plant. Tr. 1920:23-1921:6; 1924:6-11 (Becka); Tr. 6307:22-6308:18 (Metcalfe). This is illustrated on many dates on chart DDX 5-57 where little, if any, labor was charged on certain days within a loading period. DDX 5-57.

Mr. Kiraly's methodology was also flawed because the evidence showed that it took fewer hours to load a NUHOMS than a VSC-24 on a per assembly basis. Tr. 6304:19-6305:25 (Metcalfe). Further, the evidence established that VSC-24 loading hours likely were understated because, at that time, there was no specific timekeeping account for cask loading activity. Tr. 1907:3-1908:18 (Becka) (it was "a little bit more difficult to come up with all

the costs that were attributed" to campaigns prior to the establishment of project code 3.0264 for the 2006 loading campaign); Tr. 6307:4-17 (Metcalfe). A separate account was not established until the most recent NUHOMS loading campaign. Tr. 1907:3-1908:18 (Becka).

Based on the Government's failure to show that Point Beach's decision to shift to the NUHOMS design was unreasonable in any way, the Government's attempted deduction for the cost of dual-purpose casks should be rejected. This is consistent with the other SNF decisions that have approved the purchase of dual-purpose casks. *See, e.g.*, *Entergy Arkansas*, 79 Fed. Cl. at 49, 58-59 (granting recovery of dual-purpose cask costs to System Fuels, which had previously loaded VSC-24 casks at its Arkansas Nuclear One plant); *Northern States*, 78 Fed. Cl. at 469-70; *Southern Nuclear*, 77 Fed. Cl. at 424-25; *Pacific Gas & Elec.*, 73 Fed. Cl. at 418-19.

## H. WE Reasonably Incurred Foreseeable Costs in Exploring Private, Off-Site SNF Storage that Were Caused by DOE's Breach

### 1. Background

As explained in its initial post-trial submissions, WE expended funds from approximately 1994 through 1999 investigating the feasibility of several off-site private fuel storage facility projects. WE PTB 60; PFF 212-215. At the time of WE's initial 1994 investment in PFS, the PSCW had not yet approved WE's 1991 dry fuel storage application. Although WE finally received PSCW project authorization in February 1995, the PSCW Order was promptly challenged in court, creating additional uncertainty regarding when WE could begin loading spent nuclear fuel to its proposed dry storage facility. PFF 212.

WE continued its investment in PFS thereafter for several reasons. The PSCW February 1995 Order only authorized WE to load twelve VSC-24 casks. Given DOE's substantial delay, WE believed that it would need to provide storage until the end of Point Beach's licenses. PFS offered a potential solution for WE's storage needs if the PSCW denied WE's application for additional on-site storage, a very real possibility given the



LEGAL14398425.1

PSCW's and intervenors' concerns regarding the storage of spent fuel at Point Beach. PFF 212. WE also believed that its efforts in pursuing spent fuel storage outside Wisconsin through PFS enhanced the likelihood of PSCW approval of any subsequent dry cask loading authorization applications. *Id.*

After ending its investment in PFS because of uncertainties regarding its success, WE also explored other off-site alternative storage options to mitigate DOE's nonperformance. PFF 212, 214.

### 2. WE's Expenditures in Pursuit of PFS and Alternative Off-Site Storage Options Are Recoverable Because They Were Foreseeable, Caused by DOE, and Reasonably Incurred

WE's expenditures for PFS and other off-site storage alternatives were foreseeable, caused by DOE, and established with reasonable certainty. WE PTB 61, 62. Further, the Government has not satisfied its burden of establishing that these limited investments were unreasonable. Govt. PTB 63, 64.

The Government erroneously argues that the *Indiana Michigan* decision precludes, as a matter of law, recovery of WE's PFS expenditures. Govt. PTB 62-63. WE, however, was not a party to that litigation. In *Northern States*, the Court held that Northern States was not barred from recovering its PFS expenditures and that issue preclusion is not applicable against a party whose interests were not represented in the prior suit. 78 Fed. Cl. at 465.

Further, *Indiana Michigan's* holding was limited to the record in that case. The Court found that, based on the evidence in that case, Indiana Michigan's PFS investment was "too speculative" and not foreseeable to entitle recovery. *Indiana Mich. Power Co. v. United States*, 60 Fed. Cl. 639, 658-59 (2004). Conversely, here, WE established that its investments in PFS and other off-site storage options were not overly speculative and that these spent fuel management expenditures were foreseeable to the Government. WE PTB 61, 62; PFF 212-216.

The Government's argument that WE did not prove that its investment in PFS was foreseeable is disingenuous. The NWPA expressly recognized the potential development and use of a private fuel storage facility. WE PTB 62. Additionally, Mr. Morgan acknowledged the construction of private off-site storage facilities in his presentation at the December 1983 Civilian Radioactive Waste Management Information Meeting. DX 493, p. SN069599 ("During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or *at another storage location*." (emphasis added)).

Then, in a 2001 report to Congress, DOE stated that PFS could serve as an available alternative for storing SNF for Northern States. *See* PX 590, p. 7 (Jan. 2001 DOE Spent Fuel Management Alternatives Available to Northern States). DOE also included PFS in its contingency plans in its 2002 draft Yucca Mountain Environmental Impact Statement. PX 619, pp. 39, 108, vol. III § 9.1 ("DOE recognizes interim storage at the Private Fuel Storage facility in Utah to be a reasonably foreseeable future action and has included this proposed action . . . ."). Thus, WE's investigation of off-site options was foreseeable to DOE. *Northern States*, 78 Fed. Cl. at 466.

The Government ignores this evidence. Further, it offers no evidence in support of its argument that PFS and other off-site storage costs were not foreseeable. Instead, the Government relies solely on its erroneous reading of *Indiana Michigan* to assert that PFS was not foreseeable. Govt. PTB 62, 63.

As to causation, WE's pursuit of off-site storage options was caused by the anticipated substantial delay in DOE's performance. WE would not have pursued PFS if DOE had performed its obligations under the Standard Contract. PFF 215.

The Government does not appear to dispute that it substantially caused WE to incur costs related to PFS and other off-site storage options. Govt. PTB 62-66. Instead, the

Government attacks the reasonableness of WE's pursuit of PFS and other off-site storage alternatives as a means of mitigating DOE's damages. DOE, however, bears the burden of showing that WE's mitigation attempts were unreasonable. *Northern States*, 78 Fed. Cl. at 466; *Southern Nuclear*, 77 Fed. Cl. at 407; *Tennessee Valley Auth.*, 69 Fed. Cl. at 523.

The Government has not met its burden. It asserts that WE continued to contribute to PFS and other off-site investments "long after it needed to do so." Govt. PTB 63. Thus, the Government concedes that, at the very least, WE's initial costs in the development of PFS were necessary and reasonable. The Government then asserts that WE should not have continued to invest in PFS because it did not expect PFS to be available until 2003. Thus, the Government believes that PFS could only have value to WE as a means to "bridge the gap" to 1998. That is incorrect. When WE began to pursue PFS in 1994, WE anticipated that DOE would not begin to accept spent fuel from Point Beach until at least 2007, and likely much later. Thus, PFS had relevance as an alternative storage option until DOE began to perform. PFF 107, 115.

DOE continued to make very little progress towards implementation of the FWMS and WE could not predict when, if ever, DOE would perform. DOE's substantial delay caused WE to plan for the storage of the fuel through the end of Point Beach's operating licenses. Even if PFS was not available until 2003, it could have provided spent fuel storage if the PSCW denied WE's subsequent applications for additional casks. Thus, the clear road hypothesized by the Government in its criticism of WE's PFS investment is contradicted by the evidence.

Additionally, as noted, as of 1994, WE had not received PSCW approval of its November 1991 dry storage project application. *See* PX 374. Even after PSCW approval, intervenors challenged the PSCW approval in the Wisconsin courts. PFF 212. WE eventually was able to begin ISFSI construction and to load two VSC-24 casks. WE,

however, was unable to load VSC-24 casks from June 1996 and August 1998 because of NRC Confirmatory Action Letters ("CALs") concerning an ignition incident and welding problems. PFF 136, 139.

The Government also alleges that WE's motivation to contribute to PFS was as an investment, not a potential alternative spent fuel storage option. The Government fails to cite any support for this assertion and the evidence clearly contradicts it. PFF 212-215.

The Government next argues that WE's assertion that it invested in PFS because WE was concerned that the PSCW might not approve future dry fuel storage applications is inconsistent with WE's pursuit of PFS because PFS faced similar obstacles. WE has never claimed that PFS would not face challenges. However, given that any spent fuel storage option faced considerable challenges, WE believed that it was prudent to investigate a number of spent fuel storage options.

The Government cites testimony from Mr. Weaver regarding PFS as support for the contention that PFS was unlikely to be successful. The Government's argument is misleading. WE invested in PFS from 1994-1997. Mr. Weaver was discussing the prospect of WE rejoining PFS in 2001, four years after WE had withdrawn from PFS for some of the same reasons later identified by Mr. Weaver in 2001. In addition, by 2001, WE had received an additional approval from the PSCW to load sufficient casks to store spent fuel until the end of Point Beach's then-current licenses. Thus, Mr. Weaver's testimony regarding whether WE should rejoin PFS in 2001 is irrelevant to WE's reasonable decision to invest modestly in PFS during the 1994-1997 period. DX 90; Tr. 4975:7-4976:24 (Weaver).

The Government also argues that storage at an off-site facility would have been more costly than on-site storage. WE agrees that is possible. The Government, however, ignores the political and environmental costs embodied in on-site storage. The PSCW and the intervenors strongly opposed the long-term storage of spent nuclear fuel on the shores of

Lake Michigan. PX 274, pp. WISC00010703-04; PX 349; PX 367, pp. WISC00013263, WISC00013266 ("*the waste may never leave Point Beach*" (emphasis in original)); PX 374, p. 16; PX 592, pp. 10-11. There existed the possibility that the PSCW would not approve the loading of additional dry storage casks beyond the twelve casks approved in its February 1995 Order. PX 374. If WE's application for additional casks was denied, the higher cost of PFS would be preferable to a long-term shutdown of Point Beach. Thus, WE's pursuit of PFS was reasonable even if the costs of off-site storage may have exceeded those of on-site storage.

Finally, the Government suggests that WE's withdrawal from PFS indicates that WE's expenditure on PFS was too speculative. That suggestion is contrary to the evidence. The evidence demonstrated that WE believed that PFS would be successful when WE first participated. WE only decided to withdraw after several years based on its belief that the prospects of a successful PFS had diminished. PFF 213.

## I. The Dry Storage Fees Imposed by the NRC Were Caused by DOE's Breach and Were Foreseeable

In its initial post-trial submissions, WE demonstrated that it would not have built an ISFSI in the non-breach world and, accordingly, WE is entitled to recover as damages the pre-1999 NRC ISFSI license fees that it paid. PFF 217-222, 228; WE PTB 64, n.19. Further, WE demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 similarly resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69.

### 1. The Pre-1999 Fees Were Foreseeable and Caused by DOE's Delay

The Government asserts that the pre-1999 NRC ISFSI fees that WE paid were not foreseeable at the time of Standard Contract formation. Its argument is that, given that the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388 ("OBRA-90"), the statutory authority pursuant to which the NRC must recover its annual

budget through a combination of generic and specific activity fees, was not enacted until 1990, DOE could not have foreseen that WE might incur regulatory fees in connection with WE's spent fuel storage activities at the time of contract formation in 1983. Govt. PTB 67-71.

The Government's position reflects a misunderstanding of the doctrine of foreseeability. While the general response to a breach must be foreseen, the specific response need not be foreseen. *Southern Nuclear*, 77 Fed. Cl. at 405 ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."). Foreseeability also "refers to the probability, *i.e.*, the likelihood of the occurrence of a given event or circumstance as assessed in terms of common experience or specific knowledge." *Northern States*, 78 Fed. Cl. at 463 (citations omitted).

Applying the first principle, DOE certainly was aware that, if it failed to pick up WE's SNF, WE would incur costs to store the spent fuel on its own. *See, e.g.*, *Carolina Power & Light Co.*, 2008 WL 2154103 at *20 (and citations therein). The NRC fees are simply another spent fuel management storage cost that WE has incurred. Conceptually, these costs are no different from the costs that WE incurred in obtaining approval for the ISFSI from the PSCW, in constructing the ISFSI or in acquiring and loading casks. Thus, DOE need not have foreseen that WE's specific mitigation activities would result in the imposition of NRC license fees in order for these damages to be foreseeable.

Applying the second principle, given that spent nuclear fuel is highly radioactive and highly regulated, the Government cannot seriously contend that it was unlikely that WE would incur regulatory costs in connection with spent fuel storage issues. The Government admits that the NRC's predecessor, the Atomic Energy Commission, began charging fees for specific activities in 1968. Govt. PTB 67. Thus, the Government cannot contend that the pre-1999 specific fees were not foreseeable. In *Carolina Power & Light Co.*, the Court

allowed recovery of NRC licensing expenses incurred by the utility in connection with construction of a spent fuel pool. 2008 WL 2154103 at *29. *See also Northern States*, 78 Fed. Cl. at 469-70 (Court awards NRC cask transportation license costs).

Further, while foreseeability is determined at the time of contracting, the Court has recognized that "there may be situations where foreseeability is more appropriately measured at the time of the breach, because that is when the breaching party should be on notice of the ramifications of its actions or failures to act." *Southern Nuclear*, 77 Fed. Cl. at 404 . We do not believe that the Court need apply this alternative foreseeability standard in order to determine that the NRC fees were foreseeable here. Nevertheless, if it did so, the Court then would consider what was foreseeable as of January 1998. Clearly, both categories of NRC fees were foreseeable as of January 1998. Indeed, by 1998, the NRC had already assessed the pre-1999 ISFSI fee against WE. PFF 219.

The Government also contends that the pre-1999 NRC ISFSI fees are consequential damages remote from DOE's delay because they involve regulatory actions. The Government cites *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006), and *Myerle v. United States*, 33 Ct. Cl. 1 (1897) as support for its assertion. Govt. PTB 70-71. Neither decision advances the Government's cause. In *Old Stone*, the court did not hold that damages as a result of congressional and regulatory actions generally are too remote to be foreseeable or recoverable. Instead, the Federal Circuit applied the standard foreseeability test and concluded that Old Stone had not proven that the reliance damages that it claimed in that case were foreseeable. 450 F.3d at 1376 ("OSC has not called our attention to any testimony in the record that will support the foreseeability of any of these assumptions, and we have been unable to locate any."). Thus, *Old Stone* does not establish a different foreseeability or causation standard where congressional and regulatory actions are at issue.

Indeed, in *Old Stone*, the Federal Circuit awarded $74.5 million to plaintiff for costs incurred in mitigating congressional and regulatory actions. *Id.* at 1370.

The *Old Stone* decision is also factually dissimilar. The damages in *Old Stone* included lost profits, which the court found imposed a greater burden of causation on plaintiffs. *Id.* at 1377-78. The discussion relied on by the Government also involved consideration of a reliance claim, not a partial breach claim applying mitigation principles. WE is neither asserting a reliance claim nor seeking to recover lost profits.

Similarly, the *Myerle* decision does not suggest that damages resulting from congressional and regulatory actions are too remote to be recovered. Instead, *Myerle* simply required that damages be foreseeable and that there not be an intervening incident "not caused by the defaulting party." 33 Ct. Cl. at 19. Here, the evidence established that the NRC fees were directly caused by DOE's breach and, therefore, are recoverable.

Given that WE has established that DOE's delayed performance was a substantial causal factor in WE's decision, the Government's assertion that the NRC fees are "consequential damages" must be rejected. Indeed, the Court's previous awards of NRC licensing costs in *Carolina Power & Light Co.* and *Northern States* make it clear that these types of damages were proximately caused by DOE's breach. Again, given that SNF is highly radioactive, the possibility of regulatory activity and related fees or costs in connection with the storage of spent fuel is quite likely and hardly remote or consequential. *Northern States*, 78 Fed. Cl. at 463.

### 2. The Dry Storage Fees Imposed by the NRC Since 1999 Were Caused by DOE's Breach and Were Foreseeable

WE explained that the pre-1999 NRC fees were foreseeable in Section II.I.1, immediately above. Based on the same rationale, the dry storage fees imposed by the NRC since 1999 also were foreseeable. *Indiana Michigan*, 422 F.3d at 1376 ("DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its

SNF."); *Carolina Power & Light Co.*, 2008 WL 2154103 at *29; *Northern States*, 78 Fed. Cl. at 469-70. The Government also cannot seriously contend that it could not have foreseen that, at some point, the NRC might change the specific license fee to a generic license fee as it did in 1999. Therefore, the fees assessed beginning in 1999 were foreseeable.

**3. DOE's Breach Caused WE to Incur NRC Fees Under 10 C.F.R. Part 171**

In its initial post-trial submissions, WE demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69. In response, the Government asserts that the NRC fees for generic activities were not the result of DOE's delay. Govt. PTB 71-80.

The Government's response, however, ignores a number of salient facts. WE has established that it was DOE's partial breach that caused WE to implement a dry storage program. *See*, *e.g.*, WE PTB 34; PFF 158, 159. The Government cannot dispute that the NRC expended resources on dry storage activities prior to 1999. Under OBRA-90, the NRC has to recover the costs of this effort through fees and did so by charging the ISFSI license holders, including WE, ISFSI license fees through 1998. WE PTB 64; PFF 217-222, 228.

The cost of the NRC's dry storage activities did not go away in 1999. WE continued to utilize its ISFSI and the NRC continued to incur costs in connection with dry storage activities. In 1999, the NRC simply changed the manner in which it recovered those costs from the nuclear utilities by changing a specific fee to a generic fee. The NRC's dry storage costs continued and its need to recover its budget authority from the nuclear utilities continued.

Once one recognizes that the foregoing points are incontestable, then it really does not matter what rationale prompted the NRC to transform the specific ISFSI fee to a generic

fee. Under either fee, the NRC is imposing a charge for dry storage activities and those charges would not have existed absent DOE's partial breach.

In any case, the Government argues that the NRC fee change was instituted in the actual world in order to avoid a disincentive to use dry storage that was allegedly present in the pre-1999 regulatory system. Govt. PTB 71-80. While that may have been one of the reasons, it is equally true that a substantial cause of the NRC's decision to allocate the cost of its dry storage regulatory efforts was its recognition that, given the lengthy delay in DOE's performance, virtually all operating utilities will be required to have dry storage once their spent fuel pools are full. PFF 223-224. The only utilities that might have a choice in the breach world to avoid dry storage are those that have stopped operating and can choose either wet storage or dry storage as they decide on a plant decommissioning strategy. If DOE had performed, most utilities would not have had to resort to dry storage and it seems highly unlikely that this choice of wet versus dry storage would ever have become an issue. PFF 228; Tr. 2426:19-2427:6 (Gadzala).

Once DOE breached the Standard Contract, these dry storage-related NRC fees should have been charged by the NRC directly to the DOE. Indeed, the October 1998 Spent Fuel Storage and Decommissioning Fee Study recommended that the NRC obtain authority to assess fees to other Government agencies. DX 612; Tr. 4163:3-4164:1 (Rabideau). The FY 1999 Final Rule stated that the "NRC recognizes that sites will be required to continue to store spent fuel onsite until another solution becomes available." PX 1044 (Federal Register), p. WISC1044-0009.

The Government argues that the spent fuel storage/reactor decommissioning ("SFS/RD") fee was created for three "concerns" found in the NRC staff study related to spent fuel storage and decommissioning fees and was unrelated to DOE's delay. Govt. PTB 71-73. To the contrary, the decision to change the NRC's 10 C.F.R. Part 171 fee structure

originated in March 1998, after DOE had already breached the Standard Contract. In the actual world, everyone, including the NRC, was aware of the obvious, namely, that with DOE's substantial delay, more utilities would require dry storage. WE PTB 67; PFF 223. Clearly, these are not the conditions that would have existed in the non-breach world. The Government's continued reliance on actual world documents, without addressing the non-breach world, fails to address what may have occurred in the non-breach world.

WE and its damages expert, Mr. Sieracki, did address the non-breach world. They demonstrated that, in the non-breach world, it is highly likely that WE would not have paid the NRC fees at issue. WE PTB 67-68. WE presented compelling evidence that the NRC would not have imposed the generic ISFSI fee that it has assessed from 1999 forward if DOE had performed. In the non-breach world, less than ten ISFSIs would have been constructed. PFF 229. Thus, the class of ISFSI licensees would have been very small. The number obviously would have been less than "all licensees." Thus, the NRC would not have been able to impose the generic fee across the industry in the non-breach world because the NRC may only allocate generic fees "fairly and equitably" among licensees. 42 U.S.C. § 2214(c)(4). Because WE and many other licensees would not have built dry storage in the non-breach world, it would not have been reasonable to charge them generic dry storage fees. In the non-breach world, therefore, the NRC would have likely only charged fees to the applicable class – those licensees using dry storage – which would not have included WE. PFF 228-229.

The Government's argument that Mr. Sieracki's testimony should be ignored because he is not an expert on NRC fees, DFF 456-460, is misplaced. It ignores that Mr. Sieracki is an expert at linking cause and effect relationships in a non-breach world for the purposes of determining damages, which is exactly the testimony that he has so helpfully provided. PFF 33; PX 794, Appendices A, B.

The Government argues that WE has failed to demonstrate that it has been harmed because WE has paid less generic fees in the actual world than it would have paid in the non-breach world. Govt. PTB 80-82. WE disagrees. In the non-breach world where DOE performs according to the Standard Contract, there would have been fewer ISFSIs and those specific utilities that paid the Part 171 fee for dry storage activities would have continued to pay that specific fee. There would have been no impact on overall generic Part 171 fees. PFF 228.

The Government next asserts that, after 1998, WE's overall generic fee was lower than the 1998 fee until 2003 and that the SFS/RD fee has decreased since 2003. Govt. PTB 80-81. From this assertion, it then claims that this must mean that WE's annual fee in the non-breach world would have been greater than in the breach world. *Id.* The Government's logic is flawed and its assertions are irrelevant. As long as WE is paying a fee for dry storage, that cost is DOE's responsibility because, in the non-breach world, WE would not have incurred that cost. Even assuming that the SNF storage fee may have been reduced when the fee was included as part of the generic fee, that does not mean that this fee is not a recoverable damage. It simply means that the amount recoverable as a damage has been reduced; it has not gone away.

**4. WE Established at Trial the Spent Fuel Storage Portion of the NRC Fee with Reasonable Certainty**

The Government argues that the detailed information necessary to calculate damages likely does not exist. Govt. PTB 82-86. This argument is inaccurate. WE has identified with reasonable certainty the amount of the NRC's dry storage charges included in the NRC's new fee structure starting in 1999. PFF 223-230; WE PTB 64-69. WE's identification of the NRC's dry storage charges was based on the deposition and trial testimony of Peter Rabideau, NRC Deputy Chief Financial Officer. It was the Government who put forth Mr. Rabideau as the knowledgeable person on this issue. Defendant's App. A, Para. 15(a)

Witness List, p. 5, Dkt. 268 (Jan. 24, 2007). Having placed Mr. Rabideau forward as the knowledgeable person on this issue, the Government cannot now assert that Mr. Rabideau may need more information which the DOE never sought or provided to WE.[10] All of the information necessary to segregate dry storage costs from other costs is in the possession of the Government. Thus, any failure to segregate those costs with even greater certainty than WE did is attributable to the Government, as the Government had ample opportunity to do so. PFF 227; WE PTB 69.

The Government asserts that WE's claim fails to properly remove the 10 C.F.R. Part 170 fees. Govt. PTB 86-89. To the contrary, WE's damages experts, The Kenrich Group, used the net fee amount determined by the NRC after removal of Part 170 fees, with the exception of two WE-specific Part 170 charges discussed below. This is confirmed by review of the relevant Kenrich work papers. PX 1008, pp. KRGWE003411, KRGWE003439, KRGWE003502, KRGWE003537, KRGWE003583, KRGWE002619; PX 1029, pp. KRGWE003886, KRGWE003889.

The Government also asserts that WE is claiming duplicative damages. That is incorrect. Beginning with FY 1999 (when the NRC revised its spent fuel storage license structure), WE is only claiming that portion of the Part 171 fees attributable to spent fuel storage. In addition, in 2003, the NRC invoiced for two inspections related to the storage of spent fuel and charged WE separate Part 170 specific fees in the amount of $13,716 for these activities. PX 1029, p. KRGWE003864. WE is properly claiming these separate, specific fees.

In addition, in 2005, the NRC invoiced for another inspection related to the storage of spent fuel and charged WE a separate Part 170 fee in the amount of $12,360. PX 1029,

[10] The Government's attempt to fault WE by saying that WE should have conducted further discovery on this issue is unavailing. The Government did not even identify Mr. Rabideau until after fact discovery had closed and only made Mr. Rabideau available for deposition on a single day in December 2006 with limited notice.

p. KRGWE003864. Thus, these are not duplicative charges, but separate charges assessed by the NRC and incurred by WE. PX 1008, 1029.

The Government next faults WE's calculation, by asserting that it improperly includes costs for a surcharge that would have been incurred in the non-breach world because the surcharge applies to all licensees, not merely those paying the SFS/RD fee. Govt. PTB 89-90. The surcharge is part of the fee that the NRC charges WE for spent fuel activities. PX 1008. Further, WE included only that portion of the surcharge that is allocated to spent fuel storage. *Id.* Given that DOE caused WE to incur the spent fuel storage-related NRC fees, DOE is also responsible for the surcharge applied to those spent fuel storage-related costs. Therefore, the surcharge is properly included in WE's damages. PX 1008, 1029.

The Government argues that WE's calculation improperly includes costs for wet storage. Govt. PTB 90-91. As Mr. Sieracki testified, The Kenrich Group would have considered any additional information provided by the NRC to refine the segregation of the costs, but no additional information was provided by the Government. Tr. 3796:13-3797:19 (Sieracki). WE (with the assistance of The Kenrich Group) made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

The Government does not contest that WE incurred the NRC generic fees at issue. Rather, the Government disputes WE's reasoned attempt to determine that portion of WE's fees for 1999-2007 that were allocable to its dry storage based directly on testimony from a senior, knowledgeable NRC representative whom the Government put forth. The NRC possesses all relevant budgetary information and the Government has failed to put forth any contrary evidence suggesting any different or better allocation of the NRC fees allocable to WE's dry storage. PFF 227.

Therefore, WE proved its NRC fee damages to a reasonable certainty. The amount of contract damages "need not be 'ascertainable with absolute exactness or mathematical precision.'" *Indiana Michigan*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563). *See also* Restatement (Second) of Contracts § 352 cmt. a (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.").

In sum, WE has demonstrated that it would not have built an ISFSI if DOE had performed and, accordingly, it is entitled to recover the pre-1999 NRC ISFSI fees that it incurred. PFF 217-222, 228; WE PTB 64 n.19. Further, WE has demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 also resulted from DOE's breach and are recoverable damages. PFF 223-230; WE PTB 64-69. In addition, as discussed, WE is entitled to recover the two separate, specific SNF storage inspection fees assessed by the NRC against WE in 2003 and 2005, respectively. Finally, WE is entitled to recover that portion of the surcharge applied to the spent fuel storage fees.

### J. WE Has Established Its Damages with Reasonable Certainty

WE's initial post-trial brief explained that it established its damages with reasonable certainty. WE PTB 69-84. In response, the Government argues that WE should not recover more than $6.2 million in internal labor costs, allocable pension and benefit ("P&B") costs and employee expenses; $1.8 million in Administrative & General ("A&G") costs; and $44.2 million in financing costs. None of these Government positions should prevail.

#### 1. WE Should Recover Its Internal Labor Costs, Pension and Benefit Costs and Employee Expenses

The Government attempts to create the misimpression that WE somehow has not met its burden of proof to establish that the internal labor costs that it seeks were caused by DOE's breach. Govt. PTB 96. As previously explained, the WE labor costs at issue concern the dry storage project. The dry storage work was forced on WE by DOE's partial breach of

the Standard Contract. Thus, WE had to redirect its limited resources from tasks that were not caused by DOE's breach to those tasks directly caused by DOE's breach. Tr. 4797:4-20; 4784:22-4785:2; 4787:13-4788:1 (Metcalfe); Tr. 3010:11-22 (Straub).

The Government's damages expert, Mr. Kiraly, continues to question nearly $3.5 million in damages in internal labor costs, alleging that these costs lack sufficient detail for Mr. Kiraly to apply his "50 percent standard" and disallowing these costs before even applying his standard.[11] Kiraly DDX 5-18; Tr. 6121:24-6122:14; 6123:19-6124:4; 6127:21-6128:9; 6194:2-11 (Kiraly). Mr. Kiraly's position is contrary to the Joint Stipulation Regarding Accuracy of Plaintiff's Costs, in which the parties stipulated that all costs included in "WE's claim were incurred by WE and are traceable to and supported by WE's accounting records," including "labor costs." Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007).

Moreover, there is no basis for Mr. Kiraly's wholesale disallowance. The Government conducted extensive audit verification activities, including review of sample timecards for labor charges. PFF 234. All of the costs at issue, including the internal labor charges, were fully supported by WE's books and records. *See*, *e.g.*, Tr. 1734:25-1735:24; 1743:16-1745:6 (Becka); Tr. 2028:1-16 (Holzmann); Tr. 2883:7-17 (Straub); Tr. 4605:19-4606:4 (Metcalfe); PFF 238. WE further demonstrated, through the testimony of Ms. Ione Straub, Senior Cost Specialist for WE's Nuclear Department from 1990 to 2002, as well as the testimony of its damages experts, Messrs. Metcalfe and Sieracki, that the internal labor costs that it claimed were established to a reasonable certainty. PFF 231-233. In addition, nearly all of these costs (or the underlying activities) have already been approved by the PSCW, which merits consideration. *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl.

[11] Under his 50 percent standard, Mr. Kiraly disallowed all labor charges relating to any salaried employee unless the salaried employee charged more than 50 percent of his or her time to a dry storage project number during the entire period from April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report); Tr. 6194:2-20 (Kiraly).

249, 269, 292 (2006). In sum, WE established its internal labor costs to a reasonable certainty. *See*, *e.g.*, PTB 69-75; PFF 231-242.

The Government also contends that WE has not "established (or even attempted to establish) that it suffered an opportunity cost because these employees were unable to work on other, non-breach related projects." Govt. PTB 97. To the contrary, the evidence established that, but for the dry storage project, WE's internal labor would have had other work to do, for which they were hired and for which they were paid. Tr. 4607:13-4608:4 (Metcalfe); Tr. 2007:25-2015:11 (Holzmann); Tr. 1747:15-1754:19 (Becka).

Further, the Government's contention reflects a misunderstanding regarding the operation of nuclear power plants. There typically is a backlog of maintenance and other work orders at nuclear power plants which need to be performed. PFF 131, 240. When WE employees are working on activities related to the DOE breach, they are not able to perform these various maintenance activities. Tr. 4494:11-25 (Metcalfe); Tr. 2007:25-2009:10 (Becka); Tr. 2876:18-24 (Straub).

As noted, Mr. Kiraly contends that the labor charges relating to any salaried employee should be rejected unless the employee charged more than 50 percent of his or her time to a dry storage project number during the entire period from April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report); Tr. 6194:2-20 (Kiraly). WE refers to Mr. Kiraly's position as his "50 percent standard."

WE strongly disagrees with Mr. Kiraly's 50 percent standard. If WE personnel are performing work resulting from DOE's contract breach, these personnel are necessarily not available to perform other work for WE. There is clearly an opportunity cost in that WE is deprived of the right to utilize its personnel on other projects. PFF 240. *See also Southern Nuclear*, 77 Fed. Cl. at 442; *Tennessee Valley Auth.*, 69 Fed. Cl. at 539-40.

Given that these personnel are performing work resulting from DOE's breach, it is only fair that DOE pay for these activities. As Mr. Metcalfe explained, it is appropriate that WE, a regulated public utility, recover these internal labor costs. Public service commissions typically permit regulated public utilities to recover their internal labor costs. PFF 239. It also is typical to recover such costs in performing work under federal procurement contracts. Federal Acquisition Regulation ("FAR") 31.205-6 (Compensation for Personal Services). Further, under the Standard Contract, the Government can recover all of its internal labor costs. PFF 239. Moreover, WE's use of internal labor results in lower costs than the use of outside contractors. WE PTB 72-75; PFF 239. Allowing the recovery of internal labor costs incentivizes utilities to use such lower-cost labor in future dry storage work when appropriate – further mitigating the cost to DOE for its breach. *Id.*

The Court has previously rejected the 50 percent standard advanced by Mr. Kiraly. *Tennessee Valley Auth.*, 69 Fed. Cl. at 539-40; WE PTB 74-75. In *Carolina Power & Light Co.*, the Court rejected a Government expert's standard that was more lenient than Mr. Kiraly's proffered standard. In *Carolina Power & Light Co.*, the Government's expert stated that the utility should only recover internal labor costs for salaried personnel who spent more than 50 percent of their hours on a breach-related project *in a given year* (as opposed to the 50 percent in a 6-1/2 year standard used by Mr. Kiraly). 2008 WL 2154103 at *26. The Court in *Carolina Power & Light Co.* rejected this more lenient standard, stating: "Every hour that a Progress Energy employee spent on a breach-related project was an hour that the employee did not spend doing other productive work for Progress Energy." *Id.* at *34.

Further, the Court has held that internal labor costs are recoverable in numerous other SNF cases. *See, e.g.*, *Entergy Arkansas*, 79 Fed. Cl. at 67; *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 442; *Pacific Gas & Elec.*, 73 Fed. Cl. at 408; *Yankee*

*Atomic*, 73 Fed. Cl. at 322; *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 376 (2006).[12]

WE also is entitled to recover the P&B costs allocable to these internal labor costs. The accuracy of these charges is not in dispute. Joint Stipulation Regarding Accuracy of Costs, Dkt. 350 (Sept. 21, 2007). It is only reasonable that WE should recover these costs in connection with its recovery of its internal labor costs. PFF 242.

The Government also has identified no sound reason for disallowing the employee expenses at issue. The Government's contention that WE did not show at trial that these employee expenses were incurred as a result of DOE's delay in accepting SNF from Point Beach, DFF 588, is inaccurate. Similarly to WE's internal labor costs, WE established that the employee expenses were charged to specific dry cask storage projects or accounts that knowledgeable WE personnel determined were established to capture the dry storage project costs caused by DOE's breach. Tr. 2910:12-2915:17 (Straub); Tr. 4519:19-4520:19 (Metcalfe); Tr. 3779:5-3781:12 (Sieracki); PX 831; PX 794, p. 12 (May 2006 Damages Report); PDX 60 – Sieracki 38. These employee expenses then were reviewed and approved by a supervisor or a supervisor's designee prior to these expenses being reimbursed by WE. *See* WE Response to DFF 588.

Again, if the Government is contending that WE has failed to establish these employee expenses with reasonable certainty, the Joint Stipulation Regarding Accuracy of Costs, Dkt. 350 (Sept. 21, 2007) precludes the Government from maintaining this challenge.

**2. WE Should Recover Its Administrative & General Costs**

The Government argues that, in order to recover its A&G or overhead costs, WE must demonstrate that DOE's breach caused WE's A&G costs to increase.

---

[12] In DFF 582, the Government inaccurately describes Mr. Kiraly's methodology as permitting WE to recover labor costs when one of its salaried employees worked more than half of his or her time on a breach-related project during a given year. As discussed, that is not Mr. Kiraly's methodology. *See also* WE Response to DFF 582.

WE strongly disagrees. As Mr. Metcalfe testified, it is fair and reasonable to include corporate level overhead costs in WE's damages. Tr. 4808:6-11 (Metcalfe). Overhead costs are real costs incurred by WE. WE is not being made whole economically if it does not recover the overhead costs allocable to its dry storage project because WE's other projects would become more expensive than anticipated. PFF 244. Recovery of allocable overhead costs is typical in Government contract claims. *See, e.g.*, FAR 31.203; CAS 410; PFF 244. The Government also includes such costs in determining recoverable Government costs under the Standard Contract. *Id.*

Furthermore, several SNF decisions have authorized the recovery of overhead costs in these circumstances. In *Carolina Power & Light Co.,* the Court stated:

> The Court sees no basis in law or logic for Defendant's position. Plaintiffs' overhead costs were incurred and are properly attributable to mitigation projects and activities. If no overhead charges were allocated to mitigation projects, Plaintiffs' other projects would be more expensive than anticipated. Overhead, by definition is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiffs fully. See *Sys. Fuels, Inc.* 78 Fed. Cl. at 799-800 (rejecting the Government's principle that all "loader costs" [overhead] would have been incurred absent DOE's breach). The Court will allow the recovery of Plaintiffs' stores overhead and indirect overhead expenses.

2008 WL 2154103 at *28. *See also Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 441-43; *Pacific Gas & Elec.*, 73 Fed. Cl. at 408.

Furthermore, public service commissions typically permit regulated public utilities to recover overhead costs. PFF 244. Permitting a utility to recover its A&G costs also incentivizes the utility to continue to perform work resulting from DOE's breach with internal labor, which is less expensive than using outside contractors. *Carolina Power & Light Co.*, 2008 WL 2154103 at *27; PFF 244. *See also Southern Nuclear*, 77 Fed. Cl. at 442-43.

The Government contends that the A&G costs included by Kenrich in WE's claims are greater than the A&G costs recorded to WE's accounting records. For that reason, the Government contends that awarding these costs would result in a "windfall" for WE. Govt. PTB 98.

The Government's "windfall" assertion, DFF 599, is factually incorrect. Neither the cited testimony of Ms. Straub nor PX 1043 supports this assertion. The Government ignores that, if, in a given claim year, the budgeted overhead rate is less than the actual overhead rate, there is no true-up calculation or adjustment for the lower budgeted rate (which favors DOE). Ms. Straub testified that there were just as many years where the actual overhead rate exceeded the budgeted rates than years when the budgeted overhead rates exceeded the actual. Moreover, Ms. Straub testified that the budgeted and actual overhead rates are typically very close. Tr. 3008:19-3010:9 (Straub).

Similarly, the Government's assertion that Mr. Metcalfe improperly increased WE's claim, Govt. PTB 100, is inaccurate. Contrary to the Government's assertion, the budgeted A&G rates were determined by the PSCW, not Mr. Metcalfe. Mr. Metcalfe also testified that using PSCW-approved budgeted A&G rates was appropriate. *See* WE Response to DFF 599.

In addition, when WE does work for someone outside the company, it allocates A&G costs based on the PSCW-approved budgeted rates to those project costs. Tr. 2885:8-24 (Straub). The PSCW also requires that WE allocate overhead costs to projects that it performs for non-utility affiliates to ensure that the ratepayers are not subsidizing work performed for the benefit of outside parties. PFF 244.

Applying that principle here, WE should include allocable overhead costs in the damages sought from DOE because the dry storage project work performed by WE was done because of and, in essence, *for* DOE, not for the benefit of the ratepayers. PFF 244. As

Mr. Metcalfe explained, it is fair and reasonable to include these overhead costs in WE's damages. Tr. 4808:6-11 (Metcalfe).

Furthermore, the Government's contention that Ms. Straub conceded that overhead costs should not be added to this claim, Govt. PTB 100, is untrue. Again, she merely testified that WE generally has no reason to allocate overhead costs to internal projects. The dry storage project, however, is not truly an internal project because it was an outside party, DOE, who caused WE to dedicate its resources to this project. Thus, this project is work that WE is performing for an outside party (DOE) and, as noted above, overhead costs are allocated to such projects in determining the final charges. PFF 244. For these reasons, WE should recover its A&G costs in this action.

**3. WE's Financing of Its Mitigation Costs Is Recoverable**

In its initial brief, WE explained that the Federal Circuit has allowed the recovery of financing costs as a result of a Government breach of contract. *Citizens Fed. Sav. Bank*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582-83 (Fed. Cir. 1994). As in *Wickham*, this case is a construction claim for the costs of constructing the dry storage facility and for purchasing necessary equipment, including, but not limited to, the casks.

In its response, the Government asserts that *Wickham* does not apply because it involved recovery under the Changes clause, which authorizes the recovery of interest on funds borrowed to address a contract change. Govt. PTB 104-105. As the Government concedes, however, the Federal Circuit did not base its *Wickham* decision on this point. In fact, the Court does not mention the Changes clause at all.

The Government's attempted distinction of *Wickham* also is undercut by the fact that the Court applied *Wickham* in another spent fuel partial breach of contract case. In *Tennessee Valley Auth.* 69 Fed. Cl. at 541-42, the Court applied *Wickham* to find that TVA's

Allowance for Funds Used During Construction ("AFUDC") costs were recoverable as damages against the Government for breach of the Standard Contract, notwithstanding the general restriction against recovering interest as set forth in 28 U.S.C. § 2516(a). The Government responds that *Tennessee Valley Authority* was incorrectly decided, but fails to explain why it dismissed its appeal of that decision.

WE computed its cost of capital based on the weighted average cost of capital ("WACC") determined by the PSCW during each year in which WE incurred SNF-related storage costs as a result of DOE's breach. These are the same rates used to calculate its AFUDC. PFF 245, 248. WE's cost of capital incurred in constructing the ISFSI, fabricating and loading dry casks, and investigating alternative storage facilities is the type of cost recoverable under the *Wickham* and *Tennessee Valley Authority* standards and should be recoverable in this case. It is an economic cost borne by WE and its ratepayers. PFF 247.

The Government contends that WE's cost of capital constitutes a claim for "prejudgment interest." That is incorrect. "Prejudgment interest" is defined as "statutorily prescribed interest accrued either from the date of the loss or from the date when the complaint was filed up to the date the final judgment is entered." *Black's Law Dictionary* (8th ed. 2004). In contrast, WE's cost of capital rate fluctuates with the debt and equity markets for each year. PFF 246; Tr. 4584:17-4587:2 (Metcalfe). In addition, it is a WE-specific rate determined by the PSCW, not a general, statutorily prescribed rate. PFF 245, 248.[13]

[13] The Government's assertion that Mr. Metcalfe agreed that WACC is one way to calculate prejudgment interest based on the *Litigation Services Handbook*, Govt. PTB 102 n.51, is grossly misleading. That book used the term "prejudgment interest" as a general term including any claim of interest prior to judgment. Mr. Metcalfe clearly differentiated "prejudgment interest" as a statutorily fixed rate from WACC. Tr. 4828:24-4831:1 (Metcalfe). In addition, Messrs. Metcalfe and Hamal did not testify that 75 to 83 percent of the claimed financing costs are for shareholder profit. Both agreed that WE's equity has ranged from 45 to 55 percent of its overall capital. *See* WE Response to DFF 632.

The Government's "pre-judgment interest" argument also ignores the difference between interest "on a claim" and interest as a component of a claim, *i.e.*, financing costs that represent a claim in themselves. In *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part & rev 'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005), the Federal Circuit recognized this distinction and allowed recovery of cost of capital where the costs relate to actually incurred financing costs, in other words, interest as a component of a claim. The Federal Circuit also has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed. Cir. 2001). This Court recently recognized the distinction between "prejudgment interest" and the cost of capital that WE incurred to plan, design and construct the dry fuel storage project at Point Beach in *SFI-Grand Gulf*, 78 Fed. Cl. at 807-09.

Moreover, WACC is a distinct economic cost and only through an award of its WACC can WE be reimbursed for the risk that it experiences in earning its capital related to the expenditures WE was forced to incur because of DOE's breach, as well as taking into account both inflation and the time value of money. PFF 246.

The Government contends that WE's claim for financing costs must be rejected because WE cannot point to a single specific borrowing. Govt. PTB 105. To the contrary, the Court has not in every instance required that a plaintiff point to a specific equity or debt instrument as the source of funds used for the activity at issue. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542. While WE recognizes that some decisions have ruled to the contrary, WE believes that such decisions unfairly penalize utilities that traditionally do not finance on a project-by-project basis and are incurring real financing costs.

Contrary to the Government's contention, WE's cost of capital does not become impermissible merely because it is formed by both debt and equity. *LaSalle Talman Bank*,

317 F.3d 1363, 1375 (Fed. Cir. 2003). Therefore, WE may recover its cost of capital for each category of damages incurred from the time that the cost of capital expense was incurred through the start of trial, September 10, 2007. *See Tennessee Valley Auth.*, 69 Fed. Cl. at 542.

The Government contends that WE cannot recover its financing costs because, for the most part, these costs have been recovered from ratepayers. Govt. PTB 103. This Government assertion is a woefully misguided assertion of the "pass-through defense" which the U.S. Supreme Court and numerous other federal courts have uniformly rejected. *See, e.g., Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990); *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). Thus, this point is irrelevant for both WE's financing costs and its nominal damages. Tr. 4569:1-4572:4; 6321:20-6323:25 (Metcalfe). Indeed, if WE is not awarded the financing costs that it has incurred on its nominal damages, the ratepayers will have been forced to pay the financing costs for the underlying nominal costs that WE incurred because of DOE's breach of contract.

Similarly ill-founded is the Government's assertion that recovery of WACC is inappropriate because WE sold the casks to the Wisconsin Electric Fuel Trust ("WEFT"). The Government offers no explanation why this may be the case and cites no supporting case law. In any event, WE does not make a profit when it sells the cask to WEFT. WE transfers the asset to WEFT, and leases it back. As part of that leasing cost, WE pays a management fee to WEFT under a normal capital operating lease. WE does not make a profit or a return of any kind from the WEFT transaction. Tr. 6324:1-10 (Metcalfe). As Mr. Metcalfe explained, WEFT is simply a cash flow mechanism and has no impact on the WACC issue. Tr. 6319:15-6321:19 (Metcalfe).

WE further explained that there are two alternative forms of recovery available to the Court. First, the Court can award to WE its Weighted Average Cost of Debt ("WACD").

This alternative eliminates any concern that may exist with regard to providing WE a return on the equity component of the funds devoted to its dry storage project. PFF 249. Recovery of WACD was recently permitted by the Court provided that it can be proven with reasonable certainty. *SFI-Grand Gulf*, 78 Fed. Cl. at 807-09. In its post-trial brief, WE provided a chart, identifying specific WE damages categories with the cost of debt. WE PTB 82; PFF 250 (including subparagraphs).

The Government responds by stating that the discussion of WACD by WE's expert, Mr. Metcalfe, was "inappropriate, untimely, and not rebuttal testimony." Govt. PTB 107. The Government, however, cites no authority in support of its position. *Id.* In its initial post-trial brief, WE explained that the evidence of WACD damages properly responded to issues raised by the Government, "explaining" and "counteracting" evidence submitted during the Government's case in chief. This is the appropriate scope of rebuttal testimony. *Yankee Atomic*, 73 Fed. Cl. at 274.

More specifically, the Government's expert witness testified that there was a range of options by which a party can calculate the cost of money, including plaintiff's cost of borrowing. Tr. 5856:2-5857:6 (Hamal); DDX 4-46. In addition, during cross examination of Mr. Metcalfe, Government counsel asked Mr. Metcalfe a similar question and Mr. Metcalfe responded that a WACD calculation was possible. Tr. 4682:19-4686:5 (Metcalfe).

Therefore, WE asked Mr. Metcalfe to calculate the WACD in this case. *See also* WE PTB 81-82. Thus, WE's offer of this evidence was properly made to explain and counteract evidence submitted by the Government. *Yankee Atomic*, 73 Fed. Cl. at 274.

There also was no surprise or prejudice to the Government. WACD is calculated exactly the same way as WACC and is based on the same sources as WACC, namely, the PSCW's annual determinations of WE's cost of capital and cost of debt. PFF 249-250, 259-260. With Kenrich's Cost of Capital Binder work papers, the Government has available (and

has had for some time) all the information necessary to calculate the WACD. The only difference is that, instead of applying the cost of WE's equity and debt to the nominal damages, one just applies its cost of debt to these damages. PFF 249.

Thus, there was no unfair surprise to the Government. This is proper rebuttal testimony and the Court clearly has discretion to admit this rebuttal evidence. *Yankee Atomic*, 73 Fed. Cl. at 274 (citing *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1122 (Fed. Cir. 1996)).

Another alternative calculation is to permit WE to recover the AFUDC actually recorded to WE's SNF storage-related accounts. Again, the same rate is used to calculate AFUDC as WACC. AFUDC is permitted by the PSCW and the Federal Energy Regulatory Commission ("FERC"). The AFUDC for the dry storage facility was $747,865. PFF 248; PX 1029, p. KRGWE003854. The Court permitted recovery of AFUDC in *Tennessee Valley Authority*, 69 Fed. Cl. at 542.

The Government characterizes WE's alternative AFUDC claim as "an after thought." Govt. PTB 103, n.53. To the contrary, WE's alternative recovery of AFUDC and the amount of WE's recorded AFUDC were presented at trial. PFF 248. AFUDC is a cost that is recorded to WE's capital projects in accordance with PSCW and FERC rules. *Id.*

#### 4. WE Has Estimated the Temporary Rack Offset to a Reasonable Certainty

WE's initial brief explained that WE has estimated the temporary rack offset to a reasonable certainty. WE PTB 83-84. The Government does not address this issue in its response.

### K. DOE's Claimed Cask Loading Offset Is Speculative and Should Not Be Allowed

The Government argues that WE would have incurred costs to load casks if DOE had performed and that an offset of avoided loading costs in the amount of $3.68 million is necessary to avoid a windfall for WE. Govt. PTB 93.

The Government carries the burden of establishing that WE would have incurred a loss in the non-breach world. *Southern Nuclear*, 77 Fed. Cl. at 434-35. The Government also must establish the value of any offset with reasonable certainty – speculative costs are not appropriate for an offset. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. Every SNF decision has determined that the Government has failed to establish these necessary criteria for this cask loading offset claim. *Carolina Power & Light Co.*, 2008 WL 2154103 at *33; *Entergy Arkansas,* 79 Fed. Cl. at 70-71 ("The court accordingly denies a setoff because of the speculative nature of future cask loading with DOE's casks."); *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 450-51; *Pacific Gas & Elec.*, 73 Fed. Cl. at 416; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372; *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

None of the Government's arguments compel a different conclusion in this case. As explained in WE's initial brief, the Government failed to establish the reasonableness of an offset for avoided loading costs in this case. WE PTB 88-90. Point Beach will not avoid the cost of loading casks when and if DOE performs. Instead, those costs have simply been deferred. WE's recent sale of Point Beach to an FP&L subsidiary does not change this conclusion. Whether WE or FP&L incurs the costs, these costs will be incurred by Point Beach if and when DOE performs. The disposition of these future loading costs is a contractual matter between WE and FP&L and, as the Court itself recognized, the WE-FP&L contract is not before the Court. Tr. 4755:9-18 (Court).

In addition, an offset is inappropriate for speculative costs, and even less so for costs that are merely deferred to a future point when they will be known with reasonable certainty. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. Here, any purported "benefit" to WE is entirely speculative. While the Government attempts to establish the type of cask that DOE may have brought in the non-breach world, no one, including the Government's expert

witness on this issue, Mr. Brewer, knows what cask DOE will bring to Point Beach if and when it begins to accept fuel. Tr. 5628:24-5629:2 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . . ."); Tr. 961:1-2 (Hennessy) ("No, I have no idea what type of casks will be used . . . ."); Tr. 1897:7-10; 1996:25-1997:6 (Becka); Tr. 2778:5-11 (Anundson).

Thus, the best that the Government can do is speculate regarding the cask that it may bring and there are serious flaws in its speculation. For example, the Government assumes that WE would have used a truck cask in the non-breach world. Govt.. PTB 92. However, it is DOE, not WE, who is responsible for delivering the cask to Point Beach when DOE performs and for transporting the spent fuel from Point Beach. PX 41, p. KRGWE002126 ("DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility."). Thus, one needs to consider what DOE may bring at this indefinite point in the future.

In addition, the Government incorrectly assumes that a rail cask cannot be used at Point Beach. The evidence established that there is a railhead at Manitowoc that is available for heavy-haul shipments in and out of Point Beach. Tr. 2701:8-11 (Farron); Tr. 1830:12-16 (Becka). During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the Steam Generator to Kewaunee by rail. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic, self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul crossed several small bridges without problem. PFF 263. The weight of a fully loaded VSC-24 cask is less than the 200-ton weight of the lower piece of the Steam Generator. PFF 264.

In sum, the Government's unsupported assumptions do not provide the reasonable certainty required to substantiate an offset. *See, e.g.*, *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

The Government also claims that, if avoided loading costs are not offset here, the Government will be forced to pay a second time for loading the fuel to DOE. Govt. PTB 92, 93. The Government's argument is nonsensical. When DOE begins to perform, Point Beach, not DOE, will incur the loading costs.

Finally, the Government suggests that WE's experts concur that WE will be getting a windfall if the Court does not offset these costs. Govt. PTB 93. That is incorrect. Kenrich's July 2005 report included future damages and, for this reason, attempted to estimate avoided DOE loading costs. Kenrich then eliminated the cask loading offset in its May 2006 report. PX 794. Mr. Metcalfe, however, explained that these offset costs were removed from WE's claim because the Court held that future damages were removed from the scope of this proceeding based on the Federal Circuit's decision in *Indiana Michigan*. Tr. 4712:4-7 (Metcalfe).

To date, not one SNF decision has agreed with the Government and granted its cask loading offset. WE PTB 89-90. Under the same reasoning, an offset is not appropriate here.

## III. CONCLUSION

For the reasons above and those reasons stated in WE's Post-Trial Brief and based on the evidence, WE respectfully requests that the Court enter judgment on WE's breach of contract claim in the amount of $96,541,000.

Dated: July 10, 2008

Respectfully submitted,

s/Richard W. Oehler by s/Jay L. Griffiths
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on July 10, 2008, I caused a copy of the foregoing "Wisconsin Electric Power Company's Post-Trial Reply Brief" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Jay L. Griffiths
Jay L. Griffiths