IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-697C<br><br>(Senior Judge Merow) |

# WISCONSIN ELECTRIC POWER COMPANY'S RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF FACT


**Of Counsel:**

Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Attorneys for Plaintiff
WISCONSIN ELECTRIC
POWER COMPANY


Dated: July 10, 2008

## GOVERNMENT'S TABLE OF CONTENTS

PAGE

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT ..... 1

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER ..... 11

A. The Proposed Rule ..... 11

B. Comments Upon The Proposed Rule ..... 18

1. Industry Involvement In Drafting The Standard Contract Terms ..... 18

2. Rate Of SNF And HLW Acceptance ..... 19

3. Plaintiffs' Comments ..... 27

C. The Final Rule ..... 28

D. WEPCO'S Execution Of The Standard Contract ..... 44

E. Industry Activities Following The Execution Of The Standard Contract ..... 46

III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING ..... 53

IV. THE BELIEFS THAT WEPCO EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT ..... 65

V. WEPCO'S INVOLVEMENT IN INDUSTRY GROUPS, INCLUDING EEI AND UNWMG ..... 68

VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM ..... 75

VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS ..... 83

A. 1987 And 1990 Annual Capacity Reports ..... 84

B. 1991 Acceptance Priority Ranking ..... 87

C. The 1991 Annual Capacity Report ..... 88

D. The 1992 Through 1995 Annual Capacity Reports ..... 96

VIII. DELIVERY COMMITMENT SCHEDULES ..... 100

IX. TSLCCs AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS ..... 103

X. WEPCO'S PARTICIPATION IN THE DCS PROCESS ..... 105

XI. WEPCO MAINTAINS FULL CORE RESERVE ..... 120

**GOVERNMENT'S TABLE OF CONTENTS**

**PAGE**

XII. WEPCO'S NEED FOR ADDITIONAL AT-REACTOR STORAGE ........................... 138

A. WEPCO Needed To Bridge The Gap Before DOE Performed In 1998...............138

1. WEPCO Needed Additional At-Reactor Storage By 1998 ......................141

2. WEPCO'S Contemporaneous Documents During The Development Of The ISFSI Project All Indicated A Need For Additional At-Reactor Storage Before 1998 ..................................................................170

3. WEPCO Reported A Need For Dry Fuel Storage Assuming DOE Performance Beginning In 1998...........................................................180

B. The Use Of A Temporary Cask Pit Rack Was Not Considered An Option In The But-For World.......................................................................................186

1. WEPCO Did Not Evaluate The Use Of A Temporary Cask Pit Rack Until At Least 1998 ........................................................................186

2. WEPCO'S Reference To Use Of A Temporary Cask Pit Rack Is A Litigation-Driven Strategy.......................................................................209

C. The Use Of Racks In The Transfer Canal Was Not Considered An Option In The But-For World........................................................................................226

D. WEPCO Determined That Operating At Reduced Power Would Not Be Cost-Effective ...................................................................................................228

XIII. EVIDENCE OF WEPCO'S POOL CAPACITY DEMONSTRATES THAT WEPCO NEVER USED 1,500 SPACES IN ITS POOL............................................... 231

XIV. WEPCO'S DECISION TO UTILIZE THE VSC 24 CASKS........................................ 237

XV. PROBLEMS AT POINT BEACH HALT THE LOADING OF THE VSC-24 CASKS AND SHUT-DOWN BOTH UNITS 1 AND 2 ............................................... 242

XVI. WEPCO USED THE 900 MTU RATE IN ITS PLANNING DOCUMENTS ............... 249

XVII. THE OPINIONS PROFFERED AT TRIAL BY WEPCO'S EXPERT MS. SUPKO SHOULD BE IGNORED BY THE COURT ........................................... 258

A. Ms. Supko's Opinions Are Irrelevant To This Case............................................261

B. Ms. Supko's Model Mixes But-For And Actual Worlds.....................................263

C. The Test Used By Ms. Supko In Her Analysis Is Not Supported By The Evidence .............................................................................................................265

D. Ms. Supko's Rate Does Not Support Her Assertions Regarding DOE's Obligations Under The Standard Contract .........................................................270

E. Ms. Supko's Rate Does Not Support Her Assertions Regarding Removal Of Backlog Or Timely Decommissioning...............................................................274

**GOVERNMENT'S TABLE OF CONTENTS**

**PAGE**


F. Ms. Supko Did No Analysis Regarding So-Called Flexibilities ....276

1. Ms. Supko Did Not Analyze The Impact Of The Use Of The Exchanges Provision Of The Standard Contract ....276

2. Ms. Supko Did Not Analyze The Impact Of The Use Of The Plus Or Minus 20 Percent Provision Of The Standard Contract ....278

3. Ms. Supko Did Not Analyze The Effect Of The Use Of The Intra-Utility Exchanges Provision Of The Standard Contract ....280

XVIII. ISSUES RELEVANT TO THE ENTITLEMENT ADJUSTMENTS TO WEPCO'S CLAIMED COSTS .... 282

A. Expenditures By WEPCO For Private Fuel Storage And The Newton Project ....282

B. WEPCO'S Payment Of Fees To The Nuclear Regulatory Commission ....297

C. WEPCO'S Claim For ISFSI Fabrication And VSC-24 Casks 1 Through 5 ....327

D. WEPCO Incurred The Costs Of Fabricating Three TN-32B Casks ....338

1. WEPCO Sought The TN-32B Casks As A Contingency In The Event That It Could Not Load The VSC-24 Casks By The Spring 2000 Outage ....340

2. WEPCO Should Have Delayed Fabrication Of The TN-32B Casks in September 1998, And Then Cancelled The Contract By April 1999 ....351

3. WEPCO Should Have Sold Its Long-Lead Materials, Or Its Three Completed TN-32B Casks ....364

E. WEPCO'S Pursuit Of Dual-Purpose Casks ....377

1. WEPCO'S Decision To Switch To The NUHOMS Cask System ....377

2. WEPCO'S Efforts To License The VSC-24 Cask For Transportation ....398

XIX. ISSUES RELEVANT TO INDIVIDUAL COSTS IN WEPCO'S CLAIM .... 400

A. Internal Labor Costs ....400

B. Employee Expenses ....411

C. Payroll Adjustments ....414

D. Overhead Costs ....415

XX. AVOIDED COSTS OF LOADING CASKS TO DOE .... 422

XXI. WEPCO'S CLAIM FOR WEIGHTED AVERAGE COST OF CAPITAL OR WEIGHTED AVERAGE COST OF DEBT .... 436

**GOVERNMENT'S TABLE OF CONTENTS**

**PAGE**

XXII. TOTAL ADJUSTMENTS MADE TO WEPCO'S DAMAGES CLAIM ........................ 446

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **WISCONSIN ELECTRIC POWER COMPANY,**<br>**Plaintiff**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant.** | **No. 00-697C**<br>**(Senior Judge Merow)** |

**WISCONSIN ELECTRIC POWER COMPANY'S**
**RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF FACT**

Plaintiff, Wisconsin Electric Power Company ("WE") submits the following Responses to the Government's March 25, 2008 proposed findings of fact ("DFF"). To assist the Court, we have highlighted the headings to WE's Responses.

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Sections I and II.

**GENERAL OBJECTIONS TO SECTIONS I & II (DFF 1-67):**

The proposed findings of fact in Sections I and II (DFF 1-67) are misleading because they ignore relevant Nuclear Waste Policy Act ("NWPA") provisions and the corresponding legislative history. More importantly, they ignore that, while the NWPA lodged the responsibility with the utilities to pay for the Department of Energy's ("DOE") disposal program and to provide interim storage of spent nuclear fuel ("SNF"), the utilities only had the responsibility for the costs of interim storage "*until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5) (emphasis added).

The NWPA then specified that DOE was required to begin removing nuclear spent fuel "not later than January 31, 1998." 42 U.S.C. § 10222 (a)(5)(B); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement.").

Based on the NWPA's intent, DOE was expected to perform its contractual obligations at a rate sufficient for the utilities to avoid adding at-reactor storage after January 31, 1998 and to work off the backlog of accumulated spent fuel at a reasonable rate. Thus, the NWPA and the Standard Contract were designed to forestall the construction of dry storage facilities at nuclear power plants throughout the United States by setting a date certain by which DOE would take responsibility for storage of SNF. *See Tennessee Valley Auth. v. United States,* 60 Fed. Cl. 665, 674 n.10 (2004). Further, WE demonstrated that the parties were in agreement at the time of contracting that DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of accumulated SNF at a reasonable rate. *See* Plaintiff's Proposed Findings of Fact ("PFF") 48-51; Plaintiff's Post-Trial Brief ("WE PTB") at 41-42.

In addition, the proposed findings erroneously imply that utilities were able to negotiate the terms of the Standard Contract. To the contrary, the utilities did not have an opportunity to negotiate the Standard Contract's terms. Instead, utility input to DOE's proposed Standard Contract was limited to providing comments in response to the proposed Standard Contract and attending a few meetings with DOE officials. PFF 42. Further, once DOE promulgated the final Standard Contract – accepting or rejecting comments on the proposed Standard Contract at its discretion – utilities risked losing their NRC operating licenses if they did not sign the Contract. PFF 42, 44. *See also System Fuels, Inc. v. United States*, 78 Fed.Cl. 769, 774 (2007) ("Congress required the utilities to either enter into a Standard Contract or face nonrenewal of their nuclear license to operate" (citations omitted)).

Nevertheless, the terms of the NWPA and the Standard Contract – read in their entireties, and the understanding of the parties at the time of contracting, was that DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of accumulated SNF at a reasonable rate. *See* PFF 48-51; WE PTB 41-42.

1. On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). Congress specifically determined that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other, important parts of the NWPA. While the NWPA lodged the responsibility with the utilities to pay for DOE disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act." 42 U.S.C. §§ 10131(a)(4), (5). The NWPA then specified that Department of Energy was required to begin removing nuclear spent fuel "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). Based on this intent of the NWPA, DOE was expected to perform its contractual obligations at a rate sufficient to avoid adding at-reactor storage after January 31, 1998. In other words, the NWPA was designed to forestall the construction of dry storage facilities at nuclear power plants throughout the United States by setting a date

certain by which DOE would take responsibility for storage of SNF. *See Tennessee Valley Auth. v. United States,* 60 Fed. Cl. 665, 674 n.10 (2004).

The proposed finding of fact is also deficient because it fails to cite 42 U.S.C. § 10131(a)(1), which is the section in which Congress found that "radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal.

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: (1) developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; (2) establishing Federal responsibility and policy for the disposal of SNF and HLW; (3) defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and (4) establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. at § 10131(b).

**RESPONSE:**

WE objects to this proposed finding as inaccurate. The statutory language cited by the Government did not outline the purposes of the entire NWPA. Instead, Section 10131(b) expressly states that it is outlining the purposes of that *part* of the NWPA, namely Part A, Subchapter I, Chapter 108 ("Nuclear Waste Policy"), Title 42 of the U.S. Code.

Further, the proposed finding of fact is misleading because the Government's limited citation improperly purports to characterize the NWPA as a whole. *See* WE Response to DFF 1.

3. In addition to the process for the siting of a repository, the Secretary of Energy was to "prepare a comprehensive report, to be known as the Mission Plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982).

**RESPONSE:**

WE objects to this proposed finding as misleading because the NWPA required DOE to do more than prepare the Mission Plan and site a repository in order to comply with the NWPA. In addition, the NWPA expressly required DOE to assume responsibility for disposal of SNF by January 31, 1998, at which point utilities would be alleviated of the responsibility for interim storage of SNF. *See* WE Response to DFF 1.

4. The Mission Plan was to include, among other things

> (1) an identification of the primary scientific, engineering, and technical information . . . with respect to the siting and construction of a test and evaluation facility and repositories;
> (2) an identification of any information described in paragraph (1) that is not available because of any unresolved scientific, engineering, or technical questions, or undemonstrated engineering or systems integration, a schedule including specific major milestones for the research, development, and technology demonstration program required under this chapter and any additional activities to be undertaken to provide such information, a schedule for the activities necessary to achieve important programmatic milestones, and an estimate of the costs required to carry out such research, development, and demonstration programs;
> (3) an evaluation of financial, political, legal, or institutional problems that may impede the implementation of this chapter, the plans of the Secretary to resolve such problems, and recommendations for any necessary legislation to resolve such problems;
>
> * * *
>
> (7) a description of known sites at which site characterization activities should be undertaken . . .;
>
> * * *
>
> (9) an estimate of (A) the total repository capacity required to safely accommodate the disposal of all [HLW] and [SNF] expected to be generated through December 31, 2020, . . ., (B) the number and type of repositories required to be constructed to provide such disposal capacity; (C) a schedule for the construction of such repositories . . .;
> (10) an estimate, on an annual basis, of the costs required (A) to construct and operate the repositories anticipated to be needed . . .; (B) to construct and operate a test and evaluation

> facility, or any other facilities, other than repositories . . .; and
> (C) to carry out any other activities under this chapter; and
> (11) an identification of the possible adverse economic and other impacts to the State or Indian tribe involved that may arise from the development of a test and evaluation facility or repository at a site.

42 U.S.C. § 10221(a) (1982) (emphasis added).

**RESPONSE:**

WE does not dispute that the NWPA contains the quoted language regarding the Mission Plan contents. The proposed finding, however, is misleading because it ignores the latter part of 42 U.S.C. § 10221(a)(9), which provides that the Mission Plan shall include "an estimate of the period during which each repository listed in such schedule will be accepting high-level radioactive waste or spent nuclear fuel for disposal."

5. The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the Nuclear Regulatory Commission ("NRC"), and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was then to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, provide the appropriate committees of Congress with the Mission Plan. Id. § 10221(b)(2)-(3).

**RESPONSE:**

WE objects to this proposed finding of fact because the second sentence implies that all of the entities that received the draft mission plan would submit comments to DOE. To the contrary, only Government agencies were *required* to submit comments. 42 U.S.C. § 10221(b)(2).

6. Congress also included in the NWPA provisions that allowed the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least

5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the Secretary's proposal could not "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).[1]

**RESPONSE:**

WE objects to this proposed finding of fact as inaccurate. Section 10161 of the NWPA outlines the prospects and process for siting an MRS facility in considerably more detail than indicated in the Government's summarization. Further, this proposed finding is misleading because Section 10161(a)(5) of the NWPA specifically found that "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5). Thus, DOE was obligated to provide a repository whether or not an MRS was available.

WE objects that the footnote in this proposed finding is misleading and irrelevant. The Government attempts to summarize the meaning of a substantial section of never-implemented statutory provisions, and in doing so, oversimplifies the "Interim Storage Program" part of the NWPA. More specifically, the sections that the Government cites are from Title 42, Chapter 108, Subchapter I, Part B of the U.S. Code, entitled "Interim Storage Program." 42 U.S.C. §§ 10151-10157. The Government ignores Section 10155(h), which provides another layer to the "Interim Storage Program" by seemingly warning *against* interim storage, stating: "[n]othing in this Act shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility

[1] In the NWPA, Congress also provided that DOE could create a program for interim SNF and HLW storage in other than a permanent repository "to provide for the utilization of available spent nuclear fuel pools at the site of each civilian nuclear power reactor to the extent practical and the addition of new spent nuclear fuel storage capacity where practical at the site of such reactor . . .," 42 U.S.C. § 10151(b)(1) (1982), or for the establishment of Federally-owned interim storage facilities. *Id.* § 10151(b)(2); *see id.* §§ 10151-57. This interim storage program would involve interim storage contracts separate from the Standard Contract at issue in this case, to be funded through a separate interim storage fund. *Id.* § 10156(a). No utility ever entered such a contract. The possibility of an interim storage facility, to be funded through a separate interim storage fund, expired on January 1, 1990. *Id.*

located away from the site of any civilian nuclear power reactor and not owned by the Federal Government [on the date of the enactment of the NWPA]." 42 U.S.C. § 10155(h); *see also* *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 444 (2007) (acknowledging the NWPA's discussion of off-site storage in Section 10155(h)).

7. In addition, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

**RESPONSE:**

WE objects that the proposed finding is misleading because it purports to summarize a section of the NWPA by citing only parts of two sentences. Section 10222(a)(1) did involve the way that the Nuclear Waste Fund ("NWF") would be treated in the Standard Contracts, but Section 10222(a)(5) and Section 10222( b)(1)(B)(2) also related to the contracts to be entered into by DOE and the nuclear utilities. 42 U.S.C. § 10222.

8. The NWPA also mandated that:

> Contracts entered into under this section shall provide that –
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other requirements for the contracts specified by 42 U.S.C. § 10222(a)(5).

**RESPONSE:**

WE objects to this proposed finding as inaccurate. While Section 10222(a)(5) enumerated two issues to be included in the Standard Contract, it is not the case that the Standard Contract was limited to including the terms outlined in Section 10222(a)(5), that the

Standard Contract would not reflect other portions of the NWPA, or that the NWPA did not include requirements for the Standard Contract outside Section 10222(a)(5). *See* WE Response to DFF 7. As discussed in WE Response to DFF 1, the provisions of the NWPA – read together – required DOE to pick up SNF at a rate that would obviate the need for additional at-reactor storage. It is the combination of two requirements that illuminates the NWPA's intent for DOE to pick up at such a rate. The first is the January 31, 1998 date certain by which DOE should accept SNF. The second is the requirement that the utilities maintain responsibility for storage *until* DOE accepted SNF. WE Response to DFF 1.

9. The NWPA also "established within the Department of Energy an Office of Civilian Radioactive Waste Management ["OCRWM"]," which would be headed by a Director responsible "for carrying out the responsibilities of the Secretary" under the NWPA. 42 U.S.C. § 10224(a)-(b) (1982).

**RESPONSE:**

WE does not object to this proposed finding of fact.

10. There is no provision in the NWPA that requires the DOE to accept SNF at a rate that would obviate the need for additional at-reactor storage on the sites of nuclear facilities after January 31, 1998. See 42 U.S.C. §§ 10101-10270 (1982); see also Tr.5123:4-14 (Brownstein).

**RESPONSE:**

WE objects to this proposed finding as erroneous. As discussed in WE Response to DFF 1, the provisions of the NWPA – read together – required DOE to pick up SNF at a rate that would obviate the need for additional at-reactor storage. It is the combination of two requirements that illuminates the NWPA's intent for DOE to pick up at such a rate. The first is the January 31, 1998 date certain by which DOE should accept SNF. The second is the requirement that the utilities maintain responsibility for storage *until* DOE accepted SNF. WE Response to DFF 1.

The legislative history of the NWPA confirms this intent of the Act. Two of the stated congressional findings in the act were that "a national problem had been created by the

accumulation of spent nuclear fuel from nuclear reactors" and that federal efforts regarding disposal "had not been adequate." 42 U.S.C. § 10131(a)(2), (4). The House and Senate rejected efforts to extend DOE's performance deadline to remove waste in the legislation precisely because utilities were running out of space to store SNF on-site. For example, speaking in opposition to an amendment (eventually defeated) to an earlier bill that would have delayed siting of the repository three years, Senator McClure, the chief sponsor of the NWPA, stated:

> [W]e . . . begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that. . . . They will have to apply some new technologies on that site, or they simply will have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

128 Cong. Rec. 7,974 (Apr. 28, 1982). Similarly, in the House, several Representatives, speaking generally in support of the legislation, stated that the legislation was needed to address the interim and permanent storage needs of nuclear plants, many of which could be forced to close because of lack of storage. 128 Cong. Rec. 26,310-11 (Sept. 30, 1982); 128 Cong. Rec. 26,314 (Sept. 30, 1982); 128 Cong. Rec. 27,775 (Nov. 29, 1982).

WE further objects to this proposed finding because it is unsupported by the cited testimony. Alan Brownstein did not join DOE until September 1985, almost three years after the NWPA was signed into law. Tr. 5024:16-18 (Brownstein). Thus, he was not with DOE during the passage of the NWPA. Further, in the testimony cited by the Government, Mr. Brownstein was questioned about *his understanding* of the *intent* of the NWPA, not his understanding of the provisions in the NWPA, especially when those provisions are read together as a whole. *Id.*

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

11. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983); Joint Stipulation No. 8.

**RESPONSE:**

WE does not object to this proposed finding of fact, but objects to the citation to Joint Stipulation No. 8. There is no Joint Stipulation No. 8 in this case and this citation is erroneous.

12. The proposed "scope" of the Standard Contract provided for the acceptance and disposal of SNF from civilian nuclear power reactors pursuant to the NWPA:

> This Contract applies to the acceptance by DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and with respect to such material, establishes the fees to be paid by the Purchaser for the services rendered hereunder by DOE. The services provided to the Purchaser by DOE under this contract are related to **disposal** of SNF and/or HLW of domestic origin from civilian nuclear power reactors. . . .

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

**RESPONSE:**

WE objects to this proposed finding as inaccurate. The Government's quotation from the "Scope" section omits the following:

> The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A",

> annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

By excluding that language, the Government implies that the January 31, 1998 date certain by which DOE was to commence disposal services was not central to the Standard Contract. The Government's proposed finding is also misleading because it ignores that the Standard Contract ultimately required DOE to pick up fuel as expeditiously as practicable. Plaintiff's Exhibit ("PX") 41, p. KRGWE002118 (WE's Executed Standard Contract).

In addition, the proposed "Scope" of the Standard Contract, as published in the Federal Register, does not actually reference the NWPA as this proposed finding implies. The Government also incorrectly cites page 5462 of the Federal Register; the proper citation is page 5463.

13. The term "disposal," as referenced in the proposed scope of the Standard Contract, referred to emplacement in a permanent repository:

> The term "Disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.9).

**RESPONSE:**

WE objects to this proposed finding as inaccurate. The term "disposal" was not defined in the proposed *"Scope"* of the Standard Contract. Instead, it was defined in Article I, item 9 in the proposed Standard Contract, as indicated by the Government's citation. 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.9).

14. Similarly, the term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW:

> The term "DOE Facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high level radioactive waste.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.11).

**RESPONSE:**

WE does not object to the substance of the proposed finding.

15. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated or fuel in-core prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

**RESPONSE:**

WE objects to this proposed finding as misleading. It incorrectly implies that proposed Article VIII only included a payment mechanism and identification of types of fees. To the contrary, proposed Article VIII included five subparts: Fees, Payment, Interest on Late Fees, Effect of Payment, and Audit. WE also objects to the Government's citation of proposed Article VIII as the source for the "Nuclear Waste Fund" because that Article does not directly mention the Nuclear Waste Fund. 48 Fed. Reg. at 5464 (Art. VIII).

16. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract required DOE to issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, <u>acceptance priority shall be based upon the age of the SNF and/orHLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery</u>

> commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility.[2]

**RESPONSE:**

WE objects to the Government's proposed finding as misleading. The proposed finding ignores that in the breach world at the time the first APR was issued in December 1991, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115. Moreover, DOE believed at the time that the DCS process occurred that the process was nothing more than "administrivia" and that the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*

17. Although the proposed Standard Contract itself did not identify a specific rate at which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

---

[2] However, as an exception to the requirement to accept the oldest SNF and/or HLW first, the next paragraph of the proposed rule provided DOE with the discretion to grant priority to SNF and/or HLW removed from a reactor that had shut down permanently. 48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3).

**RESPONSE:**

WE objects to this proposed finding as misleading. It incorrectly implies that these two Standard Contract sections were the only sections regarding DOE's issuance of planning documents, and that the 1991 APR was more central to DOE's planning than other DOE planning documents, such as the Mission Plan and the Annual Capacity Report ("ACR"). Nowhere in the Standard Contract is one DOE document identified as more important than another. 42 U.S.C. §§ 10101-10270; PFF 59, 61.

18. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added).

**RESPONSE:**

WE objects that this proposed finding of fact as misleading. By the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115. Further, DOE then believed that the DCS process was nothing more than "administrivia" and the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*

DOE also chose a 900 MTU annual rate of acceptance that had no programmatic basis in an attempt to limit its liability to the utilities for DOE's delayed performance. *See* PFF 101; WE PTB 47.

The Government also incorrectly cites page 5462 of the Federal Register; the proper citation is page 5463.

19. Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in its Response to DFF 18 and in WE's General Objections to Section X (DFF 114-135).

Further, DOE has proffered no credible evidence that DCSs or FDSs were contractually binding. PFF 126. Further, WE objects that the proposed finding improperly implies that the procedures for submission of DCSs and FDSs was the basis for determining the rate at which DOE was obligated to pick up SNF from the Purchasers. DOE was obligated to pick up fuel at a rate to obviate the need for additional at-reactor storage after January 31, 1998, regardless of the DCSs and FDSs that were later submitted by the Purchasers. WE Response to DFF 1, 8.

20. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7).

**RESPONSE:**

WE objects to this finding for the reasons set forth in its Responses to DFF 18-19, and in WE's General Objections to Section X (DFF 114-135).

21. The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE with thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.
>
> In addition, the Purchaser may change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract. These adjustments shall be subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

**RESPONSE:**

WE does not dispute that the proposed Standard Contract contained the quoted language, but reiterates its Responses to DFF 18-21.

22. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment

> schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

**RESPONSE:**

WE does not dispute that the proposed Standard Contract contained the quoted language, but reiterates its Responses to DFF 18-21.

23. Nowhere in the proposed Standard Contract did DOE propose that it would accept at a rate equal to the annual generation rate of SNF plus some additional quantity necessary to eliminate the backlog of SNF that would accumulate by January 31, 1998. Nor did DOE propose that it would accept SNF at a rate sufficient to eliminate the need to construct additional storage facilities.

**RESPONSE:**

WE objects to this proposed finding as contrary to the evidence. The NWPA and the Standard Contract were designed to preclude the need for additional at-reactor storage for SNF by setting a date certain by which DOE would take responsibility for storage of SNF. *See* WE Response to DFF 1; PFF 46-48, 50-51.

24. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

**RESPONSE:**

WE does not object to this proposed finding of fact.

## B. Comments Upon The Proposed Rule

### 1. Industry Involvement In Drafting The Standard Contract Terms

25. The nuclear utilities and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Almost immediately after the NWPA was

signed into law, industry groups began working upon drafting comments to DOE regarding the contracts that DOE was to enter into with industry. Tr. 3906:3-3907:21 (Mills designation, Northern States trial, 11/16/06).[3]

**RESPONSE:**

WE disputes this proposed finding of fact because it is inaccurate. No utilities were involved in "drafting the Standard Contract and its terms." The Standard Contract was overwhelmingly drafted by DOE and nuclear utilities had to accept it. PFF 42, 44. *See also System Fuels, Inc. v. United States,* 78 Fed. Cl. 769, 774 (2007) ("Congress required the utilities to either enter into a Standard Contract or face nonrenewal of their nuclear license to operate"). Utility input was largely limited to providing comments in response to the draft Standard Contract and attending a few meetings with DOE officials. *See* PFF 42.

Further, the cited testimony of Mr. Mills only establishes that industry groups provided comments to DOE. It is a mischaracterization of the testimony to assert that it supports the notion that the utilities had any significant role in drafting the Standard Contract.

### 2. Rate Of SNF And HLW Acceptance

26. DOE received numerous comments in response to the proposed rule, all of which became a part of the administrative record of the rulemaking. Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 501.63 at ARC001 0537. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

[3] The designations of Loring Mills are collected in PX 1052.

**RESPONSE:**

WE objects to the proposed finding as misleading and irrelevant. That some utilities proposed that the Standard Contract contain a quantifiable, specific rate term does not contradict the fact that the NWPA and Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the backlog at a reasonable pace. *See* WE Response to DFF 1; PFF 48, 50-51; WE PTB 41-42. The proposed finding is also misleading because it implies that the parties were not in agreement regarding a reasonable DOE acceptance rate. To the contrary, the parties both understood at the time of contracting that DOE would pick up at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. *See* PFF 48-51.

WE further objects to the proposed finding as irrelevant because WE was not party to TVA's comments. TVA is not a party in this action and the actions of that third party are not relevant to WE's case.

27. Similarly, Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 501.34 at ARC001 0334.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading. That some utilities proposed that the Standard Contract contain a quantifiable, specific acceptance rate does not contradict the fact that the NWPA and the Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the accumulated SNF at a reasonable rate. *See* WE Response to DFF 1; PFF 48, 50-51; WE PTB 41-42. Further, both parties understood at the time of contracting that DOE would accept spent fuel at a rate sufficient to eliminate the

need for additional at-reactor storage after January 31, 1998 and to work off the accumulated SNF backlog at a reasonable rate. *See* PFF 48-51.

28. However, EEI and UNWMG, like several individual utilities, stated that the Standard Contract should contain a requirement that "DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." DX 501.34 at ARC001 0334. EEI and UNWMG suggested the inclusion in the Standard Contract of the following language, intended to add an additional obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC001 0335; see Tr.1407:20-1409:19 (Shimon).

**RESPONSE:**

WE objects to this finding for the reasons set forth in its Response to DFF 27. In addition, WE objects to the Government's mischaracterization that EEI and UNWMG suggested "an additional obligation upon DOE." No record evidence supports that characterization. The parties had already agreed at the time of contracting regarding a reasonable rate that would meet the requirements of the NWPA and the Standard Contract. EEI was merely advocating for explicit language to memorialize that agreement. *See* PFF 48, 49, 51.

Further, the cited testimony of Mr. Shimon does not support this finding. Mr. Shimon testified that the clause quoted was in fact included in EEI's letter, that he assumed that the DOE declined EEI's request to include that language, and that the "specific language is not" included in the Contract. Tr. 1407:20-1409:19 (Shimon). Mr. Shimon did not testify that EEI sought to "add an additional obligation upon DOE beyond that imposed by the proposed rule," as the Government contends.

29. Mr. Shimon agreed at trial that the "Whereas" clause requiring a specific performance standard, requested by EEI, was not included in the final Standard Contract:

> Q: Mr. Shimon, just so we're clear about it, you testified earlier that there is no specific rate of acceptance in the Standard Contract, that's correct, isn't it?
> A: In terms of a metric tons of uranium per year, that's correct.
> Q: And there is no requirement that DOE pick up spent fuel at a rate commensurate with the amount being generated along with an obligation to work off the backlog, isn't that right, there's no such language in the contract, correct?
> A: I believe that's correct.

Tr.1409:23-1410:10 (Shimon). One of plaintiff's experts, Mr. Sieracki, also agreed that the contract does not contain a rate of acceptance. Tr. 4003:22-25 (Sieracki).[4] Mr. Sieracki was aware that some utilities wanted to add the two-part test for a rate of acceptance, one that would result in no additional at reactor storage and working off the back log to the Standard Contract, and that this idea was not added to the contract. Tr. 4004:23-4008:25 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding as inaccurate. Some of the language proposed by EEI was included in the Standard Contract, namely, the "expeditiously as practicable" language. PX 41, p. KRGWE002118 ("Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel . . . ."). Further, the basis for a reasonable rate of acceptance was implicit in the NWPA and the Standard Contract. *See* WE Response to DFF 1, 27, 28; PFF 48-51.

WE objects to the proposed finding as mischaracterizing Richard Sieracki's testimony. Mr. Sieracki did not testify that the Standard Contract "does not contain a rate of acceptance" or that such an "idea was not added to the contract." Mr. Sieracki's testimony merely confirmed that DOE never agreed to include a specific acceptance rate in the Standard Contract.

---

[4] Richard Sieracki and Kenneth Metcalfe work for the Kenrich Group ("the Kenrich Group" or "Kenrich"). They were both retained to work on the damages claim on behalf of WEPCO for the litigation.

An acceptance rate that would obviate the need for additional at-reactor storage after January 31, 1998 and work off the backlog was already implicit in the Standard Contract and was the understanding of the parties at the time of contracting. The specific language that would quantify that rate was not, however, in the Standard Contract, and that is what EEI sought to include in the Standard Contract. The utilities did not seek to add a Contract requirement; the requirement was already implicit in the Standard Contract. *See* WE Response to DFF 1, 8, 27, 28; PFF 48-51.

30. The nuclear industry was concerned that the priority system set forth in the draft contract did not give priority to reactors that might need to ship fuel offsite to ensure continued operation of their plants. Tr.1249:5-1251:4 (Shimon). Specifically, in the cover letter to its comments, EEI recognized that "[n]o priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating (although DOE can, in its discretion, take 'emergency deliveries'). Nor is any consideration given to the size of a Purchaser's SNF inventory." DX 501.34 at ARC001 0331.

**RESPONSE:**

WE objects to this proposed finding as unsupported by the cited evidence and irrelevant.

The cited Shimon testimony does not support the Government's assertion that the industry was concerned that priority was not being given to reactors that might need to ship fuel off-site to continue operations. In his testimony, Mr. Shimon described his participation in industry groups at the working group level and the participation of his superior, Sol Burstein, at the executive level. Tr. 1249:5-1251:4 (Shimon). Mr. Shimon described how he worked with Mr. Burstein and made sure that his involvement in the working groups met Mr. Burstein's approval. Tr. 1249:22-1250:8 (Shimon). Finally, Mr. Shimon described some of the points that he made in these groups at Mr. Burstein's request. Tr. 1250:9-1251:4 (Shimon). Regarding those points, Mr. Shimon stated:

> All of those points focused on protecting the rights that Wisconsin Electric believed that they had by virtue of the terms of the Contract. I've mentioned them before, but the things he

> emphasized to me were that we had to hold firm on the January 31, 1998 date for removal of spent fuel, that the rate had to be sufficient to preclude additional storage after that date, and that the contract should continue to provide priority for oldest fuel.

Tr. 1250:16-25 (Shimon). None of this testimony supports the Government's assertion.

The Government's quotation of parts of EEI's March 7, 1983 letter is irrelevant. At the time of contracting, WE did not anticipate needing to ship SNF to DOE to continue operating. PFF 66. With oldest fuel being picked up first, WE had projected the planned Point Beach Nuclear Plant ("Point Beach") spent fuel pool discharges against the existing Point Beach spent fuel capacity and determined that WE would be able to store all of the planned discharges without additional on-site storage until DOE commenced removal of all SNF by January 31, 1998. *Id.*

31. Florida Power & Light Company, in its written comments, stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
> > "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 501.43, Attachment 1 at ARC001 0439 (Testimony & Comments of Michael Cook, VP, Florida Power & Light).

**RESPONSE:**

WE objects to the proposed finding for the reasons set forth in its Response to DFF 27.

WE further objects to the proposed finding as irrelevant. WE was not a party to Florida Power & Light's comments to DOE. Florida Power & Light is not a party to this matter, and the actions of that third party have no relevance to WE's case.

32. Many commenters suggested that the proposed contract requirement for DOE to provide reports regarding acceptance information beginning in 1991 was insufficient to allow the contract holders to plan for their future SNF interim storage needs. EEI and UNWMG stated that DOE instead should issue an annual report, beginning in 1984 (after submission of the Mission Plan to Congress), "setting out its schedules, projected receiving rates, and projected allocations for all purchasers," with the report "cover[ing] at least 10 years of repository operation." DX 501.34 at ARC001 0356 (emphasis added); see DX 501.12 at ARC001 0166 (reports beginning in 1984 "are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage"). Others suggested that, "[t]o assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity." DX 501.69 at ARC001 0627 (emphasis added).

**RESPONSE:**

This proposed finding misleadingly implies that DOE was not required to report on the OCRWM program and that the parties were not in agreement about a reasonable DOE acceptance rate. DOE published numerous program documents, including Mission Plans, ACRs, APRs, Nuclear Waste Fund Fee Adequacy Assessments, and TSLCCs. PFF 59-61. Indeed, in one of the documents cited by DOE, DX 501.34, EEI stated that "DOE will be developing information on schedules, capacities, receiving rates, etc. in connection with its development of the mission plan required by section 301 of the [NWPA]." DX 501.34 at ACR00010355.

DOE's published program documents confirmed DOE's and WE's understanding that, under the Standard Contract, and in accordance with the NWPA, DOE would have an operational facility by no later than January 31, 1998 that would ramp up to an annual

acceptance rate of 3000 MTU that would eliminate the need for utilities to construct additional storage after January 31, 1998 and that would work off the accumulated backlog at a reasonable rate. *See* PFF 60-61.

Similarly, that some utilities proposed that the Standard Contract impose various reporting requirements on DOE does not contradict the fact that the NWPA and Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. *See* WE Response to DFF 1, 27, 28; PFF 48-51.

WE objects to the Government's citation to comments submitted by Northern States Power Company (DX 501.12) and Middle South Service (DX 501.69). WE was not a party to the comments of these utilities and they are not parties in the litigation filed by WE against DOE. *See* PFF 43, PX 34.

33. EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 501.34, Attachment A at ARC001 0336-37. They stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id.; see DX 501.14 at ARC001 0180 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 501.69 at ARC001 0625 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

**RESPONSE:**

WE objects to this proposed finding as irrelevant. First, WE was not a party to comments submitted by Cincinnati Gas & Electric Company (DX 501.14) and Middle South Service (DX 501.69). *See* PFF 43, PX 34. Further, those utilities are not parties in the instant action. Second, while WE was a member of EEI/UNWMG, comments submitted regarding whether the Standard Contract should expressly authorize the use of an MRS are irrelevant to the instant matter.

### 3. Plaintiffs' Comments

34. C.W. Fay, the Vice-President of Nuclear Power for WEPCO, received a copy of the draft Standard Contract in February 1983, when it was issued in the Federal Register. PX 27.

**RESPONSE:**

WE objects to this proposed finding as inaccurate. There is no evidence in the record that C.W. Fay "received a copy of the draft Standard Contract in February 1983." Instead, DOE *sent* Mr. Fay a copy of the draft Standard Contract in February 1983 as evidenced by PX 27. In any event, this proposed finding is immaterial.

35. On March 9, 1983, Mr. Fay sent correspondence to DOE in which he noted that WEPCO had not submitted its own formal comments regarding the draft standard contract but that WEPCO supported the positions taken jointly by EEI, UNWMG, and the Electric Utility Companies' Nuclear Transportation Group. DX 42. In that correspondence, Mr. Fay provided information in response to the February 14, 1983 letter from DOE. Id.; Tr.1238:4-1239:21 (Shimon); PX 30; PX 34.

**RESPONSE:**

WE does not dispute this proposed finding.

36. WEPCO did not submit any objections to the proposed Standard Contract, including objections to the issue of rate of acceptance. Id.

**RESPONSE:**

WE objects to this proposed finding as inaccurate. WE was a party to the objections to the proposed Standard Contract submitted by the industry groups in PX 34/DX 42. As WE explained in PX 34/DX42, "we support the positions taken jointly by the Edison Electric Institute and the Utility Nuclear Waste Management Group and separately by the Electric Utility Companies' Nuclear Transportation Group." *Id.* The comments adopted by WE are set forth in PX 30, in which EEI and UNWMG included their "specific comments and suggested revisions to the provisions of the draft contract and to the appendices of the contract." *See* PX 30, p. ARC001 0326.

C. <u>The Final Rule</u>

37. On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983).

**RESPONSE:**

WE does not object to this proposed finding.

38. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to <u>disposal</u> of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added), that "disposal" was defined as emplacement in a permanent repository, <u>id.</u>, and that such "disposal" services would begin by January 31, 1998, <u>id.</u>, the <u>final</u> Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. <u>Id.</u> Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. <u>The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998</u> and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added).

**RESPONSE:**

WE objects to this proposed finding as misleading to the extent it implies that DOE was not obligated to construct a repository. Section 10161(a)(5) of the NWPA specifically provided that "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5). Thus, DOE was obligated to provide a repository whether or not an MRS was available.

WE also objects to this proposed finding as irrelevant and immaterial. Even if one assumes that DOE could perform at an MRS under the Standard Contract, that does not change the fact that DOE did not so perform and that, by no later than 1992, it was clear that DOE was not going to be able to perform at an MRS by January 31, 1998. PFF 104, 107, 115.

WE further objects that the proposed finding contains numerous errors. The Government's first citation to the proposed Standard Contract should be to page 5463, not to page 5462. The Government's second citation to the proposed Standard Contract should read "'disposal' was defined as emplacement in a repository" and not "'disposal' was defined as emplacement in a *permanent* repository." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983). The Government's third citation regarding disposal beginning on January 31, 1998 is not found at 48 Fed. Reg. 5462. Finally, the Government does not provide a citation to the final Standard Contract for its assertion that "the final Standard Contract eliminated any requirement for DOE to begin SNF 'disposal' in a permanent repository by January 31, 1998."

39. The "facility" to which the final Standard Contract refers is <u>either</u> a permanent repository to be constructed pursuant to the NWPA <u>or</u> such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or <u>such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility</u>.

<u>Id.</u> § 961.11, Art. I.10 (emphasis added).

**RESPONSE:**

WE does not object to this proposed finding.

40. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be

> an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

**RESPONSE:**

WE objects to this proposed finding as misleading to the extent it ignores the fact that the NWPA still required that DOE propose to Congress any potential use of an MRS. 42 U.S.C. § 10161(b).

WE also objects to this proposed finding as misleading to the extent it implies that DOE was not obligated to construct a repository. Section 10161(a)(5) of the NWPA specifically provided that "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5). Thus, DOE was obligated to provide a repository whether or not an MRS was available.

41. The final Standard Contract retained the fee requirements identified in the proposed rule, requiring contract holders to pay the one-time fee for waste generated prior to April 7, 1983, and continuing quarterly fees in the amount of 1.0 mill per kilowatt-hour on electricity generated. 10 C.F.R. § 961.11, Art. VIII.

**RESPONSE:**

WE does not object to this proposed finding.

42. As for the <u>order</u> of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

**RESPONSE:**

WE does not object to this proposed finding.

43. As for identification of the <u>rate</u> of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE

would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

**RESPONSE:**

WE objects that this proposed finding is erroneous, misleading and contrary to the evidence. The Government's proposed finding is misleading to the extent that it suggests that the following language in the *proposed* Standard Contract was abandoned: "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports." That language, found at Article IV.B.5 of the *proposed* Standard Contract, is found and supplemented in the *final* Standard Contract at Article V.B.4: "DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports."

The final Standard Contract notice in the Federal Register explained more than the Government indicates, by stating that "at the request of a substantial number of commenters, a *new provision has been added* as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . set[ting] forth the projected annual receiving capacity for the DOE facility.'" 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983) (emphasis added, brackets in original, ellipsis in original). With regard to the Government's quote from Article IV.B.5(b) of the *final* Standard Contract, that language did not replace Article IV.B.5 of the *proposed* Standard Contract. As noted, the quoted provision was new language, and the former Article IV.B.5 was moved to Article V.B.4 of the final Standard Contract. *Id.*

44. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." See 10 C.F.R. § 961.11.

**RESPONSE:**

WE objects that the proposed finding is immaterial and irrelevant to the present matter. Regardless of whether or not DOE accepted various commenters' proposed Standard Contract language, the parties were in agreement at the time of contracting that, in accordance with the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to pick up accumulated SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

45. Similarly, DOE did not adopt EEI and UNWMG's request for additional "performance standards" by adding a contract clause to require DOE to accept SNF and/or HLW "commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated." DX 501.02 (48 Fed. Reg. 16590, 16598 (Apr. 18, 1983)); Tr.3795:4-3798:12 (Morgan designation, Northern States trial, 11/16/06); Tr.2209:9-20 (Morgan designation, TVA trial, 7/14/05).[5]

**RESPONSE:**

WE objects that the proposed finding is immaterial and irrelevant to the present matter. Regardless of whether or not DOE accepted various commenters' proposed Standard Contract language, the parties were in agreement at the time of contracting that, in accordance with the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to pick up accumulated SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

WE also objects that the cited evidence does not support the proposed finding. The comments on page 16598 in the Federal Register do not reference a contract clause that would require DOE acceptance of spent fuel at a certain rate. 48 Fed. Reg. 16590, 16598

[5] The designations of Robert Morgan are collected in PX 1052.

(Apr. 18, 1983). While "performance standards" are discussed on page 16598, the notice explains that the commenters interested in "performance standards" "pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, [the] commenters [said], the contract provides no specific remedies against DOE for failing to meet the date." *Id.* Thus, the Government misleadingly conflates the issue of "performance standards" with the commenters' separate and distinct request for an explicit rate of acceptance to memorialize the already implicit acceptance rate requirement from the NWPA.

Further, the Morgan testimony cited in the proposed finding relates to DOE's acceptance rate and not to the "performance standards" that were referenced in the Federal Register notice. Regardless of Mr. Morgan's testimony regarding DOE's rate of acceptance, DOE was bound by the Standard Contract and the NWPA to accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to eliminate the accumulated backlog of SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

46. In the final Standard Contract, DOE inserted the following whereas clause, which corresponds, in part, to the language that EEI and UNWMG had proposed in its comments:

> Whereas, DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon request of the generator or owner of such waste or spent nuclear fuel.

10 C.F.R. § 961.11.

**RESPONSE:**

WE does not object to this proposed finding.

47. DOE denied these requests to include either an acceptance rate or qualitative acceptance performance standards in the Standard Contract because DOE did not have enough information regarding how the program would develop to be able provide such a rate.

Tr.3798:4-16, 3782:3-20 (Morgan designation, Northern States trial, 11/16/06); Tr.2211:14-2213:3 (Morgan designation, TVA trial, 7/14/05).

**RESPONSE:**

WE objects that the proposed finding is immaterial, irrelevant, and contrary to the evidence. Regardless of one DOE employee's testimony regarding why DOE may have rejected or accepted certain commenters' proposed Standard Contract language, the parties were in agreement at the time of contracting that, in accordance with the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to eliminate the accumulated backlog of SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Moreover, during development of the Standard Contract, the parties had already extensively discussed the rate at which DOE would accept spent fuel. Those discussions confirmed that the industry and DOE both understood that DOE would accept approximately 3000 MTU of spent fuel annually and that such acceptance rate would be achievable by 1998. *See* PFF 51.

Moreover, within six months of executing the Standard Contract, DOE's program documents confirmed the parties' understanding that DOE would comply with the terms of the NWPA by having an operational facility by 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would eliminate the need for utilities to construct additional storage after 1998 and that would work off the accumulated backlog at a reasonable rate. *See* PFF 61a.

Finally, Mr. Morgan's testimony demonstrates an understanding that DOE was able to identify in 1983 the rate of acceptance that would meet DOE's contract obligations. As the acting OCRWM director at that time, Mr. Morgan knew that the 1983 Draft Mission Plan ramped up to a 3000 MTU steady-state annual rate, and that the 3000 MTU steady-state annual rate meant that "generally no utility would have to provide on-site storage after

January 1998." PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3671:24-3672:4); PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 211:14-212:12); PX 1052 (Morgan Dep. Desig. 3/22/02 Tr. 225:19-24). *See also* PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3675:11-23 (Morgan knew that the 3000 steady-state annual rate was the only reference case used when he was acting director in 1983)); PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3677:23-3678:2 ("Q: But you wouldn't have made these statements in this program overview on [the 1983 Draft Mission Plan] if you didn't think it was appropriate to do so, did you? A: Of course not.")); PX 1052 (Morgan Trial Desig. *Northern States* Tr. 3887:13-3888:21 (Morgan agreed that the 1983 Draft Mission Plan included rates that ramped up to 3000 MTU annually, and that the document was intended to "effectuate the intent of Congress")); Defendant's Testimony Designations, Dkt. 368 (Nov. 9. 2007) (Morgan Trial Desig. *PG&E* Tr. 2560:25-2561:6 ("Q: Well, let me ask you the question this way, Mr. Morgan, you don't have any recollection of any consideration in June or July 1983 timeframe within the [DOE] regarding the acceptance of amounts less than those shown here in table 3-3 [of the 1983 Draft Mission Plan, which ramped up to 3000 MTU annually], do you? A: No.")).

48. DOE was unable to commit to an acceptance rate in the contract because of the numerous uncertainties that the program faced. In addition to funding constraints from Congress, Mr. Morgan and other program personnel did not know what licensing requirements the NRC would issue, whether there would be intervenors in the licensing proceedings, or, perhaps most importantly, what type of facility would be designed and built. Tr.3782:3-20 (Morgan designation, Northern States trial); Tr.2220:9-2221:17 (Morgan designation, TVA trial).

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in its Response to DFF 47.

49. Given these uncertainties, DOE chose to defer the development of an acceptance rate until the program was more developed. By 1987, DOE planned to have selected the repository site. Tr. 3838:3-3839:5 (Morgan designation, Northern States trial, 11/16/06). By 1991, DOE expected to establish a schedule for acceptance. Id. These were

the dates to which DOE was willing to commit in the Standard Contract. Tr. 93:19-94:8 (Morgan designation, Northern States trial, 11/15/06).

**RESPONSE:**

WE objects that the proposed finding is erroneous, misleading and contrary to the evidence. DOE did not choose to defer the development of an acceptance rate. The parties were in agreement at the time of contracting that, in accordance with the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to eliminate the accumulated backlog of SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Further, while DOE planned to have selected the repository site by 1987 and to have a schedule for acceptance by 1991, neither of those events contradicts the previous requirements under the NWPA and the Standard Contract with regard to the rate at which DOE would accept SNF.

Moreover, during development of the Standard Contract, DOE extensively discussed with the utilities the rate at which DOE would accept spent fuel. Those discussions confirmed that the industry and DOE both understood that DOE would accept approximately 3000 MTU of spent fuel annually and that such acceptance rate would be achievable by 1998. *See* PFF 51.

The proposed finding also is inaccurate because it ignores that, within six months of executing the Standard Contract, DOE's program documents confirmed the parties' understanding that DOE would comply with the terms of the NWPA and the Standard Contract by having an operational facility by 1998 that would ramp up to an annual acceptance rate of 3000 MTU that would eliminate the need for utilities to construct additional storage after 1998 and that would work off the accumulated backlog at a reasonable rate. *See* PFF 61.

Finally, WE objects to the proposed finding because it is unsupported by the evidence. Mr. Morgan's designated testimony from *Northern States* does not suggest that, by 1987, DOE planned to have selected a repository site. In fact, it does not even speak to repository sites. Further, the Government improperly identifies the November 15, 2006 testimony of Mr. Morgan as testimony from the *Northern States* trial. To the contrary, that testimony was given during Mr. Morgan's deposition, not at trial.

50. DOE also denied the request that priority be granted to utilities which need to ship SNF to DOE to keep their plants operating, stating that, "by the time the repository commences operations, utilities will have made adequate preparations to provide on-site storage in order to ensure continued plant operations." 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983).

**RESPONSE:**

WE objects that this proposed finding is irrelevant to the instant matter. The Government has provided no evidence that WE was one of the "[n]ine commenters" who requested special priority because of a potential need to ship SNF to DOE to keep their plants operating. 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983). To the contrary, WE knew at Contract execution – and later – that it would be able to store all of its planned discharges without additional on-site storage until DOE commenced removal of SNF by January 31, 1998. PFF 66, 159, 162. Thus, WE is not one of the parties for whom the potential Contract language was material.

In any event, the DOE position quoted by the Government only supports WE's contention that a nuclear utility could plan to continue operations for a designated period of time – namely into 1998 – if given time to make "adequate preparations." PFF 159, 161-167. In the event that WE needed to make "adequate preparations" in the non-breach world in order to continue operation to 1998 without dry fuel storage, WE had options available to do so. PFF 161. Because WE knew almost a decade ahead of time that DOE would *not* timely

perform, however, WE did not employ some of the methods available to operate into 1998 or beyond without dry fuel storage. PFF 161.

51. DOE did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan." DX 501.43, Attachment 1 at ARC001 0439.

**RESPONSE:**

WE objects to this proposed finding as irrelevant. WE was not a party to Florida Power & Light's comments to DOE. Florida Power & Light is not a party to this matter, and the actions of that third party have no relevance to WE's case.

WE also objects to this proposed finding as misleading. Even though some parties to the Standard Contract may have proposed that the Standard Contract include more specific language about DOE's rate of acceptance of SNF, the NWPA and the Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. *See* WE Response to DFF 1, 27, 28; PFF 48-51. The parties both understood at the time of contracting that the DOE acceptance rate would meet these criteria. *See* PFF 48-51.

52. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

**RESPONSE:**

WE does not object to the substance of the proposed finding.

53. Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the

1991 Annual Capacity Report ("ACR") and Acceptance Priority Ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added).

**RESPONSE:**

WE does not dispute that the quoted language was included in the final Standard Contract. WE, however, notes that the Standard Contract contains neither a requirement nor even a reference to any DOE instructions to Purchasers regarding completion of DCS submittals. PX 41; 48 Fed. Reg. 16590 (Apr. 18, 1983). Thus, the Standard Contract does not permit the Government to limit Purchasers' substantive rights in the guise of "instructions."

WE further objects to this proposed finding as misleading to the extent it implies that the DCSs were for other-than planning purposes or that the DCSs reflected binding

contractual commitments. DOE believed at the time that the DCS process was nothing more than "administrivia" and that the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*. *See also* WE's General Objections to Section X (DFF 114-135).

54. Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if DOE found a DCS that a contract holder proposed to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id. The final Standard Contract also included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).[6]

**RESPONSE:**

WE does not dispute that the quoted language in this proposed finding was included in the final Standard Contract.

WE, however, objects that this proposed finding is misleading because contract holders would only need to resolve problems with "unacceptable" DCSs if the DCSs were (a) contractually binding and/or (b) a functioning Federal waste management system existed. Neither was the case.

First, the overwhelming evidence established that DOE believed that the DCSs were not binding and characterized them as "administrivia." *See* PFF 126. DOE witnesses

[6] In its comments upon the proposed Standard Contract, EEI recognized that the Disputes clause would function to resolve any differences between the parties concerning DCSs. DX 501.34 at ARC001 0346.

testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*

Second, it was clear that DOE could not timely perform in 1998 when DOE issued its DCS instruction in 1992. PFF 104, 107, 115.

55. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

**RESPONSE:**

WE does not dispute that the quoted language in this proposed finding was included in the final Standard Contract.

WE, however, objects that this proposed finding is misleading because DOE never approved or disapproved any FDSs. *See also* WE's General Objections to Section X (DFF 114-135); PFF 126.

The proposed finding is also misleading because it implies that any parties who took issue with FDSs had an obligation to resolve those issues. Given DOE's nonperformance, however, it never approved or disapproved an FDS so there has never been the opportunity for a disagreement regarding FDS approval to arise.

56. The final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.A.

**RESPONSE:**

WE does not dispute that the quoted language is from the Standard Contract. However, the remainder of this proposed finding does not concern a factual issue. Instead, it concerns a question of law regarding the meaning of the quoted language and its precise application to this litigation. WE responds to this question of law in its post-trial reply brief.

WE does object to factual errors in this proposed finding. The Government contends that the clause at Article XXII.A of the Standard Contract precluded reliance on representations, promises or conditions "expressly" incorporated into the Contract. As the quoted language makes clear, Article XXII.A contains no reference to "express" representations, promises or conditions.

57. The final Standard Contract did not contain any language that expressly required DOE to accept fuel at a rate that would preclude the need for expenditures upon at-reactor storage after January 31, 1998, at a rate equal to the annual generation rate of SNF plus an amount sufficient to work off the backlog of fuel that would have accumulated by January 31, 1998, or at any specific numerical acceptance rate. See 10 C.F.R. § 961.11.

**RESPONSE:**

WE objects to this proposed finding because it is misleading. The NWPA and the Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. *See* WE Response to DFF 1, 8, 27, 28; PFF 48-51. The parties both understood at the time of contracting that the DOE acceptance rate would meet these criteria. *See* PFF 48-51.

58. The final Standard Contract contained an express recognition that its terms "had been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV.

**RESPONSE:**

WE does not dispute that the Standard Contract contained the language quoted in this proposed finding. The quoted language does not change the fact that implicit in the Standard Contract, the NWPA, and commensurate with the parties' understanding at the time of contracting, DOE was obligated to pick up spent fuel at a rate that would obviate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. *See* WE Response to DFF 1, 8, 27, 28; PFF 48-51.

Further, DOE was explicitly obligated to construct a repository, and any implication to the contrary is inaccurate. Section 10161(a)(5) of the NWPA specifically provided that "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5).

**D. WEPCO'S Execution Of The Standard Contract**

59. WEPCO did not refuse to sign the contract or sue DOE for developing a contract without a rate of acceptance. Tr.1449:10-1450:17 (Shimon).

**RESPONSE:**

WE objects that the Government mischaracterizes Mr. Shimon's testimony. Mr. Shimon testified that the "*performance standards* in the Contract did not include a rate of acceptance," not that the Standard Contract did not reflect a rate of acceptance. Tr. 1450:15-17 (Shimon) (emphasis added). Mr. Shimon affirmatively testified to the parties' understanding at the time of contracting that the Standard Contract implicitly required DOE to accept fuel at a rate sufficient to avoid additional at-reactor storage after 1998 and sufficient to "work off the backlog of spent fuel over a reasonable period of time." *See* PFF 48; Tr. 1245:18-1246:10; 1496:22-1501:23 (Shimon); Tr. 1496:22-1501:23 (Shimon).

WE further objects to the Government's statement that "WEPCO did not refuse to sign the contract" because it is misleading. If the nuclear utilities, (including WE) did not sign the Standard Contract, they risked losing their NRC operating licenses for Point Beach. PFF 44. In addition, in its letter to DOE, WE stated: "Our signing [the Standard Contract] should not be interpreted as agreeing with either the Final Rule or the Standard Contract." PX 38, p. 2; PFF 45. Further, WE expressly noted that its signing – with reservations – "was necessitated by the congressionally imposed urgency of signing a contract," and that the review and negotiation period had been inadequate. PX 38, p. 2.

WE also objects to the Government's mischaracterization that the Standard Contract did not include a rate of acceptance. To the contrary, the provisions of the NWPA and the Standard Contract – read in their entireties – required DOE to pick up SNF at a rate that would obviate the need for additional at-reactor storage and work off the backlog at a reasonable rate. *See* WE Responses to DFF 1, 8, 27, 28; PFF 48-51.

60. WEPCO did, however, send correspondence to DOE on June 3, 1983, several weeks before it signed the Standard Contract. PX 38. In that correspondence, signed by Sol

Burstein, WEPCO's executive vice-president, WEPCO identified its disagreement with the process for generating the one mill fee associated with the contract:

> While you have made it clear in your letter that you are not interested in receiving comments on the Final Rule and/or the disposal contract, we are, nevertheless, compelled to point out your inappropriate, and unjustifiable, adoption of "gross" kilowatt-hours of generation as the basis for assessing the one mil fee.

PX38 at COF-003-0626.

**RESPONSE:**

WE objects that this proposed finding is misleading because it implies that WE only had one disagreement with the Standard Contract. Following the language quoted by the Government in WE's June 3, 1983 letter to DOE, WE stated: "We are considering the initiation of appropriate actions at a later date to address what we perceive to be DOE's misinterpretation of the intent of Congress in this *and other regards.*" PX 38, p.2 (emphasis added). WE also noted that DOE had "made it clear [in a prior] letter that you are not interested in receiving comments on the Final Rule and/or the disposal contract . . . ." *Id.* In light of DOE's admonition, WE noted: "Our signing [the Standard Contract] should not be interpreted as agreeing with either the Final Rule or the Standard Contract." PX 38, p. 2; PFF 45. Further, WE expressly noted that its signing – with reservations – "was necessitated by the congressionally imposed urgency of signing a contract," and that the review and negotiation period had been inadequate. PX 38, p. 2. If WE did not sign the Standard Contract, it risked losing its NRC operating licenses. PFF 44.

61. On June 16, 1983, WEPCO executed its Standard Contract with DOE, which covered the SNF generated at the Point Beach Nuclear Power Plant ("Point Beach" or PBNP"), and which contained essentially the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 169A.

**RESPONSE:**

WE does not object to this proposed finding.

62. Soon after WEPCO signed the Standard Contract, WEPCO challenged the basis for the fee that it paid to DOE pursuant to the contract. DX528: Tr.1430:6-24

(Shimon). When WEPCO disagreed with an interpretation of the Standard Contract, it challenged it, in the case of the fee issue, by filing a complaint right away. Id.

**RESPONSE:**

WE objects that this proposed finding is unsupported by the cited evidence and misleading. The proposed finding implies that WE always filed complaints "right away" when it had disagreements with an interpretation of the Standard Contract. No evidence supports that contention. The Government cites no authority imposing upon WE an obligation to take legal action whenever it took issue with interpretations of the Standard Contract. The Government's position also ignores that, when the Standard Contract was executed, both parties understood and agreed that DOE was obligated to accept spent fuel at a rate that would avoid additional at-reactor storage after 1998 and would work off the backlog at a reasonable rate. PFF 48-51.

Mr. Shimon also never testified that WE challenged interpretations of the Standard Contract with which it disagreed "right away." To the contrary, Mr. Shimon specifically testified with regard to the "net versus gross issue," Tr. 1430:10 (Shimon), that "*[i]n this particular case*, we were of the opinion that we had a strong legal basis to compel the action, and so we did file it for a rule-making." Tr. 1430:21-24 (Shimon) (emphasis added).

E. **Industry Activities Following The Execution Of The Standard Contract**

63. After the contracts were signed, the industry continued to pursue the issue of incorporating additional performance standards in the Standard Contract. In September 1983, Mr. Zabransky attended numerous industry meetings with DOE during which the need for such a rulemaking was discussed:

> I believe there were several attempts and at least one that – it was a continuous theme at meetings with DOE, to lobby for such inclusion in the contract. I know there was at least some set of correspondences from the industry that was proposing, on many of the contracts, to include performance standards. I think this was a euphemism that was used, but basically, it was a rate type of amendment.

Tr.721:9-17 (Zabransky). As Mr. Zabransky further testified, the industry continued to lobby DOE because there was no rate included in the contract. Tr.721:18-722:7 (Zabransky).

**RESPONSE:**

WE objects that the proposed finding is misleading because the Government improperly conflates the issue of "performance standards" with the separate and distinct issue of including explicit language in the Standard Contract regarding DOE's rate of acceptance. In the final rule on the Standard Contract, DOE explained its response to requests for "performance standards." 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983). The notice explained that certain commenters were interested in "performance standards," and those commenters had "pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, [the] commenters [said], the contract provides no specific remedies against DOE for failing to meet the date." *Id.* As discussed in the Federal Register, the issue of "performance standards" was a separate and distinct issue from the rate at which DOE would accept spent fuel.

Furthermore, the terms of the NWPA and the Standard Contract – read in their entireties – implicitly required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work-off the backlog of spent fuel at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

64. At an informational meeting held in December 1983 with the nuclear industry, Mr. Mills of EEI explained that, in the contract, DOE had promised to take SNF "at some unspecified rate" in the future and that the industry expected to initiate a petition for rulemaking in the future to define additional contractual performance assurances:

> In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day, at some unspecified rate, hopefully starting in 1998. The DOE promise must be carried out, and it is our task as contract holders to do everything we can to assure that it is achieved.
>
> * * *
>
> We really were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance. We were not really looking for that, however, there were many concerns expressed by the utilities that were not resolved, as we believed equitably during the contract

> generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances, to include some of the things we heard this morning which were not embodied in the contract.

DX 493 at SN069619; Tr. 3924:18-3925:9 (Mills designation, Northern States trial, 11/16/06), (one of those performance standards was the rate of acceptance); Tr.1414:1-1416:21 (Shimon).

**RESPONSE:**

WE objects to this proposed finding for the reasons stated in Response to DFF 63.

WE also objects that the cited exhibit and testimonial evidence do not support the proposed finding. Mr. Mills' December 1983 statement does not reference the rate at which DOE would accept spent fuel. DX 493, p. SN069619. Moreover, the cited Mills' testimony is inconclusive with regard to whether Mr. Mills was referencing the acceptance rate issue in his December 1983 address:

> Q: Now, Mr. Mills, one of those performance standards was the ratings acceptance, right?
>
> A: While it may have been – yes, there was one, yes.

PX 1052 (Mills Trial Desig. *Northern States* Tr. 3925:5-9). Similarly, the cited testimony of Mr. Shimon does not indicate that Mr. Shimon considered the acceptance rate issue to be the same as the issue of "performance standards," as referenced in the final rule regarding the Standard Contract:

> Q: And Mr. Mills is specifically referring to performance standards that were not included in the contract, isn't that right?
>
> A: That's one of the things that he mentions [in the December 1983 speech], yes.

Tr. 1416:17-21 (Shimon).

65. On or about January 1984, UNWMG distributed a draft petition for rulemaking to be submitted to DOE. Tr.3441:19-3444:3 (Supko). The accompanying draft supporting memorandum noted that DOE had rejected its requests for additional performance standards in the rulemaking on the Standard Contract and urged that DOE provide for a

minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged – and that DOE commit to accept the entire backlog of SNF over a ten year period. Tr.720:10-722:7 (Zabransky).

**RESPONSE:**

WE objects that this proposed finding is unsupported by the cited evidence. Neither Eileen Supko nor Mr. Zabransky testified to the contents of any "draft supporting memorandum." Ms. Supko testified: "I know that I've seen the document. I don't remember the details of it." Tr. 3442:14-15 (Supko). Moreover, the document itself, while used to partially refresh Ms. Supko's recollection, was never admitted into evidence. Tr. 3442:16-3444:3 (Supko).

Mr. Zabransky also did not testify to the specific contents of any draft petition. He merely testified generally that he believed that there was some industry correspondence regarding this issue.

Finally, this proposed finding ignores that the terms of the NWPA and the Standard Contract – read in their entireties – required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

66. In April 1987, UNWMG submitted to the DOE contracting officer a request that the Standard Contract be "interpreted, clarified or amended to include additional performance standards by which DOE's progress may be evaluated." DX 541 at CTR-006-0248; Tr.3932:24-3935:10 (Mills designation, Northern States trial, 11/16/06) (letter was a request to DOE to "reconsider" the issue of the rate of acceptance). Specifically, UNWMG requested that "DOE provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged -- and that DOE commit to accept the entire backlog of SNF over a ten year period." DX 541 at CTR-006-0249; Tr.1450:15-1451:15 (Shimon) ("I'm pretty confident that I didn't say that the utilities did not ask for a rate of acceptance. In fact, they asked for it quite strongly and did not receive it."); Tr.732:10-735:4 (Zabransky); Tr.5059:13-5063:1 (Brownstein) (utilities requested insertion of performance standards into Standard Contract because they recognized it did not contain any such standards).

**RESPONSE:**

WE objects to this proposed finding as misleading. It ignores that the terms of the NWPA and the Standard Contract – read in their entireties – implicitly required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Further, in UNWMG's letter, the group acknowledged these implicit requirements of the NWPA and Standard Contract, stating: "[T]he Act nowhere prohibits DOE from providing a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel. At present, the Contract merely states that DOE's services 'shall begin, after commencement of facility operations, not later than January 31, 1998.'" DX 541, p. CTR-006-0248. UNWMG went on to reference the Standard Contract's incongruity, stating that there was an explicit requirement regarding Purchasers' fee payments but the Standard Contract "does not explicitly recite the standards for DOE's performance in accepting spent fuel from Purchasers." *Id.*, pp. CTR-006-0248, CTR-006-0249. Thus, nothing in UNWMG's request is inconsistent with the implicit requirement of the Standard Contract – and the parties' understanding at the time of contracting – with regard to the rate at which DOE was required to accept spent fuel. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Further, as UNWMG noted, its request was made in the context of "[r]ecent developments with the waste program" that indicated DOE's likely nonperformance by 1998. The UNWMG noted that "the first repository would not be ready to begin receiving spent nuclear fuel until 2003," and DOE had stated that "it remained committed to meeting the 1998 date, but was now relying upon the MRS facility, as yet unauthorized by Congress, to compensate for the first repository's delay." DX 541, p. CTR-006-0249.

WE also objects to this proposed finding because the citation to Mr. Mills' testimony is misleading. His testimony is consistent with the utilities' attempt to explicitly memorialize

the implicit terms of the Standard Contract, just as Mr. Mills had done through EEI prior to the issuance of the final Standard Contract (*see* PFF 43):

> Q: What do you consider [the UNWMG letter] document to be, sir?
>
> A: This was an information document.
>
> Q: Requesting that DOE enter into a rule-making process, correct?
>
> A: To request the Department, to issue a ruling interpreting, clarifying, or amending, it's not the way you start the rule-making process.
>
> Q: And you were asking DOE to –
>
> A: Reconsider these items.

PX 1052 (Mills Trial Desig. *Northern States* Tr. 3934:25-3935:10).

WE also objects to this proposed finding because the citation to Mr. Shimon's testimony is misleading. The Government only cites a portion of Mr. Shimon's testimony regarding the utilities' attempts to memorialize an express rate term. In subsequent testimony, Mr. Shimon explained:

> There were comments submitted at several different times. At the time that we were, the industry was commenting on the rule-making, there were some very strong requests for performance standards after the facility started operating. The list of 12 items that addressed performance standards was addressing milestones to measure progress to get to the date, while the utilities continued to pay into the Nuclear Waste Fund.

Tr. 1452:13-22 (Shimon). As explained by Mr. Shimon, and as noted above in WE's Response to DFF 63, the issues of "performance standards" and DOE's rate of acceptance were not necessarily one and the same. In any event, nothing in Mr. Shimon's testimony conflicts with the fact that the utilities were attempting to memorialize explicitly the implicit acceptance rate in the Standard Contract and the NWPA.

WE also objects to Mr. Zabransky's testimony on this issue because it conflicts with the text of UNWMG's letter and other evidence. Mr. Zabransky was asked why UNWMG

"would request that this be included in the contract," and he replied: "Because it wasn't in the contract right now, as stated in the next paragraph." Tr. 735:1-4 (Zabransky). That testimony is contrary to the "next paragraph" in which UNWMG argued: "The Act nowhere prohibits DOE from providing a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel." DX 541, p. CTR-006-0248. As noted, UNWMG went on to explain that the Standard Contract "does not explicitly recite the standards for DOE's performance in accepting fuel from Purchasers." *Id.*, pp. CTR-006-0248, CTR-006-0249. The *implicit* rate requirement in the NWPA – and the Standard Contract – is grounded in (a) the January 31, 1998 DOE pick up requirement, and (b) the requirement that utilities maintain responsibility for spent fuel *until* that date. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. The parties understood the rate requirement at the time of contracting. *Id.* Just as EEI had done (*see* PFF 43), UNWMG merely sought to include a more explicit acceptance rate in the Standard Contract.

WE objects to any reliance upon Mr. Brownstein's testimony because it conflicts with the text of UNWMG's letter to DOE and other evidence. Mr. Brownstein was asked if he had "an understanding as to what the utilities were requesting" in their letter to UNWMG. Tr. 5062:8-11 (Brownstein). He replied: "The utilities recognized that an acceptance rate was neither in the [NWPA], nor in the standard disposal contract, and so they were attempting to put a performance standard by which they can judge the Department's progress in place." Tr. 5062:14-19 (Brownstein). When asked why the utilities made that proposal, Mr. Brownstein replied: "Well, they, my, they speculated on their motives, but they understood that that rate did not exist in the law or the contract, and they were anxious to be able to judge our performance based on a rate." Tr. 5062:20-5063:1 (Brownstein). As noted above in this Response, UNWMG's letter sought to include a more explicit acceptance rate in the Standard Contract. The NWPA and the Standard Contract implicitly include a rate

requirement, and the parties understood that requirement at the time of contracting. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

67. DOE responded to this request by letter dated October 2, 1987. DX 545. In response to the industry's request that DOE commit to minimum receipt rate, the DOE contracting officer explained that, "given the current status of the [waste management system], the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel (SNF) which will equal or exceed the annual rate at which SNF is being discharged from reactors." Id. at PNL-028-1143; Tr.5063:9-5067:16 (Brownstein) (because of uncertainties in the program, DOE could not agree to a specific rate).

**RESPONSE:**

WE objects that the proposed finding is misleading. It ignores that, regardless of DOE's response to the industry's request for an explicit contract term with regard to DOE's rate of acceptance, the terms of the NWPA and the Standard Contract – read in their entireties – implicitly required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

## III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section III.

**GENERAL OBJECTIONS TO SECTION III (DFF 68-70):**

The proposed findings of fact in Section III (DFF 68-70) are misleading because they ignore early OCRWM program developments, including the publication of documents required by the NWPA in which DOE represented that it would perform at a steady-state rate of 3000 MTU. *See* WE's General Objections to Sections I and II; PFF 48-51, 61; WE PTB 41-42. Not only do the proposed findings ignore these program developments, but they ignore that the message from the OCRWM immediately after execution of the Standard Contract was *consistent* with the terms of the NWPA, the Standard Contract and the parties'

understanding at the time of contracting, namely, that DOE would accept spent fuel at a rate that would preclude the need for additional at-reactor storage and work off the backlog of accumulated SNF at a reasonable rate. See WE's General Objections to Sections I and II; PFF 48-51; WE PTB 41-42. Again, that rate was a steady-state annual acceptance rate of 3000 MTU. *Id.*

The proposed findings attempt to diminish the importance of the early OCRWM program developments by couching them as planning developments. The Government cannot dismiss the importance of these early developments. They clearly represented DOE's expressed views and confirmed that DOE planned to accept spent fuel commensurate with the parties' understanding and the terms of the NWPA and Standard Contract. It was not until years later, faced with its inability to timely perform and liability to the utilities for that delayed performance, that DOE changed to a substantially lower 900 MTU annual rate of acceptance. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

Second, the proposed findings erroneously imply that DOE's contractual obligations were potentially excusable because of (1) challenges that the OCRWM program faced; (2) an optimistic schedule; and/or (3) the possibility of needing an MRS facility to timely perform. To the contrary, DOE was explicitly and unconditionally obligated to begin performance by no later than January 31, 1998 – regardless of the type of facility at which it performed or the hurdles DOE might need to overcome in order to perform. 42 U.S.C. § 10222 (a)(5)(B). In addition, Section 10161(a)(5) of the NWPA expressly required that DOE construct a repository: "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5).

68. In June 1985, DOE issued a Mission Plan, PX 87, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon various assumptions regarding the availability of two

repositories and an MRS facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

**RESPONSE:**

WE objects that this proposed finding is misleading. The proposed finding ignores developments in 1983-1984, specifically, DOE's issuance of the 1983 and 1984 Draft Mission Plans, which were required by the NWPA, and regarding which utilities commented. 42 U.S.C. § 10221(b)(1); PX 52, 59; PFF 60, 61, 61a, 61e, 65. These two Draft Mission Plans both included an acceptance rate commensurate with the requirements of the Standard Contract and the NWPA and the parties' understanding at the time of contracting, namely, a rate that increased to a steady-state annual rate of 3000 MTU. PFF 48-51, 61; WE Response to DFF 1.

The proposed finding is also misleading because it indicates that the 1985 Mission Plan was not contractually binding and that this somehow negates the importance of this document to the utilities and DOE. The early OCRWM program documents, including the two Draft Mission Plans and the 1985 Mission Plan, were *consistent* with the parties' understanding of DOE's acceptance rate obligations under the Standard Contract and were relied upon by both parties. PFF 61. More specifically, the Draft Mission Plans and Mission Plan represented DOE's expressed views and confirmed that DOE planned to accept spent fuel at a rate sufficient to preclude additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51, 61 (specifically 61a, 61e, 61g); WE PTB 41-42. That rate was a steady-state rate of 3000 MTU annually. PFF 51-53, 61. It was not until later, faced with the reality of its inability to timely perform and likely liability to the utilities for that nonperformance, that DOE's planning disingenuously changed to include a substantially lower 900 MTU annual rate of acceptance. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

a. In his cover letter providing the Mission Plan to Congress, Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." PX 87 at PA-140164 (emphasis added); see 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. PX 87 at PA- 140201 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include An MRS facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." PX 87 at PA-140201-205.

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68.

b. Studying an assumption that it would have two repositories and an MRS, DOE projected in the Mission Plan, in Tables 2-2 and 2-3, schedules at which it could potentially accept SNF. Id.. However, these acceptance rates were not intended to be contractually binding, see, e.g., PX 87 at PA-140205; Tr.5153:9-18 (Kouts) (no relationship between Mission Plan schedules and DOE's contractual obligation), and DOE had declined the utilities' request to include in the Standard Contract a provision making the acceptance rates identified in the 1985 Mission Plan binding. See DX 501.43, Attachment 1 at ARC001 0439.

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68 and 51.

WE also objects to the cited testimony of Christopher Kouts because it is not competent evidence. In the cited testimony, Mr. Kouts was asked about *his* understanding, in *1985*, of DOE's contract obligations. Tr. 5153:9-18 (Kouts). Mr. Kouts, however, did not join OCRWM until June 1985, at which point he was only a member of an "MRS team, which was a small group of employees that was developing the MRS proposal . . . to Congress." Tr. 5144:3-13 (Kouts). Thus, Mr. Kouts did not occupy a position within

OCRWM that would have focused on the interplay of the Mission Plans and the Standard Contract. In any case, regardless of his position in OCRWM, Mr. Kouts' understanding does not impact the requirements that already existed in the Standard Contract and the NWPA. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

c. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." PX 87 at PA-140205; see Tr.5152:6-5153:8 (Kouts). Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

PX 87 at PA-140205; Tr.1466:8-1467:12 (Shimon). Accordingly, in the Mission Plan, DOE pointed to the issuance of the 1991 ACR as the beginning of the process for scheduling deliveries from utilities. Tr.5153:24-5154:15 (Kouts).

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68.

WE also objects that the proposed finding mischaracterizes the "process for scheduling deliveries from utilities." The so-called "process" did not alter DOE's obligations under the Standard Contract and NWPA. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. That "process" was merely the mechanism for allocating spent fuel pick-ups. *See* PFF 59. However, by the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115.

d. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "may operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are for illustrative purposes only at this time. The amount of Defense waste to be disposed of in the

> repository, and the actual acceptance rates, have not yet been determined by the DOE.
>
> * * *
>
> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

PX 87 at PA-140204-205 (emphasis added).

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68.

e. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *
>
> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

PX 87 at PA-140205 PX 87 at PA-140195-196 (emphasis added); see PX 87 at PA-140196 ("Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.").

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68.

Further, WE acknowledges that the Mission Plan provided that "[s]hould no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites." While utility storage of SNF remains a practical reality to this day, that does not affect DOE's liability for the *costs* of the utilities' continued storage of SNF that has resulted from DOE's partial breach of the Standard Contract. *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry.").

f. DOE issued two drafts of the Mission Plan, both of which contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 52 at CTR-042-1069 ("The Mission Plan . . . defin[es] the program objective, strategy, and current program plans . . ..") (emphasis added). In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.
>
> * * *

> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date).

PX 52 at CTR-042-1071, 1073 (emphasis added). The purpose of the draft Mission Plan, like the final version, was "to outline the plan that we were going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act." Tr.3827:17-3828:4 (Morgan designation, Northern States trial, 11/16/06). DOE was not obligating itself to accept waste at the schedules set forth in the draft Mission Plan. Tr.3828:5-9 (Morgan designation, Northern States trial, 11/16/06); see also Tr. 135:18-136:23 (Rosselli designation, 4/15/02) (reference to "firm schedule" in the December 1983 draft Mission Plan meant the delivery commitment schedules to be executed by the utilities and approved by DOE). The language regarding "the need for utilities to provide additional on-site storage after 1998" was removed from subsequent versions of the Mission Plan. Compare PX 17 and 22 and 31.

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in Response to DFF 68.

WE further objects because this proposed finding misleadingly implies that the Draft Mission Plans somehow lacked meaning because they were for planning purposes. In the absence of other expressions by DOE, these planning documents represented DOE's expressed views and confirmed that DOE planned to accept spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51, 61 (specifically 61a, 61e); WE PTB 41-42. That rate was a steady-state rate of 3000 MTU annually. PFF 51-53, 61.

g. At a conference attended by Standard Contract holders and others in December 1983, Mr. Morgan described the December 1983 draft Mission Plan as containing DOE's "basic strategy." DX 493 at SN069600 (emphasis added). He also explained that a second repository would be necessary to begin working off the backlog of spent fuel. Id. According to the schedule set forth in the December 1983 draft Mission Plan, the second