repository would need to begin operation to enable DOE to stay ahead of the projected generation rate of SNF from nuclear utilities. PX 52 at CTR-042-1072; Tr.3832:21-3833:6, 3841:1-3842:9 (Morgan designation, Northern States trial, 11/16/02). However, as of December 1983, Congress had not authorized a second repository. PX 52 at CTR-042-1074 ("upon Congressional approval, the Department will proceed to license the site and construct a second repository."); PX 87 at PA-140198 ("The Act authorizes the DOE to conduct siting activities for a second repository and submit to Congress a proposal for the authorization of a second repository.").

**RESPONSE:**

WE objects that this proposed finding is misleading. Through a speech, Mr. Morgan was not able to somehow alter the contractual obligations of DOE into a "basic strategy" and condition DOE's obligatory contractual performance on the availability of an MRS facility or second repository. In any event, Mr. Morgan acknowledged DOE's contractual obligation, explaining that beginning in 1998, utilities would *not* have to provide additional at-reactor storage. PFF 61b; DX 493, p. SN069599.

h. Because there were "a demanding set of technical, regulatory and institutional challenges" to be met in the development of the first repository, the December 1983 draft Mission Plan also discussed DOE's plans to pursue a Monitored Retrievable Storage ("MRS") facility as an alternative for performance in 1998. PX 52 at CTR-042-1076. Mr. Morgan also advised Standard Contract holders and others at the December 1983 conference that the schedule for the repository was "extremely optimistic" and, for this reason, DOE would have "an alternative plan or parallel plan" to begin receiving waste at an MRS by January 31, 1998. Tr.3836:2-21 (Morgan designation, Northern States trial, 11/16/06); Tr.2502:21-2504:12 (Morgan designation, PG&E trial, 6/13/06). However, the program "strategy" with regard to preventing the need for utilities to add additional on-site storage after 1998 did not apply to DOE's plans for the MRS.

**RESPONSE:**

WE objects to this proposed finding because it erroneously implies that DOE's performance was potentially excusable because of (1) challenges that the program faced, (2) an optimistic schedule, and/or (3) the possibility of needing an MRS facility. To the contrary, DOE is explicitly and unconditionally obligated to begin performance by no later than January 31, 1998 – regardless of the type of facility at which it performed or the hurdles DOE might need to overcome in order to perform. 42 U.S.C. § 10222 (a)(5)(B). The

implication to the contrary in this proposed finding is inaccurate. Indeed, DOE is explicitly obligated to construct a repository; Section 10161(a)(5) of the NWPA specifically provided that "disposal of high-level radioactive waste and spent nuclear fuel in a repository developed under this chapter should proceed regardless of any construction of a monitored retrievable storage facility pursuant to this section." 42 U.S.C. § 10161(a)(5).

WE further objects to the final sentence in this proposed finding because it is inaccurate and irrelevant, and the Government fails to cite any supporting evidence. In fact, DOE planned for the MRS to receive spent fuel at the same rate that DOE was planning for the permanent repository. PX 87 (June 1985 Mission Plan for the Civilian Radioactive Waste Management Program), p. 126; PX 115 (March 1987 DOE Monitored Retrievable Storage Submission to Congress), p. 20. *See also Carolina Power & Light Co. v. United States*, No. 04-37C, 2008 WL 2154103 at *7 (Fed. Cl. May 19, 2008).

69. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).[7]

DX 543 at HQR-003-1634; Tr.5187:5-5188:7 (Kouts) (acknowledging at this point that the repository was not going to be operational until 2003, but that we could still begin accepting waste at an MRS by 1998); DX 543 at HQR0032039 (acknowledgment of EEI and UNWMG that DOE could only meet its statutory and contractual obligation to begin acceptance in 1998 with performance at an MRS). Further, in the 1987 Mission Plan Amendment, DOE stated

[7] DOE's ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. *See* 42 U.S.C. § 10161(b)-(c) (1982).

that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 543 at HQR-003-1687 (emphasis added); Tr.1469:24-1470:8 (Shimon). Again, these acceptance rates were not intended or understood to be contractually binding. Instead, this language was intended to indicate that the DOE was still trying to figure out exactly how the system was going to operate. DOE understood that there were a variety of uncertainties as to how the program would be implemented and that estimate, while it was the best at the time, it could change. Tr.5189:22-5190:16 (Kouts); Tr.5123:4-5124:8 (Brownstein).

**RESPONSE:**

WE objects to this proposed finding as misleading. Neither DOE's delay in repository performance from 1998 to 2003, nor DOE's uncertainty regarding how the FWMS would operate excused DOE's contract obligations under the Standard Contract. The Standard Contract and the NWPA bound DOE to accept spent fuel in order to preclude additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. Further, DOE is explicitly and unconditionally obligated to begin performance by no later than January 31, 1998 and to construct a repository "regardless of any construction of a [MRS] facility." 42 U.S.C. §§ 10161(a)(5), 10222(a)(5)(B).

In addition, the proposed finding is not supported by Mr. Shimon's testimony. Mr. Shimon was merely asked whether page 60 of the 1987 Draft Mission Plan "inform[ed] the industry that, like the schedule in the 1985 Mission Plan, the schedule [in the Mission Plan Amendment] is only an approximation of how the system may operate, and the DOE will define and specify the system as the program progresses." Tr. 1469:24-1470:7 (Shimon). Mr. Shimon could only confirm or deny Government counsel's paraphrasing of the document, which is what he did: "That's essentially what it says, yes." Tr. 1470:8 (Shimon). Thus, Mr. Shimon's testimony does not support this proposed finding's misleading characterization of the Mission Plan Amendment.

70. DOE also represented in the 1987 Mission Plan Amendment the importance of the Acceptance Priority Ranking and Annual Capacity Report that would be issued in 1991:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 543 at HQR-003-1687. With this statement, DOE was notifying contract holders and the Congress that DOE would essentially begin the contractual planning process as specified in the contracts, beginning in 1991, by issuing an acceptance priority ranking and an annual capacity report from which the utilities would then provide information to DOE, which would then have to be evaluated and approved, which would then form a basis for a commitment for what DOE would be taking from the utility. Tr. 5190:17-5192:11 (Kouts); Tr.5130:6-5133:17 (Brownstein).

**RESPONSE:**

WE objects that the proposed finding is misleading because it incorrectly implies that the APR/ACR/DCS process defined DOE's contract obligations. DOE's obligations under the Standard Contract and the NWPA were not defined by the ACR/APR/DCS process. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. That "process" was merely the mechanism for allocating spent fuel pick-ups. *See* PFF 59. Moreover, by the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115. Further, the overwhelming evidence established that DOE believed that the DCSs were "administrivia" and were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.;* WE's General Objections to Section X (DFF 114-135).

## IV. THE BELIEFS THAT WEPCO EXPRESSED AT TRIAL ABOUT DOE'S OBLIGATIONS UNDER THE STANDARD CONTRACT

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section IV.

**GENERAL OBJECTIONS TO SECTION IV (DFF 71-73):**

The proposed findings of fact in Section IV (DFF 71-73) are ill-founded because they rely solely upon the testimony of the DOE Contracting Officer, David Zabransky, to establish the "beliefs that WEPCO expressed at trial about DOE's obligations under the Standard Contract." Mr. Zabransky, however, was not a WE senior employee and was not authorized to voice opinions on behalf of WE, particularly WE's beliefs regarding DOE's Standard Contract obligations. Tr. 339:22-340:9 (Link); Tr. 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). Mr. Shimon supervised Mr. Zabransky from 1983 until 1990, and Mr. Zabransky did not have responsibility in industry groups regarding Standard Contract issues until 1986. PFF 64. Mr. Zabransky also testified that he had no contractual authority in 1991 and, therefore, cannot testify regarding WE's understanding of the contractual significance of DOE's Standard Contract implementation in 1991 when DOE issued the 1991 APR/ACR. Tr. 579:23-580:22 (Zabransky).

71. WEPCO understood that the Standard Contract obligated DOE to begin acceptance of spent fuel beginning in January 1998 and that, because WEPCO had older fuel, WEPCO's allocations would be among the earliest. Tr.576:15-24 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section IV (DFF 71-73), above.

WE also objects that this proposed finding is inaccurate. WE understood that the Standard Contract obligated DOE to begin acceptance of spent fuel *no later than* January 31, 1998, not *in* January 1998. PFF 66.

WE notes that Messrs. Shimon and Porter competently testified regarding WE's understanding of its early allocations under the Standard Contract. *Id.* Those witnesses were

best suited to so testify, not Mr. Zabransky. Mr. Porter served in WE's Nuclear Power Department for approximately 13 years before he became a senior WE executive shortly after WE signed the Standard Contract. PFF 25; Tr. 2152:7-2154:23 (Porter). Mr. Shimon was Manager of Nuclear Fuels at the time the Standard Contract was executed and he was very involved in Standard Contract issues, especially through leadership roles in industry groups. PFF 21, 63. These two individuals did testify that WE had some of the oldest SNF and that, under the Standard Contract, WE would have some of the earliest SNF acceptances.

72. WEPCO provided comments to DOE regarding the 1983 draft mission plan. PX 67. WEPCO endorsed the comments submitted by EEI and UNWMG. Id. WEPCO also stated its belief that DOE "must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998." Id. However, WEPCO did not understand that DOE was obligated contractually to accept SNF from utilities so as to obviate the need for additional at-reactor storage after January 31, 1998. Tr.593:19-597:18 (Zabransky) ("it doesn't mean they were obligated to do it or it was part of the contract."); Tr.1408:8-1410:10 (Shimon).

**RESPONSE:**

WE incorporates its General Objections to Section IV (DFF 71-73), above.

WE also objects that the proposed finding is inaccurate. WE endorsed EEI and UNWMG's comments on the *1984* Draft Mission Plan, not the *1983* Draft Mission Plan. PX 68; PFF 65.

WE also objects to the cited testimony of Mr. Zabransky because it is contrary to other evidence. WE understood that under the Standard Contract, DOE was obligated to an acceptance rate that would obviate the need for additional at-reactor storage after January 31, 1998 and that would work off the backlog at a reasonable rate. WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

In addition, the cited testimony of Mr. Shimon does not support the proposed finding. Mr. Shimon did not testify that DOE was not obligated by the Standard Contract to accept SNF from utilities to obviate the need for additional at-reactor storage after January 31, 1998.

In the cited testimony, Mr. Shimon merely confirmed that DOE never agreed to include a *specific, quantifiable* acceptance rate in the Standard Contract:

> Q: Mr. Shimon, just so we're clear about it, you testified earlier that there is no *specific* rate of acceptance in the Standard Contract, that's correct, isn't it?
>
> A: In terms of a *metric tons of uranium per year*, that's correct.
>
> Q: And there is no requirement that DOE pick up spent fuel at a rate commensurate with the amount being generated along with an obligation to work off the backlog, isn't that right, *there's no such language in the contract*, correct?
>
> A: I believe that's correct.

Tr. 1409:23-1410:10 (Shimon) (emphasis added). Mr. Shimon affirmatively testified about what WE *did* understand about DOE's acceptance rate obligations under the Standard Contract:

> Q. And during this time period that we've been discussing, when the standard contract was being developed and executed, what was your understanding of the understanding of the parties regarding the rate at which Department of Energy would accept spent fuel?
>
> A. The rate would be sufficient to preclude utilities from having to add additional spent fuel storage capacity after January 31, 1998 and would work off the backlog of spent fuel over a reasonable period of time.

Tr. 1245:18-1246:3 (Shimon). *See also* PFF 49; WE Response to DFF 29. Thus, Mr. Shimon's cited testimony is contrary to the proposed finding.

73. When DOE issued the 1991 ACR, WEPCO believed that the rate identified in that document – 400, 600, 900 MTUs per year for the first ten years – was a reasonable rate. Tr.590:3-21 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section IV (DFF 71-73), above.

WE further objects that the proposed finding is erroneous and contrary to the evidence. First, the cited testimony does not indicate that WE believed that a 900 MTU

steady-state rate was reasonable. WE reads the cited testimony as Mr. Zabransky's personal opinion regarding the reasonableness of the 900 MTU rate, not the view of WE: "That was, *I think*, where the company was and where I was, and that *seems to be* a reasonable rate." Tr. 590:8-10 (Zabransky) (emphasis added). Thus, Mr. Zabransky's testimony merely confirms that he, the DOE Contracting Officer and trial representative, thinks a 900 MTU steady-state rate is reasonable. Second, Mr. Zabransky never was authorized to state WE's views on the DOE acceptance rate under the Standard Contract. Third, WE did not believe that DOE's accepting fuel at a 900 MTU steady-state rate would constitute satisfactory performance under the Standard Contract. PFF 56. DOE was obligated by the Standard Contract and the NWPA to accept fuel at a rate that would obviate the need for additional at-reactor storage after January 31, 1998 and work off the backlog. WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. That rate was a 3000 MTU steady-state annual rate. PFF 52.

## V. WEPCO'S INVOLVEMENT IN INDUSTRY GROUPS, INCLUDING EEI AND UNWMG

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section V.

**GENERAL OBJECTIONS TO SECTION V (DFF 74-83):**

Again, the Government relies exclusively upon the testimony of the DOE Contracting Officer, Mr. Zabransky, for its proposed findings of fact, this time with regard to WE's involvement in industry groups. Mr. Zabransky's work at WE was supervised by Mr. Shimon from 1983 until 1990, including Mr. Zabransky's work in industry groups. PFF 64. In addition, Mr. Zabransky did not have responsibility in industry groups regarding Standard Contract issues until 1986. *Id.* In addition to Mr. Shimon's supervisory role for WE with respect to industry groups until 1990, another WE employee was also very involved in industry groups, particularly regarding the NWPA and the Standard Contracts. PFF 37-39, 63. That was Sol Burstein, who was WE Senior Vice President and who represented WE at

industry groups at the senior executive level. PFF 37. Because Section V ignores significant evidence about WE's involvement in industry groups, the proposed findings in this section are misleading and incomplete.

74. WEPCO was a member of the industry groups EEI and UNWMG. Tr.593:1-18 (Zabransky); Tr.1251:1-18 (Shimon).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

75. Mr. Shimon was a member of UWASTE and Electric Utility Company's Nuclear Transportation Group ("EUCNTG") from 1982 through 1988, and he was the Chairman of the transportation working group of UWASTE during the mid-to-late 1980s. Tr.1251:1-18 (Shimon).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

WE further objects to this proposed finding as misleading because it incompletely describes Mr. Shimon's involvement in industry groups. Mr. Shimon's involvement is fully described in PFF 37-40, 63-64, and 93-94.

76. In the early 1980s, part of Mr. Zabransky's job was to attend meetings conducted by EEI. Tr.719:18-721:7 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

WE further objects that this proposed finding is misleading because it does not acknowledge that, until 1990, Mr. Zabransky's involvement in industry groups was at the direction of and under the supervision of Mr. Shimon. PFF 64. Further, Mr. Zabransky's responsibilities in industry groups did not relate to Standard Contract issues until 1986. *Id.*

77. Mr. Zabransky received, either directly or indirectly, correspondence from Shaw Pittman, including Jay Silberg, the Shaw Pittman attorney who took the lead in representing EEI and UNWMG, in the course of performing his responsibilities for WEPCO. Tr.745:17-747:19 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

WE further objects that this proposed finding is unsupported by the cited evidence. Mr. Zabransky's only reference to Mr. Silberg in the cited testimony was as follows:

> I believe that what we talked about earlier, ultimately, was the correspondence with Mr. Kraft. No, it wasn't. I think, at that point, there was a group, an effort to potentially prepare a proposed contract modification and suggested to DOE that they go through rule-making to modify the contract, and Mr. Silberg was preparing that.

Tr. 747:12-19 (Zabransky). That testimony does not indicate that Mr. Zabransky received anything from Mr. Silberg. Finally, Mr. Silberg had an attorney-client relationship with Mr. Zabransky and WE does not waive the attorney-client communication regarding any privileged communications between counsel for WE and WE personnel.

78. In December 1986, UNWMG's Standard Contract Task Force, of which Mr. Zabransky was a member, discussed a plan to submit a letter to DOE to resolve certain issues relating to the Standard Contract, including the absence of performance standards. Tr.745:17-750:18 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

WE further objects that the proposed finding is unsupported by the cited evidence. In the cited testimony, Mr. Zabransky addressed DX 544, a June 24, 1987 letter from Nancy Montgomery (the Program Manager of UNWMG) to "Members of the High-Level Waste/Spent Fuel Storage Working Group." Tr. 745:17-750:18 (Zabransky); DX 544. In the cited testimony, Mr. Zabransky did not testify about any events in December 1986, or about any potential communication with DOE regarding performance standards. *Id.* To the contrary, the cited testimony concerned the portions of DX 544 that related to the role of ACRs.

79. During his employment with WEPCO, David Zabransky was actively involved in several industry committees. Tr.593:1-18 (Zabransky); Tr.719:14-722:7 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

In addition, Mr. Zabransky also testified that he had no contractual authority in 1991 and, therefore, cannot testify regarding WE's understanding of the contractual significance of DOE's Standard Contract implementation in 1991 when DOE issued the 1991 APR/ACR. Tr. 579:23-580:22 (Zabransky).

80. Mr. Zabransky was chairman of the High-Level Waste Working Group with UNWMG, later known as UWASTE. Tr.593:6-13 (Zabransky); Tr.720:1-24 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

In addition, Mr. Zabransky also testified that he had no contractual authority in 1991 and, therefore, cannot testify regarding WE's understanding of the contractual significance of DOE's Standard Contract implementation in 1991 when DOE issued the 1991 APR/ACR. Tr. 579:23-580:22 (Zabransky).

81. He also acted as chairman of the Electric Power Research Institute[8] ("EPRI") spent fuel division. Tr.593:15-18 (Zabransky); Tr.720:18-24 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

In addition, Mr. Zabransky also testified that he had no contractual authority in 1991 and, therefore, cannot testify regarding WE's understanding of the contractual significance of DOE's Standard Contract implementation in 1991 when DOE issued the 1991 APR/ACR. Tr. 579:23-580:22 (Zabransky).

[8] EPRI is a consortium of utilities that conduct generic research on issues of importance to utilities. Tr.972:8-12 (Zabransky).

82. During Mr. Zabransky's involvement with these industry groups, these groups lobbied DOE for the inclusion of performance standards in the Standard Contract. Tr.720:25-722:7 (Zabransky); see, e.g., PX 117 at SN000232.

**RESPONSE:**

WE incorporates its General Objections to Section V (DFF 74-83), above.

WE objects that this proposed finding is misleading because it improperly conflates the issue of "performance standards" with the separate and distinct issue of including explicit language in the Standard Contract regarding DOE's rate of acceptance. As discussed in the Federal Register, the issue of "performance standards" was a separate and distinct issue from the rate at which DOE would accept spent fuel. More specifically, in the final rule on the Standard Contract, DOE explained its response to requests for "performance standards." 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983). The notice explained that certain commenters were interested in "performance standards," and those commenters had "pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, [the] commenters [said], the contract provides no specific remedies against DOE for failing to meet the date." *Id.*

In addition, the document cited in the proposed finding, PX 117, does not indicate that it was referring to the acceptance rate issue when it referenced "performance standards":

> Other Standard Contract Issues
>
> The Group discussed a draft letter prepared by Mr. Silberg to Mr. Christopher Jedry, Contracting Officer for DOE, that proposed the resolution of several long-standing contract issues through issuance by DOE of suggested interpretations, clarifications, and amendments to the Standard Contract. These issues were: 1) *establishing additional performance standards for measuring DOE's progress on the waste program;* 2) including program review and evaluation rights for the purchaser's of DOE's services; 3) setting reasonable interest rates on unpaid fees; 4) providing a more complete indemnity agreement; and 5) eliminating the purchaser's liability for damage to shipping casks when not caused by the purchaser's negligence. After consideration of a few minor changes to the draft letter, the Task Forces endorsed the letter

> essentially as drafted. A response from DOE to this letter is needed as a prerequisite for further discussions with ACORD on these issues.

PX 117, p. SN000232 (emphasis added).

Regardless of Mr. Zabransky's cited testimony that "performance standard" was a "euphemism" for the acceptance rate issue, the terms of the NWPA and the Standard Contract – read in their entireties – required DOE to pick up spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog of spent fuel at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

83. Industry groups repeatedly requested that DOE change the Standard Contract to add language that obligated DOE to accept SNF beginning in January 1998 at a rate not less than the annual rate at which SNF is being discharged. See, e.g. DX 541; Tr.732:5-735:4 (Zabransky). DOE declined to change the Standard Contract to include the requested performance standards. In a response to correspondence from Stephen Kraft of UNWMG, Christopher Jedrey, in a letter dated October 2, 1987, explained that:

> [G]iven the current status of the WMS [Waste Management System], the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel (SNF) which will be equal or exceed the annual rate at which SNF is being discharged from reactors.

DX 545; Tr.750:20-753:22 (Zabransky).

**RESPONSE:**

WE objects that this proposed finding of fact is misleading. That some utilities proposed that the Standard Contract contain a quantifiable, specific acceptance rate does not contradict the fact that the NWPA and the Standard Contract, read in their entireties, required DOE to pick up spent fuel at a rate that would eliminate the need for additional at-reactor storage after January 31, 1998 and work off the accumulated SNF at a reasonable rate. *See* WE Response to DFF 1; PFF 48, 50-51; WE PTB 41-42. Further, both parties understood at the time of contracting that DOE would accept spent fuel at such a rate. *See* PFF 48-51.

Thus, this proposed finding is misleading because it implies that the industry groups were trying to convince DOE to include an *additional* contract obligation that was not already in the Standard Contract. Given that the parties had already agreed at the time of contracting regarding a reasonable rate that would meet the requirements of the NWPA and the Standard Contract, EEI and UNWMG were merely advocating for explicit language to memorialize that agreement. *See* PFF 48, 49, 51. *See also Carolina Power & Light Co.*, 2008 WL 2154103 at *16-19.

Further, the DOE letter was sent in October 1987. As UNWMG noted, its request was made in the context of "[r]ecent developments with the waste program" that indicated DOE's likely nonperformance by 1998. The UNWMG noted that "the first repository would not be ready to begin receiving spent nuclear fuel until 2003," and DOE had stated that "it remained committed to meeting the 1998 date, but was now relying upon the MRS facility, as yet unauthorized by Congress, to compensate for the first repository's delay." DX 541, p. CTR-006-0249. Thus, WE regards the DOE's letter as its first step in its attempt to walk away from its obligations under the Standard Contract.

Mr. Zabransky's testimony on this issue also conflicts with the text of UNWMG's letter and other evidence. Mr. Zabransky was asked why UNWMG "would request that this be included in the contract," and he replied: "Because it wasn't in the contract right now, as stated in the next paragraph." Tr. 735:1-4 (Zabransky). That testimony is contrary to the "next paragraph" in which UNWMG argued: "The Act nowhere prohibits DOE from providing a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel." DX 541, p. CTR-006-0248. UNWMG went on to explain that the Standard Contract "does not explicitly recite the standards for DOE's performance in accepting fuel from Purchasers." *Id.* at CTR-006-0248 and CTR-006-0249. The NWPA and the Standard Contract, however, read together, reflected the understood acceptance rate based on the January 31, 1998 date for DOE performance and the requirement that utilities maintain

responsibility for spent fuel *until* that date. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. The parties understood the rate requirement at the time of contracting. *Id.* Just as EEI had done (*see* PFF 43), UNWMG merely sought to include a more explicit acceptance rate in the Standard Contract.

Finally, WE objects that the proposed finding is misleading because the Government conflates the issue of "performance standards" with the separate and distinct issue of including explicit language in the Standard Contract regarding DOE's rate of acceptance. This issue is more fully explained in WE Response to DFF 45, 82.

## VI. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT AND THE FURTHER DEVELOPMENT OF THE WASTE MANAGEMENT PROGRAM

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section VI.

**GENERAL OBJECTIONS TO SECTION VI (DFF 84-90):**

The proposed findings in Section VI are misleading because they imply that DOE's Standard Contract obligations are excusable because of the difficulties that the OCRWM program faced. Despite growing problems with the waste management program, DOE's obligations under the Standard Contract did not change, and DOE remained unconditionally obligated to accept spent fuel by January 31, 1998 at a rate sufficient to preclude the need for additional at-reactor storage after that date and to work off the backlog of spent fuel at a reasonable rate. *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1275-77 (D.C. Cir. 1996) (holding, 12 years ago, that DOE's obligation to pickup spent fuel was not conditioned upon the existence of a facility to receive spent fuel); *Carolina Power & Light Co.*, 2008 WL 2154103 at *10.

In addition, the proposed findings in Section VI are misleading because they do not acknowledge numerous OCRWM program developments from 1987 through 1991 that gave WE reason to know that DOE would not timely perform. By ignoring these numerous

developments, the Government's proposed findings provide the misimpression that utilities still had faith in timely DOE performance. To the contrary, WE (and numerous other utilities) had no such confidence given the many indications that DOE would not timely perform. DOE's January 1987 Draft Mission Plan Amendment placed utilities on notice of (1) a five-year delay in repository performance from 1998 to 2003 and (2) that the only way for DOE to perform by 1998 was with an MRS. PFF 69, 72. In the June 1987 ACR, DOE again confirmed the five-year delay in repository operations. PFF 73. The proposed findings in Section VI ignore the January 1987 Draft Mission Plan Amendment and the June 1987 ACR.

WE, however, was well aware of all these OCRWM program developments in the first six months of 1987. PFF 74. Indeed, in 1987, WE Senior Vice President, Sol Burstein, repeatedly expressed to the Government the industry's and WE's concerns regarding the unlikelihood of DOE's timely performance of its Standard Contract SNF acceptance obligations. PFF 75.

Then in December 1987, Congress passed the Nuclear Waste Policy Act Amendments ("NWPA Amendments") which imposed stringent conditions on DOE's construction of an MRS and made it extremely unlikely that an MRS or other DOE facility would be available by 1998 to begin accepting spent fuel. PFF 76-77. Subsequent OCRWM program developments during the 1988-1991 period continued to indicate that DOE's program was not making progress, that DOE would not timely perform by 1998, and that WE needed to plan for storage of its spent fuel well beyond 1998. PFF 81-86, 88-92, 95-101.

For example, DOE's June 1988 Draft Mission Plan Amendment stated that "under current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003." PX 150, pp. 18-19.

The acceptance rate chart in the document showed the earliest program acceptance, at either an MRS *or* a repository, to be in 2003. PX 150, p. 19; PFF 81. Similarly, the June 1988 ACR recognized the unlikelihood of timely DOE performance. PFF 82. Following these developments, WE strongly believed that DOE would not be able to meet the 1998 performance date of the Standard Contract, and stated so publicly in its 1988 Form 10-K. PFF 83, 85; PX 801, p. KRGWE000182 (Kenrich Binder J: Historical Financial Information). The Government's proposed findings, however, ignore these 1988 developments.

The Government's proposed findings further ignore that in 1989, almost two years after passage of the NWPA Amendments, DOE clearly understood that the conditions imposed by the NWPA Amendments made it unlikely that it would be able to start accepting SNF significantly before 2003. PFF 86; PX 175.

In 1989, WE was well aware of DOE's extended performance delay. Indeed, in May 1989, WE began to pursue the dry storage project as a flexible long-term solution to DOE's failure to timely perform. PFF 87, 88. Moreover, WE's Mr. Shimon spoke publicly regarding the utilities' perspective that (1) it was optimistic to assume that a permanent repository would be in operation by 2003 and (2) an MRS was only a possibility that required resolution of a number of significant issues. PFF 89. In November 1989, DOE announced that performance at a repository would be delayed an additional seven years to 2010. DOE conceded that, given the NWPA Amendments, this meant that MRS operations were not expected to commence until 2007. PFF 90. In the unlikely event that the MRS statutory conditions were lifted, DOE admitted that MRS performance was not expected to commence until 2002. *Id.*

Then, in Fall 1990, Mr. Shimon publicly stated that utilities were developing additional SNF storage because of DOE's extended performance delay. PFF 93-94. In December 1990, DOE issued the 1990 ACR, acknowledging the statutory conditions on MRS

performance and admitting that performance was unlikely at any facility before 2007. PFF 95. Then, in September 1991, the Government Accountability Office ("GAO") reported that MRS operation was unlikely by 1998 because the Nuclear Waste Negotiator did not believe it was possible to complete a siting agreement, to obtain congressional approval of an NWPA agreement, and to remove the statutory links by the end of 1992. PFF 97. The GAO report noted that DOE officials generally agreed with the accuracy of the report. *Id.* The proposed findings ignore all of these developments.

84. As directed by the NWPA, DOE submitted a proposal to Congress for the construction of an MRS facility in Clinch River, Tennessee, dated March 1987. DX 539; Tr.5154:22-5155:16 (Kouts). In the proposal, DOE stated that the "MRS facility would be critical to the DOE's ability to accept waste for disposal in 1998," given the announced delay of the start of repository operations until 2003. DX 539; Tr.5158:25-5160:7, 5165:15-5166:2 (Kouts)(DOE planning to meet 1998 obligation with waste acceptance at an MRS facility). Recognizing concerns that the MRS would become a "de facto repository" and "would diminish the resolve to develop a geologic repository," DOE proposed that Congress link the start of MRS operations to the issuance by the NRC of the construction authorization for the repository and limit the storage capacity of the MRS to 15,000 MTU. DX 539 at PNL-037-0315; Tr.5160:14-5162:17, 5164:6-5165:7 (Kouts). These proposed limits were based upon comments that DOE received from the State of Tennessee and the Clinch River MRS Task Force. DX 539 at PNL-036-0315; Tr.5161:22-5162:6 (Kouts).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE also objects that this proposed finding is misleading because it ignores that DOE's proposed MRS facility had an annual acceptance rate of 3000 MTU at full operation. PFF 70. Thus, DOE's MRS Proposal was consistent with other early OCRWM program documents that confirmed DOE's understanding that, under the Standard Contract, DOE would have an operational facility by 1998 that would eliminate the need for utilities to construct additional storage after 1998. PFF 61, 70. DOE also projected that it would ramp up to a 3000 MTU annual acceptance rate in the 1987 Draft Mission Plan Amendment (PFF 69), the 1987 ACR (PFF 73), and the 1988 ACR (PFF 82). All of these documents

were based on the assumptions that (1) repository operations would be delayed at least five years and (2) timely performance would only occur at an MRS facility. Despite those constraints on performance, through 1990, DOE still planned to perform consistently with the parties' understanding at the time of contracting that DOE would accept spent fuel at a rate that would eliminate the need for utilities to construct additional storage after 1998. *See also* PFF 70-71 (DOE March 1987 MRS proposal).

85. On December 22, 1987, after DOE had submitted the 1987 Mission Plan Amendment and the MRS Proposal to Congress, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The Committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition." Id.

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE also objects that this proposed finding is misleading to the extent it attempts to summarize the entire legislative history of the NWPA Amendments by citing and paraphrasing only sections of the legislative history.

Further, the proposed finding is misleading because it ignores that the parties understood that the MRS constraints imposed by Congress made it extremely unlikely that DOE could begin accepting spent fuel by 1998 at an MRS or any other DOE facility. PFF 76-77.

86. The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also

authorized the Secretary to site, construct, and operate one, but only one, MRS facility, 42 U.S.C. § 10162(b), but annulled and voided the siting of the MRS facility that the Department had proposed at Clinch River, Tennessee. However, the 1987 amendments provided that the Secretary could not select a site for that MRS "until the Secretary recommends to the President the approval of a site for development as a repository under section 10134(a)." 42 U.S.C. § 10164(b). Further, Congress provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3). These requirements for the MRS and linkages between the MRS and the repository were more restrictive and onerous than those proposed by DOE. Tr.5268:12-5269:7 (Kouts); Tr.5160:14-5161:11 (Kouts).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE also objects that the proposed finding is misleading by purporting to summarize the NWPA Amendments by citing and paraphrasing only sections of the legislation.

Further, the proposed finding is misleading because it ignores that the parties understood that the MRS constraints imposed by Congress made it extremely unlikely that DOE could begin accepting spent fuel by 1998 at an MRS or any other DOE facility. PFF 76-77.

The proposed finding incorrectly cites to 42 U.S.C. § 10164(b). The correct citation is 42 U.S.C. § 10165(b).

87. The 1987 amendments to the NWPA required the establishment of the MRS Review Commission to determine the need for monitored retrievable storage. 42 U.S.C. § 10163 (1987); Tr.5198:3-21 (Kouts) (MRS Commission was to study the MRS and provide its own perspective on the type of MRS, what the linkages should be and implementation should be in the waste management system). The Commission issued its report to Congress in November 1989, concluding that "the MRS as presently described in the law, which links the capacity and schedule of operation of the MRS to a permanent, geologic repository cannot be justified." PX 181 at HQR-036-3994. The Commission further reported that:

> The Commission notes that the Congress, for many years, has expressed concern that an unlinked MRS might be regarded as a de facto repository and could reduce the impetus for proceeding with permanent geologic disposal. The Commission recognizes this expression of Congressional will,

> as well as similar sentiments voiced during the course of its hearings. Although the Commission does not believe that there is a technical basis for the linkages, the Commission concludes that some linkages are justified.

Id.; PX 181 at HQR-036-4006; Tr.5199:22- 5202:17 (Kouts).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE also objects that the proposed finding is misleading because it ignores that the MRS Commission's report found that it would be impossible for an MRS to be operational more than three years before a repository. PFF 91 (Addressing the MRS Commission and its November 1989 report).

88. The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a); Tr.5215:8-21 (Kouts). The Negotiator identified several localities and states and several grants were issued to study the feasibility of hosting the MRS facility. Tr.5216:20-5217:25 (Kouts). However, the authorization for that office expired in 1994, 42 U.S.C. § 10250, without any agreements with any states or Indian tribes. Tr.5224:23-5225:18 (Kouts).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE objects that this proposed finding is misleading because it ignores that a Negotiator was not appointed until approximately four years after passage of the NWPA Amendments, leaving the Negotiator only approximately three years in which to accomplish the statutory objectives of the 1987 NWPA Amendments. PFF 76. Because the Negotiator would have only approximately three years in which to accomplish its objectives, and not seven years, it was even less likely that the Negotiator would be successful.

89. In the same month that the MRS Review Commission issued its report, DOE prepared a report to Congress from the Secretary of Energy titled "Reassessment of the Civilian Radioactive Waste Management Program," dated November 1989. DX 553; Tr.5204:1-5205:3 (Kouts). As a result of the reassessment detailed in this report, DOE

determined that the repository would not be able to open until 2010, but that DOE would continue to pursue the development of an MRS facility to enable it to begin the acceptance of SNF in 1998. DX 553 at DB-001-1449-1450; Tr.5205:11-5209:10 (Kouts) . With regard to the statutory linkages between the schedule for MRS and repository operations, DOE stated that it would seek congressional modification of the linkages when the site negotiated by the Nuclear Waste Negotiator was approved by Congress. Id. at EDB0011463-64; Tr.5215:8-5216:19 (Kouts).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

WE also objects that this proposed finding is misleading because it ignores that the Reassessment Report recognized that, unless the conditions in the NWPA Amendments were removed, performance by 1998 at an MRS facility would be impossible because, with the projected operation of the repository being extended to 2010, construction authorization for the repository – a necessary condition to have authority to construct the MRS – was not expected until 2007. PFF 90. DOE further acknowledged that, even if the statutory linkages were modified, a DOE-directed MRS would not be expected to start operations until 2002. *Id.* (discussing the 1989 Reassessment Report).

90. In September 1991, DOE issued a draft Mission Plan Amendment that outlined the current plans for the program and sought comments from interested parties. DX 564. In this draft Mission Plan Amendment, DOE advised that,

> [t]o achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy include a provision to repeal the schedule linkages established in the [1987 NWPA Amendments]. This could also be achieved through congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 564 at HQR-003-0825; see Tr.5213:11-5216:19 (Kouts). DOE also stated that its "current plans" were based upon the current statutory storage capacity limits on the MRS. DX 564 at HQR-003-0826; see Tr.5218:6-5219:6 (Kouts); Tr.5031:3-21 (Brownstein) (capacity limits existed because of continuing concerns that the MRS would become a "de facto" repository). In the 1991 draft Mission Plan Amendment, DOE also published proposed waste acceptance schedules depicting performance at an MRS from 1998-2010 and repository operations beginning in 2010. DX 564 at HQR-003-1001; Tr.5218:1-5219:6

(Kouts)(rates in waste acceptance schedule based upon 10,000 MTU capacity limit upon MRS until repository begins operations).

**RESPONSE:**

WE incorporates its General Objections to Section VI (DFF 84-90).

Further, this proposed finding is misleading by implying that, as of September 1991, there was a realistic possibility that DOE could perform at an MRS facility by 1998. By this time, DOE had issued documents in which it did not project performance at an MRS prior to 2002, namely, the June 1988 Draft Mission Plan Amendment and the November 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program. PFF 81, 90. Since June 1988, WE had planned that DOE would not perform at any facility until 2003 based upon DOE's prior representations. PFF 83, 85.

## VII. DOE'S ISSUANCE OF CONTRACTUALLY-REQUIRED ANNUAL CAPACITY REPORTS AND ACCEPTANCE PRIORITY RANKINGS

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section VII (DFF 91-107).

**GENERAL OBJECTIONS TO SECTION VII (DFF 91-107):**

The proposed findings in Section VII are misleading because they incorrectly imply that the APR/ACR/DCS process defined DOE's contract obligations. DOE's obligations under the Standard Contract and the NWPA were not defined by this process. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. This process was merely an administrative mechanism for allocating spent fuel pick-ups. *See* PFF 59. Notwithstanding any DOE employee's or DOE contractor's impressions regarding the import of this process, DOE was obligated to accept spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51, 61; WE PTB 41-42. That rate was a steady-state rate of 3000 MTU annually. PFF 51-53, 61. In 1991, when DOE was issuing the documents in

the APR/ACR/DCS process, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115.

These proposed findings also are misleading by implying that the earlier ACRs and other DOE program documents somehow lacked meaning because they were for planning purposes and were not contractually binding. To the contrary, these planning documents represented DOE's expressed views and confirmed that the parties understood at Contract execution that DOE would accept spent fuel at a rate sufficient to preclude the need for additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51, 61; WE PTB 41-42. That rate was a steady-state rate of 3000 MTU annually. PFF 51-53, 61. The 1987, 1988 and 1990 ACRs all projected a steady-state annual rate of 3000 MTU, and were consistent with the parties' aforementioned understanding and were relied upon by both parties. PFF 61, 73, 74, 82, 95. It was not until 1991, faced with its inability to timely perform and the resulting liability to the utilities, that DOE's planning disingenuously changed to include a substantially lower 900 MTU annual rate of acceptance. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

### A. <u>1987 And 1990 Annual Capacity Reports</u>

91. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of these ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 542 at 2 (HQR0012713), DX 549 at 1 (HQR0012617), DX 558 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding").

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE also objects that this proposed finding is misleading because it ignores that (1) the first three ACRs projected that DOE would accept fuel at a steady-state rate of 3000

MTU annually and (2) the 1987 Draft Mission Plan Amendment and 1987 MRS Proposal similarly projected a DOE annual acceptance rate of 3000 MTU. PFF 69, 70, 73, 82, 95. Notably, the five DOE program documents were based on the assumptions that (1) repository operations would be delayed at least five years and (2) timely performance could only potentially occur at an MRS facility. *Id.* Despite those constraints on DOE performance, through 1990, DOE still planned to perform consistently with the parties' understanding at the time of contracting, namely, at an annual acceptance rate of 3000 MTU.

92. Each ACR issued between 1987 and 1990 advised contract holders that, beginning in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 542 at 2 (HQR0012713), DX 549 at 2 (HQR0012618), DX 558 at 2 (HQR0012494).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

Further, this proposed finding mischaracterizes the cited documents. The quoted language from the cited documents does not refer to the 1991 APR or ACR as "*firm* waste acceptance schedule[s]."

93. The 1987 ACR contained the following admonitions by DOE, warning contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998:

> DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated [waste management system ("WMS")] derives, in part, from decisions yet to be

> made by Congress. DOE has presented the appropriate issues to Congress in the form of the OCRWM Mission Plan Amendment.
>
> * * *
>
> The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

DX 542 at HQR-001-2714, HQR-001-2715 (1987 ACR, ¶¶ 1.2.1 & 1.2.2) (Footnotes omitted). Again, the 1987 ACR also notified contract holders that the projections of future events and rates were only projections and were "not contractually binding." DX 542 at HQR-001-2708.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

94. The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF and/or HLW acceptance by DOE. For purposes of simplicity, the "upper bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,100 MTU total acceptance for the first 10 years of WMS operation. DX 558 at HQR-001-2496 - 2499. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR also contained the following admonitions by DOE:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

DX 558 at HQR-001-2496 (emphasis added); see Tr.5036:10 - 5039:1 (Brownstein) (explaining assumptions in 1990 ACR). The 1990 ACR also expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." DX 558 at HQR-001-2494.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

Further, this proposed finding misleadingly ignores that it was never DOE's intent to operate at the 875 MTU "lower bounding" rate. Indeed, if DOE had operated at such a rate, it would require decades to work off the spent fuel backlog. PFF 98a. *See also* Tr. 2357:18-2359:4 (Vance) (the lower bounding rate in the 1990 ACR was artificially low and the upper bounding rate was more realistic).

95. As of December 1990, DOE continued to believe that the prospects of acceptance at an MRS beginning in January 1998 were not insurmountable. Tr.5039:2-5040:21 (Brownstein).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE further objects that this proposed finding is inaccurate. By December 1990, DOE had issued documents in which it projected performance at an MRS by no earlier than 2003. These DOE documents included the June 1988 Draft Mission Plan Amendment and the November 1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program. PFF 81, 90. Since June 1988, WE had begun investigating spent fuel storage options based on the assumption that DOE would perform by 2003 at the earliest **[NOTE]**. PFF 83, 85.

### B. 1991 Acceptance Priority Ranking

96. Pursuant to Art. VI.B.5.a of the Standard Contract, DOE issued its first official Acceptance Priority Ranking("APR") in December 1991. DX 567. The APR "ranks [SNF] basically starting with the earliest or first discharge coming first." Tr.3921:12-24 (Pollog designation, Yankee trial, 8/4/04); see also Tr.5036:1-9 (Brownstein) ("1991 APR set the allocations for the utilities . . . an important step under the contract process to get to the delivery commitment schedules"). The source of the information that is set forth in the APR are the RW-859 data forms that each of the contract holders are asked to submit periodically describing their fuel discharge information. Tr.3922:2-14 (Pollog designation, Yankee trial, 8/4/04). An excerpt of this information was set forth in the 1991 ACR and provided the basis for the allocations set forth in the 1991 ACR. Tr.170:2-9 (Pollog designation, Yankee

deposition, 4/11/02); DX 567 at HQR-004-0429 ("the 1991 APR will be the basis for the annual allocation of waste acceptance capacity to purchasers in the 1991 ACR."); Tr.279:25-282:6 (Cole designation, Yankee deposition, 3/13/02).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

Further, this proposed finding misleadingly ignores that DOE informed the utilities prior to issuance of the 1991 APR that it would not be accepting any spent fuel by 1998. PFF 100. Thus, given that DOE would not actually accept spent fuel by 1998, the allocations in the 1991 APR/ACR (for acceptance in 1998) had no practical significance. *See* PFF 90. The allocations also were artificially low in an attempt to limit DOE's liability to the utilities. PFF 101.

## C. The 1991 Annual Capacity Report

97. In December 1991, DOE issued its "Annual Capacity Report" for that year, noting that, "[a]lthough the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers." DX 566 at HQR0020803. Like prior ACRs, it provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." Id. at HQR0020803-04.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

98. However, the acceptance rate set forth in the 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 566 at HQR0020804; Tr.5046:1-5047:15 (Brownstein). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id.; see DX 566 at HQR0020809 ("[t]hese allocations are the basis for DCS submittals").

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

Further, this proposed finding misleadingly ignores that DOE informed the utilities prior to issuance of the 1991 APR that it would not be accepting any spent fuel by 1998. PFF 100. Thus, given that DOE would not actually accept spent fuel by 1998, the allocations in the 1991 APR/ACR (for acceptance in 1998) had no practical significance. *See* PFF 90. The allocations also were artificially low in an attempt to limit DOE's liability to the utilities. PFF 101.

99. OCRWM created the acceptance allocations specified in the 1991 ACR with the knowledge that no permanent repository would be available by January 31, 1998, and to be "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." DX 566 at HQR0020806; Tr.128:11-136:16 (Cole designation, Yankee deposition, 3/12/02) (900 rate was reasonable) When DOE issued the 1991 ACR, it assumed that an MRS would be operational in the system by 1998. Tr.5220:12-5222:2 (Kouts). The MRS had a capacity limit of 10,000 metric tons, and the ramp-up and acceptance rate was designed so that DOE would not exceed that amount before the repository was anticipated to begin operation. Tr.5223:3-11 (Kouts); Tr. 4742:2-11, Tr. 4737:22-25 (Milner designation, Yankee trial, 8/11/04); Tr.3907:4-14 (Pollog designation, Yankee trial, 8/4/04) (basis for the rates in the 1991 ACR was compliance with the Nuclear Waste Policy Amendments of 1987, and the 10,000 metric ton statutory restrictions); Tr.140:4-141:3 (Cole designation, Yankee deposition, 3/12/02). DOE anticipated that it would receive relief from the "construction linkage" in the NWPA that tied the operation of the MRS to the receipt of construction authorization for the repository. Tr.5221:3-5222:2 (Kouts); Tr.5055:19-5056:8 (Brownstein) (MRS not a construction challenge, once site was available, it could be ready by January 1998).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

Further, this proposed finding misleadingly ignores that DOE informed the utilities prior to issuance of the 1991 ACR/APR that it would not be accepting any spent fuel by 1998. PFF 100. Thus, given that DOE would not actually accept spent fuel by 1998, the allocations in the 1991 APR/ACR (for acceptance in 1998) had no practical significance. *See* PFF 90. The allocations also were artificially low in an attempt to limit DOE's liability to the utilities. PFF 101. This proposed finding is also misleading because it ignores that it was

never DOE's intent to operate at the 900 MTU rate absent the NWPA's linkages; to do so would necessitate decades to remove all spent fuel from plant sites. PFF 98a.

This proposed finding purports to rely upon the testimony of DOE employees that, as late as 1991, they thought an MRS facility could be available in January 1998. That reliance is misplaced. By 1991, DOE had already issued documents in which it projected performance at an MRS in 2002, including the June 1988 Draft Mission Plan Amendment and the November 1989 Reassessment Report. PFF 81, 90. In addition, the 1991 ACR itself noted that DOE could not start MRS facility operations prior to 2007 because of the linkages imposed by the 1988 NWPA Amendments. PFF 98b. Further, there is no documentary or legislative evidence that DOE would be granted relief from the construction linkage in the NWPA Amendments, which was a condition precedent for MRS operations by 1998. Finally, Mr. Brownstein admitted that the Private Fuel Storage facility took "[p]robably over ten years" to procure an operating license, while DOE disingenuously expected that MRS licensing would only take three or four years. Tr. 5139:18-5140:9 (Brownstein). Thus, Mr. Brownstein's own testimony confirms the unlikelihood that DOE would have been able to license and construct an MRS by 1998.

WE also objects that this proposed finding misleadingly implies that the 1991 ACR was in full compliance with the NWPA Amendments. To the contrary, it did not comply fully with all the linkages in the NWPA Amendments. PFF 99, 101. Moreover, even if the linkages in the NWPA Amendments had been removed, there was no assurance that an MRS could be developed by 1998. *Id.*

In addition, the Government has failed to demonstrate that the acceptance rate used in the 1991 ACR (and related DCSs and subsequent ACR/APRs) is necessarily required by the capacity limitations in the NWPA Amendments. DOE need not have used a 900 MTU rate over ten years. Instead, for instance, DOE could have decided to allocate all 10,000 MTUs in the first five years of DOE's acceptance of spent fuel. DOE's decision to implement the 900

MTU rate over then entire ten year period confirms yet again that DOE's real motivation in its development of the 1991 ACR acceptance rate was to limit its liability to the utilities. *See* PFF 101.

The incongruity between the 1991 ACR and the NWPA Amendments is also highlighted when the 1991 ACR is compared to the 1988 ACR. The 1988 ACR was published after the NWPA Amendments and acknowledged *all* the limitations imposed by the NWPA Amendments, but did not use the "artificially low" acceptance rate used in the 1991 ACR. PFF 101b. Only after DOE projected that repository performance would slip to 2010 and that MRS performance could not commence until 2007 did DOE's planning change to include the 900 MTU annual rate of acceptance which was designed to limit DOE's liability to the utilities. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

In addition, the cited testimony of Mr. Kouts does not support the proposed finding. Mr. Kouts testified:

> Q: The rate that is depicted [in the 1991 ACR] at table 2.1, do *you* consider this to be a reasonable rate?
>
> A: Yes, I do, *based on the fact that the schedule linkages, excuse me, that the schedule linkages were broken* and that the capacity linkage in the Act was still in place, this was a very reasonable rate for the Department to design and operate a facility at.

Tr. 5223:3-11 (Kouts) (emphasis added). Thus, Mr. Kouts' personal opinion as to the reasonableness of the 900 MTU rate was qualified by the acknowledgement that the rate did not comply with the NWPA Amendments.

WE further objects that the parenthetical description of Mr. Cole's testimony is inaccurate and misleading. The proposed finding cites more than 12 pages of Mr. Cole's deposition testimony, but then notes that the testimony stands for the proposition that the "900 rate was reasonable." That mischaracterizes Mr. Cole's testimony in which he qualified

that the 900 MTU rate was reasonable only *because* it met the limited capacity restrictions of the NWPA Amendments:

> Q: And was it *your contention* that this was a reasonable rate to use?
>
> A: Absolutely; *if you can* only *do a limited amount of capacity, it would be nice to do it*, so it really helped solve some problems, which was the initial problem they were trying to solve.

Tr. 132:18-24 (Cole Dep. Desig. 3/12/02) (emphasis added).

Moreover, some of the cited Cole testimony does not support the proposed finding. The proposed finding cites Mr. Cole's deposition testimony from page 140:4 to page 141:3. In that testimony, Mr. Cole admitted that the acceptance rate in the 1991 ACR was based on the assumption that the MRS could somehow be built by 1998 even if the repository was not operating until 2010. Tr. 140:4-141:3 (Cole Dep. Desig. 3/12/02). Thus, Mr. Cole admitted that the rate in the 1991 ACR was not compliant with the NWPA Amendments, which required that DOE not commence MRS construction until the agency had obtained a construction license for the repository. PFF 76.

Finally, the proposed finding ignores that Mr. Brownstein told contractors that DOE's reason for using a 900 MTU acceptance rate in the 1991 ACR was to limit DOE's liability to the utilities. PFF 101.

100. Based upon anticipated limitations for the projected capacity for the first ten years, DOE identified an 8,200 MTU acceptance, at the rates identified below and stated as follows:

> The waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998 . . . ." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely

> agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of the Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or geological repository.
> The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.
> Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility.
> DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time.
>
> . . .
>
> TABLE 2.1
> Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

DX 566 at HQR-002-0806-7 (emphasis added).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE further objects that this proposed finding misleadingly ignores that it was never DOE's intent to operate at the 900 MTU rate absent the limitations imposed by the NWPA Amendments. PFF 98a. Further, it ignores the evidence that Mr. Brownstein informed DOE contractors that DOE's reason for using a 900 MTU acceptance rate in the 1991 ACR was to limit DOE's liability to the utilities. PFF 101.

In addition, this proposed finding is inaccurate in implying that the 1991 ACR complied fully with linkages in the NWPA Amendments. It did not comply with the schedule linkage. PFF 99, 101. Moreover, even if the linkages in the NWPA Amendments had been removed, there was still no assurance that an MRS could be developed by 1998. *Id.*

The Government has failed to demonstrate that the acceptance rate used in the 1991 ACR (and related DCSs and subsequent ACR/APRs) is necessarily required by the capacity limitations in the NWPA Amendments. DOE need not have used a 900 MTU rate over ten years. Instead, for instance, DOE could have decided to allocate all 8,200 MTUs in the first five years of DOE's acceptance of spent fuel. DOE's decision to implement the 900 MTU rate over then entire ten year period confirms yet again that DOE's real motivation in its development of the 1991 ACR acceptance rate was to limit its liability to the utilities. *See* PFF 101.

The incongruity between the 1991 ACR and the NWPA Amendments is also highlighted when the 1991 ACR is compared to the 1988 ACR. The 1988 ACR was published after the NWPA Amendments and acknowledged *all* the limitations imposed by the NWPA Amendments, but did not use the "artificially low" acceptance rate used in the 1991 ACR. PFF 101b. Only after DOE projected that repository performance would slip to 2010 and MRS performance could not commence until 2007 did DOE's planning change to

include the 900 MTU annual rate of acceptance which was designed to limit DOE's liability to the utilities. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

101. Table 3.1 in the 1991 ACR set forth specific allocations for each contract holder derived by applying the list of "oldest fuel first" from the 1991 APR to the rate of SNF acceptance in Table 2.1 of the 1991 ACR. DX 566 at HQR0020811; Tr.3914:15-21 (Pollog designation, Yankee trial, 8/4/04). Pursuant to this chart, WEPCO received its first allocation in 1998. DX 566 at HQR0020811.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

This proposed finding also is misleading because it ignores that DOE informed the utilities prior the issuance of the 1991 APR that it would not be accepting any spent fuel by 1998. PFF 100. Thus, given that DOE would not actually accept spent fuel by 1998, the allocations in Table 3.1 of the 1991 ACR (for acceptance in 1998) had no practical significance. *See* PFF 90. The allocations also were artificially low in an attempt to limit DOE's liability to the utilities. PFF 101.

102. DOE worked with representatives of the industry, including EEI and UNWMG, to understand utility concerns and issues regarding the ACR process. DX566 at HQR-00200804; Tr.5057:13-5059:3 (Brownstein).

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

In addition, the proposed finding is inaccurate. In the past, DOE *had* worked with the industry to understand concerns and issues regarding the ACR process. DX 566, p. HQR-002-0804 ("*Interactions to date* . . . indicate a desire by both DOE and the Purchasers to continue [the] staff-to-staff technical exchanges." (emphasis added)). Such interactions had, in fact, resulted in "great progress." Tr. 2351:6-21 (Vance). Following the issuance of the lower 900 MTU acceptance rate in the 1991 ACR, however, "the meetings between the team quickly died off, and very little progress was made after that point." Tr. 2351:19-21 (Vance). *See also* PFF 101a.

**D. The 1992 Through 1995 Annual Capacity Reports**

103. The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 578 at HQR0012324. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." Id. at HQR0012319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." Id. at HQR0012321-22.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE further objects that this proposed finding misleadingly ignores that it was never DOE's intent to operate at the 900 MTU rate absent the limitations imposed by the NWPA Amendments. PFF 98a. This proposed finding also is misleading because it ignores that DOE informed the utilities prior to December 1991 that it would not be accepting any spent fuel by 1998. PFF 100. Further, it ignores the evidence that Mr. Brownstein informed DOE contractors that DOE's reason for using a 900 MTU acceptance rate in the 1991 ACR was to limit DOE's liability to the utilities. PFF 101.

In addition, this proposed finding is inaccurate in implying that the 1992 ACR complied fully with linkages in the NWPA Amendments. It did not comply with the schedule linkage. PFF 99, 101.

Even if the linkages in the NWPA Amendments had been removed, there was still no assurance that an MRS could be developed by 1998. *Id.*

This proposed finding also is misleading because it ignores that DOE informed the utilities prior to December 1991 that it would not be accepting any spent fuel by 1998. PFF 100.

In addition, the Government has failed to demonstrate that the acceptance rate used in the 1991 and 1992 ACRs (and related DCSs and subsequent ACR/APRs) is necessarily

required by the capacity limitations in the NWPA Amendments. DOE need not have used a 900 MTU rate over ten years. Instead, for instance, DOE could have decided to allocate all 8,200 MTUs in the first five years of DOE's acceptance of spent fuel. DOE's decision to implement the 900 MTU rate over then entire ten year period confirms yet again that DOE's real motivation in its development of the 1991 ACR acceptance rate was to limit its liability to the utilities. *See* PFF 101.

104. In 1995, DOE issued a combined APR and ACR to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 584 at HQR0290676. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 MTUs for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| Year 1 | | 400 |
| Year 2 | | 600 |
| Year 3 | | 900 |
| Year 4 | | 900 |
| Year 5 | | 900 |
| Year 6 | | 900 |
| Year 7 | | 900 |
| Year 8 | | 900 |
| Year 9 | | 900 |
| Year 10 | | 900 |
| | TOTAL | 8,200 |

DX 584 at HQR-029-0681.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE further objects that this proposed finding misleadingly ignores that it was never DOE's intent to operate at the 900 MTU rate absent the limitations imposed by the NWPA Amendments. PFF 98a. Further, it ignores the evidence that Mr. Brownstein informed DOE

contractors that DOE's reason for using a 900 MTU acceptance rate in the 1991 ACR was to limit DOE's liability to the utilities. PFF 101.

The Government has failed to demonstrate that the acceptance rate used in the 1995 ACR/APR (and related DCSs and prior ACR/APRs) is necessarily required by the capacity limitations in the NWPA Amendments. DOE need not have used a 900 MTU rate over ten years. Instead, for instance, DOE could have decided to allocate all 8,200 MTUs in the first five years of DOE's acceptance of spent fuel. DOE's decision to implement the 900 MTU rate over then entire ten year period confirms yet again that DOE's real motivation in its development of the 1991 ACR acceptance rate was to limit its liability to the utilities. *See* PFF 101.

The proposed finding also improperly ignores that the 1995 ACR and APR assumed initial acceptance at an MRS, even though DOE was no longer pursuing an MRS at that time. PFF 122c.

Finally, the proposed finding ignores that, because the 1995 ACR did not identify specific years of acceptance in its acceptance schedule, it was impossible for utilities to submit DCSs based on the 1995 ACR, because a utility could not know when the DCSs would need to be submitted. *Id.*

105. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). <u>The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations</u>. These projected nominal waste

> acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

DX 584 at HQR-029-0680-0681 (section 1.2) (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Id. at HQR-029-0678 (section 1.0). However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107) and its Response to DFF 104.

106. WEPCO used the allocation rates identified in the 1991 ACR for planning purposes. For example, WEPCO used the allocations in the 1991 ACR to fill in its delivery commitment schedules ("DCSs"). See supra at DFOF ¶¶ 115-125.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE also objects that the proposed finding is inaccurate and not supported by the cited evidence. The cited evidence does not show that WE used the 1991 ACR for planning purposes. With regard to WE's use of the acceptance rate from the 1991 ACR in its DCSs, the DCS instructions told utilities that they "should" use the allocations in the 1991 ACR. DX 497, p. WISC0000026. Utilities had no choice but to do so. If a utility challenged the 1991 ACR allocations by listing more SNF in its DCSs than instructed under DOE's instructions, DOE would have rejected the DCSs. PX 246, p. HQR-001-2047 (8.0 DCS Process) ("if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved"). *See also* WE's General Objections to Section VIII (DFF 108-110) (explaining that the DCS instructions as implemented by DOE have no legal consequence); PFF 126.

107. WEPCO also used the allocation rates identified in the 1991 ACR, and subsequent ACRs for its decommissioning planning. See supra at DFOF ¶¶ 291-295.

**RESPONSE:**

WE incorporates its General Objections to Section VII (DFF 91-107).

WE also objects that the proposed finding is inaccurate and not supported by the cited evidence. WE did not create decommissioning cost studies for the purpose of SNF storage planning. Instead, WE contracted for the cost study estimates to provide a "site-specific Decommissioning Cost Estimate" assuming that WE permanently shut down the Point Beach reactors in 2010 and 2013. DX 28, p. WISC00002788. By the time WE received its first decommissioning cost estimate from its contractor NES, Inc. in October 1994, DOE had already told the nuclear power industry in May 1994 that it was not obligated to timely perform. Thus, any DOE acceptance rates identified as starting in 1998 were entirely fictional. DX 28 (October 26, 1994 cover letter); PFF 122b(May 1994 DOE Notice of Inquiry).

WE knew that DOE was not going to timely perform by 1998, but inserted DOE's published SNF acceptance rates into the decommissioning studies *because that was the information that the DOE had made available* to WE and the public. Tr. 2783:10-2784:16 (Anundson). Thus, the Government's proposed findings of fact regarding decommissioning cost estimates are irrelevant because they do not reflect the assumptions in WE's SNF storage planning. *See also* PFF Sections VI-XIII (PFF 69-135)..

## VIII. <u>DELIVERY COMMITMENT SCHEDULES</u>

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section VIII.

**GENERAL OBJECTIONS TO SECTION VIII (DFF 108-110):**

The proposed findings of fact in Section VIII (DFF 108-110) are inaccurate. The evidence contradicts the Government's unsupported claim in this section that the DCS instructions were "consistent with the original intent of the Standard Contract and were necessary for proper implementation of the waste management system." DFF 108.

The DCS instructions were inconsistent with the intent of the Standard Contract because they required utilities to use the allocations in the 1991 ACR, which included an annual acceptance rate of 900 MTU that was both illegal under existing law and artificially low. PFF 97-101; WE PTB 44-49. The DCS instructions told utilities that they "should" use the allocations in the 1991 ACR. DX 497, p. WISC0000026. Utilities, however, had no choice but to do so because, if a utility challenged the 1991 ACR allocations by listing more SNF in its DCSs than instructed under DOE's instructions, DOE's instructions expressly stated that DOE would reject the DCSs. PX 246, p. HQR-001-2047 (8.0 DCS Process) ("if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved").

Additionally, WE objects to Section VIII (DFF 108-110) because it wrongly implies that the DCS instructions as implemented by DOE had legal or factual consequence. To the contrary, DOE clearly believed at the time that the DCS process was nothing more than "administrivia." The overwhelming evidence established that DOE believed that, as "administrivia," the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendment's linkages, and never played a significant role for DOE. *Id.*

The evidence also showed that the DCS instructions addressed in Section VIII (DFF 108-110) reflected DOE's breach world understanding that it would not perform by 1998. By the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform by 1998. PFF 104, 107, 115. Mr. Robert Link was convinced that DOE was not going to perform by 1998. Tr. 358:14-23 (Link) ("Q: Did you think that the Nuclear Waste Negotiator would be able to find a volunteer site by the end of 1992? A: No. As you may recall, I came, took the position of vice president of nuclear power mid-'92, and it was in that assessment and review and getting briefed, not only by my staff, but by NEI, that it was clear that the waste negotiator was not going to be successful."). Mr. Zabransky also believed

in 1992 that there "was a great chance DOE may not have performed in 1998." Tr. 613:11-20 (Zabransky). Other WE personnel did not expect DOE to perform by 1998. Tr. 1521:6-23 (Krieser) ("[W]hen Bob [Link] became vice president, it was already very apparent to people at Wisconsin Electric, and I think probably the majority of the industry, if not all of the industry, that DOE was not going to be performing in 1998, as we all had hoped."); Tr. 2776:25-2777:3 (Anundson) ("Q: During the entirety of your time in the Nuclear Power Department, did anyone believe that DOE would perform in 1998? A: No.").

108. In March 1992, the DOE contracting officer issued a letter to each of the contract holders, including WEPCO, along with instructions for the submission of DCSs. DX 497; PX 246; PX 247; Tr.703:1-704:9 (Zabransky). Although contract holders had the option to seek approval of any acceptance amount they wanted, subject to their right to exercise the "Disputes" provision of the Standard Contract, Arts. V.B and XVI, the contracting officer recommended that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." E.g., DX 497 at WISC 00000026. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." E.g., DX 497 at WISC 00000028. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. These instructions were consistent with the original intent of the Standard Contract and were necessary for proper implementation of the waste management system.

**RESPONSE:**

WE incorporates its General Objections to Section VIII (DFF-110), above.

109. The DCS instructions provided that the contract holders' DCS submissions were to be based upon the allocations set forth in the applicable ACR. DX 497 at WISC 0000029 (Para. 7(a): "The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 ACR for planning purposes, resulting in individual Purchaser allocations. The Purchaser's allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval."). Further, the DCS instructions provided that, "[d]ue to the limited annual acceptance capacity of the

[Federal Waste Management System], only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval." Id.

**RESPONSE:**

WE incorporates its General Objections to Section VIII (DFF-110), above.

In addition, the Government has failed to demonstrate that the acceptance rate used in the DCS instructions (which was based on the 1991 ACR acceptance rate) is necessarily required by the capacity limitations in the NWPA Amendments. DOE need not have used a 900 MTU rate over ten years. Instead, for instance, DOE could have decided to allocate all 8,200 MTUs in the first five years of DOE's acceptance of spent fuel. DOE's decision to implement the 900 MTU rate over then entire ten year period confirms yet again that DOE's real motivation in its development of the 1991 ACR acceptance rate was to limit its liability to the utilities. *See* PFF 101.

110. The DCS instructions that the DOE contracting officer distributed to the contract holders were developed pursuant to a cooperative effort with the nuclear utilities, whereby DOE discussed the proper completion of a DCS with utility representatives, drafted the DCS instructions based upon those discussions, and then discussed the draft instructions with utility representatives and obtained their comments upon them. Tr.258:19-259:24 (Slater Designation, Yankee deposition, 4/22/99); Tr.704:3-707:16 (Zabransky) (Mr. Zabransky sent a WEPCO employee to a meet with the industry group in Washington, to discuss the DCS instructions).

**RESPONSE:**

WE incorporates its General Objections to Section VIII (DFF-110), above.

WE also objects to this proposed finding of fact because the cited testimony does not support it. The designated portions of the Slater testimony do not establish discussions between DOE and the industry regarding the DCS instruction. Moreover, Mr. Zabransky's cited testimony indicates only industry meetings, not industry-DOE communications.

## IX. TSLCCs AND FEE ADEQUACY REPORTS BASED UPON THE THEN-CURRENT PROGRAM PLANS

111. The per-kilowatt-hour fee paid by utilities were established by the original NWPA, 42 U.S.C. § 10222(a)(2) (1982), and have not changed. Tr.5335:9-13 (Kouts).

**RESPONSE:**

WE does not dispute this proposed finding.

112. DOE prepares Total System Life Cycle Cost ("TSLCC") reports periodically to analyze the total system life cycle costs of the program. Tr.5226:21-5227:13 (Kouts). DOE requires these reports so it can perform a fee adequacy assessment, which is required by the NWPA. Id. at 5227:17-5228:4 (Kouts). These reports contain assumptions regarding DOE's plans for performance, and the assumptions are taken from the then-current program technical baseline. Id. at 5333:24-5335:8 (Kouts). The assumptions include an assumption regarding acceptance rates, which are also taken from the program technical baseline. Id. at 5333:24-5335:8 (Kouts).

**RESPONSE:**

The proposed finding misleadingly ignores that the fee adequacy reports have been based on repositories that ramp up to an annual acceptance rate of 3000 MTU after five years of operation, and that DOE has mostly used an annual acceptance rate of 3000 MTU for projecting total life cycle costs. PFF 61f.

113. Although DOE's program technical baseline has changed significantly over the years in terms of the types of projected facilities and the start of performance, the total system cost has not varied greatly. For example, in the TSLCC dated April 1985, DOE assumed the construction and operation of two repositories, for a total steady state rate of 6,000 MTU. PX 84 at PA-176464; see also PX 84 at PA-176457-458 (description of the evolution of the program strategy between the issuance of the drafts of the Mission Plan issued in December 1983 and April 1984). In the Preliminary Estimates of the Total-System Cost for the Restructured Programs, dated December 1990, which was based upon the Secretary's 1989 Reassessment of the program, DOE assumed the operation of an MRS facility beginning in 1998 and the operation of a single repository beginning in 2010. PX 213 at PNL1071666; Tr.5336:3-5341:11 (Kouts); see also PX 213 at PNL1071613 ("It must be recognized that the waste management system is continually evolving. The TSLCC estimates represent "snapshots" in time which incorporate all available and appropriate information on program activities up to a specific point in time . . . ). In the TSLCC dated September 1995, DOE assumed the operation of a single repository beginning operation in 2010. PX 393 at HQR-025-5084-85; Tr.5227:14-5228:15 (Kouts). Despite the variations in the number and type of facilities assumed and the dates of operation, the total system costs projected in these reports do not vary greatly. Tr.5335:9-13 (Kouts).

**RESPONSE:**

The proposed finding misleadingly ignores that the fee adequacy reports have been based on repositories that ramp up to an annual acceptance rate of 3000 MTU after five years of operation, and that DOE has mostly used an annual acceptance rate of 3000 MTU for projecting total life cycle costs. PFF 61f.

## X. WEPCO'S PARTICIPATION IN THE DCS PROCESS

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section X.

**GENERAL OBJECTIONS TO SECTION X (DFF 114-135):**

The proposed findings of fact in Section X (DFF 114-135) are inaccurate because, as described below, they do not establish that WE's DOE-approved DCSs were contractually binding or that WE assented through its conduct to the acceptance rate set forth in DOE's 1991 ACR. *See* DFF 124, 129, 130.

WE objects to the Government's use of the term "DCS Process" throughout Section X (DFF 114-135) as vague and misleading. The Government wrongly implies that the so-called "DCS Process" had any legal or factual consequence. To the contrary, DOE clearly believed at the time that the DCSs were nothing more than "administrivia." The overwhelming evidence established that DOE believed that, as "administrivia," the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA linkages, and never played a significant role for DOE. *Id.*

The evidence also showed that the so-called "DCS Process" addressed in Section X (DFF 114-135) reflected DOE's breach world understanding that it would not perform by 1998. By the time that DOE issued its instructions in 1992, it was clear that DOE could not timely perform by 1998. PFF 104, 107, 115. Mr. Link was convinced that DOE was not going to perform by 1998. Tr. 358:14-23 (Link) ("Q: Did you think that the Nuclear Waste

Negotiator would be able to find a volunteer site by the end of 1992? A: No. As you may recall, I came, took the position of vice president of nuclear power mid-'92, and it was in that assessment and review and getting briefed, not only by my staff, but by NEI, that it was clear that the waste negotiator was not going to be successful."). Mr. Zabransky also believed in 1992 that there "was a great chance DOE may not have performed in 1998." Tr. 613:11-20 (Zabransky). Other WE personnel did not expect DOE to perform by 1998. Tr. 1521:6-23 (Krieser) ("[W]hen Bob [Link] became vice president, it was already very apparent to people at Wisconsin Electric, and I think probably the majority of the industry, if not all of the industry, that DOE was not going to be performing in 1998, as we all had hoped."); Tr. 2776:25-2777:3 (Anundson) ("Q: During the entirety of your time in the Nuclear Power Department, did anyone believe that DOE would perform in 1998? A: No.").

WE also objects that Mr. Zabransky is an improper witness regarding WE's understanding of the contractual significance of the DCSs. The only witness that the Government cites in DFF 114-135 (aside from the final, FDS-related finding) is Mr. Zabransky. Yet Mr. Zabransky admitted that he did not sign the DCSs that WE submitted to DOE in 1992. Tr. 585:1-4 (Zabransky). Instead, Mr. Link signed each of the DCSs and WE submitted the DCSs to DOE under a cover letter signed by Mr. Link. Tr. 457:19-459:2 (Link); PX 259 (cover letter and DCSs).

Mr. Zabransky testified that his belief in the binding nature of DCSs was an idea that he reached on his own in consultation with unnamed individuals, and not based on other WE personnel. Tr. 705:17-25 (Zabransky) ("[That DCSs were binding] was a conclusion I reached and relayed back to the company."). Mr. Link did not testify that he shared Mr. Zabransky's alleged understanding in 1992 that that the DCSs were binding on WE.

Contrary to Mr. Zabransky's testimony, WE did not believe that the DCSs were contractually binding. Mr. Zabransky's testimony on this issue is contradicted by multiple sources. At trial, Mr. Zabransky claimed that the DOE contracting officer told WE orally in

1987 and separately by letter that the DCSs were binding commitments. Tr. 759:15-760:15 (Zabransky). Yet the Government offered no documentary evidence supporting this contention. In fact, DOE's DCS instructions make clear that DOE did not believe that the DCSs were binding, but instead, were conditional: "In the event that such circumstances change [*i.e.*, DOE fails to perform in 1998], all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." PX 246, p. HQR-001-2046. Mr. Zabransky's testimony that DOE believed that the DCSs were binding is completely contrary to DOE witnesses who have testified that DCSs were "administrivia" and not binding. *See* PFF 126.

WE disputes the Government's implication that WE's submission of DCSs in response to DOE's DCS instructions was anything more than the completion of "administrivia" that did not indicate WE's assent to a specific acceptance rate because, by the late 1980s and thereafter, WE believed that DOE would not perform by 1998 at *any* rate. *See* PFF 75, 77, 79b, 83, 85, 87-89, 92, 93-94, 96, 104, 115, 117. Even though WE was convinced that DOE would not timely perform by 1998, WE submitted the DCSs and later FDSs to maintain the pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that it was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *See* PFF 123. WE also continued to perform its obligations under the Standard Contract because it did not want to give DOE an excuse for nonperformance or take any action that might jeopardize eventual fulfillment of DOE's contractual obligations. *Id.* DOE did not approve WE's FDSs and did not notify WE of that decision.

114. David Zabransky had primary responsibility for preparing DCSs at WEPCO through July 1994 and was the most knowledgeable about the DCS process. Tr.702:21-708:12 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects to this proposed finding of fact as misleading because its use of the phrase "primary responsibility" is vague and undefined.

WE disputes that Mr. Zabransky had "primary responsibility" for preparing the DCSs because it is incorrect and not supported by the record evidence. Mr. Zabransky's name does not appear on WE's DCS submissions. PX 259. The uncontroverted evidence established that Mr. Don Bulley was in fact responsible for preparing WE's DCSs. Tr. 707:8-16 (Zabransky). Mr. Bulley's name is on the DCSs that WE submitted to DOE as the contact person. PX 259.

WE also disputes that Mr. Zabransky was the "most knowledgeable" regarding the so-called "DCS Process." The evidence established that it was Mr. Bulley, not Mr. Zabransky, who attended meetings in Washington, DC with the industry regarding completing the DCSs. Tr. 707:8-16 (Zabransky). Additionally, Mr. Zabransky's alleged knowledge of the "DCS Process" does not appear to be accurate since his belief that the DCSs were binding is so clearly undercut by the record evidence.

WE also disputes this proposed finding of fact as misleading because the person primarily responsible for the DCSs that WE submitted was Mr. Link, not Mr. Zabransky. Mr. Link signed a certification on each DCS regarding the information contained therein, subject to criminal penalties for false or fraudulent statements pursuant to 18 U.S.C. § 1001. Tr. 457:3-458:2 (Link); PX 259 (WE DCSs signed by Mr. Link).

115. On or about May 15, 1991, Charles Fay, the Vice-President of Nuclear Power at WEPCO, received a letter from Carol Reuter, DOE's contracting officer, with respect to the Standard Contract, in which she enclosed a draft annual priority ranking, which contained a chronological list of the spent fuel that had been discharged by the nuclear industry contract holders. PX 221. DOE provided WEPCO, and other utilities, the opportunity to review the APR to verify the accuracy of the information because "[t]he APR will be the basis for allocating federal waste acceptance capacity." Id. at WISC00059938.

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects to this proposed finding of fact as misleading because it ignores significant text in PX 221. The document did not itself allocate Federal waste acceptance capacity, but instead "detail[ed] the order in which" capacity would be allocated. PX 221, p. WISC00059938. The document further explained that "the owners of the oldest SNF [would be] given the highest priority." PX 221, p. WISC00059938. *Id.*

116. On July 8, 1991, WEPCO issued a letter, prepared by Mr. Zabransky and signed by his supervisor, Mr. Fay, confirming that the information contained in the draft annual priority ranking accurately reflected the spent fuel discharges from the PBNP units 1 and 2. PX 224; see also DX 44; Tr.756:14-757:20 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE disputes that Mr. Zabransky prepared the July 8, 1991 letter. Mr. Zabransky's cited testimony does not support this contention. The May 31, 1991 memo regarding the APR does not indicate that Mr. Zabransky prepared it. *See* PX 44. Likewise, the July 8, 1991 letter does not indicate that Mr. Zabransky prepared it. *See* PX 224.

117. In March 1992, WEPCO received a set of instructions concerning the preparation of DCSs for DOE. PX 246; PX 247; Tr. 702:21-707:16 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE does not dispute that WE received a cover letter dated March 4, 1992 from the DOE Contracting Officer, M. Detmer, forwarding ". Department of Energy Instructions for Completing the App. C Delivery Commitment Schedule General Instructions."

118. These instructions indicated that the amount of spent fuel to be included on the DCSs should be based upon the 1991 ACR. PX 246 at HQR-001-2066; Tr. 758:2-21 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects in part to this proposed finding of fact because it purports to rely on Mr. Zabransky's testimony to interpret the DOE's 1991 DCS instructions. The best evidence of the terms in the DCS instructions is the document itself.

119. Upon receipt of the 1991 ACR (DX 566), Mr. Zabransky understood that the amounts listed on page HQR-002-0811 reflected the annual allocations that WEPCO was to receive for the first ten years of the waste acceptance program. Tr. 758:2-21 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE further objects to this proposed finding of fact because Mr. Zabransky's alleged understanding of the 1991 ACR is irrelevant. The evidence established that Mr. Zabransky did not have authority to bind WE under the Standard Contract at the time DOE issued the ACR. Tr. 579:15-580:22 (Zabransky) (Zabransky did not claim to have contractual authority until sometime after 1992); PFF 98 (1991 ACR issued in December 1991).

120. Mr. Zabransky testified that, at the time of his receipt of the 1991 ACR, WEPCO understood that, pursuant to the Standard Contract, the company had allocations in each of the first ten years of the waste management program, beginning in 1998, the first year of the program. Tr.758:22-25 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE further objects to this proposed finding of fact because Mr. Zabransky's alleged understanding of the 1991 ACR is irrelevant. The evidence established that Mr. Zabransky did not have authority to bind WE under the Standard Contract at the time DOE issued the ACR. Tr. 579:15-580:22 (Zabransky) (Zabransky did not claim to have contractual authority until sometime after 1992); PFF 98 (1991 ACR issued in December 1991).

Additionally, WE notes that Mr. Zabransky's understanding of the effect of the 1991 ACR changed after DOE hired him. Mr. Zabransky claims that while he was at WE he believed the 1991 ACR was binding on both WE and DOE. Tr. 591:1-6 (Zabransky) ("[The

1991 ACR] was the one that became committed – binding on the company and DOE, yes."). As of 2007, Mr. Zabransky had adopted DOE's position that the 1991 ACR was not binding on either DOE or any purchaser.

> Q. So the 1991 ACR by itself is not contractually binding, correct?
>
> A. That's my understanding, yes.

Tr. 1190:12-14 (Zabransky).

121. On September 21, 1992, WEPCO submitted its ten DCSs to DOE. The DCSs indicated acceptance of 16.3 metric tons of uranium ("MTU") in 1998 from Point Beach; 43 MTUs in 1999; 19.8 MTUs in 2000; 27.1 MTUs in 2001; 36.7 MTUs in 2002; 24.8 MTUs in 2003; 10.0 MTUs in 2004; 12.8 MTUs in 2005; 16.1 MTUs in 2006; and 21.7 MTUs in 2007. DX 466. Tr.762:7-766:20 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects in part to this proposed finding of fact because it purports to rely on Mr. Zabransky's testimony regarding the content of DX 466 (WE DCSs signed by Mr. Link). The best evidence of the terms of the DCSs are the documents themselves, and Mr. Zabransky did not prepare or certify to the contents of DX 466. Tr. 585:1-4 (Zabransky). Instead, Mr. Link signed each of the DCSs and WE submitted the DCSs to DOE under a cover letter signed by Mr. Link. Tr. 457:19-459:2 (Link); PX 259 (Cover letter and DCSs, identical to DX 466).

122. The ten DCSs for 1998 to 2007 that WEPCO submitted comported with the rate of acceptance set forth in the 1991 ACR and reflected WEPCO's allocations under that rate. Compare DX 466 with DX 566 at HQR-002-0811; Tr.760:16-766:20 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects in part to this proposed finding of fact because it purports to rely on Mr. Zabransky's testimony regarding the content of DX 466 (WE DCSs signed by Mr. Link).

The best evidence of the terms of the DCSs are the documents themselves, and Mr. Zabransky did not prepare or certify to the contents of DX 466. Tr. 585:1-4 (Zabransky). Instead, Mr. Link signed each of the DCSs and WE submitted the DCSs to DOE under a cover letter signed by Mr. Link. Tr. 457:19-459:2 (Link); PX 259 (Cover letter and DCSs, identical to DX 466).

123. Mr. Zabransky testified that he discussed with Mr. Link the necessity for sending in all ten of WEPCO's DCSs so that DOE would sign off on them as soon as possible. Tr. 759:1-14 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects to this proposed finding of fact as misleading and inaccurate because the quoted portion of the testimony ignores other portions of Mr. Zabransky's testimony, as well as the documentary evidence. Mr. Zabransky further testified that he urged WE to submit the DCSs as soon as possible because he had grave doubts about the so-called "DCS Process" in the future, which in his view could stop at any time. Tr. 760:1-3 (Zabransky) ("Should [DOE] at some point stop doing it, you would have had them signed up to [sic] early on."). Mr. Zabransky's doubt in the longevity of the "DCS Process" no doubt reflected his long-held belief that DOE likely would not timely perform by 1998. In 1988, for example, Mr. Zabransky stated that DOE's plan for an MRS was "optimistic and risky." PX 145, p. WISC00061015. *See also* PFF 70a. He felt that WE "should plan on providing sufficient capacity for the interim storage of spent nuclear fuel through at least 2003." *Id.* By 1991, Mr. Zabransky believed that there was a "great chance" that DOE would not timely perform by 1998. Tr. 613:13-20 (Zabransky).

As WE explained in PFF 123, any discussions between Mr. Link and Mr. Zabransky in 1992 relating to WE's submission of DCSs likely related to keeping the pressure on DOE to perform under the Standard Contract. WE had long since concluded, however, that DOE

would not be able to timely perform by 1998. *See* PFF 75, 77, 79b, 83, 85, 87-89, 92, 93-94, 96, 104, 115, 117.

124. Mr. Zabransky understood that, once WEPCO had signed its DCSs and the Government had agreed to the allocations contained in the DCSs, the DCSs would become binding commitments. Tr.759:15-760:15 (Zabransky); Tr.700:17-701:11 (Zabransky); Tr.5730:15-19 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

125. Mr. Zabransky based his understanding on information in letters from the DOE contracting officer. Tr.760:4-15 (Zabransky); DX 497; Tr.701:12-702:9 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE disputes this proposed finding of fact because it relies upon the unsupported testimony of Mr. Zabransky referencing unspecified correspondence from DOE that the Government did not offer as evidence. Moreover, the evidence, such as the DCS instructions, directly contradicts Mr. Zabransky's testimony that DOE considered the DCSs to be binding. PFF 126.

126. Mr. Zabransky also based his understanding on information that he received from technical and legal advisors at industry meetings. Tr.760:4-15 (Zabransky); Tr.705:19-25 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE disputes this proposed finding of fact because it relies upon the unsupported testimony of Mr. Zabransky referencing information that he allegedly received from unidentified sources at industry meetings. The Government did not proffer any evidence corroborating Mr. Zabransky's version of events at trial.

Additionally, to the extent that Mr. Zabransky testified as to legal advice from counsel allegedly provided to Mr. Zabransky as WE's representative at industry meetings, WE does not waive the attorney-client privilege regarding any privileged communications.

127. During the period from September 1992 through March 1993, DOE approved the ten DCSs that WEPCO had submitted, providing for acceptance allocations for Point Beach for the ten-year period from 1998 through 2007. DX 466; 467; 468; 469; DX 472.

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE does not dispute that the referenced exhibits establish that WE submitted 10 DCSs in September 1992 and that DOE approved one and disapproved nine of them. WE then submitted nine revised DCSs and DOE approved them. Exhibit DX 472, which is referenced by the Government, has nothing to do with the September 1992 to March 1993 time period.

128. WEPCO ultimately re-submitted one DCS to reflect a reinserted fuel assembly. As a result, the allocation for year 2003 changed from 10.0 MTUs to 9.64 MTUs. DX471.

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE does not dispute that in July 1993, under Mr. Link's signature, WE resubmitted a DCS for the year 2003 that DOE subsequently approved.

129. WEPCO did not challenge or object (formally or informally) to DOE's instructions concerning the submittal of DCSs. Tr.5675:7-25 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects to this proposed finding of fact because the testimony on which the Government relies is irrelevant. Mr. Zabransky admitted that he did not sign the DCSs that WE submitted to DOE in 1992. Tr. 585:1-4 (Zabransky). Instead, Mr. Link signed each of

the DCSs and WE submitted the DCSs to DOE under a cover letter signed by Mr. Link. Tr. 457:19-459:2 (Link); PX 259 (Cover letter and DCSs, identical to DX 466).

WE does not dispute that it did not protest DOE's 1992 DCS instructions but this proposed finding of fact wrongly implies that there was any reason for WE to do so at that time. As previously discussed, since DOE was not expected to timely perform by 1998 at *any* rate, WE had no reason to protest the rate in the DCSs. See PFF 75, 77, 79b, 83, 85, 87-89, 92, 93-94, 96, 104, 115, 117. Moreover, since the DCSs were for planning purposes and not binding, WE did not have a reason in 1992 to protest the DCS instructions. PFF 126

Additionally, if WE had challenged the 1991 ACR allocations by listing more SNF in its DCSs than instructed under DOE's instructions, according to DOE's instructions, DOE would have rejected the DCSs. PX 246, p. HQR-001-2047 (8.0 DCS Process) ("if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved"). WE followed DOE's instructions to the letter without protesting its imposition of the fictional 1991 ACR rate because WE did not want to give DOE an excuse for nonperformance or take any action that might jeopardize eventual fulfillment of DOE's contractual obligations. PFF 123.

130. In corresponding with DOE during the DCS process, WEPCO never complained or suggested to DOE that the allocations contained in the 1991 ACR, or in any other ACR, were inadequate or inconsistent with the Standard Contract, and never submitted any DCS or FDS subject to a reservation of rights. Tr. 5675:7-22 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects to this proposed finding of fact because the testimony on which the Government relies does not support the finding. Mr. Zabransky admitted that he did not sign the DCSs that WE submitted to DOE in 1992. Tr. 585:1-4 (Zabransky). Instead, Mr. Link signed each of the DCSs and WE submitted the DCSs to DOE under a cover letter signed by Mr. Link. Tr. 457:19-459:2 (Link); PX 259 (Cover letter and DCSs).

WE also objects to this proposed finding of fact because it wrongly implies that WE had any reason or obligation to protest the non-binding allocations in DOE's 1991 ACR. As previously discussed, since DOE was not expected to timely perform by 1998 at *any* rate, WE had no reason to protest the allocation in the 1991 ACR. *See* PFF 75, 77, 79b, 83, 85, 87-89, 92, 93-94, 96, 104, 115, 117. Additionally, because the 1991 ACR was for planning purposes and not binding, WE did not have a reason in 1992 to protest the DCS instructions. PX 237, p. HQR-004-0360 (1991 ACR) ("As specified in the Standard Contract, the ACR if for planning purposes only and thus is not contractually binding on either DOE or the Purchasers"). Moreover, prior to the DCS process, WE stated in Government filings that DOE would be substantially delayed in its performance under the Standard Contract and that WE had initiated plans to build a dry storage facility because of DOE's expected breach. PX 801, pp. KRGWE000182, 192-193, 202, 211-12.

131. The DCSs submitted by WEPCO indicated that WEPCO wanted DOE to deliver a truck cask and also that WEPCO intended to use a cask at the Point Beach site with a maximum loaded cask lifting weight of 125 tons. DX 468; Tr.767:5-768:18 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X above.

WE disputes this PFF because it mischaracterizes WE's DCSs and Mr. Zabransky's testimony regarding these documents, which Mr. Zabransky did not author.

WE further disputes that the DCS transportation questions were of any significance because they related to DOE's transportation program. DOE's DCS instructions make clear that the "Proposed Shipping Mode" in item 2.3 relates to DOE's obligation to accept a purchaser's SNF "at the Purchasers [(WE's)] gate." PX 246, p. HQR-001-2050. While DOE asked for WE's preferences, the actual movement of SNF off-site was DOE's responsibility. PX 41, p. KRGWE002126 (DOE obligated to provide transportation under the Standard Contract). Additionally, the DCS instructions stated that final selection of the shipping mode

would be determined "during the FDS process." PX 246, p. HQR-001-2050. DOE never contacted WE about its FDSs to negotiate, and never approved WE's FDSs. PFF 123.

The DCSs were also of no significance because they were not commitments by either side. As DOE's DCS instructions make clear, any transportation-related information in the DCS is for planning purposes only, and "does not imply any commitment by DOE or the Purchaser." PX 246, p. HQR-001-2050. Therefore, any information in the DCS form was subject to change, depending on the circumstances. PX 246, p. HQR-001-2046.

WE does not dispute that the crane handling capacity referenced in the DCSs is 125 tons

132. Given that a truck cask normally weighs 20 to 40 tons, and that a larger cask with a maximum loaded cask lifting weight of 125 tons would require shipment by rail or barge, the DOE contracting officer sent WEPCO a letter asking it to clarify whether it desired "to use only truck casks or heavy-haul a larger cask from the nearest rail/barge facility." DX 467 at 2 (HQR-387-0003).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE disputes this proposed finding of fact because it is incomplete and misleading. WE's response was consistent with WE's long-standing position that DOE was obligated to move WE's SNF, but did not do so. *See* PX 468. The Government's proposed finding of fact neglects to mention that WE was willing to entertain DOE ideas for improving access for DOE casks, but that WE was not itself intending to perform such heavy haul operations at the time. *Id.* As WE established at trial, however, WE was able to perform heavy haul operations when necessary such as for the Steam Generator replacement project. *See* PFF 263 and 264.

133. WEPCO replied that, even though, as indicated on its DCSs, it had a crane with the lifting capacity capable of lifting a larger 125-ton cask, it anticipated using truck casks for the delivery of its SNF to DOE because "there is neither rail nor barge access to the Point Beach site" and it did "not intend to heavy haul a larger cask from the nearest rail or barge facility." DX 468 at 1 (WISC00000713); Tr.767:5-768:18 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135),above.

WE objects to this proposed finding of fact because the testimony on which the Government relies is irrelevant. The record establishes that Mr. Zabransky did not have WE's contractual authority relating to the Standard Contract when WE submitted the DCSs. Moreover, the Government failed to establish that Mr. Zabransky had any basis for testifying regarding the letter response to DOE – PX 468. Mr. Zabransky's name or initials do not appear anywhere on PX 468. Instead, the document indicates that it was prepared by "DKB" – Mr. Don Bulley – not Mr. Zabransky.

WE disputes this proposed finding of fact because it is incomplete and misleading. WE's response was consistent with WE's longstanding position that DOE was obligated to move WE's SNF, however DOE chose to do so. *See* PX 468. The Government's proposed finding of fact neglects to mention that WE was willing to entertain DOE ideas for improving access for DOE casks, but that WE was not itself intending to perform such heavy haul operations at the time. *Id.* As WE established at trial, however, WE was able to perform heavy haul operations when necessary such as for the Steam Generator replacement project. *See* PFF 263 and 264.

DX 468 therefore establishes that WE did not discount the ability to heavy haul casks off the Point Beach site but anticipated that DOE would use trucks. WE informed DOE that it was not going to make such improvements but was willing to entertain DOE's ideas for doing so. DX 468.

134. DOE suspended the approval of DCS submissions in 1996, after the United States Court of Appeals for the District of Columbia issued its decision in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996), in which the court held that DOE's obligation to begin accepting SNF was not conditioned upon the existence of a facility to receive the SNF. See Tr. 5722:4-23 (Zabransky). DOE determined that it was not appropriate to continue to approve DCSs and make commitments to the utilities for the acceptance of their SNF when DOE knew that it could not meet those commitments before 2010. Id. at 5733:23-5734:12 (Zabransky)("We knew we couldn't go ahead and make those

pickups. To commit to do them wouldn't have been acting in the best principles on the utility side. . . .").

**RESPONSE:**

WE incorporates its General Objections to Section X (DFF 114-135), above.

WE objects that this proposed finding of fact is misleading because Mr. Zabransky's testimony is not represented completely. Mr. Zabransky went on to say that DOE's decision to suspend the "DCS Process" results in "us limiting liability." Tr. 5733:5-5734:12 (Zabransky).

WE does not dispute that DOE has not approved any DCSs since March 1997. *See* PFF 124b.

135. WEPCO submitted ten Final Delivery Schedules ("FDS") on December 18, 1997. DX74. WEPCO, on its FDS, indicated its delivery estimate for the 41 fuel assemblies to be December 30, 1998 to December 31, 1998. Id. at WISC 00003441; Tr.2636:11-2639:10 (Farron).

**RESPONSE:**

WE objects to this proposed finding of fact as irrelevant because it is undisputed that DOE was not going to timely perform when WE submitted its FDSs.

WE disputes this proposed finding to the extent that the Government wrongly implies that WE would have used a December 1998 DOE acceptance date in the non-breach world. The testimony at trial established that WE did not submit the FDSs in expectation of DOE performance. WE submitted the DCSs and FDSs because WE believed it was essential to maintain pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that it was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. PFF 123. WE also continued to perform its obligations under the Standard Contract because it did not want to give DOE an excuse for nonperformance or take any action that might jeopardize eventual fulfillment of DOE's contractual obligations. *Id.* DOE did not approve WE's FDSs and did not notify WE of that decision.

WE does not dispute that it submitted ten FDSs to DOE on December 18, 1997 and that the 1998 FDS included the information indicated in this proposed finding of fact.

## XI. WEPCO MAINTAINS FULL CORE RESERVE

136. Full core offload capability or full core reserve ("FCR") in the Point Beach SNF pool was space for 121 assemblies. Tr.675:7-9 (Zabransky).

**RESPONSE:**

WE does not dispute this proposed finding of fact.

137. WEPCO recognized the importance of maintaining FCR and believed that maintaining one FCR was desirable. Tr.1613:17-19 (Krieser); Tr.2186:18-22 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores significant text in other portions of Mr. Gary Krieser's testimony. Mr. Krieser went on to say that maintaining FCR "is desirable, yes, it's not required." Tr. 1613:19-20 (Krieser).

WE objects to the Government's characterization of the trial transcript at p. 2186 because the Government has identified the wrong witness with this testimony and the cited testimony does not support this proposed finding of fact. The witness who testified at p. 2186 was Mr. Porter, not Mr. Becka. Moreover, Mr. Porter explained that Full Core Reserve ("FCR") is not a regulatory requirement, and that Point Beach has operated with less than one full core reserve for several periods of times. Tr. 2186:18-22 (Porter).

WE also objects to this proposed finding of fact as vague and misleading in its use of the phrase "WE recognized the importance of maintaining FCR." That phrase wrongly implies that WE had a policy of always maintaining FCR. The trial record instead established that WE only regarded one full core reserve as a good operating practice. *See* PFF 178-180. As discussed above, WE has operated with less than one full core reserve for several periods of time. Tr. 2186:18-22 (Porter).