138. While WEPCO never had a written "policy," evidence at trial demonstrated that WEPCO's desire and practice was to maintain FCR. Tr.675:10-21 (Zabransky); see e.g., Tr.770:16-771:9 (Zabransky); 2185:23-2186:24; 2211:12-2212:25; 2228:20-2233:11 (Porter); 1613:17-19; 1622:1-1624:13; 1631:17-1632:12 (Krieser); 2753:16-2756:9 (Anundson); PX 236; DX 54; DX 75; DX 171; DX 430.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other relevant witness testimony. For example, Mr. Porter explained that FCR is not a regulatory requirement, and that Point Beach has operated with less than one full core reserve for several periods of times. Tr. 2186:18-22 (Porter). Likewise, Mr. Krieser went on to say in his testimony that maintaining full core reserve "is desirable, yes, it's not required." Tr. 1613:19-20 (Krieser).

WE objects to the use of Mr. Kevin Anundson's testimony regarding FCR since Mr. Anundson testified that he was not responsible for Point Beach's FCR policy and because Mr. Anundson is not a nuclear engineer. Tr. 2754:10-12; 2756:4-9 (Anundson).

WE objects to this proposed finding of fact as misleading because it ignores other significant text in DX 54. In DX 54, the Citizen's Utility Board ("CUB") acknowledged that WE told the CUB that "the NRC does not require full-core discharge capability to a spent fuel pool." DX 54, p. WISC00003435.

WE also objects to this proposed finding of fact as misleading because in the non-breach world, WE likely would have preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. Use of a temporary cask pit rack is consistent with WE's view that maintenance of FCR was generally a good operating practice, although not required. PFF 178-180.

139. For example, in 1976, WEPCO understood that it was "imperative" to ship fuel assemblies to the G.E. Morris facility in order to permit the refueling of Point Beach Units One and Two. DX 8; Tr.1381:23-1384:14 (Shimon). WEPCO also understood that, in

addition to refueling requirements, FCR provided operational flexibility. Tr. 1384:15-1385:2 (Shimon).

**RESPONSE:**

WE objects to this proposed finding of fact because it incorrectly implies that refueling of the Point Beach reactors required FCR and ignores relevant testimony. The Government ignores the testimony of Mr. William Hennessy, Supervisor of Reactor Engineering for many years, that shuffling fuel in and out of the reactor is acceptable, without FCR. Tr. 961:25-962:4 (Hennessy) ("Yes, the core shuffle technique can be used for refuelings, if desired.") Moreover, Mr. Shimon testified that he drafted DX 8 "under the assumption that" Point Beach would discharge the core in the upcoming refuelings but that "[a]nother way of doing refueling if you don't have full core reserve is simply to shuffle the fuel that's in the reactor." Tr. 1384:9-14 (Shimon). Properly understood, therefore, DX 8 merely reflects WE's SNF shipment schedule based upon certain refueling assumptions. *Id.* The record at trial established that WE operated without FCR on more than one occasion during the 1970s. Tr. 2186:16-22 (Porter). Mr. Shimon further testified that while FCR provides flexibility, plant operation is not impaired by not having FCR. Tr. 1384:21-1385:2 (Shimon).

140. In a 1978 statement in support of WEPCO's application to the Public Service Commission of Wisconsin ("PSCW") to rerack, T.R. Wilson, the Administrator of Nuclear Projects, stated that "prudent operating and engineering practices would dictate that we reserve space in the pool to temporarily store an entire core – not just one refueling – in the event inspection or maintenance might be required which involves temporarily removing all of the fuel from one of the reactors." DX 13 at WISC 00022860; see Tr.1387:22-25 (Shimon) (practice at WEPCO in 1978 to maintain one full core offload capability); Tr.2217:23-2219:19 (Porter). On June 22, 1979, WEPCO advised DOE that it intended to maintain full core reserve because core removal is required for in-service inspections. Tr.2213:1-2217:22 (Porter); DX 170.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other evidence establishing that while FCR was a goal at Point Beach in the 1970s, WE operated

with less than FCR during that time. PX 353; Tr. 2186:18-22 (Porter); Tr. 348:21-349:5 (Link). PX 353; Tr. 2186:18-22 (Porter); Tr. 348:21-349:5 (Link)

WE further objects to this proposed finding of fact as misleading because it wrongly implies that, based on DX 170, WE had to continuously maintain one full core reserve for In-Service Inspections ("ISIs"). The evidence established that ISIs are planned activities which Point Beach knows about well in advance. Tr. 892:22-893:7 (Hennessy). Reactor Engineering is therefore able to plan for ISIs to accommodate conditions in the spent fuel pool. *Id.* Additionally, as a general rule, the NRC typically allows a utility to accelerate or defer the schedule for ISIs for various periods of time. Tr. 234:4-19 (Baumann).

Planning for ISIs did not prevent Point Beach from operating with less than one FCR during the 1970s. Tr. 2186:16-22 (Porter).

141. In its February 1987 RW-859, a document that WEPCO provided to DOE, WEPCO stated that it intended to maintain FCR. DX 444 at HQR 364 0063; see also DX 442 at HQR 364 0032 (March 1986 RW-859 states WEPCO intention to maintain FCR).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other evidence establishing that while FCR was a goal at Point Beach, WE has operated with less than one FCR. Tr. 2186:16-22 (Porter). WE operated Point Beach with less than one FCR for three periods in the 1970s. PX 353; Tr. 2186:18-22 (Porter); Tr. 348:21-349:5 (Link). WE again operated Point Beach with less than one FCR in the late 1990s and early 2000 time period. Tr. 893:25-894:2 (Hennessy); Tr. 2135:10-18 (Holzmann).

142. WEPCO understood that it was good operational practice to continuously maintain FCR because certain types of inspections and repairs, such as the replacement of the steam generator, required fully unloading the core. Tr.771:4-775:16 (Zabransky); Tr.2802:9-2803:7 (Conry); DX 54. In addition, maintaining full core reserve simplified operations at Point Beach. Id.; see also Tr.5876:2-14 (Hamal); DX 392 at WXE0040005-0006, Hamal Attachment 2, 6/29/2006.

**RESPONSE:**

WE objects to this proposed finding of fact because it relies on improper evidence. Mr. Zabransky is not a nuclear engineer. Tr. 565:21-566:6 (Zabransky) (degree in civil, not nuclear, engineering). Mr. Zabransky's understanding of FCR was not direct, but instead was derivative from others in the Nuclear Power Department. Tr. 770:16-24 (Zabransky).

In addition, Mr. Zabransky's testimony does not support the Government's contention that WE planned to "continuously" maintain FCR. First, Mr. Zabransky's testimony did not establish that the possibility of unplanned inspections required WE to maintain FCR. Instead, Mr. Zabransky testified that an unforeseen event, such as corrosion that allegedly occurred at the Davis-Besse plant in Ohio, might require an immediate shutdown and inspection. Tr. 771:21-772:10 (Zabransky). Yet when asked if the Davis-Besse plant had to unload its core to conduct the required inspection, Mr. Zabransky replied, "I don't know." Tr. 772:11-15 (Zabransky).

Second, Mr. Zabransky admitted that FCR was not required for inspections. He conceded that fuel could be shuffled, and while inspections without FCR might be "harder," he did not contend that they could not be carried out. Tr. 772:16-773:9 (Zabransky).

Third, Mr. Zabransky's testimony does not support the Government's position that WE had to maintain FCR continuously to allow the replacement of the Unit 2 Steam Generator. Mr. Zabransky testified that he was no longer working for WE by the time that WE replaced the Unit 2 Steam Generator. Tr. 585:12-14 (Zabransky). Moreover, Marlin Conry, the WE engineer responsible for the Unit 2 Steam Generator replacement, testified that WE investigated using a cask pit rack for temporary FCR capability to accommodate replacement of the Steam Generator. Tr. 2817:10-2819:4 (Conry). Indeed, Mr. Conry specifically recalled discussing the use of a temporary rack in the cask pit with Mr. Zabransky in connection with the Unit 2 Steam Generator replacement project. PFF 185.

WE further objects to DFF 142 because it relies on improper evidence in solely citing Cliff Hamal for the proposition that "maintaining full core reserve simplified operations at Point Beach." Mr. Hamal did not testify that he had personal knowledge of the day-to-day operation of the Point Beach plant. In fact, Mr. Hamal testified that he has never been involved in managing SNF at a commercial nuclear facility. Tr. 5931:15-18 (Hamal). Instead, the portion of his report regarding FCR was simply a collection of fact witness testimony and documents. *See* DX 392, pp. WXE004005-006, Hamal Attachment 2. The Government may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d 1148, 1153 (10th Cir. 1990) (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

WE also objects to this proposed finding of fact and Mr. Hamal's related testimony as vague because Mr. Hamal does not identify when it was supposedly WE's practice to maintain FCR for simplified operations. *See* DX 392, p. WXE0040005. Mr. Hamal's cask decision-making analysis purports to relate generally to WE decision-making from January 1998 and afterwards. Tr. 5952:8-21 (Hamal). As WE proved at trial, however, Point Beach operated Point Beach with less than one FCR during this very time frame -- in the late 1990s and early 2000 time period. Tr. 893:25-894:2 (Hennessy); Tr. 2135:10-18 (Holzmann); Plaintiff's Demonstrative Exhibit ("PDX") 60–Sieracki 17 ("Breach Scenario: Periods When WE Operated Without Full Core Reserve"). Mr. Hamal's statement that WE "always had a policy of maintaining at least one full core reserve," DX 392, p. WXE0040008, is inconsistent with this evidence.

Additionally, Mr. Hamal's analysis of WE's FCR options is inherently flawed because it ignores the evidence establishing that, in the non-breach world, WE likely would have

preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. A temporary cask pit rack is consistent with WE's view that FCR was generally a good operating practice, although not required. PFF 178-180. This flaw in Mr. Hamal's analysis stems from his assumption that the breach and non-breach worlds in this case were essentially identical through January 1998. PFF 167. Mr. Hamal did not consider the possibility that WE could have employed a cask pit rack for FCR until the period starting January 1998 and afterwards. Tr. 5894:22-5895:1 (Hamal) ("I'm talking about a temporary rack that might have been purchased in January, '98"). Mr. Hamal's analysis therefore does not adequately consider WE's possible use of a cask pit rack during the time periods at issue in this case.

143. Furthermore, in the event that major maintenance may be required, FCR can shorten the length of a maintenance outage, which is desirable because, during an outage, the low cost generation of Point Beach has to be replaced by higher cost generating units or purchased from another source. Tr. 2211:12-2212:25 (Porter); Tr.5876:15-22 (Hamal); DX392/PX828, Hamal Attachment 2, 6/30/2006; Tr.1978:1-9 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact as improper because Mr. Becka's testimony does not refer to the length of maintenance outages. WE further objects to this proposed finding because neither Mr. Porter nor Mr. Becka stated in the cited testimony that Point Beach's generation would have to be replaced by higher cost generating units or purchased from another source. Although Point Beach was among the lowest cost generation units on the WE system, it was not always the lowest. Therefore, the Government may not rely upon the testimony of Messrs. Becka and Porter.

That leaves only the testimony and report of Mr. Hamal as potential support for this proposed finding. The Government, however, may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's

opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

Additionally, Mr. Hamal's analysis of WE's FCR options is inherently flawed because it ignores the evidence establishing that, in the non-breach world, WE likely would have preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. A temporary cask pit rack is consistent with WE's view that FCR was generally a good operating practice, although not required. PFF 178-180. This flaw in Mr. Hamal's analysis stems from his assumption that the breach and non-breach worlds in this case were essentially identical through January 1998. PFF 167. Mr. Hamal did not consider the possibility that WE could have employed a cask pit rack for FCR until the period starting January 1998. Tr. 5894:22-5895:1 (Hamal) ("I'm talking about a temporary rack that might have been purchased in January, '98"). Therefore, Mr. Hamal's analysis does not adequately consider WE's possible use of a cask pit rack during the earlier time periods at issue in this case.

144. Moreover, scheduled maintenance of the reactor, corrective maintenance, and emergency maintenance may require a full core to be removed. Tr.2219:20-2220:10 (Porter). For example, unloading the full core could be required if there were a wholesale fuel failure of a number of fuel assemblies. Tr.2220:11-16 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other evidence establishing that, while FCR was a goal at Point Beach, WE has operated with less than one FCR. Tr. 2186:16-22 (Porter). It also ignores that utilities frequently preserve FCR through the use of a temporary rack. PFF 186-187, 202, 205; Tr. 4428:13-4429:6 (Singh) ("Yes, the standard, the purpose of the cask pit rack is to serve as an alternative location to park the fuel from the reactor.").

145. On at least four occasions, WEPCO has had to offload all of the fuel from one of its reactors at Point Beach. Tr.5985:15-5987:8 (Hamal).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading and irrelevant. The four occasions referenced by Mr. Hamal were not emergency core offloads as this proposed finding of fact implies. Tr. 5985:15-5987:8 (Hamal). The Government did not establish any relevance to three offloads that occurred in the mid-1980s, before WE began long-term SNF storage planning because of DOE's anticipated breach. At trial, WE personnel testified that WE planned for core offloads related to plant maintenance, operations, and repair. Tr. 941:19-942:3 (Hennessy). The only offload referenced by Mr. Hamal that occurred in the 1990s related to the replacement of the Unit 2 Steam Generator. WE established at trial that WE could have accomplished the Unit 2 Steam Generator replacement through a temporary cask pit rack. PFF 184.

Additionally, Mr. Hamal's statement is irrelevant because it ignores the evidence establishing that, in the non-breach world, WE likely would have preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. A temporary cask pit rack is consistent with WE's view that FCR was generally a good operating practice, although not required. PFF 178-180. This flaw in Mr. Hamal's analysis stems from his assumption that the breach and non-breach worlds in this case were essentially identical through January 1998. PFF 167. Mr. Hamal did not consider the possibility that WE could have employed a cask pit rack for FCR until the period starting January 1998. Tr. 5894:22-5895:1 (Hamal) ("I'm talking about a temporary rack that might have been purchased in January, '98"). Mr. Hamal's analysis therefore does not adequately consider WE's possible use of a cask pit rack during the earlier time periods at issue in this case.

146. WEPCO filed documents with the PSCW indicating that it maintained FCR because it was a good operating practice. DX 54 at WISC 00003435-3436; Tr.775:11-780:10; Tr.2217:23-2219:19 (Porter).

**RESPONSE:**

WE objects to DFF 146 because it relies on improper evidence. Mr. Zabransky is not a nuclear engineer. Tr. 565:21-566:6 (Zabransky) (degree in civil, not nuclear, engineering). Mr. Zabransky's understanding of FCR was not direct, but instead was derivative from others in the Nuclear Power Department. Tr. 770:16-24 (Zabransky).

WE does not dispute that WE filed DX 54 at the PSCW and viewed FCR as a good operating practice. WE objects to this proposed finding of fact as misleading, however, because it ignores other evidence establishing that while FCR was a goal at Point Beach, WE has operated with less than one FCR. Tr. 2186:16-22 (Porter). It also ignores that utilities frequently preserve FCR through the use of a temporary rack. PFF 186-7, 202, 205; Tr. 4428:13-4429:6 (Singh) ("Yes, the standard, the purpose of the cask pit rack is to serve as an alternative location to park the fuel from the reactor.").

147. In some of its calculations, WEPCO assumed maintenance of two FCRs. Tr. 2753:16-2754:4 (Anundson).

**RESPONSE:**

WE objects to the use of Mr. Anundson's testimony regarding FCR because Mr. Anundson testified that he was not responsible for deciding FCR policy at Point Beach and because Mr. Anundson is not a nuclear engineer. Tr. 2754:10-12; 2756:4-9 (Anundson).

WE further objects to this proposed finding of fact as irrelevant because WE established at trial that WE never had a goal or policy of maintaining two FCRs. PFF 180. The sole exception is that WE discussed using two FCRs with regard to the need for dry storage in the ESR to its PSCW application. *Id.* WE, however, used conservative assumptions in its PSCW application and ESR in order to prompt timely approval by the PSCW. *Id.*

148. Kevin Anundson, the former project manager of the ISFSI project at WEPCO, believed it was a good idea to maintain two FCRs. Tr. 2754:5-2756:9 (Anundson).

**RESPONSE:**

WE objects to the use of Mr. Anundson's testimony regarding FCR because Mr. Anundson testified that he was not responsible for deciding FCR policy at Point Beach and because Mr. Anundson is not a nuclear engineer. Tr. 2754:10-12; 2756:4-9 (Anundson).

WE further objects to this proposed finding of fact as irrelevant because WE established at trial that WE never had a goal or policy of maintaining two FCRs. PFF 180. The sole exception is that WE discussed using two FCRs with regard to the need for dry storage in the ESR to its PSCW application. *Id.* WE, however, used conservative assumptions in its PSCW application and ESR in order to prompt timely approval by the PSCW. *Id.*

149. In 1991, when WEPCO applied to the PSCW for permission to build an ISFSI, WEPCO claimed that a 12-cask ISFSI by 1998 was necessary so that WEPCO could maintain two FCRs in its spent fuel pool. DX171/PX236 at WISC 00014728; Interrogatory response, 3/17/93, DX134/PX291 at WISC 00054807; Tr. 2185:23-2186:24 (Porter); Tr.2228:20-2229:10 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because WE established at trial that WE never had a goal or policy of maintaining two FCRs. PFF 180. The sole exception is that WE discussed using two FCRs with regard to the need for dry storage in the ESR to its PSCW application. *Id.* WE, however, used conservative assumptions in its PSCW application and ESR in order to prompt timely approval by the PSCW. *Id.*

WE further disputes this proposed finding of fact because it is contrary to the evidence and the cited evidence does not support this proposed finding of fact. Mr. Porter testified that WE told the PSCW that it would be "nice" to maintain two full core reserves, not that it was necessary. Tr. 2185:23-2186:10 (Porter). DX 171/PX 236 does not say that two full core reserves are necessary at WISC00014728. DX 134/PX 291 references plans for

two full core reserves at WISC00054807, but does not state that two full core reserves was necessary.

150. In a May 21, 1992 response to a Citizen's Utility Board ("CUB") data request, WEPCO explained several reasons that it is important to maintain FCR, including performance of NRC required in-core inspections of the reactor vessel. Tr.2229:11-2233:11 (Porter); DX 54 at WISC 00003435-3436.

**RESPONSE:**

WE does not dispute that WE filed DX 54 at the PSCW and viewed FCR as a good operating practice. WE objects to this proposed finding of fact as misleading, however, because it ignores other evidence establishing that while FCR was a goal at Point Beach, WE has operated with less than one FCR. Tr. 2186:16-22 (Porter).

WE further objects to this proposed finding of fact as misleading because it wrongly implies that, based on DX 54, WE had to continuously maintain one full core reserve for In-Service Inspections ("ISIs"). The evidence established that ISIs are planned activities that Point Beach knows about well in advance. Tr. 892:22-893:7 (Hennessy). Reactor Engineering is therefore able to plan for ISIs to accommodate conditions in the spent fuel pool. *Id.* Additionally, as a general rule, the NRC typically allows a utility to accelerate or defer the schedule for ISIs for various periods of time. Tr. 234:4-19 (Baumann). Planning for ISIs did not prevent Point Beach from operating with less than one FCR for periods of time during the 1970s. Tr. 2186:16-22 (Porter).

WE also objects to this proposed finding of fact as misleading because in the non-breach world in this case WE likely would have preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. Use of a temporary cask pit rack is consistent with WE's view that maintenance of FCR was generally a good operating practice, although not required. PFF 178-180.

151. "An emergency shutdown and the length of the offline period is unknown and unknowable prior to the time that it happens." Tr.2245:16-2246:10 (Porter); DX 179.

**RESPONSE:**

WE objects to this proposed finding as vague, ambiguous, irrelevant and conclusory.

WE further objects to this proposed finding of fact as misleading because it wrongly implies that WE would not operate Point Beach with less that one FCR because of the possibility of an emergency shutdown. In fact, in Mr. Porter's December 2000 direct testimony in DX 179, Mr. Porter stated that WE could continue operating without FCR until 2005. DX 179, p. WISC00012609:10-14.

152. For instance, in 1997, Point Beach went off line for an extended period of time. The events leading to that action had not been anticipated. Tr.2245:16-2246:10 (Porter); DX 179 at WISC00012618. During that shutdown, it was necessary for WEPCO to obtain replacement power. Tr.2248:9-11 (Porter).

**RESPONSE:**

WE objects to this proposed finding as vague, ambiguous, irrelevant, and conclusory.

WE further objects to this proposed finding of fact because it wrongly implies that loss of FCR is an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store a core for an unforeseen event can be calculated, and therefore enables appropriate planning. *Id.*

WE further objects to this proposed finding of fact as irrelevant because the Government did not establish that the 1997 shutdown would have been any shorter had WE had FCR at that time.

153. One of the reasons that WEPCO wanted to begin loading to its ISFSI after being shut-down was in order to maintain FCR. Tr. 2099:23-2100:14 (Holzmann). WEPCO recognized the enormous cost associated with having to shut down the plant for lack of full core reserve. Tr. 2243:14-2244:13; 2251:15-2252:4 (Porter); DX 135. Specifically, it

recognized that the consequences of shutting down Point Beach were "broad and extreme." Tr.2243:14-2244:13 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact because it wrongly implies that WE shut down, or would have shut down, Point Beach for lack of FCR. The evidence established that WE has operated Point Beach without FCR on multiple occasions. WE operated Point Beach with less than one FCR in the 1970s. PX 353; Tr. 2186:18-22 (Porter); Tr. 348:21-349:5 (Link). WE again operated Point Beach with less than one FCR in the late 1990s and early 2000 time period. Tr. 893:25-894:2 (Hennessy); Tr. 2135:10-18 (Holzmann).

WE also objects to this proposed finding of fact as misleading because, in the non-breach world, WE likely would have preserved FCR, like many other nuclear power plant operators faced with a similar situation, through the use of a temporary cask pit rack. PFF 182-211. Use of a temporary cask pit rack is consistent with WE's view that maintenance of FCR was generally a good operating practice, although not required. PFF 178-180.

WE disputes this proposed finding of fact because it incorrectly states that WE was in a position to "maintain" FCR in 1998 following the 1997 shutdown. The evidence established that WE did not have FCR in the 1997-1998 time frame. PX 609, p. WISC00055978, Tr. 2091:13-22; 2135:10-19 (Holzmann). At this time, WE was recovering the ability to load casks. PFF 137. Yet Point Beach resumed operations even in the absence of FCR. PX 609, p. WISC00055978; Tr. 1977:14-22; 2135:10-19 (Holzmann).

WE further objects to this proposed finding of fact as misleading because it wrongly implies that WE would not operate Point Beach with less that one FCR, allegedly resulting in "broad and extreme" consequences. At trial, the Government examined Mr. Porter regarding his December 2000 direct testimony regarding additional dry storage casks. Mr. Porter did not state that WE would have suffered "broad and extreme" consequences without FCR.

Instead, Mr. Porter explained that WE needed additional dry storage casks because "[t]he DOE has failed to meet the date to begin removal of spent fuel." DX 179, p. WISC00012611:12-15. In view of DOE's failure to perform, Point Beach risked eventual shutdown unless it was able to load more casks. *Id.* at WISC00012609:9-14.

154. There were significant costs associated with shutting down a nuclear plant because nuclear plants are usually the most cost-effective resource in the utility's generational resources. Tr. 3976:8-19 (Sieracki). At times, WEPCO calculated the cost of replacement power – a cost that could be associated with such a shutdown. Tr.2243:14-2244:13 (Porter); see Tr.2251:15-2252:4 (Porter); DX 135.

**RESPONSE:**

WE objects to this proposed finding of fact because it wrongly implies that WE would have incurred replacement power costs because of an unplanned loss of FCR. Loss of FCR is not an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store the core can be calculated, enabling appropriate planning. *Id.*

155. If WEPCO failed to maintain FCR and circumstances developed where it incurred large replacement power costs as a result of its inability to discharge nuclear fuel from one of the units at Point Beach, WEPCO's stockholders, as opposed to its ratepayers, may have been required to pay for those costs. Tr.5877:7-5878:20 (Hamal).

**RESPONSE:**

WE objects to this proposed finding of fact because it wrongly implies that WE would not operate without FCR because of purported financial risks as alleged by Mr. Hamal. The evidence established that WE has operated Point Beach without FCR on multiple occasions. WE operated Point Beach with less than one FCR in the 1970s. PX 353; Tr. 2186:18-22 (Porter); Tr. 348:21-349:5 (Link). WE again operated Point Beach with less than one FCR in

the late 1990s and early 2000 time period. Tr. 893:25-894:2 (Hennessy); Tr. 2135:10-18 (Holzmann).

WE further objects to this proposed finding of fact because it wrongly implies that loss of FCR is an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store a core for an unforeseen event can be calculated, enabling appropriate planning. *Id.*

WE also objects to this proposed finding of fact and Mr. Hamal's related testimony as vague because Mr. Hamal does not identify when, in his hypothetical, WE supposedly would have "failed to maintain" FCR. Mr. Hamal's cask decision-making analysis purports to relate primarily to 1998. Tr. 5861:24-5862:2 (Hamal) ("late '97, early '98, . . . that's the focus of my testimony"). As WE proved at trial, however, WE operated Point Beach with less than one FCR during this very time frame -- in the late 1990s and early 2000 time period. Tr. 893:25-894:2 (Hennessy); Tr. 2135:10-18 (Holzmann); PDX 60–Sieracki 17 ("Breach Scenario: Periods When WE Operated Without Full Core Reserve").

WE further objects to this proposed finding because Mr. Hamal's statement regarding who would pay for replacement power costs is rank speculation, was not referenced in his expert report, and is outside the scope of that report. *See* DX 392.

156. The PSCW believed that it was critical for WEPCO to maintain full core reserve. Tr.2266:22-2268:23 (Porter); DX 178. When the PSCW granted WEPCO's application to build an ISFSI, it specifically stated that "it is critical for the Point Beach plant to be able to move at least one whole nuclear core from a reactor into the existing spent fuel pool." DX178 at WPS 001 5341.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other significant portions of Mr. Porter's testimony. Mr. Porter specifically disclaimed insight into what the PSCW believed regarding FCR. Tr. 2268:23 (Porter) ("It's their words."). Mr. Porter also made clear that WE did not agree with the PSCW's views regarding FCR. Tr. 2268:8-11 (Porter) ("I don't think WEPCO would call [FCR] critical because we have, on occasion, operated without full core reserve.").

WE further objects to this proposed finding of fact because it ignores significant other text and the context of DX 178. Contrary to what the Government states in this proposed finding of fact, DX 178 was not the order granting WE's application to build dry storage. DX 178 was instead the PSCW's notice of reopening the PSCW docket after the Dane Country Circuit Court vacated and remanded the PSCW's February 1995 Order approving the dry storage project. In DX 178, the PSCW explains its decision to reopen the dry storage docket and conduct further proceedings rather than await the results of an appeal of the Dane County Circuit Court decision. DX 178, p. 2. It then justifies its action to reopen the docket by arguing that it needs to act on the dry storage project in "a timely manner" in order that WE may maintain full core reserve.

In DX 178, the PSCW explained that it did not concede that its original Order authorizing dry storage or the supporting Environmental Impact Statement ("EIS") was deficient in any way. Those prior PSCW documents made it clear that WE could operate into 1998 or beyond without dry storage and that the PSCW was convinced that DOE's performance was going to be substantially delayed. PFF 113; PX 346, 374. Further, the February 1995 Order stated that the PSCW was authorizing the dry storage project as a means to address the "uncertainties of whether and when DOE will take the spent fuel." PX 374, p. 17; PFF 120.

Thus, the DX 178 notice merely reflects the PSCW's use of full core reserve to lend urgency to final action on WE's dry storage application, which by this time had been filed more than four years previously. The notice does not negate the prior terms of the PSCW's Order approving dry storage because of DOE's long-term failure to perform. As discussed in PFF 182-184, if DOE had performed, WE would have maintained full core reserve in the short-term through the use of a temporary rack.

157. WEPCO expected that it would continue to strive to maintain FCR in the future, even if it extended its license. Tr.2244:4-2245:7 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading, because it ignores other evidence establishing that while FCR was a goal at Point Beach, WE has operated with less than one FCR. Tr. 2186:16-22 (Porter).

158. Mr. Sieracki was told by various company personnel that WEPCO would be concerned if it was going to lose full core reserve over an extended period of time. Tr. 3923:3-8 (Sieracki). When Mr. Sieracki presented WEPCO personnel with a hypothetical world where the government is coming to pick up fuel in 1998 and the plant would have to infringe on full core reserve starting in 1996, WEPCO personnel indicated that the company would have found a means to maintain full core reserve. Tr. 3923:9-3924:5 (Sieracki). The specific personnel that took this position included Mr. Bud Fay, Mr. Bob Link, Mr. Jim Sach, Mr. Howard Shimon, Mr. Eric Miles, Mr. Paul Farron, Mr. Dave Weaver, and Mr. Gary Krieser. Tr. 3924:6-23 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading and incomplete because it ignores other evidence establishing that WE likely would have used a temporary rack in the cask laydown area to preserve FCR in the non-breach world. PFF 182-184; Tr. 3767:15-22 (Sieracki) ("The conclusion the group came back to us with was that they would not have operated for the time period they had identified without a full core reserve and that, to achieve the full core reserve, their conclusion was they could have achieved that through a temporary cask pit rack.").

## XII. WEPCO'S NEED FOR ADDITIONAL AT-REACTOR STORAGE

### A. WEPCO Needed To Bridge The Gap Before DOE Performed In 1998

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section XII.A.

**GENERAL OBJECTIONS TO SECTION XII.A (DFF 159-200)**

WE objects to the Government's use of the term "storage needs" and other references to the "need" for storage at Point Beach employed throughout these findings because the terms are vague and misleading.

Throughout Section XII.A (DFF 159-200), the Government has opted to ignore the testimony of Mr. Link, who was the Vice President of the Nuclear Power Department and the primary decision-maker at Point Beach when WE made the final decision to construct the ISFSI at Point Beach in 1995. PFF 121. Mr. Link testified that WE knew it could operate until at least the Fall of 1998 without additional storage, but that he decided to proceed with the dry fuel storage application because it was clear to WE that DOE was not going to be picking up fuel as required by 1998. PFF 111, 113, 115. Mr. Link flatly stated that if DOE had performed their obligations under the Standard Contract, WE would not have pursued dry storage. Tr. 427:12-17 (Link) ("Q: Sure. If DOE had performed, would Wisconsin Electric have avoided the need to construct dry storage? A: Yes, if DOE performed under their obligation of the contract, we would not have pursued dry storage."); PFF 158.

The Government instead relies extensively, and in many cases exclusively, on the trial testimony of Mr. Zabransky in an attempt to define Point Beach's "storage needs." Mr. Zabransky, however, was not a WE senior employee or decision-maker, and was not authorized to voice opinions on behalf of WE. Tr. 339:22-340:9 (Link); Tr. 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). Mr. Zabransky is not a nuclear engineer. Tr. 565:21-566:6 (Zabransky) (degree in civil, not nuclear, engineering). Mr. Zabransky's understanding of FCR was not direct, but instead was derivative from others in the Nuclear Power

Department. Tr. 770:16-24 (Zabransky). The Government has not presented any evidence that Mr. Zabransky took part in any strategic decision-making or contemporaneous evaluations of Point Beach's "storage needs." More importantly, Mr. Zabransky acknowledged that WE's spent fuel storage plans in 1992 did not assume that DOE would timely perform by 1998. Tr. 611:16-613:20; 616:18-620:20 (Zabransky). The Government's critical reliance on Mr. Zabransky as knowledgeable regarding everything going on at Point Beach is misplaced and unsubstantiated.

The Government's proposition in Section XII.A (DFF 159-200) that WE "needed" additional at-reactor storage before 1998 also is misleading and contrary to the evidence. Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage."); PFF 66, 159. The Government's proposed findings ignore that, had WE believed at any point that DOE would actually perform by January 31, 1998, WE could have operated into 1998 or beyond without additional storage. PFF 159, 161-162. Instead, the Government relies upon an errant assumption that WE would have taken exactly the same actions in the non-breach world that WE took in the actual world.

DOE's assumption, however, is wholly contradicted by the evidence. In the breach world, WE began to express concern as early as 1985 regarding DOE's lack of progress toward implementing a federal waste management system. PFF 68; Tr. 1278-1282 (Shimon); PX 81, p. CTR-042-1808 (noting that DOE was already missing scheduled dates in its performance of the Standard Contract). By December 1987, both DOE and WE understood that the MRS linkages imposed by Congress made it extremely unlikely that the MRS or any other facility would be available by 1998 to begin accepting spent fuel. PFF 75-77. DOE subsequently announced in its 1988 ACR that "under current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998." PX 149, p. 5 (including

Table 2.1); PFF 82. DOE made similar statements in its Draft 1988 Mission Plan Amendment. PX 150, pp. 18-19 (including Table 2-2) ("under current conditions, waste acceptance at a waste-management facility cannot begin in 1998"); PFF 81. WE understood DOE's representations to be a confirmation of WE's doubts that DOE would be able to meet the 1998 date. Tr. 1306:3-1308:14 (Shimon); PFF 83. Because of DOE's delayed performance, WE then began pursuing a dry storage facility. PFF 66, 88, 92-93, 104, 108-111, 113-115, 120-121, 159.

The Government also mistakenly relies upon WE's statements surrounding its November 1991 dry fuel storage application as support for its argument that WE needed to "bridge the gap" to 1998. WE used highly conservative assumptions in its dry fuel storage application to the PSCW to create a greater sense of urgency with the PSCW. Tr. 2185:11-22 (Porter) ("Q: In the application, did Wisconsin Electric make any assumptions? A: Wisconsin Electric made a number of assumptions in support of the application, and since we knew the, at that point, 1991, certainly, we knew that it wasn't going to be possible for the DOE to be able to begin taking the fuel in 1998, and so we made a number of conservative assumptions describing the need for the project, the alternatives for the project, all kinds of assumptions that are in there."); PFF 105. For example, in the ESR, WE justified its request for twelve casks based on the assumption that WE would maintain sufficient room in the pool for two full core offloads (i.e., 242 SNF assemblies) in addition to providing long-term SNF storage given the strong likelihood that DOE's performance would be substantially delayed. PFF 105a.

WE's November 1991 application and ESR, however, recognized that Point Beach could operate into 1998 and likely beyond without additional storage: "By combining alternatives which extend the capacity of the existing pool with the alternative of shipping spent fuel to a federal facility, it is possible that Wisconsin Electric could avoid the necessity of building the ISFSI." PFF 105b.

Further, the ESR recognized that DOE would not have a permanent repository until 2010 and that, under DOE's schedule, the earliest that DOE could have an operational MRS was 2007. PX 236 (ESR), p. 15; PFF 107. Once WE realized that DOE would be substantially delayed in accepting WE's spent fuel, there was little reason to delay Point Beach's pursuit of dry storage, and WE already expected that PSCW approval would take a long time. Tr. 1529:2-1531:3 (Krieser) ("So if you accept that there really was no reason to wait to construct the facility because we were going to need the facility under any circumstances at that point, and so . . . it really made no sense to wait until the eleventh hour and cause us to have to rush to implement the system and load casks and all that sort of thing."); PFF 106.

Additionally, WE built the ISFSI with the capability to load 48 casks, which would provide sufficient storage for Point Beach to operate through the end of its then-current licensed life. PFF 103. WE's decision to apply for only 12 casks (but an ISFSI sized to store 48 casks) in its November 1991 application was a result of consultations with the PSCW. *Id.* In fact, although the November 1991 dry fuel storage application called for the loading of 12 VSC-24 casks at Point Beach by 1998, WE had loaded only two VSC-24 casks prior to the Fall of 1998. PX 1029, p. KRGWE003846 (ISFSI Plan View).

Thus, to the extent Point Beach had any "storage needs," they were caused by DOE's lengthy delay in the performance of its obligations under the Standard Contract. PFF 121, 159, 161-162. *See also* PX 801, pp. KRGWE000182, 192-93, 202, 211-12 (WE's 1988-1991 Form 10-Ks).

### 1. <u>WEPCO Needed Additional At-Reactor Storage By 1998</u>

159. WEPCO understood that it was responsible for any at-reactor storage needs that it might have before January 31, 1998. Tr.754:5-757:9 (Zabransky); <u>see</u> <u>also</u> PX 225 at WISC 00023045.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

In addition, WE objects to this proposed finding because it is vague and not supported by the evidence. The Government relies primarily upon the testimony of Mr. Zabransky. Mr. Zabransky, however, was not involved in the formation of the Standard Contract. Tr. 571:6-15 (Zabransky). Further, he was not a WE senior employee or decision-maker, and was not authorized to voice opinions on behalf of WE. Tr. 339:22-340:9 (Link); Tr. 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). The record establishes that Mr. Zabransky did not have authority to bind WE under the Standard Contract. Tr. 579:23-580:22 (Zabransky); *see also* WE Response to DFF 119.

Additionally, PX 225 is neither a WE document nor drafted by a WE employee. PX 225 is a letter from the Vice President of another company (Nuclear Engineering Services) to a Vice President of Northeast Utilities regarding the economics of multipurpose canisters. Thus, the document does not reflect WE's understanding regarding the storage of spent fuel prior to 1998.

160. As early as June 1977, following its planned re-racking, WEPCO realized that it would need additional at-reactor storage before January 1998. DX 181.

**RESPONSE:**

WE objects to this proposed finding of fact as inaccurate and misleading. First, DX 181 was drafted long before Congress passed the NWPA. Second, the June 1977 memorandum was drafted prior to the second reracking that occurred at Point Beach and estimated a total storage capacity of only 1450 spaces. DX 181, p. 1. However, the reracking at Point Beach in 1980 actually provided far more space in the spent fuel pool than was predicted in this 1977 memorandum. PX 245, p. 2 (the storage racks installed in 1980 increased the spent fuel capacity of Point Beach from 351 to 1502 spent fuel assemblies). Third, the memorandum's estimates were based on estimated annual discharges of 72 spent

fuel assemblies. DX 181, p. 1. WE, however, shifted to annual discharges of 56 assemblies and considered even lower discharge refueling options. PFF 11, 110. *See also* Tr. 1492:4-1494:25 (Shimon).

Moreover, the evidence demonstrated that WE understood at the time the NWPA was passed that Point Beach could operate into 1998 or beyond, by taking any number of available steps to minimize Point Beach's generation of spent fuel or by maximizing its spent fuel pool capacity. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage.").

Finally, the only exhibit cited by the Government in support of this finding was drafted by Roger Newton. The Government listed Mr. Newton as a witness that it expected to call at trial. The Government, however, failed to call him as a witness and, thus, cites no testimony of Mr. Newton in support of the Government's characterization of this memorandum.

161. In a June 1977 memorandum, Roger Newton, Assistant to the Vice-President, explained to Sol Burstein, then Executive Vice-President and Chief Operating Officer, that, even if WEPCO re-racked its spent nuclear fuel pool and added 1450 spaces, it would still need additional at-reactor storage at Point Beach beginning the spring of 1996. DX 181.

**RESPONSE:**

WE objects to this proposed finding for the same reasons that, in its Response to DFF 160, WE objected to the Government's attempt to rely upon this 1977 memorandum.

162. Using the best available information at the time, Mr. Newton further explained in his memorandum that, if WEPCO was required to take back the spent fuel that it had shipped to West Valley and G.E. Morris, as it ultimately did, that WEPCO would need additional at-reactor storage as early as the fall of 1992. DX 181; Tr.1358:19-22 (Shimon).

**RESPONSE:**

WE objects to this proposed finding for the same reasons that, in its Response to DFF 160, WE objected to the Government's attempt to rely upon this 1977 memorandum.

WE further objects to this proposed finding because DX 181 in no way indicates that it is based on the best available information at the time. As noted, the Government never called Mr. Newton as a trial witness.

Moreover, the Government's attempt to rely upon Mr. Shimon's testimony ignores that Mr. Shimon testified that he could not speak to Mr. Newton's thoughts in preparing the memorandum or whether it was based on the best available information. He testified:

> Q: And this was based on Mr. Newton's best available information as of 1977, isn't that right?
>
> A: I don't really feel that I have any way of answering that. This is what he presented. What he stated is what he stated, but I don't feel that I can shed any light on what he really believed when he wrote this.
>
> Q: All right. Mr. Newton may be able to tell us directly what he believed in his testimony, which is coming up.

Tr. 1359:23-1360:8 (Shimon).

Further, as WE proved at trial, when Congress passed the NWPA and the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage.").

Finally, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

163. In a later memorandum, dated August 5, 1977, Mr. Newton informed Sol Burstein that the evaluation of the reracking proposals had been completed. Mr. Newton explained that "[t]he recommended vendor's design would provide for storage of 1488 assemblies and have sufficient capacity to store spent fuel through 1996." DX 182.

**RESPONSE:**

WE objects to this proposed finding for the reasons stated in its Response to DFF 160.

WE further objects to this proposed finding of fact as irrelevant because WE's reracking of the pool increased the storage capacity to greater than 1488 assemblies.

Further, the Government fails to cite any evidence or testimony to establish the purpose of the memorandum, its underlying assumptions, its intent, or to what extent Messrs. Newton or Burstein considered or used DX 182. For example, although WE was at that time discharging 72 assemblies per year, Point Beach later discharged 56 assemblies per year based on a 12-month cycle and later still went to 18-month cycles. PFF 11, 166. *See also* Tr. 1492:4-1494:25 (Shimon).

164. Norbert Pitterle, a technician in the Point Beach engineering office who monitored pool inventory, sent a memorandum to J.J.Zach, the plant manager of Point Beach, in March 1986, in which he explained that the then-maximum capacity of the Point Beach spent fuel pool was 1492 fuel assemblies, assuming the use of a special fuel handling tool and ignoring the inaccessible spaces. DX 184; Tr.1361:13-1362:24 (Shimon). Mr. Pitterle explained that the Point Beach spent fuel pool would run out of space in 6.5 to 10 years, depending upon whether Point Beach maintained two FCR, one FCR, or no core offload capability. DX 184. Nevertheless, in explaining when the spent fuel pool would run out of space, Mr. Pittlerle stated that:

> <u>All of these occur long before the DOE is pledged to start accepting spent fuel in 1998.</u> This information should be considered in determining the timing of alternatives such as reconstitution, dry storage, or another spent fuel pit.

<u>Id.</u> (emphasis added).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because it is irrelevant and unsupported by credible evidence. The Government failed to elicit testimony from any witnesses regarding Mr. Pitterle's underlying assumptions in DX 184, his purpose in drafting DX 184, or whether this document was considered by WE management. The Government's failure to call Mr. Pitterle as a witness neither permits the Government to self-servingly proffer its own interpretation of the document nor to assign to DX 184 a relevance not established by the evidence. Mr. Shimon, in fact, testified that he had never seen the document and that WE's agreement with the content of the memorandum cannot be implied. Tr. 1361:13-1363:11 (Shimon). Further, Mr. Pitterle was not responsible for making decisions regarding the quantity of assemblies discharged during a refueling process, the recovery of spaces in the spent fuel pool or the consideration of various measures to prolong the use of the wet pool, such as through the use of a temporary rack.

165. Howard Shimon, who in 1986 was the Manager of Nuclear Fuel and Administrative Services for WEPCO, testified that, if Point Beach were to maintain FCR, without ever encroaching on it, WEPCO would have been forced to shut-down in 1994 or 1995 without additional at reactor storage:

> Maintain it continuously, never encroach on it . . . . Probably sometime in the timeframe of 1994, 1995.

Tr.1368:14-24 (Shimon).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this proposed finding of fact because the Government mischaracterizes the transcript cite referenced in the proposed finding and inaccurately portrays Mr. Shimon's testimony. The cited portion of the transcript involves Government counsel simply reading from Mr. Shimon's deposition testimony. Government counsel did not ask Mr. Shimon any questions regarding his deposition testimony. The deposition testimony read by Government counsel is not admissible as evidence. ("deposition designations of any witness called to testify at trial will be disregarded"), Order, p. 29 (Dkt. 334, filed August 16, 2007).

In fact, Mr. Shimon testified at trial that he could *not* testify to a need for Point Beach to shut down in the 1994-1995 timeframe if Wisconsin Electric were to maintain one full core reserve and not encroach upon it. Tr. 1367:23-1368:3 (Shimon). Mr. Shimon further testified that he did not "know why Point Beach [would] shut down simply to maintain a full core reserve" and that a 1994-1995 timeframe was "not a number that [he] would come up with." Tr. 1367:15-1368:5 (Shimon).

Moreover, other deposition testimony read into the record by Mr. Shimon contradicts the Government's proposed finding and its mischaracterization of Mr. Shimon's testimony. Mr. Shimon read the following from his deposition testimony: "I would have said that we have enough spent fuel storage capacity to get us to the date when DOE would pick up our fuel if we were willing to temporarily . . . sacrifice the full core reserve." Tr. 1487:7-13 (Shimon).

166. WEPCO started discussing additional at-reactor storage in the late 1980s, beginning with a demonstration project in 1987. WEPCO had already reracked its SNF pool twice, and it did not consider a third rerack a viable option so it looked at other technologies, including dry fuel storage. Tr.972:5-973:13 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because it is vague and not supported by the evidence. WE agrees that it began considering and evaluating options for additional spent fuel storage around 1988 in response to WE's increasing conviction, and DOE's confirmation in 1988, that DOE would not be accepting spent fuel by 1998 and likely not until at least 2003. PFF 68-74, 81-85.

In addition, WE objects to the use of the term "rerack" to the extent that the Government is attempting to mislead the Court that a "rerack" encompasses the use of a temporary rack in the cask laydown area. *See* Tr. 4428:13-4429:6 (Singh) (distinguishing between a permanent storage rack and a temporary rack). The testimony of the DOE

contracting officer, Mr. Zabransky, on this point lacks credibility. Mr. Zabransky does not have a nuclear engineering degree and has never worked in a nuclear plant. Tr. 565:21-566:6; 711:7-18; 711:23-712:15 (Zabransky). In contrast, the former WE Director of Reactor Engineering, Mr. Hennessy, testified that one could add additional racks in other areas of the pool. Tr. 875:3-876:10; 890:12-892:8 (Hennessy); PFF 110. Dr. Krishna Singh, the preeminent expert in the spent nuclear fuel rack industry, opined that the strength of the Point Beach pool was sufficient to store a temporary rack with 121 spent fuel assemblies in the pool's cask laydown area. PFF 187-188, 191. Indeed, even the Government's expert, Warren Brewer, disagreed with Mr. Zabransky and stated that it was possible to install a 121-space temporary rack in the Point Beach cask laydown area.

> Q: Based on the studies to-date, isn't it your view that a temporary rack having 121 spaces most likely could be installed in the Point Beach pool?
>
> A: I think it's possible.

Tr. 5569:8-5570:10 (Brewer); PFF 187a.

Finally, the Government fails to cite any documents supporting Mr. Zabransky's position, including any evidence indicating that WE started discussing a demonstration project in 1987. In fact, WE's internal project authorization request for the spent fuel storage demonstration project was submitted in May 1988, not 1987. PX 145.

167. WEPCO was approached sometime in or around 1987 by Reading Associates and asked to participate in a cooperative research and development ("R&D") project with DOE, EPRI, and Reading Associates to develop storage technologies. DX 40; Tr.970:7-973:13 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this finding of fact because it is not supported by the evidence. The Government relies primarily upon the testimony of Mr. Zabransky. Mr. Zabransky, however, was not a WE senior employee or decision-maker, and was not authorized to voice opinions

on behalf of WE. Tr. 339:22-340:9 (Link); 1512:20-1513:8, 1513:22-1514:6, 1526:3-5 (Krieser). The record establishes that Mr. Zabransky did not have authority to bind WE. Tr. 579:23-580:22 (Zabransky); *see also* WE's Response to DFF 119.

WE further notes that Mr. Zabransky mistakenly identified the company that approached WE regarding the RD&D project as Reading Associates. The correct name of the company is Reedy & Associates. Tr. 1329:17-1330:15 (Shimon); DX 40, p. 1.

Additionally, the proposed finding inaccurately states that WE was approached by Reedy & Associates in or around 1987. Mr. Zabransky testified that he was "not exactly sure of the year, whether it was '87 or '88" when WE was approached by Reedy & Associates. Tr. 971:6-16 (Zabransky). WE's RD&D Project Authorization (DX 40) also establishes that WE's authorization request for the spent fuel storage demonstration project was submitted in May 1988, not 1987.

168. The goals of the R&D project included, among other things, providing "licensed dry fuel storage technology for implementation at Point Beach Nuclear Plant." DX 40 at WISC 00061016. In 1988, one of the considerations at WEPCO in participating in the R&D project was the need for additional at-reactor storage by approximately 1994. Id. at WISC 00061017 ("The spent fuel storage demonstration project will develop a technology that can provide storage of spent fuel at Point Beach Nuclear Plant from approximately 1994 through the delivery of spent fuel to the DOE geologic repository."); Tr.975:8-976:23 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this finding of fact because it is inaccurate. The Government incorrectly summarizes DX 40. WE's RD&D project proposal stated that "[t]he spent fuel storage demonstration will develop a technology that *can* provide storage of spent fuel at Point Beach Nuclear Plant from *approximately 1994 through the delivery of spent fuel to the DOE geologic repository*." DX 40, p. WISC00061017 (emphasis added). Thus, DX 40

states that the project could provide storage in approximately 1994, not that storage was needed at that time.

The Government further ignores the context in which the project proposal was developed, namely, it was premised on DOE not accepting fuel from Point Beach until at least 2003. PFF 81-83; DX 40, p. WISC00061023 ("At this time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003."). Once WE had made the determination that DOE's performance would be substantially delayed, it made sense to move forward on this project without further delay. There was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); PFF 106.

169. As of 1988, WEPCO needed storage for 504 assemblies (DX 40 at WISC 00061023), or 21 24-assembly casks. WEPCO ultimately applied, in its 1991 application to the PSCW, for authorization to store 288 fuel assemblies, or 12 24-assembly casks, based upon DOE performance starting in 1998. DX 171; PX 907B at 534-535 (WPS002 6484-6485) (1994 Link testimony before the PSCW affirming WEPCO's assumption that DOE would begin performance in 1998).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this proposed finding because the Government mischaracterizes DX 40. WE did not need storage for 504 assemblies as of 1988, and WE did not state in DX 40 that it believed Point Beach needed storage for 504 assemblies to operate into 1998. DX 40, p. WISC00061023.

WE further objects to this proposed finding because it is not based on the evidence. As of 1988, WE's belief was that DOE would not perform by 1998 and, instead, would be substantially delayed. PFF 81-85. Thus, WE's plans to provide for the storage of 504 assemblies was based on highly conservative assumptions and WE's expectation that DOE would not perform by 1998, and likely not even by 2003. DX 40, p. WISC00061023 ("The DOE schedule is optimistic and risky, as no backup sites are currently being pursued. At this

time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003. *When DOE begins to remove spent fuel from the Point Beach site, the currently proposed acceptance rate exceeds the rate of reactor discharge, so additional capacity will not be required.*") (emphasis added). In fact, in 1988, WE was planning to provide storage for the life of the Point Beach reactor licenses. DX 40, p. WISC00061023 ("[b]egin the process of providing additional onsite storage capacity . . . with the potential life of reactor storage capacity").

Further, WE's 1991 application to the PSCW was based on DOE *not* performing by 1998. PFF 104, 107-108. WE's 1991 application reflected WE's knowledge that Point Beach had sufficient capacity to operate at least into 1998 and, if necessary, into 1999 without additional spent fuel storage. PX 236 (ESR), p. 39; PFF 159-163. WE's application for dry storage was a result of DOE's expected breach of its obligations under the Standard Contract and WE's determination that a dry storage project was the most cost-effective method for mitigating DOE's damages. PFF 81-85, 87-88, 104.

Further contradicting the Government's proposed finding is that, in the actual breach world, WE had only loaded 120 assemblies into additional storage at Point Beach through April 1999. PX 796, p. 16 (ISFSI Plan View). That number of assemblies could have been accommodated by a temporary rack if it became necessary to offload a full core. PFF 11, 158, 178-179, 181-187.

Finally, WE's ultimate decision to seek only 12 casks in its 1991 dry storage application was a result of consultations with the PSCW. PFF 103. WE originally intended to apply for 48 casks and an ISFSI capable of storing 48 casks because that would provide sufficient SNF storage for Point Beach until the end of the reactors' then-current licenses. *Id.* However, in an effort to accommodate the PSCW, WE eventually applied for an ISFSI capable of storing 48 casks, but only asked for authority to load 12 casks in its November 1991 application to the PSCW. *Id.*; Tr. 2177:3-2178:10, 2181:1-2182:19 (Porter);

Tr. 1154:3-1155:22 (Zabransky) (WE initially wanted authority for the full 48 casks, but after consultations with the PSCW, decided to pursue only the Independent Spent Fuel Storage Installation ("ISFSI") and the initial 12 casks).

170. In 1988, WEPCO planned to have dry storage or an ISFSI available at Point Beach by 1994 "to allow for the orderly start-up of the interim storage facility and efficient spent fuel management activities. Up to five years may be required to design, license, and implement such additional storage capacity." DX 40 at WISC 00061023; Tr.978:5-16 (Zabransky); Tr.985:20-25 (Zabransky) ("the basis was still on the knowledge that we had received from our contacts at Virginia Power and Duke Power that it was a good five-year project . . . from start to loading to do dry storage").

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because it is misleading. WE did not require spent fuel storage in 1994 because there were steps that WE could take that would enable Point Beach to operate into 1998 or beyond. PFF 78, 80, 111, 113-114, 158-159, 161-163, 173, 182. Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

In addition, the Government ignores the context in which the project proposal was developed, namely, it was premised on DOE not accepting fuel from Point Beach until at least 2003. PFF 81-83; DX 40, p. WISC00061023. Once WE had made the determination that DOE's performance would be substantially delayed, it made sense to move forward on this project and not wait until 1998. There was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); PFF 106.

Finally, even though WE understood, as of December 1987, that the MRS constraints imposed by Congress made it extremely unlikely that the MRS or any other DOE facility would be available by 1998 to begin accepting spent fuel, WE did not make a final decision

to implement dry storage until after the PSCW approved the project in February 1995. PFF 76-77, 81-83, 115-117, 121.

171. David Zabransky, the project manager and administrator for the dry fuel storage project, made the presentation to senior management at the major project review committee to gain approval of the ISFSI project in 1989. Tr.980:19-984:7 (Zabransky); DX 41. Messrs. Shimon,[9] Baumann, Farron, Link, and Hennessy were not involved in the presentation of the dry fuel storage project to the major project review committee. Tr.980:19-984:7 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because the evidence contradicts it. Mr. Shimon is listed as the ISFSI project coordinator and his signature appears in the approval section on the ISFSI project requisition summary. DX 41, p. 1. Given that Mr. Shimon was involved in preparation of the documentation presented to the Major Projects Review Committee, it is inaccurate to state that he was not involved in the presentation. Indeed, the testimony cited as support for this proposed finding expressly states that Mr. Shimon was involved in the development of the presentation of the dry fuel storage project. Tr. 982:14-19 (Zabransky).

The Government's Footnote 9 also is inaccurate. The Government again inaccurately portrays Mr. Shimon's testimony and mischaracterizes the transcript cite referenced in Footnote 9. The cited portion of the transcript reflects Government counsel reading Mr. Shimon's deposition testimony out of context. Government counsel did not ask Mr. Shimon any questions regarding his deposition testimony. The deposition testimony read by Government counsel is not admissible as evidence. Order, p. 29 ("deposition designations of any witness called to testify at trial will be disregarded"), Dkt. 334 (Aug. 16, 2007).

---

[9] In fact, Mr. Shimon was asked why WEPCO was planning to have an ISFSI operational by 1994, and he testified that *he did not have direct knowledge of that.* Tr. 1481:1-9 (Shimon).

Mr. Shimon's actual testimony at trial, in response to why WE was planning to have an operational ISFSI by 1994, was that WE "had long ago decided DOE was not coming, [so] there was no incentive to wait until 1998, and we felt that 1994 was a good date to aim for, for the ISFSI." Tr. 1477:14-1478:1 (Shimon).

WE further objects to this proposed finding as irrelevant. Mr. Zabransky was not a WE senior employee or decision-maker, and was not authorized to voice opinions on behalf of WE. Tr. 339:22-340:9 (Link); 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). The record establishes that Mr. Zabransky did not have authority to bind WE. Tr. 579:23-580:22 (Zabransky); *see also* WE's Response to DFF 119. Instead, it was Mr. Link, Vice President of the Nuclear Department, who made the final decision to implement dry storage in February 1995 after the PSCW approved the project. PFF 121.

172. Mr. Fay sent a Work Order Requisition to senior management, Messrs. Britt and McNeer, on May 3, 1989, requesting authorization for a work order that would capture all the costs for the design, licensing, construction, and operation of dry fuel storage at Point Beach. DX 15; Tr.998:22-999:20 (Zabransky). In the request, Mr. Fay stated that: "Additional spent fuel storage capacity will be required at Point Beach Nuclear Plant in 1994 to allow for continued operation. . . . It is not possible to provide additional storage by re-racking the spent fuel pool (this has been done twice previously)." DX 15 at WISC 0000045; Tr.991:12-992:24 (Zabransky). A major rationale for the ISFSI project was WEPCO's desire to maintain FCR. Tr.1000:24-1001:10 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding as misleading because it ignores the context in which the project proposal was developed, namely, it was premised on DOE not accepting fuel from Point Beach until at least 2003. PFF 81-85; DX 15, p. 1

> (While the company has a contract with [DOE] for the removal and disposal of [spent fuel], we are not certain when this service will be provided. DOE has announced a schedule that calls for the operation of a repository in 2003. . . . Rod consolidation . . . will not provide sufficient additional capacity to allow storage through 2003. A separate ISFSI . . . will have

> the ability to provide additional storage capacity for spent fuel generated through the end of the existing operating license, in the event such storage proves necessary.).

Thus, the Work Order Requisition was based on a lengthy DOE period of nonperformance.

WE began to pursue the dry storage project as a flexible long-term solution to DOE's failure to timely perform. PFF 87-90, 92. Once WE had made the determination that DOE's performance would be substantially delayed, it made sense to move forward on this project and not wait until 1998. Tr. 1529:2-1531:3 (Krieser) ("recognizing that DOE was not going to be performing by 1998 and for a considerable time after that . . . it really made no sense whatsoever to wait, for example, until we had lost full core reserve, or it really made no sense to wait until the eleventh hour"); Tr. 1491:9-13 (Shimon) ("the date on which we made the facility operational was no longer relevant because there was no point in trying to get to 1998 since DOE was not coming"); PFF 106.

This proposed finding is further contradicted by WE's statements in its 1989 10-K that DOE would not be able to accept utility spent fuel for disposal before 2010 and that WE was "reviewing the options, including advanced technologies for on-site storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal." PX 801, pp. KRGWE000192-93 (Kenrich Binder J: Historical Financial Information); PFF 92.

This proposed finding also ignores that Mr. Hennessy and others established beyond question that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9. There was no reason for WE to operate into 1998 or beyond without dry fuel storage because WE did not expect DOE to begin performance by 1988. PFF 81-85, 87-88, 90, 92.

173. As part of its evaluation of the ISFSI, WEPCO considered other potential options for increasing its SNF storage capacity, including the possibility of re-racking its SNF pool again. However, WEPCO determined, in 1989, that it could not re-rack its SNF pool

again because the company did not want to re-open the structural analysis conducted by Bechtel Power Company when WEPCO had re-racked the SNF pool in 1979. Tr.992:25-998:21 (Zabransky). While WEPCO determined that the structure of the SNF pool was safe, WEPCO was concerned that, in the event that the SNF pool was re-racked, during the licensing phase of the re-racking, the NRC might decide to re-open the issue of structural capacity. WEPCO management decided that the possibility of re-opening the structural analysis would be very expensive and could be problematic. Thus, WEPCO decided that re-racking the SNF pool was not an option. Id.; see also DX 130 at WISC 00000925-926 (providing documents and information to CUB regarding WEPCO conclusion that its SNF pool was nearing its structural capacity).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to the use of the term "rerack" to the extent that the Government is attempting to mislead the Court that a "rerack" encompasses the use of a temporary rack in the cask laydown area. *See* Tr. 4428:13-4429:6 (Singh) (distinguishing between a permanent storage rack and a temporary rack).

The former WE Director of Reactor Engineering, Mr. Hennessy, testified that one could add additional racks in other areas of the pool. Tr. 875:3-876:10; 890:12-892:8 (Hennessy); PFF 110. Dr. Singh, the preeminent expert in the spent nuclear fuel rack industry, opined that the strength of the Point Beach pool was sufficient to store a temporary rack with 121 spent fuel assemblies in the pool's cask laydown area. PFF 187-188, 191. The Government's expert disagreed with Mr. Zabransky and stated that it was possible to install a 121-space temporary rack in the Point Beach cask laydown area. Tr. 5569:8-5570:10 (Brewer); PFF 187a.

Additionally, the testimony of the DOE contracting officer, Mr. Zabransky, who is not a nuclear engineer and never worked in a nuclear plant, lacks credibility. Tr. 565:21-566:6; 711:7-18; 711:23-712:15 (Zabransky). Mr. Zabransky was not a WE senior official or decision-maker. Tr. 569:13-15 (Zabransky); Tr. 339:22-340:9 (Link); 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). Further, Mr. Zabransky's understanding is not attributable to WE, as recognized by the Court. Tr. 993:16-994:24 (Court) (allowing

Mr. Zabransky's testimony only for the purposes of showing his understanding, not for the truth of the matter).

WE decided that reracking the spent fuel pool was not the preferred option. WE preferred a dry fuel storage facility because DOE was expected to be significantly delayed in its performance obligations under the Standard Contract. After a thorough analysis of the options for responding to DOE's breach, WE determined that a modular dry fuel storage facility most economically allowed for storage of Point Beach's discharges through the end of the reactors' then-licensed operating lives. PFF 87, 110-111, 115.

174. In addition to re-racking, WEPCO also considered rod consolidation, construction of a new SNF pool, and early shut-down of Point Beach. DX 15 at WISC 00000459-460; Tr.999:21-1000:23 (Zabransky). WEPCO only considered those alternatives in 1988-1989, when it decided that a modular ISFSI was the best option for additional at-reactor storage. Id. WEPCO planned, as of May 1989, to begin operation of the ISFSI in 1994, and to continue its use as long as necessary. DX 15 at WISC 00000458; Tr, 1001:11-1002:2 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this proposed finding because it is not supported by the evidence. The Government's assertion that WE only considered spent fuel storage alternatives in 1988-1989 is plainly contradicted by the evidence. PFF 109-111; PX 236. Although the Government cites Mr. Zabransky as support for this contention, Mr. Zabransky actually testified that between 1990 and 1994, WE was considering spent fuel storage options and responding to PSCW questions regarding those options. Further, when Mr. Link became Vice President of WE's Nuclear Department in May 1992, he asked his team to assess alternative spent fuel management options. Tr. 331:10-338:4; 515:14-519:6 (Link); Tr. 1521:12-1524:20 (Krieser).

The Government's associated assertion that WE made a decision in the late 1980s and never reconsidered that decision or reevaluated the likelihood of DOE's performance is

similarly contradicted by the evidence. WE had not yet made a final decision to construct dry storage as of the end of 1992. Tr. 358:24-359:7 (Link). WE continued to monitor the likelihood of DOE's performance even after Mr. Link and his team had completed their assessment of the spent fuel management alternatives. Tr. 338:5-18 (Link). WE did not even have approval to proceed with the dry storage project until the PSCW approved the project in February 1995. It was not until after that approval that Mr. Link made a final decision to implement the dry storage project. PFF 110-111, 121.

175. The dry fuel storage project was approved by WEPCO's major project review committee on or about May 23, 1989. DX 365 at 1 (KRGWE002225); Tr.1002:3-1003:10 (Zabransky).

**RESPONSE:**

WE objects to any assertion that the Major Project Review Committee's approval of the dry storage project committed WE to its implementation. Although WE did not believe that DOE was going to begin picking up spent fuel from Point Beach by 1998, WE had not yet made a final decision to construct dry storage. Tr. 358:24-359:7 (Link); PFF 116. WE did not even have authority to proceed with the dry storage project until the PSCW approved the project in February 1995. PX 374. It was not until after the PSCW's approval that WE made a final decision to implement the dry storage project. PFF 110-111, 121.

176. In the requisition order, dated May 3, 1989, Mr. Zabransky, who drafted the work order for Mr. Fay's signature, included a request for a modular ISFSI sized to hold approximately 48 VSC-24 casks. DX 365 at 2. Mr. Zabransky explained that 48 casks were presumed in 1989 to be sufficient to store all fuel that would be discharged from Point Beach while maintaining FCR. Because WEPCO had already reracked its SNF pool twice, reracking was not considered a viable option. Tr.1003:23-1004:14 (Zabransky). Furthermore, Mr. Zabransky determined, from a cost perspective, that sizing the ISFSI for 48 casks would not be any more costly than sizing it for 12 casks. Tr.1004:15-1006:2 (Zabransky); see also DX 132 at WISC 00011072; Tr.1124:23-1126:12 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to the characterization in this finding that Mr. Zabransky was the WE person responsible for determining the size of the ISFSI. Mr. Zabransky relied on Point Beach's Reactor Engineering Group and other plant personnel for information regarding the spent fuel pool and its contents. Tr. 647:22-24 (Zabransky). Mr. Zabransky also was never a WE officer or decision-maker. Tr. 339:22-340:9 (Link); Tr. 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser).

WE also objects to inaccuracies in the proposed finding. Specifically, WE's work order requisition included a request to size the ISFSI for 45 casks, not 48 casks as the Government alleges. PX 170, p. 2 ("approximately 45 casks will be required"). This finding also ignores that WE was considering the construction of an ISFSI sized for 45 casks because it expected DOE to be significantly delayed in its performance under the Standard Contract and WE wanted to provide sufficient space to allow Point Beach to operate until the end of its then-current operating licenses. PX 170, p. 2; PFF 87-88.

177. After WEPCO decided to implement dry fuel storage at Point Beach, WEPCO received a request from Maine Yankee Atomic Power Company, in September, 1990, to store Maine Yankee's spent fuel in the Point Beach SNF pool. DX 18. Mr. Fay explained that WEPCO could not provide any space for Maine Yankee's spent fuel because Point Beach was running out of room in its SNF pool for its own SNF:

> At our present usage rate, full core reserve in our spent fuel pool will no longer be available after 1995. Accordingly, we are proceeding with the development of an independent spent fuel storage installation (ISFSI) to supplement the storage capacity of our spent fuel pool and expect to have this facility operational by 1994.

Id.; Tr.1007:9-1010:13 (Zabransky); see also DX 442 at HQR 364 0032 (March 1986 RW-859 states at section 3.22 that WEPCO loses its ability to operate the Point Beach reactor in September 1996); DX 444 at HQR 364 0063 (February 1987 RW-859 states at section 3.22 that WEPCO loses the ability to operate the Point Beach reactor in September 1996); DX 445 at HQR 364 0072 (February 1988 RW-659 states that WEPCO loses the ability to operate the Point Beach reactor in April 1997).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this proposed finding of fact because it is inaccurate. WE did not finally decide to implement dry fuel storage at Point Beach until February 1995 when it received PSCW approval for this project. PFF 110-111, 121.

WE further objects to this proposed finding because the Government ascribes a significance to this letter that is unwarranted. The WE letter does not state the assumptions underlying the statement that Point Beach would lose FCR after 1995. For example, the letter does not state how many spaces are available for the storage of spent fuel. At the time of this letter in 1990, WE had not yet procured the offset handling tool that made available substantial spaces in the wet pool that were previously unavailable. PX 1029, p. KRGWE003854 (noting at Footnote 5 that WE acquired the offset handling tool in 1993). In addition, at this time, spaces were filled with trash and other objects that could easily have been removed from the pool, thereby making them available for the storage of spent fuel. PX 321; PFF 169-172. *See also* PX 242 (1992 RW-859), p. II.B.2-1 (noting that there were not any spaces that would never be used for spent nuclear fuel and a then-current capacity of 1415 slots, leaving 87 then-unavailable but recoverable spaces).

WE also notes that any discussion of when Point Beach expected to run out of FCR in the spent fuel pool as of 1990 is irrelevant to what might have happened in the non-breach world. In 1990, WE was operating in the actual, breach world created by DOE's representations in 1988 that it would not have a facility capable of accepting spent fuel from utilities by 1998. PFF 81-85. WE knew that it could operate into 1998 or beyond without additional storage. PFF 113-114. WE's decision to pursue additional at-reactor storage was predicated on DOE's expected failure to perform by 1998. PFF 83-85, 121.

Moreover, with regard to the referenced RW-859s, the Government provides no explanation of the assumptions underlying statements in those documents and ignores that the question to which WE responded *assumed* DOE nonperformance. PX 114, p. HQR364 0063. It further ignores that later RW-859s, including one signed by Mr. Zabransky, stated that WE

could operate into 1998 without dry storage. PX 242, p. III.A-1 (1991 RW-859 states: "Without a full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998."); PX 280, p. III.A-1 (1992 RW-859 states: "Without full core reserve, Unit 1 could operate though Apr. 1998; Unit 2 Sept. 1998."); PX 328, p. II.B.2-1 (1993 RW-859 states that Point Beach could operate until September 1998 absent spent fuel pickup by DOE).

Finally, as WE proved at trial, when Congress passed the NWPA and the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage."). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

178. Mr. Link signed an RW-859 on February 5, 1993. DX 274 (Unit 1) at I-.1. That RW-859 reported to DOE that, assuming maintenance of FCR, WEPCO would be forced to shut-down Unit 1 by April 1996. Id. at II.B.2-1; Tr.503:25-507:4 (Link).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to the Government's reference to testimony of Mr. Link in support of its proposed finding. In the cited testimony, Mr. Link did not agree that the RW-859 said that Unit 1 would be forced to shut down in April 1996, even assuming maintenance of FCR. Tr. 503:25-507:4 (Link).

WE also objects to other inaccuracies in this proposed finding. The page of the February 5, 1993 RW-859 cited by the Government states that WE estimated that it would be unable to continue reactor operation as of April 1996 only if it maintained 121 slots for

operational flexibility *and* because of the Government's failure to pick up Point Beach's spent fuel. DX 274, p. II.B.2-1. The same page further states that this estimation assumes that 87 spaces in the Point Beach spent fuel pool remained inaccessible. *Id.* However, WE knew that it easily could have made those spaces available if it had believed DOE was going to perform by 1998. PX 276; PFF 160, 168-172. *See also* PFF 105a.

Notably, the February 5, 1993 RW-859 also states that, even assuming 87 unavailable spaces, "[w]ithout full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998." DX 274, p. III.A-1.

WE further notes that any discussion of when Point Beach expected to run out of FCR in the spent fuel pool as of 1993 is irrelevant to what might have happened in the non-breach world. As of this time, WE was operating in the actual, breach world created by DOE's statements in 1988 that it would not have a facility capable of accepting spent fuel from utilities by 1998. PFF 81-82. Although WE knew that it could operate into 1998 or beyond without additional storage, WE decided to pursue additional at-reactor storage because of DOE's failure to perform by 1998. PFF 83-85, 113-114, 121.

179. WEPCO continued to work toward a 1994 operational date for its ISFSI through 1990 and 1991. Tr.1010:6-10 (Zabransky); see also DX 137 (April 4, 1991, memorandum from Mr. Zabransky to G.J.Maxfield, Point Beach plant manager); DX 129 (Sept. 5, 1991, memorandum from Mr. Zabransky to S.L.Parker, supervisor in regulatory affairs); DX 19 (Oct. 14, 1991, memorandum from Mr. Zabransky to M.E. Schindhelm, a WEPCO accountant). As of October 1991, WEPCO was planning on loading 12 casks by June 1998. Id. at WISC 00009878; Tr.1012:7-1014:21 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because it is contrary to the evidence. WE did not finally decide to implement dry fuel storage at Point Beach until 1995. PFF 110-111, 121. WE was pursuing approval by the PSCW of the dry storage project because of the substantial delay in DOE's performance under the Standard Contract. PFF 81-

85, 87-88. Once WE made the determination in 1988 that DOE would not be performing by 1998, it made sense in the breach world to pursue approval for the dry storage project. There was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); PFF 106.

180. WEPCO submitted its application to the PSCW for authorization to construct and place into service an ISFSI on November 15, 1991. DX 171. Mr. Zabransky, the project manager, provided technical input for the application to Steven Parker, the supervisor of regulatory affairs at the time. Tr.1021:10-1022:4 (Zabransky). Mr. Zabransky was the primary drafter of the Environmental Screening Report ("ESR") attached to the application. DX 171 at WISC 00014734-825; Tr.1023:10-24 (Zabransky).[10]

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to the statement that Mr. Zabransky was the exclusive provider of technical input to Steve Parker. Mr. Zabransky relied upon the Reactor Engineering Department for information regarding the spent fuel storage pool and its contents. Tr. 647:22-24 (Zabransky). Mr. Zabransky also is not a nuclear engineer and has never worked in a nuclear plant. Tr. 565:21-566:6; 711:7-18; 711:23-712:15 (Zabransky).

WE also objects to Footnote 10 of the proposed finding because it is inaccurate. Nowhere in Mr. Zabransky's cited testimony does he state that Mr. Conry did not provide him with assistance in preparing the ESR. Further, Mr. Conry's cited testimony does not discuss the ESR, but indicates that Mr. Conry and Mr. Zabransky collaborated on their responses to the PSCW regarding the dry fuel storage and Steam Generator projects. Tr. 2829:4-24 (Conry).

181. The PSCW application, assuming DOE performance in 1998, stated that additional at-reactor storage was needed at Point Beach, assuming maintenance of one FCR,

[10] Mr. Baumann provided radiological calculations to Mr. Zabransky for the ESR. Tr. 1023:16-24 (Zabransky). Mr. Zabransky testified that he received no assistance from Messrs. Shimon, Link, Hennessy, Krieser, Farron, or Conry in preparing the ESR. Tr. 1023:25-1024:10 (Zabransky); *see also* Tr. 460:18-461:6 (Link); Tr. 2615:22-2616:6, 2620:23-2623:11 (Farron); Tr. 2829:4-24 (Conry).

and it established an operational date for the ISFSI of 1994. PX 171 at WISC 00014727-28. The project requested authorization for loading 12 VSC-24 casks over the period 1994 through 1998. Id. at WISC 00014728.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding as misleading. WE's November 15, 1991 application to the PSCW did not assume that DOE would begin accepting spent fuel from Point Beach by 1998. PX 236 (ESR), p. 53 ("Given current DOE schedules, the earliest an MRS could be operational is 2007."); PFF 107. As of 1988, WE was operating in the actual breach world based upon DOE's statements in 1988 that it would not be accepting spent fuel from utilities by 1998. PFF 81-85, 88. WE, in fact, submitted the November 15, 1991 application to the PSCW *because* WE did not believe that DOE would perform by 1998. PX 801, pp. KRGWE00211-12; PFF 104.

Further, the 1991 application was premised on highly conservative assumptions that were designed to prompt quick action by the PSCW. PFF 105. For example, the ESR's justification for the loading of 12 casks by 1998 was that it would allow Point Beach to maintain sufficient room in the pool for two full core offloads despite WE never having a goal or policy of maintaining two FCR. PX 236 (ESR), p. 15 ("[T]o provide additional operational flexibility, [WE] will maintain 2 full core reserves . . . once the ISFSI is operational."); Tr. 347:5-15 (Link) (it was not a policy or a goal to maintain two full core reserves at Point Beach). The ESR also assumed that WE would not recover 17 spaces in the Point Beach spent fuel pool that were filled with debris and 20 additional spaces that "may be inaccessible." PX 236 (ESR), pp. 15, 50; PFF 105a. However, WE knew that it easily could have made those spaces available if it had believed DOE was going to perform by 1998. PX 276; PFF 160, 168-172. *See also* PFF 105a.

As WE proved at trial, when Congress passed the NWPA and the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-

reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

The PSCW also knew that Point Beach could operate at least into 1998 and, if necessary, into 1999 without dry storage. PFF 114.

Finally, WE notes that the proposed finding of fact refers to DX 171, not PX 171.

182. In addition to the three major alternatives considered by WEPCO – rod consolidation, re-racking the SNF pool, and construction of a new SNF pool – there were a number of other alternatives to the ISFSI discussed in the ESR. DX 171 at WISC 00014729. For example, WEPCO considered, among other options, reduced operation of Point Beach plant, increased in-pool spent fuel storage, and use of higher burn-up fuel. Id. at WISC 00014784-85; Tr.1028:11-1046:8 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact to the extent it attempts to characterize any particular spent fuel management alternative as a "major" alternative. WE agrees that it considered a number of spent fuel management alternatives because of DOE's expected failure to begin accepting spent fuel by 1998. PFF 81-85; DX 40, p. WISC00061023 ("At this time Wisconsin Electric should plan on providing sufficient capacity for the interim storage of spent fuel through at least 2003.").

This proposed finding ignores WE's statements in its 1989 10-K that DOE would not be able to accept utility spent fuel for disposal before 2010 and that WE was "reviewing the options, including advanced technologies for on-site storage, for the storage of spent fuel generated at Point Beach after 1995 until the DOE accepts deliveries of spent fuel for disposal." PX 801, pp. KRGWE000192-93 (Kenrich Binder J: Historical Financial Information); PFF 92.

183. WEPCO determined that the option of reducing operations at Point Beach was too costly. DX 171 at WISC 00014789; Tr. 1030:18-1032:9 (Zabransky). WEPCO concluded that operation at reduced power is fundamentally impractical because the majority of costs are fixed and will not decrease with reduced power production and also because power not produced by Point Beach will have to be replaced with more costly resources. Tr.483:22-485:4 (Link). In evaluating increased in-pool spent fuel storage, WEPCO evaluated adding an addition to the pool, building a new pool, reracking the pool, adding two-tiered racks, and rod consolidation. WEPCO determined that none of these options was desirable. DX 171 at WISC 00014792-97; Tr.1037:12-1039:12 (Zabransky); DX 463 at WISC 00010271. WEPCO also evaluated the possibility of achieving higher burn-ups using less than 28 fuel assemblies, but WEPCO determined that achieving higher burn-ups would be too costly.[11] Tr.1045: 3-1046:8 (Zabransky). Later, evaluation of this option concluded it to be impossible considering operational safety issues and the existing spent fuel storage rack limits. DX 26 at WISC 00003651.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding because it is irrelevant and not supported by the evidence. The proposed finding relies upon Mr. Zabransky, but he was not involved in WE's decision-making regarding spent fuel management alternatives at Point Beach. Tr. 339:20-340:9 (Link). Mr. Zabransky's role was the administration and implementation of the decisions of senior personnel such as Mr. Link. Tr. 1221:12-23 (Shimon); Tr. 339:22-340:9 (Link); 1512:20-1513:8; 1513:22-1514:6; 1526:3-5 (Krieser). Therefore, Mr. Zabransky's testimony stating his "beliefs" regarding WE's decisions is irrelevant.

This proposed finding also ignores that WE and the PSCW knew that Point Beach could operate into 1998 or beyond without additional storage. PFF 113-114. WE's decision to pursue additional at-reactor storage was predicated on DOE's expected substantial delay in performance. PFF 83-85, 121.

[11] WEPCO received, through a contract with Westinghouse, more sophisticated equipment that was used in the 1991-1992 time frame to continue to evaluate the issue of using higher burn-ups and higher enrichments. Tr. 1046:9-1048:4 (Zabransky). In October 1993, a WEPCO team tried and failed to reduce reloads at Point Beach from 28 to 24. PX 313. Tr. 1048:8-1051:21. Thus, as of the fall of 1993, WEPCO had not been able to achieve higher enrichments or higher burn-ups. *Id.*

WE also objects to Footnote 11 in this proposed finding because the evidence does not show that, as of the fall of 1993, WE had been unable to achieve higher enrichments or higher burn-ups. Mr. Zabransky's testimony on this issue is highly suspect. He is not a nuclear engineer, never worked at the Point Beach Nuclear Plant and never worked in the Point Beach Reactor Engineering group. Tr. 565:21-566:6; 647:22-24; 711:7-18; 711:23-712:15 (Zabransky).

PX 313, cited in Footnote 11 of the proposed finding, simply recognizes the value to Point Beach of switching to 24 assembly reloads to minimize the production of high-level waste. The October 1993 memorandum does not support the Government's assertion that WE had been unable to achieve higher enrichments or burn-ups. Further, the Government ignores the testimony from Messrs. Baumann and Hennessy that WE could have extended the life of the Point Beach spent fuel pool by reducing annual spent fuel discharges through modification of the core and fuel design. Tr. 278:4-285:13 (Baumann); Tr. 873:21-875:1; 875:11-881:9 (Hennessy). In 1993, WE knew that DOE would not begin performing by 1998 and, therefore, plans to obtain approval of its dry fuel storage application were underway. PFF 81-85, 111, 115. If WE had believed DOE would begin performance by 1998, WE could have employed a variety of fuel management methods to minimize discharges into the spent fuel pool. PFF 161. The earlier that Point Beach employed such methods, the greater the reduction in Point Beach's spent fuel inventories. *Id.*

WE analyzed a number of long-term spent fuel management alternatives in the dry fuel storage application's ESR, but these analyses were prompted by DOE's expected failure to begin accepting spent fuel by 1998. PX 236 (ESR), pp. 38-39 (analyzing spent fuel management alternatives), p. 53 ("Given current DOE schedules, the earliest an MRS could be operational is 2007."); PFF 110. After an analysis of the options for mitigating DOE's breach, WE determined that a dry fuel storage facility most economically allowed for storage

of Point Beach's discharges through the end of the then-licensed reactor lives. PFF 87, 110-111, 115.

184. Mr. Zabransky demonstrated that, using the assumptions included by WEPCO in its 1991 application to the PSCW, WEPCO would lose FCR in 1995, and would not be able to operate after the fall 1997 outage. DDX 1-9; Tr.1062:10-1-69:23 (Zabransky).[12]

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this finding of fact because the vast majority of the evidence contradicts it. WE provided substantial testimony and evidence demonstrating that WE knew, at the time it executed the Standard Contract, in the late 1980s, at the time it submitted its dry storage project application to the PSCW in November 1991, and at the time it made its final decision to implement dry storage in February 1995, that Point Beach could operate into 1998 or beyond without additional storage. PFF 66, 105b, 111, 113, 159-163; Tr. 2813:25-2814:18 (Conry) (it was the general understanding of the Nuclear Power Department that Point Beach could operate into 1998 without dry storage); Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage."). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

[12] WEPCO's PSCW application contains two sets of assumptions regarding the number of spent fuel spaces available. On page 15 of the application, WEPCO notes that 1126 storage locations were filled with spent fuel or high-level waste components. On page 50 (WISC 00014796), WEPCO notes that there are 1109 spaces filled with spent fuel. Mr. Zabransky testified that, in its application, WEPCO used the 1126 number because that included the total inventory in the pool and the plan *at the time* was to leave the high-level waste in the pool so that those storage locations were filled. Tr. 1069:5-1079:11 (Zabransky).

Even Mr. Zabransky admitted that WE indicated to the PSCW that Point Beach could operate into 1998 without dry storage. Tr. 1164:16-1165:14 (Zabransky). The PSCW and Wisconsin courts also recognized that Point Beach could operate into 1998 without additional storage. PFF 114, 165.

WE also objects to Footnote 12 of the proposed finding because it is inaccurate and misleading. First, WE's 1991 dry storage application and ESR do not contain two different sets of assumptions, as the Government asserts. There were 1109 spaces filled with spent fuel and 17 additional spaces contained debris. PX 236 (ESR), pp. 15, 50.

Second, at the time of WE's dry storage application to the PSCW in 1991, WE was operating in the actual, breach world in which DOE was going to be substantially delayed in accepting spent fuel from Point Beach. PFF 81-85, 87. Even if WE did not intend to recover 17 spaces in the spent fuel pool filled with debris in 1991, it is only because WE knew DOE's anticipated breach required WE to implement a long-term storage solution. PFF 87, 105a. Therefore, there was no need to recover spaces at that time. PFF 171. The recovery of 17 spaces would not by itself allow Point Beach to continue operating until at least 2003, and WE expected that DOE's delay would likely substantially exceed that date. PFF 107, 111. However, WE easily could have recovered those 17 spaces at any time, and did, in fact, remove that debris prior to 1998. PFF 105a, 169-172.

185. In a video developed for public outreach and stockholder meetings as part of its public relations effort regarding the ISFSI project, WEPCO explained that "the spent fuel pool at Point Beach will be full by mid-1995." DX 146; Tr.785:2-5 (transcription of video); see PX 250 (proposal to increase public relations effort in light of Northern States experience); Tr.1075:23-1078:23 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to the proposed finding because it is vague and misleading. The public relations video does not state the assumptions on which it relies. For example, it does not

explain whether its description of the pool as "full" is based on the maintenance of one FCR or two FCRs in the spent fuel pool. Tr. 1156:9-1157:13 (Zabransky).

WE knew that it faced stiff political opposition in seeking approval of a dry storage facility. PFF 102. Therefore, having been forced to seek long-term spent fuel storage at Point Beach because of DOE's lengthy delay, WE employed highly conservative assumptions in its public relations effort and in its PSCW application to create a greater sense of urgency. PFF 105. The evidence demonstrated that WE knew that Point Beach could operate into 1998 or beyond without additional storage and that WE constructed the dry storage facility because WE believed DOE was going to be significantly delayed in its performance under the Standard Contract. PFF 66, 81-85, 105b, 111, 113-114, 121, 159-165. *See also* PX 801, pp. KRGWE000182, 192-93, 202, 211-12 (WE's 1988-1991 Form 10-Ks).

### 2. WEPCO'S Contemporaneous Documents During The Development Of The ISFSI Project All Indicated A Need For Additional At-Reactor Storage Before 1998

186. The video was developed by WEPCO in the summer of 1992 and conveyed to the public the need for dry fuel storage at Point Beach beginning in 1995. DX 146; Tr.790:15-791:2 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE also objects to this proposed finding for the reasons set forth in its Response to DFF 185.

187. Further explaining the rationale for the dry fuel storage project at Point Beach, WEPCO stated in the video as follows:

> The spent fuel pool was designed to store spent fuel only temporarily, but after 20 years and several reconfigurations, the spent fuel pool at Point Beach is nearing its limit. **By mid-1995, there will be no more room. To bridge the gap until the federal facilities are ready, Wisconsin Electric is proposing to build a temporary dry storage facility.**

DX 146; Tr.786:22-787:6 (Zabransky) (emphasis added).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE also objects to this proposed finding for the reasons set forth in its Response to DFF 185.

188. An internal WEPCO publication, Synergy, published in 1992, provided information about the upcoming ISFSI project to WEPCO employees. DX 283; Tr.1081:2-19 (Zabransky). The newsletter described the size of the ISFSI, as follows:

> The facility would be sized for 48 casks to accommodate operation of Point Beach through the end of its current licenses (2010 for Unit 1 and 2013 for Unit 2). The application submitted to the PSCW **requested only 12 casks – enough to bridge the gap between mid-1995, when the spent fuel pool would be full, and the acceptance of fuel at the MRS, scheduled to open in 1998.**

DX 283 at WISC00011138 (emphasis added).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to the proposed finding because it is inaccurate. Notwithstanding the statements in this newsletter, the PSCW application was never designed to bridge the gap until 1998 because, from 1987 on, WE did not believe that DOE would begin performance by 1998. PFF 75-77, 81-85. Instead, WE believed that DOE would be substantially delayed. PFF 107, 111. This was stated repeatedly in documents such as those approving the cask demonstration project and the 1991 PSCW application. PX 170, p. 2 ("provide additional spent fuel storage through life of current operating licenses"); PX 171, p. 3 ("consolidation alone would not provide sufficient on-site storage capacity to allow operation through 2003, the earliest possible date for operation of the federal waste management system"); PX 236 (ESR), p. 53 ("Given current DOE schedules, the earliest an MRS could be operational is 2007."). The same points were made in annual SEC 10-K filings that WE submitted from 1988-1991. *See, e.g.*, PX 801, pp. KRGWE000182, KRGWE000192, KRGWE000202, KRGWE00211-12; PFF 85, 108. There also were numerous, written confirming statements

made by WE personnel beginning in 1987. Further, numerous former WE personnel also testified to this effect at trial. PFF 75-77, 83, 87-89, 93-94, 104, 107, 111.

WE also objects to the proposed finding as misleading. The Synergy article likely relied upon highly conservative assumptions, but those assumptions are unstated. For example, the newsletter does not explain whether the description of the pool as "full" allows for the maintenance of one or two full core reserves in the spent fuel pool. It also does not state which spaces are available for the storage of spent fuel. This proposed finding also is contrary to the contemporaneous evidence presented at trial that demonstrated that WE knew that Point Beach could operate into 1998 or beyond without additional storage and that WE was constructing the dry storage facility because of substantial delays in DOE's performance. PX 242 (WE's February 1992 RW-859), p. HQR3640528 ("Without a full core reserve, Unit 1 could operate through Apr. 1998; Unit 2 Sept. 1998."). *See also* PFF 66, 81-85, 105b, 111, 113-114, 120-121, 159-165.

189. In response to the decision to increase WEPCO's public relations effort regarding the ISFSI, Mr. Zabransky assisted in preparing a Question and Answer Brochure that would be used to inform the public about the project. DX 456; Tr.1078:24-1079:19 (Zabransky). The brochure indicates that construction on the ISFSI will begin in late 1992, with usage beginning in 1994. DX 456 at WEP006 0509.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE also objects to this finding for the same reasons that it objected to DFF 188.

Further, given that Point Beach was going to require additional storage because of DOE's lengthy delay in performance, it made sense to proceed with seeking PSCW approval for the dry storage project. There was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); PFF 106. In retrospect, WE's push for early operation was wise given that the PSCW did not approve the dry storage project until 1995. PX 374.

190. Because Mr. Zabransky was focusing his efforts on the PSCW efforts, Robert Link, then Vice-President of Nuclear Power, in a August 1992 memorandum, announced the appointment of Kevin Anundson to head the effort at Point Beach to implement the dry fuel storage project after it was authorized by the PSCW. DX 22; Tr. 1087:12-1089:5 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because the evidence does not support it. The August 1992 memorandum does not state that Mr. Link assigned Mr. Anundson to the dry storage project management role because Mr. Zabransky was focusing his efforts on the PSCW efforts. The Government fails to cite to any testimony from Mr. Link as support for this proposed finding. Mr. Zabransky lacks the capacity to testify regarding Mr. Link's reasons for assigning Mr. Anundson as the head of the dry fuel storage project.

191. Mr. Link confirmed the 1994 operation date in his memorandum:

> The dry fuel storage facility planned for Point Beach Nuclear Plant is scheduled for operation in June 1994. The Public Service Commission of Wisconsin (PSCW) is reviewing our application for a Certificate of Authority to allow us to construct this facility. Current estimates call for a PSCW ruling in May 1993.

DX 22 at WISC 00056029.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to the proposed finding because it is misleading. Mr. Link testified that WE could have operated into 1998 or beyond without dry storage. PFF 113, 159. Mr. Krieser testified similarly. PFF 114, 158-159. Further, nowhere in the Link memorandum (DX 22) does it state that WE had made a final decision to construct the dry storage facility. Mr. Link testified that this decision was not made until 1995 after the PSCW approved the dry storage project. PFF 121.

Additionally, because WE had made the determination that DOE would not be performing by 1998 and Point Beach was going to require dry fuel storage because of DOE's expected lengthy delay in performance, there was no reason to delay WE's pursuit of PSCW approval. WE's plans were reasonable because there was no "point in trying to get to 1998 since DOE was not coming." Tr. 1489:25-1491:13 (Shimon); PFF 106.

Further, this finding ignores that when Congress passed the NWPA and the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4; 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

192. As of August 1992, Mr. Link had not proposed any alternatives to the dry fuel storage project to address the need at Point Beach for additional at-reactor storage. Tr.1089:17-20 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding of fact because it is contradicted by the evidence. When Mr. Link took over as Vice President of Nuclear in May 1992, he asked Mr. Krieser's team to evaluate the necessity for the dry storage project and conduct analyses of alternative spent fuel management options. PFF 109. During that time, WE evaluated a variety of options, including fuel cycle changes, higher enrichment fuel, private fuel storage facilities, additional spent fuel pools, pool expansions, recovery of spaces in the spent fuel pool, reactor core and fuel design changes, dry fuel storage, and the placement of temporary racks in various locations. PFF 110.

Further, the evidence established that, until WE's final decision to implement dry storage in 1995, WE continually reviewed the spent fuel management alternatives. It also discussed those options with the PSCW and intervenors. PFF 109-111, 113, 121; PX 236.

Finally, Mr. Zabransky's testimony regarding Mr. Link's activities lacks credibility. Mr. Zabransky was never a WE officer or involved in the decision-making for Point Beach, and was in no position to testify with knowledge regarding the alternatives being considered by Mr. Link and other senior WE officials. Tr. 339:20-340:9 (Link); Tr. 1512:20-1513:8, 1513:22-1514:6, 1526:3-5 (Krieser). In fact, Mr. Link testified that strategy development and implementation were not Mr. Zabransky's responsibility. Tr. 339:22-340:9 (Link).

Moreover, the evidence demonstrated that Point Beach could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7; 892:9-893:7 (Hennessy); Tr. 166:4-171:4, 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

193. The evaluation of the dry fuel storage project by the PSCW took longer than WEPCO had anticipated. Tr.1093:23-1094:24 (Zabransky). As a result, the project was expected to begin operation in 1995, a year later than planned. DX 134. However, WEPCO informed the PSCW in correspondence dated March 17, 1993, that the delay in commencement did not change the number of casks that WEPCO expected to load through 1998. Id. WEPCO continued to inform the PSCW that it would load 12 casks through 1998. Id. at WISC 00054807; Tr.1094:25-1095:17 (Zabransky); see also DX 23 (July 1993 timetable shows cask loading beginning in June 1995); DX 25 at WISC 00010064 (1994-1998 Nuclear Power Dept. Business Plan, dated Jan. 14, 1994, shows May 1995 implementation of ISFSI to maintain one FCR); Tr.1099:19-1101:22 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed finding because it ignores that, by March 17, 1993, WE had determined that DOE would not be performing by 1998 and that Point Beach was going to require substantial additional storage because of DOE's expected lengthy delay in performance. Therefore, it made sense for Point Beach to pursue dry fuel storage

sufficiently in advance to allow for any complications or delays in the approval process. WE's plans at the time to aim for a 1994 start-up date for the dry storage facility were reasonable because there was no "point in trying to get to 1998 since DOE was not coming." PFF 106; Tr. 1489:25-1491:13 (Shimon).

Further, because WE expected DOE to be significantly delayed in its performance, it made sense to load a sufficient number of casks to allow Point Beach to preserve FCR without necessarily expending the effort necessary to recover spaces in the pool or to alter Point Beach fuel discharges. PFF 115, 117.

Moreover, the evidence demonstrated that WE knew that Point Beach could operate into 1998 or beyond without additional storage and that WE was constructing the dry storage facility because WE believed DOE was going to be significantly delayed in its performance under the Standard Contract. PFF 66, 81-85, 105b, 111, 113-114, 120-121, 159-165.

194. In June 1993, WEPCO created a single page question and answer pamphlet for its employees to use as part of its continuing public relations efforts regarding the ISFSI project. In response to a question as to who will pay for the project, WEPCO's position was as follows:

> Wisconsin Electric customers will pay for the dry storage facility at Point Beach.
> The cost of the facility will be factored into the cost of producing electricity at Point Beach. As a part of its review of our application for dry storage, the Public Service Commission of Wisconsin (PSCW) will conduct a detailed economic analysis . . .
> **Although some have called for DOE to pay for the facility, the additional storage is needed prior to 1998 when DOE is required to accept responsibility for spent fuel.**

DX 440; see Tr.1095:18-1097:23 (Zabransky) (position of WEPCO in June 1993).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE further objects to this proposed of finding of fact because it is misleading. WE reasonably waited or decided to wait until after DOE failed to perform by January 31, 1998

and institute litigation against DOE for partial breach of contract. Given that approach, WE was going to need to incur the cost of dry storage and then recover those costs from DOE. WE, the PSCW, and the ratepayers knew, however, that funds recovered in litigation would be restored to the customers at a later date. PX 592, p. WISC00012221. The PSCW issued a January 18, 2005 Order that reflected that understanding and addressed the disposition of any funds received from DOE related to spent nuclear disposal fees. PX 686.

The proposed finding also is contradicted by the evidence establishing that, since the late 1980s, WE has believed that DOE would be substantially delayed in its performance of the Standard Contract. PFF 69, 75, 77, 80-87, 89-90, 92-93, 96, 107, 115, 117; *see also* PFF 118. The evidence demonstrated that WE decided to pursue a dry storage facility because of DOE's failure to perform. PFF 87-88, 121.

195. Mr. Zabransky left WEPCO in July 1994 and started employment with DOE. Tr.713:1-714:11 (Zabransky). After Mr. Zabransky left WEPCO, he was contacted by Messrs. Link and Krieser[13] and asked to assist WEPCO with the hearing before the PSCW regarding the dry fuel storage project that was scheduled for later in 1994. While Mr. Zabransky was willing to return to WEPCO and assist in those preparations, he was told by DOE that it would not be possible because of a potential conflict of interest. Tr.713:13-714:11 (Zabransky).

**RESPONSE:**

WE objects to this proposed finding of fact because it is irrelevant. WE also objects to this proposed finding of fact to the extent it relies upon the testimony of Mr. Zabransky to attempt to characterize WE's reasons for contacting Mr. Zabransky in 1994.

196. Throughout the planning for on-site storage, from 1987 to 1995, WEPCO continued to believe that there was a possibility that DOE would perform at an MRS beginning in 1998. See, e.g., DX 283 (1992 newsletter WEPCO anticipated DOE acceptance in 1998); PX 351 (September 1994 Link submission to DOE acknowledged that DOE could meet its contractual obligation with an MRS); Tr.1660:2-24; DX461 (pleading submitted December 16, 1994, stated that DOE had not "abandoned the quest for an MRS");

[13] Mr. Link was then Vice-President of the Nuclear Power Unit, and Mr. Krieser was then Manager of the Industry and Regulatory Services in the Nuclear Power Business Unit.

Tr.2256:2-2258:11 (Porter); DX73 (1995 letter submitted to the PSCW, indicated that acceptance at an MRS in 1998 was a more likely scenario than later acceptance at a repository); Tr.1606:18-1610:10 (Krieser); DX28 (WEPCO decommissioning cost study assumed that it would have to load 12 casks with acceptance commencing at an MRS in 1998); Tr.2764:20-2768:15 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE also objects to this proposed finding of fact because it is contradicted by the evidence. Since the late 1980s, WE believed that DOE would be substantially delayed in its performance of the Standard Contract. PFF 69, 75, 77, 80-87, 89-90, 92-93, 96, 107, 115, 117; *see also* PFF 118. Indeed, the evidence demonstrated that WE decided to pursue a dry storage facility because of DOE's failure to perform. PFF 87-88, 121.

Faced with DOE's lengthy delay, WE had to take steps to provide for alternative storage. Given that one of the intervenors' principal objections to the dry storage project was that it might become a de facto permanent storage facility, WE naturally pointed out that DOE was still taking the position that it might perform by 1998 through the use of an MRS. However, the 1991 ESR, filed with the 1991 application, made it clear that, if DOE had not found a voluntary MRS site by 1992, DOE would not be able to perform by 1998. PX 236 (ESR), p. 15. The ESR further noted that given then-current schedules, the earliest an MRS could be operational was 2007 and that "[g]iven the number of legal problems which must be resolved, it is doubtful that 2010 is a realistic date" for the operation of a repository. PX 236 (ESR), p. 53.

Further, WE's use in planning documents of an assumption that DOE might perform in 1998 does not support a finding of fact that WE believed DOE might perform. For example, although DX 461, dated December 1994, notes that DOE has not abandoned the quest for an MRS, it does not suggest that such an MRS will be available by 1998. Similarly, DX 73, dated July 21, 1995, merely expresses WE's grave doubt that DOE will ever perform under the Standard Contract. Both documents were drafted *after* DOE's notice to utilities that

it would not begin accepting spent fuel from utilities by 1998 and *after* WE publicly reported in the 1988-1991 period that it was pursuing a dry fuel storage facility at Point Beach because of the delay in DOE performance. PX 339; PX 385; PX 801, pp. KRGWE000182, 192-93, 202, 211-12 (WE's 1988-1991 Form 10-Ks). Thus, these documents demonstrate at most that WE used the 1998 performance date as an assumption for illustrative and advocacy purposes even though it knew that DOE would not be performing by 1998. PFF 81-85, 87-88, 90, 92, 96-97, 98b, 105, 107-108, 111, 115.

The other cited exhibits fail to support this proposed finding for similar reasons. Again, the assumption in various planning documents that DOE would perform at an MRS in 1998 was merely used as a baseline for planning purposes and in no way expressed a belief on behalf of WE that DOE might have an operational MRS by 1998. PFF 81-85, 87-88, 90, 92, 96-97, 98b, 105, 107-108, 111, 115.

In addition, the testimony of Messrs. Porter, Krieser and Anundson cited by the Government does not support this proposed finding. Nowhere in the cited testimony does Mr. Porter, Mr. Krieser or Mr. Anundson state that WE believed at any point after 1987 that DOE might still perform by 1998.

WE acknowledges that it hoped in the early 1990s that DOE might find a way to implement an MRS facility and that DOE might withdraw its statements in the June 1988 ACR and Mission Plan Amendment that DOE would be unable to begin accepting the industry's spent fuel by 1998, and likely not until at least 2003. PX 149, p. 5 (including Table 2.1); PX 150, pp. 18-19 (including Table 2-2) ("under current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003"); PFF 81-82. However, WE understood DOE's 1988 pronouncements to be a confirmation of WE's doubts that DOE would be able to meet the

1998 date. Tr. 1306:3-1308:14 (Shimon); PFF 83. Based on the Government's statement that it could not timely perform, WE put into motion efforts to mitigate its damages by providing on-site interim storage until at least 2003. PFF 85. DOE, however, never made any substantial progress on the FWMS in the 1990s and, as a result, WE remained convinced that DOE would be substantially delayed in its performance. PFF 115, 117, 122.

WE's communications with DOE and third parties regarding DOE's ability to perform by 1998 were efforts by Mr. Link and WE to press DOE to begin picking up the industry's spent fuel at the earliest opportunity. PFF 123. WE believed it was essential to maintain pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that WE was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *Id.*

### 3. WEPCO Reported A Need For Dry Fuel Storage Assuming DOE Performance Beginning In 1998

197. Mr. Link testified in October 1994 before the PSCW during hearings regarding authorization of WEPCO's dry fuel storage plan. During live testimony, Mr. Link testified that the dry fuel storage application to the PSCW was based upon the assumption that DOE would begin acceptance of spent fuel from WEPCO in 1998 and that WEPCO needed 12 casks before DOE commenced acceptance in 1998:

> We still need an ISFSI prior to 1998 which is the first date by which we believe DOE is obligated to take fuel. Yes, we considered DOE obligated to take fuel starting in 1998. That does not negate the need for an ISFSI.
>
> . . .
>
> As I stated, that does not negate the need for the ISFSI to be constructed, utilized with the 12 casks we asked for through 1998.
>
> . . .
>
> I can state that the [dry fuel storage] proposal is based on the 1998 take date underneath the provisions of the contract.

PX 907B at 534-535 (WPS002 6484-6485).

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).