WE further objects to this proposed finding as inaccurate. Mr. Link's October 1994 PSCW testimony (PX 907B, pp. 534-35) does not contradict Mr. Link's testimony at trial that WE would not have implemented the dry storage project in the non-breach world. *Compare* PX 907B, pp. 534-35 *with* Tr. 344:5-9; 493:3-9; 522:13-22 (Link).

In his October 1994 PSCW testimony, Mr. Link argued that WE would need dry storage even though WE considered DOE obligated (but not expected) to perform in 1998. By 1994, WE and the PSCW both knew that DOE would not perform in 1998. PFF 115, 117-118, 122. Thus, Mr. Link's breach world testimony continued to be based on the assumption that DOE was not going to perform according to its contractual obligations and, therefore, construction of an ISFSI by 1995 was desired for WE to maintain full core reserve in the permanent storage racks in the pool. Mr. Link testified:

> The current schedule for spent fuel disposal calls for the geologic repository to begin operation as early as 2010. In 1987, when it became clear that DOE's schedules had slipped significantly, Congress revisited the Act, passing amendments which established a voluntary siting process for siting of interim spent fuel storage facilities. While efforts to identify a host site for a temporary spent fuel storage facility initially showed promise, Congressional action has essentially blocked further progress. Recently, the DOE has taken a position that it considers the 1998 NWPA requirement to be conditional.

PX 907, pp. 424-425. Mr. Link later testified in this PSCW proceeding:

> Wisconsin Electric is interested in performance to take spent fuel from Point Beach on the least cost overall method. We still need an ISFSI prior to 1998 which is the first date by which we believe DOE is *obligated* to take fuel. Yes, we considered DOE *obligated* to take fuel starting in 1998. That does not negate the need for the ISFSI. We will continue to pursue all reasonable and expected successful paths to get performance under that contract and all provisions under that contract.

PX 907, p. 534 (emphasis added). Thus, Mr. Link's PSCW testimony distinguishes between DOE's obligation to begin acceptance of WE's fuel in 1998 and DOE's actual performance,

*i.e.*, the fact that DOE would not perform in 1998 and that no one knew when DOE may perform. PFF 115, 117-118.

Further, Mr. Link testified at trial that these statements during the PSCW hearings were based on assumptions, including WE's belief that DOE would not perform by 1998:

> Q: And that's what you said in response to the question that Mr. Martin posed during PSC hearings, correct?
>
> A: Yes, and that was based on the assumptions and the evaluations under which we have submitted the Public Service Commission request.
>
> Q: And, Mr. Link, those assumptions and that application was that the proposal was based on the 1998 take date under the provisions of the contract, correct?
>
> A: That was based on the belief that *DOE would not perform by 1998*, with a number of assumptions relative to the status of the pool and requiring a long-term solution because of the DOE's nonperformance.

Tr. 531:17-532:7 (Link) (emphasis added).

Further, in the PSCW testimony cited, Mr. Link did not testify that WE would need 12 casks before 1998. Instead, Mr. Link testified that "If Wisconsin Electric loads 12 casks as authorized by the PSCW . . . [t]his will allow subsequent discharges of spent fuel from the Point Beach reactors. Under these conditions both units could operate through the year 2000 while retaining the capability to unload one full core." PX 907, p. WISC00126004-5.

The Government also ignores that this testimony occurred in October 1994, five months after DOE's May 1994 notice stating that it would not begin performance under the Standard Contract by 1998 and after DOE indicated that it might not have any obligation to accept spent fuel in the absence of a DOE facility to accept spent fuel. PX 339. Thus, by October 1994, Mr. Link (and everyone else) knew that DOE would not be performing by 1998 and his testimony is simply reaffirming the position that WE was advocating before the PSCW, namely, that WE needed to construct the ISFSI and that WE had asked for 12 casks. PX 907, p. WISC00126001. Mr. Link, however, testified at trial that WE needed to construct

the ISFSI because DOE was going to be substantially delayed in its performance and Point Beach required a long-term spent fuel storage solution. PFF 76-77, 81-83, 90, 98b, 107, 111, 115, 117, 122. WE believed that a dry storage facility provided the most economical solution for mitigating DOE's anticipated breach. PFF 80, 110-111.

Mr. Link's testimony also reflected his efforts to press DOE to begin picking up the industry's spent fuel at the earliest opportunity. PX 907, p. WISC001260000 ("We will continue to pursue all reasonable and expected successful paths under that contract and all provisions under that contract."); PFF 123. WE believed it was essential to maintain pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that WE was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *Id.*

Finally, WE objects to this proposed finding because it is misleading. When Congress passed the NWPA and the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon) ("The January 31, 1998 date for commencing removal was critical to Wisconsin Electric because we expected to be able to provide our own storage through that date, and if the program commenced on January 31, 1998, we would not have to build additional storage."). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7, 892:9-893:7 (Hennessy); Tr. 166:4-171:4, 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

198. In his pre-filed testimony before the PSCW, dated October 11, 1994, Mr. Krieser testified that, "after the Unit 1 spring outage in 1997, there will not be enough spaces to accommodate all the spent fuel from another refueling outage." DX 36 at 2-3.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE also objects to this proposed finding because it is misleading. In connection with WE's dry storage application, WE employed highly conservative assumptions to create a greater sense of urgency. PFF 105. Mr. Krieser's testimony does not address the assumptions he employed, such as the number of spaces in the spent fuel pool unavailable for storing spent fuel assemblies.

If WE had believed that DOE would timely perform its obligations under the Standard Contract, WE knew that, if it did no more than ensure that 1500 spaces were available in the spent fuel pool, Point Beach could have operated at least into 1998 without additional spent fuel storage or other spent fuel management actions. PFF 159, 173. Additionally, WE nuclear personnel had knowledge and expertise regarding various fuel management methods that would have enabled WE to operate at least into 1999 without dry fuel storage. PFF 161. The earlier that Point Beach employed such methods, the more space in the spent fuel pool that could be saved and the further that Point Beach's operations could be extended without additional storage. *Id.*

By the time of Mr. Krieser's testimony before the PSCW in October 1994, however, WE knew that DOE was going to be substantially delayed in its performance. PFF 76-77, 81-83, 90, 98b, 107, 111, 115, 117. Therefore, WE had not yet made 1500 spaces available in the spent fuel pool or implemented the use of higher enriched fuel. The substantial delay in DOE's performance caused WE to pursue construction of a dry storage facility that would provide sufficient storage to operate Point Beach through at least 2003, and until the end of the then-current reactor licenses. PFF 81-85, 87-88, 90, 92-93, 98b, 104, 107-108, 111, 113, 115, 117, 121-122, 159.

Further, when the parties executed the Standard Contract, WE knew that it could operate into 1998 or beyond without additional at-reactor storage. PFF 66, 159; Tr. 1240:18-1241:23 (Shimon). Moreover, Mr. Hennessy and others established that WE could operate into 1998 or beyond without dry fuel storage. Tr. 867:21-874:7, 892:9-893:7 (Hennessy);

Tr. 166:4-171:4, 209:14-20 (Baumann); Tr. 2813:25-2814:18 (Conry); Tr. 2552:3-2553:6 (Farron); PFF 159-163; PDX 9.

199. In 1994 correspondence to Alan Brownstein of the OCRWM office at DOE, Mr. Link indicated that there might be utilities, as was the case with WEPCO, that would need additional on-site SNF storage even if an MRS was made available in 1998:

> Even if DOE is successful in providing a centralized interim storage facility, utilities may still need to pursue on-site storage or other alternatives to satisfy their interim storage needs. The need and use of an on-site or alternative interim storage facility is strictly a utility decision.

DX 139 at WISC 00028402.

**RESPONSE:**

WE incorporates its General Objections to Section XII.A (DFF 159-200).

WE objects to this proposed finding because it is inaccurate. The cited September 1994 memorandum does not support the Government's assertion. The memorandum was a response to DOE's May 1994 Notice of Inquiry, in which DOE stated that it did not have an obligation to accept spent fuel by 1998. In the response, Mr. Link actually stated that even if DOE was successful in making central interim storage for spent nuclear available *at an undefined future date,* "utilities may still need to pursue on-site storage or other alternatives to satisfy their interim storage needs." DX 139, p WISC00028402. Contrary to the Government's contention, this letter does not discuss the year 1998 or any other year. *Id.*

WE further objects to this proposed finding of fact because it is misleading. WE's demands that DOE perform by 1998 were efforts by Mr. Link and WE to press DOE to begin picking up the industry's spent fuel at the earliest opportunity. PFF 123. WE believed it was essential to maintain pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that WE was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *Id.* These communications do not evidence a belief by WE that DOE actually would have an MRS available by 1998. Instead, the evidence

indicates that WE knew that DOE would be substantially delayed in its performance.

PFF 76-77, 81-83, 90, 98b, 107, 111, 115, 117.

200. Eileen Supko, plaintiff's expert witness who developed a model to demonstrate what might happen in the "but-for" world, testified that a table in her model shows the need for dry fuel storage at Point Beach before 1998. Tr.3406:12-17, 3417:9-3418:16 (Supko). Even assuming DOE performance in 1998, WEPCO would have loaded 120 MTUs into dry storage before 1998, assuming a 24-assembly cask, or the equivalent of five casks. Id.

**RESPONSE:**

WE objects that the proposed finding is inaccurate. Ms. Supko's model does not show that Point Beach *needed* dry fuel storage at Point Beach before 1998; the model shows that Point Beach actually employed dry storage prior to 1998. Tr. 3406:12-17; 3417:9-3418:16 (Supko). Ms. Supko's model uses actual, breach world data for utilities' dry storage usage. PX 792, App. A.

Neither the cited testimony nor Ms. Supko's report or SPNTFUEL model provides that WE would have loaded dry storage before 1998 assuming DOE performance by 1998. Thus, the proposed finding misleadingly implies that Ms. Supko somehow agreed with the Government's erroneous position that even if DOE had performed, WE would have built dry storage. To the contrary, and as identified in her testimony, report and SPNTFUEL model, Ms. Supko took into account actual data from the breach world. Taking that data into account in no way constitutes agreement with the Government that WE would have built dry storage in the non-breach world.

### B. The Use Of A Temporary Cask Pit Rack Was Not Considered An Option In The But-For World

#### 1. WEPCO Did Not Evaluate The Use Of A Temporary Cask Pit Rack Until At Least 1998

201. When WEPCO evaluated options in 1991 for additional at-reactor storage, WEPCO did not consider utilizing a temporary cask pit rack. Tr.1053:22-1056:8 (Zabransky); Tr.1597:8-1599:1 (Krieser); DX 36.

**RESPONSE:**

WE objects that this proposed finding of fact is irrelevant and misleading because it confuses the breach and non-breach worlds. WE established at trial that, had DOE performed, WE likely would have pursued a short-term strategy of preserving FCR through the use of a temporary rack in the cask laydown area. PFF 182-211. A temporary cask pit rack can provide FCR for several years, but is not a long-term SNF storage option. Tr. 4407:1-5 (Singh) ("a full core [rack] is good for about four-and-a half years"); PX 774, p. 2 ("Inclusion of the cask laydown area postpones loss of FCR by one to five years."). Therefore, WE's breach world evaluation of its long-term SNF storage options is not the same as its evaluation of the options that WE may have considered in the non-breach world. Tr. 1524:2-4 (Krieser) ("We needed to address the situation in a long-term fashion, so we needed a long-term solution.")

202. A cask pit rack provides only temporary storage, and it must be removed in order to load casks and transfer spent fuel to DOE. Tr. 5430:13-19 (Brewer); DDX 3-7; DX 391 at 13 (WXE011 0015); Tr.5465:8-25 (Brewer); DX 418; Tr.4428:13-4429:6 (Singh).

**RESPONSE:**

WE does not dispute that the 121-assembly cask pit rack that WE likely would have used in the non-breach world would have to be removed to allow a cask to be loaded. PFF 182-186.

203. In 1991, WEPCO's projections showed a need for additional permanent storage in 1997. DX 391 at 14 (WXE011 0016). Similarly, in its application for an ISFSI to the PSCW, WEPCO projected that, at its then-current rate of discharge, even with planned improvements to the spent fuel pool, it would exceed the usable capacity with the Fall 1997 discharge, and have to shut down one of the operating units. DX 171 at WISC 00014753; Tr 1062:10-1068:9 (Zabransky); DDX 1-9A (comparing the available space of 1,482 assemblies to the cumulative discharge in fall 1997 of 1,490 assemblies).

**RESPONSE:**

WE objects to this proposed finding of fact as it relies on improper evidence. Mr. Zabransky is not a nuclear engineer. Tr. 565:21-566:6 (Zabransky) (degree in civil, not

nuclear, engineering). Mr. Zabransky's understanding of the contents of the spent fuel pool was not direct, but instead was derivative from others in the Nuclear Power Department. Tr. 770:16-24 (Zabransky).

WE further objects that Mr. Zabransky's testimony and related demonstrative DDX 1-9A is irrelevant because they reflect breach world assumptions that WE would not have made in the non-breach world. First, Mr. Zabransky assumed that Point Beach only had 1482 usable spaces in the pool. WE proved at trial that WE knew during the 1980s and 1990s that, with minor effort, the pool could store 1500 spent fuel assemblies. PFF 168-170. WE in fact did make all 1500 spaces available for the storage of spent nuclear fuel. PFF 12a, 171-172. WE made the spaces available by inspecting the "damaged" spaces. PFF 171. The spaces in fact either did not need repair, or needed only minor repairs. *Id.* WE also removed brackets to make spaces available and placed non-fuel components in spaces inaccessible to full-size spent fuel assemblies under the canal door hinges. *Id.*

Second, Mr. Zabransky counted non-fuel components in the running total of spent fuel assemblies discharged into the spent fuel pool. WE proved at trial that WE knew that the non-fuel components could be removed or relocated to open up spaces for spent fuel assemblies. PFF 168-169. WE in fact shipped 14 debris baskets off-site and removed another non-fuel component (a "spacer") from the pool. PFF 171. Additionally, WE could have removed the dummy assembly and rod can from the pool. *Id.* WE, however, had no reason to do so. *Id.*

In addition, this proposed finding is not supported by the cited evidence. The proposed finding states that WE projected in its 1991 dry storage application that it would exceed the usable capacity of the spent fuel pool in 1997, *yet DX 171 makes no such statement anywhere in the document.* In fact, WE stated in DX 171 that WE could defer the proposed dry cask storage project by using combinations of alternatives. DX 171, pp. 38-39, 59. WE did not attempt to evaluate these combinations of alternatives because it assumed the

"failure of DOE to begin accepting spent fuel before 2010" because of the uncertainty of DOE's performance through any facility, including an MRS. *Id.* at 59. The "projection" referenced in this proposed finding of fact was created at trial by the Government's witnesses, and is not included in the 1991 dry storage application.

Further, the Government ignores that WE would have projected its ability to operate to 1998 and beyond without dry storage based on different assumptions in the non-breach world, including, but not limited to, 1500 spaces being made available, the use of a temporary rack to maintain FCR and, if necessary, the employment of fuel management options. PFF 159-167.

This proposed finding also relies on improper evidence in citing the report of a Government expert, Mr. Brewer, regarding WE's purported projected SNF storage needs in 1991. Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying as an expert. Instead, Mr. Brewer created "projections" by using simple arithmetic calculations. DX 391, p. 14, n.34 (WXE011 0016). Because Mr. Brewer's testimony reflects a simple arithmetic calculation, rather than an expert opinion based upon a testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 593 (1993).

In addition, The Government may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

Finally, Mr. Brewer's projections are far less credible than the projections of WE personnel who were intimately involved in the operation of Point Beach, including but not limited to, the former Supervisor of the Point Beach Reactor Engineering group, Mr.

Hennessy. Mr. Hennessy and other fact witnesses also performed arithmetic projections during the trial, using slightly different assumptions, showing Point Beach operating to 1998 or beyond without dry storage. PDX 7; Tr. 867:21-874:7 (Hennessy); PDX 9; Tr. 166:4-171:4, 209:14-20 (Baumann).

204. A temporary cask pit rack would not have solved the storage need foreseen by WEPCO in 1991. Tr.5431:21 - 5432:2, 5571:24 - 5573:5 (Brewer); DDX 3-7; DX 391 at 14 (WXE011 0016).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate for the reasons set forth in WE's Response to DFF 201-203. As discussed in those Responses, WE demonstrated at trial that WE could have operated Point Beach into 1998 or beyond. Indeed, in the non-breach world, WE would have projected its ability to operate to 1998 or beyond without dry storage based on different assumptions, including, but not limited to 1500 spaces being made available, the use of a temporary rack to maintain FCR and, if necessary, the employment of fuel management options. PFF 159-167. All such assumptions were well known to WE during the 1991 period and could have been employed if WE had believed that DOE was going to perform by 1998. PFF 168-177.

This proposed finding also relies on improper evidence in citing Mr. Brewer's report regarding WE's purported projected SNF storage needs in 1991. Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying him as an expert. Instead, Mr. Brewer created "projections" by using simple arithmetic calculations. DX 391, p 14, n.34 (WXE011 0016). Because Mr. Brewer's testimony reflects a simple arithmetic calculation, rather than an expert opinion based upon a testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593. Further, fact witnesses with far more knowledge of Point Beach reactor operations than Mr. Brewer performed projections during trial that established that Point Beach could have

operated into 1998 without dry storage and without the use of a temporary rack. Tr. 166:4-171:4, 209:14-20 (Baumann); PDX 7; Tr. 867:21-874:7 (Hennessy); PDX 9.

Finally, WE objects to this proposed finding as unsupported by the evidence because the "projection" relied upon by Mr. Brewer was an arithmetic calculation that he performed and inserted in his report, not a projection contained in the 1991 dry storage application. DX 391, p. 14, n.34 (WXE011 0016).

205. WEPCO did not discuss the possibility of using a temporary cask pit rack until 1998, when Mr. Krieser discussed the possibility with Northern States Power Company. Tr.1589:13-1593:7 (Krieser); see also Tr.2572:8-18 (Farron).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate. Mr. Krieser testified that WE evaluated the concept of using temporary racks, including a cask pit rack, in 1992. Tr. 1523:14-20 (Krieser). Mr. Link confirmed that he directed that his staff evaluate whether the use of a temporary rack was a viable option at that time. PFF 185. In addition, WE personnel including Messrs. Conry and Zabransky discussed the use of a temporary rack to provide additional storage in the spent fuel pool by no later than 1995. *Id.*

Finally, WE objects to this proposed finding as irrelevant and misleading because it confuses the breach and non-breach worlds. A temporary cask pit rack can provide FCR for several years, but is not a long-term SNF storage option. Tr. 4407:1-5 (Singh) ("a full core [rack] is good for about four-and-a half years"); PX 774, p. 2 ("Inclusion of the cask laydown area postpones loss of FCR by one to five years."). Given the anticipated lengthy delay in DOE's performance, WE's breach world evaluation focused on long-term SNF storage options. Tr. 1524:2-4 (Krieser) ("We needed to address the situation in a long-term fashion, so we needed a long-term solution.").

206. In court pleadings filed on August 28, 1995, WEPCO represented to the Court that its storage options consisted of dry storage, a new spent fuel pool, or storage in the reactors. Tr. 2254:21-2255:10 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact because it ignores significant other portions of Mr. Porter's testimony explaining that all of the options presented were based on the assumption that "DOE does not begin accepting spent fuel in 1998." Tr. 2255:1-3 (Porter).

Indeed, the Government, yet again, confuses the breach and non-breach worlds. Accordingly, WE also incorporates the last paragraph of its Response to DFF 206.

207. To the extent that WEPCO evaluated options, these were not formal studies and did not result in any written documentation. Tr.1587:16-1588:14 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact as inaccurate. Messrs. Link and Krieser testified that Mr. Krieser's group analyzed WE's storage options during this period. The proposed finding also is misleading because it ignores other testimony by Mr. Krieser where he explained that the studies were not pursued further in favor of long-term options because of DOE's anticipated long-term breach of the Standard Contract. Tr. 1524:2-4 (Krieser) ("We needed to address the situation in a long-term fashion, so we needed a long-term solution."). WE disputes this proposed finding because Mr. Krieser testified only that he was not aware that the studies were documented; he did not state that there was no written documentation.

208. Use of a cask pit rack as proposed by WEPCO at trial would have added weight to the spent fuel pool. See DFOF 210. Compare Tr.4393:3-5 (Singh) (weight of the temporary rack proposed by WEPCO loaded with fuel of 93 tons, or 186,000 pounds) with DX 351 at WISC 00064415 (approved weight for the shipping cask to be placed in the cask laydown area, or a cask weighing 136,000 pounds).

**RESPONSE:**

WE objects to this proposed finding of fact as vague, ambiguous and irrelevant because it apparently compares the weight of a fully loaded cask pit rack with the weight of an empty and unidentified hypothetical transfer cask. DX 351.

Further, this proposed finding is inaccurate. The evidence showed that the Point Beach pool structure can fully support the weight of a loaded cask pit rack. PX 827, pp. 14-15; PDX 68, 70, 71. As Dr. Singh explained, the cask pit rack itself would have weighed less than 20,000 pounds and most of the weight would have come from spent fuel assemblies. Tr. 4392:20-4393:2 (Singh); PX 827, p. 15; PDX 68. The Point Beach pool structure could support the weight of the loaded cask pit rack. Tr. 4392:20-4393:2 (Singh); PX 827, p. 15; PDX 68, 70, 71.

Altogether the rack and fuel would still weigh less than any transfer cask used in any pool at any nuclear power plant in the country. Tr. 4393:3-19 (Singh); PDX 68. Moreover, in the 1990s, WE demonstrated its willingness to "add weight" to the Point Beach spent fuel pool because prior to loading SNF at the Point Beach ISFSI, Point Beach performed and approved a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351). In 2005, WE performed an additional calculation demonstrating that Point Beach could employ an even heavier NUHOMS transfer cask, weighing more than a loaded cask pit rack. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC10450006 (over 200,000 lbs.).

209. The analysis done in support of the re-racking that occurred in the late 1970s assumed that a shipping cask weighed 136,000 pounds (Tr.5433:12-24 (Brewer); DX 351 at WISC 00064415), but the weight of the temporary rack proposed by WEPCO loaded with fuel was determined to be 93 tons, or 186,000 pounds. Tr.4393:3-5 (Singh).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate for the reasons stated in WE's Response to DFF 208.

210. At the time of WEPCO's ISFSI application to the PSCW, the structural analyses indicated that the fuel pool was essentially at its maximum weight. Tr.1600:12-22 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact because "the structural analyses" discussed in the proposed finding is vague and undefined. WE further objects to this proposed finding as misleading because it relates to comments regarding the potential for spent fuel rod consolidation for life-of-plant storage capacity, and not to the use of a cask pit rack as suggested in the title to this section of DFF. Tr. 1600:12-22 (Krieser); PX 356, p. 15; PX 236, p. WISC00014729.

WE disputes the proposed finding because it is inaccurate. As contemporaneous documents explain, prior studies established only that the pool structure could support 1500 assemblies, but additional analyses had not yet been conducted showing whether the pool "would or would not" support a substantial capacity increase at Point Beach. PX 245, pp. WISC00000925-6. Mr. Krieser informed the PSCW, however, that the Point Beach pool structure was in fact sufficient that "limited additional spent fuel could be accommodated." PX 356, p. 15:1-20.

Moreover, WE told the PSCW in writing that a new analysis might allow for some increased capacity. PX 245, p. WISC00000926. Moreover, in the 1990s, WE demonstrated its willingness to "add weight" to the Point Beach spent fuel pool because prior to loading SNF at the Point Beach ISFSI, Point Beach performed and approved a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351). In 2005, WE performed an additional calculation demonstrating that Point Beach could employ an even heavier NUHOMS transfer cask, weighing more than a loaded cask pit rack. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC1045-0006 (over 200,000 lbs.).

As WE proved at trial, a loaded cask pit rack would have stayed within the structural limits of the spent fuel pool. PFF 191.

211. WEPCO advised the PSCW that, with the second re-rack of its SNF pool, the seismic loading of the pool reached its limits. Tr.2207:1-2209:13 (Porter); DX 130.

**RESPONSE:**

WE disputes the proposed finding because it is inaccurate. The underlying Bechtel study referenced in DX 130 stated that the pool structure could support 1500 assemblies, not whether the pool structure had reached a limit. DX 130, p. WISC00000979. Neither WE's response to the PSCW nor the Bechtel calculation stated that the pool had reached its structural limits. DX 130, p. WISC00000925, 979. Instead, WE explained to the PSCW that the pool, with the racks full, was still not at its capacity. DX 130, p. WISC00000925.

WE in fact told the PSCW that the pool could still accommodate additional spent fuel assemblies and made no mention of any seismic limitations. Mr. Krieser said that the Point Beach pool structure was sufficient so that "limited additional spent fuel could be accommodated." PX 356, p. 15:1-20. WE further told the PSCW in writing that a new analysis might allow for some increased capacity. PX 245, p. WISC00000926.

During the 1990s, WE demonstrated its willingness to "add weight" to the Point Beach spent fuel pool because prior to loading SNF at the Point Beach ISFSI, Point Beach performed and approved a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351). In 2005, WE performed an additional calculation demonstrating that Point Beach could employ an even heavier NUHOMS transfer cask, weighing more than a loaded cask pit rack. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC1045-0006 (over 200,000 lbs.).

Moreover, as WE proved at trial, a loaded cask pit rack would have stayed within the structural limits of the spent fuel pool. PFF 191.

212. WEPCO did not perform any additional analyses that superceded these conclusions before the ISFSI was loaded. Tr.1600:23-1601:2 (Krieser); Tr.2209:14-21.

**RESPONSE:**

WE objects to this proposed finding of fact as vague because the "conclusions" and "analyses" are vague.

To the extent that this proposed finding of fact relates to adding weight to the spent fuel pool, prior to loading SNF at the Point Beach ISFSI, Point Beach performed and approved a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351).

As WE proved at trial, a loaded cask pit rack would have stayed within the structural limits of the spent fuel pool. PFF 191.

213. Thus, in 1991, WEPCO dismissed any alternative that would add weight to the spent fuel pool. Tr.1038:14-1039:12 (Zabransky); DX 171 at WISC 00014792.

**RESPONSE:**

WE objects to this proposed finding of fact as vague, ambiguous and misleading when it refers to "any alternative." In addition, the proposed finding is inaccurate. Mr. Zabransky's cited testimony does not refer to any alternative. To the contrary, it only refers to three, long-term, breach world SNF storage alternatives – complete reracking, fuel rod consolidation, and two-tiered racks. Moreover, as the title to the relevant text in DX 171 states (title: "Reracking Existing Pool for More Capacity"), WE was referring to a complete pool rerack – not a cask pit rack. DX 171, p. WISC00014792.

Additionally, this proposed finding of fact is inaccurate because even the project proposed in the 1991 dry storage application included "adding weight" to the spent fuel pool. In fact, prior to loading SNF at the Point Beach ISFSI, Point Beach performed and approved a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351). In 2005, WE performed an additional calculation demonstrating

that Point Beach could employ an even heavier NUHOMS transfer cask, weighing more than a loaded cask pit rack. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC1045-0006 (over 200,000 lbs.).

Finally, this proposed finding ignores that, given DOE's lengthy delay, WE was focused on long-term solutions rather than the use of a temporary rack. Thus, even if this proposed finding were accurate (which it is not), it in no way precludes WE from demonstrating that, in the non-breach world, it could and would have used a temporary rack to preserve FCR.

214. The notes on the original installation of the racks in the Point Beach spent fuel pool show that the pool walls and the cask containment area were not perfectly square or plumb and the cask containment area was shimmed. Tr.2258:12-2261:19 (Porter); Tr.2263:12-2264:5 (Porter); DX 398; Tr.2264:6-2266:21 (Porter); Tr.5538:15:2-5543:18 (Brewer); DX 398; DX 399.

**RESPONSE:**

WE objects that this proposed finding of fact is misleading because it ignores significant other portions of Mr. Brewer's testimony where he admitted that geometric irregularities are common in fabricated structures. Tr. 5583:11-16 (Brewer).

Further, this proposed finding of fact is irrelevant because the evidence, including the testimony of experts for both parties, established that the cask containment frame could have been removed. PFF 193.

WE further objects to this proposed finding because it is not supported by the cited evidence. Mr. Brewer's testimony at pages 5538-5543 deals with SNF casks and has nothing to do with the racks in the Point Beach pool.

215. The cask laydown area of the spent fuel pool contains an anti-tipping frame. Tr.1130:9-1133:19 (Zabransky); Tr.5437:9-16 (Brewer); DX 397 at WISC 00025333; DX 455 at WEP072 0020.

**RESPONSE:**

WE does not dispute that the cask laydown area contains an anti-tipping frame. However, WE notes that the evidence, including Mr. Brewer's testimony, established that the cask containment frame could have been removed. PFF 193. At trial, Dr. Singh explained why removal of the frame would have been straightforward and therefore posed no obstacle to the installation of a cask pit rack: "The anti-tipping frame is not attached to the pool. It is connected to the adjoining structure through shims. Basically, shims are compression only members, so there are no obstacles, operational obstacles to lifting the structure out of the pool." Tr. 4392:7-12 (Singh). Dr. Singh further explained that removing the anti-tipping frame was "well within the expertise of the temporary and underwater structure technology in the time." Tr. 4401:1-4 (Singh); PDX 72.

216. The anti-tipping frame prevents a spent fuel shipping cask from tipping over and falling against the racks. DX 391 at WXE011 0017. The anti-tipping frame also serves as a path to transfer loads during an earthquake from the spent fuel racks to the spent fuel pool walls. DX at 397 (WISC 00025331).

**RESPONSE:**

WE disputes that the anti-tipping frame is necessary for the purposes listed. The evidence, particularly the testimony of Dr. Singh, established that the anti-tipping frame is not necessary in case of a seismic event and is not required for safe operation or use of any NRC-certified canisters. PFF 193. Dr. Singh testified based on his expert knowledge that the zero period acceleration at the Point Beach spent fuel pool is less than .3 times the force of gravity, and therefore a cylindrical rigid body (cask) would not move appreciably under earthquake conditions. Tr. 4389:16-25; 4451:15-4452:21 (Singh). Dr. Singh testified to this fact based on Holtec parametric studies. Tr. 4451:15-4452:21 (Singh). Because a cask would not move appreciably in these conditions, the cask anti-tipping frame served no purpose. *Id.* Dr. Singh further explained that the anti-tipping frame actually increased the

likelihood of adverse outcomes stemming from seismic events. Tr. 4387:1-11; 4389:16-25 (Singh).

WE further objects to this proposed finding of fact as it relies on improper evidence in citing Mr. Brewer's report regarding the purpose of the anti-tipping frame. Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying him as an expert. Instead, Mr. Brewer's report simply repeated what is stated in DX 397, p WISC00025257 (WE's March 1978 technical specification change request to the NRC). Mr. Brewer provided no analysis supporting his conclusion regarding the seismic forces potentially acting on a cask at Point Beach. Because Mr. Brewer's testimony is not expert testimony on this point, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

217. Either the anti-tipping frame or the pool structure have an irregular geometry. Tr.5435:24 - 5436:8 (Brewer); DDX 3-8, DX 399 at WISC 00051684 (notation for 12/14).

**RESPONSE:**

WE objects that this proposed finding of fact is misleading because it ignores significant other portions of Mr. Brewer's testimony where he admitted that geometric irregularities are common in fabricated structures. Tr. 5583:11-16 (Brewer).

WE notes that the evidence, including Mr. Brewer's testimony, established that the cask containment frame could have been removed. PFF 193. At trial, Dr. Singh explained why removal of the frame would have been straightforward and therefore posed no obstacle to the installation of a cask pit rack: "The anti-tipping frame is not attached to the pool. It is connected to the adjoining structure through shims. Basically, shims are compression only members, so there are no obstacles, operational obstacles to lifting the structure out of the pool." Tr. 4392:7-12 (Singh). Dr. Singh further explained that removing the anti-tipping frame was "well within the expertise of the temporary and underwater structure technology in the time." Tr. 4401:1-4 (Singh); PDX 72.

218. This irregularity can make removal of the device difficult. Tr.5441:14-21 (Brewer); DDX 3-8, DX 391 at 17 (WXE011 019).

**RESPONSE:**

WE disputes this proposed finding of fact because it is inaccurate. In Dr. Singh's expert opinion, based upon having performed dozens of rack projects, the cask pit rack project would not have been difficult, but instead "technically unchallenging." PFF 193. At trial, Dr. Singh explained why removal of the frame would have been straightforward once the shims were removed: "The anti-tipping frame is not attached to the pool. It is connected to the adjoining structure through shims. Basically, shims are compression only members, so there are no obstacles, operational obstacles to lifting the structure out of the pool." Tr. 4392:7-12 (Singh). Dr. Singh further explained that removing the anti-tipping frame was "well within the expertise of the temporary and underwater structure technology in the time." Tr. 4401:1-4 (Singh); PDX 72.

WE further objects to this proposed finding of fact because the Government's expert, Mr. Brewer, testified that the cask containment frame could have been removed. PFF 193.

219. The anti-tipping frame must be removed before a temporary cask pit rack can be installed. Tr.5435:8-19 (Brewer); DDX 3-8.

**RESPONSE:**

WE does not dispute that in order to install a cask pit rack sized to accommodate 121 storage locations, the anti-tipping frame should be removed. Tr. 4392:4-6 (Singh), PDX 67, PX 827. p 6.

220. Installation of a temporary cask pit rack would require that the spent fuel pool be relicensed to allow it to be used to store fuel without the anti-tipping frame. Tr.5435:15-24 (Brewer); DDX 3-8; Tr.1136:7-1137:19 (Zabransky).

**RESPONSE:**

WE objects to this proposed finding of fact because it is not supported by the cited Zabransky testimony. At pages 1136-1137, Mr. Zabransky did not testify regarding the anti-tipping frame, but only the cask pit rack generally.

WE does not dispute that the Point Beach pool would require requalification with the seismic restraints (including the anti-tipping frame) removed, but as WE proved at trial, the NRC has previously requalified racks with seismic restraints removed. PFF 204. Dr. Singh testified that, in his expert opinion, there is no question that the pool would have been requalified with this modification. *Id.*

221. Mr. Zabransky testified that management did not want to return to the NRC for re-licensing of the spent fuel pool because of concerns that it might lead to a complete inspection of the pool. Tr.996:16-997:10 (Zabransky); see also Tr.995:1-996:14 (Zabransky).

**RESPONSE:**

WE objects to this proposed finding because it is incorrect and not supported by the evidence. The record at trial established that WE has performed calculations allowing the application of additional weight to the cask pit twice since DX 351 was performed. In the 1990s, WE demonstrated its willingness to "add weight" to the Point Beach spent fuel pool by approving a calculation that assumed a heavier load (loaded transfer cask) than assumed in the earlier Bechtel calculation (DX 351). PX 391, p. WISC00123962 (156,467 lbs. in PX 391 versus 136,000 lbs. in DX 351). In 2005, WE performed an additional calculation demonstrating that Point Beach could employ an even heavier NUHOMS transfer cask, weighing more than a loaded cask pit rack. Tr. 1848:9-1851:8 (Becka); PX 1045, p. WISC1045-0006 (over 200,000 lbs.).

The Government's reliance upon Mr. Zabransky's testimony is misplaced. Mr. Zabransky was neither a decision-maker at WE nor a senior official. Tr. 339:22-340:9 (Link); 1512:20-1513:8; 1513:22-1514:2; 1526:3-5 (Krieser). Mr. Zabransky never even

worked at Point Beach. Tr. 569:13-15 (Zabransky). Mr. Zabransky relied on Point Beach's Reactor Engineering group and other plant personnel for information regarding the spent fuel pool and its contents. Tr. 647:22-24 (Zabransky). Further, Mr. Zabransky's testimony is vague and conclusory.

Finally, Dr. Singh opined that the NRC would have approved an appropriately supported application to amend the Point Beach license to allow the use of a temporary rack in the cask laydown area. PFF 199-203.

222. To use a temporary rack in the Point Beach spent fuel pool, the pool would need to be re-qualified for permanent removal of the seismic restraints. Tr.4426:21-4427:1 (Singh).

**RESPONSE:**

WE does not dispute that the Point Beach pool would require requalification with the seismic restraints removed, but disputes any suggestion that this somehow would have precluded WE from using a temporary rack in the non-breach world. As WE proved at trial, the NRC has previously requalified racks with seismic restraints removed. PFF 204. Dr. Singh testified that, in his expert opinion, the pool would have been requalified with this modification. *Id.*

223. Until a survey is completed, the difficulty or time required to remove the anti-tipping frame cannot be determined. Tr.5460:24 - 5461:8 (Brewer).

**RESPONSE:**

WE objects to this proposed finding of fact because it is contrary to the credible evidence adduced at trial. In Dr. Singh's expert opinion, based upon having performed dozens of rack projects, the cask pit rack project would not have been difficult, but instead "technically unchallenging." PFF 193. At trial, Dr. Singh explained why removal of the frame would have been straightforward once the shims were removed: "The anti-tipping frame is not attached to the pool. It is connected to the adjoining structure through shims.

Basically, shims are compression only members, so there are no obstacles, operational obstacles to lifting the structure out of the pool." Tr. 4392:7-12 (Singh). Dr. Singh further explained that removing the anti-tipping frame was "well within the expertise of the temporary and underwater structure technology in the time." Tr. 4401:1-4 (Singh); PDX 72.

WE further objects to this proposed finding because even Mr. Brewer conceded that the cask containment frame could have been removed. PFF 193. WE, however, objects to any Government reliance upon Mr. Brewer's testimony regarding site surveys related to a cask pit rack because Mr. Brewer testified that he has never been involved in the design, construction, licensing, or operation of spent nuclear fuel storage racks, or performed an independent design review of a spent nuclear fuel storage rack. Tr. 5406:15-5407:3 (Brewer). Therefore, he has no expert basis for knowing whether pool surveys are required to determine the scope of work required to remove an anti-tipping frame. By contrast, based upon his extensive experience with pool rack projects, Dr. Singh testified that it was his determination that sufficient information was available for his opinion regarding the cask pit rack project without performing a site survey. Tr. 4431:20-4432:22 (Singh).

224. Rerack applications require 33 months for design and licensing -- 13 months longer than the time assumed by WEPCO.[14] Tr.5463:2-17 (Brewer); DX 391 at 18 (WXE 011 0020).

**RESPONSE:**

WE objects to this proposed finding of fact as it relies on improper evidence in citing Mr. Brewer's report and testimony regarding the duration for NRC approvals for cask pit rack applications. Unlike Dr. Singh, Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying him as an expert. Instead, Mr. Brewer used simple

[14] If the licensing and design were to require longer than 27 months, replacement of the Steam Generators would have been impacted. Tr. 5463:18 - 5464:3 (Brewer); DX 391 at 17-18 (WXE011 0019-WXE011 0020). In fall 1995, WEPCO concluded Unit 2 could not restart following its 1996 outage unless its Steam Generators were replaced. DX 3.

arithmetic averaging of certain projects identified by Dr. Singh in arriving at an average duration for design and licensing. Tr. 5574:9-17 (Brewer). Mr. Brewer made no qualitative, analytical judgment based on the specific parameters of the Point Beach project. *Id.* Given that Mr. Brewer's testimony reflects a simple arithmetic calculation, not an expert opinion based upon a testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

By contrast, Dr. Singh based his estimate on several factors arising from his extensive expert background: the state of the applicable regulations and how the NRC applied them at the time, the relative simplicity of the Point Beach cask pit rack project; the modest capacity expansion in this project compared to other projects performed in the mid-1990s, and the lack of novelty to the cask pit rack project. PFF 199-206; PX 827, p. 17-19; PDX 73-75. Thus, the methodology of Dr. Singh to estimate the duration from the ground up based upon the regulatory requirements and project complexity is the correct one to determine the NRC review period, not the purported "methodology" ostensibly employed by Mr. Brewer. PX 827, pp. 17-19. Based upon Dr. Singh's methodology, the NRC review period would likely have been 14 months. PFF 206.

Finally, this proposed finding of fact is not even supported by the cited evidence. It states that rerack applications take 33 months, yet Mr. Brewer's report states that a design and license period averages 24 months. DX 391, p. 18 (WXE011 0020). Mr. Brewer testified at trial that design and licensing takes an average of 23 months. Tr. 5463:2-17 (Brewer). Therefore, the evidence proffered by the Government on this issue is woefully inconsistent and should be disregarded in favor of the expert opinion of the preeminent spent fuel rack expert, Dr. Singh.

225. NRC approvals of licensee requests have taken longer than requested by licensees, even faced with specific needs by the licensee. Tr.5464:8 - 5465:7, 5467:18 - 5470:21 (Brewer); DX 418; PX 642; PX 681.

**RESPONSE:**

WE objects to this proposed finding of fact because the expert testimony of Dr. Singh established a well-grounded, reasonable period for NRC review. Further, if the NRC does not approve an application within the time requested, the utility has the option of mitigating the delay by manufacturing the rack concurrent with NRC review of the application. Tr. 4367:14-23 (Singh).

This proposed finding also wrongly assumes, without reasonable basis, that the cited cask pit rack applications presented identical levels of complexity as the Point Beach cask pit rack. The St. Lucie application was for two cask pit racks in two separate pools. PX 641, 893. The Turkey Point application was also for two cask pit racks in two separate pools. PX 642, 681. Thus, while these applications provide data points regarding cask pit rack applications in general, the proper method to evaluate the duration of WE's cask pit rack application is through an individual analysis of the specific project. In the case of WE, the project would be less complex, and only involve one cask pit rack. PFF 206.

Finally, WE objects to the testimony of Mr. Brewer regarding the duration for NRC approvals for two rerack applications. Unlike Dr. Singh, Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying him as an expert. Instead, Mr. Brewer simply read the NRC dockets and failed to analyze the underlying reasons for the length of the NRC review periods for these licenses. Mr. Brewer testified: "I haven't gone and looked at all the [Requests for Additional Information] that went with this or anything else to figure out what the difficulty was." Tr. 5470:10-12 (Brewer). Mr. Brewer therefore made no qualitative, analytical judgment such as the expert analysis provided by Dr. Singh. PFF 199-206; PX 827, pp. 17-19; PDX 73-75. Because Mr. Brewer's testimony merely reflects reading the NRC docket submissions, rather than an expert opinion based upon a testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

226. NRC approvals of licensee requests have included restrictions or limitations not requested by the licensees. Tr.5465:8-21, 5466:1 - 5467:17 (Brewer); DX 418; DX 414.

**RESPONSE:**

WE objects to this proposed finding of fact because it relies on improper evidence in citing Mr. Brewer's testimony regarding the terms of NRC approvals of rack-related applications. Mr. Brewer did not testify on this issue based on any specialized knowledge qualifying him as an expert. Instead, Mr. Brewer simply read certain NRC dockets for restrictions and said that the "potential" existed for limitations on the Point Beach cask pit rack application. Tr. 5467:9-17 (Brewer). Therefore, Mr. Brewer undertook no analysis to determine whether similar restrictions would apply at Point Beach. Given that Mr. Brewer's testimony merely reflects reading the NRC docket submissions, rather than an expert opinion based upon a testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

By contrast, Dr. Singh analyzed the specifics of the Point Beach cask pit rack application, and determined that WE would not ask the NRC to license the cask pit rack for permanent storage. PFF 199-206; PX 827, pp. 17-19; PDX 73-75.

This proposed finding also mischaracterizes DX 418. Similar to WE's non-breach world cask pit rack, the St. Lucie cask pit racks were not being licensed for permanent spent fuel storage. When Florida Power & Light applied for approval of the St. Lucie cask pit racks, it told the NRC that the cask pit racks would not be permanent: "It is expected that each cask pit rack would be installed and remain in place until cask loading operations necessitate their removal." PX 641, p. WISC0641-0006. Thus, the terms of the NRC's approval merely ratified the licensee's intent to "assure the capability to unload and remove the cask pit rack when cask loading operations are necessary" and did not represent a new restriction. DX 418, p. WXE001 5517. As WE proved at trial, WE would have used a cask pit rack - the same as the St. Lucie racks - for nonpermanent FCR capability. PFF 186

("Because the cask pit rack is removed to allow shipment of fuel out of the pool by cask, it is not used for permanent storage.").

This proposed finding of fact also mischaracterizes DX 414 which concerns the Northern States Power ("NSP") Prairie Island rerack application. First, this application is distinguishable from the Point Beach application because Prairie Island involved a full rerack, not only a cask pit rack. Second, the NSP application involved a plant limitation that was not present at Point Beach during the relevant time frame. The NRC's review of the Prairie Island application reflected that the Prairie Island plant was conducting plant modifications with construction cranes that were not "single-failure-proof." DX 414, p. WXE001 5076. Therefore, the potential existed that the cranes would drop their loads into the spent fuel pool. *Id.* For this reason, the NRC imposed a restriction on the number of assemblies licensed for storage in the Prairie Island plant. *Id.*

In contrast, WE's evidence established that Point Beach's crane is and has long been a single-failure proof crane, PFF 12d, and therefore would not have had a restriction such as encountered by Prairie Island. Therefore, the NSP application and resulting limitation in the NRC approval are inapplicable to WE's circumstances.

Further, DOE itself later suggested that the Prairie Island plant could use its cask pit rack area for additional temporary storage to allow the plant to operate for three additional cycles. PX 590, pp. 5-6 ("SNF Management Options Available to NSP; Utilizing pool space reserved for maintenance of a full core discharge").

227. The temporary rack proposed by WEPCO is a region II rack. As a result, the rack could not accommodate all of the fuel that may be in the reactor. Tr.5477:20-5478:7 (Brewer).

**RESPONSE:**

WE objects to this proposed finding because it is inaccurate. The temporary rack is a Region II rack and, therefore, is designed to hold less reactive fuel. PFF 188. The Region II

rack can be sized to accommodate 121 spent fuel assemblies. PFF 189. As WE established at trial, however, WE could have used a Region II cask pit rack without any operational hindrances. PFF 188-189.

228. Every time spent fuel is moved, there is a potential for damage to the fuel. Consequently, licensees avoid moving spent fuel unless it is required. Tr.5584:18-5585:6 (Brewer).

**RESPONSE:**

WE objects to this proposed finding of fact because the terms "potential" and "required" are vague and ambiguous. Mr. Brewer, whose testimony is cited in this proposed finding, did not provide any testimony to define the likelihood of fuel damage related to fuel movement. He also did not address what may constitute a requirement to move fuel.

WE further objects to this proposed finding of fact as inaccurate to the extent that it wrongly implies that WE would not have used a temporary cask pit rack if it entailed additional fuel movements, if any. As Mr. Brewer himself testified, licensees routinely move spent fuel in spent fuel pools. Tr. 5584:18-5585:6 (Brewer).

Moreover, Mr. Hennessy explained that movement of spent nuclear fuel is a routine process at Point Beach. Reactor Engineering is responsible for maintaining, testing and practicing the use of the plant fuel handling system, which includes all of the equipment for moving and storing spent nuclear fuel assemblies. Tr. 816:7-24 (Hennessy); PX 652, p. WXE001 1043. The fuel handling system is "a safe and effective means" of moving spent fuel assemblies "commonly serviced by fuel handling equipment in the reactor cavity or spent fuel pool." PX 640, p. WISC00060246. Reactor Engineering routinely practices fuel moves prior to outages with a "dummy" fuel assembly so that the fuel handling system is tested and operators are proficient in the movement of spent fuel assemblies. Tr. 820:5-19 (Hennessy).

Finally, this proposed finding is incorrect in suggesting that the movement of fuel related to the use of a cask pit rack presents a significant spent fuel movement issue. As

Dr. Singh explained, fuel movement related to the use of a cask pit rack is not a "hindrance or an operational problem." Tr. 4360:19-4361:6 (Singh).

229. A rack in the cask laydown area must be removed prior to loading a spent fuel transportation cask. Tr.4427:22-4428:3;4428:13-4429:3 (Singh)

**RESPONSE:**

WE does not dispute that the 121 assembly cask pit rack that WE likely would have used in the non-breach world would have to be removed to allow a cask to be loaded. PFF 182-186.

**2. WEPCO'S Reference To Use Of A Temporary Cask Pit Rack Is A Litigation-Driven Strategy**

230. WEPCO relied in large part upon the expert report of Dr. Krishna Singh to support its assertion that it would have used a temporary cask pit rack in the but-for world. Tr.3822:10-13 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding as vague and misleading. It is vague because one cannot tell from this finding what is meant by stating that WE "relied in large part" upon Dr. Singh's expert report "to support its assertion that it would have used a temporary cask pit rack in the but-for world." To the extent that this proposed finding suggests that Dr. Singh originated the idea that WE would have used a temporary rack in the non-breach world, that is incorrect. As explained by WE's expert, Mr. Sieracki, current and former WE personnel determined that, in the non-breach world, WE would have employed a temporary rack in the cask laydown area to offload a full core as needed pending DOE's performance. Tr. 3767:16-22 (Sieracki); PX 794, p. 18 (KRG May 2006 Report).

Dr. Singh provided two supporting elements. First, Mr. Sieracki's cited testimony established that Dr. Singh provided an estimate of $1,837,272 for a cask pit rack for the non-breach world cost estimate.

Second, as set out in WE's proposed findings of fact, WE relied on Dr. Singh's testimony as evidence that it was technically feasible to install a spent fuel rack capable of storing 121 spent fuel assemblies in the cask loading area of the existing spent fuel pool structure at Point Beach. PFF 186-195. Dr. Singh's testimony also established that there was no question that the NRC would have approved a cask pit rack application for Point Beach in the mid-1990s. PFF 199-204. Dr. Singh further estimated that the NRC would have approved the application within 14 months of the application and expended approximately 500 hours of staff time in the review process. PFF 206. As noted above, Dr. Singh also testified to the cost for the design and engineering, license application support, manufacture, and installation of the temporary cask pit rack. PFF 207-209.

231. However, Dr. Singh's report was a non-rigorous scoping study, which was not supported by any inspection of the Point Beach spent fuel pool. Dr. Singh also never conducted a feasibility study, a more rigorous, time-intensive survey of the SNF pool. Furthermore, Dr. Singh never surveyed the spent fuel pool to determine what, if any, obstructions exist. Tr.4431:10-4432:22; 4436:1-5 (Singh).

**RESPONSE:**

WE objects to this proposed finding because the terms "rigorous" and "non-rigorous" are vague and undefined. WE further objects to this proposed finding because it wrongly implies that WE's experts should have completed an entire cask pit rack application, including a pool survey, suitable for submission to the NRC to prove the technical feasibility of a cask pit rack. Preparation of such an application would have cost considerable monies and no authority requires that WE incur that level of expense in order to establish a credible non-breach world. PX 826, p. 12 (engineering services estimated at $1,428,500 in current dollars).

WE further disputes that Dr. Singh's report did not perform the depth of evaluation necessary to render his opinion. Under Dr. Singh's leadership, Holtec is the preeminent supplier of spent nuclear fuel storage racks for U.S.-designed reactors worldwide. PX 827,

p. 2; Tr. 3822:14-21 (Sieracki). Based upon his extensive experience with dozens of projects installing hundreds of spent fuel storage racks, Dr. Singh examined Point Beach drawings, calculations and documents, as well as Holtec software and resources, in order to arrive at his expert opinion that a cask pit rack could have been installed at Point Beach. Tr. 4383:17-4385:4 (Singh). WE did not place any restrictions on Holtec's work. Tr. 4431:20-4432:22 (Singh). Dr. Singh testified that he has performed more than 50 rack license amendment applications before the NRC and that NRC amendment applications frequently relate to more than one rack. Dr. Singh then further testified that, based on his experience, he performed the depth of review required to establish the technical feasibility of the Point Beach cask pit rack project. Tr. 4440:10-4401:21 (Singh).

232. Dr. Singh did not analyze whether a temporary rack would have met WEPCO's projected storage needs. Tr.4453:19-23 (Singh); see DFOF ¶¶ 202-205.

**RESPONSE:**

WE objects to this proposed finding of fact as irrelevant because the subject is outside the scope of Dr. Singh's opinion and Dr. Singh did not testify to this issue. PX 827, p. 1; Tr. 4453:19-23 (Singh). Instead, as set out in WE's proposed findings of fact, WE could have operated Point Beach into 1998 or beyond without dry storage and likely would have used a cask pit rack to preserve FCR capability. PFF 159-211.

However, Dr. Singh did testify that, in his experience, cask pit racks are typically used to provide a temporary increased spent fuel storage capacity, particularly when spent fuel pools have large inventories. PX 827, p. 3.

233. Dr. Singh did not determine whether the fuel in WEPCO's spent fuel pool could have been moved in such a manner as to provide sufficient space to permit the use of divers for the installation of a cask pit rack.[15] Tr.4445:24-4446:5 (Singh). In the event that

[15] Dr. Singh suggested that divers could be used to dismantle the anti-tipping frame that occupied the space in the cask pit, so that the temporary cask could be inserted there. Tr. 4445:24-4446:5 (Singh). One of the issues raised, but not resolved, by Dr. Singh's suggestion, was the potential radiation exposure of the divers doing such work. *Id.* Unless the SNF could be moved a far enough distance away from the area where the

divers could not be used, Dr. Singh never evaluated the cost of using an alternative means of removing the anti-tipping frame and inserting the temporary cask, for example, the use of remote tools. Tr.5470:22-5474:9 (Brewer). As a result of Dr. Singh's failure to demonstrate that divers could actually be used and his failure to evaluate the cost and schedule necessary to implement alternate means, plaintiff never established the viability of using a temporary cask.

**RESPONSE:**

WE objects to this proposed finding of fact and its related footnote because they are without foundation and contrary to the evidence. Dr. Singh repeatedly explained that project technicians could have performed the Point Beach cask pit rack project, including removal of the anti-tipping frame, remotely from the pool deck, without entering the pool water. Tr. 4407:9-13; 4459:12-19; 4463:2-9; 4464:7-11; 4471:7-4473:3 (Singh). The technicians are trained to perform diving operations, but would not have to do so because of the simplicity and lack of obstacles to the Point Beach cask pit rack project. *Id.* Additionally, Mr. Brewer specifically agreed that the Point Beach cask pit project could be accomplished using only remote tools. Tr. 5473:23-24 (Brewer) ("I agree that one can use remote tools to do this kind of work."). Consequently, there is no evidence establishing that divers had to enter the spent fuel pool water to perform the Point Beach cask pit rack project.

As Dr. Singh explained at trial, pool modifications such as the installation of racks have been performed remotely for decades. PX 899; Tr. 4364:19-23 (Singh) ("A remote handling tool is a tool that is used from the pool deck or from the fuel handling bridge. In other words, the individual who's operating the tool does not go in the water."). Technicians routinely remove appurtenances from pool walls and perform other tasks through the use of remote tools. Tr. 4456:9-13 (Singh).

WE further disputes this proposed finding because Dr. Singh did consider the cost of performing the Point Beach cask pit rack project remotely. Tr. 4473:23-17 (Singh).

---

divers were working, the radiation exposure would be large enough to give divers a lethal dose in an hour -- clearly, an unacceptable hazard. Tr. 5470:22-5474:9 (Brewer).

Specifically, Dr. Singh established that the costs of using divers and operating remotely are roughly comparable. *Id.* Remote operations require more tools, but diving operations require significant training and consumable items, such as dive suits, that are treated as contaminated materials. *Id.* The cost is essentially the same under either option. *Id.*

Further, Dr. Singh testified that while the project could have been done remotely, it also could have been completed with divers using proper shielding techniques. Tr. 4459:4-8 (Singh). Dr. Singh testified that techniques such as the use of a lead shield or a lead or steel cage allow divers to safely perform in-pool diving operations in various pool storage configurations, if necessary to accomplish a project. Tr. 4445:6-23; 4446:6-18; 4447:13-4448:6 (Singh). Additionally, the space available in the pool for diving operations can be maximized by placing colder (earlier discharge date) spent fuel assemblies around a work area. Tr. 4445:6-23 (Singh). While the project could be done remotely, the use of divers remained a viable option. Tr. 4459:16-19 (Singh).

234. Dr. Singh's analysis assumed that full core reserve was available in the 1995 to 1996 period for installation of a cask pit rack, although he had never studied how much space was available. Tr.4450:20-4451:9 (Singh). However, contemporaneous documents demonstrate that Dr. Singh's assumption was <u>false</u>. For example, at the end of 1995, there were 1,346 fuel assemblies in the pool, and 24 fuel assemblies in dry storage – for a total of 1,370 fuel assemblies on site. DX 60. At this point, in order to have FCR, the pool would have needed 1,491 usable spaces or 1,370 + 121 (FCR). However, by 1997, a year after the temporary rack would have been installed, there were still 18 unusable spaces, leaving at most 1,484 usable spaces (1,502-18 = 1,484).[16]

**RESPONSE:**

WE disputes this proposed finding of fact because it wrongly suggests that FCR was necessary at the Point Beach plant in order to install or use the cask pit rack. Neither Dr. Singh's nor Mr. Brewer's expert reports state that FCR was necessary for the project.

[16] In 1996, the year the temporary rack was allegedly to be installed, WEPCO determined that 12 spaces were damaged. *See* DX 206. These 12 damaged spaces alone would have precluded maintenance of FCR, absent dry storage – 1502 -12 = 1490, less than the 1491 spaces needed. Thus, even without considering other unusable spaces, clearly WEPCO did not have the usable space Dr. Singh assumed.

PX 827; 880. Not surprisingly, the Government has not cited any evidence that one FCR was needed for the project. In fact, the very purpose of the cask pit rack was to provide Point Beach with one FCR until DOE performed. PFF 182-186.

WE further disputes this proposed finding of fact because the evidence cited by the Government does not establish that Point Beach lacked FCR in 1995 in the breach world. The RW-859 form identified by the Government lists an inventory of 1346 fuel assemblies compared to a 1502 installed storage capacity, a gap of more than 121 assemblies. DX 60, p. WISC00001233. The form makes no statement regarding FCR. *Id.* Thus, Dr. Singh's knowledge of the Point Beach spent fuel pool during this timeframe in the breach world was consistent with this RW-859 form and, therefore, was not "false" as the Government contends.

Additionally, Dr. Singh's final report did not assume the need for available spaces in the spent fuel pool to accomplish the cask pit rack project. PX 827. As Dr. Singh explained at trial, the Point Beach cask pit rack project could have been performed either by technicians operating remotely or by divers in the spent fuel pool. If divers were used, Dr. Singh testified that techniques such as the use of a lead shield or a lead or steel cage would have allowed divers to safely perform in-pool diving operations if necessary to accomplish the project. Tr. 4445:6-23; 4446:6-18; 4447:13-4448:6 (Singh). Additionally, the space available in the pool for diving operations can be maximized by placing colder (earlier discharge date) spent fuel assemblies around a work area. Tr. 4445:6-23 (Singh). Dr. Singh testified that, through the use of these techniques, the diver could be as little as three to four feet away from a cold spent fuel assembly behind a shield. Tr. 4445:17-23 (Singh). Dr. Singh further emphasized that "the operations that we use are secure, and the proof is that [Holtec has] installed perhaps over a thousand racks and removed thousands of appurtenances from pools using divers and by remote means without any incidents." Tr. 4472:16-21 (Singh).

Finally, WE disputes this proposed finding of fact because it confuses the breach and non-breach worlds. The Government cites breach world assumptions regarding the number of spaces that would have been available in a spent fuel pool. As set out in WE's proposed findings of fact, WE had the ability to make 1500 pool spaces available and would have done so in the non-breach world. PFF 168-172.

235. WEPCO also used the expert report of the Kenrich Group to support its assertions regarding use of the temporary cask pit rack in the but-for world.

**RESPONSE:**

WE objects to this proposed finding of fact as vague, ambiguous and conclusory and moves that it be stricken since the Government cites no supporting evidence for it.

236. The Kenrich Group was hired by WEPCO to prepare its damages claim. In its first report, dated July 14, 2005, Kenrich noted that WEPCO was still considering what it would have done in the but-for world to remedy its at-reactor storage issues. Tr.3866:9-3867:9 (Sieracki). The first report of Kenrich did not contain any reference to the use of a temporary cask pit in the but-for world. Id.; see also DDX0001-15 (Defendant's Demonstrative Showing Changes to Plaintiff's Expert Report Over Time).

**RESPONSE:**

WE disputes this proposed finding of fact because the Government does not accurately quote PX 498 or Mr. Sieracki's related testimony. Mr. Sieracki explained at trial that WE reserved the right to supplement the Kenrich report because at the time WE continued to "consider whether it may have incurred any additional costs had DOE performed in accordance with its contractual obligations." PX 498, p. 18, n.24; Tr. 3866:18-25 (Sieracki).

WE objects to this proposed finding because its statement that WE did not reference a "temporary cask pit [rack] in the but-for world" is misleading. The first (July 2005) Kenrich report stated that WE was considering whether WE may have incurred "any additional costs" had DOE timely performed. PX 498, p. 18, n.24; Tr. 3866:18-25 (Sieracki). The Kenrich

report therefore clearly reserved WE's right to identify the costs of a temporary cask pit rack in a supplemental report. *Id.*

237. In its second report, dated May 8, 2006, Kenrich noted that it had removed from damages an offset handling tool included in the original report because, at the time that the report was generated, the company was still evaluating what their likely approach might have been if DOE had performed, and it was unclear in 2005 whether they would have tried to free up spaces with an offset handling tool. Tr.3863:1-3864:21 (Sieracki).

**RESPONSE:**

WE does not dispute that, as Mr. Sieracki explained at trial, in 2005 WE reserved the right to supplement the Kenrich report because at the time WE continued to "consider whether it may have incurred any additional costs had DOE performed in accordance with its contractual obligations." PX 498, p. 18, n.24; Tr. 3866:18-25 (Sieracki).

238. WEPCO ultimately reached a decision, based clearly on hindsight, regarding what it would have done in the but-for world through a series of meetings in 2005 and 2006. The options that it considered included building an ISFSI. Tr.3867:10-3870:16 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact as vague, misleading and conclusory.

WE disputes this proposed finding of fact because it is inaccurate. Mr. Sieracki's testimony establishes that WE personnel did not consider an ISFSI as a non-breach world option beyond an initial meeting because it was apparent that Point Beach could operate to 1998. Tr. 3868:9-12 (Sieracki). Contrary to the proposed finding, Mr. Sieracki did not testify that WE evaluated whether to use an ISFSI in 2006. *Id.*

WE disputes this proposed finding because WE established at trial that, *assuming DOE would have timely performed*, WE would not have built dry storage. WE did not want to build dry storage and would have avoided doing so in the non-breach world. PFF 158-159. WE also established that WE knew at all relevant times that it had the capability to operate into 1998 or until DOE performed without building dry storage and would have acted on that knowledge in the non-breach world to avoid dry storage. PFF 159-166; 168-177. WE further

established that WE's breach world decision to build dry storage was based on DOE's long-term failure to perform under the Standard Contract. PFF Sections VI-XIII (PFF 69-135). WE's belief that it would have used a temporary cask pit rack in the non-breach world for full core reserve is consistent with WE's belief that it had alternative short-term SNF storage options to operate into 1998 or 1999, if necessary, while preserving full core reserve without dry storage. PFF 109-111; 113-121. WE did not pursue those options at the time because WE planned based on the long-term uncertainty of DOE's performance under the Standard Contract. PFF 111. Given DOE's substantial delay, there was no reason for WE to make a final decision in the actual world regarding the spent fuel management options that it would employ in a world in which DOE actually performs its obligations under the Standard Contract.

239. WEPCO personnel made the ultimate decision about what course WEPCO would have pursued in the but-for world, but not without a lot of interaction with Mr. Sieracki and his team. Tr.3870:17-3871:1 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading regarding WE's purported "ultimate decision" regarding the non-breach world. The non-breach world is a hypothetical world. As set out in WE's proposed findings of fact, WE established a plausible non-breach world consistent with the hypothetical assumption that DOE would actually perform its obligations under the Standard Contract. PFF Sections VI-XIII (PFF 69-135).

In addition, this proposed finding is misleading because it ignores other testimony where Mr. Sieracki explained that, in evaluating the non-breach world, WE witnesses provided discharge and pool capacity information, and different operating scenarios to Kenrich. Based on that information, the WE witnesses further determined that WE would have used a temporary cask pit rack in the non-breach world. Tr. 3871:22-25; 3872:25-3873:2 (Sieracki). Mr. Sieracki further explained that Kenrich's interaction with WE

witnesses consisted of orienting the witnesses to the hypothetical non-breach world. Tr. 3872:10-15 (Sieracki).

WE also incorporates the last paragraph of its Response to DFF 239.

240. WEPCO personnel did not provide written documentation to Kenrich defining the but-for world. Rather, the process was more one of Kenrich describing to them the but-for world that would have existed. Tr.3871:2-3872:17 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding because it is inaccurate. Mr. Sieracki testified that WEPCO personnel *did provide* various pool capacity projections to Kenrich. Tr. 3871:2-3873:1 (Sieracki). The WE witnesses, however, lived and made decisions in the breach world, a world in which they expected DOE's performance under the Standard Contract to be delayed substantially. PFF 75, 80, 87, 96. *See* WE PTB 20-23. In these circumstances, Kenrich outlined a set of facts and circumstances in order to assist the WE witnesses in determining what the situation would have been like in the non-breach world. It was the WE witnesses, however, who determined what actions WE would have taken in the non-breach world. Tr. 3709:19-3710:21 (Sieracki).

241. Mr. Farron was one of the WEPCO employees who ultimately decided what WEPCO would have done in the but-for world, but he did not have any first hand knowledge of WEPCO's decision-making process because he only began working at WEPCO in 1995 after WEPCO had started to implement dry storage. Tr. 3873:3-21 (Sieracki); Tr.2620:1-2627:1 (Farron).

**RESPONSE:**

WE objects that this proposed finding of fact as vague and misleading. It is vague because one cannot tell from this finding what is meant by "WEPCO's decision-making process."

WE further objects to this proposed finding to the extent that it refers to WE's decision-making in the hypothetical non-breach world where DOE would have performed. The proposed finding assumes that only those persons employed by WE when WE made

*real, breach world* SNF storage decisions have knowledge probative of the *hypothetical non-breach* world. Yet, from 1988 forward, the non-breach world essentially did not exist at WE because, starting in 1988, WE began investigating long-term SNF storage options because it could not rely upon DOE's timely performance by 1998. PFF Section VII (PFF 78-85).

Consequently, contrary to the Government's contention, evidence of the *non-breach world* need not be exclusively derived from *breach world* facts using *breach world* assumptions. Instead, the non-breach world can be determined by reference to witnesses with relevant knowledge testifying based on assumptions that would have been used in the non-breach world, such as the fact that WE could have avoided building dry storage and preserved full core reserve with a temporary cask pit rack. PFF Section XVI (PFF 158-210).

Paul Farron clearly has relevant knowledge regarding the options that WE would have had in the non-breach world and its likely decision-making in the non-breach world because of his experience with the NRC, other utilities, and WE. Prior to joining WE in 1995, he worked for twenty years in the nuclear industry, first with Commonwealth Edison and then with the NRC. While with the NRC, Mr. Farron analyzed events in functioning nuclear power plants as well as those under construction. Mr. Farron also worked in enforcement. Tr. 2499:8-2500:17 (Farron). After leaving the NRC, Mr. Farron joined a consulting firm, providing technical assistance to utilities, the NRC and DOE. Tr. 2500:17-2501:13 (Farron). A number of his NRC assignments related to the review of spent fuel pool emergency procedures. Tr. 2502:11-25 (Farron). Mr. Farron's consulting work included projects at Point Beach, where he was routinely updated regarding the dry storage project. Tr. 2504:17-2505:18 (Farron). After joining WE in 1995 as the Manager for Strategic Issues in the Nuclear Power Business Unit, Mr. Farron focused on issues relating to the continued operation of Point Beach, including storage of SNF. Tr. 2506:3-20; 2510:25-2511:6 (Farron). Mr. Farron became involved in industry groups and reviewed various documents issued by DOE after the execution of the Standard Contract and internal WE documents,

particularly those relating to the February 1995 authorization. Tr. 2515:15-2516:8 (Farron). Mr. Farron was instrumental in preparing the strategy for and filing the 2000 application for PSCW authorization to purchase additional casks, and he attended every meeting with the PSCW regarding this application. Tr. 2517:21-2521:5 (Farron). Mr. Farron's involvement with the PSCW continues to this day, in his regulatory affairs position, which he has held since 2000. Tr. 2508:8-17 (Farron).

Further, while the Kenrich report cited discussions that Kenrich had with Messrs. Farron and Link regarding the non-breach world, WE's expert, Mr. Sieracki, also indicated that he attended a meeting attended by numerous current and former WE personnel to discuss options that WE would have considered in the non-breach world. Attendees at that meeting included knowledgeable witnesses such as Messrs. Shimon, Krieser and Baumann. Tr. 3769:11-3770:2; 3872:10-12 (Sieracki).

242. Mr. Link was the other employee who ultimately told Kenrich what WEPCO would have done, but Mr. Link arrived at WEPCO in 1992 after WEPCO had submitted its application to the PSCW for dry storage, and Mr. Link testified before the PSCW that WEPCO would need an ISFSI prior to 1998, even assuming performance in 1998. Tr. 3873:22-3878:9 (Sieracki); PX 907B at WPS002 6484-6485 (Link testimony before PSCW).

**RESPONSE:**

WE objects to this proposed finding of fact because, similarly to DFF 241, it implies that Kenrich only consulted with Messrs. Farron and Link regarding WE's likely actions in the non-breach world. Instead, Mr. Sieracki testified that Kenrich met with several current and former WE employees, including Messrs. Krieser, Shimon and Baumann, and others. Tr. 3769:11-3770:2; 3872:10-12 (Sieracki).

WE further objects to this proposed finding to the extent that it refers to WE's decision-making in the hypothetical non-breach world where DOE would have performed. The proposed finding assumes that only those persons employed by WE when WE made *real, breach world* SNF storage decisions have knowledge probative regarding decisions WE

may have made in the *hypothetical non-breach* world. Yet, from 1988 forward, the non-breach world essentially did not exist at WE. PFF Section VII. Starting in 1988, WE began investigating long-term SNF storage options because it could not rely upon DOE's timely performance by January 31, 1998. *Id.*

Consequently, evidence of the *non-breach world* cannot be derived only from, as the Government contends, *breach world* facts using *breach world* assumptions. Instead, the non-breach world must be determined by reference to witnesses with relevant knowledge testifying based on assumptions that would have been used in the non-breach world, such as the fact that WE could have avoided building dry storage and preserved full core reserve with a temporary cask pit rack. PFF Section XVI (PFF 158-181).

Mr. Link clearly has relevant knowledge regarding the options that WE would have had in the non-breach world and its likely decision-making because of his experience at WE and his contemporaneous evaluation of WE's options. Mr. Link worked at WE after graduating from college, except for a short period with another company, until late 1996. PFF 18. He was Vice President of WE's Nuclear Department from May 1992 until his departure from WE. *Id.*

During his time at WE, Mr. Link worked in Reactor Engineering where he developed intimate knowledge of the spent fuel pool, including its construction, design and attributes. Tr. 313:13-20 (Link). Mr. Link also had a position at WE where he dealt with regulatory authorities, particularly the PSCW. Tr. 316:12-317:22 (Link). Mr. Link testified extensively regarding WE's dry storage application to the PSCW. PFF 104, 113a. Mr. Link also testified regarding WE's investigation of alternatives to dry storage, including short-term options had DOE performed, such as the use of a temporary cask pit rack, fuel management techniques, and the possible use of additional locations to store SNF in the Point Beach spent fuel pool. PFF 109-111. Mr. Link also testified that WE performed studies establishing that WE could operate into 1998 or beyond without dry storage. PFF 111, 113. Mr. Link further testified

that WE did not make the final decision to proceed with the dry storage project until February 1995. PFF 121. The testimony at trial established that Mr. Link made the decision to proceed with dry storage at Point Beach and that WE would not have chosen dry storage in the non-breach world but, instead, would have used a temporary cask pit rack to maintain FCR pending DOE's performance. PFF 158, 182-185.

WE further disputes this proposed finding because the testimony of Messrs. Sieracki and Link contradicts this proposed finding. While Mr. Link testified before the PSCW in October 1994 that DOE was obligated to start accepting SNF by 1998, he certainly did *not* state that WE assumed that DOE would begin performance by 1998. Tr. 3873:22-3878:9 (Sieracki); PX 907B, pp. WPS002 6484-6485 (Link testimony before PSCW). Indeed, Mr. Link provided this PSCW testimony six months after DOE announced that it was not obligated to timely perform and several years after WE had publicly reported that it was pursuing dry fuel storage because of the substantial delay in DOE's performance under the Standard Contract. PX 907B, p. WPS002 6459; PX 801, p. KRGWE000212; Tr. 540:21-543:10 (Link). WE's long-standing position in connection with the dry storage application was that DOE was highly unlikely to perform by 1998 and that WE needed a long-term solution to its storage needs. PX 236 (ESR), p. WISC00014799 (earliest an MRS could be operational is 2007, doubtful that 2010 is a realistic date for permanent repository); Tr. 532:3-7 (Link).

Mr. Link's testimony, both in 1994 and at trial in 2007, reflected that, while DOE had an obligation to perform by 1998, WE did not expect DOE to do so. PX 907, pp. WISC00125983-4 (Link 1994 testimony noting DOE's schedule slippage starting in 1987, DOE's failure to make progress following the NWPA Amendments, DOE's position that the 1998 acceptance date was "conditional," and the 2010 projected start date for the geologic repository); Tr. 546:9-547:7 (Link) (by October 1994, it was inconceivable to Mr. Link that DOE would timely perform by 1998). Mr. Sieracki confirmed in discussions with Mr. Link

that, while Mr. Link testified to the PSCW in 1994 that DOE still had an obligation to perform by 1998, WE's SNF storage plans were based on the fact that DOE was "not coming" to accept WE's SNF by 1998. Tr. 4012:7-11 (Sieracki).

243. The May 8, 2006 Kenrich report is premised upon the notion that, in the but-for world, the decision not to pursue dry storage would have been made at the same time they started to pursue it in the actual world – that is, in the but-for world, they would have refrained at the outset from taking the actions they took in the actual world. Tr.3878:10-22 (Sieracki); 3882:11-3883:6 (Sieracki). The report is further premised upon the idea that WEPCO would have continued to evaluate its options and would eventually make the decision to install a cask pit rack prior to 1993 and would implement that decision in 1993. Tr.3885:15-22 (Sieracki). Finally, the report assumes that WEPCO would have been able to make these decisions at that time because it would have had definitive information that DOE would perform beginning in 1998. Tr.3885:23-3886:1 (Sieracki). There would have been no uncertainties over DOE's acceptance of WEPCO's fuel on the schedule assumed in the Kenrich fuel management model. Tr.3888:1-3889:25 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding because it is not a proposed finding of fact, but, instead, represents the Government's arguments regarding its interpretation of the Kenrich report.

WE further object to this proposed finding because it is vague. One cannot tell from this proposed finding what is meant by "uncertainties over DOE's acceptance."

WE further objects to this proposed finding's reference to "uncertainties over DOE's acceptance" because it wrongly implies that, even in the non-breach world, breach world assumptions (*i.e.*, uncertainty over DOE performance) apply. Tr. 4016:3-17 (Sieracki). This reflects the Government's unfounded legal position that the non-breach world is not a world in which DOE performs in accordance with the terms of the Standard Contract. Instead, according to the Government, it is a world in which DOE may or may not perform. Not surprisingly, the Government cites no authority in support of its strained vision of the non-breach world.

WE also objects to this proposed finding of fact as misleading because it ignores other portions of Mr. Sieracki's testimony. Mr. Sieracki testified that WE's SNF storage decisions would have reflected WE's assessment of the situation in the non-breach world and that WE would have continuously made SNF storage decisions based on the facts and circumstances as they arose. Tr. 3878:15-20; 3883:6-23 (Sieracki). Additionally, the Government ignores Mr. Sieracki's explanation of how WE would have decided that it was likely that DOE would timely perform: "Maybe the word 'definitive' if I used that, might be a little strong. There certainly would have been strong indications that DOE was coming." Tr. 3885:23-3886:6 (Sieracki).

244. In spite of the fact that, at the time of Kenrich's initial report, WEPCO had not determined what it would have done in the but-for world, Kenrich reached the same conclusion as it did in its final report – that the inventory of spent fuel at Point Beach would never have exceeded the capacity of the spent fuel pool. Tr.3890:1-3892:8 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact as vague and misleading. It is vague because one cannot tell from this proposed finding what is meant by "WEPCO had not determined what it would have done in the but-for world."

To the extent that this proposed finding refers to WE's position that it would have avoided building dry storage in the non-breach world, the record shows that both Kenrich reports (and WE personnel) are consistent on that point. As Mr. Sieracki testified, WE definitely concluded that WE would not have constructed an ISFSI, and that's "what was concluded in the first report, [and] that's the same conclusion here." Tr. 3892:21-3893:6 (Sieracki).

As Mr. Sieracki testified, WE continued to consider whether and how it might have preserved full core reserve following the submission of the initial Kenrich report in July 2005. Tr. 3892:21-3893:6 (Sieracki). Kenrich's July 2005 report noted that WE expressly reserved the right to do so. Tr. 3866:18-35 (Sieracki). Although maintenance of FCR was

not a requirement, but rather a discretionary decision based on WE's belief that it was a good operating practice, WE ultimately concluded that Point Beach would have used a temporary cask pit rack to maintain FCR as necessary pending DOE's performance. Tr. 3892:21-3893:6 (Sieracki); PFF 178-211.

245. Kenrich included an offset for the temporary cask pit rack of $2,047,641 in WEPCO's damages claim. That offset was not based upon actual costs incurred by WEPCO. DX 393 at 21.

**RESPONSE:**

WE objects to this proposed finding because it is nonsensical. The non-breach world in which DOE timely performs never existed. Thus, WE did not incur the actual cost of the hypothetical temporary cask pit rack. Nonetheless, WE established the cost of the non-breach world temporary cask pit rack through highly credible means, namely, by relying upon the extraordinary knowledge of Dr. Singh, WE labor hour estimates and hourly rates provided by Mr. Krieser (labor hour estimates) and Ms. Straub (average hourly labor rates). PFF 206-208.

246. Stephen Kiraly, the Government's expert who calculated an alternative damages claim, in his damages analysis, reversed that offset based upon the assumption that WEPCO would have built an ISFSI in the but-for world and loaded five VSC-24 casks and, thus, would not have needed the temporary cask pit rack. Id.; DDX 5-11.

**RESPONSE:**

WE does not dispute that Stephen Kiraly made the adjustment referenced in this proposed finding of fact.

WE disputes the assumption made in Mr. Kiraly's report that WE would have built dry storage in the non-breach world and, therefore, disputes Mr. Kiraly's reversal of the cask pit rack costs as unfounded and incorrect. PFF Section XVI (PFF 158-210).

### C. The Use Of Racks In The Transfer Canal Was Not Considered An Option In The But-For World

247. WEPCO did not consider using racks in the transfer canal in 1991. Tr. 1056:9-11 (Zabransky) ("not when I was at Wisconsin Electric").

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate. The evidence established that WE considered the potential use of racks in the transfer canal to store SNF in 1992. PFF 110.

Any testimony by Mr. Zabransky to the contrary is neither credible nor competent. Mr. Zabransky is not a nuclear engineer and never actually worked at Point Beach or any other nuclear plant. Tr. 565:21-566:6 (Zabransky) (degree in civil, not nuclear, engineering). Tr. 569:13-15; 711:7-18; 711:23-712:15 (Zabransky). Mr. Zabransky also testified that his understanding of WE's policies regarding utilization of the spent fuel pool was not direct, but instead was derived from others in the Nuclear Power Department. Tr. 770:16-24 (Zabransky).

248. WEPCO did not initially consider the option of using racks in the transfer canal. Tr.1597:8-1599:1 (Krieser); DX 36. WEPCO did not consider the use of racks in the transfer canal until sometime after the hydrogen gas ignition event ("hydrogen gas event") occurred on May 28, 1996. Tr.1593:14-1594:21 (Krieser).

**RESPONSE:**

WE objects to this proposed finding as vague because the term "initially" is undefined.

WE further objects to this proposed finding of fact as irrelevant because Mr. Krieser's 1994 testimony relates to long-term storage options, not short-term options, such as the use of the transfer canals. Tr. 1667:16-21 (Krieser) ("the alternatives that we were looking at were long-term alternatives").

WE further objects to this proposed finding of fact as misleading because it ignores significant other testimony by both Mr. Krieser and Mr. Link establishing that WE investigated the option of using racks in the transfer canal in 1992. PFF 110.

249. There is no space on the transfer canal floors to install spent fuel racks. Tr. 5482:8-16 (Brewer). The single fuel transfer canal at WEPCO services both reactors. Fuel is moved on carriages which operate in the transfer canal. The tracks for the fuel transfer carriages are continuous along the canal, and when operating, the carriage for one unit overlaps onto the track of the other unit. The canal must be drained for maintenance on the fuel handling equipment. The canal can be isolated from the spent fuel pool by gates which allow the canal to be drained for maintenance on fuel handling equipment. PX 652, Pages 9.4-4, 9.4-9 and 9.4-13 of FSAR; PX 640 at WISC 00060334.[17]

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores other significant testimony by Mr. Brewer. Mr. Brewer admitted that SNF storage racks could potentially be mounted on the sides of the transfer canals for temporary storage. Tr. 5482:9-12; 5483:1-6 (Brewer).

250. Work on equipment in the fuel transfer canal would require that any storage in the transfer canal, were it even possible, would by necessity be temporary storage. Tr.5482:17 - 5483:6 (Brewer).

**RESPONSE:**

WE does not dispute that SNF storage in the fuel transfer canal, if utilized, would have been temporary storage. PFF 110. WE witnesses testified that WE explored the use of the fuel transfer canal for temporary SNF storage. *Id.*

251. If additional spaces were added to the transfer canal for the storage of spent fuel, WEPCO would need to seek NRC approval. Tr.1137:14-19 (Zabransky).

---

[17] The Court ruled that, in the event plaintiff includes findings regarding the transfer canal issue in its findings of fact, defendant may in turn include findings on the transfer canal. Tr. 5484:5-13.

**RESPONSE:**

WE further objects to this proposed finding of fact as vague and misleading. It is vague because one cannot tell from this proposed finding what is meant by "[i]f additional spaces were added to the transfer canal for the storage of spent fuel."

As Dr. Singh explained, the standard for determining whether a licensee would need to seek NRC approval is whether the plant modification will impact any provision of the plant's technical specifications. PFF 110. To the extent that this proposed finding refers to a plant modification to add temporary SNF storage racks to the transfer canal, WE does not dispute that NRC approval may have been required.

Finally, WE objects to this proposed finding because the testimony on which it relies, exclusively that of Mr. Zabransky is not competent or reliable. The Government failed to establish that Mr. Zabransky had any knowledge regarding NRC license requirements. Instead, Mr. Zabransky admitted that he did not have a degree in nuclear engineering, had never worked in Reactor Engineering at Point Beach or any other nuclear power plant, had never worked for the NRC, and had not applied for an NRC license for a temporary rack. Tr. 565:21-566:6; 1145:18-1146:15 (Zabransky).

### D. WEPCO Determined That Operating At Reduced Power Would Not Be Cost-Effective

252. In its application to the PSCW for construction authority to replace the steam generators, WEPCO concluded that it was much more cost effective to incur a $119 million outlay than to operate at a reduced power. Tr. 2237:1-2240:19 (Porter); DX 172. In fact, in its application for authorization to construct an ISFSI, WEPCO concluded that operating at reduced power would be significantly more expensive than construction of an ISFSI. DX 171 at WISC 00014789.

**RESPONSE:**

WE objects to this proposed finding because it is vague. The proposed finding quantifies neither the amount of power reduction nor the duration during which WE would

need to operate at reduced power for that option to be less cost effective than incurring a $119 million expenditure.

WE also objects to this proposed finding because it is misleading. The Government cites WE's September 1992 Steam Generator replacement application as support for this proposed finding. However, in that application, WE was contrasting a $119 million expenditure against a 25 percent derating of the Unit 2 Steam Generator for a duration of 21 years. In analyzing this expenditure, WE was not facing a short-term reduction of power, but rather a very lengthy partial reduction in power in Unit 2 and the risk of total shutdown if the corrosion rate was not arrested. DX 172, p. WISC00014678. Even with this significant reduction in power generation over a lengthy period of time, the revenue requirements were only marginally higher than the Steam Generator replacement costs. *Id.*

The Government also alleges that WE's November 1991 dry storage application concluded that operating at reduced power would be significantly more expensive than construction of an ISFSI. The reduced power alternative in the 1991 application, however, assumed total shutdown of one of Point Beach's two units for eight years. WE agrees that constructing an ISFSI was expected to be more economically favorable than not operating a reactor for eight years, which is why WE chose the construction of an ISFSI to mitigate the substantial delay in DOE's performance.

253. Mr. Link testified that the option of reduced power was rejected:

> With respect to the remaining alternatives, reduced operation, new coal-fired base load, and purchased power, all of which address operation of Point Beach at less than full power, WEPCO concluded that operation at reduced power is fundamentally impractical, because the majority of costs are fixed and will not decrease with reduced power production, and also because power not produced by Point Beach will have to be replaced with more costly resources.

Tr.483:22-485:4 (Link).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate and misleading. Mr. Link did not make this statement in his trial testimony. The cited trial testimony contains a discussion of Mr. Link's October 1994 testimony before the PSCW in support of the dry storage application. Even in his October 1994 testimony, however, Mr. Link does not make this statement. DX 275.

In addition, WE analyzed a number of spent fuel management alternatives in the November 1991 dry storage application and ESR. The Government ignores that, by November 1991, WE expected that DOE would not accept spent fuel from Point Beach by 1998, but, instead, would be substantially delayed. PFF 69, 75, 77, 80-87, 89-90, 92-93, 96, 107, 115, 117; *see also* PFF 118. Thus, the analyses in the ESR were driven by DOE's anticipated breach. PX 236 (ESR), pp. 38-39 (analyzing spent fuel management alternatives), 53 ("Given current DOE schedules, the earliest an MRS could be operational is 2007."); PFF 110. After an analysis of the options, WE determined that a dry fuel storage facility most effectively mitigated the expected substantial delay in DOE's performance and allowed for storage of Point Beach's discharges through the end of the then-licensed reactor lives. PFF 87, 110-111, 115, 127.

Finally, while Mr. Link discussed the reduced power option in his October 1994 testimony, the Government ignores the context in which these comments were made. Mr. Link was discussing alternative methods of mitigating DOE's anticipated breach. DX 275, pp. 12-13 (reduced power operation considered as an *alternative* to dry fuel storage). Thus, his comments regarding the operation of Point Beach at reduced power in the breach world are irrelevant to short-term options that WE may have considered in the non-breach world in which DOE begins performance by 1998. WE PTB 37-40; PFF 182-184.

## XIII. EVIDENCE OF WEPCO'S POOL CAPACITY DEMONSTRATES THAT WEPCO NEVER USED 1,500 SPACES IN ITS POOL

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XIII.

**GENERAL OBJECTIONS TO SECTION XIII (DFF 254-261):**

The proposed findings of fact in Section XIII (DFF 254-261) are irrelevant for two main reasons. First, the relevant issue is whether WE had the ability to make 1500 pool spaces available. The evidence demonstrated this point beyond question. As reflected in a December 16, 1993 WE memorandum, there were 217 "empty, good spaces" and 36 "Other" spaces. Wisconsin Electric knew that, with some effort, 34 of the 36 "Other" spaces could be made "empty, good spaces." PFF 169, PX 321 (Dec. 16, 1993 Memo from Fieldhack re: Spent Fuel Pool Summary). Tr. 854:25-856:8; 865:18-866:23 (Hennessy) ("Well, when the Fieldhack memo came out, we had categorized all of the locations, what we knew about those locations, and we knew, I knew that, with some effort, that we would be able to regain the use of those spaces."); PDX 11 (blown-up versions of PX 728.9 and 727, side-by-side); Tr. 856:9-865:13 (Hennessy).

Second, WE actually made 32 of these 34 spaces available. PFF 171. The other two spaces can easily be made available by removing a dummy assembly and a rod can. PFF 171.

Further, these findings wrongly assume that WE had reason to use 1500 spaces in the pool in the breach (actual) world, but never did so. The evidence showed that, in the breach world, WE's wet storage needs peaked in 1998 at 1419 spent fuel assemblies. PX 529.

254. WEPCO completed the last re-rack of its SNF pool in 1980. With that rerack, storage locations for 1,502 spaces were installed. However, not all of the spaces were usable. Catwalks located on the north and south sides of the pool made some spaces inaccessible. DX 397; Tr.144:22-145:1 (Baumann).

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact as misleading because it ignores other, significant testimony by Mr. Baumann, namely, that WE used an offset handling tool to make the spaces under the catwalk accessible. Tr. 145:2-5 (Baumann); PX 674 (Offset Handling Tool operating instructions).

255. In 1989, the year that WEPCO initiated its dry fuel storage project, there were 1,387 spaces in the spent fuel pool that were available to store fuel assemblies. This number of available spaces remained the same through the end of 1990.[18] DX 15; DX 53 at HQR364 0241; DX 51 at WISC HQR364 0405.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because its discussion of the cited documents is inaccurate and misleading. The RW-859s reported that Point Beach had an "established" capacity of 1387, but did *not* state that the remaining spaces could not be made available for use. DX 53, p. HQR364 0241; DX 51, p. HQR364 0405. To the contrary, WE reported that obstructions in the pool would be cleared. DX 53, p. HQR364 0263.

WE notes that DX 15, cited by the Government, contains no storage capacity data.

WE also objects to the Government's citation to DX 28, DX 73, DX 214, and DX 53 in Footnote 18 as misleading. Each of these documents generally reflect the 36 spaces that Mr. Fieldhack identified in a contemporaneous memo (PX 321) as spaces that could be utilized with some effort and therefore were not "unavailable" if WE wanted to use them. PFF 169-172.

256. In 1991, when WEPCO applied for authorization to construct its ISFSI, there were 1,415 spaces in the spent fuel pool that were available to store fuel assemblies. In its application, however, WEPCO assumed that most of the spaces that were then unusable

---

[18] Other documents contemporaneous with WEPCO's decision to build an ISFSI also demonstrate that less than 1500 spaces were available for storage of SNF. *See, e.g.,* DX 28 at WISC00002797 (decommissioning estimate assumption stated "[o]nly 36 of the 1502 spaces in the spent fuel pool are unavailable"); DX 73 at WISC00001317 (1466 spaces currently available); DX 214 at WISC00009835 (analysis excludes 37 spaces leaving 1465 usable spaces); DX 58 at HQR364 0809 (1468 assemblies currently available).

could be made available. WEPCO's judgment was that 20 spaces was a reasonable estimate of the number of spaces that would remain inaccessible after WEPCO took additional actions to make spaces available. Tr.647:4-24 (Zabransky); Tr.2210:19-2211:11 (Porter); DX 171 at WISC00014753; DX 50 at HQR364 0465.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because, given that WE did not believe in 1991 that DOE would timely perform, there was no need to conduct an extensive analysis of how many of these 20 inaccessible spaces could have been made available. PFF 104, 107. In fact, it was established at trial that, in the 1991 application, WE used highly conservative assumptions regarding available spent fuel pool spaces in order to create a greater sense of urgency. PFF 105. More importantly, as discussed above, in a 1993 memorandum, WE documented the results of just such an analysis and stated that 1500 spaces could be made available. PX 321 (Dec. 16, 1993 Memo from Fieldhack re: Spent Fuel Pool Summary).

WE also established that Point Beach Reactor Engineering knew as early as the 1980s that 1500 spaces could have been made available to store SNF, if necessary. PFF 170-172.

WE objects to this proposed finding of fact because its discussion of DX 50 is misleading and inaccurate. This RW-859 reported that Point Beach had a licensed capacity of 1502 spaces and that Point Beach had an "established" capacity of 1488. DX 50, p. HQR364 0465. Moreover, WE reported that Point Beach had sufficient pool capacity to operate Unit 1 through April 1998 and Unit 2 through September 1998. DX 50, p. HQR364 0528. The RW-859 also stated that WE intended to preserve FCR, and WE could have done so in the non-breach world through a cask pit rack. PFF 182-211.

Finally, WE objects to this proposed finding of fact because it relies on testimony of Mr. Zabransky that is neither credible nor reliable. Mr. Zabransky is not a nuclear engineer and never worked at Point Beach (or in any other nuclear plant). Tr. 565:21-566:6; 569:13-15; 711:7-18; 711:23-712:15 (Zabransky). Mr. Zabransky's understanding of FCR was not

direct, but instead was derived from others in the Nuclear Power Department. Tr. 770:16-24 (Zabransky). The Government also ignores that Mr. Zabransky agreed with Mr. Porter that WE used conservative assumptions in the 1991 dry storage application. PFF 105.

257. By 1994, the year of the PSCW hearings on the dry cask storage project, 1,468[19] spaces had been made available in the spent fuel pool for storage of fuel assemblies. DX 450 at HQR364 0688.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because its discussion of DX 450 is misleading and inaccurate. This RW-859 reported that Point Beach had a licensed capacity of 1502 spaces *and that Point Beach had an "established" capacity of 1500*. DX 450, p. HQR364 00688. The RW-859 explained that only 2 slots would never be used to store SNF, and that 34 slots could be used as required. *Id.* It explained that: "19 SLOTS CONTAIN NON FUEL COMPONENTS WHICH COULD BE RELOCATED. 9 SLOTS ARE DAMAGED, BUT COULD BE REPAIRED IF NEEDED. 6 SLOTS ARE RECOVERABLE BY ADDITIONAL MODIFICATION OF POOL." DX 450, p. HQR364 00760.

Moreover, in DX 450, WE reported that Point Beach had sufficient pool capacity to operate Unit 1 through April 1998 and Unit 2 through September 1998 without dry storage. DX 450, p. HQR364 0688; DX 451, p. HQR364 0766.

WE also objects to the Government's citation in Footnote 3 to PX 346 and Mr. Anundson's testimony because the proposed finding ignores significant other evidence. As Mr. Anundson testified, the information in PX 346 is the PSCW's Final EIS and did not represent WE's plans. WE also did not operate Point Beach based on the assumptions in the

[19] The Final Environmental Impact Statement prepared by the PSCW, and issued in August, 1994, using data provided by WEPCO, assumed that 1457 spaces were available in the spent fuel pool for storage of fuel assemblies. Tr. 2759:20-2760:3; 2760:19-2761:14 (Anundson), PX 346 at WISC00003759.

charts in DX 346. Tr. 2780:1-7 (Anundson); DX 346, p. WISC0003757. Mr. Anundson further explained that "it wasn't like WEPCO wasn't going to address the debris baskets or the unavailable spaces or just leave the cells not to be used." Tr. 2780:13-16 (Anundson).

258. After PSCW approval of the dry cask storage facility, the number of usable spaces in the spent fuel pool remained at 1,468. Tr.137:24-138:23 (Baumann); PX 381 at HQR364 0809.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because its discussion of the PX 381 and Mr. Baumann's testimony is misleading and inaccurate. This RW-859 reported that Point Beach had a licensed capacity of 1502 spaces *and that Point Beach had an "established" capacity of 1500.* PX 381, p. HQR364 0809; Tr. 142:18-143:1 (Baumann). As in prior RW-859s, this RW-859 explained that only two slots would not be used to store SNF, and that 34 slots could be used as required. *Id.* It explained that: "19 SLOTS CONTAIN NON FUEL COMPONENTS WHICH COULD BE RELOCATED. 9 SLOTS ARE DAMAGED, BUT COULD BE REPAIRED IF NEEDED. 6 SLOTS ARE RECOVERABLE BY ADDITIONAL MODIFICATION OF POOL." PX 381, p. HQR364 00760.

259. Even as late as 1997, when WEPCO was unable to load VSC-24 casks, only 1,484 spaces had been made available for storage of fuel assemblies in the spent fuel pool. Tr.2112:23-2113:1 (Holzmann), DX 75, p. WISC 00059463.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because it ignores significant other testimony in which Mr. Holzmann explained that DX 75 was based on breach world assumptions – *i.e.*, no DOE performance was expected by 1998. Tr. 2137:4-7 (Holzmann). Again, there is ample evidence that 1500 spaces could be made available and were made available. PFF 12a.

260. In 1996, WEPCO's annual inventory records indicate that 12 pool spaces were damaged and should not be used for insertion or removal of fuel assemblies. Tr.929:19-930:8 (Hennessy), DX 206, DDX 1-8. For fuel inventory records thereafter, see the following. DX 193 (1997 fuel inventory); PX 529 (1998 fuel inventory); PX 559 (1999 fuel inventory); PX 585 (2000 fuel inventory); PX 591 (2001 fuel inventory); DX 305 (2002 fuel inventory).

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because it ignores significant other testimony regarding the fuel inventory records. Mr. Hennessy explained that limitations inherent in the inventory document meant that it "does not actually indicate the true status of the locations." Tr. 929:22-930:1 (Hennessy). In fact, the hash marks that appeared on the inventory did not mean that a spent fuel assembly could not be stored in the cell or space. Tr. 960:7-20 (Hennessy).

261. By 2003, WEPCO's annual inventory records indicate that six spaces were damaged, including some new spaces that were not listed as damaged in the 1996 inventory. Tr.937:20-938:6 (Hennessy); PX653 (2003 fuel inventory); DDX 1-8.

**RESPONSE:**

WE incorporates its General Objections to Section XIII (DFF 254-261), above.

WE objects to this proposed finding of fact because it ignores significant other testimony regarding PX 653. Mr. Hennessy explained that, of the six spaces, two are under the canal door hinges. Tr. 937:20-938:2 (Hennessy). These locations are not used to store spent fuel assemblies, but are used to store non-fuel components – a vacuum device and reactor vessel specimen basket that had previously occupied two of the 1500 available spaces. Tr. 887:9-16; 937:20-938:2 (Hennessy).

The remaining four, though shaded as damaged on the inventory, are "available for use." Tr. 938:19-939:1 (Hennessy). WE simply uses greater care in loading spent fuel assemblies in those spaces, including the use of a camera to show operators where to place the spent fuel assembly to avoid any problems. Tr. 938:10-939:1 (Hennessy).

## XIV. WEPCO'S DECISION TO UTILIZE THE VSC 24 CASKS

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XIV.

**GENERAL OBJECTIONS TO SECTION XIV (DFF 262-272):**

The proposed findings of fact in Section XIV (DFF 262-272) are irrelevant to any issue in this case. WE established at trial that WE's initial decision to procure VSC-24 dry storage casks properly mitigated DOE's partial breach of the Standard Contract. PFF 127. In Section XIV, the Government does not appear to question WE's decision to procure VSC-24s, but apparently implies (incorrectly) that WE should not have shifted to the NUHOMS cask because of alleged "benefits" in the flawed VSC-24 design.

Section XIV (DFF 262-272) ignores that, in 1996, WE experienced a hydrogen ignition event when loading the third VSC-24, which seriously disrupted WE's SNF storage operations. PFF 136. After careful consideration of its options, WE subsequently switched to the NUHOMS system for WE's future SNF storage needs. PFF 152. The reasons that WE switched to the NUHOMS system included, among others, the following: (1) the NUHOMS was licensed to store a greater variety of SNF than the VSC-24 in 2001, (2) the NUHOMS is a dual-purpose cask and will not need to be unloaded for transport off-site, resulting in increased safety and reduced radiation exposure compared to the VSC-24, (3) the NUHOMS is easier to load than a VSC-24, (4) the VSC-24 produces 10 to 100 times more explosive hydrogen gas during loading compared to the NUHOMS, and (5) Point Beach benefited from the fact that the other nuclear power plants in the Nuclear Management Corporation ("NMC") system also used the NUHOMS system. *Id.*

There are no utilities currently loading VSC-24 casks. PFF 153. The Government's proposed findings of fact in Section XIV fail to establish that it was unreasonable for WE to shift to the NUHOMS system in view of the numerous safety and operational advantages that

the NUHOMS system has compared with the VSC-24. PFF 152. Consequently the proposed findings in Section XIV should be disregarded.

262. During WEPCO's evaluation of its dry storage options, it worked with Sierra Nuclear to prepare estimates of the cost of unloading the cask and then reloading the fuel into another cask for transportation by DOE. Tr.2747:15-2748:10 (Anundson). WEPCO assumed the VSC-24 casks would not be transportable. Id.

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272), above.

WE objects to this proposed finding of fact because it is inaccurate. WE believed that the VSC-24 might be acceptable for SNF transportation with a certified, compatible transportation cask. DX 171, pp. WISC00014791-2. WE anticipated that further research and development would "develop further the concept of an overpack shipping cask for use with the MSB." DX 171, p. WISC00014792.

263. Specifically, the estimates assumed that WEPCO would be required to cut the casks open and place the assemblies into a DOE shipping cask. Tr.2748:11-14 (Anundson); DX 171.

**RESPONSE:**

WE incorporates its General Objections to Section XIV above.

WE objects to this proposed finding of fact as vague. It is vague because one cannot tell from this finding what is meant by the "estimates."

To the extent that this proposed finding of fact refers to the loading and unloading costs referenced in DX 171, p. WISC00014791, WE does not dispute that, at the point in time referenced in this proposed finding, the VSC-24 was not licensed for transportation.

264. WEPCO estimated that the total cost of this process would be $55,000 per VSC-24 cask. Tr.2748:15-2749:2 (Anundson); DX 171.

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272) above.

WE objects that this proposed finding of fact as vague. It is vague because one cannot tell from this finding what is meant by the phrase "this process."

To the extent that this proposed finding of fact refers to the loading and unloading costs referenced at DX 171, p. WISC00014791, WE objects to this proposed finding of fact because it is inaccurate. The $55,000 figure was the "current value" of the costs per cask at the time of the application. DX 171, p. WISC00014791. WE assumed the cost of unloading the cask and reloading a cask later would not occur until "10 to 20 years" after the cask went into service. *Id.*

265. Based upon this estimate, WEPCO concluded that, even considering the costs of unloading the casks and reloading the fuel into DOE casks, the cost of a storage-only cask was less than the cost of a dual-purpose cask. Tr.2749:7-12 (Anundson); DX 171.

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272) above.

WE objects to this proposed finding of fact as vague. It is vague because one cannot tell from this finding what is meant by the phrase "this estimate."

To the extent that this proposed finding of fact refers to the loading and unloading costs referenced at DX 171, p. WISC00014791, WE does not dispute that WE believed at the time of its 1991 dry storage application that the estimated financial cost of a storage-only cask was less than the estimated financial cost of a dual-purpose cask. Tr. 2749:7-12 (Anundson); DX 171. This proposed finding, however, ignores the environmental costs and employee exposure to radiation associated with the reloading of spent fuel that occurs when spent fuel is stored in a storage-only cask. Tr. 293:25-295:22 (Baumann) (WE is required to do economic analyses based on dollars per REM of radiation exposure). The minimized SNF handling with a dual-purpose cask also reduces the likelihood of an accident. PFF 152c.

WE also incorporates its Response to DFF 266.

266. This conclusion was one of the reasons that WEPCO selected the VSC-24 casks. Tr.2749:13-17 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272) above.

WE objects to this proposed finding of fact as vague. It is vague because one cannot tell from this finding what is meant by the phrase "this conclusion."

WE objects to this proposed finding as misleading because it ignores significant other evidence. For example, Mr. Anundson testified that cost was only one criterion resulting in WE's selection of the VSC-24. Tr. 2749:13-17 (Anundson). As discussed in WE's General Objections to Section XIV (DFF 262-272) above, however, in 1996, WE experienced a hydrogen ignition event when loading the third VSC-24, which seriously disrupted WE's SNF storage operations. PFF 136. After careful consideration, WE subsequently switched to the NUHOMS system for WE's future SNF storage needs. PFF 152. There are no utilities currently loading VSC-24 casks. PFF 153.

267. WEPCO developed procedures for cutting the VSC-24 casks open for transfer of the SNF into another cask when DOE performed at Point Beach. Tr.2749:18-2750:6 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272) above.

WE objects to this proposed finding of fact because it is not supported by the cited testimony. Mr. Anundson testified that WE developed procedures for unloading casks for several reasons. Tr. 2749:18-2750:6 (Anundson). Mr. Becka further testified that the procedure for unloading a VSC-24 related to any situation where that might be necessary, and was not limited to shipment to DOE. Tr. 1720:21-1721:1 (Becka).

268. Transportation capability or licensing for transportation was not something that was necessary for the storage of spent nuclear fuel at WEPCO. Tr.2750:7-2751:3 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272), above.