WE further objects to this proposed finding of fact because it is not supported by the cited testimony. Mr. Anundson testified only that a cask does not need to be able to transport SNF in order to store SNF. Tr. 2750:7-2751:3 (Anundson).

269. WEPCO was not required to buy the VSC-24 casks through Sierra Nuclear. Rather, WEPCO served as its own general contractor. Tr.2738:18-25 (Anundson) Tr.1562:25-1563:7; 1566:12-25 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272) above.

WE does not dispute that WE fabricated VSC-24 cask components and directly contracted with companies other than Sierra Nuclear to fabricate other VSC-24 cask components.

270. WEPCO believed it had "a fantastic quality assurance program" for building the VSC-24 casks. Tr.2738:23-25 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272), above.

WE does not dispute Mr. Anundson's testimony regarding WE's quality assurance program.

271. In addition to the other benefits of using the VSC-24 cask, British Nuclear Fuels Limited ("BNFL"),[20] the company that purchased Sierra Nuclear, received a revised certificate of compliance which expanded the limitations on enrichment and burn-up for fuel stored in the VSC-24s. Tr.1567:1-16 (Krieser); Tr.5509:22-5513:8 (Brewer); DX 409.

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272), above.

WE objects to this proposed finding of fact as vague. It is vague because one cannot tell from this finding what is meant by the term "benefits."

[20] BNFL purchased Sierra Nuclear in May 1998. Tr. 5923:6-19 (Hamal).

WE further objects to this proposed finding of fact as misleading because the NRC did not issue the certificate until January 2003. By 2001, WE had already decided to discontinue loading VSC-24s and to shift to the NUHOMS system, which offered numerous safety and operational advantages over the VSC-24 in addition to dual-purpose capability. PFF 152.

272. After BNFL had purchased Sierra Nuclear, WEPCO reached the same agreement with BNFL to continue to fabricate the VSC-24 cask. Tr.1566:12-25 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XIV (DFF 262-272), above.

WE does not dispute Mr. Krieser's testimony referenced in this proposed finding of fact.

## XV. PROBLEMS AT POINT BEACH HALT THE LOADING OF THE VSC-24 CASKS AND SHUT-DOWN BOTH UNITS 1 AND 2

273. On December 16, 1995, WEPCO placed its first VSC-24 cask containing 24 fuel assemblies on the ISFSI pad. Tr.1917:13-1918:14 (Becka); DX 80; DX 616.

**RESPONSE:**

WE does not object to this proposed finding of fact.

274. On May 26, 1996, WEPCO placed the second loaded VSC-24 cask on the ISFSI pad. Tr.1918:15-17 (Becka); DX 80; DX 616.

**RESPONSE:**

WE does not object to this proposed finding of fact.

275. While WEPCO was loading its third VSC-24 cask in May 1996, a hydrogen gas ignition event occurred. WEPCO aborted the loading and returned the SNF fuel assemblies to the spent fuel pool. Tr.2019:6-2020:3, Tr. 2023:2-21 (Holzmann); PX 424 at WISC 00010137-10151.

**RESPONSE:**

WE objects to the proposed finding as vague because it fails to identify where the hydrogen ignition event occurred. The May 1996 ignition event occurred at Point Beach. PFF 136.

276. On June 3, 1996, the NRC issued Confirmatory Action Letter ("CAL") No. 3-96-0005, in which it suspended any use of the VSC-24 cask pending review and acceptance of any corrective action necessitated by the hydrogen gas event. Tr.2020:25-2022:11 (Holzmann); PX 1034; DX 78.

**RESPONSE:**

WE objects to this proposed finding to the extent it suggests that corrective action may not have been necessitated. The NRC's CAL 3-96-0005 required WE to assess the potential for the generation and ignition of explosive gases during all phases of operation of the VSC-24 system, to implement compensatory actions to minimize the potential for the generation and ignition of explosive gases, to implement procedures for responding in the event of a gas ignition, and to train and brief personnel regarding the procedures for responding to gas ignition events. Only after completing all of these efforts could WE seek approval from the NRC to load additional VSC-24 casks by providing 14 days advance notice to the NRC of any loading or unloading of a VSC-24 cask. PX 1034, p. 2.

277. Shortly after the hydrogen gas event, WEPCO assembled a dry fuel storage group to focus on its goal to resume loading VSC-24 casks to the ISFSI at Point Beach. Tr.2023:22-2024:20 (Holzmann).

**RESPONSE:**

WE objects to this proposed finding because it is misleading. Although a purpose of the Dry Storage Group was to recover the ability to load dry storage casks, the Government ignores that another goal of the recovery effort was to examine and maximize the safety with which WE could utilize the VSC-24 cask at Point Beach. The recovery effort included identifying potential issues that existed in the VSC-24 design, such as the generation of

explosive hydrogen gas arising from the reaction of the borated water with the VSC-24's carbo-zinc interior coating. Although WE hoped to recover the ability to load VSC-24 casks, the safe operation of Point Beach was of paramount importance. Tr. 201:11-203:10 (Baumann); Tr. 2028:17-2031:11 (Holzmann); PX 645, p. WISC00130146.

278. WEPCO shut-down Point Beach Unit 2 in October 1996 for the steam generator replacement project. DX 479 at WTK001 0479; DX392 at ¶19 (Hamal Report).

**RESPONSE:**

WE does not dispute this proposed finding of fact.

279. In December 1996, WEPCO paid $325,000 in civil penalties to the NRC, "for performance deficiencies and violations of NRC requirements in various plant activities." PX 801 at KRGWE000274. On January 27, 1997, the NRC issued a letter informing WEPCO of additional potential violations that it had observed during a special inspection and noting the "declining trend" of operations at Point Beach. Id.; see also DX 479 at WTK0010479.

**RESPONSE:**

WE objects to this finding because it has no relevance to any issue in this case, but, instead, appears designed to portray WE in a poor light. The payment of civil penalties to the NRC and the NRC's issuance of a declining trend letter are not relevant to the spent fuel management decisions that WE made in the actual world or may have made in the non-breach world.

280. WEPCO committed to keeping Unit 2 shut-down until the issues identified by the NRC were resolved. DX 235.

**RESPONSE:**

WE objects to this proposed finding as vague because it neither specifies any dates nor "the issues" identified by the NRC.

Additionally, the Government's allegation that the NRC identified "the issues" to be resolved is inaccurate. To the contrary, as part of implementing a plan for achieving operational excellence, it was WE, in a December 1996 letter, who provided to the NRC a list

of issues that WE believed required resolution prior to the restart of Point Beach Unit 2 after its fall 1996 refueling outage. DX 235, p. 1 ("we were requested to provide a list of issues which we believe will require resolution prior to the restart of Point Beach Nuclear Plant, Unit 2").

Further, nowhere in its December 1996 letter did WE commit to keeping Unit 2 shut down until the identified issues were resolved. WE advised the NRC that it would "routinely update [the NRC] and [its] staff as to our progress and any necessary changes to this list." DX 235, p. 1.

The proposed finding of fact also is misleading to the extent it suggests that WE could not restart Point Beach Unit 2 without NRC approval. Point Beach Unit 2 was permitted to operate while WE addressed the list of issues it provided to the NRC. In fact, even though the NRC did not rescind its declining trend letter until January 21, 1998, WE began operating Point Beach Unit 2 in August 1997 after the Steam Generator replacement project. DX 479, p. WTK001 0479.

281. In February 1997, WEPCO shut down Unit 1 at Point Beach because of equipment problems, and it remained out-of-service so that WEPCO could focus on the work needed to bring Unit 2 back on line. DX479 at WTK001 0479; DX392 at ¶ 20 (Hamal Report).

**RESPONSE:**

WE does not dispute this finding of fact.

282. On May 16, 1997, the NRC issued a second CAL, No. 97-7-004, which prohibited further use of VSC-24 casks until there was a resolution of the weld cracking problems that had been encountered by other utilities using the VSC-24 casks. Tr.2031:18-2033:8 (Holzmann); Tr. 2035:8-2036:15 (Holzmann); Tr.2040:9-2040:15 (Holzmann); DX 194; PX 1035; DX 479 at WTK0010480.

**RESPONSE:**

WE objects to this proposed finding as vague and misleading because CAL 97-7-004 only restricted the use of VSC-24 casks at Point Beach. The NRC issued CAL 97-7-001 to

Sierra Nuclear requiring the VSC-24 fabricator to determine the root cause of the weld cracking and to determine appropriate corrective actions. PX 1035 (CAL 97-7-01). The NRC also issued CALs 97-7-002 and 97-7-003 to the Palisades and Arkansas Nuclear One plants, restricting the use of VSC-24 casks at those plants. PFF 136.

Further, the proposed finding ignores that CAL 97-7-004 was supplemented by CAL 97-7-004A on September 5, 1997, which prohibited the loading of VSC-24 casks at Point Beach until WE and Sierra Nuclear adequately addressed the NRC's Request for Additional Information and implemented additional corrective actions. PX 1036 (CAL 97-7-004A).

WE also objects to the proposed finding as misleading because it suggests that weld cracking concerns were limited to other utilities. WE also was forced to develop new procedures and identify mechanisms to avoid the cracking in the cask lid welds. Tr. 2040:9-2042:7 (Holzmann); PX 525; PFF 136.

283. Point Beach Unit 2 went back on-line in August 1997 after the steam generator was replaced, then was shut-down again from mid-1997 through February 1998, because of various equipment issues. DX479 at WTK001 0479; DX392 at ¶20 (Hamal Report).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate. Point Beach Unit 2 was not shut-down in *mid-1997*. Instead, Point Beach Unit 2 was taken out of service only from *mid-November 1997* through early February 1998 to address equipment issues. DX 479, p. WTK001 0479.

284. On September 12, 1997, the NRC issued a closure notice relating to the hydrogen gas event. DX 78.

**RESPONSE:**

WE objects to the proposed finding of fact because it is misleading. Although the NRC issued a closure notice for CALs RIII-96-0005 and 3-96-005A on September 12, 1997, the NRC's closure letter required WE to continue incorporating revised procedures to

mitigate the buildup of explosive gases in the VSC-24 casks. DX 78, p. 2; PFF 139. The NRC also promised to continue to examine activities related to the dry cask storage program during future inspections. DX 78, p. 2.

285. On October 20, 1997, WEPCO invited proposals from other cask vendors for casks to be used at Point Beach by early 2000. PX471; DX149.

**RESPONSE:**

WE objects to the proposed finding of fact because it is not accurate. WE's invitation for proposals from cask vendors stated that WE was seeking other casks for anticipated use beginning in the year 2000, not early 2000. PX 471; DX 149. The Government's proposed finding also ignores WE's expression of interest in transportable technologies. *Id.*

286. In December 1997, Unit 1 at Point Beach was brought back into service through February 1998, when it began a three-month refueling outage. DX479 at WTK0010479; DX392 at ¶20 (Hamal Report).

**RESPONSE:**

WE objects to the proposed finding of fact because it is vague and inaccurate. Although WE began a scheduled refueling outage of Point Beach Unit 1 in mid-February 1998, the Unit 1 refueling outage ended in late June 1998 (*i.e.*, 4 ½ months later), with WE initiating its first 18-month extended fuel cycle as part of that refueling. PX 801, p. KRGWE000305.

287. As a result of these outages, Point Beach had roughly a full year of lost production. DX 392 at ¶20.

**RESPONSE:**

WE objects to this proposed finding as misleading in stating that Point Beach WE "lost" a year of production. The refueling outage and the Steam Generator replacement outage were scheduled and planned far in advance. In addition, until 1998, WE shut down each Point Beach Unit for a refueling outage every year. Thereafter Point Beach went to 18-month refueling outages. PX 801, p. KRGWE000305.

288. Because WEPCO's reactors at Point Beach were shut down after 1996, SNF discharges from those reactors were lower than had been previously forecast, ultimately reducing the amount of SNF discharged at Point Beach by approximately 56 assemblies in 1997. Tr.2673:19-2675:5 (Farron); Tr.5867:20-5868:10, Tr.5878:21-5881:7, Tr.5963:9-5964:14 (Hamal).

**RESPONSE:**

WE objects to this proposed finding because it is inaccurate and not supported by the evidence. The Point Beach reactors were not "shut down after 1996." Both Units 1 and 2 were operational during 1997. DX 479, p. WTK001 0479. Further, annual refueling outages were standard operating procedure from the time of Point Beach's start-up through 1998, when Point Beach shifted to an 18-month refueling cycle. PX 801, p. KRGWE000305. Moreover, the testimony of Mr. Farron does not support the point for which it is cited by the Government. Mr. Farron testified that, in the nonbreach world, WE could have altered its operating cycles and reduced its spent nuclear fuel output such that Point Beach could have operated into 1999 without dry fuel storage. Tr. 2588:6-2589:6 (Farron).

WE also objects to this proposed finding as misleading because it ignores that Point Beach discharged 98 assemblies in 1998, far more than the 56 assemblies annually discharged on average. PX 796, p. KRGWE003252.

WE further objects to this proposed finding as unsupported by the evidence because the finding fails to explain or substantiate the previous forecast referenced in this finding. Additionally, Mr. Farron did not discuss discharge forecasts in his cited testimony. Thus, the proposed finding relies solely on Mr. Hamal's testimony. The Government, however, may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

289. In January 1998, the NRC issued a letter stating that the negative trend at Point Beach had been arrested. DX479 at WTK001 0479.

**RESPONSE:**

WE objects to the proposed finding as misleading. The NRC's January 1998 letter informed WE "that the corrective actions [being taken by WE] have been effective in addressing [the NRC's] concerns and that the adverse trends in performance at Point Beach have been arrested." DX 479, p. WTK001 0479.

## XVI. WEPCO USED THE 900 MTU RATE IN ITS PLANNING DOCUMENTS

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section XVI (DFF 290-309).

**GENERAL OBJECTIONS TO SECTION XVI (DFF 290-309):**

WE objects to the proposed findings of fact in Section XVI (DFF 290-309) because they are misleading. Notwithstanding the Government's misleading title to this section, WE did not create decommissioning cost studies for the purpose of SNF storage planning. Instead, WE contracted for the estimates to provide a "site-specific Decommissioning Cost Estimate" assuming that WE permanently shut down the Point Beach reactors in 2010 and 2013. DX 28, p. WISC00002788. By the time WE received its first decommissioning cost estimate from its contractor NES in October 1994, DOE had already told the nuclear power industry in May 1994 that it was not obligated to timely perform. Thus, any DOE acceptance rates identified as starting in 1998 were entirely fictional. DX 28 (October 26, 1994 cover letter); PFF 122b (May 1994 DOE Notice of Inquiry).

WE knew that DOE was not going to timely perform by 1998, but inserted DOE's published SNF acceptance rates into the decommissioning studies *because that was the information that the DOE had made available* to WE and the public. Tr. 2783:10-2784:16 (Anundson). Thus, the Government's proposed findings of fact regarding decommissioning

cost estimates are irrelevant because they do not reflect the assumptions in WE's SNF storage planning. PFF Sections VI-XIII (PFF 69-135).

290. Mr. Zabransky was responsible for developing, for a PSCW decommissioning rate case, the estimate that established the appropriate rate of collection from the ratepayers to set up a reserve that would be used to decommission the Point Beach facility. Tr.1106:15-1108:10 (Zabransky). He developed the estimate over the period 1992 to 1993. Id.

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE disputes this proposed finding of fact because it is unsupported by the evidence cited and is contradicted by the evidence. Mr. Zabransky testified that he contracted with an outside contractor to develop the decommissioning cost estimate and that Mr. Fieldhack, not Mr. Zabransky, worked with the contractor to develop the detailed cost estimate. Tr. 1107:18-1108:10 (Zabransky). Moreover, the NES decommissioning cost estimate was not even provided to WE (Mr. Anundson) until October 1994 which was months after Mr. Zabransky left WE to work for DOE. DX 28 (October 26, 1994 cover letter); PFF 19 (Zabransky left Nuclear Department in July 1994).

291. Mr. Zabransky contracted with NES, Inc. ("NES"), a Connecticut company that performs decommissioning studies, to evaluate and analyze WEPCO's decommissioning options for the Point Beach facility. Tr.1107:2-1110:1 (Zabransky). NES developed the cost estimate for the decommissioning rate case. Id. WEPCO and NES both made efforts to make sure the decommissioning costs estimates for WEPCO were accurate. Tr.2764:5-9 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it ignores significant other testimony. Mr. Anundson testified that, while WE sought to insure the accuracy of the decommissioning cost estimates, it included DOE's planned SNF acceptance rates simply because those were the rates that DOE was publishing even though WE did not expect DOE to timely perform. Tr. 2764:5-9; 2783:2-2784:16 (Anundson).

WE further disputes this proposed finding of fact because it is unsupported by the evidence cited by the Government and is contradicted by relevant evidence. Mr. Zabransky testified that Mr. Fieldhack worked with NES to develop the detailed cost estimate. Tr. 1107:18-1108:10 (Zabransky).

Moreover, the NES decommissioning cost estimate was not even provided to WE (Mr. Anundson) until October 1994, which was months after Mr. Zabransky left WE to work for DOE. DX 28 (October 26, 1994 cover letter); PFF 19 (Zabransky left Nuclear Department in July 1994).

292. WEPCO planned to implement a near-term dismantlement decommissioning of Point Beach which would include, after shut-down, taking the plant apart and isolating the spent fuel so the rest of the plant could be dismantled. Tr.1107:12-1108:10 (Zabransky). WEPCO's plans were to keep its SNF in its spent fuel pool and in dry storage. Tr.1108:11-18 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it is not based on competent evidence. Mr. Zabransky was no longer with the Nuclear Department when NES provided the decommissioning study in October 1994 for use in developing WE's estimate. Therefore, he does not have personal knowledge regarding the assumptions used in WE's decommissioning studies. DX 28 (October 26, 1994 cover letter); PFF 19 (Zabransky left Nuclear Department in July 1994).

293. As part of the decommissioning evaluation process, Mr. Zabransky also contracted with Energy Resources International ("ERI") to estimate at what rate of acceptance DOE would perform, after the first ten years of disposal by DOE. DX 86; Tr.1110:9-1111:12 (Zabransky). ERI provided an estimated acceptance schedule to Mr. Zabransky in March 1993. DX 86. The acceptance schedule prepared by ERI used the 1991 ACR rates for the first ten years, then estimated that fuel would be removed from Point Beach at an acceptance rate of 900 MTUs for the following two years, 1800 MTUs for the following five years, and then a steady-state rate of 3000 MTUs thereafter, until 2030. DX 86 at WISC 00000456. The assumption underlying the estimate was a DOE acceptance start-date of 1998. Id. The

information provided by ERI was the best estimate of what WEPCO's future allocations would be. Tr.1112:12-16 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it is misleading and contradicted by the evidence. ERI's main role was to apply its proprietary computer model, SPNTFUEL, to estimate WE's allocations, based on various assumptions. DX 288, p. WISC00055981. ERI used "assumed" overall DOE SNF acceptance rates for the first ten years because those were the rates that DOE published to the public. DX 86 (referencing use of 1991 ACR); DX 288, p. WISC00055982.

294. Eileen Supko of ERI, one of the expert witnesses WEPCO retained for trial, provided the estimated rate of acceptance to Mr. Zabransky in 1993. DX 86; Tr.1110:9-1115:3 (Zabransky); Tr.3452:23-3454:2 (Supko). At the time Ms. Supko provided WEPCO with these projected allocations and discharges, she believed that the rates were reasonable. Tr.3454:3-3461:2, 3464:12-16 (Supko). WEPCO proffered no other analyses at trial that utilized higher rates. Tr.3458:8-13, 3460:10-25 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE disputes this proposed finding of fact as inaccurate and contradicted by the evidence. Ms. Supko testified that WE was reasonable in "informing the state public utility commission regarding what the DOE thought they were planning." Tr. 3459:19-25 (Supko). She did not say that the 900 rate was reasonable. Instead, she noted that it reflected the information contained in "an official DOE document at the time." Tr. 3458:18-20 (Supko). Further, WE did proffer other spent fuel analyses at trial that utilized higher rates. PFF 54-55; WE PTB 43.

295. In May 1994, Ms. Supko forwarded to Mr. Zabransky the methodology that ERI used to develop the acceptance schedule for WEPCO. DX 288; Tr.1115:17-1116:19 (Zabransky). The schedule provided by Ms. Supko in that transmission to Mr. Zabransky relied upon the allocation rates identified in the 1992 ACR, which were identical to those in the 1991 ACR. DX 288; Tr.1117:2-13 (Zabransky).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it is misleading and contradicted by the evidence. ERI's main role was to apply its proprietary computer model, SPNTFUEL, to estimate WE's allocations, based on various assumptions. DX 288, p. WISC00055981. ERI used "assumed" overall DOE SNF acceptance rates for the first ten years because those were the rates that DOE published to the public. DX 86 (referencing use of 1991 ACR); DX 288, p. WISC00055982.

296. NES subsequently prepared a decommissioning cost estimate for WEPCO dated October 1994, and used the acceptance schedule prepared by ERI. DX 28; Tr.2763:12-2764:17 (Anundson); compare DX 288 at WISC 00055983 with DX 28 at WISC 00002806; Tr.1123:17-1124:19 (Zabransky). WEPCO agreed with the information contained in its decommissioning study. Tr.2771:23-2772:11 (Anundson).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it ignores significant testimony. Mr. Anundson, on which this proposed finding purports to rely, also testified that, while WE sought to insure the accuracy of the decommissioning cost estimates, it included DOE's planned SNF acceptance rates because those were the rates that DOE was publishing even though WE did not expect DOE to timely perform. Tr. 2764:5-9; 2783:2-2784:16 (Anundson).

297. In its decommissioning cost study, WEPCO assumed that it would load 12 casks, with DOE acceptance commencing at an MRS in 1998. Tr.2764:20-2768:15 (Anundson); DX 28 at WISC 00002797.

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it ignores significant testimony. Mr. Anundson, on which this proposed finding purports to rely, also testified that, while WE

sought to ensure the accuracy of the decommissioning cost estimates, it used DOE's planned SNF acceptance rates because those were the rates that DOE was publishing, not because WE expected DOE to timely perform at those rates. Tr. 2764:5-9; 2783:2-2784:16 (Anundson).

298. In its decommissioning cost study WEPCO assumed that it would continue to load fuel to an ISFSI even as it gained space in its spent fuel pool. Tr.2768:16-2770:3 (Anundson); DX 28 at WISC 0000 2806.

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE does not dispute that the spent fuel is emptied from the spent fuel pool in the decommissioning cost study because the purpose of the decommissioning scenario selected for this cost estimate involved the removal of the entire facility, including SNF, from the site. DX 28, p. WISC0000 2788.

299. This was the only scenario considered in the decommissioning cost study. Tr.2757:4-2762:23, Tr.2770:3-2771:22 (Anundson); DX 28; <u>see</u> <u>also</u> PX 346 at WISC 00003758 (charts prepared by Mr. Anundson for the PSCW FEIS show use of 900 MTU rate).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact as vague because the phrase "[t]his was the only scenario" is vague.

WE further objects to the Government's citation to Mr. Anundson's testimony regarding PX 346 as misleading because it ignores significant other testimony.
Mr. Anundson further testified that charts in PX 346 did "not represent Wisconsin Electric plans" and that WE "didn't operate their facility based on the charts." Tr. 2780:1-12 (Anundson). WE further stated that the values in the charts would change, depending on the validity of its assumptions. PX 346, p. WISC00003758.

300. David Weaver, the nuclear asset manager at WE Energies, was in charge of updating WEPCO's decommissioning cost study in 1998. Tr.4974:6-10 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

301. Mr. Weaver and the finance group at the company reviewed the reports before they were finalized. Tr.4974:24-4975:3, 4983:25-4984:3 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact as vague because it is unclear what "reports" to which this proposed finding of fact refers.

302. The 1998 decommissioning cost study was filed with the PSCW. Tr.4984:4-7 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because the cited evidence does not support it. David Weaver stated that the study would have been filed with the PSCW, but did not testify that he knew whether it was filed with the PSCW. Tr. 4984:4-7 (Weaver).

303. The 1998 decommissioning study was produced because WEPCO was required by the PSCW to provide an updated site specific decommissioning cost estimate every four years. Tr.4985:21-4986:5 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

304. The 1998 decommissioning study was used to establish the decommissioning annuity which is paid by WEPCO's customers to fund the decommissioning trust. Tr.4986:6-10 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

305. The dollars in the decommissioning fund will ultimately be used to fund the decommissioning effort after the plant is shut down. Tr.4986:15-22 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

306. The assumptions in the 1998 decommissioning costs study were WEPCO's assumptions at the time. Tr.4986:23-4987:1 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact as vague because the "assumptions" to which this proposed finding of fact refers are vague and undefined. WE further objects to this proposed finding of fact because it is unsupported. Mr. Weaver testified that he did not become involved in spent fuel issues until 2000. Tr. 5016:6-10 (Weaver). Thus, this was not a matter within his expertise and, with regard to matters not within his expertise, he would engage the WE or the NMC subject matter expert for information. Tr. 4974:16-4975:23 (Weaver). It was not established at trial that Mr. Weaver had expertise in any areas covered in the decommissioning study.

307. In its 1998 decommissioning cost study WEPCO relied upon the 1995 ACR in making assumptions about the rate at which DOE would accept spent nuclear fuel. Tr.4987:2-22 (Weaver); DX 98 at WISC 0000 2018.

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE objects to this proposed finding of fact because it ignores significant other testimony. Mr. Anundson further testified that WE included DOE's planned SNF acceptance rates in decommissioning cost studies because those were the rates that DOE was publishing, although WE did not expect DOE to timely perform. Tr. 2764:5-9; 2783:2-2784:16 (Anundson). Indeed, by the time WE received the 1998 decommissioning cost estimate from its contractor NES, DOE had already told the nuclear power industry that it was not obligated

to timely perform and would not be doing so by 1998. DX 98 (October 16, 1998 cover letter); PFF 122.

308. WEPCO submitted DCSs in 1992 to DOE which reflected the acceptance rates in the 1991 ACR. DX 466.

**RESPONSE:**

WE incorporates its General Objections to Section XVI (DFF 290-309).

WE hereby incorporates by reference its General Response to Sections X (relating to WE's DCS and FDS submissions) and XVI (DFF 114-135, 290-309).

WE disputes this proposed finding to the extent that the Government wrongly implies that WE adopted the 1995 ACR rate through its DCS submissions. WE followed DOE's Instructions in filling out the DCS forms that it submitted to DOE in 1992 and those DCS instruction required utilities to use the allocations identified in the 1991 ACR. PX 246, p. HQR-001-2066. Thus, WE's submission of the DCSs did not indicate its assent to a specific acceptance rate because, by the late 1980s and thereafter, WE became increasingly concerned that DOE would not perform by 1998 at *any* rate. *See* PFF 75, 77, 79b, 83, 85, 87-89, 92, 93-94, 96, 104, 115, 117. Even though WE was convinced that DOE would not timely perform by 1998, WE submitted the DCSs and later FDSs to maintain pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that WE was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *See* PFF 123. WE also continued to perform its obligations under the Standard Contract because it did not want to give DOE an excuse for nonperformance or take any action that might jeopardize in any way eventual fulfillment of DOE's contractual obligations. *Id.* WE's actions had nothing to do with "acceptance" of the rate in DOE's 1995 ACR.

309. Furthermore, the final delivery schedules sent to DOE by WEPCO in 1997 reflected the acceptance rates in the 1995 ACR – the same rate as those in the 1991 and 1992 ACRs. DX 74; see also DX73 (data sent to PSCW in 1995 using 900 MTU rate).

**RESPONSE:**

WE hereby incorporates by reference its General Objections to Sections X (relating to WE's DCS and FDS submissions) and XVI above (DFF 114-135, 290-309).

WE objects to this proposed finding of fact as irrelevant because DOE had stated that it was not going to perform by 1998, and likely not until much later (2010 at the earliest), before WE submitted DX 73 to the PSCW and its FDSs to DOE in 1997. *See* PFF 122.

WE disputes this proposed finding to the extent that the Government wrongly implies that WE adopted the 1995 ACR rate through its FDS submissions. The testimony at trial established that WE did not submit the FDSs in expectation of DOE performance. As WE explained in PFF 123, WE submitted the DCSs because WE believed it was essential to maintain the pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that it was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. *Id.* WE also continued to perform its obligations under the Standard Contract because it did not want to give DOE an excuse for nonperformance or take any action that might jeopardize in any way eventual fulfillment of DOE's contractual obligations. PFF 123.

## XVII. THE OPINIONS PROFFERED AT TRIAL BY WEPCO'S EXPERT MS. SUPKO SHOULD BE IGNORED BY THE COURT

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section XVII (DFF 310-361).

**GENERAL OBJECTIONS TO SECTION XVII (DFF 310-361):**

In this case, Ms. Supko was qualified as an expert witness in "nuclear engineering, DOE's nuclear waste management program, the storage and transportation of spent nuclear fuel, and the modeling of acceptance rate scenarios and allocations of spent nuclear fuel acceptance rights." Tr. 3062:17-24 (Supko). The proposed findings criticize Ms. Supko for, among other things, not being involved in the DOE program in 1983, for not working on

issues related to the Standard Contract prior to 1990, and for not working for DOE. *See* DFF 310. The Court's aforementioned qualification of Ms. Supko, however, was not conditioned on Ms. Supko's becoming involved in these issues by a certain date, and the Court did not require that Ms. Supko have been employed by DOE. Tr. 3062:17-3096:23 (Supko). *See also* Tr. 3062:14-16 (Supko) (Ms. Supko has been qualified in other SNF trials at the U.S. Court of Federal Claims); PX 792, p.B-2, B-3. Thus, the Government's criticisms are of no significance.

The proposed findings are misleading because they mischaracterize Ms. Supko's opinion regarding the DOE acceptance rate. Ms. Supko evaluated, as a factual matter, whether certain DOE acceptance rates would accomplish the following objectives identified by WE counsel: (1) to accept spent fuel so as to limit additional at-reactor storage after January 31, 1998 and (2) to work off the backlog of accumulated spent fuel in order to allow timely decommissioning. PX 792, p.1. WE has already established that those objectives constitute DOE's contractual rate obligations. WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. Ms. Supko's opinion was limited to modeling four acceptance rate scenarios against the two aforementioned criteria provided by WE counsel. Tr. 3426:13-14 (Supko) ("I'm simply modeling acceptance rates."). When Ms. Supko evaluated the acceptance rate scenarios against those assumptions, she found that DOE performance at a steady-state acceptance rate of 3000 MTU after a five-year ramp up period most efficiently met the two criteria – the Standard Contract obligations – that Ms. Supko was directed to assume by counsel. Tr. 3098:24-3099:17 (Supko).

The Government seeks to diminish the validity of Ms. Supko's analysis by noting that she did not express opinions on other issues such as DOE's contract obligations and DOE's performance in the non-breach world. For example, the Government criticizes the data she modeled because it includes actual world and non-breach world information, notes that she did not analyze how utilities would have stored spent fuel in the non-breach world, and

criticizes her analysis for not considering intra-company and inter-company exchanges and the Standard Contract "plus or minus twenty percent provision." *See*, *e.g.*, DFF 319-324, 332-343, 344-361. The proposed findings, however, do not explain the impact, if any, that those criticisms may have on Ms. Supko's opinion that a 3000 MTU annual acceptance rate best accomplishes the criteria of (1) limiting additional at-reactor storage after January 31, 1998, and (2) working off the backlog in order to allow for timely decommissioning. The proposed findings also fail to address whether a 900 MTU annual acceptance rate can achieve those objectives. Thus, the Government's criticisms of Ms. Supko's opinion are without substance. Ms. Supko's opinion has the limited scope and purpose of determining which of four steady-state acceptance rates best met the two objectives provided by counsel and none of the Government's mischaracterizations of her analysis seriously challenges the overall result of Ms. Supko's modeling.

WE further objects that the proposed findings mischaracterize Ms. Supko's expert opinion regarding the "reasonableness" of various DOE acceptance rates. Ms. Supko's opinion is that:

> [I]f DOE had begun acceptance of [SNF] by January 31, 1998, an overall steady-state spent fuel acceptance rate of 3,000 [MTUs], reached after a five-year ramp up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning.

PX 792, p.1; Tr. 3098:24-3099:17 (Supko). Ms. Supko's opinion regarding the 3000 MTU rate, and other possible rates, is not whether they were reasonable in absolute terms, but instead, whether they met the two criteria. Ms. Supko addressed this issue in her testimony thusly:

> Q: Now, you're offering an affirmative opinion that the 3000 rate is reasonable, correct?

> A: *Based on the analysis that I performed and the criteria against which I was evaluating the, the acceptance rate,* yes, I am.
>
> Q: And you're not offering an opinion in this case that your scenarios two, three, and four are unreasonable, correct?
>
> A. I've not said they're unreasonable, and my opinion is that scenario one is a reasonable rate of acceptance. However, yesterday, I did go through questions from Mrs. Hughes, where she asked me about, and I don't recall the terms, *whether the rates were efficient, and maybe it was practicable, and I did comment that scenario two was neither, and scenario three might have been practicable from the standpoint of it could have been implemented, but it wasn't efficient.*

Tr. 3463:17-3464:11 (Supko) (emphasis added). As noted, Ms. Supko outlined how rates other than the 3000 MTU rate, which she termed Scenarios 2, 3 and 4, failed to satisfy efficiently the two objectives that she was considering. Tr. 3130:11-3133:13 (Supko); PX 792, pp. 10-13.

A. <u>**Ms. Supko's Opinions Are Irrelevant To This Case**</u>

310. Ms. Supko was not involved in the DOE program in 1983. She has never worked for the Department of Energy. She was not involved in any contract holder's discussion with DOE before the execution of the Standard Contract. Indeed, prior to working at ERI in 1990, she never had any discussions with DOE employees regarding issues related to the Standard Contract. Specifically, Ms. Supko did not personally begin to work on SNF issues related to the DOE program until 1990.[21] Tr.3430:21-3431:15 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

311. Ms. Supko's opinion that a 3,000 MTU acceptance rate is "reasonable" is irrelevant to any issue in this case.

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

[21] Prior to 1990, Ms. Supko had not reviewed documents such as the 1983 draft mission plan, the 1984 draft mission plan, or the 1985 mission plan that was submitted to Congress. Of course, she had no involvement in the preparation of those documents. Tr. 3431:16-3432:2 (Supko).

The proposed finding is unsupported, and it concerns a question of law, not a question of fact. Further, WE disagrees with this proposed finding because Ms. Supko's opinion reasonably establishes that the acceptance rate repeatedly used by DOE in its various analyses is the same rate that meets the aforementioned objectives. PFF 54; PX 792, pp. 20-22.

312. Ms. Supko is not offering an opinion regarding how DOE would have performed in the non-breach world. Tr.3425:19-22 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

313. Ms. Supko is not offering an opinion concerning what DOE's obligations are under the Standard Contract concerning the rate of acceptance. Tr.3425:23-3426:3 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

314. Ms. Supko is not offering an opinion concerning what rate of acceptance is required by the Nuclear Waste Policy Act. Tr.3426:4-8 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

315. Ms. Supko is not offering an opinion that the 3,000 MTU steady-state rate of acceptance would have been used by DOE in the non-breach world. Tr.3426:9-14 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

316. Ms. Supko is not offering an opinion that DOE has to satisfy the two key issues identified by counsel in the non-breach world, that is, that DOE was obligated to accept fuel from utilities to obviate the need for additional at-reactor storage after January 1998 and to work off the back-log. Tr.3426:15-19 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

317. Ms. Supko is not offering an opinion as to what the minimum reasonable rate of acceptance is. Tr.3465:4-8 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

318. Nor is Ms. Supko offering an opinion in this case that her Scenarios 2, 3, and 4 are unreasonable.[22] Tr.3464:12-16 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

### B. Ms. Supko's Model Mixes But-For And Actual Worlds

319. Ms. Supko's analysis is endeavoring to demonstrate a but-for world – that is, how much additional storage would have been required under various acceptance rates had DOE performed in 1998. However, Ms. Supko acknowledged that her model does not actually reflect the "but for" or the actual worlds. Tr.3404:21-3406:17 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE also objects that the proposed finding is inaccurate and misleading. Ms. Supko explained that her analysis is a "good representation of what the but-for world *may have* looked like." Tr. 3405:8-13 (Supko) (emphasis added). *See also* Tr. 3405:19-3406:17 (Supko) (explaining that her model relies on certain data from the breach world regarding the storage of spent fuel).

320. Ms. Supko characterizes her model as a hybrid between the but-for and the actual world. It is a hybrid because she includes in her model dry storage for certain utilities even though they claim they would not have used dry storage had DOE performed. Tr.3405:10-3406:6 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

---

[22] In fact, Ms. Supko believes that a rate or rates lower than 3000 MTU may be reasonable, but she has never conducted the analysis to determine what that rate may be. Tr. 3464:17-23 (Supko).

321. In fact, Ms. Supko includes dry storage in her but-for world model for WEPCO, despite its claim that it would have added a temporary rack had DOE performed. Specifically, Ms. Supko assumed, consistent with the Government's position at trial, that, even had DOE performed, WEPCO would have loaded the equivalent of five 24-assembly casks to dry storage.[23] Tr.3406:12-17; 3417:9-3418:16 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE further objects that the second sentence of the proposed finding is unsupported by the cited evidence. Ms. Supko never agreed with the Government's position that, even if DOE had performed, WE would have loaded five dry storage casks. Tr. 3406:12-17; 3417:9-3418:16 (Supko). To the contrary, and as identified in her testimony, report and SPNTFUEL model, Ms. Supko testified that, in her analysis, she simply accepted actual data from the breach world. Tr. 3405:8-17 (Supko); PX 792, App. A. The fact that Ms. Supko used actual world data does not mean that she agrees with the Government's position that WE would have built dry storage in the non-breach world.

322. Ms. Supko's model is also a hybrid between the "but for" and actual worlds because it assumes post-1998 re-racks for about a dozen utilities. Specifically, with regard to pool capacities, Ms. Supko's model is not consistently utilizing pool capacity for utilities as they existed in 1998. In fact, that is true for approximately 10 percent of Ms. Supko's model. Yet, she relies upon post-1998 pool modifications in modeling what she believes the additional at-reactor storage requirements would look like in a 1998 acceptance world. Tr.3407:9-3408:25 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

323. For example, Ms. Supko includes South Carolina's post-1998 re-rack in her but-for world model. Tr.3408:3-9 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

---

[23] In addition, Ms. Supko includes dry storage for NSP's Prairie Island plant in her but-for model despite NSP's claim that it would not have used dry storage had DOE performed. Tr. 3406:7-11 (Supko).

324. She also included the Southern Nuclear, Plant Hatch, post-1998 re-rack in her but-for model in this case, as well as a second bathtub rack that was not actually installed.[24] Tr.3408:10-25 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

**C. The Test Used By Ms. Supko In Her Analysis Is Not Supported By The Evidence**

325. Ms. Supko's ultimate opinion is that Scenario 1, using the 3,000 MTU rate, reflects a reasonable acceptance rate. Her reasonableness determination is based in part upon the output of her model and how those outputs impact two benchmarks, or the two-part test, that counsel for WEPCO asked her to consider. Those two benchmarks or tests are (1) the amount of additional SNF storage required after 1998, and (2) the number of years of post-shutdown SNF storage required. Tr.3420:1-3421:3 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

326. However, the WEPCO "benchmarks" lack any factual support. For example, a 3,000 MTU per year rate of acceptance is not included in either the Standard Contract or the NWPA. Tr.3426:20-24 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE objects that the proposed finding is unsupported by the evidence. First, the proposed finding does not explain how Ms. Supko's assumptions, *i.e.*, the "benchmarks," "lack factual support." To the contrary, the Standard Contract and the NWPA – read in their entireties – establish the "benchmarks" as DOE's acceptance rate obligations. WE Response

[24] Ms. Supko acknowledged that the use of post-1998 pool capacity may have an impact upon her calculation of additional storage requirements. For example, the amount of at-reactor storage she calculated would be even greater if she omitted the 2000 Plant Hatch re-rack from her pool capacity analysis and, if she did not assume the post-1998 re-rack for Southern Nuclear, she would have calculated Southern Nuclear as requiring additional at-reactor storage after 1998 based upon a strict oldest fuel first basis. Accordingly, the total number of plants with additional at-reactor storage after 1998 that Ms. Supko calculates would go from 14 plants to 15 plants. Tr. 3409:16-3410:23 (Supko).

to DFF 1, 27; PFF 48-51; WE PTB 41-42. Those "benchmarks" were also understood by the parties at the time of contracting as reflecting the DOE acceptance rate. PFF 48.

327. Similarly, neither the Standard Contract nor the NWPA contain a reference to the two key benchmarks that counsel for Wisconsin Electric has identified. Tr.3426:25-3427:4 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE further objects that the proposed finding is misleading. Ms. Supko indicated that she was not opining regarding the terms of the Standard Contract or the NWPA:

> Q: Sure. If the Court concludes that it needs to determine what rate the government is contractually obligated to perform at, you can't answer that question, correct?
>
> A: That sounds like a legal issue, and, no, I wouldn't answer that.

Tr. 3427:11-16 (Supko). As WE has established, the Standard Contract and the NWPA – read in their entireties – establish the "benchmarks" as DOE's acceptance rate obligations. WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42. Those "benchmarks" were also understood by the parties at the time of contracting as reflecting the DOE acceptance rate. PFF 48.

328. Furthermore, Ms. Supko could not identify <u>any</u> DOE documents that discuss these two key benchmarks or two-part test prior to the issuance of the Standard Contract. Tr.3428:2- 3429:5 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE also objects that the proposed finding is irrelevant because Ms. Supko was not expressing an opinion on this issue and she was not testifying as a fact witness.

WE further objects that the proposed finding is misleading. Regardless of whether Ms. Supko is aware of any documents regarding the "benchmarks" from prior to issuance of

the Standard Contract, WE has established that, during development of the Standard Contract, DOE and the industry discussed extensively the rate at which DOE would accept spent fuel. PFF 51. Those discussions confirm that the parties both understood that DOE would accept spent fuel at a rate that would preclude the need for additional at-reactor storage and work off the backlog of spent fuel at a reasonable rate. PFF 52.

329. In addition, Ms. Supko acknowledged that utilities and industry groups such as EEI requested the inclusion of language into the Standard Contract consistent with the two-part test advocated by counsel for WEPCO, and that language was not included in the Standard Contract. In fact, Ms. Supko acknowledged that Mr. Morgan, the first Director of OCRWM expressly rejected the inclusion of either a particular rate or a qualitative two-part test in the Standard Contract. Tr.3432:25-3436:6 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE also objects that the proposed finding is irrelevant because Ms. Supko was not expressing an opinion on this issue and she was not testifying as a fact witness.

The proposed finding is also misleading. Regardless of why DOE may have rejected or accepted certain commenters' proposed Standard Contract language, the parties were in agreement at the time of contracting that, in accordance with the Standard Contract and the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to pick up accumulated SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Moreover, during development of the Standard Contract, the parties discussed extensively the rate at which DOE would accept spent fuel. Those discussions confirmed that the parties both understood that DOE would accept approximately 3000 MTU of spent fuel annually. *See* PFF 51. Further, the parties both understood that the 3000 MTU rate would preclude the need for additional at-reactor storage and work off the backlog of spent fuel at a reasonable rate. PFF 52.

Thereafter, within six months of executing the Standard Contract, DOE's program documents confirmed the parties' understanding that DOE would comply with the terms of the NWPA by having an operational facility by 1998 that would ramp up to an annual acceptance rate of 3000 MTU, which would eliminate the need for utilities to construct additional storage after 1998 and which would work off the accumulated backlog at a reasonable rate. *See* PFF 61a.

Finally, Mr. Morgan's testimony demonstrates an understanding that DOE was able to identify in 1983 the rate of acceptance that would meet DOE's contract obligations. As the acting OCRWM director, Mr. Morgan knew that the 1983 Draft Mission Plan ramped up to a 3000 MTU steady-state annual rate, and that the 3000 MTU steady-state annual rate meant that "generally no utility would have to provide on-site storage after January 1998." PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3671:24-3672:4); PX 1052 (Morgan Dep. Desig. 3/21/02 Tr. 211:14-212:12); PX 1052 (Morgan Dep. Desig. 3/22/02 Tr. 225:19-24). *See also* PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3675:11-23 (Morgan knew that the 3000 steady-state annual rate was the only reference case used when he was acting director in 1983)); PX 1052 (Morgan Trial Desig. *Northern States* Tr. 3887:13-3888:21 (Morgan agreed that the 1983 Draft Mission Plan included rates that ramped up to 3000 MTU annually, and that the document was intended to "effectuate the intent of Congress")); PX 1052 (Morgan Trial Desig. *Yankee Atomic* Tr. 3677:23-3678:2 ("Q: But you wouldn't have made these statements in this program overview on [the 1983 Draft Mission Plan] if you didn't think it was appropriate to do so, did you? A: Of course not.")); Defendant's Testimony Designations, Dkt. 368 (Nov. 9. 2007) (Morgan Trial Desig. *PG&E* Tr. 2560:25-2561:6 ("Q: Well, let me ask you the question this way, Mr. Morgan, you don't have any recollection of any consideration in June or July 1983 timeframe within the [DOE] regarding the acceptance of amounts less than those shown here in table 3-3 [of the 1983 Draft Mission Plan, which ramped up to 3000 MTU annually], do you? A: No.")).

330. None of the 16 documents Ms. Supko identified to support her opinion regarding the "reasonableness" of a 3,000 MTU acceptance rate reflect DOE performance in 1998 at a single repository at a 3,000 MTU rate of acceptance after a 5 year ramp up, which she purports to model in this case. Tr.3535:5-13 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

Further, the proposed finding is misleading. Early OCRWM program documents were *consistent* with the parties' understanding of DOE's acceptance rate obligations under the Standard Contract and were relied upon by both parties. PFF 61, 69, 70, 73, 82. These documents confirmed that DOE planned to accept spent fuel at a rate sufficient to preclude additional at-reactor storage after January 31, 1998 and to work off the backlog at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51, 61, 69, 70, 73, 82; WE PTB 41-42. That rate was a steady-state rate of 3000 MTU annually. PFF 51-53, 61. It was not until later, faced with the reality of its inability to timely perform and likely liability to the utilities for that nonperformance, that DOE's planning disingenuously changed to include a substantially lower 900 MTU annual rate of acceptance. PFF 86, 90, 98, 100, 101, 122; PX 149, 150, 175, 183; WE PTB 41-49.

In any event, all of the documents that Ms. Supko identified in her opinion identify DOE plans for a 3000 MTU rate of acceptance at a single facility, whether that facility is the first repository, second repository or an MRS facility.

331. Ms. Supko acknowledged that her analysis in this case is based upon a benchmark that DOE rejected at the time of contract formation. Tr.3436:23-3438:6 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE also objects that the proposed finding is irrelevant because Ms. Supko was not expressing an opinion on this issue and she was not testifying as a fact witness.

The proposed finding is also misleading. The parties were in agreement at the time of contracting that, in accordance with the NWPA, DOE would accept spent fuel at a rate sufficient to eliminate the need for additional at-reactor storage after January 31, 1998 and to pick up accumulated SNF at a reasonable rate. *See* WE Response to DFF 1, 27; PFF 48-51; WE PTB 41-42.

Moreover, during development of the Standard Contract, the parties had already extensively discussed the rate at which DOE would accept spent fuel. Those discussions confirmed that both the industry and DOE understood that DOE would accept approximately 3000 MTU of spent fuel annually. *See* PFF 51. Further, the parties both understood that the 3000 MTU rate would preclude the need for additional at-reactor storage and work off the backlog of spent fuel at a reasonable rate. PFF 52.

### D. Ms. Supko's Rate Does Not Support Her Assertions Regarding DOE's Obligations Under The Standard Contract

For the convenience of the Court, WE sets forth here its General Objections to the main contentions contained in Section XVII.D and XVII.E (DFF 332-343).

**GENERAL OBJECTIONS TO SECTION XVII.D and XVII.E (DFF 332-343):**

The proposed findings in these sections are misleading. Ms. Supko never claimed that her analysis found a rate that would necessarily preclude *all* additional at-reactor storage after January 31, 1998 and work off the backlog in order to allow timely decommissioning in a *fixed* period of years. As expressly stated, her analysis considered which of several specific acceptance rate scenarios best *limited* additional at-reactor storage after January 31, 1998 and worked off the backlog to allow *timely* decommissioning based on the data available from the non-breach and breach worlds. PX 792, p. 1; PDX 36; Tr. 3098:21-3099:17 (Supko).

332. Ms. Supko's analysis does not meet WEPCO's claimed obligation of precluding the need for all additional at-reactor storage after 1998. In fact, under her Scenario 1, using the 3,000 rate, she calculated that there are 14 utilities, or 10 percent of the

industry, that have additional at-reactor storage needs after 1998.[25] Tr.3473:22-3477:8 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

333. Ms. Supko did not conduct any quantitative analysis in this case to determine if any of the 14 utilities she identified would have taken a different action regarding spent fuel storage had they believed DOE would perform. Tr.3483:2-9 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

334. In preparing her "but for" world model, she did not review utility by utility to discern what those utilities would have done had DOE performed in 1998. Tr.3483:10-18 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

335. Ms. Supko has not done any analysis in her base case scenario to determine whether the 1031.5 MTU number she calculated under Scenario 1 would have been any different had DOE begun performance in 1998. Tr.3484:15-3485:6 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

The proposed finding is also contrary to the evidence. Ms. Supko did analyze the 14 plants for whom additional storage totaled 1030 MTU. Tr. 3138:13-3145:16 (Supko);

---

[25] Ms. Supko had no opinion as to the number of plants that would have to have additional at-reactor storage for the number to be unreasonable. Nor could Ms. Supko provide any brightline that a specific number of utilities that require additional at-reactor storage is unreasonable. (Tr. 3477:9-3478:5)

PDX 44-46. Ms. Supko explained that most of those 14 plants would have had a requirement for less than one reload of additional storage, or 40 MTU per reactor. *Id.* Ms. Supko noted that 40 MTU of storage per reactor is not a large amount of SNF, especially if the DOE facility has a 3000 MTU steady-state annual acceptance capacity. *Id.* Finally, Ms. Supko noted that the additional storage requirements likely could have been accommodated by using the flexibilities in the Standard Contract, which she considered qualitatively in her opinion. *Id.*

336. In fact, Ms. Supko's selected ramp up to 3,000 MTU further demonstrates that a 3,000 MTU acceptance rate does not preclude all additional at-reactor storage after 1998. For example, because utilities discharge approximately 2,000 MTUs annually, Ms. Supko's selected rate ramps up from 400 MTU in 1998, 600 MTU in 1999, 1200 MTU in 2000, neither keeps up with the cumulative discharge rate nor works off the backlog. In other words, for the first three years of acceptance under Ms. Supko's Scenario 1, the acceptance rate does not keep up with the generation rate. Further, for the first four years, Scenario 1 does not reduce the backlog.[26] Tr.3518:20-3520:25 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

337. Ms. Supko admitted during her testimony that she did not know how high the rate of acceptance would have to be to preclude <u>all</u> additional at-reactor storage under a strict Oldest Fuel First schedule because she has not done the analysis to make that determination. Tr.3574: 18-3591:15 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

338. Further, Ms. Supko has never conducted any analysis to determine whether, under the criteria that she models, her Scenario 3 would meet that criteria. Specifically, one way that Ms. Supko measures the reasonableness of additional at-reactor storage is by how it

---

[26] Ms. Supko's opinion is that the Government would not be capable of accepting at the generation rate in the first year or two of the program because, as an engineer, she believes that you need to walk before you run. Tr. 3521:1-3522:1 (Supko).

compares to one year's worth of discharges. However, Ms. Supko does not know whether, had all the flexibilities that she identified been utilized, there could have been 2,000 MTU of additional at-reactor storage under Scenario 3. Tr.3510:14-21 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

The proposed finding also mischaracterizes Ms. Supko's analysis, opinions and testimony. While Ms. Supko has not specifically modeled whether the Standard Contract flexibilities would result in only 2000 MTU of required additional at-reactor storage under Scenario 3 (the 900 MTU rate), Ms. Supko's quantitative analysis of intra-company acceptance rate exchanges reveals that, under Scenario 3 (the *900* MTU rate), it would have been improbable for an exchanges market to have developed because the requirements for additional at-reactor storage were so close to the pick up rates under that scenario. Tr. 3151:4-3153:23 (Supko); PDX 47-48. No specific analysis is required; Ms. Supko's analysis of intra-company acceptance rate exchanges already shows that the 900 MTU rate (Scenario *3*) would not encourage the use of Standard Contract flexibilities such as exchanges. Ms. Supko explained that, under her model, 500-800 MTU of additional storage requirements were necessary for the 2005-2009 timeframe. Accordingly, if there was a 900 MTU annual steady-state rate, this rate would not have provided an incentive for exchanges to accommodate those additional storage requirements. *Id.* In other words, the pick up rate and the additional storage needs were too close to generate any incentive for exchanges under Scenario 1. Moreover, on an annual basis in the present, utilities place more than 1000 MTU into dry storage, which is more than the 900 MTU rate of acceptance in Scenario 3. *Id.* This fact further demonstrates that, under Scenario 3, there would be no incentive for an exchanges market.

Ms. Supko's analysis of Scenario 1 (the 3000 MTU rate) further illuminates the *lack* of incentive for using Standard Contract flexibilities under Scenario 3 (the 900 MTU rate).

PDX 45. Under Scenario 3, there is a considerable incentive for an exchanges market to develop because of the significant delta between the required additional at-reactor storage (less than 100 MTU per year) and the rate at which DOE would accept spent fuel (3000 MTU per year). *Id.*; Tr. 3143:25-3145:11 (Supko) (including Ms. Supko's explanation at page 3145, lines 8-11 that, under Scenario 1, "there would have been a fair amount of flexibility within the system to potentially accommodate this [additional at-reactor storage requirement] through the flexibilities allowed under the standard contract.").

**E. Ms. Supko's Rate Does Not Support Her Assertions Regarding Removal Of Backlog Or Timely Decommissioning**

339. In addition to modeling rates against the amount of post-1998 additional at-reactor storage, Ms. Supko also evaluated how the rates impact timely decommissioning. Yet, as with the first criteria – precluding all additional at-reactor storage after 1998, Ms. Supko's analysis demonstrates that a 3,000 MTU acceptance rate does not satisfy the test identified by counsel for Wisconsin Electric. Tr.3510:22-3514:1, Tr.3097:25-3098:20 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

WE also objects to the proposed finding as unsupported by the cited evidence. Ms. Supko did not testify that the Scenario 1 rate (the 3000 MTU rate) does not satisfy the criteria identified by counsel for WE. To the contrary, Ms. Supko's analysis demonstrated that of the scenarios that she analyzed, Scenario 1 (the 3000 MTU rate) and Scenario 4 (the 6000 MTU rate) allow for the *most* timely decommissioning (9 years and 6 years, respectively, relative to the 65 or 16.5 years required by Scenarios 2 or 3). PDX 42; Tr. 3126:1-3133:13 (Supko).

340. Ms. Supko calculated that, under a 3,000 MTU rate, there would be nine years of average post-shutdown time. Tr.3513:13-16 (Supko).

**RESPONSE:**

WE does not object to the proposed finding.

341. However, Ms. Supko testified that early DOE program documents discuss "timely decommissioning" as decommissioning nuclear power plants within five years after plants shut down. Indeed, the goal of "timely decommissioning," as Ms. Supko understands it, is to remove all SNF five years post-shutdown.[27] Tr.3512:9-3513:12 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

WE also objects that the proposed finding is not supported by the cited evidence. Ms. Supko did not testify that the Scenario 1 rate (the 3000 MTU rate) does not satisfy the criteria identified by counsel for WE. To the contrary, Ms. Supko's analysis demonstrated that of the scenarios that she analyzed, Scenario 1 (the 3000 MTU rate) and Scenario 4 (the 6000 MTU rate) allow for the *most* timely decommissioning (9 years and 6 years, respectively, relative to the 65 or 16.5 years required by Scenarios 2 or 3). PDX 42, Tr. 3126:1-3133:13 (Supko).

WE also objects that the proposed finding is contrary to the evidence. Ms. Supko testified:

> Q: Indeed, Ms. Supko, the goal of timely decommissioning, as you understand it, is to remove all spent fuel five years post shutdown, correct?
>
> A: *No.*

Tr. 3612:9-13 (Supko) (emphasis added). Government counsel unsuccessfully attempted to impeach Ms. Supko with prior testimony from a deposition in which Ms. Supko explained that "ultimately removing from at-reactor storage all waste five years old, that was the *ultimate* goal." Tr. 3513:6-12 (Supko). That prior testimony, however, is not inconsistent with Ms. Supko's above-quoted trial testimony.

[27] The Standard Contract classifies standard fuel as fuel that has been cooled for five years.

342. In fact, even under Scenario 4, which is twice as great a rate as Scenario 1, and a rate that Ms. Supko believes is inefficient, Ms. Supko calculated the average post-shutdown time as six years. Tr.3128:1-3129:5 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

WE also objects that the proposed finding mischaracterizes Ms. Supko's analysis. Ms. Supko's analysis demonstrated that, of the scenarios that she analyzed, Scenario 1 (the 3000 MTU rate) and Scenario 4 (the 6000 MTU rate) allow for the *most* timely decommissioning (9 years and 6 years, respectively, relative to the 65 or 16.5 years required by Scenarios 2 or 3). PDX 42; Tr. 3126:1-3133:13 (Supko).

343. Ms. Supko cannot identify any document that says nine years of average post-shutdown time is acceptable or reasonable. Rather, this is simply an untestable, so-called "judgment call" that she is making. Tr.3518:4-19 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361) and its General Objections to Section XVII.D and XVII.E (DFF 332-343).

## F. Ms. Supko Did No Analysis Regarding So-Called Flexibilities

### 1. Ms. Supko Did Not Analyze The Impact Of The Use Of The Exchanges Provision Of The Standard Contract

344. Under the Standard Contract, utilities are permitted, with DOE approval, to exchange approved Delivery Commitment Schedules. PX 41, Article V(E).

**RESPONSE:**

WE does not object to the proposed finding.

345. Ms. Supko did not conduct any quantitative analysis to determine how exchanges would have worked had DOE performed. Specifically, she did not estimate qualitatively what the effect would be on the need for additional storage through the use of exchanges. Accordingly, she does not know how much the amount of additional at-reactor

storage she calculated would have decreased had utilities engaged in exchanges. Tr.3615:2-3615:22 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

The proposed finding is also inaccurate and mischaracterizes Ms. Supko's testimony. Ms. Supko did analyze quantitatively the impact of intra-company exchanges of acceptance rights. Tr. 3151:4-3153:23 (Supko); PDX 47-48.

346. In modeling her "but for" world, Ms. Supko did not endeavor to model a "but for" exchanges market. Ms. Supko has not conducted any analysis to determine the timing of when an exchanges market would have developed in the "but for" world. Nor did she conduct any analysis to determine which particular utilities move up in the queue as a result of exchanges or, conversely which particular utilities move down in the acceptance queue. Ms. Supko has not performed any analysis to determine what a potential exchange would cost or determined how much a utility would be willing to pay to engage in an exchange. Tr.3515:7-3616:5 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

The proposed finding is also inaccurate and mischaracterizes Ms. Supko's testimony. Ms. Supko did analyze quantitatively the impact of intra-company exchanges of acceptance rights. Tr. 3151:4-3153:23 (Supko); PDX 47-48.

347. Ms. Supko agreed that there would have been some companies that would not have even considered trading because of their own political considerations. In fact, this reluctance on the part of utilities to exchange would have manifested itself in the early years of acceptance. Tellingly, despite testifying in 13 SNF cases, she is unaware of any plaintiff indicating its willingness to move down in the SNF queue. Tr.3616:6-19; 3617:12-3619:16 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

The proposed finding is also inaccurate and mischaracterizes Ms. Supko's testimony. Ms. Supko did analyze quantitatively the impact of intra-company exchanges of acceptance rights. Tr. 3151:4-3153:23 (Supko); PDX 47-48.

348. Of the 14 plants listed on Ms. Supko's demonstrative that have additional storage needs after 1998, she does not know which of these utilities have approved DCSs. Tr.3616:25-3617:11 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

The proposed finding is also inaccurate and mischaracterizes Ms. Supko's testimony. Ms. Supko did analyze quantitatively the impact of intra-company exchanges of acceptance rights. Tr. 3151:4-3153:23 (Supko); PDX 47-48.

WE also objects that Ms. Supko's knowledge of which utilities have approved DCSs is irrelevant. In any event, by the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115. Further, DOE clearly believed at the time that the DCS process occurred that the process was nothing more than "administrivia." The overwhelming evidence established that DOE believed that, as "administrivia," the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages and never played a significant role for DOE. *Id.; see also* WE's General Objections to Section X (DFF 114-135).

349. Plaintiff proffered no evidence at trial showing any evaluation by WEPCO of the use of exchanges under the Standard Contract.

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

The proposed finding is also inaccurate and mischaracterizes Ms. Supko's testimony. Ms. Supko did analyze quantitatively the impact of intra-company exchanges of acceptance rights. Tr. 3151:4-3153:23 (Supko); PDX 47-48.

**2. Ms. Supko Did Not Analyze The Impact Of The Use Of The Plus Or Minus 20 Percent Provision Of The Standard Contract**

350. The Standard Contract provides that "[p]urchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus twenty percent (20%), and the delivery

schedule up to two (2) months, until the submission of the final delivery schedule." PX 41. Article V(B)(2).

**RESPONSE:**

WE does not object to this proposed finding. *See also* PFF 57.

351. Ms. Supko has not conducted any analysis to determine what utilities would have actually done with respect to the 20 percent provision in the Standard Contract. Specifically, Ms. Supko has not looked at how the 20 percent provision would work on a specific utility-by-utility basis. She did not speak to any utility regarding its willingness to use this provision of the Standard Contract. Tr.3619:17-3620:5 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

352. Ms. Supko assumed that the total amount of additional at-reactor storage could be reduced by as much as 20 percent if utilities used this provision. However, Ms. Supko has not conducted any analysis to determine the impact on other utilities if DOE were to grant a particular utility's request for an additional 20 percent of SNF acceptance. Ms. Supko is aware, based upon her involvement in the ACR Resolution Process, that the industry suggested that the plus or minus 20 percent provision not be exercised. Tr.3620:6-3621:3 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

353. As with exchanges, under the Standard Contract, utilities that have approved DCSs may adjust their allocations by 20 percent. Yet, as with exchanges, of the 14 plants that Ms. Supko has identified as having additional storage needs after 1998, she does not know which ones have approved DCSs. Ms. Supko has not done any analysis to see the timing of these 14 plants acceptance needs versus their ability to use the plus or minus 20 percent provision. Yet, based upon the age of some of these plants, she is aware that some of these 14 plants may not be able to take advantage of the plus-or-minus 20 percent provision to alleviate their additional storage requirements. Tr.3621:4-3623:7 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE also objects that Ms. Supko's knowledge of which utilities have approved DCSs is irrelevant and meaningless.

In any event, by the time that DOE issued its DCS instruction in 1992, it was clear that DOE could not timely perform in 1998. PFF 104, 107, 115. Further, DOE clearly believed at the time that the DCS process occurred that the process was nothing more than "administrivia." The overwhelming evidence established that DOE believed that, as "administrivia," the DCSs were not binding. *See* PFF 126. DOE witnesses testified that the DCSs did not represent a commitment by DOE, were conditional, were inconsistent with the NWPA Amendments' linkages, and never played a significant role for DOE. *Id.*; *see also* WE's General Objections to Section X (DFF 114-135).

354. Notably, in all of the SNF cases in which Ms. Supko has been involved, she is unaware of any utility claiming they would have accepted 20 percent less than their OFF allocation, or any amount less than their OFF allocation. Tr.3623:20-3624:3 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

355. Plaintiff proffered no evidence at trial showing any evaluation by WEPCO of the use of the 20 percent provision in the Standard Contract.

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

### 3. Ms. Supko Did Not Analyze The Effect Of The Use Of The Intra-Utility Exchanges Provision Of The Standard Contract

356. The Standard Contract provides that "[p]urchaser shall have the right to determine which SNF and/or HLW is delivered to DOE." PX 41, Article V(E).

**RESPONSE:**

WE does not dispute this proposed finding.

357. Despite Ms. Supko's acknowledgment that the decision to engage in intra-utility trades is very company specific, she admitted that she has not reviewed data company-by-company and determined what a particular company would have done in 1998 regarding its willingness to engage in intra-utility exchanges. Nor has Ms. Supko had any discussions with co-owners of any particular plant about their willingness to engage in an intra-utility exchange. Tr.3624:19-3626:11 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

358. Companies who contemplated engaging in intra-utility exchanges would have to consider, for example, the political ramifications of such a swap. Yet, Ms. Supko's analysis does not contemplate political considerations associated with intra-utility exchanges.[28] Tr.3626:12-3627:12 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

359. When Ms. Supko conducted her sensitivity analysis for intra-utility exchanges, she only analyzed the impact to her calculation for additional at-reactor storage. In other words, she did not do an analysis to see the impact of intra-utility trading on the average post-shutdown calculation. However, she believes that, had she performed such an analysis, the average post shutdown storage time would decrease for Scenarios 1 and 3. Tr.3627:13-3628:2 (Supko).

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

360. Kenrich's report relies upon annual discharge information from Ms. Supko's report that reflects actual discharges. Tr. 3899:23-3900:4 (Sieracki).

**RESPONSE:**

WE does not dispute this proposed finding of fact.

361. In her model, Ms. Supko projected that DOE would have accepted 41 assemblies in 1998. However, the Kenrich report assumes the number will be rounded up to 48 assemblies. Tr. 3913:23-3914:7 (Sieracki); PX 796 p 3256. If an acceptance of 41 assemblies is assumed, than even assuming 1500 spaces, an acceptance before the fall outage in 1998 is not adequate to prevent WEPCO from exceeding the space in its pool. Tr. 3912:8-3913:22 (Sieracki); DDX-1-9-A. Kenrich did not do any analysis of the programmatic impact of DOE accepting more than WEPCO's allocation. Tr. 3914:8-23 (Sieracki).

---

[28] For example, a utility like Southern Nuclear has different rate payers in different states for the different nuclear plants. To the extent that Georgia's ratepayers had to hold on to certain of their SNF longer to allow Alabama the ability to ship SNF earlier, Ms. Supko has not considered whether that would create certain political impediments. (Tr. 3626:25-3627:8)

**RESPONSE:**

WE incorporates its General Objections to Section XVII (DFF 310-361).

WE objects to the following sentence in this proposed finding of fact as inaccurate: "If an acceptance of 41 assemblies is assumed, than even assuming 1500 spaces, an acceptance before the fall outage in 1998 is not adequate to prevent WEPCO from exceeding the space in its pool." The assumptions used by the Government for its calculation during the cross examination of Mr. Sieracki were incorrect. Specifically, Government counsel used DDX 1-9A in questioning Mr. Sieracki regarding whether DOE acceptance of 41 assemblies in 1998 would prevent WE from exceeding its pool capacity. DDX 1-9A, however, uses an incorrect pool inventory for the "Beginning of Year Inventory" for 1991. Government counsel uses 1126 as the pool inventory, presumably obtaining that number from page 15 of PX 236 (ESR). As Mr. Hennessy explained, however, 17 spaces were filled with high-level nuclear waste components which could be removed as needed. Tr. 867:21-874:7 (Hennessy); PX 236. Thus, the correct spent fuel inventory for 1991 is 1109 spent fuel assemblies as stated on page 50 of PX 236. When one uses the correct spent fuel pool inventory, WE's spent fuel pool does not exceed capacity whether DOE accepts 41 or 48 assemblies in 1998. Tr. 867:21-874:7 (Hennessy); PX 236. In fact, Mr. Sieracki expressly stated this point in his testimony. Tr. 3750:23-3753:2 (Sieracki); PDX 60–Sieracki 24 through 27.

## XVIII. ISSUES RELEVANT TO THE ENTITLEMENT ADJUSTMENTS TO WEPCO'S CLAIMED COSTS

### A. Expenditures By WEPCO For Private Fuel Storage And The Newton Project

362. WEPCO contributed from 1994 to 1997, along with other utilities, to the development of an ISFSI on Indian lands, called Private Fuel Storage or PFS. PX 355 at WISC 00010191.

**RESPONSE:**

WE does not object to this proposed finding of fact.

363. The PSCW never required WEPCO to seek off-site storage. Tr.1629:19-1630:5 (Krieser).

**RESPONSE:**

WE objects to this proposed finding because it is misleading. Although the PSCW never explicitly required WE to seek off-site storage in a final decision or order, WE reasonably believed that its chances of obtaining any future SNF storage approvals from the PSCW would be enhanced if WE investigated options for transportation of Point Beach's SNF out of Wisconsin. Tr. 422:15-432:10, 424:17-425:9, 535:17-536:2 (Link); Tr. 1551:3-1553:1, Tr. 1629:19-1630:2 (Krieser) (the PSCW "certainly encouraged us and others to seek out other opportunities, and [PFS] was one of those"); PFF 212.

364. WEPCO withdrew from the PFS project in 1997 because it would have had to contribute additional funding but it was not confident in the viability of the project. Tr.1625:15-1626:2 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact because it is somewhat misleading. WE withdrew from the PFS project in 1997 because it began to believe that the successful construction and operation of PFS was unlikely. Therefore, WE decided that additional participation by WE was not warranted. Tr. 1552:3-1555:4 (Krieser) ("We were a very active participant in this project from the beginning, up through early 1997, I think I would say. And at that point, the project was beginning to run into considerable opposition...."); PFF 213.

365. WEPCO recognized that, even once PFS was licensed by the NRC, the real battle was yet to be fought. Tr.4979:7-12 (Weaver); DX 90.

**RESPONSE:**

WE objects to this proposed finding of fact as vague because it does not identify what "real battle" PFS faced after NRC licensing. The PFS project was planned for construction on Goshutes tribal land in Utah. Mr. Weaver, however, believed that the state of Utah was

unfriendly towards the nuclear industry and expected significant state and congressional opposition to the PFS project. Tr. 4979:7-12 (Weaver); DX 90. It also should be noted that Mr. Weaver had no involvement in either PFS or SNF issues during the time in which WE participated in PFS. WE withdrew from PFS in 1997 and Mr. Weaver did not become involved in SNF issues until 2000 or 2001. PFF 213; Tr. 4975:4-23, 5016:6-21 (Weaver).

Finally, WE notes that DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused by DOE's failure to perform the Standard Contract in a timely manner:

> Transport of the [spent nuclear fuel] to licensed off-site storage facilities has been successfully done in the United States for many years. This includes transshipment of [spent nuclear fuel] to other reactor sites owned by the utility. Shipments could also be made to a licensed facility owned by another company, such as another utility site, the proposed Private Fuel Storage (PFS) facility which is currently undergoing licensing review by the NRC, or the Owl Creek Project planned for Wyoming by the NEW Company.

PX 590; PFF 216; *see also Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 466 (2007) ("Given DOE's acknowledgment that '[t]ransport of the [spent nuclear fuel] to licensed off-site storage facilities has been successfully done in the United States for many years,' defendant cannot persuasively argue here that plaintiff had embarked on a commercially reckless venture in pursuing the development of a private fuel storage facility.").

366. Specifically, WEPCO believed there would be a level of public, state, and congressional opposition to PFS that would make it very unlikely that PFS would move forward. Tr.4979:13-4980:1, 4980:23-4981:2 (Weaver); DX 90.

**RESPONSE:**

WE objects to this proposed finding of fact as vague because it does not specify a timeframe. As of 2001, Mr. Weaver believed that the political climate then existing at the state and Congressional level did not favor PFS. As a result, he recommended that WE

monitor the political climate and potentially revisit the decision whether to participate in PFS should factors shift in PFS's favor. Tr. 4979:7-4980:1, 4980:23-4981:2 (Weaver); DX 90. However, Mr. Weaver had no involvement in either PFS or SNF issues during the time in which WE participated in PFS. WE withdrew from PFS in 1997, and Mr. Weaver did not become involved in SNF issues until 2000 or 2001. PFF 213; Tr. 4975:4-23, 5016:6-21 (Weaver).

Finally, WE notes that DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused by DOE's failure to perform the Standard Contract in a timely manner:

> Transport of the [spent nuclear fuel] to licensed off-site storage facilities has been successfully done in the United States for many years. This includes transshipment of [spent nuclear fuel] to other reactor sites owned by the utility. Shipments could also be made to a licensed facility owned by another company, such as another utility site, the proposed Private Fuel Storage (PFS) facility which is currently undergoing licensing review by the NRC, or the Owl Creek Project planned for Wyoming by the NEW Company.

PX 590; PFF 216; *see also Northern States,* 78 Fed. Cl. at 466. ("Given DOE's acknowledgment that '[t]ransport of the [spent nuclear fuel] to licensed off-site storage facilities has been successfully done in the United States for many years,' defendant cannot persuasively argue here that plaintiff had embarked on a commercially reckless venture in pursuing the development of a private fuel storage facility.").

367. WEPCO was also concerned that the transportation issues involved in PFS were completely untested. Tr.4979:17-20 (Weaver); DX 90; Tr.1627:9-1628:4 (Krieser).

**RESPONSE:**

WE objects to this proposed finding as vague because it does not define "transportation issues."

WE also objects to this proposed finding because it mischaracterizes the evidence. WE was concerned that PFS transportation issues were largely untested, not "completely" untested. Tr. 4979:17-20 (Weaver); DX 90.

Further, Mr. Weaver had no involvement in either PFS or SNF issues during the time in which WE participated in PFS. WE withdrew from PFS in 1997 and Mr. Weaver did not become involved in SNF issues until 2000 or 2001. PFF 213; Tr. 4975:4-23, 5016:6-21 (Weaver).

Finally, WE notes that DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused by DOE's failure to perform the Standard Contract in a timely manner. PX 590; PFF 216; *see also Northern States*, 78 Fed. Cl. at 466.

368. Specifically, the transportation for PFS was in its infant stages. PFS had not selected any kind of transportation mode or packaging or determined any routes. Moreover, on all levels, local, state, and national, there were political issues associated with whether or not spent nuclear fuel would be allowed to move between utilities and the storage site. Tr.1628:16-1629:10 (Krieser).

**RESPONSE:**

WE does not dispute that Mr. Krieser so testified. This in no way indicates that WE's decision to investigate PFS in 1994 and expend limited funds in pursuit of this opportunity ($883,503) was unreasonable. WE investigated this option for sound reasons. First, it did not obtain PSCW approval for the WE dry storage project until February 1995. PFF 212. Second, the PSCW approval was challenged in court and that created additional uncertainty regarding when WE could implement its dry storage project. *Id.* Third, the PSCW only approved the purchase of 12 casks and WE estimated that it would need approximately 36 casks more, for a total of 48 casks, to operate until the end of Point Beach's then-current licenses because of DOE's lengthy anticipated delay. As noted, WE reasonably believed that its chances of obtaining any future SNF storage approvals from the PSCW would be enhanced if WE investigated options for transportation of Point Beach's SNF out of

Wisconsin. *Id.* Fourth, after approval of its dry storage project, WE continued to investigate off-site storage options because of problems that it encountered with the VSC-24 cask, including a prohibition on loading such casks for several years. *Id.*

Additionally, the PFS project continues to this day and has received an NRC license. Thus, other utilities find that PFS continues to be a prudent investment. In WE's case, however, the PSCW had issued an order in March 2001 approving additional casks sufficient to store Point Beach's spent fuel generated through the end of the reactors' then-current licenses. PX 592; PFF 151.

Finally, WE notes that DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs, caused by DOE's failure to perform the Standard Contract in a timely manner. PX 590; PFF 216; *see also Northern States*, 78 Fed. Cl. at 466.

369. WEPCO was familiar with heated opposition to the transportation of spent nuclear fuel. Tr.2180:4-25 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact as vague and misleading because Mr. Porter was discussing transportation issues during a much earlier period. More specifically, Mr. Porter testified that Ohio was opposed to the transportation of spent nuclear fuel through its state when WE was moving SNF from the West Valley facility to Point Beach. Tr. 2180:4-25 (Porter). That occurred in the late 1970s. PFF 15.

370. In addition to uncertainties regarding the transportation of SNF to the PFS, WEPCO was also concerned about continuing its participation in PFS because there were issues with the tribe, including how much funding it would receive and whether factions who did not support the project would derail it. Tr.1627:24-1628:13 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact because it is misleading. In 1997, when WE ceased investing in PFS, WE had begun to believe that the imminent construction and operation of PFS was unlikely. Tr. 1552:3-1555:4 (Krieser) ("We were a very active

participant in this project from the beginning, up through early 1997, I think I would say. And at that point, the project was beginning to run into considerable opposition...."); PFF 213.

WE also objects to this proposed finding of fact because the Government improperly mischaracterizes the transcript cite referenced in the proposed finding and inaccurately portrays the Mr. Krieser's testimony. The cited portion of the transcript involves Government counsel simply reading from Mr. Krieser's deposition testimony in an effort to refresh Mr. Krieser's recollection. Tr. 1626:3-1628:13 (Krieser). The deposition testimony read by Government counsel is not admissible as evidence. Order, p. 29 ("deposition designations of any witness called to testify at trial will be disregarded"), Dkt. 334 (Aug. 16, 2007).

Finally, WE notes that DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused by DOE's failure to perform the Standard Contract in a timely manner. PX 590; PFF 216; *see also Northern States*, 78 Fed. Cl. at 466.

371. WEPCO recognized that it would be more costly to store fuel with PFS than to store it on site. Specifically, it estimated that the storage costs at PFS would be $1 million per cask and $20,000 per cask per year for storage at a time when its costs at Point Beach were $300,000 per cask and $30,000 per year for O&M for the entire facility. Tr.4980:2-22 (Weaver); DX 90.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores the fact that the cask storage costs at PFS included the costs for transportation of the casks to PFS. DX 90 ("current cost estimates are $1 million/cask (including transportation) and $20,000/cask/year for storage"). The proposed finding also ignores the significant political costs of storing fuel onsite rather than out of the state. At the time that WE initially participated in PFS in 1994, WE had not yet been able to secure PSCW approval for the dry storage facility and WE's attempt to do so faced considerable opposition. It also was

uncertain at this time whether WE would receive PSCW approval for the acquisition of additional casks without exploring SNF storage outside Wisconsin. PFF 212.

Despite the higher cost to store SNF with PFS as compared to storing SNF on-site, DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused by DOE's failure to perform the Standard Contract in a timely manner. PX 590; PFF 216; *see also Northern States*, 78 Fed. Cl. at 466.

372. Additional off-site costs include transportation of casks to the off-site location, transfer of fuel to a storage cask at the off-site location, O&M costs for the off-site location, any return on investment by the off-site storage operator, and any needed equipment or plant modifications for the required cask design. Tr.5484:21 -5488:7 (Brewer); DDX 3-17, DX 391 at 19-21 (WXE011 0021 - WXE011 0023).

**RESPONSE:**

WE objects to this proposed finding of fact as inaccurate and misleading. This proposed finding implies that the cost of the transportation of casks to an off-site location was not included in the $1 million per cask estimated PFS cost already identified in DFF 371. The Government, however, ignores that Mr. Weaver's January 15, 2001 email expressly stated that the $1 million per cask PFS cost estimate *included* the costs of transportation to the PFS facility. DX 90. Further, Mr. Weaver's email explicitly stated that estimated PFS O&M costs were $20,000 annually per cask, as the Government already noted in DFF 371.

WE also interprets Mr. Weaver's January 15, 2001 email as providing an all-inclusive cost estimate per cask for storage at PFS. The Government provides no evidence to support its assertion that the estimated cost of $1 million per cask did not include all of the costs listed in this proposed finding. Nothing in Mr. Weaver's testimony or in his January 15, 2001 email suggests that additional costs would be applicable. Tr. 4978:16-4981:2; DX 80.

Despite the higher cost to store SNF with PFS as compared to storing SNF on-site, DOE itself saw PFS as a reasonable and viable solution to Point Beach's storage needs caused

by DOE's failure to perform the Standard Contract in a timely manner. PX 590; PFF 216; *see also Northern States*, 78 Fed. Cl. at 466.

Finally, WE objects to this proposed finding of fact because the Government may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

373. When WEPCO withdrew from the project, it had already loaded casks to its own ISFSI. Tr.1629:11-14 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because the Government ignores that WE's motives for its involvement in PFS were not resolved by the loading of a cask to the Point Beach ISFSI. *See* WE Response to DFF 368; PFF 212.

374. WEPCO concluded that any decision regarding its re-entry into PFS should not be made until the dry storage application before the PSCW was decided. Tr.4978:15-4979:6 (Weaver); DX 90.

**RESPONSE:**

WE objects to this proposed finding of fact as vague because it does not identify a timeframe.

Further, WE objects to the proposed finding as inaccurate. In his January 15, 2001 email, Mr. Weaver stated that another WE employee, Steve Cartwright, recommended that any decision regarding WE's re-entry into PFS be delayed until WE's dry fuel storage application was decided. Mr. Weaver's email, however, further stated that Messrs. Krieser and Weaver recommended that WE continue to monitor the political climate in Utah and

revisit the decision regarding re-entry into PFS if the political climate shifted in PFS's favor. DX 90.

375. Thus, WEPCO ultimately decided to stay out of the PFS project and only pursued its application to the PSCW. Tr.4982:18-4983:11 (Weaver); DX 90.

**RESPONSE:**

WE agrees that it did not rejoin the PFS venture after its withdrawal in 1997. WE, however, objects that this proposed finding is misleading. WE did not conclude that a decision regarding re-entry into PFS should be delayed pending the PSCW's decision on WE's dry fuel storage application. *See* WE's Response to DFF 374. Instead, WE suspended a decision on rejoining PFS pending a shift in Utah's political climate in favor of PFS. DX 90. Thus, WE's decision to not rejoin PFS and its application to the PSCW were not related. *Id.*

376. In this regard, WEPCO did not find it necessary simultaneously to pursue alternate storage options while applying to the PSCW to add additional dry storage. DX 90, see also Tr. 2245:8-15 (Porter).

**RESPONSE:**

WE objects to this proposed finding of fact as vague.

WE further objects to this finding as inaccurate for the reasons set forth in WE's Responses to DFF 373-375. WE's decision to withdraw from PFS in 1997 was based on WE's determination at that time that construction and operation of PFS in the near future was unlikely. Tr. 1552:3-1555:4 (Krieser) ("We were a very active participant in this project from the beginning, up through early 1997, I think I would say. And at that point, the project was beginning to run into considerable opposition from- there were regulatory issues that were involved. . . . And they were going to be requiring a considerable amount of injection of additional equity into the project, and considering all the issues that we felt were out there affecting the possible success of the project, we decided at that point that we were going to withdraw from our participation, and we did."); PFF 213.

377. Mr Link, then Vice-President of Nuclear Business at WEPCO, testified in pre-filed testimony in October 1994 before the PSCW in the dry fuel storage hearings that, even if the operation of PFS commenced by 2003, that would be too late for WEPCO because Point Beach needed additional at-reactor storage capacity before that date. DX 275 at WISC 00010192.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores that DOE was obligated to begin accepting WE's SNF in 1998 and DOE's failure to perform caused WE to investigate PFS. Thus, Mr. Link testified that a PFS that did not become operational until at least 2003 would not resolve Point Beach's spent fuel storage dilemma caused by DOE's anticipated failure to begin accepting spent fuel from Point Beach by 1998. DX 275, p. WISC00010190-192; PFF 115, 117-118, 122d, 212. Further, Mr. Link testified at trial that WE investigated PFS because of the substantial delay in DOE's performance. Tr. 421:9-425:10 (Link).

378. A business plan supporting PFS indicated that there was a possibility that WEPCO would make a profit from that venture. Tr.537:3-7 (Link).

**RESPONSE:**

WE objects to this proposed finding of fact because it is misleading. The Government ignores Mr. Link's testimony that the possibility of profit was not WE's motive for pursuing PFS. Tr. 421:9-425:10 (Link) ("Q: In participating in PFS, did Wisconsin Electric have any financial motives? A: No, we were primarily motivated to work with the industry on resolving basically what I'll call an interim problem that DOE was creating by their nonperformance to take fuel, and so we, like some other utilities, were trying to join forces and make some sense out of it. It was simply that. We did not anticipate really making any money out of it in that regard."). Instead, WE pursued PFS and other alternative storage options to mitigate DOE's partial breach of contract. PFF 215.

379. In order to recover the costs associated with any investment in PFS, WEPCO would have needed to seek approval from the PSCW, which it did not do. Tr.436:1-25

(Link). In the event that PFS was implemented, and WEPCO had shipped its SNF there, WEPCO would have needed to seek approval from the PSCW to recover its costs.

**RESPONSE:**

WE objects to this proposed finding of fact as unsupported. The Government cites no evidence to support its assertion that if WE had shipped SNF to the PFS, WE would then need to seek approval from the PSCW to recover its costs.

The proposed finding is also inaccurate in that Mr. Link testified that if WE had actually built the PFS facility, then investments of that size would require PSCW approval for WE to recover those costs through rates. Tr. 436:1-25 (Link). WE, however, did not require PSCW approval to participate at the financial level at which WE participated during the period from 1994 to 1997. Tr. 436:1-9 (Link); Tr. 2577:23-2578:16 (Farron); Wis. Admin. Code PSC § 112.05(1)(b) (1982); PFF 183b.

380. WEPCO also investigated the possibility of developing an international spent fuel repository with other international entities, such as the British company BNFL and the African nation Cape Verde. Tr.537:8-539:24 (Link). Nothing came of those discussions and analyses. Id.

**RESPONSE:**

WE does not object to this proposed finding of fact.

381. Roger Newton, an assistant to Mr. Link, developed a proposal for such an international repository. DX 185; Tr.537:8-539:9 (Link). WEPCO intended to benefit economically from such an undertaking: "The world's spent fuel disposal problems had also created a significant business opportunity and Wisconsin Electric plans to benefit from the opportunity by creating a highly profitable international repository." DX 185 at WISC 00003326; see Tr. 537:21-539:24 (Link).

**RESPONSE:**

WE objects to this proposed finding of fact because it is not supported by the evidence. The Government erroneously cites Mr. Link's testimony as support for the Government's assertion that WE intended to benefit economically from an international repository. Mr. Link made no such statement or inference.

In addition, WE's June 1995 proposal identifies WE's actual reasons for pursuing an international repository. WE's primary reason for pursuing an international repository was that WE was running out of storage for its spent fuel and "[d]espite the $600 million paid by the U.S. utilities each year into a special fund for the Yucca Mountain program, [DOE] is years behind schedule, billions of dollars over budget, and it is highly questionable whether the repository will ever open. DX 185, p. WISC00003326. The proposal then stated that *"[f]or these reasons*, Wisconsin Electric intends to create an international repository to solve its own and the rest of the nuclear power industry's spent fuel disposal problem." *Id.* (emphasis added). After addressing why WE was pursuing the repository, WE then noted that the world's spent fuel disposal problem had created a business opportunity that WE might be able to benefit from if it was able to construct and operate an international repository. *Id.*

However, as WE's June 1995 proposal and the testimony of Mr. Krieser make clear, WE's motive for pursuing the international repository was to resolve the spent fuel dilemma caused by DOE's anticipated lengthy breach, not profit. *Id.*; Tr. 1551:3-1553:1, 1554:5-24 (Krieser) ("Q: And why did Wisconsin Electric pursue PFS? A: I think what I stated just a minute ago was the reason for that. It was . . . a potential opportunity for us to ship spent fuel from Point Beach, it was an away-from-reactor storage opportunity, if you will. . . . Q: And did you explore these options for the same reasons that you just described that you explored PFS? A: Yes, we did."); PFF 213-216.

382. While WEPCO expended capital evaluating these business opportunities, which costs are included in the claim before the Court, nothing came of these business ventures. Tr.539:6-24 (Link).

**RESPONSE:**

WE disputes this proposed finding of fact because it mischaracterizes WE's expenditures on PFS and other off-site storage options as business opportunities. In fact, WE

explored these off-site storage alternatives because of DOE's substantial delay in performing its acceptance obligations under the Standard Contract. PFF 215-216.

Further, the Government cites Mr. Link's testimony as support for its assertion that PFS and other off-site storage options were business opportunities. However, Mr. Link never stated or inferred such. Tr. 539:6-24 (Link).

WE properly included its expenditures for these off-site storage alternatives in its claim because WE would not have investigated them if DOE had performed under the Standard Contract. Tr. 1551:3-1553:1, 1553:25-1554:24 (Krieser) ("Q: And if DOE had performed under the Standard Contract, do you believe that Wisconsin Electric would have pursued the PFS initiative? A: Not at all."); Tr. 425:10-20 (Link); PFF 50, 134-135, 214-216.

Finally, WE's expenditures in investigating PFS and other off-site SNF storage options were not substantial. WE spent approximately $1.2 million investigating these off-site options. These eminently reasonable expenditures were a prudent investigation of off-site spent fuel storage options, which were the only options that provided WE with performance equivalent to DOE's obligations under the Standard Contract (namely, removal of spent fuel from Point Beach and Wisconsin). PFF 213-214.

383. WEPCO used money from account 124 to pay the costs of participation in PFS and its other off-site options, and all of the costs were disallowed and excluded from the rates by the PSCW. WEPCO performed a write-down on the PFS costs incurred. Tr.2998:25 - 2999:2; 3007:15 - 3008:2 (Straub); DX 227; <u>see also</u> DX142 at WISC0001 0298.

**RESPONSE:**

WE objects to this proposed finding as inaccurate because it is not supported by the cited evidence. Ione Straub testified that she did not know if the PFS costs were ever included in a WE rate case. Tr. 2998:17-21 (Straub). Additionally, Ms. Straub testified that DX 227 did not refresh her recollection on whether the PFS costs were disallowed by PSCW and excluded from rates because the exhibit is a letter from a commissioner, not a docket document from the PSCW. Tr. 3003:5-3004:21 (Straub). Finally, as Kenneth Metcalfe

testified, it was his understanding that WE never included the PFS costs in a rate case submission to the PSCW. Tr. 4803:3-4804:23 (Metcalfe).

WE also disputes this proposed finding because DX 227 is an August 1997 letter from the PSCW to Fawn Shillinglaw. The letter was not drafted by or on behalf of WE. Further, the letter states that WE intends to perform a write-down, not that WE has done so. Finally, the PSCW's letter states that WE used money from Account 124 for PFS, but does not address the funding of other off-site storage alternatives that WE pursued. DX 227, p.1.

384. Costs for PFS were interspersed among various project codes included in WEPCO's claim. Tr.6143:6-17 (Kiraly); DDX 5-35; DX 625 (Attachment 6, WXE 0220080 - WXE 0220083).

**RESPONSE:**

WE does not dispute this proposed finding of fact.

385. Mr. Kiraly adjusted WEPCO's claim for PFS and off-site storage costs by $883,503. Tr.6143:6-17 (Kiraly); DDX 5-34 and 5-35; DX 625 (Attachment 6, WXE 0220080 - WXE 0220083). There was an additional $342,255 in legal costs relating to legal activities in connection with alternative off-site storage projects, which Mr. Kiraly deducted from plaintiff's claim.[29] Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Dkt. 369 (Nov. 20, 2007).

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed PFS and off-site storage costs are not recoverable. They are recoverable as explained in PFF 212-216 and in WE PTB 59-64.

[29] The $342,255 had originally been included in ISFSI and VSC-24 cask costs by Mr. Kiraly because he was unable to discern from the documentation provided by plaintiff in discovery whether any of these legal costs related to other activities. *See* DDX 5-42. During the course of the trial, plaintiff provided additional documentation so that the legal costs could be uniquely identified and properly assigned to offset storage issues. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Dkt. 369 (Nov. 20, 2007).

**B. WEPCO'S Payment Of Fees To The Nuclear Regulatory Commission**

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XVIII.B.

**GENERAL OBJECTIONS TO SECTION XVIII.B (DFF 386-460):**

WE has demonstrated that it would not have built an ISFSI if DOE had performed and, accordingly, WE is entitled to recover as damages the pre-1999 NRC ISFSI fees that it paid. PFF 217-222, 228; WE PTB 64 n.19. Further, WE has demonstrated that the dry storage fees included in the NRC annual fee beginning in 1999 also resulted from DOE's breach and are recoverable damages. PFF 223-230: WE PTB 64-69.

The Government's proposed findings on this issue ignore a number of salient facts. First, there can be no dispute that the NRC expended resources on dry storage activities prior to 1999. The NRC has to recover the costs of this effort through license fees and annual fees and did so by charging the ISFSI license holders, including WE, the ISFSI license fees from 1996 through 1998. PFF 217-222, 228; WE PTB 64.

The cost of NRC dry storage activities did not go away in 1999. WE continued to utilize its ISFSI and the NRC continued to incur costs. In 1999, the NRC simply changed the manner in which it allocated to, and recovered these costs from, the nuclear utilities that it oversees. This is a change in form, not in substance. WE has identified with reasonable certainty the amount of the NRC's dry storage charges included in the NRC's new fee structure starting in 1999. PFF 223-230; WE PTB 64-69. WE's identification of the NRC's dry storage charges was based on the deposition and trial testimony of Mr. Peter Rabideau, NRC Deputy Chief Financial Officer. It was DOE who put forth Mr. Rabideau as the knowledgeable person on this issue. The Government cannot now hide behind the fact that Mr. Rabideau may have needed more information which the DOE never sought or provided to WE. Thus, it also should be noted that all of the information to segregate dry storage costs from other costs is within the possession of the Government and any failure to segregate

those costs with even greater certainty than WE did is attributable to the Government, as the Government had ample opportunity to do so. PFF 227; WE PTB 69.

The decision to change the NRC's 10 C.F.R. Part 171 fee structure originates in March 1998, after DOE had already breached the Standard Contract. In this actual world, everyone, including the NRC, was aware of the obvious, namely, that with DOE's delay, more utilities would require dry storage. WE PTB 67; PFF 223. Clearly, these are not the conditions that would have existed in the non-breach world. The Government's continued reliance upon actual world documents, without addressing the non-breach world, fails to address what may have occurred in the non-breach world in which DOE performs. WE and its damages experts, The Kenrich Group, demonstrated a credible non-breach world in which WE would not have paid the NRC fees at issue. The Government's argument that Mr. Sieracki's testimony should be ignored because he is not an expert on NRC fees, DFF 456-460, is misplaced. It ignores that Mr. Sieracki is an expert at linking cause-and-effect relationships in a non-breach world, which is exactly what WE has done. PFF 33; PX 794, App. A and B.

The Government argues that the NRC fee change was instituted in the actual world in order to avoid a disincentive to use dry storage that was allegedly present in the pre-1999 regulatory system. While that may have been one of the reasons, it is equally true that a substantial cause of the NRC's decision to allocate the cost of its dry storage regulatory efforts was its recognition that, given the lengthy delay in DOE's performance, virtually all operating utilities will be required to have dry storage once their spent fuel pools are full. PFF 223-224. The only utilities that would have a choice in the actual world to possibly avoid dry storage are those that have stopped operating and can choose wet storage or dry storage as they decide on a plant decommissioning strategy. If DOE had performed, most utilities would not have had to resort to dry storage and it seems highly unlikely that this choice of wet versus dry storage would ever have become an issue. PFF 228.

Once the DOE breached the Standard Contract, these dry storage related NRC fees should have been charged by the NRC directly to the DOE. The October 1998 Spent Fuel Storage and Decommissioning Fee Study recommended that the NRC gain the authority to assess fees to other Government agencies. DX 612; Tr. 4163:3-4164:1 (Rabideau). The FY 1999 final rule (Federal Register) stated that the "NRC recognizes that sites will be required to continue to store spent fuel onsite until another solution becomes available." PX 1044.

Finally, many of the Government's proposed findings of fact in this section are wholly irrelevant to the validity of WE's claim for this damage element, as well as the reasonableness of the calculation of the amount of those damages.

386. The NRC issues licenses to operate commercial nuclear power plants pursuant to 10 C.F.R. Part 50. Tr.4035:21-25 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

387. The NRC also issues licenses to operate spent fuel storage installations or ISFSIs pursuant to 10 C.F.R. Part 72. Tr.4036:1-4 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

388. Mr. Peter Rabideau, who testified on behalf of the Government, has been the Deputy Chief Financial Officer of the NRC since 1997. He is responsible for overseeing the financial management of the agency including budget activities, accounting, finance, and license fees. He has been an employee with the NRC in different positions related to finance and budgeting since 1978. Tr.4031:6-4032:10 (Rabideau).

**RESPONSE:**

WE does not object to this proposed finding of fact.

389. Ms. Tammy Croote, who testified on behalf of the Government, is the Deputy Director of the Division of Planning, Budget, and Analysis in the Office of the Chief Financial Officer at the NRC. From 2003 to 2007, Ms. Croote was a senior fee policy analyst in the Division of Financial Management. While in that position, her responsibilities included calculating the fees necessary for the NRC to recover its budget from licensees. Ms.

Croote wrote the fee rule for FY2005 and FY2006 and created the associated worksheets. Tr.4841:1-4842:20; 4873:24-4847:15 (Croote).

**RESPONSE:**

WE does not object to this proposed finding of fact.

390. The NRC is required to recover approximately 90 percent of its annual budget in fees from its licensees and applicants. Tr.4846:8-18 (Croote).

**RESPONSE:**

WE does not object to this proposed finding of fact.

391. The NRC charges two types of fees to its licensees and applicants pursuant to 10 C.F.R. Parts 170 and 171. Tr.4846:19-4847:14 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

392. 10 C.F.R. Part 170 fees are hourly rate fees charged to NRC licensees for site-specific direct services such as inspections, review of license applications, or review of amendments to license applications. Tr.4033:11-16; 4033:17-24; 4079:6-23 (Rabideau); Tr.4846:19-4847:25 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

393. 10 C.F.R. Part 171 annual fees are fees charged to NRC licensees for generic activities such as rule-making, incident response, research, or development of regulatory guidance that benefit an entire class of licensees or type of license. Tr.4033:11-4034:6; 4079:24-4080:5 (Rabideau); Tr.4846:19-4847:14; 4848:1-16 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

394. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee encompasses all generic activities that the NRC conducts related to dry storage of SNF, wet storage of SNF, and reactor decommissioning. Tr.4050:6-11 (Rabideau); 5648:17-5649:2 (Brewer); DX422; PX 945; PX 1044.