**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

395. The activities that comprise the costs paid for by the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee include generic and research activities directly related to reactor decommissioning and spent fuel storage, and other safety, environmental, and safeguards activities related to reactor decommissioning and spent fuel storage that are not recovered under 10 C.F.R. Part 170 specific fees. Tr.4033:25-4034:13, 4050:6-11, 4079:24-4080:5 (Rabideau); Tr.4848:1-16 (Croote); PX 1044.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

396. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee became a part of, and was included in, the 10 C.F.R. Part 50 reactor operating fee beginning in FY1999. Tr.4119:25-4120:8; 4140:20-4141:4 (Rabideau); DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

397. Beginning in FY1999, all operating reactor licensees who paid a 10 C.F.R. Part 50 operating reactor fee also paid the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. Tr.4263:10-19 (Rabideau); DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

398. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee is assessed to all 10 C.F.R. Part 50 operating reactors regardless of whether they utilize dry fuel storage or not. Tr.4262:18-25; 4264:3-10 (Rabideau); DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

399. The total annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, is divided, after adjustments, by the total number of licensees to determine the actual fee assessed to licensees. Tr.4865:3-16 (Croote); DX601: DX604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

400. Prior to FY1999, utilities paid the NRC an annual fee under 10 C.F.R. Part 171 for each commercial nuclear power reactor licensed under 10 C.F.R. Part 50. That fee included costs for generic activities related to reactor operation, wet spent fuel storage, and decommissioning. In 1999, there were 104 10 C.F.R. Part 50 reactor operator licensees. Thirteen of the 104 also held 10 C.F.R. Part 72 licences. Tr.4036:5-4037:16; 4038:22-24; 4107:16-4108:12 (Rabideau); DX612; DDX1-13; Brewer DDX 3-4; Tr.5426:23-5427:6 (Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

401. Prior to FY1999, utilities with dry storage facilities paid the 10 C.F.R. Part 171 annual fee for generic activities related to dry storage of spent nuclear fuel ("SNF"). In FY1998, 15 NRC licensees with dry storage facilities paid generic fees for dry storage of spent nuclear fuel. Tr.4036:5-4037:16; 4038:9-24; 4107:16-4108:12; 4145:12-21 (Rabideau); DX 612; DDX1-13; Tr.5427:6-9 (Brewer); DDX 3-4.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

402. Prior to FY1999, utilities that held 10 C.F.R. Part 50 licenses but no longer operated, i.e., shutdown reactors, and did not have dry fuel storage did not pay an annual 10 C.F.R. Part 171 fee. In FY1999, there were 21 10 C.F.R. Part 50 licensees that were shutdown. Tr.4037:20-4038:8; 4107:16-4108:12 (Rabideau); DX 612; DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

403. In 1998, the NRC initiated a staff study of the annual 10 C.F.R. Part 171 fees for spent fuel storage because of concerns that the then current fee structure provided a disincentive to licensees related to the use of dry storage because "possession only," i.e., shutdown reactors, that stored SNF in spent fuel pools rather than in dry storage did not pay an annual 10 C.F.R. Part 171 fee. Tr.4034:22-4035:8; 4039:7-4041:20; 4042:13-4045:13; 4143:20-4144:17 (Rabideau); DX 611; PX 947 (March 9, 1998 memo to Jesse L. Funches, CFO, NRC and L. Joseph Callan, Exec. Dir. for Ops., NRC, from John C. Hoyle, Secretary NRC, Subj: COMSAG-98-001/COMEXM-98-001-Annual Fees for Storage of Spent Fuel).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading because it ignores that, in making this regulatory change, the NRC further recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and, that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

If DOE had performed in accordance with the Standard Contract, most utilities would not have needed dry storage and the "disincentive" issue would not have arisen. PFF 228.

404. On November 5, 1998, Jesse L. Funches, the NRC Chief Financial Officer to the NRC, responded to internal memoranda regarding the annual 10 C.F.R. Part 171 fees for spent fuel storage and noted that the current policy raised two concerns: (1) the fee structure could create a disincentive for licensees to pursue dry storage, and (2) whether it was fair to assess multiple fees to a 10 C.F.R. Part 72 licensee that holds multiple licenses for different dry storage designs. Tr.4051:12-4052:8 (Rabideau); DX612.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding as misleading because it ignores that, in making this regulatory change, the NRC further recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and, that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

If DOE had performed in accordance with the Standard Contract, most utilities would not have needed dry storage and the "disincentive" issue would not have arisen. PFF 228.

405. Mr. Funches recommended that the NRC propose for public comment a revision to its spent fuel storage fee policies in FY1999 for recovery of generic costs under 10 C.F.R. Part 171 by establishing a spent fuel storage/reactor decommissioning fee to be assessed to all reactor operator licensees (10 C.F.R. Part 50) regardless of operating status, i.e., operating or shutdown, and those 10 C.F.R. Part 72 licensees who do not hold a 10 C.F.R. Part 50 license, and recover the remaining generic decommissioning costs through a

surcharge. This change would result in all licensees that stored spent fuel on-site paying for generic spent fuel storage costs regardless of whether the licensee used wet storage, dry storage, or both. Tr.4059:18-4060:18 (Rabideau); DX612; DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding as misleading because it ignores that, in making this regulatory change, the NRC further recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued to operate would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and, that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

406. The NRC agreed with Mr. Funches recommendation to establish a spent fuel storage/reactor decommissioning fee and approved publication of the proposed rule. The NRC also required submission and discussion of legislation to allow the NRC to recover generic costs associated with spent fuel storage from the Nuclear Waste Fund. However, there have not been any changes made to the Nuclear Waste Fund that would allow the NRC to recover 10 C.F.R. Part 171 generic costs associated with spent fuel storage. Tr.4060:25-4063:7 (Rabideau); PX 1009.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding as misleading because it ignores that, in making this regulatory change, the NRC further recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

407. In FY1999, the NRC eliminated its annual 10 C.F.R. Part 171 fee for 10 C.F.R. Part 72 licensees. Tr.4061:12-4062:5; 4067:6-4068:24; 4073:5-15 (Rabideau); PX 1009; PX 1044; DX621; DDX 1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

408. In FY1999, the NRC published its proposed and final rule adopting the spent fuel storage reactor/decommissioning fee, and eliminating the 10 C.F.R. Part 72 licensee fee. The notice cited three concerns raised by the prior fee structure: (1) disincentive for licensees to pursue dry storage; (2) the fairness of assessing multiple fees if a licensee holds multiple 10 C.F.R. Part 72 licences for different designs; and (3) not all affected licensees were being assessed the costs of NRC generic decommissioning costs and in the future as the number of operating licensees declined the financial burden on active licensees would increase. Tr.4064:12-4067:5; 4056:9-4057:15; 4067:17-4071:21; 4237:11-4238:11 (Rabideau); DX621; PX 1002; PX 1044.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading. Both DX 621 (NRC FY1999 Proposed Rule) and PX 1002 (FY1999 Proposed Rule Work Papers) list the three "concerns" mentioned in DFF 408, but neither exhibit supports the statement "and in the future as the number of operating licensees declined the financial burden on active licensees would increase." In fact, none of the citations listed support that statement.

WE further objects to this proposed finding as misleading because it ignores that, in making this regulatory change, the NRC further recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

409. After the FY1999 10 C.F.R. Part 171 fee rule change, all 10 C.F.R. Part 50 licensees with operating reactors paid an annual 10 C.F.R. Part 171 reactor operating fee that included the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. All 10 C.F.R. Part 50 licensed operating reactors utilize wet storage. Each licensed operating reactor is required to have a spent fuel pool. Tr.40712:4073:15; 4119:25-4120:8; 4241:4-17 (Rabideau); DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

410. After the FY1999 10 C.F.R. Part 171 fee rule change, all 10 C.F.R. Part 50 licensees that were shutdown and had fuel on-site paid the annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee regardless of how their spent fuel was stored. Tr.4034:22-4035:8; 4067:7-4071:21; 4072:10-4075:21 (Rabideau); DX 621; PX 1044; DDX1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

411. The NRC did not revise its 10 C.F.R. Part 171 fees related to the generic costs for spent fuel storage and reactor decommissioning because of DOE's delay in accepting SNF under the Standard Contract. The NRC revised the fee rule to address the issues raised by commission members and the NRC staff, and those issues existed regardless of DOE's delay. Tr.4053:8-22; 4076:16-24; 4176:20-4177:13 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it is inaccurate. The proposed finding confuses the breach and non-breach worlds. It implies that in the non-breach world the NRC would have acted the same way it did in the breach world. In the non-breach world, there would have been fewer ISFSIs and the issues raised by the Commission members in the breach world would not have occurred. PFF 228.

Further, this proposed finding ignores that, in making this regulatory change, the NRC recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

412. From FY1998 to FY1999, the amount of the 10 C.F.R. Part 171 annual fees paid by operating reactors related to dry storage declined because the number of licensees

paying the annual fee for generic costs related to spent fuel storage increased. Prior to FY1999, 15 licensees paid the annual 10 C.F.R. Part 171 fee for dry storage activities. In FY1999, more than 104 licensees paid the annual 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee. Tr.2460:7-2466:13 (Gadzala); 4075:22-4076:8; 4081:16-4082:9; 4082:14-4083:1; 4108:24-4109:22; 4112:22-4114:1 (Rabideau); DX612; DDX1-13; DDX1-14.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it is irrelevant as it only addresses the breach world. In the non-breach world where DOE performs according to the Standard Contract, there would have been fewer ISFSIs and those specific utilities that paid the 10 C.F.R. Part 171 fee for dry storage activities would have continued to pay that specific fee. There would have been no impact on overall generic 10 C.F.R Part 171 fees. PFF 228.

After 1998, the Part 171 fees became generic to all nuclear reactors. The fact that the fee might have been greater for WE in 1999 (and beyond if the NRC had continued such charges only to licensees with ISFSIs) does not mean that whatever that "reduced" spent fuel storage related fee that WE did pay under the NRC's new fee structure is not claimable.

413. The amount of 10 C.F.R. Part 171 annual fees for operating reactors, 10 C.F.R. Part 50 licensees, regardless of whether they had dry storage or not, declined from FY1998 (prior to the 10 C.F.R. Part 171 fee rule change creating the Spent Fuel Storage Reactor Decommissioning Fee) to FY1999 (after the 10 C.F.R. Part 171 fee rule change) and remained below the FY1998 fee amount until FY2003.

| | Reactor Operating Fee in thousands (Part 171 Fee for Dry Storage Not Included) | Reactor Operating Fee X 2 (two reactor facilities, i.e., Point Beach) in thousands (Part 171 Fee for Dry Storage Not Included) |
|---|---|---|
| FY1995 | $2,427 | $4,854 |
| FY1996 | $2,746 | $5,492 |
| | | |

| | | |
|---|---|---|
| FY1997 | $2,978 | $5,956 |
| FY1998 | $2,976 | $5,952 |
| | Reactor Operating Fee in Thousands (Part 171 Spent Fuel Storage/Reactor Decommissioning fee included pursuant to 10 C.F.R. § 171.15) | Reactor Operating Fee X 2 (two reactor facilities, i.e., Point Beach) in thousands (Part 171 Spent Fuel Storage/Reactor Decommissioning fee included pursuant to 10 C.F.R. § 171.15) |
| FY1999 | $2,776 | $5,552 |
| FY2000 | $2,815 | $5,630 |
| FY2001 | $2,753 | $5,506 |
| FY2002 | $2,849 | $5,698 |
| FY2003 | $3,251 | $6,502 |
| FY2004 | $3,283 | $6,566 |
| FY2005 | $3,115 | $6,230 |
| FY2006 | $3,704 | $7,408 |

Tr.4115:13-4124:22 (Rabideau); PX 945; PX 961; PX 962; PX 963; PX 964; PX 1044; DX 422; DDX1-14.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as both misleading and irrelevant. Again, the Government is citing to actions only in the breach world. Even if the total 10 C.F.R. Part

171 annual fees decreased in FY1999 from FY1998, that in no way suggests that an incremental amount of that fee paid by WE did not relate to dry storage activities and is properly claimable by WE. Indeed, Mr. Rabideau agreed that portions of the fee pertained to dry storage activities. PFF 226; Tr. 4217, 4223, 4225-4230 (Rabideau).

414. From FY1999 to FY2006, the total number of full time equivalents, e.g., Government personnel time, allocated to the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee planned activities and the total amount charged licensees for the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee decreased. This decrease occurred despite the increase in dry storage in the nuclear utility industry. Therefore, the amount that the NRC charges utilities annually for the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee does not causally relate to the amount of dry storage in the industry. In all but one year, FY2003, the amount of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee (including wet storage, dry storage, and reactor decommissioning) has been less than the pre-FY1999 10 C.F.R. Part 171 fee for dry storage alone. Tr.4123:8-16 (Rabideau); Tr.3367:2-3368:3 (Supko); PX 945; PX 961; PX 962; PX 963; PX 964; PX 1044; DX 422; DDX1-14.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as both misleading and irrelevant. Even if it were true that the total number of full-time equivalents and the total amount charged for 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning fees decreased in FY1999 from FY1998, that in no way suggests that an incremental amount of that fee paid by WE did not relate to dry storage activities. Indeed, Mr. Rabideau agreed that portions of the fee pertained to dry storage activities. PFF 226; Tr. 4217, 4223, 4225-4230 (Rabideau).

415. The FY1999 fee policy change resulted in lower fees to 10 C.F.R. Part 50 licensees with operating reactors regardless of whether they had dry storage. If the NRC had not modified the 10 C.F.R. Part 171 fees in FY1999, as WEPCO incorrectly claims would have occurred in the "but-for" world, WEPCO would have paid higher fees regardless of whether they had dry storage or not. Tr.2459:11-2466:9 (Gadzalla); Tr.4055:17-4056:3; 4075:22-4078:16; 4080:15-4082:9; 4115:13-4123:16 (Rabideau); DDX1-14.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it confuses the breach and non-breach worlds. The total amount of 10 C.F.R. Part 171 fees is irrelevant. *See* PFF 228. In the non-breach world, only a few utilities with ISFSIs would be paying Part 171 fees related to dry storage activities. WE is only claiming the incremental portion of the Part 171 fees related to dry storage activities, and Mr. Rabideau agreed that portions of that fee pertained to dry storage activities. PFF 226; Tr. 4217, 4223, 4225-4230 (Rabideau).

416. When the NRC allocates its budget by fee class, those allocations are for resources associated within that fee class. In addition, NRC's policy is to allocate those costs with a resource to the entire fee class. Tr.4136:3-11; 4136:12-4137:4; 4137:12-4138:21 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE further objects to the second sentence in this proposed finding because it is ambiguous.

417. The NRC assigns its resources for budgeting purposes by programs and sub-programs. Planned activities, also called planned accomplishments, are the activities the NRC performs in a year and are identified by programs or sub-programs. Planned activities are the lowest level of detail to which the NRC budgets. Tr.4085:12-18 (Rabideau); 4866:25-4867:14; 4879:2-9 (Croote); DX 603.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading. Tammy Croote testified that planned activities are at the lowest level of detail available to the agency-wide system, *but that* some offices may have additional budget information below the planned activities. Tr. 4879:2-10 (Croote).

418. The resource allocations for planned activities are determined in the budget formulation process far in advance of the fee calculation process. Tr.4867:19-4868:3 (Croote); DX 603.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

419. During the budget formation process, the NRC establishes the actual amount of resources that the NRC is going to use for each planned activity. Tr.4868:4-20 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

420. The NRC allocates its budgeted resources to the license fee classes during the fee calculation process, a separate process than budget formation. Tr.4868:4-20 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

421. Planned activities are paid for by both 10 C.F.R. Part 170 and 10 C.F.R. Part 171 fees. Tr.4085:19-4086:1 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

422. In the NRC's calculation of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, an estimate of the amount of 10 C.F.R. Part 170 fees for specific services that the NRC expects to collect per fee class in a year is subtracted from the total amount budgeted to the spent fuel storage/reactor decommissioning fee class. Tr.4086:5-4087:1 (Rabideau); DX 601; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

423. 10 C.F.R. Part 170 and 10 C.F.R. Part 171 activities are included as budgeted resources allocated to the Spent Fuel Storage/Reactor Decommissioning Fee. However, it is not possible to tell simply by looking at the planned activities which are 10 C.F.R. Part 170 and which are 10 C.F.R. Part 171 activities. Therefore, an estimate of the 10 C.F.R. Part 170 fees to be collected is subtracted out from the total budgeted resources allocated. Tr.4860:22-486:14 (Croote); DX 601; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

424. The 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee includes a budgeted resource amount for generic transportation resources. Tr.4862:15-4863:4 (Croote); DX 601; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

In addition, WE objects to this proposed finding to the extent that it implies that WE has not reasonably determined the portion of the fee that is attributable to dry storage, given the level of information that the Government provided to WE and the very detailed testimony of Mr. Rabideau in deposition, which he fully confirmed at trial. WE PTB 68-69.

425. If the DOE had begun to accept SNF from utilities in 1998, it is not clear if the NRC would have conducted fewer Part 171 generic activities related to dry storage. However, the NRC would have had to conduct fewer Part 170 site-specific service activities. Tr.4077:15-24; 4176:5-18 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it attempts to prove something that is too speculative. WE further objects because this proposed finding confuses the breach and non-breach worlds. In the non-breach world, only a very few utilities with ISFSIs would be paying Part 171 fees related to dry storage activities. PFF 228-229. WE would not have been one of those utilities. *Id.*; WE PTB 66-68.

426. Some nuclear utilities required dry storage by 1998 regardless of the DOE's performance under the Standard Contract. Tr.2442:15-2443:1 (Gadzala); Tr.3138:8-3139:21 (Supko); Tr.3798:4-3799:11 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as vague and misleading. It ignores the fact that WE's expert, Mr. Sieracki, testified that, in the non-breach world, there would have been at most eight ISFSIs and there would have been few, if any, ISFSIs constructed after

1998. Pursuant to its past practice, the NRC likely would have only charged the NRC dry storage project costs to those few licensees who had dry storage. Given that WE would not have built an ISFSI if DOE had performed, WE would not have paid those utility-specific fees. Tr. 3798:4-3800:18, 3803:4-20 (Sieracki); Tr. 4172:18-23; 4187:18-4188:12 (Rabideau); Tr. 2426:19-2427:6 (Gadzala); PFF 228a.

427. Mr. Rabideau reviewed work papers related to the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee and was not able to distinguish whether planned activities listed related to wet or dry storage because the work papers did not provide sufficient information. In addition, Mr. Rabideau's division between spent fuel storage and reactor decommissioning was his general understanding and, as he notified plaintiff's counsel, lacked specific detail. Mr. Rabideau was unable to divide between spent fuel storage and reactor decommissioning for approximately twenty percent of the planned activities he reviewed. Tr.4087:15-25; 4252:23-4253:1; 4254:12-15; 4255:11-14; 4255:24-4256:6 (Rabideau); PX 961; PX 1029; PX 1048.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

In addition, this proposed finding ignores that, in making this regulatory change, the NRC recognized that, with the substantial delays in DOE's performance, all nuclear utilities that continued operating would eventually need dry storage; that the NRC could not recover the cost of its dry storage activities from DOE; and that, given the foregoing circumstances, it made sense to include the ISFSI fee in the general license fee charged to all operating licensees. PFF 223-224; WE PTB 66-67.

428. In its calculation of damages, plaintiff failed to segregate wet fuel storage costs, and, therefore, its claim includes generic costs for wet fuel storage, costs that would have been incurred regardless of DOE's delay in accepting SNF. Therefore, plaintiff's calculation of damages attributable to the dry fuel storage portion of 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee is inaccurate. Tr.4112:6-21 (Rabideau); PX 1029 at KRGWE003887-88.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because the cited testimony from Mr. Rabideau does not support the proposed finding. Mr. Rabideau's cited testimony discusses the number of licensees paying specific fees. In addition, this finding ignores that, as Mr. Sieracki testified, The Kenrich Group would have considered any additional information provided by the NRC to refine the segregation of the costs, but no additional information was provided by the Government. Tr. 3796:13-3797:20 (Sieracki). WE made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

429. To distinguish allocation of resources between spent fuel storage and reactor decommissioning for some planned activities, Mr. Rabideau would have to talk to NRC employees in the program offices or to those employees who allocated the budgeted resources to obtain more information. Tr.4219:20-4220:8; 4225:3-13; 4226:16-24; 4228:3-12; 4229:16-23; 4230:22-4231:6 (Rabideau); PX 961; PX 962; PX 963; PX 964; PX 965; PX 1048; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as incomplete. In fact, Mr. Rabideau did not talk to the NRC employees in the program offices or to those employees who allocated the budgeted resources to obtain more information, thereby depriving WE of that additional information. WE does not have access to NRC personnel. PFF 227. Further, WE made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

430. To distinguish the Part 171 spent fuel storage/reactor decommissioning fee between spent fuel storage and reactor decommissioning, information must be obtained from the program offices of the NRC by having them apportion their budgeted resources allocated between the two categories. In addition, each line item of the fee calculation process must be divided between spent fuel storage and reactor decommissioning, not merely the budgeting process, between the two categories. Tr.4883:2-17; 4883:18-4886:21 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as incomplete and misleading. Although she had ample time and opportunity to do so, Ms. Croote did not talk to the NRC employees in the program offices to obtain more information and WE does not have access to these NRC personnel. PFF 227. Further, Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between spent fuel storage ("SFS") and reactor decommissioning ("RD"). PFF 226. WE then applied the SFS percentage reflected in this 80 precent to the remaining percent. In these circumstances, WE made a reasonable calculation of the incremental fees based on the facts and detailed information provided by the NRC. PFF 226-227, 231. As WE's damages experts have testified, the level and analysis provided by WE for this damage element definitely meets the damages standard of reasonable certainty. Tr. 4624:14-22; PFF 231.

431. Information at the NRC program offices as to whether a budgeted resource allocated is for purposes of the spent fuel storage or reactor decommissioning portions of the spent fuel storage/reactor decommissioning fee is not available. The allocation information does not exist because the NRC's finance office does not ask the program offices to allocate its resources in that manner. The allocations are based upon the qualitative judgments of employees made at the time and not on quantitative data. Planned activities related to the spent fuel storage/reactor decommissioning fee are work activities that are generic by nature and support whole fee classes. To obtain that information would require talking to the same person who made the judgment as to the resource allocation at the time and getting their recollection about that particular activity. In Ms. Croote's opinion, Mr. Rabideau could make some determinations as to the allocations between spent fuel storage and reactor decommissioning, but not all. Tr.4894:8-13; 4895:17-4898:2 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

In addition, WE objects to this proposed finding of fact as unsupported by the cited testimony. Ms. Croote testified that information was "probably not" available, not that it definitely wasn't. Ms. Croote "believes" that the information does not exist, but again she

did not ask these other NRC offices and, therefore, does not know with any degree of certainty. Further, Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between SFS and RD. PFF 226. WE then applied the SFS percentage reflected in this 80% to the remaining 20%. *Id.* In these circumstances, WE made a reasonable calculation of the incremental fees based on the facts and information that was provided by the NRC. PFF 226-227, 231.

432. There is typically no relationship between the number of licensees in a fee class and the 10 C.F.R. Part 171 generic costs for the NRC because if you perform activities on a particular topic it will cost the same amount regardless of whether there is a handful of licensees or dozens. Tr.4080:15-4081:1 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE further objects to this proposed finding of fact as misleading because it ignores that, in the non-breach world, only eight utilities, not including WE, would have had ISFSIs and, pursuant to its past practice, the NRC likely only would have charged NRC dry storage project costs to those licensees who had dry storage. PFF 228b. Given that WE would not have built an ISFSI if DOE had performed, WE would not have paid those utility-specific dry storage fees. *Id.*

433. If the number of licensees in a 10 C.F.R. Part 171 fee class increases, the fee per licensee decreases. Tr.4081:6-15; 4082:5-9; 4082:18-4083:1 (Rabideau); DDX 1-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as irrelevant and misleading. Even if an increase in the number of licenses in a 10 C.F.R. Part 171 fee class would decrease the fee per licensee, that does *not* mean that WE did not pay an incremental amount of that fee related to dry storage activities. Indeed, Mr. Rabideau agreed that portions of the fee pertained to dry storage activities. PFF 226; Tr. 4217, 4223, 4225-4230 (Rabideau). Further,

Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between SFS and RD. PFF 226. WE then applied the SFS percentage reflected in this 80 percent to the remaining percent. In these circumstances, WE made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

434. The 10 C.F.R. Part 171 Spent Fuel Storage/ Reactor Decommissioning Fee calculation includes a surcharge for those NRC activities that do not directly benefit NRC licensees and have not been paid for through appropriations, such as international activities. The surcharge is allocated based upon a fee classes percent of the budget, e.g., if the power reactor fee class has 80 percent of the budgeted resources, the surcharge to the power reactor fee class would be 80 percent. Plaintiff's calculation of damages is flawed because it failed to remove the surcharge, which is unrelated to DOE's delay in performance, from its calculation of damages. Tr.4852:11-4854:16; 4863:8-15 (Croote); DX 601; DX 604; PX 1029 at KRGWE003887-88.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading. The surcharge is part of the fee that the NRC charges WE for spent fuel activities. PX 1008. Further, WE included only that portion of the surcharge that is allocated to spent fuel storage. *Id.* Given that DOE caused WE to incur the spent fuel storage-related NRC fees, DOE is also responsible for the surcharge applied to those spent fuel storage-related costs. Therefore, the surcharge is properly included in WE's damages. PX 1008; PX 1029.

435. The NRC's program offices determine and submit their allocations for resources as they begin to develop budget requests approximately one and a half years before the start of the fiscal year for which the offices are requesting funds, i.e., in February or March of 2007 for FY2009. The NRC submits its budget to the Office of Management and Budget ("OMB") approximately thirteen months prior to the start of the fiscal year budgeted for. Once agreement is reached between NRC and OMB, the budget is submitted to Congress in early February about eight months before the fiscal year for which the funds are requested. Tr.4244:5-4245:19 (Rabideau); Tr.4845:2-4846:1; 4868:21-4869:10 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

436. During the budget formation process, budgeted resources are determined by the NRC. Many NRC employees are involved in this activity. Allocations are not made to fee classes during the budget process. Tr.4869:19-4870:10; 4881:6-12 (Croote); DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

437. In the fee calculation process, the NRC program offices determine how resources are allocated by fee class. The resource allocations by fee class is a complex process taking about six months to complete and involving many people. Tr.4870:11-4871:12 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

438. The fee class allocations made by the NRC program offices are based on some data but also on the judgment of many NRC employees. There is no model that can produce a defined result of exactly what percentage of a regulation benefits a type of licensee. The resource allocation by fee class is a judgment of the program offices performing the activities. Tr.4871:13-872:16 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between SFS and RD. PFF 226. WE then applied the SFS percentage reflected in this 80 percent to the remaining percent. In these circumstances, WE made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

439. The NRC's fiscal year runs from October 1 to September 31 each year. Tr.4245:23-4246:9 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

440. The fee calculation process is separate from the budget process. The fee rule process begins the April prior to the fiscal year for which the fee rule applies e.g., April 1999 for FY2000 (FY2000 began October 1999). Tr.4846:2-7; 4850:15-24 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because the citations are contradictory. The proposed finding states that the fee rule process would start in April 1999 for FY2000. This is contradicted by Ms. Croote's testimony that the fee process would start in April 2007 to recover the budgeted resources for FY2007. Tr. 4846:2-7 (Croote).

441. The proposed fee rule for 10 C.F.R. Part 171 fees, including the spent fuel storage/reactor decommissioning fee, is generally published in February or March of the fiscal year in which the fees are assessed, i.e., February or March 2009 for the FY2009 fee. Tr.4245:23-246:9 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

442. From the beginning of the budget cycle, to include the submission of allocations for resources from program offices, to the publication of the 10 C.F.R. Part 171 fee rule, including the spent fuel storage/reactor decommissioning fee, approximately two years elapse. Tr.4244:5-4246:9; 4247:2-23 (Rabideau); Tr.4845:16-4846:1 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

443. In calculating the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee, the resources budgeted during the budget process (by activity) are allocated by program to the different fee classes. Tr.4856:7-4857:10 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

444. The program offices make the determinations of what resources are allocated to the fee classes. Tr.4857:11-16 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

445. The total budgeted resources allocated to the spent fuel storage/reactor decommissioning fee class includes 10 C.F.R. Part 170 and 10 C.F.R. Part 171 activities. Tr.4857:17-4858:1 (Croote); DX 601; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

446. In calculating the spent fuel storage/reactor decommissioning fee, the subtotal for the fee class is a starting point and it is adjusted prior to determining the fee amount. Tr.4858:2-13 (Croote); DX 601; DX 604.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

447. As time passes it is more and more difficult to identify whether a past allocation was for spent fuel storage or reactor decommissioning. Tr.4247:24-4248:14 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE further objects to this proposed finding as misleading. WE calculated the SFS portion of the SFS/RD for FY2001 through 2006 based on Mr. Rabideau's deposition testimony. PFF 226. Based on this testimony, Kenrich calculated to a reasonable certainty that portion of the SFS/RD fee attributable to the NRC's dry storage activities. PFF 226.

448. Even if more information on past allocations was obtained, it would not assist Mr. Rabideau determine which planned activities related to 10 C.F.R. Part 170 activities versus 10 C.F.R. Part 171 activities. Tr.4248:15-24 (Rabideau).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding as ambiguous. If information regarding which planned activity related to a 10 C.F.R. Part 170 activity as opposed to a 10 C.F.R. Part 171 activity, that would certainly assist Mr. Rabideau in making that determination.

449. The NRC's work papers do not divide the spent fuel storage/reactor decommissioning fee between spent fuel storage and reactor decommissioning portions and it is not provided in the fee rule published in the federal register. Moreover, Mr. Rabideau does not, as part of his employment with the NRC, distinguish allocations of the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee between spent fuel storage and reactor decommissioning activities. Tr.4248:25-4249:8 (Rabideau); Tr.4882:10-4883:1 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE further objects to this proposed finding as misleading. WE calculated the SFS portion of the SFS/RD for FY2001 through 2006 based on Mr. Rabideau's deposition testimony – in part because such information is indeed NOT broken out elsewhere. Relying on Mr. Rabideau's testimony, given his position and role with the NRC, is appropriate in determining damages such as these to a reasonable certainty. PFF 226. Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between SFS and RD. PFF 226. WE then applied the SFS percentage reflected in this 80 percent to the remaining 20 percent. In these circumstances, WE made a reasonable calculation of the incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

Further, WE notes that the Government has offered no alternative calculation of these damages. Instead, it seems content to assert that WE has not determined with absolute certainty that portion of the SFS/RD fee attributable to dry storage. That, of course, ignores that the amount of contract damages need only be calculated to a reasonable certainty, not with absolute exactness.

450. 10 C.F.R. Part 171 fees are determined based on a detailed review of the budgeted resources for each planned activity the NRC performs. Budgeted resources for each planned activity are allocated to the different fee licensee classes regulated by the NRC. Tr.4848:17-25 (Croote).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

451. Plaintiff's estimate of damages related to 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fees is based upon the total budgeted resources allocated to the fee class. The total budgeted resources is merely a starting point in determining the annual fee amount. Several adjustments must be made to determine the final fee amount. One of the adjustments is a subtraction of the estimated 10 C.F.R. Part 170 fees, fees for specific services, to be collected from the fee class. Plaintiff based its fee calculation on the total budgeted resources without any adjustments. Plaintiff's calculation is flawed because it fails to subtract the estimated 10 C.F.R. Part 170 fees from the total budgeted resources, as the NRC does, in its determination of the 10 C.F.R. Part 171 fee. Plaintiff has separately claimed 10 C.F.R. Part 170 fees for the period in which the 10 C.F.R. Part 171 Spent Fuel Storage/Reactor Decommissioning Fee was charged. Thus, in addition to inaccurately determining the 10 C.F.R. Part 171 fee amount, plaintiff is also claiming 10 C.F.R. Part 170 fees, one estimated and one actual, in two separate parts of its claim and is, therefore, claiming duplicative damages. Tr.4857:17-4858:13; 4860:5-4864:4 (Croote); PX 1029 at KRGWE003828, 3886-88; PX 1047 at KRGWE003914.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it is inaccurate. WE's damages experts, The Kenrich Group, used the net fee amount determined by the NRC *after removal of Part 170 fees,* with the exception of two WE-specific Part 170 charges discussed below. This is confirmed by review of the relevant Kenrich work papers. PX 1008

The Government also asserts that WE is claiming duplicative damages. That is incorrect. Beginning with FY1999 (when the NRC revised its spent fuel storage license structure), WE is only claiming that portion of the Part 171 fees attributable to spent fuel storage. In addition, in 2003, the NRC invoiced for two inspections related to the storage of spent fuel and charged WE separate Part 170 fees in the amount of $13,716 for these activities. PX 1029, p. KRGWE003864. Also, in 2005, the NRC invoiced for another inspection related to the storage of spent fuel and charged WE a separate Part 170 fee in the

amount of $12,360. PX 1029, p. KRGWE003864. Thus, these are not duplicative charges, but separate charges assessed by the NRC and incurred by WE. PX 1008; PX 1029.

452. Chairman Ivan Selin left the NRC in 1995. Tr.4040:9-14 (Rabideau).

**RESPONSE:**

WE objects to this proposed finding of fact because it is irrelevant.

453. Mr. Kiraly adjusted plaintiff's damages claim by removing the entire $2,283,333 in annual NRC licensing fees, based upon the expert opinion of Warren Brewer. DX 393 at 17-17; DX 625 (Attachment 1(Rev.2)); DDX 5-36; DDX 5-37.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE agrees that Mr. Kiraly removed WE's claim for NRC fees based on the opinion of Mr. Brewer. Ironically, the Government rarely cites Mr. Brewer in the Government's 75 proposed findings on the NRC fee issue, and even when cited, it is only as alleged support of very general propositions and on nothing related to the veracity or reasonableness of WE's calculation of this element of damages.

454. The FY1999 fee change resulted in lower fees for WEPCO post 1999. Tr. 3948:12-24. (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as irrelevant. Even if the FY1999 fee change resulted in lower 10 C.F.R. Part 171 annual fees post 1999, that does *not* mean that WE did not pay an incremental amount of that fee for dry storage related activities. Further, Mr. Rabideau was able to allocate approximately 80 percent of the budget line items between SFS and RD. PFF 226. WE then applied the SFS percentage reflected in this 80 percent to the remaining 20 percent. In these circumstances, WE made a reasonable calculation of the

incremental fees based on the facts and information provided by the NRC. PFF 226-227, 231.

455. WEPCO has claimed as damages a portion of the post 1999 fee even though Mr. Sieracki acknowledged that WEPCO would have paid the same fee whether or not it had an ISFSI. Tr. 3946:16-3947:22 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading and inaccurate. Mr. Sieracki's testimony was in response to a Government-related hypothetical with which neither Mr. Sieracki nor WE agreed (i.e., where WE does not have an ISFSI, but the fee change occurred in 1999 in the non-breach world). The Government's hypothetical is fatally flawed because it does not consider what would have occurred in the non-breach world. In the non-breach world (where DOE performs in accordance with the Standard Contract), WE would not have built an ISFSI. PFF 158. In addition, all but, at most, eight of the nuclear utilities would not have needed to build an ISFSI. Thus, in the non-breach world, the NRC would not have been concerned that its fee structure might act as a disincentive to utilities choosing dry storage because few utilities would have had such spent fuel storage space concerns. Thus, in the non-breach world, the NRC would have retained its ISFSI fee and WE would not have paid this dry storage fee. PFF 228.

456. Plaintiff's expert, Mr. Sieracki, used Mr. Rabideau's testimony to divide the NRC planned activities fees within the spent fuel storage/reactor decommissioning fee class between fuel storage and reactor decommissioning. Aside from Mr. Rabideau's testimony, he did not have any basis to divide those costs. Tr. 3963:5-22 (Sieracki). Mr. Sieracki did not have any independent knowledge of the scope of the program/planned accomplishments in the NRC budget materials or whether they related to wet storage and Mr. Rabideau was unable to provide this information in his deposition. Tr. 3964:1-3965:6 (Sieracki); DFOF ¶ 428-432. Mr. Sieracki was not able to identify which of the program activities represent activities for which the costs were recovered under Part 170. Tr. 3965:7-14 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading. WE obtained information from the Government to enable WE's expert, Mr. Sieracki, to calculate the spent fuel storage portion of the SFS/RD fee. He performed a reasonable calculation based on the information and testimony made available from NRC. PFF 226. There can be no dispute that portion of the SFS/RD fee related to fees incurred for dry storage related activities. Based on Mr. Rabideau's detailed deposition testimony on the subject (which he specifically affirmed at trial), Mr. Sieracki then calculated to a reasonable certainty that portion of the SFS/RD fee attributable to the NRC's dry storage activities. PFF 226; WE PTB 68-69.

Further, WE notes that the Government has offered no alternative calculation of these damages. Instead, it seems content to assert only that WE has not determined with absolute certainty that portion of the SFS/RD fee attributable to dry storage. That, of course, ignores that the amount of contract damages need only be calculated to a reasonable certainty, not with absolute exactness.

457. The basis for Mr. Sieraki's opinion regarding the NRC fees were conversations with Mr. Krieser and the depositions of Ms. Croote and Mr. Rabideau. Tr. 3949:15-3950:14 (Sieracki). Mr. Krieser has never worked for the NRC, did not have dealing with the NRC regarding the fee change, and did not testify at trial regarding NRC fees. Tr. 3949:23-3950:8 (Sieracki). Mr. Sieracki did not discuss the basis for his opinion with the NRC. Tr. 3954:10-14 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as misleading. Although Mr. Sieracki did not discuss the basis for his opinion with the NRC, the Government had ample opportunity to critique the Kenrich calculation or to submit its own calculation of the spent fuel storage portion of the Part 171 fee. PFF 226. The Government never did so, but was content to assert only that WE has not determined with absolute certainty that portion of the SFS/RD fee

attributable to dry storage. That, of course, ignores that the amount of contract damages need only be calculated to a reasonable certainty, not with absolute exactness. WE PTB 68-69.

458. Mr. Sieracki was not aware of whether, and how, the fee itself would have changed had the fee structure remained the same. Tr. 3952:6-23 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as irrelevant. As Mr. Sieracki testified, the Government's scenario is irrelevant because, in the non-breach world, WE would not have built an ISFSI and, accordingly, would not have had to pay any dry storage related fees. Tr. 3952:6-23 (Sieracki). PFF 158, 228.

459. Mr. Sieracki believed that had DOE performed starting in 1998 many utilities that have ISFSIs would not have had ISFSIs, but he had not studied the issue and did not know how many utilities would have had ISFSIs had DOE performed in 1998. Tr. 3950:14-3951:11 (Sieracki). While Mr. Sieracki believed the majority of utilities would not have had ISFSIs had DOE performed, he had not studied the issue, was not aware of anyone else studying the issue, and did not have a belief as to whether that "majority of utilities" consisted of 51 percent or 99 percent. Tr. 3951:12-3952:5 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact because it is inaccurate. Mr. Sieracki testified that his understanding is that many utilities that have ISFSIs now would not have needed ISFSIs had the DOE performed in accordance with the Standard Contract. This general understanding came from discussions with Ms. Supko, Mr. Krieser and Mr. Sieracki's extensive work on the SNF cases. Tr. 3950:15-3951:11 (Sieracki).

460. Mr. Sieracki did not do an evaluation of how many people the NRC added to its staff as a result of the utilization of dry fuel storage in the industry. Tr. 3953:18-3954:3 (Sieracki). He did not do an evaluation of how the NRC annual budget may have changed as a result of the utilization of dry storage in the industry. Tr. 3954:4-9 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.B (DFF 386-460).

WE objects to this proposed finding of fact as irrelevant. As Mr. Sieracki testified, no evaluation of staff personnel at the NRC was needed. Tr. 3953:18-3954:3 (Sieracki). It also is unnecessary to determine the changes in the NRC annual budget. There is no doubt that there was a cost for NRC dry storage activities and that these costs continued after the fee structure changed in 1999. WE is entitled to recover the monies attributable to the NRC fee for its dry storage activities because WE (and the overwhelming majority of the U.S. nuclear utilities) would not have had to build dry storage facilities in the non-breach world. PFF 228-229; WE PTB 66-68.

**C. <u>WEPCO'S Claim For ISFSI Fabrication And VSC-24 Casks 1 Through 5</u>**

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XVIII.C (DFF 461-472).

**GENERAL OBJECTIONS TO SECTION XVIII.C (DFF 461-472):**

WE objects to and disputes the proposed findings of fact in Section XVIII.C (DFF 461-472) because they rely upon improper evidence. Mr. Hamal's opinion regarding the non-breach world is based upon his assumption, supplied by the DOJ, that the breach and non-breach worlds would have been essentially identical through January 1998. PFF 167. The overwhelming evidence, however, demonstrated that WE would not have built a dry storage facility had DOE timely performed by 1998. PFF 158-211. Consequently, the DOJ's assumption regarding the non-breach world is flawed, and Mr. Hamal's opinion adopting that assumption in analyzing the non-breach world is unreliable and irrelevant.

461. As a regulated monopoly, WEPCO is allowed to recover its operating costs and to earn a regulated rate of return on invested capital to the extent such expenditures are deemed prudent in return for taking on the obligation to serve its customers. Tr.5870:13-5872:23 (Hamal).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE does not dispute that WE is a regulated electric power utility and that its recovery of capital expenditures from ratepayers is subject to regulatory approval. PFF 4; Tr. 101:2-10 (Baumann). WE does not dispute that state regulatory authorities perform a prudence review in connection with WE's construction projects. Tr. 6267:25-6269:8 (Farron).

462. Point Beach provides roughly 25 to 30 per cent of WEPCO's electricity. Tr.5872:23-5873:3 (Hamal); DX 392/PX 828, Hamal Attachment 3.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE objects to DFF 462 as it relies on improper evidence in purporting to cite Mr. Hamal as a source for facts relating to WE's electricity production. The Government may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

Further, Mr. Hamal did not testify that he had personal knowledge of WE's electricity-generating operations. Instead, Mr. Hamal's testimony regarding the production of electricity at Point Beach simply restated his interpretation of information from third party documents. See DX 392, p. WXE004 0048. Because Mr. Hamal's testimony regarding WE's electricity generation operations is not based upon personal knowledge or any testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

WE, however, does not dispute that nuclear power-generated electricity from Point Beach supplies approximately 25 percent of WE's power requirements. PFF 7.

463. Point Beach has relatively low operating costs while the cost of replacing the power generated by just one of the units at Point Beach was estimated to run from $165,000 to $500,000 per day. Tr.5872:3-12 (Hamal); DX 392/PX 828, Hamal Attachment 4.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE objects to this proposed finding of fact as vague because the phrase "relatively low operating costs" is vague and ambiguous. The proposed finding cites no evidence to establish Point Beach's operating costs.

WE further objects to this proposed finding because it relies solely on Mr. Hamal as a source for facts relating to the costs of WE's electricity production. Mr. Hamal did not testify that he had personal knowledge of the costs of WE's electricity-generating operations. Instead, Mr. Hamal's testimony regarding the production of electricity at Point Beach simply restated his interpretation of information from third party documents. *See* DX 392, p. WXE004 0050. Because Mr. Hamal's testimony regarding WE's electricity generation operations is not based upon personal knowledge or any testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

Further, the Government may not attempt to establish facts solely by citing the testimony of Mr. Hamal, one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

WE also objects to this proposed finding of fact because it wrongly implies that WE would have potentially incurred replacement power costs because of an unplanned loss of

FCR in the non-breach world unless WE constructed an ISFSI. Loss of FCR is not an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store the core can be calculated, enabling appropriate planning. *Id.* WE could and would have used a temporary cask pit rack in the non-breach world as needed to provide FCR capability. PFF 158-211.

464. An outage at Point Beach at the wrong time could result in rolling blackouts which would violate WEPCO's obligation to serve its customers. Tr.5872:13-5874:17 (Hamal).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE objects to this proposed finding of fact as vague because the phrase "wrong time" is vague and ambiguous.

WE also objects to this proposed finding of fact because it wrongly implies that WE would have potentially encountered "rolling blackouts" because of an unplanned loss of FCR in the non-breach world unless WE constructed an ISFSI. Loss of FCR is not an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store the core can be calculated, enabling appropriate planning. *Id.* WE could and would likely have used a temporary cask pit rack in the non-breach world as needed to provide FCR capability. PFF 158-211.

WE further objects to this proposed finding because Mr. Hamal's statement regarding rolling blackouts was not referenced in his expert report and was first advanced at trial. Given that it is outside the scope of his report, and the Government never provided advance notice of this new opinion, it should be stricken for failure to comply with RCFC 26(a)(2). *See* DX 392; Tr. 5953:25-5954:3 (Hamal) ("I don't believe I used the term blackouts in my report.").

465. An outage at Point Beach caused by the lack of SNF storage space could last a long time because of the time-consuming effort needed to add SNF storage space by building an ISFSI. Tr.5874:18-5875:12 (Hamal); Tr.2179:18-2180:3 (Porter).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE objects to this proposed finding of fact as vague because the phrase "long time" is vague.

WE further objects to this proposed finding of fact because it is not supported by the cited evidence. Mr. Porter's cited testimony concerns the PSCW authorization process, not the duration of an unplanned outage. Tr. 2179:18-2180:3 (Porter).

WE also objects to this proposed finding of fact because it wrongly implies that WE would have potentially experienced an outage of extended duration because of an unplanned loss of FCR in the non-breach world unless WE constructed an ISFSI. Loss of FCR is not an unplanned event. As WE established at trial, FCR capacity can be calculated based upon projected permanent spent fuel discharges and permanent and temporary storage rack capacity. PFF 159-167. Whether or not an unplanned emergency causes the need to temporarily offload a core, the capacity of the spent fuel pool, including temporary rack(s), to store the core can be calculated, enabling appropriate planning. *Id.* WE could and would likely have used a temporary cask pit rack in the non-breach world as needed to provide FCR capability. PFF 158-211.

WE further objects to this proposed finding because Mr. Hamal's statement regarding the duration of an outage was not referenced in his expert report and was first advanced at trial. *See* DX 392. Given that it is outside the scope of his report, and the Government never provided advance notice of this new opinion, it should be stricken for failure to comply with RCFC 26(a)(2). At trial, Mr. Hamal admitted that he had not even analyzed the issue. Tr. 5960:24-5961:4 (Hamal) ("I haven't performed an analysis of this issue, no.").

466. At the beginning of 1998, WEPCO had loaded two VSC-24 casks. Two more VSC-24 casks were on site, ready to be loaded. Eight additional casks were in various states of production. Tr.5886:5-5887:2 (Hamal), DDX 4-12.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE further objects to this proposed finding of fact because Mr. Hamal did not testify that he had personal knowledge regarding the daily operation of the Point Beach plant and its ISFSI. Instead, Mr. Hamal's testimony regarding the status of VSC-24 casks at Point Beach was simply the restatement of a collection of WE documents. *See* DDX 4-12 and citations therein. Because Mr. Hamal's testimony regarding the status of VSC-24 casks at Point Beach is not based on personal knowledge or any testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

In addition, the Government may not attempt to establish facts solely by citing the testimony of one of its expert witnesses. *Wilson v. Merrell Dow Pharms., Inc.*, 893 F.2d at 1153 (Rule 703 limits admission of hearsay to showing the basis of an expert's opinion and not for proving the truth of the matter asserted); *United States v. .59 Acres of Land*, 109 F.3d at 1496 (otherwise inadmissible evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence).

467. In January 1998, the spent fuel pool held 1,374 assemblies (in addition to having spent fuel in the two loaded VSC-24 casks). To restore full core reserve in the critical 1998-1999 time period, even with DOE accepting spent fuel starting in 1998, WEPCO would

have loaded three additional VSC-24 casks. Loading three additional casks is roughly the cost of a single day of replacement power. Tr.5888:4-6; 5890:10-22 (Hamal), DDX 4-13.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

Further, Mr. Hamal's opinion regarding the non-breach world is based upon his assumption, supplied by the DOJ, that the breach and non-breach worlds would have been essentially identical through January 1998. PFF 167. The overwhelming evidence, however, demonstrated that WE would not have built a dry storage facility had DOE timely performed by 1998. PFF 158-211. Consequently, the DOJ's assumption regarding the non-breach world is flawed, and Mr. Hamal's opinion is therefore unreliable and irrelevant.

WE proved at trial that in the non-breach world Point Beach would have operated through 1998 until DOE accepted WE's SNF while preserving FCR through a temporary cask pit rack and Mr. Hamal's opinion cast no doubt on WE's ability to do so. PFF 163. WE's spent fuel assembly inventory in January 1998, based on actual discharges, totaled 1422. Tr. 3750:9-20 (Sieracki); PDX 60-Sieracki 24. At trial, WE applied its spent fuel management model showing that had DOE timely performed, it would have accepted 41 - 48 spent fuel assemblies in Spring 1998. Tr. 3750:9-20 (Sieracki). WE used the 48 assembly figure on the assumption that DOE would have accepted two full transportation canisters. Tr. 3751:15-3753:2 (Sieracki). With DOE having removed 41 - 48 assemblies, WE would have had sufficient space in the pool to accommodate the 98 spent fuel assembly discharges in 1998 using only its wet storage capacity. Tr. 3753:11-3754:10 (Sieracki) (1472 assemblies at year end of 1998 was below the pool's 1550 space capacity); PDX 60-Sieracki 29-30.

By purchasing a temporary cask pit rack in the mid-1990s, Point Beach would have had FCR throughout this period in the non-breach world. Tr. 3749:13-24 (Sieracki); PDX 60-Sieracki 23. The discharge data and fuel management model showed that WE would not have exceeded its spent fuel pool capacity in the non-breach world and that the

only measure that WE would have needed to take to preserve FCR was to purchase a temporary rack. Tr. 3750:3-8 (Sieracki); PDX 60-Sieracki 23. No additional on-site storage (dry storage) would have been necessary for FCR in the non-breach world. *Id.* Furthermore, under Mr. Hamal's analysis, the inventory of spent fuel assemblies at Point Beach would never have exceeded 1500 spent fuel assemblies. Tr. 5975:2-5978:3 (Hamal); PX 828, Attachment 6.

468. Unless additional casks were loaded in 1998, WEPCO would lose FCR throughout 1998 and 1999, and again in 2000, 2001, 2002, 2005, 2006, and 2007, even assuming DOE performance starting in 1998. Loading a total of five casks allows FCR to be recovered in 1998 and maintained through 2007, with DOE performance starting in 1998. Tr.5892:19-5893:21 (Hamal), DDX 4-17, DDX 4-18.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE further objects to this proposed finding regarding when WE might have lost FCR in the non-breach world as misleading. Mr. Hamal testified that, in his spent fuel analysis, he was directed to assume by DOJ that DOE acceptance of WE's spent fuel could happen as late as the *very* end of a given year. In fact, for 1998 and 1999, Mr. Hamal placed the DOE pickup in January 1999 and January 2000, respectively. Tr. 5966:19-5968:13 (Hamal); DDX 4-14; PX 828 (Attachment 6, p. WXE004 0058-0061). As discussed in PFF 59d, WE would have stated in its FDSs the specific dates on which it desired DOE to pick up its spent fuel. If DOE disapproved of WE's requested pickup date, the parties would have negotiated a *mutually-acceptable* schedule. Thus, Mr. Hamal's FCR analysis, including DDX 4-17, is flawed because of his assumption that DOE would always pick up WE's spent fuel at the very end of the year.

Another flaw in Mr. Hamal's analysis is that it ignores that, and WE demonstrated that, in the non-breach world, WE most likely would have purchased a temporary rack for use in the cask pit area to maintain FCR. PFF 182. Thus, as Mr. Sieracki and others testified at

trial, WE would have maintained FCR in the non-breach world. Tr. 3748:18-3750:8 (Sieracki); PDX 60-Sieracki 23; PX 796, p. KRGWE003254; Tr. 344:17-345:11 (Link); Tr. 2568:15-2570:21 (Farron); Tr. 1532:3-1524:13 (Krieser). *See* PFF 178.

469. The fifth cask at Point Beach was loaded at the end of 1998. The cost of a 12 space ISFSI versus a 48 space ISFSI would have been essentially the same. Tr.1004:15-1006:2, 1124:13-1126:12 (Zabransky); DX 132 at WISC 00011072. Start-up costs for construction of the ISFSI pad and casks would be the same regardless of the number of casks loaded. Tr.6147:3-13; 6241:19-24 (Kiraly); DDX 5-40; DX 616 (ISFSI Plan View); DX 132.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE objects to the Government's use of Mr. Kiraly's testimony in support of this proposed finding of fact because Mr. Kiraly demonstrated at trial that he was not familiar with the Point Beach ISFSI. Indeed, Mr. Kiraly erroneously believed that the ISFSI was within the Point Beach security perimeter or "footprint." Tr. 6181:18-6182:24 (Kiraly). Mr. Kiraly did not perform any analysis or examination of whether the ISFSI costs would have differed if the ISFSI was sized for five casks rather than 48 casks. Tr. 6182:16-24 (Kiraly). Mr. Kiraly, instead, admitted that he simply assumed that the ISFSI costs would be the same regardless of the ISFSI's size. Tr. 6180:14-6182:24. (Kiraly).

WE also objects to the proposed finding of fact as vague because it does not describe the types of costs included in "start-up costs." If "start-up" costs include Operations & Maintenance costs (O&M), then this proposed finding is inaccurate. The March 10, 1993 letter from WE's counsel to the Tellus Institute shows that the annual O&M costs for a 12 cask and 48 cask ISFSI were projected to differ by $16.6 million. DX 132, p. WISC00011072 (O&M costs were only $2,846,000 for a 12 cask ISFSI, but $19,493,000 for a 48 cask ISFSI).

Additionally, WE disputes the citation to testimony of Mr. Zabransky in support of this proposed finding. Mr. Zabransky left WE in 1994. The PSCW did not approve the

ISFSI until February 1995, and WE did not make a final decision to construct the ISFSI until after the PSCW's approval. PX 374; PFF 121.

470. The costs that plaintiff is claiming related to the ISFSI fabrication and first five VSC-24 casks are separately identifiable from other costs that plaintiff is claiming. Tr.6147:3-8; 6148:8-16 (Kiraly); DDX 5-42; DX 625 (Attachment 8, WXE 0220088 - WXE 0220133).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

471. WEPCO should not recover costs relating to the procurement and loading of the first five VSC-24 casks. DX392 at ¶¶13-21; Tr.5858:5-9; 5860:2-5862:9; 5867:11-5870:4, 5870:13-5881:7, 5884:24-5897:2 (Hamal). Further, $20,550,207 in plaintiff's damages claim constituted the costs of the ISFSI fabrication and five VSC-24 casks, and the claim should be adjusted by that amount. Tr.6145:6-20 (Kiraly); DDX 5-13; DDX 5-38; DDX 5-39. Of the $20,550,207, there is $4,844,381 which could also be disallowed for accounting reasons, such as salaried labor, A&G, and employee expenses. Tr.6147:14 – 6149:7 (Kiraly); DDX 5-43; DX 625 (Attachment 8, WXE 0220088 - WXE 0220133); DX 625 (Attachment 1-a-4.4, WXE 0220016).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

WE further objects that the testimony of Mr. Kiraly is not a sufficient evidentiary basis for the removal of the ISFSI fabrication costs from WE's damages. There is no evidence cited in the DFF that supports the removal of the ISFSI construction costs. Further, Mr. Kiraly demonstrated at trial that he was unfamiliar with the Point Beach ISFSI. Tr. 6181:18-6182:24 (Kiraly). Further, Mr. Kiraly testified at trial that he was asked to assume by counsel that WE would have constructed an ISFSI even if DOE had begun performance under the Standard Contract. DDX 5-39; Tr. 6144:23-6145:5 (Kiraly).

Mr. Hamal expressly stated that DOJ directed him to assume that the breach and non-breach worlds were exactly the same through January 1998. Thus, he *assumed* that WE would have built an ISFSI and loaded two casks by the end of 1997 in the non-breach world. Accordingly, he did not express an opinion regarding whether WE would have built dry

storage or loaded the first two casks in the non-breach world. Instead, Mr. Hamal's opinion is limited as to whether, assuming that WE constructed an ISFSI and loaded two casks in the non-breach world, WE would have loaded three more casks in 1998 or purchased a temporary rack. Tr. 5869:15-19, 5939:19-5946:8, 5947:17-23, 5952:8-5953:6, 5970:2-20 (Hamal).

Further, Mr. Hamal's opinion is incorrect and irrelevant. *See* General Objections to Section XVIII.C (DFF 461-472). In the non-breach world, WE never would have built dry storage and most likely would have purchased a temporary rack for the cask laydown area to use, if needed, to offload a core. PFF 158, 182. The overwhelming evidence demonstrated that WE would not have built a dry storage facility had DOE timely performed by 1998. PFF 158-211. Therefore, the assumed circumstances underlying Mr. Hamal's opinion never would have existed.

For these reasons, *no* adjustments should be made to the claimed costs for the ISFSI and the dry casks. The proper amount of damages to be recovered for ISFSI costs is the total amount claimed, $20,683,000 nominal dollars. The proper amount of damages to be recovered for dry casks is the total amount claimed, $31,536,000 nominal dollars. Tr. 3730:7-15 (Sieracki); PDX 60-Sieracki 4.

472. Included within the $20,550,207 is $1,222,393 of legal expenses. DDX 5-42. The legal expenses include $880,138 of legal activities relating to WEPCO's on-site dry fuel storage program. The legal expenses also include $342,255 for legal activities in connection with alternative off-site storage projects. See DFOF ¶ 386. Taking into account the off-site storage project's legal expenses, plaintiff should not recover a total of $20,207,952 in costs relating to the ISFSI fabrication and first five VSC-24 casks. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Dkt. 369 (Nov. 20, 2007).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.C (DFF 461-472).

Further, the legal expenses expended on spent fuel storage issues are clearly recoverable expenses. Joint Stipulation Regarding Plaintiff's Claim for Legal Costs, Dkt. 369 (Nov. 20, 2007); *Carolina Power & Light Co.*, 2008 WL 2154103 at *29.

Further, this proposed finding is unsupported. DFF 386 does not discuss legal expenses, but instead discusses NRC licensing. Finally, WE is entitled to recover all of the expenses that this proposed finding attempts to remove. PFF 231-237; WE PTB 69-83.

## D. WEPCO Incurred The Costs Of Fabricating Three TN-32B Casks

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XVIII.D.

**GENERAL OBJECTIONS TO SECTION XVIII.D (DFF 473-531):**

As part of its dry storage project, WE initially procured VSC-24 casks and later experienced serious problems with the VSC-24 cask, including the NRC's prohibition of the loading of these casks for several years. PFF 142. There also were other significant regulatory, technical and business risks with the VSC-24 casks that motivated WE's decision to acquire an alternative cask. PFF 141. Faced with possible shutdown because of the prohibited use of (and other problems with) the VSC-24 casks, in May 1998, WE prudently acquired three TN-32B casks as a backup even though the PSCW authorized the acquisition of six TN-32B casks. PX 524, p. KRGWE002387; PFF 107, 115, 142.

The Government does not contend that WE acted unreasonably in its initial acquisition of these casks. PFF 143, 144. Instead, in these proposed findings, the Government argues that WE should have suspended fabrication of the TN-32B casks in September 1998 and cancelled the contract by April 1999. The Government, however, ignores that, after the NRC CALs were lifted, significant VSC-24 cask regulatory, technical and business risks persisted and WE's need for these backup casks did not end. PFF 141, 145. WE's fears proved well-founded when Palisades Nuclear Plant experienced ignition

incidents in June 1999, encouraging WE to continue procuring the TN-32B casks. PFF 140. WE remained concerned that events such as these would lead the NRC to issue a new CAL prohibiting again the loading of VSC-24 casks. PFF 140, 141.

Moreover, the fact that Point Beach has not loaded the TN-32B casks does not establish that they were not reasonably procured. WE needed the TN-32B casks to serve as backup casks in the event that additional problems arose with the VSC-24 casks. The non-use of this backup option does not render that backup option unreasonable mitigation.

The proposed findings in this section discuss at length the date until which Point Beach could have operated based on the number of VSC-24 casks loaded and placed in service at Point Beach's ISFSI. There is no legal requirement that a utility conduct the sort of analysis prepared in hindsight by the Government's expert. Instead, WE made legitimate and reasonable business decisions based on the facts and concerns at hand. The evidence demonstrated WE's concerns regarding the continued availability of the VSC-24 casks were reasonable. PFF 141, 145.

Given that WE reasonably continued with the TN-32B cask procurement, the assertion in the proposed findings that WE's TN-32B contract permitted WE to terminate work on the TN-32B casks at any time without penalty is incorrect. That contract required that WE compensate Transnuclear for all milestones met as of the date of cancellation, in addition to the value of any work then authorized by WE, profit on any in-process work, and all reasonable subcontractor cancellation fees. PX 503, p. WISC00064081.

Similarly ill-founded is the assertion that WE somehow could have recovered all of the costs it incurred in pursuing the TN-32B casks if it had cancelled the contract in September 1998. There is no evidence that other utilities would have acquired the long-lead materials from WE at WE's contract price. PX 880, pp. 23-25; DFF 511-513.

### 1. WEPCO Sought The TN-32B Casks As A Contingency In The Event That It Could Not Load The VSC-24 Casks By The Spring 2000 Outage

473. In early 1998, WEPCO concluded that it faced shut-down in spring 2000, if it was unable to load more VSC-24 casks. Tr.1568:1-9 (Krieser); see PX 510; see also DFOF ¶¶ 465-468.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact as misleading because it fails to specify the assumptions underlying the projection, such as the number of unavailable spaces in the spent fuel pool.

WE also objects to the proposed finding of fact as misleading because WE counsel's May 1998 letter indicated that it was "possible that Wisconsin Electric will not be able to load additional VSC-24 casks in time for refueling in 2000, which could be as early as the Spring of that year," noting that refueling dates in 2000 may vary based upon a number of factors. The letter further stated that, if WE remained unable to load VSC-24 casks at Point Beach, Unit 1 would have to shut down in late 2000. PX 510. Mr. Krieser testified that, if WE was unable to load additional casks, then Point Beach would have to shut down sometime in the year 2000. Tr. 1568:1-9 (Krieser).

The proposed finding also ignores that Point Beach had loaded only two VSC-24s, or 48 spent fuel assemblies, as of early 1998. The loading of only 48 assemblies (less than Point Beach's annual discharge of 56 spent fuel assemblies) was expected to allow Point Beach to operate into the year 2000. Tr. 1568:1-9 (Krieser).

474. Therefore, WEPCO pursued the TN-32B cask system as a "backup solution," a "contingency plan," or an "insurance policy." Tr.1569:18-25 (Krieser); PX 524 at 4.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact to the extent that it mischaracterizes WE's understanding of the TN-32B cask system as an "insurance policy." Mr. Krieser testified that he personally liked to "refer to it as an insurance policy." However, WE's May 1998 application for authority to load TN-32B casks referred to the potential use of TN-32B casks at Point Beach as an "alternative plan." PX 510, p. 1. Further, the PSCW referred to the TN-32B cask system as a "back-up option" for the VSC-24 casks. PX 524, p. 4.

The proposed finding ignores the fact that the PSCW found that WE's procurement of up to six TN-32B casks was reasonable. PX 524; PFF 148. In addition, Messrs. Brewer and Hamal believed that it was reasonable for WE to procure the three TN-32B casks that it purchased. Tr. 5651:2-11 (Brewer) ("I've never taken exception, and I don't think anyone has taken exception to the idea that the concerns that led WEPCO to starting down the TN-32 metal cask path were unreasonable or irrational."); Tr. 5898:2-10 (Hamal) ("I start by looking at the situation WEPCO found itself in, in the spring of 98 when it decided to order the TN-32B casks as a contingency plan in case there were further problems on the VSC-24 casks. I don't disagree with that conclusion. I do not reach – you know, reach an opinion that it was unreasonable for them to order these casks in the first place."); PFF 143, 144.

475. In an effort to procure TN-32B casks quickly, WEPCO wrote to Virginia Power, on March 25, 1998, seeking to acquire two TN-32B casks from the company's fabrication queue to meet WEPCO's cask delivery needs by the end of 1999. DX 33; PX 492; Tr.1634:15-1635:22 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. WE did not seek to acquire TN-32B casks from Virginia Power. Rather, WE explored the possibility of swapping places with Virginia Electric in the TN-32B fabrication queue at Transnuclear. PX 492, p. 1.

476. Because WEPCO was unable to procure casks from Virginia Power, it sought to purchase casks from Transnuclear, the license holder of the cask. DX 161. On April 9, 1998, WEPCO requested that the NRC grant Transnuclear an exemption to permit procurement and fabrication of up to six TN-32B casks in time to have additional SNF storage following the spring 2000 refueling outage. DX 223.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. WE did not seek to purchase casks from Transnuclear because WE was unable to procure casks from Virginia Power. Instead, WE explored the possibility of swapping positions in the fabrication queue with Virginia Power. On May 7, 1998, WE submitted a Purchase Order to Transnuclear to initiate the purchase of three TN-32B casks because the NRC's cask lid welding CAL, which prohibited the use of VSC-24 casks at Point Beach, was still in effect and a number of other significant WE concerns with the VSC-24 cask existed. PFF 142.

The proposed finding is also inaccurate in that WE's April 1998 letter to the NRC stated: "Point Beach needs TN-32 casks on-site no later than December, 1999" to allow ample time to prepare for loading operations. WE also advised the NRC that "[p]rocurement activities must be initiated immediately to provide for the timely deployment of the TN-32 casks to Point Beach." DX 223.

477. On April 20, 1998, WEPCO sent another letter to the NRC stating that three TN-32B casks were needed and that WEPCO would lose full-core reserve after the current refueling outage and would run out of space in the pool to refuel in early 2000, if Transnuclear was not granted the requested exemption. DX 153/PX 513 at 2; DX 150; PX 496.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding because it is inaccurate in its characterization of WE's April 20, 1998 letter. WE's letter stated that "[t]he loading of three Transnuclear TN-32 casks is necessary to enable continued operation into 2001." PX 496, p. 1. In addition, based

on WE's then-current refueling schedules, if WE had remained unable to load additional casks, Point Beach would have had insufficient space in the spent fuel pool to refuel the Point Beach units beginning in early 2000. PX 496.

478. On May 1, 1998, WEPCO entered into a contract to purchase three TN-32B casks from Transnuclear, as a contingency in the event that WEPCO could not resume loading the VSC-24 casks. DX 161 at WISC 0006481-84; Tr.1573:7-14 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because it mischaracterizes WE's contract with Transnuclear as a contingency. As evidenced by WE's April 20, 1998 letter to the NRC, WE then believed that "[t]he loading of three Transnuclear TN-32 casks is necessary to enable continued operation into 2001." PX 496, p. 1. By April 1998, nuclear utilities (including WE) had been prohibited from loading VSC-24 casks for nearly two years and WE was uncertain if and when it would be authorized to resume loading VSC-24 casks. PX 1034; PFF 136, 141-142.

WE further objects to the proposed finding of fact as inaccurate because WE's Purchase Order 4500170358 is dated May 7, 1998, not May 1, 1998.

479. Mr. Krieser testified that WEPCO deliberately included in its purchase order for the TN-32B casks the ability to cancel the contract <u>at any time</u> because WEPCO knew that it might be able to begin using the VSC-24 cask again:

> We wrote into the purchase order as much flexibility as we could. We had a number of exit ramps built into it, if we were able to resolve all of the issues with the VSC-24s, and we had a provision in the contract that allowed us to essentially terminate the contract for convenience at any time.

Tr.1585:13-19 (Krieser); DX 161. The purchase agreement with Transnuclear indeed provided just that flexibility:

> Buyer may terminate work on this order for its own convenience in whole or in part by written notice at any time.

DX 161 at WISC 00064081.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE agrees that it reasonably attempted to mitigate the Government's partial breach damages by requiring that the TN-32B contract with Transnuclear allow WE to terminate the contract for convenience at any time.

WE, however, objects to the proposed finding because it is misleading and mischaracterizes the termination clause of the TN-32B contract. The proposed finding wholly ignores the payments that WE would be required to pay for terminating the TN-32B contract for convenience. The TN-32B contract stated:

> "[s]eller shall be compensated for all Activities met as of the date of notification of cancellation or suspension per the Cancellation Payment Schedule. *Seller shall also be compensated for the value of any work, authorized by Buyer, in process plus profit limited to 10% on that in-process work, plus all reasonable subcontractor cancellation fees incurred by Seller as a result of the cancellation.*

DX 161, p. WISC00064081 (emphasis added).

If WE needed to restart the TN-32B work after canceling the project, WE would be obligated to pay remobilization costs for Transnuclear and its subcontractors in addition to those costs required to complete the work. DX 161, p. WISC00064082.

Moreover, the payment schedule in the TN-32B contract obligated WE to pay for at least 46 percent of the value of the first three casks ($2,037,600) upon the order of long lead and basket materials. *Id.*

WE further objects to the proposed finding because it inaccurately quotes Mr. Krieser's testimony.

480. On May 7, 1998, WEPCO again asked the NRC to grant Transnuclear an exemption to permit the fabrication of up to six TN-32B casks so that WEPCO would be able to load casks to its ISFSI by the spring 2000 refueling outage. DX 153/PX 513 at WISC 0042538; DX 150; PX 502 at WISC00055674-765.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

While WE sought an exemption to permit the fabrication of TN-32B casks that would be available to Point Beach by the spring 2000 refueling outage, the proposed finding ignores WE's reason for requesting the NRC exemption which are stated in its May 7, 1998 letter:

> Wisconsin Electric initiated the evaluation of alternative spent fuel storage options late last year because of uncertainties in resuming the loading of Sierra Nuclear Corporation (SNC) VSC-24 casks. This uncertainty comes from several factors, including lid welding issues, changes in SNC ownership and subsequent support for the VSC-24 design; and potential issues resulting from the NRC Demand for Information sent to SNC on October 6, 1997. Presently none of these issues are fully resolved. In the case of the last two issues their full impact on future use of the VSC-24 is not known at this time.

PX 502, p. 1. WE further explained to the NRC that TN-32B casks were "likely the only alternative casks that can be fabricated in time to meet our needs." *Id.*

For the Court's convenience, WE notes that the cite to PX 502 should be only for bates numbers WISC00055764-65.

481. On May 20, 1998, WEPCO sought approval from the PSCW to load six TN-32B casks in lieu of loading eight VSC-24 casks to avoid having to shut down Unit 2 at Point Beach in the spring of 2000. PX 510. WEPCO sought authorization to use the TN-32B casks "<u>if and only if</u> the VSC-24 casks are not available in time for the refueling currently scheduled for 2000." PX 510 at WISC 00073452 (emphasis added); <u>see</u> <u>also</u> DX 152, KRGWE002380; Tr.1641:9-1642:9 (Krieser); Tr.1646:22-1648:10 (Krieser); Tr.5903:11-25 (Hamal); Tr.1577:15-1579:22 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. WE did not need to load eight VSC-24 casks or six TN-32B casks to avoid having to shut down Unit 2 at Point Beach in the spring of 2000. WE's application for the use of the TN-32B casks stated that

WE faced a shutdown if it remained unable to load any casks at Point Beach in spring 2000. PX 510, pp. 1-2.

482. The NRC lifted the CAL regarding the use of the VSC-24 casks on July 22, 1998, but included in its correspondence to WEPCO, in Appendices C & D, "corrective actions that the utilities will implement into plant procedures prior to loading until the affected licensing documents can be updated." DX 154 at WISC 00002282; Tr.1574:14-22 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate and misleading. On July 22, 1998, the NRC lifted CAL 97-7-001, which had been issued to Sierra Nuclear. However, the lifting of CAL 97-7-001 did not permit WE to resume loading of the VSC-24 casks at Point Beach if WE implemented corrective actions. Instead, the NRC finally lifted WE's CAL on August 13, 1998. PX 525, p. 2 ("CAL 97-7-004A is closed effective the date of this letter."). This proposed finding is also contrary to the statements of the Government's experts that the NRC CAL was lifted on August 13, 1998. DDX 3-19 ("Second NRC CAL lifted August 13, 1998"); Tr. 5488:15-5490:9 (Brewer); DDX 4-30 ("The NRC CAL on WEPCO was lifted on August 13, 1998"); Tr. 5913:10-14 (Hamal) ("WEPCO's CAL was lifted on August 13th").

The proposed finding also ignores that the NRC's closeout of CAL 97-7-004A on August 13, 1998 imposed further conditions on WE. WE was required to ultrasonically test the two VSC-24s then in use at Point Beach by August 31, 1999 and notify the NRC in writing of the results. WE also was subject to three new commitments for controlling fabrication and use of the VSC-24. PX 525, pp. 1-2. If WE failed to comply with the conditions, or if WE in the process of fulfilling those conditions had discovered any other VSC-24 problems, the NRC likely would have issued new CALs. PFF 139.

Finally, as of July 1999, there remained 20 corrective actions that Sierra Nuclear still had not adequately responded to as part of Sierra Nuclear's responsibilities in responding to the NRC's Demand for Information following up on the VSC-24 issues and concerns. PX 556.

483. On July 31, 1998, WEPCO notified the NRC that it had complied with the CALs initiated in response to issues regarding the welding of the VSC-24s. WEPCO informed the NRC that it was ready to begin loading VSC-24s as soon as the NRC provided written approval. DX 154. WEPCO had taken the actions it believed necessary to close the CAL that prevented WEPCO from using the VSC-24 casks by the end of July 1998. DX 154 at WISC 00002282; Tr.1642:25-1644:18 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it mischaracterizes WE's correspondence to the NRC. In its July 31, 1998 letter, WE stated that it believed it had implemented all the requirements set out by the NRC, but that "WE will not load additional VSC-24 casks until the NRC has provided us with written approval to proceed." DX 154, p. 3. The letter also did not state that Point Beach was ready to begin loading VSC-24s as soon as the NRC provided written approval. Instead, WE stated that it hoped to load three additional casks in 1998 beginning in September and that "NRC approval to support this schedule would be appreciated." *Id.*

484. On July 20, 1998, Transnuclear, on behalf of WEPCO, released Precision Components Corporation (" PCC"), a vendor for Transnuclear, to procure materials for the containment vessel for the three TN-32B casks. Tr.1642:10-24 (Krieser); DX 307.

**RESPONSE:**

WE agrees that Transnuclear requested that PCC procure long-lead materials for three TN-32B casks on July 20, 1998. DX 307.

485. After the NRC closed the CAL and after WEPCO informed the NRC it was ready to begin loading VSC-24s anew, the PSCW conditionally authorized WEPCO to purchase up to six TN-32B casks as a "back-up option" at an additional cost of up to

$5,000,000, on August 11, 1998. PX 524; DX 35; Tr.1579:23-1582:1 (Krieser); Tr.1644:19-1647:11 (Krieser). However, the approval by the PSCW was conditional:

> WEPCO may only use the TN-32 casks if the VSC-24 casks are not available in time for its scheduled refueling in Spring 2000, and if the NRC issues all necessary approvals for the use of the TN-32 casks at Point Beach.

DX 35 at 5 (emphasis added). The PSCW authorization order did not provide for the recovery of costs from WEPCO's rate base.[30] Id.; Tr.5902:13-5906:1, Tr.5994:11-5998:6 (Hamal).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because it is inaccurate and contrary to the evidence. As explained in WE Response to DFF 482, the Government inaccurately identifies the date that the NRC lifted WE's cask lid welding CAL. The NRC lifted CAL 97-7-004A on August 13, 1998.

More importantly, WE objects to the implication in this proposed finding that the PSCW's authorization for WE to purchase the TN-32B casks was "conditional." The approval of the purchase was *not* conditional. Instead, it was WE's use of the TN-32B casks for the storage of spent fuel that was conditional. DX 35, p. WXE002 0896 (PSCW Order dated August 11, 1998). *See also* WE Response to DFF 482.

WE also objects to the Government's allegation that the PSCW authorization order did not provide for the recovery of costs from WE's rate base because the evidence is to the contrary. The only cite provided by the Government is to the testimony of its expert witness. However, Mr. Hamal's testimony on this issue is irrelevant given that he testified at trial that

---

[30] On August 28, 1998, the PSCW informed an intervenor, Ms. Fawn Shillinglaw, who had asked the PSCW about the costs of the TN-32B cask program, that any concerns over the cost of the TN-32B program should be deferred until such time as they were actually put into customer rates. DX 79; Tr. 5995:25-5996:23 (Hamal). In March 1999, the PSCW stated, in a letter to an intervener, that WEPCO was limited to using only the VSC-24 casks and that the authority the PSCW had granted to use the TN-32B casks was no longer valid. DX 155/PX 552; Tr. 5998:8-5999:16 (Hamal). WEPCO did not produce in discovery any documentation that it had recovered the cost of the TN-32B casks in the rate case in spite of certifying that it had produced everything that existed, nor did it produce any documentation to this effect in trial. Tr. 6285:2-6289:1 (Farron).

"I'm not trying to interpret this order, other than as a utility would recognize how this influences its behavior." Tr. 5902:19-22 (Hamal). Moreover, Mr. Hamal did not demonstrate any experience with the PSCW beyond his limited involvement in this matter.

At trial, WE established that it recovered the costs for the TN-32B casks through the testimony of Mr. Farron. Mr. Farron has been involved in WE's nuclear regulatory dealings with the PSCW for more than 12 years, and is intimately familiar with how the PSCW regulates Wisconsin utilities. Tr. 2516:14-2517:15; 2508:8-2509:22 (Farron). He testified that the PSCW's August 11, 1998 Order authorized the recovery of TN-32B cask costs. Tr. 6267:25-6270:5; 6270:12-6271:20 (Farron); PFF 148. Mr. Farron further testified that the PSCW's approval of the TN-32B acted as a prudence review and that he received a verbal confirmation of the cost recovery. Tr. 6267:25-6270:5, 6270:12-6271:20, 6288:3-16 (Farron). To the extent an expert witness's testimony is probative, Mr. Metcalfe testified that WE advised him that the TN-32B costs were recovered in rates. Tr. 6294:10-17 (Metcalfe). Mr. Metcalfe also testified that preapproved costs are automatically recovered and deemed prudent unless exceeded in amount. Tr. 6359:21-6361:1 (Metcalfe).

The Government's reference to an August 28, 1998 letter from the PSCW to Fawn Shillinglaw does not compel a different conclusion. In this letter, the PSCW stated that "[w]hether ratepayers will pay for unused casks may be determined in the fuel rate case that would be filed this fall." DX 79. However, no Fall 1998 rate case occurred and the PSCW never disallowed the costs for the three TN-32B casks. PFF 148. Indeed, Mr. Farron testified that WE did not apply for a Fall 1998 fuel rate case and that WE did not hold any subsequent hearings regarding the TN-32B casks because the matter was approved by the PSCW based on the original authorization. Tr. 6272:15-6275:4, 6283:14-19 (Farron) (the PSCW never directed WE to discontinue purchasing activities related to the TN-32B, Mr. Farron had frequent conversations with the PSCW about cask issues, and the PSCW never disallowed the costs for the TN-32B); PFF 148.

486. On August 13, 1998, the NRC cleared the VSC-24 casks for additional loading. Tr.1583:11-16, 1632:13-1633:9 (Krieser); DX 77/PX 525 at WISC 00002312-3.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because it is not entirely accurate. On August 13, 1998, the NRC lifted CAL 97-7-004A, but placed conditions on WE's use of VSC-24 casks. Specifically, WE was required to ultrasonically test the two VSC-24s then in use at Point Beach by August 31, 1999 and notify the NRC in writing of the results. WE also was subject to three new commitments for controlling fabrication and use of the VSC-24. PX 525, pp. 1-2. If WE failed to comply with the conditions, or if WE in the process of fulfilling those conditions had discovered any other VSC-24 problems, the NRC likely would have issued new CALs. PFF 139.

487. On August 24, 1998, Transnuclear notified the NRC that long-lead materials for three TN-32B casks were on order for WEPCO's TN-32B casks, but would not be delivered until January 1999. Negotiations with Virginia Power and WEPCO were on-going for the transfer of certain materials from Virginia Power for earlier delivery of these materials. Tr.1649:21-1650:10 (Krieser); DX 308.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding as vague because "certain materials" is not defined.

488. On November 13, 1998, Transnuclear informed the NRC that the long-lead materials for WEPCO's TN-32B casks would not be delivered until December 1998. DX 309.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding because it is inaccurate. The November 13, 1998 letter states that materials for the TN-32B casks were scheduled for delivery by mid-

December 1998, which allowed for a delivery between November 13, 1998 and mid-December 1998. DX 309. This proposed finding also is misleading because it ignores that WE was already obligated at that point to pay Transnuclear at least 46 percent of the value ($2,037,600) of these three TN-32B casks. *See* WE Response to PFF 479.

489. WEPCO loaded the third VSC-24 cask on September 10, 1998. PX 796 at KRGWE 002705; Tr.1584:9-11 (Krieser).

**RESPONSE:**

WE does not object to this proposed finding of fact.

### 2. WEPCO Should Have Delayed Fabrication Of The TN-32B Casks in September 1998, And Then Cancelled The Contract By April 1999

490. With the loading of the third VSC-24 cask, WEPCO no longer faced a potential shutdown by spring of 2000; it could operate until October 2000. Tr.5914:7-16 (Hamal); DX 392/PX 828; DDX 4, p. 32.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding because it is unsupported by competent evidence and fails to identify the assumptions underlying the Government's assertion. This proposed finding cites an excerpt of Mr. Hamal's testimony, his report and a demonstrative used by Mr. Hamal. Mr. Hamal's demonstrative, DDX 4, cites as support an August 24, 1998 letter from Transnuclear to the NRC. However, Transnuclear's letter says nothing about how much longer WE could operate as a result of loading a third VSC-24 cask.

Further, Point Beach expected to perform, and in fact performed, only one refueling outage in the year 2000. PX 801, pp. KRGWE000305, KRGWE000332 (1998 and 2000 10-K Annual Reports). Unit 2 had a refueling outage in the fall of 2000. *Id.* (noting that "[d]uring the Unit 2 outage, Wisconsin Electric initiated an extended fuel cycle, which should allow for the operation of the unit until its next refueling and maintenance outage scheduled

for the *fall of 2000*.") (emphasis added). Thus, the loading of a third VSC-24 cask did not impact the timing of a potential Point Beach shutdown.

491. Because of the flexibilities that WEPCO had deliberately built into the contract for TN-32B casks, WEPCO could have delayed fabrication of those casks in September 1998 when it resumed loading the VSC-24 casks. DX 161 at WISC 00064081; Tr.1584:13-19 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE had the right to terminate fabrication of the TN-32B casks under its contract with Transnuclear. However, the proposed finding ignores the many reasons that WE decided not to delay TN-32B fabrication.

First, the loading of a third VSC-24 cask did not resolve most of WE's concerns regarding the continued viability and use of VSC-24 casks at Point Beach. Tr. 1585:4-1587:3 (Krieser) ("Just to reiterate what I said a little earlier, there still were a lot of uncertainties with the VSC-24. The track record was not good. It would have been a poor assumption to make, I think, at that point, that everything was going to be well and good from that point on."); PFF 145. WE remained concerned about significant regulatory, technical and business risks, including: (1) BNFL's acquisition of Sierra Nuclear and whether it would continue to support the single purposeVSC-24; (2) quality control problems being experienced in the fabrication of VSC-24 casks; (3) the potential for other latent, unpredictable problems with the VSC-24 cask; (4) Sierra Nuclear's problems in responding to the NRC's Demand for Information; (5) recurring weld or ignition problems such as the June 1999 ignition incident at the Palisades Nuclear Plant; and (6) at that time, the VSC-24 was limited in the types of Point Beach fuel that it could store. Tr. 1559:16-1562:18, 1574:14-1575:12, 1582:15-1587:3 (Krieser); Tr. 2043:18-2046:19 (Holzmann); Tr. 2598:2-2600:5 (Farron); PFF 141, 145. *See also* PFF 140 (discussing the June 1999 VSC-24 ignition incident at the Palisades plant).

Second, WE believed that completion of the casks would make it easier for WE to sell the TN-32B casks if WE decided not to use them. Tr. 1585:4-1587:3 (Krieser); PFF 145. Mr. Brewer agreed that it was reasonable for WE to continue construction of the TN-32B casks to improve their marketability. Tr. 5616:1-8 (Brewer); PFF 147.

Third, WE believed it could receive authorization from the PSCW to load the TN-32B casks even if WE was able to load the then-approved 12 VSC-24s. Tr. 6275:5-6276:17 (Farron). In fact, WE could have loaded the TN-32B casks under the PSCW's March 2001 Order approving the use of 36 additional dry storage casks at Point Beach because the Order did not specify a specific cask. WE, however, decided not to load the TN-32B casks because of its 2001 decision to procure a dual-purpose cask system. PX 592; Tr. 2696:24-2697:7; 2715:11-21; 2713:16-2715:3; 6283:20-6284:8 (Farron); Tr. 1645:23-1646:13 (Krieser); PFF 145.

The TN-32B contract also required WE to pay the remobilization costs of Transnuclear and any subcontractors in the event that WE delayed and restarted production of the TN-32B casks. PX 503, p. WISC00064082. This would have increased the costs of ultimately procuring the TN-32B casks.

Finally, the proposed finding also ignores the significant payments that WE would be required to make for *suspending* or terminating the TN-32B contract for convenience (some of which, such as subcontractor cancellation fees, cannot be calculated in advance). The TN-32B contract stated:

> "[s]eller shall be compensated for all Activities met as of the date of notification of cancellation or suspension per the Cancellation Payment Schedule. *Seller shall also be compensated for the value of any work, authorized by Buyer, in process plus profit limited to 10% on that in-process work, plus all reasonable subcontractor cancellation fees incurred by Seller as a result of the cancellation.*

DX 161, p. WISC00064081 (emphasis added).

492. Fabrication of the TN-32B casks had not yet begun. DX 308; DX 309.

**RESPONSE:**

WE objects to this proposed finding of fact as vague and nonsensical because it does not state by when fabrication of the TN-32B casks had not yet begun.

493. As of September 1998, long-lead time materials for fabrication of the TN-32B casks had been ordered, but were not expected to be delivered until December 1998 - January 1999. DX 308/PX 530 at WISC 00073502-3; DX309/PX543 at WISC 00073465; Tr.1649:21-1651:1 (Krieser); Tr.5914:23-5915:24 (Hamal).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding because it is inaccurate. The August 24, 1998 letter from Transnuclear to the NRC indicated that long-lead materials on order would not be delivered until January 1999. However, WE was then negotiating with Virginia Power the possible transfer of partially fabricated TN-32 materials to WE. DX 308.

A November 13, 1998 Transnuclear letter to the NRC indicated that WE's TN-32B materials were scheduled for delivery by mid-December 1998 and that PCC was scheduled to commence fabrication on January 5, 1999. DX 309.

494. As of September 1998, fabrication of the TN-32B casks using Virginia Power's materials had been discussed, but had not commenced. DX 308; Tr.1650:5-11 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact because it suggests that Transnuclear used Virginia Power's materials in the fabrication of WE's TN-32B casks. The evidence does not indicate that WE actually acquired cask materials from Virginia Power.

495. In fact, as of November 13, 1998, the materials for the TN-32B casks for WEPCO were not scheduled for delivery by mid-December 1998. At that time, fabrications of the TN-32B cask at PCC was scheduled to commence on January 5, 1999. Tr. 1649:11-1651:1 (Krieser);
DX 309.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as inaccurate. Transnuclear's November 13, 1998 letter informed the NRC that the materials for the TN-32B casks *were* scheduled for delivery by mid-December 1998. DX 309 ("Materials for the TN-32 casks for Wisconsin Electric are scheduled for delivery by mid-December 1998.").

496. WEPCO should have placed a hold on the fabrication of TN-32B casks under contract with Transnuclear in September 1998. WEPCO's failure to stop progress on the contract, in light of dramatically changed circumstances, was unreasonable. Tr.5913:8-5917:15 (Hamal); Tr.5898:8-18 (Hamal); DDX4 at 32.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. As of September 1998, the circumstances facing WE had not dramatically changed. The loading of a third VSC-24 cask did not resolve most of WE's concerns regarding the continued viability and use of VSC-24 casks at Point Beach. Tr. 1585:4-1587:3 (Krieser) ("Just to reiterate what I said a little earlier, there still were a lot of uncertainties with the VSC-24. The track record was not good. It would have been a poor assumption to make, I think, at that point, that everything was going to be well and good from that point on."); PFF 145.

WE remained concerned about significant regulatory, technical and business risks, including (1) BNFL's acquisition of Sierra Nuclear and whether it would continue to support the single purpose VSC-24; (2) quality control problems being experienced in the fabrication of VSC-24 casks; (3) the potential for other, unpredictable latent problems with the VSC-24; (4) Sierra Nuclear's problems in responding to the NRC's Demand for Information; (5) recurring weld or ignition problems, including the June 1999 ignition incidents at the Palisades Nuclear Plant; and (6) the VSC-24's limitation on the type of Point Beach fuel that it could store. Tr. 1559:16-1562:18; 1574:14-1575:12; 1582:15-1587:3 (Krieser);

Tr. 2043:18-2046:19 (Holzmann); Tr. 2598:2-2600:5 (Farron); PFF 141, 145. *See also* PFF 140 (discussing the June 1999 VSC-24 ignition incident at the Palisades plant).

WE also believed that completion of the casks would make it easier for WE to sell the TN-32B casks in the event that WE never loaded them. Tr. 1585:4-1587:3 (Krieser); PFF 145. Mr. Brewer agreed that it was reasonable for WE to continue construction of the TN-32B casks to improve their marketability. Tr. 5616:1-8 (Brewer); PFF 147.

Additionally, WE believed it would be able to load the TN-32B casks after WE loaded the approved 12 VSC-24s. Tr. 6275:5-6276:17 (Farron). In fact, WE was authorized to load TN-32B casks under the PSCW's March 2001 Order approving the use of 36 additional dry storage casks at Point Beach because the Order was not restricted to a specific cask. WE, however, did not load the TN-32B casks because, in 2001, it decided to procure a dual-purpose cask. PX 592; Tr. 2696:24-2697:7; 2715:11-21; 2713:16-2715:3; 6283:20-6284:8 (Farron); Tr. 1645:23-1646:13 (Krieser); PFF 145.

The TN-32B contract also required WE to pay the remobilization costs of Transnuclear and any subcontractors in the event that WE delayed and restarted production of the TN-32B casks. PX 503, p. WISC00064082. This would have increased the costs of ultimately procuring the TN-32B casks.

Finally, the proposed finding also ignores the payments that WE would be required to pay for *suspending* or terminating the TN-32B contract for convenience. DX 161, p. WISC00064081.

497. In fact, since WEPCO had resumed loading casks prior to the spring 2000 outage, WEPCO could not load the TN-32Bs under the terms of the PSCW's conditional order. Tr.1647:12-1648:2 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is misleading. The PSCW Order *unconditionally* authorized WE to *procure* the TN-32B casks. WE's *use* of the TN-32B casks, however, was conditional pursuant to WE's request. PX 524, pp. KRGWE002387-88.

Further, WE could have submitted an application for a new Order authorizing the use of the TN-32B casks at Point Beach if something had occurred, such as if the VSC-24 casks experienced further problems, the NRC again prohibited the use of VSC-24 casks at Point Beach or WE decided to switch to the TN-32B casks.

In fact, the PSCW authorized WE to load TN-32B casks at Point Beach under the terms of its March 2001 Order. PX 592; Tr. 6283:20-6284:8 (Farron) (WE was authorized to use the TN-32B casks under the second dry fuel storage approval from the PSCW).

498. WEPCO's use of the TN-32 casks was authorized only if additional VSC-24 casks could not be loaded before the spring 2000 outage. Tr.1581:23-1582:1 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact for the reasons stated in its Response to DFF 497.

499. WEPCO loaded the fourth and fifth VSC-24 casks in October and November, 1998. Tr.1917:19-1919:4 (Becka); DX 80; PX 796 at KRGWE 002705; Tr.1584:9-11 (Krieser).

**RESPONSE:**

WE does not object to this proposed finding of fact.

500. Even if TN-32B casks were still needed, WEPCO could wait until July 1999 to re-start the fabrication process and have them delivered in time. Tr.5914:7-16 (Hamal); Tr.5916:2-5917:1 (Hamal); DDX4 at 32.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as vague because it does not explain how WE could have waited until July 1999 to re-start the fabrication process and have these casks delivered in time. The proposed finding also ignores the considerable lead times that could be associated with remobilization of the TN-32B fabrication process. PX 569.

Even if WE could have theoretically waited a certain period of time to restart the fabrication process for the TN-32B casks, WE did not believe that such a delay was prudent. After WE had resumed loading VSC-24 casks in 1998, WE remained concerned about significant regulatory, technical and business risks related to the VSC-24 cask. *See* WE Response to DFF 496.

WE also believed that completion of the casks would make it easier for WE to sell the TN-32B casks in the event that WE never loaded them. Tr. 1585:4-1587:3 (Krieser); PFF 145. Mr. Brewer agreed that it was reasonable for WE to continue construction of the TN-32B casks to improve their marketability. Tr. 5616:1-8 (Brewer); PFF 147.

WE believed it would be able to load the TN-32B casks even after WE was able to load the then-approved 12 VSC-24s. Tr. 6275:5-6276:17 (Farron). In fact, Point Beach was (and remains) authorized to load TN-32B casks under the PSCW's March 2001 Order approving the use of 36 additional dry storage casks at Point Beach because the Order was not restricted to a specific cask. WE, however, did not load the TN-32B casks because, in 2001, it decided to procure a dual-purpose cask. PX 592; Tr. 2696:24-2697:7; 2715:11-21; 2713:16-2715:3; 6283:20-6284:8 (Farron); Tr. 1645:23-1646:13 (Krieser); PFF 145.

The TN-32B contract also required WE to pay the remobilization costs of Transnuclear and any subcontractors in the event that WE delayed and restarted production of the TN-32B casks. PX 503, p. WISC00064082. This would have increased the costs of ultimately procuring the TN-32B casks.

Finally, the proposed finding also ignores the payments that WE would be required to pay for *suspending* or terminating the TN-32B contract for convenience. DX 161, p. WISC00064081.

501. WEPCO had full rights to the license for the VSC-24 casks, which it could purchase directly from a fabricator, and WEPCO maintained this right after BNFL[24] purchased Sierra Nuclear Corporation.[25] DX93 at WISC 00041026; Tr.1566:6-25 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as misleading. WE did not have a free license to purchase the VSC-24 casks from another manufacturer. DX 93. Instead, WE had the right to fabricate VSC-24 casks for a $10,000 royalty fee under WE's agreement with Sierra Nuclear. BNFL later assured WE that it would have the right to procure or fabricate VSC-24 casks beyond the original 12 procured by WE for a royalty fee of $10,000, which would be adjusted annually. DX 93, p. WISC00041026.

502. After WEPCO finished loading the fourth and fifth VSC-24 casks by November 1998, the potential need for TN-32B casks was pushed to May of 2001, and a decision to fabricate the TN-32B casks should have been delayed until February 2000. Tr.5917:5-15 (Hamal); DDX4 at 33; PX 796 at KRGWE 002705.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as vague because it does not define "potential need." Further, this proposed finding ignores the considerable lead times that could be associated with remobilization of the TN-32B fabrication process. PX 569.

---

[24] BNFL had previously affirmed WEPCO's right to continue to fabricate VSC-24 casks beyond the original 12 that were ordered, on May 19, 1999. WISC00041024-27. DX 93.

[25] Sierra Nuclear Corporation was the fabricator of the VSC024, but WEPCO had a special agreement that permitted it to fabricate the VSC-24 cask itself.

WE also objects to the proposed finding of fact as misleading for the reasons stated in its Responses to DFF 496, 500.

503. With each VSC-24 that was loaded, the need date for use of the TN-32B casks to provide additional storage was extended by approximately one refueling outage. Tr.5613:17 - 5614:4 (Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as vague because it does not define "need date." WE also objects to the proposed finding of fact as misleading for the reasons set forth in its Responses to DFF 496, 500.

504. By April 1999, after WEPCO had completed loading the sixth VSC-24 cask, WEPCO had added an additional 96 fuel assemblies to its ISFSI, which was equal to the capacity of the three TN-32B casks. Tr.5917:16-5919:13, 5921:22-5922:5 (Hamal); DDX4-35; DX 616. Moreover, WEPCO had three empty VSC-24 casks on site, and four more in fabrication. Tr. 2128:15-2129:24 (Holzmann); DX 80; DX 201.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as inaccurate because four VSC-24 casks were not in fabrication as of April 1999. Hi-Tech Manufacturing had been in the process of manufacturing four additional VSC-24 casks for Wisconsin Electric. However, the work on those casks had been stopped since Summer 1997 because of coating and quality assurance concerns. DX 201. As of April 1999, WE was evaluating whether to use Hi-Tech Manufacturing or Precision Components Corporation to resume fabricating the four VSC-24 casks, but a decision had not yet been made. *Id.*

Finally, WE objects to the proposed finding of fact because it cites to DX 616, which is not an exhibit admitted into evidence.