505. Thus, if no additional casks were loaded after April 1999, Point Beach would not have run out of space in the SNF pool until May 2002. Tr.5917:16-5919:13 (Hamal); DDX4-35.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. Assuming that no additional casks were loaded and that WE took no other actions, Point Beach would have run out of space in the SNF pool in April 2002 when Unit 2 discharged 36 spent fuel assemblies. PX 796, p. KRGWE002715.

506. Further, WEPCO committed to complete the fabrication of VSC-24 casks numbers 9-12 in or around April 1999, demonstrating WEPCO's overall confidence in the VSC-24 cask system. Tr.5922:6-5923:1, 5925:17-5926:20 (Hamal); Tr.2131:24-2132:18 (Holzmann).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact as inaccurate. Mr. Holzmann testified that WE had demonstrated the ability to safely load VSC-24 casks, not that WE had committed to completing the fabrication of any additional VSC-24 casks. The Government fails to cite to any other evidence in support of this proposed finding.

507. WEPCO placed the seventh loaded VSC-24 in service ISFSI on August 16, 1999, and the eighth was placed into service on September 19, 1999. Tr.1917:19-1918:21 (Becka); DX 616.

**RESPONSE:**

WE objects to the citation to DX616, which was not admitted into evidence.

508. When WEPCO loaded VSC-24 cask number eight in September 1999, the earliest date that WEPCO might have needed the TN-32B casks was pushed to October 2002, and WEPCO could have waited until February 2001 to re-order the TN-32B casks, if they were needed. Tr.5919:23-5920:16 (Hamal); DDX4-36.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the after-the-fact theories of Mr. Hamal as in no way reflecting the actual world decision that WE made in real time to purchase three TN -32B casks as an alternative to the problematic VSC-24 casks. The reasonableness of WE's decision to procure these three casks is further confirmed by the express finding by the PSCW that it would be reasonable for WE to purchase *six* TN-32B casks. PX 524, p. KRGWE002387.

WE further objects to this proposed finding because it is not a proposed finding of fact, but a conclusion of law that this cask purchase was unreasonable based solely on the opinion of a paid Government expert.

Further, this proposed finding is not accurate. The assumption in DDX 4-36 that WE could acquire a TN-32B cask 15 months from the time it made the decision to restart fabrication is not supported by any evidence. Mr. Hamal relies on an August 24, 1998 Transnuclear letter as support for the 15-month fabrication period. PX 530; DDX 4-32. However, the August 1998 letter does not provide fabrication timelines or discuss the impact of remobilization and start-up efforts on any fabrication schedules.

The proposed finding of fact also ignores the valid reasons for WE's decision to continue fabrication of the TN-32B casks. On June 9, 1999, the Palisades plant experienced two separate hydrogen ignition incidents. PX 558; PFF 140. This incident significantly added to WE's concerns regarding the continued viability and use of VSC-24 casks at Point Beach. Tr. 2600:22-2602:24, 2606:7-2607:16 (Farron) (noting that WE was aware of the Palisades ignition incidents, that they reinforced WE's concern regarding the VSC-24's viability, and that it encouraged WE to continue procuring the TN-32B casks); PFF 140.

WE also believed that completion of the casks would make it easier for WE to sell the TN-32B casks in the event that WE never loaded them. Tr. 1585:4-1587:3 (Krieser);

PFF 145. Mr. Brewer agreed that it was reasonable for WE to continue construction of the TN-32B casks to improve their marketability. Tr. 5616:1-8 (Brewer); PFF 147.

WE believed it could receive authorization from the PSCW to load the TN-32B casks after WE loaded the 12 approved VSC-24 casks. Tr. 6275:5-6276:17 (Farron). In fact, WE was authorized to load TN-32B casks under the PSCW's March 2001 Order approving the use of 36 additional dry storage casks at Point Beach because the Order was not restricted to a specific cask. WE, however, did not load the TN-32B casks because, in 2001, it decided to procure a dual-purpose cask. PX 592; Tr. 2696:24-2697:7, 2715:11-21, 2713:16-2715:3, 6283:20-6284:8 (Farron); Tr. 1645:23-1646:13 (Krieser); PFF 145.

The TN-32B contract also required WE to pay the remobilization costs of Transnuclear and any subcontractors in the event that WE delayed and restarted production of the TN-32B casks. PX 503, p. WISC00064082. This would have increased the costs of ultimately procuring the TN-32B casks.

Finally, the proposed finding also ignores the payments that WE would be required to pay for *suspending* or terminating the TN-32B contract for convenience. DX 161, p. WISC00064081.

509. WEPCO chose to fabricate VSC-24 casks numbers 9-12 in 1999 in lieu of using the TN-32B casks. DX201 at WISC00078223; Tr.2128:15-2129:6 (Holzmann); Tr.2133:8-12 (Holzmann).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is inaccurate. WE chose to fabricate VSC-24 casks number 9 through 12, but not in lieu of using the TN-32B casks. WE continued to believe that Point Beach might eventually load the TN-32B casks then in production. Tr. 2696:1-23, 6275:5-6276:17 (Farron); PX 577. WE was authorized to load TN-32B casks under the PSCW's March 2001 Order approving the use of 36 additional dry

storage casks at Point Beach because the Order was not restricted to a specific cask. Tr. 1645:23-1646:13, 2713:16-2715:3 (Krieser). WE, however, did not load the TN-32B casks because, in 2001, it decided to procure a dual-purpose cask. PX 592; Tr. 2696:24-2697:7; 2715:11-21; 2713:16-2715:3; 6283:20-6284:8 (Farron); Tr. 1645:23-1646:13 (Krieser); PFF 145.

510. WEPCO purchased four more VSC-24 casks, numbers 13-16, in 2000-2001. Tr.1739:1-7 (Becka).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is not entirely accurate. WE's procurement of VSC-24 casks 13 through 16 occurred in 2001-2002. PX 811, p. WISC00006523. Further, WE was unable to load additional VSC-24 casks until the PSCW authorized the loading of casks beyond the initial 12 VSC-24 casks approved by the PSCW. PX 374. On March 27, 2001, the PSCW issued its approval for the loading of an additional 36 casks at Point Beach. PX 592.

### 3. WEPCO Should Have Sold Its Long-Lead Materials, Or Its Three Completed TN-32B Casks

511. Long-lead materials are not specific to WEPCO's TN-32B casks, and can be used for casks at other nuclear facilities. Tr.5491:9-18 (Brewer) DDX 3-20.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is unsupported. The proposed finding relies upon Mr. Brewer, but Mr. Brewer cites no treatises or other support for his position. Even if his views were properly supported, the language in the proposed finding does not accurately reflect the views that Mr. Brewer expressed. Long-lead materials for use in TN-32B casks can be used *only* in the fabrication of other TN-32B casks for other nuclear

facilities. DDX 3-20 ("Long-lead materials were common to TN-32B customers"); Tr. 5491:9-18 (Brewer).

512. WEPCO's long-lead materials could have been sold to someone else, including Virginia Power.[26] Tr.5491:25 - 5492:4 (Brewer); DDX 3-20.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is unsupported and impermissibly speculative. The proposed finding only cites Mr. Brewer's conclusory allegation that, if WE cancelled the TN-32 fabrication, "then this long lead material that they had could have simply been sold to someone else, mainly, in this case, most likely, Virginia Power." Mr. Brewer suggests that because Virginia Power had orders in place for "20-something" TN-32B casks, Virginia Power would have been interested in procuring WE's long-lead material. Tr. 5492:5-11 (Brewer). However, neither Mr. Brewer nor the Government provided any evidence to support this conclusory assertion. *See* Tr. 6294:10-6304:13.

The Government argues that because 36 TN-32B casks were on order, that WE could have sold its long-lead materials to another utility. However, the Government offers no evidence of any TN-32B orders placed subsequent to the year 2000, which is when WE determined that it was in its best interest to attempt to sell the casks. PFF 145.

Further, WE's inability to sell the TN-32B casks since 2000 suggests that the sale of the long-lead materials is not as simple as the Government would like the Court to believe. *Id.*

The proposed finding also is misleading because it ignores the realities facing WE and the reasons it continued with fabrication of the TN-32B after Point Beach resumed loading VSC-24 casks in September 1998. *See* WE Response to DFF 500. Even if the evidence

---

[26] In 1998, there were 36 TN-32B casks on order. DX 32; Tr. 5492:5-11 (Brewer).

suggested that WE could have sold its TN-32B long-lead materials in 2000 (which it does *not*), it certainly was not in WE's best interest to do so at that time.

513. The best estimate of the value of the long-lead materials is the milestone payment for those materials in the Transnuclear contract. Tr.5492:14 - 5493:7 (Brewer); DDX 3-20.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because the evidence does not demonstrate that a market even existed for the sale of the long-lead materials. *See* WE Response to DFF 512.

WE also objects to this proposed finding of fact because the Government provides no evidence of any sales of long-lead materials or other information that would establish the costs that a utility could expect to recover through the sale of cask long-lead materials. Mr. Brewer simply *assumed* that the revenues that WE might obtain from the sale of the long-lead materials would be equal to its cost of acquisition. Tr. 5492:12-5493:7 (Brewer). Mr. Brewer referenced no evidence to support his assertion; it represents merely his speculation.

514. WEPCO's TN-32B casks were very similar to those being used at Duke's McGuire Nuclear Station and WEPCO's casks could have been sequenced into Duke's loading plans. DX 315; Tr.4997:2-24 (Weaver). WEPCO was aware that Duke was a potential buyer for its TN-32B casks. DX 231; Tr.4993:25-4994:18 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as inaccurate because the evidence does not support the Government's assertion that WE's casks could have been sequenced into Duke's loading plans. Although the TN-32B casks procured for use at Point Beach and the TN-32As in use by Duke were similar in design, there remained "major design differences." DX 315, p. WISC00075195. In order for WE's TN-32B casks to be used by Duke, major

modifications would have to be made to the casks, including modification or redesign of the TN-32B lids. *Id.* Absent those necessary and costly modifications, WE's TN-32B casks could not be loaded at Duke's McGuire Nuclear Station. *Id.*

Further, the proposed finding ignores that WE pursued a sale of the TN-32B casks to Duke, but that the parties did not reach agreement. Tr. 2609:5-11; 2697:11-2698:5 (Farron); Tr. 4994:10-16; 4996:4-7 (Weaver); PX 577, 603, 605, 620; DX 315.

515. WEPCO was also aware that Virginia Power, Dominion, and Northern States Power could use WEPCO's TN-32B casks. DX 312; Tr.4999:4-5000:8 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because it is inaccurate. First, Virginia Power and Dominion are the same entity, not two separate utilities as the proposed finding suggests. DX 312 ("Virginia Power aka. Dominion"); Tr. 5000:3-7 (Weaver) ("Virginia Power, which is also known as Dominion"). Second, WE was aware that Virginia Power and Northern States Power could use TN-32 casks, but not necessarily WE's TN-32B casks as built. DX 312 ("contact the 3 utilities which could use the TN-32s (Virginia Power aka. Dominion, Duke Energy, and Northern States Power)"). WE indicated that modifications may have been required for the use of WE's TN-32B casks by these utilities. *Id.*

516. Like WEPCO, Northern States Power is operated by Nuclear Management Corporation ("NMC").[27] Tr. 5000:9-11 (Weaver).

**RESPONSE:**

WE objects to this proposed finding of fact because it is irrelevant. It is also inaccurate. Until October 2007, NMC operated Point Beach, not WE.

---

[27] NMC took over the operation of the Point Beach Nuclear Power Plant in January 2000. Tr. 96:25-97:2 (Baumann).

517. WEPCO made a business decision to complete the casks in order to make them more saleable. Tr.1655:22-1656:15 (Krieser).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE agrees that it decided to complete the fabrication of the TN-32B casks in order to make them more saleable. PFF 145. WE believed that completing the TN-32B casks and selling them would return a greater value on the dollar than leaving them incomplete and attempting to sell them. Tr. 2697:15-19 (Farron); Tr. 1585:20-1586:14 (Krieser).

Mr. Brewer agreed that WE's decision to continue fabrication of partially manufactured TN-32B casks to improve their marketability was a reasonable attempt by WE to mitigate DOE's damages. PFF 147.

518. Prior to 2000, WEPCO management never gave any instructions to suspend work on the TN-32B casks. Tr.1658:22-1659:3 (Krieser).

**RESPONSE:**

WE does not object to this proposed finding of fact.

519. On March 16, 2000, WEPCO notified Transnuclear that it should suspend work on the TN-32B casks prior to shipment. Tr.4988:25-4990:1 (Weaver); DX 34/PX 570 at WISC 00055414.

**RESPONSE:**

WE does not object to this proposed finding of fact.

520. WEPCO preferred not to load the TN-32B casks because having three different storage systems at Point Beach would be unnecessarily complicated.[28] Tr.1974:10-22; 1975:2-5; 1976:8 – 1977:1 (Becka).

---

[28] Moreover, in order to use the TN-32B casks, WEPCO would have to make plant modifications to Point Beach costing approximately $900,000, including revising operating and loading procedures, making some revisions to a transport vehicle, obtaining a different lifting yoke, making changes to the cask lay down area, making changes to the cask drying area, and making modifications to decontamination. Tr. 1636:9-1637:113 (Krieser). Those plant modifications were never made. Tr. 1636:9-1640:3-23,1651:6-11 (Krieser); Tr. 2690:22-2691:15 (Farron); DX 151.

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is misleading. As late as May 2000, WE contemplated the loading of TN-32B casks at Point Beach. PX 577. WE only decided not to load the TN-32B casks in 2001 after it had decided to transition to the NUHOMS system because at that point WE would have been utilizing three different dry storage systems. Tr. 1974:2-1975:1 (Becka) ("because we now have two systems at Point Beach, so my preference would be not to use [the TN-32B casks]"). WE, however, had suspended fabrication of the TN-32B casks and initiated efforts to sell them prior to Point Beach's transition to the NUHOMS system. PX 570, 577, 602.

With regard to Footnote 28, WE determined that it would not make the plant modifications necessary for the use of the TN-32B casks at Point Beach until WE decided to load a TN-32B cask. Tr. 1651:2-11 (Krieser). WE reasonably mitigated DOE's damages by not making unnecessary modifications.

521. By letter dated May 17, 2001, WEPCO asked Transnuclear to pursue the sale of the three TN-32B casks. Tr.4991:19-4992:3 (Weaver); PX 603; DX 105.

**RESPONSE:**

WE does not object to this proposed finding of fact.

522. The decision to try to sell the casks was made by Richard Grigg, the President and Chief Operating Officer, because WEPCO had no plans to load the casks. Tr.4992:4-13 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact because it is inaccurate. WE had initiated efforts to sell the casks prior to its May 17, 2001 letter to Transnuclear. PX 577. Mr. Grigg authorized the sale of the TN-32B casks. PX 620; Tr. 4992:4-13 (Weaver).

WE also objects to this proposed finding of fact because it is misleading. WE considered loading the TN-32B casks. PX 577 ("Developing an implementation schedule to outline the durations and critical path to get from 'go' to loading TN-32s."). Further, the PSCW's March 2001 Order approving the installation of up to 36 additional dry casks at Point Beach authorized the loading of TN-32B casks at Point Beach. Tr. 2697:2-7; 2713:3-2715:3 (Farron); PX 592.

523. Although WEPCO initially sought to maintain the TN-32B casks as an "insurance policy" or "backup," WEPCO had concluded that the casks had already served this purpose. DX 311; Tr. 4992:14-4993:24 (Weaver); see also DX 315; Tr. 4996:8-4997:1 (Weaver); Tr. 5007:20-5008:6 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to the proposed finding of fact to the extent that it mischaracterizes WE's understanding of the TN-32B cask system as an "insurance policy." Mr. Krieser testified that he personally liked to "refer to it as an insurance policy." However, WE's May 1998 application for authority to load TN-32B casks referred to the potential use of TN-32B casks at Point Beach as an "alternative plan." PX 510, p. 1. The PSCW referred to the TN-32B cask system as a "back-up option" for the VSC-24 casks. PX 524, p. 4.

WE did not believe that the TN-32B casks had fully served their purpose of backing up the VSC-24 casks until WE decided to acquire a dual-purpose cask, the NUHOMS system. Tr. 2608:7-2609:4 (Farron) (the TN-32B was needed as a backup cask until WE acquired a successor cask); Tr. 1585:4-1587:3 (Krieser). Even after WE began acquiring NUHOMS casks, it continued to believe that Point Beach might eventually load the TN-32B casks. Tr. 2696:1-23; 6275:5-6276:17 (Farron); PX 577.

524. On August 24, 2001, WEPCO informed the NRC that its decision not to use the three TN-32B casks was based upon a number of factors, including limiting the variety of systems employed, impact on plant resources, and the magnitude of attendant infrastructure changes that would be required (cost versus benefit) of the attendant program, procedure and

plant and equipment modifications. PX 609; DX 104. WEPCO already had the VSC-24 systems and this would add another variety of cask to the mix. DX 104; Tr.4991:7-13 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it is not entirely accurate. As noted in NMC's August 24, 2001 letter to the NRC, the PSCW's March 2001 approval for the use of an additional 36 casks at Point Beach came "with a caveat that WE transition to a dual-purpose system to eliminate the need to repackage the fuel for transport." In accord with the PSCW's caveat, WE selected the Transnuclear NUHOMS TN-32PT dry storage system as the successor to the VSC-24 cask. PX 602, 609. The TN-32PT was a dual-purpose system; the TN-32B was not. PX 609.

After WE decided to transition Point Beach to the NUHOMS dual-purpose system, WE preferred not to load the TN-32B casks to avoid implementing three different dry storage systems. Tr. 1974:2-1975:1 (Becka) ("because we now have two systems at Point Beach, so my preference would be not to use [the TN-32B casks]"); DX 104 (discussing WE's decision to transition Point Beach to the NUHOMS system).

As late as May 2000, however, WE contemplated loading TN-32B casks at Point Beach. PX 577.

525. On October 31, 2001, WEPCO considered the benefits of halting construction and ceasing milestone payments on the casks until serious negotiations with potential purchasers of the three casks began, as under the contract, delaying the work would not increase the total cost. DX 313; Tr.4997:25-4999:3 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact because it mischaracterizes the evidence. While WE's contract with Transnuclear did not contain escalation clauses that would cause an increase in the final price as part of a delay, the TN-32B contract did require WE to pay

the remobilization costs of Transnuclear and any subcontractors in the event that WE suspended and restarted production of the TN-32B casks. PX 503, p. WISC00064082. This would have increased the costs of ultimately procuring the TN-32B casks.

526. As of the time of trial, and the sale of Point Beach to FPL Energy,[29] WEPCO had no plans to use the TN-32B casks. Tr.4991:14-18 (Weaver).

**RESPONSE:**

WE objects to this proposed finding of fact because it is misleading. It is more accurate to state that WE had no current plans to use the TN-32B casks given the sale of Point Beach.

527. WEPCO did ultimately sell its TN-32B casks to FPL Energy, as part of the sale of Point Beach. Tr.5013:24-5014:5 (Weaver).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE further objects to this proposed finding because it is unsupported by the evidence. There is no evidence that WE received any compensation from FP&L Energy with regard to the TN-32B casks. Tr. 5013:24-5014:5 (Weaver). The transfer of assets such as the TN-32B casks as part of the Point Beach transaction in no way suggests that there was a specific sale of the TN-32B casks by WE to FP&L. More importantly, Mr. Weaver testified that WE owns the claim against DOE under the Standard Contract up through the closing date of the transaction selling Point Beach to FP&L Energy. Tr. 5015:7-5016:3 (Weaver). Thus, the claim for the costs incurred in purchasing the three TN-32B casks remains with WE and WE properly seeks these costs in this action.

528. No other utility maintains a backup cask system. Tr.5650:20-5651:1(Brewer).

[29] The sale of Point Beach to FPL Energy became final in October 2007. Tr. 5013:23-5014:4 (Weaver).

**RESPONSE:**

WE objects to this proposed finding of fact because it is not supported by evidence. Mr. Brewer testified that he was unaware of any other utilities who maintained a backup cask. Tr. 5650:24-5651:1 (Brewer). He did not testify that no other utility maintains a backup cask system.

529. The PSCW never held any additional hearings regarding the TN-32B casks. Tr. 6283:13-19 (Farron).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE objects to this proposed finding of fact as vague because it does not identify what it means by "additional hearings" or what the Government considers as the initial hearing.

WE also objects to this proposed finding of fact because it is inaccurate and contradicted by the evidence. For example, the PSCW initially authorized the purchase of six TN-32B casks in an August 11, 1998 Order. PX 524. Then, the PSCW's March 2001 Order authorized the use of additional casks at Point Beach (including the TN-32B cask). PX 592.

WE further objects to this proposed finding as misleading. WE established at trial that WE recovered the costs for the TN-32B casks. Mr. Farron, who has been involved in WE's communications and interactions with the PSCW for more than 12 years and is intimately familiar with how the PSCW regulates Wisconsin utilities, testified that the PSCW's August 11, 1998 Order authorized the recovery of TN-32B cask costs. Tr. 2508:8-2509:22; 2516:14-2517:15; 6267:25-5270:5; 6270:12-6271:20 (Farron); PFF 148. Mr. Farron further testified that the PSCW's approval of the TN-32B acted as a prudence review and that he received a verbal confirmation of the cost recovery. Tr. 6267:25-6270:5; 6270:12-6271:20; 6288:3-16 (Farron). To the extent an expert witness's testimony is probative, Mr. Metcalfe also testified that WE advised him that the TN-32B costs were

recovered in rates. Tr. 6294:10-17 (Metcalfe). No further PSCW hearings were required or necessary in order for WE to recover the TN-32B costs in WE's rates. PFF 148.

530. Mr. Hamal concluded that, under the circumstances, WEPCO should have delayed the fabrication of the TN-32B casks in September 1998, and concluded that WEPCO should have cancelled its contract for production of the three TN-32B casks after April 1999, and then sold the long-lead materials that were purchased for the project. DX 392 at ¶25 (Hamal Report).

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE does not dispute that Mr. Hamal argues that WE should have delayed fabrication of the TN-32B casks in September 1998. However, Mr. Hamal ignores the operational realities facing WE at that time and his opinion casts no doubt on the reasonableness of WE's decisions regarding this issue. The loading of a VSC-24 cask in September 1998 resolved only one of WE's many concerns regarding the viability of the VSC-24 cask. PFF 141. Other concerns included (1) Sierra Nuclear's inadequate responses to the NRC's Demand for Information, (2) Sierra Nuclear's inadequate staffing and poor financial condition, (3) the risk that BNFL would cease to support the VSC-24 after its acquisition of Sierra Nuclear, (4) the quality of support provided for the VSC-24, (5) the risk that other latent problems would surface, and (6) quality control concerns in the fabrication process. PFF 141. These other concerns persisted beyond September 1998.

Mr. Hamal's opinion also ignores the remobilization costs that WE would incur if it later needed to restart fabrication of the TN-32B casks. PX 503, p WISC00064082. This would have increased the procurement cost of the TN-32B casks.

Further, Mr. Hamal has never worked as an employee at a nuclear facility, has never been involved in managing spent nuclear fuel at a commercial nuclear facility, and does not have the ability to operate a nuclear power plant or act as a nuclear plant engineer. Tr. 5929:15-23; 5931:15-18; Tr. 5932:4-5; 5932:20-25; 5933:11-15 (Hamal). The lack of

weight accorded his hindsight judgments regarding operational decisions facing WE should reflect his lack of experience.

531. Mr. Kiraly reduced plaintiff's claim by $5,058,733, of which $91,507 could also be disallowed for accounting reasons, which represents all costs claimed by plaintiff relating to the TN-32B casks. Tr.6155:11-20 (Kiraly); DDX 5-47; DX 625 (Kiraly Report, Attachment 9, WXE 0220135 – WXE 0220146); DX 625 (Attachment 1-a-4.4, WXE 0220016).[30]

**RESPONSE:**

WE incorporates its General Objections to Section XVIII.D (DFF 473-531).

WE does not dispute that Mr. Kiraly argues that WE's claim should be reduced by $5,058,733 for costs relating to the TN-32B casks.

Interestingly, Mr. Kiraly argues that all TN-32B costs should be disallowed, in clear contradiction of the opinions of the Government's other expert witnesses. Mr. Brewer and Mr. Hamal believed it was reasonable for WE to procure the TN-32B casks. Tr. 5651:2-11 (Brewer) ("I've never taken exception, and I don't think anyone has taken exception to the idea that the concerns that led WEPCO to starting down the TN-32 metal cask path were unreasonable or irrational."); Tr. 5898:2-10 (Hamal) ("I start by looking at the situation WEPCO found itself in, in the spring of 98 when it decided to order the TN-32B casks as a contingency plan in case there were further problems on the VSC-24 casks. I don't disagree with that conclusion. I do not reach – you know, reach an opinion that it was unreasonable for them to order these casks in the first place."); PFF 143, 144.

WE also objects to Footnote 30 of this proposed finding of fact. The Government's calculation of the costs incurred by WE for long-lead materials wholly ignores the significant payments that WE would be required to pay for terminating the TN-32B contract for convenience. The TN-32B contract stated that:

---

[30] If the Court finds that costs incurred by WEPCO for long-lead materials through September 10, 1998 were reasonable, which total $1,246,041, then the adjustment to the claim would be reduced to $3,812,692. *See* DDX 5-46 at 69.

> "[s]eller shall be compensated for all Activities met as of the date of notification of cancellation or suspension per the Cancellation Payment Schedule. *Seller shall also be compensated for the value of any work, authorized by Buyer, in process plus profit limited to 10% on that in-process work, plus all reasonable subcontractor cancellation fees incurred by Seller as a result of the cancellation.*

DX 161, p. WISC00064081 (emphasis added).

By the time the NRC lifted the final CAL on the VSC-24s and authorized WE to resume loading VSC-24s, WE had already ordered the long-lead materials for the TN-32B. PX 521, 525. By that time, WE was obligated for 46 percent of the TN-32B contract's price, which was $2,037,600. DX 161, p. WISC00064082 (payment schedule in the TN-32B contract obligated WE to pay for 46 percent of the value of the first three casks upon the order of long-lead and basket materials). As noted earlier, the Government's own experts acknowledge that WE's procurement of the TN-32B casks at least up to that point was reasonable. The situation had not changed as of September 1998, when Mr. Hamal argues that WE should first have delayed fabrication of the TN-32B casks. Thus, even under Mr. Hamal's and Mr. Brewer's views, WE should be entitled to recovery of 46 percent of the TN-32B contract costs ($2,037,600) and all other associated costs. WE, however, believes that it is entitled to recover all of these costs or at least the monies expended through Spring 2000 based on the PSCW's August 1998 Order, stating that "WEPCO may only use the TN-32 casks if the VSC-24 casks are not available in time for its scheduled refueling in Spring 2000 . . ." PX 524, p. KRGWE002388.

The proposed finding also ignores that if WE had decided to terminate the TN-32B effort in spring 2000 based on the PSCW's August 1998 Order, WE would have spent from $2,508,000 to $3,230,000, with the likely cost being at the high end. PFF 149.

## E. WEPCO'S Pursuit Of Dual-Purpose Casks

### 1. WEPCO'S Decision To Switch To The NUHOMS Cask System

532. At the time of WEPCO's application to the PSCW for authorization to load additional VSC-24 casks in May 2000, WEPCO had sufficient spent fuel assemblies qualified to load into those VSC-24 casks to provide sufficient storage for at least 5 additional years.[31] Tr.5507:8-5509:21 (Brewer); DX 391 at 26 (WXE011 0028); DDX 3-22; DX 453; DX 406.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it wrongly implies that WE should have continued to load early-discharge, lower-radiation ("colder") spent fuel assemblies in the VSC-24 for an additional period of time.

The evidence, particularly the testimony of experienced Spent Fuel Manager Jim Becka, established that loading all available colder spent fuel assemblies in VSC-24s would have been a very disadvantageous spent fuel management strategy. Tr. 1773:20-1774:23 (Becka). The trend in the nuclear power industry, including at Point Beach, is for nuclear power plants to discharge increasingly radiologically intense ("hotter") spent fuel. *Id.* In order to avoid having to use very high burn-up cask designs to store the hotter discharged spent fuel assemblies, the industry prefers mixing hot and cold assemblies. *Id.* Storing all colder assemblies only in VSC-24s for five years based on the VSC-24's then-licensed burn-up capacity, as Mr. Brewer suggests, would have been an inflexible and disadvantageous strategy resulting in WE "painting itself into a corner" and reducing its ability to mix cold spent fuel with hot spent fuel in the future. Tr. 1777:11-1778:12 (Becka).

WE further objects to DFF Footnote 31 because it is unsupported by the evidence. There is no evidence that WE decided that it would never load the TN-32B casks as the

[31] At the time WEPCO decided it would not load the TN-32B casks, it had already made the decision to use the NUHOMS system. WEPCO did not perform any evaluation to determine if it was cheaper to use the three TN-32B casks, instead of three completely new and different NUHOMS casks. There would be similar costs to set up and load the TN-32B metals casks as there was for the NUHOMS system. Tr. 1974:10-22; 1975:2-5; 1976:8 – 1977:1 (Becka).

Government contends. Instead, WE continued with fabrication of the TN-32B casks because of its continued concerns regarding the VSC-24 and the potential to use the TN-32B casks for later storage at Point Beach. PFF 145. WE reasonably continued with fabrication of the TN-32B backup casks to have them available for storage and in the belief that it would be easier to sell completed casks. *Id.* In 2000 WE began attempting to sell the TN-32B casks, without success. *Id.* Mr. Becka's testimony reflects WE's decision to acquire and load NUHOMS canisters, but does not foreclose the potential use of TN-32B casks at Point Beach.

533. In 2000, BNFL, the manufacturer of the VSC-24 cask, indicated to WEPCO its intention to modify its cask license to accommodate all of WEPCO's spent fuel.[32] Tr.5509:22 - 5510:20 (Brewer); DX 255.

**RESPONSE:**

WE disputes this proposed finding of fact because it is unsupported by the evidence cited. The BNFL business proposal, DX 255, only covered the "current" spent fuel inventory. DX 255, p. WISC00055165. It does not state that it would accommodate spent fuel from future Point Beach discharges; therefore, it does not propose a design to accommodate "all" of Point Beach's spent fuel.

534. In 2003, the VSC-24 license modification started in 2000 was completed, allowing a sufficient quantity of WEPCO's spent fuel assemblies to be loaded into VSC-24 casks to provide storage for 24 additional years. Tr.5513:14-19 (Brewer); DX 391 at 26 (WXE011 0028); DX 409.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because WE decided to switch to the NUHOMS system in 2001, long before the NRC approved the VSC-24 license modification. PFF 152. Moreover, WE decided to use the NUHOMS system because it was

---

[32] In 1999, BNFL had notified the NRC of the status of various licenses, and specifically stated that it intended to maintain the VSC-24 Certificate of Compliance. DX 623.

superior to the VSC-24 in many ways. *Id.* The NUHOMS system's ability to accommodate a greater range of spent fuel than the VSC-24 when WE made its decision in 2001 was only one of the factors that WE considered in switching to the NUHOMS system. *Id.*

535. In two cases, WEPCO (directly, or by NMC on its behalf) entered into contracts for casks that had not yet been licensed by the NRC. The first case was in May, 1998, when WEPCO contracted for the purchase of the TN-32B casks, a license for use of those casks at the Point Beach site had not yet been obtained. Tr.1573:5-21 (Krieser). In fact, WEPCO was required to obtain permission to manufacture these casks prior to obtaining a license for them. DX 223. The second case was in 2001, when Transnuclear stated that the license for the NUHOMS 32PT was not expected to be issued until May 2002. In spite of this statement, however, WEPCO still contracted for this cask prior to its license being obtained. The Transnuclear contract for the Point Beach site, dated March 5, 2002, notes that there is still a potential that Transnuclear would be unable to license the TN-32PT. PX 597 at WISC 00018125; PX 692 at WISC 00019211 ("If TN fails to license the - 32PT, TN shall supply the NUHOMS - 24PT2 for the same per-assembly price as the - 32PT").

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it wrongly implies that the NRC's approval of Transnuclear storage cask license applications is somehow relevant to the VSC-24 design. The cited evidence does not support the Government's inference because the Transnuclear designs were based on proven technology compared to the trouble-plagued VSC-24. PFF 136, 140. The technology used in the TN-32B "had been successfully used" and was "tried-and-true." Tr. 204:17-19 (Baumann). Point Beach selected the Transnuclear NUHOMS design in part because this type of system had been used successfully at several sites. Tr. 1802:17-23 (Becka); PX 793, p. 11 (Table 1) (identifying numerous nuclear plants utilizing NUHOMS casks). The relatively low risk of the NUHOMS design is confirmed by the Government's cited evidence, which included Transnuclear's promise to provide another Transnuclear design if the NUHOMS was not licensed. PX 692, p. WISC00019211. By contrast, the VSC-24 had a less favorable record. PFF 136, 140. Moreover, the Government failed to show at trial that BNFL offered any design alternative to the VSC-24 cask if BNFL's attempt to license the VSC-24 cask failed.

536. In spite of these facts, WEPCO eventually made the decision to switch to a third type of cask, the NUHOMS or the TN-32PT system, a dual-purpose system. Tr.1659:4-16 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact as vague and misleading. It is vague because one cannot tell from this proposed finding what is meant by "these facts."

WE does not dispute that it decided to switch from the VSC-24 to the NUHOMS system in order to store SNF because of DOE's long-term failure to perform under the Standard Contract and because of the performance problems with the VSC-24. PFF 151-152. WE disputes that this was a "third" switch of SNF storage technologies utilized at Point Beach. PFF 142. WE procured three of the six PSCW-approved TN-32B casks as a backup to the VSC-24 cask, but did not implement them at Point Beach. PFF 142. Point Beach has loaded only two types of casks, the VSC-24 and the NUHOMS casks. PFF 16.

537. When WEPCO sought authorization to load additional casks from the PSCW in 2000, WEPCO understood that dual purpose cask were approximately $700,000 more expensive on a per casks basis than the VSC-24 casks that it was using at the time. Tr.272:25-274:16 (Baumann); DX 70 at KRGWE002411; DX 463 at WISC 00010273.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores significant other testimony. For example, Mr. Baumann also testified that the cost for VSC-24 canisters did not include other costs that WE would incur by purchasing additional VSC-24 canisters, including the cost of additional radiation exposure and of having to offload fuel from a loaded storage-only VSC-24 in order to place the SNF into a DOE transportation cask. Tr. 294:1-295:23 (Baumann). Moreover, the proposed finding of fact is irrelevant because the Government did not establish that the dual-purpose cask referenced in the exhibits was the NUHOMS system that WE eventually selected. Tr. 296:7-10 (Baumann).

538. WEPCO conceded that it does not need a dual-purpose system in order to store its spent fuel on site. Tr.1659:17-20 (Krieser).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores significant other testimony. Mr. Krieser further testified that dual-purpose casks are the current industry standard for dry cask storage. Tr. 1659:21-1660:1 (Krieser); *see also* PX 793, p. 10 (Expert Report Regarding The Development of Dual-purpose Casks) ("[N]early all of the dry storage facilities that have been commissioned at nuclear power plant sites since 2000 have loaded spent fuel into dual-purpose dry storage systems. In addition, many of the ISFSIs that began operation in the 1980s and 1990s are in the process of transitioning from storage-only dry storage systems to dual-purpose systems").

539. The fleet dry fuel storage manager working for NMC advised the Point Beach Vice President that Point Beach was "vastly underestimating" the level of effort required to implement a different dry fuel system. DX 5; Tr.5012:7-5013:20 (Weaver).

**RESPONSE:**

WE objects to this proposed finding of fact as improper because it is unsupported and relies upon improper evidence. DX 5 is a 1987 statement of Mr. Burstein and has nothing to do with this proposed finding of fact. *See* DX 5. Moreover, Mr. Weaver was not the NMC fleet dry storage manager, but rather was WE's Nuclear Asset Manager. Therefore, he had no basis to testify on behalf of the NMC fleet dry storage manager. Tr. 4975:16-23 (Weaver). In fact, Mr. Weaver only testified that Government counsel had correctly read into the record a portion of a different exhibit, DX 251. Tr. 5013:19-20 (Weaver).

The portion of DX 251 that the Government read into the record during Mr. Weaver's testimony was an email message from Mr. John Broschak, at the time an NMC employee. The Government's citation to Mr. Broschak's email is misleading because, put in context, it reflects the NMC fleet manager's overall concerns with coordinating loadings fleet-wide, rather than constituting a critique of Point Beach's implementation of NUHOMS: "As it is right now, the 2003/4 schedule is extremely tight in terms of accomplishing these 23 [NMC

fleet] cask loadings in the available time." DX 251, p. WISC00076257. In the same email, Mr. Broschak explains that the NMC fleet-wide approach to loading resulted in significant savings in NUHOMS loading costs: "the equipment lease option results in significant savings in equipment costs." *Id.* As the evidence shows, Mr. Broschak participated in Point Beach's selection of the NUHOMS system in May 2001, which included detailed cost estimates for the SNF storage systems considered at Point Beach. PX 602 (Becka memo regarding selection of NUHOMS for Point Beach listing Mr. Broschak as an attendee).

WE further objects to this proposed finding of fact because it is unsupported. It was not established at trial that Mr. Weaver had expertise in any areas covered in Mr. Broschak's email.

540. Specifically, he explained that the existing ISFSI would have to be evaluated to show that it was suitable for use with the new system, which would involve repeating a number of previous analyses under more stringent standards than existed when they were originally done. He further explained that the change would necessitate all new cask loading and handling procedures as well as review and revision of any other site procedures affected by dry storage. He explained that a new 72.212 report would need to be generated for the NUHOMS system and some plant modifications would be required. DX 51; Tr.5012:7-5013:20 (Weaver).

**RESPONSE:**

WE objects to this proposed finding of fact as improper because it is unsupported and relies upon improper evidence. DX 51 is an RW-859 from the early 1990s and has nothing to do with this proposed finding of fact. *See* DX 51. Moreover, Mr. Weaver was not the NMC fleet dry storage manager, but rather was WE's Nuclear Asset Manager. Therefore, he had no basis to testify on behalf of the NMC fleet dry storage manager. Tr. 4975:16-23 (Weaver).

The portion of DX 251 that the Government read into the record during Mr. Weaver's testimony was an email message from Mr. John Broschak, at the time an NMC employee. The Government's citation to Mr. Broschak's email is misleading because, put in context, it reflects the NMC fleet manager's overall concerns with coordinating loadings fleet-wide,

rather than constituting a critique of Point Beach's implementation of NUHOMS: "As it is right now, the 2003/4 schedule is extremely tight in terms of accomplishing these 23 [NMC fleet] cask loadings in the available time." DX 251, p. WISC00076257. In the same email, Mr. Broschak explains that the NMC fleet-wide approach to loading resulted in significant savings in NUHOMS loading costs: "the equipment lease option results in significant savings in equipment costs." *Id.* As the evidence shows, Mr. Broschak participated in Point Beach's selection of the NUHOMS system in May 2001, which included detailed cost estimates for the SNF storage systems considered at Point Beach. PX 602 (Becka memo regarding selection of NUHOMS for Point Beach listing Mr. Broschak as an attendee).

WE further objects to this proposed finding of fact because it is unsupported. It was not established at trial that Mr. Weaver had expertise in any areas covered in Mr. Broschak's email.

541. Furthermore, the acquisition costs for the number of VSC-24 casks needed to store the same amount of fuel as the NUHOMS casks is less than half the cost of the NUHOMS casks. WEPCO paid more on a unit basis for a NUHOMS cask compared to a VSC-24 cask. Increasing the cost of the new cask system even more, WEPCO paid a premium to move delivery of NUHOMS canisters out to a later time so those costs would be incurred after the conclusion of the rate freeze. WEPCO was also forced to purchase ancillary equipment and perform site modifications in order to use the NUHOMS casks. Tr.1819:22 -1820:3; 1825:15-1827:7; 1829:16-21; 1831:1-9; 1928:14-1929:15 (Becka); Tr. 6158:4-8; 6159:19-24 (Kiraly); DDX 5-51; DDX 5-52; DX 253; PX 597.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores significant other evidence. WE established at trial that WE purchased the NUHOMS system because WE believed that the costs for dual-purpose casks would be only slightly higher than the costs for storage-only casks because Point Beach would not need to transfer fuel from a dual-purpose cask to a transportable cask prior to shipping fuel off-site. PFF 152c. The minimized fuel handling also reduced the likelihood of an accident and reduced radiation exposure to WE's employees. *Id.*

WE also objects to this proposed finding of fact as irrelevant insofar as it relates to staggered cask deliveries. The record at trial established that WE staggered cask deliveries because of a rate freeze. Tr. 1928:16-1929:15 (Becka). The Government did not prove that WE incurred additional costs specifically because it used the NUHOMS system compared to any other cask. The record does not establish that WE would not have also incurred similar, additional costs if it had fabricated VSC-24s in this time frame. Therefore, the Government cannot tie these increased costs specifically to WE's selection of the NUHOMS system compared to use of another cask design.

WE notes that WE obtained substantial efficiencies of scale by acquiring the NUHOMS system as part of the NMC fleet. PFF 152g. Moreover, the NUHOMS system offered numerous safety and operational advantages over the VSC-24, as well as dual-purpose capability. PFF 152.

542. Moreover, the operating lifetime of the VSC-24 cask is the same or longer than that of a dual purpose cask, including the NUHOMS casks that WEPCO began using in lieu of the VSC-24 casks. Tr.5514:14 - 5515:23 (Brewer); DDX 3-23, DX 391 at 26-27( WXE011 0028 - WXE011 0029); DX 406, PX 658.

**RESPONSE:**

WE objects to this proposed finding of fact as vague because the term "operating lifetime" is undefined.

WE further objects to this proposed finding of fact as misleading because Mr. Brewer apparently compares the design and/or license period for the VSC-24 with dual-purpose casks generally, including the Holtec system. *See* DX 391, p. WXE011-0028-29. Mr. Brewer admitted at trial, however, that there is no license period advantage to the VSC-24 system compared to the NUHOMS system. Tr. 5515:16-23 (Brewer). WE also notes that it decided to use the NUHOMS system because it was superior to the VSC-24 cask in many ways. PFF 152.

543. There is no safety issue with the continued use of the VSC-24 casks. WEPCO believes that the VSC-24s are safe and can continue to be loaded safely. Tr.2699:16-21 (Farron); Tr.1961:7-1963:20 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading as it ignores significant other testimony. Mr. Farron testified only that WE did not have a safety issue with *already-loaded* VSC-24 canisters from a safety perspective. Tr. 2699:6-21 (Farron). He was not discussing the continued loading of the VSC-24 casks. Moreover, Mr. Farron testified that he favored moving to a dual-purpose design such as the NUHOMS because of, among other reasons, DOE's preference for dual-purpose casks, WE's interest in reducing the radiation dose to personnel by not loading more VSC-24 casks, and to avoid having to unload the fuel from additional VSC-24s for reloading into transportation casks. Tr. 2522:18-2523:6 (Farron).

Mr. Becka testified that the NUHOMS system is safer to load than the VSC-24, including reduced radiation exposure to workers. PFF 152d. Loading a NUHOMS generates far less explosive hydrogen gas than loading a VSC-24. PFF 152e. Moreover, unloading a storage-only VSC-24 for off-site shipment presents increased risks associated from high levels of explosive hydrogen gas generation, as well as additional radiation exposure and other costs. PFF 152c.

Additionally, the proposed finding ignores that the PSCW encouraged WE to transition to dual-purpose casks to avoid the safety issues implicit in unloading and reloading spent nuclear fuel. PX 592, pp. WISC00012217-18 ("The Commission . . . encourages WEPCO to consider dual purpose casks in the future because they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport.").

544. The contract for the final four VSC-24 casks that WEPCO purchased included a provision to supply more casks at the same price. Therefore, WEPCO never incurred any

increase in the VSC-24 costs over the life of the project. Tr.6233:16 - 6234:6 (Kiraly); DX 70.

**RESPONSE:**

WE objects to this proposed finding of fact because it is not supported by the evidence cited. The cited evidence does not establish that, by contract or any other basis, future VSC-24 purchases would have cost the same as casks 13 through 16.

WE also notes that it decided to use the NUHOMS system because it was superior to the VSC-24 in many ways. PFF 152. WE also established at trial that WE purchased the NUHOMS system because WE believed that the costs for dual-purpose casks would be only slightly higher than the costs for storage-only casks because Point Beach would not need to transfer fuel from a dual-purpose cask to a transportable cask prior to shipping fuel off-site. PFF 152c. The minimized fuel handling also reduced the likelihood of an accident and reduced radiation exposure to WE's employees. *Id.* Additionally, WE was able to gain financial efficiencies of scale because the NUHOMS cask and associated rental equipment were purchased at other NMC fleet plants. PFF 152g.

545. There is not currently a licensed transportation cask that can accommodate the NUHOMS 32-PT canister used by WEPCO. Tr.5518:23-5519:10 (Brewer).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading because it ignores significant other evidence. Mr. Brewer admitted that Transnuclear intends to license the NUHOMS cask system to transport the dual-purpose canister. Tr. 5519:7-8 (Brewer). Moreover, the evidence established that the PSCW's March 28, 2001 Order encouraged WE's use of dual-purpose casks on the expectation that they would be licensed by the NRC for transportation. *See* PX 592, pp. WISC00012217-18 ("The [PSCW] . . . encourages WEPCO to consider dual-purpose casks in the future because they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport.").

546. In addition, unless the canister is qualified for disposal at the DOE repository, the content will have to be repackaged. In this event, there is no savings of effort or radiation exposure by use of a dual purpose cask. Tr.5519:25 - 5520:18 (Brewer).

**RESPONSE:**

WE objects to this proposed finding of fact as speculative because there is no evidence establishing that the NRC will deny license approval for dual-purpose casks to transport SNF. Moreover, the evidence established that PCSW encouraged WE's use of dual-purpose casks on the expectation that they would be licensed by the NRC for transportation and that this technology would eliminate re-packaging of SNF at Point Beach. PX 592, pp. WISC00012217-18 ("The [PSCW] . . . encourages WEPCO to consider dual-purpose casks in the future because they will eliminate the need to unload storage casks and place spent fuel assemblies in casks that are certified for transport.").

WE further notes that it proved that WE, the PSCW, and the entire industry began to plan on shifting to dual-purpose cask technology as the most flexible option to get SNF off-site with DOE's encouragement. *See* PFF 151, 152, 154. Additionally, DOE's own planning assumes that DOE will accept commercial spent nuclear fuel in dual-purpose canisters at the permanent repository. PFF 154.

547. Furthermore, WEPCO had no expectation that DOE would accept any fuel except bare fuel that would be loaded directly into a DOE cask. DX 28 at WISC 00002798.

**RESPONSE:**

WE objects to this proposed finding as vague and unintelligible. The Government identified no statement on page WISC00002798 of DX 28 that supports this proposed finding of fact.

WE further objects to this proposed finding of fact because it relies upon improper evidence. WE did not create the cited decommissioning cost study for the purpose of SNF storage planning. Instead, WE contracted for the estimate to provide a "site-specific Decommissioning Cost Estimate" assuming that WE permanently shut down the Point Beach

reactors in 2010 and 2013. DX 28, p. WISC00002788. Moreover, by the time that WE received its first decommissioning cost estimate from its contractor, NES, in October 1994, DOE had already told the nuclear power industry in May 1994 that it was not obligated to timely perform. DX 28 (October 26, 1994 cover letter); PFF 122b. (May 1994 DOE Notice of Inquiry). Thus, any assumptions in the cost study were entirely hypothetical.

WE proved that it, the PSCW, and the entire industry began to plan on shifting to dual-purpose cask technology as the most flexible option to get SNF off-site with DOE's encouragement. *See* PFF 151, 152, 154. Additionally, DOE's own planning assumes that DOE will accept commercial spent nuclear fuel in dual-purpose canisters at the permanent repository. PFF 154.

548. It is speculative that a large rail cask, like the NUHOMS cask, could be removed from the Point Beach site. Tr.5519:15-25 (Brewer).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . .").

WE further objects to this proposed finding of fact as unsupported. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

WE disputes this proposed finding because the Government has failed to establish the factual predicate of the proposed finding. The proposed finding states that the NUHOMS cask is a "large rail cask" but cites no evidence that the NUHOMS is not suitable for transport by heavy haul vehicle. To the contrary, WE established at trial that NUHOMS canisters are moved from the Point Beach plant to the ISFSI by heavy-haul vehicle. Tr. 1864:3-19 (Becka); PX 740.119.

WE further disputes this proposed finding of fact because it is contradicted by the evidence. During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the steam generator to Kewaunee by rail. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul crossed several small bridges without problem. PFF 263. The weight of a fully loaded VSC-24 is less than the 200-ton weight of the lower piece of the steam generator. PFF 264.

549. First, Point Beach does not currently have a rail or barge facility. Tr.5519:15-16 (Brewer). Previous spent fuel shipments from Point Beach used a truck cask because Point Beach did not have a rail spur. The rail line serving Kewaunee was abandoned in 1998, and there is currently no rail spur in Kewaunee to which a heavy cask could be hauled. Tr.5522:18 - 5523:3 (Brewer); DX 455. Moreover, Point Beach did not in 1998, and does not currently have, an operational barge facility. If Point Beach were to ship fuel today, it would likely be shipped by truck. Tr.1381:23-1382:14 (Shimon); Tr.1978:10-18 (Becka); Tr.2700:23-2701:16 (Farron).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . .").

WE further objects to this proposed finding of fact because Mr. Brewer's testimony is contradictory on this issue. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

Further, this proposed finding is not supported by the cited evidence. Mr. Shimon's testimony relates to past SNF shipments in the 1970s, not to how Point Beach would handle SNF shipments now. Tr. 1381:23-1382:14 (Shimon). Mr. Becka's testimony stated that fuel would be moved "over the road" out of the plant but did not refer to trucks of any kind. Tr. 1978:10-18 (Becka). Elsewhere in his testimony, Mr. Becka explained that heavy shipments have been delivered to a rail head and transported over the road via heavy-haul

vehicle to the Point Beach site. Tr. 1830:12-16 (Becka). Additionally, Mr. Farron's testimony did not state that SNF would be shipped off-site by truck. Tr. 2700:23-2701:16 (Farron).

WE also disputes this proposed finding because Mr. Brewer's conclusion that SNF shipments would likely be shipped off-site in a "truck cask" is speculative and contradicted by the evidence. During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the steam generator to Kewaunee by rail. PFF 263. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic self-propelled transporter to Point Beach. On its way to Point Beach, the heavy-haul vehicle crossed several small bridges without problem. *Id.* The weight of a fully loaded VSC-24 cask is less than the 200-ton weight of the lower piece of the steam generator. PFF 264. In addition to the Kewaunee railhead, there is a railhead at Manitowoc that is also available for heavy-haul shipments in and out of Point Beach. Tr. 2701:8-11 (Farron); Tr. 1830:12-16 (Becka).

550. Moreover, the path to a second rail spur near the Point Beach site contains bridges with weight limits of 80 tons and 105 tons. Tr.5524:20 - 5527:1 (Brewer).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . ."). WE objects to this proposed finding of fact because it is vague. It is vague because the "second rail spur" is undefined and the no route(s) for shipments in and out of Point Beach are identified.

WE objects to this proposed finding of fact because it is outside of the scope of Mr. Brewer's report and the Government never disclosed this expert opinion as required by RCFC 26(a)(2)(B). The strength of bridges relates to civil engineering issues outside the scope of Mr. Brewer's claimed expertise in nuclear engineering. Mr. Brewer offered no proof of the purported bridge limits other than his own testimony.

WE further objects to this proposed finding of fact because Mr. Brewer's testimony is contradictory on this issue. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

WE further objects to this proposed finding of fact because it ignores the evidence that WE successfully moved very heavy objects from railheads to the Point Beach site by heavy-haul vehicle. *See* WE Response to DFF 549.

551. A loaded NUHOMS transportation cask would weigh 140 tons. Tr.5527:2-6 (Brewer).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . . .").

WE objects to this proposed finding of fact as vague and unsupported. Mr. Brewer did not identify his assumptions regarding fuel type and other variables in arriving at a weight of 140 tons. The proposed finding is unsupported because it is based only on Mr. Brewer's unidentified assumptions.

WE further objects to this proposed finding of fact because Mr. Brewer's testimony is contradictory on this issue. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

552. In order to heavy haul a cask to a rail spur, it is necessary to obtain permits to traverse bridges that are not rated for the load of a large, rail cask, and there is no guarantee that these permits will be approved. Tr.5595:22 - 5596:16 (Brewer).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . .").

WE objects to this proposed finding of fact as vague and unsupported. Mr. Brewer did not identify his assumptions regarding fuel type and other variables in arriving at a weight of 140 tons. The proposed finding is unsupported because it is based only on Mr. Brewer's unidentified assumptions.

WE further objects to this proposed finding of fact because Mr. Brewer's testimony is contradictory on this issue. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

WE objects to this proposed finding of fact because it is outside of the scope of Mr. Brewer's report and the Government never disclosed this expert opinion as required by RCFC 26(a)(2)(B). Bridge permit issues also are outside the scope of Mr. Brewer's claimed expertise in nuclear engineering.

WE also disputes this proposed finding of fact as unsupported because it is based only on Mr. Brewer's own testimony without other support.

WE objects to this proposed finding of fact as speculative because there is no evidence establishing that bridge permits would be necessary to transport SNF nor is there any reason in the record for Wisconsin state authorities to deny such permits were they requested. In fact, evidence established that Wisconsin state authorities fully endorsed any means of removing SNF from Wisconsin, including the use of dual-purpose casks. PX 592, p. WISC00012217 ("The [PSCW] . . . encourages WEPCO to consider dual-purpose casks in the future . . . .").

553. There are currently 58 VSC-24 casks loaded and being used to store fuel in the industry. The majority (over 40) of these casks were loaded after the hydrogen ignition and weld cracking events of 1996-1998. The VSC-24 cask license will have to be maintained, and thus renewed, as long as there are VSC-24 casks in use. Tr.5532:14-55:33:4, 5535:12 - 5536:11 (Brewer); DDX 3-25.

**RESPONSE:**

WE objects to this proposed finding of fact because it is misleading. As Mr. Brewer admitted, no more utilities are currently loading VSC-24 casks. PFF 153. As WE established, the bare maintenance of the VSC-24 license is not sufficient reason to load additional VSC-24 casks in light of the VSC-24's severe flaws and drawbacks. PFF 152.

554. Switching to the NUHOMS cask system did not eliminate the concern about hydrogen generation in the VSC-24 cask because the NRC noted hydrogen generation with all welded canisters. Tr.5540:3 - 5541:24 (Brewer); DX 624.

**RESPONSE:**

WE objects to this proposed finding of fact as misleading. Under cross examination, Mr. Brewer admitted that the NRC document required that the VSC-24 cask be vented to prevent combustible hydrogen gas concentrations, but did not require similar venting for the NUHOMS designs because the gas concentration produced by the NUHOMS design was far lower. Tr. 5605:21-5606:3 (Brewer); DX 624. At trial, WE proved that loading a VSC-24 canister produces 10 to 100 times more hydrogen gas than loading a NUHOMS canister. PFF 152e.

555. Loading of the VSC-24 cask is not more labor intensive than loading the NUHOMS cask. Tr.6162:4-13; 6164:23 - 6166:4 (Kiraly); DDX 5-55.

**RESPONSE:**

WE objects to this proposed finding of fact because cask loading is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, App. A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2).

In addition, WE disputes this proposed finding because the evidence established that VSC-24 loading hours were understated because a specific account for cask loading was not set up at Point Beach until the most recent loading campaign of NUHOMS casks. Tr. 1907:3-1908:18 (Becka) (it was "a little bit more difficult to come up with all the costs

that were attributed" to campaigns prior to the establishment of project code 3.0264 for the 2006 loading campaign); Tr. 6307:4-17 (Metcalfe). Even with the differing accounting codes, the evidence showed that it took fewer hours to load a NUHOMS than a VSC-24 on a per assembly basis. Tr. 6304:19-6305:25 (Metcalfe).

556. A typical loading time for the NUHOMS 32PT casks was six days. Tr. 5654:20 - 5655:22 (Brewer); DX 248.

**RESPONSE:**

WE objects to this proposed finding as vague. It is vague because the term "typical" is not defined.

WE further disputes this proposed finding of fact because it is unsupported by the cited evidence and is contrary to the evidence. The document relied upon by Mr. Brewer is part of a group of undated documents labeled as estimates. DX 248. Mr. Brewer provided no basis for his conclusion regarding the meaning of DX 248 other than his own interpretation. Tr. 5655:19-22 (Brewer) ("I mean, that's the, that's what I draw from this."). Mr. Brewer's inference is not credible because WE established through Mr. Becka's testimony that at Point Beach it takes four to five days to load a NUHOMS canister. PFF 152d.

557. The loading time required for the first VSC-24 cask was six days. Tr. 5655:23 - 5658:12 (Brewer); DX 401; DX 404; DX 80.

**RESPONSE:**

WE objects to this proposed finding as irrelevant and misleading. The first VSC-24 loading occurred prior to the hydrogen ignition incident that occurred in 1996. PFF 136. The recovery effort after the hydrogen ignition incident included identifying potential issues that existed in the VSC-24 design, including the generation of explosive hydrogen gas arising from the reaction of the borated water with the carbo-zinc coating. PFF 137. To remedy that problem, during the VSC-24 loading process, the WE loading team had to purge continuously hydrogen gas to prevent gas buildup to an explosive level. *Id.* WE also had to draft revised

loading and unloading procedures to deal with the hydrogen buildup. *Id.* This purge process, among other tasks, resulted in eight to nine days to load a VSC-24 cask. PFF 152d.

558. Furthermore, WEPCO's accounting records demonstrate that the NUHOMS casks took longer than four days to load. Tr.6162:4-13; 6164:23 - 6166:4 (Kiraly); DDX 5-55.

**RESPONSE:**

WE objects to this proposed finding of fact because cask loading is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, App. A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2).

WE disputes this proposed finding of fact because the evidence established that while the actual time to load a NUHOMS canister is between four and five days and that the accounting records may show a longer period of time because of delays related to the operations of the Point Beach nuclear power plant. Tr. 1920:23-1921:6; 1924:6-11 (Becka); 6307:22-6308:18 (Metcalfe).

559. The accounting records show that there were fewer hours recorded the ten days prior to VSC-24 casks numbers 13 through 16 going into service, compared to the four days prior to NUHOMS casks 5 through 9 going into service. On average, more hours were recorded during the time that NUHOMS casks were being loaded, compared to the average hours recorded during the time that VSC-24 casks were being loaded. Tr.6163:22 - 6164:1 (Kiraly); DDX 5-56.

**RESPONSE:**

WE objects to this proposed finding of fact because cask loading is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, App. A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2).

WE disputes this proposed finding of fact because the evidence established that VSC-24 loading hours were understated because a specific account for cask loading was not set up at Point Beach until the most recent NUHOMS loading campaign. Tr. 1907:3-1908:18 (Becka) (it was "a little bit more difficult to come up with all the costs that were attributed" to

campaigns prior to the establishment of project code 3.0264 for the 2006 loading campaign); Tr. 6307:4-17 (Metcalfe). Even with the differing accounting codes, the evidence showed that it took fewer hours to load a NUHOMS than a VSC-24 on a per assembly basis. Tr. 6304:19-6305:25 (Metcalfe).

560. The accounting records actually show that the five NUHOMS casks loaded in 2006 included eight, seventeen, seven, five and eleven days of labor respectively and not the 4.5 days asserted by plaintiff at trial. Tr.6164:23 - 6166:4 (Kiraly); DDX 5-57.

**RESPONSE:**

WE objects to this proposed finding of fact because cask loading is outside the scope of Mr. Kiraly's claimed expertise. PX 862, Kiraly Report, App. A. Further, the Government failed to disclose this expert opinion as required by RCFC 26(a)(2).

WE disputes this proposed finding of fact because the evidence established that, while the actual time to load a NUHOMS canister is between four and five days, the accounting records may show a longer duration of time because of delays related to the operations of the Point Beach nuclear power plant. Tr. 1920:23-1921:6; 1924:6-11 (Becka); 6307:22-6308:18 (Metcalfe). This is illustrated on many dates on chart DDX 5-57 where little, if any, labor was charged on dates included within a loading period. DDX 5-57.

561. Continuing use of the VSC-24 cask is a reasonable technical and engineering decision. Tr.5537:10-19 (Brewer).

**RESPONSE:**

WE objects to this proposed finding of fact because it is outside the scope of the opinion that Mr. Brewer offered in this case. In his expert report, Mr. Brewer's opinion was limited to his conclusion that WE could have continued to use the VSC-24 to store spent fuel. *See* PX 880, p. WXE001 0030. Mr. Brewer's new opinion regarding the reasonableness of Point Beach's continued use of the VSC-24 is completely beyond the scope of his expert report, which dealt only with the alleged minimal technical sufficiency of the VSC-24. *See*

Plaintiff's Motion *In Limine* to Exclude Certain Demonstratives and Any Related Testimony (Dkt. 357, filed Oct. 8, 2007). As such, it should be stricken.

In any case, as discussed in WE Responses to DFF Section XVIII.E (DFF 532-569), WE disputes this opinion. Moreover, Mr. Brewer lacks the expertise to opine on the reasonableness of the use of any particular cask at Point Beach. Tr. 5403:25-5404:4 ("Q: And you . . . also have not designed, constructed, or been involved in the design, construction, licensing, operation or construction of a dry storage cask, right? A: I have not . . ."). Because Mr. Hamal's testimony regarding the VSC-24 cask is not based upon personal knowledge or any testable methodology, his testimony cannot and does not support this proposed finding of fact. *Daubert*, 509 U.S. at 593.

562. Mr. Kiraly determined that WEPCO would have used 19 VSC casks in lieu of the 14 NUHOMS casks that it loaded. DDX 5-51; Tr.6158:1-25 ( Kiraly).

**RESPONSE:**

WE objects to this proposed finding of fact because it relies upon Mr. Brewer's purported opinion that WE should have continued to load additional VSC-24 casks to store SNF at Point Beach. Tr. 6156:21-6157:5 (Kiraly). Mr. Brewer's opinion is unsupported by the evidence and outside the scope of his opinion. *See* WE Response to DFF 532-561. Mr. Kiraly's determination is also invalid because DOE's breach of the Standard Contract was a substantial causal factor in WE's incurrence of costs related to the NUHOMS system. PFF 157. WE also acted reasonably in deciding to utilize dual-purpose casks and in incurring these costs. *Id.*

563. Mr. Kiraly calculated that WEPCO incurred $14,695,1127 million to fabricate and acquire the 19 NUHOMS casks. DDX 5-52; Tr.6159:1-6161:17 (Kiraly).

**RESPONSE:**

WE hereby incorporates its Response to DFF 562.

564. Mr. Kiraly calculated replacement costs of $6,299,325 for VSC-24 casks. DDX 5-53; DDX 5-54; Tr.6159:1-6161:17 (Kiraly).

**RESPONSE:**

WE hereby incorporates its Response to DFF 562.

WE further disputes this proposed finding because Mr. Kiraly's estimate was based upon inadequate data. Under cross-examination, Mr. Kiraly admitted that he did not account for the extreme price escalation in steel that occurred in the early 2000s. Tr. 6234:7-10 (Kiraly).

565. Thus, Mr. Kiraly adjusted plaintiff's claim by $8,395,802 which represented the costs incurred by WEPCO for fabrication of the NUHOMS system minus the cost of the VSC-24 casks needed to store the same amount of fuel. Included in the $8,395,802 is $238,337 for fixed labor, A&G, and employee costs that are associated with the NUHOMS system. DDX 5-58; Tr.6167:2-9 (Kiraly); DX 625 (Attachment 10, WXE 0220148 – WXE 0220157); DX 625 (Attachment 1-a-4.4, WXE 0220016).

**RESPONSE:**

WE hereby incorporates its Response to DFF 562.

### 2. WEPCO'S Efforts To License The VSC-24 Cask For Transportation

566. When WEPCO purchased the VSC-24 cask system, it was licensed for the storage of SNF only, under 10 CFR Part 72. Tr. 1778:19-22 (Becka). In 2002, BNFL proposed that it license the VSC-24 cask system for transportation under 10 CFR Part 71. Tr.1834:18-1835:5 (Becka), PX 633. WEPCO pursued this effort, and the license amendment request is currently being reviewed by the NRC. Tr.1837:20-1838:3 (Becka).

**RESPONSE:**

WE does not dispute this proposed finding of fact. WE disputes the Government's reliance on PX 633. The correct exhibit concerning Mr. Becka's testimony at 1834:18-1835:5 is PX 639.

567. It is not known if DOE will accept the transportable VSC-24 canister. If DOE does not accept that canister, the cost that WEPCO paid to obtain the transportation license is not a cost savings. WEPCO did not need a transportable VSC-24 canister in order to store fuel. Tr.1971:1-18, 1972:6-9 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact as speculative because there is no evidence establishing any reason for the NRC to deny license approval for dual-purpose casks to transport SNF. WE further notes that the Government's own expert, Mr. Brewer, believed that it was reasonable to spend money on making the VSC-24 transportable because the amount of money to do so was not very large. Tr. 5627:3-14 (Brewer).

568. If WEPCO were to ship fuel off site, the only method available is by road. Licensing the VSC-24 canisters for transportation provides no benefit if the large, rail casks cannot be removed from the site. It is less risky to wait to license the VSC canisters until it is determined whether the large casks can be transported off-site. Tr.5654:4-20 (Brewer); Tr.1978:12-18 (Becka).

**RESPONSE:**

WE objects to this proposed finding as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . . .").

WE further objects to this proposed finding of fact because Mr. Brewer's testimony is contradictory on this issue. Mr. Brewer admitted that that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

WE disputes this proposed finding because the Government has failed to establish the factual predicate of the proposed finding. The proposed finding states that the VSC-24 canisters would have to be transported by "large, rail casks" and questions whether such large cask could be used at Point Beach. This ignores that there is no evidence that the VSC-24 canister is not suitable for transport by heavy haul vehicle.

WE disputes this proposed finding of fact because it is contradicted by the evidence. During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the steam generator to Kewaunee by rail. From there, Morrison Knudsen

moved the lower piece by multi-axle hydraulic self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul crossed some small bridges without problem. PFF 263. The weight of a fully loaded VSC-24 cask is less than the 200-ton weight of the lower piece of the steam generator. PFF 264.

WE further notes that the Government's own expert, Mr. Brewer, believed that it was reasonable to spend money on making the VSC-24 transportable because the amount of money to do so was not very large. Tr. 5627:3-14 (Brewer).

569. Mr. Kiraly has adjusted plaintiff's damages claim for the effort to license the VSC-24 cask for transportation by removing $383,037 which was the amount paid by WEPCO to BNFL. Tr.6167:2-9 (Kiraly); DDX 5-58; DX 625 (Attachment 10, WXE 0220148 – WXE 0220157); DX 625 (Attachment 1-a-4.4, WXE 0220016).

**RESPONSE:**

WE objects to this proposed finding of fact because the cited testimony relies upon Mr. Brewer's purported opinion that WE should not have spent funds on licensing the VSC-24 for transportation. Tr. 6156:21-6157:7 (Kiraly). Mr. Brewer's opinion on this subject is contradictory and unsupported by the trial record. *See* WE Response to DFF 566-568. WE's expenditures in support of licensing the VSC-24 for transportation are reasonable based on the potential benefits of that capability in avoiding the repackaging of the spent fuel assemblies. PFF 152b.

## XIX. ISSUES RELEVANT TO INDIVIDUAL COSTS IN WEPCO'S CLAIM

### A. Internal Labor Costs

For the convenience of the Court, WE sets forth here its General Objections to the main contentions in Section XIX.A.

**GENERAL OBJECTIONS TO SECTION XIX.A (DFF 570-586):**

WE used internal labor to perform various work activities in connection with the dry storage project (just as it has used and does use internal labor in work on other projects and as