is typical in the regulated utility industry). Internal labor was used where feasible because these employees were more reliable, better trained, more familiar with Point Beach, and less expensive than outside labor.

At trial, WE established all of its damages, including its internal labor costs, to a reasonable certainty. *See*, *e.g.*, PTB 69-75; PFF 231-242. All of the costs at issue, including the internal labor charges, were fully supported by WE's books and records. *See*, *e.g.*, Tr. 1734:25-1735:24; 1743:16-1745:6 (Becka); Tr. 2028:1-16 (Holzmann); Tr. 2883:7-17 (Straub); Tr. 4605:19-4606:4 (Metcalfe); PFF 238. WE further demonstrated, through the testimony of Ms. Ione Straub, Senior Cost Specialist for WE's Nuclear Department from 1990 to 2002, as well as the testimony of its damages experts, Messrs. Metcalfe and Sieracki, that the internal labor costs that it claimed were established to a reasonable certainty. In addition, nearly all of these costs (or the underlying activities) have already been approved by the PSCW, which merits consideration. *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249, 269, 292 (2006). The Government also conducted extensive audit verification activities, including review of sample timecards for labor charges. PFF 234.

Nevertheless, the Government's damages expert, Mr. Kiraly, continues to question nearly $3.5 million in damages in internal labor costs, alleging that these costs lack sufficient detail for Mr. Kiraly to apply his "50 percent standard" and disallowing these costs before even applying his standard.[31] Kiraly DDX 5-18; Tr. 6121:24-6122:14, 6123:19-6124:4, 6127:21-6128:9, 6194:2-11 (Kiraly). Mr. Kiraly's position is contrary to the Joint Stipulation Regarding Accuracy of Plaintiff's Costs, in which the parties stipulated that all costs included in "WE's claim were incurred by WE and are traceable to and supported by WE's accounting

[31] Under his 50 percent standard, Mr. Kiraly disallowed all labor charges relating to any salaried employee unless the salaried employee charged more than 50 percent of his or her time to a dry storage project number during the entire period from April 1999 through December 2005. PX 862, pp. 11-13 (June 2006 Kiraly report); Tr. 6194:2-20 (Kiraly). The Court has rejected Mr. Kiraly's proffered standard (or similar standards) on prior occasions. *See, e.g.*, *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 539-40 (2006), *appeal dismissed*, 188 Fed. Appx. 1004 (2006); *Carolina Power & Light Co.*, 2008 WL 2154103 at *26.

records," including "labor costs." Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007).

It is appropriate that WE, a regulated utility, recover the cost of its internal labor expended in activities resulting from the Government's contract breach. Regulated public utilities, such as WE, are cost-conscious and minimize staff at nuclear plants for safe and reliable plant operation. Second, WE's dry storage project, a large, complex project, required extensive planning and staffing, by outside contractors, internal labor or a combination of both. If WE personnel are performing work resulting from DOE's contract breach, these personnel are necessarily not available to perform other work for the benefit of WE and its ratepayers. But for the dry storage project, WE's internal labor would have performed other work, for which they were hired and for which they were paid. Tr. 4607:13-4608:4 (Metcalfe); Tr. 2007:25-2015:17 (Holzmann); Tr. 1747:15-1754:19 (Becka); PX 376 (Feb. 1995 Draft Training Roster); PFF 240.

In addition, public service commissions typically permit regulated public utilities to recover their internal labor costs. It also is typical to recover the cost of internal labor in Government contract work. Under the Standard Contract, the Government can recover its internal labor costs. Finally, WE's use of internal labor results in lower costs than would the use of outside contractors. Thus, recovery of internal labor costs will incentivize utilities to continue to use such lower-cost internal labor in future dry storage work whenever appropriate – further mitigating the cost to DOE for its breach. Tr. 4605:2-4611:19, 4620:19-4621:25 (Metcalfe); PDX 61-Metcalfe 19 (Determination of Individual Damages Elements Reasonableness of WE Internal Labor); PFF 239.

570. WEPCO pays its salaried employees regardless of the project on which they are working. If a salaried employee with available free time worked on an internal project, there would be no additional costs to WEPCO for the work that person performed. Tr.4797:4-20; 4784:22 - 4785:2; 4787:13-4788:1 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding of fact because it is misleading and takes the testimony of WE's damages expert, Mr. Metcalfe, out of context. The Government ignores that Mr. Metcalfe testified that the above statements would be true if the employees were working on projects that benefit the company. The dry storage work, however, was not a project that was performed by WE's choice and for its benefit. To the contrary, that work was forced on WE by DOE's partial breach of the Standard Contract. Thus, WE had to redirect its limited resources from tasks that were not caused by DOE's breach to those tasks directly caused by DOE's breach. Thus, WE was performing work for the benefit of DOE. Tr. 4797:4-20; 4784:22 - 4785:2; 4787:13-4788:1 (Metcalfe); Tr. 3010:11-22 (Straub).

571. Plaintiff produced no evidence demonstrating that its salaried employees were hired to replace employees working on the dry fuel storage project. There was also no documentation produced to demonstrate that WEPCO employees were moved from one project to another to backfill for the dry fuel storage project. There was no documentation identifying requests for personnel from one department to assist another department in covering a shortfall of work allegedly caused by the spent nuclear fuel project. In fact, WEPCO did not perform a search for these types of departmental documents in response to the Government's requests. Tr.2942:11-21; 2943:3-7 (Straub); Tr.4785:3-19; 4800:5-12 (Metcalfe); Tr.6129:7-23 (Kiraly); DDX 5-19.

**RESPONSE:**

WE objects to this proposed finding of fact. There is no requirement for WE to provide the type of documentation envisioned by this proposed finding in order to recover its internal labor costs. Instead, the test is whether the use of WE personnel on the dry storage project deprived WE of the ability to employ those resources on other projects. *Tennessee Valley Auth.*, 69 Fed. Cl. at 539. *See also* WE PTB 73-75 (and additional citations therein). Clearly, it did so.

WE further objects to this proposed finding as misleading. Ms. Straub simply testified that she did not know if any documentation existed to support an employee being

hired for a specific project. There was no testimony that she did not search for the documentation. Tr. 2942:22-2943:7 (Straub).

572. WEPCO could not identify any projects that the company would have pursued but did not because it was occupied by activities related to the partial breach. There is no documentation in the record to demonstrate that projects were not completed because they were deferred or delayed, and no evidence showing that employees could not accomplish other project work along with the dry fuel storage project. Tr. 1875:4-9; 1876:4-9; 1922:24-1923:6; 1955:24-1956:5 (Becka); Tr. 6135:7-19 (Kiraly).

**RESPONSE:**

WE objects to this proposed finding of fact as immaterial. As WE's damages expert, Mr. Metcalfe, explained, no such documentation or analysis is necessary for the claimed WE internal labor costs to be awarded. Tr. 4797:21-4798:1 (Metcalfe). In addition, WE refers the Court to its Response to DFF 570-571. Moreover, this proposed finding evidences a misunderstanding regarding how nuclear power plants operate and the regulatory environment in which they do so. It is typical to have backlog of maintenance and other work orders at nuclear power plants for work which needs to be performed. When WE employees are working on activities related to the DOE breach, they are not able to perform other maintenance activities. Tr. 4494:11-25 (Metcalfe); Tr. 2007:25-2009:10 (Becka); Tr. 2876:18-24 (Straub). The relevant testimony at trial was that, but for the dry storage project, WE's personnel would have performed other work, for which they were hired and for which they were paid. Tr. 4607:13-4608:4 (Metcalfe); Tr. 2007:25-2015:17 (Holzmann); Tr. 1747:15-1754:19 (Becka).

573. WEPCO provided no analysis to demonstrate that it was deprived of the ability to employ salaried personnel who were determined to be non-incremental. For example, personnel working on the loading campaigns also performed other jobs. There were times during the loading campaigns when crews assigned to the loading campaign would be assigned to other work in the plant. In fact, during the 2006 loading campaign, staff from the loading crews assisted with the control room emergency filtration system. Tr. 1875:4-9; 1876:4-9, 1922:24-1923:6, 1955:24-1956:5 (Becka); Tr. 6135:7-19 (Kiraly).

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

In addition, WE objects to this proposed finding of fact because it is inaccurate. The relevant testimony at trial was that, but for the dry storage project, WE personnel would have performed other work, for which they were hired and for which they were paid. Tr. 4607:13-4608:4 (Metcalfe); Tr. 2007:25-2015:17 (Holzmann); Tr. 1747:15-1754:19 (Becka). In addition, WE refers the Court to its Response to DFF 570-571.

574. At times, the dry fuel storage project only utilized internal employee assistance, when those personnel were available and had no other work to perform. Otherwise, outside contractors were used. In these instances, the dry fuel storage project was able to actively utilize otherwise unutilized personnel. Tr.1904:24-1906: 23 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact because it is inaccurate. Mr. Becka did not testify in the manner suggested by the Government's proposed finding. To the contrary, Mr. Becka testified that a planning contractor used for the 2004 loading campaign was not needed for the 2006 loading campaign because WE had performed a NUHOMS cask loading in 2004 and not as much planning assistance was required for the 2006 campaign given the experience that WE had gained during the 2004 campaign. Mr. Becka never stated that "the dry fuel storage project was able to actively utilize otherwise unutilized personnel."

575. Once the SNF loading campaigns were completed, WEPCO did not fire the employees who participated in the loading. Tr.1948:24-1950:13 (Becka).

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

WE objects to this proposed finding of fact as immaterial as explained in its Responses to DFF 570-571. In addition, the proposed finding is inaccurate to the extent that it suggests the internal labor costs are not recoverable. *See* PFF 238-242; WE PTB 72-75.

576. Mr. Becka is the senior engineer in charge of the dry fuel storage project whose position was created because of the dry fuel storage project. He would still have been retained by NMC if the dry fuel storage project had not been implemented. Tr.1948:24-1950:13 (Becka).

**RESPONSE:**

WE objects to this proposed finding of fact as unsupported by the evidence and speculative. Mr. Becka testified that he did not know whether he would have been terminated if the dry storage project did not exist and that he potentially could have been let go or transferred to another position within the organization. Tr. 1948:24-13 (Becka).

577. The nuclear power department staffing, especially engineers and operations and maintenance personnel, increased significantly from July 1990 through the 2000s. The increased staffing was primarily due to the fact that Point Beach was an aging plant. Tr.2876:8-24 (Straub).

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

578. WEPCO conducted no analysis to determine if the overall headcount of salaried personnel changed over time. Tr.2929:19-2930:10; 2934:20-23; 2937:7-10; 2938:11-20; 2950:3-20 (Straub); Tr.4788:16-4789:3 (Metcalfe); DX 332; DX 322.

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

In addition, WE objects to this proposed finding of fact as misleading. As WE's damages expert, Mr. Metcalfe, explained, no headcount analysis is necessary for the claimed WE internal labor costs to be awarded. Tr. 4789:21-4790:2 (Metcalfe). In addition, WE refers the Court to its Responses to DFF 570-571.

579. WEPCO did not demonstrate that it experienced any increase in salaried labor as a result of DOE's delay in accepting SNF from Point Beach. The ledger reports that WEPCO produced did not contain detailed hours and amounts per employee. It did not indicate the actual services provided by the salaried staff, nor did it disclose the extent to which most of the employees were committed to the dry fuel storage project. Tr.2928:14-2929:18 (Straub); Tr.6125:3-10; 6125:21 - 6126:1; 6200:24 - 6201:8 (Kiraly); DDX 5-16; DDX 5-17; DX 337.

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

WE also objects to this proposed finding of fact as immaterial and misleading. As explained by WE's damages expert, Mr. Metcalfe, no such showing is required to recover the claimed internal labor costs. Tr. 4789:21-4790:2 (Metcalfe). In addition, WE provided numerous sample time cards that allowed Mr. Kiraly to determine that it was reasonable that the labor costs had been recorded to dry fuel storage accounts. Thus, the Government's discussion of ledger reports is misleading. Tr. 6122:22-6123:8 (Kiraly). *See also* PFF 238-242 and WE PTB 72-75.

580. Beyond limiting its inclusion of labor charges to time charged to those projects considered to be partial breach-related, plaintiff made no effort to distinguish between the labor charges that it incurred which were incremental to any partial breach from those that were not. Tr.6195:10-12 (Kiraly).

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

WE also objects to this proposed finding of fact as inaccurate. The labor costs charged to the dry storage project were all costs caused by DOE's failure to perform under the Standard Contract. There was no reason to further investigate these costs. As WE's damages expert, Mr. Metcalfe, explained, all labor charges that should not have been incurred but for DOE's breach are incremental and should be recovered as damages. If a WE employee worked on a project caused by DOE's breach (and the dry storage project is such a project), WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe). *See also* PFF 238-242; WE PTB 72-75.

581. The proper method for determining whether an internal labor charge is incremental is to conduct an analysis to determine what amount of claimed costs associated with internal labor has resulted in economic harm to the company. Tr.6126:14-16, 6121:11-16, 6195:1–12 (Kiraly). Not all work that a company's labor force performs because of a breach results in economic harm to the company. Id.

**RESPONSE:**

WE objects to this proposed finding of fact as a conclusion of law, not a finding of fact. Further, WE disagrees with the Government's proffered conclusion of law. In several decisions, this Court has wholly rejected the 50 percent standard proposed by the Government's expert, Mr. Kiraly. Instead, the Court has endorsed the standard articulated by WE's damages expert, Mr. Metcalfe, namely, that all labor charges that were properly incurred and recorded for work caused by the DOE's breach are incremental and should be recovered as damages. *See* WE PTB 73-75 (and citations therein). *Northern States* 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 440-443. If a WE employee worked on the dry storage project that was caused by DOE's delay, WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe).

Further, Mr. Kiraly disallowed nearly $3.5 million in internal labor costs because of allegedly inadequate documentation before even applying his 50% analysis. This purported disallowance is ill-founded for the reasons stated in WE's General Objections to Section XIX.A (DFF 570-586).

582. To determine the amount of WEPCO's labor charges that were incremental to the breach, Mr. Kiraly analyzed the labor data produced by the plaintiff and isolated those salaried employees who never worked more than half of their time on a breach-related project in any given year. As a conservative measure, Mr. Becka and Mr. Rogers were included as incremental labor costs because they spent a majority of their time on the project. The dry fuel storage group consists of Mr. Becka and Mr. Rogers, a senior engineer that reports to Mr. Becka. Tr.1712:3-6 (Becka); Tr.6130:9-14; 6130:20 - 6131:2; 6197:22 - 6198:4 (Kiraly).

**RESPONSE:**

WE objects to this proposed finding of fact as a conclusion of law, not a finding of fact. Further, WE disagrees with the Government's proffered conclusion of law. In several decisions, this Court has wholly rejected the 50 percent standard proposed by the Government's expert, Mr. Kiraly. *See* WE PTB 73-75. Instead, they have endorsed the standard articulated by WE's damages expert, Mr. Metcalfe, namely, that all labor charges

that were properly incurred and recorded for work caused by the DOE's breach are incremental and should be recovered as damages. If a WE employee worked on the dry storage project that was caused by DOE's delay, WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe).

WE further objects to this proposed finding because it inaccurately describes Mr. Kiraly's methodology. Under Mr. Kiraly's approach, WE would only recover the labor costs when one of its salaried employees worked more than half their time on a breach-related project during *the entire period* from 1999 through February 2007, *not* in each given year as asserted in this proposed finding. There would have been many more WE personnel that Mr. Kiraly would have deemed "incremental" had he applied his 50 percent standard to each given year. In addition to being rejected by this Court in prior decisions, there also is no treatise or peer review study that supports Mr. Kiraly's analysis. Tr. 6193:19-6194:20; 6197:6-18; 6198:20-6199:1 (Kiraly).

583. Mr. Kiraly determined that the WEPCO employees who were incremental to the partial breach average nearly 1300 hours per year, or 32 weeks per year, while those determined to be non-incremental average only 42 hours a year, or one week a year. The data and analysis trend indicates that the non-incremental WEPCO employees performed other tasks, and, therefore, the company did not incur any additional costs because they worked on the dry fuels storage project. Tr.6131:22-6132:12 (Kiraly); DDX 5-20; DDX 5-21; DDX 5-22; DX 625 (Attachment 2-a-3.1, WXE 0220030 – WXE 0220037).

**RESPONSE:**

WE objects to this proposed finding of fact as a conclusion of law, not a finding of fact. Further, WE disagrees with the Government's proffered conclusion of law. In several decisions, this Court has wholly rejected the 50 percent standard proposed by the Government's expert, Mr. Kiraly. *See* WE PTB 73-75 (and citations therein). Instead, they have endorsed the standard articulated by WE's damages expert, Mr. Metcalfe, namely, that all labor charges that would not have been incurred but for DOE's breach are incremental and should be recovered as damages. If a WE employee worked on the dry storage project that

was caused by DOE's delay, WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe).

584. Mr. Kiraly opined, as an expert in the analysis of economic damages, that, in the absence of any proof of foregone opportunities, WEPCO did not incur economic harm merely because a portion of its salaried work force was required to perform, on average, two additional hours of work per week upon breach-related projects. Tr.6131:22-6232:12 (Kiraly).

**RESPONSE:**

WE objects to this proposed finding of fact as a conclusion of law, not a finding of fact. Further, WE disagrees with the Government's proffered conclusion of law. In several decisions, this Court has wholly rejected the 50 percent standard proposed by the Government's expert, Mr. Kiraly. *See* WE PTB 73-75. Instead, they have endorsed the standard articulated by WE's damages expert, Mr. Metcalfe, namely, that all labor charges that would not have been incurred but for DOE's breach are incremental and should be recovered as damages. If a WE employee worked on the dry storage project that was caused by DOE's delay, WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe).

WE further objects to this proposed finding of fact because the cited Kiraly testimony supports the position taken by the Government in DFF 583, but does not support this proposed finding.

585. Mr. Kiraly made no adjustment for labor costs associated with hourly employees or for overtime pay. Tr.6121:7-17 (Kiraly).

**RESPONSE:**

WE has no objection to this proposed finding of fact.

586. Mr. Kiraly adjusted plaintiff's claim for internal labor costs to deduct $5,572,636 of non-incremental internal salaried labor costs, corresponding to the amount of work performed by employees who never worked more than half their time on breach-related project activities. In Mr. Kiraly's expert opinion, this amount reflects a "reasoned estimate" of the portion of the approximately $9.2 million in labor charges included in plaintiffs' damage claim that would have been incurred in the absence of a partial breach by DOE. DDX 5-24. Of the $5,572,636, there is $3,426,451 of salaried labor that could be disallowed

for other reasons as well: for example, $3.3 million relates to the fixed labor costs incurred prior to loading the fifth cask, and $73,000 relates to the TN-32B cask. Tr.6134:6-16 (Kiraly); DDX 5-24.

**RESPONSE:**

WE incorporates its General Objections to Section XIX.A (DFF 570-586).

WE also objects to this proposed finding of fact as a conclusion of law, not a finding of fact. Further, WE disagrees with the Government's proffered conclusion of law. In several decisions, this Court has wholly rejected the 50 percent standard proposed by the Government's expert, Mr. Kiraly. *See* WE PTB 73-75. Instead, they have endorsed the standard articulated by WE's damages expert, Mr. Metcalfe, namely, that all labor charges that would not have been incurred but for DOE's breach are incremental and should be recovered as damages. If a WE employee worked on the dry storage project that was caused by DOE's delay, WE should recover that labor cost. Tr. 4783:16-4784:8 (Metcalfe). *See also* PFF 238-242.

WE further objects to this proposed finding because its description of Mr. Kiraly's methodology is misleading. Under Mr. Kiraly's approach, WE would only recover the labor costs when one of its salaried employees worked more than half their time on a breach-related project during *the entire period* from 1999 through February 2007. In contrast, this proposed finding suggests that, if there was a lesser period of time during which an employee worked more than half his time on a breach-related project, Mr. Kiraly would have allowed that cost. He did not do so. If he had, there would have been many more WE personnel that Mr. Kiraly would have deemed "incremental." Tr. 6193:19-6194:20; 6197:6-18 (Kiraly).

**B. Employee Expenses**

587. Employee expenses, e.g., travel expenses and meals, were reviewed to ensure that they were incurred as a result of the partial breach and to ensure that there were corresponding recorded hours for the employee charging expenses. Tr.6136:19 – 6137:3 (Kiraly); DDX 5-26.

**RESPONSE:**

WE objects to this proposed finding of fact because, as WE's damages expert testified, it is unnecessary to audit each individual employee expense item. Tr. 3852:19-3854:4 (Sieracki). These employee expenses were reviewed and approved by a supervisor or a supervisor's designee prior to the any reimbursement payment. These employee expenses then were charged to specific dry cask storage projects or accounts that knowledgeable WE personnel had determined included costs caused by DOE's impending breach. Tr. 2910:12-2915:17 (Straub); Tr. 4519:19-4520:19 (Metcalfe); Tr. 3779:5-3781:12 (Sieracki); PX 231; 794, p. 12 (May 2006 Damages Report); PDX 60–Sieracki 38.

The fact that these costs were charged to these accounts containing costs provides a reasonable basis for including them in the claim because the costs of regulated public utilities are subject to vigorous review by state regulatory commissions and by FERC. As a result, public utilities traditionally have excellent cost accounting controls and practices. Indeed, Mr. Metcalfe testified that public utilities are the most regulated industry in the United States. Mr. Metcalfe confirmed that the WE accounting controls were equal to and in some respects stronger than other regulated utilities. In the case of WE, its costs accounting is subject to review by two regulatory commissions, the PSCW and the Michigan Public Service Commission. Yet another control exists in that, since 2000, NMC has operated plants for several utilities, and naturally no utility wants to be charged for an item that does not pertain to its plant(s). Tr. 4519:19-4520:19; 4527:11-4528:1; 4545:23-4551:22 (Metcalfe); Tr. 690:9-696:15 (Zabransky); Tr. 2744:7-2745:15 (Anundson); PX 87 (May 8, 1995 Email from Anundson re: WE labor hours).

In addition, as discussed in PFF 235, the parties executed a Joint Stipulation Regarding Accuracy of Plaintiff's Costs. The Government has stipulated that the employee expenses included in WE's claim were incurred by WE and are traceable to and supported by

WE's accounting records. Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007).

No further showing is required for WE to recover the employee expenses that it incurred. *See, e.g.*, Tr. 3851:19-3854:4 (Sieracki).

588. There was no showing at trial by WEPCO that any employee expenses were incurred as a result of DOE's delay in accepting SNF from Point Beach.

**RESPONSE:**

This proposed finding of fact is inaccurate. WE did establish that the employee expenses were incurred as a result of DOE's impending breach of contract. The employee expenses included in the claim were charged to specific dry cask storage projects or accounts that knowledgeable WE personnel had determined included costs caused by DOE's impending breach. Tr. 2910:12-2915:17 (Straub); Tr. 4519:19-4520:19 (Metcalfe); Tr. 3779:5-3781:12 (Sieracki); PX 231; 794, p. 12 (May 2006 Damages Report); PDX 60–Sieracki 38. These employee expenses then were reviewed and approved by a supervisor or a supervisor's designee prior to the any reimbursement payment. Thus, it was appropriate to include these costs in WE's claim for the reasons set forth in its Response to DFF 587.

In addition, as discussed in PFF 235, the parties executed a Joint Stipulation Regarding Accuracy of Plaintiff's Costs. The Government has stipulated that the employee expenses included in WE's claim were incurred by WE and are traceable to and supported by WE's accounting records. Joint Stipulation Regarding Accuracy of Plaintiff's Costs, Dkt. 350 (Sept. 21, 2007).

589. Employee expense costs should not be allowed if there are no corresponding recorded hours for the employee charging expenses. Tr. 6137: 7-18 (Kiraly); DDX 5-26.

**RESPONSE:**

WE objects to this proposed finding of fact as inaccurate for the reasons expressed in its Response to DFF 587.

Further, WE objects to this proposed finding as irrelevant because whether an employee has hours charged to a project may not have any bearing on whether that employee has expenses charged to that project.

590. Mr. Kiraly adjusted plaintiff's claim by $84,127, which represents employee expenses claimed by plaintiff that are not related to personnel working on a partial breach-related project. Of the $84,127, there are $18,910 of employee expenses that could be disallowed for other reasons as well. Tr. 6138:2-15 (Kiraly); DDX 5-27; DX 625.

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed employee expenses are not recoverable for the reasons set forth in its Response to DFF 587.

**C. Payroll Adjustments**

591. The Kenrich Group applied a payroll adjustment (or an adder) to the labor recorded in WEPCO's MSA accounting system to include amounts for pensions and benefits that were not included in the labor rates. The payroll adjustments are tied to the underlying recorded labor. DX 393 at 14 (WXE010 0017); Tr.6138:16-6139:6 (Kiraly); PX 1047.

**RESPONSE:**

WE does not dispute this proposed finding of fact.

592. Mr. Kiraly opined, as an expert in analysis of economic damages, that, if the underlying labor during the MSA accounting time period is questioned and removed based upon litigation opinions, all the payroll adjustments should be removed as well. Tr.6138:16 – 6139:6 (Kiraly); DX 625 (Attachment 4-b, WXE 0220070).

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed internal labor costs, including payroll adjustments, during the MSA accounting time period are not recoverable. Such costs are recoverable. See PFF 242; WE PTB 75.

593. Plaintiff claimed $536,444 in payroll adjustments all of which are questionable. Therefore, the entire $536,444 should be removed from plaintiff's claim. Tr.6138:16 – 6139:6 (Kiraly); DDX 5-6; DX 625 (Attachment 4, WXE 0220068).

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the payroll adjustments are not recoverable. As discussed in PFF 242, WE is entitled to recover these costs as part of its recovery of its internal labor costs. *See also* WE PTB 75.

**D. Overhead Costs**

594. Administrative and General ("A&G") costs are corporate level costs have not changed as a result of the DOE's delay in accepting SNF from Point Beach. The Kenrich Group included A&G costs in WEPCO's damages claim. Tr.6139:24-6140:5, 6141:15-6142:11 (Kiraly).

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable. WE's damages expert, Mr. Metcalfe, testified that under the circumstances of this case, corporate level costs are fair and reasonable to be included in damages. Tr. 4808:6-11 (Metcalfe). It is appropriate that WE recover its overhead costs. Overhead costs are real costs to WE and are actually incurred by WE. WE is not being made whole if it does not recover the overhead costs allocable to WE's spent fuel storage activities at issue. It also is normal practice to identify the overhead costs and allocate them in a fair, reasonable and objective manner to cost objectives. Recovery of overhead costs also is typical in Governm( contracts under the Federal Acquisition Regulations and the Cost Accounting Standards and in Government contract claims. The Government also includes such costs in determining its recoverable costs under the uranium enrichment contracts and in determining recoverable Government costs under the Standard Contract. Public service commissions also typically permit regulated public utilities to recover such costs. In addition, the PSCW requires that WE bill allowable overhead costs to nonutility affiliates to ensure that the ratepayers are not subsidizing work performed for the benefit of outside parties. It is proper for WE to include overhead costs in its damages sought from DOE because the work performed related to dry storage at Point Beach was done because of and, in

essence, for DOE, and not for the benefit of the ratepayers. Finally, permitting a utility to recover its A&G costs also incentivizes the utility to continue to perform work resulting from the Government's breach with internal labor, which is less expensive than using outside contractors. Tr. 4613:19-4621:25 (Metcalfe); PDX 61-Metcalfe 20 (Determination of Individual Damages Elements Reasonableness of WE Overheads); PX 1047 (Kenrich Trial Damages Binder); PX 1043.1 (PSCW Order); PX 1043.2 (WE Energies Policies & Procedures); Tr. 2885:8-2899:17; 3008:19-3010:22 (Straub).

595. A&G costs include costs that do not change as a result of DOE's failure to perform beginning in 1998, such as office supplies, office space, and office furniture. The A&G costs also include the costs of buildings and the expense of buildings which WEPCO would have regardless of the partial breach. The expenses related to these buildings would not change if DOE performed, and there was no evidence in the record that WEPCO would have sold the buildings had the dry fuel storage project not existed. WEPCO would still need the buildings to operate its company. The A&G costs also include depreciation expenses for Washington Gas, which would have been incurred regardless of the partial breach and, therefore, are not claimable as damages. Any changes in the A&G rates from 2000 to 2001 were the result of the PSCW allowing WEPCO to include additional cost items in the A&G pool. Tr.2968:7-11; 2968:12 – 2969:6; 2976:7-10; 2977:7-17; 2980:12 - 2981:9; 2984:1-5 (Straub); Tr.4808:25 - 4809:5, 4814:6-17, 4815:7-19, 4816:9-20 (Metcalfe); Tr.6140:6–6141:10 (Kiraly); DDX 5-29; DDX 5-30 & 5-31; DX 338.

**RESPONSE:**

WE objects to the use of Ms. Straub's testimony as supporting the proposed statements in DFF 595. Ms. Straub testified that no study or analysis was performed concerning whether the A&G costs had changed as a result of DOE's breach:

> (Q. Now, Ms. Straub, you don't know if the A&G costs would have been different if DOE had begun picking up fuel from Point Beach in 1998, do you?
>
> A. No, I don't. Q. To your knowledge, no analysis was performed to determine if any of the project support cost would be different had DOE begun performance, correct? A. That's correct.
>
> Q. You haven't done any analysis to evaluate how the A&G costs of WEPCO changed as a result of having to engage in the dry fuel storage project, correct?

A. I haven't. However, that would never have been a practice in any of the invoices or claims to any other nonutility affiliate or third party.)

Tr. 2968:7-24 (Straub).

(Q. You didn't do any study to determine if the costs changed in these pools as a result of the DOE not performing in 1998, did you?

A. No.)

Tr. 2976:7-10 (Straub).

These testimony citations do not confirm that the A&G costs were unchanged as a result of DOE's failure to perform by 1998. WE disputes this proposed finding of fact to the extent that it suggests that the claimed A&G costs are not recoverable. As previously discussed in PFF 244 and WE Response to DFF 594, these A&G costs are properly recoverable.

596. The A&G costs in the claim are not recorded to the project level on WEPCO's books and records, nor are they managed by the project administrators. Thus, claiming them at the project level, as WEPCO does in its damages claim, is inconsistent with company practices. The company's practice of recording A&G as a period cost, and not allocating them to the project level, is consistent with GAAP. Thus, by claiming costs at the project level in the damages claim, the claim is inconsistent with GAAP. Tr.2951:6-13 (Straub); Tr. 4614:20-4615:1, 4807:22-4808:5, 4812:10-17 (Metcalfe); Tr.6139:24-6140:5; 6185:23-6186:20 (Kiraly); DDX 5-29.

**RESPONSE:**

WE objects to the use of Mr. Metcalfe's testimony as supporting the proposed statements in DFF 596. The listed testimony citations for Mr. Metcalfe do not support the proposed statements in DFF 596. Mr. Metcalfe's cited testimony discusses (1) spreading allocable costs to WE internal labor, (2) that using PSCW approved budgeted A&G rates was appropriate, and (3) how the A&G rates used in the claim increase the claimed cost for labor. WE objects to this proposed finding of fact because it is not necessary for claimed costs to be recorded at a project level to be recoverable. The way the company tracks costs for business purposes is not relevant as to which costs to include in a damages claim. In addition, when

WE does work for someone outside the company, it charges out all its A&G costs, as approved by the PSCW. Tr. 2885:8-24 (Straub).

597. For claim purposes, the Kenrich Group, plaintiff's experts, applied the A&G costs to WEPCO's internal labor, thereby increasing the claim for labor to reflect overhead. Tr.2951:6-13 (Straub); Tr.4614:20-4615:1, 4807:22-4808:5, 4812:10-17 (Metcalfe); Tr.6139:24-6140:5; 6185:23-6186:20 (Kiraly); DDX 5-29.

**RESPONSE:**

WE objects to this proposed finding of fact because the cited testimony from Mr. Kiraly and DDX 5-29 (Mr. Kiraly's demonstrative) do not support the statement. The cited testimony from Mr. Kiraly discusses A&G on the corporate level and that A&G costs are a period cost which are not allocated to the projects. WE also objects to the use of some of Mr. Metcalfe's testimony as supporting the proposed statements in DFF 597. The first two listed testimony citations for Mr. Metcalfe do not support the proposed statement in DFF 597. Mr. Metcalfe's testimony from the first two citations discusses spreading allocable costs to WE internal labor and that using PSCW-approved budgeted A&G rates was appropriate.

Further, WE disputes this proposed finding of fact because the cited testimony from Ms. Straub does not support the statement. Ms. Straub's cited testimony only confirms that A&G costs were never allocated to the projects in the business unit in the SAP accounting system.

WE also disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable.

598. The Kenrich Group included more A&G costs in WEPCO's damages claim than the A&G costs recorded to the WEPCO accounting codes. Tr.2951:6-13 (Straub);Tr.4614:20-4615:1; 4807:1-4808:5; 4812:10-17 (Metcalfe); Tr.6139:24 - 6140:5; 6185:23 - 6186:20 (Kiraly); DDX 5-29.

**RESPONSE:**

WE objects to this proposed finding of fact because the cited testimony from Mr. Kiraly and DDX 5-29 (Mr. Kiraly's demonstrative) do not support the statement. The

cited testimony from Mr. Kiraly discusses A&G on the corporate level and that A&G costs are a period cost which are not allocated to the projects. WE also objects to the use of Mr. Metcalfe's testimony as supporting the proposed statements in DFF 598. Mr. Metcalfe's cited testimony discusses (1) spreading allocable costs to WE internal labor, (2) that using PSCW-approved budgeted A&G rates was appropriate, and (3) how the A&G rates used in the claim increase the claimed cost for labor.

Further, WE disputes this proposed finding of fact because the cited testimony from Ms. Straub does not support the statement. Ms. Straub's cited testimony only confirms that A&G costs were never allocated to the projects in the business unit in the SAP accounting system.

WE also disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable.

599. Once the actual annual overhead rate is calculated, the rate is compared to the budgeted overhead rate which was used on billings. If the budgeted overhead rate is greater than the actual annual overhead rate, no true-up or true-up calculation is completed. Using budgeted rates that are higher than the actual rates, as the Kenrich Group did in calculating the damages here, results in a windfall to WEPCO because it recovers costs that it did not, in fact, incur. Tr. 2919:14–2920:4 (Straub); PX 1043 (PSCW Order 05-AU-105 (Application for Approval of Affiliated Interest Agreement between Wisc. Energy Cor., WICOR, Inc., WEPCO, Wisconsin Gas Company, and Other Nonutility Affiliates).

**RESPONSE:**

We objects to this proposed finding of fact because it is unsupported by the evidence cited. There is no support for the statement "as the Kenrich Group did in calculating the damages here, results in a windfall to WEPCO because it recovers costs that it did not, in fact, incur." Neither the cited testimony of Ms. Straub nor PX 1043 support this statement.

The proposed finding is also vague and misleading because it ignores that, if the budgeted overhead rate is lesser than the actual annual overhead rate, no true-up calculation is completed for those third party transactions either (resulting in a windfall to DOE).

Ms. Straub testified that there were just as many years where the actual overhead rate exceeds the budgeted rates as when the budgeted overhead rates exceed the actual. In fact, the budgeted and actual overhead rates are typically very close. Tr. 3008:19-3010:9 (Straub).

600. If the dry fuel storage project was not performed, the A&G costs that WEPCO incurred, regardless of the partial breach, would be allocated to a smaller pool of projects. Tr. 6142:3-8, 6222:5-8 (Kiraly); DDX 5-32.

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable. The cited testimony segment of 6222:5-8 from Mr. Kiraly is incomplete. The citation should have begun at 6221:24 to include the original question, rather than the cited "(the reporter read the record as requested)." But more importantly, this proposed finding of fact is irrelevant because these A&G costs are properly recoverable. PFF 244. *See* WE Response to DFF 594.

601. The Kenrich Group conducted no analysis to determine if A&G costs would have been different if the dry fuel storage project had not been implemented. Tr.4808:18-24 (Metcalfe).

**RESPONSE:**

WE disputes this proposed finding of fact because it does not contain all of Mr. Metcalfe's comments on this issue. Mr. Metcalfe also testified that no analysis is required for charging A&G costs to a third party. Tr. 4808:18-24 (Metcalfe). For the purposes of this damages analysis, DOE is the third party.

602. WEPCO presented no evidence to demonstrate that the A&G costs would have increased as a result of the partial breach. Tr. 2968:7-11; 2968:12 – 2969:6; 2976:7-10; 2977:7-17; 2980:12 - 2981:9; 2984:1-5 (Straub); Tr. 4808:25 - 4809:5; 4814:6-17; 4815:7-19; 4816:9-20 (Metcalfe); Tr. 6140:6 – 6141:10 (Kiraly); DDX 5-29; DDX 5-30 & 5-31; DX 338.

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable. Under the circumstances of this case, corporate level costs can fairly and reasonably be included in damages. Tr. 4808:6-11 (Metcalfe). Also, as previously discussed in PFF 244 and WE Response to DFF 594, these A&G costs are properly recoverable.

603. WEPCO did not perform any analysis to determine if support staff would have been fired if the dry fuel storage project had not occurred. Tr. 2969:20-2970:6; 2970:13-19; 2974:9-22 (Straub).

**RESPONSE:**

WE does not dispute the accuracy of this proposed finding of fact, but as WE's damages expert, Mr. Metcalfe testified, no such analysis is necessary for calculating a damages claim. Tr. 4789:21-4790:2 (Metcalfe).

604. The PSCW does not require that A&G be added to internal projects. Thus, because the dry fuel storage project was not billed externally, A&G would not be added to that project under PSCW rules. Tr. 2953:13-15; 2959:6-11 (Straub).

**RESPONSE:**

The proposed finding is immaterial. It does not matter that the total dry fuel storage project was not billed externally. DOE is an entity outside WE. WE performed the dry storage project for the benefit of DOE because they had breached the Standard Contract. Tr. 3010:11-22 (Straub). The A&G rates used in the damages analysis are the rates approved by the PSCW to be used in the case of charging work done by WE to third parties. Given WE's assumptions of the breach, DOE is having work done for it by the utility. Tr. 4615:25-4616:11 (Metcalfe). Thus, it is proper for the A&G costs to be claimed.

605. Mr. Kiraly adjusted plaintiff's claim and reduced it by the entire $1,733,273 of claimed A&G costs. Of the $1,733,273, there is $1,058,009 that could also be disallowed for other reasons; for example, $957,000 related to ISFSI costs, $87,000 related to dual-purpose

costs, and $13,000 related to the TN-32B casks. Tr. 6142:15-23 (Kiraly); DDX 5-33; DX 625 (Attachment 5, WXE 0220072 – WXE 0220078).

**RESPONSE:**

WE disputes this proposed finding of fact to the extent that it suggests the claimed A&G costs are not recoverable. As previously discussed in PFF 244 and WE Response to DFF 594, these A&G costs are properly recoverable.

## XX. AVOIDED COSTS OF LOADING CASKS TO DOE

For the convenience of the Court, WE sets forth here its General Objections to the main Government contentions contained in Section XX (DFF 607-628).

**GENERAL OBJECTIONS TO SECTION XX (DFF 607-628)**

WE objects to the Government's allegation that avoided loading costs should be included as an offset to WE's damages. Notably, not one SNF decision has granted the Government its claimed cask loading offset. WE PTB 89. This is because every nuclear plant eventually will incur the loading cost when DOE performs, and any attempt at calculating an offset now is far too speculative.

Point Beach will not avoid the cost of loading casks for DOE's acceptance. These costs are merely deferred until DOE performs. The fact that WE recently sold Point Beach to a Florida Power & Light ("FP&L") subsidiary does not change this conclusion. The fact remains that the entity owning Point Beach will incur these loading costs at some point (if DOE does eventually perform). The manner in which WE and FP&L decide to assign these costs in their Asset Purchase Agreement is a contractual matter not before the Court. Tr. 4755:9-18 (Court). Further, any purported benefit to the utility is speculative. The size and type of casks to be used to transport the spent fuel and the means of transportation are unknown, as is the date at which DOE will begin to perform. Tr. 5519:11-14 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . ."); Tr. 6238:4-11 (Kiraly); Tr. 960:21-961:2

(Hennessy) ("No, I have no idea what type of casks will be used"); Tr. 1897:7-10, 1996:26-1997:6 (Becka); Tr. 2778:5-11 (Anundson); PFF 2, 261, 262. There is no need for DOE to receive an offset now for costs that may eventually be incurred at Point Beach.

Additionally, there are mechanisms for providing the Government with an offset, if appropriate, once DOE begins performance of the Standard Contract. PFF 262.

WE also objects to this section because the proposed findings are irrelevant. No cask loading offset is appropriate in this case because future damages were removed from the claim.

Finally, WE objects to any Government characterization of the non-breach world as requiring WE to establish anything more than that the Government's partial breach of the Standard Contract was a substantial causal factor of WE's mitigating actions and damages.

606. The proper damages calculation is the costs that WEPCO incurred minus the costs that WEPCO would have incurred absent the breach. Tr. 4723:2-7 (Metcalfe); Tr. 6168:10-19; 6237:8-14 (Kiraly); DDX 5-61; Tr. 3858:21-3859:23 (Sieracki); Tr. 3859:24-3860:3 (Sieracki); Tr. 3860: 4-3861:13 (Sieracki).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact because it is an inaccurate conclusion of law. It also is unsupported by the testimony of WE's damages experts, Messrs. Sieracki and Metcalfe. They simply testified that no cask loading offset is appropriate in this case because future damages were removed from the claim. Further, in determining reasonableness, the Court must determine whether an offset is required in order to avoid placing an injured party in a better position than if the breach had not occurred. *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 367 (2006). The Government carries the burden of establishing that WE would have incurred a loss in the non-breach world if DOE had performed. *Southern Nuclear*, 77 Fed. Cl. at 434-35. The Government also must establish the value of the offset with reasonable certainty – speculative costs are not appropriate for an

offset. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. As each SNF decision has determined, the Government has not established these points. *See, e.g.*, *Carolina Power & Light Co.*, 2008 WL 2154103 at *33; WE PTB 89.

607. WEPCO would have incurred costs to load fuel to DOE in the but-for world, and it is possible to estimate those costs. Tr.5542:1-5543:5 (Brewer); DDX 3-26; DX 391 at 28-35(WXE011 0030 - WXE011 0037); Tr. 3893:7-3894:6 (Sieracki): DX 248; Tr. 3982:12-3985:19 (Sieracki); Tr. 3895:12-25 (Sieracki); Tr. 4029:6-12 (Sieracki); Tr. 3896:1-6 (Sieracki); Tr. 3896:1-11; DX 498 p 18.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact because it is misleading. It is not possible to reasonably estimate WE's loading costs in the non-breach world because the actions that WE and the Government would have taken in the non-breach world from the mid-1980s through 1998 would have differed significantly from the parties' actions in the actual world. PFF 158, 159. Thus, one cannot base WE's estimated costs to load spent nuclear fuel into DOE-provided casks on WE's costs to load spent fuel in the actual world through 1998. The Government must establish any offsets with reasonable certainty, and a rough estimate based on faulty assumptions does not satisfy the Government's burden. *Carolina Power & Light Co.*, 2008 WL 2154103 at *24. Finally, no Government witness could state with certainty the cask that DOE would bring to Point Beach. Tr. 5519:11-14 (Brewer); *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. at 542-43. ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . .").

608. Because these loading costs were avoided, a proper damages model would account for them. Tr. 4723:2-7 (Metcalfe); Tr. 6168:10-19; 6237:8-14 (Kiraly); DDX 5-61.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE also disputes this proposed finding of fact as inaccurate because it mischaracterizes the applicable law. The Government failed to establish whether or when DOE will perform or, if DOE does perform, the type of cask that it may utilize. PFF 261. DOE's claimed loading offset should therefore be denied because the costs are speculative and will be incurred if and when DOE performs. *Id.*; WE PTB 89-90; *see also Carolina Power & Light Co.*, 2008 WL 2154103 at *33; *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 71 (2007); *Northern States*, 78 Fed. Cl. at 468; *Southern Nuclear*, 77 Fed. Cl. at 450-51; *Pacific Gas & Elec.*, 73 Fed. Cl. at 416; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372; *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43.

Further, this proposed finding of fact ignores that Point Beach will not avoid the cost of loading casks for DOE's acceptance. These costs are merely deferred until DOE performs. An offset is not appropriate for speculative costs, and even less so for costs that are merely deferred to a point in time in the future when they will be known with reasonable certainty. *Tennessee Valley Auth.*, 69 Fed. Cl. at 542-43. Instead, there are multiple mechanisms for effecting offsets in the future, if appropriate. PFF 262.

WE also objects to this proposed finding of fact because it mischaracterizes Mr. Metcalfe's testimony. In the cited passage, Mr. Metcalfe was simply stating that if DOE performed, WE would then have incurred loading costs. Nowhere in the cited testimony does Mr. Metcalfe discuss or propose the inclusion of a DOE cask loading offset in a proper damages model.

609. The costs to load casks to DOE in the but-for world depend on the regulatory environment, the technology, the cask designs, the state of the Point Beach site, and the infrastructure of Point Beach site. Those factors that influence the cost of loading to DOE in the but-for world are known today. Tr.5542:22 - 5543:23 (Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact as inaccurate because the factors impacting WE's cost to load casks in the non-breach world are not limited to the listed factors. Other factors, including cask configurations and sizes, employee skill levels and applicable wages and equipment-related costs, may impact the cost to load casks at Point Beach. Further, the factors that may have influenced the cost of loading a DOE cask in the non-breach world are not necessarily known today. It is impossible to know with certainty what actions WE and the Government may have taken in the non-breach world between the mid-1980s and 1998 if DOE and WE had believed that DOE would begin accepting spent fuel from Point Beach by 1998. WE and DOE actions in the non-breach world may have altered available technology, the regulatory environment, cask designs, the state of the Point Beach site and the infrastructure of the Point Beach site, among the many other factors that would influence the cost of cask loading at Point Beach. For example, DOE may have instituted a more aggressive cask development program that resulted in a cask that is significantly more or less expensive to load.

The Government cites only Mr. Brewer's testimony in support of this proposed finding of fact. Mr. Brewer's testimony was based on an assumption that the casks available in 1998 in the non-breach world would be identical to the casks that were actually available in the actual world. Mr. Brewer acknowledged the fluidity of the dry cask market when he recognized that "the kinds of casks that are available now aren't the same as they were 10 or 15 years ago, they likely won't be in 10 or 15 years in the future." Tr. 5543:16-19 (Brewer). Thus, Mr. Brewer's and the Government's assumption that utilities, the cask building industry, and DOE would not have acted any differently if they believed that DOE was going to perform by 1998 is without foundation and must be rejected. Even in the breach world, nobody knows what cask DOE will bring to Point Beach when it begins to accept fuel. Tr. 5519:11-14 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . ."); Tr. 960:21-961:2

(Hennessy) ("No, I have no idea what type of casks will be used"); Tr. 1897:7-10, 1996:26-1997:6 (Becka); Tr. 2778:5-11 (Anundson).

610. "The question of what would have happened in 1998, while a question that involves some uncertainty, is a question that at least has boundaries and the boundaries being the facts as they existed at the time, the technology that existed at the time, and the regulatory environment that existed at the time." Tr.5543:24-5544:6 (Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact because it is inaccurate. Mr. Brewer's testimony erroneously assumes that WE, DOE and the utility industry would not have taken any action in the non-breach world different from what occurred in the actual world. Given that WE would not have constructed a dry storage facility if DOE had performed, neither the Government nor Mr. Brewer can reasonably estimate the cost parameters that would have existed in the non-breach world based on the actual world. PFF 158, 159.

611. The type of cask that DOE may actually use to accept the spent fuel from Point Beach in the future does not help to estimate what type of cask DOE would have brought to Point Beach had it started accepting spent fuel in 1998. Tr.5642:9 - 5643:24(Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

While WE does not dispute that the cask that DOE ultimately selects to accept fuel from nuclear utilities does not help estimate what cask DOE would have brought to Point Beach by 1998, the Government ignores that it is not possible under any circumstances to estimate what type of cask DOE would have brought to nuclear utilities if it had started accepting spent fuel by 1998. This is because, by 1988, WE, the cask industry, the nuclear utility industry and DOE all believed that DOE would not begin accepting the industry's spent fuel by 1998. PFF 81-83, 86-88, 90, 97, 107, 111, 115, 117-118, 122; PX 801, pp. KRGWE000182, 192-93, 202, 211-12 (WE's 1988-1991 Form 10-Ks); Tr. 2911:25-2913:10

(Straub). Thus, the parties would have taken different actions in the non-breach world. PFF 158, 159; Tr. 3935:6-3936:13; 3940:23-3941:19; 4538:4-4541:15 (Metcalfe).

612. Based on the 1991 and 1995 ACRs, WEPCO would have loaded 11 GA-4 truck casks in 1998; 28 casks in 1999; 13 casks in 2000; 18 casks in 2001; 23 casks in 2002; 16 casks in 2003; 6 casks in 2004; 8 casks in 2005; and 10 casks in 2006. Tr. 5552:4 - 5557:4 (Brewer); DDX 3-30; DDX 3-31; DX 566; DX 584; DX 391 at 33-34 (WXE011 0035 - WXE011 0036); DX 619.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact because it is not supported by evidence. First, as WE demonstrated at trial, the 1991 and 1995 ACRs did not accurately reflect the acceptance rates at which DOE would have accepted spent fuel from the nuclear industry in a functioning federal waste management system. It was never DOE's intent to operate at the 900 MTU rate. PFF 98a. Further, DOE knew that it could not begin MRS operations until at least 2007 because of the NWPA Amendment linkages, and that DOE would not have an operational repository before 2010. PFF 98b, 99. When DOE issued its 1995 ACR, it knew that it would not be able to accept spent fuel from the commercial nuclear industry by 1998. PFF 122. Mr. Brewer's expert report, in fact, noted that he was instructed to use the DOE acceptance rates by Government counsel and that he therefore did not determine the appropriateness of such a rate. DX 391, p. WXE0110035. Thus, any estimate of loaded casks based upon the acceptance rates provided in the 1991 or 1995 ACRs is inaccurate.

Second, the Government provides no evidence that DOE would have brought GA-4 truck casks if DOE had begun accepting spent fuel from Point Beach by 1998. The 1991 and 1995 ACRs did not specify a cask type. In fact, nobody knows what type of casks DOE will bring to Point Beach if it performs. Tr. 5519:11-14 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . ."); Tr. 6238:4-11 (Kiraly); Tr. 960:21-961:2 (Hennessy) ("No, I have no idea

what type of casks will be used"); Tr. 1897:7-10; 1996:26-1997:6 (Becka); Tr. 2778:5-11 (Anundson); PFF 261.

613. But-for loading costs should be based upon real data obtained from cask loading at WEPCO. Tr. 5546:17-21(Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

Any offset for loading costs, if later deemed appropriate, should be based upon real data derived when DOE actually begins accepting spent fuel from Point Beach and WE loads the DOE-supplied casks. To the extent this proposed finding asserts that WE's past cask loading data is indicative of cask loading costs in the non-breach world, WE disagrees for the reasons stated in its Responses to DFF 610-612.

614. The $179,253 cost calculated by WEPCO in its 2005 claim for mobilization for but-for loading, and the $47,851 cost for demobilization for but-for loading are two parts of the total loading cost calculation that should be used to calculate loading costs to DOE. Tr. 5546:22 - 5547:6 (Brewer); DDX 3-28; DX 391 at 29 (WXE011 0031); DX 248. The basis of the plaintiff's DOE loading estimate was used to prepare the budget for the 2006 loading campaign. Tr. 1896:8-12; 1897:15-22; 1902:19 - 1903:4; 1903:13-20; 1904:18-23 (Becka); Tr. 4710:10 - 4711:2; 4711:20 - 4712:2; 4712:8-11; 4714:19 - 4715:5; 4723:22-25 (Metcalfe); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-63; DX 248.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE also objects to this proposed finding of fact as nonsensical because it refers to calculating "loading costs to DOE."

WE disputes this proposed finding of fact because any WE internal loading campaign estimates would be irrelevant to the costs that WE would incur in loading DOE-supplied casks. For the reasons mentioned in WE's Responses to DFF 610-612, it is impossible to predict what cask DOE would have provided by 1998 to accept Point Beach's spent fuel and what cask developments may have occurred in the non-breach world.

WE further objects to this proposed finding of fact because the cited testimony of Mr. Metcalfe does not support it. Mr. Metcalfe did not testify that the basis of the DOE loading estimate was used to prepare the budget for the 2006 loading campaign. Instead, the Government ignores Mr. Metcalfe's testimony regarding why DOE loading costs were included and later removed from the claim. WE removed these offset costs from its claim because future damages were removed from the scope of this proceeding. Tr. 4712:4-7 (Metcalfe).

615. WEPCO included in its 2005 estimated loading costs, a per cask cost with a 5/6 modifier.[33] DX 498. In calculating the per cask cost for but-for loading, Mr. Brewer, the Government's technical expert, removed the 5/6 modifier for the WEPCO estimate of mobilization and demobilization costs. Tr.1896:8-1897:22 (Becka); Tr.5547:7-5550:1 (Brewer). Based upon the expert opinions of Messrs. Brewer and Kiraly, the per cask cost for a large, 24-assembly rail cask is estimated to be $119,206.[34] Tr.5547:7-5550:1 (Brewer); DDX 3-28; DX 391 at 29-31 (WXE011 0031 - WXE011 0033); DX 248. However, the Government assumed in its calculations a GA-4 truck cask so divided the $119,206 cost by six and then applied that to the 123 casks that WEPCO would have loaded beginning in 1998 through 2005. See DFOF ¶ 613.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628) and its Responses to DFF 610-612.

616. A legal weight truck cask should be assumed for the transfer of WEPCO SNF to DOE because there is no rail or barge facility at Point Beach to remove large rail casks. Furthermore, WEPCO indicated on its RW-859 form and on its DCS that it intended to use a light weight truck cask. Tr.5550:2-20 (Brewer). Use of a legal weight truck cask is conservative and benefits WEPCO because the loading costs would be less. The cost of loading a legal weight truck cask is $19,867 per cask. Tr.5550:2-5552:3 (Brewer); DDX 3-29; DX 391 at 31-32 (WXE011 0033 - WXE0011 0034).

[33] In its estimate of but-for loading costs ("costs to handle DOE containers"), Kenrich assumed that WEPCO would load a bolted 24 assembly cask to DOE in five days, as opposed to loading a welded 24 assembly cask to its ISFSI in six days. Tr. 5547:7-21 (Brewer). Kenrich thus estimated that DOE's loading costs would be 5/6s of the WEPCO loading cost. Tr. 1893:15-1895:23 (Becka). However, WEPCO conceded that this calculation did not apply to the costs to mobilize and demobilize. Tr. 1895:7-1897:22 (Becka).

[34] This $119,206 estimate includes fixed labor, overhead, and other adjustments that the Government has challenged. *See* DFOF ¶ 615 for total with and without the adjustments.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628) and its Response to DFF 610-612.

WE objects to this proposed finding of fact as irrelevant because it is DOE's responsibility to remove SNF from the Point Beach site. PX 41, p. KRGWE002126 ("DOE shall . . . provide subsequent transportation for such material . . . .").

WE further objects to this proposed finding of fact as unsupported. Mr. Brewer admitted that a NUHOMS canister could be removed from Point Beach. Tr. 5594:10-15; 5596:14-21 (Brewer); PX 880, p. WXE011 0022 n.64.

WE disputes this proposed finding of fact because the Government has failed to establish the factual predicate of the proposed finding. The proposed finding states that a legal weight truck should be assumed for the transfer of WE SNF to DOE because there is no rail or barge facility at Point Beach to remove large rail casks. The Government cites no evidence that the dry storage casks in use at Point Beach are not suitable for transport by heavy-haul vehicle. To the contrary, WE established at trial that NUHOMS canisters are moved from the Point Beach plant to the ISFSI by heavy haul vehicle. Tr. 1864:3-19 (Becka); PX 740.119.

WE further disputes this proposed finding of fact because it is contradicted by the evidence. During the Unit 2 Steam Generator replacement in 1996, Westinghouse shipped the 200-ton lower piece of the Steam Generator to Kewaunee by rail. From there, Morrison Knudsen moved the lower piece by multi-axle hydraulic self-propelled transporter to Point Beach. On its way to Point Beach, the heavy haul vehicle crossed several small bridges without problem. PFF 263. The weight of a fully loaded VSC-24 cask is less than the 200-ton weight of the lower piece of the Steam Generator. PFF 264. The proposed finding also ignores that a site assessment of Point Beach revealed that a simple barge facility could be implemented at Point Beach and that Point Beach was capable of shipping casks by barge and

rail. PX 230, pp. HQX.19910918.0011.00003, .00033, .00039 ("on-site barge service could be established on plant site areas bordering Lake Michigan").

WE also disputes the Government's assertion that WE's RW-859s and DCSs required the use of a legal weight truck cask at Point Beach. WE's RW-859, for example, noted that Point Beach was capable of handling a 125-ton cask. PX 327, p. HQR3640687; *see also* PX 230. Likewise, the DCS forms provided by DOE to WE did not provide a heavy haul vehicle as a shipping option. The only listed options were truck, rail and barge. WE also noted on its DCS submissions that 125-ton casks could be loaded at Point Beach. PX 259, p. WISC00000911. Further, WE's DCS forms had no significance to WE's cask choices because they related to DOE's transportation program and were not binding. *See* WE Response to DFF 131. Moreover, WE submitted the DCSs in line with its belief that it was essential to maintain the pressure on DOE to minimize DOE's delay and to assure its ratepayers and the PSCW that it was taking all appropriate actions to push for the removal of spent fuel from the shores of Lake Michigan. PFF 123. WE also did not want to give DOE an excuse for nonperformance or take any action that might jeopardize the eventual fulfillment of DOE's contractual obligations. PFF 123. By 1992, WE believed it highly unlikely that DOE would begin accepting spent fuel by 1998. PFF 81-83.

Finally, nobody knows what casks DOE may bring to Point Beach in the breach world or even when it may begin accepting spent fuel from the nation's nuclear utilities. Tr. 5519:11-14 (Brewer) ("Q: If it does bring a cask, if and when it does perform, you don't know what kind of cask that will be, correct? A: I agree with that . . ."); Tr. 6238:4-11 (Kiraly); Tr. 960:21-961:2 (Hennessy) ("No, I have no idea what type of casks will be used"); Tr. 1897:7-10; 1996:26-1997:6 (Becka); Tr. 2778:5-11 (Anundson); PFF 261.

617. Mr. Brewer assumed in his analysis of but-for loading costs that WEPCO would have used a GA4 legal weight truck cask that holds four PWR fuel assemblies. Tr.5550:2-12 (Brewer).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

618. The 2006 but-for loading costs can be calculated based on the actual costs WEPCO's incurred in 2006. Tr.5556:20 - 5557:12 (Brewer); DDX 3-31; DX 619.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628) and its Responses to DFF 610-612.

619. In its initial report, the Kenrich Group quantified the cost of loading fuel to the DOE based upon use of a 24 assembly bolted cask. Tr.3895:12-25,Tr.3896:1-6, 4029:6-12 (Sieracki); DX 498 at 18; Tr. 3865:8-3866:8 (Sieracki); DX 498; DX 794. The Kenrich Group used t. Tr. 3896:1-11; DX 498 at 18.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE objects to this proposed finding of fact because the second sentence is incomplete and nonsensical.

WE further objects to this proposed finding because the Government has made a citation error. DX 794 was not admitted into evidence. It appears the Government may be citing to PX 794.

Additionally, WE objects to the use of DX 498 and PX 794 in support of the proposed finding of fact. Neither DX 498 nor PX 794 reference a 24 assembly bolted cask.

Finally, this proposed finding ignores that Messrs. Sieracki and Metcalfe testified that the analysis using a 24 assembly bolted cask was no longer relevant once the Court decided that the nuclear utilities could no longer bring an action for future damages. Tr. 3894:12-3893:18; 4029:6-12 (Sieracki); 4710:10-4711:2 (Metcalfe).

620. The Kenrich calculation of but-for loading costs was based upon the quantification of mobilization, loading, and demobilization costs. Tr.3895:12-21 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact because Kenrich did not include a loading cost offset in its final report. WE does not dispute the Government's assertion that, before future damages were removed from the claim, Kenrich's calculation of non-breach world loading costs was based upon the quantification of mobilization, loading and demobilization costs.

621. The offset the Kenrich Group calculated – totaling $4.7 million – was for avoided loading costs from 1998 through 2004. DX 498 at 18.

**RESPONSE:**

WE objects to the proposed finding of fact because it is not supported by the evidence. Page 18 of Kenrich's July 2005 report does not list the total of $4.7 million or state that the costs were calculated for 1998 through 2004.

622. Kenrich later removed the but-for loading cost offset from its damages report dated May 8, 2006, based upon instruction of counsel. Tr.3894:7-3895:11 (Sieracki).

**RESPONSE:**

WE objects to this proposed finding of fact as incomplete. Kenrich originally included the loading cost offset in its report because it was matching projected actual DOE loadings with non-breach world DOE loadings. Kenrich, however, removed the loading cost offset from its damages report when future damages were removed from the claim. Tr. 3894:12-3895:11 (Sieraki); PX 794, pp. 18-19.

623. The Government's calculation of an offset for avoided DOE loading costs for 1998 through 2005 was based upon the plaintiff's own estimate for "handling DOE casks." The estimate included mobilization, loading, and demobilization costs where the mobilization and demobilization costs would be the same regardless of the cask being loaded. Tr. 1896:8-12; 1897:15-22; 1902:19 - 1903:4; 1903:13-20; 1904:18-23 (Becka); Tr. 4710:10 - 4711:2; 4711:20 - 4712:2; 4712:8-11; 4714:19 - 4715:5; 4723:22-25 (Metcalfe); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-63; DX 248.

**RESPONSE:**

WE disputes this proposed finding of fact because it is not supported by the cited testimony. Mr. Metcalfe's testimony indicated that DOE loading costs were removed from the claim because future damages were no longer part of the claim. Likewise, Mr. Becka's testimony indicates that mobilization costs are independent of the loading time for individual casks, but does not support the Government's assertion that mobilization costs are identical among all casks. Thus, the Government offers no support for its assertion that the mobilization and demobilization costs would be the same regardless of the cask being loaded.

624. The Government's calculation of an offset for avoided DOE loading costs for 2006 was based upon the actual loading data from WEPCO for 2006. The 2006 loading started in earnest at Point Beach on or around April 17, 2006. Costs from April 17, 2006 through June 8, 2006 related to loading costs. The costs related to project 3.0264 incurred prior to April 17, 2006 would be related to the mobilization and preparation for the loading campaign. The costs recorded after June 8, 2006 would be demobilization costs. Tr.1920:20-22; 1922:4-13; 1923:14-23; 1924:3 – 1925:1 (Becka); Tr. 6168:20 - 6169:25 (Kiraly); DDX 5-64. The actual cost per cask was $30,083 applied to ten casks.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE disputes this proposed finding of fact because Mr. Becka's testimony does not support it. Instead, Mr. Becka discussed delays in loading. Additionally, the Government cites no evidence in support of its assertion that the actual cost per cask was $30,083.

625. Thus, based upon input from Mr. Brewer, Mr. Kiraly deducted a total of $3.68 million in avoided loading costs from WEPCO's damages claim.[35] Tr.6170:1-9 (Kiraly); DDX 5-65; DX 625 (Attachment 13, WXE 0220168 - WXE 0220184).

---

[35] In the event that the Court rules that the 3000 MTU rate is the proper rate to be applied here, then the but-for loading cost assumptions will change, as follows: 247 casks would have been loaded at a loading cost of $4,259,510 with mobilization costs of $1,328,709 and demobilization costs of $204,795, for a total avoided cost of $ 5,793,014, excluding fixed labor and overheads. If the Court denies our challenge to plaintiff's labor and overhead costs, then the avoided cost increases to $8,805.716.

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628).

WE objects to Footnote 35 of this proposed finding of fact because the evidence does not support it. For the reasons WE established in its proposed findings of fact, a cask loading offset is not appropriate here. PFF 261-262.

626. To the extent that a ruling on internal salaried labor or A&G is made in favor of the plaintiff, a higher offset – $5,642,637 – for loading costs would be appropriate. Tr.6170:1-9 (Kiraly); DDX 5-65; DX 625 (Attachment 13, WXE 0220168 - WXE 0220184).

**RESPONSE:**

WE incorporates its General Objections to Section XX (DFF 607-628). WE also objects to this proposed finding of fact for the reasons stated in its Response to DFF 238-244.

627. The sale of WEPCO to FP&L Energy became final in or around October, 2007. Tr.5013:23-5014:5 (Weaver). Therefore, WEPCO will never incur the cost of loading SNF to the DOE in the future and the avoided costs offset should be taken against the damages claim asserted by WEPCO in this litigation.

**RESPONSE:**

WE objects to this proposed finding of fact as speculative and unsupported by the evidence. Point Beach will incur the cost of loading casks at some point in the future. The disposition and allocation of the future loading costs between WE and FP&L is relevant only to the agreement between those parties and is not before the Court in this action. Tr. 4755:9-18 (Court).

## XXI. WEPCO'S CLAIM FOR WEIGHTED AVERAGE COST OF CAPITAL OR WEIGHTED AVERAGE COST OF DEBT

628. WEPCO's financing damages claim is based upon the weighted average cost of capital ("WACC"). Tr.4658:8-16 (Metcalfe).

**RESPONSE:**

WE does not object to this proposed finding of fact.

629. WACC accounts for the time value of money, which includes inflation, increase in the money supply, overall return of money, risk-free return, and the risk of a particular entity. Time value of money and the effects of financing are terms for the same thing. Tr. 4660:3-7; 4663:12-19; 4664:8-12; 4686:6-16 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding because it is unsupported by the cited testimony of Mr. Metcalfe. In the testimony referenced, Mr. Metcalfe discussed WACC being applied to capital, operation and maintenance costs and fuel. He further testified that his general approach to WACC has been consistent with other SNF cases.

In addition, the proposed finding is redundant because it lists the same concept twice, as inflation represents an increase in the money supply. Tr. 4564:11-13 (Metcalfe).

630. WEPCO's alternative financing damages claim is based upon the weighted average cost of debt ("WACD"), essentially assuming SNF costs have been financed entirely at WEPCO's debt costs. Tr.6310:20-6313:16 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding of fact because the cited testimony of Mr. Metcalfe does not support the Government's assertion that WACD is "essentially assuming SNF costs have been financed entirely at WEPCO's debt costs." In the testimony referenced, Mr. Metcalfe explained that WACD is an alternative to WACC, but that he still firmly believes that WACC is the correct way to calculate damages. He further testified that the WACD calculation uses the same source documentation as the WACC calculation (the PSCW rate case documentation). Finally, Mr. Metcalfe testified to the calculation of damages using the WACD method. Tr. 6310:20-6313:16 (Metcalfe).

631. WEPCO's financing damages claims, the weighted average cost of capital or weighted average cost of debt, are based upon interest rates derived from all outstanding debt and equity, regardless of when it was raised, including financing completed long before the SNF expenses were incurred. Tr.5843:13-22 (Hamal).

**RESPONSE:**

The proposed finding is inaccurate. Equity does not carry an interest cost. Additionally, therefore, when the financing is completed is irrelevant to the proper calculations. WE also objects to this proposed finding of fact to the extent that it suggests the claimed financing costs are not recoverable. As previously discussed in PFF 247, WACC is an appropriate damage element and should be recovered.

632. Under the WACC approach, 75 to 83 percent of WEPCO's claimed financing costs are for stockholder profit. Tr.5845:16-5847:17 (Hamal); PDX 61 at 16; Tr.4669:6-4670:23 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding because it is inaccurate and misleading. Mr. Hamal agreed that WACC for WE is approximately 55 percent equity and 45 percent debt. Tr. 6380:7-10 (Hamal).

In addition, Mr. Hamal's calculation is conceptually incorrect and grossly misleading. As Mr. Metcalfe explained, Mr. Hamal's calculation is

> tak[ing] advantage of the fact that we're benefitting the government by tax affecting the debt component and then using that benefit as a way to say that equity is overstated. But the weighted average cost of capital for the utility is approximately 55 percent equity and 45 percent debt, which, again is typical of the industry. It just so happens, in calculating an after-tax rate, we take advantage of the fact that the utility was able to deduct from income taxes that it paid.

Tr. 4669:6-4670:23; 6313:17-6314:1 (Metcalfe).

633. WEPCO continues to finance projects with both debt and equity. Tr.6380:2-18 (Hamal).

**RESPONSE:**

WE objects to this proposed finding because it is irrelevant. Further, WE objects to this proposed finding of fact to the extent that it suggests the claimed financing costs are not recoverable. They are recoverable. WE PTB 77-83.

634. WEPCO does not finance its expenditures solely through the use of debt. Tr.6358:15-6359:4 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding because it is irrelevant. Further, WE objects to this proposed finding of fact to the extent that it suggests the claimed financing costs are not recoverable. They are recoverable. WE PTB 77-83.

635. WEPCO booked Allowance for Funds Used During Construction ("AFUDC") on capital projects and, therefore, has earned a return on some of its dry fuel storage costs. Tr.4661:11-18 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading. It is more accurately stated that WE earned a return from its ratepayers. Tr. 4661:11-18 (Metcalfe). Ratepayers have reimbursed many of WE's claimed costs. That in no way suggests that these costs are not recoverable in this action. Pursuant to an order of the PSCW, any net costs recovered from DOE in this case will be returned to the ratepayers. If WE is not awarded the financing costs that it has incurred on its nominal damages, the ratepayers will have been forced to pay the financing costs for these underlying nominal costs that WE incurred because of DOE's breach of contract. Any such Government assertion is a woefully misguided assertion of the pass-through defense, which the United States Supreme Court and numerous subsequent federal courts have uniformly rejected since 1968. *See, e.g.*, *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 110 S. Ct. 2807 (1990); *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481,

88 S. Ct. 2224 (1968). Thus, this point is irrelevant for both WE's financing costs and its nominal damages. Tr. 4569:1-4572:4; 6321:20-6323:25 (Metcalfe).

636. PSCW orders indicate that dry cask storage costs have been paid by ratepayers and that any costs recovered in this litigation will be returned to ratepayers. Tr.2702:23-2703:7 (Farron); Tr.4825:5-12 (Metcalfe); DX102/PX592 at WISC 00012219, 00012221; PX 686 at WISC 00123295-96.

**RESPONSE:**

WE does not dispute the accuracy of this proposed finding of fact, but notes that it is misleading and irrelevant for the reasons stated in its Response to DFF 635.

637. WEPCO's financing damages claim ignores the recovery of costs from ratepayers. Tr.5853:15-5854:10 (Hamal).

**RESPONSE:**

WE objects to this proposed finding of fact as misleading and irrelevant to the extent it implies that the recovery of costs from ratepayers precludes WE from recovering its claimed financing costs. The costs being passed on to the ratepayers is a financing mechanism for the utility. The ratepayer has been harmed in this case. WE is attempting to recover those costs that will ultimately go back to the ratepayers who were harmed because of DOE's breach. Tr. 4824:14-4825:12; 4828:3-23 (Metcalfe). The Government's attempted assertion of the pass-through defense is totally ill-founded as discussed in WE Response to DFF 635.

638. A review of WEPCO's financing practices needs to consider three categories of costs: operating and maintenance ("O&M") costs, cask costs, and capital costs. Tr.5849:25-5853:14 (Hamal); DDX 4 at 45.

**RESPONSE:**

WE objects to this proposed finding because it is irrelevant. WE disputes the implication that categories of costs make any difference whatsoever in calculating the financing aspect of damages. Tr. 4705:9-4706:7 (Metcalfe). *See* WE Response to DFF 637.

639. A utility recovers its O&M costs each year as they are incurred; its capital cost items over a period of time, depending on the depreciation schedule of each of the assets in question; and its fuels costs (cask costs) over generally shorter periods of time than capital items. Tr.6323:5-19 (Metcalfe); Tr.2994:18-2995:3, 2996:5-8 (Straub); DX 330.

**RESPONSE:**

WE objects to this proposed finding because it is irrelevant. *See* WE Response to DFF 638.

640. WEPCO does not recover any kind of an interest component from its ratepayers relating to O&M costs. There were costs included in the claim that were O&M costs. Tr.2994:18-2995:3 (Straub); Tr.5850:19-25 (Hamal); Tr.6323:5-19 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding as irrelevant and misleading When ratepayers pay for costs that would not have been incurred but for DOE's breach, the ratepayers incur a cost of capital that should be recovered in this case. Tr. 6323:5-25 (Metcalfe). *See* WE Responses to DFF 635, 638.

641. WEPCO did not consider the fact that capital costs are recovered from ratepayers over time in its financing damages claim. Tr.5851:8-22 (Hamal).

**RESPONSE:**

WE objects to the proposed finding because it is misleading and irrelevant. WE objects to any implication that categories of costs or their recovery from ratepayers makes any difference in calculating the financing aspect of damages. Tr. 4705:9-4706:7 (Metcalfe). *See* WE Response to DFF 635, 638.

642. Spent nuclear fuel casks are sold by WEPCO to the Wisconsin Electric Fuel Trust ("WEFT"). When WEPCO sells the casks to WEFT, the casks are sold at a price higher than the total cost, producing a profit for WEPCO. Tr.5852:4-5853:7 (Hamal); Tr.6381:16-6382:5 (Hamal).

**RESPONSE:**

WE objects to the proposed finding as contrary to the evidence. WE does not make a profit when it sells the cask to WEFT. WE transfers the asset to WEFT and leases it back.

As part of that leasing cost, WE pays a management fee to WEFT under a normal capital operating lease. WE does not make a profit or receive a return of any kind. Tr. 6324:1-10 (Metcalfe). Thus, all costs paid by WEFT for the underlying assets are ultimately recovered from WE, in addition to a fee collected by WEFT for its "sale and lease-back" service. Tr. 6319:15-6320:8; 6324:4-10 (Metcalfe).

643. WEPCO leases the casks back from WEFT over several years, with the lease payments recovered from ratepayers in the year they are incurred. Tr.5852:14-21 (Hamal).

**RESPONSE:**

WE objects to the proposed finding because it is misleading and irrelevant. WE objects to any implication that categories of costs or their recovery from ratepayers makes any difference in calculating the financing aspect of damages. Tr. 4705:9-4706:7 (Metcalfe). *See* WE Response to DFF 635, 638.

644. WEPCO's financing damages claim based upon WEPCO's after-tax cost of capital does not take WEFT financing and the sale/lease-back arrangement into account. Tr.5852:22-5853:7 (Hamal).

**RESPONSE:**

WE objects to the proposed finding as irrelevant. WE disputes the implication that categories of costs or their recovery from ratepayers makes a difference in calculating the financing aspect of damages. Tr. 4705:9-4706:7 (Metcalfe). *See also* WE Response to DFF 635, 638.

645. Further, financing damages claim calculations based upon either the WACC or WACD are inconsistent with the WEFT. DX 26A/PX 0346 at WISC 00016913; DX 268/PX 679.

**RESPONSE:**

WE objects to the proposed finding as irrelevant and also because the cited exhibits do not support the proposed finding. In addition, WE disputes the implication that categories of costs or their recovery from ratepayers makes a difference in calculating the financing

aspect of damages. Tr. 4705:9-4706:7 (Metcalfe). *See* WE Response to DFF 635, 638. As Mr. Metcalfe testified, WEFT is simply a cash management mechanism and has no impact on the weighted average cost of capital. Tr. 6319:15-6321:19 (Metcalfe).

646. WEFT financing costs are very low, as low as less than one percent a year, which is much lower than either the WACC or WACD. Tr.6383:6-16 (Hamal).

**RESPONSE:**

WE objects to the proposed finding as misleading and irrelevant. As Mr. Metcalfe testified, WEFT is simply a cash management mechanism and has no impact on the weighted average cost of capital. Tr. 6319:15-6321:19 (Metcalfe). *See* WE Response to DFF 645.

647. WEPCO's financing damages costs are not tied to specific borrowing. Tr.5842:19-5843:1 (Hamal); Tr.6346:5-10 (Metcalfe); Tr.6379:13-18 (Hamal).

**RESPONSE:**

This proposed finding of fact is accurate, but misleading. Utilizing specific borrowings for projects is not how the utility industry typically operates. Instead, utilities such as WE typically fund their costs (like those included in the damages claim) through the working capital of the company. Tr. 4666:2-10 (Metcalfe).

648. WEPCO's financing damages costs are not tied to the raising of specific equity. Tr.5843:1-12 (Hamal).

**RESPONSE:**

WE objects to the proposed finding of fact because it is irrelevant. The Court has not required that a plaintiff utility point to a specific equity or debt instrument as the source of funds used for the activity at issue. *Tennessee Valley Auth.*, 69 Fed. Cl. at 541-42; *System Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 807-09 (2007) ("SFI-Grand Gulf").

649. WEPCO has not raised capital through issuing debt or selling equity for its SNF costs. Tr.4666:9-4667:12 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding for the reasons set forth in its Response to DFF 648.

650. WEPCO did not change its financing policies during the dry fuel storage project. Tr. 2995:4-11; 2995:21-25; 2996:1-4 (Straub); Tr. 4666:9-20; 4666:25 - 4667:19 (Metcalfe).

**RESPONSE:**

WE objects to this proposed finding as irrelevant for the reasons set forth in WE's Response to DFF 649. In addition, the cited testimony of Mr. Metcalfe does not support the proposed finding. Instead, in the cited testimony, Mr. Metcalfe discusses that WE has not made any specific borrowing or raised equity specifically for dry fuel storage costs.

651. Mr. Metcalfe, WEPCO's damages expert, utilized the same economic methodology to determine the weighted average cost of capital for WEPCO that he did in Southern Nuclear Operating Company v. United States, 77 Fed. Cl. 396, 449 (2007), Northern States Power Co. v. United States, 78 Fed. Cl. 449, 471-72 (2007), and System Fuels, Inc. v. United States, 79 Fed. Cl. 37, 67 (2007). Tr. 4660:3-7; 4663:12-19; 4664:8-12; 4686:6-16 (Metcalfe).

**RESPONSE:**

WE does not dispute this proposed finding of fact.

652. WEPCO's financing damages claim is simply a claim for prejudgment interest. Tr.5855:15-5857:6, 6378:6-6380:1 (Hamal); DDX4 47; Tr. 4673:25-4676:17, 4678:18-4679:6, 4681:22-4682:14 (Metcalfe); Keir and Keir, Litigation Services Handbook at 9-5.

**RESPONSE:**

WE objects to this proposed finding of fact as contrary to the evidence. WACC is an actual economic cost to the utility for any money that it expends. WE needs to be compensated for its WACC in order to be made economically whole. Only through an award of its WACC can WE be reimbursed for the risk that it experiences in earning its capital as well as taking into account both inflation and the time value of money. In contrast, prejudgment interest is a statutory rate that is applied in cases to attempt to account for

interest costs for a party in a dispute. PX 794, p. 15 (May 8, 2006 Kenrich Damages Report); Tr. 4558:10-4559:23; 4561:25-4562:8; 4564:1-4566:3; 4587:25-4589:14 (Metcalfe); PDX 61-Metcalfe 13 (Economic Basis for Cost of Capital). Thus, WE's claim is not one for prejudgment interest, which is defined as "*statutorily prescribed interest* accrued either from the date of the loss or from the date when the complaint was filed up to the date the final judgment is entered." BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added). Again, as Mr. Metcalfe explained, WE's financing claim based on WACC is not the equivalent of prejudgment interest. Tr. 4587:25-4589:14 (Metcalfe).

653. Mr. Kiraly deducted $44,204,521.00 associated with WACC from WEPCO's damages claim at the direction of counsel. Tr.6117:12-24 (Kiraly); Kiraly DDX 5-13.

**RESPONSE:**

WE objects to this proposed finding of fact to the extent that it suggests the claimed financing costs are not recoverable. The economic basis for the cost of capital damages is as follows: Cost of capital is an actual economic damage to WE and its recovery is required to make WE reasonably whole economically. Recovery of the cost of capital is consistent with utility practice, regulatory requirements, and the calculation of WE's financial obligation to the Government when it owes money to the Government under the Standard Contract. Examples include the one-time fee under Article VIII.B.2(b) in the Standard Contract and any late payment of an ongoing payment under Article VIII.C in the Standard Contract. There is also a continuing significant impact because DOE's delay in accepting WE's spent fuel under the Standard Contract is expected to continue for a number of years. Cost of capital is also recognized and used by the Government's experts in other spent fuel cases, such as in calculating the total value of Government offsets. Finally, the failure to provide the cost of capital provides a disincentive for spent fuel cases to be resolved in a timely manner. Tr. 4564:1-4580:21 (Metcalfe); PDX 61-Metcalfe 13 (Economic Basis for Cost of Capital).

## XXII. TOTAL ADJUSTMENTS MADE TO WEPCO'S DAMAGES CLAIM

654. The Government's damages expert, Mr. Kiraly, calculated total adjustments to plaintiff's damages claim, including an adjustment for but-for loading costs and the exclusion of the weighted average cost of capital (or prejudgment interest), of $86,281,996 million. Kiraly DDX 5-8. Therefore, the total adjusted damages claim is $10,259,004 million. DDX 5-8. A graphic representation of Mr. Kiraly's adjustments to WEPCO's claim for nominal costs (excluding interest and the temporary rack offset) is:

| | WEPCO Claim Category | | | | |
|---|---|---|---|---|---|
| **Description** | **ISFSI** | **Dry Casks** | **Private Fuel** | **Spent Fuel** | **Total** |
| Past Costs in Claim | $ 20,682,871 | $ 31,535,692 | $ 883,503 | $ 1,282,054 | $ 54,384,120 |
| **Government Claim Adjustment Categories** | | | | | |
| Non-Incremental Salaried Internal Labor | $ | $ | $ 0 | $ (130,349) | $ |
| Employee Expenses | | | 0 | (5,490) | |
| Non-Incremental A&G Overhead | | | 0 | (568) | |
| NRC Annual Fees | | 0 | 0 | 0 | |
| Private Fuel Storage | 0 | 0 | | 0 | |
| ISFSI & VSC-24 Casks 1-5 | | | 0 | (467,964) | |
| TN-32B Metal Casks | 0 | | 0 | 0 | |
| Pursuit of Dual-Purpose Casks | | | 0 | 0 | |
| Total Adjustments to Past Costs | $ | $ | $ | $ (604,372) | $ |
| **WEPCO Claim After Adjustments** | **$ 555,594** | **$ 12,713,894** | **$ 0** | **$ 677,682** | **$ 13,947,170** |
| But-For Loading | | | | | |
| **Net WEPCO Claim** | | | | | **$ 10,259,004** |

Source: Kiraly Demonstrative DDX 5-13.

**RESPONSE:**

WE objects to this proposed finding of fact. The source of the graphic demonstrative listed as Kiraly Demonstrative DDX 5-13 is incorrect; it should be DDX 5-12. Further, the total nominal damages stated by the Government are based upon assumptions asserted by Government counsel and its experts. WE should be awarded its total nominal damages of $52,337,000. In addition, WE should be awarded its total damages, including the financing

claim for a total of $86,281,996 million. Tr. 4623:12-4624:22 (Metcalfe); PDX 61-Metcalfe 22 (Summary of Total Past Damages). *See also* WE Response to DFF 652-653.

Dated: July 10, 2008

Respectfully submitted,
s/Richard W. Oehler by s/Jay L. Griffiths
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 359-8419

Of Counsel:
Donald J. Carney
Mary Rose Hughes
Emily C.C. Poulin
Jay L. Griffiths
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003
(202) 434-1675

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, on July 10, 2008, I caused a copy of the foregoing "Wisconsin Electric Power Company's Responses to Defendant's Proposed Findings of Fact" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Jay L. Griffiths
Jay L. Griffiths