IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 00-697C<br>Senior Judge Merow |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR ENLARGEMENT OF TIME**

Wisconsin Electric Power Company ("WE") respectfully opposes the Government's motion, filed earlier today, requesting an indefinite enlargement of time for the Government to submit a supplemental brief addressing the Federal Circuit's opinions in *Yankee Atomic Electric Co. v. United States*, Nos. 2007-5025, 5031 (Fed. Cir. Aug. 7, 2008) ("*Yankee*") and *Pacific Gas & Electric Co. v. United States*, No. 2007-5046 (Fed. Cir. Aug. 7, 2008) ("*PG&E*") and requesting an indefinite delay in the August 22, 2008 post-trial closing argument. WE does not oppose a telephonic status conference with the Court.

**1. For Purposes Of Evaluating WE's Causation Case, The "Substantial Acceptance Rate" That WE Presented At Trial Is Essentially Indistinguishable From The 1987 ACR Rate**

Contrary to the Government's motion, WE presented evidence of a specific acceptance rate at trial, and the 1987 ACR rate adopted by the Federal Circuit only confirms, and does not materially affect, WE's causation case. As WE counsel explained to Government counsel on Tuesday, WE's position has been that DOE would have picked up spent fuel at "a substantial rate," namely, at a rate (1) sufficient for the utilities not to have to add additional at-reactor storage after January 31, 1998 and (2) for DOE to work off the backlog of previously discharged fuel at a reasonable rate. WE PTB 41-44; PFF 48-49, 51-52, 54, 63.

Indeed, WE personnel so testified and further testified that their understanding was that an annual acceptance rate that ramped up to 3,000 MTU met those objectives. Tr. 1245:18-1246:10, 1264:16-1266:11 (Shimon); Tr. 2544:25-2567:10 (Farron); PFF 48, 52. In addition, WE's expert witness, Eileen Supko, determined that the 3,000 MTU rate satisfied these two criteria. PX 792. WE's damages experts, Richard Sieracki and Kenneth Metcalfe of the Kenrich Group, then used WE's spent fuel MTU allocations under the 3,000 MTU rate in its fuel management model. PX 796, pp. KRGWE003254-55.

In *PG&E*, the Federal Circuit has now determined that the acceptance rates under the Standard Contract are the rates set forth in the 1987 Annual Capacity Report. Slip op. at 12, 16, 18; PX 123 (1987 ACR). The rates for the first ten years in the 1987 ACR are set forth in the table, below. The 1987 ACR, in turn, references its acceptance schedule as consistent with the schedule in the June 1987 Mission Plan Amendment. PX 124, p. HQR-003-1688. The acceptance rate schedule in the 1987 Mission Plan Amendment ramps up to an annual rate of 3,000 MTU in the eleventh year and maintains that rate going forward.[1]

As shown in the following chart, the 1987 ACR rate and the 3,000 rate that WE proved at trial are comparable:

[1] The sole exception is that, in the June 1987 Mission Plan Amendment, the acceptance rate dips below 3,000 MTU in 2023 and 2024. PX 124, p. HQR-003-1688.

| YEAR | 1987 ACR ACCEPTANCE RATES (IN MTUS) (PX 123) | ERI ACCEPTANCE RATES (IN MTUS) (PX 791, P. 6) |
|---|---|---|
| 1998 | 1200 | 400 |
| 1999 | 1200 | 600 |
| 2000 | 1200 | 1200 |
| 2001 | 1200 | 2000 |
| 2002 | 1200 | 3000 |
| 2003 | 2000 | 3000 |
| 2004 | 2650 | 3000 |
| 2005 | 2650 | 3000 |
| 2006 | 2650 | 3000 |
| 2007 | 2650 | 3000 |

Under the 3,000 MTU rate, DOE would accept 22,500 tons during the first ten years; under the Federal Circuit's rate, DOE would accept 18,600 during the first ten years. Both rates are then at 3,000 MTU in the eleventh year and going forward.

To refresh the Court's recollection, in this case, the important years for WE's SNF storage needs would have been the early years in DOE's performance, 1998 and 1999. During those years, the Federal Circuit's *PG&E* rate accepts a greater quantity of spent fuel (2,400 MTU) – more than twice as much – as WE's 3,000 rate (1,000 MTU). Thus, the Court can conclude based on the existing record that the 1987 ACR rate would not impact either WE's causation case or its damages.

**2. WE Does Not Seek to Introduce New Expert Reports But Only Calculations Confirming That The 1987 ACR Rate Does Not Affect WE's Causation Case**

The Government also asserts that, during the August 12 telephone conference, WE counsel informed Government counsel that "WEPCO intended to provide the Court with additional expert analysis as part of its closing argument." Govt. Mot. at 1. The Government further asserts that WE indicated that it would hand "the Court new expert reports at closing arguments" and contends "[t]hat type of trial supplementation by surprise is inappropriate." Govt. Mot. at 2.

The Government's assertions are inaccurate. Instead, WE counsel advised the Government that WE anticipated taking the *PG&E* acceptance rates and simply running them

through Ms. Supko's spent fuel allocation model (PX 791) and through the Kenrich fuel management model (PX 796) to confirm that the *PG&E* acceptance rates do not change WE's damages in this case.

As demonstrated above, however, the Court would not need the Supko and Kenrich calculations to provide the Court with a basis to conclude that the 1987 ACR rate would not impact WE's causation case or its damages. The Court can reach that conclusion based on the Table above, which, in turn, is based on PX 123 and PX 791.

Nevertheless, even if the Court were to consider the Supko and Kenrich calculations, the Government can hardly argue that this constitutes new expert reports. To the contrary, WE is simply having Ms. Supko and Kenrich run a calculation in their existing analytical models to confirm that the *PG&E* acceptance rate has no impact on WE's damages. The Government is extremely familiar with Ms. Supko's determination of the spent fuel allocations of WE and the Kenrich fuel management model in this case (and in other spent fuel cases).

Further, WE counsel informed the Government that, if WE decided to include such calculations, these calculations would be included with WE's August 18 supplemental brief so that the Government would have ample time to review these calculations prior to the August 22 oral argument. Indeed, if WE had intended to "surprise" the Government with new expert reports at the August 22 post-trial oral argument, WE counsel hardly would have informed the Government of WE's anticipated actions ten days earlier on August 12.

To place this non-issue to rest, WE includes the calculations of Ms. Supko and Mr. Sieracki with this pleading as Attachments 1 and 2. Ms. Supko's calculation evidences that WE's allocations under the 1987 ACR rate are as follows:

| YEAR | WE ALLOCATIONS UNDER 1987 ACR (IN SFAS)[2] | WE ALLOCATIONS UNDER ERI ACCEPTANCE RATES (IN SFAS) (PX 791, P. 11) |
|---|---|---|
| 1998 | 151 | 41 |
| 1999 | 119 | 110 |
| 2000 | 92 | 82 |
| 2001 | 62 | 162 |
| 2002 | 56 | 125 |
| 2003 | 65 | 142 |
| 2004 | 117 | 75 |
| 2005 | 75 | 135 |
| 2006 | 135 | 100 |
| 2007 | 100 | 103 |

The Table also includes WE's allocations under the 3,000 MTU acceptance rate as reflected in WE's evidence in this case. WE's allocations under the 1987 ACR rate in the first two years are substantially larger than its allocations under the 3,000 MTU rate used in the Kenrich Fuel Management Model (270 assemblies compared with 151 assemblies). The total number of assemblies that DOE would pick up under the two rates during the first ten years is comparable (972 assemblies compared with 1,075 assemblies). In addition, WE asked that Kenrich run its fuel management model based on the 1987 ACR acceptance rate. The results show that there are no differences in WE's damages under these two rates. *See* Attachment 2.

As an aside, WE notes that, as explained in its Reply, WE does not believe that utilization of the Government's proffered 900 MTU rate (rejected by the Federal Circuit in *PG&E*) would result in a different damage recovery for WE given that DOE's pickups in the early years under that rate are comparable to pickups under the 3,000 MTU rate. WE Reply 62.

Thus, even if the Court should decide to consider the attached calculations, these calculations are not new expert reports, expert models, methodologies, or substantive evidence. The rates on which the calculations are based are the rates that the parties have

[2] As noted, Eileen Supko, who provided the initial WE allocations (PX 791), has calculated WE's allocations under the 1987 ACR rate adopted by the Federal Circuit in *PG&E*. *See* Declaration of Eileen Supko (Attachment 1).

been directed to use by the Federal Circuit in *PG&E.* The Government has already had an opportunity to examine WE's experts in deposition and at trial at length regarding the models that they use to calculate the Point Beach SNF allocations and spent fuel inventory under the 1987 ACR acceptance rates. No new expert analysis is provided. Instead, these calculations merely run the Federal Circuit's *PG&E* acceptance rate through the existing models. Further, the Government has the ability to perform these same calculations.

Thus, there is no basis for the Government's alleged concern or for further delay. In addition, issuance of the *Yankee* and *PG&E* decisions should not permit the Government an opportunity to reopen this matter in an attempt to remedy the material flaws in its case.

**3. WE Presented A Thorough Causation Case When It Established A Plausible Non-Breach World Under A Substantial Acceptance Rate**

The Government contends that WE "presented no evidence to support any" analysis of the "specific activities in which it would have engaged and costs it would have incurred" had DOE timely performed under a substantial rate such as the 1987 ACR rate. Govt. Mot. at 2. The Government's contention is plainly incorrect.

To the contrary, the evidence established that WE would not have built dry storage if DOE had performed because Point Beach could have operated into 1998 and beyond, if necessary, without dry storage. WE PTB 34-37. In operating into 1998 or beyond, the evidence showed that WE could and likely would have used a temporary cask pit rack to preserve FCR in the non-breach world. WE PTB 38-41; PFF 182-184. WE submitted evidence that a cask pit rack would have provided Point Beach with FCR capability at a small fraction of the cost of the dry storage project and would not have required PSCW approval. WE PTB 41; PFF 183. WE presented evidence through the testimony of Messrs. Link and Farron (and others) that WE definitely would have favored the temporary rack over dry storage in the non-breach world. WE PTB 41; PFF 182-185. Further, Dr. Singh, the founder and chief executive of Holtec, testified on behalf of WE on this issue, establishing

the feasibility and the cost of the cask pit rack option. PX 827, p. 2; Tr. 3822:14-21 (Sieracki).

WE also submitted overwhelming evidence that WE was well aware of significant delays in DOE's performance during the 1980s; that WE was aware of its spent fuel storage limitations and implementation lead time; and that WE's investigation of additional SNF storage beginning in 1988 was based on a reasonable belief that DOE would not perform in a timely manner, but, instead, would be substantially delayed. WE PTB 16-20; PFF 69, 75, 78-85; WE Reply 7. Moreover, many of the same events that WE cites as a basis for its belief during the 1987-1988 period that DOE's performance would be substantially delayed are the same events that the Federal Circuit cites in *PG&E* as establishing the high likelihood that DOE's performance would be substantially delayed. *Compare PG&E*, slip op. at 7-8, 15-17 *with* WE PTB 16-23; PFF 69-85; WE Reply 7-10.

WE's causation case is clear on the existing record.

**4. A Proposed Schedule for Completing this Case**

On August 7, 2008, the Court wisely ordered the parties to file Supplemental Briefs to address the *Yankee* and *PG&E* decisions. These briefs then can assist the Court in determining whether WE is presenting new expert analysis and whether the Government's plea to reopen this case has any merit. Moreover, if the Court should conclude that some additional activity is necessary, the Court can carefully craft that activity to minimize any further delay in the resolution of this case that is now nearly eight years old.

Therefore, WE believes that the parties should file Supplemental Briefs as soon as possible. While WE further believes that the filing date for these briefs can and should be August 18 as ordered by the Court, WE would not oppose an enlargement until August 22, 2008 for the filing of these briefs. The Federal Circuit's opinions combined are barely more than 40 pages. This provides sufficient time for the Government to evaluate WE's attached calculations and to prepare and file its Supplemental Brief. The Government also can

explain in its Supplemental Brief if it needs to respond to the attached calculations and inform the Court regarding the nature of that response. WE also will file its Supplemental Brief on that same day.

The Court then can decide whether it believes that the Government should be afforded an opportunity to respond to the attached calculations and, if so, order the Government to file any such response by August 29, 2008. The Court then can reschedule post-trial oral argument for the week of September 8.

For the foregoing reasons, we respectfully request that the Court order the parties to file Supplemental Briefs on August 22, 2008, order the Government to file any response to the attached calculations by August 29, 2008, and to reschedule closing argument in this case for the week of September 8, 2008.

DATED: August 14, 2008

Respectfully submitted,

s/Richard W. Oehler by s/Jay Griffiths
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8419 Phone
(206) 359-9419 Fax

Attorneys for Plaintiff
WISCONSIN ELECTRIC POWER COMPANY

Of Counsel:

Donald J. Carney
Mary Rose Hughes
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2001
(202) 434-1675

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, on August 14, 2008, I caused a copy of the foregoing "Plaintiff's Opposition To Defendant's Motion For Enlargement Of Time" to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Jay Griffiths
Jay Griffiths